IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
NORFOLK DIVISION

FILED

JUL 27 2018

CLERK, U.S. DISTRICT COURT
NORFOLK, VA

LATASHA HOLLOWAY,

plaintiff,

vs.                          ACTION NO. 2:18-cv-69 AWA-RJK

CITY OF VIRGINIA BEACH, VIRGINIA,

defendants.

## CONSOLIDATED REPLY MEMORANDUM IN OPPOSITION TO CITY 'S BRIEF IN OPPOSITION TO PLAINTIFF'S REPLY MOTION TO DISMISS PLAINTIFF'S AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND PRELIMINARY INJUNCTION

COMES NOW Plaintiff LaTasha Holloway, an African American citizens and registered voter in the City of Virginia Beach, Virginia who, on and after November 7, 2017, was subjected to the City's at-large, citywide elections for members of the Virginia Beach City Council responsible for the unlawful dilution of their voting strength that was suffered by Plaintiff in violation of Section 2 of the Voting Rights Act, of 1965, the Fourteenth and Fifteenth Amendments to the Constitution filed by the Plaintiff and the Defendants should be denied says as follows:

---

[1] **TAKE JUDICIAL NOTICE:** It should be noted in 1967, the Court did not address invidious discrimination in voting, it was held the City's plan made no distinction based on race, creed, or economic status or location and the charter was local, and not one for a three-judge court; and this Court in 1967, did address vote dilution and dismissed Lincoln for failure to prosecute. Moody v. Flowers, ante, p. 387 U. S. 97, followed. P. 387 U.S. 114. Dusch v. Davis, 387 U.S. 112, May 22, 1967. See Lincoln v. City of Virginia Beach, No. 2:97cv756(E.D. V.A. Dec. 29, 1997).

## Argument

1. **Holloway's Amended Complaint Stated a Claim against Defendants and established the Gingles pre-conditions, they are not entitled to dismissal**

    a. Holloway disagrees that their amended complaint and affidavit alleging unlawful at-large elections that results in the dilution of minority voting strength and, thus, impairs a minority's ability to elect the representative of its choice fails to state a claim." Burton v. City of Belle Glade, 178 F.3d 1175 (11th Cir. 1999).

    b. Holloway's complaint sufficiently cured the alleged violations and discloses her race, and that she is a resident and registered voter of the City of Virginia Beach, Virginia and she suffered injury casually connected to the City Defendants likely to be redressed by the Court.

    c. The Complaint contained "sufficient factual matter, that the current "at-large" voting method employed by the City violates Section 2 of the Voting Rights Act by diluting the votes of African-American citizens.

    d. The City's at large voting, enhance the discrimination that African-Americans communities experience because of socioeconomic and other disparities in life opportunities between African-American and white communities.

    e. Holloway seeks declaratory and injunctive relief to declare pursuant to 28 U.S.C. § 2201 and 2202 that at-large Virginia Beach City Council elections unlawfully minimize and dilute African American voting strength and deny African American citizens equal access to the political process in violation of the rights of plaintiff and those similarly situated secured by the Fourteenth and Fifteenth

Amendments to the United States Constitution, 42 U.S.C. § 1983, and   Section 2 of the Voting Rights Act of 1965, as amended in 1982.

f. A preliminary and permanent injunctive relief restraining and enjoining the defendants, their officers, agents, employees, attorneys, successors in office, and all persons in active concert and participation with them, from holding any future elections for members of the Virginia Beach City Council on an at-large, citywide basis.

g. Relief from at-large, citywide elections for members of the Virginia Beach City Council, including but not limited to ordering into effect a plan for the election of members of the Virginia Beach City Council under which all eleven members are elected from single-member districts or wards and which provides the African American voters of Virginia Beach with a remedy for the above-stated violations of their rights.

h. The amended complaint contained a short plain statement of claim that Holloway is entitled to relief and gave the defendants fair notice of what the claim is and the grounds upon which it rests. Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). Moreover, the Court held that "[a] claim that has plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id.

The Supreme Court also has held that a complaint must allege as here more than a "sheer possibility that the defendant has acted unlawfully," to survive a motion to dismiss for failure to state a claim upon which relief can be granted. Id. Although a sufficiently pleaded complaint does not "require" detailed factual allegations, '" it does require as here facts which are more than "merely consistent with' a defendant's liability" in order to cross "the line between possibility and plausibility of 'entitlement to relief.'" Id. (quoting Twombly, 550 U.S. at 557).

2.   **Plaintiff plans to go forward against the City of Virginia Beach, Virginia Beach City Council, members of the City of Virginia Beach Electorial Board and the City of Virginia Beach Electorial Board.**

   a. Plaintiff has standing to sue and disagrees that their amended complaint is not proper against the City of Virginia Beach, Virginia Beach City Council, Members of Virginia Beach Electorial Board, and the City of Virginia Beach Electorial Board.

   b. Plaintiff alleges that the defendants are proper parties and responsible for causing the harm that was suffered by Plaintiff and members of the "class" and disagrees that their amended complaint filed in good faith is futile and does not serve any legitimate purpose; and the addition of a class action claim is unnecessary, unwarranted, burdensome, and expensive.

---

2. **TAKE JUDICIAL NOTICE**: Plaintiff alleges that from 1906 until 1986 every member of Virginia Beach's City Council to hold office was white. In 1986 John Richard Logan Perry, was the first African American elected to Council until 1990, Louisa M. Strayhorn was the first African American female from 1994-1998, and Dr. Amelia Ross-Hammond was the second African American female from 2013 until 2016, and from that time, until this amended complaint was filed, the council had no black member. In an at-large system, the majority always has the strength to elect all of its candidates. By taking a historical white bloc voting analysis into consideration, it provides a more accurate portrayal of vote dilution or compelling evidence that the system is operating to dilute black votes. Gingles, 478 U.S. at 56, 106 S.Ct. at 2769.

## RESPONSE TO OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION-INJUNCTIVE AND DECLARATORY RELIEF

**A.**     **Defendants' memorandum in opposition as to Plaintiff's request for preliminary injunction, injunctive and declaratory relief**

In relying upon the United States Supreme Court decision of Shelby Cnty., Ala. v. Holder, No. 12-96, 570 U.S.___,___, slip op. at *17-18, *24 (U.S. June 25, 2013), Shelby County is a largely white suburb of Birmingham, Ala., that challenged the constitutionality of Section 5 of the Voting Rights Act (VRA). Respondents erroneously argues that Petitioners is precluded from litigating Section 2 of the Voting Rights Act, 42 U.S.C.1973, which they raised in their Complaint and request for preliminary injunction. See Collins v. City of Norfolk, 883 F.2d 1232, 1244 (4th Cir; 1989); filed with the United States District Court for the Eastern District of Virginia. Defendants' reliance upon Holder, and 2011 Justice Department's per-clearance  however, is misplaced.

> The clear teaching of Holder is that §4(b) of the Voting Rights Act of 1965, as unconstitutional and holding that "[t]he formula in that section can no longer be used as a basis for subjection jurisdictions to preclearance"). Regardless of any preclusive effect federal law might accord them. Section 2 does not apply to such determinations, and the Court in Holder refused to fashion a federal common-law rule preclusion in the Section 2 context that cover the entire United States. *Collins v. City of Norfolk,* 883 F.2d 1232, 1244 (4th Cir; 1989) (Collins VI), Citing with approval Thornburg v. Gingles, 478, U.S. 30, 106 S. Ct. 2752, 92 L. Ed 25 (1986).

—

In Collins, the Fourth Circuit reversed the District Court and directed that: [u]pon remand, the district court should enjoin at-large elections for city council. The district court afforded the city a reasonable, specified time to prepare a plan that would remedy the vote dilution arising out of the city's at-large electoral system. The city enacted a legally approved single member district plan approved by this court that compiled with the Voting Rights Act of 1965, 42 U.S.C. § 1973c for the conduct of *future* elections.

As the Fourth Circuit in Collins explained, "[T]he [Elliott] Court reached the opposite conclusion with regard to §4(b) of the Voting Rights Act of 1965, claim, because 'Congress did not intend unreviewed judicial proceedings to have preclusive effect on Section 2 claims.' Collins, 883 F.2d 1232 (4th Cir. Cir.1989).

## PRELIMINARY INJUNCTION-DECLARATORY AND INJUNCTIVE RELIEF

B.

In addition to moving for dismissal on the issues of preclusion of Section 2 because of the Supreme Court §4(b) of the Voting Rights Act of 1965, decision, Defendants fail to argue or cite any statutory authority or case law contrary to Plaintiff's claim that Virginia Beach was operating an unlawful at-large elections that results in the dilution of minority voting strength and, thus, impairs a minority's ability to elect the representative of its choice *Gingles,* 478 U.S. at 43-44, in support that there is no basis for a preliminary injunction, injunctive and declaratory relief. That immediately following Reconstruction and again in the mid-twentieth century, "laws were widely employed, designed to

dilute African American voting strength, and that "gerrymandered election districts, and instituted at-large elections.

The at-large elections method has the purpose and effect of partisan vote dilution by denying equitable representation or abridging the right to vote on account of race or color, raises previously-settled issues concerning district-based vs. at large city council elections enjoined. Collins, 883 F.2d 1232 (4th Cir.1989). Defendants have exceeded the scope of its enforcement power under the Fourteenth and Fifteenth Amendments and acted unconstitutionally by enforcing discriminatory at-large elections procedures that resist or circumvent Section 2 of the Voting Rights Act. See Riley v. Kennedy, 553 US 406 (2008). Simons v. Montgomery County Police Officers, 762 F.2d 30, 31-32 (4th Cir.1985).

## FIFTEENTH AMENDMENT

Plaintiff an African-American citizens of the United States and registered voter alleged the racially motivated practice of at-large under an "at-large system of electing members of the Virginia Beach City Council unlawfully dilute[d] African American voting strength in violation of Section 2 of the Voting Rights Act of 1965, As amended in 1982, 42 U.S.C. § 1973, Fourteenth and of the Fifteenth Amendment. Mobile v. Bolden, 446 U.S. 55 (1980); See Ex parte Yarbrough, 110 U. S. 651, 665; Neal v. Delaware, 103 U. S. 370, 389-390; United States v. Cruikshank, 92 U. S. 542, 555-556; United States v. Reese, 92 U. S. 214.

---

\* Plaintiff has proven a cause of action under the Voting Rights Act when the inhibiting electoral device is at-large voting. Gingles, 478 U.S. at 51, 106 S. Ct. at 2766.

## FOURTEENTH AMENDMENT

Plaintiff an African-American citizens of the United States registered voter
alleged Defendants' authorized and/or conducted racially motivated practice
of an "at-large system of electing members of the Virginia Beach City Council
unlawfully dilute[d] African Americans voting strength that deprived them
within its jurisdiction representative government and equal protection of the
laws in violation of Section 2 of the Voting Rights Act of 1965, As amended in
1982, 42 U.S.C. § 1973, the Fourteenth and Fifteenth Amendments. Mobile v.
Bolden, 446 U.S. 55 (1980); See Ex parte Yarbrough, 110 U. S. 651, 665; Neal v.
Delaware, 103 U. S. 370, 389-390; United States v. Cruikshank, 92 U. S. 542,
555-556; United States v. Reese, 92 U. S. 214.

C.                          INTRODUCTION

From 1906 until 1986 every member of Virginia Beach's City Council to hold
office was white. In 1986 John Richard Logan Perry, was the first African
American elected to Council until 1990, Louisa M. Strayhorn was the first
African American female from 1994-1998, and Dr. Amelia Ross-Hammond was
the second African American female from 2013 until 2016, and from that time,
until this amended complaint was filed, the council had no black member. In an
at-large system, the majority  always has the strength to elect all of its
candidates. By taking a historical white bloc voting analysis into consideration,
it provides a more accurate portrayal of vote dilution or compelling evidence that
the system is operating to dilute black votes. Gingles, 478 U.S. at 56, 106 S.Ct.
at 2769.

### D. A FACTUAL COMPELLING HISTORICAL PATTERN AND PRACTICE OF INSTITUTIONAL RACISM AND POLITICAL DISCRIMINATION AGAINST AFRICAN AMERICANS AND ETHNIC MINORITIES

The City of Virginia Beach and Commonwealth of Virginia has engaged in a well-documented historical pattern and practice of systematic exclusion of persons of African descent from serving as Mayor, City Council Clerk, City Attorney, the Commissioner of Revenue or Secretary to Mayor, this practice of institutional racism, racial discrimination and political segregation deprives African Americans, multi-racial or ethnic minorities access to political office in general such as the office of mayor reserved for white males only through bias at-large City Council elections, since the City's 1906 inception as a means to promote racially discriminatory objectives undermines Section 2 of Voting Rights Act, 15th and 1st Amendment. See: Brown v. Board of Education, 344 U.S. 1 (1954), 344 U.S. 141 (1952), 347 U.S. 483 (1954), 349 U.S. 294 (1955), segregated schools in the several states are unconstitutional in violation of the Fourteenth Amendment. Found that "The "separate but equal" doctrine adopted in Plessy v. Ferguson, 163 U.S. 537, "has no place in the field of public education." United States v. Virginia, 518 U.S. 515 (1996), Sex-based "separate but equal" military training facilities violate the Fourteenth Amendment's Equal Protection Clause. See: Selle v. Gibb, 741 U.S. 896 (1984), the doctrine of striking similarities is not enough, evidence of access must extend beyond mere speculation.

---

* A moment's reflection shows how the city's illegal eleven member at large voting method undermines and defeats a primary purpose of the Voting Rights Act.

## ARGUMENT

**E. THE SUPREME COURT'S DECISION IN THRONBURG v. GINGLES AND THE FOURTH CIRCUIT'S DECISION IN THIS CASE ESTABLISH LEGAL PRINCIPLES WHICH ARE CONTROLLING ON REMAND.**

F. The 1982 amendment to Section 2 of the Voting Rights Act of 1965 prohibits any voting practice or procedure "imposed or applied ... in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color ..." 42 U.S.C. § 1973(a). As set forth in subsection (b), a violation is shown if "based on the totality of the circumstances" minority voters prove that they "have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice,"

The purpose of the new statute was "to prohibit any voting practice, or procedure [which] results in discrimination" and "to make clear that proof of discriminatory intent is not required to establish a violation of Section 2."

S. Rep. No. 97-417, 97th

---

Section 2, as amended in 1982, 42 U.S.C. § 1973, provides:

Sec. 2. (a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color, or in contravention of the guarantees set forth in section 1973b (f) (2), as provided  in subsection (b).

(b) A violation of subsection (a) is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) in that its members have less opportunity than other members of the electorate  to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the State of political

subdivision is one circumstance which may be considered: <u>Provided,</u> That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in population.

Cong., 2d Sess.2 (1982), <u>reprinted in</u> 1982 U.S. Code Cong. & Ad. News 177,

179. The legislative history of the amendment indicates that the new statue

was particularly aimed at eliminating at-large voting systems that dilute the

voting strength of minority voter. H.R. Rep. No. 97-227, 97th Cong., 1st Sess.

30 (1981) ("Numerous empirical studies based on data collected from many

communities have found a strong link between at-large elections and lack of

minority representation.") (footnote omitted); S. Rep. No. 97-417, <u>supra.</u> 30, 38-

39, 1982 U.S. Code Cong. & Ad. News 207-08, 216-17.

   The Senate Judiciary Committee report lists a number of "typical

factors" that may be used to prove a violation, but emphasizes that "there

is no requirement that any particular number of factors be proved, or that a

majority of them point one way or the other." S. Rep. No. 97-417, <u>supra,</u> 29,

1982 U.S. Code Cong. & Ad. News 207.

   G. <u>The Supreme Court's Decision in Thornburg v. Gingles.</u>

   These are: (1) a history of official discrimination affecting the right to vote; (2) racially polarized voting; (3) electoral mechanisms such as unusually large election districts, majority vote requirements, and prohibitions on single-shot voting "that may enhance the opportunity for discrimination against the minority group;" (4) discrimination in candidate slating; (5) socioeconomic disparities between whites and minorities which hinder minorities' "ability   to participate effectively in the political process;" (6) overt or subtle racial campaigning; and (7) the extent to which minorities have been elected to public office. The Senate report also lists two "additional factors" that may have probative value: Lack of responsiveness on the part of elected officials to minority needs, and whether the policy underlying the challenged electoral practice is "tenuous." S. Rep. No. 97-417, <u>supar,</u> 28-29, 1982 U.S. Code Cong. & Ad. News 206-07.

In Thornburg v. Gingles, 106 S. Ct. 2752 (1986), the Supreme Court interpreted the statutory language and legislative history of Section 2 and set forth the essential elements of a Section 2 minority vote dilution claim. In reaching its decision the Court unanimously affirmed the decision of a three-judge District Court in North Carolina, Gingles v. Edmisten, 590 F. Supp. 345 (E.D.N.-C. 1984), holding invalid under Section 2 for dilution of black voting strength at-large voting in multimember state legislative districts. The Supreme Court struck down four of the five districts involved in the appeal despite facts showing that black candidates had been elected in all of the contested districts, that there were substantial levels of white cross-over voting for black candidates, and that the state had made special efforts in recent years to close the gap between white and black voter registration rates (106 S.Ct. at 2761-62, 2771, 2782-83; 590 F. Supp. At 361).

(1)   The section 2 Legal Standard: Whether Minority Voters Have Less Opportunity To Elect Representatives of Their Choice.

Under Gingles, the essential question in a Section 2 case is whether under the challenged electoral system minority voters have less opportunity than white votes to elect candidates of their choice. As the Supreme Court held:

The essence of a § 2 claim is that a certain electoral law, practice or structure interacts with social and historical conditions to cause an inequality in the opportunities enjoyed by black and white voters to elect their preferred representatives.

106 S Ct. at 2764-65 (emphasis added). The Court explained that the theoretical basis for challenging impairment of  minority voting strength in at-large voting schemes in that "where minority and majority voters consistently prefer different candidates, the majority, by virtue of its numerical superiority, will regularly defeat the choices of minority voters." Id. at 2765.

A Section 2 violation is established when these factors are present.

> Stated succinctly, a bloc voting majority must <u>usually</u> be able to defeat candidates supported by a politically cohesive, geographically insular minority group.

Id. at 2766. The Court then analyzed each of the elements of a valid claim of minority vote dilution under the statue:

> First, the minority group must be able to demonstrate that it is sufficiently large and geographically compact to constitute a majority in a single-member district.

> Second, the minority group must be able to show that it is politically cohesive.

> Third, the minority must be able to demonstrate that the white majority votes sufficiently as a bloc to enable it--in the absence of special circumstances, such as the minority candidate running unopposed, ...usually to defeat the minority's preferred candidate.

> Finally, we observe that the usual predictability of the majority's success distinguishes structural dilution form the mere loss of an occasional election.

Id. at 2766-67. Under this "functional" approach, the other evidentiary factors set forth in the Senate Judiciary Committee report take on a more peripheral role:

> [T]he most important Senate Report factors bearing on § 2 challenges to multimember districts are the "extent to which minority group members have been elected to public office in the jurisdiction" and the "extent to which voting in the elections of the state or political subdivision is racially polarized." [S. Rep. No. 97-417 at] 28-29, U.S. Code Cong. & Admin. News 1982, p. 206. If present, the other factors, such as the lingering effects of past discrimination, the use of appeals to racial bias in election campaigns, and the use of electoral devices which enhance the dilutive effects of multimember districts when substantial white bloc voting exists--for example antibullet voting laws and majority vote requirements, are supportive of, <u>but not essential to,</u> a minority voter's claim. Id. at 2766 n. 15 (emphasis in original).

**(2)  The Legal Standard for Proving Racially Polarized Voting Is Met when the Proof Shows that White and Black Voters Vote Differently and Minority-Supported Candidates Are Defeated by White Bloc Voting.**

The Court defined the key element of racially polarized voting as "' a consistent relationship between [the] race of the voter and the way in which the voter votes,'...or to put it differently, where 'black voters and white voters vote differently.'" Id. at 2768 n. 21. Noting that the extent of racial bloc voting necessary to show that minorities have unequal opportunities to elect their preferred representatives depends upon "several factual circumstance" and "will vary from district to district." the Court set forth two standards for measuring "legally significant" racial bloc voting. The first is the measure of the "political cohesiveness" of minority voters based on a "showing that a significant number of minority group members usually vote for the same candidates" (id. at 2769). Second, "a white bloc vote that normally will defeat the combined strength of minority support plus white 'crossover' votes rises to the level of legally significant white bloc voting" (id. at 2770).

Because a pattern of racial bloc voting "over a period of time" is "more probative" of a violation, where a pattern of polarization has been shown "the fact that racially polarized voting is not present in one or a few individual elections does not necessarily negate the conclusion that the district experiences legally significant bloc voting" (id.) . For the same reason, "the success of a minority candidate in a particular election does not necessarily prove that the district did not experience polarized voting in that election; special circumstances, such as the absence of an opponent, incumbency, or the utilization of bullet voting, may explain minority electoral success in a polarized contest" (id. , footnotes omitted).

Further, in a ruling that is particularly applicable here, the Court rejected arguments by the defendants and the Solicitor General that proof of racially

polarized voting must include more than simply a showing of a correlation between the race of the voters and voting for candidates. Defendants and the Solicitor General argued that proof of racial bloc voting must include proof that race is the primary determinant of the voters' choices and not other variables which might influence voting, such as party affiliation, age, religion, income, incumbency, education, campaign expenditures, and the like. In rejecting this argument, the Court held:

> For purposes of § 2, the legal concept of racially polarized voting incorporates neither causation nor intent. It means simply that the race of voters correlates with the election of a certain candidates or candidates; that is, it refers to the situation where different races (or minority language groups) vote in blocs for different candidates.

Id. at 2773. The Court reasoned that because Section 2 prohibits voting systems which impair minorities' ability to elect candidates of their choice when whites and minorities vote for different candidates, it is the difference between the choices made by white and minority voters that is relevant under Section 2 and the reasons for these differences are irrelevant (id.) Further, the Court noted the practical difficulty of separating out race from other socioeconomic variables which might influence voting, such as income, education, employment, housing, and the like, because race and socioeconomic characteristics "are often closely correlated," frequently because of past or present discrimination against the minority group (id. at 2773-75).

Finally, the Court recognized that the goal of Congress in enacting the 1982 amendment to Section 2 was to eliminate the necessity of proving discriminatory intent.

To require proof that white voters bloc vote against minority supported candidates because of race or from racial hostility "would frustrate the goals Congress sought to achieve by repudiating the intent test ..." (id. at 2777).

---

* Only four justices (Justices O'Connor, Powell, Rehnquist, and Chief Justice Burger) dissented from Part III-C of the Court's opinion in which the Court rejected the defense argument that the elements of causation or intent were relevant to the Section 2 inquiry into voting patterns. Justice White, in his separate concurrence, disagreed with this section of Justice Brennan's opinion for the Court only on the narrow issue of the

(3) The Election of Some Black Candidates Does Not Foreclose a Section 2 Claim.

The Court also rejected the defense argument that the electoral success of black candidates in the challenged districts demonstrated conclusively that black voters were not denied an equal opportunity to elect candidates of their choice (id. at 2779-80). The statue itself states that this factor "is one circumstance which may be considered," and, the Court noted, the Senate report expressly states that "the election of a few minority candidates does not 'necessarily foreclose the possibility of dilution of the black vote' " (id.) . From this the Court concluded:

Thus, the language of § 2 and its legislative history plainly demonstrate that proof that some minority candidates have been elected does not foreclose  a § 2 claim. Id.

With regard to one district, however, the Court concluded that the fact that black voters in House District 23 had enjoyed

---

Relevance of the race of the candidates in determining racially polarized voting (id. at 2783-84). Moreover, Justice O'Connor agreed with Justice Brennan that proof that divergent racial voting patterns were caused by factors other than race should not be part of the proof of racially polarized voting:

In so far as statistical evidence of divergent racial voting patterns is admitted solely to establish that the minority group is politically cohesive and to assess its prospects for electoral success, I agree with the plurality that defendants cannot rebut this showing by offering evidence that the divergent racial voting patterns may be explained in part by causes other than race, such as an underlying divergence in the interests of minority and white voters. Id. at 2792. Four justices were of the opinion, however, that such evidence was relevant to "the overall vote dilution inquiry." Id.

proportional representation consistently since 1973, coupled with the failure of the plaintiffs to offer any demonstration that such sustained success did not accurately reflect the minority group's ability to elect its preferred representatives, required reversal of the District Court's ruling with respect to that district. Id. at 2779.

H. The Fourth Circuit's Decision.

The Fourth Circuit applied the legal standards set forth in Gingles to hold that this Court in its prior decision erred as a matter of law (1) in accepting defendants' definition of racially polarized voting which requires proof of "white backlash" and "whether whites attempt to limit the field of candidates" (816 F.2d at 935-37); (2) in ruling that the degree of minority electoral success in Norfolk precludes a Section 2 claim (id. at 937-38); (3) in adopting an "overly restrictive" definition of "a candidates slating process" (id. at 938-39) ; and (4) in requiring proof of discriminatory intent to show white officials' unresponsiveness to minority needs. The Fourth Circuit also indicated that increases in black voter registration and turnout in Norfolk were not dispositive of black electoral participation (id. at 939).

I. Racially polarized voting. The Fourth Circuit held that under Gingles:

The legal standard for the existence of racially polarized voting looks only to the difference between how majority votes and minority votes were cast; it does not ask why those votes were cast the way they were nor whether there were

other factors present in contested elections, such as "white backlash." Id.
On remand, the court ruled, "the court should pursue the question solely
through the analysis of voting patterns, without seeking to explain why those
patterns." exist." Id. at 936. The District Court also should reexamine its
rejection of plaintiffs' studies of voting patterns due to methodological problems
and accept them "unless their methodological flaws were so severe as to render
them irrelevant or totally misleading." Id.

J. Minority electoral success.

From 1906 until 1986 every member of Virginia Beach's City Council to hold
office was white. In 1986 John Richard Logan Perry, was the first African
American elected to Council until 1990, Louisa M. Strayhorn was the first
African American female from 1994-1998, and Dr. Amelia Ross-Hammond
was the second African American female from 2013 until 2016, and from that
time, until this Reply Objection was filed, the council had no black member.
In an at-large system, the majority always has the strength to elect all of its
candidates. By taking a historical white bloc voting analysis into consideration,
it provides a more accurate portrayal of vote dilution or compelling evidence that
the system is operating to dilute black votes. Gingles, 478 U.S. at 56, 106 S.Ct.
at 2769. White v. Register (1973),

---

**J. TAKE JUDICIAL NOTICE:** Voting includes "all action necessary to make a vote
effective." Reynolds v. Simms (1964).

## II. UNDER THE LEGAL STANDARDS ESTABLISHED BY THE SUPREME COURT IN GINGLES AND BY THE FOURTH CIRCUIT, PLAINTIFFS' PROOF IN THIS CASE ESTABLISHES A SECTION 2 VIOLATION.

All four elements of proof established by the Supreme Court in <u>Gingles</u> for proving a Section 2 violation are met by the proof in this case. Plaintiff has proved (1) that the black population of Virginia Beach is "sufficiently large and geographically compact to constitute  a majority in a single-member district;" (2) that African American voters are" politically cohesive," that is," a significant number of minority group members usually vote for the same candidates;" (3) white voters bloc vote to enable them " in the absence of special circumstances…usually to defeat the minority's preferred candidate;" and (4) this pattern of racial bloc voting " extends over a period of time" and does not constitute merely " loss of an occasional election." 106 S. Ct. at 2766-67.

K. <u>The Size and Compactness of Virginia Beach African American Population.</u>
The 2018 census data or formula showed African Americans in Virginia Beach constituted 19.2% and whites 20.7% of the city's population and percent of the voting age population of African Americans an estimated 38.2% and whites 42.2% percent of the registered voters

The African American population is sufficiently concentrated that Virginia Beach is divided into eleven member districts, African Americans have voting majorities in three of the eleven districts.

Under Gingles, this proof shows that Virginia Beach at-large voting system is "responsible for minority voters' inability to elect its candidates" (106 S. Ct. at 2766, footnote omitted); "[t]he single-member district is generally the appropriate standard against which to measure minority group potential to elect… "candidates of their choice (id. at 2766-67 n. 17).

L. Racially Polarized Voting.

 The proof in this case shows a high degree of racially polarized voting, stronger even than the proof presented in Gingles. The Supreme Court in Gingles (106 S. Ct. at 2768), which yielded data on the voting patterns of whites and blacks in Virginia Beach, including estimates of the percentages of votes from each race for white and black candidates.

---

\* The at-large city council elections gives whites in the City of Virginia Beach, a large unfair advantage, where whites and minorities consistently prefer different candidates at the polls, this political advantage ensure that minority voters are unable to elect a candidate of their choice.

Given the definition of racially polarized voting adopted by the Supreme Court in Gingles —" a consistent relationship between [the] race of the voter and the way in which the voters votes,... or to put it differently' " (106 S. Ct. at 2768 n. 21 — the evidence shows a high degree of racially polarized voting in Virginia Beach and that is it " legally significant " under Gingles.

In Gingles, the Supreme Court explained that three preconditions must be established for any Section 2 Violation. First, "the minority group must be able to demonstrate that it is sufficiently large and geographically compact to constitute a majority in a single-member district."

Second, "the minority group must be able to show that it is politically cohesive." Third, "the minority group must be able to demonstrate that the white majority votes sufficiently as a bloc to enable it...usually to defeat the minority's preferred candidate." See also: (White v. Regester, 412 U.S. 755, 765 (1973)).

"If these preconditions are met, the court must then determine under the "totality of circumstances" whether there has been a violation of Section 2.

"Lewis v. Alamance Country, N.C., 99 F.3d 600, 604 (4th Cir. 1996) (citing Johnson v. De Grandy, 512 U.S. 997, 1011 (1994); Collins v. City of Norfolk, Va. ("Collins I"). 816 F.2d 932, 938 (4th Cir. 1987)). In this analysis, courts should consider the factors set forth in the Senate Judiciary Committee Majority Report (the "Senate Report") accompanying the 1982 amendment to Section 2 to determine whether, under the totality of the circumstances, Section 2 has been violated. Collins I, 816 F.2d at 934.

## ARTICLE III STANDING

Article III of the Constitution limits federal court jurisdiction to "actual cases or controversies." Stauffer v. Brooks Brothers, Inc. Because the government would have standing to enforce its own law, Stauffer, as the government's assignee, also had standing to enforce § 292, even if Stauffer himself had not suffered a concrete injury. *Id.*

Plaintiff a registered voter of a protected minority, alleges, The Commonwealth and United States suffered an injury causally connected to the City of Virginia Beach's conduct that is likely to be redressed by the Court. The City Defendants diluted Plaintiff's voting rights using "at large elections" that facilitate racial bloc voting, having cause or effect of minimizing or diluting minority voting strength deprived Holloway an equal opportunity to vote for a candidate of their choice as guaranteed by the Voting Rights Act, acting under color of law." 15 James Wm. Moore et al., Moore's Federal Practice § 101.22 (3d ed. 2008) (internal citations omitted); *see* Frank Krasner Enters, v. Montgomery County, 401 F.3d 230, 234 (4th Cir.2005). (See attached Exhibit(s) U, V, W& X).

---

**B.** Minority voters do not have to prove that the electoral system was created or is maintained for a discriminatory purpose. Congress intended that a violation could be proved by showing discriminatory effect alone. Gingles, 478 U.S. at 35, 43-44, 106 S. Ct. at 2758, 2762-63.

First, the plaintiff must have suffered an injury in fact-an invasion of a legally protected interest that is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical. Second, there must be a causal connection between the injury and the conduct complained of.... Third, it must be likely, as opposed to merely speculative, that the injury will be addressed by a favorable decision. 504 U.S. 555, 560-61, 112 S. Ct. 2130, 119 L.Ed.2d 351 (1992) (footnote, citations, and internal quotation marks omitted); Burke v. City of Charleston, 139 F.3d 401, 405 (4th Cir.1998). The Supreme Court has repeatedly refused to recognize generalized grievances against alleged illegal government conduct as sufficient to establish federal jurisdiction. Lance v. Coffman, 549 U.S. 437, 442, 127 S.Ct. 1194, 167 L.Ed.2d 29 (2007); Allen v. Wright, 468 U.S. 737, 751, 104 S. Ct. 3315, 82 L.Ed.2d 556 (1984); Valley Forge Christian Coll. v. Americans United for Separation of Church and State, Inc., 454 U.S. 464, 472, 102 S. Ct. 752, 70 L.Ed.2d 700 (1982); See Winstead v. Stodola, No. 4:07cv682WRW, 2007 WL 2710096, at 2007 U.S. Dist. LEXIS 68049, at (E.D. Ark. Sept. 13, 2007). Furthermore, the burden of proof is on the party invoking a district court's jurisdiction. McNutt v. Gen. Motors Acceptance Corp., 298 U.S. 178, 189, 56 S. Ct. 780, 80 L. Ed. 1135 (1936). Therefore, plaintiffs are required to allege facts demonstrating that they are the proper parties to request judicial resolution of a dispute before a court. Warth v. Seldin, 422 U.S. 490, 518, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975). (1). Plaintiff objects to Defendants, and have standing because: (2) there is a real controversy between Plaintiff and the City, (3) they have standing pursuant to the overbreadth doctrine, (4) The City offends Gingle's mandate

by maintaining at large city council elections, (5) Plaintiff has standing as
private citizens on their own behalf due to injury sustained from public
retaliation, economic loss, vote dilution, voter suppression, as registered
voter or otherwise deprived plaintiff's right to participate in the democratic
process, (6) the unlawful at-large city council elections offends the Voting
Rights Act, (7) illegal at-large voting in effect enhances the opportunity for
discrimination against minority members and also deprives minorities the
office of Mayor, (8) discriminatory at-large voting limits, freezes or suppresses
minorities voting influence, freedom of expression, association and equal
protection under the Fifteenth and Fourteenth Amendments because of racially
polarized voting, white majority votes sufficiently as a bloc to enable it...usually
to defeat the minority's preferred candidates most of the time, (9) The City's
at-large voting scheme provides for an eleven member white majority voting
council that operates to dilute, or effectively cancel out and minimize the
voting strength of minorities.

---

\* The Voting Rights Act 42 U.S.C. § 1973(b) was intended to assure that
  minorities do not have less opportunity than other members of the electorate
"to elect representatives of their choice. The evidence is more compelling that the
  system is operating to dilute minority votes. See Gingles, 478 U.S. at 56, 106 S.
  Ct. at 2769. Id.

## PLAINTIFF'S ENTITLED TO PRELIMINARY INJUNCTION

In Gingles, 478 U.S. at 57 ("[A] pattern of racial bloc voting that extends over a period of time is more probative of . . . legally significant polarization than are the results of a single election."); Hines v. Mayor and Town Council of Ahoskie, 998 F.2d 1266, 1272 (4th Cir. 1993) ("[The] `results' test [of section 2 of the VRA] `supposes the need to consider multiple electoral contests.'" (quoting Baird v. Consolidated City of Indianapolis, 976 F.2d 357, 359 (7th Cir. 1992), cert. denied, 508 U.S. 907 (1993))); Baird, 976 F.2d at 359 ("Any approach that depends on outcomes supposes the need to consider multiple electoral contests the same position over many years, many positions during the same year, or both."); Collins I, 816 F.2d at 936 ("[W]hether there is a `pattern of racial bloc voting that extends over a period of time' [is] a critical factor in a claim of vote dilution under § 2."); see also Uno, 72 F.3d at 985 ("[R]ace-conscious politics (or its absence, for that matter) can more readily be seen by producing a documentary that spans a series of elections than by taking an isolated snapshot of a single election."). In opposing the Defendants' motion to dismiss, Plaintiff claims that Virginia Beach at-large elections reduces the potential effectiveness of African Americans voting strength by limiting their chances to translate voting strength into power and thus has violated the Section 2 of the Voting Rights Act of 1965, 42 U.S.C. § 1973, as amended in 1982 *et seq.*,

TAKE JUDICIAL NOTICE: In 2017 the at-large election method, showed African Americans in Virginia Beach constituted 19.2% and whites 20.7% of the city's population and percent of the voting age population of African Americans an estimated 38.2% and whites 42.2% percent of the registered voters, in the City of Virginia Beach with high inactive voter rates that exceeds 26.6%.

This Court's mandate, 478 U.S. 30, 106 S. Ct. 2752 enforced or administered at-large voting operates to discriminate against minorities as result of racial bloc voting, vote dilution, voter suppression, denying minority voters, potential voters, unregistered voters, disenfranchised voters, and their candidates right to participate in meaningful and free elections untainted by the vestiges of outlawed city council at-large elections scheme for its members, legally, enjoined. (See Kokkonen v. Guardian Life Ins. Co. of America, 511 U.S. 375, 397 (1994). *Id.*

---

The Equal Protection Clause requires states to govern impartially, and has particular force in protecting the right to vote. There must be neutral justification for rules or practices that discriminate against individuals on the basis of identifiable characteristics-including groups of individuals that are defined by race, by political affiliation, or by their residence in a particular location. See Katzenbach v. Morgan, 384 U.S. 641 (1966); Reynolds v. Sims, 377 U.S. 533 (1964); York Wo v. Hopkins, 118 U.S. 356, 370 (1886).

In 1982, Virginia was designated a covered jurisdiction subject to Section 2 of the Voting Rights Act, 42 U.S.C. § 1973, no voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color, United States v. Board of Commissions of Sheffield, Ala., 435 U.S. 110, 98 S. Ct. 965, 55 L Ed. 2d 148 (1978). 42 U.S.C. § 1973a et seq.

It is not disputed that the 1976 changes in Virginia Beach's electoral system has led to a retrogression in the position of racial minorities with respect to their effective exercise of the electoral franchise were within the purview of the Act. See e.g., Allen v. State Board of Elections, 393 U.S. 544, 89 S. Ct. 817, 22 L Ed 2d 1 (1969); Beer v. United States 425 U.S. 130 1976. Title 42 U.S.C. 1973c et seq.

Thus, under Beer, a voting change that makes minority voters worst off violates Section 2 effect test. Nonetheless, the city did knowing conducted unlawful at-large elections. Beer v. United States 425 U.S. 130 1976. Defendants actions are an unlawful abuse of voting practices, procedures and attempt to violate the Voting Rights Act, other federal voting rights statutes, and that of the U.S. Supreme Court in Thornburg, thus effectively, diluting minority voting strength and their influence on city council having discriminatory and vote dilution impact.

---

\* The Act was intended to assure that minorities do not have less opportunity than other members of the electorate "to elect representatives of their choice." Title 42 U.S.C. § 1973(b).

## JURISDICTION AND VENUE

The Court has jurisdiction under 28 U.S.C. §§ 1331, 1651 and venue under 42 U.S.C. § 1973c and the Supremacy Clause (Article VI, Clause 2) of the United States Constitution declares that federal laws are the "supreme Law of the Land" the Constitution of the United States.

## ENJOIN CITY'S AT-LARGE ELECTIONS

Plaintiff seeks an order to enjoin Virginia Beach by the court to do or refrain from doing an act. To enjoin is to prohibit by judicial order or issue an injunction against. For example, a federal court recently found that federal courts have jurisdiction over a suit to enjoin state officials from enforcing a state law on the ground that federal law preempts the state law. Ammex, Inc. v. Cox, 351 F. 3d 697 (6th Cir. 2003). The court referred to "the Supreme Court's repeated holdings that federal jurisdiction extends to suits to enjoin state enforcement on federal preemption and comparable grounds."

## ENCOURAGEMENT

The Supreme Court has determined that state action is present when judges are asked to enforce or authorize a discriminatory practice. See, e.g., Edmonson v. Leesville Concrete Co., 500 U.S. 614, 627-28 (1991)" Shelley v. Kraemer, 334 U.S. at 22-23.

## PLAINTIFF STATED A CLAIM

Plaintiff alleged the minority group is sufficiently large and geographically compact to constitute a majority in single-member district, that minority group is politically cohesive, and that white majority votes sufficiently as bloc to enable it, in absence of special circumstances, usually to defeat minority's preferred candidate, and the City's at-large system of electing city council members racially motivated unlawfully dilute[s] their voting strength in violation of Section 2 of the Voting Rights Act of 1965, As amended in 1982, 42 U.S.C. § 1973, the Fourteenth and Fifteenth Amendment stated a claim.

## M. STANDARD FOR CONSIDERATION OF MOTION TO DISMISS

Federal Rule of Civil Procedure 12(b)(6) permits a defendant to request dismissal of the claims against her if the plaintiff has filed a claim upon which relief cannot be granted. Fed. R. Civ. P. 12 (b) (6). "A motion to dismiss under Rule 12(b)(6) tests the sufficiency of a complaint; importantly, it does not resolve contests surrounding the facts, the merits of a claim, or applicability of defenses." Republican Party of North Carolina v. Martin, 980 F.2d 943, 952 (4th Cir.1992) (citing 5A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure §1356 (1990)). "[A] Rule 12(b)(6) motion should only be granted if, after accepting all well-pleaded allegations in the plaintiffs complaint as true and drawing all reasonable inferences from those facts in the plaintiffs favor, it appears certain that the plaintiff cannot prove any set of facts in support of his claim entitling him to relief." Edwards v. City of Goldsboro, 178 F.3d 231, 244 (4th Cir.1999).

---

**TAKE JUDICIAL NOTICE:** Multimember districts are unconstitutional if they dilute minority votes. White v. Regester (1973).

Additionally, a complaint must be dismissed if it does not allege "enough facts to state a claim to relief that is plausible on its face." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 127 S.Ct. 1955, 1974, 167 L.Ed.2d 929 (2007). As the Bell Atlantic Court explained, "a plaintiff's obligation to provide the `grounds' of his `entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do.'" Id. at 1964-65. Accordingly, in Bell Atlantic, the Court upheld the dismissal of a complaint where the plaintiffs failed to "nudge[] their claims across the line from conceivable to plausible." Id. at 1974.

A motion pursuant to Federal Rule of Civil Procedure 12(b)(6)must be read in conjunction with Federal Rule of Civil Procedure 8(a)(2). Rule 8(a)(2) requires only "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), so as "to `give the defendant fair notice of what the ... claim is and the grounds upon which it rests.'" Bell Atlantic, 127 S. Ct. at 1964. A court relies primarily on the allegations in the complaint when considering a Rule 12(b)(6) motion, but may also consider documents attached to the complaint and incorporated by reference. Simons v. Montgomery County Police Officers, 762 F.2d 30, 31-32 (4th Cir.1985). Simons documents may include undisputed public documents and copies of case law. Id.; see also Hall v. Commonwealth of Virginia, 276 F.Supp.2d 528, 531 (E.D.Va.2003).

---

*At-large elections often present an unconstitutional dilution of minority vote strength. Thornburg v. Gingles (1986).

The Plaintiff is representing the interests of African Americans and is proceeding pro se, While pro se plaintiff is not relieved of the obligation to provide sufficient factual allegations for a defendant to respond, they are entitled to have their pleadings held to "less stringent standards than formal pleadings drafted by lawyers." Erickson v. Pardus, 551 U.S.89, 127 S. Ct. 2197, 2200, 167 L.Ed.2d 1081 (2007) (citation omitted).

### N. The evidence brought by Plaintiff demonstrates that their voting rights have been diluted "but for" Virginia Beach's illegal at-large elections

From 1906 until 1986 every member of Virginia Beach's City Council to hold office was white. In 1986 John Richard Logan Perry, was the first African American elected to Council until 1990, Louisa M. Strayhorn was the first African American female from 1994-1998, and Dr. Amelia Ross-Hammond was the second African American female from 2013 until 2016, and from that time, until the amended complaint was filed, the council had no black member. In an at-large system, the majority  always has the strength to elect all of its candidates. By taking a historical white bloc voting analysis into consideration, it provides a more accurate portrayal of vote dilution or compelling evidence that the system is operating to dilute black votes. Gingles, 478 U.S. at 56, 106 S.Ct. at 2769.

Therefore, the reasonable inference to be drawn from Plaintiff's evidence is that is the City of Virginia Beach's at large method of electing members of the City Council which operate to dilute Plaintiff's voting strength as a member of a protected class of citizens having less opportunity than other members of the electorate to participate in the political process and elect representatives of

## CERTIFICATE OF SERVICE

I hereby certify that on July 27, 2018, a true copy of the foregoing was mailed to Mark D. Stiles and Gerald L. Harris Counsel for defendants, City Attorney Office of the City Attorney 2401 Courthouse Dr Building 1 Virginia Beach, Virginia 23456.(757)385-5687 mstiles@vbgov.com

Ms. Latasha Holloway
3683 Windmill Drive
Virginia Beach, Virginia 23453
(757)34

CIVIL ACTION NO: 2:18-cv-69 AWA-RJK