**IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
NORFOLK DIVISION**

| | |
|---|---|
| **Latasha Holloway, et al.,** | |
| **Plaintiffs,** | |
| **v.** | **Civil Action No. 2:18-cv-0069** |
| **City of Virginia Beach, et al.,** | |
| **Defendants.** | |

**MEMORANDUM IN SUPPORT OF DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT**

COME NOW the Defendants, City of Virginia Beach, Virginia Beach City Council, Louis Jones, James Wood, Jessica Abbott, Aaron Rouse, Robert Dyer, Barbara Henley, Michael Berlucchi, John Moss, Guy Tower, Sabrina Wooten, Rosemary Wilson, all in their official capacity as members of the Virginia Beach City Council, Tom Leahy, in his official capacity as Acting City Manager, and Donna Patterson, in her official capacity as Director of Elections/General Registrar for the City of Virginia Beach (collectively "Defendants"), by counsel, and pursuant to Federal Rule of Civil Procedure 56, in support of their motion for summary judgment in their favor and to dismiss this case in its entirety, state as follows:

**STATEMENT OF THE CASE**

On November 20, 2017, Plaintiff Latasha Holloway filed, *pro se*, her original Complaint against the City of Virginia Beach ("City"), alleging that the City's at-large system of electing councilmembers and its mayor diluted the voting power of African-Americans in the City in violation of Section 2 of the Voting Rights Act of 1965. (ECF No. 5.) In response, on April 10, 2018, the City filed a motion to dismiss for failure to state a claim. (ECF No. 13.)

After having attained the representation of the Campaign Legal Center, and joined by co-Plaintiff Georgia Allen, Plaintiffs filed an Amended Complaint on November 13, 2018—one week

after the most recent councilmanic elections.  The Amended Complaint altered the theory of Plaintiffs' claim, now basing the Section 2 vote dilution claim on an alleged tri-partite coalition of Black, Asian, and Hispanic voters.  All discovery deadlines have passed, and, per the Court's October 22, 2019 deadline for filing dispositive motions, Defendants move for summary judgment.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

1)      Plaintiffs' Amended Complaint asserts a vote dilution claim under Section 2 of the Voting Rights Act of 1965, seeking to replace the present seven residence district, all at-large voting system of electing council members "with a system in which Black, Hispanic or Latino, and Asian American voters are together able to elect their preferred candidates of choice to the City Council." (Am. Compl. ¶ 1.)

2)      Georgia Allen and Latasha Holloway, the two Plaintiffs in the present action, are African-American residents of Virginia Beach. There are no Plaintiffs of Asian or Hispanic descent or from the Asian or Hispanic communities. (*See generally* Am. Compl.)

3)      Plaintiffs' retained expert, Anthony Fairfax, is offered to opine upon the plausibility of creating at least one district in Virginia Beach with a Black-Asian-Hispanic tripartite majority-minority population.  This inquiry is commonly referred to as *Gingles* Prong 1. (Ex. 3 at 80.)

4)      Fairfax has not been retained to offer opinions on *Gingles* Prong 2 or 3. (Ex. 3 at 80.)

5)      Fairfax produced an Initial Report and a Rebuttal Report.  Fairfax's Initial Report is attached as Exhibit 1 and his Rebuttal Report is attached as Exhibit 2.

6)      In Fairfax's Initial Report, he proposed a ten-district map of Virginia Beach that purported to contain two tri-partite (Black-Asian-Hispanic) majority-minority districts. (Ex. 1 at 20.)

7)      Fairfax contends that these two proposed majority-minority districts would have combined Black-Asian-Hispanic citizen voting age populations (CVAP) of 50.03% and 50.04%, respectively.  (Ex. 1 at 19-20.)

8)    Fairfax amplified his opinions regarding *Gingles* Prong 1 in deposition testimony given on September 24, 2019.  Fairfax's deposition transcript is attached as Exhibit 3.

9)    Fairfax testified that 69 of 100 total precincts in Virginia Beach have less than 40% combined HBA CVAP; that 21 of 100 total precincts have between 40% and 50% percent combined HBA CVAP; and that only 10 of 100 total precincts (10% of the total) have a combined HBA CVAP greater than 50% percent combined HBA CVAP.  (Ex. 3 at 167-168, Ex. l at 13).

10)    Fairfax testified he did not calculate a margin of error for the 50.03% and 50.04% combined HBA CVAP estimates for his proposed majority-minority districts.  (Ex. 3 at 191).

11)    Plaintiffs' vote dilution claim asserts that a tri-partite coalition of Black, Hispanic, and Asian minority voters in Virginia Beach is politically cohesive.  Plaintiffs specifically allege: "Hispanic and Asian voting patterns track Black voting patterns" and "Black, Hispanic, and Asian voters vote together as a coalition, and not just for minority candidates in general."  (Am. Compl. ¶¶ 1, 48, 53, 55).

12)    Plaintiffs' vote dilution claim asserts that the white majority in Virginia Beach votes sufficiently as a bloc to usually defeat the tri-partite minority's preferred candidate.  (Am. Compl. ¶¶ 8, 48, 51, 57).

13)    Plaintiffs' retained expert, Dr. Douglas Spencer, is offered to opine whether Black, Hispanic, and Asian voters in Virginia Beach vote cohesively and whether the white majority in Virginia Beach votes sufficiently as a bloc to usually defeat the preferred candidates of the alleged tripartite minority coalition-group—these two inquiries being commonly referred to as *Gingles* Prong 2 and Prong 3, respectively.  (Ex. 4 at 3.)

14)    Spencer produced two reports ("Initial Report" and "Rebuttal Report") containing his opinions with regard to *Gingles* Prongs 2 and 3.  Spencer's Initial Report is attached as Exhibit 4 and his Rebuttal Report is attached as Exhibit 5.

3

15)     Spencer amplified his written opinions in deposition testimony given on October 1, 2019. Spencer's deposition transcript is attached as Exhibit 6.

16)     Spencer's Initial Report contains the only *Gingles* Prongs 2 and 3 statistical point-estimates for voting support levels and cohesiveness among minority groups and of voting support levels of whites for candidates running for City Council in Virginia Beach provided by Plaintiffs to Defendants on or before Plaintiffs' expert report disclosure deadline. (*See generally* Ex. 4; *see also* Ex. 3 at 80-81, Ex. 8 at 118-120).

17)     In his deposition, Spencer defined <u>cohesion</u> among different racial minority groups as "each group has the most preferred candidate, and the most preferred candidate of each three groups is the same." (Ex. 6 at 109).

18)     For each election analyzed in Spencer's Initial Report, Spencer provided voting support point estimates *only* for white voters (alone), black voters (alone), and "All Minority" voters—the latter category combining Black, Hispanic, Asian, and all other non-white voters. (Ex. 4 at 8-10, Ex. 5 at 6, Ex. 6 at 106).

19)     In his Initial Report, Spencer offered no voting support point estimates for Hispanic voters (alone) or Asian voters (alone). (Ex. 4; Ex. 6 at 68-71).

20)     Spencer wrote and testified that he did not produce voting support point estimates for Hispanic voters (alone) or Asian voters (alone) because he believed those populations were too small and insufficiently concentrated in precincts in Virginia Beach to produce reliable estimates. (Ex. 4 at 6; Ex. 5 at 8 (Table 1), Ex. 6 at 68-71).

21)     In his Initial Report, Spencer stated: "I define elections as <u>*probative*</u> of racially polarized voting when they feature a minority candidate running for the office under investigation; in this case the City Council." (Ex. 4 at 11; *See also* Ex. 6 at 71-72) (emphasis added).

22)     In his Initial Report, Spencer identified 17 City Council races featuring a minority candidate running for the office under investigation from 2008-2018[1] and in his charts referred to these 17 races collectively as "All Probative Races." (Ex. 4 at 14, 16, 19, 21, 23, 27, and 29; Ex. 6 at 71-72).

23)     Spencer chose to exclude 3 of the 17 City Council races (4 seats total) involving George Furman, a minority candidate, from his analysis – Mayor (2016), At-Large (2014), and Bayside (2010).  (Ex. 4 at 3, 14, 16, 19, 27, 39 and Appendix B; Ex. 6 at 85).

24)     In the races that Spencer chose to exclude, three candidates who Spencer identified as being a "minority candidate of choice" prevailed – Sessoms (2016), Davenport (2014), and Jones (2010).  (Ex. 4, at 14, 16, 19, and 27; Ex. 6 at 84-89).

25)     Spencer's Rebuttal Report contains the only additional *Gingles* Prongs 2 and 3 voting pattern data and analysis that was provided to Defendants on or before Plaintiffs' rebuttal report disclosure deadline.  (Ex. 5).

26)     In his Rebuttal Report, Spencer presented a new Racially Polarized Voting Analysis (Table 1) considering 13 specific candidates – 10 minority and 3 white.  (Ex. 5 at 8).

27)     Spencer's new analysis, contained in Table 1 of his Rebuttal Report, excludes three prevailing candidates who Spencer initially identified as being minority candidates of choice in the Furman elections: Sessoms (2016), Davenport (2014), and Jones (2010). (Ex. 5 at 8 (Table 1)).

28)     In his Rebuttal Report, Spencer presented, for the first time, voting support point estimates for Hispanic voters (alone) and for Asian voters (alone), but only as to a single candidate—Aaron Rouse (2018).  (Ex. 5 at 7-8).

---

[1] The 2018, 2014, and 2010 At-Large races had two seats available in each cycle and are thus considered as 6 of the 17 races analyzed.

29)     Upon the Defendants' request (following receipt of Spencer's Rebuttal Report), Spencer provided point estimates for Hispanic voters (alone) and Asian voters (alone) for the 13 candidates he analyzed in Table 1 of his Rebuttal Report – but not for any other candidates in those or any other elections.   Spencer's point estimates for Black, Hispanic, and Asian support (and the corresponding standards of error) were provided as a data set ("Data Set") to Defendants on September 5, 2019.  The Data Set is attached hereto as Exhibit 7.

30)     Spencer wrote that "[t]o draw my conclusions…" regarding cohesion as contained in Table 1, "…I adopt the logic of equivalence testing."  (Ex. 5 at 7).

31)      Spencer confided during his deposition testimony, however, that "I don't think Table 1 is very meaningful, which is why I did not generate it for my original report.  I don't think the estimates that are used in this table actually mean much.  I am not confident in their findings at all." (Ex. 6 at 125).

32)     Spencer further admitted in deposition that the confidence intervals (similar to standards of error) for his point estimates of Hispanic and Asian voter support are "so ridiculous, ridiculously big." (Ex. 6 at 44, 146).

33)     In Spencer's Data Set, only 6 of the 13 candidates analyzed received 50% or more support from both Black voters and Hispanics voters: Wooten (2018), Ross-Hammond (2012), Bullock (2010), Allen (2008), White (2018) and Henley (2014).  Only 3 of those 13 candidates—Wooten (2018), Bullock (2010) and Henley (2014)—received 50% or greater support from Black, Hispanic and Asian voters.  (Ex. 7).

34)     Spencer further conceded in deposition that using his equivalence testing method, he could only conclude that 7 of the 13 candidates were minority preferred.  Of those 7 candidates, 4 won election.  (Ex. 5 at 8 (Table 1), Ex. 6 at 152).

35)     Plaintiffs' retained expert, Dr. Allan Lichtman, is offered to provide testimony regarding racial polarization and the "totality-of-the-circumstances" analysis under *Gingles*.  Lichtman did not generate his own voter support or cohesiveness data or analysis under the *Gingles* factors, and to the extent he has any opinions on *Gingles* Factor 2 or Factor 3, he relies exclusively upon the data and opinions generated by Spencer.  (Ex. 8 at 220-221).

36)     Lichtman amplified his written opinions in deposition testimony given on September 30, 2019.  Lichtman's deposition transcript is attached hereto as Exhibit 8.

37)     Lichtman conceded in deposition testimony that he had reviewed Virginia Beach data and concluded that it is not possible to develop statistically reliable voter support point estimates for either Asian voters (alone) or Hispanic voters (alone) in Virginia Beach and equivalence testing is needed to compare voting behavior across these three minority groups. (Ex. 8 at 58-62, 220-222).

38)     Lichtman conceded there were no "extreme case" or "homogenous precincts" for Asians or Hispanics in Virginia Beach.  (Ex. at 59-60; *see also* Ex. 6 at 71).

39)     Lichtman testified that because the error margins are going to be wide for isolated estimates of Asians and Hispanics, "you've got to use the equivalence testing analysis" to compare candidate preferences among Asian, Hispanic, and Black voters in Virginia Beach.  (Ex. 8 at 220-221.)

## **STANDARD OF REVIEW**

Summary judgment is appropriate only when the Court, viewing the record as a whole and in the light most favorable to the nonmoving party, determines that there exists "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); Fed. R. Civ. P. 56(a); *see Seabulk Offshore, Ltd. V. Am. Home Assur. Co.*, 377 F.3d 408, 418 (4th Cir. 2004).  The moving party has the initial burden to show the absence of an essential element of the nonmoving party's case and to demonstrate that the moving party is entitled to judgment as a matter of law. *Honor v. Booz-Allen*

& *Hamilton, Inc.*, 383 F.3d 180, 185 (4ᵗʰ Cir. 2004); *McLean v. Patten Cmtys., Inc.*, 332 F.3d 714, 718 (4ᵗʰ Cir. 2003).

When the moving party has met its burden to show that the evidence is insufficient to support the nonmoving party's case, the burden then shifts to the nonmoving party to present specific facts demonstrating that there is a genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986); *Honor*, 383 F.3d at 185; *McLean*, 332 F.3d at 718-19. Such facts must be presented in the form of exhibits and sworn affidavits. *Celotex*, 477 U.S. at 324. Failure by a plaintiff to rebut a defendant's motion with such evidence on his behalf will result in summary judgment when appropriate. "[T]he plain language of Rule 56(c) mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322.

Although a court must draw all justifiable inferences in favor of the nonmoving party, in order to successfully defeat a motion for summary judgment, the nonmoving party must rely on more than conclusory allegations, "mere speculation," the "building of one inference upon another," the "mere existence of a scintilla of evidence," or the appearance of "some metaphysical doubt" concerning a material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986); *Thompson v. Potomac Elec. Power Co.*, 312 F.3d 645, 649 (4th Cir. 2002). Rather, the evidence must be such that the fact-finder reasonably could find for the nonmoving party. *See Anderson*, 477 U.S. at 252.

## **LEGAL STANDARD**

In *Thornburg v. Gingles*, the Supreme Court of the United States set forth the elements that plaintiffs must prove in order to succeed on vote dilution claim under Section 2 of the Voting Rights Act. 478 U.S. 30 (1986). Vote dilution claims consist of two phases, (1) a set of three

preconditions that must be established before (2) a "totality of the circumstances" analysis is undertaken. *United States v. Charleston County*, 365 F.3d 341, 348 (2004). The *Gingles* preconditions are as follows: (1) the minority group is sufficiently large and geographically compact to constitute a majority in a single-member district; (2) the minority group is politically cohesive; and (3) the white majority votes sufficiently as a bloc to enable it usually to defeat the minority's preferred candidate. 478 U.S. 30, 51 (1986). These threshold inquiries are focused mostly on data regarding voting patterns and demographic information. Only when a plaintiff meets their burden of satisfying all three *Gingles* preconditions do courts need evaluate whether, under the "totality of the circumstances," the minority vote is diluted in contravention of Section 2. *Levy v. Lexington County*, 589 F. 3d 708, 713 (4th Cir. 2009). If a plaintiff cannot satisfy all three *Gingles* preconditions, the vote dilution claim is defeated. *See id.; Hall v. Virginia*, 385 F.3d 421 (2004) (dismissing plaintiffs' vote dilution suit for failure to state a claim where the three *Gingles* preconditions could not be satisfied.).

The United States Court of Appeals for the Fourth Circuit describes the "totality of the circumstances" inquiry "s "a searching practical evaluation of the past and present reality which demands a comprehensive, not limited, canvassing of relevant facts." *Charleston County*, 365 at 348 (quotations omitted).

## ARGUMENT

The Defendants contend that Plaintiffs cannot meet any of the myriad burdens to successfully prove a vote dilution claim under Section 2 of the Voting Rights Act—not only in regard to the three *Gingles* preconditions, but also regarding the "totality-of-the-circumstances" inquiry. The Defendants' summary judgment motion, however, focuses solely on the second and third *Gingles* prongs—the respective requirements that Plaintiffs demonstrate that the minority

group in question is politically cohesive and that the white majority in Virginia Beach votes sufficiently as a bloc to usually defeat the preferred candidates of the minority group in question.

It is appropriate to note at the outset what is <u>not</u> before this Court with respect to the undisputed facts Defendants intend to marshal in support of the arguments for summary judgment: those facts do not evince a so-called "battle-of-the-experts."  Rather, Defendants present herein an "exposure-of-the-expert"—a repudiation of Plaintiffs' expert's core conclusions regarding Prongs 2 and 3 that is performed, ironically, by the Plaintiffs' expert himself.

The reports and testimony of Dr. Douglas Spencer, Plaintiffs' retained expert regarding Prongs 2 and 3, are the foundation of the arguments Defendants advance herein.  Spencer's own words and data show unmistakably that the evidence adduced by his own methodology and analysis is hopelessly inadequate to satisfy Plaintiffs' Prong 2 cohesion burden, and further, tends to disprove the existence of the Prong 3 precondition.  In the wake of Spencer's analysis and testimony, any possibility that Plaintiffs can prevail in this case is reduced to zero.

I.    ***Gingles* Prong 2: Coalition claims are not cognizable under Section 2, or, at the very least, create a burden regarding cohesion among the Minority Group that Plaintiffs' own data reveals they cannot satisfy.**

Plaintiffs' theory of this case relies upon the alleged cohesion of Black, Asian, and Hispanic voters in Virginia Beach.  (Am. Compl. ¶¶ 1, 8, 48, 53, 55).  It remains an open question in the Fourth Circuit whether such a coalition claim is even cognizable under Section 2. Defendants first ask this Court to hold that a tri-partite minority coalition claim is impermissible as a matter of law and grant Defendants' summary judgment on this independent basis. Alternatively, assuming *arguendo* that tri-partite minority coalition claims are cognizable, Defendants ask this Court to grant summary judgment because Plaintiffs' evidence fails to establish cohesion of Black, Hispanic, and Asian voters in Virginia Beach, as required by *Gingles*.

a. Plaintiffs' tri-partite minority coalition claim should not be permitted under the plain language of Section 2 of the Voting Rights Act.

The Supreme Court has not resolved whether two or more allegedly cohesive minority groups can satisfy the *Gingles* preconditions.   In *Johnson v. De Grandy*, 512 U.S. 997, 1020 (1994), and *Growe v. Emison*, 507 U.S. 25, 41 (1993), the Court assumed, without deciding, that minority coalition groups may be used to establish a claim under the Voting Rights Act, while in *Bartlett v. Strickland*, 556 U.S. 1, 13–14 (2009), it declined to address the issue.  Meanwhile, lower courts are split, with some circuits resolving the issue either in favor of a minority plaintiff or resolving the case on other grounds. *See, e.g., Bridgeport Coal. for Fair Representation v. City of Bridgeport,* 26 F.3d 271, 276 (2d Cir. 1994), *vacated*, 512 U.S. 1283 (1994); *LULAC v. Clements*, 999 F.2d 831, 864 (5th Cir. 1993) (en banc); *Concerned Citizens v. Hardee Cnty. Bd. of Comm'rs*, 906 F.2d 524, 525 (11th Cir. 1990).

On the other hand, in *Nixon v. Kent County*, the court held that coalition claims were not cognizable under Section 2, as a matter of law. 76 F.3d 1381, 1393 (6th Cir. 1996). The Sixth Circuit explained that the plain language of the statute "does not mention minority coalitions, either expressly or conceptually," that Section 2 "consistently speaks of a 'class' in the singular," and that if Congress "had intended to sanction coalition suits," the statute would have read "participation by members of the classes of citizens protected by subsection (a)." *Id.* at 1386.  The court in *Nixon* also outlined four policy considerations to support the conclusion that minority coalitions were not cognizable under Section 2.  *Id.* at 1390-93.   Defendants urge this Court to adopt the *Nixon* holding.

In *Hall v. Virginia*, the United States Court of Appeals for the Fourth Circuit also cast serious doubt on whether multiracial coalition claims are cognizable under Section 2.  385 F.3d 421 (4th Cir. 2004).  The *Hall* opinion addressed whether "crossover" districts—wherein Blacks

did not form a majority but attained the ability to elect their preferred candidates with the help of a segment of white voters—could be used to satisfy the compactness and numerosity requirement of *Gingles*' first prong. *Id.* at 425. The Fourth Circuit ultimately held that such crossover districts could not satisfy Prong 1, stating that "any construction of Section 2 that authorizes the vote dilution claims of multiracial coalitions would transform the Voting Rights Act from a law that removes disadvantages based on race, into one that creates advantages for political coalitions that are not so defined." *Id.* at 431 (emphasis added). The *Hall* court further explained its reasoning as follows:

> when minority voters, as a group, are too small or loosely distributed to form a majority in a single-member district, they have no ability to elect candidates of *their own* choice, but must instead rely on the support of other groups to elect candidates. Under these circumstances, minorities cannot claim that their voting strength—that is, the potential to independently decide the outcome of an election—has been diluted in violation of Section 2.

*Id.* at 429 (emphasis original). Although at issue in *Hall* was a Black minority being complemented by a segment of white voters—and not by other minority groups—the court's language was not limited to black-white coalitions. Further, the *Hall* opinion supported its decision with the following language from the dissent from the first Fifth Circuit case to recognize multiracial coalitions: "If a minority group lacks a common race or ethnicity, cohesion must rely principally on shared values, socio-economic factors, and coalition formation, making the group almost indistinguishable from political minorities as opposed to racial minorities." *Id.* at 431 (quoting *Campos v. City of Baytown*, 849 F.2d 943, 945 (5th Cir. 1988) (Higginbotham, J., dissenting from denial of reh'g en banc)). Although the Fourth Circuit did not definitively decide the issue, the dicta in *Hall* strongly suggests that Section 2 multiracial coalitions are not permitted.[2]

---

[2] *See also Hall v. Virginia*, 276 F. Supp. 2d 528, 536 (E.D.Va 2003) ("The question [] is whether the disfavor that has befallen vote dilution claims in influence districts likewise precludes such claims with respect to coalition districts. The Court FINDS that it does.")

Here, it is undisputed that Plaintiffs' vote dilution claim is predicated upon the alleged political cohesiveness of a tri-partite racial coalition of Black, Hispanic, and Asian minority voters in Virginia Beach.  Plaintiffs specifically allege, "Hispanic and Asian voting patterns track Black voting patterns" and "Black, Hispanic, and Asian voters vote together as a coalition, and not just for minority candidates in general."  (Am. Compl. ¶¶ 53, 55).  Plaintiffs make no allegations as to any single minority group alone being sufficient to state a claim under Section 2, and there is no evidence in the record that Blacks alone, Hispanics alone, or Asians alone could plausibly state a claim for a Section 2 violation.  Therefore, Plaintiffs rest their entire case on the hope that this Court does not adopt the logic of the Sixth Circuit, and that it disregards the strong indications provided by this Court and the Fourth Circuit in *Hall v. Virginia* that coalition claims are not cognizable.  Defendants ask this Court to join the Sixth Circuit in holding that coalition claims are not cognizable under Section 2 and, as a result, Defendants' summary judgment motion is granted.

      b.  <u>Assuming the Plaintiffs' tripartite coalition theory is cognizable under Section 2, Plaintiffs' own evidence fails to establish that the combined group of Blacks, Hispanics, and Asians are a politically cohesive in Virginia Beach.</u>

The Supreme Court of the United States has set forth the cohesion requirement for vote dilution claims in unambiguous terms, stating in *Gingles* that "the minority group must be able to show that it is politically cohesive.  If the minority group is not politically cohesive, it cannot be said that the selection of a multimember electoral structure thwarts distinctive minority group interests." 478 U.S. 30, 51 (1986).  In *Shaw v. Reno*, the Court emphasized that it had "unanimously reaffirmed that racial bloc voting and minority-group political <u>cohesion never can be assumed</u>, but specifically must be proved in each case in order to establish that a redistricting plan dilutes minority voting strength in violation of § 2." 509 U.S. 630, 653 (1993) (emphasis added) (citing *Growe* v. *Emison*, 507 U.S. 25, 40-41 (1993)).

The most common method of proving such cohesion is "[a] showing that a significant number of minority group members usually vote for the same candidates" *Gingles*, 478 U.S. at 56. A "boilerplate" vote dilution claim, as contemplated by *Gingles*, focuses upon only one ethnic or language minority group. *See*, *e.g.*, 478 U.S. 30. In that context, this Court has adopted 60% voting support for a given candidate as the appropriate marker of cohesion within a single group. *Smith v. Board of Supervisors*, 801 F. Supp. 1513, n. 11 (E.D.Va. 1992) ("This Court finds persuasive Dr. Lichtman's use of a 60 percent figure for a cohesion rate.").

The Supreme Court has never recognized the validity of Section 2 vote dilution claims based upon the alleged cohesiveness of multiple language or ethnic groups. In *Growe v. Emison*, the Court did, however, address how the cohesion requirement <u>would</u> operate <u>if</u> multiracial coalition Section 2 claims were permitted. 507 U.S. 25 (1993). The Court held as follows:

> Assuming (without deciding) that it was permissible for the District Court to combine distinct ethnic and minority groups for purposes of assessing compliance with § 2, when dilution of the power of such an agglomerated political bloc is the basis for an alleged violation, <u>proof of minority political cohesion is all the more essential</u>. Since a court may not presume bloc voting within even a single minority group, it made no sense for the District Court to (in effect) indulge that presumption as to bloc voting within an agglomeration of distinct minority groups.

> *Id.* at 41 (emphasis added) (citations omitted).

Following the Supreme Court's lead, those circuit courts that have allowed multiracial coalition claims to move forward have emphasized the high burden required to prove cohesiveness in such a context. In *Brewer v. Ham*, the Fifth Circuit—which has been more receptive to vote dilution claims predicated upon multiracial coalitions than any other circuit—held the standard for cohesion in such cases to be as follows:

> the determinative question is whether black-supported candidates receive a majority of the Hispanic and Asian vote; whether Hispanic-supported candidates receive a majority of the black and Asian vote; and whether Asian-supported candidates receive a majority of the black and Hispanic vote in most instances in the [local district] area.

876 F.2d 448, 454 (5th Cir. 1989) (citations omitted).

Proving cohesion clearly becomes more difficult then, as more minority groups are added to a multiracial coalition.  This is likely why Plaintiffs have been unable to point to a single case where a tri-partite coalition claim has been successful.

Further, in keeping with the Supreme Court's admonition in *Growe*, this definition of <u>cohesion</u> sets a bar far higher than merely establishing an ordinary political <u>coalition</u>—the latter being a loose agglomeration of various segments of an electorate, perhaps varying in composition from one election to another and whose constituent parts may be motivated by differing concerns. To prove <u>cohesion</u>, on the other hand, "groups must be shown to vote together by some sort of <u>reliable evidence</u> for this Court to be able to make a finding of political cohesiveness. *Brewer v. Ham*, 876 F.2d 448, 454 (emphasis added).

At a very minimum, *Hall* and many other Section 2 opinions must be read—consistent with the Supreme Court's rulings in *Gingles* and *Growe*—to require much more than proof of the existence of an ordinary political coalition in order satisfy the cohesion requirement for a multiracial coalition vote dilution claim.  As will be shown, Plaintiffs offer no evidence that could establish the cohesion precondition.

        c.   <u>Spencer's Initial Report attempts to prove cohesion by presumption.</u>

The Plaintiffs' expert regarding cohesion, Spencer, concludes in his initial report ("Initial Report") that "[t]here is strong evidence of voting cohesion between black voters and other minority group voters."  (Ex. 4 at 3).  However, there is no competent evidence to support this conclusion because, as Spencer himself explained in his rebuttal report and in deposition testimony (and Lichtman explains in his deposition testimony), both the Asian and Hispanic populations lack the size and geographic concentration necessary to create reliable estimates for Asian and Hispanic

voters as separate groups.  (Ex. 4 at 6, Ex. 5 at 8, Ex. 6 at 68-71, Ex. 8 at 58-62).  Spencer's Initial Report does not produce a single data point regarding the voting patterns of Asian and Hispanic voters by themselves.  (*See generally* Ex. 4).

How, then, does Spencer conclude that Blacks, Asians and Hispanics are cohesive with each other?  Spencer does so by disregarding the clear instruction of *Growe* and simply presumes that these three groups vote together, banding them together in a repeated "All minority support" data point for each candidate in the races he identifies as probative.  Spencer makes clear that "All Minority" includes Asians, Blacks, Hispanics, and other minorities.  (Ex. 4 at 9, Ex 6. at 106).  He further admits that this "All minority support" data point cannot be used to isolate point estimates for either Asian support or for Hispanic support. (Ex. 6 at 106-108).  This is a fact that is confirmed by Plaintiffs' other retained expert, Dr. Allan Lichtman, and is undisputed in this case. Ex. 8 at 59-62.  This missing data is crucial to Plaintiffs' effort to prove cohesion under Prong 2.  Without it, they cannot carry their burden.

Spencer attempts to cover over this missing data from his Initial Report by with a sleight of hand.  For each candidate analyzed, Spencer provides a point estimate for Black voters alone and for "All minorit[ies]."  If both of these numbers are above 50%, it might appear at first glance that minority voters were in fact cohesive.  That appearance is utterly deceiving.  An examination of Spencer's estimated minority support levels for Dr. Amelia Ross-Hammond, a Black candidate in the 2016 election for the Kempsville seat, shows why this is so.  Spencer's "King's EI" estimate reports that Dr. Ross-Hammond achieved 76.7% support among Black voters and 59.9% "All minority support." (Ex. 4 at 15).  Consideration of the operation of averages leads to the conclusion that, because Black voters are also included in the "All minority support" estimate, one must infer

that Asian and Hispanic underlined combined support is far less than 59.9%.[5]  The inevitability of this conclusion can be demonstrated with a simple hypothetical. Imagine that Jack has 90 apples and that Jack and Jill combined have an average of 50 apples.  It would be dishonest to suggest based upon these two data points that Jack and Jill both are both carrying a similar number of apples— since the operation of averages requires the conclusion that Jill actually has only 10 apples (100 total apples divided by 2 people equals 50).[6]

In the same way, it is wholly inaccurate to suggest that the two data points Spencer provides for Dr. Ross-Hammond suggest that she has strong support from Asian and/or Hispanic voters. What we can conclude is that the level of voter support of Asians, Hispanics, and other non-Black minority voters combined has significantly "dragged down" the 76.7% level of support of Blacks alone.  Further, while we have some general hint of what the non-Black minority support would be for Dr. Ross-Hammond (it must be far below 59.9%), we still have no information about the estimated support levels of Asians alone and Hispanics alone.

The "black box" of Spencer's All Minority data points in the Initial Report are patently inadequate for proving cohesion, even by Spencer's own telling.  During his deposition testimony, Spencer was asked, "When you're talking about three different distinct minority groups, what does cohesion mean to you?"  (Ex. 6 at 109).  Spencer explained, "My definition [of cohesion] would be each group has the most preferred candidate, and the most preferred candidate of each three

---

[5] If Asian and Hispanic voters combined were equal in number to Black voters in the 2016 Kempsville election, the operation of averages would dictate that the Asian and Hispanic combined level of support for Ms. Ross-Hammond was 43.1%. This is a generous assumption to Plaintiffs, however, the total combined Asian and Hispanic population in Virginia Beach is considerably less than the Black population in the City. Further, unless Asians and Hispanics voted in perfect lock step, one group would have given an even lower level of support for Ms. Ross-Hammond—possibly much lower.

[6] The data at issue in this case, involving estimated averages for voting support among groups comprising many individuals, is more complicated than this simple "Jack and Jill" hypothetical; however, the underlying logic and algebraic operation of averages still apply.

groups is the same." (Ex. 6 at 109.)[7]  Unfortunately, when Spencer was asked how he was "able to determine the individual group support" in order to determine candidate preferences for each group, he answered, "I did not attempt to do that." (Ex. 6 at 119).

Although the United States Court of Appeals for the Fifth Circuit has determined that multiracial coalition claims may be valid, it has also admonished that "plaintiffs must prove that the minorities so identified actually vote together."  *Campos v. Baytown*, 840 F.2d 1240, (5th Cir. 1988) (emphasis added).   Consistent with that burden, the Fifth Circuit opined that "the most persuasive evidence of inter-minority political cohesion for Section 2 purposes is to be found in *voting patterns."  Brewer v. Ham*, 876 F.2d 448, 453 (5th Cir. 1989) (emphasis original). Without any evidence concerning the voting patterns of Asians as a distinct group or Hispanics as a distinct group, it simply is impossible to perform the kind of cohesion inquiry that Spencer himself calls for.  The undisputed fact that evidence necessary for Plaintiffs to carry their Prong 2 burden is completely absent is grounds for summary judgment in favor of the Defendants.

d.  Spencer's Rebuttal Report: A novel and unsuccessful attempt to prove cohesion amongst black, Asian, and Hispanic voters.

Spencer' rebuttal report ("Rebuttal Report") is largely an attempt to remedy the deficiencies of the data he produced in his Initial Report.  The underlying data Spencer relies upon in his Rebuttal Report appears in a data set ("Spencer's Data Set") that finally provides separate point estimates for both Asian and Hispanic voters—at least for a limited batch of candidates. Spencer's Data Set was produced to Defendants only after the Rebuttal Report was submitted, perhaps owing to the fact that the self-described "ridiculous" data contained therein reveals only

---

[7] Dr. Spencer's definition, while arguably more permissive than the standard set for in *Ham v. Brewer*, has the virtue at least of requiring some separate analysis of each group and a comparison of the groups' preferences to each other (the former analysis being required to perform the latter comparison)—both necessary elements of any test of cohesion that would not run roughshod over *Growe* and the case law from various circuit courts.

that black, Asian, and Hispanic voting patterns diverge wildly.  To remedy this problem, Spencer employs a novel methodology, "equivalence testing," in order to find the cohesion that Plaintiffs require to successfully make their claim.  By the conclusion of Spencer's deposition, however, he confirmed that equivalence testing is not at all appropriate as he applies it.  Further, Spencer attempted to distance himself from his own reported conclusions.  A more detailed description of this surreal saga follows.

In his Rebuttal Report, Spencer confirms that, given the lack of any precincts in Virginia Beach with significant concentrations of Hispanic and Asian voters, the "precinct populations are simply too small to draw reliable conclusions about the voting preferences of these groups independently."  (Ex. 5 at 6).  Spencer candidly admits the circular logic behind his initial approach, which manifestly presumes—and does not at all prove—that these groups are cohesive: the "most reliable method for interpreting the candidate preferences of black, Hispanic, and Asian voters is to estimate their joint vote share, which I reported in my original report in a category called "All Minority."  (Ex. 5 at 6).

Spencer then proceeds to address a critique leveled by Defendants' expert, Dr. Quentin Kidd—the essence of which, as Spencer explains, is that a data point for "All Minority" support, or "coalition support" could be "driven by extreme support among black voters that masks weak support among Hispanic and Asian voters."[8]  (Ex. 5 at 7).  Spencer does not dispute the plain logic

---

[8] It should be noted that, while a high degree of Black support for a candidate could indeed mask relatively weak levels of support among Hispanic <u>and</u> Asian voters, as Dr. Spencer explains, another possibility would equally undermine any claim of cohesion: that strong levels of Black support for a candidate could be coupled in some instances with strong support from one of the other two groups (e.g. Asians) and that the combined strong support of those two groups masks an extreme lack of support among the third group (e.g. Hispanics). The ultimate point, here, is that a combined "All Minority" support data point provides no information about the support of Asian and Hispanic voters separately and does not allow for an analysis of whether these three groups prefer the same candidates.

of Dr. Kidd's critique, but states that "the evidence suggests that the voting preferences of black, Hispanic, and Asian voters are <u>not distinguishable</u> from each other." (Ex. 5 at 7). The following Table A—a distillation of Spencer's Data Set—exposes the facial absurdity of that claim. (See Ex. 7).

**Table A—Spencer's Data for Black and Asian Support for Various Candidates**

| Candidate (Year) | Estimated Black Support | Estimated Asian Support |
|---|---|---|
| Rouse (2018) | 83.0% | 53.0% |
| Wooten (2018) | 90.3% | 73.4% |
| White (2018) | 61.1% | 19.6% |
| Ross-Hammond (2016) | 81.2% | 26.2% |
| Cabiness (2014) | 70.2% | 9.4% |
| Henley (2014) | 62.4% | 82.9% |
| Ross-Hammond (2012) | 82.6% | 33.6% |
| Sherrod (2011) | 90.2% | 27.2% |
| Jackson (2010) | 52.9% | 6.9% |
| Bellitto (2010) | 8.4% | 47.2% |
| Bullock (2010) | 79.0% | 87.9% |
| Allen (2008) | 79.4% | 29.8% |
| Flores (2008) | 52.9% | 33.9% |

The data in Table A constitutes a fatal blow to the Plaintiffs' case, demonstrating not only that black and Asian support levels are <u>easily distinguishable</u> from one another, but more specifically that these two groups do not support the same candidates in a large majority of cases. In other words, Blacks and Asians are not politically cohesive under Spencer's own data. In fact, a comparison of Spencer's estimated levels of white support for these same candidates, which are provided in his Initial Report, demonstrates that <u>Asian voting patterns actually track white voting patterns much more closely than those of Blacks</u>. Furthermore, an examination of Spencer's Data Set reveals that in only six (6) of thirteen (13) races presented did a majority of both blacks and Hispanics support the candidates listed. Finally, in only three (3) of thirteen (13) races do all three minority groups give greater than 50% support for the same candidate.

Given this startling data, Plaintiffs cannot possibly satisfy the cohesion definitions set forth by Spencer himself and by the Fifth Circuit in *Brewer v. Ham*.  Both standards properly require that Plaintiffs prove cohesion amongst a multiracial coalition by demonstrating that <u>each</u> of these groups share the <u>same</u> preferred candidates.  According to Spencer's own data, that simply is not the case.  Perhaps this is why—excepting data regarding candidate Aaron Rouse in 2018—Spencer's Data Set was not included in his Rebuttal Report and was produced later, upon request from Defendants' counsel.

As devastating as the Table 1 data is to Plaintiffs' case, Spencer was not deterred in his attempt to establish the cohesion that Plaintiffs must prove in this case.  To do so, Spencer "adopt[ed] the logic of equivalence testing" to his estimates of Asian and Hispanic voter support, describing his methodology on pages 8 and 9 of his Rebuttal Report.  Spencer states that his equivalence testing methodology "compares the distributions of black, Hispanic, and Asian vote shares . . . against the threshold needed" for victory in a given councilmanic race. (Ex. 5 at 9.)

To further explain his "equivalence testing" approach, Spencer uses data regarding minority voter support levels for African American candidate Aaron Rouse.  He states that Rouse garnered an estimated 70% ($\pm$ 6%) of the black vote; 53% ($\pm$ 15.24%) of the Asian vote; and 34% ($\pm$ 20.9%) of the Hispanic vote.  (Ex. 5 at 7-8).  The "threshold" for victory, a standard for cohesion apparently of Spencer's own invention, is 45.2%.  (Ex. 5 at 7).  Spencer's premise—one without apparent support in case law—is that if each minority group's level of support exceeds the victory threshold, cohesion exists.  One might assume that, as Spencer's point estimate for Hispanic support (33.3%) falls well below his self-identified threshold (45.2%), Spencer would conclude that Hispanics <u>did not</u> share blacks' and Asians' apparent preference for candidate Rouse.  (Ex. 7).  Not so.  As the table on Page 8 of the Rebuttal Report indicates, Spencer found a way—against all

odds and common sense—to determine that Rouse was the preferred candidate of Hispanic voters. (Ex. 5 at 8, Table 1).

In his search for cohesion, applying more than a little creativity to data he himself characterizes as not reliable takes Spencer a long way. (Ex. 5 at 6). As Spencer explains, he does not require his point estimate itself to exceed his identified "threshold" in order to conclude that a given candidate is preferred by the minority group in question. Rather, he requires only that there is "at least 10% overlap [of the voter support distribution range] with the threshold." (Ex. 5 at 9). A 10% overlap of a distribution range[9] with the threshold indicates, however, only a small possibility that the group in question preferred a given candidate. As Spencer admits, where there is 10% overlap above the threshold, "90 percent in that case would be [be]low."[10] (Ex. 6 at 141).

As "admittedly permissive" as this 10% overlap standard is according to Spencer, he is given an additional assist by the unreliability of his data (data which he, ironically, relies upon for his equivalence testing approach). (Ex. 5 at 9). In fact, in Spencer's quest for 10% overlap, the more unreliable a point estimate is, the better. Rouse's support among Hispanic voters is a perfect example. Spencer states in his deposition testimony that there is a corresponding "confidence interval" of approximately plus or minus 42%, meaning that Hispanic voter support for Rouse ranged from approximately (– 6%) to 75%. (Ex. 6 at 133-37). Spencer's hand-drawn modifications to Spencer's Deposition Exhibit #7 provide a rough approximation of the confidence interval under

---

[9] The distribution range is produced by extending a confidence interval, which is given alongside a " $\pm$ ", in both directions from a point estimate. (E.g. A point estimate of 20% with a $\pm$ 5 confidence interval will result in a distribution range from 15% to 25%). (Ex. 6 at 131-133).

[10] As Dr. Spencer indicated in his deposition testimony, a "bell curve" applies to the distribution range, meaning that a 10% overlap with the threshold does not indicate a 10% probability that the actual support level is above the threshold. In fact, in such an instance, there is a far smaller probability that the support level is above the threshold. (Ex. 6 at 136 (Deposition Exhibit #6) and 140 (Deposition Exhibit #7).

discussion.  Spencer checks the box for Hispanic support of Rouse in Table 1 because a tiny portion of the huge distribution range exceeds the threshold.

Notably, Spencer's data indicates that a much larger part of the distribution range for Hispanic voter support for Mr. Rouse is below the 45.2 threshold than above it.  It is hard to conceive how, in light of this fact, anyone could conclude that Hispanics preferred Rouse.  The absurdity of such a conclusion becomes even more apparent when one considers the results that would follow had Spencer's point estimate of Hispanic voter support been more reliable.  For example, if the standard error had been 4.3 (the median standard error for the more reliable black voter support estimates on Spencer's Data Set), the resultant confidence interval would be $\pm$ 8.43%,[11] yielding a distribution range of 24.87% to 41.73%.  This smaller range does not overlap with the 45.2% threshold at all.  Stated differently, a more reliable estimate for Hispanic voter support would require the conclusion that Rouse was not the preferred candidate of Hispanic voters.  Fortunately for Spencer, he was not hamstrung with the inconvenience of such reliable numbers.  To his credit, when Spencer was asked, "So the less reliable the number, the better chance it has of going across the threshold?" he answered with candor, "Totally."  (Ex. 6 at 138).

Moreover, Spencer himself ultimately admitted that using his equivalence testing approach in the present context was deeply problematic.  Not only was Spencer unaware of equivalence testing ever having been used in any Voting Rights Act case, he stated that he "frankly would not use equivalence testing in a voting rights case but for responding to a criticism about regular null hypotheses."  (Ex. 6 at 145).  Spencer goes on to explain that this is because, "[t]he equivalence test is even more permissive.  As you pointed out, you're rejecting [the null hypothesis of difference between two groups] with only 10 percent overlap."  (Ex. 6 at 145).  Spencer provided

---

[11] Spencer testified that the confidence interval is arrived at by multiplying the standard error by 1.96. (Ex. 6 at 44)

another rationale for why equivalence testing cannot be relied upon, stating, "if my baseline assumption is an equivalence test, I'm going to have <u>everything</u> across the threshold, because the threshold is smaller and the estimates we get here are so ridiculous, ridiculously big."  (Ex. 6 at 146) (emphasis added).  Defendants could not agree more with this assessment.

It makes little sense for Spencer to respond to a general critique that he merely had assumed cohesion among black, Asian, and Hispanic voters using deceptive operation of averages by employing a methodology that produced conclusions about Black, Hispanic, and Asian cohesion regarding which he stated, "I am not confident in their findings at all"—further explaining that the size of the confidence intervals are "ridiculous to begin with, which is why I wouldn't have done this originally."  (Ex. 6 at 125-127).[12]

The answer for this flailing second attempt at proving cohesion may lie in Plaintiffs' recognition that the data in Spencer's Initial Report was not sufficient to prove cohesion.  As Dr. Allan Lichtman, another of Plaintiffs' experts, testified repeatedly, any point estimates for Asian and Hispanic voting in Virginia Beach "[w]on't be reliable" because of "the error margins are going to be large."  (Ex. 8 at 58-60).  According to Lichtman, one cannot "isolate Hispanic and Asian voting" reliably, "which is why you've got to use the equivalence testing analysis."  (Ex. 8 at 58).  Lichtman, however, who has been retained on an expert regarding voting rights in upwards

---

[12] In his deposition testimony, Dr. Spencer claimed that he "generated [a table based on his equivalence testing method] in response to some comments made by Dr. Kidd to try to – to try to point out exactly why I didn't do this in my original report." (Ex. 6 at 125-126.) This rationale is a marked departure from the way he presented his equivalence testing-based findings in his Rebuttal Report, wherein he introduced his equivalence testing as a way to "make sense of this uncertainty" regarding unreliable estimates for Hispanic and Asian vote shares. (Ex. 5 at 8). He follows this by stating, "To draw <u>my conclusions</u>, I adopt the logic of equivalence testing." (Ex. 5 at 8). Nowhere in his Rebuttal Report does Dr. Spencer mention that these conclusions were based on 'ridiculous' or unreliable data or that he was only performing equivalence testing to show why he had not isolated the three minority groups in the first place. If that was Dr. Spencer's intention from the outset, the language of his Rebuttal Report is deeply misleading.

of 90 cases, (Ex. 8 at 30), is "only casually aware of" equivalence testing—predominantly from literature in "psychology and biology," (Ex. 8 at 225). Lichtman, like Spencer, could not cite a single case where equivalence testing had been used in a Voting Rights Act case. (Ex. 8 at 223). Lichtman explained that equivalence testing is "just a comparison" of different groups, (Ex. 8 at 222), and does not itself allow for a reliable isolation of Hispanic and Asian voters, (Ex. 8 at 226).[13]

In sum, Lichtman's testimony is that, because it is not possible to produce reliable estimates of Hispanic and Asian voter support, "you've got to" use a methodology he knows little about, has never seen in a Voting Rights Act case, and which does nothing to make those unreliable point estimates reliable. Lichtman also appears unaware that Spencer was "not confident" in the findings of equivalence testing "at all" despite Lichtman's own suggestion that "you've got to use the equivalence testing analysis" in this case.

It is undisputed that, given the huge confidence intervals that correspond to Spencer's data, precise conclusions about Asian and Hispanic voting patterns alone cannot be reached with any level of reliability or certainty for Virginia Beach. It is further undisputed that Spencer's Initial Report makes no effort to isolate Hispanic and Asian voting estimates. That Spencer later produced a Data Set that point strongly towards a lack of cohesion among blacks, Asians, and Hispanics is a bell that cannot be un-rung. Spencer's gambit to save this case by using a misapplied methodology is to no avail. The reverberations of Spencer's Data Set and Table 1 (which was based upon that data set) are deafening, drowning out any chance Plaintiffs can meet their burden to prove cohesion among these three groups.

---

[13] Lichtman was asked, "Would you say that equivalency testing is a method to reliably isolate Hispanics and Asians?" He answered, "Not to estimate their particular percentage of voting for any individual candidate. No, that's not what it does." (Ex. 8 at 226.)

Simply put, without isolated, reliable estimates of Hispanic and Asian voting preferences, Plaintiffs cannot carry their burden of establishing the political cohesiveness of their concocted tri-partite minority group of Blacks, Hispanics, and Asians under Prong 2.  To the extent Spencer chooses to rely upon his admittedly unreliable method of equivalence testing to cure this defect, Spencer's Rebuttal Report only serves the purpose of further proving there is no triable issue of fact that in this matter where it appears from Plaintiffs' expert's own data that Asian voters are clearly not politically cohesive with Black voters in Virginia Beach. For these reasons, summary judgment should be granted in favor of the Defendants.

**II.     Gingles Prong 3: The analysis is mooted by a lack of cohesion among Black, Asian and Hispanic voters; however, Spencer's own data indicates his identified minority-preferred candidates usually win elections.**

As demonstrated in the prior section, Spencer's own data, reports, and deposition testimony proves that Plaintiffs cannot meet their burden to demonstrate that Black, Asian, and Hispanic voters are cohesive.  Because of this lack of cohesion, Plaintiffs' vote dilution claim must fail. Inquiries regarding the two other Gingles prongs and the totality of the circumstances are entirely moot.  Even assuming, *arguendo*, that cohesion does exist, however, Spencer's conclusion that his identified minority preferred candidates usually win election presents yet another fact that definitively precludes Plaintiffs from prevailing on Prong 3 and thus defeats their claim.

    a.   The Impossible Inquiry: Whether the White Majority Votes Sufficiently as a Block Usually to Defeat the Minority Preferred Candidates of a Coalition that Does Not Exist

*Gingles* Prong 3 requires Plaintiffs to "demonstrate that the white majority votes sufficiently as a bloc to enable it . . . usually to defeat the minority's preferred candidate." 478 U.S. at 51 (emphasis added). The Fourth Circuit and other circuits have consistently held "usually" to mean more than half the time.  *See Lewis v. Alamance County*, 99 F.3d 600, 606 (4th Cir. 1996) ("Suffice it to say that ['usually,' 'normally,' and 'generally'] mean something more than just 51%.").

In *Levy v. Lexington County*, the Fourth Circuit explained that a court must "first identify those individuals who constitute minority-preferred candidates of choice, and then analyze whether those candidates are usually defeated by majority White bloc voting." 589 F.3d 708, 716 (2009).

In the instant case, *Gingles* Prong 3 poses a conundrum: how does one determine the preferred candidate of a cohesive minority bloc that does not actually exist?  Here, because there is no cohesive block of Black, Asian, and Hispanic voters, the Prong 3 inquiry cannot be conducted in a meaningful manner.

Nevertheless, even granting the Plaintiffs a host of favorable assumptions required even to attempt a Prong 3 analysis, they cannot meet their burden in this regard on the evidence Plaintiffs plan to offer this Court.

> b.  Even by the tally of Plaintiffs' own expert, minority-preferred candidates usually win election, definitively defeating their Prong 3 claim.

In Spencer's Rebuttal Report, he produced "Table 1," which he admits in deposition testimony ultimately indicates that a majority of the candidates he identifies as minority-preferred have won election—a remarkable contention given that Plaintiffs need to prove the exact opposite. It is a rare occasion that a party's own expert creates a graphic that so clearly deals a fatal blow to their own case, and the context of Table 1 bears further examination.

In Table 1, Spencer claims to "present a summary of minority support for the thirteen candidates (ten black, three white) that I identified as minority candidates of choice in my [original] report."  (Ex. 5 at 7).  Table 1 is compiled based upon Spencer's equivalence testing approach. (Ex. 5 at 7, Ex. 6 at 124).  The virtue of Table 1 is that it at least feints towards consideration of the actual preferences of Asians and Hispanics by relying upon Spencer's point estimates for these individual groups.  The problem for Plaintiffs is that Spencer's Data Set, which informs his Table 1, demonstrates clearly that these three groups did not in fact generally share candidate preferences,

as discussed *supra*.  Spencer's adoption of the logic of equivalence testing—which he thoroughly discredited in his deposition testimony—was an attempt to 'cure' data in his Initial Report that missed the mark.

Even the magic of equivalence testing, however, cannot support Spencer's original conclusions—according to Spencer himself.  In compiling Table 1, Spencer changes his testimony regarding how many candidates of choice there actually were for the elections he considered probative.  Spencer marks only eight (8) of those thirteen (13) candidates with a "Y" in Table 1's "Minority preferred?" column.  (Ex. 5 at 8 (Table 1)).  Spencer uses the term "minority preferred" interchangeably with "minority candidates of choice."  (Ex. 6 at 77).  Moreover, Spencer admitted that—applying the numbers reported on Spencer's Data Set—his identification of candidate Flores as the minority-preferred candidate could no longer be supported.  (Ex. 6 at 148-52).  Therefore, Spencer could only identify seven (7) minority candidates of choice going all the way back to 2008.  (Ex. 6 at 152).  Of those seven (7), four (4) won election: Rouse (2018), Wooten (2018), Henley (2014), and Ross-Hammond (2012). (Ex. 6 at 152; Ex. 7 at 8 (Table 1)). Stated as a percentage, 57% of Plaintiffs' identified minority-preferred candidates have won election. Plaintiffs' own expert's data thus forecloses any chance that they could prove that a white majority votes sufficiently as a block to usually defeat minority-preferred candidates.

As staggering as the four-of-seven data point is, it must be remembered that Table 1 reflects Spencer's own framing of which elections are probative—a framing that could not be any more favorable to Plaintiffs.  Spencer conveniently omits, for example, all three elections wherein George Furman, an African American, ran for office.  Despite defining probative elections as "previous city council races that featured a minority candidate," Spencer claims that the races involving Furman are not probative because Furman was not a viable candidate—this despite the fact that in the 2010 Bayside race, Furman garnered more All Minority support than Pieri Burton,

another African-America candidate, in the Princess Anne race.  (Ex. 4 at 19, 27).  Inexplicably, Spencer does consider the Burton race probative.  (Ex. 6 at 97).  Were all three Furman races included, Spencer's Table 1 would, inconveniently for Plaintiffs, include three more races where the candidates he initially defined as minority candidates of choice – Sessoms (2016), Davenport (2014), and Jones (2010) – all won election.

Defendants contend that the races involving George Furman are probative.  Defendants also contend that Spencer's proposed universe of elections spans too far back in time.  Courts have consistently made clear that more recent elections are more probative than older ones.  *See*, *e.g.*, *United States v. Charleston County*, 365 F.3d 341, 350 (4th Cir. 2004) (citing cases from the 2nd, 3rd and 9th Circuits). This is particularly true in a case like the one at bar, wherein Plaintiffs have alleged—correctly—that the minority population of Virginia Beach has grown dramatically in recent years.  (Am. Compl. ¶¶ 31, 32).  As that minority population grows, minority voters rightly should have an ever-increasing voice in determining who is elected to City Council.  As Spencer's Table 1 demonstrates in stark terms, the voice of minority voters has been heard loud and clear in recent elections.  It makes little sense to go back to elections more than a decade in the past—and to a time before the last decennial census and the last redistricting—since the Court can obtain an accurate current picture of minority voters' ability to elect candidates of their choosing by examining the five elections that have occurred since the 2010 decennial census took place: 2011 (a special election), 2012, 2014, 2016, and 2018.  Ultimately, any shortening of the timespan in question and/or inclusion of all elections that featured a minority candidate will only strengthen the conclusion: Plaintiffs cannot carry their burden as to Prong 3.

Fortunately, the Court has a sound basis for granting summary judgment on Prong 3 without having to resolve any underlying disputes as to the most appropriate election cycles to consider: the legal validity of Spencer's standard for identifying minority-preferred candidates; the

propriety of Spencer's use of a methodology (equivalence testing) that produces findings he has no confidence in; or the determination of which elections are probative in resolving *Gingles* Prong 3 against Plaintiffs.  Table 1 represents the most favorable possible framing to Plaintiffs regarding which races are probative and which candidates are minority-preferred.  And yet, even granting to Plaintiffs the multiple layers of assumptions required to consider Table 1 at face value, <u>Plaintiffs' own data shows they cannot meet their burden</u> to prove that the white majority in Virginia Beach votes sufficiently as a block to usually defeat minority candidates of choice.

## **CONCLUSION**

WHEREFORE, for all the reasons set forth herein, the Defendants hereby respectfully request that this Court grant the Defendants' Motion for Summary Judgment, dismiss the Amended Complaint with prejudice and for such other relief as the Court deems appropriate.

Respectfully submitted,

CITY OF VIRGINIA BEACH, et al.

By:  _____/s/_____
                        Of Counsel

**Mark D. Stiles** (VSB No. 30683)
City Attorney
**Christopher S. Boynton** (VSB No. 38501)
Deputy City Attorney
**Gerald L. Harris** (VSB No. 80446)
Associate City Attorney
**Joseph M. Kurt** (VSB No. 90854)
Assistant City Attorney
*Attorneys for the City of Virginia Beach*
Office of the City Attorney
Municipal Center, Building One
2401 Courthouse Drive
Virginia Beach, Virginia 23456
(757) 385-4531 (Office)
(757) 385-5687 (Facsimile)
mstiles@vbgov.com
cboynton@vbgov.com
glharris@vbgov.com
jkurt@vbgov.com

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 22nd day of October 2019, I will electronically file the foregoing with the Clerk of the Court using the CM/ECF system, which will then send a notification of such filing (NEF) to the following:

**Joseph Gerald Hebert**
**Danielle Marie Lang**
**Paul March Smith**
**Annabelle Harless**
**Ruth Merewyn Greenwood**
Campaign Legal Center
1411 K Street, NW
Suite 1400
Washington, DC 20005
(202) 736-2200 (telephone)
(202) 736-2222 (facsimile)
ghebert@campaignlegal.org
dlang@campaignlegal.org
psmith@campaignlegal.org
aharless@campaignlegal.org
rgreenwood@campainlegal.org


                              /s/
                        Gerald L. Harris

**Mark D. Stiles** (VSB No. 30683)
City Attorney
**Christopher S. Boynton** (VSB No. 38501)
Deputy City Attorney
**Gerald L. Harris** (VSB No. 80446)
Associate City Attorney
**Joseph M. Kurt**
Assistant City Attorney (VSB No. 90854)
*Attorneys for the City of Virginia Beach*
Office of the City Attorney
Municipal Center, Building One, Room 260
2401 Courthouse Drive
Virginia Beach, Virginia 23456
(757) 385-8803 (Office)
(757) 385-5687 (Facsimile)
mstiles@vbgov.com
cboynton@vbgov.com
glharris@vbgov.com
jkurt@vbgov.com

31