IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
NORFOLK DIVISION

| | |
|---|---|
| Latasha Holloway, et al., | |
| Plaintiffs, | |
| v. | Civil Action No. 2:18-cv-0069 |
| City of Virginia Beach, et al., | |
| Defendants. | |

**Defendants' Memorandum of Law in Support of Motion for Summary Judgment**

# EXHIBIT THREE

Deposition Transcript of Anthony E. Fairfax

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
NORFOLK DIVISION


------------------------------------
LATASHA HOLLOWAY and GEORGIA ALLEN,

     Plaintiffs,              CIVIL ACTION NO.
                            2:18-cv-00069

v.

CITY OF VIRGINIA BEACH, et al.,

     Defendants.
------------------------------------



DEPOSITION UPON ORAL EXAMINATION
OF ANTHONY E. FAIRFAX,
TAKEN ON BEHALF OF THE DEFENDANTS


Virginia Beach, Virginia

September 24, 2019




Appearances:

    CAMPAIGN LEGAL CENTER
    By:  ANNABELLE HARLESS, ESQUIRE
        J. GERALD HEBERT, ESQUIRE
        Counsel for the Plaintiffs

    OFFICE OF THE VIRGINIA BEACH CITY ATTORNEY
    By:  CHRISTOPHER S. BOYNTON, ESQUIRE
        JOSEPH M. KURT, ESQUIRE
        Counsel for the Defendants

Also Present:  Tim Koehl, Videographer

1                        I N D E X

2

3       DEPONENT                EXAMINATION BY          PAGE

        Anthony E. Fairfax    Mr. Boynton                3

4

5

6                         EXHIBITS

7

8       NO.    DESCRIPTION                              PAGE

9       1     Amended Complaint                          5

10      2     Expert Report of Anthony E. Fairfax       3
              July 15, 2019

11
        3     Report of Peter A. Morrison, Ph.D.        3

12
        4     Expert Report of Anthony E. Fairfax,      3

13            Response to Peter Morrison's Report,
              8/26/19

14
        5     Curriculum Vitae of Anthony E. Fairfax 11

15

16

17

18

19

20

21

22

23

24

25

1            Deposition upon oral examination of

2    ANTHONY E. FAIRFAX, taken on behalf of the

3    Defendants before Kathleen Beard Adams, CCR, RPR,

4    CRR, a Notary Public for the Commonwealth of

5    Virginia at large, commencing at 2:07 p.m. on

6    September 24, 2019, at the Office of the Virginia

7    Beach City Attorney, Building 1, 2401 Courthouse

8    Drive, Virginia Beach, Virginia; and this in

9    accordance with the Federal Rules of Civil

10   Procedure.

11                    - - - - -

12            (Fairfax Exhibits 1 through 4 were

13            marked for identification.)

14            THE VIDEOGRAPHER:  We are now on record.

15   The time is 2:07 p.m.  To -- today's date is

16   September 24th, 2019.  This is the videotaped

17   deposition of Anthony Fairfax being held at 2401

18   Courthouse Drive, Virginia Beach, Virginia, in the

19   matter of Latasha Holloway, et al. versus the City

20   of Virginia Beach, et al., Civil Action No.

21   2:18-cv-0069, pending in the United States District

22   Court for the Eastern District of Virginia, Norfolk

23   Division.  This deposition is being taken on behalf

24   of the defendant.

25            My name is Tim Koehl.  I'm with Legal

 1   Video Solutions.  I'm the video specialist for the

 2   deposition.

 3             The court reporter is Kathy Adams of

 4   Adams Harris Reporting.

 5             Will counsel please I -- introduce

 6   yourselves for the record and state whom you

 7   represent.

 8             MR. BOYNTON:  Mr. Fairfax, my name is

 9   Chris Boynton and together with my colleague, Joe

10   Kurt to my right, we represent the City of Virginia

11   Beach and all the other defendants in this matter.

12             THE DEPONENT:  Okay.

13             MS. HARLESS:  Annabelle Harless,

14   representing the plaintiffs and the witness Mr.

15   Fairfax today from the Campaign Legal Center in

16   Chicago.

17             MR. HEBERT:  And I'm Gerald Hebert, also

18   counsel for the plaintiffs.

19             MR. KURT:  And I'm Joe Kurt and, as

20   Chris mentioned, I represent the defendants.

21             THE VIDEOGRAPHER:  Will you please swear

22   in the witness.

23             (The deponent was sworn.)

24

25

ANTHONY E. FAIRFAX was sworn and deposed
on behalf of the Defendants as follows:

EXAMINATION

BY MR. BOYNTON:

14:10:08  Q.    Mr. Fairfax, good afternoon.

A.    Good afternoon.

Q.    My name is Chris Boynton, as we've just
established, and I -- I am representing the
defendants in this matter.  And I'm -- I'm sure

14:10:17  you've been deposed before, but if we could go
through a couple of ground rules --

A.    Sure.

Q.    -- that hopefully will simplify things.

A.    Sure.

14:10:25  Q.    First of all, I am sure at some point I
will ask a question that is unclear in some way, and
if you'll speak up I'll be happy to clarify.

Secondly, if you will allow me to
complete my questions, and then I'll allow you to

14:10:35  complete your answers, so that the court reporter
does not have to jump back and forth any more than
necessary as to our relative voices.

Third, court reporters cannot take down
gestures and nods, and the infamous uh-huh versus

14:10:52  uh-uh does not translate very well in a transcript.

1    So I'd ask you to respond verbally and with yeses

2    and nos when the an -- when the questions calls for

3    it.

4              And, finally, if you have given

14:11:01  5    testimony and then at some point later in the

6    deposition it becomes clear to you that you've given

7    incomplete or inaccurate testimony, just speak up.

8    We'll clarify the record.  We'll go from there.

9              Does that all sound good to you, sir?

14:11:10 10         A.    It sounds excellent.

11         Q.    Out -- outstanding.  Thank you.

12              Please tell us your -- your full name.

13         A.    Anthony Edward Fairfax.

14         Q.    And, sir, where is your residence?

14:11:18 15         A.    Hampton, Virginia.

16         Q.    Okay.  And what -- where are you

17    presently employed?

18         A.    I am a demographic and mapping

19    consultant.  I'm the principal consultant and CEO of

14:11:31 20    CensusChannel, LLC.  It's my own company.

21         Q.    And what is the loc -- the business

22    address of that?

23         A.    The mailing address is 16 Castle Haven

24    Road, Hampton, Virginia, 23666.  I have a co-op

14:11:45 25    office space at a different location where I can

1    share offices.

2              Q.    But also within Hampton?

3              A.    Yes.

4              Q.    And what is your residence address?

14:11:53  5    A.    Sorry.  16 Castle Haven Road, Hampton,

6    Virginia, 23666.

7              Q.    Fair enough.  Thank you, sir.

8                    I'm going to show you a document that's

9    not been marked and hopefully we won't need to.

14:12:06 10    I'll represent to you that it is the initial

11    plaintiffs' expert witness disclosures that were

12    transmitted to us in this case.  I have highlighted

13    the piece of it that references you.  I'd just ask

14    you to review that for a moment.

14:12:23 15    A.    (Moved head up and down.)

16              Q.    It provides only cursory --

17              A.    Uh-huh.

18              Q.    -- identifying information.

19              A.    Looks correct.

14:12:28 20    Q.    Okay.  And you don't see anything

21    inaccurate --

22              A.    No.

23              Q.    -- in that document?

24              A.    No.  No.

14:12:33 25    Q.    Okay.  Fair enough.

```
 1              Now, from that document there is a -- a
 2   -- a -- a web link to censuschannel.net that
 3   identifies some further particulars about you
 4   personally.
 5        A.    Yeah.
 6        Q.    I --
 7        A.    It should be Censuschannel --
 8        Q.    Yeah.
 9        A.    -- com, but --
10        Q.    I'm sorry.
11        A.    Is it -- it -- is it dot net --
12        Q.    I --
13        A.    -- that's included?
14        Q.    It -- it says dot net.
15        A.    That's -- that's --
16        Q.    And I clicked through dot -- I actually
17   typed in this morning dot net, that exact address,
18   and I will represent to you that this document came
19   up.
20        A.    Yeah.  I --
21        Q.    So again I'll ask you to take a look at
22   it.  And, again, it's very basic background
23   information, but I just want to make sure that it's
24   accurate.
25        A.    Sure.  That's -- that's an old website
```

14:12:44
14:12:47
14:12:51
14:13:00
14:13:08

9

```
        1    that I used probably about seven or eight years ago.
        2    The dot com is the one that -- that I currently use
        3    for business.
        4         Q.    So you believe there's a more recent --
14:13:22 5         A.    Yes.  Yes.
        6         Q.    And what is the web address for that?
        7         A.    Censuschannel.com.
        8         Q.    But they're otherwise the same?
        9         A.    Censuschannel -- yes.
14:13:30 10   Censuschannel.com.  Yes.
       11         Q.    And I'll -- I'm -- I guess it would help
       12    if I actually put the web address that we were
       13    provided in front of you.  And I'm referring back
       14    then to the initial disclosure document that you
14:13:40 15   looked at and confirmed was accurate a moment ago.
       16         A.    I missed the -- I missed the web
       17    address.  Yeah, it -- it's the dot com.
       18         Q.    Okay.  Is --
       19         A.    My apologies.
14:13:51 20        Q.    Is it otherwise that exact link?
       21         A.    Censuschannel.com is the main website.
       22    I can't give you where it specifically goes to my
       23    bio --
       24         Q.    Okay.
14:14:01 25        A.    -- but censuschannel.com.  And you can
```

10

```
        1    actually find the bio.  Once you click on About my
        2    name will show up.
        3         Q.    What -- what I will do so as to not
        4    delay the deposition is -- let's go ahead and mark
        5    this exhibit as Exhibit 5 because we premarked four
        6    others.  And I say this exhibit.  It's the -- the
        7    printout that I pro -- provided you with that you're
        8    saying is outdated.  We'll mark that as Exhibit 5.
        9         A.    Okay.
14:14:25 10         Q.    And then I will send my colleague Joe
       11    Kurt here briefly to step out and -- and to go find
       12    a more recent one and print out four copies and not
       13    delay our proceedings?
       14         A.    Okay.  That -- that sounds good.
14:14:36 15              MR. BOYNTON:  So would you like to mark
       16    one --
       17         A.    And so all of this information has, you
       18    know, been clearly updated.
       19    BY MR. BOYNTON:
14:14:41 20         Q.    So it's not inaccurate, but it might be
       21    incomplete?
       22         A.    Exactly.  That's right.  And it -- it
       23    may be now that I'm -- I apologize.  It may be more
       24    states than 22 different states.
14:14:51 25         Q.    But you -- that was accurate at a point
```

11

```
 1    in time previously?
 2            A.     At a point in time --
 3                   MS. HARLESS:  Hold on.
 4            A.     -- it was accurate.
 5                   MS. HARLESS:  Is this getting marked
 6    or --
 7                   MR. BOYNTON:  She's got it right here
 8    for that purpose.  It's 5?
 9                   THE REPORTER:  Yes.  I'm just waiting to
10    get my hands off the keys.
11                   MR. BOYNTON:  I'm sorry.  We can stop
12    for a second.
13                   (Off-the-record discussion)
14                   (Fairfax Exhibit 5 was marked for
15                   identification.)
16                   MR. BOYNTON:  Back on the record.
17                   We have marked the printout of
18    Mr. Fairfax's bio that he has identified as from an
19    earlier point in time in his career as Fairfax 5.
20    My colleague, Mr. Kurt, has left the room briefly --
21                   MS. HARLESS:  Do you want me to hand him
22    that one?
23                   MR. BOYNTON:  I wasn't even going to ask
24    him any more questions on it, but he's welcome to --
25                   MS. HARLESS:  Oh.
```

14: 14: 55 (line 5)
14: 15: 42 (line 15)
14: 16: 09 (line 20)

12

```
            1    BY MR. BOYNTON:

            2         Q.    You're welcome to have it in front of

            3    you, sir.  I'm not --

            4         A.    Got you.

14:16:22    5         Q.    -- trying to hide anything from you.

            6         A.    No.  No.  No.  No.  I think you showed

            7    it to me.  It's exactly as you said.  It's another

            8    point in time, but it's correct.

            9         Q.    Thank you.

14:16:31   10               And we will step away from that document

           11    for a moment until we can revisit the more updated

           12    version of it.

           13               I -- I think maybe the most or at least

           14    cumbersome from your perspective way to address your

14:16:49   15    -- your background is to work through your biography

           16    which -- or at least the portion of it that was

           17    provided to us in the original expert report, the

           18    initial expert report --

           19         A.    Uh-huh.

14:17:00   20         Q.    -- in Appendix A.

           21         A.    Okay.

           22         Q.    So we've premarked as Fairfax Exhibit 2

           23    the entire expert report, which includes all of the

           24    appendices --

14:17:10   25         A.    Okay.
```

```
              1          Q.     -- and at this point anyway I'm drawing

              2    your attention only to Appendix A.  Does that sound

              3    good to you, sir?

              4          A.     That sounds perfect.

14:17:17      5          Q.     Okay.  I will flip it open to you.

              6          A.     All right.  I appreciate it.

              7          Q.     And please take whatever time you'd like

              8    with the document.

              9          A.     Uh-huh.

14:17:26     10          Q.     Do you recognize -- and -- and go ahead

             11    and flip through at least Appendix A, if you would.

             12          A.     Oh, just to make sure that it's

             13    complete?

             14          Q.     Exactly.

14:18:16     15          A.     Let's see.  We are going focus on the

             16    résumé portion or --

             17          Q.     At -- at -- yes.

             18          A.     At this point --

             19          Q.     At this point --

             20          A.     Okay.

             21          Q.     -- in time we're going to focus on the

             22    résumé por -- portion, then circle back to the rest

             23    of the report, but --

             24          A.     Okay.

14:18:28     25          Q.     -- for -- for the pages you've reviewed
```

```
 1    does that appear to be Appendix A --
 2         A.    Yes.
 3         Q.    -- of your initial report?
 4         A.    Yes.
14:18:32  5         Q.    And your initial report, as I understand
 6    it, was given -- or were finalized -- two more
 7    pieces of paper in front of you -- on July 15th,
 8    2019?
 9         A.    Yes.
14:18:46 10         Q.    So the information provided in Appendix
11    A would have been accurate and complete, to your
12    knowledge, as of that date?
13         A.    Yes.  I would imagine so.
14         Q.    And do you have any reason, sitting here
14:18:59 15    today, to believe it's inaccurate or incomplete?
16         A.    No, not at this moment.
17         Q.    Fair enough.  It's always a challenge to
18    either go forward or backward in time.
19         A.    That's right.
14:19:11 20         Q.    But let's do this.  Let's do current and
21    then we'll trace it from -- in -- in chronological
22    order.
23         A.    Okay.
24         Q.    Does that work for you, sir?
14:19:19 25         A.    Sounds good.
```

```
 1              Q.    So currently, sir --
 2                    (Off-the-record discussion between
 3                     defense counsel)
 4                    MR. BOYNTON:  Okay.  Another level of --
14:19:29  5    another degree of difficulty.  All right.
 6                    What I will do at this moment is just
 7    give this to your counsel to look at.  And this is
 8    the -- the information that has been printed off the
 9    censuschannel.com page, but the formatting of it is
14:19:47 10    a bit challenging to read.  So my colleague has
11    endeavored to do a cut and paste, I believe, of the
12    relevant portions as to Mr. Fairfax's background.
13    I'm not going to put you on the spot right now, but
14    if you'd review it at a break or -- or whenever, and
14:20:03 15    if you -- we can agree that the -- the second doc --
16    document is -- is consistent with the first, maybe
17    we can mark them as a number A and B and go from
18    there.
19                    MS. HARLESS:  Yeah.
14:20:12 20                    MR. BOYNTON:  But I'm not --
21                    MS. HARLESS:  Fine.
22                    MR. BOYNTON:  -- asking you to do that
23    right this second.
24                    MS. HARLESS:  Thank you.
14:20:16 25
```

BY MR. BOYNTON:

    Q.   So, Mr. Fairfax, I'm going to ask you a series of questions about your background and your ex -- experience and expertise.  I'm going to start

14:20:30  with what you do presently and then we can trace it forward in time --

    A.   Sure.

    Q.   -- if that works for you?

    A.   Uh-huh.  Very good.

14:20:35    Q.   What do you do presently?

    A.   I -- I focus on exactly what I call myself, a demographic and mapping consultant, which encovers -- encompasses a variety of demographic and mapping analysis and processes.

14:20:48         So my specialty is redistricting; however, once I got my master's I began expanding on that.  And so now I do more geospatial analysis and some database analysis pertaining to mapping let's say.

14:21:11    Q.   So how long would you say you've been a demographic and mapping consultant?

    A.   I first began my involvement with GIS in 1991 working on a project at Norfolk State University.  That was The Redistricting Research

14:21:36  Project.

```
              1        Q.    I --

              2        A.    I -- go ahead.

              3        Q.    I'm -- I'm sorry.  I --

              4        A.    Uh-huh.

14:21:39      5        Q.    I didn't mean to cut you off at all.

              6        A.    Uh-huh.  Sure.

              7        Q.    I'm looking at page 31 of the overall

              8    Exhibit 2.  And it identifies a period of time

              9    Norfolk State University, Political Science

14:21:49     10    Department, Norfolk, Virginia --

             11        A.    Yes.

             12        Q.    -- 1991 to 1999.  Was that the period of

             13    time you're referring to?

             14        A.    That's correct.

14:21:55     15        Q.    So how did you come to start in that

             16    position?

             17        A.    It -- I got there a long way, let's say,

             18    not a straight -- straight way.  I had worked for a

             19    couple of companies, Teledyne, which was a Fortune

14:22:13     20    500, manufacturing division, and then EER Systems, a

             21    government consulting firm, and then decided to go

             22    out on my own with a couple individuals and create a

             23    computer training center, the first one on -- in our

             24    area on the peninsula.

14:22:31     25              Did that.  Timing was bad because it was
```

18

```
 1   right before the recession, so we closed the -- the
 2   company.  And I wanted to consult and landed a
 3   consulting position at Norfolk State University
 4   working in their computer lab as the lab manager and
 5   network person.  And then they -- someone introduced
 6   me to another project called The Redistricting
 7   Research Project and I went over there and got hired
 8   for that.
 9          Q.    And I appreciate you being expansive on
10   that.
11                Starting with 1991, were you hired as an
12   employee or a independent contractor with Norfolk
13   State?
14          A.    Independent contractor.
15          Q.    Okay.  And -- and what was your title at
16   that point in time as an independent contractor?
17          A.    GIS consultant.
18          Q.    And what was the scope of the work you
19   were providing for Norfolk State at that point in
20   time in 1991?
21          A.    The project -- one of the objectives was
22   to provide technical support in the form of
23   technical resources to organizations that did not
24   have the technical know-how or wherewithal to create
25   redistricting plans.  And so I was the plan
```

14:22:54  (line 5)
14:23:10  (line 10)
14:23:18  (line 15)
14:23:29  (line 20)
14:23:46  (line 25)

19

```
 1    developer.  I was a map drawer, if you will.

 2              And the second aspect was to go out and

 3    train other universities on how to duplicate what we

 4    were doing at Norfolk State.  And so I went to three

 5    or four different universities and trained them

 6    actually to do what we were doing.

 7         Q.   Was Norfolk State developing its own

 8    maps or demographic information at that time?

 9         A.   They would develop their own plans, yes.

10         Q.   Okay.  And for what purposes were they

11    developing their plans?

12         A.   Oh, you meant --

13         Q.   Norfolk State University.

14         A.   Oh, no.  No.  Norfolk State did not

15    develop its own plans.  I thought you meant for

16    other individuals.

17         Q.   Okay.  I -- I --

18         A.   Yeah.

19         Q.   I'm just trying to understand the nature

20    of the work --

21         A.   Yeah.

22         Q.   -- at this point.

23         A.   Yeah.

24         Q.   So they hire you as an independent

25    contractor --
```

14:24:02  5
14:24:14  10
14:24:22  15
14:24:28  20
14:24:29  25

1          A.     Right.

2          Q.     -- to -- to develop this ge --

3    geographic and demographic expertise.  Is that fair?

4          A.     To a certain extent.  Maybe I wasn't too

14:24:40   5    clear.  They -- there was a Ford and Rockefeller

6    Foundation grant.  Now, maybe I should have added

7    that in there.  And the purpose of those grants was

8    to support nonprofit organizations, mostly in the

9    south, that didn't have the wherewithal -- the

14:24:57  10    technical wherewithal or the skill to draw or

11    develop their plans.  We were the -- there to

12    develop the plans for them.

13                And the second part was to train other

14    universities to do the same thing we were doing so

14:25:14  15    they would be trained.  And then they would go out

16    to other organizations, help those organizations

17    actually develop plans like we were doing.

18          Q.     I see.  And so when these other

19    nonprofit organizations were interested in

14:25:25  20    developing plans were they compensating Norfolk

21    State for that work?

22          A.     No, not that I recall.  I think this was

23    done through the Ford and -- and Rockefeller

24    Foundation grants.

14:25:34  25                I think there was a period of time where

|       |    |                                                       |
|-------|----|-------------------------------------------------------|
|       | 1  | they purchased software or something.  I -- I can't   |
|       | 2  | remember that, but we got a great deal on the         |
|       | 3  | software package, but I --  there wasn't a -- a -- a   |
|       | 4  | cost associated.  Maybe a cost expense or something   |
| 14:25:49 | 5 | like that.  There was some expenses associated with |
|       | 6  | it.                                                    |
|       | 7  | Q.    And so you were paid from the grant             |
|       | 8  | funding?                                              |
|       | 9  | A.    Yes.                                             |
|       | 10 | Q.    Okay.                                            |
|       | 11 | A.    Yes.                                             |
|       | 12 | Q.    And were you paid on an hourly basis?            |
|       | 13 | A.    Yes.                                             |
|       | 14 | Q.    Do you recall what your rate of pay was          |
| 14:26:01 | 15 | back then?                                           |
|       | 16 | A.    Hmm.  I -- I -- I think it was $20 an            |
|       | 17 | hour.                                                 |
|       | 18 | Q.    Just getting started.  Understood.              |
|       | 19 | A.    Right.  You know.                                |
| 14:26:10 | 20 | Q.    Absolutely.                                    |
|       | 21 | A.    Yeah.                                            |
|       | 22 | Q.    Okay.  So -- so that became -- well,             |
|       | 23 | what was the next iteration of that work with         |
|       | 24 | Norfolk State?                                         |
| 14:26:17 | 25 | A.    Insofar as the project was concerned           |

22

```
          1    or --

          2         Q.    Yes.  Or other work at N -- at Norfolk

          3    State at that time.

          4         A.    Right.  At -- at -- the -- the

14:26:25  5    co-director and I became -- I'm thinking of the

          6    Miami-Dade expert masters.  We became expert masters

          7    for Miami-Dade in a court case that -- we drew

          8    probably over 50 plans in -- in that -- in that

          9    project or that effort.

14:26:47 10              There was another project or effort --

         11    I'm thinking of special ones that came out, which is

         12    where we actually -- I think the -- the legal

         13    defense fund -- NAACP legal defense fund turned to

         14    us and the attorneys I think that they were

14:27:03 15    collaborating to do some analysis on compactness

         16    measures for the 12th Congressional District in the

         17    context of the Shaw v. Reno case.  And so that was a

         18    -- a unique aspect.

         19         Q.    All right.  What -- what state's 12th

         20    Congressional --

         21         A.    12th.

         22         Q.    -- District?

         23         A.    North Carolina's 12th --

         24         Q.    North Carolina.

14:27:23 25         A.    -- Congressional District.
```

23

```
 1          Q.     Okay.  So you did some work with North
 2   Carolina in -- or in North Carolina and in
 3   Miami-Dade at that point in time with Norfolk State?
 4          A.     Right.
 5          Q.     Okay.
 6          A.     In addition to all the other plans we
 7   drew throughout the south.  We -- we covered a
 8   variety of different states.  Probably 200 to 300
 9   plans we drew at Norfolk State during that period of
10   time.
11          Q.     And you were in the role of special
12   master with respect to the Miami-Dade --
13          A.     I --
14          Q.     -- plan.  Were you a special master --
15          A.     Team.
16          Q.     I'm sorry.  Your -- your team was
17   special master.
18          A.     The -- the co-director and I were sort
19   of a special masters team.  I was the map drawer.
20   He was the political science person.
21          Q.     Did you give testimony in that case
22   or --
23          A.     No.
24          Q.     -- just provide a report?
25          A.     No.  Just provided the plan.
```

14:27:41 (line 10)
14:27:44 (line 15)
14:27:54 (line 20)
14:28:01 (line 25)

24

```
           1        Q.    Did you or your team serve as special
           2   master between 1991 and 1999 on any other matters?
           3        A.    No.
           4        Q.    Okay.  With respect to the other
14: 28: 20 5   redistricting plans that were developed during that
           6   Norfolk State period from 1991 to 1999 in what role
           7   did you serve?
           8        A.    In pa -- post the redistricting project
           9   or -- because it -- it evolved into what was called
14: 28: 38 10  the special projects.  And that covered a variety of
          11   different analyses -- socioeconomic analyses that
          12   efforts came in.  And so it sort of evolved because
          13   the redistricting cycle ran out, of course, and
          14   there were other sort of database and geospatial
14: 28: 59 15  projects that they turned to.
          16        Q.    Fair enough.  And I -- I'm looking at --
          17   at the particular bullet point that says "developed
          18   over 200 redistricting plans located in over 60
          19   jurisdictions in the states of Florida, Louisiana,
14: 29: 14 20  North Carolina, Texas and Virginia."  Just that
          21   sentence.
          22             We -- we -- we talked about the -- the
          23   plans that were developed for Miami-Dade as -- as
          24   part of a special master team.  I'm trying to get at
14: 29: 28 25  in what other circumstances or contexts you
```

25

```
         1    developed -- contexts you developed these plans.
         2              MS. HARLESS:  Objection to form.
         3    BY MR. BOYNTON:
         4         Q.    You can answer.
14:29:43 5         A.    First, this doesn't include the
         6    Miami-Dade, right?
         7         Q.    Okay.
         8         A.    And -- and so that's in addition.
         9              And so any of the plans outside of that
14:29:56 10   I cannot recall at this particular time.  I don't
        11    think there were any -- any other plans.  They
        12    weren't noteworthy for me to put it in my résumé.
        13              You know, of course, I might have done a
        14    plan here and there that I just might have
14:30:16 15   forgotten, but this covers, I think, the bulk of
        16    them.
        17         Q.    And -- and I'm still trying to
        18    understand --
        19         A.    Uh-huh.
14:30:26 20        Q.    -- the context in which you developed
        21    over 200 redistricting plans while -- for -- during
        22    your time at Norfolk State between 1991 and 1999.
        23         A.    Okay.  And what's your -- what's the
        24    issue?
14:30:39 25              There -- there were multiple
```

```
              1    organizations.  And I can't -- I can't recall how

              2    many organizations, but they turned to us for plan

              3    development.  We would develop those plans and

              4    provide it to them.  Explanations in addition.  And

14:30:59      5    -- and possibly the co-director would go and -- and

              6    actually maybe speak at a -- a public hearing or

              7    something in that context.

              8         Q.   Do you recall any of them being in a

              9    litigation context other than the Miami-Dade one?

14:31:21     10         A.   Yes.  And I'm trying to recall.  The

             11    very first plan that we drew was for the City of

             12    Norfolk.  And -- and we drew those plans -- it

             13    ultimately was -- was selected, but I cannot recall

             14    the specifics of the litigation.  I think there was

14:31:52     15    some litigation that -- pertaining to that.

             16         Q.   Okay.  Do you recall giving testimony?

             17         A.   No.  No, I didn't.  At no time during

             18    this period of time at -- at the -- The

             19    Redistricting Research Project did I give any

14:32:05     20    testimony.

             21         Q.   Okay.  That helps --

             22         A.   Yes.

             23         Q.   -- clarify.

             24         A.   Yes.  I didn't understand what you were

14:32:09     25    looking for.
```

```
 1          Q.    You were on a team that developed maps

 2    for whatever reasons, and you were not kind of the

 3    point person on it; is that fair?

 4          A.    Absolutely.  I was the map drawer at

 5    that time.

 6          Q.    Understood.

 7          A.    Yes.

 8          Q.    So where did your work with Norfolk

 9    State University from 1991 and nine -- through 1999

10    take you next?

11          A.    The next redistricting cycle, which was

12    in 2000, centered around an effort at the

13    Congressional Black Caucus Institute, and that's

14    where I became the consulting demographer.  I

15    believe it was 2001 to 2003.

16                And so during that period of time the

17    effort centered around analyzing, reviewing,

18    developing plans where African Americans could elect

19    a member of -- candidate of choice at the

20    congressional level.

21          Q.    And were you a consultant or -- that's

22    not the right word.  Were you a employee or an

23    independent contractor for the Congressional Black

24    Caucus Institute?

25          A.    Consulting -- consulting demographer is
```

14: 32: 20   5

14: 32: 32   10

14: 32: 54   15

14: 33: 13   20

14: 33: 20   25

1    what they called me.

2         Q.    And that -- you were never an employee;

3    is that correct?

4         A.    That's correct.

14:33:26   5    Q.    Do you recall what your rate of pay was

6    as a consulting demographer for -- for that

7    organization?

8         A.    I -- I believe I was paid -- it wasn't

9    -- the total came to about 85,000 a year.  So I know

14:33:47  10   they -- they apportioned it somehow.  I can't

11   recall, but, yeah, the total came to about 85- a

12   year.

13        Q.    Were they the only entity for whom you

14   were performing consulting or demographic services

14:33:59  15   between 2001 and 2003?

16        A.    They were the primary.  I might pick up

17   -- because I -- I'm a consultant I might pick up a

18   occasional job here and there.  So -- and let me

19   see.  I don't know if anything is included.  For

14:34:13  20   example, I would train somebody.

21        Q.    And I'm not trying to trick you at all.

22        A.    Uh-huh.

23        Q.    I see --

24        A.    The training was --

14:34:21  25   Q.    -- the 2001 to 2003 was essentially a

1    stand-alone period of time on your résumé.

2         A.    Uh-huh.

3         Q.    I'm just trying to get a sense of the

4    scope of work you were providing for that

14:34:30  5    organization.

6         A.    Right.  Right.  In -- in essence, they

7    were really the -- the sole contractor because it

8    was a lot of hours.

9         Q.    Did you do that -- well, did you live in

14:34:41 10    Hampton for the entirety of your professional

11    career?

12         A.    Yes.  Yes.

13         Q.    Did you perform this work from Hampton

14    or were you in another location?

14:34:47 15         A.    Both.  I would come up, I would spend

16    three days, sometimes four days, and then drive

17    back.  And then I was on call if a project effort

18    popped up, so...

19         Q.    Did you have an entity under whom you

14:35:05 20    worked or were you essentially kind of bidding

21    yourself out for -- for work?

22         A.    I -- I was Anthony Fairfax sole

23    proprietor at the time.

24         Q.    I see.  And what -- and just for

14:35:14 25    completeness purposes, what was the period of time

1  for which you were -- during which you were Anthony

2  Fairfax sole proprietor?

3       A.    From I believe 2001 all the way till I

4  formed CensusChannel, which was 2009.

14:35:30  5       Q.    Thank you.

6             Did your work for the Congressional

7  Black Caucus Institute involve anything beyond the

8  drawing or analysis of congressional district maps.

9       A.    There was one occasion where a member of

14:35:53  10  Congress wanted to be represented in a court case,

11  so I developed a plan so he could submit to the

12  court.  And I went down -- it was Earl Hilliard,

13  Congressman Earl Hilliard.  And I, you know,

14  represented I guess as an expert.  I didn't testify,

14:36:09  15  but I was providing advice, essentially, to -- to

16  the attorneys that were there.

17       Q.    What state was that?

18       A.    Alabama.

19       Q.    Alabama.

14:36:20  20            Did you have occasion to provide expert

21  testimony or evidence in any other matters in the

22  congressional Black Caucus Institute consultation?

23       A.    No.

24       Q.    Okay.  It appears from that consultancy,

14:36:42  25  if that's the right word, you -- you moved into

```
 1    Democracy South work in 2004.  Is that accurate?
 2         A.    Yes.  Yes.
 3         Q.    What -- what was that -- the scope of
 4    that work?
 5         A.    Es -- essentially Democracy South
 6    focused on increasing voter registration, getting
 7    out the vote, in underserved communities.  So I was
 8    a consultant for them.  A small organization.
 9         Q.    Are they a -- a nonprofit?
10         A.    Yes.  Yes.  A nonprofit.
11         Q.    Were -- were you physically in Virginia
12    Beach or is that where they are based or both?
13         A.    They were based in Virginia Beach.
14         Q.    Were you working primarily from Hampton
15    at that point --
16         A.    Yes.
17         Q.    -- in time?
18         A.    Uh-huh.
19         Q.    Okay.
20         A.    Yes.
21         Q.    Did you provide specific map drawing in
22    regard to the Democracy South work?
23         A.    Yes.  Yes.  One of the things we did was
24    provide under-registered-voting maps or
25    get-out-the-vote maps in the context of where to go
```

14:36:51   5
14:37:11  10
14:37:20  15
14:37:22  20
14:37:39  25

32

```
 1    and target for voter registration drives or
 2    canvassing.
 3           Q.    How do you determine that information?
 4           A.    That may be proprietary.  No.
14:37:54  5           I'll give you the general sense.  In
 6    essence, you look at the difference between the
 7    voting age population and the registered voters in a
 8    particular area and the difference are -- could be
 9    those that are unregistered.  I mean, there's a
14:38:16 10    little more to that, but --
11           Q.    That's the 30,000-foot-view's worth?
12           A.    Exactly.
13           Q.    Okay.
14           A.    That's right.  That's right.
14:38:23 15           Q.    Fair enough.
16           Was it primarily a voter registration
17    effort or were there other efforts on -- on --
18    ongoing that you were involved with at Democracy
19    South?
14:38:32 20           A.    There were projects that -- that
21    actually came up.  For example, let me -- let me --
22    there was one project that was pretty interesting.
23    Like this web-based interactive map.  We developed
24    something that people could click on and actually
14:38:48 25    see the unregistered voters in a particular area.
```

```
 1          Q.    And -- and that was generated -- that

 2    was based on data that you had generated with this

 3    proprietary work?

 4          A.    Correct.

 5          Q.    Okay.

 6          A.    Correct.

 7                Let me see.  There was another project.

 8    I don't know if I even included it, so -- a scanning

 9    project where we were looking at accelerating how

10    people scanned walk lists, essentially.  And we

11    developed a routine to -- to -- to scan

12    automatically through a scanner, which would help

13    input data.  And I don't -- I don't see that.

14          Q.    Oh.  I -- I -- I see responsibilities

15    included co-managing the overall civic engagement

16    effort and was solely responsible for integrating

17    and processing catalyst voter data into targeting

18    maps and walk lists for all focus areas.

19          A.    Uh-huh.

20          Q.    Is that what you're referring to?

21          A.    Not exactly.  This was -- this is

22    somewhat different.  That was a -- where I was

23    co-director of this project, a sub-project of

24    course, with Democ -- Democracy South, but this was

25    a separate effort, and I -- I probably didn't
```

14:38:56  5
14:39:16  10
14:39:32  15
14:39:46  20
14:40:01  25

34

```
          1    include this in the résumé because I don't see it.
          2        Q.    Explain to me what a walk list is.
          3        A.    Essentially, when you're looking at
          4    those individuals that -- there's a database -- of
14:40:23  5    course, a voter database.  And you can determine
          6    which voters vote and which voters don't.  And from
          7    that you can develop a walk list to try to go to
          8    those places and households of those individuals
          9    that don't vote.  And that walk list represents the
14:40:37 10    name and address.  And you can do a variety of other
         11    things.
         12        Q.    So is it accurate -- or that's probably
         13    not a good word.  Is it a fair summary to say this
         14    was efforts to generate a database relating to
14:40:55 15    unregistered voters?
         16        A.    And you're speaking walk lists?
         17        Q.    The walk -- the -- the walk list effort
         18    in that context.
         19        A.    The walk list comes from a database
14:41:02 20    that's generated.  And then you only pull from those
         21    individuals that don't turn out and vote.  And so
         22    that's the database.  And then you print those out
         23    in -- in some, you know, tabular manner that can
         24    allow a person to go to a street.  And, of course,
14:41:18 25    we would produce a map so they'd know where to go,
```

```
 1    but --

 2           Q.    And the scanning function?

 3           A.    Which was a separate -- the scanning

 4    function involved at that project was -- if you went

14:41:31  5    to a door you would make a notation.  And the

 6    scanning function we put together was you would take

 7    that sheet and then insert it into a scanner.  It

 8    would automatically tally that.

 9                 So what would normally occur would --

14:41:45 10    someone have to type that in.

11           Q.    It -- it was a shortcut for data entry?

12           A.    Exactly.

13           Q.    Okay.  Now I understand.

14           A.    Exactly.

14:41:53 15           Q.    Thank you.

16                 That work continued through 2008?

17           A.    Yes.

18           Q.    What -- why did you cease doing that

19    work?

14:42:03 20           A.    Democracy South was a small organization

21    and it -- it -- it really ended.  It -- it closed

22    its doors, really, probably around that time.

23                 And around that time that's where the

24    next round of redistricting was really picking up,

14:42:19 25    in 2009.  And so I don't know if it's -- you know,
```

36

```
        1    it's just the fate, but -- fates, but I happened to
        2    begin to pick up in redistricting work around that
        3    particular period of time.
        4         Q.    So that's with CensusChannel, LLC?
14:42:36 5         A.    Yes.
        6         Q.    That's an LLC you formed personally?
        7         A.    Yes.
        8         Q.    Does it have any employees?
        9         A.    I would be the only employee.  There is
14:42:43 10   just -- it's a single-member LLC.
       11         Q.    And that was formed in 2009?
       12         A.    Yes.
       13         Q.    It's existed continually until today?
       14         A.    Yes.
14:42:52 15        Q.    What are the annual revenues let's say
       16   this year or the last calendar year?
       17         A.    Last year I didn't do that well.  I'm --
       18   I'm down close to around under 60,000 last year.
       19   And I guess the year before was close to about
14:43:15 20   80,000.  This year I'll probably do back to the
       21   80,000, so may break 90- if --
       22         Q.    Okay.
       23         A.    -- a couple things come through.
       24         Q.    And -- and that's revenues not net
14:43:24 25   income?
```

37

```
 1          A.    That's revenues.  That's correct.

 2          Q.    Okay.

 3          A.    And I keep a -- a lean -- you know,

 4    that's why I have an office at home.  So most of

 5    that is -- you know, for consulting what -- what you

 6    try to do is make everything -- the operating

 7    expenses very low.

 8          Q.    Understood.

 9          A.    Uh-huh.

10          Q.    And -- and so I assume that the bulk of

11    the work was during the redistricting cycle coming

12    out of the 2010 centrus -- cen -- census; is that

13    correct?

14                MS. HARLESS:  Objection to form.

15                MR. BOYNTON:  I -- I -- I'm sure I can

16    rephrase.

17          A.    Uh-huh.

18    BY MR. BOYNTON:

19          Q.    What -- what's the high point of the

20    revenue on an annualized basis from clear --

21    CensusChannel, LLC's formation till today?  What was

22    your best year?

23          A.    The best year was probably -- wow.  I

24    think it was 120- to -30,000.  Something like that.

25          Q.    Do you recall which year that was?  Best
```

14:43:31  5
14:43:42  10
14:43:54  15
14:43:59  20
14:44:22  25

38

            1    guess.

            2         A.    2009 or '11 -- 2009 or '10.  2009, '10

            3    or '11.  2010 probably.  Well, I -- I don't want to

            4    ask -- answer for sure because -- it's either 2009,

14:44:55    5    2010.  I -- probably 2010, but I -- I'm not a

            6    hundred percent sure.

            7         Q.    Fair enough.

            8         A.    Okay.

            9         Q.    And -- and so in 2009-2010 who were your

14:45:05   10    primary clients?

           11         A.    One of the projects was a national black

           12    caucus of state legislators.  And that was a -- that

           13    was probably one of the -- the biggest projects

           14    during that particular period of time.

14:45:26   15         Q.    Now, was that an ex -- exercise in -- in

           16    map drawing or was there some other type of service

           17    that you were principally providing to the NBCSL?

           18         A.    Yes.  Yes.  That's probably what I

           19    should have said, yes.  It -- it pertained to the

14:45:42   20    2010 census.  And it was map drawing and it was

           21    development of a series of targeted maps going out

           22    to black state legislators throughout the country so

           23    they can actually know the areas that they need to

           24    focus in on for the -- the 2010 census.

14:46:01   25         Q.    For redistricting purposes of their own?

            A.    No, not for redistricting.  This is
purely 2010 census.

            One -- one of the things -- one of the
-- one of the purposes of the census outreach is to
14:46:16   ensure that we have a full and complete count.  And
so you do that by, you know, finding and locating
areas that they call hard to count.  And the census
has a measurement of what's hard to count.  And so
you can actually target those census tracts, maybe
14:46:30   even block groups, of where to actually go that has
a high likelihood of being undercounted.

            Q.    This was pre-results?  This was the
effort to actually count?

            A.    Absolutely.
14:46:40       Q.    I see.

            A.    That's right.  And that's exactly --
that's right.

            Q.    And you also did some work with Duke
University during that 2010-2011 window; is that
14:46:49   correct?

            A.    That's correct.

            Q.    What was that work?

            A.    I -- i was one of -- of two project
managers.  I was on the mapping side.  I -- I
14:46:57   managed the -- the cartographic side, if you will.

1       And the goal was to prepare or train

2  possibly, if you will, different cartographers to

3  show them how to actually become a mapping expert on

4  that side.

14:47:14  5       And the other side was -- Dick Angstrom

6  was on the other side.  He actually trained

7  individuals to show them how to become an expert in

8  the political science side.

9       Q.    And -- and with respect to the -- well,

14:47:28  10  first of all, what is the Southern Coalition for

11  Social Justice?

12       A.    That's an organization that focuses on

13  -- they have a variety of aspects, but they have --

14  they're focused on having a litigation team that can

14:47:45  15  ensure that voting, civil rights, a variety of

16  aspects like that, are fair.  And it's grown from

17  virtually nothing to a -- a -- a fairly decent size

18  organization now.

19       Q.    And what is REGSS?

14:48:02  20       A.    Right.  At Duke there's a Center for

21  Race and Ethnicity and Gender in the Social

22  Sciences.  And so they focus on those -- those

23  aspects.  And they were the two sponsors of this.

24       Q.    Of this effort to do --

14:48:16  25       A.    To train or prepare.

```
              1        Q.    Did you ever do work directly for either

              2   of those organizations?

              3        A.    I've done -- excuse me -- work as a --

              4   excuse me -- redistricting expert for the Southern

14:48:31      5   Coalition for Social Justice.

              6        Q.    And I -- it may well be here.  Did you

              7   tell me when that work was done?  I see it's 25 --

              8   '15 to 2018.

              9        A.    Yes.  A variety of -- of cases.

14:48:42     10        Q.    Okay.  So we'll get up --

             11        A.    Uh-huh.

             12        Q.    -- to that --

             13        A.    Uh-huh.

             14        Q.    -- in a minute.

14:48:47     15              Did you do work directly for the REGSS?

             16        A.    No.  No.  Just pertaining to that

             17   particular effort.  It was, you know, several months

             18   in preparation and then the actual two weeks to

             19   actually do this.

14:49:01     20        Q.    What is the Community Policy Research &

             21   Training Institute (One Voice in -- close

             22   parentheses, in -- in Jackson, Mississippi?

             23        A.    Right.  It -- it's a nonprofit

             24   organization.  Exactly what it says.  It does

14:49:16     25   research and educational training around a variety
```

42

                of things.  I believe, you know, voting rights,

                education and -- locally in the state.

                        And so one -- what I did was I developed

                or helped develop a plan.  One of the aspects of

14:49:38        that was them involving themselves in restricting.

                And so as they were getting going in -- in

                redistricting they needed some help and assistance,

                and so I helped them actually develop a -- a plan.

                And -- and they needed -- I put a large-scale map

14:49:56        because they wanted this huge map to show the -- the

                entire state so someone could come and look at that

                map.

                        Q.   And -- and so that was

                post-census-results work in support of

14:50:11        redistricting?

                        A.   Yes.  Yes.  That's after this 2010

                census came out.

                        Q.   Okay.

                        A.   That's correct.

14:50:14        Q.   Then in 2011 you did work for a number

                of different other organizations.  Can you tell me

                what the -- the largest portion of that work was by

                client group?

                        A.   And -- and you're speaking in regards to

14:50:31        just -- are you saying what did I focus on?

43

```
 1              Q.    Well, I see a number of -- of entries

 2       for 2011 --

 3              A.    Uh-huh.

 4              Q.    -- on page 29.  And that comports with

 5       what you recall being a pretty busy time --

 6              A.    Uh-huh.

 7              Q.    -- or at least a --

 8              A.    Uh-huh.

 9              Q.    -- a higher --

10              A.    Uh-huh.

11              Q.    -- revenue time --

12              A.    Uh-huh.

13              Q.    -- for you.  And so I'm trying to get a

14       sense of what you primarily were spending your time

15       on in 2011.

16              A.    Redistricting was mostly the -- you

17       know, usually the period of time between 2010 to

18       2012, maybe '13, was a very hot point in time for

19       me.

20              Q.    All of the entries on the bottom half of

21       page 29 starting with Congressional Black Caucus

22       Institute --

23              A.    Uh-huh.

24              Q.    -- and ending with Louisiana Legislative

25       Black Caucus -- all of those were consulting work,
```

14:50:42  5
14:50:52  15
14:51:08  20
14:51:24  25

```
 1    correct?

 2         A.    Correct.

 3         Q.    You were not an employee for any of

 4    those organizations?

 5         A.    That is correct.

 6         Q.    Was the nature of the consulting work

 7    you provided to those different organizations

 8    primarily map-drawing efforts?

 9         A.    Map-drawing efforts, that's correct, or

10    -- or -- map-drawing efforts either in -- in

11    physical contact or in online mapping.  There was a

12    -- a -- a -- a project, a -- an effort of a

13    subcontract for one of the energy companies.

14         Q.    Do you recall what energy company?

15         A.    You know, I -- I -- I signed a

16    nondisclosure agreement and I'm not sure whether --

17         Q.    I'm not going to ask you to go --

18         A.    But the --

19         Q.    -- beyond that --

20         A.    -- the contractor was Net --

21         Q.    -- in this context.

22         A.    Net Communications.

23               THE REPORTER:  I'm sorry.

24               THE DEPONENT:  Net Communications was --

25    was the primary contractor.  That's in 2014 and '15.
```

14:51:28
14:51:45
14:52:01
14:52:19

BY MR. BOYNTON:

          Q.    That's Tallahassee, Florida, 2014-'15?

          A.    Yes.

          Q.    Okay.  Did -- did the nature of your
14:52:29  work change or evolve in a general sense after 2011?

          A.    What happened -- oh, somewhat, yes.
Yes.

          Q.    Explain how.

          A.    Yes.  In -- in -- in 2010 -- '12 I began
14:52:47  to obtain my master's.  And so, one, a couple things
hap -- happened.  I realized that I could not com --
complete that master's at the level that I wanted to
complete, so I had to, one, reduce workload in order
to actually complete the program.
14:53:10          So 2012 to 2016 is sparse because I was
completing my master's.

          Q.    And you received both a graduate
certificate and a master's of geospatial information
science and technology from North Carolina State
14:53:27  University; is that correct?

          A.    That's correct.

          Q.    Were you physically located in Raleigh
during that time?

          A.    No.  No.
14:53:31          Q.    Those were remote --

1           A.     Yeah.

2           Q.     -- work?  I'm sorry.

3           A.     Right.  They have a -- a program that

4    has both on-site and off-site.  And probably about

14:53:41  5    60 to 70 percent -- and I'm guessing -- of the

6    courses are both -- are dual.  And so what I had to

7    do was pick and choose the ones that would enable me

8    to not have to uproot myself and -- and physically

9    be there.  But it's possible, and so that's what I

14:54:01  10    did during that period of time.

11           Q.     What prompted you to seek a master's of

12    geospatial information science and technology?

13           A.     Well, two things.  One, I wanted to move

14    my credibility up some.  And with a bachelor's, even

14:54:18  15    though it's a bachelor's in electrical engineering,

16    there still is a question when you begin to move up

17    the ladder of do you have a master's.  And so I

18    wanted to check that off and -- and -- and -- and do

19    so.

14:54:32  20           The second thing I wanted to do was

21    expand my business capabilities.  And so what this

22    did is this broadened what I can do I think

23    significantly now from what I used to be able to do.

24           Q.     Describe the difference in what you can

14:54:47  25    do post master's versus previous master's.

```
          1         A.    One of the things that -- yeah, I

          2    focused -- prior to that I told you -- told you is

          3    was with -- with redistricting, maybe voter

          4    registration, getting out the vote.

14:55:07  5              This program is divided really into --

          6    to two different -- accessing, processing and

          7    analysis.  One is using what's called ras -- raster

          8    data -- it's like images -- satellite images, which

          9    I had no experience in.  And just to give you a -- a

14:55:31 10    brief, you know, analysis, you can, for example,

         11    analyze what they call land coverage and from

         12    satellite images able to determine whether something

         13    is grass or something is an infrastructure or

         14    something is water or soil.  I had no clue of what

14:55:48 15    that was.

         16              And the other is vector analysis.

         17              And my experience with probably the

         18    leading GIS package dramatically improved, which is

         19    -- ArcGIS is probably the leading GIS package that's

14:56:06 20    out there.

         21              And so I'm now able to utilize that

         22    system both desktop as well as online proficiently.

         23         Q.    How did those additional skill sets

         24    impact your work in this case?

14:56:23 25         A.    In this --
```

```
                 1          Q.    In -- in the case we are presently
                 2    having a deposition in, the -- the Holloway and
                 3    Allen v. City of Virginia Beach, et al.
                 4               MS. HARLESS:  Objection to form.
14:56:33         5          A.    I -- I would say that, although I -- I
                 6    intentionally focused on Maptitude -- using
                 7    Maptitude for everything because I didn't want to
                 8    mix up two different GIS packages -- I could
                 9    probably do some of the processing disaggregation
14:56:55        10    using the ArcGIS.  I didn't, but I could have.
                11               Prior to that I -- I -- I -- I wouldn't
                12    have been able to do that.
                13    BY MR. BOYNTON:
                14          Q.    Because you wouldn't have had the RGIS
14:57:10        15    background?
                16          A.    The Arc.
                17               MS. HARLESS:  Objection to form.
                18    BY MR. BOYNTON:
                19          Q.    I'm sorry.  Please answer the question
14:57:14        20    or -- or I can rephrase it if you prefer.
                21          A.    No.  I -- I -- I didn't have the
                22    experience of using ArcGIS.  And so I decided -- I
                23    mean, Maptitude is proficient.  All of the functions
                24    is -- are excellent.  So there was no need for me to
14:57:27        25    actually go to ArcGIS, but I could.  I could have
```

```
 1    done something similar using ArcGIS.

 2              MS. HARLESS:  And for the record can you

 3    spell ArcGIS?

 4              THE DEPONENT:  Oh.  I'm sorry.

 5    A-R-C-G-I-S.  Arc.

 6    BY MR. BOYNTON:

 7         Q.   And -- and the --

 8         A.   I'm sorry.

 9         Q.   You had used Maptitude previous to

10    receiving your master's degree from North Carolina

11    State, correct?

12         A.   Yes.  Yes.

13         Q.   How did you learn to use the Maptitude

14    software package?

15         A.   I think a long time ago I went to a

16    training.  That was probably the only training that

17    I had.  But then besides that it's basically

18    using -- reading manuals, software manuals, and the

19    experience of figuring things out.

20         Q.   How long have you been using Maptitude

21    on your -- based on your recollection?

22         A.   Probably 20 years.  I think it -- it --

23    it -- the -- the program was called something else

24    prior to Maptitude, and I used that.  So actually

25    probably more -- I used the precursor to Maptitude
```

14:57:48
14:58:01
14:58:11
14:58:35

50

```
          1   as well.  So probably more than 20 years.  Maybe 22,
          2   23, if you add in the precursor to Maptitude.  I
          3   think it was -- I don't want to guess.  It was a
          4   different name.
14:58:51  5          Q.    Did that take you to the mid to late
          6   1990s --
          7          A.    Yes.  Yes.
          8          Q.    -- when you started using this software
          9   suite or its predecessor?
14:58:58 10          A.    Yes.  Well, maybe not the -- the mid.
         11   More of the end --
         12          Q.    Okay.
         13          A.    -- of the '90s.
         14          Q.    Okay.  I get it.
         15          A.    Yes.
         16          Q.    Okay.  Fair enough.
         17                Any other ways that the GIS master's
         18   benefits your work in the Holloway case?
         19          A.    Let me think about this.
14:59:47 20                I think all of the aspects that I've
         21   achieved or performed in this -- I probably could
         22   have done them prior to the master's.  And I'm
         23   trying to think if there's anything I couldn't have
         24   done.
15:00:05 25          Q.    There may be some things you could have
```

```
 1    done a different way; is that --
 2            A.    Yes.
 3            Q.    -- your testimony?
 4            A.    It -- it --
 5                  MS. HARLESS:  Object --
 6                  MR. BOYNTON:  Okay.  I'm --
 7                  MS. HARLESS:  Objection to form.
 8                  MR. BOYNTON:  I'm happy to rephrase.
 9    BY MR. BOYNTON:
10            Q.    Were there other thing -- are there
11    certain tasks you performed in regard to providing
12    testimony in this case that you could have performed
13    prior to receiving your master's but you can now
14    perform in ways different than before?
15            A.    Right.  I think there -- there are
16    aspects that I could ex -- expand on where prior to
17    that I wouldn't be able to do it.  Maybe multiple
18    ways, like I think what you're leading to.  Yeah.
19            Q.    Shifting to a litigation context, when
20    did you first provide expert testimony to any -- or
21    expert opinions to any litigation client?
22            A.    Hmm.  I'm probably have to look at my
23    résumé for that.  And -- and you're speaking of in
24    -- in the context of either a expert report or
25    deposition or testimony?
```

15:00:09
15:00:12
15:00:28
15:00:58
15:01:20

1          Q.    Correct.

2          A.    Yeah.  I -- I would have to say that,

3     although it's not in the context of a court case, it

4     was -- the Louisiana Legislative Black Caucus in

15:02:11  5     2011 was the first time I testified, but that was in

6     front of the legislature.  It wasn't in the context

7     of a court case.

8          Q.    What year was that?

9          A.    2011.

15:02:23 10          Q.    2011?

11          A.    Yeah.

12          Q.    When -- when did you first testify or

13     provide opinions in the context of a court case?

14          A.    I -- I believe it was the Texas -- the

15:02:34 15     Perez v. Perry case in 2011.

16          Q.    And what was that case about, to your

17     understanding?

18          A.    My understanding was that there were

19     several legislative districts that the plaintiffs

15:02:56 20     seeked to -- and let me phrase this from a nonma --

21     -- litera -- attorney's point of view -- seeked to

22     adopt versus the -- the districts that they were

23     approved.  And so there were -- there were several

24     districts that they want -- they wanted to actually

15:03:21 25     see approved and several districts that they felt

53

1    were unconstitutional.

2         Q.    And you gave testimony?  You were

3    providing specific opinions in that case?

4         A.    Yes.  What I did was comparative

15:03:35  5    analysis.

6         Q.    By whom -- by which party were you

7    retained?

8         A.    The NAACP.

9         Q.    So if -- if I'm reading pages 33 and 34

15:03:55 10    of your report -- I'm sorry -- Appendix A of the

11    original Court Exhibit 2, the -- the actual

12    retaining entity is the -- the listed party?  For

13    example, the Southern Coalition for Social Justice

14    is who retained you in regard to Moore versus State

15:04:17 15    of Tennessee?

16              Look -- looking right above the Texas

17    NAACP thing on page 34.  I'm sorry.  I -- you're on

18    30 -- 33, I believe.

19         A.    Oh.  Okay.  You said 34.

15:04:32 20              And could you repeat the -- the

21    question?

22         Q.    I can.

23         A.    Uh-huh.

24         Q.    Where in -- in the matter of Moore

15:04:41 25    versus State of Tennessee you provided expert

54

```
 1    opinions and analysis.
 2            A.    Yes.
 3            Q.    In that instance were you retained by
 4    and paid by the Southern Coalition for Social
 5    Justice?
 6            A.    Yes.
 7            Q.    Okay.  And -- and so your testimony was
 8    on behalf of either the parties or a third non-party
 9    entity?
10            A.    Correct.
11            Q.    Looking at the North Carolina NAACP, I
12    see that in that case they were the plaintiff in the
13    matter.  Is that correct?
14            A.    Correct.
15            Q.    And so you provided expert opinions and
16    analysis on behalf of the plaintiff, North Carolina
17    NAACP, in 2012?
18            A.    Correct.
19            Q.    What was the nature of that case?
20            A.    It -- it centered around looking at
21    various compactness measures pertaining to the
22    congressional and legislative districts.
23            Q.    Do you recall what your opinion was on
24    the compactness measures in that case?
25            A.    What I found was there were several
```

15:04:53  5
15:05:00  10
15:05:13  15
15:05:24  20
15:05:41  25

1    potential plans that could have been adopted and

2    those plans were more compact than the approved

3    plans.

4         Q.    What was the nature of your testimony in

15:06:00    5    the Moore versus State of Tennessee matter?

6         A.    And I'm trying to recall the specific

7    issue for the analysis.

8         Q.    There's reference to analysis of county

9    splits.

15:06:39   10         A.    Uh-huh.

11         Q.    What do you recall about that aspect of

12    the case?

13         A.    I -- I know that Tennessee has somewhat

14    of a whole-county provision very similar to North

15:06:56   15    Carolina and Texas, and there was an issue with

16    splitting the counties.  And I can't recall what the

17    crux of the issue was, but I essentially analyzed

18    the county splits and made a determination of

19    whether they had to be split or not.  I can't

15:07:15   20    recall.

21         Q.    And this is all within your expertise in

22    -- in demographic --

23         A.    Yes.

24         Q.    -- and --

25         A.    Yes.

1          Q.      -- mapping consulting?

2          A.      Yes.

3          Q.      Okay.  Switching to page 33, again

4    trying to work forward in time, Southern Coalition

15:07:31   5    for Social Justice -- it appears they retained you

6    in 2014 as well for Perez versus Texas?

7          A.      Yes.

8          Q.      And that's the matter you had been

9    previously involved in in 2011?

15:07:42  10          A.      Yes.

11          Q.      Explain your involvement in the 2014

12    Southern Coalition for Social Justice engagement.

13          A.      Uh-huh.  This centered around producing

14    population projections really for the districts.

15:08:03  15    And so, in essence, what they were looking for was a

16    method and a way of actually producing more-current

17    population numbers for the districts.  And so what I

18    did was I extrapolated the districts in order to

19    produce a more current population projection.

15:08:24  20          Q.      Something more current than the 2010

21    census data?

22          A.      Correct.

23          Q.      And you used another source of that data

24    or you generated a projection of some kind?

15:08:34  25          A.      In essence, what I did was -- when data

57

```
           1   is not available I utilized a -- a higher level.
           2   And so I utilized the county-level percentages to
           3   project what the districts were.  And I did that --
           4   normally I would not do that, but I did that and
15:08:58   5   created a verification process.
           6           So I first verified that the county and
           7   the districts mimicked each other, meaning that they
           8   followed the same pattern.  And once I saw that they
           9   were above -- I think the bulk of it was 90 percent
15:09:13  10   accurate, let's say.  Once I found that out -- I
          11   think there was one that was 80 percent -- then I
          12   could go and actually use the county to actually
          13   project what the district population was.
          14       Q.    Was -- was that a federal or state case?
15:09:27  15       A.    That was, I believe, federal.  Wasn't
          16   it?  Yes.
          17       Q.    Okay.  And can you describe your method
          18   of verifying your ability to project data from
          19   county to district level?
15:09:47  20       A.    The verification utilized the ACS.  And
          21   so what I did was I went back and looked at a
          22   previous county year, provided the same process of
          23   projecting, and then comparing the results to the
          24   ACS that we currently had.  So we had the currently
15:10:13  25   -- we had the current ACS that we could look at.
```

58

|   |   |
|---|---|
| | 1 |
| | 2 |
| | 3 |
| | 4 |
| 15:10:33 | 5 |

1  And so I took the previous ACS, utilized the county

2  projections to see if they'd come close to the

3  current ACS.  And they did.  And so that meant that

4  the county was -- or the district was following the

5  county demographics.

6          Q.    And district was smaller or larger than

7  county in that analysis?

8          A.    In some cases they were both, yeah.

9  Yeah.

15:10:40  10          Q.    Okay.

11          A.    And if there was multiple counties, I

12  apportioned it.  So it wasn't a matter of just using

13  one county.  Because many times they split multiple

14  counties.  So I had to actually use -- come up with

15:10:53  15  a methodology of -- of using the -- the weighted

16  amount for one county versus the weighted amount of

17  another county.

18          Q.    Why did you not simply use the ACS data?

19          A.    It wasn't available.

15:11:03  20          Q.    But then how were you able to check with

21  ACS data?

22          A.    Right.  I checked -- I checked a

23  previous year.  I checked to see if the county

24  followed the district in a previous year.  So we had

15:11:15  25  -- we had the previous year avail -- available, but

59

```
          1    not --
          2         Q.    So you were in the 20-to-13 window --
          3    2013-to-2017 window.
          4         A.    Right.
15:11:25  5         Q.    You had the 2013 data.  You were
          6    projecting to get the 2014?
          7         A.    It was more of the 2008-2012.  Had that
          8    data.  So projecting it to get to exactly what you
          9    were saying.
15:11:37 10         Q.    The earlier cycle --
         11         A.    Yeah.
         12         Q.    -- but --
         13         A.    The earlier cycle.  Exactly.
         14         Q.    I got it.
         15         A.    Exactly.
         16         Q.    Okay.
         17         A.    And then the county was more recent data
         18    because that was available.
         19         Q.    Did you ever come back afterward -- and
15:11:47 20    once the ACS data was available for 20 -- 2013 to
         21    2017 and see how close your projections had worked
         22    out?
         23         A.    No.  I always wanted to do that, but I
         24    didn't.  But the -- from what I understand, the
15:11:59 25    courts actually accepted what I did.
```

60

```
            1          Q.    Did you actually testify in that case?

            2          A.    Yes.

            3          Q.    Do you recall if it was by deposition or

            4    at trial or both?

15:12:06    5          A.    I know I testified at -- at trial.  I'm

            6    trying to remember whether I did at deposition.

            7    Yes.

            8          Q.    And that was in a Norfolk -- I'm

            9    sorry -- a North Carolina federal court --

           10          A.    That --

           11          Q.    -- or you were just retained by -- by

           12    the social justice group in Durham for testimony in

           13    Texas?

           14          A.    Right.  I had to actually fly to Texas

15:12:32   15    and do the deposition, I believe, and the testimony,

           16    I believe.  And that's what I recall.  It may not

           17    be, but that's what I recall.

           18          Q.    Okay.  So you were originally engaged by

           19    the Texas NAACP, but then you were later engaged by

15:12:51   20    the Southern Coalition for Social Justice in the

           21    same case?

           22          A.    I guess I -- like you said, I look at

           23    who pays me, I guess.

           24          Q.    And I'm not complaining.

           25          A.    Right.
```

61

```
 1            Q.    I'm just trying to understand.
 2            A.    Right.  And so --
 3            Q.    What -- what -- you were -- your
 4     engagements -- one engagement ended before the next
15:13:03  5     one began?
 6            A.    Yes.  Yes.  One was just specifically --
 7     if you notice, one is in 2011, and then the other is
 8     2013, three years later.
 9            Q.    Okay.  So that -- that case was still
15:13:15 10     lingering in some fashion and somebody else went on
11     and hired you?
12            A.    Yes.
13            Q.    Got you.
14                  What was the nature of your -- well, the
15:13:31 15     Alabama Democratic Conference -- you developed plans
16     for the State of Alabama for the ADC versus Alabama
17     court case.  You -- you know, you say you developed
18     them in -- for the chro -- geographic State of
19     Alabama.  You did not actually do work for the
15:13:49 20     entity State of Alabama, correct?
21                  MS. HARLESS:  Objection to form.
22     BY MR. BOYNTON:
23            Q.    You were hired by the Alabama Democratic
24     Conference, correct?
15:13:57 25            A.    Correct.
```

62

```
          1          Q.     You were not hired by -- and that was

          2     the plaintiff in the case, correct?

          3          A.     Correct.

          4          Q.     And that was not the defendant --

15:14:00  5          A.     One of the plaintiffs.

          6          Q.     -- Alabama in the case?

          7          A.     Correct.

          8          Q.     And the nature of the work you did in

          9     that case was what?

15:14:06 10          A.     In -- initially the Court wanted to see

         11     examples of how districts were, in essence, packed

         12     really.  And so they turned to me to come up with a

         13     series of maps that would show that.  So I obtained

         14     the data and began to create a series of thematic

15:14:30 15     maps that would highlight how they kind of split

         16     VTDs and actually plu -- packed African Americans

         17     inside many of the districts.

         18          Q.     Did -- go ahead.

         19          A.     Oh.

15:14:42 20          Q.     Sorry.

         21          A.     Then I was just going to follow on and

         22     say that then they came back to me, and this was

         23     over I know a year per -- period of time or

         24     something, to develop the state senate and house

15:14:54 25     plans.
```

63

```
            1          Q.    In that case you provided deposition
            2    testimony; is that correct?
            3          A.    I provided a deposition.  No testimony.
            4          Q.    Okay.  I'm -- I'm probably confusing
15:15:05    5    you.  You were deposed in that case?
            6          A.    Yes.
            7          Q.    And so in the context of being deposed
            8    you were on the record and asked oral questions to
            9    which you provided answers under oath?
15:15:16   10          A.    Yes.
           11          Q.    But you did not go to trial in that
           12    matter?
           13          A.    Correct.
           14          Q.    I understand.  Okay.
15:15:22   15                What do you recall being the -- the
           16    primary issue in that Alabama case?
           17          A.    They found that the -- several of the
           18    state senate and state house were what I would say
           19    packed unconstitutionally, gerrymandered -- racially
15:15:50   20    gerrymandered.  And so they turned it back to the
           21    State and said that, "You have to redraw these
           22    districts."
           23          Q.    Now, did you provide testimony as to
           24    whether it was in fact gerrymandered or --
15:16:01   25          A.    No.  No.
```

64

```
          1              Q.     Solely as to the -- the -- the remedial

          2    maps?

          3              A.     Exactly.  Correct.

          4              Q.     Okay.  With respect to your involvement

15:16:09  5    in City of Greensboro versus Guilford -- what was

          6    the nature of that case?  To your understanding, of

          7    course.

          8              A.     Correct.  Correct.  I -- one of the

          9    things that I provided was, of course, what I call a

15:16:26 10    comparative analysis.  And anytime I say that that

         11    means I compared one plan to -- to another plan,

         12    usually a plan that someone submitted and wasn't

         13    approved with the approved plan.  But I also looked

         14    at partisan performances, meaning how did they

15:16:46 15    configure the district according to a particular

         16    party.

         17              Q.     DOR, for example?

         18              A.     Right.  DOR.  Exactly.

         19                     And then incumbent analysis, which was

15:16:54 20    -- in this particular case I believe once I analyzed

         21    it they ended up actually doing what's called

         22    double-bunking or pairing up only the Democrats

         23    together and they didn't pair the Republicans

         24    together in multiple districts.

15:17:11 25              Q.     On whose behalf did you provide
```

testimony in the case?  I understand you were paid

by the SCSJ, but on whose behalf did you provide

testimony?

  A. I'm not sure if it was the NAACP, but I

15:17:28 know that the Southern Coalition for Social Justice

was -- was the one that paid me.

  Q. And it looks like the matter was City

versus County of a Board of Elections.  Do you

recall anything other than engagement by Southern

15:17:47 Coalition for Social Justice in terms of the -- the

-- the -- the scope of your representation?

  A. No.  No.

  Q. Okay.  Perez v. Abbott, Texas NAACP,

2017.  What was the nature of that case, to your

15:18:02 understanding?

  A. Once again comparative analysis of

different districting plans, but this added a -- an

-- a -- an additional aspect of looking at

communities of interest.

15:18:19   The counsel at that time said that the

courts wanted to see -- see something more than just

pure stats.  And so what I did was I looked at

communities of interest in -- it was in the context

of why these districts should be connected or

15:18:36 configured the way they are of the proposed -- some

66

|     |     |
| --- | --- |
|  | 1 |
|  | 2 |
|  | 3 |
|  | 4 |
| 15:18:54 | 5 |

proposed districts.  And so in the context of that I looked at school district areas to see if they were within the school districts.  I looked at media markets.  I looked at transportation.  And overall I found that there was a commonality amongst these -- the districts that would enable them to actually be together or configured the way they were configured.

Q.    Did you generate your own maps in that case?

A.    No.  Just looked at someone else's.

Q.    And that's the same for the Greensboro case?

A.    Yes.

Q.    Okay.  And then Southern Coalition for Social Justice, 2018, North Carolina State Conference of NAACP Branches v. Lewis, Wake County Superior Court case.  What was the nature of your engagement in that matter?

A.    There were two districts that the courts found to be racially gerrymandered districts.  And the legislature, I believe, in this particular case, I think, created a -- a -- a plan to correct these racially gerrymandered districts.  And in doing so they redrew all of the districts inside Wake.

Q.    Okay.

```
         1        A.     And what my purpose was, to show that
         2   they did not have to redraw all of the districts or
         3   what you call nonadjacent districts, meaning that
         4   clearly you have to redraw the districts that are
15:20:19 5   adjacent, because anytime you change a district you
         6   change two, but they didn't have to redraw all of
         7   the districts.  And, of course, it -- you know, the
         8   -- the -- it was stated that they drew a district to
         9   get some sort of benefit to -- to that.
15:20:34 10            And so what I did was I went through and
        11   corrected the racially gerrymandered districts not
        12   touching any of the -- the nonadjacent districts,
        13   and -- and kind of walked through in -- in my report
        14   how that could be done.
15:20:54 15        Q.     And that's a state court case, I
        16   presume.
        17        A.     Yes, I believe so.
        18        Q.     And then we -- we come to Latasha
        19   Holloway v. City of Virginia Beach.  Is this your
15:21:04 20  first engagement in -- involving Campaign Legal
        21   Center, sir?
        22        A.     Yes.
        23        Q.     Okay.  Without getting into
        24   attorney-client communications, how did -- or
15:21:12 25  litigation work product, how did you come to be
```

```
             1    involved in this case?

             2         A.    I received a phone call from someone who

             3    who's an attorney on the CLC asking if --

             4              MS. HARLESS:  I -- I just want to --

15:21:28     5    BY MR. BOYNTON:

             6         Q.    I don't need the context.

             7              MS. HARLESS:  Yeah.

             8    BY MR. BOYNTON:

             9         Q.    I just -- yeah.  You received a phone

15:21:33    10    call from an attorney --

            11         A.    Right.

            12         Q.    -- that was affiliated with CLC.  That

            13    --

            14         A.    That's right.

15:21:37    15         Q.    That's fine --

            16         A.    Yeah.

            17         Q.    -- as far as it goes.

            18              Do you recall when you were en --

            19    engaged for this matter originally?

15:21:43    20         A.    Last year was the first time that I put

            21    together some preliminary plans, or plans basically

            22    if you will, of configurations for the city.

            23         Q.    Do you recall in what month of 2018 you

            24    were originally retained?

15:22:05    25         A.    I would say -- I don't have it there.  I
```

69

```
 1    would say probably the fall.  And that meant
 2    probably September, October, November.  Somewhere
 3    around that --
 4         Q.    Understood.
 5         A.    -- period of time.  Yeah.
 6         Q.    And I understand --
 7         A.    Yeah.
 8         Q.    -- your basis for compensation in this
 9    case is $180 an hour.
10         A.    Yes.
11         Q.    Does that change based upon providing
12    testimony or going to court or traveling?
13         A.    I -- I don't think I included that this
14    time.  I do include it most times, but I don't think
15    I did include a different rate.
16         Q.    So 180 an hour when you're working for
17    the --
18         A.    Right.
19         Q.    -- for this case?
20         A.    Correct.  I -- I think that's the
21    contract that I looked at.
22         Q.    Was there any advance payment or fixed
23    fee for the generation of --
24         A.    No.
25         Q.    -- a map at any point in time?
```

15:22:23  5
15:22:29  10
15:22:39  15
15:22:46  20
15:22:54  25

70

```
  1            A.    No.  No.

  2            Q.    Okay.

  3            A.    That would be nice.

  4            Q.    Had you prepared a -- a -- a map for the
15:23:07  5   purposes of -- of establishing what we will be

  6   talking about as Gingles precondition 1 prior to the

  7   Holloway case?

  8            A.    Have I --

  9            MS. HARLESS:  To -- hold on.  To the
15:23:18 10   extent you're asking him -- I just want to

 11   differentiate.  To the extent you're asking him

 12   about a draft expert report, I'm going to instruct

 13   him not to answer that.

 14            MR. BOYNTON:  I'm just asking him --

 15   BY MR. BOYNTON:

 16            Q.    Outside of the Holloway case have you

 17   ever previously been engaged for the purpose of

 18   providing expert opinions or testimonies in regard

 19   to establishing the Gingles 1 factor in any court?
15:23:39 20            A.    Outside the Holloway case?

 21            Q.    Yes.

 22            A.    No.

 23            You're -- you're saying now -- could you

 24   repeat that just in case?  I want to make sure that
15:23:47 25   I --
```

71

1          Q.    Sure.  I'll be happy to.  My

2    understanding is your testimony in the Latasha

3    Holloway case, the case that we're having the

4    deposition --

15:23:55  5          A.    Correct.

6          Q.    -- in today, relates to your opinions

7    that one or more maps can be drawn in the city of

8    Virginia Beach that satisfy Gingles precondition

9    number 1, correct?

15:24:06  10         A.    Correct.

11         Q.    Have you been retained to provide

12   testimony of that ilk -- of that scope in a case

13   other than the Latasha Holloway case?

14         A.    Oh, I see what you're -- you're getting

15:24:20  15   to.

16               No.

17         Q.    What portion of your -- or I should say

18   what portion of CensusChannel, LLC's work is what I

19   will describe as litigation consulting at this point

15:25:10  20   in 2019?

21         A.    As far as the percentage of --

22         Q.    Percentage of revenue.

23         A.    -- revenue?

24         Q.    Litigation consulting versus other

15:25:16  25   sources.

1          A.    I would probably say maybe -- at this

2     particular moment 20 percent probably.

3          Q.    Ha -- has that increased or decreased

4     over the years?

15:25:33   5          A.    It -- the percentage?

6          Q.    The proportion of your work --

7          A.    For?

8          Q.    -- in percentage terms that is for

9     litigation consulting.

15:25:41  10          A.    It depends on the -- the timeframe,

11     meaning that -- the purpose of my master's was to

12     expand beyond just pure redistricting.  And that's

13     what has occurred.  It took a -- it took a -- a year

14     or so to actually get going, but it -- it expands.

15:26:06  15     So restricting would not take up a sizable amount.

16     That would expand to other areas.

17          Q.    One of those areas being litigation

18     consulting?

19          A.    Yes.  Yes.  I mean --

15:26:15  20          Q.    Are there other significant practice

21     areas that you have gleaned or gained since 2016?

22          A.    Yes.  Yes.

23          Q.    What are those?

24          A.    For example, I have a couple of clients.

15:26:27  25     The NAACP is one client.  All of it's related to

```
 1   mapping or demographics.
 2              And then another client, Southern Echo,
 3   which is related to mapping as well.  More
 4   educational based.
15:26:43  5              I just picked up a third client, the
 6   Legal Defense Fund, which I guess is pertaining to
 7   redistricting, although they're looking at other
 8   things as -- demographic population expansions.
 9   Things of that nature.
15:26:55 10        Q.   And when you say Legal Defense Fund are
11   you also referring to the NAACP?
12        A.   Yes.  The -- yeah.  Okay.
13        Q.   But that's a different client than the
14   -- the ones --
15:27:04 15        A.   That's correct.
16        Q.   -- you mentioned a moment ago?
17        A.   They're two separate entities.  That's
18   right.
19        Q.   Okay.  Since 2016 has the percentage of
15:27:13 20   your practice or work that is represented by
21   litigation consulting increased or decreased?
22        A.   The percentage has decreased overall.
23   And that was the purpose is that it would decrease
24   and I wouldn't be dependent upon that.
15:27:32 25        Q.   Dependent upon litigation consulting?
```

74

```
         1          A.    Exactly.

         2          Q.    Okay.

         3          A.    Exactly.

         4          Q.    Do you believe you were dependent upon
15:27:39 5     litigation consulting prior to 2016?

         6          A.    When you say -- and -- and probably I
         7     wouldn't -- I shouldn't have said dependent upon.  I
         8     would say that was probably my specialty and I
         9     focused on that.  Specifically during the period of
15:27:51 10    time where I was getting my master's, that's what I
         11    focused a lot -- a lot of my energy on.

         12             But besides that I would say that, as I
         13    said before, the plan that I had was to actually
         14    expand -- expand beyond my redistricting litigation
15:28:15 15    and add on -- on other demographic and
         16    mapping-related projects, and that's what has
         17    occurred.

         18         Q.    And I don't want to take but so much
         19    time on it, but if you would turn then to the
15:28:34 20    earlier portions of your career.  And you were
         21    educated at the Virginia Tech University?

         22         A.    Yes.

         23         Q.    Virginia Polytechnic Institute and State
         24    University I believe is the full name.

15:28:47 25         A.    That I think is the cor -- the -- still
```

```
 1    the legal name, I believe.
 2           Q.    And you received your --
 3                 MS. HARLESS:   Sorry.  I'm sorry.  Are
 4    you on page 28, just to clarify?
 5                 MR. BOYNTON:   Yeah.  I -- I jumped back
 6    to 28.  I'm sorry.
 7    BY MR. BOYNTON:
 8           Q.    You received your bachelor's of science
 9    degree in electrical engineering in 1982, correct?
10           A.    Correct.
11           Q.    And what prompted you to -- at least
12    initially by -- by education to become an electrical
13    engineer?
14           A.    I loved designing things, and so
15    engineering became a natural career to pursue
16    because I always loved putting things together and
17    creating things.  And so in high school I took a
18    couple of electronic courses that led me to actually
19    I think expand my electronics knowledge.
20           Q.    What -- what happened between 1982 and
21    1991 to cause you to transition from engineering to
22    demographics or -- or mapping?
23           A.    Right.  And -- and I mentioned this, but
24    I'll -- I'll repeat.  The -- I worked for Teledyne,
25    Inc., which was, as I said, a manufacturing
```

15: 28: 54
15: 29: 00
15: 29: 10
15: 29: 34
15: 29: 55

1    company -- a division of -- of -- of Teledyne, Inc.,

2    for a few years.

3              And then I worked for a government

4    consulting firm, EER Systems -- excuse me -- eng --

15:30:11  5    engineering and economics research, a government

6    contractor.  And then I received, like I said, the

7    entrepreneurial bug where I wanted to be in business

8    for myself, and so I started with another individual

9    and -- and a silent partner a computer training

15:30:30  10   center called the Executive -- Executive Training

11   Center.  And we had -- I don't need to go into

12   detail, but after a couple of years the -- like I

13   said, the recession was kicking in.  One of the

14   things that they -- ha -- what occurs with companies

15:30:53  15   is they cut back on training.  That is one of the

16   first things they cut back on.  So we got hurt and

17   so we had to close the doors.

18              I wanted to continue to be in somewhat

19   of the entrepreneurial world and so consulting

15:31:07  20   became that logical choice.

21              After a -- a -- a -- a -- we closed our

22   doors I began looking for computer consulting work

23   and landed a contract with Norfolk State University

24   at the School of Education's computer lab as their

15:31:28  25   lab manager, setting up network systems, helping

```
          1    people with problems throughout the -- the -- the

          2    department.

          3              And then someone who was -- who was

          4    affiliated with the pro -- the -- the department

15:31:43  5    came to me and said there's a project in political

          6    science that I would be suited for.  I went over and

          7    -- and talked to the co-directors of The

          8    Redistricting Research Project and they hired me.

          9    And so my life took off in a completely different

15:32:00 10    direction after that.

         11         Q.    Where would you say your pre-1991

         12    background in demographics or mapping came from?

         13         A.    Just experience really.  Dealing with

         14    census data.  What -- you know, in redistricting you

15:32:18 15    have to deal with census data and understanding how

         16    to use it and utilize it and process and analysis,

         17    access it.  And so I was forced and compelled to

         18    actually understand that.

         19              And, of course, you -- you know, you --

15:32:32 20    you pick up manuals, read -- you know, Census

         21    Bureau -- I focused on census data a lot.  And --

         22    and the census has a plethora of -- of manuals and

         23    -- and technical documentation you can turn to.

         24         Q.    The -- the first electoral map you

15:32:49 25    produced was in conjunction with your work at
```

```
 1    Norfolk State University in 1991 to 1999; is that

 2    correct?

 3           A.    Correct.  Correct.

 4           Q.    Is there any specialized training as to

15:32:59  5    the -- the -- the generation of -- of electoral maps

 6    separate and apart from what we've talked about

 7    today that you had as of 1999 -- 1991 or earlier?

 8           A.    No, no training in electoral maps

 9    creation.

15:33:24  10          Utilizing the geographic information

11    system, which really started to occur in the '90

12    round, required -- began to require a person with a

13    technical background.  So I think I was suited for

14    the map-drawing aspects -- not the political

15:33:43  15    science, but the map-drawing aspects because sort of

16    the level of experts split at that particular period

17    of time.  You had political science doing many

18    things and attorneys, but at that particular time it

19    split into political science and then map drawing

15:34:00  20    once GIS technology took off in the '90s.

21           Q.    Okay.  Thank you.

22           A.    Uh-huh.

23           MR. BOYNTON:  I'm going to suggest --

24    we're kind of done with the résumé portion of this.

15:34:09  25    It's been about an hour and a half.  Would it be
```

1    good to take about a five-minute break?

2                    THE DEPONENT:  Yes.

3                    MR. BOYNTON:  Okay.

4                    THE DEPONENT:  Appreciate that.

15:34:15  5          THE VIDEOGRAPHER:  We're off record at

6    3:33 p.m.

7                    (Recess)

8                    THE VIDEOGRAPHER:  We are back on record

9    at 3:45 p.m.

15:46:56  10  BY MR. BOYNTON:

11        Q.    Mr. Fairfax, we are back on the record.

12              Let's, if we can, turn our attention to

13   your initial report dated July 15th, 2019, that I

14   believe you have in front of you as Exhibit 2.  Is

15   that correct?

16        A.    That's correct.

17        Q.    I'd ask you just as a preliminary matter

18   to kind of flip through it and make sure it looks

19   like a complete copy of the report that you

15:47:19  20  provided.  I'm not asking you to give me a close

21   reading but just to identify that it appears to be

22   yours and complete.

23        A.    Yes.

24        Q.    Okay.  Thank you.

15:48:17  25          Looking at the very beginning, or page 2

80

 1    I guess, of your report, would you describe for me

 2    the -- the -- in your own words the scope of your

 3    representation initially in this matter?

 4         A.    What I was asked to do or --

15:48:33  5    Q.    Yes.  Exactly.

 6         A.    Okay.  I -- I was asked to determine

 7    whether one or more majority Hispanic, black and

 8    Asian combined districts could be created in the

 9    city of Virginia Beach.

10         Q.    All right.

11         A.    And then I was also asked to look at

12    past and recent demographics in the city.

13         Q.    Okay.  In terms of reviewing past and

14    recent demographics pertaining to the city, what did

15:48:57 15    you understand the purpose of that inquiry to be?

16         A.    I wasn't given any rationale for it.

17         Q.    Does it inform the -- the first task, if

18    we call that the second task?

19         A.    I would -- I -- I would potentially do

15:49:13 20    some type of analysis for socioeconomic data

21    potentially.

22         Q.    Well, you -- you were not retained to

23    provide expert opinions regarding what we will call

24    Gingles prong 2 or 3, correct?

15:49:31 25    A.    No.  No.

81

```
             1          Q.    You are not offering any opinions in
             2   this case as to political co -- co -- cohesion,
             3   correct?
             4          A.    Correct.
15:49:35     5          Q.    You were told that the -- the group you
             6   were asked to analyze was Latino or Hispanic, black
             7   and Asian combined districts, correct?
             8          A.    Correct.
             9          Q.    That was -- that was in the mission
15:49:47    10   statement from the beginning?
            11          A.    Correct.
            12          Q.    Okay.  Were you retained to provide
            13   expert opinions in regard to the what -- what we
            14   understand to be the totality of the circumstances
15:49:59    15   analysis?
            16          A.    No.
            17          Q.    Okay.  Are you intending to provide
            18   opinions in this case as regard -- in regards to
            19   totality of the circumstances analysis under
15:50:08    20   Gingles?
            21          A.    No.
            22          Q.    You've obviously looked at a lot of
            23   jurisdictions around the country in -- in your work
            24   since 1991.
15:50:23    25          A.    (Moved head up and down.)
```

82

```
          1          Q.     Have you done demographic analytical
          2     work in regard to the District of Columbia?
          3          A.     D.C.?
          4          Q.     (Moved head up and down.)
15:50:36  5          A.     I -- I know I've looked at D.C., but --
          6     but I'm trying to think any particular project, but
          7     I have looked at it.  I can't recall a specific, you
          8     know, contract or project on D.C.
          9          Q.     What about the Baltimore area?
15:50:58 10          A.     In the context I guess of drawing or
         11     developing plans for the -- in the state in what --
         12          Q.     The state -- the whole state of
         13     Maryland?
         14          A.     Yeah.  Yeah.  I mean, Baltimore, of
15:51:10 15     course, was included.  And, of course, there's a
         16     district that exists, you know, in the city or
         17     around the city.
         18          Q.     And you -- obviously from your special
         19     master work you've looked at the Miami-Dade area; is
         20     that correct?
         21          A.     Uh-huh.  Yes.
         22          Q.     What other highly populated areas have
         23     you looked at nationally as part of your demographic
         24     work?  Largest hundred cities.
15:51:47 25          A.     I know in -- in Florida -- I looked at
```

```
           1    socioeconomic aspects in several cities and counties
           2    in Florida, and several of them were large.
           3        Q.    Texas as well, I presume.
           4        A.    Texas, the -- the -- of course, the
15:52:15   5    projections for the districts in Texas.
           6        Q.    What specific cities did you look at
           7    with any degree of granularity?
           8        A.    I know there was the cities around or --
           9    Harris County.
15:52:28  10        Q.    Is that Dallas?
          11        A.    Fort -- yeah.  Dallas, yes.
          12        Q.    I'm asking, so...
          13             MR. HEBERT:  It's Houston.
          14        A.    It's Houston.  Okay.  Good.  Houston.
15:52:38  15    There you go.
          16             The other one as well.  There -- there
          17    are two big hubs, and I can't remember the counties.
          18    It's -- it's...
          19    BY MR. BOYNTON:
15:52:45  20        Q.    You recall looking at the Dallas --
          21        A.    Yes.
          22        Q.    -- metro area?
          23        A.    Yes.
          24        Q.    Okay.  Well, we can talk about metro
15:52:50  25    areas.
```

84

```
              1          A.     Yeah.

              2          Q.     I don't need exact county names.  I'm --

              3    I'm more focused, actually, on the metro areas.  I

              4    think people will understand that better going

15:52:55      5    forward.

              6          A.     Right.

              7          Q.     What other major metro areas have you

              8    reviewed or -- or studied as part of your

              9    demographic work?

15:53:07     10          A.     I looked at Los Angeles.  I looked at

             11    the city of Los -- now, are you referring to

             12    redistricting or any -- any redistricting?

             13          Q.     Anything that would allow you to look at

             14    population --

             15          A.     Yeah.  Yeah.

             16          Q.     -- location trends.

             17          A.     Yeah.  Well, I mean, if -- if that's the

             18    case, then you have New York City and you have Los

             19    Angeles.  You have, like you said, Texas.  Atlanta.

15:53:53     20    You know, several places in -- in Florida.  You

             21    know, Miami, Jacksonville.

             22          Q.     The Raleigh-Durham area in North

             23    Carolina?

             24          A.     Raleigh-Durham area.  Yes.

15:54:06     25          Q.     Charlotte in North Carolina?
```

1          A.    Wake, which is big.  And Charlotte,

2     that's right.

3          Q.    Anywhere in Alabama?

4          A.    Yes.  Mississippi.  Alabama and

15:54:22    5     Mississippi.  I'm think -- thinking of the cities

6     there.  I guess Birmingham would be Alabama.

7          Q.    Louisiana?

8          A.    Louisiana.

9          Q.    Large cities there?

15:54:36   10          A.    That's right.  New Orleans.  Baton

11     Rouge.

12          Q.    Okay.

13          A.    Uh-huh.  Yes.

14          Q.    So a -- a significant number of the --

15:54:43   15     the top hundred metro -- major metropolitan areas in

16     the country?

17          A.    Correct.

18          Q.    What's your familiarity with other

19     unique cities within the Hampton Roads area?

15:54:52   20               MS. HARLESS:  Objection to form.

21     BY MR. BOYNTON:

22          Q.    In terms -- I can rephrase.

23               What -- what demographic analysis have

24     you done in regard to the specific cities in the

15:55:00   25     Hampton Roads area?

```
              1          A.    I -- I've looked at the population

              2    increase in the Hampton Roads area, meaning that in

              3    the context of how population changed from 2000 to

              4    2010, in order to show deviation percentages of --
15:55:28      5    of particular districts and their lack thereof, in

              6    -- increase or decrease in population.

              7          Q.    And has that been with respect to racial

              8    or ethnicity demographics as well?

              9          A.    It was -- now, mostly just the
15:55:43     10    population deviations.

             11          Q.    General growth?

             12          A.    General growth, yeah.

             13          Q.    Not -- not trends as to African American

             14    or --
15:55:50     15          A.    Correct.

             16          Q.    -- or Hispanic or Asian locations?

             17          A.    Correct.  Correct.  Not that.

             18          Q.    Anything specific to political

             19    affiliation in the Hampton Roads area?
15:55:58     20          A.    No.  Well, in the context of I worked --

             21    and this isn't included in my résumé.  I should have

             22    included it -- with the Bethune-Hill case.

             23          Q.    Just tell me about that case.

             24          A.    Yes.
15:56:14     25          Q.    That's probably the easiest way.
```

87

                 1     What --
                 2             A.      Right.
                 3             Q.      What do you understand that case to have
                 4     been about?
15:56:17         5             A.      Right.   There -- there were 11
                 6     unconstitutional districts, house districts, and the
                 7     courts directed the State to redraw those districts.
                 8     And so for the NAACP I developed a plan that
                 9     corrected the racial gerrymanders.
15:56:36        10             Q.      Was your plan adopted by the court?
                11             A.      No.
                12             Q.      It was submitted to the court, though?
                13             A.      Yes.
                14             Q.      What -- what plan was adopted, to your
15:56:43        15     knowledge?
                16             A.      From -- from my understanding, you know,
                17     they hired the special masters.   And the special
                18     masters received input from various individuals,
                19     including NAACP -- various organizations, rather.
15:56:58        20     And he developed a plan, but I don't think they
                21     adopted that plan.   They adopted a -- an alternative
                22     plan to what the special masters I think even
                23     created.   That's my understanding.
                24             Q.      What -- just to kind of track the --
15:57:14        25     your involvement, you were hired by the NAACP to

88

```
 1    prepare a -- a set of maps to be remedial in the

 2    context of that case?

 3            A.    Correct.

 4            Q.    And they were submitted under the -- the

 5    name of the NAACP as suggestions to the court?

 6            A.    Correct.

 7            Q.    And then the court obviously makes its

 8    choice for whatever reasons.

 9                  Were you given any reason as to why the

10    plans that you prepared on behalf of the NAACP were

11    not adopted in that context?

12            A.    Yes.  And at the time I didn't -- I

13    should have realized this because I worked on the --

14    the court case on Wake County.  One of the districts

15    that had to be changed was a nonadjacent district.

16    And so that eliminated that plan because I did touch

17    a nonadjacent district.

18            Q.    So the Court's desire was to not touch

19    nonadjacent districts and you happened to change a

20    nonadjacent district?

21            A.    Now, when you say the Court's --

22            Q.    I -- I -- I --

23            A.    -- the -- the special master --

24            Q.    Yeah.

25            A.    -- is what you're saying?
```

15:57:25    5
15:57:35   10
15:57:53   15
15:58:10   20
15:58:13   25

```
 1          Q.    I apologize.  Yeah.  And I -- that was a
 2    tough question anyway.
 3          A.    Yeah.
 4          Q.    Let me see if I can rephrase it.
 5          A.    Right.
 6          Q.    The report that you prepared for the
 7    NAACP that was submitted to the special master or to
 8    the court changed a noncontiguous district, correct?
 9                MS. HARLESS:  Objection to form.
10          A.    Nonadjacent.
11    BY MR. BOYNTON:
12          Q.    You can answer.
13          A.    A nonadjacent district.
14          Q.    I'm sorry.  A nonadjacent district.
15          A.    Yes.
16          Q.    Thank you for clarifying.
17          A.    Uh-huh.
18          Q.    And the court -- the -- the -- the plan
19    ultimately adopted by the court did not change any
20    nonadjacent districts.  Is that your understanding?
21          A.    Correct.
22          Q.    Okay.
23          A.    That's my understanding.  Yes.
24          Q.    Did you understand that the special
25    master or the court was seeking to implement a plan
```

15:58:18
15:58:31
15:58:42
15:58:50

```
  1    that did not change any nonadjacent districts?
  2           A.    No.
  3           Q.    It did not submit --
  4           A.    I --
15:59:01  5         Q.    -- criteria to the -- to the --
  6           A.    The --
  7           Q.    -- folks who were providing plans?
  8           A.    The -- the -- the criteria I had didn't
  9    include that.
15:59:08 10        Q.    What criteria did it include?
 11           A.    Well, I mean, the normal traditional
 12    redistricting criteria; minimizing splits,
 13    compactness.  There was a certain deviation
 14    percentage that they were looking for.  And you had
15:59:26 15   to develop a plan and not -- they were looking --
 16    and I can't re -- remember the wording, but they
 17    were looking, of course, to dilute -- not dilute
 18    minority voting strength.
 19           Q.    I understand that the -- the -- the
15:59:45 20   target for the reconfigured minority and majority
 21    districts was 51 or 52 percent, something less than
 22    the 55 that was found unconstitutional.  I'm just
 23    asking for your understanding.
 24           A.    Right, right, right.  I -- I -- I don't
15:59:55 25   know if there was a particular target in --
```

1    involved.  I don't know if there was a target per

2    se.

3         Q.    Do you know if the court in that case

4    was using the -- the HBA breakdown, the -- the

16:00:07  5    Hispanic-black-Asian breakdown that's being applied

6    in the -- or attempted to be applied in the Holloway

7    case?

8              MS. HARLESS:  Objection to form.

9         A.    Yeah.  I don't know that.

16:00:19  10   BY MR. BOYNTON:

11        Q.    When you prepare -- prepared your

12   districts did you target a certain percentage of

13   minority population in the reconfigured districts?

14        A.    No.  Huh-uh.  No.

16:00:28  15        Q.    You -- you were just reconfiguring under

16   traditional principles?

17        A.    That's exactly right.

18        Q.    Okay.

19        A.    No.  No.  And not dilute minority voting

16:00:37  20   strength.

21        Q.    And -- and of -- in attempting to avoid

22   diluting minority voting strength in the

23   Bethune-Hill case --

24        A.    Uh-huh.

16:00:48  25        Q.    -- did you consider -- well, what ethnic

92

```
           1    groups did you consider to be the minority
           2    population?
           3         A.    They were -- those districts were
           4    African American -- majority African American.
16:01:05   5    Yeah.
           6         Q.    Did you do a separate analysis or -- or
           7    consideration --
           8         A.    No.
           9         Q.    -- of -- of -- of Hispanic or Asian
16:01:12  10    voters in that case?
          11         A.    No.   Huh-uh.
          12         Q.    How did you treat mixed-race voters in
          13    that case?
          14         A.    I can't recall if I added them
16:01:28  15    separately or just used the stand-alone -- I can't
          16    recall whether I -- whether I added them separately.
          17         Q.    Okay.   Now, for purposes of our
          18    discussion here today when we use the term "HBA"
          19    what does that mean in your report?
16:01:54  20         A.    It means Hispanic, black and Asian
          21    combined.   And usually the term "CVAP" is after it
          22    if it's citizen voting age population.
          23         Q.    And -- and it -- I'm sorry.   I didn't
          24    mean to talk over you.
          25         A.    Uh-huh.
```

1      Q.    So we have citizen voting age

2  population, correct?

3      A.    Correct.

4      Q.    We also then have just overall voting

16:02:14  5  age population?

6      A.    Correct.

7      Q.    And then we have total population?

8      A.    Right.

9      Q.    And --

16:02:18  10     A.    Correct.

11     Q.    And the -- in normal circumstances C --

12  CVAP is a subset of VAP, correct?

13     A.    Correct.

14     Q.    And then under normal circumstances VAP

16:02:27  15  is a subset of total population, correct?

16     A.    Correct.

17     Q.    Okay.  Do you recall what specific past

18  and recent demographics you were asked to review

19  pertaining to the city of Virginia Beach?

16:02:53  20     A.    I wasn't given any direction on all of

21  the various, you know, aspects/attributes, and so

22  that I picked the ones that I thought would be

23  appropriate from just past experience.

24     Q.    Which ones did you pick?

16:03:09  25     A.    I looked at -- for the -- comparing the

```
            1    city's growth I looked at total population.  Then,
            2    of course, I looked at the -- the three races;
            3    Hispanic, black and Asian, and then also white
            4    population for the city.
16:03:25    5            And then with socioeconomic data I
            6    picked the indices that I thought would give some
            7    sort of the social status or outcomes that are
            8    normally used, which are income, education, poverty.
            9    And then later on I think I used housing values as
16:03:42   10    well.
           11        Q.    What were the indices you referred to
           12    for those four topics?
           13        A.    Now, say the --
           14        Q.    I -- I believe you said you referred to
16:03:50   15    indices for income, education --
           16        A.    Right.
           17        Q.    -- property values and a fourth one that
           18    escapes me at the moment.
           19        A.    Right.
16:03:58   20        Q.    Which specific indices did you look at
           21    for each of those -- those datasets?
           22        A.    Right.  When I say indices I'm looking
           23    at the American Community Survey data.  That's what
           24    I'm looking at.  I'm not speaking of the indices
16:04:12   25    like you would get at -- like the U.S. government
```

95

```
 1    would have indices.  I'm looking at the American
 2    Community Survey data variables.
 3         Q.    Okay.  So you -- you looked, obviously,
 4    at the American Community Survey and all of its --
 5         A.    Correct.
 6         Q.    -- iterations for 2013 to 2017, correct?
 7         A.    Correct.
 8         Q.    You looked at the 2010 census data,
 9    correct?
10         A.    Correct.
11         Q.    You looked at other decennial census
12    datas from past cycles, correct?
13         A.    Correct.
14         Q.    What other demographic data did you look
15    at to inform your initial report?
16         A.    I think you've covered -- the -- the
17    1990 census you might have left out.  I looked at
18    the 2000 census, looked at the 2010 census for
19    decennial census.  And this came from the P.L. 94,
20    which is the standard redistricting file.
21              And then I looked at information
22    pertaining to the American Community Survey, the
23    five-year -- the 2013 to 2017 for the more recent
24    one that would break it down to a -- a block le --
25    group level.
```

16:04:31  10
16:04:39  15
16:04:56  20
16:05:15  25

```
 1                And then I believe I also looked at one

 2    time the 20 -- 2008 to 2012 five-year as well.  And

 3    I --

 4         Q.    Do -- do you recall if you looked at ACS

16:05:27  5    2008 to 2012 dataset for your -- to inform your

 6    initial report or your rebuttal report or both?

 7         A.    The initial report.

 8         Q.    Okay.

 9         A.    I -- I've got it in the initial report

16:05:38 10    in one of the sections.  And I can't recall it right

11    now, but we'll probably go --

12         Q.    All right.

13         A.    -- go through it.

14         Q.    Anything else in terms of sources of

16:05:47 15    demographic data to inform your initial report?

16         A.    I think that was it as far as the

17    demographic data.

18         Q.    Okay.  Any non-demographic data you

19    considered in preparing your initial report?

16:06:07 20         A.    From the City's website I pulled down

21    precinct shape files, in essence, that gave me the

22    boundaries of precincts.  I also pulled down the

23    shape files for what they call subdivisions, and

24    they're similar to neighborhoods.  I pulled those

16:06:22 25    down.  The boundaries of the 1990 TIGER files -- I
```

97

1    accessed those from the census website.

2           Q.    And before we go further what is a TIGER

3    file?

4           A.    Oh.  It's the shape -- Topographically

16:06:39  5    Integrated Geographic Encoding Referencing -- and

6    they call it lines.  They used it to call it lines.

7    I'm sorry.  Did you get...

8           Q.    She did not or she did?

9                 THE REPORTER:  I'm fine.  Go ahead.

10   BY MR. BOYNTON:

11          Q.    Okay.

12          A.    Okay.  But it's -- it's TIGER's boundary

13   file for block -- bloc, groups tract -- all their

14   geographies use TIGER.  And it's how they

16:07:01 15   standardize the boundaries.

16          Q.    Is that -- so you said 1990 data?

17          A.    Yeah.  That was 1990 for census tract.

18   And then, of course, for 2010 -- the 2010 boundary

19   files.  And it comes with Maptitude.  Caliper

16:07:18 20   processes the census data and -- and puts it into a

21   format -- their format, but it's the same data, just

22   in their format.

23          Q.    Anything else?

24          A.    I'm trying to -- at -- at one period of

16:07:43 25   time I think I requested the addresses from the City

98

```
           1    for incumbents --
           2           Q.    Okay.
           3           A.    -- just to see where they were -- you
           4    know, they resided.
16:07:55   5           Q.    Did that get incorporated into your
           6    initial report in any way?
           7           A.    No.  I just wanted to look at them to
           8    see where they were included to -- in the map to
           9    make sure that -- that I could potentially create
16:08:07  10    something if they were ex -- ex -- not excluded
          11    basically or were there any problems.  And there
          12    wasn't a priority, but I always try to look at that
          13    to stop the -- a political argument let's say.
          14           Q.    But you didn't develop any specific maps
16:08:23  15    to -- to accommodate for that?
          16           A.    No.  No.  No.
          17           Q.    Okay.  And you -- you, I assume, had
          18    addresses for Ms. Holloway and Ms. Allen.
          19           A.    Yes.  Yes.  That's right.  You -- I
16:08:36  20    appreciate that.  Yes, I had those addresses as
          21    well.
          22           Q.    I presume those were provided to you by
          23    counsel.
          24           A.    Yes.
16:08:42  25           Q.    Okay.  And so you didn't independently
```

99

```
          1    determine where they lived, you just took whatever
          2    address was provided and punched it in?
          3         A.    Correct.
          4         Q.    Okay.
16:09:04  5         A.    Did I mention the CVAP data?  I'm
          6    looking at my report now.  I think I mentioned that,
          7    the ACS data including the CVAP data.
          8         Q.    You're -- you're looking at -- I don't
          9    know if you're looking at it or not, but page 3
16:09:24 10    tends to or -- or starts to explain several of the
         11    datasets were utilized and obtained from various
         12    government websites.
         13         A.    Right.  Correct.
         14         Q.    If you would review pages 3 and 4 of
16:09:34 15    your report.
         16         A.    Excuse me.  Yes.
         17         Q.    Sitting here today, are there any other
         18    datasets or data that you downloaded or received or
         19    considered for your report other than the items
16:10:00 20    you've testified to here today or the items listed
         21    on pages 3 and 4?
         22         A.    Not that I can think of right at this
         23    particular moment.  It looks concise and complete.
         24         Q.    Well -- well, I'm staying on page --
16:10:13 25    well, yeah -- page 4.  I thought -- my understanding
```

100

```
          1    is that the ACS dataset 23 -- 2013 through 2017 is

          2    only available at the block group level and not the

          3    block level; is that correct?

          4         A.    That is correct.

16:10:24  5         Q.    And is that why to get to a block level

          6    -- we'll get there later, but you applied a

          7    disaggregation process?

          8         A.    Correct.

          9         Q.    And that process in -- in your original

16:10:36 10    iteration was using the Maptitude software?

         11         A.    Correct.

         12         Q.    When you say estimated CVAP data was

         13    available for review at the district level what do

         14    you mean by district level?

16:11:00 15         A.    Well, district meaning the district.

         16    It's -- once the disaggregation process was

         17    completed, then estimated data is available.

         18         Q.    And when you say the district you mean

         19    the ten different --

16:11:11 20         A.    Yes.

         21         Q.    -- districts you are setting forth as a

         22    proposed illustrative plan?

         23         A.    Correct.

         24         Q.    Okay.  We get to the summary of your

16:11:29 25    opinions and conclusions on page 4 and 5.
```

1          A.     Yes.

2          Q.     To -- to what level of scientific or

3    statistical certainty do you render your opinions?

4    Is there a percentage factor you can put on them?

16:11:44  5    90 percent certain?  How do you get there as a

6    statistician or a demograph -- demographer in your

7    world?

8          A.     It -- I saw that in -- in Professor

9    Morrison's opinion.  And my -- my -- all of my

16:12:06  10   opinions I -- I'm certain about.

11             Applying a -- a confidence level -- I

12   don't know how you do that.

13         Q.     Well, certain --

14         A.     It's -- it's based upon subjective.

16:12:18  15         Q.     Well, and that's what I'm getting to --

16         A.     Yeah.

17         Q.     -- is your certainty.

18             I mean, certain to me means a hundred

19   percent, but I -- I understand to --

16:12:23  20         A.     Yes.

21         Q.     -- statisticians it may mean something

22   different.  So --

23         A.     Right.  Right.

24         Q.     -- are you saying you're certain at a

16:12:29  25   hundred-percent level or something else?

102

```
              1         A.    Well, you're never certain at a hundred
              2   percent because there's always exceptions to the
              3   rule, but -- I mean, if I was compelled to put a
              4   percentage, it -- I -- I would probably use the same
16:12:47      5   percentage as he would -- he did, which is 95
              6   percent.  But -- but it's all subjective.  I can't
              7   -- I don't -- there's no quantification --
              8         Q.    I -- I --
              9         A.    -- of how you actually --
16:12:55     10         Q.    I'm -- I'm sorry.  I'm not trying to cut
             11   you off.
             12         A.    Yeah.
             13         Q.    I'm just asking for your definition as
             14   you employed it --
16:12:59     15         A.    Right.
             16         Q.    -- in this report.
             17         A.    I -- I provide you my opinion and I
             18   provide it, you know, truthfully.  And applying a --
             19   a -- a confidence level is difficult for me to do
16:13:14     20   because you have to provide some quantification.
             21   And I don't know how you do that without data.
             22         Q.    Okay.  And -- and I'll -- I'll drill
             23   down on it in more detail in a -- in a bit, but you
             24   say thirty-one -- I'm on top of page 5 now for --
16:13:44     25         A.    Okay.
```

103

```
        1           Q.     -- ease of following.
        2                  Thirty-one out of the hundred census
        3     tracts in Virginia Beach contain 54.4 percent of the
        4     HBA population.
16:13:56 5                 Is -- is that -- again not using
        6     certainty, but is it roughly -- is that -- in --
        7     using lay person's terms, that roughly a third of
        8     the census tracts contain roughly half of the HBA
        9     population in Virginia Beach?
16:14:10 10          A.     Right.  Less than a third.
        11          Q.     Slightly less than a third?
        12          A.     (Moved head up and down.)
        13          Q.     33 percent would --
        14          A.     Right.
16:14:14 15          Q.     33 districts would be --
        16          A.     Right.
        17          Q.     -- a third?
        18          A.     That's right.
        19          Q.     You -- you go further at the -- in the
16:14:24 20   summary page to discuss Virginia Beach's white
        21    population outpaces the HBA population on several
        22    socioeconomic indicators according to ACS data.
        23                 Did you -- so did you compare simply the
        24    Virginia Beach white population versus other
16:14:45 25   ethnicities' popu -- status under the ACS or did you
```

104

```
          1    go to national averages or any other --
          2         A.    No.
          3         Q.    -- extrinsic source?
          4         A.    No.  Just in the city.
16:14:55  5         Q.    Comparing -- comparing different --
          6    across the ethnicities?
          7         A.    That's correct.
          8         Q.    Okay.  What -- what data source or --
          9    and maybe what -- what location within the ACS data
16:15:10 10    source did you determine that Hispanic, black and
         11    Asian persons had significant -- significantly
         12    higher percentages of persons with no high school
         13    education?
         14         A.    This is using the five-year 2013 to 2017
16:15:24 15    ACS.
         16         Q.    And that's the same pervodian -- lower
         17    median household incomes?
         18         A.    Right.
         19         Q.    Okay.
         20         A.    Uh-huh.
         21         Q.    And -- and the same for higher
         22    below-poverty percentages?
         23         A.    Correct.
         24         Q.    And then we get kind of to the meat of
16:15:42 25    the -- the -- the Gingles 1 test in your finding H.
```

105

1    And -- and you conclude, finally, the HBA citizen

2    voting age population in the city of Virginia Beach

3    is sufficiently large and geographically compact to

4    enable the creation of two single-member majority

16:16:01  5    Hispanic, black and Asian combined districts,

6    correct?

7          A.    That's correct.

8          Q.    And in rendering that opinion were you

9    asked to create one or two single-member majority

16:16:10  10    districts?

11          A.    Just asked to determine how many could

12    be created, one or more.

13          Q.    At -- at that point in time, meaning

14    when your report came out, you only provided a -- a

16:16:19  15    map with two districts, correct?

16          A.    Correct.

17          Q.    Did you provide any information

18    supporting the map that was included in the amended

19    complaint?  And I'll put it in front of you so you

16:16:33  20    do not have to guess.

21          A.    Uh-huh.

22          Q.    I'm showing you a document that was

23    premarked Exhibit Fairfax 1 and page 18.  And now

24    you can flip through it, but I'm referring

16:16:47  25    specifically to Appendix A --

106

```
            1          A.     Okay.

            2          Q.     -- which is on page 18.

            3          A.     Yes.

            4          Q.     Yes you've reviewed this --

16: 16: 56  5          A.     This --

            6          Q.     -- or yes that's a map you prepared?

            7          A.     Excuse me.  Yes, this is the map that I

            8   prepared.

            9          Q.     Okay.  When -- when you prepared that

16: 17: 03  10  map what was your task?  What was the scope of work

            11  you were given to prepare that map?

            12         A.     It was very similar.  To determine

            13  whether one or more districts could be created in

            14  the city.

16: 17: 15  15         Q.     In each instance you prepared two, the

            16  -- the amended complaint version and then the

            17  initial report version, correct?

            18         A.     Correct.

            19         Q.     Is there any reason at that point in

16: 17: 26  20  time you didn't provide a single-district map?

            21             MS. HARLESS:  Objection to form.

            22         A.     No, because many times I think if you

            23  can produce two, then you know you can create one.

            24  BY MR. BOYNTON:

16: 17: 40  25         Q.     And with respect to the map that you
```

```
 1    prepared for the amended complaint that's identified

 2    as Exhib -- Appendix A to the amended complaint,

 3    Exhibit 1 here, you developed a map that had HBA

 4    CVAP, correct?

16:18:01  5        A.    Correct.

 6        Q.    And that is -- I understand to be your

 7    estimate of the Hispanic, black and Asian citizen

 8    voting age population for those two proposed

 9    districts, correct?

16:18:13  10        A.    Correct.

11        Q.    And I also note that there are two red

12    dots in Appendix A.  What do those two red dots

13    represent?

14        A.    The location of the plaintiffs.

16:18:22  15        Q.    Why did you include those on your map?

16        A.    Because I was told by counsel that

17    the --

18             MS. HARLESS:  I --

19    BY MR. BOYNTON:

16:18:33  20        Q.    I don't need the words.  I -- but -- but

21    without -- without revealing communications --

22        A.    Right.

23        Q.    -- why did you choose to include those?

24        A.    I was told by counsel to see if they

16:18:49  25    were included --
```

108

```
           1            MS. HARLESS:  Hold -- hold --
           2       A.     -- in the district.
           3            MS. HARLESS:  Yeah.
           4            MR. BOYNTON:  I -- I -- I don't know how
16:18:53   5   to solve that, but I don't think it changes much
           6   either, so --
           7            MR. HEBERT:  Maybe if -- maybe if he
           8   just is asked what his understanding was of why he
           9   -- his understanding of why he --
16:19:04  10            MR. BOYNTON:  I can -- I'm happy to
          11   rephrase that.
          12            MR. HEBERT: -- included those maybe that
          13   will --
          14            MR. BOYNTON:  Sure.
16:19:07  15            MR. HEBERT:  -- eliminate the problem.
          16   BY MR. BOYNTON:
          17       Q.    What was your understanding for -- for
          18   why you were including the two dots on Appendix A?
          19       A.    To determine whether they resided in one
16:19:17  20   of the two districts.
          21       Q.    And you concluded for purposes of the
          22   amended-complaint exhibit they did?
          23       A.    Yes.
          24       Q.    Okay.  Do you recall, sitting here
16:19:25  25   today, which dot represents which individual?
```

109

                    A.    No.

                    Q.    With respect to using HBA CVAP, why did
you use HBA -- HBA CVAP for Appendix A of the
amended complaint?

16:19:46      A.    Why did I use the HBA citizen voting
population?

                    Q.    Correct.

                    A.    Because I wanted to use the most
conservative percentage to determine whether a
16:19:58 majority or minority district existed.

                    Q.    How is that the most conservative, for
us non-demographers?

                    A.    Because usually -- usually, as you --
you pointed out very quickly, that as you move to
16:20:11 voting age population normally that percentage would
go up, specifically if you are in an area that has
non-citizens, specifically Hispanic populations.  So
if there's somewhat of -- of a significant amount of
Hispanic population, then a portion of that actually
16:20:34 will be non-citizens, and so that decreases the HBA
percentage when you go to CVAP.

                    Q.    I see.  And in -- in that iteration of
-- of the map you prepared Plan C2, which is the
northwesternmost district -- illustrative district
16:20:56 is 50.13 HBA CVAP, correct?

110

                    A.    I believe so.

                    Q.    And under Plan D, which I understand to
be the southeasterly proposed illustrative district,
you came up with an HBA CVAP of 50.21, correct?

16:21:23        A.    Correct.

                      Let me check something very quickly.

                    Q.    Certainly.

                    A.    Correct.  C2 is the Western District,
yes, and D is the middle district.

16:21:58        Q.    Okay.  Did -- did you use the
methodology that you recite in your initial report
to prepare the map that is Appendix A in the amended
complaint?

                    A.    Methodology as far as disaggregation?

16:22:13        Q.    Yes.

                    A.    I believe so.  Yeah.  I used Maptitude
as far as the disaggregation.

                    Q.    So this -- this Appendix A map in the
amended complaint was drafted using block level data
16:22:28 from the ACS 2013 through 2017 dataset disaggregated
from block group levels, correct?

                    A.    Correct.  Let me rephrase that.

                    Q.    Please.

                    A.    Yes.  I -- I -- I used block group level
16:22:44 data.  And this happened to be the 2012 to 2016 ACS

111

```
         1    -- five-year ACS.
         2          Q.    So a different dataset?
         3          A.     Different dataset.
         4          Q.     Is -- is that -- is that the sole
16:22:59 5    explanation for any differences in the map that is
         6    Appendix A on page 18 of the amended complaint
         7    versus the map you proposed in your original expert
         8    report?
         9               MS. HARLESS:   To -- to the extent you
16:23:15 10   can answer that without revealing communications
        11    you've had with the attorneys.
        12          A.    Let me say that -- that when I developed
        13    this plan the only dataset that was available or the
        14    latest dataset was the 2012 and 2016 AC -- five-year
16:23:42 15   ACS.  That came out a few months later.
        16               And the next part of this, when the
        17    litigation kicked in for the expert report, I
        18    inputted -- I realized that there's a new dataset.
        19    And so I inputted or imported the -- the latest
16:24:02 20   dataset and realized that the percentages decreased
        21    under 50 percent for this particular plan.
        22               So that's why I had to modify the plan
        23    for a new plan, we -- using the new and latest
        24    dataset.
16:24:22 25
```

BY MR. BOYNTON:

    Q.    Was there anything other than the different dataset that -- let me rephrase.

16:24:37          Other than there being a different dataset as source data for the two maps we're referring to, were there any changes to your methodology preparing one map versus the second map?

    A.    Not that I recall.  I think I used the same process.  Yeah.

16:24:53    Q.    But your goal was to come up with a map that showed HBA CVAP at 50.00 or more for two districts in Virginia Beach?

    A.    Correct.  Correct.

    Q.    I -- I'm pretty sure I know the answer

16:25:21 to this, but I need to confirm it.  If you stay on the amended complaint --

    A.    Okay.

    Q.    -- and go to page 10.  If you look at paragraph 51, there is reference to, "A statistical

16:25:38 analysis demonstrates that voting patterns in the City Council elections are racially polarized, with Minority Voters consistently voting for a particular (often Black) candidate of choice.  White bloc voting in support of their preferred candidates has

16:25:56 repeatedly led to the defeat of candidates preferred

113

```
            1    by Minority Voters."
            2              Did you have any role in the preparation
            3    of that statistical analysis?
            4         A.    No.
16:26:03    5         Q.    Okay.  Did you do any analysis of
            6    whether voting in Virginia Beach is racially
            7    polarized?
            8         A.    No.
            9         Q.    Were you asked to look at -- well, no.
16:26:29   10    I'll rephrase it.
           11              Did you -- in the preparation of your
           12    map that was used in the amended complaint did you
           13    look at seven-member districts versus ten-member
           14    districts?
16:26:40   15         A.    I did only in the context of looking at
           16    the existing residency plan.
           17         Q.    You did not develop a illustrative plan
           18    at that time that showed one or more
           19    minority-majority districts or majority-minority
16:26:55   20    districts in Virginia Beach for a seven-district
           21    system?
           22         A.    No.  No.
           23         Q.    Okay.  Were you asked or was -- was --
           24    was -- was your direction to look at ten-member
16:27:07   25    districts or did you select that on your own?
```

1          A.      I was asked to look at ten districts

2     only.

3          Q.      Were you asked to look at any other

4     number of districts?

16:27:17  5          A.      No.

6          Q.      Turning your attention to page 14,

7     paragraph 76, that paragraph says, "Minorities in

8     Virginia Beach bear the effects of longstanding

9     societal, economic, and educational discrimination,

16:28:36  10    effects that are apparent in the areas of education,

11    employment, housing, and health.  Such

12    discriminatory effects hinder Minority Voters'

13    ability to participate effectively in the political

14    process."

16:28:50  15          Did you have any role in analyzing the

16    effects of any longstanding or otherwise societal,

17    economic and/or educational discrimination?

18          A.      No.

19          Q.      You can set aside the amended complaint.

16:29:14  20    Thank you.

21          A.      Okay.

22          Q.      Returning to your report, I'd ask you to

23    review specifically the Methodology section, section

24    V, that starts on page 5 and -- and goes to the top

16:29:38  25    of -- the end of the first paragraph on page 6.

115

```
                1              MS. HARLESS:  Do you want him to review
                2    the full section or just the --
                3              MR. BOYNTON:  No.
                4    BY MR. BOYNTON:
16: 30: 06      5         Q.   Just -- just page -- starting at V,
                6    Methodology, on page 5 --
                7         A.   Uh-huh.
                8         Q.   -- concluding at the end -- the end of
                9    paragraph 1 on top of page 6 --
16: 30: 16     10              MS. HARLESS:  Okay.
               11         A.   Okay.
               12    BY MR. BOYNTON:
               13         Q.   -- to try to keep it in a manageable
               14    chunk.
16: 30: 19     15         A.   Very good.  Appreciate it.
               16         Q.   Chunk is a legal term.
               17         A.   I use it all the time.
               18         Q.   Just let me know when you've had an
               19    opportunity to review it.
16: 30: 54     20         A.   I've -- I have perused it, so --
               21         Q.   Are you ready?
               22         A.   I'm ready.
               23         Q.   Okay.
               24         A.   I may have to reference it, but --
16: 31: 00     25         Q.   Of course.
```

116

```
 1                Does that accurately represent your
 2      methodology for preparing your initial report --
 3           A.    Yes.
 4           Q.    -- to -- to the extent --
16:31:13   5           A.    And -- and --
 6           Q.    -- to -- to the per -- to the point
 7      where I asked you to stop reading?
 8           A.    Correct.
 9           Q.    Okay.  You -- you first analyzed the
16:31:27  10      recent and past demographic and socioeconomic
11      profiles in the city of Virginia Beach, correct?
12           A.    Correct.
13                Let me -- this probably wanted worded --
14      I didn't do any past socioeconomic.  And so it
16:31:41  15      depended upon -- it may not be worded correctly.
16      Recent and past demographic, but not past
17      socioeconomic profiles, just to be clear.
18           Q.    It looks to me like the -- there are
19      four datasets referenced in the sense of the city's
16:32:02  20      HBA combined populations over the 1990, 2000 and
21      2010 decennial censuses, three there, plus you
22      looked at ACS 2013 to 2017, correct?
23           A.    Correct.
24           Q.    Okay.  Why -- why is -- and -- and I'll
16:32:18  25      use the wording you used there subject to your
```

1    caveat today.

2         A.    Okay.

3         Q.    Why is the recent and past demographic

4    and socioeconomic profile of the city of Virginia

16:32:30  5    Beach im -- important to look at in informing your

6    ultimate opinions in this case?

7         A.    The recent -- or the past to the recent,

8    actually, shows any type of trend of these HBA

9    communities you could call them and where they're

16:32:46 10    actually growing in the particular areas of the

11    city.  And so that's the reason why you want to see

12    recent and past.

13              The other is to show citywide the trend

14    in growth of Hispanic, black and Asian combined in

16:33:03 15    the city in the context of -- of -- of -- of

16    representation, if you will, whether they can

17    sustain a majority-minority district.

18         Q.    And -- and -- and so that paragraph at

19    least refers to the size and the location of the

16:33:25 20    minority communities in Virginia Beach over time?

21         A.    Correct.

22         Q.    Okay.  The second paragraph.  "I also

23    reviewed socioeconomic data in order to observe

24    various racial/ethnicity disparities and

16:33:40 25    commonalities within the city at large as well as

1    within the HBA communities."

2              What is the purpose of that review?

3         A.    The purpose of the commonalities, first,

4    is to understand whether there was some common let's

16:34:00   5    say communities of interest between the Hispanic,

6    black and Asian combined population groups.

7         Q.    When -- when you say communities of

8    interest I think neighborhoods, but --

9         A.    Right.

16:34:13  10         Q.    -- that may be oversimplifying.  What do

11    you mean by the words "communities of interest"?

12         A.    Right.  And -- and communities of

13    interest could mean neighborhoods.

14         Q.    Well, what else could it mean?

16:34:22  15         A.    It could be income, education, poverty.

16    It could be crime.  It could be geographic, meaning

17    that these are areas of interest for that particular

18    community.

19              So clearly, you know, increasing income

16:34:41  20    in a particular area would be an interest to the

21    population.  Lowering poverty levels in that area or

22    areas would be a -- a -- a -- an interest for that

23    that group.  Raising up or lowering the non --

24    no-high-school percentage would be an interest.

16:35:01  25              And so the first part, the

```
 1    commonalities, to show whether there is a

 2    commonality amongst those groups.  And -- and there

 3    was.

 4              Now, the second part, when you look at

16:35:11   5    the disparity, that gives you an idea there -- there

 6    would be an interest in increasing income,

 7    decreasing poverty levels, increasing income --

 8    increasing the non -- decreasing the non-high school

 9    education percentages.  So there is an -- an

16:35:33  10    interest because of the disparity, and then you show

11    there is a commonality amongst the particular group.

12         Q.    So did you have data on socioeconomic

13    factors on economic groups -- I'm sorry -- on HBA

14    communities at a level more granular than the city

16:36:01  15    at large?

16         A.    The -- I also looked at the tracts that

17    per -- made of the Hispanic, black and Asian --

18    majority Hispanic, black and Asian tracts that made

19    up the -- the districts or were included in the

16:36:20  20    districts.

21         Q.    From 2010?

22         A.    No.  The -- the --

23         Q.    That's fine.  I'm trying to --

24         A.    The --

16:36:25  25         Q.    And I'm not ask -- asking it well.  And
```

1      so there's probably a better way for me to ask it --

2            A.    Right.

3            Q.    -- before you continue answering.

4                  I'm trying to understand, A, what

16:36:33   5   specific socioeconomic data informed the specific

6      districting that you proposed --

7            A.    Right.

8            Q.    -- and, second, how you used that data

9      to inform it.

16:36:46  10        A.    Right.  Right.  First, citywide -- I

11     looked at whether there were commonalities citywide

12     for each of the racial groups.

13           Q.    Okay.  Let's stop there.

14           A.    Right.  So --

16:36:58  15        Q.    What commonalities did you identify?

16           A.    So -- so, for example, the Hispanic,

17     black and Asian population groups had significantly

18     higher no high school education than white

19     populations.

16:37:17  20        Q.    Okay.  And let's stop there.

21           A.    Right.

22           Q.    And then is that citywide data?

23           A.    Citywide right now.

24           Q.    Okay.

16:37:23  25        A.    Right.

121

|   |   |
|---|---|
|   | 1 |
|   | 2 |
|   | 3 |
|   | 4 |
| 16: 37: 30 | 5 |
|   | 6 |
|   | 7 |
|   | 8 |
|   | 9 |
| 16: 37: 41 | 10 |

          Q.    Keep going.

          A.    Citywide.  As well as lower median
household incomes.

          Q.    Also citywide?

          A.    Citywide.

          Q.    Okay.

          A.    So we're at citywide.

          And Hispanic and black -- not Asian.
Hispanic and black had higher below-poverty level
percentages than the white persons in the city.
Citywide again.

          But then later on I looked at those
tracts that were majority Hispanic, black and Asian
to see if there are any commonalities amongst the
tracts.  And so that's where you get into whether
these communities, if you will, analogous to the
census tracts would go together inside a particular
district.

          Q.    So in terms of the commonalities at the
tract level, what conclusions did you reach?

          A.    That there's a -- they mimic the same as
the city -- citywide.  So those HBA -- majority HBA
census tracts tended to mimic those indicators at
the citywide level for Hispanic, black and Asian.

          Q.    So you essentially extrapolated the data

11 Citywide again.
12 But then later on I looked at those
13 tracts that were majority Hispanic, black and Asian
14 to see if there are any commonalities amongst the
16: 37: 56 15 tracts.  And so that's where you get into whether
16 these communities, if you will, analogous to the
17 census tracts would go together inside a particular
18 district.
19 Q. So in terms of the commonalities at the
16: 38: 12 20 tract level, what conclusions did you reach?
21 A. That there's a -- they mimic the same as
22 the city -- citywide.  So those HBA -- majority HBA
23 census tracts tended to mimic those indicators at
24 the citywide level for Hispanic, black and Asian.
16: 38: 31 25 Q. So you essentially extrapolated the data

1   down to a -- a -- a -- a census tract level from

2   citywide?

3            A.    Now, I looked at the data.  I didn't do

4   any extrapolation.  I looked at the data at the

16:38:45  5   tract level.  So I looked at the majority Hispanic,

6   black and Asian combined tracts and looked at it in

7   the context of the same citywide indicators that I

8   looked at, and they followed the same trends.

9            Q.   So how did that inform or change your

16:39:04  10   formation of these two illustrative districts?

11           A.    Because I -- I -- I used it from the

12   context of communities of interest.  I used it from

13   the context of -- of -- of including those areas

14   inside the same district, so -- because they had

16:39:35  15   similar socioeconomic status or indicators.

16           Q.    You -- you treated them as de facto

17   neighborhoods?

18           A.    Communities.

19           Q.    Communities.  Okay.

16:39:44  20           A.    Yeah.  Yeah.

21           Q.    And did you have tract-level data that

22   separated out for Hispanic versus black versus Asian

23   populations?

24           A.    No.  That's why I used the majority

16:39:58  25   Hispanic, black and Asian combined.  So I knew which

1  ones were Hispanic, black -- majority Hispanic,

2  black and Asian combined, but I didn't know the

3  specifics of the income, education and poverty for

4  each of the different races.  So I used the whole as

16:40:16  5  the indicator, meaning the community as the

6  indicator.

7        Q.    But it's solely to inform the analysis

8  of districts under Gingles 1 not to provide

9  testimony or evidence as to cohesion?

16:40:33  10        A.    Oh, no.  No.  Yeah.  No, not to provide

11  cohesion.

12             Now, I don't know who else may take and

13  -- and say something on my report, but I'm --

14        Q.    I --

16:40:46  15        A.    -- I'm not there.

16        Q.    I just care what you say at --

17        A.    Right.

18        Q.    -- this --

19        A.    Right.

16:40:49  20        Q.    -- at this moment in time.

21        A.    Right.

22        Q.    Tomorrow I'll care what somebody else

23  says.

24        A.    Right.

16:40:54  25        Q.    Did you look at actual neighborhoods in

124

```
         1    -- in drawing your maps?
         2         A.    The -- the subdivisions reflect the
         3    neighborhoods, and so that's what I downloaded from
         4    the city's website.  And so there, of course, was an
16:41:19 5    attempt to not split neighborhoods and specifically
         6    ensure that those Hispan -- the HBA neighborhoods
         7    were included in the districts because they carried
         8    on the same indicators.
         9         Q.    But, sitting here today, can you name a
16:41:35 10   neighborhood that you considered to be an HBA
        11    neighborhood in Virginia Beach?
        12         A.    They're -- I recall the two areas Green
        13    Run, I believe, and Newtown.  And so there were two
        14    areas, I believe, that were somewhat hubs of
16:41:54 15   clusters.  And so I recall that because I -- I -- I
        16    don't know if you'll ask this question, but that's
        17    how I began developing the plan itself.
        18         Q.    And -- and those two clusters -- can --
        19    do you recall the breakdown of Hispanic versus black
16:42:09 20   versus Asian in those --
        21         A.    No.
        22         Q.    -- two clusters?
        23         A.    No.  No, I don't recall that.
        24         Q.    Were both majority black?  Do you know?
16:42:14 25        A.    I -- I really -- no.  I know that they
```

1   were HBA, you know --

2           Q.    Okay.

3           A.    -- Hispanic, black and Asian.

4           Q.    And -- and even then do you know if they

16:42:19  5   were even majority HBA or a plurality HBA?

6           A.    I believe they were majority HBA, but

7   I'm not sure because I didn't break the data down to

8   look at the subdivisions.

9           Q.    Okay.  And then you used Maptitude for

16:42:44  10  redistricting --

11          A.    (Moved head up and down.)

12          Q.    -- to review locations of majority HBA

13  communities in the form of census tracts throughout

14  the city.  What is that process?

16:42:52  15          A.    Essentially, you can get a good idea

16  with the maps that -- that I created that showed

17  1990 and -- and 2000 -- I mean 2010 rather.

18          Q.    Is this in one of the appendices --

19          A.    Yes.

16:43:09  20          Q.    -- or is it at the end of the --

21          A.    On page 14.

22          Q.    Oh.

23          A.    And so --

24          Q.    The report itself.

16:43:16  25          A.    -- this map gave me the ability to

126

1    understand the location of where these HBA

2    communities existed.  And so this was a starting

3    point of where districts would be created.

4              And what I found out was that there are

16:43:31  5    really four -- you could say three, but four

6    different cluster areas that I had to combine at

7    least two of them together in order to form a

8    district.  And -- and that was the process of -- of

9    creating and developing the plans.

16:43:45  10         Q.    Okay.  And the cluster areas are shown

11   on the map on the right on page 14?

12         A.    Correct.

13         Q.    Okay.

14         A.    Correct.

16:43:51  15         Q.    And -- and then so how would you

16   describe those cluster areas geographically to us?

17         A.    I -- I -- I call it -- and I -- I don't

18   know if I included this in the -- the report.  I

19   think I didn't.  I called this the -- so the upper

16:44:08  20   right quadrant of the city.  And so it's the middle

21   to northwest -- upper left, rather.  I think I said

22   right, but it's the mid to northwest to mid to

23   western portion of the city.

24         Q.    Those are the two different ones?

16:44:27  25         A.    Yes.

127

         Q.    Okay.

         A.    And -- and -- and -- well, no.  Those
are the areas.  They represent the areas of -- the
generic areas where the bulk of the Hispanic, black
16:44:40  and Asian populations combined exist.

               The -- the -- the three areas -- I mean
the three or four areas would be the mid -- sort of
the mid of Virginia Beach -- there is one in the
northwest of Virginia Beach, there's one in the
16:44:56  west, and then one leaning toward northwest.  And so
there -- like I said, there's either three or four.
I like to say four because there's four areas of
majority Hispanic, black and Asian combined sort of
clusters.  One of them is a single cluster, if there
16:45:14  is such a thing.

         Q.    And -- and in terms of the -- the
overall total population of the city, is there -- is
that clustered in any part of the city?

               MS. HARLESS:  Objection to form.
16:45:30  BY MR. BOYNTON:

         Q.    Tot -- total population.  In -- in terms
of all races, where is population concentrated in
the city of Virginia Beach?

         A.    Oh.  I didn't look at that.  Yeah.
16:45:39  Q.    You did not look at that.

128

```
            1        A.      No.

            2        Q.      Okay.

            3        A.      No.

            4        Q.      And looking at this map, the darker
16:45:43    5    green on the right -- on the map on the right

            6    represents 50.00 percent to 100.00 percent HBA

            7    combined census tracts, correct?

            8        A.      Correct.

            9        Q.      And what was the highest percentage you
16:45:57   10    found of any of these census tracts?

           11        A.      I can't recall.

           12        Q.      And do you recall the breakdown for the

           13    ones that are 50 or over between black versus

           14    Hispanic versus Asian populations?
16:46:11   15        A.      I -- I -- I was concerned about the

           16    community as whole, not individual races.

           17        Q.      Is -- is that phase that we're at where

           18    you said, "Next, I used Maptitude for

           19    Redistricting..." -- is that where you did the
16:46:32   20    disaggregation or is that later?

           21        A.      That's later.  And -- and I don't know

           22    if I included that as -- I don't know if I included

           23    that as a step in the methodology or that was just

           24    an assumption that when I used CVAP that was
16:47:05   25    understood that I did it.
```

1    Q.    Okay.  Next paragraphs, the bottom

2    paragraph on page 5 --

3    A.    Uh-huh.

4    Q.    -- "Maptitude for Redistricting was also

16:47:14  5    utilized the draw of the Illustrative Plan."

6         What is involved in that step?  Walk me

7    through it.

8    A.    Right.  And so, as I said before, that

9    the initial step was to determine where the location

16:47:26  10   of HBA communities exist.  And so the second thing

11   is I understood -- or I realized, rather, that you

12   needed to connect two of -- excuse me -- these four

13   cluster areas, if you want -- if you wish, in order

14   to draw a particular district.

16:47:46  15        And so the process basically was

16   involved in how do you actually connect two of these

17   HBA communities in a compact fashion with splitting,

18   you know, minimal VTDs and preserving the

19   neighborhoods that exist.

16:48:03  20   Q.    And you said you used voting tabulation

21   districts as the dominant building block for the

22   plan, correct?

23   A.    Right.  Right.

24   Q.    What is a voting tabulation district?

16:48:15  25   A.    Voting tabulation districts, or VTDs,

130

        1    are created by the census.  And they're created by

        2    the census to approximate precincts.  In some areas

        3    they are identical to precincts, in other areas

        4    they're slightly off and then other further areas

16:48:34  5    they're really off.

        6          Q.    Did you determine which of those

        7    categories Virginia Beach falls into?

        8          A.    Slightly off.

        9          Q.    Okay.  So the fact that there is a

16:48:43 10    voting tabulation district under 2010 census data

      11    does not mean that it is a precinct in -- in modern

      12    Virginia Beach?

      13          A.    Correct.  I'd say the majority of them

      14    are -- are matching the precincts, but there are

16:48:59 15    some that don't.  And that's why I leaned toward

      16    using the VTDs because the VTDs carry with it the

      17    census data.  The precincts don't.

      18          Q.    You said you downloaded the precinct

      19    data, though, correct?

16:49:12 20          A.    Correct.

      21          Q.    So you did have access to that?

      22          A.    Yes.

      23          Q.    But you chose not to use the census --

      24    the -- I'm sorry -- the precinct data?

16:49:21 25          A.    Correct, because they slice through not

131

| | | |
|---|---|---|
| | 1 | only VTDs, but they also cut through census blocks. |
| | 2 | And so the question is what population exists in the |
| | 3 | precincts. |
| | 4 | Q.    Are -- |
| 16:49:32 | 5 | A.    And unless -- |
| | 6 | Q.    Go ahead. |
| | 7 | A.    Okay.  Unless Virginia Beach had some -- |
| | 8 | had done some analysis to determine that this split |
| | 9 | -- census block was split this way, you couldn't |
| 16:49:41 | 10 | determine the population inside the precincts. |
| | 11 | Q.    Are -- are you aware of any Virginia |
| | 12 | requirements for when redistricting occurs that |
| | 13 | precincts not be split? |
| | 14 | A.    I -- I think there is something that |
| 16:49:59 | 15 | mentions not splitting precincts, but my |
| | 16 | understanding was that was not for redistricting |
| | 17 | purposes.  It was for a different purpose. |
| | 18 | Q.    What purpose do you understand it to be? |
| | 19 | A.    I -- I think what they're trying to do |
| 16:50:19 | 20 | is cut back on administrative costs in not having |
| | 21 | multiple ballots in the same precinct.  And so that |
| | 22 | was the purpose of that.  It's not that you couldn't |
| | 23 | split it.  It's that they were trying to not have |
| | 24 | multiple ballots in -- in the same precincts. |
| 16:50:35 | 25 | Q.    And I'm -- I'm just asking as to your |

          1   understanding.  Is it your understanding that if --

          2   if a -- a map is adopted in Virginia Beach that it

          3   can be based on voting tab -- voter tabulation

          4   districts instead of precincts even where they don't

16:50:49  5   match?

          6        A.   They would have to realign the precincts

          7   or realign the areas definitely in -- in the city.

          8        Q.   They'd have to realign the --

          9        A.   Precincts.

16:51:00 10        Q.   Or they'd have to change the VTDs to

         11   precincts, or both?

         12        A.   They'd have to realign the precincts --

         13   I mean, the -- changing the VTDs would require input

         14   from the census, and that wouldn't occur.

16:51:11 15        Q.   As it stands today, the VTDs that you

         16   used do not exactly align with Virginia Beach

         17   precincts?

         18        A.   Correct.

         19        Q.   Okay.

16:51:21 20        A.   But that is the -- that would -- they

         21   would -- they reflect the initial -- or the official

         22   census blocks data associated with it.  So you're

         23   forced or compelled to using it unless you can

         24   translate population from the census blocks to the

16:51:46 25   precincts.

133

1       Q.     Does -- does that get into

2   disaggregation or are we still at a higher level at

3   that point?

4       A.     That would be up to the City in how they

16:51:59  5   actually apportion that.  It could be a variety of

6   different ways how they apportion it.

7       Q.     For you to convert voting dis -- voting

8   tabulation districts to precincts would involve what

9   activities?

16:52:12  10       A.     To convert voting tabulation to

11  precincts?

12       Q.     To precincts.  To existing precincts.

13       A.     I would probably do it the opposite way.

14  I'd convert the precincts to the voting tabulation

16:52:26  15  districts.  That would involve changing the

16  precincts.  And the reason for that is precincts are

17  created by census blocks, and you want to use census

18  blocks as that building block.  If -- if you did --

19  and maybe this is your question -- I would have to

16:52:41  20  apportion the census block, meaning that determine

21  when you split a census block what population goes

22  into one side of the precinct and what population

23  goes to the other side.  So there has to be

24  something that gives that sort of indication.

16:52:57  25       Q.     But just to be clear, in all the maps

134

1    you prepared in this case from Appendix A in the

2    amended complaint to the map you provided in the

3    initial report to the, I think, five maps you

4    provided in the rebuttal report, none of those are

16:53:13  5    based on precincts, correct?

6         A.    Correct.  Correct.  All based on -- on

7    voting tabulation districts.

8         Q.    Okay.  And you -- I believe you say here

9    -- well, you do say here, "...and used single race

16:53:26 10    alone CVAP instead of VAP in determining whether

11    majority HBA districts could be developed."

12         Does that correctly restate the process

13    you used --

14         A.    Yes.

16:53:37 15         Q.    -- for -- for the initial report?

16         A.    Right.  I used the single race alone,

17    but then, of course, separately, as I say, provided

18    the black and white mixed race.

19         Q.    Only in your rebuttal report, though?

16:53:50 20         A.    No.  No.  No.  In -- inside there --

21    it's an indication of what black and white

22    percentages are for the initial report as well.

23         Q.    Okay.  Over here.  All right.

24         A.    Yeah.  So -- and it's included in the

16:54:03 25    appendix as well, the tables, but I wanted to

135

```
         1    provide a -- the most conservative estimate without

         2    the black and white mixed race.

         3         Q.    And so the most conservative estimate is

         4    using CVAP instead of VAP, correct?

16:54:19 5         A.    Right.

         6         Q.    And it's using the three single race

         7    groups alone and not the blacks and whites mixed

         8    race?

         9         A.    Correct.  Correct.

16:54:27 10        Q.    You call out in footnote 8, "In most

        11    instances, Hispanic and Asian CVAP percentages yield

        12    lower percentages than their associated VAP

        13    percentages."

        14              Why do you believe that is?

16:54:52 15        A.    Because of the non-citizens,

        16    essentially.  So when you remove non-citizens that

        17    percentage goes down.

        18        Q.    Is that a trend that you do not find

        19    with black per -- CVAP percentages or white CVAP

16:55:09 20    percentages?

        21        A.    Black sometimes possibly, but not as

        22    much as Hispanic and -- and Asian.  Some -- many

        23    times when you look at a plan -- a plan and you look

        24    at the CVAP the black percentage will actually

16:55:26 25    increase versus the voting age percentage.
```

136

```
 1            Q.    And why do you -- what do you attribute
 2      that to?
 3            A.    Because the non-citizen rate for
 4      Hispanic and let's say Asian is higher than the
16:55:35  5   non-citizen rate for whites and blacks.
 6            Q.    As -- as part of preparing your report,
 7      your initial report, the July 15th, twenty-eight --
 8      2019 report, you also reviewed certain code
 9      provisions -- Virginia Code provisions, correct?
16:55:52 10         A.    Uh-huh.
11            Q.    How did you select those code provisions
12      to review?
13            A.    How did I select?
14            Q.    Why did you choose to review those code
16:55:59 15   provisions versus others?
16            A.    Oh.  This seemed like the only relevant
17      portion for drawing a district plan.
18            Q.    Okay.  And that's Title 24, Chapter 3
19      of --
16:56:09 20         A.    Yes.
21            Q.    -- the Code of Virginia?
22            A.    Yes.
23            Q.    And so that particular provision, 2 --
24      24.2-30 -- 304.1 says, "If the members are elected
16:56:23 25   from districts or wards and other than entirely at
```

1    large from the locality, the districts or wards

2    shall be composed of contiguous and compact

3    territory and shall be so constituted as to give, as

4    nearly as is practicable, representation in

16:56:39    5    proportion to the population of the district or

6    ward," correct?

7        A.    Correct.

8        Q.    And so in -- in endeavoring to draw the

9    illustrative map that was provided in the initial

16:56:49   10    report you were looking to comprise the districts or

11    wards of contiguous and compact territory, correct?

12        A.    Correct.

13        Q.    And you were looking to constitute them

14    and -- as nearly as practicable, representation in

16:57:06   15    proportion to the population of the district or

16    ward?

17        A.    Correct.

18        Q.    So those were goals of your initial

19    report map?

16:57:11   20        A.    Correct.

21        Q.    Okay.  And then I believe you call out

22    the five most commonly used traditional

23    redistricting criteria during the map drawing

24    process, correct?

16:57:21   25        A.    Correct.  Those are the --

138

1        Q.    You -- you utilized all five?

2        A.    Yes, correct.

3        Q.    Well, how do you balance equal

4  population where maybe that conflicts with con --

16:57:32  5  contiguity or compactness?

6        A.    Right.  Equal population is probably

7  easy because it's -- it's just best to just say

8  within the ten percent overall or the plus or minus

9  five percent as a guide that map drawers do.  They

16:57:46  10  usually draw maps of plus or minus five.  And that

11  stage keeps you out of trouble.  And so that's --

12  that's easy, and so you prioritize -- prioritize

13  that.

14        Contiguity -- that's easy as well.

16:57:59  15  Unless you're in a -- a -- a city that annexes areas

16  that aren't adjacent, you can make the districts con

17  -- contiguous.

18        Then comes the other ones.

19        Q.    In compactness -- let's start there.

16:58:16  20        A.    Right.

21        Q.    You, I believe, used three different

22  compactness measures --

23        A.    Uh-huh.

24        Q.    -- or ratings, correct?

16:58:22  25        A.    Correct.

139

```
             1        Q.     How -- how -- is it Reock --

             2        A.     Reock.

             3        Q.     -- Polsby-Popper --

             4        A.     Correct.

16:58:26     5        Q.     -- and Minimum Convex Hull?

             6        A.     Correct.

             7        Q.     Is there one you prefer over the other

             8   two?

             9        A.     No.  And -- no.  I always tell people

16:58:36    10   that you should -- you should use three.

            11        Q.     What is your level of tolerance in each

            12   of these measures on a margin perspective?

            13              MS. HARLESS:  Objection to form.

            14   BY MR. BOYNTON:

16:58:48    15        Q.     And I -- I can probably reword that.

            16              You know, what -- what -- starting first

            17   with Reock.

            18        A.     Uh-huh.

            19        Q.     You know, what -- what -- when you're

16:58:54    20   drawing maps generally, whether it be for, you know,

            21   the -- the Campaign Legal Center or anyone else --

            22        A.     Uh-huh.

            23        Q.     -- what is your standard of deviation

            24   for your -- for the Reock factor?

16:59:05    25        A.     There's not a particular value --
```

140

1    universal value.  You have to look at the

2    configuration of the city or state, or whatever, or

3    county and then look at other plans, the resident --

4    residency plan, and then you draw some sort of

16:59:27    5    opinion of a low mark that you would actually go.

6              Q.    Do you have a number in mind when you

7    are drawing plans as a demographer?

8              A.    No, not -- not until I, you know,

9    develop the plans and then begin to look at other

16:59:42    10   comparative -- comparisons.

11             Q.    And is that the same for Polsby-Popper

12   and Minimum Convex Hull?

13             A.    Yes.

14             Q.    And, as I understand it, the most

16:59:51    15   compact is zero and the least compact is one under

16   all three scales?

17             A.    Reverse.

18             Q.    I'm sorry.  The -- the --

19             A.    The most compact is one.

16:59:58    20             Q.    And the least compact is zero?

21             A.    Right.

22             Q.    Okay.  When you at footnote 11 on page 6

23   say, "The Gingles case requires plaintiffs to show

24   that the minority group 'is sufficiently numerous

17:00:28    25   and geographically compact to form a majority in a

141

1   single-member district,'" what standard of

2   compactness do you apply?

3        A.    The three measures.

4        Q.    Okay.  But you don't have a -- other

17:00:38  5   than using those three --

6        A.    Right.

7        Q.    -- methods for determining compactness,

8   do you have any specific tolerance for compactness

9   in following the Gingles prong 1?

17:00:48  10        A.    No, but again it varies depending upon

11   the jurisdiction and the -- the -- the lay of the

12   land, if you will.  And so that's the reason why --

13   it -- this is just my opinion.  The courts did not

14   pick out a specific compactness measure or any

17:01:08  15   values.  They --

16        Q.    Did you --

17        A.    -- didn't say.

18        Q.    I'm sorry.

19        A.    Oh.  They -- they didn't pick out any

17:01:12  20   specific measures or values to -- to target because

21   there is a -- a level of subjective expert opinion

22   in determining this.

23        Q.    So did -- is it fair to say that you

24   used your normal compactness tolerance in preparing

17:01:30  25   this particular Gingles illustrative plan?

```
 1                    MS. HARLESS:   Objection to form.
 2       BY MR. BOYNTON:
 3            Q.    You can answer.
 4            A.    When you say usual, yes, usual.   Not
 5       necessarily usual values.
 6            Q.    Well, explain to me what that means.
 7            A.    Meaning that, as I mentioned before,
 8       every jurisdiction is different.  And so .5 in a
 9       particular jurisdiction for Reock may be okay where
10       in another -- well, let me use -- .3 may be a -- a
11       low point in a particular jurisdiction.   In another
12       jurisdiction it may be .2 or .1.   It all depends on
13       the particular district, the dynamics going on in
14       there.
15            Q.    With respect to the Virginia Beach plans
16       you have prepared in this case, did you have a more
17       stringent or a more relaxed compactness tolerance
18       because you were doing a Gingles plan as opposed to
19       another plan?
20            A.    Right.  I -- I'm -- in -- in this
21       particular case I'm looking at breaking the
22       threshold, which is different than if I'm analyzing
23       multiple plans and saying this is the better plan.
24       So --
25            Q.    What threshold are you looking to break?
```

17:01:41   5
17:01:58  10
17:02:13  15
17:02:25  20
17:02:40  25

143

```
            1              A.    So I'm looking at a threshold of a
            2       particular set of values for Reock, Polsby-Popper
            3       and Minimum Convex.  And so I -- I look at those and
            4       make a determination in the end, of course, of
17:02:56    5       whether this is compact enough.
            6              Q.    But what threshold are you looking to
            7       break?  That's what I'm trying to understand.  You
            8       said --
            9              A.    Yeah, but I know you -- I -- are you --
17:03:05   10       are you looking for a particular value?
           11              Q.    No.  I'm saying are -- you -- there are
           12       two pieces to what you've cited the Gingles case as
           13       requiring.
           14              A.    Right.
17:03:17   15              Q.    One, that the minority group is
           16       sufficiently numerous, and, two, that the minority
           17       group is geographically compact.
           18              A.    Right.
           19              Q.    And so sufficiently numerous I
17:03:26   20       understand to be you shooting for 50 percent under
           21       some analysis, correct?
           22              A.    Right.  Right.
           23              Q.    Okay.  Well, geographically compact as
           24       compared to sufficiently numerous -- what is -- how
17:03:36   25       do you interpret that in your work in this case?
```

144

```
 1           A.    Right.  And -- and it's easy to do the

 2      sufficiently num -- numerous because, as you know,

 3      50 percent -- over 50 percent becomes a majority.

 4      That doesn't translate into compactness.  It -- it

17:03:54  5      -- it may be .1, it may be .2, depending upon the

 6      situation.  And so that's why you can't use a

 7      universal number or val -- set of values from

 8      jurisdiction to jurisdiction.

 9           So what I do is after the plan or during

17:04:11 10      the process of creating a plan you look at those

11      values, you consider other plans, the residency

12      plan, and you make a judgment call of whether it's

13      compact or not.

14           So it's not that I need to get it above

17:04:26 15      this particular amount for -- for all of the

16      different jurisdictions out there.  It's dependent

17      upon the situation.

18           Q.    Okay.  But you feel compelled to make a

19      judgment call in preparing this plan --

17:04:38 20           A.    Right.

21           Q.    -- under Gingles with respect to it

22      being sufficiently compact?

23           A.    Right.

24           Q.    And you made that judgment call as to

17:04:45 25      the map that is proposed in the original report?
```

145

          1          A.    Correct.

          2          Q.    And your process for determining whether

          3    that particular plan was sufficiently complact --

          4    compact was what?

17:05:00  5          A.    Was looking at the three measures and

          6    making a determination of whether the district or

          7    districts were compact.

          8          Q.    Well, how do you decide whether Virginia

          9    Beach is X versus Tampa, Florida is Y versus

17:05:12  10   Birmingham, Alabama is Z?

          11         A.    One of the things that you do is -- you

          12   know, first I said you'd look at the comparison of

          13   other plans, and the -- I only had one plan

          14   basically.  Second is the configuration of the city,

17:05:27  15   whether there is any reasons why a particular

          16   district would be lower.  And I found one, which is

          17   the notch in Virginia Beach, causes districts in

          18   that particular area to be -- to be lower.  And so

          19   you -- you -- and then you just use your experience

17:05:45  20   off of districts that you've seen overall and

          21   integrate all of it and come up with a -- basically

          22   an opinion of -- of whether it's compact or not.

          23         Q.    Just to -- on page 14 -- I believe you

          24   already referred to that, those two exhibits on page

17:06:10  25   14 --

146

```
              1          A.    Uh-huh.

              2          Q.    -- can you tell me where the notch is?

              3          A.    If you see on the -- I believe it's

              4    Norfolk right there.  It's on the northwest edge of

17:06:24      5    Virginia Beach.  You can see it's a little nook

              6    that's in there.  And that causes for the most part

              7    the Polsby-Popper and -- oh, I have to recall -- I

              8    believe Polsby-Popper and the Convex Hull to be

              9    lower than what it would normally be if you had a

17:06:52     10    district adjacent to that -- that notch.

             11          Q.    But it does not materially affect the

             12    first test, the Reock?

             13          A.    Reock.

             14          Q.    Reock.

17:06:59     15          A.    It -- it -- it does a -- a little bit,

             16    but not as much as the other ones because of the way

             17    that the algorithms are.

             18          Q.    Are there any other Virginia Beach

             19    geographic factors that impact your ability to draw

17:07:09     20    a compact district?

             21          A.    Well, besides the shape of the VTDs,

             22    meaning that if you're trying to keep VTDs intact,

             23    then some of the VTDs are not conducive for compact

             24    districts.

17:07:30     25          Q.    This is the only thing that's coming to
```

```
 1    mind today on --

 2           A.     Correct.

 3           Q.     -- geographic limitations to

 4    compactness --

 5           A.     Correct.

 6           Q.     -- of districts in Virginia Beach?

 7           A.     Correct.

 8           Q.     Okay.  Now, you get to the item 4 of the

 9    5 that you identify as most commonly used

17:07:49 10    traditional restriction -- redistricting criteria

10    which is minimizing political subdivision splits.

12    What -- what political subdivisions did you identify

13    as potentially being split in Virginia Beach?

14           A.     These are the VTDs that reflect

17:08:05 15    precincts.

16           Q.     That's where you get into the -- you

17    know, the district is harder to draw if you don't

18    know where the line is between precincts or

19    districts in this case?

17:08:17 20                MS. HARLESS:  Objection --

21           A.     The --

22                MS. HARLESS:  -- to the form.

23    BY MR. BOYNTON:

24           Q.     I can rephrase.

17:08:18 25           A.     Uh-huh.
```

148

```
          1          Q.    Does minimizing political subdivision
          2   splits impact this analysis other than where the
          3   VTDs are located?  Is there any other factor that
          4   impacts minimizing subdivision splits besides the --
17:08:42  5   the orientation or alignment of VTDs under the prior
          6   census map?
          7          A.    Is there any other -- I'm trying to
          8   understand your question.
          9          Q.    Uh-huh.
         10          A.    And --
         11          Q.    You've said that a goal of redistricting
         12   or -- or drawing districts is minimizing political
         13   subdivision splits, correct?
         14          A.    Correct.
17:09:02 15          Q.    I personally as a non-demographer don't
         16   see a VTD as a political subdivision, but I
         17   understand that you do.  Is that correct?
         18          A.    Oh, yeah.  Yeah.  V -- VTDs, I think,
         19   are universally accepted as a political subdivision
         20   split --
         21          Q.    But --
         22          A.    -- when you look at them because they
         23   mimic precincts.
         24          Q.    I think this is a language issue.
         25          A.    Okay.
```

149

```
             1              Q.    When I hear political subdivision I
             2     think City of Virginia Beach versus City of Norfolk
             3     versus --
             4              A.    Right.
17:09:31     5              Q.    -- City of Hampton.
             6              A.    Right.  Right.
             7              Q.    Are -- are any of those political
             8     subdivisions impacted in -- in the way I am using
             9     the word "impacted" in your analysis?
17:09:38    10              A.    I -- I got you.  No.  No.  No.  None of
            11     those city -- is a city -- is an independent city,
            12     so clearly you -- it doesn't have any
            13     subdivisions --
            14              Q.    And -- and and --
17:09:46    15              A.    -- inside the city.
            16              Q.    And there's nothing with respect to how
            17     state house or senate districts or congressional
            18     districts are drawn that impacts your ability to
            19     draw City Council districts under your analysis,
            20     correct?
            21              A.    Correct.
            22              Q.    Okay.
            23              A.    Correct.  Correct.
            24              Q.    Preservation of communities of interest.
17:10:04    25     What does that mean in the context of the
```

1    preparation of your illustrative plan for -- within

2    the original expert report?

3        A.    Right.   And, as I mentioned before -- I

4    think you were correct -- that neighborhoods that

17:10:21  5    were reflected with the subdivisions are commonly

6    used as a community of interest in your attempt to

7    not split neighborhoods, but there also could be

8    other interests of different population groups, such

9    as income, such as education, poverty.   And so those

17:10:43  10   are also common interests that a partic --

11   particular group has an interest in, let's say, a --

12   decreasing poverty in a particular area.   And so if

13   you can keep a cohesive group of common communities

14   that have -- let's say below poverty level, there is

17:11:03  15   a desire to keep them in tact so they can advocate

16   for certain issues that --

17       Q.    Okay.

18       A.    -- you know, relate to increasing --

19       Q.    Now --

17:11:09  20       A.    -- or decreasing poverty.

21       Q.    -- you've said you downloaded from city

22   sources neighborhood or subdivision data, correct?

23       A.    Yes.

24       Q.    How did you incorporate that into your

17:11:18  25   maps?

```
 1              A.    I overlaid them so I could actually view

 2    while I was drawing or developing the plan to see if

 3    I was splitting any -- any neighborhoods.  So I

 4    could actually visually see.

17:11:31  5          Q.    What -- what did you determine in terms

 6    of how many neighborhoods you were splitting or not

 7    splitting under the illustrative plan in your

 8    initial expert report?

 9              A.    Right.  I didn't do any analysis off of

17:11:43 10   not splitting, but I determined that visually I kept

11    the bulk of the neighborhoods intact.

12              Q.    So you don't have a count, sitting here

13    today, of neighborhoods that got split?

14              A.    No.  No.

17:11:54 15         Q.    Okay.  And then you say, "Finally, after

16    drawing a full Illustrative Plan, I generated a

17    final report from Maptitude summarizing the Plan's

18    performance on a set of traditional redistricting

19    criteria and relevant conclusions."

17:12:10 20         A.    Right.

21              Q.    What's involved in generating that final

22    report?

23              A.    And so, you know, Maptitude has a series

24    of reports that pertain to these traditional

17:12:22 25   redistricting criteria.  So I pro -- produced the
```

152

```
 1   reports on political subdivision splits, produced a
 2   report on contiguity, produced a report on
 3   compactness and then equal population, just so you
 4   have a record of what -- what each of these
17:12:41  5  districts actually have as far as those traditional
 6   redistricting criteria.
 7          Q.   And -- and where can I find those in
 8   your report?
 9          A.   They're in the appendix.
17:12:50 10     Q.   Well, are there sep -- are there
11   separate reports for contiguity --
12          A.   Yes.
13          Q.   -- vis-á-vis political subdivision
14   splits versus compactness?
17:13:17 15     A.   Yes.  The Appendix G, Political
16   Subdivision Splits.
17          Q.   Okay.  So those -- those are the reports
18   you're talking about?
19          A.   Correct.
17:13:27 20     Q.   They're -- and they're all attached?
21          A.   Correct.
22          Q.   Okay.
23          A.   Yes.  G, H, and maybe another one, but
24   they're in the appendix section.
17:13:39 25     Q.   Going to table in paragraph 8 -- on page
```

153

1    8, Table 1, Total Population -- that's the -- the

2    broadest net, correct?

3         A.    Correct.

4         Q.    If that's the -- I guess the -- if -- if

17:13:57  5    CVAP is the most conservative, how would you

6    characterize total population for purposes of

7    drawing maps and as a demographer?

8         A.    Oh, I -- I -- I think I get where you're

9    -- you're coming to, which is most likely, but

17:14:22  10   that's not in all cases, that the percentage of

11   Hispanic, black and Asian or the minority percentage

12   would be higher with total population usually.

13        Q.    Does it -- can I -- can we say the alt

14   -- the alternative most aggressive?

17:14:37  15        MS. HARLESS:  Objection to form.

16        A.    I don't know if it's the most

17   aggressive, but it's -- it's the highest percentage.

18   BY MR. BOYNTON:

19        Q.    Okay.

17:14:43  20        A.    Usually, but it's not -- not necessarily

21   that because --

22        Q.    Do you -- I'm sorry.

23        A.    All right.  Well, because of the fact

24   when you -- when you end up going to CVAP many times

17:14:54  25   things become reversed and you actually end up with

154

          1    a higher percentage sometimes.

          2         Q.    Is it the least conservative?  Can we

          3    agree on that?

          4         A.    It -- it -- sometimes.  Okay?  How about

17:15:10  5    that?

          6         Q.    You -- you make a reference in that

          7    chart to using five-year ACS data 13 through 17

          8    MP2015, and then you drop a footnote as to what that

          9    is.

17:15:27 10              I am to understand that to mean you are

         11    using only the 2015 dataset from the ACS because

         12    it's the temporal midpoint of the five-year survey?

         13         A.    Yes.  I -- just to re -- just to

         14    rephrase it slightly, the five-year ACS 2013 to 2017

17:15:50 15    has a midpoint of 2015.  And it's there just to give

         16    you a -- a -- an understandable reference point

         17    because people usually don't understand a five-year

         18    span of time, but they do understand a particular

         19    point in time.  And it's -- it's there as a purpose

17:16:09 20    to show -- visually understand the growth and the

         21    trend of the populations.

         22         Q.    Stated another way, whenever you say

         23    MP2015 in this report you're using data only from

         24    2015, correct?

17:16:24 25         A.    No.

```
 1          Q.    You are averaging?  And that's --
 2          A.    No.
 3          Q.    -- what I'm trying to get to.
 4          A.    That's what I'm saying.  It's the
```
17:16:32  5   five-year data point.  So what you see here where it
```
 6   says five-year ACS thir -- 2013 to 2017 -- the
 7   midpoint for that dataset is 2015.  That gives you
 8   an idea, a reference in time, of approximately where
 9   you can actually view that dataset.
```
17:16:51 10          The dataset is collected over five
```
11   years, but sometimes -- or not sometimes.  Most of
12   the time it's not understandable how you can
13   reference when that timeframe is, 2013 to 2017.  So
14   this just provides you somewhat of a context of
```
17:17:10 15   looking at 1990, looking at 2000, looking at 2010,
```
16   okay, this five-year, it -- it -- it's not 2015, but
17   it's approximately the timeframe somewhere -- a -- a
18   snapshot in time 2013 to 2017.  The perfect
19   situation would be that 2015 would be the values for
```
17:17:33 20   that if they took a perfect census.  If they
```
21   averaged both sides and every year was exactly the
22   same, 2015 would be the amount for that --
23          Q.    I --
24          A.    -- as an average.
```
17:17:42 25          Q.    I -- I think I'm asking a simpler

1     question.

2          A.     Okay.

3          Q.     If you look at total population --

4          A.     Uh-huh.

17:17:50  5       Q.     -- the first column -- or first -- first

6     row, you have 450055 under your five-year ACS 13 to

7     17 MP --

8          A.     Right.

9          Q.     -- 2015.

17:18:03  10      A.     Correct.

11         Q.     Is that 450055 a five-year average or is

12    it the single data point from 2015 in the ACS?

13         A.     It is the five-year what they call

14    average for the ACS.

15         Q.     Okay.

16         A.     That's the value of the -- the -- the

17    dataset.  The 2015 is just there for a referencing

18    point of the midpoint to there to let you know that

19    you're talking about a sequence 1990, 2000, 2010.

17:18:31  20   And you put that 2015 to just show that you're

21    talking about approximately that time -- excuse me

22    -- period between 2013-2017 and then you have 2017.

23         Q.     So whenever you call out in your report

24    MP2015 data you are using the five-year average ACS

17:18:51  25   2013 to 2017 and saying, "I mean this to approximate

1    the 2015 number"?

2            A.    No.

3            Q.    Okay.  Well, tell me --

4            A.    I'm -- I'm -- I'm using it just for

17:19:01  5    visualization so individuals can look at this to

6    understand a reference point of where that is.

7                  It's hard to understand 2013 to 2017.

8    What -- what year are we talking?  It's a five-year

9    period of time.  But you can understand that the

17:19:18  10   midpoint for that is 2015.  So --

11           Q.    But -- but -- I -- well, I'm still

12   trying to understand.  I hope it's a universal

13   answer --

14           A.    Okay.

17:19:26  15           Q.    -- because I don't want to have this

16   conversation again.

17           A.    Right.

18           Q.    This portion of the conversation again I

19   should say.

17:19:30  20           A.    Yeah.

21           Q.    Whenever you call out five-year ACS 13

22   to 17 MP2015 you are incorporating the five-year

23   average number?

24           A.    That is the five year-average number.

25           Q.    Okay.

```
            1          A.    Correct.

            2          Q.    Hallelujah.

            3          A.    Correct.  Okay.

            4          Q.    I -- I -- it's hard to not be a

17:19:49    5    statistician or --

            6          A.    Well --

            7          Q.    -- demographer and ask the question --

            8          A.    Yes.

            9          Q.    -- that your intending sometime, so I

17:19:53   10    appreciate you bearing with me on that.

           11          A.    Uh-huh.  No problem.

           12          Q.    So let's go over to page 10.  You have a

           13    chart there and it identifies Figure 1, and you have

           14    two vertical bars in the bar graph, one for ACS

17:20:37   15    1317, and another for 2017 with two asterisks beside

           16    it.

           17                Am I understanding that the orange or

           18    the ACS 1315 is the five-year average number?

           19          A.    Yes.

17:20:52   20          Q.    And the 2017 is the point number for

           21    2017 only?

           22          A.    Correct.

           23          Q.    Okay.

           24          A.    And that said, and this gets into the

17:21:07   25    weeds too, the 2017 comes from the one-year ACS
```

159

                estimates.  That's also a rolling census as well.

1

        Q.    So there's some data smoothing that

2

happens within the ACS --

3

        A.    It's --

4

        Q.    -- that gives you your one-year

5   17:21:24

estimate?

6

        A.    It's the same as a five-year, but it's

7

just one year.

8

        Q.    Okay.  And generally that shows a

9

uptrend in Hispanic, black and Asian voting

10   17:21:40

population percentages moving forward in time?

11

        A.    Correct.

12

        Q.    Zipping along.

13

        Turning to page 12 then, the Figure 2,

14

you are charting the same trends but using CVAP as

15   17:22:22

opposed to simply VAP?

16

        A.    Correct.

17

        Q.    And there's no other difference in what

18

you're representing there?

19

        A.    Correct.

20   17:22:34

        Q.    You get into median household income

21

toward the bottom of that page, page 12.  And you

22

report that medium household income in 2017 for the

23

city of Virginia Beach was $72,586, and then you get

24

into poverty-level statistics and education

25   17:22:57

1    statistics, correct?

2         A.    Correct.

3         Q.    And that's for purposes of defining your

4    communities of interest to draw the maps; is that

5    correct?

6         A.    Correct.

7         Q.    Did you look at how various ethnic

8    groups in Virginia Beach or dif -- or racial groups

9    in Virginia Beach compare to the national averages?

17:23:19  10         A.    No.  No.

11         Q.    Okay.  Do you know if -- if African

12   American or -- or black median household income in

13   Virginia Beach is higher or lower than the national

14   average?

17:23:32  15         A.    No.

16         Q.    Do you know if Hispanic household income

17   in Virginia Beach is higher or lower than the

18   national average?

19         A.    No.  Didn't look at that.

17:23:39  20         Q.    Is that not important to your analysis?

21         A.    Not in the context of redistricting.

22   I'm looking at what's going on inside the city.

23         Q.    And -- and you're using all of the

24   one-year 2017 data for that?

17:23:53  25         A.    Yes.

161

1    Q.    With the caveat that there's data

2    smoothing -- smoothing even in the one-year?

3    A.    Yes.  It's a rolling census still.

4    Q.    You make a statement that, "In fact..."

17:24:19   5    -- we're -- this is at the bottom of page 13 where

6    we're looking at the distribution of majority HBA

7    communities.  And in the bottom paragraph you say in

8    the middle of that paragraph, "In fact, reviewing

9    data that sums each race/ethnicity in the census

17:24:37  10    tracts that have greater than 40% percent HBA

11    verifies that the most Hispanic, Black, and Asian

12    persons reside in the same communities," correct?

13    A.    Correct.

14    Q.    And then you -- your reference or your

17:24:50  15    -- your data point for that is that Table 5 says

16    that 31 of Virginia Beach's hundred census tracts

17    contain 54.90 of the HBA combined population,

18    correct?

19    A.    Correct.

17:25:03  20    Q.    How does that compare in terms of level

21    of segregation or integration of neighborhoods with

22    other communities you've -- you've -- you've

23    evaluated demographically?  And I'm talking about

24    major cities, top 100 metropolitan areas.

17:25:22  25    A.    Offhand I don't know, but I would

162

1   imagine that they are similar.  I -- but I don't

2   know.  I would imagine that they're similar.  This

3   is a pattern that I have seen throughout the

4   country.

17:25:41  5       Q.   But you would agree that no community

6   has exact distribution of its minorities through

7   various and --  and -- and majorities throughout

8   each neighborhood within the -- the community,

9   correct?

17:25:56  10       A.   I don't know if I would say no community

11   or no city.

12       Q.   Have you seen one?

13       A.   I -- I -- for some reason I can't

14   recall, but I do recall cities going through a

17:26:15  15   transition point where they're -- where they are

16   apportioned somewhat equally, but I can't recall the

17   particular city, but it -- it is rare.  It -- it is

18   rare.

19       Q.    Is -- is Virginia Beach in your

17:26:32  20   experience more or less integrated than, say,

21   Baltimore?

22            MS. HARLESS:  Objection to form.

23       A.   I don't know.  I don't know, but I was

24   looking at it only from the context of redistricting

17:26:53  25   and whether there is a community or a growing

163

1    community of HBA in the city of Virginia Beach.

2    BY MR. BOYNTON:

3         Q.    Would you be surprised to learn that

4    there's at least one study that ranked Virginia

17:27:08  5    Beach as the most integrated of the largest hundred

6    metropolitan areas in the country?

7         A.    I wouldn't be surprised at all.

8         Q.    Why wouldn't you be surprised?

9         A.    Virginia Beach is a progressive city and

17:27:21  10   trying to -- Virginia Beach is a progressive city.

11        Q.    Would you characterize Virginia Beach

12   neighborhoods overall as -- as integrated or

13   segregated?

14        A.    I don't know.  It -- that's a different

17:27:37  15   type of analysis than -- than what I'm looking at.

16   You know, the analysis that I'm looking at is

17   whether these Hispanic, black and Asian combined

18   populations are existing in certain areas that could

19   be considered communities, and what I've shown is

17:28:01  20   that that is the case.

21             Now, whether Virginia Beach is

22   segregated as a matter of fact is -- is a completely

23   separate question and I didn't do any analysis of

24   that.

17:28:11  25        Q.    And -- and I'm referring solely to the

```
 1   -- the population densities in neighborhoods and not
 2   in any other way --
 3        A.   Uh-huh.
 4        Q.   -- just to be clear.
 5        A.   Uh-huh.  Sure.  Sure.
 6        Q.   Would you agree that it would be more
 7   telling to you or -- or -- or more useful in your
 8   analysis at least from a compactness perspective if
 9   you could have said that 90 percent of the HBA
10   communities in Virginia Beach live in four of the
11   hundred census tracts?
12        A.   Would it be --
13        Q.   Easier to draw a district that -- that
14   comports both with the -- the -- the -- the
15   sufficiently numerous prong -- or sub-prong and the
16   geographically compact --
17        A.   Uh-huh.
18        Q.   -- sub-prong?
19        A.   Right.
20        MS. HARLESS:  Objection to form.
21   BY MR. BOYNTON:
22        Q.   You can answer.
23        A.   It -- it -- it really depends.  I mean,
24   clearly if there was two census tracts that held all
25   the black and Hispanic and Asian populations and I
```

17:28:18  5
17:28:38  10
17:28:50  15
17:28:57  20
17:29:07  25

165

```
 1    could group them together in a district, that would

 2    be pretty easy to do that.

 3         Q.    Well, one of the challenges to drawing

 4    these maps is the -- the distribution of the --

 5    the --

 6         A.    Yeah.

 7         Q.    -- the -- the HBA population in Virginia

 8    Beach, correct?

 9              MS. HARLESS:  Objection to form.

10         A.    One of the challenges is that -- as I

11    mentioned before, is that there are clusters that

12    are not necessarily next to each other.  They're in

13    the same vicinity of the city, but they're not

14    adjacent to each other, so you have to connect the

15    two.  So that's -- that's the challenge I would say

16    in changing what you just said.

17              MR. BOYNTON:  Fair enough.  And I'm told

18    we're almost at the end of the tape, so it's a good

19    time to take a break.  And hopefully it will be our

20    final break and we'll roll through the rest of it

21    and get out of here at a semi-decent hour.

22              THE VIDEOGRAPHER:  We're off record at

23    5:29 p.m.

24              (Recess)

25              THE VIDEOGRAPHER:  We are back on record
```

17:29:19  5
17:29:24  10
17:29:45  15
17:29:58  20
17:38:03  25

```
              1    at 5:43 p.m.
              2    BY MR. BOYNTON:
              3         Q.    Mr. Fairfax, before we took a break we
              4    were talking particularly about distribution of
17:44:18      5    majority HBA communities in Virginia Beach, correct,
              6    on page 13 of your report?
              7         A.    Yes.
              8         Q.    Okay.  And then just inverting kind of
              9    what said, if 45.5 percent of the Hispanic
17:44:34     10    population lives in 31 census tracts, that means the
             11    majority of the Hispanic population in Virginia
             12    Beach lives in the other 69, correct?
             13         A.    Correct.
             14         Q.    Okay.  And you'd said there are ten
17:44:54     15    census tracts with 50 percent or more HBA clusters,
             16    if that's a better word?
             17         A.    Could you repeat that --
             18         Q.    Sure.
             19         A.    -- to me?
17:45:04     20         Q.    The -- I believe you said that there
             21    were 10 census tracts -- and this is your report
             22    saying it --
             23         A.    Right.
             24         Q.    -- not you personally.
17:45:13     25         A.    Uh-huh.
```

1      Q.    Ten census tracts with 50 percent or

2  more HBA performance or -- or representation,

3  correct?

4      A.    Correct.

17:45:22  5      Q.    And so that means that in 21 of your 31

6  most heavily minority tracts HBAs are actually

7  living in a majority white area, correct?

8      A.    Correct, if you're subtracting the two.

9      Q.    Yes.

17:45:43  10      A.    Can you repeat that just in case I'm --

11      Q.    Sure.  I mean, you -- you -- you've said

12  that there were ten census tracts --

13      A.    Right.

14      Q.    -- and -- and, then, i.e., not 11 or

17:45:51  15  more, that have 50 percent or more HBAs.

16      A.    Correct.

17      Q.    And so you have 31 census tracts that

18  are the most heavily minority tracts that you've

19  identified, correct?

17:46:02  20      A.    Correct.

21      Q.    And so, therefore, 31 minus ten equals

22  21.

23      A.    Correct.

24      Q.    So I take from that inferentially that

17:46:09  25  there are 21 of 31 most heavily minority tracts that

168

1    you identified where HBAs are actually living in
2    majority white areas.
3          A.    Correct.  I see what you're saying.
4    Yeah, you're -- you're saying somewhere in between
17:46:25   5    50 and 40 percent.
6          Q.    Yes.
7          A.    Correct.
8          Q.    Switching then --
9          A.    I'm --
17:46:39  10          Q.    Go ahead.
11          A.    Okay.  I -- I -- I -- I -- I definitely
12    think you're accurate on what you said there was 69
13    that were in below 40 percent.  And there are -- let
14    me just reiterate what I see there -- 21 that are
17:47:00  15    between 40 and 50 percent.
16          Q.    Correct.
17          A.    And they are majority white.
18          Q.    Correct.
19          A.    Okay.
17:47:05  20          Q.    So we're saying the same thing.
21          A.    Okay.
22          Q.    All right.  Now, looking at your pages
23    15, 16 and 17, these are your dot density points for
24    Hispanic, black and Asian populations in Virginia
17:47:20  25    Beach, correct?

169

```
              1            A.    Yes.  Yes.

              2            Q.    Now, you have overlaid -- well, let me

              3    just word it -- the -- the -- the green -- dark and

              4    light green are the same on each of the three maps,

17: 47: 32    5    correct?

              6            A.    Correct.

              7            Q.    And they represent the combined HBA at

              8    40 to 50 percent for light green and 50 or more for

              9    dark green?

17: 47: 43   10            A.    Correct.  And --

             11            Q.    Okay.

             12            A.    -- on mine just the -- there is a color

             13    variation on -- on -- on the printout let me just

             14    say.

17: 47: 53   15            Q.    Okay.

             16            MS. HARLESS:  Yeah.  Let the -- let's

             17    just let the record reflect that the printing has

             18    turned the two shades into three shades.

             19            THE DEPONENT:  Right.

17: 48: 01   20            MR. BOYNTON:  Okay.

             21            THE DEPONENT:  There's -- there is a --

             22            MR. BOYNTON:  Well, that's unfortunate.

             23            THE DEPONENT:  There's a yellowish --

             24            MR. BOYNTON:  Okay.

17: 48: 06   25            THE DEPONENT:  -- green.  So -- but I --
```

1    I'm looking at it as --

2    BY MR. BOYNTON:

3        Q.    You intended to represent two different

4    shades of green and that's how it came across to us

17:48:15  5    originally, and you were not trying to put out three

6    different groups, correct --

7        A.    Correct.  And I --

8        Q.    -- of the shading?

9        A.    And I thought on -- on mine it came out

17:48:23  10   correctly, but I --

11       Q.    Well, no.  Oh, it did.

12       A.    Okay.

13       Q.    We -- it's purely copying from us.

14       A.    Okay.  Okay.

17:48:27  15       Q.    So that's why I'm trying to clarify

16   this.

17       A.    Okay.

18       Q.    And I can show you my version of it if

19   it helps you to feel --

17:48:34  20       A.    Got you.

21       Q.    --  confident in -- in what was done,

22   but the version that I'm asking from -- but for

23   whatever reason the copy version that is the

24   exhibit, the colors are off somewhat in the exhibit.

17:48:50  25       A.    Right.  Okay.

171

```
         1          Q.    But what I am working from shows me two

         2    sets of green.

         3          A.    Correct.

         4          Q.    There's a dark green and then there's a

17:48:58 5    lighter-shaded green.

         6          A.    (Moved head up and down.)

         7          Q.    And -- and I see a couple of those came

         8    on the yellow for you.

         9          A.    Right.  Right.

17:49:02 10         Q.    And so I will represent to you that all

        11    of the yellow ones appear on my exhibit to be light

        12    green.

        13          A.    Yes.

        14          Q.    And so that's where we get again --

17:49:12 15         A.    Yes.

        16          Q.    -- ten districts that are 50 or more --

        17          A.    Correct.

        18          Q.    -- 50 percent or more and then 21

        19    districts that are between 40 and 50 percent?

17:49:21 20         A.    Correct.

        21          Q.    And -- and you are intending to

        22    represent on each of Figures 4, 5 and 6 the same

        23    representation with respect to the shadings?

        24          A.    Okay.  That is correct.

17:49:31 25         Q.    And then you are overlaying onto those
```

1    shaded maps red dots that represent different

2    things?

3                A.    That's correct.

4                Q.    In Figure 4 it represents Hispanic dot

17:49:45  5    density?

6                A.    Yes.

7                Q.    Figure 5 black dot density?

8                A.    Yes.

9                Q.    Figure 6 Asian dot density?

17:49:52 10            A.    Yes.   Correct.

11                Q.    Looking at those three exhibits together

12    -- and all I'm asking you to look at is the dots,

13    not the shadings anyway -- what do you glean about

14    the comparative density points of the three

17:50:03 15    different communities in Virginia Beach?

16                A.    Right.   At -- when I look at these dots

17    what I surmise is that they are mostly congregating

18    around the -- the majority Hispanic/black census

19    tracts as well as the ones above 40 to 50 percent

17:50:23 20    let's say for each of the racial groups.

21                Q.    Well, you would agree with me that there

22    are an awful lot more dots in Figure 5 outside of

23    those shaded areas than Figure 4, for example?

24                A.    I don't necessarily agree that there are

17:50:44 25    a lot more outside than inside.   I don't know if I

173

1    necessarily agree.

2            Q.    That wasn't exactly my question.

3            A.    Okay.

4            Q.    I'm sorry.  I -- I -- I'm saying that --

17:50:55 5   well, first of all, there are just more red dots on

6    Figure 5 than Figure 4, correct?

7            A.    Correct.  Okay.

8            Q.    Because there are in fact more black

9    residents of Virginia Beach than -- than Hispanic

17:51:06 10  residents, correct?

11           A.    Exactly.  Correct.

12           Q.    But looking at that, there are dozens of

13   red dots on Figure 5 representing black density

14   points that are outside of the shaded areas?

17:51:21 15          MS. HARLESS:  Objection to form.

16   BY MR. BOYNTON:

17           Q.    I mean, you can count them if you want.

18           A.    Well, it -- it's --

19           Q.    More than a dozen?

17:51:28 20          A.    It -- it --

21           MS. HARLESS:  Objection to form.

22           A.    It -- it's -- it's difficult -- you

23   know, one dot density is used just as sort of a

24   visual indication level of -- of where a population

17:51:39 25  resides.  And so at this level it may be difficult

174

          1    to count specifically ones because of the

          2    overlapping of the dots.

          3              This is used just to give you an -- an

          4    indication, a visual indication, that each of these

17:51:58  5    races are residing and locating themselves in these

          6    HBA communities or near HBA communities.  And -- and

          7    so when I look at 5 I look at it as validating that.

          8    I look at that the bulk of those dots are residing

          9    in those HBA communities or the near-HBA

17:52:23 10    communities, and that's what the data reflects with

         11    the 31 out of 100.

         12    BY MR. BOYNTON:

         13        Q.    Turning your attention to page 18 of

         14    your report, and we're starting to get into the

17:52:35 15    illustrative plan now, you would agree that the

         16    illustrative plan that you prepared and provided in

         17    your initial report is two separate majority HBA

         18    CVAP districts, correct?

         19        A.    Correct.

17:52:55 20        Q.    You've also stated that, "The

         21    Illustrative Plan also adheres to the Virginia Code

         22    sections relating to election districts..." --

         23    footnote 28 "...as well as traditional redistricting

         24    criteria."

17:53:15 25              What analysis did you perform to make

1    that statement?

2         A.    From the reports that I produced, the

3    equal population report, I looked at the deviation

4    overall for the plan as well as the districts.  So

17:53:30    5    that's a check.

6              I -- I looked at the compactness reports

7    and -- and made that call on whether they were

8    compact or non-compact districts.

9              I looked at the political subdivision

17:53:43   10    splits, which are VTDs.  One compared them to the

11    residency plan.  Made a call that they were

12    minimized subdivision splits.

13              And then the communities of interest,

14    visually indicating that the -- the subdivisions

17:54:02   15    that were not split from a visual point of view.

16         Q.    Okay.  And -- and so with respect to the

17    communities of interest, did you make any analysis

18    beyond looking at the -- the commonality of

19    interests of socioeconomic factors as it relates to

17:54:24   20    Hispanics, blacks and Asian populations in the

21    neighborhood overlay that you talked about?  Did you

22    do anything else?

23         A.    The census tract analysis, which should

24    be also in here, where I looked at the census tracts

17:54:40   25    that were majority Hispanic, black and Asian -- you

176

```
 1    are talking in addition to that or you're not

 2    talking about that?

 3            Q.    No.  You -- you testified that you look

 4    at the socioeconomic aspect of this in some

 5    detail --

 6            A.    Right.

 7            Q.    -- for -- with respect to HBA

 8    communities.

 9            A.    Right.

10            Q.    And -- and -- and you -- you've also

11    testified that you overlaid neighborhoods to -- to

12    -- to look at or subdivisions to look at in your not

13    splitting neighborhood communities.

14            A.    Correct.

15            Q.    I said -- I'm asking you did you do

16    anything else beyond those two steps?

17            A.    No.  No.  Nothing else beyond those two

18    steps.

19            Q.    Okay.  And -- and --

20            A.    And we're talking -- I don't want to cut

21    you off, but --

22            Q.    Go ahead.

23            A.    -- we're talking about -- in addition to

24    the citywide we're talking also the census tracts as

25    well.
```

17:54:52   5
17:54:56  10
17:55:04  15
17:55:11  20
17:55:18  25

177

```
              1          Q.     Yes.

              2          A.     Okay.  I just want to make sure.

              3          Q.     Because you -- you -- I think you went

              4    into how you distilled down from at large to census

17:55:26      5    tract data and applied socioeconomic factors.

              6          A.     Right.  Where I reviewed the census --

              7    the majority HBA census tracts that were included in

              8    the districts and found that there were

              9    commonalities that existed that the city's reflected

17:55:42     10    also in those census tracts.

             11          Q.     Nothing beyond that and looking at the

             12    neighborhoods?

             13          A.     Correct.

             14          Q.     That's what I was trying to get to.

17:55:47     15          A.     Okay.

             16          Q.     Yeah.  Did you identify any other

             17    Virginia Beach communities of interest in

             18    determining what to look for?

             19          A.     No.

17:55:59     20          Q.     Okay.  Going back to compactness, I

             21    believe your testimony was that there's some

             22    subjectivity to determining what amount of deviation

             23    in compactness is tolerable community by community,

             24    correct?

17:56:13     25          A.     Correct.
```

178

1          Q.     And -- and for purposes of your

2     conclusion that the illustrative plan adheres to

3     Virginia code sections relating -- and I'll say to

4     compactness only --

5          A.     Okay.

6          Q.     -- as well as visual redistricting --

7     redistricting criteria, compactness only, what steps

8     did you do to make yourself comfortable that it

9     complied with compactness requirements?

17:56:36  10          A.     The first step really was -- well, of

11     course, I produced the port -- report.  But the --

12     the first step really was to compare to the

13     residency plan, which is the current plan.  And I

14     found that one situation they -- the -- the range of

17:56:55  15     the illustrative plans for compactness fit inside

16     the range for the residency plan for District 1.

17     And District 2 was extremely close.

18               So we're talking about, you know,

19     comparing it to an existing plan that has been

17:57:11  20     already approved by the City.  And so that gave me a

21     -- a comfortability that this was a -- a compact

22     plan.  Not to say that if I would have went lower I

23     -- I would have gone lower and it also probably

24     would have been within the range of what I had

17:57:31  25     considered compact.  But certainly since these were

Adams Harris Reporting, Inc.
Virginia Beach, Virginia

```
 1    close to the res -- residency plan or falling within

 2    the residency plan, I felt very comfortable in

 3    saying they were sufficiently compact.

 4         Q.    So you essentially compared it to

 5    existing districts from 2010 under a seven-district

 6    system and decided that was sufficiently --

 7         A.    Correct.

 8         Q.    -- comparable?

 9         A.    Correct.  That was the only plan that

10    the City had as far as the Council -- City Council.

11         Q.    Now, when the City drew the seven-member

12    district plan in -- in or around 2011 did it draw a

13    majority-minority district from your perspective?

14         A.    I -- I never looked at that.  I didn't

15    look at that.

16         Q.    You -- sitting here today, you don't

17    have knowledge one way or the other?

18         A.    No, I don't have knowledge to that.

19         Q.    And we get to page 20 of your report,

20    and that is the illustrative plan with two majority

21    HBA districts that you prepared for provision in

22    your expert report, correct?

23         A.    Correct.

24         Q.    There are no other maps contained in

25    your expert report, correct, as -- as it relates
```

17:57:48  5
17:57:56 10
17:58:11 15
17:58:38 20
17:58:54 25

180

```
          1    illustrative plans for two or one majority HBA
          2    districts?
          3          A.    Correct.
          4          Q.    And you -- you used -- well, did you
17:59:05  5    make an effort for these two majority HBA districts
          6    to incorporate Ms. Allen and Ms. Holloway's
          7    residencies within the -- one of the two
          8    majority-minority districts?
          9          A.    Yes.
17:59:18 10          Q.    Why did you do that?
         11          A.    Prior conversations of seeing whether
         12    they were included --
         13          Q.    You continued to do that?
         14          A.    I continued to do that.
17:59:33 15          Q.    So sitting here today, even if they're
         16    not called out on the map on page 20, you believe
         17    that Ms. Holloway and Ms. Allen's residences were
         18    contained within one of the two districts?
         19          A.    I believe so.  I believe so.
17:59:55 20          Q.    Okay.  But -- but they aren't called
         21    out?
         22          A.    They aren't called out.
         23          Q.    Now, looking at Table 7, Illustrative
         24    Plan.
18:00:05 25          A.    Okay.
```

181

```
 1              Q.    Now, I am just trying to follow math at
 2      this point.
 3              A.    Uh-huh.
 4              Q.    I'm not trying to examine the -- the
18:00:14  5     undergirdings of it to the extent it's not
 6      necessary.
 7              A.    Uh-huh.
 8              Q.    When I look at the CVAP table for
 9      District 1, correct --
18:00:25 10             A.    Uh-huh.
11             Q.    -- I see the total CVAP 13 to 17 ACS for
12      District 1 as 29761, correct?
13             A.    Yes.
14             Q.    Okay.  So my understanding is that if I
18:00:38 15     -- well, that -- that's -- that's everybody in the
16      district under your analysis?
17             A.    That's the total --
18             Q.    Okay.
19             A.    -- CVAP.
18:00:45 20             Q.    Then we get to the breakdown -- past --
21      we go past the deviation and the population totals
22      based on your -- your population target, correct?
23             A.    Correct.
24             Q.    Then we get to Hispanic CVAP, white
18:00:56 25     CVAP, black CVAP and Asian CVAP, correct?
```

182

```
         1          A.    Correct.
         2          Q.    Now, if I add Hispanic, black and Asian,
         3    I should get to the final column, which is Hispanic,
         4    black, Asian CVAP, correct?
18:01:09 5          A.    No.
         6          Q.    I should not?
         7          A.    No.
         8          Q.    Why not?
         9          A.    Because when I went through the
18:01:15 10   disaggregation process -- and there's two ways of
         11   doing it.  You can disaggregate each of these
         12   Hispanic, black and Asian and then total up at the
         13   end and you would get an equal amount, or you can
         14   total in the beginning Hispanic, black and Asian and
18:01:33 15   then disaggregate.  And what I did was total in the
         16   beginning and disaggregate.
         17              And the reason why I did that is because
         18   when you're disaggregating and adding you're adding
         19   up three different disaggregation errors.  When you
18:01:47 20   total in the beginning you're only disaggregating
         21   one.  So you'll have one disaggregation error.
         22          Q.    Okay.
         23          A.    So that's why the totals don't add up.
         24          Q.    Okay.  So the long -- the long
18:01:59 25   explanation is 2176 plus 9135 plus 3566 was never
```

183

```
 1    intended to add up to the number under HBA?

 2         A.    Correct.  Correct.

 3         Q.    And if you actually add those numbers

 4    you do get 14877 not 14888, correct?

 5         A.    That could be true, yeah.  I don't know,

 6    but that could be true.

 7         Q.    And -- and the same thing with District

 8    2.  If I add 2235 under Hispanic CVAP and 12810

 9    under black CVAP --

10         A.    Correct.

11         Q.    -- and 1367 under Asian CVAP, I would

12    not expect to get HBA CVAP?

13         A.    That's correct.

14         Q.    And in fact if I do add those I get

15    16412 not 16415?

16         A.    That -- that could be true.

17         Q.    Okay.  And so if -- if we were to use

18    the alternate process of -- of adding afterwards as

19    opposed --

20         A.    Uh-huh.

21         Q.    -- to using the before number, you would

22    actually get a number 14877 for District 1, which

23    when divided by total CVAP 29761 yields 50.03, I

24    believe, for one of those.

25         A.    Uh-huh.
```

18:02:15 (line 5)
18:02:40 (line 15)
18:03:14 (line 25)

184

```
 1            Q.    You -- yeah.
 2            A.    Well --
 3            Q.    Well, I'm sorry.  148 -- if I could type
 4    it would help.
 5            A.    Uh-huh.
 6            Q.    14877 divided by 29761 yields -- I'm
 7    sorry -- 49.988 percent.
 8                  MS. HARLESS:  Objection to form.
 9    BY MR. BOYNTON:
18:03:30 10          Q.    That I -- I'm happy to put the
11    calculator in your hand, sir.  I just want you to do
12    the math.
13            A.    Oh, no, no.  I -- I -- I trust you to
14    calculate, but it's a less accurate number.
15            Q.    Okay.
16            A.    Yeah.
17            Q.    But calculating it that way the number
18    does come back at 49.988, correct?
19            A.    That's probably so.  Yes.
18:03:46 20          Q.    I'm --
21            A.    I mean --
22            Q.    I'm happy to give you the time to do it.
23            A.    No.  I -- I trust that you -- you
24    calculated correctly.  Yes.
18:03:51 25          Q.    Okay.
```

185

         1          A.     Right.  Yeah.

         2          Q.     And -- and if I do the same process on

         3     District 2, I take the -- the addition of the three

         4     numbers you've given us for Hispanic CVAP, black

18:04:02 5     CVAP and Asian CVAP, which totals 16412, divide that

         6     by a total CVAP in District 2 of 32804, I get fif --

         7     that's the one I get 50.03 on.

         8          A.     Uh-huh.

         9          Q.     And -- and I -- I understand you stand

18:04:21 10    by the process you used, but --

         11         A.     Sure.

         12         Q.     -- you don't quibble with the numbers --

         13    the arithmetic I've employed in my approach?

         14         A.     No.  No.  If you -- I assume you're just

18:04:31 15    adding up the numbers and coming up with a total and

         16    then figuring out a percentage, and I --

         17         Q.     Uh-huh.

         18         A.     -- I trust you on -- on that.

         19         Q.     And the reason you used the before

18:04:38 20    number for H -- HBA CVAP as opposed to the after

         21    number on HBA CVAP is to minimize the impact of

         22    error from disaggregation?

         23         A.     Correct.  Correct.  Disaggregating one

         24    versus three.

18:04:53 25         Q.     So that assumes there is some error

|    | embedded in disaggregation? |
|----|----|
| 1  | embedded in disaggregation? |
| 2  | A.    There's error in every disaggregation |
| 3  | process. |
| 4  | Q.    So you used the Maptitude just -- this |

                1    embedded in disaggregation?

                2         A.    There's error in every disaggregation

                3    process.

                4         Q.    So you used the Maptitude just -- this

18:05:06        5    disaggregation process.  Why did you select that

                6    process?

                7         A.    Because it's -- it's a proficient and

                8    accurate disaggregation process.

                9         Q.    Is it the only one available?

18:05:19       10         A.    No.  You can disaggregate in many

               11    different ways.

               12         Q.    Well, tell me about iterative

               13    proportional fit, which I think is actually

               14    abbreviated IFP not IPF; is that right?

18:05:32       15         A.    Yeah.  And it -- and it's IPF.

               16         Q.    Iterative proportional fit.

               17         A.    Right.  IPF.  Yeah.

               18         Q.    So we'll use -- we'll use IPF, which

               19    makes more sense to me.

18:05:43       20         A.    Exactly.

               21         Q.    Did -- you did not do that in your

               22    initial report?

               23         A.    No.

               24         Q.    Why did you select one process over the

18:05:48       25    other?

```
          1          A.    Because the Maptitude process is fine
          2    and accurate and proficient.  I didn't need to.
          3          Q.    Is that what you had in your computer?
          4          A.    It -- it was in the Maptitude program to
18:05:59  5    do so, and I've used it many times and other
          6    consultants have used it.
          7          Q.    Do you have the iterative proportional
          8    fit software, if that's the right term?
          9          A.    No.  No.
18:06:09 10          Q.    You do not have that software?
         11          A.    No.  No.
         12          Q.    Do you have --
         13          A.    No.
         14          Q.    -- an opinion, sitting here today, as to
18:06:14 15    which approach, iterative proportional fit or a
         16    Maptitude disaggregation, renders a more accurate
         17    result?
         18          A.    I -- I would say that they're virtually
         19    the same under these circum -- circumstances.  I
18:06:29 20    know that the Census Bureau uses it, but they use it
         21    in the context of sample data.
         22          Q.    Uses iterative proportional fit?
         23          A.    Yes, in the context of sample data.
         24          Q.    Okay.
18:06:41 25          A.    And this doesn't have sample data.  And
```

188

1    so when I say it doesn't happen, what we're doing is

2    we're actually looking at static data for the

3    blocks, not individual records as -- as a survey

4    sample.  And they use it in the context of that, so

18:06:57  5    there is a difference.

6          Q.    So tell me what the benefit is of using

7    Maptitude versus IPF for disaggregation?

8          A.    I don't know if there is a benefit.  I

9    -- I -- as a matter of fact, you know, when I

18:07:12  10   received the report from Professor Morrison he kind

11   of validated that both of them are virtually the

12   same.  They're a difference of .04 percent and .08

13   percent for District 1 and District 2.

14               And so when you think of it, two

18:07:31  15   different operations coming up with virtually the

16   same process, he really validated that Maptitude has

17   an accurate process as long as his was accurate.

18         Q.    What benefits, if any, does IPF provide

19   over Maptitude?

18:07:47  20         A.    I -- like I said, I -- I don't know.

21   All I know is that they came out virtually the same

22   using two different processes.

23         Q.    But virtually the same in each instance

24   puts them right at or very close to 50.00 percent

18:08:06  25   for each of these districts using HBA CVAP?

189

```
 1          A.    Correct, without adding the black and
 2    white.  Once you add the black and white, which, you
 3    know, DOJ guidelines is acceptable, you're at 51
 4    percent --
 5          Q.    Well --
 6          A.    -- just -- just --
 7          Q.    Right.  So --
 8          A.    -- right there.
 9          Q.    So again going back to the -- the data
18:08:23 10   that was originally focused upon --
11          A.    Uh-huh.
12          Q.    -- in your report --
13          A.    Uh-huh.
14                MS. HARLESS:  Objection to form.
18:08:29 15         A.    Uh-huh.
16    BY MR. BOYNTON:
17          Q.    -- at page 20 you are presenting this in
18    the context of HBA CVAP, correct, that table and
19    that map?
18:08:39 20         A.    Right, but the paragraph right after it
21    talks about the black and white percentage added.
22          Q.    Understood.  And so --
23          A.    Right.
24          Q.    But --
25          A.    So it --
```

190

```
 1          Q.    But when you did a grid you did a grid
 2    for HBA CVAP, correct?
 3          A.    The table has that, you're right, but --
 4          Q.    Okay.
 5          A.    -- not the -- the -- you have to take
 6    the whole --
 7          Q.    Uh-huh.
 8          A.    -- report in context.
 9          Q.    Understood.
10          A.    Right.
11          Q.    But going back to what you chose to put
12    in the table, you were focused on HBA CVAP, correct?
13          A.    Correct.
14          Q.    And -- and --
15          A.    But that's more of a -- I -- I don't
16    want to cut you off, but that was more of a context
17    of fitting the table, not necessarily of focusing in
18    on the CVAP.
19          Q.    Well, you would agree that the HBA CVAP
20    that you put in your table for whatever reason, even
21    using your approach, says 50.03 and 50.04
22    majority-minority districts, correct?
23          A.    Correct.
24          Q.    That all is very close to 50, correct?
25          A.    Correct.
```

18:09:00 at line 15
18:09:13 at line 20
18:09:26 at line 25

          1          Q.    Okay.  And there's a standard deviation

          2     or a margin of error that probably exceeds

          3     three-one-hundredths of a percent for both of these,

          4     correct?

18:09:36  5               MS. HARLESS:  Objection to form.

          6     BY MR. BOYNTON:

          7          Q.    You can answer.

          8          A.    I don't -- don't know.

          9          Q.    Didn't do the math?

18:09:39 10          A.    No.  And -- and it --  it's very

         11     difficult -- once you begin to disaggregate the ACS

         12     data it's very difficult to determine what the

         13     margin of error is.  They have it how you determine

         14     it for -- the Census Bureau has it how you determine

18:09:57 15     to keeping whole areas intact, but -- but they don't

         16     talk about how you could determine it with -- broken

         17     down to the block level.  So --

         18          Q.    So, sitting here today, you do not know

         19     what the margin of error is on that 50.03 and 50.04

18:10:07 20     number you've included in your report?

         21          A.    No.

         22          Q.    You did not calculate it --

         23          A.    No.

         24          Q.    -- or it was not possible to calculate?

18:10:14 25          A.    It -- it -- as I said before, the -- the

192

1    -- the Census Bureau tells you how to calculate when

2    you begin to merge and aggregate block or block

3    groups but not when you actually combine blocks.

4              Let me back up and repeat that.

18: 10: 35    5    They provide you with a formula for

6    calculating margins of error using the level of the

7    ACS block group census tract, but not when you begin

8    to disaggregate down.

9              And so I -- what I'm saying is that it's

18: 10: 50    10   extremely difficult, if not impossible, to actually

11   calculate that from ACS data because of the --

12        Q.    So you could do it at the block group

13   level?

14        A.    Yes.  It -- it --

18: 10: 58    15        Q.    Did you do it at -- well --

16        A.    Huh?

17        Q.    -- I guess you disaggregated so you

18   couldn't do it for this data.

19        A.    Right.

18: 11: 03    20        Q.    Okay.  And -- and -- but you've already

21   said disaggregating injects additional area of error

22   into the analysis, correct?

23        A.    Potentially.

24        Q.    So your margin of error, if you could

18: 11: 13    25   calculate it, having done a disaggregation

193

```
 1    block-by-block approach, can't have a lower standard
 2    of -- of -- of deviation or standard -- margin of
 3    error, can it?
 4              MS. HARLESS:  Objection to form.
```
18:11:23  5        A.    A -- a lower than --
```
 6    BY MR. BOYNTON:
 7              Q.    Than the block group level data.
 8              MS. HARLESS:  Objection to form.
 9              A.    Don't know.  It could be.  Depending
```
18:11:35 10  upon how it works out it could be because when you
```
11    begin to add and subtract it could end up with --
12    with a margin of error that's closer.
13    BY MR. BOYNTON:
14              Q.    And under the top of page 21, that
```
18:11:59 15  paragraph where you're adding in both black and
```
16    white identifiers, people who identify as both, you
17    get District 1 and 2 percentage yields of 51.11 and
18    51.08, correct?
19              A.    Correct.
```
18:12:13 20        Q.    Did you do a margin of error on those?
```
21              A.    No.
22              Q.    Okay.  And that's because they include
23    disaggregated data too?
24              A.    Correct.
```
18:12:20 25        Q.    And you would agree that at least the

194

```
          1    Reock score for compactness for District 2 does fall
          2    outside of the range of any of the current City
          3    Council districts?
          4         A.    Correct.
18:12:40  5         Q.    But you deemed that okay for your
          6    purposes?
          7         A.    Correct.
          8         Q.    And -- and anything specific about why
          9    you deemed that okay for your purposes?
18:12:48 10         A.    Because it wasn't significantly lower.
         11         Q.    And in point -- and zero is least
         12    compact and one is most compact; is that right?
         13         A.    One is most compact, yeah.
         14         Q.    Okay.
18:13:01 15         A.    Zero is least.
         16         Q.    And on your political subdivision splits
         17    you're analyzing splitting voting -- voter
         18    tabulation districts not neighborhoods, correct?
         19         A.    Correct.
18:13:29 20         Q.    You -- you make a statement, most -- in
         21    most in -- instances neighborhoods were not split,
         22    at the bottom of page 23.
         23         A.    Correct.
         24         Q.    Did you do any statistical analysis to
18:13:44 25    say how many neighborhoods were split?
```

195

```
 1              A.    No.  No.

 2              Q.    That's your overlay, eyeball, it looks

 3     like it's not too bad?

 4              A.    Correct.  Correct.  Visual indication.

18:13:51  5     Q.    Turning your attention to your rebuttal

 6     report dated August 26th, 2019, I'd ask you -- it's

 7     Fairfax Exhibit 4.  I'm going to put it in front of

 8     you and ask you to review it and confirm it is in

 9     fact your rebuttal report.  And it's another thick

18:15:02 10     one, so feel free to take a moment or two.

11              Does Exhibit 4 appear to be your

12     rebuttal report, sir?

13              A.    Yes.

14              Q.    Do you see anything that appears to be

18:15:52 15     omitted or missing?

16              A.    No.  I haven't found anything.

17              MS. HARLESS:  I'd just like to say on

18     the record at least the copy I have is not printed

19     in color.

18:16:02 20              THE DEPONENT:  Right.

21              MS. HARLESS:  I don't know about what --

22              THE DEPONENT:  No, it's not in color.

23              MR. BOYNTON:  And -- and that -- if --

24     if that matters, we will address it at the time.

18:16:10 25              THE DEPONENT:  All right.
```

196

```
           1              MR. BOYNTON:  And I do want to be
           2     mindful of everybody's time, but I also have --
           3              THE DEPONENT:  Sure.
           4              MR. BOYNTON:  -- a job to do today,
           5     so --
           6              THE DEPONENT:  No.  You do your job.
           7     BY MR. BOYNTON:
           8         Q.    Okay.  So you ultimately were in receipt
           9     of a -- a report from Peter Morrison that was dated
18:16:36  10     August 12th, 2019, correct?
          11         A.    Correct.
          12         Q.    You reviewed that?
          13         A.    Correct.
          14         Q.    You -- you sometime after that developed
18:16:42  15     a response to the Peter Morrison report which we
          16     will call the rebuttal report?
          17         A.    Correct.
          18         Q.    And that's Exhibit 4 today?
          19         A.    Correct.
18:16:50  20         Q.    And that was, at least for purposes of
          21     delivery to counsel for the defendants, prepared by
          22     you on August 26th, 2019?
          23         A.    Correct.
          24         Q.    Okay.  Do you -- well, do you have an
18:17:19  25     estimate of how many hours you put in preparing your
```

197

        1    first report?
        2            A.     Preparing the report --
        3            Q.     The -- the work --
        4            A.     -- not the plan?
18:17:29 5          Q.     Well, the plan and the report that --
        6    that informed the initial disclosure.
        7            A.     I believe it was somewhere between 40 to
        8    50 hours on one -- the initial, and maybe -- let me
        9    -- let me think about this.  I think it was a total
18:18:03 10   of -- a total of 90 hours, I guess, total -- maybe
       11    80 hours total for both of them.
       12            Q.     So can I extrapolate -- and maybe I
       13    shouldn't extrapolate, especially with a
       14    demographer.
18:18:28 15         A.     Yeah.
       16            Q.     You said 40 to 50 hours for the work
       17    that informed the initial report, including
       18    preparation of the report, correct?  Approximation.
       19            A.     Yeah.  I'm trying to -- trying to
18:18:42 20   approximate.  The initial one was more than -- than
       21    the re -- response, and so I'm trying to break it --
       22    break it up into its pieces.  And I would say --
       23    let's just say 80-ish hours total and, you know,
       24    40-some to 30-some, let's say.  Something like that.
18:19:14 25         Q.     40 to 30 like a split?

198

```
          1          A.    Well, the 40-ish-some to 30-ish-some

          2    might -- you know, it could be 35 to 48 or something

          3    like that.  I'm trying to --

          4          Q.    And that -- that's outside of deposition

18:19:26  5    preparation --

          6          A.    Right.  Right.

          7          Q.    -- correct?

          8          A.    Yeah.

          9          Q.    And all of those were at an hourly rate

18:19:34 10    of 180 per hour?

         11          A.    Correct.

         12          Q.    Okay.  You -- you make a statement on

         13    page 3 of your rebuttal report, and this is

         14    responding to Dr. Morrison's, where you say "claim

18:20:22 15    of inconsistent data."

         16                You say, "If districts were made up of a

         17    few census blocks..." -- the second paragraph --

         18    "...Dr. Morrison's point might carry more weight.

         19    However, the Illustrative Plan's districts and

18:20:34 20    alternative plans' districts are made up of hundreds

         21    of census blocks, which diminishes the census block

         22    data variations to virtually nil."

         23                Can you explain that to me?

         24          A.    What Dr. Morrison is pointing out is the

18:20:51 25    technique that Maptitude uses to disaggregate.  And
```

```
 1    essentially it uses a largest populated block to

 2    allocate the fractions of -- of persons in order to

 3    create integers or whole persons.

 4              And so what happens is that the process

 5    -- the first process is disaggregating using a

 6    weighted amount.  So, for example, if there was a

 7    thousand VAP in the block group and a hundred in the

 8    block, then that's a ten-percent weight.  And so if

 9    there is 500 CVAP, then it would multiply that

10    weighted amount by ten percent and you end up with

11    50 CVAP for the block.  And that's fine unless you

12    have a fraction.  And so when you have fractions

13    what do you do with that fraction?  And what

14    Maptitude does it assigns that fraction to the

15    largest populated block.  So if there's 4.5 persons,

16    it chops off the .5 and adds it to the largest

17    populated block.  And what that does is that allows

18    integers to be used and not fractions.

19              And so what Dr. Morrison sees is -- when

20    you go down to the block level you see that largest

21    populated block, that's increased because all those

22    fractional pieces are added to the block population.

23    And all of the other populated blocks, even --

24    although he didn't point this out, are actually less

25    than what they should because they're -- they're --
```

18:21:18    5
18:21:43   10
18:22:00   15
18:22:17   20
18:22:32   25

200

1      you know, that 5 -- that 4.5 is now four.

2                 And so what happens is is that at the

3      block level, if districts lie at the block level,

4      which they don't, there would be that error

18:22:44  5      associated with that largest populated block.  But

6      once you begin to aggregate the largest populated

7      block with those underpopulated blocks the error --

8      or the largest populated block diminishes the effect

9      or the impact.  The more populated blocks you add

18:23:02  10     together the more it diminishes down to virtually

11     nil or actually -- actually nil when you get to a

12     block group.

13                So once you begin to aggregate to the

14     block group that disaggregation of the largest

18:23:15  15     populated block error disappears.

16          Q.    How -- how many blocks are in a block

17     group?

18          A.    It could be anywhere -- I think the

19     average -- I looked at it -- in the city of Virginia

18:23:29  20     Beach was 20-something.

21          Q.    The average?

22          A.    Average is like 20-something, I believe.

23          Q.    Average of 20 blocks in one block group?

24          A.    Correct.

18:23:35  25     Q.    How many block groups are in --

|  |  |  |
|---|---|---|
| | 1 | A.      20-something, yeah. |
| | 2 | Q.      -- your District 1? |
| | 3 | A.      How many block groups? |
| | 4 | Q.      Yes. |
| 18:23:42 | 5 | A.      I don't know.  I didn't count the block |
| | 6 | groups, but I counted the blocks.  The blocks are |
| | 7 | hundreds. |
| | 8 | Q.      Hundreds are blocks? |
| | 9 | A.      Correct. |
| 18:23:49 | 10 | Q.      Does that mean you have a dozen block |
| | 11 | groups? |
| | 12 | A.      Yeah.  I mean, you can kind of calculate |
| | 13 | it and come up with an average, I assume. |
| | 14 | Q.      And does your districting in District 1 |
| 18:24:02 | 15 | and District 2 of the illustrative plan, the first |
| | 16 | one, where you've done the disaggregation to block |
| | 17 | level -- do you split block groups in that plan? |
| | 18 | A.      Yes. |
| | 19 | Q.      Okay. |
| 18:24:12 | 20 | A.      Uh-huh. |
| | 21 | Q.      So it could be that the people that are |
| | 22 | added are on one side of the split and who are |
| | 23 | subtracted are on the other side of the split, |
| | 24 | correct? |
| 18:24:20 | 25 | A.      Correct. |

1      Q.     So that would not be re -- removing the

2   error?

3      A.     Right.  But what happens is because of

4   the largest populated block -- and I put this in my

18:24:26   5   report -- is randomly positioned throughout the

6   city, you have some that are outside and some that

7   are inside, and they tend to offset each other just

8   virtually from being in different locations.

9      Q.     But you are looking for the blocks that

18:24:42   10   are most HBA CVAP-centric, correct?

11      A.     Block groups, I guess.

12      Q.     Block -- or blocks too because block --

13   groups are made up of blocks.  And you split block

14   groups.

18:24:55   15      A.     Right.

16      Q.     So really you're looking for blocks that

17   are most HBA -- highest concentration of HBA CVAP to

18   do your map, correct?

19      A.     I -- I don't know if I am hesitating

18:25:11   20   because I'm -- I'm -- when I developed the map I

21   first looked at VTDs and I tried to concentrate

22   those areas that had the census tracts that had the

23   -- the majority HBA populations as -- as a whole.

24   And then as the lower level would be the

18:25:36   25   neighborhood that I look at.  So the blocks -- what

203

```
          1    you're -- when you start to say blocks I'm a little

          2    hesitant in -- on agreeing because I'm trying to

          3    understand what --

          4        Q.    Well, it's not fully randomized when

18:25:51  5    your goal is to pick the -- the assemblage of blocks

          6    that have the highest HBA CVAP percentages.

          7        A.    Oh, I see what you're saying.  You're --

          8    you're -- let me see if I can understand it.  You're

          9    saying that it's not randomized; therefore, the

18:26:07 10    specific blocks in an HBA district would be in a

         11    certain configuration.  And I don't think that's

         12    true.

         13        Q.    I --

         14        A.    The -- the --

18:26:17 15        Q.    That's not what I'm saying --

         16        A.    Okay.

         17        Q.    -- so I -- I'll stop you.

         18        A.    Okay.

         19        Q.    What -- what I'm -- what I'm asking is

18:26:22 20    if I'm a demographic consultant --

         21        A.    Uh-huh.

         22        Q.    -- and I've been hired to draw a map

         23    that shows 50.00 percent or more --

         24        A.    Uh-huh.

18:26:33 25        Q.    -- of historically -- historically --
```

           1    Hispanic, black, Asian CVAP --
           2          A.    Uh-huh.
           3          Q.    -- and I've taken it down to block group
           4    level --
           5          A.    Uh-huh.
           6          Q.    -- and I've disaggregated it to certain
           7    blocks --
           8          A.    Uh-huh.
           9          Q.    -- and I'm splitting those blocks, I'm
18:26:45  10    not splitting it just to split it.  I'm splitting it
          11    to get that -- that number as high as it'll get, as
          12    compact as it'll get?
          13               MS. HARLESS:  Objection to form.
          14    BY MR. BOYNTON:
18:26:53  15          Q.    You can answer.
          16          A.    Right, but I -- I think there's a -- an
          17    assumption that you're making that there isn't a
          18    random aspect to the Hispan -- to Hispanic --
          19    Lord -- to the, yeah, Hispanic, black and Asian
18:27:10  20    block groups.  There's no indication that those
          21    Hispanic, black and Asian block groups have a
          22    largest populated block in a particular area.  I --
          23    I don't -- I haven't seen any indication to say
          24    that.
18:27:23  25               So creating a Hispanic, black and Asian

205

1    district should still have this randomization of the

2    largest block being outside and some largest block

3    being inside.

4         Q.    But -- but your disaggregation is a

18:27:35  5    process that starts with the -- the notion that you

6    don't know who is in each block, and so you're

7    trying to break it apart and -- and -- and apply a

8    -- an algorithm to tell us that, correct?

9         A.    No.  No.

18:27:52  10         Q.    What's the purpose of disaggregation?

11         A.    Right.  The -- the purpose of -- the --

12    the real purpose of disaggregation is determining

13    the percentage at the district level.  And -- and

14    that's really important because disaggregation in

18:28:08  15    the context of what we're doing really isn't to

16    determine what the population is at the block level.

17    What we're doing is we're trying to determine what

18    the Hispanic, black and Asian population is at the

19    district level.  We have to do that by

18:28:23  20    disaggregating to the block level.

21              And so the purpose really is not whether

22    there's an issue at the block level.  The purpose is

23    whether there's an issue at the district level.  And

24    the analysis shows that there isn't a issue at the

18:28:36  25    district level.

206

         1          Q.    And you -- just to be clear, you're

         2    saying voting tabulation district, not illustrative

         3    district?

         4          A.    No.  No.  I'm talking about the district

18:28:43 5    itself.

         6          Q.    Oh, the overall.

         7          A.    Right.  I -- the pur -- the reason why

         8    we want to actually -- actually disaggregate is

         9    because we want to know the CVAP for the district,

18:28:55 10   not for the block.  We have to disaggregate down to

        11    the block, but really what we're trying to determine

        12    is what is the Hispanic, black and Asian CVAP for

        13    the district.  And so along the --

        14          Q.    Is it -- I'm sorry, but what is that

18:29:06 15   other than a sum of a -- a summation of the blocks?

        16          A.    Right.  But once we sum back up the

        17    error disappears.  And that's my whole point.

        18    Because what happens is, yes, down at the block

        19    level there are these largest populated blocks, but

18:29:20 20   as you begin to aggregate them together it

        21    diminishes.  And -- and I've shown that

        22    disaggregating with just a straight disaggregation

        23    method and disaggregating using Maptitudes virtually

        24    are identical at the end.  You have to go to the

18:29:37 25   third decimal place to see a difference.

207

```
 1              So that largest populated block doesn't
 2    really correct -- have -- or re -- doesn't really
 3    have an effect or impact at the district level.
 4         Q.   So, sitting here today, you are
 5    confident that you are not repeating the error and
 6    just blowing it up block -- block by block
 7    cumulatively across the district, but actually it's
 8    going to zero.  That's your testimony?
 9         A.   A -- a -- going to zero.  Not zero, but
10    it's going.  It's diminishing.  And -- and if you
11    think about it, it makes sense because each block
12    group that's wholly contained within the district,
13    there's a zero disaggregation error of the largest
14    populated block.  So each one.  And because when we
15    split we split in a random fashion -- and I know you
16    talked about the HBA maybe not splitting in a random
17    fashion, but I've seen no indication that splitting
18    because it's an HBA district doesn't still mean that
19    you're randomly putting that block -- that largest
20    populated block on the outside sometimes and on the
21    inside sometimes.
22         Q.   You make a statement in the next
23    paragraph on page 3, "In addition to the
24    Illustrative Plan that I included in my initial
25    report, it is possible to draw a number of
```

18:29:56  5
18:30:08  10
18:30:23  15
18:30:39  20
18:31:53  25

208

```
          1    additional alternative plans with two majority HBA

          2    CVAP districts," correct?

          3         A.    Correct.

          4         Q.    And then you say, "When analyzing all of

18:32:06  5    the plans using total population, VAP, and CVAP,

          6    there are only two instances where the HBA

          7    percentages are below 50%."

          8               What -- what are you explaining there?

          9         A.    Now, could you point me in the right

18:32:19 10    paragraph?

         11         Q.    I'm sorry.

         12         A.    I'm sorry.

         13         Q.    "In addition to..." -- it starts --

         14         A.    Where?

18:32:22 15         Q.    -- "In addition to..."

         16         A.    Oh, right here?

         17         Q.    Yes.

         18         A.    Okay.

         19         Q.    And go ahead and review it.

18:32:29 20         A.    Okay.  Well -- well, what I'm referring

         21    to, if you look at the tables in the back,

         22    practically the totals for each of those plans, the

         23    illustrative plan including the alternative plans,

         24    and you look at the voting age percentage, CVAP, and

18:33:00 25    A -- and VAP, there were only two instances where
```

|  | 1 | the Hispanic, black and Asian percentage were below |
|  | 2 | 50 percent.  So all of the other metrics, I guess, |
|  | 3 | of whether this is a majority HBA district showed |
|  | 4 | that all of them except for two were above 50 |
| 18:33:23 | 5 | percent essentially. |
|  | 6 | Q.    So -- so let's talk about that.  You're |
|  | 7 | -- you're looking at the il -- illustrative plan, |
|  | 8 | which I understand to be the original or the initial |
|  | 9 | report's plan. |
| 18:33:34 | 10 | A.    Correct. |
|  | 11 | Q.    And then you are saying there are a |
|  | 12 | number of additional alternative plans with two |
|  | 13 | majority HBA CVAP districts.  Are those the |
|  | 14 | alternative plans that are included for the first |
| 18:33:44 | 15 | time in your rebuttal report? |
|  | 16 | A.    Correct. |
|  | 17 | Q.    Okay.  Those were not provided in the |
|  | 18 | initial report? |
|  | 19 | A.    Correct. |
| 18:33:49 | 20 | Q.    They were not existing and -- or at the |
|  | 21 | time the initial report was provided? |
|  | 22 | MS. HARLESS:  Objecting to the extent |
|  | 23 | you're asking about draft reports or draft analyses. |
|  | 24 | BY MR. BOYNTON: |
| 18:33:59 | 25 | Q.    When did you first prepare the districts |

```
         1   -- or the alternative plans that were provided in
         2   the -- in the rebuttal report?
         3             MS. HARLESS:  So objecting to the extent
         4   that you're asking about draft analyses and draft
18:34:11 5   reports.  If you can answer subject to that, you
         6   can, but if not I'm instructing you not to answer.
         7   BY MR. BOYNTON:
         8        Q.   Okay.  So with respect to -- were these
         9   reports in existence -- or these alternative plans
18:34:25 10  in existence on July 15, 2019?
        11             MR. HARRIS:  Same objection.
        12   BY MR. BOYNTON:
        13        Q.   You can answer.
        14        A.   Well, let me -- let me say that, as I
18:34:34 15  mentioned in the initial report, there were other
        16   configurations.  And so along the way of developing
        17   a plan you have many different options that you look
        18   at.  This is just the process of developing
        19   redistricting plans.
18:34:48 20             And so those plans in there, except for
        21   one, which was the block group one, I had come
        22   across somewhere in the, you know, plan development.
        23   You -- you know, they're not full plans.  You
        24   don't -- you know, you don't print them out, but you
18:35:07 25  come across configurations as you're actually
```

211

```
          1    developing a plan.  It's just the process of
          2    redistricting.
          3              And so I recalled those plans and
          4    recreated those again except for the -- the block
18:35:20  5    group plan.
          6         Q.   But none of those were provided in the
          7    initial report?
          8         A.   No.  Correct.
          9         Q.   And -- and the block group one did not
18:35:26 10    exist in any shape or form until after July 15,
         11    2019?
         12         A.   Correct.  I specifically di -- created
         13    that because of Dr. Morrison's issue with
         14    disaggregation.  And that was a plan created that
18:35:41 15    had no disaggregation to show that you could create
         16    a plan without disaggregating.
         17         Q.   And Alternative 2 is the only of your
         18    alternative plans that provides block group level
         19    data or that -- that uses -- that relies on block
18:35:58 20    group level data to generate the map?
         21         A.   That -- that doesn't split block groups,
         22    yeah.
         23         Q.   You -- you make a statement in the
         24    second-to-last paragraph on -- still on page 3 --
18:36:57 25         A.   Okay.
```

1       Q.      -- "It is also possible to draw plans
2   with at least one HBA majority CVAP district, which
3   is still more than contained in the current City
4   Council plan (which has zero)."

18:37:13  5           Did you independently analyze whether
6   the current City Council plan actually had zero or
7   did you make an assumption?

8       A.      I -- I looked at the plan and I did not
9   see a majority HBA CVAP district in the residency

18:37:46  10  plan.

11      Q.      From the 2010 re -- or 2011
12  redistricting of City Council?

13      A.      Yes, the -- the residency plan that was,
14  yeah, created.

18:37:54  15      Q.      To -- to -- to your understanding, based
16  on your analysis --

17      A.      Uh-huh.

18      Q.      -- none of the seven current City
19  Council districts were HBA majority CVAP as of their

18:38:08  20  creation?

21      A.      I can make a determination because I
22  have that in here, don't I, and I can tell you for
23  sure.

24           MR. BOYNTON.  Let the record reflect

18:38:36  25  that the witness is reviewing Exhibit 2.

213

```
            1          A.     Yes.   That's correct.   I do not see a
            2    majority HBA CVAP district in the current residency
            3    plan.
            4    BY MR. BOYNTON:
18:38:51    5          Q.     And, to be clear, you are relying upon
            6    what page of your report that -- I think it was
            7    on --
            8          A.     Page 69.
            9          Q.     I'm sorry.   Page what?
18:38:59   10          A.     Of the initial report.
           11          Q.     Of the -- okay.
           12          A.     Yeah.   The initial report.
           13          Q.     Page 69?
           14          A.     Yes.
18:39:11   15          Q.     And that is specifically --
           16          A.     The third table down at the bottom to
           17    the far right.   And you'll see HBA CVAP 17.   And 17
           18    really just reflects the last part of 2013-2017.
           19          Q.     So when you say 17 you're looking at the
18:39:33   20    ACS data, you're not looking at the 2010 census
           21    data, correct?
           22          A.     Correct.   Correct.   The most --
           23          Q.     And so --
           24          A.     The current data, that's correct.
18:39:43   25          Q.     So on the metric of HBA CVAP calculated
```

1    under ACS data you're not seeing 50-plus percent?

2         A.    That's correct.

3         Q.    Okay.  All right.

4         A.    And -- and I don't see it with the

18:39:55  5    voting age as -- as well.  The 2010 data doesn't

6    show it as well.

7         Q.    And --

8         A.    And the total population doesn't show it

9    as well.

18:40:01 10        Q.    Where -- where are those?

11        A.    Those are up at the top.  If you look at

12    the -- the two tables, you have one that's got HBA

13    total percentage.  That's 47.97.  And then the VAP

14    is 47.28 percent.  For the highest one I'm looking

18:40:17 15    at.

16        Q.    And those are based on which dataset?

17        A.    2010.

18        Q.    2010-2011?

19        A.    Yeah.  These --  the top two are 2010.

18:40:25 20    The bottom is the HBA five-year ACS.

21        Q.    And that -- that goes to whether one was

22    drawn not whether one was possible to be drawn,

23    correct?

24        A.    Right.  Correct.  This is the existing

18:40:34 25    plan.  Yeah.  I have no idea of what potentially was

215

```
 1    drawn.
 2          Q.    Let's go to your Alt 1 plan on page 5.
 3    What informed the configuration of plan Alt 1?
 4          A.    The purpose of this was to really show
18:41:57  5    that, you know, minor changes could be made to the
 6    illustrative plan and the percentage of HBA could be
 7    increased to a sufficient amount.
 8          Q.    Did you independently verify that both
 9    Ms. Holloway and Ms. Allen still reside in Figure 1?
18:42:21 10          MS. HARLESS:   Objection to form.
11    BY MR. BOYNTON:
12          Q.    All right.  And I'll -- I can rephrase
13    to make that clearer.
14          Did you independently determine that the
18:42:36 15    illustrative Alternative 1 plan -- the addresses
16    known to you for Ms. Allen and Ms. Holloway were
17    included in one of the two illustrative districts?
18          A.    I -- I did not look at that.  That
19    wasn't one of my objectives.
18:42:55 20          Q.    Can you say, sitting here today, if one
21    or both live inside of or outside of the
22    illustrative districts?
23          A.    It appears that they do, but -- yeah.
24          Q.    You base the appearance on what?
18:43:12 25          A.    The map that you showed me earlier.
```

216

1          Q.    So let's look at Appendix A of the

2     original complaint, which is Exhibit 1.  Go to page

3     18.

4                And I'd ask you -- and I'll be happy to

18:44:06  5     show you the color version if I can move without

6     messing up the microphone because that may be

7     helpful.  The color version on page 6 of Exhibit 4,

8     I believe.

9                MS. HARLESS:  Yeah.

18:44:20 10     BY MR. BOYNTON:

11          Q.    So what I'm asking you to do is to

12     compare the location of the two red dots in Appendix

13     A to the amended complaint, which is Exhibit 1, to

14     the configured district Figure 1 in -- which is also

18:44:35 15     Alternative 1 in your rebuttal report.  I'm asking

16     particularly about the easternmost red dot.  Does

17     that appear to be located within either of the

18     Alternative 1 plan majority-minority districts?

19          A.    It's -- it's hard for me to tell, but

18:44:57 20     I'm trying to find the reference points.

21                Let -- let me -- may I look at it

22     closer?

23          Q.    You -- you certainly may.

24          A.    Let me see.

18:45:40 25                All right.  They -- it may be poten --

217

                it may be -- one may be potentially out, now that

                I'm -- now that I'm looking at it.

                      Q.    And you don't know, sitting here today,

                if that's Ms. Allen or Ms. Holloway?

18:45:56        A.    I have no idea.

                      Q.    Okay.

                      A.    No.   Yeah, but it's -- it's difficult

                for me to be absolutely sure.

                      Q.    Understood.   Thank you.

18:46:09              Going back to -- not going back to, but

                we're talking about Figure 1, which is Alternative 1

                plan in your rebuttal report.   Can you tell me what

                the margin of error is for that particular data

                that's relied upon for HBA CVAP?

18:46:48              MS. HARLESS:   Objection to form.

                      A.    No.

                BY MR. BOYNTON:

                      Q.    Can you tell me what your confidence

                interval is for the data relied upon for HBA CVAP

18:46:57        for those two districts in Alternative 1?

                      A.    No.

                      Q.    Is that something that you didn't try to

                calculate or you couldn't calculate or both?

                      A.    It's one of those things that I have not

18:47:10        seen in normal plan development for redistricting

```
 1   plans.
 2        Q.    Is it -- is it not something you
 3   routinely calculate?
 4        A.    No.  No.  I -- matter of fact, I haven't
 5   seen it.
 6        Q.    Have you ever done that calculation?
 7        A.    Maybe a long time ago as far as not
 8   district concerns but other areas of confidence
 9   levels.  But I have not seen any confidence level
10   being produced in a proposed district plan out of
11   the hundreds that I have seen.
12        Q.    What is the compactness rating for
13   Alternative District 1 and Alternative District --
14   I'm sorry -- Alternative 1, Districts 1 and 2?
15        A.    For Alternative 1 --
16        Q.    Yes.
17        A.    -- for District 1 and 2?
18        Q.    Yeah.  I understand there are three
19   different measures, but...
20        A.    Hold on.  Let me see.  I'm not sure that
21   I have -- I think that's on page -- I think it's on
22   page 29, I believe.  Let's see.
23             And so District 1 includes .31 Reock, .2
24   Polsby-Popper and .58 for Convex Hull.  And District
25   2 is .20, .16 and .54 for Convex Hull.
```

18:47:21  5
18:47:34 10
18:47:52 15
18:48:03 20
18:49:07 25

219

1    Q.    Are those more or less compact than your

2    illustrative districts in the original plan?

3    A.    Overall I would say they were less.

4    District 1 is close, but -- close to the same.

18:49:37  5    Q.    Did you do a communities of interest

6    analysis for Alternative 1?

7    A.    No.  No more than the visualization of

8    the -- the neighborhoods.

9    Q.    You don't know, sitting here today, how

18:49:51  10    many neighborhoods are split to draw alternative

11    district -- I'm sorry -- Alternative 1 in two

12    districts?

13    A.    No.  No.  But one -- once again using

14    visualization it wasn't that many.  It's hard to

18:50:06  15    tell on a black-and-white --

16    Q.    Uh-huh.

17    A.    -- map here, though.

18    Q.    As you were making the changes from the

19    one illustrative plan that was provided in the

18:50:30  20    original report to Alternative 1 in your rebuttal

21    report what considerations did you include that

22    informed the change other than race?

23    A.    Oh.  I'm -- I'm always looking at

24    compactness and political subdivision splits.

18:50:52  25    Q.    So why -- why --

220

```
         1          A.    So --
         2          Q.    -- did you provide Alternative 1 instead
         3   of the original -- relying on the original plan?
         4          A.    Oh.   The -- it was a dem -- a
18:51:03 5   demonstrative plan to show that you could make some
         6   minor changes and come up with a -- a -- a plan that
         7   had an HBA percentage that was higher.   So it was
         8   just a minor-change plan because the discussion was
         9   around the 50 percent.
18:51:32 10         Q.    Were the changes that you made from the
        11   first plan to Alternative 1 based on anything other
        12   than race?
        13               I know you considered everything, but --
        14         A.    Right.   Right.
18:51:41 15         Q.    -- the illustration was to provide a --
        16   a minority -- a majority-minority district, correct?
        17         A.    Sure.   Sure.   I mean, yeah.   You know, I
        18   -- I used the same criterias that I used before.
        19   It's just that one of the things would show that the
18:51:54 20  percentage would be higher.   And so it ended up
        21   being less compact and maybe a -- a split more, I
        22   believe, of -- of VTDs.
        23         Q.    Okay.   Turning your attention to
        24   Alternative 2 -- and I'll tell you you make it
18:52:17 25  challenging when you put your text for Alternative 2
```

221

```
           1    on the same page as your figure for Alternative 1,

           2    but I will hopefully not confuse you when I go

           3    through it all.

           4         A.    I know.  I know.  Yeah.  It's -- let me

18:52:31   5    see.

           6         Q.    So Alternative 2 is the one for which

           7    you used block-group-only data?

           8         A.    Yes.

           9         Q.    And -- and your purpose in preparing

18:52:43  10    that map was what?

          11         A.    The purpose was to show -- since there

          12    was an issue with disaggregation and the process of

          13    Maptitude including an error, then I -- I thought

          14    I'd show a plan where you could eliminate the error

18:53:00  15    associated with that disaggregation and create a --

          16    a Hispanic, black and Asian -- two Hispanic, black

          17    and Asian combined districts.

          18         Q.    And what are the benefits and detriments

          19    of using block-group-only data versus disaggregated

18:53:21  20    block data?

          21              MS. HARLESS:  Objection to form.

          22    BY MR. BOYNTON:

          23         Q.    You can answer.

          24         A.    The benefits is exactly what I just

18:53:29  25    explained, is -- the purpose was to show that one
```

222

```
          1    could be created with block groups only.
          2             The disadvantage is that you're somewhat
          3    hamstringed -- hamstrung by the configuration of the
          4    block groups.  And so they're not necessarily
18:53:47  5    configured properly let's say in a compact fashion
          6    let's say.
          7        Q.    So your -- your compactness goes way
          8    down when you use that approach?
          9        A.    It -- it probably suffers because you're
18:54:00 10    forced if you're trying to force block groups only.
         11        Q.    And what -- what's the impact on -- on
         12    your -- your district plans in terms of communities
         13    of interest when you go to block groups?
         14        A.    Well, actually, it's -- it's -- remains
18:54:15 15    the same or it's better because block groups tend to
         16    actually contain neighborhoods.
         17        Q.    What were the compactness ratings for
         18    Figure 2?
         19        A.    .32 for Reock, .21 for Polsby-Popper and
18:54:52 20    .61 for Convex Hull.  And then District 2 was .20,
         21    .15 and .49 for Convex Hull.
         22        Q.    So --
         23        A.    Reock, Polsby-Popper and Convex Hull.
         24        Q.    So also less compact than the
18:55:09 25    illustrative plan that was contained in your initial
```

223

```
           1   report?
           2        A.   Yes.  District -- District 1 actually
           3   increased, I believe, with the Convex Hull.  And
           4   District 1 also had Polsby-Popper, I believe --
18:55:26   5   believe approx -- approximately the same or higher.
           6             So District 1, I think, wasn't worse.
           7   District 2 might have been lower compactness.
           8        Q.   Okay.  And can you tell me if
           9   Ms. Holloway and Ms. Allen both reside in either
18:55:45  10   majority-minority district in Figure 2?
          11        A.   I -- once again it -- it's very
          12   difficult for me to -- to say, but I'll say
          13   potentially one of them may be out.
          14        Q.   Okay.  No -- no margin of error for --
18:56:16  15   calculated for Alt 2, correct?
          16        A.   Correct.
          17        Q.   No confidence interval calculated for
          18   mar -- for Alt 2, correct?
          19        A.   Correct.
          20             (Off-the-record discussion between the
          21             reporter and Mr. Boynton.)
          22   BY MR. BOYNTON:
          23        Q.   For Alternative Plan 2 you did not
          24   calculate a margin of error, correct?
18:56:40  25        A.   Correct.
```

1          Q.    For Alternative Plan 2 you did not

2    calculate a confidence interval, correct?

3          A.    Correct.

4          Q.    And -- and to save a question, you did

18:56:50  5    not for any of the alternative maps provided in your

6    rebuttal report calculate a margin of error or a

7    confidence interval, correct?

8          A.    Correct.

9          Q.    Yeah.  And -- and just to make sure I

18:57:08  10   didn't ask it before, with respect to the map that

11   was prepared and submitted in the original report,

12   did you perform a margin-of-error calculation?

13         A.    No.

14               MS. HARLESS:  Objection, asked and

18:57:20  15   answered.

16   BY MR. BOYNTON:

17         Q.    Did you perform with respect to the

18   original report a calculation of confidence interval

19   for the illustrative plan?

18:57:29  20               MS. HARLESS:  Objection, asked and

21   answered.

22         A.    No.

23   BY MR. BOYNTON:

24         Q.    Why did you choose to use disaggregated

18:57:43  25   block data instead of block group data in your

                original report?

            2          A.     Excuse me.  Can you repeat that again?

            3          Q.     Yeah.  We're comparing the --

            4          A.     Uh-huh.

18:57:53    5          Q.     -- illustrative plan contained in the

            6   original report --

            7          A.     Uh-huh.

            8          Q.     -- versus Alternative 2 contained in the

            9   rebuttal report.  The initial report relies on

18:58:04   10   disaggregated block level data, correct?

           11          A.     The original report does.

           12          Q.     Okay.

           13          A.     Correct.

           14          Q.     The Alternative 2 relies on block group

18:58:14   15   level data, correct?

           16          A.     Correct.

           17          Q.     Why did you choose to use disaggregated

           18   block level data for your original report instead of

           19   block group level data?

18:58:24   20          A.     Oh.  Because usually you do not build

           21   plans at the block group level.  You build them at

           22   the VTD level, the precinct level, which is

           23   synonymous.

           24          Q.     So you believed that using disaggregated

18:58:39   25   block level data was the best approach at that time?

226

```
             1              MS. HARLESS:  Objection to form.
             2         A.   And I'm -- I'm trying to -- to
             3    understand your question.  Usually you build at the
             4    VTD or precinct level, which is synonymous, and then
18:58:58     5    when you have to you split those VTDs.  And so
             6    normally you do not build at the block group level.
             7              And disaggregation is a separate
             8    question.
             9    BY MR. BOYNTON:
18:59:16    10         Q.   And -- and fair enough.  And I'm just --
            11         A.   Yeah.  Yeah.
            12         Q.   -- trying to a --
            13         A.   Yeah.
            14         Q.   -- trying to get at, and it --
            15         A.   Yeah.
            16         Q.   -- maybe it's a simple why question --
            17         A.   Right.
            18         Q.   -- why did you use block level data in
            19    your original report instead of block group level
18:59:32    20    data?
            21         A.   Because you have to split VTDs to draw
            22    two majority HBA districts, and you have to split
            23    them in order to meet the population deviations.  So
            24    the -- from what I've seen you can't create two
19:00:00    25    majority HBA districts without splitting.  You can
```

227

```
           1   create one, though.  So that's the next one I guess
           2   we're going to get to.
           3        Q.    Uh-huh.  Uh-huh.
           4        A.    But you can create one without splitting
19:00:12   5   a voting district.
           6        Q.    That's fine.
           7              So switching then to Alt 3, and -- and
           8   that I believe the -- the narrative is on page 7.
           9        A.    Uh-huh.  Yeah.
19:00:31  10        Q.    What was your purpose in generating Alt
          11   3 in the rebuttal report?
          12        A.    One, I wanted to show, as I mentioned
          13   before, that there are a variety of configurations
          14   that could be made by two majority Hispanic, black
19:00:51  15   and Asian CVAP districts.  And these two come from
          16   sort of different areas -- or one of them comes from
          17   a different area, just to show that there are
          18   multiple ways of doing so.  You're not stuck with
          19   one particular way of -- of -- of developing the
19:01:08  20   district.  And so that was a -- a -- a primary
          21   reason.
          22              The -- the other one is that 3 also use
          23   -- uses -- 3 also is a majority Hispanic, black VAP
          24   district, not CVAP district.  And so Alt 3 also
19:01:36  25   reveals that in 2010 a -- a district such as this
```

228

```
        1    could have been created at the time using the data
        2    that they had.
        3            Q.    Dividing seven or dividing ten ways?
        4            A.    Ten.  All of these are ten-district
19:01:55 5    plans.
        6            Q.    In figure 3 do you -- are you able to
        7    tell whether Ms. Allen and Ms. Holloway both live in
        8    Districts 1 or 2?
        9            A.    I'm not able to tell, but once again one
19:02:19 10   may be out.
       11            Q.    And that would be the easternmost one?
       12            A.    Yes.
       13            Q.    What is the compactness -- I'm sorry.
       14    Yeah, we've already established that you didn't do a
19:02:29 15   margin of error or a compactness -- I'm sorry -- a
       16    confidence interval for plan 3, correct?
       17            A.    Yes.  Yes.  Correct.
       18            Q.    Going to page 43, which I believe is
       19    your compactness report for Alt 3.
19:02:46 20           A.    Yes.  So we have .14 for Reock,
       21    Polsby-Popper .14 and Convex Hull .49.  And then for
       22    District 2, .12, .12, and then .41 for Reock,
       23    Polsby-Popper and Convex Hull.
       24            Q.    So you're -- you're losing a fair amount
19:03:10 25   on compactness on both 1 and 2 under this map as
```

229

|  | |
|---|---|
| 1 | compared to the original illustrative plan? |
| 2 | A.    That is correct. |
| 3 | Q.    And Districts 1 and 2 are far and away |
| 4 | the least compact of the ten districts you proposed |
| 19:03:27  5 | in Alternative 3, correct? |
| 6 | A.    I don't know.  I can check that, but I |
| 7 | don't know offhand. |
| 8 | Q.    I'm just looking at the ten stacked |
| 9 | up -- |
| 19:03:36  10 | A.    Oh, you're talking about then -- the ten |
| 11 | out of these districts.  Yes.  Yes. |
| 12 | Q.    Well -- |
| 13 | A.    I though you -- |
| 14 | Q.    -- District 1 and 2 are far and away the |
| 19:03:43  15 | least compact of those two districts? |
| 16 | A.    Correct. |
| 17 | Q.    So then we get to Alternative 4, and |
| 18 | that's where you draw a single majority-minority |
| 19 | district, correct? |
| 19:04:03  20 | A.    Correct. |
| 21 | Q.    And I need to be clear.  Figure 3 was |
| 22 | where we're using block level data again?  We're not |
| 23 | using block group data to generate the districts, |
| 24 | correct? |
| 19:04:16  25 | A.    Correct. |

230

              1          Q.     Okay.

              2          A.     Correct.

              3          Q.     And same thing with 4?  We're at block

              4     level data not block group data for 4?

    19:04:24  5          A.     4 is VTDs.

              6          Q.     Okay.  So what does that mean as to

              7     block versus block group level data?

              8          A.     Now, let me -- let me back up and make

              9     sure we're on the same page here.

    19:04:36 10                 All of these plans are using the same

             11     disaggregated data.  There was just one plan where I

             12     used or assembled block groups in order to create

             13     the district plan, but all of them use the same

             14     disaggregation process.

    19:04:55 15          Q.     So my question then I guess -- and

             16     that's Alternative 2 that you're referring to,

             17     correct?

             18          A.     Uh-huh.

             19          Q.     And for Alternative 2 do you

    19:05:04 20     disaggregate and reaggregate or do you do -- use the

             21     original block group numbers?

             22          A.     Yeah.  The process that Maptitude does

             23     is it dis -- disaggregates down to the block level,

             24     then it reaggregates, or aggregates really, up to

    19:05:16 25     all the other levels, including block group, census

231

```
 1    tract, VTD, county.  If there was a place in there

 2    it would aggregate to that.  So all of those levels

 3    now have this -- the aggregated CVAP data.

 4         Q.    So it is not the original block group

 5    data.  It is block group data that has gone through

 6    a process of disaggregation and then aggregation,

 7    correct?

 8         A.    Correct, except for the block group

 9    data.  When you -- if you build a district on block

10    group, the block groups have no disaggregation error

11    because it is the same level that's brought in.  So

12    one of the Maptitude's -- the reason why they did

13    what they did is when you sum up all of these block

14    pieces and you get to the block group level you're

15    at the same level that you were before when you

16    brought the data in.

17         Q.    And the data is the same as those

18    brought in at -- on the block group level?

19         A.    At the block group level, right, or in

20    the tract.  The tract is the same way.  Anything

21    that's a derivative of block groups would be with no

22    disaggregation level.  So, hence, if you build a

23    district with block groups, then you don't have the

24    disaggregation data.  And that's the reason why I

25    built one of them.
```

232

```
  1        Q.    Well, what is the purpose of

  2   disaggregating and reaggregating when you're

  3   building a district from block groups?

  4        A.    Well, you -- you have to reaggregate to

19:06:38  5   determine what the district CVAP is.  You have to

  6   aggregate, rather, not reaggregate.  Sorry.  You

  7   have to aggregate back up to determine what the

  8   district population is.

  9              So that's the process of really

19:06:50 10   determining what the -- the citizen voting age

 11   population is.  You begin to aggregate those blocks.

 12   And when you reach the district level you know that

 13   this is the level of CVAP for that particular

 14   district.

19:07:03 15        Q.    I think I understand.

 16        A.    Okay.

 17        Q.    But -- not but.

 18        A.    Uh-huh.

 19        Q.    The only illustrative plan that's been

19:07:16 20   presented that purports to draw illustrative

 21   districts off of block group level data is

 22   Alternative 2, correct?

 23        A.    Right.  Correct.

 24        Q.    Okay.

19:07:30 25        A.    I believe it was 2.  Let me make sure of
```

233

```
          1   that.

          2                Yes, Alternative 2.  That's correct.

          3        Q.    What was your purpose in drawing

          4   Alternative 4?

19:07:47  5        A.    Alternative 4 was a plan that was

          6   designed only with VTDs, with no split VTDs.  And

          7   the rationale for that was -- I -- I -- well, I

          8   don't know how to say this without a conversation.

          9                If there was a State guidelines to not

19:08:27 10   split VTDs, then you could still create a majority

         11   Hispanic, black and Asian combined district without

         12   splitting VTDs.

         13        Q.    Here too, though, you're using VTDs as a

         14   estimation of precincts, correct?

19:08:52 15        A.    Yes.

         16        Q.    It's not exact as to precinct

         17   boundaries?

         18        A.    Yes.  And I didn't -- I didn't overlay

         19   the precincts because many precincts were exactly

19:09:04 20   the same as VTDs.  It could be that these actually

         21   match up to the ones that are exactly the same.

         22        Q.    But you didn't do that analysis?

         23        A.    No, I didn't do that analysis.

         24        Q.    So, sitting here today, you can't tell

19:09:16 25   us?
```

234

```
             1          A.    No, I can't tell you.

             2          Q.    And -- and this purports to represent a

             3   single majority HBA combined CVAP, correct?

             4          A.    Correct.

19: 09: 31   5          Q.    And in -- in terms of calculating the

             6   HBA CVAP percentage, you're still using 2017 data,

             7   cor -- or the -- the ACS data not the 2010 census

             8   data; is that --

             9          A.    The five-year data, yes.  Correct.

19: 09: 59  10          Q.    But you're relying on 2010 VTDs?

            11          A.    Yes.

            12          Q.    Okay.

            13          A.    Yes.

            14          Q.    What is the compactness of that in

19: 10: 19  15   Figure 4?

            16          A.    Point -- for Reock it was .19,

            17   Polsby-Popper .11 and Convex Hull .47.

            18          Q.    Again less compact under every measure

            19   than the original illustrative plan from the

19: 10: 46  20   original report?

            21          A.    Less compact, yes.

            22          Q.    Is there a point you get to where you

            23   just say, "This is so not compact I can't support

            24   the district"?

19: 10: 58  25          A.    There -- sure, there is a point.  I
```

235

         1    didn't get to it with these plans, but there's a
         2    point.
         3         Q.    Tell me what that point looks like from
         4    where you sit.
19:11:07 5         A.    I -- I would have to actually think
         6    about it.  I -- I've seen approved plans with worse
         7    compactness measures than these.
         8         Q.    Okay.  Where -- where have you seen
         9    them?
19:11:22 10        A.    Oh.  Throughout, many times, yeah.
        11    This, for example, isn't such a crazy district as
        12    I've seen before throughout the -- the states.
        13        Q.    Have you seen anywhere in Virginia?
        14        A.    I don't know.  I don't know.  I'd have
19:11:42 15   to think about that.
        16        Q.    Sitting here today, you can't think of
        17   anything in Virginia?
        18        A.    Yeah.  I can't think of anything in --
        19   in Virginia, although -- no.  I take that back.  In
19:11:51 20  the state legislative plans in -- for Bethune-Hill,
        21   the original plans had some crazy districts in it,
        22   so --
        23        Q.    And -- and they were set aside on
        24   constitutional --
        25        A.    Yeah.

236

                    Q.     -- reasons, correct?

                    A.     Yeah.  Uh-huh.  Yep.  They were much
        worse than these.

                    Q.     Then we get to Alt 5.  What was your
19:12:18   purpose in preparing Alternative 5?

                    A.     The purpose was to show that a Hispanic
        and black CVAP district could be created.

                    Q.     Taking out Asian voters?

                    A.     Exactly.

19:12:30            Q.     And you used block level data for this
        one?

                    A.     Disaggregated down, exactly, and
        aggregated back up.

                    Q.     What is your purpose in removing the
19:12:50   Asian communities from the -- that map?

                    A.     Just to show that Hispanic and black
        could form a particular district.

                    Q.     And so that -- that map by itself is
        totally different than any other map you prepared?

19:13:11            A.     Correct.

                    Q.     And outside of the original scope of
        what you were asked to do in the case?

                    MS. HARLESS:  Objection to form.

        BY MR. BOYNTON:

19:13:18            Q.     You can answer it.

237

          A.    It's outside of the original ask, yes,
1
if you specifically talk about Hispanic, black and
2
Asian.
3
          Q.    The compactness ratings, I believe, for
4
19:13:42  5   District 5, Alternative -- I'm sorry -- Alternative
Plan 5 are at page 56, I believe.
6
          A.    For Reock it's .11, for Polsby-Pop --
7
Popper it's .09 and Convex Hull it's .42.
8
          Q.    And -- and that -- that's the lowest
9
19:14:20  10  overall compactness for any of the plans you've
prepared in this case, correct?
11
          A.    Correct.
12
          Q.    Have we reached your threshold for not
13
being sufficiently compact to survive scrutiny?
14
19:14:31  15  A.    This is close.  This is certainly close
to that.
16
          Q.    Can you tell me what impact Alternative
17
5 has on communities of interest?  Did you do a
18
communities of interest analysis for number 5?
19
19:14:47  20  A.    Oh.  Oh.  No, other than the
visualization.
21
          Q.    You did -- you overlaid the -- the
22
subdivision map on each of these maps?
23
          A.    Correct.
24
19:14:54  25  Q.    Can you tell me which map was -- was

238

1    worst for preservation of communities of interest?

2         A.    I didn't analyze that.  If you're

3    looking at me to guess at this moment or give you an

4    answer --

19:15:13   5         Q.    Would it be surprising to you that

6    splitting communities of interest in -- some of

7    these split up as many as 23 neighborhoods?

8         A.    As district -- or Alternative 5 or --

9         Q.    One of the al -- at least one of the

19:15:27   10   alternatives provided.

11        A.    You -- you're talking about you don't

12   know which one or one of the alternatives did that?

13        Q.    Yes.  I'm asking you if you know if any

14   of them do that.

19:15:37   15            MS. HARLESS:  Objection to foundation.

16        A.    It would not surprise me if they did

17   that.  And -- and part of the reason for that is the

18   VTDs actually end up splitting some neighborhoods.

19   And so if you're following along VTD lines, then

19:15:55   20   many times you'll end up splitting neighborhoods.

21   So it's -- it's a juggling act that you actually

22   perform.

23            (Off-the-record discussion between

24            defense counsel)

25            MR. BOYNTON:  Yeah, yeah, yeah.  Okay.

239

```
            1    I know.
            2                MR. STILES:  Oh, I'm sorry.
            3                MR. BOYNTON:  We're still going.
            4                MR. STILES:  Excuse me.
19:16:36    5    BY MR. BOYNTON:
            6         Q.    You had the data to draft -- to draft
            7    all five alternative plans prior to July 15, 2019,
            8    correct?
            9         A.    You're talking about the --
19:16:45   10         Q.    Alternative plans.
           11         A.    You're talking -- yes.  You're talking
           12    about the -- all the data that we talked about in --
           13    in the report?
           14         Q.    Correct.
19:17:03   15         A.    Yeah.  Yes, I had it prior to July
           16    25th -- - prior to the -- the initial report is I
           17    think what you're talking about.  Yes.
           18         Q.    But for whatever reason you did not
           19    include any of those plans in your original report?
19:17:15   20         A.    Correct.
           21         Q.    And, sitting here today, without getting
           22    into draft conversa -- conversations about drafts --
           23         A.    Right.
           24         Q.    -- you -- you -- you can or can't tell
19:17:28   25    me which ones -- which of these plans actually
```

240

```
         1    existed in the form provided in your rebuttal report
         2    prior to July 15, 2019?
         3                 MS. HARLESS:  Same objection as earlier,
         4    to the extent you can answer that without discussing
19:17:42 5    communications with attorneys --
         6                 MR. HEBERT:  Or draft analyses.
         7                 MS. HARLESS:  -- or draft analyses.
         8         A.   Right.  And, as I said before, that, you
         9    know, I -- as I developed these plans I had various
19:17:55 10   configurations.  And so none of these plans were in
         11   a -- a final form.  More of a conceptual form, if
         12   you will.  And so they weren't in any -- any final
         13   form, but I knew that they could be configured in a
         14   certain way and that's why I put in the report that
19:18:16 15   there are alternative configurations that could be
         16   created knowing that.
         17                 MR. BOYNTON:  Okay.
         18                 (Off-the-record discussion between
         19                 defense counsel)
19:18:21 20   BY MR. BOYNTON:
         21        Q.   Okay.  I -- I believe you testified
         22   earlier with respect to the original plan and Mr.
         23   Mor -- Dr. Morrison's rebuttal to your original plan
         24   that his challenge of the Maptitude disaggregation
19:19:01 25   process using the IPF --
```

|     |     |
| --- | --- |
| 1   | A.    IPF, yes.  I think that's -- |
| 2   | Q.    -- process instead validated -- the |
| 3   | results of his work validated your work? |
| 4   | A.    Correct. |

19:19:12   5    Q.    Is it equally true that the results of

6    your work validated his numbers?

7         A.    Insofar as the disaggregation; is that

8    what you're speaking of?

9         Q.    Yes.

19:19:22  10    A.    Yes, both of them tend to validate each

11   other.

12        Q.    And so you have a range of possible

13   outcomes between his numbers under the IPF and your

14   numbers under the -- under the Maptitude

19:19:37  15   disaggregation process?

16        A.    I don't know if it's a range of possible

17   outcomes.  I would say that the Maptitude would be

18   more accurate.  So I would lean in that direction.

19   So -- -

19:19:48  20    Q.    And -- and your experience with IPF is

21   what?

22        A.    I -- I -- one of the things that --

23   well, one -- my experience with IPF is is I have

24   never used it.  I've never developed plans in it.

19:20:03  25   But in -- in reading something about it it does seem

1    as though the two processes are very similar because

2    of the weighting and the weighting -- basically if

3    you're using the same weighting scheme, and that's

4    why they came up with basically virtually the same

19:20:27   5    answer.

6              The second thing is I also looked at the

7    purely disaggregated process, and that was in my

8    response report.  So that's actually a third

9    analysis.

19:20:41  10              So you have the purely disaggregation,

11    you have the Maptitude, and then you have

12    Morrison's.  And so the -- the difference between

13    the third -- the third one, which is the purely

14    disaggregation, it -- it's closer to the Maptitude.

19:20:58  15         Q.    Now, explain to me -- and I don't want

16    to spend --

17         A.    Uh-huh.

18         Q.    -- a ton of time on this, especially at

19    this tender hour -- what is the pure disaggregation

19:21:05  20    process?

21         A.    So -- so when I determine the error

22    associated with the largest populated block I -- I

23    determine it by doing a straight weighted

24    disaggregation.  And so that just means that I

19:21:21  25    didn't care whether you had fractional people.  So,

243

```
           1    you know, whether the weight ended up being 4.5

           2    persons there in the block I didn't care.

           3         Q.    You left it in fraction form?

           4         A.    Left it in fraction forms.

19:21:36   5         Q.    Got it.

           6         A.    So I disaggregated that and then

           7    compared it to the Maptitude.  And both of them came

           8    out to be virtually the same.

           9              So you have two different processes that

19:21:46  10    actually come out to be virtually the same, and then

          11    you have Peter Morrison's process.

          12              MR. BOYNTON:  Give me two minutes.  I

          13    think maybe we're totally done.  Can we go off?

          14              MR. HEBERT:  We'll stipulate to two

19:22:11  15    minutes.

          16              MR. BOYNTON:  Okay.  Yeah.  Because

          17    you'll restrict yourself to that in all future

          18    depositions, right?

          19              MR. HEBERT:  I'll restrict you to two

19:22:16  20    minutes.

          21              MR. BOYNTON:  I'm -- very kind of you.

          22              THE VIDEOGRAPHER:  Can I go off the

          23    video?

          24              MR. BOYNTON:  Yes.

19:22:41  25              THE VIDEOGRAPHER:  Off record at 7:21
```

244

```
 1    p.m.
 2               (Off-the-record discussion)
 3               MS. HARLESS:  Can I just put on the
 4    record that he's going to retain the right to read
19:24:27  5    and sign?
 6               MR. BOYNTON:  Sure.  I -- I was going to
 7    tell him publicly that I was done --
 8               MS. HARLESS:  Oh, that's fine.
 9               MR. BOYNTON:  -- asking questions,
19:24:29 10    but --
11               THE VIDEOGRAPHER:  Stand by real quick.
12               We are back on record at 7:23 p.m.
13               MR. BOYNTON:  Mr. Fairfax, I have no
14    further questions for you today.  Thank you for your
19:24:42 15    time.
16               THE DEPONENT:  Thank you.
17               MS. HARLESS:  And Mr. Fairfax is going
18    to retain the right to read and sign the transcript.
19               MR. BOYNTON:  All right.  And --
19:24:49 20               THE VIDEOGRAPHER:  This concludes the
21    deposition.  We're off record at 7:23 p.m.
22               (Signature not waived)
23               (The deposition concluded at 7:24 p.m.)
24
25
```

```
 1                  DEPOSITION ERRATA SHEET

 2

 3    Case Caption:  Latasha Holloway, et al. v. City of

 4                   Virginia Beach, et al.

 5    Deponent:   Anthony E. Fairfax

 6    Deposition Date: September 24, 2019

 7

 8         I have read the entire transcript of my
      deposition taken in the captioned matter or the same
      has been read to me.  I request that the following
 9    changes be entered upon the record for the reasons
      indicated.  I have signed my name to the Errata
10    Sheet and the appropriate Certificate and request
      both to be attached to the original transcript.

11

      Page/Line Nos.  Correction/Reason
12    _____   _____

13    _____   _____

14    _____   _____

15    _____   _____

16    _____   _____

17    _____   _____

18    _____   _____

19    _____   _____

20    _____   _____

21    _____   _____

22    _____   _____

23    _____   _____

24    Signature:_____ Date: _____
                   ANTHONY E. FAIRFAX
25
```

```
 1                    CERTIFICATE OF DEPONENT

 2    COMMONWEALTH OF VIRGINIA
      CITY OF _____
 3
          Before me, this day, personally appeared ANTHONY
 4    E. FAIRFAX, who, being duly sworn, states that the
      foregoing transcript of this deposition, taken in
 5    the matter, on the date and at the place set out on
      the title page hereof, constitutes a true and
 6    complete transcript of said deposition.

 7

 8
                      ----------------------------
 9                        ANTHONY E. FAIRFAX

10

11
          SUBSCRIBED and SWORN to before me this _____
12    day of _____, 2019, in the jurisdiction
      aforesaid.
13

14

15
      _____    _____
16    My Commission Expires            Notary Public

17

18

19

20

21

22

23

24

25
```

1   COMMONWEALTH OF VIRGINIA AT LARGE, to wit:

2         I, Kathleen Beard Adams, CCR, RPR, CRR, a
    Notary Public for the Commonwealth of Virginia at
3   large, of qualification in the Circuit Court of the
    City of Virginia Beach, Virginia, and whose
4   commission expires August 31, 2018, do hereby
    certify that the within named deponent, ANTHONY E.
5   FAIRFAX, appeared before me at Virginia Beach,
    Virginia, as hereinbefore set forth, and after being
6   first duly sworn by me, was thereupon examined upon
    his oath by counsel for the respective parties; that
7   his examination was recorded in Stenotype by me and
    reduced to computer printout under my direction; and
8   that the foregoing constitutes, to the best of my
    ability, a true, accurate, and complete transcript
9   of such examination.

10        I further certify that I am not related to
    nor otherwise associated with any counsel or party
11  to this proceeding, nor otherwise interested in the
    event thereof.

12
          Given under my hand and notarial seal this
13  2nd day of October, 2019.

14

15
                         _____
16                             Notary Public
                    Certified Court Reporter No. 0313086
17

18

19

20

21

22

23

24

25