**IN THE UNITED STATES DISTRICT COURT FOR THE**
**EASTERN DISTRICT OF VIRGINIA**
**NORFOLK DIVISION**

| | |
|---|---|
| **Latasha Holloway, et al.,** | |
| **Plaintiffs,** | |
| **v.** | **Civil Action No. 2:18-cv-0069** |
| **City of Virginia Beach, et al.,** | |
| **Defendants.** | |

**Defendants' Memorandum of Law in Support of Motion for Summary Judgment**

# EXHIBIT SIX

Deposition Transcript of Douglas M. Spencer, Ph.D.



# Transcript of Douglas Spencer, Ph.D.

**Date:** October 1, 2019
**Case:** Holloway, et al. -v- City of Virginia Beach, et al.

**Planet Depos**
**Phone:** 888.433.3767
**Email::** transcripts@planetdepos.com
**www.planetdepos.com**

WORLDWIDE COURT REPORTING & LITIGATION TECHNOLOGY

1      IN THE UNITED STATES DISTRICT COURT

2      FOR THE EASTERN DISTRICT OF VIRGINIA

3   --------------------------X

4   LATASHA HOLLOWAY, et al.,  :

5               Plaintiffs, :

6      v.                  : Case No.

7   CITY OF VIRGINIA BEACH,    : 2:18-cv-00069

8   et al.,                    :

9               Defendants. :

10  --------------------------X

11

12          Videotaped Deposition of

13          DOUGLAS M. SPENCER, Ph.D.

14             Washington, D.C.

15          Tuesday, October 1, 2019

16                10:03 a.m.

17

18

19

20  Job No.: 262152

21  Pages: 1 - 161

22  Reported by: Marney Alena Mederos, RPR, CRR

Transcript of Douglas Spencer, Ph.D.
Conducted on October 1, 2019                                    2

1        Videotaped Deposition of DOUGLAS M.

2    SPENCER, Ph.D., held at the law offices of:

3

4        CAMPAIGN LEGAL CENTER

5        1411 K Street, N.W.

6        Washington, D.C. 20005

7        (202) 736-2200

8

9

10

11        Pursuant to notice, before Marney Alena

12   Mederos, Registered Professional Reporter,

13   Certified Realtime Reporter, and Notary Public

14   in and for the District of Columbia.

15

16

17

18

19

20

21

22

1           A P P E A R A N C E S

2   ON BEHALF OF THE PLAINTIFFS:

3        ANNABELLE HARLESS, ESQUIRE

4        CAMPAIGN LEGAL CENTER

5        73 W. Monroe Street

6        Suite 302

7        Chicago, Illinois 60603

8        (312) 561-5508

9             -and-

10       J. GERALD HEBERT, ESQUIRE

11       CAMPAIGN LEGAL CENTER

12       1101 14th Street, N.W.

13       Suite 400

14       Washington, D.C. 20005

15       (202) 736-2200

16

17

18

19

20

21

22

Transcript of Douglas Spencer, Ph.D.
Conducted on October 1, 2019                    4

```
 1     A P P E A R A N C E S   C O N T I N U E D

 2     ON BEHALF OF THE DEFENDANTS:

 3          CHRISTOPHER BOYNTON, ESQUIRE

 4          JOSEPH M. KURT, ESQUIRE

 5          GERALD L. HARRIS, ESQUIRE

 6          VIRGINIA BEACH CITY ATTORNEY'S OFFICE

 7          2401 Courthouse Drive

 8          Virginia Beach, Virginia 23456

 9          (757) 385-8803

10

11

12     ALSO PRESENT:

13          MILES TAG, VIDEOGRAPHER

14

15

16

17

18

19

20

21

22
```

Transcript of Douglas Spencer, Ph.D.
Conducted on October 1, 2019                              5

1                    C O N T E N T S

2       EXAMINATION OF DOUGLAS M. SPENCER, Ph.D.:   PAGE

3            By Mr. Boynton                          8

4

5                    E X H I B I T S

6              (Attached to transcript)

7       SPENCER DEPOSITION EXHIBIT               PAGE

8        Exhibit 1   Expert Report                7

9        Exhibit 2   Response to Report by        7

10                   Dr. Quentin Kidd

11       Exhibit 3   Plaintiffs' Expert Witness   13

12                   Disclosures

13       Exhibit 4   Webpage                      13

14       Exhibit 5   Data                        128

15       Exhibit 6   Chart 1 - Applying          136

16                   Dr. Spencer's Data to

17                   Equivalence Test of Cohesion

18                   for Candidate Aaron Rouse

19       Exhibit 7   Chart 1 - Applying          140

20                   Dr. Spencer's Data to

21                   Equivalence Test of Cohesion

22                   for Candidate Aaron Rouse

PLANET DEPOS
888.433.3767 | WWW.PLANETDEPOS.COM

Transcript of Douglas Spencer, Ph.D.
Conducted on October 1, 2019                    6

1      E X H I B I T S   C O N T I N U E D

2    Exhibit 8    Chart 1. Spencer's Prong 2    144

3                 and 3 Racially Polarized Voting

4                 Analysis (Rebuttal Report)

5    Exhibit 9    Handwritten calculations      149

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

Transcript of Douglas Spencer, Ph.D.
Conducted on October 1, 2019                    7

```
1              P R O C E E D I N G S

2              (Spencer Exhibits 1 and 2 were marked

3    for identification and attached to the

4    transcript.)

5              THE VIDEOGRAPHER:  Here begins Disc        10:03:08

6    Number 1 in the videotaped deposition of Douglas     10:03:09

7    Spencer in the matter of Holloway, et al., versus    10:03:14

8    City of Virginia Beach, et al., in the United        10:03:17

9    States District Court for the Eastern District of    10:03:23

10   Virginia, Case Number 2:18-cv-00069.                 10:03:23

11             Today's date is Tuesday, October 1st.      10:03:35

12   The time on the video monitor is 10:02 a.m.  The     10:03:38

13   videographer today is Miles Tag representing         10:03:44

14   Planet Depos.  This deposition is taking place at    10:03:47

15   1411 K Street, Northwest, Washington, D.C. 20005.    10:03:51

16             Would counsel please voice identify        10:04:00

17   themselves and state whom they represent.            10:04:02

18             MR. BOYNTON:  Chris Boynton for the        10:04:04

19   Defendants.                                          10:04:06

20             MR. KURT:  Joseph Kurt for the             10:04:07

21   Defendants.                                          10:04:08

22             MR. HARRIS:  Gerald Harris for the         10:04:11
```

Transcript of Douglas Spencer, Ph.D.
Conducted on October 1, 2019                    8

| | | |
|---|---|---|
| 1 | Defendants. | 10:04:12 |
| 2 | MS. HARLESS:  Annabelle Harless for the | 10:04:12 |
| 3 | Plaintiffs. | 10:04:12 |
| 4 | MR. HEBERT:  Joseph Hebert for the | 10:04:15 |
| 5 | Plaintiffs. | 10:04:16 |
| 6 | THE VIDEOGRAPHER:  The court reporter | 10:04:17 |
| 7 | today is Marney Mederos also representing Planet | 10:04:18 |
| 8 | Depos. | 10:04:18 |
| 9 | Will the reporter please swear in the | 10:04:19 |
| 10 | witness. | 10:04:19 |
| 11 | THE REPORTER:  Raise your right hand, | 10:04:20 |
| 12 | please. | 10:04:20 |
| 13 | Whereupon, | 10:04:20 |
| 14 | DOUGLAS M. SPENCER, Ph.D. | 10:04:20 |
| 15 | being first duly sworn or affirmed to testify to | 10:04:27 |
| 16 | the truth, the whole truth, and nothing but the | 10:04:27 |
| 17 | truth, was examined and testified as follows: | 10:04:27 |
| 18 | EXAMINATION BY COUNSEL FOR DEFENDANTS | 10:04:28 |
| 19 | BY MR. BOYNTON: | 10:04:28 |
| 20 | Q    Dr. Spencer, good morning. | 10:04:31 |
| 21 | A    Good morning. | 10:04:32 |
| 22 | Q    My name is Chris Boynton, and all of my | 10:04:33 |

Transcript of Douglas Spencer, Ph.D.
Conducted on October 1, 2019                          9

| | | |
|---|---|---|
| 1 | colleagues, Joe and Gerry here, we represent the | 10:04:36 |
| 2 | Defendants in this case. | 10:04:39 |
| 3 | We understand that you have been | 10:04:40 |
| 4 | identified as an expert witness in this case, and | 10:04:41 |
| 5 | we have received two reports that were authored by | 10:04:43 |
| 6 | you. | 10:04:46 |
| 7 | Is that correct, sir? | 10:04:47 |
| 8 | A    That's correct. | 10:04:48 |
| 9 | Q    Okay.  We'll get to those in a moment. | 10:04:48 |
| 10 | Would you please tell us your full | 10:04:51 |
| 11 | name? | 10:04:52 |
| 12 | A    Yep.  Douglas Spencer. | 10:04:53 |
| 13 | Q    And what is -- you don't have a middle | 10:04:54 |
| 14 | initial? | 10:04:56 |
| 15 | A    I have a middle initial M. | 10:04:56 |
| 16 | Q    M, okay. | 10:04:58 |
| 17 | And where do you presently reside? | 10:04:58 |
| 18 | A    I presently reside in Chicago, | 10:05:00 |
| 19 | Illinois. | 10:05:01 |
| 20 | Q    Chicago. | 10:05:01 |
| 21 | And, again, I don't intend to | 10:05:03 |
| 22 | disseminate it outside the litigation, but what's | 10:05:04 |

| 1  | your residence address?                              | 10:05:06 |
| 2  | A    5825 South Dorchester Avenue,                   | 10:05:08 |
| 3  | Apartment 10W, Chicago, 60637.                       | 10:05:12 |
| 4  | Q    Thank you.                                      | 10:05:16 |
| 5  | And what is your professional address?               | 10:05:16 |
| 6  | A    My professional address is 65 Elizabeth         | 10:05:17 |
| 7  | Street, Hartford, Connecticut 06105.                 | 10:05:20 |
| 8  | Q    And by whom are you employed, sir?              | 10:05:24 |
| 9  | A    The University of Connecticut.                  | 10:05:26 |
| 10 | Q    I see.                                          | 10:05:27 |
| 11 | Before we get started -- or we're                    | 10:05:27 |
| 12 | getting started, I guess -- I'm going to show you    | 10:05:29 |
| 13 | two documents that I would ask you to peruse.        | 10:05:32 |
| 14 | Take as much time as you need.  I just want to       | 10:05:34 |
| 15 | make sure they are true and complete copies, first  | 10:05:37 |
| 16 | Exhibit 1, which was the original report that we     | 10:05:39 |
| 17 | received under your name, and then Exhibit 2 is      | 10:05:41 |
| 18 | the rebuttal report that we received also under      | 10:05:45 |
| 19 | your name.                                           | 10:05:48 |
| 20 | Do they appear to be accurate and                    | 10:06:07 |
| 21 | complete copies of your two reports?                 | 10:06:09 |
| 22 | A    They do.                                        | 10:06:11 |

Transcript of Douglas Spencer, Ph.D.
Conducted on October 1, 2019                    11

| | | |
|---|---|---|
| 1 | Q      Okay.  Thank you. | 10:06:11 |
| 2 |         A couple of things.  Have you ever been | 10:06:12 |
| 3 | deposed before? | 10:06:15 |
| 4 | A      I have one time. | 10:06:16 |
| 5 | Q      Okay.  Fair enough. | 10:06:17 |
| 6 |         So it's relatively new in your life, | 10:06:18 |
| 7 | so -- and I know you are a licensed attorney, so | 10:06:20 |
| 8 | I'm not trying to patronize you, but I will go | 10:06:23 |
| 9 | through a couple ground rules. | 10:06:24 |
| 10 |         First of all, it would be helpful if | 10:06:25 |
| 11 | you respond verbally to all the questions.  The | 10:06:27 |
| 12 | court reporter can't take down nods and gestures, | 10:06:30 |
| 13 | and the infamous "uh-huh" versus "huh-uh" is | 10:06:32 |
| 14 | unintelligible on a transcript. | 10:06:36 |
| 15 |         Second, if at any point I ask an | 10:06:37 |
| 16 | unclear question, please let me know.  I'll be | 10:06:39 |
| 17 | happy to rephrase. | 10:06:41 |
| 18 |         Third, if you've given an answer that | 10:06:42 |
| 19 | at some point appears inaccurate or incomplete | 10:06:44 |
| 20 | upon later reflection, just speak up and we'll | 10:06:44 |
| 21 | correct the record going forward. | 10:06:48 |
| 22 |         And, finally, if you will give me the | 10:06:50 |

Transcript of Douglas Spencer, Ph.D.
Conducted on October 1, 2019                                    12

| 1 | courtesy of completing my question, and then I | 10:06:52 |
| 2 | will give you the courtesy of completing your | 10:06:55 |
| 3 | answer, it will allow the court reporter to not | 10:06:57 |
| 4 | have to shift voices any more than necessary. | 10:06:59 |
| 5 | Does that all work for you, sir? | 10:07:02 |
| 6 | A    That works for me, yep. | 10:07:03 |
| 7 | Q    Thank you. | 10:07:05 |
| 8 | I'm going to show you first -- and | 10:07:05 |
| 9 | we've got the two exhibits marked, but prior to | 10:07:07 |
| 10 | even your initial expert report which was dated | 10:07:10 |
| 11 | July 15th, we received an expert witness | 10:07:14 |
| 12 | designation, which I'll put a copy of you in | 10:07:17 |
| 13 | front -- a copy in front of you. | 10:07:19 |
| 14 | I'd ask you to review that just with | 10:07:20 |
| 15 | respect to the information pertaining to you. | 10:07:22 |
| 16 | A    Okay. | 10:07:34 |
| 17 | Q    Does that appear to be accurate for -- | 10:07:34 |
| 18 | to the extent it describes your background and | 10:07:36 |
| 19 | profession? | 10:07:39 |
| 20 | A    Yes, it does. | 10:07:40 |
| 21 | Q    Okay.  Fair enough. | 10:07:41 |
| 22 | MR. BOYNTON:  I'd ask that we go ahead | 10:07:42 |

Transcript of Douglas Spencer, Ph.D.
Conducted on October 1, 2019                    13

| | | |
|---|---|---|
| 1 | and mark that as Exhibit 3 just for reference | 10:07:44 |
| 2 | purposes. | 10:07:46 |
| 3 | (Spencer Exhibit 3 was marked for | 10:07:46 |
| 4 | identification and is attached to the transcript.) | 10:07:51 |
| 5 | BY MR. BOYNTON: | 10:07:51 |
| 6 | Q    In that Expert Witness Disclosures, | 10:08:00 |
| 7 | sir, there is a referenced link? | 10:08:01 |
| 8 | A    Yep. | 10:08:07 |
| 9 | Q    I would ask you to look at that. | 10:08:08 |
| 10 | I will represent to you that I have | 10:08:10 |
| 11 | printed a copy, clicking through that link or | 10:08:12 |
| 12 | typing that link into my browser, and this was the | 10:08:16 |
| 13 | page that came up. | 10:08:19 |
| 14 | A    That looks correct. | 10:08:20 |
| 15 | Q    Does that appear to be an accurate copy | 10:08:22 |
| 16 | of that webpage describing you as Professor of Law | 10:08:24 |
| 17 | and Public Policy at UConn School of Law? | 10:08:27 |
| 18 | A    Yes. | 10:08:31 |
| 19 | MR. BOYNTON:  Okay.  I would ask, then, | 10:08:31 |
| 20 | that we go ahead and make that Exhibit 4 today. | 10:08:31 |
| 21 | (Spencer Exhibit 4 was marked for | 10:08:34 |
| 22 | identification and is attached to the transcript.) | 10:08:34 |

Transcript of Douglas Spencer, Ph.D.
Conducted on October 1, 2019                    14

| | | |
|---|---|---|
| 1 | BY MR. BOYNTON: | 10:08:40 |
| 2 | Q     Do those two documents, Exhibit 3 -- | 10:08:48 |
| 3 | Exhibits 3 and 4, amplify your qualifications and | 10:08:50 |
| 4 | your curriculum vitae that are attached to your | 10:08:54 |
| 5 | initial expert report? | 10:08:58 |
| 6 | A     I think they represent them.  I don't | 10:09:00 |
| 7 | know what you mean by "amplify." | 10:09:02 |
| 8 | Q     Is there anything inconsistent?  I | 10:09:04 |
| 9 | understand that your statement of qualifications | 10:09:06 |
| 10 | together with your CV is multi-pages and probably | 10:09:07 |
| 11 | has more detail to it. | 10:09:10 |
| 12 | I'm just asking if those two documents | 10:09:12 |
| 13 | are -- are inconsistent with your statement of | 10:09:14 |
| 14 | qualifications or your CV in any way? | 10:09:19 |
| 15 | A     I don't think they're inconsistent, no. | 10:09:21 |
| 16 | Q     Perhaps just not as complete? | 10:09:24 |
| 17 | A     Yeah, not as complete. | 10:09:25 |
| 18 | Q     Fair enough. | 10:09:27 |
| 19 | You can put them down.  I just was -- | 10:09:27 |
| 20 | thank you very much. | 10:09:30 |
| 21 | So describe to me your area of | 10:09:33 |
| 22 | expertise in your own words. | 10:09:35 |

Transcript of Douglas Spencer, Ph.D.
Conducted on October 1, 2019                     15

| | | |
|---|---|---|
| 1 | A    So I've been asked to look at racially | 10:09:38 |
| 2 | polarized voting in Virginia Beach.  My expertise | 10:09:42 |
| 3 | in this matter comes from my Ph.D. training, some | 10:09:44 |
| 4 | of the classes that I've taught, training that I | 10:09:48 |
| 5 | received in empirical methods and statistics | 10:09:51 |
| 6 | outside of the Ph.D., I guess, since graduating. | 10:09:54 |
| 7 | I think that's particularly the relevant parts to | 10:09:57 |
| 8 | this. | 10:10:00 |
| 9 | Q    Do you consider yourself a political | 10:10:01 |
| 10 | scientist? | 10:10:03 |
| 11 | A    I do. | 10:10:04 |
| 12 | Q    Do you consider yourself a political | 10:10:04 |
| 13 | historian? | 10:10:06 |
| 14 | A    I do not. | 10:10:07 |
| 15 | Q    Do you consider yourself a demographer? | 10:10:08 |
| 16 | A    I do not. | 10:10:11 |
| 17 | Q    Okay.  With respect to the scope of | 10:10:11 |
| 18 | your testimony here today and the scope of your | 10:10:12 |
| 19 | preparation of an expert report and rebuttal | 10:10:18 |
| 20 | report, what was the scope of your assignment | 10:10:21 |
| 21 | prior to July 15th? | 10:10:24 |
| 22 | MS. HARLESS:  Objection to form. | 10:10:27 |

Transcript of Douglas Spencer, Ph.D.
Conducted on October 1, 2019                    16

| | | |
|---|---|---|
| 1 | MR. BOYNTON:  I can rephrase it. | 10:10:28 |
| 2 | BY MR. BOYNTON: | 10:10:29 |
| 3 | Q     What were you asked to do -- I mean, | 10:10:29 |
| 4 | what -- what -- there's a Purpose and Summary | 10:10:31 |
| 5 | page, which is page 3 of your initial report. | 10:10:36 |
| 6 | A     Yep, I see it. | 10:10:41 |
| 7 | Q     I'd ask you to review it. | 10:10:42 |
| 8 | A     Yes. | 10:10:53 |
| 9 | Q     As a shorthand, were you asked to | 10:10:53 |
| 10 | review Gingles factors 2 and 3 for purposes of | 10:10:58 |
| 11 | this litigation? | 10:11:02 |
| 12 | A     Essentially, yes. | 10:11:04 |
| 13 | Q     Did you provide any expert opinions as | 10:11:05 |
| 14 | to Gingles factor 1, the ability to draw certain | 10:11:07 |
| 15 | maps with certain demographic groups? | 10:11:10 |
| 16 | A     So part of this summary does not | 10:11:13 |
| 17 | foresee some analysis I did about the performance | 10:11:16 |
| 18 | of some illustrative districts.  I did not draw | 10:11:18 |
| 19 | those districts or have anything to do with kind | 10:11:22 |
| 20 | of building those up, just evaluating Gingles | 10:11:24 |
| 21 | prong 2 and 3 in those districts. | 10:11:27 |
| 22 | Q     You're not intending to offer expert | 10:11:30 |

Transcript of Douglas Spencer, Ph.D.
Conducted on October 1, 2019                    17

| | | |
|---|---|---|
| 1 | testimony as to the drawing of maps, but you might | 10:11:31 |
| 2 | offer testimony as to the performance of the maps | 10:11:33 |
| 3 | drawn by others? | 10:11:35 |
| 4 | A     That's correct. | 10:11:36 |
| 5 | Q     Okay.  Now, I am going to represent to | 10:11:36 |
| 6 | you that I understand Gingles factor 2 to be a | 10:11:40 |
| 7 | determination of whether a racial or language | 10:11:44 |
| 8 | minority group is politically -- politically | 10:11:48 |
| 9 | cohesive in that its members tend to vote | 10:11:48 |
| 10 | similarly. | 10:11:54 |
| 11 | Is that a fair definition for purposes | 10:11:55 |
| 12 | of your work? | 10:11:56 |
| 13 | A     Yeah. | 10:11:57 |
| 14 | Q     Okay.  And I interpret Gingles 3 for | 10:11:57 |
| 15 | purposes of today as a determination of whether | 10:12:01 |
| 16 | the majority vote sufficiently as a bloc to enable | 10:12:04 |
| 17 | it to usually defeat the racial or language | 10:12:08 |
| 18 | minority group's preferred candidates. | 10:12:11 |
| 19 | Is that a fair representation of | 10:12:14 |
| 20 | Gingles 3 for purposes of your work? | 10:12:16 |
| 21 | A     I think that's a fair representation. | 10:12:18 |
| 22 | Q     Thank you. | 10:12:20 |

Transcript of Douglas Spencer, Ph.D.
Conducted on October 1, 2019                    18

| | | |
|---|---|---|
| 1 | Were you asked to provide any opinions | 10:12:32 |
| 2 | in this case with regard to the Senate Factors or | 10:12:34 |
| 3 | the totality-of-the-circumstances analysis? | 10:12:36 |
| 4 | A    I was not. | 10:12:38 |
| 5 | Q    Okay.  So we can fairly limit the scope | 10:12:39 |
| 6 | of your testimony today to Gingles 2 and 3? | 10:12:43 |
| 7 | MS. HARLESS:  Objection to form. | 10:12:45 |
| 8 | MR. BOYNTON:  I -- I can rephrase. | 10:12:47 |
| 9 | BY MR. BOYNTON: | 10:12:48 |
| 10 | Q    Is -- do you intend to offer opinions | 10:12:49 |
| 11 | in this case outside of Gingles 2 and 3 save and | 10:12:51 |
| 12 | except for the performance of the -- the maps | 10:12:55 |
| 13 | drawn by others? | 10:12:59 |
| 14 | A    No, I don't think so. | 10:13:03 |
| 15 | Q    Okay.  Fair enough. | 10:13:05 |
| 16 | Returning, then, to your CV, just so I | 10:13:12 |
| 17 | can have a better understanding of your career | 10:13:14 |
| 18 | evolution. | 10:13:19 |
| 19 | A    Yeah. | 10:13:21 |
| 20 | Q    And take a moment to get to it.  I know | 10:13:21 |
| 21 | it's a pretty thick report, and I think we're on | 10:13:24 |
| 22 | the same page.  It has your name at the top, | 10:13:27 |

Transcript of Douglas Spencer, Ph.D.
Conducted on October 1, 2019                    19

| | | |
|---|---|---|
| 1 | Contact, Academic Positions; is that correct? | 10:13:29 |
| 2 | A    That's correct. | 10:13:32 |
| 3 | Q    I have it identified as page 1 with | 10:13:32 |
| 4 | respect to that series of documents within your | 10:13:34 |
| 5 | packet? | 10:13:36 |
| 6 | A    That's correct. | 10:13:38 |
| 7 | Q    Okay.  So you graduated from Columbia | 10:13:38 |
| 8 | University with your Bachelor of Arts in | 10:13:41 |
| 9 | philosophy in 2004; is that correct? | 10:13:44 |
| 10 | A    That's correct. | 10:13:46 |
| 11 | Q    Did you do anything from a political | 10:13:46 |
| 12 | science study area at Columbia University? | 10:13:48 |
| 13 | A    I took political science courses, but | 10:13:53 |
| 14 | it wasn't my major. | 10:13:55 |
| 15 | Q    Was it a minor? | 10:13:56 |
| 16 | A    It wasn't a minor. | 10:13:57 |
| 17 | Q    Was it a concentration of any kind? | 10:13:58 |
| 18 | A    No. | 10:14:00 |
| 19 | Q    Okay.  So what next -- and you | 10:14:01 |
| 20 | graduated in 2004.  What next informs your | 10:14:03 |
| 21 | professional expertise as it relates to this | 10:14:09 |
| 22 | matter in the sequence of time of your career? | 10:14:11 |

Transcript of Douglas Spencer, Ph.D.
Conducted on October 1, 2019                    20

| | | |
|---|---|---|
| 1 | Did you go straight to the Goldman School of | 10:14:17 |
| 2 | Public Policy, or did you take some time -- | 10:14:18 |
| 3 | A     No, I did not.  I spent two years doing | 10:14:20 |
| 4 | other work.  So one of the -- work that I did that | 10:14:24 |
| 5 | was relevant to this was, while living in | 10:14:26 |
| 6 | Thailand, I was a monitor of the election -- their | 10:14:29 |
| 7 | parliamentary election, which was not a political | 10:14:35 |
| 8 | science exercise, but it was my involvement and | 10:14:39 |
| 9 | first exposure to learning about the process of | 10:14:41 |
| 10 | elections. | 10:14:43 |
| 11 | Q     What prompted you to be a monitor in | 10:14:44 |
| 12 | Thailand? | 10:14:46 |
| 13 | A     Opportunity and interest.  I was living | 10:14:47 |
| 14 | there, and the Asian Network for Free Elections | 10:14:49 |
| 15 | was looking for monitors, so I -- | 10:14:52 |
| 16 | Q     Was -- I'm sorry. | 10:14:54 |
| 17 | A     So I responded to a call, I was | 10:14:55 |
| 18 | trained, and I went and par- -- participated as a | 10:14:57 |
| 19 | monitor. | 10:14:59 |
| 20 | Q     Was it a paid position? | 10:15:00 |
| 21 | A     It was not. | 10:15:01 |
| 22 | Q     Okay.  And did you have, other than | 10:15:02 |

Transcript of Douglas Spencer, Ph.D.
Conducted on October 1, 2019                    21

| | | |
|---|---|---|
| 1 | that training, any particular expertise in | 10:15:03 |
| 2 | election monitoring at that point in time? | 10:15:06 |
| 3 | A    I did not. | 10:15:09 |
| 4 | Q    Okay.  Tell me about that training. | 10:15:09 |
| 5 | A    That training was a learning exercise | 10:15:11 |
| 6 | about local laws and customs, what to expect, what | 10:15:13 |
| 7 | to document.  So we were giving forms to fill out, | 10:15:16 |
| 8 | interviews with people who were leaving the | 10:15:22 |
| 9 | polling station, monitoring election officials | 10:15:24 |
| 10 | during the day, how they conducted themselves, | 10:15:27 |
| 11 | when the polling box was open whether it was | 10:15:28 |
| 12 | locked and secured, things like that. | 10:15:32 |
| 13 | Q    What did you understand to be the | 10:15:33 |
| 14 | purpose of that monitoring effort? | 10:15:35 |
| 15 | A    The purpose of the monitoring effort | 10:15:36 |
| 16 | was this organization of Asian states had an | 10:15:38 |
| 17 | organization that was reviewing each others | 10:15:41 |
| 18 | elections for transparency.  There was a report | 10:15:47 |
| 19 | that was published about how the elections were | 10:15:50 |
| 20 | conducted, I think, for review by their election | 10:15:53 |
| 21 | boards for better service going forward. | 10:15:56 |
| 22 | Q    Did you publish anything formally as a | 10:15:58 |

Transcript of Douglas Spencer, Ph.D.
Conducted on October 1, 2019                                    22

| | | |
|---|---|---|
| 1 | result of that effort? | 10:16:00 |
| 2 | A     Not under my own name, no. | 10:16:02 |
| 3 | Q     You provided information to others for | 10:16:04 |
| 4 | their -- | 10:16:06 |
| 5 | A     That's right. | 10:16:07 |
| 6 | Q     -- assimilation? | 10:16:07 |
| 7 | A     It went into a report. | 10:16:08 |
| 8 | Q     Fair enough. | 10:16:10 |
| 9 |       What -- what next sequentially in your | 10:16:11 |
| 10 | career informed your background or expertise as a | 10:16:14 |
| 11 | political scientist? | 10:16:15 |
| 12 | A     So when I arrived at Berkeley to earn a | 10:16:16 |
| 13 | Master's of Public Policy degree in 2008, that's | 10:16:19 |
| 14 | when I started my formal graduate training in | 10:16:22 |
| 15 | political economics.  So I took courses in | 10:16:25 |
| 16 | political science and economics, I did a project | 10:16:28 |
| 17 | that looked at the queuing of people at polling | 10:16:33 |
| 18 | stations at elections. | 10:16:38 |
| 19 | Q     You received a Master's in Public | 10:16:40 |
| 20 | Policy from University of California, Berkeley in | 10:16:41 |
| 21 | 2008, correct? | 10:16:44 |
| 22 | A     That's correct. | 10:16:45 |

Transcript of Douglas Spencer, Ph.D.
Conducted on October 1, 2019                    23

| | | |
|---|---|---|
| 1 | Q     What was -- was there any concentration | 10:16:45 |
| 2 | within that school or that master's program? | 10:16:47 |
| 3 | A     Nope. | 10:16:51 |
| 4 | Q     What generally was your course of | 10:16:52 |
| 5 | study?  Describe it, if you can. | 10:16:53 |
| 6 | A     So there -- there's a core set of | 10:16:57 |
| 7 | courses about quantitative statistical training, | 10:17:01 |
| 8 | there's a series of courses in economic analysis | 10:17:04 |
| 9 | of public policy, and then there were training in | 10:17:08 |
| 10 | law and elective courses that I took in political | 10:17:12 |
| 11 | science and the law school. | 10:17:17 |
| 12 | Q     And then you ultimately went to the | 10:17:20 |
| 13 | Berkeley Law School, correct? | 10:17:22 |
| 14 | A     I did. | 10:17:23 |
| 15 | Q     And that was a full three-year program? | 10:17:24 |
| 16 | A     It's a three-year program. | 10:17:26 |
| 17 | Q     Was it a hybrid program at that point, | 10:17:27 |
| 18 | or did you go to pure law school for three years? | 10:17:29 |
| 19 | A     I was attending multiple programs at | 10:17:32 |
| 20 | the same time, but I did not earn a joint degree, | 10:17:35 |
| 21 | meaning I did them sequentially and did not earn | 10:17:39 |
| 22 | crossover credits, but I was taking double class | 10:17:43 |

Transcript of Douglas Spencer, Ph.D.
Conducted on October 1, 2019                          24

| | | |
|---|---|---|
| 1 | loads. | 10:17:47 |
| 2 | Q    I see. | 10:17:47 |
| 3 | So in addition to taking a full | 10:17:47 |
| 4 | three-year J.D. course load, you were taking | 10:17:48 |
| 5 | jurisprudence and social policy classes from 2008 | 10:17:51 |
| 6 | to 2011? | 10:17:56 |
| 7 | A    Yeah, from 2009 is when I entered the | 10:17:57 |
| 8 | JSP, the jurisprudence and social policy program. | 10:18:01 |
| 9 | Q    Fair enough.  Thank you. | 10:18:02 |
| 10 | Any concentration in your law | 10:18:03 |
| 11 | curriculum? | 10:18:05 |
| 12 | A    For J.D., no. | 10:18:07 |
| 13 | Q    Any concentration in your jurisprudence | 10:18:13 |
| 14 | and social policy doctoral program? | 10:18:16 |
| 15 | A    Yes.  My concentration there was | 10:18:19 |
| 16 | political science. | 10:18:21 |
| 17 | Q    Okay.  And what did you write your | 10:18:22 |
| 18 | dissertation on? | 10:18:23 |
| 19 | A    My dissertation title was Regulating | 10:18:24 |
| 20 | Elections, and it was political science -- a | 10:18:27 |
| 21 | series of four political science articles that | 10:18:32 |
| 22 | looked at different aspects of the law of the | 10:18:34 |

Transcript of Douglas Spencer, Ph.D.
Conducted on October 1, 2019                                    25

| | | |
|---|---|---|
| 1 | political process. | 10:18:37 |
| 2 | Q    Did you have a central thesis that you | 10:18:38 |
| 3 | were seeking to prove or advance? | 10:18:40 |
| 4 | A    The central thesis for all of these was | 10:18:42 |
| 5 | trying to identify what the field of election law | 10:18:45 |
| 6 | is and whether it maps onto political science | 10:18:48 |
| 7 | theories about what elections should be. | 10:18:52 |
| 8 | Q    What did you conclude? | 10:18:54 |
| 9 | A    I concluded that there is a uniform | 10:18:56 |
| 10 | area of election law that's unified by a whole | 10:18:58 |
| 11 | bunch of political science literature. | 10:19:03 |
| 12 | Q    Can you explain to me your study of | 10:19:05 |
| 13 | queuing in elections? | 10:19:09 |
| 14 | A    Sure.  It was a field study.  We | 10:19:11 |
| 15 | recruited -- I don't have the exact number, but | 10:19:14 |
| 16 | somewhere in the neighborhood of a hundred or 120 | 10:19:17 |
| 17 | undergraduate students to go and stand at polling | 10:19:20 |
| 18 | places in a bunch of -- three counties in Northern | 10:19:23 |
| 19 | California. | 10:19:25 |
| 20 | Q    What was the purpose of that study? | 10:19:25 |
| 21 | A    To try to learn about what would cause | 10:19:28 |
| 22 | a long line to form at election -- on Election | 10:19:31 |

Transcript of Douglas Spencer, Ph.D.
Conducted on October 1, 2019                                26

| | | |
|---|---|---|
| 1 | Day. | 10:19:33 |
| 2 | Q      See -- see what the -- what prompted | 10:19:34 |
| 3 | delays? | 10:19:36 |
| 4 | A      That's right.  Well, to learn more | 10:19:38 |
| 5 | about the process, which we knew nothing about, | 10:19:39 |
| 6 | and then to learn what parts of the process might | 10:19:41 |
| 7 | contribute to a line forming. | 10:19:43 |
| 8 | Q      Did you do any studying of -- of the | 10:19:45 |
| 9 | sociology of people leaving the line if it was too | 10:19:47 |
| 10 | long, anything like that? | 10:19:50 |
| 11 | A      So I don't know -- I don't know about | 10:19:54 |
| 12 | sociological research, but -- | 10:19:56 |
| 13 | Q      I didn't mean that, but yeah. | 10:19:57 |
| 14 | A      -- we -- yes, we definitely observed | 10:19:58 |
| 15 | when people left the line in our data set and | 10:20:00 |
| 16 | tried to evaluate what was contributing to that, | 10:20:04 |
| 17 | you know, correlating the length of a line to the | 10:20:07 |
| 18 | probability of stepping out of line. | 10:20:09 |
| 19 | Q      Did you interview them, the people who | 10:20:11 |
| 20 | left the line? | 10:20:12 |
| 21 | A      We did not. | 10:20:13 |
| 22 | Q      Okay.  Did you interview people who | 10:20:13 |

| | | |
|---|---|---|
| 1 | were poll workers, and I mean, you know, the | 10:20:15 |
| 2 | actual -- not campaigners, but people who were | 10:20:18 |
| 3 | visibly working the polls? | 10:20:22 |
| 4 | A     Yes, we did. | 10:20:24 |
| 5 | Q     And that was to determine the sources | 10:20:25 |
| 6 | of delays? | 10:20:26 |
| 7 | A     That was to learn information about | 10:20:27 |
| 8 | their personal characteristics, how long they had | 10:20:28 |
| 9 | been working, whether they had received training, | 10:20:32 |
| 10 | and to get some of their views about what they had | 10:20:34 |
| 11 | seen. | 10:20:37 |
| 12 | Q     Did that study reach any conclusions | 10:20:37 |
| 13 | that you recall here today? | 10:20:39 |
| 14 | A     Yeah, so the study concluded a few | 10:20:41 |
| 15 | things.  One was that the check-in service of a | 10:20:43 |
| 16 | voting station had as much to contribute to a long | 10:20:48 |
| 17 | line as the voting technology, the line length was | 10:20:51 |
| 18 | not correlated with the ballot length, and | 10:20:55 |
| 19 | primarily we learned -- I would say the most | 10:20:59 |
| 20 | important thing to take away from that article is | 10:21:02 |
| 21 | we learned the distribution of voters that arrived | 10:21:04 |
| 22 | at a polling station during that day, which before | 10:21:06 |

Transcript of Douglas Spencer, Ph.D.
Conducted on October 1, 2019                              28

| | | |
|---|---|---|
| 1 | that study had never been monitored. | 10:21:10 |
| 2 | Q     Meaning time-of-day distribution? | 10:21:10 |
| 3 | A     Time-of-day distribution. | 10:21:11 |
| 4 | Q     Okay.  Not distribution of polling | 10:21:12 |
| 5 | places? | 10:21:15 |
| 6 | A     That's right.  No. | 10:21:16 |
| 7 | Q     Okay.  So I think we've gotten to 2013 | 10:21:16 |
| 8 | now.  We're -- we're moving along briskly. | 10:21:26 |
| 9 | A     Yeah. | 10:21:29 |
| 10 | Q     What -- what did you do immediately | 10:21:29 |
| 11 | after receiving your doctoral degree in | 10:21:30 |
| 12 | jurisprudence and social policy? | 10:21:33 |
| 13 | A     I immediately accepted a job at the | 10:21:36 |
| 14 | University of Connecticut. | 10:21:37 |
| 15 | Q     And that's the Associate Professor of | 10:21:39 |
| 16 | Law and Public Policy position? | 10:21:40 |
| 17 | A     That's correct. | 10:21:41 |
| 18 | Q     And during that period of time, 2013 to | 10:21:41 |
| 19 | 2017, what were your duties at the University of | 10:21:44 |
| 20 | Connecticut? | 10:21:46 |
| 21 | A     I have a joint appointment in the | 10:21:48 |
| 22 | School of Law and in the Department of Public | 10:21:50 |

Transcript of Douglas Spencer, Ph.D.
Conducted on October 1, 2019                              29

| | | |
|---|---|---|
| 1 | Policy, which is part of our College of Letters in | 10:21:52 |
| 2 | Arts and Sciences.  I'm a faculty member in both | 10:21:54 |
| 3 | departments. | 10:21:57 |
| 4 | Q    And I know you identified some courses. | 10:21:58 |
| 5 | Which are public policy courses, and which are law | 10:22:00 |
| 6 | or legal courses? | 10:22:03 |
| 7 | A    So the course -- the courses I teach at | 10:22:04 |
| 8 | the law school that I've taught for the last six | 10:22:06 |
| 9 | years are the Introduction to Constitutional Law | 10:22:08 |
| 10 | class for our first-year students, a seminar on | 10:22:12 |
| 11 | Election Law. | 10:22:14 |
| 12 | And then in the Department of Public | 10:22:14 |
| 13 | Policy, I teach a class called Introduction to | 10:22:16 |
| 14 | Public Policy.  That is a survey course of | 10:22:18 |
| 15 | different ways of evaluating all kinds of public | 10:22:22 |
| 16 | policy.  Basically, it's a survey.  We talk about | 10:22:25 |
| 17 | environmental law, we talk about politics in the | 10:22:28 |
| 18 | law, we talk about several issues. | 10:22:30 |
| 19 | I taught a course in the undergraduate | 10:22:32 |
| 20 | Political Science Department called How to Fix | 10:22:35 |
| 21 | Elections, which is noted here.  It's about | 10:22:38 |
| 22 | election administration in the United States, and | 10:22:39 |

Transcript of Douglas Spencer, Ph.D.
Conducted on October 1, 2019                    30

| | | |
|---|---|---|
| 1 | there was also a survey course of the political | 10:22:40 |
| 2 | science of how elections are managed. | 10:22:43 |
| 3 | Q    Was there a text that you taught from | 10:22:46 |
| 4 | for that course? | 10:22:48 |
| 5 | A    We used several books that we assigned | 10:22:50 |
| 6 | and then also some case materials.  There is some | 10:22:52 |
| 7 | law.  We used Congressional Elections, a book by | 10:22:56 |
| 8 | Paul Herrnson, who was my co-professor.  We were | 10:23:00 |
| 9 | co-teachers of that class.  You know, he's a | 10:23:03 |
| 10 | political scientist.  We assigned a dozen books to | 10:23:06 |
| 11 | students. | 10:23:13 |
| 12 | Q    Did you develop that curriculum by | 10:23:13 |
| 13 | yourself, or with this other gentleman, or -- | 10:23:15 |
| 14 | A    Yeah, Professor Herrnson and I | 10:23:18 |
| 15 | developed it together. | 10:23:19 |
| 16 | Q    Was it a new curriculum? | 10:23:20 |
| 17 | A    It was new for the University of | 10:23:22 |
| 18 | Connecticut. | 10:23:22 |
| 19 | Q    Fair enough. | 10:23:23 |
| 20 | Have you changed the curriculum | 10:23:24 |
| 21 | material over time, or was it a one-off class? | 10:23:26 |
| 22 | A    We taught it one time so far.  We plan | 10:23:30 |

Transcript of Douglas Spencer, Ph.D.
Conducted on October 1, 2019                                31

| | | |
|---|---|---|
| 1 | to teach it again next year. | 10:23:32 |
| 2 | Q    I see. | 10:23:34 |
| 3 | And that's a three-year cycle, | 10:23:35 |
| 4 | four-year cycle? | 10:23:37 |
| 5 | A    It should be every year, but I was on | 10:23:37 |
| 6 | leave last year, so I -- | 10:23:38 |
| 7 | Q    Understood. | 10:23:39 |
| 8 | Tell me about that.  You -- you've had | 10:23:40 |
| 9 | two visiting professorships -- or I guess the | 10:23:41 |
| 10 | first one was a visiting scholar at Yale. | 10:23:43 |
| 11 | What was the purpose of that -- that | 10:23:47 |
| 12 | assignment? | 10:23:48 |
| 13 | A    So that was a visit where I had no | 10:23:49 |
| 14 | teaching obligations but I had an office space, | 10:23:52 |
| 15 | participation in their political science research | 10:23:56 |
| 16 | workshop, which was where people present works in | 10:23:58 |
| 17 | progress that they're working on, I was doing some | 10:24:01 |
| 18 | work on surveys and how to develop reliable survey | 10:24:03 |
| 19 | estimates from large data sets into local | 10:24:07 |
| 20 | elections, and I was there as I developed that | 10:24:10 |
| 21 | project. | 10:24:14 |
| 22 | Q    And that was approximately a year? | 10:24:15 |

Transcript of Douglas Spencer, Ph.D.
Conducted on October 1, 2019                                    32

```
1          A      It was an academic year.              10:24:17

2          Q      Okay.  So it started in the fall, ended 10:24:20

3   in the spring?                                      10:24:23

4          A      Yeah, August to May-ish.              10:24:23

5          Q      Thank you.                            10:24:25

6                 And then you did have a visiting      10:24:25

7   professorship at the University of Chicago,         10:24:26

8   correct?                                            10:24:27

9          A      That's correct.                       10:24:29

10         Q      Are you still in that position?       10:24:29

11         A      No.  That concluded in June.          10:24:31

12         Q      Okay.  And what was the scope of that 10:24:32

13  visiting professorship?                             10:24:34

14         A      That visit was at the Harris School of 10:24:36

15  Public Policy.  I had three courses -- two          10:24:38

16  different courses.  I taught three sections         10:24:43

17  overall, two sections of Constitutional Law and a   10:24:46

18  section on Supreme Court and Public Policy, to      10:24:47

19  public policy grad students.                        10:24:50

20         Q      Separate and apart from your academic 10:24:55

21  positions and your education, what experiences or   10:24:58

22  work have informed your ability to provide          10:25:01
```

Transcript of Douglas Spencer, Ph.D.
Conducted on October 1, 2019                              33

| | | |
|---|---|---|
| 1 | opinions on racial polarization or racially | 10:25:03 |
| 2 | polarized voting? | 10:25:07 |
| 3 | A    So a number of things, actually.  My | 10:25:09 |
| 4 | Ph.D. committee members, Kevin Quinn and Henry | 10:25:13 |
| 5 | Brady, are both political methodologists.  They're | 10:25:17 |
| 6 | former presidents of the Society of Political | 10:25:22 |
| 7 | Methodology. | 10:25:23 |
| 8 | THE REPORTER:  Can you slow down a | 10:25:26 |
| 9 | little bit, please? | 10:25:26 |
| 10 | THE WITNESS:  Yes. | 10:25:26 |
| 11 | THE REPORTER:  Thank you. | 10:25:26 |
| 12 | BY MR. BOYNTON: | 10:25:26 |
| 13 | Q    I'm usually the fast talker, so you're | 10:25:27 |
| 14 | helping me out. | 10:25:28 |
| 15 | A    So specifically my training from Kevin | 10:25:31 |
| 16 | Quinn and Henry Brady, they're on my committee for | 10:25:33 |
| 17 | a reason.  They're both former presidents of the | 10:25:36 |
| 18 | Society for Political Methodology. | 10:25:39 |
| 19 | Kevin Quinn is a leading scholar in the | 10:25:41 |
| 20 | statistical use of ecological inference.  He's | 10:25:45 |
| 21 | developed many of the models that are used.  I'm | 10:25:49 |
| 22 | just pointing to their names -- | 10:25:50 |

Transcript of Douglas Spencer, Ph.D.
Conducted on October 1, 2019                              34

| | | | |
|---|---|---|---|
| 1 | Q | Okay. | 10:25:52 |
| 2 | A | -- on my CV. | 10:25:52 |
| 3 | Q | Understood. | 10:25:53 |
| 4 | A | Henry Brady is the former chair of the | 10:25:55 |

Political Science Department at Berkeley.         10:25:57

And I worked with them specifically on            10:25:58

my dissertation to develop kind of the political  10:26:00

science around voting, the determinants of voting, 10:26:03

and how to measure them.                          10:26:08

In my report -- let's see.  On page 35            10:26:11

where I describe my qualifications, I note a few   10:26:21

of the specific training opportunities that I had  10:26:27

in statistics and elections, this Empirical        10:26:31

Implications of Theoretical Models, there's a      10:26:36

Workshop for Research Design and Causal Inference  10:26:39

at Northwestern.                                   10:26:41

I provided political science research             10:26:45

for the Pew Center on the States, a project in     10:26:47

looking at the -- the return rates and             10:26:50

mobilization of overseas voting.  I've done some   10:26:53

work for the Early Voting Information Center       10:26:58

providing political science research about who     10:26:58

Transcript of Douglas Spencer, Ph.D.
Conducted on October 1, 2019                                    35

| | | |
|---|---|---|
| 1 | shows up early and why.  I think those are the | 10:27:02 |
| 2 | most directly on point in addition to my | 10:27:09 |
| 3 | coursework as part of a Ph.D. | 10:27:11 |
| 4 | Q    Fair enough.  And that was in response | 10:27:14 |
| 5 | to my question about analyzing racially polarized | 10:27:16 |
| 6 | voting. | 10:27:19 |
| 7 | Does your listing of primary | 10:27:20 |
| 8 | influencers of your expertise change if we talk | 10:27:23 |
| 9 | specifically about opinions as to which we'll call | 10:27:27 |
| 10 | shorthand Gingles 2 and Gingles 3? | 10:27:31 |
| 11 | A    Definitely. | 10:27:34 |
| 12 | Q    Okay.  Tell me, then.  What other | 10:27:34 |
| 13 | things inform that background? | 10:27:36 |
| 14 | A    So my study of the law in law school. | 10:27:38 |
| 15 | I took a class on Election Law from Robert Rubin, | 10:27:42 |
| 16 | who was, I think, Director of Litigation at the | 10:27:48 |
| 17 | Lawyers' Committee for Civil Rights in the Bay | 10:27:50 |
| 18 | Area, who had filed -- I don't know how many -- | 10:27:52 |
| 19 | half-a-dozen, maybe a dozen voting rights cases. | 10:27:55 |
| 20 | We spent a significant portion of that class | 10:27:59 |
| 21 | talking specifically about the history of Gingles, | 10:28:01 |
| 22 | development of the criteria, and how it's used in | 10:28:03 |

Transcript of Douglas Spencer, Ph.D.
Conducted on October 1, 2019                              36

| | | |
|---|---|---|
| 1 | litigation. | 10:28:05 |
| 2 | Q      Beyond that class, what other things | 10:28:06 |
| 3 | specifically inform your ability to offer opinions | 10:28:08 |
| 4 | in this case relating to Gingles 2 or Gingles 3? | 10:28:11 |
| 5 | A      Extending from that class, I -- I | 10:28:14 |
| 6 | served as a law clerk for Robert in that Lawyers' | 10:28:16 |
| 7 | Committee office in San Francisco working | 10:28:20 |
| 8 | primarily on voting rights cases. | 10:28:22 |
| 9 | Q      Anything beyond that? | 10:28:29 |
| 10 | A      Not that I can think of right now. | 10:28:34 |
| 11 | Q      Fair enough. | 10:28:35 |
| 12 |        How are you being compensated for your | 10:28:47 |
| 13 | testimony in this case? | 10:28:49 |
| 14 | A      So as I disclosed, I'm being | 10:28:49 |
| 15 | compensated at a rate of $250 an hour. | 10:28:51 |
| 16 | Q      And that is all time, whether you're | 10:28:54 |
| 17 | working or testifying? | 10:28:57 |
| 18 | A      That's correct. | 10:28:58 |
| 19 | Q      Okay.  There's no different rates for | 10:28:59 |
| 20 | testimony? | 10:29:01 |
| 21 | A      There is definitely not. | 10:29:01 |
| 22 | Q      Okay.  And I see on your Professional | 10:29:02 |

Transcript of Douglas Spencer, Ph.D.
Conducted on October 1, 2019                           37

| | | |
|---|---|---|
| 1 | Activities two references to serving as an expert | 10:29:08 |
| 2 | witness.  I'm now on page 6 of your résumé | 10:29:12 |
| 3 | disclosure. | 10:29:16 |
| 4 | A    Okay. | 10:29:27 |
| 5 | Q    The first one says, Expert witness | 10:29:27 |
| 6 | (rebuttal on behalf of Colorado Secretary of | 10:29:29 |
| 7 | State) in defense of state campaign finance law. | 10:29:33 |
| 8 | Case: Holland v. Williams, (2018). | 10:29:37 |
| 9 | What is that case about? | 10:29:42 |
| 10 | A    That is a case involving a challenge | 10:29:43 |
| 11 | from a local organization in Colorado against the | 10:29:46 |
| 12 | State's disclosure regime in Colorado. | 10:29:51 |
| 13 | Q    And what is your role in that case? | 10:29:56 |
| 14 | A    My role simply was to provide a | 10:29:59 |
| 15 | rebuttal to the plaintiff's expert. | 10:30:01 |
| 16 | Q    And you did that in writing? | 10:30:04 |
| 17 | A    I provided a written report. | 10:30:06 |
| 18 | Q    Were you deposed in that case? | 10:30:08 |
| 19 | A    I was. | 10:30:10 |
| 20 | Q    Was that your other deposition? | 10:30:11 |
| 21 | A    That's the only other deposition. | 10:30:13 |
| 22 | Q    Okay.  Did you testify at trial in that | 10:30:14 |

Transcript of Douglas Spencer, Ph.D.
Conducted on October 1, 2019                    38

| | | |
|---|---|---|
| 1 | matter? | 10:30:16 |
| 2 | A    I did not. | 10:30:16 |
| 3 | Q    Is that case resolved? | 10:30:17 |
| 4 | A    As I understand it, there was a Summary | 10:30:19 |
| 5 | Judgment motion at the trial court. | 10:30:22 |
| 6 | Q    What is a summary of your opinions in | 10:30:26 |
| 7 | that case? | 10:30:27 |
| 8 | A    It was limited to evaluating the | 10:30:32 |
| 9 | reliability of the estimates provided by the | 10:30:39 |
| 10 | plaintiff's expert. | 10:30:43 |
| 11 | Q    Was it a Voting Rights Act case? | 10:30:45 |
| 12 | A    It was not. | 10:30:48 |
| 13 | Q    You did not develop your own | 10:30:52 |
| 14 | independent opinions?  You are evaluating someone | 10:30:54 |
| 15 | else's opinions in that case? | 10:30:56 |
| 16 | A    That's correct. | 10:30:58 |
| 17 | MS. HARLESS:  Objection to form. | 10:30:58 |
| 18 | BY MR. BOYNTON: | 10:31:03 |
| 19 | Q    Did you develop your own opinions in | 10:31:04 |
| 20 | that case? | 10:31:05 |
| 21 | A    I did not. | 10:31:07 |
| 22 | Q    Okay.  There's another reference to | 10:31:08 |

Transcript of Douglas Spencer, Ph.D.
Conducted on October 1, 2019                              39

| | | |
|---|---|---|
| 1 | serving as an expert witness (consulting) for | 10:31:11 |
| 2 | Voting Rights Act, Chicago Lawyers' Committee for | 10:31:15 |
| 3 | Civil Rights, 2015. | 10:31:17 |
| 4 | What was that consulting work for you? | 10:31:19 |
| 5 | MS. HARLESS:  So I'm going to object | 10:31:25 |
| 6 | just to the extent if he's a consulting witness, | 10:31:26 |
| 7 | it's not clear if he's testifying or | 10:31:30 |
| 8 | non-testifying, so just that difference. | 10:31:33 |
| 9 | MR. BOYNTON:  I'm happy to clarify. | 10:31:36 |
| 10 | BY MR. BOYNTON: | 10:31:37 |
| 11 | Q     Were you retained to provide testimony | 10:31:37 |
| 12 | in that case? | 10:31:39 |
| 13 | A     No. | 10:31:40 |
| 14 | Q     Is there a case, or is it a | 10:31:40 |
| 15 | pre-litigation-type retention? | 10:31:42 |
| 16 | A     I think it's pre-litigation, as far as | 10:31:49 |
| 17 | I understand. | 10:31:51 |
| 18 | Q     You're still involved in that, or is it | 10:31:53 |
| 19 | resolved from your perspective? | 10:31:55 |
| 20 | A     From my perspective, I think that my | 10:31:57 |
| 21 | involvement's been resolved. | 10:31:59 |
| 22 | Q     Are those the only two times, other | 10:32:01 |

Transcript of Douglas Spencer, Ph.D.
Conducted on October 1, 2019                                    40

| | | |
|---|---|---|
| 1 | than in this case, you've been retained as an | 10:32:04 |
| 2 | expert witness? | 10:32:06 |
| 3 | A    No. | 10:32:07 |
| 4 | Q    What other cases have you been retained | 10:32:08 |
| 5 | as an expert witness in? | 10:32:10 |
| 6 | A    I am currently on a case in | 10:32:11 |
| 7 | Massachusetts.  I checked the -- my participation | 10:32:14 |
| 8 | was disclosed two weeks ago.  Another campaign | 10:32:17 |
| 9 | finance case, not a voting rights case, on behalf | 10:32:21 |
| 10 | of the State of Massachusetts, whose state law has | 10:32:24 |
| 11 | been challenged because of its disclosure regime. | 10:32:27 |
| 12 | Q    And so you did not list that here for | 10:32:32 |
| 13 | what reason? | 10:32:33 |
| 14 | A    It was not -- in July, I had not signed | 10:32:34 |
| 15 | an agreement and had not been disclosed to the | 10:32:37 |
| 16 | Court as participating in that case. | 10:32:41 |
| 17 | Q    I see. | 10:32:43 |
| 18 | Okay.  And you said that case is not a | 10:32:43 |
| 19 | Voting Rights Act case? | 10:32:45 |
| 20 | A    It is not. | 10:32:46 |
| 21 | Q    So this is your first case in which | 10:32:47 |
| 22 | you've been retained as a Voting Rights Act expert | 10:32:48 |

Transcript of Douglas Spencer, Ph.D.
Conducted on October 1, 2019                              41

| | | |
|---|---|---|
| 1 | as -- I'll -- I'll rephrase. | 10:32:51 |
| 2 | This is the first Voting Rights Act | 10:32:52 |
| 3 | case in which you've been retained as an expert? | 10:32:53 |
| 4 | A    A testifying expert. | 10:32:57 |
| 5 | MS. HARLESS:  Objection to form. | 10:32:58 |
| 6 | BY MR. BOYNTON: | 10:32:59 |
| 7 | Q    Is this the first Voting Rights Act | 10:32:59 |
| 8 | case in which you've been retained as a testifying | 10:33:01 |
| 9 | expert? | 10:33:06 |
| 10 | A    Yes. | 10:33:17 |
| 11 | (Discussion off the record.) | 10:33:19 |
| 12 | BY MR. BOYNTON: | 10:33:20 |
| 13 | Q    Let's turn to your report, Exhibit 1, | 10:33:20 |
| 14 | please. | 10:33:22 |
| 15 | A    (Witness complies.) | 10:33:30 |
| 16 | Q    Are the six itemized conclusions on | 10:33:33 |
| 17 | page 3 a summary of your conclusions in this case | 10:33:37 |
| 18 | at least as of the date of your original expert | 10:33:46 |
| 19 | opinion? | 10:33:49 |
| 20 | A    As of July 15th, yes. | 10:33:49 |
| 21 | Q    Can you define for me what you consider | 10:34:02 |
| 22 | to be scientific certainty -- or, I'm sorry, | 10:34:06 |

Transcript of Douglas Spencer, Ph.D.
Conducted on October 1, 2019                                    42

| | | |
|---|---|---|
| 1 | reasonable degree of scientific certainty? | 10:34:11 |
| 2 | A    I can speak to certainty in the context | 10:34:16 |
| 3 | of political science research. | 10:34:18 |
| 4 | Q    Perfect. | 10:34:20 |
| 5 | A    Depending on the context, I'm trying to | 10:34:29 |
| 6 | think of the most relevant context.  In political | 10:34:31 |
| 7 | science literature when we're comparing the | 10:34:36 |
| 8 | differences between two groups of individuals, | 10:34:38 |
| 9 | certainty, you're trying to find a reliable | 10:34:42 |
| 10 | estimate if the two groups are statistically | 10:34:45 |
| 11 | significantly different. | 10:34:52 |
| 12 | Q    Do you -- are you able to put a | 10:34:54 |
| 13 | percentage confidence on that, 90 percent | 10:34:56 |
| 14 | reliability, 80 percent reliability, anything to | 10:34:58 |
| 15 | that order? | 10:35:03 |
| 16 | A    I mean, each estimate has its own | 10:35:03 |
| 17 | reliability mark, so there's -- in the political | 10:35:05 |
| 18 | science literature, the ideal is that the -- the | 10:35:08 |
| 19 | probability of rejecting your null hypothesis is | 10:35:13 |
| 20 | 5 percent. | 10:35:17 |
| 21 | Q    Well, you're jumping straight to -- as | 10:35:18 |
| 22 | I understand it at least, to equivalence testing. | 10:35:21 |

Transcript of Douglas Spencer, Ph.D.
Conducted on October 1, 2019                              43

| | | |
|---|---|---|
| 1 | I'm trying to at this point stay with | 10:35:24 |
| 2 | your original report, and I think there were three | 10:35:28 |
| 3 | different methodologies used in that.  And so I | 10:35:30 |
| 4 | would ask you, with respect to those | 10:35:34 |
| 5 | methodologies, what constitutes a reasonable | 10:35:35 |
| 6 | degree of scientific certainty? | 10:35:37 |
| 7 | A     If there's a statistically significant | 10:35:39 |
| 8 | difference between the groups using the method | 10:35:41 |
| 9 | that you've used. | 10:35:45 |
| 10 | Q     How do you define statistically | 10:35:46 |
| 11 | different? | 10:35:48 |
| 12 | A     Statistically different means there's | 10:35:49 |
| 13 | an estimate for one group, and there's an estimate | 10:35:51 |
| 14 | for another group, and statistically they're | 10:35:53 |
| 15 | independent of each other. | 10:35:57 |
| 16 | Q     Okay.  Is there a standard of error or | 10:35:58 |
| 17 | confidence interval that you rely on as making | 10:36:05 |
| 18 | documents -- not documents -- making point | 10:36:07 |
| 19 | estimates more reliable than less reliable? | 10:36:09 |
| 20 | (The reporter clarified the record.) | 10:36:11 |
| 21 | MR. BOYNTON:  That's a terrible | 10:36:13 |
| 22 | question.  Let me start over. | 10:36:14 |

Transcript of Douglas Spencer, Ph.D.
Conducted on October 1, 2019                              44

| | | |
|---|---|---|
| 1 | BY MR. BOYNTON: | 10:36:16 |
| 2 | Q     Well, first of all, what is a | 10:36:16 |
| 3 | confidence interval? | 10:36:18 |
| 4 | A     So a confidence interval is a phrase to | 10:36:21 |
| 5 | describe the dispersion of a finding.  You can | 10:36:23 |
| 6 | say, as an example, 41 percent of people have this | 10:36:29 |
| 7 | particular view, plus or minus 6.  It means that | 10:36:34 |
| 8 | the -- the -- the viewpoint is dispersed about | 10:36:37 |
| 9 | 6 percentage points. | 10:36:40 |
| 10 | Q     Is that the same as a standard of | 10:36:41 |
| 11 | error? | 10:36:42 |
| 12 | A     They both -- it's a different term, and | 10:36:43 |
| 13 | a confidence interval is generated by multiplying | 10:36:46 |
| 14 | a standard error by 1.96 if there's a normal | 10:36:49 |
| 15 | distribution of your finding, but it's the same | 10:36:52 |
| 16 | concept, which is a measure of the dispersion of | 10:36:56 |
| 17 | your finding. | 10:36:59 |
| 18 | Q     When you say "a normal distribution," | 10:37:00 |
| 19 | is that what we understand to be kind of a bell | 10:37:01 |
| 20 | curve? | 10:37:04 |
| 21 | A     Yes. | 10:37:04 |
| 22 | Q     Okay.  And how do you determine in -- | 10:37:04 |

Transcript of Douglas Spencer, Ph.D.
Conducted on October 1, 2019                              45

| | | |
|---|---|---|
| 1 | in -- well, I'll get there. | 10:37:07 |
| 2 | A      Okay. | 10:37:09 |
| 3 | Q      As I understand it, the larger number | 10:37:16 |
| 4 | of confidence interval means the less confidence. | 10:37:20 |
| 5 | Is that accurate? | 10:37:24 |
| 6 | A      I'm -- the less accurate of what? | 10:37:28 |
| 7 | Q      Well, if you have a point estimate and | 10:37:32 |
| 8 | the confidence interval is 20 instead of 5, is | 10:37:35 |
| 9 | that point estimate more or less reliable? | 10:37:41 |
| 10 | A      In the language of political science, | 10:37:44 |
| 11 | it would be less reliable. | 10:37:47 |
| 12 | Q      At what point in your profession, the | 10:38:07 |
| 13 | political science profession, do confidence | 10:38:10 |
| 14 | intervals become too large to rely upon? | 10:38:13 |
| 15 | A      So everything is about context of the | 10:38:17 |
| 16 | question that's being asked.  There's no point at | 10:38:21 |
| 17 | which a confidence interval becomes too large for | 10:38:24 |
| 18 | one estimate. | 10:38:28 |
| 19 | The confidence intervals I've generated | 10:38:29 |
| 20 | are to compare two groups, and the confidence | 10:38:32 |
| 21 | interval that's too large is if those two groups | 10:38:35 |
| 22 | have a confidence interval that overlap, and | 10:38:38 |

| | | |
|---|---|---|
| 1 | that's it.  It's not about the size of the | 10:38:41 |
| 2 | confidence interval.  It's about its relationship | 10:38:42 |
| 3 | from one group to the next. | 10:38:45 |
| 4 | Q     Tell me your process -- and I'm | 10:38:50 |
| 5 | focusing on the original order at this point -- | 10:38:53 |
| 6 | your process in measuring racially polarized | 10:38:56 |
| 7 | voting. | 10:38:59 |
| 8 | A     Okay.  I'm going to rely heavily on | 10:39:00 |
| 9 | pages 4 through 7 at first -- | 10:39:04 |
| 10 | Q     And that's fine, but I do want to hear | 10:39:07 |
| 11 | it conversationally. | 10:39:09 |
| 12 | A     -- but I'll explain what I'm doing. | 10:39:11 |
| 13 | Q     Sure. | 10:39:13 |
| 14 | A     There's more than one way to evaluate | 10:39:13 |
| 15 | the voting preferences of a voting group.  Each of | 10:39:15 |
| 16 | these processes has -- involves trade-offs, so I | 10:39:19 |
| 17 | provided three different ways of evaluating | 10:39:25 |
| 18 | racially polarized voting, identifying candidates | 10:39:28 |
| 19 | of choice. | 10:39:32 |
| 20 |      The first is called homogeneous | 10:39:33 |
| 21 | precinct analysis, which evaluates the voting | 10:39:36 |
| 22 | pattern in the precincts that have the most | 10:39:38 |

Transcript of Douglas Spencer, Ph.D.
Conducted on October 1, 2019                               47

| | | |
|---|---|---|
| 1 | racially homogeneous profile. | 10:39:44 |
| 2 | Q     The second method is? | 10:39:48 |
| 3 | A     The second method is called ecological | 10:39:50 |
| 4 | regression, and it's easy to graphically represent | 10:39:52 |
| 5 | by plotting each of the precincts and drawing a | 10:39:57 |
| 6 | line -- a regression line through them. | 10:40:02 |
| 7 | Q     Do we call that a scatter plot in | 10:40:03 |
| 8 | conversation? | 10:40:05 |
| 9 | A     Yeah. | 10:40:06 |
| 10 | Q     Okay.  And the ecological inference, | 10:40:06 |
| 11 | describe that for me, please. | 10:40:09 |
| 12 | A     Ecological inference is a statistical | 10:40:11 |
| 13 | tool used to make distinctions about individuals | 10:40:13 |
| 14 | using group-level information. | 10:40:16 |
| 15 | Q     You don't get a scatter plot from that, | 10:40:21 |
| 16 | from ecological inference, or you don't rely on a | 10:40:24 |
| 17 | scatter plot for ecological inference? | 10:40:29 |
| 18 | A     I personally do not rely on a scatter | 10:40:33 |
| 19 | plot.  The underlying model is based on an | 10:40:33 |
| 20 | algorithm that uses point estimates of the | 10:40:37 |
| 21 | precincts. | 10:40:37 |
| 22 | Q     Some people would colloquially call | 10:40:39 |

Transcript of Douglas Spencer, Ph.D.
Conducted on October 1, 2019                              48

| | | |
|---|---|---|
| 1 | that a black box? | 10:40:40 |
| 2 | MS. HARLESS:  Objection to form. | 10:40:42 |
| 3 | BY MR. BOYNTON: | 10:40:43 |
| 4 | Q    Is that a term you -- your profession | 10:40:44 |
| 5 | uses? | 10:40:47 |
| 6 | A    Yes. | 10:40:47 |
| 7 | Q    Okay.  Is that a term that fits for | 10:40:47 |
| 8 | ecological inference? | 10:40:49 |
| 9 | A    For the uninitiated, yes. | 10:40:51 |
| 10 | Q    Well, initiate me, please. | 10:40:53 |
| 11 | A    Okay.  The -- the statistical | 10:40:56 |
| 12 | development compares not the voting outcome of a | 10:41:01 |
| 13 | particular race of voting group to the outcome of | 10:41:07 |
| 14 | a candidate's vote total, but it looks at the | 10:41:11 |
| 15 | relationship of vote totals between different | 10:41:14 |
| 16 | races themselves. | 10:41:16 |
| 17 | Q    The -- the result or the -- the level | 10:41:18 |
| 18 | of confidence in the estimates -- point estimates | 10:41:23 |
| 19 | produced by ecological inference are dependent | 10:41:26 |
| 20 | upon that algorithm -- the accuracy of the | 10:41:29 |
| 21 | algorithm, correct? | 10:41:29 |
| 22 | A    They're dependent on how similar other | 10:41:32 |

Transcript of Douglas Spencer, Ph.D.
Conducted on October 1, 2019                    49

| | | |
|---|---|---|
| 1 | precincts are to the precinct you're evaluating in | 10:41:37 |
| 2 | space. | 10:41:40 |
| 3 | Q     So the more similar the precinct, the | 10:41:40 |
| 4 | better the data, or the more -- | 10:41:43 |
| 5 | A     That's correct. | 10:41:45 |
| 6 | Q     Okay.  So the less similar the | 10:41:46 |
| 7 | precincts, the less reliable the data? | 10:41:49 |
| 8 | A     The larger the confidence interval. | 10:41:52 |
| 9 | Q     Okay.  Now let's speak to homogeneous | 10:41:54 |
| 10 | precinct analysis. | 10:41:57 |
| 11 | What is a homogeneous precinct in your | 10:41:58 |
| 12 | definition for purposes of this report? | 10:42:01 |
| 13 | A     For the purposes of this report, I've | 10:42:04 |
| 14 | identified homogeneous precincts as precincts | 10:42:06 |
| 15 | where the non-white CVAP is greater than | 10:42:09 |
| 16 | 60 percent. | 10:42:15 |
| 17 | Q     Why did you use 60 percent? | 10:42:16 |
| 18 | A     Those -- that -- there were enough | 10:42:18 |
| 19 | precincts exceeding 60 percent to create a | 10:42:25 |
| 20 | distribution. | 10:42:28 |
| 21 | Q     There were no 70 percent-plus precincts | 10:42:29 |
| 22 | that you found -- | 10:42:32 |

Transcript of Douglas Spencer, Ph.D.
Conducted on October 1, 2019                          50

| | | |
|---|---|---|
| 1 | MS. HARLESS:  Objection. | 10:42:33 |
| 2 | BY MR. BOYNTON: | 10:42:34 |
| 3 | Q    -- non-white -- | 10:42:34 |
| 4 | MS. HARLESS:  Objection. | 10:42:35 |
| 5 | BY MR. BOYNTON: | 10:42:35 |
| 6 | Q    -- in Virginia Beach? | 10:42:35 |
| 7 | MR. BOYNTON:  I can rephrase, but I | 10:42:37 |
| 8 | don't understand the -- the issue. | 10:42:38 |
| 9 | MS. HARLESS:  Do you want me to -- | 10:42:42 |
| 10 | MR. BOYNTON:  Yeah.  Go ahead. | 10:42:42 |
| 11 | MS. HARLESS:  I think you're | 10:42:43 |
| 12 | mischaracterizing what he just said. | 10:42:44 |
| 13 | MR. BOYNTON:  Okay. | 10:42:46 |
| 14 | BY MR. BOYNTON: | 10:42:47 |
| 15 | Q    Did you find precincts that were | 10:42:47 |
| 16 | 70 percent homogeneous in Virginia Beach? | 10:42:51 |
| 17 | A    I do not believe so. | 10:42:55 |
| 18 | Q    And that, therefore, means you did not | 10:42:58 |
| 19 | find precincts that were 80 or 90 percent | 10:43:01 |
| 20 | homogeneous in Virginia Beach, correct? | 10:43:04 |
| 21 | A    That's correct. | 10:43:05 |
| 22 | Q    And for the 60 percent precinct, they | 10:43:06 |

Transcript of Douglas Spencer, Ph.D.
Conducted on October 1, 2019                                51

| | | |
|---|---|---|
| 1 | were identified as all-minority 60 percent | 10:43:08 |
| 2 | precincts, or -- | 10:43:14 |
| 3 | A      For my all-minority estimate, yes. | 10:43:15 |
| 4 | Q      Okay.  Were there 60 percent black-only | 10:43:18 |
| 5 | precincts that you found in Virginia Beach? | 10:43:21 |
| 6 | A      I think so.  I can't remember exactly | 10:43:30 |
| 7 | the number of those precinct totals off the top of | 10:43:32 |
| 8 | my head. | 10:43:34 |
| 9 | Q      Sure.  You're welcome to look at your | 10:43:35 |
| 10 | report.  I'm certainly not trying to -- | 10:43:37 |
| 11 | A      Yeah. | 10:43:39 |
| 12 | Q      -- have it be a memory test. | 10:43:39 |
| 13 | A      I identified them, so let me find it. | 10:43:42 |
| 14 | So I list on page 8 the precincts that | 10:44:08 |
| 15 | exceed 60 percent by all minority in the second | 10:44:14 |
| 16 | paragraph: Baker, Newtown, Davis Corner.  I don't | 10:44:18 |
| 17 | report the precinct percent of black in this | 10:44:23 |
| 18 | report. | 10:44:30 |
| 19 | Q      Okay.  And so you have the four -- | 10:44:33 |
| 20 | Baker, Newtown, Davis Corner, and Reon -- that | 10:44:36 |
| 21 | have minority -- total all-minority population | 10:44:40 |
| 22 | exceeding 60 percent, correct? | 10:44:42 |

Transcript of Douglas Spencer, Ph.D.
Conducted on October 1, 2019                           52

| | | | |
|---|---|---|---|
| 1 | A | That's correct. | 10:44:43 |
| 2 | Q | So those are the four that you relied | 10:44:44 |
| 3 | on for your homogeneous precinct analysis? | | 10:44:46 |
| 4 | A | Yes -- | 10:44:49 |
| 5 | Q | Okay. | 10:44:50 |
| 6 | A | -- for the all-minority estimates. | 10:44:51 |
| 7 | Q | And on the white estimates, you relied | 10:44:53 |
| 8 | on Capps Shop, Kings Grant, Lake Joyce, Ocean | | 10:44:55 |
| 9 | Park, and Rudee; is that correct? | | 10:45:00 |
| 10 | A | That's correct. | 10:45:02 |
| 11 | Q | Is there any political science | 10:45:05 |
| 12 | literature supporting the 60 percent homogeneous | | 10:45:09 |
| 13 | figure that you relied on in this case? | | 10:45:12 |
| 14 | A | I -- I think what you're asking is | 10:45:22 |
| 15 | whether there's a threshold that is seen as | | 10:45:24 |
| 16 | defining a homogeneous precinct versus not, and, | | 10:45:27 |
| 17 | no, there's not. | | 10:45:30 |
| 18 | Q | You'd have a higher level of confidence | 10:45:31 |
| 19 | in your data if the precincts you're relying on | | 10:45:33 |
| 20 | were more homogeneous, correct? | | 10:45:36 |
| 21 | A | The resulting estimates would have | 10:45:37 |
| 22 | smaller confidence intervals. | | 10:45:39 |

Transcript of Douglas Spencer, Ph.D.
Conducted on October 1, 2019                              53

| | | |
|---|---|---|
| 1 | Q     And, similarly, if you had more than | 10:45:40 |
| 2 | four homogeneous precincts, you would have a | 10:45:43 |
| 3 | smaller confidence interval and your results on | 10:45:46 |
| 4 | point estimates? | 10:45:49 |
| 5 | A     Not necessarily. | 10:45:50 |
| 6 | Q     Tell me -- explain that to me. | 10:45:50 |
| 7 | A     So the confidence interval just | 10:45:52 |
| 8 | describes how far apart the dots are from each | 10:45:54 |
| 9 | other.  So if I had four dots that were really | 10:45:56 |
| 10 | close together on a scatter plot and 500 dots but | 10:45:59 |
| 11 | all over the place, even though there's more, the | 10:46:02 |
| 12 | confidence interval would be bigger than the four | 10:46:05 |
| 13 | dots that were very close together.  So it's not | 10:46:07 |
| 14 | about the number of precincts used.  It's about | 10:46:10 |
| 15 | their dispersion. | 10:46:12 |
| 16 | Q     Fair enough. | 10:46:13 |
| 17 | Is there a way that you capture the | 10:46:14 |
| 18 | fact that you only have four data points instead | 10:46:16 |
| 19 | of 50 in terms of the reliability of your | 10:46:18 |
| 20 | estimate? | 10:46:21 |
| 21 | A     I don't understand the question. | 10:46:28 |
| 22 | Q     I'm saying that the more data, the | 10:46:29 |

Transcript of Douglas Spencer, Ph.D.
Conducted on October 1, 2019                    54

| | | |
|---|---|---|
| 1 | better usually. | 10:46:31 |
| 2 | Is that a general principle in | 10:46:33 |
| 3 | political science? | 10:46:38 |
| 4 | A    That's -- yeah, that's a general | 10:46:38 |
| 5 | principal. | 10:46:40 |
| 6 | Q    If you had ten homogeneous precincts, | 10:46:41 |
| 7 | you would prefer to have that in your analysis | 10:46:42 |
| 8 | than four? | 10:46:44 |
| 9 | A    Yeah, that's correct. | 10:46:46 |
| 10 | Q    Is homogeneous precinct analysis the | 10:46:58 |
| 11 | same as -- is it extraordinary case -- extreme | 10:47:00 |
| 12 | case analysis? | 10:47:05 |
| 13 | A    I -- I -- I believe so. | 10:47:07 |
| 14 | Q    Okay.  You don't know of any material | 10:47:08 |
| 15 | differences between those two terms as it relates | 10:47:11 |
| 16 | to political science? | 10:47:13 |
| 17 | A    I do not. | 10:47:14 |
| 18 | Q    Why do you choose the term "homogeneous | 10:47:15 |
| 19 | precinct analysis" as opposed to "extreme case | 10:47:17 |
| 20 | analysis"? | 10:47:20 |
| 21 | A    That was the way that I learned this | 10:47:20 |
| 22 | from my instructors. | 10:47:23 |

Transcript of Douglas Spencer, Ph.D.
Conducted on October 1, 2019                                    55

| | | |
|---|---|---|
| 1 | Q      And those were at California Berkeley? | 10:47:24 |
| 2 | A      That's right. | 10:47:26 |
| 3 | Q      Okay.  Let's switch to ecological | 10:47:27 |
| 4 | regression for a moment. | 10:47:39 |
| 5 | Well, first of all, let's -- what are | 10:47:41 |
| 6 | the strengths and -- well, first, what are the | 10:47:43 |
| 7 | strengths in homogeneous precinct analysis from | 10:47:46 |
| 8 | your perspective? | 10:47:48 |
| 9 | A      It's easy to conceptualize.  So as I | 10:47:51 |
| 10 | mentioned before, it's not a black box.  I can | 10:47:55 |
| 11 | explain exactly where I'm looking, what I'm | 10:47:58 |
| 12 | looking at, and I can compare voting patterns in | 10:48:01 |
| 13 | extreme or homogeneous precincts. | 10:48:05 |
| 14 | The logic of homogeneous precincts is | 10:48:08 |
| 15 | that the -- the precincts that are at different | 10:48:13 |
| 16 | ends of these extremes are reliable proxies of the | 10:48:14 |
| 17 | underlying population voting behavior. | 10:48:21 |
| 18 | Q      What are the weaknesses in the | 10:48:24 |
| 19 | homogeneous precinct analysis? | 10:48:26 |
| 20 | A      Well, you're only using four data | 10:48:29 |
| 21 | points, as you brought up, so you're throwing | 10:48:31 |
| 22 | away, as they say, a majority of your data points, | 10:48:35 |

Transcript of Douglas Spencer, Ph.D.
Conducted on October 1, 2019                              56

| | | |
|---|---|---|
| 1 | all of the scatter plot that's in the middle of | 10:48:38 |
| 2 | the extremes. | 10:48:41 |
| 3 | Q    Now, you also in this case used a | 10:48:45 |
| 4 | process called ecological regression, correct? | 10:48:47 |
| 5 | A    Yes. | 10:48:50 |
| 6 | Q    And I think you started to tell me or | 10:48:50 |
| 7 | describe that for me, but if you could kind of | 10:48:52 |
| 8 | give me a bullet of what that is. | 10:48:53 |
| 9 | A    Ecological regression is two steps. | 10:48:56 |
| 10 | You create a scatter plot that compares the | 10:49:00 |
| 11 | vote -- the vote totals for a candidate against | 10:49:03 |
| 12 | the demographic information of the precincts, and | 10:49:07 |
| 13 | then you draw a best-fit regression line through | 10:49:10 |
| 14 | that data that accounts for all of the data points | 10:49:13 |
| 15 | on that scatter plot, not just the extreme cases. | 10:49:17 |
| 16 | Q    Is one of the advantages of ecological | 10:49:21 |
| 17 | regression that you can quote/unquote check your | 10:49:23 |
| 18 | data with the hom- -- homogeneous precinct | 10:49:26 |
| 19 | analysis? | 10:49:29 |
| 20 | A    Yes. | 10:49:30 |
| 21 | Q    Are you able to do that in this | 10:49:38 |
| 22 | instance? | 10:49:40 |

Transcript of Douglas Spencer, Ph.D.
Conducted on October 1, 2019                                        57

| | | | |
|---|---|---|---|
| 1 | A | What do you mean am I able? | 10:49:43 |
| 2 | Q | In the Vir- -- in the Virginia Beach | 10:49:45 |
| 3 | analysis for the original report, were you able to | | 10:49:46 |
| 4 | check your ecological regression point estimates | | 10:49:50 |
| 5 | against the homogeneous precinct analysis and | | 10:49:55 |
| 6 | determine with confidence that it confirms the | | 10:50:00 |
| 7 | reliability of the ecological regression data? | | 10:50:03 |
| 8 | A | Yes. | 10:50:06 |
| 9 | Q | What are the strengths of ecological | 10:50:07 |
| 10 | regression? | | 10:50:16 |
| 11 | A | It's graphical simplicity. | 10:50:17 |
| 12 | Q | Are -- | 10:50:21 |
| 13 | A | It's easy to see. | 10:50:21 |
| 14 | Q | Sorry. | 10:50:22 |
| 15 | | Are there other strengths? | 10:50:23 |
| 16 | A | It utilizes information from every | 10:50:24 |
| 17 | precinct that you're evaluating, not just the | | 10:50:27 |
| 18 | extreme precincts. | | 10:50:31 |
| 19 | Q | Are there limitations or weaknesses in | 10:50:32 |
| 20 | ecological regression as a methodology here? | | 10:50:36 |
| 21 | A | The weaknesses of ecological regression | 10:50:39 |
| 22 | are the weaknesses of regression in general, which | | 10:50:41 |

Transcript of Douglas Spencer, Ph.D.
Conducted on October 1, 2019                     58

| | | |
|---|---|---|
| 1 | is we're extrapolating from data to make | 10:50:44 |
| 2 | estimates, and that's probably the primary | 10:50:48 |
| 3 | weakness. | 10:50:55 |
| 4 | Q    You say in your report that one | 10:51:00 |
| 5 | limitation of ecological regression is its | 10:51:14 |
| 6 | reliance on linear regression, which can be | 10:51:16 |
| 7 | negative or exceed 100 percent, adding some | 10:51:19 |
| 8 | confusion to the model's practical interpretation. | 10:51:22 |
| 9 | What do you mean by that sentence? | 10:51:27 |
| 10 | A    So the extrap- -- this problem I | 10:51:29 |
| 11 | pointed out of extrapolation means that wherever | 10:51:31 |
| 12 | the data stop, at 60 percent, 70 percent, | 10:51:35 |
| 13 | 80 percent, the line will continue on until it | 10:51:38 |
| 14 | gets to a hundred.  And if the slope is too steep, | 10:51:41 |
| 15 | it shows clear evidence that the groups are | 10:51:45 |
| 16 | different, but the line, by extrapolating, which | 10:51:47 |
| 17 | is this weakness, might reach 105 percent or | 10:51:50 |
| 18 | 110 percent. | 10:51:54 |
| 19 | Q    You also say that ecological regression | 10:51:57 |
| 20 | can also be misleading when the underlying data do | 10:51:59 |
| 21 | not have a linear relationship? | 10:52:02 |
| 22 | A    That's correct. | 10:52:04 |

PLANET DEPOS
888.433.3767 | WWW.PLANETDEPOS.COM

Transcript of Douglas Spencer, Ph.D.
Conducted on October 1, 2019                              59

| | | |
|---|---|---|
| 1 | Q     How do you determine whether or not the | 10:52:05 |
| 2 | underlying data have a linear relationship in | 10:52:07 |
| 3 | ecological regression? | 10:52:10 |
| 4 | A     By plotting a linear line through the | 10:52:11 |
| 5 | data and seeing if it's statistically | 10:52:14 |
| 6 | significantly sloped. | 10:52:20 |
| 7 | Q     Is there a scientific process for | 10:52:21 |
| 8 | determining whether that line actually fits or | 10:52:23 |
| 9 | is -- do you eyeball it?  How do you know that | 10:52:25 |
| 10 | it's a legitimate line-drawing exercise for the | 10:52:29 |
| 11 | scatter plot? | 10:52:33 |
| 12 | A     Well, if the estimates that it produces | 10:52:34 |
| 13 | are statistically different, that's a first way to | 10:52:37 |
| 14 | suggest that the data actually are linear, because | 10:52:40 |
| 15 | the line you've drawn represents them.  And | 10:52:42 |
| 16 | there -- there are a number of ways, I suppose, to | 10:52:48 |
| 17 | run placebo tests, which I've done some but not in | 10:52:52 |
| 18 | this report. | 10:52:57 |
| 19 | But the general idea is you run a line | 10:52:58 |
| 20 | through the data, and if you get -- if you don't | 10:53:00 |
| 21 | get a statistically different answer, there may be | 10:53:03 |
| 22 | a couple reasons.  One, your data may not be | 10:53:06 |

Transcript of Douglas Spencer, Ph.D.
Conducted on October 1, 2019                              60

| | | |
|---|---|---|
| 1 | linear, and so the fact that you do get a | 10:53:09 |
| 2 | statistically significant difference is a good | 10:53:09 |
| 3 | indicator that the data are linear. | 10:53:11 |
| 4 | Q    And in the Virginia Beach instance in | 10:53:13 |
| 5 | your original report, did you find any evidence | 10:53:16 |
| 6 | that any of your data was not linear? | 10:53:18 |
| 7 | A    No. | 10:53:21 |
| 8 | Q    So you say then, "To address this | 10:53:29 |
| 9 | problem, I turn to a third method that has become | 10:53:30 |
| 10 | the gold-standard for evaluating racially | 10:53:33 |
| 11 | polarized voting in Voting Rights Act litigation: | 10:53:35 |
| 12 | ecological inference." | 10:53:39 |
| 13 | Are you addressing a problem in | 10:53:40 |
| 14 | Virginia Beach that you did not encounter in | 10:53:42 |
| 15 | Virginia Beach? | 10:53:45 |
| 16 | MS. HARLESS:  Objection to form. | 10:53:45 |
| 17 | BY MR. BOYNTON: | 10:53:48 |
| 18 | Q    I'm trying to compare the prior | 10:53:48 |
| 19 | sentence to the last sentence, which is, you say | 10:53:49 |
| 20 | that ecological regression can be misleading when | 10:53:52 |
| 21 | the underlying data do not have a linear | 10:53:56 |
| 22 | relationship. | 10:53:58 |

Transcript of Douglas Spencer, Ph.D.
Conducted on October 1, 2019                    61

| | | |
|---|---|---|
| 1 | You've testified, as I understand it, | 10:53:58 |
| 2 | that the data you looked at for Virginia Beach did | 10:54:01 |
| 3 | not have that problem, correct? | 10:54:03 |
| 4 | A    That's correct. | 10:54:05 |
| 5 | Q    So in addressing this problem, you're | 10:54:06 |
| 6 | addressing a problem that did not exist, correct? | 10:54:08 |
| 7 | A    That's correct.  I'm adding | 10:54:11 |
| 8 | confirmation. | 10:54:12 |
| 9 | Q    And your confirmation is ecological | 10:54:15 |
| 10 | inference? | 10:54:17 |
| 11 | A    That's correct. | 10:54:17 |
| 12 | Q    And you call that the gold standard? | 10:54:18 |
| 13 | A    Yes. | 10:54:20 |
| 14 | Q    What informs you that ecological | 10:54:20 |
| 15 | inference is the gold standard for evaluating | 10:54:22 |
| 16 | racially polarized voting in Virginia Beach or in | 10:54:26 |
| 17 | Voting Rights Act cases generally? | 10:54:31 |
| 18 | A    I have seen the method referred that | 10:54:33 |
| 19 | way in literature -- political science literature | 10:54:35 |
| 20 | about voting rights. | 10:54:38 |
| 21 | Q    Can you tell me who has made that | 10:54:39 |
| 22 | reference that ecological inference is the gold | 10:54:41 |

PLANET DEPOS
888.433.3767 | WWW.PLANETDEPOS.COM

Transcript of Douglas Spencer, Ph.D.
Conducted on October 1, 2019                                    62

| | | |
|---|---|---|
| 1 | standard? | 10:54:44 |
| 2 | A    I've -- I can't cite to an article off | 10:54:44 |
| 3 | the top of my head.  I've heard that phrase from | 10:54:47 |
| 4 | Kevin Quinn.  I've heard that phrase from Robert | 10:54:50 |
| 5 | Rubin. | 10:54:53 |
| 6 | Q    Are they both still affiliated with | 10:55:00 |
| 7 | Berkeley? | 10:55:03 |
| 8 | A    No.  Robert was an adjunct professor, | 10:55:04 |
| 9 | who now, I think, may be retired and may be | 10:55:07 |
| 10 | private practice.  Kevin Quinn is now in the | 10:55:12 |
| 11 | Michigan Political Science Department. | 10:55:14 |
| 12 | Q    University of Michigan? | 10:55:17 |
| 13 | A    University of Michigan. | 10:55:18 |
| 14 | Maybe jointly in the Statistics | 10:55:20 |
| 15 | Department.  I don't know. | 10:55:22 |
| 16 | Q    Can you tell me -- and I know you also | 10:55:24 |
| 17 | are a lawyer -- what cases that ecological | 10:55:27 |
| 18 | inference has been approved of as a methodology in | 10:55:31 |
| 19 | Voting Rights Act cases? | 10:55:38 |
| 20 | A    I don't know that off the top of my | 10:55:38 |
| 21 | head. | 10:55:39 |
| 22 | Q    Okay.  Are you aware if there are any | 10:55:40 |

Transcript of Douglas Spencer, Ph.D.
Conducted on October 1, 2019                    63

| | | |
|---|---|---|
| 1 | Supreme Court of the United States cases that | 10:55:43 |
| 2 | affirm the use of ecological inference? | 10:55:45 |
| 3 | A    I don't know that off the top of my | 10:55:49 |
| 4 | head. | 10:55:49 |
| 5 | Q    Are you aware if there are any Circuit | 10:55:50 |
| 6 | Court of Appeals in the federal circuits that have | 10:55:52 |
| 7 | affirmed the use of ecological inference? | 10:55:55 |
| 8 | A    I can't speak reliably to that.  I know | 10:56:02 |
| 9 | that I've read expert reports that use ecological | 10:56:05 |
| 10 | inference.  I don't remember the cases they were | 10:56:08 |
| 11 | involved in. | 10:56:10 |
| 12 | Q    Fair enough. | 10:56:12 |
| 13 | Do you recall who else has used | 10:56:13 |
| 14 | ecological inference in the expert reports you've | 10:56:15 |
| 15 | reviewed? | 10:56:17 |
| 16 | A    I can't -- I can't think right now off | 10:56:22 |
| 17 | the top of my head. | 10:56:24 |
| 18 | Q    And these are the three methodologies | 10:56:37 |
| 19 | you utilized for your original expert report on or | 10:56:39 |
| 20 | before July 15th, correct? | 10:56:44 |
| 21 | A    That's correct. | 10:56:44 |
| 22 | Q    You did not do equivalence testing for | 10:56:45 |

Transcript of Douglas Spencer, Ph.D.
Conducted on October 1, 2019                                    64

| 1 | your original report, correct? | 10:56:47 |
|---|---|---|
| 2 | A      That's correct. | 10:56:49 |
| 3 | Q      Okay.  So that's a process that you | 10:56:49 |
| 4 | employed after July 15th, 2019? | 10:56:51 |
| 5 | A      Correct. | 10:56:54 |
| 6 | MR. BOYNTON:  Do you want to take a | 10:56:59 |
| 7 | break?  It doesn't matter, but -- | 10:57:00 |
| 8 | MR. HEBERT:  If it suits you, sure. | 10:57:04 |
| 9 | MR. BOYNTON:  It suits me.  Thank you, | 10:57:06 |
| 10 | sir. | 10:57:07 |
| 11 | THE VIDEOGRAPHER:  Please stand by. | 10:57:08 |
| 12 | We are going off the record.  The time | 10:57:09 |
| 13 | is 10:56 a.m. | 10:57:11 |
| 14 | (A recess was taken.) | 10:57:13 |
| 15 | THE VIDEOGRAPHER:  We are back on the | 11:04:32 |
| 16 | record.  The time is 11:03 a.m. | 11:04:33 |
| 17 | BY MR. BOYNTON: | 11:04:36 |
| 18 | Q      Dr. Spencer, a couple cleanup questions | 11:04:38 |
| 19 | with respect to just your process in generating | 11:04:42 |
| 20 | this report. | 11:04:45 |
| 21 | First of all, how many hours did you | 11:04:46 |
| 22 | spend preparing the original report? | 11:04:47 |

Transcript of Douglas Spencer, Ph.D.
Conducted on October 1, 2019                    65

| | | | |
|---|---|---|---|
| 1 | A | I think something like 35 or 40. | 11:04:50 |
| 2 | Q | What -- what source -- what written | 11:04:53 |
| 3 | sources did you consider as informing your | | 11:04:55 |
| 4 | original report? | | 11:04:59 |
| 5 | A | The written sources I relied on I cited | 11:05:00 |
| 6 | in the footnotes. | | 11:05:04 |
| 7 | Q | There's nothing outside of the | 11:05:05 |
| 8 | footnotes that you relied on or considered in | | 11:05:08 |
| 9 | this -- in the preparation of this original | | 11:05:10 |
| 10 | report? | | 11:05:11 |
| 11 | A | Not that contributed to the substance. | 11:05:12 |
| 12 | Q | Fair enough. | 11:05:15 |
| 13 | | Did you have any assistance with the | 11:05:17 |
| 14 | preparation of your report? | | 11:05:19 |
| 15 | A | I did not. | 11:05:20 |
| 16 | Q | You don't have a research assistant or | 11:05:21 |
| 17 | anybody to do work for you that -- that -- even if | | 11:05:23 |
| 18 | it's just collecting materials? | | 11:05:26 |
| 19 | A | No. | 11:05:28 |
| 20 | Q | This is 100 percent your work? | 11:05:28 |
| 21 | A | Yes. | 11:05:30 |
| 22 | Q | Okay.  Without giving me the substance | 11:05:31 |

Transcript of Douglas Spencer, Ph.D.
Conducted on October 1, 2019                          66

| | | |
|---|---|---|
| 1 | of any conversations, who did you speak with in | 11:05:34 |
| 2 | informing yourself about this report? | 11:05:36 |
| 3 | A    In addition to counsel? | 11:05:42 |
| 4 | Q    Yeah, separate from counsel.  I | 11:05:43 |
| 5 | don't -- | 11:05:45 |
| 6 | A    I exchanged e-mails with the GIS | 11:05:48 |
| 7 | department in Virginia Beach -- | 11:05:53 |
| 8 | Q    I saw that. | 11:05:54 |
| 9 | A    -- as part of -- I disclosed that. | 11:05:54 |
| 10 | Q    Appendix B? | 11:05:56 |
| 11 | (The reporter clarified the record.) | 11:05:56 |
| 12 | BY MR. BOYNTON: | 11:05:58 |
| 13 | Q    Appendix B?  I'm just -- | 11:05:59 |
| 14 | A    Appendix B of response. | 11:06:01 |
| 15 | I think that's all. | 11:06:03 |
| 16 | Q    Did you speak with any of Plaintiffs' | 11:06:05 |
| 17 | experts in the case? | 11:06:08 |
| 18 | MS. HARLESS:  Objection to -- | 11:06:11 |
| 19 | MR. BOYNTON:  I'm not asking for | 11:06:12 |
| 20 | content.  I'm just asking if he spoke with them. | 11:06:13 |
| 21 | THE WITNESS:  No. | 11:06:17 |
| 22 | BY MR. BOYNTON: | 11:06:17 |

Transcript of Douglas Spencer, Ph.D.
Conducted on October 1, 2019                          67

| | | |
|---|---|---|
| 1 | Q    Okay.  And that includes electronic | 11:06:17 |
| 2 | communications? | 11:06:20 |
| 3 | A    That includes -- yes, that -- I did not | 11:06:21 |
| 4 | communicate with any experts. | 11:06:23 |
| 5 | Q    Fair enough. | 11:06:24 |
| 6 | And that is all in regard to the | 11:06:25 |
| 7 | original report, correct? | 11:06:27 |
| 8 | A    Correct. | 11:06:29 |
| 9 | Q    Okay.  Does that change with respect to | 11:06:29 |
| 10 | the rebuttal report? | 11:06:31 |
| 11 | A    No. | 11:06:34 |
| 12 | Q    Okay.  Explain to me King's ecological | 11:06:34 |
| 13 | inference method.  Have fun with that. | 11:06:44 |
| 14 | A    Well -- | 11:06:51 |
| 15 | Q    He (indicating) wrote that one.  He's | 11:06:53 |
| 16 | been loving it. | 11:06:54 |
| 17 | A    To the best that I can, as I mentioned | 11:06:56 |
| 18 | earlier, the primary contribution of this method | 11:07:03 |
| 19 | is to compare the vote totals of white voters and | 11:07:06 |
| 20 | the vote totals of non-white voters directly to | 11:07:11 |
| 21 | each other in homogeneous precinct analysis and | 11:07:15 |
| 22 | ecological regression. | 11:07:19 |

Transcript of Douglas Spencer, Ph.D.
Conducted on October 1, 2019                    68

| | | |
|---|---|---|
| 1 | Each of those estimates is generated in | 11:07:20 |
| 2 | its own way separately, and this combines those | 11:07:23 |
| 3 | into the same model in generating a relation- -- a | 11:07:26 |
| 4 | linear relationship, which is noted on page 6 of | 11:07:30 |
| 5 | the original report. | 11:07:33 |
| 6 | And the estimate for white or non-white | 11:07:37 |
| 7 | voting in a precinct is driven by the | 11:07:41 |
| 8 | relationship -- this linear relationship and | 11:07:43 |
| 9 | information about precincts that are nearby in | 11:07:47 |
| 10 | space. | 11:07:51 |
| 11 | Q    And under each of these three | 11:07:51 |
| 12 | methodologies, you were able to generate a -- or | 11:07:55 |
| 13 | generate multiple point estimates for black | 11:08:01 |
| 14 | support for various candidates, correct? | 11:08:04 |
| 15 | A    Correct. | 11:08:06 |
| 16 | Q    And under all three of these | 11:08:07 |
| 17 | methodologies, you were able to generate point | 11:08:09 |
| 18 | estimates for all-minority support, correct? | 11:08:13 |
| 19 | A    That's correct. | 11:08:17 |
| 20 | Q    You were not able to develop point | 11:08:17 |
| 21 | estimates under these three methodologies for | 11:08:19 |
| 22 | Asian support, correct? | 11:08:22 |

Transcript of Douglas Spencer, Ph.D.
Conducted on October 1, 2019                              69

| | | |
|---|---|---|
| 1 | A     That's correct. | 11:08:26 |
| 2 | Q     And you were not able to develop under | 11:08:26 |
| 3 | these three methodologies point estimates for | 11:08:29 |
| 4 | Hispanic support in Virginia Beach? | 11:08:35 |
| 5 | A     I did not, no. | 11:08:38 |
| 6 | Q     And that's because the information | 11:08:40 |
| 7 | available does not allow you to make a reliable | 11:08:41 |
| 8 | estimate, correct? | 11:08:43 |
| 9 | A     That's correct. | 11:08:44 |
| 10 | Q     Okay.  Why is that? | 11:08:44 |
| 11 | A     The homogeneous characteristic or | 11:08:48 |
| 12 | extreme characteristic does not exist for Hispanic | 11:08:54 |
| 13 | and Asian.  The population size is too small. | 11:08:58 |
| 14 | Q     And that applies to all three methods | 11:09:02 |
| 15 | or just to the homogeneous precinct analysis? | 11:09:05 |
| 16 | A     It applies to all three methods. | 11:09:07 |
| 17 | Q     The data -- the data available or | 11:09:09 |
| 18 | the -- rephrase. | 11:09:11 |
| 19 | You don't have a sufficient enough | 11:09:17 |
| 20 | concentration of Asian voters or Hispanic voters | 11:09:19 |
| 21 | in Virginia Beach to be able to reliably estimate | 11:09:23 |
| 22 | them using these three sources? | 11:09:26 |

Transcript of Douglas Spencer, Ph.D.
Conducted on October 1, 2019                         70

| | | |
|---|---|---|
| 1 | MS. HARLESS:  Objecting to form. | 11:09:28 |
| 2 | BY MR. BOYNTON: | 11:09:29 |
| 3 | Q     These three methods?  Sorry. | 11:09:30 |
| 4 | MS. HARLESS:  Objection to the form. | 11:09:35 |
| 5 | THE WITNESS:  I'm happy to answer, but | 11:09:36 |
| 6 | I'm just -- walk me through it one more time. | 11:09:38 |
| 7 | There's not a sufficient -- say that one more | 11:09:40 |
| 8 | time.  Sorry. | 11:09:44 |
| 9 | Q     Yeah, that's fine. | 11:09:45 |
| 10 | Do you -- can you reliably estimate | 11:09:49 |
| 11 | Asian or Hispanic -- I already established that. | 11:09:59 |
| 12 | I'm trying to get something else.  Sorry. | 11:10:01 |
| 13 | A     That's fine. | 11:10:04 |
| 14 | Q     Too many voices in my head. | 11:10:06 |
| 15 | Is it the lack of a sufficient | 11:10:08 |
| 16 | concentration of Asian voters in a small location | 11:10:15 |
| 17 | in Virginia Beach or multiple small locations that | 11:10:21 |
| 18 | prevent you from being able to have a reliable | 11:10:24 |
| 19 | estimate of those voters in Virginia Beach under | 11:10:27 |
| 20 | the three methods you used in your original | 11:10:31 |
| 21 | report? | 11:10:34 |
| 22 | MS. HARLESS:  Objection to form. | 11:10:34 |

Transcript of Douglas Spencer, Ph.D.
Conducted on October 1, 2019                    71

| | | |
|---|---|---|
| 1 | THE WITNESS:  I'm not sure I know | 11:10:37 |
| 2 | anything about their geographic dispersion, | 11:10:39 |
| 3 | where -- where -- where they're in multiple small | 11:10:41 |
| 4 | spots. | 11:10:45 |
| 5 | BY MR. BOYNTON: | 11:10:45 |
| 6 | Q    Well, what is it that prevents you from | 11:10:46 |
| 7 | being able to make an accurate estimate of | 11:10:47 |
| 8 | Hispanic or Asian voters in Virginia Beach under | 11:10:48 |
| 9 | those three methodologies? | 11:10:53 |
| 10 | A    There are no precincts where the | 11:10:53 |
| 11 | population size of Hispanic and Asian is larger | 11:10:56 |
| 12 | than 15 or 20 percent. | 11:11:01 |
| 13 | Q    Thank you.  That took us a while. | 11:11:01 |
| 14 | Sorry.  That's my fault. | 11:11:08 |
| 15 | So then we get into your determination | 11:11:15 |
| 16 | of probative races, correct? | 11:11:17 |
| 17 | A    Correct. | 11:11:20 |
| 18 | Q    I'll say probative elections.  That's | 11:11:21 |
| 19 | probably a better term. | 11:11:22 |
| 20 | A    Yep. | 11:11:24 |
| 21 | Q    And how many probative -- well, first | 11:11:24 |
| 22 | of all, what was your definition of a probative | 11:11:26 |

Transcript of Douglas Spencer, Ph.D.
Conducted on October 1, 2019                                    72

| | | |
|---|---|---|
| 1 | election for the original report? | 11:11:29 |
| 2 | A     I began by looking at races that began | 11:11:35 |
| 3 | in 2008 and more recent, because that's when the | 11:11:39 |
| 4 | precinct-level data were publicly available at the | 11:11:43 |
| 5 | election site.  I identified all races -- all | 11:11:47 |
| 6 | elections where there was a minority candidate | 11:11:52 |
| 7 | running in the election as the starting point for | 11:11:55 |
| 8 | which elections would be probative. | 11:12:00 |
| 9 | Q     And how many elections did you find | 11:12:03 |
| 10 | that featured a minority candidate running for | 11:12:04 |
| 11 | office and City Council of Virginia Beach between | 11:12:09 |
| 12 | 2008 and 2018? | 11:12:11 |
| 13 | A     I should know this number off the top | 11:12:16 |
| 14 | of my head, but let me look. | 11:12:17 |
| 15 | I'll say 19 minority candidates in that | 11:12:44 |
| 16 | time period. | 11:12:46 |
| 17 | Q     All things being equal, are -- for your | 11:12:52 |
| 18 | purposes, using these three methodologies, are | 11:12:57 |
| 19 | more recent elections more probative or are older | 11:13:00 |
| 20 | elections more probative? | 11:13:04 |
| 21 | A     The timing does not dictate the | 11:13:08 |
| 22 | probativeness except to the extent that my goal | 11:13:11 |

Transcript of Douglas Spencer, Ph.D.
Conducted on October 1, 2019                    73

| | | |
|---|---|---|
| 1 | is -- my -- my purpose in evaluating is to see | 11:13:15 |
| 2 | whether there's a pattern, not a one-time effect. | 11:13:18 |
| 3 | Q     Fair enough. | 11:13:21 |
| 4 | Are you aware of which races -- I'm | 11:13:21 |
| 5 | sorry, which elections occurred after the re- -- | 11:13:23 |
| 6 | the last redistricting in Virginia Beach in which | 11:13:27 |
| 7 | these elections occurred before the last | 11:13:31 |
| 8 | redistricting? | 11:13:33 |
| 9 | A     I'm not.  I presume the redistricting | 11:13:35 |
| 10 | happened in 2010. | 11:13:41 |
| 11 | Q     Are you aware of which elections | 11:13:43 |
| 12 | occurred after the last census in Virginia Beach | 11:13:45 |
| 13 | versus prior to the last census? | 11:13:48 |
| 14 | A     The last decennial census?  Yeah, the | 11:13:51 |
| 15 | elections after 2010. | 11:13:56 |
| 16 | Q     Do you find that races -- I'm sorry, | 11:14:01 |
| 17 | elections that occurred after the last census was | 11:14:03 |
| 18 | taken are more probative than elections that | 11:14:07 |
| 19 | occurred before the last census was taken? | 11:14:09 |
| 20 | A     No, I do not. | 11:14:13 |
| 21 | Q     You would agree that the demographic | 11:14:26 |
| 22 | information post-2010 census is likely to be more | 11:14:30 |

Transcript of Douglas Spencer, Ph.D.
Conducted on October 1, 2019                    74

| | | |
|---|---|---|
| 1 | accurate from your purposes than that that is | 11:14:39 |
| 2 | before for current day? | 11:14:43 |
| 3 | A     That's actually not -- | 11:14:44 |
| 4 | MS. HARLESS:  Objection to form. | 11:14:46 |
| 5 | THE WITNESS:  Sorry. | 11:14:46 |
| 6 | MS. HARLESS:  Sorry. | 11:14:46 |
| 7 | BY MR. BOYNTON: | 11:14:47 |
| 8 | Q     You can answer. | 11:14:47 |
| 9 | A     No, that's not the case, because the | 11:14:49 |
| 10 | data I rely on come from the American Community | 11:14:51 |
| 11 | Survey, which is administered every year. | 11:14:53 |
| 12 | Q     Fair enough. | 11:14:56 |
| 13 | Did you rely on any census date in | 11:14:57 |
| 14 | this, or just ACS? | 11:15:01 |
| 15 | A     So my understanding is the ACS is a | 11:15:02 |
| 16 | census product of census data but not the | 11:15:04 |
| 17 | decennial census information, the -- the short | 11:15:06 |
| 18 | form. | 11:15:09 |
| 19 | Q     Did you rely on any information from | 11:15:10 |
| 20 | the decennial census from 2010? | 11:15:11 |
| 21 | A     I don't think so.  I'll clarify.  Not | 11:15:17 |
| 22 | for my homogeneous precincts, ecological | 11:15:21 |

Transcript of Douglas Spencer, Ph.D.
Conducted on October 1, 2019                                      75

| | | |
|---|---|---|
| 1 | regression, and ecological inference.  It may be | 11:15:26 |
| 2 | the case when I summarized the overall statistics | 11:15:28 |
| 3 | of what happens in Virginia Beach, that may have | 11:15:30 |
| 4 | come from the long form -- or, excuse me, the | 11:15:33 |
| 5 | decennial census. | 11:15:39 |
| 6 | Q    Directing your attention to page 11 of | 11:15:41 |
| 7 | your original report -- | 11:15:43 |
| 8 | A    Yes. | 11:15:54 |
| 9 | Q    -- you have a chart there that calls | 11:15:54 |
| 10 | out various races -- I'm sorry, various elections, | 11:15:56 |
| 11 | and in 2018 you mention the Princess Anne race as | 11:16:00 |
| 12 | having a coalition. | 11:16:04 |
| 13 | Did you perhaps mean the Centerville | 11:16:06 |
| 14 | race there? | 11:16:08 |
| 15 | A    Yes.  And the 2018 race here was | 11:16:08 |
| 16 | provisional, and some of the final resolution of | 11:16:16 |
| 17 | that case was pending. | 11:16:19 |
| 18 | Q    In July of 2019? | 11:16:20 |
| 19 | A    If I remember correctly, when I | 11:16:22 |
| 20 | submitted the report, I didn't know the resolution | 11:16:24 |
| 21 | of that election. | 11:16:26 |
| 22 | Q    Okay.  But -- but when you refer to | 11:16:28 |

Transcript of Douglas Spencer, Ph.D.
Conducted on October 1, 2019                                76

| | | |
|---|---|---|
| 1 | Princess Anne, the race that you follow up with on | 11:16:31 |
| 2 | the next page is actually Centerville? | 11:16:34 |
| 3 | A    Yes.  That's a typo -- | 11:16:36 |
| 4 | Q    Okay. | 11:16:38 |
| 5 | A    -- I believe.  Let me check just to | 11:16:38 |
| 6 | confirm. | 11:16:40 |
| 7 | Yes, that's a typo. | 11:16:43 |
| 8 | Q    Okay.  You reviewed the Centerville | 11:16:52 |
| 9 | race that had -- I'm sorry, the Centerville | 11:16:54 |
| 10 | election that had how many candidates? | 11:16:56 |
| 11 | A    Three candidates. | 11:17:01 |
| 12 | Q    In 2018.  Sorry, I can be more specific | 11:17:02 |
| 13 | if that's helpful. | 11:17:04 |
| 14 | And how many of those candidates were | 11:17:05 |
| 15 | minority candidates? | 11:17:07 |
| 16 | A    Two. | 11:17:08 |
| 17 | Q    Who were those candidates? | 11:17:08 |
| 18 | A    Sabrina Wooten, and I think Eric Wray. | 11:17:12 |
| 19 | Q    Did you determine that one candidate or | 11:17:17 |
| 20 | more in that race was a minority candidate of | 11:17:19 |
| 21 | choice? | 11:17:22 |
| 22 | A    Yes. | 11:17:23 |

Transcript of Douglas Spencer, Ph.D.
Conducted on October 1, 2019                    77

| | | | |
|---|---|---|---|
| 1 | Q | Who was that person? | 11:17:23 |
| 2 | A | Sabrina Wooten. | 11:17:25 |
| 3 | Q | What is a minority candidate of choice | 11:17:26 |
| 4 | | from your perspective? | 11:17:28 |
| 5 | A | Minority candidate of choice is the | 11:17:32 |
| 6 | | most preferred candidate among a particular | 11:17:34 |
| 7 | | minority population. | 11:17:37 |
| 8 | Q | Do you use the terms "minority | 11:17:39 |
| 9 | | preferred" and "minority candidate of choice" | 11:17:41 |
| 10 | | interchangeably in this or other reports? | 11:17:43 |
| 11 | A | Yes. | 11:17:47 |
| 12 | Q | Okay.  Going back to page 11 just for a | 11:17:48 |
| 13 | | second -- | 11:17:55 |
| 14 | A | Uh-huh. | 11:17:55 |
| 15 | Q | -- you make in your chart a column for | 11:17:56 |
| 16 | | minority coalition and a column for minority | 11:18:02 |
| 17 | | cohesion. | 11:18:05 |
| 18 | | Tell me what the difference is in those | 11:18:07 |
| 19 | | two terms from your perspective preparing this | 11:18:09 |
| 20 | | chart. | 11:18:12 |
| 21 | A | The cohesion column represents that | 11:18:22 |
| 22 | | there is minority-preferred candidate in a race. | 11:18:27 |

Transcript of Douglas Spencer, Ph.D.
Conducted on October 1, 2019                                    78

| | | |
|---|---|---|
| 1 | The coalition shows that that is an estimate in | 11:18:35 |
| 2 | this all-minority row of these tables. | 11:18:39 |
| 3 | Q    And you say "these tables."  You're | 11:18:43 |
| 4 | looking at page 14? | 11:18:46 |
| 5 | A    The tables that exist on page 14 and | 11:18:47 |
| 6 | 16, et cetera. | 11:18:52 |
| 7 | Q    So help me understand.  The Centerville | 11:18:53 |
| 8 | race had a minority candidate of choice, correct? | 11:18:59 |
| 9 | A    That's correct. | 11:19:03 |
| 10 | Q    So that would check the cohesion box | 11:19:05 |
| 11 | for that race, correct? | 11:19:07 |
| 12 | A    Correct. | 11:19:09 |
| 13 | Q    But that box isn't checked on your | 11:19:10 |
| 14 | report? | 11:19:12 |
| 15 | A    That's correct.  That's wrong. | 11:19:14 |
| 16 | Q    Okay.  And so what -- now, help me | 11:19:16 |
| 17 | understand why you checked the coalition box for | 11:19:20 |
| 18 | that race. | 11:19:23 |
| 19 | A    When the -- when I began writing this | 11:19:27 |
| 20 | table -- it's not as clear as I would have liked. | 11:19:32 |
| 21 | The idea was to show that the all-minority | 11:19:35 |
| 22 | estimate was also in support of the same | 11:19:40 |

| | | |
|---|---|---|
| 1 | minority-preferred candidate as the black-voter | 11:19:45 |
| 2 | estimate. | 11:19:48 |
| 3 | Q    So you are saying minority -- for | 11:19:51 |
| 4 | cohesion, you have a check for both black and all | 11:19:56 |
| 5 | minority, but for coalition, you just have one | 11:20:01 |
| 6 | check, or am I totally misunderstanding it? | 11:20:04 |
| 7 | A    No.  I think the understanding is that | 11:20:07 |
| 8 | the cohesion column represents the co- -- the | 11:20:08 |
| 9 | minority-preferred candidate of black voters, and | 11:20:14 |
| 10 | the coalition shows when the minority-preferred | 11:20:17 |
| 11 | candidate of all minority voters supports that. | 11:20:21 |
| 12 | Q    Okay.  So, for example, for | 11:20:26 |
| 13 | Ms. Wooten's race on page 14 -- Ms. Wooten's | 11:20:30 |
| 14 | campaign on page 14 -- | 11:20:35 |
| 15 | A    Yeah. | 11:20:36 |
| 16 | Q    -- the top check is that she was the | 11:20:36 |
| 17 | minority candidate of choice for black voters? | 11:20:40 |
| 18 | A    That's correct. | 11:20:42 |
| 19 | Q    So that would identify cohesion? | 11:20:43 |
| 20 | A    Under this -- | 11:20:46 |
| 21 | Q    Chart? | 11:20:47 |
| 22 | A    -- chart. | 11:20:47 |

Transcript of Douglas Spencer, Ph.D.
Conducted on October 1, 2019                              80

| | | |
|---|---|---|
| 1 | Q    And the fact that there's a second | 11:20:49 |
| 2 | check next to "All Minority" for Ms. Wooten in the | 11:20:50 |
| 3 | Centerville election means that there is also a | 11:20:54 |
| 4 | coalition? | 11:21:00 |
| 5 | A    That is the -- that was the purpose of | 11:21:01 |
| 6 | building this table. | 11:21:02 |
| 7 | Q    Okay.  The table on page 11? | 11:21:03 |
| 8 | A    On page 11. | 11:21:06 |
| 9 | Q    Okay.  Now, for the 2018 at-large | 11:21:06 |
| 10 | races, I think you've acknowledged in your | 11:21:25 |
| 11 | rebuttal report that the numbers for HP, ER, and | 11:21:31 |
| 12 | EI all need to be doubled for each candidate? | 11:21:35 |
| 13 | A    That's correct. | 11:21:38 |
| 14 | Q    And why is that? | 11:21:38 |
| 15 | A    Because there were two candidates | 11:21:41 |
| 16 | chosen, which I note, and so the vote -- because | 11:21:43 |
| 17 | each person voting for that seat could vote | 11:21:47 |
| 18 | basically for two people, the total sum should | 11:21:50 |
| 19 | equal 200 percent, not 100 percent. | 11:21:54 |
| 20 | Q    What did you do in your three | 11:21:57 |
| 21 | methodologies to account for the possibility of | 11:21:58 |
| 22 | certain voters voting for just one candidate when | 11:22:04 |

Transcript of Douglas Spencer, Ph.D.
Conducted on October 1, 2019                              81

| | | |
|---|---|---|
| 1 | they could have voted for two in the at-large | 11:22:08 |
| 2 | races? | 11:22:12 |
| 3 | A    Here, I did -- I did nothing. | 11:22:14 |
| 4 | Q    Okay.  When you updated the at-large | 11:22:15 |
| 5 | election estimates for HP, ER, and EI in the | 11:22:30 |
| 6 | appendix of your rebuttal report to reflect the | 11:22:37 |
| 7 | two seats, did you make any adjustment or factor | 11:22:41 |
| 8 | in in any way at that point in time the | 11:22:45 |
| 9 | possibility of voters voting for just one | 11:22:49 |
| 10 | candidate when they could have voted for two in | 11:22:51 |
| 11 | that at-large race? | 11:22:53 |
| 12 | A    Yes, to the extent that the denominator | 11:22:55 |
| 13 | is the total votes that were cast in that race. | 11:22:58 |
| 14 | Q    But beyond that, there was no type of | 11:23:03 |
| 15 | offset? | 11:23:06 |
| 16 | A    I don't know what "offset" means, but | 11:23:07 |
| 17 | the total number of votes cast would capture how | 11:23:09 |
| 18 | many votes were actually cast.  And if there was | 11:23:12 |
| 19 | only one cast instead of two, it would be | 11:23:15 |
| 20 | reflected in that, which would then go into the | 11:23:18 |
| 21 | ratio that this represents. | 11:23:21 |
| 22 | Q    Okay.  You conclude for 2018 that there | 11:23:22 |

Transcript of Douglas Spencer, Ph.D.
Conducted on October 1, 2019                                    82

| | | |
|---|---|---|
| 1 | are three probative races, correct, two at-large | 11:23:32 |
| 2 | seats and one Centerville seat? | 11:23:40 |
| 3 | A    Correct. | 11:23:43 |
| 4 | Q    And you find three minority candidates | 11:23:44 |
| 5 | of choice for the 2018 election, correct? | 11:23:47 |
| 6 | A    Correct. | 11:23:53 |
| 7 | Q    And both minor- -- or, I'm sorry, two | 11:23:53 |
| 8 | of the three minority candidates of choice | 11:23:55 |
| 9 | prevailed in that election, correct? | 11:23:58 |
| 10 | A    Correct. | 11:24:00 |
| 11 | Q    And the one who did not prevail was | 11:24:00 |
| 12 | Ms. White? | 11:24:02 |
| 13 | A    Correct. | 11:24:03 |
| 14 | Q    Okay.  And do you know her actual race? | 11:24:03 |
| 15 | A    I believe that she's white. | 11:24:08 |
| 16 | Q    Okay.  And you understand that | 11:24:10 |
| 17 | Mr. Rouse and Ms. Wooten are African-American? | 11:24:12 |
| 18 | A    Yes. | 11:24:19 |
| 19 | Q    Okay.  Did you do any analysis of | 11:24:19 |
| 20 | whether the 2018 election presented any type of | 11:24:22 |
| 21 | special circumstances that would negate the | 11:24:26 |
| 22 | victories by Mr. Rouse and Ms. Wooten as minority | 11:24:32 |

Transcript of Douglas Spencer, Ph.D.
Conducted on October 1, 2019                              83

| | | |
|---|---|---|
| 1 | candidates of choice? | 11:24:37 |
| 2 | MS. HARLESS:  Object to form. | 11:24:38 |
| 3 | THE WITNESS:  I -- the -- that were | 11:24:40 |
| 4 | special, you said? | 11:24:46 |
| 5 | BY MR. BOYNTON: | 11:24:47 |
| 6 | Q     Okay.  Well, I can try to rephrase. | 11:24:47 |
| 7 | A     Yeah. | 11:24:50 |
| 8 | Q     Is there anything about the 2018 | 11:24:50 |
| 9 | election that you studied that led you to devalue | 11:24:51 |
| 10 | the import of the 2018 election? | 11:24:55 |
| 11 | A     I don't know about whether it devalues, | 11:25:02 |
| 12 | but I can tell you some things that were different | 11:25:05 |
| 13 | about the 2018 race. | 11:25:07 |
| 14 | Q     Go right ahead, please. | 11:25:10 |
| 15 | A     As I note on page 12, Ms. Wooten is the | 11:25:12 |
| 16 | only candidate in the entire time period that I | 11:25:17 |
| 17 | studied who earned a majority of white support, | 11:25:19 |
| 18 | which stuck out to me as different.  Her support | 11:25:24 |
| 19 | was about three times the average of the average | 11:25:29 |
| 20 | white support for minority candidates during that | 11:25:33 |
| 21 | period. | 11:25:37 |
| 22 | Let me go back to this table. | 11:25:43 |

Transcript of Douglas Spencer, Ph.D.
Conducted on October 1, 2019                    84

| | | |
|---|---|---|
| 1 | Mr. Rouse also was supported by a lot of crossover | 11:25:55 |
| 2 | voting, more than expected for a race with six | 11:26:00 |
| 3 | candidates.  So that -- that -- that sticks out to | 11:26:04 |
| 4 | me as different, if that's what you're asking. | 11:26:09 |
| 5 | Q    But nothing led you to not consider | 11:26:11 |
| 6 | those races to be probative? | 11:26:12 |
| 7 | MS. HARLESS:  Objection to form. | 11:26:14 |
| 8 | BY MR. BOYNTON: | 11:26:16 |
| 9 | Q    You deemed those three races as | 11:26:16 |
| 10 | probative races, correct?  That's what your report | 11:26:19 |
| 11 | says? | 11:26:22 |
| 12 | A    Yes. | 11:26:22 |
| 13 | Q    And you deemed Mr. Rouse and Ms. Wooten | 11:26:22 |
| 14 | to be minority candidates of choice in your | 11:26:24 |
| 15 | original report? | 11:26:27 |
| 16 | A    That's correct. | 11:26:28 |
| 17 | Q    Okay.  Turning to the 2016 Kempsville | 11:26:28 |
| 18 | election, page 16 -- | 11:26:38 |
| 19 | A    Uh-huh. | 11:26:49 |
| 20 | Q    -- did you find two probative races for | 11:26:49 |
| 21 | 2016? | 11:26:53 |
| 22 | A    I found the Kempsville race to be | 11:26:58 |

Transcript of Douglas Spencer, Ph.D.
Conducted on October 1, 2019                                          85

| # | | Time |
|---|---|---|
| 1 | probative and not the mayoral race. | 11:27:00 |
| 2 | Q       So why are you calling out on page 16 | 11:27:06 |
| 3 | the mayor's race under your "All Probative Races" | 11:27:09 |
| 4 | header? | 11:27:14 |
| 5 | A       So the starting point for my probative | 11:27:15 |
| 6 | races were all races that involved a minority | 11:27:18 |
| 7 | candidate, and then these can- -- these elections | 11:27:21 |
| 8 | that included Mr. Furman, I note several times in | 11:27:25 |
| 9 | the report they're not, in my opinion, probative | 11:27:30 |
| 10 | because of his habitual lack of minority support, | 11:27:32 |
| 11 | and I've included his results also in an appendix | 11:27:37 |
| 12 | kind of highlighting that fact. | 11:27:40 |
| 13 | Q       You would agree, though, that | 11:27:44 |
| 14 | Mr. Furman is African-American? | 11:27:44 |
| 15 | A       Yes. | 11:27:46 |
| 16 | Q       Okay.  And if that race was probative, | 11:27:46 |
| 17 | you agree that Will Sessoms was the minority | 11:27:49 |
| 18 | candidate of choice in that race? | 11:27:56 |
| 19 | A       Yes. | 11:27:57 |
| 20 | Q       And he prevailed? | 11:27:57 |
| 21 | A       Yes. | 11:27:58 |
| 22 | Q       And in the Kempsville race, you found | 11:27:58 |

Transcript of Douglas Spencer, Ph.D.
Conducted on October 1, 2019                                    86

| | | |
|---|---|---|
| 1 | that Dr. Ross-Hammond was the minority candidate | 11:27:59 |
| 2 | of choice, correct? | 11:28:03 |
| 3 | A      Correct. | 11:28:04 |
| 4 | Q      But she did not prevail? | 11:28:04 |
| 5 | A      That's correct. | 11:28:06 |
| 6 | Q      Did you determine if she was defeated | 11:28:09 |
| 7 | by white bloc voting? | 11:28:13 |
| 8 | A      Yes. | 11:28:17 |
| 9 | Q      How did you determine that? | 11:28:17 |
| 10 | A      Well, the support among white voters | 11:28:21 |
| 11 | was significantly -- statistically significantly | 11:28:27 |
| 12 | different, her support among white voters was far | 11:28:30 |
| 13 | less than the threshold that would be needed to | 11:28:33 |
| 14 | win, and the winning candidate, Abbott, had the | 11:28:35 |
| 15 | support of nearly 70 percent of white voters. | 11:28:39 |
| 16 | Q      Turning to the 2014 Rose Hall | 11:29:06 |
| 17 | election -- sorry. | 11:29:11 |
| 18 |        Turning to the 2014 City Council | 11:29:17 |
| 19 | elections in general -- | 11:29:21 |
| 20 | A      Okay. | 11:29:22 |
| 21 | Q      -- that's another one where for | 11:29:22 |
| 22 | at-large you needed to double your numbers, | 11:29:23 |

Transcript of Douglas Spencer, Ph.D.
Conducted on October 1, 2019                    87

| | | |
|---|---|---|
| 1 | correct? | 11:29:26 |
| 2 | A    Correct. | 11:29:26 |
| 3 | Q    Does doubling your numbers -- and I | 11:29:35 |
| 4 | understand that that's another one where you | 11:29:37 |
| 5 | determine ultimately that the at-large race is not | 11:29:40 |
| 6 | probative because Mr. Furman was in it, correct? | 11:29:44 |
| 7 | A    Correct.  To the extent that Mr. Furman | 11:29:51 |
| 8 | was also a candidate in other races, it's not just | 11:29:53 |
| 9 | his presence and it's not just this race.  It's | 11:29:57 |
| 10 | the habitual pattern of his inability to show | 11:30:01 |
| 11 | support among this community.  But, yes, the | 11:30:03 |
| 12 | reason I don't consider it probative is -- I don't | 11:30:05 |
| 13 | consider the Furman races as probative. | 11:30:08 |
| 14 | Q    So you started out designating all | 11:30:10 |
| 15 | races that have all been African-American | 11:30:13 |
| 16 | candidates as probative, and then you pull out | 11:30:13 |
| 17 | three Furman races and no other races, correct? | 11:30:15 |
| 18 | A    That's correct. | 11:30:18 |
| 19 | Q    Okay.  And once you double the numbers | 11:30:19 |
| 20 | for the at-large race, does that change your | 11:30:23 |
| 21 | conclusion as to whether Mr. Davenport had | 11:30:27 |
| 22 | minority-candidate-of-choice support for both | 11:30:32 |

Transcript of Douglas Spencer, Ph.D.
Conducted on October 1, 2019                      88

| | | |
|---|---|---|
| 1 | black and all minorities? | 11:30:35 |
| 2 | MS. HARLESS:  Objection to form. | 11:30:37 |
| 3 | THE WITNESS:  So it doesn't change my | 11:30:42 |
| 4 | view about Davenport.  There is an argument to be | 11:30:45 |
| 5 | made that Furman would have the second-highest | 11:30:53 |
| 6 | support and, because there were two seats | 11:30:58 |
| 7 | available, which I did not account for in this, | 11:31:00 |
| 8 | could be considered the candidate of choice. | 11:31:02 |
| 9 | BY MR. BOYNTON: | 11:31:07 |
| 10 | Q    So Mr. Furman could have been the | 11:31:07 |
| 11 | minority candidate of choice under your data? | 11:31:10 |
| 12 | A    That's correct. | 11:31:12 |
| 13 | Q    And you have two spots.  So in the two | 11:31:17 |
| 14 | spots, were there two minority candidates of | 11:31:20 |
| 15 | choice? | 11:31:22 |
| 16 | MS. HARLESS:  Objection to form. | 11:31:24 |
| 17 | THE WITNESS:  For two spot there, yes. | 11:31:29 |
| 18 | BY MR. BOYNTON: | 11:31:31 |
| 19 | Q    So you have two minority candidates of | 11:31:33 |
| 20 | choice under that race, and Furman is the second? | 11:31:34 |
| 21 | A    Let me look really quickly. | 11:31:47 |
| 22 | It's -- it's not clear who the second | 11:32:16 |

Transcript of Douglas Spencer, Ph.D.
Conducted on October 1, 2019                          89

| | | |
|---|---|---|
| 1 | candidate of choice would be, in my opinion. | 11:32:20 |
| 2 | Furman could be defended as a candidate of choice, | 11:32:24 |
| 3 | but not necessarily. | 11:32:27 |
| 4 | Q    Davenport is clearly a minority | 11:32:29 |
| 5 | candidate of choice, though, correct? | 11:32:30 |
| 6 | A    Davenport is, yes. | 11:32:32 |
| 7 | Q    For both blacks and all minorities, | 11:32:32 |
| 8 | correct? | 11:32:36 |
| 9 | A    Yes. | 11:32:37 |
| 10 | Q    Okay.  So there should have been | 11:32:37 |
| 11 | another check on your report next to Davenport | 11:32:39 |
| 12 | under -- | 11:32:39 |
| 13 | A    Correct. | 11:32:40 |
| 14 | Q    -- "All Minority, Minority candidate of | 11:32:40 |
| 15 | choice"? | 11:32:40 |
| 16 | That's an error, correct? | 11:32:42 |
| 17 | A    Yes. | 11:32:43 |
| 18 | Q    Okay. | 11:32:43 |
| 19 | MS. HARLESS:  Make sure you guys aren't | 11:32:44 |
| 20 | talking over each other. | 11:32:46 |
| 21 | MR. BOYNTON:  I'm sorry.  You're | 11:32:47 |
| 22 | correct.  Sorry about that. | 11:32:47 |

Transcript of Douglas Spencer, Ph.D.
Conducted on October 1, 2019                          90

| | | |
|---|---|---|
| 1 | BY MR. BOYNTON: | 11:32:53 |
| 2 | Q     So I understand you remove the at-large | 11:32:53 |
| 3 | race from your probative races, but if you did not | 11:32:57 |
| 4 | remove it, Davenport was the minority candidate of | 11:33:01 |
| 5 | choice who prevailed, correct? | 11:33:05 |
| 6 | A     Correct. | 11:33:08 |
| 7 | Q     In the Rose Hall race, did you find a | 11:33:17 |
| 8 | minority candidate of choice? | 11:33:19 |
| 9 | A     Yes. | 11:33:23 |
| 10 | Q     Who was that? | 11:33:24 |
| 11 | A     Mr. Cabiness. | 11:33:27 |
| 12 | Q     Did he prevail? | 11:33:33 |
| 13 | A     He did not. | 11:33:34 |
| 14 | Q     Was he defeated by white bloc voting? | 11:33:35 |
| 15 | A     Yes. | 11:33:39 |
| 16 | Q     And how do you conclude that from this | 11:33:39 |
| 17 | data? | 11:33:41 |
| 18 | A     He earned an estimated 2 to 6 percent | 11:33:42 |
| 19 | of white vote support, and the winning candidate | 11:33:45 |
| 20 | earned 60 percent of white support. | 11:33:48 |
| 21 | Q     And under the Princess Anne race for | 11:33:51 |
| 22 | 2014, did you find a minority candidate of choice? | 11:33:55 |

Transcript of Douglas Spencer, Ph.D.
Conducted on October 1, 2019                    91

| | | | |
|---|---|---|---|
| 1 | A | Yes, Barbara Henley. | 11:33:59 |
| 2 | Q | And did she prevail. | 11:34:02 |
| 3 | A | She did. | 11:34:03 |
| 4 | Q | And you find that race probative, | 11:34:13 |
| 5 | | correct? | 11:34:15 |
| 6 | A | Yes. | 11:34:15 |
| 7 | Q | When you are determining minority | 11:34:23 |
| 8 | | candidates of choice under these various | 11:34:26 |
| 9 | | elections, are you requiring that all three of the | 11:34:29 |
| 10 | | analyses align? | 11:34:38 |
| 11 | A | I'm looking for a pattern of support | 11:34:40 |
| 12 | | that is confirmed by all three methods. | 11:34:42 |
| 13 | Q | So if one of the three methods does not | 11:34:45 |
| 14 | | confirm, do you -- well, what results from that | 11:34:48 |
| 15 | | occurrence? | 11:34:54 |
| 16 | A | So I give the most weight to ecological | 11:34:57 |
| 17 | | regression and ecological inference estimates.  So | 11:35:00 |
| 18 | | if the homogeneous precinct analysis is the one | 11:35:03 |
| 19 | | outlier because of -- I give that less weight, but | 11:35:06 |
| 20 | | I'm looking to see if the candidate who earned the | 11:35:13 |
| 21 | | most support from minority voters is identified as | 11:35:16 |
| 22 | | the candidate of choice, and that is, you know, | 11:35:21 |

Transcript of Douglas Spencer, Ph.D.
Conducted on October 1, 2019                                   92

1    comparing the regression and ecological inference        11:35:27

2    and homogeneous precinct estimates of each               11:35:30

3    candidate across the board.                              11:35:34

4         Q     Turning your attention to 2012, did you       11:35:44

5    find the 2012 Kempsville race to be probative?           11:35:53

6         A     I did.                                         11:35:57

7         Q     Did you find Dr. Ross-Hammond to be the       11:35:58

8    minority candidate of choice for both black and          11:36:01

9    all minority?                                            11:36:01

10        A     Yes.                                          11:36:02

11        Q     Did she prevail?                              11:36:03

12        A     She did.                                       11:36:04

13        Q     And she is African-American?                  11:36:07

14        A     Yes.                                          11:36:10

15        Q     Turning your attention to the 2011            11:36:15

16   at-large special election for City Council, do you       11:36:19

17   recall if this particular election occurred before       11:36:23

18   or after the most recent City Council                    11:36:25

19   redistricting?                                           11:36:31

20        A     I'm not aware that the City Council was       11:36:34

21   redistricted.  I think it's an at-large election.        11:36:36

22        Q     But do you know when the redistricting        11:36:43

Transcript of Douglas Spencer, Ph.D.
Conducted on October 1, 2019                    93

| | | |
|---|---|---|
| 1 | occurred? | 11:36:45 |
| 2 | A      I don't know the date that whatever | 11:36:47 |
| 3 | state redistricting happened for Congressional | 11:36:49 |
| 4 | districts or something would have taken effect. | 11:36:53 |
| 5 | Q      With respect to the seven residence | 11:36:55 |
| 6 | districts of Virginia Beach, do you know when | 11:36:56 |
| 7 | those were redistricted last? | 11:36:59 |
| 8 | A      I do not. | 11:37:01 |
| 9 | Q      Did you find a minority candidate of | 11:37:02 |
| 10 | choice in the 2011 Virginia Beach City Council | 11:37:04 |
| 11 | special election? | 11:37:09 |
| 12 | A      Yes, Sherrod. | 11:37:10 |
| 13 | Q      Did he prevail? | 11:37:12 |
| 14 | A      No. | 11:37:14 |
| 15 | Q      Was he defeated by white bloc voting? | 11:37:17 |
| 16 | A      Yes. | 11:37:21 |
| 17 | Q      And you know from the vote totals of | 11:37:21 |
| 18 | white on that page 23? | 11:37:24 |
| 19 | A      Uh-huh.  The white support was | 11:37:25 |
| 20 | 50 percent less than minority support and | 11:37:27 |
| 21 | significantly less than the winning candidate's. | 11:37:31 |
| 22 | Q      And you found that race to be | 11:37:34 |

Transcript of Douglas Spencer, Ph.D.
Conducted on October 1, 2019                    94

| | | |
|---|---|---|
| 1 | probative? | 11:37:35 |
| 2 | A    Yes. | 11:37:36 |
| 3 | Q    Turning your attention to 2010, it | 11:37:36 |
| 4 | appears there were three elections you looked at, | 11:37:55 |
| 5 | the At-large election, the Bayside election, and | 11:38:00 |
| 6 | the Princess Anne, correct? | 11:38:03 |
| 7 | A    I've listed the Bayside here, but, | 11:38:06 |
| 8 | again, that included Furman, who I put in an | 11:38:08 |
| 9 | appendix, but I have estimates here for all of | 11:38:12 |
| 10 | them. | 11:38:15 |
| 11 | Q    Okay.  So that passed -- the Furman | 11:38:15 |
| 12 | Bayside race at least passed your first cut for | 11:38:16 |
| 13 | being probative, but then you later removed it | 11:38:19 |
| 14 | because of Furman? | 11:38:23 |
| 15 | A    That's correct. | 11:38:26 |
| 16 | Q    And in this instance, Mr. Furman | 11:38:27 |
| 17 | received between 36.8 and 44.2 percent of the | 11:38:30 |
| 18 | African-American vote in Bayside, correct, or for | 11:38:38 |
| 19 | the whole city for the Bayside district? | 11:38:42 |
| 20 | MS. HARLESS:  Objection to form. | 11:38:44 |
| 21 | THE WITNESS:  But according to this | 11:38:46 |
| 22 | table, those numbers seem correct, yes. | 11:38:47 |

Transcript of Douglas Spencer, Ph.D.
Conducted on October 1, 2019                    95

| | | |
|---|---|---|
| 1 | BY MR. BOYNTON: | 11:38:49 |
| 2 | Q     Okay.  So do you deem between | 11:38:49 |
| 3 | 36.8 percent and 44.2 percent of black support in | 11:38:53 |
| 4 | a race insignificant? | 11:38:58 |
| 5 | A     In a race featuring just two | 11:39:03 |
| 6 | candidates? | 11:39:05 |
| 7 | Q     Yes. | 11:39:06 |
| 8 | A     Where my goal is to identify a | 11:39:08 |
| 9 | candidate of choice, yes. | 11:39:10 |
| 10 | Q     Well, I'm not asking if he's a | 11:39:12 |
| 11 | candidate of choice. | 11:39:13 |
| 12 | You've said that the Bayside 2010 | 11:39:14 |
| 13 | election is not probative, correct? | 11:39:18 |
| 14 | A     That's correct. | 11:39:20 |
| 15 | Q     But Mr. Furman received 44.2 percent of | 11:39:21 |
| 16 | the black vote under your gold standard, correct? | 11:39:24 |
| 17 | MS. HARLESS:  Objection to form. | 11:39:27 |
| 18 | BY MR. BOYNTON: | 11:39:28 |
| 19 | Q     Under ecological inference, which | 11:39:28 |
| 20 | you've identified as the gold standard, correct? | 11:39:30 |
| 21 | A     Correct. | 11:39:33 |
| 22 | Q     What about Mr. Furman's vote totals | 11:39:37 |

Transcript of Douglas Spencer, Ph.D.
Conducted on October 1, 2019                    96

| | | |
|---|---|---|
| 1 | there caused you to remove that election from your | 11:39:40 |
| 2 | consideration? | 11:39:42 |
| 3 |     A    Because as a pattern over the course of | 11:39:43 |
| 4 | four elections, he was not ever the minority | 11:39:46 |
| 5 | candidate of choice. | 11:39:51 |
| 6 |     Q    If that race was deemed probative, you | 11:39:58 |
| 7 | would agree that Mr. Jones was the minority | 11:40:00 |
| 8 | candidate of choice in your original report? | 11:40:02 |
| 9 |     A    I have checked that box, and I -- but I | 11:40:07 |
| 10 | would reserve the right to confirm that.  If | 11:40:10 |
| 11 | you'll note that these estimates don't have | 11:40:12 |
| 12 | asterisks next to them, which is my designation | 11:40:16 |
| 13 | that there's a statistically significant | 11:40:18 |
| 14 | difference between the vote totals, and I'd want | 11:40:20 |
| 15 | to confirm that they're actually different. | 11:40:24 |
| 16 |     Q    And if they were different, that might | 11:40:28 |
| 17 | suggest that Furman was actually the minority | 11:40:30 |
| 18 | candidate of choice in that race? | 11:40:32 |
| 19 |     A    No.  If they were different, it would | 11:40:33 |
| 20 | suggest Furman definitely wasn't the candidate of | 11:40:36 |
| 21 | choice. | 11:40:41 |
| 22 |     Q    Comparing the 2010 Bayside race -- | 11:41:17 |

Transcript of Douglas Spencer, Ph.D.
Conducted on October 1, 2019                          97

| | | |
|---|---|---|
| 1 | A      Uh-huh. | 11:41:25 |
| 2 | Q      -- on page 27 to the 2014 Princess Anne | 11:41:25 |
| 3 | race on page 19 -- | 11:41:34 |
| 4 | A      Yep. | 11:41:41 |
| 5 | Q      -- you would agree that under your | 11:41:41 |
| 6 | numbers, Mr. Furman had a higher percentage of | 11:41:43 |
| 7 | black and all-minority support than Mr. Burton? | 11:41:48 |
| 8 | A      I would agree that they're similar. | 11:41:54 |
| 9 | Q      But Mr. Burton's race was probative and | 11:41:56 |
| 10 | Mr. Furman's race was not probative under your | 11:42:00 |
| 11 | analysis? | 11:42:03 |
| 12 | A      That's correct.  Furman was dropped | 11:42:06 |
| 13 | because of the habitual pattern of not gaining | 11:42:07 |
| 14 | minority-candidate-of-choice status. | 11:42:11 |
| 15 | Q      He did not have that habitual pattern | 11:42:13 |
| 16 | as of 2010, correct?  He developed that after | 11:42:15 |
| 17 | 2010? | 11:42:19 |
| 18 | MS. HARLESS:  Objection to form. | 11:42:19 |
| 19 | BY MR. BOYNTON: | 11:42:21 |
| 20 | Q      You can answer. | 11:42:21 |
| 21 | A      From the races that I evaluated, that's | 11:42:25 |
| 22 | correct. | 11:42:27 |

Transcript of Douglas Spencer, Ph.D.
Conducted on October 1, 2019

98

| | | |
|---|---|---|
| 1 | Q    He -- | 11:42:28 |
| 2 | A    The first races that I evaluated were | 11:42:28 |
| 3 | in 2008, and he was not in that election. | 11:42:30 |
| 4 | Q    So the first race Mr. Furman was in | 11:42:34 |
| 5 | that you evaluated was the 2010 Bayside race, | 11:42:36 |
| 6 | correct? | 11:42:40 |
| 7 | A    That's correct. | 11:42:41 |
| 8 | Q    Did you need to double your at-large | 11:42:51 |
| 9 | numbers for 2010? | 11:42:53 |
| 10 | A    I did not. | 11:42:54 |
| 11 | Q    Why not? | 11:42:55 |
| 12 | A    Because the baseline number of votes | 11:42:56 |
| 13 | that I used accounted for the fact that two people | 11:42:58 |
| 14 | were elected. | 11:43:01 |
| 15 | Q    And that differs from your approach to | 11:43:04 |
| 16 | 2014 and 2018? | 11:43:06 |
| 17 | A    I used a different column of the | 11:43:07 |
| 18 | summary, which was the summary of each candidate's | 11:43:08 |
| 19 | vote added up, as opposed to the summary of all | 11:43:13 |
| 20 | votes cast.  Once I was alerted to that fact, I | 11:43:16 |
| 21 | used that new denominator, which doubled these | 11:43:19 |
| 22 | numbers with no change. | 11:43:23 |

Transcript of Douglas Spencer, Ph.D.
Conducted on October 1, 2019                    99

```
1        Q     Why was Ms. Bellitto not the black        11:43:27

2   candidate of choice in the at-large race, or a       11:43:30

3   black candidate of choice in the at-large race?      11:43:37

4        A     Well, Mr. Jackson is clearly the black    11:43:37

5   candidate of choice, and the second, because there   11:43:40

6   are two candidates chosen, there would be two        11:43:44

7   candidates of choice, and the black estimated        11:43:48

8   support for Cabiness and was 38.5 and for Bellitto   11:43:50

9   was 38, and that's not clear who would have been     11:43:54

10  the black candidate of choice.                       11:43:57

11       Q     It's possible that Ms. Bellitto was the   11:43:59

12  black candidate of choice in that race given the     11:44:01

13  closeness of the numbers?                            11:44:03

14       A     It's possible, but they're               11:44:04

15  indistinguishable.                                   11:44:09

16       Q     Ms. Bellitto prevailed in that race,     11:44:19

17  correct?                                             11:44:22

18       A     Yes, Ms. Bellitto prevailed, and I       11:44:26

19  think it's worth -- I mean, you've identified the    11:44:29

20  difference between these two just as the             11:44:32

21  ecological inference estimate, but there are other   11:44:34

22  estimates.                                           11:44:37
```

Transcript of Douglas Spencer, Ph.D.
Conducted on October 1, 2019                                    100

| | | |
|---|---|---|
| 1 | So if you look at the ecological | 11:44:38 |
| 2 | regression, Cabiness earned more than Bellitto for | 11:44:40 |
| 3 | the black estimate if that's what -- if that's our | 11:44:46 |
| 4 | focus, so that's -- part of the evaluation is | 11:44:48 |
| 5 | looking for this pattern across all three methods. | 11:44:50 |
| 6 | Q    It remains your position, though, that | 11:44:55 |
| 7 | the EI method is your gold standard, correct? | 11:44:57 |
| 8 | A    I'm eval- -- whether or not I | 11:45:01 |
| 9 | identified that that way, I'm evaluating these | 11:45:04 |
| 10 | determinations of candidate of choice using all | 11:45:07 |
| 11 | three methods.  It's not surplusage.  They're all | 11:45:10 |
| 12 | in there because I'm looking for a pattern. | 11:45:14 |
| 13 | Q    Mr. Jackson was a minority candidate of | 11:45:18 |
| 14 | choice in the at-large election, correct? | 11:45:20 |
| 15 | A    Correct. | 11:45:23 |
| 16 | Q    He did not prevail, correct? | 11:45:23 |
| 17 | A    Correct. | 11:45:25 |
| 18 | Q    That entire race, the at-large election | 11:45:26 |
| 19 | of 2010, was probative? | 11:45:28 |
| 20 | A    Yes. | 11:45:30 |
| 21 | Q    So if Ms. Bellitto was the minority | 11:45:31 |
| 22 | candidate of choice for blacks as well as all | 11:45:34 |

Transcript of Douglas Spencer, Ph.D.
Conducted on October 1, 2019                           101

| | | |
|---|---|---|
| 1 | minority, that would be a second successful | 11:45:36 |
| 2 | minority candidate of choice in that race, | 11:45:38 |
| 3 | correct? | 11:45:40 |
| 4 | A       That's correct, if she were. | 11:45:40 |
| 5 | Q       In the Princess Anne race, you identify | 11:45:46 |
| 6 | Ms. Bullock as the minority candidate of choice | 11:45:48 |
| 7 | for both blacks and all minority, correct? | 11:45:52 |
| 8 | A       Correct. | 11:45:55 |
| 9 | Q       And she did not prevail? | 11:45:55 |
| 10 | A       She did not. | 11:45:57 |
| 11 | Q       And you find that to be a probative | 11:45:58 |
| 12 | race? | 11:46:03 |
| 13 | A       Yes. | 11:46:04 |
| 14 | Q       Turning to 2008, you found how many | 11:46:21 |
| 15 | probative races in that election? | 11:46:27 |
| 16 | A       Two probative elections. | 11:46:29 |
| 17 | Q       Okay.  The first is the at-large? | 11:46:31 |
| 18 | A       Correct. | 11:46:33 |
| 19 | Q       And the minority candidate of choice | 11:46:34 |
| 20 | was whom? | 11:46:35 |
| 21 | A       I think Ms. Georgia Allen.  I believe | 11:46:37 |
| 22 | that's her first name. | 11:46:40 |

Transcript of Douglas Spencer, Ph.D.
Conducted on October 1, 2019                          102

| | | | |
|---|---|---|---|
| 1 | Q | And she's a Plaintiff in the case? | 11:46:41 |
| 2 | A | Okay. | 11:46:45 |
| 3 | Q | Did you know that? | 11:46:45 |
| 4 | A | I did not. | 11:46:46 |
| 5 | Q | Okay.  And she did not prevail? | 11:46:46 |
| 6 | A | She did not prevail. | 11:46:50 |
| 7 | Q | And you find that race probative? | 11:46:51 |
| 8 | A | Yes. | 11:46:54 |
| 9 | Q | Tell me about the Kempsville race.  You | 11:46:54 |
| 10 | | have two individuals who you identify as black | 11:46:56 |
| 11 | | candidates, correct? | 11:47:00 |
| 12 | A | Yep. | 11:47:01 |
| 13 | Q | Mr. Flores and Mr. Jackson, correct? | 11:47:01 |
| 14 | A | That's correct. | 11:47:05 |
| 15 | Q | And you have -- as I read your checked | 11:47:06 |
| 16 | | boxes, you have both of them identified as the | 11:47:10 |
| 17 | | all-minority candidate of choice; is that correct? | 11:47:13 |
| 18 | A | So just -- I need to point out a typo | 11:47:16 |
| 19 | | in this table. | 11:47:20 |
| 20 | Q | Okay. | 11:47:21 |
| 21 | A | If you look at the -- the page | 11:47:21 |
| 22 | | immediately preceding, on page 28, the exact | 11:47:24 |

Transcript of Douglas Spencer, Ph.D.
Conducted on October 1, 2019                              103

| | | |
|---|---|---|
| 1 | numbers are reproduced except for Flores in the | 11:47:28 |
| 2 | middle row on the two right columns -- maybe all | 11:47:33 |
| 3 | three columns, excuse me. | 11:47:38 |
| 4 | So you'll notice that on page 28, the | 11:47:40 |
| 5 | all-minority support is 41, 46, and 44.  That | 11:47:44 |
| 6 | is -- those are the correct numbers.  I've | 11:47:51 |
| 7 | double-checked that upon noticing this | 11:47:53 |
| 8 | incongru- -- incongruity. | 11:47:55 |
| 9 | Q    Okay. | 11:47:59 |
| 10 | A    So I just want to make sure at least | 11:48:00 |
| 11 | we're talking about the same numbers. | 11:48:01 |
| 12 | Q    So with those being the correct numbers | 11:48:03 |
| 13 | under your analysis, who is the all-minority | 11:48:05 |
| 14 | candidate of choice in that election? | 11:48:08 |
| 15 | A    I've checked both, but their vote total | 11:48:12 |
| 16 | separately is not distinguishable.  I highlighted | 11:48:20 |
| 17 | the fact, because together -- | 11:48:22 |
| 18 | THE REPORTER:  I don't think you're | 11:48:25 |
| 19 | supposed to write on that. | 11:48:26 |
| 20 | THE WITNESS:  Oh, sorry. | 11:48:29 |
| 21 | BY MR. BOYNTON: | 11:48:29 |
| 22 | Q    I prefer you not to unless -- | 11:48:30 |

Transcript of Douglas Spencer, Ph.D.
Conducted on October 1, 2019                              104

| | | |
|---|---|---|
| 1 | A     Okay.  I will not do that.  Sorry about | 11:48:31 |
| 2 | that.  Thank you. | 11:48:33 |
| 3 | Q     And just let the record reflect that he | 11:48:36 |
| 4 | made some notes on page 20 -- | 11:48:38 |
| 5 | A     28. | 11:48:41 |
| 6 | Q     -- 28.  It appears to be circling the | 11:48:42 |
| 7 | vote totals that he's relying upon for the next | 11:48:44 |
| 8 | page. | 11:48:47 |
| 9 | Is that correct, sir? | 11:48:48 |
| 10 | A     Correct. | 11:48:49 |
| 11 | Q     Okay.  That resolves that. | 11:48:49 |
| 12 | But based upon relying on the numbers | 11:48:53 |
| 13 | from page 28, what do you conclude about the | 11:48:55 |
| 14 | minority candidate of choice for the Kempsville | 11:48:59 |
| 15 | 2008 election? | 11:49:02 |
| 16 | A     The minority voters preferred to have | 11:49:08 |
| 17 | Jackson or Flores be elected. | 11:49:11 |
| 18 | Q     Was there a single minority candidate | 11:49:14 |
| 19 | of choice in that race? | 11:49:17 |
| 20 | A     Statistically, I can't distinguish | 11:49:19 |
| 21 | between the minority support for Jackson and | 11:49:21 |
| 22 | Flores, but their support's extremely high | 11:49:24 |

Transcript of Douglas Spencer, Ph.D.
Conducted on October 1, 2019                                    105

| | | |
|---|---|---|
| 1 | compared to Diezel, and clearly, you know, except | 11:49:26 |
| 2 | for white bloc voting, the result of this election | 11:49:27 |
| 3 | would have been a black candidate. | 11:49:31 |
| 4 | Q    Can you have more than one minority | 11:49:32 |
| 5 | candidate of choice for a single seat? | 11:49:34 |
| 6 | A    No, you cannot. | 11:49:37 |
| 7 | Q    Does this mean that where you have two, | 11:49:39 |
| 8 | that means you really have an unknown? | 11:49:41 |
| 9 | A    Well, I should put a different marker | 11:49:45 |
| 10 | to raise the fact that this is a unique situation. | 11:49:47 |
| 11 | So I don't think it's correct to say there's no | 11:49:50 |
| 12 | minority candidate of choice, and I agree with you | 11:49:52 |
| 13 | that it's probably not correct to say there's two | 11:49:55 |
| 14 | minority candidates of choice for one race. | 11:50:00 |
| 15 | But the pattern of support is so strong | 11:50:03 |
| 16 | for Jackson and Flores among minority voters, and | 11:50:04 |
| 17 | their defeat, both of them, was due to white bloc | 11:50:09 |
| 18 | voting, which is a probative inquiry in my mind to | 11:50:13 |
| 19 | whether the preferences of minority voters were | 11:50:16 |
| 20 | defeated due to white bloc voting. | 11:50:21 |
| 21 | Q    You would agree that the combined total | 11:50:25 |
| 22 | vote of Jackson and Flores would have defeated | 11:50:27 |

Transcript of Douglas Spencer, Ph.D.
Conducted on October 1, 2019                               106

| | | |
|---|---|---|
| 1 | Diezel, correct? | 11:50:29 |
| 2 | A    Yes. | 11:50:30 |
| 3 | Q    In generating your original report, you | 11:51:39 |
| 4 | developed estimates using your three methods for | 11:51:42 |
| 5 | black voters alone, correct? | 11:51:45 |
| 6 | A    Correct. | 11:51:48 |
| 7 | Q    And for all-minority voters, correct? | 11:51:49 |
| 8 | A    Correct. | 11:51:51 |
| 9 | Q    How did you get the all-minority | 11:51:52 |
| 10 | voters' number? | 11:51:53 |
| 11 | A    That number comes from the Citizen | 11:51:54 |
| 12 | Voting Age Population estimates of the ACS. | 11:51:57 |
| 13 | Q    That data point places Hispanic, Asian, | 11:52:04 |
| 14 | black, and other minority voters all in one bloc, | 11:52:07 |
| 15 | correct? | 11:52:11 |
| 16 | A    Correct. | 11:52:11 |
| 17 | Q    Can you infer anything about cohesion | 11:52:12 |
| 18 | from the fact that those data points are set forth | 11:52:14 |
| 19 | that way in your origin data from ACS? | 11:52:17 |
| 20 | A    The exact same way I look at black | 11:52:24 |
| 21 | support, I'm looking for the most preferred | 11:52:28 |
| 22 | candidate of those -- that coalition. | 11:52:30 |

Transcript of Douglas Spencer, Ph.D.
Conducted on October 1, 2019                    107

| | | |
|---|---|---|
| 1 | Q    But they are combined for statistical | 11:52:33 |
| 2 | purposes.  It doesn't mean they're cohesive | 11:52:36 |
| 3 | necessarily? | 11:52:38 |
| 4 | A    As a group -- as a coalition, they are | 11:52:40 |
| 5 | supporting the candidate in the same logic.  I use | 11:52:41 |
| 6 | the same logic to evaluate who's a minority | 11:52:44 |
| 7 | candidate of choice. | 11:52:47 |
| 8 | Q    I understand, but you can't tell from | 11:52:47 |
| 9 | the all-minority group whether there's a | 11:52:49 |
| 10 | dispersion between black support, Asian support, | 11:52:52 |
| 11 | and Hispanic support, correct? | 11:52:56 |
| 12 | MS. HARLESS:  Objection to form. | 11:52:59 |
| 13 | BY MR. BOYNTON: | 11:53:00 |
| 14 | Q    You can answer. | 11:53:00 |
| 15 | A    I definitely -- I don't -- the estimate | 11:53:06 |
| 16 | is an estimate of the coalition working together. | 11:53:10 |
| 17 | Q    Exactly. | 11:53:13 |
| 18 | So you don't know from that data how | 11:53:13 |
| 19 | the various members of the coalition perform as | 11:53:17 |
| 20 | against each other? | 11:53:20 |
| 21 | MS. HARLESS:  Objection to form. | 11:53:21 |
| 22 | THE WITNESS:  I -- I don't know the -- | 11:53:24 |

Transcript of Douglas Spencer, Ph.D.
Conducted on October 1, 2019                                    108

| | | |
|---|---|---|
| 1 | I have not presented an estimate in the original | 11:53:26 |
| 2 | report of Asian support, for example, or Hispanic | 11:53:28 |
| 3 | support separately.  It's not -- because of their | 11:53:31 |
| 4 | small size, which I'm sure we're getting to, | 11:53:35 |
| 5 | there's no reliable way to make an independent | 11:53:37 |
| 6 | assessment, but as a coalition they -- they -- | 11:53:42 |
| 7 | they seem to be -- well, I should -- I -- I use | 11:53:45 |
| 8 | the same logic to evaluate them as a coalition as | 11:53:49 |
| 9 | I did black support, which is a large population. | 11:53:53 |
| 10 | BY MR. BOYNTON: | 11:53:55 |
| 11 | Q    Does the all-minority voter estimate | 11:53:58 |
| 12 | prove anything in and of itself about Asian | 11:54:01 |
| 13 | voting? | 11:54:05 |
| 14 | A    In my opinion, it means that Asian | 11:54:08 |
| 15 | voting and black voting and Hispanic voting | 11:54:10 |
| 16 | together are voting in this way, as it appears on | 11:54:13 |
| 17 | the report. | 11:54:16 |
| 18 | Q    Can you tell anything about Asian | 11:54:18 |
| 19 | voters, in particular, from that number? | 11:54:20 |
| 20 | A    I cannot generate a point estimate for | 11:54:24 |
| 21 | them. | 11:54:26 |
| 22 | Q    Same thing for Hispanics, correct? | 11:54:26 |

Transcript of Douglas Spencer, Ph.D.
Conducted on October 1, 2019                    109

```
1        A     The same thing for Hispanics.              11:54:28

2        Q     Define for me cohesion.                    11:54:30

3        A     Well, the idea of cohesion is that         11:54:35

4   minority voters prefer a candidate, their most        11:54:39

5   preferred candidate, and that's what I'm looking      11:54:43

6   for.                                                  11:54:46

7        Q     When you're talking about three            11:54:49

8   different distinct minority groups, what does         11:54:51

9   cohesion mean to you?                                 11:54:56

10       A     So I think about three distinct            11:54:57

11  minority groups as a -- in terms of the language      11:55:00

12  of coalition?                                         11:55:02

13       Q     Well, no.  Whether -- I'm asking you       11:55:03

14  about the use of the word cohesion to define the      11:55:04

15  behavior of three distinct minority groups.           11:55:09

16       A     Then my definition would be each group     11:55:10

17  has the most preferred candidate, and the most        11:55:16

18  preferred candidate of each three groups is the       11:55:20

19  same.                                                 11:55:24

20       Q     And when you say "most preferred,"         11:55:25

21  you're not requiring a 50 percent threshold for       11:55:28

22  any of those three groups, correct?                   11:55:31
```

Transcript of Douglas Spencer, Ph.D.
Conducted on October 1, 2019                          110

| | | |
|---|---|---|
| 1 | A    Correct. | 11:55:33 |
| 2 | Q    It's solely what it would take to | 11:55:33 |
| 3 | prevail? | 11:55:37 |
| 4 | A    Correct. | 11:55:37 |
| 5 | MR. BOYNTON:  It hasn't been that long, | 11:56:12 |
| 6 | but let's take a quick break because I'm | 11:56:15 |
| 7 | transitioning, anyway, to the rebuttal report. | 11:56:17 |
| 8 | MR. HEBERT:  Okay. | 11:56:20 |
| 9 | THE WITNESS:  Okay. | 11:56:20 |
| 10 | THE VIDEOGRAPHER:  Please stand by. | 11:56:22 |
| 11 | This marks the end of Disc 1 in the | 11:56:23 |
| 12 | videotaped deposition of Douglas Spencer.  We are | 11:56:25 |
| 13 | off the record at 11:55 a.m. | 11:56:28 |
| 14 | (A recess was taken.) | 11:57:12 |
| 15 | THE VIDEOGRAPHER:  Here begins Disc | 12:06:37 |
| 16 | Number 2 in the videotaped deposition of Douglas | 12:06:38 |
| 17 | Spencer.  We are back on the record at 12:05 p.m. | 12:06:41 |
| 18 | BY MR. BOYNTON: | 12:06:45 |
| 19 | Q    Dr. Spencer, if I can turn your | 12:06:48 |
| 20 | attention now to your rebuttal report, and that is | 12:06:50 |
| 21 | Exhibit 2, and I believe it's in front of you. | 12:06:55 |
| 22 | You prepared that report on or around | 12:06:58 |

Transcript of Douglas Spencer, Ph.D.
Conducted on October 1, 2019                                    111

| | | |
|---|---|---|
| 1 | August 26th, 2019, correct? | 12:07:01 |
| 2 | A     That's correct. | 12:07:04 |
| 3 | Q     And you were responding to a response | 12:07:06 |
| 4 | report from a Dr. Quentin Kidd, correct? | 12:07:09 |
| 5 | A     Correct. | 12:07:12 |
| 6 | Q     Okay.  Now, you have a Summary section | 12:07:12 |
| 7 | there on page 2, "Between 2008-2018 there were | 12:07:17 |
| 8 | sixteen opportunities for a black candidate to win | 12:07:22 |
| 9 | a seat on the Virginia Beach City Council." | 12:07:24 |
| 10 | So what you're saying is, I think, | 12:07:28 |
| 11 | there are nineteen originally, three of whom were | 12:07:29 |
| 12 | Furman, and you discount those three | 12:07:33 |
| 13 | opportunities, correct? | 12:07:35 |
| 14 | A     Correct. | 12:07:37 |
| 15 | Q     So if Furman was a candidate -- well, | 12:07:37 |
| 16 | Mr. Furman was a black candidate for City Council, | 12:07:41 |
| 17 | correct? | 12:07:44 |
| 18 | A     Correct. | 12:07:44 |
| 19 | Q     And he ran three times, correct? | 12:07:45 |
| 20 | A     Correct. | 12:07:46 |
| 21 | Q     And adding those three efforts in, you | 12:07:47 |
| 22 | would have 19 opportunities, correct? | 12:07:49 |

Transcript of Douglas Spencer, Ph.D.
Conducted on October 1, 2019                                112

| | | |
|---|---|---|
| 1 | A    That's correct. | 12:07:51 |
| 2 | Q    Okay.  You note that in ten of these | 12:07:51 |
| 3 | cases, the black candidate was the candidate of | 12:08:01 |
| 4 | choice for minorities. | 12:08:04 |
| 5 |        Can you tell me which ten cases?  And | 12:08:07 |
| 6 | it may take you a minute to put all that together, | 12:08:09 |
| 7 | but it gets -- bless you -- to be an exercise. | 12:08:12 |
| 8 | A    Thank you. | 12:08:19 |
| 9 |        Okay.  I believe it's the ten | 12:08:20 |
| 10 | candidates listed on page 8 of the response | 12:09:39 |
| 11 | report. | 12:09:41 |
| 12 | Q    Well, let's look at that chart for a | 12:09:58 |
| 13 | second. | 12:10:00 |
| 14 | A    Okay. | 12:10:01 |
| 15 | Q    You say that in ten of these races, the | 12:10:02 |
| 16 | black candidate was the candidate of choice for | 12:10:05 |
| 17 | minority voters, but I'm looking at "Minority | 12:10:07 |
| 18 | preferred," and I'm seeing one, two, three, four, | 12:10:10 |
| 19 | five, six, seven yeses, not ten. | 12:10:13 |
| 20 | A    Yeah, on this table (indicating). | 12:10:17 |
| 21 | Q    So what are you referring to on page 2 | 12:10:19 |
| 22 | where you say, "In ten of these cases the black | 12:10:23 |

Transcript of Douglas Spencer, Ph.D.
Conducted on October 1, 2019                                    113

| | | |
|---|---|---|
| 1 | candidate was the candidate of choice for minority | 12:10:26 |
| 2 | voters"? | 12:10:28 |
| 3 | A    I'm referring to their | 12:10:29 |
| 4 | minority-preferred status in my original report. | 12:10:31 |
| 5 | Q    So this is the original report? | 12:10:33 |
| 6 | A    That's correct. | 12:10:36 |
| 7 | Q    Ten, okay. | 12:10:38 |
| 8 | And then obviously your chart on | 12:10:38 |
| 9 | page 8, which we'll get to, disagrees with that? | 12:10:41 |
| 10 | A    Yes. | 12:10:45 |
| 11 | Q    So which -- if you're looking at your | 12:11:19 |
| 12 | original report, and feel free to refer back to | 12:11:22 |
| 13 | it, Exhibit 1, who are the ten cases we're | 12:11:24 |
| 14 | referring to? | 12:11:26 |
| 15 | A    They are the ten candidates in the | 12:11:32 |
| 16 | table on page 8.  So that's Rouse in the 2018 | 12:11:33 |
| 17 | At-large; Wooten, 2018 Centerville; Ross-Hammond, | 12:11:37 |
| 18 | Kempsville 2016, Kempsville 2012; Cabiness, 2014 | 12:11:42 |
| 19 | Rose Hall; Sherrod, 2011 At-large Special | 12:11:47 |
| 20 | Election; Jackson, 2010 At-large; Bullock, 2010 | 12:11:52 |
| 21 | Princess Anne; Allen, 2008 At-large; and Flores, | 12:11:57 |
| 22 | Kempsville 2008. | 12:12:03 |

Transcript of Douglas Spencer, Ph.D.
Conducted on October 1, 2019                              114

| | | |
|---|---|---|
| 1 | Q     So you are counting Flores as one of | 12:12:10 |
| 2 | the original ten minority candidates of choice | 12:12:13 |
| 3 | notwithstanding what we discussed earlier today? | 12:12:18 |
| 4 | A     Let me look at that quickly. | 12:12:20 |
| 5 | Yes, I am. | 12:12:28 |
| 6 | Q     Why is that? | 12:12:30 |
| 7 | A     Taken across all three estimates of | 12:12:34 |
| 8 | homogeneous precinct, ecological regression, and | 12:12:37 |
| 9 | King's ecological inference, the support for | 12:12:39 |
| 10 | Flores was higher among all minorities than the | 12:12:42 |
| 11 | estimates for all-minority support of Andrew | 12:12:45 |
| 12 | Jackson even though the ecological inference | 12:12:47 |
| 13 | number was similar. | 12:12:49 |
| 14 | Q     And in this instance when you're saying | 12:12:54 |
| 15 | minority candidate of choice, you're saying for | 12:12:56 |
| 16 | all minority voters, correct? | 12:12:58 |
| 17 | A     Correct. | 12:12:59 |
| 18 | Q     Okay.  Which of the ten lost due to | 12:13:00 |
| 19 | white bloc voting? | 12:13:12 |
| 20 | A     Well, all of the candidates marked on | 12:13:42 |
| 21 | Table 1, page 8 who didn't win their election of | 12:13:45 |
| 22 | the minority candidates. | 12:13:49 |

Transcript of Douglas Spencer, Ph.D.
Conducted on October 1, 2019                            115

| | | | |
|---|---|---|---|
| 1 | Q | So looking backwards, that is Flores? | 12:13:57 |
| 2 | A | Excuse me. | 12:14:03 |
| 3 | | Yes. | 12:14:03 |
| 4 | Q | Allen? | 12:14:05 |
| 5 | A | Yes. | 12:14:06 |
| 6 | Q | Bullock? | 12:14:08 |
| 7 | A | Yes. | 12:14:09 |
| 8 | Q | Jackson? | 12:14:11 |
| 9 | A | Yes. | 12:14:13 |
| 10 | Q | Sherrod? | 12:14:16 |
| 11 | A | Yes. | 12:14:17 |
| 12 | Q | Not Ross-Hammond in 2012? | 12:14:18 |
| 13 | A | Correct. | 12:14:22 |
| 14 | Q | Cabiness? | 12:14:22 |
| 15 | A | Yes. | 12:14:24 |
| 16 | Q | Ross-Hammond in 2016? | 12:14:25 |
| 17 | A | Yes. | 12:14:26 |
| 18 | Q | And you acknowledge that there are | 12:14:34 |
| 19 | | three white candidates who are candidates of | 12:14:35 |
| 20 | | choice for minority voters, correct? | 12:14:35 |
| 21 | A | Yes, the three that we identified | 12:14:37 |
| 22 | | previously. | 12:14:39 |

Transcript of Douglas Spencer, Ph.D.
Conducted on October 1, 2019                                   116

```
 1        Q      And that is Council Candidate White in      12:14:40

 2   2018?                                                     12:14:44

 3        A      Yes.                                          12:14:44

 4        Q      Council Candidate Henley in 2014?            12:14:45

 5        A      Yes.                                          12:14:48

 6        Q      And Council Candidate Bellitto in 2010?      12:14:48

 7        A      That's correct.                              12:14:58

 8        Q      And --                                       12:14:59

 9        A      Although, as we discussed earlier,           12:15:00

10   looking across all the different patterns,               12:15:02

11   including ecological regression and inference, the       12:15:05

12   difference between Bellitto and Cabiness, I want         12:15:08

13   to reserve the right to test whether they were           12:15:10

14   actually statistically different to support the          12:15:13

15   Bellitto finding.                                        12:15:15

16        Q      Okay.  But Bellitto and Henley both          12:15:16

17   prevailed?                                               12:15:20

18        A      Correct.                                     12:15:21

19        Q      So here you offer on page 2 your             12:15:34

20   statement as to cohesion, "Minority voters are           12:15:42

21   cohesive when their most preferred candidate earns       12:15:44

22   enough minority support to win an election,"             12:15:49
```

Transcript of Douglas Spencer, Ph.D.
Conducted on October 1, 2019                                    117

| | | |
|---|---|---|
| 1 | correct? | 12:15:51 |
| 2 | A    Correct. | 12:15:53 |
| 3 | Q    Based on your original report, how did | 12:15:55 |
| 4 | you determine that Asian voters specifically are | 12:15:58 |
| 5 | cohesive in these ten races? | 12:16:06 |
| 6 | A    I didn't generate a separate estimate | 12:16:11 |
| 7 | for Asian support. | 12:16:13 |
| 8 | Q    How did you determine whether Hispanic | 12:16:16 |
| 9 | voters are cohesive in your original report as to | 12:16:21 |
| 10 | these ten races? | 12:16:26 |
| 11 | A    In my original report, I provided an | 12:16:28 |
| 12 | estimate of all minority voters together. | 12:16:30 |
| 13 | Q    Because it's not reliable to try to | 12:16:33 |
| 14 | break down the numbers under those three | 12:16:35 |
| 15 | approaches to Asian and Hispanic voters, correct? | 12:16:39 |
| 16 | A    That was the argument that I made that | 12:16:44 |
| 17 | still is my opinion. | 12:16:47 |
| 18 | Q    Now, you also talk about minority | 12:17:01 |
| 19 | coalitional voting, and your definition for that | 12:17:05 |
| 20 | in your rebuttal report is, "Minority groups are | 12:17:08 |
| 21 | considered a coalition when they share candidate | 12:17:13 |
| 22 | preferences and their individual group support is | 12:17:17 |

Transcript of Douglas Spencer, Ph.D.
Conducted on October 1, 2019                                    118

| | | |
|---|---|---|
| 1 | sufficient to elect their preferred candidate," | 12:17:20 |
| 2 | correct? | 12:17:25 |
| 3 |     A    That, as a group, their support is | 12:17:28 |
| 4 | sufficient to elect their preferred candidate. | 12:17:32 |
| 5 |     Q    Their individual group support is | 12:17:34 |
| 6 | sufficient? | 12:17:35 |
| 7 |     A    I think that statement's correct. | 12:17:40 |
| 8 |     Q    What do you mean by "individual group | 12:17:43 |
| 9 | support"? | 12:17:45 |
| 10 |     A    In the -- in the context of identifying | 12:17:59 |
| 11 | what a coalition is, the idea is that the | 12:18:09 |
| 12 | groups -- each of these group supports a candidate | 12:18:13 |
| 13 | of choice that's the same.  Their most preferred | 12:18:17 |
| 14 | candidate of choice is the same. | 12:18:21 |
| 15 |     Q    And you say each group.  Does that mean | 12:18:22 |
| 16 | Asians, versus Hispanics, versus -- | 12:18:25 |
| 17 |     A    Yes. | 12:18:27 |
| 18 |     Q    -- African-Americans? | 12:18:27 |
| 19 |     Okay.  Explain the difference between | 12:18:32 |
| 20 | your use of the word "coalition" here -- and I am | 12:18:40 |
| 21 | referring to page 2 of your rebuttal report -- and | 12:18:45 |
| 22 | your use of the word "cohesion" here on page 2 of | 12:18:48 |

Transcript of Douglas Spencer, Ph.D.
Conducted on October 1, 2019                              119

| | | |
|---|---|---|
| 1 | your rebuttal report. | 12:18:51 |
| 2 | A     Minority political cohesion is a | 12:18:55 |
| 3 | statement about minority voters generally that | 12:19:01 |
| 4 | their preferred candidates would win.  Coalition | 12:19:04 |
| 5 | voting is that the candidate preferences are | 12:19:08 |
| 6 | shared among each individual group. | 12:19:11 |
| 7 | Q     How were you able to determine the | 12:19:23 |
| 8 | individual group support in your original report? | 12:19:24 |
| 9 | A     I did not attempt to do that. | 12:19:29 |
| 10 | Q     You then on page 3 have a data | 12:19:48 |
| 11 | clarification? | 12:19:51 |
| 12 | A     Yes. | 12:19:51 |
| 13 | Q     Explain that first item of | 12:19:51 |
| 14 | clarification with respect to your source of | 12:19:59 |
| 15 | Citizen Voting Age Population. | 12:20:01 |
| 16 | A     So my understanding of Dr. Kidd's | 12:20:03 |
| 17 | report, in one of the footnotes there's an | 12:20:07 |
| 18 | assertion that I relied on data from Mr. Anthony | 12:20:12 |
| 19 | Fairfax to build my racially polarized voting | 12:20:15 |
| 20 | analysis, and I don't know where that assertion | 12:20:18 |
| 21 | came from, but I just wanted to clarify that I | 12:20:21 |
| 22 | downloaded my own CVAP data from the census and | 12:20:23 |

Transcript of Douglas Spencer, Ph.D.
Conducted on October 1, 2019                    120

| | | |
|---|---|---|
| 1 | used that myself. | 12:20:27 |
| 2 | Q     When you say "from the census," you | 12:20:28 |
| 3 | mean the American Community Survey? | 12:20:30 |
| 4 | A     Yes. | 12:20:32 |
| 5 | Q     Please explain your second note with | 12:20:42 |
| 6 | regard to precinct files. | 12:20:43 |
| 7 | A     So the Voter Tabulation Districts, | 12:20:46 |
| 8 | these VTDs that are generated through census, are | 12:20:48 |
| 9 | the files I relied on as my precinct shapefiles. | 12:20:54 |
| 10 | They have them historically. | 12:21:00 |
| 11 |      The difficulty, as I pointed out, was | 12:21:02 |
| 12 | that in 2016, Virginia Beach expanded from 94 | 12:21:06 |
| 13 | precincts to 98 precincts, and the Virginia Beach | 12:21:09 |
| 14 | Geographic Information Systems office didn't have | 12:21:13 |
| 15 | those shapefiles for the 98, but they did for the | 12:21:18 |
| 16 | 100 when Virginia Beach expanded to a hundred in | 12:21:22 |
| 17 | 2018. | 12:21:23 |
| 18 |      So for 2018, I used the current | 12:21:24 |
| 19 | shapefiles from the Virginia Beach GIS office. | 12:21:26 |
| 20 | From 2008 through 2014, I used the census Voter | 12:21:30 |
| 21 | Tabulation Districts of the 94 precincts, which | 12:21:37 |
| 22 | were stable over that time period.  And 2016, | 12:21:39 |

Transcript of Douglas Spencer, Ph.D.
Conducted on October 1, 2019                                        121

| | | |
|---|---|---|
| 1 | there were four precincts that were listed in the | 12:21:42 |
| 2 | election returns in Virginia Beach that I do not | 12:21:46 |
| 3 | have a Voter Tabulation District for. | 12:21:49 |
| 4 | Q    Do you know if in Virginia Beach the | 12:21:51 |
| 5 | Voter Tabulation Districts exactly overlap the | 12:21:54 |
| 6 | actual precincts? | 12:21:57 |
| 7 | A    They did in 2018 when I compared them. | 12:21:58 |
| 8 | Q    Before that, you can't tell us? | 12:22:03 |
| 9 | A    I can't tell, because Virginia Beach | 12:22:05 |
| 10 | GIS doesn't have those files. | 12:22:06 |
| 11 | Q    And then you make reference to the vote | 12:22:12 |
| 12 | totals for at-large elections, the doubling that | 12:22:14 |
| 13 | we talked about for 2018 and 2014? | 12:22:17 |
| 14 | A    Yes. | 12:22:20 |
| 15 | Q    And exp- -- I'm sorry, go ahead. | 12:22:20 |
| 16 | A    No.  Finish your question. | 12:22:23 |
| 17 | Q    I would just ask that, because, you | 12:22:24 |
| 18 | know, the way you explained it, I didn't | 12:22:27 |
| 19 | understand earlier -- | 12:22:29 |
| 20 | A    Okay. | 12:22:30 |
| 21 | Q    -- why you needed to make the doubling | 12:22:30 |
| 22 | of the at-large seats for 2018 and 2014 but not | 12:22:34 |

Transcript of Douglas Spencer, Ph.D.
Conducted on October 1, 2019                    122

| | | |
|---|---|---|
| 1 | 2010.  If you would explain that piece of it. | 12:22:37 |
| 2 | A    So because there were two seats | 12:22:41 |
| 3 | available to be earned, the number of ballots that | 12:22:43 |
| 4 | are cast are reported differently by Virginia -- | 12:22:48 |
| 5 | by Virginia Board of Elections.  So in one column | 12:22:51 |
| 6 | it's the number of ballots that were cast, and in | 12:22:54 |
| 7 | one column it's the number of votes that were | 12:22:57 |
| 8 | cast. | 12:22:59 |
| 9 | And for 2014 and 2018, I had divided | 12:23:00 |
| 10 | the vote totals for each candidate by the total | 12:23:03 |
| 11 | number of ballots cast, which is one per person, | 12:23:06 |
| 12 | but that didn't account for the fact that people | 12:23:10 |
| 13 | voted for two seats. | 12:23:12 |
| 14 | So I replaced the denominator with the | 12:23:14 |
| 15 | number of votes that were cast, which was | 12:23:17 |
| 16 | double -- essentially double what that number was. | 12:23:19 |
| 17 | It's not exactly double, because it would account | 12:23:22 |
| 18 | for people who voted for one candidate and not | 12:23:25 |
| 19 | another.  That's how that would be baked into that | 12:23:27 |
| 20 | measure. | 12:23:29 |
| 21 | Q    But in 2010, you used a different | 12:23:30 |
| 22 | process? | 12:23:32 |

Transcript of Douglas Spencer, Ph.D.
Conducted on October 1, 2019                           123

1        A        In 2010, I correctly -- I used the            12:23:33

2   denominator of vote totals, which is the correct            12:23:35

3   way to do it, and I used the wrong denominator --           12:23:38

4   I don't want to say "wrong denominator," but I              12:23:42

5   used a different denominator in 2014 and 2018.              12:23:44

6        Q        The -- the -- the error did not extend        12:23:46

7   to 2010?                                                    12:23:48

8        A        It did not, no.                               12:23:49

9                 Now 2018 and 2014 are congruent with          12:23:51

10   exactly how I conducted 2010.                              12:23:54

11        Q       And those changes to double 2014 and          12:24:01

12   2018 did not yield any changes to your opinions in         12:24:04

13   the original report as to minority candidates of           12:24:08

14   choice?                                                    12:24:11

15        A       Exactly.  It did not.                         12:24:13

16        Q       It did not lead to any changes in             12:24:15

17   regard to probative races?                                 12:24:18

18        A       They did not.                                 12:24:23

19        Q       Turning your attention to page 7 of the       12:25:52

20   rebuttal report, you in the rebuttal report               12:25:55

21   generate a table called Table 1, correct?                 12:26:07

22        A       Yes.                                          12:26:12

Transcript of Douglas Spencer, Ph.D.
Conducted on October 1, 2019                                   124

| | | |
|---|---|---|
| 1 | Q      And that is displayed on page 8 of the | 12:26:12 |
| 2 | report? | 12:26:16 |
| 3 | A      Correct. | 12:26:16 |
| 4 | Q      And that table was generated using an | 12:26:20 |
| 5 | approach called equivalence testing; is that | 12:26:22 |
| 6 | correct? | 12:26:26 |
| 7 | A      The table wasn't generated using | 12:26:28 |
| 8 | equivalence testing, but it reports the difference | 12:26:31 |
| 9 | between groups using an equivalence approach. | 12:26:35 |
| 10 | Q      Okay.  Tell me what equivalence testing | 12:26:40 |
| 11 | is in this context. | 12:26:47 |
| 12 | A      So the entire question boils down to -- | 12:26:50 |
| 13 | my report is completely focused on comparing | 12:26:53 |
| 14 | different groups of individuals to each other, and | 12:26:57 |
| 15 | there are complications in doing that in trying to | 12:27:03 |
| 16 | figure out is one group really different than | 12:27:09 |
| 17 | another group. | 12:27:11 |
| 18 | Equivalence testing is one way to ask | 12:27:12 |
| 19 | is Group A significantly different than Group B, | 12:27:15 |
| 20 | and the logic of the equivalence test says assume | 12:27:19 |
| 21 | that the groups are different, and then see | 12:27:25 |
| 22 | whether or not what you find about those groups | 12:27:29 |

Transcript of Douglas Spencer, Ph.D.
Conducted on October 1, 2019                                     125

| | | |
|---|---|---|
| 1 | overlaps to a degree that you can't be confident | 12:27:31 |
| 2 | that they're different anymore.  Now it's just as | 12:27:34 |
| 3 | likely they're the same as it was they were | 12:27:36 |
| 4 | different, and that's the logic. | 12:27:39 |
| 5 | Q    Just as likely that they are the same | 12:27:41 |
| 6 | as different? | 12:27:44 |
| 7 | A    No.  The proper language would be to | 12:27:44 |
| 8 | say if my baseline hypothesis is that they're | 12:27:47 |
| 9 | different, I have enough evidence that they're not | 12:27:53 |
| 10 | different that I can reject that hypothesis. | 12:27:55 |
| 11 | Q    So describe the process that leads to | 12:28:06 |
| 12 | Table 1. | 12:28:08 |
| 13 | A    Okay.  Well, I'll start procedurally | 12:28:10 |
| 14 | and then mechanically. | 12:28:22 |
| 15 | Q    Perfect. | 12:28:24 |
| 16 | A    Procedurally, I don't think Table 1 is | 12:28:25 |
| 17 | very meaningful, which is why I did not generate | 12:28:27 |
| 18 | it for my original report.  I don't think the | 12:28:30 |
| 19 | estimates that are used in this table actually | 12:28:32 |
| 20 | mean much.  I am not confident in their findings | 12:28:35 |
| 21 | at all, but I generated it in response to some | 12:28:38 |
| 22 | comments made by Dr. Kidd to try to -- to try to | 12:28:41 |

Transcript of Douglas Spencer, Ph.D.
Conducted on October 1, 2019                                    126

| | | |
|---|---|---|
| 1 | point out exactly why I didn't do this in my | 12:28:46 |
| 2 | original report.  So that's -- that's kind of | 12:28:49 |
| 3 | procedurally. | 12:28:51 |
| 4 | Mechanically, I estimated using an | 12:28:53 |
| 5 | ecological inference.  It's not a customization, | 12:28:55 |
| 6 | but it's a different algorithm.  There's two | 12:29:03 |
| 7 | different algorithms to use ecological inference. | 12:29:06 |
| 8 | There is an algorithm that's called R by C, | 12:29:10 |
| 9 | meaning row by column, and it allows the model to | 12:29:12 |
| 10 | generate a number for numerous races in the same | 12:29:15 |
| 11 | model. | 12:29:21 |
| 12 | But because the numbers are so small, | 12:29:24 |
| 13 | as I mentioned, the model also generates | 12:29:26 |
| 14 | confidence intervals, and the confidence intervals | 12:29:29 |
| 15 | are enormous, and that's what I used to generate | 12:29:32 |
| 16 | the estimates of each of these groups. | 12:29:36 |
| 17 | So now I have an estimate of Asians | 12:29:39 |
| 18 | that's 50 percent support for a candidate of plus | 12:29:41 |
| 19 | or minus 30 percent, so it could be anywhere | 12:29:44 |
| 20 | between 20 and 80.  And I'm assuming that these | 12:29:45 |
| 21 | groups are different, but their confidence | 12:29:47 |
| 22 | intervals are so big that they're overlapping, and | 12:29:49 |

Transcript of Douglas Spencer, Ph.D.
Conducted on October 1, 2019                                    127

| | | |
|---|---|---|
| 1 | I can't reject that they're different. | 12:29:52 |
| 2 | But if it's from 20 to 80, it's kind of | 12:29:54 |
| 3 | ridiculous to begin with, which is why I wouldn't | 12:29:57 |
| 4 | have done this originally, but that was what is | 12:29:59 |
| 5 | baked into this table. | 12:30:02 |
| 6 | Q    Now, we had asked for some follow-up | 12:30:23 |
| 7 | data in response to receiving that table, and we | 12:30:25 |
| 8 | received -- let me make sure I give you a clean | 12:30:30 |
| 9 | copy. | 12:30:36 |
| 10 | A    I'll keep it clean. | 12:30:36 |
| 11 | Q    -- that which -- that match numbers | 12:30:38 |
| 12 | to -- yes, sir, I'll give you a clean one too. | 12:30:42 |
| 13 | MR. HEBERT:  Thank you. | 12:30:46 |
| 14 | BY MR. BOYNTON: | 12:30:47 |
| 15 | Q    -- match numbers to the checks and the | 12:30:47 |
| 16 | X's on your Chart 1. | 12:30:49 |
| 17 | Does that printout appear to be the | 12:30:53 |
| 18 | numbers that match Chart 1? | 12:30:55 |
| 19 | A    As far as I remember, yes. | 12:30:59 |
| 20 | Q    Okay. | 12:31:00 |
| 21 | MR. BOYNTON:  I will mark that, then, | 12:31:00 |
| 22 | as Exhibit 4 -- 5. | 12:31:03 |

Transcript of Douglas Spencer, Ph.D.
Conducted on October 1, 2019                                    128

```
 1              (Spencer Exhibit 5 was marked for           12:31:07

 2      identification and is attached to the transcript.)  12:31:07

 3      BY MR. BOYNTON:                                     12:31:23

 4          Q     So as we look at that data, the first     12:31:23

 5      column is -- well, the first column is Year, and    12:31:27

 6      then you have the seat that was run for, the        12:31:31

 7      candidate, and then you get to Threshold?           12:31:34

 8          A     Yes.                                      12:31:37

 9          Q     What does threshold mean?                 12:31:37

10          A     So threshold -- the way that I've         12:31:39

11      identified threshold in this case, and I think      12:31:41

12      it's more conservative than I need to -- I'll       12:31:43

13      explain in a minute -- is this was the vote total   12:31:46

14      of the winning candidate.                           12:31:49

15              And so the logic is, in order to have       12:31:52

16      won in this election this year, Rouse or Wooten or  12:31:55

17      Ross-Hammond or Cabiness would have needed to earn  12:32:00

18      at least the support of what the -- exceed the      12:32:03

19      support of the winner.                              12:32:06

20              The reason why I say that's               12:32:08

21      conservative is that if you see, for example, in    12:32:09

22      Wooten Centerville, the threshold is 62.  I         12:32:13
```

Transcript of Douglas Spencer, Ph.D.
Conducted on October 1, 2019                    129

| | | |
|---|---|---|
| 1 | believe that there were two candidates in that | 12:32:17 |
| 2 | race, Wooten and Wray, maybe there was a third | 12:32:19 |
| 3 | candidate.  Let me come up with a better example. | 12:32:26 |
| 4 | Let's look at Ross-Hammond in | 12:32:36 |
| 5 | Kempsville, 2016.  I've listed a threshold of | 12:32:37 |
| 6 | 59.4, because that's the vote total that Abbott | 12:32:40 |
| 7 | earned, but in a two-candidate race, I think it's | 12:32:45 |
| 8 | also compelling to state a threshold of 50 percent | 12:32:50 |
| 9 | plus one in order to have won. | 12:32:53 |
| 10 | So these thresholds in every case are | 12:32:56 |
| 11 | larger than -- than a plurality of votes would be | 12:32:58 |
| 12 | needed to win, but that's where the number itself | 12:33:02 |
| 13 | comes from, is the winning candidate's total in | 12:33:05 |
| 14 | that race. | 12:33:08 |
| 15 | Q    Across all races -- I'm sorry, across | 12:33:10 |
| 16 | all ethnic groups, that's total vote percentage, | 12:33:12 |
| 17 | not a breakdown of a -- | 12:33:16 |
| 18 | A    That's right.  So Rouse earned | 12:33:18 |
| 19 | 45.2 percent of the vote in Virginia Beach when he | 12:33:19 |
| 20 | won, yes.  And for a person who lost, like | 12:33:24 |
| 21 | Ross-Hammond in Kempsville, 59.4 percent was the | 12:33:26 |
| 22 | overall vote total for her opponent. | 12:33:29 |

Transcript of Douglas Spencer, Ph.D.
Conducted on October 1, 2019                                    130

| | | |
|---|---|---|
| 1 | Q      I see. | 12:33:34 |
| 2 | And so then we get to three columns, | 12:33:34 |
| 3 | and this -- well, we get six columns, but three | 12:33:36 |
| 4 | subheadings: Black, Hispanic, and Asian, correct? | 12:33:41 |
| 5 | A      Correct. | 12:33:44 |
| 6 | Q      "est." means the estimate? | 12:33:44 |
| 7 | A      Correct. | 12:33:46 |
| 8 | Q      Of what? | 12:33:47 |
| 9 | A      Of the ecological inference R-by-C | 12:33:48 |
| 10 | model. | 12:33:52 |
| 11 | Q      And those numbers will not necessarily | 12:33:52 |
| 12 | match your economic -- I'm sorry, your ecological | 12:33:56 |
| 13 | inference numbers from your first report, correct? | 12:33:58 |
| 14 | A      That's correct.  In my first report, I | 12:34:00 |
| 15 | used the traditional ecological inference model. | 12:34:03 |
| 16 | I've compared the two, and they're substantively | 12:34:07 |
| 17 | similar within a few points but not exactly the | 12:34:11 |
| 18 | same. | 12:34:13 |
| 19 | Q      Why did you use the second ecological | 12:34:14 |
| 20 | inference model for this analysis in the rebuttal | 12:34:16 |
| 21 | report? | 12:34:19 |
| 22 | A      Because it's the only model that | 12:34:20 |

Transcript of Douglas Spencer, Ph.D.
Conducted on October 1, 2019                                    131

| | | |
|---|---|---|
| 1 | permits the inclusion of multiple races at the | 12:34:22 |
| 2 | same time. | 12:34:26 |
| 3 | Q    And you did not use that model for your | 12:34:28 |
| 4 | original report? | 12:34:31 |
| 5 | A    That's correct. | 12:34:33 |
| 6 | Q    Now, you have -- in addition to the | 12:34:36 |
| 7 | estimate for each ethnic group, you also have an | 12:34:39 |
| 8 | SE for each ethnic group. | 12:34:45 |
| 9 | What is SE? | 12:34:48 |
| 10 | A    An SE is the standard error of the | 12:34:49 |
| 11 | estimate, which is another way of saying the | 12:34:52 |
| 12 | standard deviation of that estimate if that | 12:34:55 |
| 13 | estimate were in a bell curve.  And standard | 12:34:57 |
| 14 | errors are used to generate confidence intervals, | 12:35:01 |
| 15 | which the confidence interval is essentially two | 12:35:06 |
| 16 | times the standard error.  It's technically 1.96 | 12:35:07 |
| 17 | times the standard error. | 12:35:08 |
| 18 | Q    So you are assuming a normal | 12:35:10 |
| 19 | distribution of numbers? | 12:35:12 |
| 20 | A    That's correct. | 12:35:13 |
| 21 | Q    And so where, for example, in the -- in | 12:35:16 |
| 22 | the case of Mr. Jackson, 2010, you have a | 12:35:28 |

Transcript of Douglas Spencer, Ph.D.
Conducted on October 1, 2019                    132

| 1 | 11.6 percent of Hispanic support, correct -- | 12:35:38 |
|---|---|---|
| 2 | A     Correct. | 12:35:47 |
| 3 | Q     -- as your point estimate? | 12:35:47 |
| 4 | A     Correct. | 12:35:48 |
| 5 | Q     You then have a standard deviation of | 12:35:49 |
| 6 | 8.6 percent? | 12:35:52 |
| 7 | MS. HARLESS:  Objection to form. | 12:35:54 |
| 8 | BY MR. BOYNTON: | 12:35:56 |
| 9 | Q     Standard error? | 12:35:56 |
| 10 | A     Correct, a standard error of | 12:35:57 |
| 11 | 8.6 percent. | 12:35:59 |
| 12 | Q     And that translates to what in terms of | 12:36:00 |
| 13 | confidence interval? | 12:36:03 |
| 14 | A     It would be approximately twice, so | 12:36:03 |
| 15 | approximately 17 percent. | 12:36:06 |
| 16 | Q     And so explain to me, then, the | 12:36:08 |
| 17 | analysis that takes these numbers that are | 12:36:15 |
| 18 | generated by the equivalence -- I'm sorry, the | 12:36:18 |
| 19 | ecological inference model that you used for the | 12:36:24 |
| 20 | rebuttal report and generates ranges for | 12:36:27 |
| 21 | consideration under equivalence testing? | 12:36:31 |
| 22 | A     So the range here in Table 1 on page 8 | 12:36:34 |

Transcript of Douglas Spencer, Ph.D.
Conducted on October 1, 2019                                   133

| | | |
|---|---|---|
| 1 | refers to the estimate on Exhibit 5 for a | 12:36:38 |
| 2 | particular race, meaning racial minority group, | 12:36:44 |
| 3 | plus or minus 1.96 times the standard error. | 12:36:48 |
| 4 | So the example I gave earlier, if we | 12:36:54 |
| 5 | look at Asian support for Rouse, the estimate was | 12:36:56 |
| 6 | 53 percent.  That would be plus or minus two times | 12:36:59 |
| 7 | the standard error, or plus or minus 30 percent. | 12:37:04 |
| 8 | So the estimated Asian support for Rouse was | 12:37:08 |
| 9 | somewhere between 20 percent and 80 percent. | 12:37:10 |
| 10 | And then I look to see whether or not | 12:37:14 |
| 11 | there's enough overlap between 20 percent and | 12:37:15 |
| 12 | 80 percent in the threshold to reject the | 12:37:20 |
| 13 | hypothesis that Asian support was not high enough | 12:37:26 |
| 14 | to reach that threshold. | 12:37:30 |
| 15 | Q    I'm going to show you a document we've | 12:37:44 |
| 16 | prepared and ask you to digest it.  It takes the | 12:37:46 |
| 17 | numbers that you are using in Exhibit 5 | 12:37:53 |
| 18 | specifically for Hispanic support. | 12:37:59 |
| 19 | A    Okay. | 12:38:07 |
| 20 | Q    And then -- and I think it uses the SE | 12:38:09 |
| 21 | number as opposed to the CI number, but it's | 12:38:16 |
| 22 | attempting to have a visual representation of the | 12:38:19 |

Transcript of Douglas Spencer, Ph.D.
Conducted on October 1, 2019                                    134

| | | |
|---|---|---|
| 1 | equivalence testing approach. | 12:38:27 |
| 2 | A     Can you explain what the blue bar is? | 12:38:30 |
| 3 | Q     Sure. | 12:38:33 |
| 4 | Blue is zero to a hundred.  It's just | 12:38:36 |
| 5 | showing you a range of possible votes. | 12:38:39 |
| 6 | A     Okay. | 12:38:41 |
| 7 | Q     Green is the range of possible Hispanic | 12:38:42 |
| 8 | support using the equivalence testing range | 12:38:48 |
| 9 | factoring in a standard error. | 12:38:54 |
| 10 | A     Okay.  That makes sense now. | 12:39:01 |
| 11 | Q     Okay. | 12:39:02 |
| 12 | MS. HARLESS:  This says "confidence | 12:39:04 |
| 13 | interval," so -- | 12:39:05 |
| 14 | BY MR. BOYNTON: | 12:39:07 |
| 15 | Q     Okay.  You can -- you're welcome to | 12:39:07 |
| 16 | mark on that however you want to correct it to | 12:39:09 |
| 17 | make it work.  We're trying to understand the | 12:39:12 |
| 18 | concept here, and this is our effort at -- | 12:39:14 |
| 19 | A     Yep. | 12:39:15 |
| 20 | Q     -- doing that. | 12:39:15 |
| 21 | A     I welcome it. | 12:39:16 |
| 22 | Q     So go ahead and make that correction | 12:39:17 |

Transcript of Douglas Spencer, Ph.D.
Conducted on October 1, 2019                                  135

| | | |
|---|---|---|
| 1 | that that is not actually a confidence-interval | 12:39:20 |
| 2 | calculation.  That is a standard-of-error | 12:39:24 |
| 3 | calculation. | 12:39:27 |
| 4 | A     (Witness complies.) | 12:39:31 |
| 5 | Q     We will ask you a question, though, | 12:39:33 |
| 6 | when we look at -- going back to your report, just | 12:39:35 |
| 7 | so we can understand it, we're using your Rouse | 12:39:37 |
| 8 | estimate on page 8. | 12:39:40 |
| 9 | A     Yes. | 12:39:42 |
| 10 | Q     And you say -- | 12:39:44 |
| 11 | A     Yes. | 12:39:45 |
| 12 | Q     -- "the estimated Hispanic support has | 12:39:46 |
| 13 | a confidence interval of plus or minus 20.9"? | 12:39:47 |
| 14 | A     That's correct.  Sorry, it's correct | 12:39:51 |
| 15 | that I wrote it that way.  It's a typo.  This was | 12:39:52 |
| 16 | a typo that I recognized after writing this. | 12:39:55 |
| 17 | Q     So the confidence interval is really | 12:39:58 |
| 18 | almost twice 20.9 percent? | 12:39:59 |
| 19 | A     Exactly. | 12:40:01 |
| 20 | Q     The confidence interval is 42 percent? | 12:40:02 |
| 21 | A     Yeah, something like that. | 12:40:04 |
| 22 | Q     Okay.  So if we use confidence | 12:40:07 |

Transcript of Douglas Spencer, Ph.D.
Conducted on October 1, 2019                              136

| | | |
|---|---|---|
| 1 | intervals on this exhibit -- let's call it | 12:40:09 |
| 2 | Exhibit 6. | 12:40:14 |
| 3 | (Spencer Exhibit 6 was marked for | 12:40:19 |
| 4 | identification and is attached to the transcript.) | 12:40:20 |
| 5 | BY MR. BOYNTON: | 12:40:20 |
| 6 | Q       -- the green bar gets bigger in both | 12:40:20 |
| 7 | directions, correct? | 12:40:23 |
| 8 | A       Correct. | 12:40:24 |
| 9 | Q       It doubles in size coming out from the | 12:40:24 |
| 10 | midpoint of 33.3 percent, which is your point | 12:40:27 |
| 11 | estimate? | 12:40:30 |
| 12 | A       That's right. | 12:40:31 |
| 13 | Q       So do you want to draw on that kind | 12:40:36 |
| 14 | of -- do you understand what we're doing here? | 12:40:38 |
| 15 | A       You're -- you're -- it looks something | 12:40:41 |
| 16 | like this (indicating). | 12:40:43 |
| 17 | Q       Okay. | 12:40:45 |
| 18 | A       I mean, that's extreme, but... | 12:40:45 |
| 19 | Q       It's a graphical depiction? | 12:40:46 |
| 20 | A       Yep. | 12:40:48 |
| 21 | Q       It would go out in either direction | 12:40:49 |
| 22 | equal amounts? | 12:40:51 |

Transcript of Douglas Spencer, Ph.D.
Conducted on October 1, 2019                          137

| | | |
|---|---|---|
| 1 | A     Yes. | 12:40:52 |
| 2 | Q     It's double the length of the whole | 12:40:53 |
| 3 | green thing? | 12:40:54 |
| 4 | A     That's correct. | 12:40:56 |
| 5 | Q     Okay.  So your point estimate for | 12:40:56 |
| 6 | Hispanic support for Aaron Rouse was 33.3 percent, | 12:41:00 |
| 7 | and that is represented by the yellow line? | 12:41:03 |
| 8 | A     Yep, I see. | 12:41:06 |
| 9 | Q     Okay.  And so my understanding of | 12:41:08 |
| 10 | equivalence testing's application to this is the | 12:41:11 |
| 11 | fact that the confidence interval is so large | 12:41:15 |
| 12 | means that the green bar gets pushed up high | 12:41:19 |
| 13 | enough to cross the threshold. | 12:41:22 |
| 14 | A     Not just across the threshold, but a | 12:41:28 |
| 15 | significant portion of the green bar is over the | 12:41:30 |
| 16 | threshold. | 12:41:33 |
| 17 | Q     Okay.  So the bigger the confidence | 12:41:33 |
| 18 | interval -- | 12:41:35 |
| 19 | A     Yep. | 12:41:35 |
| 20 | Q     -- the further it gets pushes -- pushed | 12:41:35 |
| 21 | over the threshold? | 12:41:38 |
| 22 | A     Correct. | 12:41:39 |

Transcript of Douglas Spencer, Ph.D.
Conducted on October 1, 2019                                     138

```
1        Q     So the less reliable the number, the          12:41:39

2    better chance it has of going across the               12:41:42

3    threshold?                                              12:41:45

4        A     Totally.                                      12:41:46

5        Q     Okay.  What amount of overlap are you         12:41:46

6    looking for to check the box, so to speak, that        12:41:57

7    equivalence testing has allowed the range to pass      12:42:05

8    the threshold?                                          12:42:08

9        A     So I'm using an overlap of 10 percent.        12:42:09

10       Q     And where did you come up with that?          12:42:14

11       A     That's based on the -- the statistical        12:42:16

12   rejection threshold in political science               12:42:25

13   literature is 5 percent in details of a -- of a        12:42:30

14   normal -- of a bell curve, two standard deviations     12:42:34

15   from the middle.                                        12:42:38

16       Q     Not specific to equivalence testing?          12:42:38

17   Just general --                                         12:42:40

18       A     Just the general logic of when you            12:42:41

19   would reject something in a -- in a normal bell         12:42:43

20   curve.  And if there's 5 percent rejection rate in     12:42:45

21   each of these groups was the -- the overlap that I     12:42:49

22   asked for.  If it's in -- if the rejection region      12:42:53
```

Transcript of Douglas Spencer, Ph.D.
Conducted on October 1, 2019                                    139

| | | |
|---|---|---|
| 1 | of both of these distributions overlaps more than | 12:42:57 |
| 2 | the 5 percent of each group, then -- then I would | 12:43:00 |
| 3 | reject. | 12:43:04 |
| 4 | Notice that the threshold has a | 12:43:05 |
| 5 | confidence interval of zero.  So I'm looking for | 12:43:07 |
| 6 | actually 10 percent rejection in the range for | 12:43:10 |
| 7 | each candidate, which is twice as much as I would | 12:43:14 |
| 8 | normally need for rejecting at 5 percent cut-off. | 12:43:17 |
| 9 | Q     But rejecting at this point is | 12:43:21 |
| 10 | equivalent to saying there's a possibility that | 12:43:24 |
| 11 | your null hypothesis is disproved? | 12:43:29 |
| 12 | A     That's correct. | 12:43:32 |
| 13 | Q     Okay.  And the majority of the green | 12:43:32 |
| 14 | bar is below your threshold, correct? | 12:43:35 |
| 15 | A     I -- I don't know. | 12:43:41 |
| 16 | Q     I mean -- okay.  Well, we can -- we can | 12:43:45 |
| 17 | step away from that example, yeah. | 12:43:47 |
| 18 | You have a bell curve, correct? | 12:43:50 |
| 19 | A     Yes. | 12:43:52 |
| 20 | Q     And so would you draw a bell curve | 12:43:52 |
| 21 | on -- on -- actually, I'm going to give you a | 12:43:54 |
| 22 | clean one. | 12:43:56 |

Transcript of Douglas Spencer, Ph.D.
Conducted on October 1, 2019                    140

| | | | |
|---|---|---|---|
| 1 | A | Okay. | 12:43:57 |
| 2 | Q | I'll make it 7. | 12:43:58 |
| 3 | A | Okay. | 12:43:59 |
| 4 | | (Spencer Exhibit 7 was marked for | 12:43:59 |
| 5 | identification and is attached to the transcript.) | | 12:44:04 |
| 6 | BY MR. BOYNTON: | | 12:44:04 |
| 7 | Q | And let's assume -- and, again, these | 12:44:05 |
| 8 | are representative numbers only, but let's assume | | 12:44:05 |
| 9 | that on Exhibit 7 the green -- | | 12:44:07 |
| 10 | A | Yep. | 12:44:10 |
| 11 | Q | -- represents the actual range | 12:44:10 |
| 12 | demonstrated by the equivalence testing -- | | 12:44:14 |
| 13 | A | Okay. | 12:44:17 |
| 14 | Q | -- and the threshold remains the purple | 12:44:17 |
| 15 | line, and the point estimate remains the green. | | 12:44:21 |
| 16 | | So draw me a bell curve. | 12:44:27 |
| 17 | A | Something like that (indicating). | 12:44:28 |
| 18 | Q | Okay. So in that illustration, at | 12:44:29 |
| 19 | least, the portion of the range above the | | 12:44:31 |
| 20 | threshold is very small? | | 12:44:35 |
| 21 | | MS. HARLESS: Objection to form. | 12:44:37 |
| 22 | BY MR. BOYNTON: | | 12:44:38 |

Transcript of Douglas Spencer, Ph.D.
Conducted on October 1, 2019                    141

| | | |
|---|---|---|
| 1 | Q    In that illustration.  I'm sorry, I can | 12:44:38 |
| 2 | rephrase it. | 12:44:41 |
| 3 | This is purely an illustration, but, | 12:44:41 |
| 4 | you know, looking at that illustration, would you | 12:44:43 |
| 5 | tell me what the -- where the vast majority of the | 12:44:45 |
| 6 | data points are?  Are they below or above the | 12:44:56 |
| 7 | threshold? | 12:44:59 |
| 8 | A    Well, the threshold to identify is | 12:44:59 |
| 9 | 10 percent.  So if there's more than 10 percent | 12:45:03 |
| 10 | overlap above the threshold, we can reject the | 12:45:06 |
| 11 | null hypothesis, which means 90 percent in that | 12:45:09 |
| 12 | case would be the low. | 12:45:13 |
| 13 | Q    Thank you. | 12:45:13 |
| 14 | MR. BOYNTON:  We'll make that 7 if we | 12:45:19 |
| 15 | haven't already. | 12:45:21 |
| 16 | THE REPORTER:  We already did. | 12:45:23 |
| 17 | BY MR. BOYNTON: | 12:45:24 |
| 18 | Q    Tell me, have you used equivalence | 12:45:24 |
| 19 | testing in any of your work prior to this case? | 12:45:28 |
| 20 | A    I think on a paper I'm working with | 12:45:40 |
| 21 | with a -- with a co-author, we use an equivalence | 12:45:44 |
| 22 | test in a study of campaign finance vouchers in | 12:45:47 |

Transcript of Douglas Spencer, Ph.D.
Conducted on October 1, 2019                                    142

```
 1   Seattle to decide whether our treatment group and        12:45:51

 2   our control are different or the same.                    12:45:54

 3        Q     And that's not yet been published?             12:45:55

 4        A     It's under review.                             12:45:56

 5        Q     Is that your first use of equivalence          12:45:57

 6   testing in your experience?                               12:45:59

 7        A     In a professional research publication,        12:46:01

 8   yes.                                                      12:46:03

 9        Q     Have you seen equivalence testing used         12:46:04

10   in the political science world by others?                12:46:07

11        A     Yes.                                           12:46:10

12        Q     Who?                                           12:46:11

13        A     I -- I can't name papers off the top of       12:46:15

14   my head.  I know that the paper that developed           12:46:21

15   this idea for political science has been cited to        12:46:24

16   a few dozen times.  I've seen its presentation at        12:46:28

17   academic conferences.  I know that my co-author,         12:46:33

18   Abby Wood, has used it in her work.  I've read it        12:46:37

19   in other -- usually in the context of comparing          12:46:41

20   treatment and control groups in experiments.             12:46:43

21        Q     How does this setting that you're using        12:46:46

22   it in differ from setting up treatment and control        12:46:49
```

Transcript of Douglas Spencer, Ph.D.
Conducted on October 1, 2019                    143

| | | |
|---|---|---|
| 1 | groups? | 12:46:53 |
| 2 | A     It's not -- they're not the same thing. | 12:46:56 |
| 3 | The equivalence test just says we want to test if | 12:46:59 |
| 4 | the treatment and control group are separately. | 12:47:02 |
| 5 | How you set up the treatment and control group is | 12:47:05 |
| 6 | a different question of your research design, who | 12:47:08 |
| 7 | are you going to give something to or who aren't | 12:47:11 |
| 8 | you going to give something to. | 12:47:12 |
| 9 | Q     Why do you believe that equivalence | 12:47:14 |
| 10 | testing can apply in this circumstance? | 12:47:15 |
| 11 | A     I'll answer it two ways.  I apply | 12:47:21 |
| 12 | equivalence testing only in response to Dr. Kidd's | 12:47:26 |
| 13 | critique that my assumption these groups are the | 12:47:29 |
| 14 | same.  That's the primary reason to introduce | 12:47:32 |
| 15 | this. | 12:47:35 |
| 16 | The traditional hypothesis testing | 12:47:35 |
| 17 | posits that your baseline hypothesis is that your | 12:47:40 |
| 18 | treatment and control group are the same, and you | 12:47:45 |
| 19 | try to reject that.  Equivalence approach has | 12:47:46 |
| 20 | recognized that may pose problems in certain | 12:47:50 |
| 21 | circumstances. | 12:47:53 |
| 22 | And if your goal is to provide evidence | 12:47:53 |

Transcript of Douglas Spencer, Ph.D.
Conducted on October 1, 2019                    144

| | | |
|---|---|---|
| 1 | to somebody that your baseline hypothesis isn't | 12:47:55 |
| 2 | that two groups are the same, then you can apply | 12:47:57 |
| 3 | the equivalence approach which says, okay, we'll | 12:48:00 |
| 4 | just do this inverse.  Presume they're different, | 12:48:03 |
| 5 | and see if you can reject that.  It's just an | 12:48:05 |
| 6 | inverse logic of the traditional way of doing | 12:48:09 |
| 7 | hypothesis testing. | 12:48:13 |
| 8 | Q    I think it might be useful, and so I'm | 12:48:18 |
| 9 | going to offer this as Exhibit 8.  It is simply | 12:48:20 |
| 10 | taking the chart from page 8 of the rebuttal | 12:48:24 |
| 11 | report and putting it on the same page with a -- | 12:48:30 |
| 12 | what we call Chart 2, which is the numbers that | 12:48:38 |
| 13 | are represented on Exhibit 5.  I'd ask you to | 12:48:41 |
| 14 | compare that to Exhibit 5 and make sure it's | 12:48:46 |
| 15 | accurate. | 12:48:48 |
| 16 | A    It appears accurate. | 12:48:51 |
| 17 | MR. BOYNTON:  I would just mark that | 12:48:53 |
| 18 | as -- I'm sorry, I would just ask that be marked | 12:48:55 |
| 19 | as Exhibit 8. | 12:48:58 |
| 20 | (Spencer Exhibit 8 was marked for | 12:48:59 |
| 21 | identification and is attached to the transcript.) | 12:49:00 |
| 22 | BY MR. BOYNTON: | 12:49:10 |

Transcript of Douglas Spencer, Ph.D.
Conducted on October 1, 2019                              145

| | | |
|---|---|---|
| 1 | Q     Have you seen or are you aware of | 12:49:14 |
| 2 | equivalence testing being used in a Voting Rights | 12:49:17 |
| 3 | Act case? | 12:49:21 |
| 4 | A     No. | 12:49:23 |
| 5 | Q     Are you aware of any professional | 12:49:23 |
| 6 | literature that suggests the use of equivalence | 12:49:26 |
| 7 | testing in a Voting Rights Act case? | 12:49:30 |
| 8 | A     No.  I also frankly would not use | 12:49:34 |
| 9 | equivalence testing in a voting rights case myself | 12:49:39 |
| 10 | but for responding to a criticism about regular | 12:49:42 |
| 11 | null hypotheses. | 12:49:46 |
| 12 | The equivalence test is even more | 12:49:48 |
| 13 | permissive.  As you pointed out, you're rejecting | 12:49:51 |
| 14 | with only 10 percent overlap.  In a regular | 12:49:54 |
| 15 | hypothesis, you only reject once the 90 percent is | 12:49:57 |
| 16 | over the threshold. | 12:50:00 |
| 17 | But that wasn't -- the critique that I | 12:50:01 |
| 18 | got from Dr. Kidd was you're rejecting a null | 12:50:02 |
| 19 | hypothesis based on the way we've always done this | 12:50:06 |
| 20 | in political science literature, which is a | 12:50:09 |
| 21 | hypothesis test, because your baseline assumption | 12:50:12 |
| 22 | is wrong. | 12:50:15 |

Transcript of Douglas Spencer, Ph.D.
Conducted on October 1, 2019                                      146

| | | |
|---|---|---|
| 1 | And my response was, well, if my | 12:50:16 |
| 2 | baseline assumption is an equivalence test, I'm | 12:50:16 |
| 3 | going to have everything across the threshold, | 12:50:19 |
| 4 | because the threshold is smaller and the estimates | 12:50:22 |
| 5 | we get here are so ridiculous, ridiculously big. | 12:50:25 |
| 6 | Q    Okay.  I would like you to use the data | 12:52:01 |
| 7 | in Exhibit 8 to show the Allen -- to apply | 12:52:10 |
| 8 | equivalence testing for Asian support.  And if you | 12:52:36 |
| 9 | need a piece of paper, I'll provide you that.  I | 12:52:39 |
| 10 | think you have a pen. | 12:52:41 |
| 11 | MS. HARLESS:  Objection to form. | 12:52:43 |
| 12 | BY MR. BOYNTON: | 12:52:50 |
| 13 | Q    And if you just want to talk me through | 12:52:50 |
| 14 | it, that's fine too.  I'm just asking you how | 12:52:53 |
| 15 | to -- you know, how to calculate. | 12:52:57 |
| 16 | A    So the idea is to take this, you know, | 12:52:58 |
| 17 | estimate, 29.8, plus or minus something like 20, | 12:53:02 |
| 18 | which would give you 50 percent-ish.  So | 12:53:19 |
| 19 | 50 percent's greater than 44.1. | 12:53:25 |
| 20 | Q    And so your range is from what to what? | 12:53:38 |
| 21 | A    Let me figure this out. | 12:53:48 |
| 22 | MS. HARLESS:  I have a calculator if | 12:54:09 |

Transcript of Douglas Spencer, Ph.D.
Conducted on October 1, 2019                    147

| | | |
|---|---|---|
| 1 | that would be helpful. | 12:54:10 |
| 2 | BY MR. BOYNTON: | 12:54:12 |
| 3 | Q     And we're not trying to make it hard on | 12:54:12 |
| 4 | you.  I probably have one, too, somewhere. | 12:54:14 |
| 5 | A     Let me just multiply the standard error | 12:54:16 |
| 6 | by 2, instead of 1.96. | 12:54:16 |
| 7 | Is that okay? | 12:54:16 |
| 8 | Q     Please use 2.  That's -- | 12:54:18 |
| 9 | A     Okay.  That's easier. | 12:54:22 |
| 10 | Q     Okay.  So -- | 12:54:48 |
| 11 | A     My range would go from 10 to 49.6. | 12:54:48 |
| 12 | Q     And so 49.6 is above 44.1.  Is it | 12:54:51 |
| 13 | 10 percent above? | 12:54:57 |
| 14 | A     It -- it is 10 percent above if you -- | 12:54:58 |
| 15 | if you had 10, 39.6, it looks like this | 12:55:01 |
| 16 | (indicating).  Wherever that 40 percent is, this | 12:55:11 |
| 17 | is -- there's 10 percent above 44. | 12:55:15 |
| 18 | Q     So it's not a straight 10 percent? | 12:55:17 |
| 19 | A     No.  It's just at least 10 percent. | 12:55:19 |
| 20 | Q     Okay.  Now I'm going to give you one | 12:55:21 |
| 21 | more, and then I will be off of it. | 12:55:23 |
| 22 | A     Okay. | 12:55:26 |

Transcript of Douglas Spencer, Ph.D.
Conducted on October 1, 2019                              148

| | | |
|---|---|---|
| 1 | Q    Asian support for Flores, you have a | 12:55:26 |
| 2 | point estimate of 33.9, I believe? | 12:55:31 |
| 3 | A    Yep. | 12:55:34 |
| 4 | Q    You have an SE of 7, which makes your | 12:55:34 |
| 5 | CI 14? | 12:55:40 |
| 6 | A    Yep. | 12:55:42 |
| 7 | So I would have a range of 19.9 to | 12:56:04 |
| 8 | 47.9. | 12:56:06 |
| 9 | Q    And what's the threshold for | 12:56:07 |
| 10 | Mr. Flores? | 12:56:09 |
| 11 | A    48.7. | 12:56:10 |
| 12 | Q    So that would be a "No" for "Minority | 12:56:11 |
| 13 | preferred"? | 12:56:14 |
| 14 | A    That's correct, for Asian. | 12:56:14 |
| 15 | Q    For Asian. | 12:56:16 |
| 16 | But you've got the box checked "Yes" on | 12:56:16 |
| 17 | your Chart 1? | 12:56:17 |
| 18 | A    Let me check. | 12:56:19 |
| 19 | Yes, you're right.  So something's | 12:56:24 |
| 20 | wrong either in this estimate that I produced | 12:56:26 |
| 21 | after -- or that I generated for you after or in | 12:56:30 |
| 22 | this check box. | 12:56:32 |

Transcript of Douglas Spencer, Ph.D.
Conducted on October 1, 2019                           149

| | | | |
|---|---|---|---|
| 1 | Q | There's an error somewhere in that? | 12:56:34 |
| 2 | A | Yep. | 12:56:36 |
| 3 | Q | Fair enough. | 12:56:37 |
| 4 | | Yeah, let's do a break.  I don't think | 12:56:53 |
| 5 | | I have a lot more, and it might be more efficient | 12:56:54 |
| 6 | | to put our heads together and -- | 12:56:57 |
| 7 | A | It saves us time to -- like, I don't do | 12:56:59 |
| 8 | | statistics like this either -- | 12:57:00 |
| 9 | Q | Okay. | 12:57:02 |
| 10 | A | -- so this is good. | 12:57:02 |
| 11 | Q | Fair enough. | 12:57:03 |
| 12 | | Let's go ahead and mark that 9 just | 12:57:04 |
| 13 | | because you were kind enough to do the work. | 12:57:06 |
| 14 | | (Spencer Exhibit 9 was marked for | 12:57:08 |
| 15 | | identification and is attached to the transcript.) | 12:57:12 |
| 16 | | THE VIDEOGRAPHER:  Please stand by. | 12:57:13 |
| 17 | | We are going off the record.  The time | 12:57:14 |
| 18 | | is 12:56 p.m. | 12:57:17 |
| 19 | | (A recess was taken.) | 12:57:19 |
| 20 | | THE VIDEOGRAPHER:  We are back on the | 01:09:12 |
| 21 | | record.  The time is 1:08 p.m. | 01:09:13 |
| 22 | | BY MR. BOYNTON: | 01:09:16 |

Transcript of Douglas Spencer, Ph.D.
Conducted on October 1, 2019                              150

```
 1      Q     Back on the record.                          01:09:17

 2            I believe we were working with               01:09:19

 3   Exhibit 8 before we did the exercise with             01:09:21

 4   Mr. Flores.  Thank you for putting that back in       01:09:25

 5   front of you.                                          01:09:28

 6            So what we took from Mr. Flores'             01:09:29

 7   confidence interval and estimate for Asian is that    01:09:36

 8   there was an error somewhere, and we did not          01:09:39

 9   believe that the -- the check for Asian range is      01:09:42

10   accurate for Mr. Flores, correct?                     01:09:45

11      A     I'm -- I'm not -- I'm not sure that's        01:09:48

12   the right takeaway.  Something is not right.  It      01:09:50

13   might be the check, it might be the standard          01:09:53

14   error, but, yeah, something is incongruent between    01:09:55

15   those two estimates to the degree --                  01:09:58

16      Q     So based on that incongruence, you           01:10:00

17   can't say today at least that under the               01:10:03

18   equivalence testing that Mr. Flores was minority      01:10:06

19   preferred by all three, black, Hispanic, and          01:10:10

20   Asians, correct?                                      01:10:14

21      A     Under this equivalence thing, yeah.          01:10:15

22      Q     Correct?                                     01:10:17
```

Transcript of Douglas Spencer, Ph.D.
Conducted on October 1, 2019                            151

| | | |
|---|---|---|
| 1 | A      Correct.  That's correct. | 01:10:18 |
| 2 | Q      So that "Y" in "Minority preferred" | 01:10:19 |
| 3 | becomes either an "N" or a question mark, correct? | 01:10:22 |
| 4 | MS. HARLESS:  Objection to form. | 01:10:26 |
| 5 | BY MR. BOYNTON: | 01:10:30 |
| 6 | Q     What happens to your conclusion that | 01:10:30 |
| 7 | Mr. Flores is minority preferred where the Asian | 01:10:34 |
| 8 | range is in doubt based on your own data? | 01:10:37 |
| 9 | A      So if we go along with this equivalence | 01:10:41 |
| 10 | logic, then I wouldn't be able to reject the null | 01:10:43 |
| 11 | hypothesis about this Asian range itself and this | 01:10:48 |
| 12 | threshold of 48.7 percent. | 01:10:52 |
| 13 | Q      So you could not confirm that he was | 01:10:54 |
| 14 | minority preferred, correct? | 01:10:56 |
| 15 | A      Using this logic, you're correct. | 01:11:00 |
| 16 | Q      Okay.  So if that is no longer a | 01:11:02 |
| 17 | "Yes" -- if the Flores "Minority preferred" box is | 01:11:06 |
| 18 | no longer a "Yes," how many minority-preferred | 01:11:09 |
| 19 | candidates do you have under the equivalence | 01:11:11 |
| 20 | testing approach? | 01:11:13 |
| 21 | MS. HARLESS:  Objection to form. | 01:11:15 |
| 22 | BY MR. BOYNTON: | 01:11:19 |

Transcript of Douglas Spencer, Ph.D.
Conducted on October 1, 2019                                    152

| | | |
|---|---|---|
| 1 | Q    How many Y's result from losing the "Y" | 01:11:20 |
| 2 | for Flores under "Minority preferred"? | 01:11:22 |
| 3 | (The reporter clarified the record.) | 01:11:25 |
| 4 | BY MR. BOYNTON: | 01:11:26 |
| 5 | Q    How many yeses do you have for | 01:11:26 |
| 6 | "Minority preferred" if you can't count on Flores | 01:11:28 |
| 7 | for a yes? | 01:11:31 |
| 8 | A    Under the minority candidates of this | 01:11:32 |
| 9 | table, six. | 01:11:33 |
| 10 | Q    Okay.  Plus one for the white | 01:11:34 |
| 11 | candidates, correct? | 01:11:38 |
| 12 | A    On this table, yes. | 01:11:41 |
| 13 | Q    So a total of seven yeses for "Minority | 01:11:42 |
| 14 | preferred"? | 01:11:45 |
| 15 | A    On this table, yes. | 01:11:45 |
| 16 | Q    Okay.  And how many won of the yeses | 01:11:46 |
| 17 | that were minority preferred? | 01:11:52 |
| 18 | A    In the column of "Won" on the table, it | 01:11:56 |
| 19 | looks like four. | 01:12:04 |
| 20 | Q    That's what I come up with. | 01:12:05 |
| 21 | Now -- so how does that match, in terms | 01:12:07 |
| 22 | of minority preferred, your original conclusions | 01:12:12 |

PLANET DEPOS
888.433.3767 | WWW.PLANETDEPOS.COM

Transcript of Douglas Spencer, Ph.D.
Conducted on October 1, 2019                            153

| | | |
|---|---|---|
| 1 | of minority preferred?  How many -- we have seven | 01:12:15 |
| 2 | that are yeses under the equivalence testing.  How | 01:12:18 |
| 3 | many minority preferred did you have or minority | 01:12:23 |
| 4 | candidates of choice did you have under your | 01:12:27 |
| 5 | original analysis? | 01:12:29 |
| 6 | MS. HARLESS:  Objection to form. | 01:12:30 |
| 7 | THE WITNESS:  Can you restate again now | 01:12:37 |
| 8 | that I'm looking at the numbers?  Sorry. | 01:12:39 |
| 9 | BY MR. BOYNTON: | 01:12:40 |
| 10 | Q    And then go ahead and look at your | 01:12:41 |
| 11 | original report if that's easier.  I don't mind | 01:12:42 |
| 12 | either. | 01:12:45 |
| 13 | How many minority candidates of choice | 01:12:47 |
| 14 | did you arrive at under your original report? | 01:12:49 |
| 15 | A    Ten. | 01:12:52 |
| 16 | Q    Ten. | 01:12:53 |
| 17 | And under the rebuttal report, you end | 01:12:54 |
| 18 | up with seven? | 01:12:58 |
| 19 | A    Well, so in Table 1 of the rebuttal | 01:13:00 |
| 20 | report, there's seven checkmarks in the "Minority | 01:13:02 |
| 21 | preferred" table, but that's not the analysis I | 01:13:05 |
| 22 | would use to identify a minority candidate of | 01:13:08 |

Transcript of Douglas Spencer, Ph.D.
Conducted on October 1, 2019                              154

| | | |
|---|---|---|
| 1 | choice.  It's just what I did in response to Kidd. | 01:13:10 |
| 2 | Q      Understood. | 01:13:14 |
| 3 | A      My -- my final of seven is from the | 01:13:15 |
| 4 | initial analysis. | 01:13:19 |
| 5 | Q      And you published an article for the | 01:13:20 |
| 6 | School of Law, University of California, Davis, | 01:13:22 |
| 7 | "Administering Section 2 of the VRA" -- I presume | 01:13:24 |
| 8 | Voting Rights -- Voting Rights Act -- "After | 01:13:30 |
| 9 | Shelby County," correct? | 01:13:32 |
| 10 | A      That's correct. | 01:13:34 |
| 11 | Q      You were a co-author with Christopher | 01:13:35 |
| 12 | Elmendorf? | 01:13:36 |
| 13 | A      Yeah.  He's a professor at UC Davis, | 01:13:37 |
| 14 | which is why there's maybe a title page from him. | 01:13:40 |
| 15 | We didn't write it for Davis.  That's where he's | 01:13:42 |
| 16 | from -- | 01:13:44 |
| 17 | Q      Okay. | 01:13:44 |
| 18 | A      -- but incidental. | 01:13:44 |
| 19 | Q      Fair enough. | 01:13:45 |
| 20 | But you are a co-author of that? | 01:13:46 |
| 21 | A      That's correct. | 01:13:48 |
| 22 | Q      Do you stand by everything that was | 01:13:49 |

Transcript of Douglas Spencer, Ph.D.
Conducted on October 1, 2019                                    155

| | | |
|---|---|---|
| 1 | written in that report? | 01:13:50 |
| 2 | A    Yes, I do. | 01:13:51 |
| 3 | Q    Okay.  Do you recall referring to | 01:13:52 |
| 4 | ecological inference as, quote, often unreliable? | 01:13:59 |
| 5 | MS. HARLESS:  Can you show him a copy? | 01:14:02 |
| 6 | MR. BOYNTON:  I would be happy to. | 01:14:04 |
| 7 | THE WITNESS:  Yes, I -- I recall | 01:14:09 |
| 8 | writing that.  I should clarify that is a | 01:14:10 |
| 9 | statistical problem, not the method that's being | 01:14:15 |
| 10 | used in VRA cases.  Ecological inference is a -- | 01:14:19 |
| 11 | is -- is a -- it's a fallacy of trying to estimate | 01:14:22 |
| 12 | individual characteristics from group data that | 01:14:26 |
| 13 | exists in a lot of different environments, and | 01:14:29 |
| 14 | that's what that's referring to, is that problem. | 01:14:32 |
| 15 | BY MR. BOYNTON: | 01:14:35 |
| 16 | Q    Okay.  Did you also make the statement | 01:14:35 |
| 17 | in that Law Review article that the other rising | 01:14:44 |
| 18 | threat to Section 2 is that the statistical | 01:14:49 |
| 19 | techniques used to establish minority political | 01:14:53 |
| 20 | cohesion and white bloc voting tend to break down | 01:14:54 |
| 21 | if there are more than two racial groups? | 01:14:58 |
| 22 | A    And/or significant residential | 01:15:01 |

Transcript of Douglas Spencer, Ph.D.
Conducted on October 1, 2019                                    156

| | | |
|---|---|---|
| 1 | integration, yes. | 01:15:02 |
| 2 | Q     Did you have -- were you looking at two | 01:15:05 |
| 3 | or more racial groups in this instance? | 01:15:07 |
| 4 | A     So what that refers to -- | 01:15:11 |
| 5 | Q     I'm sorry, I need to correct the | 01:15:13 |
| 6 | question. | 01:15:15 |
| 7 | A     Yeah. | 01:15:16 |
| 8 | Q     Were you looking -- in the Virginia | 01:15:16 |
| 9 | Beach case, were you considering more than two | 01:15:17 |
| 10 | racial groups? | 01:15:19 |
| 11 | A     Yes. | 01:15:21 |
| 12 | Q     Okay.  And did you observe significant | 01:15:22 |
| 13 | residential integration in Virginia Beach in your | 01:15:26 |
| 14 | analysis? | 01:15:29 |
| 15 | MS. HARLESS:  Objection to form. | 01:15:29 |
| 16 | THE WITNESS:  I don't know I can speak | 01:15:31 |
| 17 | credibly about integration, but there was | 01:15:35 |
| 18 | definitely a dispersion of racial minority groups | 01:15:36 |
| 19 | by precinct. | 01:15:41 |
| 20 | BY MR. BOYNTON: | 01:15:42 |
| 21 | Q     And both of -- the presence of one or | 01:15:43 |
| 22 | both of those conditions caused the statistical | 01:15:46 |

Transcript of Douglas Spencer, Ph.D.
Conducted on October 1, 2019                    157

| | | |
|---|---|---|
| 1 | techniques used to establish minority political | 01:15:51 |
| 2 | cohesion and white bloc voting to break down, | 01:15:55 |
| 3 | correct? | 01:15:57 |
| 4 |    A   If both are present, then some of the | 01:15:58 |
| 5 | aspects of the interpretation of ecological | 01:16:00 |
| 6 | regression, homogeneous precincts, and King's EI | 01:16:05 |
| 7 | become challenging in some ways. | 01:16:09 |
| 8 |    Q   In light of everything that you've | 01:16:42 |
| 9 | testified to today, can you state to a reasonable | 01:16:44 |
| 10 | degree of scientific certainty that Asians | 01:16:46 |
| 11 | alone -- Asian voters alone are cohesive in | 01:16:48 |
| 12 | Virginia Beach?  I'm sorry, cohesive with Hispanic | 01:16:52 |
| 13 | and black voters? | 01:16:57 |
| 14 |       MS. HARLESS:  Objection to form. | 01:16:59 |
| 15 | BY MR. BOYNTON: | 01:16:59 |
| 16 |    Q   Okay.  Okay.  In light of everything | 01:17:00 |
| 17 | you've testified to today, can you state to a | 01:17:03 |
| 18 | reasonable degree of scientific certainty that | 01:17:06 |
| 19 | Asian voters alone are cohesive with Hispanics | 01:17:08 |
| 20 | alone in Virginia Beach? | 01:17:12 |
| 21 |       MS. HARLESS:  Object as to form. | 01:17:24 |
| 22 |       THE WITNESS:  My strong opinion is that | 01:17:31 |

Transcript of Douglas Spencer, Ph.D.
Conducted on October 1, 2019                              158

1    these groups function as a coalition and that          01:17:32

2    they're -- that Asian voters are voting cohesively      01:17:36

3    and with black voters as evidenced by the report        01:17:42

4    that I had submitted, which I interpret to be           01:17:48

5    cohesiveness among those groups.                        01:17:52

6    BY MR. BOYNTON:                                         01:17:54

7         Q     And I'll rephrase.                           01:17:54

8               Can you state to a reasonable degree of      01:17:55

9    scientific certainty that Asians -- Asian voters        01:17:56

10   alone in Virginia Beach are cohesive with Hispanic      01:17:59

11   voters alone in Virginia Beach?                         01:18:02

12        A     I don't have point estimates for those       01:18:05

13   groups, but I do have analysis that shows that          01:18:07

14   without cohesive voting, candidates would not be        01:18:11

15   winning these votes -- these elections.  So my          01:18:14

16   interpretation of that is that there's cohesive         01:18:16

17   voting among these groups and between these             01:18:20

18   groups.                                                 01:18:22

19        Q     Are you stating to a reasonable degree       01:18:23

20   of scientific certainty that Asians alone -- Asian      01:18:24

21   voters alone are cohesive with Hispanic voters          01:18:28

22   alone in Virginia Beach?                                01:18:31

Transcript of Douglas Spencer, Ph.D.
Conducted on October 1, 2019                        159

| | | |
|---|---|---|
| 1 | MS. HARLESS:  Objection.  Asked and | 01:18:32 |
| 2 | answered. | 01:18:32 |
| 3 | THE WITNESS:  My opinion -- my opinion | 01:18:33 |
| 4 | is that, so -- and I think my opinion is based on | 01:18:35 |
| 5 | scientific certainty of what would be the | 01:18:39 |
| 6 | threshold for deciding that. | 01:18:41 |
| 7 | Q    Okay.  Thank you.  We're done. | 01:18:42 |
| 8 | A    Yeah. | 01:18:47 |
| 9 | MR. HEBERT:  Thank you. | 01:18:48 |
| 10 | THE WITNESS:  Thank you. | 01:18:49 |
| 11 | THE VIDEOGRAPHER:  Please stand by. | 01:18:50 |
| 12 | This marks the end of the videotaped | 01:18:52 |
| 13 | deposition of Douglas Spencer.  We are off the | 01:18:55 |
| 14 | record at 1:18 p.m. | 01:18:58 |
| 15 | (Off the video record.) | |
| 16 | THE REPORTER:  Do you need regular | |
| 17 | delivery or expedite? | |
| 18 | MR. BOYNTON:  We need to expedite it. | |
| 19 | THE REPORTER:  Okay.  How quickly would | |
| 20 | you like it? | |
| 21 | MR. BOYNTON:  How quickly can you do | |
| 22 | it? | |

Transcript of Douglas Spencer, Ph.D.
Conducted on October 1, 2019                                    160

```
 1               THE REPORTER:  Do you want it tomorrow?

 2               MR. BOYNTON:  Friday.

 3               THE REPORTER:  Friday is good.

 4               Annabelle, they're getting it Friday.

 5    Do you need an expedite also?

 6               MS. HARLESS:  No.

 7               THE REPORTER:  Do you need a copy of

 8    the transcript?

 9               MS. HARLESS:  Yes.

10               (Off the record at 1:19 p.m.)

11

12

13

14

15

16

17

18

19

20

21

22
```

Transcript of Douglas Spencer, Ph.D.
Conducted on October 1, 2019                    161

```
1     CERTIFICATE OF SHORTHAND REPORTER - NOTARY PUBLIC

2              I, Marney Alena Mederos, the officer

3     before whom the foregoing deposition was taken, do

4     hereby certify that the foregoing transcript is a

5     true and correct record of the testimony given;

6     that said testimony was taken by me

7     stenographically and thereafter reduced to

8     typewriting under my direction; that reading and

9     signing was not requested; and that I am neither

10    counsel for, related to, nor employed by any of

11    the parties to this case and have no interest,

12    financial or otherwise, in its outcome.

13             IN WITNESS WHEREOF, I have hereunto set

14    my hand and affixed my notarial seal this 3rd day

15    of October 2019.

16    My commission expires January 14, 2023.

17

18

19

20

21    NOTARY PUBLIC IN AND FOR

22    THE DISTRICT OF COLUMBIA
```

Transcript of Douglas Spencer, Ph.D.
Conducted on October 1, 2019

162

**A**

**aaron**
5:18, 5:22,
137:6
**abbott**
86:14, 129:6
**abby**
142:18
**ability**
16:14, 32:22,
36:3
**able**
42:12, 56:21,
57:1, 57:3,
68:12, 68:17,
68:20, 69:2,
69:21, 70:18,
71:7, 119:7,
151:10
**about**
16:17, 20:9,
21:4, 21:6,
21:19, 23:7,
25:7, 25:21,
26:5, 26:11,
27:7, 27:10,
29:16, 29:17,
29:18, 29:21,
31:8, 34:22,
35:5, 35:9,
35:21, 37:9,
44:8, 45:15,
46:1, 46:2,
47:13, 53:14,
61:20, 66:2,
68:9, 71:2,
83:8, 83:11,
83:13, 83:19,
88:4, 89:22,
95:22, 102:9,
103:11, 104:1,
104:13, 106:17,
108:12, 108:18,
109:7, 109:10,
109:14, 117:18,
119:3, 121:13,
124:22, 145:10,

151:11, 156:17
**above**
140:19, 141:6,
141:10, 147:12,
147:13, 147:14,
147:17
**academic**
19:1, 32:1,
32:20, 142:17
**accepted**
28:13
**according**
94:21
**account**
80:21, 88:7,
122:12, 122:17
**accounted**
98:13
**accounts**
56:14
**accuracy**
48:20
**accurate**
10:20, 12:17,
13:15, 45:5,
45:6, 71:7,
74:1, 144:15,
144:16, 150:10
**acknowledge**
115:18
**acknowledged**
80:10
**across**
92:3, 100:5,
114:7, 116:10,
129:15, 137:14,
138:2, 146:3
**acs**
74:14, 74:15,
106:12, 106:19
**act**
38:11, 39:2,
40:19, 40:22,
41:2, 41:7,
60:11, 61:17,
62:19, 145:3,
145:7, 154:8
**activities**
37:1

**actual**
27:2, 82:14,
121:6, 140:11
**actually**
33:3, 59:8,
59:14, 74:3,
76:2, 81:18,
96:15, 96:17,
116:14, 125:19,
135:1, 139:6,
139:21
**added**
98:19
**adding**
58:7, 61:7,
111:21
**addition**
24:3, 35:2,
66:3, 131:6
**address**
10:1, 10:5,
10:6, 60:8
**addressing**
60:13, 61:5,
61:6
**adjunct**
62:8
**adjustment**
81:7
**administered**
74:11
**administering**
154:7
**administration**
29:22
**advance**
25:3
**advantages**
56:16
**affiliated**
62:6
**affirm**
63:2
**affirmed**
8:15, 63:7
**affixed**
161:14
**african-american**
82:17, 85:14,

87:15, 92:13,
94:18
**african-americans**
118:18
**after**
28:11, 64:4,
73:5, 73:12,
73:15, 73:17,
92:18, 97:16,
135:16, 148:21,
154:8
**again**
9:21, 31:1,
94:8, 140:7,
153:7
**against**
37:11, 56:11,
57:5, 107:20
**age**
106:12, 119:15
**ago**
40:8
**agree**
73:21, 85:13,
85:17, 96:7,
97:5, 97:8,
105:12, 105:21
**agreement**
40:15
**ahead**
12:22, 13:20,
50:10, 83:14,
121:15, 134:22,
149:12, 153:10
**al**
1:4, 1:8, 7:7,
7:8
**alena**
1:22, 2:11,
161:2
**alerted**
98:20
**algorithm**
47:20, 48:20,
48:21, 126:6,
126:8
**algorithms**
126:7

Transcript of Douglas Spencer, Ph.D.
Conducted on October 1, 2019                                    163

| | | | |
|---|---|---|---|
| **align** | **almost** | 46:21, 49:10, | 60:5, 60:6, |
| 91:10 | 135:18 | 52:3, 54:7, | 62:22, 63:5, |
| **all** | **alone** | 54:10, 54:12, | 65:13, 66:1, |
| 8:22, 11:10, | 106:5, 157:11, | 54:19, 54:20, | 66:16, 67:4, |
| 11:11, 12:5, | 157:19, 157:20, | 55:7, 55:19, | 74:13, 74:19, |
| 25:4, 29:15, | 158:10, 158:11, | 56:19, 57:3, | 81:7, 81:8, |
| 36:16, 44:2, | 158:20, 158:21, | 57:5, 67:21, | 82:19, 82:20, |
| 51:15, 53:11, | 158:22 | 69:15, 82:19, | 109:22, 123:12, |
| 55:5, 56:1, | **along** | 91:18, 97:11, | 123:16, 141:19, |
| 56:14, 64:21, | 28:8, 151:9 | 103:13, 119:20, | 145:5, 161:10 |
| 66:15, 67:6, | **already** | 130:20, 132:17, | **anybody** |
| 68:16, 69:14, | 70:11, 141:15, | 153:5, 153:21, | 65:17 |
| 69:16, 71:22, | 141:16 | 154:4, 156:14, | **anymore** |
| 72:5, 72:17, | **also** | 158:13 | 125:2 |
| 79:4, 79:11, | 4:12, 8:7, | **analyzing** | **anything** |
| 80:2, 80:12, | 10:18, 30:1, | 35:5 | 14:8, 16:19, |
| 85:3, 85:6, | 30:6, 56:3, | **andrew** | 19:11, 21:22, |
| 87:14, 87:15, | 58:19, 58:20, | 114:11 | 26:10, 36:9, |
| 88:1, 89:7, | 62:16, 78:22, | **annabelle** | 42:14, 71:2, |
| 89:14, 91:9, | 80:3, 84:1, | 3:3, 8:2, 160:4 | 83:8, 106:17, |
| 91:12, 92:9, | 85:11, 87:8, | **anne** | 108:12, 108:18 |
| 94:9, 98:19, | 117:18, 126:13, | 75:11, 76:1, | **anyway** |
| 100:5, 100:10, | 129:8, 131:7, | 90:21, 94:6, | 110:7 |
| 100:11, 100:22, | 145:8, 155:16, | 97:2, 101:5, | **anywhere** |
| 101:7, 103:2, | 160:5 | 113:21 | 126:19 |
| 106:14, 112:6, | **although** | **another** | **apart** |
| 114:7, 114:10, | 116:9 | 38:22, 40:8, | 32:20, 53:8 |
| 114:16, 114:20, | **always** | 43:14, 86:21, | **apartment** |
| 116:10, 117:12, | 145:19 | 87:4, 89:11, | 10:3 |
| 125:21, 129:15, | **american** | 122:19, 124:17, | **appeals** |
| 129:16, 150:19 | 74:10, 120:3 | 131:11 | 63:6 |
| **all-minority** | **among** | **answer** | **appear** |
| 51:1, 51:3, | 77:6, 86:10, | 11:18, 12:3, | 10:20, 12:17, |
| 51:21, 52:6, | 86:12, 87:11, | 59:21, 70:5, | 13:15, 127:17 |
| 68:18, 78:2, | 105:16, 114:10, | 74:8, 97:20, | **appears** |
| 78:21, 97:7, | 119:6, 158:5, | 107:14, 143:11 | 11:19, 94:4, |
| 102:17, 103:5, | 158:17 | **answered** | 104:6, 108:16, |
| 103:13, 106:7, | **amount** | 159:2 | 144:16 |
| 106:9, 107:9, | 138:5 | **anthony** | **appendix** |
| 108:11, 114:11 | **amounts** | 119:18 | 66:10, 66:13, |
| **allen** | 136:22 | **any** | 66:14, 81:6, |
| 101:21, 113:21, | **amplify** | 11:15, 12:4, | 85:11, 94:9 |
| 115:4, 146:7 | 14:3, 14:7 | 14:14, 16:13, | **application** |
| **allow** | **analyses** | 18:1, 19:17, | 137:10 |
| 12:3, 69:7 | 91:10 | 21:1, 23:1, | **applies** |
| **allowed** | **analysis** | 24:10, 24:13, | 69:14, 69:16 |
| 138:7 | 6:4, 16:17, | 26:8, 27:12, | **apply** |
| **allows** | 18:3, 23:8, | 52:11, 54:14, | 143:10, 143:11, |
| 126:9 | | | |

Transcript of Douglas Spencer, Ph.D.
Conducted on October 1, 2019                                    164

144:2, 146:7
**applying**
5:15, 5:19
**appointment**
28:21
**approach**
98:15, 124:5,
124:9, 134:1,
143:19, 144:3,
151:20
**approaches**
117:15
**approved**
62:18
**approximately**
31:22, 132:14,
132:15
**area**
14:21, 19:12,
25:10, 35:18
**aren't**
89:19, 143:7
**argument**
88:4, 117:16
**around**
34:8, 110:22
**arrive**
153:14
**arrived**
22:12, 27:21
**article**
27:20, 62:2,
154:5, 155:17
**articles**
24:21
**arts**
19:8, 29:2
**asian**
20:14, 21:16,
68:22, 69:13,
69:20, 70:11,
70:16, 71:8,
71:11, 106:13,
107:10, 108:2,
108:12, 108:14,
108:18, 117:4,
117:7, 117:15,
130:4, 133:5,

133:8, 133:13,
146:8, 148:1,
148:14, 148:15,
150:7, 150:9,
151:7, 151:11,
157:11, 157:19,
158:2, 158:9,
158:20
**asians**
118:16, 126:17,
150:20, 157:10,
158:9, 158:20
**asked**
15:1, 16:3,
16:9, 18:1,
45:16, 127:6,
138:22, 159:1
**asking**
14:12, 52:14,
66:19, 66:20,
84:4, 95:10,
109:13, 146:14
**aspects**
24:22, 157:5
**assertion**
119:18, 119:20
**assessment**
108:6
**assigned**
30:5, 30:10
**assignment**
15:20, 31:12
**assimilation**
22:6
**assistance**
65:13
**assistant**
65:16
**associate**
28:15
**assume**
124:20, 140:7,
140:8
**assuming**
126:20, 131:18
**assumption**
143:13, 145:21,
146:2

**asterisks**
96:12
**at-large**
80:9, 81:1,
81:4, 81:11,
82:1, 86:22,
87:5, 87:20,
90:2, 92:16,
92:21, 94:5,
98:8, 99:2,
99:3, 100:14,
100:18, 101:17,
113:17, 113:19,
113:20, 113:21,
121:12, 121:22
**attached**
5:6, 7:3, 13:4,
13:22, 14:4,
128:2, 136:4,
140:5, 144:21,
149:15
**attempt**
119:9
**attempting**
133:22
**attending**
23:19
**attention**
75:6, 92:4,
92:15, 94:3,
110:20, 123:19
**attorney**
11:7
**attorney's**
4:6
**august**
32:4, 111:1
**authored**
9:5
**available**
69:7, 69:17,
72:4, 88:7,
122:3
**avenue**
10:2
**average**
83:19
**aware**
62:22, 63:5,

73:4, 73:11,
92:20, 145:1,
145:5
**away**
27:20, 55:22,
139:17

_____
          **B**
_____
**bachelor**
19:8
**back**
64:15, 77:12,
83:22, 110:17,
113:12, 135:6,
149:20, 150:1,
150:4
**background**
12:18, 22:10,
35:13
**backwards**
115:1
**baked**
122:19, 127:5
**baker**
51:16, 51:20
**ballot**
27:18
**ballots**
122:3, 122:6,
122:11
**bar**
134:2, 136:6,
137:12, 137:15,
139:14
**barbara**
91:1
**based**
47:19, 104:12,
117:3, 138:11,
145:19, 150:16,
151:8, 159:4
**baseline**
98:12, 125:8,
143:17, 144:1,
145:21, 146:2
**basically**
29:16, 80:18
**bay**
35:17

Transcript of Douglas Spencer, Ph.D.
Conducted on October 1, 2019

165

**bayside**
94:5, 94:7,
94:12, 94:18,
94:19, 95:12,
96:22, 98:5
**beach**
1:7, 4:6, 4:8,
7:8, 15:2, 50:6,
50:16, 50:20,
51:5, 57:2,
60:4, 60:14,
60:15, 61:2,
61:16, 66:7,
69:4, 69:21,
70:17, 70:19,
71:8, 72:11,
73:6, 73:12,
75:3, 93:6,
93:10, 111:9,
120:12, 120:13,
120:16, 120:19,
121:2, 121:4,
121:9, 129:19,
156:9, 156:13,
157:12, 157:20,
158:10, 158:11,
158:22
**because**
40:11, 59:14,
69:6, 72:3,
74:9, 80:15,
80:16, 85:10,
87:6, 88:6,
91:19, 94:14,
96:3, 97:13,
98:12, 99:5,
100:12, 103:17,
108:3, 110:6,
117:13, 121:9,
121:17, 122:2,
122:17, 126:12,
129:6, 130:22,
145:21, 146:4,
149:13
**become**
45:14, 60:9,
157:7
**becomes**
45:17, 151:3

**been**
9:3, 11:2,
15:1, 27:9,
28:1, 39:21,
40:1, 40:4,
40:11, 40:15,
40:22, 41:3,
41:8, 62:18,
67:16, 87:15,
88:10, 89:10,
99:9, 105:3,
110:5, 142:3,
142:15
**before**
2:11, 10:11,
11:3, 27:22,
55:10, 63:20,
73:7, 73:19,
74:2, 92:17,
121:8, 150:3,
161:3
**began**
72:2, 78:19
**begin**
127:3
**begins**
7:5, 110:15
**behalf**
3:2, 4:2, 37:6,
40:9
**behavior**
55:17, 109:15
**being**
8:15, 36:12,
36:14, 45:16,
70:18, 71:7,
72:17, 94:13,
103:12, 145:2,
155:9
**believe**
50:17, 54:13,
76:5, 82:15,
101:21, 110:21,
112:9, 129:1,
143:9, 148:2,
150:2, 150:9
**bell**
44:19, 131:13,

138:14, 138:19,
139:18, 139:20,
140:16
**bellitto**
99:1, 99:8,
99:11, 99:16,
99:18, 100:2,
100:21, 116:6,
116:12, 116:15,
116:16
**below**
139:14, 141:6
**berkeley**
22:12, 22:20,
23:13, 34:5,
55:1, 62:7
**best**
67:17
**best-fit**
56:13
**better**
18:17, 21:21,
49:4, 54:1,
71:19, 129:3,
138:2
**between**
42:8, 43:8,
48:15, 54:15,
72:11, 94:17,
95:2, 96:14,
99:20, 104:21,
107:10, 111:7,
116:12, 118:19,
124:9, 126:20,
133:9, 133:11,
150:14, 158:17
**beyond**
36:2, 36:9,
81:14
**big**
126:22, 146:5
**bigger**
53:12, 136:6,
137:17
**bit**
33:9
**black**
48:1, 51:17,

55:10, 68:13,
79:4, 79:9,
79:17, 88:1,
92:8, 95:3,
95:16, 97:7,
99:1, 99:3,
99:4, 99:7,
99:10, 99:12,
100:3, 102:10,
105:3, 106:5,
106:14, 106:20,
107:10, 108:9,
108:15, 111:8,
111:16, 112:3,
112:16, 112:22,
130:4, 150:19,
157:13, 158:3
**black-only**
51:4
**black-voter**
79:1
**blacks**
89:7, 100:22,
101:7
**bless**
112:7
**bloc**
17:16, 86:7,
90:14, 93:15,
105:2, 105:17,
105:20, 106:14,
114:19, 155:20,
157:2
**blue**
134:2, 134:4
**board**
92:3, 122:5
**boards**
21:21
**boils**
124:12
**book**
30:7
**books**
30:5, 30:10
**both**
29:2, 33:5,
33:17, 44:12,

62:6, 79:4,
82:7, 87:22,
89:7, 92:8,
101:7, 102:16,
103:15, 105:17,
116:16, 136:6,
139:1, 156:21,
156:22, 157:4
**box**
21:11, 48:1,
55:10, 78:10,
78:13, 78:17,
96:9, 138:6,
148:16, 148:22,
151:17
**boxes**
102:16
**boynton**
4:3, 5:3, 7:18,
8:19, 8:22,
12:22, 13:5,
13:19, 14:1,
16:1, 16:2,
18:8, 18:9,
33:12, 38:18,
39:9, 39:10,
41:6, 41:12,
43:21, 44:1,
48:3, 50:2,
50:5, 50:7,
50:10, 50:13,
50:14, 60:17,
64:6, 64:9,
64:17, 66:12,
66:19, 66:22,
70:2, 71:5,
74:7, 83:5,
84:8, 88:9,
88:18, 89:21,
90:1, 95:1,
95:18, 97:19,
103:21, 107:13,
108:10, 110:5,
110:18, 127:14,
127:21, 128:3,
132:8, 134:14,
136:5, 140:6,
140:22, 141:14,

141:17, 144:17,
144:22, 146:12,
147:2, 149:22,
151:5, 151:22,
152:4, 153:9,
155:6, 155:15,
156:20, 157:15,
158:6, 159:18,
159:21, 160:2
**brady**
33:5, 33:16,
34:4
**break**
64:7, 110:6,
117:14, 149:4,
155:20, 157:2
**breakdown**
129:17
**briskly**
28:8
**brought**
55:21
**browser**
13:12
**build**
119:19
**building**
16:20, 80:6
**bullet**
56:8
**bullock**
101:6, 113:20,
115:6
**bunch**
25:11, 25:18
**burton**
97:7
**burton's**
97:9

--- C ---
**cabiness**
90:11, 99:8,
100:2, 113:18,
115:14, 116:12,
128:17
**calculate**
146:15

**calculation**
135:2, 135:3
**calculations**
6:5
**calculator**
146:22
**california**
22:20, 25:19,
55:1, 154:6
**call**
20:17, 35:9,
47:7, 47:22,
61:12, 136:1,
144:12
**called**
29:13, 29:20,
46:20, 47:3,
56:4, 123:21,
124:5, 126:8
**calling**
85:2
**calls**
75:9
**came**
13:13, 119:21
**campaign**
2:4, 3:4, 3:11,
37:7, 40:8,
79:14, 141:22
**campaigners**
27:2
**can't**
11:12, 51:6,
62:2, 63:8,
63:16, 104:20,
107:8, 121:8,
121:9, 125:1,
127:1, 142:13,
150:17, 152:6
**candidate**
5:18, 5:22,
56:11, 72:6,
72:10, 76:19,
76:20, 77:3,
77:5, 77:6,
77:9, 77:22,
78:8, 79:1,
79:9, 79:11,

79:17, 80:12,
80:22, 81:10,
83:16, 85:7,
85:18, 86:1,
86:14, 87:8,
88:8, 88:11,
89:1, 89:2,
89:5, 89:14,
90:4, 90:8,
90:19, 90:22,
91:20, 91:22,
92:3, 92:8,
93:9, 95:9,
95:11, 96:5,
96:8, 96:18,
96:20, 99:2,
99:3, 99:5,
99:10, 99:12,
100:10, 100:13,
100:22, 101:2,
101:6, 101:19,
102:17, 103:14,
104:14, 104:18,
105:3, 105:5,
105:12, 106:22,
107:5, 107:7,
109:4, 109:5,
109:17, 109:18,
111:8, 111:15,
111:16, 112:3,
112:16, 113:1,
114:15, 116:1,
116:4, 116:6,
116:21, 117:21,
118:1, 118:4,
118:12, 118:14,
119:5, 122:10,
122:18, 126:18,
128:7, 128:14,
129:3, 139:7,
153:22
**candidate's**
48:14, 93:21,
98:18, 129:13
**candidates**
17:18, 46:18,
68:14, 72:15,
76:10, 76:11,

76:14, 76:15,
76:17, 80:15,
82:4, 82:8,
83:1, 83:20,
84:3, 84:14,
87:16, 88:14,
88:19, 91:8,
95:6, 99:6,
99:7, 102:11,
105:14, 112:10,
113:15, 114:2,
114:20, 114:22,
115:19, 119:4,
123:13, 129:1,
151:19, 152:8,
152:11, 153:4,
153:13, 158:14
**cannot**
105:6, 108:20
**capps**
52:8
**capture**
53:17, 81:17
**career**
18:17, 19:22,
22:10
**case**
1:6, 7:10, 9:2,
9:4, 18:2,
18:11, 30:6,
36:4, 36:13,
37:8, 37:9,
37:10, 37:13,
37:18, 38:3,
38:7, 38:11,
38:15, 38:20,
39:12, 39:14,
40:1, 40:6,
40:9, 40:16,
40:18, 40:19,
40:21, 41:3,
41:8, 41:17,
52:13, 54:11,
54:12, 54:19,
56:3, 66:17,
74:9, 75:2,
75:17, 102:1,
128:11, 129:10,

131:22, 141:12,
141:19, 145:3,
145:7, 145:9,
156:9, 161:11
**cases**
35:19, 36:8,
40:4, 56:15,
61:17, 62:17,
62:19, 63:1,
63:10, 112:3,
112:5, 112:22,
113:13, 155:10
**cast**
81:13, 81:17,
81:18, 81:19,
98:20, 122:4,
122:6, 122:8,
122:11, 122:15
**causal**
34:15
**cause**
25:21
**caused**
96:1, 156:22
**census**
73:12, 73:13,
73:14, 73:17,
73:19, 73:22,
74:13, 74:16,
74:17, 74:20,
75:5, 119:22,
120:2, 120:8,
120:20
**center**
2:4, 3:4, 3:11,
34:18, 34:21
**centerville**
75:13, 76:2,
76:8, 76:9,
78:7, 80:3,
82:2, 113:17,
128:22
**central**
25:2, 25:4
**certain**
16:14, 16:15,
80:22, 143:20
**certainly**
51:10

**certainty**
41:22, 42:1,
42:2, 42:9,
43:6, 157:10,
157:18, 158:9,
158:20, 159:5
**certificate**
161:1
**certified**
2:13
**certify**
161:4
**cetera**
78:6
**chair**
34:4
**challenge**
37:10
**challenged**
40:11
**challenging**
157:7
**chance**
138:2
**change**
35:8, 67:9,
87:20, 88:3,
98:22
**changed**
30:20
**changes**
123:11, 123:12,
123:16
**characteristic**
69:11, 69:12
**characteristics**
27:8, 155:12
**chart**
5:15, 5:19,
6:2, 75:9,
77:15, 77:20,
79:21, 79:22,
112:12, 113:8,
127:16, 127:18,
144:10, 144:12,
148:17
**check**
56:17, 57:4,

76:5, 78:10,
79:4, 79:6,
79:16, 80:2,
89:11, 138:6,
148:18, 148:22,
150:9, 150:13
**check-in**
27:15
**checked**
40:7, 78:13,
78:17, 96:9,
102:15, 103:15,
148:16
**checkmarks**
153:20
**checks**
127:15
**chicago**
3:7, 9:18,
9:20, 10:3,
32:7, 39:2
**choice**
46:19, 76:21,
77:3, 77:5,
77:9, 78:8,
79:17, 82:5,
82:8, 83:1,
84:14, 85:18,
86:2, 88:8,
88:11, 88:15,
88:20, 89:1,
89:2, 89:5,
89:15, 90:5,
90:8, 90:22,
91:8, 91:22,
92:8, 93:10,
95:9, 95:11,
96:5, 96:8,
96:18, 96:21,
99:2, 99:3,
99:5, 99:7,
99:10, 99:12,
100:10, 100:14,
100:22, 101:2,
101:6, 101:19,
102:17, 103:14,
104:14, 104:19,
105:5, 105:12,

Transcript of Douglas Spencer, Ph.D.
Conducted on October 1, 2019

168

105:14, 107:7,
112:4, 112:16,
113:1, 114:2,
114:15, 115:20,
118:13, 118:14,
123:14, 153:4,
153:13, 154:1
**choose**
54:18
**chosen**
80:16, 99:6
**chris**
7:18, 8:22
**christopher**
4:3, 154:11
**ci**
133:21, 148:5
**circling**
104:6
**circuit**
63:5
**circuits**
63:6
**circumstance**
143:10
**circumstances**
82:21, 143:21
**cite**
62:2
**cited**
65:5, 142:15
**citizen**
106:11, 119:15
**city**
1:7, 4:6, 7:8,
72:11, 86:18,
92:16, 92:18,
92:20, 93:10,
94:19, 111:9,
111:16
**civil**
35:17, 39:3
**clarification**
119:11, 119:14
**clarified**
43:20, 66:11,
152:3
**clarify**
39:9, 74:21,

119:21, 155:8
**class**
23:22, 29:10,
29:13, 30:9,
30:21, 35:15,
35:20, 36:2,
36:5
**classes**
15:4, 24:5
**clean**
127:8, 127:10,
127:12, 139:22
**cleanup**
64:18
**clear**
39:7, 58:15,
78:20, 88:22,
99:9
**clearly**
89:4, 99:4,
105:1
**clerk**
36:6
**clicking**
13:11
**close**
53:10, 53:13
**closeness**
99:13
**co-author**
141:21, 142:17,
154:11, 154:20
**co-professor**
30:8
**co-teachers**
30:9
**coalition**
75:12, 77:16,
78:1, 78:17,
79:5, 79:10,
80:4, 106:22,
107:4, 107:16,
107:19, 108:6,
108:8, 109:12,
117:21, 118:11,
118:20, 119:4,
158:1
**coalitional**
117:19

**cohesion**
5:17, 5:21,
77:17, 77:21,
78:10, 79:4,
79:8, 79:19,
106:17, 109:2,
109:3, 109:9,
109:14, 116:20,
118:22, 119:2,
155:20, 157:2
**cohesive**
17:9, 107:2,
116:21, 117:5,
117:9, 157:11,
157:12, 157:19,
158:10, 158:14,
158:16, 158:21
**cohesively**
158:2
**cohesiveness**
158:5
**colleagues**
9:1
**collecting**
65:18
**college**
29:1
**colloquially**
47:22
**colorado**
37:6, 37:11,
37:12
**columbia**
2:14, 19:7,
19:12, 161:22
**column**
77:15, 77:16,
77:21, 79:8,
98:17, 122:5,
122:7, 126:9,
128:5, 152:18
**columns**
103:2, 103:3,
130:2, 130:3
**combined**
105:21, 107:1
**combines**
68:2

**come**
74:10, 75:4,
129:3, 138:10,
152:20
**comes**
15:3, 106:11,
129:13
**coming**
136:9
**comments**
125:22
**commission**
161:16
**committee**
33:4, 33:16,
35:17, 36:7,
39:2
**communicate**
67:4
**communications**
67:2
**community**
74:10, 87:11,
120:3
**compare**
45:20, 55:12,
60:18, 67:19,
144:14
**compared**
105:1, 121:7,
130:16
**compares**
48:12, 56:10
**comparing**
42:7, 92:1,
96:22, 124:13,
142:19
**compelling**
129:8
**compensated**
36:12, 36:15
**complete**
10:15, 10:21,
14:16, 14:17
**completely**
124:13
**completing**
12:1, 12:2

Transcript of Douglas Spencer, Ph.D.
Conducted on October 1, 2019

169

complications
124:15
complies
41:15, 135:4
concentration
19:17, 23:1,
24:10, 24:13,
24:15, 69:20,
70:16
concept
44:16, 134:18
conceptualize
55:9
conclude
25:8, 81:22,
90:16, 104:13
concluded
25:9, 27:14,
32:11
conclusion
87:21, 151:6
conclusions
27:12, 41:16,
41:17, 152:22
conditions
156:22
conducted
21:10, 21:20,
123:10
conferences
142:17
confidence
42:13, 43:17,
44:3, 44:4,
44:13, 45:4,
45:8, 45:13,
45:17, 45:19,
45:20, 45:22,
46:2, 48:18,
49:8, 52:18,
52:22, 53:3,
53:7, 53:12,
57:6, 126:14,
126:21, 131:14,
131:15, 132:13,
134:12, 135:13,
135:17, 135:20,
135:22, 137:11,

137:17, 139:5,
150:7
confidence-inter-
val
135:1
confident
125:1, 125:20
confirm
76:6, 91:14,
96:10, 96:15,
151:13
confirmation
61:8, 61:9
confirmed
91:12
confirms
57:6
confusion
58:8
congressional
30:7, 93:3
congruent
123:9
connecticut
10:7, 10:9,
28:14, 28:20,
30:18
conservative
128:12, 128:21
consider
15:9, 15:12,
15:15, 41:21,
65:3, 84:5,
87:12, 87:13
consideration
96:2, 132:21
considered
65:8, 88:8,
117:21
considering
156:9
constitutes
43:5
constitutional
29:9, 32:17
consulting
39:1, 39:4,
39:6

contact
19:1
content
66:20
context
42:2, 42:5,
42:6, 45:15,
118:12, 124:11,
142:19
continue
58:13
contribute
26:7, 27:16
contributed
65:11
contributing
26:16
contribution
67:18
control
142:2, 142:20,
142:22, 143:4,
143:5, 143:18
conversation
47:8
conversationally
46:11
conversations
66:1
copies
10:15, 10:21
copy
12:12, 12:13,
13:11, 13:15,
127:9, 155:5,
160:7
core
23:6
corner
51:16, 51:20
correction
134:22
correctly
75:19, 123:1
correlated
27:18
correlating
26:17

could
56:7, 80:17,
81:1, 81:10,
88:8, 88:10,
89:2, 126:19,
151:13
council
72:11, 86:18,
92:16, 92:18,
92:20, 93:10,
111:9, 111:16,
116:1, 116:4,
116:6
counsel
7:16, 8:18,
66:3, 66:4,
161:10
count
152:6
counties
25:18
counting
114:1
county
154:9
couple
11:2, 11:9,
59:22, 64:18
course
23:4, 24:4,
29:7, 29:14,
29:19, 30:1,
30:4, 96:3
courses
19:13, 22:15,
23:7, 23:8,
23:10, 29:4,
29:5, 29:6,
29:7, 32:15,
32:16
coursework
35:3
court
1:1, 7:9, 8:6,
11:12, 12:3,
32:18, 38:5,
40:16, 63:1,
63:6

Transcript of Douglas Spencer, Ph.D.
Conducted on October 1, 2019

170

| | | | |
|---|---|---|---|
| courtesy | cycle | decide | demographic |
| 12:1, 12:2 | 31:3, 31:4 | 142:1 | 16:15, 56:12, |
| courthouse | **D** | deciding | 73:21 |
| 4:7 | data | 159:6 | demonstrated |
| create | 5:14, 5:16, | deem | 140:12 |
| 49:19, 56:10 | 5:20, 26:15, | 95:2 | denominator |
| credibly | 31:19, 49:4, | deemed | 81:12, 98:21, |
| 156:17 | 49:7, 52:19, | 84:9, 84:13, | 122:14, 123:2, |
| credits | 53:18, 53:22, | 96:6 | 123:3, 123:4, |
| 23:22 | 55:20, 55:22, | defeat | 123:5 |
| criteria | 56:14, 56:18, | 17:17, 105:17 | department |
| 35:22 | 57:7, 58:1, | defeated | 28:22, 29:12, |
| criticism | 58:12, 58:20, | 86:6, 90:14, | 29:20, 34:5, |
| 145:10 | 59:2, 59:5, | 93:15, 105:20, | 62:11, 62:15, |
| critique | 59:14, 59:20, | 105:22 | 66:7 |
| 143:13, 145:17 | 59:22, 60:3, | defendants | departments |
| cross | 60:6, 60:21, | 1:9, 4:2, 7:19, | 29:3 |
| 137:13 | 61:2, 69:17, | 7:21, 8:1, 8:18, | dependent |
| crossover | 72:4, 74:10, | 9:2 | 48:19, 48:22 |
| 23:22, 84:1 | 74:16, 88:11, | defended | depending |
| crr | 90:17, 106:13, | 89:2 | 42:5 |
| 1:22 | 106:18, 106:19, | defense | depiction |
| current | 107:18, 119:10, | 37:7 | 136:19 |
| 74:2, 120:18 | 119:18, 119:22, | define | depos |
| currently | 127:7, 128:4, | 41:21, 43:10, | 7:14, 8:8 |
| 40:6 | 141:6, 146:6, | 109:2, 109:14 | deposed |
| curriculum | 151:8, 155:12 | defining | 11:3, 37:18 |
| 14:4, 24:11, | date | 52:16 | deposition |
| 30:12, 30:16, | 7:11, 41:18, | definitely | 1:12, 2:1, 5:7, |
| 30:20 | 74:13, 93:2 | 26:14, 35:11, | 7:6, 7:14, |
| curve | dated | 36:21, 96:20, | 37:20, 37:21, |
| 44:20, 131:13, | 12:10 | 107:15, 156:18 | 110:12, 110:16, |
| 138:14, 138:20, | davenport | definition | 159:13, 161:3 |
| 139:18, 139:20, | 87:21, 88:4, | 17:11, 49:12, | describe |
| 140:16 | 89:4, 89:6, | 71:22, 109:16, | 14:21, 23:5, |
| customization | 89:11, 90:4 | 117:19 | 34:11, 44:5, |
| 126:5 | davis | degree | 47:11, 56:7, |
| customs | 51:16, 51:20, | 22:13, 23:20, | 125:11 |
| 21:6 | 154:6, 154:13, | 28:11, 42:1, | describes |
| cut | 154:15 | 43:6, 125:1, | 12:18, 53:8 |
| 94:12 | day | 150:15, 157:10, | describing |
| cut-off | 21:10, 26:1, | 157:18, 158:8, | 13:16 |
| 139:8 | 27:22, 74:2, | 158:19 | design |
| cv | 161:14 | delays | 34:15, 143:6 |
| 14:10, 14:14, | decennial | 26:3, 27:6 | designating |
| 18:16, 34:2 | 73:14, 74:17, | delivery | 87:14 |
| cvap | 74:20, 75:5 | 159:17 | designation |
| 49:15, 119:22 | | demographer | 12:12, 96:12 |
| | | 15:15 | |

Transcript of Douglas Spencer, Ph.D.
Conducted on October 1, 2019                                      171

**detail**
14:11
**details**
138:13
**determinants**
34:8
**determination**
17:7, 17:15,
71:15
**determinations**
100:10
**determine**
27:5, 44:22,
57:6, 59:1,
76:19, 86:6,
86:9, 87:5,
117:4, 117:8,
119:7
**determining**
59:8, 91:7
**devalue**
83:9
**devalues**
83:11
**develop**
30:12, 31:18,
34:7, 38:13,
38:19, 68:20,
69:2
**developed**
30:15, 31:20,
33:21, 97:16,
106:4, 142:14
**development**
35:22, 48:12
**deviation**
131:12, 132:5
**deviations**
138:14
**dictate**
72:21
**diezel**
105:1, 106:1
**differ**
142:22
**difference**
39:8, 43:8,
60:2, 77:18,

96:14, 99:20,
116:12, 118:19,
124:8
**differences**
42:8, 54:15
**different**
24:22, 29:15,
32:16, 36:19,
42:11, 43:3,
43:11, 43:12,
44:12, 46:17,
48:15, 55:15,
58:16, 59:13,
59:21, 83:12,
83:18, 84:4,
86:12, 96:15,
96:16, 96:19,
98:17, 105:9,
109:8, 116:10,
116:14, 122:21,
123:5, 124:14,
124:16, 124:19,
124:21, 125:2,
125:4, 125:6,
125:9, 125:10,
126:6, 126:7,
126:21, 127:1,
142:2, 143:6,
144:4, 155:13
**differently**
122:4
**differs**
98:15
**difficulty**
120:11
**digest**
133:16
**directing**
75:6
**direction**
136:21, 161:8
**directions**
136:7
**directly**
35:2, 67:20
**director**
35:16
**disagrees**
113:9

**disc**
7:5, 110:11,
110:15
**disclosed**
36:14, 40:8,
40:15, 66:9
**disclosure**
37:3, 37:12,
40:11
**disclosures**
5:12, 13:6
**discount**
111:12
**discussed**
114:3, 116:9
**discussion**
41:11
**dispersed**
44:8
**dispersion**
44:5, 44:16,
53:15, 71:2,
107:10, 156:18
**displayed**
124:1
**disproved**
139:11
**disseminate**
9:22
**dissertation**
24:18, 24:19,
34:7
**distinct**
109:8, 109:10,
109:15
**distinctions**
47:13
**distinguish**
104:20
**distinguishable**
103:16
**distribution**
27:21, 28:2,
28:3, 28:4,
44:15, 44:18,
49:20, 131:19
**distributions**
139:1

**district**
1:1, 1:2, 2:14,
7:9, 94:19,
121:3, 161:22
**districts**
16:18, 16:19,
16:21, 93:4,
93:6, 120:7,
120:21, 121:5
**divided**
122:9
**doctoral**
24:14, 28:11
**document**
21:7, 133:15
**documents**
10:13, 14:2,
14:12, 19:4,
43:18
**doing**
20:3, 31:17,
46:12, 124:15,
134:20, 136:14,
144:6
**done**
34:20, 59:17,
127:4, 145:19,
159:7
**dorchester**
10:2
**dots**
53:8, 53:9,
53:10, 53:13
**double**
23:22, 86:22,
87:19, 98:8,
122:16, 122:17,
123:11, 137:2
**double-checked**
103:7
**doubled**
80:12, 98:21
**doubles**
136:9
**doubling**
87:3, 121:12,
121:21
**doubt**
151:8

Transcript of Douglas Spencer, Ph.D.
Conducted on October 1, 2019

172

douglas
1:13, 2:1, 5:2,
7:6, 8:14, 9:12,
110:12, 110:16,
159:13
down
11:12, 14:19,
33:8, 117:14,
124:12, 155:20,
157:2
downloaded
119:22
dozen
30:10, 35:19,
142:16
dr
5:10, 5:16,
5:20, 8:20,
64:18, 86:1,
92:7, 110:19,
111:4, 119:16,
125:22, 143:12,
145:18
draw
16:14, 16:18,
56:13, 136:13,
139:20, 140:16
drawing
17:1, 47:5
drawn
17:3, 18:13,
59:15
drive
4:7
driven
68:7
dropped
97:12
due
105:17, 105:20,
114:18
duly
8:15
during
21:10, 27:22,
28:18, 83:20
duties
28:19

**E**

e-mails
66:6
each
21:17, 42:16,
43:15, 46:15,
47:5, 53:8,
67:21, 68:1,
68:11, 80:12,
80:17, 89:20,
92:2, 98:18,
107:20, 109:16,
109:18, 118:12,
118:15, 119:6,
122:10, 124:14,
126:16, 131:7,
131:8, 138:21,
139:2, 139:7
earlier
67:18, 114:3,
116:9, 121:19,
133:4
early
34:21, 35:1
earn
22:12, 23:20,
23:21, 128:17
earned
83:17, 90:18,
90:20, 91:20,
100:2, 122:3,
129:7, 129:18
earns
116:21
easier
147:9, 153:11
eastern
1:2, 7:9
easy
47:4, 55:9,
57:13
ecological
33:20, 47:3,
47:10, 47:12,
47:16, 47:17,
48:8, 48:19,
55:3, 56:4,

56:9, 56:16,
57:4, 57:7,
57:9, 57:20,
57:21, 58:5,
58:19, 59:3,
60:12, 60:20,
61:9, 61:14,
61:22, 62:17,
63:2, 63:7,
63:9, 63:14,
67:12, 67:22,
74:22, 75:1,
91:16, 91:17,
92:1, 95:19,
99:21, 100:1,
114:8, 114:9,
114:12, 116:11,
126:5, 126:7,
130:9, 130:12,
130:15, 130:19,
132:19, 155:4,
155:10, 157:5
economic
23:8, 130:12
economics
22:15, 22:16
education
32:21
effect
73:2, 93:4
efficient
149:5
effort
21:14, 21:15,
22:1, 134:18
efforts
111:21
ei
80:12, 81:5,
100:7, 157:6
either
136:21, 148:20,
149:8, 151:3,
153:12
elect
118:1, 118:4
elected
98:14, 104:17

election
20:6, 20:7,
21:2, 21:9,
21:20, 25:5,
25:10, 25:22,
29:11, 29:22,
35:15, 72:1,
72:5, 72:7,
75:21, 76:10,
80:3, 81:5,
82:5, 82:9,
82:20, 83:9,
83:10, 84:18,
86:17, 92:16,
92:17, 92:21,
93:11, 94:5,
95:13, 96:1,
98:3, 100:14,
100:18, 101:15,
103:14, 104:15,
105:2, 113:20,
114:21, 116:22,
121:2, 128:16
elections
20:10, 20:14,
21:18, 21:19,
22:18, 24:20,
25:7, 25:13,
29:21, 30:2,
30:7, 31:20,
34:13, 71:18,
72:6, 72:8,
72:9, 72:19,
72:20, 73:5,
73:7, 73:11,
73:15, 73:17,
73:18, 75:10,
85:7, 86:19,
91:9, 94:4,
96:4, 101:16,
121:12, 122:5,
158:15
elective
23:10
electronic
67:1
elizabeth
10:6

Transcript of Douglas Spencer, Ph.D.
Conducted on October 1, 2019                                          173

elmendorf
154:12
else
63:13, 70:12
else's
38:15
empirical
15:5, 34:13
employed
10:8, 64:4,
161:10
enable
17:16
encounter
60:14
end
110:11, 153:17,
159:12
ended
32:2
ends
55:16
enormous
126:15
enough
11:5, 12:21,
14:18, 18:15,
22:8, 24:9,
30:19, 35:4,
36:11, 49:18,
53:16, 63:12,
65:12, 67:5,
69:19, 73:3,
74:12, 116:22,
125:9, 133:11,
133:13, 137:13,
149:3, 149:11,
149:13, 154:19
entered
24:7
entire
83:16, 100:18,
124:12
environmental
29:17
environments
155:13
equal
72:17, 80:19,

136:22
equivalence
5:17, 5:21,
42:22, 63:22,
124:5, 124:8,
124:9, 124:10,
124:18, 124:20,
132:18, 132:21,
134:1, 134:8,
137:10, 138:7,
138:16, 140:12,
141:18, 141:21,
142:5, 142:9,
143:3, 143:9,
143:12, 143:19,
144:3, 145:2,
145:6, 145:9,
145:12, 146:2,
146:8, 150:18,
150:21, 151:9,
151:19, 153:2
equivalent
139:10
er
80:11, 81:5
eric
76:18
error
43:16, 44:11,
44:14, 89:16,
123:6, 131:10,
131:16, 131:17,
132:9, 132:10,
133:3, 133:7,
134:9, 147:5,
149:1, 150:8,
150:14
errors
131:14
esquire
3:3, 3:10, 4:3,
4:4, 4:5
essentially
16:12, 122:16,
131:15
est
130:6
establish
155:19, 157:1

established
70:11
estimate
42:10, 42:16,
43:13, 45:7,
45:9, 45:18,
51:3, 53:20,
68:6, 69:8,
69:21, 70:10,
70:19, 71:7,
78:1, 78:22,
79:2, 99:21,
100:3, 107:15,
107:16, 108:1,
108:11, 108:20,
117:6, 117:12,
126:17, 130:6,
131:7, 131:11,
131:12, 131:13,
132:3, 133:1,
133:5, 135:8,
136:11, 137:5,
140:15, 146:17,
148:2, 148:20,
150:7, 155:11
estimated
90:18, 99:7,
126:4, 133:8,
135:12
estimates
31:19, 38:9,
43:19, 47:20,
48:18, 52:6,
52:7, 52:21,
53:4, 57:4,
58:2, 59:12,
68:1, 68:13,
68:18, 68:21,
69:3, 81:5,
91:17, 92:2,
94:9, 96:11,
99:22, 106:4,
106:12, 114:7,
114:11, 125:19,
126:16, 146:4,
150:15, 158:12
et
1:4, 1:8, 7:7,

7:8, 78:6
ethnic
129:16, 131:7,
131:8
eval
100:8
evaluate
26:16, 46:14,
107:6, 108:8
evaluated
97:21, 98:2,
98:5
evaluates
46:21
evaluating
16:20, 29:15,
38:8, 38:14,
46:17, 49:1,
57:17, 60:10,
61:15, 73:1,
100:9
evaluation
100:4
even
12:10, 53:11,
65:17, 114:12,
145:12
ever
11:2, 96:4
every
31:5, 57:16,
74:11, 129:10
everything
45:15, 146:3,
154:22, 157:8,
157:16
evidence
58:15, 60:5,
125:9, 143:22
evidenced
158:3
evolution
18:18
exact
25:15, 102:22,
106:20
exactly
51:6, 55:11,

Transcript of Douglas Spencer, Ph.D.
Conducted on October 1, 2019

174

107:17, 121:5,
122:17, 123:10,
123:15, 126:1,
130:17, 135:19
**examination**
5:2, 8:18
**examined**
8:17
**example**
44:6, 79:12,
108:2, 128:21,
129:3, 131:21,
133:4, 139:17
**exceed**
51:15, 58:7,
128:18
**exceeding**
49:19, 51:22
**except**
18:12, 72:22,
103:1, 105:1
**exchanged**
66:6
**excuse**
75:4, 103:3,
115:2
**exercise**
20:8, 21:5,
59:10, 112:7,
150:3
**exhibit**
5:7, 5:8, 5:9,
5:11, 5:13,
5:14, 5:15,
5:19, 6:2, 6:5,
10:16, 10:17,
13:1, 13:3,
13:20, 13:21,
14:2, 41:13,
110:21, 113:13,
127:22, 128:1,
133:1, 133:17,
136:1, 136:2,
136:3, 140:4,
140:9, 144:9,
144:13, 144:14,
144:19, 144:20,
146:7, 149:14,

150:3
**exhibits**
7:2, 12:9, 14:3
**exist**
61:6, 69:12,
78:5
**exists**
155:13
**exp**
121:15
**expanded**
120:12, 120:16
**expect**
21:6
**expected**
84:2
**expedite**
159:17, 159:18,
160:5
**experience**
142:6
**experiences**
32:21
**experiments**
142:20
**expert**
5:8, 5:11, 9:4,
12:10, 12:11,
13:6, 14:5,
15:19, 16:13,
16:22, 37:1,
37:5, 37:15,
38:10, 39:1,
40:2, 40:5,
40:22, 41:3,
41:4, 41:9,
41:18, 63:9,
63:14, 63:19
**expertise**
14:22, 15:2,
19:21, 21:1,
22:10, 35:8
**experts**
66:17, 67:4
**expires**
161:16
**explain**
25:12, 46:12,

53:6, 55:11,
67:12, 118:19,
119:13, 120:5,
122:1, 128:13,
132:16, 134:2
**explained**
121:18
**exposure**
20:9
**extend**
123:6
**extending**
36:5
**extent**
12:18, 39:6,
72:22, 81:12,
87:7
**extraordinary**
54:11
**extrap**
58:10
**extrapolating**
58:1, 58:16
**extrapolation**
58:11
**extreme**
54:11, 54:19,
55:13, 56:15,
57:18, 69:12,
136:18
**extremely**
104:22
**extremes**
55:16, 56:2
**eyeball**
59:9

**F**

**fact**
53:18, 60:1,
80:1, 85:12,
98:13, 98:20,
103:17, 105:10,
106:18, 122:12,
137:11
**factor**
16:14, 17:6,
81:7

**factoring**
134:9
**factors**
16:10, 18:2
**faculty**
29:2
**fair**
11:5, 12:21,
14:18, 17:11,
17:19, 17:21,
18:15, 22:8,
24:9, 30:19,
35:4, 36:11,
53:16, 63:12,
65:12, 67:5,
73:3, 74:12,
149:3, 149:11,
154:19
**fairfax**
119:19
**fairly**
18:5
**fall**
32:2
**fallacy**
155:11
**far**
30:22, 39:16,
53:8, 86:12,
127:19
**fast**
33:13
**fault**
71:14
**featured**
72:10
**featuring**
95:5
**federal**
63:6
**feel**
113:12
**few**
27:14, 34:11,
130:17, 142:16
**field**
25:5, 25:14
**figure**
52:13, 124:16,

Transcript of Douglas Spencer, Ph.D.
Conducted on October 1, 2019                                   175

146:21
**filed**
35:18
**files**
120:6, 120:9,
121:10
**fill**
21:7
**final**
75:16, 154:3
**finally**
11:22
**finance**
37:7, 40:9,
141:22
**financial**
161:12
**find**
42:9, 50:15,
50:19, 51:13,
60:5, 72:9,
73:16, 82:4,
84:20, 90:7,
90:22, 91:4,
92:5, 92:7,
93:9, 101:11,
102:7, 124:22
**finding**
44:5, 44:15,
44:17, 116:15
**findings**
125:20
**fine**
46:10, 70:9,
70:13, 146:14
**finish**
121:16
**first**
8:15, 10:15,
11:10, 12:8,
20:9, 31:10,
37:5, 40:21,
41:2, 41:7,
44:2, 46:9,
46:20, 55:5,
55:6, 59:13,
64:21, 71:21,
94:12, 98:2,

98:4, 101:17,
101:22, 119:13,
128:4, 128:5,
130:13, 130:14,
142:5
**first-year**
29:10
**fits**
48:7, 59:8
**five**
112:19
**fix**
29:20
**flores**
102:13, 103:1,
104:17, 104:22,
105:16, 105:22,
113:21, 114:1,
114:10, 115:1,
148:1, 148:10,
150:4, 150:6,
150:10, 150:18,
151:7, 151:17,
152:2, 152:6
**focus**
100:4
**focused**
124:13
**focusing**
46:5
**follow**
76:1
**follow-up**
127:6
**follows**
8:17
**footnotes**
65:6, 65:8,
119:17
**foregoing**
161:3, 161:4
**foresee**
16:17
**form**
15:22, 18:7,
25:22, 38:17,
41:5, 48:2,
60:16, 70:1,

70:4, 70:22,
74:4, 74:18,
75:4, 83:2,
84:7, 88:2,
88:16, 94:20,
95:17, 97:18,
107:12, 107:21,
132:7, 140:21,
146:11, 151:4,
151:21, 153:6,
156:15, 157:14,
157:21
**formal**
22:14
**formally**
21:22
**former**
33:6, 33:17,
34:4
**forming**
26:7
**forms**
21:7
**forth**
106:18
**forward**
11:21, 21:21
**found**
49:22, 51:5,
84:22, 85:22,
93:22, 101:14
**four**
24:21, 51:19,
52:2, 53:2,
53:9, 53:12,
53:18, 54:8,
55:20, 96:4,
112:18, 121:1,
152:19
**four-year**
31:4
**francisco**
36:7
**frankly**
145:8
**free**
20:14, 113:12
**friday**
160:2, 160:3,

160:4
**front**
12:13, 110:21,
150:5
**full**
9:10, 23:15,
24:3
**fun**
67:13
**function**
158:1
**furman**
85:8, 85:14,
87:6, 87:7,
87:13, 87:17,
88:5, 88:10,
88:20, 89:2,
94:8, 94:11,
94:14, 94:16,
95:15, 96:17,
96:20, 97:6,
97:12, 98:4,
111:12, 111:15,
111:16
**furman's**
95:22, 97:10
**further**
137:20

**G**
**gaining**
97:13
**gave**
133:4
**general**
54:2, 54:4,
57:22, 59:19,
86:19, 138:17,
138:18
**generally**
23:4, 61:17,
119:3
**generate**
68:12, 68:13,
68:17, 108:20,
117:6, 123:21,
125:17, 126:10,
126:15, 131:14

Transcript of Douglas Spencer, Ph.D.
Conducted on October 1, 2019

176

**generated**
44:13, 45:19,
68:1, 120:8,
124:4, 124:7,
125:21, 132:18,
148:21
**generates**
126:13, 132:20
**generating**
64:19, 68:3,
106:3
**gentleman**
30:13
**geographic**
71:2, 120:14
**georgia**
101:21
**gerald**
3:10, 4:5, 7:22
**gerry**
9:1
**gestures**
11:12
**getting**
10:12, 108:4,
160:4
**gingles**
16:10, 16:14,
16:20, 17:6,
17:14, 17:20,
18:6, 18:11,
35:10, 35:21,
36:4
**gis**
66:6, 120:19,
121:10
**give**
11:22, 12:2,
56:8, 91:16,
91:19, 127:8,
127:12, 139:21,
143:7, 143:8,
146:18, 147:20
**given**
11:18, 99:12,
161:5
**giving**
21:7, 65:22

**go**
11:8, 12:22,
13:20, 20:1,
23:18, 25:17,
50:10, 81:20,
83:14, 83:22,
121:15, 134:22,
136:21, 147:11,
149:12, 151:9,
153:10
**goal**
72:22, 95:8,
143:22
**going**
10:12, 11:21,
12:8, 17:5,
21:21, 39:5,
46:8, 64:12,
77:12, 133:15,
135:6, 138:2,
139:21, 143:7,
143:8, 144:9,
146:3, 147:20,
149:17
**gold**
61:12, 61:15,
61:22, 95:16,
95:20, 100:7
**gold-standard**
60:10
**goldman**
20:1
**good**
8:20, 8:21,
60:2, 149:10,
160:3
**gotten**
28:7
**grad**
32:19
**graduate**
22:14
**graduated**
19:7, 19:20
**graduating**
15:6
**grant**
52:8

**graphical**
57:11, 136:19
**graphically**
47:4
**greater**
49:15, 146:19
**green**
134:7, 136:6,
137:3, 137:12,
137:15, 139:13,
140:9, 140:15
**ground**
11:9
**group**
17:8, 43:13,
43:14, 46:3,
46:15, 48:13,
107:4, 107:9,
109:16, 117:22,
118:3, 118:5,
118:8, 118:12,
118:15, 119:6,
119:8, 124:16,
124:17, 124:19,
131:7, 131:8,
133:2, 139:2,
142:1, 143:4,
143:5, 143:18,
155:12
**group's**
17:18
**group-level**
47:14
**groups**
16:15, 42:8,
42:10, 43:8,
45:20, 45:21,
58:15, 109:8,
109:11, 109:15,
109:18, 109:22,
117:20, 118:12,
124:9, 124:14,
124:21, 124:22,
126:16, 126:21,
129:16, 138:21,
142:20, 143:1,
143:13, 144:2,
155:21, 156:3,

156:10, 156:18,
158:1, 158:5,
158:13, 158:17,
158:18
**guess**
10:12, 15:6,
31:9
**guys**
89:19

**H**

**habitual**
85:10, 87:10,
97:13, 97:15
**half-a-dozen**
35:19
**hall**
86:16, 90:7,
113:19
**hand**
8:11, 161:14
**handwritten**
6:5
**happened**
73:10, 93:3
**happens**
75:3, 151:6
**happy**
11:17, 39:9,
70:5, 155:6
**hard**
147:3
**harless**
3:3, 8:2,
15:22, 18:7,
38:17, 39:5,
41:5, 48:2,
50:1, 50:4,
50:9, 50:11,
60:16, 66:18,
70:1, 70:4,
70:22, 74:4,
74:6, 83:2,
84:7, 88:2,
88:16, 89:19,
94:20, 95:17,
97:18, 107:12,
107:21, 132:7,

Transcript of Douglas Spencer, Ph.D.
Conducted on October 1, 2019

134:12, 140:21,
146:11, 146:22,
151:4, 151:21,
153:6, 155:5,
156:15, 157:14,
157:21, 159:1,
160:6, 160:9
**harris**
4:5, 7:22,
32:14
**hartford**
10:7
**head**
51:8, 62:3,
62:21, 63:4,
63:17, 70:14,
72:14, 142:14
**header**
85:4
**heads**
149:6
**hear**
46:10
**heard**
62:3, 62:4
**heavily**
46:8
**hebert**
3:10, 8:4,
64:8, 110:8,
127:13, 159:9
**held**
2:2
**help**
78:7, 78:16
**helpful**
11:10, 76:13,
147:1
**helping**
33:14
**henley**
91:1, 116:4,
116:16
**henry**
33:4, 33:16,
34:4
**here**
7:5, 9:1,

15:18, 27:13,
29:21, 40:12,
57:20, 75:15,
81:3, 94:7,
94:9, 110:15,
116:19, 118:20,
118:22, 132:22,
134:18, 136:14,
146:5
**hereby**
161:4
**hereunto**
161:13
**herrnson**
30:8, 30:14
**high**
104:22, 133:13,
137:12
**higher**
52:18, 97:6,
114:10
**highlighted**
103:16
**highlighting**
85:12
**hispanic**
69:4, 69:12,
69:20, 70:11,
71:8, 71:11,
106:13, 107:11,
108:2, 108:15,
117:8, 117:15,
130:4, 132:1,
133:18, 134:7,
135:12, 137:6,
150:19, 157:12,
158:10, 158:21
**hispanics**
108:22, 109:1,
118:16, 157:19
**historian**
15:13
**historically**
120:10
**history**
35:21
**holland**
37:8

**holloway**
1:4, 7:7
**hom**
56:18
**homogeneous**
46:20, 47:1,
49:9, 49:11,
49:14, 50:16,
50:20, 52:3,
52:12, 52:16,
52:20, 53:2,
54:6, 54:10,
54:18, 55:7,
55:13, 55:14,
55:19, 56:18,
57:5, 67:21,
69:11, 69:15,
74:22, 91:18,
92:2, 114:8,
157:6
**hour**
36:15
**hours**
64:21
**however**
134:16
**hp**
80:11, 81:5
**huh-uh**
11:13
**hundred**
25:16, 58:14,
120:16, 134:4
**hybrid**
23:17
**hypotheses**
145:11
**hypothesis**
42:19, 125:8,
125:10, 133:13,
139:11, 141:11,
143:16, 143:17,
144:1, 144:7,
145:15, 145:19,
145:21, 151:11

**I**

**idea**
59:19, 78:21,

109:3, 118:11,
142:15, 146:16
**ideal**
42:18
**identification**
7:3, 13:4,
13:22, 128:2,
136:4, 140:5,
144:21, 149:15
**identified**
9:4, 19:3,
29:4, 49:14,
51:1, 51:13,
72:5, 91:21,
95:20, 99:19,
100:9, 102:16,
115:21, 128:11
**identify**
7:16, 25:5,
79:19, 95:8,
101:5, 102:10,
141:8, 153:22
**identifying**
46:18, 118:10
**illinois**
3:7, 9:19
**illustration**
140:18, 141:1,
141:3, 141:4
**illustrative**
16:18
**immediately**
28:10, 28:13,
102:22
**implications**
34:14
**import**
83:10
**important**
27:20
**inability**
87:10
**inaccurate**
11:19
**incidental**
154:18
**included**
85:8, 85:11,

Transcript of Douglas Spencer, Ph.D.
Conducted on October 1, 2019                    178

94:8
**includes**
67:1, 67:3
**including**
116:11
**inclusion**
131:1
**incomplete**
11:19
**incongru**
103:8
**incongruence**
150:16
**incongruent**
150:14
**incongruity**
103:8
**inconsistent**
14:8, 14:13,
14:15
**independent**
38:14, 43:15,
108:5
**indicating**
67:15, 112:20,
136:16, 140:17,
147:16
**indicator**
60:3
**indistinguishable**
99:15
**individual**
117:22, 118:5,
118:8, 119:6,
119:8, 155:12
**individuals**
42:8, 47:13,
102:10, 124:14
**infamous**
11:13
**infer**
106:17
**inference**
33:20, 34:15,
47:10, 47:12,
47:16, 47:17,
48:8, 48:19,
60:12, 61:10,

61:15, 61:22,
62:18, 63:2,
63:7, 63:10,
63:14, 67:13,
75:1, 91:17,
92:1, 95:19,
99:21, 114:9,
114:12, 116:11,
126:5, 126:7,
130:9, 130:13,
130:15, 130:20,
132:19, 155:4,
155:10
**influencers**
35:8
**inform**
35:13, 36:3
**information**
12:15, 22:3,
27:7, 34:21,
47:14, 56:12,
57:16, 68:9,
69:6, 73:22,
74:17, 74:19,
120:14
**informed**
22:10, 32:22
**informing**
65:3, 66:2
**informs**
19:20, 61:14
**initial**
9:14, 9:15,
12:10, 14:5,
16:5, 154:4
**initiate**
48:10
**inquiry**
105:18
**insignificant**
95:4
**instance**
56:22, 60:4,
94:16, 114:14,
156:3
**instead**
45:8, 53:18,
81:19, 147:6

**instructors**
54:22
**integration**
156:1, 156:13,
156:17
**intend**
9:21, 18:10
**intending**
16:22
**interchangeably**
77:10
**interest**
20:13, 161:11
**interpret**
17:14, 158:4
**interpretation**
58:8, 157:5,
158:16
**interval**
43:17, 44:3,
44:4, 44:13,
45:4, 45:8,
45:17, 45:21,
45:22, 46:2,
49:8, 53:3,
53:7, 53:12,
131:15, 132:13,
134:13, 135:13,
135:17, 135:20,
137:11, 137:18,
139:5, 150:7
**intervals**
45:14, 45:19,
52:22, 126:14,
126:22, 131:14,
136:1
**interview**
26:19, 26:22
**interviews**
21:8
**introduce**
143:14
**introduction**
29:9, 29:13
**inverse**
144:4, 144:6
**involved**
39:18, 63:11,

85:6
**involvement**
20:8
**involvement's**
39:21
**involves**
46:16
**involving**
37:10
**issue**
50:8
**issues**
29:18
**item**
119:13
**itemized**
41:16
**itself**
108:12, 129:12,
151:11

**J**

**jackson**
99:4, 100:13,
102:13, 104:17,
104:21, 105:16,
105:22, 113:20,
114:12, 115:8,
131:22
**january**
161:16
**job**
1:20, 28:13
**joe**
9:1
**joint**
23:20, 28:21
**jointly**
62:14
**jones**
96:7
**joseph**
4:4, 7:20, 8:4
**joyce**
52:8
**jsp**
24:8
**judgment**
38:5

july
12:11, 15:21,
40:14, 41:20,
63:20, 64:4,
75:18
jumping
42:21
june
32:11
jurisprudence
24:5, 24:8,
24:13, 28:12

**K**

keep
127:10
kempsville
84:17, 84:22,
85:22, 92:5,
102:9, 104:14,
113:18, 113:22,
129:5, 129:21
kevin
33:4, 33:15,
33:19, 62:4,
62:10
kidd
5:10, 111:4,
125:22, 145:18,
154:1
kidd's
119:16, 143:12
kind
16:19, 19:17,
34:7, 44:19,
56:7, 85:12,
126:2, 127:2,
136:13, 149:13
kinds
29:15
king's
67:12, 114:9,
157:6
kings
52:8
knew
26:5
know
11:7, 11:16,

14:7, 18:20,
26:11, 26:17,
27:1, 29:4,
30:9, 35:18,
54:14, 59:9,
62:15, 62:16,
62:20, 63:3,
63:8, 71:1,
72:13, 75:20,
81:16, 82:14,
83:11, 91:22,
92:22, 93:2,
93:6, 93:17,
102:3, 105:1,
107:18, 107:22,
119:20, 121:4,
121:18, 139:15,
141:4, 142:14,
142:17, 146:15,
146:16, 156:16
kurt
4:4, 7:20

**L**

lack
70:15, 85:10
lake
52:8
language
17:7, 17:17,
45:10, 109:11,
125:7
large
31:19, 45:14,
45:17, 45:21,
108:9, 137:11
larger
45:3, 49:8,
71:11, 129:11
last
29:8, 31:6,
60:19, 73:6,
73:7, 73:12,
73:13, 73:14,
73:17, 73:19,
93:7
latasha
1:4

later
11:20, 94:13
law
2:2, 13:16,
13:17, 23:10,
23:11, 23:13,
23:18, 24:10,
24:22, 25:5,
25:10, 28:16,
28:22, 29:5,
29:8, 29:9,
29:11, 29:17,
29:18, 30:7,
32:17, 35:14,
35:15, 36:6,
37:7, 40:10,
154:6, 155:17
laws
21:6
lawyer
62:17
lawyers
35:17, 36:6,
39:2
lead
123:16
leading
33:19
leads
125:11
learn
25:21, 26:4,
26:6, 27:7
learned
27:19, 27:21,
54:21
learning
20:9, 21:5
least
41:18, 42:22,
94:12, 103:10,
128:18, 140:19,
147:19, 150:17
leave
31:6
leaving
21:8, 26:9
led
83:9, 84:5

left
26:15, 26:20
legal
2:4, 3:4, 3:11,
29:6
legitimate
59:10
length
26:17, 27:17,
27:18, 137:2
less
43:19, 45:4,
45:6, 45:9,
45:11, 49:6,
49:7, 86:13,
91:19, 93:20,
93:21, 138:1
let's
34:10, 41:13,
49:9, 55:3,
55:5, 110:6,
112:12, 129:4,
136:1, 140:7,
140:8, 149:4,
149:12
letters
29:1
level
48:17, 52:18
licensed
11:7
life
11:6
light
157:8, 157:16
liked
78:20
likely
73:22, 125:3,
125:5
limit
18:5
limitation
58:5
limitations
57:19
limited
38:8

Transcript of Douglas Spencer, Ph.D.
Conducted on October 1, 2019

180

line
25:22, 26:7,
26:9, 26:15,
26:17, 26:18,
26:20, 27:17,
47:6, 56:13,
58:13, 58:16,
59:4, 59:8,
59:15, 59:19,
137:7, 140:15
line-drawing
59:10
linear
58:6, 58:21,
59:2, 59:4,
59:14, 60:1,
60:3, 60:6,
60:21, 68:4,
68:8
link
13:7, 13:11,
13:12
list
40:12, 51:14
listed
94:7, 112:10,
121:1, 129:5
listing
35:7
literature
25:11, 42:7,
42:18, 52:12,
61:19, 138:13,
145:6, 145:20
litigation
9:22, 16:11,
35:16, 36:1,
60:11
little
33:9
living
20:5, 20:13
load
24:4
loads
24:1
local
21:6, 31:19,

37:11
location
70:16
locations
70:17
locked
21:12
logic
55:14, 107:5,
107:6, 108:8,
124:20, 125:4,
128:15, 138:18,
144:6, 151:10,
151:15
long
25:22, 26:10,
27:8, 27:16,
75:4, 110:5
longer
151:16, 151:18
look
13:9, 15:1,
51:9, 72:14,
88:21, 100:1,
102:21, 106:20,
112:12, 114:4,
128:4, 129:4,
133:5, 133:10,
135:6, 153:10
looked
22:17, 24:22,
61:2, 94:4
looking
20:15, 34:19,
55:11, 55:12,
72:2, 78:4,
91:11, 91:20,
100:5, 100:12,
106:21, 109:5,
112:17, 113:11,
115:1, 116:10,
138:6, 139:5,
141:4, 153:8,
156:2, 156:8
looks
13:14, 48:14,
136:15, 147:15,
152:19

losing
152:1
lost
114:18, 129:20
lot
84:1, 149:5,
155:13
loving
67:16
low
141:12

M

made
61:21, 88:5,
104:4, 117:16,
125:22
major
19:14
majority
17:16, 55:22,
83:17, 139:13,
141:5
make
10:15, 13:20,
47:13, 58:1,
69:7, 71:7,
77:15, 81:7,
89:19, 103:10,
108:5, 121:11,
121:21, 127:8,
134:17, 134:22,
140:2, 141:14,
144:14, 147:3,
155:16
makes
134:10, 148:4
making
43:17, 43:18
managed
30:2
many
33:21, 35:18,
64:21, 70:14,
71:21, 72:9,
76:10, 76:14,
81:18, 101:14,
151:18, 152:1,

152:5, 152:16,
153:1, 153:3,
153:13
maps
16:15, 17:1,
17:2, 18:12,
25:6
mark
13:1, 42:17,
127:21, 134:16,
144:17, 149:12,
151:3
marked
7:2, 12:9,
13:3, 13:21,
114:20, 128:1,
136:3, 140:4,
144:18, 144:20,
149:14
marker
105:9
marks
110:11, 159:12
marney
1:22, 2:11,
8:7, 161:2
massachusetts
40:7, 40:10
master's
22:13, 22:19,
23:2
match
127:11, 127:15,
127:18, 130:12,
152:21
material
30:21, 54:14
materials
30:6, 65:18
matter
7:7, 15:3,
19:22, 38:1,
64:7
may-ish
32:4
maybe
35:19, 62:14,
103:2, 129:2,

Transcript of Douglas Spencer, Ph.D.
Conducted on October 1, 2019

181

154:14
**mayor's**
85:3
**mayoral**
85:1
**mean**
14:7, 16:3,
26:13, 27:1,
42:16, 57:1,
58:9, 75:13,
99:19, 105:7,
107:2, 109:9,
118:8, 118:15,
120:3, 125:20,
128:9, 136:18,
139:16
**meaning**
23:21, 28:2,
126:9, 133:2
**meaningful**
125:17
**means**
43:12, 44:7,
45:4, 50:18,
58:11, 80:3,
81:16, 105:8,
108:14, 130:6,
137:12, 141:11
**measure**
34:9, 44:16,
122:20
**measuring**
46:6
**mechanically**
125:14, 126:4
**mederos**
1:22, 2:12,
8:7, 161:2
**member**
29:2
**members**
17:9, 33:4,
107:19
**memory**
51:12
**mention**
75:11
**mentioned**
55:10, 67:17,

126:13
**method**
43:8, 47:2,
47:3, 60:9,
61:18, 67:13,
67:18, 100:7,
155:9
**methodologies**
43:3, 43:5,
63:18, 68:12,
68:17, 68:21,
69:3, 71:9,
72:18, 80:21
**methodologists**
33:5
**methodology**
33:7, 33:18,
57:20, 62:18
**methods**
15:5, 69:14,
69:16, 70:3,
70:20, 91:12,
91:13, 100:5,
100:11, 106:4
**michigan**
62:11, 62:12,
62:13
**middle**
9:13, 9:15,
56:1, 103:2,
138:15
**midpoint**
136:10
**might**
17:1, 26:6,
58:17, 96:16,
144:8, 149:5,
150:13
**miles**
4:13, 7:13
**mind**
105:18, 153:11
**minor**
19:15, 19:16,
82:7
**minorities**
88:1, 89:7,
112:4, 114:10

**minority-candida-
te-of-choice**
87:22, 97:14
**minority-preferr-
ed**
77:22, 79:1,
79:9, 79:10,
113:4, 151:18
**minus**
44:7, 126:19,
133:3, 133:6,
133:7, 135:13,
146:17
**minute**
112:6, 128:13
**mischaracterizing**
50:12
**misleading**
58:20, 60:20
**misunderstanding**
79:6
**mobilization**
34:20
**model**
47:19, 68:3,
126:9, 126:11,
126:13, 130:10,
130:15, 130:20,
130:22, 131:3,
132:19
**model's**
58:8
**models**
33:21, 34:14
**moment**
9:9, 18:20,
55:4
**monitor**
7:12, 20:6,
20:11, 20:19
**monitored**
28:1
**monitoring**
21:2, 21:9,
21:14, 21:15
**monitors**
20:15
**monroe**
3:5

**more**
12:4, 14:11,
26:4, 43:19,
45:9, 46:14,
49:3, 49:4,
52:20, 53:1,
53:11, 53:22,
70:6, 70:7,
72:3, 72:19,
72:20, 73:18,
73:22, 76:12,
76:20, 84:2,
100:2, 105:4,
128:12, 139:1,
141:9, 145:12,
147:21, 149:5,
155:21, 156:3,
156:9
**morning**
8:20, 8:21
**most**
27:19, 35:2,
42:6, 46:22,
77:6, 91:16,
91:21, 92:18,
106:21, 109:4,
109:17, 109:20,
116:21, 118:13
**motion**
38:5
**moving**
28:8
**much**
10:14, 14:20,
27:16, 125:20,
139:7
**multi-pages**
14:10
**multiple**
23:19, 68:13,
70:17, 71:3,
131:1
**multiply**
147:5
**multiplying**
44:13
**myself**
120:1, 145:9

Transcript of Douglas Spencer, Ph.D.
Conducted on October 1, 2019

182

| N | | | |
|---|---|---|---|
| **n** 151:3 | **next** 19:19, 19:20, 22:9, 31:1, 46:3, 76:2, 80:2, 89:11, 96:12, 104:7 | **139**:4 **noticing** 103:7 **notwithstanding** 114:3 | 38:17, 41:5, 48:2, 50:1, 50:4, 60:16, 66:18, 70:4, 70:22, 74:4, |
| **name** 8:22, 9:11, 10:17, 10:19, 18:22, 22:2, 101:22, 142:13 | **nineteen** 111:11 | **null** 42:19, 139:11, 141:11, 145:11, 145:18, 151:10 | 84:7, 88:2, 88:16, 94:20, 95:17, 97:18, 107:12, 107:21, |
| **names** 33:22 | **nods** 11:12 **non-testifying** 39:8 | **number** 7:6, 7:10, 25:15, 33:3, 45:3, 51:7, | 132:7, 140:21, 146:11, 151:4, 151:21, 153:6, 156:15, 157:14, |
| **nearby** 68:9 | **non-white** 49:15, 50:3, 67:20, 68:6 | 53:14, 59:16, 72:13, 81:17, 98:12, 106:10, | 159:1 **obligations** 31:14 |
| **nearly** 86:15 | **nope** 23:3 | 106:11, 108:19, 110:16, 114:13, 122:3, 122:6, | **observe** 156:12 |
| **necessarily** 53:5, 89:3, 107:3, 130:11 | **normal** 44:14, 44:18, 131:13, 138:14, 138:19 | 122:7, 122:11, 122:15, 122:16, 126:10, 129:12, | **observed** 26:14 **obviously** |
| **necessary** 12:4 | **normally** 139:8 | 133:21, 138:1 **numbers** | 113:8 **occurred** 73:5, 73:7, |
| **need** 10:14, 80:12, 98:8, 102:18, 128:12, 139:8, | **northern** 25:18 **northwest** | 80:11, 86:22, 87:3, 87:19, 94:22, 97:6, | 73:12, 73:17, 73:19, 92:17, 93:1 |
| 146:9, 156:5, 159:16, 159:18, 160:5, 160:7 | 7:15 **northwestern** 34:16 | 98:9, 98:22, 99:13, 103:1, 103:6, 103:11, | **occurrence** 91:15 **ocean** |
| **needed** 86:13, 86:22, 121:21, 128:17, 129:12 | **notarial** 161:14 **notary** | 103:12, 104:12, 117:14, 126:12, 127:11, 127:15, | 52:8 **october** 1:15, 7:11, |
| **negate** 82:21 | 2:13, 161:1, 161:21 **note** | 127:18, 130:11, 130:13, 131:19, 132:17, 133:17, | 161:15 **offer** 16:22, 17:2, |
| **negative** 58:7 | 34:11, 80:16, 83:15, 85:8, 96:11, 112:2, | 140:8, 144:12, 153:8 | 18:10, 36:3, 116:19, 144:9 |
| **neighborhood** 25:16 | 120:5 **noted** | **numerous** 126:10 | **office** 4:6, 31:14, 36:7, 72:11, |
| **neither** 161:9 | 29:21, 68:4 **notes** | **O** | 120:14, 120:19 **officer** |
| **network** 20:14 | 104:4 **nothing** | **object** 39:5, 83:2, | 161:2 **offices** 2:2 |
| **never** 28:1 | 8:16, 26:5, 65:7, 81:3, 84:5 | 157:21 **objecting** 70:1 | **officials** 21:9 |
| **new** 11:6, 30:16, 30:17, 98:21 | **notice** 2:11, 103:4, | **objection** 15:22, 18:7, | |
| **newtown** 51:16, 51:20 | | | |

Transcript of Douglas Spencer, Ph.D.
Conducted on October 1, 2019

183

offset
81:15, 81:16
often
155:4
oh
103:20
older
72:19
once
87:19, 98:20,
145:15
one
11:4, 20:4,
27:15, 30:22,
31:10, 37:5,
43:13, 45:18,
46:3, 46:14,
56:16, 58:4,
59:22, 67:15,
70:6, 70:7,
76:19, 79:5,
80:22, 81:9,
81:19, 82:2,
82:11, 86:21,
87:4, 91:13,
91:18, 105:4,
105:14, 106:14,
112:18, 114:1,
119:17, 122:5,
122:7, 122:11,
122:18, 124:16,
124:18, 127:12,
129:9, 139:22,
147:4, 147:20,
152:10, 156:21
one-off
30:21
one-time
73:2
only
37:21, 39:22,
53:18, 55:20,
81:19, 83:16,
130:22, 140:8,
143:12, 145:14,
145:15
open
21:11

opinion
41:19, 85:9,
89:1, 108:14,
117:17, 157:22,
159:3, 159:4
opinions
16:13, 18:1,
18:10, 33:1,
35:9, 36:3,
38:6, 38:14,
38:15, 38:19,
123:12
opponent
129:22
opportunities
34:12, 111:8,
111:13, 111:22
opportunity
20:13
opposed
54:19, 98:19,
133:21
order
42:15, 46:5,
128:15, 129:9
organization
21:16, 21:17,
37:11
origin
106:19
original
10:16, 41:18,
43:2, 46:5,
57:3, 60:5,
63:19, 64:1,
64:22, 65:4,
65:9, 67:7,
68:5, 70:20,
72:1, 75:7,
84:15, 96:8,
106:3, 108:1,
113:4, 113:5,
113:12, 114:2,
117:3, 117:9,
117:11, 119:8,
123:13, 125:18,
126:2, 131:4,
152:22, 153:5,

153:11, 153:14
originally
111:11, 127:4
other
20:4, 20:22,
30:13, 35:12,
36:2, 37:20,
37:21, 39:22,
40:4, 43:15,
48:22, 53:9,
57:15, 67:21,
77:10, 87:8,
87:17, 89:20,
99:21, 106:14,
107:20, 124:14,
142:19, 155:17
others
17:3, 18:13,
21:17, 22:3,
142:10
otherwise
161:12
out
21:7, 26:18,
33:14, 58:11,
75:10, 83:18,
84:3, 85:2,
87:14, 87:16,
102:18, 120:11,
124:16, 126:1,
136:9, 136:21,
145:13, 146:21
outcome
48:12, 48:13,
161:12
outlier
91:19
outside
9:22, 15:6,
18:11, 65:7
over
30:21, 43:22,
53:11, 89:20,
96:3, 120:22,
137:15, 137:21,
145:16
overall
32:17, 75:2,

129:22
overlap
45:22, 121:5,
133:11, 138:5,
138:9, 138:21,
141:10, 145:14
overlapping
126:22
overlaps
125:1, 139:1
overseas
34:20
own
14:22, 22:2,
38:13, 38:19,
42:16, 68:2,
119:22, 151:8

**P**

packet
19:5
page
5:2, 5:7,
13:13, 16:5,
18:22, 19:3,
34:10, 37:2,
41:17, 51:14,
68:4, 75:6,
76:2, 77:12,
78:4, 78:5,
79:13, 79:14,
80:7, 80:8,
83:15, 84:18,
85:2, 93:18,
97:2, 97:3,
102:21, 102:22,
103:4, 104:4,
104:8, 104:13,
111:7, 112:10,
112:21, 113:9,
113:16, 114:21,
116:19, 118:21,
118:22, 119:10,
123:19, 124:1,
132:22, 135:8,
144:10, 144:11,
154:14
pages
1:21, 46:9

Transcript of Douglas Spencer, Ph.D.
Conducted on October 1, 2019

184

paid
20:20
paper
141:20, 142:14,
146:9
papers
142:13
par
20:18
paragraph
51:16
park
52:9
parliamentary
20:7
part
16:16, 29:1,
35:3, 66:9,
100:4
participated
20:18
participating
40:16
participation
31:15, 40:7
particular
21:1, 44:7,
48:13, 77:6,
92:17, 108:19,
133:2
particularly
15:7
parties
161:11
parts
15:7, 26:6
pass
138:7
passed
94:11, 94:12
patronize
11:8
pattern
46:22, 73:2,
87:10, 91:11,
96:3, 97:13,
97:15, 100:5,
100:12, 105:15

patterns
55:12, 116:10
paul
30:8
pen
146:10
pending
75:17
people
21:8, 22:17,
26:9, 26:15,
26:19, 26:22,
27:2, 31:16,
44:6, 47:22,
80:18, 98:13,
122:12, 122:18
percent
42:13, 42:14,
42:20, 44:6,
49:16, 49:17,
49:19, 50:16,
50:19, 50:22,
51:1, 51:4,
51:15, 51:17,
51:22, 52:12,
58:7, 58:12,
58:13, 58:17,
58:18, 65:20,
71:12, 80:19,
86:15, 90:18,
90:20, 93:20,
94:17, 95:3,
95:15, 109:21,
126:18, 126:19,
129:8, 129:19,
129:21, 132:1,
132:6, 132:11,
132:15, 133:6,
133:7, 133:9,
133:11, 133:12,
135:18, 135:20,
136:10, 137:6,
138:9, 138:13,
138:20, 139:2,
139:6, 139:8,
141:9, 141:11,
145:14, 145:15,
147:13, 147:14,

147:16, 147:17,
147:18, 147:19,
151:12
percent's
146:19
percent-ish
146:18
percent-plus
49:21
percentage
42:13, 44:9,
97:6, 129:16
perfect
42:4, 125:15
perform
107:19
performance
16:17, 17:2,
18:12
perhaps
14:16, 75:13
period
28:18, 72:16,
83:16, 83:21,
120:22
permissive
145:13
permits
131:1
person
77:1, 80:17,
122:11, 129:20
personal
27:8
personally
47:18
perspective
39:19, 39:20,
55:8, 77:4,
77:19
pertaining
12:15
peruse
10:13
pew
34:18
ph
1:13, 2:2, 5:2,

8:14, 15:3,
15:6, 33:4, 35:3
philosophy
19:9
phrase
44:4, 62:3,
62:4
piece
122:1, 146:9
place
7:14, 53:11
placebo
59:17
places
25:18, 28:5,
106:13
plaintiff
102:1
plaintiff's
37:15, 38:10
plaintiffs
1:5, 3:2, 5:11,
8:3, 8:5, 66:16
plan
30:22
planet
7:14, 8:7
please
7:16, 8:9,
8:12, 9:10,
11:16, 33:9,
41:14, 47:11,
48:10, 64:11,
83:14, 110:10,
120:5, 147:8,
149:16, 159:11
plot
47:7, 47:15,
47:17, 47:19,
53:10, 56:1,
56:10, 56:15,
59:11
plotting
47:5, 59:4
plurality
129:11
plus
44:7, 126:18,

Transcript of Douglas Spencer, Ph.D.
Conducted on October 1, 2019

185

129:9, 133:3,
133:6, 133:7,
135:13, 146:17,
152:10
**point**
11:15, 11:19,
21:2, 23:17,
35:2, 43:1,
43:18, 45:7,
45:9, 45:12,
45:16, 46:5,
47:20, 48:18,
53:4, 57:4,
68:13, 68:17,
68:20, 69:3,
72:7, 81:8,
85:5, 102:18,
106:13, 108:20,
126:1, 132:3,
136:10, 137:5,
139:9, 140:15,
148:2, 158:12
**pointed**
58:11, 120:11,
145:13
**pointing**
33:22
**points**
44:9, 53:18,
55:21, 55:22,
56:14, 106:18,
130:17, 141:6
**polarization**
33:1
**polarized**
6:3, 15:2,
33:2, 35:5,
46:6, 46:18,
60:11, 61:16,
119:19
**policy**
13:17, 20:2,
22:13, 22:20,
23:9, 24:5,
24:8, 24:14,
28:12, 28:16,
29:1, 29:5,
29:13, 29:14,

29:16, 32:15,
32:18, 32:19
**political**
15:9, 15:12,
19:11, 19:13,
20:7, 22:11,
22:15, 22:16,
23:10, 24:16,
24:20, 24:21,
25:1, 25:6,
25:11, 29:20,
30:1, 30:10,
31:15, 33:5,
33:6, 33:18,
34:5, 34:7,
34:17, 34:22,
42:3, 42:6,
42:17, 45:10,
45:13, 52:11,
54:3, 54:16,
61:19, 62:11,
119:2, 138:12,
142:10, 142:15,
145:20, 155:19,
157:1
**politically**
17:8
**politics**
29:17
**poll**
27:1
**polling**
21:9, 21:11,
22:17, 25:17,
27:22, 28:4
**polls**
27:3
**population**
51:21, 55:17,
69:13, 71:11,
77:7, 106:12,
108:9, 119:15
**portion**
35:20, 137:15,
140:19
**pose**
143:20
**position**
20:20, 28:16,

32:10, 100:6
**positions**
19:1, 32:21
**posits**
143:17
**possibility**
80:21, 81:9,
139:10
**possible**
99:11, 99:14,
134:5, 134:7
**post**
73:22
**practical**
58:8
**practice**
62:10
**pre-litigation**
39:16
**pre-litigation-t-
ype**
39:15
**preceding**
102:22
**precinct**
46:21, 49:1,
49:3, 49:10,
49:11, 50:22,
51:7, 51:17,
52:3, 52:16,
54:10, 54:19,
55:7, 55:19,
56:18, 57:5,
57:17, 67:21,
68:7, 69:15,
91:18, 92:2,
114:8, 120:6,
120:9, 156:19
**precinct-level**
72:4
**precincts**
46:22, 47:5,
47:21, 49:1,
49:7, 49:14,
49:19, 49:21,
50:15, 50:19,
51:2, 51:5,
51:14, 52:19,

53:2, 53:14,
54:6, 55:13,
55:14, 55:15,
56:12, 57:18,
68:9, 71:10,
74:22, 120:13,
120:21, 121:1,
121:6, 157:6
**prefer**
54:7, 103:22,
109:4
**preferences**
46:15, 105:19,
117:22, 119:5
**preferred**
17:18, 77:6,
77:9, 104:16,
106:21, 109:5,
109:17, 109:18,
109:20, 112:18,
116:21, 118:1,
118:4, 118:13,
119:4, 148:13,
150:19, 151:2,
151:7, 151:14,
151:17, 152:2,
152:6, 152:14,
152:17, 152:22,
153:1, 153:3,
153:21
**preparation**
15:19, 65:9,
65:14
**prepared**
110:22, 133:16
**preparing**
64:22, 77:19
**presence**
87:9, 156:21
**present**
4:12, 31:16,
157:4
**presentation**
142:16
**presented**
82:20, 108:1
**presently**
9:17, 9:18

Transcript of Douglas Spencer, Ph.D.
Conducted on October 1, 2019

186

| | | | |
|---|---|---|---|
| **presidents** 33:6, 33:17 | **probability** 26:18, 42:19 | **produces** 59:12 | 37:17, 38:9, 46:17, 117:11 |
| **presume** 73:9, 144:4, 154:7 | **probably** 14:10, 58:2, 71:19, 105:13, 147:4 | **product** 74:16 | **providing** 34:22 |
| **pretty** 18:21 | **probative** 71:16, 71:18, 71:21, 71:22, 72:8, 72:19, 72:20, 73:18, 82:1, 84:6, 84:10, 84:20, 85:1, 85:3, 85:5, 85:9, 85:16, 87:6, 87:12, 87:13, 87:16, 90:3, 91:4, 92:5, 94:1, 94:13, 95:13, 96:6, 97:9, 97:10, 100:19, 101:11, 101:15, 101:16, 102:7, 105:18, 123:17 | **profession** 12:19, 45:12, 45:13, 48:4 | **provisional** 75:16 |
| **prevail** 82:11, 86:4, 90:12, 91:2, 92:11, 93:13, 100:16, 101:9, 102:5, 102:6, 110:3 | | **professional** 2:12, 10:5, 10:6, 19:21, 36:22, 142:7, 145:5 | **proxies** 55:16 |
| | | **professor** 13:16, 28:15, 30:14, 62:8, 154:13 | **public** 2:13, 13:17, 20:2, 22:13, 22:19, 23:9, 28:16, 28:22, 29:5, 29:12, 29:14, 29:15, 32:15, 32:18, 32:19, 161:1, 161:21 |
| **prevailed** 82:9, 85:20, 90:5, 99:16, 99:18, 116:17 | | **professorship** 32:7, 32:13 | |
| **prevent** 70:18 | | **professorships** 31:9 | **publication** 142:7 |
| **prevents** 71:6 | | **profile** 47:1 | **publicly** 72:4 |
| **previously** 115:22 | | **program** 23:2, 23:15, 23:16, 23:17, 24:8, 24:14 | **publish** 21:22 |
| **primarily** 27:19, 36:8 | **probativeness** 72:22 | | **published** 21:19, 142:3, 154:5 |
| **primary** 35:7, 58:2, 67:18, 143:14 | **problem** 58:10, 60:9, 60:13, 61:3, 61:5, 61:6, 155:9, 155:14 | **programs** 23:19 | **pull** 87:16 |
| **princess** 75:11, 76:1, 90:21, 94:6, 97:2, 101:5, 113:21 | | **progress** 31:17 | **pure** 23:18 |
| | | **project** 22:16, 31:21, 34:18 | **purely** 141:3 |
| | **problems** 143:20 | **prompted** 20:11, 26:2 | **purple** 140:14 |
| **principal** 54:5 | **procedurally** 125:13, 125:16, 126:3 | **prong** 6:2, 16:21 | **purpose** 16:4, 21:14, 21:15, 25:20, 31:11, 73:1, 80:5 |
| **principle** 54:2 | | **proper** 125:7 | |
| **printed** 13:11 | **process** 20:9, 25:1, 26:5, 26:6, 46:4, 46:6, 56:4, 59:7, 64:3, 64:19, 122:22, 125:11 | **prove** 25:3, 108:12 | **purposes** 13:2, 16:10, 17:11, 17:15, 17:20, 49:12, 49:13, 72:18, 74:1, 107:2 |
| **printout** 127:17 | | **provide** 16:13, 18:1, 32:22, 37:14, 39:11, 143:22, 146:9 | |
| **prior** 12:9, 15:21, 60:18, 73:13, 141:19 | | | |
| | **processes** 46:16 | | **pursuant** 2:11 |
| **private** 62:10 | **produced** 48:19, 148:20 | **provided** 22:3, 34:17, | |

Transcript of Douglas Spencer, Ph.D.
Conducted on October 1, 2019

187

**pushed**
137:12, 137:20
**pushes**
137:20
**put**
12:12, 14:19,
42:12, 94:8,
105:9, 112:6,
149:6
**putting**
144:11, 150:4

**Q**

**qualifications**
14:3, 14:9,
14:14, 34:11
**quantitative**
23:7
**quentin**
5:10, 111:4
**question**
11:16, 12:1,
35:5, 43:22,
45:16, 53:21,
121:16, 124:12,
135:5, 143:6,
151:3, 156:6
**questions**
11:11, 64:18
**queuing**
22:17, 25:13
**quick**
110:6
**quickly**
88:21, 114:4,
159:19, 159:21
**quinn**
33:4, 33:16,
33:19, 62:4,
62:10
**quote**
56:17, 155:4

**R**

**r-by-c**
130:9
**race**
48:13, 75:11,

75:14, 75:15,
76:1, 76:9,
76:20, 77:22,
78:8, 78:11,
78:18, 79:13,
81:11, 81:13,
82:14, 83:13,
84:2, 84:22,
85:1, 85:3,
85:16, 85:18,
85:22, 87:5,
87:9, 87:20,
88:20, 90:3,
90:7, 90:21,
91:4, 92:5,
93:22, 94:12,
95:4, 95:5,
96:6, 96:18,
96:22, 97:3,
97:9, 97:10,
98:4, 98:5,
99:2, 99:3,
99:12, 99:16,
100:18, 101:2,
101:5, 101:12,
102:7, 102:9,
104:19, 105:14,
129:2, 129:7,
129:14, 133:2
**races**
48:16, 71:16,
72:2, 72:5,
73:4, 73:16,
75:10, 80:10,
81:2, 82:1,
84:6, 84:9,
84:10, 84:20,
85:3, 85:6,
87:8, 87:13,
87:15, 87:17,
90:3, 97:21,
98:2, 101:15,
112:15, 117:5,
117:10, 123:17,
126:10, 129:15,
131:1
**racial**
17:7, 17:17,

33:1, 133:2,
155:21, 156:3,
156:10, 156:18
**racially**
6:3, 15:1,
33:1, 35:5,
46:6, 46:18,
47:1, 60:10,
61:16, 119:19
**raise**
8:11, 105:10
**ran**
111:19
**range**
132:22, 134:5,
134:7, 134:8,
138:7, 139:6,
140:11, 140:19,
146:20, 147:11,
148:7, 150:9,
151:8, 151:11
**ranges**
132:20
**rate**
36:15, 138:20
**rates**
34:19, 36:19
**ratio**
81:21
**reach**
27:12, 58:17,
133:14
**read**
63:9, 102:15,
142:18
**reading**
161:8
**really**
53:9, 88:21,
105:8, 124:16,
135:17
**realtime**
2:13
**reason**
33:17, 40:13,
87:12, 128:20,
143:14
**reasonable**
42:1, 43:5,

157:9, 157:18,
158:8, 158:19
**reasons**
59:22
**rebuttal**
6:4, 10:18,
15:19, 37:6,
37:15, 67:10,
80:11, 81:6,
110:7, 110:20,
117:20, 118:21,
119:1, 123:20,
130:20, 132:20,
144:10, 153:17,
153:19
**recall**
27:13, 63:13,
92:17, 155:3,
155:7
**received**
9:5, 10:17,
10:18, 12:11,
15:5, 22:19,
27:9, 94:17,
95:15, 127:8
**receiving**
28:11, 127:7
**recent**
72:3, 72:19,
92:18
**recess**
64:14, 110:14,
149:19
**recognized**
135:16, 143:20
**record**
11:21, 41:11,
43:20, 64:12,
64:16, 66:11,
104:3, 110:13,
110:17, 149:17,
149:21, 150:1,
152:3, 159:14,
159:15, 160:10,
161:5
**recruited**
25:15
**redistricted**
92:21, 93:7

Transcript of Douglas Spencer, Ph.D.
Conducted on October 1, 2019

188

redistricting
73:6, 73:8,
73:9, 92:19,
92:22, 93:3
reduced
161:7
refer
75:22, 113:12
reference
13:1, 38:22,
61:22, 121:11
referenced
13:7
references
37:1
referred
61:18
referring
112:21, 113:3,
113:14, 118:21,
155:3, 155:14
refers
133:1, 156:4
reflect
81:6, 104:3
reflected
81:20
reflection
11:20
regard
18:2, 67:6,
120:6, 123:17
regime
37:12, 40:11
region
138:22
registered
2:12
regression
47:4, 47:6,
55:4, 56:4,
56:9, 56:13,
56:17, 57:4,
57:7, 57:10,
57:20, 57:21,
57:22, 58:5,
58:6, 58:19,
59:3, 60:20,

67:22, 75:1,
91:17, 92:1,
100:2, 114:8,
116:11, 157:6
regular
145:10, 145:14,
159:16
regulating
24:19
reject
125:10, 127:1,
133:12, 138:19,
139:3, 141:10,
143:19, 144:5,
145:15, 151:10
rejecting
42:19, 139:8,
139:9, 145:13,
145:18
rejection
138:12, 138:20,
138:22, 139:6
related
161:10
relates
19:21, 54:15
relating
36:4
relation
68:3
relationship
46:2, 48:15,
58:21, 59:2,
60:22, 68:4,
68:8
relatively
11:6
relevant
15:7, 20:5,
42:6
reliability
38:9, 42:14,
42:17, 53:19,
57:7
reliable
31:18, 42:9,
43:19, 45:9,
45:11, 49:7,

55:16, 69:7,
70:18, 108:5,
117:13, 138:1
reliably
63:8, 69:21,
70:10
reliance
58:6
relied
52:2, 52:7,
52:13, 65:5,
65:8, 119:18,
120:9
rely
43:17, 45:14,
46:8, 47:16,
47:18, 74:10,
74:13, 74:19
relying
52:19, 104:7,
104:12
remains
100:6, 140:14,
140:15
remember
51:6, 63:10,
75:19, 127:19
remove
90:2, 90:4,
96:1
removed
94:13
reon
51:20
rephrase
11:17, 16:1,
18:8, 41:1,
50:7, 69:18,
83:6, 141:2,
158:7
replaced
122:14
report
5:8, 5:9, 6:4,
10:16, 10:18,
12:10, 14:5,
15:19, 15:20,
16:5, 18:21,

21:18, 22:7,
34:10, 37:17,
41:13, 43:2,
49:12, 49:13,
51:10, 51:17,
51:18, 57:3,
58:4, 59:18,
60:5, 63:19,
64:1, 64:20,
64:22, 65:4,
65:10, 65:14,
66:2, 67:7,
67:10, 68:5,
70:21, 72:1,
75:7, 75:20,
78:14, 80:11,
81:6, 84:10,
84:15, 85:9,
89:11, 96:8,
106:3, 108:2,
108:17, 110:7,
110:20, 110:22,
111:4, 112:11,
113:4, 113:5,
113:12, 117:3,
117:9, 117:11,
117:20, 118:21,
119:1, 119:8,
119:17, 123:13,
123:20, 124:2,
124:13, 125:18,
126:2, 130:13,
130:14, 130:21,
131:4, 132:20,
135:6, 144:11,
153:11, 153:14,
153:17, 153:20,
155:1, 158:3
reported
1:22, 122:4
reporter
2:12, 2:13,
8:6, 8:9, 8:11,
11:12, 12:3,
33:8, 33:11,
43:20, 66:11,
103:18, 141:16,
152:3, 159:16,

Transcript of Douglas Spencer, Ph.D.
Conducted on October 1, 2019

159:19, 160:1,
160:3, 160:7,
161:1
**reports**
9:5, 10:21,
63:9, 63:14,
77:10, 124:8
**represent**
7:17, 9:1,
13:10, 14:6,
17:5, 47:4
**representation**
17:19, 17:21,
133:22
**representative**
140:8
**represented**
137:7, 144:13
**representing**
7:13, 8:7
**represents**
59:15, 77:21,
79:8, 81:21,
140:11
**reproduced**
103:1
**requested**
161:9
**requiring**
91:9, 109:21
**research**
26:12, 31:15,
34:15, 34:17,
34:22, 42:3,
65:16, 142:7,
143:6
**reserve**
96:10, 116:13
**reside**
9:17, 9:18
**residence**
10:1, 93:5
**residential**
155:22, 156:13
**resolution**
75:16, 75:20
**resolved**
38:3, 39:19,

39:21
**resolves**
104:11
**respect**
12:15, 15:17,
19:4, 43:4,
64:19, 67:9,
93:5, 119:14
**respond**
11:11
**responded**
20:17
**responding**
111:3, 145:10
**response**
5:9, 35:4,
66:14, 111:3,
112:10, 125:21,
127:7, 143:12,
146:1, 154:1
**restate**
153:7
**result**
22:1, 48:17,
105:2, 152:1
**resulting**
52:21
**results**
53:3, 85:11,
91:14
**retained**
39:11, 40:1,
40:4, 40:22,
41:3, 41:8
**retention**
39:15
**retired**
62:9
**return**
34:19
**returning**
18:16
**returns**
121:2
**review**
12:14, 16:7,
16:10, 21:20,
142:4, 155:17

**reviewed**
63:15, 76:8
**reviewing**
21:17
**ridiculous**
127:3, 146:5
**ridiculously**
146:5
**right**
8:11, 22:5,
26:4, 28:6,
36:10, 55:2,
63:16, 83:14,
96:10, 103:2,
116:13, 129:18,
136:12, 148:19,
150:12
**rights**
35:17, 35:19,
36:8, 38:11,
39:2, 39:3,
40:9, 40:19,
40:22, 41:2,
41:7, 60:11,
61:17, 61:20,
62:19, 145:2,
145:7, 145:9,
154:8
**rising**
155:17
**robert**
35:15, 36:6,
62:4, 62:8
**role**
37:13, 37:14
**rose**
86:16, 90:7,
113:19
**ross-hammond**
86:1, 92:7,
113:17, 115:12,
115:16, 128:17,
129:4, 129:21
**rouse**
5:18, 5:22,
82:17, 82:22,
84:1, 84:13,
113:16, 128:16,

129:18, 133:5,
133:8, 135:7,
137:6
**row**
78:2, 103:2,
126:9
**rpr**
1:22
**rubin**
35:15, 62:5
**rudee**
52:9
**rules**
11:9
**run**
59:17, 59:19,
128:6
**running**
72:7, 72:10
**résumé**
37:2

**S**

**sabrina**
76:18, 77:2
**said**
40:18, 50:12,
83:4, 95:12,
161:6
**same**
18:22, 23:20,
44:10, 44:15,
54:11, 68:3,
78:22, 103:11,
106:20, 107:5,
107:6, 108:8,
108:22, 109:1,
109:19, 118:13,
118:14, 125:3,
125:5, 126:10,
130:18, 131:2,
142:2, 143:2,
143:14, 143:18,
144:2, 144:11
**san**
36:7
**save**
18:11

Transcript of Douglas Spencer, Ph.D.
Conducted on October 1, 2019

190

saves
149:7
saw
66:8
say
27:19, 44:6,
44:18, 55:22,
58:4, 58:19,
60:8, 60:19,
70:7, 71:18,
72:15, 78:3,
105:11, 105:13,
109:20, 112:15,
112:22, 118:15,
120:2, 123:4,
125:8, 128:20,
135:10, 150:17
saying
53:22, 79:3,
111:10, 114:14,
114:15, 131:11,
139:10
says
37:5, 84:11,
124:20, 134:12,
143:3, 144:3
scatter
47:7, 47:15,
47:17, 47:18,
53:10, 56:1,
56:10, 56:15,
59:11
scholar
31:10, 33:19
school
13:17, 20:1,
23:2, 23:11,
23:13, 23:18,
28:22, 29:8,
32:14, 35:14,
154:6
science
19:12, 19:13,
20:8, 22:16,
23:11, 24:16,
24:20, 24:21,
25:6, 25:11,
29:20, 30:2,

31:15, 34:5,
34:8, 34:17,
34:22, 42:3,
42:7, 42:18,
45:10, 45:13,
52:11, 54:3,
54:16, 61:19,
62:11, 138:12,
142:10, 142:15,
145:20
sciences
29:2
scientific
41:22, 42:1,
43:6, 59:7,
157:10, 157:18,
158:9, 158:20,
159:5
scientist
15:10, 22:11,
30:10
scope
15:17, 15:18,
15:20, 18:5,
32:12
se
131:8, 131:9,
131:10, 133:20,
148:4
seal
161:14
seat
80:17, 82:2,
105:5, 111:9,
128:6
seats
81:7, 82:2,
88:6, 121:22,
122:2, 122:13
seattle
142:1
second
11:15, 47:2,
47:3, 51:15,
77:13, 80:1,
88:20, 88:22,
99:5, 101:1,
112:13, 120:5,

130:19
second-highest
88:5
secretary
37:6
section
32:18, 111:6,
154:7, 155:18
sections
32:16, 32:17
secured
21:12
see
10:10, 16:6,
24:2, 26:2,
31:2, 34:10,
36:22, 40:17,
57:13, 73:1,
91:20, 124:21,
128:21, 130:1,
133:10, 137:8,
144:5
seeing
59:5, 112:18
seeking
25:3
seem
94:22, 108:7
seen
27:11, 52:15,
61:18, 142:9,
142:16, 145:1
seminar
29:10
senate
18:2
sense
134:10
sentence
58:9, 60:19
separate
32:20, 66:4,
117:6
separately
68:2, 103:16,
108:3, 143:4
sequence
19:22

sequentially
22:9, 23:21
series
19:4, 23:8,
24:21
served
36:6
service
21:21, 27:15
serving
37:1, 39:1
sessoms
85:17
set
23:6, 26:15,
106:18, 143:5,
161:13
sets
31:19
setting
142:21, 142:22
seven
93:5, 112:19,
152:13, 153:1,
153:18, 153:20,
154:3
several
29:18, 30:5,
85:8
shapefiles
120:9, 120:15,
120:19
share
117:21
shared
119:6
shelby
154:9
sherrod
93:12, 113:19,
115:10
shift
12:4
shop
52:8
short
74:17
shorthand
16:9, 35:10,

161:1
**should**
25:7, 31:5,
72:13, 80:18,
89:10, 105:9,
108:7, 155:8
**show**
10:12, 12:8,
78:21, 87:10,
133:15, 146:7,
155:5
**showing**
134:5
**shows**
35:1, 58:15,
78:1, 79:10,
158:13
**signature-8g8ru**
161:17
**signed**
40:14
**significant**
35:20, 43:7,
60:2, 96:13,
137:15, 155:22,
156:12
**significantly**
42:11, 59:6,
86:11, 93:21,
124:19
**signing**
161:9
**similar**
48:22, 49:3,
49:6, 97:8,
114:13, 130:17
**similarly**
17:10, 53:1
**simplicity**
57:11
**simply**
37:14, 144:9
**since**
15:6
**single**
104:18, 105:5
**sir**
9:7, 10:8,

12:5, 13:7,
64:10, 104:9,
127:12
**site**
72:5
**situation**
105:10
**six**
29:8, 41:16,
84:2, 112:19,
130:3, 152:9
**sixteen**
111:8
**size**
46:1, 69:13,
71:11, 108:4,
136:9
**slope**
58:14
**sloped**
59:6
**slow**
33:8
**small**
69:13, 70:16,
70:17, 71:3,
108:4, 126:12,
140:20
**smaller**
52:22, 53:3,
146:4
**social**
24:5, 24:8,
24:14, 28:12
**society**
33:6, 33:18
**sociological**
26:12
**sociology**
26:9
**solely**
110:2
**some**
11:19, 15:3,
16:17, 16:18,
20:2, 27:10,
29:4, 30:6,
31:17, 34:20,

47:22, 58:7,
59:17, 75:16,
83:12, 104:4,
125:21, 127:6,
157:4, 157:7
**somebody**
144:1
**someone**
38:14
**something**
65:1, 70:12,
93:4, 135:21,
136:15, 138:19,
140:17, 143:7,
143:8, 146:17,
150:12, 150:14
**something's**
148:19
**somewhere**
25:16, 133:9,
147:4, 149:1,
150:8
**sorry**
20:16, 41:22,
57:14, 70:3,
70:8, 70:12,
71:14, 73:5,
73:16, 74:5,
74:6, 75:10,
76:9, 76:12,
82:7, 86:17,
89:21, 89:22,
103:20, 104:1,
121:15, 129:15,
130:12, 132:18,
135:14, 141:1,
144:18, 153:8,
156:5, 157:12
**source**
65:2, 119:14
**sources**
27:5, 65:3,
65:5, 69:22
**south**
10:2
**space**
31:14, 49:2,
68:10

**speak**
11:20, 42:2,
49:9, 63:8,
66:1, 66:16,
138:6, 156:16
**special**
82:21, 83:4,
92:16, 93:11,
113:19
**specific**
34:12, 76:12,
138:16
**specifically**
33:15, 34:6,
35:9, 35:21,
36:3, 117:4,
133:18
**spencer**
1:13, 2:2, 5:2,
5:7, 7:2, 7:7,
8:14, 8:20,
9:12, 13:3,
13:21, 64:18,
110:12, 110:17,
110:19, 128:1,
136:3, 140:4,
144:20, 149:14,
159:13
**spencer's**
5:16, 5:20, 6:2
**spend**
64:22
**spent**
20:3, 35:20
**spoke**
66:20
**spot**
88:17
**spots**
71:4, 88:13,
88:14
**spring**
32:3
**stable**
120:22
**stand**
25:17, 64:11,
110:10, 149:16,

Transcript of Douglas Spencer, Ph.D.
Conducted on October 1, 2019

192

154:22, 159:11
**standard**
43:16, 44:10,
44:14, 61:12,
61:15, 62:1,
95:16, 95:20,
100:7, 131:10,
131:12, 131:13,
131:16, 131:17,
132:5, 132:9,
132:10, 133:3,
133:7, 134:9,
138:14, 147:5,
150:13
**standard-of-error**
135:2
**start**
43:22, 125:13
**started**
10:11, 10:12,
22:14, 32:2,
56:6, 87:14
**starting**
72:7, 85:5
**state**
7:17, 37:7,
40:10, 93:3,
129:8, 157:9,
157:17, 158:8
**state's**
37:12
**statement**
14:9, 14:13,
116:20, 119:3,
155:16
**statement's**
118:7
**states**
1:1, 7:9,
21:16, 29:22,
34:18, 63:1
**stating**
158:19
**station**
21:9, 27:16,
27:22
**stations**
22:18

**statistical**
23:7, 33:20,
47:12, 48:11,
107:1, 138:11,
155:9, 155:18,
156:22
**statistically**
42:10, 43:7,
43:10, 43:12,
43:14, 59:5,
59:13, 59:21,
60:2, 86:11,
96:13, 104:20,
116:14
**statistics**
15:5, 34:13,
62:14, 75:2,
149:8
**status**
97:14, 113:4
**stay**
43:1
**steep**
58:14
**stenographically**
161:7
**step**
139:17
**stepping**
26:18
**steps**
56:9
**sticks**
84:3
**still**
32:10, 39:18,
62:6, 117:17
**stop**
58:12
**straight**
20:1, 42:21,
147:18
**street**
2:5, 3:5, 3:12,
7:15, 10:7
**strengths**
55:6, 55:7,
57:9, 57:15

**strong**
105:15, 157:22
**stuck**
83:18
**students**
25:17, 29:10,
30:11, 32:19
**studied**
83:9, 83:17
**study**
19:12, 23:5,
25:12, 25:14,
25:20, 27:12,
27:14, 28:1,
35:14, 141:22
**studying**
26:8
**subheadings**
130:4
**submitted**
75:20, 158:4
**substance**
65:11, 65:22
**substantively**
130:16
**successful**
101:1
**sufficient**
69:19, 70:7,
70:15, 118:1,
118:4, 118:6
**sufficiently**
17:16
**suggest**
59:14, 96:17,
96:20
**suggests**
145:6
**suite**
3:6, 3:13
**suits**
64:8, 64:9
**sum**
80:18
**summarized**
75:2
**summary**
16:4, 16:16,

38:4, 38:6,
41:17, 98:18,
98:19, 111:6
**support**
68:14, 68:18,
68:22, 69:4,
78:22, 83:17,
83:18, 83:20,
85:10, 86:10,
86:12, 86:15,
87:11, 87:22,
88:6, 90:19,
90:20, 91:11,
91:21, 93:19,
93:20, 95:3,
97:7, 99:8,
103:5, 104:21,
105:15, 106:21,
107:10, 107:11,
108:2, 108:3,
108:9, 114:9,
114:11, 116:14,
116:22, 117:7,
117:22, 118:3,
118:5, 118:9,
119:8, 126:18,
128:18, 128:19,
132:1, 133:5,
133:8, 133:13,
133:18, 134:8,
135:12, 137:6,
146:8, 148:1
**support's**
104:22
**supported**
84:1
**supporting**
52:12, 107:5
**supports**
79:11, 118:12
**suppose**
59:16
**supposed**
103:19
**supreme**
32:18, 63:1
**sure**
10:15, 25:14,

Transcript of Douglas Spencer, Ph.D.
Conducted on October 1, 2019

193

46:13, 51:9,
64:8, 71:1,
89:19, 103:10,
108:4, 127:8,
134:3, 144:14,
150:11
**surplusage**
100:11
**survey**
29:14, 29:16,
30:1, 31:18,
74:11, 120:3
**surveys**
31:18
**swear**
8:9
**switch**
55:3
**sworn**
8:15
**systems**
120:14

**T**

**table**
78:20, 80:6,
80:7, 83:22,
94:22, 102:19,
112:20, 113:16,
114:21, 123:21,
124:4, 124:7,
125:12, 125:16,
125:19, 127:5,
127:7, 132:22,
152:9, 152:12,
152:15, 152:18,
153:19, 153:21
**tables**
78:2, 78:3,
78:5
**tabulation**
120:7, 120:21,
121:3, 121:5
**tag**
4:13, 7:13
**take**
10:14, 11:12,
18:20, 20:2,

27:20, 64:6,
110:2, 110:6,
112:6, 146:16
**takeaway**
150:12
**taken**
64:14, 73:18,
73:19, 93:4,
110:14, 114:7,
149:19, 161:3,
161:6
**takes**
132:17, 133:16
**taking**
7:14, 23:22,
24:3, 24:4,
144:10
**talk**
29:16, 29:17,
29:18, 35:8,
117:18, 146:13
**talked**
121:13
**talker**
33:13
**talking**
35:21, 89:20,
103:11, 109:7
**taught**
15:4, 29:8,
29:19, 30:3,
30:22, 32:16
**teach**
29:7, 29:13,
31:1
**teaching**
31:14
**technically**
131:16
**techniques**
155:19, 157:1
**technology**
27:17
**tell**
9:10, 21:4,
31:8, 35:12,
46:4, 53:6,
56:6, 61:21,

62:16, 77:18,
83:12, 102:9,
107:8, 108:18,
112:5, 121:8,
121:9, 124:10,
141:5, 141:18
**ten**
54:6, 112:2,
112:5, 112:9,
112:15, 112:19,
112:22, 113:7,
113:13, 113:15,
114:2, 114:18,
117:5, 117:10,
153:15, 153:16
**tend**
17:9, 155:20
**term**
44:12, 48:4,
48:7, 54:18,
71:19
**terms**
53:19, 54:15,
77:8, 77:19,
109:11, 132:12,
152:21
**terrible**
43:21
**test**
5:17, 5:21,
51:12, 116:13,
124:20, 141:22,
143:3, 145:12,
145:21, 146:2
**testified**
8:17, 61:1,
157:9, 157:17
**testify**
8:15, 37:22
**testifying**
36:17, 39:7,
41:4, 41:8
**testimony**
15:18, 17:1,
17:2, 18:6,
36:13, 36:20,
39:11, 161:5,
161:6

**testing**
42:22, 63:22,
124:5, 124:8,
124:10, 124:18,
132:21, 134:1,
134:8, 138:7,
138:16, 140:12,
141:19, 142:6,
142:9, 143:10,
143:12, 143:16,
144:7, 145:2,
145:7, 145:9,
146:8, 150:18,
151:20, 153:2
**testing's**
137:10
**tests**
59:17
**text**
30:3
**th**
3:12, 12:11,
15:21, 41:20,
63:20, 64:4,
111:1
**thailand**
20:6, 20:12
**thank**
10:4, 11:1,
12:7, 14:20,
17:22, 24:9,
32:5, 33:11,
64:9, 71:13,
104:2, 112:8,
127:13, 141:13,
150:4, 159:7,
159:9, 159:10
**themselves**
7:17, 21:10,
48:16
**theoretical**
34:14
**theories**
25:7
**thereafter**
161:7
**therefore**
50:18

Transcript of Douglas Spencer, Ph.D.
Conducted on October 1, 2019

194

thesis
25:2, 25:4
thick
18:21
thing
27:20, 108:22,
109:1, 137:3,
143:2, 150:21
things
11:2, 21:12,
27:15, 33:3,
35:13, 36:2,
72:17, 83:12
think
14:6, 14:15,
15:7, 17:21,
18:14, 18:21,
21:20, 28:7,
35:1, 35:16,
36:10, 39:16,
39:20, 42:6,
43:2, 50:11,
51:6, 52:14,
56:6, 62:9,
63:16, 65:1,
66:15, 74:21,
76:18, 79:7,
80:10, 92:21,
99:19, 101:21,
103:18, 105:11,
109:10, 111:10,
118:7, 125:16,
125:18, 128:11,
129:7, 133:20,
141:20, 144:8,
146:10, 149:4,
159:4
third
11:18, 60:9,
129:2
threat
155:18
three
23:18, 25:18,
32:15, 32:16,
43:2, 46:17,
63:18, 68:11,
68:16, 68:21,

69:3, 69:14,
69:16, 69:22,
70:3, 70:20,
71:9, 72:18,
76:11, 80:20,
82:1, 82:4,
82:8, 83:19,
84:9, 87:17,
91:9, 91:12,
91:13, 94:4,
100:5, 100:11,
103:3, 106:4,
109:7, 109:10,
109:15, 109:18,
109:22, 111:11,
111:12, 111:19,
111:21, 112:18,
114:7, 115:19,
115:21, 117:14,
130:2, 130:3,
150:19
three-year
23:15, 23:16,
24:4, 31:3
threshold
52:15, 86:13,
109:21, 128:7,
128:9, 128:10,
128:11, 128:22,
129:5, 129:8,
133:12, 133:14,
137:13, 137:14,
137:16, 137:21,
138:3, 138:8,
138:12, 139:4,
139:14, 140:14,
140:20, 141:7,
141:8, 141:10,
145:16, 146:3,
146:4, 148:9,
151:12, 159:6
thresholds
129:10
through
11:9, 13:11,
46:9, 47:6,
56:13, 59:4,
59:20, 70:6,

120:8, 120:20,
146:13
throwing
55:21
time
7:12, 10:14,
11:4, 19:22,
20:2, 21:2,
23:20, 28:18,
30:21, 30:22,
36:16, 64:12,
64:16, 70:6,
70:8, 72:16,
81:8, 83:16,
120:22, 131:2,
149:7, 149:17,
149:21
time-of-day
28:2, 28:3
times
39:22, 83:19,
85:8, 111:19,
131:16, 131:17,
133:3, 133:6,
142:16
timing
72:21
title
24:19, 154:14
today
7:13, 8:7,
13:20, 15:18,
17:15, 18:6,
27:13, 114:3,
150:17, 157:9,
157:17
today's
7:11
together
14:10, 30:15,
53:10, 53:13,
103:17, 107:16,
108:16, 112:6,
117:12, 149:6
tomorrow
160:1
took
19:13, 22:15,

23:10, 35:15,
71:13, 150:6
tool
47:13
top
18:22, 51:7,
62:3, 62:20,
63:3, 63:17,
72:13, 79:16,
142:13
total
48:14, 51:21,
80:18, 81:13,
81:17, 103:15,
105:21, 122:10,
128:13, 129:6,
129:13, 129:16,
129:22, 152:13
totality-of-the--
circumstances
18:3
totally
79:6, 138:4
totals
48:15, 51:7,
56:11, 67:19,
67:20, 93:17,
95:22, 96:14,
104:7, 121:12,
122:10, 123:2
trade-offs
46:16
traditional
130:15, 143:16,
144:6
trained
20:18
training
15:3, 15:4,
21:1, 21:4,
21:5, 22:14,
23:7, 23:9,
27:9, 33:15,
34:12
transcript
5:6, 7:4,
11:14, 13:4,
13:22, 128:2,

Transcript of Douglas Spencer, Ph.D.
Conducted on October 1, 2019

195

136:4, 140:5,
144:21, 149:15,
160:8, 161:4
**transitioning**
110:7
**translates**
132:12
**transparency**
21:18
**treatment**
142:1, 142:20,
142:22, 143:4,
143:5, 143:18
**trial**
37:22, 38:5
**tried**
26:16
**true**
10:15, 161:5
**truth**
8:16, 8:17
**try**
25:21, 83:6,
117:13, 125:22,
143:19
**trying**
11:8, 25:5,
42:5, 42:9,
43:1, 51:10,
60:18, 70:12,
124:15, 134:17,
147:3, 155:11
**tuesday**
1:15, 7:11
**turn**
41:13, 60:9,
110:19
**turning**
84:17, 86:16,
86:18, 92:4,
92:15, 94:3,
101:14, 123:19
**twice**
132:14, 135:18,
139:7
**two**
9:5, 10:13,
10:21, 12:9,

14:2, 14:12,
20:3, 31:9,
32:15, 32:17,
37:1, 39:22,
40:8, 42:8,
42:10, 45:20,
45:21, 54:15,
56:9, 76:16,
77:19, 80:15,
80:18, 81:1,
81:7, 81:10,
81:19, 82:1,
82:7, 84:20,
88:6, 88:13,
88:14, 88:17,
88:19, 95:5,
98:13, 99:6,
99:20, 101:16,
102:10, 103:2,
105:7, 105:13,
112:18, 122:2,
122:13, 126:6,
129:1, 130:16,
131:15, 133:6,
138:14, 143:11,
144:2, 150:15,
155:21, 156:2,
156:9
**two-candidate**
129:7
**type**
81:14, 82:20
**typewriting**
161:8
**typing**
13:12
**typo**
76:3, 76:7,
102:18, 135:15,
135:16

---
**U**
---

**uc**
154:13
**uconn**
13:17
**uh-huh**
11:13, 77:14,

84:19, 93:19,
97:1
**ultimately**
23:12, 87:5
**unclear**
11:16
**under**
10:17, 10:18,
22:2, 68:11,
68:16, 68:21,
69:2, 70:19,
71:8, 79:20,
85:3, 88:11,
88:20, 89:12,
90:21, 91:8,
95:16, 95:19,
97:5, 97:10,
103:13, 117:14,
132:21, 142:4,
150:17, 150:21,
151:19, 152:2,
152:8, 153:2,
153:4, 153:14,
153:17, 161:8
**undergraduate**
25:17, 29:19
**underlying**
47:19, 55:17,
58:20, 59:2,
60:21
**understand**
9:3, 14:9,
17:6, 21:13,
38:4, 39:17,
42:22, 44:19,
45:3, 50:8,
53:21, 61:1,
78:7, 78:17,
82:16, 87:4,
90:2, 107:8,
121:19, 134:17,
135:7, 136:14
**understanding**
18:17, 74:15,
79:7, 119:16,
137:9
**understood**
31:7, 34:3,

154:2
**unified**
25:10
**uniform**
25:9
**uninitiated**
48:9
**unintelligible**
11:14
**unique**
105:10
**united**
1:1, 7:8,
29:22, 63:1
**university**
10:9, 19:8,
19:12, 22:20,
28:14, 28:19,
30:17, 32:7,
62:12, 62:13,
154:6
**unknown**
105:8
**unless**
103:22
**unquote**
56:17
**unreliable**
155:4
**until**
58:13
**updated**
81:4
**use**
33:20, 49:17,
63:2, 63:7,
63:9, 77:8,
107:5, 108:7,
109:14, 118:20,
118:22, 126:7,
130:19, 131:3,
135:22, 141:21,
142:5, 145:6,
145:8, 146:6,
147:8, 153:22
**useful**
144:8
**uses**
47:20, 48:5,

Transcript of Douglas Spencer, Ph.D.
Conducted on October 1, 2019

196

133:20
**using**
43:8, 47:14,
55:20, 69:22,
72:18, 100:10,
106:4, 124:4,
124:7, 124:9,
126:4, 133:17,
134:8, 135:7,
138:9, 142:21,
151:15
**usually**
17:17, 33:13,
54:1, 142:19
**utilized**
63:19
**utilizes**
57:16

**V**

**various**
68:14, 75:10,
91:8, 107:19
**vast**
141:5
**verbally**
11:11
**versus**
7:7, 11:13,
52:16, 73:13,
118:16
**victories**
82:22
**video**
7:12, 159:15
**videographer**
4:13, 7:5,
7:13, 8:6,
64:11, 64:15,
110:10, 110:15,
149:16, 149:20,
159:11
**videotaped**
1:12, 2:1, 7:6,
110:12, 110:16,
159:12
**view**
44:7, 88:4

**viewpoint**
44:8
**views**
27:10
**vir**
57:2
**virginia**
1:2, 1:7, 4:6,
4:8, 7:8, 7:10,
15:2, 50:6,
50:16, 50:20,
51:5, 57:2,
60:4, 60:14,
60:15, 61:2,
61:16, 66:7,
69:4, 69:21,
70:17, 70:19,
71:8, 72:11,
73:6, 73:12,
75:3, 93:6,
93:10, 111:9,
120:12, 120:13,
120:16, 120:19,
121:2, 121:4,
121:9, 122:4,
122:5, 129:19,
156:8, 156:13,
157:12, 157:20,
158:10, 158:11,
158:22
**visibly**
27:3
**visit**
31:13, 32:14
**visiting**
31:9, 31:10,
32:6, 32:13
**visual**
133:22
**vitae**
14:4
**voice**
7:16
**voices**
12:4, 70:14
**vote**
17:9, 17:16,
48:14, 48:15,

56:11, 67:19,
67:20, 80:16,
80:17, 90:19,
93:17, 94:18,
95:16, 95:22,
96:14, 98:19,
103:15, 104:7,
105:22, 121:11,
122:10, 123:2,
128:13, 129:6,
129:16, 129:19,
129:22
**voted**
81:1, 81:10,
122:13, 122:18
**voter**
108:11, 120:7,
120:20, 121:3,
121:5
**voters**
27:21, 67:19,
67:20, 69:20,
70:16, 70:19,
71:8, 79:9,
79:11, 79:17,
80:22, 81:9,
86:10, 86:12,
86:15, 91:21,
104:16, 105:16,
105:19, 106:5,
106:7, 106:10,
106:14, 108:19,
109:4, 112:17,
113:2, 114:16,
115:20, 116:20,
117:4, 117:9,
117:12, 117:15,
119:3, 157:11,
157:13, 157:19,
158:2, 158:3,
158:9, 158:11,
158:21
**votes**
81:13, 81:17,
81:18, 98:12,
98:20, 122:7,
122:15, 129:11,
134:5, 158:15

**voting**
6:3, 15:2,
27:16, 27:17,
33:2, 34:8,
34:20, 34:21,
35:6, 35:19,
36:8, 38:11,
39:2, 40:9,
40:19, 40:22,
41:2, 41:7,
46:7, 46:15,
46:18, 46:21,
48:12, 48:13,
55:12, 55:17,
60:11, 61:16,
61:17, 61:20,
62:19, 68:7,
80:17, 80:22,
81:9, 84:2,
86:7, 90:14,
93:15, 105:2,
105:18, 105:20,
106:12, 108:13,
108:15, 108:16,
114:19, 117:19,
119:5, 119:15,
119:19, 145:2,
145:7, 145:9,
154:8, 155:20,
157:2, 158:2,
158:14, 158:17
**vouchers**
141:22
**vra**
154:7, 155:10
**vtds**
120:8

**W**

**walk**
70:6
**want**
10:14, 46:10,
50:9, 64:6,
96:14, 103:10,
116:12, 123:4,
134:16, 136:13,
143:3, 146:13,

Transcript of Douglas Spencer, Ph.D.
Conducted on October 1, 2019

197

160:1
**wanted**
119:21
**washington**
1:14, 2:6,
3:14, 7:15
**way**
14:14, 46:14,
53:17, 54:21,
59:13, 61:19,
68:2, 81:8,
100:9, 106:19,
106:20, 108:5,
108:16, 121:18,
123:3, 124:18,
128:10, 131:11,
135:15, 144:6,
145:19
**ways**
29:15, 46:17,
59:16, 143:11,
157:7
**we'll**
9:9, 11:20,
35:9, 113:9,
141:14, 144:3
**we're**
10:11, 18:21,
28:8, 42:7,
58:1, 103:11,
108:4, 113:13,
134:17, 135:7,
136:14, 147:3,
159:7
**we've**
12:9, 28:7,
133:15, 145:19
**weakness**
58:3, 58:17
**weaknesses**
55:18, 57:19,
57:21, 57:22
**webpage**
5:13, 13:16
**weeks**
40:8
**weight**
91:16, 91:19

**welcome**
51:9, 134:15,
134:21
**went**
20:18, 22:7,
23:12
**whatever**
93:2
**whereof**
161:13
**whereupon**
8:13
**wherever**
58:11, 147:16
**whether**
17:7, 17:15,
21:11, 25:6,
27:9, 36:16,
52:15, 59:1,
59:8, 73:2,
82:20, 83:11,
87:21, 100:8,
105:19, 107:9,
109:13, 116:13,
117:8, 124:22,
133:10, 142:1
**white**
52:7, 67:19,
68:6, 82:12,
82:15, 83:17,
83:20, 86:7,
86:10, 86:12,
86:15, 90:14,
90:19, 90:20,
93:15, 93:18,
93:19, 105:2,
105:17, 105:20,
114:19, 115:19,
116:1, 152:10,
155:20, 157:2
**whole**
8:16, 25:10,
94:19, 137:2
**williams**
37:8
**win**
86:14, 111:8,
114:21, 116:22,

119:4, 129:12
**winner**
128:19
**winning**
86:14, 90:19,
93:21, 128:14,
129:13, 158:15
**within**
19:4, 23:2,
130:17
**without**
65:22, 158:14
**witness**
5:11, 8:10,
9:4, 12:11,
13:6, 33:10,
37:2, 37:5,
39:1, 39:6,
40:2, 40:5,
41:15, 66:21,
70:5, 71:1,
74:5, 83:3,
88:3, 88:17,
94:21, 103:20,
107:22, 110:9,
135:4, 153:7,
155:7, 156:16,
157:22, 159:3,
159:10, 161:13
**won**
128:16, 129:9,
129:20, 152:16,
152:18
**wood**
142:18
**wooten**
76:18, 77:2,
80:2, 82:17,
82:22, 83:15,
84:13, 113:17,
128:16, 128:22,
129:2
**wooten's**
79:13
**word**
109:14, 118:20,
118:22
**words**
14:22

**work**
12:5, 17:12,
17:20, 20:4,
31:18, 32:22,
34:21, 39:4,
65:17, 65:20,
134:17, 141:19,
142:18, 149:13
**worked**
34:6
**workers**
27:1
**working**
27:3, 27:9,
31:17, 36:7,
36:17, 107:16,
141:20, 150:2
**works**
12:6, 31:16
**workshop**
31:16, 34:15
**world**
142:10
**worth**
99:19
**wouldn't**
127:3, 151:10
**wray**
76:18, 129:2
**write**
24:17, 103:19,
154:15
**writing**
37:16, 78:19,
135:16, 155:8
**written**
37:17, 65:2,
65:5, 155:1
**wrong**
78:15, 123:3,
123:4, 145:22,
148:20
**wrote**
67:15, 135:15

**X**

**x's**
127:16

Transcript of Douglas Spencer, Ph.D.
Conducted on October 1, 2019

198

| Y | | | |
|---|---|---|---|

**y**
151:2, 152:1
**y's**
152:1
**yale**
31:10
**yeah**
14:17, 17:13,
18:19, 24:7,
26:13, 27:14,
28:9, 30:14,
32:4, 47:9,
50:10, 51:11,
54:4, 54:9,
66:4, 70:9,
73:14, 79:15,
83:7, 112:20,
135:21, 139:17,
149:4, 150:14,
150:21, 154:13,
156:7, 159:8
**year**
31:1, 31:5,
31:6, 31:22,
32:1, 74:11,
128:5, 128:16
**years**
20:3, 23:18,
29:9
**yellow**
137:7
**yep**
9:12, 12:6,
13:8, 16:6,
71:20, 97:4,
102:12, 134:19,
136:20, 137:8,
137:19, 140:10,
148:3, 148:6,
149:2
**yeses**
112:19, 152:5,
152:13, 152:16,
153:2
**yield**
123:12

**yourself**
15:9, 15:12,
15:15, 30:13,
66:2

| Z |
|---|

**zero**
134:4, 139:5

| $ |
|---|

**$250**
36:15

| 0 |
|---|

**00069**
1:7, 7:10
**02**
7:12
**03**
1:16, 64:16
**05**
110:17
**06105**
10:7
**08**
149:21

| 1 |
|---|

**1**
149:21, 159:14,
160:10
**1.96**
44:14, 131:16,
133:3, 147:6
**10**
1:16, 7:12,
10:3, 64:13,
138:9, 139:6,
141:9, 145:14,
147:11, 147:13,
147:14, 147:15,
147:17, 147:18,
147:19
**100**
58:7, 65:20,
80:19, 120:16
**105**
58:17

**11**
64:16, 75:6,
77:12, 80:7,
80:8, 110:13
**11.6**
132:1
**110**
58:18
**1101**
3:12
**12**
83:15, 110:17,
149:18
**120**
25:16
**128**
5:14
**13**
5:11, 5:13
**136**
5:15
**14**
3:12, 78:4,
78:5, 79:13,
79:14, 148:5,
161:16
**140**
5:19
**1411**
2:5, 7:15
**144**
6:2
**149**
6:5
**15**
12:11, 15:21,
41:20, 63:20,
64:4, 71:12
**16**
78:6, 84:18,
85:2
**161**
1:21
**17**
132:15
**18**
1:7, 7:10,
159:14

**19**
72:15, 97:3,
111:22, 160:10
**19.9**
148:7
**1st**
7:11

| 2 |
|---|

**20**
45:8, 71:12,
104:4, 126:20,
127:2, 133:9,
133:11, 146:17
**20.9**
135:13, 135:18
**200**
80:19
**20005**
2:6, 3:14, 7:15
**2004**
19:9, 19:20
**2008**
22:13, 22:21,
24:5, 72:3,
72:12, 98:3,
101:14, 104:15,
111:7, 113:21,
113:22, 120:20
**2009**
24:7
**2010**
73:10, 73:15,
73:22, 74:20,
94:3, 95:12,
96:22, 97:16,
97:17, 98:5,
98:9, 100:19,
113:20, 116:6,
122:1, 122:21,
123:1, 123:7,
123:10, 131:22
**2011**
24:6, 92:15,
93:10, 113:19
**2012**
92:4, 92:5,
113:18, 115:12

Transcript of Douglas Spencer, Ph.D.
Conducted on October 1, 2019

199

**2013**
28:7, 28:18
**2014**
86:16, 86:18,
90:22, 97:2,
98:16, 113:18,
116:4, 120:20,
121:13, 121:22,
122:9, 123:5,
123:9, 123:11
**2015**
39:3
**2016**
84:17, 84:21,
113:18, 115:16,
120:12, 120:22,
129:5
**2017**
28:19
**2018**
37:8, 72:12,
75:11, 75:15,
76:12, 80:9,
81:22, 82:5,
82:20, 83:8,
83:10, 83:13,
98:16, 111:7,
113:16, 113:17,
116:2, 120:17,
120:18, 121:7,
121:13, 121:22,
122:9, 123:5,
123:9, 123:12
**2019**
1:15, 64:4,
75:18, 111:1,
161:15
**202**
2:7, 3:15
**2023**
161:16
**2200**
2:7, 3:15
**23**
93:18
**23456**
4:8
**2401**
4:7

**26**
111:1
**262152**
1:20
**27**
97:2
**28**
102:22, 103:4,
104:5, 104:6,
104:13
**29.8**
146:17
**2:-cv**
1:7, 7:10

---
**3**
---

**30**
126:19, 133:7
**302**
3:6
**312**
3:8
**33.3**
136:10, 137:6
**33.9**
148:2
**35**
34:10, 65:1
**36.8**
94:17, 95:3
**38**
99:9
**38.5**
99:8
**385**
4:9
**39.6**
147:15
**3rd**
161:14

---
**4**
---

**40**
65:1, 147:16
**400**
3:13
**41**
44:6, 103:5

**42**
135:20
**44**
103:5, 147:17
**44.1**
146:19, 147:12
**44.2**
94:17, 95:3,
95:15
**45.2**
129:19
**46**
103:5
**47.9**
148:8
**48.7**
148:11, 151:12
**49.6**
147:11, 147:12

---
**5**
---

**50**
53:19, 93:20,
109:21, 126:18,
129:8, 146:18,
146:19
**500**
53:10
**53**
133:6
**55**
110:13
**5508**
3:8
**56**
64:13, 149:18
**561**
3:8
**5825**
10:2
**59.4**
129:6, 129:21

---
**6**
---

**60**
49:16, 49:17,
49:19, 50:22,
51:1, 51:4,

51:15, 51:22,
52:12, 58:12,
90:20
**60603**
3:7
**60637**
10:3
**62**
128:22
**65**
10:6

---
**7**
---

**70**
49:21, 50:16,
58:12, 86:15
**73**
3:5
**736**
2:7, 3:15
**757**
4:9

---
**8**
---

**8.6**
132:6, 132:11
**80**
42:14, 50:19,
58:13, 126:20,
127:2, 133:9,
133:12
**8803**
4:9

---
**9**
---

**90**
42:13, 50:19,
141:11, 145:15
**94**
120:12, 120:21
**98**
120:13, 120:15

July 15, 2019

*Expert Report*:

# Racially Polarized Voting in Virginia Beach

Prepared by:

**Douglas M. Spencer, Ph.D.**
Professor of Law & Public Policy
University of Connecticut



EXHIBIT
PENGAD 800-631-6989
Spencer 1
10-1-19 MAM

# Contents

**Purpose and Summary**                                                     3

**Measuring Racially Polarized Voting (RPV)**                               4
    Homogeneous Precinct Analysis . . . . . . . . . . . . . . . . . . . . . .   4
    Ecological Regression . . . . . . . . . . . . . . . . . . . . . . . . . . .   5
    Ecological Inference . . . . . . . . . . . . . . . . . . . . . . . . . . . .   6

**Racial Polarization in City Council Elections**                          7
    A Guide for Interpreting Figures . . . . . . . . . . . . . . . . . . . . .   8
    RPV Analysis of Minority Candidates . . . . . . . . . . . . . . . . . .  11

**Racial Polarization in Federal Elections**                               30

**Analysis of Alternative Districts**                                      32

**Qualifications**                                                         35

**Appendices**                                                             37
    A. Technical Note: Merging Census and Elections Data . . . . . . . . . .  38
    B. RPV Analysis for Elections with George Furman . . . . . . . . . . . .  39
    C. Curriculum Vitae . . . . . . . . . . . . . . . . . . . . . . . . . . . .  42

## Purpose and Summary

I have been asked by the Campaign Legal Center to analyze election returns in the city of Virginia Beach, Virginia. I have specifically been asked to assess whether there is any evidence of racially polarized voting and whether white bloc voting is usually sufficient to defeat minority candidates of choice. Using election data from fourteen races between 2008-2018 I find the following:

1. Despite a citywide black population of approximately 90,000 (20%), only six African Americans have ever served on the Virginia Beach City Council in its fifty-five year history. Of the 605 possible seats during that time (eleven seats × 55 years) less than 1% have been occupied by an African American.

2. The overall lack of minority representation on the City Council is not due to a lack of minority candidates. Between 2008-2018, 23% of all candidates on the ballot for the City Council (20 out of 87) were black, yet just five won their election.

3. There is evidence of racially polarized voting between minority and white voters in Virginia Beach elections. Excluding George Furman, a black candidate who ran and lost in 2010, 2014, and 2016 and was not the candidate of choice among black or other minority voters in any of those elections, ten of the 16 black candidates who ran were the candidates of choice for minority voters.

4. Of the ten candidates of choice for black voters, seven faced strong opposition by white voters and were defeated by white bloc voting.

5. There is strong evidence of voting cohesion between black voters and other minority group voters in city council elections.

6. There is also strong evidence of racially polarized voting in federal elections, including the 2008 Democratic presidential primary.

3

## Measuring Racially Polarized Voting

Because voting is a private act, it is impossible to know for certain how individuals cast their ballots. How is it possible, then, to estimate the preferences of white or minority voters when their individual identity is not known? Exit polls and surveys are one way to match the demographic characteristics of a voter with his or her vote choice. Unfortunately, there is no historical survey data on vote choice that are representative of racial minority groups in Virginia Beach over the time period of my analysis. Instead, I leverage information about individual voting precincts to infer the voting behavior of demographic subgroups, using the following three methods: (1) homogeneous precinct analysis, (2) ecological regression, and (3) ecological inference.

### Homogeneous Precinct Analysis

The first method for inferring the voting behavior of racial groups compares the election outcomes in voting precincts that are racially homogeneous. An example is presented in Table 1. This example illustrates how precinct-level demographics and vote totals can be used to estimate support for different candidates among different racial groups. In statistical parlance, we observe the "marginal distributions" of data that give us a single piece of information, such as how many white people live in a precinct or how many votes the Democratic candidate got, and use this data to estimate unobserved "joint distributions," such as how many white people voted for the Democratic candidate.

| | Precinct 1 | | | | Precinct 2 | | |
|---|---|---|---|---|---|---|---|
| | Candidate A | Candidate B | | | Candidate A | Candidate B | |
| Black voters | ? | ? | 3 | | ? | ? | 95 |
| White voters | ? | ? | 97 | | ? | ? | 5 |
| | 90 | 10 | 100 | | 8 | 92 | 100 |

Table 1: Hypothetical voting precincts with 100 voters. The marginal distribution (numbers outside the box) is observed while the joint distribution (question marks inside the boxes) is unobserved. Homogeneous precinct analysis uses the marginal distribution to estimate the joint distributions. In this example, the election returns in Precinct 1 show that white voters strongly preferred Candidate A, while election returns in Precinct 2 shows that black voters strongly preferred Candidate B.

Homogeneous precinct analysis is used to estimate joint distributions by looking at the election results in precincts where the population is very homogeneous. In the example in Table 1, Precinct 1 is 97% white and Precinct 2 is 95% black. The intuition behind homogeneous precinct analysis is that the election outcomes in Precinct 1 will be a good proxy of how white people vote more generally and the election outcomes in Precinct 2 will be a good proxy of how black people vote more generally.

## Ecological Regression

One important limitation to homogeneous precinct analysis is its reliance on a small subset of voting precincts. Ecological regression compensates for this problem by extrapolating voter behavior from the correlation of race and candidate preference across the entire sample of voting precincts. In practice, ecological regression plots the vote totals for a candidate on the y-axis against the target population on the x-axis and uses ordinary least squares (OLS) regression to fit a line through the data.[1] The "best-fit" line is then used to estimate support for each candidate: white support is the value where the trend line crosses 100% in a plot of white citizen voting age population (CVAP) and minority support is the value where the trend line crosses 100% in a plot of minority CVAP. This method is illustrated in various figures throughout this report. One limitation of ecological regression is its reliance on linear regression, which can be negative or exceed 100%, adding some confusion to the model's practical interpretation.[2] Ecological regression can also be misleading when the underlying data do not have a linear relationship.[3] To address this problem, I turn to a third method that has become the gold-standard for evaluating racially polarized voting in Voting Rights Act litigation: ecological inference.

---

[1]For an overview of the mechanics of ecological regression see Leo S. Goodman, *Some Alternatives to Ecological Correlation*, 64 AM. J. SOC. 610 (1959) and J. Morgan Kousser, *Ecological Regression and the Analysis of Past Politics*, 4 J. INTERDISC. HIST. 237 (1973).

[2]In this report, when ecological regression estimates are negative or exceed 100% I report the coefficients as 0 or 100, respectively.

[3]See D. James Greiner, *Causal Inference in Civil Rights Litigation*, 122 HARV. L.REV. 533 (2008).

## Ecological Inference

Whereas homogeneous precinct analysis is conceptually compelling, it throws away a substantial (majority) percentage of relevant data. Whereas ecological regression incorporates all available data and is visually compelling, it presumes a linear relationship between election returns and the racial composition of voting precincts, which may not be true.

A third method, developed by Gary King at Harvard, addresses these particular limitations.[4] King's ecological inference (EI) improves on previous attempts at ecological inference by generalizing the relationship between marginal and joint distributions (see Table 2) and employing OLS regression to estimate a relationship that is always linear based on observations from the full dataset of voting precincts.

|  | Candidate A | Candidate B |  |
|---|---|---|---|
| Nonwhite voters | $\beta_i^b$ | $1-\beta_i^b$ | $\chi_i$ |
| White voters | $\beta_i^w$ | $1-\beta_i^w$ | $1-\chi_i$ |
|  | $T_i$ | $1-T_i$ | $N_i$ |

Table 2: Marginal distribution $(\chi_i, T_i)$ and joint distribution $(\beta_i^b, \beta_i^w)$ of vote shares for two candidates.

Instead of comparing election outcomes to the size of the minority population, King's EI leverages the fact that voting preferences between white voters $(\beta_i^w)$ and nonwhite voters $(\beta_i^b)$ will always be linear. Using the notation in Table 2:

$$\beta_i^w = \left(\frac{T_i}{1-X_i}\right) - \left(\frac{X_i}{1-X_i}\right)\beta_i^b$$

This relationship is called the "method of bounds" and formalizes the simple fact that white support for a candidate can be inferred by subtracting the nonwhite vote from the total of possible votes. When there are more possible votes than nonwhite votes (or more nonwhite votes than possible votes), the estimated white support will fall into a range. This range is bounded by the particulars of each precinct. For example, if 90% of voters supported Candidate A and 80% of all voters were white, then white support for Candidate A must fall somewhere between the bounds of 70% (if all nonwhite voters supported Candidate A) and 80% (if no nonwhite voters supported Candidate A). King's EI then uses regression analysis to narrow those

---

[4]See GARY KING. A SOLUTION TO THE ECOLOGICAL INFERENCE PROBLEM. (1997). See also GARY KING ET AL. ECOLOGICAL INFERENCE: NEW METHODOLOGICAL STRATEGIES.(2004), BERNARD GROFMAN, LISA HANDLEY & RICHARD G. NIEMI. MINORITY REPRESENTATION AND THE QUEST FOR VOTING EQUALITY. (1994), and Kosuke Imai, Ying Lu & Aaron Strauss, *Bayesian and Likelihood Inference for 2×2 Ecological Tables: An Incomplete Data Approach*, 16 POL. ANALYSIS 41 (2008).

bounds based on the bounds of similar precincts. When there are many demographically similar precincts the EI estimates become quite precise, meaning the confidence interval for each estimate is small. When there are few demographically similar precincts the confidence intervals are larger. Because King's EI is not as easily explained as homogeneous precinct analysis, nor as visually intuitive as ecological regression, I present the results of all three methods in my analysis below. The strongest case that voting is racially polarized is when all three methods generate similar estimates and point in the same direction, which is nearly always the case in Virginia Beach.

## Racial Polarization in City Council Elections

The Virginia Beach City Council has eleven members who are elected to four-year terms in the November general election. Nearly all candidates run as independents. Five members are elected in presidential years and six members are elected in midterm years. All members are elected at-large though seven seats have a residency requirement and one seat is designated as the Mayor. See Table 3. There are currently two black members of the Virginia Beach City Council, both of whom were elected in 2018.[5] Before 2018, just four black residents in the city's fifty-five year history had ever served on the Council (three elected and one appointed) despite a citywide black population of 83,000, or 18%.[6] The overall lack of minority representation is not due to a lack of minority candidates. Between 2008 and 2018 23% of all candidates for the Council (20 out of 87) were black. However, there is strong evidence of racially polarized voting between minority and white voters in Virginia Beach elections. Ten of the 17 black candidates who ran were the candidate of choice for black and other minority voters.[7] Of the ten candidates who were the candidate of choice, seven faced strong opposition by white voters and were defeated by white bloc voting.[8]

---

[5] A directory of the current Council is available at: https://www.vbgov.com/government/departments/city-clerk/city-council/Pages/city-council-members.aspx.

[6] As of 2017 the Census reports that the share of Virginia Beach's population that is Black or African American (and not Hispanic) is 18.42%. See ACS Demographic and Housing Estimates, 2013-2017 American Community Survey 5-year Estimates (Table DP05).

[7] I exclude George Furman who ran for the City Council in 2010, 2014, and 2016 but was not the candidate of choice among black voters in any of those elections. See Appendix B.

[8] I am still gathering electoral data and intend to analyze more elections as data become available, particularly the elections involving Ron Villanueva, a Filipino, who served on the city council between 2002-2009.

| | Election | | |
|---|---|---|---|
| | year | method | Residency req. |
| 1 | Presidential | at-large | – (Mayor) |
| 2 | | at-large | – |
| 3 | | at-large | Centerville |
| 4 | | at-large | Kempsville |
| 5 | | at-large | Rose Hall |
| 6 | Midterm | at-large | – |
| 7 | | at-large | – |
| 8 | | at-large | Bayside |
| 9 | | at-large | Beach |
| 10 | | at-large | Lynnhaven |
| 11 | | at-large | Princess Anne |

Table 3: Overview of the election year, method, and residency requirement for seats on the eleven-member Virginia Beach City Council.

## A Guide for Interpreting Figures in this Report

Consider the case of Georgia Allen, a black female who challenged the white female incumbent Rosemary Wilson for the at-large city council seat in 2010. Although Ms. Allen was the candidate of choice for minority voters, she lost the election with just 35% of the vote. Figure 1 (next page) plots the proportion of voters that supported Ms. Allen on the y-axis against the proportion of the minority citizen voting age population (CVAP) on the x-axis. Each dot in the left panel represents one precinct. Support for Ms. Allen spanned a range from 23% in the Capps Shop precinct to 67% in the Newtown precinct. Her support increased as the percent minority CVAP increased. The results of all three statistical methods are presented.

The homogeneous precinct analysis compares vote totals in the most racially homogeneous precincts. Thirteen precincts in Virginia Beach were majority-minority in 2008. The Baker, Newtown, Davis Corner, and Reon precincts had a minority population that exceeded > 60% and they are circled in orange in the figure. Five precincts—Capps Shop, Kings Grant, Lake Joyce, Ocean Park, and Rudee—are all at least 96% white and are circled in gray. Support for Ms. Allen in the homogeneous minority precincts was 58.7% (sd=4.9) compared to just 24.4% (sd=4.0) in the homogeneous white precincts.

The dotted diagonal line in the left panel represents the "best-fit" line of the ecological regression. This regression extrapolates from the observed data to provide estimates of support when minority CVAP is 100% and when white CVAP is 100%,



| Georgia Allen | Homogeneous precincts (⊙) | Ecological regression (△) | King's EI (×) |
|---|---|---|---|
| Black support (%) | 59.4 | 87.2 | 86.3* |
| All minority support (%)** | 58.7* | 70.8* | 70.5* |
| White support (%) | 22.9 | 20.0 | 19.9 |

\* Estimated minority support is statistically significantly different from estimated white support ($p < 0.01$).

\*\* All minority support includes Hispanic, Asian, and other minority groups.

Figure 1: Estimated support for Georgia Allen in the 2008 election for Virginia Beach's at-large seat. All three methods of estimating support for Ms. Allen by race illustrate that she was the candidate of choice for all minority voters—by individual race and as a coalition—and that white bloc voting contributed to her defeat.

and is marked by △ in the figure.[9] 95% confidence intervals are marked with gray vertical lines. The ecological regression estimates that 70.8% of minority voters supported Ms. Allen compared to 20.0% of white voters (± 5.7%). This difference is large and is statistically significant ($p < 0.001$).[10]

The estimates generated using King's EI are very similar with an estimated 70.5% support among minority voters (± 4.29%) and 19.9% support among whites (± 1.8%). King's EI estimates are plotted in the left panel with an × and the 95% confidence intervals are plotted as vertical solid lines. The difference between King's EI estimates for minority and white support is statistically significant ($p < 0.001$).

Together these three different approaches—homogeneous precinct analysis, ecolog-

---

[9]White support is plotted where black CVAP is 0% for illustrative purposes. White CVAP is not necessarily 100% when black CVAP is 0%.

[10]Statistical significance is determined using a Student's t-test.

ical regression, and King's EI— suggest that all minority voters strongly preferred Ms. Allen and that white voters did not. Furthermore, King's EI can be used to show that Ms. Allen was the preferred candidate of black, and other minority voters by overwhelming margins (and much larger than the winning candidate's vote total of 44%). In the right panel I plot the ecological regression best-fit line predicting support for Ms. Allen by race. The lines representing black and other minority precincts are all pointing in the same direction; all have a positive slope, meaning the larger the minority population in a precinct the more support for Ms. Allen. On the other hand, the best-fit line representing white precincts cuts in the opposite direction, illustrating white bloc voting against Ms. Allen. To illustrate the implications of this opposition, I plot the vote totals for the candidate that won the at-large seat that Ms. Allen contested in 2008. See gray dots in the left panel of Figure 1. Support for Ms. Allen's white opponent, Rosemary Wilson, exceeded 53.2% in homogeneous white districts, but was just 22.0% in homogeneous minority precincts. Minority support for Ms. Wilson was just 7% based on ecological regression and 8% based on ecological inference. Wilson ultimately defeated Allen 44.1% to 34.6%. According to the voting patterns in Figure 1, Ms. Allen was the clear candidate of choice for all minority voters—by individual race and as a coalition—and white bloc opposition voting contributed to her defeat.

## RPV Analysis of Minority Candidates

In the pages that follow, I present figures and captions for every race that involved a nonwhite candidate between 2008-2018. In the table below, I summarize the racial polarization of every "probative" election between 2008-2018. I define elections as probative of racially polarized voting when they feature a minority candidate running for the office under investigation; in this case the City Council. In seven of the fourteen probative elections in my sample I find strong evidence of racially polarized voting: racial minority voters are cohesive in their support for a particular candidate and white voters opposed the same candidate sufficiently to deter his or her election. In addition, in 11 of the 14 races I find evidence that all minority voters share the same strong preference for a candidate and vote as a coalition. In the sections that follow I present a detailed analysis of each race followed by a summary of all races in each election year.

|  |  | Minority | | White |
|---|---|---|---|---|
|  |  | coalition | cohesion | opposition |
| 2018 | At-large | ✓ | | |
| | ~~Princess Anne~~ | | | |
| 2016 | Mayor | ✓ | | |
| | Kempsville | ✓ | ✓ | ✓ |
| 2014 | At-large | ✓ | | |
| | Rose Hall | ✓ | ✓ | ✓ |
| | Princess Anne | | | |
| 2012 | Kempsville | ✓ | ✓ | |
| 2011 | Rose Hall | ✓ | ✓ | ✓ |
| 2010 | At-large | ✓ | ✓ | ✓ |
| | Bayside | | | |
| | Princess Anne | ✓ | ✓ | ✓ |
| 2008 | At-large | ✓ | ✓ | ✓ |
| | Kempsville | ✓ | ✓ | ✓ |

CENTERVILLE

Table 4: Summary of racial polarization in voting by probative elections, which are defined as previous city council races that featured a minority candidate.

11

## 2018 Virginia Beach City Council Election
## (Centerville)



| | Homogeneous precincts (⊙) | Ecological regression (△) | King's EI (×) |
|---|---|---|---|
| **Sabrina Wooten** | | | |
| Black support (%) | 75.7* | 99.5* | 95.6* |
| All minority support (%)** | 75.0* | 85.4* | 85.5* |
| White support (%) | 56.5 | 51.1 | 51.1 |
| **Eric Wray II** | | | |
| Black support (%) | 19.7* | 0.0* | 1.1* |
| All minority support (%)** | 20.4* | 8.5* | 8.5* |
| White support (%) | 38.0 | 43.3 | 43.3 |

\* Estimated minority support is statistically significantly different from estimated white support ($p < 0.01$).

\*\* All minority support includes Hispanic, Asian, and other minority groups.

Figure 2: The 2018 election for the Centerville seat provides evidence that all minority voters formed a coalition in support of Ms. Sabrina Wooten and against Mr. Eric Wray II (both of whom were minority candidates). Election results also show that that Ms. Wooten benefited from crossover support from white voters. Ms. Wooten was the clear candidate of choice for black and other minority voters. While white voters did not support Ms. Wooten at the level of minority voters, they did not vote as a bloc in opposition to her. In fact, Ms. Wooten earned more support from white voters than any other minority candidate between 2008-2018; the 51% of white voters who supported her is more than three times the average support for minority candidates during this time period. Note a third candidate, Conrad Schesventer received very little support from all voters, and earned just 5.8% of the vote.

## 2018 Virginia Beach City Council Election
### (At-large: 2 seats)



|  | Homogeneous precincts (⊙) | Ecological regression (Δ) | King's EI (×) |
|---|---|---|---|
| **Aaron Rouse** | | | |
| Black support (%) | 34.4 | 41.2* | 36.6 |
| All minority support (%)** | 36.0* | 35.2* | 31.8 |
| White support (%) | 27.6 | 23.5 | 24.4 |
| **Linda Bright** | | | |
| Black support (%) | 11.4* | 19.5* | 23.1* |
| All minority support (%)** | 11.6* | 16.0* | 16.5* |
| White support (%) | 6.2 | 5.9 | 5.7 |

\* Estimated minority support is statistically significantly different from estimated white support ($p < 0.01$).

\*\* All minority support includes Hispanic, Asian, and other minority groups.

Figure 3: The 2018 at-large election provides mixed evidence of coalitional voting, minority cohesion, and oppositional white voting. Aaron Rouse (black male) and Allison White (white female) were the candidates of choice for all minority voters, who split their votes between the two candidates. Mr. Rouse won a seat with the most votes due to crossover support from white voters. Ms. White came in a distant fourth (of six candidates) due to opposition voting by white voters. John Moss, an incumbent, narrowly defeated Dee Oliver for the second seat. Linda Bright (black female) was not the most preferred candidate among minority voters, yet her support was strong enough to be in the running; her support among minority voters was stronger than Mr. Moss's overall support but less than estimated minority support for Ms. White. Ms. Bright faced strong oppositional voting among white voters and came in 5th of six candidates.

## 2018 Virginia Beach City Council Election

### (All Probative Races)

| | Candidate (incumbent†) | Overall vote | | HP | ER | EI | Won election? | Minority cand. of choice | Minority % ↑ winner? |
|---|---|---|---|---|---|---|---|---|---|
| At-large | Rouse | 26.7 | Black | 34.4 | 41.2* | 36.6 | | ✓ | |
| | | | All Minority | 36.0* | 35.2* | 31.8 | ✓ | ✓ | |
| | | | White | 27.6 | 23.5 | 24.4 | | | |
| | Moss† | 22.6 | Black | 10.2* | 0.0* | 0.4* | | | |
| | | | All Minority | 10.3* | 3.3* | 3.9* | ✓ | | |
| | | | White | 26.6 | 31.1 | 30.8 | | | |
| | Oliver | 22.5 | Black | 17.6 | 9.1 | 7.4 | | | |
| | | | All Minority | 16.9 | 14.3 | 14.8 | | | |
| | | | White | 25.5 | 26.0 | 25.9 | | | |
| | White | 13.7 | Black | 22.6* | 34.8* | 36.3* | | ✓ | ✓ |
| | | | All Minority | 21.3* | 26.4* | 26.1* | | ✓ | ✓ |
| | | | White | 9.6 | 8.2 | 8.3 | | | |
| | Bright | 8.8 | Black | 11.4* | 19.5* | 23.1* | | | |
| | | | All Minority | 11.6* | 16.0* | 16.5* | | | |
| | | | White | 6.2 | 5.9 | 5.7 | | | |
| | Hubbard | 5.1 | Black | 3.8 | 4.2 | 2.7 | | | |
| | | | All Minority | 3.8 | 4.6 | 4.0 | | | |
| | | | White | 4.6 | 5.3 | 5.8 | | | |
| Centerville | Wooten | 62.1 | Black | 75.7* | 99.5* | 95.7* | | ✓ | |
| | | | All Minority | 75.0* | 85.4* | 85.5* | ✓ | ✓ | |
| | | | White | 56.5 | 51.1 | 51.0 | | | |
| | Wray | 32.1 | Black | 19.7* | 0.0* | 1.1* | | | |
| | | | All Minority | 20.4* | 8.5* | 8.5* | | | |
| | | | White | 38.0 | 43.3 | 43.4 | | | |
| | Schesventer | 5.8 | Black | 4.6 | 5.8 | 7.8 | | | |
| | | | All Minority | 5.0 | 6.2 | 6.2 | | | |
| | | | White | 5.6 | 5.7 | 5.7 | | | |

\* $p < 0.05$ (minority vs. white support). Candidates of color highlighted by red text.

## 2016 Virginia Beach City Council Election
### (Kempsville)



Amelia Ross-Hammond

|  | Homogeneous precincts (⊙) | Ecological regression (Δ) | King's EI (×) |
|---|---|---|---|
| Black support (%) | 62.3* | 83.3* | 76.7* |
| All minority support (%)** | 62.1* | 65.9* | 59.9* |
| White support (%) | 33.9 | 28.4 | 30.3 |

\* Estimated minority support is statistically significantly different from estimated white support ($p < 0.01$).

\*\* All minority support includes Hispanic, Asian, and other minority groups.

Figure 4: The 2016 election for the Kempsville seat provides strong evidence of coalitional racially polarized voting. Amelia Ross-Hammond was just the third black member of the Virginia Beach City Council in its fifty-five year history and was seeking re-election after her first term. She was strongly supported by black and other minority voters. As a coalition, estimated support among racial minority voters for Ms. Ross-Hammond (59.9%) was higher than the overall vote total of her opponent Jessica Abbott (59.4%). Despite incumbency and strong support among a cohesive coalition of minority voters, Ms. Ross-Hammond was defeated due to white bloc voting in opposition to her candidacy. This pattern is plotted in the right panel. The best-fit lines from ecological regressions predicting support among black and other voters are positively sloped, illustrating that as the minority population increases in a precinct so does support for Ms. Ross-Hammond. On the other hand, the negatively sloped thick line illustrates that white support for Ms. Ross-Hammond cuts against the voting preferences of the coalition of minority voters.

15

## 2016 Virginia Beach City Council Election

### (All Probative Races)

| | Candidate (incumbent†) | Overall vote | | HP | ER | EI | Won election? | Minority cand. of choice | Minority % † winner? |
|---|---|---|---|---|---|---|---|---|---|
| Mayor | Sessoms† | 54.3 | Black | 64.1 | 73.3* | 75.4* | | ✓ | |
| | | | All Minority | 63.7* | 66.1* | 66.1* | ✓ | ✓ | |
| | | | White | 52.5 | 48.2 | 47.1 | | | |
| | Kowalewitch | 19.5 | Black | 12.1* | 0.0* | 1.4* | | | |
| | | | All Minority | 11.9* | 5.8* | 4.8* | | | |
| | | | White | 24.8 | 27.0 | 27.4 | | | |
| | Weeks | 18.6 | Black | 10.1* | 4.8* | 3.6* | | | |
| | | | All Minority | 10.8* | 10.1* | 10.9* | | | |
| | | | White | 18.8 | 21.8 | 21.8 | | | |
| | Furman | 7.6 | Black | 13.7* | 23.7* | 26.5* | | | |
| | | | All Minority | 13.6* | 18.1* | 18.1* | | | |
| | | | White | 3.9 | 3.0 | 3.0 | | | |
| Kempsville | Abbott | 59.4 | Black | 37.7* | 16.7* | 23.1* | | | |
| | | | All Minority | 37.9 | 34.1 | 40.6 | ✓ | | |
| | | | White | 66.1 | 71.6 | 69.7 | | | |
| | Ross-Hammond† | 40.6 | Black | 62.3* | 83.3* | 76.8* | | ✓ | ✓ |
| | | | All Minority | 62.1* | 65.9* | 59.9* | | ✓ | ✓ |
| | | | White | 33.9 | 28.4 | 30.1 | | | |

* $p < 0.05$ (minority vs. white support). Candidates of color highlighted by red text.

16

## 2014 Virginia Beach City Council Election
## (Rose Hall)



### James Cabiness

|  | Homogeneous precincts (⊙) | Ecological regression (Δ) | King's EI (×) |
|---|---|---|---|
| Black support (%) | 48.7 | 74.7* | 51.7* |
| All minority support (%)** | 42.6* | 51.2* | 37.0* |
| White support (%) | 9.9 | 2.4 | 6.4 |

* Estimated minority support is statistically significantly different from estimated white support ($p < 0.01$).

** All minority support includes Hispanic, Asian, and other minority groups.

Figure 5: The 2014 special election for the Rose Hall seat provides evidence of coalitional racially polarized voting. Mr. James Cabiness was the clear candidate of choice for black and other minority voters yet he earned the least amount of votes among four candidates and was easily defeated by white candidate Shannon Kane. Mr. Cabiness faced two challenges that proved too difficult to overcome. The first was strong opposition among white voters, whose support is estimated in the single digits making Mr. James the least popular of all candidates among white voters. As the right panel illustrates, support for Mr. Cabiness among white voters cuts strongly against his estimated support among minority voters. The second challenge was campaign finance: Mr. Cabiness was outspent by Ms. Kane $122,000 to $3,500. (See the Virginia Public Access Project at: https://www.vpap.org/candidates/190492-james-cabiness/).

2014 Virginia Beach City Council Election
(Princess Anne)



Pieri Burton

| | Homogeneous precincts (⊙) | Ecological regression (Δ) | King's EI (×) |
|---|---|---|---|
| Black support (%) | 33.0 | 42.3* | 41.8 |
| All minority support (%)** | 33.9 | 35.6* | 34.3 |
| White support (%) | 21.8 | 18.5 | 18.9 |

\* Estimated minority support is statistically significantly different from estimated white support ($p < 0.01$).

\*\* All minority support includes Hispanic, Asian, and other minority groups.

Figure 6: The 2014 election for the Princess Anne seat provides little evidence of minority coalitional voting, coethnic vote cohesion, or oppositional white bloc voting. Incumbent Barbara Henley, a white female, decisively retained her seat against a challenge from Pieri Burton, a black male. Support for Ms. Henley was strong among white voters (80-20%) as well as black (58-42%) and other minority voters (65-35%).

18

## 2014 Virginia Beach City Council Election

### (All Probative Races)

| | Candidate (incumbent†) | Overall vote | | HP | ER | EI | Won election? | Minority cand. of choice | Minority % ↑ winner? |
|---|---|---|---|---|---|---|---|---|---|
| **At-large** | Davenport | 32.7 | Black | 51.5 | 58.2* | 48.5* | | ✓ | |
| | | | All Minority | 46.9 | 45.9* | 39.5* | ✓ | ✓ | |
| | | | White | 32.1 | 28.1 | 30.0 | | | |
| | Moss† | 32.6 | Black | 22.5* | 14.0* | 14.4* | | | |
| | | | All Minority | 24.8* | 21.3* | 21.7* | ✓ | | |
| | | | White | 35.4 | 36.6 | 36.8 | | | |
| | Martin | 26.7 | Black | 15.2 | 8.7* | 11.2* | | | |
| | | | All Minority | 17.0* | 17.1* | 19.0* | | | |
| | | | White | 27.2 | 30.0 | 29.3 | | | |
| | Furman | 8.1 | Black | 10.9* | 19.1* | 23.4* | | | |
| | | | All Minority | 11.3* | 15.7* | 16.4* | | | |
| | | | White | 5.3 | 5.3 | 5.1 | | | |
| **Rose Hall (special)** | Kane | 48.3 | Black | 24.9* | 1.5* | 8.1* | | | |
| | | | All Minority | 19.7* | 19.9* | 22.7* | ✓ | | |
| | | | White | 56.6 | 60.2 | 59.1 | | | |
| | Johnston | 17.5 | Black | 10.2* | 5.4* | 3.8* | | | |
| | | | All Minority | 11.3* | 10.3* | 10.2 | | | |
| | | | White | 18.0 | 20.3 | 20.8 | | | |
| | Browder | 17.3 | Black | 16.2 | 18.4 | 24.3 | | | |
| | | | All Minority | 17.4 | 18.6 | 19.9 | | | |
| | | | White | 15.5 | 17.1 | 16.6 | | | |
| | Cabiness | 16.8 | Black | 48.7 | 74.7* | 51.7* | | ✓ | ✓ |
| | | | All Minority | 42.6* | 51.2* | 37.0* | | ✓ | |
| | | | White | 9.9 | 2.4 | 6.4 | | | |
| **Princess Anne** | Henley† | 76.7 | Black | 67.0 | 57.7* | 58.0* | | ✓ | |
| | | | All Minority | 67.0* | 64.4* | 65.5* | ✓ | ✓ | |
| | | | White | 78.2 | 81.5 | 81.1 | | | |
| | Burton | 23.3 | Black | 33.0 | 42.3* | 41.8* | | | |
| | | | All Minority | 33.0* | 35.6* | 34.3* | | | |
| | | | White | 21.8 | 18.5 | 18.9 | | | |

\* $p < 0.05$ (minority vs. white support). Candidates of color highlighted by red text.

2012 Virginia Beach City Council Election
(Kempsville)



Amelia Ross-Hammond

|  | Homogeneous precincts (⊙) | Ecological regression (Δ) | King's EI (×) |
|---|---|---|---|
| Black support (%) | 58.6* | 90.2* | 86.9* |
| All minority support (%)** | 55.6* | 70.0* | 65.7* |
| White support (%) | 20.1 | 15.4 | 17.0 |

* Estimated minority support is statistically significantly different from estimated white support ($p < 0.01$).

** All minority support includes Hispanic, Asian, and other minority groups.

Figure 7: The 2012 election for the Kempsville seat provides strong evidence of minority cohesion as support among black and other minority voters was overwhelming in favor of black candidate Ms. Ross-Hammond. Voting patterns also indicate that Ms. Ross-Hammond was the least popular of four candidates among white voters. However, white voters split their support between Ms. Ross-Hammond's opponents and the result was a victory for Ms. Ross-Hammond, who became just the third black member of the Virginia Beach City Council in the city's history.

## 2012 Virginia Beach City Council Election

### (All Probative Races)

| | Candidate (incumbent†) | Overall vote | | HP | ER | EI | Won election? | Minority cand. of choice | Minority % ↑ winner? |
|---|---|---|---|---|---|---|---|---|---|
| Kempsville | Ross-Hammond | 32.2 | Black | 58.6* | 90.2* | 86.9* | | ✓ | |
| | | | All Minority | 55.6* | 70.0* | 65.7* | | ✓ | |
| | | | White | 20.1 | 15.4 | 17.0 | ✓ | | |
| | Dale | 23.2 | Black | 14.8* | 0.0* | 2.1* | | | |
| | | | All Minority | 15.1* | 7.6* | 7.6* | | | |
| | | | White | 28.8 | 30.4 | 30.2 | | | |
| | Weeks | 22.5 | Black | 10.6* | 0.0* | 0.3* | | | |
| | | | All Minority | 12.0* | 5.1* | 5.7* | | | |
| | | | White | 26.6 | 30.0 | 29.8 | | | |
| | Smith | 22.1 | Black | 15.9* | 12.8* | 13.4* | | | |
| | | | All Minority | 17.3* | 17.3* | 17.9 | | | |
| | | | White | 24.5 | 24.2 | 24.1 | | | |

* $p < 0.05$ (minority vs. white support). Candidates of color highlighted by red text.

21

## 2011 Virginia Beach City Council Election
### (At-large special)



### Prescott Sherrod

|  | Homogeneous precincts (⊙) | Ecological regression (Δ) | King's EI (×) |
|---|---|---|---|
| Black support (%) | 60.5 | 92.4* | 87.0* |
| All minority support (%)** | 56.8* | 70.9* | 64.8* |
| White support (%) | 17.5 | 9.8 | 11.5 |

\* Estimated minority support is statistically significantly different from estimated white support ($p < 0.01$).

\*\* All minority support includes Hispanic, Asian, and other minority groups.

Figure 8: The 2011 at-large special election provides evidence of racially polarized voting between whites and all minority voters. Mr. Prescott Sherrod, a black male, was appointed to fill this vacant seat six months before the election when the prior incumbent moved out of state. As the new short-term incumbent, Mr. Sherrod had very strong support among black and other minority voters. Support for Mr. Sherrod among white voters was so low that he was ultimately defeated.

## 2011 Virginia Beach City Council Special Election

### (All Probative Races)

| | Candidate (incumbent†) | Overall vote | | HP | ER | EI | Won election? | Minority cand. of choice | Minority % ↑ winner? |
|---|---|---|---|---|---|---|---|---|---|
| At-large | Moss | 37.0 | Black | 20.8* | 2.8* | 5.9* | ✓ | | |
| | | | All Minority | 22.6* | 13.0* | 12.8* | | | |
| | | | White | 44.7 | 45.0 | 45.2 | | | |
| | Free | 33.2 | Black | 14.7* | 0.0* | 0.4* | | | |
| | | | All Minority | 14.8 * | 9.7* | 6.7* | | | |
| | | | White | 35.5 | 42.4 | 43.7 | | | |
| | Sherrod† | 25.9 | Black | 60.5 | 92.4* | 87.0* | | ✓ | ✓ |
| | | | All Minority | 58.8* | 70.9* | 64.8* | | ✓ | ✓ |
| | | | White | 17.5 | 9.8 | 11.5 | | | |

* $p < 0.05$ (minority vs. white support). Candidates of color highlighted by red text.

Note: Candidate Mike Makela dropped out of the race two months before the election (on September 30, 2011). His name appeared on the ballot and received 3.5% of the vote.



2010 Virginia Beach City Council Election
(At-large: 2 seats)

|  | Homogeneous precincts (⊙) | Ecological regression (Δ) | King's EI (×) |
|---|---|---|---|
| **Andrew Jackson** | | | |
| Black support (%) | 76.7* | 100.0* | 85.6* |
| All minority support (%)** | 72.4* | 80.7* | 58.2* |
| White support (%) | 8.0 | 0.0 | 7.7 |
| **James Cabiness** | | | |
| Black support (%) | 39.2* | 54.2* | 38.5* |
| All minority support (%)** | 38.6* | 38.3* | 26.7* |
| White support (%) | 6.1 | 1.3 | 4.5 |

\* Estimated minority support is statistically significantly different from estimated white support ($p < 0.01$).

\*\* All minority support includes Hispanic, Asian, and other minority groups.

Figure 9.  The 2010 at-large election provides strong evidence of coalitional voting, minority vote cohesion, and oppositional white bloc voting. Andrew Jackson, a black male, was the clear candidate of choice for black and other minority voters. However, oppositional white bloc voting was sufficient to prevent his election. There were two at-large seats and minority voters were split in their second-choice candidate. Black voters were equally supportive of James Cabiness, a black male who earned the fewest votes of all seven candidates, and Rita Bellitto, a white female who earned the most votes of all candidates. Importantly, white support was very strong for Bellitto ($> 50\%$ in a seven-candidate race) and non-existent for Cabiness ($< 5\%$). In the end, the two candidates preferred by white voters won while two of the three candidates preferred by minority voters (both of them black) came in last and second-to-last in the election.



### Tanya Bullock

|  | Homogeneous precincts (⊙) | Ecological regression (Δ) | King's EI (×) |
|---|---|---|---|
| Black support (%) | 62.3* | 89.9* | 89.2* |
| All minority support (%)** | 61.6* | 79.1* | 79.9* |
| White support (%) | 37.1 | 33.1 | 32.9 |

\* Estimated minority support is statistically significantly different from estimated white support ($p < 0.01$).

\*\* All minority support includes Hispanic, Asian, and other minority groups.

Figure 10: The 2010 election for the Princess Anne seat provides strong evidence of coalitional voting, minority vote cohesion, and oppositional white bloc voting. Tanya Bullock, a black female, was defeated despite overwhelming support among black and other minority voters (80%). White voters strongly preferred the incumbent Barbara Henley, a white female, by a margin of 2-to-1. The voting pattern in the right panel illustrates that as the minority population increases, support for Bullock substantially increases among all minority voters, while white voter support cuts strongly in the opposite direction.

## 2010 Virginia Beach City Council Election

### (All Probative Races)

| | Candidate (incumbent†) | Overall vote | | HP | ER | EI | Won election? | Minority cand. of choice | Minority % ↑ winner? |
|---|---|---|---|---|---|---|---|---|---|
| **At-large** | Bellitto | 49.4 | Black | 29.8 | 26.3 | 38.0 | | ✓ | |
| | | | All Minority | 31.4 | 37.9 | 44.9 | ✓ | | |
| | | | White | 47.5 | 53.3 | 51.3 | | | |
| | DeSteph† | 44.8 | Black | 20.0* | 3.1* | 4.9* | | | |
| | | | All Minority | 20.7 | 17.9 | 20.1 | ✓ | | |
| | | | White | 52.4 | 54.6 | 53.9 | | | |
| | Moss | 30.1 | Black | 16.4* | 7.1* | 7.2* | | | |
| | | | All Minority | 17.1 | 14.6 | 15.8 | | | |
| | | | White | 33.6 | 35.8 | 35.5 | | | |
| | Erb | 22.5 | Black | 10.1* | 4.6* | 0.3* | | | |
| | | | All Minority | 11.2 | 10.6 | 11.9 | | | |
| | | | White | 23.6 | 27.7 | 27.7 | | | |
| | Redmond | 21.4 | Black | 7.5* | 0.0* | 1.8* | | | |
| | | | All Minority | 8.6 | 0.0 | 0.1 | | | |
| | | | White | 28.7 | 28.8 | 27.6 | | | |
| | Jackson | 20.3 | Black | 76.7* | 100.0* | 85.6* | | ✓ | ✓ |
| | | | All Minority | 72.4* | 80.7* | 58.2* | | ✓ | ✓ |
| | | | White | 8.0 | 0.0 | 7.5 | | | |
| | Cabiness | 11.3 | Black | 39.2* | 54.2* | 38.5* | | | |
| | | | All Minority | 38.6 | 38.3 | 26.7 | | | |
| | | | White | 6.1 | 1.3 | 4.5 | | | |
| **Bayside** | Jones† | 64.7 | Black | 63.2* | 53.8* | 55.2 | | ✓ | |
| | | | All Minority | 63.1 | 56.2 | 56.6 | ✓ | ✓ | |
| | | | White | 68.9 | 67.5 | 67.3 | | | |
| | Furman | 35.3 | Black | 36.8 | 46.2 | 44.2 | | | |
| | | | All Minority | 36.9 | 43.8 | 43.7 | | | |
| | | | White | 31.1 | 32.5 | 32.8 | | | |
| **Princess Anne** | Henley† | 54.4 | Black | 37.7* | 10.1* | 11.0* | | | |
| | | | All Minority | 38.4 | 10.1 | 20.2 | ✓ | | |
| | | | White | 62.9 | 66.9 | 67.1 | | | |
| | Bullock | 45.6 | Black | 62.3* | 89.9* | 89.2* | | ✓ | ✓ |
| | | | All Minority | 61.6 | 79.1 | 79.9 | | ✓ | ✓ |
| | | | White | 37.1 | 33.1 | 32.9 | | | |

* $p < 0.05$ (minority vs. white support). Candidates of color highlighted by red text.

27

### 2008 Virginia Beach City Council Election
### (Kempsville)



|  | Homogeneous precincts (⊙) | Ecological regression (Δ) | King's EI (×) |
|---|---|---|---|
| **Andrew Jackson** | | | |
| Black support (%) | 33.2* | 48.8* | 50.5* |
| All minority support (%)** | 33.5* | 42.0* | 42.2* |
| White support (%) | 21.0 | 20.0 | 19.8 |
| **Jose Flores** | | | |
| Black support (%) | 41.8* | 57.1* | 56.5* |
| All minority support (%)** | 41.4* | 46.7* | 44.2* |
| White support (%) | 17.8 | 14.6 | 15.3 |

\* Estimated minority support is statistically significantly different from estimated white support ($p < 0.01$).

\*\* All minority support includes Hispanic, Asian, and other minority groups.

Figure 11: The 2008 election for the Kempsville provides evidence of minority cohesion, and oppositional white bloc voting. The race featured three candidates: Harry Diezel (white male incumbent), Andrew Jackson (black challenger), and Jose Flores (black Hispanic challenger). Black voters did not support the white incumbent Diezel, but almost unanimously supported Jackson or Flores. White voters, on the other hand, strongly supported Diezel. Jackson won 27% and Flores won 24% of the vote for a combined total of 51%.

## 2008 Virginia Beach City Council Election

### (All Probative Races)

| | Candidate (incumbent†) | Overall vote | | HP | ER | EI | Won election? | Minority cand. of choice | Minority % ↑ winner? |
|---|---|---|---|---|---|---|---|---|---|
| **At-large** | Wilson† | 44.1 | Black | 20.8* | 0.0* | 0.9* | ✓ | | |
| | | | All Minority | 22.0 | 7.0 | 8.3 | | | |
| | | | White | 57.1 | 59.3 | 58.8 | | | |
| | Allen | 34.6 | Black | 59.4* | 87.2* | 86.3* | | ✓ | ✓ |
| | | | All Minority | 58.7 | 70.8 | 70.5 | | ✓ | ✓ |
| | | | White | 22.9 | 20.0 | 19.9 | | | |
| | Strausbaugh | 9.4 | Black | 5.3 | 4.5 | 2.8* | | | |
| | | | All Minority | 5.5 | 6.7 | 7.6 | | | |
| | | | White | 8.7 | 10.5 | 12.2 | | | |
| | Shuler | 7.6 | Black | 9.9 | 11.0* | 6.3* | | | |
| | | | All Minority | 9.4 | 10.0* | 10.7* | | | |
| | | | White | 8.0 | 6.6 | 6.3 | | | |
| | Teator | 4.2 | Black | 4.7 | 5.9 | 6.6 | | | |
| | | | All Minority | 4.4 | 5.5 | 5.5 | | | |
| | | | White | 3.3 | 3.5 | 3.5 | | | |
| **Kempsville** | Diezel† | 48.7 | Black | 25.0* | 0.0* | 3.7* | ✓ | | |
| | | | All Minority | 25.1 | 11.3 | 12.3 | | | |
| | | | White | 61.9 | 65.4 | 65.0 | | | |
| | Jackson | 27.2 | Black | 33.2* | 48.8* | 50.5* | | ✓ | |
| | | | All Minority | 33.5 | 42.0 | 42.2 | | | |
| | | | White | 21.0 | 20.0 | 19.8 | | | |
| | Flores | 24.0 | Black | 41.8* | 57.1* | 56.5* | | ✓ | ✓ |
| | | | All Minority | 22.0 | 7.0 | 8.3 | | | |
| | | | White | 17.8 | 14.6 | 15.3 | | | |

\* $p < 0.05$ (minority vs. white support). Candidates of color highlighted by red text.

29

# Racial Polarization in Federal Elections



Figure 12: Presidential election returns for precincts in Virginia Beach. Minority voters strongly preferred Obama over both John McCain and Mitt Romney, with an estimated 90% support. White voters strongly preferred McCain and Romney (65% support) over Obama (35% support). Overall, Virginia Beach went for McCain in 2008 (49.7% to 48.9%) and for Romney in 2012 (50.3% to 47.8%).



Figure 13: Precinct-level election returns for the February 2008 presidential primary. Virginia's primary elections are open to all voters, so election returns are not necessarily restricted to Democratic voters. All voters in Virginia Beach preferred Obama to Clinton (he captured 65% of the vote), but support for Obama was much stronger among minority voters. In short, even controlling for party label there is evidence of racially polarized voting in Virginia Beach.



2016 Congressional Election
(Virginia Beach precincts)

## Shaun Brown

|  | Homogeneous precincts (⊙) | Ecological regression (Δ) | King's EI (×) |
|---|---|---|---|
| Black support (%) | 70.7* | 100.0* | 94.9* |
| All minority support (%)** | 70.7* | 82.9* | 78.1* |
| White support (%) | 25.2 | 15.7 | 17.7 |

* Estimated black support is statistically significantly different from estimated white support ($p < 0.01$).

** All minority support includes Hispanic, Asian, and other minority groups.

Figure 14: The 2016 congressional election provides evidence of racial coalitional voting, minority cohesion, and oppositional white bloc voting. Minority voters strongly preferred Shaun Brown (black female) over Scott Taylor (white male). On the other hand white voters strongly supported Taylor over Brown. Despite being the candidate of choice for black and other minority voters in Virginia Beach, Brown earned just 36.6% of the city's overall votes compared to 63.3% for Taylor.

## Analysis of Alternative Districts

In addition to analyzing the extent of racially polarized voting in Virginia Beach elections, I have been asked to evaluate the potential ameliorative effects of two possible voting districts. Figure 15 shows a map of Virginia Beach. The gray shaded areas are individual voting precincts and the highlighted regions are two potential majority-minority districts. A breakdown of each district's citizen voting age population (CVAP) is presented in Table 5. The question is whether minority voters in Virginia Beach will be more able to elect candidates of their choice in a district-based election that included these two districts. The short answer is yes.



Proposed illustrative districts
☐ District 1
☐ District 2

Figure 15: Two potential majority-minority districts in Virginia Beach. Gray shaded areas are voting precincts.

As I illustrate below, minority voters will be more likely to elect candidates of their choice in these two districts not just because of the sheer number of minority voters in each district, but because voting in these districts is less likely to be racially polarized. This means that black and other minority candidates are more likely to win in these districts, and are more likely to benefit from cross-over support from white voters. I arrive at this finding by merging voting data from previous elections to the boundaries of each new districts. There are 13 precincts (or parts of precincts) in the District 1 and nine precincts (or parts of precincts) in District 2.

|  | At-large | District 1 | District 2 |
|---|---|---|---|
| White CVAP | 67.2 | 46.13 | 47.38 |
| Nonwhite CVAP | 32.8 | 50.03 | 50.04 |
| Black | 18.5 | 30.7 | 39.05 |
| Hispanic | 5.9 | 7.31 | 6.81 |
| Asian | 5.4 | 11.98 | 4.17 |

Table 5: Citizen voting age population statistitcs for two proposed majority-minoirty districts, compared to the at-large citywide population. Source: 2016 American Community Survey.

32

In Figure 16 I plot support for each of the six minority candidates of choice that lost between 2008-2016 and a seventh candidate that ran against the black candidate of choice (and lost) in 2010. Much like the ecological regression models presented earlier, I plot voter support on the y-axis and the percent of minority CVAP on the x-axis. Because there are so few precincts in these districts, I use a locally weighted smoother "loess" line that is flexible and represents how the data are actually structured. The loess illustrates the extent to which the homogeneous precincts (which have more leverage given the small number of observations) drive any estimates of racially polarized voting. The gray regions are 95% confidence intervals. The plots that are shaded in red signal that the candidate would have won an election in these new districts based on the same voting patterns of their original elections. I present the full dataset of estimated election outcomes in Table 6 on the next page.

There are three important takeaways from Figure 16. First, although the hypothetical elections of Jackson (2010) and Sherrod (2011) would see significant racially polarized voting in District 2, the election preferences of white and minority voters is statistically indistinguishable or not substantively significant for all other hypothetical elections in both proposed districts. The election returns in Table 6 show how voting preferences between white and minority voters would shrink considerably in the two new districts.



Figure 16: Precinct-level election returns for minority candidates of choice that lost their election between 2008-2016. (Mr. James Cabiness was not the candidate of choice in 2010 but competed with Mr. Andrew Jackson who was). The blue lines are locally weighted smoothing "loess" lines that do not impose a linear relationship on the data. The gray shaded regions are 95% confidence intervals. Plots that are shaded in red signal that the candidate would have won an election in these districts based on the same voting patterns of their original election.

Second, the distribution of minority voters varies considerably between the two proposed districts. In District 2 the minority CVAP ranges from 20.7% to 84.4% of precinct population. This is evidence that there is some neighborhood segregation. In District 1, on the other hand, the distribution is much more uniform with a range of 40.4-54.6%. Minority voters in District 1 are much more integrated with white voters throughout the entire district.

| Year | Candidate | At-large | | District 1 | | District 2 | |
|---|---|---|---|---|---|---|---|
| | | Total votes | Win election? | Total votes | Win election? | Total votes | Win election? |
| 2016 | Abbott | 59.4 | ✓ | 356 | | 32.4 | |
| | Ross-Hammond* | 40.6 | | 64.4 | ✓ | 67.6 | ✓ |
| 2014 | Kane | 48.3 | ✓ | 41.8 | ✓ | 35.2 | ✓ |
| | Johnston | 17.5 | | 14.8 | | 15.4 | |
| | Browder | 17.3 | | 18.5 | | 17.6 | |
| | Cabiness* | 16.8 | | 25.0 | | 31.9 | |
| 2011 | Moss | 37.0 | ✓ | 29.4 | | 33.7 | |
| | Free | 33.2 | | 27.9 | | 23.8 | |
| | Sherrod* | 25.9 | | 39.1 | ✓ | 38.6 | ✓ |
| 2010 AL | Bellitto | 49.4 | ✓ | 25.1 | ✓ | 20.0 | ✓ |
| | DeSteph | 44.8 | ✓ | 20.8 | ✓ | 17.1 | |
| | Moss | 30.1 | | 12.0 | | 13.7 | |
| | Erb | 22.5 | | 9.0 | | 10.2 | |
| | Redmond | 21.4 | | 7.8 | | 7.2 | |
| | Jackson* | 20.3 | | 16.7 | | 21.1 | ✓ |
| | Cabiness* | 11.3 | | 8.7 | | 10.9 | |
| 2010 PA | Henley | 54.4 | ✓ | 42.1 | | 46.8 | |
| | Bullock* | 45.6 | | 57.9 | ✓ | 53.2 | ✓ |
| 2008 AL | Wilson | 44.1 | ✓ | 34.5 | | 36.8 | |
| | Allen | 34.6 | | 43.2 | ✓ | 43.5 | ✓ |

Table 6: Estimated vote shares for candidates in races that featured losing minority candidates of choice. Actual election returns are reported "At-large" total votes. Shaded rows indicate the black candidate of choice. * indicates minority candidate.

34

## Qualifications

I am Professor of Law and Public Policy at the University of Connecticut with a joint appointment in the School of Law and the Department of Public Policy. During 2018-2019, when I did much of my work, I was a Visiting Professor at the Harris School of Public Policy Studies at the University of Chicago. From 2016-2017, I was a Visiting Fellow at the Center for the Study of American Politics at Yale University.

I received my Ph.D. in Jurisprudence and Social Policy from the University of California, Berkeley in 2013. I also earned a J.D. from UC Berkeley in 2011, and a Master of Public Policy degree from UC Berkeley in 2008. In addition to my formal graduate training in statistics and empirical methods I also participated in the Empirical Implications of Theoretical Models Conference at UC Berkeley (2010) and I attended the Workshop on Research Design for Causal Inference at Northwestern University (2012). I have also worked as a law clerk at the Lawyers' Committee for Civil Rights of the San Francisco Bay Area (2011), a researcher for the Pew Center on the States' Military and Overseas Voting Reform Project (2011) and a researcher for the Early Voting Information Center (2009-2010).

My expertise is the empirical analysis of public law, with an emphasis on campaign finance and voting rights. My scholarship has been published in the peer-reviewed *Election Law Journal* and *Journal of Law & Courts* as well as in the *Columbia Law Review*, *California Law Review*, *Indiana Law Journal*, *University of Illinois Law Review*, and the *U.C. Irvine Law Review*. I have presented my research at the Conference on Empirical Legal Studies, the Public Economy and Public Law Conference, the American Political Science Association annual meeting, the American Law & Economics Association annual meeting, and other local, state, and national academic conferences.

I teach Constitutional Law (graduate and undergraduate), Election Law, Introduction to Public Policy and Administration, and a seminar on The Supreme Court and Public Policy. My full curriculum vitae is appended to this report.

I will be compensated by the Campaign Legal Center for my work in this case at a rate of $250 per hour.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Date: July 15, 2019

_____

Douglas M. Spencer, Ph.D.
*Professor of Law & Public Policy*
University of Connecticut

# Appendices

A. Technical Note on Merging Census and Election Data

B. RPV Analysis for Elections with George Furman

C. Curriculum Vitae

## A. Technical Note: Merging Census and Elections Data

One of the most challenging aspects of racially polarized voting analysis is the geographic mismatch of available demographic and political data. Demographic information, such as the size of citizen voting age population (CVAP), are reported at the level of census blocks. Election returns are reported at the level of voting district or precinct. Unfortunately, these two geographies do not perfectly overlap, so merging the data require some modeling choices. For my analysis, I performed a "spatial join" that aggregated data from census blocks in proportion to the area of each block within each district.[11] If a census block is completely within the boundaries of a voting precinct then the entire count of CVAP is added to that precinct's total. If a census block is split between two precincts—for example, 60% in one precinct and 40% in another precinct—then I assign 60% of the CVAP to the former and 40% of the CVAP to the latter. I outline the mechanics of the spatial join in the script file "vabeach_vtd.R".

---

[11]For more information about various approaches to geographic spatial joins, see Brian Amos et al. *When Boundaries Collide: Constructing a National Database of Demographic and Voting Statistics*, 81 PUB. OPINION Q. 385 (2017).

## B. RPV Analysis for Elections with George Furman



George Furman

|  | Homogeneous precincts (⊙) | Ecological regression (Δ) | Ecological inference (×) |
|---|---|---|---|
| Black support (%) | 13.7* | 23.7* | 26.5* |
| All minority support (%)** | 13.6* | 18.1* | 18.1* |
| White support (%) | 3.9 | 3.0 | 3.0 |

\* Estimated black support is statistically significantly different from estimated white support ($p < 0.01$).

\*\* All minority support includes Hispanic, Asian, and other minority groups.

Figure 17: Estimated support for Will Sessoms for the 2016 mayoral seat. The race featured three white males and a black male, George Furman. Mr. Furman earned 7.6% of the vote and was not the minority candidate of choice. Support for Mr. Furman was less than 30%. Will Sessoms, who won with 54.3% of the vote was the preferred candidate among all groups of voters.



### Ben Davenport

|  | Homogeneous precincts (⊙) | Ecological regression (Δ) | Ecological inference (×) |
|---|---|---|---|
| Black support (%) | 51.5 | 58.2* | 48.5* |
| All minority support (%)** | 46.9 | 45.9* | 39.5* |
| White support (%) | 32.1 | 28.1 | 30.0 |

\* Estimated black support is statistically significantly different from estimated white support ($p < 0.01$).

\*\* All minority support includes Hispanic, Asian, and other minority groups.

Figure 18: Estimated support for candidates running for an at-large seat in 2014. The race was contested by three white men and one black male. Ben Davenport (a white male) was the minority candidate of choice and defeated the incumbent by just 194 votes out of more than 146,000 votes cast. Mr. Furman, a black male, earned 7.6% of the overall vote, with an estimated support among black voters of approximately 20%.



|  | Homogeneous precincts (⊙) | Ecological regression (Δ) | Ecological inference (×) |
|---|---|---|---|
| **Louis Jones** |  |  |  |
| Black support (%) | 63.2* | 53.8* | 55.2 |
| All minority support (%)** | 63.1 | 56.2 | 56.6 |
| White support (%) | 68.9 | 67.5 | 67.3 |
| **George Furman** |  |  |  |
| Black support (%) | 36.8* | 46.2* | 45.5 |
| All minority support (%)** | 36.9 | 43.8 | 43.7 |
| White support (%) | 31.1 | 32.5 | 32.8 |

\* Estimated black support is statistically significantly different from estimated white support ($p < 0.01$).

\*\* All minority support includes Hispanic, Asian, and other minority groups.

Figure 19: Racial voting patterns for Louis Jones (white male) and George Furman (black male) for the Bayside city council seat in 2010. White voters strongly preferred Jones (67-33%) who was the incumbent since 1990. The estimated support among black voters is more ambiguous. Black voters were more likely to support Mr. Jones, but only by a few points. According to the ecological inference models, support for Mr. Jones among black voters was 55.7% ± 13% while support for Mr. Furman was 45.1% ± 16%.

## C. Curriculum Vitae

See attached.

# Douglas M. Spencer

**Contact:**

312 Hosmer Hall
University of Connecticut
School of Law
Hartford, CT 06105

Website: www.dougspencer.org
Email: dougspencer@gmail.com
Phone: (415) 335-9698

## ACADEMIC POSITIONS

**University of Connecticut**

Professor of Law and Public Policy, 2017–

Associate Professor of Law and Public Policy, 2013–2017

- *Courses*: Constitutional Law, Election Law, Introduction to Public Policy (MPA Program), How to Fix Elections: Election Administration in the United States (undergraduate Poli. Sci.)

**University of Chicago,** *Visiting Professor*, Harris School of Public Policy, 2018-2019

- *Courses*: The Supreme Court & Public Policy (grad); Constitutional Law (undergrad)

**Yale University,** *Visiting Scholar*, Center for the Study of American Politics, 2016-2017

## EDUCATION

**University of California, Berkeley**

Ph.D., Jurisprudence and Social Policy, 2013
- *Committee:* Robert D. Cooter, Kevin Quinn, and Henry E. Brady

J.D., Berkeley Law, 2011

M.P.P., Goldman School of Public Policy, 2008

**Columbia University**

B.A., Philosophy, *magna cum laude*, 2004

## PUBLICATIONS

- Bertrall L. Ross II & Douglas M. Spencer. 2019. "Passive Voter Suppression," *Northwestern University Law Review* (forthcoming).

- Guy-Uriel Charles & Douglas M. Spencer. 2019. "The Law of Gerrymandering," *Political Geometry*, (ed. Moon Duchin et al.) Boston, MA: Birkhauser Science (forthcoming).

- Paul S. Herrnson, Douglas M. Spencer & Jennifer Heerwig. 2018. "The Impact of Organizational Characteristics on Super PAC Financing," in *The State of the Parties 2018*, (ed. John Green et al.) New York: Rowman & Littlefield, pp. 248-262.

- Douglas M. Spencer. 2017. "Corporations as Conduits: A Cautionary Note About Regulating Hypotheticals," *Stetson Law Review*, 47(2), pp. 225-258 (invited symposium).

- Abby K. Wood and Douglas M. Spencer. 2016. "In the Shadows of Sunlight: The Effects of Transparency on State Political Campaigns," *Election Law Journal*, 15(4), pp. 302-329.

- Christopher S. Elmendorf and Douglas M. Spencer. 2015. "Administering Section 2 of the VRA After Shelby County," *Columbia Law Review*, 115(7), pp. 2143-2217.

- Gabriel J. Chin & Douglas M. Spencer. 2015. "Did Multicultural America Result From a Mistake? The 1965 Immigration Act and Evidence From Roll Call Votes," *U. Illinois Law Review*, 2015(3), pp. 1239-58.
- Chris Elmendorf and Douglas M. Spencer. 2014. "The Geography of Racial Stereotyping: Evidence and Implications for VRA 'Preclearance' After Shelby County," *California Law Review*, 102(5), pp. 1123-80.
- Sean Farhang and Douglas M. Spencer. 2014. "Legislating Incentives for Attorney Representation in Civil Rights Litigation," *Journal of Law & Courts*, 2(2), pp. 241-71.
- Douglas M. Spencer and Abby K. Wood. 2014. "Citizens United, States Divided: An Empirical Analysis of Independent Political Spending," *Indiana Law Journal*, 89(1), pp. 315-72.
- Christopher S. Elmendorf and Douglas M. Spencer. 2013. "Are Ballot Titles Biased? Partisanship and Ideology in California's Supervision of Direct Democracy," *U.C. Irvine Law Review*, 3(3), pp. 511-49 (invited symposium).
- Douglas M. Spencer and Zachary S. Markovits. 2010. "Long Lines at Polling Stations? Observations from an Election Day Study," *Election Law Journal*, 9(1), pp. 3-17.

# IN PROGRESS

## *Working Papers*

(under review)
**Mind the (Participation) Gap: Vouchers, Voting, and Visibility**
(with Chris Elmendorf & Abby Wood)

**Campaign Finance and the Rhetoric of Corruption: A Conjoint Experiment**
(with Alexander Theodoridis)

(under review)
**Super PAC Strategies and Tactics**
(with Jay Goodliffe and Paul Herrnson)

**The Impact of Associational Ties on the Financing of Super PACs**
(with Jay Goodliffe, Jen Heerwig, and Paul Herrnson)

## *Works in Progress*

### **Social Media and Racial Appeals in Political Campaigns**

The federall Voting Rights Act creates a special duty on state and local governments to accommodate minority voters and ensure that they have a fair opportunity to elect candidates of their choice in jurisdictions whose politics have been shaped by racial discrimination and conflict. Courts have long treated "racial campaign appeals" as an important indicator of such discrimination and conflict. But to date, analysts have not been able to create objective measures of the extent to which a campaign's messaging appeals to racial preferences. Advances in face recognition and sentiment make it possible to create measures of racial campaign appeals that do not depend on contested judgments about the social meaning of particular phrases or sentences. Our measure of racial appeals will be very timely. Given the intensity of modern partisanship and the pervasiveness of motivated reasoning, it seems very unlikely that Democratic and Republican judges will be able to decide questions about racial campaign appeals impartially and consistently if their decisions must turn on interpreting and then attributing significance to one or another statement by a candidate. Because our measure is objective and does not require judges to interpret the social meaning of particular campaign statements, it should help judges who have very different prior beliefs about racism in the United States today to reach similar results in similar cases.

**Democratic Responsiveness in State Policy Implementation**
(with Miranda Yaver)

A question at the core of American politics and policymaking is to what extent elected representatives act in ways that reflect the preferences of the electorate to which they are accountable. This issue of democratic responsiveness has been been evaluated in depth in the context of legislative behavior and the role of public opinion in shaping legislators' votes. An important limitation to the existing studies is their failure to disentangle de facto and de jure policymaking at the state level. The practice of measuring policy adoptions is common, with the observation that once adopted, policies are rarely appealed. Yet policies may in fact stay "on the books" while changing with respect to the nature and vigor of their actual enforcement given developments in public opinion or the partisan configuration in which the relevant institutions are operating. We seek in this paper to remedy what we see as an important oversight in the democratic responsiveness literature to date, and work to answer the following core question: To what extent, and under what conditions, does public opinion shape the vigor of state-level policy enforcement? We evaluate this within the policy domains of the death penalty and hate crimes, but hope to extend to additional policies in future work.

## Other Writing

"How Surveys Can Strengthen the Voting Rights Act."
SSN KEY FINDINGS BRIEF, May 2017.

"Affirmative Action Setback in the Supreme Court Could Be a Boost to Voting Rights."
THE NEW REPUBLIC, April 29, 2014 (with Chris Elmendorf).

"Fears Over the Impact of Citizens United May Be Misplaced."
LONDON SCHOOL OF ECONOMICS USApp BLOG, January 27, 2014 (with Abby Wood).

"New Tools for Bail In: Using the Geography of Discrimination to Reconstruct Preclearance Judicially."
ELECTION LAW BLOG, July 25, 2013 (with Chris Elmendorf).

"How to Save the Voting Rights Act: Here's the best option for Congress."
SLATE, July 17, 2013 (with Chris Elmendorf).

"Are the Covered States "More Racist" than Other States?"
ELECTION LAW BLOG, March 4, 2013 (with Chris Elmendorf).

# PRESENTATIONS

## Conferences, Symposia and Academic Workshops

**2018**   Conference on Empirical Legal Studies. University of Michigan. Poster presentation. "Mind the (Participation) Gap: Vouchers, Voting, and Visibility." November 9.

Northeastern Political Science Association Annual Meetings. Montreal, Canada. Paper presentation. "Are Super PACs the Downfall of Transparent Campaigns? Funding Sources and Their Impact on Campaign Activity." November 8.

American Political Science Association Annual Meetings. Boston MA. Paper presentation. "The Electoral Bogeyman: Beneficiaries and Targets of Super PAC Spending." August 31.

Political Economy & Public Law Conference, University of Connecticut School of Law. Discussant for Dane Thorley, "The Limitations of Procedure: A Randomized Field Experiment Testing the Efficacy of Judicial Recusal and Disclosure." June 16.

American Law & Economics Association, Boston University. Paper presentation, "Mind the (Participation) Gap: Vouchers, Voting, and Visibility." May 12.

Midwest Political Science Association, Chicago, IL. Paper presentation, "Mind the (Participation) Gap: Vouchers, Voting, and Visibility." April 3.

**2017**   American Political Science Association, San Francisco, CA. Paper presentation, "The Impact of Associational Ties on the Financing of Super PACs." September 1.

Political Economy and Public Law Conference, University of Southern California Gould School of Law. Paper presentation, "Campaign Finance and the Rhetoric of Corruption: A Conjoint Experiment." April 16.

Symposium: Can Corporations Be Good Citizens? How Corporate Law, Litigation, Lobbying and Money in Politics Intersect, Stetson Law School, Gulfport, FL. Paper presentation, "Corporations as Conduits: A Cautionary Note About Regulating Hypotheticals." March 24.

**2016**   Conference on Money and the First Amendment, University of Colorado, Boulder. Paper presentation, "Campaign Finance and the Rhetoric of Corruption." April 15.

Midwest Political Science Association, Chicago, IL. Paper presentation, "Minority Turnout and the Political Incentives to Discriminate after *Shelby County*." April 8.

**2015**   Conference on Empirical Legal Studies, Washington University in St. Louis. Discussant for Marc Meredith and Michael Morse, "Discretionary Disenfranchisement: The Case of Legal Financial Obligations." October 30.

Empirical Studies in Public Law Workshop, Hebrew University, Jerusalem. Paper presentation, "Administering the Voting Rights Act After Shelby County." May 25.

Center for Law and Social Science Workshop, University of Southern California. Paper presentation, "Administering Section 2 of the VRA After Shelby County." March 30.

Workshop on Voting Rights, Ash Center for Democratic Governance and Innovation, Harvard Kennedy School. Paper presentation, "Administering Section 2 of the VRA After Shelby County." March 27.

American Association of Law Schools, Washington DC. Paper presentation, "Multilevel Regression with Poststratification: Implications for Legal Scholarship." (Winner of the Law & Social Science Section's call for papers on "Extreme Empirical Methods.") January 6.

**2014**   Conference on Empirical Legal Studies, Berkeley, CA. Paper presentation, "After Shelby County: Getting Section 2 of the VRA to Do the Work of Section 5." November 7.

Faculty Workshop, UConn School of Law, Hartford, CT. Paper presentation, "After Shelby County: Getting Section 2 of the VRA to Do the Work of Section 5." October 8.

Southeastern Association of Law Schools, Amelia Island, FL. Paper presentation, "A Precautionary Tale From State Campaign Finance." August 5.

Political Economy and Public Law Conference, University of Rochester. Paper presentation, "The Geography of Discrimination: Evidence and Implications for Voting Rights After *Shelby County*." May 29.

Midwest Political Science Association, Chicago, IL. Paper presentation, "Administering Section 2 of the VRA After *Shelby County*." April 5.

**2013**   Political Science Faculty Colloquium, University of Connecticut. Paper presentation, "The Geography of Racial Stereotyping: Implications for VRA 'Preclearance' After *Shelby County*." October 28.

Cooperative Congressional Election Survey (CCES) Conference, Sundance, UT. Paper presentation, "The Geography of Discrimination in Voting: MRP Meets the VRA." May 24.

**2012**   Faculty Workshop, UConn School of Law. Paper presentation, "Citizens United, States Divided: Evidence of Elasticity in Independent Expenditures." November 12.

Conference on Empirical Legal Studies, Stanford, CA. Paper presentation, "In the Shadows of Sunlight: Measuring the Effects of Transparency on State Political Campaigns." November 10.

Faculty Workshop, UC Davis School of Law. Paper presentation, "Citizens United, States Divided: Evidence of Elasticity in Independent Expenditures." October. 25.

Faculty Workshop, George Mason Law School. Paper presentation, "Citizens United, States Divided: Evidence of Elasticity in Independent Expenditures." October 23.

Law & Economics Workshop, Berkeley Law. Paper presentation, "Citizens United, States Divided: Evidence of Elasticity in Independent Expenditures." September 17.

Symposium on Nonpartisan Election Administration, Redistricting, and Campaign Finance, Irvine, CA. Paper presentation, "Are Ballot Titles Biased? Partisanship in California's Supervision of Direct Democracy." September 13.

Law & Society Association, Honolulu, HI. Paper presentation, "Citizens United, States Divided: Evidence of Elasticity in Independent Expenditures." June 6.

American Law & Economics Association, Stanford, CA. Paper presentation, "Economic Recovery Rules and Attorney Representation in Job Discrimination Litigation." May 18.

Midwest Political Science Association, Chicago, IL. Paper presentation, "Regulate or Delegate? Implications for Election Law." April 14.

Midwest Political Science Association, Chicago, IL. Paper presentation, "Citizens United, States Divided: Evidence of Elasticity in Independent Expenditures." April 13.

Western Empirical Legal Studies Conference, UCLA School of Law. Paper presentation, "Economic Recovery Rules and Attorney Representation in Civil Rights Litigation." February 18.

**2011**  American Political Science Association, Seattle, WA. Paper presentation, "Citizens United, States Divided? The Interaction of Transparency and Spending in State Elections." September 3.

Law & Society Association, San Francisco, CA. Paper presentation, "Economic Recovery Rules and Attorney Representation in Civil Rights Litigation." June 3.

Midwest Political Science Association, Chicago, IL. Paper presentation, "Constitutions and Close Elections." April 1.

**2010**  Conference on Empirical Legal Studies, Yale Law School. Poster, "Constitutions and Credible Commitments: A Modern Day Investment Scheme?" November 5.

**2009**  Midwest Political Science Association, Chicago, IL. Paper presentation, "Long Lines at Polling Stations? Observations from an Election Day Field Study." April 3.

## PROFESSIONAL ACTIVITIES

Referee    *Journal of Empirical Legal Studies*    *Election Law Journal*
             *Supreme Court Economic Review*    *Electoral Studies*
             *Political Research Quarterly*    *American Politics Research*
             *Law & Social Inquiry*

Expert witness (rebuttal on behalf of Colorado Secretary of State) in defense of state campaign finance law. Case: *Holland v. Williams*, No. 16-cv-00138-RM-MLC (2018)

Chair, Section on Law and Social Sciences, *Association of American Law Schools*, 2016-2017

Expert witness (consulting) for Voting Rights Act, *Chicago Lawyers' Committee for Civil Rights*, 2015

Researcher, *Pew Center on the States' Military and Overseas Voting Reforms Project*, 2011

Researcher, *Pew Center on the States / Early Voting Information Center*, 2009-2010

## HONORS, AWARDS, & FELLOWSHIPS

Research Grant ($14,000) from the MIT Election Data and Science Lab (2017)

Excellence in Teaching Award, UConn Department of Public Policy, 2013, 2014, 2015

Research Grant ($2,000) from the Berkeley Experimental Social Science Laboratory, 2012

Berkeley Empirical Legal Studies Fellow, 2010-2011

Berkeley Law and Economics Fellow, 2009-2010

Research Grant ($4,000) from the Pew Center on the States, 2008

Research Grant ($15,000) from the UC Berkeley Survey Research Center, 2007-2008

Outstanding Graduate Student Instructor, UC Berkeley, 2007 & 2011

Outstanding Graduate Student Instructor, UC Berkeley Political Science Department, 2007

## NON-ACADEMIC EMPLOYMENT

*Treasurer*, Chris Mattei for CT Attorney General campaign, 2017-2018

*Law Clerk*, Lawyers' Committee for Civil Rights of the San Francisco Bay Area, Summer 2011

*Reseacher*, Pew Center on the States, Military and Overseas Voting Reforms Project, 2011

*Program Assistant*, International Finance Corporation (World Bank Group), Washington, DC, 2005-2006

*Congressional Liaison*, United States Department of the Interior, Washington DC, 2005

*Election Monitor*, Asian Network for Free Elections, Thailand National Election, February 2005

*Chief Interpreter*, Russian National Olympic Delegation, 2002.

# Response to Report by Dr. Quentin Kidd

Submitted by:
Douglas M. Spencer, Ph.D.

*Holloway v. City of Virginia Beach*
No. 2:18-cv-00069

August 26, 2019

## Contents

**Summary**     2

**1   Minority political cohesion**     4

**2   Minority coalitional voting**     6

**3   Other**     10

Probative elections . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

My Data . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

    Source of CVAP . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

    Precinct files . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

    At-large elections in 2018 and 2014 . . . . . . . . . . . . . . . . . . . 12

**Appendices**     14

Correspondence with Virginia Beach Center for GIS . . . . . . . . . . . . . . 14

Updated 2018 and 2014 At-Large Election Estimates . . . . . . . . . . . . . . 15

2018 Election Performance in Illustration Districts 1 and 2 . . . . . . . . . . . 16



1

Douglas M. Spencer                                                                    August 26, 2019

# Summary

Between 2008-2018 there were sixteen opportunities for a black candidate to win a seat on the Virginia Beach City Council.[1] In ten of these cases the black candidate was the candidate of choice for minority voters. Seven of these ten candidates lost due to white bloc voting. Three white candidates were also candidates of choice for minority voters, and one lost her election due to white bloc voting. In all, of the 13 candidates of choice, white and black, eight lost their elections due to oppositional voting by white voters. In other words, minority-preferred candidates have usually (61.5%) lost due to white bloc voting, *Thornburg v. Gingles*, 478 U.S. 30, 56 (1986).

**Minority political cohesion.**   Minority voters are cohesive when their most preferred candidate earns enough minority support to win an election. Dr. Kidd misinterprets the *Gingles* factors as requiring that candidates earn more than 50% support from minority voters to be considered a candidate of choice. At no time has the Court defined cohesiveness as 50% support or more among minority voters. In fact, in multi-member districts the Court has acknowledged that the degree of support may be lower when many candidates are running. The Gingles factors merely require plaintiffs to provide evidence that candidates with enough minority support to win their election usually end up losing due to white bloc voting. Voting patterns in Virginia Beach clearly meet this standard.

**Minority coalitional voting.**   Minority groups are considered a coalition when they share candidate preferences and their individual group support is sufficient to elect their preferred candidate. Coalitions are not defined by groups sharing more than 50% support for candidates, nor by groups sharing an exactly equal level of support for candidates. In my report I identified 13 candidates whose support from minority voters was sufficient for their election, eight of whom were defeated due to oppositional white bloc voting. I provide further evidence that the minority support for six of these eight candidates represents support from more than just one racial minority group.

**Responses to Dr. Kidd**

- **Probative elections**. My analysis is limited to elections that are probative of the Gingles factors. As is customary, I begin with the assumption that minority candidates provide a setting that is more probative of the question whether racially polarized voting is preventing minority-preferred candidates from winning. This does not mean that minority candidates exclusively are probative, but it serves as my starting point.

---

[1]As I explained in my original report and reiterate below, I exclude George Furman from my analysis because in three races against seven different candidates, Mr. Furman always came in last and never earned the support of minority voters. Elections featuring Mr. Furman do not provide a setting that is probative of the Gingles factors and are dropped from the analysis throughout.

2

- **Data clarification**

  * Source of CVAP. Contrary to Dr. Kidd's assertion, I do not rely on Anthony Fairfax's census block data for my racially polarized voting analysis. My analysis is based on Citizen Voting Age Population (CVAP) estimates at the block group level (not block level) that I downloaded directly from the Census.

  * Precinct files. I rely on the Census TIGER/Line VTD file of 94 precincts for my analysis of elections between 2008-2016. Note that I must drop four precincts in 2016 for which I am unable to merge in CVAP data. I rely on the current shapefile of 100 precincts for my analysis of the 2018 election.

  * Vote totals for at-large elections. Dr. Kidd is correct that my vote totals for at-large seats in 2018 and 2014 (but not 2010) sum to 100% when they should sum to 200%. This was a simple error with no effect on my conclusions as the transformation applies to all estimates for all candidates. Although all estimates—homogeneous precincts, ecological regression, and ecological inference—should be doubled, the relationship between candidates remains unchanged. In addition, the 2014 at-large election includes Furman as a candidate. As I noted above, my analysis treats the Furman race as non-probative, further minimizing the impact of any error.

Douglas M. Spencer                                                                                August 26, 2019

# 1   Minority political cohesion

*Minority voters are cohesive when their most preferred candidate earns enough minority support to win an election. At no time has the Supreme Court defined cohesiveness as 50% or more among minority voters. In multi-member districts the Court has even acknowledged that the degree of support may be lower when multiple candidates are running.*

The second and third Gingles factors direct lower courts to focus their attention on both minority and white voting practices, yet the Supreme Court has not established a strict definition of minority political cohesion, nor has the Court provided a numerical cutoff to determine when majority voting is sufficient for defeating minority-backed candidates. In fact, the Court in *Gingles* acknowledged that "there is no simple doctrinal test for the existence of legally significant racial bloc voting," 478 U.S. at 58. Instead, the Court noted that "the degree of racial bloc voting that is cognizable as an element of a §2 vote dilution claim will vary according to a variety of factual circumstances," *Id.* at 57-58, including "the number of seats open and the number of candidates," *Id.* at 56.

Furthermore, when discussing the evidence necessary to prove minority political cohesion, the Court in *Gingles* held that "showing that a **significant number** of minority group members usually vote for the same candidates is one way of proving the political cohesiveness necessary to a vote dilution claim," 478 U.S. at 56 (emphasis added). At no time has the Court defined cohesiveness as 50% support or more among minority voters. In fact, in multi-member districts the Court has acknowledged that the degree of support may be lower when multiple candidates are running. The Gingles factors require plaintiffs to provide evidence that candidates with enough minority support to win their election "usually" end up losing due to white bloc voting. Voting patterns in Virginia Beach clearly meet this standard.

In his August 12, 2019 response to my report on racially polarized voting in Virginia Beach, Dr. Quentin Kidd challenged some of my findings by repeatedly relying on the incorrect assumption that minority voters are not cohesive when their support for minority candidates dips below 50%. For example:

- Page 3 (repeated on page 5): "Less than a third of the elections analyzed by Spencer resulted in an African American candidate who **received a majority support** among minority voters..."

- Page 8: "It is thus likely that Rouse...did in fact **receive a majority of the black vote** in 2018."

- Tables 1-3 all distinguish between candidates who "received cohesive support" and those who "did not receive cohesive support." The distinguishing feature is support among minority voters at the 50% level or higher.

4

- Page 10: "Since 2012, two of five African American candidates who **received majority support among African American voters** lost their respective races. . ."

- Page 10: ". . .one of four African American candidates who **received majority support among minority voters** lost. . ."

- Page 10: ". . .all four African American candidates who **received majority support among minority voters**. . ."

- Page 10, fn 10: "Cabiness is included in Table 4 but is removed from Table 5, having received according to Spencer's analysis **51.7% support from black voters** but only 37% of minority voters overall."

- Page 13: ". . .if Spencer considered only Jackson or Flores to have **received majority black support**, then his 10th case might be Cabiness in the 2014 Rose Hall district race, who **got 51.7% of the African American vote**. However, like Jackson and Flores, Cabiness was not the choice of minority voters, attracting only 37.0% of their votes."

- Page 13: ". . .no more than seven candidates **received a majority of the minority vote**. . ."

- Page 13, fn 13: ". . .it is possible (likely) that in 2018 Rouse, who won, **received a majority of the minority vote.**"

- Page 18: ". . .when Spencer shows a **majority of African Americans supporting** a candidate but a **majority of All Minorities** failing to support that candidate."

- Table 9 distinguishes between Bullock (2010 Princess Anne) whose support among Asian and Hispanic voters exceeded 50% (according to Dr. Kidd) and four candidates whose support among Asian and Hispanic voters fell short of 50%. Because Bullock exceeds the 50% threshold, Dr. Kidd writes that he "is the only candidate on this list who manages to be the preferred candidate of African American AND Asian + Hispanic voters."

- Page 22: "Table 10 is a recreation of Table 7 above with changes to reflect instances in which support from Asian + Hispanic voters **failed to reach a majority**.

Dr. Kidd's reliance on the idea that minority voters are only cohesive under §2 of the VRA when their support for candidates exceeds 50% is mistaken and results in an unreliable taxonomy of candidates throughout his report. His assumption is only persuasive when just two candidates are running as it would take more than 50% support for a candidate to win. Indeed, in every probative race in Virginia Beach featuring two candidates between 2008-2018, the candidate of choice received more than 50% support from minority voters.[2] However, as the number of candidates increases the level of minority support necessary to win an election decreases, and most of the probative elections in Virginia Beach involve more than two candidates. Thus, the inquiry into racially polarized voting is contextual and, as the Supreme Court in *Thornburg v. Gingles* explicitly noted, "the degree of bloc voting which constitutes the threshold of legal significance will vary from

---

[2] The four probative races that featured two candidates between 2008-2018 were for the Kempsville seat in 2016, the Princess Anne seat in 2010 and 2014, and the Bayside seat in 2010.

5

district to district," 478 U.S. at 55-56.

This context explains why a candidate that received 37.0% support from minority voters in one race (James Cabiness in the 2014 Rose Hall special election) was the minority candidate of choice while a candidate that received 34.3% in another race (Pieri Burton in the 2014 Princess Anne election) was not. The former race was an open seat that featured four candidates while the latter race featured a single challenger to the incumbent.

## 2   Minority coalitional voting

*Minority groups are considered a coalition when they share candidate prefer- ences and their individual group support is sufficient to elect their preferred candidate. Coalitions are not defined by groups sharing more than 50% sup- port for candidates, nor by groups sharing an exactly equal level of support for candidates.*

As I note in my original report, the population of Hispanic and Asian voters is not large enough to generate precise estimates of candidate preference using traditional statistical methods. As of 2017, the citywide Hispanic CVAP in Virginia Beach is 5.9%, and there are only two precincts with more than 12% Hispanic CVAP—Magic Hollow (14.6%) and Brandon (14.5%). The Asian population is more segregated: although the citywide Asian CVAP is 5.4% there are five precincts with more than 15% Asian CVAP and one (Dahlia) with 21.6% Asian CVAP. Nevertheless, these precinct-level populations are simply too small to draw reliable conclusions about the voting preferences of these groups indepen- dently.[3] As a result, I did not generate independent estimates for these groups.[4]

The most reliable method for interpreting the candidate preferences of black, Hispanic, and Asian voters is to estimate their joint vote share, which I reported in my original report in a category called "All Minority."[5] Black, Hispanic, and Asian voters combined generate estimates that are statistically significantly different from white voting, which then makes a comparison between these groups possible. Does the coalition of black, His- panic, and Asian voters strongly support candidate X? Are white voters strongly opposing

---

[3]Quentin Kidd, "Expert Report of Dr. Quentin Kidd: Response to Spencer and Lichtman," (here- inafter Kidd Report), p. 5 ("Plaintiffs fail to analyze Hispanic and Asian voters independent of African American voters.").

[4]Note that I have not generated estimates for races included Ron Villanueva for a similar reason. In footnote 8 of my original report I expressed my intention to evaluate races when Mr. Villanueva was on the ballot. Mr. Villanueva is a former member of the Virginia Beach City Council who was elected to represent District 21 in the Virginia House of Delegates. District 21 comprises just 15 of Virginia Beach's 100 precincts, meaning there are too few data points to generate good ecological inference estimates.

[5]My category of "All Minority" also included all nonwhite voters. The percent of voters that are not black, Hispanic, or Asian is less than 2% of each precinct. The ecological inference models require that racial percentages sum to 1, which necessitates comparing white voting to all nonwhite voters.

candidate X? These questions are difficult to answer if voting preferences between all of these groups are statistically indistinguishable.

Dr. Kidd criticizes my approach by posing a hypothetical: what if the coalitional support for a candidate is driven by extreme support among black voters that masks weak support among Hispanic and Asian voters? Kidd provides the following example:

|  | Black | Hispanic | Asian | White | Total |
|---|---|---|---|---|---|
| Candidate A | 9 | 1 | 1 | 4 | 15 |
| Candidate B | 1 | 4 | 4 | 16 | 25 |
|  | 10 | 5 | 5 | 20 | 40 |

In Kidd's example above, a category that combines black, Hispanic, and Asian voters will identify Candidate A as the minority candidate of choice with 73.3% support (11 of 15 votes), even though both Hispanic and Asian voters strongly preferred Candidate B by a 4-to-1 margin.

However, as I show below, on the whole there is not evidence that minority voting is fractured. To the contrary, the evidence suggests that the voting preferences of black, Hispanic, and Asian voters are not distinguishable from each other.

In Table 1, I present a summary of minority support for the thirteen candidates (ten black, three white) that I identified as minority candidates of choice in my report. In 11 of the 13 cases, I find that coalitional voting was sufficient enough for minority-preferred candidates to have been elected in the absence of white bloc voting. In just two of the 13 cases (Cabiness in 2014 and Jackson in 2010) I find that minority support was likely not due to coalitional voting.

For all but one of the 13 candidates, support from black voters was sufficient for the candidate to have been elected in the absence of white bloc voting. Given the large black population in Virginia Beach, the estimated support of black voters is statistically significantly higher than the threshold necessary for each candidate to win his/her election. The estimates for Hispanic and Asian voters are much noisier due to smaller populations. Consider the case of Aaron Rouse, a black male candidate who won an at-large seat in 2018. In order to have won an at-large seat in 2018 a candidate needed to earn at least 45.2% of the vote. Support among black voters exceeded 70%, plus or minus 6%, meaning we can be confident that black support exceeded the threshold of 45.2%. By contrast, support among Asian voters is estimated to be 53.0% ± 15.24. Thus, while the estimated vote share exceeded the threshold needed to win, the confidence interval is large enough that it is possible Asian support was not strong enough to help elect Mr. Rouse. Finally,

Douglas M. Spencer                                                                August 26, 2019

|       |              |              | Threshold | Support above threshold | | | | |
|-------|--------------|--------------|-----------|-------|-------------------|-------------|----------------------|------|
| Year  | Seat         | Candidate    | to win    | Black | Hispanic range | Asian range | Minority preferred? | Won? |
| **Minority candidates** | | | | | | | | |
| 2018  | At-large     | Rouse        | 45.2      | ✓ | ✓ | ✓ | Y | Y |
| 2018  | Centerville  | Wooten       | 62.1      | ✓ | ✓ | ✓ | Y | Y |
| 2016  | Kempsville   | Ross-Hammond | 59.4      | ✓ | ✓ | ✗ | ? | N |
| 2014  | Rose Hall    | Cabiness     | 48.3      | ✓ | ✗ | ✗ | N | N |
| 2012  | Kempsville   | Ross-Hammond | 32.2      | ✓ | ✓ | ✓ | Y | Y |
| 2011  | At-large     | Sherrod      | 37.0      | ✓ | ✓ | ✓ | Y | N |
| 2010  | At-large     | Jackson      | 44.8      | ✓ | ✗ | ✗ | N | N |
| 2010  | Princess Anne| Bullock      | 54.4      | ✓ | ✓ | ✓ | Y | N |
| 2008  | At-large     | Allen        | 44.1      | ✓ | ✓ | ✓ | Y | N |
| 2008  | Kempsville   | Flores       | 48.7      | ✓ | ✓ | ✓ | Y | N |
| **White candidates** | | | | | | | | |
| 2018  | At-large     | White        | 45.2      | ✓ | ✓ | ✗ | ? | N |
| 2014  | Princess Anne| Henley       | 76.7      | ✓ | ✓ | ✓ | Y | Y |
| 2010  | At-large     | Bellitto     | 44.8      | ✗ | ✓ | ✓ | ? | Y |

Table 1: Summary of minority support for candidates in races where at least one candidate was nonwhite. Minority support sufficient to have elected a candidate in the absence of white bloc voting is marked with a ✓. Because the population of Hispanic and Asian CVAP prevents precise estimates of candidate preference, support is marked with a ✓ when the null hypothesis that candidates did not receive support sufficient to be elected in the absence of white bloc voting is rejected.

the estimated support of Hispanic voters is 34%, suggesting that Mr. Rouse was less preferred than other candidates. However, the estimated Hispanic support has a confidence interval of ± 20.9% meaning support among Hispanics could very well be *higher* than support among Asians. How do we make sense of this uncertainty?

To draw my conclusions, I adopt the logic of equivalence testing.[6] The purpose of an equivalence test is to determine whether two or more groups are equivalent. Contrary to Dr. Kidd's assertion that I am merely assuming coalitional voting (Kidd Report p. 17), the baseline assumption of an equivalence test (usually referred to as the "null hypothesis") is that groups are *not* the same. I then compare the distribution of each minority group to determine whether there is evidence that the groups are, in fact, the same. If the groups are determined to be the same, then I reject the null hypothesis.

When using an equivalence test, we start by assuming that black, Hispanic, and Asian voters each prefer different candidates due to the logic of Dr. Kidd's hypothetical above. A traditional equivalence test compares the distribution of two datasets in the abstract and rejects the null hypothesis when there is at least 10% overlap between two distributions (for p-values less than the standard 0.05 level). An equivalence test in the context of coalitional voting compares the distributions of black, Hispanic, and Asian vote shares

---

[6]See Erin E. Hartman & F. Daniel Hidalgo. 2018. "An Equivalence Approach to Balance and Placebo Tests," *American Journal of Political Science*, 62(4): 1000-13.

not in the abstract, but against the threshold needed for a candidate to win his/her election. In other words, even in the absence of overlapping distributions, two groups are deemed a coalition if they both exceed the threshold. For example, if the threshold for victory is 30% and the distribution of vote shares is 85% (± 10%) for black voters, 40% (± 8%) for Hispanic voters, and 28% (± 6%) for Asian voters, we would reject the null hypothesis that these groups are different not because their distributions overlap each other, but there is at least 10% overlap with the threshold. This use of equivalence testing is admittedly permissive, though not so permissive as to reject the null hypothesis in every case. Indeed, there is facial validity to the results of this test as it identifies a fractured coalition in support of James Cabiness in 2014. Although support for Mr. Cabiness was strong among black voters, the Hispanic vote was split among all four candidates, and Asians coalesced around Mr. Cabiness's opponent.

In short, when estimating the exact voting preferences of minority voters the larger the population, the more precise the estimates. But we are not helpless in understanding patterns of support that implicate the Voting Rights Act. In my report I identified thirteen candidates whose support from minority voters was sufficient for their election, eight of whom were defeated due to oppositional white bloc voting. In this report I provide further evidence that the minority support for six of these eight candidates represented more than just one racial minority group.

On pages 19-23 of Dr. Kidd's report, Dr. Kidd argues that allegedly lower turnout among Hispanic and Asian voters "produces an over-estimate of the Asian + Hispanic support for black candidates." Kidd Report, p. 21. However, Dr. Kidd is incorrect that an alleged variation in turnout levels would erase the existence of a minority voting coalition. As shown above, there is substantial evidence of minority coalitional voting in Virginia Beach. Further, courts have entirely discounted analyses such as Dr. Kidd's. See *Montes v. City of Yakima*, 40 F. Supp. 3d 1377, 1405 (E.D. Wash. 2014) ("...the Ninth Circuit has prohibited district courts from discounting statistics about a minority group's candidate preferences on the basis of low voter turnout. *See Gomez*, 863 F.2d at 1416 ('The district court erred by focusing on low minority voter registration and turnout as evidence that the minority group was not politically cohesive.'). This makes good sense; 'if low voter turnout could defeat a section 2 claim, excluded minority voters would find themselves in a vicious cycle: their exclusion from the political process would increase apathy, which in turn would undermine their ability to bring a legal challenge to the discriminatory practices, which would perpetuate low voter turnout, and so on.' *Blaine Cnty.*, 363 F.3d at 911.").

Further, on pages 32-34 of my original report, I provided an analysis with reconstituted election results showing that the Illustrative Plan's Districts 1 and 2 would perform, in other words, allow minority voters an opportunity to elect candidates of their choice, "not just because of the sheer number of minority voters in each district, but because voting in these districts is less likely to be racially polarized. This means that black and other minority candidates are more likely to win in these districts, and are more likely to benefit from cross-over support from white voters." (Spencer Report, p. 32). In Appendix C of this report, I update the analysis on pages 32-34 of my initial report to include the 2018 election results, which again confirm that the Illustrative Plan's Districts 1 and 2 gives minority voters the opportunity to elect candidates of their choice.

## 3   Other

### Probative elections

Dr. Kidd notes in footnote 6 on page 6 that "Spencer analyzes 17 contested elections with at least one African American candidate. However, between 2008-2018 there were 27 contested City Council elections in Virginia Beach. Despite Spencer and plaintiffs' concession that white candidates can be and have been minority candidates of choice, they do not conduct a full analysis of all contested City Council elections during this time." Dr. Kidd is correct that I do not present an analysis of all City Council elections between 2008-2018. My analysis is limited to elections that are probative of the *Gingles* threshold test. As is customary, I begin with the assumption that minority candidates provide a setting that is more probative of the question whether racially polarized voting is preventing minority-backed candidates from winning. This does not mean that minority candidates exclusively are probative, but it serves as my starting point. Fourteen black candidates ran for the City Council between 2008-2018, some more than once. One example of a repeat campaigner is Mr. George Furman who ran for the Bayside seat in 2010, for the at-large seat in 2014, and for Mayor in 2016. In all, Mr. Furman ran against seven different candidates and came in last every single time. More importantly for the current purpose, minority candidates preferred Mr. Furman's opponents every single time, meaning elections that featured Mr. Furman are not probative of potential racially polarized voting. Had Mr. Furman lost a single election, or earned a "significant number" of minority supporters (per *Gingles*[7]) then his candidacies would have raised probative questions about racial vote dilution. However, as a habitual campaigner with overall support in the single digits and minority support for his opponents, elections featuring Mr. Furman do not provide a setting that is probative of the Gingles factors and so I drop him from my analysis, although I included an analysis of his races in the Appendix of my original report in the spirit of full transparency.

---

[7]478 U.S. 30, 56 (1986).

Of the remaining 13 candidates, three ran for office twice. Ms. Amelia Ross-Hammond was elected to the Kempsville seat in 2012 and then lost her re-election bid in 2014. Mr. James Cabiness ran for one of the at-large seats in 2010 and 2014, coming in last place both times. Unlike Mr. Furman above, however, Mr. Cabiness was the minority candidate of choice in 2014 (although he earned just 6.4% of the white vote), and in 2010 he ran against another popular black candidate (Mr. Andrew Jackson) who was, himself, the candidate of choice for the at-large seat in 2010 and the Kempsville seat in 2008.

In all, there were sixteen opportunities for a black candidate to win office between 2008-2018. In ten of these cases the black candidate was the candidate of choice for minority voters. Of the six who were not the candidate of choice, five ran against another black candidate and one lost to a popular incumbent. Ultimately, 7 of the 10 candidates of choice lost due to white bloc voting.

There were three elections featuring black candidates where a white candidate was a minority candidate of choice. Two of these elections were for at-large seats, where minority voters preferred one black and one white candidate for the two seats—Rouse (B) and White (W) in 2018, Jackson (B) and Bellitto (W) in 2010. The third white candidate of choice was longtime incumbent Barbara Henley who defeated the minority candidate of choice in 2010 and then became the minority candidate of choice in 2014.

Contrary to Dr. Kidd's analysis (based on a theory that minority cohesion requires 50% support), including white candidates of choice does not undermine the Gingles analysis. Indeed, of the 13 minority candidates of choice, white and black, eight lost their elections due to oppositional voting by white voters. In other words, minority-preferred candidates usually (61.5%) lost due to white bloc voting.[8]

## My data

### Source of CVAP

Dr. Kidd claims in footnote 4 on page 5 that "the dataset used by Spencer is provided by plaintiffs' expert witness Anthony E. Fairfax." This is incorrect. My analysis of racially polarized voting—homogeneous precinct analysis, ecological regression, and ecological inference—is based on Citizen Voting Age Population (CVAP) estimates at the block

---

[8]Note that even according to Dr. Kidd's own analysis, "when White candidates who were the preferred candidates of minority voters are considered...the number of African American-preferred candidates who won their races is seven of 17, including six of seven since 2012." Kidd Report, p. 5. Taking this statement at face value, ten of 17 minority-preferred candidates, including white candidates, lost their race. In other words, even according to Dr. Kidd, minority-preferred candidates "usually" lose their election due to white bloc voting.

group level that I downloaded directly from the Census. Confusion on this issue likely stems from my reference to "census blocks" (as opposed to "block groups") in Appendix A. Dr. Kidd should have had access to the data that I used, which were provided to counsel for defendants as well as step-by-step documentation for downloading the data and merging them to precinct shapefiles.

## Precinct files

Dr. Kidd claims in footnote 5 on page 5 that "Spencer has maintained the same 94 precinct configurations from 2008 throughout his analysis, taking no account of the newly drawn (or redrawn or newly created) precincts and the new voters in those precincts." This is also incorrect. My analysis of the 2018 election was based on election returns and CVAP data for all 100 (current) precincts in Virginia Beach. These data were disclosed in the file "cvap2018.csv." Dr. Kidd cites to this file in footnote 18 of his report. Unfortunately, I was unable to locate a shapefile for 2016, when the City increased the number of precincts from 94 to 98. I contacted the Virginia Beach Center for Geospatial Information Services about this file in July 2018. On Sept. 26, 2018 I received an e-mail from Ms. Nina Gilbert of the Virginia Beach Center for GIS informing me (in response to my query) that the City does not "keep the previous year on the voting changes due to the fact that a third party makes those decisions." Ms. Gilbert directed me to the Census TIGER/Line VTD files, which I used for my analysis. See Appendix A. The Census files provided me with all relevant precincts from 2008-2014. My analysis in 2016 drops the four precincts for which I am unable to merge in CVAP data because the precinct file is not available.

## At-large elections in 2018 and 2014

Dr. Kidd is correct that my vote totals for at-large seats in 2018 and 2014 (but not 2010) sum to 100% when they should sum to 200%. This was a simple error with no effect on my conclusions as the transformation applies to all estimates for all candidates. Although all estimates—homogeneous precincts, ecological regression, and ecological inference—should be doubled, the relationship between candidates remains unchanged. The updated numbers for the 2018 and 2014 at-large election seats are reported in Appendix B.

12

Douglas M. Spencer                                                    August 26, 2019

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Date: August 26, 2019

Douglas M. Spencer, Ph.D.
*Professor of Law & Public Policy*
University of Connecticut

13

Douglas M. Spencer _____     August 26, 2019

# Appendix A
## Correspondence with Virginia Beach Center for GIS

https://outlook.office.com/mail/search/id/AAQkADFlM2RjNT...

**Re: Question**

**Douglas Spencer**
Wed 9/26/2018 3:27 PM
**To:** Nina L. Gilbert <NGilbert@vbgov.com>
Nina --

I appreciate you following up with me on this. TIGER/Line has VTD shapefiles for 2008-2014, but for some reason they don't have the 2016 file. Oh well, it could be a timing thing and they are still updating their database (they don't have 2018 either, but that is available through gis.vbgov).

In any case, I really appreciate your effort. And I'll keep digging around as well.

All the best,
Doug



**Douglas M. Spencer**
*Visiting Professor, 2018-2019*
Harris Public Policy
University of Chicago
(415) 335-9698 | www.dougspencer.org

Social Impact, Down to a Science.

---

**From:** Nina L. Gilbert <NGilbert@vbgov.com>
**Sent:** Wednesday, September 26, 2018 3:04:54 PM
**To:** Douglas Spencer
**Subject:** RE: Question

Doug, I just found out that we don't keep the previous year on the voting changes due to the fact that a third party makes those decision. However I came across a link that may help you out. Sorry for the delay in founding this answer out for you. Please try the link and let me know if it helped you out any. Have a great day. Nina

https://catalog.data.gov/dataset/tiger-line-shapefile-2014-county-virginia-beach-city-va-all-roads-county-based-shapefile/resource/49fa6da4-63b4-4e6d-9020-475371a85466

*Nina L. Gilbert, GISP*
2405 Courthouse Dr.
Virginia Beach, Va. 23456
Office: (757) 385-1820
Fax: (757) 385-8482
ngilbert@vbgov.com

**From:** Douglas Spencer [mailto:dougspencer@uchicago.edu]
**Sent:** Monday, September 24, 2018 10:48 AM
**To:** Nina L. Gilbert

1 of 2                                                                                    8/21/19, 11:15 PM

14

Douglas M. Spencer                                                                 August 26, 2019

# Appendix B
## Updated At-Large Election Estimates

| | Candidate (incumbent†) | Overall vote | | HP | ER | EI | Won election? | Minority cand. of choice | Minority % ↑ winner? |
|---|---|---|---|---|---|---|---|---|---|
| **2018** | Rouse | 54.5 | Black | 68.8 | 82.3* | 73.7 | | ✓ | |
| | | | All Minority | 72.1* | 70.4* | 65.9 | ✓ | ✓ | |
| | | | White | 55.1 | 47.0 | 48.9 | | | |
| | Moss† | 45.3 | Black | 20.4* | 0.0* | 0.0* | | | |
| | | | All Minority | 20.7* | 6.6* | 7.8* | ✓ | | |
| | | | White | 53.2 | 62.2 | 62.0 | | | |
| | Oliver | 45.2 | Black | 35.2 | 18.3 | 14.1 | | | |
| | | | All Minority | 33.9 | 28.6 | 28.3 | | | |
| | | | White | 50.9 | 52.0 | 52.2 | | | |
| | White | 27.4 | Black | 45.1* | 69.6* | 70.2* | | ✓ | ✓ |
| | | | All Minority | 42.5* | 52.8* | 52.0* | | ✓ | ✓ |
| | | | White | 19.3 | 16.3 | 16.7 | | | |
| | Bright | 17.7 | Black | 22.9* | 38.9* | 45.9* | | | |
| | | | All Minority | 23.3* | 32.0* | 33.1* | | | |
| | | | White | 12.3 | 11.8 | 11.5 | | | |
| | Hubbard | 10.1 | Black | 7.5 | 8.4 | 4.6 | | | |
| | | | All Minority | 7.6 | 9.6 | 8.1 | | | |
| | | | White | 9.2 | 10.7 | 11.7 | | | |
| **2014** | Davenport | 65.5 | Black | 100.0 | 100.0* | 99.6* | | ✓ | |
| | | | All Minority | 93.2 | 90.7* | 91.3* | ✓ | | |
| | | | White | 64.0 | 56.0 | 56.6 | | | |
| | Moss† | 64.2 | Black | 44.6* | 27.4* | 27.6* | | | |
| | | | All Minority | 49.2* | 42.0* | 42.3* | ✓ | | |
| | | | White | 70.5 | 73.0 | 73.1 | | | |
| | Martin | 53.1 | Black | 30.1 | 16.8* | 22.0* | | | |
| | | | All Minority | 33.7* | 33.6* | 37.8* | | | |
| | | | White | 54.1 | 59.8 | 58.4 | | | |
| | Furman | 15.9 | Black | 21.6* | 37.7* | 46.0* | | | |
| | | | All Minority | 22.4* | 31.1* | 32.7* | | | |
| | | | White | 10.6 | 10.5 | 10.3 | | | |

* $p < 0.05$ (minority vs. white support). Candidates of color highlighted by red text.

15

Douglas M. Spencer                                                      August 26, 2019

# Appendix C
## 2018 Election Performance in Illustration Districts 1 and 2

| | | At-large | | District 1 | | District 2 | |
|---|---|---|---|---|---|---|---|
| Year | Candidate | Total votes | Win election? | Total votes | Win election? | Total votes | Win election? |
| 2018 | Rouse* | 54.5 | ✓ | 61.1 | ✓ | 59.2 | ✓ |
| 2018 | Moss | 45.3 | ✓ | 33.5 | | 37.5 | |
| 2018 | Oliver | 45.2 | | 40.6 | ✓ | 45.2 | ✓ |
| 2018 | White | 27.4 | | 35.0 | | 31.7 | |
| 2018 | Bright* | 17.7 | | 20.5 | | 19.4 | |
| 2018 | Hubbard | 10.1 | | 10.2 | | 10.3 | |

Table 2: Estimated vote shares for 2018 at-large election. Actual election returns are reported as "At-large" total votes. Shaded rows indicate the black candidate of choice. * indicates minority candidate. Although the losing candidate of choice (Allison White) would not have won in either District 1 or District 2, her margin of defeat would shrink from 18% to just 5.6% in District 1 and 13.5% in District 2. Furthermore, minority candidates preferred Dee Oliver over the incumbent John Moss by a three-to-one margin, yet Moss won re-election. In Districts 1 and 2, Ms. Oliver would have won a seat on the City Council instead.



Figure 1: Precinct-level election returns for top four candidates in the 2018 at-large election. Although Mr. Moss and Mr. Rouse would face racially polarized voting in a hypothetical matchup in District 2, the election preferences of white and minority voters is statistically indistinguishable or not substantively significant for all other hypothetical elections in both districts.

16



IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

LATASHA HOLLOWAY and
GEORGIA ALLEN,

       Plaintiffs,

       v.                        No. 2:18-CV-00069

CITY OF VIRGINIA BEACH, et al.,

       Defendants;

## **PLAINTIFFS' EXPERT WITNESS DISCLOSURES**

Pursuant to the scheduling order entered by this Court and Rule 26(a)(2) of Federal Rules

of Civil Procedure, Plaintiffs identify the following expert witnesses:

1.  Dr. Douglas M. Spencer
    University of Connecticut School of Law
    55 Elizabeth Street
    Hartford, CT 06105
    (860) 570-5437

Dr. Douglas Spencer is a professor with appointments in both the law school and

department of public policy. His research interests include the empirical study of public law,

campaign finance, voting rights (including racially polarized voting), and election administration.

Further details regarding Dr. Spencer's areas of expertise are available here:

https://www.law.uconn.edu/faculty/profiles/douglas-m-spencer

2.  Mr. Anthony E. Fairfax
    Census Channel LLC
    16 Castle Haven Road
    Hampton, VA 23666
    (757) 838-3881

Mr. Fairfax is a Demographic Consultant and President of CensusChannel LLC. For over

20 years, Mr. Fairfax worked as a demographic data & mapping consultant. Specializing in

1

redistricting, he has personally developed hundreds of redistricting plans covering 22 different states. Further details of Mr. Fairfax's areas of expertise are detailed here:

http://censuschannel.net/cc/about-2/anthony-e-fairfax

3. Dr. Allan J. Lichtman
   9219 Villa Drive
   Bethesda, MD 20817
   (202) 885-2411

Dr. Lichtman is a Distinguished Professor of History at American University in Washington, DC. Allan J. Lichtman received his PhD from Harvard University in 1973 with a specialty in modern American history and quantitative methods. He has been an expert witness in more than 75 civil and voting rights cases, and has testified as an expert on racially polarized voting, totality of circumstances, discriminatory intent, and other topics relevant in voting rights cases. Further details of Dr. Lichtman's expertise are available here:

https://www.american.edu/cas/faculty/lichtman.cfm

Respectfully submitted,

/s/ J. Gerald Hebert
State Bar No. 38432
Paul M. Smith
Danielle M. Lang
Christopher D. Lamar*+
CAMPAIGN LEGAL CENTER
1101 14th Street NW, Suite 400
Washington, DC 20005
(202) 736-2200
ghebert@campaignlegal.org
psmith@campaignlegal.org
dlang@campaignlegal.org
clamar@campaignlegal.org
*Licensed to practice in Florida only; supervised by
a member of the DC Bar
+Pro hac vice application pending before the Court

2

## CERTIFICATE OF SERVICE

I hereby certify that, on June 14, 2019, I served a copy of the foregoing PLAINTIFFS'

EXPERT WITNESS DISCLOSURES upon counsel of record for Defendant City of Virginia

Beach by electronic mail.

Mark D. Stiles (VSB No. 30683)
Christopher Boynston (VSB No. 38501)
Gerald L. Harris (VSB No. 80446)
Joseph M. Kurt (VSB No. 90854)
*Attorneys for the City of Virginia Beach*
Office of the City Attorney
Municipal Center, Building One, Room 260
2401 Courthouse Drive
Virginia Beach, VA 23456
mstiles@vbgov.com
cboynton@vbgov.com
glharris@vbgov.com
jkurt@vbgov.com

/s/ Danielle Lang
*Attorney for Plaintiffs*

3





**UCONN**  **School of Law**                                    [Search]

Admissions    Academics    Library    Faculty    Student Life & Resources    Alumni    About

# Douglas M. Spencer

Professor of Law and Public Policy

Douglas Spencer is a professor with appointments in both the law school and the department of public policy. His research interests include the empirical study of public law, campaign finance, voting rights, and election administration. He teaches Constitutional Law, Election Law, and the Introduction to Public Policy course in the Master of Public Administration program at UConn.

Professor Spencer's research has been published, or is forthcoming, in the *Columbia Law Review, California Law Review, Indiana Law Journal, University of Illinois Law Review, Journal of Law & Courts,* and the *Election Law Journal.* His work has also been featured in *The New York Times, Wall Street Journal, Slate* and other media outlets.

Professor Spencer was a clerk at the Lawyers' Committee for Civil Rights in San Francisco, and worked at the U.S. Department of the Interior and the International Finance Corporation of the World Bank Group in Washington, DC. In 2005 he was an election monitor for the Thailand national parliamentary elections and later worked as a non-resident researcher for the Pew Center on the States' Military and Overseas Voting Reform Project.

Professor Spencer holds a Ph.D. in Jurisprudence and Social Policy from the University of California, Berkeley, a J.D. from Berkeley Law, an M.P.P. from UC Berkeley's Goldman School of Public Policy, and a B.A. degree in Philosophy from Columbia University.

douglas.spencer@uconn.edu
860-570-5437
Office: Hosmer 312
Scholarship

**Courses Taught:**
Constitutional Law
Election Law

## Representative Works:

**Douglas M. Spencer &** Christopher S. Elmendorf, *Administering Section 2 of the VRA After Shelby County,* 115 Colum. L. Rev. 2143 (2015)

**Douglas M. Spencer** & Gabriel J. Chin, *Did Multicultural America Result From a Mistake? The 1965 Immigration Act and Evidence From Roll Call Votes,* 2015 U. Ill. L. Rev. 1239 (2015).

**Douglas M. Spencer** & Christopher S. Elmendorf, *The Geography of Racial Stereotyping: Evidence and Implications for VRA "Preclearance" After Shelby County* 102 *Cal. L. Rev.* 1123 (2014)

**Douglas M. Spencer** & Sean Farhang, *Legislating Incentives for Attorney Representation in Civil Rights Litigation,* 2 J.L. & Courts 241 (2014)

**Douglas M. Spencer** & Abby K. Wood, *Citizens United, States Divided: An Empirical Analysis of Independent Political Spending,* 89 Ind. L.J. 315 (2014)

**Douglas M. Spencer** & Christopher S. Elmendorf, *Are Ballot Titles Biased? Partisanship in California's Supervision of Direct Democracy,* 3 U.C. Irvine L. Rev. 2013

**Douglas M. Spencer** & Zachary S. Markovits, *Long Lines at Polling Stations? Observations from an Election Day Field Study,* 9 Election Law Journal 3 (2010)

## Recent In The Media

Douglas M. Spencer in *Hearst Newspapers:* U.S. Supreme Court asked to rule on Stratford House election *(Aug 7, 2019)*

Douglas M. Spencer in *Washington Times:* Lawsuit wants FEC to take action against Pro-Clinton PAC *(Aug 5, 2019)*

Douglas M. Spencer in *BYURadio:* Felons Voting, Filial Fatigue, Brand Me *(Jun 12, 2019)*

Douglas M. Spencer in *Vox:* Can the president be prosecuted? I asked 16 legal experts. *(May 29, 2019)*

Douglas M. Spencer in *Vox:* Trump declared a national emergency at the border. I asked 11 experts if it's legal. *(Feb 15, 2019)*

View more Faculty In the Media »

University of Connecticut    School of Law    Directory    UConn Home    Disclaimers, Privacy & Copyright    Text Only
School of Law

University of Connecticut School of Law
55 Elizabeth Street
Hartford, CT 06105-2290 USA
860-570-5000
webfeedback.law@uconn.edu



| Year | Seat | Candidate | Threshold | Black | | Hispanic | | Asian | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | est. | se | est. | se | est. | se |
| **Minority Candidates** | | | | | | | | | |
| 2018 | At-large | Rouse | 45.2 | 83.0 | 6.4 | 33.3 | 21.0 | 53.0 | 15.2 |
| 2018 | Centerville | Wooten | 62.1 | 90.3 | 14.9 | 79.9 | 25.1 | 73.4 | 18.4 |
| 2016 | Kempsville | Ross-Hammond | 59.4 | 81.2 | 4.7 | 49.0 | 18.8 | 26.2 | 10.7 |
| 2014 | Rose Hall | Cabiness | 48.3 | 70.2 | 4.5 | 13.0 | 11.0 | 9.4 | 7.4 |
| 2012 | Kempsville | Ross-Hammond | 32.2 | 82.6 | 4.4 | 53.9 | 20.5 | 33.6 | 12.6 |
| 2011 | At-large | Sherrod | 37.0 | 90.2 | 4.3 | 49.5 | 22.0 | 27.2 | 12.7 |
| 2010 | At-large | Jackson | 44.8 | 52.9 | 2.5 | 11.6 | 8.6 | 6.9 | 5.0 |
| 2010 | Princess Anne | Bullock | 54.4 | 79.0 | 3.6 | 67.1 | 17.7 | 87.9 | 8.1 |
| 2008 | At-large | Allen | 44.1 | 79.4 | 3.4 | 77.0 | 14.6 | 29.8 | 9.9 |
| 2008 | Kempsville | Flores | 48.7 | 52.9 | 2.4 | 40.4 | 13.0 | 33.9 | 7.0 |
| | | | | | | | | | |
| **White Candidates** | | | | | | | | | |
| 2018 | At-large | White | 45.2 | 61.1 | 10.7 | 53.3 | 40.4 | 19.6 | 20.4 |
| 2014 | Princess Anne | Henley | 76.7 | 62.4 | 2.8 | 69.5 | 12.4 | 82.9 | 6.9 |
| 2010 | At-large | Bellitto | 44.8 | 8.4 | 2.3 | 45.2 | 12.2 | 47.2 | 6.4 |

EXHIBIT 5
PENGAD 800-631-6989





Chart 1 – Applying Dr. Spencer's Data to Equivalence Test of Cohesion for Candidate Aaron Rouse



Dr. Spencer identified cohesion "threshold": 45.2%

Estimated Hispanic support for Aaron Rouse, 2018 At-large: 33.3% (+/- 21%)

Range of possible Hispanic support for Rouse factoring in +/- 21% ~~confidence interval~~ std. err. (12.3 – 54.3%)





**Hispanic Voter Support for Aaron Rouse**

Chart 1 – Applying Dr. Spencer's Data to Equivalence Test of Cohesion for Candidate Aaron Rouse

Dr. Spencer identified cohesion "threshold": 45.2%

Estimated Hispanic support for Aaron Rouse, 2018 At-large: 33.3% (+/- 21%)

Range of possible Hispanic support for Rouse factoring in +/- 21% confidence interval (12.3 – 54.3%)

Series 1



## Chart 1. Spencer's Prong 2 and 3 Racially Polarized Voting Analysis (Rebuttal Report)

| Year | Seat | Candidate | Threshold to win | Black | Hispanic range | Asian range | Minority preferred? | Won? |
|------|------|-----------|------------------|-------|----------------|-------------|---------------------|------|
| | | | | *Support above threshold* | | | | |
| **Minority candidates** | | | | | | | | |
| 2018 | At-large | Rouse | 45.2 | ✓ | ✓ | ✓ | Y | Y |
| 2018 | Centerville | Wooten | 62.1 | ✓ | ✓ | ✓ | Y | Y |
| 2016 | Kempsville | Ross-Hammond | 59.4 | ✓ | ✓ | ✗ | ? | N |
| 2014 | Rose Hall | Cabiness | 48.3 | ✓ | ✗ | ✗ | N | N |
| 2012 | Kempsville | Ross-Hammond | 32.2 | ✓ | ✓ | ✓ | Y | Y |
| 2011 | At-large | Sherrod | 37.0 | ✓ | ✓ | ✓ | Y | N |
| 2010 | At-large | Jackson | 44.8 | ✓ | ✗ | ✗ | N | N |
| 2010 | Princess Anne | Bullock | 54.4 | ✓ | ✓ | ✓ | Y | N |
| 2008 | At-large | Allen | 44.1 | ✓ | ✓ | ✓ | Y | N |
| 2008 | Kempsville | Flores | 48.7 | ✓ | ✓ | ✓ | Y | N |
| **White candidates** | | | | | | | | |
| 2018 | At-large | White | 45.2 | ✓ | ✓ | ✗ | ? | N |
| 2014 | Princess Anne | Henley | 76.7 | ✓ | ✓ | ✓ | Y | Y |
| 2010 | At-large | Bellitto | 44.8 | ✗ | ✓ | ✓ | ? | Y |

Table 1: Summary of minority support for candidates in races where at least one candidate was nonwhite. Minority support sufficient to have elected a candidate in the absence of white bloc voting is marked with a ✓. Because the population of Hispanic and Asian CVAP prevents precise estimates of candidate preference, support is marked with a ✓ when the null hypothesis that candidates did not receive support sufficient to be elected in the absence of white bloc voting is rejected.

## Chart 2. Spencer's Prong 2 Cohesiveness Analysis (Supplement to Rebuttal Report)

| Year | Seat | Candidate | Threshold | Black est. | Black se | Hispanic est. | Hispanic se | Asian est. | Asian se |
|------|------|-----------|-----------|------------|----------|---------------|-------------|------------|----------|
| **Minority Candidates** | | | | | | | | | |
| 2018 | At-large | Rouse | 45.2 | 83.0 | 6.4 | 33.3 | 21.0 | 53.0 | 15.2 |
| 2018 | Centerville | Wooten | 62.1 | 90.3 | 14.9 | 79.9 | 25.1 | 73.4 | 18.4 |
| 2016 | Kempsville | Ross-Hammond | 59.4 | 81.2 | 4.7 | 49.0 | 18.8 | 26.2 | 10.7 |
| 2014 | Rose Hall | Cabiness | 48.3 | 70.2 | 4.5 | 13.0 | 11.0 | 9.4 | 7.4 |
| 2012 | Kempsville | Ross-Hammond | 32.2 | 82.6 | 4.4 | 53.9 | 20.5 | 33.6 | 12.6 |
| 2011 | At-large | Sherrod | 37.0 | 90.2 | 4.3 | 49.5 | 22.0 | 27.2 | 12.7 |
| 2010 | At-large | Jackson | 44.8 | 52.9 | 2.5 | 11.6 | 8.6 | 6.9 | 5.0 |
| 2010 | Princess Anne | Bullock | 54.4 | 79.0 | 3.6 | 67.1 | 17.7 | 87.9 | 8.1 |
| 2008 | At-large | Allen | 44.1 | 79.4 | 3.4 | 77.0 | 14.6 | 29.8 | 9.9 |
| 2008 | Kempsville | Flores | 48.7 | 52.9 | 2.4 | 40.4 | 13.0 | 33.9 | 7.0 |
| **White Candidates** | | | | | | | | | |
| 2018 | At-large | White | 45.2 | 61.1 | 10.7 | 53.3 | 40.4 | 19.6 | 20.4 |
| 2014 | Princess Anne | Henley | 76.7 | 62.4 | 2.8 | 69.5 | 12.4 | 82.9 | 6.9 |
| 2010 | At-large | Bellitto | 44.8 | 8.4 | 2.3 | 45.2 | 12.2 | 47.2 | 6.4 |



EXHIBIT
Spencer 9
10-1-19  MAM

```
                    5 1
   29.8            9.9                    9.90
                   2.6                    1.96
                  ──────                  ──────
                  59 4
                 198 0
                 ──────
                 25.7 4                      1
                                         2 | 9.9
                                            2
                                          ──────
                                          19.8
```

```
                              1 1
                             29.8            29.8
                             19.8            15.8
                            ──────          ──────
                             49.6   ←──→     10.0
```



```
                                    7 1
   34            33.9              83.9
   14            14.0              14.0
  ────          ──────            ──────
   48            47.9   ←──→       19.9
```