**IN THE UNITED STATES DISTRICT COURT FOR THE**
**EASTERN DISTRICT OF VIRGINIA**
**NORFOLK DIVISION**

| | |
|---|---|
| **Latasha Holloway, et al.,** | |
|     **Plaintiffs,** | |
| **v.** | **Civil Action No. 2:18-cv-0069** |
| **City of Virginia Beach, et al.,** | |
|     **Defendants.** | |

**Defendants' Memorandum of Law in Support of Motion for Summary Judgment**

# EXHIBIT EIGHT

Deposition Transcript of Dr. Allan J. Lichtman



# Transcript of Allan Lichtman

**Date:** September 30, 2019
**Case:** Holloway, et al. -v- City of Virginia Beach, et al.

**Planet Depos**
**Phone:** 888.433.3767
**Email::** transcripts@planetdepos.com
**www.planetdepos.com**

```
 1              IN THE UNITED STATES DISTRICT COURT

 2           FOR THE EASTERN DISTRICT OF VIRGINIA

 3      - - - - - - - - - - - - - - - - -x

 4    LATASHA HOLLOWAY and                  :

 5    GEORGIA ALLEN,                        :

 6              Plaintiffs,         :    Case No.:

 7       v.                        :    2:18-cv-00069

 8                                  :

 9    CITY OF VIRGINIA BEACH, et al.,  :

10              Defendants.          :

11      - - - - - - - - - - - - - - - - -x

12

13              Deposition of ALLAN LICHTMAN

14                   WASHINGTON, DC

15             Monday, September 30, 2019

16                    11:42 a.m.

17

18

19

20    Job No.: 266087

21    Pages: 1 - 246

22    Transcribed By: Robert Leifer, CET 970
```

1      Deposition of ALLAN LICHTMAN, held at the

2    offices of:

3

4

5           CAMPAIGN LEGAL CENTER

6           1101 14th St. NW

7           Suite 400

8           Washington, DC 20005

9           (202) 736-2200

10

11

12

13

14

15      Pursuant to notice, before Darrell Lowe, Notary

16    Public in and for the District of Columbia.

17

18

19

20

21

22

```
 1              A P P E A R A N C E S

 2   ON BEHALF OF THE PLAINTIFFS:

 3        PAUL M. HEBERT, ESQUIRE

 4        ANNABELLE HARLESS, ESQUIRE

 5        CHRISTOPHER LAMAR, ESQUIRE

 6        JEFF ZALESIN

 7        Campaign Legal Center

 8        1101 14th Street NW, Suite 400

 9        Washington, DC 20005

10        (202) 736-2204

11

12   ON BEHALF OF THE DEFENDANTS:

13        GERALD L. HARRIS, ESQUIRE

14        CHRISTOPHER S. BOYNTON, ESQUIRE

15        JOSEPH M. KURT, ESQUIRE

16        CITY OF VIRGINIA BEACH

17        2401 Courthouse Drive, Room 260

18        Virginia Beach, VA 23456

19        (757) 385-4531

20

21   ALSO PRESENT:

22        Nam Ngo, Videographer
```

1                    C O N T E N T S

2    EXAMINATION OF ALLAN LICHTMAN                PAGE

3        By Mr. Harris                              6

4

5

6                    E X H I B I T S

7            (Attached to Transcript)

8    DEPOSITION EXHIBIT                           PAGE

9     Exhibit 1   Expert Report Dr. Lichtman        9

10    Exhibit 2   Rebuttal Report Dr. Lichtman      9

11    Exhibit 3   Dr. Lichtman Case list           76

12    Exhibit 4   Curriculum Vitae                 77

13    Exhibit 5   Table R3                        212

14    Exhibit 6   Chart R3                        213

15    Exhibit 7   Copy of Data                    226

16

17

18

19

20

21

22

```
1                 P R O C E E D I N G S

2              THE VIDEOGRAPHER:  This is the start of

3    the videotaped deposition of Professor Allan

4    Lichtman in the matter of Holloway, et al. v. City

5    of Virginia Beach, et al. in the United States

6    District Court for the Eastern District of

7    Virginia, Case No. 2:18-cv-00069.

8              This deposition is being held at

9    Campaign Legal Center, 1104 14th Street Northwest,

10   Suite 400, Washington, DC 20005 on September 30,

11   2019, at approximately 11:41 a.m.

12             My name is Nam Ngo from Planet Depos,

13   and I'm the legal video specialist.  The court

14   reporter is Darrell Lowe representing Planet

15   Depos.  Would counsel please introduce themselves?

16             MR. HARRIS:  My name is Gerald Harris

17   for the defendants in this case.

18             MR. BOYNTON:  My name is Chris Boynton

19   for the defendants in this case.

20             MR. KURT:  Joseph Kurt for the

21   defendants.

22             MR. HEBERT:  Gerald Hebert for the
```

Transcript of Allan Lichtman
Conducted on September 30, 2019                    6

```
 1   plaintiffs.
 2             MS. HARLESS:  Annabelle Harless for the
 3   plaintiffs.
 4             MR. LAMAR:  Christopher Lamar for the
 5   plaintiffs.
 6             MR. ZALESIN:  Jeff Zalesin, law clerk
 7   for the plaintiffs.
 8             THE VIDEOGRAPHER:  Would the court
 9   reporter please swear in the witness.
10   Whereupon,
11                   ALLAN LICHTMAN
12   being first duly sworn or affirmed to testify to
13   the truth, the whole truth, and nothing but the
14   truth, was examined and testified as follows:
15       EXAMINATION BY COUNSEL FOR THE DEFENDANTS
16   BY MR. HARRIS:
17       Q    Dr. Lichtman, my name is Jerry Harris.
18   I represent the defendants in this case, as we've
19   just discussed.  We're starting a little behind
20   schedule today.  It's now 11:45.  I thank you for
21   your patience this morning.  I'll do my best to
22   get us right through what we need to today.
```

Transcript of Allan Lichtman
Conducted on September 30, 2019                    7

```
 1        A     That would be great.

 2        Q     I understand you've been deposed

 3   previously?

 4        A     Correct.

 5        Q     I think your report indicated at least

 6   90 times?

 7        A     I don't know if I've been deposed 90

 8   times but probably dozens of times.

 9        Q     Okay.

10        A     I haven't been deposed in every case.

11        Q     When I conduct depositions, there's a

12   few general ground rules that I like to use to

13   make our time go together.  I'm going to go over

14   those ground rules and hope that they are

15   agreeable to you.  If they're not, please let me

16   know.

17              The first is I'm going to assume that

18   you understand the question that I've asked.

19   Invariably, it may be unclear to you or you may

20   not completely understand my question.  If that is

21   the case, please ask me to clarify, because I will

22   assume that, if you've answered the question, you
```

Transcript of Allan Lichtman
Conducted on September 30, 2019                                    8

1    understood it as I've asked it.

2            The other thing -- you're reminded that

3    you're under oath, so I'm going to assume all the

4    answers you have provided today are truthful and

5    to the best of your knowledge with the information

6    you have as we sit here today.

7            As a matter of convenience to you,

8    should you have any need for a restroom break or a

9    personal break, please just let me know, and we'll

10   stop the deposition at that moment.  The only

11   request I'll have is that we finish whatever

12   question that we're on and that you take the time

13   that you may need for that personal rest or

14   whatever the case may be.

15           Does that all sound agreeable to you?

16       A    Yes.

17       Q    Okay.

18           THE REPORTER:  Before we get started,

19   just by virtue of having to substitute in a

20   different court reporter than we started, I just

21   want to make sure there's no objection to the

22   deposition being taken in a way that does not

Transcript of Allan Lichtman
Conducted on September 30, 2019                    9

1    immediately record it by stenographic means but by

2    later transcription.

3                MR. HEBERT:  No objection.

4                THE REPORTER:  Thank you, sir.

5                MR. HARRIS:  Thank you.  Thank you for

6    bringing that up.

7                (Deposition Exhibits 1 and 2 were marked

8    and were attached to the transcript.)

9         Q    Dr. Lichtman, I've marked the reports I

10   will offer to you that we were provided as your

11   initial report, dated July 15, 2019, and your

12   rebuttal report, dated August 26, 2019.

13               The initial report I've marked as

14   Exhibit 1; the rebuttal report I've marked as

15   Exhibit 2.  During our deposition together today,

16   I'm going to be referring to these reports.  I'll

17   ask you just to look through those and confirm

18   that those are, in fact, your reports in this

19   case.

20        A    Happy to do that.

21        Q    Thank you.

22        A    Just give me a little bit of time.

Transcript of Allan Lichtman
Conducted on September 30, 2019                    10

1        Q     I understand.

2        A     Won't take long.

3              This initial report looks accurate and

4   complete.  I'll look at the rebuttal report now.

5   It won't take long.  This also looks accurate and

6   complete in terms of what I have submitted.

7        Q     Thank you, sir.  Referring specifically

8   to Exhibit 1, the initial expert report dated July

9   15, 2019, did you write this report entirely

10  yourself?

11       A     Yes.

12       Q     Did you copy any parts of this report

13  from any prior reports you may have submitted to

14  courts or other cases?

15       A     I may have copied parts of

16  qualifications, but a lot of that doesn't change.

17  Some of it probably was added to -- but not the

18  substance of the report.

19       Q     Did you have any help from office

20  assistants or office staff in preparing this

21  report?

22       A     No.

Transcript of Allan Lichtman
Conducted on September 30, 2019                    11

1        Q    Did you have any help from graduate

2   students or other university students in preparing

3   this report?

4        A    I think I might have.  I'm not sure

5   because I do a lot of reports.  The only thing I

6   would have had would have been a proofreading from

7   one of my grad students who I use for

8   proofreading.  Other than that, nothing

9   substantive.

10       Q    Do you ever use graduate students -- I

11   shouldn't say you ever.

12            Have you used graduate students in this

13   case to conduct any of your preliminary research

14   or underlying research data that informs your

15   opinions in this case?

16       A    No.  I did it all myself.

17       Q    I know you went through the July 15th

18   report fairly quickly to confirm that it was

19   accurate and complete.

20            Do you have any opinions that were

21   rendered in this July 15, 2019, report that you

22   need to update before we go any further in your

Transcript of Allan Lichtman
Conducted on September 30, 2019                    12

1   deposition?

2        A    No.  I haven't changed any of my

3   opinions.

4        Q    Have you had the opportunity to review

5   the reports of Mr. Fairfax and Dr. Spencer in this

6   case?

7        A    I certainly have reviewed the reports of

8   Dr. Spencer; briefly the report of Dr. Fairfax.

9   Not in depth because, as I think I mentioned in my

10  rebuttal report, I have not been involved in the

11  details of the demographic analysis or the drawing

12  of illustrative plans or anything like that.

13       Q    Are you aware that Dr. -- excuse me.

14  Are you aware that Mr. Fairfax submitted an

15  initial report and a rebuttal report in this case?

16       A    I believe that's right.

17       Q    Have you had an opportunity to at least

18  read both of those reports?

19       A    Not in depth.  I might have just looked

20  at them briefly but -- yeah, I did look at them,

21  but as I said, not analyzing them in depth the way

22  I've done with other reports.

Transcript of Allan Lichtman
Conducted on September 30, 2019                         13

1        Q     When you looked at the reports of

2   Mr. Fairfax, were there any opinions of his that

3   you disagreed with?

4        A     Nothing that struck me that way, no.

5        Q     You also indicated that you have had an

6   opportunity to read the reports of Dr. Spencer --

7   that is, his initial report and his rebuttal

8   report?

9        A     That's correct.

10       Q     And in reading Dr. Spencer's initial

11  report, did you agree with the conclusions he

12  reached in his initial report?

13       A     Again, I didn't get into depth in the

14  Gingles factors because that was not my brief.

15  But in terms of my brief, which was there was

16  racial polarization in Virginia Beach elections, I

17  agreed.

18       Q     And as to Dr. Spencer's rebuttal report,

19  do you concur or are you in agreement with his

20  conclusions that are contained in that report?

21       A     Again, to the extent that my brief was

22  looking at racial polarization, yes.

Transcript of Allan Lichtman
Conducted on September 30, 2019                    14

1        Q      Did you work with Dr. Spencer or

2    Mr. Fairfax in preparation of their reports?

3        A      Never spoken to either gentlemen or had

4    any correspondence with either gentlemen.

5        Q      Other than discussions with legal

6    counsel for the Campaign Legal Center, was there

7    anyone else involved in the preparation of your

8    reports?

9        A      No.

10       Q      Does your report contain all the facts

11   and data you considered in forming your opinions?

12       A      Yes; although, some new things have

13   emerged since I produced my two reports.

14       Q      We'll get to those later; but as of July

15   15th, when you rendered this Exhibit 1 report, all

16   the facts or data you considered at that time are

17   contained or referenced in this report?

18       A      Essentially, yes; but, of course,

19   whenever you write a report, the totality of your

20   knowledge and your experience goes into it.

21       Q      I will refer to August 26, 2019,

22   Exhibit 2.

Transcript of Allan Lichtman
Conducted on September 30, 2019                    15

1            Same question.  Does your report as of

2    August 26, 2019, contain all the facts or data you

3    had considered at that point in time?

4        A    Yes; although, some new things have come

5    to light since.  And, again, my whole totality of

6    my experiences obviously informs everything I

7    write.

8        Q    Have you had an opportunity to review

9    the plaintiff's discovery responses to defense's

10   discovery in preparation of your reports?

11       A    Run that by me again.

12       Q    Have you had the opportunity to review

13   the plaintiff's -- that is my Ms. Holloway and

14   Ms. Allen's responses -- to the defense's

15   discovery request?

16       A    It's possible that pieces of that were

17   sent to me, but I don't recall reviewing that in

18   its totality, no.

19       Q    And have you had an opportunity to

20   review the defendant's discovery responses to the

21   plaintiffs in the preparation of your report?

22       A    I've looked at some of that.  I'm not

Transcript of Allan Lichtman
Conducted on September 30, 2019                    16

1    sure I've looked at everything.

2        Q    Did you review the amended complaint in

3    preparation of your report?

4        A    I believe I did way back when.

5        Q    Did you have any involvement in the

6    preparation or drafting of the amended complaint?

7        A    No.

8        Q    You mentioned that you had certain

9    changes in your opinions or new information -- I

10   should say -- I think that mischaracterizes your

11   testimony.

12       A    You did.

13       Q    You had indicated that there were some

14   new things that had come to light.

15            Without going into specifically what

16   they are, did those new things that came to light

17   change your opinion that you've rendered in this

18   case?

19       A    They strengthened them.

20       Q    So the change to your opinion is you've

21   become more certain, I'll say, based on new

22   information that you received?

1      A    Yes; although, I was pretty -- I was

2   quite certain when I produced these reports.  This

3   new information just added to that.

4      Q    If I'd stated it in a different way, it

5   confirms what you already opined on?

6      A    Yes.

7      Q    Do you expect to file a supplemental

8   report based on that new information?

9      A    No.

10      Q    Have you been asked to file a

11   supplemental report based on this new information?

12      A    No.  Just one small correction to my

13   rebuttal report, and I've prepared a couple of

14   pages reflecting that.

15      Q    Is that something that you've provided

16   to your counsel?

17      A    Yes.  And if I could interrupt, I have

18   copies, and I'm happy to share it with you now or

19   when you get to the rebuttal report.

20      Q    Why don't you share it now, and then we

21   can digest at a break and --

22      A    Okay.

1          MR. BOYNTON:  It's very small.  It won't

2   take you much to figure it out.

3      Q    For the record, you're handing me two

4   pages that appears to be Table R3 and Chart R3.

5      A    That is correct.

6      Q    Okay.  We'll set those aside for now

7   and, like Mr. Boynton mentioned, we'll look at

8   those at a break and have you come back to it.

9      A    Sure.  Not a problem.

10     Q    Other than the new information that you

11  were provided and the supplement or obviously the

12  updated charts that were provided, are there any

13  other information that you've had since submitting

14  these reports that either strengthen your opinions

15  or change your opinions?

16     A    Yes.

17     Q    What are those things?

18     A    I've since read an article just recently

19  published in NPR suggesting that there is now an

20  investigation ongoing about whether a hostile work

21  environment in Virginia Beach with respect to

22  minorities may have contributed to the horrific

Transcript of Allan Lichtman
Conducted on September 30, 2019                    19

1    mass shooting that we all so lament.

2              And in pursuit of that new information,

3    which came out obviously well after I did my

4    reports, I looked at some information regarding to

5    former City Manager Hansen, who had resigned,

6    also, I believe subsequent to the preparation of

7    my report.

8              And I did uncover racially insensitive

9    remarks and a racially insensitive email chain.

10   And I looked at his deposition, and I didn't see

11   much racial sensitivity there, to tell you the

12   truth.

13        Q    Let's start back with the NPR article.

14             Do you have the source cite for that NPR

15   article off the top of your head?

16        A    No.  But if you want, I can get it for

17   you and send it to you.  It's easy to find on a

18   Google search, and that's not the only article

19   relating.  It's pretty well known within the

20   press.

21        Q    Do you intend to rely on that article as

22   part of your opinions you're intending to render

Transcript of Allan Lichtman
Conducted on September 30, 2019                     20

```
1    in this case?

2         A    Well, since it was brought up here, I

3    might bring it up.

4         Q    Respectfully, Doctor, you brought it up

5    as new information that you were able to find

6    since your rebuttal report.  And I'm asking you

7    whether you intend to rely on that if called to

8    testify at trial.

9         A    It's possible certainly.  I don't know

10   what exactly I'm going to say in testimony this

11   far in advance of the trial, which you understand

12   has even been postponed beyond January, but it's

13   possible.

14           As I said, this all came out subsequent

15   to my reports, and it's relevant to my reports.

16        Q    That being the case, we would like a

17   copy of the article he's referring to

18   specifically.

19           MR. HEBERT:  As he said, he'll provide

20   that to me, and I will provide it to you promptly.

21           MR. HARRIS:  Great.

22        Q    The article that you referenced from NPR
```

Transcript of Allan Lichtman
Conducted on September 30, 2019                    21

```
1    discuss a potentially hostile or toxic work

2    environment in the City of Virginia Beach.

3              Have you formed an opinion as to whether

4    there is a hostile or toxic work environment in

5    the City of Virginia Beach?

6        A    Not a final opinion, but I certainly

7    think there is a -- based on the article -- I

8    certainly wouldn't draw an opinion just based on

9    the article; but having looked at remarks and

10   email chains from Mr. Hansen, having seen his

11   resignation, having now read his deposition, I

12   think there's some reason to believe that.

13       Q    Which racially insensitive remarks are

14   you referring to?

15       A    His being part of an email chain talking

16   about five percenters being those involved in this

17   predominantly minority demonstration; his

18   commenting about, you know, if you color yourself

19   in a certain way, that is going to protect you

20   from being stopped.

21             These are pretty -- you know, in this

22   day and age, those are pretty blatant racially
```

Transcript of Allan Lichtman
Conducted on September 30, 2019                                    22

1    insensitive remarks.  And even Hansen admitted he

2    made a poor choice of words, you know, that this

3    could be interpreted as racially insensitive in

4    this particular climate.

5            I think it goes well beyond that.  These

6    are pretty shocking things to come out of a city

7    manager's mouth and to be involved with a city

8    manager in an email chain.

9        Q    Do you believe the city manager, Dave

10   Hansen, to be a racist?

11       A    I'm not going to comment on that.  I do

12   believe he's racially insensitive.

13       Q    What does the term five percenter mean

14   to you?

15       A    It means, you know, there's obviously --

16   this is an obscure reference to the five percent

17   nation coming out of the Islamic black Muslim

18   movement, but clearly it refers to people on the

19   margin.  Five percenters means you're way out of

20   the mainstream.

21           And he tried to explain it away as kind

22   of just bland assessment of percentages.  Well,

Transcript of Allan Lichtman
Conducted on September 30, 2019                    23

1    then you would say percentages.  You wouldn't say

2    five percenters.  And he admitted -- and it was

3    clear from the response to it -- that African

4    Americans took offense, and I think rightly so.

5              You know, I've been studying these

6    matters for well-on more than 50 years.

7        Q    Did Dave Hansen make the five percenters

8    remark?

9        A    No.  That was part of an email chain

10   that he was involved in and then tried to explain

11   it away as not necessarily being racially

12   insensitive.  He did himself make the other

13   remark, then resigned his position, I believe,

14   fairly recently.

15       Q    As to the five percenter remark in the

16   email chain, in any following emails, did you see

17   Dave Hansen encouraging or validating that

18   comment?

19       A    No.  I didn't see him questioning it,

20   criticizing it; I just saw him participating in

21   what I thought was a pretty outrageous email

22   chain.  And then I saw him make this other

Transcript of Allan Lichtman
Conducted on September 30, 2019                    24

1    outrageous racially insensitive statement.

2              And then combine that with the

3    investigation that's now ongoing, there's

4    certainly reason to believe there are issues here.

5    And that fits with some of the other information

6    that's in my report.

7        Q    The other racially insensitive remark

8    you referenced, I heard you say color your face.

9              Can you tell me what you know about that

10   remark when it was made?

11       A    I think it was made -- I'm trying to

12   remember exactly.  We can refer to the deposition.

13   But I think it was made during a monitoring of a

14   festival in Virginia Beach in that context.

15       Q    Do you know anything else about the

16   context of the comment about coloring your face?

17       A    Well, I think it had to do with

18   policing.  It was pretty clear.  Because they were

19   talking about being stopped by the police.

20       Q    Are you aware as to whether that was

21   related to minorities versus non-minorities?

22       A    I think it's pretty clear, when you're

Transcript of Allan Lichtman
Conducted on September 30, 2019                    25

1    talking about coloring yourself, you're talking

2    about minorities.  That's pretty unmistakable and

3    pretty amazing in this day and age to make that

4    kind of remark.

5        Q    It sounds like you don't have much doubt

6    that that was the subtext of his comment.

7        A    I do not have much doubt about that.

8    And then, you know, that was part of the

9    controversy that led to his resignation.

10       Q    What else do you believe led to his

11   resignation?

12       A    I think there were issues -- I mean, I

13   don't know exactly what led to his resignation,

14   but it came shortly after these controversies

15   about racially insensitive remarks emerged in the

16   context of, you know, race being an especially

17   sensitive issue in the State of Virginia right

18   now.

19            And I also read complaints about old-boy

20   networks and preferential awarding of city

21   contracts, which does accord with information in

22   my report about great disparities, particularly

Transcript of Allan Lichtman
Conducted on September 30, 2019                    26

1   with respect to African Americans and Hispanics in

2   the awarding of city contracts.  Complaints by

3   Bruce Smith, you know, former NFL Hall of Fame

4   player and developer in Virginia Beach.  This was

5   a lively issue there.

6       Q    In reference to the investigation of the

7   May 31, 2019, shooting, you're familiar with the

8   agency of Hillard Heintze, who's responsible for

9   that independent investigation?

10      A    I'm not familiar with it, but I looked

11  them up, and they seem to be a -- you know, a

12  pretty respectable company.  I didn't notice any

13  issues with them.

14      Q    When you looked them up, did you review

15  the scope of their investigation in the City of

16  Virginia Beach?

17      A    I don't think, when I looked it up, it

18  had that information included.  Probably their --

19  it may be public somewhere.  I'll look for it.

20  But I didn't -- I didn't see it in the time I had.

21      Q    As you sit here today, what do you

22  understand the scope of their investigation to be?

Transcript of Allan Lichtman
Conducted on September 30, 2019                    27

1      A    I understand the scope of their

2    investigation would be whether there was a hostile

3    environment for minorities in terms of how

4    minorities are treated, in terms of promotions and

5    other prerequisites within the city government of

6    Virginia Beach.  That's my understanding.

7      Q    Given all this information that we

8    discussed now that you were able to determine or

9    investigate following your rebuttal report, is

10   it -- I want to be clear, it's still not your

11   intention to file a supplemental or another report

12   in this case?

13          MR. HEBERT:  If I can just state for the

14   record, the decision about whether he will file

15   any supplemental reports will be made by counsel.

16     A    Yeah.  I never know what counsel may or

17   may not ask me to do.  Having been in scores of

18   cases, you can't predict in advance what counsel

19   may ask you to do.

20          MR. HEBERT:  But I will tell you, Jerry,

21   we don't envision that at this moment.

22     Q    Dr. Lichtman, what did you do to prepare

1   for today's deposition?

2        A    Just talked about it with counsel.

3   That's all.

4        Q    Did you review your reports before the

5   deposition today?

6        A    Yeah, briefly.

7        Q    Did you review the report of Dr. Spencer

8   before the deposition today?

9        A    I reviewed the reports of Dr. Spencer

10  before; but I also reviewed parts of it prior,

11  just prior to this deposition, particularly the

12  analyses of racially polarized -- I mean the

13  tables in particular, not the verbiage or anything

14  like that.

15       Q    When you mention the tables, there were

16  tables included in his initial report and his

17  rebuttal report.

18            Are you including both reports when you

19  say you reviewed his table?

20       A    Yeah.  And, in fact, the slight

21  correction I gave you, update to my rebuttal

22  report, was alerted to me by Spencer's rebuttal

Transcript of Allan Lichtman
Conducted on September 30, 2019                    29

1    report.

2         Q    Tell me what you mean by that.  I'm not

3    sure I'm following.

4         A    Yeah.  It's a very small correction in

5    that one of the black candidates who was not

6    listed as a candidate of choice was, in fact, the

7    second candidate of choice in a two-seat, at-large

8    election.

9              That was alerted to me when I saw that

10   Dr. Spencer had made some updates to his initial

11   analysis for 2014 because two seats were up that

12   apparently had no ability to cast two votes.

13   That's the only change.

14        Q    We've mentioned an NPR article already.

15             Did you review any news articles or

16   other periodicals specifically for preparation

17   today?

18        A    You know, the NPR article sticks in my

19   head, but that wasn't the only article about this

20   controversy in Virginia Beach.  I think there was

21   others.

22        Q    Let's define, when you say this

Transcript of Allan Lichtman
Conducted on September 30, 2019                    30

1    controversy, are you saying specifically to the

2    Hillard Heintze independent investigation?

3         A    Yes.  I don't think I reviewed any other

4    articles that I hadn't already reviewed for the

5    preparation of my reports.

6         Q    Let me try phrasing it in an easier way.

7         A    Okay.

8         Q    The reports that you've cited include

9    several footnotes with newspaper articles.

10             My question to you, sir, is did you pull

11    any of those news articles back out and read them

12    again today for your deposition?

13         A    No.

14         Q    Dr. Lichtman, when I started today, I

15    had made an errant reference to 90 prior

16    depositions.  You said, perhaps, dozens of times.

17             Can you tell me how many times you've

18    been retained as an expert as it relates to voting

19    rights litigation?

20         A    I've never counted, but it could be

21    upwards of 90.  I think I -- we passed on a table

22    of cases to you.

Transcript of Allan Lichtman
Conducted on September 30, 2019                    31

1      Q    Well, we'll get to that in one second.

2  Let me step back.

3           I understand that you are a

4  distinguished professor of history at American

5  University in Washington, DC, correct?

6      A    Yes.

7      Q    How long have you held that position?

8      A    I started at American University in

9  1973.  I was appointed full professor -- I'm

10  trying to remember -- '79, '80 -- around there.

11  And I was appointed distinguished professor, which

12  is the highest faculty rank only held by very few,

13  in 2011.

14     Q    If I understand your testimony, then,

15  you've essentially worked continuously at the --

16  at the American University here in Washington, DC

17  since 1973?

18     A    Hard to believe, but true.

19     Q    Congratulations.

20     A    Thank you.  I started when I was nine.

21     Q    I believe that.

22          MR. HEBERT:  You're under oath,

Transcript of Allan Lichtman
Conducted on September 30, 2019                    32

1    remember.

2              THE WITNESS:  Oh, no.

3         Q    When did you first begin working as a

4    retained expert in voting rights cases?

5         A    Probably around 1980 with respect to --

6    I think the case was Anderson v. Celebrezze that

7    involved ballot access for third parties.  John

8    Anderson, of course, was the independent

9    presidential candidate in 1980.  And I did a

10   report on the role of third parties in American

11   political history.

12             I did not testify; I was not deposed in

13   that case.

14        Q    Would it be fair to say that you have

15   over 30 years of experience testifying as an

16   expert in Voting Rights Act cases?

17        A    Yes.

18        Q    During that period of time have you ever

19   been excluded as an expert by any court?

20        A    No.  I once had a Daubert motion filed,

21   and it was rejected.

22        Q    Have you ever had a court explicitly

Transcript of Allan Lichtman
Conducted on September 30, 2019                    33

```
 1   refute or refuse to agree with any of your

 2   findings in a written opinion?

 3       A    Of course.  You can't be involved in

 4   more than 90 cases and not have every judge every

 5   time agree with you.

 6       Q    Do any of those cases stick out in your

 7   mind?

 8       A    Well, the one that sticks out in my mind

 9   because it was recent and very important was North

10   Carolina NAACP v. McCrory in which the district

11   court disagreed with my analyses and opinions, but

12   all of that was overturned unanimously by the 4th

13   Circuit, which agreed with my analyses and

14   opinions down the line.

15       Q    Can you spell the name of that

16   defendant, by chance?

17       A    McCrory, M-C-C-R-O-R-Y, former governor

18   of North Carolina.

19       Q    Any other cases that you can recall

20   where a district court or appellate court

21   specifically refuted your opinion or your

22   findings?
```

Transcript of Allan Lichtman
Conducted on September 30, 2019                    34

1      A    I'm sure there were, certainly in part,
2  but that's the one that really stands out.
3      Q    What do you do to stay up to date on the
4  most recent or, I'll say, cutting edge political
5  science research methods?
6      A    Just read, and I also do a lot of
7  writing.  And in the course of my writings, I
8  utilize methodologies.  But I'm not a political
9  scientist.  I am a political historian.  And I
10  have written in my own right quite a bit on
11  methodologies for analyzing voting behavior and
12  have developed some methodologies for it.
13      Q    I want to --
14      A    One other thing --
15      Q    I'm sorry?
16      A    And, of course, in the course of doing
17  litigation, you engage with methodologies.
18      Q    For purposes of racially polarized
19  voting analysis, are you familiar with the most
20  commonly employed methodologies?
21      A    I think there are three methodologies
22  and the same ones that have been discussed in this

Transcript of Allan Lichtman
Conducted on September 30, 2019                      35

1    case.  I don't like to call it homogeneous

2    precinct, I call it extreme case analysis,

3    ecological regression, and ecological inference.

4         Q    Based on your experience as an expert

5    witness, those are the three most commonly

6    employed methodologies?

7         A    That's correct.  And I believe two of

8    them, ecological regression and extreme case

9    analysis -- certainly ecological regression --

10   were the methodologies validated by the Supreme

11   Court in its landmark decision of Thornburg v.

12   Gingles in the 1980s.

13        Q    I've heard of that one.

14        A    Yeah.  And the Supreme Court also

15   accepted my methodology in the LULAC case.  That

16   was the big congressional redistributing case

17   coming out of Texas and --

18        Q    I apologize for interrupting.  Before

19   you go too far away, will you spell LULAC for me?

20        A    Certainly.  I think it's all caps,

21   L-U-L-A-C.

22             And Justice Kennedy's opinion in that

Transcript of Allan Lichtman
Conducted on September 30, 2019                    36

1    case cited my statistical work more than once, I

2    believe, in striking down the one district that it

3    did strike down in the congressional redistricting

4    plan in the first decade of the 21st century.

5         Q    The methodology you're referring to in

6    the LULAC case, is that different than ecological

7    regression or ecological inference?

8         A    It was ecological regression.

9         Q    Do you prefer ecological regression to

10   ecological inference?

11        A    I think they both generally give you the

12   same results, but I do prefer ecological

13   regression.

14        Q    Why is that?

15        A    First of all, it has been validated by

16   the United States Supreme Court.  I'm not aware of

17   ecological inference being validated by the United

18   States Supreme Court.  It's easy to explain.  You

19   can have pictures, you know, of scatter plots on

20   which ecological regression is based.

21             I have yet to see anyone explain

22   ecological inference in a way that a court can

Transcript of Allan Lichtman
Conducted on September 30, 2019                    37

1    understand.  And ecological inference will give

2    you answers no matter what.  Ecological

3    regression, which I always check, can give you

4    warning signs when you really shouldn't be getting

5    answers.

6              And ecological inference, you know, can

7    be hard to use if you're not truly an expert.

8         Q    Well --

9         A    But, again, I have not seen a litigation

10   where it would turn on the difference between the

11   two of them.  Because they don't always give you

12   exactly the same answers, but they certainly give

13   you answers in the ballpark.

14        Q    I heard you say something that I'm going

15   to agree with, that sometimes these are difficult

16   to understand when you're not an expert.  And I

17   will confess to you that I am not an expert in

18   this area particularly.

19              But you used a phrase, warning signs, as

20   important between your distinction of the ER

21   methodology --

22        A    Right.

Transcript of Allan Lichtman
Conducted on September 30, 2019                           38

1        Q       -- and the EI methodology.

2                Can you tell me a little bit about those

3    warning signs?

4        A       Yeah.  You know, as you saw in one of my

5    reports, I produced what's known as scatter plots,

6    which is a plotting of whatever variable you're

7    interested in -- it could be turnout, it could be

8    the votes for candidates -- against the

9    demographic composition of the precincts.

10               And if there is a relationship, you'll

11   see either a linear upward slope or a linear

12   downward slope.  It's those scatter plots that are

13   the basis of the ecological regression

14   methodology.

15               So the truth is, while I might not be

16   able to explain to you ecological regression or I

17   think I can, you can see the scatter plots.  You

18   can see what the ecological regression is based --

19   you can't see anything for ecological inference.

20   It's essentially a black box.

21               You can also check ecological regression

22   with an extreme case; and those can be, you know,

Transcript of Allan Lichtman
Conducted on September 30, 2019                                    39

1    the warning signs, you know, if there's something

2    disparate between the results and the scatter

3    plots and the homogeneous precinct.  It will tell

4    you that.

5              Also, by looking at the scatter plots,

6    you can see whether or not there is enough

7    variation in your analysis.  For example, you

8    might say, well, I'd love to do an analysis of

9    voting behavior of Hispanics.  But Hispanics don't

10   vary that much across precincts.  You don't have,

11   you know, 60 percent and 10 percent.

12             And that would be a warning sign that

13   you're not going to get a particularly reliable

14   analysis by trying to isolate.  You put it into

15   EI, EI will give you an answer, which may or may

16   not be right for something like that.

17        Q    You had mentioned the homogeneous

18   precinct, and we -- you also referred to it as

19   extreme case.  So using your vernacular, I'll call

20   it extreme case during the deposition.

21        A    Yeah.  I have a reason I don't call

22   it -- because they're not 100 percent.  They're

Transcript of Allan Lichtman
Conducted on September 30, 2019                    40

1    not totally homogeneous.

2         Q    When you refer to extreme case, do you

3    put a percentile on that?

4         A    You know, I'd like to get at 90 percent

5    for whatever racial group I'm looking at.

6    Sometimes you can't get there and you've got to go

7    down to 80 percent.

8              But the truth is, the extreme case

9    analysis is also fairly evident in the visuals.

10   You know, Bernard -- Dr. Bernard Grofman, who was

11   the expert in the Thornburg v. Gingles case called

12   it the interocular test.  You can see things with

13   your own two eyes.  And that's why I like scatter

14   plots, and that's why I look at them.

15        Q    Can you give me an example of one of

16   these cases where you would -- and I'm referring

17   purely to a hypothetical case now -- where you

18   would see something that you would categorize as a

19   warning sign as between extreme case, ER, and EI?

20        A    Well, I'm not sure you see a warning

21   sign between them; but, rather, the warning sign

22   is maybe there isn't enough variation in the

Transcript of Allan Lichtman
Conducted on September 30, 2019                    41

1    demographic variable you're looking at to isolate

2    that particular demographic group and come up with

3    an estimate that isn't very noisy.  That's -- a

4    scatter plot will do that for you.

5         Q    Tell me what the word noisy means to you

6    from a methodological perspective.

7         A    Yeah.  I was trying to keep it simple.

8    It means it can be a big error margin of what

9    you're looking at.  It's not going to be totally

10   reliable.

11        Q    For purposes of statistical analysis,

12   particularly in EI and ER, is there a percentile

13   for what is reliable and what is not reliable?

14        A    No.  There isn't, you know, a fine line;

15   but when you've been doing this long enough, you

16   get a pretty good sense of -- you know, if the

17   variation in your variable is between 0 and

18   20 percent, you know isolating that particular

19   variable is going to be an issue.

20        Q    So is there a certain statistical

21   variance that you would identify as a warning sign

22   in these cases?

Transcript of Allan Lichtman
Conducted on September 30, 2019                    42

```
1        A    Again, there's no hard and fast line,
2   but you would certainly like to get at least on
3   either side close to a majority.
4        Q    I want to go back to the word noisy.
5             You had said big margin in response to
6   that, and I want to make sure I understand what
7   you mean by big error margin.
8        A    That the estimate is just not going to
9   be a reliable estimate in terms of specifying the
10  behavior of that group.  And that makes sense.  If
11  you think about it, if the highest percentage of
12  the group is 12 percent, distinguishing that group
13  from the 88 percent in the top precinct is going
14  to be difficult.
15       Q    And in some cases can it be so
16  unreliable that it would be improper to draw
17  conclusions based on those margins?
18       A    It could be.
19       Q    Is there a number, a percentage of the
20  margin of error that you would say conclusively is
21  unreliable to draw conclusions?
22       A    No.  Because, you know, even with large
```

Transcript of Allan Lichtman
Conducted on September 30, 2019                    43

1    margins of error, sometimes you could say

2    something about the behavior.  And there is a

3    methodology, for example, that Dr. Spencer used to

4    test differences among different groups, even when

5    the margins of error can be large for those

6    groups.

7         Q    You've talked some about ecological

8    regression, ecological inference, and now the

9    extreme case analysis.

10            I want to point your attention in your

11   report to page 2.

12        A    Which report?

13        Q    The first report, I'm sorry, Exhibit 1.

14        A    I'm there.

15        Q    You write a statement of purpose here --

16   and I read this essentially to be your -- the

17   scope of your opinion in this case.

18            Am I correct in that assumption that

19   this is the scope of your opinion?

20        A    The Senate Factors, yes, which are

21   pretty broad but --

22        Q    Yes, sir.  For purposes of ecological

Transcript of Allan Lichtman
Conducted on September 30, 2019                    44

1    inference and ecological regression, where do you

2    see those analyses fitting into Senate Factors?

3         A    Certainly fitting in racially polarized

4    voting and certainly fitting in on the lingering

5    effects of discrimination.

6         Q    In preparing your report, did you rely

7    on the data presented by Dr. Spencer?

8         A    Correct.  I did not do -- well, for this

9    report -- okay.  We're only focusing on this

10   report.  I did not do for this report my own

11   independent statistical analysis of racially

12   polarized voting on turnout.

13        Q    Did you do any independent statistical

14   analysis on any extreme case precincts in Virginia

15   Beach?

16        A    I think I just said for this report I

17   did not do any of my own independent statistical

18   analysis of racially polarized voting.

19        Q    And would I be correct to say that you

20   do not intend to offer an opinion on the

21   satisfaction of Gingles prongs 1, 2, or 3 based on

22   this report?

1              MR. HEBERT:  Object to the form of the

2    question.

3        A    I've got to think about that.  I

4    certainly --

5        Q    Let me try to rephrase the question.

6        A    Yeah.

7        Q    I do not read in the scope of your

8    statement of purpose that you are opining on

9    Gingles prong 1 in this report; is that correct?

10       A    That's correct.

11       Q    And I should clarify for the record,

12   when I use the phrase Gingles prong 1, you

13   understand I'm referring to the geographic

14   compactness requirement as set forth in Thornburg

15   v. Gingles?

16       A    Yes.  But I presume you're not referring

17   to any particular legal interpretation of it, just

18   that it refers to drawing of districts, not what's

19   required or anything like that.

20       Q    Yeah.  I -- Dr. Lichtman, I'm trying to

21   determine where the scope of your --

22       A    Gotcha.

Transcript of Allan Lichtman
Conducted on September 30, 2019                          46

1        Q      -- opinions begin and end on this point,

2   not whether we agree or disagree on what prong 1

3   means.

4        A      No.  I don't think this report addresses

5   that.

6        Q      For Gingles prong 2, are you offering an

7   opinion in this report as to whether prong 2 is

8   satisfied?

9        A      Not to the extent that I talk

10  specifically about prong 2 but to the extent prong

11  2 is implicated in racially polarized voting,

12  which I do address in this report.  Then it would

13  be relevant to prong 2.

14       Q      For prong 3, are you opining

15  specifically in this report as to whether Gingles

16  prong 3 is satisfied?

17       A      Not specifically but indirectly to the

18  extent racially polarized voting bears on that.

19       Q      Can you tell me what you identify as the

20  component parts of racially polarized voting?

21       A      Yes.  Racially polarized voting exists

22  when -- let's just simplify it to two racial

1    groups, but it need not be limited to that -- when

2    two racial groups differ in their choices of

3    candidates, say, blacks and whites.

4            And then you can measure the degree of

5    racially polarized voting by looking at the degree

6    of difference in the choices of candidates of

7    those two racial groups.

8        Q    Can there be racially polarized voting

9    between minority groups?

10       A    There can be racially polarized voting

11   between any group, however you define it.  It's an

12   empirical question.

13       Q    Have you written any publications or

14   journals in reference to racially polarized

15   voting?

16       A    Certainly.

17       Q    Can you give me an idea of how many?

18       A    Certainly several.

19       Q    What would you say your most recent

20   article relating to or your most recent

21   publication relating to racially polarized voting

22   was?

Transcript of Allan Lichtman
Conducted on September 30, 2019                              48

```
 1      A    It's been some time since I addressed

 2  this.  I'd have to review my CV.  I certainly

 3  addressed it in my evaluation review article,

 4  which I think is the early 1990s.

 5           And there may be something subsequent to

 6  that.  And I certainly would have touched on it in

 7  my very recent book on voting rights.  It's called

 8  The Embattled Vote in America:  From the Founding

 9  to the Present.  That was just September 2018.

10      Q    Have you also published or written in

11  reference to political cohesiveness of minority

12  groups?

13      A    Probably in the context of racially

14  polarized voting, but I can't recall an article,

15  per se, on that.

16      Q    And have you published any writings or

17  journals in reference to white/black voting as it

18  relates to racially polarized voting?

19      A    Again, that would have been encompassed,

20  but I don't recall writing an article on that per

21  se.

22      Q    Have you written any articles related to
```

Transcript of Allan Lichtman
Conducted on September 30, 2019                    49

1   political coalitions or coalition districts?

2        A    Not that I can recall.  But, again, I

3   may have touched on that.  But I don't recall

4   writing an article specifically on that.  But I'm

5   sure I've touched on it in other publications.

6        Q    Have you published or written regarding

7   influence districts?

8        A    Again, not specifically, but I'm sure --

9   I'm not sure, but I may well have touched on that

10  in other publications.

11       Q    And any publications or writings

12  referencing specifically crossover districts?

13       A    Again, not per se, but it's certainly

14  possible that was referenced in other pieces.

15       Q    We've talked some about your 30-year

16  history as a consulting expert in these types of

17  cases.  I want to move your attention closer to

18  the most recent four years.

19            In the last four years, can you tell me

20  approximately how many times you've been retained

21  as an expert and offered written or oral

22  testimony?

Transcript of Allan Lichtman
Conducted on September 30, 2019                    50

```
 1        A    I can't tell you how many.  I guess --
 2   it's hard to say exactly.  10?  12?  But if we
 3   reviewed my table of cases, we can draw a line
 4   where the last four years were.
 5        Q    You understand that, when a report is
 6   submitted, it is to include a table of cases and
 7   an updated CV?
 8        A    Yes.
 9        Q    And it's your normal practice to include
10   that?
11        A    Yes.
12        Q    And you've indicated that you've
13   testified at least ten times in the last --
14   approximately -- let's just say approximately ten
15   times in the last four years?
16        A    Very approximately.
17        Q    Do you recall whether those approximate
18   ten times were more often for the plaintiff or the
19   defendant?
20        A    They were both.  I can think of several
21   cases on both sides -- or on either side would be
22   more accurate.
```

Transcript of Allan Lichtman
Conducted on September 30, 2019                    51

```
1        Q    And of those approximate ten cases, were

2   any of them in Virginia?

3        A    One was in Virginia.  I don't know

4   exactly whether it was in the four-year time frame

5   or not, but it was fairly recently.  It may not be

6   exactly in the four-year time frame -- I don't

7   recall -- but it's right around there.

8        Q    Tell me what case you're referring to,

9   please.

10       A    That was the voter ID case in Virginia.

11       Q    Do you recall the names of the parties

12  in that case?

13       A    I think Lee was the plaintiff, Lee v.

14  Virginia State Board of Elections, if I remember

15  correctly.

16       Q    You've been received as an expert in

17  federal courts in Virginia before?

18       A    Certainly in that one.  I think some --

19  a long time ago I did a case involving

20  redistricting in Virginia.  So at least a couple

21  of times.

22       Q    Do you recall the name of that
```

Transcript of Allan Lichtman
Conducted on September 30, 2019                    52

1    redistricting case?

2         A    I have no idea.  It was a very long time

3    ago.

4         Q    Do you recall where it may have been in

5    Virginia?

6         A    I have no recollection.

7         Q    And do you know if the 4th Circuit has

8    ever cited you approvingly?

9         A    Yes.

10        Q    Okay.  Do you recall which cases those

11   might have been?

12        A    Just recently in North Carolina NAACP v.

13   McCrory.  They didn't cite me specifically, but

14   they cited testimony.

15        Q    And prior to that, do you recall any

16   other cases where the 4th Circuit has cited your

17   work approvingly?

18        A    I don't recall.

19        Q    Dr. Lichtman, I want to turn your

20   attention to page 3 of Exhibit 1, your initial

21   report.

22        A    Certainly.

Transcript of Allan Lichtman
Conducted on September 30, 2019                    53

1          Q     The last paragraph there indicates that

2     you're being compensated for your work in this

3     matter at a rate of $350 per hour.

4                Is that still accurate?

5          A     Yes.

6          Q     That includes your preparing of reports

7     and also your time to testify either at --

8          A     Yes.

9          Q     -- sorry I interrupted you -- either at

10    deposition or at trial?

11         A     Yes.

12         Q     You indicate in the next sentence that

13    you have attached an updated CV and a table of

14    cases which I have provided written or oral

15    testimony?

16         A     Yes.

17         Q     I do not see that CV or table of cases

18    as attached to this report.

19                Can you identify in that exhibit if it's

20    been attached?

21         A     I don't see it either.  I sent it to the

22    attorneys to pass on to you.

Transcript of Allan Lichtman
Conducted on September 30, 2019                54

1      Q     This updated table of cases, how many

2   cases would you say are on that list?

3      A     90-plus.

4      Q     And they include all of the cases in

5   which you've provided written or oral testimony?

6      A     From 1980 on.

7      Q     When you say written testimony, you're

8   referring to reports that you've provided to

9   either plaintiff's or defendant's counsel?

10      A     I'm not sure they included every case in

11   which I just wrote a report but didn't do a

12   deposition and didn't do testimony.

13           So I'm not -- I mean, overwhelmingly,

14   the majority of cases I've done one or the other.

15   It may be a very few that got settled or dismissed

16   or something or I just submitted a report and it

17   never went anywhere.

18      Q     And it's your testimony today under oath

19   that you provided that table and your updated CV

20   to counsel?

21      A     Yep.

22      Q     And you don't have any explanation as to

Transcript of Allan Lichtman
Conducted on September 30, 2019                         55

```
1    why it may not have been provided to the

2    defendants in this case?

3         A    Nope.

4              MR. HEBERT:  For what it's worth -- and

5    we're on record -- we're checking, because, to the

6    best of our knowledge, we did submit it to you.

7    But we're trying to find out verification of that.

8              MR. HARRIS:  Well, to the extent that it

9    purports to include Dr. Lichtman's CV and table of

10   cases in this report, I would object on the record

11   that it doesn't appear that it's included based on

12   what we received as the defendants, understanding

13   what you've indicated, Mr. Hebert.

14             MR. HEBERT:  Understood your objection.

15        Q    Dr. Lichtman, if I can ask you also to

16   flip back through both reports just to confirm

17   that what you've been shown as Exhibit 1 or

18   Exhibit 2 does not include your full CV and your

19   table of cases.

20        A    It doesn't.

21        Q    Dr. Lichtman, do you agree with the

22   statement that Virginia Beach's minority voters
```

1    are politically cohesive?

2         A    Yes.

3         Q    Do you agree with the statement that

4    Hispanic and Asian voting patterns track black

5    voting patterns in Virginia Beach?

6              MR. HEBERT:  Object to the form of the

7    question.

8         A    Yeah.  I'm not sure what that means.

9    How much do they track black voting patterns?

10        Q    My question is do you agree with the

11   statement that Hispanic and Asian voting patterns

12   track black voting patterns?

13        A    Again, I would need a further

14   explanation of what that means.

15        Q    All right.  Do you agree with the

16   statement that Hispanic-white vote polarization

17   tends to be greater than black-white vote

18   polarization in Virginia Beach?

19        A    Run that by me again.  There was a lot

20   of blacks and whites in there.

21        Q    Yes, sir.  I'm asking if you agree with

22   the statement that Hispanic-white vote

Transcript of Allan Lichtman
Conducted on September 30, 2019                 57

```
 1    polarization tends to be greater than black-white
 2    vote polarization.
 3              MR. HEBERT:  Object to the form of the
 4    question.
 5         A    Yeah.  I'm not sure what that means
 6    either.  If you could clarify what you mean by
 7    Hispanic-white and black-white polarization.
 8         Q    I'm asking you to make a comparison
 9    between the vote polarization between Hispanics
10    and whites in Virginia Beach and blacks and whites
11    in Virginia Beach?
12         A    I have not made such a comparison.
13         Q    Have you made a comparison between Asian
14    and white vote polarization and black-white
15    polarization in Virginia Beach?
16              MR. HEBERT:  Object to the form of the
17    question.
18         A    I've made no such comparison.
19         Q    Have you made any comparison between
20    Hispanic-Asian vote polarization and
21    black-Hispanic vote polarization?
22              MR. HEBERT:  Object to the form of the
```

Transcript of Allan Lichtman
Conducted on September 30, 2019                    58

1    question.

2         A    I haven't made that determination.

3         Q    Why haven't you made that determination?

4         A    There's no reason to make that

5    determination in terms of the analyses I was doing

6    for my reports.

7         Q    Is it your opinion that that analysis is

8    not important?

9         A    Depends what the issue is that you are

10   referring to it.  I also don't think you can

11   isolate Hispanic and Asian voting.

12        Q    Let's go back to that last statement.

13             You indicated you don't -- your opinion

14   is that you can't isolate Hispanic and Asian

15   voting in the City of Virginia Beach?

16        A    Not per se because of white error

17   margins.  You can certainly get estimates, but the

18   error margins are going to be large, which is why

19   you've got to use the equivalence testing

20   analysis.

21        Q    Do you believe that the error margins

22   you get from the Asian and Hispanic inquiry are

Transcript of Allan Lichtman
Conducted on September 30, 2019          59

1  reliable?

2       A     The term reliable does not refer to the

3  error margins.

4       Q     Do you believe that the Asian and

5  Hispanic analysis, if you were to isolate them --

6  and you indicated that you can't, so you'd have to

7  do equivalence testing, correct?

8       A     Equivalence testing.

9       Q     Can you do an isolated analysis of Asian

10 vote preference in Virginia Beach using ecological

11 inference?

12      A     It will give you an answer, but it won't

13 be reliable.

14      Q     Can you do an isolated analysis of Asian

15 vote preference using ecological regression in

16 Virginia Beach?

17      A     Same problem.  Won't be reliable.

18      Q     Can you use extreme case to determine

19 the Asian vote preference in Virginia Beach?

20      A     There are no extreme cases for Asians.

21      Q     Referencing Hispanics now, sir, can you

22 use ecological regression to isolate the Hispanic

Transcript of Allan Lichtman
Conducted on September 30, 2019                    60

1    vote preferences in Virginia Beach?

2         A     Won't be reliable.

3         Q     Same question for ecological inference.

4         A     Won't be reliable.

5         Q     And the same question for extreme case.

6         A     There are no extreme cases.  That's why

7    you look at the scatter plots, to see what kind of

8    analyses you can and can't do.  And that's why you

9    use equivalence testing here.

10        Q     Have you provided opinions in prior

11   cases specifically relating to the satisfaction of

12   Gingles prongs 2 and 3?

13        A     I'm sure I have.

14        Q     In those other cases, have you done

15   isolated point estimates of racial groups using EI

16   or ER analysis?

17        A     Yes.

18        Q     What was the difference between those

19   cases and this case in Virginia Beach?

20        A     You want me to go through all the

21   differences between those cases and these cases in

22   Virginia Beach?  There's lots of differences.

Transcript of Allan Lichtman
Conducted on September 30, 2019                    61

1          Q     Dr. Lichtman, I'm trying to understand

2     why in one case you're able to isolate the

3     Hispanic or Asian choice using ER and EI, but I

4     understand your testimony today that you can't

5     isolate Asian or Hispanic using EI or ER in

6     Virginia Beach.

7          A     That's correct.

8          Q     Not being an expert, I'm trying to

9     understand why that happens.

10         A     It's simple.  When I have used

11    ecological regression to estimate the behavior of

12    particular demographic groups, there's been enough

13    variation in the concentration of those groups

14    across the precincts.  And that distinguishes from

15    an attempt to isolate Hispanic and Asian votes

16    here.

17         Q     And is that because you understand

18    Virginia Beach to be a largely integrated city?

19         A     I make no opinion about that.  I'm just

20    looking at the precinct-by-precinct variation.

21         Q     And precinct-by-precinct -- what

22    information would you expect or hope to see in the

Transcript of Allan Lichtman
Conducted on September 30, 2019                    62

1    precinct-by-precinct variation that would allow

2    you to do EI or ER in Virginia Beach?

3         A    Well, you would look at the scatter

4    plot, you would look at the areas; but as I said,

5    you'd want to at least get something approaching a

6    majority on both sides.

7         Q    Is it your opinion in this case that

8    black, Hispanic, and Asian voters vote together as

9    a coalition in Virginia Beach?

10        A    I think that's correct.

11        Q    Is it your opinion in this case that

12   black, Hispanic, and Asian voters vote together as

13   a coalition and not just for minority candidates

14   in general?

15        A    I don't understand that question, I'm

16   sorry.

17        Q    Is it your opinion that minority

18   candidates that are strongly preferred by black,

19   Hispanic, and Asian voters are systematically

20   losing elections in Virginia Beach?

21        A    I think that's right.

22        Q    It's your opinion that elections for the

Transcript of Allan Lichtman
Conducted on September 30, 2019                    63

1    Virginia Beach City Council have been marked by

2    racial appeals?

3         A    Some of them.

4         Q    It's your opinion that Latinos in

5    Virginia and Virginia Beach have been notoriously

6    discriminated against when renting apartments?

7         A    I think that's right; although, I might

8    not use myself the word notoriously; but I think

9    that's true.  There's a study I cite that bears

10   that out.

11        Q    Is it your opinion that, as a result of

12   the history of official and private discrimination

13   in Virginia Beach, that black, Hispanic, and Asian

14   residents have lower rates of educational

15   attainment?

16        A    That's particularly true of Hispanics

17   and blacks.  It's more mixed for Asians.

18        Q    Is it your opinion that, as a result of

19   the history of official and private

20   discrimination, that black, Hispanic, and Asian

21   residents in Virginia Beach experience poverty

22   more frequently?

Transcript of Allan Lichtman
Conducted on September 30, 2019                    64

1        A    I think that's correct.  Let me check

2   something in my report.  You're asking me to do a

3   lot of things from memory here, but I have it -- I

4   have it bound.

5        Q    That's no problem.  Take the time you

6   need, sir.

7        A    Yes.  Blacks, Hispanics, and Asians have

8   higher poverty rates than whites; and that's

9   particularly marked for blacks and Hispanics where

10  the rates are more than double.

11       Q    And is it also your opinion that, as a

12  result of the history of official and private

13  discrimination, that black, Hispanic, and Asian

14  residents of Virginia Beach are unemployed at

15  higher rates than white residents?

16       A    That's certainly true substantial for

17  blacks and Hispanics; Asians and whites have

18  roughly comparable unemployment rates.

19       Q    Do you still have Exhibit 1, your

20  initial report in front of you, sir?

21       A    I do.

22       Q    We referenced briefly the statement of

Transcript of Allan Lichtman
Conducted on September 30, 2019                    65

1    purpose found on page 2.

2         A     Correct.

3         Q     The first line indicates that you were

4    to examine the totality of the circumstances, and

5    then you referenced the Senate Factors.

6               My understanding is that there's nine

7    Senate Factors?

8         A     Correct.

9         Q     Is it your opinion that all nine Senate

10   Factors are present in Virginia Beach?

11        A     Yes.  And that's unusual.

12        Q     In your Senate Factor analysis as to

13   Virginia Beach, do you analyze Virginia Beach as

14   its currently constituted since the town of

15   Virginia Beach in Princess Anne County joined in

16   1963, or do you go beyond -- back in time past

17   1963?

18        A     I don't go back in time for Virginia

19   Beach per se, I obviously do go much farther back

20   in time for the Commonwealth of Virginia, which,

21   of course, affects everyone in the state,

22   including anyone in the current configuration or

Transcript of Allan Lichtman
Conducted on September 30, 2019                          66

1    previously in the Virginia Beach area.

2         Q    You understand that the current

3    configuration of the City of Virginia Beach was

4    established in the early 60s?

5         A    That's right.

6         Q    Are you aware of what the total

7    non-black and non-white population was in Virginia

8    Beach in the early 60s?

9         A    Non-black, non-white population was

10   probably quite small in the early 60s.  I can't

11   give you an exact number.

12        Q    If I told you that the 1970 census

13   reported that it was less than one percent --

14        A    That's possible.  As I said, I know it

15   was very small.

16        Q    Do you consider that fact to be

17   important to your opinion or your analysis of the

18   Senate Factors?

19        A    No, because so much of the

20   discrimination post-dates that and really runs

21   right up to the present time when you have

22   substantial populations of Asians and Hispanics.

Transcript of Allan Lichtman
Conducted on September 30, 2019                    67

1     Q    When you say substantial populations of

2  Asians and Hispanics, do you know what percent

3  you're referring to when you say that?

4     A    Sure.  I think I have that here.  Yep.

5     Q    What are those percentages, sir?

6     A    Sure.  Hispanic population for total,

7  7.8; voting age, 7; citizen, 6.1; non-Hispanic

8  Asian, total 7.9; voting age 7.8; citizen voting

9  age, 6.6 and rising.

10     Q    For the record, you're reading from your

11  report on page 14.

12          Which table is that?

13     A    One.

14     Q    Do you consider those percentages

15  significant?

16     A    Absolutely.  You're talking about a

17  pretty large city with hundreds of thousands of

18  people, so yes.  You're involving a lot of people.

19     Q    Earlier, we had talked about the ability

20  to produce isolated estimates for Asians and

21  Hispanics for ER or EI analysis.

22          My understanding of your testimony was

Transcript of Allan Lichtman
Conducted on September 30, 2019                    68

1    that it couldn't be done using those methods in

2    Virginia Beach.

3         A    Well, you could do it, but it's going to

4    have large error margins.

5         Q    And having large error margins would be

6    an indication of an unreliable estimate?

7         A    Yeah, an estimate, you know, that you

8    would not want to rely on, that's correct.  That's

9    why you've got to use equivalency testing.

10        Q    I'm trying to understand the distinction

11   between the significance of the Asian population

12   in that context and then your use of the phrase

13   significant in this context.

14        A    Totally different context.  In this case

15   we're talking about people affected by ongoing

16   discrimination, which is the Senate Factor you

17   were referring to me.  In the other we're talking

18   about something entirely different and that is

19   whether the size of the population and its

20   distribution across precincts enables you to

21   utilize effectively EI, ER, or extreme case

22   analysis.  These are complete apples and oranges.

Transcript of Allan Lichtman
Conducted on September 30, 2019                    69

1        Q    Is it your opinion that blacks,

2   Hispanics, and Asians share the lingering effects

3   of discrimination in Virginia Beach equally?

4        A    To a very large extent, blacks and

5   Hispanics; to a lesser extent, Asians.

6        Q    Sir, while you have your report open,

7   I'm going to turn your attention to page 5.

8        A    Okay.  I'm there.

9        Q    There's a header that says State of

10  Virginia.

11            Do you see that?

12       A    Of course.

13       Q    But follow that section.  It goes all

14  the way until page 12.

15       A    That's just at the very top of page 12.

16       Q    Yes, sir.

17       A    Not all of page 12.  That's right.

18       Q    My review of these sections from the

19  start of page 5 to the top of page 12 leads me to

20  believe that this is related to Virginia writ

21  large.

22       A    To the Commonwealth of Virginia, that's

Transcript of Allan Lichtman
Conducted on September 30, 2019                 70

1    correct.

2        Q    The only specific reference to Virginia

3    Beach I observe in those pages is contained on

4    page 11.

5            MR. HEBERT:  Object to the form of the

6    question, and I believe the premise of the

7    question is wrong.

8        A    I'm lost now between the objection and

9    the question.  Maybe you can rephrase it.

10       Q    Let me ask it a different way, and I'll

11   try and avoid the objection, and maybe that will

12   make it easier.

13       A    Good.

14       Q    I'm pointing your attention to this

15   section, State of Virginia.  I see it going from

16   page 5 to page 12.  I believe you confirmed that.

17       A    Yes.  To the very top of page 12 and

18   kind of the middle of page 5, that's right.

19       Q    Can you tell me where, from page 5 to

20   page 12, you refer specifically to the City of

21   Virginia Beach?

22       A    Okay.  That question I think I can

Transcript of Allan Lichtman
Conducted on September 30, 2019                71

```
1    answer because it's straight factual.
2         Q    I'm doing my best.
3         A    That was a fair question.  Page 11, page
4    12.
5         Q    Can you tell me for the record where
6    you're referring to on page 11, please?
7         A    The second full paragraph -- one, two,
8    three, four -- five lines down.
9         Q    In reference to the Equal Rights Center
10   report?
11        A    That's correct.
12        Q    And on page 12, can you point me to
13   where for the record you're referring to Virginia
14   Beach?
15        A    Yes.  First full paragraph -- one, two,
16   three -- four lines down.
17        Q    That's in reference to the general
18   assembly's passage of house bill 2270?
19        A    I think 2270 comes after that.  I'm not
20   sure it's the exact same bill number.
21        Q    That's fair.  And I'm not trying to trap
22   you --
```

Transcript of Allan Lichtman
Conducted on September 30, 2019                    72

1        A     Yeah.

2        Q     -- I'm just trying to make sure --

3        A     It's what's known as the sanctuary

4    cities bill, well known in Virginia.

5        Q     I'm going to turn your attention back to

6    page 11 where you've identified the City of

7    Virginia Beach in the Equal Rights Center report.

8        A     Correct.

9        Q     It appears that that report was

10   completed in 2013 based on your report?

11       A     Yes.

12       Q     And you provide a date and the Footnote

13   No. 24 of 30 April, 2013?

14       A     Yes.

15       Q     I understand that to be the date in

16   which the report was published?

17       A     Correct.

18       Q     And you accessed that report through

19   this URL?

20       A     Correct.

21       Q     Did you have an opportunity to review

22   the full report in preparing your opinions in this

Transcript of Allan Lichtman
Conducted on September 30, 2019                73

1   case?

2        A    I'm sure I did.  I don't recall exactly.

3   It's been a while now.

4        Q    In your review of the entire report, do

5   you know if the report did a breakdown of each

6   independent city?

7        A    I don't think so.

8        Q    Do you have any understanding or any

9   knowledge related to what levels of adverse

10  treatment were found in Virginia Beach

11  specifically?

12       A    I don't think it broke it down to the

13  particular jurisdictions.  That's why it's under

14  the heading of State of Virginia or Commonwealth

15  of Virginia rather than Virginia Beach per se.

16  There's a separate section on Virginia Beach.

17            I think it's time for me to get a break.

18       Q    Certainly.

19       A    Is this a good time?

20       Q    That's fine.  No problem.

21            THE VIDEOGRAPHER:  We are going off the

22  record.  The time is 1:00 p.m.

Transcript of Allan Lichtman
Conducted on September 30, 2019                    74

1              (Off the record at 1:00 p.m.)

2              (On the record at 1:31 p.m.)

3              THE VIDEOGRAPHER:  Back on.  The time is

4    1:31 p.m.

5              MR. HEBERT:  So during the break, I have

6    done some checking of my emails as well as my

7    co-counsel.  And despite my hopeful recollection

8    that we had sent the list of cases as well as the

9    CV of Dr. Lichtman, it appears that we were -- I

10   was mistaken, that we did not do so, for which I

11   am profusely apologetic to counsel.

12             As I said earlier when we were on the

13   break, you know, we've -- both sides have worked

14   very cooperatively in my opinion in this case and

15   professionally; and I can only say that, if you

16   had let me know on July 15th, I would have gotten

17   it to you then or this morning while we were

18   waiting for the hour-and-30-minute delay of the

19   court reporter; however, I am willing -- I have

20   the -- both documents here, and I'm going to

21   distribute them now.

22             If you want to take a break and review

Transcript of Allan Lichtman
Conducted on September 30, 2019                75

1   them for a time period, you're welcome to do that.

2   You can question -- without a break, I'm going to

3   leave that to you as a good-faith effort on my

4   part to not inconvenience you more than you've

5   already been inconvenienced and, again, for which

6   I apologize.

7           I think -- and my only explanation is,

8   when I saw in his report that I have attached my

9   most recent CV and listing of cases, I thought it

10  was literally part of that document.  And I should

11  have checked, and I did not.  And when Ms. Lang

12  transmitted it to you, she perhaps thought the

13  same thing as well but --

14          MR. BOYNTON:  Well, Mr. Hebert, we thank

15  you for your candor in that record, and we'll

16  receive it now.  And obviously everybody preserves

17  all objections and responses to objections, but

18  we'll at this point proceed as best we can.

19          MR. HEBERT:  Okay.  There is the listing

20  of cases.  Can you give me back one?

21          MR. BOYNTON:  Sure.  Go ahead and mark

22  it.  Yes, I think that makes sense, to mark what

Transcript of Allan Lichtman
Conducted on September 30, 2019                76

1   was provided in the deposition.  And we will put

2   on the record this is the first time we've seen

3   it, obviously, so -- and then I will refer to

4   Mr. Harris as to one of us take a break now or

5   later to review it and digest it and all that.

6             MR. HEBERT:  And I'm not going to go

7   into anything else on the record as to when you

8   discovered it wasn't there or anything like that.

9   As far as I'm concerned, it was my mistake.  I

10  take full responsibility for it, and I apologize

11  for it.

12            MR. BOYNTON:  We appreciate that.

13            MR. HEBERT:  And this is the resume,

14  Jerry.

15            MR. HARRIS:  Okay.

16            MR. HEBERT:  And those are multiple

17  copies.

18            MR. HARRIS:  That's been marked

19  Exhibit 3, the Allan J. Lichtman cases (dates

20  approximate) deposition, affidavit, or oral

21  testimony.

22            (Deposition Exhibit 3 was marked and was

Transcript of Allan Lichtman
Conducted on September 30, 2019                    77

```
1    attached to the transcript.)

2            MR. HARRIS:  I'll put an Exhibit 4

3    sticker on the CV.

4            (Deposition Exhibit 4 was marked and was

5    attached to the transcript.)

6            MR. BOYNTON:  Okay.  And so in order to

7    try to make tomorrow as streamlined as possible,

8    I'm going to step out and work on Mr. Spencer's

9    deposition a little bit more.  And I appreciate

10   everybody's time today, and I'll leave it in the

11   capable hands of my colleagues, so --

12           MR. HEBERT:  Okay.  Thank you, Chris.

13           MR. BOYNTON:  Thank you.

14           MR. HEBERT:  Always good to be with you.

15           MR. HARRIS:  I don't intend to take

16   another break to review it.  What I'd like to do

17   is continue with my line of questioning.  And

18   then, if we end up taking another break in an hour

19   or so, I'll review it during the break so that we

20   don't delay --

21           THE WITNESS:  We'll definitely be taking

22   a break in an hour or so.
```

Transcript of Allan Lichtman
Conducted on September 30, 2019                    78

```
 1            MR. HARRIS:  The day is getting long
 2  already for a lot of stuff --
 3            THE WITNESS:  No kidding.  I'm sitting a
 4  long time.
 5            I don't need this right now.
 6  BY MR. HARRIS:
 7      Q    Dr. Lichtman, we've just had a
 8  discussion on the record in reference to the prior
 9  cases, deposition, affidavit, or oral testimony
10  marked as Exhibit 3.  I suspect you've seen this
11  document.  I just need you to confirm on the
12  record that it is what it purports to be.
13      A    It is.
14      Q    And Exhibit 4, which is your CV, I would
15  have the same question.
16            Just confirm for us on the record that
17  it is, in fact, your updated CV.
18      A    At least updated to the time of my
19  original report.  That's when I would have sent it
20  in.
21      Q    That's an important clarification.
22            And can I ask you for the same
```

Transcript of Allan Lichtman
Conducted on September 30, 2019                    79

```
 1   clarification on Exhibit 3, which is your cases,

 2   deposition, affidavit, or oral testimony.  Is that

 3   up to date as of the initial report?

 4        A    Yes.  But I don't think anything would

 5   be added to that.  There wouldn't be anything

 6   substantial added to the CV except I'm pretty

 7   continually writing op-eds, so maybe a couple of

 8   new op-eds.  Other than that, it's pretty

 9   accurate.

10        Q    We're all waiting for your Trump

11   prediction for your next op-ed.

12        A    You and, like, a lot of other people.

13   You know, I got a note from him after my

14   first prediction.

15        Q    Wow.

16        A    In his Sharpie on the Washington Post

17   article where I did his prediction.

18        Q    We have something else to look at during

19   the break.

20             I want to get back to --

21        A    You can have it.  I'm happy to give you

22   a copy if you're interested.
```

Transcript of Allan Lichtman
Conducted on September 30, 2019                    80

```
1        Q    I want to turn your attention back to

2   page 11 of your initial report, sir.

3        A    Yes.

4        Q    Before we took the break, we were

5   discussing the 2013 Equal Rights Center report.

6        A    Yes.

7        Q    And we were discussing how the data was

8   presented in that report.  And I understood your

9   testimony to be that you didn't see in the report

10  Virginia Beach reported in isolation; is that

11  correct?

12       A    That's my best recollection, yes.

13       Q    And that recollection comes from what

14  you believe was your review of the full report?

15       A    That's correct.

16       Q    Do you have any independent evidence of

17  these sorts of violations in Virginia Beach beyond

18  what's reported inside the study that you've

19  offered me today?

20       A    I certainly have evidence of

21  discrimination in Virginia Beach, but I don't

22  think it deals specifically with the subject of
```

Transcript of Allan Lichtman
Conducted on September 30, 2019                    81

1    this study.

2         Q    I want to turn your attention to page

3    12.  And we've made a reference to page 12 already

4    today as it relates to the sanctuary city bills or

5    sanctuary city laws.

6         A    Yes.

7         Q    Do you see at the top of page 12 where

8    you've identified previously in your testimony

9    that Virginia Beach is referenced?

10        A    Yes.

11        Q    Tell me about why sanctuary city bills

12   are important to your analysis and your ultimate

13   opinions?

14        A    Well, they're not central to my analysis

15   or my ultimate opinion.  They are just one small

16   element of it.  And they stem out of the quotation

17   on the previous page from the center's executive

18   director, John Kohl (phonetic), where he said,

19   While we're beginning to see movement towards a

20   consensus around immigration reform, hostility

21   towards immigrants at the local level

22   unfortunately continues to result in unfair

1   treatment for many irrespective of their immigrant

2   status, unquote.

3           The center recommended that, quote,

4   legislators should ensure that all

5   immigration-related bills encourage fair housing

6   and comply with federal civil rights laws.

7           That flows out of that -- I'm pointing

8   out that the sanctuary city bills simply inflames

9   the tension around immigration and particularly,

10  obviously, Latinos, which is also reflected in the

11  housing discrimination.

12          MR. HEBERT:  Excuse me, can we pause for

13  like 30 seconds off the record?

14          MR. HARRIS:  Yes.

15          THE VIDEOGRAPHER:  We are going off the

16  record.  The time is 1:39 p.m.

17          (Off the record at 1:39 p.m.)

18          (On the record at 1:40 p.m.)

19          THE VIDEOGRAPHER:  Back on the record.

20  The time is 1:40 p.m.

21          MR. HEBERT:  I apologize for that

22  inconvenience.  I had to step out for 30 seconds

Transcript of Allan Lichtman
Conducted on September 30, 2019                    83

1    or so.

2              MR. HARRIS:  Not a problem.

3              THE WITNESS:  And I finished my answer.

4    BY MR. HARRIS:

5         Q    Relating specifically to the City of

6    Virginia Beach, has Virginia Beach, to your

7    knowledge, been labeled a sanctuary city?

8         A    I don't believe so.  Not to my

9    knowledge.  And it certainly could be, but not to

10   my knowledge.

11        Q    In your profession or in your

12   professional experience, do you have an idea of

13   how cities become labeled as, quote/unquote,

14   sanctuary cities?

15        A    I think that's a political label.

16   There's no such standard definition that's

17   objective of sanctuary cities.

18        Q    I guess I'm trying to understand is

19   there some legal criteria that would say -- or at

20   least some legal criteria you're aware of that

21   would say this city is a sanctuary city versus

22   this city is not a sanctuary city?

Transcript of Allan Lichtman
Conducted on September 30, 2019                    84

1              MR. HEBERT:  Object to the form of the

2    question.

3        A    I'm not a lawyer, so I can't parse that

4    out for you.  My understanding is it's a political

5    designation.

6        Q    I want to continue down on page 12 of

7    your report, sir.

8        A    Yes.

9        Q    You make a reference on the second

10   paragraph from the bottom, As indicated in table 2

11   and chart 1.

12             Do you see that paragraph?

13       A    Yes.

14       Q    The statement, The minority population

15   of Virginia Beach has been growing in recent years

16   relevant to non-Hispanic white population.

17       A    Correct.

18       Q    It appears that you rely on the census

19   date of 2000 through the ACS data of 2013 to 2017

20   estimates to reach that conclusion.

21       A    Correct.

22       Q    Did you rely on the 2010 census

Transcript of Allan Lichtman
Conducted on September 30, 2019                    85

1    information to reach that conclusion as well?

2         A    I may have looked at it, but I don't

3    recall because I wanted to look at the most recent

4    census materials.

5         Q    Is there any other reason why you

6    wouldn't also place the 2010 census information on

7    that chart?

8         A    I think I just wanted to get the most

9    recent.

10        Q    Did you do an independent analysis of

11   the growth of Hispanics alone in that same time

12   frame?

13        A    I think I just looked at the minority

14   population versus the non-Hispanic white

15   population.  I don't think my tables isolate

16   individual minority groups.

17        Q    Was it important to your opinion to

18   isolate those minority groups?

19        A    No.  My critical element here that I was

20   looking at was the fact that you have a city

21   that's becoming increasingly minority and

22   increasingly less non-Hispanic white.

Transcript of Allan Lichtman
Conducted on September 30, 2019                    86

1       Q    Can I assume, then, you did not do an

2   individualized or isolated analysis on the trends

3   of African Americans alone in Virginia Beach?

4       A    As the table indicates, it's all

5   minority.

6       Q    Would it be significant to your analysis

7   or your opinions if one of those groups of the

8   three tri-part minority groups were growing more

9   quickly than others?

10      A    No.

11      Q    Why not?

12      A    Because all I'm trying to document here

13  was this is becoming an increasingly minority

14  city, not to parse out distinctions among minority

15  groups.

16      Q    And if any of those distinct minority

17  groups' population had actually declined from 2010

18  until 2013, would that be important to your

19  opinion in that chart?

20      A    No.  The chart just looks at minorities

21  combined.

22      Q    Can you tell me what you understand the

Transcript of Allan Lichtman
Conducted on September 30, 2019                    87

1    difference to be between ACS or American Community

2    Survey data and decennial census data?

3         A    Yes.  ACS data is a sample; the

4    decennial census data at least attempts to

5    enumerate the entire population.

6         Q    Is there --

7         A    ACS data is used as a standard basis by

8    social scientists all the time.

9         Q    Is a margin of error reported with ACS

10   data estimates?

11        A    Yes.

12        Q    Okay.  Is a margin of error reported for

13   decennial census data estimates?

14        A    I don't believe it is.

15        Q    Do you know why not?

16        A    Because they try to enumerate the entire

17   population rather than a sample.

18        Q    I want to continue forward through your

19   report to page 17, please, sir.

20             The second full paragraph down begins,

21   In addition to the at-large election system.

22        A    Yes.

Transcript of Allan Lichtman
Conducted on September 30, 2019                    88

1        Q     You make a reference in the report; and

2    it states, The allocation of polling place

3    resources has been found to burden minority

4    residents of Virginia Beach.

5              Is that still your opinion as you sit

6    here today?

7        A     Yes.

8        Q     What's the significance of allocation of

9    polling place resources as it relates to this

10   Senate Factor?

11       A     The more polling place resources, the

12   easier it is to vote.  And this is one aspect of

13   discrimination against minorities that

14   particularly relates to voting and in this case

15   particularly the predominant minority group in

16   Virginia Beach, specifically African Americans.

17       Q     You reference a study in the next

18   sentence, it appears, A study of the allocation of

19   polling place resources in 2004 and 2008 by

20   Dr. Walter R. -- I apologize, Doctor -- Mebane,

21   M-E-B-A-N-E, Jr.?

22       A     Yes.  Yes.

Transcript of Allan Lichtman
Conducted on September 30, 2019                    89

1         Q    You've had an opportunity to review that

2    full report?

3         A    Yes.  In fact, I cite the detailed

4    statistical analysis here.

5         Q    And that report was submitted as a

6    declaration in the case that you quote in -- or

7    cite in Footnote 30?

8         A    Yes.

9         Q    What was your understanding of the

10   findings of that study as it relates to Virginia

11   Beach?

12        A    I can read to you what I wrote here.

13   It's all outlined in paragraphs 1, 2, 3, 4 in the

14   middle of page 17.

15        Q    I don't need you to read it.  I want to

16   confirm your understanding of that study is

17   summarized, I'll say, in those next four

18   paragraphs.

19        A    That's correct.

20        Q    Have you done your own analysis of the

21   allocation of polling place resources in Virginia

22   Beach more recent that 2004 and 2008?

Transcript of Allan Lichtman
Conducted on September 30, 2019                    90

1      A     No.  But what I did was I think in my

2   rebuttal report I documented the lower turnout of

3   minorities as compared to whites in Virginia

4   Beach, which is obviously not just a function of

5   this but is obviously relevant.

6      Q     You would attribute the allocation of

7   polling place resources as one of multiple factors

8   to the reduced voter turnout for African Americans

9   in Virginia Beach?

10     A     Yes.  And Dr. Mebane says it's

11   substantial, on the order of five to ten percent;

12   so it's not an irrelevant factor.  Obviously the

13   biggest factor may well be lingering and ongoing

14   discrimination.

15     Q     Are you aware of any studies related to

16   Virginia Beach regarding the allocation of polling

17   place resources in predominantly Asian

18   communities?

19     A     No.

20     Q     Are you aware of any studies regarding

21   the allocation of polling place resources in the

22   City of Virginia Beach regarding predominantly

Transcript of Allan Lichtman
Conducted on September 30, 2019                     91

1    Hispanic communities?

2         A    No.  The African American community is

3    the predominant minority community.

4         Q    You cite Virginia State Conference of

5    the NAACP v. Kaine in Footnote 30.

6              Do you know the outcome of that case?

7         A    I have no idea.

8         Q    Do you have if an answer was ever filed

9    by the defense in that case?

10        A    An answer to what?

11        Q    The complaint that was filed.

12        A    I don't know.

13        Q    Do you know if a response report was

14   ever produced in that case in response to the

15   declaration of Dr. Mebane?

16        A    I didn't see one, but I can't say for

17   sure there wasn't one.

18        Q    You understand that Dr. Mebane was the

19   retained expert on behalf of the plaintiffs in

20   that case?

21        A    Yes.

22        Q    Did you consider his opinion in that

Transcript of Allan Lichtman
Conducted on September 30, 2019                    92

1   case unbiased?

2        A    Yes, because it's supported by detailed

3   statistical analysis.  What counts is the

4   analysis, not the identity in this case of the

5   scholar in terms of where he stood in the case.

6        Q    I want to turn your attention now two

7   pages forward to page 19, sir.

8        A    Okay.  That's the chart?

9        Q    Yes, sir.  Chart 2 on the top of page

10  19.

11       A    Yes.

12       Q    It appears you produced point estimates

13  and you've charted them for black and white

14  students.

15            And the chart indicates, For short-term

16  suspensions by race, public schools, Virginia

17  Beach 2015 to '16.

18       A    That's incorrect.

19       Q    That's incorrect?  What did I say

20  incorrectly?

21       A    I didn't produce these.  These were

22  produced by the study that is previously

Transcript of Allan Lichtman
Conducted on September 30, 2019                    93

1    referenced.  In other words, these are not my

2    numbers.

3        Q    Thank you.  That's a proper

4    clarification.

5             You've taken the study's numbers and

6    you've populated them into this chart; is that

7    correct?

8        A    Yes.

9        Q    The phrase short-term suspensions, can

10   you tell me what that means?

11       A    It means you're not expelled permanently

12   from the school.

13       Q    Do you know if it's in-school

14   suspensions or out-of-school suspensions?

15       A    I'm trying to remember, and I can't --

16   let me see if I -- out-of-school suspensions.

17       Q    Did you read your report somewhere that

18   refreshed your recollection on that?

19       A    Yeah.

20       Q    Can you tell me where?

21       A    Yeah.  Page 18, first full paragraph,

22   Virginia schools continue to issue a huge number

Transcript of Allan Lichtman
Conducted on September 30, 2019                    94

1    of out-of-school suspensions, posting a slight

2    increase from even the 2014/2015 totals.

3        Q    Thank you.  Going back to page 19 on the

4    chart, the chart gives a date of 2015 to 2016 --

5        A    Right.

6        Q    -- but it -- that same sentence you just

7    read from on page 18, shows 2014/2015 totals.

8        A    No.  It says, Posting a slight increase

9    from even the 2000.

10       Q    So the comparison that's being made here

11   is 2015 to '16, which is on your chart, references

12   that it's up from just the prior year?

13       A    No.  Let me explain.  I put that

14   sentence in just to explain what they're looking

15   at.  My chart does not reference the temporal

16   comparison between 2014, 2015, and 2015/2016 which

17   the present study looks at.  It simply reports the

18   suspensions for blacks and whites in the same time

19   frame so that you actually have an apples to

20   apples comparison.

21       Q    You did not select 2015/16 specifically;

22   is that correct?

1      A    That's the latest year they looked at,

2  so I took the latest year, which makes perfect

3  sense.

4      Q    Have you had the opportunity to review

5  any data since filing this report more recent than

6  2015/2016?

7      A    I did not come across any updated

8  information, and your expert in responding to my

9  report did not present any.

10      Q    I'll ask it another way.

11           You don't have any more recent

12  information than beyond 2015/2016?

13           MR. HEBERT:  Object to the form of the

14  question.

15      A    The study that I looked at, the latest

16  year they had was 2015/2016.  I'm not aware of an

17  update, and your expert did not challenge this by

18  presenting updated data.

19      Q    Hispanics and Asians are not included on

20  chart 2.  Is that because they weren't included in

21  the study that's referenced on the prior page?

22      A    No.  Asians were not; Hispanics were.

Transcript of Allan Lichtman
Conducted on September 30, 2019                    96

1    And interestingly, the suspension rate for African

2    Americans was much larger than for Hispanics.

3        Q    Do you know what the suspension rate was

4    for Hispanics?

5        A    I don't have it off the top of my head,

6    but anyone can find it in the survey.

7        Q    Why didn't you put it on that chart?

8        A    I did.  I put it in the --

9        Q    On chart 2?

10       A    No.  But I put it in the explanatory

11   paragraph.

12       Q    Can you point me to that paragraph in

13   your report?

14       A    Middle paragraph on page 18.

15       Q    The last paragraph, it says, The

16   suspension rate for African American students was

17   3.8 times --

18       A    Yes.  That's it.

19       Q    But as you sit here today, you don't

20   recall the precise point estimate?

21       A    I do not.

22       Q    Do you have any information as to what

Transcript of Allan Lichtman
Conducted on September 30, 2019                    97

1    the Asian short-term suspension rates were in that

2    same time frame?

3        A    I don't recall Asians being isolated,

4    but it's possible they were.  I just don't recall.

5        Q    Do you consider that, the absence of

6    Asians in this chart, important to your analysis?

7        A    No.

8             MR. HEBERT:  Object to the form of the

9    question.

10       A    I think it's important to show that, for

11   the predominant minority group in Virginia Beach,

12   there is this massive difference in short-term

13   suspensions.  That's extremely important in terms

14   of documenting discrimination that has a

15   fundamental affect on people's lifetime

16   opportunities, students' lifetime opportunities.

17       Q    Do you have any indication or any

18   information you can provide me today that there's

19   a massive difference between the suspension rates

20   of Hispanics and white?

21       A    No.  It seems to be fairly comparable.

22   I don't have the exact point estimates, though.

Transcript of Allan Lichtman
Conducted on September 30, 2019                    98

```
1        Q    And do you have any information that

2   would indicate or lead you to believe that there's

3   a massive difference between the suspension rates

4   of white and Asian students?

5             MR. HEBERT:  Object to the form of the

6   question.

7        A    I don't believe that the Asians will

8   isolate -- at least I don't recall.  What I was

9   highlighting was what's happening to the

10  predominant minority.  And whatever is going on

11  with Asians and Hispanics doesn't cancel that out.

12       Q    I'm going to turn your attention next to

13  page 20, please, sir.

14       A    I'm there.

15       Q    There's a single paragraph on that page,

16  and I'm going to draw your attention to the end of

17  that paragraph to the sentence that's cited on

18  Footnote 34.  This imbalance affects all minority

19  groups in Virginia Beach including African

20  Americans, Hispanics, and Asians.

21            That's still your opinion today, sir?

22       A    Correct.
```

Transcript of Allan Lichtman
Conducted on September 30, 2019                    99

1      Q    Can you tell me how the imbalance
2  affects African Americans?
3      A    Because the teachers in Virginia are
4  disproportionately white, so you have African
5  Americans not having the opportunity they would
6  otherwise have to have role models and mentors of
7  their own race.
8           And while I can't document a causal
9  connection, you combine that with the massive
10  disparity in suspension rates between African
11  Americans and whites, and you have this very
12  disturbing synergy for African Americans in
13  schools in Virginia Beach.
14      Q    How does this imbalance affect Hispanics
15  specifically?
16      A    Well, again, with the predominant
17  teachers being white and such a large percentage
18  of students being minority -- this means for all
19  minority groups, not just African Americans --
20  they're less likely to have mentors, role models
21  of their own race or ethnic identification.
22      Q    Do you make any correlation between the

Transcript of Allan Lichtman
Conducted on September 30, 2019                    100

1   suspension rates of Hispanics and this imbalance?

2        A    No.  I said particularly for African

3   Americans there is this unfortunate synergy

4   between the two measures.  I'm not equating that

5   for Hispanics and Asians in terms of the

6   suspension rates.

7        Q    Dr. Lichtman, I want to turn now to

8   factor 2.

9             Factor 2 starts in your report on page

10  21, and I believe you reference factor 2 also in

11  your rebuttal report which we've marked as

12  Exhibit 2.

13       A    Yeah.  Actually, extensively in my

14  rebuttal report.

15       Q    Yes, sir.  I want to talk broadly about

16  factor 2, more specifically, racially polarized

17  voting.

18            When we started our deposition earlier,

19  I understood your testimony to be that racially

20  polarized voting has two component parts.  I would

21  shorthand those to prong 2 and prong 3 together as

22  evidence of racially polarized voting.

Transcript of Allan Lichtman
Conducted on September 30, 2019                    101

1          That's your testimony.  I'm wondering if

2    you can describe for me how you define racially

3    polarized voting in any jurisdiction?

4        A    That's not my testimony.  The words you

5    used are not my words.  In fact, I used very

6    different words because I'm not dealing with the

7    Gingles factors per se.  I'm dealing with racially

8    polarized voting which is when there are

9    differences in the choices of candidates between

10   two racial groups or one racial group and a

11   combined racial group and then the degree of that

12   difference.

13          I do not anywhere here reference prongs

14   2 and 3 specifically or believe even in my

15   rebuttal report; although, I'd have to look at it.

16       Q    In the general sense -- let's use a

17   two-person race, one African American candidate

18   and one white candidate -- what analysis would you

19   do to determine whether there's racially polarized

20   voting occurring in that hypothetical race?

21       A    Presuming the data sustained it -- and

22   we went through a lengthy explanation about that.

Transcript of Allan Lichtman
Conducted on September 30, 2019                    102

1    There are three standard methodologies:  Extreme

2    case analysis, ecological regression, and

3    ecological inference whereby you could derive

4    estimates of the vote for each candidate by the

5    racial groups in question and then measure the

6    differences between them.

7              I believe that was done by Dr. Spencer

8    specifically with respect to several

9    presidential -- I think it was a congressional

10   election which covered the boundaries of Virginia

11   Beach.  We essentially had a one-on-one situation

12   that's very rare for city council elections in

13   Virginia Beach.

14        Q    Is there any rule of thumb for the

15   percentages you would want to see on EI or ER

16   analysis to conclude there is racially polarized

17   voting?

18        A    No.  It's a continuum, right?  It goes

19   from zero, which indicates no racially polarized

20   voting, up to 100, which indicates, you know, one

21   group is 100 percent behind, the other is zero,

22   which you never see.

Transcript of Allan Lichtman
Conducted on September 30, 2019                    103

1              So it's a continuum that's measurable.

2    If you want to see how that's done, you can look

3    at my rebuttal report where I actually do that

4    kind of analysis.  I don't do that here.

5        Q    Well, I want to talk more in a general

6    sense in your expertise.

7              I understand you say that it's a

8    continuum, but is there a point on that continuum

9    where you begin to say I don't find racially

10   polarized voting in this instance?

11       A    Again, you know, there's no

12   hard-and-fast rule, but I'd like to see more than

13   one or two or three or four percent difference.

14   I'd like to see something more substantial than

15   that.

16             But I report it to the judge, whatever

17   the numbers are, and you can see the difference

18   between very minimal racially polarized voting

19   and, you know, a very high degree of racially

20   polarized voting.

21       Q    I want to try and understands the

22   varying degrees of polarization.  I understand

Transcript of Allan Lichtman
Conducted on September 30, 2019                    104

```
 1   you're saying it's on a continuum, but is there a
 2   point where you say, for example, it's very clear
 3   and then there's other examples that you would say
 4   it's not as clear?
 5        A    I would say in a one-on-one election
 6   with one black candidate and one white candidate,
 7   it's very clear if it's a landslide difference,
 8   60/40, okay?  Let me finish.
 9              But that's not, you know, an absolute
10   standard.  You certainly can have racially
11   polarized voting with less of a difference.  But
12   that kind of landslide difference certainly would
13   be indicative of substantial racially polarized --
14   well, even then -- and then it goes on and becomes
15   higher than that.
16        Q    I only furrowed my brow because of the
17   word landslide.
18              Is that a term you're putting on it, or
19   is that a term of art within your --
20        A    It's a term of art.  Landslide elections
21   are usually elections where one side gets
22   60 percent or more of the vote.  It's not -- you
```

Transcript of Allan Lichtman
Conducted on September 30, 2019                                    105

 1    know, again, these things are not hard-and-fast

 2    rules; but that's a rule of thumb.

 3         Q    Is that the rule of thumb you've applied

 4    in this case, in your rebuttal report?

 5              MR. HEBERT:  Object to the form of the

 6    question.

 7              Are you still talking about your

 8    hypothetical one-on-one race, or are you talking

 9    about something else?

10              MR. HARRIS:  Well, I'm asking

11    specifically now.

12         Q    You had mentioned your rule of thumb in

13    a one-on-one race was 60 percent, admitting that

14    it can vary --

15         A    Right.  But still have racial

16    polarization with lower numbers than that.  But

17    once you get there, it's pretty definitive in my

18    view.

19         Q    And I'm asking generally, did you apply

20    that rule of thumb or that landslide method to

21    your reports?

22         A    I didn't have to because polarization

Transcript of Allan Lichtman
Conducted on September 30, 2019                    106

1    was vastly greater between whites and blacks in

2    the election I looked at than this 20 percent

3    margin.  I think it was 59 percent difference,

4    which is enormous.

5         Q    Do you recall what election specifically

6    that was?

7         A    We can look at my report.

8         Q    Please.

9         A    I think these are elections that your

10   expert, Dr. Kidd, had singled out as a majority of

11   blacks voting for these candidates.  So it's on

12   the page 7.

13        Q    Of the initial report or the rebuttal?

14        A    It's the rebuttal report.  I didn't do

15   any of these analysis in the initial report.

16        Q    I'm with you, sir.

17        A    Yeah.  And you can see on average

18   81.9 percent of the black vote went for these

19   candidates.  And in contrast, only 22 percent of

20   the white vote -- that's a 59.9 percent

21   polarization difference, and that is very

22   substantial.  Far beyond the 60/40 margin that I

Transcript of Allan Lichtman
Conducted on September 30, 2019                    107

```
1   talked about as being a clear indication of

2   racially polarized voting.  This is extreme

3   racially polarized voting.

4        Q    Your analysis in Table R2 on page 7 is

5   specifically between the black voters and the

6   white voters of the City of Virginia Beach?

7        A    That's correct.

8        Q    Did you produce a similar table related

9   to the racial polarization in Virginia Beach

10  comparing Asians to whites in Virginia Beach?

11       A    We've been through a long colloquy on

12  that about why you can't isolate the Asian vote.

13       Q    Is that the reason you can't produce a

14  table like this for Asian?

15       A    You cannot reliably produce a table like

16  this for Asians the same way you can for blacks.

17       Q    As to Hispanics, can you reliably

18  produce a table like Table R2 comparing Hispanic

19  and white vote in Virginia Beach?

20       A    You could do it; but, you know, it would

21  have problems.  And we've been through that at

22  great length.
```

Transcript of Allan Lichtman
Conducted on September 30, 2019                    108

1        Q    I want to talk about the term minority

2    candidate of choice.

3             Is that a term you're familiar with?

4        A    I am.

5        Q    Can you tell me what that term means to

6    you?

7        A    Candidates supported by majority or

8    plurality of the minority voters.  Or to put it a

9    simple way, would this candidate have won based

10   upon minority votes alone.  And that could be for

11   single minority or for minorities combined.

12       Q    Is there a difference between the

13   minority candidate of choice and a -- let me step

14   back.  I'm about to ask a bad question, and I

15   don't want to do that.

16       A    I won't answer a bad question, don't

17   worry.

18       Q    Good.  I want to talk about two types of

19   hypothetical races.

20            We've talked about black candidate

21   versus a white candidate as just a single-seat

22   election head to head.

Transcript of Allan Lichtman
Conducted on September 30, 2019                    109

```
 1        A     That's the simplest example.

 2        Q     That's the simplest example.

 3              So in that race, the minority candidate

 4   of choice would be determined how?

 5        A     You would do an ecological regression or

 6   an ecological inference, checked for me -- not

 7   necessarily by everyone -- by an extreme case

 8   analysis.  You'd probably look at the scatter

 9   plots and determine which candidate got a majority

10   of the minority vote.

11              And we're talking majority here because

12   by definition it has to be.

13        Q     Assume now that it was a racial

14   coalition, not just blacks supporting black

15   candidates versus whites supporting white

16   candidates.

17        A     Okay.

18        Q     If there was Hispanic and Asian -- I

19   mean, excuse me, Hispanic and black support for a

20   singular candidate and you assume cohesion of

21   those two groups, the blacks and the Hispanics,

22   does your definition of minority candidate of
```

Transcript of Allan Lichtman
Conducted on September 30, 2019                    110

1    choice change in that circumstance?

2              MR. HEBERT:  I'm going to object to the

3    form of the question.

4        A    Yeah.  Without getting into the

5    premises, just look at the math of it, it can't.

6    If it's a one-on-one election by definition,

7    whether you're looking at a group of minorities or

8    one minority, it's going to be 50 percent plus

9    one.

10       Q    Is there a difference between minority

11   candidates of choice and political cohesiveness of

12   a minority group?

13       A    I think you look at political

14   cohesiveness through looking at minority

15   candidates of choice.

16       Q    Can you help me understand better how

17   those two terms, political cohesiveness and

18   minority candidate of choice, sort of go together?

19       A    I think they pretty much go together.

20   How do you figure out whether minorities are

21   cohesive?  My methodology is to look at elections

22   with members -- with minorities running and see

Transcript of Allan Lichtman
Conducted on September 30, 2019                    111

1    whether or not the minority group favors the

2    minority candidates.

3              Sometimes that could be through

4    50 percent or more, as we have seen here in my

5    Table 7; sometimes, when you have a lot of

6    splits -- of course you've got a lot of candidates

7    running -- it could be less than 50 percent.

8        Q    Another term that's often used in these

9    types of cases is black voting.

10             Can you tell me what that means?

11       A    Yes.  That means whites predominantly

12   vote against the minority candidate of choice like

13   we see in my Table 7.

14             MR. HEBERT:  Did you say Table 7?

15       A    I'm sorry, page 7.

16       Q    Page 7, Table R2.

17             THE WITNESS:  Boy, you're sharp.  He's

18   sharp; I'm old.

19       Q    Dr. Lichtman, do you agree that the

20   existence of a cohesive minority group that is

21   usually defeated by black voting would be evidence

22   of racially polarized voting?

Transcript of Allan Lichtman
Conducted on September 30, 2019                    112

1        A     That isn't per se racially polarized

2    voting.  You can have racially polarized voting

3    even where the candidate wins.

4        Q     Are you of the opinion that distinct

5    racial and minority groups may be aggregated for

6    the purpose of asserting a Section 2 violation.

7        A     I'm not going to comment on --

8              MR. HEBERT:  Object to the form of the

9    question.

10       A     I'm not going to comment on the legal

11   definition of a Section 2 violation.  I certainly

12   think you can present to the court evidence of how

13   combined minority groups vote.  Then it's up to

14   the court to decide whether it's a violation of

15   law.

16       Q     Have you opined in prior cases on cases

17   where there was aggregating of minority groups?

18       A     I'm sure I have.  It doesn't immediately

19   come to mind.  In Texas we did a lot of it.  In

20   Florida we did a lot of analysis of different

21   minority groups, but the groups were large and

22   distinctive enough so you can separate them out.

Transcript of Allan Lichtman
Conducted on September 30, 2019                                113

```
1      Q     When you say separate them out, are you
2  referring to the isolated analysis that we talked
3  about?
4      A     That's right.  As opposed to looking at
5  them as a complete coalition.
6      Q     Have you ever opined in a case where
7  there was a tri-part coalition of minorities
8  before such as this case?
9      A     I'm sure I have.  Let me look at my
10  cases and see if there's any recent cases in which
11  I did that.  Most of these cases did not involve
12  combined minorities.
13          I may have done it -- there's so many
14  iterations of the Texas redistricting cases, I
15  can't keep them all straight.  But I think I did
16  in at least one or two of the iterations in the
17  Texas redistricting.  Because one of the issues
18  was you couldn't draw a district -- this was a
19  redistricting case.  You couldn't draw a district
20  at a certain area of the state where a single
21  minority group had a majority of the citizen
22  voting-age population, but you could draw a
```

1    combined group.

2          And because blacks, Hispanics -- I don't

3    remember if we did Asians, but we certainly did

4    blacks and Hispanics -- were cohesive in general

5    elections, that, in fact, that district could

6    elect a combined candidate of choice of blacks and

7    Hispanics.

8          Q     The Texas redistricting case is in --

9    can you point me on your chart which ones those

10   may have been?

11         A     Yeah.  I'm trying.  I think Perez v.

12   Abbott -- the names of these keep changing because

13   they go on forever -- from 2017; and I believe

14   Veasey v. Perry, 2014; and Texas v. U.S., 2012 --

15   although, I'm not sure I did a statistical

16   analysis for that one.  It was definitely this

17   issue, as I said, in these cases of the ability of

18   combined minority groups to elect a candidate of

19   their choice, which I said they could.

20         Q     Does your analysis of political

21   cohesiveness become more difficult when you add a

22   second minority group to it?

Transcript of Allan Lichtman
Conducted on September 30, 2019                    115

1        A     It can.  It can.  I mean, it can

2   complicate it.  The simplest case is one minority,

3   whites, one-on-one election for one position.

4        Q    It stands to reason, then, that it would

5   complicate it further if there was three minority

6   groups being coalesced together?

7        A     Not necessarily if you're not isolating

8   all the minority groups.  It's not that

9   complicated to do an analysis of all the groups

10  together as a coalition.

11       Q    Do you believe the most persuasive

12  evidence of inter-minority political cohesion is

13  voting patterns of those groups?

14       A    I think there's two elements.  One,

15  certainly you want to look at voting patterns; and

16  then, you know, if you're dealing with a

17  districting issue like we had in the Texas case,

18  you want to look at districts and see if those

19  districts would elect minority candidates of

20  choice.

21            MR. HEBERT:  Counsel, I'm not trying to

22  testify, but I was counsel in all the cases that

Transcript of Allan Lichtman
Conducted on September 30, 2019                    116

1   he's referring to Texas redistricting.  Would you

2   like me to go through and tell you which ones,

3   because that's what your first question was, or do

4   you want to just leave the record as is?

5              MR. HARRIS:  We'll leave the record as

6   it is.  I imagine we can circle back off the

7   record.  That would be helpful to me if you're

8   prepared to offer that.  But I don't want to keep

9   Dr. Lichtman more than -- he's been here all day,

10  so I want to keep on moving.

11       A    Good.  Keep going.

12       Q    I want to ask you, Dr. Lichtman, have

13  you formed an opinion in this case as to whether

14  blacks', Hispanics', and Asians' voting patterns

15  indicate inner-minority cohesion?

16       A    Yes.  The candidates of choice of

17  combined minorities tend to be the same -- usually

18  the same candidates of choice of blacks, the one

19  group big enough and variable enough to be

20  analyzed separately.

21       Q    And you're prepared to offer that

22  opinion in this case without the ability to

Transcript of Allan Lichtman
Conducted on September 30, 2019                    117

1    isolate the specific votes of Asians and

2    Hispanics?

3         A    Yeah.  We're talking about combined

4    minorities, and we're talking -- yeah.  As a

5    coalition, combined minorities usually prefer the

6    same candidates as African Americans.

7         Q    I want to make sure we're not talking

8    about different things.

9              Is there a difference in your mind

10   between a coalition of Hispanic, black, and Asian

11   voters in Virginia Beach and cohesion between

12   blacks, Hispanics, and Asians in their voting

13   patterns?

14        A    I don't understand the question.

15        Q    We've used the term cohesion and

16   coalition today, and I'm trying to understand in

17   your mind if there is a difference between a

18   coalition of voters and cohesion between voters.

19        A    I'm not sure what you mean by cohesion

20   between voters.  We don't usually use that term to

21   describe differences between voters.  So maybe if

22   you could be more specific.

Transcript of Allan Lichtman
Conducted on September 30, 2019                                118

```
 1        Q     Well, let me ask it this way:  Do you
 2   believe that in Virginia Beach blacks, Hispanics,
 3   and Asians are politically cohesive?
 4        A     As a group, yes.
 5        Q     Is that because you believe that they
 6   form a coalition of voters?
 7        A     Yes.
 8        Q     Have you done any analysis as to whether
 9   blacks and Hispanics are a political coalition
10   together?
11             MR. HEBERT:  Object to the form of the
12   question.
13        A     None of this analysis was done by me.
14   It was all done by Dr. Spencer.  Certainly I
15   didn't do that analysis.
16        Q     Were you able to find in Dr. Spencer's
17   report anywhere he produced an analysis of
18   cohesion between blacks and Hispanics?
19        A     Only to the extent he did an equivalency
20   testing but not at length why you can't isolate
21   the Hispanic vote and isolate the Asian vote.
22        Q     And were you able to identify anywhere
```

Transcript of Allan Lichtman
Conducted on September 30, 2019                    119

1   in Dr. Spencer's reports where he does a cohesion

2   analysis between blacks and Asians?

3          A    I don't know what a cohesion analysis

4   between groups is, so I can't answer that.

5          Q    Did you identify anywhere in

6   Dr. Spencer's report where he did an analysis of

7   whether blacks and Asians form a political

8   coalition?

9          A    I don't think he isolated blacks and

10  Asians.  I think he looked at all minorities.  But

11  you best ask him all these questions.

12         Q    Would it be fair to say that you do not

13  dispute Dr. Spencer's finding regarding political

14  cohesiveness of blacks, Hispanics, and Asians?

15         A    Again, when you say the political

16  cohesiveness between -- that's not usually a term

17  we describe across groups.  That's a term we

18  usually say, Are blacks politically cohesive.

19              If you want to rephrase your question, I

20  can answer it.

21         Q    Are blacks politically cohesive in

22  Virginia Beach?

Transcript of Allan Lichtman
Conducted on September 30, 2019                    120

```
 1        A    Yes.

 2        Q    Are Asians politically cohesive in

 3  Virginia Beach?

 4        A    We can't isolate -- we've been over this

 5  many times -- the Asian vote.

 6        Q    So the answer to my question is you do

 7  not have information that Asian are cohesive in

 8  Virginia Beach?

 9        A    That's putting words in my mouth.

10  That's not correct.  We don't have information one

11  way or the other on the individual behavior of

12  Asians.  Beyond that, we can't go.

13        Q    Are Hispanics politically cohesive in

14  Virginia Beach?

15        A    Same answer as with Asians.

16        Q    I apologize, we may have covered this

17  earlier and I don't mean to belabor it.

18             Were you able to observe any homogeneous

19  precincts in Virginia Beach for any of these

20  minority groups -- blacks, Asians, or Hispanics?

21        A    And when you say homogeneous, I assume

22  you mean 90 percent or more?
```

Transcript of Allan Lichtman
Conducted on September 30, 2019                              121

1        Q     Extreme case.

2        A     No.

3        Q     I should have used extreme case.  That

4   was the term you used earlier.

5        A     I get your point, and there are no

6   90 percent-plus that I was able to see, and I only

7   did a very limited analysis on turnout.  I can't

8   speak for Dr. Spencer.  And as I said, it doesn't

9   have to be 90 percent.  It could be 80 percent

10  or -- but I did not look for that particularly for

11  combined minorities.

12       Q     Aside from any statistical evidence,

13  either yours or Dr. Spencer's, do you have any

14  other evidence you believe demonstrates a

15  political coalition between blacks, Hispanics, and

16  Asians in Virginia Beach?

17       A     I don't have it, but other evidence

18  would be whether or not the minority candidates

19  could win in illustrative districts drawn without

20  a majority of one group but a combined majority.

21              That would be -- you know, we'd call

22  that reconstituted elections, and that's a second

1    powerful test.

2         Q    Do you know if Dr. Spencer undertook

3    that effort?

4         A    I don't know.  You'd have to ask him.

5         Q    Are you familiar with a process called

6    double regression for determining racial group

7    voting preferences from aggregate data?

8         A    I am.

9         Q    Why are you familiar with that term?

10        A    I'm one of the originators.

11        Q    Can you tell me about what double

12   regression means?

13        A    Yeah.  One of the issues in any kind of

14   statistical analysis, unless you have -- which

15   sometimes we do but very rarely -- demographic

16   breakdown of actual voters because people register

17   by race and then their race is recorded when they

18   vote -- not their individual vote but their race

19   in the precincts -- there could be turnout

20   differences.

21             And the two regression methods takes

22   into account turnout differences.  That's the only

Transcript of Allan Lichtman
Conducted on September 30, 2019                    123

1    difference between that and the one regression --

2    one-equation regression method.  They usually

3    don't give you different answers, but the two

4    regression methodology is a little bit more

5    refined.

6          Q    And you're the creator of that method?

7          A    I think I'm one of them, and I've been

8    credited by Dr. Grofman as one of the developers.

9    I wouldn't take sole credit.

10         Q    I won't tell.

11              Was the double regression method applied

12   anywhere in your report or Dr. Spencer's report,

13   as best you can tell?

14         A    I did not do any -- well, I did turnout,

15   but that didn't require the double regression

16   method.  I didn't do any candidate analyses.  And

17   as far as the nitty-gritty details of what

18   Dr. Spencer did, you should ask him.

19         Q    As you sit here today, you're not aware

20   of whether Dr. Spencer relied on your double

21   regression analysis?

22         A    I don't recall whether he did or not.

Transcript of Allan Lichtman
Conducted on September 30, 2019                         124

1    But reading your expert response to Dr. Spencer, I

2    didn't see any challenge to the numbers

3    themselves, just to the interpretation of the

4    numbers.

5         Q    I want to go to page 25 of your report.

6         A    How about a break at this point?

7         Q    Yes, sir.

8              THE VIDEOGRAPHER:  We're going off the

9    record.  The time is 2:27 p.m.

10             (Off the record at 2:27 p.m.)

11             (On the record at 2:36 p.m.)

12   BY MR. HARRIS:

13        Q    Dr. Lichtman, I want to turn your

14   attention to page 25 on your report.

15        A    Okay.

16        Q    This is in reference to the candidate

17   slating process --

18        A    Right.

19        Q    -- factor 4?

20             In your first sentence there, you write,

21   Although I have not yet uncovered evidence of

22   formal slating for city council candidates -- as

Transcript of Allan Lichtman
Conducted on September 30, 2019                    125

1    you sit here today, have you discovered any

2    additional evidence of formal slating for city

3    council in Virginia Beach?

4        A    No.  I did some subsequent analysis, but

5    it wasn't formal slating.  It was relating to this

6    contribution analysis.

7        Q    I believe you referred to that as an

8    informal slating process in this case?

9        A    That's correct.

10       Q    Have you relied on that in other cases,

11   this informal slating process?

12       A    I think this is the first time that I

13   used this.  It's not impossible that I may have,

14   but it doesn't -- you know, when you've been in

15   90 cases, you forget a lot.  But it doesn't ring a

16   bell with me immediately in terms of slating.

17            I've certainly used contributions in

18   terms of assessing white contributions to black

19   candidates and issues related to that, but I don't

20   think I've used it as a proxy for slating

21   previously.

22       Q    Are you aware of any other experts who

Transcript of Allan Lichtman
Conducted on September 30, 2019                         126

1    have used this informal slating process as

2    indication of a factor 4?

3         A    It's a good question.  I don't know.

4    But your expert didn't dispute its relevance.  He

5    just analyzed it on another basis.

6         Q    How are slates of candidates identified

7    in a formal slating process?

8         A    Well, usually they'll get together and

9    put out endorsements of one another or common

10   literature.

11        Q    And do those usually involve candidates

12   who are competing simultaneously?

13        A    Not necessarily.  It could also -- you

14   also have incumbents involved because it's quite

15   relevant to an incumbent who they're going to be

16   serving with.

17        Q    What was your criteria for

18   identification of informal slating?

19        A    I think it was contributions of $250 or

20   more.

21        Q    How did you pick that number?

22        A    Basically, I was looking at the

Transcript of Allan Lichtman
Conducted on September 30, 2019                    127

1    distribution of contributions, and there did seem

2    to be a fall off after 250.  But the truth is, if

3    I had looked lower, it wouldn't have made a

4    substantive difference in the analysis.

5        Q    You also make an indication -- I'm

6    looking on page 25, sir -- you make an indication

7    that $250 in contributions from two or more other

8    candidates who ran for city council during this

9    period.

10       A    That's correct.

11       Q    How did you decide two or more was the

12   appropriate threshold?

13       A    Well, you wouldn't want one because that

14   really, you know, would be marginal for a slate,

15   but you wouldn't want to restrict it too much; so

16   two is a reasonable way of looking at it.

17       Q    I want to turn your attention now to

18   Tables 5 and 6 on the next two pages that I

19   believe are tables you relied on to come to your

20   conclusion of informal slating.

21       A    Right.

22       Q    I want to go down to -- on Table 5 on

Transcript of Allan Lichtman
Conducted on September 30, 2019                          128

1    page 26.  Shannon Kain.

2         A    Okay.

3         Q    Are you aware that Amelia Ross-Hammond

4    donated $100 to Ms. Kane?

5         A    That's certainly possible.

6         Q    And for Rosemary Wilson, the

7    second-to-the-last column on that table, are you

8    aware that Ms. Ross-Hammond in 2016 donated $200

9    to Ms. Wilson?

10        A    It's certainly possible.

11        Q    Assuming that's true, does that change

12   your opinion in any way?

13        A    No.

14        Q    As to Table 6, you are aware that Aaron

15   Rouse was an African American candidate in 2018

16   for Virginia Beach city council, correct?

17        A    That's correct.

18        Q    Are you aware that Ben Davenport donated

19   $1,500 to Aaron Rouse in --

20        A    Yes.

21             MR. HEBERT:  If I could, Dr. Lichtman,

22   try to let him finish his question, and he'll let

Transcript of Allan Lichtman
Conducted on September 30, 2019                    129

```
 1    you finish your answer before he talks.  The tape

 2    will read much smoother later.

 3              THE WITNESS:  I thought he was finished.

 4       Q    Can I assume the reason Aaron Rouse was

 5    not included on this chart is because only

 6    Mr. Davenport supported his candidacy, therefore,

 7    he did not meet the two or more standard you've

 8    set?

 9              MR. HEBERT:  Object to the form of the

10    question.

11       A    As far as I can recall, that's true.

12       Q    And Ms. Bright was an African American

13    candidate in Virginia Beach.

14              You recall that from your report?

15       A    It's bolded right there.

16       Q    Are you aware that Will Sessoms donated

17    $250 to her candidacy and Ms. Ross-Hammond donated

18    $150 to her candidacy?

19       A    That's possible.

20       Q    Assuming that's correct, does that

21    change your opinion in any way?

22       A    No.  I think my $250 threshold was
```

Transcript of Allan Lichtman
Conducted on September 30, 2019                    130

1   reasonable, and if you went below that, you'd have

2   to redo the entire table.  You can't just pick and

3   choose.

4        Q    On this chart, do you have an

5   understanding or knowledge of what percentage of

6   all contributions from these council raises

7   constitute those contained in this chart?

8        A    I was looking --

9             MR. HEBERT:  Objection.  I'm not clear

10  what chart you're on because we were talking about

11  charts 5 and then 6.

12            MR. HARRIS:  I'm sorry.

13       Q    I should have said, in reference to

14  Tables 5 and 6, are you aware of what percentage

15  of the total contributions are contained in Table

16  5 and 6?

17       A    No.  That wasn't the purpose of my

18  analysis.

19       Q    Would it be surprising to you that that

20  constitutes less than one percent of all

21  contributions?

22       A    That may be.  It doesn't matter.

Transcript of Allan Lichtman
Conducted on September 30, 2019                    131

```
 1        Q    It doesn't affect your opinion?

 2        A    No. I wasn't looking at that.  I was

 3   simply looking at the degree to which you have

 4   these informal coalitions, and $350 is not

 5   insignificant in a local race like this.

 6        Q    Dr. Lichtman, you've done an analysis in

 7   this case of the socioeconomic outcomes for

 8   blacks, Hispanics, and Asians in Virginia Beach,

 9   correct?

10        A    That's correct.

11        Q    You spend -- I hesitate to use an

12   adjective, but you spend a good bit of your report

13   comparing the socioeconomic outcomes of blacks,

14   Hispanics, and Asians to whites.

15             MR. HEBERT:  Object to the form of the

16   question.

17        A    It's actually not a good bit of my

18   report because almost all of it is tables and

19   charts.  The actual discussion is quite brief.

20        Q    Well, I want to talk about -- it appears

21   to me it begins on page 28.

22        A    That's correct.
```

Transcript of Allan Lichtman
Conducted on September 30, 2019                    132

1       Q    And it's your opinion in this case that

2  historical and current discrimination of blacks,

3  Hispanics, and Asians affect their -- affect them

4  in areas of education, employment, and health.

5       A    It's more than that.

6       Q    More than that?

7       A    Much more than that.

8            MR. HEBERT:  Object to the form of the

9  question.

10      Q    You produced a series of tables and

11  charts, and it appears from page 28 that those --

12  it's Table 7 through 9 and Charts 3 to 9 in your

13  report.

14      A    That looks correct.

15      Q    You provided at the beginning of the

16  deposition two updated charts to your rebuttal

17  report.

18           Do you have any updates or changes to

19  this section of your report?

20      A    No.

21      Q    I'm looking at the final paragraph of

22  page 28.

Transcript of Allan Lichtman
Conducted on September 30, 2019                    133

1          You indicate, Disparities between

2    non-Hispanic whites and Hispanics emerge for every

3    measure but the availability of the (inaudible).

4          A    That's correct.

5          Q    And you identified a disparity between

6    non-Hispanic whites and African Americans for

7    every measure.

8          A    That's correct.

9          Q    My count of the measures in these tables

10   is a total of 15 factors.

11         A    I'm not going to dispute that.  I'm not

12   going to go back and count, but that sounds right.

13         Q    You indicate that disparities emerge for

14   Asians on per-capita income, poverty, welfare

15   assistance, the availability of health insurance,

16   and home value in the last sentence of page 28.

17         A    That's correct.

18         Q    I identify that as five factors.

19         A    That's correct.

20         Q    Discussing per-capita income as it

21   relates to Asians, it appears on Table 7 that the

22   per-capita income of Asians are less than white

Transcript of Allan Lichtman
Conducted on September 30, 2019                    134

1    but the median household income of Asians is

2    greater than whites.

3         A    That's correct.

4         Q    Do you have an opinion about that

5    disparity?

6         A    Bigger families, bigger households.

7         Q    Speaking to poverty rate, you've

8    identified a disparity between whites and Asians

9    with Asians at 7.4 percent and whites at

10   5.8 percent.

11        A    That is correct.

12        Q    You would agree with me that the Asian

13   poverty rate is closer to the white poverty rate

14   than it is to the black and Hispanic poverty rate?

15        A    Mathematically, that's true; but that's

16   not what I'm looking at.

17        Q    What are you looking at when you

18   indicate there's a disparity as to that --

19        A    Just looking at the differences between

20   Asians and whites.  The fact that Hispanics and

21   blacks are even more burdened by poverty does not

22   wipe out the fact that the Asian poverty rate is

Transcript of Allan Lichtman
Conducted on September 30, 2019                    135

1    28 percent higher than the white poverty rate.

2          Q     You said 28 percent?

3          A     Right.

4          Q     How do you come to that number?

5          A     1.6 divided by 5.8 --

6          Q     I'm with you, I just want to make sure.

7          A     Okay.

8          Q     All I'm trying to do is make sure that

9    the math I'm doing in my head is the same math

10   you're doing over there.

11         A     Well, I can't do it in my head.  That's

12   why I have my calculator.

13         Q     That's why I asked you how you came up

14   with it.

15         A     Very good.

16         Q     You did not indicate a disparity on this

17   chart for unemployment rates.

18               I presume that's because the point

19   estimate for unemployment for Asians is actually

20   lower than whites?

21         A     They're essentially comparable.  You're

22   talking about 4/10s of 1 percent.  There's no

Transcript of Allan Lichtman
Conducted on September 30, 2019                         136

1   difference there.

2        Q    Dr. Lichtman, let's be clear because I

3   messed this up once already.

4             Percentage versus percentage point --

5        A    Yes.

6        Q    -- there's a difference between those

7   two things?

8        A    Correct.

9        Q    I as a lawyer don't understand that

10  different.  Can you help me understand that

11  difference?

12       A    Yes.  Let's look at the poverty rate for

13  Asians and whites.  Okay?

14            Asians have a poverty rate that is 1.6

15  percentage points higher than whites; but, because

16  you're starting at a low rate of 5.8, 1.6

17  percentage points is 28 percent higher than the

18  white rate.

19       Q    Did you calculate the percentage

20  difference -- percentage rate difference when you

21  came to your conclusions as to the factor 5?

22       A    I had it in mind.  I didn't think it was

Transcript of Allan Lichtman
Conducted on September 30, 2019                    137

1    necessary to calculate it because it's pretty

2    obvious from this table what's comparable and

3    what's ahead or behind for Asians and whites.

4            For example, median household income is

5    comparable, unemployment rate is comparable, and

6    all the other measures Hispanics are -- excuse me,

7    Asians are behind whites.

8        Q    If I understand your testimony, then,

9    you've identified four categories on this Table 7

10   where you've identified a disparity between Asians

11   and whites?

12       A    Four categories where there's a

13   disparity; two categories where they're

14   comparable.

15       Q    The date range on this table is 2011 to

16   2015.  I assume that's because the American

17   Community Survey only reports this data from that

18   time frame?

19       A    That's what I could find.  That can't.

20       Q    Did you do a search for any more recent

21   data?

22       A    I didn't see more recent data at this

Transcript of Allan Lichtman
Conducted on September 30, 2019                    138

1    level of detail when I did it.  You know, it may

2    be updated -- it's certainly possible -- since

3    then.

4         Q    When you did your analysis of Table 7,

5    did you consider the national averages for these

6    measures?

7         A    No.  It's irrelevant.  In other words,

8    whatever the national average is, that doesn't

9    wipe out the burdens on minorities from their

10   disparities with lives in Virginia Beach.

11        Q    I'm going to turn your attention to

12   page 33, Table 8, please.

13        A    Uh-huh.

14        Q    Doesn't it appear from your conclusions

15   regarding disparities between Asians and whites

16   that there are any disparities that you've

17   identified on this table between Asians and

18   whites; am I correct about that?

19        A    Well, if you look at the table overall,

20   it kind of balances.  I think that's what I say.

21   You know, looking kind of panoramically at

22   education, you can't make a claim one way or

Transcript of Allan Lichtman
Conducted on September 30, 2019                    139

```
 1   another.

 2       Q    Turn your attention now to Table 9,

 3   please.

 4            You identified in your written summary

 5   that there was a disparity between home value for

 6   Asians and whites.  That's reflected here in the

 7   chart as 253,400 and 273,700?

 8       A    Yes.

 9       Q    Because you did not include it in the

10   identified disparities, can I assume that you did

11   not find a disparity between percent owner

12   occupied and percent with no vehicle?

13       A    Yeah.  They're pretty much the same.

14       Q    By my count, then, Dr. Lichtman,

15   approximately 5 of the 15 factors or one-third of

16   the measures show a disparity for the Asian

17   population between the white population?

18       A    That's correct.  And the others are

19   basically comparable.

20       Q    Dr. Lichtman, I want to talk now about

21   racial appeals in Virginia and Virginia Beach.

22       A    Fair enough.
```

Transcript of Allan Lichtman
Conducted on September 30, 2019                    140

```
 1        Q     Identified as factor 6 in your report,
 2   sir?
 3        A     That's correct.
 4        Q     You begin with the 2006 campaign for
 5   U.S. senate?
 6        A     That's correct.
 7        Q     In your consideration or your opining on
 8   overt or subtle racial appeals, do you give more
 9   weight to more recent appeals than older appeals?
10        A     To a small degree.  But it's not like
11   I'm going back to the 19th century here for
12   appeals.  None of these are particularly that old.
13   And the fact that these appeals span a period of
14   more than a decade I think is also significant.
15        Q     You identify the comment of Macaca,
16   M-A-C-A-C-A, as a racial slur --
17        A     Correct.
18        Q     -- in this report.
19              This was a comment made by George Allen
20   to an individual by the name of Sidarth?
21        A     Yes.
22        Q     As reported by the article you cite here
```

Transcript of Allan Lichtman
Conducted on September 30, 2019                                  141

1    on Footnote 35?

2         A    It's a video.

3         Q    Oh, I'm sorry, you're right.  YouTube

4    video you site.

5         A    But as you know, this was covered

6    extensively all over the country.

7         Q    I understand it occurred at Breaks

8    Interstate Park on the Kentucky/Virginia border?

9         A    I have no reason to dispute that.  I

10   don't -- I'm not sure I identified exactly where

11   it occurred because it's not relevant.

12        Q    The distance between where it occurred

13   and the City of Virginia Beach is not relevant to

14   your analysis?

15        A    No, because this was so widely

16   disseminated across Virginia and across the

17   nation.  We live in a -- even back in 2006, we're

18   in a digital age.  Physical distance doesn't mean

19   much anymore.

20        Q    Would you use the 2006 incident with

21   George Allen as evidence of an overt racial appeal

22   in any jurisdiction in Virginia then?

Transcript of Allan Lichtman
Conducted on September 30, 2019                    142

```
 1        A    I think it's an overt racial appeal for

 2   someone who's running statewide in Virginia and,

 3   therefore, has implications for all the localities

 4   within Virginia.

 5        Q    You also reference this Halloween 2011

 6   Loudoun County flier.

 7        A    Yes.

 8        Q    It's actually included on page 38 of

 9   your report.

10        A    That's right.

11        Q    Would you categorize this as an overt

12   racial appeal?

13        A    I think anyone looking at that picture

14   would reach that conclusion.

15        Q    What is the racial appeal of that flier?

16        A    The racial appeal is, you know, that

17   Obama is associated with zombies and creatures,

18   looks like a zombie or a creature.  Right smack in

19   the middle of the picture, it has a bullet hole in

20   his head.  That's a pretty grotesque way to

21   portray the President of the United States who

22   happens to be the first African American president
```

Transcript of Allan Lichtman
Conducted on September 30, 2019                    143

1    we've ever had.

2        Q    Am I correct that the individual in the

3    bottom right-hand corner of that flier is Nancy

4    Pelosi?

5        A    That is correct.

6        Q    Who's also depicted as a zombie in this

7    flier?

8        A    Correct.  But Obama is front and center.

9        Q    Is it your opinion that any depictions

10   of violence on President Obama would be an overt

11   or subtle racial appeal?

12       A    I'm always reluctant to make 100 percent

13   statements, but certainly prima facie it would be.

14       Q    You've identified in your written report

15   that this was on Halloween of 2011?

16       A    I think that's right.

17       Q    Knowing that there's a Halloween theme

18   to this emailed image, does that change your

19   opinion in any way?

20       A    In a sense it strengthens it.  They're

21   exploiting Halloween to demean the African

22   American president.

Transcript of Allan Lichtman
Conducted on September 30, 2019                    144

1      Q      You would agree with me that it's also

2    demeaning, then, to Speaker Nancy Pelosi?

3      A      Yes.  But it's Obama who's the president

4    and Obama who's front and center.  And if you look

5    at the figures, you know, near Obama, a lot of

6    them tend to be quite dark.

7      Q      The individuals in the top-right corner

8    appear to be white.

9             Would you agree with that assessment?

10     A      Both.  But predominantly white, that's

11   correct.  But the really grotesque figures are

12   dark.

13     Q      You go on in your report on page 39 to

14   reference the removal of confederate statues in

15   the Corey Stewart 2017 gubernatorial race.  I'm

16   looking at the second paragraph down.

17     A      Where are we?

18     Q      Second paragraph down on page 39.

19     A      Yeah.

20     Q      Is it your opinion that discussions by

21   candidates of removal of confederate statues can

22   be seen as overt or subtle racial appeals?

Transcript of Allan Lichtman
Conducted on September 30, 2019                    145

1      A    They're subtle.  And not every

2  discussion of confederate monuments is, but I

3  think I provide the context showing why what

4  Stewart was saying and doing was.

5      Q    I understood your testimony to be that

6  there is at least some distinction where a

7  discussion of removal of confederate statues may

8  not be an a racial appeal.

9      A    That's possible.  I'd have to look at

10  it, but this one clearly is.

11      Q    In your initial report, you've

12  identified two instances that you identify as

13  racial appeals specifically in Virginia Beach.

14          And I've now turned to page 40 of your

15  report.

16      A    I'm with you.

17      Q    You begin that paragraph with, There are

18  at least two instances.

19          I want to talk about those two

20  instances.

21      A    Okay.

22      Q    The first you identify is a 1998

Transcript of Allan Lichtman
Conducted on September 30, 2019                    146

1  incident with Louisa Strayhorn.  You cite an

2  article in Footnote 46 recounting that incident.

3       A     That's correct.

4       Q     Do you have any other source information

5  for this incident?  Have you spoken to

6  Ms. Strayhorn, for example?

7       A     No.  But she's directly quoted there.

8  And I think, you know, more contemporary

9  evidence -- and I -- it's not just one article

10 that I cite.  I think I cite at least two.  And

11 more contemporary evidence I think is usually

12 better than waiting, you know, subsequent to that;

13 although, that wouldn't be irrelevant either.

14      Q     Does any of the articles you've cited or

15 from your own independent research indicate that

16 any of the individuals responsible for those

17 statements were from political campaigns?

18      A     We don't know who they are apparently,

19 and people making those kinds of threats would not

20 likely identify themselves.  But it's an

21 indication of racial issues within Virginia Beach,

22 which is, I think, what the factor is pointing to.

Transcript of Allan Lichtman
Conducted on September 30, 2019                    147

1        Q    Were you able to identify any other

2    similar incidents more recent than 1998 in your

3    research?

4        A    Well, I just read a deposition -- it

5    just came out -- by Mr. Moss in which there is

6    mention of -- I don't think it's more recent.  I

7    don't even know the date.  It may even be a little

8    older -- about categorizing a group of candidates

9    that included an African American as monkeys and

10   then more recently reference to giving out

11   color-coded ballots to members of different racial

12   groups.

13       Q    Let's talk --

14       A    I just saw that, and I really haven't

15   had a chance to fully run it down.

16       Q    Do you expect to do further

17   investigation of those two incidents?

18       A    If asked.

19       Q    As you sit here today, you haven't been

20   asked to do that?

21       A    I have not.  This just came to my

22   attention the last day or two.

Transcript of Allan Lichtman
Conducted on September 30, 2019                    148

```
 1        Q    You then, after the Louisa Strayhorn

 2   incident, reference a 2017 House of Delegates

 3   election regarding Rocky Holcomb.

 4        A    Yes.

 5        Q    I want to turn your attention to the

 6   last sentence of the last paragraph on page 40.

 7             And that sentence read, The ad shows a

 8   dark hand over the mouth of a little girl who

 9   clearly appears to be white.

10        A    Yes.

11        Q    Is that your opinion?

12        A    Yeah.  And but -- you can judge for

13   yourself.  The hand is much darker than the face.

14        Q    You use the adjective dark.

15             Are you meaning to say that the hand

16   belongs to a person of color?

17        A    It looks like it.

18        Q    Does it appear to you to be the hand of

19   an African American?

20        A    Hard to tell.

21        Q    Does it appear to you to be the hand of

22   an Asian?
```

Transcript of Allan Lichtman
Conducted on September 30, 2019                    149

1        A    It could be.  It doesn't look Asian, but

2    it could be Hispanic, it could be African

3    American, it could be mixed race.

4        Q    Do you leave open the possibility that

5    it's actually a white hand?

6        A    If it was a white hand, why would it be

7    so much darker than the face of the white girl?

8    If they meant it to be white on white, they

9    wouldn't use this picture.

10       Q    What do you define as the racial appeal

11   of that photograph?

12       A    That Ms. Turpin is soft on predatory

13   criminals who is implied are people of color.

14       Q    Do you -- I'm sorry, I thought --

15       A    No, that's it.

16       Q    Are you familiar with the ad of

17   President Bush regarding Willie Horton?

18       A    I am.

19       Q    Do you equate what's occurring in this

20   ad to what was occurring in the Willie Horton ad?

21       A    It's similar; although, in the Willie

22   Horton ad, I think it was more overt.  This one is

Transcript of Allan Lichtman
Conducted on September 30, 2019                    150

1    a little subtler; with you we're looking for both

2    the most overt and more subtle racial appeals.

3    But this isn't very subtle.  To say it's more

4    subtle than Willie Horton, you know, is like

5    saying an atomic bomb isn't as bad as a nuclear

6    bomb.

7         Q    But suffice it to say that it is your

8    opinion that this hand on page 42 is a hand of a

9    person of color?

10        A    It looks that way, yeah.  I mean, as I

11   said, if they mean it to imply that, they wouldn't

12   have had the contrast between the white girl and

13   the much darker hand.  It's pretty blatant.

14        Q    Are you aware that Mr. Holcomb's

15   campaign denied that that was ever the intention

16   of this photograph?

17        A    You know, people deny things all the

18   time that they do.

19        Q    Are you aware of any civil rights groups

20   who spoke out against this flyer?

21        A    I'd have to look.  It doesn't ring a

22   bell with me.  But it caused quite a stir.  I

Transcript of Allan Lichtman
Conducted on September 30, 2019                    151

1    think even your own expert admitted that.

2         Q    Are you aware of the NAACP condemning

3    this advertisement?

4         A    I don't recall.  It's possible, but I

5    don't recall that.

6         Q    Are you aware of the ACLU condemning

7    this advertisement?

8         A    I think you asked me if I recall any

9    particular group condemning it, and I don't.

10        Q    And you understand that Ms. Turpin won

11   that election?

12        A    Yes.  I mean, of course, many factors go

13   into who wins and loses an election.  She won

14   barely, just by a few hundred votes.  And the

15   factor does not ask whether the racial appeal led

16   to a victory or defeat, just whether it's

17   indicative of racial issues.

18        Q    Do you have any evidence, as you sit

19   here today, that that advertisement garnered more

20   support for Rocky Holcomb in Virginia Beach?

21        A    No way to tell.  There's so many things

22   that go into who wins and loses.  And that's not

Transcript of Allan Lichtman
Conducted on September 30, 2019                    152

1    the purpose of the factor to decide, how a racial

2    appeal may or may not have affected the election.

3    Very difficult analysis to do and not asked for.

4         Q    Your rebuttal report contains another

5    flyer.

6         A    That's correct.

7         Q    That's the Sessoms flyer.  Can we -- I

8    hate to jump reports --

9         A    That's okay.  Just tell me what page

10   you're going to.

11            MR. HARRIS:  If someone finds it before

12   me, please speak up.

13       A    I got it.  I think it's on page 33.

14            MR. HEBERT:  I have 34.

15            MS. HARLESS:  You discuss it on 33, but

16   it's on 34 and 35.

17       A    It's on 34 and 35.

18       Q    For the record, we're on page 34 and

19   moving over to page 35.

20            It's your opinion in this case,

21   Dr. Lichtman, that this flyer depicted on page 34

22   and 35 is a racial appeal?

Transcript of Allan Lichtman
Conducted on September 30, 2019                        153

1      A     Yeah.  No attribution.  That wasn't

2    anything approved by the Sessoms campaign or any

3    other campaign.  And it's associating Sessoms with

4    the African American mayor.  And then you've got

5    to put it in the context with the second

6    unattributed flyer which makes up this phony

7    organization, African Americans for Change, which

8    further attempts to associate Sessoms with African

9    Americans.

10          I think putting the two together,

11   there's no question these are racial appeals.

12     Q     Do you -- would you describe them as

13   overt appeals or subtle appeals?

14     A     They're pretty overt.

15          MR. HEBERT:  And, Jerry, if I can

16   interject just quickly here, I believe that the

17   testimony that he gave he said that Mr. Sessoms --

18   and maybe I misheard it -- was pictured with an

19   African American mayor, but I think he meant to

20   say African American president.

21          THE WITNESS:  Right.  Sessoms is the

22   mayor, obviously, and Obama is the President.  If

Transcript of Allan Lichtman
Conducted on September 30, 2019                    154

1    I misspoke it's just dyslexia from age.

2         Q    I want to turn your attention to page 33

3    and the last sentence of that second paragraph.

4         A    Okay.

5         Q    Your statement is, These were unabashed

6    and deceitful racial appeals to black voters, and

7    the flyer attempted to associate Sessoms with

8    Obama and the so-called African Americans for

9    Change.

10             Can you tell me what you mean when you

11   use the phrase unabashed and deceitful?

12        A    Well, they're obviously deceitful

13   because they're breaking the law.  Whoever is

14   doing this is not identifying themselves, and

15   that's illegal.  And I explain why they're

16   unabashed.  I mean, what could be more obvious

17   than what's being said here and shown here.

18        Q    Is it your opinion that Mayor Sessoms

19   was falsely claiming an alliance with President

20   Obama?

21        A    It may just have been Sessoms

22   supporters.  It may not have been Sessoms himself.

Transcript of Allan Lichtman
Conducted on September 30, 2019                              155

1    There's no way of knowing.  That's why the law

2    says you have to have attributions and why this is

3    so deceitful.

4        Q    But is it your opinion that Mayor

5    Sessoms or his supporters were trying to falsely

6    claim an alliance with President Obama?

7        A    Yes.  It certainly is pretty obvious

8    from here.  And an alliance with this phony

9    African Americans for Change.

10       Q    Are you aware that Mayor Sessoms has

11   historically supported Democrat candidates?

12       A    I don't know.

13       Q    Would that change your opinion if he's

14   previously supported Democrat candidates?

15       A    Well, if he wanted to be associated with

16   Obama, he could have put out his own legally

17   permissible flyer, explained it; and he certainly

18   would not have made up some phony organization

19   with purported support from that organization,

20   which is African American to Sessoms.

21            This is not something any respectable or

22   responsible candidate would do.

Transcript of Allan Lichtman
Conducted on September 30, 2019                    156

1      Q    Do you know who was responsible for
2  distributing that flyer?
3      A    No way to know.  That's the whole point.
4  They hide themselves by not putting the proper
5  attribution.  But this is a pretty overt racial
6  appeal, whoever is behind it.
7      Q    If the flyer had attributed it to Mayor
8  Sessoms; if it would have said at the bottom, Paid
9  for by friends of Will Sessoms, would you still
10 categorize it as a racial appeal?
11     A    In combination with making up a phony
12 African American organization, absolutely.
13     Q    Do you know if Mayor Sessoms and his
14 campaign is responsible for the contents of that
15 advertisement?
16     A    You already asked me that.  The whole
17 purpose of these kinds of things is to put out
18 these illegal publications with no attribution so
19 you can't point the finger at Sessoms or anyone
20 else.
21     Q    Are you aware that Mayor Sessoms
22 publicly left the Republican party of Virginia

Transcript of Allan Lichtman
Conducted on September 30, 2019                                    157

1    Beach?

2         A    No.

3         Q    Are you aware that Mayor Sessoms has

4    been identified as the candidate of choice of

5    African American voters by Dr. Spencer in his

6    report?

7         A    That's possible.  Yeah, he's been

8    supported by African American voters, and maybe

9    this contributed to it.  Who knows?

10        Q    Assuming this was a flyer by Mayor

11   Sessoms to garner support of the African American

12   community, if his desire for support of the

13   African American community was in earnest, would

14   you still call it a racial appeal?

15        A    I don't understand your question.  And

16   to the extent I do, I think I already answered it.

17   If this was a forthright, honest attempt by Mayor

18   Sessoms to explain why he was supportive of

19   African Americans, there would have been more than

20   just a picture.  I think there would have been

21   some explanation.  There would have been an

22   attribution line.  And there certainly would not

Transcript of Allan Lichtman
Conducted on September 30, 2019                158

```
1    have been the fabrication of a phony African

2    American organization.

3         Q    Dr. Lichtman, do you draw a distinction

4    or any meaningful difference between racial

5    appeals that are positive in nature versus those

6    that are negative in nature?

7         A    Sure.  There can be a distinction.  But

8    here we're not talking about a forthright,

9    positive appeal.  We're talking about deceitful

10   attempts to bamboozle the electorate.

11        Q    Have you studied the positions that are

12   stated on this flyer on page 35?

13        A    No.  It's not relevant because it's

14   attributed to a phony organization.  Whatever

15   these positions may be, to attribute it to a phony

16   organization is obviously deceitful; and that's

17   why there's no attribution line, since nobody

18   wants to be held responsible for deceiving the

19   electorate.

20        Q    Would it change your opinion in any way

21   if it was shown to you that the issues identified

22   on page 35 were, in fact, issues brought forth by
```

Transcript of Allan Lichtman
Conducted on September 30, 2019                    159

1    Mayor Sessoms himself?

2        A    No.  Not when they're attributed to a

3    fabricated group and associated with African

4    Americans in that way.

5        Q    Did you do a search for the group

6    African Americans for Change?

7        A    Yeah.  And I couldn't find such a group.

8        Q    Where did you conduct your search?

9        A    Just a Google.  And, you know, if that

10   was a legitimate organization that existed, their

11   attribution line would be there.  That's any of.

12       Q    What about the flyer leads you to

13   conclude that this is an organization or purports

14   to be an organization?

15       A    The very big banner headline, African

16   Americans for Change in Virginia Beach.  That

17   looks like an organization.  And I think, you

18   know, common sensically, it certainly could be

19   interpreted that way.  That's, you know, a common

20   name of organizations.  You know?  Citizens United

21   For Change.  That's a common way in which

22   organizations describe themselves.

Transcript of Allan Lichtman
Conducted on September 30, 2019                    160

```
1        Q    I understand that you're a particular

2   historian particularly for presidential politics.

3             Would you agree with that?

4        A    I am a political historian, certainly

5   not limited to presidential politics.

6        Q    You spent much of your career at least

7   opining and studying presidential politics?

8        A    That's correct but not exclusively.

9        Q    I understand.  I certainly don't want to

10  limit the scope of your expertise.

11       A    Thank you.

12       Q    The 2008 election for the mayor, at that

13  point President Obama had used a frequent refrain

14  in his presidential campaign that often included

15  the word change.

16       A    Hope and change.

17       Q    I want to talk about the 2018 election

18  in the City of Virginia Beach.

19       A    What page are we on?

20       Q    I believe that factor is factor 7 on

21  page 43.

22       A    That's correct.  So we're talking about
```

1   the rebuttal report or the initial report?

2        Q    Well, I want to -- unfortunately, I've

3   got to jump --

4        A    I don't mind that.  Just orient me where

5   you're going first.

6        Q    First we're going to go to your initial

7   report.

8        A    Very good.

9        Q    On page 43, the short paragraph that

10  begins in the middle of the page, In 2018.

11           Do you see that?

12       A    I do.

13       Q    Two African Americans were elected to

14  city council.  And then you go on to say that

15  these elections occurred during the pendency of

16  the current lawsuit, a special circumstance for

17  the election of members of a minority group.

18       A    Is there a question or --

19       Q    I just -- that's your opinion as stated

20  in this report.  I want to confirm that it is

21  still your opinion, as you sit here today, that

22  the -- the 2018 election is a special

Transcript of Allan Lichtman
Conducted on September 30, 2019                         162

1    circumstance, as you put it.

2         A    No.   What I said was the pendency of

3    elections occurring during the pendency of a

4    current lawsuit is a special circumstance for the

5    elections of members of a minority group.

6         Q    Is it your opinion in this case that the

7    pendency in this lawsuit contributed to the

8    victories of Aaron Rouse and Sabrina Wooten?

9         A    Yes.

10        Q    Can you tell me what --

11        A    At this point -- I just want to

12   clarify -- at this point I'm simply talking about

13   the pendency of a current lawsuit being a special

14   circumstance.   I then go on to explain how that

15   special circumstance operated for the elections of

16   Wooten and Rouse in Virginia Beach.   I just want

17   to make that distinction clear.   Those are two

18   different things.

19        Q    Let's go to the second portion of the

20   explanation that you just gave, what makes this

21   election of Aaron Rouse and Sabrina Wooten

22   evidence of the special circumstance.

Transcript of Allan Lichtman
Conducted on September 30, 2019                    163

1        A     Very good.

2        Q     Can you tell me in sum what evidence you

3   are relying on to come to that conclusion?

4        A     I'm relying on evidence from votes,

5   comparing the votes for Rouse and Wooten with the

6   votes of other African American candidates.  I am

7   relying on contributions, analyses of the

8   contributions to Rouse and Wooten from the major

9   donors in Virginia Beach, all of whom is white; as

10  well as the sources of contributions, particularly

11  substantial contributions to Rouse and Wooten,

12  almost all of which were from whites.

13             I was looking at the fact that it was

14  very unusual to elect two African Americans at the

15  same time.  There had only been an occasional

16  election of one, none of which had ever been

17  reelected or, if appointed, had their appointment

18  ratified by an election.  So there's an array of

19  information all of which is spelled out in this

20  report.  And then there's further elaboration in

21  the rebuttal report.

22        Q     I understand in your report -- and I

Transcript of Allan Lichtman
Conducted on September 30, 2019                    164

1    apologize, I don't have a particular page number

2    to point you to here -- that you rely on the

3    support of whites for Sabrina Wooten at the level

4    of 51.1 percent as significant to your opinion.

5        A    That's one of the many things that I

6    cite, that she was the only African American

7    candidate, I believe, of 20 or more or so -- I

8    don't remember the exact number, but something

9    around there -- over a period from 2008 to 2018

10   ever to get a majority of whites.

11           But that's just one little piece of it.

12   I do a much more extended analysis in which I

13   compare her vote to the vote for other African

14   American candidates running in districts.

15       Q    You will recall that she ran against

16   Mr. Wray in that election in 2018, correct?

17       A    I believe that's correct.  I don't think

18   he's the only one she ran against, though.  But we

19   can look at -- look at the actual election returns

20   and see.  I might have something here.  I'm not

21   sure.  I'm quite sure the other 49 percent didn't

22   just go to Mr. Wray.  There must have been another

Transcript of Allan Lichtman
Conducted on September 30, 2019                165

1    candidate in there.  I can't recall the name.

2        Q    Dr. Lichtman, I'm going to show you

3    what's contained in Dr. Douglas Spencer's expert

4    report submitted July 15, 2019, on page 12.

5            I don't intend to mark this as an

6    exhibit for your deposition, but I want to know if

7    that helps you refresh your recollection as to

8    what the results were in the 2018 election.

9            MR. HEBERT:  Counsel, can you have him

10   also look at page 14?

11           MR. HARRIS:  Yes.

12       A    That's where I'm going.  Yes, there was

13   another candidate in the race, and that was

14   Schesventer; so it was a three-way -- it was a

15   three-way race.

16       Q    What was the white support for Mr. Wray

17   in that election?

18       A    43 percent.

19       Q    Is that significant to you for any

20   reason?

21       A    That's pretty high white support for an

22   African American candidate, yes.

Transcript of Allan Lichtman
Conducted on September 30, 2019                    166

1        Q    Would you consider --

2        A    On the other hand, that's got to be put

3   in the context of the fact that he got almost no

4   black support; whereas, Wooten got almost all the

5   black vote.  So it might not be that surprising in

6   that context that this was not a candidate who

7   represented the black community.

8        Q    Do you have any information or evidence

9   as to why Mr. Wray, an African American candidate,

10  received so little support of the African American

11  community?

12       A    I can't say specifically why; but

13  generally, when you see that, it's because he's

14  out of step with the African American community --

15  or she -- in some way or another.  But that's just

16  from general knowledge not from particularized

17  knowledge of Wray.

18       Q    And you reference the third candidate,

19  Schesventer, S-C-H-E-S-V-E-N-T-E-R.

20            Would you consider him a viable

21  candidate for that Centerville seat in that

22  election?

Transcript of Allan Lichtman
Conducted on September 30, 2019                    167

1        A     It looks like he got a very small amount

2   of the vote, but it's interesting that he got many

3   of the black vote than Wray did and more -- pretty

4   close to the minority vote that Wray got.

5        Q     So would you consider him to be a viable

6   candidate for the Centerville district in the 2018

7   election?

8        A     I don't know anything about the

9   campaign, but just looking at the numbers, he

10  doesn't seem like a candidate who's likely to win.

11       Q     Dr. Spencer, I'm -- Dr. Spencer.  You're

12  Dr. Lichtman.  Dr. Spencer's report is what we're

13  looking at.  I'm going to take that from you.  We

14  don't want to --

15       A     Is this it?

16       Q     -- yes -- clutter the table more than it

17  already is.

18            Is it your opinion in this case,

19  Dr. Lichtman, that the threat of this pending

20  lawsuit was enough to rally the white vote?

21            MR. HEBERT:  Object to the form.

22       A     Yeah.  I don't understand that question.

Transcript of Allan Lichtman
Conducted on September 30, 2019                    168

1        Q    Is it your opinion in this -- is it your

2   opinion that the threat of this lawsuit was enough

3   to rally the support of the white vote for African

4   American candidates?

5             MR. HEBERT:   Same objection.

6        A    Yeah.  I can't answer it the way you

7   phrased it, but I can say what I said in this

8   report, that it certainly created unusual white

9   votes for black candidates.

10       Q    If I understood your prior testimony,

11  it's the unusual white support in addition to the

12  amount of donations that were coming in on that

13  election that at least informed, in part, your

14  opinion?

15       A    It wasn't just the amount of donations.

16  The analysis was much more extensive, and it had

17  to do with the race of the donor, who was

18  donating, how the donations compared to other

19  black candidates and even other white candidates.

20       Q    Do you have any specific evidence that

21  those donors were aware of this lawsuit?

22       A    I think I presented extensive evidence

Transcript of Allan Lichtman
Conducted on September 30, 2019                    169

1    showing how commonly this lawsuit was reported in

2    the press.  If you're a donor, you're going to

3    keep up with political developments in the area in

4    which you're interested.

5         Q    In your research, were you ever able to

6    find any public statements by these donors that

7    referenced this lawsuit?

8         A    I didn't see any, but I didn't

9    particularly look for that.

10        Q    In your research, did you find any

11   public statements from city council members

12   specifically referencing this lawsuit?

13        A    I think I did.  I think there were some

14   council members who endorsed it or at least

15   endorsed the move to districts.  At least two of

16   them.  I do recall that.

17        Q    Would you agree with me that there's a

18   difference between endorsing a move to a district

19   system and specifically endorsing a lawsuit?

20        A    Yeah.  But they're certainly related

21   since that's the aim of the lawsuit.

22        Q    Did you do a search for any meetings or

Transcript of Allan Lichtman
Conducted on September 30, 2019                    170

1    flyers related to this lawsuit on social media?

2         A    Let me see.  I might have; I might not

3    have.

4              I cited both print media and broadcast

5    media.  I think this was mostly in my supplemental

6    response report, page 36.  So -- one, two, three,

7    four, five, six, seven -- and I did find in social

8    media a question posed to 2018 candidates for city

9    council in Virginia Beach from the Princess Anne

10   Independent News which asked, quote, Voters from

11   across the city select members of the city

12   council, including members who represent district

13   seats should the city consider another way of

14   selecting members of the council such as award

15   system.

16             So I both cite specific references to

17   the lawsuit as well as references to the issue,

18   which was obviously very much present in the

19   community of switching to at-large seats.  Then I

20   go on to cite other articles relating to that.  So

21   certainly this was very much present within

22   Virginia Beach.

Transcript of Allan Lichtman
Conducted on September 30, 2019                          171

1      Q    Based on the timing of the articles that

2   you've cited, it appears that only Ms. Holloway's

3   pro se complaint had been filed at that time.

4           Are you aware of the timing of the

5   filing of the amended complaint in this case?

6      A    I don't recall the timing of the finding

7   of the amended complaint, no.  My citations that I

8   have here go from November of 2017, when the

9   complaint was filed, to close to the 2018

10  election, which is the relevant period.

11     Q    Are you aware that the amended complaint

12  was not filed until after the November 2018

13  election?

14     A    That's certainly quite possible.

15     Q    Are you aware of the differences between

16  the initial filing by Ms. Holloway as a pro se

17  litigant and the formal filing by Campaign Legal

18  Center's amended complaint?

19          MR. HEBERT:  I'm going to object to the

20  form of the question.

21          MR. HARRIS:  Let me ask it a different

22  way.

Transcript of Allan Lichtman
Conducted on September 30, 2019                    172

```
 1        Q    Have you seen the pro se complaint that
 2   was filed by Ms. Holloway?
 3        A    If I did, I don't remember it; but
 4   here's WTKR saying that she's challenging the
 5   at-large election system, which is fundamentally
 6   what the later complaint was challenging.
 7        Q    In addition to the periodicals and print
 8   media that you've cited, were you able to cite any
 9   further evidence of community members or community
10   leaders talking about the Holloway lawsuit?
11        A    Well, the Princess Anne questionnaire
12   didn't specifically reference a lawsuit, but it
13   did reference this issue of selecting members of
14   the council.  An editorial in the Virginian-Pilot,
15   February 1st, violations of the Voting Rights Act.
16   Another article specifically refers to council
17   members who are among the group of residents
18   challenging the city's election system.  So those
19   are some examples and --
20        Q    Dr. Lichtman, I'm sorry.  I think my
21   question was unclear, and that's my fault.
22        A    Oh.
```

Transcript of Allan Lichtman
Conducted on September 30, 2019                          173

```
 1        Q    I'm asking specifically whether you were

 2   able to identify specific committee members who

 3   spoke out related to this lawsuit.

 4             MR. HEBERT:  I'll object to the form of

 5   the question.  Committee members, did you say?

 6             MR. HARRIS:  Yes.

 7        A    Well, I think I referenced the two

 8   council members, Jessica Abbott and John Moss, who

 9   wanted to change the current system.  I don't

10   recall if they specifically referenced a lawsuit

11   as opposed to ending at-large elections.

12             But certainly the lawsuit was pending at

13   that time, and they said they are among a group of

14   residents challenging the city's election system.

15   That's a pretty clear reference to the lawsuit.

16        Q    You cited the New Journal and Guide in

17   your report on several of the footnotes that I

18   think you write in here.

19        A    Yes.

20        Q    You're aware that that's an African

21   American periodical?

22        A    Yes.  I'm just citing them for the
```

Transcript of Allan Lichtman
Conducted on September 30, 2019                    174

1   information, not for their opinions.

2        Q    And you cite Roger Chesley as an

3   individual responsible for certain editorials in

4   the Virginian-Pilot.

5             Are you aware that Roger Chesley is on

6   the editorial staff of the Virginian-Pilot?

7        A    Where do I cite Chesley?  I'm looking.

8   If you could orient me to the page, that would be

9   helpful.

10       Q    Yes, sir.  I'm sorry, I'm going off of

11  memory on that, not --

12       A    That's okay.

13       Q    Let's not waste any more time looking at

14  that.  I'll see if we can find it.  If not, we'll

15  move on to the next question.

16       A    Yeah.  That's fine.

17       Q    Is it your opinion that the elections of

18  Aaron Rouse and Sabrina Wooten are not worthy of

19  consideration in this case because you call it a

20  special circumstance?

21       A    You're putting words in my mouth.  What

22  I'm saying is they are special circumstance

Transcript of Allan Lichtman
Conducted on September 30, 2019                              175

1    elections; and, therefore, they should not be

2    probative of this factor which is the extent to

3    which members of the minority group have been

4    elected to public office in the jurisdictions,

5    particularly in light of the fact that no African

6    American has ever been reelected in the entire

7    history of Virginia Beach.

8         Q    Dr. Lichtman, can I ask you to turn to

9    page 56 of your initial report, please?

10        A    Certainly.  Yep.

11        Q    Table 14 appears to be a chart that

12   you --

13        A    Oh, I'm looking at my rebuttal report.

14   I'm sorry.  We're going back and forth here.  Page

15   56?

16        Q    Uh-huh.

17        A    Yeah.  This is a chart on contributions.

18        Q    This is a chart you've prepared, but the

19   source data is from the Virginia Public Access

20   Project, correct?

21        A    Correct.

22        Q    You've identified the donor and the race

Transcript of Allan Lichtman
Conducted on September 30, 2019                    176

1    of the donor in the far-left column?

2        A    Correct.

3        Q    And you identify first Bruce Smith as

4    the most significant donor to Aaron Rouse at

5    $16,000.

6             In your report, you attribute that to

7    their association at Virginia Tech alumni and also

8    retirees or veterans of the National Football

9    League.

10       A    I think I mentioned they're both -- had

11   that commonality, that's right, that this was

12   unusual for Bruce Smith to do that.  That was a

13   very large amount of money for a city council

14   race.

15       Q    Have you formed any opinion as to why

16   Bruce Smith may have supported Aaron Rouse at such

17   a high level?

18       A    I mean, you can never just get into the

19   head of someone like that, but I think I explained

20   their commonalities.  It may also be that Bruce

21   Smith is a developer and he wanted to challenge

22   other developers and thought Rouse would help him

Transcript of Allan Lichtman
Conducted on September 30, 2019                    177

1    do that.  I don't know if that's true or not; but,

2    you know, there are other possibilities.

3         Q    Are you aware that Bruce Smith also

4    loaned $5,500 to Aaron Rouse's campaign?

5         A    I'm not, but that's certainly possible.

6         Q    Assuming that's true, would that

7    strengthen your opinion regarding the connection

8    between Bruce Smith and Aaron Rouse?

9         A    It would certainly cause -- well, I've

10   already said they had a strong connection.

11        Q    Marie Finch is the next name now, and

12   it's indicated with UNK.

13             I take that to mean unknown race?

14        A    I couldn't find out what that person's

15   race was.

16        Q    Did you search for Marie Finch to find

17   out where she might live?

18        A    I did all kinds of searches, and it's

19   not an uncommon name, and I just couldn't nail it

20   down reliably enough.

21        Q    If Ms. Finch was a resident of the City

22   of Norfolk, would that be significant to your

Transcript of Allan Lichtman
Conducted on September 30, 2019                    178

1   analysis?

2        A    Not necessarily.  You know, it's

3   certainly legal to make contributions across

4   cities.  I mean, if you found her -- and I didn't

5   see anything in your expert report indicating that

6   he was able to correct the unknown to anything.

7   But if you found something, I'm happy to look at

8   it.

9        Q    Well, I'm not referring to the race

10  unknown, I'm asking would it be significant to

11  your analysis if it was determined that Marie

12  Finch was a resident of the City of Norfolk?

13       A    Not necessarily, no.  It's not like

14  these cities are thousands of miles away.

15       Q    Is there any reason to believe that a

16  citizen in the City of Norfolk would have concerns

17  over the City of Virginia Beach's electoral

18  process?

19       A    Of course.  They could for many reasons.

20  They might have residents, friends, do business

21  there -- any number of reasons why they might.

22       Q    The next individual you list is Steven

Transcript of Allan Lichtman
Conducted on September 30, 2019                    179

1    Johnson.

2         A    Yes.

3         Q    He's listed as a white male.

4         A    I didn't say anything about male.

5         Q    I'm sorry, I shouldn't assume in this

6    day and age.

7              It's -- Steven Johnson is listed, and

8    it's only indicated as white.

9         A    That's all the indications I did was

10   race.  I didn't do gender.

11        Q    What search did you perform to determine

12   the race of that individual?

13        A    I searched the Virginia database that

14   we've already been talking about, I had one of

15   those programs that could search for individuals,

16   I asked counsel to consult local sources on my

17   assessment of the race of these individuals.

18        Q    I'm certainly not going to inquire as to

19   your conversations with your counsel.

20             Are you aware that Steven Johnson is a

21   major supporter of Virginia Tech athletics?

22        A    That's certainly possible.

Transcript of Allan Lichtman
Conducted on September 30, 2019                    180

```
 1      Q    Are you aware that Steven Johnson is a
 2   resident of Bristol, Virginia?
 3      A    Certainly possible.
 4      Q    Are you aware that Steven Johnson paid
 5   for the practice facilities for the Virginia Tech
 6   football program?
 7      A    Certainly possible.  I'm not aware of
 8   any of those things and didn't look at the
 9   background of any of these people.  I just looked
10   at their race.
11      Q    Is it your opinion that the background
12   of these people don't make a distinction or a
13   difference in your analysis?
14      A    I'm looking at patterns, and the pattern
15   is overwhelming that all of these major donors,
16   with Bruce Smith as an exception, which we've
17   talked about, are white.  That was the analysis I
18   was looking at, period.
19      Q    If you were to take a deeper analysis
20   and determine the number of individuals on this
21   list who were Virginia Tech alumni, would that
22   change your opinion if the number of Virginia Tech
```

Transcript of Allan Lichtman
Conducted on September 30, 2019                    181

1   alumni on this list was, say, more than half?

2        A    More than half of the whites?

3        Q    Yes.

4        A    Not necessarily.  I'd have to listen to

5   exactly what that represented and why.

6        Q    Do you understand that Aaron Rouse was a

7   football player at Virginia Tech?

8        A    A long time ago.

9        Q    Bruce Smith was a football player at

10  Virginia Tech; is that correct?

11       A    I'm not sure.  I know he was in the NFL

12  and was a Hall of Famer.  I don't know where he

13  went to college.

14       Q    Steven Johnson --

15       A    And frankly, I'm not even positive about

16  Aaron Rouse.  I mean, I'll take your word for it.

17       Q    Are you aware that Steven Johnson was a

18  football player at Virginia Tech?

19       A    I'm not.

20       Q    And also went on to play in the NFL?

21       A    I'm not.

22       Q    Are you aware that Frank B. Gigoiotti,

Transcript of Allan Lichtman
Conducted on September 30, 2019                    182

1    G-I-G-O-I-O-T-T-I, is also a Virginia Tech alumni?

2        A    I'm not.

3        Q    Is it possible in your mind or do you

4    leave open the possibility that many of these

5    donors are supporting a fellow Virginia Tech

6    alumni?

7              MR. HEBERT:  Object to the form of the

8    question.

9        A    I'm just looking at their race.  I don't

10   see a lot of black Virginia Tech alumnus lining up

11   here.  The pattern that unites them is not that

12   they're all Virginia Tech alums but that they're

13   all white.  And some of them are companies.

14       Q    Were you aware that Joseph W. Luter is

15   up from Smithfield, Virginia?

16       A    That's certainly possible and not

17   relevant to my analysis.

18       Q    Are you aware that Morchelle Pryor is

19   registered at Chesapeake, Virginia?

20       A    I couldn't run down Morchelle Pryor.  If

21   you've got some information about her or him, I'd

22   be happy to look at it.  I didn't see anything in

Transcript of Allan Lichtman
Conducted on September 30, 2019                      183

1    your expert report about any of this.

2         Q    Is it your opinion that these individual

3    contributors's affiliation with Virginia Tech is

4    not meaningful in your analysis?

5         A    The common pattern -- and they're not

6    just individuals.  A good number of them are

7    companies -- the common pattern is they're white.

8    And you don't see that for others.  And as I said,

9    a good number of them are companies.

10        Q    Is it your opinion that the fact that

11   several of these individuals do not live in the

12   City of Virginia Beach, is that important to your

13   analysis?

14             MR. HEBERT:  Object to the form of the

15   question.

16        A    No.  I explained why residents of other

17   places could have business dealings, friends,

18   relatives, may have lived in Virginia Beach at

19   some other time -- it's quite common to get

20   campaign contributions from people outside of the

21   particular jurisdiction where an election is

22   taking place.

Transcript of Allan Lichtman
Conducted on September 30, 2019

184

1        Q    On the far-left column of your list of

2   donors, do you have any direct evidence of any of

3   these individuals speaking out against this

4   current lawsuit?

5        A    I didn't look at that issue.  I was just

6   looking at their contribution levels and their

7   race.

8        Q    I'll turn your attention to page 57.

9             The donor column and race column is the

10  same on Table 15 in its location, but it appears

11  the names are at least somewhat different.  And

12  you've done us the favor of showing us where it's

13  different and where it's not through the remaining

14  columns to the right.

15            Am I reading that correctly, that

16  Ms. Wooten's candidacy --

17       A    What page are we on?

18       Q    I'm on page 57 of the initial report.

19       A    Okay.  I'm with you there.

20       Q    The second column, the amount column,

21  you're indicating the amount given to Sabrina

22  Wooten in that column, correct?

Transcript of Allan Lichtman
Conducted on September 30, 2019                    185

1        A     That's right.

2        Q     And the remaining columns is a

3    comparison of what other candidates received from

4    that donor as compared to Ms. Wooten?

5        A     That's correct.

6        Q     You're not indicating that Rouse gave

7    $2,500 for --

8        A     No.  I'm showing that, for every one of

9    these donors, they either gave nothing to these

10   other black candidates or gave far more to Wooten.

11       Q     There's a name third down on your column

12   of donors of Bruce Thompson.

13       A     Yes.

14       Q     It does not indicate here that he

15   provided any money to Aaron Rouse.

16       A     He may have, but it may have been below,

17   I think, the threshold I was looking at.

18       Q     What was that threshold?

19       A     I think it was, again, 250.  I don't

20   think I looked at every single tiny contribution.

21             And it's not the same contributors.  I'm

22   not arguing to Wooten and Rouse.  But what is

Transcript of Allan Lichtman
Conducted on September 30, 2019                    186

1    striking is in both cases the vast majority -- in

2    this case, all that could be identified are white

3    and either gave nothing or much less to any other

4    black candidate.

5          Q    Did you do any further investigation

6    into where any of these donors may live on this

7    column?

8          A    No.  And I've explained why that's not

9    relevant.

10         Q    Have you made any effort to reach out to

11   any of these individuals to find out whether they

12   even knew about this lawsuit?

13         A    No.

14         Q    Is that also true for Table 14?  Have

15   you reached out to any of those individuals to

16   find out whether they knew of this lawsuit?

17         A    No.

18         Q    Dr. Lichtman, do you leave open the

19   possibility that Aaron Rouse was just a qualified

20   candidate who won the election?

21              MR. HEBERT:  Object to the form.

22         A    Yeah.  That's not a question that is

Transcript of Allan Lichtman
Conducted on September 30, 2019                    187

1    phrased in a way that's answerable.  It's got

2    premises stuck into it.  You'd have to rephrase

3    that to me to answer it.  It's too loaded.

4         Q    I'll try and rephrase it.

5         A    Thank you.

6         Q    Is it your opinion that Aaron Rouse was

7    elected as a result of an effort of the white

8    donors to defeat this lawsuit?

9              MR. HEBERT:  Object to the form of the

10   question.

11        A    Yeah.  I'm not saying that's why he was

12   elected, but I am saying that we did have this

13   unusual white support for him which, in donations

14   and in the vote, certainly could be responsible

15   for his being elected.

16             Obviously there are other factors as

17   well, but when you look at the unusual white

18   support and the unusual white donations, that

19   suggests we are dealing with a special

20   circumstance of his election.  There are plenty

21   other qualified black candidates, including

22   incumbents, who lost because they didn't get the

Transcript of Allan Lichtman
Conducted on September 30, 2019                    188

1   kind of white support that Aaron Rouse did.

2        Q    Dr. Lichtman, I'm going to try and

3   phrase this question in a way that doesn't confuse

4   the issue.  But I understand your testimony to be

5   that there may not have been a cause and effect

6   relationship between this lawsuit and the election

7   of Aaron Rouse.

8             Am I understanding that correctly?

9        A    No.  There may well have been a cause

10  and effect relationship, and I think there

11  probably was.  Were those the only factors?  Well,

12  that I can't say, but the pendency of the lawsuit

13  and the white support in terms of money and in

14  terms of vote certainly means that you cannot use

15  this candidacy to refute the lack of election of

16  minorities in Virginia Beach.

17       Q    In regard to Ms. Wooten, would you also

18  opine that there is a cause and effect and

19  relationship between the election of Ms. Wooten

20  and the pendency of this lawsuit?

21       A    Again, I'll answer it in my words.  I

22  certainly think there are unusual factors

Transcript of Allan Lichtman
Conducted on September 30, 2019                     189

1    operating for the election of Ms. Wooten.  All her

2    donors that we could identify were white.  She had

3    incredibly unusual support from white voters and

4    the major white donors.

5              There didn't appear to be the

6    white-community sponsoring as it has in every

7    other district election, a strong white candidate.

8    And she got very unusual white support.  So, yes,

9    again, I think there's enough going on here to

10   say -- not just because the pendency of a lawsuit

11   is a special circumstance but because of all of

12   these other factors, you cannot count the election

13   of Wooten against the lack of election of

14   minorities in Virginia Beach.

15             And, again, you need to put this all in

16   the context of the fact that never in the history

17   of the city has an African American incumbent been

18   reelected or an appointed African American

19   incumbent get elected on their own.

20        Q    Dr. Lichtman, what I'm trying to get to

21   here is where your opinion is and where it is not.

22   And so let me try to phrase it in the negative.

Transcript of Allan Lichtman
Conducted on September 30, 2019                    190

```
 1            It is not your opinion that white voters
 2   and white-owned companies banded together to mute
 3   or stifle this lawsuit?
 4            MR. HEBERT:  Object to the form of the
 5   question.
 6       A    I'm not arguing because I don't have the
 7   evidence there was an overt conspiracy, but as the
 8   sources I cite indicate, you don't need an overt
 9   conspiracy.  Is it my testimony that white voters
10   and white donors unusually -- very unusually
11   backed these African American candidates more than
12   sufficiently to make this a special circumstance?
13   Yes.
14       Q    Do you believe Aaron Rouse and Sabrina
15   Wooten to be token candidates for the white
16   community?
17            MR. HEBERT:  Object to the form of the
18   question.
19       A    Yeah.  I don't even know what that
20   means.
21       Q    Do you believe that Aaron Rouse and
22   Sabrina Wooten were unknowingly propped up as
```

Transcript of Allan Lichtman
Conducted on September 30, 2019                    191

```
1    white candidates of choice --

2              MR. HEBERT:  Objection.

3         Q    -- in 2019.

4              MR. HEBERT:  I'm sorry, Counsel.  I

5    didn't mean to interrupt you.  I thought you were

6    done.

7              MR. HARRIS:  That's okay.

8              MR. HEBERT:  Object to the form of the

9    question.

10        A    Unknowingly by whom?

11        Q    By the white majority.  These donors --

12   these white donors and these white companies that

13   you've identified.

14        A    Well, unknowing in what sense.  I don't

15   quite understand the question.

16        Q    I understand your testimony to be that

17   the unusual amount of support from these white

18   donors individually and these white-owned

19   companies to be an indication of special

20   circumstances.

21        A    That's correct that I've -- you know,

22   I've developed this in previous cases as well.
```

1    This is not something that I developed for the

2    first time for this particular litigation.

3         Q    And that's -- that's not my contention.

4    What I'm trying to get to is a phrase -- and I

5    think you used it already -- is this an overt

6    conspiracy?  It's not your opinion that there was

7    some overt conspiracy amongst these individuals

8    and these companies to elect Wooten and Rouse, is

9    it?

10        A    I don't have evidence one way or the

11   other on that, yeah.

12        Q    Let's change gears to factor 8.

13             Do you want to take another break, or do

14   you want to --

15        A    Let's take another break.  This is a

16   good time before we move into another factor.  I

17   just need five minutes.

18        Q    Yes, sir.

19             THE VIDEOGRAPHER:  We are going off the

20   record.  The time is 3:57 p.m.

21             (Off the record at 3:57 p.m.)

22             (On the record at 4:06 p.m.)

Transcript of Allan Lichtman
Conducted on September 30, 2019                    193

```
 1              THE VIDEOGRAPHER:  We are back on the

 2    record.  The time is 4:06 p.m.

 3              MR. HEBERT:  And while we were at the

 4    break, for the record, I provided counsel for

 5    Virginia Beach the NPR story that was requested

 6    earlier today by counsel dated September 24, 2019,

 7    entitled, Hostile environment for black workers

 8    probed in Virginia Beach shooting investigation.

 9    BY MR. HARRIS:

10        Q    Dr. Lichtman, I'm not going to mark this

11    as an exhibit, but if you would, just flip through

12    this and confirm for me that that was, in fact,

13    the article you were referencing.

14        A    That's it.

15        Q    Thank you, sir.

16        A    As I said, it wasn't necessarily the

17    only article I saw, but it was the one I

18    referenced to you.

19        Q    All right.  Dr. Lichtman, I want to talk

20    about factor 8.

21        A    Yes.

22        Q    And factor 8 begins on page 59 of your
```

Transcript of Allan Lichtman
Conducted on September 30, 2019                              194

1    report.

2         A    Yes.

3         Q    Is it your opinion in this case that, in

4    a general sense, there is a lack of responsiveness

5    to the needs of the black, Hispanic, and Asian

6    community in the City of Virginia Beach?

7         A    There was certainly evidence of that --

8    the disparities in contracts, hiring practices --

9    and I think I had previously referenced school

10   segregation and lack of minority teachers.  And

11   then I also mentioned, I think, subsequent to the

12   filing of this report -- and we've been through

13   this at length -- articles and other indicia of a

14   hostile work environment for minorities.

15             So all that is certainly indicators of a

16   lack of responsiveness.  And I didn't see any

17   counterevidence from your expert.

18        Q    I want to make a distinction in

19   something you said there between your review of

20   articles and periodicals that allege a hostile

21   work environment versus you offering an opinion

22   that there is a hostile work environment.

Transcript of Allan Lichtman
Conducted on September 30, 2019                    195

1        A     That's fair.

2        Q     Okay.

3        A     That's fair.  I can simply say that it's

4    being investigated.  It's been reported.  But I

5    can say definitively that your city manager

6    certainly has indicated severe racial

7    insensitivity, your former city manager.  He

8    resigned under pressure.  And that gives

9    credibility to the accusations.

10       Q     And for the record, that resignation

11   occurred almost a year after the filing of the

12   amended complaint, correct?

13       A     If you say so.  I don't have those dates

14   in my head.

15       Q     And that resignation had not occurred

16   yet at the time of the filing of your initial

17   report or your rebuttal report?

18       A     That's right.  That's why I said it's

19   new information since I filed these reports.  I've

20   been pretty careful to distinguish between

21   information I had at the time and then subsequent

22   information.

Transcript of Allan Lichtman
Conducted on September 30, 2019                    196

```
 1          Q     I understand.  As part of your research

 2    or analysis of factor 8, did you do any

 3    independent analysis or investigation of the

 4    city's -- City of Virginia Beach's boards and

 5    commissions?

 6          A     No.

 7          Q     Did you look to the racial makeup of

 8    those boards and commissions?

 9          A     Not that I can recall.

10          Q     Is there any reason you wouldn't have

11    looked at the racial makeup of those boards and

12    commissions for the City of Virginia Beach?

13          A     Well, they don't necessarily go to the

14    issue of responsiveness.  It's more factors that

15    actually affect the lives of African Americans

16    within the city like the police, the schools, and

17    businesses.

18          Q     You referenced police.  And I think in

19    your rebuttal report you even make a chart and

20    some reference to the minority makeup of the

21    Virginia Beach Police Department.

22          A     That may be in my main report.  I'm not
```

Transcript of Allan Lichtman
Conducted on September 30, 2019                    197

1    sure which.

2        Q    And, frankly, Dr. Lichtman, I can't tell

3    you which one it's in either, but I know I read

4    it.

5            But you would agree with me that you at

6    least pointed that out in one of your reports,

7    that there is a dragging behind or a small amount

8    of minority police officers in Virginia Beach

9    compared to their relevant population in Virginia

10   Beach?

11       A    Can I --

12           MR. HEBERT:  Just for the record, this

13   is on page 59 of the original report.

14           THE WITNESS:  I have it on page 64.

15           MR. HEBERT:  If you go to page 59,

16   you'll see there's a narrative there.

17           THE WITNESS:  There's a narrative that

18   runs from 59 to 63 and then a table on 64, which

19   does show the disparities.  And, in fact, this was

20   highlighted in studies.  This is not data that I

21   worked up.  This is data I got from independent

22   studies.

Transcript of Allan Lichtman
Conducted on September 30, 2019                          198

```
 1        Q    Did you work up any data regarding

 2   recruitment fairs or recruitment efforts of the

 3   Virginia Beach Police Department and minority

 4   communities?

 5        A    I didn't work up independent

 6   information; but, in fact, the U.S. Department of

 7   Justice had to reach a consent decree with the

 8   city to end the discriminatory hiring practice.

 9        Q    That was in 2006?

10        A    That's correct.  And then we had an

11   updated study which showed that the city was still

12   well behind in its hiring of minority police,

13   despite a much earlier consent decree.  So there

14   was a follow-up as well.

15        Q    Do you have any evidence that the City

16   of Virginia Beach Police Department is not

17   actively recruiting minority candidates to serve

18   on the Virginia Beach Police Department?

19        A    You know, it's very difficult --

20             MR. HEBERT:  Object to the form of the

21   question.

22        A    Yeah.  It's very difficult to figure out
```

Transcript of Allan Lichtman
Conducted on September 30, 2019                              199

1    the actual hiring practices.  The objective data

2    shows whatever they're doing is not working.  They

3    may have an overt minority hiring program, but to

4    the extent to which it's actually put into

5    practice is another issue.

6         Q    So to the extent that there is a

7    concerted effort to recruit minority candidates,

8    that effort doesn't change your opinion in this

9    case?

10             MR. HEBERT:  Object to the form of the

11   question.

12        A    That's not at all what I said.  I don't

13   know if there is a concerted effort that's

14   effective to recruit minorities.  There may be

15   paper policies, but the extent to which they're

16   put into effect is a whole other matter.

17             And although I didn't have the

18   information available then, the attitude of the

19   city manager, the possible hostile environment

20   towards minorities, would obviously be relevant to

21   assessing this.

22        Q    Let's go back specifically to the

Transcript of Allan Lichtman
Conducted on September 30, 2019                    200

1    recruitment efforts of minority candidates to the

2    Virginia Beach Police Department.

3              I want to talk specifically whether you

4    discovered any evidence of a recruitment effort

5    within the Virginia Police Department.

6        A    I'm sure there is, as there is in every

7    city, a policy on that.  But whether those

8    policies are on paper only or for show only but

9    are actually being effectively implemented is

10   another question which I can't answer.  I'm not

11   sure anyone could.  The objective data shows it's

12   not working and that there was past overt

13   discrimination.

14       Q    In reaching your conclusions regarding

15   the lack of responsiveness of the City of Virginia

16   Beach to blacks, Hispanics, and Asians, did you

17   come across the Minority Business Council in your

18   research?

19       A    I may have.  I don't recall it

20   specifically.  But I did look at minority

21   contracting.

22       Q    In your research did you come across the

1    Vision 2040 Committee?

2        A    I might have.  I don't recall the

3    details of it.  Again, I was looking at concrete

4    results.

5        Q    When you say concrete results, I'm not

6    sure I understand what you mean as it relates to

7    the responsiveness of the City of Virginia Beach?

8        A    I mean not aspirational things, but how

9    do your allocations of contracts actually play out

10   when you're dealing with minorities?  How does

11   your hiring of teachers and principals and police

12   actually play out when it comes to meeting the

13   needs of minorities?  What kind of work

14   environment is there for minorities?

15            And I think I also earlier referred to

16   how are minority students being treated within

17   your schools.  I didn't specifically stick that

18   under this factor, but it certainly applies to

19   this factor; although, I put it in another factor.

20       Q    So stated another way, would you agree

21   that the responsiveness by the City of Virginia

22   Beach would include -- or have to include some

Transcript of Allan Lichtman
Conducted on September 30, 2019                              202

```
 1   positive trends towards improvement on these areas

 2   you've identified?

 3        A    Well, that's why I looked at the

 4   follow-up study to the hiring of minorities.

 5   That's why I looked at the most recent data on

 6   suspensions.  That's why I looked at the very

 7   recent disparity studied that was reported in

 8   January 2019.

 9        Q    Is it your opinion that there's no

10   meaningful improvement in any of those areas?

11        A    I'm not necessarily saying no

12   improvement, but I'm saying they're still lagging

13   behind in all of these areas, and that affects the

14   daily lives of African Americans.

15             And, again, I didn't see any dispute of

16   any of this in your expert report, and he's

17   someone who was in -- you know, identifies himself

18   as an expert in Virginia, per se.

19        Q    Well, I'm asking you right now,

20   Dr. Lichtman, about your own reporting and your

21   own research.  And I don't see a reference to, for

22   example, the Vision 2040 Committee in either of
```

Transcript of Allan Lichtman
Conducted on September 30, 2019                    203

1    your reports.

2        A    It's not in either of my reports.  If

3    you want to tell me it's relevant, I'm willing to

4    listen.

5        Q    Again, I don't see a reference to the

6    Virginia Beach Human Rights Commission in either

7    of your reports.

8        A    That's correct.  I'm looking at actual

9    concrete effects -- not commissions, not

10   aspirational committees, but what's actually

11   happening on the ground to African Americans, in

12   particular, in a whole host of indicators --

13   schooling, contracting, police, teachers, worker

14   environment -- these are the critical areas in

15   which Virginia Beach actually affects its minority

16   residents.

17       Q    You've cited the Virginia Beach

18   disparity study I believe in both of your reports.

19   It's not so much important where it is in your

20   reports, but you've also used the phrase

21   aspirational goals.

22            Do you understand that there were

Transcript of Allan Lichtman
Conducted on September 30, 2019                                    204

1    aspirational goals set by the Virginia Beach

2    council in response to the disparity study?

3         A    I'm sure there are.  There are always

4    aspirational goals set when disparities like this

5    are affecting people's lives.  But you know what?

6    That doesn't change.  That doesn't wipe out all of

7    these disparities which directly had a negative

8    impact on the minority community.

9         Q    If I told you that the Virginia Beach

10   city council set an aspirational goal of

11   10 percent in response to the disparity study,

12   would you have any reason to not believe that's

13   true?

14        A    10 percent of what?

15        Q    Of contracting.  Of contracts awarded.

16        A    10 percent of contracts awarded --

17        Q    Minority contracts -- 10 percent of

18   contracts awarded by the City of Virginia Beach

19   would be minority-awarded contracts.

20        A    It's a nice goal.  We'll see what

21   happens down the road.  But all we can -- you

22   know, what we have now is the minority community

Transcript of Allan Lichtman
Conducted on September 30, 2019                    205

1   has been severely negatively impacted by these

2   disparities, and it took a lot of work to even get

3   a disparity study.

4        Q    But, Dr. Lichtman, you would at least

5   agree with me that setting an aspirational goal is

6   at least some step towards being responsive to the

7   minority community, correct?

8        A    Some step, but it doesn't wipe out what

9   I've analyzed here.  And, you know, it will be

10  many years down the road before we see whether

11  that's just for show or means something.

12       Q    Would it surprise you, then, to know

13  that they've already raised their aspirational

14  goal to 12 percent?

15       A    I'm not aware of that.

16            MR. HEBERT:  Object to the form of the

17  question.

18       A    I'm not aware of that.

19       Q    Is it your opinion that the setting of

20  those aspirational goals doesn't affect your

21  opinion as to factor 8?

22       A    Certainly not.  Maybe five years from

Transcript of Allan Lichtman
Conducted on September 30, 2019                    206

1    now it might, but not now.  And, again, you don't

2    wipe out these things just because you've -- after

3    its been exposed, you set an aspirational goal.

4         Q    But you would agree with me that it

5    takes at least some time to correct the things

6    you've identified as failings or disparities?  It

7    can't occur with the snap of a finger.

8         A    It should have occurred way before now.

9         Q    But in response to my question, you

10   would at least agree with me that these changes

11   don't occur in the snap of a finger?

12        A    Nothing occurs in the snap of a finger,

13   but if the city was truly responsive to

14   minorities, these changes should have occurred a

15   long time ago.  This isn't surprising.

16        Q    I want to turn your attention to the

17   candidate George Furman.

18        A    Okay.

19        Q    Your Table R1 --

20        A    Are we now on the rebuttal report?

21        Q    On the rebuttal report, R1.

22             MR. HEBERT:  I believe it's page 5,

1   Jerry.

2        A    It's page 4 of my copy.  The chart is on

3   page 5, but same stuff.

4        Q    Is it your opinion that George Furman

5   and his three candidacies are not probative for

6   purposes of a racially polarized voting analysis?

7        A    I was following the lead here of

8   Dr. Spencer, who looked at that.  But when I

9   responded to what your expert was arguing, I did

10  include Furman.  And including Furman would not in

11  any significant way change anything from Table R1.

12       Q    Table R1 does not include Asian and

13  Hispanic candidates, and I know that we've covered

14  this, but I want to confirm that they're not

15  included because it's your opinion that they

16  don't -- you cannot isolate Asian and Hispanic

17  amounts; is that correct?

18            MR. HEBERT:  I'm going to object to the

19  form of the question.

20       A    I'm not -- yeah, I'm not sure --

21       Q    I'm sorry, I'm looking at the wrong

22  table.

Transcript of Allan Lichtman
Conducted on September 30, 2019                  208

1        A     Yeah.

2        Q     Strike the question.  Don't even bother

3   trying to answer.

4        A     Okay.

5        Q     Table R1 includes only black candidates

6   and white voters; is that correct?

7        A     No.

8        Q     Black candidates --

9              MR. HEBERT:  Object to the form of the

10  question.

11       A     No.  That's incorrect.

12       Q     What are you trying to show with Table

13  R1?

14       A     Just who the candidates of choice of

15  blacks and whites were to show they're so

16  different.

17       Q     You use the phrase, Burton was a token

18  candidate.

19             What do you mean by token candidate?

20       A     I think he withdrew his name but

21  remained on the ballot.

22       Q     Does that mean --

Transcript of Allan Lichtman
Conducted on September 30, 2019                    209

1        A      I think I say that right there.

2        Q      Does that make him a token candidate?

3        A      As close to a token candidate as you can

4   get.  You can say -- you know, it's a little --

5   the terminology can't be exact here because, on

6   the one hand, he was a non-candidate; but on the

7   other hand, his name remained on the ballot, and

8   he got a very small vote.

9               That's why, for want of a better term, I

10  use the term token candidate.

11       Q      Dr. Lichtman, why are Asians and

12  Hispanics not shown on this Table R1?

13       A      You can't isolate the choices of Asian

14  and Hispanics.  Plus, I was simply trying to show,

15  for the predominant minority group and all the

16  candidates of minorities for this period from that

17  same group, that the choices of black voters and

18  the choices of white voters are different.

19              And, remember, my purpose is -- I think

20  it's factor 2 -- to show polarization between

21  whites and minorities, not necessarily to parse

22  out different minorities.

Transcript of Allan Lichtman
Conducted on September 30, 2019                    210

1      Q    It's not important to your analysis to

2    understand the difference between each group and

3    whites?

4      A    All I'm trying to establish is polarized

5    voting.  And as I said, unfortunately you can't

6    isolate the votes of Hispanics and Asians.  And

7    certainly I've shown extreme polarization between

8    the predominant minority group, the group that is

9    represented by all the candidates, and whites.

10          That's more than enough to satisfy

11   factor 2.  If you want to get into the Gingles

12   factors, that's another matter.  And I'm happy to

13   discuss them with you if you want to open that up.

14     Q    I don't want to -- I want to ask a more

15   general question.  And this is likely coming again

16   from a place of ignorance for me.

17          What do you identify as the differences

18   between a Gingles 2 and 3 analysis versus a factor

19   2 analysis on the Senate Factors?

20     A    Right.  Because in this case we're

21   dealing with coalition districts, a factor 2 of

22   Gingles 2 and 3 analysis, without making any legal

1   opinion about what the judge may or may not decide

2   about that, has to address the coalition, look at

3   not just blacks but combined minorities to see if

4   the coalition has candidates of choice that are

5   different than whites.

6          And I think that's patently obvious here

7   as well as the differences between blacks and

8   whites.  In addition, the Gingles analysis has to

9   be concerned with whether white-block voting

10  defeats candidates of choice of blacks.

11         You can have polarized voting with that.

12  That's an element of polarized voting.  But you

13  can still have polarized voting without addressing

14  that question; although, I do address that

15  question because I think it is at least relevant.

16  But obviously, you would need to look at it

17  directly in doing a Gingles three-prong analysis.

18  But I think I did provide for you an updated Table

19  R3 and chart which gets into that issue.

20      Q    That's what I'm looking at now.  And

21  Table R3 is on page 9 of your rebuttal report.

22      A    That's right.

Transcript of Allan Lichtman
Conducted on September 30, 2019                    212

1            MR. HARRIS:  I'm going to mark, for

2    purposes of today's deposition -- I think we're on

3    Exhibit 4.

4            I'm sorry, we're on Exhibit 5 now.

5            (Deposition Exhibit 5 was marked and was

6    attached to the transcript.)

7        Q    Dr. Lichtman, many hours ago you showed

8    me this piece of paper.

9            Can you tell me the differences between

10   that Exhibit 5 that you provided at today's

11   deposition and Table R3 on page 9 of your --

12       A    Just one very small change.

13       Q    Okay.

14       A    I added Furman in 2014 to the candidates

15   of choice of African Americans because, when I

16   looked at the Spencer response, I saw that he

17   analyzed 2014 as a two-vote, two-seat election at

18   large, which alerted me to the fact that Furman

19   was the second candidate of choice of African

20   Americans and, therefore, should count as a

21   candidate of choice.

22           And then the chart reflects that by

Transcript of Allan Lichtman
Conducted on September 30, 2019                    213

1    saying, Among these candidates --

2              MR. HEBERT:  If we can just stop for a

3    second, I believe that the chart is going to be a

4    new exhibit, so we should wait.

5              THE WITNESS:  Oh, I'm sorry.

6         Q    That's okay.  Dr. Lichtman, we've spent

7    enough time together today you know exactly where

8    I'm going.

9         A    Yes.

10             (Deposition Exhibit 6 was marked and was

11   attached to the transcript.)

12        Q    Exhibit 6 has been marked as Chart R3.

13   I understand this is reflective of the change that

14   is contained in Exhibit 5.

15        A    Right.

16        Q    Can you just confirm that on the record?

17        A    That's correct.

18        Q    Thank you.

19        A    And as I was saying, the change is only

20   that, instead of nine candidates of choice --

21   instead of eight candidates of choice of blacks

22   who lost, it's now nine.  The three candidates of

Transcript of Allan Lichtman
Conducted on September 30, 2019                                214

```
 1   choice who won remain the same, and the one
 2   candidate of choice who won, who wasn't part of
 3   the special circumstances of 2018, remains at one.
 4        Q    Can I see Exhibit 5, please?
 5             Did you do an analysis of Mr. Furman's
 6   other two elections?
 7        A    Yes.  There they are.  Not candidates of
 8   choice.  They're on the next-to-last column.
 9   Remember I said, when I dealt with Kidd's
10   material, I would include Furman to be consistent
11   with what he did.
12        Q    Can you draw any conclusions from Furman
13   being the candidate of choice -- not being the
14   candidate of choice in two elections but being the
15   candidate of choice in one?
16        A    I think it's probably because it was a
17   two-seat election in which you can have more than
18   one candidate of choice.  But to be consistent, I
19   included him, and we can see that now nine out of
20   twelve African American candidates or
21   three-quarters, 75 percent, lost.
22        Q    And that --
```

Transcript of Allan Lichtman
Conducted on September 30, 2019                    215

1      A    Even though they would have won with

2  black votes, all of them.

3      Q    And that numerator denominator for

4  action that you've just given assumes coalition

5  between the black, Hispanic, and Asian voters in

6  Virginia Beach?

7      A    It assumes nothing about coalition.  All

8  it says is all of these candidates would have won

9  based on black votes.  They all lost.

10      Q    So --

11      A    So in Virginia Beach, candidates of

12  choice for blacks overwhelmingly are being

13  defeated.  And, in fact, it would be even more

14  overwhelming but for the special circumstances in

15  2018.

16           And the other African American who won

17  who was a candidate of choice for African

18  Americans, Ross Hammond, lost reelection; so it's

19  a pretty dismal record in Virginia Beach for

20  candidates of choice of African Americans.

21      Q    Are there any conclusions to be drawn

22  from that table regarding the candidates of choice

Transcript of Allan Lichtman
Conducted on September 30, 2019                    216

1    for Hispanics or Asians?

2        A    As I said, you can't isolate Hispanics

3    and Asians, but if you looked at the candidates of

4    choice of minorities combined, you would see a

5    very similar pattern as well that combines support

6    as a candidate of choice of minorities does not

7    lead to victory either in Virginia Beach.

8             And I'd be happy to supplement this

9    table with one follow-up on your question that

10   looks at combined minorities.

11       Q    Well, it's my understanding that

12   Dr. Spencer has actually done that using what's

13   called equivalency testing.

14       A    No.

15       Q    Am I wrong about that?

16       A    Totally wrong.

17       Q    Okay.  Tell me why I'm totally wrong.

18       A    The analysis I will supplement for you

19   that you asked about does the same thing here

20   except it looks at Dr. Spencer's estimates,

21   sometimes to do with the equivalence analysis, of

22   the votes by combined minorities for the

Transcript of Allan Lichtman
Conducted on September 30, 2019                    217

1    candidates.

2            If you want to give me back

3    Dr. Spencer's tables, I can show you how that

4    works.

5        Q    You're referencing his initial report at

6    this point?  The combined minority support in the

7    initial report or the rebuttal report?

8        A    It makes no difference.  It would yield

9    the same results.  And I'm not referencing

10   equivalency analysis.

11       Q    I'm handing you what we were provided as

12   Dr. Spencer's report.

13       A    Thank you.

14       Q    That's his initial report.  I'll let you

15   look through that, and if it's not there, then I

16   can -- I think I have a copy of the rebuttal.

17       A    All right.  Let me give you just an

18   example that just hit me as I turned it in.

19            Rose Hall, Cabinis (phonetic) is the

20   candidate of choice for blacks.  He's also the

21   candidate of choice of minorities whether you look

22   at ER, which says he has a majority of all

Transcript of Allan Lichtman
Conducted on September 30, 2019                    218

1    minorities combined or you look at EI -- although

2    it doesn't give a majority -- he's substantially

3    ahead of all the other candidates.

4              So he is both the candidate of choice of

5    black voters and the candidate of choice of all

6    the minorities combined -- blacks, Hispanics, and

7    Asians -- and would have won either based on black

8    votes alone or combined minority votes alone but

9    still lost the election.

10             So what I'm going to do for you is the

11   same thing here, instead of just look at the black

12   vote or the black candidates -- black voters alone

13   make as their candidate of choice, who the

14   combined minorities make as their candidate of

15   choice.

16        Q    That will be great.  Thank you.

17        A    I'm happy to supplement that for you.

18   It'll take a few days.  I'm not going to have it

19   for you tomorrow.

20        Q    I understand a little busy.

21        A    You understand how this is different now

22   from an equivalency analysis?

Transcript of Allan Lichtman
Conducted on September 30, 2019                    219

1      Q     How what is different than an
2  equivalency analysis?  You're talking about the --
3      A     My supplemental table which looks at
4  combined minorities rather than just black voters.
5  It's nothing to do with equivalency analysis.
6  It's a replication of this table changing black
7  candidate of choice of all minority voters who
8  would have won with all minority votes.
9      Q     And would you expect to rely in that
10 supplemental table on ER or EI estimates of --
11     A     I'm going to look at both, but I think
12 they're both going to give you the same candidates
13 of choice.
14     Q     I would ask you, when you make that
15 decision, whether you average the two or use one
16 over the other, would you please indicate that on
17 the table somewhere?
18     A     Happy to do it.
19     Q     Thank you.  That way we can avoid a
20 supplemental deposition.
21     A     Of course.  I try to be, you know, as
22 transparent as possible.  I hate to say that in

Transcript of Allan Lichtman
Conducted on September 30, 2019                    220

```
 1   light of some politicians who said that.
 2        Q    These charts in Dr. Spencer's report --
 3   actually, keep them in front of you.  I'm going to
 4   ask you a question about it --
 5        A    Sure.
 6        Q    -- you haven't been provided the source
 7   data to create those charts, have you?
 8        A    No.
 9        Q    So you would still be relying on
10   Dr. Spencer's data to create a supplemental chart?
11        A    Dr. Spencer's results.
12        Q    Yes.
13        A    And I think we all are.  I don't think
14   Dr. Kidd either did his own independent analysis.
15        Q    That's what I'm trying to get to.  I'm
16   just trying to make sure you're not going to go
17   back and run your own EI or ER analysis.  You're
18   still going to rely on the results of --
19             THE WITNESS:  You're not going to ask me
20   to do that, are you, Mr. Hebert?
21             MR. HEBERT:  I reserve the right to ask
22   you.
```

Transcript of Allan Lichtman
Conducted on September 30, 2019                    221

```
 1              THE WITNESS:  I understand you reserve

 2    your right but --

 3              MR. HEBERT:  But I don't have any

 4    intention to do it at this moment.

 5              THE WITNESS:  And I don't have any

 6    intention to do it at this moment.

 7        Q    All I'm trying to do is get an

 8    understanding of, when I look at this supplemental

 9    report, what I'm looking at.

10        A    You're going to be looking at data --

11    excuse me, a compilation derived from

12    Dr. Spencer's reports, not from any independent

13    analysis that I'm going to do on my own.

14        Q    Now, in Dr. Spencer's initial report, he

15    does rely on extreme case or homogeneous precinct

16    EI and ER.  In his rebuttal report he does, then,

17    apply this equivalence testing method.

18              You're aware of that?

19        A    Yes, of course.

20        Q    Can you tell me what you understand

21    equivalence testing to be?

22        A    Yeah.  It's not an attempt to estimate
```

Transcript of Allan Lichtman
Conducted on September 30, 2019                    222

1    the votes of any group.  It's just a comparison,

2    given that there's a lot of error, as we know, in

3    any attempt to isolate Hispanic and Asian voting.

4    It's just testing the null hypothesis that blacks,

5    Hispanics, and Asians vote differently.

6              And if you can reject that null

7    hypothesis, that's an indication along with

8    looking at all minorities combined of a

9    commonality.  It's not an estimate of how any

10   individual group votes.

11        Q    Have you used equivalency testing in

12   your prior testimony?

13        A    I've read about it, but I don't think

14   I've ever used it myself.

15        Q    Do you know of any other expert who's

16   used it?

17        A    I couldn't say, but there's certainly

18   plenty on it in the literature going back, I

19   think, to a -- at least an article in 1993 in the

20   Psychological Bulletin.

21        Q    What did you -- when you say you've read

22   about it, can you tell me some of the sources of

1    those --

2        A    Yeah.  I think I recall an article in

3    the Psychological Bulletin from 1993 on

4    equivalency testing.  I think there's some

5    literature in the -- actually, biological

6    literature, I think.  But it's nothing that I

7    focused on.  I'm casually aware of it, and those

8    are a couple of sources that pop into my head.

9    But I can't give you a bibliography off the top of

10   my head.

11       Q    Did you have an opportunity to review

12   the article that Dr. Spencer attached to his

13   rebuttal report regarding equivalency testing?

14       A    I don't think I did.  I may have seen it

15   at some time, but like I said, I've never used

16   equivalency analysis.  I know what it is, I know

17   how it works, but I haven't focused on it.

18       Q    Do you see it used commonly in Voting

19   Rights Act cases?

20       A    Not that I can recall.  But we have a

21   pretty special situation here.

22       Q    Tell me what you mean by that, special

Transcript of Allan Lichtman
Conducted on September 30, 2019                    224

1   situation.

2       A    Because you can look at the coalition,

3   but you can't isolate separately a reliable

4   estimate of Hispanic and Asian votes.  In other

5   cases -- I think I mentioned Florida and Texas

6   where you actually can separately analyze the

7   black and Hispanic vote.

8       Q    This equivalency testing, it didn't

9   appear in Dr. Spencer's initial report as far as I

10  can tell.

11           Did you see in his initial report when

12  you read it?

13      A    I think you're correct.  I don't

14  recall -- again, it's much better to ask him these

15  questions, but I don't recall seeing it in his

16  initial report either.  Doesn't mean it's not

17  buried in the footnote or something, but I don't

18  recall it.

19      Q    The -- the sources for your

20  understanding of this equivalency testing, would

21  it be fair to say it was in -- more often in other

22  disciplines outside of political science?

Transcript of Allan Lichtman
Conducted on September 30, 2019                                    225

1        A     I think that's correct.  More in

2    psychology and biology.  Which is not to say it's

3    not in political -- I haven't scrutinized the

4    sources.  Again, you're much better off asking

5    Dr. Spencer about it.

6        Q     What do you understand equivalency

7    testing to be doing as far as a methodological

8    approach to a Gingles prong 2 and 3 analysis?

9            MR. HEBERT:  Object to the form of the

10   question.

11       A     I think I already answered that.  I said

12   equivalency testing is a mechanism for determining

13   whether you can reject the null hypothesis of

14   different behavior across the groups.  How that is

15   then legally applied to prongs 2 and 3, that's,

16   you know, obviously for the judge to decide.

17       Q     So -- and, again, I'll confess

18   ignorance -- you have indicated today in your

19   testimony that you cannot isolate Hispanics and

20   Asians using EI or ER.

21       A     Reliably.

22       Q     Reliably.

Transcript of Allan Lichtman
Conducted on September 30, 2019                    226

```
 1        A     I mean, you can do whatever you want.

 2        Q     Sure.  Would you say that equivalency

 3   testing is a method to reliably isolate Hispanics

 4   and Asians?

 5        A     Not to estimate their particular

 6   percentage of voting for any individual candidate.

 7   No, that's not what it does.

 8        Q     Is it your understanding that the

 9   equivalency testing that Dr. Spencer has done

10   relies on the same data that he used to conduct

11   his EI and ER analysis?

12        A     Again, you're better off asking him, but

13   I would imagine so.  I'm not aware of a new data

14   set that he worked up for his response report.

15             MR. HARRIS:  Mr. Hebert, do you recall

16   are we on Exhibit 7?

17             MR. HEBERT:  Yes.

18             MR. HARRIS:  Thank you.  For the record,

19   I'm marking Exhibit 7.

20             (Deposition Exhibit 7 was marked and was

21   attached to the transcript.)

22        Q     Dr. Lichtman, I'm showing you an email
```

1    that was provided to our office by the Campaign

2    Legal Center on September 5, 2019.

3            The purpose of me including the email on

4    this exhibit is only to show you the source of a

5    table that's contained as page 2 of that exhibit.

6    Have you seen this table before?

7        A    I'm not certain.  You know, I

8    reviewed -- if it's in Spencer's report or

9    appendices I have.  And it may well be because I

10   did see some indication of these large standard

11   areas for Hispanics and Asians.  Whether it's

12   exactly this, I can't say.  This is the first time

13   I've seen this.  That's all I can tell you.

14   You're better off asking Dr. Spencer about that.

15       Q    And just to clarify your testimony,

16   you're testifying this is the first time you've

17   seen the email, and you leave open the possibility

18   that you may have seen this chart at some point?

19       A    Either the chart or some part of the

20   chart.

21       Q    Okay.  When a standard of error gets

22   larger, is it fair to say that you have less

Transcript of Allan Lichtman
Conducted on September 30, 2019

228

1   confidence in that point estimate?

2       A    That's correct.

3       Q    Dr. Spencer, let's change --

4       A    No.

5       Q    You're correct.  Dr. Lichtman.  I

6   apologize.  I'm talking about Dr. Spencer to

7   Dr. Lichtman.

8       A    There you go.

9       Q    I want to change the person we're

10  talking about.  I want to talking about Peter

11  Morrison.

12      A    Okay.

13      Q    You've included in your rebuttal report

14  a reference to cases where you've testified

15  previously with Peter Morrison as opposing counsel

16  expert.

17      A    Correct.

18      Q    Other than those two cases, can you

19  recall any other instances where you would say

20  that Peter Morrison had offered an unreliable

21  opinion?

22      A    I think -- I can't cite chapter and

Transcript of Allan Lichtman
Conducted on September 30, 2019                    229

1    verse, but I do recall in the Texas case -- I

2    think it was in the Texas case.  I've seen so many

3    cases.  There maybe others.  There are other

4    examples of where indeed Dr. Morrison had provided

5    unreliable opinions, I think even cited

6    specifically to that factor by judges.

7         Q    Were those cases in which you were the

8    expert on the other side?

9         A    No.  I think I was -- I've been an

10   expert in a couple of other cases with

11   Dr. Morrison.  One was the Illinois congressional

12   redistricting case in 2011, and the other was --

13   I'm going way back to the famous Garza case on

14   county council -- county commission positions in

15   LA County.

16            And while I can't recall whether

17   Dr. Morrison was criticized specifically or not,

18   his analysis was not accepted in either case.

19        Q    The cases you're referring to -- and

20   admittedly, I'm looking quickly --

21        A    That's okay.

22        Q    -- are they in your --

Transcript of Allan Lichtman
Conducted on September 30, 2019                     230

```
 1        A    Yes.  I can identity them for you if

 2   you'd like me to.

 3        Q    It would help me just so I'd know --

 4        A    Exactly what the case is.  One was 2011.

 5   It's Committee for a Fair and Balanced Map, et al.

 6   v. Illinois State Board of Elections.  The other

 7   was way back when.  Yeah, top of page 5, Garza v.

 8   County of Los Angeles.

 9        Q    What year was that?

10        A    1990.

11        Q    You guys have been going back and forth

12   for a while.

13        A    No kidding.  I think he's even older

14   than I am, and that's hard.

15        Q    Your initial report doesn't indicate you

16   intend to offer an opinion specifically related to

17   Gingles prong 1?

18             MR. HEBERT:  Object.  Asked and answered

19   but --

20             MR. HARRIS:  Well, let me --

21        Q    You agree with that premise, correct?

22        A    I don't think I specifically reference
```

Transcript of Allan Lichtman
Conducted on September 30, 2019                    231

1    that in my initial report, that's correct.

2         Q    And your criticism of Morrison in this

3    case appears to me to relate to your rebuttal or

4    your response to his credibility as a witness.

5              Is that fair to say?

6         A    It's not limited to that, but it does

7    include that.

8         Q    That's a portion of it.  And then the

9    other portions appears that you're opining on

10   the -- a fatal flaw in his prong 1 analysis, I'll

11   call it.

12        A    In his analysis of the illustrative --

13   or plan.

14        Q    Let's make sure we get on the same page

15   with vocabulary.

16             Do you understand what I mean when I say

17   prong 1 analysis?

18        A    I assume you mean the illustrative plan.

19        Q    Yes.  We'll go with -- I'll use the

20   phrase illustrative plan.

21        A    Yeah.

22        Q    So have you had an opportunity to review

Transcript of Allan Lichtman
Conducted on September 30, 2019                              232

1    Peter Morrison's response to Mr. Fairfax's report

2    regarding the illustrative district?

3         A    Yes.  I didn't get into the guts and

4    details.  The only comment I had on it was it's

5    very close.  Even taking at face value everything

6    Morrison did, we're right at the edge of

7    15 percent using data that's four years old in a

8    city that's becoming over time more and more

9    minority.

10        Q    Can you identify a case where the

11   minority population trends were applied to that

12   illustrative analysis to cross over a 50 percent

13   threshold?

14        A    I don't usually deal with prong 1 or the

15   illustrative plans, so I'm not the right person to

16   ask; but I do believe, going all the way back to

17   the Garza case, that population projections were

18   used.  It wasn't for the 50 percent -- I forget

19   what threshold it was for; but population

20   projections, I believe, were used in the Garza

21   case.

22        Q    For purposes of population forecasting,

Transcript of Allan Lichtman
Conducted on September 30, 2019                          233

1    it's common for political scientists to rely on

2    ACS data?

3        A    Absolutely.

4        Q    But you would agree with me that the

5    2020 census data will be more reliable or more

6    accurate than the current ACS estimates from 2013

7    to 2017?

8        A    It certainly will be more current and

9    perhaps more accurate, yeah.  Depending if, you

10   know, they do the census right; and I have a lot

11   of doubts about that.

12       Q    Well, I really want to ask a follow-up

13   question, but I'm not going to do that.

14            In your -- and forgive me, because it's

15   been several hours now --

16       A    Yeah, we've been a long time.

17       Q    -- did you tell me that you had reviewed

18   Fairfax's initial and rebuttal reports?

19       A    Only very cursorily.  I wanted to look

20   at one thing and one thing only that struck me.

21       Q    What was that?

22       A    The issue of how you deal with

Transcript of Allan Lichtman
Conducted on September 30, 2019                    234

1    multiracial.  And I noticed in Dr. Fairfax's

2    rebuttal that, when you treat multiracial

3    blacks -- blacks and whites as blacks -- there's

4    no question you're going with a 50 percent

5    threshold.  And I faced that issue not for drawing

6    plans but for doing other analyses.

7              And so I had some reason to research

8    that in the past, and it's always been my

9    understanding under OMB, Office of Management and

10   Budget, and Justice Department guidelines, when

11   there is a complaint involving blacks, you treat

12   blacks and whites as black.

13             I think that's telling for the

14   illustrative plan.

15        Q    You said blacks and whites as black, and

16   because it's going to end up on a transcript, I

17   want to make sure you mean mixed race, black and

18   white, as blacks.

19        A    Yes.  We're getting late, and I'm --

20        Q    I understand.

21        A    My precision is declining a bit; but,

22   yes, mixed race, those who identify as both black

Transcript of Allan Lichtman
Conducted on September 30, 2019                           235

1    and white.

2         Q    Understanding that you only did a

3    cursorily or basic review of Fairfax's reports,

4    did you see anywhere where he references a

5    reliance on population trends?

6         A    I don't recall one way or the other.

7              MR. HARRIS:  Can I ask for five minutes,

8    and I think we maybe -- even less.  Two minutes.

9              MR. HEBERT:  Yeah.  Absolutely.  Yep.

10             THE VIDEOGRAPHER:  We are going off the

11   record.  The time is 4:53 p.m.

12             (Off the record at 4:53 p.m.)

13             (On the record at 4:59 p.m.)

14             THE VIDEOGRAPHER:  Back on the record at

15   4:59 p.m.

16   BY MR. HARRIS:

17        Q    Dr. Lichtman, you had mentioned that you

18   had read the depositions of Dave Hansen and John

19   Moss during your testimony today.

20             Are there other depositions that you've

21   read?

22        A    I don't believe -- I don't believe I

Transcript of Allan Lichtman
Conducted on September 30, 2019                    236

1   have read any other depositions.  Obviously, there

2   are going to be depositions I haven't seen yet

3   that I'll probably read for other experts, but I

4   haven't seen those to this point.

5       Q    So at this point it is your expectation

6   that you will read further deposition testimony in

7   this case?

8       A    Most likely.  I mean, I won't swear to

9   it, but I think I'd be interested in what other

10  experts have to say.

11      Q    During the course of your research for

12  the Senate Factors, did you ever do any

13  independent witness interviews?

14      A    No.

15      Q    During the course of your investigation

16  of the Senate Factors in Virginia Beach, did the

17  name Gary McCullum (phonetic) come up?

18      A    It doesn't ring a bell.  It doesn't mean

19  I haven't seen it.  I've seen a lot of material,

20  but it doesn't strike me at the moment.

21      Q    Can you confirm that the data you've

22  relied upon is the data that was created by

Transcript of Allan Lichtman
Conducted on September 30, 2019                    237

1    Dr. Spencer?

2         A    Well, no.  I mean, I --

3         Q    It's too broad of a question.

4              For purposes of ecological inference and

5    ecological regression, the data you've relied upon

6    is Dr. Spencer's data?

7         A    For the most part, it's Dr. Spencer's

8    results.  I didn't look at his data.  And then I

9    did some, as you know, independent analyses of my

10   own based on the data supplied by Dr. Kidd on

11   turnout.

12        Q    And if I understand the turnout, that

13   was an ecological inference and ecological

14   regression that you used for African American

15   turnout; is that correct?

16        A    And white.

17        Q    And white turnout?

18        A    Yes.

19        Q    But like the other circumstances in this

20   case, the Hispanic and Asian was not able to be

21   isolated in your ecological inference or

22   regression analysis?

1      A     I did not isolate -- that's right.  I

2  did not isolate Hispanic and Asian.

3      Q     You also mentioned the racially

4  insensitive comments of Dave Hansen during your

5  testimony today.

6           Did you discover any other racially

7  insensitive comments by sitting city council

8  members?

9      A     Not that I can recall.  I think I

10 probably would have cited them if they were pretty

11 clear.  It doesn't mean there weren't any.

12     Q     And I want to go back to something --

13 and I'm not intending to reopen a can of worms,

14 but we referenced this landslide victories

15 standard, and I think you used the phrase rule of

16 thumb as to the landslide victory.

17     A     Yes.

18     Q     In our discussions, I recall it being

19 related to racially polarized voting analysis in

20 which you would utilize this landslide victory

21 standard or rule of thumb.

22     A     Only in a one-on-one election, not where

Transcript of Allan Lichtman
Conducted on September 30, 2019                    239

1   there are multiple candidates, obviously.

2       Q    Have you ever applied this landslide

3   victory standard to an analysis of a minority --

4   single minority groups cohesion amongst each

5   other?

6       A    In a one-on-one election?  I probably

7   have.  Although, certainly not recently.  I can't

8   recall.  But I may have in the dim past.

9       Q    So if I understand, then, there's an

10  application of the landslide victory standard or

11  rule of thumb in a racially polarized voting

12  analysis, but there also may be some application

13  to this landslide victory standard to cohesion

14  within a single minority group?

15      A    In a one-on-one election.  But that

16  doesn't mean it's necessarily -- you have to reach

17  that standard.  It's just, if you reach that

18  standard, it's beyond dispute.

19      Q    So then related specifically to cohesion

20  within a single minority group in a two-candidate

21  election, how would you measure cohesion of that

22  minority group?

Transcript of Allan Lichtman
Conducted on September 30, 2019                    240

1      A    You'd look at the percentage of the

2  minority group that aligned behind the minority

3  candidate.

4      Q    And then what would you do next?

5      A    As I said, if it's -- averages --

6  remember, cohesion is never measured in a single

7  election.  It's measured as a pattern.  And if it

8  was around 60 percent, then I'd say there's no

9  issue.  If it's below 60 percent, there still

10 could well be cohesion, and you would look at

11 reasons why it might fall below 60 percent.

12     Q    Is there any lower percentage where you

13 just say, no, this is not cohesive?

14     A    I suppose, if over a pattern of

15 elections, you would find it's, you know, 51,

16 52 percent, you'd certainly question whether it

17 was cohesive.  But, again, we're talking about --

18     Q    Sure.

19     A    -- elections where it's either below or

20 above.  There's no plurality here.

21     Q    And on those single elections, certainly

22 you would agree that, if there was a pattern of

Transcript of Allan Lichtman
Conducted on September 30, 2019                    241

1    consistently below 50 percent, you couldn't allege

2    cohesion amongst that group?

3         A    If there was a pattern, more often than

4    not, in one-on-one elections that -- let's just do

5    black and white to make it simple, that black

6    voters supported black candidates below

7    50 percent -- again, unless there was some very

8    special circumstances, that would certainly raise

9    a question about cohesion.

10        Q    Dr. Lichtman, I don't have any other

11   questions for you today.  I thank you for your

12   patience with me today.  It's been a pleasure to

13   meet you, and I will await your predictions for

14   2020.

15        A    You and a lot of other people.

16             MR. HEBERT:  There was an issue, when

17   you went out to do your final tally, Dr. Lichtman

18   said that he remembered a case about population

19   projections that he wanted to give you an update

20   on.

21             MR. HARRIS:  Okay.

22             MR. HEBERT:  So you can ask the

Transcript of Allan Lichtman
Conducted on September 30, 2019                    242

```
 1   witness --

 2             MR. HARRIS:  I'll ask the follow-up

 3   questions.

 4        Q    I had asked you a specific question

 5   about population trends crossing the threshold

 6   from below 50 percent to over 50 percent, and I

 7   understand you have a follow-up.

 8        A    Yeah.  Again, I'm not sure, because I

 9   wasn't involved in drawing plans, whether it

10   related to the over or under; but it certainly

11   related to the composition of the districts.  We

12   did discuss in the Ann Harding case, which I think

13   is one of the very ones on the top of the list I

14   gave you -- it's the Dallas County case -- we did

15   discuss the issue -- same thing here, that Dallas

16   County like the City of Virginia Beach has a

17   declining white population.

18             And these districts that were drawn

19   based on older data are not going to accurately

20   reflect the actual white population once the real

21   plan is drawn because it's going to be lower.

22        Q    Do you know if the Court accepted that
```

1    approach?

2        A    I don't.  I don't know.  As I said, I

3    was not centrally involved in the plan.

4        Q    Do you know how close they were to a

5    decennial census in that case?

6        A    It was a recent case.  I mean, I have

7    the date on --

8        Q    I'm sorry, I should be looking at the --

9        A    I think it's 2018, so it's pretty

10   recent.  But we can reference it.  What's the

11   date?

12       Q    I'm looking at Exhibit 3, Ann Harding v.

13   County of Dallas.  The date appears to be 2018.

14       A    Yeah.  That's the one.

15       Q    You may not know this, but do you know

16   when that case was initially filed?

17       A    I have no idea.

18       Q    You had indicated that there was that

19   follow-up.

20            Is there any other follow-up you had?

21       A    I'm done.

22       Q    Great.

Transcript of Allan Lichtman
Conducted on September 30, 2019                    244

1        A       Thank you.

2        Q       You too.  Thank you, sir.

3                THE VIDEOGRAPHER:  We are going off the

4    record.  The time is 5:07 p.m.

5                (Off the record at 5:07 p.m.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

Transcript of Allan Lichtman
Conducted on September 30, 2019                    245

1   CERTIFICATE OF COURT REPORTER - NOTARY PUBLIC

2      I, DARRELL LOWE, the officer before whom the

3   foregoing deposition was taken, do hereby certify

4   that said proceedings were electronically recorded

5   by me; and that I am neither counsel for, related

6   to, nor employed by any of the parties to this

7   case and have no interest, financial or otherwise,

8   in its outcome.

9      IN WITNESS WHEREOF, I have hereunto set my hand

10  and affixed my notarial seal this 30th day of

11  September, 2019.

12

13

14  _____

15  Darrell Lowe, Notary Public

16  for the District of Columbia

17

18

19

20

21

22

1              CERTIFICATE OF TRANSCRIBER

2        I, ROBERT LEIFER, do hereby certify that the

3    foregoing transcript is a true and correct record

4    of the recorded proceedings; that said proceedings

5    were transcribed to the best of my ability from

6    the audio recording and supporting information;

7    and that I am neither counsel for, related to, nor

8    employed by any of the parties to this case and

9    have no interest, financial or otherwise, in its

10   outcome.

11

12

13

14

15   _____

16   ROBERT LEIFER

17   October 4, 2019

18

19

20

21

22

Transcript of Allan Lichtman
Conducted on September 30, 2019

247

| A |
|---|

**aaron**
128:14, 128:19, 129:4, 162:8, 162:21, 174:18, 176:4, 176:16, 177:4, 177:8, 181:6, 181:16, 185:15, 186:19, 187:6, 188:1, 188:7, 190:14, 190:21

**abbott**
114:12, 173:8

**ability**
29:12, 67:19, 114:17, 116:22, 246:5

**able**
20:5, 27:8, 38:16, 61:2, 118:16, 118:22, 120:18, 121:6, 147:1, 169:5, 172:8, 173:2, 178:6, 237:20

**about**
18:20, 21:16, 21:18, 24:9, 24:15, 24:16, 24:19, 25:1, 25:2, 25:7, 25:15, 25:19, 25:22, 27:14, 28:2, 29:19, 38:2, 42:11, 43:2, 43:7, 45:3, 46:10, 49:15, 61:19, 67:16, 67:19, 68:15, 68:18, 81:11, 100:15, 101:22, 105:7, 105:9, 107:1, 107:12, 108:1, 108:14, 108:18, 108:20, 113:3,

117:3, 117:8, 122:11, 124:6, 130:10, 131:20, 134:4, 135:22, 138:18, 139:20, 145:19, 147:8, 158:8, 158:9, 159:12, 160:17, 160:22, 162:12, 167:8, 172:10, 179:4, 179:14, 180:17, 181:15, 182:21, 183:1, 186:12, 193:20, 202:20, 211:1, 211:2, 215:7, 216:15, 216:19, 219:2, 220:4, 222:13, 222:22, 225:5, 227:14, 228:6, 228:10, 233:11, 240:17, 241:9, 241:18, 242:5

**above**
240:20

**absence**
97:5

**absolute**
104:9

**absolutely**
67:16, 156:12, 233:3, 235:9

**accepted**
35:15, 229:18, 242:22

**access**
32:7, 175:19

**accessed**
72:18

**accord**
25:21

**account**
122:22

**accurate**
10:3, 10:5, 11:19, 50:22, 53:4, 79:9,

233:6, 233:9

**accurately**
242:19

**accusations**
195:9

**aclu**
151:6

**across**
39:10, 61:14, 68:20, 95:7, 119:17, 141:16, 170:11, 178:3, 200:17, 200:22, 225:14

**acs**
84:19, 87:1, 87:3, 87:7, 87:9, 233:2, 233:6

**act**
32:16, 172:15, 223:19

**action**
215:4

**actively**
198:17

**actual**
122:16, 131:19, 164:19, 199:1, 203:8, 242:20

**actually**
86:17, 94:19, 100:13, 103:3, 131:17, 135:19, 142:8, 149:5, 196:15, 199:4, 200:9, 201:9, 201:12, 203:10, 203:15, 216:12, 220:3, 223:5, 224:6

**ad**
148:7, 149:16, 149:20, 149:22

**add**
114:21

**added**
10:17, 17:3,

79:5, 79:6, 212:14

**addition**
87:21, 168:11, 172:7, 211:8

**additional**
125:2

**address**
46:12, 211:2, 211:14

**addressed**
48:1, 48:3

**addresses**
46:4

**addressing**
211:13

**adjective**
131:12, 148:14

**admitted**
22:1, 23:2, 151:1

**admittedly**
229:20

**admitting**
105:13

**advance**
20:11, 27:18

**adverse**
73:9

**advertisement**
151:3, 151:7, 151:19, 156:15

**affect**
97:15, 99:14, 131:1, 132:3, 196:15, 205:20

**affected**
68:15, 152:2

**affecting**
204:5

**affects**
65:21, 98:18, 99:2, 202:13, 203:15

**affidavit**
76:20, 78:9, 79:2

**affiliation**
183:3

Transcript of Allan Lichtman
Conducted on September 30, 2019

248

**affirmed**
6:12
**affixed**
245:10
**african**
23:3, 26:1,
86:3, 88:16,
90:8, 91:2,
96:1, 96:16,
98:19, 99:2,
99:4, 99:10,
99:12, 99:19,
100:2, 101:17,
117:6, 128:15,
129:12, 133:6,
142:22, 143:21,
147:9, 148:19,
149:2, 153:4,
153:7, 153:8,
153:19, 153:20,
154:8, 155:9,
155:20, 156:12,
157:5, 157:8,
157:11, 157:13,
157:19, 158:1,
159:3, 159:6,
159:15, 161:13,
163:6, 163:14,
164:6, 164:13,
165:22, 166:9,
166:10, 166:14,
168:3, 173:20,
175:5, 189:17,
189:18, 190:11,
196:15, 202:14,
203:11, 212:15,
212:19, 214:20,
215:16, 215:17,
215:20, 237:14
**after**
19:3, 25:14,
71:19, 79:13,
127:2, 148:1,
171:12, 195:11,
206:2
**again**
13:13, 13:21,
15:5, 15:11,

30:12, 37:9,
42:1, 48:19,
49:2, 49:8,
49:13, 56:13,
56:19, 75:5,
99:16, 103:11,
105:1, 119:15,
185:19, 188:21,
189:9, 189:15,
201:3, 202:15,
203:5, 206:1,
210:15, 224:14,
225:4, 225:17,
226:12, 240:17,
241:7, 242:8
**against**
38:8, 63:6,
88:13, 111:12,
150:20, 164:15,
164:18, 184:3,
189:13
**age**
21:22, 25:3,
67:7, 67:8,
67:9, 141:18,
154:1, 179:6
**agency**
26:8
**aggregate**
122:7
**aggregated**
112:5
**aggregating**
112:17
**ago**
51:19, 52:3,
181:8, 206:15,
212:7
**agree**
13:11, 33:1,
33:5, 37:15,
46:2, 55:21,
56:3, 56:10,
56:15, 56:21,
111:19, 134:12,
144:1, 144:9,
160:3, 169:17,
197:5, 201:20,

205:5, 206:4,
206:10, 230:21,
233:4, 240:22
**agreeable**
7:15, 8:15
**agreed**
13:17, 33:13
**agreement**
13:19
**ahead**
75:21, 137:3,
218:3
**aim**
169:21
**al**
1:9, 5:4, 5:5,
230:5
**alerted**
28:22, 29:9,
212:18
**aligned**
240:2
**all**
8:3, 8:15,
11:16, 14:10,
14:15, 15:2,
19:1, 20:14,
27:7, 28:3,
33:12, 35:20,
36:15, 54:4,
56:15, 60:20,
65:9, 69:13,
69:17, 75:17,
76:5, 79:10,
82:4, 86:4,
86:12, 87:8,
89:13, 98:18,
99:18, 113:15,
115:8, 115:9,
115:22, 116:9,
118:14, 119:10,
119:11, 130:6,
130:20, 131:18,
135:8, 137:6,
141:6, 142:3,
150:17, 163:9,
163:12, 163:19,
166:4, 177:18,

179:9, 180:15,
182:12, 182:13,
186:2, 189:1,
189:11, 189:15,
193:19, 194:15,
199:12, 202:13,
204:6, 204:21,
209:15, 210:4,
210:9, 215:2,
215:7, 215:8,
215:9, 217:17,
217:22, 218:3,
218:5, 219:7,
219:8, 220:13,
221:7, 222:8,
227:13, 232:16
**allan**
1:13, 2:1, 4:2,
5:3, 6:11, 76:19
**allege**
194:20, 241:1
**allen**
1:5, 140:19,
141:21
**allen's**
15:14
**alliance**
154:19, 155:6,
155:8
**allocation**
88:2, 88:8,
88:18, 89:21,
90:6, 90:16,
90:21
**allocations**
201:9
**allow**
62:1
**almost**
131:18, 163:12,
166:3, 166:4,
195:11
**alone**
85:11, 86:3,
108:10, 218:8,
218:12
**along**
222:7

Transcript of Allan Lichtman
Conducted on September 30, 2019

249

**already**
17:5, 29:14,
30:4, 75:5,
78:2, 81:3,
136:3, 156:16,
157:16, 167:17,
177:10, 179:14,
192:5, 205:13,
225:11
**also**
3:21, 10:5,
13:5, 19:6,
25:19, 28:10,
34:6, 35:14,
38:21, 39:5,
39:18, 40:9,
48:10, 53:7,
55:15, 58:10,
64:11, 82:10,
85:6, 100:10,
126:13, 126:14,
127:5, 140:14,
142:5, 143:6,
144:1, 165:10,
176:7, 176:20,
177:3, 181:20,
182:1, 186:14,
188:17, 194:11,
201:15, 203:20,
217:20, 238:3,
239:12
**although**
14:12, 15:4,
17:1, 63:7,
101:15, 114:15,
124:21, 146:13,
149:21, 199:17,
201:19, 211:14,
218:1, 239:7
**alumni**
176:7, 180:21,
181:1, 182:1,
182:6
**alumnus**
182:10
**alums**
182:12
**always**
37:3, 37:11,

**amazing**
77:14, 143:12,
204:3, 234:8
**amazing**
25:3
**amelia**
128:3
**amended**
16:2, 16:6,
171:5, 171:7,
171:11, 171:18,
195:12
**america**
48:8
**american**
31:4, 31:8,
31:16, 32:10,
87:1, 91:2,
96:16, 101:17,
128:15, 129:12,
137:16, 142:22,
143:22, 147:9,
148:19, 149:3,
153:4, 153:19,
153:20, 155:20,
156:12, 157:5,
157:8, 157:11,
157:13, 158:2,
163:6, 164:6,
164:14, 165:22,
166:9, 166:10,
166:14, 168:4,
173:21, 175:6,
189:17, 189:18,
190:11, 214:20,
215:16, 237:14
**americans**
23:4, 26:1,
86:3, 88:16,
90:8, 96:2,
98:20, 99:2,
99:5, 99:11,
99:12, 99:19,
100:3, 117:6,
133:6, 153:7,
153:9, 154:8,
155:9, 157:19,
159:4, 159:6,
159:16, 161:13,

**among**
163:14, 196:15,
202:14, 203:11,
212:15, 212:20,
215:18, 215:20
**among**
43:4, 86:14,
172:17, 173:13,
213:1
**amongst**
192:7, 239:4,
241:2
**amount**
167:1, 168:12,
168:15, 176:13,
184:20, 184:21,
191:17, 197:7
**amounts**
207:17
**analyses**
28:12, 33:11,
33:13, 44:2,
58:5, 60:8,
123:16, 163:7,
234:6, 237:9
**analyze**
65:13, 224:6
**analyzed**
116:20, 126:5,
205:9, 212:17
**analyzing**
12:21, 34:11
**anderson**
32:6, 32:8
**angeles**
230:8
**ann**
242:12, 243:12
**annabelle**
3:4, 6:2
**anne**
65:15, 170:9,
172:11
**another**
27:11, 77:16,
77:18, 95:10,
111:8, 126:5,
126:9, 139:1,
152:4, 164:22,

**answer**
165:13, 166:15,
170:13, 172:16,
192:13, 192:15,
192:16, 199:5,
200:10, 201:19,
201:20, 210:12
**answer**
39:15, 59:12,
71:1, 83:3,
91:8, 91:10,
108:16, 119:4,
119:20, 120:6,
120:15, 129:1,
168:6, 187:3,
188:21, 200:10,
208:3
**answerable**
187:1
**answered**
7:22, 157:16,
225:11, 230:18
**answers**
8:4, 37:2,
37:5, 37:12,
37:13, 123:3
**anymore**
141:19
**anyone**
14:7, 36:21,
65:22, 96:6,
142:13, 156:19,
200:11
**anything**
12:12, 24:15,
28:13, 38:19,
45:19, 76:7,
76:8, 79:4,
79:5, 153:2,
167:8, 178:5,
178:6, 179:4,
182:22, 207:11
**anywhere**
54:17, 101:13,
118:17, 118:22,
119:5, 123:12,
235:4
**apartments**
63:6

Transcript of Allan Lichtman
Conducted on September 30, 2019

250

apologetic
74:11
apologize
35:18, 75:6,
76:10, 82:21,
88:20, 120:16,
164:1, 228:6
apparently
29:12, 146:18
appeal
141:21, 142:1,
142:12, 142:15,
142:16, 143:11,
145:8, 149:10,
151:15, 152:2,
152:22, 156:6,
156:10, 157:14,
158:9
appeals
63:2, 139:21,
140:8, 140:9,
140:12, 140:13,
144:22, 145:13,
150:2, 153:11,
153:13, 154:6,
158:5
appear
55:11, 138:14,
144:8, 148:18,
148:21, 189:5,
224:9
appears
18:4, 72:9,
74:9, 84:18,
88:18, 92:12,
131:20, 132:11,
133:21, 148:9,
171:2, 175:11,
184:10, 231:3,
231:9, 243:13
appellate
33:20
appendices
227:9
apples
68:22, 94:19,
94:20
application
239:10, 239:12

applied
105:3, 123:11,
225:15, 232:11,
239:2
applies
201:18
apply
105:19, 221:17
appointed
31:9, 31:11,
163:17, 189:18
appointment
163:17
appreciate
76:12, 77:9
approach
225:8, 243:1
approaching
62:5
appropriate
127:12
approved
153:2
approvingly
52:8, 52:17
approximate
50:17, 51:1,
76:20
approximately
5:11, 49:20,
50:14, 50:16,
139:15
april
72:13
area
37:18, 66:1,
113:20, 169:3
areas
62:4, 132:4,
202:1, 202:10,
202:13, 203:14,
227:11
arguing
185:22, 190:6,
207:9
around
31:10, 32:5,
51:7, 81:20,

82:9, 164:9,
240:8
array
163:18
art
104:19, 104:20
article
18:18, 19:13,
19:15, 19:18,
19:21, 20:17,
20:22, 21:7,
21:9, 29:14,
29:18, 29:19,
47:20, 48:3,
48:14, 48:20,
49:4, 79:17,
140:22, 146:2,
146:9, 172:16,
193:13, 193:17,
222:19, 223:2,
223:12
articles
29:15, 30:4,
30:9, 30:11,
48:22, 146:14,
170:20, 171:1,
194:13, 194:20
asian
56:4, 56:11,
57:13, 58:11,
58:14, 58:22,
59:4, 59:9,
59:14, 59:19,
61:3, 61:5,
61:15, 62:8,
62:12, 62:19,
63:13, 63:20,
64:13, 67:8,
68:11, 90:17,
97:1, 98:4,
107:12, 107:14,
109:18, 117:10,
118:21, 120:5,
120:7, 134:12,
134:22, 139:16,
148:22, 149:1,
194:5, 207:12,
207:16, 209:13,

215:5, 222:3,
224:4, 237:20,
238:2
asians
59:20, 63:17,
64:7, 64:17,
66:22, 67:2,
67:20, 69:2,
69:5, 95:19,
95:22, 97:3,
97:6, 98:7,
98:11, 98:20,
100:5, 107:10,
107:16, 114:3,
116:14, 117:1,
117:12, 118:3,
119:2, 119:7,
119:10, 119:14,
120:2, 120:12,
120:15, 120:20,
121:16, 131:8,
131:14, 132:3,
133:14, 133:21,
133:22, 134:1,
134:8, 134:9,
134:20, 135:19,
136:13, 136:14,
137:3, 137:7,
137:10, 138:15,
138:17, 139:6,
200:16, 209:11,
210:6, 216:1,
216:3, 218:7,
222:5, 225:20,
226:4, 227:11
aside
18:6, 121:12
asked
7:18, 8:1,
17:10, 135:13,
147:18, 147:20,
151:8, 152:3,
156:16, 170:10,
179:16, 216:19,
230:18, 242:4
asking
20:6, 56:21,
57:8, 64:2,

Transcript of Allan Lichtman
Conducted on September 30, 2019

251

105:10, 105:19,
173:1, 178:10,
202:19, 225:4,
226:12, 227:14
**aspect**
88:12
**aspirational**
201:8, 203:10,
203:21, 204:1,
204:4, 204:10,
205:5, 205:13,
205:20, 206:3
**assembly's**
71:18
**asserting**
112:6
**assessing**
125:18, 199:21
**assessment**
22:22, 144:9,
179:17
**assistance**
133:15
**assistants**
10:20
**associate**
153:8, 154:7
**associated**
142:17, 155:15,
159:3
**associating**
153:3
**association**
176:7
**assume**
7:17, 7:22,
8:3, 86:1,
109:13, 109:20,
120:21, 129:4,
137:16, 139:10,
179:5, 231:18
**assumes**
215:4, 215:7
**assuming**
128:11, 129:20,
157:10, 177:6
**assumption**
43:18

**at-large**
29:7, 87:21,
170:19, 172:5,
173:11
**athletics**
179:21
**atomic**
150:5
**attached**
4:7, 9:8,
53:13, 53:18,
53:20, 75:8,
77:1, 77:5,
212:6, 213:11,
223:12, 226:21
**attainment**
63:15
**attempt**
61:15, 157:17,
221:22, 222:3
**attempted**
154:7
**attempts**
87:4, 153:8,
158:10
**attention**
43:10, 49:17,
52:20, 69:7,
70:14, 72:5,
80:1, 81:2,
92:6, 98:12,
98:16, 124:14,
127:17, 138:11,
139:2, 147:22,
148:5, 154:2,
184:8, 206:16
**attitude**
199:18
**attorneys**
53:22
**attribute**
90:6, 158:15,
176:6
**attributed**
156:7, 158:14,
159:2
**attribution**
153:1, 156:5,

156:18, 157:22,
158:17, 159:11
**attributions**
155:2
**audio**
246:6
**august**
9:12, 14:21,
15:2
**availability**
133:3, 133:15
**available**
199:18
**average**
106:17, 138:8,
219:15
**averages**
138:5, 240:5
**avoid**
70:11, 219:19
**await**
241:13
**award**
170:14
**awarded**
204:15, 204:16,
204:18
**awarding**
25:20, 26:2
**aware**
12:13, 12:14,
24:20, 36:16,
66:6, 83:20,
90:15, 90:20,
95:16, 123:19,
125:22, 128:3,
128:8, 128:14,
128:18, 129:16,
130:14, 150:14,
150:19, 151:2,
151:6, 155:10,
156:21, 157:3,
168:21, 171:4,
171:11, 171:15,
173:20, 174:5,
177:3, 179:20,
180:1, 180:4,
180:7, 181:17,

181:22, 182:14,
182:18, 205:15,
205:18, 221:18,
223:7, 226:13
**away**
22:21, 23:11,
35:19, 178:14

**B**

**back**
16:4, 18:8,
19:13, 30:11,
31:2, 42:4,
55:16, 58:12,
65:16, 65:18,
65:19, 72:5,
74:3, 75:20,
79:20, 80:1,
82:19, 94:3,
108:14, 116:6,
133:12, 140:11,
141:17, 175:14,
193:1, 199:22,
217:2, 220:17,
222:18, 229:13,
230:7, 230:11,
232:16, 235:14,
238:12
**backed**
190:11
**background**
180:9, 180:11
**bad**
108:14, 108:16,
150:5
**balanced**
230:5
**balances**
138:20
**ballot**
32:7, 208:21,
209:7
**ballots**
147:11
**ballpark**
37:13
**bamboozle**
158:10

Transcript of Allan Lichtman
Conducted on September 30, 2019

252

**banded**
190:2
**banner**
159:15
**barely**
151:14
**based**
16:21, 17:8,
17:11, 21:7,
21:8, 35:4,
36:20, 38:18,
42:17, 44:21,
55:11, 72:10,
108:9, 171:1,
215:9, 218:7,
237:10, 242:19
**basic**
235:3
**basically**
126:22, 139:19
**basis**
38:13, 87:7,
126:5
**beach's**
55:22, 178:17,
196:4
**bears**
46:18, 63:9
**because**
7:21, 11:5,
12:9, 13:14,
24:18, 29:11,
33:9, 37:11,
39:22, 42:22,
55:5, 58:16,
61:17, 66:19,
71:1, 85:3,
86:12, 87:16,
92:2, 95:20,
99:3, 101:6,
104:16, 105:22,
109:11, 113:17,
114:2, 114:12,
116:3, 118:5,
122:16, 126:14,
127:13, 129:5,
130:10, 131:18,
135:18, 136:2,

136:15, 137:1,
137:16, 139:9,
141:11, 141:15,
154:13, 158:13,
166:13, 174:19,
187:22, 189:10,
189:11, 190:6,
206:2, 207:15,
209:5, 210:20,
211:15, 212:15,
214:16, 224:2,
227:9, 233:14,
234:16, 242:8,
242:21
**become**
16:21, 83:13,
114:21
**becomes**
104:14
**becoming**
85:21, 86:13,
232:8
**been**
7:2, 7:7, 7:10,
11:6, 12:10,
17:10, 20:12,
23:5, 27:17,
30:18, 32:19,
34:22, 36:15,
41:15, 48:1,
48:19, 49:20,
51:16, 52:4,
52:11, 53:20,
55:1, 55:17,
61:12, 63:1,
63:5, 73:3,
75:5, 76:18,
83:7, 84:15,
88:3, 107:11,
107:21, 114:10,
116:9, 120:4,
123:7, 125:14,
147:19, 154:21,
154:22, 157:4,
157:7, 157:19,
157:20, 157:21,
158:1, 163:15,
163:16, 164:22,

171:3, 175:3,
175:6, 179:14,
185:16, 188:5,
188:9, 189:17,
194:12, 195:4,
195:20, 205:1,
206:3, 213:12,
220:6, 229:9,
230:11, 233:15,
233:16, 234:8,
241:12
**before**
2:15, 8:18,
11:22, 28:4,
28:8, 28:10,
35:18, 51:17,
80:4, 113:8,
129:1, 152:11,
192:16, 205:10,
206:8, 227:6,
245:2
**begin**
32:3, 46:1,
103:9, 140:4,
145:17
**beginning**
81:19, 132:15
**begins**
87:20, 131:21,
161:10, 193:22
**behalf**
3:2, 3:12,
91:19
**behavior**
34:11, 39:9,
42:10, 43:2,
61:11, 120:11,
225:14
**behind**
6:19, 102:21,
137:3, 137:7,
156:6, 197:7,
198:12, 202:13,
240:2
**being**
5:8, 6:12,
8:22, 20:16,
21:15, 21:16,

21:20, 23:11,
24:19, 25:16,
36:17, 53:2,
61:8, 94:10,
97:3, 99:17,
99:18, 107:1,
115:6, 154:17,
162:13, 187:15,
195:4, 200:9,
201:16, 205:6,
214:13, 214:14,
215:12, 238:18
**belabor**
120:17
**believe**
12:16, 16:4,
19:6, 21:12,
22:9, 22:12,
23:13, 24:4,
25:10, 31:18,
31:21, 35:7,
36:2, 58:21,
59:4, 69:20,
70:6, 70:16,
80:14, 83:8,
87:14, 98:2,
98:7, 100:10,
101:14, 102:7,
114:13, 115:11,
118:2, 118:5,
121:14, 125:7,
127:19, 153:16,
160:20, 164:7,
164:17, 178:15,
190:14, 190:21,
203:18, 204:12,
206:22, 213:3,
232:16, 232:20,
235:22
**bell**
125:16, 150:22,
236:18
**belongs**
148:16
**below**
130:1, 185:16,
240:9, 240:11,
240:19, 241:1,

Transcript of Allan Lichtman
Conducted on September 30, 2019

253

241:6, 242:6
**ben**
128:18
**bernard**
40:10
**best**
6:21, 8:5,
55:6, 71:2,
75:18, 80:12,
119:11, 123:13,
246:5
**better**
110:16, 146:12,
209:9, 224:14,
225:4, 226:12,
227:14
**between**
37:10, 37:20,
39:2, 40:19,
40:21, 41:17,
47:9, 47:11,
57:9, 57:13,
57:19, 60:18,
60:21, 68:11,
70:8, 87:1,
94:16, 97:19,
98:3, 99:10,
99:22, 100:4,
101:9, 102:6,
103:18, 106:1,
107:5, 108:12,
110:10, 117:10,
117:11, 117:17,
117:18, 117:20,
117:21, 118:18,
119:2, 119:4,
119:16, 121:15,
123:1, 133:1,
133:5, 134:8,
134:19, 136:6,
137:10, 138:15,
138:17, 139:5,
139:11, 139:17,
141:12, 150:12,
158:4, 169:18,
171:15, 177:8,
188:6, 188:19,
194:19, 195:20,

209:20, 210:2,
210:7, 210:18,
211:7, 212:9,
215:5
**beyond**
20:12, 22:5,
65:16, 80:17,
95:12, 106:22,
120:12, 239:18
**bibliography**
223:9
**big**
35:16, 41:8,
42:5, 42:7,
116:19, 159:15
**bigger**
134:6
**biggest**
90:13
**bill**
71:18, 71:20,
72:4
**bills**
81:4, 81:11,
82:5, 82:8
**biological**
223:5
**biology**
225:2
**bit**
9:22, 34:10,
38:2, 77:9,
123:4, 131:12,
131:17, 234:21
**black**
22:17, 29:5,
38:20, 48:17,
56:4, 56:9,
56:12, 62:8,
62:12, 62:18,
63:13, 63:20,
64:13, 92:13,
104:6, 106:18,
107:5, 108:20,
109:14, 109:19,
111:9, 111:21,
117:10, 125:18,
134:14, 154:6,

166:4, 166:5,
166:7, 167:3,
168:9, 168:19,
182:10, 185:10,
186:4, 187:21,
193:7, 194:5,
208:5, 208:8,
209:17, 215:2,
215:5, 215:9,
218:5, 218:7,
218:11, 218:12,
219:4, 219:6,
224:7, 234:12,
234:15, 234:17,
234:22, 241:5,
241:6
**black-hispanic**
57:21
**black-white**
56:17, 57:1,
57:7, 57:14
**blacks**
47:3, 56:20,
57:10, 63:17,
64:7, 64:9,
64:17, 69:1,
69:4, 94:18,
106:1, 106:11,
107:16, 109:14,
109:21, 114:2,
114:4, 114:6,
116:14, 116:18,
117:12, 118:2,
118:9, 118:18,
119:2, 119:7,
119:9, 119:14,
119:18, 119:21,
120:20, 121:15,
131:8, 131:13,
132:2, 134:21,
200:16, 208:15,
211:3, 211:7,
211:10, 213:21,
215:12, 217:20,
218:6, 222:4,
234:3, 234:11,
234:12, 234:15,
234:18

**bland**
22:22
**blatant**
21:22, 150:13
**board**
51:14, 230:6
**boards**
196:4, 196:8,
196:11
**bolded**
129:15
**bomb**
150:5, 150:6
**book**
48:7
**border**
141:8
**both**
12:18, 28:18,
36:11, 50:20,
50:21, 55:16,
62:6, 74:13,
74:20, 144:10,
150:1, 170:4,
170:16, 176:10,
186:1, 203:18,
218:4, 219:11,
219:12, 234:22
**bother**
208:2
**bottom**
84:10, 143:3,
156:8
**bound**
64:4
**boundaries**
102:10
**box**
38:20
**boy**
111:17
**boynton**
3:14, 5:18,
18:1, 18:7,
75:14, 75:21,
76:12, 77:6,
77:13
**break**
8:8, 8:9,

Transcript of Allan Lichtman
Conducted on September 30, 2019

254

17:21, 18:8,
73:17, 74:5,
74:13, 74:22,
75:2, 76:4,
77:16, 77:18,
77:19, 77:22,
79:19, 80:4,
124:6, 192:13,
192:15, 193:4
**breakdown**
73:5, 122:16
**breaking**
154:13
**breaks**
141:7
**brief**
13:14, 13:15,
13:21, 131:19
**briefly**
12:8, 12:20,
28:6, 64:22
**bright**
129:12
**bring**
20:3
**bringing**
9:6
**bristol**
180:2
**broad**
43:21, 237:3
**broadcast**
170:4
**broadly**
100:15
**broke**
73:12
**brought**
20:2, 20:4,
158:22
**brow**
104:16
**bruce**
26:3, 176:3,
176:12, 176:16,
176:20, 177:3,
177:8, 180:16,
181:9, 185:12

**budget**
234:10
**bullet**
142:19
**bulletin**
222:20, 223:3
**burden**
88:3
**burdened**
134:21
**burdens**
138:9
**buried**
224:17
**burton**
208:17
**bush**
149:17
**business**
178:20, 183:17,
200:17
**businesses**
196:17
**busy**
218:20

----
**C**

**cabinis**
217:19
**calculate**
136:19, 137:1
**calculator**
135:12
**call**
35:1, 35:2,
39:19, 39:21,
121:21, 157:14,
174:19, 231:11
**called**
20:7, 40:11,
48:7, 122:5,
216:13
**came**
16:16, 19:3,
20:14, 25:14,
135:13, 136:21,
147:5, 147:21
**campaign**
2:5, 3:7, 5:9,

14:6, 140:4,
150:15, 153:2,
153:3, 156:14,
160:14, 167:9,
171:17, 177:4,
183:20, 227:1
**campaigns**
146:17
**can't**
27:18, 33:3,
38:19, 40:6,
48:14, 50:1,
58:14, 59:6,
60:8, 61:4,
66:10, 84:3,
91:16, 93:15,
99:8, 107:12,
107:13, 110:5,
113:15, 118:20,
119:4, 120:4,
120:12, 121:7,
130:2, 135:11,
137:19, 138:22,
156:19, 165:1,
166:12, 168:6,
188:12, 197:2,
200:10, 206:7,
209:5, 209:13,
210:5, 216:2,
223:9, 224:3,
227:12, 228:22,
229:16, 239:7
**cancel**
98:11
**candidacies**
207:5
**candidacy**
129:6, 129:17,
129:18, 184:16,
188:15
**candidate**
29:6, 29:7,
32:9, 101:17,
101:18, 102:4,
104:6, 108:2,
108:9, 108:13,
108:20, 108:21,
109:3, 109:9,

109:20, 109:22,
110:18, 111:12,
112:3, 114:6,
114:18, 123:16,
124:16, 128:15,
129:13, 155:22,
157:4, 164:7,
165:1, 165:13,
165:22, 166:6,
166:9, 166:18,
166:21, 167:6,
167:10, 186:4,
186:20, 189:7,
206:17, 208:18,
208:19, 209:2,
209:3, 209:10,
212:19, 212:21,
214:2, 214:13,
214:14, 214:15,
214:18, 215:17,
216:6, 217:20,
217:21, 218:4,
218:5, 218:13,
218:14, 219:7,
226:6, 240:3
**candidates**
29:5, 38:8,
47:3, 47:6,
62:13, 62:18,
101:9, 106:11,
106:19, 108:7,
109:15, 109:16,
110:11, 110:15,
111:2, 111:6,
115:19, 116:16,
116:18, 117:6,
121:18, 124:22,
125:19, 126:6,
126:11, 127:8,
144:21, 147:8,
155:11, 155:14,
163:6, 164:14,
168:4, 168:9,
168:19, 170:8,
185:3, 185:10,
187:21, 190:11,
190:15, 191:1,
198:17, 199:7,

Transcript of Allan Lichtman
Conducted on September 30, 2019

255

200:1, 207:13,
208:5, 208:8,
208:14, 209:16,
210:9, 211:4,
211:10, 212:14,
213:1, 213:20,
213:21, 213:22,
214:7, 214:20,
215:8, 215:11,
215:20, 215:22,
216:3, 217:1,
218:3, 218:12,
219:12, 239:1,
241:6
**candor**
75:15
**cannot**
107:15, 188:14,
189:12, 207:16,
225:19
**capable**
77:11
**caps**
35:20
**career**
160:6
**careful**
195:20
**carolina**
33:10, 33:18,
52:12
**cases**
10:14, 27:18,
30:22, 32:4,
32:16, 33:4,
33:6, 33:19,
40:16, 41:22,
42:15, 49:17,
50:3, 50:6,
50:21, 51:1,
52:10, 52:16,
53:14, 53:17,
54:1, 54:2,
54:4, 54:14,
55:10, 55:19,
59:20, 60:6,
60:11, 60:14,
60:19, 60:21,

74:8, 75:9,
75:20, 76:19,
78:9, 79:1,
111:9, 112:16,
113:10, 113:11,
113:14, 114:17,
115:22, 125:10,
125:15, 186:1,
191:22, 223:19,
224:5, 228:14,
228:18, 229:3,
229:7, 229:10,
229:19
**cast**
29:12
**casually**
223:7
**categories**
137:9, 137:12,
137:13
**categorize**
40:18, 142:11,
156:10
**categorizing**
147:8
**causal**
99:8
**cause**
177:9, 188:5,
188:9, 188:18
**caused**
150:22
**celebrezze**
32:6
**census**
66:12, 84:18,
84:22, 85:4,
85:6, 87:2,
87:4, 87:13,
233:5, 233:10,
243:5
**center**
2:5, 3:7, 5:9,
14:6, 71:9,
72:7, 80:5,
82:3, 143:8,
144:4, 227:2
**center's**
81:17, 171:18

**centerville**
166:21, 167:6
**central**
81:14
**centrally**
243:3
**century**
36:4, 140:11
**certain**
16:8, 16:21,
17:2, 21:19,
41:20, 113:20,
174:3, 227:7
**certainly**
12:7, 20:9,
21:6, 21:8,
24:4, 34:1,
35:9, 35:20,
37:12, 42:2,
44:3, 44:4,
45:4, 47:16,
47:18, 48:2,
48:6, 49:13,
51:18, 52:22,
58:17, 64:16,
73:18, 80:20,
83:9, 104:10,
104:12, 112:11,
114:3, 115:15,
118:14, 125:17,
128:5, 128:10,
138:2, 143:13,
155:7, 155:17,
157:22, 159:18,
160:4, 160:9,
168:8, 169:20,
170:21, 171:14,
173:12, 175:10,
177:5, 177:9,
178:3, 179:18,
179:22, 180:3,
180:7, 182:16,
187:14, 188:14,
188:22, 194:7,
194:15, 195:6,
201:18, 205:22,
210:7, 222:17,
233:8, 239:7,

240:16, 240:21,
241:8, 242:10
**certificate**
245:1, 246:1
**certify**
245:3, 246:2
**cet**
1:22
**chain**
19:9, 21:15,
22:8, 23:9,
23:16, 23:22
**chains**
21:10
**challenge**
95:17, 124:2,
176:21
**challenging**
172:4, 172:6,
172:18, 173:14
**chance**
33:16, 147:15
**change**
10:16, 16:17,
16:20, 18:15,
29:13, 110:1,
128:11, 129:21,
143:18, 153:7,
154:9, 155:9,
155:13, 158:20,
159:6, 159:16,
159:21, 160:15,
160:16, 173:9,
180:22, 192:12,
199:8, 204:6,
207:11, 212:12,
213:13, 213:19,
228:3, 228:9
**changed**
12:2
**changes**
16:9, 132:18,
206:10, 206:14
**changing**
114:12, 219:6
**chapter**
228:22
**chart**
4:14, 18:4,

Transcript of Allan Lichtman
Conducted on September 30, 2019

256

84:11, 85:7,
86:19, 86:20,
92:8, 92:9,
92:15, 93:6,
94:4, 94:11,
94:15, 95:20,
96:7, 96:9,
97:6, 114:9,
129:5, 130:4,
130:7, 130:10,
135:17, 139:7,
175:11, 175:17,
175:18, 196:19,
207:2, 211:19,
212:22, 213:3,
213:12, 220:10,
227:18, 227:19,
227:20
**charted**
92:13
**charts**
18:12, 130:11,
131:19, 132:11,
132:12, 132:16,
220:2, 220:7
**check**
37:3, 38:21,
64:1
**checked**
75:11, 109:6
**checking**
55:5, 74:6
**chesapeake**
182:19
**chesley**
174:2, 174:5,
174:7
**choice**
22:2, 29:6,
29:7, 61:3,
108:2, 108:13,
109:4, 110:1,
110:11, 110:15,
110:18, 111:12,
114:6, 114:19,
115:20, 116:16,
116:18, 157:4,
191:1, 208:14,

211:4, 211:10,
212:15, 212:19,
212:21, 213:20,
213:21, 214:1,
214:2, 214:8,
214:13, 214:14,
214:15, 214:18,
215:12, 215:17,
215:20, 215:22,
216:4, 216:6,
217:20, 217:21,
218:4, 218:5,
218:13, 218:15,
219:7, 219:13
**choices**
47:2, 47:6,
101:9, 209:13,
209:17, 209:18
**choose**
130:3
**chris**
5:18, 77:12
**christopher**
3:5, 3:14, 6:4
**circle**
116:6
**circuit**
33:13, 52:7,
52:16
**circumstance**
110:1, 161:16,
162:1, 162:4,
162:14, 162:15,
162:22, 174:20,
174:22, 187:20,
189:11, 190:12
**circumstances**
65:4, 191:20,
214:3, 215:14,
237:19, 241:8
**citations**
171:7
**cite**
19:14, 52:13,
63:9, 89:3,
89:7, 91:4,
140:22, 146:1,
146:10, 164:6,

170:16, 170:20,
172:8, 174:2,
174:7, 190:8,
228:22
**cited**
30:8, 36:1,
52:8, 52:14,
52:16, 98:17,
146:14, 170:4,
171:2, 172:8,
173:16, 203:17,
229:5, 238:10
**cities**
72:4, 83:13,
83:14, 83:17,
178:4, 178:14
**citing**
173:22
**citizen**
67:7, 67:8,
113:21, 178:16
**citizens**
159:20
**city**
1:9, 3:16, 5:4,
19:5, 21:2,
21:5, 22:6,
22:7, 22:9,
25:20, 26:2,
26:15, 27:5,
58:15, 61:18,
63:1, 66:3,
67:17, 70:20,
72:6, 73:6,
81:4, 81:5,
81:11, 82:8,
83:5, 83:7,
83:21, 83:22,
85:20, 86:14,
90:22, 102:12,
107:6, 124:22,
125:2, 127:8,
128:16, 141:13,
160:18, 161:14,
169:11, 170:8,
170:11, 170:13,
176:13, 177:21,
178:12, 178:16,

178:17, 183:12,
189:17, 194:6,
195:5, 195:7,
196:4, 196:12,
196:16, 198:8,
198:11, 198:15,
199:19, 200:7,
200:15, 201:7,
201:21, 204:10,
204:18, 206:13,
232:8, 238:7,
242:16
**city's**
172:18, 173:14,
196:4
**civil**
82:6, 150:19
**claim**
138:22, 155:6
**claiming**
154:19
**clarification**
78:21, 79:1,
93:4
**clarify**
7:21, 45:11,
57:6, 162:12,
227:15
**clear**
23:3, 24:18,
24:22, 27:10,
104:2, 104:4,
104:7, 107:1,
130:9, 136:2,
162:17, 173:15,
238:11
**clearly**
22:18, 145:10,
148:9
**clerk**
6:6
**climate**
22:4
**close**
42:3, 167:4,
171:9, 209:3,
232:5, 243:4
**closer**
49:17, 134:13

Transcript of Allan Lichtman
Conducted on September 30, 2019

| | | | |
|---|---|---|---|
| **clutter** 167:16 | **color** 21:18, 24:8, 148:16, 149:13, 150:9 | **coming** 22:17, 35:17, 168:12, 210:15 | 172:9, 190:16, 194:6, 204:8, 204:22, 205:7 |
| **co-counsel** 74:7 | **color-coded** 147:11 | **comment** 22:11, 23:18, 24:16, 25:6, 112:7, 112:10, 140:15, 140:19, 232:4 | **compactness** 45:14 |
| **coalesced** 115:6 | **coloring** 24:16, 25:1 | | **companies** 182:13, 183:7, 183:9, 190:2, 191:12, 191:19, 192:8 |
| **coalition** 49:1, 62:9, 62:13, 109:14, 113:5, 113:7, 115:10, 117:5, 117:10, 117:16, 117:18, 118:6, 118:9, 119:8, 121:15, 210:21, 211:2, 211:4, 215:4, 215:7, 224:2 | **columbia** 2:16, 245:16 | **commenting** 21:18 | **company** 26:12 |
| | **column** 128:7, 176:1, 184:1, 184:9, 184:20, 184:22, 185:11, 186:7, 214:8 | **comments** 238:4, 238:7 | **comparable** 64:18, 97:21, 135:21, 137:2, 137:5, 137:14, 139:19 |
| | | **commission** 203:6, 229:14 | |
| | | **commissions** 196:5, 196:8, 196:12, 203:9 | **compare** 164:13 |
| | **columns** 184:14, 185:2 | **committee** 173:2, 173:5, 201:1, 202:22, 230:5 | **compared** 90:3, 168:18, 185:4, 197:9 |
| **coalitions** 49:1, 131:4 | **combination** 156:11 | | |
| **cohesion** 109:20, 115:12, 116:15, 117:11, 117:15, 117:18, 117:19, 118:18, 119:1, 119:3, 239:4, 239:13, 239:19, 239:21, 240:6, 240:10, 241:2, 241:9 | **combine** 24:2, 99:9 | **committees** 203:10 | **comparing** 107:10, 107:18, 131:13, 163:5 |
| | **combined** 86:21, 101:11, 108:11, 112:13, 113:12, 114:1, 114:6, 114:18, 116:17, 117:3, 117:5, 121:11, 121:20, 211:3, 216:4, 216:10, 216:22, 217:6, 218:1, 218:6, 218:8, 218:14, 219:4, 222:8 | **common** 126:9, 159:18, 159:19, 159:21, 183:5, 183:7, 183:19, 233:1 | **comparison** 57:8, 57:12, 57:13, 57:18, 57:19, 94:10, 94:16, 94:20, 185:3, 222:1 |
| | | **commonalities** 176:20 | **compensated** 53:2 |
| | | **commonality** 176:11, 222:9 | **competing** 126:12 |
| **cohesive** 56:1, 110:21, 111:20, 114:4, 118:3, 119:18, 119:21, 120:2, 120:7, 120:13, 240:13, 240:17 | | **commonly** 34:20, 35:5, 169:1, 223:18 | **compilation** 221:11 |
| | **combines** 216:5 | **commonwealth** 65:20, 69:22, 73:14 | **complaint** 16:2, 16:6, 91:11, 171:3, 171:5, 171:7, 171:9, 171:11, 171:18, 172:1, 172:6, 195:12, 234:11 |
| | **come** 15:4, 16:14, 18:8, 22:6, 41:2, 95:7, 112:19, 127:19, 135:4, 163:3, 200:17, 200:22, 236:17 | **communities** 90:18, 91:1, 198:4 | |
| **cohesiveness** 48:11, 110:11, 110:14, 110:17, 114:21, 119:14, 119:16 | | **community** 87:1, 91:2, 91:3, 137:17, 157:12, 157:13, 166:7, 166:11, 166:14, 170:19, | |
| **colleagues** 77:11 | | | **complaints** 25:19, 26:2 |
| **college** 181:13 | **comes** 71:19, 80:13, 201:12 | | **complete** 10:4, 10:6, |
| **colloquy** 107:11 | | | |

Transcript of Allan Lichtman
Conducted on September 30, 2019

258

11:19, 68:22,
113:5
**completed**
72:10
**completely**
7:20
**complicate**
115:2, 115:5
**complicated**
115:9
**comply**
82:6
**component**
46:20, 100:20
**composition**
38:9, 242:11
**concentration**
61:13
**concerned**
76:9, 211:9
**concerns**
178:16
**concerted**
199:7, 199:13
**conclude**
102:16, 159:13
**conclusion**
84:20, 85:1,
127:20, 142:14,
163:3
**conclusions**
13:11, 13:20,
42:17, 42:21,
136:21, 138:14,
200:14, 214:12,
215:21
**conclusively**
42:20
**concrete**
201:3, 201:5,
203:9
**concur**
13:19
**condemning**
151:2, 151:6,
151:9
**conduct**
7:11, 11:13,

159:8, 226:10
**confederate**
144:14, 144:21,
145:2, 145:7
**conference**
91:4
**confess**
37:17, 225:17
**confidence**
228:1
**configuration**
65:22, 66:3
**confirm**
9:17, 11:18,
55:16, 78:11,
78:16, 89:16,
161:20, 193:12,
207:14, 213:16,
236:21
**confirmed**
70:16
**confirms**
17:5
**confuse**
188:3
**congratulations**
31:19
**congressional**
35:16, 36:3,
102:9, 229:11
**connection**
99:9, 177:7,
177:10
**consensus**
81:20
**consent**
198:7, 198:13
**consider**
66:16, 67:14,
91:22, 97:5,
138:5, 166:1,
166:20, 167:5,
170:13
**consideration**
140:7, 174:19
**considered**
14:11, 14:16,
15:3

**consistent**
214:10, 214:18
**consistently**
241:1
**conspiracy**
190:7, 190:9,
192:6, 192:7
**constitute**
130:7
**constituted**
65:14
**constitutes**
130:20
**consult**
179:16
**consulting**
49:16
**contain**
14:10, 15:2
**contained**
13:20, 14:17,
70:3, 130:7,
130:15, 165:3,
213:14, 227:5
**contains**
152:4
**contemporary**
146:8, 146:11
**contention**
192:3
**contents**
156:14
**context**
24:14, 24:16,
25:16, 48:13,
68:12, 68:13,
68:14, 145:3,
153:5, 166:3,
166:6, 189:16
**continually**
79:7
**continue**
77:17, 84:6,
87:18, 93:22
**continues**
81:22
**continuously**
31:15

**continuum**
102:18, 103:1,
103:8, 104:1
**contracting**
200:21, 203:13,
204:15
**contracts**
25:21, 26:2,
194:8, 201:9,
204:15, 204:16,
204:17, 204:18,
204:19
**contrast**
106:19, 150:12
**contributed**
18:22, 157:9,
162:7
**contribution**
125:6, 184:6,
185:20
**contributions**
125:17, 125:18,
126:19, 127:1,
127:7, 130:6,
130:15, 130:21,
163:7, 163:8,
163:10, 163:11,
175:17, 178:3,
183:20
**contributors**
185:21
**contributors's**
183:3
**controversies**
25:14
**controversy**
25:9, 29:20,
30:1
**convenience**
8:7
**conversations**
179:19
**cooperatively**
74:14
**copied**
10:15
**copies**
17:18, 76:17

Transcript of Allan Lichtman
Conducted on September 30, 2019

259

**copy**
4:15, 10:12,
20:17, 79:22,
207:2, 217:16
**corey**
144:15
**corner**
143:3, 144:7
**correct**
7:4, 13:9,
18:5, 31:5,
35:7, 43:18,
44:8, 44:19,
45:9, 45:10,
59:7, 61:7,
62:10, 64:1,
65:2, 65:8,
68:8, 70:1,
71:11, 72:8,
72:17, 72:20,
80:11, 80:15,
84:17, 84:21,
89:19, 93:7,
94:22, 98:22,
107:7, 120:10,
125:9, 127:10,
128:16, 128:17,
129:20, 131:9,
131:10, 131:22,
132:14, 133:4,
133:8, 133:17,
133:19, 134:3,
134:11, 136:8,
138:18, 139:18,
140:3, 140:6,
140:17, 143:2,
143:5, 143:8,
144:11, 146:3,
152:6, 160:8,
160:22, 164:16,
164:17, 175:20,
175:21, 176:2,
178:6, 181:10,
184:22, 185:5,
191:21, 195:12,
198:10, 203:8,
205:7, 206:5,
207:17, 208:6,

213:17, 224:13,
225:1, 228:2,
228:5, 228:17,
230:21, 231:1,
237:15, 246:3
**correction**
17:12, 28:21,
29:4
**correctly**
51:15, 184:15,
188:8
**correlation**
99:22
**correspondence**
14:4
**could**
17:17, 22:3,
30:20, 38:7,
42:18, 43:1,
57:6, 68:3,
83:9, 102:3,
107:20, 108:10,
111:3, 111:7,
113:22, 114:5,
114:19, 117:22,
121:9, 121:19,
122:19, 126:13,
128:21, 137:19,
149:1, 149:2,
149:3, 154:16,
155:16, 159:18,
174:8, 178:19,
179:15, 183:17,
186:2, 187:14,
189:2, 200:11,
240:10
**couldn't**
68:1, 113:18,
113:19, 159:7,
177:14, 177:19,
182:20, 222:17,
241:1
**council**
63:1, 102:12,
124:22, 125:3,
127:8, 128:16,
130:6, 161:14,
169:11, 169:14,

170:9, 170:12,
170:14, 172:14,
172:16, 173:8,
176:13, 200:17,
204:2, 204:10,
229:14, 238:7
**counsel**
5:15, 6:15,
14:6, 17:16,
27:15, 27:16,
27:18, 28:2,
54:9, 54:20,
74:11, 115:21,
115:22, 165:9,
179:16, 179:19,
191:4, 193:4,
193:6, 228:15,
245:5, 246:7
**count**
133:9, 133:12,
139:14, 189:12,
212:20
**counted**
30:20
**counterevidence**
194:17
**country**
141:6
**counts**
92:3
**county**
65:15, 142:6,
229:14, 229:15,
230:8, 242:14,
242:16, 243:13
**couple**
17:13, 51:20,
79:7, 223:8,
229:10
**course**
14:18, 32:8,
33:3, 34:7,
34:16, 65:21,
69:12, 111:6,
151:12, 178:19,
219:21, 221:19,
236:11, 236:15
**court**
1:1, 5:6, 5:13,

6:8, 8:20,
32:19, 32:22,
33:11, 33:20,
35:11, 35:14,
36:16, 36:18,
36:22, 74:19,
112:12, 112:14,
242:22, 245:1
**courthouse**
3:17
**courts**
10:14, 51:17
**covered**
102:10, 120:16,
141:5, 207:13
**create**
220:7, 220:10
**created**
168:8, 236:22
**creator**
123:6
**creature**
142:18
**creatures**
142:17
**credibility**
195:9, 231:4
**credit**
123:9
**credited**
123:8
**criminals**
149:13
**criteria**
83:19, 83:20,
126:17
**critical**
85:19, 203:14
**criticism**
231:2
**criticized**
229:17
**criticizing**
23:20
**cross**
232:12
**crossing**
242:5

Transcript of Allan Lichtman
Conducted on September 30, 2019

260

**crossover**
49:12
**current**
65:22, 66:2,
132:2, 161:16,
162:4, 162:13,
173:9, 184:4,
233:6, 233:8
**currently**
65:14
**curriculum**
4:12
**cursorily**
233:19, 235:3
**cutting**
34:4
**cv**
48:2, 50:7,
53:13, 53:17,
54:19, 55:9,
55:18, 74:9,
75:9, 77:3,
78:14, 78:17,
79:6

**D**

**daily**
202:14
**dallas**
242:14, 242:15,
243:13
**dark**
144:6, 144:12,
148:8, 148:14
**darker**
148:13, 149:7,
150:13
**darrell**
2:15, 5:14,
245:2, 245:15
**data**
4:15, 11:14,
14:11, 14:16,
15:2, 44:7,
80:7, 84:19,
87:2, 87:3,
87:4, 87:7,
87:10, 87:13,

95:5, 95:18,
101:21, 122:7,
137:17, 137:21,
137:22, 175:19,
197:20, 197:21,
198:1, 199:1,
200:11, 202:5,
220:7, 220:10,
221:10, 226:10,
226:13, 232:7,
233:2, 233:5,
236:21, 236:22,
237:5, 237:6,
237:8, 237:10,
242:19
**database**
179:13
**date**
34:3, 72:12,
72:15, 79:3,
84:19, 94:4,
137:15, 147:7,
243:7, 243:11,
243:13
**dated**
9:11, 9:12,
10:8, 193:6
**dates**
76:19, 195:13
**daubert**
32:20
**dave**
22:9, 23:7,
23:17, 235:18,
238:4
**davenport**
128:18, 129:6
**day**
21:22, 25:3,
78:1, 116:9,
147:22, 179:6,
245:10
**days**
218:18
**dc**
1:14, 2:8, 3:9,
5:10, 31:5,
31:16

**deal**
232:14, 233:22
**dealing**
101:6, 101:7,
115:16, 187:19,
201:10, 210:21
**dealings**
183:17
**deals**
80:22
**dealt**
214:9
**decade**
36:4, 140:14
**deceitful**
154:6, 154:11,
154:12, 155:3,
158:9, 158:16
**deceiving**
158:18
**decennial**
87:2, 87:4,
87:13, 243:5
**decide**
112:14, 127:11,
152:1, 211:1,
225:16
**decision**
27:14, 35:11,
219:15
**declaration**
89:6, 91:15
**declined**
86:17
**declining**
234:21, 242:17
**decree**
198:7, 198:13
**deeper**
180:19
**defeat**
151:16, 187:8
**defeated**
111:21, 215:13
**defeats**
211:10
**defendant**
33:16, 50:19

**defendant's**
15:20, 54:9
**defendants**
1:10, 3:12,
5:17, 5:19,
5:21, 6:15,
6:18, 55:2,
55:12
**defense**
91:9
**defense's**
15:9, 15:14
**define**
29:22, 47:11,
101:2, 149:10
**definitely**
77:21, 114:16
**definition**
83:16, 109:12,
109:22, 110:6,
112:11
**definitive**
105:17
**definitively**
195:5
**degree**
47:4, 47:5,
101:11, 103:19,
131:3, 140:10
**degrees**
103:22
**delay**
74:18, 77:20
**delegates**
148:2
**demean**
143:21
**demeaning**
144:2
**democrat**
155:11, 155:14
**demographic**
12:11, 38:9,
41:1, 41:2,
61:12, 122:15
**demonstrates**
121:14
**demonstration**
21:17

Transcript of Allan Lichtman
Conducted on September 30, 2019

261

**denied**
150:15
**denominator**
215:3
**deny**
150:17
**department**
196:21, 198:3,
198:6, 198:16,
198:18, 200:2,
200:5, 234:10
**depending**
233:9
**depends**
58:9
**depicted**
143:6, 152:21
**depictions**
143:9
**depos**
5:12, 5:15
**deposed**
7:2, 7:7, 7:10,
32:12
**deposition**
1:13, 2:1, 4:8,
5:3, 5:8, 8:10,
8:22, 9:7, 9:15,
12:1, 19:10,
21:11, 24:12,
28:1, 28:5,
28:8, 28:11,
30:12, 39:20,
53:10, 54:12,
76:1, 76:20,
76:22, 77:4,
77:9, 78:9,
79:2, 100:18,
132:16, 147:4,
165:6, 212:2,
212:5, 212:11,
213:10, 219:20,
226:20, 236:6,
245:3
**depositions**
7:11, 30:16,
235:18, 235:20,
236:1, 236:2

**depth**
12:9, 12:19,
12:21, 13:13
**derive**
102:3
**derived**
221:11
**describe**
101:2, 117:21,
119:17, 153:12,
159:22
**designation**
84:5
**desire**
157:12
**despite**
74:7, 198:13
**detail**
138:1
**detailed**
89:3, 92:2
**details**
12:11, 123:17,
201:3, 232:4
**determination**
58:2, 58:3,
58:5
**determine**
27:8, 45:21,
59:18, 101:19,
109:9, 179:11,
180:20
**determined**
109:4, 178:11
**determining**
122:6, 225:12
**developed**
34:12, 191:22,
192:1
**developer**
26:4, 176:21
**developers**
123:8, 176:22
**developments**
169:3
**differ**
47:2
**difference**
37:10, 47:6,

60:18, 87:1,
97:12, 97:19,
98:3, 101:12,
103:13, 103:17,
104:7, 104:11,
104:12, 106:3,
106:21, 108:12,
110:10, 117:9,
117:17, 123:1,
127:4, 136:1,
136:6, 136:11,
136:20, 158:4,
169:18, 180:13,
210:2, 217:8
**differences**
43:4, 60:21,
60:22, 101:9,
102:6, 117:21,
122:20, 122:22,
134:19, 171:15,
210:17, 211:7,
212:9
**different**
8:20, 17:4,
36:6, 43:4,
68:14, 68:18,
70:10, 101:6,
112:20, 117:8,
123:3, 136:10,
147:11, 162:18,
171:21, 184:11,
184:13, 208:16,
209:18, 209:22,
211:5, 218:21,
219:1, 225:14
**differently**
222:5
**difficult**
37:15, 42:14,
114:21, 152:3,
198:19, 198:22
**digest**
17:21, 76:5
**digital**
141:18
**dim**
239:8
**direct**
184:2

**directly**
146:7, 204:7,
211:17
**director**
81:18
**disagree**
46:2
**disagreed**
13:3, 33:11
**disciplines**
224:22
**discover**
238:6
**discovered**
76:8, 125:1,
200:4
**discovery**
15:9, 15:10,
15:15, 15:20
**discriminated**
63:6
**discrimination**
44:5, 63:12,
63:20, 64:13,
66:20, 68:16,
69:3, 80:21,
82:11, 88:13,
90:14, 97:14,
132:2, 200:13
**discriminatory**
198:8
**discuss**
21:1, 152:15,
210:13, 242:12,
242:15
**discussed**
6:19, 27:8,
34:22
**discussing**
80:5, 80:7,
133:20
**discussion**
78:8, 131:19,
145:2, 145:7
**discussions**
14:5, 144:20,
238:18
**dismal**
215:19

Transcript of Allan Lichtman
Conducted on September 30, 2019

262

| | | | |
|---|---|---|---|
| dismissed | distinguishing | donated | 73:12, 84:6, |
| 54:15 | 42:12 | 128:4, 128:8, | 87:20, 127:22, |
| disparate | distribute | 128:18, 129:16, | 144:16, 144:18, |
| 39:2 | 74:21 | 129:17 | 147:15, 177:20, |
| disparities | distributing | donating | 182:20, 185:11, |
| 25:22, 133:1, | 156:2 | 168:18 | 204:21, 205:10 |
| 133:13, 138:10, | distribution | donations | downward |
| 138:15, 138:16, | 68:20, 127:1 | 168:12, 168:15, | 38:12 |
| 139:10, 194:8, | district | 168:18, 187:13, | dozens |
| 197:19, 204:4, | 1:1, 1:2, 2:16, | 187:18 | 7:8, 30:16 |
| 204:7, 205:2, | 5:6, 33:10, | done | drafting |
| 206:6 | 33:20, 36:2, | 12:22, 54:14, | 16:6 |
| disparity | 113:18, 113:19, | 60:14, 68:1, | dragging |
| 99:10, 133:5, | 114:5, 167:6, | 74:6, 89:20, | 197:7 |
| 134:5, 134:8, | 169:18, 170:12, | 102:7, 103:2, | draw |
| 134:18, 135:16, | 189:7, 232:2, | 113:13, 118:8, | 21:8, 42:16, |
| 137:10, 137:13, | 245:16 | 118:13, 118:14, | 42:21, 50:3, |
| 139:5, 139:11, | districting | 131:6, 184:12, | 98:16, 113:18, |
| 139:16, 202:7, | 115:17 | 191:6, 216:12, | 113:19, 113:22, |
| 203:18, 204:2, | districts | 226:9, 243:21 | 158:3, 214:12 |
| 204:11, 205:3 | 45:18, 49:1, | donor | drawing |
| disproportionate- | 49:7, 49:12, | 168:17, 169:2, | 12:11, 45:18, |
| ly | 115:19, 115:19, | 175:22, 176:1, | 234:5, 242:9 |
| 99:4 | 121:19, 164:14, | 176:4, 184:9, | drawn |
| dispute | 169:15, 210:21, | 185:4 | 121:19, 215:21, |
| 119:13, 126:4, | 242:11, 242:18 | donors | 242:18, 242:21 |
| 133:11, 141:9, | disturbing | 163:9, 168:21, | drive |
| 202:15, 239:18 | 99:12 | 169:6, 180:15, | 3:17 |
| disseminated | divided | 182:5, 184:2, | duly |
| 141:16 | 135:5 | 185:9, 185:12, | 6:12 |
| distance | doctor | 186:6, 187:8, | during |
| 141:12, 141:18 | 20:4, 88:20 | 189:2, 189:4, | 9:15, 24:13, |
| distinct | document | 190:10, 191:11, | 32:18, 39:20, |
| 86:16, 112:4 | 75:10, 78:11, | 191:12, 191:18 | 74:5, 77:19, |
| distinction | 86:12, 99:8 | double | 79:18, 127:8, |
| 37:20, 68:10, | documented | 64:10, 122:6, | 161:15, 162:3, |
| 145:6, 158:3, | 90:2 | 122:11, 123:11, | 235:19, 236:11, |
| 158:7, 162:17, | documenting | 123:15, 123:20 | 236:15, 238:4 |
| 180:12, 194:18 | 97:14 | doubt | dyslexia |
| distinctions | documents | 25:5, 25:7 | 154:1 |
| 86:14 | 74:20 | doubts | |
| distinctive | doing | 233:11 | **E** |
| 112:22 | 34:16, 41:15, | douglas | each |
| distinguish | 58:5, 71:2, | 165:3 | 73:5, 102:4, |
| 195:20 | 135:9, 135:10, | down | 210:2, 239:4 |
| distinguished | 145:4, 154:14, | 33:14, 36:2, | earlier |
| 31:4, 31:11 | 199:2, 211:17, | 36:3, 40:7, | 67:19, 74:12, |
| distinguishes | 225:7, 234:6 | 71:8, 71:16, | 100:18, 120:17, |
| 61:14 | | | |

Transcript of Allan Lichtman
Conducted on September 30, 2019

263

121:4, 193:6,
198:13, 201:15
**early**
48:4, 66:4,
66:8, 66:10
**earnest**
157:13
**easier**
30:6, 70:12,
88:12
**eastern**
1:2, 5:6
**easy**
19:17, 36:18
**ecological**
35:3, 35:8,
35:9, 36:6,
36:7, 36:8,
36:9, 36:10,
36:12, 36:17,
36:20, 36:22,
37:1, 37:2,
37:6, 38:13,
38:16, 38:18,
38:19, 38:21,
43:7, 43:8,
43:22, 44:1,
59:10, 59:15,
59:22, 60:3,
61:11, 102:2,
102:3, 109:5,
109:6, 237:4,
237:5, 237:13,
237:21
**edge**
34:4, 232:6
**editorial**
172:14, 174:6
**editorials**
174:3
**education**
132:4, 138:22
**educational**
63:14
**effect**
188:5, 188:10,
188:18, 199:16
**effective**
199:14

**effectively**
68:21, 200:9
**effects**
44:5, 69:2,
203:9
**effort**
75:3, 122:3,
186:10, 187:7,
199:7, 199:8,
199:13, 200:4
**efforts**
198:2, 200:1
**ei**
38:1, 39:15,
40:19, 41:12,
60:15, 61:3,
61:5, 62:2,
67:21, 68:21,
102:15, 218:1,
219:10, 220:17,
221:16, 225:20,
226:11
**eight**
213:21
**either**
14:3, 14:4,
18:14, 38:11,
42:3, 50:21,
53:7, 53:9,
53:21, 54:9,
57:6, 121:13,
146:13, 185:9,
186:3, 197:3,
202:22, 203:2,
203:6, 216:7,
218:7, 220:14,
224:16, 227:19,
229:18, 240:19
**elaboration**
163:20
**elect**
114:6, 114:18,
115:19, 163:14,
192:8
**elected**
161:13, 175:4,
187:7, 187:12,
187:15, 189:19

**election**
29:8, 87:21,
102:10, 104:5,
106:2, 106:5,
108:22, 110:6,
115:3, 148:3,
151:11, 151:13,
152:2, 160:12,
160:17, 161:17,
161:22, 162:21,
163:16, 163:18,
164:16, 164:19,
165:8, 165:17,
166:22, 167:7,
168:13, 171:10,
171:13, 172:5,
172:18, 173:14,
183:21, 186:20,
187:20, 188:6,
188:15, 188:19,
189:1, 189:7,
189:12, 189:13,
212:17, 214:17,
218:9, 238:22,
239:6, 239:15,
239:21, 240:7
**elections**
13:16, 51:14,
62:20, 62:22,
102:12, 104:20,
104:21, 106:9,
110:21, 114:5,
121:22, 161:15,
162:3, 162:5,
162:15, 173:11,
174:17, 175:1,
214:6, 214:14,
230:6, 240:15,
240:19, 240:21,
241:4
**electoral**
178:17
**electorate**
158:10, 158:19
**electronically**
245:4
**element**
81:16, 85:19,

211:12
**elements**
115:14
**else**
14:7, 24:15,
25:10, 76:7,
79:18, 105:9,
156:20
**email**
19:9, 21:10,
21:15, 22:8,
23:9, 23:16,
23:21, 226:22,
227:3, 227:17
**emailed**
143:18
**emails**
23:16, 74:6
**embattled**
48:8
**emerge**
133:2, 133:13
**emerged**
14:13, 25:15
**empirical**
47:12
**employed**
34:20, 35:6,
245:6, 246:8
**employment**
132:4
**enables**
68:20
**encompassed**
48:19
**encourage**
82:5
**encouraging**
23:17
**end**
46:1, 77:18,
98:16, 198:8,
234:16
**ending**
173:11
**endorsed**
169:14, 169:15
**endorsements**
126:9

Transcript of Allan Lichtman
Conducted on September 30, 2019

264

endorsing
169:18, 169:19
engage
34:17
enormous
106:4
enough
39:6, 40:22,
41:15, 61:12,
112:22, 116:19,
139:22, 167:20,
168:2, 177:20,
189:9, 210:10,
213:7
ensure
82:4
entire
73:4, 87:5,
87:16, 130:2,
175:6
entirely
10:9, 68:18
entitled
193:7
enumerate
87:5, 87:16
environment
18:21, 21:2,
21:4, 27:3,
193:7, 194:14,
194:21, 194:22,
199:19, 201:14,
203:14
envision
27:21
equal
71:9, 72:7,
80:5
equally
69:3
equate
149:19
equating
100:4
equivalence
58:19, 59:7,
59:8, 60:9,
216:21, 221:17,

221:21
equivalency
68:9, 118:19,
216:13, 217:10,
218:22, 219:2,
219:5, 222:11,
223:4, 223:13,
223:16, 224:8,
224:20, 225:6,
225:12, 226:2,
226:9
er
37:20, 40:19,
41:12, 60:16,
61:3, 61:5,
62:2, 67:21,
68:21, 102:15,
217:22, 219:10,
220:17, 221:16,
225:20, 226:11
errant
30:15
error
41:8, 42:7,
42:20, 43:1,
43:5, 58:16,
58:18, 58:21,
59:3, 68:4,
68:5, 87:9,
87:12, 222:2,
227:21
especially
25:16
esquire
3:3, 3:4, 3:5,
3:13, 3:14, 3:15
essentially
14:18, 31:15,
38:20, 43:16,
102:11, 135:21
establish
210:4
established
66:4
estimate
41:3, 42:8,
42:9, 61:11,
68:6, 68:7,

96:20, 135:19,
221:22, 222:9,
224:4, 226:5,
228:1
estimates
58:17, 60:15,
67:20, 84:20,
87:10, 87:13,
92:12, 97:22,
102:4, 216:20,
219:10, 233:6
et
1:9, 5:4, 5:5,
230:5
ethnic
99:21
evaluation
48:3
even
20:12, 22:1,
42:22, 43:4,
94:2, 94:9,
101:14, 104:14,
112:3, 134:21,
141:17, 147:7,
151:1, 168:19,
181:15, 186:12,
190:19, 196:19,
205:2, 208:2,
215:1, 215:13,
229:5, 230:13,
232:5, 235:8
ever
11:10, 11:11,
32:18, 32:22,
52:8, 91:8,
91:14, 113:6,
143:1, 150:15,
163:16, 164:10,
169:5, 175:6,
222:14, 236:12,
239:2
every
7:10, 33:4,
54:10, 133:2,
133:7, 145:1,
185:8, 185:20,
189:6, 200:6

everybody
75:16
everybody's
77:10
everyone
65:21, 109:7
everything
15:6, 16:1,
232:5
evidence
80:16, 80:20,
100:22, 111:21,
112:12, 115:12,
121:12, 121:14,
121:17, 124:21,
125:2, 141:21,
146:9, 146:11,
151:18, 162:22,
163:2, 163:4,
166:8, 168:20,
168:22, 172:9,
184:2, 190:7,
192:10, 194:7,
198:15, 200:4
evident
40:9
exact
66:11, 71:20,
97:22, 164:8,
209:5
exactly
20:10, 24:12,
25:13, 37:12,
50:2, 51:4,
51:6, 73:2,
141:10, 181:5,
213:7, 227:12,
230:4
examination
4:2, 6:15
examine
65:4
examined
6:14
example
39:7, 40:15,
43:3, 104:2,
109:1, 109:2,

Transcript of Allan Lichtman
Conducted on September 30, 2019

265

137:4, 146:6,
202:22, 217:18
**examples**
104:3, 172:19,
229:4
**except**
79:6, 216:20
**exception**
180:16
**excluded**
32:19
**exclusively**
160:8
**excuse**
12:13, 82:12,
109:19, 137:6,
221:11
**executive**
81:17
**exhibit**
4:8, 4:9, 4:10,
4:11, 4:12,
4:13, 4:14,
4:15, 9:14,
9:15, 10:8,
14:15, 14:22,
43:13, 52:20,
53:19, 55:17,
55:18, 64:19,
76:19, 76:22,
77:2, 77:4,
78:10, 78:14,
79:1, 100:12,
165:6, 193:11,
212:3, 212:4,
212:5, 212:10,
213:4, 213:10,
213:12, 213:14,
214:4, 226:16,
226:19, 226:20,
227:4, 227:5,
243:12
**exhibits**
9:7
**existed**
159:10
**existence**
111:20

**exists**
46:21
**expect**
17:7, 61:22,
147:16, 219:9
**expectation**
236:5
**expelled**
93:11
**experience**
14:20, 32:15,
35:4, 63:21,
83:12
**experiences**
15:6
**expert**
4:9, 10:8,
30:18, 32:4,
32:16, 32:19,
35:4, 37:7,
37:16, 37:17,
40:11, 49:16,
49:21, 51:16,
61:8, 91:19,
95:8, 95:17,
106:10, 124:1,
126:4, 151:1,
165:3, 178:5,
183:1, 194:17,
202:16, 202:18,
207:9, 222:15,
228:16, 229:8,
229:10
**expertise**
103:6, 160:10
**experts**
125:22, 236:3,
236:10
**explain**
22:21, 23:10,
36:18, 36:21,
38:16, 94:13,
94:14, 154:15,
157:18, 162:14
**explained**
155:17, 176:19,
183:16, 186:8
**explanation**
54:22, 56:14,

75:7, 101:22,
157:21, 162:20
**explanatory**
96:10
**explicitly**
32:22
**exploiting**
143:21
**exposed**
206:3
**extended**
164:12
**extensive**
168:16, 168:22
**extensively**
100:13, 141:6
**extent**
13:21, 46:9,
46:10, 46:18,
55:8, 69:4,
69:5, 118:19,
157:16, 175:2,
199:4, 199:6,
199:15
**extreme**
35:2, 35:8,
38:22, 39:19,
39:20, 40:2,
40:8, 40:19,
43:9, 44:14,
59:18, 59:20,
60:5, 60:6,
68:21, 102:1,
107:2, 109:7,
121:1, 121:3,
210:7, 221:15
**extremely**
97:13
**eyes**
40:13

**F**

**fabricated**
159:3
**fabrication**
158:1
**face**
24:8, 24:16,

148:13, 149:7,
232:5
**faced**
234:5
**facie**
143:13
**facilities**
180:5
**fact**
9:18, 28:20,
29:6, 66:16,
78:17, 85:20,
89:3, 101:5,
114:5, 134:20,
134:22, 140:13,
158:22, 163:13,
166:3, 175:5,
183:10, 189:16,
193:12, 197:19,
198:6, 212:18,
215:13
**factor**
65:12, 68:16,
88:10, 90:12,
90:13, 100:8,
100:9, 100:10,
100:16, 124:19,
126:2, 136:21,
140:1, 146:22,
151:15, 152:1,
160:20, 175:2,
192:12, 192:16,
193:20, 193:22,
196:2, 201:18,
201:19, 205:21,
209:20, 210:11,
210:18, 210:21,
229:6
**factors**
13:14, 43:20,
44:2, 65:5,
65:7, 65:10,
66:18, 90:7,
101:7, 133:10,
133:18, 139:15,
151:12, 187:16,
188:11, 188:22,
189:12, 196:14,

Transcript of Allan Lichtman
Conducted on September 30, 2019

266

210:12, 210:19,
236:12, 236:16
**facts**
14:10, 14:16,
15:2
**factual**
71:1
**faculty**
31:12
**failings**
206:6
**fair**
32:14, 71:3,
71:21, 82:5,
119:12, 139:22,
195:1, 195:3,
224:21, 227:22,
230:5, 231:5
**fairfax**
12:5, 12:8,
12:14, 13:2,
14:2
**fairfax's**
232:1, 233:18,
234:1, 235:3
**fairly**
11:18, 23:14,
40:9, 51:5,
97:21
**fairs**
198:2
**fall**
127:2, 240:11
**falsely**
154:19, 155:5
**fame**
26:3
**famer**
181:12
**familiar**
26:7, 26:10,
34:19, 108:3,
122:5, 122:9,
149:16
**families**
134:6
**famous**
229:13

**far**
20:11, 35:19,
76:9, 106:22,
123:17, 129:11,
185:10, 224:9,
225:7
**far-left**
176:1, 184:1
**farther**
65:19
**fast**
42:1
**fatal**
231:10
**fault**
172:21
**favor**
184:12
**favors**
111:1
**february**
172:15
**federal**
51:17, 82:6
**fellow**
182:5
**festival**
24:14
**few**
7:12, 31:12,
54:15, 151:14,
218:18
**figure**
18:2, 110:20,
198:22
**figures**
144:5, 144:11
**file**
17:7, 17:10,
27:11, 27:14
**filed**
32:20, 91:8,
91:11, 171:3,
171:9, 171:12,
172:2, 195:19,
243:16
**filing**
95:5, 171:5,

171:16, 171:17,
194:12, 195:11,
195:16
**final**
21:6, 132:21,
241:17
**financial**
245:7, 246:9
**finch**
177:11, 177:16,
177:21, 178:12
**find**
19:17, 20:5,
55:7, 96:6,
103:9, 118:16,
137:19, 139:11,
159:7, 169:6,
169:10, 170:7,
174:14, 177:14,
177:16, 186:11,
186:16, 240:15
**finding**
119:13, 171:6
**findings**
33:2, 33:22,
89:10
**finds**
152:11
**fine**
41:14, 73:20,
174:16
**finger**
156:19, 206:7,
206:11, 206:12
**finish**
8:11, 104:8,
128:22, 129:1
**finished**
83:3, 129:3
**first**
6:12, 7:17,
32:3, 36:4,
36:15, 43:13,
65:3, 71:15,
76:2, 79:14,
93:21, 116:3,
124:20, 125:12,
142:22, 145:22,

161:5, 161:6,
176:3, 192:2,
227:12, 227:16
**fits**
24:5
**fitting**
44:2, 44:3,
44:4
**five**
21:16, 22:13,
22:16, 22:19,
23:2, 23:7,
23:15, 71:8,
90:11, 133:18,
170:7, 192:17,
205:22, 235:7
**flaw**
231:10
**flier**
142:6, 142:15,
143:3, 143:7
**flip**
55:16, 193:11
**florida**
112:20, 224:5
**flows**
82:7
**flyer**
150:20, 152:5,
152:7, 152:21,
153:6, 154:7,
155:17, 156:2,
156:7, 157:10,
158:12, 159:12
**flyers**
170:1
**focused**
223:7, 223:17
**focusing**
44:9
**follow**
69:13
**follow-up**
198:14, 202:4,
216:9, 233:12,
242:2, 242:7,
243:19, 243:20
**following**
23:16, 27:9,

29:3, 207:7
**follows**
6:14
**football**
176:8, 180:6,
181:7, 181:9,
181:18
**footnote**
72:12, 89:7,
91:5, 98:18,
141:1, 146:2,
224:17
**footnotes**
30:9, 173:17
**forecasting**
232:22
**foregoing**
245:3, 246:3
**forever**
114:13
**forget**
125:15, 232:18
**forgive**
233:14
**form**
45:1, 56:6,
57:3, 57:16,
57:22, 70:5,
84:1, 95:13,
97:8, 98:5,
105:5, 110:3,
112:8, 118:6,
118:11, 119:7,
129:9, 131:15,
132:8, 167:21,
171:20, 173:4,
182:7, 183:14,
186:21, 187:9,
190:4, 190:17,
191:8, 198:20,
199:10, 205:16,
207:19, 208:9,
225:9
**formal**
124:22, 125:2,
125:5, 126:7,
171:17
**formed**
21:3, 116:13,

176:15
**former**
19:5, 26:3,
33:17, 195:7
**forming**
14:11
**forth**
45:14, 158:22,
175:14, 230:11
**forthright**
157:17, 158:8
**forward**
87:18, 92:7
**found**
65:1, 73:10,
88:3, 178:4,
178:7
**founding**
48:8
**four**
49:18, 49:19,
50:4, 50:15,
71:8, 71:16,
89:17, 103:13,
137:9, 137:12,
170:7, 232:7
**four-year**
51:4, 51:6
**frame**
51:4, 51:6,
85:12, 94:19,
97:2, 137:18
**frank**
181:22
**frankly**
181:15, 197:2
**frequent**
160:13
**frequently**
63:22
**friends**
156:9, 178:20,
183:17
**front**
64:20, 143:8,
144:4, 220:3
**full**
31:9, 55:18,

71:7, 71:15,
72:22, 76:10,
80:14, 87:20,
89:2, 93:21
**fully**
147:15
**function**
90:4
**fundamental**
97:15
**fundamentally**
172:5
**furman**
206:17, 207:4,
207:10, 212:14,
212:18, 214:10,
214:12
**furman's**
214:5
**furrowed**
104:16
**further**
11:22, 56:13,
115:5, 147:16,
153:8, 163:20,
172:9, 186:5,
236:6

---

**G**

**g-i-g-o-i-o-t-t-i**
182:1
**garner**
157:11
**garnered**
151:19
**gary**
236:17
**garza**
229:13, 230:7,
232:17, 232:20
**gave**
28:21, 153:17,
162:20, 185:6,
185:9, 185:10,
186:3, 242:14
**gears**
192:12
**gender**
179:10

**general**
7:12, 62:14,
71:17, 101:16,
103:5, 114:4,
166:16, 194:4,
210:15
**generally**
36:11, 105:19,
166:13
**gentlemen**
14:3, 14:4
**geographic**
45:13
**george**
140:19, 141:21,
206:17, 207:4
**georgia**
1:5
**gerald**
3:13, 5:16,
5:22
**getting**
37:4, 78:1,
110:4, 234:19
**gigoiotti**
181:22
**gingles**
13:14, 35:12,
40:11, 44:21,
45:9, 45:12,
45:15, 46:6,
46:15, 60:12,
101:7, 210:11,
210:18, 210:22,
211:8, 211:17,
225:8, 230:17
**girl**
148:8, 149:7,
150:12
**give**
9:22, 36:11,
37:1, 37:3,
37:11, 37:12,
39:15, 40:15,
47:17, 59:12,
66:11, 75:20,
79:21, 123:3,
140:8, 217:2,

Transcript of Allan Lichtman
Conducted on September 30, 2019

268

**217:17, 218:2,**
**219:12, 223:9,**
**241:19**
**given**
27:7, 184:21,
215:4, 222:2
**gives**
94:4, 195:8
**giving**
147:10
**go**
7:13, 11:22,
35:19, 40:6,
42:4, 58:12,
60:20, 65:16,
65:18, 65:19,
75:21, 76:6,
110:18, 110:19,
114:13, 116:2,
120:12, 124:5,
127:22, 133:12,
144:13, 151:12,
151:22, 161:6,
161:14, 162:14,
162:19, 164:22,
170:20, 171:8,
196:13, 197:15,
199:22, 220:16,
228:8, 231:19,
238:12
**goal**
204:20, 204:20,
205:5, 205:14,
206:3
**goals**
203:21, 204:1,
204:4, 205:20
**goes**
14:20, 22:5,
69:13, 102:18,
104:14
**going**
7:13, 7:17,
8:3, 9:16,
16:15, 20:10,
21:19, 22:11,
37:14, 39:13,
41:9, 41:19,

42:8, 42:13,
58:18, 68:3,
69:7, 70:15,
72:5, 73:21,
74:20, 75:2,
76:6, 77:8,
82:15, 94:3,
98:10, 98:12,
98:16, 110:2,
110:8, 112:7,
112:10, 116:11,
124:8, 126:15,
133:11, 133:12,
138:11, 140:11,
152:10, 161:5,
161:6, 165:2,
165:12, 167:13,
169:2, 171:19,
174:10, 175:14,
179:18, 188:2,
189:9, 192:19,
193:10, 207:18,
212:1, 213:3,
213:8, 218:10,
218:18, 219:11,
219:12, 220:3,
220:16, 220:18,
220:19, 221:10,
221:13, 222:18,
229:13, 230:11,
232:16, 233:13,
234:4, 234:16,
235:10, 236:2,
242:19, 242:21,
244:3
**good**
41:16, 70:13,
73:19, 77:14,
108:18, 116:11,
126:3, 131:12,
131:17, 135:15,
161:8, 163:1,
183:6, 183:9,
192:16
**good-faith**
75:3
**google**
19:18, 159:9

**gotcha**
45:22
**gotten**
74:16
**government**
27:5
**governor**
33:17
**grad**
11:7
**graduate**
11:1, 11:10,
11:12
**great**
7:1, 20:21,
25:22, 107:22,
218:16, 243:22
**greater**
56:17, 57:1,
106:1, 134:2
**grofman**
40:10, 123:8
**grotesque**
142:20, 144:11
**ground**
7:12, 7:14,
203:11
**group**
40:5, 41:2,
42:10, 42:12,
47:11, 88:15,
97:11, 101:10,
101:11, 102:21,
110:7, 110:12,
111:1, 111:20,
113:21, 114:1,
114:22, 116:19,
118:4, 121:20,
122:6, 147:8,
151:9, 159:3,
159:5, 159:7,
161:17, 162:5,
172:17, 173:13,
175:3, 209:15,
209:17, 210:2,
210:8, 222:1,
222:10, 239:14,
239:20, 239:22,

240:2, 241:2
**groups**
43:4, 43:6,
47:1, 47:2,
47:7, 47:9,
48:12, 60:15,
61:12, 61:13,
85:16, 85:18,
86:7, 86:8,
86:15, 86:17,
98:19, 99:19,
101:10, 102:5,
109:21, 112:5,
112:13, 112:17,
112:21, 114:18,
115:6, 115:8,
115:9, 115:13,
119:4, 119:17,
120:20, 147:12,
150:19, 225:14,
239:4
**growing**
84:15, 86:8
**growth**
85:11
**gubernatorial**
144:15
**guess**
50:1, 83:18
**guide**
173:16
**guidelines**
234:10
**guts**
232:3
**guys**
230:11

**H**

**half**
181:1, 181:2
**hall**
26:3, 181:12,
217:19
**halloween**
142:5, 143:15,
143:17, 143:21
**hammond**
215:18

Transcript of Allan Lichtman
Conducted on September 30, 2019

269

**hand**
148:8, 148:13,
148:15, 148:18,
148:21, 149:5,
149:6, 150:8,
150:13, 166:2,
209:6, 209:7,
245:9
**handing**
18:3, 217:11
**hands**
77:11
**hansen**
19:5, 21:10,
22:1, 22:10,
23:7, 23:17,
235:18, 238:4
**happening**
98:9, 203:11
**happens**
61:9, 142:22,
204:21
**happy**
9:20, 17:18,
79:21, 178:7,
182:22, 210:12,
216:8, 218:17,
219:18
**hard**
31:18, 37:7,
42:1, 50:2,
148:20, 230:14
**hard-and-fast**
103:12, 105:1
**harding**
242:12, 243:12
**harless**
3:4, 6:2,
152:15
**harris**
3:13, 4:3,
5:16, 6:16,
6:17, 9:5,
20:21, 55:8,
76:4, 76:15,
76:18, 77:2,
77:15, 78:1,
78:6, 82:14,

83:2, 83:4,
105:10, 116:5,
124:12, 130:12,
152:11, 165:11,
171:21, 173:6,
191:7, 193:9,
212:1, 226:15,
226:18, 230:20,
235:7, 235:16,
241:21, 242:2
**hate**
152:8, 219:22
**he'll**
20:19, 128:22
**head**
19:15, 29:19,
96:5, 108:22,
135:9, 135:11,
142:20, 176:19,
195:14, 223:8,
223:10
**header**
69:9
**heading**
73:14
**headline**
159:15
**health**
132:4, 133:15
**heard**
24:8, 35:13,
37:14
**hebert**
3:3, 5:22, 9:3,
20:19, 27:13,
27:20, 31:22,
45:1, 55:4,
55:13, 55:14,
56:6, 57:3,
57:16, 57:22,
70:5, 74:5,
75:14, 75:19,
76:6, 76:13,
76:16, 77:12,
77:14, 82:12,
82:21, 84:1,
95:13, 97:8,
98:5, 105:5,

110:2, 111:14,
112:8, 115:21,
118:11, 128:21,
129:9, 130:9,
131:15, 132:8,
152:14, 153:15,
165:9, 167:21,
168:5, 171:19,
173:4, 182:7,
183:14, 186:21,
187:9, 190:4,
190:17, 191:2,
191:4, 191:8,
193:3, 197:12,
197:15, 198:20,
199:10, 205:16,
206:22, 207:18,
208:9, 213:2,
220:20, 220:21,
221:3, 225:9,
226:15, 226:17,
230:18, 235:9,
241:16, 241:22
**heintze**
26:8, 30:2
**held**
2:1, 5:8, 31:7,
31:12, 158:18
**help**
10:19, 11:1,
110:16, 136:10,
176:22, 230:3
**helpful**
116:7, 174:9
**helps**
165:7
**here**
8:6, 20:2,
24:4, 26:21,
31:16, 43:15,
60:9, 61:16,
64:3, 67:4,
74:20, 85:19,
86:12, 88:6,
89:4, 89:12,
94:10, 96:19,
101:13, 103:4,
109:11, 111:4,

116:9, 123:19,
125:1, 139:6,
140:11, 140:22,
147:19, 151:19,
153:16, 154:17,
155:8, 158:8,
161:21, 164:2,
164:20, 171:8,
173:18, 175:14,
182:11, 185:14,
189:9, 189:21,
205:9, 207:7,
209:5, 211:6,
216:19, 218:11,
223:21, 240:20,
242:15
**here's**
172:4
**hereby**
245:3, 246:2
**hereunto**
245:9
**hesitate**
131:11
**hide**
156:4
**high**
103:19, 165:21,
176:17
**higher**
64:8, 64:15,
104:15, 135:1,
136:15, 136:17
**highest**
31:12, 42:11
**highlighted**
197:20
**highlighting**
98:9
**hillard**
26:8, 30:2
**himself**
23:12, 154:22,
159:1, 202:17
**hiring**
194:8, 198:8,
198:12, 199:1,
199:3, 201:11,

Transcript of Allan Lichtman
Conducted on September 30, 2019

270

202:4
**hispanic**
56:4, 56:11,
58:11, 58:14,
58:22, 59:5,
59:22, 61:3,
61:5, 61:15,
62:8, 62:12,
62:19, 63:13,
63:20, 64:13,
67:6, 91:1,
107:18, 109:18,
109:19, 117:10,
118:21, 134:14,
149:2, 194:5,
207:13, 207:16,
215:5, 222:3,
224:4, 224:7,
237:20, 238:2
**hispanic-asian**
57:20
**hispanic-white**
56:16, 56:22,
57:7
**hispanics**
26:1, 39:9,
57:9, 59:21,
63:16, 64:7,
64:9, 64:17,
66:22, 67:2,
67:21, 69:2,
69:5, 85:11,
95:19, 95:22,
96:2, 96:4,
97:20, 98:11,
98:20, 99:14,
100:1, 100:5,
107:17, 109:21,
114:2, 114:4,
114:7, 116:14,
117:2, 117:12,
118:2, 118:9,
118:18, 119:14,
120:13, 120:20,
121:15, 131:8,
131:14, 132:3,
133:2, 134:20,
137:6, 200:16,

209:12, 209:14,
210:6, 216:1,
216:2, 218:6,
222:5, 225:19,
226:3, 227:11
**historian**
34:9, 160:2,
160:4
**historical**
132:2
**historically**
155:11
**history**
31:4, 32:11,
49:16, 63:12,
63:19, 64:12,
175:7, 189:16
**hit**
217:18
**holcomb**
148:3, 151:20
**holcomb's**
150:14
**hole**
142:19
**holloway**
1:4, 5:4,
15:13, 171:16,
172:2, 172:10
**holloway's**
171:2
**home**
133:16, 139:5
**homogeneous**
35:1, 39:3,
39:17, 40:1,
120:18, 120:21,
221:15
**honest**
157:17
**hope**
7:14, 61:22,
160:16
**hopeful**
74:7
**horrific**
18:22
**horton**
149:17, 149:20,

149:22, 150:4
**host**
203:12
**hostile**
18:20, 21:1,
21:4, 27:2,
193:7, 194:14,
194:20, 194:22,
199:19
**hostility**
81:20
**hour**
53:3, 77:18,
77:22
**hour-and--minute**
74:18
**hours**
212:7, 233:15
**house**
71:18, 148:2
**household**
134:1, 137:4
**households**
134:6
**housing**
82:5, 82:11
**however**
47:11, 74:19
**huge**
93:22
**human**
203:6
**hundred**
151:14
**hundreds**
67:17
**hypothesis**
222:4, 222:7,
225:13
**hypothetical**
40:17, 101:20,
105:8, 108:19

---
**I**
---
**id**
51:10
**idea**
47:17, 52:2,

83:12, 91:7,
243:17
**identification**
99:21, 126:18
**identified**
72:6, 81:8,
126:6, 133:5,
134:8, 137:9,
137:10, 138:17,
139:4, 139:10,
140:1, 141:10,
143:14, 145:12,
157:4, 158:21,
175:22, 186:2,
191:13, 202:2,
206:6
**identifies**
202:17
**identify**
41:21, 46:19,
53:19, 118:22,
119:5, 133:18,
140:15, 145:12,
145:22, 146:20,
147:1, 173:2,
176:3, 189:2,
210:17, 232:10,
234:22
**identifying**
154:14
**identity**
92:4, 230:1
**ignorance**
210:16, 225:18
**illegal**
154:15, 156:18
**illinois**
229:11, 230:6
**illustrative**
12:12, 121:19,
231:12, 231:18,
231:20, 232:2,
232:12, 232:15,
234:14
**image**
143:18
**imagine**
116:6, 226:13

Transcript of Allan Lichtman
Conducted on September 30, 2019

271

imbalance
98:18, 99:1,
99:14, 100:1
immediately
9:1, 112:18,
125:16
immigrant
82:1
immigrants
81:21
immigration
81:20, 82:9
immigration-rela-
ted
82:5
impact
204:8
impacted
205:1
implemented
200:9
implicated
46:11
implications
142:3
implied
149:13
imply
150:11
important
33:9, 37:20,
58:8, 66:17,
78:21, 81:12,
85:17, 86:18,
97:6, 97:10,
97:13, 183:12,
203:19, 210:1
impossible
125:13
improper
42:16
improvement
202:1, 202:10,
202:12
in-school
93:13
incident
141:20, 146:1,

146:2, 146:5,
148:2
incidents
147:2, 147:17
include
30:8, 50:6,
50:9, 54:4,
55:9, 55:18,
139:9, 201:22,
207:10, 207:12,
214:10, 231:7
included
26:18, 28:16,
54:10, 55:11,
95:19, 95:20,
129:5, 142:8,
147:9, 160:14,
207:15, 214:19,
228:13
includes
53:6, 208:5
including
28:18, 65:22,
98:19, 170:12,
187:21, 207:10,
227:3
income
133:14, 133:20,
133:22, 134:1,
137:4
inconvenience
75:4, 82:22
inconvenienced
75:5
incorrect
92:18, 92:19,
208:11
incorrectly
92:20
increase
94:2, 94:8
increasingly
85:21, 85:22,
86:13
incredibly
189:3
incumbent
126:15, 189:17,

189:19
incumbents
126:14, 187:22
indeed
229:4
independent
26:9, 30:2,
32:8, 44:11,
44:13, 44:17,
73:6, 80:16,
85:10, 146:15,
170:10, 196:3,
197:21, 198:5,
220:14, 221:12,
236:13, 237:9
indicate
53:12, 98:2,
116:15, 133:1,
133:13, 134:18,
135:16, 146:15,
185:14, 190:8,
219:16, 230:15
indicated
7:5, 13:5,
16:13, 50:12,
55:13, 58:13,
59:6, 84:10,
177:12, 179:8,
195:6, 225:18,
243:18
indicates
53:1, 65:3,
86:4, 92:15,
102:19, 102:20
indicating
178:5, 184:21,
185:6
indication
68:6, 97:17,
107:1, 126:2,
127:5, 127:6,
146:21, 191:19,
222:7, 227:10
indications
179:9
indicative
104:13, 151:17
indicators
194:15, 203:12

indicia
194:13
indirectly
46:17
individual
85:16, 120:11,
122:18, 140:20,
143:2, 174:3,
178:22, 179:12,
183:2, 222:10,
226:6
individualized
86:2
individually
191:18
individuals
144:7, 146:16,
179:15, 179:17,
180:20, 183:6,
183:11, 184:3,
186:11, 186:15,
192:7
inference
35:3, 36:7,
36:10, 36:17,
36:22, 37:1,
37:6, 38:19,
43:8, 44:1,
59:11, 60:3,
102:3, 109:6,
237:4, 237:13,
237:21
inflames
82:8
influence
49:7
informal
125:8, 125:11,
126:1, 126:18,
127:20, 131:4
information
8:5, 16:9,
16:22, 17:3,
17:8, 17:11,
18:10, 18:13,
19:2, 19:4,
20:5, 24:5,
25:21, 26:18,

Transcript of Allan Lichtman
Conducted on September 30, 2019

272

27:7, 61:22,
85:1, 85:6,
95:8, 95:12,
96:22, 97:18,
98:1, 120:7,
120:10, 146:4,
163:19, 166:8,
174:1, 182:21,
195:19, 195:21,
195:22, 198:6,
199:18, 246:6
**informed**
168:13
**informs**
11:14, 15:6
**initial**
9:11, 9:13,
10:3, 10:8,
12:15, 13:7,
13:10, 13:12,
28:16, 29:10,
52:20, 64:20,
79:3, 80:2,
106:13, 106:15,
145:11, 161:1,
161:6, 171:16,
175:9, 184:18,
195:16, 217:5,
217:7, 217:14,
221:14, 224:9,
224:11, 224:16,
230:15, 231:1,
233:18
**initially**
243:16
**inner-minority**
116:15
**inquire**
179:18
**inquiry**
58:22
**insensitive**
19:8, 19:9,
21:13, 22:1,
22:3, 22:12,
23:12, 24:1,
24:7, 25:15,
238:4, 238:7

**insensitivity**
195:7
**inside**
80:18
**insignificant**
131:5
**instance**
103:10
**instances**
145:12, 145:18,
145:20, 228:19
**instead**
213:20, 213:21,
218:11
**insurance**
133:15
**integrated**
61:18
**intend**
19:21, 20:7,
44:20, 77:15,
165:5, 230:16
**intending**
19:22, 238:13
**intention**
27:11, 150:15,
221:4, 221:6
**inter-minority**
115:12
**interest**
245:7, 246:9
**interested**
38:7, 79:22,
169:4, 236:9
**interesting**
167:2
**interestingly**
96:1
**interject**
153:16
**interocular**
40:12
**interpretation**
45:17, 124:3
**interpreted**
22:3, 159:19
**interrupt**
17:17, 191:5

**interrupted**
53:9
**interrupting**
35:18
**interstate**
141:8
**interviews**
236:13
**introduce**
5:15
**invariably**
7:19
**investigate**
27:9
**investigated**
195:4
**investigation**
18:20, 24:3,
26:6, 26:9,
26:15, 26:22,
27:2, 30:2,
147:17, 186:5,
193:8, 196:3,
236:15
**involve**
113:11, 126:11
**involved**
12:10, 14:7,
21:16, 22:7,
23:10, 32:7,
33:3, 126:14,
242:9, 243:3
**involvement**
16:5
**involving**
51:19, 67:18,
234:11
**irrelevant**
90:12, 138:7,
146:13
**irrespective**
82:1
**islamic**
22:17
**isolate**
39:14, 41:1,
58:11, 58:14,
59:5, 59:22,

61:2, 61:5,
61:15, 85:15,
85:18, 98:8,
107:12, 117:1,
118:20, 118:21,
120:4, 207:16,
209:13, 210:6,
216:2, 222:3,
224:3, 225:19,
226:3, 238:1,
238:2
**isolated**
59:9, 59:14,
60:15, 67:20,
86:2, 97:3,
113:2, 119:9,
237:21
**isolating**
41:18, 115:7
**isolation**
80:10
**issue**
25:17, 26:5,
41:19, 58:9,
93:22, 114:17,
115:17, 170:17,
172:13, 184:5,
188:4, 196:14,
199:5, 211:19,
233:22, 234:5,
240:9, 241:16,
242:15
**issues**
24:4, 25:12,
26:13, 113:17,
122:13, 125:19,
146:21, 151:17,
158:21, 158:22
**it'll**
218:18
**iterations**
113:14, 113:16

—— **J** ——

**january**
20:12, 202:8
**jeff**
3:6, 6:6

Transcript of Allan Lichtman
Conducted on September 30, 2019

273

**jerry**
6:17, 27:20,
76:14, 153:15,
207:1
**jessica**
173:8
**job**
1:20
**john**
32:7, 81:18,
173:8, 235:18
**johnson**
179:1, 179:7,
179:20, 180:1,
180:4, 181:14,
181:17
**joined**
65:15
**joseph**
3:15, 5:20,
182:14
**journal**
173:16
**journals**
47:14, 48:17
**jr**
88:21
**judge**
33:4, 103:16,
148:12, 211:1,
225:16
**judges**
229:6
**july**
9:11, 10:8,
11:17, 11:21,
14:14, 74:16,
165:4
**jump**
152:8, 161:3
**jurisdiction**
101:3, 141:22,
183:21
**jurisdictions**
73:13, 175:4
**justice**
35:22, 198:7,
234:10

**K**

**kain**
128:1
**kaine**
91:5
**kane**
128:4
**keep**
41:7, 113:15,
114:12, 116:8,
116:10, 116:11,
169:3, 220:3
**kennedy's**
35:22
**kentucky**
141:8
**kidd**
106:10, 220:14,
237:10
**kidd's**
214:9
**kidding**
78:3, 230:13
**kind**
22:21, 25:4,
60:7, 70:18,
103:4, 104:12,
122:13, 138:20,
138:21, 188:1,
201:13
**kinds**
146:19, 156:17,
177:18
**knew**
186:12, 186:16
**knowing**
143:17, 155:1
**knowledge**
8:5, 14:20,
55:6, 73:9,
83:7, 83:9,
83:10, 130:5,
166:16, 166:17
**known**
19:19, 38:5,
72:3, 72:4
**knows**
157:9

**kohl**
81:18
**kurt**
3:15, 5:20

**L**

**l-u-l-a-c**
35:21
**la**
229:15
**label**
83:15
**labeled**
83:7, 83:13
**lack**
188:15, 189:13,
194:4, 194:10,
194:16, 200:15
**lagging**
202:12
**lamar**
3:5, 6:4
**lament**
19:1
**landmark**
35:11
**landslide**
104:7, 104:12,
104:17, 104:20,
105:20, 238:14,
238:16, 238:20,
239:2, 239:10,
239:13
**lang**
75:11
**large**
42:22, 43:5,
58:18, 67:17,
68:4, 68:5,
69:4, 69:21,
99:17, 112:21,
176:13, 212:18,
227:10
**largely**
61:18
**larger**
96:2, 227:22
**last**
49:19, 50:4,

50:13, 50:15,
53:1, 58:12,
96:15, 133:16,
147:22, 148:6,
154:3
**latasha**
1:4
**late**
234:19
**later**
9:2, 14:14,
76:5, 129:2,
172:6
**latest**
95:1, 95:2,
95:15
**latinos**
63:4, 82:10
**law**
6:6, 112:15,
154:13, 155:1
**laws**
81:5, 82:6
**lawsuit**
161:16, 162:4,
162:7, 162:13,
167:20, 168:2,
168:21, 169:1,
169:7, 169:12,
169:19, 169:21,
170:1, 170:17,
172:10, 172:12,
173:3, 173:10,
173:12, 173:15,
184:4, 186:12,
186:16, 187:8,
188:6, 188:12,
188:20, 189:10,
190:3
**lawyer**
84:3, 136:9
**lead**
98:2, 207:7,
216:7
**leaders**
172:10
**leads**
69:19, 159:12

Transcript of Allan Lichtman
Conducted on September 30, 2019

274

| | | | |
|---|---|---|---|
| **league**<br>176:9<br>**least**<br>7:5, 12:17,<br>42:2, 50:13,<br>51:20, 62:5,<br>78:18, 83:20,<br>87:4, 98:8,<br>113:16, 145:6,<br>145:18, 146:10,<br>160:6, 168:13,<br>169:14, 169:15,<br>184:11, 197:6,<br>205:4, 205:6,<br>206:5, 206:10,<br>211:15, 222:19<br>**leave**<br>75:3, 77:10,<br>116:4, 116:5,<br>149:4, 182:4,<br>186:18, 227:17<br>**led**<br>25:9, 25:10,<br>25:13, 151:15<br>**lee**<br>51:13<br>**left**<br>156:22<br>**legal**<br>2:5, 3:7, 5:9,<br>5:13, 14:5,<br>14:6, 45:17,<br>83:19, 83:20,<br>112:10, 171:17,<br>178:3, 210:22,<br>227:2<br>**legally**<br>155:16, 225:15<br>**legislators**<br>82:4<br>**legitimate**<br>159:10<br>**leifer**<br>1:22, 246:2,<br>246:16<br>**length**<br>107:22, 118:20,<br>194:13 | **lengthy**<br>101:22<br>**less**<br>66:13, 85:22,<br>99:20, 104:11,<br>111:7, 130:20,<br>133:22, 186:3,<br>227:22, 235:8<br>**lesser**<br>69:5<br>**let's**<br>19:13, 29:22,<br>46:22, 50:14,<br>58:12, 101:16,<br>136:2, 136:12,<br>147:13, 162:19,<br>174:13, 192:12,<br>192:15, 199:22,<br>228:3, 231:14,<br>241:4<br>**level**<br>81:21, 138:1,<br>164:3, 176:17<br>**levels**<br>73:9, 184:6<br>**lichtman**<br>1:13, 2:1, 4:2,<br>4:9, 4:10, 4:11,<br>5:4, 6:11, 6:17,<br>9:9, 27:22,<br>30:14, 45:20,<br>52:19, 55:15,<br>55:21, 61:1,<br>74:9, 76:19,<br>78:7, 100:7,<br>111:19, 116:9,<br>116:12, 124:13,<br>128:21, 131:6,<br>136:2, 139:14,<br>139:20, 152:21,<br>158:3, 165:2,<br>167:12, 167:19,<br>172:20, 175:8,<br>186:18, 188:2,<br>189:20, 193:10,<br>193:19, 197:2,<br>202:20, 205:4,<br>209:11, 212:7, | 213:6, 226:22,<br>228:5, 228:7,<br>235:17, 241:10,<br>241:17<br>**lichtman's**<br>55:9<br>**lifetime**<br>97:15, 97:16<br>**light**<br>15:5, 16:14,<br>16:16, 175:5,<br>220:1<br>**likely**<br>99:20, 146:20,<br>167:10, 210:15,<br>236:8<br>**limit**<br>160:10<br>**limited**<br>47:1, 121:7,<br>160:5, 231:6<br>**line**<br>33:14, 41:14,<br>42:1, 50:3,<br>65:3, 77:17,<br>157:22, 158:17,<br>159:11<br>**linear**<br>38:11<br>**lines**<br>71:8, 71:16<br>**lingering**<br>44:4, 69:2,<br>90:13<br>**lining**<br>182:10<br>**list**<br>4:11, 54:2,<br>74:8, 178:22,<br>180:21, 181:1,<br>184:1, 242:13<br>**listed**<br>29:6, 179:3,<br>179:7<br>**listen**<br>181:4, 203:4<br>**listing**<br>75:9, 75:19 | **literally**<br>75:10<br>**literature**<br>126:10, 222:18,<br>223:5, 223:6<br>**litigant**<br>171:17<br>**litigation**<br>30:19, 34:17,<br>37:9, 192:2<br>**little**<br>6:19, 9:22,<br>38:2, 77:9,<br>123:4, 147:7,<br>148:8, 150:1,<br>164:11, 166:10,<br>209:4, 218:20<br>**live**<br>141:17, 177:17,<br>183:11, 186:6<br>**lived**<br>183:18<br>**lively**<br>26:5<br>**lives**<br>138:10, 196:15,<br>202:14, 204:5<br>**loaded**<br>187:3<br>**loaned**<br>177:4<br>**local**<br>81:21, 131:5,<br>179:16<br>**localities**<br>142:3<br>**location**<br>184:10<br>**long**<br>10:2, 10:5,<br>31:7, 41:15,<br>51:19, 52:2,<br>78:1, 78:4,<br>107:11, 181:8,<br>206:15, 233:16<br>**look**<br>9:17, 10:4,<br>12:20, 18:7, |

Transcript of Allan Lichtman
Conducted on September 30, 2019

275

26:19, 40:14,
60:7, 62:3,
62:4, 79:18,
85:3, 101:15,
103:2, 106:7,
109:8, 110:5,
110:13, 110:21,
113:9, 115:15,
115:18, 121:10,
136:12, 138:19,
144:4, 145:9,
149:1, 150:21,
164:19, 165:10,
169:9, 178:7,
180:8, 182:22,
184:5, 187:17,
196:7, 200:20,
211:2, 211:16,
217:15, 217:21,
218:1, 218:11,
219:11, 221:8,
224:2, 233:19,
237:8, 240:1,
240:10
**looked**
12:19, 13:1,
15:22, 16:1,
19:4, 19:10,
21:9, 26:10,
26:14, 26:17,
85:2, 85:13,
95:1, 95:15,
106:2, 119:10,
127:3, 180:9,
185:20, 196:11,
202:3, 202:5,
202:6, 207:8,
212:16, 216:3
**looking**
13:22, 39:5,
40:5, 41:1,
41:9, 47:5,
61:20, 85:20,
94:14, 110:7,
110:14, 113:4,
126:22, 127:6,
127:16, 130:8,
131:2, 131:3,

132:21, 134:16,
134:17, 134:19,
138:21, 142:13,
144:16, 150:1,
163:13, 167:9,
167:13, 174:7,
174:13, 175:13,
180:14, 180:18,
182:9, 184:6,
185:17, 201:3,
203:8, 207:21,
211:20, 221:9,
221:10, 222:8,
229:20, 243:8,
243:12
**looks**
10:3, 10:5,
86:20, 94:17,
132:14, 142:18,
148:17, 150:10,
159:17, 167:1,
216:10, 216:20,
219:3
**los**
230:8
**loses**
151:13, 151:22
**losing**
62:20
**lost**
70:8, 187:22,
213:22, 214:21,
215:9, 215:18,
218:9
**lot**
10:16, 11:5,
34:6, 56:19,
64:3, 67:18,
78:2, 79:12,
111:5, 111:6,
112:19, 112:20,
125:15, 144:5,
182:10, 205:2,
222:2, 233:10,
236:19, 241:15
**lots**
60:22
**loudoun**
142:6

**louisa**
146:1, 148:1
**love**
39:8
**low**
136:16
**lowe**
2:15, 5:14,
245:2, 245:15
**lower**
63:14, 90:2,
105:16, 127:3,
135:20, 240:12,
242:21
**lulac**
35:15, 35:19,
36:6
**luter**
182:14

---
**M**
---

**m-a-c-a-c-a**
140:16
**m-c-c-r-o-r-y**
33:17
**m-e-b-a-n-e**
88:21
**macaca**
140:15
**made**
22:2, 24:10,
24:11, 24:13,
27:15, 29:10,
30:15, 57:12,
57:13, 57:18,
57:19, 58:2,
58:3, 81:3,
94:10, 127:3,
140:19, 155:18,
186:10
**main**
196:22
**mainstream**
22:20
**major**
163:8, 179:21,
180:15, 189:4
**majority**
42:3, 54:14,

62:6, 106:10,
108:7, 109:9,
109:11, 113:21,
121:20, 164:10,
186:1, 191:11,
217:22, 218:2
**make**
7:13, 8:21,
23:7, 23:12,
23:22, 25:3,
42:6, 57:8,
58:4, 61:19,
70:12, 72:2,
77:7, 84:9,
88:1, 99:22,
117:7, 127:5,
127:6, 135:6,
135:8, 138:22,
143:12, 162:17,
178:3, 180:12,
190:12, 194:18,
196:19, 209:2,
218:13, 218:14,
219:14, 220:16,
231:14, 234:17,
241:5
**makes**
42:10, 75:22,
95:2, 153:6,
162:20, 217:8
**makeup**
196:7, 196:11,
196:20
**making**
146:19, 156:11,
210:22
**male**
179:3, 179:4
**management**
234:9
**manager**
19:5, 22:8,
22:9, 195:5,
195:7, 199:19
**manager's**
22:7
**many**
30:17, 47:17,

Transcript of Allan Lichtman
Conducted on September 30, 2019

276

49:20, 50:1,
54:1, 82:1,
113:13, 120:5,
151:12, 151:21,
164:5, 167:2,
178:19, 182:4,
205:10, 212:7,
229:2
**map**
230:5
**margin**
22:19, 41:8,
42:5, 42:7,
42:20, 87:9,
87:12, 106:3,
106:22
**marginal**
127:14
**margins**
42:17, 43:1,
43:5, 58:17,
58:18, 58:21,
59:3, 68:4, 68:5
**marie**
177:11, 177:16,
178:11
**mark**
75:21, 75:22,
165:5, 193:10,
212:1
**marked**
9:7, 9:9, 9:13,
9:14, 63:1,
64:9, 76:18,
76:22, 77:4,
78:10, 100:11,
212:5, 213:10,
213:12, 226:20
**marking**
226:19
**mass**
19:1
**massive**
97:12, 97:19,
98:3, 99:9
**material**
214:10, 236:19
**materials**
85:4

**math**
110:5, 135:9
**mathematically**
134:15
**matter**
5:4, 8:7, 37:2,
53:3, 130:22,
199:16, 210:12
**matters**
23:6
**maybe**
40:22, 70:9,
70:11, 79:7,
117:21, 153:18,
157:8, 205:22,
229:3, 235:8
**mayor**
153:4, 153:19,
153:22, 154:18,
155:4, 155:10,
156:7, 156:13,
156:21, 157:3,
157:10, 157:17,
159:1, 160:12
**mccrory**
33:10, 33:17,
52:13
**mccullum**
236:17
**mean**
22:13, 25:12,
28:12, 29:2,
42:7, 54:13,
57:6, 109:19,
115:1, 117:19,
120:17, 120:22,
141:18, 150:10,
150:11, 151:12,
154:10, 154:16,
176:18, 177:13,
178:4, 181:16,
191:5, 201:6,
201:8, 208:19,
208:22, 223:22,
224:16, 226:1,
231:16, 231:18,
234:17, 236:8,
236:18, 237:2,

238:11, 239:16,
243:6
**meaning**
148:15
**meaningful**
158:4, 183:4,
202:10
**means**
9:1, 22:15,
22:19, 41:5,
41:8, 46:3,
56:8, 56:14,
57:5, 93:10,
93:11, 99:18,
108:5, 111:10,
111:11, 122:12,
188:14, 190:20,
205:11
**meant**
149:8, 153:19
**measurable**
103:1
**measure**
47:4, 102:5,
133:3, 133:7,
239:21
**measured**
240:6, 240:7
**measures**
100:4, 133:9,
137:6, 138:6,
139:16
**mebane**
88:20, 90:10,
91:15, 91:18
**mechanism**
225:12
**media**
170:1, 170:4,
170:5, 170:8,
172:8
**median**
134:1, 137:4
**meet**
129:7, 241:13
**meeting**
201:12
**meetings**
169:22

**members**
110:22, 147:11,
161:17, 162:5,
169:11, 169:14,
170:11, 170:12,
170:14, 172:9,
172:13, 172:17,
173:2, 173:5,
173:8, 175:3,
238:8
**memory**
64:3, 174:11
**mention**
28:15, 147:6
**mentioned**
12:9, 16:8,
18:7, 29:14,
39:17, 105:12,
176:10, 194:11,
224:5, 235:17,
238:3
**mentors**
99:6, 99:20
**messed**
136:3
**method**
105:20, 123:2,
123:6, 123:11,
123:16, 221:17,
226:3
**methodological**
41:6, 225:7
**methodologies**
34:8, 34:11,
34:12, 34:17,
34:20, 34:21,
35:6, 35:10,
102:1
**methodology**
35:15, 36:5,
37:21, 38:1,
38:14, 43:3,
110:21, 123:4
**methods**
34:5, 68:1,
122:21
**middle**
70:18, 89:14,

Transcript of Allan Lichtman
Conducted on September 30, 2019

277

96:14, 142:19,
161:10
**might**
11:4, 12:19,
20:3, 38:15,
39:8, 52:11,
63:7, 164:20,
166:5, 170:2,
177:17, 178:20,
178:21, 201:2,
206:1, 240:11
**miles**
178:14
**mind**
33:7, 33:8,
112:19, 117:9,
117:17, 136:22,
161:4, 182:3
**minimal**
103:18
**minorities**
18:22, 24:21,
25:2, 27:3,
27:4, 86:20,
88:13, 90:3,
108:11, 110:7,
110:20, 110:22,
113:7, 113:12,
116:17, 117:4,
117:5, 119:10,
121:11, 138:9,
188:16, 189:14,
194:14, 199:14,
199:20, 201:10,
201:13, 201:14,
202:4, 206:14,
209:16, 209:21,
209:22, 211:3,
216:4, 216:6,
216:10, 216:22,
217:21, 218:1,
218:6, 218:14,
219:4, 222:8
**minority**
21:17, 47:9,
48:11, 55:22,
62:13, 62:17,
84:14, 85:13,

85:16, 85:18,
85:21, 86:5,
86:8, 86:13,
86:14, 86:16,
88:3, 88:15,
91:3, 97:11,
98:10, 98:18,
99:18, 99:19,
108:1, 108:8,
108:10, 108:11,
108:13, 109:3,
109:10, 109:22,
110:8, 110:10,
110:12, 110:14,
110:18, 111:1,
111:2, 111:12,
111:20, 112:5,
112:13, 112:17,
112:21, 113:21,
114:18, 114:22,
115:2, 115:5,
115:8, 115:19,
120:20, 121:18,
161:17, 162:5,
167:4, 175:3,
194:10, 196:20,
197:8, 198:3,
198:12, 198:17,
199:3, 199:7,
200:1, 200:17,
200:20, 201:16,
203:15, 204:8,
204:17, 204:22,
205:7, 209:15,
210:8, 217:6,
218:8, 219:7,
219:8, 232:9,
232:11, 239:3,
239:4, 239:14,
239:20, 239:22,
240:2
**minority-awarded**
204:19
**minutes**
192:17, 235:7,
235:8
**mischaracterizes**
16:10

**misheard**
153:18
**misspoke**
154:1
**mistake**
76:9
**mistaken**
74:10
**mixed**
63:17, 149:3,
234:17, 234:22
**models**
99:6, 99:20
**moment**
8:10, 27:21,
221:4, 221:6,
236:20
**monday**
1:15
**money**
176:13, 185:15,
188:13
**monitoring**
24:13
**monkeys**
147:9
**monuments**
145:2
**morchelle**
182:18, 182:20
**more**
16:21, 23:6,
33:4, 36:1,
50:18, 50:22,
63:17, 63:22,
64:10, 75:4,
77:9, 86:8,
88:11, 89:22,
95:5, 95:11,
100:16, 103:5,
103:12, 103:14,
104:22, 111:4,
114:21, 116:9,
117:22, 120:22,
123:4, 126:20,
127:7, 127:11,
129:7, 132:5,
132:6, 132:7,

134:21, 137:20,
137:22, 140:8,
140:9, 140:14,
146:8, 146:11,
147:2, 147:6,
147:10, 149:22,
150:2, 150:3,
151:19, 154:16,
157:19, 164:7,
164:12, 167:3,
167:16, 168:16,
174:13, 181:1,
181:2, 185:10,
190:11, 196:14,
210:10, 210:14,
214:17, 215:13,
224:21, 225:1,
232:8, 233:5,
233:8, 233:9,
241:3
**morning**
6:21, 74:17
**morrison**
228:11, 228:15,
228:20, 229:4,
229:11, 229:17,
231:2, 232:6
**morrison's**
232:1
**moss**
147:5, 173:8,
235:19
**most**
34:4, 34:19,
35:5, 47:19,
47:20, 49:18,
75:9, 85:3,
85:8, 113:11,
115:11, 150:2,
176:4, 202:5,
236:8, 237:7
**mostly**
170:5
**motion**
32:20
**mouth**
22:7, 120:9,
148:8, 174:21

Transcript of Allan Lichtman
Conducted on September 30, 2019                                    278

| | | | |
|---|---|---|---|
| **move** | 5:18, 6:17, | **networks** | 42:4 |
| 49:17, 169:15, | 33:15, 51:22, | 25:20 | **non-black** |
| 169:18, 174:15, | 140:20, 159:20, | **never** | 66:7, 66:9 |
| 192:16 | 165:1, 177:11, | 14:3, 27:16, | **non-candidate** |
| **movement** | 177:19, 185:11, | 30:20, 54:17, | 209:6 |
| 22:18, 81:19 | 208:20, 209:7, | 102:22, 176:18, | **non-hispanic** |
| **moving** | 236:17 | 189:16, 223:15, | 67:7, 84:16, |
| 116:10, 152:19 | **names** | 240:6 | 85:14, 85:22, |
| **much** | 51:11, 114:12, | **new** | 133:2, 133:6 |
| 18:2, 19:11, | 184:11 | 14:12, 15:4, | **non-minorities** |
| 25:5, 25:7, | **nancy** | 16:9, 16:14, | 24:21 |
| 39:10, 56:9, | 143:3, 144:2 | 16:16, 16:21, | **non-white** |
| 65:19, 66:19, | **narrative** | 17:3, 17:8, | 66:7, 66:9 |
| 96:2, 110:19, | 197:16, 197:17 | 17:11, 18:10, | **none** |
| 127:15, 129:2, | **nation** | 19:2, 20:5, | 118:13, 140:12, |
| 132:7, 139:13, | 22:17, 141:17 | 79:8, 173:16, | 163:16 |
| 141:19, 148:13, | **national** | 195:19, 213:4, | **nope** |
| 149:7, 150:13, | 138:5, 138:8, | 226:13 | 55:3 |
| 160:6, 164:12, | 176:8 | **news** | **norfolk** |
| 168:16, 170:18, | **nature** | 29:15, 30:11, | 177:22, 178:12, |
| 170:21, 186:3, | 158:5, 158:6 | 170:10 | 178:16 |
| 198:13, 203:19, | **near** | **newspaper** | **normal** |
| 224:14, 225:4 | 144:5 | 30:9 | 50:9 |
| **multiple** | **necessarily** | **next** | **north** |
| 76:16, 90:7, | 23:11, 109:7, | 53:12, 79:11, | 33:9, 33:18, |
| 239:1 | 115:7, 126:13, | 88:17, 89:17, | 52:12 |
| **multiracial** | 178:2, 178:13, | 98:12, 127:18, | **northwest** |
| 234:1, 234:2 | 181:4, 193:16, | 174:15, 177:11, | 5:9 |
| **muslim** | 196:13, 202:11, | 178:22, 240:4 | **notarial** |
| 22:17 | 209:21, 239:16 | **next-to-last** | 245:10 |
| **must** | **necessary** | 214:8 | **notary** |
| 164:22 | 137:1 | **nfl** | 2:15, 245:1, |
| **mute** | **need** | 26:3, 181:11, | 245:15 |
| 190:2 | 6:22, 8:8, | 181:20 | **note** |
| **myself** | 8:13, 11:22, | **ngo** | 79:13 |
| 11:16, 63:8, | 47:1, 56:13, | 3:22, 5:12 | **nothing** |
| 222:14 | 64:6, 78:5, | **nice** | 6:13, 11:8, |
| | 78:11, 89:15, | 204:20 | 13:4, 185:9, |
| **N** | 189:15, 190:8, | **nine** | 186:3, 206:12, |
| **naacp** | 192:17, 211:16 | 31:20, 65:6, | 215:7, 219:5, |
| 33:10, 52:12, | **needs** | 65:9, 213:20, | 223:6 |
| 91:5, 151:2 | 194:5, 201:13 | 213:22, 214:19 | **notice** |
| **nail** | **negative** | **nitty-gritty** | 2:15, 26:12 |
| 177:19 | 158:6, 189:22, | 123:17 | **noticed** |
| **nam** | 204:7 | **nobody** | 234:1 |
| 3:22, 5:12 | **negatively** | 158:17 | **notoriously** |
| **name** | 205:1 | **noisy** | 63:5, 63:8 |
| 5:12, 5:16, | **neither** | 41:3, 41:5, | **november** |
| | 245:5, 246:7 | | 171:8, 171:12 |

Transcript of Allan Lichtman
Conducted on September 30, 2019

279

**npr**
18:19, 19:13,
19:14, 20:22,
29:14, 29:18,
193:5
**nuclear**
150:5
**null**
222:4, 222:6,
225:13
**number**
42:19, 66:11,
71:20, 93:22,
126:21, 135:4,
164:1, 164:8,
178:21, 180:20,
180:22, 183:6,
183:9
**numbers**
93:2, 93:5,
103:17, 105:16,
124:2, 124:4,
167:9
**numerator**
215:3
**nw**
2:6, 3:8

**O**

**oath**
8:3, 31:22,
54:18
**obama**
142:17, 143:8,
143:10, 144:3,
144:4, 144:5,
153:22, 154:8,
154:20, 155:6,
155:16, 160:13
**object**
45:1, 55:10,
56:6, 57:3,
57:16, 57:22,
70:5, 84:1,
95:13, 97:8,
98:5, 105:5,
110:2, 112:8,
118:11, 129:9,

131:15, 132:8,
167:21, 171:19,
173:4, 182:7,
183:14, 186:21,
187:9, 190:4,
190:17, 191:8,
198:20, 199:10,
205:16, 207:18,
208:9, 225:9,
230:18
**objection**
8:21, 9:3,
55:14, 70:8,
70:11, 130:9,
168:5, 191:2
**objections**
75:17
**objective**
83:17, 199:1,
200:11
**obscure**
22:16
**observe**
70:3, 120:18
**obvious**
137:2, 154:16,
155:7, 211:6
**obviously**
15:6, 18:11,
19:3, 22:15,
65:19, 75:16,
76:3, 82:10,
90:4, 90:5,
90:12, 153:22,
154:12, 158:16,
170:18, 187:16,
199:20, 211:16,
225:16, 236:1,
239:1
**occasional**
163:15
**occupied**
139:12
**occur**
206:7, 206:11
**occurred**
141:7, 141:11,
141:12, 161:15,

195:11, 195:15,
206:8, 206:14
**occurring**
101:20, 149:19,
149:20, 162:3
**occurs**
206:12
**october**
246:17
**offense**
23:4
**offer**
9:10, 44:20,
116:8, 116:21,
230:16
**offered**
49:21, 80:19,
228:20
**offering**
46:6, 194:21
**office**
10:19, 10:20,
175:4, 227:1,
234:9
**officer**
245:2
**officers**
197:8
**offices**
2:2
**official**
63:12, 63:19,
64:12
**often**
50:18, 111:8,
160:14, 224:21,
241:3
**oh**
32:2, 141:3,
172:22, 175:13,
213:5
**okay**
7:9, 8:17,
17:22, 18:6,
30:7, 44:9,
52:10, 69:8,
70:22, 75:19,
76:15, 77:6,

77:12, 87:12,
92:8, 104:8,
109:17, 124:15,
128:2, 135:7,
136:13, 145:21,
152:9, 154:4,
174:12, 184:19,
191:7, 195:2,
206:18, 208:4,
212:13, 213:6,
216:17, 227:21,
228:12, 229:21,
241:21
**old**
111:18, 140:12,
232:7
**old-boy**
25:19
**older**
140:9, 147:8,
230:13, 242:19
**omb**
234:9
**once**
32:20, 36:1,
105:17, 136:3,
242:20
**one**
11:7, 17:12,
29:5, 31:1,
33:8, 34:2,
34:14, 35:13,
36:2, 38:4,
40:15, 51:3,
51:18, 54:14,
61:2, 66:13,
67:13, 71:7,
71:15, 75:20,
76:4, 81:15,
86:7, 88:12,
90:7, 91:16,
91:17, 101:10,
101:17, 101:18,
102:20, 103:13,
104:6, 104:21,
110:8, 110:9,
113:16, 113:17,
114:16, 115:2,

Transcript of Allan Lichtman
Conducted on September 30, 2019

280

115:3, 115:14,
116:18, 120:10,
121:20, 122:10,
122:13, 123:1,
123:7, 123:8,
126:9, 127:13,
130:20, 138:22,
145:10, 146:9,
149:22, 163:16,
164:5, 164:11,
164:18, 170:6,
179:14, 185:8,
192:10, 193:17,
197:3, 197:6,
209:6, 212:12,
214:1, 214:3,
214:15, 214:18,
216:9, 219:15,
229:11, 230:4,
233:20, 235:6,
242:13, 243:14
**one-equation**
123:2
**one-on-one**
102:11, 104:5,
105:8, 105:13,
110:6, 115:3,
238:22, 239:6,
239:15, 241:4
**one-third**
139:15
**ones**
34:22, 114:9,
116:2, 242:13
**ongoing**
18:20, 24:3,
68:15, 90:13
**only**
8:10, 11:5,
19:18, 29:13,
29:19, 31:12,
44:9, 70:2,
74:15, 75:7,
104:16, 106:19,
118:19, 121:6,
122:22, 129:5,
137:17, 163:15,
164:6, 164:18,

171:2, 179:8,
188:11, 193:17,
200:8, 208:5,
213:19, 227:4,
232:4, 233:19,
233:20, 235:2,
238:22
**op-ed**
79:11
**op-eds**
79:7, 79:8
**open**
69:6, 149:4,
182:4, 186:18,
210:13, 227:17
**operated**
162:15
**operating**
189:1
**opine**
188:18
**opined**
17:5, 112:16,
113:6
**opining**
45:8, 46:14,
140:7, 160:7,
231:9
**opinion**
16:17, 16:20,
21:3, 21:6,
21:8, 33:2,
33:21, 35:22,
43:17, 43:19,
44:20, 46:7,
58:7, 58:13,
61:19, 62:7,
62:11, 62:17,
62:22, 63:4,
63:11, 63:18,
64:11, 65:9,
66:17, 69:1,
74:14, 81:15,
85:17, 86:19,
88:5, 91:22,
98:21, 112:4,
116:13, 116:22,
128:12, 129:21,

131:1, 132:1,
134:4, 143:9,
143:19, 144:20,
148:11, 150:8,
152:20, 154:18,
155:4, 155:13,
158:20, 161:19,
161:21, 162:6,
164:4, 167:18,
168:1, 168:2,
168:14, 174:17,
176:15, 177:7,
180:11, 180:22,
183:2, 183:10,
187:6, 189:21,
190:1, 192:6,
194:3, 194:21,
199:8, 202:9,
205:19, 205:21,
207:4, 207:15,
211:1, 228:21,
230:16
**opinions**
11:15, 11:20,
12:3, 13:2,
14:11, 16:9,
18:14, 18:15,
19:22, 33:11,
33:14, 46:1,
60:10, 72:22,
81:13, 86:7,
174:1, 229:5
**opportunities**
97:16
**opportunity**
12:4, 12:17,
13:6, 15:8,
15:12, 15:19,
72:21, 89:1,
95:4, 99:5,
223:11, 231:22
**opposed**
113:4, 173:11
**opposing**
228:15
**oral**
49:21, 53:14,
54:5, 76:20,

78:9, 79:2
**oranges**
68:22
**order**
77:6, 90:11
**organization**
153:7, 155:18,
155:19, 156:12,
158:2, 158:14,
158:16, 159:10,
159:13, 159:14,
159:17
**organizations**
159:20, 159:22
**orient**
161:4, 174:8
**original**
78:19, 197:13
**originators**
122:10
**other**
8:2, 10:14,
11:2, 11:8,
12:22, 14:5,
18:10, 18:13,
23:12, 23:22,
24:5, 24:7,
27:5, 29:16,
30:3, 33:19,
34:14, 49:5,
49:10, 49:14,
52:16, 54:14,
60:14, 68:17,
79:8, 79:12,
85:5, 93:1,
102:21, 104:3,
120:11, 121:14,
121:17, 125:10,
125:22, 127:7,
137:6, 138:7,
146:4, 147:1,
153:3, 163:6,
164:13, 164:21,
166:2, 168:18,
168:19, 170:20,
176:22, 177:2,
183:16, 183:19,
185:3, 185:10,

Transcript of Allan Lichtman
Conducted on September 30, 2019

281

186:3, 187:16,
187:21, 189:7,
189:12, 192:11,
194:13, 199:16,
209:7, 214:6,
215:16, 218:3,
219:16, 222:15,
224:4, 224:21,
228:18, 228:19,
229:3, 229:8,
229:10, 229:12,
230:6, 231:9,
234:6, 235:6,
235:20, 236:1,
236:3, 236:9,
237:19, 238:6,
239:5, 241:10,
241:15, 243:20
**others**
29:21, 86:9,
139:18, 183:8,
229:3
**otherwise**
99:6, 245:7,
246:9
**out**
18:2, 19:3,
20:14, 22:6,
22:17, 22:19,
30:11, 33:6,
33:8, 34:2,
35:17, 55:7,
63:10, 77:8,
81:16, 82:7,
82:8, 82:22,
84:4, 86:14,
98:11, 106:10,
110:20, 112:22,
113:1, 126:9,
134:22, 138:9,
147:5, 147:10,
150:20, 155:16,
156:17, 163:19,
166:14, 173:3,
177:14, 177:17,
184:3, 186:10,
186:11, 186:15,
186:16, 197:6,

198:22, 201:9,
201:12, 204:6,
205:8, 206:2,
209:22, 214:19,
241:17
**out-of-school**
93:14, 93:16,
94:1
**outcome**
91:6, 245:8,
246:10
**outcomes**
131:7, 131:13
**outlined**
89:13
**outrageous**
23:21, 24:1
**outside**
183:20, 224:22
**over**
7:13, 32:15,
120:4, 135:10,
141:6, 148:8,
152:19, 164:9,
178:17, 219:16,
232:8, 232:12,
240:14, 242:6,
242:10
**overall**
138:19
**overt**
140:8, 141:21,
142:1, 142:11,
143:10, 144:22,
149:22, 150:2,
153:13, 153:14,
156:5, 190:7,
190:8, 192:5,
192:7, 199:3,
200:12
**overturned**
33:12
**overwhelming**
180:15, 215:14
**overwhelmingly**
54:13, 215:12
**own**
34:10, 40:13,

44:10, 44:17,
89:20, 99:7,
99:21, 146:15,
151:1, 155:16,
189:19, 202:20,
202:21, 220:14,
220:17, 221:13,
237:10
**owner**
139:11

**P**

**page**
4:2, 4:8,
43:11, 52:20,
65:1, 67:11,
69:7, 69:14,
69:15, 69:17,
69:19, 70:4,
70:16, 70:17,
70:18, 70:19,
70:20, 71:3,
71:6, 71:12,
72:6, 80:2,
81:2, 81:3,
81:7, 81:17,
84:6, 87:19,
89:14, 92:7,
92:9, 93:21,
94:3, 94:7,
95:21, 96:14,
98:13, 98:15,
100:9, 106:12,
107:4, 111:15,
111:16, 124:5,
124:14, 127:6,
128:1, 131:21,
132:11, 132:22,
133:16, 138:12,
142:8, 144:13,
144:18, 145:14,
148:6, 150:8,
152:9, 152:13,
152:18, 152:19,
152:21, 154:2,
158:12, 158:22,
160:19, 160:21,
161:9, 161:10,

164:1, 165:4,
165:10, 170:6,
174:8, 175:9,
175:14, 184:8,
184:17, 184:18,
193:22, 197:13,
197:14, 197:15,
206:22, 207:2,
207:3, 211:21,
212:11, 227:5,
230:7, 231:14
**pages**
1:21, 17:14,
18:4, 70:3,
92:7, 127:18
**paid**
156:8, 180:4
**panoramically**
138:21
**paper**
199:15, 200:8,
212:8
**paragraph**
53:1, 71:7,
71:15, 84:10,
84:12, 87:20,
93:21, 96:11,
96:12, 96:14,
96:15, 98:15,
98:17, 132:21,
144:16, 144:18,
145:17, 148:6,
154:3, 161:9
**paragraphs**
89:13, 89:18
**park**
141:8
**parse**
84:3, 86:14,
209:21
**part**
19:22, 21:15,
23:9, 25:8,
34:1, 75:4,
75:10, 168:13,
196:1, 214:2,
227:19, 237:7
**participating**
23:20

Transcript of Allan Lichtman
Conducted on September 30, 2019

282

**particular**
22:4, 28:13,
41:2, 41:18,
45:17, 61:12,
73:13, 151:9,
160:1, 164:1,
183:21, 192:2,
203:12, 226:5
**particularized**
166:16
**particularly**
25:22, 28:11,
37:18, 39:13,
41:12, 63:16,
64:9, 82:9,
88:14, 88:15,
100:2, 121:10,
140:12, 160:2,
163:10, 169:9,
175:5
**parties**
32:7, 32:10,
51:11, 245:6,
246:8
**parts**
10:12, 10:15,
28:10, 46:20,
100:20
**party**
156:22
**pass**
53:22
**passage**
71:18
**passed**
30:21
**past**
65:16, 200:12,
234:8, 239:8
**patently**
211:6
**patience**
6:21, 241:12
**pattern**
180:14, 182:11,
183:5, 183:7,
216:5, 240:7,
240:14, 240:22,

241:3
**patterns**
56:4, 56:5,
56:9, 56:11,
56:12, 115:13,
115:15, 116:14,
117:13, 180:14
**paul**
3:3
**pause**
82:12
**pelosi**
143:4, 144:2
**pendency**
161:15, 162:2,
162:3, 162:7,
162:13, 188:12,
188:20, 189:10
**pending**
167:19, 173:12
**people**
22:18, 67:18,
68:15, 79:12,
122:16, 146:19,
149:13, 150:17,
180:9, 180:12,
183:20, 241:15
**people's**
97:15, 204:5
**per-capita**
133:14, 133:20,
133:22
**percent**
22:16, 39:11,
39:22, 40:4,
40:7, 41:18,
42:12, 42:13,
66:13, 67:2,
90:11, 102:21,
103:13, 104:22,
105:13, 106:2,
106:3, 106:18,
106:19, 106:20,
110:8, 111:4,
111:7, 120:22,
121:9, 130:20,
134:9, 134:10,
135:1, 135:2,

135:22, 136:17,
139:11, 139:12,
143:12, 164:4,
164:21, 165:18,
204:11, 204:14,
204:16, 204:17,
205:14, 214:21,
232:7, 232:12,
232:18, 234:4,
240:8, 240:9,
240:11, 240:16,
241:1, 241:7,
242:6
**percent-plus**
121:6
**percentage**
42:11, 42:19,
99:17, 130:5,
130:14, 136:4,
136:15, 136:17,
136:19, 136:20,
226:6, 240:1,
240:12
**percentages**
22:22, 23:1,
67:5, 67:14,
102:15
**percenter**
22:13, 23:15
**percenters**
21:16, 22:19,
23:2, 23:7
**percentile**
40:3, 41:12
**perez**
114:11
**perfect**
95:2
**perform**
179:11
**perhaps**
30:16, 75:12,
233:9
**period**
32:18, 75:1,
127:9, 140:13,
164:9, 171:10,
180:18, 209:16

**periodical**
173:21
**periodicals**
29:16, 172:7,
194:20
**permanently**
93:11
**permissible**
155:17
**perry**
114:14
**person**
148:16, 150:9,
228:9, 232:15
**person's**
177:14
**personal**
8:9, 8:13
**perspective**
41:6
**persuasive**
115:11
**peter**
228:10, 228:15,
228:20, 232:1
**phonetic**
81:18, 217:19,
236:17
**phony**
153:6, 155:8,
155:18, 156:11,
158:1, 158:14,
158:15
**photograph**
149:11, 150:16
**phrase**
37:19, 45:12,
68:12, 93:9,
154:11, 188:3,
189:22, 192:4,
203:20, 208:17,
231:20, 238:15
**phrased**
168:7, 187:1
**phrasing**
30:6
**physical**
141:18

Transcript of Allan Lichtman
Conducted on September 30, 2019

283

| | | | |
|---|---|---|---|
| **pick** | **7:15**, **7:21**, **8:9**, | **polarization** | **34:8**, **34:9**, |
| 126:21, 130:2 | 51:9, 71:6, | 13:16, 13:22, | 48:11, 49:1, |
| **picture** | 87:19, 98:13, | 56:16, 56:18, | 83:15, 84:4, |
| 142:13, 142:19, | 106:8, 138:12, | 57:1, 57:2, | 110:11, 110:13, |
| 149:9, 157:20 | 139:3, 152:12, | 57:7, 57:9, | 110:17, 114:20, |
| **pictured** | 175:9, 214:4, | 57:14, 57:15, | 115:12, 118:9, |
| 153:18 | 219:16 | 57:20, 57:21, | 119:7, 119:13, |
| **pictures** | **pleasure** | 103:22, 105:16, | 119:15, 121:15, |
| 36:19 | 241:12 | 105:22, 106:21, | 146:17, 160:4, |
| **piece** | **plenty** | 107:9, 209:20, | 169:3, 224:22, |
| 164:11, 212:8 | 187:20, 222:18 | 210:7 | 225:3, 233:1 |
| **pieces** | **plot** | **polarized** | **politically** |
| 15:16, 49:14 | 41:4, 62:4 | 28:12, 34:18, | 56:1, 118:3, |
| **place** | **plots** | 44:3, 44:12, | 119:18, 119:21, |
| 85:6, 88:2, | 36:19, 38:5, | 44:18, 46:11, | 120:2, 120:13 |
| 88:9, 88:11, | 38:12, 38:17, | 46:18, 46:20, | **politicians** |
| 88:19, 89:21, | 39:3, 39:5, | 46:21, 47:5, | 220:1 |
| 90:7, 90:17, | 40:14, 60:7, | 47:8, 47:10, | **politics** |
| 90:21, 183:22, | 109:9 | 47:14, 47:21, | 160:2, 160:5, |
| 210:16 | **plotting** | 48:14, 48:18, | 160:7 |
| **places** | 38:6 | 100:16, 100:20, | **polling** |
| 183:17 | **plurality** | 100:22, 101:3, | 88:2, 88:9, |
| **plaintiff** | 108:8, 240:20 | 101:8, 101:19, | 88:11, 88:19, |
| 50:18, 51:13 | **plus** | 102:16, 102:19, | 89:21, 90:7, |
| **plaintiff's** | 54:3, 110:8, | 103:10, 103:18, | 90:16, 90:21 |
| 15:9, 15:13, | 209:14 | 103:20, 104:11, | **poor** |
| 54:9 | **point** | 104:13, 107:2, | 22:2 |
| **plaintiffs** | 15:3, 43:10, | 107:3, 111:22, | **pop** |
| 1:6, 3:2, 6:1, | 46:1, 60:15, | 112:1, 112:2, | 223:8 |
| 6:3, 6:5, 6:7, | 71:12, 75:18, | 207:6, 210:4, | **populated** |
| 15:21, 91:19 | 92:12, 96:12, | 211:11, 211:12, | 93:6 |
| **plan** | 96:20, 97:22, | 211:13, 238:19, | **population** |
| 36:4, 231:13, | 103:8, 104:2, | 239:11 | 66:7, 66:9, |
| 231:18, 231:20, | 114:9, 121:5, | **police** | 67:6, 68:11, |
| 234:14, 242:21, | 124:6, 135:18, | 24:19, 196:16, | 68:19, 84:14, |
| 243:3 | 136:4, 156:3, | 196:18, 196:21, | 84:16, 85:14, |
| **planet** | 156:19, 160:13, | 197:8, 198:3, | 85:15, 86:17, |
| 5:12, 5:14 | 162:11, 162:12, | 198:12, 198:16, | 87:5, 87:17, |
| **plans** | 164:2, 217:6, | 198:18, 200:2, | 113:22, 139:17, |
| 12:12, 232:15, | 227:18, 228:1, | 200:5, 201:11, | 197:9, 232:11, |
| 234:6, 242:9 | 236:4, 236:5 | 203:13 | 232:17, 232:19, |
| **play** | **pointed** | **policies** | 232:22, 235:5, |
| 181:20, 201:9, | 197:6 | 199:15, 200:8 | 241:18, 242:5, |
| 201:12 | **pointing** | **policing** | 242:17, 242:20 |
| **player** | 70:14, 82:7, | 24:18 | **populations** |
| 26:4, 181:7, | 146:22 | **policy** | 66:22, 67:1 |
| 181:9, 181:18 | **points** | 200:7 | **portion** |
| **please** | 136:15, 136:17 | **political** | 162:19, 231:8 |
| 5:15, 6:9, | | 32:11, 34:4, | |

Transcript of Allan Lichtman
Conducted on September 30, 2019

284

portions
231:9
portray
142:21
posed
170:8
position
23:13, 31:7,
115:3
positions
158:11, 158:15,
229:14
positive
158:5, 158:9,
181:15, 202:1
possibilities
177:2
possibility
149:4, 182:4,
186:19, 227:17
possible
15:16, 20:9,
20:13, 49:14,
66:14, 77:7,
97:4, 128:5,
128:10, 129:19,
138:2, 145:9,
151:4, 157:7,
171:14, 177:5,
179:22, 180:3,
180:7, 182:3,
182:16, 199:19,
219:22
post
79:16
post-dates
66:20
posting
94:1, 94:8
postponed
20:12
potentially
21:1
poverty
63:21, 64:8,
133:14, 134:7,
134:13, 134:14,
134:21, 134:22,

135:1, 136:12,
136:14
powerful
122:1
practice
50:9, 180:5,
198:8, 199:5
practices
194:8, 199:1
precinct
35:2, 39:3,
39:18, 42:13,
221:15
precinct-by-prec-
inct
61:20, 61:21,
62:1
precincts
38:9, 39:10,
44:14, 61:14,
68:20, 120:19,
122:19
precise
96:20
precision
234:21
predatory
149:12
predict
27:18
prediction
79:11, 79:14,
79:17
predictions
241:13
predominant
88:15, 91:3,
97:11, 98:10,
99:16, 209:15,
210:8
predominantly
21:17, 90:17,
90:22, 111:11,
144:10
prefer
36:9, 36:12,
117:5
preference
59:10, 59:15,

59:19
preferences
60:1, 122:7
preferential
25:20
preferred
62:18
preliminary
11:13
premise
70:6, 230:21
premises
110:5, 187:2
preparation
14:2, 14:7,
15:10, 15:21,
16:3, 16:6,
19:6, 29:16,
30:5
prepare
27:22
prepared
17:13, 116:8,
116:21, 175:18
preparing
10:20, 11:2,
44:6, 53:6,
72:22
prerequisites
27:5
present
3:21, 48:9,
65:10, 66:21,
94:17, 95:9,
112:12, 170:18,
170:21
presented
44:7, 80:8,
168:22
presenting
95:18
preserves
75:16
president
142:21, 142:22,
143:10, 143:22,
144:3, 149:17,
153:20, 153:22,

154:19, 155:6,
160:13
presidential
32:9, 102:9,
160:2, 160:5,
160:7, 160:14
press
19:20, 169:2
pressure
195:8
presume
45:16, 135:18
presuming
101:21
pretty
17:1, 19:19,
21:21, 21:22,
22:6, 23:21,
24:18, 24:22,
25:2, 25:3,
26:12, 41:16,
43:21, 67:17,
79:6, 79:8,
105:17, 110:19,
137:1, 139:13,
142:20, 150:13,
153:14, 155:7,
156:5, 165:21,
167:3, 173:15,
195:20, 215:19,
223:21, 238:10,
243:9
previous
81:17, 191:22
previously
7:3, 66:1,
81:8, 92:22,
125:21, 155:14,
194:9, 228:15
prima
143:13
princess
65:15, 170:9,
172:11
principals
201:11
print
170:4, 172:7

Transcript of Allan Lichtman
Conducted on September 30, 2019

285

**prior**
10:13, 28:10, 28:11, 30:15, 52:15, 60:10, 78:8, 94:12, 95:21, 112:16, 168:10, 222:12
**private**
63:12, 63:19, 64:12
**pro**
171:3, 171:16, 172:1
**probably**
7:8, 10:17, 26:18, 32:5, 48:13, 66:10, 109:8, 188:11, 214:16, 236:3, 238:10, 239:6
**probative**
175:2, 207:5
**probed**
193:8
**problem**
18:9, 59:17, 64:5, 73:20, 83:2
**problems**
107:21
**proceed**
75:18
**proceedings**
245:4, 246:4
**process**
122:5, 124:17, 125:8, 125:11, 126:1, 126:7, 178:18
**produce**
67:20, 92:21, 107:8, 107:13, 107:15, 107:18
**produced**
14:13, 17:2, 38:5, 91:14, 92:12, 92:22, 118:17, 132:10

**profession**
83:11
**professional**
83:12
**professionally**
74:15
**professor**
5:3, 31:4, 31:9, 31:11
**profusely**
74:11
**program**
180:6, 199:3
**programs**
179:15
**project**
175:20
**projections**
232:17, 232:20, 241:19
**promotions**
27:4
**promptly**
20:20
**prong**
45:9, 45:12, 46:2, 46:6, 46:7, 46:10, 46:13, 46:14, 46:16, 100:21, 225:8, 230:17, 231:10, 231:17, 232:14
**prongs**
44:21, 60:12, 101:13, 225:15
**proofreading**
11:6, 11:8
**proper**
93:3, 156:4
**propped**
190:22
**protect**
21:19
**provide**
20:19, 20:20, 72:12, 97:18, 145:3, 211:18

**provided**
8:4, 9:10, 17:15, 18:11, 18:12, 53:14, 54:5, 54:8, 54:19, 55:1, 60:10, 76:1, 132:15, 185:15, 193:4, 212:10, 217:11, 220:6, 227:1, 229:4
**proxy**
125:20
**pryor**
182:18, 182:20
**psychological**
222:20, 223:3
**psychology**
225:2
**public**
2:16, 26:19, 92:16, 169:6, 169:11, 175:4, 175:19, 245:1, 245:15
**publication**
47:21
**publications**
47:13, 49:5, 49:10, 49:11, 156:18
**publicly**
156:22
**published**
18:19, 48:10, 48:16, 49:6, 72:16
**pull**
30:10
**purely**
40:17
**purported**
155:19
**purports**
55:9, 78:12, 159:13
**purpose**
43:15, 45:8,

**provided** (cont'd)
65:1, 112:6, 130:17, 152:1, 156:17, 209:19, 227:3
**purposes**
34:18, 41:11, 43:22, 207:6, 212:2, 232:22, 237:4
**pursuant**
2:15
**pursuit**
19:2
**put**
39:14, 40:3, 76:1, 77:2, 94:13, 96:7, 96:8, 96:10, 108:8, 126:9, 153:5, 155:16, 156:17, 162:1, 166:2, 189:15, 199:4, 199:16, 201:19
**putting**
104:18, 120:9, 153:10, 156:4, 174:21

**Q**

**qualifications**
10:16
**qualified**
186:19, 187:21
**question**
7:18, 7:20, 7:22, 8:12, 15:1, 30:10, 45:2, 45:5, 47:12, 56:7, 56:10, 57:4, 57:17, 58:1, 60:3, 60:5, 62:15, 70:6, 70:7, 70:9, 70:22, 71:3, 75:2, 78:15, 84:2, 95:14,

Transcript of Allan Lichtman
Conducted on September 30, 2019

286

97:9, 98:6,
102:5, 105:6,
108:14, 108:16,
110:3, 112:9,
116:3, 117:14,
118:12, 119:19,
120:6, 126:3,
128:22, 129:10,
131:16, 132:9,
153:11, 157:15,
161:18, 167:22,
170:8, 171:20,
172:21, 173:5,
174:15, 182:8,
183:15, 186:22,
187:10, 188:3,
190:5, 190:18,
191:9, 191:15,
198:21, 199:11,
200:10, 205:17,
206:9, 207:19,
208:2, 208:10,
210:15, 211:14,
211:15, 216:9,
220:4, 225:10,
233:13, 234:4,
237:3, 240:16,
241:9, 242:4
**questioning**
23:19, 77:17
**questionnaire**
172:11
**questions**
119:11, 224:15,
241:11, 242:3
**quickly**
11:18, 86:9,
153:16, 229:20
**quite**
17:2, 34:10,
66:10, 126:14,
131:19, 144:6,
150:22, 164:21,
171:14, 183:19,
191:15
**quotation**
81:16
**quote**
82:3, 83:13,

89:6, 170:10
**quoted**
146:7

**R**

**r1**
206:19, 206:21,
207:11, 207:12,
208:5, 208:13,
209:12
**r2**
107:4, 107:18,
111:16
**r3**
4:13, 4:14,
18:4, 211:19,
211:21, 212:11,
213:12
**race**
25:16, 92:16,
99:7, 99:21,
101:17, 101:20,
105:8, 105:13,
109:3, 122:17,
122:18, 131:5,
144:15, 149:3,
165:13, 165:15,
168:17, 175:22,
176:14, 177:13,
177:15, 178:9,
179:10, 179:12,
179:17, 180:10,
182:9, 184:7,
184:9, 234:17,
234:22
**races**
108:19
**racial**
13:16, 13:22,
19:11, 40:5,
46:22, 47:2,
47:7, 60:15,
63:2, 101:10,
101:11, 102:5,
105:15, 107:9,
109:13, 112:5,
122:6, 139:21,
140:8, 140:16,

141:21, 142:1,
142:12, 142:15,
142:16, 143:11,
144:22, 145:8,
145:13, 146:21,
147:11, 149:10,
150:2, 151:15,
151:17, 152:1,
152:22, 153:11,
154:6, 156:5,
156:10, 157:14,
158:4, 195:6,
196:7, 196:11
**racially**
19:8, 19:9,
21:13, 21:22,
22:3, 22:12,
23:11, 24:1,
24:7, 25:15,
28:12, 34:18,
44:3, 44:11,
44:18, 46:11,
46:18, 46:20,
46:21, 47:5,
47:8, 47:10,
47:14, 47:21,
48:13, 48:18,
100:16, 100:19,
100:22, 101:2,
101:7, 101:19,
102:16, 102:19,
103:9, 103:18,
103:19, 104:10,
104:13, 107:2,
107:3, 111:22,
112:1, 112:2,
207:6, 238:3,
238:6, 238:19,
239:11
**racist**
22:10
**raise**
241:8
**raised**
205:13
**raises**
130:6
**rally**
167:20, 168:3

**ran**
127:8, 164:15,
164:18
**range**
137:15
**rank**
31:12
**rare**
102:12
**rarely**
122:15
**rate**
53:3, 96:1,
96:3, 96:16,
134:7, 134:13,
134:14, 134:22,
135:1, 136:12,
136:14, 136:16,
136:18, 136:20,
137:5
**rates**
63:14, 64:8,
64:10, 64:15,
64:18, 97:1,
97:19, 98:3,
99:10, 100:1,
100:6, 135:17
**rather**
40:21, 73:15,
87:17, 219:4
**ratified**
163:18
**reach**
84:20, 85:1,
142:14, 186:10,
198:7, 239:16,
239:17
**reached**
13:12, 186:15
**reaching**
200:14
**read**
12:18, 13:6,
18:18, 21:11,
25:19, 30:11,
34:6, 43:16,
45:7, 89:12,
89:15, 93:17,

Transcript of Allan Lichtman
Conducted on September 30, 2019

287

94:7, 129:2,
147:4, 148:7,
197:3, 222:13,
222:21, 224:12,
235:18, 235:21,
236:1, 236:3,
236:6
**reading**
13:10, 67:10,
124:1, 184:15
**real**
242:20
**really**
34:2, 37:4,
66:20, 127:14,
144:11, 147:14,
233:12
**reason**
21:12, 24:4,
39:21, 58:4,
85:5, 107:13,
115:4, 129:4,
141:9, 165:20,
178:15, 196:10,
204:12, 234:7
**reasonable**
127:16, 130:1
**reasons**
178:19, 178:21,
240:11
**rebuttal**
4:10, 9:12,
9:14, 10:4,
12:10, 12:15,
13:7, 13:18,
17:13, 17:19,
20:6, 27:9,
28:17, 28:21,
28:22, 90:2,
100:11, 100:14,
101:15, 103:3,
105:4, 106:13,
106:14, 132:16,
152:4, 161:1,
163:21, 175:13,
195:17, 196:19,
206:20, 206:21,
211:21, 217:7,

217:16, 221:16,
223:13, 228:13,
231:3, 233:18,
234:2
**recall**
15:17, 33:19,
48:14, 48:20,
49:2, 49:3,
50:17, 51:7,
51:11, 51:22,
52:4, 52:10,
52:15, 52:18,
73:2, 85:3,
96:20, 97:3,
97:4, 98:8,
106:5, 123:22,
129:11, 129:14,
151:4, 151:5,
151:8, 164:15,
165:1, 169:16,
171:6, 173:10,
196:9, 200:19,
201:2, 223:2,
223:20, 224:14,
224:15, 224:18,
226:15, 228:19,
229:1, 229:16,
235:6, 238:9,
238:18, 239:8
**receive**
75:16
**received**
16:22, 51:16,
55:12, 166:10,
185:3
**recent**
33:9, 34:4,
47:19, 47:20,
48:7, 49:18,
75:9, 84:15,
85:3, 85:9,
89:22, 95:5,
95:11, 113:10,
137:20, 137:22,
140:9, 147:2,
147:6, 202:5,
202:7, 243:6,
243:10

**recently**
18:18, 23:14,
51:5, 52:12,
147:10, 239:7
**recollection**
52:6, 74:7,
80:12, 80:13,
93:18, 165:7
**recommended**
82:3
**reconstituted**
121:22
**record**
9:1, 18:3,
27:14, 45:11,
55:5, 55:10,
67:10, 71:5,
71:13, 73:22,
74:1, 74:2,
75:15, 76:2,
76:7, 78:8,
78:12, 78:16,
82:13, 82:16,
82:17, 82:18,
82:19, 116:4,
116:5, 116:7,
124:9, 124:10,
124:11, 152:18,
192:20, 192:21,
192:22, 193:2,
193:4, 195:10,
197:12, 213:16,
215:19, 226:18,
235:11, 235:12,
235:13, 235:14,
244:4, 244:5,
246:3
**recorded**
122:17, 245:4,
246:4
**recording**
246:6
**recounting**
146:2
**recruit**
199:7, 199:14
**recruiting**
198:17

**recruitment**
198:2, 200:1,
200:4
**redistributing**
35:16
**redistricting**
36:3, 51:20,
52:1, 113:14,
113:17, 113:19,
114:8, 116:1,
229:12
**redo**
130:2
**reduced**
90:8
**reelected**
163:17, 175:6,
189:18
**reelection**
215:18
**refer**
14:21, 24:12,
40:2, 59:2,
70:20, 76:3
**reference**
22:16, 26:6,
30:15, 47:14,
48:11, 48:17,
70:2, 71:9,
71:17, 78:8,
81:3, 84:9,
88:1, 88:17,
94:15, 100:10,
101:13, 124:16,
130:13, 142:5,
144:14, 147:10,
148:2, 166:18,
172:12, 172:13,
173:15, 196:20,
202:21, 203:5,
228:14, 230:22,
243:10
**referenced**
14:17, 20:22,
24:8, 49:14,
64:22, 65:5,
81:9, 93:1,
95:21, 169:7,

Transcript of Allan Lichtman
Conducted on September 30, 2019

288

173:7, 173:10,
193:18, 194:9,
196:18, 238:14
**references**
94:11, 170:16,
170:17, 235:4
**referencing**
49:12, 59:21,
169:12, 193:13,
217:5, 217:9
**referred**
39:18, 125:7,
201:15
**referring**
9:16, 10:7,
20:17, 21:14,
36:5, 40:16,
45:13, 45:16,
51:8, 54:8,
58:10, 67:3,
68:17, 71:6,
71:13, 113:2,
116:1, 178:9,
229:19
**refers**
22:18, 45:18,
172:16
**refined**
123:5
**reflect**
242:20
**reflected**
82:10, 139:6
**reflecting**
17:14
**reflective**
213:13
**reflects**
212:22
**reform**
81:20
**refrain**
160:13
**refresh**
165:7
**refreshed**
93:18
**refuse**
33:1

**refute**
33:1, 188:15
**refuted**
33:21
**regard**
188:17
**regarding**
19:4, 49:6,
90:16, 90:20,
90:22, 119:13,
138:15, 148:3,
149:17, 177:7,
198:1, 200:14,
215:22, 223:13,
232:2
**register**
122:16
**registered**
182:19
**regression**
35:3, 35:8,
35:9, 36:7,
36:8, 36:9,
36:13, 36:20,
37:3, 38:13,
38:16, 38:18,
38:21, 43:8,
44:1, 59:15,
59:22, 61:11,
102:2, 109:5,
122:6, 122:12,
122:21, 123:1,
123:2, 123:4,
123:11, 123:15,
123:21, 237:5,
237:14, 237:22
**reject**
222:6, 225:13
**rejected**
32:21
**relate**
231:3
**related**
24:21, 48:22,
69:20, 73:9,
90:15, 107:8,
125:19, 169:20,
170:1, 173:3,

230:16, 238:19,
239:19, 242:10,
242:11, 245:5,
246:7
**relates**
30:18, 48:18,
81:4, 88:9,
88:14, 89:10,
133:21, 201:6
**relating**
19:19, 47:20,
47:21, 60:11,
83:5, 125:5,
170:20
**relationship**
38:10, 188:6,
188:10, 188:19
**relatives**
183:18
**relevance**
126:4
**relevant**
20:15, 46:13,
84:16, 90:5,
126:15, 141:11,
141:13, 158:13,
171:10, 182:17,
186:9, 197:9,
199:20, 203:3,
211:15
**reliable**
39:13, 41:10,
41:13, 42:9,
59:1, 59:2,
59:13, 59:17,
60:2, 60:4,
224:3, 233:5
**reliably**
107:15, 107:17,
177:20, 225:21,
225:22, 226:3
**reliance**
235:5
**relied**
123:20, 125:10,
127:19, 236:22,
237:5
**relies**
226:10

**reluctant**
143:12
**rely**
19:21, 20:7,
44:6, 68:8,
84:18, 84:22,
164:2, 219:9,
220:18, 221:15,
233:1
**relying**
163:3, 163:4,
163:7, 220:9
**remain**
214:1
**remained**
208:21, 209:7
**remaining**
184:13, 185:2
**remains**
214:3
**remark**
23:8, 23:13,
23:15, 24:7,
24:10, 25:4
**remarks**
19:9, 21:9,
21:13, 22:1,
25:15
**remember**
24:12, 31:10,
32:1, 51:14,
93:15, 114:3,
164:8, 172:3,
209:19, 214:9,
240:6
**remembered**
241:18
**reminded**
8:2
**removal**
144:14, 144:21,
145:7
**render**
19:22
**rendered**
11:21, 14:15,
16:17
**renting**
63:6

Transcript of Allan Lichtman
Conducted on September 30, 2019

289

**reopen**
238:13
**rephrase**
45:5, 70:9,
119:19, 187:2,
187:4
**replication**
219:6
**reported**
66:13, 80:10,
80:18, 87:9,
87:12, 140:22,
169:1, 195:4,
202:7
**reporter**
5:14, 6:9,
8:18, 8:20, 9:4,
74:19, 245:1
**reporting**
202:20
**reports**
9:9, 9:16,
9:18, 10:13,
11:5, 12:5,
12:7, 12:18,
12:22, 13:1,
13:6, 14:2,
14:8, 14:13,
15:10, 17:2,
18:14, 19:4,
20:15, 27:15,
28:4, 28:9,
28:18, 30:5,
30:8, 38:5,
53:6, 54:8,
55:16, 58:6,
94:17, 105:21,
119:1, 137:17,
152:8, 195:19,
197:6, 203:1,
203:2, 203:7,
203:18, 203:20,
221:12, 233:18,
235:3
**represent**
6:18, 170:12
**represented**
166:7, 181:5,

210:9
**representing**
5:14
**republican**
156:22
**request**
8:11, 15:15
**requested**
193:5
**require**
123:15
**required**
45:19
**requirement**
45:14
**research**
11:13, 11:14,
34:5, 146:15,
147:3, 169:5,
169:10, 196:1,
200:18, 200:22,
202:21, 234:7,
236:11
**reserve**
220:21, 221:1
**resident**
177:21, 178:12,
180:2
**residents**
63:14, 63:21,
64:14, 64:15,
88:4, 172:17,
173:14, 178:20,
183:16, 203:16
**resignation**
21:11, 25:9,
25:11, 25:13,
195:10, 195:15
**resigned**
19:5, 23:13,
195:8
**resources**
88:3, 88:9,
88:11, 88:19,
89:21, 90:7,
90:17, 90:21
**respect**
18:21, 26:1,

32:5, 102:8
**respectable**
26:12, 155:21
**respectfully**
20:4
**responded**
207:9
**responding**
95:8
**response**
23:3, 42:5,
91:13, 91:14,
124:1, 170:6,
204:2, 204:11,
206:9, 212:16,
226:14, 231:4,
232:1
**responses**
15:9, 15:14,
15:20, 75:17
**responsibility**
76:10
**responsible**
26:8, 146:16,
155:22, 156:1,
156:14, 158:18,
174:3, 187:14
**responsive**
205:6, 206:13
**responsiveness**
194:4, 194:16,
196:14, 200:15,
201:7, 201:21
**rest**
8:13
**restrict**
127:15
**restroom**
8:8
**result**
63:11, 63:18,
64:12, 81:22,
187:7
**results**
36:12, 39:2,
165:8, 201:4,
201:5, 217:9,
220:11, 220:18,

237:8
**resume**
76:13
**retained**
30:18, 32:4,
49:20, 91:19
**retirees**
176:8
**returns**
164:19
**review**
12:4, 15:8,
15:12, 15:20,
16:2, 26:14,
28:4, 28:7,
29:15, 48:2,
48:3, 69:18,
72:21, 73:4,
74:22, 76:5,
77:16, 77:19,
80:14, 89:1,
95:4, 194:19,
223:11, 231:22,
235:3
**reviewed**
12:7, 28:9,
28:10, 28:19,
30:3, 30:4,
50:3, 227:8,
233:17
**reviewing**
15:17
**right**
6:22, 12:16,
25:17, 34:10,
37:22, 39:16,
51:7, 56:15,
62:21, 63:7,
66:5, 66:21,
69:17, 70:18,
78:5, 94:5,
102:18, 105:15,
113:4, 124:18,
127:21, 129:15,
133:12, 135:3,
141:3, 142:10,
142:18, 143:16,
153:21, 176:11,

Transcript of Allan Lichtman
Conducted on September 30, 2019

184:14, 185:1,
193:19, 195:18,
202:19, 209:1,
210:20, 211:22,
213:15, 217:17,
220:21, 221:2,
232:6, 232:15,
233:10, 238:1
**right-hand**
143:3
**rightly**
23:4
**rights**
30:19, 32:4,
32:16, 48:7,
71:9, 72:7,
80:5, 82:6,
150:19, 172:15,
203:6, 223:19
**ring**
125:15, 150:21,
236:18
**rising**
67:9
**road**
204:21, 205:10
**robert**
1:22, 246:2,
246:16
**rocky**
148:3, 151:20
**roger**
174:2, 174:5
**role**
32:10, 99:6,
99:20
**room**
3:17
**rose**
217:19
**rosemary**
128:6
**ross**
215:18
**ross-hammond**
128:3, 128:8,
129:17
**roughly**
64:18

**rouse**
128:15, 128:19,
129:4, 162:8,
162:16, 162:21,
163:5, 163:8,
163:11, 174:18,
176:4, 176:16,
176:22, 177:8,
181:6, 181:16,
185:6, 185:15,
185:22, 186:19,
187:6, 188:1,
188:7, 190:14,
190:21, 192:8
**rouse's**
177:4
**rule**
102:14, 103:12,
105:2, 105:3,
105:12, 105:20,
238:15, 238:21,
239:11
**rules**
7:12, 7:14,
105:2
**run**
15:11, 56:19,
147:15, 182:20,
220:17
**running**
110:22, 111:7,
142:2, 164:14
**runs**
66:20, 197:18

**S**

**s-c-h-e-s-v-e-n--**
**t-e-r**
166:19
**sabrina**
162:8, 162:21,
164:3, 174:18,
184:21, 190:14,
190:22
**said**
12:21, 20:14,
20:19, 30:16,
42:5, 44:16,

62:4, 66:14,
74:12, 81:18,
100:2, 114:17,
114:19, 121:8,
130:13, 135:2,
150:11, 153:17,
154:17, 156:8,
162:2, 168:7,
173:13, 177:10,
183:8, 193:16,
194:19, 195:18,
199:12, 210:5,
214:9, 216:2,
220:1, 223:15,
225:11, 234:15,
240:5, 241:18,
243:2, 245:4,
246:4
**same**
15:1, 34:22,
36:12, 37:12,
59:17, 60:3,
60:5, 71:20,
75:13, 78:15,
78:22, 85:11,
94:6, 94:18,
97:2, 107:16,
116:17, 116:18,
117:6, 120:15,
135:9, 139:13,
163:15, 168:5,
184:10, 185:21,
207:3, 209:17,
214:1, 216:19,
217:9, 218:11,
219:12, 226:10,
231:14, 242:15
**sample**
87:3, 87:17
**sanctuary**
72:3, 81:4,
81:5, 81:11,
82:8, 83:7,
83:14, 83:17,
83:21, 83:22
**satisfaction**
44:21, 60:11
**satisfied**
46:8, 46:16

**satisfy**
210:10
**saw**
23:20, 23:22,
29:9, 38:4,
75:8, 147:14,
193:17, 212:16
**say**
11:11, 16:10,
16:21, 20:10,
23:1, 24:8,
28:19, 29:22,
32:14, 34:4,
37:14, 39:8,
42:20, 43:1,
44:19, 47:3,
47:19, 50:2,
50:14, 54:2,
54:7, 67:1,
67:3, 74:15,
83:19, 83:21,
89:17, 91:16,
92:19, 103:7,
103:9, 104:2,
104:3, 104:5,
111:14, 113:1,
119:12, 119:15,
119:18, 120:21,
138:20, 148:15,
150:3, 150:7,
153:20, 161:14,
166:12, 168:7,
173:5, 179:4,
181:1, 188:12,
189:10, 195:3,
195:5, 195:13,
201:5, 209:1,
209:4, 219:22,
222:17, 222:21,
224:21, 225:2,
226:2, 227:12,
227:22, 228:19,
231:5, 231:16,
236:10, 240:8,
240:13
**saying**
30:1, 104:1,
145:4, 150:5,

Transcript of Allan Lichtman
Conducted on September 30, 2019

291

172:4, 174:22,
187:11, 187:12,
202:11, 202:12,
213:1, 213:19
**says**
69:9, 90:10,
94:8, 96:15,
155:2, 215:8,
217:22
**scatter**
36:19, 38:5,
38:12, 38:17,
39:2, 39:5,
40:13, 41:4,
60:7, 62:3,
109:8
**schedule**
6:20
**schesventer**
165:14, 166:19
**scholar**
92:5
**school**
93:12, 194:9
**schooling**
203:13
**schools**
92:16, 93:22,
99:13, 196:16,
201:17
**science**
34:5, 224:22
**scientist**
34:9
**scientists**
87:8, 233:1
**scope**
26:15, 26:22,
27:1, 43:17,
43:19, 45:7,
45:21, 160:10
**scores**
27:17
**scrutinized**
225:3
**se**
48:15, 48:21,
49:13, 58:16,

65:15, 73:15,
101:7, 112:1,
171:3, 171:16,
172:1, 202:18
**seal**
245:10
**search**
19:18, 137:20,
159:5, 159:8,
169:22, 177:16,
179:11, 179:15
**searched**
179:13
**searches**
177:18
**seat**
166:21
**seats**
29:11, 170:13,
170:19
**second**
29:7, 31:1,
71:7, 84:9,
87:20, 114:22,
121:22, 144:16,
144:18, 153:5,
154:3, 162:19,
184:20, 212:19,
213:3
**second-to-the-la-
st**
128:7
**seconds**
82:13, 82:22
**section**
69:13, 70:15,
73:16, 112:6,
112:11, 132:19
**sections**
69:18
**see**
19:10, 23:16,
23:19, 26:20,
36:21, 38:11,
38:17, 38:18,
38:19, 39:6,
40:12, 40:18,
40:20, 44:2,

53:17, 53:21,
60:7, 61:22,
69:11, 70:15,
80:9, 81:7,
81:19, 84:12,
91:16, 93:16,
102:15, 102:22,
103:2, 103:12,
103:14, 103:17,
106:17, 110:22,
111:13, 113:10,
115:18, 121:6,
124:2, 137:22,
161:11, 164:20,
166:13, 169:8,
170:2, 174:14,
178:5, 182:10,
182:22, 183:8,
194:16, 197:16,
202:15, 202:21,
203:5, 204:20,
205:10, 211:3,
214:4, 214:19,
216:4, 223:18,
224:11, 227:10,
235:4
**seeing**
224:15
**seem**
26:11, 127:1,
167:10
**seems**
97:21
**seen**
21:10, 37:9,
76:2, 78:10,
111:4, 144:22,
172:1, 223:14,
227:6, 227:13,
227:17, 227:18,
229:2, 236:2,
236:4, 236:19
**segregation**
194:10
**select**
94:21, 170:11
**selecting**
170:14, 172:13

**senate**
43:20, 44:2,
65:5, 65:7,
65:9, 65:12,
66:18, 68:16,
88:10, 140:5,
210:19, 236:12,
236:16
**send**
19:17
**sense**
41:16, 42:10,
75:22, 95:3,
101:16, 103:6,
143:20, 191:14,
194:4
**sensically**
159:18
**sensitive**
25:17
**sensitivity**
19:11
**sent**
15:17, 53:21,
74:8, 78:19
**sentence**
53:12, 88:18,
94:6, 94:14,
98:17, 124:20,
133:16, 148:6,
148:7, 154:3
**separate**
73:16, 112:22,
113:1
**separately**
116:20, 224:3,
224:6
**september**
1:15, 5:10,
48:9, 193:6,
227:2, 245:11
**series**
132:10
**serve**
198:17
**serving**
126:16
**sessoms**
129:16, 152:7,

Transcript of Allan Lichtman
Conducted on September 30, 2019

292

153:2, 153:3,
153:8, 153:17,
153:21, 154:7,
154:18, 154:21,
154:22, 155:5,
155:10, 155:20,
156:8, 156:9,
156:13, 156:19,
156:21, 157:3,
157:11, 157:18,
159:1
**set**
18:6, 45:14,
129:8, 204:1,
204:4, 204:10,
206:3, 226:14,
245:9
**setting**
205:5, 205:19
**settled**
54:15
**seven**
170:7
**several**
30:9, 47:18,
50:20, 102:8,
173:17, 183:11,
233:15
**severe**
195:6
**severely**
205:1
**shannon**
128:1
**share**
17:18, 17:20,
69:2
**sharp**
111:17, 111:18
**sharpie**
79:16
**shocking**
22:6
**shooting**
19:1, 26:7,
193:8
**short**
161:9

**short-term**
92:15, 93:9,
97:1, 97:12
**shorthand**
100:21
**shortly**
25:14
**should**
8:8, 16:10,
45:11, 75:10,
82:4, 121:3,
123:18, 130:13,
170:13, 175:1,
206:8, 206:14,
212:20, 213:4,
243:8
**shouldn't**
11:11, 37:4,
179:5
**show**
97:10, 139:16,
165:2, 197:19,
200:8, 205:11,
208:12, 208:15,
209:14, 209:20,
217:3, 227:4
**showed**
198:11, 212:7
**showing**
145:3, 169:1,
184:12, 185:8,
226:22
**shown**
55:17, 154:17,
158:21, 209:12,
210:7
**shows**
94:7, 148:7,
199:2, 200:11
**sidarth**
140:20
**side**
42:3, 50:21,
104:21, 229:8
**sides**
50:21, 62:6,
74:13
**sign**
39:12, 40:19,

40:21, 41:21
**signature-1apgj**
245:13
**signature-k9lvk**
246:14
**significance**
68:11, 88:8
**significant**
67:15, 68:13,
86:6, 140:14,
164:4, 165:19,
176:4, 177:22,
178:10, 207:11
**signs**
37:4, 37:19,
38:3, 39:1
**similar**
107:8, 147:2,
149:21, 216:5
**simple**
41:7, 61:10,
108:9, 241:5
**simplest**
109:1, 109:2,
115:2
**simplify**
46:22
**simply**
82:8, 94:17,
131:3, 162:12,
195:3, 209:14
**simultaneously**
126:12
**since**
14:13, 15:5,
18:13, 18:18,
20:2, 20:6,
31:17, 48:1,
65:14, 95:5,
138:2, 158:17,
169:21, 195:19
**single**
98:15, 108:11,
113:20, 185:20,
239:4, 239:14,
239:20, 240:6,
240:21
**single-seat**
108:21

**singled**
106:10
**singular**
109:20
**sir**
9:4, 10:7,
30:10, 43:22,
56:21, 59:21,
64:6, 64:20,
67:5, 69:6,
69:16, 80:2,
84:7, 87:19,
92:7, 92:9,
98:13, 98:21,
100:15, 106:16,
124:7, 127:6,
140:2, 174:10,
192:18, 193:15,
244:2
**sit**
8:6, 26:21,
88:5, 96:19,
123:19, 125:1,
147:19, 151:18,
161:21
**site**
141:4
**sitting**
78:3, 238:7
**situation**
102:11, 223:21,
224:1
**six**
170:7
**size**
68:19
**slate**
127:14
**slates**
126:6
**slating**
124:17, 124:22,
125:2, 125:5,
125:8, 125:11,
125:16, 125:20,
126:1, 126:7,
126:18, 127:20
**slight**
28:20, 94:1,

Transcript of Allan Lichtman
Conducted on September 30, 2019

293

| | | | |
|---|---|---|---|
| 94:8 | 83:20, 125:4, | 212:4, 213:5, | 46:10, 46:15, |
| **slope** | 145:6, 155:18, | 243:8 | 46:17, 49:4, |
| 38:11, 38:12 | 157:21, 166:15, | **sort** | 49:8, 49:12, |
| **slur** | 169:13, 172:19, | 110:18 | 52:13, 60:11, |
| 140:16 | 182:13, 182:21, | **sorts** | 70:20, 73:11, |
| **smack** | 183:19, 192:7, | 80:17 | 80:22, 83:5, |
| 142:18 | 196:20, 201:22, | **sound** | 88:16, 94:21, |
| **small** | 205:6, 205:8, | 8:15 | 99:15, 100:16, |
| 17:12, 18:1, | 206:5, 220:1, | **sounds** | 101:14, 102:8, |
| 29:4, 66:10, | 222:22, 223:4, | 25:5, 133:12 | 105:11, 106:5, |
| 66:15, 81:15, | 223:15, 227:10, | **source** | 107:5, 145:13, |
| 140:10, 167:1, | 227:18, 227:19, | 19:14, 146:4, | 166:12, 169:12, |
| 197:7, 209:8, | 234:7, 237:9, | 175:19, 220:6, | 169:19, 172:12, |
| 212:12 | 239:12, 241:7 | 227:4 | 172:16, 173:1, |
| **smith** | **someone** | **sources** | 173:10, 199:22, |
| 26:3, 176:3, | 142:2, 152:11, | 163:10, 179:16, | 200:3, 200:20, |
| 176:12, 176:16, | 176:19, 202:17 | 190:8, 222:22, | 201:17, 229:6, |
| 176:21, 177:3, | **something** | 223:8, 224:19, | 229:17, 230:16, |
| 177:8, 180:16, | 17:15, 37:14, | 225:4 | 230:22, 239:19 |
| 181:9 | 39:1, 39:16, | **span** | **specifying** |
| **smithfield** | 40:18, 43:2, | 140:13 | 42:9 |
| 182:15 | 48:5, 54:16, | **speak** | **spell** |
| **smoother** | 62:5, 64:2, | 121:8, 152:12 | 33:15, 35:19 |
| 129:2 | 68:18, 79:18, | **speaker** | **spelled** |
| **snap** | 103:14, 105:9, | 144:2 | 163:19 |
| 206:7, 206:11, | 155:21, 164:8, | **speaking** | **spencer** |
| 206:12 | 164:20, 178:7, | 134:7, 184:3 | 12:5, 12:8, |
| **so-called** | 192:1, 194:19, | **special** | 13:6, 14:1, |
| 154:8 | 205:11, 224:17, | 161:16, 161:22, | 28:7, 28:9, |
| **social** | 238:12 | 162:4, 162:13, | 29:10, 43:3, |
| 87:8, 170:1, | **sometimes** | 162:15, 162:22, | 44:7, 102:7, |
| 170:7 | 37:15, 40:6, | 174:20, 174:22, | 118:14, 121:8, |
| **socioeconomic** | 43:1, 111:3, | 187:19, 189:11, | 122:2, 123:18, |
| 131:7, 131:13 | 111:5, 122:15, | 190:12, 191:19, | 123:20, 124:1, |
| **soft** | 216:21 | 214:3, 215:14, | 157:5, 167:11, |
| 149:12 | **somewhat** | 223:21, 223:22, | 207:8, 212:16, |
| **sole** | 184:11 | 241:8 | 216:12, 223:12, |
| 123:9 | **somewhere** | **specialist** | 225:5, 226:9, |
| **some** | 26:19, 93:17, | 5:13 | 227:14, 228:3, |
| 10:17, 14:12, | 219:17 | **specific** | 228:6, 237:1 |
| 15:4, 15:22, | **sorry** | 70:2, 117:1, | **spencer's** |
| 16:13, 19:4, | 34:15, 43:13, | 117:22, 168:20, | 13:10, 13:18, |
| 21:12, 24:5, | 53:9, 62:16, | 170:16, 173:2, | 28:22, 77:8, |
| 29:10, 34:12, | 111:15, 130:12, | 242:4 | 118:16, 119:1, |
| 42:15, 43:7, | 141:3, 149:14, | **specifically** | 119:6, 119:13, |
| 48:1, 49:15, | 172:20, 174:10, | 10:7, 16:15, | 121:13, 123:12, |
| 51:18, 63:3, | 175:14, 179:5, | 20:18, 29:16, | 165:3, 167:12, |
| 74:6, 83:19, | 191:4, 207:21, | 30:1, 33:21, | 216:20, 217:3, |

Transcript of Allan Lichtman
Conducted on September 30, 2019

294

217:12, 220:2, 220:10, 220:11, 221:12, 221:14, 224:9, 227:8, 237:6, 237:7
**spend**
131:11, 131:12
**spent**
160:6, 213:6
**splits**
111:6
**spoke**
150:20, 173:3
**spoken**
14:3, 146:5
**sponsoring**
189:6
**st**
2:6, 36:4
**staff**
10:20, 174:6
**standard**
83:16, 87:7, 102:1, 104:10, 129:7, 227:10, 227:21, 238:15, 238:21, 239:3, 239:10, 239:13, 239:17, 239:18
**stands**
34:2, 115:4
**start**
5:2, 19:13, 69:19
**started**
8:18, 8:20, 30:14, 31:8, 31:20, 100:18
**starting**
6:19, 136:16
**starts**
100:9
**state**
25:17, 27:13, 51:14, 65:21, 69:9, 70:15, 73:14, 91:4, 113:20, 230:6

**stated**
17:4, 158:12, 161:19, 201:20
**statement**
24:1, 43:15, 45:8, 55:22, 56:3, 56:11, 56:16, 56:22, 58:12, 64:22, 84:14, 154:5
**statements**
143:13, 146:17, 169:6, 169:11
**states**
1:1, 5:5, 36:16, 36:18, 88:2, 142:21
**statewide**
142:2
**statistical**
36:1, 41:11, 41:20, 44:11, 44:13, 44:17, 89:4, 92:3, 114:15, 121:12, 122:14
**statues**
144:14, 144:21, 145:7
**status**
82:2
**stay**
34:3
**stem**
81:16
**stenographic**
9:1
**step**
31:2, 77:8, 82:22, 108:13, 166:14, 205:6, 205:8
**steven**
178:22, 179:7, 179:20, 180:1, 180:4, 181:14, 181:17
**stewart**
144:15, 145:4

**stick**
33:6, 201:17
**sticker**
77:3
**sticks**
29:18, 33:8
**stifle**
190:3
**still**
27:10, 53:4, 64:19, 88:5, 98:21, 105:7, 105:15, 156:9, 157:14, 161:21, 198:11, 202:12, 211:13, 218:9, 220:9, 220:18, 240:9
**stir**
150:22
**stood**
92:5
**stop**
8:10, 213:2
**stopped**
21:20, 24:19
**story**
193:5
**straight**
71:1, 113:15
**strayhorn**
146:1, 146:6, 148:1
**streamlined**
77:7
**street**
3:8, 5:9
**strengthen**
18:14, 177:7
**strengthened**
16:19
**strengthens**
143:20
**strike**
36:3, 208:2, 236:20
**striking**
36:2, 186:1

**strong**
177:10, 189:7
**strongly**
62:18
**struck**
13:4, 233:20
**stuck**
187:2
**students**
11:2, 11:7, 11:10, 11:12, 92:14, 96:16, 97:16, 98:4, 99:18, 201:16
**studied**
158:11, 202:7
**studies**
90:15, 90:20, 197:20, 197:22
**study**
63:9, 80:18, 81:1, 88:17, 88:18, 89:10, 89:16, 92:22, 94:17, 95:15, 95:21, 198:11, 202:4, 203:18, 204:2, 204:11, 205:3
**study's**
93:5
**studying**
23:5, 160:7
**stuff**
78:2, 207:3
**subject**
80:22
**submit**
55:6
**submitted**
10:6, 10:13, 12:14, 50:6, 54:16, 89:5, 165:4
**submitting**
18:13
**subsequent**
19:6, 20:14,

Transcript of Allan Lichtman
Conducted on September 30, 2019

295

48:5, 125:4,
146:12, 194:11,
195:21
**substance**
10:18
**substantial**
64:16, 66:22,
67:1, 79:6,
90:11, 103:14,
104:13, 106:22,
163:11
**substantially**
218:2
**substantive**
11:9, 127:4
**substitute**
8:19
**subtext**
25:6
**subtle**
140:8, 143:11,
144:22, 145:1,
150:2, 150:3,
150:4, 153:13
**subtler**
150:1
**suffice**
150:7
**sufficiently**
190:12
**suggesting**
18:19
**suggests**
187:19
**suite**
2:7, 3:8, 5:10
**sum**
163:2
**summarized**
89:17
**summary**
139:4
**supplement**
18:11, 216:8,
216:18, 218:17
**supplemental**
17:7, 17:11,
27:11, 27:15,

170:5, 219:3,
219:10, 219:20,
220:10, 221:8
**supplied**
237:10
**support**
109:19, 151:20,
155:19, 157:11,
157:12, 164:3,
165:16, 165:21,
166:4, 166:10,
168:3, 168:11,
187:13, 187:18,
188:1, 188:13,
189:3, 189:8,
191:17, 216:5,
217:6
**supported**
92:2, 108:7,
129:6, 155:11,
155:14, 157:8,
176:16, 241:6
**supporter**
179:21
**supporters**
154:22, 155:5
**supporting**
109:14, 109:15,
182:5, 246:6
**supportive**
157:18
**suppose**
240:14
**supreme**
35:10, 35:14,
36:16, 36:18
**sure**
8:21, 11:4,
16:1, 18:9,
29:3, 34:1,
40:20, 42:6,
49:5, 49:8,
49:9, 54:10,
56:8, 57:5,
60:13, 67:4,
67:6, 71:20,
72:2, 73:2,
75:21, 91:17,

112:18, 113:9,
114:15, 117:7,
117:19, 135:6,
135:8, 141:10,
158:7, 164:21,
181:11, 197:1,
200:6, 200:11,
201:6, 204:3,
207:20, 220:5,
220:16, 226:2,
231:14, 234:17,
240:18, 242:8
**surprise**
205:12
**surprising**
130:19, 166:5,
206:15
**survey**
87:2, 96:6,
137:17
**suspect**
78:10
**suspension**
96:1, 96:3,
96:16, 97:1,
97:19, 98:3,
99:10, 100:1,
100:6
**suspensions**
92:16, 93:9,
93:14, 93:16,
94:1, 94:18,
97:13, 202:6
**sustained**
101:21
**swear**
6:9, 236:8
**switching**
170:19
**sworn**
6:12
**synergy**
99:12, 100:3
**system**
87:21, 169:19,
170:15, 172:5,
172:18, 173:9,
173:14

**systematically**
62:19

**T**

**table**
4:13, 18:4,
28:19, 30:21,
50:3, 50:6,
53:13, 53:17,
54:1, 54:19,
55:9, 55:19,
67:12, 84:10,
86:4, 107:4,
107:8, 107:14,
107:15, 107:18,
111:5, 111:13,
111:14, 111:16,
127:22, 128:7,
128:14, 130:2,
130:15, 132:12,
133:21, 137:2,
137:9, 137:15,
138:4, 138:12,
138:17, 138:19,
139:2, 167:16,
175:11, 184:10,
186:14, 197:18,
206:19, 207:11,
207:12, 207:22,
208:5, 208:12,
209:12, 211:18,
211:21, 212:11,
215:22, 216:9,
219:3, 219:6,
219:10, 219:17,
227:5, 227:6
**tables**
28:13, 28:15,
28:16, 85:15,
127:18, 127:19,
130:14, 131:18,
132:10, 133:9,
217:3
**take**
8:12, 10:2,
10:5, 18:2,
64:5, 74:22,
76:4, 76:10,

Transcript of Allan Lichtman
Conducted on September 30, 2019

296

**taken**
77:15, 123:9,
167:13, 177:13,
180:19, 181:16,
192:13, 192:15,
218:18
**taken**
8:22, 93:5,
245:3
**takes**
122:21, 206:5
**taking**
77:18, 77:21,
183:22, 232:5
**talk**
46:9, 100:15,
103:5, 108:1,
108:18, 131:20,
139:20, 145:19,
147:13, 160:17,
193:19, 200:3
**talked**
28:2, 43:7,
49:15, 67:19,
107:1, 108:20,
113:2, 180:17
**talking**
21:15, 24:19,
25:1, 67:16,
68:15, 68:17,
105:7, 105:8,
109:11, 117:3,
117:4, 117:7,
130:10, 135:22,
158:8, 158:9,
160:22, 162:12,
172:10, 179:14,
219:2, 228:6,
228:10, 240:17
**talks**
129:1
**tally**
241:17
**tape**
129:1
**teachers**
99:3, 99:17,
194:10, 201:11,
203:13

**tech**
176:7, 179:21,
180:5, 180:21,
180:22, 181:7,
181:10, 181:18,
182:1, 182:5,
182:10, 182:12,
183:3
**tell**
19:11, 24:9,
27:20, 29:2,
30:17, 38:2,
39:3, 41:5,
46:19, 49:19,
50:1, 51:8,
70:19, 71:5,
81:11, 86:22,
93:10, 93:20,
99:1, 108:5,
111:10, 116:2,
122:11, 123:10,
123:13, 148:20,
151:21, 152:9,
154:10, 162:10,
163:2, 197:2,
203:3, 212:9,
216:17, 221:20,
222:22, 223:22,
224:10, 227:13,
233:17
**telling**
234:13
**temporal**
94:15
**ten**
50:13, 50:14,
50:18, 51:1,
90:11
**tend**
116:17, 144:6
**tends**
56:17, 57:1
**tension**
82:9
**term**
22:13, 59:2,
104:18, 104:19,
104:20, 108:1,

**terminology**
209:5
**terms**
10:6, 13:15,
27:3, 27:4,
42:9, 58:5,
92:5, 97:13,
100:5, 110:17,
125:16, 125:18,
188:13, 188:14
**test**
40:12, 43:4,
122:1
**testified**
6:14, 50:13,
228:14
**testify**
6:12, 20:8,
32:12, 53:7,
115:22
**testifying**
32:15, 227:16
**testimony**
16:11, 20:10,
31:14, 49:22,
52:14, 53:15,
54:5, 54:7,
54:12, 54:18,
61:4, 67:22,
76:21, 78:9,
79:2, 80:9,
81:8, 100:19,
101:1, 101:4,
137:8, 145:5,
153:17, 168:10,
188:4, 190:9,
191:16, 222:12,
225:19, 227:15,
235:19, 236:6,
238:5
**testing**
58:19, 59:7,

108:3, 108:5,
111:8, 117:15,
117:20, 119:16,
119:17, 121:4,
122:9, 209:9,
209:10

59:8, 60:9,
68:9, 118:20,
216:13, 221:17,
221:21, 222:4,
222:11, 223:4,
223:13, 224:8,
224:20, 225:7,
225:12, 226:3,
226:9
**texas**
35:17, 112:19,
113:14, 113:17,
114:8, 114:14,
115:17, 116:1,
224:5, 229:1,
229:2
**th**
2:6, 3:8, 5:9,
11:17, 14:15,
74:16, 140:11,
245:10
**thank**
6:20, 9:4, 9:5,
9:21, 10:7,
31:20, 75:14,
77:12, 77:13,
93:3, 94:3,
160:11, 187:5,
193:15, 213:18,
217:13, 218:16,
219:19, 226:18,
241:11, 244:1,
244:2
**theme**
143:17
**themselves**
5:15, 124:3,
146:20, 154:14,
156:4, 159:22
**therefore**
129:6, 142:3,
175:1, 212:20
**thing**
8:2, 11:5,
34:14, 75:13,
216:19, 218:11,
233:20, 242:15
**things**
14:12, 15:4,

Transcript of Allan Lichtman
Conducted on September 30, 2019

297

16:14, 16:16,
18:17, 22:6,
40:12, 64:3,
105:1, 117:8,
136:7, 150:17,
151:21, 156:17,
162:18, 164:5,
180:8, 201:8,
206:2, 206:5
**third**
32:7, 32:10,
166:18, 185:11
**thompson**
185:12
**thornburg**
35:11, 40:11,
45:14
**thought**
23:21, 75:9,
75:12, 129:3,
149:14, 176:22,
191:5
**thousands**
67:17, 178:14
**threat**
167:19, 168:2
**threats**
146:19
**three**
34:21, 35:5,
71:8, 71:16,
86:8, 102:1,
103:13, 115:5,
170:6, 207:5,
213:22
**three-prong**
211:17
**three-quarters**
214:21
**three-way**
165:14, 165:15
**threshold**
127:12, 129:22,
185:17, 185:18,
232:13, 232:19,
234:5, 242:5
**through**
6:22, 9:17,

11:17, 55:16,
60:20, 72:18,
84:19, 87:18,
101:22, 107:11,
107:21, 110:14,
111:3, 116:2,
132:12, 184:13,
193:11, 194:12,
217:15
**thumb**
102:14, 105:2,
105:3, 105:12,
105:20, 238:16,
238:21, 239:11
**time**
7:13, 8:12,
9:22, 14:16,
15:3, 26:20,
32:18, 33:5,
48:1, 51:4,
51:6, 51:19,
52:2, 53:7,
64:5, 65:16,
65:18, 65:20,
66:21, 73:17,
73:19, 73:22,
74:3, 75:1,
76:2, 77:10,
78:4, 78:18,
82:16, 82:20,
85:11, 87:8,
94:18, 97:2,
124:9, 125:12,
137:18, 150:18,
163:15, 171:3,
173:13, 174:13,
181:8, 183:19,
192:2, 192:16,
192:20, 193:2,
195:16, 195:21,
206:5, 206:15,
213:7, 223:15,
227:12, 227:16,
232:8, 233:16,
235:11, 244:4
**times**
7:6, 7:8,
30:16, 30:17,

49:20, 50:13,
50:15, 50:18,
51:21, 96:17,
120:5
**timing**
171:1, 171:4,
171:6
**tiny**
185:20
**today**
6:20, 6:22,
8:4, 8:6, 9:15,
26:21, 28:5,
28:8, 29:17,
30:12, 30:14,
54:18, 61:4,
77:10, 80:19,
81:4, 88:6,
96:19, 97:18,
98:21, 117:16,
123:19, 125:1,
147:19, 151:19,
161:21, 193:6,
213:7, 225:18,
235:19, 238:5,
241:11, 241:12
**today's**
28:1, 212:2,
212:10
**together**
7:13, 9:15,
62:8, 62:12,
100:21, 110:18,
110:19, 115:6,
115:10, 118:10,
126:8, 153:10,
190:2, 213:7
**token**
190:15, 208:17,
208:19, 209:2,
209:3, 209:10
**told**
66:12, 204:9
**tomorrow**
77:7, 218:19
**took**
23:4, 80:4,
95:2, 205:2

**top**
19:15, 42:13,
69:15, 69:19,
70:17, 81:7,
92:9, 96:5,
223:9, 230:7,
242:13
**top-right**
144:7
**total**
66:6, 67:6,
67:8, 130:15,
133:10
**totality**
14:19, 15:5,
15:18, 65:4
**totally**
40:1, 41:9,
68:14, 216:16,
216:17
**totals**
94:2, 94:7
**touched**
48:6, 49:3,
49:5, 49:9
**towards**
81:19, 81:21,
199:20, 202:1,
205:6
**town**
65:14
**toxic**
21:1, 21:4
**track**
56:4, 56:9,
56:12
**transcribed**
1:22, 246:5
**transcriber**
246:1
**transcript**
4:7, 9:8, 77:1,
77:5, 212:6,
213:11, 226:21,
234:16, 246:3
**transcription**
9:2
**transmitted**
75:12

Transcript of Allan Lichtman
Conducted on September 30, 2019

298

transparent
219:22
trap
71:21
treat
234:2, 234:11
treated
27:4, 201:16
treatment
73:10, 82:1
trends
86:2, 202:1,
232:11, 235:5,
242:5
tri-part
86:8, 113:7
trial
20:8, 20:11,
53:10
tried
22:21, 23:10
true
31:18, 63:9,
63:16, 64:16,
128:11, 129:11,
134:15, 177:1,
177:6, 186:14,
204:13, 246:3
truly
37:7, 206:13
trump
79:10
truth
6:13, 6:14,
19:12, 38:15,
40:8, 127:2
truthful
8:4
try
30:6, 45:5,
70:11, 77:7,
87:16, 103:21,
128:22, 187:4,
188:2, 189:22,
219:21
trying
24:11, 31:10,
39:14, 41:7,

45:20, 55:7,
61:1, 61:8,
68:10, 71:21,
72:2, 83:18,
86:12, 93:15,
114:11, 115:21,
117:16, 135:8,
155:5, 189:20,
192:4, 208:3,
208:12, 209:14,
210:4, 220:15,
220:16, 221:7
turn
37:10, 52:19,
69:7, 72:5,
80:1, 81:2,
92:6, 98:12,
100:7, 124:13,
127:17, 138:11,
139:2, 148:5,
154:2, 175:8,
184:8, 206:16
turned
145:14, 217:18
turnout
38:7, 44:12,
90:2, 90:8,
121:7, 122:19,
122:22, 123:14,
237:11, 237:12,
237:15, 237:17
turpin
149:12, 151:10
twelve
214:20
two
14:13, 18:3,
29:11, 29:12,
35:7, 37:11,
40:13, 46:22,
47:2, 47:7,
71:7, 71:15,
92:6, 100:4,
100:20, 101:10,
103:13, 108:18,
109:21, 110:17,
113:16, 115:14,
122:21, 123:3,

127:7, 127:11,
127:16, 127:18,
129:7, 132:16,
136:7, 137:13,
145:12, 145:18,
145:19, 146:10,
147:17, 147:22,
153:10, 161:13,
162:17, 163:14,
169:15, 170:6,
173:7, 214:6,
214:14, 219:15,
228:18, 235:8
two-candidate
239:20
two-person
101:17
two-seat
29:7, 212:17,
214:17
two-vote
212:17
types
49:16, 108:18,
111:9

| U |
| --- |

uh-huh
138:13, 175:16
ultimate
81:12, 81:15
unabashed
154:5, 154:11,
154:16
unanimously
33:12
unattributed
153:6
unbiased
92:1
unclear
7:19, 172:21
uncommon
177:19
uncover
19:8
uncovered
124:21

under
8:3, 31:22,
54:18, 73:13,
195:8, 201:18,
234:9, 242:10
underlying
11:14
understand
7:2, 7:18,
7:20, 10:1,
20:11, 26:22,
27:1, 31:3,
31:14, 37:1,
37:16, 42:6,
45:13, 50:5,
61:1, 61:4,
61:9, 61:17,
62:15, 66:2,
68:10, 72:15,
83:18, 86:22,
91:18, 103:7,
103:22, 110:16,
117:14, 117:16,
136:9, 136:10,
137:8, 141:7,
151:10, 157:15,
160:1, 160:9,
163:22, 167:22,
181:6, 188:4,
191:15, 191:16,
196:1, 201:6,
203:22, 210:2,
213:13, 218:20,
218:21, 221:1,
221:20, 225:6,
231:16, 234:20,
237:12, 239:9,
242:7
understanding
27:6, 55:12,
65:6, 67:22,
73:8, 84:4,
89:9, 89:16,
130:5, 188:8,
216:11, 221:8,
224:20, 226:8,
234:9, 235:2
understands
103:21

Transcript of Allan Lichtman
Conducted on September 30, 2019

299

| | | | |
|---|---|---|---|
| **understood** | 171:12 | **usually** | **vernacular** |
| 8:1, 55:14, | **unusual** | 104:21, 111:21, | 39:19 |
| 80:8, 100:19, | 65:11, 163:14, | 116:17, 117:5, | **verse** |
| 145:5, 168:10 | 168:8, 168:11, | 117:20, 119:16, | 229:1 |
| **undertook** | 176:12, 187:13, | 119:18, 123:2, | **versus** |
| 122:2 | 187:17, 187:18, | 126:8, 126:11, | 24:21, 83:21, |
| **unemployed** | 188:22, 189:3, | 146:11, 232:14 | 85:14, 108:21, |
| 64:14 | 189:8, 191:17 | **utilize** | 109:15, 136:4, |
| **unemployment** | **unusually** | 34:8, 68:21, | 158:5, 194:21, |
| 64:18, 135:17, | 190:10 | 238:20 | 210:18 |
| 135:19, 137:5 | **update** | | **veterans** |
| **unfair** | 11:22, 28:21, | **V** | 176:8 |
| 81:22 | 95:17, 241:19 | **va** | **viable** |
| **unfortunate** | **updated** | 3:18 | 166:20, 167:5 |
| 100:3 | 18:12, 50:7, | **validated** | **victories** |
| **unfortunately** | 53:13, 54:1, | 35:10, 36:15, | 162:8, 238:14 |
| 81:22, 161:2, | 54:19, 78:17, | 36:17 | **victory** |
| 210:5 | 78:18, 95:7, | **validating** | 151:16, 216:7, |
| **united** | 95:18, 132:16, | 23:17 | 238:16, 238:20, |
| 1:1, 5:5, | 138:2, 198:11, | **value** | 239:3, 239:10, |
| 36:16, 36:17, | 211:18 | 133:16, 139:5, | 239:13 |
| 142:21, 159:20 | **updates** | 232:5 | **video** |
| **unites** | 29:11, 132:18 | **variable** | 5:13, 141:2, |
| 182:11 | **upward** | 38:6, 41:1, | 141:4 |
| **university** | 38:11 | 41:17, 41:19, | **videographer** |
| 11:2, 31:5, | **upwards** | 116:19 | 3:22, 5:2, 6:8, |
| 31:8, 31:16 | 30:21 | **variance** | 73:21, 74:3, |
| **unk** | **url** | 41:21 | 82:15, 82:19, |
| 177:12 | 72:19 | **variation** | 124:8, 192:19, |
| **unknowing** | **use** | 39:7, 40:22, | 193:1, 235:10, |
| 191:14 | 7:12, 11:7, | 41:17, 61:13, | 235:14, 244:3 |
| **unknowingly** | 11:10, 37:7, | 61:20, 62:1 | **videotaped** |
| 190:22, 191:10 | 45:12, 58:19, | **vary** | 5:3 |
| **unknown** | 59:18, 59:22, | 39:10, 105:14 | **view** |
| 177:13, 178:6, | 60:9, 63:8, | **varying** | 105:18 |
| 178:10 | 68:9, 68:12, | 103:22 | **violation** |
| **unless** | 101:16, 117:20, | **vast** | 112:6, 112:11, |
| 122:14, 241:7 | 131:11, 141:20, | 186:1 | 112:14 |
| **unmistakable** | 148:14, 149:9, | **vastly** | **violations** |
| 25:2 | 154:11, 188:14, | 106:1 | 80:17, 172:15 |
| **unquote** | 208:17, 209:10, | **veasey** | **violence** |
| 82:2, 83:13 | 219:15, 231:19 | 114:14 | 143:10 |
| **unreliable** | **using** | **vehicle** | **virginian-pilot** |
| 42:16, 42:21, | 39:19, 59:10, | 139:12 | 172:14, 174:4, |
| 68:6, 228:20, | 59:15, 60:15, | **verbiage** | 174:6 |
| 229:5 | 61:3, 61:5, | 28:13 | **virtue** |
| **until** | 68:1, 216:12, | **verification** | 8:19 |
| 69:14, 86:18, | 225:20, 232:7 | 55:7 | **vision** |
| | | | 201:1, 202:22 |

Transcript of Allan Lichtman
Conducted on September 30, 2019

300

**visuals**
40:9
**vitae**
4:12
**vocabulary**
231:15
**vote**
48:8, 56:16,
56:17, 56:22,
57:2, 57:9,
57:14, 57:20,
57:21, 59:10,
59:15, 59:19,
60:1, 62:8,
62:12, 88:12,
102:4, 104:22,
106:18, 106:20,
107:12, 107:19,
109:10, 111:12,
112:13, 118:21,
120:5, 122:18,
164:13, 166:5,
167:2, 167:3,
167:4, 167:20,
168:3, 187:14,
188:14, 209:8,
218:12, 222:5,
224:7
**voter**
51:10, 90:8
**voters**
55:22, 62:8,
62:12, 62:19,
107:5, 107:6,
108:8, 117:11,
117:18, 117:20,
117:21, 118:6,
122:16, 154:6,
157:5, 157:8,
170:10, 189:3,
190:1, 190:9,
208:6, 209:17,
209:18, 215:5,
218:5, 218:12,
219:4, 219:7,
241:6
**votes**
29:12, 38:8,

61:15, 108:10,
117:1, 151:14,
163:4, 163:5,
163:6, 168:9,
210:6, 215:2,
215:9, 216:22,
218:8, 219:8,
222:1, 222:10,
224:4
**voting**
30:18, 32:4,
32:16, 34:11,
34:19, 39:9,
44:4, 44:12,
44:18, 46:11,
46:18, 46:20,
46:21, 47:5,
47:8, 47:10,
47:15, 47:21,
48:7, 48:14,
48:17, 48:18,
56:4, 56:5,
56:9, 56:11,
56:12, 58:11,
58:15, 67:7,
67:8, 88:14,
100:17, 100:20,
100:22, 101:3,
101:8, 101:20,
102:17, 102:20,
103:10, 103:18,
103:20, 104:11,
106:11, 107:2,
107:3, 111:9,
111:21, 111:22,
112:2, 115:13,
115:15, 116:14,
117:12, 122:7,
172:15, 207:6,
210:5, 211:9,
211:11, 211:12,
211:13, 222:3,
223:18, 226:6,
238:19, 239:11
**voting-age**
113:22

---
**W**
---

**wait**
213:4

**waiting**
74:18, 79:10,
146:12
**walter**
88:20
**want**
8:21, 19:16,
27:10, 34:13,
42:4, 42:6,
43:10, 49:17,
52:19, 60:20,
62:5, 68:8,
74:22, 79:20,
80:1, 81:2,
84:6, 87:18,
89:15, 92:6,
100:7, 100:15,
102:5, 103:2,
103:5, 103:21,
108:1, 108:15,
108:18, 115:15,
115:18, 116:4,
116:8, 116:10,
116:12, 117:7,
119:19, 124:5,
124:13, 127:13,
127:15, 127:17,
127:22, 131:20,
135:6, 139:20,
145:19, 148:5,
154:2, 160:9,
160:17, 161:2,
161:20, 162:11,
162:16, 165:6,
167:14, 192:13,
192:14, 193:19,
194:18, 200:3,
203:3, 206:16,
207:14, 209:9,
210:11, 210:13,
210:14, 217:2,
226:1, 228:9,
228:10, 233:12,
234:17, 238:12
**wanted**
85:3, 85:8,
155:15, 173:9,
176:21, 233:19,

241:19
**wants**
158:18
**warning**
37:4, 37:19,
38:3, 39:1,
39:12, 40:19,
40:20, 40:21,
41:21
**washington**
1:14, 2:8, 3:9,
5:10, 31:5,
31:16, 79:16
**waste**
174:13
**way**
8:22, 12:21,
13:4, 16:4,
17:4, 21:19,
22:19, 30:6,
36:22, 69:14,
70:10, 95:10,
107:16, 108:9,
118:1, 120:11,
127:16, 128:12,
129:21, 138:22,
142:20, 143:19,
150:10, 151:21,
155:1, 156:3,
158:20, 159:4,
159:19, 159:21,
166:15, 168:6,
170:13, 171:22,
187:1, 188:3,
192:10, 201:20,
206:8, 207:11,
219:19, 229:13,
230:7, 232:16,
235:6
**we'll**
8:9, 14:14,
18:6, 18:7,
31:1, 75:15,
75:18, 77:21,
116:5, 174:14,
204:20, 231:19
**we're**
6:19, 8:12,

Transcript of Allan Lichtman
Conducted on September 30, 2019

301

44:9, 55:5,
55:7, 68:15,
68:17, 79:10,
81:19, 109:11,
117:3, 117:4,
117:7, 124:8,
141:17, 150:1,
152:18, 158:8,
158:9, 160:22,
161:6, 167:12,
175:14, 210:20,
212:2, 212:4,
228:9, 232:6,
234:19, 240:17
**we've**
6:18, 29:14,
49:15, 74:13,
76:2, 78:7,
81:3, 100:11,
107:11, 107:21,
108:20, 117:15,
120:4, 143:1,
179:14, 180:16,
194:12, 207:13,
213:6, 233:16
**weight**
140:9
**welcome**
75:1
**welfare**
133:14
**well-on**
23:6
**went**
11:17, 54:17,
101:22, 106:18,
130:1, 181:13,
181:20, 241:17
**weren't**
95:20, 238:11
**whatever**
8:11, 8:14,
38:6, 40:5,
98:10, 103:16,
138:8, 158:14,
199:2, 226:1
**whenever**
14:19

**whereas**
166:4
**whereby**
102:3
**whereof**
245:9
**whereupon**
6:10
**whether**
18:20, 20:7,
21:3, 24:20,
27:2, 27:14,
39:6, 46:2,
46:7, 46:15,
50:17, 51:4,
68:19, 101:19,
110:7, 110:20,
111:1, 112:14,
116:13, 118:8,
119:7, 121:18,
123:20, 123:22,
151:15, 151:16,
173:1, 186:11,
186:16, 200:3,
200:7, 205:10,
211:9, 217:21,
219:15, 225:13,
227:11, 229:16,
240:16, 242:9
**white**
48:17, 57:14,
58:16, 64:15,
84:16, 85:14,
85:22, 92:13,
97:20, 98:4,
99:4, 99:17,
101:18, 104:6,
106:20, 107:6,
107:19, 108:21,
109:15, 125:18,
133:22, 134:13,
135:1, 136:18,
139:17, 144:8,
144:10, 148:9,
149:5, 149:6,
149:7, 149:8,
150:12, 163:9,
165:16, 165:21,

167:20, 168:3,
168:8, 168:11,
168:19, 179:3,
179:8, 180:17,
182:13, 183:7,
186:2, 187:7,
187:13, 187:17,
187:18, 188:1,
188:13, 189:2,
189:3, 189:4,
189:7, 189:8,
190:1, 190:9,
190:10, 190:15,
191:1, 191:11,
191:12, 191:17,
208:6, 209:18,
234:18, 235:1,
237:16, 237:17,
241:5, 242:17,
242:20
**white-block**
211:9
**white-community**
189:6
**white-owned**
190:2, 191:18
**whites**
47:3, 56:20,
57:10, 64:8,
64:17, 90:3,
94:18, 99:11,
106:1, 107:10,
109:15, 111:11,
115:3, 131:14,
133:2, 133:6,
134:2, 134:8,
134:9, 134:20,
135:20, 136:13,
136:15, 137:3,
137:7, 137:11,
138:15, 138:18,
139:6, 163:12,
164:3, 164:10,
181:2, 208:15,
209:21, 210:3,
210:9, 211:5,
211:8, 234:3,
234:12, 234:15

**whoever**
154:13, 156:6
**whole**
6:13, 15:5,
156:3, 156:16,
199:16, 203:12
**widely**
141:15
**willie**
149:17, 149:20,
149:21, 150:4
**willing**
74:19, 203:3
**wilson**
128:6, 128:9
**win**
121:19, 167:10
**wins**
112:3, 151:13,
151:22
**wipe**
134:22, 138:9,
204:6, 205:8,
206:2
**withdrew**
208:20
**within**
19:19, 27:5,
104:19, 142:4,
146:21, 170:21,
196:16, 200:5,
201:16, 239:14,
239:20
**without**
16:15, 75:2,
110:4, 116:22,
121:19, 210:22,
211:13
**witness**
6:9, 32:2,
35:5, 77:21,
78:3, 83:3,
111:17, 129:3,
153:21, 197:14,
197:17, 213:5,
220:19, 221:1,
221:5, 231:4,
236:13, 242:1,

**won**
108:9, 151:10, 151:13, 186:20, 214:1, 214:2, 215:1, 215:8, 215:16, 218:7, 219:8
**wondering**
101:1
**wooten**
162:8, 162:16, 162:21, 163:5, 163:8, 163:11, 164:3, 166:4, 174:18, 184:22, 185:4, 185:10, 185:22, 188:17, 188:19, 189:1, 189:13, 190:15, 190:22, 192:8
**wooten's**
184:16
**word**
41:5, 42:4, 63:8, 104:17, 160:15, 181:16
**words**
22:2, 93:1, 101:4, 101:5, 101:6, 120:9, 138:7, 174:21, 188:21
**work**
14:1, 18:20, 21:1, 21:4, 36:1, 52:17, 53:2, 77:8, 194:14, 194:21, 194:22, 198:1, 198:5, 201:13, 205:2
**worked**
31:15, 74:13, 197:21, 226:14
**worker**
203:13
**workers**
193:7

**working**
32:3, 199:2, 200:12
**works**
217:4, 223:17
**worms**
238:13
**worry**
108:17
**worth**
55:4
**worthy**
174:18
**wouldn't**
21:8, 23:1, 79:5, 85:6, 123:9, 127:3, 127:13, 127:15, 146:13, 149:9, 150:11, 196:10
**wow**
79:15
**wray**
164:16, 164:22, 165:16, 166:9, 166:17, 167:3, 167:4
**writ**
69:20
**write**
10:9, 14:19, 15:7, 43:15, 124:20, 173:18
**writing**
34:7, 48:20, 49:4, 79:7
**writings**
34:7, 48:16, 49:11
**written**
33:2, 34:10, 47:13, 48:10, 48:22, 49:6, 49:21, 53:14, 54:5, 54:7, 139:4, 143:14
**wrong**
70:7, 207:21,

216:15, 216:16, 216:17
**wrote**
54:11, 89:12
**wtkr**
172:4

| X |
| --- |

**x**
1:3, 1:11

| Y |
| --- |

**yeah**
12:20, 27:16, 28:6, 28:20, 29:4, 35:14, 38:4, 39:21, 41:7, 45:6, 45:20, 56:8, 57:5, 68:7, 72:1, 93:19, 93:21, 100:13, 106:17, 110:4, 114:11, 117:3, 117:4, 122:13, 139:13, 144:19, 148:12, 150:10, 153:1, 157:7, 159:7, 167:22, 168:6, 169:20, 174:16, 175:17, 186:22, 187:11, 190:19, 192:11, 198:22, 207:20, 208:1, 221:22, 223:2, 230:7, 231:21, 233:9, 233:16, 235:9, 242:8, 243:14
**year**
49:15, 94:12, 95:1, 95:2, 95:16, 195:11, 230:9
**years**
23:6, 32:15, 49:18, 49:19, 50:4, 50:15,

84:15, 205:10, 205:22, 232:7
**yep**
54:21, 67:4, 175:10, 235:9
**yield**
217:8
**yourself**
10:10, 21:18, 25:1, 148:13
**youtube**
141:3

| Z |
| --- |

**zalesin**
3:6, 6:6
**zero**
102:19, 102:21
**zombie**
142:18, 143:6
**zombies**
142:17

| $ |
| --- |

**$1,500**
128:19
**$100**
128:4
**$150**
129:18
**$16,000**
176:5
**$2,500**
185:7
**$200**
128:8
**$250**
126:19, 127:7, 129:17, 129:22
**$350**
53:3, 131:4
**$5,500**
177:4

| 0 |
| --- |

**00**
73:22, 74:1
**00069**
1:7, 5:7

Transcript of Allan Lichtman
Conducted on September 30, 2019

303

**06**
192:22, 193:2
**07**
244:4, 244:5

---

**1**

**1**
9:14, 73:22,
74:1, 74:2,
74:4, 82:16,
82:17, 82:18,
82:20
**1.6**
135:5, 136:14,
136:16
**10**
39:11, 50:2,
135:22, 204:11,
204:14, 204:16,
204:17
**100**
39:22, 102:20,
102:21, 143:12
**11**
1:16, 5:11,
6:20, 70:4,
71:3, 71:6,
72:6, 80:2
**1101**
2:6, 3:8
**1104**
5:9
**12**
42:12, 50:2,
69:14, 69:15,
69:17, 69:19,
70:16, 70:17,
70:20, 71:4,
71:12, 81:3,
81:7, 84:6,
165:4, 205:14
**14**
2:6, 3:8, 5:9,
67:11, 165:10,
175:11, 186:14
**15**
9:11, 10:9,
11:17, 11:21,

14:15, 74:16,
133:10, 139:15,
165:4, 184:10,
232:7
**16**
92:17, 94:11,
94:21
**17**
87:19, 89:14
**18**
1:7, 5:7,
93:21, 94:7,
96:14
**19**
92:7, 92:10,
94:3, 140:11
**1963**
65:16, 65:17
**1970**
66:12
**1973**
31:9, 31:17
**1980**
32:5, 32:9,
35:12, 54:6
**1990**
48:4, 230:10
**1993**
222:19, 223:3
**1998**
145:22, 147:2
**1st**
172:15

---

**2**

**2**
124:9, 124:10,
124:11
**20**
41:18, 98:13,
106:2, 164:7
**2000**
84:19, 94:9
**20005**
2:8, 3:9, 5:10
**2004**
88:19, 89:22
**2006**
140:4, 141:17,

141:20, 198:9
**2008**
88:19, 89:22,
160:12, 164:9
**2010**
84:22, 85:6,
86:17
**2011**
31:13, 137:15,
142:5, 143:15,
229:12, 230:4
**2012**
114:14
**2013**
72:10, 72:13,
80:5, 84:19,
86:18, 233:6
**2014**
29:11, 94:2,
94:7, 94:16,
114:14, 212:14,
212:17
**2015**
92:17, 94:2,
94:4, 94:7,
94:11, 94:16,
94:21, 95:6,
95:12, 95:16,
137:16
**2016**
94:4, 94:16,
95:6, 95:12,
95:16, 128:8
**2017**
84:19, 114:13,
144:15, 148:2,
171:8, 233:7
**2018**
48:9, 128:15,
160:17, 161:10,
161:22, 164:9,
164:16, 165:8,
167:6, 170:8,
171:9, 171:12,
214:3, 215:15,
243:9, 243:13
**2019**
1:15, 5:11,

9:11, 9:12,
10:9, 11:21,
14:21, 15:2,
26:7, 165:4,
191:3, 193:6,
202:8, 227:2,
245:11, 246:17
**202**
2:9, 3:10
**2020**
233:5, 241:14
**2040**
201:1, 202:22
**21**
36:4, 100:10
**212**
4:13
**213**
4:14
**22**
106:19
**2200**
2:9
**2204**
3:10
**226**
4:15
**2270**
71:18, 71:19
**23456**
3:18
**24**
72:13, 193:6
**2401**
3:17
**246**
1:21
**25**
124:5, 124:14,
127:6
**250**
127:2, 185:19
**253,400**
139:7
**26**
9:12, 14:21,
15:2, 128:1
**260**
3:17

Transcript of Allan Lichtman
Conducted on September 30, 2019

304

**266087**
1:20
**27**
124:9, 124:10
**273,700**
139:7
**28**
131:21, 132:11,
132:22, 133:16,
135:1, 135:2,
136:17
**2:-cv**
1:7, 5:7

---
**3**
---

**3**
192:20, 192:21
**3.8**
96:17
**30**
1:15, 5:10,
32:15, 49:15,
72:13, 74:18,
82:13, 82:22,
89:7, 91:5,
245:10
**31**
26:7, 74:2,
74:4
**33**
138:12, 152:13,
152:15, 154:2
**34**
98:18, 152:14,
152:16, 152:17,
152:18, 152:21
**35**
141:1, 152:16,
152:17, 152:19,
152:22, 158:12,
158:22
**36**
124:11, 170:6
**38**
142:8
**385**
3:19
**39**
82:16, 82:17,

144:13, 144:18

---
**4**
---

**4**
192:22, 193:2,
235:11, 235:12,
235:13, 235:15
**40**
82:18, 82:20,
104:8, 106:22,
145:14, 148:6
**400**
2:7, 3:8, 5:10
**41**
5:11
**42**
1:16, 150:8
**43**
160:21, 161:9,
165:18
**45**
6:20
**4531**
3:19
**46**
146:2
**49**
164:21
**4th**
33:12, 52:7,
52:16

---
**5**
---

**5**
244:4, 244:5
**5.8**
134:10, 135:5,
136:16
**50**
23:6, 110:8,
111:4, 111:7,
232:12, 232:18,
234:4, 241:1,
241:7, 242:6
**51**
240:15
**51.1**
164:4

**52**
240:16
**53**
235:11, 235:12
**56**
175:9, 175:15
**57**
184:8, 184:18,
192:20, 192:21
**59**
106:3, 193:22,
197:13, 197:15,
197:18, 235:13,
235:15
**59.9**
106:20

---
**6**
---

**6.1**
67:7
**6.6**
67:9
**60**
39:11, 66:4,
66:8, 66:10,
104:8, 104:22,
105:13, 106:22,
240:8, 240:9,
240:11
**63**
197:18
**64**
197:14, 197:18

---
**7**
---

**7**
67:7, 111:5
**7.4**
134:9
**7.8**
67:7, 67:8
**7.9**
67:8
**736**
2:9, 3:10
**75**
214:21
**757**
3:19

**76**
4:11
**77**
4:12
**79**
31:10

---
**8**
---

**80**
31:10, 40:7,
121:9
**81.9**
106:18
**88**
42:13

---
**9**
---

**90**
7:6, 7:7,
30:15, 30:21,
33:4, 40:4,
54:3, 120:22,
121:6, 121:9,
125:15
**970**
1:22

July 15, 2019

**United States District Court for the Eastern District of Virginia**

*Holloway v. City of Virginia Beach*

**Case No.: 2:18-cv-00069**

**Expert Report of Dr. Allan J. Lichtman:**
**Totality of Circumstances Analysis**

**Distinguished Professor of History**
**American University**
**Washington, DC**

Allan J. Lichtman



# I. STATEMENT OF PURPOSE

I have been asked by Plaintiffs' counsel to examine the totality of circumstances applicable under Section 2 of the Voting Rights Act ("VRA") to the City of Virginia Beach. In doing so, I have been guided by the "Senate factors," which were detailed in a report accompanying the 1982 renewal of the VRA by the Senate Committee on the Judiciary. My analysis is relevant to the Court's consideration of the impact of these factors under Section 2 of the VRA.

The Senate factors are: (1) "the extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process;" (2) "the extent to which voting in the elections of the state or political subdivision is racially polarized;" (3) "the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group;" (4) "if there is a candidate slating process, whether the members of the minority group have been denied access to that process;" (5) "the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process;" (6) "whether political campaigns have been characterized by overt or subtle racial appeals;" and (7) "the extent to which members of the minority group have been elected to public office in the jurisdiction."[1]

Additional factors include: (1) "whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group" and (2) "whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous." The Report emphasized that the list of factors is neither comprehensive nor exclusive and that "there is no requirement that any particular number of factors be proved, or that a majority of them point one way or the other."[2]

# II. QUALIFICATIONS

This study draws on my experience in voting rights litigation and expertise in political history, political analysis, and historical and statistical methodology. I am Distinguished Professor of History at American University in Washington, D.C., where I have been employed for 45 years. Formerly, I served as Chair of the History Department and Associate Dean of the College of Arts and Sciences at American University. I received my BA in History from Brandeis University in 1967 and my Ph.D. in History from Harvard University in 1973, with a specialty in the mathematical analysis of historical data.

---

[1] *Thornburg v. Gingles*, 478 U.S. 30, 36-37 (1986) (quoting S. Rep. No. 97-417, at 28-29 (1982), *reprinted in* 1982 U.S.C.C.A.N. 177, 206-07) (internal quotation marks omitted).
[2] Ibid.

2

I am the author of numerous scholarly works on quantitative methodology in social science. This scholarship includes articles in such academic journals as *Political Methodology*, *Journal of Interdisciplinary History*, *International Journal of Forecasting*, and *Social Science History*. In addition, I coauthored *Ecological Inference* with Dr. Laura Langbein, a standard text on the analysis of social science data, including political information. I have published articles on the application of social science analysis to civil rights issues. This work includes articles in such journals as *Journal of Law and Politics*, *La Raza Law Journal*, *Evaluation Review*, *Journal of Legal Studies*, and *National Law Journal*. My scholarship also includes the use of quantitative and qualitative methods to conduct contemporary and historical studies, published in such academic journals as *Proceedings of the National Academy of Sciences*, *American Historical Review*, *International Journal of Forecasting*, *International Journal of Information Systems & Social Change*, and *Journal of Social History*.

Quantitative and historical analyses also ground my books, including, *Prejudice and the Old Politics: The Presidential Election of 1928*, *The Thirteen Keys to the Presidency* (co-authored with Ken DeCell), *The Keys to the White House*, *White Protestant Nation: The Rise of the American Conservative Movement*, and *FDR and the Jews* (co-authored with Richard Breitman). My most recent books are *The Case for Impeachment*, and *The Embattled Vote in America: From the Founding to the Present*. This latter book, published in September 2018 by Harvard University Press, examines the history and current status of voting rights in America.

My book, *White Protestant Nation*, was one of five finalists for the National Book Critics Circle Award for the best general nonfiction book published in America. My book, *FDR and the Jews*, was published under the Belknap Imprint of the Harvard University Press, reserved for works of special significance and lasting impact. This book was an editor's choice book of the New York Times in 2013, the winner of the most prestigious prize in American Jewish Studies, the National Jewish Book Award, and a finalist for Los Angeles Times Book Prize in history. My book, *The Case for Impeachment*, was an independent bookstore bestseller. In 2018, I was the winner of the Alfred Nelson Marquis Life Time Achievement Award for top 5% of persons included in Marquis WHO'S WHO.

I have worked as a consultant or expert witness for both plaintiffs and defendants in more than ninety voting and civil rights cases. My work includes more than a dozen cases for the United States Department of Justice and cases for many civil rights organizations. I have also worked as a consultant or expert witness numerous times for state and local jurisdictions. In the U. S. Supreme Court case, *League of United Latin Am. Citizens (LULAC) v. Perry*, 548 U.S. 399 (2006), the majority opinion written by Justice Kennedy authoritatively cited my statistical work. My work as an expert witness includes several cases in the state of Virginia.

I am being compensated for my work in this matter at the rate of $350 per hour. I have attached an updated CV and a table of cases in which I have provided written or oral testimony.

3

## III. EVIDENCE, METHODOLOGY, AND SUMMARY OF OPINIONS

I understand that the parties to this lawsuit have had a discovery dispute and that the City of Virginia Beach has not responded to Plaintiffs' totality of circumstances discovery requests. As a result, I reserve the right to supplement this report with additional information as the discovery process moves forward.

My analysis draws upon sources standard in historical and social scientific analysis. These include scholarly books, articles, and reports; newspaper and other journalistic articles; demographic and socio-economic information; election returns; voter registration and turnout data; court opinions, briefs, and reports; government and organizational documents; and scientific surveys and studies.

Through my analysis of this material I have found that nearly all of the Senate Factors are present in Virginia Beach. Minorities are burdened by a long history of racial discrimination in Virginia, which continues into recent times in both the state and the city. Voting in Virginia Beach is polarized along racial lines between whites and minorities. Under Virginia Beach's at-large election system, candidates for city council must compete across a large city of some 250 square miles and more than 450,000 persons. Virginia Beach's at-large election system includes 7 designated positions or numbered posts that prevent minorities from concentrating their votes on one or a small number of candidates. The lingering effects of discrimination in Virginia and the City of Virginia Beach are reflected in significant present-day disparities with regard to income, unemployment, poverty, education, housing, and the availability of vehicles. These socio-economic disparities bear directly on the ability of minorities to elect candidates of their choice and participate fully and effectively in the political process. Political campaigns in Virginia and Virginia Beach have been marked by racial appeals, and both Virginia and Virginia Beach have a weak record of electing minorities to public office. In significant ways, Virginia Beach has not been responsive to the particularized needs of minorities, and the justification for the current at-large election system with designated places is tenuous when compared to practices in other large Virginia cities.

## IV. SENATE FACTORS

**Factor 1: The extent of any history of official discrimination in the state or political subdivision that touched the right of members of the minority group to register, vote, or otherwise to participate in the democratic process.**

The state of Virginia has a long and well-recognized history of racial discrimination, which has primarily been directed against African Americans—Virginia's largest minority group—but has also affected all people of color. Indeed, such discrimination is persistent and ongoing even in the contemporary era, and directly affects the opportunity of African Americans and other minority residents to participate fully in the political process and elect candidates of their choice in Virginia. Decisions made by the state impact voters across Virginia, including the City of Virginia Beach. Consequently, Virginia Beach has its own legacy of racial discrimination that persists to the present day, although the scope of its authority is naturally much more limited than that of the

4

state.

The following analysis briefly explores Virginia's history of racial discrimination and its modern incarnation. This analysis includes not only direct restrictions on voting and registration, but also other forms of discrimination that burdened racial minorities, contributed to racial isolation, and limited opportunities for advancing their socio-economic status. In turn, such discrimination has and does restrict minorities' ability to participate fully and effectively in the political process in Virginia.[3]

### State of Virginia

During the Reconstruction period that followed the era of slavery and the end of the Civil War, African Americans in Virginia participated robustly in the politics of the Commonwealth as voters and office-holders. By the 1880s, however, the white supremacists who dominated the Democratic Party began to adopt measures aimed at eliminating black voting and office-holding in Virginia. In 1884, the state passed the Walton Act—a secret ballot law—which aimed at disenfranchising illiterate individuals, most of whom were black.[4] The law proscribed ballots from including names or symbols for parties, and limited the time for voters to navigate through the names of all candidates.

Then, in Virginia's Constitutional Convention of 1901-1902, white supremacists effectively snuffed out black voting and office-holding through literacy and poll tax requirements. Convention delegate Carter Glass, who later became a U.S. Senator from Virginia said, "Discrimination! Why, that is precisely what we propose; that, exactly is what this Convention was elected for—to discriminate to the very extremity of permissible action under the limitations of the Federal Constitution, with a view to the elimination of every negro voter who can be gotten rid of, legally, without Discrimination!" He explained that the Convention would circumvent the Fifteenth

---

[3] For more detailed historical analysis see, Thomas R. Morris and Neal Bradley, "Virginia," in Chandler Davidson and Bernard Grofman, eds., Quiet Revolution in the South (Princeton University Press, 1994), pp. 217-291 and United States District Court for the Eastern District Of Virginia, Lee, et. al. v. Virginia State Board of Elections, et. al., Case No. 3:15-CV-357, "Expert Report of Dr. John Douglas Smith," 14 December 2015. On the relationship between socio-economic standing and political opportunities see, for example: Steven J. Rosenstone and John Mark Hansen, Mobilization, Participation and Democracy in America, (Macmillan, 1993); Sidney Verba, Kay Lehman Schlozman, and Henry E. Brady, Voice and Equality: Civic Volunteerism in American Politics (Harvard, 1995); D. Sunshine Hillygus, The Missing Link: Exploring the Relationship Between Higher Education and Political Engagement, 27 Political Behavior 25-47 (2005); Michael Parkin and Frances Zlotnick, English Proficiency and Latino Participation in U.S. Elections, 39 Politics and Policy 515-37 (2011), Pew Research Center, The Party of Non-Voters, October 31, 2014, http://www.people-press.org/2014/10/31/the-party-of-nonvoters-2/; Jan E. Leighley and Jonathan Nagler, Who Votes Now? Demographics, Issues, Inequality and Turnout in the United States, (Princeton University Press, 2014); Randall Akee, et al., "Family Income and the Intergenerational Transmission of Voting Behavior: Evidence from an Income Intervention" National Bureau of Economic Research, Working Paper, No. 24770, June 2018, https://www.nber.org/papers/w24770; Joseph M. Colomer, "Benefits and Costs of Voting," Electoral Studies 10 (1991), 313-325; Lee Sigelman and William D, Berry, "Costs and the Calculus of Voting," Political Behavior 4 (1982), 419-428; Martin Gilens and Benjamin I. Page, "Testing Theories of American Politics: Elites, Interest Groups, and Average Citizens," Perspectives on Politics, 12 (2004), pp. 564-581.

[4] J. Morgan Kousser, The Shaping of Southern Politics: Suffrage Restrictions and the Establishment of the One-Party South, 1880-1910 (Yale University Press, 1974), p. 173.

Amendment by adopting measures that had the effect of disenfranchising African Americans without specifically invoking race: "As has been said, we have accomplished our purpose strictly within the limitations of the Federal Constitution by legislating against the characteristics of the black race, not against the 'race, color or previous condition' of the people themselves." By 1905, only 10,500 of 147,000 eligible African Americans in Virginia (7 percent) remained on the registration lists.[5]

By the early twentieth century, Virginia had also established the multi-faceted system of racial discrimination known as Jim Crow. This included legal segregation in schools, transportation, and public facilities, and de facto segregation in housing and public accommodations. Participation in the legal system—including service as judges, prosecutors, police officers and jurors—was largely limited to whites. In 1924, Virginia enacted an involuntary sterilization law which was upheld by the U.S. Supreme Court. As a result, "[f]or nearly fifty years, the Commonwealth of Virginia sterilized thousands of persons, white and black, who were deemed feebleminded, insane, or prone to criminal behavior."[6]

In 1924, as part of the eugenics movement that had led to the involuntary sterilization law, Virginia enacted legislation that became known as the Racial Integrity Act, which one historian called "the most draconian miscegenation law in American history." This legislation, which had no parallel in any other state, criminalized "willfully lying about one's color," prohibited whites from marrying nonwhites (subject to a "Pocahontas Exception"), and defined a "a white person as one 'who has no trace whatsoever of any blood other than Caucasian.'" In 1930, Virginia revised the Racial Integrity Act to define as black anyone with "one-drop" of alleged black blood, with a single exception to permit "persons with at least one-fourth Indian blood and less than one-sixteenth black blood to remain classified as Indians, but only if they lived on a recognized reservation." These racial integrity laws applied not just to African Americans but to all non-caucasians in Virginia.[7]

In 1926, the General Assembly enacted the Public Assembly Act, designed to keep blacks and whites separate in public places. The law required "the separation of white and colored persons at public halls, theaters, opera houses, motion picture shows and places of public entertainment and public assemblages." According to historian of race relations and the South Richard B. Sherman, Reverend James Franklin Love of the Southern Baptist Foreign Mission futilely opposed the bill because it would discriminate against Chinese and Japanese students attending the University of Richmond. Sherman explained that the Act "was unique. Despite the proliferation of Jim Crow laws since the turn of the century, no other state passed such a law. It was obviously a product of the hysteria created by the campaign for racial integrity."[8]

The Supreme Court's 1954 *Brown v. Board of Education* decision led Virginia to join the white South's "massive resistance" to the integration of its public schools. Every member of

---

[5] Ibid., 178-181; Smith, "Expert Report," pp. 9-11; Davidson and Grofman, "Virginia," pp. 273-274.
[6] Smith, "Expert Report," pp. 22-23.
[7] Richard B. Sherman, "'The Last Stand': The Fight for Racial Integrity in Virginia in the 1920s," *Journal of Southern History*, 54 (1988); Smith, Expert Report," pp. 25-28; Leslie Bow, *Partly Colored: Asian Americans and Racial Anomaly in the Segregated South* (New York: NYU Press, 2010), p. 50.
[8] "Separation of the Races 1926," *Encyclopedia Virginia*,
https://www.encyclopediavirginia.org/Separation_of_Races_1926; Ibid., Sherman, "'The Last Stand,'" pp. 83-85.

Virginia's congressional delegation signed the "Declaration of Constitutional Principles"—also known as the "Southern Manifesto"—which pledged resistance to school desegregation. As explained by historian James H. Hershman, Jr., school segregation in Virginia advantaged whites and severely disadvantaged African Americans and other people of color: "The discrimination was egregious—school facilities, educational materials, teacher salaries, and transportation in the separate black system were markedly inferior to those provided white students. African American children under this regime were denied many of the opportunities for economic advancement provided by public school education, and such conditions distorted the educational development of all students."[9]

In 1956, a special session of the Virginia General Assembly put the stamp of law on so-called "massive resistance." The legislature put pupil placement authority in the hands of the state to prevent the assignment of black pupils to white schools. It authorized the governor to close schools that courts had ordered to be integrated – which was quickly struck down as unconstitutional -- and required the NAACP to disclose its membership. In 1958, after a federal court issued a desegregation order for the city of Norfolk, Governor Almond closed all public schools, which affected nearly 13,000 students. In 1959, the state reopened the schools to permit limited desegregation. However, Prince Edward County closed its public schools in defiance of an integration order that same year. With the assistance of grants from the states, whites set up a segregated private school in Prince Edward County, but no alternatives were available to black students. Other school districts sought to maintain segregation through so-called "freedom of choice" plans that enabled white parents to send their children to all-white schools. Public schools did not reopen in Prince Edward County until 1964, and the pace of integration in Virginia did not pick up until the late 1960s.[10]

Federal intervention in the 1960s struck a blow against Jim Crow and expanded opportunities for non-whites in Virginia to participate in the political process. In 1964, Congress enacted the Civil Rights Act that banned racial discrimination in both public facilities and public accommodations. It prohibited employment discrimination based on race or sex and racial discrimination in programs and activities receiving federal financial assistance, and applied to institutions such as federally-funded schools and colleges. In 1967, in *Loving v. Virginia*, the U.S. Supreme Court struck down the prohibitions on interracial marriage in force in Virginia and fifteen other states. Miscegenation laws like one struck down in *Loving* affected all minorities, not just African Americans: for example, a dozen years before *Loving*, the Virginia Supreme Court rejected a challenge to its ban on interracial marriage brought by an Asian man married to a white woman. The U.S. Supreme Court declined to hear plaintiffs' appeal. In 1962, the state Supreme Court also ruled that a bi-racial Asian and white couple who had married in New Jersey and moved to Virginia did not have a legal marriage in Virginia and could not pursue a divorce in the state.[11]

---

[9] James M. Hershman, Jr., "Massive Resistance," Encyclopedia Virginia, https://www.encyclopediavirginia.org/massive_resistance; James W Ely, *The Crisis Of Conservative Virginia: The Byrd Organization And The Politics Of Massive Resistance* (University of Tennessee Press, 1976); Alexander Leidholdt, *Standing Before the Shouting Mob: Lenoir Chambers and Virginia's Massive Resistance to Public-School Integration* (University of Alabama Press, 1997).
[10] Ibid.
[11] *Loving v. Virginia*, 388 U.S. 1 (1967); *Ham Say Naim v. Ruby Elaine Naim*, 197 Va. 80 [87 S E. 2d 749] (1955); Peggy Pascoe, *What Comes Naturally: Miscegenation Law and the Making of Race in America* (New York: Oxford University Press, 2009), pp. 226-231; *Calma v. Calma*, 128 S.E.2d 440 (Va. 1962).

In January 1964, the Twenty-Fourth Amendment abolished the use of the poll tax in federal elections. At the time, Virginia was one of only five states that still enforced the poll tax. The state of Virginia, however, sought to blunt the effect of the poll tax's elimination by passing other legislation aimed at disenfranchising voters. In the fall of 1963, in anticipation of the ratification of the Twenty-Fourth Amendment, the Virginia General Assembly passed a law requiring potential voters to file a "certificate of residence" six months prior to a federal election in order to prove continuing residence in the state. In May of 1964, a federal district court struck down the law as discriminatory. In 1966, the US. Supreme Court struck down Virginia's use of the poll tax in state elections in *Harper v. Virginia Board of Elections* and ruled that the use of the poll tax in any elections—not just federal elections—violated the Equal Protection Clause of the Fourteenth Amendment. In his majority opinion, Chief Justice Earl Warren wrote that "the Virginia poll tax was born of a desire to disenfranchise the Negro."[12]

In 1965, Congress enacted the landmark Voting Rights Act. With one exception, the entire Virginia congressional delegation opposed passage of the Act. Only two members of Virginia's twelve-member congressional delegation subsequently supported extensions of the Voting Rights Act in 1970, 1975, and 1982.[13]

The VRA, which contains nearly 5,500 words and nineteen sections, would be enforced through both direct administrative action by the U.S. Department of Justice and lawsuits that could be filed by both the Justice Department and private parties. Among other provisions, the VRA made it a federal crime for any person or conspiracy of people, whether acting under color of law or not, to intimidate, threaten, or coerce anyone for attempting to vote. It declared that individuals could not be denied the right to vote for a lack of English proficiency if they had completed at least a sixth-grade education. It also authorized courts nationwide to suspend the use of any discriminatory test or device used by a jurisdiction as a prerequisite for voting and to appoint federal election examiners to register voters and monitor elections.[14]

Section 2 of the VRA stipulated that "no voting qualification or prerequisite to voting, or standard, practice, or procedure shall be imposed or applied by any State or political subdivision to deny or abridge the right of any citizen of the United States to vote on account of race or color." Beyond prohibiting practices that deny the vote to minorities, Congress designed Section 2 to ensure that minorities could make their vote count by having a reasonable opportunity to participate fully and effectively in the political process and elect candidates of their choice. Sections 4 and 5 singled out for special treatment certain "covered" jurisdictions that employed discriminatory tests or devices and had low rates of voter registration or turnout. These covered jurisdictions were prohibited from enacting any laws affecting voting—including redistricting schemes—without first submitting them

---

[12] Steven F. Lawson, *Black Ballots: Voting Rights in the South, 1944–1969.* (Columbia University Press, 1976); Frederick D. Ogden, *The Poll Tax in the South* (University of Alabama Press, 1958), Davidson and Grofman, "Virginia," p. 276.
[13] Smith, "Expert Report," p. 45.
[14] Text of Voting Rights Act (1965), https://www.ourdocuments.gov/doc.php?flash=false&doc=100&page=transcript

to the U.S. Attorney General or the U.S. District Court for D.C. for "preclearance" so as to ensure they did not discriminate against minority voters. Virginia was one of only six southern states covered in their entirety under preclearance from the Act's inception in 1965 until 2013, when the U.S. Supreme Court's holding in *Shelby County v. Holder* invalidated the coverage formula in Section 4 of the Act.[15]

In the decades following the VRA's passage, the Department of Justice and federal courts objected to multiple voting-related laws proposed by Virginia's General Assembly.

The Justice Department interposed objections during Section 5 preclearance review to Virginia's redistricting plans for both chambers of the General Assembly following the Census of 1970. The State Senate responded by creating single-member districts, with one exception in Norfolk. There, the State House was able to retain multi-member districts after the U.S. Supreme Court in *Whitcomb v. Chambers* declined to rule that such districts violated the Fourteenth Amendment.[16]

In 1973, the Virginia General Assembly passed a resolution for "bailing" the state out of coverage under Section 5 of the Voting Rights Act. The Attorney General then filed a lawsuit under the "bail out" provision of the Act arguing that Virginia had rectified the low registration and turnout of African Americans that justified its original coverage under Section 4. A federal district court rejected the bail out in part because of "the causal connection between the maintenance of inferior schools for blacks and their lesser ability to pass Virginia's literacy requirement prior to 1965."[17]

At the time of the 1980s restricting, Virginia's "record of four blacks in the hundred-member lower house and one black in the forty-member upper gave it the lowest level of black representation in the South." Unsurprisingly, the state legislative redistricting process following the 1980s census was protracted and contentious: It encompassed "some fourteen legislative sessions, six redistricting plans, a ruling of unconstitutional population disparities by a three-judge federal panel, a gubernatorial veto, and Justice Department Section 5 objections to plans for both houses."[18] Under pressure, the legislature allowed civil rights groups to participate in the map drawing process. As a result of the redistricting, the House of Delegates transitioned to single-member districts, 9 of 100 of which (9 percent) had black majorities. In the elections following redistricting, black representation in the state senate moved from one to three members (7.5 percent) in a state that was 19 percent black.[19]

In 1991, the Department of Justice interposed another Section 5 objection to Virginia's redistricting plan for the State House of Delegates. The Department's objection letter stated:

---

[15] Ibid. U.S. Department of Justice, "Jurisdictions Previously Covered By Section 5," https://www.justice.gov/crt/jurisdictions-previously-covered-section-5.
[16] Davidson and Grofman," Virginia," p. 281.
[17] *Commonwealth of Virginia v. United States*, 386 F. Supp. 1319 (D.D.C. 1975), at 1324.
[18] Davidson and Grofman, "Virginia," p. 281.
[19] Quotes and data on Ibid., pp. 281-282.

9

"We have examined the 1991 House redistricting choices in light of the element of racially polarized voting that appears to characterize at least some elections in the state. For the most part, our analysis shows that the Virginia House redistricting plan meets Section 5 preclearance requirements. In one area, however, the proposed configuration of district boundary lines appears to have been drawn in such a way as to minimize black voting strength. Specifically, we refer to the considerable concentration of black population in Charles City County where approximately 4000 blacks are submerged in a majority white district. We are aware that the Legislature rejected available alternatives that would have recognized this concentration of voters by drawing them into a district with black voters in the Richmond area that likely would result in an additional district which provides black voters an equal opportunity to participate in the political process and to elect candidates of their choice to office. While we have noted the state's explanation that the submitted districting in this area was designed to protect certain incumbents, and even though incumbency protection is not in and of itself an inappropriate consideration, it may not be accomplished at the expense of minority voting potential."[20]

Discrimination against minorities in Virginia has continued well into the 21st century. In 2014, a three-judge federal court for the Eastern District of Virginia held in *Page v. Virginia State Board of Elections* that Virginia's post-2010 congressional redistricting was unconstitutional because it needlessly packed African American voters into a single district, diminishing their political influence elsewhere in the state. The Court found "that plaintiffs have shown race predominated. We find that the Third Congressional District cannot survive review under the exacting standard of district scrutiny. While compliance with Section 5 was a compelling state interest when the General Assembly acted, their districting plan was not narrowly tailored to further that interest. Accordingly, we are compelled to hold that the challenged Third Congressional District violates the Equal Protection Clause of the Fourteenth Amendment." This finding was reaffirmed by the district court panel a second time after the Supreme Court remanded the matter for further consideration following its decision in *Alabama Legislative Black Caucus v. Alabama*.[21]

In June 2018, after a remand from the U.S. Supreme Court, a three-judge federal district court held in *Bethune-Hill v. Virginia State Bd. of Elections* that Virginia had similarly engaged in an unlawfully racial gerrymander of state legislative districts. The court found that the state legislature had unlawfully packed African Americans into 11 voting districts drawn after the 2010 census. All of these districts had at least a 55 percent population of black residents of voting age, which was higher than the percentage necessary to provide African American voters with a realistic opportunity to elect candidates of their choice. This packing diminished the voting power of African Americans across other districts, and the Court ruled that "overwhelming evidence in this case shows that, contrary to this constitutional mandate, the state has sorted voters into districts based on the color of their skin. The legislature made no effort to determine whether the mechanical

---

[20] John R. Dunne, Assistant Attorney General to K. Marshall Cook, Deputy Attorney General, Virginia, 16 July 1991, https://www.justice.gov/sites/default/files/crt/legacy/2014/05/30/VA-1230.pdf.
[21] *Page v. Virginia State Board of Elections*, 58 F. Supp. 3d 533 (E.D. Va. 2014); *Page v. Virginia State Board of Elections*, No. 3:13CV678, 2015 WL 3604029, at *6 (E.D. Va. June 5, 2015).

55% racial threshold was required to comply with the VRA, and instead arbitrarily applied the same racial mandate to 12 vastly dissimilar districts. This predominant use of race and disregard of narrow tailoring principles plainly are at odds with the guarantees of the Equal Protection Clause."[22]

After Republicans in the General Assembly could not develop a plan that gained bipartisan support, the District Court appointed a special master to redraw the unconstitutional districts. In June 2019, the U.S. Supreme Court rejected on procedural grounds a challenge to this ruling by the Republican majority in the state House of Representatives.[23]

Voting is not the only domain in which Virginia's minorities experience discrimination. In 2013, the Equal Rights Center reported results of a "testing-based study of Latinos and whites seeking rental housing across the Commonwealth of Virginia." The Center found that Latinos "experienced at least one form of adverse treatment as compared to their white counterparts in 55 percent of inquiries." The study included the City of Virginia Beach along with "the City of Fairfax, the City of Richmond, Henrico County, Loudoun County, Prince William County and Manassas, Roanoke County, Northwest Virginia (covering Augusta, Culpeper, Frederick, and Rockingham Counties)." The Center found that "in 55 percent of tests, the Latino tester received adverse, differential treatment as compared to the white tester, in at least one respect, including:

- Being quoted higher rents or higher fees for the same rental unit than white testers;
- Not being offered incentives or "specials" that were offered to white testers seeking the same housing;
- Being offered fewer available units or later availability dates than those offered to white testers; and
- Being told about additional application requirements, such as credit checks or providing a social security card, which were not told to white testers."[24]

The Center's Executive Director John Kohl concluded that "while we are beginning to see movement toward a consensus around immigration reform, hostility towards immigrants at the local level, unfortunately, continues to result in unfair treatment for many—irrespective of their immigrant status." The Center recommended that Virginia "legislators should ensure that all immigration-related bills encourage fair housing and comply with federal civil rights laws." [25]

---

[22] *Bethune-Hill v. Virginia State Bd. of Elections*, 580 U.S. ___ (2017); *Bethune-Hill v. Virginia State Board of Elections*, 326 F. Supp. 3d 128 (E.D. Va. 2018), at 92.

[23] Gregory S. Schneider, "Federal Court Releases Plan for Possible Redistricting in Virginia, *Washington Post*, 7 December 2018, https://www.washingtonpost.com/local/virginia-politics/federal-court-releases-plans-for-possible-redistricting-in-virginia-refuses-to-delay-process/2018/12/07/a1a58be6-f728-11e8-8d64-4e79db33382f_story.html?utm_term=.d20e4ce179f7; Adam Liptak, "Justices Dismiss Appeal in Virginia Racial Gerrymandering Case," *New York Times*, 19 June 2019, https://www.nytimes.com/2019/06/17/us/politics/virginia-racial-gerrymandering-supreme-court.html; *Virginia House of Delegates v. Bethune-Hill*, No. 18–281. Argued March 18, 2019—Decided June 17, 2019.

[24] Equal Rights Center, "Investigation Finds Adverse Treatment Of Latinos In 55 Percent Of Rental Housing Inquiries," 30 April 2013, https://equalrightscenter.org/press-releases/investigation-finds-adverse-treatment-of-latinos-in-55-of-rental-housing-inquiries/.

[25] Ibid.

However, the Virginia General Assembly has only inflamed tensions around immigration. In 2019, it passed the anti-sanctuary Senate Bill that provides that "no locality shall adopt any ordinance, procedure, or policy intended to restrict the enforcement of federal immigration laws." All but one of the state legislators representing at least part of Virginia Beach voted for the Sanctuary Cities Bill. Also in 2019, the General Assembly passed House Bill 2270 that "requires that the sheriff, jail superintendent, or other official in charge of a local correctional facility or a regional jail in which an alien is incarcerated shall notify U.S. Immigration and Customs Enforcement of the release or discharge of the alien forthwith as soon as the release date is known." Democratic Governor Ralph Northam vetoed both bills, stating that "the safety of our communities requires that all people, whether they are documented or not, feel comfortable, supported and protected by our public safety agencies." He had vetoed similar "sanctuary legislation" the year prior as well.[26]

**Virginia Beach**

Virginia Beach is the largest city in Virginia, with a population of more than 450,000 persons according to the latest U.S. Census estimates. As indicated in Table 1, based on U.S. Census data for 2013-2017, Virginia Beach is slightly less than two-thirds non-Hispanic white and slightly more than one-third combined minority, with the non-Hispanic white percentage largest for citizen voting age and smallest for total population. African Americans comprise by far the largest minority group with just under 20 percent, following by Hispanics and Asians with approximately equal populations that range from 6.1 percent to 7.8 percent, depending on the measure examined. Other minorities comprise a minimal percentage of Virginia Beach's population. In terms of absolute numbers, Virginia Beach has the largest African American population of any Virginia city, with nearly 100,000 African American residents.

As indicted in Table 2 and Chart 1, the minority population of Virginia Beach has been growing in recent years relative to the non-Hispanic white population. From the Census of 2000 through the 2013-2017 ACS estimates, the minority population in Virginia Beach has increased by 22.2 percent for all persons, 25.4 percent for voting-age persons, and 25.1 percent for citizen voting-age persons.

Like the Commonwealth of Virginia, the City of Virginia Beach has a history of discrimination which extends from its founding in the 1960s through recent times. In 1966, the city adopted at-large elections for electing 11 city council members, which meant that all candidates had to compete for positions in a large city of 249 square miles. In addition, it established that 7 members would be selected from designated or numbered posts, where they would run from residential districts with a single seat at stake, but all voters in the city would participate. The Senate Report lists the use of large places for elections as among the factors in the totality of

---

[26] Virginia's Legislative Information System, 2019 Session, "SB 1156," http://lis.virginia.gov/cgi-bin/legp604.exe?191+sum+SB1156 and "HB 2270," https://lis.virginia.gov/cgi-bin/legp604.exe?191+sum+HB2270; Mel Leonor, "Northam Vetoes 'Sanctuary Cities' Bill, *Richmond Times-Dispatch*, 19 March 2019, https://www.richmond.com/news/virginia/government-politics/northam-vetoes-sanctuary-cities-bill/article_a0594c7e-b87f-5e4e-9eb8-feb32abdbfc7.html.

circumstances (Factor 3) that can impede minority voting opportunities. The report also cites the designatation or numbering of posts in Factor 3, because such a labeling prevents "single-shot voting" —the practice of concentrating minority votes on a candidate of choice or a limited number of candidates of choice when multiple candidates are up for election in a multi-seat contest. According to a 2006 scholarly analysis of post-1982 decisions under Section 2 of the VRA, 26 courts that found a violation of Section 2 cited "anti-single shot provisions, such as staggered terms and/or numbered-place requirements" as factors informing their findings. Thirteen courts cited "unusually large districts."[27] The City of Virginia Beach has all both, plus an at-large scheme.

In the 1990s, the City of Virginia Beach considered switching from its at-large system to a district system for electing members of the city council. During this period, other jurisdictions in Virginia were converting from at-large elections to districts—and consequently increasing minority representation on their governing bodies—in order to appease the Justice Department and respond to votings rights litigation.[28] However, the City of Virginia Beach ultimately decided not to adopt district elections, and the at-large election system remains in operation to this day.

---

[27] Ellen D. Katz, et al., "Documenting Discrimination in Voting: Judicial Findings Under Section 2 of the Voting Rights Act Since 1982" *University of Michigan Journal of Law Reform*, 39 (2006), p. 698.
[28] Davidson and Grofman, "Virginia," pp. 283-286; Deidre Fernandes, "Candidates: Wards Would Help Blacks Get Elected," *Virginian-Pilot*, 12 October 2008, p. B1; John Warren, "Black Leaders Discuss a Shift in Voting System," *Virginian-Pilot*, 12 April 2008, p. A1.

13

| POPULATION MEASURE | NON-HISP. WHITE | NON-HISP. BLACK | HISPANIC | NON-HISP. ASIAN | OTHER | BLACK, HISP. ASIAN | ALL MINORITY |
|---|---|---|---|---|---|---|---|
| **TOTAL** | **62.6%** | 20.0% | 7.8% | 7.9% | 1.7% | **35.7%** | **37.4%** |
| **VOTING AGE** | **65.0%** | 18.7% | 7.0% | 7.8% | 1.5% | **33.5%** | **35.0%** |
| **CITIZEN VOTING AGE** | **66.6%** | 19.3% | 6.1% | 6.6% | 1.4% | **32.0%** | **33.4%** |

**TABLE 1**
**POPULATION, VOTING AGE POPULATION, CITIZEN VOTING AGE PERCENTAGES BY RACE, VIRGINIA BEACH, US CENSUS, AMERICAN COMMUNITY SURVEY, 2013-2017**

Source: CVAP, 2013-2017, US Census, ACS,  https://www.census.gov/programs-surveys/decennial-census/about/voting-rights/cvap.html.

14

| POP. MEASURE | NON-HISP. WHITE 2000 | NON-HISP. WHITE 2013-2017 | PERCENT CHANGE | ALL MINORITY 2000 | ALL MINORITY 2013-2017 | PERCENT CHANGE |
|---|---|---|---|---|---|---|
| | | | | | | |
| **TOTAL** | 69.4% | 62.6% | **-9.8%** | 30.6% | 37.4% | **+22.2%** |
| **VOTING AGE** | 72.1% | 65.0% | **-9.8%** | 27.9% | 35.0% | **+25.4%** |
| **CITIZEN VOTING AGE** | 73.3% | 66.6% | **-9.1%** | 26.7% | 33.4% | **+25.1%** |

**TABLE 2
POPULATION CHANGE, 2000 TO 2013-2107, TOTAL, VOTING AGE POPULATION, CITIZEN VOTING AGE PERCENTAGES BY RACE, VIRGINIA BEACH**

Sources: CVAP, 2013-2017, US Census, ACS, U.S. Census 2000, Special Tabulation, Citizen Voting Age Population.

**CHART 1**
**MINORITY POPULATION CHANGE, 2000 TO 2013-2107, TOTAL, VOTING AGE POPULATION (VAP), CITIZEN VOTING AGE (CVAP) PERCENTAGES, VIRGINIA BEACH**



16

As a result of its election system, the City of Virginia Beach is behind its neighbors in terms of minority representation on its city council. In 2003, Norfolk, with a black population of 44 percent and a district system of elections, had 3 black members on its 7-member city council. Meanwhile, Virginia Beach, with a black population of 19 percent and an at-large election system, had no black members on its 11-member city council. In fact, only two African Americans had ever been elected to the Virginia Beach city council from its founding in the 1960s through 2003, and none had survived reelection. Only one other minority— Filipino Ron A. Villaneuva—had ever been elected, and was serving in 2003.[29]

In addition to the at-large election system, the allocation of polling place resources has been found to burden minority residents of Virginia Beach. A study of the allocation of polling place resources in 2004 and 2008 by Dr. Walter R. Mebane, Jr., Professor in the Department of Political Science and Statistics at the University of Michigan, found that allocation decisions in Virginia Beach had a discriminatory effect on voting opportunities for its predominant minority group of African Americans. His key findings are as follows:

"The distribution of machines in both Richmond and Virginia Beach for the upcoming [2008] election is clearly biased against voters in precincts with high proportions of African-Americans. In other words, precincts with high proportions of African-Americans have substantially more registered voters per allocated machine than precincts with fewer African Americans. There were similar relationships in the allocation of voting machines in 2004."

"In both Richmond and Virginia Beach, as the proportion of the voting age population that is African American increases, the mean number of registered voters per voting machine also increases."

"In examining the registration, turnout, and machine allocation data from the 2004 election, I found that higher ratios of registered voters per machine were associated with lower levels of voter participation in Norfolk, Richmond, and Virginia Beach. This indicates that voters in those precincts with relatively many voters for each machine were more likely to be deterred from voting than voters in precincts with fewer voters for each machine."

"In Virginia Beach, voter participation declines steadily throughout the range of ratios observed in the city. The magnitude of the declines is substantial: from the peak value to the lowest the decrease in voter participation is on the order of five to ten percent."[30]

Like the rest of the Commonwealth, the City of Virginia Beach supported segregated schools that legally separated white and black students until it was court ordered to integrate in 1969. A study of school segregation by the Lewis Mumford Center for Comparative Urban and Regional Research University at Albany shows progress towards school integration in the Virginia Beach School District

---

[29] Bruce Murphy, "Virginia Beach, Nearby Cities Tell Complex Story of Black White Politics," *Milwaukee Journal-Sentinel*, 23 February 2013, 011403MURPHYjsonline.pdf.
[30] Quotes are from *Virginia State Conf. of the NAACP v. Kaine*, No. 3:08-cv-00692 (E.D. Va. Nov. 3, 2008), "Expert Declaration of Walter Richard Mebane, Jr. on Behalf of Plaintiffs," 27 October 2008, pp 7-9; see also the detailed statistical analysis in his additional report, "Voting Machine Provision and Allocation in the Virginia the 2008 General Election," 27 October 2018.

in the two decades after the court order, followed by a reversal towards increasing segregation in the 1990s. The Center examined the "dissimilarity index"—which measures the percentage of African American students that would have to change schools to achieve system-wide integration—and found that the index declined from 45.0 in 1968 to 27.0 in 1990, but then rose to 32.7 by 2000. An updated study by The Heller School for Social Policy and Management examined segregation for African Americans and whites in Virginia Beach's public and primary schools—which comprised 70 percent of enrollments for pre-college students according to the U.S. Census of 2010—and found that for the 2010-2011 school year ,the dissimilarity index was a yet higher 38.9.[31]

African American pupils in Virginia Beach's public schools also suffer disproportionately from suspensions and expulsions. An October 2017 study by the Legal Aid Justice Center reported that, as in the past, for the 2015-2016 academic year, "Virginia schools continue to issue a huge number of out-of-school suspensions, posting a slight increase from even the 2014-2015 totals." Specifically, they found that "the majority of suspensions were issued for minor offenses, with approximately two-thirds of all suspensions given for behavior offenses, such as possession of cell phones, minor insubordination, disrespect, and using inappropriate language." But "perhaps most disturbing is that Virginia schools continue to disproportionately suspend African American students and students with disabilities. The suspension rate for African-American students was 3.8 times larger than for Hispanic and white students."

The Legal Aid Justice Center report compiled data on short-term suspensions for African Americans and whites in the City of Virginia Beach .As indicated in Chart 2, the short-term suspension rate for white students in Virginia Beach is comparable to the state rate for suspensions, while the rate of African American suspensions is 3.7 times higher than the white rate.[32] This is nearly identical to the disparities that the study found statewide, where the suspension rate for African-American students was 3.8 times larger than the suspension rate for Hispanic and white students.[33]

---

[31] John R. Logan and Deidre Oakley, "The Continuing Legacy of the Brown Decision: Court Action and School Segregation, 1960-2000," Lewis Mumford Center for Comparative Urban and Regional Research University at Albany, 28 January 2004, p. 10, https://s4.ad.brown.edu/Projects/usschools/reports/report2.pdf; "School Segregation (Dissimilarity Index): Public Primary School Students Dissimilarity with White (Non-Hispanic) Students by Race/Ethnicity,"2010-2011, The Heller School for Social Policy and Management, http://www.diversitydatakids.org/data/ranking/90/school-segregation-dissimilarity-index-public-primary-school-students-dissimilar#loct=6&tf=5&ch=2,3,4,5.

[32] Ibid., p. 17.

[33] Amy Woolard, "Suspended Progress 2017: An Update on the State of Exclusionary Discipline in Virginia's Public Schools," Legal Aid Justice Center, October 2017, Executive Summary, pp. 3, 17, https://www.justice4all.org/wp-content/uploads/2016/04/Suspended-Progress-2017.pdf.

**CHART 2**
**SHORT-TERM SUSPENSIONS BY RACE, PUBLIC SCHOOLS, VIRGINIA BEACH, 2015-2016.**



19

Virginia Beach also lags in the employment of minority teachers relative to minority public school enrollment. According to a 2011 study by the Virginia Pilot, as compared to neighboring jurisdictions, "the racial imbalance is most pronounced in Virginia Beach, where 85 percent of public school teachers are white and close to half of students are not, statistics show." The study found that "the demographic imbalance isn't unique to Virginia Beach, but the disparity is sharper there than in surrounding school divisions. Statewide, 43 percent of students and 17 percent of teachers are minorities." Virginia Beach, on the other hand, "employs one white classroom teacher for every nine white students but only one minority teacher for every 43 minority students." This imbalance affects all minority groups in Virginia Beach, including African Americans, Hispanics, and Asians.[34] Although there are generally challenges in recruiting minority teachers, that issue does not explain the sharper racial imbalance in Virginia Beach as compared to other Virginia communities given that the challenge is ubiquitous across markets.

---

[34] All quotes from: Mike Hixenbaugh, "Teacher-Student Racial Imbalance Widest in Va. Beach," *Virginia Pilot*, 17 September 2011, https://pilotonline.com/news/local/education/article_99d4e10f-7582-5625-b2c5-549983e5f028.html??dssReturn=true.

20

**Factor 2: The extent to which voting in the elections of the state or political subdivision is racially polarized.**

The report of Dr. Douglas M. Spencer of the University of Connecticut establishes that voting is polarized along racial lines in Virginia Beach between whites and African Americans (the predominant minority group in Virginia Beach), and generally between whites and all minorities (blacks, Hispanics, Asians, and a small number of others). For city council elections studied from 2008 to 2018, blacks and all minorities typically preferred to vote for black candidates and whites typically preferred to vote for white candidates. White bloc voting usually defeated city council candidates of choice of blacks and minorities.

From 2008 to 2016, only one black candidate—Amelia Ross-Hammond—won election to a city council position, but she was defeated in her reelection bid by a 27-year-old white woman. No black candidate has ever won reelection to a city council position in Virginia Beach, even though white incumbents typically win reelection in the city.

In 2018, for the first time in the history of Virginia Beach, two minority candidates—African Americans Rouse (at-large) and Wooten (Centerville District)—won election to city council. Wooten was the only minority candidate since 2008 to emerge as the candidate of choice of white voters, although she was competing against another black candidate and a token white candidate who won only 6 percent of the overall vote. Rouse, the first choice of black and other minority voters, was not first or second candidate of choice of white voters, although he did gain unusually high white support.

It is important to note that the 2018 elections took place during the pendency of this lawsuit and thus represent a special circumstance that must be considered in evaluating election results. A detailed analysis of the special circumstances involving Rouse and Wooten in 2018 is presented under Factor 7 (page 43), which focuses on the extent to which members of the minority group have been elected to public office in the jurisdiction.

The results of federal elections for the precincts of Virginia Beach further validates the pattern of racially polarized voting that Dr. Spencer identifies for city council elections. Dr. Spencer analyzed the presidential general elections of 2008 and 2012, the Democratic presidential primary of 2008, and the 2016 general election in Congressional District 2. He found a pattern of substantial racially polarized voting in these four federal elections. In 3 of 4 elections, white bloc voting defeated the candidate of choice of black and minority voters within the precincts of Virginia Beach. The one exception is the 2008 Democratic primary for president, in which Obama was the candidate of choice of all racial groups in Virginia Beach. Statewide, Obama swept the 2008 Democratic presidential primary statewide with 64 percent of the vote and won in Virginia Beach. However, according to Dr. Spencer, Obama garnered a much higher percentage of the black and minority vote than the white vote.

21

**Factor 3: The extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group.**

Minority candidates compete at-large for city council in Virginia Beach, meaning that they have to cover an entire municipality which is unusually large both in area (249 square miles) and population (450,055 persons). In addition, 7 positions have designated, or numbered posts, which are elected at-large. These designated positions prohibit minorities from single-shot voting for a candidate or concentrating their votes on a small number of candidates. Similarly, the election for mayor, who is also a member of the city council, involves a single-seat contest that precludes single-shot or concentrated voting. The staggering of the three non-designated city council elections likewise makes single-shot or concentrated voting less effective. Under the staggered system for election to the three at-large positions in Virginia Beach, candidates compete for 1 position in one election year and 2 positions in the next election year. This renders single-shot or concentrated voting impossible in the case of the single-seat election and ineffective in the case of the 2 seat election.

Table 3 analyzes the method of election and the number of square miles in which a candidate must cover to win a city council seat for cities in Virginia with populations over 50,000. As indicated in Table 3, the square miles that candidates must cover in Virginia Beach is typically far higher than the square miles that candidates must cover on average in other cities. Though the square mileage is slightly greater in Chesapeake and Roanoke than in Virginia Beach, the square mileage in Virginia Beach is many multiples higher than in the ten other cities. The ratio of the square mileage for the place of election in Virginia Beach as compared to these other cities ranges from 2.5 to 1 to 37.7 to 1.

Table 4 analyzes the population size that city council candidates must cover to win a city council seat in the same Virginia cities. The population size for Virginia Beach is many multiples higher than any of the 12 other cities in Table 4. The ratio of the population for the place of election in Virginia Beach as compared to these other cities ranges from 1.9 to 1 to 21.3 to 1.

22

| TABLE 3 VIRGINIA CITIES WITH MORE THAN 50,000 POPULATION, AVERAGE SQUARE MILES OF PLACE OF ELECTION FOR CITY COUNCIL | | | | | |
|---|---|---|---|---|---|
| CITY | POPULATION US CENSUS 2018 | SQ. MILES US CENSUS | METHOD OF ELECTION CITY COUNCIL | MEAN SIZE, PLACE OF ELECTION SQ. MILES | RATIO SIZE OF PLACE VA BEACH TO OTHER CITY |
| **VIRGINIA BEACH** | 450,055 | 249 | At-Large | 249 | **NA** |
| **NORFOLK** | 242,827 | 54.1 | 5 Wards, 2 Superward | 15.4 | **16.2 to 1** |
| **CHESAPEAKE** | 242,624 | 340.8 | At-large, 7 Seats | 340.8 | **.73 to 1** |
| **RICHMOND** | 228,783 | 59.8 | 9 Districts | 6.6 | **37.7 to 1** |
| **NEWPORT NEWS** | 178,626 | 68.7 | 1 At-large (Mayor), 6 Districts | 11.5 | **21.7 to 1** |
| **ALEXANDRIA** | 160,530 | 15 | At-large, 7 Seats | 15 | **16.6 to 1** |
| **HAMPTON** | 134,313 | 51.4 | At-large, 7 Seats | 51.4 | **4.8 to 1** |
| **PORTSMOUTH** | 94,632 | 33.7 | At-large, 7 Seats | 33.7 | **7.4 to 1** |
| **ROANOKE** | 94,073 | 250.6 | At-large, 7 Seats | 250.6 | **.99 to 1** |
| **SUFFOLK** | 84,572 | 400 | 7 Boroughs, | 100 | **2.5 to 1** |
| **LYNCHBURG** | 82,126 | 49.1 | 4 Ward, 3 At-large | 22.8 | **10.9 to 1** |
| **HARRISONBURG** | 54,033 | 17.4 | At-large, 5 Seats | 17.4 | **14.3 to 1** |
| **LEESBURG** | 53,914 | 12.4 | At-large, 7 Seats | 12.4 | **20.1 to 1** |
| Sources: U.S. Census Quick Facts, Municipal websites. | | | | | |

23

| TABLE 4 | | | | |
|---|---|---|---|---|
| **VIRGINIA CITIES WITH MORE THAN 50,000 POPULATION, AVERAGE POPULATION OF PLACE OF ELECTION FOR CITY COUNCIL** | | | | |
| CITY | POPULATION US CENSUS 2018 | METHOD OF ELECTION, CITY COUNCIL | AVERAGE POPULATION OF PLACE OF ELECTION | RATIO VA BEACH TO CITY POPULATION |
| **VIRGINIA BEACH** | 450,189 | At-Large | 450,159 | **NA** |
| **NORFOLK** | 242,827 | 5 Wards, 2 Superwards | 69,379 | **6.5 to 1** |
| **CHESAPEAKE** | 242,624 | At-large, 7 Seats | 242,624 | **1.9 to 1** |
| **RICHMOND** | 228,783 | 9 Districts | 25,420 | **17.7 to 1** |
| **NEWPORT NEWS** | 178,626 | 1 At-large, 6 Districts | 51,036 | **8.8 to 1** |
| **ALEXANDRIA** | 160,530 | At-large, 7 Seats | 160,530 | **2.8 to 1** |
| **HAMPTON** | 134,313 | At-large, 7 Seats | 134,313 | **3.4 to 1** |
| **PORTSMOUTH** | 94,632 | At-large, 7 Seats | 94,632 | **4.8 to 1** |
| **ROANOKE** | 94,073 | At-large, 7 Seats | 94,073 | **4.8 to 1** |
| **SUFFOLK** | 84,572 | 7 Boroughs, 1 At-large | 21,143 | **21.3 to 1** |
| **LYNCHBURG** | 82,126 | 4 Ward, 3 At-large | 46,929 | **9.6 to 1** |
| **HARRISONBURG** | 54,033 | At-large, 5 Seats | 54,033 | **8.3 to 1** |
| **LEESBURG** | 53,914 | At-large, 7 Seats | 53,914 | **8.3 to 1** |
| Sources: U.S. Census Quick Facts, Municipal websites. | | | | |

24

**Factor 4: If there is a candidate slating process, whether the members of the minority group have been denied access to that process.**

Although I have not yet uncovered evidence of formal slating for city council candidates in Virginia Beach, I have probed the issue by examining the extent to which candidates unite to finance each other's campaigns. For white and black candidates from 2008 to 2018, Tables 5 and 6 report the white and black candidates respectively who have received at least $250 in contributions from two or more other candidates who ran for city council during this period.

As indicated in these tables, such combined support is largely confined to white candidates. Table 5 demonstrates that 17 white candidates received a minimum contribution of $250 from two or more other candidates. Only 3 of the contributors were black. All other contributions came from white candidates.

Table 6 demonstrates that only 2 black candidates received a minimum contribution of $250 from two or more other candidates. These candidates were Wooten in 2018 and elected incumbent Ross-Hammond in 2016. The ratio of white to black candidates receiving $250 or more from 2 or more other candidates is 8.5 to 1.

25

| TABLE 5 |
|---|
| **WHITE CITY COUNCIL CANDIDATES, VIRGINIA BEACH, WITH AT LEAST $250 IN CONTRIBUTIONS FROM TWO OR MORE OTHER CANDIDATES, 2008 TO 2018** |

| CANDIDATE | OTHER CANDIDATE CONTRIBUTORS (BLACK CANDIDATES IN **BOLD**) |
|---|---|
| | |
| BELITTO | SESSOMS, DIEZEL, UHRIN, DAVIS |
| DALE | JONES, SESSOMS, |
| DAVIS | JONES, SESSOMS, UHRIN, WILSON, DIEZEL |
| DEAN | MOSS, DESTEPH, |
| FREE | DESTEPH, WILSON |
| GOLDEN | DESTEPH, MOSS |
| HENLEY | DAVENPORT, SESSOMS, UHRIN, JONES |
| JONES | SESSOMS, WILSON |
| KANE | SESSOMS, JONES, DAVIS, WOOD, WILSON, UHRIN |
| MARTIN | SESSOMS, JONES, UHRIN, WOOD, WILSON |
| MCCORMICK | DESTEPH, MOSS |
| MOSS | JONES, KOWALEWITCH, BLYTHE, DEAN, WORST |
| REDMOND | SESSOMS, UHRIN, |
| SESSOMS | UHRIN, OLIVER, **BRIGHT**, KANE, MARTIN, **SHERROD**, |
| UHRIN | SESSOMS, DAVENPORT, WILSON, DAVIS |
| WILSON | JONES, DAVENPORT, WOOD, DAVIS, SESSOMS, JONES, UHRIN |
| WOOD | DAVENPORT, UHRIN, SESSOMS, **SHERROD**, DIEZEL |
| | |
| Source: Virginia Public Access Project, "Money," https://www.vpap.org/money/. | |

26

| TABLE 6 BLACK CITY COUNCIL CANDIDATES, VIRGINIA BEACH, WITH AT LEAST $250 IN CONTRIBUTIONS FROM TWO OR MORE OTHER CANDIDATES, 2008 TO 2018 | |
|---|---|
| | |
| CANDIDATE | OTHER CANDIDATE CONTRIBUTORS (BLACK CANDIDATES IN **BOLD**) |
| | |
| ROSS-HAMMOND | SESSOMS, JONES, **BRIGHT**, DIEZEL, UHRIN, DAVENPORT * |
| WOOTEN | SESSOMS, WILSON, DAVENPORT |
| | |
| * Contributions from 2016 when Ross-Hammond was elected incumbent. | |
| | |
| Source: Virginia Public Access Project, "Money," https://www.vpap.org/money/. | |

27

**Factor 5: The extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process.**

The lingering effects of past discrimination are amply demonstrated in the deficient socio-economic position of minorities in Virginia Beach. These disparities, which exist with regard to income, unemployment, poverty, education, and housing, are documented in Tables 7-9 and Charts 3 to 9. The data for whites, blacks, and Asians is for non-Hispanics only, and the black and Asian metrics include multi-race individuals. As indicated in the section discussing the history of discrimination (Factor 1, page 4), socio-economic disparities have an important impact on restricting the opportunities for minorities to participate fully in the political process and elect candidates of their choice. The election system described above (Factor 3, page 22), which features at-large elections spanning large areas and populations with virtually no single-shot voting ability, magnifies the effects of socio-economic disparities.

Table 7 and Charts 3 through 5 demonstrate substantial disparities between non-Hispanic whites and both non-Hispanic African Americans and Hispanics on all standard economic and educational measures in Virginia Beach. For African Americans and Hispanics, the economic disparities are evident for income, poverty, unemployment, welfare assistance, and the availability of health insurance. Disparities for Asian Americans, although less substantial than for blacks and Hispanics, also emerge for per-capita income, poverty, welfare assistance, and the availability of health insurance.

Table 8 and Charts 6 and 7 similarly demonstrate substantial educational disparities between whites and African Americans and Hispanics for such standard measures as high school and college graduation rates and student performance on reading, writing, science, and mathematics. Disparities do not emerge for Asians on educational measures.

Table 9 and Charts 8 and 9 demonstrate substantial disparities between whites and both African Americans and Hispanics in rates of home ownership and the median value of owned homes. Disparities emerge for Asians in the value of homes. It also demonstrates disparities between non-Hispanic whites and African Americans in the availability of vehicles.

In sum, a wide range of economic, educational and housing measures, disparities between non-Hispanic whites and African Americans emerge for every measure. Disparities between non-Hispanic whites and Hispanics emerge for every measure but the availability of vehicles. Disparities emerge for Asians on per-capita income, poverty, welfare assistance, the availability of health insurance, and home value.

28

| TABLE 7<br>ECONOMIC MEASURES BY RACE<br>VIRGINIA BEACH, US CENSUS, AMERICAN COMMUNITY SURVEY,<br>2011-2015 | | | | |
|---|---|---|---|---|
| MEASURE | BLACK | HISPANIC | ASIAN | WHITE |
| MEDIAN HOUSEHOLD INCOME | $51,559 | $54,825 | $72,001 | $71,948 |
| PER CAPITA INCOME | $22,773 | $20,784 | $26,512 | $37,443 |
| POVERTY RATE FOR PERSONS INDIVIDUALS | 14.4% | 14.2% | 7.4% | 5.8% |
| UNEMPLOYMENT RATE | 9.2% | 8.8% | 4.6% | 5.0% |
| % WITH FOOD STAMPS/SNAP | 15.9% | 10.9% | 5.5% | 4.1% |
| 18-64 NO HEALTH INSURANCE | 17.1% | 24.5% | 15.7% | 11.6% |

29

**CHART 3**
**MEDIAN HOUSEHOLD AND PER CAPITA INCOME BY RACE, VIRGINIA BEACH**





**CHART 4**
**POVERTY, UNEMPLOYMENT & FOOD STAMPS RATE BY RACE, VIRGINIA BEACH**

**CHART 5**
**NO HEALTH INSURANCE, 18-64 YEARS-OLD BY RACE, VIRGINIA BEACH**



| TABLE 8<br>EDUCATION MEASURES BY RACE<br>VIRGINIA BEACH | | | | |
|---|---|---|---|---|
| MEASURE | BLACK | HISPANIC | ASIAN | WHITE |
| **HIGH SCHOOL GRADUATES** | 89.4% | 88.7% | 91.8% | 95.0% |
| **BACHELOR'S DEGREE OR MORE** | 25.3% | 21.8% | 41.6% | 36.4% |
| **PASS: ENGLISH READING** | 74% | 84% | 91% | 91% |
| **PASS: ENGLISH WRITING** | 68% | 81% | 90% | 89% |
| **PASS: SCIENCE** | 69% | 82% | 94% | 92% |
| **PASS: MATH** | 70% | 81% | 94% | 88% |

Sources: Us Census, American Community Survey, 2011-2015; Virginia State Board of Education, SOL Test Results, 2017-2018, http://www.doe.virginia.gov/statistics_reports/sol-pass-rates/index.shtml.

33

## CHART 6
## EDUCATIONAL ATTAINMENT BY RACE, VIRGINIA BEACH



**CHART 7**
**STUDENT ACHIEVEMENT SCORES, PASS RATES BY RACE, VIRGINIA BEACH**



| TABLE 9 | | | | |
|---|---|---|---|---|
| **HOUSING CHARACTERISTICS BY RACE, VIRGINIA BEACH, 2011-2015 US CENSUS, AMERICAN COMMUNITY SURVEY** | | | | |
| MEASURE | BLACK | HISPANIC | ASIAN | WHITE |
| **PERCENT OWNER OCCUPIED** | 44.9% | 46.1% | 69.4% | 69.5% |
| **MEDIAN HOME VALUE** | $218,100 | $231,400 | $253,400 | $273,700 |
| **PERCENT WITH NO VEHICLE** | 8.3% | 2.7% | 2.0% | 3.2% |

36

**CHART 8**
**MEDIAN HOME VALUE BY RACE, VIRGINIA BEACH**



## CHART 9
## HOME OWNERSHIP AND VEHICLE AVAILABILITY BY RACE, VIRGINIA BEACH



**Factor 6: Whether political campaigns have been characterized by overt or subtle racial appeals.**

Virginia political campaigns, including for officials elected from Virginia Beach, have been marked in recent years by overt racial appeals. In the 2006 campaign for U.S. Senate, incumbent Republican candidate and former governor George Allen called a volunteer of East Indian descent for his Democratic opponent Jim Webb a "macaca." This racial slur occurred at a rally for Allen, where the volunteer, S.R. Sidarth said, "I was the only person of color there." Pointing at Sidarth, Allen said:

> "This fellow here, over here with the yellow shirt, macaca, or whatever his name is. He's with my opponent. He's following us around everywhere. And it's just great," … "Let's give a welcome to macaca, here. Welcome to America and the real world of Virginia."[35]

The word *macaca* sounds like and refers to a monkey. After Allen's remarks stirred controversy, his campaign manager dismissed the matter by saying that Allen had "nothing to apologize for." Later, however, Allen did apologize, saying: "I would never want to demean him as an individual. I do apologize if he's offended by that. That was [in] no way the point." This was not the first time, however, that Allen acted in a way offensive to minorities.[36] For example, as Governor, Allen issued a proclamation noting the South's celebration of Confederate History Month without any mention of slavery. In 2010, Governor Bob McDonnell reignited this controversy by yet again issuing a Confederate History proclamation without any mention of slavery.[37]

On Halloween 2011, shortly before the general election, the Republican Party of Loudon County, Virginia circulated via email a photo montage showing President Barack Obama with a bullet in his head and various Obama supporters as grotesque zombie figures (reproduced below). The image was condemned by the statewide Virginia Republican Party and the Loudon County Republican Chair Mark Sell issued an apology saying, "we deeply and sincerely apologize to the president and anyone who viewed the image … The LCRC deplores any effort to display, suggest or promote violence against the president or any other political figure."[38]

Even after the controversy over the Loudon GOP montage, the Republican Party of Mecklenburg County, Virginia posted on its Facebook page images of President Obama as a witchdoctor, a caveman, and a thug during the run-up to the 2012 general election. Once again,

---

[35] Video of Allen available at https://www.youtube.com/watch?v=r90z0PMnKwI.

[36] Tim Craig and Michael D. Shear, "Allen Quip Provokes Outrage, Apology," *Washington Post*, 15 August 2006, http://www.washingtonpost.com/wp-dyn/content/article/2006/08/14/AR2006081400589.html.

[37] Anita Kumar and Rosalind S. Helderman, "McDonnell's Confederate History Month Proclamation Irks Civil Rights Leaders," *Washington Post*, 7 April 2010, http://www.washingtonpost.com/wp-dyn/content/article/2010/04/06/AR2010040604416.html.

[38] Tim Mack, "GOP Group Blasted for Obama Image," *Politico*, 1 November 2011, http://www.politico.com/story/2011/11/gop-group-blasted-for-obama-image-067315.

**Loudon County Republican Party Halloween Emailed Image, 2011**
(Source Politico, 1 November 2011)



the state Republican Party condemned the images, but the head of the Mecklenburg Republicans, R. Wallace Mullins, refused to back down. He said, "if that group is that sensitive, I'm sorry, they're just not human," chuckling. "It's not American. If they've got a problem with it, we're not going to change what we do."[39]

During the Republican primaries in 2017, gubernatorial candidate Corey Stewart embraced Confederate symbols and upheld the Confederacy as part of Virginia's heritage. He attended the "Old South Ball" in 2017 and said that Virginia was the state of Confederates Robert E. Lee and Stonewall Jackson and that the Confederate flag "is our heritage, it is what makes us Virginia, and if you take that away we lose our identity." Stewart narrowly lost the Republican gubernatorial nomination to Ed Gillespie, but was nominated in 2018 as the Republican candidate for the U.S. Senate.[40]

In August 2017, the Republican Party of Virginia posted two tweets which asserted that Democratic candidate Ralph Northam had "turned his back on his own family's heritage in demanding monument removal" and that he "would do or say anything to try and be #VAGov. - #Pathetic."[41] The tweets shortly followed violent white supremacist protests in Charlottesville, which ostensibly centered around the removal of Confederate statues in the city, and during which a white supremacist participant killed a young woman and was subsequently convicted for murder. Several Democrats charged that Virginia Republicans had appealed to white supremacists in its tweets about candidate Northam. The Republican Party later apologized and deleted the tweets, claiming to have intended to argue that Northam had turned on his family members who had been injured fighting for the Confederacy during the Civil War.[42]

During the 2017 gubernatorial campaign, Republican candidate Ed Gillespie issued a campaign video attacking the Democratic candidate for supporting the removal of Confederate statutes in Virginia. Gillespie promised to preserve such statutes as symbols of "our history."[43]

In that same election, the Latino Victory Fund ran an ad in which a truck displaying a Gadsden flag license plate, a Confederate flag, and an Ed Gillespie bumper sticker chases down a black child and children who appear to be of Latino descent. Another child appears to be of Middle Eastern, North African, or South East Asian descent and wears a hijab. The driver of the truck is

---

[39] Laura Vozella, Va. GOP Orders Affiliate to Remove "Offensive" Obama Images," *Washington Post*, 25 September 2012, https://www.washingtonpost.com/local/dc-politics/va-gop-orders-affiliate-to-remove-offensive-obama-photos/2012/09/25/8c17d62c-0741-11e2-858a-5311df86ab04_story.html.
[40] Jane Coaston, "Virginia Republicans Just Nominated an alt-Right Hero to Run For Senate," *Vox*, 8 August 2018, https://www.vox.com/2018/6/13/17458452/alt-right-corey-stewart-virginia-gop.
[41] Eli Watkins, "Virginia GOP Deletes Confederate 'Heritage' Tweet Targeting Democrats," CNN, 23 August 2013, https://www.cnn.com/2017/08/23/politics/ralph-northam-birginia-confederacy/index.html.
[42] Graham Moomaw, "Virginia Republican Party Apologizes For Saying Northam Rejected His 'Family's Heritage' By Opposing Confederate Statues," Richmond Times-Dispatch, 23 August 2017,
https://www.richmond.com/news/virginia/government-politics/virginia-republican-party-apologizes-for-saying-northam-rejected-his-family/article_91413fad-e6af-5ccc-b175-636704345ee2.html.
[43] https://www.youtube.com/watch?v=JSd_rxHXvsU.

white. The ad ends with footage of a 2017 march at the University of Virginia, where participants shouted anti-Semitic chants and advocated for white supremacist viewpoints.[44]

In 2017, The Dominion Leadership Trust issued two mailers against Democratic House of Delegates candidate Elizabeth Guzman (D-31), who had immigrated from Peru.  The mailer shows a gun with bullets, alcohol, and a sticker saying, "I voted," and claims that Guzman supported allowing "illegal aliens" to obtain driver's licenses.  The mailer warns that if Guzman gets elected, "[illegal aliens] and even criminals will have the ID they need to buy a gun."  One mailer shows six bullet holes in a piece of glass and states, "If you fear this in your neighborhood, then you should fear this..."[45]

In the same year, the Republican House of Delegates candidate Richard Anderson's campaign sent out a mailer targeting his Democratic rival, Hala Ayala (D-51).  The mailer depicts what appears to be a black man cast in darkness, wearing a hood and holding a wooden post.  It says, "Hala Ayala: Restore rights to felons: thugs, violent criminals, gang members, and child predators."

There are at least two instances of racial appeals during political campaigns in Virginia Beach. In 1998, Louisa Strayhorn faced racial appeals in her losing reelection bid after becoming only the second African American elected to the Virginia Beach city council four years prior. "I had phone calls saying, 'We're going to make sure that nigger doesn't get elected.' After the election, people would drive by and say, 'See, nigger, we said we'd get you,'" she recalled in 2003. She also said in a 2009 interview that her campaign workers had received racist threats in 1998.[46]

During the 2017 House of Delegates elections, Delegate Rocky Holcomb (R-85 in Virginia Beach) launched an ad which said that his Democratic opponent Cheryl Turpin wanted to reinstate parole in Virginia "and let rapists out of jail early." The ad shows a dark hand over the mouth of a little girl who clearly appears to be white. Under the picture is the caption, "Police: Convicted rapist out on parole attacked 7-year old girl."[47]

---

[44] "New Ad Seeks to Link Gillespie to Racism," *WAMU*, 30 October 2017, ahttps://wamu.org/story/17/10/30/democratic-advocates-run-ads-blasting-gops-gillespie-racism-xenophobia/.
[45] Patrick Wilson, "This Virginia House Candidate Says Her Opponent's Mailers Hurt Her. But Not in the political Way," *Richmond Times-Dispatch*, 19 October 2017, https://www.richmond.com/news/virginia/government-politics/this-virginia-house-candidate-says-her-opponent-s-mailers-hurt/article_3f6a7b8f-f41e-5ed0-968f-ccf5dc0d48bc.html.
[46] Murphy, "Virginia Beach, Nearby Cities Tell Complex Story of Black White Politics;" Deidre Fernandes, "Checkered History: For Va, Beach Blacks Power Still Elusive," *Virginian-Pilot*, 9 September 2009, https://pilotonline.com/news/article_4eaaf0c4-0c3d-5722-9e67-1e72606620c0.html.
[47] Jennifer Portnoy, "Attack Ads Multiply in the Final Days Before Virginia Election," *Washington Post*, 2 November 2017, https://www.washingtonpost.com/local/virginia-politics/attack-ads-multiply-in-the-final-days-before-the-virginia-election/2017/11/01/7a88a174-bf3e-11e7-8444-a0d4f04b89eb_story.html?utm_term=.f0f9b7cb6bf7.

Turpin struck back with an ad of her own that attempted to link Holcomb to white hate groups. In turn, Scott Pressler, the person depicted in the ad next to Holcomb, sued Turpin for defamation, claiming that he was not a racist or a hate group leader.[48]

---

[48] Joshua Weinstein, "Defamation Lawsuit Against Del. Cheryl Turpin Hinges on Definitions," All News 102, 19 January 2019, https://allnews102.com/latest-news/2019/01/30/defamation-lawsuit-against-del-cheryl-turpin-hinges-on-definitions/.

41

Paid for by the Republican Party of Virginia-www.rpv.org
Authorized by Rocky Holcomb, candidate for Delegate
115 East Grace Street
Richmond, VA 23219

Non-Profit Org.
U.S. Postage
PAID
Richmond, VA
Permit #551

# LIBERAL CHERYL TURPIN
# WANTS TO BRING BACK PAROLE
# & LET RAPISTS OUT OF JAIL EARLY



Virginia abolished all discretionary parole in 1994. Since the abolition of parole, violent criminals in Virginia are required to serve at least 85 percent of their sentences— no exceptions.

Now, Cheryl Turpin wants to restore parole for convicted felons in Virginia. With the safety of our families and children at stake, we can't take that chance.

**Cheryl Turpin puts the interests of criminals ahead of the interests of rape victims and our community.**

## VOTE ON NOV. 7TH
### YOU CAN STOP CHERYL'S TURPIN'S DANGEROUS PLAN

1. Public statements said at Arrowhead Civic League Meeting, 9/12/17



Other States Currently Have Parole and it's a Nightmare.

**Police: Convicted rapist out on parole attacked 7-year-old girl**
A convicted rapist has been arrested and charged with sexually assaulting a 7-year-old girl, just six weeks after he was released from prison, authorities said. FOX35.COM, 8/23/17

42

**Factor 7: The extent to which members of the minority group have been elected to public office in the jurisdiction**.

For a city that is 19.3 percent African American in citizen voting age population and has a citizen voting age population that is one-third non-white, Virginia Beach has a weak record in electing minority candidates to city positions. In the history of Virginia Beach, no African Americans and only one minority—Tina E. Sinnen, the current Latina Circuit Court Clerk—has ever been elected to any of the city's five constitutional offices. The remaining officials elected citywide in Virginia Beach are white, including Treasurer, Sheriff, Commissioner of Revenue, and Commonwealth's Attorney. Only one of 11 members of the elected School Board—African American Sharon R. Felton—is a minority. A second African American woman, Jessica L. Owens, was appointed to the School Board in 2019, during the pendency of this lawsuit. The congressional, state senate, and state House of Delegates districts that encompass at least parts of Virginia Beach have no elected African Americans or Asians representatives, and only one Hispanic elected official—Jason Miyares of the 82nd House of Delegates District. [49]

From the city's founding until 2016, only three African Americans—John Perry (1986), Louisa Strayhorn (1994), and Amelia Ross-Hammond (2012)—had been elected to the city council, and none won reelection. One African American—Prescott Sherrod—was appointed to a city council seat in 2011, but he was defeated in his attempt to keep his seat that November. Only one other non-black minority candidate (Filipino Ron A. Villanueva) has been elected to the city council. No Hispanics have ever been elected to the city council. [50]

In 2018, two African Americans were elected to the city council. However, as previously noted, these elections occurred during the pendency of the current lawsuit a special circumstance for the election of members of a minority group.

In *Thornburg v. Gingles*, Justice Brennan emphasized the importance of discounting a sporadic minority success, *especially* after the filing of a voting rights lawsuit:

> Moreover, in conducting its 'independent consideration of the record' and its 'searching practical evaluation of the past and present reality,' the District Court could appropriately take account of the circumstances surrounding recent black electoral success in deciding its significance to appellees' claim. In particular, as the Senate Report makes clear, the court could properly notice the fact that black electoral success increased markedly in the 1982 election -- an election that occurred after the instant lawsuit had been filed -- and could properly consider to what extent 'the pendency of this very litigation [might have] worked a one-time

---

[49] Form of Government and City Officials, Virginia Beach, https://www.vbgov.com/government/departments/city-manager/Pages/form-of-government-and-city-officials.aspx; School Board Members Virginia Beach, https://www.vbschools.com/about_us/our_leadership/school_board/members.

[50] Leonard E. Colvin, Virginia Beach, Portsmouth Voters to Elect City Council Members," *New Journal & Guide*, 12 October 2018, http://thenewjournalandguide.com/virginia-beach-portsmouth-voters-to-elect-city-council-members/.

advantage for black candidates in the form of unusual organized political support by white leaders concerned to forestall single-member districting.[89]

Other courts have held the same. In the city of Norfolk, which neighbors Virginia Beach, there had been only one African American on the city council from 1968 through 1984 under its at-large election system. In August 1983, plaintiffs filed the lawsuit *Collins v. City of Norfolk, Virginia* in federal court to challenge the at-large system. In response, the white leadership of the city, including the white mayor, sought to back the election of a second black city council member in the upcoming election in order to undermine the lawsuit. "After the election, the issue of black representation may become a moot point," the mayor said.[51]

However, the Fourth Circuit Court of Appeals did not agree, ruling that even absent an explicit "conspiracy or an intent to moot this litigation … does not end the district court's inquiry." The court offered important instruction for the analysis of black electoral success during the pendency of a lawsuit: "The court should probe further to determine whether the black candidate's success in 1984, while this action was pending, resulted from unusual circumstances. Never before in the history of the city had two black councilmen served simultaneously." It called for a particularized investigation of the facts of the election: "The mayor's intent, or whether he and other white leaders conspired, is not dispositive."[52]

The court also provided important guidance on the kind of analysis that a social scientist expert should provide to the trier of fact: "If voting patterns showed unusual white support for the black candidate in 1984, the legal significance of this success should be diminished."[53]

The analysis below probes the white voter support for the two winning black Virginia Beach city council candidates in 2018. The results show that as compared to all other black city council candidates since 2008, Rouse and Wooten did receive "unusual white support." Table 10 and Chart 9 compare the white vote for Rouse with the white vote for other black candidates for at-large seats (omitting perennial candidate Furman who has not been a black voter choice and whose inclusion would expand the difference between Rouse and other black candidates). As indicated in Table 10, the white vote for Rouse was higher than any of these other black candidates. With the exception of Allen in 2008, the white vote for Rouse was multiples higher than the white vote for the other candidates, with Rouse's lead in percentage points ranging from 13.3 percentage points to 21.1 percentage points, and in percent, ranging from 124 percent to 728 percent. Overall, as indicated in Table 10 and Chart 9, white support for Rouse's candidacy was 15.4 percentage points and 179 percent higher than the average white support of 8.6 percent for the 5 other black candidates.

---

[51] *Collins v. City of Norfolk, Virginia*, 883 F.2d 1232 (4th Cir. 1989).
[52] Ibid.
[53] Ibid.

| TABLE 10 | | | |
| --- | --- | --- | --- |
| WHITE VOTE FOR AT-LARGE CITY COUNCIL CANDIDATE ROUSE IN 2018 COMPARED TO WHITE VOTE FOR OTHER BLACK CANDIDATES FOR AT-LARGE SEATS, VIRGINIA BEACH, 2008-2018 | | | |
| CANDIDATE | % OF WHITE VOTERS FOR CANDIDATE | ROUSE: PERCENTAGE POINT DIFFERENCE WITH CANDIDATE | ROUSE: PERCENT DIFFERENCE WITH CANDIDATE |
| **Rouse 2018** | 24% | NA | NA |
| Bright 2018 | 5.8% | + 18.2 Percentage Points | +314 Percent |
| Sherrod 2011 | 10.7% | + 13.3 Percentage Points | +124 Percent |
| Jackson 2010 | 3.8% | +20.2 Percentage Points | +532 Percent |
| Cabiness 2010 | 2.9% | + 21.1 Percentage Points | +728 Percent |
| Allen 2008 | 20.0% | +4 Percentage Points | +20 Percent |
| **Average 5 Other Candidates** | 8.6% | +15.4% | +179% |
| Source: Dr. Douglas M. Spencer, "Expert Report: Polarized Voting in Virginia Beach," July 15, 2019. White support is average of Ecological Inference (EI) and Ecological Regression estimates, which in several elections are identical and never differ substantially. | | | |

45

**CHART 9**

**WHITE VOTE FOR AT-LARGE CITY COUNCIL CANDIDATE ROUSE IN 2018
COMPARED TO AVERAGE WHITE VOTE FOR OTHER BLACK CANDIDATES FOR
AT-LARGE SEATS, VIRGINIA BEACH, 2008-2018**



Table 11 compares the white vote for Wooten with the white vote for other black candidates for district seats (omitting Furman and marginal candidate Burton in 2018 who received negligible white support).[54] As indicated in Table 10, the white vote for Wooten was higher than any of these other black candidates. Wooten's lead in percentage points ranged from 7.6 percentage points to 46.6 percentage points, and in percent ranged from 18 percent to 1,059 percent. Overall, as indicated in Table 11 and Chart 10, white support for Wooten's candidacy was 28.3 percentage points and 125 percent higher than the average white support of 22.7 percent for the 9 other black candidates.

An examination of contributions by white people and businesses run by white people in Virginia Beach to Rouse and Wooten further documents the special circumstances of their victories in 2018. The most prolific donors to city council elections are real estate developers and managers including, Michael Sifen, who is white, and the companies Armada Hoffler, Breeden, Franklin Johnston (since 2014), Runnymede, all of which are run by white executives. All of these donors gave unusually large contributions to Rouse and Wooten as compared to other black candidates for city council in Virginia Beach. These five contributors were selected for analysis based on their record for giving uniquely large political gifts: each contributed $1,000 or more to at least ten city council candidates and more than $50,000 for the seven elections since 2008 or, in the case of Franklin Johnston, more than $35,000 for the three elections since 2014.[55]

As indicated in Table 12, Summary Table 13, and Chart 11, these white donors contributed primarily to white candidates, whether measured by number of candidates or the dollar amount of contributions. As further indicated in Table 12, Summary Table 13, and Chart 11, only four black candidates between 2008 and 2018 received contributions from these donors, including appointed incumbent Sherrod (who lost in the special election of 2011), elected incumbent Ross-Hammond (who only garnered their support in her reelection bid in 2016, which she lost), challenger Rouse (who won his 2018 at-large election) and challenger Wooten (who won her 2018 Centreville District election). Despite being non-incumbents, Rouse and Wooten garnered 72 percent of the total dollar amount contributed to black candidates from 2008 to 2018, as indicated in Summary Table 13 and Chart 12.

---

[54] Burton withdrew from the race but his name remained on the ballot.

[55] In recent litigation challenging at-large elections in the 23rd Judicial District in Louisiana, I also used contribution data to establish the special circumstances regarding the election of a black candidate during the pendency of the lawsuit. *Terrebonne Parish NAACP v. Jindal, 274 F. Supp. 3d 395 (M.D. La. 2017)*. The addition of the very few other contributors coming close to these benchmarks would not change the results of the analysis.

| TABLE 11<br>WHITE VOTE FOR CENTERVILLE CITY COUNCIL CANDIDATE WOOTEN IN 2008 COMPARED TO WHITE VOTE FOR OTHER BLACK CANDIDATES OF BLACK VOTER CHOICE FOR DISTRICT SEATS, VIRGINIA BEACH, 2008-2018 | | | |
|---|---|---|---|
| CANDIDATE | % OF WHITE VOTERS FOR CANDIDATE | WOOTEN: PERCENTAGE POINT DIFFERENCE WITH CANDIDATE | WOOTEN: PERCENT DIFFERENCE WITH CANDIDATE |
| **Wooten 2018** | **51%** | NA | NA |
| Wray 2018 | 43.4% | **+ 7.6 Percentage Points** | **+18 Percent** |
| Ross-Hammond 2016 | 29.3% | **+21.7 Percentage Points** | **+73 Percent** |
| Cabiness 2014 | 4.4% | **+ 46.6 Percentage Points** | **+1,059 Percent** |
| Burton 2014 | 18.7% | **+32.3 Percentage Points** | **+173 Percent** |
| Ross-Hammond 2012 | 16.2% | **+34.8 Percentage Points** | **+215 Percent** |
| Smith 2012 | 24.2% | **+26.8 Percentage Points** | **+112 Percent** |
| Bullock 2010 | 33.0% | **+18.0 Percentage Points** | **+55 Percent** |
| Jackson 2008 | 19.9% | **+31.1 Percent Points** | **+155 Percent** |
| Flores 2008 | 15% | **+36 Percentage Points** | **+240 Percent** |
| **Average 9 Other Candidates** | **22.7%** | **+28.3%** | **+125%** |
| Source: Dr. Douglas M. Spencer, "Expert Report: Polarized Voting in Virginia Beach," July 15, 2019. | | | |

**CHART 10**
**WHITE VOTE FOR DISTRICT CITY COUNCIL CANDIDATE WOOTEN IN 2018
COMPARED TO AVERAGE WHITE VOTE FOR OTHER BLACK CANDIDATES FOR
DISTRICT SEATS, VIRGINIA BEACH, 2008-2018**



| TABLE 12 CONTRIBUTIONS TO VIRGINIA BEACH CITY COUNCIL CANDIDATES, 5 MAJOR WHITE DONORS, 2008-2018, BLACK CANDIDATES IN BOLD | | | | | | |
|---|---|---|---|---|---|---|
| CANDIDATE & ELECTION CYCLE | ARMADA HOFFLER | BREEDEN | FRANKLIN JOHNSTON | RUNNYMEDE | SIFEN | TOTAL |
| *2017-2018* | | | | | | |
| Davenport | $5,000 | $20,000 | | $2,500 | $2,500 | $30,000 |
| Dyer | | | | | $2,000 | $2,000 |
| Henley | | | | $2,500 | $2,000 | $4,500 |
| Jones | $2,500 | $5,000 | $2,500 | | $2,000 | $12,000 |
| Kwasny | | $1,500 | | | | $1,500 |
| Martin | | | | $1,500 | | $1,500 |
| Oliver | | $5,000 | $3,500 | $1,500 | $2,500 | $12,500 |
| Uhrin | $2,000 | | | | $5,000 | $7,000 |
| Wood | $2,500 | $5,000 | $5,000 | | $2,000 | $14,500 |
| **Rouse** | $2,500 | $2,500 | $3,500 | $1,500 | $2,000 | $12,000 |
| **Wooten** | $1,000 | $10,000 | $5,000 | $1,500 | $7,000 | $24,500 |
| *2015-2016* | | | | | | |
| Kane | $1,000 | $2,500 | | $500 | $1,500 | $5,500 |
| **Ross-Hammond** | $3,500 | $1,000 | | $2,000 | $1,500 | $8,000 |
| Sessoms | $5,000 | $10,000 | $2,500 | $10,000 | $10,000 | $37,500 |
| Wilson | $1,000 | $2,500 | $4,000 | $500 | $2,500 | $10,500 |
| *2013-2014* | | | | | | |
| Davenport | | | $2,000 | | | $2,000 |
| Davis | | $2,500 | | | | $2,500 |
| Henley | $1,000 | | | | | $1,000 |
| Kane | $2,000 | $2,500 | $1,000 | | $1,000 | $6,500 |
| Martin | | $2,850 | $1,000 | | $3,000 | $6,850 |
| Sessoms | $5,000 | $5,000 | $5,000 | $5,000 | $20,000 | $40,000 |
| Uhrin | | $2,500 | | $1,000 | | $3,500 |
| *2012* | | | | | | |
| Dale | $3,000 | $5,000 | | | $1,000 | $9,000 |
| Davis | $4,000 | $5,000 | | $900 | $1,000 | $10,900 |
| Sessoms | | $10,000 | | $5,000 | $6,000 | $21,000 |
| Wilson | $2,000 | $5,000 | | $500 | $1,000 | $8,500 |

50

| TABLE 12, CONTINUED | | | | | | |
|---|---|---|---|---|---|---|
| CONTRIBUTIONS TO VIRGINIA BEACH CITY COUNCIL CANDIDATES, 5 MAJOR WHITE DONORS, 2008-2018, BLACK CANDIDATES IN BOLD | | | | | | |
| ELECTION CYCLE & CANDIDATE | ARMADA HOFFLER | BREEDEN* | FRANKLIN JOHNSTON | RUNNYMEDE | SIFEN | TOTAL |
| *2011 Special* | | | | | | |
| **Sherrod** | | $5,000 | | $1,000 | | $6,000 |
| Sessoms | | | | | $10,000 | $10,000 |
| *2009-2010* | | | | | | |
| Belitto | $1,000 | $1,000 | | $1,000 | | $3,000 |
| DeSteph | | $1,000 | | | $1,000 | $2,000 |
| Henley | | | | $500 | $1,000 | $1,500 |
| Jones | | $1,000 | | | $1,000 | $2,000 |
| Redmond | $2,000 | | | $500 | $1,000 | $3,500 |
| Sessoms | $5,000 | | | $5,000 | $5,000 | $15,000 |
| Uhrin | | | | $1,000 | | $1,000 |
| Wilson | | $1,000 | | | $2,000 | $3,000 |
| Wood | $2,500 | $1,000 | | $1,000 | $1,000 | $5,500 |
| *2007-2008* | | | | | | |
| Davis | | $1,000 | | $500 | $1,500 | $3,000 |
| Diezel | | | | $500 | $1,000 | $1,500 |
| Sessoms | | | | $1,000 | $11,000 | $12,000 |
| Wilson | | $5,000 | | $1,000 | $1,000 | $7,000 |
| Wood | | $500 | | | | $500 |
| * Includes small amounts from founder Raymon W. Breeden and Breeden Investments. | | | | | | |
| Source: Virginia Public Access Project, "Money," https://www.vpap.org/money/. | | | | | | |

| TABLE 13 | | | | |
|---|---|---|---|---|
| **SUMMARY TABLE, CONTRIBUTIONS TO WHITE & BLACK CITY COUNCIL CANDIDATES, 5 MAJOR WHITE DONORS, VIRGINIA BEACH, 2008-2018** | | | | |
| **ALL CANDIDATES** | | | | |
| MEASURE | WHITE CANDIDATES | BLACK CANDIDATES | PERCENT WHITE | PERCENT BLACK |
| | | | | |
| # of Candidates With Contributions | 18 | 4 | **82%** | **18%** |
| | | | | |
| Amount of Contributions | $321,250 | $50,500 | **86%** | **14%** |
| | | | | |
| **BLACK CANDIDATES ONLY** | | | | |
| | ROSS & WOOTEN | SHERROD & ROSS-HAMMOND | PERCENT ROSS & WOOTEN | PERCENT SHERROD & ROSS-HAMMOND |
| | | | | |
| Amount of Contributions | $36,500 | $14,000 | **72%** | **28%** |
| | | | | |
| Source: Table 12. | | | | |

52

**CHART 11**
**PERCENT CONTRIBUTIONS BY 5 MAJOR WHITE CONTRIBUTORS TO WHITE AND BLACK CITY COUNCIL CANDIDATES, 2008-2018**



**CHART 12**

**PERCENT DOLLAR AMOUNT CONTRIBUTIONS BY 5 MAJOR WHITE CONTRIBUTORS TO BLACK CITY COUNCIL CANDIDATES, 2008-2018**



An examination of the top donors for candidates Rouse and Wooten in 2018 indicates that their high-level financial support came predominantly from white donors (either individuals or white-run businesses). Table 14 reports the racial identity of the top ten donors to candidate Rouse in 2018, with several tied at $2,500, which results in 15 total entries instead instead of ten. For 12 of 15 donors I could ascertain a racial identity. Eleven of these 12 racially identified donors were white. Prior to 2018, none had contributed to a non-incumbent black candidate.

The major exception to Rouse receiving major donations from white individuals and businesses was former NFL player and Hall of Fame member Bruce Smith. Smith, who is black, was seeking city contracts (see Factor 8), and backed fellow former NFL player Rouse. Smith contributed $16,000 to Rouse's campaign, which is more than triple his largest contribution of $5,000 to any other Virginia Beach city council candidate from 2008 to 2018.

Table 15 reports the racial identity of the top ten donors to candidate Wooten in 2018. For 8 of 10 donors I could ascertain a racial identity. All of these racially identified donors were white. Again, prior to 2018 none had contributed to a non-incumbent black candidate.

| TABLE 14 TOP TEN CONTRIBUTORS TO AT-LARGE CANDIDATE ROUSE, 2018 (9 TIED AT $2,500) | | | | | | |
|---|---|---|---|---|---|---|
| | | CONTRIBUTIONS TO OTHER BLACK CITY COUNCIL CANDIDATES, 2008-2018 | | | | |
| DONOR & RACE | $ AMT | WOOTEN 2018 | BRIGHT 2018 | ROSS-HAMMOND 2016 | SHERROD 2011 | BULLOCK |
| Bruce Smith (B) | $16,000 | | | $1,500 | $2,500 | $1,000 |
| Marie Finch (UNK) | $7,500 | | | | | |
| Charles Barker Auto (W) | $7,500 | | | | | |
| Steven Johnson (W) | $7,500 | | | | | |
| Franklin Johnston Grp (W) | $3,500 | $5,000 | | | | |
| Michael Smith (UNK) | $3,000 | | | | | |
| Michael Standing Jr. (W) | $2,500 | | | | | |
| Priority Auto Group (W) | $2,500 | | | | | |
| Frank B. Gigliotti (W) | $2,500 | | | | | |
| Russell Kirk (W) | $2,500 | | | | | |
| Joseph W. Luter IV (W) | $2,500 | | | | | |
| Morchell Pryor (UNK) | $2,500 | | | | | |
| Doug White (W) | $2,500 | | | | | |
| Breeden (W) | $2,500 | $10,000 | | $1,000 | $5,000 | |
| Armada Hoffler (W) | $2,500 | $1,000 | | $3,500 | $7,500 | $1,000 |
| | | | | | | |
| TOTAL | $67,500 | $16,000 | | $6,000 | $15,000 | $1,000 |
| | | | | | | |
| Source: Virginia Public Access Project, "Money," https://www.vpap.org/money/. Empty cells indicate no contributions to that candidate. | | | | | | |

56

| TABLE 15 | | | | | | |
|---|---|---|---|---|---|---|
| **TOP TEN CONTRIBUTORS TO CENTERVILLE CANDIDATE WOOTEN, 2018** | | | | | | |
| | | **CONTRIBUTIONS TO OTHER BLACK CITY COUNCIL CANDIDATES, 2008-2018** | | | | |
| DONOR & RACE | $ AMT | ROUSE 2018 | BRIGHT 2018 | ROSS-HAMMOND 2016 | SHERROD 2011 | BULLOCK |
| Breeden (W) | $10,000 | $2,500 | | $1,000 | $5,000 | |
| Ben Davenport (W) | $8,000 | | | | | |
| Bruce C. Thompson (W) | $7,500 | | $2,500 | | | |
| Sifen (W) | $7,000 | $2,000 | | $1,500 | | |
| Franklin Johnston Grp (W) | $5,000 | $3,000 | | | | |
| McLesky (W) | $4,500 | | | | | |
| John F. Malbon (W) | $3,000 | | $1,000 | $1,000 | $500 | |
| J3H3 LLC (UNK) | $2,500 | | | | | |
| HHH2 LLC (UNK) | $2,500 | | | | | |
| Dwight Dunton (W) | $2,000 | | | | | |
| | | | | | | |
| **TOTAL** | **$52,000** | **$7,500** | **$3,500** | **$3,500** | **$5,500** | |
| | | | | | | |
| Source: Virginia Public Access Project, "Money," https://www.vpap.org/money/. Empty cells indicate no contributions to that candidate. | | | | | | |

57

In addition to struggling to get a foothold in Virginia Beach politics, minorities have fared poorly in gaining election to public office across the state of Virginia in general. Since African American Douglas Wilder won the governorship in 1989, no African American has been elected statewide to a U.S. Senate position in Virginia and only one African American (the current Lieutenant Governor) has been elected to a statewide Virginia office. No other minority group members have been elected to the U.S. Senate or to a statewide position.

Moreover, African Americans and other minorities are substantially underrepresented in the Virginia General Assembly. African Americans comprise 12.5 percent of the State Senate, which amounts to 65 percent of the African American citizen voting age population of 19.3 percent. This disparity is about equal to three State Senate seats. There are no other minority members of the State Senate. The 12.5 percent of all minorities amounts to 37 percent of the minority citizen voting age population of 33.4 percent. This disparity is about equal to about eight State Senate seats.

African Americans comprise 14 percent of the State House of Delegates, equaling 73 percent of the African American citizen voting age population. This disparity is about equal to about five State House seats. All minorities comprise 20 percent of the State House of Delegates, equaling 60 percent of the minority citizen voting age population. This disparity is about equal to about 13 State House seats.[56]

---

[56] Virginia Legislative Black Caucus 2019, pp. 4-5, http://www.dbava.com/2019_vlbc/4; websites of Senate and House of Delegates, https://apps.senate.virginia.gov/Senator/index.php, https://virginiageneralassembly.gov/house/members/members.php.

**Factor 8: Whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group.**

Several examples illustrate the city of Virginia Beach's lack of responsiveness to the particularized needs of minority residents. Prompted by repeated complaints from former African American NFL player Bruce Smith—who claimed the city had turned him down for multiple projects—Virginia Beach authorized a disparity study of city contracts. The researchers reported their results in January 2019. They computed a "disparity index" that measures differences between the availability for contracts among minority-owned businesses and the actual participation of such businesses in city contracts. They note that in their display of the index that "the line down the center of the graph shows a disparity index level of 100, which indicates parity between participation and availability. A line is also drawn at a disparity index level of 80, because some courts use 80 as the threshold for what indicates a substantial disparity." A disparity index of 80 means that a business category received \$0.80 "for every dollar that they might be expected to receive based on their availability for the relevant prime contracts and subcontracts that the City awarded during the study period."[57]

The results of the disparity analysis are reported in Table 16 and Chart 13. As indicated in Table 16 and Chart 13, among minority-owned businesses, firms owned by African Americans were available by far for the largest percentage of city contracts at 8.1 percent. However, such businesses received only 4.5 percent of city contracts, for a disparity index of 56, well below the threshold of 80. Hispanic-owned business had the second highest eligibility at 2.7 percent, but received only 0.5 percent of city contracts, for a disparity index of 20. In contrast, Asian-American owned businesses which had a minimal eligibility percentage of just 0.8 percent, received 5.6 percent of city contracts for a disparity index of some 700. Asian-American owned businesses accounted for just 7 percent of eligible business owned by members of the three minority groups but accounted for 53 percent of the contracts that the city awarded to these minority businesses. The study identified numerous deficiencies in city policies that if rectified could help in achieving greater participation for minority-owned businesses.[58]

Furthermore, the city's hiring practices have not kept pace with demographic change. The city has lagged in the hiring of African American and minority members of the police force. In 2006, the city reached a consent decree with the U.S. Department of Justice aimed at ending a hiring practice that discriminated against African American and Hispanic police-force applicants. According to the decree, "the City has pursued policies and practices that

---

[57] WVEC Staff, "NFL Great Bruce Smith Calls for Racial Disparity Study, Offers to Pay for Half of It," 2WGRZ, 28 November 2018, https://www.wgrz.com/article/news/local/mycity/virginia-beach/nfl-great-bruce-smith-calls-for-racial-disparity-study-pledges-to-pay-for-half-of-it/291-357057349; BBC Research & Consulting, "2018 Disparity Study: City of Virginia Beach," Final Report, January 2019, https://www.vbgov.com/government/departments/finance/mbc/Documents/2018%20Virginia%20Beach%20Disparity%20Study%20Final%20Report.pdf, Chapter ES, p 7.
[58] Ibid., "Disparity Study," pp. 4, 6, 8, 11-14.

discriminate against and deprive or tend to deprive African Americans and Hispanics of employment opportunities because of their race and national origin." In particular, "the City's use of a mathematics test as a pass/fail screening device in the selection process for the entry-level position of police officer has had a statistically significant disparate impact against African-American and Hispanic applicants" and "has not been shown to be job related for the position in question and consistent with business necessity." The consent decree charged that the city's practice had the effect of discriminating against blacks and Latinos but did not charge intentional discrimination.[59]

---

[59] U.S. v. Virginia Beach, *Consent Decree*, 3 April 2006, https://www.justice.gov/sites/default/files/crt/legacy/2010/12/15/vabeachcd.pdf.

| TABLE 16 | | | |
| --- | --- | --- | --- |
| DISPARITIES BY RACE IN CITY CONTRACTS, VIRGINIA BEACH | | | |
| **MINORITY GROUP** | **BUSINESS AVAILABILITY FOR CONTRACTS** | **ACTUAL PARTICIPATION IN CONTRACTS** | **DISPARITY INDEX** |
| **BLACK** | 8.1% | 4.5% | 56% |
| **HISPANIC** | 2.7% | 0.5% | 19% |
| **ASIAN** | 0.8% | 5.6% | 700% |
| Source: BBC Research & Consulting, "2018 Disparity Study: City of Virginia Beach," Final Report, January 2019, https://www.vbgov.com/government/departments/finance/mbc/Documents/2018%20Virginia%20Beach%20Disparity%20Study%20Final%20Report.pdf, pp. 4, 6, 8. | | | |

**CHART 13**
**DISPARITIES BY RACE IN CITY CONTRACTS, VIRGINIA BEACH**



A 2015 study called Governing: The States and Localities found that the city was still behind in its hiring of minorities based on 2013 police personnel data. As indicated in Table 17 and Chart 14, the police force representation is 52 percent below the adult population for all minorities, 50 percent below for African Americans, 41 percent below for Hispanics, and 69 percent below for Asians.[60]

Virginia Beach has also lagged in the hiring of minority teachers. A 2011 analysis by the Virginian-Pilot "of federal employment data and student enrollment statistics shows the Beach employs one white classroom teacher for every nine white students but only one minority teacher for every 43 minority students. The district has only one black male principal. Of more than 2,100 grade school teachers, just 16 are black men. Fewer than one in five top administrators are nonwhite." As compared to neighboring jurisdictions, the study found that "the racial imbalance is most pronounced in Virginia Beach, where 85 percent of public school teachers are white and close to half of students are not, statistics show."[61]

---

[60] "Diversity on the Force: Where Police Don't Mirror Communities," *Governing*, September 2015, p. 12, https://media.governing.com/documents/policediversityreport.pdf.
[61] Mike Hixenbaugh, "Teacher-Student Racial Imbalance Most Pronounced in Va Beach," *Virginian-Pilot*, 17 September 2011, https://pilotonline.com/news/local/education/article_99d4e10f-7582-5625-b2c5-549983e5f028.html.

| TABLE 17 COMPARISON OF PERCENT OF MINORITIES ON BEACH POLICE FORCE COMPARED TO PERCENT IN ADULT POPULATION, VIRGINIA BEACH | | | | |
|---|---|---|---|---|
| | % POLICE FORCE | % ADULT POPULATION | PERCENTAGE POINT DIFFERENCE | PERCENT DIFFERENCE |
| MINORITY GROUP | | | | |
| ALL | 15.5% | 32.6% | -17.1 Percentage Points | **52 Percent Lower** |
| BLACK | 9.4% | 18.9% | -9.5 Percentage Points | **50 Percent Lower** |
| HISPANIC | 3.3% | 5.6% | -2.3 Percentage Points | **41 Percent Lower** |
| ASIAN | 2.2% | 7.2% | -5 Percentage Points | **69 Percent Lower** |

Source: "Diversity on the Force: Where Police Don't Mirror Communities," *Governing*, September 2015, p. 12, https://media.governing.com/documents/policediversityreport.pdf; U.S. of Population, 2010 Complete Enumeration.

**CHART 14**
**COMPARISON OF PERCENT OF MINORITIES ON BEACH POLICE FORCE**
**COMPARED TO PERCENT IN ADULT POPULATION, VIRGINIA BEACH**



65

**Factor 9: Whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice, or procedure is tenuous.**

The policy underlying the current at-large election system for city council in Virginia Beach is tenuous at best. As indicated in Table 3 above, six of 12 other large independent cities utilize for their city council elections either a straight district system or a mixed at-large district system, with the majority of members elected from districts. Even among other large cities using an at-large system, none share Virginia Beach's problematic combination of at-large elections, designated or numbered post for the majority of positions, and staggered terms.   Such provisions as staggered terms or numbered posts, "while not in themselves improper nor invidious... can enhance the opportunities for racial discriminations" in an at-large election system.[62]

---

[62] Sen. Rep. at 22.

66

**CONCLUSION**

      In sum, this analysis shows that the totality of circumstances in Virginia Beach undermines the ability of minorities in the city to participate fully in the political process and elect candidates of their choice. All nine of the Senate Factors are present in Virginia Beach.

      There is a long and ongoing history of discrimination in Virginia and in the City of Virginia Beach. Voting in Virginia Beach is polarized along racial lines. The city uses an at-large system for electing members of the city council that has features such as numbered posts, staggered terms, and large districts that disproportionately burden minority voters. White candidates for city council typically align with other white candidates in providing donations for campaigns. Minorities in Virginia Beach, especially African Americans and Hispanics and to a lesser extent Asians bear the effects of historical and ongoing discrimination in their diminished socio-economic standing relative to whites. Political campaigns in Virginia and Virginia Beach have been marked by racial appeals. Minorities have not fared well in election to public office in Virginia Beach, including on the city council, and no African American member of the city council has ever stood the test of reelection. The unprecedented election of two African Americans to the city council in 2018 reflects the special circumstances of the pending lawsuit. In important ways, Virginia Beach has not been responsive to the particularized needs of minorities, and the justification for the present system of electing city council members is tenuous at best.

67

August 26, 2019

United States District Court for the Eastern District of Virginia

Holloway v. City of Virginia Beach

Case No.: 2:18-cv-00069

Rebuttal Report of Dr. Allan J. Lichtman: Totality of Circumstances

Distinguished Professor of History
American University
Washington, DC

Allan J. Lichtman

EXHIBIT

2

Planet Depos, LLC

# I. STATEMENT OF PURPOSE

This report responds to the reports submitted by defendants' experts Dr. Quentin Kidd and Dr. Peter Morrison. As a general matter, nothing presented in either report has prompted me to revise any of the findings and conclusions in my initial expert report of July 15, 2019.

## I. Report of Dr. Quentin Kidd

Even taken at face value, which this report cannot, it fails even to address my findings on three of the nine "totality of the circumstances" factors analyzed in my report. These include:

**FACTOR 1:** The long and ongoing history of discrimination against minorities in Virginia and Virginia Beach.

**FACTOR 8:** The significant lack of responsiveness on the part of elected officials in Virginia Beach to the particularized needs of the members of the minority group.

**FACTOR 9:** The tenuous nature of the policy underlying the system for electing city council members in Virginia Beach.

With respect to the remaining two other factors, the Kidd report only considers limited and partial elements of those factors:

**FACTOR 5: The extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process.**

**FACTOR 7: the lagging extent to which members of the minority group have been elected to public office.**

The following considers each of the factors addressed or partially addressed in the Kidd Report, which include Factors 2, 3, 4, 5, 6, and 7:

**FACTOR 2: The extent to which voting in the elections of the state or political subdivision is racially polarized.**

Before delving into the details of the Kidd report, it is important to note that he makes no attempt to refute Dr. Spencer's findings, summarized in Table 4 of my initial report, that voting was polarized along racial lines in all four of the recent presidential and congressional elections with black versus white candidates within the precincts of Virginia Beach. This polarization applied to all minority voters. In all four elections, the minority support for black candidates averaged about 90 percent or more, showing an extreme degree of cohesion. In three of the four

2

elections, white voters in contrast voted substantially against these candidates. Only in the 2008 presidential primary, which black candidate Obama overwhelming won in Virginia, did a majority of white voters back the black candidate, but at much lower levels than did minority voters. Although overlooked in the Kidd Report, these findings are certainly relevant to assessing the question posed by the factor as to whether voting is racially polarized in Virginia Beach.

With respect to city council elections, the analysis in the Kidd's report is premised on a false proposition that minority voters are cohesive only when they provide majority support for a particular candidate. That is not true for city council elections in Virginia Beach involving black candidates. Many of these elections involve multiple candidacies, with no majority-vote requirement, and where votes are spread out among an array of candidates. Some of these elections (at-large) also involve multiple seat, multiple candidate contests. The standard procedure in these situations is to assess whether minority voters vote to make a black candidate their candidate of choice and then whether such a candidate who would have been elected with minority votes is defeated by white bloc voting. In fact, the Kidd report implicitly recognizes the appropriateness of this standard by including Rouse among the candidates receiving cohesive black support in his Table 2. For the continuing discussion of this factor, I focus on black voters as the predominant minority group in Virginia Beach. In addition, all minority candidates from 2008 to 2018 are black.

Rouse was the candidate of choice among black voters but received well less than 50 percent support. By adding in Rouse to his roster of minority candidates of choice, Kidd increases the number of percentage of candidates who receive cohesive black voter support and also won election to the city council. Kidd cannot have it both ways. He cannot include Rouse in Table 2 without including other black candidates who were the candidates of choice of black voters (although short of 50 percent support) but who, unlike Rouse, lost their elections.

Table 3 of my initial report, which is unrefuted and not even addressed in the Kidd report, provides this proper analysis. As indicated in Table R1, which presents candidates of choice from Table 3, and Chart R1, in contests for 11 of 14 positions, black voters supported a black candidate as their candidate of choice. For purposes of this analysis it is correct to say that they favored a white candidate of choice over a black candidate only in two elections for 13 positions. In the 2018 in Princess Anne, black candidate Burton had withdrawn from the race, but his name remained on the ballot. So, the ratio in which non-withdrawn candidates were on the ballot, the ratio is 11 to 2 and indicated in Chart R1. Of those two outlier cases, one involved a white candidate as the second choice in the two-seat at-large election in 2018.

In 10 of 11 elections where black voters preferred a black candidate, voting was polarized along racial lines, with white voters preferring a white candidate. For 8 of these 10 ten candidates in polarized elections, the candidate of choice of black voters lost. Prior to 2018, the only winning exception was Ross-Hammond in 2012, in the Kempsville District. However, white bloc voting defeated Ross-Hammond in her bid for reelection in 2016, a rare defeat for an incumbent. In addition, in elections for all but one position, the candidate of choice of white voters prevailed, demonstrating the extent to which white voters control elections in Virginia Beach.

3

| TABLE R1 | | | | |
|---|---|---|---|---|
| **POLARIZED VOTING IN VIRGINIA BEACH CITY COUNCIL ELECTIONS WITH BLACK CANDIDATES, 2008-2018** | | | | |
| YEAR, SEAT | BLACK CANDIDATE(S) | CANDIDATE OF CHOICE OF BLACK VOTERS | CANDIDATE OF CHOICE OF WHITE VOTERS | WINNER |
| 2008 At-large | **Allen** | **Allen** | Wilson (W) | Wilson (W) |
| 2008 Kempsville | **Jackson** **Flores** | **Flores** | Diezel (W) | Diezel (W) |
| 2010 At-large (2 Elected) | **Jackson** **Cabiness** | **Jackson** **Cabiness** | Belitto (W) DeSteph (W) | Bellitto (W) DeSteph (W) |
| 2010 Princess Anne | **Bullock** | **Bullock** | Henley (W) | Henley (W) |
| 2011 At-large | **Sherrod** | **Sherrod** | Moss (W) | Moss (W) |
| 2012 Kempsville | **Ross-Hammond** **Smith** | **Ross-Hammond** | Dale (W) * Weeks (W) * | **Ross-Hammond** |
| 2014 Princess Anne | **Burton** | Henley (W) | Henley (W) | Henley (W) |
| 2014 Rose Hall | **Cabiness** | **Cabiness** | Kane (W) | Kane (W) |
| 2016 Kempsville | **Ross-Hammond** | **Ross-Hammond** | Abbot (W) | Abbot (W) |
| 2018 At-large (2 elected) | **Rouse** **Bright** | **Rouse** White (W) | Moss (W) Oliver (W) | Moss (W) **Rouse (B)** |
| 2018 Centerville | **Wooten** **Wray** | **Wooten** | **Wooten** | **Wooten** |
| 2018 Princess Anne | **Burton *** | Henley (W) | Henley (W) | Henley (W) |
| | | | | |
| * Burton was a token candidate who won just 2.9 percent of the vote against incumbent Henley in the 2018 election for the Princess Anne District. Burton withdrew, but his name remained on the ballot. | | | | |
| Source: Dr. Douglas M. Spencer, "Expert Report: Polarized Voting in Virginia Beach, 18 October 2018 with update for 2018, 10 April 2019, pp. 19-24 | | | | |

**CHART R1: CANDIDATES OF CHOICE OF BLACK VOTERS FOR POSITIONS IN ELECTIONS WITH BLACK CANDIDATES, CITY COUNCIL ELECTIONS, VIRGINIA BEACH, 2008-2018**



The analysis provided in Table R1 also indicates the need for fundamental revisions of Table 1 and Table 2 of the Kidd report. Before displaying these revisions, it is worth noting that even taking Kidd's Table 1 at face value, it shows that even when black candidates receive upwards of 50 percent support from minority voters (a very high threshold for multi-candidate elections), they are *still* usually defeated by white bloc voting. The count in Kidd Table 1 shows that of the 8 black candidates with the strongest black voter support of upwards of 50 percent of the black vote, 6 of the 8 (75 percent) lost their elections. One of the two winners was the special case of candidate Wooten in 2018, which was discussed in my initial report and which will be addressed again below.

The extreme degree of bloc voting is further demonstrated in a revision of Kidd's Table 1 that looks at the degree of black and white voter support for candidates, all of whom topped 50 percent of the black vote and unquestionably had cohesive black voter support. The results reported in Table R2 and Chart R2 demonstrate that black support for these candidates averaged 81.9 percent, compared to an average white support of 22.0 percent. This amounts to a difference of 59.9 percent, which demonstrates not just racially polarized voting, but underline racially polarized voting.

Table R3 of this report provides a revision of the Kidd Tables 1 and 2, with the proper criteria of identifying black candidates of choice and determining whether or not they were defeated by white bloc voting. Although Spencer provided sound and unrefuted reasons for not including candidate Furman, to be consistent with the Kidd report, Furman is included in Table R3. As indicated in Table R3, African American voters usually prefer black candidates as their candidates of choice 11 to 8.

But in reality, the ratio is much higher than that. Candidate Wray was the second black candidate in the single-seat Centerville election in 2018, in which black candidate Wooten was the candidate of choice of black voters. So, by definition, Wray could not have been the black candidate of choice of black voters. Similarly, candidate Smith was the second black candidate in the single-seat Kempsville election in 2012, in which black candidate Ross-Hammond was the candidate of choice of black voters. So, by definition, Smith could not have been the candidate of choice of black voters. Finally, black candidate Jackson was the second candidate of choice in the single-seat Kempsville election in 2008, in which black candidate Flores was the black candidate of choice. So, by definition Jackson could not have been the candidate of choice of black voters.

6

| TABLE R2: RACIAL POLARIZATION IN VIRGINIA BEACH CITY COUNCIL ELECTIONS FROM KIDD TABLE 1, BLACK CANDIDATES WITH 50%+ OF THE BLACK VOTE, DESCENDING ORDER OF BLACK VOTER SUPPORT | | | | |
|---|---|---|---|---|
| Candidate | % Of Black Vote | % of White Vote | Difference | Won or Lost |
| Wooten 2018 | 95.7% | 51.0% | +44.7% | Won |
| Bullock 2010 | 89.2% | 32.9% | +56.3% | Lost |
| Sherrod 2011 | 87.0% | 11.5% | +75.5% | Lost |
| Ross-Hammond 2012 | 86.9% | 17.0% | +69.9% | Won |
| Allen 2008 | 86.3% | 19.9% | +66.4% | Lost |
| Jackson 2010 | 85.6%* | 7.5% | +78.1% | Lost |
| Ross-Hammond 2016 | 76.8% | 30.1% | +46.7% | Lost |
| Cabiness 2014 | 51.7% | 6.4% | +45.3% | Lost |
| **Mean all Candidates** | **81.9%** | **22.0%** | **59.9%** | |

* The Kidd report incorrectly lists the black % as 86.5%.

Sources: Kidd Report, Table 1, Spencer Initial Report, pp. 14-29. To be consistent with Kidd Table 1, this Table uses Ecological Inference (EI) estimates, but the Ecological Regression (ER) estimates would yield essentially the same results.

7

**CHART R2: RACIAL POLARIZATION IN ELECTIONS FOR BLACK CITY COUNCIL CANDIDATES OF CHOICE WITH MORE THAN 50% BLACK VOTER SUPPORT (DESCENDING ORDER OF BLACK SUPPORT)**



| TABLE R3 AFRICAN AMERICAN CITY COUNCIL CANDIDATES IN VIRGINIA BEACH, 2008 TO 2018, REVISION OF KIDD TABLES 1 AND 2 | | | |
|---|---|---|---|
| **Black Candidate of Choice of Black Voters, Would Have Won With Black Votes** | **Outcome** | **Not Candidate of Choice of Black Voters** | **Outcome** |
| | | | |
| Wooten 2018 | Won | Wray 2018 | Lost |
| Rouse 2018 | Won | Bright 2018 | Lost |
| Ross-Hammond 2016 | Lost | Furman 2016 | Lost |
| Cabiness 2014 | Lost | Furman 2014 | Lost |
| Ross-Hammond 2012 | Won | Burton 2014 | Lost |
| Sherrod 2011 | Lost | Smith 2012 | Lost |
| Jackson 2010 * | Lost | Furman 2014 | Lost |
| Cabiness 2010 * | Lost | Jackson 2008 | Lost |
| Bullock 2010 | Lost | | |
| Allen 2008 | Lost | | |
| Flores 2008 | Lost | | |
| | | | |
| * These were the first and second choices of black candidates in a two-seat at-large election. | | | |

9

Eliminating these three candidacies, the ratio of black candidates of choice of black voters to black candidates who were not the black candidates of choice of black voters rises to 11 to 5 (69 percent). Of those 5 black candidates, 3 involved perennial candidate Furman. As further indicated in Table R3 and Chart R3, 8 of these 11 black candidates of choice of black voters lost their elections. Two of the three victors represented the special cases of Rouse and Wooten in 2018. Absent these special cases, only one black candidate of choice, Ross-Hammond in 2012, won a city council seat. Although an incumbent, Ross-Hammond then lost her seat in the next election of 2016.

**Factor 3: the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group.**

In its consideration of Factor 3, the Kidd report ignores the most distinctive discriminatory feature of city council elections in Virginia Beach that distinguishes it from election procedures in all other large cities in Virginia. That feature, which I examine in my initial report, is the use of designated or numbered posts, elected at-large for the election of 7 of 11 seats on the city council of Virginia Beach. This provision prohibits minority voters from single-shot voting for a preferred candidate or concentrating their votes on a small number of candidates. Such an anti-single shot provision is explicitly named in the Senate Report's description of the factor and the dilutive impact of at-large elections is further enhanced in Virginia Beach through the use of staggered elections for non-designated posts.

The failure of the Kidd report to consider this discriminatory feature is especially notable because it has been the subject of considerable local public commentary, especially in recent years.

On July 17, 2012, in an op ed entitled "It's Time to Ditch Beach's Baffling Election System, *Virginian-Pilot* columnist Roger Chesley wrote, "The Beach has a hybrid system possibly unmatched across the country. Voters select three at-large members and the mayor. For the remaining seven district seats, voters citywide pick each member." Moreover, "*Spokespersons with the National League of Cities and U.S. Conference of Mayors told me they're unaware of any city with a structure similar to the one in Virginia Beach.*"[1] (emphasis added).

On October 1, 2018 Virginia Beach city council candidate David Nygaard wrote, "We are the only city in America where we vote for everyone's representative, whether we live there or not. We were supposed to change this system when we were first incorporated as a city in 1963

---

[1] Roger Chesley, "It's Time to Ditch Beach's Baffling Election System, *Virginian-Pilot,* 17 July 2012, https://pilotonline.com/news/local/columnist/roger-chesley/article_01fdf121-21f0-5664-be4d-a0b6a6f18f7a.html.

**CHART R3: VICTORIES AND DEFEATS FOR BLACK CITY COUNCIL CANDIDATES OF CHOICE OF BLACK VOTERS, VIRGINIA BEACH, 2008-2018**



and given seven years to accomplish it. 55 years later, nothing has changed and the flawed system remains in place."[2]

On October 2, 2018, an article in the *Virginian-Pilot* voted, "Since the 1960s, Virginia Beach has used an unusual hybrid approach: *It's the region's only locality in which candidates represent specific residential districts but are elected by voters from the entire city.*" (emphasis added).[3]

On October 5, 2018 Roger Chesley reiterated his critique of the hybrid system, writing that, "Strange hybrid system for Beach council should go the way of the dodo."[4]

On December 19, 2018 an article in the *Virginian-Pilot* noted, "Virginia Beach uses a wonky hybrid election system where seven seats on the council require candidates to live in a specific district, but they're still elected by the entire city. It's a blend of the at-large and ward approaches, and there is a renewed effort to change this."[5]

On April 5, 2019 an editorial in the Princess Anne Independent News said, "The city's hybrid system of at-large seats and district seats can seem confusing, and it is not universally beloved, but this is the system by which we pick our local leaders."[6]

Dr. Kidd is a professor at the local Christopher Newport University, which is less than 50 miles from Virginia Beach. He is a specialist in Virginia politics and Director of the Judy Ford Wason Center for Public Policy which "was established in 2007 to provide unbiased and non-partisan scientific research about public policy issues facing Virginia."[7] He could not plausibly have been unaware of the controversy over Virginia Beach's unusual hybrid system for electing members of its city council. Yet his report is silent on this crucial issue.

Dr. Kidd does address other aspects of features of Virginia Beach's system for electing city council members that I identified in my report as also demonstrating the presence of Factor 3. First, there is the large geographic space of some 249 square miles across which candidates must campaign. Kidd says this "district size is not out of the ordinary" because it "does not even rank as the largest, with Chesapeake and Roanoke coming in larger according to Lichtman's Table 3."

---

[2] David Nygaard, "Virginia Beach Needs a New Voting System for City Council," *Outwire757*, 1 October 2018, https://outwire757.com/commentary-virginia-beach-needs-a-new-voting-system-for-city-council/.

[3] Stacy Parker, "2 Virginia Beach City Council Members Want to Change the City's Election System," *Virginian-Pilot*, 2 October 2018, https://www.pilotonline.com/government/local/article_5aea8b7a-c591-11e8-b572-3b015d1704d3.html.

[4] Roger Chesley, "Strange Hybrid System for Beach Council Should Go the Way of the Dodo." *Virginian-Pilot*, 5 October 2018, https://pilotonline.com/news/local/columnist/roger-chesley/article_91e44f38-c804-11e8-a08b-9f61debbc67d.html.

[5] Peter Contu, "If Virginia Beach City Council Used a Ward Election System, Would Results Change? Probably." *Virginian-Pilot*, 19 December 2018, https://pilotonline.com/news/government/local/article_90b96212-f016-11e8-ab72-23e06bcb9e2f.html.

[6] "The Virginia Beach Public Servant's Guide to Where You Live," *Princess Anne Independent News*, 5 April 2019, http://princessanneindy.com/2019/04/05/editorial-residency/.

[7] Judy Ford Wason Center for Public Policy, "About the Center," https://cnu.edu/wasoncenter/about/.

12

(p. 31). The third largest district or jurisdiction size among the 13 most comparative cities certainly would rank as unusual by any standard definition of the term. Moreover, Virginia Beach at 250.6 square miles is essentially tied with Roanoke for second geographically among the 13 cities and its order of magnitude is larger than the 10 other comparative cities. As noted in my initial report, "The ratio of the square mileage for the place of election in Virginia Beach as compared to these other cities ranges from 2.5 to 1 to 37.7 to 1." The mean difference is 15.2 to 1.

Kidd further notes that if "Virginia Beach were to adopt the 10 SMD model proposed by plaintiffs, the mean district sizes would be 24.9 square miles, making them larger than 7 of the cities shown on Table 3 of Lichtman's report." (p. 31). He fails to note, however, that such a change would reduce the area for electoral city council competition in Virginia Beach by 90 percent, a most significant reform for minority voters. He also notes that 7 cities would still have larger districts. But that would place Virginia Beach close to the middle of the distribution. Moreover, the average ratio of the 24.9 square miles district to the size of the other 7 smaller districts is just 2 to 1, whereas the current ratio of Virginia Beach to these 7 cities is 19.6 to 1.

The third feature of city council elections in Virginia Beach that demonstrates the presence of Factor 3 is the large population of the city council district --the entire city-- with a population of 450,000 persons. This population under at-large elections makes it difficult for minority candidates to campaign door-to-door as opposed to running a much more expensive advertising campaign. Kidd does not dispute the finding of my initial report that Virginia Beach ranks *first* among the 13 cities in the population size of the district or jurisdiction in which candidates must run. As noted in my initial report, "The ratio of the population for the place of election in Virginia Beach as compared to these other cities ranges from 1.9 to 1 to 21.3 to 1."

Dr. Kidd notes only that "The major distinguishing feature between Virginia Beach and the rest of the cities that Lichtman compares it with is its population, which is 90% larger than the next two largest cities (Norfolk and Chesapeake), and almost 9 times larger than the two smallest cities on the list (Harrisonburg and Leesburg)." (p. 31). Of course, it is not just the large population of Virginia Beach that makes it unique among other cities, but also the fact that all city council candidates must run citywide. Dr. Kidd notes the number of square miles in plaintiffs' 10 member proposed district plan but does not reference population. The plan would comparably reduce the population for running for city council by 90 percent from 450,000 to 45,000, which would move it from first among the 13 cities down to 11th place, with just two cities requiring city council candidates to run in districts or jurisdictions with larger populations.

Table R4 below compares for both geographic size and population the ratio of the district (entire city) used to elect members of the city council, with the mean for the other 12 cities with a population of 50,000 or more. As indicated in Table R4 with respect to size, Virginia Beach elections currently take place across a geographic area that is more than three times the size of the average for other cities. However, under plaintiffs' Illustrative Plan, Virginia Beach's area would be only about a third the size of the average for other cities. As also indicated in Table R4 with respect to population, Virginia Beach elections currently take place with a population that is more than five times the size of the average for other cities. However, under plaintiffs' Illustrative Plan, Virginia Beach's districts would be only about half the population of the average for other cities.

13

| TABLE R4 | | | |
|---|---|---|---|
| VIRGINIA CITIES WITH MORE THAN 50,000 POPULATION, AVERAGE SIZE AND POPULATION OF PLACE OF ELECTION FOR CITY COUNCIL, CURRENT SYSTEM VERSUS PLAINTIFFS' ILLUSTRATIVE PLAN | | | |
| | Virginia Beach | Mean Other Cities | Ratio VA Beach to Others |
| Current Square Miles for City Council Election | 249 | 73.1 | 3.4 to 1 |
| Square Miles Plaintiff Plan | 24.9 | 73.1 | .34 to 1 |
| | | | |
| Current Population for City Council Election | 450,159 | 87,336 | 5.2 to 1 |
| Population Plaintiff Plan | 45,016 | 87,336 | .52 to 1 |
| | | | |
| Source: Tables 3-4, Lichtman, Initial Report, July 15, 2019. | | | |

14

In sum, after considering the Kidd Report on Factor 3, the following remains unrefuted:

1. Unique among comparable cities, Virginia Beach uniquely maintains numbered or designated posts for the election of the majority of city council members, a well-known device that often enhances the discriminatory nature of an at-large election system.

2. Virginia Beach is essentially tied for second among 13 comparable cities in the size of the land mass that candidates must traverse to win election to a city council position.

3. Adoption of plaintiffs' proposed illustrative districting plan would reduce this land area by 90 percent placing Virginia Beach just one city above the middle of the distribution.

4. Virginia Beach ranks first among comparable cities in population in the district or jurisdiction in which candidates for city council must compete.

5. Adoption of plaintiffs' proposed illustrative districting plan would reduce this population by 90 percent placing Virginia Beach 11th among 13 cities in the population of city council districts or jurisdictions.

**Factor 4: If there is a candidate slating process, whether the members of the minority group have been denied access to that process.**

The Kidd report does not dispute that united funding by candidates can be a form of informal slating. He also does not deny or refute the analysis in my initial report which shows that such slating favors white candidates in Virginia Beach City Council elections. Rather, he claims that only contributors to a candidate who are other candidates running in the same election should be counted as part of this informal slating process.

Even assuming that Kidd is correct, which he is not, his Table 11 fundamentally misrepresents intra-election contributions, because it misses many contributing candidates running in the same election as documented in Appendix I, which replicates from the Virginia Beach government the candidates running by year from Virginia Beach. Kidd Table 11 on p. 33 of his report lists 13 intra-election donors. However, he erroneously fails to include almost half of the 25 intra-election donors listed on Table R5. The data reported in Table R4 clearly demonstrates, even under Kidd's standard, informal slating that heavily favors white candidates, even more so than was indicated in my initial analysis. Of city council candidates who garnered contributions from at least two or more intra-election candidates, an indication of slating and not just an individual contribution, seven were white and none were black. The only black candidates to garner any intra-election contributions (one each) were incumbent Ross-Hammond in 2016 and Rouse and Wooten in 2018.[8]

---

[8] The Kidd report also incorrectly indicates that Ross-Hammond received $13,000 from Mayor Sessoms, when, in fact she received $11,500:
https://www.vpap.org/committees/215566/donor/1925/?start_year=all&end_year=all&contrib_type=all.

| TABLE R5 INTRA-ELECTION CONTRIBUTIONS TO CANDIDATES, CITY COUNCIL, VIRGINIA BEACH, 2008-2018 | | |
|---|---|---|
| **Candidate** | **Contributors & Amount** | **Total** |
| Bellitto (W) 2010 | Uhrin $500 | $500 |
| Dale (W) 2012 | Sessoms $1,000 | $1,000 |
| Davis (W) 2008, 2012 | Sessoms, $500, Wilson $1,000 | $1,500 |
| Diezel (W) 2008 | Wilson $250 | |
| Henley 2010, 2014, 2018 | Davenport, $9,500, Jones, $1,000, Uhrin, $1,500 | $12,000 |
| Kane (W) 2014 | Jones, $4,000, Uhrin $1,500, Wood, $350 | $5,850 |
| Martin (W) 2014, 2018 | Jones, $2,000, Uhrin, $1,000 | $3,000 |
| Moss (W) 2010, 2014, 2018 | Jones, $5,000, Worst, $250 | $5,250 |
| Redmond (W) 2010 | Uhrin, $8,500 | $8,500 |
| Rouse (B) 2018 | Davenport $1,500 | $1,500 |
| Ross-Hammond (B) 2012, 2016 | Sessoms, $11,500 | $11,500 |
| Uhrin (W) 2010, 2014, 2018 | Davenport, $2,000 | $2,000 |
| Wilson (W) 2008, 2012, 2016 | Sessoms, $1,250, Davis $1,325 | $2,575 |
| Wood (W) 2010, 2014, 2018 | Davenport $2,000, Uhrin $1,000, Redmond $250 | $3,250 |
| Wooten (B) 2018 | Davenport $8,000 | $8,000 |
| | | |
| Sources: Source: Virginia Beach, Election Information & Results, https://www.vbgov.com/government/departments/voter-registrar/elections/pages/default.aspx; Virginia Public Access Project, VPAP.org. | | |

16

The other problem with Kidd's analysis is that not only are there intra-election contributions to candidates, but also incumbents who may not be running in a particular election are involved in slating. The reason is clear: incumbents, no less than candidates in a particular election, would certainly care about the persons with whom they will be governing in an upcoming session. Most of the non-intra-election contributors in my initial report were incumbents.

**Factor 5: The extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process.**

As noted above, the Kidd report does not challenge any of the facts and analyses I presented in the discussion of Factor 1 on the ongoing history of racial discrimination in Virginia and Virginia Beach. He does, however, fundamentally misrepresent my report by implying that discrimination ended "long ago," perhaps around 1970 and therefore could not have much of current effect on Hispanics and Asians, who constituted a small share of the Virginia Beach population at that time. (p. 26) Yet, my examination of Factor 1 demonstrated that discrimination persisted long after 1970 and continues throughout time. In fact, far more of the section on this factor is devoted to the period after, rather than before, 1970.

The Kidd report does not dispute that for blacks and Hispanics in Virginia, the effects of discrimination have resulted in a socio-economic standing that is substantially lower than for whites. His only quarrel is for Asians, who he alleges do not have an equivalent history of discrimination. He partially argues that Asians are comparable to whites in socio-economic standing, which is the appropriate measure, not whether they are better off than blacks or Hispanics. In fact, Kidd's count of the comparability between whites and Asians is incorrect. He says that of 15 measures in my initial report, "On six of these, Asians score better than non-Hispanic whites; on two measures they (Asians and non-Hispanic whites) have comparable scores, and on three measures Asians are more like whites than like Hispanics or African Americans." That adds to eleven not fifteen measures. However, an examination of all 15 measures shows that the gap between Asians and whites does slightly favor whites on measures where the two groups are not comparable. The Kidd report also claims incorrectly that "in recent elections Asians have participated at rates statistically equal to or even slightly _higher_ than whites." As will be shown below, Asians in fact participate at lower rates than whites.

Kidd does attempt to show that such socio-economic disparities do not necessarily result in lower turnout for minorities, not just for Asians, but also for Hispanics and blacks. Yet, lower turnout is not the only impact on political opportunity of lower socio-economic standing. It is also reflected in difficulties in recruiting candidates and in financing campaigns. As was demonstrated in my initial report, the five major political donors in Virginia Beach are either white individuals or businesses run by whites. And these donors contribute primarily to white candidates. Lower socio-economic standing is further reflected in the challenges posed by campaigning across the large municipality of Virginia Beach, which encompasses 249 square miles and includes more than 450,000 persons.

17

Contrary to Kidd's claim, the data he presents does not show a lack of a turnout gap between whites and minorities in Virginia Beach. First, Kidd conducts an apples to oranges comparison; his survey data from the Current Population Survey is for the state of Virginia, not for Virginia Beach, which comprises only about 5 percent of Virginia's population. Kidd turns to overall state turnout even though in his data disclosure he presents the precinct-level turnout and demographic information from which estimates of turnout by race can be computed (see the analysis below). Dr. Kidd simply presumes without evidence or rationale that turnout patterns in Virginia Beach must mirror those statewide: "We can further observe that there is no logical reason to think that the political participation of black, Hispanic, and Asian citizens in Virginia Beach would look different from those across the Commonwealth." Yet, insofar as comparison is possible, turnout patterns in Virginia Beach do not mirror those of the Commonwealth.

The Commonwealth and city provide actual turnout data for the percent of registered voters voting in recent elections. This is not self-reported information. The results show that turnout in Virginia Beach is not the same as turnout statewide, even though the Beach and the Commonwealth have virtually identical demographic profiles. In 2018, turnout in Virginia Beach was 66.0 percent, compared to 71.2 percent statewide; and in 2018, turnout in Virginia Beach was 54.6 percent, compared to 71.1 statewide. The point here is that you cannot uncritically infer political patterns to a locality from patterns statewide. That would be even more true for the more fine-grained turnout of racial groups.[9]

Further, the data presented in the Kidd report represent not actual turnout like the above governmental statistics, but self-reported turnout in the Current Population Survey (CPS). In addition, the data do not show that minority turnout is comparable to white turnout. Rather, as presented in the Kidd report, the data show only that there is a wide margin of error for some measures of self-reported turnout.

However, an examination of the point estimates (the self-reported turnout percentage around which the margin of error is computed) from Kidd's data disclosure of CPS results, demonstrates that the turnout of African Americans, Hispanics, and Asians across all six election cycles from 2008 to 2018 is almost invariably lower than white turnout. This near-universal pattern of turnout differences cannot be the result of chance variation.

As indicated in Table R6 and Chart R4, low turnout in comparison to white voters impacts all three minority groups in Virginia Beach, black voters, Hispanic voters, and Asian voters. For every election and every group, minority turnout trails white turnout with the single exception of a 0.3 percent lead for Asian turnout in the election of 2016. African American turnout substantially trails white turnout in all elections, save for the presidential elections of 2008 and

---

[9] City of Virginia Beach, Election Information and Results, https://www.vbgov.com/government/departments/voter-registrar/elections/pages/default.aspx; Virginia Department of Elections, Summary of Virginia Registration and Turnout Statistics, https://www.elections.virginia.gov/resultsreports/registration-statistics/registrationturnout-statistics/index.html.

**TABLE R6**

**POINT ESTIMATES OF TURNOUT BY RACE FOR CITIZEN VOTING AGE POPULATION (CVAP) IN VIRGINIA, 2008-2018, BASED ON CURRENT POPULATION SURVEY (CPS) RESULTS RELIED ON IN KIDD REPORT**

| Election | White | Black | Difference With white | Hispanic | Difference With white | Asian | Difference With white |
|---|---|---|---|---|---|---|---|
| 2018 | 60.8% | 56.4% | -4.4 percentage points | 34.6% | -26.2 percentage points | 46% | -14.8 percentage Points |
| 2016 | 69.6% | 64.9% | -4.7 percentage points | 64.2% | -5.4 percentage points | 69.9% | +0.3 percentage points |
| 2014 | 45.6% | 34.2% | -11.4 percentage points | 25.4% | -20.2 percentage points | 31.6% | -14 percentage points |
| 2012 | 67.5% | 67.2% | -0.3 percentage points | 66.8% | -0.7 percentage points | 53% | -14.5 percentage points |
| 2010 | 44.9% | 35.6% | -9.3 percentage point | 18.9% | -26 percentage points | 22.7% | -22.2 percentage points |
| 2008 | 69.4% | 68.3% | -1.1 percentage points | 56.5% | -12.9 Percentage points | 61.4% | -8 percentage points |
| Mean All Elections | 59.6% | 54.4% | -5.2 percentage points | 44.4% | -15.2 percentage points | 47.4% | -12.2 percentage points |

Source: Current Population Survey (CPS) results provided by Dr. Quentin Kidd in his data disclosure.

19

**CHART R4: MEAN POINT ESTIMATES OF TURNOUT BY RACE FOR CITIZEN
VOTING AGE POPULATION (CVAP) IN VIRGINIA, 2008-2018, BASED ON CURRENT
CENSUS REPORT (CPS) RESULTS RELIED ON IN KIDD REPORT**



20

2012 when Barack Obama headed the ballot. On average for all elections, black voter turnout was 5.2 percentage points lower than white turnout. Hispanic voter turnout trailed white turnout in all elections. As indicated in Table R6 and Chart R4, on average for all elections, Hispanic turnout was 15.2 percentage points lower than white turnout. Asian voter turnout trailed white turnout in all elections except for the outlier of 2016, when it exceeded white turnout by 0.3 percentage points. On average for all elections, Asian voter turnout was 12.2 percentage points lower than white turnout.

Ironically, while Kidd declines to use the point estimates to compare white to minority turnout, he does use the point estimates to compare African American and Hispanic turnout. He writes, "While black and Hispanic participation is within the margin of error for every election, and while during two elections (2012 and 2016) the two groups are very close to equal in their levels of voting, *black participation is always higher than Hispanic participation*," based on the point estimates. (p. 34, emphasis added).

Kidd uses this point estimate comparison between African Americans and Hispanics in an attempt to loosen the connection between socio-economic status and turnout. He writes, "On 11 of the 15 dimensions presented by Lichtman, African Americans score poorer than Hispanics. This is the case for all of the measures of academic achievement. Relying on the logic of Lichtman's presentation, Hispanics should be more politically active than blacks." (p. 34). This analysis is flawed, first because it represents another apples to oranges comparison. The socio-economic data in my initial report was for Virginia Beach, whereas Kidd's turnout data is for all of Virginia. Even for Virginia Beach, the differences between blacks and Hispanics are typically small compared to their differences with whites. Kidd emphasizes the differences between blacks and Hispanics on educational performance, but these are for 8th graders not yet eligible to vote. On educational attainment, Hispanics trail African Americans.

Second, the Kidd analysis assumes incorrectly that socio-economic differences are the sole determinant of turnout. Diminished socio-economic status is an important barrier to political participation that affects all three racial minorities in Virginia Beach, but it is not the sole determinant. Also important is political mobilization. African Americans have achieved significant mobilization in the twenty-first century, which Latinos have not yet matched.[10] Dr. Kidd has acknowledged in his own writings the importance of the political mobilization of African Americans in the South. He wrote that "the two most significant components of the modern transformation of southern politics" are "1) the growth of the GOP and 2) the political mobilization of the African Americans."[11]

---

[10] See for example, Louis DeSipio, "Latino Civic and Political Participation," in Martha Tienda and Faith Miller, eds. *Hispanics and the Future of America* (National Academies Press, 2006), pp. 447-480; Marcela Valdes, "27 Million Potential Hispanic Votes. But What Will They Really Add Up To?" *New York Times Magazine Feature*, 14 September 2016, https://www.nytimes.com/2016/09/18/magazine/27-million-potential-hispanic-votes-but-what-will-they-really-add-up-to.html; John A. Garcia, *Latino Politics in America: Community, Culture, and Interests*, 3thd ed. (Rowman & Littlefield, 2017).
[11] M.V. Hood III, Quentin Kidd, and Irwin L. Morris, *The Rational Southerner: Black Mobilization, Republican Growth, and the Partisan Transformation of the American South* (Oxford University Press, 2012), p. 70.

Third, African Americans in Virginia are substantially more likely than Hispanics to be contacted by political campaigns. Table R7 reports results from the Cooperative Congressional Election Study (CCES), a standard source for political analysis. For the elections of 2010, 2012, 2014, and 2016, the CCES asked whether respondents had been contacted by a political campaign or candidate. As indicated in Table R7, 59.1 percent of African Americans in Virginia reported such a contact, compared to 46.9 percent of Hispanics. These differences are statistically significant at levels well beyond what is standard in social science.

| TABLE R7 CAMPAIGN CONTACT FOR AFRICAN AMERICANS AND HISPANICS IN VIRGINIA, 2010-2016 GENERAL ELECTIONS | | | |
|---|---|---|---|
| Group | # Contacted | Total # of Respondents | % Contacted |
| Black | 438 | 741 | 59.1% |
| Hispanic | 97 | 207 | 46.9% |
| Source: Cooperative Congressional Election Study (CCES), 2010, 2012, 2014, 2016, https://cces.gov.harvard.edu/. | | | |

22

Fourth, unlike African Americans, Latinos face a significant language barrier, which makes it more difficult to navigate and participate effectively in the political system. According to the 2017 US Census American Community Survey, 34 percent of Hispanics in Virginia speak English "less than 'very well,'" compared to 2 percent of African Americans.

Dr. Kidd also ignores a disparity in his own data  on registration rates for whites, blacks, Hispanics, and Asians in Virginia. Disparities in registration are another indicator of the effects of lingering discrimination. Moreover, because of the larger numbers involved, the error margins are smaller for registration than for turnout.

As indicated in Table R8, in every instance, bar none, for all three minority groups, blacks, Hispanics, and Asians, voter registration rates are substantially lower than white rates. Again, the universal pattern cannot be attributed to chance or random factors. In addition, more than half the individual differences between whites and the minority groups are outside the margins of error of the estimates. As indicated in Table R8 and Chart R5, on average black registration rates are 7.9 percentage point lower than white rates. Hispanic rates are 17.3 percentage points lower and Asian rates are 9.8 percentage points lower.

In the data disclosed by Dr. Kidd, he presents precinct-level data prepared by Kim Brace on voter turnout and demographics for Virginia Beach. Yet, rather than using this non-self-reported data to estimate turnout rates for Virginia Beach, he instead turns to survey data for the entire Commonwealth. Analysis of the data in the database that was disclosed and used by Kidd or the elections of 2016 and 2018 demonstrates major turnout differentials based on race.

23

## TABLE R8
### POINT ESTIMATES OF REGISTRATION BY RACE FOR CITIZEN VOTING AGE POPULATION (CVAP) IN VIRGINIA, BASED ON CURRENT POPULATION SURVEY (CPS) RESULTS RELIED ON IN KIDD REPORT

| Election | White | Black | Difference With white | Hispanic | Difference With white | Asian | Difference With white |
|---|---|---|---|---|---|---|---|
| 2018 | 76.8% | 66.8% | -10.7 percentage points* | 49.0% | -27.8 percentage points* | 61.4% | -15.4 percentage Points* |
| 2016 | 77.5% | 71.9% | -6.7 percentage points | 70.1% | -7.4 percentage points | 73.0% | -4.5 percentage points |
| 2014 | 69.6% | 61.7% | -8.4 percentage Points* | 47.4% | -22.2 percentage points* | 61.0% | -8.6 percentage points |
| 2012 | 75.8% | 72.6% | -3.8 percentage points | 73.6% | -2.2 percentage points | 61.1 | -14.7 percentage points* |
| 2010 | 69.5% | 51.4% | -17.5 percentage points* | 34.6% | -24.9 percentage points* | 58.1% | -11.4 percentage points |
| 2008 | 75.3% | 72.3% | -2.8 percentage points | 56.5% | -18.8 Percentage points* | 70.8% | -4.5 percentage points |
| Mean All Elections | 74.0% | 66.1% | -7.9 percentage points | 55.2% | -17.3 percentage points | 64.2% | -9.8 percentage points |

Source: Current Population Survey (CPS) results provided by Dr. Quentin Kidd in his data disclosure.

24

**CHART R5: MEAN POINT ESTIMATES OF REGISTRATION BY RACE FOR CITIZEN VOTING AGE POPULATION (CVAP) IN VIRGINIA, BASED ON CURRENT CENSUS REPORT (CPS) RESULTS RELIED ON IN KIDD REPORT**



Demonstration of turnout differences between whites and minorities and specifically whites and blacks in Virginia Beach does not require elaborate statistical analysis. The visual display of actual precinct-level turnout percentages paired with precinct-level demography are themselves telling. For the general election of 2018, Chart R6 plots for each precinct (each dot represents a precinct) the percent of the citizen voting age population voting and the percent of the citizen voting age population that is white. As is evident from Chart R7 there is a steep, upward relationship between the white share of a precinct and its turnout level in 2018. Chart R8 displays the same turnout data, but this time for the percentage of the CVAP that is black. The Chart R8 shows the opposite results, with a steeply downward relationship between the black share of a precinct and its turnout level in 2018. A nearly identical pattern of relationships between precinct-level turnout prevails for the general election of 2016 as shown in Charts R8 and R9.[12]

This data also enables the use of ecological regression to estimate the relative turnout of whites and blacks in Virginia Beach for 2018 and 2016. The percentages of Hispanics and Asians are too small for separate estimation. The turnout results reported in Table R9 confirm what the charts show, that there is a major gap in turnout rates for white voters and black voters in Virginia Beach. The ecological regression results are further confirmed by the actual turnout rates in precincts that are 90 percent or more white. There are no comparable precincts for blacks.

---

[12] The Kidd data disclosure includes estimates of total voting age and citizen voting age population and Hispanic CVAP. It includes VAP data for whites and blacks, the great majority of whom are citizens in Virginia Beach.

26

**CHART R6: RELATIONSHIP BETWEEN TURNOUT AND PERCENT WHITE CVAP, 2018 ELECTION, VIRGINIA BEACH**



**CHART R7: RELATIONSHIP BETWEEN TURNOUT AND PERCENT BLACK CVAP, 2018 ELECTION, VIRGINIA BEACH**



**CHART R8: RELATIONSHIP BETWEEN TURNOUT AND PERCENT WHITE CVAP, 2016 ELECTION, VIRGINIA BEACH**



**CHART R9: RELATIONSHIP BETWEEN TURNOUT AND PERCENT BLACK CVAP, 2016 ELECTION, VIRGINIA BEACH**



| | | | | |
|---|---|---|---|---|
| **TABLE R9**<br>**ECOLOGICAL REGRESSION ESTIMATES OF BLACK & WHITE TURNOUT, VIRGINIA BEACH, 2016-2018 AND WHITE 90%+ CVAP PRECINCTS** | | | | |
| Election | % White CVAP Turning Out | % Black CVAP Turning Out | Difference | Percent Turning Out in 90%+ White CVAP Precincts |
| | | | | |
| 2018 | 61% | 29% | +32 Percentage Points | 65% |
| | | | | |
| 2016 | 66% | 30% | +36 Percentage Points | 70% |
| | | | | |
| Source: Data disclosure of Dr. Quentin Kidd. | | | | |

31

**Factor 6: Racial Appeals**

A contradiction cuts through the heart of Kidd's assessment of racial appeals and his use of turnout data to assess the effects of socio-economic disparities in Virginia Beach. On the one hand, he incorrectly relies on statewide turnout data to assess these effects in Virginia Beach. He does so even though he has available local turnout data and demographic data from which to assess racial differences in turnout for Virginia Beach. On the other hand, he rejects as irrelevant racial appeals in statewide elections, by the Republican Party, or elections outside of Virginia. Kidd cannot have it both ways. If statewide turnout data is relevant, so then must be statewide racial appeals and certainly racial appeals to the set or subset of voters in Virginia Beach.

Kidd also indicates that a racial appeal must be successful in electing a candidate for relevance under Factor 6. But the Factor imposes no such requirement, as there are many reasons why candidates win or lose. Rather, its purpose is to assess the presence or existence of racially charged politics.

The Kidd report only examines three of the many examples of racial appeals presented in my initial report:

**Republican George Allen's use of the racial slur "macaca" in his 2006 U.S. Senate campaign.**

His only response to this example is to say that "George Allen's infamous 'Macaca' moment occurred on a highway rest stop in the western part of the state. Loudoun County is hundreds of miles away from Virginia Beach." (p. 36) The venue, of course, is irrelevant. Allen was running a statewide campaign and his "infamous" racial slur was widely publicized across the Commonwealth, indeed across the nation.

**Racist threats against Virginia Beach black city council candidate Louisa Strayhorn and staffers in 1998.**

The Kidd report asserts that this example is irrelevant because it involved an underground campaign of intimidation rather than an open racial appeal in the campaign. Kidd admits, however, that "they reflect racism on the part of some individuals," in this case within Virginia Beach. The threats, therefore, whether or not overtly part of the campaign against her, certainly are indicative of racial politics within Virginia Beach and racial opposition to her campaign, which is the essential purpose of Factor 6. (p. 36). Moreover, Strayhorn, the only minority then on the city council, was specifically targeted by the Republican Party. "We had taken dead aim on Louisa," said Leo Waldrup, Republican state delegate from Virginia Beach and head of the GOP House caucus, she was a rising Democrat, "and that's clearly enough for us to lock and load."[13]

---

[13] Bruce Murphy, "Even in the Most Integrated City, Race is Still a Thorny Issue," *Milwaukee Journal Sentinel*, 14 January 2003, http://mumford.albany.edu/census/2003newspdf/jsonlineSeries/011403MURPHYjsonline.pdf.

**Racial Appeal by Republican candidate Rocky Holcomb in his 2017 campaign for House of Delegates.**

Kidd does not deny that my initial report established not just a subtle but an overt racial appeal. He notes the Holcomb mailer was one which did not just involve candidate Turpin, but also "many in the community accused of being an overt racial appeal." (p. 36). He discounts this mailer not because it failed to demonstrate a racial appeal to the voters of Virginia Beach, but rather because Holcomb lost: "Voters in Virginia Beach, recoiling from the Holcomb mailer, rejected the appeal and the candidate who ran it." Yet, regardless of the outcome of the election, this example shows the infusion of race in that election. Moreover, the Kidd report presents not a shred of evidence that white voters in Virginia Beach rejected the appeal. Turpin actually won the election by just 389 votes. Given the many factors that decide elections, it is not possible to attribute Holcomb's defeat to his racial appeal or even in the absence of analysis to assess whether it helped or hurt his campaign in what Kidd says was otherwise a difficult environment for Republicans. Again, the factor does not require that the candidate making the appeal must win the election.

In light of Kidd's claim about examples for Virginia Beach, I have uncovered an additional racial appeal specifically for a position on the City Council. In 2008, a flier was distributed in black neighborhoods showing white Republican Virginia Beach mayoral candidate Will Sessoms together with a smiling Barack Obama. As is evident from Picture 1 below, the flier had no attribution or authorization of any kind, (e.g., "paid for by …"), which is required by law. A second flier was also circulated likewise without the legally required attribution/authorization purporting to represent "African Americans for Change." (Picture 2) It claimed that Will Sessoms "will do more in his first term as mayor to contract with African Americans than the current mayor has done in twenty years." These were unabashed and deceitful racial appeals to black voters, and the flyer attempted to associate Sessoms with Obama and the so-called African Americans for Change.[14]

---

[14] The source for the fliers and their circulation is Vivian J. Page, "Illegal Fliers' Effect on VB Mayoral Election," All Politics is Local, 25 November 2008, https://blog.vivianpaige.com/2008/11/25/illegal-fliers-effect-on-vb-mayoral-election/comment-page-3/. A biography of Ms. Page can be found at https://www.facebook.com/YWCASHR/posts/lets-meet-our-honorees-vivian-j-paige-is-our-2017-women-of-distinction-honoree-i/10155074327349500/, when she was honored by the South Hampton Road, YWCA as "our 2017 Women of Distinction honoree in Communication."

33

**Picture 1: Flier Circulated During 2008 Campaign for Mayor in Virginia Beach**



**Picture 2: Flier Circulated During 2008 Campaign for Mayor in Virginia Beach**



**Factor 7: the extent to which members of the minority group have been elected to public office in the jurisdiction**.

Dr. Kidd's report does not dispute that minorities have trailed behind whites in their election to public office. He also does not dispute that the election of minority candidates during the pendency of a voting rights lawsuit is a special circumstance where, as in Virginia Beach, there has been a lack of prior minority representation on a governing body. Rather, he suggests that members of the city council and others within Virginia Beach may not have been aware of the lawsuit prior to the November 2018 election. The only evidence he presents in support of the supposition is an undisclosed email indicating that the counsel for defendants first briefed the city council on the lawsuit in January 2019.

Contrary to Kidd's supposition, the local media covered the lawsuit immediately after its filing nearly a year before the election on November 18, 2018, and continued coverage during the period prior to the 2018 election. Two members of the city council endorsed the lawsuit long before the 2018 election and in February 2018, the federal judge ordered the city to respond to the complaint:

* On November 20, 2017, three days after the filing of the lawsuit, *WTKR* reported, "Activist Files Lawsuit Against Virginia Beach for Violations of Voting Rights Act." *WTKR* noted that "Latasha Holloway alleges in her lawsuit that the city dilutes minority voting strength to promote white supremacy in the Virginia Beach City Council by using an at-large election system."[15]

* A day later on November 21, 2017, WAVY similarly reported "Virginia Beach Woman Files Lawsuit Files Legal Action Over City's Election System."[16]

* Three days later, on November 23, 2017, *The New Journal & Guide* likewise reported, "Suit Filed Opposes At-Large Elections in Virginia Beach."[17]

* On March 4, 2018 *The New Journal & Guide* headlined "Virginia Beach Must Respond to At-Large Voting Complaint." The article reported, "United States District Court Judge Arenda L. Wright Allen has ordered the city to answer political rights activist Latasha Holloway's lawsuit challenging the at-large method of electing the city council of Virginia Beach."[18]

* On October 2, 2018 the *Virginian-Pilot* published an article headlined "2 Virginia Beach

---

[15] "Activist Files Lawsuit Against Virginia Beach for Violations of Voting Rights Act." WTKR 20 November 2017, https://wtkr.com/2017/11/20/activist-files-lawsuit-against-virginia-beach-for-violations-of-voting-rights-act/.
[16] "Virginia Beach Woman Files Lawsuit Files Legal Action Over City's Election System," *WAVY*, 21 November 2017, https://www.wavy.com/news/virginia-beach-woman-files-legal-action-over-citys-election-system_201803260732334/1078257257. (link no longer active)
[17] "Suit Filed Opposes At-Large Elections in Virginia Beach," The New Journal & Guide, 23 November 2017, http://thenewjournalandguide.com/suit-filed-opposes-large-voting-virginia-beach/.
[18] "Virginia Beach Must Respond to At-Large Voting Complaint," The New Journal & Guide, 4 March 2018, http://thenewjournalandguide.com/virginia-beach-must-respond-large-voting-complaint/.

Council Members Want to Change the City's Election System." The article noted that "Two council members are among a group of residents challenging the city's election system, charging that it thwarts competition, favors wealth and special interests, and discourages diversity ... Virginia Beach council members Jessica Abbott and John Moss want the current election system to end."[19]

* On October 15, 2018 the *Virginian-Pilot* published an editorial headlined "A Push to Change Beach Voting." editorial noted, "An inability to provide for minority representation on the council led to a lawsuit last year arguing that the hybrid election system 'has the effect of unlawfully diluting or minimizing 'minority voting strength''' and violated the Voting Rights Act of 1965 and the U.S. Constitution." The editorial further noted, "There is no question that the Beach's manner of electing its municipal officials is a worthy subject for robust community debate. It's critical that the city make certain that every resident has a voice in governance."[20]

* Among its questions posed to 2018 candidates for city council in Virginia Beach the *Princess Anne Independent News* asked: "Voters from across the city select members of the city council, including members who represent district seats. Should the city consider another way of selecting members of the council, such as a ward system?"[21]

Long before the filing of the lawsuit, allegations that the at-large system for electing members of the city council and reform through a district system had been a matter of controversy in Virginia Beach. The October 2, 2018 article in the *Virginian-Pilot* noted that "*Six years ago, Moss and state Sen. Bill DeSteph, a former councilman, made a similar effort to end at-large voting districts but couldn't persuade most council members to get on board.*" (emphasis added) The March 4, 2018 article in *The New Journal and Guide* noted that, "Black leaders have complained for years  about Virginia Beach's system of  electing council but have failed to reform it." The following are examples of local media coverage of the controversy in the decade prior to the filing of the complaint:

* On October 12, 2008 the *Virginian-Pilot* published an article headlined "Wards Would Help Blacks Get Elected." The article said, "African American candidates would have a better chance of getting elected to the council if the city had a ward system, if more residents got involved in leadership boards, or if the black community came together to back one choice, those running for office told a gathering of the Hampton Roads Committee of 200+ Men Inc."[22]

* On November 16, 2008, the *Virginian-Pilot* published an article headlined "Black Leaders Discuss a Shift in Voting System." The article quotes African American Louisa Strayhorn, who

---

[19] Stacy Parker, "2 Virginia Beach Council Members Want to Change the City's Election System," *Virginian-Pilot*, 2 October 2018, https://pilotonline.com/news/government/local/article_5aea8b7a-c591-11e8-b572-3b015d1704d3.html.

[20] "A Push to Change Beach Voting," *Virginian-Pilot*, 18 October 2018, p. 8.

[21] "2018 Virginia Beach Elections: Questions for candidates for City Council, Bayside District," Answers posted: *Princess Anne Independent News*, 1 November 2018, http://princessanneindy.com/2018/11/01/2018-ccbayside-qa/.

[22] Deidre Fernandes, "Ward Would Help Blacks Get Elected," *Virginian-Pilot*, 12 October 2008, p. B1

lost her reelection bid in 1998 as saying that "It's not in their [the city council] best interests to change it. I have a feeling we're going to have to mount a campaign."[23]

* On September 6, 2009, the *Virginian-Pilot* headlined "Beach History of Race Relations." It reported that "As the city's minority population grew, the NAACP and some residents urged the City Council to redraw its election districts to create a more heavily minority voting ward, or at least alter the way candidates are elected. While seven of the 11 council members represent districts, they must win the citywide vote, too."[24]

* On February 6, 2010, the *Virginian-Pilot* published an article headlined "Filling a Seat at the Table." The article notes, "The city should, however, take a close look at how council seats are allocated. The system is a weird hybrid. Most cities have either an at-large system, ward system or mix of the two. In Virginia Beach, non-mayoral candidates run for three at-large seats or by district, but voters citywide get to pick the district representatives, too."[25]

Second, the Kidd report claims that whites in Virginia Beach interested in electing black candidates during the pendency of the lawsuit should have provided "across-the-board" support for all black candidates running in 2018, "Rouse, Bright, Wooten, & Wray." (Kidd Report, p. 38). However, such a strategy would have been irrational and counter-productive because it would have diluted support for the strongest candidates (Rouse and Wooten) and undercut an effort to elect these candidates to the city council. As indicated in Appendix I on overlapping candidacies, Bright was running against Rouse at-large in 2018 and Wray was running against Wooten in Centerville.

As part of the misguided notion that whites should have diluted their support among four candidates, Kidd notes that the four did not necessarily get strong support from white voters. A focus on Rouse and Wooten, however, tells a different story. Wooten was the only black candidate for city council in Virginia Beach since 2008 to win a majority of the white vote. As indicated in Table 11 of my initial report, she exceeded the average vote for ten other district candidates by 28 percentage points and 125 percent. Although Rouse did not garner a majority of the white vote in his multiple-seat, multiple-candidate race, Table 10 of my initial report indicated that he exceeded the average vote for ten other at-large candidates by 15 percentage point and 179 percent

Campaign finance reports further document the white focus on Rouse and Wooten, rather than Bright and Wray. Rouse raised $115,146 and as documented in my initial report, with the exception of fellow retired NFL player Bruce Smith, his major donations all came from whites. In contrast, Bright self-financed her campaign with loans of more than $60,000. Other contributions amounted to less than $6,000. Wooten raised $82,751 in 2018, with all major donations coming from whites. In contrast, Wray raised just $6,025. In addition, the Kidd report does not cite any

[23] John Warren, "Black Leaders Discuss a Shift in Voting System," *Virginian-Pilot*, 16 November 2008, p. 1.
[24] Deidre Fernandes, "Beach History of Race Relations," *Virginian-Pilot*, 6 September 2009, p. 1.
[25] "Filling a Seat at the Table." *Virginian-Pilot*, 6 February 2010, p. B7.

black candidates other than Rouse and Wooten who garnered substantial contributions from white donors.[26]

With respect to contributions by the five major donors in Virginia Beach (all white), the Kidd report fundamentally misunderstands my analysis. (Kidd Report, pp. 38-39). The point of my analysis was not to compare contributions to Rouse and Wooten in 2018 as compared to contributions to other candidates that year. The critical purpose of my analysis was to show that compared to their contribution record since 2008, the contributions by the five major donors to Rouse and Wooten were highly unusual for contributions by these donors to black candidates. This analysis, which the Kidd report does not address, demonstrates that these donors primarily contributed to white candidates from 2008 to 2018, with 18 white candidates receiving contributions as compared to just 4 black candidates. With the exceptions of Rouse and Wooten in 2018, the five donors combined contributed to only two other black candidates, both incumbents, Sherrod in 2011 and Ross-Hammond in 2016. Although not running as incumbents, Rouse and Wooten garnered more than two and a half times the dollar amount contributed by these donors to Sherrod and Ross-Hammond ($36,500 to $14,000).[27]

Moreover, in key ways the Kidd report actually supports the concentration of white donors on Rouse and Wooten. It makes a point of noting that Bright received no contributions from the major white donors. He further notes that "none of Rouse's top donors contributed to Bright's campaign" and that "only 2 of the top 10 contributors to Wooten's campaign for the Centerville District seat in 2018 also contributed to Bright." He also notes that "only 3 of Rouse's top donors also contributed to Wooten," but does not disclose that they were all among the five major white donors to city council campaigns in Virginia Beach. (Kidd Report, p. 39).

Kidd further suggests incorrectly that "the large-donor class appears to have behaved as they often do, which is to spread financial support around as widely as possible with an eye toward supporting candidates who they perceive as having the best chances of winning and who are most likely to support policies that they favor." He fails to note that in contradiction to the claim of widely spreading the money around, all five of the major donors contributed to both Rouse and Wooten, all in the amount of $1,000 or more. No other candidate in 2018 received contributions from all five major donors. Overall, the only other candidates to receive united financial support from all five of the major donors were white incumbent mayor Will Sessoms and white incumbent council member Rosemary Wilson in earlier elections. Kidd also provides no evidence to suggest that Rouse and Wooten uniquely favored the policies of all five major donors or that compared to other candidates from 2008 to 2018, they had the best chances of winning. In fact, Rouse's most prolific backer, Bruce Smith, is a Virginia Beach developer, who, as indicated in my initial report, has assailed the city for allegedly steering contracts disproportionately to whites and turning down his own projects.[28]

---

[26] Virginia Public Access Project, VPAP.org. For a detailed accounting of Bright's loans see, Virginia Department of Elections, Campaign Finance Reports, "Reports for Friends of Linda Bright,"
https://cfreports.elections.virginia.gov/Committee/Index/a71fe5b0-2ac0-e811-bffd-984be103f032.
[27] The analysis of campaign contributions is on initial Lichtman report, pp. 47, 50-54.
[28] See, also, Alissa Skelton, "NFL Hall of Famer Bruce Smith questions whether race played a part in denial of Oceanfront projects," Virginian-Pilot, 16 November 2016.

It is also worth noting that victory in one election may not accurately portray black electoral opportunities in Virginia Beach. Of the few African Americans who have won election to the Virginia Beach city council, none has ever won reelection. The last such defeat of an incumbent African American council member occurred recently, in 2016, with the loss of Ross-Hammond in the Kempsville District in 2016.

## II. Report of Dr. Peter Morrison

Although I was not involved in the census analysis for the construction of illustrative plans in this case, I have previously encountered Dr. Peter Morrison in two previous recent cases in which as in this litigation, he conducted an analysis of Census data for the scrutiny of districting plans. In these prior cases, I was directly involved in performing such an analysis, and assessing Dr. Morrison's analysis. As documented below, in both cases Dr. Morrison committed extreme, consequential errors that fundamentally undermined his conclusions. In both cases, Dr. Morrison worked on behalf of plaintiffs challenging congressional district plans in Maryland and in Dallas County, Texas, respectively. In addition to the examination of Dr. Morrison's factual errors that I encountered in this prior litigation, I will also probe a fundamental flaw in his claim that Dr. Anthony Fairfax's illustrative districts fail to provide a majority of blacks, Hispanics, and Asians combined.

## Maryland: Challenge to 2011 Congressional District Plan: *Benisek v. Lamone*, U.S. District Court, Maryland, Case No. 13-cv-3233

In this litigation, Dr. Morrison conducted a fine-grained analysis of census data as he did in the present case. In an attempt to demonstrate that the district under challenge in Maryland, Congressional District 6, under the 2011 plan, did not represent a community of interest, he stated that the 2011 plan split far more Census places than previously under the 2001 plan. This analysis, however, was based on fundamentally flawed data on the percentage of split Census Places in CD6 under the 2001 and 2011 plans. Based upon the correction of his data, the difference in split Census Places in prior CD6 under Maryland's 2001 plan compared to splits in CD6 under the state's 2011 plan was not 48 percentage points as Dr. Morrison previously claimed, but a *de minimis* 4 percentage points, a difference of 44 percentage points and 92 percent (44/48).[29]

Dr. Morrison admitted to these errors in that case and presented in a supplemental report what he called minor corrections of his initial errors, which he claimed did not alter his conclusions. These corrections, however, were far from minor.

---

https://pilotonline.com/news/government/local/article_7fd9bd2d-69f7-5cd5-b02a-2660f2c526ef.html.

[29] For a full explanation, see, *Benisek v. Lamone*, Second Supplemental Expert Report of Allan J. Lichtman, July 12, 2017.

Rather, as demonstrated in Table A1 (all tables are included in Appendix II to this report) the new data he presented on Census Places in Maryland CD6 under the 2001 and 2011 state congressional plans differs by many orders of magnitude from the data on which he relied for his conclusion in his opening report. As indicated in Table A1, in his supplemental declaration, Morrison identified 135 Census Places as falling wholly or partially within CD6 under the 2001 plan, compared to 35 Census Places that he identified in his opening report. This amounts to an additional 100 Census Places, for *an increase of 286 percent*. In his supplemental declaration, Morrison identified 122 Census Places as falling wholly or partially within CD6 under the 2011 plan, compared to 22 Census Places that he identified in his opening report. This amounts again to an additional 100 Census Places, but it results in *a much larger percentage increase of 455 percent.*

As indicated in Table A2, these corrections by Dr. Morrison in *Benisek v. Lamone* account for the reduction in the difference in split Census Places under the two plans from 48 percentage points in his opening report to 8 percentage points in his supplemental declaration. His 286-percent correction in the number of Census Places in CD6 under the 2001 plan reduces the percentage of split precincts from 11 percent to 3 percent. His much larger 455 percent correction in the number of Census Places in CD6 under the 2011 plan results in a far more substantial reduction in the percentage of split Census Places *from 59 percent to 11 percent*. These two corrections, as shown in Chart R10, explain the reduction in the difference in split Census Places from 48 percent to just 8 percent.

Despite the drastic reduction in any difference in split Census places between the 2001 and 2011 plans, Morrison made no changes in his dramatic finding of a "smoking gun" he initially drew from the flawed data. In fact, he simply plugged the new numbers into his prior language with no qualification of explanation:

**Morrison Opening Expert Report, Benisek, paragraph 145, page 68**

"The post-redistricting increase in non-intact Census places (from 11% to 59% of all places) is a "smoking gun" that exposes motives beyond simply rebalancing total population."

**Morrison Supplemental Expert Report, Benisek, paragraph 9, page 3**

"The post-redistricting increase in non-intact census places (from 3% to 11% of all places) is a "smoking gun" that exposes motives beyond simply rebalancing the total population."

Dr. Morrison purports to have presented in his supplemental report the correct number of Census Places in CD6 under the two plans. Consistent with his opening report, however, he provides no citations or sources for his corrected counts. These counts *even after the corrections* are still erroneous based on the U.S. Census data, that lists the number of Census Places in Maryland and identifies the congressional districts in which they are wholly or partially contained

41

**CHART R10: CHANGES IN DR. MORRISON'S ASSESSMENT OF CENSUS PLACE SPLITS FIRST AND CORRECTED REPORT, MARYLAND 2001 AND 2011 CONGRESSIONAL REDISTRICTING PLANS**



under the 2001 and 2011 Maryland congressional plans. In fact, even Dr. Morrison's corrected data was still highly inaccurate.

Dr. Morrison identified 135 Census Places as within CD6 under the 2001 plan, compared to the 75, according to Census data. Dr. Morrison did not identify the source of the data, but he purported to use data from the 111th Congress while the 108th Congress was the data available from the Census on its public website. Therefore, the source of his data for the 111th Congress was unclear, and it is also unclear whether he was using the definitions of census designated places under the 2000 Census or whether he was using definitions of census designated places that would be used in the 2010 Census. The boundaries of census designated places change over time. *See* U.S. Census Bureau, "Geographic Boundary Change Notes, Maryland," https://www.census.gov/geo/reference/bndrychange/changenotedisplay.php.

The 108th Congress was therefore the appropriate comparator as the version of the data that was publicly available, as it contained the congressional district boundaries for the 2001 plan, and the census designated place definitions closest in time to the ones that would have been known to the 2001 map-drawers in Maryland. Data from a later Congress that Dr. Morrison purported to use may not match the Census Places at the time of the redistricting and therefore was misleading.

By using non-public information related to the 111th Congress without specifying the date of the census designated place definitions in his corrected data, Dr. Morrison identified 135 Census Places as within CD6 under the 2001 plan. As indicated in Table A3, and Chart R10, this compares to the correct 75 Census Places according to Census data. He thus overstated the number of 2001 Census Places in CD6 by 60, for *an increase of 80 percent*. In his corrected data, Morrison identified 122 Census Places as within CD6 under the 2011 plan, compared to 147 according to Census data. Thus, for the 2011 plan, he understated not overstated the number of Census Places by 26, *for a decrease of 17 percent.*

As indicated in Table A4, and Chart R11, Dr. Morrison's *overstatement* of the number of Census Places in CD6 under the 2001 plan in his corrected data, resulted in an *understatement* of the percentage of split Census Places of 3 percent, compared to a corrected 5 percent, for *an increase of 2 percent*. In contrast, Dr. Morrison's *understatement* of the number of Census Places in CD6 under the 2011 plan in his supplemental declaration, resulted in an *overstatement* of the percentage of split Census Places of 11 percent, compared to a corrected 9 percent, for *a decrease of 2 percent.* Thus, his opposite and compounding errors, even in his corrected data, resulted in an overstatement of the difference in split precincts of 8 percentage points, compared to a correct *de minimis* difference of just 4 percentage points.

43

**CHART R11: ERRORS IN MORRISON'S *CORRECTED* NUMBERS OF CENSUS PLACES FOR MARYLAND CONGRESSIONAL 2001 AND 2011 PLANS**



Dr. Morrison also included in his count of split Census Places in the 2011 plan places that are not split in any consequential way. That is, no persons or a minimal number of persons are included in one side of the split. For example, the most important splits that he identified are the only cities split between CD6 and CD8 in the 2011 plan: Frederick and Rockville (no district other than CD8 borders CD6). However, a declaration submitted by Shelly Aprill of the Planning Data Analysis Unit of the Maryland Department of Planning, indicated that the CD6 side of the Frederick City split *contained no population* and the CD8 side of the Rockville City split contained *only 4 persons*. Just the elimination of these two splits from Dr. Morrison's tally of 13 split Census Places in CD6 under the 2011 plan would have reduced the percentage of split Census Places from 9 percent to 7 percent, just 2 percentage points more than the percentage of CD6 splits under the 2001 plan.[30]

These errors demonstrate that Dr. Morrison's analysis is unreliable.

**Dallas County Texas: Challenge to 2011 County Commission District Plan: *Harding v. Dallas County*, U.S. District Court, Northern District, Texas, Case No. Civ. No. 3:15-CV-131-D**

In parallel with his analyses in the Maryland litigation, Dr. Morrison analyzed for this case split precincts within the 2011 districting plan for the Dallas County Commissioners' Court. Here, his aim was to show that a large number of splits within Census designated municipalities showed that the plan failed to represent to communities of interest. As in the Maryland litigation, his analysis was again marked by extreme, consequential errors that fundamentally impacted his conclusions.[31]

Dr. Morrison indicated in his report to the Dallas County Court that he "tentatively identified 16 separate instances where commissioner district boundaries appear to split the boundaries of established cities." Morrison was not equivocal about the important impact of this finding: He termed this number of city splits "indefensible." Map 1 below and the official Texas Legislative Council (TLC) report of split cities in the 2011 Dallas County Commissioners Court plan provided the necessary information to test Dr. Morrison's assessment in that case. This information summarized in Table R10 demonstrates that Dr. Morrison's tally of city splits in the Dallas County case was highly inaccurate. The Table evaluates descriptions of each of the 16 splits provided to defendants in Dr. Morrison's data disclosure for the Dallas County litigation. The results presented in Table R10 indicate that, upon correction, there were not 16 splits that involve exchanges of population in the 2011 plan, but only 9 such splits. For 6 of the 16 splits that Dr. Morrison identified, there was no exchange of population (splits #s 1,2,4,5,6, and 16). This includes one split (# 6) that involves only water, not people. The actual 9 splits were fewer than the 12 splits in his own alternative plan, drawn without any of the constraints incumbent on any political body.

---

[30] *Benisek v. Lamone*, Declaration of Shelly Aprill, June 29, 2017, p. 2.
[31] For a full explication see, *Harding v. Dallas County*, Rebuttal Report of Dr. Allan J. Lichtman, October 13, 2017.

**Table R10**
**Analysis of the 16 Splits of Cities in the 2011 Dallas County Commissioners Court Redistricting Map Alleged in the Morrison First Report**

| Split Described in Morrison Data Disclosure | Analysis of the Purported Split |
|---|---|
| 1. District 3 reaching into Grand Prairie | Error: District 3 under the current map does not include any population from Grand Prairie. |
| 2. District 3 reaching into Grand Prairie a second time | Error: District 3 under the current map does not include any population from Grand Prairie. |
| 3. District 3 reaching into Southwest Dallas | Correct |
| 4. District 4 reaching down into Cedar Hill | Error: District 4 under the current map does not include any population from Cedar Hill. |
| 5. District 3 reaching up into Southwest Dallas | Error: The area identified is water, part of Joe Pool Lake, and does not include any population. |
| 6. District 1 reaching into Balch Springs | Error: District 1 does not include any population from Balch Springs. |
| 7. District 1 reaching into Mesquite | Correct |
| 8. District 3 reaching into Eastern Garland | Correct |
| 9. District 2 reaching from Rowlett into Southeast Garland | Correct |
| 10. District 2 avoiding Southern, Western, and Central Garland | Correct: With caveat that it is difficult to determine the exact meaning of "avoiding." |
| 11. District 1 reaching into Garland, but avoiding Eastern Garland | Error: Duplicates splits described in # 8 and #9. |
| 12. District 1 reaching into Richardson | Correct |
| 13. District 1 reaching west of Richardson into North Dallas | Correct |
| 14. District 2 reaching out of Farmers Branch into West Dallas | Correct |
| 15. District 2 reaching from Coppell and Addison into Irving | Correct |
| 16. District 2 reaching from Coppell and Addison into Irving | Error: District 4 does not include any population from Coppell. |
| | |
| Source: Maps and Texas Legislative Council (TLC) report of Split cities. | |

46

## Map 1
## Overlay of County Commissioners Court Districts on Dallas County With Morrison Errors Circled



Morrison's erroneous city splits were all documented in the TLC report of split precincts and circled in Map 1, above. (TLC reports are used in Texas litigation and are relied upon by federal courts). In addition, split # 11 duplicates splits #s 8 and 9. Thus, Dr. Morrison *inflated by 78 percent*, from 9 to 16, the number of splits in the 2011 Dallas County redistricting plan. Moreover, even the 9 alleged splits exaggerated the realistic tally of split cities in the current map, because they included splits in the city of Dallas. The City of Dallas had to be split in any County redistricting plan because its population is so large. According to the maps and the TLC split city report, there are only 5 city splits in the 2011map (Garland twice, Irving, Mesquite, and Richardson).

Dr. Morrison also highlighted four city splits as of special significance in his report in the *Harding v. Dallas County* case:

"1. The northeastern portion of Irving (circled in red): An area has been amputated from this city and included instead in a different district (D2, shown in blue).

2. A tiny northern portion of Cockrell Hill (circled in red): This area has been amputated from this city and included as well in a different district (D2, shown in blue).

3. A southern part of Richardson (circled in red): This area has been amputated from this city and included instead in District 1, shown in brown.

4. A southeast portion of Garland (circled in red): This area has been separated off and included in District 2 (shown in blue)."

Morrison said in the Dallas County case that "This exchange of territory" had "the obvious effect of shifting predominately White areas within each city *into* Commissioner District 2" and "the obvious effect of shifting areas that are less heavily White *out* of District 2." These exchanges, he states, were indicative of a "packing" of whites into District 2. (p. 9, emphasis in original)

Once again, Dr. Morrison's analysis had a serious, consequential error. The results were not at all obvious. Cockrell Hill was not split at all. The red dot to which he referred on the map in his report was not a city split, but simply represented the residence of Dallas County Commissioner John Wiley Price, who is African American. Dr. Morrison failed to explain why he singled out the residence of the only African American member of the Commissioners' Court. Thus, one of the four alleged splits that Dr. Morrison highlighted as of special significance in his report does not exist.

Dr. Morrison indicated in his deposition in the Dallas County case that he had not fully checked or verified this crucial analysis of split precincts prior to submitting his report to the court in that case and concluding that the number of splits was "indefensible." He implausibly stated that even if his analysis was "completely flawed and misunderstood on my part," it wouldn't have changed his conclusion. As he testified at trial:

> **Morrison**: And I am still at a stage of needing to verify where those splits are. I've not completed that analysis. And I'm not entirely sure that all ·of

the splits that I've identified are where they appear to be. And I'm not entirely sure I've perfectly approximated them.

**Question:** Isn't that though -- that analysis and process -- isn't that, sort of, the keystone to your conclusion that the enacted map split too many precincts or cities?

**Morrison:** It's not a keystone conclusion; it's a peripheral issue. I'm saying that -- well, let me put it this way. I haven't yet completed that analysis, so I'm going to say that analysis is still in the works. *My opinion would not change if that analysis proved to be completely flawed and misunderstood on my part in terms of the boundaries that I see.* (emphasis added)[32]

Even at the time of trial, Dr. Morrison did not produce a corrected and verified report of city splits. Referring back to his November 8, 2017 deposition, Dr. Morrison was asked the following at trial. As the expert analyzing Dr. Morrison's work in that case, I attended both the deposition and the trial:

**Question:** "And at some point did you produce a subsequent report that does accurately approximate them [City splits] and identify them and verify them for us. Isn't that true."

**Morrison:** "I didn't feel it was necessary to do any further --."

**Question:** "I'm sure you have an explanation, sir."

**Morrison:** "No I did not."

**Question:** "Did you produce a report or not?"

**Morrison:** "Pardon me."

**Question:** "Did you produce a report and provide us your verified list which you had not done on November 8?"

**Morrison:** No, I did not.[33]

In addition, there was the following relevant exchange:

**Question:** "Is there any quality social science journal that would produce this as a peer-reviewed work at the level that you've done at this point, unverified and unfinished?"

[32] *Harding v. Dallas County*, Deposition of Dr. Peter A. Morrison, p. 131, l. 19-22, 132, l. 1-14.
[33] *Harding v. Dallas County*, Trial Transcript, 16 April 2018, Vol. 2 Tr. at 26:9-219:5, p. 102, l. 12-22.

49

**Morrison**: "Before I submitted it to a journal, which I intend to do, I would very likely want to take a look at these and verify them – or at least say the ones that I'm confident of now illustrate how one goes about identifying the statistical footprint of intent."

**Question**: "The court was entitled to that courtesy?"

**Morrison**: "I don't regard it as a courtesy. I regard it as a peripheral issue at this point from the court's standpoint."[34]

The only other issue I consider in response to the Morrison report in this litigation relates to his critical bottom-line conclusion. Based on his own construction of Census data, Morrison concludes that the two districts in the illustrative plan of Dr. Anthony E. Fairfax fall just short of the 50% threshold. Morrison writes on p.2 of his report: "Specifically, I obtain 49.99% for his District 1 (vs. Fairfax's 50.03%) and 49.96% for his District 2 (vs. Fairfax's 50.04%)." As a result, he claims that the illustrative plan fails to satisfy Prong One of the three-part *Gingles* test.

Even taking Dr. Morrison's results at face value, they fail to show that the Fairfax's illustrative plan fails to meet Prong One of the *Gingles* test, because Dr. Morrison is relying on 2013 – 2017 Census data, with a midpoint of 2015. What Dr. Morrison fails to acknowledge is that the percentage of the white population in Virginia Beach has been shrinking and the percentage of the minority population has been rising.

Table 3 of the Fairfax report demonstrates that from the Census estimates of 2008-2012, midpoint 2010, to the estimates of 2013-2017, midpoint 2015, the white CVAP of Virginia Beach shrank by 2.3 percentage points. In contrast, the combined black, Hispanic, and Asian CVAP rose by a 1.55 percent. If these trends are even roughly approximated over the next five years than even by Dr. Morrison's calculations districts at 49.99% and 49.96% combined black, Hispanic, and Asian CVAP (which round to 50%) would surely rise above the 50% mark by 2019 and 2020, the time of the next municipal election in Virginia Beach.

Population projections confirm the continuation of this trend toward greater diversity in Virginia Beach through a shrinking white percentage and a rising black, Hispanic, and Asian percentage. As indicated in Figure 1 below, the USA Today diversity index, computed by Proximity One for Virginia Beach, has been rising steadily and is projected to continue to rise through 2020 and beyond.[35]

Furthermore, in order to meet *Gingles* Prong 1, plaintiffs merely need to establish that minorities constitute a majority in *a* single member district. Thus, an illustrative plan showing a substantial majority in at least one district would meet Prong 1. Moreover, Dr. Spencer has

---

[34] Ibid., p. 104, l. 4-15.
[35] Proximity One, USA Today Diversity Index, Virginia Beach, VA, http://proximityone.com/county_diversity_1960_2060.htm#diversity.

produced reconstituted election results showing minority voters would enjoy an effective opportunity to elect candidates of their choice under the illustrative plan's Districts 1 and 2.

**Conclusions:**

In sum, the Kidd report addresses only a limited number of the factors relevant to the totality of circumstances confronting minorities in Virginia Beach that were analyzed in my initial July 15, 2019 report. His consideration of the remaining factors fails to undermine any of the conclusions of my initial report. Even using his own standards, voting is clearly polarized along racial lines in Virginia Beach. The eight black candidates, garnering more than 50 percent of the black vote, for which Kidd concedes black voter cohesion, averaged 81.9 percent black voter support and 22.0 percent white voter support for a polarization level of 59.9 percent. In elections for 13 positions in which black candidates competed (excluding withdrawn candidate Burton) from 2008 to 2014 11 black candidates were the candidate of choice of black voters. Only 3 of these candidates prevailed and only one before the pendency of the lawsuit.

In numerous ways the unique hybrid system of electing members of the city council in Virginia Beach burdens minorities. The Kidd report ignores the unique use of numbered or designated posts in Virginia Beach. Such a system that precludes single-shot voting is a long established mechanism for discriminating against minorities and is unique to Virginia Beach among Commonwealth cities. Criticism of the system has long been covered in the local press. According to data that Kidd does not dispute, there are two other discriminatory features of the Virginia Beach electoral system. The city tied for second in the largest area and first in the largest population for campaigning for city council among 12 other large cities in the Commonwealth. The Kidd report concedes that the Illustrative Plan would reduce the geographic area and population for city council campaigning in Virginia Beach by 90 percent. The Illustrative Plan would move Virginia Beach to near the middle of the distribution in geographic area and near the bottom in population.

The Kidd report accepts contributions by candidates to other candidates as an informal form of slating and his standard of examining only intra-election contributions (although flawed) only strengthens the finding that such slating heavily favors white over black candidates. Seven white candidates and no black candidates competing for city council positions in Virginia Beach from 2008 to 2018 garnered contributions from two or more other intra-election candidates.

The Kidd report's attempt to diminish turnout differences between whites and the three minority groups in Virginia Beach is flawed by his reliance on self-reported statewide data, even though he had available the information needed to estimate white and minority turnout for Virginia Beach. Yet even his own source of statewide data, when properly analyzed shows that with one minor exception, turnout by all three minority groups trailed white turnout, a pattern that cannot be explained by chance variation. The Kidd report also ignores the information on statewide registration rates contained in his data disclosure. Examination of this data shows that all three minority groups universally trailed whites in their registration rates. The overall pattern cannot be explained by chance variation and half the differences for individual groups and years fell outside the margins of error. Examination of actual precinct-level turnout and demographic

51

data for the precincts of Virginia Beach provided in the Kidd data disclosure shows that black voters and other minority voters substantially lagged behind whites in voter turnout for Virginia Beach elections in 2018 and 2016.

Finally, the Kidd report acknowledges that the election of minorities to a governing body during the pendency of a lawsuit can be a special circumstance. However, his attempts to show otherwise for the elections of black candidates Rouse and Wooten in 2018 are unavailing. Contrary to Kidd's assertion, the lawsuit was covered widely in the local media well prior to the 2018 election. Prior to the election, it was a matter of commentary by members of the city council and the subject of a judicial order. Controversy over the system for electing members of the city council and proposed reforms had been a matter of lively controversy in the city long before the lawsuit. In addition, the Kidd report does not present any evidence to refute the findings of my July 15, 2019 report that as compared to all prior black candidates for city council, Rouse and Wooten received highly unusual support from both white donors and white voters -- standard indicia of special circumstances.

With respect to the Morrison report, any claims on his part should be regarded with caution given my recounting of the experiences when I was an opposing expert in the Maryland partisan gerrymandering and the Dallas County voting rights litigation. In addition, Dr. Morrison's claims about the failure of illustrative districts to reach the 50%+ combined black, Hispanic, and Asian threshold is fatally flawed by his failure to consider demographic trends within Virginia Beach showing a rising combined minority and a falling white share of the citizen voting age population.

52

## FIGURE 1 USA DIVERSITY INDEX, PROJECTIONS, VIRGINIA BEACH, PROXIMITY ONE

VIRGINIA BEACH
*VA*



# APPENDIX

## APPENDIX I: OVERLAPPING CANDIDACIES, VIRGINIA BEACH CITY COUNCIL ELECTIONS, 2008-2018

November 4, 2008 General and Special Elections City of Virginia Beach - Official Results Mayor: John D. Moss Meyera E. Oberndorf W. D. Sessoms, Jr Scott W. Taylor

At Large: Georgia F. Allen Leona M. Shuler Keith J. Strausbaugh Lawrence J. Teator Rosemary A. Wilson

CENTERVILLE: Robert M. Dyer, Kempsville: Harry E. Diezel Jose P. Flores Iii Andrew R. Jackson Rose Hall: Glenn R. Davis Reba S. Mcclanan

November 2, 2010 General and Special Elections City of Virginia Beach - Official Results Member City Council - At Large: R S Bellitto J D Cabiness Ii B R Desteph Jr W W Erb A R Jackson J D Moss D S Redmond

BAYSIDE: G Furman Iii L R Jones, Beach: S J E Uhrin, Lynnhaven: J T Hedrick J L Wood, Princess Anne: T J Bullock B M Henley

Commonwealth of Virginia, 11/8/2011 - Election Results for 2011 November General: At Large: Dennis E. Free Mike P. Makala  John D. Moss Prescott Sherrod

November 6, 2012 General and Special Elections City of Virginia Beach - Official Results Mayor: Walter W. Erb Richard W. Kowalewitch W. D. Sessoms, Jr.

At Large: Kenny E. Golden, Rosemary A. Wilson

CENTERVILLE: Robert M. Dyer, KEMPSVILLE: Bill J. Dale Amelia N. Ross-Hammond C. L. Smith, A. M. Weeks, ROSE HALL: Glenn R. Davis, Jr. David M. McCormick

Commonwealth of Virginia Official Results 2014 November General, At Large: M. Ben Davenport George Furman III Brad D. Martin John D. Moss

BAYSIDE: Louis R. Jones, BEACH: John E. Uhrin, LYNNHAVEN: James L. Wood, PRINCESS ANNE: Pieri E. Burton Barbara M. Henley, ROSE HALL: Beatrice R. "Petey" Browder James D. Cabiness II Stephen A. Johnston Shannon D.S. Kane

COMMONWEALTH OF VIRGINIA Official Results 2016 November General, Mayor: George Furman III (I) Richard W. "RK" Kowalewitch (I) W. D. "Will" Sessoms, Jr. A. M. "Don" Weeks

54

At Large: Dane U. Blythe Courtney L. LaLonde Rosemary A. Wilson Pam D. Witham,

CENTERVILLE: Robert M. "Bobby" Dyer, KEMPSVILLE: Jessica P. Abbott Amelia N. Ross-Hammond, ROSE HALL: Robert K. Dean Shannon D. S. Kane

COMMONWEALTH OF VIRGINIA Official Results, 2018 November General, Mayor: M. Ben Davenport Robert M. "Bobby" Dyer

At Large: Linda M. Bright  Garry B. Hubbard John D. Moss Dee B. Oliver Aaron R. Rouse Allison M. White

BAYSIDE: Louis R. Jones Brad D. Martin, BEACH: John E. Coker Richard W. "RK" Kowalewitch David Nygaard  John E. Uhrin, CENTERVILLE: C. Conrad Schesventer II Sabrina D. Wooten Eric V. Wray, Jr, LYNNHAVEN: Susanne M. Henderson Michael P. "Mike" Maskell James L. "Jim" Wood, PRINCESS ANNE: Pieri Evan Burton Barbara M. Henley Karen B. Kwasny Tim P. Worst

Source: Virginia Beach, Election Information & Results, https://www.vbgov.com/government/departments/voter-registrar/elections/pages/default.aspx

## APPENDIX II: TABLES INDICATING MORRISON ERRORS IN *BENISEK V. LAMONE.*

### TABLE A1
### DATA IN MORRISON OPENING REPORTED COMPARED TO DATA IN SUPPLEMENTAL DECLARATION

| Number of Census Places in CD6 in Maryland's 2001 Congressional Plan | | | |
|---|---|---|---|
| **Morrison Supplemental Declaration** | **Morrison Opening Report** | **Difference in Number** | **Difference in Percent** |
| 100 | 35 | **100** | **+286%** |
| **Number of Census Places in CD6 in Maryland's 2011 Congressional Plan** | | | |
| **Morrison Supplemental Declaration** | **Morrison Opening Report** | **Difference in Number** | **Difference in Percent** |
| 122 | 122 | **100** | **+455%** |
| Sources: Morrison Opening Report, Table 3, p. 67; Morrison Supplemental Declaration, Unnumbered Table, p 3. | | | |

**TABLE A2**

**THE PERCENTAGE OF SPLIT PRECINCTS IN THE 2001 AND 2011 CONGRESSIONAL PLANS, MORRISON SUPPLEMENTAL DECLARATION COMPARED TO CORRECT DATA**

| Morrison Opening Report | | | | | | |
|---|---|---|---|---|---|---|
| # of Census Places 2001 Plan | # of Split Places 2001 Plan | % of Split Places 2001 Plan | # of Census Place 2011 Plan | # of Split Places 2011 Plan | % of Split Places 2011 Plan | Difference In Percentage Points |
| 35 | 4 | 11% | 22 | 13 | 59% | +48% |
| Morrison Supplemental Declaration | | | | | | |
| # of Census Places 2011 Plan | # of Split Places 2001 Plan | % of Split Places 2001 Plan | # of Census Place 2011 Plan | # of Split Places 2011 Plan | % of Split Places 2011 Plan | Difference In Percentage Points |
| 135 | 4 | 3% | 122 | 13 | 11% | +8% |
| Sources: Morrison Opening Report, Table 3, p. 67; Morrison Supplemental Declaration, Unnumbered Table, p 3. | | | | | | |

57

**TABLE A3**
**DATA IN MORRISON SUPPLEMENTAL DECLARATION COMPARED TO CORRECTED DATA**

| Number of Census Places in CD6 in Maryland's 2001 Congressional Plan | | | |
|---|---|---|---|
| Data From Census Report | Data in Morrison Supplemental Declaration | Difference in Number | Difference in Percent |
| 75 | 135 | 60 | +80% |
| **Number of Census Places in CD6 in Maryland's 2011 Congressional Plan** | | | |
| Data From Census Report | Data in Morrison Supplemental Declaration | Difference in Number | Difference in Percent |
| 147 | 122 | 25 | -17% |
| Sources: Morrison Supplemental Declaration, Unnumbered Table, p 3; MARYLAND CONGRESSIONAL DISTRICTS BY PLACE," 108th Congress, https://www2.census.gov/geo/relfiles/cd108th/MD/plc_c8_24.txt; ; MARYLAND CONGRESSIONAL DISTRICTS BY PLACE," 113th Congress, https://www2.census.gov/geo/relfiles/cdsld13/24/pl_cd_24.txt. | | | |

3

**TABLE A4**
**PERCENT OF SPLIT CENSUS PLACES: DATA IN MORRISON SUPPLEMENTAL DECLARATION COMPARED TO CORRECTED DATA**

| Data in Morrison Supp. Declaration 2001 Plan | | Corrected Data 2001 Plan | | Comparison |
|---|---|---|---|---|
| # of Census Places | % of Split Census Places (4/135) | # of Census Places | % of Split Census Places (4/75) | Difference |
| | | | | |
| 135 | 3% | 75 | 5% | +2% |
| | | | | |
| | | | | |
| # of Census Places | % of Split Census Places (13/122) | # of Census Places | % of Split Census Places (13/147) | Difference |
| | | | | |
| 122 | 11% | 147 | 9% | -2% |
| | | | | |
| Sources: Morrison Supplemental Declaration, Unnumbered Table, p 3; MARYLAND CONGRESSIONAL DISTRICTS BY PLACE," 108th Congress, https://www2.census.gov/geo/relfiles/cd108th/MD/plc_c8_24.txt; ; MARYLAND CONGRESSIONAL DISTRICTS BY PLACE," 113th Congress, https://www2.census.gov/geo/relfiles/cdsld13/24/pl_cd_24.txt. | | | | |

## ALLAN J. LICHTMAN, CASES (DATES APPROXIMATE)
## DEPOSITION, AFFIDAVIT, OR ORAL TESTIMONY

Jason Gonzalez v. Michael J. Madigan (U.S. District Court for the Northern District of Illinois), 2019

Anne Harding v. County of Dallas, (U.S. District Court for the Northern District of Texas), 2018

Pico Neighborhood Association v. Santa Monica (State Superior Court, California), 2018

Benisek v. Lamone, (U.S. District Court, Maryland), 2017

Arizona Democratic Party v. Reagan (U.S. District Court, Arizona), 2017

Perez v. Abbott (U.S. District Court for the Western District of Texas), 2017

Terrebonne Parish NAACP v. Jindal (U.S. District Court for the Middle District of Louisiana), 2017

Feldman v. Arizona Secretary of State (U.S. District Court for the District of Arizona), 2016, 2017

Covington v. North Carolina (U. S. District Court Middle District of North Carolina) 2016

One Wisconsin Institute v. Nichols (United States District Court for the Western District of Wisconsin) 2016

Lee v. Virginia State Board of Elections (United States District Court for the Eastern District of Virginia) 2016

League of Women Voters v. Detzner, (Circuit Court for the Second Judicial Circuit, Leon County) 2015

North Carolina State Conference of the NAACP v. McCrory (U. S. District Court Middle District of North Carolina) 2015

Veasey v. Perry (U. S. District Court, Southern District of Texas, Corpus Christi Div.) 2014

Newton, et al. vs. Alabama (U. S. District Court, Alabama) 2013

North Carolina NAACP v. North Carolina (State Superior Court, North Carolina) 2013

Texas v. United States (Voter ID) (U. S. District Court, District of Columbia) 2012

Texas v. United States (Redistricting) (U. S. District Court, District of Columbia) 2012



Coalition for Equity and Excellence in Higher Education v. Maryland Higher Education Committee, et al. (U. S. District Court, Maryland) 2012, Remedy 2017.

Radogno, et al. v. Illinois State Board of Elections, et al. (U.S. District Court, Illinois) 2011

Committee for a Fair and Balanced Map, et al. v. Illinois State Board of Elections, et al. (U.S. District Court, Illinois) 2011

Perez, et al. v. Perry, et al. (U. S. District Court, Texas) 2011

United States vs. Demario James Atwater (U. S. District Court, North Carolina) 2010

Boddie v. Cleveland School Board, Mississippi (U.S. District Court, Mississippi) 2010

Esther V. Madera Unified School District (Superior Court, California) 2008

Negron v. Bethlehem Area School District (U.S. District Court, Pennsylvania) 2008

Farley v. City of Hattiesburg (U.S. District Court, Mississippi) 2008

Jamison v. City of Tupelo (U.S. District Court, Mississippi) 2005

Session v. Perry (U.S. District Court, Texas) 2003

Rodriguez v. Pataki (U.S. District Court, New York) 2003

Boddie v. Cleveland, Mississippi (U.S. District Court, Mississippi) 2003

Levy v. Miami-Dade County (U.S. District Court, Florida) 2002

Martinez v. Bush (U.S. District Court, Florida) 2002

Curry v. Glendening (Maryland, State Court) 2002

O'Lear v. Miller (U.S. District Court, Michigan) 2002

Campuzano v. Illinois Board of Election (U.S. District Court, Illinois) 2002

Vieth v. Commonwealth of Pennsylvania (U.S. District Court, Pennsylvania) 2002

Leroux v. Miller (Michigan, State Supreme Court) 2002

Balderas v. State of Texas (U.S. District Court, Texas) 2001

Del Rio v. Perry (Texas, State Court) 2001

Page V. Bartels (U.S. District Court, New Jersey) 2001

West v. Gilmore (Virginia, State Court), 2001

U.S. v. City of Santa Paula (California, U.S. District Court) 2001

NAACP v. Fordice (Mississippi, U.S. District Court) 2000

Voting Integrity Project v. Marc Fleisher (Arizona, U.S. District Court) 2000

Packingham v. Metropolitan Dade County (U.S. District Court, Florida) 1999

Houston v. Lafayette County (U.S. District Court, Northern District of Mississippi, Western District) 1991, 1998

Citizens to Establish a Reform Party in Arkansas v. Sharon Priest (U.S. District Court, Eastern District of Arkansas) 1996

National Coalition v. Glendening (U.S. District Court, Maryland) 1996

Vecinos de Barrio Uno v. Holyoke (U.S. District Court, Massachusetts), 1996

Scott v. Florida Senate (U.S. District Court, Middle District of Florida) 1995

King v. Board of Elections (U.S. District Court, Northern District of Illinois) 1995

Vera v. Richards (U.S. District Court, Southern District of Texas) 1994

United States v. Jones (U.S. District Court, Southern District of Alabama) 1994

Johnson v. Miller (U.S. District Court, Southern District of Georgia, Augusta Division) 1994

Hays v. Louisiana (U.S. District Court, Western District of Louisiana, Shreveport Division) 1993

People Who Care v. Rockford Board of Education (U.S. District Court, Northern District of Illinois, Eastern Division) 1993

Republican Party of North Carolina v. Hunt (U.S. District Court, Eastern District of North Carolina, Raleigh District) 1993

Shaw v. Hunt (U.S. District Court, Eastern District of North Carolina, Raleigh District) 1993

Neff v. Austin (State of Michigan, Supreme Court) 1992

Terrazas v. Slagle (U.S. District Court, Western District of Texas, Austin Division) 1992

Gonzalez v. Monterey County (U.S. District Court, Northern District of California) 1992

DeGrandy v. Wetherell (U.S. District Court, Northern District of Florida, Tallahassee Division) 1992

NAACP v. Austin (U.S. District Court, Eastern District of Michigan, Eastern Division) 1992

Good v. Austin (U.S. District Court, Eastern District of Michigan, Southern Division) 1992

Ortiz v. City of Philadelphia (U.S. District Court, Eastern District of Pennsylvania) 1991-1993

FAIR v. Weprin (U.S. District Court, Northern District, of New York) 1992

Davis v. Chiles (U.S. District Court, Northern District of Florida) 1991

McDaniels v. Mehfoud (U.S. District Court, Eastern District of Virginia) 1991

Rollins v. Dallas County Commission  (U.S. District Court, Southern District of Alabama) 1991-1992

Ward v. Columbus County (U.S. District Court, Eastern District of North Carolina) 1991

Republican Party State Committee v. Michael J. Connolly (U.S. District Court, Massachusetts) 1991

Jenkins v. Red Clay Consolidated School District (U.S. District Court, District of Delaware) 1991

Watkins v. Mabus (U.S. District Court, Southern District of Mississippi) 1991

Mena v. Richards (Hidalgo County Texas District Court) 1991

Republican Party of Virginia v. Wilder (U.S. District Court, Western District of Virginia) 1991

Nipper v. Chiles (U.S. District Court, Middle District of Florida) 1991-1994

Smith v. Board of Superivsors of Brunswick County (U.S. District Court, Eastern District of Virginia) 1991-1992

New Alliance Party v. Hand (U.S. District Court, Alabama) 1990

Concerned Citizens v. Hardee County (U.S. District Court, Florida) 1990

United Parents Association v. NYC Board of Elections (U.S. District Court, New York) 1990

Garza v. County of Los Angeles (U.S. District Court, California) 1990

Person v. Moore County (U.S. District Court, Middle District of North Carolina, Rockingham Division) 1989

Ewing v. Monroe County (U.S. District Court, Northern District of Mississippi) 1989

White v. Daniel (U.S. District Court, Eastern District of Virginia) 1989

Gunn v. Chickasaw County (U.S. District Court, Mississippi) 1989

SCLC v. State of Alabama (U.S. District Court, Middle District of Alabama, Northern Division) 1989-1995

Bradford County NAACP v. City of Starke (U.S. District Court, Middle District of Florida) 1988

PUSH v. Allain (U.S. District Court, Mississippi) 1988

Baltimore Neighborhoods, Inc. v. C.F. Sauers (U.S. District Court, Maryland) 1988

United States v. Wicomico County (U.S. District Court, Maryland) 1988

Metropolitan Pittsburgh Crusade v. City of Pittsburgh (U.S. District Court, Western District of Pennsylvania) 1987

McNeil v. City of Springfield (U.S. District Court, Central District of Illinois) 1987

Harper v. City of Chicago Heights (U.S. District Court, Northern District of Illinois) 1987-1993

Robinson v. City of Cleveland (U.S. District Court, Delta District of Mississippi) 1987

Martin v. Allain (U.S. District Court, Southern District of Mississippi) 1987

Smith v. Clinton (U.S. District Court, Eastern District of Arkansas) 1987

Burrell v. Allain (U.S. District Court, Southern District, of Mississippi) 1986

United States v. Dallas County (U.S. District Court, Southern District of Alabama) 1986

United States v. Marengo County (U.S. District Court, Southern District of Alabama) 1986

Jordan v. City of Greenwood (U.S. District Court, Mississippi) 1984

Johnson v. Halifax County (U.S. District Court, Eastern District of North Carolina) 1984

Anderson v. Celebreeze (U.S. District Court, Ohio) 1980

# Curriculum Vitae

Allan J. Lichtman
9219 Villa Dr.
Bethesda, MD 20817

(240) 498-8738 h
(202) 885-2411 o

## EDUCATION

BA, Brandeis University, Phi Beta Kappa, Magna Cum Laude, 1967

PhD, Harvard University, Graduate Prize Fellow, 1973

## PROFESSIONAL EXPERIENCE

Teaching Fellow, American History, Harvard University, 1969-73

Instructor, Brandeis University, 1970, quantitative history.

Assistant Professor of History, American University, 1973-1977

Associate Professor of History, American University, 1977-1978

Professor of History, American University, 1979 –

Distinguished Professor, 2011 -

Expert witness in more than 90 redistricting, voting rights and civil rights cases

Associate Dean for Faculty and Curricular Development, College of Arts & Sciences, The American University 1985-1987

Chair, Department of History, American University, 1997- 2001

Regular political analyst for CNN Headline News, 2003-2006

## HONORS AND AWARDS

Outstanding Teacher, College of Arts and Sciences, 1975-76

Outstanding Scholar, College of Arts and Sciences, 1978-79

Outstanding Scholar, The American University, 1982-83

1



Outstanding Scholar/Teacher, The American University, 1992-93 (Highest University faculty award)

Sherman Fairchild Distinguished Visiting Scholar, California Institute of Technology, 1980-81

American University summer research grant, 1978 & 1982

Chamber of Commerce, Outstanding Young Men of America 1979-80

Graduate Student Council, American University, Faculty Award, 1982

Top Speaker Award, National Convention of the International Platform Association, 1983, 1984, 1987

National Age Group Champion (30-34) 3000-meter steeplechase 1979

Eastern Region Age Group Champion (30-34) 1500 meter run 1979

Defeated twenty opponents on nationally syndicated quiz show, TIC TAC DOUGH, 1981

Listing in Marquis, WHO'S WHO IN THE AMERICA AND WHO'S WHO IN THE WORLD

McDonnell Foundation, Prediction of Complex Systems ($50,000, three years), 2003-2005

Organization of American Historians, Distinguished Lecturer, 2004 -

Selected by the Teaching Company as one of America's Super Star Teachers."

Associate Editor, International Journal of Operations Research and Information Systems, 2008 -

Keynote Speaker, International Forecasting Summit, 2007 and 2008

Cited authoritatively by United States Supreme Court in statewide Texas Congressional redistricting case *LULAC v. Perry* (2006)

Interviews nominated by the Associated Press for the Edward R. Murrow Award for broadcasting excellence.

WHITE PROTESTANT NATION: THE RISE OF THE AMERICAN CONSERVATIVE MOVEMENT: Finalist for the 2008 National Book Critics Circle Award in general nonfiction.

Elected Member, PEN American Center, 2009

Appointed Distinguished Professor, 2011

FDR AND THE JEWS: Designated for Belknap Imprint of the Harvard University Press,

2

reserved for works of special distinction and lasting value; *New York Times* editors' choice book for 2013, submitted for Pulitzer Prize 2013, winner of Tikkun Olam Award for Holocaust Studies, winner of National Jewish Book Award in American Jewish Studies, finalist for Los Angeles Times Book Award in History.

THE CASE FOR IMPEACHMENT: Independent bookstore bestseller, Amazon.com bestseller in several academic categories, *Newsweek*, best new book releases, April 18, 2017.

Winner of the Alfred Nelson Marquis Life Time Achievement Award for top 5% of persons included in Marquis WHO'S WHO, 2018.

Listed by rise.global as # 85 among 100 most influential geopolitical experts in the world.

**SCHOLARSHIP**

A. Books

PREJUDICE AND THE OLD POLITICS: THE PRESIDENTIAL ELECTION OF 1928 (Chapel Hill: University of North Carolina Press, 1979)

PREJUDICE AND THE OLD POLITICS: THE PRESIDENTIAL ELECTION OF 1928 (Lanham, MD: Lexington Books, 2000), reprint of 1979 edition with new introduction.

HISTORIANS AND THE LIVING PAST: THE THEORY AND PRACTICE OF HISTORICAL STUDY (Arlington Heights, Ill.: Harlan Davidson, Inc., 1978, with Valerie French)

ECOLOGICAL INFERENCE (Sage Series in Quantitative Applications in the Social Sciences, 1978, with Laura Irwin Langbein)

YOUR FAMILY HISTORY: HOW TO USE ORAL HISTORY, PERSONAL FAMILY ARCHIVES, AND PUBLIC DOCUMENTS TO DISCOVER YOUR HERITAGE (New York: Random House, 1978)

KIN AND COMMUNITIES: FAMILIES IN AMERICA (edited, Washington, D. C.: Smithsonian Press, 1979, with Joan Challinor)

THE THIRTEEN KEYS TO THE PRESIDENCY (Lanham: Madison Books, 1990, with Ken DeCell)

THE KEYS TO THE WHITE HOUSE, 1996 EDITION (Lanham: Madison Books, 1996)

THE KEYS TO THE WHITE HOUSE, (Lanham: Lexington Books Edition, 2000)

THE KEYS TO THE WHITE HOUSE, POST-2004 EDITION (Lanham: Lexington Books Edition, 2005)

3

THE KEYS TO THE WHITE HOUSE, 2008 EDITION (Lanham: Rowman & Littlefield, 2008)

WHITE PROTESTANT NATION: THE RISE OF THE AMERICAN CONSERVATIVE MOVEMENT (New York: Grove/Atlantic Press, 2008)

THE KEYS TO THE WHITE HOUSE, 2012 EDITION (2012, Lanham: Rowman & Littlefield)

FDR AND THE JEWS, (Cambridge: Harvard University Press, Belknap Imprint, 2013, with Richard Breitman).

THE KEYS TO THE WHITE HOUSE, 2016 EDITION (Lanham: Rowman & Littlefield)

THE CASE FOR IMPEACHMENT (HarperCollins, April 2017, updated paperback January 2018)

THE EMBATTLED VOTE IN AMERICA: FROM THE FOUNDING TO THE PRESENT (Harvard University Press, 2018)

REPEAL THE SECOND AMENDMENT: THE CASE FOR A SAFER AMERICA (forthcoming, January 2020, St. Martin's Press)

Monographs:

"Report on the Implications for Minority Voter Opportunities if Corrected census Data Had Been Used for the Post-1990 Redistricting: States With The Largest Numerical Undercount," UNITED STATES CENSUS MONITORING BOARD, January 2001

"Report on the Racial Impact of the Rejection of Ballots Cast in the 2000 Presidential Election in the State of Florida," and "Supplemental Report," in VOTING IRREGULARITIES IN FLORIDA DURING THE 2000 PRESIDENTIAL ELECTION, United States Commission on Civil Rights, June 2001

B. Scholarly Articles

"The Federal Assault Against Voting Discrimination in the Deep South, 1957-1967," JOURNAL OF NEGRO HISTORY (Oct. 1969) REF

"Executive Enforcement of Voting Rights, 1957-60," in Terrence Goggin and John Seidel, eds., POLITICS AMERICAN STYLE (1971)

"Correlation, Regression, and the Ecological Fallacy: A Critique," JOURNAL OF INTERDISCIPLINARY HISTORY (Winter 1974) REF

"Critical Election Theory and the Reality of American Presidential Politics, 1916-1940," AMERICAN HISTORICAL REVIEW (April 1976) REF

"Across the Great Divide: Inferring Individual Behavior From Aggregate Data," POLITICAL METHODOLOGY (with Laura Irwin, Fall 1976) REF

"Regression vs. Homogeneous Units: A Specification Analysis," SOCIAL SCIENCE HISTORY (Winter 1978) REF

"Language Games, Social Science, and Public Policy: The Case of the Family," in Harold Wallach, ed., APPROACHES TO CHILD AND FAMILY POLICY (Washington, D.C.: American Association for the Advancement of Science, 1981)

"Pattern Recognition Applied to Presidential Elections in the United States, 1860-1980: The Role of Integral Social, Economic, and Political Traits," PROCEEDINGS OF THE NATIONAL ACADEMY OF SCIENCE (with V. I. Keilis-Borok, November 1981) REF

"The End of Realignment Theory? Toward a New Research Program for American Political History," HISTORICAL METHODS (Fall 1982)

"Kinship and Family in American History," in National Council for Social Studies Bulletin, UNITED STATES HISTORY IN THE 1980s (1982)

"Modeling the Past: The Specification of Functional Form," JOURNAL OF INTERDISCIPLINARY HISTORY (with Ivy Broder, Winter 1983) REF

"Political Realignment and `Ethnocultural` Voting in Late Nineteenth Century America," JOURNAL OF SOCIAL HISTORY (March 1983) REF

"The `New Political History:`Some Statistical Questions Answered," SOCIAL SCIENCE HISTORY (with J. Morgan Kousser, August 1983) REF

"Personal Family History: A Bridge to the Past," PROLOGUE (Spring 1984)

"Geography as Destiny," REVIEWS IN AMERICAN HISTORY (September 1985)

"Civil Rights Law: High Court Decision on Voting Act Helps to Remove Minority Barriers," NATIONAL LAW JOURNAL (with Gerald Hebert, November 10, 1986).

"Tommy The Cork: The Secret World of Washington`s First Modern Lobbyist," WASHINGTON MONTHLY (February 1987).

"Discriminatory Election Systems and the Political Cohesion Doctrine," NATIONAL LAW JOURNAL (with Gerald Hebert, Oct. 5, 1987)

"Aggregate-Level Analysis of American Midterm Senatorial Election Results, 1974-1986," PROCEEDINGS OF THE NATIONAL ACADEMY OF SCIENCES (Dec. 1989, with Volodia Keilis-Borok) REF

"Black/White Voter Registration Disparities in Mississippi: Legal and Methodological Issues in Challenging Bureau of Census Data," JOURNAL OF LAW AND POLITICS (Spring, 1991, with Samuel Issacharoff) REF

"Adjusting Census Data for Reapportionment: The Independent Role of the States," NATIONAL BLACK LAW JOURNAL (1991)

"Passing the Test: Ecological Regression in the Los Angeles County Case and Beyond," EVALUATION REVIEW (December 1991) REF

Understanding and Prediction of Large Unstable Systems in the Absence of Basic Equations," PROCEEDINGS OF THE INTERNATIONAL SYMPOSIUM ON CONCEPTUAL TOOLS FOR UNDERSTANDING NATURE (with V. I. Keilis-Borok, Trieste, Italy, 1991).

"The Self-Organization of American Society in Presidential and Senatorial Elections," in Yu. Krautsov, ed., THE LIMITS OF PREDICTABILITY (with V.I. Keilis-Borok, Nauka, Moscow, 1992).

"'They Endured:' The Democratic Party in the 1920s," in Ira Foreman, ed., DEMOCRATS AND THE AMERICAN IDEA: A BICENTENNIAL APPRAISAL (1992).

"A General Theory of Vote Dilution," LA RAZA (with Gerald Hebert) 6 (1993). REF

"Adjusting Census Data for Reapportionment: The Independent Role of the States," JOURNAL OF LITIGATION (December 1993, with Samuel Issacharoff)

"The Keys to the White House: Who Will be the Next American President?," SOCIAL EDUCATION 60 (1996)

"The Rise of Big Government: Not As Simple As It Seems," REVIEWS IN AMERICAN HISTORY 26 (1998)

"The Keys to Election 2000," SOCIAL EDUCATION (Nov/Dec. 1999)

"The Keys to the White House 2000," NATIONAL FORUM (Winter 2000)

"What Really Happened in Florida's 2000 Presidential Election," JOURNAL OF LEGAL STUDIES (January 2003) REF

"The Keys to Election 2004," SOCIAL EDUCATION (January 2004)

"History: Social Science Applications," ENCYCLOPEDIA OF SOCIAL MEASUREMENT (Elseveir, 2006)

"The Keys to the White House: Forecast for 2008," SPECIAL FEATURE, *FORESIGHT: THE INTERNATIONAL JOURNAL OF APPLIED FORECASTING* 3 (February 2006), 5-9 with

response: J. Scott Armstrong and Alfred G. Cuzan, "Index Methods for Forecasting: An Application to the American Presidential Elections."

"The Keys to the White House: Updated Forecast for 2008," *FORESIGHT; THE INTERNATIONAL JOURNAL OF APPLIED FORECASTING* 7 (Fall 2007)

"The Keys to the White House: Prediction for 2008," SOCIAL EDUCATION (January 2008)

"The Keys to the White House: An Index Forecast for 2008," INTERNATIONAL JOURNAL OF FORECASTING 4 (April-June 2008) REF

"The Updated Version of the Keys," SOCIAL EDUCATION (October 2008)

"Extreme Events in Socio-Economic and Political Complex Systems, Predictability of," ENCYCLOPEDIA OF COMPLEXITY AND SYSTEMS SCIENCE (Springer, 2009, with Vladimir Keilis-Borok & Alexandre Soloviev)

"The Keys to the White House: A Preliminary Forecast for 2012" INTERNATIONAL JOURNAL OF INFORMATION SYSTEMS & SOCIAL CHANGE (Jan.-March 2010) REF

"The Keys to the White House: Forecast for 2012," FORESIGHT: THE INTERNATIONAL JOURNAL OF APPLIED FORECASTING (Summer 2010)

"The Keys to the White House: Prediction for 2012," SOCIAL EDUCATION (March 2012)

"The Keys to the White House: Prediction for 2016," SOCIAL EDUCATION (February 2016)

"The Keys to the White House," SOCIAL EDUCATION (October 2016)

"The Keys to the White House: Forecast for 2016," WORLD FINANCIAL REVIEW (January-February 2016)

"Barack Obama" in James M. Banner, Jr., ed., PRESIDENTIAL MISCONDUCT: FROM GEORGE WASHINGTON TO TODAY (New Press, 2019)

"The Alternative-Justification Affirmative: A New Case Form," JOURNAL OF THE AMERICAN FORENSIC ASSOCIATION (with Charles Garvin and Jerome Corsi, Fall 1973) REF

"The Alternative-Justification Case Revisited: A Critique of Goodnight, Balthrop and Parsons, `The Substance of Inherency,'" JOURNAL OF THE AMERICAN FORENSIC ASSOCIATION (with Jerome Corsi, Spring 1975) REF

"A General Theory of the Counterplan," JOURNAL OF THE AMERICAN FORENSIC ASSOCIATION (with Daniel Rohrer, Fall 1975) REF

"The Logic of Policy Dispute," JOURNAL OF THE AMERICAN FORENSIC ASSOCIATION (with Daniel Rohrer, Spring 1980) REF

"Policy Dispute and Paradigm Evaluation," JOURNAL OF THE AMERICAN FORENSIC ASSOCIATION (with Daniel Rohrer, Fall 1982) REF

"New Paradigms For Academic Debate," JOURNAL OF THE AMERICAN FORENSIC ASSOCIATION (Fall 1985) REF

"Competing Models of the Debate Process," JOURNAL OF THE AMERICAN FORENSIC ASSOCIATION (Winter 1986) REF

"The Role of the Criteria Case in the Conceptual Framework of Academic Debate," in Donald Terry, ed., MODERN DEBATE CASE TECHNIQUES (with Daniel Rohrer, 1970)

"Decision Rules for Policy Debate," and "Debate as a Comparison of Policy Systems," in Robert 2, ed., THE NEW DEBATE: READINGS IN CONTEMPORARY DEBATE THEORY (with Daniel Rohrer, 1975)

"A Systems Approach to Presumption and Burden of Proof;" "The Role of Empirical Evidence in Debate;" and "A General Theory of the Counterplan," in David Thomas, ed., ADVANCED DEBATE: READINGS IN THEORY, PRACTICE, AND TEACHING (with Daniel Rohrer, 1975)

"Decision Rules in Policy Debate;" "The Debate Resolution;" "Affirmative Case Approaches;" "A General Theory of the Counterplan;" "The Role of Empirical Evidence in Debate;" and "Policy Systems Analysis in Debate," in David Thomas, ed., ADVANCED DEBATE (revised edition, with Daniel Rohrer and Jerome Corsi, 1979)

C. Selected Popular Articles

"Presidency By The Book," POLITICS TODAY (November 1979) Reprinted:
LOS ANGELES TIMES

"The Grand Old Ploys," NEW YORK TIMES
Op Ed (July 18, 1980)

"The New Prohibitionism," THE CHRISTIAN CENTURY (October 29, 1980)

"Which Party Really Wants to `Get Government Off Our Backs`?" CHRISTIAN SCIENCE MONITOR Opinion Page (December 2, 1980)

"Do Americans Really Want `Coolidge Prosperity` Again?" CHRISTIAN SCIENCE MONITOR Opinion Page (August 19, 1981)

"Chipping Away at Civil Rights," CHRISTIAN SCIENCE MONITOR Opinion Page (February 17, 1982)

"How to Bet in 1984. A Presidential Election Guide," WASHINGTONIAN MAGAZINE (April 1982) Reprinted: THE CHICAGO TRIBUNE

"The Mirage of Efficiency," CHRISTIAN SCIENCE MONITOR Opinion Page (October 6, 1982)

"For RIFs, It Should Be RIP," LOS ANGELES TIMES Opinion Page (January 25, 1983)

"The Patronage Monster, Con`t." WASHINGTON POST Free For All Page (March 16, 1983)

"A Strong Rights Unit," NEW YORK TIMES Op Ed Page (June 19, 1983)

"Abusing the Public Till," LOS ANGELES TIMES Opinion Page (July 26, 1983)

The First Gender Gap," CHRISTIAN SCIENCE MONITOR Opinion Page (August 16, 1983)

"Is Reagan A Sure Thing?" FT. LAUDERDALE NEWS Outlook Section (February 5, 1984)

"The Keys to the American Presidency: Predicting the Next Election," TALENT (Summer 1984)

"GOP: Winning the Political Battle for `88," CHRISTIAN SCIENCE MONITOR, Opinion Page, (December 27, 1984)

"The Return of `Benign Neglect`," WASHINGTON POST, Free For All, (May 25, 1985)

"Selma Revisited: A Quiet Revolution," CHRISTIAN SCIENCE MONITOR, Opinion Page, (April 1, 1986)

"Democrats Take Over the Senate" THE WASHINGTONIAN (November 1986; article by Ken DeCell on Lichtman`s advance predictions that the Democrats would recapture the Senate in 1986)

"Welcome War?" THE BALTIMORE EVENING SUN, Opinion Page, (July 15, 1987)

"How to Bet in 1988," WASHINGTONIAN (May 1988; advance prediction of George Bush's 1988 victory)

"President Bill?," WASHINGTONIAN (October 1992; advance prediction of Bill Clinton's 1992 victory)

"Don't be Talked Out of Boldness," CHRISTIAN SCIENCE MONITOR, Opinion Page (with Jesse Jackson, November 9, 1992)

9

"Defending the Second Reconstruction," CHRISTIAN SCIENCE MONITOR, Opinion Page (April 8, 1994)

"Quotas Aren't The Issue," NEW YORK TIMES, Op Ed Page (December 7, 1994)

"History According to Newt," WASHINGTON MONTHLY (May, 1995)

"A Ballot on Democracy," WASHINGTON POST Op Ed (November 1, 1998)

"The Theory of Counting Heads vs. One, Two, Three," CHRISTIAN SCIENCE MONITOR Op Ed (June 22, 1999)

"Race Was Big Factor in Ballot Rejection, BALTIMORE SUN Op Ed (March 5, 2002)

"Why is George Bush President?" NATIONAL CATHOLIC REPORTER (Dec. 19, 2003)

"In Plain Sight: With the Public Distracted, George W. Bush is Building a Big Government of the Right," NEWSDAY, (August 7, 2005)

"Why Obama is Colorblind and McCain is Ageless," JEWISH DAILY FORWARD (June 26, 2008)

"Splintered Conservatives McCain," POLITICO ( June 24, 2008)

"Will Obama be a Smith or a Kennedy," NATIONAL CATHOLIC REPORTER (October 17, 2008)

"What Obama Should Do Now," POLITICO (Jan. 22, 2010)

"Why Democrats Need Hillary Clinton in 2016," THE HILL, June 11, 2014

"How Corporations Buy Our Government," THE HILL, July 1, 2014

"Who Rules America," THE HILL, August 12, 2014

"The End of Civil Discourse?" THE HILL, September 10, 2014

"Pass the Ache Act and Stop Destroying Appalachia?" THE HILL, October 28, 2014

"Democrats Have No One to Blame But Themselves,' THE HILL, November 7, 2014

10

"Donald Trump's Best Friend: Bernie Sanders," THE HILL March 10, 2016

"Trump Had One Thing Right About Abortion," THE HILL, April 1, 2016

"What is so Progressive About Sanders' Old-Fashioned Protectionism," April 7, 2016

"Sanders is Only Helping Trump by Staying in Race," THE HILL, June 30, 2016

"7 Pieces of Advice for Hillary Clinton," THE HILL, July 25, 2016

"Donald Trump's Call For Russia To Hack Hillary Clinton's Email Is A New Low For American Politics — And Maybe A Crime, NEW YORK DAILY NEWS, July 27, 2016

"Here's the Big Speech Clinton Needs to Make," THE HILL, September 9, 2016

"The Real Story Behind Trump's Tax Returns," THE HILL, October 3, 2016

"Trump is Establishment No Matter What He Says," THE HILL, October 12, 2016

"Trump Brings the Big Lie About Voter Fraud," THE HILL, October 19, 2016

"How a New Clinton Presidency Will Change American Politics Forever," THE HILL, October 22, 2016

"The Media is Rigging the Election by Reporting WikiLeaks Emails," THE HILL, October 26, 2016

"Why James Comey Must Resign Now," THE HILL, November 3, 2016

"Why Trump is Vulnerable to Impeachment," USA TODAY, April 18, 2017

"Donald Trump Meet the Real Andrew Jackson," THE HILL, May 5, 2017

"Why Does Trump's Voter Fraud Commission Really Wants Your Personal Voter Information," THE HILL, August 3, 2017

"Trump is a Lot Closer to Being Impeached, TIME.COM, November 2, 2017

"American Democracy Could be at Risk in the 2018 Elections," VICE December 20, 2017

"We are One Tantrum Away From Accidental War With North Korea," THE HILL, January 25, 2018

"Democrats Can't Survive on Anti-Trumpism Alone," TIME.COM, January 28, 2018

"Don't Expect the Mueller Investigation to End Anytime Soon," VICE March 21, 2018

"President Trump Faces Political Disaster if he Tries to Fire Mueller," THE HILL April 5, 2018

"Framers Fail: Voting is a Basic Right But They Didn't Guarantee it in the Constitution," USA TODAY, September 26, 2018

Suppressing Voting Rights is as Old as the Republic, But the Tactics Change," ZOCALO, October 8, 2018

"Voter Fraud Isn't a Problem in America. Low Turnout Is," WASHINGTON POST, Made for History, October 22, 2018

"Here are five ways a Democratic US House might try to impeach Donald Trump," LONDON SCHOOL OF ECONOMICS, US CENTRE, October 26, 2018.

"The Midterm Results Will Reveal What Drives Voters: A Love or Hate of Trump," THE GUARDIAN, November 5, 2018

"Unless Democrats Find a 2020 Candidate Like Beto O'Rourke, Trump May Well Be Set to Win" THE DAILY CALLER, November 7, 2018

"Why Nancy Pelosi Should be the Next Speaker, FORTUNE, November 27, 2018

"Its Well Past Time to Restructure the U.S. Senate," DAILY CALLER, December 4, 2018

"The Seven Crucial Takeaways From William Barr's Confirmation Hearings," SPECTATOR USA, January 16, 2019

"Did Democrats Forfeit, 2020" THE HILL March 14, 2019

"Barr's 'Summary' Of The Mueller Report Hardly Vindicates Trump," DAILY CALLER, March 25, 2019

"Collusion and Obstruction by Trump remain Open Questions after Attorney General's "Summary" of the Mueller Report," ARTSFORUM, March 26, 2019

"21 Questions for Robert Mueller," THE HILL, April 24, 2019

With U.S. Representative Al Green, "Congress Has a Duty to go Through With the Impeachment and Trial of Donald Trump," THE HILL May 17, 2019

"If Democrats Want to Beat Trump, They Need to Take off the Gloves in the Primary," GQ June 26, 2019

12

Bi-weekly column, THE MONTGOMERY JOURNAL, GAZETTE 1990 - 2013

Election-year column, REUTERS NEWS SERVICE 1996 & 2000

Contributor: THE HILL, 2014-present

D. Video Publication

"Great American Presidents," The Teaching Company, 2000.

## TEACHING

Ongoing Courses

The History of the U. S. I & II, The Emergence of Modern America, The U. S. in the Twentieth Century, United States Economic History, Historiography, Major Seminar in History, Graduate Research Seminar, Colloquium in U. S. History Since 1865, The American Dream, The Urban-Technological Era, Senior Seminar in American Studies, Seminar in Human Communication.

New Courses: Taught for the first time at The American University

Quantification in History, Women in Twentieth Century American Politics, Women in Twentieth Century America, Historians and the Living Past (a course designed to introduce students to the excitement and relevance of historical study), **Historians and the Living Past for Honors Students**, How to Think: Critical Analysis in the Social Sciences, Pivotal Years of American Politics, **Government and the Citizen (Honors Program),** Introduction to Historical Quantification, Public Policy in U. S. History, **Honors Seminar in U.S. Presidential Elections**, America's Presidential Elections, What Is America?, **Honors Seminar on FDR, Jews, and the Holocaust**.

## TELEVISION APPEARANCES

More than 1,000 instances of political commentary on NBC, CBS, ABC, CNN, C-SPAN, FOX, MSNBC, BBC, CBC, CTV, NPR, VOA, and numerous other broadcasting outlets internationally, including Japanese, Russian, Chinese, German, French, Irish, Austrian, Australian, Russian, Swedish, Danish, Dutch, and Middle Eastern television.

Regular political commentary for NBC News Nightside.

Regular political commentary for Voice of America and USIA.

Regular political commentary for America's Talking Cable Network.

13

Regular political commentary for the Canadian Broadcasting System.

Regular political commentary for CNN, Headline News

Consultant and on-air commentator for NBC special productions video project on the history of the American presidency.

CBS New Consultant, 1998 and 1999

Featured appearances on several History Channel specials including *The Nuclear Football* and *The President's Book of Secrets*.

## RADIO SHOWS

I have participated in many thousands of radio interview and talk shows broadcast nationwide, in foreign nations, and in cities such as Washington, D. C., New York, Atlanta, Chicago, Los Angeles and Detroit. My appearances include the Voice of America, National Public Radio, and well as all major commercial radio networks.

## PRESS CITATIONS

I have been cited many hundreds of times on public affairs in the leading newspapers and magazines worldwide. These include, among many others,

*New York Times, Washington Post, USA Today, Los Angeles Times, Wall Street Journal, Miami Herald, Washington Times, St. Louis Post Dispatch, Christian Science Monitor, Philadelphia Inquirer, Time, Newsweek, Business Week, Le Monde, Globe and Mail, Yomuiri Shimbun, Die Welt, El Mundo, and South China Post,* among others.

## SELECTED CONFERENCES, PRESENTATIONS, & LECTURES: UNITED STATES

Invited participant and speaker, Bostick Conference on Fogel and Engerman's TIME ON THE CROSS, University of South Carolina, November 1-2, 1974

"Critical Election Theory and the Presidential Election of 1928," Annual Meeting of the American Historical Association, December 1974

"A Psychological Model of American Nativism," Bloomsberg State Historical Conference, April 1975

"Methodology for Aggregating Data in Education Research," National Institute of Education, Symposium on Methodology, July 1975, with Laura Irwin

Featured Speaker, The Joint Washington State Bicentennial Conference on Family History,

October 1975

Featured Speaker, The Santa Barbara Conference on Family History, May 1976

Chair, The Smithsonian Institution and the American University Conference on Techniques for Studying Historical and Contemporary Families, June 1976

Panel Chair, Sixth International Smithsonian Symposium on Kin and Communities in America, June 1977

"The uses of History for Policy Analysis," invited lecture, Federal Interagency Panel on Early Childhood Research, October 1977

Invited participant, Conference on "Child Development within the Family - Evolving New Research Approaches," Interagency Panel of the Federal Government for Research and Development on Adolescence, June 1978

Commentator on papers in argumentation, Annual Meeting of the Speech Communication Association, November 1978

Commentator on papers on family policy, Annual Meeting of the American Association for the Advancement of Science, Jan. 1979

"Phenomenology, History, and Social Science," Graduate Colloquium of the Department of Philosophy," The American University, March 1979

"Comparing Tests for Aggregation Bias: Party Realignments of the 1930`s," Annual Meeting of the Midwest Political Science Association March 1979, with Laura Irwin Langbein

"Party Loyalty and Progressive Politics: Quantitative Analysis of the Vote for President in 1912," Annual Meeting of the Organization of American Historians, April 1979, with Jack Lord II

"Policy Systems Debate: A Reaffirmation," Annual Meeting of the Speech Communication Association, November 1979

"Personal Family History: Toward a Unified Approach," Invited Paper, World Conference on Records, Salt Lake City, August 1980

"Crisis at the Archives: The Acquisition, Preservation, and Dissemination of Public Documents," Annual Meeting of the Speech Communication Association, November 1980

"Recruitment, Conversion, and Political Realignment in America: 1888- 1940," Social Science Seminar, California Institute of Technology, April 1980

15

"Toward a Situational Logic of American Presidential Elections," Annual Meeting of the Speech Communication Association, November 1981

"Political Realignment in American History," Annual Meeting of the Social Science History Association, October 1981

"Critical Elections in Historical Perspective: the 1890s and the 1930s," Annual Meeting of the Social Science History Association, November 1982

Commentator for Papers on the use of Census data for historical research, Annual Meeting of the Organization of American Historians, April 1983

"Thirteen Keys to the Presidency: How to Predict the Next Election," Featured Presentation, Annual Conference of the International Platform Association, August 1983, Received a Top Speaker Award

"Paradigms for Academic Debate," Annual Meeting of the Speech Communication Association, November 1983

Local Arrangements Chair, Annual Convention of the Social Science History Association, October 1983

"Forecasting the Next Election," Featured Speaker, Annual Convention of the American Feed Manufacturers Association, May 1984

Featured Speaker, "The Ferraro Nomination," Annual Convention of The International Platform Association, August 1984, Top Speaker Award

"Forecasting the 1984 Election," Annual Convention of the Social Science History Association Oct. 1984,

Featured Speaker, "The Keys to the Presidency," Meeting of Women in Government Relations October 1984

Featured Speaker, "The Presidential Election of 1988," Convention of the American Association of Political Consultants, December 1986

Featured Speaker, "The Presidential Election of 1988," Convention of the Senior Executive Service of the United States, July 1987

Commentary on Papers on Voting Rights, Annual Meeting of the American Political Science Association, September 1987.

Commentary on Papers on Ecological Inference, Annual Meeting of the Social Science History Association, November 1987.

16

Featured Speaker: "Expert Witnesses in Federal Voting Rights Cases," National Conference on Voting Rights, November 1987.

Featured Speaker: "The Quantitative Analysis of Electoral Data," NAACP National Conference on Voting Rights and School Desegregation, July 1988.

Panel Chair, "Quantitative Analysis of the New Deal Realignment," Annual Meeting of the Social Science History Association, Nov. 1989.

Keynote Speaker, Convocation of Lake Forest College, Nov. 1989.

Featured Speaker, The American University-Smithsonian Institution Conference on the Voting Rights Act, April 1990

Panel Speaker, Voting Rights Conference of the Lawyer's Committee for Civil Rights Under Law, April 1990

Panel Speaker, Voting Rights Conference of the NAACP, July 1990

Panel Speaker, Voting Rights Conference of Stetson University, April 1991

Panel Chair, Annual Meeting of the Organization of American Historians, April, 1992

Panel Speaker, Symposium on "Lessons from 200 Years of Democratic Party History, Center for National Policy, May 1992

Olin Memorial Lecture, U.S. Naval Academy, October 1992

Commentator, Annual Meeting of the Organization of American Historians, April, 1993

Panel presentation, Conference on Indian Law, National Bar Association, April 1993

Feature Presentation, Black Political Science Association, Norfolk State University, June 1993

Feature Presentation, Southern Regional Council Conference, Atlanta Georgia, November, 1994

Master of Ceremonies and Speaker, State of the County Brunch, Montgomery County, February, 1996

Feature Presentation, Predicting The Next Presidential Election, Freedom's Foundation Seminar on the American Presidency, August 1996

Feature Presentation, Predicting The Next Presidential Election, Salisbury State College, October 1996

Feature Presentation on the Keys to the White House, Dirksen Center, Peoria, Illinois, August, 2000

Feature Presentation on American Political History, Regional Conference of the Organization of American Historians, August 2000

Testimony Presented Before the United States Commission on Civil Rights Regarding Voting Systems and Voting Rights, January 2001

Testimony Presented Before the United States House of Representatives, Judiciary Committee, Subcommittee on the Constitution, February 2001

Testimony Presented Before the United States Senate, Government Operations Committee, Regarding Racial Differentials in Ballot Rejection Rates in the Florida Presidential Election, June 2001

Testimony Presented Before the Texas State Senate Redistricting Committee, Congressional Redistricting, July 2003

Testimony Presented Before the Texas State House Redistricting Committee, Congressional Redistricting, July 2003

American University Honors Program Tea Talk on the Election, September 2004

Feature Presentation, The Keys to the White House, International Symposium on Forecasting, June 2006.

Feature Presentation, The Keys to the White House, International Symposium on Forecasting, New York, June 2007.

Keynote Speaker, Hubert Humphrey Fellows, Arlington, Virginia, 2007-2013

Feature Presentation, Forecasting 2008, Annual Meeting of the American Political Science Association, Chicago, August 2007

Keynote Speaker, International Forecasting Summit, Orlando, Florida, February 2008.

Feature Presentation on the Keys to the White House, Senior Executive's Service, Washington, DC, June 2008

Feature Presentation, American Political History, Rockford Illinois School District, July 2008

American University Honors Program Tea Talk on the Election, September 2008

Featured Lecture, Keys to the White House, American Association for the Advancement of

Science, Washington, DC, September 2008

Keynote Speaker, International Forecasting Summit, Boston, September 2008

Keynote Lecture, Hubert Humphrey Fellows, Arlington, Virginia October 2008

Featured Lectures, Keys to the White, Oklahoma Central and East Central Universities, October 2008

Bishop C. C. McCabe Lecture, "Seven Days until Tomorrow" American University, October 28, 2008

Featured Lecture, WHITE PROTESTANT NATION, Eisenhower Institute, December 2008

American University Faculty on the Road Lecture, "Election 2008: What Happened and Why?" Boston, February 2009

Critic Meets Author Session on WHITE PROTESTANT NATION, Social Science History Association, November 2009

American University Faculty on the Road Lecture, "The Keys for 2012" Chicago, April 2010

Keynote Speaker, Hubert Humphrey Fellows, Arlington, Virginia October, 2010, 2011

Panel Participant, Search for Common Ground, Washington, DC, April 2011

Presentation, The Keys to the White House, International Symposium on Forecasting, June 2012

**SELECTED CONFERENCES, PRESENTATIONS, & LECTURES: INTERNATIONAL**

Featured Speaker, World Conference on Disarmament, Moscow, Russia, November 1986

Delegation Head, Delegation of Washington Area Scholars to Taiwan, Presented Paper on the promotion of democracy based on the American experience, July 1993

Lecture Series, American History, Doshisha University, Kyoto, Japan, December 2000

Lectures and Political Consultation, Nairobi, Kenya, for RFK Memorial Institute, October 2002

Featured Lectures, US Department of State, Scotland and England, including Oxford University, University of Edinburg, and Chatham House, June 2004

Keynote Speech, American University in Cairo, October 2004

Feature Presentation on the Keys to the White House, University of Munich, June 2008

Featured Lectures, US Department of State, Russia, Ukraine, Slovenia, Austria, and Romania, 2008-2010

Paper Presentation, Fourth International Conference on Interdisciplinary Social Science, Athens, Greece, July 2009

Featured Lectures, US Department of State, India, Korea, and Belgium 2012

Panel Speaker, Economic Forun, Krynica, Poland, 2013

**DEPARTMENTAL AND UNIVERSITY SERVICE**

Department of History Council 1973 -

Undergraduate Committee, Department of History 1973-1977

Chair Undergraduate Committee, Department of History 1984-1985

Graduate Committee, Department of History, 1978-1984

Freshman Advisor, 1973-1979

First Year Module in Human Communications, 1977-1979

University Committee on Fellowships and Awards 1976-1978

University Senate 1978-1979, 1984-1985

University Senate Parliamentarian and Executive Board 1978-1979

Founding Director, American University Honors Program, 1977-1979

Chair, College of Arts and Sciences Budget Committee 1977-1978, 1982-1984

University Grievance Committee, 1984-1985

Member, University Honors Committee 1981-1982

College of Arts and Sciences Curriculum Committee 1981-1982

Jewish Studies Advisory Board, 1982-1984

Mellon Grant Executive Board, College of Arts & Sciences, 1982-1983

Chair, College of Arts and Sciences Faculty Colloquium, 1983

Chair, College of Arts and Sciences Task Force on the Department of Performing Arts, 1984-1985

Local Arrangements Chair, National Convention of the Social Science History Association, 1983

Chair, Rank & Tenure Committee of the Department of History, 1981-1982, 1984-1985

Board Member, Center for Congressional and Presidential Studies, The American University, 1988-1989

Chair, Graduate Committee, Department of History, 1989 - 1991

Chair, Distinguished Professor Search Committee 1991

Member, College of Arts & Sciences Associate Dean Search Committee, 1991

Board Member, The American University Press, 1991-1995

Chair, Subcommittee on Demographic Change, The American University Committee on Middle States Accreditation Review 1992-1994

Member, Dean's Committee on Curriculum Change, College of Arts and Sciences 1992-1993

Member, Dean's Committee on Teaching, College of Arts and Sciences 1992

Co-Chair, Department of History Graduate Committee, 1994-1995

Vice-Chair, College of Arts & Sciences Educational Policy Committee, 1994-1995

Elected Member, University Provost Search Committee, 1995-1996

Chair, Search Committee for British and European Historian, Department of History, 1996

Department Chair, 1999-2001

CAS Research Committee, 2006-2007

University Budget and Benefits Committee, 2008

Chair, Personnel Committee, Department of History, 2010-11, 2012-13

Chair, Term Faculty Search Committee, Department of History, 2011

**OTHER POSITIONS**

Director of Forensics, Brandeis University, 1968-71

Director of Forensics, Harvard University, 1971-72

Chair, New York-New England Debate Committee, 1970-71

Historical consultant to the Kin and Communities Program of the Smithsonian Institution 1974-1979

Along with general advisory duties, this position has involved the following activities:

    1. directing a national conference on techniques for studying historical and contemporary families held at the Smithsonian in June 1976.
    2. chairing a public session at the Smithsonian on how to do the history of one's own family.
    3. helping to direct the Sixth International Smithsonian Symposium on Kin and Communities in America (June 1977).
    4. editing the volume of essays from the symposium.

Consultant to John Anderson campaign for president, 1980.

I researched and wrote a study on "Restrictive Ballot Laws and Third-Force Presidential Candidates." This document was a major component of Anderson's legal arguments against restrictive ballot laws that ultimately prevailed in the Supreme Court (Anderson v. Celebreeze 1983). According to Anderson's attorney: "the basis for the majority's decision echoes the themes you incorporated in your original historical piece we filed in the District Court."

Statistical Consultant to the George Washington University Program of Policy Studies in Science and Technology, 1983

I advised researchers at the Policy Studies Program on the application of pattern recognition techniques to their work on the recovery of communities from the effects of such natural disasters as earthquakes and floods.

Consultant to the New York City Charter Revision Commission, 2000-2006

I analyzed the implications of non-partisan elections for voting rights issues for the Charter Revision Commissions appointed by mayors Rudy Giuliani and Michael Bloomberg.

| TABLE R3<br>AFRICAN AMERICAN CITY COUNCIL CANDIDATES IN VIRGINIA BEACH, 2008 TO 2018, REVISION OF KIDD TABLES 1 AND 2 | | | |
|---|---|---|---|
| **Black Candidate of Choice of Black Voters, Would Have Won With Black Votes** | **Outcome** | **Not Candidate of Choice of Black Voters** | **Outcome** |
| Wooten 2018 | Won | Wray 2018 | Lost |
| Rouse 2018 | Won | Bright 2018 | Lost |
| Ross-Hammond 2016 | Lost | Furman 2016 | Lost |
| Cabiness 2014 | Lost | Burton 2014 | Lost |
| Furman 2014* | Lost | Smith 2012 | Lost |
| Ross-Hammond 2012 | Won | Furman 2010 | Lost |
| Sherrod 2011 | Lost | Jackson 2008 | Lost |
| Jackson 2010 ** | Lost | | |
| Cabiness 2010 ** | Lost | | |
| Bullock 2010 | Lost | | |
| Allen 2008 | Lost | | |
| Flores 2008 | Lost | | |

\* This was the second choice of black voters in a two-seat at-large election. ** These were the first and second choices of black voters in a two-seat at-large election.



EXHIBIT

5

Planet Depos, LLC

**CHART R3: VICTORIES AND DEFEATS FOR BLACK CITY COUNCIL CANDIDATES OF CHOICE OF BLACK VOTERS, VIRGINIA BEACH, 2008-2018**





## Gerald L. Harris

| | |
|---|---|
| **From:** | Danielle Lang <dlang@campaignlegalcenter.org> |
| **Sent:** | Thursday, September 05, 2019 10:32 AM |
| **To:** | Christopher S. Boynton; Gerald L. Harris; Joseph M. Kurt |
| **Cc:** | Annabelle Harless; Gerry Hebert; Christopher Lamar |
| **Subject:** | Fw: Fw: Holloway - Data referenced in Spencer rebuttal report but not provided |
| **Attachments:** | coalition_estimates_se.xlsx |

See attached.



**Danielle Lang**
Co-Director, Voting Rights & Redistricting

202.856.7911 | @DaniLang_DC

Campaign Legal Center
1101 14th St. NW Suite 400
Washington, DC 20005
campaignlegalcenter.org

Facebook | Twitter

**From:** Doug Spencer <dougspencer@gmail.com>
**Sent:** Thursday, September 5, 2019 12:46 AM
**To:** Danielle Lang <dlang@campaignlegalcenter.org>
**Cc:** Annabelle Harless <aharless@campaignlegalcenter.org>
**Subject:** Re: Fw: Holloway - Data referenced in Spencer rebuttal report but not provided

See attached.

Doug



| Year | Seat | Candidate | Threshold | Black est. | Black se | Hispanic est. | Hispanic se | Asian est. | Asian se |
|------|------|-----------|-----------|------------|----------|---------------|-------------|------------|----------|
| **Minority Candidates** | | | | | | | | | |
| 2018 | At-large | Rouse | 45.2 | 83.0 | 6.4 | 33.3 | 21.0 | 53.0 | 15.2 |
| 2018 | Centerville | Wooten | 62.1 | 90.3 | 14.9 | 79.9 | 25.1 | 73.4 | 18.4 |
| 2016 | Kempsville | Ross-Hammond | 59.4 | 81.2 | 4.7 | 49.0 | 18.8 | 26.2 | 10.7 |
| 2014 | Rose Hall | Cabiness | 48.3 | 70.2 | 4.5 | 13.0 | 11.0 | 9.4 | 7.4 |
| 2012 | Kempsville | Ross-Hammond | 32.2 | 82.6 | 4.4 | 53.9 | 20.5 | 33.6 | 12.6 |
| 2011 | At-large | Sherrod | 37.0 | 90.2 | 4.3 | 49.5 | 22.0 | 27.2 | 12.7 |
| 2010 | At-large | Jackson | 44.8 | 52.9 | 2.5 | 11.6 | 8.6 | 6.9 | 5.0 |
| 2010 | Princess Anne | Bullock | 54.4 | 79.0 | 3.6 | 67.1 | 17.7 | 87.9 | 8.1 |
| 2008 | At-large | Allen | 44.1 | 79.4 | 3.4 | 77.0 | 14.6 | 29.8 | 9.9 |
| 2008 | Kempsville | Flores | 48.7 | 52.9 | 2.4 | 40.4 | 13.0 | 33.9 | 7.0 |
| **White Candidates** | | | | | | | | | |
| 2018 | At-large | White | 45.2 | 61.1 | 10.7 | 53.3 | 40.4 | 19.6 | 20.4 |
| 2014 | Princess Anne | Henley | 76.7 | 62.4 | 2.8 | 69.5 | 12.4 | 82.9 | 6.9 |
| 2010 | At-large | Bellitto | 44.8 | 8.4 | 2.3 | 45.2 | 12.2 | 47.2 | 6.4 |