IN THE UNITED STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF VIRGINIA
NORFOLK DIVISION

| | |
|---|---|
| Latasha Holloway, *et al.*, | |
| Plaintiffs, | |
| v. | Civil Action No. 2:18-cv-0069 |
| City of Virginia Beach, *et al.*, | |
| Defendants | |

**PLAINTIFFS' BRIEF IN OPPOSITION TO DEFENDANTS' MOTION FOR SUM-MARY JUDGMENT**

## TABLE OF CONTENTS

INTRODUCTION ........................................................................................................ 1

STATEMENT OF MATERIAL DISPUTED FACTS .................................................. 1

LEGAL STANDARDS ............................................................................................... 6

    I.      Summary Judgment ................................................................................ 6

    II.    Section 2 of the Voting Rights Act .......................................................... 6

ARGUMENT

    I.      Virginia Beach's At-Large City Council System Dilutes the Combined Voting Strength of Hispanic, Black, and Asian Voters ...................................................... 7

      A.  A Coalition of Minority Groups Can Bring a Claim Together Under Section 2 ... 7

      B.  Hispanic, Black, and Asian Voters in Virginia Beach Are Politically Cohesive . 11

            1.  Elections in Virginia Beach Demonstrate Significant Levels of Racially Polarized Voting and Cohesion Between Hispanic, Black, and Asian Voters ......................................................... 12

                  i.  City Council Elections in Virginia Beach Are Marked by Racially Polarized Voting Between Minority Voters and White Voters . 12

                  ii.  Dr. Spencer's "All Minority" Estimate is a Reliable Measurement of Cohesion Between Hispanic, Black, and Asian Voters ........ 14

                  iii.  Defendants Ignore Significant Yet Undisputed Record Evidence from Plaintiffs' Experts Showing Cohesion Among HBA Voters ......................................................... 18

            2.  Plaintiffs Have Also Produced Qualitative Evidence That Is Probative of Cohesion Among Hispanic, Black, and Asian Voters ......................... 22

      C.  Plaintiffs' Evidence Satisfies the Gingles Requirement of White Bloc Voting .. 27

            1.  The 2018 City Council Elections Are Special Circumstances That Should be Discounted ......................................................... 27

            2.  Even If the 2018 City Council Elections Are Not Special Circumstances, Minority-Preferred Candidates in Virginia Beach Usually Lose ........... 30

                  i.  In Probative Elections, Minority-Preferred Candidates Usually Lose Due to White Bloc Voting ................................................. 31

                  ii.  Disputes of Material Facts Preclude Summary Judgment on the Third Gingles Precondition ......................................................... 33

    II.    Defendants' Attempts to Discredit Plaintiffs' Evidence Are Misguided and Premature ......................................................... 34

      A.  Plaintiffs Need Not Statistically Pinpoint Asian and Hispanic Voting Behavior 34

      B.  Contrary to Defendants' Suggestion, Plaintiffs' Case Does Not Hinge on Equivalence Test Results ......................................................... 36

CONCLUSION ......................................................................................................... 40

## INTRODUCTION

Virginia Beach's at-large system for electing city councilmembers dilutes the political power of Hispanic, Black, and Asian citizens, in violation of Section 2 of the Voting Rights Act. Plaintiffs are prepared to prove at trial that this challenge meets all requirements for liability under Section 2, including cohesive minority voting and white bloc voting that usually defeats minority-preferred candidates. Defendants' motion for summary judgment misrepresents Plaintiffs' expert analysis and ignores other evidence in an effort to conceal genuine disputes of material fact. The Court should therefore deny summary judgment and set this case for trial.

## STATEMENT OF MATERIAL DISPUTED FACTS

Plaintiffs do not dispute Facts 1-2, 4-5, 8-9, 11-19, 23, 26, 28, 32, 36 and 38 in Defendants' statement of material facts (ECF No. 115 at 2-7). Pursuant to Local Civil Rule 56(B), Plaintiffs dispute the following facts in the Defendants' statement of material facts:

**Defs. Fact No. 3**: Plaintiffs dispute this fact to the extent that it attempts to define all opinions being offered by Plaintiffs' expert Anthony Fairfax. In addition to the opinions outlined by Defendants, Mr. Fairfax offered opinions on past and recent demographics pertaining to the City of Virginia Beach, Defs. Ex. 1 at 2, as well as the possibility of drawing at least one district with a majority Black and Hispanic Citizen Voting Age Population ("CVAP"). Defs. Ex. 2 at 3.

**Defs. Fact No. 6**: Plaintiffs dispute Defendants' allegation that Mr. Fairfax's Initial Report "purported" to contain a ten-district map with two majority Hispanic, Black, and Asian majority districts. *See, e.g.,* Defs. Ex. 1 at 20-21. To the extent Defendants dispute this fact, it is a genuine issue to be litigated in this case.

**Defs. Fact No. 7:** Plaintiffs dispute this fact as incomplete. This fact is correct as alleged with respect to *single race alone* CVAP percentages, but Plaintiffs dispute that this is the only

relevant statistic. The second relevant measure includes mixed race individuals (those who identify as Black and white). The CVAP percentages including persons who identify as mixed race in Plaintiffs' Illustrative Districts 1 and 2 are 51.11% and 51.08% respectively. Defs. Ex. 1 at 21.

**Defs. Fact No. 10:** Plaintiffs dispute this fact to the extent that Mr. Fairfax also testified that "it is extremely difficult, if not impossible" to calculate the margin of error for disaggregated ACS data, Defs. Ex. 3 at 191:18-192:19, and that doing so is "not seen in normal plan development for redistricting plans" and that he "ha[s] not seen any confidence level . . . produced in a proposed district plan out of the hundreds that [he] has seen." *Id.* at 217:18-218:11.

**Defs. Fact No. 20**: Plaintiffs dispute this fact. Dr. Spencer never testified that Hispanic voters or Asian voters were "too insufficiently concentrated in precincts in Virginia Beach to produce reliable estimates." In fact, Dr. Spencer testified "I'm not sure I know anything about [those voters'] geographic dispersion" at his deposition. Defs. Ex. 6 at 70:14-71:4.

**Defs. Fact Nos. 21 and 22:** Plaintiffs dispute these facts. Dr. Spencer noted that whether a minority candidate was running was a "starting point" for determining probative elections. Defs. Ex. 6 at 71:21-72:8. Dr. Spencer then excluded three races involving the Black candidate George Furman as non-probative, because Furman "ran against seven different candidates and came in last every single time. More importantly . . . minority [voters] preferred Mr. Furman's opponents every single time, meaning elections that featured Mr. Furman are not probative of potential racially polarized voting." Defs. Ex. 5 at 2, n.1, 10; Defs. Ex. 4 at 3, 7 n.7, 39-41.

**Defs. Fact No. 24**: Plaintiffs dispute this fact. Dr. Spencer testified that "he would reserve the right to confirm that" Louis Jones was the candidate of choice in 2010 because the statistical estimates for that election "don't have asterisks next to them, which is [Dr. Spencer's] designation that there's a statistically significant difference between the vote totals." Defs. Ex. 6 at 96:6-15.

**Defs. Fact No. 25**: Plaintiffs dispute this fact. Plaintiffs' expert Dr. Lichtman's two expert reports also contain "*Gingles* Prongs 2 and 3 voting pattern data and analysis that was provided to the Defendants on or before Plaintiffs' rebuttal report disclosure deadline." Pls. Ex. 1 at 21; Pls. Ex. 2 at 2-10. In addition, Dr. Lichtman provided a supplemental table and chart R3-A to the Defendants at the Defendants' request. Defs. Ex. 8 at 215:21-219:20; Pls. Ex. 3.

**Defs. Fact No. 27**: Plaintiffs dispute this fact. As explained above in response to Facts 21, 22 and 24, Dr. Spencer specifically identified the races involving candidate George Furman as non-probative in his reports. Defs. Ex. 4 at 3, 7 n.7, 39-41; Defs. Ex. 5 at 2, n.1, 10.

**Defs. Fact No. 29**: Plaintiffs dispute this fact. Defendants' accounting of events is erroneous. Plaintiffs first provided Dr. Spencer's individual point estimates for all the candidates listed in Table 1 of Dr. Spencer's rebuttal report as a file titled "Spencer_script.R" with the disclosure of Dr. Spencer's rebuttal report on August 26, 2019. Pls. Ex. 4. However, Defendants do not have an expert competent to analyze Dr. Spencer's code. Pls. Ex 5 at 53:6-18. Thus, they requested via email that Plaintiffs provide this data to them in chart form on August 30, 2019. Pls. Ex. 6. Plaintiffs provided Dr. Spencer's individual estimates to them a *second time* on September 5, 2019, which is Defendants' Exhibit 7.

**Defs. Fact No. 30**: Plaintiffs dispute this fact. The quote from Dr. Spencer's rebuttal report is taken out of context. Defs. Ex. 5 at 8.

**Defs. Fact No. 31**: Plaintiffs dispute this fact. Dr. Spencer testified that he only calculated the individual point estimates for Hispanic and Asian voters and the equivalence testing analysis contained in Table 1 of his rebuttal report in response to Defendants' expert Dr. Kidd's critiques. Defs. Ex. 5 at 6-8; Defs. Ex. 6 at 143:9-146:5; 153:17-154:4.

**Defs. Fact No. 33**: Plaintiffs dispute this fact. The relevant threshold for analyzing the results of Ex. 7 is not a 50% threshold, but rather the vote percentage that the winning candidate received in the race. Defs. Ex. 6 at 128:1-129:22.

In addition, in many of the races included in Defendants' Exhibit 7, more than two candidates ran for each seat in question, meaning only 33% plus one vote could be enough to win, not 50%. Defs. Ex. 5 at 4-6. The races in Defendants' Exhibit 7 that involved more than two candidates include the two 2018 at-large seats, the 2018 Centerville seat, the 2014 Rose Hall seat, the 2012 Kemspville seat, the 2011 at-large seat, both 2010 at-large seats, the 2008 at-large seat, and the 2008 Kempsville seat, for a total of 10 out of 13 races considered. Defs. Ex. 4 at 12-29; Defs. Ex. 5 at 15; Defs. Ex. 7. Thus, if the applicable alternative threshold for each race (50+1% for two-candidate races, and 33+1% for races with three candidates or more) is used instead of Dr. Spencer's more conservative threshold, 12 out of 13 candidates would pass the relevant threshold for both Black and Hispanic support when considering the confidence intervals, and 9 out of 13 candidates could pass the relevant threshold for Hispanic, Black, and Asian support. Defs. Ex. 7.

Further, even using a 50% threshold, Defendants are not considering the confidence interval for the estimates in their Exhibit 7, which is improper. Defs. Ex. 8 at 67:19-68:9; Defs Ex. 6 at 125:11-127:5. The confidence interval is the standard error multiplied by 1.96. *Id.* at 44:2-17. When the confidence interval is considered, at least 10 of the 13 candidates analyzed could have received 50% or more support from both Black and Hispanic voters. Defs. Ex. 7. Further, at least seven candidates could have received 50% or greater support from Hispanic, Black and Asian voters according to Defendants' Exhibit 7 if the confidence interval is considered. *Id*.

**Defs. Fact No. 34**: Plaintiffs dispute this fact to the extent that Dr. Spencer testified that Table 1 shows eight of 13 candidates were minority preferred, but that he would need to check the

calculations for Mr. Flores in Defendants' Exhibit 7. Defs Ex. 6 at 150:1-15. Of those eight candidates, four won election. Defs. Ex. 7; Defs. Ex. 5 at 8; Defs. Ex. 6 at 152. Dr. Spencer also stated that "the most reliable method for interpreting the candidate preferences of Black, Hispanic, and Asian voters is to estimate their joint vote share, which I reported in my original report in a category called 'All Minority.'" Defs Ex. 5 at 6.

**Defs. Fact No. 35:** Plaintiffs dispute this fact. Dr. Lichtman did generate his own voter support and cohesiveness analysis in his initial and rebuttal reports, Pls. Exs. 1 and 2, as well as in a supplemental table R3-A that Defendants requested Dr. Lichtman's deposition. Defs. Ex. 8 at 215:21-219:20; Pls. Ex. 3.

**Defs. Fact No. 37:** Plaintiffs dispute this fact to the extent that Defendants allege that Dr. Lichtman testified equivalence testing is "needed" to compare voting behavior between Hispanic, Black, and Asian voters in Virginia Beach. Dr. Lichtman compared the voting behavior of these three groups in his expert reports by analyzing the statistical estimates, ecological regression and ecological inference, reported in Dr. Spencer's initial report. Pls Ex. 1 at 21; Pls. Ex. 2 at 2-10; Pls. Ex. 3. He also testified that another way to compare voting behavior between racial groups is to "look at [illustrative] districts and see if those districts would elect minority candidates of choice." Defs. Ex. 8 at 115:11-20, 121:12-122:1.

**Defs. Fact No. 39**: Plaintiffs dispute this fact. Dr. Lichtman testified that "you've got to use equivalence testing analysis" if using the unreliable individual estimates of Hispanic and Asian voting behavior, and *not* that equivalence testing is the only way to compare the preferences among Hispanic, Black, and Asian voters. Defs. Ex. 8 at 58:13-20, 67:19-68:9; Response to Defs. Fact No. 37, *supra*.

## LEGAL STANDARDS

### I.      Summary Judgment

A party seeking summary judgment must show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The court is "obliged to view the facts and inferences reasonably drawn therefrom in the light most favorable to the nonmoving party." *Gordon v. Schilling*, 937 F.3d 348, 356 (4th Cir. 2019) (quotation omitted).

### II.     Section 2 of the Voting Rights Act

Section 2 of the Voting Rights Act ("VRA") prohibits any state or political subdivision from imposing or applying voting requirements or procedures in a manner that denies or restricts the right of any United States citizen to vote "on account of race or color, or [membership in a language minority group], as provided in subsection (b)." 52 U.S.C. § 10301(a). To vindicate this right against an at-large or districting scheme, plaintiffs must satisfy three "necessary preconditions." *Thornburg v. Gingles*, 478 U.S. 30, 50 (1986). "The minority group must be 'sufficiently large and geographically compact to constitute a majority in a single-member district,' (2) the minority group must be 'politically cohesive,' and (3) the majority must vote 'sufficiently as a bloc to enable it . . . usually to defeat the minority's preferred candidate.'" *Bartlett v. Strickland*, 556 U.S. 1, 11 (2009) (quoting *Gingles*, 478 U.S. at 50–51). Additionally, plaintiffs must show, based on the "totality of the circumstances," that protected minority voters "have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." 52 U.S.C. § 10301(b). In conducting the totality of the circumstances analysis,

courts should consider the factors listed in the Senate committee report to the VRA's 1982 amend-

ments. *See Gingles*, 478 at 36–37; *Levy v. Lexington County, S.C.*, 589 F.3d 708, 713 (4th Cir.

2009).

In Section 2 cases, summary judgment "presents particular challenges due to the fact-

driven nature of the legal tests required by the Supreme Court." *Ga. State Conference of NAACP

v. Fayette Cnty. Bd. of Comm'rs*, 775 F.3d 1336, 1348 (11th Cir. 2015). Because district courts

must conduct "a searching practical evaluation of the past and present reality" in a jurisdiction,

*Gingles*, 478 U.S. at 79, and a "comprehensive, not limited, canvassing of relevant facts," *Johnson

v. De Grandy*, 512 U.S. 997, 1011 (1994), summary adjudication is rare.

## ARGUMENT

### I. Virginia Beach's At-Large City Council System Dilutes the Combined Voting Strength of Hispanic, Black, and Asian Voters

#### A. A Coalition of Minority Groups Can Bring a Claim Together Under Section 2

A coalition of two or more politically cohesive minority groups can bring a claim together

under Section 2. While the Supreme Court and the Fourth Circuit have not expressly addressed the

question,[1] the Second, Fifth, and Eleventh Circuits have each ruled that coalition claims are cog-

nizable under Section 2. *See Bridgeport Coal. for Fair Representation v. City of Bridgeport*, 26

F.3d 271, 276–77 (2nd Cir. 1994), *vacated on other grounds*, 512 U.S. 1283 (1994); *Concerned

Citizens of Hardee Cnty. v. Hardee Cnty. Bd. of Comm'rs*, 906 F.2d 524, 526 (11th Cir. 1990);

*Campos v. City of Baytown, Tex.*, 840 F.2d 1240, 1244 (5th Cir. 1988). The Ninth Circuit has

implicitly agreed, explaining, in a coalitional Section 2 case, that "[p]laintiffs must be able to show

---

[1] The Supreme Court has expressly declined to reach this issue. *See Bartlett*, 556 U.S. at 13–14. But when the issue has arisen, the Supreme Court assumed without deciding that coalition districts would be permissible. *Growe v. Emison*, 507 U.S. 25, 41 (1993).

that minorities have in the past voted cohesively for minorities and have the potential to elect minority representatives." *Badillo v. City of Stockton, Cal.*, 956 F.2d 884, 891 (9th Cir. 1992).[2]

The prevailing rule allowing coalition claims under Section 2 is correct. Section 2 protects "any citizen" against denial or abridgement of voting rights on account of race, color, or membership in a language minority. 52 U.S.C. 10301(a). With this inclusive language, Congress recognized that discrimination in voting is not a problem limited to any one race, but a legacy of white supremacy that can affect and has affected all people of color. It would be anomalous to conclude that when those voters' common experience of discrimination leads to inter-minority collective action, Congress's chosen safeguard would be powerless to protect those coalitions against voting discrimination.

The Fifth Circuit's decision in *LULAC Council No. 4386 v. Midland Independent School District* illustrates the commonsense logic of Section 2 coalition claims. *See* 812 F.2d 1494, 1495 (5th Cir. 1987), *vacated on other grounds*, 829 F.2d 546 (5th Cir. 1987) (en banc). In that case, a coalition of Black and Hispanic voters challenged the at-large structure of their local school board. The record showed a history of discrimination against both groups; resulting socioeconomic disparities; and consistent defeat of both groups' preferred candidates by white bloc voting. *Id.* at 1496–99. These circumstances led Black and Hispanic voters to the "realization that, at least in Midland, Texas, they have common social, economic, and political interests which converge and

---

[2] A district court in the First Circuit, adjudicating the claims of a Hispanic and Asian coalition of voters, recently adopted the prevailing view. *See Huot v. City of Lowell*, 280 F. Supp. 3d 228, 231 (D. Mass. 2017). The plaintiffs and defendants later settled via consent decree. *See* Consent Decree, *Huot v. City of Lowell,* No. 1:17-cv-10895 (D. Mass. Oct. 9, 2019), ECF No. 109.

make them a cohesive political group." *Id.* at 1501. Consequently, the court affirmed the district court's remedial order imposing single-member districts. *Id.* at 1503.[3]

Defendants nevertheless urge this Court to follow the lone exception to the prevailing view, *Nixon v. Kent County*, in which the Sixth Circuit ruled that Section 2 does not permit coalition-based claims of discriminatory results. 76 F.3d 1381, 1393 (6th Cir. 1996) (en banc). That decision cannot withstand scrutiny and this Court should decline to follow it.

The decision misinterprets the text of the statute. It suggests that Section 2 excludes coalition claims because subsection (b) refers to "participation by members of *a class* of citizens protected by subsection (a)." *Id.* at 1386-87 (quoting 52 U.S.C. § 10301(b)). But nothing in the statute requires every member of such a "class" to share the same race, as opposed to sharing the same experience of being politically excluded on account of race. "[A] class of citizens protected by subsection (a)" means just that—a class of individuals who are protected by subsection (a) against denial or abridgement of their individual right to vote. In this case, the minority coalition consists of three groups whose members are each protected by the VRA. Together, the coalition members here, each wielding the right conferred by subsection (a), are the "class of citizens" that subsection (b) protects.[4]

---

[3] The en banc Fifth Circuit later vacated the panel decision on other grounds. *See LULAC Council No. 4386*, 829 F.2d at 547–48. The Fifth Circuit has since adhered to the panel's ruling that Section 2 allows coalition claims. *See, e.g.*, *Brewer v. Ham*, 876 F.2d 448, 453 (5th Cir. 1989); *Campos*, 840 F.2d at 1244.

[4] Moreover, *Nixon* also depended on dubious "policy concerns" that the *Gingles* framework was created to resolve regardless of the minority group or groups involved. *Nixon* suggests that even if Congress found discrimination against two minority groups, "there is no basis for presuming such a finding regarding a group consisting of a mixture of both minorities." 76 F.3d at 1391. But the fact that two racial minorities together shoulder the burdens of discrimination in voting should not negate their right to an equal opportunity to elect candidates of their choice. Under Section 2, the homogeneity of a community is *never* presumed whether the minority group is comprised of one or several racial minorities. Instead, the *Gingles* prongs establish the cohesiveness of the minority

Defendants' reliance on *Hall v. Virginia*, 385 F.3d 421 (4th Cir. 2004), is also misplaced. That inapposite case concerns "crossover" districts, not coalition claims. *See Bartlett*, 556 U.S. at 13 (distinguishing between crossover claims and coalition claims and explaining why crossover claims are analytically distinct and cannot be conflated with coalition claims). Defendants' selective reliance on abstract language from *Hall*'s discussion of crossover districts fails to support their inference that *Hall* also prohibits coalition districts. Defs. Br. at at 11–13. The Fourth Circuit in *Hall* concluded only that "[a] coalition of black and white voters can certainly join forces to elect a candidate, but Section 2 does not create an entitlement for minorities to form an alliance with other voters in a district *who do not share the same statutory disability as the protected class*." 385 F.3d at 431 n.13 (emphasis added). That conclusion does not preclude a claim by an alliance of minority voters who *do* share the "statutory disability" of Section 2—i.e., a shared experience of discrimination. This distinction makes sense because the VRA specifically contemplates relief for subjugated minorities who are *not* receiving significant political support from the white majority. *See Gingles*, 478 U.S. at 50.

Finally, Defendants' proposed approach—which demands racial homogeneity among minority voters in order to benefit from the VRA's protections against discrimination—is deeply problematic. Indeed, as the dissent explained in *Nixon*, such a ruling that "voters historically denied access to the political process, protected under the Voting Rights Act, and sharing identical interests must be ethnically classified and segregated from one another denigrates the spirit and the language of the constitution." 76 F.3d at 1399. The VRA is a remedial statute intended to protect

---

community and the cohesiveness of a white majority voting bloc in opposition. Plaintiffs seek only the same opportunity to prove their claim that any other plaintiff would have.

minority voters from historical discrimination; it should not be used to balkanize minority communities suffering under the same discriminatory conditions. The line-drawing that the Defendants' approach espouses is nearly impossible to cabin and lends itself to easy manipulation by Defendants who will seek to slice and dice racial categories, using the unique heterogeneity of our communities of color against them. *See id.* at 1401 ("If we are to make these distinctions, where will they end? Must a community that would be considered racially both Black and Hispanic be segregated from other Blacks who are not Hispanic? Should the dwindling numbers of Native Americans be further decimated by a parsing of Navaho from Apache? Must Puerto–Ricans and Dominicans in the same neighborhood be separated based on their separate cultural and historical backgrounds?"). The Court should decline to follow such a path.

**B.     Hispanic, Black, and Asian Voters in Virginia Beach Are Politically Cohesive.**

Contrary to Defendants' assertions, evidence in the record demonstrates that Hispanic, Black, and Asian ("HBA") voters in Virginia Beach are politically cohesive. At minimum, this evidence raises a triable issue of fact as to the political cohesion of the minority communities in Virginia Beach. This evidence includes analysis of voting patterns in City Council elections ("endogenous" elections) performed by Plaintiffs' experts Dr. Spencer and Dr. Lichtman, as well as unchallenged evidence showing political cohesion among HBA voters in federal elections ("exogenous" elections), and reconstituted election results in Plaintiffs' Illustrative Plan's two majority-HBA districts. Moreover, Defendants misinterpret Dr. Spencer's report and improperly narrow the scope of evidence relevant to the cohesion inquiry. Alongside Plaintiffs' statistical evidence of political cohesion among HBA voters, qualitative evidence such as the combined efforts of HBA voters on core political issues and the City Council's own treatment of the HBA population as a

group during redistricting provides additional proof of cohesion among HBA voters in Virginia

Beach.

     1.   *Elections in Virginia Beach Demonstrate Significant Levels of Racially Polar-*
        *ized Voting and Cohesion Between Hispanic, Black, and Asian Voters*

          i.  <u>City Council Elections in Virginia Beach Are Marked by Racially Po-</u>
              <u>larized Voting Between Minority Voters and White Voters.</u>

Dr. Spencer's initial report analyzed minority political cohesion and white bloc voting in

Virginia Beach. He first performed a precinct-level assessment to "infer the voting behavior of

demographic subgroups," in every City Council election from 2008-2018 that featured a nonwhite

candidate. Defs. Ex. 4 at 4.[5] This assessment used the widely accepted and well-established statis-

tical measures of homogenous precinct analysis, ecological regression, and ecological inference.

*Id.* at 4-6.[6] Using these methods, estimates of candidate preferences can be produced for individual

racial groups or a combined minority group.

Since "the population of Hispanic and Asian voters [in Virginia Beach] is not large enough

to generate precise estimates of candidate preference using [these] traditional statistical methods,"

Defs. Ex. 5 at 6, Dr. Spencer estimated the candidate preferences of the combined minority voters

in Virginia Beach. Dr. Spencer explained that this was "the most reliable method for interpreting

the candidate preferences of black, Hispanic, and Asian voters." *Id.* Dr. Spencer reported these

---

[5] All nonwhite candidates for City Council between 2008-2018 were Black candidates. Defs. Ex. 4 at 3. Dr. Spencer excluded three races featuring perennial candidate George Furman as non-probative. George Furman, while African American, was not the candidate of choice of the minor-ity community in any of those races.

[6] Courts routinely approve the use of these methods. *See, e.g., Gingles*, 478 U.S. at 52-53, n.20 (approving use of homogenous precincts and ecological regression); *U.S. v. Charleston Cnty.*, 316 F. Supp. 2d 268, 303-04 (D.S.C. 2003), *aff'd*, 365 F.3d 341 (4th Cir. 2004) (finding Section 2 violation where both sides' experts used ecological regression and homogenous precinct analy-sis); *Bone Shirt v. Hazeltine*, 336 F. Supp. 2d 976, 1003 (D.S.D. 2004), *aff'd*, 461 F.3d 1101 (8th Cir. 2006) (approving use of ecological inference).

estimates on pages 12-31 of his initial report as the "All minority" category.[7] Using these estimates, Dr. Spencer found that of the 16 Black candidates who ran in probative elections from 2008-2018, ten of them "were the candidates of choice for minority voters" and seven of those ten (70%) "faced strong opposition by white voters and were defeated by white bloc voting." Defs. Ex. 4 at 3.[8] In addition, he found that "in 11 of 1[3] races, [there is] evidence that all minority voters share the same strong preference for a candidate and vote as a coalition." *Id.* at 11.[9] Dr. Spencer found that this was "strong evidence of racially polarized voting between minority and white voters in Virginia Beach elections." *Id*. at 7.

Defendants' motion ignores the analysis of Plaintiffs' expert Dr. Lichtman, who also examined racially polarized voting in City Council elections as part of his initial report, rebuttal report, and supplemental tables. Pls. Exs. 1, 2, and 3. In his initial report, Dr. Lichtman wrote: "For city council elections studied from 2008 to 2018, blacks and all minorities typically preferred to vote for black candidates and whites typically preferred to vote for white candidates. White bloc voting usually defeated city council candidates of choice of blacks and minorities." Pls. Ex. 1 at 21. He also noted that "no black candidate has ever won reelection to a city council position in

---

[7] Plaintiffs address Defendants' flawed arguments regarding the reliability of Dr. Spencer's combined estimate *infra*.

[8] Defendants' expert Dr. Kidd disputes this finding, instead opining that only one candidate between 2008-2018 experienced white bloc voting: Tanya Bullock in 2010. Pls. Ex. 5 at 76:6-11. These are precisely the types of material factual disputes unsuitable to resolution at the summary judgment stage.

[9] These 11 races include the following: the 2018 Centerville seat; 2016 Kempsville seat; 2014 at-large and Rose Hall seat; 2012 Kempsville seat, 2011 at-large seat, 2010 at-large, Bayside, and Princess Anne seats, and the 2008 at-large and Kempsville seats. Defs. Ex. 4 at 3, 11; Defs. Ex. 6 at 75:6-76:7; 84:17-85:1.

Virginia Beach," and that from 2008-2016 only one Black candidate won election to the City Council, "but she was defeated in her reelection bid by a 27-year old white woman." *Id*.[10]

Dr. Lichtman's rebuttal report and supplemental analyses further discuss racially polarized voting in Virginia Beach and several disputes with Dr. Kidd's expert report. Pls. Ex. 2 at 2-10; Pls. Ex. 3. In particular, Dr. Lichtman's supplemental Table R3-A demonstrates that of the 10 minority candidates of choice of HBA voters between 2008-2018, only three won their elections (30%). *Id.* Significantly, two of the three successful Black candidates were elected in 2018, during the pendency of this lawsuit. The Supreme Court has specifically recognized that elections during the pendency of VRA litigation constitute special circumstances making them less probative.[11] If these two elections are discounted, *only one of eight* Black candidates of choice of minority voters was elected between 2008-2018. This disputed evidence, unmentioned in Defendants' brief, precludes resolution of either *Gingles* prong 2 or 3 by a summary judgment motion.

        ii.   <u>Dr. Spencer's "All Minority" Estimate is a Reliable Measurement of Cohesion Between Hispanic, Black, and Asian Voters.</u>

As explained above, given that the Hispanic and Asian "precinct-level populations are simply too small to draw reliable conclusions about . . . independently," Dr. Spencer estimated the joint preferences of Hispanic, Black, and Asian voters together. Defs. Ex. 5 at 6. This combined estimate provides a reliable measure of cohesion among minority voters in Virginia Beach.  Yet Defendants' contention that combined estimates are not probative of cohesion among the minority community raises a factual dispute, is unsupported by the case law and, at most, goes to the *weight*

---

[10] During the City's 55-year history, only six African Americans have served on the City Council. "Of the 605 possible seats during that time (eleven seats x 55 years) less than 1% have been occupied by an African American." Defs. Ex. 4 at 3. To Plaintiffs' knowledge, there have been no Hispanic City Council members, and only one Asian City Council member (Ron Villanueva). *See, e.g.,* Pls. Ex. 7 (Moss Dep) at 111:5-10.

[11] The special circumstances doctrine is discussed further in Subsection I.C.1 of the brief.

this Court should give to the combined estimates at trial once all evidence is presented. Where, as here, the evidence "sets up a battle of the experts," the case "should not be resolved at summary judgment." *Reyazuddin v. Montgomery Cnty., Md.*, 789 F.3d 407, 417 (4th Cir. 2015).

Combined estimates of minority voting are properly used as evidence of inter-minority cohesion. *See, e.g.*, *Campos*, 840 F.2d at 1247 (upholding finding of cohesion based on "statistical evidence of the voting pattern of the combined minority," where the district court properly declined to credit defendant's attempt at single-race estimates); *Rodriguez v. Pataki*, 308 F. Supp. 2d 346, 421 (S.D.N.Y. 2004), *aff'd mem.*, 543 U.S. 997 (2004) (faulting plaintiffs' expert for failing to use a combined estimate of Black and Hispanic voting to analyze cohesion). In addition, given the relatively small Hispanic and Asian population in Virginia Beach, a combined estimate is *the best available data* for assessing levels of minority political cohesion. Defs. Ex. 5 at 6-7. Under these circumstances, using combined estimates to show cohesion allows this court to avoid "mechanically" applying the *Gingles* preconditions "without regard to the claim." *Voinovich v. Quilter*, 507 U.S. 146, 158 (1993).

Contrary to Defendants' arguments, there is nothing "deceptive" about Dr. Spencer's combined estimate of minority candidate preferences, nor does it "presume" cohesion. Defs. Br. at 16. Dr. Spencer's "All Minority" estimate is exactly what Plaintiffs' experts say it is: an estimate of the preferences of Hispanic, Black, and Asian voters *together*. And, as Dr. Spencer noted, "Black, Hispanic, and Asian voters combined generate estimates that are statistically significantly different from white voting, which then makes a comparison between these groups possible." Defs. Ex. 5 at 6. Dr. Spencer's analysis also shows that the "All minority" estimates correlate strongly with the independently reported "Black" estimates of candidate preference. The 2016 race between

Black female candidate Amelia Ross-Hammond and white female candidate Jessica Abbott is illustrative. Defs. Ex. 4 at 16. In this race, Hispanic, Black, and Asian voters *together* strongly preferred Ross-Hammond over Abbott, while white voters strongly supported Abbott, leading to Ross-Hammond's defeat. *Id*.

Defendants' arguments simply reflect a flawed understanding of how statistical estimates of voter preference work. For example, Defendants focus only on the ecological inference estimate, but that is improper when assessing cohesion. Dr. Spencer testified that it generally is best to "look for a pattern of support that is confirmed by all three methods." Defs. Ex. 6 at 91:7-12. Thus, while Defendants focus on one estimate alone for the Ross-Hammond and Abbott race, what *all three* estimates show is a statistically significant difference between the high all minority support and the low white support for Ross-Hammond. Defs. Ex. 4 at 15. This corresponds with a statistically significant difference between the high Black support and low white support for Ross-Hammond. *Id*. In addition, the homogenous precinct estimates for Black and All minority support for Ross-Hammond are virtually identical (at 62.3 versus 62.1), showing no meaningful difference between the preferences of the two groups. *Id*. at 15-16.

For similar reasons, Defendants' "Jack & Jill" example is not persuasive. As shown above, Dr. Spencer's combined estimates using three different statistical methods, along with the individual "Black support" estimate, provide much more information about voter preferences than the Defendants' simple hypothetical based on a single measurement. And, as discussed below, Dr. Spencer's analysis of exogenous elections and reconstituted election results also show that Hispanic, Black, and Asian voters vote together, otherwise they would not be able to elect their candidates of choice in Plaintiffs' illustrative districts. Defs. Ex. 4 at 31-32. This is additional evidence that the combined estimate is not "masking" differences between racial groups.

Defendants' flawed understanding of the complex statistical evidence in this case is likely informed by their chosen expert, who lacks the necessary qualifications to assess the evidence. Dr. Kidd has never analyzed racially polarized voting, either personally or professionally. Pls. Ex. 5 at 39:2-18. He has never published any peer-reviewed articles on conducting a racially polarized voting analysis and he has no expertise on the methodology for doing so. *Id.* at 37:16-38:13. He did not attempt to calculate his own homogenous precinct, ecological regression, or ecological inference estimates, *id*. at 52:1-9, and he did not even open the file Dr. Spencer produced containing his estimates. *Id*. at 53:6-18. When Dr. Kidd actually engages with Dr. Spencer's analysis, he incorrectly applies a 50% threshold for candidates of choice in *every* election, a standard which makes no sense given the high number of multi-candidate races in Virginia Beach. *See*, *e.g.,* Pls. Ex. 5 at 78:1-12; Defs. Ex. 5 at 5-6, n. 2. Dr. Kidd's 50% threshold is patently improper. *See, e.g.,* Defs. Ex. 5 at 4-6; Pls. Ex. 2 at 3, 6. As Dr. Lichtman's rebuttal report indicates, Dr. Kidd's report is filled with omissions, errors, and inconsistencies. *See, e.g.,* Pls. Ex. 2 at 10, 12, 15-40.

Finally, Dr. Kidd's primary critique of Dr. Spencer's combined estimate is an analysis that relies in part on different levels of turnout between Black, Hispanic, and Asian voters in Virginia. Pls. Ex. 8 at 19-20. Dr. Kidd writes "we know that Asian and Hispanic voters do not turn out at the same rate as African American voters . . . The average African American turnout [in Virginia] during these election years is 54.3%. Asian average turnout lags that by 6.9% and Hispanic average turnout lags it by 9.9%." *Id.* However, courts have repeatedly discounted analyses that rely on turnout rates to disprove a Section 2 claim, and to the extent Dr. Kidd's analysis relies on differential turnout rates, this Court should discount it as well. *See, e.g., Montes v. City of Yakima*, 40 F. Supp. 3d 1377, 1405 (E.D. Wash. 2014) ("[T]he Ninth Circuit has prohibited district courts from discounting statistics about a minority group's candidate preferences on the basis of low voter

turnout"); *Gomez v. City of Watsonville*, 863 F.2d 1407, 1416 (9th Cir. 1988) ("The district court erred by focusing on low minority voter registration and turnout as evidence that the minority group was not politically cohesive.").[12]

The parties' disagreements over the reliability of a combined minority estimate to show political cohesion demonstrate genuine disputes of material facts. This classic "battle of the experts" precludes summary judgment. *See, e.g., LifeNet Health v. LifeCell Corp.*, 2014 WL 5456521 at *12 (E.D. Va. Oct. 27, 2014) (holding summary judgment is inappropriate where parties dispute "'the credibility and weight that should be afforded to conflicting expert reports'").

    iii.  <u>Defendants Ignore Significant Yet Undisputed Record Evidence from Plaintiffs' Experts Showing Cohesion Among HBA Voters</u>

In addition to the statistical evidence from Dr. Spencer and Dr. Lichtman showing political cohesion in endogenous elections, Dr. Spencer also offers two other categories of statistical evidence that are *undisputed* in this case: analysis of voting patterns in exogenous federal elections and reconstituted election results in Plaintiffs' Illustrative Plan's majority-HBA districts.[13] This powerful and unchallenged evidence of cohesion among HBA voters in Virginia Beach is additional proof that genuine issues of material fact regarding cohesion remain.

Dr. Spencer's initial report, Defs. Ex. 4, provides analysis of racially polarized voting in four federal elections with precincts in Virginia Beach, including the 2008 and 2012 Presidential elections, the 2008 Presidential primary, and the 2016 Congressional election, all of which featured

---

[12] In addition, Dr. Kidd's analysis relies on turnout estimates for *Virginia* as a whole, not Virginia Beach. Pls. Ex. 8 at 19-20. He also did not calculate margins of error for the estimates in this table, even though he could have. Pls. Ex. 5 at 109:13-110:3.

[13] Defendants' experts did not mention and offered *no opinions whatsoever* in their expert reports, deposition testimony, or Defendants' Motion regarding Dr. Spencer's analysis of racially polarized voting in federal elections or his analysis of reconstituted elections in Plaintiffs' Illustrative Plan districts.

a Black candidate challenging a white candidate. *Id.* at 30-31. All four of these elections show significant levels of racially polarized voting in Virginia Beach. As Dr. Spencer found, in the 2008 and 2012 Presidential elections, "Minority voters strongly preferred Obama over both John McCain and Mitt Romney, with an estimated 90% support. White voters strongly preferred McCain and Romney (65% support) over Obama (35% support)." *Id.* at 30, Fig. 12. The 2008 primary results, which show "much stronger" support for Obama "among minority voters," also demonstrate that "even controlling for party label there is evidence of racially polarized voting in Virginia Beach." *Id.* at Fig. 13. Finally, the 2016 Congressional election between Black female candidate Shaun Brown and white male candidate Scott Taylor "provides evidence of racial coalitional voting, minority cohesion, and oppositional white bloc voting" in Virginia Beach. *Id.* at 31, Fig. 14. Despite being the clear candidate of choice for HBA voters, "Brown earned just 36.6% of the city's overall votes compared to 63.3% for Taylor." *Id.*[14]

Courts considering Section 2 claims, including in the Fourth Circuit, have repeatedly held that exogenous elections are probative of whether minority voters are politically cohesive. *See, e.g., Cane v. Worcester Cnty., Md.*, 840 F. Supp. 1081, 1088 (D. Md. 1994) (explaining that "plaintiffs may rely on factors beyond endogenous election data that prove political cohesion," including exogenous elections) (quoting *Gingles*, 478 U.S. at 57, n. 25; *Hall v. Holder*, 955 F.2d 1563, 1571 (11th Cir. 1992)), *aff'd in part, rev'd in part on other grounds, Cane v. Worcester Cnty., Md.*, 35

---

[14] Dr. Lichtman also analyzed these exogenous elections, concluding in his initial report that Dr. Spencer "found a pattern of substantial racially polarized voting in these four federal elections. In 3 of 4 elections, white bloc voting defeated the candidate of choice of black and minority voters within the precincts of Virginia Beach." Pls. Ex. 1 at 21. In his rebuttal report, Dr. Lichtman further stated that "this polarization applied to all minority voters. In all four elections, the minority support for black candidates averaged about 90 percent or more, showing an extreme degree of cohesion." Pls. Ex. 1 at 2-3.

F.3d 921 (4th Cir. 1994); *Jenkins v. Red Clay Consolidated Sch. Dist. Bd. of Educ.*, 4 F.3d 1103, 1134-35 (3rd Cir. 1993) (holding that exogenous elections could be considered in racially polarized voting analysis); *Citizens for a Better Gretna v. City of Gretna, La.,* 834 F.2d 496, 502 (5th Cir. 1987) ("[T]he district court properly considered [exogenous elections] as additional evidence of bloc voting—particularly in light of the sparsity of available data."). This authority leaves no doubt that exogenous election results are relevant in assessing political cohesion. Here, the results unequivocally demonstrate political cohesion among HBA voters.

Dr. Spencer also offered *uncontested* analyses of reconstituted election results in Plaintiffs' Illustrative Plan's majority-HBA districts. Defs. Ex. 4 at 32-34; Defs. Ex. 5 at 10, 16. Reconstituted elections analysis "merg[es] voting data from previous elections to the boundaries of each new district[]" to determine whether minority candidates of choice could be elected if single-member districts replaced at-large elections. Defs. Ex. 4 at 32; *see also Rodriguez v. Bexar Cnty., Tex.,* 385 F.3d 853, 861 (5th Cir. 2004) (defining reconstituted elections analysis). As Dr. Lichtman testified at his deposition, "other evidence [to prove political cohesion] would be whether or not the minority candidates could win in illustrative districts drawn without a majority of one group but a combined majority. That would be—you know, we'd call that reconstituted elections, and that's a second powerful test." Defs. Ex. 8 at 121:12-122:1; *see, e.g., Johnson v. Miller*, 864 F. Supp. 1354, 1391 (S.D. Ga. 1994) (per curiam) ("Statistically speaking, reconstituted election results from precincts within a certain district, actual prior election results from a certain district, and frequency distributions are the primary methods used to estimate the percentages needed to give [minority] voters an equal opportunity to elect a candidate of their choice.") *aff'd Miller v. Johnson,* 515 U.S. 900 (1995); *Hall v. Louisiana*, 108 F. Supp. 3d 419, 436 (M.D. La. 2015) ("[R]econstituted elec-

tions are valuable in demonstrating voting patterns within the relevant electorate, to elucidate voting patterns within the jurisdiction when voters have an opportunity to vote for [a minority] candidate.").

Dr. Spencer performed this "second powerful test" in both of his expert reports, and his findings demonstrate significant political cohesion among HBA voters in Virginia Beach. This analysis makes sense intuitively. If HBA voters do not vote together in elections, they would not be able to regularly elect candidates of choice in Plaintiffs' illustrative districts containing 50.03% and 50.04% HBA CVAP. Defs. Ex. 1 at 20.[15]

In his initial report, Dr. Spencer performed a reconstituted elections analysis for seven City Council races between 2008 and 2016. Defs. Ex. 4 at 33. Table 6 of the report shows that of those seven races in the reconstituted elections analysis, 4 of 7 minority preferred candidates would win election in District 1 (compared to 0 of 7 under the at-large system), and 5 of 7 minority preferred candidates would win election in District 2 (compared to 0 of 7 under the current at-large system). *Id.* at 34. This marked improvement is critical evidence of political cohesion among HBA voters.

Dr. Spencer's rebuttal report added an analysis of the 2018 City Council election results in the Plaintiffs' Illustrative Plan's districts. Defs. Ex. 5 at 10, 16. Under this analysis, Black candidate Aaron Rouse would still be elected under Illustrative Districts 1 and 2. *Id.* at 16. In addition, "minority [voters] preferred Dee Oliver over the incumbent John Moss by a three-to-one margin, yet Moss won re-election [in 2018]" under the at-large system. But, in Illustrative Districts 1 and 2, "Ms. Oliver would have won a seat on the City Council instead." *Id.* This analysis again presents

---

[15] Including mixed race individuals (those who identify as black and white), District 1 has a 51.11% Hispanic, Black, and Asian Citizen Voting Age Population ("HBA CVAP"), and District two has a 51.08% HBA CVAP. Defs. Ex. 1 at 21.

significant, uncontested evidence of cohesion among HBA voters in endogenous elections. Defendants thus cannot credibly argue that the question of whether political cohesion among minority voters exists is undisputed. At a minimum, it is a material fact in dispute.

>    2.   *Plaintiffs Have Also Produced Qualitative Evidence That Is Probative of Cohesion Among Hispanic, Black, and Asian Voters*

Qualitative evidence may also be used to demonstrate cohesion. *Brewer v. Ham*, which Defendants cite, makes clear that "statistical evidence is not a *sine qua non* to establishing cohesion." 876 F.2d 448, 454 (5th Cir. 1989). Rather, under *Gingles*, "[c]ourts may look to [non-statistical] evidence to demonstrate political cohesiveness, since '[t]he experiences and observations of individuals involved in the political process are clearly relevant to the question of whether the minority group is politically cohesive.'" *Luna v. Cnty. of Kern*, 291 F. Supp. 3d 1088, 1125 (E.D. Cal. 2018) (quoting *Sanchez v. Bond*, 875 F.2d 1488, 1494 (10th Cir. 1989)).

Defendants wrongly contend that the statistical evidence presented fails to be probative for Asian-Americans and Hispanic-Americans. But even if that were true—*it is not*—Plaintiffs' claims need not hinge on statistical evidence alone. In *Bridgeport Coal. for Fair Representation v. City of Bridgeport*, for example, the statistical evidence was stronger for one of the groups in the coalition but lacking for the other, but the court found sufficient evidence of cohesiveness by supplementing the statistical evidence with qualitative evidence from the community. 26 F.3d 271, 276 (2d Cir. 1994), *vacated on other grounds, City of Bridgeport, Conn. v. Bridgeport Coal. for Fair Representation*, 512 U.S. 1283(1994). Even in the absence of any statistical evidence, a court could still find that cohesiveness has been sufficiently demonstrated by qualitative evidence of political cohesiveness. *See Arbor Hill Concerned Citizens Neighborhood Ass'n. v. Cnty. of Albany*, 2003 WL 21524820 at *8-9 (N.D.N.Y. 2003).

This makes sense. Where the statistics may be stymied by limitations of the data, local leaders often understand the political dynamics of their communities quite well. Here, the record reflects four primary types of qualitative evidence in addition to the statistical evidence: evidence of the city treating the HBA communities as one group, evidence of elected officials treating the HBA communities as one group, evidence of shared interests of the HBA communities, and evidence of the HBA communities working together as a unified coalition. This evidence is consistent with the types of qualitative evidence other courts have relied upon in assessing cohesiveness. Defendants ignore this qualitative evidence entirely. Below is a non-exhaustive description of the qualitative evidence currently in the record. This evidence, like the statistical evidence, plainly demonstrates a serious dispute as to the material fact of political cohesion.

First, the record demonstrates that the Virginia Beach city government frequently regards the HBA community as one cohesive group. In 2011, for example, the city touted the City Council's attempt to create a majority-minority district (albeit one that only dictates the residence of the candidate, not the voters that may cast ballots in that district). Pls. Ex. 9.[16] That district, the Centerville District, is comprised of Hispanic, Black, and Asian voters. Pls. Ex. 10; Pls. Ex. 11 at 39:2–16.[17] Plainly, the city saw those minority groups as a cohesive group such that the creation of a district in which there was an HBA majority would satisfy those communities. Councilman Dyer specifically explained that his and the Council's motivation behind the creation of the district was "to see equal representation." Pls Ex. 11 at 39: 2–16.[18] Additionally, the Virginia Beach Minority

---

[16] All exhibits obtained from Defendants and in response to subpoenas are authenticated by the declaration of Simone Leeper. *See* Pls. Ex. 37.

[17] In fact, the Centerville District is just shy of being a majority-minority district with 45.91% HBA CVAP. Defs. Ex. 1 at 69.

[18] Similar evidence has been used to demonstrate cohesiveness in other cases. *See, e.g.*, *Arbor Hill Concerned Citizens Neighborhood Ass'n*, 2003 WL 21524820 at *9 (considering consent decree

Business Council (MBC) works to support "minority business owners" without limiting that support to any particular group. Pls. Ex. 17 at 107:2-9 (describing the purpose of the MBC). Members of the MBC reflect the true diversity of Virginia Beach rather than just coming from one specific racial group. Pls. Ex. 33.[19]

Second, Virginia Beach City Council members treat the HBA community as a cohesive community. For example, City Council members Aaron Rouse and Rosemary Wilson speak about minorities in Virginia Beach as a group with group-specific needs and priorities. *See, e.g.*, Pls. Ex. 17 at 48:13-19 (Councilman Rouse discussing his platform goal about increasing *minority* participation to level the playing field economically); Pls. Ex. 32 at 170:4 (Councilwoman Wilson discussing the hiring of minority police officers and saying "we really love having minorities"). Other courts have considered the impressions of elected officials based on their "observations of past city elections and personal contacts with minority citizens." *Bridgeport Coal. for Fair Representation v. City of Bridgeport*, 26 F.3d 271, 276 (2d Cir. 1994).

Third, there is substantial evidence that the HBA communities have shared interests in Virginia Beach. This type of evidence is appropriate because, when assessing cohesiveness, courts may consider evidence that the minority coalition has shared concerns that are different than those of the majority community. *Luna v. Cnty. of Kern*, 291 F. Supp. 3d 1088, 1126 (E.D. Cal. 2018).

---

creating a majority-minority district comprised of both black and Hispanic communities to resolve a VRA claim Act as an admission that the county considered the groups to be politically cohesive).

[19] Virginia Beach has indicated in other ways that it considers the HBA community to be a cohesive group. For example, in multiple Virginia Beach Equal Employment Opportunity Plans, the greater category of "minorities" has been included before parsing it out into subcategories. *See, e.g.*, Pls. Ex. 12 at DEF 11629, Pls. Ex. 13 at DEF 11878, Pls. Ex. 14 at DEF 11940, and Pls. Ex. 15 at DEF 11554-11555. And the City of Virginia Beach Department of Housing and Neighborhood Preservation identified "minorities" writ large as a target of their outreach without disaggregating by race. Pls. Ex. 16 at DEF 10610-10613.

Councilman Rouse specifically identified the shared interests of the minority community in Virginia Beach as such unique concerns in speaking about why there was a lack of minority representation on City Council and why that matters. Councilman Rouse testified that "what may particularly have been an issue for the minority population may be overlooked by the majority." *See* Pls. Ex. 17 at 89:18–20. Councilwoman Abbott identified what some of those minority-specific issues were when she testified that the two issues she had spoken about with minority community members most frequently were (1) district voting and (2) the minority community's desire for a disparity study. Pls. Ex. 18 at 136:15-137:12. Regarding district voting, Plaintiff Latasha Holloway testified that she believes "all black and brown individuals" including Hispanic, Black, and Asian persons are affected by breakdowns resulting from a deficit of representation. Pls. Ex. 19 at 53:13-54:10. Councilwoman Abbott echoed this sentiment when she provided documentation in response to her subpoena that reflected her support for a district system of election because of "systemic racial disparities" that result from at large systems. Pls. Ex. 20 at 17.

Finally, there is evidence that the HBA communities have acted as a unified coalition in Virginia Beach. In a 2001 redistricting effort, the HBA coalition united under a single name, "Community Coalition for a Better Virginia Beach," to advocate for single-member districts. This effort is reflected both in a transcript from a public hearing that was held on the redistricting effort and in Plaintiff Georgia Allen's declaration. Pls. Ex. 21; Pls. Ex. 22 at 2. In 2003, the HBA coalition united to protest the Virginia Beach city treasurer on two separate occasions after he made derogatory remarks to the African-American and Asian-American communities. Pls. Ex. 22 at 3. These and other examples demonstrate a united HBA coalition probative of cohesiveness. *See*

*Arbor Hill Concerned Citizens Neighborhood Ass'n.*, 2003 WL 21524820 at *9 (considering evidence of past instances when minority groups "jointly participated in and supported various events and projects of interest to one or the other group").

The record includes all four types of qualitative evidence regarding the 2018 disparity study conducted by Virginia Beach. First, the disparity study and the underlying disparate result were of considerable interest to the minority community as a whole, not simply African-Americans. Pls. Ex. 23 at DEF07724-07725 ("Many small businesses led by people of all races are not getting a fair shake at city contracts.") ("This is a conversation that has been going on in a lot of communities—and not just the African American community—for decades."); Pls. Ex. 24 at DEF0790–07791 (reporting that "businesses owned by Native Americans, Hispanics and African Americans" were underutilized). Second, the disparity study was only undertaken after persistent public agitation from a diverse coalition of the minority community. Pls. Ex. 23 at DEF 07725 07725 ("Facing backlash from community, Virginia Beach agrees to study whether enough city contracts given to minorities."); Pls. Ex. 28 at DEF 07750 ("The 2017 faith march drew blacks, but also whites and Latinos."). Third, city council members recognized that the study was a priority for the minority community at large. Pls. Ex. 25 (Councilwoman Wooten specifically inviting Hispanic, Filipino, and Asian-American community groups to an event addressing the disparity study); Pls. Ex. 18 at 136:15-137:12 (Councilwoman Abbott identifying the desire for a disparity study as one of the most common topics with the minority community). And finally, the disparity study itself discusses "minority-owned businesses," which is defined to include businesses owned by people identifying as Black, Asian, Hispanic, or Native American. Pls. Ex. 29 at DEF 08945.

Defendants dismiss this important qualitative evidence, which bolsters Plaintiffs' claims of minority cohesion. Plaintiffs provided a lengthy and diverse list of witnesses who can testify to

the minority community's longstanding efforts to work together to overcome racial discrimination. Pls. Exs. 30-31. Defendants chose not to depose any of them. The evidence in the record demonstrates that the city and City Council members treat the HBA community as cohesive, that the HBA communities share common interests not shared by the majority, and that the HBA communities have historically worked as a united coalition. This qualitative evidence corroborates the statistical evidence provided by Plaintiffs that the HBA communities in Virginia Beach are cohesive.

### C.       Plaintiffs' Evidence Satisfies the *Gingles* Requirement of White Bloc Voting

The third *Gingles* precondition asks whether "the white majority votes sufficiently as a bloc to enable it – in the absence of special circumstances . . . – to defeat the minority's preferred candidate." *Gingles*, 478 U.S. at 51. In making this determination, "the court must first identify those individuals who constitute minority-preferred candidates of choice, and then analyze whether those candidates are usually defeated by majority White bloc voting." *Levy v. Lexington Cnty., S.C.*, 589 F.3d 708, 716 (4th Cir. 2009). After factoring in the special circumstances of the 2018 elections, the white majority in Virginia Beach has usually defeated minority-preferred candidates. Further, even if the special circumstances did not exist, minority candidates usually lose due to white bloc voting.

### 1.   *The 2018 City Council Elections Are Special Circumstances That Should be Discounted*

Defendants' argument on *Gingles* prong 3 is largely premised on the success of Aaron Rouse and Sabrina Wooten in the 2018 elections. But a single election cannot outweigh decades of white majority bloc voting defeating minority candidates of choice. *N.C. State Conference of NAACP v. McCrory*, 831 F.3d 204, 232 (4th Cir. 2016) ("First, as the Supreme Court has explained, courts should not place much evidentiary weight on any one election."). Prior to 2018, in

its entire history Virginia Beach had only elected three Black city councilmembers, one Asian city councilmember, and zero Hispanic city councilmembers. Defs. Ex. 4 at 7; Pls. Ex. 7 at 111:5-10. Likewise, only one minority candidate has *ever* been elected to any of the city's five constitutional offices, all of which are elected citywide. Pls Ex. 1 at 43. No Black city councilmember has ever won re-election, despite the natural incumbency advantage of current members. Pls. Ex. 1 at 21. That is not the type of "*sustained* success" of minority candidates of choice that can defeat a Section 2 challenge. *Gingles,* 478 U.S. at 77 (emphasis added).

Moreover, Defendants fail to recognize the well-established doctrine of "special circumstances," under which courts steeply discount the probative value of elections taking place during the pendency of VRA litigation, such as the 2018 elections here. Under *Gingles*, Plaintiffs must "demonstrate that the white majority votes sufficiently as a bloc to enable it—*in the absence of special circumstances . . .*—usually to defeat the minority's preferred candidate." 478 U.S. at 51 (emphasis added). One of those special circumstances, recognized in *Gingles*, is when the elections relied upon occurred during the pendency of litigation, which could "work[] a one-time advantage for black candidates in the form of unusual organized political support by white leaders concerned to forestall single-member districting." *Id.* at 76 (citation omitted).

Indeed, elections held during the pendency of litigation is the prototypical "special circumstance" that makes an election less than probative. Even absent a "conspiracy or an intent to moot this litigation," the Fourth Circuit has held that elections during the pendency of litigation can be suspect. *Collins v. City of Norfolk,* 816 F.2d 932, 938 (4th Cir. 1987). Like here, in *Collins,* the city elected two Black councilpersons simultaneously for the first time in its history. *Id.* The Fourth Circuit held that this raised a serious question of special circumstances and remanded the matter to the district court. *Id.* at 937-38. On further appeal, the Fourth Circuit found that "prior to the

special circumstances of 1984, white voters were able to defeat the combined strength of black voters and white crossover votes, denying the black community a second seat on the council" and held that "the election of a second black councilman in 1984 was the result of special circumstances" and could not be determinative. *Collins v. City of Norfolk,* 883 F.2d 1232, 1242 (4th Cir. 1989); *see also Jenkins*, 4 F.3d at 1132 ("Prior to the commencement of this lawsuit, only a single black had been elected to the Red Clay School Board. Although Scotton's victory in the 1990 election was not shown to have been caused by the pendency of the lawsuit . . . the minority successes in 1990 and 1991 are sufficiently recent and, potentially, transitory to limit their probative value.").

The 2018 elections of Councilmembers Rouse and Wooten meet all the indicia of special circumstances. Councilwoman Wooten is the only minority candidate in the record who has ever received a majority of white support. Indeed, "the 51% of white voters who supported her is more than three times the average support for the minority candidates during" the time period studied by Dr. Spencer. Defs. Ex. 4 at 12; *see also* Defs. Ex. 6 at 83:8-21. Likewise, the white support for Councilman Rouse far exceeded ordinary white support for minority candidates. *See* Pls. Ex. 1 at 44 ("[W]hite support for Rouse's candidacy was 15.4 percentage points and 179 percent higher than the average white support of 8.6 percent for the 5 other black candidates."). Both Councilmembers Wooten and Rouse also received unusual levels of financial support from wealthy white donors in Virginia Beach as compared to the ordinary minority candidate for city council. *See* Pls. Ex. 1 at 47-57.

Council members Rouse and Wooten also received unusual support from white incumbent city councilmembers. Councilwoman Rosemary Wilson affirmatively reached out to Ms. Wooten to support her campaign. Councilwoman Wilson not only endorsed Ms. Wooten but also donated

to her campaign, introduced Ms. Wooten to many of her top donors and helped her solicit those donations, attended her events, and lent her other support and advice. Pls. Ex. 34 at 132:16-21, 137:4-6, 138:13-140:13, 141:1-11; Pls. Ex. 35 at 69:3-22, 64:17-19. Ms. Wooten was also a former student of Mayor Dyer and received support from Mayor Dyer and Councilmember Jim Wood. Pls. Ex. 11 at 30:19-21; Pls. Ex. 34 at 133:4-11.

Notably, Mr. Rouse was included on a slate of candidates supported by an organization headed by a prominent Republican in Virginia Beach, Friends of the Elephant. Pls. Ex. 26 at 8-9; Pls. Ex. 18 at 174:10-17. Troublingly, Mr. Rouse was *only* included on the slate in a flyer passed out solely to non-white voters at the polls. Pls. Ex. 36 at 77:4-13. White voters received a separate flyer that did not include Mr. Rouse. *Id*. Mr. Rouse's election was also accompanied by other special circumstances. His status as a well-known college and professional football player gave him immediate name recognition and helped his campaign. Pls. Ex. 17 at 61:6-63:18. He was also endorsed by the Governor of Virginia and U.S. Senator Warner, both very rare for a local city council election. *Id*. at 41:10-17. The minority community should not be limited to electing candidates of choice who are famous football players with statewide endorsements and unusual white donor and voter support.

> 2. *Even If the 2018 City Council Elections Are Not Special Circumstances, Minority-Preferred Candidates in Virginia Beach Usually Lose*

Whether or not the 2018 City Council elections are discounted, Plaintiffs have presented sufficient evidence to satisfy *Gingles* prong 3. To determine whether white bloc voting usually defeats minority candidates of choice, the Court must determine which elections to analyze. *See Gingles*, 478 U.S. at 57 n. 25. Not all elections are equally probative. "Endogenous and interracial elections are the best indicators of whether the white majority usually defeats the minority candidate." *Bone Shirt v. Hazeltine*, 461 F.3d 1011, 1020-21 (8th Cir. 2006); *see also Old Person v.*

*Cooney*, 230 F.3d 1113, 1123–24 (9th Cir. 2000) ("Elections between white and minority candidates are the most probative in determining the existence of legally sufficient white bloc voting."). However, the Court "must consider, at a minimum, a representative cross-section of elections, and not merely those in which a minority candidate appeared on the ballot, at least where elections in which minorities were on the ballot do not constitute a substantial majority of the total number of elections." *Lewis v. Alamance Cnty., N.C.*, 99 F.3d 600, 608 (4th Cir. 1996).

In Virginia Beach, between 2008 and 2018 there were 27 total City Council elections. Seventeen of these elections – approximately 63 percent – included a minority candidate. That 63 percent constitutes a "substantial majority" and a "representative cross-section" of the endogenous elections is not in dispute in this case.

i.   In Probative Elections, Minority-Preferred Candidates Usually Lose Due to White Bloc Voting.

Defendants argument that *Gingles* prong 3 is not met is contrary to the evidence. Indeed, both Dr. Spencer and Defendants' own expert conclude that white bloc voting usually leads to the defeat of minority-preferred candidates.

In his initial report, Dr. Spencer found 17 City Council elections between 2008 and 2018 to be probative. In 10 of those elections, Dr. Spencer identified a minority-preferred candidate. Unsurprisingly, of the 10 candidates, only three won their elections, and two of the three (Mr. Rouse and Ms. Wooten) were elected in 2018 during the pendency of this lawsuit. Dr. Spencer reached this conclusion by running three iterations of racially polarized voting analysis: homogenous precinct, ecological regression, and ecological inference. All three reached the same conclusion: minority-preferred candidates in Virginia Beach usually lose elections due to white bloc voting. Defs. Ex. 4 at 4-7.

Defendants' expert, Dr. Quentin Kidd, also reached a similar conclusion despite imposing artificial limitations on the analysis. Dr. Kidd, who provided no data of his own, used an improper threshold of 50% minority support in every election no matter how many candidates, and who ignored the special circumstances in 2018, opined that when "white candidates who were the preferred candidates of minority voters are considered . . . the number of African American and minority-preferred candidates who won their electoral contests is seven of 17, including six of seven since 2012."[20] Pls. Ex. 8 at 3. That is, between 2008 and 2018, 10 out of 17 minority-preferred candidates *lost* their elections. Thus, while Dr. Kidd's analysis is unduly limited, he ultimately agrees with Dr. Spencer: minority-preferred candidates in Virginia Beach usually lose their elections.

In their motion, Defendants do not acknowledge, let alone refute, Dr. Spencer's analysis of exogenous elections. "Although they are not as probative as endogenous elections, exogenous elections hold some probative value." *Bone Shirt,* 461 F.3d at 1021. Dr. Spencer found racially polarized voting in two presidential elections, one presidential primary, and one congressional race. Dr. Spencer also found that oppositional white bloc voting was sufficient to block the preferred candidates of minority voters for President (Obama in 2008 and 2012) and for Congress in 2016 (between a black female candidate and a white male candidate). Although President Obama went on to win Virginia's electoral votes, he lost Virginia Beach to McCain and Romney, respectively. Defs. Ex. 4 at 30-31. Adding these candidates to the list of minority-preferred candidates in endogenous elections further bolsters Dr. Spencer's and Dr. Kidd's conclusion that minority-preferred candidates are usually defeated by white bloc voting.

---

[20] Contrary to Dr. Kidd's assumption, white-white contests are not entitled the same weight as elections involving a minority candidate. *See Rural W. Tennessee African-Am. Affairs Council v. Sundquist*, 209 F.3d 835, 840 (6th Cir. 2000).

ii.    Disputes of Material Facts Preclude Summary Judgment on the Third *Gingles* Precondition

Even if the Court is not yet able to conclude that minority candidates of choice usually lose in Virginia Beach due to bloc voting by the white majority, genuine disputes of material fact preclude summary judgment concerning the third *Gingles* precondition.

The parties dispute several factual claims underlying Dr. Spencer's initial expert report. Dr. Spencer opined that elections that included George Furman were not probative because he was a serial candidate who was never the minority-preferred candidate. Defs. Ex. 4 at 7 n.7. In their motion, Defendants "contend that the races involving George Furman are probative." Defs. Br. at 29. The probative weight (if any) of Furman's elections is an issue for trial.

Similarly, Defendants argue that this Court should only review elections that occurred in 2011 and later because of the decennial census, Defs. Br. at 29, but Plaintiffs disagree. Dr. Spencer's reports focus on elections between 2008 and 2018, and Plaintiffs believe the full history of the minority community's struggles to elect candidates of their choice is relevant. The 2011 redistricting is a particularly arbitrary line to draw considering that *all* Councilmembers are elected at-large and it does not matter how the district lines are drawn.

Lastly, Dr. Kidd believes that the threshold to determine minority-preferred candidates is whether a candidate received over 50% of minority support. Pls. Ex. 5 at 78:9-12. Again, Plaintiffs and their experts disagree. The Fourth Circuit has held that candidates are not required to "achieve a threshold of 50% in a multi-candidate election" to be considered a minority-preferred candidate. *Lewis*, 99 F.3d at 613 n. 10. In multi-candidate elections, "[c]andidates who receive less than 50% of the minority vote, but who would have been elected had the election been held only among [minority] voters, are presumed also to be minority-preferred candidates, *although an individualized assessment should be made in order to confirm that such a candidate may appropriately be*

*so considered*." *Id*. at 614 (emphasis added). This matter should proceed to trial so the Court can perform the necessary individualized assessments.

## II.    Defendants' Attempts to Discredit Plaintiffs' Evidence Are Misguided and Premature

### A.  Plaintiffs Need Not Statistically Pinpoint Asian and Hispanic Voting Behavior

Dr. Spencer has properly opined, based on robust statistical evidence, that HBA voters in Virginia Beach are politically cohesive. In response, Defendants complain that Dr. Spencer did not produce reliable statistics that isolate the respective voting behaviors of Asians or Hispanics. Defs. Br. at 15-26. But Plaintiffs do not need to provide isolated point estimates of Hispanic and Asian voting behavior to win this case, let alone to survive summary judgment.

Like any minority group, a multi-racial minority coalition must show that it is "politically cohesive" to win a vote dilution claim under *Gingles*. *Campos*, 840 F.2d at 1244 (citing *Gingles*, 478 U.S. at 56). If the evidence establishes that "one part of the group cannot be expected to vote with the other part[s], the combination is not cohesive." *Id*. at 1245. But if "the minority group as a whole" votes together for the minority candidate of choice, "then cohesion is shown." *Id*.

Defendants apparently assume that because all coalition plaintiffs must show cohesion, they all must prove it by the same means. Specifically, Defendants insist that cohesion cannot be proven without using statistical methods to calculate "isolated, reliable estimates" of the voting patterns of each individual racial group in the coalition. Defs. Br. at 26. That is wrong. The VRA requires "a flexible approach" to evaluating evidence, so that minority voters are not "forced to suffer a violation of their rights under the Act because of external circumstances that limit the availability of data." *Jenkins*, 4 F.3d at 1134 (citing, *inter alia*, *Gingles*, 478 U.S. at 57 n.5).

Courts have made clear that this flexible approach applies to the methods plaintiffs may use to prove inter-racial cohesion. Determining whether minority groups are cohesive with each

other requires "a diligent inquiry into the political dynamics of the particular community." *Brewer*, 876 F.2d at 453. In some cases, this diligent inquiry leads to separate, reliable statistics on how each racial group votes. But in other cases, it may be "impossible" or infeasible to produce isolated statistics on each racial group's voting. *Campos*, 840 F.2d at 1245.[21]

This case perfectly illustrates why isolated single-race voting statistics cannot be a prerequisite for proving cohesion. Plaintiffs have performed a "diligent inquiry," *Brewer*, 876 F.2d at 453, which has yielded ample statistical and qualitative evidence of inter-racial minority cohesion. No party has purported to offer individual point estimates of Hispanic and Asian voting in Virginia Beach, and for good reason: As Dr. Spencer testified, it is impossible to calculate those point estimates reliably because there are no voting precincts where Hispanics or Asians make up a sufficiently high proportion of the population. Defs. Ex. 6 at 70-73. Defendants would have the Court ignore all the existing evidence of cohesion because Plaintiffs did not supplement it with an additional piece of evidence that does not and cannot exist (and is not required). Granting summary judgment on this basis would not only violate the Court's duty to view the evidence "in the light most favorable to" the nonmoving party, *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 157 (1970), but also unjustly condemn Plaintiffs and their communities "to suffer a violation of their rights

---

[21] For example, as the court recognized in *Campos*, sometimes two minority communities are about equally concentrated in the same voting precincts, which can make it "nearly impossible to attribute the votes of those precincts to one minority group or the other but quite possible to determine whether the two minority groups together are politically cohesive." *Id*. at 1245 n.6. In such circumstances, the court should not punish the plaintiff for failing to perform impossible calculations. *See id*. Instead, it should work with the reliable evidence available after a diligent inquiry, which may include aggregated statistics on minority voting as well as qualitative evidence of political cohesion. *See id.* at 1245-48; *Bridgeport Coal. for Fair Representation*, 26 F.3d at 276 (upholding finding of Black-Hispanic cohesion based on "both testimonial and statistical evidence," where statistical evidence of Hispanic voting was limited to results of two elections); *see also Pataki*, 308 F. Supp. 2d at 421.

under the [VRA] because of external circumstances that limit the availability of data." *Jenkins*, 4

F.3d at 1134.

### B. Contrary to Defendants' Suggestion, Plaintiffs' Case Does Not Hinge on Equivalence Test Results

Dr. Spencer's initial report alone proves cohesion among HBA voters in Virginia Beach,

including through unchallenged evidence showing cohesion in exogenous elections and reconsti-

tuted election results. Yet, Defendants spend almost one-third of their brief discussing the equiva-

lence testing Dr. Spencer performed for his rebuttal report. Defendants' fixation on equivalence

testing demonstrates a deeply flawed understanding of this technique and its role in this case. Con-

trary to Defendants' suggestion, equivalence testing is not necessary to prove cohesion among

Hispanic, Black, and Asian voters in this case.

First, Defendants mischaracterize why Dr. Spencer provided individual estimates of voter

preferences for each racial group, and why he performed equivalence testing in the first place.

They argue incorrectly that "Spencer'[s] rebuttal report . . . is largely an attempt to remedy the

deficiencies of the data he produced in his Initial Report." Defs. Br. at 18. As Dr. Spencer explained

at length in his rebuttal report, the report's purpose was to respond to criticisms from Dr. Kidd,

who, among other things, admitted that individual estimates are unreliable, yet criticized Dr. Spen-

cer for not providing them. Pls. Ex. _8 at 17. From the start, Dr. Spencer chose to model only

combined estimates, because individual estimates for Hispanic and Asian voters are not reliable in

Virginia Beach, a fact that he stated explicitly in his rebuttal report.[22] Defs. Ex. 5 at 6-7; Defs. Ex.

---

[22] In footnote 12 of their brief, Defendants claim that Dr. Spencer's explanation that "he was only performing equivalence testing to show why he had not isolated the three minority groups in the first place" was "deeply misleading." Defs Br. at 24, n.12. That is plainly wrong. As Plaintiffs have already explained, *Defendants' own expert* criticized Dr. Spencer for not providing unreliable individual estimates, and Dr. Spencer explained this thoroughly in his rebuttal report. See Defs. Ex. 5 at 6-7.

6 at 68:20-69:16. In response to Dr. Kidd's circular criticism, Dr. Spencer calculated individual estimates for Hispanic, Black, and Asian voter preferences using ecological inference, giving Defendants just what they asked for: unreliable individual estimates for Hispanic and Asian voters. Defs. Ex. 6 at 143:9-146:5, 153:17-154:4. Defs. Ex. 7. He then used equivalence testing, which is a basic "statistical procedure" used to "determine whether . . .two groups. . . are equivalent in some way," to compare "the distributions of black, Hispanic, and Asian vote shares . . . against the threshold needed for a candidate to win his/her election." Pls. Ex. 5 at 96:6-14; Defs. Ex. 5 at 8. This analysis resulted in Table 1 in Dr. Spencer's rebuttal report. Rather than a "flailing second attempt at proving cohesion," Defs. Br. at 24, the purpose of Dr. Spencer's calculation of individual estimates, along with equivalence testing, was to show that the individual estimates alone are not reliable measures of candidate preference, and thus why he necessarily relied on the combined minority estimates in his initial report. Defs. Ex. 6 at 125:11-127:5; Defs. Ex. 5 at 6-7.

Plaintiffs' experts have testified at length as to why Dr. Spencer's equivalence testing cannot be used to reliably estimate individual group voting preferences. *Id.*; Defs. Ex. 8 at 59:9-60:9, 67:19-68:9. Defendants' expert also agrees that individual estimates are not reliable in Virginia Beach. Pls. Ex. 8 at 17. It is thus puzzling why Defendants, who argue that Plaintiffs cannot prove cohesion in this case because they present no reliable estimates of individual preferences for Hispanic and Asian voters, proceed to use these same unreliable estimates to comment on candidate preferences. Defs. Br. at 18-26. A prime example of this is Defendants' Table A, which is meaningless when put into context. *See id.* at 20. Defendants allege that Table A shows that "black and Asian support levels are easily distinguishable from one another . . ." *Id*. However, Table A presents only *point estimates* for Asian voter support levels and fails to take into account the wide confidence intervals for Asian estimates inherent in Virginia Beach given the population size. *See*

Defs. Ex. 8 at 67:19-68:9; Defs Ex. 6 at 125:11-127:5. Plaintiffs' experts have testified that not only are the point estimates alone unreliable, but that it is impossible to tell anything meaningful about any differences between two different groups without considering the standard error and/or confidence interval. *Id*. When Table A is reconfigured to include the large confidence intervals, it is apparent just how little certainty is present in the Asian estimates alone. *See* Pls. Ex. 27. Defendants Table A is, at best, misleading and gives the Court no useful information about any similarities or differences between Black and Asian voter preferences.

Defendants also criticize the threshold Dr. Spencer uses in his equivalence testing, stating that "Spencer's premise—one without apparent support in case law—is that if each minority group's level of support exceeds the victory threshold, cohesion exists." Defs. Br. at 21. This claim is also meritless. The threshold Dr. Spencer uses is the vote total of the winning candidate, which is a more conservative threshold than necessary. Defs. Ex. 6 at 128:129:14. In other words, it makes it *less likely* that minority voters will be considered cohesive. If Dr. Spencer used a lower threshold as Defendants suggest, such as 50%+1 in a two-candidate race, or a 33%+1 in a three or more candidate race, almost every single minority candidate of choice in Defs. Ex. 7, Dr. Spencer's Table 1, or Defendants Table A would exceed the threshold, given the unreliable nature of the individual Hispanic and Asian estimates. *See*, *e.g.,* Defs. Ex. 7; Defs. Ex. 5 at 8; Defs. Br. at 20; Disputed Fact No. 33, *supra*.

Defendants make numerous other errors in their discussion of equivalence testing, resulting in an incoherent and inaccurate analysis. For example, Defendants discuss candidate Aaron Rouse and the level of Hispanic support for him according to the individual estimates, stating that "one might assume that, as Spencer's point estimate for Hispanic support (33.3%) falls well below his self-identified threshold (45.2%), Spencer would conclude that Hispanics did not share blacks'

and Asians' apparent preference for candidate Rouse." Defs. Br. at 21-22. This analysis is wrong for at least two reasons. First, Defendants fail to account for the confidence interval, which is necessary to determine if any of the estimates are statistically significantly different.[23] Once the confidence interval (42%) is considered, Hispanic support for Rouse ranges from 0% to 74.3%, meaning it is *not* "against all odds and common sense" for Hispanic support to surpass the more conservative threshold of 45.2%. Defs. Ex. 7; Defs. Br. at 21-22.[24] Second, Rouse was one of six candidates running for two at-large seats in 2018, meaning that the plurality threshold would be 33% plus one vote, which would put the individual estimate of Hispanic support right at the plurality threshold (even without considering the confidence interval). *See* Defs. Ex. 7; Defs. Ex. 4 at 14. Thus, if Defendants prefer a lower threshold, the Hispanic level of support for Rouse would also meet it.

Defendants' focus on and criticism of equivalence testing is a red herring. Plaintiffs' experts have stated from the beginning that individual estimates of voter preference for Hispanic and Asian voters in Virginia Beach are not reliable. Dr. Spencer has unequivocally stated that the combined estimates are reliable, and thus equivalence testing is not necessary to show cohesion in this

---

[23] The confidence interval can be calculated by multiplying the standard error by 1.96 if a normal distribution is present (and it is here). Defs. Ex. 6 at 44:10-17.

[24] Plaintiffs cannot point out all of the Defendants' errors and mischaracterizations in discussing equivalence testing here, but there are several more. One includes Defendants' discussion of Aaron Rouse and the percent of his distribution above and below the 45.2% threshold. Defs. Br. at 23. That percentage is relevant, but what one would really need to know to make sense of the distribution is the probability that any chosen value within the distribution would fall above or below that threshold, not just the percentage above or below the threshold itself. Another example is the Defendants discussion of the "10% overlap standard." *Id*. at 22. Again, a 10% overlap in this case is actually higher than usually used, making it a more conservative threshold. If a 5% threshold were used, even more of the distributions would exceed the threshold. Further, Defendants' misstate Dr. Lichtman's testimony when they say he "knows little about" equivalence testing. *Id*. at 25. To the contrary, Dr. Lichtman testified that he read an article about the method published in 1993, and that it is used in a variety of fields. Defs. Ex. 8 at 222-224.

case. *See, e.g.*, Defs. Ex. 5 at 6. In response to criticism from Dr. Kidd, Dr. Spencer calculated

these unreliable individual estimates, but not to prove cohesion among individual racial groups. If

Defendants insist on using the unreliable individual estimates produced by Dr. Spencer to make

conclusions, at worst the individual estimates and equivalence testing show that cohesion among

Hispanic, Black, and Asian voters cannot be ruled out, and at best they confirm this cohesion.[25]

*See generally id*. at 6-9. Thus, Dr. Spencer's equivalence testing is yet another analysis that shows

a genuine dispute of material fact exists.

## CONCLUSION

WHEREFORE, for all the reasons set for above, the Plaintiffs respectfully request that this

Court deny the Defendants' Motion for Summary judgment and set this case for trial.

Respectfully submitted,

/s/ J. Gerald Hebert
State Bar No. 38432
Paul M. Smith
Danielle M. Lang
Christopher Lamar*
CAMPAIGN LEGAL CENTER
1101 14th Street NW, Suite 400
Washington, DC 20005
(202) 736-2200
ghebert@campaignlegal.org
psmith@campaignlegal.org
dlang@campaignlegal.org
clamar@campaignlegal.org
*Licensed to practice in Florida only, su-
pervised by a member of the D.C. bar.*

---

[25] When considering the margins of error, Dr. Spencer's equivalence testing actually shows the following: for 8 of 10 candidates Dr. Spencer initially identified as preferred by Black voters, the margin of error for Hispanic voters also overlaps the percentages needed for victory. Defs. Ex. 7; Defs. Ex. 5 at 8. For 7 of 10 candidates preferred by Black voters, the margin of error for Asian voters overlaps the percentage of votes needed for victory. *Id.* And, for 7 of 10 candidates preferred by Black voters, the margin of error for both Asian and Hispanic voters overlap the percentage of votes needed for victory in the election. *Id.*

<u>/s/ Annabelle E. Harless</u>
Ruth M. Greenwood
CAMPAIGN LEGAL CENTER
73 W. Monroe St., Ste. 302
Chicago, IL 60603
(312) 561-5508
aharless@campaignlegal.org
rgreenwood@campaignlegal.org

*Attorneys for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 5th day of November 2019, I will electronically file the foregoing with the Clerk of the Court using the CM/ECF system, which will then send a notification of such filing to the following:

**Mark D. Stiles** (VSB No. 30683)
**Christopher S. Boynton** (VSB No. 38501)
**Gerald L. Harris** (VSB No. 80446)
**Joseph M. Kurt** (VSB No. 90854)
Office of the City Attorney
Municipal Center, Building One, Room 260 2401 Courthouse Drive
Virginia Beach, Virginia 23456
(757) 385-8803 (Office)
(757) 385-5687 (Facsimile)
mstiles@vbgov.com
cboynton@vbgov.com
glharris@vbgov.com
jkurt@vbgov.com

          /s/ Danielle Lang_____

*Counsel for Plaintiffs*