**IN THE UNITED STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF VIRGINIA
NORFOLK DIVISION**

| | |
|---|---|
| **Latasha Holloway**, *et al.*, | |
| **Plaintiffs,** | |
| | **Civil Action No. 2:18-cv-0069** |
| **v.** | |
| **City of Virginia Beach**, *et al.*, | |
| **Defendants** | |

**PLAINTIFFS' BRIEF IN OPPOSITION TO DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT**

# PLAINTIFFS' EXHIBIT 1
Expert Report of Dr. Allan Lichtman

**July 15, 2019**

**United States District Court for the Eastern District of Virginia**

***Holloway v. City of Virginia Beach***

**Case No.: 2:18-cv-00069**

**Expert Report of Dr. Allan J. Lichtman:**
**Totality of Circumstances Analysis**

**Distinguished Professor of History**
**American University**
**Washington, DC**

_(signature)_

Allan J. Lichtman

## I. STATEMENT OF PURPOSE

I have been asked by Plaintiffs' counsel to examine the totality of circumstances applicable under Section 2 of the Voting Rights Act ("VRA") to the City of Virginia Beach. In doing so, I have been guided by the "Senate factors," which were detailed in a report accompanying the 1982 renewal of the VRA by the Senate Committee on the Judiciary. My analysis is relevant to the Court's consideration of the impact of these factors under Section 2 of the VRA.

The Senate factors are: (1) "the extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process;" (2) "the extent to which voting in the elections of the state or political subdivision is racially polarized;" (3) "the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group;" (4) "if there is a candidate slating process, whether the members of the minority group have been denied access to that process;" (5) "the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process;" (6) "whether political campaigns have been characterized by overt or subtle racial appeals;" and (7) "the extent to which members of the minority group have been elected to public office in the jurisdiction."[1]

Additional factors include: (1) "whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group" and (2) "whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous." The Report emphasized that the list of factors is neither comprehensive nor exclusive and that "there is no requirement that any particular number of factors be proved, or that a majority of them point one way or the other."[2]

## II. QUALIFICATIONS

This study draws on my experience in voting rights litigation and expertise in political history, political analysis, and historical and statistical methodology. I am Distinguished Professor of History at American University in Washington, D.C., where I have been employed for 45 years. Formerly, I served as Chair of the History Department and Associate Dean of the College of Arts and Sciences at American University. I received my BA in History from Brandeis University in 1967 and my Ph.D. in History from Harvard University in 1973, with a specialty in the mathematical analysis of historical data.

---

[1] *Thornburg v. Gingles*, 478 U.S. 30, 36-37 (1986) (quoting S. Rep. No. 97-417, at 28-29 (1982), *reprinted in* 1982 U.S.C.C.A.N. 177, 206-07) (internal quotation marks omitted).
[2] Ibid.

2

I am the author of numerous scholarly works on quantitative methodology in social science. This scholarship includes articles in such academic journals as *Political Methodology*, *Journal of Interdisciplinary History*, *International Journal of Forecasting*, and *Social Science History*. In addition, I coauthored *Ecological Inference* with Dr. Laura Langbein, a standard text on the analysis of social science data, including political information. I have published articles on the application of social science analysis to civil rights issues. This work includes articles in such journals as *Journal of Law and Politics*, *La Raza Law Journal*, *Evaluation Review*, *Journal of Legal Studies*, and *National Law Journal*. My scholarship also includes the use of quantitative and qualitative methods to conduct contemporary and historical studies, published in such academic journals as *Proceedings of the National Academy of Sciences*, *American Historical Review*, *International Journal of Forecasting*, *International Journal of Information Systems & Social Change*, and *Journal of Social History*.

Quantitative and historical analyses also ground my books, including, *Prejudice and the Old Politics: The Presidential Election of 1928*, *The Thirteen Keys to the Presidency* (co-authored with Ken DeCell), *The Keys to the White House*, *White Protestant Nation: The Rise of the American Conservative Movement*, and *FDR and the Jews* (co-authored with Richard Breitman). My most recent books are *The Case for Impeachment*, and *The Embattled Vote in America: From the Founding to the Present.* This latter book, published in September 2018 by Harvard University Press, examines the history and current status of voting rights in America.

My book, *White Protestant Nation*, was one of five finalists for the National Book Critics Circle Award for the best general nonfiction book published in America. My book, *FDR and the Jews*, was published under the Belknap Imprint of the Harvard University Press, reserved for works of special significance and lasting impact. This book was an editor's choice book of the New York Times in 2013, the winner of the most prestigious prize in American Jewish Studies, the National Jewish Book Award, and a finalist for Los Angeles Times Book Prize in history. My book, *The Case for Impeachment,* was an independent bookstore bestseller. In 2018, I was the winner of the Alfred Nelson Marquis Life Time Achievement Award for top 5% of persons included in Marquis WHO'S WHO.

I have worked as a consultant or expert witness for both plaintiffs and defendants in more than ninety voting and civil rights cases. My work includes more than a dozen cases for the United States Department of Justice and cases for many civil rights organizations. I have also worked as a consultant or expert witness numerous times for state and local jurisdictions. In the U. S. Supreme Court case, *League of United Latin Am. Citizens (LULAC) v. Perry*, 548 U.S. 399 (2006), the majority opinion written by Justice Kennedy authoritatively cited my statistical work. My work as an expert witness includes several cases in the state of Virginia.

I am being compensated for my work in this matter at the rate of $350 per hour. I have attached an updated CV and a table of cases in which I have provided written or oral testimony.

## III. EVIDENCE, METHODOLOGY, AND SUMMARY OF OPINIONS

I understand that the parties to this lawsuit have had a discovery dispute and that the City of Virginia Beach has not responded to Plaintiffs' totality of circumstances discovery requests. As a result, I reserve the right to supplement this report with additional information as the discovery process moves forward.

My analysis draws upon sources standard in historical and social scientific analysis. These include scholarly books, articles, and reports; newspaper and other journalistic articles; demographic and socio-economic information; election returns; voter registration and turnout data; court opinions, briefs, and reports; government and organizational documents; and scientific surveys and studies.

Through my analysis of this material I have found that nearly all of the Senate Factors are present in Virginia Beach. Minorities are burdened by a long history of racial discrimination in Virginia, which continues into recent times in both the state and the city. Voting in Virginia Beach is polarized along racial lines between whites and minorities. Under Virginia Beach's at-large election system, candidates for city council must compete across a large city of some 250 square miles and more than 450,000 persons. Virginia Beach's at-large election system includes 7 designated positions or numbered posts that prevent minorities from concentrating their votes on one or a small number of candidates. The lingering effects of discrimination in Virginia and the City of Virginia Beach are reflected in significant present-day disparities with regard to income, unemployment, poverty, education, housing, and the availability of vehicles. These socio-economic disparities bear directly on the ability of minorities to elect candidates of their choice and participate fully and effectively in the political process. Political campaigns in Virginia and Virginia Beach have been marked by racial appeals, and both Virginia and Virginia Beach have a weak record of electing minorities to public office. In significant ways, Virginia Beach has not been responsive to the particularized needs of minorities, and the justification for the current at-large election system with designated places is tenuous when compared to practices in other large Virginia cities.

## IV. SENATE FACTORS

**Factor 1: The extent of any history of official discrimination in the state or political subdivision that touched the right of members of the minority group to register, vote, or otherwise to participate in the democratic process.**

The state of Virginia has a long and well-recognized history of racial discrimination, which has primarily been directed against African Americans—Virginia's largest minority group—but has also affected all people of color. Indeed, such discrimination is persistent and ongoing even in the contemporary era, and directly affects the opportunity of African Americans and other minority residents to participate fully in the political process and elect candidates of their choice in Virginia. Decisions made by the state impact voters across Virginia, including the City of Virginia Beach. Consequently, Virginia Beach has its own legacy of racial discrimination that persists to the present day, although the scope of its authority is naturally much more limited than that of the

4

state.

The following analysis briefly explores Virginia's history of racial discrimination and its modern incarnation. This analysis includes not only direct restrictions on voting and registration, but also other forms of discrimination that burdened racial minorities, contributed to racial isolation, and limited opportunities for advancing their socio-economic status. In turn, such discrimination has and does restrict minorities' ability to participate fully and effectively in the political process in Virginia.[3]

**State of Virginia**

During the Reconstruction period that followed the era of slavery and the end of the Civil War, African Americans in Virginia participated robustly in the politics of the Commonwealth as voters and office-holders. By the 1880s, however, the white supremacists who dominated the Democratic Party began to adopt measures aimed at eliminating black voting and office-holding in Virginia. In 1884, the state passed the Walton Act—a secret ballot law—which aimed at disenfranchising illiterate individuals, most of whom were black.[4] The law proscribed ballots from including names or symbols for parties, and limited the time for voters to navigate through the names of all candidates.

Then, in Virginia's Constitutional Convention of 1901-1902, white supremacists effectively snuffed out black voting and office-holding through literacy and poll tax requirements. Convention delegate Carter Glass, who later became a U.S. Senator from Virginia said, "Discrimination! Why, that is precisely what we propose; that, exactly is what this Convention was elected for—to discriminate to the very extremity of permissible action under the limitations of the Federal Constitution, with a view to the elimination of every negro voter who can be gotten rid of, legally, without Discrimination!" He explained that the Convention would circumvent the Fifteenth

---

[3] For more detailed historical analysis see, Thomas R. Morris and Neal Bradley, "Virginia," in Chandler Davidson and Bernard Grofman, eds., Quiet Revolution in the South (Princeton University Press, 1994), pp. 217-291 and United States District Court for the Eastern District Of Virginia, *Lee, et. al.* v. *Virginia State Board of Elections, et. al.,* Case No. 3:15-CV-357, "Expert Report of Dr. John Douglas Smith," 14 December 2015. On the relationship between socio-economic standing and political opportunities see, for example: Steven J. Rosenstone and John Mark Hansen, *Mobilization, Participation and Democracy in America*, (Macmillan, 1993); Sidney Verba, Kay Lehman Schlozman, and Henry E. Brady, *Voice and Equality: Civic Volunteerism in American Politics* (Harvard, 1995); D. Sunshine Hillygus, *The Missing Link: Exploring the Relationship Between Higher Education and Political Engagement*, 27 Political Behavior 25-47 (2005); Michael Parkin and Frances Zlotnick, *English Proficiency and Latino Participation in U.S. Elections*, 39 Politics and Policy 515-37 (2011), Pew Research Center, *The Party of Non-Voters*, October 31, 2014, http://www.people-press.org/2014/10/31/the-party-of-nonvoters-2/; Jan E. Leighley and Jonathan Nagler, *Who Votes Now? Demographics, Issues, Inequality and Turnout in the United States*, (Princeton University Press, 2014); Randall Akee, et al., "Family Income and the Intergenerational Transmission of Voting Behavior: Evidence from an Income Intervention" National Bureau of Economic Research, Working Paper, No. 24770, June 2018, https://www.nber.org/papers/w24770; Joseph M. Colomer, "Benefits and Costs of Voting," *Electoral Studies* 10 (1991), 313-325; Lee Sigelman and William D, Berry, "Costs and the Calculus of Voting," *Political Behavior* 4 (1982), 419-428; Martin Gilens and Benjamin I. Page, "Testing Theories of American Politics: Elites, Interest Groups, and Average Citizens," *Perspectives on Politics*, 12 (2004), pp. 564-581.

[4] J. Morgan Kousser, *The Shaping of Southern Politics: Suffrage Restrictions and the Establishment of the One-Party South, 1880-1910* (Yale University Press, 1974), p. 173.

Amendment by adopting measures that had the effect of disenfranchising African Americans without specifically invoking race: "As has been said, we have accomplished our purpose strictly within the limitations of the Federal Constitution by legislating against the characteristics of the black race, not against the 'race, color or previous condition' of the people themselves." By 1905, only 10,500 of 147,000 eligible African Americans in Virginia (7 percent) remained on the registration lists.[5]

By the early twentieth century, Virginia had also established the multi-faceted system of racial discrimination known as Jim Crow. This included legal segregation in schools, transportation, and public facilities, and de facto segregation in housing and public accommodations. Participation in the legal system—including service as judges, prosecutors, police officers and jurors—was largely limited to whites. In 1924, Virginia enacted an involuntary sterilization law which was upheld by the U.S. Supreme Court. As a result, "[f]or nearly fifty years, the Commonwealth of Virginia sterilized thousands of persons, white and black, who were deemed feebleminded, insane, or prone to criminal behavior."[6]

In 1924, as part of the eugenics movement that had led to the involuntary sterilization law, Virginia enacted legislation that became known as the Racial Integrity Act, which one historian called "the most draconian miscegenation law in American history." This legislation, which had no parallel in any other state, criminalized "willfully lying about one's color," prohibited whites from marrying nonwhites (subject to a "Pocahontas Exception"), and defined a "a white person as one 'who has no trace whatsoever of any blood other than Caucasian.'" In 1930, Virginia revised the Racial Integrity Act to define as black anyone with "one-drop" of alleged black blood, with a single exception to permit "persons with at least one-fourth Indian blood and less than one-sixteenth black blood to remain classified as Indians, but only if they lived on a recognized reservation." These racial integrity laws applied not just to African Americans but to all non-caucasians in Virginia.[7]

In 1926, the General Assembly enacted the Public Assembly Act, designed to keep blacks and whites separate in public places. The law required "the separation of white and colored persons at public halls, theaters, opera houses, motion picture shows and places of public entertainment and public assemblages." According to historian of race relations and the South Richard B. Sherman, Reverend James Franklin Love of the Southern Baptist Foreign Mission futilely opposed the bill because it would discriminate against Chinese and Japanese students attending the University of Richmond. Sherman explained that the Act "was unique. Despite the proliferation of Jim Crow laws since the turn of the century, no other state passed such a law. It was obviously a product of the hysteria created by the campaign for racial integrity."[8]

The Supreme Court's 1954 *Brown v. Board of Education* decision led Virginia to join the white South's "massive resistance" to the integration of its public schools. Every member of

---

[5] Ibid., 178-181; Smith, "Expert Report," pp. 9-11; Davidson and Grofman, "Virginia," pp. 273-274.

[6] Smith, "Expert Report," pp. 22-23.

[7] Richard B. Sherman, "'The Last Stand': The Fight for Racial Integrity in Virginia in the 1920s," *Journal of Southern History*, 54 (1988); Smith, Expert Report," pp. 25-28; Leslie Bow, *Partly Colored: Asian Americans and Racial Anomaly in the Segregated South* (New York: NYU Press, 2010), p. 50.

[8] "Separation of the Races 1926," *Encyclopedia Virginia*, https://www.encyclopediavirginia.org/Separation_of_Races_1926; Ibid., Sherman, "'The Last Stand,'" pp. 83-85.

Virginia's congressional delegation signed the "Declaration of Constitutional Principles"—also known as the "Southern Manifesto"—which pledged resistance to school desegregation. As explained by historian James H. Hershman, Jr., school segregation in Virginia advantaged whites and severely disadvantaged African Americans and other people of color: "The discrimination was egregious—school facilities, educational materials, teacher salaries, and transportation in the separate black system were markedly inferior to those provided white students. African American children under this regime were denied many of the opportunities for economic advancement provided by public school education, and such conditions distorted the educational development of all students."[9]

In 1956, a special session of the Virginia General Assembly put the stamp of law on so-called "massive resistance." The legislature put pupil placement authority in the hands of the state to prevent the assignment of black pupils to white schools. It authorized the governor to close schools that courts had ordered to be integrated – which was quickly struck down as unconstitutional -- and required the NAACP to disclose its membership. In 1958, after a federal court issued a desegregation order for the city of Norfolk, Governor Almond closed all public schools, which affected nearly 13,000 students. In 1959, the state reopened the schools to permit limited desegregation. However, Prince Edward County closed its public schools in defiance of an integration order that same year. With the assistance of grants from the states, whites set up a segregated private school in Prince Edward County, but no alternatives were available to black students. Other school districts sought to maintain segregation through so-called "freedom of choice" plans that enabled white parents to send their children to all-white schools. Public schools did not reopen in Prince Edward County until 1964, and the pace of integration in Virginia did not pick up until the late 1960s.[10]

Federal intervention in the 1960s struck a blow against Jim Crow and expanded opportunities for non-whites in Virginia to participate in the political process. In 1964, Congress enacted the Civil Rights Act that banned racial discrimination in both public facilities and public accommodations. It prohibited employment discrimination based on race or sex and racial discrimination in programs and activities receiving federal financial assistance, and applied to institutions such as federally-funded schools and colleges. In 1967, in *Loving v. Virginia*, the U.S. Supreme Court struck down the prohibitions on interracial marriage in force in Virginia and fifteen other states. Miscegenation laws like one struck down in *Loving* affected all minorities, not just African Americans: for example, a dozen years before *Loving*, the Virginia Supreme Court rejected a challenge to its ban on interracial marriage brought by an Asian man married to a white woman. The U.S. Supreme Court declined to hear plaintiffs' appeal. In 1962, the state Supreme Court also ruled that a bi-racial Asian and white couple who had married in New Jersey and moved to Virginia did not have a legal marriage in Virginia and could not pursue a divorce in the state.[11]

---

[9] James M. Hershman, Jr., "Massive Resistance," Encyclopedia Virginia, https://www.encyclopediavirginia.org/massive_resistance; James W Ely, *The Crisis Of Conservative Virginia: The Byrd Organization And The Politics Of Massive Resistance* (University of Tennessee Press, 1976); Alexander Leidholdt, *Standing Before the Shouting Mob: Lenoir Chambers and Virginia's Massive Resistance to Public-School Integration* (University of Alabama Press, 1997).
[10] Ibid.
[11] *Loving v. Virginia*, 388 U.S. 1 (1967); *Ham Say Naim v. Ruby Elaine Naim*, 197 Va. 80 [87 S E. 2d 749] (1955); Peggy Pascoe, *What Comes Naturally: Miscegenation Law and the Making of Race in America* (New York: Oxford University Press, 2009), pp. 226-231; *Calma v. Calma*, 128 S.E.2d 440 (Va. 1962).

In January 1964, the Twenty-Fourth Amendment abolished the use of the poll tax in federal elections. At the time, Virginia was one of only five states that still enforced the poll tax. The state of Virginia, however, sought to blunt the effect of the poll tax's elimination by passing other legislation aimed at disenfranchising voters. In the fall of 1963, in anticipation of the ratification of the Twenty-Fourth Amendment, the Virginia General Assembly passed a law requiring potential voters to file a "certificate of residence" six months prior to a federal election in order to prove continuing residence in the state. In May of 1964, a federal district court struck down the law as discriminatory. In 1966, the US Supreme Court struck down Virginia's use of the poll tax in state elections in *Harper v. Virginia Board of Elections* and ruled that the use of the poll tax in any elections—not just federal elections—violated the Equal Protection Clause of the Fourteenth Amendment. In his majority opinion, Chief Justice Earl Warren wrote that "the Virginia poll tax was born of a desire to disenfranchise the Negro."[12]

In 1965, Congress enacted the landmark Voting Rights Act. With one exception, the entire Virginia congressional delegation opposed passage of the Act. Only two members of Virginia's twelve-member congressional delegation subsequently supported extensions of the Voting Rights Act in 1970, 1975, and 1982.[13]

The VRA, which contains nearly 5,500 words and nineteen sections, would be enforced through both direct administrative action by the U.S. Department of Justice and lawsuits that could be filed by both the Justice Department and private parties. Among other provisions, the VRA made it a federal crime for any person or conspiracy of people, whether acting under color of law or not, to intimidate, threaten, or coerce anyone for attempting to vote. It declared that individuals could not be denied the right to vote for a lack of English proficiency if they had completed at least a sixth-grade education. It also authorized courts nationwide to suspend the use of any discriminatory test or device used by a jurisdiction as a prerequisite for voting and to appoint federal election examiners to register voters and monitor elections.[14]

Section 2 of the VRA stipulated that "no voting qualification or prerequisite to voting, or standard, practice, or procedure shall be imposed or applied by any State or political subdivision to deny or abridge the right of any citizen of the United States to vote on account of race or color." Beyond prohibiting practices that deny the vote to minorities, Congress designed Section 2 to ensure that minorities could make their vote count by having a reasonable opportunity to participate fully and effectively in the political process and elect candidates of their choice. Sections 4 and 5 singled out for special treatment certain "covered" jurisdictions that employed discriminatory tests or devices and had low rates of voter registration or turnout. These covered jurisdictions were prohibited from enacting any laws affecting voting—including redistricting schemes—without first submitting them

---

[12] Steven F. Lawson, *Black Ballots: Voting Rights in the South, 1944–1969.* (Columbia University Press, 1976); Frederick D. Ogden*, The Poll Tax in the South* (University of Alabama Press, 1958), Davidson and Grofman, "Virginia," p. 276.
[13] Smith, "Expert Report," p. 45.
[14] Text of Voting Rights Act (1965), https://www.ourdocuments.gov/doc.php?flash=false&doc=100&page=transcript

to the U.S. Attorney General or the U.S. District Court for D.C. for "preclearance" so as to ensure they did not discriminate against minority voters. Virginia was one of only six southern states covered in their entirety under preclearance from the Act's inception in 1965 until 2013, when the U.S. Supreme Court's holding in *Shelby County v. Holder* invalidated the coverage formula in Section 4 of the Act.[15]

In the decades following the VRA's passage, the Department of Justice and federal courts objected to multiple voting-related laws proposed by Virginia's General Assembly.

The Justice Department interposed objections during Section 5 preclearance review to Virginia's redistricting plans for both chambers of the General Assembly following the Census of 1970. The State Senate responded by creating single-member districts, with one exception in Norfolk. There, the State House was able to retain multi-member districts after the U.S. Supreme Court in *Whitcomb v. Chambers* declined to rule that such districts violated the Fourteenth Amendment.[16]

In 1973, the Virginia General Assembly passed a resolution for "bailing" the state out of coverage under Section 5 of the Voting Rights Act. The Attorney General then filed a lawsuit under the "bail out" provision of the Act arguing that Virginia had rectified the low registration and turnout of African Americans that justified its original coverage under Section 4. A federal district court rejected the bail out in part because of "the causal connection between the maintenance of inferior schools for blacks and their lesser ability to pass Virginia's literacy requirement prior to 1965."[17]

At the time of the 1980s restricting, Virginia's "record of four blacks in the hundred-member lower house and one black in the forty-member upper gave it the lowest level of black representation in the South." Unsurprisingly, the state legislative redistricting process following the 1980s census was protracted and contentious: It encompassed "some fourteen legislative sessions, six redistricting plans, a ruling of unconstitutional population disparities by a three-judge federal panel, a gubernatorial veto, and Justice Department Section 5 objections to plans for both houses."[18] Under pressure, the legislature allowed civil rights groups to participate in the map drawing process. As a result of the redistrcting, the House of Delegates transitioned to single-member districts, 9 of 100 of which (9 percent) had black majorities. In the elections following redistricting, black representation in the state senate moved from one to three members (7.5 percent) in a state that was 19 percent black.[19]

In 1991, the Department of Justice interposed another Section 5 objection to Virginia's redistricting plan for the State House of Delegates. The Department's objection letter stated:

---

[15] Ibid. U.S. Department of Justice, "Jurisdictions Previously Covered By Section 5," https://www.justice.gov/crt/jurisdictions-previously-covered-section-5.
[16] Davidson and Grofman," Virginia," p. 281.
[17] *Commonwealth of Virginia v. United States*, 386 F. Supp. 1319 (D.D.C. 1975), at 1324.
[18] Davidson and Grofman, "Virginia," p. 281.
[19] Quotes and data on Ibid., pp. 281-282.

"We have examined the 1991 House redistricting choices in light of the element of racially polarized voting that appears to characterize at least some elections in the state. For the most part, our analysis shows that the Virginia House redistricting plan meets Section 5 preclearance requirements. In one area, however, the proposed configuration of district boundary lines appears to have been drawn in such a way as to minimize black voting strength. Specifically, we refer to the considerable concentration of black population in Charles City County where approximately 4000 blacks are submerged in a majority white district. We are aware that the Legislature rejected available alternatives that would have recognized this concentration of voters by drawing them into a district with black voters in the Richmond area that likely would result in an additional district which provides black voters an equal opportunity to participate in the political process and to elect candidates of their choice to office. While we have noted the state's explanation that the submitted districting in this area was designed to protect certain incumbents, and even though incumbency protection is not in and of itself an inappropriate consideration, it may not be accomplished at the expense of minority voting potential."[20]

Discrimination against minorities in Virginia has continued well into the 21st century. In 2014, a three-judge federal court for the Eastern District of Virginia held in *Page v. Virginia State Board of Elections* that Virginia's post-2010 congressional redistricting was unconstitutional because it needlessly packed African American voters into a single district, diminishing their political influence elsewhere in the state. The Court found "that plaintiffs have shown race predominated. We find that the Third Congressional District cannot survive review under the exacting standard of district scrutiny. While compliance with Section 5 was a compelling state interest when the General Assembly acted, their districting plan was not narrowly tailored to further that interest. Accordingly, we are compelled to hold that the challenged Third Congressional District violates the Equal Protection Clause of the Fourteenth Amendment." This finding was reaffirmed by the district court panel a second time after the Supreme Court remanded the matter for further consideration following its decision in *Alabama Legislative Black Caucus v. Alabama*.[21]

In June 2018, after a remand from the U.S. Supreme Court, a three-judge federal district court held in *Bethune-Hill v. Virginia State Bd. of Elections* that Virginia had similarly engaged in an unlawfully racial gerrymander of state legislative districts. The court found that the state legislature had unlawfully packed African Americans into 11 voting districts drawn after the 2010 census. All of these districts had at least a 55 percent population of black residents of voting age, which was higher than the percentage necessary to provide African American voters with a realistic opportunity to elect candidates of their choice. This packing diminished the voting power of African Americans across other districts, and the Court ruled that "overwhelming evidence in this case shows that, contrary to this constitutional mandate, the state has sorted voters into districts based on the color of their skin. The legislature made no effort to determine whether the mechanical

---

[20] John R. Dunne, Assistant Attorney General to K. Marshall Cook, Deputy Attorney General, Virginia, 16 July 1991, https://www.justice.gov/sites/default/files/crt/legacy/2014/05/30/VA-1230.pdf.
[21] *Page v. Virginia State Board of Elections*, 58 F. Supp. 3d 533 (E.D. Va. 2014); *Page v. Virginia State Board of Elections*, No. 3:13CV678, 2015 WL 3604029, at *6 (E.D. Va. June 5, 2015).

55% racial threshold was required to comply with the VRA, and instead arbitrarily applied the same racial mandate to 12 vastly dissimilar districts. This predominant use of race and disregard of narrow tailoring principles plainly are at odds with the guarantees of the Equal Protection Clause."[22]

After Republicans in the General Assembly could not develop a plan that gained bipartisan support, the District Court appointed a special master to redraw the unconstitutional districts. In June 2019, the U.S. Supreme Court rejected on procedural grounds a challenge to this ruling by the Republican majority in the state House of Representatives.[23]

Voting is not the only domain in which Virginia's minorities experience discrimination. In 2013, the Equal Rights Center reported results of a "testing-based study of Latinos and whites seeking rental housing across the Commonwealth of Virginia." The Center found that Latinos "experienced at least one form of adverse treatment as compared to their white counterparts in 55 percent of inquiries." The study included the City of Virginia Beach along with "the City of Fairfax, the City of Richmond, Henrico County, Loudoun County, Prince William County and Manassas, Roanoke County, Northwest Virginia (covering Augusta, Culpeper, Frederick, and Rockingham Counties)." The Center found that "in 55 percent of tests, the Latino tester received adverse, differential treatment as compared to the white tester, in at least one respect, including:

- Being quoted higher rents or higher fees for the same rental unit than white testers;
- Not being offered incentives or "specials" that were offered to white testers seeking the same housing;
- Being offered fewer available units or later availability dates than those offered to white testers; and
- Being told about additional application requirements, such as credit checks or providing a social security card, which were not told to white testers."[24]

The Center's Executive Director John Kohl concluded that "while we are beginning to see movement toward a consensus around immigration reform, hostility towards immigrants at the local level, unfortunately, continues to result in unfair treatment for many—irrespective of their immigrant status." The Center recommended that Virginia "legislators should ensure that all immigration-related bills encourage fair housing and comply with federal civil rights laws." [25]

---

[22] *Bethune-Hill v. Virginia State Bd. of Elections*, 580 U.S. ___ (2017); *Bethune-Hill v. Virginia State Board of Elections*, 326 F. Supp. 3d 128 (E.D. Va. 2018), at 92.

[23] Gregory S. Schneider, "Federal Court Releases Plan for Possible Redistricting in Virginia, *Washington Post*, 7 December 2018, https://www.washingtonpost.com/local/virginia-politics/federal-court-releases-plans-for-possible-redistricting-in-virginia-refuses-to-delay-process/2018/12/07/a1a58be6-f728-11e8-8d64-4e79db33382f_story.html?utm_term=.d20e4ce179f7; Adam Liptak, "Justices Dismiss Appeal in Virginia Racial Gerrymandering Case," *New York Times*, 19 June 2019, https://www.nytimes.com/2019/06/17/us/politics/virginia-racial-gerrymandering-supreme-court.html; *Virginia House of Delegates v. Bethune-Hill*, No. 18–281. Argued March 18, 2019—Decided June 17, 2019.

[24] Equal Rights Center, "Investigation Finds Adverse Treatment Of Latinos In 55 Percent Of Rental Housing Inquiries," 30 April 2013, https://equalrightscenter.org/press-releases/investigation-finds-adverse-treatment-of-latinos-in-55-of-rental-housing-inquiries/.

[25] Ibid.

However, the Virginia General Assembly has only inflamed tensions around immigration. In 2019, it passed the anti-sanctuary Senate Bill that provides that "no locality shall adopt any ordinance, procedure, or policy intended to restrict the enforcement of federal immigration laws." All but one of the state legislators representing at least part of Virginia Beach voted for the Sanctuary Cities Bill. Also in 2019, the General Assembly passed House Bill 2270 that "requires that the sheriff, jail superintendent, or other official in charge of a local correctional facility or a regional jail in which an alien is incarcerated shall notify U.S. Immigration and Customs Enforcement of the release or discharge of the alien forthwith as soon as the release date is known." Democratic Governor Ralph Northam vetoed both bills, stating that "the safety of our communities requires that all people, whether they are documented or not, feel comfortable, supported and protected by our public safety agencies." He had vetoed similar "sanctuary legislation" the year prior as well.[26]

**Virginia Beach**

Virginia Beach is the largest city in Virginia, with a population of more than 450,000 persons according to the latest U.S. Census estimates. As indicated in Table 1, based on U.S. Census data for 2013-2017, Virginia Beach is slightly less than two-thirds non-Hispanic white and slightly more than one-third combined minority, with the non-Hispanic white percentage largest for citizen voting age and smallest for total population. African Americans comprise by far the largest minority group with just under 20 percent, following by Hispanics and Asians with approximately equal populations that range from 6.1 percent to 7.8 percent, depending on the measure examined. Other minorities comprise a minimal percentage of Virginia Beach's population. In terms of absolute numbers, Virginia Beach has the largest African American population of any Virginia city, with nearly 100,000 African American residents.

As indicted in Table 2 and Chart 1, the minority population of Virginia Beach has been growing in recent years relative to the non-Hispanic white population. From the Census of 2000 through the 2013-2017 ACS estimates, the minority population in Virginia Beach has increased by 22.2 percent for all persons, 25.4 percent for voting-age persons, and 25.1 percent for citizen voting-age persons.

Like the Commonwealth of Virginia, the City of Virginia Beach has a history of discrimination which extends from its founding in the 1960s through recent times. In 1966, the city adopted at-large elections for electing 11 city council members, which meant that all candidates had to compete for positions in a large city of 249 square miles. In addition, it established that 7 members would be selected from designated or numbered posts, where they would run from residential districts with a single seat at stake, but all voters in the city would participate. The Senate Report lists the use of large places for elections as among the factors in the totality of

---

[26] Virginia's Legislative Information System, 2019 Session, "SB 1156," http://lis.virginia.gov/cgi-bin/legp604.exe?191+sum+SB1156 and "HB 2270," https://lis.virginia.gov/cgi-bin/legp604.exe?191+sum+HB2270; Mel Leonor, "Northam Vetoes 'Sanctuary Cities' Bill, *Richmond Times-Dispatch*, 19 March 2019, https://www.richmond.com/news/virginia/government-politics/northam-vetoes-sanctuary-cities-bill/article_a0594c7e-b87f-5e4e-9eb8-feb32abdbfc7.html.

circumstances (Factor 3) that can impede minority voting opportunities. The report also cites the designatation or numbering of posts in Factor 3, because such a labeling prevents "single-shot voting" —the practice of concentrating minority votes on a candidate of choice or a limited number of candidates of choice when multiple candidates are up for election in a multi-seat contest. According to a 2006 scholarly analysis of post-1982 decisions under Section 2 of the VRA, 26 courts that found a violation of Section 2 cited "anti-single shot provisions, such as staggered terms and/or numbered-place requirements" as factors informing their findings. Thirteen courts cited "unusually large districts."[27] The City of Virginia Beach has all both, plus an at-large scheme.

In the 1990s, the City of Virginia Beach considered switching from its at-large system to a district system for electing members of the city council. During this period, other jurisdictions in Virginia were converting from at-large elections to districts—and consequently increasing minority representation on their governing bodies—in order to appease the Justice Department and respond to votings rights litigation.[28] However, the City of Virginia Beach ultimately decided not to adopt district elections, and the at-large election system remains in operation to this day.

---

[27] Ellen D. Katz, et al., "Documenting Discrimination in Voting: Judicial Findings Under Section 2 of the Voting Rights Act Since 1982" *University of Michigan Journal of Law Reform*, 39 (2006), p. 698.
[28] Davidson and Grofman, "Virginia," pp. 283-286; Deidre Fernandes, "Candidates: Wards Would Help Blacks Get Elected," *Virginian-Pilot*, 12 October 2008, p. B1; John Warren, "Black Leaders Discuss a Shift in Voting System," *Virginian-Pilot*, 12 April 2008, p. A1.

13

| **TABLE 1**<br>**POPULATION, VOTING AGE POPULATION, CITIZEN VOTING AGE<br>PERCENTAGES BY RACE, VIRGINIA BEACH, US CENSUS, AMERICAN<br>COMMUNITY SURVEY, 2013-2017** | | | | | | | |
|---|---|---|---|---|---|---|---|
| **POPULATION MEASURE** | **NON-HISP. WHITE** | **NON-HISP. BLACK** | **HISPANIC** | **NON-HISP. ASIAN** | **OTHER** | **BLACK, HISP. ASIAN** | **ALL MINORITY** |
| **TOTAL** | **62.6%** | 20.0% | 7.8% | 7.9% | 1.7% | **35.7%** | **37.4%** |
| **VOTING AGE** | **65.0%** | 18.7% | 7.0% | 7.8% | 1.5% | **33.5%** | **35.0%** |
| **CITIZEN VOTING AGE** | **66.6%** | 19.3% | 6.1% | 6.6% | 1.4% | **32.0%** | **33.4%** |
| Source: CVAP, 2013-2017, US Census, ACS,  https://www.census.gov/programs-surveys/decennial-census/about/voting-rights/cvap.html. | | | | | | | |

14

| TABLE 2 POPULATION CHANGE, 2000 TO 2013-2107, TOTAL, VOTING AGE POPULATION, CITIZEN VOTING AGE PERCENTAGES BY RACE, VIRGINIA BEACH | | | | | | |
|---|---|---|---|---|---|---|
| POP. MEASURE | NON-HISP. WHITE 2000 | NON-HISP. WHITE 2013-2017 | PERCENT CHANGE | ALL MINORITY 2000 | ALL MINORITY 2013-2017 | PERCENT CHANGE |
| | | | | | | |
| TOTAL | 69.4% | 62.6% | **-9.8%** | 30.6% | 37.4% | **+22.2%** |
| VOTING AGE | 72.1% | 65.0% | **-9.8%** | 27.9% | 35.0% | **+25.4%** |
| CITIZEN VOTING AGE | 73.3% | 66.6% | **-9.1%** | 26.7% | 33.4% | **+25.1%** |
| | | | | | | |
| Sources: CVAP, 2013-2017, US Census, ACS, U.S. Census 2000, Special Tabulation, Citizen Voting Age Population. | | | | | | |

**CHART 1**
**MINORITY POPULATION CHANGE, 2000 TO 2013-2107, TOTAL, VOTING AGE**
**POPULATION (VAP), CITIZEN VOTING AGE (CVAP) PERCENTAGES, VIRGINIA**
**BEACH**



As a result of its election system, the City of Virginia Beach is behind its neighbors in terms of minority representation on its city council. In 2003, Norfolk, with a black population of 44 percent and a district system of elections, had 3 black members on its 7-member city council. Meanwhile, Virginia Beach, with a black population of 19 percent and an at-large election system, had no black members on its 11-member city council. In fact, only two African Americans had ever been elected to the Virginia Beach city council from its founding in the 1960s through 2003, and none had survived reelection. Only one other minority— Filipino Ron A. Villaneuva—had ever been elected, and was serving in 2003.[29]

In addition to the at-large election system, the allocation of polling place resources has been found to burden minority residents of Virginia Beach. A study of the allocation of polling place resources in 2004 and 2008 by Dr. Walter R. Mebane, Jr., Professor in the Department of Political Science and Statistics at the University of Michigan, found that allocation decisions in Virginia Beach had a discriminatory effect on voting opportunities for its predominant minority group of African Americans. His key findings are as follows:

"The distribution of machines in both Richmond and Virginia Beach for the upcoming [2008] election is clearly biased against voters in precincts with high proportions of African-Americans. In other words, precincts with high proportions of African-Americans have substantially more registered voters per allocated machine than precincts with fewer African Americans. There were similar relationships in the allocation of voting machines in 2004."

"In both Richmond and Virginia Beach, as the proportion of the voting age population that is African American increases, the mean number of registered voters per voting machine also increases."

"In examining the registration, turnout, and machine allocation data from the 2004 election, I found that higher ratios of registered voters per machine were associated with lower levels of voter participation in Norfolk, Richmond, and Virginia Beach. This indicates that voters in those precincts with relatively many voters for each machine were more likely to be deterred from voting than voters in precincts with fewer voters for each machine."

"In Virginia Beach, voter participation declines steadily throughout the range of ratios observed in the city. The magnitude of the declines is substantial: from the peak value to the lowest the decrease in voter participation is on the order of five to ten percent."[30]

Like the rest of the Commonwealth, the City of Virginia Beach supported segregated schools that legally separated white and black students until it was court ordered to integrate in 1969. A study of school segregation by the Lewis Mumford Center for Comparative Urban and Regional Research University at Albany shows progress towards school integration in the Virginia Beach School District

---

[29] Bruce Murphy, "Virginia Beach, Nearby Cities Tell Complex Story of Black White Politics," *Milwaukee Journal-Sentinel*, 23 February 2013, 011403MURPHYjsonline.pdf.

[30] Quotes are from *Virginia State Conf. of the NAACP v. Kaine*, No. 3:08-cv-00692 (E.D. Va. Nov. 3, 2008), "Expert Declaration of Walter Richard Mebane, Jr. on Behalf of Plaintiffs," 27 October 2008, pp 7-9; see also the detailed statistical analysis in his additional report, "Voting Machine Provision and Allocation in the Virginia the 2008 General Election," 27 October 2018.

in the two decades after the court order, followed by a reversal towards increasing segregation in the 1990s. The Center examined the "dissimilarity index"—which measures the percentage of African American students that would have to change schools to achieve system-wide integration—and found that the index declined from 45.0 in 1968 to 27.0 in 1990, but then rose to 32.7 by 2000. An updated study by The Heller School for Social Policy and Management examined segregation for African Americans and whites in Virginia Beach's public and primary schools—which comprised 70 percent of enrollments for pre-college students according to the U.S. Census of 2010—and found that for the 2010-2011 school year ,the dissimilarity index was a yet higher 38.9.[31]

African American pupils in Virginia Beach's public schools also suffer disproportionately from suspensions and expulsions. An October 2017 study by the Legal Aid Justice Center reported that, as in the past, for the 2015-2016 academic year, "Virginia schools continue to issue a huge number of out-of-school suspensions, posting a slight increase from even the 2014-2015 totals." Specifically, they found that "the majority of suspensions were issued for minor offenses, with approximately two-thirds of all suspensions given for behavior offenses, such as possession of cell phones, minor insubordination, disrespect, and using inappropriate language." But "perhaps most disturbing is that Virginia schools continue to disproportionately suspend African American students and students with disabilities. The suspension rate for African-American students was 3.8 times larger than for Hispanic and white students."

The Legal Aid Justice Center report compiled data on short-term suspensions for African Americans and whites in the City of Virginia Beach .As indicated in Chart 2, the short-term suspension rate for white students in Virginia Beach is comparable to the state rate for suspensions, while the rate of African American suspensions is 3.7 times higher than the white rate.[32] This is nearly identical to the disparities that the study found statewide, where the suspension rate for African-American students was 3.8 times larger than the suspension rate for Hispanic and white students.[33]

---

[31] John R. Logan and Deidre Oakley, "The Continuing Legacy of the Brown Decision: Court Action and School Segregation, 1960-2000," Lewis Mumford Center for Comparative Urban and Regional Research University at Albany, 28 January 2004, p. 10, https://s4.ad.brown.edu/Projects/usschools/reports/report2.pdf; "School Segregation (Dissimilarity Index): Public Primary School Students Dissimilarity with White (Non-Hispanic) Students by Race/Ethnicity,"2010-2011, The Heller School for Social Policy and Management, http://www.diversitydatakids.org/data/ranking/90/school-segregation-dissimilarity-index-public-primary-school-students-dissimilar#loct=6&tf=5&ch=2,3,4,5.

[32] Ibid., p. 17.

[33] Amy Woolard, "Suspended Progress 2017: An Update on the State of Exclusionary Discipline in Virginia's Public Schools," Legal Aid Justice Center, October 2017, Executive Summary, pp. 3, 17, https://www.justice4all.org/wp-content/uploads/2016/04/Suspended-Progress-2017.pdf.

**CHART 2**
**SHORT-TERM SUSPENSIONS BY RACE, PUBLIC SCHOOLS, VIRGINIA BEACH, 2015-2016.**



Virginia Beach also lags in the employment of minority teachers relative to minority public school enrollment. According to a 2011 study by the Virginia Pilot, as compared to neighboring jurisdictions, "the racial imbalance is most pronounced in Virginia Beach, where 85 percent of public school teachers are white and close to half of students are not, statistics show." The study found that "the demographic imbalance isn't unique to Virginia Beach, but the disparity is sharper there than in surrounding school divisions. Statewide, 43 percent of students and 17 percent of teachers are minorities." Virginia Beach, on the other hand, "employs one white classroom teacher for every nine white students but only one minority teacher for every 43 minority students." This imbalance affects all minority groups in Virginia Beach, including African Americans, Hispanics, and Asians.[34] Although there are generally challenges in recruiting minority teachers, that issue does not explain the sharper racial imbalance in Virginia Beach as compared to other Virginia communities given that the challenge is ubiquitous across markets.

---

[34] All quotes from: Mike Hixenbaugh, "Teacher-Student Racial Imbalance Widest in Va. Beach," *Virginia Pilot*, 17 September 2011, https://pilotonline.com/news/local/education/article_99d4e10f-7582-5625-b2c5-549983e5f028.html??dssReturn=true.

**Factor 2: The extent to which voting in the elections of the state or political subdivision is racially polarized.**

The report of Dr. Douglas M. Spencer of the University of Connecticut establishes that voting is polarized along racial lines in Virginia Beach between whites and African Americans (the predominant minority group in Virginia Beach), and generally between whites and all minorities (blacks, Hispanics, Asians, and a small number of others). For city council elections studied from 2008 to 2018, blacks and all minorities typically preferred to vote for black candidates and whites typically preferred to vote for white candidates. White bloc voting usually defeated city council candidates of choice of blacks and minorities.

From 2008 to 2016, only one black candidate—Amelia Ross-Hammond—won election to a city council position, but she was defeated in her reelection bid by a 27-year-old white woman. No black candidate has ever won reelection to a city council position in Virginia Beach, even though white incumbents typically win reelection in the city.

In 2018, for the first time in the history of Virginia Beach, two minority candidates—African Americans Rouse (at-large) and Wooten (Centerville District)—won election to city council. Wooten was the only minority candidate since 2008 to emerge as the candidate of choice of white voters, although she was competing against another black candidate and a token white candidate who won only 6 percent of the overall vote. Rouse, the first choice of black and other minority voters, was not first or second candidate of choice of white voters, although he did gain unusually high white support.

It is important to note that the 2018 elections took place during the pendency of this lawsuit and thus represent a special circumstance that must be considered in evaluating election results. A detailed analysis of the special circumstances involving Rouse and Wooten in 2018 is presented under Factor 7 (page 43), which focuses on the extent to which members of the minority group have been elected to public office in the jurisdiction.

The results of federal elections for the precincts of Virginia Beach further validates the pattern of racially polarized voting that Dr. Spencer identifies within city council elections. Dr. Spencer analyzed the presidential general elections of 2008 and 2012, the Democratic presidential primary of 2008, and the 2016 general election in Congressional District 2. He found a pattern of substantial racially polarized voting in these four federal elections. In 3 of 4 elections, white bloc voting defeated the candidate of choice of black and minority voters within the precincts of Virginia Beach. The one exception is the 2008 Democratic primary for president, in which Obama was the candidate of choice of all racial groups in Virginia Beach. Statewide, Obama swept the 2008 Democratic presidential primary statewide with 64 percent of the vote and won in Virginia Beach. However, according to Dr. Spencer, Obama garnered a much higher percentage of the black and minority vote than the white vote.

**Factor 3: The extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group.**

Minority candidates compete at-large for city council in Virginia Beach, meaning that they have to cover an entire municipality which is unusually large both in area (249 square miles) and population (450,055 persons). In addition, 7 positions have designated, or numbered posts, which are elected at-large. These designated positions prohibit minorities from single-shot voting for a candidate or concentrating their votes on a small number of candidates. Similarly, the election for mayor, who is also a member of the city council, involves a single-seat contest that precludes single-shot or concentrated voting. The staggering of the three non-designated city council elections likewise makes single-shot or concentrated voting less effective. Under the staggered system for election to the three at-large positions in Virginia Beach, candidates compete for 1 position in one election year and 2 positions in the next election year. This renders single-shot or concentrated voting impossible in the case of the single-seat election and ineffective in the case of the 2 seat election.

Table 3 analyzes the method of election and the number of square miles in which a candidate must cover to win a city council seat for cities in Virginia with populations over 50,000. As indicated in Table 3, the square miles that candidates must cover in Virginia Beach is typically far higher than the square miles that candidates must cover on average in other cities. Though the square mileage is slightly greater in Chesapeake and Roanoke than in Virginia Beach, the square mileage in Virginia Beach is many multiples higher than in the ten other cities. The ratio of the square mileage for the place of election in Virginia Beach as compared to these other cities ranges from 2.5 to 1 to 37.7 to 1.

Table 4 analyzes the population size that city council candidates must cover to win a city council seat in the same Virginia cities. The population size for Virginia Beach is many multiples higher than in any of the 12 other cities in Table 4. The ratio of the population for the place of election in Virginia Beach as compared to these other cities ranges from 1.9 to 1 to 21.3 to 1.

| TABLE 3<br>VIRGINIA CITIES WITH MORE THAN 50,000 POPULATION, AVERAGE<br>SQUARE MILES OF PLACE OF ELECTION FOR CITY COUNCIL | | | | | |
|---|---|---|---|---|---|
| CITY | POPULATION US CENSUS 2018 | SQ. MILES US CENSUS | METHOD OF ELECTION CITY COUNCIL | MEAN SIZE, PLACE OF ELECTION SQ. MILES | RATIO SIZE OF PLACE VA BEACH TO OTHER CITY |
| **VIRGINIA BEACH** | 450,055 | 249 | At-Large | 249 | **NA** |
| **NORFOLK** | 242,827 | 54.1 | 5 Wards, 2 Superward | 15.4 | **16.2 to 1** |
| **CHESAPEAKE** | 242,624 | 340.8 | At-large, 7 Seats | 340.8 | **.73 to 1** |
| **RICHMOND** | 228,783 | 59.8 | 9 Districts | 6.6 | **37.7 to 1** |
| **NEWPORT NEWS** | 178,626 | 68.7 | 1 At-large (Mayor), 6 Districts | 11.5 | **21.7 to 1** |
| **ALEXANDRIA** | 160,530 | 15 | At-large, 7 Seats | 15 | **16.6 to 1** |
| **HAMPTON** | 134,313 | 51.4 | At-large, 7 Seats | 51.4 | **4.8 to 1** |
| **PORTSMOUTH** | 94,632 | 33.7 | At-large, 7 Seats | 33.7 | **7.4 to 1** |
| **ROANOKE** | 94,073 | 250.6 | At-large, 7 Seats | 250.6 | **.99 to 1** |
| **SUFFOLK** | 84,572 | 400 | 7 Boroughs, | 100 | **2.5 to 1** |
| **LYNCHBURG** | 82,126 | 49.1 | 4 Ward, 3 At-large | 22.8 | **10.9 to 1** |
| **HARRISONBURG** | 54,033 | 17.4 | At-large, 5 Seats | 17.4 | **14.3 to 1** |
| **LEESBURG** | 53,914 | 12.4 | At-large, 7 Seats | 12.4 | **20.1 to 1** |
| Sources: U.S. Census Quick Facts, Municipal websites. | | | | | |

23

| TABLE 4 VIRGINIA CITIES WITH MORE THAN 50,000 POPULATION, AVERAGE POPULATION OF PLACE OF ELECTION FOR CITY COUNCIL | | | | |
|---|---|---|---|---|
| CITY | POPULATION US CENSUS 2018 | METHOD OF ELECTION, CITY COUNCIL | AVERAGE POPULATION OF PLACE OF ELECTION | RATIO VA BEACH TO CITY POPULATION |
| **VIRGINIA BEACH** | 450,189 | At-Large | 450,159 | **NA** |
| **NORFOLK** | 242,827 | 5 Wards, 2 Superwards | 69,379 | **6.5 to 1** |
| **CHESAPEAKE** | 242,624 | At-large, 7 Seats | 242,624 | **1.9 to 1** |
| **RICHMOND** | 228,783 | 9 Districts | 25,420 | **17.7 to 1** |
| **NEWPORT NEWS** | 178,626 | 1 At-large, 6 Districts | 51,036 | **8.8 to 1** |
| **ALEXANDRIA** | 160,530 | At-large, 7 Seats | 160,530 | **2.8 to 1** |
| **HAMPTON** | 134,313 | At-large, 7 Seats | 134,313 | **3.4 to 1** |
| **PORTSMOUTH** | 94,632 | At-large, 7 Seats | 94,632 | **4.8 to 1** |
| **ROANOKE** | 94,073 | At-large, 7 Seats | 94,073 | **4.8 to 1** |
| **SUFFOLK** | 84,572 | 7 Boroughs, 1 At-large | 21,143 | **21.3 to 1** |
| **LYNCHBURG** | 82,126 | 4 Ward, 3 At-large | 46,929 | **9.6 to 1** |
| **HARRISONBURG** | 54,033 | At-large, 5 Seats | 54,033 | **8.3 to 1** |
| **LEESBURG** | 53,914 | At-large, 7 Seats | 53,914 | **8.3 to 1** |
| Sources: U.S. Census Quick Facts, Municipal websites. | | | | |

24

**Factor 4: If there is a candidate slating process, whether the members of the minority group have been denied access to that process.**

Although I have not yet uncovered evidence of formal slating for city council candidates in Virginia Beach, I have probed the issue by examining the extent to which candidates unite to finance each other's campaigns. For white and black candidates from 2008 to 2018, Tables 5 and 6 report the white and black candidates respectively who have received at least $250 in contributions from two or more other candidates who ran for city council during this period.

As indicated in these tables, such combined support is largely confined to white candidates. Table 5 demonstrates that 17 white candidates received a minimum contribution of $250 from two or more other candidates. Only 3 of the contributors were black. All other contributions came from white candidates.

Table 6 demonstrates that only 2 black candidates received a minimum contribution of $250 from two or more other candidates. These candidates were Wooten in 2018 and elected incumbent Ross-Hammond in 2016. The ratio of white to black candidates receiving $250 or more from 2 or more other candidates is 8.5 to 1.

25

| TABLE 5 | |
|---|---|
| **WHITE CITY COUNCIL CANDIDATES, VIRGINIA BEACH, WITH AT LEAST $250 IN CONTRIBUTIONS FROM TWO OR MORE OTHER CANDIDATES, 2008 TO 2018** | |
| CANDIDATE | OTHER     CANDIDATE     CONTRIBUTORS     (BLACK CANDIDATES IN **BOLD**) |
| | |
| BELITTO | SESSOMS, DIEZEL, UHRIN, DAVIS |
| DALE | JONES, SESSOMS, |
| DAVIS | JONES, SESSOMS, UHRIN, WILSON, DIEZEL |
| DEAN | MOSS, DESTEPH, |
| FREE | DESTEPH, WILSON |
| GOLDEN | DESTEPH, MOSS |
| HENLEY | DAVENPORT, SESSOMS, UHRIN, JONES |
| JONES | SESSOMS, WILSON |
| KANE | SESSOMS, JONES, DAVIS, WOOD, WILSON, UHRIN |
| MARTIN | SESSOMS, JONES, UHRIN, WOOD, WILSON |
| MCCORMICK | DESTEPH, MOSS |
| MOSS | JONES, KOWALEWITCH, BLYTHE, DEAN, WORST |
| REDMOND | SESSOMS, UHRIN**,** |
| SESSOMS | UHRIN,  OLIVER, **BRIGHT,** KANE, MARTIN, **SHERROD**, |
| UHRIN | SESSOMS, DAVENPORT, WILSON, DAVIS |
| WILSON | JONES, DAVENPORT, WOOD, DAVIS, SESSOMS, JONES, UHRIN |
| WOOD | DAVENPORT, UHRIN, SESSOMS, **SHERROD**, DIEZEL |
| | |
| Source: Virginia Public Access Project, "Money," https://www.vpap.org/money/. | |

| TABLE 6<br>BLACK CITY COUNCIL CANDIDATES, VIRGINIA BEACH, WITH AT LEAST $250 IN CONTRIBUTIONS FROM TWO OR MORE OTHER CANDIDATES, 2008 TO 2018 | |
|---|---|
| CANDIDATE | OTHER CANDIDATE CONTRIBUTORS (BLACK CANDIDATES IN **BOLD**) |
| ROSS-HAMMOND | SESSOMS, JONES, **BRIGHT**, DIEZEL, UHRIN, DAVENPORT * |
| WOOTEN | SESSOMS, WILSON, DAVENPORT |
| * Contributions from 2016 when Ross-Hammond was elected incumbent. | |
| Source: Virginia Public Access Project, "Money," https://www.vpap.org/money/. | |

27

**Factor 5: The extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process.**

The lingering effects of past discrimination are amply demonstrated in the deficient socio-economic position of minorities in Virginia Beach. These disparities, which exist with regard to income, unemployment, poverty, education, and housing, are documented in Tables 7-9 and Charts 3 to 9. The data for whites, blacks, and Asians is for non-Hispanics only, and the black and Asian metrics include multi-race individuals. As indicated in the section discussing the history of discrimination (Factor 1, page 4), socio-economic disparities have an important impact on restricting the opportunities for minorities to participate fully in the political process and elect candidates of their choice. The election system described above (Factor 3, page 22), which features at-large elections spanning large areas and populations with virtually no single-shot voting ability, magnifies the effects of socio-economic disparities.

Table 7 and Charts 3 through 5 demonstrate substantial disparities between non-Hispanic whites and both non-Hispanic African Americans and Hispanics on all standard economic and educational measures in Virginia Beach. For African Americans and Hispanics, the economic disparities are evident for income, poverty, unemployment, welfare assistance, and the availability of health insurance. Disparities for Asian Americans, although less substantial than for blacks and Hispanics, also emerge for per-capita income, poverty, welfare assistance, and the availability of health insurance.

Table 8 and Charts 6 and 7 similarly demonstrate substantial educational disparities between whites and African Americans and Hispanics for such standard measures as high school and college graduation rates and student performance on reading, writing, science, and mathematics. Disparities do not emerge for Asians on educational measures.

Table 9 and Charts 8 and 9 demonstrate substantial disparities between whites and both African Americans and Hispanics in rates of home ownership and the median value of owned homes. Disparities emerge for Asians in the value of homes. It also demonstrates disparities between non-Hispanic whites and African Americans in the availability of vehicles.

In sum, a wide range of economic, educational and housing measures, disparities between non-Hispanic whites and African Americans emerge for every measure. Disparities between non-Hispanic whites and Hispanics emerge for every measure but the availability of vehicles. Disparities emerge for Asians on per-capita income, poverty, welfare assistance, the availability of health insurance, and home value.

| TABLE 7<br>ECONOMIC MEASURES BY RACE<br>VIRGINIA BEACH, US CENSUS, AMERICAN COMMUNITY SURVEY,<br>2011-2015 | | | | |
|---|---|---|---|---|
| MEASURE | BLACK | HISPANIC | ASIAN | WHITE |
| | | | | |
| **MEDIAN HOUSEHOLD INCOME** | $51,559 | $54,825 | $72,001 | $71,948 |
| | | | | |
| **PER CAPITA INCOME** | $22,773 | $20,784 | $26,512 | $37,443 |
| | | | | |
| **POVERTY RATE FOR PERSONS INDIVIDUALS** | 14.4% | 14.2% | 7.4% | 5.8% |
| | | | | |
| **UNEMPLOYMENT RATE** | 9.2% | 8.8% | 4.6% | 5.0% |
| | | | | |
| **% WITH FOOD STAMPS/SNAP** | 15.9% | 10.9% | 5.5% | 4.1% |
| | | | | |
| **18-64 NO HEALTH INSURANCE** | 17.1% | 24.5% | 15.7% | 11.6% |

29

**CHART 3**
**MEDIAN HOUSEHOLD AND PER CAPITA INCOME BY RACE, VIRGINIA BEACH**



**CHART 4**
**POVERTY, UNEMPLOYMENT & FOOD STAMPS RATE BY RACE,**
**VIRGINIA BEACH**



**CHART 5**
**NO HEALTH INSURANCE, 18-64 YEARS-OLD BY RACE, VIRGINIA BEACH**



| TABLE 8<br>EDUCATION MEASURES BY RACE<br>VIRGINIA BEACH | | | | |
|---|---|---|---|---|
| MEASURE | BLACK | HISPANIC | ASIAN | WHITE |
| **HIGH SCHOOL GRADUATES** | 89.4% | 88.7% | 91.8% | 95.0% |
| **BACHELOR'S DEGREE OR MORE** | 25.3% | 21.8% | 41.6% | 36.4% |
| **PASS: ENGLISH READING** | 74% | 84% | 91% | 91% |
| **PASS: ENGLISH WRITING** | 68% | 81% | 90% | 89% |
| **PASS: SCIENCE** | 69% | 82% | 94% | 92% |
| **PASS: MATH** | 70% | 81% | 94% | 88% |
| Sources: Us Census, American Community Survey**,** 2011-2015; Virginia State Board of Education, SOL Test Results, 2017-2018, http://www.doe.virginia.gov/statistics_reports/sol-pass-rates/index.shtml. | | | | |

**CHART 6**
**EDUCATIONAL ATTAINMENT BY RACE, VIRGINIA BEACH**



**CHART 7**
**STUDENT ACHIEVEMENT SCORES, PASS RATES BY RACE, VIRGINIA BEACH**



| TABLE 9 | | | |
|---|---|---|---|
| **HOUSING CHARACTERISTICS BY RACE, VIRGINIA BEACH, 2011-2015 US CENSUS, AMERICAN COMMUNITY SURVEY** | | | |
| | | | |
| MEASURE | BLACK | HISPANIC | ASIAN | WHITE |
| | | | |
| **PERCENT OWNER OCCUPIED** | 44.9% | 46.1% | 69.4% | 69.5% |
| | | | |
| **MEDIAN HOME VALUE** | $218,100 | $231,400 | $253,400 | $273,700 |
| | | | |
| **PERCENT WITH NO VEHICLE** | 8.3% | 2.7% | 2.0% | 3.2% |
| | | | |

36

## CHART 8
## MEDIAN HOME VALUE BY RACE, VIRGINIA BEACH



**CHART 9**
**HOME OWNERSHIP AND VEHICLE AVAILABILITY BY RACE, VIRGINIA BEACH**



**Factor 6: Whether political campaigns have been characterized by overt or subtle racial appeals.**

Virginia political campaigns, including for officials elected from Virginia Beach, have been marked in recent years by overt racial appeals. In the 2006 campaign for U.S. Senate, incumbent Republican candidate and former governor George Allen called a volunteer of East Indian descent for his Democratic opponent Jim Webb a "macaca." This racial slur occurred at a rally for Allen, where the volunteer, S.R. Sidarth said, "I was the only person of color there." Pointing at Sidarth, Allen said:

> "This fellow here, over here with the yellow shirt, macaca, or whatever his name is. He's with my opponent. He's following us around everywhere. And it's just great," … "Let's give a welcome to macaca, here. Welcome to America and the real world of Virginia."[35]

The word *macaca* sounds like and refers to a monkey. After Allen's remarks stirred controversy, his campaign manager dismissed the matter by saying that Allen had "nothing to apologize for." Later, however, Allen did apologize, saying: "I would never want to demean him as an individual. I do apologize if he's offended by that. That was [in] no way the point." This was not the first time, however, that Allen acted in a way offensive to minorities.[36] For example, as Governor, Allen issued a proclamation noting the South's celebration of Confederate History Month without any mention of slavery. In 2010, Governor Bob McDonnell reignited this controversy by yet again issuing a Confederate History proclamation without any mention of slavery.[37]

On Halloween 2011, shortly before the general election, the Republican Party of Loudon County, Virginia circulated via email a photo montage showing President Barack Obama with a bullet in his head and various Obama supporters as grotesque zombie figures (reproduced below). The image was condemned by the statewide Virginia Republican Party and the Loudon County Republican Chair Mark Sell issued an apology saying, "we deeply and sincerely apologize to the president and anyone who viewed the image … The LCRC deplores any effort to display, suggest or promote violence against the president or any other political figure."[38]

Even after the controversy over the Loudon GOP montage, the Republican Party of Mecklenburg County, Virginia posted on its Facebook page images of President Obama as a witchdoctor, a caveman, and a thug during the run-up to the 2012 general election. Once again,

---

[35] Video of Allen available at https://www.youtube.com/watch?v=r90z0PMnKwI.

[36] Tim Craig and Michael D. Shear, "Allen Quip Provokes Outrage, Apology," *Washington Post*, 15 August 2006, http://www.washingtonpost.com/wp-dyn/content/article/2006/08/14/AR2006081400589.html.

[37] Anita Kumar and Rosalind S. Helderman, "McDonnell's Confederate History Month Proclamation Irks Civil Rights Leaders," *Washington Post*, 7 April 2010, http://www.washingtonpost.com/wp-dyn/content/article/2010/04/06/AR2010040604416.html.

[38] Tim Mack, "GOP Group Blasted for Obama Image," *Politico*, 1 November 2011, http://www.politico.com/story/2011/11/gop-group-blasted-for-obama-image-067315.

**Loudon County Republican Party Halloween Emailed Image, 2011**
(Source Politico, 1 November 2011)



the state Republican Party condemned the images, but the head of the Mecklenburg Republicans, R. Wallace Mullins, refused to back down. He said, "if that group is that sensitive, I'm sorry, they're just not human," chuckling. "It's not American. If they've got a problem with it, we're not going to change what we do."[39]

During the Republican primaries in 2017, gubernatorial candidate Corey Stewart embraced Confederate symbols and upheld the Confederacy as part of Virginia's heritage. He attended the "Old South Ball" in 2017 and said that Virginia was the state of Confederates Robert E. Lee and Stonewall Jackson and that the Confederate flag "is our heritage, it is what makes us Virginia, and if you take that away we lose our identity." Stewart narrowly lost the Republican gubernatorial nomination to Ed Gillespie, but was nominated in 2018 as the Republican candidate for the U.S. Senate.[40]

In August 2017, the Republican Party of Virginia posted two tweets which asserted that Democratic candidate Ralph Northam had "turned his back on his own family's heritage in demanding monument removal" and that he "would do or say anything to try and be #VAGov. -#Pathetic."[41]  The tweets shortly followed violent white supremacist protests in Charlottesville, which ostensibly centered around the removal of Confederate statues in the city, and during which a white supremacist participant killed a young woman and was subsequently convicted for murder. Several Democrats charged that Virginia Republicans had appealed to white supremacists in its tweets about candidate Northam. The Republican Party later apologized and deleted the tweets, claiming to have intended to argue that Northam had turned on his family members who had been injured fighting for the Confederacy during the Civil War.[42]

During the 2017 gubernatorial campaign, Republican candidate Ed Gillespie issued a campaign video attacking the Democratic candidate for supporting the removal of Confederate statutes in Virginia.  Gillespie promised to preserve such statutes as symbols of "our history."[43]

In that same election, the Latino Victory Fund ran an ad in which a truck displaying a Gadsden flag license plate, a Confederate flag, and an Ed Gillespie bumper sticker chases down a black child and children who appear to be of Latino descent. Another child appears to be of Middle Eastern, North African, or South East Asian descent and wears a hijab. The driver of the truck is

---

[39] Laura Vozella, Va. GOP Orders Affiliate to Remove "Offensive" Obama Images," *Washington Post*, 25 September 2012, https://www.washingtonpost.com/local/dc-politics/va-gop-orders-affiliate-to-remove-offensive- obama-photos/2012/09/25/8c17d62c-0741-11e2-858a-5311df86ab04_story.html.
[40] Jane Coaston, "Virginia Republicans Just Nominated an alt-Right Hero to Run For Senate," *Vox*, 8 August 2018, https://www.vox.com/2018/6/13/17458452/alt-right-corey-stewart-virginia-gop.
[41] Eli Watkins, "Virginia GOP Deletes Confederate 'Heritage' Tweet Targeting Democrats," CNN,  23 August 2013, https://www.cnn.com/2017/08/23/politics/ralph-northam-birginia-confederacy/index.html.
[42] Graham Moomaw, "Virginia Republican Party Apologizes For Saying Northam Rejected His 'Family's Heritage' By Opposing Confederate Statues," Richmond Times-Dispatch, 23 August 2017, https://www.richmond.com/news/virginia/government-politics/virginia-republican-party-apologizes-for-saying-northam-rejected-his-family/article_91413fad-e6af-5ccc-b175-636704345ee2.html.
[43] https://www.youtube.com/watch?v=JSd_rxHXvsU.

white. The ad ends with footage of a 2017 march at the University of Virginia, where participants shouted anti-Semitic chants and advocated for white supremacist viewpoints.[44]

In 2017, The Dominion Leadership Trust issued two mailers against Democratic House of Delegates candidate Elizabeth Guzman (D-31), who had immigrated from Peru.  The mailer shows a gun with bullets, alcohol, and a sticker saying, "I voted," and claims that Guzman supported allowing "illegal aliens" to obtain driver's licenses.  The mailer warns that if Guzman gets elected, "[illegal aliens] and even criminals will have the ID they need to buy a gun."  One mailer shows six bullet holes in a piece of glass and states, "If you fear this in your neighborhood, then you should fear this..."[45]

In the same year, the Republican House of Delegates candidate Richard Anderson's campaign sent out a mailer targeting his Democratic rival, Hala Ayala (D-51).  The mailer depicts what appears to be a black man cast in darkness, wearing a hood and holding a wooden post.  It says, "Hala Ayala: Restore rights to felons: thugs, violent criminals, gang members, and child predators."

There are at least two instances of racial appeals during political campaigns in Virginia Beach. In 1998, Louisa Strayhorn faced racial appeals in her losing reelection bid after becoming only the second African American elected to the Virginia Beach city council four years prior. "I had phone calls saying, 'We're going to make sure that nigger doesn't get elected.' After the election, people would drive by and say, 'See, nigger, we said we'd get you,'" she recalled in 2003. She also said in a 2009 interview that her campaign workers had received racist threats in 1998.[46]

During the 2017 House of Delegates elections, Delegate Rocky Holcomb (R-85 in Virginia Beach) launched an ad which stated that his Democratic opponent Cheryl Turpin wanted to reinstate parole in Virginia "and let rapists out of jail early." The ad shows a dark hand over the mouth of a little girl who clearly appears to be white. Under the picture is the caption, "Police: Convicted rapist out on parole attacked 7-year old girl."[47]

[44] "New Ad Seeks to Link Gillespie to Racism," *WAMU*, 30 October 2017, ahttps://wamu.org/story/17/10/30/democratic-advocates-run-ads-blasting-gops-gillespie-racism-xenophobia/.
[45] Patrick Wilson, "This Virginia House Candidate Says Her Opponent's Mailers Hurt Her. But Not in the political Way," *Richmond Times-Dispatch*, 19 October 2017, https://www.richmond.com/news/virginia/government-politics/this-virginia-house-candidate-says-her-opponent-s-mailers-hurt/article_3f6a7b8f-f41e-5ed0-968f-ccf5dc0d48bc.html.
[46] Murphy, "Virginia Beach, Nearby Cities Tell Complex Story of Black White Politics;" Deidre Fernandes, "Checkered History: For Va, Beach Blacks Power Still Elusive," *Virginian-Pilot*, 9 September 2009, https://pilotonline.com/news/article_4eaaf0c4-0c3d-5722-9e67-1e72606620c0.html.
[47] Jennifer Portnoy, "Attack Ads Multiply in the Final Days Before Virginia Election," *Washington Post*, 2 November 2017, https://www.washingtonpost.com/local/virginia-politics/attack-ads-multiply-in-the-final-days-before-the-virginia-election/2017/11/01/7a88a174-bf3e-11e7-8444-a0d4f04b89eb_story.html?utm_term=.f0f9b7cb6bf7.

Turpin struck back with an ad of her own that attempted to link Holcomb to white hate groups. In turn, Scott Pressler, the person depicted in the ad next to Holcomb, sued Turpin for defamation, claiming that he was not a racist or a hate group leader.[48]

---

[48] Joshua Weinstein, "Defamation Lawsuit Against Del. Cheryl Turpin Hinges on Definitions," All News 102, 19 January 2019, https://allnews102.com/latest-news/2019/01/30/defamation-lawsuit-against-del-cheryl-turpin-hinges-on-definitions/.

41

Paid for by the Republican Party of Virginia-www.rpv.org
Authorized by Rocky Holcomb, candidate for Delegate
115 East Grace Street
Richmond, VA 23219

Non-Profit Org.
U.S. Postage
PAID
Richmond, VA
Permit #551

## LIBERAL CHERYL TURPIN
# WANTS TO BRING BACK PAROLE
# & LET RAPISTS OUT OF JAIL EARLY



Virginia abolished all discretionary parole in 1994. Since the abolition of parole, violent criminals in Virginia are required to serve at least 85 percent of their sentences— no exceptions.

Now, Cheryl Turpin wants to restore parole for convicted felons in Virginia. With the safety of our families and children at stake, we can't take that chance.

**Cheryl Turpin puts the interests of criminals ahead of the interests of rape victims and our community.**

# VOTE ON NOV. 7TH
## YOU CAN STOP CHERYL'S TURPIN'S DANGEROUS PLAN

1. Public statements said at Arrowhead Civic League Meeting, 9/12/17



Other States Currently Have Parole and it's a Nightmare.

**Police: Convicted rapist out on parole attacked 7-year-old girl**
A convicted rapist has been arrested and charged with sexually assaulting a 7-year-old girl, just six weeks after he was released from prison, authorities said.

FOX29.COM, 6/23/17

42

**Factor 7: The extent to which members of the minority group have been elected to public office in the jurisdiction.**

For a city that is 19.3 percent African American in citizen voting age population and has a citizen voting age population that is one-third non-white, Virginia Beach has a weak record in electing minority candidates to city positions. In the history of Virginia Beach, no African Americans and only one minority—Tina E. Sinnen, the current Latina Circuit Court Clerk—has ever been elected to any of the city's five constitutional offices. The remaining officials elected citywide in Virginia Beach are white, including Treasurer, Sheriff, Commissioner of Revenue, and Commonwealth's Attorney. Only one of 11 members of the elected School Board—African American Sharon R. Felton—is a minority. A second African American woman, Jessica L. Owens, was appointed to the School Board in 2019, during the pendency of this lawsuit. The congressional, state senate, and state House of Delegates districts that encompass at least parts of Virginia Beach have no elected African Americans or Asians representatives, and only one Hispanic elected official—Jason Miyares of the 82nd House of Delegates District. [49]

From the city's founding until 2016, only three African Americans—John Perry (1986), Louisa Strayhorn (1994), and Amelia Ross-Hammond (2012)—had been elected to the city council, and none won reelection. One African American—Prescott Sherrod—was appointed to a city council seat in 2011, but he was defeated in his attempt to keep his seat that November. Only one other non-black minority candidate (Filipino Ron A. Villanueva) has been elected to the city council. No Hispanics have ever been elected to the city council. [50]

In 2018, two African Americans were elected to the city council. However, as previously noted, these elections occurred during the pendency of the current lawsuit a special circumstance for the election of members of a minority group.

In *Thornburg v. Gingles*, Justice Brennan emphasized the importance of discounting a sporadic minority success, *especially* after the filing of a voting rights lawsuit:

> Moreover, in conducting its 'independent consideration of the record' and its 'searching practical evaluation of the past and present reality,' the District Court could appropriately take account of the circumstances surrounding recent black electoral success in deciding its significance to appellees' claim. In particular, as the Senate Report makes clear, the court could properly notice the fact that black electoral success increased markedly in the 1982 election -- an election that occurred after the instant lawsuit had been filed -- and could properly consider to what extent 'the pendency of this very litigation [might have] worked a one-time

---

[49] Form of Government and City Officials, Virginia Beach, https://www.vbgov.com/government/departments/city-manager/Pages/form-of-government-and-city-officials.aspx; School Board Members Virginia Beach, https://www.vbschools.com/about_us/our_leadership/school_board/members.

[50] Leonard E. Colvin, Virginia Beach, Portsmouth Voters to Elect City Council Members," *New Journal & Guide*, 12 October 2018, http://thenewjournalandguide.com/virginia-beach-portsmouth-voters-to-elect-city-council-members/.

advantage for black candidates in the form of unusual organized political support by white leaders concerned to forestall single-member districting.[89]

Other courts have held the same. In the city of Norfolk, which neighbors Virginia Beach, there had been only one African American on the city council from 1968 through 1984 under its at-large election system. In August 1983, plaintiffs filed the lawsuit *Collins v. City of Norfolk, Virginia* in federal court to challenge the at-large system. In response, the white leadership of the city, including the white mayor, sought to back the election of a second black city council member in the upcoming election in order to undermine the lawsuit. "After the election, the issue of black representation may become a moot point," the mayor said.[51]

However, the Fourth Circuit Court of Appeals did not agree, ruling that even absent an explicit "conspiracy or an intent to moot this litigation … does not end the district court's inquiry." The court offered important instruction for the analysis of black electoral success during the pendency of a lawsuit: "The court should probe further to determine whether the black candidate's success in 1984, while this action was pending, resulted from unusual circumstances. Never before in the history of the city had two black councilmen served simultaneously." It called for a particularized investigation of the facts of the election: "The mayor's intent, or whether he and other white leaders conspired, is not dispositive."[52]

The court also provided important guidance on the kind of analysis that a social scientist expert should provide to the trier of fact: "If voting patterns showed unusual white support for the black candidate in 1984, the legal significance of this success should be diminished."[53]

The analysis below probes the white voter support for the two winning black Virginia Beach city council candidates in 2018. The results show that as compared to all other black city council candidates since 2008, Rouse and Wooten did receive "unusual white support." Table 10 and Chart 9 compare the white vote for Rouse with the white vote for other black candidates for at-large seats (omitting perennial candidate Furman who has not been a black voter choice and whose inclusion would expand the difference between Rouse and other black candidates). As indicated in Table 10, the white vote for Rouse was higher than any of these other black candidates. With the exception of Allen in 2008, the white vote for Rouse was multiples higher than the white vote for the other candidates, with Rouse's lead in percentage points ranging from 13.3 percentage points to 21.1 percentage points, and in percent, ranging from 124 percent to 728 percent.  Overall, as indicated in Table 10 and Chart 9, white support for Rouse's candidacy was 15.4 percentage points and 179 percent higher than the average white support of 8.6 percent for the 5 other black candidates.

---

[51] *Collins v. City of Norfolk, Virginia,* 883 F.2d 1232 (4th Cir. 1989).
[52] Ibid.
[53] Ibid.

| TABLE 10<br>WHITE VOTE FOR AT-LARGE CITY COUNCIL CANDIDATE ROUSE IN 2018 COMPARED TO WHITE VOTE FOR OTHER BLACK CANDIDATES FOR AT-LARGE SEATS, VIRGINIA BEACH, 2008-2018 | | | |
|---|---|---|---|
| CANDIDATE | % OF WHITE VOTERS FOR CANDIDATE | ROUSE: PERCENTAGE POINT DIFFERENCE WITH CANDIDATE | ROUSE: PERCENT DIFFERENCE WITH CANDIDATE |
| **Rouse 2018** | **24%** | **NA** | **NA** |
| Bright 2018 | **5.8%** | **+ 18.2 Percentage Points** | **+314 Percent** |
| Sherrod 2011 | **10.7%** | **+ 13.3 Percentage Points** | **+124 Percent** |
| Jackson 2010 | **3.8%** | **+20.2 Percentage Points** | **+532 Percent** |
| Cabiness 2010 | **2.9%** | **+ 21.1 Percentage Points** | **+728 Percent** |
| Allen 2008 | **20.0%** | **+4 Percentage Points** | **+20 Percent** |
| **Average 5 Other Candidates** | **8.6%** | **+15.4%** | **+179%** |
| Source: Dr. Douglas M. Spencer, "Expert Report: Polarized Voting in Virginia Beach," July 15, 2019. White support is average of Ecological Inference (EI) and Ecological Regression estimates, which in several elections are identical and never differ substantially. | | | |

45

**CHART 9**
**WHITE VOTE FOR AT-LARGE CITY COUNCIL CANDIDATE ROUSE IN 2018**
**COMPARED TO AVERAGE WHITE VOTE FOR OTHER BLACK CANDIDATES FOR**
**AT-LARGE SEATS, VIRGINIA BEACH, 2008-2018**



46

Table 11 compares the white vote for Wooten with the white vote for other black candidates for district seats (omitting Furman and marginal candidate Burton in 2018 who received negligible white support).[54] As indicated in Table 10, the white vote for Wooten was higher than any of these other black candidates. Wooten's lead in percentage points ranged from 7.6 percentage points to 46.6 percentage points, and in percent ranged from 18 percent to 1,059 percent. Overall, as indicated in Table 11 and Chart 10, white support for Wooten's candidacy was 28.3 percentage points and 125 percent higher than the average white support of 22.7 percent for the 9 other black candidates.

An examination of contributions by white people and businesses run by white people in Virginia Beach to Rouse and Wooten further documents the special circumstances of their victories in 2018. The most prolific donors to city council elections are real estate developers and managers including, Michael Sifen, who is white, and the companies Armada Hoffler, Breeden, Franklin Johnston (since 2014), Runnymede, all of which are run by white executives. All of these donors gave unusually large contributions to Rouse and Wooten as compared to other black candidates for city council in Virginia Beach. These five contributors were selected for analysis based on their record for giving uniquely large political gifts: each contributed $1,000 or more to at least ten city council candidates and more than $50,000 for the seven elections since 2008 or, in the case of Franklin Johnston, more than $35,000 for the three elections since 2014.[55]

As indicated in Table 12, Summary Table 13, and Chart 11, these white donors contributed primarily to white candidates, whether measured by number of candidates or the dollar amount of contributions. As further indicated in Table 12, Summary Table 13, and Chart 11, only four black candidates between 2008 and 2018 received contributions from these donors, including appointed incumbent Sherrod (who lost in the special election of 2011), elected incumbent Ross-Hammond (who only garnered their support in her reelection bid in 2016, which she lost), challenger Rouse (who won his 2018 at-large election) and challenger Wooten (who won her 2018 Centreville District election). Despite being non-incumbents, Rouse and Wooten garnered 72 percent of the total dollar amount contributed to black candidates from 2008 to 2018, as indicated in Summary Table 13 and Chart 12.

---

[54] Burton withdrew from the race but his name remained on the ballot.

[55] In recent litigation challenging at-large elections in the 23rd Judicial District in Louisiana, I also used contribution data to establish the special circumstances regarding the election of a black candidate during the pendency of the lawsuit. *Terrebonne Parish NAACP v. Jindal, 274 F. Supp. 3d 395 (M.D. La. 2017)*. The addition of the very few other contributors coming close to these benchmarks would not change the results of the analysis.

| TABLE 11 |||
| --- | --- | --- |
| **WHITE VOTE FOR CENTERVILLE CITY COUNCIL CANDIDATE WOOTEN IN 2018 COMPARED TO WHITE VOTE FOR OTHER BLACK CANDIDATES OF BLACK VOTER CHOICE FOR DISTRICT SEATS, VIRGINIA BEACH, 2008-2018** ||||
| CANDIDATE | % OF WHITE VOTERS FOR CANDIDATE | WOOTEN: PERCENTAGE POINT DIFFERENCE WITH CANDIDATE | WOOTEN: PERCENT DIFFERENCE WITH CANDIDATE |
| **Wooten 2018** | **51%** | NA | NA |
| Wray 2018 | **43.4%** | **+ 7.6 Percentage Points** | **+18 Percent** |
| Ross-Hammond 2016 | **29.3%** | **+21.7 Percentage Points** | **+73 Percent** |
| Cabiness 2014 | **4.4%** | **+ 46.6 Percentage Points** | **+1,059 Percent** |
| Burton 2014 | **18.7%** | **+32.3 Percentage Points** | **+173 Percent** |
| Ross-Hammond 2012 | **16.2%** | **+34.8 Percentage Points** | **+215 Percent** |
| Smith 2012 | **24.2%** | **+26.8 Percentage Points** | **+112 Percent** |
| Bullock 2010 | **33.0%** | **+18.0 Percentage Points** | **+55 Percent** |
| Jackson 2008 | **19.9%** | **+31.1 Percent Points** | **+155 Percent** |
| Flores 2008 | **15%** | **+36 Percentage Points** | **+240 Percent** |
| **Average 9 Other Candidates** | **22.7%** | **+28.3%** | **+125%** |
| Source: Dr. Douglas M. Spencer, "Expert Report: Polarized Voting in Virginia Beach," July 15, 2019. ||||

48

**CHART 10**
**WHITE VOTE FOR DISTRICT CITY COUNCIL CANDIDATE WOOTEN IN 2018**
**COMPARED TO AVERAGE WHITE VOTE FOR OTHER BLACK CANDIDATES FOR**
**DISTRICT SEATS, VIRGINIA BEACH, 2008-2018**



| TABLE 12<br>CONTRIBUTIONS TO VIRGINIA BEACH CITY COUNCIL CANDIDATES, 5 MAJOR<br>WHITE DONORS, 2008-2018, BLACK CANDIDATES IN BOLD | | | | | | |
|---|---|---|---|---|---|---|
| CANDIDATE &<br>ELECTION CYCLE | ARMADA<br>HOFFLER | BREEDEN | FRANKLIN<br>JOHNSTON | RUNNYMEDE | SIFEN | TOTAL |
| *2017-2018* | | | | | | |
| Davenport | $5,000 | $20,000 | | $2,500 | $2,500 | $30,000 |
| Dyer | | | | | $2,000 | $2,000 |
| Henley | | | | $2,500 | $2,000 | $4,500 |
| Jones | $2,500 | $5,000 | $2,500 | | $2,000 | $12,000 |
| Kwasny | | $1,500 | | | | $1,500 |
| Martin | | | | $1,500 | | $1,500 |
| Oliver | | $5,000 | $3,500 | $1,500 | $2,500 | $12,500 |
| Uhrin | $2,000 | | | | $5,000 | $7,000 |
| Wood | $2,500 | $5,000 | $5,000 | | $2,000 | $14,500 |
| **Rouse** | $2,500 | $2,500 | $3,500 | $1,500 | $2,000 | $12,000 |
| **Wooten** | $1,000 | $10,000 | $5,000 | $1,500 | $7,000 | $24,500 |
| *2015-2016* | | | | | | |
| Kane | $1,000 | $2,500 | | $500 | $1,500 | $5,500 |
| **Ross-Hammond** | $3,500 | $1,000 | | $2,000 | $1,500 | $8,000 |
| Sessoms | $5,000 | $10,000 | $2,500 | $10,000 | $10,000 | $37,500 |
| Wilson | $1,000 | $2,500 | $4,000 | $500 | $2,500 | $10,500 |
| *2013-2014* | | | | | | |
| Davenport | | | $2,000 | | | $2,000 |
| Davis | | $2,500 | | | | $2,500 |
| Henley | $1,000 | | | | | $1,000 |
| Kane | $2,000 | $2,500 | $1,000 | | $1,000 | $6,500 |
| Martin | | $2,850 | $1,000 | | $3,000 | $6,850 |
| Sessoms | $5,000 | $5,000 | $5,000 | $5,000 | $20,000 | $40,000 |
| Uhrin | | $2,500 | | $1,000 | | $3,500 |
| *2012* | | | | | | |
| Dale | $3,000 | $5,000 | | | $1,000 | $9,000 |
| Davis | $4,000 | $5,000 | | $900 | $1,000 | $10,900 |
| Sessoms | | $10,000 | | $5,000 | $6,000 | $21,000 |
| Wilson | $2,000 | $5,000 | | $500 | $1,000 | $8,500 |

| TABLE 12, CONTINUED CONTRIBUTIONS TO VIRGINIA BEACH CITY COUNCIL CANDIDATES, 5 MAJOR WHITE DONORS, 2008-2018, BLACK CANDIDATES IN BOLD | | | | | | |
|---|---|---|---|---|---|---|
| ELECTION CYCLE & CANDIDATE | ARMADA HOFFLER | BREEDEN* | FRANKLIN JOHNSTON | RUNNYMEDE | SIFEN | TOTAL |
| *2011 Special* | | | | | | |
| **Sherrod** | | $5,000 | | $1,000 | | $6,000 |
| Sessoms | | | | | $10,000 | $10,000 |
| *2009-2010* | | | | | | |
| Belitto | $1,000 | $1,000 | | $1,000 | | $3,000 |
| DeSteph | | $1,000 | | | $1,000 | $2,000 |
| Henley | | | | $500 | $1,000 | $1,500 |
| Jones | | $1,000 | | | $1,000 | $2,000 |
| Redmond | $2,000 | | | $500 | $1,000 | $3,500 |
| Sessoms | $5,000 | | | $5,000 | $5,000 | $15,000 |
| Uhrin | | | | $1,000 | | $1,000 |
| Wilson | | $1,000 | | | $2,000 | $3,000 |
| Wood | $2,500 | $1,000 | | $1,000 | $1,000 | $5,500 |
| *2007-2008* | | | | | | |
| Davis | | $1,000 | | $500 | $1,500 | $3,000 |
| Diezel | | | | $500 | $1,000 | $1,500 |
| Sessoms | | | | $1,000 | $11,000 | $12,000 |
| Wilson | | $5,000 | | $1,000 | $1,000 | $7,000 |
| Wood | | $500 | | | | $500 |
| * Includes small amounts from founder Raymon W. Breeden and Breeden Investments. | | | | | | |
| Source: Virginia Public Access Project, "Money," https://www.vpap.org/money/. | | | | | | |

| TABLE 13<br>SUMMARY TABLE, CONTRIBUTIONS TO WHITE & BLACK CITY COUNCIL<br>CANDIDATES, 5 MAJOR WHITE DONORS, VIRGINIA BEACH, 2008-2018 | | | | |
|---|---|---|---|---|
| **ALL CANDIDATES** | | | | |
| MEASURE | WHITE CANDIDATES | BLACK CANDIDATES | PERCENT WHITE | PERCENT BLACK |
| | | | | |
| # of Candidates With Contributions | 18 | 4 | **82%** | **18%** |
| | | | | |
| Amount of Contributions | $321,250 | $50,500 | **86%** | **14%** |
| | | | | |
| **BLACK CANDIDATES ONLY** | | | | |
| | ROSS & WOOTEN | SHERROD & ROSS-HAMMOND | PERCENT ROSS & WOOTEN | PERCENT SHERROD & ROSS-HAMMOND |
| | | | | |
| Amount of Contributions | $36,500 | $14,000 | **72%** | **28%** |
| | | | | |
| Source: Table 12. | | | | |

52

**CHART 11**
**PERCENT CONTRIBUTIONS BY 5 MAJOR WHITE CONTRIBUTORS TO**
**WHITE AND BLACK CITY COUNCIL CANDIDATES, 2008-2018**



**CHART 12**
**PERCENT DOLLAR AMOUNT CONTRIBUTIONS BY 5 MAJOR WHITE**
**CONTRIBUTORS TO BLACK CITY COUNCIL CANDIDATES, 2008-2018**



An examination of the top donors for candidates Rouse and Wooten in 2018 indicates that their high-level financial support came predominantly from white donors (either individuals or white-run businesses). Table 14 reports the racial identity of the top ten donors to candidate Rouse in 2018, with several tied at $2,500, which results in 15 total entries instead instead of ten. For 12 of 15 donors I could ascertain a racial identity. Eleven of these 12 racially identified donors were white. Prior to 2018, none had contributed to a non-incumbent black candidate.

The major exception to Rouse receiving major donations from white individuals and businesses was former NFL player and Hall of Fame member Bruce Smith. Smith, who is black, was seeking city contracts (see Factor 8), and backed fellow former NFL player Rouse. Smith contributed $16,000 to Rouse's campaign, which is more than triple his largest contribution of $5,000 to any other Virginia Beach city council candidate from 2008 to 2018.

Table 15 reports the racial identity of the top ten donors to candidate Wooten in 2018. For 8 of 10 donors I could ascertain a racial identity. All of these racially identified donors were white. Again, prior to 2018 none had contributed to a non-incumbent black candidate.

| TABLE 14<br>TOP TEN CONTRIBUTORS TO AT-LARGE CANDIDATE ROUSE, 2018 (9 TIED AT $2,500) | | | | | | |
|---|---|---|---|---|---|---|
| | | **CONTRIBUTIONS TO OTHER BLACK CITY COUNCIL CANDIDATES, 2008-2018** | | | | |
| DONOR & RACE | $ AMT | WOOTEN 2018 | BRIGHT 2018 | ROSS-HAMMOND 2016 | SHERROD 2011 | BULLOCK |
| Bruce Smith (B) | $16,000 | | | $1,500 | $2,500 | $1,000 |
| Marie Finch (UNK) | $7,500 | | | | | |
| Charles Barker Auto (W) | $7,500 | | | | | |
| Steven Johnson (W) | $7,500 | | | | | |
| Franklin Johnston Grp (W) | $3,500 | $5,000 | | | | |
| Michael Smith (UNK) | $3,000 | | | | | |
| Michael Standing Jr. (W) | $2,500 | | | | | |
| Priority Auto Group (W) | $2,500 | | | | | |
| Frank B. Gigliotti (W) | $2,500 | | | | | |
| Russell Kirk (W) | $2,500 | | | | | |
| Joseph W. Luter IV (W) | $2,500 | | | | | |
| Morchell Pryor (UNK) | $2,500 | | | | | |
| Doug White (W) | $2,500 | | | | | |
| Breeden (W) | $2,500 | $10,000 | | $1,000 | $5,000 | |
| Armada Hoffler (W) | $2,500 | $1,000 | | $3,500 | $7,500 | $1,000 |
| | | | | | | |
| **TOTAL** | **$67,500** | **$16,000** | | **$6,000** | **$15,000** | **$1,000** |
| | | | | | | |
| Source: Virginia Public Access Project, "Money," https://www.vpap.org/money/. Empty cells indicate no contributions to that candidate. | | | | | | |

| TABLE 15 TOP TEN CONTRIBUTORS TO CENTERVILLE CANDIDATE WOOTEN, 2018 | | | | | | |
|---|---|---|---|---|---|---|
| | | CONTRIBUTIONS TO OTHER BLACK CITY COUNCIL CANDIDATES, 2008-2018 | | | | |
| DONOR & RACE | $ AMT | ROUSE 2018 | BRIGHT 2018 | ROSS-HAMMOND 2016 | SHERROD 2011 | BULLOCK |
| Breeden (W) | $10,000 | $2,500 | | $1,000 | $5,000 | |
| Ben Davenport (W) | $8,000 | | | | | |
| Bruce C. Thompson (W) | $7,500 | | $2,500 | | | |
| Sifen (W) | $7,000 | $2,000 | | $1,500 | | |
| Franklin Johnston Grp (W) | $5,000 | $3,000 | | | | |
| McLesky (W) | $4,500 | | | | | |
| John F. Malbon (W) | $3,000 | | $1,000 | $1,000 | $500 | |
| J3H3 LLC (UNK) | $2,500 | | | | | |
| HHH2 LLC (UNK) | $2,500 | | | | | |
| Dwight Dunton (W) | $2,000 | | | | | |
| | | | | | | |
| TOTAL | $52,000 | $7,500 | $3,500 | $3,500 | $5,500 | |
| | | | | | | |
| Source: Virginia Public Access Project, "Money," https://www.vpap.org/money/. Empty cells indicate no contributions to that candidate. | | | | | | |

57

In addition to struggling to get a foothold in Virginia Beach politics, minorities have fared poorly in gaining election to public office across the state of Virginia in general. Since African American Douglas Wilder won the governorship in 1989, no African American has been elected statewide to a U.S. Senate position in Virginia and only one African American (the current Lieutenant Governor) has been elected to a statewide Virginia office. No other minority group members have been elected to the U.S. Senate or to a statewide position.

Moreover, African Americans and other minorities are substantially underrepresented in the Virginia General Assembly. African Americans comprise 12.5 percent of the State Senate, which amounts to 65 percent of the African American citizen voting age population of 19.3 percent. This disparity is about equal to three State Senate seats. There are no other minority members of the State Senate. The 12.5 percent of all minorities amounts to 37 percent of the minority citizen voting age population of 33.4 percent. This disparity is about equal to about eight State Senate seats.

African Americans comprise 14 percent of the State House of Delegates, equaling 73 percent of the African American citizen voting age population. This disparity is about equal to about five State House seats. All minorities comprise 20 percent of the State House of Delegates, equaling 60 percent of the minority citizen voting age population. This disparity is about equal to about 13 State House seats.[56]

---

[56] Virginia Legislative Black Caucus 2019, pp. 4-5, http://www.dbava.com/2019_vlbc/4; websites of Senate and House of Delegates, https://apps.senate.virginia.gov/Senator/index.php, https://virginiageneralassembly.gov/house/members/members.php.

**Factor 8: Whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group**.

Several examples illustrate the city of Virginia Beach's lack of responsiveness to the particularized needs of minority residents. Prompted by repeated complaints from former African American NFL player Bruce Smith—who claimed the city had turned him down for multiple projects—Virginia Beach authorized a disparity study of city contracts. The researchers reported their results in January 2019. They computed a "disparity index" that measures differences between the availability for contracts among minority-owned businesses and the actual participation of such businesses in city contracts. They note that in their display of the index that "the line down the center of the graph shows a disparity index level of 100, which indicates parity between participation and availability. A line is also drawn at a disparity index level of 80, because some courts use 80 as the threshold for what indicates a substantial disparity." A disparity index of 80 means that a business category received $0.80 "for every dollar that they might be expected to receive based on their availability for the relevant prime contracts and subcontracts that the City awarded during the study period."[57]

The results of the disparity analysis are reported in Table 16 and Chart 13. As indicated in Table 16 and Chart 13, among minority-owned businesses, firms owned by African Americans were available by far for the largest percentage of city contracts at 8.1 percent. However, such businesses received only 4.5 percent of city contracts, for a disparity index of 56, well below the threshold of 80. Hispanic-owned business had the second highest eligibility at 2.7 percent, but received only 0.5 percent of city contracts, for a disparity index of 20. In contrast, Asian-American owned businesses which had a minimal eligibility percentage of just 0.8 percent, received 5.6 percent of city contracts for a disparity index of some 700. Asian-American owned businesses accounted for just 7 percent of eligible business owned by members of the three minority groups but accounted for 53 percent of the contracts that the city awarded to these minority businesses. The study identified numerous deficiencies in city policies that if rectified could help in achieving greater participation for minority-owned businesses.[58]

Furthermore, the city's hiring practices have not kept pace with demographic change. The city has lagged in the hiring of African American and minority members of the police force. In 2006, the city reached a consent decree with the U.S. Department of Justice aimed at ending a hiring practice that discriminated against African American and Hispanic police-force applicants. According to the decree, "the City has pursued policies and practices that

---

[57] WVEC Staff, "NFL Great Bruce Smith Calls for Racial Disparity Study, Offers to Pay for Half of It," 2WGRZ, 28 November 2018, https://www.wgrz.com/article/news/local/mycity/virginia-beach/nfl-great-bruce-smith-calls-for-racial-disparity-study-pledges-to-pay-for-half-of-it/291-357057349; BBC Research & Consulting, "2018 Disparity Study: City of Virginia Beach," Final Report, January 2019, https://www.vbgov.com/government/departments/finance/mbc/Documents/2018%20Virginia%20Beach%20Disparity%20Study%20Final%20Report.pdf, Chapter ES, p 7.
[58] Ibid., "Disparity Study," pp. 4, 6, 8, 11-14.

discriminate against and deprive or tend to deprive African Americans and Hispanics of employment opportunities because of their race and national origin." In particular, "the City's use of a mathematics test as a pass/fail screening device in the selection process for the entry-level position of police officer has had a statistically significant disparate impact against African- American and Hispanic applicants" and "has not been shown to be job related for the position in question and consistent with business necessity." The consent decree charged that the city's practice had the effect of discriminating against blacks and Latinos but did not charge intentional discrimination.[59]

---

[59] U.S. v. Virginia Beach, *Consent Decree*, 3 April 2006, https://www.justice.gov/sites/default/files/crt/legacy/2010/12/15/vabeachcd.pdf.

| TABLE 16<br>DISPARITIES BY RACE IN CITY CONTRACTS, VIRGINIA BEACH | | | |
|---|---|---|---|
| **MINORITY GROUP** | **BUSINESS AVAILABILITY FOR CONTRACTS** | **ACTUAL PARTICIPATION IN CONTRACTS** | **DISPARITY INDEX** |
| | | | |
| **BLACK** | 8.1% | 4.5% | 56% |
| | | | |
| **HISPANIC** | 2.7% | 0.5% | 19% |
| | | | |
| **ASIAN** | 0.8% | 5.6% | 700% |
| | | | |

Source: BBC Research & Consulting, "2018 Disparity Study: City of Virginia Beach," Final Report, January 2019, https://www.vbgov.com/government/departments/finance/mbc/Documents/2018%20Virginia%20Beach%20Disparity%20Study%20Final%20Report.pdf, pp. 4, 6, 8.

**CHART 13**
**DISPARITIES BY RACE IN CITY CONTRACTS, VIRGINIA BEACH**



A 2015 study called Governing: The States and Localities found that the city was still behind in its hiring of minorities based on 2013 police personnel data. As indicated in Table 17 and Chart 14, the police force representation is 52 percent below the adult population for all minorities, 50 percent below for African Americans, 41 percent below for Hispanics, and 69 percent below for Asians.[60]

Virginia Beach has also lagged in the hiring of minority teachers. A 2011 analysis by the Virginian-Pilot "of federal employment data and student enrollment statistics shows the Beach employs one white classroom teacher for every nine white students but only one minority teacher for every 43 minority students. The district has only one black male principal. Of more than 2,100 grade school teachers, just 16 are black men. Fewer than one in five top administrators are nonwhite." As compared to neighboring jurisdictions, the study found that "the racial imbalance is most pronounced in Virginia Beach, where 85 percent of public school teachers are white and close to half of students are not, statistics show."[61]

---

[60] "Diversity on the Force: Where Police Don't Mirror Communities," *Governing*, September 2015, p. 12, https://media.governing.com/documents/policediversityreport.pdf.
[61] Mike Hixenbaugh, "Teacher-Student Racial Imbalance Most Pronounced in Va Beach," *Virginian-Pilot*, 17 September 2011, https://pilotonline.com/news/local/education/article_99d4e10f-7582-5625-b2c5-549983e5f028.html.

| | | | | |
|---|---|---|---|---|
| **TABLE 17**<br>**COMPARISON OF PERCENT OF MINORITIES ON BEACH POLICE**<br>**FORCE COMPARED TO PERCENT IN ADULT POPULATION, VIRGINIA**<br>**BEACH** | | | | |
| | **% POLICE FORCE** | **% ADULT POPULATION** | **PERCENTAGE POINT DIFFERENCE** | **PERCENT DIFFERENCE** |
| MINORITY GROUP | | | | |
| ALL | 15.5% | 32.6% | -17.1 Percentage Points | **52 Percent Lower** |
| BLACK | 9.4% | 18.9% | -9.5 Percentage Points | **50 Percent Lower** |
| HISPANIC | 3.3% | 5.6% | -2.3 Percentage Points | **41 Percent Lower** |
| ASIAN | 2.2% | 7.2% | -5 Percentage Points | **69 Percent Lower** |

Source: "Diversity on the Force: Where Police Don't Mirror Communities," *Governing*, September 2015, p. 12, https://media.governing.com/documents/policediversityreport.pdf; U.S. of Population, 2010 Complete Enumeration.

**CHART 14**
**COMPARISON OF PERCENT OF MINORITIES ON BEACH POLICE FORCE**
**COMPARED TO PERCENT IN ADULT POPULATION, VIRGINIA BEACH**



**Factor 9: Whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice, or procedure is tenuous.**

The policy underlying the current at-large election system for city council in Virginia Beach is tenuous at best. As indicated in Table 3 above, six of 12 other large independent cities utilize for their city council elections either a straight district system or a mixed at-large district system, with the majority of members elected from districts. Even among other large cities using an at-large system, none share Virginia Beach's problematic combination of at-large elections, designated or numbered post for the majority of positions, and staggered terms. Such provisions as staggered terms or numbered posts, "while not in themselves improper nor invidious… can enhance the opportunities for racial discriminations" in an at-large election system.[62]

---

[62] Sen. Rep. at 22.

**CONCLUSION**

In sum, this analysis shows that the totality of circumstances in Virginia Beach undermines the ability of minorities in the city to participate fully in the political process and elect candidates of their choice. All nine of the Senate Factors are present in Virginia Beach.

There is a long and ongoing history of discrimination in Virginia and in the City of Virginia Beach. Voting in Virginia Beach is polarized along racial lines. The city uses an at-large system for electing members of the city council that has features such as numbered posts, staggered terms, and large districts that disproportionately burden minority voters. White candidates for city council typically align with other white candidates in providing donations for campaigns. Minorities in Virginia Beach, especially African Americans and Hispanics and to a lesser extent Asians bear the effects of historical and ongoing discrimination in their diminished socio-economic standing relative to whites. Political campaigns in Virginia and Virginia Beach have been marked by racial appeals. Minorities have not fared well in election to public office in Virginia Beach, including on the city council, and no African American member of the city council has ever stood the test of reelection. The unprecedented election of two African Americans to the city council in 2018 reflects the special circumstances of the pending lawsuit. In important ways, Virginia Beach has not been responsive to the particularized needs of minorities, and the justification for the present system of electing city council members is tenuous at best.