**IN THE UNITED STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF VIRGINIA
NORFOLK DIVISION**

| | |
|---|---|
| **Latasha Holloway,** *et al.***,** | |
| **Plaintiffs,** | |
| | **Civil Action No. 2:18-cv-0069** |
| **v.** | |
| **City of Virginia Beach,** *et al.***,** | |
| **Defendants** | |

**PLAINTIFFS' BRIEF IN OPPOSITION TO DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT**

# PLAINTIFFS' EXHIBIT 2
Rebuttal Report of Dr. Allan Lichtman

**August 26, 2019**

**United States District Court for the Eastern District of Virginia**

**Holloway v. City of Virginia Beach**

**Case No.: 2:18-cv-00069**

**Rebuttal Report of Dr. Allan J. Lichtman: Totality of Circumstances**

**Distinguished Professor of History**
**American University**
**Washington, DC**

Allan J. Lichtman

## I. STATEMENT OF PURPOSE

This report responds to the reports submitted by defendants' experts Dr. Quentin Kidd and Dr. Peter Morrison. As a general matter, nothing presented in either report has prompted me to revise any of the findings and conclusions in my initial expert report of July 15, 2019.

### I. Report of Dr. Quentin Kidd

Even taken at face value, which this report cannot, it fails even to address my findings on three of the nine "totality of the circumstances" factors analyzed in my report. These include:

**FACTOR 1**: The long and ongoing history of discrimination against minorities in Virginia and Virginia Beach.

**FACTOR 8:** The significant lack of responsiveness on the part of elected officials in Virginia Beach to the particularized needs of the members of the minority group.

**FACTOR 9**: The tenuous nature of the policy underlying the system for electing city council members in Virginia Beach.

With respect to the remaining two other factors, the Kidd report only considers limited and partial elements of those factors:

**FACTOR 5: The extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process.**

**FACTOR 7: the lagging extent to which members of the minority group have been elected to public office.**

The following considers each of the factors addressed or partially addressed in the Kidd Report, which include Factors 2, 3, 4, 5, 6, and 7:

**FACTOR 2: The extent to which voting in the elections of the state or political subdivision is racially polarized.**

Before delving into the details of the Kidd report, it is important to note that he makes no attempt to refute Dr. Spencer's findings, summarized in Table 4 of my initial report, that voting was polarized along racial lines in all four of the recent presidential and congressional elections with black versus white candidates within the precincts of Virginia Beach. This polarization applied to all minority voters. In all four elections, the minority support for black candidates averaged about 90 percent or more, showing an extreme degree of cohesion. In three of the four

2

elections, white voters in contrast voted substantially against these candidates. Only in the 2008 presidential primary, which black candidate Obama overwhelming won in Virginia, did a majority of white voters back the black candidate, but at much lower levels than did minority voters. Although overlooked in the Kidd Report, these findings are certainly relevant to assessing the question posed by the factor as to whether voting is racially polarized in Virginia Beach.

With respect to city council elections, the analysis in the Kidd's report is premised on a false proposition that minority voters are cohesive only when they provide majority support for a particular candidate. That is not true for city council elections in Virginia Beach involving black candidates. Many of these elections involve multiple candidacies, with no majority-vote requirement, and where votes are spread out among an array of candidates. Some of these elections (at-large) also involve multiple seat, multiple candidate contests. The standard procedure in these situations is to assess whether minority voters vote to make a black candidate their candidate of choice and then whether such a candidate who would have been elected with minority votes is defeated by white bloc voting. In fact, the Kidd report implicitly recognizes the appropriateness of this standard by including Rouse among the candidates receiving cohesive black support in his Table 2. For the continuing discussion of this factor, I focus on black voters as the predominant minority group in Virginia Beach. In addition, all minority candidates from 2008 to 2018 are black.

Rouse was the candidate of choice among black voters but received well less than 50 percent support. By adding in Rouse to his roster of minority candidates of choice, Kidd increases the number of percentage of candidates who receive cohesive black voter support and also won election to the city council. Kidd cannot have it both ways. He cannot include Rouse in Table 2 without including other black candidates who were the candidates of choice of black voters (although short of 50 percent support) but who, unlike Rouse, lost their elections.

Table 3 of my initial report, which is unrefuted and not even addressed in the Kidd report, provides this proper analysis. As indicated in Table R1, which presents candidates of choice from Table 3, and Chart R1, in contests for 11 of 14 positions, black voters supported a black candidate as their candidate of choice. For purposes of this analysis it is correct to say that they favored a white candidate of choice over a black candidate only in two elections for 13 positions. In the 2018 in Princess Anne, black candidate Burton had withdrawn from the race, but his name remained on the ballot. So, the ratio in which non-withdrawn candidates were on the ballot, the ratio is 11 to 2 and indicated in Chart R1. Of those two outlier cases, one involved a white candidate as the second choice in the two-seat at-large election in 2018.

In 10 of 11 elections where black voters preferred a black candidate, voting was polarized along racial lines, with white voters preferring a white candidate. For 8 of these 10 ten candidates in polarized elections, the candidate of choice of black voters lost. Prior to 2018, the only winning exception was Ross-Hammond in 2012, in the Kempsville District. However, white bloc voting defeated Ross-Hammond in her bid for reelection in 2016, a rare defeat for an incumbent. In addition, in elections for all but one position, the candidate of choice of white voters prevailed, demonstrating the extent to which white voters control elections in Virginia Beach.

3

| TABLE R1 POLARIZED VOTING IN VIRGINIA BEACH CITY COUNCIL ELECTIONS WITH BLACK CANDIDATES, 2008-2018 | | | | |
|---|---|---|---|---|
| YEAR, SEAT | BLACK CANDIDATE(S) | CANDIDATE OF CHOICE OF BLACK VOTERS | CANDIDATE OF CHOICE OF WHITE VOTERS | WINNER |
| 2008 At-large | **Allen** | **Allen** | Wilson (W) | Wilson (W) |
| 2008 Kempsville | **Jackson** **Flores** | **Flores** | Diezel (W) | Diezel (W) |
| 2010 At-large (2 Elected) | **Jackson** **Cabiness** | **Jackson** **Cabiness** | Belitto (W) DeSteph (W) | Bellitto (W) DeSteph (W) |
| 2010 Princess Anne | **Bullock** | **Bullock** | Henley (W) | Henley (W) |
| 2011 At-large | **Sherrod** | **Sherrod** | Moss (W) | Moss (W) |
| 2012 Kempsville | **Ross-Hammond** **Smith** | **Ross-Hammond** | Dale (W) * Weeks (W) * | **Ross-Hammond** |
| 2014 Princess Anne | **Burton** | Henley (W) | Henley (W) | Henley (W) |
| 2014 Rose Hall | **Cabiness** | **Cabiness** | Kane (W) | Kane (W) |
| 2016 Kempsville | **Ross-Hammond** | **Ross-Hammond** | Abbot (W) | Abbot (W) |
| 2018 At-large (2 elected) | **Rouse** **Bright** | **Rouse** White (W) | Moss (W) Oliver (W) | Moss (W) **Rouse (B)** |
| 2018 Centerville | **Wooten** **Wray** | **Wooten** | **Wooten** | **Wooten** |
| 2018 Princess Anne | **Burton** * | Henley (W) | Henley (W) | Henley (W) |
| | | | | |
| * Burton was a token candidate who won just 2.9 percent of the vote against incumbent Henley in the 2018 election for the Princess Anne District. Burton withdrew, but his name remained on the ballot. | | | | |
| Source: Dr. Douglas M. Spencer, "Expert Report: Polarized Voting in Virginia Beach, 18 October 2018 with update for 2018, 10 April 2019, pp. 19-24 | | | | |

4

**CHART R1: CANDIDATES OF CHOICE OF BLACK VOTERS FOR POSITIONS IN ELECTIONS WITH BLACK CANDIDATES, CITY COUNCIL ELECTIONS, VIRGINIA BEACH, 2008-2018**



The analysis provided in Table R1 also indicates the need for fundamental revisions of Table 1 and Table 2 of the Kidd report. Before displaying these revisions, it is worth noting that even taking Kidd's Table 1 at face value, it shows that even when black candidates receive upwards of 50 percent support from minority voters (a very high threshold for multi-candidate elections), they are *still* usually defeated by white bloc voting. The count in Kidd Table 1 shows that of the 8 black candidates with the strongest black voter support of upwards of 50 percent of the black vote, 6 of the 8 (75 percent) lost their elections. One of the two winners was the special case of candidate Wooten in 2018, which was discussed in my initial report and which will be addressed again below.

The extreme degree of bloc voting is further demonstrated in a revision of Kidd's Table 1 that looks at the degree of black and white voter support for candidates, all of whom topped 50 percent of the black vote and unquestionably had cohesive black voter support. The results reported in Table R2 and Chart R2 demonstrate that black support for these candidates averaged 81.9 percent, compared to an average white support of 22.0 percent. This amounts to a difference of 59.9 percent, which demonstrates not just racially polarized voting, but <u>extreme</u> racially polarized voting.

Table R3 of this report provides a revision of the Kidd Tables 1 and 2, with the proper criteria of identifying black candidates of choice and determining whether or not they were defeated by white bloc voting. Although Spencer provided sound and unrefuted reasons for not including candidate Furman, to be consistent with the Kidd report, Furman is included in Table R3. As indicated in Table R3, African American voters usually prefer black candidates as their candidates of choice 11 to 8.

But in reality, the ratio is much higher than that. Candidate Wray was the second black candidate in the single-seat Centerville election in 2018, in which black candidate Wooten was the candidate of choice of black voters. So, by definition, Wray could not have been the black candidate of choice of black voters. Similarly, candidate Smith was the second black candidate in the single-seat Kempsville election in 2012, in which black candidate Ross-Hammond was the candidate of choice of black voters. So, by definition, Smith could not have been the candidate of choice of black voters. Finally, black candidate Jackson was the second candidate of choice in the single-seat Kempsville election in 2008, in which black candidate Flores was the black candidate of choice. So, by definition Jackson could not have been the candidate of choice of black voters.

6

| TABLE R2: RACIAL POLARIZATION IN VIRGINIA BEACH CITY COUNCIL ELECTIONS FROM KIDD TABLE 1, BLACK CANDIDATES WITH 50%+ OF THE BLACK VOTE, DESCENDING ORDER OF BLACK VOTER SUPPORT | | | | |
|---|---|---|---|---|
| **Candidate** | **% Of Black Vote** | **% of White Vote** | **Difference** | **Won or Lost** |
| | | | | |
| Wooten 2018 | 95.7% | 51.0% | +44.7% | Won |
| Bullock 2010 | 89.2% | 32.9% | +56.3% | Lost |
| Sherrod 2011 | 87.0% | 11.5% | +75.5% | Lost |
| Ross-Hammond 2012 | 86.9% | 17.0% | +69.9% | Won |
| Allen 2008 | 86.3% | 19.9% | +66.4% | Lost |
| Jackson 2010 | 85.6%* | 7.5% | +78.1% | Lost |
| Ross-Hammond 2016 | 76.8% | 30.1% | +46.7% | Lost |
| Cabiness 2014 | 51.7% | 6.4% | +45.3% | Lost |
| | | | | |
| **Mean all Candidates** | **81.9%** | **22.0%** | **59.9%** | |

* The Kidd report incorrectly lists the black % as 86.5%.

Sources: Kidd Report, Table 1, Spencer Initial Report, pp. 14-29. To be consistent with Kidd Table 1, this Table uses Ecological Inference (EI) estimates, but the Ecological Regression (ER) estimates would yield essentially the same results.

7

**CHART R2: RACIAL POLARIZATION IN ELECTIONS FOR BLACK CITY COUNCIL CANDIDATES OF CHOICE WITH MORE THAN 50% BLACK VOTER SUPPORT (DESCENDING ORDER OF BLACK SUPPORT)**



| TABLE R3<br>AFRICAN AMERICAN CITY COUNCIL CANDIDATES IN VIRGINIA BEACH, 2008 TO 2018, REVISION OF KIDD TABLES 1 AND 2 | | | |
|---|---|---|---|
| **Black Candidate of Choice of Black Voters, Would Have Won With Black Votes** | **Outcome** | **Not Candidate of Choice of Black Voters** | **Outcome** |
| | | | |
| Wooten 2018 | **Won** | Wray 2018 | **Lost** |
| Rouse 2018 | **Won** | Bright 2018 | **Lost** |
| Ross-Hammond 2016 | **Lost** | Furman 2016 | **Lost** |
| Cabiness 2014 | **Lost** | Furman 2014 | **Lost** |
| Ross-Hammond 2012 | **Won** | Burton 2014 | **Lost** |
| Sherrod 2011 | **Lost** | Smith 2012 | **Lost** |
| Jackson 2010 * | **Lost** | Furman 2014 | **Lost** |
| Cabiness 2010 * | **Lost** | Jackson 2008 | **Lost** |
| Bullock 2010 | **Lost** | | |
| Allen 2008 | **Lost** | | |
| Flores 2008 | **Lost** | | |
| | | | |
| * These were the first and second choices of black candidates in a two-seat at-large election. | | | |

9

Eliminating these three candidacies, the ratio of black candidates of choice of black voters to black candidates who were not the black candidates of choice of black voters rises to 11 to 5 (69 percent). Of those 5 black candidates, 3 involved perennial candidate Furman. As further indicated in Table R3 and Chart R3, 8 of these 11 black candidates of choice of black voters lost their elections. Two of the three victors represented the special cases of Rouse and Wooten in 2018. Absent these special cases, only one black candidate of choice, Ross-Hammond in 2012, won a city council seat. Although an incumbent, Ross-Hammond then lost her seat in the next election of 2016.

**Factor 3: the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group.**

In its consideration of Factor 3, the Kidd report ignores the most distinctive discriminatory feature of city council elections in Virginia Beach that distinguishes it from election procedures in all other large cities in Virginia. That feature, which I examine in my initial report, is the use of designated or numbered posts, elected at-large for the election of 7 of 11 seats on the city council of Virginia Beach. This provision prohibits minority voters from single-shot voting for a preferred candidate or concentrating their votes on a small number of candidates. Such an anti-single shot provision is explicitly named in the Senate Report's description of the factor and the dilutive impact of at-large elections is further enhanced in Virginia Beach through the use of staggered elections for non-designated posts.

The failure of the Kidd report to consider this discriminatory feature is especially notable because it has been the subject of considerable local public commentary, especially in recent years.

On July 17, 2012,  in an op ed entitled  "It's Time to Ditch Beach's Baffling Election System, *Virginian-Pilot* columnist Roger Chesley wrote, "The Beach has a hybrid system possibly unmatched across the country. Voters select three at-large members and the mayor. For the remaining seven district seats, voters citywide pick each member." Moreover, "*Spokespersons with the National League of Cities and U.S. Conference of Mayors told me they're unaware of any city with a structure similar to the one in Virginia Beach."[1]* (emphasis added).

On October 1, 2018 Virginia Beach city council candidate David Nygaard wrote, "We are the only city in America where we vote for everyone's representative, whether we live there or not. We were supposed to change this system when we were first incorporated as a city in 1963

---

[1] Roger Chesley, "It's Time to Ditch Beach's Baffling Election System, *Virginian-Pilot,* 17 July 2012, https://pilotonline.com/news/local/columnist/roger-chesley/article_01fdf121-21f0-5664-be4d-a0b6a6f18f7a.html.

**CHART R3: VICTORIES AND DEFEATS FOR BLACK CITY COUNCIL CANDIDATES
OF CHOICE OF BLACK VOTERS, VIRGINIA BEACH, 2008-2018**



and given seven years to accomplish it. 55 years later, nothing has changed and the flawed system remains in place."[2]

On October 2, 2018, an article in the *Virginian-Pilot* voted, "Since the 1960s, Virginia Beach has used an unusual hybrid approach: *It's the region's only locality in which candidates represent specific residential districts but are elected by voters from the entire city*." (emphasis added).[3]

On October 5, 2018 Roger Chesley reiterated his critique of the hybrid system, writing that, "Strange hybrid system for Beach council should go the way of the dodo."[4]

On December 19, 2018 an article in the *Virginian-Pilot* noted, "Virginia Beach uses a wonky hybrid election system where seven seats on the council require candidates to live in a specific district, but they're still elected by the entire city. It's a blend of the at-large and ward approaches, and there is a renewed effort to change this."[5]

On April 5, 2019 an editorial in the Princess Anne Independent News said, "The city's hybrid system of at-large seats and district seats can seem confusing, and it is not universally beloved, but this is the system by which we pick our local leaders."[6]

Dr. Kidd is a professor at the local Christopher Newport University, which is less than 50 miles from Virginia Beach. He is a specialist in Virginia politics and Director of the Judy Ford Wason Center for Public Policy which "was established in 2007 to provide unbiased and non-partisan scientific research about public policy issues facing Virginia."[7] He could not plausibly have been unaware of the controversy over Virginia Beach's unusual hybrid system for electing members of its city council. Yet his report is silent on this crucial issue.

Dr. Kidd does address other aspects of features of Virginia Beach's system for electing city council members that I identified in my report as also demonstrating the presence of Factor 3. First, there is the large geographic space of some 249 square miles across which candidates must campaign. Kidd says this "district size is not out of the ordinary" because it "does not even rank as the largest, with Chesapeake and Roanoke coming in larger according to Lichtman's Table 3."

[2] David Nygaard, "Virginia Beach Needs a New Voting System for City Council," *Outwire757*, 1 October 2018, https://outwire757.com/commentary-virginia-beach-needs-a-new-voting-system-for-city-council/.

[3] Stacy Parker, "2 Virginia Beach City Council Members Want to Change the City's Election System," *Virginian-Pilot*, 2 October 2018, https://www.pilotonline.com/government/local/article_5aea8b7a-c591-11e8-b572-3b015d1704d3.html.

[4] Roger Chesley, "Strange Hybrid System for Beach Council Should Go the Way of the Dodo." *Virginian-Pilot*, 5 October 2018, https://pilotonline.com/news/local/columnist/roger-chesley/article_91e44f38-c804-11e8-a08b-9f61debbc67d.html.

[5] Peter Contu, "If Virginia Beach City Council Used a Ward Election System, Would Results Change? Probably." *Virginian-Pilot*, 19 December 2018, https://pilotonline.com/news/government/local/article_90b96212-f016-11e8-ab72-23e06bcb9e2f.html.

[6] "The Virginia Beach Public Servant's Guide to Where You Live," *Princess Anne Independent News*, 5 April 2019, http://princessanneindy.com/2019/04/05/editorial-residency/.

[7] Judy Ford Wason Center for Public Policy, "About the Center," https://cnu.edu/wasoncenter/about/.

(p. 31). The third largest district or jurisdiction size among the 13 most comparative cities certainly would rank as unusual by any standard definition of the term. Moreover, Virginia Beach at 250.6 square miles is essentially tied with Roanoke for second geographically among the 13 cities and its order of magnitude is larger than the 10 other comparative cities. As noted in my initial report, "The ratio of the square mileage for the place of election in Virginia Beach as compared to these other cities ranges from 2.5 to 1 to 37.7 to 1." The mean difference is 15.2 to 1.

Kidd further notes that if "Virginia Beach were to adopt the 10 SMD model proposed by plaintiffs, the mean district sizes would be 24.9 square miles, making them larger than 7 of the cities shown on Table 3 of Lichtman's report." (p. 31). He fails to note, however, that such a change would reduce the area for electoral city council competition in Virginia Beach by 90 percent, a most significant reform for minority voters. He also notes that 7 cities would still have larger districts. But that would place Virginia Beach close to the middle of the distribution. Moreover, the average ratio of the 24.9 square miles district to the size of the other 7 smaller districts is just 2 to 1, whereas the current ratio of Virginia Beach to these 7 cities is 19.6 to 1.

The third feature of city council elections in Virginia Beach that demonstrates the presence of Factor 3 is the large population of the city council district --the entire city-- with a population of 450,000 persons. This population under at-large elections makes it difficult for minority candidates to campaign door-to-door as opposed to running a much more expensive advertising campaign. Kidd does not dispute the finding of my initial report that Virginia Beach ranks *first* among the 13 cities in the population size of the district or jurisdiction in which candidates must run. As noted in my initial report, "The ratio of the population for the place of election in Virginia Beach as compared to these other cities ranges from 1.9 to 1 to 21.3 to 1."

Dr. Kidd notes only that "The major distinguishing feature between Virginia Beach and the rest of the cities that Lichtman compares it with is its population, which is 90% larger than the next two largest cities (Norfolk and Chesapeake), and almost 9 times larger than the two smallest cities on the list (Harrisonburg and Leesburg)." (p. 31). Of course, it is not just the large population of Virginia Beach that makes it unique among other cities, but also the fact that all city council candidates must run citywide. Dr. Kidd notes the number of square miles in plaintiffs' 10 member proposed district plan but does not reference population. The plan would comparably reduce the population for running for city council by 90 percent from 450,000 to 45,000, which would move it from first among the 13 cities down to 11th place, with just two cities requiring city council candidates to run in districts or jurisdictions with larger populations.

Table R4 below compares for both geographic size and population the ratio of the district (entire city) used to elect members of the city council, with the mean for the other 12 cities with a population of 50,000 or more. As indicated in Table R4 with respect to size, Virginia Beach elections currently take place across a geographic area that is more than three times the size of the average for other cities. However, under plaintiffs' Illustrative Plan, Virginia Beach's area would be only about a third the size of the average for other cities. As also indicated in Table R4 with respect to population, Virginia Beach elections currently take place with a population that is more than five times the size of the average for other cities. However, under plaintiffs' Illustrative Plan, Virginia Beach's districts would be only about half the population of the average for other cities.

13

| TABLE R4<br>VIRGINIA CITIES WITH MORE THAN 50,000 POPULATION, AVERAGE SIZE AND POPULATION OF PLACE OF ELECTION FOR CITY COUNCIL, CURRENT SYSTEM VERSUS PLAINTIFFS' ILLUSTRATIVE PLAN | | | |
|---|---|---|---|
| | **Virginia Beach** | **Mean Other Cities** | **Ratio VA Beach to Others** |
| Current Square Miles for City Council Election | 249 | 73.1 | **3.4 to 1** |
| Square Miles Plaintiff Plan | 24.9 | 73.1 | **.34 to 1** |
| | | | |
| Current Population for City Council Election | 450,159 | 87,336 | **5.2 to 1** |
| Population Plaintiff Plan | 45,016 | 87,336 | **.52 to 1** |
| | | | |
| Source: Tables 3-4, Lichtman, Initial Report, July 15, 2019. | | | |

14

In sum, after considering the Kidd Report on Factor 3, the following remains unrefuted:

1. Unique among comparable cities, Virginia Beach uniquely maintains numbered or designated posts for the election of the majority of city council members, a well-known device that often enhances the discriminatory nature of an at-large election system.

2. Virginia Beach is essentially tied for second among 13 comparable cities in the size of the land mass that candidates must traverse to win election to a city council position.

3. Adoption of plaintiffs' proposed illustrative districting plan would reduce this land area by 90 percent placing Virginia Beach just one city above the middle of the distribution.

4. Virginia Beach ranks first among comparable cities in population in the district or jurisdiction in which candidates for city council must compete.

5. Adoption of plaintiffs' proposed illustrative districting plan would reduce this population by 90 percent placing Virginia Beach 11th among 13 cities in the population of city council districts or jurisdictions.

**Factor 4: If there is a candidate slating process, whether the members of the minority group have been denied access to that process.**

The Kidd report does not dispute that united funding by candidates can be a form of informal slating. He also does not deny or refute the analysis in my initial report which shows that such slating favors white candidates in Virginia Beach City Council elections. Rather, he claims that only contributors to a candidate who are other candidates running in the same election should be counted as part of this informal slating process.

Even assuming that Kidd is correct, which he is not, his Table 11 fundamentally misrepresents  intra-election contributions, because it misses many contributing candidates running in the same election as documented in Appendix I, which replicates from the Virginia Beach government the candidates running by year from Virginia Beach. Kidd Table 11 on p. 33 of his report lists 13 intra-election donors. However, he erroneously fails to include almost half of the 25 intra-election donors listed on Table R5. The data reported in Table R4 clearly demonstrates, even under Kidd's standard, informal slating that heavily favors white candidates, even more so than was indicated in my initial analysis. Of city council candidates who garnered contributions from at least two or more intra-election candidates, an indication of slating and not just an individual contribution, seven were white and none were black. The only black candidates to garner any intra-election contributions (one each) were incumbent Ross-Hammond in 2016 and Rouse and Wooten in 2018.[8]

---

[8] The Kidd report also incorrectly indicates that Ross-Hammond received $13,000 from Mayor Sessoms, when, in fact she received $11,500:
https://www.vpap.org/committees/215566/donor/1925/?start_year=all&end_year=all&contrib_type=all.

| TABLE R5 INTRA-ELECTION CONTRIBUTIONS TO CANDIDATES, CITY COUNCIL, VIRGINIA BEACH, 2008-2018 | | |
|---|---|---|
| **Candidate** | **Contributors & Amount** | **Total** |
| Bellitto (W) 2010 | Uhrin $500 | $500 |
| Dale (W) 2012 | Sessoms $1,000 | $1,000 |
| Davis (W) 2008, 2012 | Sessoms, $500, Wilson $1,000 | $1,500 |
| Diezel (W) 2008 | Wilson $250 | |
| Henley 2010, 2014, 2018 | Davenport, $9,500, Jones, $1,000, Uhrin, $1,500 | $12,000 |
| Kane (W) 2014 | Jones, $4,000, Uhrin $1,500, Wood, $350 | $5,850 |
| Martin (W) 2014, 2018 | Jones, $2,000, Uhrin, $1,000 | $3,000 |
| Moss (W) 2010, 2014, 2018 | Jones, $5,000, Worst, $250 | $5,250 |
| Redmond (W) 2010 | Uhrin, $8,500 | $8,500 |
| Rouse (B) 2018 | Davenport $1,500 | $1,500 |
| Ross-Hammond (B) 2012, 2016 | Sessoms, $11,500 | $11,500 |
| Uhrin (W)  2010, 2014, 2018 | Davenport, $2,000 | $2,000 |
| Wilson (W) 2008, 2012, 2016 | Sessoms, $1,250, Davis $1,325 | $2,575 |
| Wood (W) 2010, 2014, 2018 | Davenport $2,000, Uhrin $1,000, Redmond $250 | $3,250 |
| Wooten (B) 2018 | Davenport $8,000 | $8,000 |
| | | |
| Sources: Source: Virginia Beach, Election Information & Results, https://www.vbgov.com/government/departments/voter-registrar/elections/pages/default.aspx; Virginia Public Access Project, VPAP.org. | | |

16

The other problem with Kidd's analysis is that not only are there intra-election contributions to candidates, but also incumbents who may not be running in a particular election are involved in slating. The reason is clear: incumbents, no less than candidates in a particular election, would certainly care about the persons with whom they will be governing in an upcoming session. Most of the non-intra-election contributors in my initial report were incumbents.

**Factor 5: The extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process.**

As noted above, the Kidd report does not challenge any of the facts and analyses I presented in the discussion of Factor 1 on the ongoing history of racial discrimination in Virginia and Virginia Beach. He does, however, fundamentally misrepresent my report by implying that discrimination ended "long ago," perhaps around 1970 and therefore could not have much of current effect on Hispanics and Asians, who constituted a small share of the Virginia Beach population at that time. (p. 26) Yet, my examination of Factor 1 demonstrated that discrimination persisted long after 1970 and continues throughout time. In fact, far more of the section on this factor is devoted to the period after, rather than before, 1970.

The Kidd report does not dispute that for blacks and Hispanics in Virginia, the effects of discrimination have resulted in a socio-economic standing that is substantially lower than for whites. His only quarrel is for Asians, who he alleges do not have an equivalent history of discrimination. He partially argues that Asians are comparable to whites in socio-economic standing, which is the appropriate measure, not whether they are better off than blacks or Hispanics. In fact, Kidd's count of the comparability between whites and Asians is incorrect. He says that of 15 measures in my initial report, "On six of these, Asians score better than non-Hispanic whites; on two measures they (Asians and non-Hispanic whites) have comparable scores, and on three measures Asians are more like whites than like Hispanics or African Americans." That adds to eleven not fifteen measures. However, an examination of all 15 measures shows that the gap between Asians and whites does slightly favor whites on measures where the two groups are not comparable. The Kidd report also claims incorrectly that "in recent elections Asians have participated at rates statistically equal to or even slightly <u>higher</u> than whites." As will be shown below, Asians in fact participate at lower rates than whites.

Kidd does attempt to show that such socio-economic disparities do not necessarily result in lower turnout for minorities, not just for Asians, but also for Hispanics and blacks. Yet, lower turnout is not the only impact on political opportunity of lower socio-economic standing. It is also reflected in difficulties in recruiting candidates and in financing campaigns. As was demonstrated in my initial report, the five major political donors in Virginia Beach are either white individuals or businesses run by whites. And these donors contribute primarily to white candidates. Lower socio-economic standing is further reflected in the challenges posed by campaigning across the large municipality of Virginia Beach, which encompasses 249 square miles and includes more than 450,000 persons.

17

Contrary to Kidd's claim, the data he presents does not show a lack of a turnout gap between whites and minorities in Virginia Beach. First, Kidd conducts an apples to oranges comparison; his survey data from the Current Population Survey is for the state of Virginia, not for Virginia Beach, which comprises only about 5 percent of Virginia's population. Kidd turns to overall state turnout even though in his data disclosure he presents the precinct-level turnout and demographic information from which estimates of turnout by race can be computed (see the analysis below). Dr. Kidd simply presumes without evidence or rationale that turnout patterns in Virginia Beach must mirror those statewide: "We can further observe that there is no logical reason to think that the political participation of black, Hispanic, and Asian citizens in Virginia Beach would look different from those across the Commonwealth." Yet, insofar as comparison is possible, turnout patterns in Virginia Beach do <u>not</u> mirror those of the Commonwealth.

The Commonwealth and city provide actual turnout data for the percent of registered voters voting in recent elections. This is not self-reported information. The results show that turnout in Virginia Beach is not the same as turnout statewide, even though the Beach and the Commonwealth have virtually identical demographic profiles. In 2018, turnout in Virginia Beach was 66.0 percent, compared to 71.2 percent statewide; and in 2018, turnout in Virginia Beach was 54.6 percent, compared to 71.1 statewide. The point here is that you cannot uncritically infer political patterns to a locality from patterns statewide. That would be even more true for the more fine-grained turnout of racial groups.[9]

Further, the data presented in the Kidd report represent not actual turnout like the above governmental statistics, but self-reported turnout in the Current Population Survey (CPS). In addition, the data do not show that minority turnout is comparable to white turnout. Rather, as presented in the Kidd report, the data show only that there is a wide margin of error for some measures of self-reported turnout.

However, an examination of the point estimates (the self-reported turnout percentage around which the margin of error is computed) from Kidd's data disclosure of CPS results, demonstrates that the turnout of African Americans, Hispanics, and Asians across all six election cycles from 2008 to 2018 is almost invariably lower than white turnout. This near-universal pattern of turnout differences cannot be the result of chance variation.

As indicated in Table R6 and Chart R4, low turnout in comparison to white voters impacts all three minority groups in Virginia Beach, black voters, Hispanic voters, and Asian voters. For every election and every group, minority turnout trails white turnout with the single exception of a 0.3 percent lead for Asian turnout in the election of 2016. African American turnout substantially trails white turnout in all elections, save for the presidential elections of 2008 and

---

[9] City of Virginia Beach, Election Information and Results, https://www.vbgov.com/government/departments/voter-registrar/elections/pages/default.aspx; Virginia Department of Elections, Summary of Virginia Registration and Turnout Statistics, https://www.elections.virginia.gov/resultsreports/registration-statistics/registrationturnout-statistics/index.html.

| TABLE R6 POINT ESTIMATES OF TURNOUT BY RACE FOR CITIZEN VOTING AGE POPULATION (CVAP) IN VIRGINIA, 2008-2018, BASED ON CURRENT POPULATION SURVEY (CPS) RESULTS RELIED ON IN KIDD REPORT | | | | | | | |
|---|---|---|---|---|---|---|---|
| Election | White | Black | Difference With white | Hispanic | Difference With white | Asian | Difference With white |
| 2018 | 60.8% | 56.4% | -4.4 percentage points | 34.6% | -26.2 percentage points | 46% | -14.8 percentage Points |
| 2016 | 69.6% | 64.9% | -4.7 percentage points | 64.2% | -5.4 percentage points | 69.9% | +0.3 percentage points |
| 2014 | 45.6% | 34.2% | -11.4 percentage points | 25.4% | -20.2 percentage points | 31.6% | -14 percentage points |
| 2012 | 67.5% | 67.2% | -0.3 percentage points | 66.8% | -0.7 percentage points | 53% | -14.5 percentage points |
| 2010 | 44.9% | 35.6% | -9.3 percentage point | 18.9% | -26 percentage points | 22.7% | -22.2 percentage points |
| 2008 | 69.4% | 68.3% | -1.1 percentage points | 56.5% | -12.9 Percentage points | 61.4% | -8 percentage points |
| Mean All Elections | 59.6% | 54.4% | -5.2 percentage points | 44.4% | -15.2 percentage points | 47.4% | -12.2 percentage points |
| Source: Current Population Survey (CPS) results provided by Dr. Quentin Kidd in his data disclosure. | | | | | | | |

**CHART R4: MEAN POINT ESTIMATES OF TURNOUT BY RACE FOR CITIZEN VOTING AGE POPULATION (CVAP) IN VIRGINIA, 2008-2018, BASED ON CURRENT CENSUS REPORT (CPS) RESULTS RELIED ON IN KIDD REPORT**



2012 when Barack Obama headed the ballot. On average for all elections, black voter turnout was 5.2 percentage points lower than white turnout. Hispanic voter turnout trailed white turnout in all elections. As indicated in Table R6 and Chart R4, on average for all elections, Hispanic turnout was 15.2 percentage points lower than white turnout. Asian voter turnout trailed white turnout in all elections except for the outlier of 2016, when it exceeded white turnout by 0.3 percentage points. On average for all elections, Asian voter turnout was 12.2 percentage points lower than white turnout.

Ironically, while Kidd declines to use the point estimates to compare white to minority turnout, he does use the point estimates to compare African American and Hispanic turnout. He writes, "While black and Hispanic participation is within the margin of error for every election, and while during two elections (2012 and 2016) the two groups are very close to equal in their levels of voting, *black participation is always higher than Hispanic participation*," based on the point estimates. (p. 34, emphasis added).

Kidd uses this point estimate comparison between African Americans and Hispanics in an attempt to loosen the connection between socio-economic status and turnout. He writes, "On 11 of the 15 dimensions presented by Lichtman, African Americans score poorer than Hispanics. This is the case for all of the measures of academic achievement. Relying on the logic of Lichtman's presentation, Hispanics should be more politically active than blacks." (p. 34). This analysis is flawed, first because it represents another apples to oranges comparison. The socio-economic data in my initial report was for Virginia Beach, whereas Kidd's turnout data is for all of Virginia. Even for Virginia Beach, the differences between blacks and Hispanics are typically small compared to their differences with whites. Kidd emphasizes the differences between blacks and Hispanics on educational performance, but these are for 8th graders not yet eligible to vote. On educational attainment, Hispanics trail African Americans.

Second, the Kidd analysis assumes incorrectly that socio-economic differences are the sole determinant of turnout. Diminished socio-economic status is an important barrier to political participation that affects all three racial minorities in Virginia Beach, but it is not the sole determinant. Also important is political mobilization. African Americans have achieved significant mobilization in the twenty-first century, which Latinos have not yet matched.[10] Dr. Kidd has acknowledged in his own writings the importance of the political mobilization of African Americans in the South. He wrote that "the two most significant components of the modern transformation of southern politics" are "1) the growth of the GOP and 2) the political mobilization of the African Americans."[11]

---

[10] See for example, Louis DeSipio, "Latino Civic and Political Participation," in Martha Tienda and Faith Miller, eds. *Hispanics and the Future of America* (National Academies Press, 2006), pp. 447-480; Marcela Valdes, "27 Million Potential Hispanic Votes. But What Will They Really Add Up To?" *New York Times Magazine Feature*, 14 September 2016, https://www.nytimes.com/2016/09/18/magazine/27-million-potential-hispanic-votes-but-what-will-they-really-add-up-to.html; John A. Garcia, *Latino Politics in America: Community, Culture, and Interests*, 3thd ed. (Rowman & Littlefield, 2017).

[11] M.V. Hood III, Quentin Kidd, and Irwin L. Morris, *The Rational Southerner: Black Mobilization, Republican Growth, and the Partisan Transformation of the American South* (Oxford University Press, 2012),  p. 70.

Third, African Americans in Virginia are substantially more likely than Hispanics to be contacted by political campaigns. Table R7 reports results from the Cooperative Congressional Election Study (CCES), a standard source for political analysis. For the elections of 2010, 2012, 2014, and 2016, the CCES asked whether respondents had been contacted by a political campaign or candidate. As indicated in Table R7, 59.1 percent of African Americans in Virginia reported such a contact, compared to 46.9 percent of Hispanics. These differences are statistically significant at levels well beyond what is standard in social science.

| TABLE R7 CAMPAIGN CONTACT FOR AFRICAN AMERICANS AND HISPANICS IN VIRGINIA, 2010-2016 GENERAL ELECTIONS | | | |
|---|---|---|---|
| Group | # Contacted | Total # of Respondents | % Contacted |
|  |  |  |  |
| Black | 438 | 741 | 59.1% |
|  |  |  |  |
| Hispanic | 97 | 207 | 46.9% |
|  |  |  |  |
| Source: Cooperative Congressional Election Study (CCES), 2010, 2012, 2014, 2016, https://cces.gov.harvard.edu/. | | | |

Fourth, unlike African Americans, Latinos face a significant language barrier, which makes it more difficult to navigate and participate effectively in the political system. According to the 2017 US Census American Community Survey, 34 percent of Hispanics in Virginia speak English "less than 'very well,'" compared to 2 percent of African Americans.

Dr. Kidd also ignores a disparity in his own data  on registration rates for whites, blacks, Hispanics, and Asians in Virginia. Disparities in registration are another indicator of the effects of lingering discrimination. Moreover, because of the larger numbers involved, the error margins are smaller for registration than for turnout.

As indicated in Table R8, in every instance, bar none, for all three minority groups, blacks, Hispanics, and Asians, voter registration rates are substantially lower than white rates. Again, the universal pattern cannot be attributed to chance or random factors. In addition, more than half the individual differences between whites and the minority groups are outside the margins of error of the estimates. As indicated in Table R8 and Chart R5, on average black registration rates are 7.9 percentage point lower than white rates. Hispanic rates are 17.3 percentage points lower and Asian rates are 9.8 percentage points lower.

In the data disclosed by Dr. Kidd, he presents precinct-level data prepared by Kim Brace on voter turnout and demographics for Virginia Beach. Yet, rather than using this non-self-reported data to estimate turnout rates for Virginia Beach, he instead turns to survey data for the entire Commonwealth. Analysis of the data in the database that was disclosed and used by Kidd or the elections of 2016 and 2018 demonstrates major turnout differentials based on race.

23

| TABLE R8 |
|---|
| **POINT ESTIMATES OF REGISTRATION BY RACE FOR CITIZEN VOTING AGE POPULATION (CVAP) IN VIRGINIA, BASED ON CURRENT POPULATION SURVEY (CPS) RESULTS RELIED ON IN KIDD REPORT** |

| Election | White | Black | Difference With white | Hispanic | Difference With white | Asian | Difference With white |
|---|---|---|---|---|---|---|---|
| 2018 | 76.8% | 66.8% | -10.7 percentage points* | 49.0% | -27.8 percentage points* | 61.4% | -15.4 percentage Points* |
| 2016 | 77.5% | 71.9% | -6.7 percentage points | 70.1% | -7.4 percentage points | 73.0% | -4.5 percentage points |
| 2014 | 69.6% | 61.7% | -8.4 percentage Points* | 47.4% | -22.2 percentage points* | 61.0% | -8.6 percentage points |
| 2012 | 75.8% | 72.6% | -3.8 percentage points | 73.6% | -2.2 percentage points | 61.1 | -14.7 percentage points* |
| 2010 | 69.5% | 51.4% | -17.5 percentage points* | 34.6% | -24.9 percentage points* | 58.1% | -11.4 percentage points |
| 2008 | 75.3% | 72.3% | -2.8 percentage points | 56.5% | -18.8 Percentage points* | 70.8% | -4.5 percentage points |
| **Mean All Elections** | **74.0%** | **66.1%** | **-7.9 percentage points** | **55.2%** | **-17.3 percentage points** | **64.2%** | **-9.8 percentage points** |

Source: Current Population Survey (CPS) results provided by Dr. Quentin Kidd in his data disclosure.

24

**CHART R5: MEAN POINT ESTIMATES OF REGISTRATION BY RACE FOR CITIZEN VOTING AGE POPULATION (CVAP) IN VIRGINIA, BASED ON CURRENT CENSUS REPORT (CPS) RESULTS RELIED ON IN KIDD REPORT**



Demonstration of turnout differences between whites and minorities and specifically whites and blacks in Virginia Beach does not require elaborate statistical analysis. The visual display of actual precinct-level turnout percentages paired with precinct-level demography are themselves telling. For the general election of 2018, Chart R6 plots for each precinct (each dot represents a precinct) the percent of the citizen voting age population voting and the percent of the citizen voting age population that is white. As is evident from Chart R7 there is a steep, upward relationship between the white share of a precinct and its turnout level in 2018. Chart R8 displays the same turnout data, but this time for the percentage of the CVAP that is black. The Chart R8 shows the opposite results, with a steeply downward relationship between the black share of a precinct and its turnout level in 2018. A nearly identical pattern of relationships between precinct-level turnout prevails for the general election of 2016 as shown in Charts R8 and R9.[12]

This data also enables the use of ecological regression to estimate the relative turnout of whites and blacks in Virginia Beach for 2018 and 2016. The percentages of Hispanics and Asians are too small for separate estimation. The turnout results reported in Table R9 confirm what the charts show, that there is a major gap in turnout rates for white voters and black voters in Virginia Beach. The ecological regression results are further confirmed by the actual turnout rates in precincts that are 90 percent or more white. There are no comparable precincts for blacks.

---

[12] The Kidd data disclosure includes estimates of total voting age and citizen voting age population and Hispanic CVAP. It includes VAP data for whites and blacks, the great majority of whom are citizens in Virginia Beach.

**CHART R6: RELATIONSHIP BETWEEN TURNOUT AND PERCENT WHITE CVAP,
2018 ELECTION, VIRGINIA BEACH**



**CHART R7: RELATIONSHIP BETWEEN TURNOUT AND PERCENT BLACK CVAP, 2018 ELECTION, VIRGINIA BEACH**



**CHART R8: RELATIONSHIP BETWEEN TURNOUT AND PERCENT WHITE CVAP, 2016 ELECTION, VIRGINIA BEACH**



**CHART R9: RELATIONSHIP BETWEEN TURNOUT AND PERCENT BLACK CVAP, 2016 ELECTION, VIRGINIA BEACH**



| TABLE R9 ECOLOGICAL REGRESSION ESTIMATES OF BLACK & WHITE TURNOUT, VIRGINIA BEACH, 2016-2018 AND WHITE 90%+ CVAP PRECINCTS | | | |
|---|---|---|---|
| Election | % White CVAP Turning Out | % Black CVAP Turning Out | Difference | Percent Turning Out in 90%+ White CVAP Precincts |
| | | | | |
| 2018 | 61% | 29% | +32 Percentage Points | 65% |
| | | | | |
| 2016 | 66% | 30% | +36 Percentage Points | 70% |
| | | | | |
| Source: Data disclosure of Dr. Quentin Kidd. | | | | |

**Factor 6: Racial Appeals**

A contradiction cuts through the heart of Kidd's assessment of racial appeals and his use of turnout data to assess the effects of socio-economic disparities in Virginia Beach. On the one hand, he incorrectly relies on statewide turnout data to assess these effects in Virginia Beach. He does so even though he has available local turnout data and demographic data from which to assess racial differences in turnout for Virginia Beach. On the other hand, he rejects as irrelevant racial appeals in statewide elections, by the Republican Party, or elections outside of Virginia. Kidd cannot have it both ways. If statewide turnout data is relevant, so then must be statewide racial appeals and certainly racial appeals to the set or subset of voters in Virginia Beach.

Kidd also indicates that a racial appeal must be successful in electing a candidate for relevance under Factor 6. But the Factor imposes no such requirement, as there are many reasons why candidates win or lose. Rather, its purpose is to assess the presence or existence of racially charged politics.

The Kidd report only examines three of the many examples of racial appeals presented in my initial report:

**Republican George Allen's use of the racial slur "macaca" in his 2006 U.S. Senate campaign.**

His only response to this example is to say that "George Allen's infamous 'Macaca' moment occurred on a highway rest stop in the western part of the state. Loudoun County is hundreds of miles away from Virginia Beach." (p. 36) The venue, of course, is irrelevant. Allen was running a statewide campaign and his "infamous" racial slur was widely publicized across the Commonwealth, indeed across the nation.

**Racist threats against Virginia Beach black city council candidate Louisa Strayhorn and staffers in 1998.**

The Kidd report asserts that this example is irrelevant because it involved an underground campaign of intimidation rather than an open racial appeal in the campaign. Kidd admits, however, that "they reflect racism on the part of some individuals," in this case within Virginia Beach. The threats, therefore, whether or not overtly part of the campaign against her, certainly are indicative of racial politics within Virginia Beach and racial opposition to her campaign, which is the essential purpose of Factor 6. (p. 36). Moreover, Strayhorn, the only minority then on the city council, was specifically targeted by the Republican Party. "We had taken dead aim on Louisa," said Leo Waldrup, Republican state delegate from Virginia Beach and head of the GOP House caucus, she was a rising Democrat, "and that's clearly enough for us to lock and load."[13]

---

[13] Bruce Murphy, "Even in the Most Integrated City, Race is Still a Thorny Issue," *Milwaukee Journal Sentinel*, 14 January 2003, http://mumford.albany.edu/census/2003newspdf/jsonlineSeries/011403MURPHYjsonline.pdf.

**Racial Appeal by Republican candidate Rocky Holcomb in his 2017 campaign for House of Delegates.**

Kidd does not deny that my initial report established not just a subtle but an overt racial appeal. He notes the Holcomb mailer was one which did not just involve candidate Turpin, but also "many in the community accused of being an overt racial appeal." (p. 36). He discounts this mailer not because it failed to demonstrate a racial appeal to the voters of Virginia Beach, but rather because Holcomb lost: "Voters in Virginia Beach, recoiling from the Holcomb mailer, rejected the appeal and the candidate who ran it." Yet, regardless of the outcome of the election, this example shows the infusion of race in that election. Moreover, the Kidd report presents not a shred of evidence that white voters in Virginia Beach rejected the appeal. Turpin actually won the election by just 389 votes. Given the many factors that decide elections, it is not possible to attribute Holcomb's defeat to his racial appeal or even in the absence of analysis to assess whether it helped or hurt his campaign in what Kidd says was otherwise a difficult environment for Republicans. Again, the factor does not require that the candidate making the appeal must win the election.

In light of Kidd's claim about examples for Virginia Beach, I have uncovered an additional racial appeal specifically for a position on the City Council. In 2008, a flier was distributed in black neighborhoods showing white Republican Virginia Beach mayoral candidate Will Sessoms together with a smiling Barack Obama. As is evident from Picture 1 below, the flier had no attribution or authorization of any kind, (e.g., "paid for by …"), which is required by law. A second flier was also circulated likewise without the legally required attribution/authorization purporting to represent "African Americans for Change." (Picture 2) It claimed that Will Sessoms "will do more in his first term as mayor to contract with African Americans than the current mayor has done in twenty years." These were unabashed and deceitful racial appeals to black voters, and the flyer attempted to associate Sessoms with Obama and the so-called African Americans for Change.[14]

---

[14] The source for the fliers and their circulation is Vivian J. Page, "Illegal Fliers' Effect on VB Mayoral Election," All Politics is Local, 25 November 2008, https://blog.vivianpaige.com/2008/11/25/illegal-fliers-effect-on-vb-mayoral-election/comment-page-3/. A biography of Ms. Page can be found at https://www.facebook.com/YWCASHR/posts/lets-meet-our-honorees-vivian-j-paige-is-our-2017-women-of-distinction-honoree-i/10155074327349500/, when she was honored by the South Hampton Road, YWCA as "our 2017 Women of Distinction honoree in Communication."

33

**Picture 1: Flier Circulated During 2008 Campaign for Mayor in Virginia Beach**



**Picture 2: Flier Circulated During 2008 Campaign for Mayor in Virginia Beach**



**Factor 7: the extent to which members of the minority group have been elected to public office in the jurisdiction**.

Dr. Kidd's report does not dispute that minorities have trailed behind whites in their election to public office. He also does not dispute that the election of minority candidates during the pendency of a voting rights lawsuit is a special circumstance where, as in Virginia Beach, there has been a lack of prior minority representation on a governing body. Rather, he suggests that members of the city council and others within Virginia Beach may not have been aware of the lawsuit prior to the November 2018 election. The only evidence he presents in support of the supposition is an undisclosed email indicating that the counsel for defendants first briefed the city council on the lawsuit in January 2019.

Contrary to Kidd's supposition, the local media covered the lawsuit immediately after its filing nearly a year before the election on November 18, 2018, and continued coverage during the period prior to the 2018 election. Two members of the city council endorsed the lawsuit long before the 2018 election and in February 2018, the federal judge ordered the city to respond to the complaint:

* On November 20, 2017, three days after the filing of the lawsuit, *WTKR* reported, "Activist Files Lawsuit Against Virginia Beach for Violations of Voting Rights Act." *WTKR* noted that "Latasha Holloway alleges in her lawsuit that the city dilutes minority voting strength to promote white supremacy in the Virginia Beach City Council by using an at-large election system."[15]

* A day later on November 21, 2017, WAVY similarly reported "Virginia Beach Woman Files Lawsuit Files Legal Action Over City's Election System."[16]

* Three days later, on November 23, 2017, *The New Journal & Guide* likewise reported, "Suit Filed Opposes At-Large Elections in Virginia Beach."[17]

* On March 4, 2018 *The New Journal & Guide* headlined "Virginia Beach Must Respond to At-Large Voting Complaint." The article reported, "United States District Court Judge Arenda L. Wright Allen has ordered the city to answer political rights activist Latasha Holloway's lawsuit challenging the at-large method of electing the city council of Virginia Beach."[18]

* On October 2, 2018 the *Virginian-Pilot* published an article headlined "2 Virginia Beach

---

[15] "Activist Files Lawsuit Against Virginia Beach for Violations of Voting Rights Act." WTKR 20 November 2017, https://wtkr.com/2017/11/20/activist-files-lawsuit-against-virginia-beach-for-violations-of-voting-rights-act/.
[16] "Virginia Beach Woman Files Lawsuit Files Legal Action Over City's Election System," *WAVY*, 21 November 2017, https://www.wavy.com/news/virginia-beach-woman-files-legal-action-over-citys-election-system_201803260732334/1078257257. (link no longer active)
[17] "Suit Filed Opposes At-Large Elections in Virginia Beach," The New Journal & Guide, 23 November 2017, http://thenewjournalandguide.com/suit-filed-opposes-large-voting-virginia-beach/.
[18] "Virginia Beach Must Respond to At-Large Voting Complaint," The New Journal & Guide, 4 March 2018, http://thenewjournalandguide.com/virginia-beach-must-respond-large-voting-complaint/.

Council Members Want to Change the City's Election System." The article noted that "Two council members are among a group of residents challenging the city's election system, charging that it thwarts competition, favors wealth and special interests, and discourages diversity ... Virginia Beach council members Jessica Abbott and John Moss want the current election system to end."[19]

* On October 15, 2018 the *Virginian-Pilot* published an editorial headlined "A Push to Change Beach Voting." editorial noted, "An inability to provide for minority representation on the council led to a lawsuit last year arguing that the hybrid election system "has the effect of unlawfully diluting or minimizing 'minority voting strength'" and violated the Voting Rights Act of 1965 and the U.S. Constitution." The editorial further noted, "There is no question that the Beach's manner of electing its municipal officials is a worthy subject for robust community debate. It's critical that the city make certain that every resident has a voice in governance."[20]

* Among its questions posed to 2018 candidates for city council in Virginia Beach the *Princess Anne Independent News* asked: "Voters from across the city select members of the city council, including members who represent district seats. Should the city consider another way of selecting members of the council, such as a ward system?"[21]

        Long before the filing of the lawsuit, allegations that the at-large system for electing members of the city council and reform through a district system had been a matter of controversy in Virginia Beach. The October 2, 2018 article in the *Virginian-Pilot* noted that "*Six years ago, Moss and state Sen. Bill DeSteph, a former councilman, made a similar effort to end at-large voting districts but couldn't persuade most council members to get on board.*" (emphasis added) The March 4, 2018 article in *The New Journal and Guide* noted that, "Black leaders have complained for years  about Virginia Beach's system of  electing council but have failed to reform it." The following are examples of local media coverage of the controversy in the decade prior to the filing of the complaint:

* On October 12, 2008 the *Virginian-Pilot* published an article headlined "Wards Would Help Blacks Get Elected." The article said, "African American candidates would have a better chance of getting elected to the council if the city had a ward system, if more residents got involved in leadership boards, or if the black community came together to back one choice, those running for office told a gathering of the Hampton Roads Committee of 200+ Men Inc."[22]

* On November 16, 2008, the *Virginian-Pilot* published an article headlined "Black Leaders Discuss a Shift in Voting System." The article quotes African American Louisa Strayhorn, who

---

[19] Stacy Parker, "2 Virginia Beach Council Members Want to Change the City's Election System," *Virginian-Pilot*, 2 October 2018, https://pilotonline.com/news/government/local/article_5aea8b7a-c591-11e8-b572-3b015d1704d3.html.
[20] "A Push to Change Beach Voting," *Virginian-Pilot*, 18 October 2018, p. 8.
[21] "2018 Virginia Beach Elections: Questions for candidates for City Council, Bayside District," Answers posted: *Princess Anne Independent News*, 1 November 2018, http://princessanneindy.com/2018/11/01/2018-ccbayside-qa/.
[22] Deidre Fernandes, "Ward Would Help Blacks Get Elected," *Virginian-Pilot*, 12 October 2008, p. B1

lost her reelection bid in 1998 as saying that "It's not in their [the city council] best interests to change it. I have a feeling we're going to have to mount a campaign."[23]

* On September 6, 2009, the *Virginian-Pilot* headlined "Beach History of Race Relations." It reported that "As the city's minority population grew, the NAACP and some residents urged the City Council to redraw its election districts to create a more heavily minority voting ward, or at least alter the way candidates are elected. While seven of the 11 council members represent districts, they must win the citywide vote, too."[24]

* On February 6, 2010, the *Virginian-Pilot* published an article headlined "Filling a Seat at the Table." The article notes, "The city should, however, take a close look at how council seats are allocated. The system is a weird hybrid. Most cities have either an at-large system, ward system or mix of the two. In Virginia Beach, non-mayoral candidates run for three at-large seats or by district, but voters citywide get to pick the district representatives, too."[25]

Second, the Kidd report claims that whites in Virginia Beach interested in electing black candidates during the pendency of the lawsuit should have provided "across-the-board" support for all black candidates running in 2018, "Rouse, Bright, Wooten, & Wray." (Kidd Report, p. 38). However, such a strategy would have been irrational and counter-productive because it would have diluted support for the strongest candidates (Rouse and Wooten) and undercut an effort to elect these candidates to the city council. As indicated in Appendix I on overlapping candidacies, Bright was running against Rouse at-large in 2018 and Wray was running against Wooten in Centerville.

As part of the misguided notion that whites should have diluted their support among four candidates, Kidd notes that the four did not necessarily get strong support from white voters. A focus on Rouse and Wooten, however, tells a different story. Wooten was the only black candidate for city council in Virginia Beach since 2008 to win a majority of the white vote. As indicated in Table 11 of my initial report, she exceeded the average vote for ten other district candidates by 28 percentage points and 125 percent. Although Rouse did not garner a majority of the white vote in his multiple-seat, multiple-candidate race, Table 10 of my initial report indicated that he exceeded the average vote for ten other at-large candidates by 15 percentage point and 179 percent

Campaign finance reports further document the white focus on Rouse and Wooten, rather than Bright and Wray. Rouse raised $115,146 and as documented in my initial report, with the exception of fellow retired NFL player Bruce Smith, his major donations all came from whites. In contrast, Bright self-financed her campaign with loans of more than $60,000. Other contributions amounted to less than $6,000. Wooten raised $82,751 in 2018, with all major donations coming from whites. In contrast, Wray raised just $6,025. In addition, the Kidd report does not cite any

---

[23] John Warren, "Black Leaders Discuss a Shift in Voting System," *Virginian-Pilot*, 16 November 2008, p. 1.

[24] Deidre Fernandes, "Beach History of Race Relations," *Virginian-Pilot*, 6 September 2009, p. 1.

[25] "Filling a Seat at the Table." *Virginian-Pilot,* 6 February 2010, p. B7.

black candidates other than Rouse and Wooten who garnered substantial contributions from white donors.[26]

With respect to contributions by the five major donors in Virginia Beach (all white), the Kidd report fundamentally misunderstands my analysis. (Kidd Report, pp. 38-39). The point of my analysis was not to compare contributions to Rouse and Wooten in 2018 as compared to contributions to other candidates that year. The critical purpose of my analysis was to show that compared to their contribution record since 2008, the contributions by the five major donors to Rouse and Wooten were highly unusual for contributions by these donors to black candidates. This analysis, which the Kidd report does not address, demonstrates that these donors primarily contributed to white candidates from 2008 to 2018, with 18 white candidates receiving contributions as compared to just 4 black candidates. With the exceptions of Rouse and Wooten in 2018, the five donors combined contributed to only two other black candidates, both incumbents, Sherrod in 2011 and Ross-Hammond in 2016. Although not running as incumbents, Rouse and Wooten garnered more than two and a half times the dollar amount contributed by these donors to Sherrod and Ross-Hammond ($36,500 to $14,000).[27]

Moreover, in key ways the Kidd report actually supports the concentration of white donors on Rouse and Wooten. It makes a point of noting that Bright received no contributions from the major white donors. He further notes that "none of Rouse's top donors contributed to Bright's campaign" and that "only 2 of the top 10 contributors to Wooten's campaign for the Centerville District seat in 2018 also contributed to Bright." He also notes that "only 3 of Rouse's top donors also contributed to Wooten," but does not disclose that they were all among the five major white donors to city council campaigns in Virginia Beach. (Kidd Report, p. 39).

Kidd further suggests incorrectly that "the large-donor class appears to have behaved as they often do, which is to spread financial support around as widely as possible with an eye toward supporting candidates who they perceive as having the best chances of winning and who are most likely to support policies that they favor." He fails to note that in contradiction to the claim of widely spreading the money around, all five of the major donors contributed to both Rouse and Wooten, all in the amount of $1,000 or more. No other candidate in 2018 received contributions from all five major donors. Overall, the only other candidates to receive united financial support from all five of the major donors were white incumbent mayor Will Sessoms and white incumbent council member Rosemary Wilson in earlier elections. Kidd also provides no evidence to suggest that Rouse and Wooten uniquely favored the policies of all five major donors or that compared to other candidates from 2008 to 2018, they had the best chances of winning. In fact, Rouse's most prolific backer, Bruce Smith, is a Virginia Beach developer, who, as indicated in my initial report, has assailed the city for allegedly steering contracts disproportionately to whites and turning down his own projects.[28]

---

[26] Virginia Public Access Project, VPAP.org. For a detailed accounting of Bright's loans see, Virginia Department of Elections, Campaign Finance Reports, "Reports for Friends of Linda Bright,"
https://cfreports.elections.virginia.gov/Committee/Index/a71fe5b0-2ac0-e811-bffd-984be103f032.
[27] The analysis of campaign contributions is on initial Lichtman report, pp. 47, 50-54.
[28] See, also, Alissa Skelton, "NFL Hall of Famer Bruce Smith questions whether race played a part in denial of Oceanfront projects," Virginian-Pilot, 16 November 2016.

It is also worth noting that victory in one election may not accurately portray black electoral opportunities in Virginia Beach. Of the few African Americans who have won election to the Virginia Beach city council, none has ever won reelection. The last such defeat of an incumbent African American council member occurred recently, in 2016, with the loss of Ross-Hammond in the Kempsville District in 2016.

## II. Report of Dr. Peter Morrison

Although I was not involved in the census analysis for the construction of illustrative plans in this case, I have previously encountered Dr. Peter Morrison in two previous recent cases in which as in this litigation, he conducted an analysis of Census data for the scrutiny of districting plans. In these prior cases, I was directly involved in performing such an analysis, and assessing Dr. Morrison's analysis. As documented below, in both cases Dr. Morrison committed extreme, consequential errors that fundamentally undermined his conclusions. In both cases, Dr. Morrison worked on behalf of plaintiffs challenging congressional district plans in Maryland and in Dallas County, Texas, respectively. In addition to the examination of Dr. Morrison's factual errors that I encountered in this prior litigation, I will also probe a fundamental flaw in his claim that Dr. Anthony Fairfax's illustrative districts fail to provide a majority of blacks, Hispanics, and Asians combined.

## Maryland: Challenge to 2011 Congressional District Plan: *Benisek v. Lamone*, U.S. District Court, Maryland, Case No. 13-cv-3233

In this litigation, Dr. Morrison conducted a fine-grained analysis of census data as he did in the present case. In an attempt to demonstrate that the district under challenge in Maryland, Congressional District 6, under the 2011 plan, did not represent a community of interest, he stated that the 2011 plan split far more Census places than previously under the 2001 plan. This analysis, however, was based on fundamentally flawed data on the percentage of split Census Places in CD6 under the 2001 and 2011 plans. Based upon the correction of his data, the difference in split Census Places in prior CD6 under Maryland's 2001 plan compared to splits in CD6 under the state's 2011 plan was not 48 percentage points as Dr. Morrison previously claimed, but a *de minimis* 4 percentage points, a difference of 44 percentage points and 92 percent (44/48).[29]

Dr. Morrison admitted to these errors in that case and presented in a supplemental report what he called minor corrections of his initial errors, which he claimed did not alter his conclusions. These corrections, however, were far from minor.

---

https://pilotonline.com/news/government/local/article_7fd9bd2d-69f7-5cd5-b02a-2660f2c526ef.html.

[29] For a full explanation see, *Benisek v. Lamone*, Second Supplemental Expert Report of Allan J. Lichtman, July 12, 2017.

Rather, as demonstrated in Table A1 (all tables are included in Appendix II to this report) the new data he presented on Census Places in Maryland CD6 under the 2001 and 2011 state congressional plans differs by many orders of magnitude from the data on which he relied for his conclusion in his opening report. As indicated in Table A1, in his supplemental declaration, Morrison identified 135 Census Places as falling wholly or partially within CD6 under the 2001 plan, compared to 35 Census Places that he identified in his opening report. This amounts to an additional 100 Census Places, for *an increase of 286 percent*. In his supplemental declaration, Morrison identified 122 Census Places as falling wholly or partially within CD6 under the 2011 plan, compared to 22 Census Places that he identified in his opening report. This amounts again to an additional 100 Census Places, but it results in *a much larger percentage increase of 455 percent*.

As indicated in Table A2, these corrections by Dr. Morrison in *Benisek v. Lamone* account for the reduction in the difference in split Census Places under the two plans from 48 percentage points in his opening report to 8 percentage points in his supplemental declaration. His 286-percent correction in the number of Census Places in CD6 under the 2001 plan reduces the percentage of split precincts from 11 percent to 3 percent. His much larger 455 percent correction in the number of Census Places in CD6 under the 2011 plan results in a far more substantial reduction in the percentage of split Census Places *from 59 percent to 11 percent*. These two corrections, as shown in Chart R10, explain the reduction in the difference in split Census Places from 48 percent to just 8 percent.

Despite the drastic reduction in any difference in split Census places between the 2001 and 2011 plans, Morrison made no changes in his dramatic finding of a "smoking gun" he initially drew from the flawed data. In fact, he simply plugged the new numbers into his prior language with no qualification of explanation:

**Morrison Opening Expert Report, Benisek, paragraph 145, page 68**

"The post-redistricting increase in non-intact Census places (from 11% to 59% of all places) is a "smoking gun" that exposes motives beyond simply rebalancing total population."

**Morrison Supplemental Expert Report, Benisek, paragraph 9, page 3**

"The post-redistricting increase in non-intact census places (from 3% to 11% of all places) is a "smoking gun" that exposes motives beyond simply rebalancing the total population."

Dr. Morrison purports to have presented in his supplemental report the correct number of Census Places in CD6 under the two plans. Consistent with his opening report, however, he provides no citations or sources for his corrected counts. These counts *even after the corrections* are still erroneous based on the U.S. Census data, that lists the number of Census Places in Maryland and identifies the congressional districts in which they are wholly or partially contained

41

**CHART R10: CHANGES IN DR. MORRISON'S ASSESSMENT OF CENSUS PLACE SPLITS FIRST AND CORRECTED REPORT, MARYLAND 2001 AND 2011 CONGRESSIONAL REDISTRICTING PLANS**



under the 2001 and 2011 Maryland congressional plans. In fact, even Dr. Morrison's corrected data was still highly inaccurate.

Dr. Morrison identified 135 Census Places as within CD6 under the 2001 plan, compared to the 75, according to Census data. Dr. Morrison did not identify the source of the data, but he purported to use data from the 111th Congress while the 108th Congress was the data available from the Census on its public website. Therefore, the source of his data for the 111th Congress was unclear, and it is also unclear whether he was using the definitions of census designated places under the 2000 Census or whether he was using definitions of census designated places that would be used in the 2010 Census. The boundaries of census designated places change over time. *See* U.S. Census Bureau, "Geographic Boundary Change Notes, Maryland," https://www.census.gov/geo/reference/bndrychange/changenotedisplay.php.

The 108th Congress was therefore the appropriate comparator as the version of the data that was publicly available, as it contained the congressional district boundaries for the 2001 plan, and the census designated place definitions closest in time to the ones that would have been known to the 2001 map-drawers in Maryland. Data from a later Congress that Dr. Morrison purported to use may not match the Census Places at the time of the redistricting and therefore was misleading.

By using non-public information related to the 111th Congress without specifying the date of the census designated place definitions in his corrected data, Dr. Morrison identified 135 Census Places as within CD6 under the 2001 plan. As indicated in Table A3, and Chart R10, this compares to the correct 75 Census Places according to Census data. He thus overstated the number of 2001 Census Places in CD6 by 60, for *an increase of 80 percent*. In his corrected data, Morrison identified 122 Census Places as within CD6 under the 2011 plan, compared to 147 according to Census data. Thus, for the 2011 plan, he understated not overstated the number of Census Places by 26, *for a decrease of 17 percent*.

As indicated in Table A4, and Chart R11, Dr. Morrison's *overstatement* of the number of Census Places in CD6 under the 2001 plan in his corrected data, resulted in an *understatement* of the percentage of split Census Places of 3 percent, compared to a corrected 5 percent, for *an increase of 2 percent*. In contrast, Dr. Morrison's *understatement* of the number of Census Places in CD6 under the 2011 plan in his supplemental declaration, resulted in an *overstatement* of the percentage of split Census Places of 11 percent, compared to a corrected 9 percent, for *a decrease of 2 percent.* Thus, his opposite and compounding errors, even in his corrected data, resulted in an overstatement of the difference in split precincts of 8 percentage points, compared to a correct *de minimis* difference of just 4 percentage points.

**CHART R11: ERRORS IN MORRISON'S *CORRECTED* NUMBERS OF CENSUS PLACES FOR MARYLAND CONGRESSIONAL 2001 AND 2011 PLANS**



Dr. Morrison also included in his count of split Census Places in the 2011 plan places that are not split in any consequential way. That is, no persons or a minimal number of persons are included in one side of the split. For example, the most important splits that he identified are the only cities split between CD6 and CD8 in the 2011 plan: Frederick and Rockville (no district other than CD8 borders CD6). However, a declaration submitted by Shelly Aprill of the Planning Data Analysis Unit of the Maryland Department of Planning, indicated that the CD6 side of the Frederick City split *contained no population* and the CD8 side of the Rockville City split contained *only 4 persons*. Just the elimination of these two splits from Dr. Morrison's tally of 13 split Census Places in CD6 under the 2011 plan would have reduced the percentage of split Census Places from 9 percent to 7 percent, just 2 percentage points more than the percentage of CD6 splits under the 2001 plan.[30]

These errors demonstrate that Dr. Morrison's analysis is unreliable.

**Dallas County Texas: Challenge to 2011 County Commission District Plan: *Harding v. Dallas County*, U.S. District Court, Northern District, Texas, Case No. Civ. No. 3:15-CV-131-D**

In parallel with his analyses in the Maryland litigation, Dr. Morrison analyzed for this case split precincts within the 2011 districting plan for the Dallas County Commissioners' Court. Here, his aim was to show that a large number of splits within Census designated municipalities showed that the plan failed to represent to communities of interest. As in the Maryland litigation, his analysis was again marked by extreme, consequential errors that fundamentally impacted his conclusions.[31]

Dr. Morrison indicated in his report to the Dallas County Court that he "tentatively identified 16 separate instances where commissioner district boundaries appear to split the boundaries of established cities." Morrison was not equivocal about the important impact of this finding: He termed this number of city splits "indefensible." Map 1 below and the official Texas Legislative Council (TLC) report of split cities in the 2011 Dallas County Commissioners Court plan provided the necessary information to test Dr. Morrison's assessment in that case. This information summarized in Table R10 demonstrates that Dr. Morrison's tally of city splits in the Dallas County case was highly inaccurate. The Table evaluates descriptions of each of the 16 splits provided to defendants in Dr. Morrison's data disclosure for the Dallas County litigation. The results presented in Table R10 indicate that, upon correction, there were not 16 splits that involve exchanges of population in the 2011 plan, but only 9 such splits. For 6 of the 16 splits that Dr. Morrison identified, there was no exchange of population (splits #s 1,2,4,5,6, and 16). This includes one split (# 6) that involves only water, not people. The actual 9 splits were fewer than the 12 splits in his own alternative plan, drawn without any of the constraints incumbent on any political body.

---

[30] *Benisek v. Lamone*, Declaration of Shelly Aprill, June 29, 2017, p. 2.
[31] For a full explication see, *Harding v. Dallas County*, Rebuttal Report of Dr. Allan J. Lichtman, October 13, 2017.

**Table R10**
**Analysis of the 16 Splits of Cities in the 2011 Dallas County Commissioners Court**
**Redistricting Map Alleged in the Morrison First Report**

| Split Described in Morrison Data Disclosure | Analysis of the Purported Split |
|---|---|
| 1. District 3 reaching into Grand Prairie | **Error:** District 3 under the current map does not include any population from Grand Prairie. |
| 2. District 3 reaching into Grand Prairie a second time | **Error:** District 3 under the current map does not include any population from Grand Prairie. |
| 3. District 3 reaching into Southwest Dallas | **Correct** |
| 4. District 4 reaching down into Cedar Hill | **Error:** District 4 under the current map does not include any population from Cedar Hill. |
| 5. District 3 reaching up into Southwest Dallas | **Error:** The area identified is water, part of Joe Pool Lake, and does not include any population. |
| 6. District 1 reaching into Balch Springs | **Error:** District 1 does not include any population from Balch Springs. |
| 7. District 1 reaching into Mesquite | **Correct** |
| 8. District 3 reaching into Eastern Garland | **Correct** |
| 9. District 2 reaching from Rowlett into Southeast Garland | **Correct** |
| 10. District 2 avoiding Southern, Western, and Central Garland | **Correct:** With caveat that it is difficult to determine the exact meaning of "avoiding." |
| 11. District 1 reaching into Garland, but avoiding Eastern Garland | **Error:** Duplicates splits described in # 8 and #9. |
| 12. District 1 reaching into Richardson | **Correct** |
| 13. District 1 reaching west of Richardson into North Dallas | **Correct** |
| 14. District 2 reaching out of Farmers Branch into West Dallas | **Correct** |
| 15. District 2 reaching from Coppell and Addison into Irving | **Correct** |
| 16. District 2 reaching from Coppell and Addison into Irving | **Error:** District 4 does not include any population from Coppell. |
| | |
| Source: Maps and Texas Legislative Council (TLC) report of Split cities. | |

**Map 1**
**Overlay of County Commissioners Court Districts on Dallas County With Morrison Errors Circled**



Morrison's erroneous city splits were all documented in the TLC report of split precincts and circled in Map 1, above. (TLC reports are used in Texas litigation and are relied upon by federal courts). In addition, split # 11 duplicates splits #s 8 and 9. Thus, Dr. Morrison *inflated by 78 percent*, from 9 to 16, the number of splits in the 2011 Dallas County redistricting plan. Moreover, even the 9 alleged splits exaggerated the realistic tally of split cities in the current map, because they included splits in the city of Dallas. The City of Dallas had to be split in any County redistricting plan because its population is so large. According to the maps and the TLC split city report, there are only 5 city splits in the 2011 map (Garland twice, Irving, Mesquite, and Richardson).

Dr. Morrison also highlighted four city splits as of special significance in his report in the *Harding v. Dallas County* case:

"1. The northeastern portion of Irving (circled in red): An area has been amputated from this city and included instead in a different district (D2, shown in blue).

2. A tiny northern portion of Cockrell Hill (circled in red): This area has been amputated from this city and included as well in a different district (D2, shown in blue).

3. A southern part of Richardson (circled in red): This area has been amputated from this city and included instead in District 1, shown in brown.

4. A southeast portion of Garland (circled in red): This area has been separated off and included in District 2 (shown in blue)."

Morrison said in the Dallas County case that "This exchange of territory" had "the obvious effect of shifting predominately White areas within each city *into* Commissioner District 2" and "the obvious effect of shifting areas that are less heavily White *out* of District 2." These exchanges, he states, were indicative of a "packing" of whites into District 2. (p. 9, emphasis in original)

Once again, Dr. Morrison's analysis had a serious, consequential error. The results were not at all obvious. Cockrell Hill was not split at all. The red dot to which he referred on the map in his report was not a city split, but simply represented the residence of Dallas County Commissioner John Wiley Price, who is African American. Dr. Morrison failed to explain why he singled out the residence of the only African American member of the Commissioners' Court. Thus, one of the four alleged splits that Dr. Morrison highlighted as of special significance in his report does not exist.

Dr. Morrison indicated in his deposition in the Dallas County case that he had not fully checked or verified this crucial analysis of split precincts prior to submitting his report to the court in that case and concluding that the number of splits was "indefensible." He implausibly stated that even if his analysis was "completely flawed and misunderstood on my part," it wouldn't have changed his conclusion. As he testified at trial:

> **Morrison**: And I am still at a stage of needing to verify where those splits are. I've not completed that analysis. And I'm not entirely sure that all ·of

the splits that I've identified are where they appear to be.· And I'm not entirely sure I've perfectly approximated them.

**Question**: Isn't that though -- that analysis and process -- isn't that, sort of, the keystone to your conclusion that the enacted map split too many precincts or cities?

**Morrison**: It's not a keystone conclusion; it's a peripheral issue. I'm saying that -- well, let me put it this way. I haven't yet completed that analysis, so I'm going to say that analysis is still in the works. *My opinion would not change if that analysis proved to be completely flawed and misunderstood on my part in terms of the boundaries that I see.* (emphasis added)[32]

Even at the time of trial, Dr. Morrison did not produce a corrected and verified report of city splits. Referring back to his November 8, 2017 deposition, Dr. Morrison was asked the following at trial. As the expert analyzing Dr. Morrison's work in that case, I attended both the deposition and the trial:

**Question**: "And at some point did you produce a subsequent report that does accurately approximate them [City splits] and identify them and verify them for us. Isn't that true."

**Morrison**: "I didn't feel it was necessary to do any further --."

**Question**: "I'm sure you have an explanation, sir."

**Morrison**: "No I did not."

**Question**: "Did you produce a report or not?"

**Morrison**: "Pardon me."

**Question**: "Did you produce a report and provide us your verified list which you had not done on November 8?"

**Morrison**: No, I did not.[33]

In addition, there was the following relevant exchange:

**Question**: "Is there any quality social science journal that would produce this as a peer-reviewed work at the level that you've done at this point, unverified and unfinished?"

---

[32] *Harding v. Dallas County*, Deposition of Dr. Peter A. Morrison, p. 131, l. 19-22, 132, l. 1-14.
[33] *Harding v. Dallas County*, Trial Transcript, 16 April 2018, Vol. 2 Tr. at 26:9-219:5, p. 102, l. 12-22.

49

> **Morrison**: "Before I submitted it to a journal, which I intend to do, I would very likely want to take a look at these and verify them – or at least say the ones that I'm confident of now illustrate how one goes about identifying the statistical footprint of intent."
>
> **Question**: "The court was entitled to that courtesy?"
>
> **Morrison**: "I don't regard it as a courtesy. I regard it as a peripheral issue at this point from the court's standpoint."[34]

The only other issue I consider in response to the Morrison report in this litigation relates to his critical bottom-line conclusion. Based on his own construction of Census data, Morrison concludes that the two districts in the illustrative plan of Dr. Anthony E. Fairfax fall just short of the 50% threshold. Morrison writes on p.2 of his report: "Specifically, I obtain 49.99% for his District 1 (vs. Fairfax's 50.03%) and 49.96% for his District 2 (vs. Fairfax's 50.04%)." As a result, he claims that the illustrative plan fails to satisfy Prong One of the three-part *Gingles* test.

Even taking Dr. Morrison's results at face value, they fail to show that the Fairfax's illustrative plan fails to meet Prong One of the *Gingles* test, because Dr. Morrison is relying on 2013 – 2017 Census data, with a midpoint of 2015. What Dr. Morrison fails to acknowledge is that the percentage of the white population in Virginia Beach has been shrinking and the percentage of the minority population has been rising.

Table 3 of the Fairfax report demonstrates that from the Census estimates of 2008-2012, midpoint 2010, to the estimates of 2013-2017, midpoint 2015, the white CVAP of Virginia Beach shrank by 2.3 percentage points. In contrast, the combined black, Hispanic, and Asian CVAP rose by a 1.55 percent. If these trends are even roughly approximated over the next five years than even by Dr. Morrison's calculations districts at 49.99% and 49.96% combined black, Hispanic, and Asian CVAP (which round to 50%) would surely rise above the 50% mark by 2019 and 2020, the time of the next municipal election in Virginia Beach.

Population projections confirm the continuation of this trend toward greater diversity in Virginia Beach through a shrinking white percentage and a rising black, Hispanic, and Asian percentage. As indicated in Figure 1 below, the USA Today diversity index, computed by Proximity One for Virginia Beach, has been rising steadily and is projected to continue to rise through 2020 and beyond.[35]

Furthermore, in order to meet *Gingles* Prong 1, plaintiffs merely need to establish that minorities constitute a majority in *a* single member district.  Thus, an illustrative plan showing a substantial majority in at least one district would meet Prong 1. Moreover, Dr. Spencer has

---

[34] Ibid., p. 104, l. 4-15.
[35] Proximity One, USA Today Diversity Index, Virginia Beach, VA, http://proximityone.com/county_diversity_1960_2060.htm#diversity.

produced reconstituted election results showing minority voters would enjoy an effective opportunity to elect candidates of their choice under the illustrative plan's Districts 1 and 2.

**Conclusions:**

In sum, the Kidd report addresses only a limited number of the factors relevant to the totality of circumstances confronting minorities in Virginia Beach that were analyzed in my initial July 15, 2019 report. His consideration of the remaining factors fails to undermine any of the conclusions of my initial report. Even using his own standards, voting is clearly polarized along racial lines in Virginia Beach. The eight black candidates, garnering more than 50 percent of the black vote, for which Kidd concedes black voter cohesion, averaged 81.9 percent black voter support and 22.0 percent white voter support for a polarization level of 59.9 percent. In elections for 13 positions in which black candidates competed (excluding withdrawn candidate Burton) from 2008 to 2014 11 black candidates were the candidate of choice of black voters. Only 3 of these candidates prevailed and only one before the pendency of the lawsuit.

In numerous ways the unique hybrid system of electing members of the city council in Virginia Beach burdens minorities. The Kidd report ignores the unique use of numbered or designated posts in Virginia Beach. Such a system that precludes single-shot voting is a long established mechanism for discriminating against minorities and is unique to Virginia Beach among Commonwealth cities. Criticism of the system has long been covered in the local press. According to data that Kidd does not dispute, there are two other discriminatory features of the Virginia Beach electoral system. The city tied for second in the largest area and first in the largest population for campaigning for city council among 12 other large cities in the Commonwealth. The Kidd report concedes that the Illustrative Plan would reduce the geographic area and population for city council campaigning in Virginia Beach by 90 percent. The Illustrative Plan would move Virginia Beach to near the middle of the distribution in geographic area and near the bottom in population.

The Kidd report accepts contributions by candidates to other candidates as an informal form of slating and his standard of examining only intra-election contributions (although flawed) only strengthens the finding that such slating heavily favors white over black candidates. Seven white candidates and no black candidates competing for city council positions in Virginia Beach from 2008 to 2018 garnered contributions from two or more other intra-election candidates.

The Kidd report's attempt to diminish turnout differences between whites and the three minority groups in Virginia Beach is flawed by his reliance on self-reported statewide data, even though he had available the information needed to estimate white and minority turnout for Virginia Beach. Yet even his own source of statewide data, when properly analyzed shows that with one minor exception, turnout by all three minority groups trailed white turnout, a pattern that cannot be explained by chance variation. The Kidd report also ignores the information on statewide registration rates contained in his data disclosure. Examination of this data shows that all three minority groups universally trailed whites in their registration rates. The overall pattern cannot be explained by chance variation and half the differences for individual groups and years fell outside the margins of error. Examination of actual precinct-level turnout and demographic

51

data for the precincts of Virginia Beach provided in the Kidd data disclosure shows that black voters and other minority voters substantially lagged behind whites in voter turnout for Virginia Beach elections in 2018 and 2016.

Finally, the Kidd report acknowledges that the election of minorities to a governing body during the pendency of a lawsuit can be a special circumstance. However, his attempts to show otherwise for the elections of black candidates Rouse and Wooten in 2018 are unavailing. Contrary to Kidd's assertion, the lawsuit was covered widely in the local media well prior to the 2018 election. Prior to the election, it was a matter of commentary by members of the city council and the subject of a judicial order. Controversy over the system for electing members of the city council and proposed reforms had been a matter of lively controversy in the city long before the lawsuit. In addition, the Kidd report does not present any evidence to refute the findings of my July 15, 2019 report that as compared to all prior black candidates for city council, Rouse and Wooten received highly unusual support from both white donors and white voters -- standard indicia of special circumstances.

With respect to the Morrison report, any claims on his part should be regarded with caution given my recounting of the experiences when I was an opposing expert in the Maryland partisan gerrymandering and the Dallas County voting rights litigation. In addition, Dr. Morrison's claims about the failure of illustrative districts to reach the 50%+ combined black, Hispanic, and Asian threshold is fatally flawed by his failure to consider demographic trends within Virginia Beach showing a rising combined minority and a falling white share of the citizen voting age population.

**FIGURE 1 USA DIVERSITY INDEX, PROJECTIONS, VIRGINIA BEACH, PROXIMITY ONE**

VIRGINIA BEACH
*VA*



# APPENDIX

## APPENDIX I: OVERLAPPING CANDIDACIES, VIRGINIA BEACH CITY COUNCIL ELECTIONS, 2008-2018

November 4, 2008 General and Special Elections City of Virginia Beach - Official Results Mayor: John D. Moss Meyera E. Oberndorf W. D. Sessoms, Jr Scott W. Taylor

At Large: Georgia F. Allen Leona M. Shuler Keith J. Strausbaugh Lawrence J. Teator Rosemary A. Wilson

CENTERVILLE: Robert M. Dyer, Kempsville: Harry E. Diezel Jose P. Flores Iii Andrew R. Jackson Rose Hall: Glenn R. Davis Reba S. Mcclanan

November 2, 2010 General and Special Elections City of Virginia Beach - Official Results Member City Council - At Large: R S Bellitto J D Cabiness Ii B R Desteph Jr W W Erb A R Jackson J D Moss D S Redmond

BAYSIDE: G Furman Iii L R Jones, Beach: S J E Uhrin, Lynnhaven: J T Hedrick J L Wood, Princess Anne: T J Bullock B M Henley

Commonwealth of Virginia, 11/8/2011 - Election Results for 2011 November General: At Large: Dennis E. Free Mike P. Makala  John D. Moss Prescott Sherrod

November 6, 2012 General and Special Elections City of Virginia Beach - Official Results Mayor: Walter W. Erb Richard W. Kowalewitch W. D. Sessoms, Jr.

At Large: Kenny E. Golden, Rosemary A. Wilson

CENTERVILLE: Robert M. Dyer, KEMPSVILLE: Bill J. Dale Amelia N. Ross-Hammond C. L. Smith, A. M. Weeks, ROSE HALL: Glenn R. Davis, Jr. David M. McCormick

Commonwealth of Virginia Official Results 2014 November General, At Large: M. Ben Davenport George Furman III Brad D. Martin John D. Moss

BAYSIDE: Louis R. Jones, BEACH: John E. Uhrin, LYNNHAVEN: James L. Wood, PRINCESS ANNE: Pieri E. Burton Barbara M. Henley, ROSE HALL: Beatrice R. "Petey" Browder James D. Cabiness II Stephen A. Johnston Shannon D.S. Kane

COMMONWEALTH OF VIRGINIA Official Results 2016 November General, Mayor: George Furman III (I) Richard W. "RK" Kowalewitch (I) W. D. "Will" Sessoms, Jr. A. M. "Don" Weeks

54

At Large: Dane U. Blythe Courtney L. LaLonde Rosemary A. Wilson Pam D. Witham,

CENTERVILLE: Robert M. "Bobby" Dyer, KEMPSVILLE: Jessica P. Abbott Amelia N. Ross-Hammond, ROSE HALL: Robert K. Dean Shannon D. S. Kane


COMMONWEALTH OF VIRGINIA Official Results, 2018 November General, Mayor: M. Ben Davenport Robert M. "Bobby" Dyer

At Large: Linda M. Bright  Garry B. Hubbard John D. Moss Dee B. Oliver Aaron R. Rouse Allison M. White

BAYSIDE: Louis R. Jones Brad D. Martin, BEACH: John E. Coker Richard W. "RK" Kowalewitch David Nygaard  John E. Uhrin, CENTERVILLE: C. Conrad Schesventer II Sabrina D. Wooten Eric V. Wray, Jr, LYNNHAVEN: Susanne M. Henderson Michael P. "Mike" Maskell James L. "Jim" Wood, PRINCESS ANNE: Pieri Evan Burton Barbara M. Henley Karen B. Kwasny Tim P. Worst

Source: Virginia Beach, Election Information & Results, https://www.vbgov.com/government/departments/voter-registrar/elections/pages/default.aspx

**APPENDIX II: TABLES INDICATING MORRISON ERRORS IN _BENISEK V. LAMONE_.**

**TABLE A1**
**DATA IN MORRISON OPENING REPORTED COMPARED TO DATA IN SUPPLEMENTAL DECLARATION**

| Number of Census Places in CD6 in Maryland's 2001 Congressional Plan | | | |
|---|---|---|---|
| | | | |
| **Morrison Supplemental Declaration** | **Morrison Opening Report** | **Difference in Number** | **Difference in Percent** |
| | | | |
| 100 | 35 | **100** | **+286%** |
| | | | |
| **Number of Census Places in CD6 in Maryland's 2011 Congressional Plan** | | | |
| | | | |
| **Morrison Supplemental Declaration** | **Morrison Opening Report** | **Difference in Number** | **Difference in Percent** |
| | | | |
| 122 | 122 | **100** | **+455%** |
| | | | |
| Sources: Morrison Opening Report, Table 3, p. 67; Morrison Supplemental Declaration, Unnumbered Table, p 3. | | | |

**TABLE A2**
**THE PERCENTAGE OF SPLIT PRECINCTS IN THE 2001 AND 2011 CONGRESSIONAL PLANS,**
**MORRISON SUPPLEMENTAL DECLARATION COMPARED TO CORRECT DATA**

| Morrison Opening Report | | | | | | |
|---|---|---|---|---|---|---|
| # of Census Places 2001 Plan | # of Split Places 2001 Plan | % of Split Places 2001 Plan | # of Census Place 2011 Plan | # of Split Places 2011 Plan | % of Split Places 2011 Plan | Difference In Percentage Points |
| | | | | | | |
| 35 | 4 | 11% | 22 | 13 | 59% | +48% |
| | | | | | | |
| Morrison Supplemental Declaration | | | | | | |
| | | | | | | |
| # of Census Places 2011 Plan | # of Split Places 2001 Plan | % of Split Places 2001 Plan | # of Census Place 2011 Plan | # of Split Places 2011 Plan | % of Split Places 2011 Plan | Difference In Percentage Points |
| | | | | | | |
| 135 | 4 | 3% | 122 | 13 | 11% | +8% |
| | | | | | | |
| Sources: Morrison Opening Report, Table 3, p. 67; Morrison Supplemental Declaration, Unnumbered Table, p 3. | | | | | | |

**TABLE A3**
**DATA IN MORRISON SUPPLEMENTAL DECLARATION COMPARED TO
CORRECTED DATA**

| Number of Census Places in CD6 in Maryland's 2001 Congressional Plan | | | |
|---|---|---|---|
| **Data From Census Report** | **Data in Morrison Supplemental Declaration** | **Difference in Number** | **Difference in Percent** |
| 75 | 135 | **60** | **+80%** |

| Number of Census Places in CD6 in Maryland's 2011 Congressional Plan | | | |
|---|---|---|---|
| **Data From Census Report** | **Data in Morrison Supplemental Declaration** | **Difference in Number** | **Difference in Percent** |
| 147 | 122 | **25** | **-17%** |

Sources: Morrison Supplemental Declaration, Unnumbered Table, p 3; MARYLAND CONGRESSIONAL DISTRICTS BY PLACE," 108th Congress, https://www2.census.gov/geo/relfiles/cd108th/MD/plc_c8_24.txt; ; MARYLAND CONGRESSIONAL DISTRICTS BY PLACE," 113th Congress, https://www2.census.gov/geo/relfiles/cdsld13/24/pl_cd_24.txt.

3

**TABLE A4**
**PERCENT OF SPLIT CENSUS PLACES: DATA IN MORRISON SUPPLEMENTAL DECLARATION COMPARED TO CORRECTED DATA**

| Data in Morrison Supp. Declaration 2001 Plan | | Corrected Data 2001 Plan | | Comparison |
|---|---|---|---|---|
| # of Census Places | % of Split Census Places (4/135) | # of Census Places | % of Split Census Places (4/75) | Difference |
| | | | | |
| 135 | 3% | **75** | **5%** | **+2%** |
| | | | | |
| | | | | |
| # of Census Places | % of Split Census Places (13/122) | # of Census Places | % of Split Census Places (13/147) | Difference |
| | | | | |
| 122 | 11% | **147** | **9%** | **-2%** |
| | | | | |
| Sources: Morrison Supplemental Declaration, Unnumbered Table, p 3; MARYLAND CONGRESSIONAL DISTRICTS BY PLACE," 108th Congress, https://www2.census.gov/geo/relfiles/cd108th/MD/plc_c8_24.txt; ; MARYLAND CONGRESSIONAL DISTRICTS BY PLACE," 113th Congress, https://www2.census.gov/geo/relfiles/cdsld13/24/pl_cd_24.txt. | | | | |