**IN THE UNITED STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF VIRGINIA
NORFOLK DIVISION**

| | |
|---|---|
| **Latasha Holloway,** *et al.***,** | |
| **Plaintiffs,** | |
| | **Civil Action No. 2:18-cv-0069** |
| **v.** | |
| **City of Virginia Beach,** *et al.***,** | |
| **Defendants** | |

**PLAINTIFFS' BRIEF IN OPPOSITION TO DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT**

# PLAINTIFFS' EXHIBIT 5
Deposition Transcript of Dr. Quentin Kidd



# Transcript of Quentin Kidd, Ph.D.

**Date:** September 25, 2019
**Case:** Holloway, et al. -v- City of Virginia Beach, et al.

**Planet Depos**
**Phone:** 888.433.3767
**Email::** transcripts@planetdepos.com
**www.planetdepos.com**

WORLDWIDE COURT REPORTING & LITIGATION TECHNOLOGY

```
 1            IN THE UNITED STATES DISTRICT COURT

 2           FOR THE EASTERN DISTRICT OF VIRGINIA

 3                    NORFOLK DIVISION

 4    -------------------------------x

 5    LATASHA HOLLOWAY and           :

 6    GEORGIA ALLEN,                 :

 7                  Plaintiffs,   :    CASE NO.

 8    v.                            :    2:18cv00069

 9    CITY OF VIRGINIA BEACH, et al.,:

10                  Defendants.   :

11    -------------------------------x

12

13

14         Deposition of QUENTIN KIDD, Ph.D.

15            Virginia Beach, Virginia

16          Wednesday, September 25, 2019

17                    9:35 a.m.

18

19

20    Job No. 261911

21    Pages 1 - 152

22    Reported by:  Penny C. Wile, RPR, RMR, CRR
```

1          Deposition of QUENTIN KIDD, Ph.D., held at

2    the offices of:

3

4

5          VIRGINIA BEACH CITY ATTORNEY

6          2401 Courthouse Drive

7          Municipal Center, Building One

8          Room 260

9          Virginia Beach, VA 23456

10         (757)385-4351

11

12

13

14

15

16

17          Pursuant to Notice, before Penny C. Wile,

18    RPR, RMR, CRR, Notary Public of the Commonwealth

19    of Virginia.

20

21

22

```
 1              A P P E A R A N C E S

 2   ON BEHALF OF THE PLAINTIFFS, LATASHA HOLLOWAY

 3   AND GEORGIA ALLEN:

 4        J. GERALD HEBERT, ESQUIRE

 5        CAMPAIGN LEGAL CENTER

 6        1101 14th Street NW

 7        Suite 400

 8        Washington, DC 20005

 9        (202)736-2200

10           and

11        ANNABELLE E. HARLESS, ESQUIRE

12        CAMPAIGN LEGAL CENTER

13        73 W. Monroe Street

14        Suite 302

15        Chicago, IL 60603

16        (312)561-5508

17

18

19

20

21

22
```

1            A P P E A R A N C E S

2    ON BEHALF OF THE DEFENDANTS, CITY OF VIRGINIA

3    BEACH, ET AL.:

4          CHRISTOPHER S. BOYNTON, ESQUIRE

5          GERALD L. HARRIS, ESQUIRE

6          JOSEPH M. KURT, ESQUIRE

7          OFFICE OF THE VIRGINIA BEACH CITY ATTORNEY

8          2401 Courthouse Drive

9          Municipal Center, Building One

10         Room 260

11         Virginia Beach, VA 23456

12         (757)385-4351

13

14

15

16

17

18

19

20

21

22

1                    C O N T E N T S

2    EXAMINATION OF QUENTIN KIDD, Ph.D.        PAGE

3          By Ms. Harless                      6

4

5

6

7

8                    E X H I B I T S

9    KIDD DEPOSITION EXHIBIT                   PAGE

10   Exhibit 1    Report, August 12, 2019      27

11   Exhibit 2    Diagram                      107

12   Exhibit 3    Excel spreadsheet            134

13

14

15

16

17

18

19

20

21

22

```
1                P R O C E E D I N G S

2   Whereupon,

3                QUENTIN KIDD, Ph.D.,

4   after having been first duly sworn, was examined

5   and did testify under oath as follows:

6    EXAMINATION BY COUNSEL FOR THE PLAINTIFFS:

7   BY MS. HARLESS:

8       Q. Good morning, Mr. Kidd.  My name is

9   Annabelle Harless, and I'm an attorney for the

10  plaintiffs in this case.  And I'm going to be

11  asking you some questions today.

12      A. Okay.

13      Q. Have you ever been deposed before?

14      A. This is the first time.

15      Q. Okay.  So we'll go over a few ground

16  rules.  And you can let me know if you have any

17  questions.

18      A. Okay.

19      Q. The court reporter is writing down

20  everything that we say here today.  So that she

21  can get everything on the record, make sure that

22  you wait for me to finish asking my questions
```

1    before you start answering, and I'll wait for you

2    to finish your answer before I ask you the next

3    question, so that we don't talk over one another.

4        A. Okay.

5        Q. The court reporter can only record verbal

6    responses, so it's important that you don't nod

7    or -- that you answer yes or no or with a verbal

8    answer.

9        A. Okay.

10       Q. And we can take a break at any time.  I

11   only ask that you answer the question that's

12   pending before we take a break.

13       A. Okay.

14       Q. Does that make sense?

15       A. Yep.

16       Q. Could you please state your full name for

17   the record?

18       A. Quentin Kidd.  No middle initial.

19       Q. Do you understand you're under oath today?

20       A. I do.

21       Q. And is there any reason why you can't

22   truthfully answer my questions today?

1      A. None.

2      Q. When were you first retained as an expert

3   witness in this case?

4      A. Sometime mid-July.  I don't know that I

5   can remember the exact date.  I think July 12th,

6   actually.

7      Q. July 12th, 2019?

8      A. Correct.  2019.

9      Q. Were you contacted before that or is that

10  the date you signed a retainer agreement?

11     A. I was probably contacted two or three days

12  before that, had a phone conversation with Chris,

13  and --

14     Q. Don't tell me about the content of that

15  conversation.

16     A. No.  No.  I'm just saying I had a phone

17  conversation with Chris.  And, then, some point --

18  some days later I signed a contract.  I can't tell

19  you the exact dates.

20     Q. What is your understanding of the scope of

21  the work you were assigned to do in this case?

22     A. To review two expert reports, from

1    Dr. Spencer and Dr. Lichtman, and provide

2    responses to those.

3        Q. Anything else that you can think of?

4        A. Well, I had to agree to be available

5    throughout the entirety of this case, so...

6        Q. Have you signed a retention agreement

7    regarding your work on this case?

8        A. That's what the agreement was, right?

9    Isn't that --

10       Q. I'm asking you if you've ever signed a

11   retention agreement?

12       A. As a part of this case?

13       Q. Yes.

14       A. The contract that I signed?  Is that what

15   you mean?

16       Q. Most likely, yes.

17       A. Yes.  Okay.  Yes.

18       Q. Okay.  And do you still have a copy of

19   that retention agreement?

20       A. I do.

21       Q. Do you submit invoices regarding your work

22   in this case?

Transcript of Quentin Kidd, Ph.D.
Conducted on September 25, 2019                    10

```
 1          A. I do.  I have.

 2          Q. Who do you submit those to?

 3          A. I submitted them to Chris or I submitted

 4     one.  I've only submitted one invoice.

 5          Q. Has that invoice been paid?

 6          A. Yes.

 7          Q. And you're being paid $225 per hour for

 8     review and preparation of your report, correct?

 9          A. Correct.

10          Q. About how many hours have you spent

11     working on this case so far?

12          A. Sixty.  Somewhere between 60 and 70.

13          Q. And how much have you been paid for your

14     work on this case so far?

15          A. Around $20,000.

16          Q. And you're billing about $275 per hour for

17     your deposition time and attendance, correct?

18          A. Correct.

19          Q. So you'll be billing for your time at this

20     deposition today, right?

21          A. Correct.

22          Q. Are you going to bill for your time to
```

Transcript of Quentin Kidd, Ph.D.
Conducted on September 25, 2019                          11

1    travel to this deposition?

2        A. Mileage.  I live locally, so there is

3    really little time involved in traveling.

4        Q. Where do you live?

5        A. I live in Newport News.

6        Q. Is there any kind of cap on your fees?

7        A. Not that I'm aware of.  I don't remember

8    there being a cap in the agreement that I signed.

9        Q. You are currently a Professor of Political

10   Science at Christopher Newport University,

11   correct?

12       A. Correct.

13       Q. What is your current salary at Christopher

14   Newport University?

15       A. 100 and about 57,000.  I'm actually a

16   Dean.  So the salary is a little bit higher

17   because I'm a Dean.

18       Q. And you're, also, currently the Director

19   of the Wason Center for Public Policy?

20       A. Wason.

21       Q. The Wason Center for Public Policy?

22       A. Correct.

Transcript of Quentin Kidd, Ph.D.
Conducted on September 25, 2019                    12

1      Q. What is your current compensation at the

2   Wason Center?

3      A. I receive no compensation.  It's just a

4   part of my -- my regular academic assignment at

5   the University.

6         MR. HARRIS:  Dr. Kidd, will you spell

7   Wason for us?

8      A. W-A-S-O-N.  It's pro -- it's Wason instead

9   of Wayson because the Wasons are a Northeastern

10  Massachusetts family that pronounces it Wason.

11     Q. Do you have any other sources of income

12  besides your salary from Christopher Newport

13  University or your work as an expert in this case?

14     A. I do not.

15        Oh.  You know what?  Let me back up.  I

16  own a rental property, so I do -- I do have income

17  that comes from that rental property.

18     Q. And you've never been an expert witness

19  before, correct?

20     A. Never.

21     Q. Why did you decide to become an expert

22  witness in this case?

1      A. Because it's a local -- it's a local case.

2    So I've spent -- I've been at Christopher Newport

3    University for about 23 years.  I've spent nearly

4    25 years studying Virginia politics and Hampton

5    Roads politics, so I'm very familiar with, you

6    know, politics in the region, and I do a lot of

7    studying and analysis on it, and it's a local

8    case, so I had some expertise to lend to it.

9      Q. Since you've never been an expert before,

10   how did you decide to set your hourly rates at 225

11   and $275 an hour?

12     A. So there was a -- there was a case --

13   there was a situation about four or five years ago

14   where I had -- I had started to work with an

15   attorney in Roanoke on a case that never get filed

16   or anything like that.  We just began exploring

17   whether there was a case.  It was a state-related

18   case.  And in conversations with them, that rate

19   is what we were going to agree to if we went

20   forward.  We never went forward.  And so I used

21   that as my baseline.

22     Q. What year was that?

Transcript of Quentin Kidd, Ph.D.
Conducted on September 25, 2019                    14

1      A. This would have been -- I think this would

2  have been -- this would have to have been five,

3  six years ago.

4      Q. And what was that case about?

5      A. It was about -- it was a redistricting

6  case.  And the attorney that came to me to talk to

7  me about it came to me because I had -- I had

8  organized a redistricting competition in Virginia

9  among high school -- college students, and so he

10  thought that I had some knowledge of the

11  redistricting process in Virginia.

12          So it really -- it really was several

13  hours of conversation that never went anywhere,

14  so...

15      Q. The case was not filed?

16      A. No.  No.

17      Q. Was the case challenging an at-large

18  method of election?

19      A. No.

20      Q. Did the case have anything to do with

21  Section 2 of the Voting Rights Act?

22      A. It would have, yes.

1     Q. Can you explain how it would have?

2     A. Well, it was a -- it was a minority -- it

3 was a majority minority -- it was a case that

4 looked at whether there were enough -- it would

5 have been a case that would have looked at whether

6 there were enough African American voters in

7 Roanoke to create a majority minority district at

8 the state level.

9     Q. For the General Assembly?

10    A. For the General Assembly, House of

11 Delegates.

12    Q. Was there currently a majority minority

13 district in that area?

14    A. No.

15    Q. So the lawsuit would have been a challenge

16 under Section 2 of the Voting Rights Act?

17    A. If it had been filed, yes.

18    Q. Did you -- in your discussions about that

19 case, did you ever perform any analyses about

20 racially polarized voting?

21    A. No.  It never got -- literally, it

22 never -- it went -- it never went to the point of

Transcript of Quentin Kidd, Ph.D.
Conducted on September 25, 2019                    16

 1    any analysis being done at all.  It never went

 2    beyond, literally, discussions.

 3        Q. Why not?

 4        A. Because -- I don't know, honestly.  It was

 5    their decision not to do it.  They just -- my

 6    discussions with them involved would I be willing

 7    to support them in that case.  This is the larger

 8    parameters that they were looking at.  And that

 9    was it.  I mean, it never went forward.

10        Q. And you mentioned earlier that you

11    organized a redistricting competition among

12    students?

13        A. Correct.

14        Q. Could you tell me a little bit more about

15    that?

16        A. Yeah.  It was -- so it was an educational

17    endeavor.  We were trying to encourage students to

18    pay attention to redistricting and understand the

19    redistricting process in Virginia.  And so we --

20    we -- we worked -- we worked -- we, literally,

21    tried to get every college and university in

22    Virginia to put forward a team.  And we wanted

Transcript of Quentin Kidd, Ph.D.
Conducted on September 25, 2019                    17

```
1    them -- each team to draw House of Delegate and
2    State Senate maps in time for the General Assembly
3    to be able to consider those maps when they were
4    working on redistricting.
5         And so we ended up raising I don't
6    remember how much money because we wanted to give
7    prizes for the first and second place winners of
8    those -- of that competition.  So we probably had
9    17 teams from different colleges and universities
10   around Virginia that submitted maps of -- either
11   one map or sets of maps.  And we had two judges,
12   whose names I'm drawing a blank on now.  Mann.
13   Anyway, I'm totally drawing blanks on their names.
14        But, anyway, we had these two judges who
15   judged the maps and declared winners.  There was a
16   set of criteria that we had sent the teams.  And
17   some of the teams actually -- some of the teams
18   actually were invited to testify in front --
19   before the General Assembly about their maps.  So
20   it was totally an educational project.
21      Q. What were the criteria?
22      A. I do not remember.  The criteria were
```

1    essentially the criteria the General Assembly had

2    laid out for its redistricting competition or --

3    for its redistricting process, but I can't tell

4    you the exact criteria here.

5         Q. As part of that competition, did you do

6    any kinds of training for students on the Voting

7    Rights Act?

8         A. No.  What we did is we required every team

9    to have a faculty mentor.  And it was up to the

10   faculty mentor to provide any teaching or guidance

11   that the team needed.

12        Q. And you didn't submit a map as part of

13   that competition, correct?

14        A. I did not, no.

15        Q. And you didn't perform any kind of

16   racially polarized voting analyses?

17        A. No.  I didn't perform any analysis.

18        Q. A moment ago we were talking about the

19   potential Roanoke case, correct?  Who was the

20   attorney that contacted you about that case?

21        A. I knew you were going to ask that.  I

22   cannot remember.  I cannot remember his name.  He

Transcript of Quentin Kidd, Ph.D.
Conducted on September 25, 2019                                    19

1    was a recently retired attorney.  I just don't

2    remember his name.

3         Q. Do you remember where he was based?

4         A. I think Roanoke.

5         Q. And do you remember what he said when he

6    reached out to you?

7         A. He reached out to me because of the

8    redistricting competition.  So that was his reason

9    for reaching out to me.

10        Q. Did the attorney contact you on behalf of

11   a political party?

12        A. No.

13        Q. Do you know why he was interested in

14   bringing the case?

15        A. I actually don't.  I just -- I just can

16   tell you what he -- he reached out to me because

17   of that redistricting competition.  We had a

18   couple hours of conversation back and forth about

19   what he was thinking about trying to do, and that

20   was it.  Several months of no communication, and

21   then he let me know that they weren't going

22   forward with it.

Transcript of Quentin Kidd, Ph.D.
Conducted on September 25, 2019                    20

```
1        Q. Did you put him in contact with anyone
2    else about the case?
3        A. No.
4        Q. And when you said he let me know they
5    weren't going forward with it, was there anyone
6    else associated with that matter besides him?
7        A. Well, I say they because I'm thinking of
8    his law firm.
9        Q. Okay.  Did you speak with anyone besides
10   the defendants' attorneys in preparation for this
11   deposition?
12           MR. HARRIS:  I object to the extent it
13   calls for litigation work product with other
14   experts.
15       Q. Yes or no?
16       A. Only people that were involved in the
17   case.  I never talked about it with anybody that
18   wasn't involved in the case.
19       Q. So you communicated with Peter Morrison
20   about this deposition?
21           MR. HARRIS:  Object as attorney work
22   product and litigation work product.  And I'm
```

1    instructing him not to answer that question.

2           MR. HEBERT:  Can we go off the record for

3    a second?

4           (A discussion was held off the record.)

5           (A recess was taken.)

6      Q. Outside of the presence of counsel have

7    you ever communicated in any way with Peter

8    Morrison?

9      A. No.

10     Q. Ever?  Not even about this case?

11     A. (Moved head from side to side.)

12          MR. BOYNTON:  You need to respond

13   verbally.

14     A. No.  The first time I ever communicated

15   with Peter Morrison was in a group conversation.

16     Q. Outside of the presence of counsel, have

17   you ever communicated in any way with Kimball

18   Brace?

19     A. No.

20     Q. Did you communicate in any way with any of

21   your colleagues at Christopher Newport University

22   about this case?

Transcript of Quentin Kidd, Ph.D.
Conducted on September 25, 2019                    22

1        A. No.

2            Let me back up.  I did have to get

3    permission from my Provost to be able to be a

4    consultant on this case, and so I did have to ask

5    for permission.  So if you consider that

6    communication about the case, then the answer is

7    yes, but it was just to get permission to do this.

8        Q. And besides that, no other communication

9    about this case?

10       A. No.

11       Q. Have you ever talked with any Virginia

12   Beach City Council members or the Mayor about this

13   case?

14       A. No.

15       Q. Besides attorneys for the defendants, have

16   you ever talked to anyone else about this case?

17       A. Besides attorneys for the defendants?

18           MR. BOYNTON:  He's already testified about

19   who he talked to, counselor.

20       Q. Besides those conversations with attorneys

21   for the defendants or conversations where counsel

22   and experts were present, have you ever talked to

Transcript of Quentin Kidd, Ph.D.
Conducted on September 25, 2019                23

1    anyone else about this case?

2       A. Yes.

3       Q. Who?

4       A. My wife, for one.  And I had a -- this

5    is -- so I --

6          MR. BOYNTON:  I'll put on the record there

7    is a non-testifying expert consultant that we have

8    spoken with.  I don't believe that is

9    discoverable.  He can answer that, whether he

10   talked to that person or not.  I'd prefer to keep

11   the rest of it under the privilege.

12         MS. HARLESS:  So I'm just going to ask him

13   who the consultant was and not ask anything else.

14         MR. BOYNTON:  I understand.

15      Q. Have you -- my understanding is that there

16   is a non-testifying consultant in this case,

17   correct?

18      A. Correct.

19      Q. Who is that individual?

20      A. Chuck Bullock.

21      Q. Can you spell that name?

22      A. B-U-L-L-O-C-K.

Transcript of Quentin Kidd, Ph.D.
Conducted on September 25, 2019                         24

1       Q. Besides Chuck Bullock and your wife and

2   attorneys for the defendants and any conversations

3   you had with experts and attorneys present, have

4   you talked to anyone else about this case?

5       A. No.

6       Q. Have you reviewed the expert report

7   prepared by Peter Morrison for defendants in this

8   case?

9       A. I mean, I did look over it.  I didn't

10  review -- I didn't in such detail that I could

11  repeat it to you line-by-line here.

12      Q. But you read it?

13      A. Yes.

14      Q. Did you read the original expert report of

15  plaintiffs' expert, Tony Fairfax, in this case?

16      A. I reviewed it.  I would not say that I

17  read it.  I reviewed it.

18      Q. What do you mean when you say you reviewed

19  it?

20      A. Something similar to the graduate school

21  skim, if you're familiar with that.

22      Q. So you skimmed it?

1       A. Yes.

2       Q. Have you reviewed any of the three

3   rebuttal reports prepared by plaintiffs' experts

4   in this case?

5           MR. HARRIS:   Object to foundation and

6   form.

7           You can answer.

8       Q. Do you understand the question?

9       A. Just repeat.

10      Q. Have you reviewed any of the three

11  rebuttal reports prepared by plaintiffs' experts

12  in this case?

13      A. The Lichtman report and the Spencer

14  report?

15      Q. The rebuttal -- the second report?

16      A. Yes.

17      Q. You have?

18      A. Yes.

19      Q. Did you also read the second report by

20  Tony Fairfax?

21      A. Skimmed.

22      Q. Did you skim the Spencer report?

Transcript of Quentin Kidd, Ph.D.
Conducted on September 25, 2019                    26

1        A. I read the Spencer report.

2        Q. Did you skim the Lichtman report?

3        A. I read the Lichtman report.

4        Q. When did you read the Spencer report?

5        A. Probably the evening, into the next day,

6    after it was sent -- sent to me by Chris.

7        Q. So around August 26th?

8        A. (Moved head up and down.)

9        Q. When did you --

10       A. That would be correct, yeah.

11       Q. When did you read the Lichtman report?

12       A. Similar timeframe.  I mean, I read both of

13   those reports within the day or two after they

14   were sent.

15       Q. Besides reviewing plaintiffs' experts'

16   rebuttal reports, have you done any other work for

17   the defendants on this case since submitting your

18   report?

19       A. No.

20       Q. Do you envision doing any analysis of the

21   Spencer or Lichtman rebuttal reports?

22       A. No.

Transcript of Quentin Kidd, Ph.D.
Conducted on September 25, 2019                    27

```
1         Q. I am going to mark this as Exhibit 1.  It

2    is your expert report.

3                        (Exhibit 1 was marked and

4                         attached to the transcript.)

5         Q. Dr. Kidd, you've just been handed what has

6    been marked as Exhibit 1.  Have you seen this

7    document before?

8         A. I have.

9         Q. What is it?

10        A. It is my expert report in response to the

11   Spencer and Lichtman reports.

12        Q. And I'll give you a second, if you just

13   want to look through and make sure it's a complete

14   copy.

15        A. It does look to be complete to me.

16        Q. All right.  I'd like you to turn to page

17   44 of Exhibit 1 which is labeled Appendix B.  This

18   is your CV, correct?

19        A. It is.

20        Q. Is this your most recent CV?

21        A. This is probably -- I mean, it is.  I

22   probably updated it sometime in late July or
```

1    August.

2        Q. All right.  Any updates that you can think

3    of that need to be added to this?

4        A. I will tell you exactly.  So on page 47,

5    Refereed Journal Articles and Book Chapters,

6    Double-blind reviewed articles on Politics (11),

7    the 2019 pending has a publication date and a

8    volume number and a page number, so -- so this

9    must be my -- July -- so sometime in mid-August

10   that got -- sometime in late August, actually,

11   that got published.

12       Q. So that was published in August 2019?

13       A. Right.  So there is a volume and a page

14   number, and the pending would be taken off, so...

15       Q. Anything else?

16       A. No.

17       Q. Any corrections that need to be made to

18   this CV?

19       A. None that I know of.

20       Q. All right.  Do you currently teach any

21   classes at Christopher Newport University?

22       A. I do.  I teach a summer class.  During the

1   academic year my administrative duties are too

2   heavy to teach class.

3       Q. Is the summer class that you teach an

4   undergraduate or a graduate course?

5       A. Undergraduate.

6       Q. What is it?

7       A. It is an Honors program course called The

8   Good Society.

9       Q. What is that class about?

10      A. It looks at -- it's an interdisciplinary

11  course.  We have students from all majors in the

12  Honors program.  And it looks at the role of

13  various Liberal Arts disciplines and their

14  influence on making society better.  So, you know,

15  what about Music improves our quality of life?

16  What about Philosophy?  What about Chemistry?  So

17  that's really what the course is about.

18      Q. When was the last time you taught classes

19  during the fall or winter semesters?

20      A. Probably five years ago I became a Vice

21  Provost.  So just to look at my CV.  So the fall

22  of 2014 would be the last time I taught regularly

Transcript of Quentin Kidd, Ph.D.
Conducted on September 25, 2019                    30

1   during a semester because in the fall of 2014 I

2   became Vice Provost of the University.  And that's

3   a point where the administrative duties become

4   too -- too heavy.

5       Q. So the last time you were teaching in the

6   fall semester, what classes were you teaching?

7       A. Fall of 2014 would have been probably a

8   Political Campaigns and Elections class and a --

9   or a Political Behavior class, and Research

10  Methods class, both undergraduate.  All three

11  undergraduate.

12      Q. Have you ever taught graduate courses?

13      A. I taught, about 20 years ago -- maybe, 18,

14  20 years ago I taught a graduate level Research

15  Methods class for a Public Administration program.

16  Taught one, and then -- and, then, that was it.

17      Q. Generally, what was the Political

18  Campaigns and Elections course about?

19      A. Just the basic structure of the way we run

20  elections and campaigns in the United States,

21  history of the development of campaigns and

22  elections in the United States, how candidates

1  organize campaigns, nuts and bolts type stuff,

2  fundraising, all that kind of stuff, the role of

3  consulting firms in politics these days, that kind

4  of stuff.

5      Q. And, generally, what was the Political

6  Behavior class about?

7      A. Political Behavior class was really a

8  class that looked at the evolution of the

9  discipline of Political Science, you know, sort of

10  marking the middle of the -- marking the '60s,

11  '70s as a time when our primary method of analysis

12  shifted from case study and descriptive to more

13  analytic and predictive efforts to understand

14  individualized behavior and its influence on the

15  political process, that sort of thing.

16      Q. And what was the Research Methods class

17  about, briefly?

18      A. Just the first half of the semester is

19  sort of a theory class, you know, how we got to

20  where we are with our methods.  The second half of

21  the semester is actually a practice class,

22  teaching students how to conduct bivariate,

1    multivariate regression analysis, and teaching

2    them some software programs like SPSS or Stata.

3        Q. Have you ever taught any classes that

4    discuss the Voting Rights Act?

5        A. So -- yeah.  I haven't done this in a

6    while, but 10, 15 years ago I taught Judicial

7    Process a few times.  And I've done Con Law a

8    couple times in the past.  As our department grew,

9    we ended up hiring people with the expertise in

10   those areas, so -- so I stopped teaching them.  So

11   I would call that surface level, not anything as

12   deep as, say, a Campaigns and Elections class or a

13   Political Behavior class.

14       Q. Do you have a J.D.?

15       A. I do not.

16       Q. What did you discuss about the Voting

17   Rights Act in the Judicial Process class?  Do you

18   remember?

19       A. We're going back a dozen years.  I

20   couldn't tell you exactly.

21       Q. Same answer for the Con Law class?

22       A. Yeah.  I mean, it's -- yeah.  We're going

1   back 12 or 15 years on those.

2       Q. Have you ever taught any classes that

3   discussed racially polarized voting specifically?

4       A. No.

5       Q. Have you ever taught any classes that

6   discussed redistricting?

7       A. Not redistricting as a class but

8   redistricting in the context of Intro to American

9   Politics.  And the Political Campaigns and

10  Elections class would have talked about

11  redistricting, especially around redistricting

12  time.

13      Q. What would you have discussed about

14  redistricting in the Political Campaigns and

15  Elections class?

16      A. So probably we would have been focusing on

17  the arguments about redistricting, for one.  And,

18  then, secondly, I would have probably spent some

19  time on how redistricting has become much more

20  lethal as a political tool in the age of big data

21  analysis and computers.  So it would have been

22  that -- those two general, kind of, conversations.

1       And, then, we probably would have

2   discussed the redistricting debates in Virginia

3   because those would have been around the time of

4   redistricting.  And I do Virginia politics, so I

5   probably would have talked about that.

6       Q. And you referenced one of the things that

7   you talked about is arguments regarding

8   redistricting?

9       A. Yeah.  The political debate.  The

10  political debate about -- around redistricting and

11  whether it should be -- fundamentally, the debate

12  is about should this be -- should redistricting be

13  done by, you know, legislators with a -- as a

14  political tool as opposed to taken out of the

15  legislative process, taken out of the hands of

16  elected officials, and done by independent

17  commissions or things like that.  I would have

18  talked through all of that.

19      Q. Do you have a view on that?

20      A. No.  I mean, I -- my general approach to

21  teaching is to try to keep my views out of that.

22  And so I would have given -- I would have

1    facilitated the conversation, obviously.  I would

2    have challenged somebody on both sides just to

3    generate the conversations.

4        Q. Do you personally, not as a teacher but do

5    you personally, have a view on that?

6        A. Sure I do.  Personally, I think

7    redistricting -- so my personal view is that

8    within -- within a certain -- redistricting was

9    much less lethal in the past than it is today

10   because of the availability of computers and big

11   data.  And so where -- where redistricting is used

12   as an effort to, you know, to sort of nullify or,

13   you know, kill the prospects of one party or the

14   other, then I think -- I think it can go too far.

15   But basically -- my personal view is I think

16   redistricting can go too far as a political tool.

17       Q. Have you written any peer-reviewed

18   articles on the Voting Rights Act?

19       A. No.

20       Q. Have you published any articles at all

21   that discuss the Voting Rights Act?

22       A. Well, I've got a book on Southern politics

Transcript of Quentin Kidd, Ph.D.
Conducted on September 25, 2019                              36

1     that probably talks about the Voting Rights Act in

2     it because we talk through the transition -- we go

3     through the transition of the South over -- you

4     know, from the '50s to present.  So I'm sure that

5     we talked about the Voting Rights Act there.

6         Q. What is the name of that book?

7         A. The Rational Southerner.  And it is on

8     page 47.

9         Q. What is the general thesis of that book?

10        A. The general thesis of the book is that it

11    has -- the transformation of the South is the

12    result of the mobilization of black voters across

13    the South and the shift in conservative white

14    voters toward the Republican party, that dynamic

15    has sort of created the modern -- the politics of

16    the modern South.

17            And in that context we would have talked

18    about the Voting Rights Act and the Civil Rights

19    Act as pivotal pieces of legislation that sort of

20    caused the mobilization of black voters that would

21    have been -- also led to the shift of white

22    conservatives.

1      Q. Can you describe in a little more detail

2   why you think the Voting Rights Act was pivotal?

3      A. Well, because the Voting Rights Act and

4   the Civil Rights Act resulted in -- were

5   essentially the federal government saying we're

6   going to enforce the Civil -- the post-Civil War

7   amendments to the Constitution and we're going to

8   dismantle Jim Crow laws that existed all over the

9   South and other parts of the country.

10        So it was the federal government

11   essentially stepping in for the first time in

12   nearly 100 years and saying we're going to enforce

13   the rights of African Americans and others that

14   are disenfranchised, poor whites and others, to be

15   able to participate in politics, vote, et cetera.

16      Q. Have you published any peer-reviewed

17   articles on racially polarized voting?

18      A. Not that I -- not specifically on racially

19   polarized voting.  I'm just thinking there may --

20   no.  I would say no.  I'm just thinking through

21   stuff that got published, you know, 10, 15 years

22   ago.

Transcript of Quentin Kidd, Ph.D.
Conducted on September 25, 2019                    38

1        Q. Have you published any peer-reviewed

2    articles on the methodology for conducting

3    racially polarized voting?

4        A. The methodology of conducting racially

5    polarized voting?

6        Q. Yes.

7        A. No.

8          Like articles that say this is how we

9    would racially polarize -- this is how we would

10   vote in a racially polarized manner?

11       Q. This is how we would conduct a racially

12   polarized voting analysis?

13       A. No.

14       Q. Have you ever reviewed a state or local

15   government method of election to evaluate whether

16   the method provides an equal opportunity for

17   minority voters to elect their preferred candidate

18   of choice?

19       A. Have I reviewed a -- say again.  Do you

20   mean reviewed an academic article that was sent to

21   be peer-reviewed?

22       Q. No.

Transcript of Quentin Kidd, Ph.D.
Conducted on September 25, 2019                         39

1        A. Okay.

2        Q. Have you ever evaluated a state or local

3    government's method of election, so election

4    system, for whatever method provides an equal

5    opportunity for minority voters to elect their

6    preferred candidate of choice?

7        A. Not -- not that I can think of.

8        Q. Before your work on this case, had you

9    ever done an analysis of racially polarized voting

10   in a local jurisdiction?

11       A. No.

12       Q. Had you ever done an analysis of racially

13   polarized voting in any jurisdiction?

14       A. No.

15       Q. Before your work on this case, had you

16   ever done an analysis of white bloc voting in any

17   jurisdiction?

18       A. No.

19       Q. All right.  Let's turn to page 53 of your

20   report.  On this page, under the activities and

21   services do you see that in 2011 you were an

22   advisor to the Independent Bipartisan Advisory

Transcript of Quentin Kidd, Ph.D.
Conducted on September 25, 2019                    40

1    Commission on Redistricting, correct?

2        A. Correct.

3        Q. What was the Independent Bipartisan

4    Advisory Commission on Redistricting?

5        A. So the Governor, Governor McDonnell,

6    created this commission.  I want to say it was,

7    like, in January of 2011.  But because it -- I'll

8    tell you, all we did was we hosted the Commission.

9    So that's what advisory means.  We hosted the

10   Commission in the sense that we -- the Wason

11   Center for Public Policy, that had sponsored that

12   redistricting competition, hosted the Commission

13   in the sense that we supported them.

14           Because -- I'm trying to remember.  The

15   Governor didn't have a budget to pay for it or

16   there hadn't been legislatively approved money.

17   And because our redistricting competition put

18   pressure on the General -- on the Governor and the

19   General Assembly to be more open about the

20   redistricting process, the Governor came in, like,

21   January of that year and said, I had made a

22   promise to do an independent commission when I was

Transcript of Quentin Kidd, Ph.D.
Conducted on September 25, 2019                    41

1    running, so I'll do it, but I need you to -- I

2    need support in hosting it.

3         And so the Governor appointed Bob

4    Hallworth from VCU, formerly VCU at that time, to

5    chair the Commission.  And the Wason Center agreed

6    to, sort of, support it administratively.  And we

7    apparently could do that because we were a state

8    agency.

9         So I didn't -- I didn't do anything in

10   terms of testifying or anything like that.  I,

11   literally, hosted meetings and arranged meetings

12   for them.

13      Q. Who appointed you as an advisor to that

14   commission?

15      A. The Governor did.

16      Q. As an advisor to the Commission, did you

17   evaluate any maps for compliance with Section 2 of

18   the Voting Rights Act?

19      A. No.

20      Q. Did you perform any racially polarized

21   voting analyses?

22      A. No.

Transcript of Quentin Kidd, Ph.D.
Conducted on September 25, 2019                          42

1        Q. Did you perform any analyses of white bloc

2    voting?

3        A. No.

4        Q. Did you consider or analyze racial data

5    regarding proposed maps in any way?

6        A. No.

7        Q. Besides serving as an advisor to the

8    Bipartisan Advisory Commission in 2011, have you

9    ever assisted a state legislature in drawing state

10   legislative districts in the United States?

11       A. No.

12       Q. Have you ever been retained to draw a

13   district plan for any local government?

14       A. No.

15       Q. Were you involved in any way in the

16   redistricting of the Virginia Beach City Council

17   in 2011?

18       A. No.

19       Q. Have you ever drawn a congressional map

20   for any U.S. state?

21       A. No.

22       Q. Have you ever been appointed by a court to

Transcript of Quentin Kidd, Ph.D.
Conducted on September 25, 2019                    43

1    draw a redistricting plan?

2        A. No.

3        Q. And have you ever drawn a district that

4    has been adopted by a court as a remedy to a

5    redistricting claim?

6        A. No.

7        Q. All right.  Let's go back to the cover

8    page of your report.  And on the cover page here

9    you state that supporting data and analysis was

10   provided by Kimball Brace.  What supporting data

11   did Kimball Brace provide?

12       A. Kimball Brace provided -- I don't know

13   that it was analysis that has ended up in the

14   report, but it was analysis that he did that we

15   discussed.

16       Q. So you don't know if it's in this final

17   report or not?

18       A. It is not in the final report.  I was

19   being overly transparent there.

20       Q. What about data that he gave you?

21       A. Well, supporting data and analysis meaning

22   he -- the CVAP data was the data that he provided

Transcript of Quentin Kidd, Ph.D.
Conducted on September 25, 2019                    44

1    some analysis on essentially as a result of

2    questions that were -- that were -- as we were

3    talking through this as a -- as a team.  So

4    that's -- it's really that data, CVAP data.

5         Q. When you say as we were talking about this

6    as a team, you mean you and Kimball Brace or do

7    you mean you and the attorneys and Kimball Brace?

8         A. All the attorneys.  Everybody.

9         Q. Okay.  So as far as you know, there is

10   nothing -- there is no data that was provided to

11   you by Kimball Brace that's actually contained in

12   this report?

13        A. (Moved head from side to side.)

14        Q. And there is no analysis that was done by

15   Kimball Brace that's actually on this report?

16        A. (Moved head from side to side.)

17        MR. BOYNTON:  You need to respond

18   verbally.

19        A. Oh.  Actually, I'm thinking.  As I'm

20   thinking -- no.  There is none.  I mean, this --

21   this is all my work and my -- there is nothing

22   that Kimball did in here.

1      Q. Did you use the data that Kimball Brace

2  provided to you in any way in preparing your

3  report?

4         MR. HARRIS:  Object to the form of the

5  question.

6         You can answer.

7      A. So the data that Kimball Brace -- what

8  Kimball Brace provided was answers to questions

9  and clarifications that ended up in this report.

10  There were questions that I asked or were being

11  discussed as the group.  And so he might have

12  tried to answer those questions by going and doing

13  some analysis and coming back with it.  But that's

14  how -- so it ended up -- that, and then it ends

15  up, you know, running through me into this report,

16  if that makes sense.

17      Q. Can you point to anything specifically in

18  the report that you -- that was provided by

19  Kimball Brace, even if it's just answers to

20  questions?

21      A. No.  I actually cannot because I don't

22  think anything in -- there isn't a direct line

Transcript of Quentin Kidd, Ph.D.
Conducted on September 25, 2019                           46

1    between something he -- analysis he did that ended

2    up in this report.  It was really more him chiming

3    in on questions.  And most of those questions were

4    really, as I'm thinking back through this,

5    attempting to understand Spencer's analysis, so...

6        Q. Did you ever email Kimball Brace without

7    either of your attorneys on it?

8        A. No.

9        Q. Did you ever talk to him on the phone?

10       A. No.  I never talked to him on the phone

11   where the attorneys weren't also on the phone

12   call.

13       Q. Did you write this expert report?

14       A. Yes.

15       Q. Did you write every word of it?

16       A. Yes.

17       Q. Did anyone else write any portion of this

18   report?

19       A. No.  This is -- this is all my writing.

20       Q. Besides Kimball Brace or the -- your

21   attorneys, did you confer with anyone else or get

22   any assistance in creating your expert report?

Transcript of Quentin Kidd, Ph.D.
Conducted on September 25, 2019                    47

```
1        A. No.
2        Q. Did any students help you in preparing
3    this report?
4        A. None.
5        Q. Did anyone review your calculations?
6        A. Well --
7            MR. HARRIS:  Excluding counsel.
8        A. Not excluding counsel and other expert
9    witnesses.
10        Q. Did any of your colleagues at Christopher
11    Newport University assist you or review it before
12    you submitted it?
13        A. No.
14        Q. Dr. Kidd, are you familiar with the
15    Gingles' prong of three conditions?
16        A. I am.
17        Q. The first Gingles prong requires that
18    racial or language minority group is sufficiently
19    numeric and compact to form a majority in a
20    single-member district, correct?
21        A. That is correct.
22        Q. You'd agree that you are not offering an
```

1    opinion in this case on the first Gingles prong,

2    right?

3        A. I do not see that as my role in this case.

4        Q. So you're not offering an opinion on the

5    first --

6        A. Correct.

7        Q. If we could look at page 3 of Exhibit 1.

8        A. All right.

9        Q. In the fourth paragraph from the top, you

10   state that you rely almost completely on Spencer's

11   own data and analysis in your report.  What did

12   you mean by that?

13       A. Meaning that we were -- that I was taking

14   Spencer's analysis and using only his analysis to

15   write the response.  In other words, I'm not doing

16   any independent analysis on my own with data that

17   I've collected or data that I've gotten from

18   somewhere else.

19       Q. So in this report you use the racially

20   polarized voting estimates provided by

21   Dr. Spencer, correct?

22       A. Correct.

Transcript of Quentin Kidd, Ph.D.
Conducted on September 25, 2019                          49

1      Q. And except where noted in your report, you

2  do not dispute Dr. Spencer's estimates, right?

3      A. I would say I generally dispute a lot of

4  them.  They're noted in here, yeah.

5      Q. So the question was, except where noted in

6  your report you do not dispute Dr. Spencer's

7  estimates, correct?

8          MR. HARRIS:  Object to the form of the

9  question.

10          You can answer.

11      A. No.  I would say there probably are

12  disputes that I -- I would say there probably are

13  estimates that I would dispute that didn't end up

14  in here, but I'd have to go back and look through

15  all my notes to actually, you know, say what they

16  were.

17          I think I generally dispute his framing.

18  And that's what I'm -- what's -- why I'm

19  hesitating because I would generally dispute the

20  way he structured it.

21      Q. But those other disputes you may have are

22  not included in this expert report, correct?

1        A. Right.

2        Q. And you can't remember what any of those

3    are --

4        A. Well, I --

5        Q. -- sitting here today?

6           MR. HARRIS:  Object to the form of the

7    question.

8        A. I would just say I generally dispute his

9    framing.  And so I would -- you know, what flows

10   from that is a dispute of all the individual

11   numbers, you know.  You have to --

12       Q. What do you mean when you say you

13   generally dispute his framing?

14       A. The way he structured his report, I would

15   generally dispute in the sense that he is -- he's

16   creating standards for prong 2 and prong 3 that I

17   think are too loose.

18       Q. What do you mean by that?

19       A. The standards that he's -- so if you

20   look -- I don't have his -- part of the reason I'm

21   struggling here is I don't have his report in

22   front of me.  But if you look at his -- he's

1    actually -- he's actually -- in his report and his

2    rebuttal report he sort of demonstrated this.

3         In his report there are places where he

4    would say, you know, this analysis, you know,

5    strongly shows that minorities supported this

6    candidate.  And, then, in his rebuttal or in his

7    rebuttal of my report he's changed that, where

8    he's not demonstrating -- where he's not showing a

9    candidate being supported strongly by minorities.

10        I'm -- this is totally from memory.  But I

11   think Cabiness is one of them.  In his original

12   report Cabiness is strongly -- and he uses the

13   word strongly.  And in his rebuttal Cabiness is

14   pulled back from that.  I think he's conceded that

15   Cabiness is not strongly supported by minorities.

16   But I think he puts a question mark by it, so

17   conceding that.

18        So his general structure of his initial

19   report, as spelled out here in this report, was

20   loosely -- loosely constructed.  And when it was

21   challenged, he then comes back with a rebuttal

22   that is essentially a completely different report.

Transcript of Quentin Kidd, Ph.D.
Conducted on September 25, 2019            52

1      Q. You did not perform your own homogeneous

2   precinct calculations, correct?

3      A. That's correct.

4      Q. And you did not perform your own

5   ecological regression calculations, correct?

6      A. Correct.

7      Q. And you did not perform your own

8   ecological inference calculations, correct?

9      A. Correct.

10     Q. Are you familiar with the statistical

11  programming language of R?

12     A. No.  I mean, I'm familiar with it, but I

13  couldn't -- I couldn't sit here and pop out an R

14  model for you.

15     Q. What do you mean by you're familiar with

16  it?

17     A. Well, familiar with it in the sense that I

18  read a lot of academic work that is -- that uses

19  R, and so you just sort of generally become

20  familiar with the language that people use.  But

21  I -- for most of my work I use a program called

22  Stata or SPSS.

Transcript of Quentin Kidd, Ph.D.
Conducted on September 25, 2019                    53

1      Q. So you could read -- I'm trying to

2   understand what you said.  You could read R, but

3   you couldn't necessarily program --

4      A. I could understand the output from R.  I

5   couldn't program in R.

6      Q. Okay.  Are you aware Dr. Spencer disclosed

7   his R code with each of his expert reports?

8      A. I am.

9      Q. Did you run Dr. Spencer's R code?

10     A. I did not.

11     Q. Did you ever open Dr. Spencer's R code

12  file?

13     A. I did not.  I don't have -- no.  I don't

14  have the ability to work R, so...

15     Q. So you never opened or reviewed the R code

16  file to check the calculations, correct?

17     A. Nope.  That wasn't my job.  I took his

18  work for -- for face value.

19     Q. In Sections II and III of your report your

20  opinions are based on your personal understanding

21  of what Gingles prongs 2 and 3 require, correct?

22        MR. HARRIS:  Objection to the form of the

Transcript of Quentin Kidd, Ph.D.
Conducted on September 25, 2019                              54

```
1    question.
2            You can answer.
3        A. I'm -- yes.  I mean, isn't -- aren't
4    all -- isn't everything we all do based upon our
5    personal understandings of --
6        Q. You aren't rendering any legal opinions?
7        A. Oh.  Got it.  Yes.  Yes.  I'm not
8    rendering legal opinion.  That's right.
9        Q. Let's look at page 3 still.  Here you in
10   the -- I think it's in the fifth paragraph down.
11   The fourth paragraph down, the big one --
12       A. One.  Two.  Three.  Four.  The one that
13   says never in bold.
14       Q. Exactly.
15           You state that, Conducting an
16   examination -- I'm sorry.  You write that, When
17   candidates that are the preferred candidates of
18   minority voters are considered, the number of
19   African American and minority-preferred candidates
20   who won their elections is seven of 17.
21           Do you see that?
22       A. Are you in the middle of the paragraph?
```

Transcript of Quentin Kidd, Ph.D.
Conducted on September 25, 2019                    55

```
 1        Q. Yes.

 2        A. I'm trying to find -- When white

 3   candidates who Spencer identifies --

 4        Q. I think it's the sentence before the one

 5   with the never.

 6        A. When white candidates who Spencer

 7   identifies as the preferred candidates of minority

 8   voters are considered, the number of African

 9   American and minority-preferred candidates who won

10   their elections is seven of 17, including six of

11   seven since 2012.

12            Is that the sentence?

13        Q. That one.

14        A. Okay.

15        Q. As a percentage, seven of 17 is 41

16   percent, correct?

17        A. I'm going to take your word for it.

18   Otherwise, I --

19        Q. Do you want a calculator?

20        A. No.  I'll take your word for it.

21        Q. Further down in this same paragraph, I'm

22   looking at the sentence that starts finally.
```

1        A. Uh-huh.

2        Q. You state that, Conducting an examination

3    of Asian and Hispanic voters independent of

4    African American voters is a prong 3 obligation.

5            Do you see that?

6        A. Further down in that paragraph.  Finally

7    and very importantly, Spencer never conducts an

8    examination of Asian and Hispanic voters

9    independent of African American voters, which is a

10   prong 3 obligation.

11           Yes.  I do see that.

12       Q. What is your basis for believing that

13   conducting an analysis of each group separately is

14   required under Gingles prong 3?

15       A. It's my -- my understanding of Gingles

16   prong 3 and my understanding in talking with the

17   legal team.

18       Q. So besides your conversations with the

19   legal team, what is that understanding based on?

20       A. Reading.

21       Q. Reading what?

22       A. Reading other -- reading other cases.  I

1    didn't keep a record of other cases, but

2    reading -- just reading about this, attempting to

3    understand, as well as I could, prongs 2 and 3.

4        Q. Do you remember any of those cases

5    specifically that you're talking about?

6        A. No.  There are some -- you know, at this

7    moment in time I couldn't give you a citation.  I

8    probably read a couple of dozen cases or articles,

9    law review articles about cases.

10       Q. Did you find those cases in your own

11   independent search or were those provided to you

12   by your attorneys?

13       A. My own.

14       MR. HARRIS:  Object to the form of that

15   question.

16       MS. HARLESS:  He just said his own.

17       MR. HEBERT:  He just said his own.

18       Q. So as best as you can remember today, can

19   you give me the name of any specific case that

20   states that each minority group has to separately

21   be analyzed under Gingles prong 3?

22       MR. HARRIS:  Object to the form of the

Transcript of Quentin Kidd, Ph.D.
Conducted on September 25, 2019                    58

```
 1   question.
 2           You can answer.
 3      A. No, I cannot.
 4      Q. And, again, you're not offering a legal
 5   opinion in this case, correct?
 6      A. I'm not offering a legal opinion.
 7      Q. And you said that you found those cases on
 8   your own, correct?  How did you go about doing
 9   that?
10      A. Database searches essentially.
11      Q. Which databases?
12      A. LexisNexis, ABI.  I think one is called
13   ABI.  I can't tell you all the databases.
14      Q. And what were the search terms that you
15   used?
16      A. Gingles, voting rights.  I can't tell you
17   all the search terms precisely, but it would be
18   things like that.
19      Q. You would agree that elections for City
20   Council seats in Virginia Beach often include more
21   than two candidates for a seat, correct?
22      A. I don't know that I would say often.
```

Transcript of Quentin Kidd, Ph.D.
Conducted on September 25, 2019                          59

1    At-large City Council races do, but district races

2    don't.  And I think there are far more district

3    races with two candidates than there are at-large

4    races with multiple candidates.

5        Q. I want to be clear what you're talking

6    about because all races are at-large.  So are you

7    talking about the residency district races?

8        A. Correct.

9        Q. Would you agree that in each election year

10   multiple seats are often up for election?

11       A. Well, no, because there are years where

12   multiple seats aren't up for reelection.

13       Q. So more often than not would you agree

14   that multiple seats are often up for election?

15       A. So if I remember right, during the time of

16   analysis, from 2008 to present, in Spencer's

17   report there were three or four of -- what did he

18   do -- 10 years of races.  There were three or four

19   in his analysis where there were multiple

20   candidates.

21       Q. I'm not talking about multiple candidates.

22   I'm talking about multiple City Council seats.

Transcript of Quentin Kidd, Ph.D.
Conducted on September 25, 2019                    60

1        A. Correct.  Yeah.  That's the same thing.  I

2   mean, there are three or four where there are

3   multiple seats, essentially two seats, available.

4   So I don't even know if that's a majority.  I

5   think it's actually less than a majority.

6        Q. Are there years where there is only one

7   City Council seat up for election?

8        A. I'm not looking at Spencer's report, but,

9   if you look at it, I do think there are election

10  years where there is only -- where they're

11  residential -- they're residential elections and

12  there is only one seat up, yeah.

13       Q. One out of 10?

14       A. One -- what do you mean, one out of 10?

15       Q. One seat out of the 10 possible seats on

16  the City Council is the only one up for election?

17       A. Oh.  I don't know about that.  I'm just

18  saying where the elections that -- the elections

19  that happen include just one seat, residential

20  seat, like a Kempsville seat.

21       Q. So I'm talking about in an election

22  year --

Transcript of Quentin Kidd, Ph.D.
Conducted on September 25, 2019                                    61

1         A. Yeah.

2         Q. -- is there more than one seat up for

3     election, whether it's a residency district or an

4     at-large?

5         A. Got it.

6            MR. HARRIS:  Object to the form of the

7     question.

8            You can answer.

9         A. Yes.  I think most of the time, yes.

10        Q. Okay.  So you'd agree that most of the

11    time there is more than one seat up for election

12    for City Council races?

13        A. Yeah.  I can't -- I can't remember off the

14    top of my head whether there is only one seat up

15    for reelection in any of these -- in any of these

16    elections between 2008 and present.

17        Q. And you would agree that most elections

18    often include more than two candidates for a

19    single seat, correct?

20        A. Say that again.

21        Q. And you would agree that elections for

22    City Council seats often include more than two

1    candidates for a single seat, correct?

2         MR. HARRIS:  Object to the form of the

3    question.

4         A. I don't know that I would say often.

5         Q. Okay.

6         A. Sometimes.  I would use the term sometimes

7    but not often.

8         Q. What do you mean by sometimes?

9         A. Well, I think, if I'm remembering right,

10   of the 10 or so elections that are included in

11   Spencer's analysis, only three or four of those

12   included multiple seats up; in other words,

13   multiple at-large seats.

14        Q. So I'm not talking about multiple seats.

15   I'm talking about how many candidates are running

16   for a seat.

17        A. And I think it's -- I think it's only

18   three or four.

19        Q. George Furman is a black candidate who ran

20   for Virginia Beach city office in 2010 -- 2014 and

21   2016, correct?

22        A. Yes.

1      Q. And Mr. Furman has run for a City Council

2    seat several times in Virginia Beach, right?

3      A. That is true.

4      Q. And it would appear from election results

5    that Mr. Furman is not a viable candidate,

6    correct?

7      A. If viable --

8        MR. HARRIS:  Object to the form of the

9    question.

10        You can answer.

11      A. If viable means didn't win, yes.

12      Q. Mr. Furman came in last place every time

13    he ran, right?

14      A. I don't know that that's true.  If you say

15    it's true, but I'd have to actually go back and

16    look.

17      Q. So sitting here today, you don't know

18    whether George Furman came in last place every

19    single time he ran?

20      A. No.  I'd need to look.  I'd need to

21    actually look at that.

22      Q. Is it in your report?

Transcript of Quentin Kidd, Ph.D.
Conducted on September 25, 2019                    64

1      A. It is -- I don't think it's in my report.

2  I know Furman didn't win.  I don't know if he came

3  in last place off the top of my head.

4      Q. You'd agree that analysis of Mr. Furman's

5  candidacy is not probative of racially polarized

6  voting, right?

7          MR. HARRIS:   I object to the form of the

8  question.

9      A. I would not agree.

10     Q. Why not?

11     A. It's cherry-picking in my mind.

12     Q. Why is it cherry-picking in your mind?

13     A. So initially Spencer says minority

14  candidates.  Right?  And, then, as he works his

15  way through his report, he says minority

16  candidates who -- I'm not going to use -- I'm not

17  going to be able to repeat his verbiage exactly,

18  but he's essentially saying minority candidates

19  who are supported -- African American candidates

20  who are supported at some certain level are

21  probative.

22          And it seems to me like he's essentially

1    cherry-picking.  He's essentially saying minority

2    candidates who reach a certain level of support

3    based upon my, you know, preference of whatever

4    that support would be I'm going to consider

5    probative but, if not, I'm going to -- I'm going

6    to not consider them probative.  So I wouldn't

7    agree with that statement.

8        Q. Ignoring a candidate's race, if that

9    candidate comes in last place every single time

10   they run, do you think their candidacy is useful?

11        MR. HARRIS:  Objection to the form of the

12   question.

13        You can answer.

14       A. I don't know what you mean by useful.

15       Q. Do you think that candidacy is probative

16   in any kind of analysis of racially polarized

17   voting?

18       A. I don't think you could ignore a

19   candidate's race.

20       Q. Whether -- if a white candidate ran and

21   every single time that candidate came in last

22   place, would that election and candidacy be

1    probative of racially polarized voting in Virginia

2    Beach?

3         MR. HARRIS:  Object to the form of the

4    question.

5         You can answer.

6       A. I don't -- I don't know that I can answer

7    that.  I mean, I don't --

8       Q. Why not?

9       A. I think -- the trouble I'm having with it

10   is essentially what that says is if minority

11   voters:  black voters, Asian voters, Hispanic

12   voters, don't support a candidate at a certain

13   level, undefined, then we're not going to consider

14   it probative.  And I just don't -- I don't -- I

15   guess I don't -- I need a -- some -- some standard

16   to say it's not probative.

17      Q. So in your mind every single election for

18   City Council and every single candidate is

19   probative of a racially polarized voting analysis?

20        MR. HARRIS:  Object to the form of the

21   question.

22        You can answer.

1        A. Yes.  If minority candidates -- initially

2    in Spencer's analysis he includes minority

3    candidates.  And even in some of his analysis

4    where -- after he says Furman isn't probative, he

5    includes Furman in some of his lists.  So I think

6    that's where my confusion comes in is that

7    sometimes he says it's probative, sometimes he

8    says it isn't, sometimes he includes Furman,

9    sometimes he doesn't.  And so I don't know what

10   the standard is is where I'm confused.

11       Q. My question is what do you consider to be

12   the standard?

13       A. My -- so the way I approach this is

14   attempting to look at what Spencer did and study

15   what Spencer did.  And Spencer did both things.

16       Q. So you have no --

17       A. So I would say Furman is probative.

18       Q. So you have no independent opinion on what

19   makes a candidate probative or not besides what

20   Dr. Spencer did?

21       MR. HARRIS:  Object to the form of the

22   question.

1      You can answer.

2    A. As it relates to this analysis, that was

3  my opinion.  My opinion was an effort to

4  understand what Spencer was doing.  And Spencer

5  was in both places at the same time.  And I think

6  Spencer was in both places at the same time

7  because he was trying to use Furman where it was

8  beneficial to him and trying to exclude Furman

9  where it wasn't.

10    Q. So setting Dr. Spencer's analysis aside,

11  what do you think makes a candidate probative for

12  a racially polarized voting analysis?

13    A. Well, at a basic level, if a -- if a

14  minority candidate is running, then they're

15  probative.  And if you're going to -- if you're

16  going to argue they're not probative, you have to

17  have -- you have to make your argument and stick

18  with it.  And Spencer didn't do that.

19      So I think you have to begin with a

20  minority candidate is probative.  And, then, if

21  you're going to exclude them, you have to have a

22  rationale for excluding them and stick with your

Transcript of Quentin Kidd, Ph.D.
Conducted on September 25, 2019                    69

```
 1   rationale.  And he didn't do that.

 2       Q. Are only minority candidates probative?

 3       A. No.

 4       Q. Can you think of any example of a specific

 5   candidacy that you would exclude from an analysis

 6   of racially polarized voting in Virginia Beach as

 7   not probative?

 8       MR. HARRIS:  Object to the form of the

 9   question.

10       You can answer.

11       A. Can I think of any specific candidate that

12   I would exclude?  I suppose -- no.  Not a specific

13   candidate.

14       Q. All right.  Let's turn to page 6 of your

15   report.  I'm looking at the second paragraph from

16   the top.

17       A. Table 1?

18       Q. Yes.  But I'm looking at the last

19   sentence.  So there you state that although you

20   consider elections during the time period of 2008

21   to 2018, the period of 2012 to 2018 is more

22   probative.
```

Transcript of Quentin Kidd, Ph.D.
Conducted on September 25, 2019                              70

```
1          A. Uh-huh.

2          Q. What is your basis for the belief that the

3     time period of 2012 to 2018 is more probative than

4     the entire time period of 2008 to 2018?

5          A. Well, because I think what's happening

6     currently is more probative than what happened in

7     the past, generally speaking.

8          Q. Any other reasons?

9          A. I mean, no.  That's my general -- my

10    general view is that what happened in the past is

11    less probative than what's happening today.

12         Q. Why is 2012 the starting point for your

13    time period -- for the time period you view as

14    more probative and not 2010?

15         A. 2012 would be the first election after the

16    redistricting that happened post-2010 -- 2011

17    redistricting.  Is that right?  Yeah.

18         Q. All elections in Virginia Beach are

19    at-large, correct?

20         A. Yes.

21         Q. Why is 2012 the starting point for the

22    time period you view as more probative and not
```

1    2014?

2        A. Well, because you're trying to capture

3    whatever census population changes that you know

4    about as a result of the census, all that stuff.

5    I mean, you can't say 2010 because actually the

6    redistricting and the census doesn't actually

7    happen in 2010.  It's done in 2010, but you don't

8    get the results immediately.

9        Q. Do you have any understanding of whether

10   there was a majority minority district -- if any

11   of the seven residency districts were majority

12   minority following the redistricting?

13       A. I don't think any of them were.

14       Q. And do you know if any of the districts

15   were before the 2011 redistricting?

16       A. I don't think Virginia Beach has ever had

17   a majority minority district.  I could be wrong

18   about that, but I don't think they ever have.

19       Q. Let's turn to page 7 of your report.  I'm

20   looking at Table 1.

21       A. Uh-huh.

22       Q. Of the candidates you've identified in

1   Table 1 that received 50 percent or more support

2   from black voters, six of eight lost, correct?

3          MR. HARRIS:  Object to the form of the

4   question.

5          You can answer.

6      A. Ask you question again.  I'm just trying

7   to get my bearings on the table.

8      Q. Of the candidates you've identified in

9   Table 1 that received 50 percent or more support

10  from black voters, six of eight lost, correct?

11         MR. HARRIS:  Object to the form of the

12  question.

13         You can answer.

14     A. Yes.

15     Q. Isn't it true that all eight candidates

16  would have won with black votes alone?

17         MR. HARRIS:  Objection to the form of the

18  question.

19         You can answer.

20     A. I don't know that that's true.

21     Q. What information would you need to know

22  whether that's true?

Transcript of Quentin Kidd, Ph.D.
Conducted on September 25, 2019          73

1      A. I would need to know what proportion of

2   the population in any of those elections -- what

3   proportion of the voters in any of those elections

4   were African American.  And I would need to know

5   something that's really impossible to know, and

6   that is how many of those African American voters

7   voted -- we have a certain number of City Council

8   elections where you can cast two votes.

9      Q. Uh-huh.

10     A. And a not insignificant number of voters

11  cast one vote.  It's impossible to know which of

12  those voters cast one vote versus two votes.  And

13  so I would need to know which of those African

14  American voters cast votes in both -- cast two

15  votes when they're able to cast two votes.

16     Q. Have you done any analysis of voting -- of

17  whether voters cast one or two votes in Virginia

18  Beach?

19     A. No, but what makes me understand that is I

20  looked at the total votes -- so Spencer has a --

21  has a mistake in his -- in a couple of his tables

22  in his first report.  And the mistake is

Transcript of Quentin Kidd, Ph.D.
Conducted on September 25, 2019                    74

1    essentially in a couple of those at-large races

2    where you could cast two votes, his numbers are

3    off.  Right?  I pointed it out in my report.

4         Well, in the context of looking at that

5    to, like, say did he make a mistake, it became

6    obvious -- when I looked at total votes that

7    people cast in Virginia Beach, it was clear that a

8    not insignificant number of voters were not voting

9    twice.  And it was just in my -- in my attempting

10   to understand whether he actually made a mistake

11   or not that I -- that I noticed that.

12        Q. And you don't know the race of those

13   voters, correct?

14        A. No.  Virginia has -- Virginia doesn't

15   register voters by race.

16        Q. Candidate Sabrina Wooten won her race in

17   2018, correct?

18        A. She did.

19        Q. And candidate Ross-Hammond won in 2012 but

20   lost her reelection bid in 2016, correct?

21        A. That is correct.

22        Q. Isn't it true that white bloc voted

Transcript of Quentin Kidd, Ph.D.
Conducted on September 25, 2019                    75

1    against a losing candidate Ross-Hammond in 2016?

2         MR. HARRIS:  Objection to the form of the

3    question.

4         You can answer.

5         A. That's incorrect.

6         Q. Let's turn to page 10, Table 4.  So the

7    title of Table 4 is African American Candidates

8    for Virginia Beach City Council From 2008 to 2018

9    Who Received Cohesive African American Support

10   According to Spencer Sorted by Whether They Won or

11   Lost Due to White Bloc Voting.

12        A. Right.

13        Q. And one of the candidates listed as

14   satisfying prong 3 is Ross-Hammond in 2016,

15   correct?

16        A. According to Spencer.

17        Q. And you disagree with that?

18        A. I disagree with that.  In fact, what I'm

19   doing in here is I'm sort of walking -- I'm

20   telling the story walking through this ultimately

21   to get at -- when you get to the end, there is

22   essentially one election where white bloc voting

1    causing a minority candidate to lose.

2        Q. And what was that election, in your

3    opinion?

4        A. Well, if you go to the very end -- if you

5    go to the very end on 23, Bullock in 2010.

6        Q. So you'd agree that white bloc voted

7    against the losing candidate Bullock in 2010?

8        A. I would agree with that.

9        Q. And that's the only candidate that you

10   believe experienced white bloc voting?

11       A. That is correct.

12       Q. Let's go back to Table 1.  Overall, 16 of

13   19 black candidates in Table 1 lost, correct?

14       A. That is correct.

15       Q. And of the three black candidates in Table

16   1 who won, two of them won in 2018, right?

17       A. That's correct.

18       Q. And of the 10 candidates in Table 1 you've

19   listed as not receiving 50 percent or more of

20   black support, three of those were George Furman,

21   correct?

22           MR. HARRIS:  Object to the form of the

Transcript of Quentin Kidd, Ph.D.
Conducted on September 25, 2019                    77

1   question.

2          You can answer.

3      A. So -- yes.  Table 1 is according to

4   Spencer.  Yes.

5      Q. Let's turn to page 8 of your report.  I'm

6   looking at Table 2.  Of the candidates you've

7   identified in Table 2 with black support of 50

8   percent or more, six of nine lost, correct?

9          MR. HARRIS:  Objection to the form of the

10  question.

11         You can answer.

12     A. According to Spencer, yes.  That Table 2

13  is according to Spencer.

14     Q. But this table only includes candidates

15  who received 50 percent or more black support,

16  correct?

17     A. Sorted by whether they received cohesive

18  African American support according to Spencer,

19  yes.

20     Q. Table 2 is your reconstruction of the

21  data, correct?

22     A. Correct.

Transcript of Quentin Kidd, Ph.D.
Conducted on September 25, 2019                              78

1        Q. And what is your definition of cohesive

2     support?

3           MR. HARRIS:  Object to the form of the

4     question.

5           You can answer.

6        A. I am not attempting to provide my

7     definition.  I'm attempting to analyze Spencer's

8     definition.

9        Q. You have no definition, sitting here

10    today, of what cohesive support means in a

11    racially polarized voting analysis?

12       A. It means 50 percent plus one to me.

13       Q. 14 of 17 black candidates listed in Table

14    2 lost, correct?

15       A. That is correct.

16       Q. And two of the three black candidates

17    identified as winning in Table 2 won in 2018,

18    right?

19       A. That is correct.

20       Q. And of the eight candidates in Table 2

21    listed as not receiving 50 percent or more black

22    support, three were George Furman, correct?

1       A. That is correct.

2       Q. Let's turn to page 9.  In the top

3   paragraph of this page you write that a majority

4   of contests between the time period of 2008 to

5   2018 satisfied prong 2 in terms of black cohesion,

6   correct?

7       A. I'm getting -- yes.  Majority African

8   American support since 2012, five candidates

9   satisfied prong 2 and four failed to satisfy prong

10  2.  Correct.

11      The context is important, though.

12  Remember what I'm doing is walking through a

13  deconstruction of Spencer's analysis.  So this is

14  what -- a third step in that deconstructive

15  process.

16      MR. BOYNTON:  We don't have to do it right

17  now, but we're at about an hour-and-a-half.  Maybe

18  a break at some point would be useful.

19      MS. HARLESS:  Would you like to take a

20  break now?

21      MR. BOYNTON:  If it's a good point for

22  you.

Transcript of Quentin Kidd, Ph.D.
Conducted on September 25, 2019                    80

1        MS. HARLESS:  Fine with me.

2        (A recess was taken.)

3     Q. So we were looking at Table 3.

4     A. Uh-huh.

5     Q. Isn't it true that five of eight black

6  candidates in Table 3 with minority support of 50

7  percent or more lost?

8        MR. HARRIS:  Objection to form of the

9  question.

10        You can answer.

11     A. This is -- again, this is according to

12  Spencer.  Five of eight black candidates with --

13  one.  Two.  Three.  Four.  Five.  That is true.

14     Q. And even though this is according to

15  Spencer, you created this table, correct?

16     A. Yeah.  I just re -- I just redesigned

17  Spencer's data here.

18     Q. And you didn't --

19     A. None of this is independently my data.

20     Q. And you didn't independently calculate

21  different estimates, correct?

22     A. No.  I just -- this is all Spencer's

Transcript of Quentin Kidd, Ph.D.
Conducted on September 25, 2019                    81

1    results.

2        Q. And you'd agree that two of the three

3    winning black candidates in Table 3 won in 2018,

4    correct?

5        A. I would agree.

6        Q. And Ms. Hammond did not win the reelection

7    in 2016 despite having 59.9 percent of minority

8    support, right?

9        MR. HARRIS:  Object to the form of the

10   question.

11       You can answer.

12       A. According to Spencer, yes.

13       Q. Do you believe that Amelia Ross-Hammond in

14   2016 was the minority candidate of choice?

15       A. Ultimately, no.

16       Q. Why not?

17       A. If you go to the last table in here, on

18   page 23, in 2016 she did not have Asian support.

19   There was no Asian or Hispanic cohesion.

20       Q. And this is according to your analysis?

21       A. This is me reconfiguring Spencer's data

22   and then attempting to unpack -- as we explain in

1    here, attempting to unpack his all minority

2    category of data.  I mean, we walked through it,

3    you know.  It's walked through pretty clearly in

4    here.

5        Q. Yeah.  We'll get to that.

6            Of the eight candidates in Table 3 listed

7    as not receiving 50 percent or more minority

8    support, three were George Furman, correct?

9        A. That is true.  According to Spencer's

10   data, yes.

11       Q. Let's go to page 10.  And I'm looking at

12   Table 4.

13       A. Okay.

14       Q. You would agree that between 2008 and 2018

15   six out of the nine candidates listed here as

16   preferred by black voters lost their elections,

17   correct?

18           MR. HARRIS:  Objection to the form of the

19   question.

20           You can answer.

21       A. This is, again, according to Spencer.

22   This is Spencer's data.  The table is African

1    American Candidates for Virginia Beach City

2    Council from 2008 to 2018 Who Received Cohesive

3    African American Support According to Spencer

4    Sorted by Whether They Won or Lost Due to White

5    Bloc Voting.

6        Q. That's not what I asked.

7            So I'm asking you, you would agree that

8    between 2008 and 2018 six out of the nine

9    candidates listed here as preferred by black

10   voters lost their elections, correct?

11           MR. HARRIS:  Objection to the form of the

12   question.

13           You can answer.

14       A. I would agree that that's what Spencer

15   alleges.

16       Q. You created this table, correct?

17       A. This is a reconfiguration of Spencer's

18   data.  I created -- I mean, yes, I physically

19   created the table, but it's all Spencer's data; I

20   just reorganized it in a different way.

21       Q. Two of the three black candidates

22   identified as winning in this table won in 2018,

1    correct?

2        A. That is correct.

3        Q. Let's go to page 11.  I'm looking at Table

4    5.  You would agree that between 2008 and 2018

5    five of the candidates identified as preferred by

6    all minority voters lost their elections, right?

7        MR. HARRIS:  Objection to the form of the

8    question.

9        You can answer.

10       A. Five of the candidates identified by

11   Spencer, yes.  I would agree that that's what

12   Spencer is alleging.

13       Q. Did Dr. Spencer create any tables that

14   divided elections by --

15       A. No.  This is my reconfiguration of

16   Spencer's data.

17       Q. So just to be clear -- I don't know if I

18   got an answer or not to that, so I'm just going to

19   ask again.

20       A. Okay.

21       Q. Between 2008 and 2018, according to Table

22   5, five of the eight candidates identified as

1    preferred by all minority voters lost their

2    elections, correct?

3         MR. HARRIS:  Objection to the form of the

4    question.  That's not what the table says.  You

5    said all minority voters.  And it says African

6    American at the top of Table 5.

7         MS. HARLESS:  No.

8      A. It is minority.  Cohesive minority support

9    according to Spencer.

10        MR. HEBERT:  Correct.

11        MR. HARRIS:  I withdraw that objection.

12   But I do have an objection to the form of the

13   question.

14        You can answer it.

15     A. Duke it out.

16        I would agree that, according to Spencer,

17   that is -- I would agree with that.  That is what

18   Spencer's data has shown.

19     Q. So according to Table 5, minority

20   preferred candidates usually lose, correct?

21        MR. HARRIS:  Objection to the form of the

22   question.

Transcript of Quentin Kidd, Ph.D.
Conducted on September 25, 2019                    86

1        You can answer.

2     A. I would not agree with that.  I would

3 disagree with that.

4     Q. Why would you disagree with that?

5     A. Well, if you go to the last table on page

6 24, again I'm walking -- I'm walking -- this

7 entire report for the Spencer portion of it is

8 literally -- is just walking a deconstructive path

9 through Spencer's report.  And at the end of it

10 there is one candidate who loses because of white

11 bloc voting who has cohesive Asian plus Hispanic

12 plus African American support.  So I wouldn't

13 agree with that statement that you just made.

14     Q. All right.  Let's go to page 12.

15 According to your analysis in Table 6, the

16 election involving George Allen in 2010 satisfies

17 both Gingles prongs 2 and 3, correct?

18        MR. HARRIS:  Objection to the form of the

19 question.

20        You can answer.

21     A. This is according to -- as reported by

22 Spencer, yes.  This isn't -- this is me again

Transcript of Quentin Kidd, Ph.D.
Conducted on September 25, 2019                    87

1    reconfiguring Spencer's analysis, again walking

2    through this path of deconstructing Spencer's

3    report.  According to Spencer, yes.

4        Q. In deconstructing the results of Spencer's

5    report, did you utilize the services of any other

6    expert in this case?

7        A. None that wasn't a part of this team,

8    whatever you want to call it.

9        Q. Did you create this chart?

10       A. Yes.

11       Q. Did you personally deconstruct the data

12   that was put into this chart?

13       A. Yeah.  I mean, this is essentially

14   reconfiguring Spencer's report.  This is, you

15   know -- all of that essentially comes from

16   Spencer's report.  So it's not like I created an

17   Excel spreadsheet and did analysis.  I mean, this

18   is just Spencer's report.

19       Q. So according to Spencer's analysis, the

20   election involving Tanya Bullock in 2010 satisfies

21   both Gingles prongs 2 and 3, correct?

22       A. According to Spencer's analysis, yes.

```
1        Q. And you would agree with that, correct?

2        A. I wouldn't agree with that, no.

3        Q. Tanya Bullock in 2010?

4        A. Oh.  I'm sorry.  If you go to the very

5   last table, I think Tanya -- I think Bullock is

6   the last -- is the only one -- let me just make

7   sure that I'm right before I say yes or no.  Page

8   23.  Yes.  Bullock is the only one.

9        Q. And according to Table 6, the election

10  involving Andrew Jackson in 2010 satisfies both

11  Gingles prongs 2 and 3, correct?

12       A. I would not agree with that.  That's what

13  Spencer is alleging.  I would not agree with that.

14       Q. So according to Table 6 is all I'm asking.

15       MR. HARRIS:  Object to the form of that

16  question.

17       You can answer.

18       A. I mean -- yes.  And Table 6 is a

19  reconfiguration of Spencer's analysis.

20       Q. According to Table 6, the election

21  involving Prescott Sherrod in 2011 satisfies both

22  Gingles prongs 2 and 3, correct?
```

1          MR. HARRIS:  Objection to the form of the

2     question.

3          You can answer.

4      A. That's what Spencer alleges, and that is

5     what is in Table 6.  It's a reconfiguration of

6     Spencer's analysis.

7      Q. And according to Table 6, the election

8     involving Amelia Ross-Hammond in 2016 satisfies

9     both Gingles prongs 2 and 3, correct?

10         MR. HARRIS:  Object to the form of the

11    question.

12         You can answer.

13     A. According to Spencer's analysis, and this

14    is a reconfiguration of his analysis, that's what

15    it says.

16     Q. In Table 6, five of the candidates listed

17    as having 50 percent or more minority support

18    lost, correct?

19     A. According to Spencer's analysis, that is

20    what he is alleging here.

21     Q. And you would agree that 14 of the 17

22    candidates listed in Table 6 lost, correct?

Transcript of Quentin Kidd, Ph.D.
Conducted on September 25, 2019                    90

```
 1        A. That is what Spencer is alleging.  I'm

 2   simply reconfiguring what Spencer is alleging

 3   here.  I wouldn't agree to it.

 4        Q. Let's turn to page 15 of your report.  I'm

 5   looking at Table 7.

 6        A. Okay.

 7        Q. Of the seven winners listed in Table 7,

 8   Sessoms, Davenport, Henley, and Jones were

 9   candidates of choice of white voters, correct?

10        MR. HARRIS:  Object to the form of the

11   question.

12        You can answer.

13        A. You'll just have to give me a minute to --

14   all right.  Ask that question again.

15        Q. Of the seven winners listed in Table 7 --

16        A. Okay.

17        Q. -- Sessoms, Davenport, Henley, and Jones

18   were candidates of choice of white voters,

19   correct?

20        MR. HARRIS:  Object to the form of the

21   question.

22        You can answer.
```

Transcript of Quentin Kidd, Ph.D.
Conducted on September 25, 2019                    91

1          A. I don't -- I don't know that Table 7 says

2     that.  I don't know that that's in Table 7.

3          Q. So sitting here today, you don't know

4     whether Sessoms, Davenport, Henley, and Jones were

5     candidates of choice of white voters?

6          MR. HARRIS:  Objection to the form of the

7     question.

8          You can answer.

9          A. Well, you just asked me what Table 7 says.

10    Sitting here at this moment, I can't tell you what

11    the white vote percentage was for those

12    candidates.

13         Q. Is that because you didn't calculate them?

14         A. I'm sure that I looked at them.  I

15    looked -- I mean, it's publicly available, you

16    know, information.  So I looked at it.

17         Oh.  The percentage of vote.  Percentage

18    of white voters.  No.  I'm sure I looked at --

19    it's in Spencer's report.

20         Q. But you didn't calculate those numbers?

21         A. I didn't calculate them independently, no.

22    I didn't do any independent analysis.  This is all

1    Spencer's data.

2        Q. And so there is no information in this

3    report about whether those candidates are white

4    candidates of choice, correct?

5        MR. HARRIS:  Objection to the form of the

6    question.

7        You can answer.

8        A. Ask that question again.

9        Q. Is there anywhere you can point to in your

10   report that would identify whether Sessoms,

11   Davenport, Henley, or Jones were candidates of

12   choice of white voters?

13       A. I don't think so.  I mean, not that I can

14   remember.  I don't think so, though.  I'm going to

15   go back to that last table.

16       I don't think specifically there is

17   anywhere in here that would identify the

18   percentage of vote that white -- that a candidate

19   got from white voters.

20       Q. And you don't know whether -- other than

21   what's in your report, you can't remember whether

22   they're candidates of choice of white voters?

1      A. I'd have to -- no.  I'd have to go back

2   and look at what Spencer reported.

3      Q. So you'd have to look at Dr. Spencer's

4   report?

5      A. Correct.  I was hired to analyze his

6   report, so that's really what I did.  I mean, I

7   didn't do anything else.

8      Q. All four:  Sessoms, Davenport, Henley, and

9   Jones, are white, correct?

10      A. I believe that's true.  I don't know how

11   they identify themselves, but I believe that's

12   true.

13      Q. In the 2018 at-large election the

14   candidate Bright was not a candidate of choice of

15   minority voters, correct?

16      A. Bright?

17      MR. HARRIS:  Object to the form of the

18   question.

19         You can answer.

20      A. So according to Spencer's analysis, as

21   reconfigured in this table, Bright in 2018 has no

22   black or minority cohesion.

Transcript of Quentin Kidd, Ph.D.
Conducted on September 25, 2019                    94

1       Q. So Bright was not the candidate of choice

2    for minority voters, right?

3          MR. HARRIS:  Object to the form of the

4    question.

5          You can answer.

6       A. I mean, all I'm comfortable in saying is

7    that there's no black or minority cohesion.

8       Q. In the 2018 at-large election Allison

9    White was the second candidate of choice of

10   minority voters, correct?

11         MR. HARRIS:  Object to the form of the

12   question.

13         You can answer.  It's Linda Bright.

14         MS. HARLESS:  I didn't say Bright.  I said

15   Allison White.

16         MR. HARRIS:  I thought you said Bright.

17   I'm sorry.

18      Q. In the 2018 election Allison White was the

19   second candidate of choice of minority voters,

20   correct?

21      A. I would have to actually look at the

22   results to know.  I mean, I assume you're basing

1    that on Spencer's report, on his analysis.

2         Q. I'm asking you.

3         A. I'd have to look.  I can't remember.  I

4    mean, I'd have to look at his -- at his tables.

5         Q. Are you aware of whether White won an

6    at-large seat in 2018?

7         A. White did not win, as far as I know,

8    because the two candidates that did win are not

9    named White.

10        Q. But you're not aware of whether White

11   was --

12        A. I'm not -- I cannot remember, as I sit

13   here at this moment, what White's percentage of

14   white vote was from Spencer's analysis.

15        Q. All right.

16        A. I think I said that right.  I'm not aware

17   of what White's percentage of the white vote was

18   according to Spencer's analysis.  I can't remember

19   if I said white -- white twice.

20            MR. HARRIS:  You did.

21        Q. So in order for you to know the percentage

22   of any candidate's level of support, you'd need to

1    look at Dr. Spencer's report?

2        A. That was what I was hired to do.  I was

3    just hired to analyze Spencer's report.

4        Q. Is that a yes?

5        A. That's a yes.

6        Q. What is equivalence testing?

7        A. Equivalence testing is when you -- it's a

8    statistical procedure where you're attempting to

9    determine whether two -- two groups of something,

10   people mostly, are equivalent in some way,

11   whatever way or category you're trying to measure

12   them, whether you're trying to determine whether

13   two groups respond to a drug in the same way, for

14   example, by doing randomized testing.

15       Q. Have you ever used equivalence testing as

16   a statistical technique?

17       A. No.

18       Q. Would you agree that equivalence testing

19   is a fairly common statistical technique?

20       A. No.  It's there.  I mean, it's there.

21   It's there, but there are far more common

22   statistical techniques.  Ecological inference is

1    far more common --

2         THE REPORTER:  Sir, could you say that

3    again?

4       A. Sorry.  Slower?

5       Q. Were you done?

6       A. I can't remember --

7         THE REPORTER:  Ecological --

8       A. Ecological inference is far more common.

9    Correlation analysis is far more common.

10   Regression analysis is far more common.  In the

11   context of Political Science, which is my

12   discipline, it's relatively new.  In the context

13   of Political Science, Economics, Sociology, it's

14   actually relatively new.

15      Q. Isn't equivalence testing frequently

16   taught?

17      A. It is not frequently taught.  It's

18   certainly not taught at the undergraduate level.

19   Far more complex than that.  I would say it's

20   probably taught at -- in graduate programs that

21   have pretty serious methodological sides to them

22   and in what I would consider to be advanced data

1    analysis courses in those graduate programs.

2          So I bet you could come out of -- just

3    taking my discipline, Political Science, you could

4    probably come out of there -- there are about 98,

5    99 Ph.D. programs in Political Science.  You could

6    probably come out of 60 or 70 of them and never

7    have the opportunity to take a class that taught

8    you equivalency testing.

9      Q. In statistical applications equivalence

10   testing is used to draw inferences from observed

11   data, correct?

12         MR. HARRIS:  Object to the form of the

13   question.

14         You can answer.

15     A. Ask that again.

16     Q. In the statistical applications

17   equivalence testing is used to draw inferences

18   from observed data, correct?

19     A. I think that's correct.

20     Q. Can you describe in detail how equivalence

21   testing works?

22     A. I can describe generally how it works.

Transcript of Quentin Kidd, Ph.D.
Conducted on September 25, 2019                    99

1      Q. Okay.

2      A. And I just did earlier.  The equivalence

3  testing is most -- the way I understand it, most

4  commonly used would be in randomized trials, like

5  in medicine where you -- where you randomize --

6  you know, you take a group of 100 patients and you

7  randomly give 50 percent of them the drug you're

8  testing, you give 50 percent the placebo, and you

9  look for responses.

10      And you conduct an equivalency test to

11  determine -- this actually would be a test of the

12  placebo effect actually.  Attempt to determine

13  whether there is an equivalent reaction.

14      Q. Why do you think it's used in randomized

15  trials in medicine?

16      A. That's my -- that's sort of where -- as I

17  think -- as I think about how -- where I've

18  understood or where I've heard about equivalency

19  testing, that's where I've most commonly heard

20  about it.  I think that's why.  It's just not --

21  it is not common in Political Science, I'll tell

22  you that.

Transcript of Quentin Kidd, Ph.D.
Conducted on September 25, 2019                    100

1        Q. That's not what I meant by my question, so
2    let me try again.
3        A. Right.
4        Q. Why is that a method that is useful for
5    randomized trials in medicine?
6        A. Oh.  In that example, it might tell you
7    the effects of a placebo effect, you know.  And so
8    it might be helpful to know that people who think
9    they are taking a drug when they're really not
10   have a similar or not or dissimilar reaction
11   because it might help you understand the
12   psychological effects of thinking you're taking
13   medicine when you're not.
14       Q. Why is it used -- why is equivalence
15   testing used often in randomized trials in
16   medicine rather than another method, like
17   regression?
18       A. Well, I think it's -- I think it's a
19   matter of disciplines.  You know, different
20   methods and statistical procedures sort of take
21   hold in disciplines and not in other disciplines
22   for whatever reasons, you know, for all sorts of

Transcript of Quentin Kidd, Ph.D.
Conducted on September 25, 2019                    101

1   reasons.  And so those -- those methodologies as

2   they become more common in a discipline and

3   demonstrate their usefulness in understanding

4   human behavior then sometimes will migrate over to

5   other disciplines.  You know, so that's really it.

6   It's just -- it's really the social behavior of

7   academics in their silos of disciplines.

8       Q. Do you have an opinion about the use of

9   equivalence testing to determine the voting

10  preferences of black, Hispanic, and Asian voters?

11      A. Only that when I read Spencer's rebuttal I

12  just had never seen it used like that before in

13  a -- in a -- in a case like this.

14       I did a little bit of searching to

15  determine whether it was -- whether I could find

16  it in any other kind of court cases, and I

17  couldn't find it anywhere.

18       He did include a reference to the -- to

19  the article that seemed to motivate or inspire his

20  analysis.  It was published, if I'm remembering

21  right, in October 2018, so it's less than a year

22  old.

Transcript of Quentin Kidd, Ph.D.
Conducted on September 25, 2019                          102

1          So the -- the problem is that there is not

2     a lot of academic research support behind it in

3     Political Science, in Economics and Sociology,

4     that -- you know, those Social Science

5     disciplines.

6          So, you know, that's -- I mean, that's my

7     opinion.  It's, like, in my world if you're going

8     to use a statistical procedure, especially in a

9     case like this where you're trying to -- you know,

10    you want a city to change the way it elects its

11    City Council members, you would want to use a

12    method that has a body of research behind it,

13    where it's been replicated, where it's been, you

14    know, tested in various scenarios to determine its

15    viability to demonstrate itself in various

16    scenarios.

17         You know, ecological inference is like

18    that.  When Gary King came out with ecological

19    inference 15, 18 years ago now, maybe 20 years ago

20    now, it was sort of an innovation in Political

21    Science.  You know, the idea that you could -- you

22    know, you could infer from an individual to a

Transcript of Quentin Kidd, Ph.D.
Conducted on September 25, 2019                    103

1    population and a population to an individual was

2    sort of an innovation to Political Science, and so

3    lots of people were excited about it.  But as a

4    discipline we understood it had to be replicated,

5    it had to be tested, it had to be -- it had to

6    demonstrate its viability.

7          And so I would look for this -- I would

8    want this to be similarly put through the ringers,

9    if you will, in academic research.  I don't know

10   that it -- it was published 10 months ago.  I

11   don't know that it's been replicated in

12   publication yet.

13      Q. So besides that, do you have any other

14   opinions about the use of equivalence testing to

15   determine the voting preferences of black,

16   Hispanic, and Asian voters?

17      A. No.  Just that it's -- just that -- just

18   that I would -- I lack confidence in it because my

19   confidence would come from the body of scholars

20   who would test it and put it through the ringers

21   and demonstrates its viability.

22      Q. Have you done any analysis of

```
1    Dr. Spencer's equivalence testing?

2         A. I was not hired to do any -- any analysis

3    on his rebuttal.  I mean, I read it, so...

4         Q. Are you offering any opinions on the

5    estimates that are produced by the equivalence

6    testing?

7         A. Offering them to who?  I mean, I have

8    opinions, but...

9         Q. You're an expert in this case.  The way we

10   phrase it is are you offering an expert opinion.

11        A. Okay.

12        Q. So are you offering any expert opinions in

13   this case on the equivalence testing estimates

14   produced by Dr. Spencer?

15        A. My opinion is that it's -- by doing this

16   Spencer has laid a plank out and then laid another

17   plank out on top of that and walked out on it.  If

18   we're going to -- can I borrow a pen?  Can I write

19   on a court document?

20          MR. BOYNTON:  Just write on a piece of

21   paper.

22        Q. You can write on the exhibit.  I can get
```

1   you a pen.

2          MR. BOYNTON:  It might be cleaner to do on

3   a clean piece of paper.

4          MS. HARLESS:  It's fine with me if he

5   writes on the back of that.

6       A. If we -- so if we were going to -- so,

7   typically, when you're doing statistical analysis

8   you're looking for a point estimate.  And what

9   Spencer has done is he's essentially said -- and,

10  you know, so if -- if this is, you know, black and

11  this is Asian, we would say, well, that's far

12  apart.  Right?  Spencer has said, well, if they

13  overlap at all over here, we're going to consider

14  them the same.

15         So it could be the case that 25 percent of

16  Asian voters supported the candidate and 80

17  percent African American supported the candidate.

18  And Spencer would say forget that 75 percent of

19  these voters didn't support that candidate, we're

20  going to consider that cohesion.  And that, in my

21  mind, is walking out on a plank with another plank

22  put out beyond it.

Transcript of Quentin Kidd, Ph.D.
Conducted on September 25, 2019                    106

1       Q. Are you basing this on the equivalence

2    testing?

3       A. Yeah.  That's what the -- that's what he's

4    doing in that equivalency testing.

5       Q. So have you done any analysis of the

6    actual estimates he produced?

7       A. This is my read of his rebuttal report,

8    not any independent analysis that I've done.

9       Q. So you've done no independent analysis?

10      A. Correct.

11      Q. Will you just mark with a star where you

12   put -- you mentioned here is where Spencer is.

13   Just so we can understand that later --

14      A. Yeah.

15      Q. -- can you put a star there?

16      A. Sure.

17         (Witness complied.)

18         This is a conceptual rendering.

19         MR. BOYNTON:  You should have been a

20   lawyer.

21      A. This is not based upon any individual

22   election.  That's sort of a conceptual rendering

Transcript of Quentin Kidd, Ph.D.
Conducted on September 25, 2019                        107

1    of what I -- of what in many cases Spencer is

2    doing.

3          MS. HARLESS:  Can we mark this as Exhibit

4    2?

5                          (Exhibit 2 was marked and

6                          attached to the transcript.)

7          A. I'll tell you what else bothers me

8    about -- since we're talking about the equivalency

9    testing, what else bothers me about it is I don't

10   know why his original -- his original report and

11   his rebuttal report are almost two different

12   reports.  And I don't know why if the equivalency

13   testing -- I don't -- I don't know why he produced

14   two different reports.  I mean --

15         Q. Do you understand that it is common

16   practice for plaintiffs' experts to produce

17   rebuttal reports?

18         A. I know that.  But my -- my impression is

19   that the plaintiff should defend their report in a

20   rebuttal, not produce a completely different

21   report.

22         Q. What is that understanding based on?

1     A. General knowledge.  General -- a general

2  sense of how it should work.  I mean, certainly

3  not any expertise in terms of having done this

4  before.  That's just my -- I mean, when I read

5  it -- so when Chris sent it around and I read it,

6  I thought, well, this is a completely different

7  report.

8     Q. And you've never been an expert before,

9  correct?

10     A. (Moved head from side to side.)

11         Certainly not in a legal case.

12     Q. And you've never produced a rebuttal

13  report before, correct?

14     A. Correct.  Yes.  So that's just my opinion.

15  I just -- my opinion was rather than defending

16  what he did initially, he completely shifted and

17  did something else and in the context of doing

18  that changed his results.  I mean, there were --

19  there were elections in his initial report where

20  he said this candidate was the minority candidate

21  of choice and lost and, then, in his rebuttal --

22  in his response, rebuttal to my response, he

1    changed that, and so it's a completely different

2    analysis.

3        Q. But you've done no independent analysis of

4    the equivalence testing estimates, correct?

5        A. Correct.

6        Q. All right.  Let's look at page 20 of your

7    expert report.

8        A. If Virginia Beach wanted to hire me to do

9    that, I would have done it, but...

10       Q. And I'm looking at Table 8.

11       A. Table 8.  Okay.  Got it.

12       Q. What is Table 8?

13       A. Table 8 is Census Bureau Estimates of

14   Virginia Turnout Among Black, Asian, and Hispanic

15   Voters CVAP, 2008 to 2018.

16       Q. Did you calculate margins of error for the

17   point estimates in Table 8?

18       A. No.  They're not reported here.

19       Q. Why not?

20       A. Because I didn't think I needed them.

21       Q. You could have calculated margins of

22   error, correct?

Transcript of Quentin Kidd, Ph.D.
Conducted on September 25, 2019                    110

1       A. Uh-huh.

2          MR. HEBERT:  Is that a yes?

3       A. Yes.  I'm sorry.  Yes.

4       Q. A water-drinking yes.

5       A. Yeah.

6       Q. Let's look at page 21.

7       A. Clearly lawyers speak differently than the

8    rest of us.  I'm just not used to that.

9       Q. In Table 9 you are reporting estimates of

10   the share of the Asian and Hispanic vote for five

11   candidates, correct?

12      A. Correct.  That is five candidates who

13   Spencer's results indicate satisfy Gingles prong 2

14   and 3.

15      Q. Did you calculate margins of error for the

16   Asian and Latino vote estimates in Table 9?

17      A. No.

18      Q. But you could have calculated margins of

19   error, correct?

20      A. Yeah.

21      Q. Why didn't you?

22      A. I didn't think I needed them.

Transcript of Quentin Kidd, Ph.D.
Conducted on September 25, 2019                    111

1        Q. Let's go to page 23.  And I'm looking at

2    the paragraph underneath the table.

3        A. Yep.

4        Q. So here you note that the estimates for

5    Asian plus Hispanic support reported here involve

6    a set of assumptions about what share of the all

7    minority vote are from these two groups and what

8    share are from African Americans.  It is an

9    informed and parsimonious estimation.

10        Do you see that?

11        A. Yep.  Yes.

12        Q. What do you mean when you say it is an

13    informed and parsimonious estimation?

14        A. So it's based upon the only known that we

15    can know is what proportion they are of the

16    population, what proportion Asians are of the

17    population, what proportion Hispanics are of the

18    population, African Americans, and so --

19        Q. Can I just ask to clarify, are you talking

20    about the population of Virginia or Virginia

21    Beach?

22        A. Virginia Beach.  Sorry.

Transcript of Quentin Kidd, Ph.D.
Conducted on September 25, 2019                    112

1          And so it's informed in the sense and

2     parsimonious in the sense that that's what we can

3     know.  So if you -- if you're going to -- if

4     you're going to produce -- if you're going to do

5     some analysis that is going to assume, because you

6     can't know, then the safest assumption in my mind

7     is to say, you know, if -- if Asians are 8.8

8     percent of the population, then let's assume they

9     turn out at their proportion of the population.

10    And so that's what I mean by informed and

11    parsimonious.

12         Q. What are the assumptions that you used to

13    arrive at these estimates?

14         A. It's that assumption.  It's the assumption

15    that a group votes at their -- at their population

16    percentage.

17         Q. Any others?

18         A. No.  No.

19         Q. So, then, how did you apply this

20    assumption that groups vote at their population

21    percentage in your analysis?

22         A. So if you want to go back -- if you want

1    to go back -- I just have to get to it.  So I

2    start with this hypothetical -- I'm sorry.  If you

3    look on page 17, the last paragraph, I start with

4    this hypothetical which demonstrates that --

5    demonstrates in the hypothetical that you could

6    have -- if you take African American, Asian, and

7    Hispanic, and white voters, and you -- you can

8    create a scenario where African American voters

9    can support a candidate, you know, at -- in this

10   case -- in this case 10 African Americans, five

11   Asians, five Hispanics, and 20 whites --

12       THE REPORTER:  Sir, if you could say that

13   again.

14     A. Sorry.  Yeah.  You're right, I read fast.

15       I'll just say it this way.  I created a

16   hypothetical where African Americans

17   overwhelmingly supported a candidate, Asians and

18   Hispanics didn't overwhelming support that

19   candidate.  And, yet, when you combine African

20   American, Asian, and Hispanics, it looks like

21   there is majority support for a candidate.

22       To demonstrate that, it is very likely in

1    many of these races where it's African American

2    voters that are driving what appears to be

3    minority support for a candidate, in that it isn't

4    a cohesion between or among African Americans,

5    Asians, and Hispanics; it's actually African

6    American voters driving the appearance of a

7    cohesion.

8            So that hypothetical begins what I then

9    walk through with several of these elections,

10   which is to demonstrate, using Spencer's data

11   where he -- where he -- where he shows black

12   support and then all minority support.  Using

13   those cases where there is a significant drop-off

14   between black support and all minority support,

15   that was what keyed me off to this was how could

16   you have black support at 80 percent for a

17   candidate and, then, all minority support dropped

18   down pretty significantly -- I'm making this up

19   because I'm not looking at a table -- but drop

20   down to, like, 40 percent or 60 black support and,

21   then, all minority support is at 30 percent?

22            Oh.  Well, what that means is that Asian

1   and Hispanic voters aren't supporting that

2   candidate at the same rate that African American

3   voters are supporting that candidate.  So

4   something is going on here.  And that's what keyed

5   me to do this analysis.  And --

6       Q. So I want to know how you did the

7   analysis.  That's what I'm asking.

8       A. Well, I can read all of this for you.  All

9   right.  So I'll read slowly.

10      Q. What page?

11      A. I'm on page 18.  I'll read it.

12      Q. You don't need to read through it.  If you

13  tell us where it is.

14      A. On page 18, that first -- that big

15  paragraph in the middle, The simplest and most

16  obvious evidence of a disparity -- that

17  paragraph -- in preferences between black voters

18  and other minority groups can be seen when Spencer

19  shows a majority of African Americans supporting a

20  candidate but a majority of all minorities failing

21  to support that candidate.

22          And I -- and I point out there are two

1    elections where this happens:  2014 Rose Hall with

2    Cabiness.  And I will note that's one that he

3    changed from his initial report to his second

4    report.  So I think he conceded that essentially

5    by changing it.  And 2008, Kempsville with Jackson

6    and Flores.

7            And, then, I go on and explain how -- how

8    the -- what I did essentially to demonstrate that.

9        Q. What statistical procedure did you use to

10   deconstruct Asian and Hispanic voter support from

11   black voter support?

12       A. We -- so -- statistical procedure?

13   Addition, subtraction, division.  It wasn't

14   anything complex.  I mean, it was -- in order to

15   be most accurate I would want to read it as it --

16   as it's shown here.

17       Q. So I'm just having difficulty, looking at

18   this paragraph alone, understanding exactly what

19   you did to get the analysis.

20       A. Look at the first paragraph on page 19.

21   I'll read it just so we've got this.  And I'll

22   read it slowly.

1          With Cabiness receiving 51.7 of the

2    African American vote but only 37 percent of the

3    overall minority vote, it means that his support

4    from Asian and Hispanics was actually far less

5    than 37 percent.  Consider, for example, that if

6    the overall minority vote (all minority) was half

7    from black voters and half from Asian plus

8    Hispanic voters, Cabiness would have netted 51.7

9    percent of the black vote but only 22.3 percent of

10   the combined Asian and Hispanic vote since (51.7

11   plus 22.3 divided by 2 equals 37).  Thus, while

12   Cabiness gets a bare majority of the African

13   American vote, he is soundly rejected by Asian and

14   Hispanic voters.

15          Then I go -- in the next paragraph is

16   where I explain, but, of course, it isn't 50 and

17   50 because the majority -- the African American

18   voting population is larger than the Asian and

19   Hispanic voting population.  Right?

20          And so the black vote constitutes a little

21   over 60 percent; 60.3.  And the Asian/Hispanic

22   vote is 6.6 percent for Asian and 6.1 percent for

1    Hispanic.  And so that paragraph details what I

2    think is a more -- not the hypothetical in the

3    first paragraph or the paragraph above where it's

4    50/50 but a more realistic assessment where it's,

5    you know, the African American population is much

6    larger than the Asian and Hispanic population.

7        Q. Did you disclose the calculations you used

8    to produce these numbers anywhere?

9        A. Yeah.  The only calculations that I -- the

10   only calculations that I did are all in here,

11   spelled out in each paragraph.  And the equation

12   is on footnote 22 there.

13        So every election that I did this for,

14   where I had questions about, each -- I, basically,

15   did it in each paragraph.  So the paragraphs that

16   follow are in there.

17       Q. Did either Bullock, Brace, or Morrison

18   verify this analysis?

19       A. So I assume --

20       MR. HARRIS:  To the extent you're asking

21   about a conversation that occurred in the presence

22   of the attorneys, we're going to object to that.

1        MR. HEBERT:  We're not.

2        MR. BOYNTON:  So outside of that.

3    A. Outside of that, no.

4    Q. Did you send your report to Bullock,

5  Brace, or Morrison before it was submitted to the

6  plaintiffs?

7        MR. HARRIS:  Again, same objection.  To

8  the extent it implicates being sent to any of

9  those individuals through counsel or in discussion

10  with counsel, we would object to that as

11  attorney-client privilege and litigation work

12  product.

13    A. I will say this.  I haven't communicated

14  with anyone outside of communicating through the

15  attorneys, except exchanging an email with Chuck

16  last night.

17    Q. What was that email?

18        MR. HARRIS:  We're certainly objecting to

19  that because that is getting into what is clearly

20  prohibitive by the rules.  And I can quote the

21  rule for that.

22        We've already talked about non-testifying

1   experts and his opinions and facts known or can be

2   held of those non-testifying experts are not

3   discoverable.  And that's Rule 26(b)(4)(D)(ii).

4   So I would instruct him not to answer that

5   question.

6          MR. BOYNTON:  We're back to where I think

7   we left off a while ago, where we can identify the

8   person to you, which we've done.  We've told you

9   there was a conversation.  But that's the end of

10  what we're going to give you on that.

11         MR. HEBERT:  Okay.  I understand what

12  you're saying.

13     Q. Is there any other time you've spoken to

14  Bullock by yourself without the attorneys present?

15     A. No.

16         Well, to be perfectly honest, 15 years ago

17  Chuck was on a panel at a conference where I

18  presented a paper, so...

19         MR. BOYNTON:  Not in the context of this

20  case?

21     A. Not in the context of this case, no, but

22  just to be honest.

1      Q. I'm going to go back to the paragraph

2    under Table 10 on page 23.

3      A. Okay.

4      Q. And here you continue on to say, Of

5    course, alternative values for African Americans

6    and Asian plus Hispanic vote share to reflect

7    other years and other conditions can be estimated,

8    but results more favorable to plaintiffs can only

9    be estimated if the distribution of the African

10   American vote share is assumed to be less than

11   60.3 percent.

12         Do you see that?

13     A. Yes.

14     Q. Where does the 60.3 percent figure come

15   from?

16     A. So if you come back to page 19, that

17   middle paragraph, there is a sentence.  Thus,

18   blacks constitute 60.3 percent of the combined

19   African American-Asian-Hispanic potential

20   electorate.

21     Q. I'm asking where did you get that number?

22     A. So that's what I was -- I mean, that's

Transcript of Quentin Kidd, Ph.D.
Conducted on September 25, 2019

122

1    what I described up above here.  The combined vote

2    for Asians plus Hispanics is almost certainly less

3    than the number of votes cast by African

4    Americans.  Using plaintiffs' own data, according

5    to the Lichtman report African Americans make up

6    19.3 percent of the CVAP, Asians are 6.6 percent,

7    and Hispanics are 6.1 percent.  Thus, blacks

8    constitute 60.3 percent of the combined African

9    American-Asian-Hispanic potential electorate.

10       Q. In your opinion, why would the black vote

11   share have to be less than 60.3 percent in order

12   to "be more favorable to plaintiffs"?

13       A. Because in the context of those three

14   racial and ethnic groups it's a zero sum game.

15   You can't be more than 60.3 percent without taking

16   some of that percent away from Asians and

17   Hispanics.  And Asians and Hispanics can't be more

18   than their percent without taking some away from

19   African Americans in the context of what is known.

20   And that is what is known right here, which is,

21   according to Lichtman's report, 19.3 percent of

22   the CVAP is Asian, Hispanic, and black.  I mean,

1    that's -- so that's where that comes from.

2        Q. If Hispanics gave 25 percent of their

3    votes to a black candidate and five to 15 to a

4    white candidate, would you agree that the black

5    candidate was the candidate of choice of Hispanic

6    voters?

7        A. All right.  Say that again.  If --

8        Q. If Hispanics gave 25 percent of their

9    votes to a black candidate and five percent to 15

10   other white candidates, would you agree that the

11   black candidate was the candidate of choice of

12   Hispanic voters?

13       A. I don't know that I would agree to that.

14       Q. Why?

15       A. Because two-thirds of the -- of that vote

16   didn't go to the black candidate.  And I just

17   don't know how you can say a quarter of the vote

18   constitutes a preference.

19       Q. In the hypothetical we just discussed, who

20   was the candidate of choice of Hispanic voters?

21       A. I think in a situation where you have

22   multiple candidates, it is also possible for there

Transcript of Quentin Kidd, Ph.D.
Conducted on September 25, 2019                    124

1    not to be a candidate of choice.

2        Q. So in this hypothetical you think there is

3    no candidate of choice?

4            MR. HARRIS:  Object to the form of the

5    question.

6            You can answer it.

7        A. In that hypothetical I would argue that

8    the candidate of choice isn't clear.

9        Q. Are there any reasons why the vote share

10   estimates you provide for Asian and Latino voters

11   in Virginia Beach may not be accurate predictors

12   of candidate preference?

13       A. Are there any reasons why -- say that

14   again.  I'm just processing what you -- what you

15   asked me.

16       Q. Are there any reasons why the vote share

17   estimates you provide for Asian and Latino voters

18   in Virginia Beach may not be accurate predictors

19   of candidate preference?

20       A. I can't think of any sort of off the top

21   of my head.

22       Q. All right.  Let's move to Section III of

1    your report or -- Section IV.

2        A. Page 25?

3        Q. Section IV.

4            MR. BOYNTON:  I'm going to take my leave

5    and leave it to my two capable colleagues.

6        Q. Section IV of your report offers opinions

7    on several totality of the circumstances factors,

8    correct?

9        A. Correct.

10       Q. You have not studied whether elected

11   officials in Virginia Beach have been responsive

12   to the particularized needs of the minority

13   community, correct?

14           MR. HARRIS:  Objection to foundation and

15   form.

16       A. I don't know what that means.

17       Q. You can answer.

18       A. I don't know what that means.

19           MR. HARRIS:  Sorry.  It's legal-speak.

20   You can answer the question.

21       A. I have not -- all right.

22           So when you say I have not studied, what

1    do you mean by that?  Like, I have not conducted a

2    formal study?

3        Q. In your report you did not look at whether

4    elected officials in Virginia Beach have been

5    responsive to the particularized needs of the

6    minority community, correct?

7        A. I think that's correct.

8        Q. Okay.  And in your report you have not

9    done any analysis comparing the adoption of

10   Virginia Beach's method of election with other

11   cities across the state?

12       A. I did do some analysis on that.

13       Q. Of why Virginia Beach chose its election

14   system?

15       A. So I can tell you why they chose their

16   election system.  But I didn't -- but that didn't

17   seem relevant for me in this report.

18       Q. So that analysis is not in your report?

19       A. It is not in the report.  I can tell you

20   why, if you want to know.  It goes back to rural

21   urban representational issues.

22       Q. It's not whether I want to know or not.

Transcript of Quentin Kidd, Ph.D.
Conducted on September 25, 2019                    127

1        A. Okay.

2        Q. It's just whether it's in your report.

3        A. I'm a teacher by training.

4        Q. I know.

5             You'd agree, wouldn't you, that the way

6     election districts are drawn can determine which

7     candidates run for office?

8             MR. HARRIS:  Object to the form of the

9     question.

10            You can answer.

11       A. I would agree -- I would agree that the

12    way election districts are drawn determines

13    whether somebody runs or doesn't run.

14       Q. Can determine --

15       A. Can determine.

16       Q. -- which candidates run for office?

17       A. I would -- I would agree with that.

18       Q. And you'd also agree that the way election

19    districts are drawn can determine which candidates

20    win, correct?

21       A. I would -- I mean, yeah, I would agree

22    with that.  I don't think that -- I don't think

Transcript of Quentin Kidd, Ph.D.
Conducted on September 25, 2019                    128

```
 1    it's all the time, but, yeah, there are times when

 2    it can.

 3        Q. And it is true that the electoral system

 4    in place in a jurisdiction can impact voter

 5    turnout, correct?

 6        A. I would agree with that.  There are many

 7    cases around the country where you have 80 percent

 8    red districts and Democratic turnout is really

 9    low, 80 percent blue districts and Republican

10    turnout is really low.

11        Q. Is it your opinion that Latinos and Asians

12    in the State of Virginia have never faced

13    voting-related discrimination?

14        A. I have -- I don't want to ever -- I don't

15    want to ever say never because I don't know every

16    single, you know, issue that might have ever

17    happened in Virginia anywhere.  I would say -- I

18    would be willing to say as a general rule, and

19    probably a pretty strong rule, Asians and

20    Hispanics have not faced the kind of voter

21    discrimination historically in Virginia that

22    African Americans did.
```

Transcript of Quentin Kidd, Ph.D.
Conducted on September 25, 2019                                    129

1        But I would also say this.  In my opinion,

2    my opinion, this case is about Virginia Beach.

3    And I will say in Virginia Beach I don't know of

4    an incidence where Asians or Hispanics have faced

5    voter discrimination.

6       Q. Did you do any kind of analysis looking

7    into that?

8       A. I actually did do some Google searching

9    trying to find incidences of voter discrimination

10   for Asians and Hispanics in Virginia Beach.  I

11   couldn't find anything, I mean.  It's just a

12   Google search, so...

13       And I will also say this.  I've been

14   watching -- I've been watching politics in

15   Virginia Beach and Hampton Roads for almost 25

16   years, so I also just have the awareness and

17   knowledge of sort of what goes on politically in

18   Virginia Beach and in Hampton Roads generally.

19       So a lot of that is just sort of drawn

20   from my understanding of, you know -- like when

21   Lichtman tries to -- uses that case with Cheryl

22   Turpin and Rocky Holcomb, what he -- because he's

Transcript of Quentin Kidd, Ph.D.
Conducted on September 25, 2019                          130

1    not here, he doesn't know this area, what he

2    doesn't realize is there was massive push-back at

3    Rocky Holcomb and he lost largely because people

4    didn't like any -- any sort of racial implications

5    being drawn into an election.

6         Q. We'll get to that, I promise.

7             Besides doing some Google searches to look

8    for instances of voter discrimination against

9    Latinos and Asians in Virginia Beach, did you do

10   anything else.

11        A. I'm not aware -- no.  And I'm not aware of

12   any, so...

13        Q. Are you aware of efforts that have taken

14   place in Virginia Beach since the 1990s to change

15   the election system to a single-member district

16   system?

17        A. Yes.

18        Q. Were you involved in those efforts in any

19   way?

20        A. No.

21        Q. Have you ever commented on those efforts?

22        A. Oh, geez.  I mean, I've commented to

1    newspapers and TV stations about Hampton Roads

2    politics for 20 years, so maybe.  I don't know

3    if -- I can't name a specific time when I did.

4        Q. Is it your opinion that Latinos and Asians

5    in Virginia Beach specifically have never faced

6    any kind of discrimination?

7            MR. HARRIS:  Object to the form of the

8    question.

9            You can answer.

10       A. All I can say is I don't know of a

11   particular instance where they -- where they did.

12       Q. And what analysis did you do to determine

13   whether Latinos and Asians have experienced any

14   kind of discrimination?

15       A. Again, like I said earlier, I don't know

16   of an incidence.  And I did do a Google search to

17   try to find something, but I couldn't find

18   anything.  So that's -- so if you want to call

19   that analysis, that would be my analysis.

20       Q. Would you call it an analysis?

21       A. No.  I would call that a Google search.

22       Q. You have not done any analysis in this

1   case on instances of past or present

2   discrimination against minorities in education,

3   employment, or health, correct?

4        MR. HARRIS:  Object to the form of the

5   question.

6        You can answer.

7      A. No.

8      Q. In your report you did not provide

9   estimates of the turnout for Asian, black, or

10  Hispanic voters in Virginia Beach specifically,

11  correct?

12     A. I believe the closest I came -- let me go

13  back.  The closest I came was Table 8.  And so it

14  is in my report.

15     Q. And Table 8 is estimates of Virginia

16  turnout, correct?

17     A. Correct.

18     Q. Not Virginia Beach?

19     A. That is correct.  Yep.

20     Q. So you did not provide estimates of the

21  turnout for Asian, black, or Hispanic voters in

22  Virginia Beach specifically, correct?

Transcript of Quentin Kidd, Ph.D.
Conducted on September 25, 2019                    133

1        A. Correct.

2        Q. I'd like you to go to pages 28 through 30

3    of your report.  On pages 28 through 30 of your

4    report, Figures 1 through 3 contain Census Bureau

5    estimates of voter turnout among minority groups

6    in the State of Virginia from 2008 to 2018,

7    correct?

8        A. Correct.

9        Q. Why does Figure 1 have data from 2006 to

10   2018 while Figures 2 and 3 have data from 2008 to

11   2018?

12       A. It's a typo.  It is 2008.  It's just I

13   didn't put -- it's a typo.

14       Q. So you actually used 2008 to 2018?

15       A. It's 2008 to 2018 on all of them.  But for

16   whatever reason, I have no idea how that typo

17   happened, but it's a typo.

18       Q. Okay.

19       A. The table clearly indicates it's 2008.

20   And it is 2008.

21       Q. In your expert report you disclose the

22   data you used to compile Figures 1 through 3 in

Transcript of Quentin Kidd, Ph.D.
Conducted on September 25, 2019                          134

1   your report, correct?

2       A. I believe that I did.  It should be -- if

3   I did, it's in a footnote.

4       Q. Was it an Excel file?

5       A. So I created an Excel file.  I created an

6   Excel spreadsheet to create these figures.

7       Q. And the Excel spreadsheet included point

8   estimates for Figures 1 through 3 of your report,

9   correct?

10      A. Correct.

11      Q. Mark this as Exhibit 3.

12          I had to tape the pages here together, so

13  it's pretty big.  I had to get the whole -- and

14  we'll mark it.  But I just want you to see it.

15          Mark that as Exhibit 3.

16                          (Exhibit 3 was marked and

17                       attached to the transcript.)

18      A. Sometimes I wish I had a screen this big

19  (indicating) so I could see it all at once.

20      Q. Dr. Kidd, you've just been handed what's

21  been marked as Exhibit 3 by the court reporter.

22  Have you seen this before?

1       A. I have.

2       Q. What is this?

3       A. It is Census Bureau current population

4   survey estimates for various years.  And, then, I

5   took parts of those and created other tables so

6   that I could create figures that tracked point

7   estimates and margins for turnout among Asians,

8   Hispanics, and African Americans.

9       Q. Did you compile this data or did somebody

10  else?

11      A. I did.  No.  I did.

12      Q. And just to confirm, this spreadsheet

13  contains the point estimates for Figures 1 through

14  3 in your report, correct?

15      A. Correct.

16      Q. Now you can put that aside.

17      A. All right.  You'd agree, wouldn't you,

18  that Latino voters face a language barrier that

19  makes it more difficult to navigate the political

20  system?

21          MR. HARRIS:  Objection to the form of the

22  question.

Transcript of Quentin Kidd, Ph.D.
Conducted on September 25, 2019                    136

1        You can answer.

2      A. What I would agree to -- what I would

3    agree with is that there are times when Latinos

4    face language barriers.  There are, also, lots of

5    support organizations that help with those, so I'm

6    not convinced that they actually are 100 percent

7    limitations.

8      Q. But they do impact Latinos' ability to

9    navigate the political system, correct?

10        MR. HARRIS:  Object to the form of the

11    question.

12        You can answer.

13      A. I mean, to the extent to which a language

14    barrier impacts your ability to navigate society,

15    yes.

16      Q. What are the instances you were thinking

17    of, the particular times you mentioned where a

18    language barrier can make it more difficult to

19    navigate the political system?

20      A. What are the specific -- that I was

21    thinking?  I wasn't thinking about any.  I was

22    just answering the question.

Transcript of Quentin Kidd, Ph.D.
Conducted on September 25, 2019                     137

1      Q. You said there are times.  When?

2      A. Well, society generally.  Like, there are

3  times when if you don't speak the language -- I

4  mean, at my university if you have a language

5  problem you'd struggle to figure out how to drop

6  and add classes.  I mean, if you're struggling --

7  if you have a language problem, you're going to

8  struggle with how to go open a checking account or

9  register to vote if you don't have support from

10  organizations.

11      Q. Are you aware that voter registration

12  rates in Virginia for blacks, Latinos, and Asians

13  are lower than whites?

14      A. I am -- I am aware that -- I can't tell

15  you exactly what I've read or where I've read it,

16  but, yes, I do -- I am generally aware of that.

17      Q. Data disclosed with your report included

18  precinct level data on voter turnout and

19  demographics for Virginia Beach prepared by

20  Kimball Brace, correct?

21      A. Yeah.

22      Q. Did you look at that data?

Transcript of Quentin Kidd, Ph.D.
Conducted on September 25, 2019                    138

1      A. Not for this (indicating).  I did look at

2  the data.  I opened the Excel file.

3      Q. Just to be clear, when you say not for

4  this, do you mean for your report?

5      A. I'm sorry.  Not for my -- not for these

6  figures that I put in there.

7      Q. Is it your opinion that an appeal used by

8  a campaign can only be an overt or subtle racial

9  appeal if the candidate using the appeal wins

10  their election?

11     A. All right.  Ask that question again.

12     Q. Is it your opinion that an appeal used by

13  a campaign can only be an overt or subtle racial

14  appeal if the candidate using the appeal wins

15  their election?

16     A. No.

17     Q. Why not?

18     A. I mean, because an overt racial appeal --

19  I mean, I would hope most of the time people lose

20  when they do overt racial appeals.  But an overt

21  racial appeal is an overt racial appeal.  It

22  has -- whether the appeal is overtly racial or not

Transcript of Quentin Kidd, Ph.D.
Conducted on September 25, 2019                                    139

1   has no bearing on whether -- is not defined by

2   whether the candidate wins or loses, I guess is

3   what I would say.

4       Q. And a subtle racial appeal is a subtle

5   racial appeal, as well, right?

6       A. A subtle racial appeal is a subtle appeal?

7   I mean, that's tautology.

8       Q. It's not -- you just said an overt racial

9   appeal is an overt racial appeal, it doesn't

10  matter if the candidate wins.

11      A. Oh.  I see what you're saying.  Okay.  In

12  that context, yeah.

13          Now, what I would say about subtle versus

14  overt -- and it's almost like the -- I'm not a

15  lawyer here.  Whoever the Justice was that said

16  you know pornography when you see it, what defines

17  a subtle versus an overt racial appeal, I think,

18  is probably -- the subtle part of it in particular

19  is probably arguable by different people.

20          Overt racial appeals, I mean, if you -- if

21  you get people into a room and get them to be

22  honest for a moment, most people probably would

1    say if an overt racial appeal is overt.  But I

2    think subtle racial appeals, I think people can

3    see things differently, legitimately and honestly.

4    So I don't -- that would be my clarification of

5    that.

6         Q. Is it your opinion that a racial appeal

7    itself must be successful in electing the

8    candidate to be relevant to factor 6 of the

9    totality of the circumstances test?

10        A. Is it my -- say that again.

11        Q. Is it your opinion that a racial appeal

12   itself must be successful in electing the

13   candidate to be relevant to factor 6 of the

14   totality of the circumstances test?

15        A. I guess I'm tripping up on the itself.

16   Like, is it -- is it itself --

17        Q. Is the racial --

18        A. -- a definer of --

19        Q. Is the racial appeal the reason why the

20   candidate won?

21        A. I don't -- no.  That isn't -- I wouldn't

22   say that's my opinion.

Transcript of Quentin Kidd, Ph.D.
Conducted on September 25, 2019                          141

1      Q. In the 2017 election between Rocky Holcomb

2   and Cheryl Turpin, Turpin won by only 389 votes,

3   correct?

4      A. If you say so, but I'm not looking at the

5   vote count right now.  I know she only won by a

6   few hundred votes.

7      Q. In his rebuttal -- you said you've read

8   the Lichtman rebuttal report, correct?

9      A. I did.

10      Q. I'm not going to mark this as an exhibit,

11   but I'll show it to you.

12         In his rebuttal report Dr. Lichtman points

13   to a 2008 flyer distributed during a City Council

14   race in support of candidate Sessoms as an example

15   of a racial appeal in Virginia Beach.  Do you have

16   any opinions regarding that flyer?

17      A. I do, actually.

18      Q. Would you like to see it?

19      A. So this is -- this is an example where I

20   said a minute ago there's -- subtlety is in the

21   eyes of the beholder.  Right?

22         So if -- so as a subtle racial appeal, I

Transcript of Quentin Kidd, Ph.D.
Conducted on September 25, 2019                    142

1    think you can have positive appeals and negative

2    appeals.  So in this particular case what was --

3    what was illegal about this was there was no

4    ownership stamp as required by law.  But it was --

5    it was Sessoms appealing for African American

6    support.  Sessoms wasn't demeaning the President.

7    He wasn't altering the image of the President or

8    anything like that.  He was appealing for African

9    American support.

10        My understanding of these flyers being

11   circulated were they were circulated in -- the

12   allegation is they were circulated in largely

13   African American voter precincts in an effort to

14   gain African American support.

15        So is it a subtle racial appeal?  I could

16   see somebody saying it's a subtle racial appeal.

17   Is it a negative racial appeal?  I would argue no.

18       Q. Even if it's not a negative racial appeal,

19   it's still a racial appeal?  You'd agree to that,

20   correct?

21       A. I would agree it's a racial appeal.  It's

22   appealing -- it is an appeal to African American

1    voters to support a candidate who wants to align

2    himself with the President, who happens to be the

3    first black President in this country's history.

4        Q. So a racial appeal doesn't have to be

5    negative to be a racial appeal, correct?

6        A. I would say no, but I would also

7    distinguish between positive racial appeals and

8    negative racial appeals.  I mean, look, if Will

9    Sessoms were an African American candidate for

10   Mayor of Virginia Beach and that flyer went out,

11   it would still be illegal because it didn't have

12   an ownership stamp.  But it would not be

13   considered a racial appeal the same way that we're

14   talking about it as a racial appeal.  And it

15   certainly, if it was, it would be considered a

16   positive racial appeal.

17       Q. But whether something is a positive or

18   negative racial appeal, you'd agree it's still a

19   racial appeal, right?

20       MR. HARRIS:  Object to the form of the

21   question.

22           You can answer.

Transcript of Quentin Kidd, Ph.D.
Conducted on September 25, 2019                                   144

1          A. I mean, yeah.

2              I will add -- let me add something else

3      here.  The person -- so where I think Lichtman got

4      this was a local blogger who wrote -- I want to

5      say she wrote, like, four or five blog posts on

6      this.  She was an African American, well-known in

7      Hampton Roads, political activist, nicest person

8      in the world.  She wrote four or five blog posts

9      about this.

10             I went back and read those blog posts.

11     She doesn't call it -- she doesn't -- her focus is

12     on the, sort of, dirty politics of putting out

13     flyers that are -- that don't have the stamp of

14     ownership on them and stuff like that.  But she's

15     not -- she's not, sort of, going after the racial

16     appeal -- negative racial appeal part of it, like,

17     for example, the firestorm that was created by

18     Rocky Holcomb's campaign when he put out that

19     flyer the latter stages of his race against Cheryl

20     Turpin four years ago -- two years ago.

21             I would also say in Lichtman's report --

22     if you look at the other side of the flyer and you

1    read that, Sessoms is saying support me, I'll

2    do -- I'll do the things that you want done when

3    I'm in the Mayor's Office.  That's a completely

4    different kind of appeal than a negative racial

5    appeal where you're trying to suppress vote or

6    you're trying to demoralize vote or you're trying

7    to, quite frankly, damage a candidate.

8        Q. This flyer is still using race to try to

9    appeal to a certain group of voters, correct?

10       A. Yeah.  I mean, I think so because of

11   the -- because of the President's image on there,

12   yes.

13        MS. HARLESS:  And for the record, we've

14   been talking about the flyer that's contained on

15   page 34 through 35 of Dr. Lichtman's rebuttal

16   report.

17       A. I don't know how you-guys do this every

18   day.

19        MR. HARRIS:  Do you want to take five

20   minutes?

21        MS. HARLESS:  We're almost done.

22       Q. In your report you haven't done any

Transcript of Quentin Kidd, Ph.D.
Conducted on September 25, 2019                    146

1    analysis of news articles regarding a change to

2    single-member districts in Virginia Beach,

3    correct?

4        A. I didn't do any analysis of them.  I did

5    do a brief look to see if I could find news

6    coverage of it.  And I found some.  Didn't find a

7    lot.  And then, of course, in Lichtman's response

8    he pointed out some other stuff that had been

9    published or had been in the newspaper or TV.

10       Q. Are you talking about news coverage of a

11   change to single-member districts or news coverage

12   of this lawsuit?

13       A. Oh.  I'm talking about coverage of this

14   lawsuit.  I'm sorry.  I may be on a different

15   subject than -- you may have been on a different

16   subject than that.

17       Q. That's okay.

18       A. I'm not -- I didn't do any news analysis

19   search.  I didn't do any searches for news of

20   coverage about the effort to change Virginia

21   Beach's voting -- the way Virginia Beach votes for

22   City Council races, if that's what your question

1    was.

2        Q. Are you aware whether Sabrina Wooten was

3    the only black candidate for City Council in

4    Virginia Beach since 2008 to win a majority of the

5    white vote?

6        A. I probably am aware of that just looking

7    at Spencer's analysis.

8        Q. Is that yes?

9        MR. HARRIS:  Objection to the form of the

10   question.

11       A. I mean, based upon Spencer's analysis,

12   I -- if that is correct in Spencer's analysis,

13   then I'm aware of it, but I would want to go back

14   and look at his analysis.

15       The only way I'm going to know who got

16   what percentage of white or black or Asian or

17   Hispanic vote or all minority vote is from

18   Spencer's analysis.  I didn't do any independent

19   analysis on my own.  I just analyzed Spencer's

20   report.  So if that's what Spencer reports, then I

21   do know that.

22       Q. Since your report was submitted, have you

1    discovered any errors?

2        A. I just discovered --

3        MR. HARRIS:  Objection to form.  You

4    mean -- we're talking about his report now, not

5    Dr. Spencer's report?

6        Q. I said since your report was submitted.

7        A. I just discovered an error.  I put 2006 on

8    a figure when it should have been 2008.  But, no,

9    I've not -- I don't know of any errors.  I haven't

10   discovered any, so...

11       Q. As of today, does your report contain a

12   complete statement of your opinions in this case?

13       A. Well, no, because I have some strong

14   opinions about Spencer's rebuttal report, but they

15   aren't in my report.  I read them.  I have strong

16   opinions about them.  I expressed some of them to

17   you.

18        My report is my full and complete

19   statement about my analysis of Spencer and

20   Lichtman's initial reports.

21       Q. Are there any other opinions you have

22   about Spencer's rebuttal report that you haven't

Transcript of Quentin Kidd, Ph.D.
Conducted on September 25, 2019                                    149

```
1    already told me about today?
2        A. No.  I think I've -- I think I've covered
3    them.
4            MS. HARLESS:  Could we just take a
5    two-minute break?
6            MR. HARRIS:  That would be fine.  We'll
7    step out.
8            (A recess was taken.)
9        Q. Earlier today you testified that you did
10   not do your own ecological regression, ecological
11   inference, or homogeneous precinct calculations,
12   correct?
13       A. Correct.
14       Q. But you could have, correct?
15       A. Yeah.  I can do EI and -- ecological
16   regression and ecological inference analysis.
17       Q. And you didn't?
18       A. Correct.
19           MS. HARLESS:  No further questions.
20           MR. HEBERT:  Thank you, Dr. Kidd.
21           MS. HARLESS:  Thank you.
22           MR. HARRIS:  Dr. Kidd, as a point of
```

Transcript of Quentin Kidd, Ph.D.
Conducted on September 25, 2019                    150

1    order, we ask all our experts to read and sign

2    their depositions to verify the accuracy.  So

3    we're going to ask you to do that, as well.

4         THE DEPONENT:  I've got to read all this

5    right now?

6         MR. HARRIS:  No.  Not right now.  She'll

7    prepare the report and provide an errata sheet.

8         So we'll read and sign.

9

10        (Signature having not been waived, the

11   deposition of QUENTIN KIDD, Ph.D. was concluded at

12   12:35 p.m.)

13

14

15

16

17

18

19

20

21

22

1              ACKNOWLEDGMENT OF DEPONENT

2          I, QUENTIN KIDD, Ph.D., do hereby

3    acknowledge that I have read and examined the

4    foregoing testimony, and the same is a true,

5    correct, and complete transcription of the

6    testimony given by me and any corrections appear

7    on the attached Errata Sheet signed by me.

8

9

10   _____        _____

11        (DATE)                          (SIGNATURE)

12

13

14

15

16

17

18

19

20

21

22

Transcript of Quentin Kidd, Ph.D.
Conducted on September 25, 2019                                    152

1   CERTIFICATE OF SHORTHAND REPORTER-NOTARY PUBLIC

2           I, Penny C. Wile, RPR, RMR, CRR, the

3   officer before whom the foregoing deposition was

4   taken, do hereby certify that the foregoing

5   transcript is a true and correct record of the

6   testimony given; that said testimony was taken by

7   me stenographically and thereafter reduced to

8   typewriting under my direction; that reading and

9   signing was requested; and that I am neither

10  counsel for, related to, nor employed by any of

11  the parties to this case and have no interest,

12  financial or otherwise, in its outcome.

13          IN WITNESS WHEREOF, I have hereunto set my

14  hand and affixed my notarial seal this 6th day of

15  October, 2019.

16          My commission expires:  January 31, 2021.

17

18

19

20  _____

21   NOTARY PUBLIC IN AND FOR

22  THE COMMONWEALTH OF VIRGINIA

Transcript of Quentin Kidd, Ph.D.
Conducted on September 25, 2019

153

| A |
|---|

**abi**
58:12, 58:13
**ability**
53:14, 136:8,
136:14
**able**
17:3, 22:3,
37:15, 64:17,
73:15
**about**
8:14, 10:10,
10:16, 11:15,
13:3, 13:13,
14:4, 14:5,
14:7, 15:18,
15:19, 16:14,
17:19, 18:18,
18:20, 19:18,
19:19, 20:2,
20:17, 20:20,
21:10, 21:22,
22:6, 22:9,
22:12, 22:16,
22:18, 23:1,
24:4, 29:9,
29:15, 29:16,
29:17, 30:13,
30:18, 31:6,
31:17, 32:16,
33:10, 33:13,
33:17, 34:5,
34:7, 34:10,
34:12, 36:1,
36:5, 36:18,
40:19, 43:20,
44:5, 57:2,
57:5, 57:9,
58:8, 59:6,
59:7, 59:21,
59:22, 60:17,
60:21, 62:14,
62:15, 71:4,
71:18, 79:17,
92:3, 98:4,
99:17, 99:18,
99:20, 101:8,

103:3, 103:14,
107:8, 107:9,
111:6, 111:20,
118:14, 118:21,
119:22, 129:2,
131:1, 136:21,
139:13, 142:3,
143:14, 144:9,
145:14, 146:10,
146:13, 146:20,
148:4, 148:14,
148:16, 148:19,
148:22, 149:1
**above**
118:3, 122:1
**academic**
12:4, 29:1,
38:20, 52:18,
102:2, 103:9
**academics**
101:7
**according**
75:10, 75:16,
77:3, 77:12,
77:13, 77:18,
80:11, 80:14,
81:12, 81:20,
82:9, 82:21,
83:3, 84:21,
85:9, 85:16,
85:19, 86:15,
86:21, 87:3,
87:19, 87:22,
88:9, 88:14,
88:20, 89:7,
89:13, 89:19,
93:20, 95:18,
122:4, 122:21
**account**
137:8
**accuracy**
150:2
**accurate**
116:15, 124:11,
124:18
**acknowledge**
151:3
**acknowledgment**
151:1

**across**
36:12, 126:11
**act**
14:21, 15:16,
18:7, 32:4,
32:17, 35:18,
35:21, 36:1,
36:5, 36:18,
36:19, 37:2,
37:3, 37:4,
41:18
**activist**
144:7
**activities**
39:20
**actual**
106:6
**actually**
8:6, 11:15,
17:17, 17:18,
19:15, 28:10,
31:21, 44:11,
44:15, 44:19,
45:21, 49:15,
51:1, 60:5,
63:15, 63:21,
71:5, 71:6,
74:10, 94:21,
97:14, 99:11,
99:12, 114:5,
117:4, 129:8,
133:14, 136:6,
141:17
**add**
137:6, 144:2
**added**
28:3
**addition**
116:13
**administration**
30:15
**administrative**
29:1, 30:3
**administratively**
41:6
**adopted**
43:4
**adoption**
126:9

**advanced**
97:22
**advisor**
39:22, 41:13,
41:16, 42:7
**advisory**
39:22, 40:4,
40:9, 42:8
**affixed**
152:14
**african**
15:6, 37:13,
54:19, 55:8,
56:4, 56:9,
64:19, 73:4,
73:6, 73:13,
75:7, 75:9,
77:18, 79:7,
82:22, 83:3,
85:5, 86:12,
105:17, 111:8,
111:18, 113:6,
113:8, 113:10,
113:16, 113:19,
114:1, 114:4,
114:5, 115:2,
115:19, 117:2,
117:12, 117:17,
118:5, 121:5,
121:9, 121:19,
122:3, 122:5,
122:8, 122:19,
128:22, 135:8,
142:5, 142:8,
142:13, 142:14,
142:22, 143:9,
144:6
**after**
6:4, 26:6,
26:13, 67:4,
70:15, 144:15
**again**
38:19, 58:4,
61:20, 72:6,
80:11, 82:21,
84:19, 86:6,
86:22, 87:1,
90:14, 92:8,

Transcript of Quentin Kidd, Ph.D.
Conducted on September 25, 2019

154

97:3, 98:15,
100:2, 113:13,
119:7, 123:7,
124:14, 131:15,
138:11, 140:10
**against**
75:1, 76:7,
130:8, 132:2,
144:19
**age**
33:20
**agency**
41:8
**ago**
13:13, 14:3,
18:18, 29:20,
30:13, 30:14,
32:6, 37:22,
102:19, 103:10,
120:7, 120:16,
141:20, 144:20
**agree**
9:4, 13:19,
47:22, 58:19,
59:9, 59:13,
61:10, 61:17,
61:21, 64:4,
64:9, 65:7,
76:6, 76:8,
81:2, 81:5,
82:14, 83:7,
83:14, 84:4,
84:11, 85:16,
85:17, 86:2,
86:13, 88:1,
88:2, 88:12,
88:13, 89:21,
90:3, 96:18,
123:4, 123:10,
123:13, 127:5,
127:11, 127:17,
127:18, 127:21,
128:6, 135:17,
136:2, 136:3,
142:19, 142:21,
143:18
**agreed**
41:5

**agreement**
8:10, 9:6, 9:8,
9:11, 9:19, 11:8
**al**
1:9, 4:3
**align**
143:1
**all**
16:1, 27:16,
28:2, 28:20,
29:11, 30:10,
31:2, 34:18,
35:20, 37:8,
39:19, 40:8,
43:7, 44:8,
44:21, 46:19,
48:8, 49:15,
50:10, 54:4,
58:13, 58:17,
59:6, 69:14,
70:18, 71:4,
72:15, 80:22,
82:1, 83:19,
84:6, 85:1,
85:5, 86:14,
87:15, 88:14,
90:14, 91:22,
93:8, 94:6,
95:15, 100:22,
105:13, 109:6,
111:6, 114:12,
114:14, 114:17,
114:21, 115:8,
115:20, 117:6,
118:10, 123:7,
124:22, 125:21,
128:1, 131:10,
133:15, 134:19,
135:17, 138:11,
147:17, 150:1,
150:4
**allegation**
142:12
**alleges**
83:15, 89:4
**alleging**
84:12, 88:13,
89:20, 90:1,

90:2
**allen**
1:6, 3:3, 86:16
**allison**
94:8, 94:15,
94:18
**almost**
48:10, 107:11,
122:2, 129:15,
139:14, 145:21
**alone**
72:16, 116:18
**already**
22:18, 119:22,
149:1
**also**
11:18, 25:19,
36:21, 46:11,
123:22, 127:18,
129:1, 129:13,
129:16, 136:4,
143:6, 144:21
**altering**
142:7
**alternative**
121:5
**although**
69:19
**amelia**
81:13, 89:8
**amendments**
37:7
**american**
15:6, 33:8,
54:19, 55:9,
56:4, 56:9,
64:19, 73:4,
73:6, 73:14,
75:7, 75:9,
77:18, 79:8,
83:1, 83:3,
85:6, 86:12,
105:17, 113:6,
113:8, 113:20,
114:1, 114:6,
115:2, 117:2,
117:13, 117:17,
118:5, 121:10,

142:5, 142:9,
142:13, 142:14,
142:22, 143:9,
144:6
**american-asian-h-
ispanic**
121:19, 122:9
**americans**
37:13, 111:8,
111:18, 113:10,
113:16, 114:4,
115:19, 121:5,
122:4, 122:5,
122:19, 128:22,
135:8
**among**
14:9, 16:11,
109:14, 114:4,
133:5, 135:7
**analyses**
15:19, 18:16,
41:21, 42:1
**analysis**
13:7, 16:1,
18:17, 26:20,
31:11, 32:1,
33:21, 38:12,
39:9, 39:12,
39:16, 43:9,
43:13, 43:14,
43:21, 44:1,
44:14, 45:13,
46:1, 46:5,
48:11, 48:14,
48:16, 51:4,
56:13, 59:16,
59:19, 62:11,
64:4, 65:16,
66:19, 67:2,
67:3, 68:2,
68:10, 68:12,
69:5, 73:16,
78:11, 79:13,
87:1, 87:17,
87:19, 87:22,
88:19, 89:6,
89:13, 89:14,

Transcript of Quentin Kidd, Ph.D.
Conducted on September 25, 2019

155

89:19, 91:22,
93:20, 95:1,
95:14, 95:18,
97:9, 97:10,
98:1, 101:20,
103:22, 104:2,
105:7, 106:5,
106:8, 106:9,
109:2, 109:3,
112:5, 112:21,
115:5, 115:7,
116:19, 118:18,
126:9, 126:12,
126:18, 129:6,
131:12, 131:19,
131:20, 131:22,
146:1, 146:4,
146:18, 147:7,
147:11, 147:12,
147:14, 147:18,
147:19, 148:19,
149:16
**analytic**
31:13
**analyze**
42:4, 78:7,
93:5, 96:3
**analyzed**
57:21, 147:19
**andrew**
88:10
**annabelle**
3:11, 6:9
**another**
7:3, 100:16,
104:16, 105:21
**answer**
7:2, 7:7, 7:8,
7:11, 7:22,
21:1, 22:6,
23:9, 25:7,
32:21, 45:6,
45:12, 49:10,
54:2, 58:2,
61:8, 63:10,
65:13, 66:5,
66:6, 66:22,
68:1, 69:10,

72:5, 72:13,
72:19, 75:4,
77:2, 77:11,
78:5, 80:10,
81:11, 82:20,
83:13, 84:9,
84:18, 85:14,
86:1, 86:20,
88:17, 89:3,
89:12, 90:12,
90:22, 91:8,
92:7, 93:19,
94:5, 94:13,
98:14, 120:4,
124:6, 125:17,
125:20, 127:10,
131:9, 132:6,
136:1, 136:12,
143:22
**answering**
7:1, 136:22
**answers**
45:8, 45:19
**anybody**
20:17
**anyone**
20:1, 20:5,
20:9, 22:16,
23:1, 24:4,
46:17, 46:21,
47:5, 119:14
**anything**
9:3, 13:16,
14:20, 23:13,
28:15, 32:11,
41:9, 41:10,
45:17, 45:22,
93:7, 116:14,
129:11, 130:10,
131:18, 142:8
**anyway**
17:13, 17:14
**anywhere**
14:13, 92:9,
92:17, 101:17,
118:8, 128:17
**apart**
105:12

**apparently**
41:7
**appeal**
138:7, 138:9,
138:12, 138:14,
138:18, 138:21,
138:22, 139:4,
139:5, 139:6,
139:9, 139:17,
140:1, 140:6,
140:11, 140:19,
141:15, 141:22,
142:15, 142:16,
142:17, 142:18,
142:19, 142:21,
142:22, 143:4,
143:5, 143:13,
143:14, 143:16,
143:18, 143:19,
144:16, 145:4,
145:5, 145:9
**appealing**
142:5, 142:8,
142:22
**appeals**
138:20, 139:20,
140:2, 142:1,
142:2, 143:7,
143:8
**appear**
63:4, 151:6
**appearance**
114:6
**appears**
114:2
**appendix**
27:17
**applications**
98:9, 98:16
**apply**
112:19
**appointed**
41:3, 41:13,
42:22
**approach**
34:20, 67:13
**approved**
40:16

**area**
15:13, 130:1
**areas**
32:10
**aren't**
54:3, 54:6,
59:12, 115:1,
148:15
**arguable**
139:19
**argue**
68:16, 124:7,
142:17
**argument**
68:17
**arguments**
33:17, 34:7
**around**
10:15, 17:10,
26:7, 33:11,
34:3, 34:10,
108:5, 128:7
**arranged**
41:11
**arrive**
112:13
**article**
38:20, 101:19
**articles**
28:5, 28:6,
35:18, 35:20,
37:17, 38:2,
38:8, 57:8,
57:9, 146:1
**arts**
29:13
**asian**
56:3, 56:8,
66:11, 81:18,
81:19, 86:11,
101:10, 103:16,
105:11, 105:16,
109:14, 110:10,
110:16, 111:5,
113:6, 113:20,
114:22, 116:10,
117:4, 117:7,
117:10, 117:13,

Transcript of Quentin Kidd, Ph.D.
Conducted on September 25, 2019

156

117:18, 117:21,
117:22, 118:6,
121:6, 122:22,
124:10, 124:17,
132:9, 132:21,
147:16
**asians**
111:16, 112:7,
113:11, 113:17,
114:5, 122:2,
122:6, 122:16,
122:17, 128:11,
128:19, 129:4,
129:10, 130:9,
131:4, 131:13,
135:7, 137:12
**aside**
68:10, 135:16
**asked**
45:10, 83:6,
91:9, 124:15
**asking**
6:11, 6:22,
9:10, 83:7,
88:14, 95:2,
115:7, 118:20,
121:21
**assembly**
15:9, 15:10,
17:2, 17:19,
18:1, 40:19
**assessment**
118:4
**assigned**
8:21
**assignment**
12:4
**assist**
47:11
**assistance**
46:22
**assisted**
42:9
**associated**
20:6
**assume**
94:22, 112:5,
112:8, 118:19

**assumed**
121:10
**assumption**
112:6, 112:14,
112:20
**assumptions**
111:6, 112:12
**at-large**
14:17, 59:1,
59:3, 59:6,
61:4, 62:13,
70:19, 74:1,
93:13, 94:8,
95:6
**attached**
27:4, 107:6,
134:17, 151:7
**attempt**
99:12
**attempting**
46:5, 57:2,
67:14, 74:9,
78:6, 78:7,
81:22, 82:1,
96:8
**attendance**
10:17
**attention**
16:18
**attorney**
2:5, 4:7, 6:9,
13:15, 14:6,
18:20, 19:1,
19:10, 20:21
**attorney-client**
119:11
**attorneys**
20:10, 22:15,
22:17, 22:20,
24:2, 24:3,
44:7, 44:8,
46:7, 46:11,
46:21, 57:12,
118:22, 119:15,
120:14
**august**
5:10, 26:7,
28:1, 28:10,

28:12
**availability**
35:10
**available**
9:4, 60:3,
91:15
**aware**
11:7, 53:6,
95:5, 95:10,
95:16, 130:11,
130:13, 137:11,
137:14, 137:16,
147:2, 147:6,
147:13
**awareness**
129:16
**away**
122:16, 122:18

**B**

**b) (4) (d) (ii**
120:3
**b-u-l-l-o-c-k**
23:22
**back**
12:15, 19:18,
22:2, 32:19,
33:1, 43:7,
45:13, 46:4,
49:14, 51:14,
51:21, 63:15,
76:12, 92:15,
93:1, 105:5,
112:22, 113:1,
120:6, 121:1,
121:16, 126:20,
132:13, 144:10,
147:13
**bare**
117:12
**barrier**
135:18, 136:14,
136:18
**barriers**
136:4
**based**
19:3, 53:20,
54:4, 56:19,

65:3, 106:21,
107:22, 111:14,
147:11
**baseline**
13:21
**basic**
30:19, 68:13
**basically**
35:15, 118:14
**basing**
94:22, 106:1
**basis**
56:12, 70:2
**beach**
1:9, 1:15, 2:5,
2:9, 4:3, 4:7,
4:11, 22:12,
42:16, 58:20,
62:20, 63:2,
66:2, 69:6,
70:18, 71:16,
73:18, 74:7,
75:8, 83:1,
109:8, 111:21,
111:22, 124:11,
124:18, 125:11,
126:4, 126:13,
129:2, 129:3,
129:10, 129:15,
129:18, 130:9,
130:14, 131:5,
132:10, 132:18,
132:22, 137:19,
141:15, 143:10,
146:2, 146:21,
147:4
**beach's**
126:10, 146:21
**bearing**
139:1
**bearings**
72:7
**became**
29:20, 30:2,
74:5
**because**
11:17, 12:9,
13:1, 14:7,

Transcript of Quentin Kidd, Ph.D.
Conducted on September 25, 2019

157

16:4, 17:6,
19:7, 19:16,
20:7, 30:1,
34:3, 35:10,
36:2, 37:3,
40:7, 40:14,
40:17, 41:7,
45:21, 49:19,
59:6, 59:11,
68:7, 70:5,
71:2, 71:5,
86:10, 91:13,
95:8, 100:11,
103:18, 109:20,
112:5, 114:19,
117:17, 119:19,
122:13, 123:15,
128:15, 129:22,
130:3, 138:18,
143:11, 145:10,
145:11, 148:13
**become**
12:21, 30:3,
33:19, 52:19,
101:2
**been**
6:4, 6:13,
10:5, 10:13,
12:18, 13:2,
13:9, 14:1,
14:2, 15:5,
15:15, 15:17,
27:5, 27:6,
30:7, 33:16,
33:21, 34:3,
36:21, 40:16,
42:12, 42:22,
43:4, 102:13,
103:11, 106:19,
108:8, 125:11,
126:4, 129:13,
129:14, 134:20,
134:21, 145:14,
146:8, 146:9,
146:15, 148:8,
150:10
**before**
2:17, 6:13,

7:1, 7:2, 7:12,
8:9, 8:12,
12:19, 13:9,
17:19, 27:7,
39:8, 39:15,
47:11, 55:4,
71:15, 88:7,
101:12, 108:4,
108:8, 108:13,
119:5, 134:22,
152:3
**began**
13:16
**begin**
68:19
**begins**
114:8
**behalf**
3:2, 4:2, 19:10
**behavior**
30:9, 31:6,
31:7, 31:14,
32:13, 101:4,
101:6
**behind**
102:2, 102:12
**beholder**
141:21
**being**
10:7, 11:8,
16:1, 43:19,
45:10, 51:9,
119:8, 130:5,
142:10
**belief**
70:2
**believe**
23:8, 76:10,
81:13, 93:10,
93:11, 132:12,
134:2
**believing**
56:12
**beneficial**
68:8
**besides**
12:12, 20:6,
20:9, 22:8,

22:15, 22:17,
22:20, 24:1,
26:15, 42:7,
46:20, 56:18,
67:19, 103:13,
130:7
**best**
57:18
**bet**
98:2
**better**
29:14
**between**
10:12, 46:1,
61:16, 79:4,
82:14, 83:8,
84:4, 84:21,
114:4, 114:14,
115:17, 141:1,
143:7
**beyond**
16:2, 105:22
**bid**
74:20
**big**
33:20, 35:10,
54:11, 115:14,
134:13, 134:18
**bill**
10:22
**billing**
10:16, 10:19
**bipartisan**
39:22, 40:3,
42:8
**bit**
11:16, 16:14,
101:14
**bivariate**
31:22
**black**
36:12, 36:20,
62:19, 66:11,
72:2, 72:10,
72:16, 76:13,
76:15, 76:20,
77:7, 77:15,
78:13, 78:16,

78:21, 79:5,
80:5, 80:12,
81:3, 82:16,
83:9, 83:21,
93:22, 94:7,
101:10, 103:15,
105:10, 109:14,
114:11, 114:14,
114:16, 114:20,
115:17, 116:11,
117:7, 117:9,
117:20, 122:10,
122:22, 123:3,
123:4, 123:9,
123:11, 123:16,
132:9, 132:21,
143:3, 147:3,
147:16
**blacks**
121:18, 122:7,
137:12
**blank**
17:12
**blanks**
17:13
**bloc**
39:16, 42:1,
74:22, 75:11,
75:22, 76:6,
76:10, 83:5,
86:11
**blog**
144:5, 144:8,
144:10
**blogger**
144:4
**blue**
128:9
**bob**
41:3
**body**
102:12, 103:19
**bold**
54:13
**bolts**
31:1
**book**
28:5, 35:22,

Transcript of Quentin Kidd, Ph.D.
Conducted on September 25, 2019

158

36:6, 36:9,
36:10
**borrow**
104:18
**both**
26:12, 30:10,
35:2, 67:15,
68:5, 68:6,
73:14, 86:17,
87:21, 88:10,
88:21, 89:9
**bothers**
107:7, 107:9
**boynton**
4:4, 21:12,
22:18, 23:6,
23:14, 44:17,
79:16, 79:21,
104:20, 105:2,
106:19, 119:2,
120:6, 120:19,
125:4
**brace**
21:18, 43:10,
43:11, 43:12,
44:6, 44:7,
44:11, 44:15,
45:1, 45:7,
45:8, 45:19,
46:6, 46:20,
118:17, 119:5,
137:20
**break**
7:10, 7:12,
79:18, 79:20,
149:5
**brief**
146:5
**briefly**
31:17
**bright**
93:14, 93:16,
93:21, 94:1,
94:13, 94:14,
94:16
**bringing**
19:14
**budget**
40:15

**building**
2:7, 4:9
**bullock**
23:20, 24:1,
76:5, 76:7,
87:20, 88:3,
88:5, 88:8,
118:17, 119:4,
120:14
**bureau**
109:13, 133:4,
135:3

**C**

**cabiness**
51:11, 51:12,
51:13, 51:15,
116:2, 117:1,
117:8, 117:12
**calculate**
80:20, 91:13,
91:20, 91:21,
109:16, 110:15
**calculated**
109:21, 110:18
**calculations**
47:5, 52:2,
52:5, 52:8,
53:16, 118:7,
118:9, 118:10,
149:11
**calculator**
55:19
**call**
32:11, 46:12,
87:8, 131:18,
131:20, 131:21,
144:11
**called**
29:7, 52:21,
58:12
**calls**
20:13
**came**
14:6, 14:7,
40:20, 63:12,
63:18, 64:2,
65:21, 102:18,

132:12, 132:13
**campaign**
3:5, 3:12,
138:8, 138:13,
144:18
**campaigns**
30:8, 30:18,
30:20, 30:21,
31:1, 32:12,
33:9, 33:14
**can't**
7:21, 8:18,
18:3, 50:2,
58:13, 58:16,
61:13, 71:5,
91:10, 92:21,
95:3, 95:18,
97:6, 112:6,
122:15, 122:17,
124:20, 131:3,
137:14
**candidacy**
64:5, 65:10,
65:15, 65:22,
69:5
**candidate**
38:17, 39:6,
51:6, 51:9,
62:19, 63:5,
65:9, 65:20,
65:21, 66:12,
66:18, 67:19,
68:11, 68:14,
68:20, 69:11,
69:13, 74:16,
74:19, 75:1,
76:1, 76:7,
76:9, 81:14,
86:10, 92:18,
93:14, 94:1,
94:9, 94:19,
105:16, 105:17,
105:19, 108:20,
113:9, 113:17,
113:19, 113:21,
114:3, 114:17,
115:2, 115:3,
115:20, 115:21,

123:3, 123:4,
123:5, 123:9,
123:11, 123:16,
123:20, 124:1,
124:3, 124:8,
124:12, 124:19,
138:9, 138:14,
139:2, 139:10,
140:8, 140:13,
140:20, 141:14,
143:1, 143:9,
145:7, 147:3
**candidate's**
65:8, 65:19,
95:22
**candidates**
30:22, 54:17,
54:19, 55:3,
55:6, 55:7,
55:9, 58:21,
59:3, 59:4,
59:20, 59:21,
61:18, 62:1,
62:15, 64:14,
64:16, 64:18,
64:19, 65:2,
67:1, 67:3,
69:2, 71:22,
72:8, 72:15,
75:7, 75:13,
76:13, 76:15,
76:18, 77:6,
77:14, 78:13,
78:16, 78:20,
79:8, 80:6,
80:12, 81:3,
82:6, 82:15,
83:1, 83:9,
83:21, 84:5,
84:10, 84:22,
85:20, 89:16,
89:22, 90:9,
90:18, 91:5,
91:12, 92:3,
92:4, 92:11,
92:22, 95:8,
110:11, 110:12,
123:10, 123:22,

Transcript of Quentin Kidd, Ph.D.
Conducted on September 25, 2019

159

127:7, 127:16,
127:19
**cannot**
18:22, 45:21,
58:3, 95:12
**cap**
11:6, 11:8
**capable**
125:5
**capture**
71:2
**case**
1:7, 6:10, 8:3,
8:21, 9:5, 9:7,
9:12, 9:22,
10:11, 10:14,
12:13, 12:22,
13:1, 13:8,
13:12, 13:15,
13:17, 13:18,
14:4, 14:6,
14:15, 14:17,
14:20, 15:3,
15:5, 15:19,
16:7, 18:19,
18:20, 19:14,
20:2, 20:17,
20:18, 21:10,
21:22, 22:4,
22:6, 22:9,
22:13, 22:16,
23:1, 23:16,
24:4, 24:8,
24:15, 25:4,
25:12, 26:17,
31:12, 39:8,
39:15, 48:1,
48:3, 57:19,
58:5, 87:6,
101:13, 102:9,
104:9, 104:13,
105:15, 108:11,
113:10, 120:20,
120:21, 129:2,
129:21, 132:1,
142:2, 148:12,
152:11
**cases**
56:22, 57:1,

57:4, 57:8,
57:9, 57:10,
58:7, 101:16,
107:1, 114:13,
128:7
**cast**
73:8, 73:11,
73:12, 73:14,
73:15, 73:17,
74:2, 74:7,
122:3
**category**
82:2, 96:11
**caused**
36:20
**causing**
76:1
**census**
71:3, 71:4,
71:6, 109:13,
133:4, 135:3
**center**
2:7, 3:5, 3:12,
4:9, 11:19,
11:21, 12:2,
40:11, 41:5
**certain**
35:8, 64:20,
65:2, 66:12,
73:7, 145:9
**certainly**
97:18, 108:2,
108:11, 119:18,
122:2, 143:15
**certificate**
152:1
**certify**
152:4
**cetera**
37:15
**chair**
41:5
**challenge**
15:15
**challenged**
35:2, 51:21
**challenging**
14:17

**change**
102:10, 130:14,
146:1, 146:11,
146:20
**changed**
51:7, 108:18,
109:1, 116:3
**changes**
71:3
**changing**
116:5
**chapters**
28:5
**chart**
87:9, 87:12
**check**
53:16
**checking**
137:8
**chemistry**
29:16
**cherry-picking**
64:11, 64:12,
65:1
**cheryl**
129:21, 141:2,
144:19
**chicago**
3:15
**chiming**
46:2
**choice**
38:18, 39:6,
81:14, 90:9,
90:18, 91:5,
92:4, 92:12,
92:22, 93:14,
94:1, 94:9,
94:19, 108:21,
123:5, 123:11,
123:20, 124:1,
124:3, 124:8
**chose**
126:13, 126:15
**chris**
8:12, 8:17,
10:3, 26:6,
108:5

**christopher**
4:4, 11:10,
11:13, 12:12,
13:2, 21:21,
28:21, 47:10
**chuck**
23:20, 24:1,
119:15, 120:17
**circulated**
142:11, 142:12
**circumstances**
125:7, 140:9,
140:14
**citation**
57:7
**cities**
126:11
**city**
1:9, 2:5, 4:2,
4:7, 22:12,
42:16, 58:19,
59:1, 59:22,
60:7, 60:16,
61:12, 61:22,
62:20, 63:1,
66:18, 73:7,
75:8, 83:1,
102:10, 102:11,
141:13, 146:22,
147:3
**civil**
36:18, 37:4,
37:6
**claim**
43:5
**clarification**
140:4
**clarifications**
45:9
**clarify**
111:19
**class**
28:22, 29:2,
29:3, 29:9,
30:8, 30:9,
30:10, 30:15,
31:6, 31:7,
31:8, 31:16,

Transcript of Quentin Kidd, Ph.D.
Conducted on September 25, 2019

160

31:19, 31:21,
32:12, 32:13,
32:17, 32:21,
33:7, 33:10,
33:15, 98:7
**classes**
28:21, 29:18,
30:6, 32:3,
33:2, 33:5,
137:6
**clean**
105:3
**cleaner**
105:2
**clear**
59:5, 74:7,
84:17, 124:8,
138:3
**clearly**
82:3, 110:7,
119:19, 133:19
**closest**
132:12, 132:13
**code**
53:7, 53:9,
53:11, 53:15
**cohesion**
79:5, 81:19,
93:22, 94:7,
105:20, 114:4,
114:7
**cohesive**
75:9, 77:17,
78:1, 78:10,
83:2, 85:8,
86:11
**colleagues**
21:21, 47:10,
125:5
**collected**
48:17
**college**
14:9, 16:21
**colleges**
17:9
**combine**
113:19
**combined**
117:10, 121:18,

122:1, 122:8
**come**
98:2, 98:4,
98:6, 103:19,
121:14, 121:16
**comes**
12:17, 51:21,
65:9, 67:6,
87:15, 123:1
**comfortable**
94:6
**coming**
45:13
**commented**
130:21, 130:22
**commission**
40:1, 40:4,
40:6, 40:8,
40:10, 40:12,
40:22, 41:5,
41:14, 41:16,
42:8, 152:16
**commissions**
34:17
**common**
96:19, 96:21,
97:1, 97:8,
97:9, 97:10,
99:21, 101:2,
107:15
**commonly**
99:4, 99:19
**commonwealth**
2:18, 152:22
**communicate**
21:20
**communicated**
20:19, 21:7,
21:14, 21:17,
119:13
**communicating**
119:14
**communication**
19:20, 22:6,
22:8
**community**
125:13, 126:6
**compact**
47:19

**comparing**
126:9
**compensation**
12:1, 12:3
**competition**
14:8, 16:11,
17:8, 18:2,
18:5, 18:13,
19:8, 19:17,
40:12, 40:17
**compile**
133:22, 135:9
**complete**
27:13, 27:15,
148:12, 148:18,
151:5
**completely**
48:10, 51:22,
107:20, 108:6,
108:16, 109:1,
145:3
**complex**
97:19, 116:14
**compliance**
41:17
**complied**
106:17
**computers**
33:21, 35:10
**con**
32:7, 32:21
**conceded**
51:14, 116:4
**conceding**
51:17
**conceptual**
106:18, 106:22
**concluded**
150:11
**conditions**
47:15, 121:7
**conduct**
31:22, 38:11,
99:10
**conducted**
126:1
**conducting**
38:2, 38:4,

54:15, 56:2,
56:13
**conducts**
56:7
**confer**
46:21
**conference**
120:17
**confidence**
103:18, 103:19
**confirm**
135:12
**confused**
67:10
**confusion**
67:6
**congressional**
42:19
**conservative**
36:13
**conservatives**
36:22
**consider**
17:3, 22:5,
42:4, 65:4,
65:6, 66:13,
67:11, 69:20,
97:22, 105:13,
105:20, 117:5
**considered**
54:18, 55:8,
143:13, 143:15
**constitute**
121:18, 122:8
**constitutes**
117:20, 123:18
**constitution**
37:7
**constructed**
51:20
**consultant**
22:4, 23:7,
23:13, 23:16
**consulting**
31:3
**contact**
19:10, 20:1
**contacted**
8:9, 8:11,

Transcript of Quentin Kidd, Ph.D.
Conducted on September 25, 2019

161

18:20
**contain**
133:4, 148:11
**contained**
44:11, 145:14
**contains**
135:13
**content**
8:14
**contests**
79:4
**context**
33:8, 36:17,
74:4, 79:11,
97:11, 97:12,
108:17, 120:19,
120:21, 122:13,
122:19, 139:12
**continue**
121:4
**contract**
8:18, 9:14
**conversation**
8:12, 8:15,
8:17, 14:13,
19:18, 21:15,
35:1, 118:21,
120:9
**conversations**
13:18, 22:20,
22:21, 24:2,
33:22, 35:3,
56:18
**convinced**
136:6
**copy**
9:18, 27:14
**corrections**
28:17, 151:6
**correlation**
97:9
**could**
7:16, 16:14,
24:10, 41:7,
48:7, 53:1,
53:2, 53:4,
57:3, 65:18,
71:17, 74:2,

97:2, 98:2,
98:3, 98:5,
101:15, 102:21,
102:22, 105:15,
109:21, 110:18,
113:5, 113:12,
114:15, 134:19,
135:6, 142:15,
146:5, 149:4,
149:14
**couldn't**
32:20, 52:13,
53:3, 53:5,
57:7, 101:17,
129:11, 131:17
**council**
22:12, 42:16,
58:20, 59:1,
59:22, 60:7,
60:16, 61:12,
61:22, 63:1,
66:18, 73:7,
75:8, 83:2,
102:11, 141:13,
146:22, 147:3
**counsel**
6:6, 21:6,
21:16, 22:21,
47:7, 47:8,
119:9, 119:10,
152:10
**counselor**
22:19
**count**
141:5
**country**
37:9, 128:7
**country's**
143:3
**couple**
19:18, 32:8,
57:8, 73:21,
74:1
**course**
29:4, 29:7,
29:11, 29:17,
30:18, 117:16,
121:5, 146:7

**courses**
30:12, 98:1
**court**
1:1, 6:19, 7:5,
42:22, 43:4,
101:16, 104:19,
134:21
**courthouse**
2:6, 4:8
**cover**
43:7, 43:8
**coverage**
146:6, 146:10,
146:11, 146:13,
146:20
**covered**
149:2
**create**
15:7, 84:13,
87:9, 113:8,
134:6, 135:6
**created**
36:15, 40:6,
80:15, 83:16,
83:18, 83:19,
87:16, 113:15,
134:5, 135:5,
144:17
**creating**
46:22, 50:16
**criteria**
17:16, 17:21,
17:22, 18:1,
18:4
**crow**
37:8
**crr**
1:22, 2:18,
152:2
**current**
11:13, 12:1,
135:3
**currently**
11:9, 11:18,
15:12, 28:20,
70:6
**cv**
27:18, 27:20,

28:18, 29:21
**cvap**
43:22, 44:4,
109:15, 122:6,
122:22

**D**

**damage**
145:7
**data**
33:20, 35:11,
42:4, 43:9,
43:10, 43:20,
43:21, 43:22,
44:4, 44:10,
45:1, 45:7,
48:11, 48:16,
48:17, 77:21,
80:17, 80:19,
81:21, 82:2,
82:10, 82:22,
83:18, 83:19,
84:16, 85:18,
87:11, 92:1,
97:22, 98:11,
98:18, 114:10,
122:4, 133:9,
133:10, 133:22,
135:9, 137:17,
137:18, 137:22,
138:2
**database**
58:10
**databases**
58:11, 58:13
**date**
8:5, 8:10,
28:7, 151:11
**dates**
8:19
**davenport**
90:8, 90:17,
91:4, 92:11,
93:8
**day**
26:5, 26:13,
145:18, 152:14
**days**
8:11, 8:18,

Transcript of Quentin Kidd, Ph.D.
Conducted on September 25, 2019

162

31:3
dc
3:8
dean
11:16, 11:17
debate
34:9, 34:10,
34:11
debates
34:2
decide
12:21, 13:10
decision
16:5
declared
17:15
deconstruct
87:11, 116:10
deconstructing
87:2, 87:4
deconstruction
79:13
deconstructive
79:14, 86:8
deep
32:12
defend
107:19
defendants
1:10, 4:2,
20:10, 22:15,
22:17, 22:21,
24:2, 24:7,
26:17
defending
108:15
defined
139:1
definer
140:18
defines
139:16
definition
78:1, 78:7,
78:8, 78:9
delegate
17:1
delegates
15:11

demeaning
142:6
democratic
128:8
demographics
137:19
demonstrate
101:3, 102:15,
103:6, 113:22,
114:10, 116:8
demonstrated
51:2
demonstrates
103:21, 113:4,
113:5
demonstrating
51:8
demoralize
145:6
department
32:8
deponent
150:4, 151:1
deposed
6:13
deposition
1:14, 2:1, 5:9,
10:17, 10:20,
11:1, 20:11,
20:20, 150:11,
152:3
depositions
150:2
describe
37:1, 98:20,
98:22
described
122:1
descriptive
31:12
despite
81:7
detail
24:10, 37:1,
98:20
details
118:1
determine
96:9, 96:12,

99:11, 99:12,
101:9, 101:15,
102:14, 103:15,
127:6, 127:14,
127:15, 127:19,
131:12
determines
127:12
development
30:21
diagram
5:11
different
17:9, 51:22,
80:21, 83:20,
100:19, 107:11,
107:14, 107:20,
108:6, 109:1,
139:19, 145:4,
146:14, 146:15
differently
110:7, 140:3
difficult
135:19, 136:18
difficulty
116:17
direct
45:22
direction
152:8
director
11:18
dirty
144:12
disagree
75:17, 75:18,
86:3, 86:4
discipline
31:9, 97:12,
98:3, 101:2,
103:4
disciplines
29:13, 100:19,
100:21, 101:5,
101:7, 102:5
disclose
118:7, 133:21
disclosed
53:6, 137:17

discoverable
23:9, 120:3
discovered
148:1, 148:2,
148:7, 148:10
discrimination
128:13, 128:21,
129:5, 129:9,
130:8, 131:6,
131:14, 132:2
discuss
32:4, 32:16,
35:21
discussed
33:3, 33:6,
33:13, 34:2,
43:15, 45:11,
123:19
discussion
21:4, 119:9
discussions
15:18, 16:2,
16:6
disenfranchised
37:14
dismantle
37:8
disparity
115:16
dispute
49:2, 49:3,
49:6, 49:13,
49:17, 49:19,
50:8, 50:10,
50:13, 50:15
disputes
49:12, 49:21
dissimilar
100:10
distinguish
143:7
distributed
141:13
distribution
121:9
district
1:1, 1:2, 15:7,
15:13, 42:13,

Transcript of Quentin Kidd, Ph.D.
Conducted on September 25, 2019

163

43:3, 47:20,
59:1, 59:2,
59:7, 61:3,
71:10, 71:17,
130:15
**districts**
42:10, 71:11,
71:14, 127:6,
127:12, 127:19,
128:8, 128:9,
146:2, 146:11
**divided**
84:14, 117:11
**division**
1:3, 116:13
**document**
27:7, 104:19
**doing**
26:20, 45:12,
48:15, 58:8,
68:4, 75:19,
79:12, 96:14,
104:15, 105:7,
106:4, 107:2,
108:17, 130:7
**done**
16:1, 26:16,
32:5, 32:7,
34:13, 34:16,
39:9, 39:12,
39:16, 44:14,
71:7, 73:16,
97:5, 103:22,
105:9, 106:5,
106:8, 106:9,
108:3, 109:3,
109:9, 120:8,
126:9, 131:22,
145:2, 145:21,
145:22
**double-blind**
28:6
**down**
6:19, 26:8,
54:10, 54:11,
55:21, 56:6,
114:18, 114:20
**dozen**
32:19, 57:8

**dr**
9:1, 12:6,
27:5, 47:14,
48:21, 49:2,
49:6, 53:6,
53:9, 53:11,
67:20, 68:10,
84:13, 93:3,
96:1, 104:1,
104:14, 134:20,
141:12, 145:15,
148:5, 149:20,
149:22
**draw**
17:1, 42:12,
43:1, 98:10,
98:17
**drawing**
17:12, 17:13,
42:9
**drawn**
42:19, 43:3,
127:6, 127:12,
127:19, 129:19,
130:5
**drive**
2:6, 4:8
**driving**
114:2, 114:6
**drop**
114:19, 137:5
**drop-off**
114:13
**dropped**
114:17
**drug**
96:13, 99:7,
100:9
**due**
75:11, 83:4
**duke**
85:15
**duly**
6:4
**during**
28:22, 29:19,
30:1, 59:15,
69:20, 141:13

**duties**
29:1, 30:3
**dynamic**
36:14

**E**

**each**
17:1, 53:7,
56:13, 57:20,
59:9, 118:11,
118:14, 118:15
**earlier**
16:10, 99:2,
131:15, 149:9
**eastern**
1:2
**ecological**
52:5, 52:8,
96:22, 97:7,
97:8, 102:17,
102:18, 149:10,
149:15, 149:16
**economics**
97:13, 102:3
**education**
132:2
**educational**
16:16, 17:20
**effect**
99:12, 100:7
**effects**
100:7, 100:12
**effort**
35:12, 68:3,
142:13, 146:20
**efforts**
31:13, 130:13,
130:18, 130:21
**ei**
149:15
**eight**
72:2, 72:10,
72:15, 78:20,
80:5, 80:12,
82:6, 84:22
**either**
17:10, 46:7,
118:17

**elect**
38:17, 39:5
**elected**
34:16, 125:10,
126:4
**electing**
140:7, 140:12
**election**
14:18, 38:15,
39:3, 59:9,
59:10, 59:14,
60:7, 60:9,
60:16, 60:21,
61:3, 61:11,
63:4, 65:22,
66:17, 70:15,
75:22, 76:2,
86:16, 87:20,
88:9, 88:20,
89:7, 93:13,
94:8, 94:18,
106:22, 118:13,
126:10, 126:13,
126:16, 127:6,
127:12, 127:18,
130:5, 130:15,
138:10, 138:15,
141:1
**elections**
30:8, 30:18,
30:20, 30:22,
32:12, 33:10,
33:15, 54:20,
55:10, 58:19,
60:11, 60:18,
61:16, 61:17,
61:21, 62:10,
69:20, 70:18,
73:2, 73:3,
73:8, 82:16,
83:10, 84:6,
84:14, 85:2,
108:19, 114:9,
116:1
**electoral**
128:3
**electorate**
121:20, 122:9

Transcript of Quentin Kidd, Ph.D.
Conducted on September 25, 2019

164

| | | | |
|---|---|---|---|
| **elects** | **equivalence** | 109:4, 109:13, | 66:18, 118:13, |
| 102:10 | 96:6, 96:7, | 109:17, 110:9, | 128:15, 145:17 |
| **else** | 96:15, 96:18, | 110:16, 111:4, | **everybody** |
| 9:3, 20:2, | 97:15, 98:9, | 112:13, 124:10, | 44:8 |
| 20:6, 22:16, | 98:17, 98:20, | 124:17, 132:9, | **everything** |
| 23:1, 23:13, | 99:2, 100:14, | 132:15, 132:20, | 6:20, 6:21, |
| 24:4, 28:15, | 101:9, 103:14, | 133:5, 134:8, | 54:4 |
| 46:17, 46:21, | 104:1, 104:5, | 135:4, 135:7, | **evidence** |
| 48:18, 93:7, | 104:13, 106:1, | 135:13 | 115:16 |
| 107:7, 107:9, | 109:4 | **estimation** | **evolution** |
| 108:17, 130:10, | **equivalency** | 111:9, 111:13 | 31:8 |
| 135:10, 144:2 | 98:8, 99:10, | **et** | **exact** |
| **email** | 99:18, 106:4, | 1:9, 4:3, 37:15 | 8:5, 8:19, 18:4 |
| 46:6, 119:15, | 107:8, 107:12 | **ethnic** | **exactly** |
| 119:17 | **equivalent** | 122:14 | 28:4, 32:20, |
| **employed** | 96:10, 99:13 | **evaluate** | 54:14, 64:17, |
| 152:10 | **errata** | 38:15, 41:17 | 116:18, 137:15 |
| **employment** | 150:7, 151:7 | **evaluated** | **examination** |
| 132:3 | **error** | 39:2 | 5:2, 6:6, |
| **encourage** | 109:16, 109:22, | **even** | 54:16, 56:2, |
| 16:17 | 110:15, 110:19, | 21:10, 45:19, | 56:8 |
| **end** | 148:7 | 60:4, 67:3, | **examined** |
| 49:13, 75:21, | **errors** | 80:14, 142:18 | 6:4, 151:3 |
| 76:4, 76:5, | 148:1, 148:9 | **evening** | **example** |
| 86:9, 120:9 | **especially** | 26:5 | 69:4, 96:14, |
| **endeavor** | 33:11, 102:8 | **ever** | 100:6, 117:5, |
| 16:17 | **esquire** | 6:13, 9:10, | 141:14, 141:19, |
| **ended** | 3:4, 3:11, 4:4, | 15:19, 21:7, | 144:17 |
| 17:5, 32:9, | 4:5, 4:6 | 21:10, 21:14, | **excel** |
| 43:13, 45:9, | **essentially** | 21:17, 22:11, | 5:12, 87:17, |
| 45:14, 46:1 | 18:1, 37:5, | 22:16, 22:22, | 134:4, 134:5, |
| **ends** | 37:11, 44:1, | 30:12, 32:3, | 134:6, 134:7, |
| 45:14 | 51:22, 58:10, | 33:2, 33:5, | 138:2 |
| **enforce** | 60:3, 64:18, | 38:14, 39:2, | **except** |
| 37:6, 37:12 | 64:22, 65:1, | 39:9, 39:12, | 49:1, 49:5, |
| **enough** | 66:10, 74:1, | 39:16, 42:9, | 119:15 |
| 15:4, 15:6 | 75:22, 87:13, | 42:12, 42:19, | **exchanging** |
| **entire** | 87:15, 105:9, | 42:22, 43:3, | 119:15 |
| 70:4, 86:7 | 116:4, 116:8 | 46:6, 46:9, | **excited** |
| **entirety** | **estimate** | 53:11, 71:16, | 103:3 |
| 9:5 | 105:8 | 71:18, 96:15, | **exclude** |
| **envision** | **estimated** | 128:14, 128:15, | 68:8, 68:21, |
| 26:20 | 121:7, 121:9 | 128:16, 130:21 | 69:5, 69:12 |
| **equal** | **estimates** | **every** | **excluding** |
| 38:16, 39:4 | 48:20, 49:2, | 16:21, 18:8, | 47:7, 47:8, |
| **equals** | 49:7, 49:13, | 46:15, 63:12, | 68:22 |
| 117:11 | 80:21, 104:5, | 63:18, 65:9, | **exhibit** |
| **equation** | 104:13, 106:6, | 65:21, 66:17, | 5:9, 5:10, |
| 118:11 | | | |

Transcript of Quentin Kidd, Ph.D.
Conducted on September 25, 2019

165

5:11, 5:12,
27:1, 27:3,
27:6, 27:17,
48:7, 104:22,
107:3, 107:5,
134:11, 134:15,
134:16, 134:21,
141:10
**existed**
37:8
**experienced**
76:10, 131:13
**expert**
8:2, 8:22,
12:13, 12:18,
12:21, 13:9,
23:7, 24:6,
24:14, 24:15,
27:2, 27:10,
46:13, 46:22,
47:8, 49:22,
53:7, 87:6,
104:9, 104:10,
104:12, 108:8,
109:7, 133:21
**expertise**
13:8, 32:9,
108:3
**experts**
20:14, 22:22,
24:3, 25:3,
25:11, 26:15,
107:16, 120:1,
120:2, 150:1
**expires**
152:16
**explain**
15:1, 81:22,
116:7, 117:16
**exploring**
13:16
**expressed**
148:16
**extent**
20:12, 118:20,
119:8, 136:13
**eyes**
141:21

**F**

**face**
53:18, 135:18,
136:4
**faced**
128:12, 128:20,
129:4, 131:5
**facilitated**
35:1
**fact**
75:18
**factor**
140:8, 140:13
**factors**
125:7
**facts**
120:1
**faculty**
18:9, 18:10
**failed**
79:9
**failing**
115:20
**fairfax**
24:15, 25:20
**fairly**
96:19
**fall**
29:19, 29:21,
30:1, 30:6, 30:7
**familiar**
13:5, 24:21,
47:14, 52:10,
52:12, 52:15,
52:17, 52:20
**family**
12:10
**far**
10:11, 10:14,
35:14, 35:16,
44:9, 59:2,
95:7, 96:21,
97:1, 97:8,
97:9, 97:10,
97:19, 105:11,
117:4
**fast**
113:14

**favorable**
121:8, 122:12
**federal**
37:5, 37:10
**fees**
11:6
**few**
6:15, 32:7,
141:6
**fifth**
54:10
**figure**
121:14, 133:9,
137:5, 148:8
**figures**
133:4, 133:10,
133:22, 134:6,
134:8, 135:6,
135:13, 138:6
**file**
53:12, 53:16,
134:4, 134:5,
138:2
**filed**
13:15, 14:15,
15:17
**final**
43:16, 43:18
**finally**
55:22, 56:6
**financial**
152:12
**find**
55:2, 57:10,
101:15, 101:17,
129:9, 129:11,
131:17, 146:5,
146:6
**fine**
80:1, 105:4,
149:6
**finish**
6:22, 7:2
**firestorm**
144:17
**firm**
20:8
**firms**
31:3

**first**
6:4, 6:14, 8:2,
17:7, 21:14,
31:18, 37:11,
47:17, 48:1,
48:5, 70:15,
73:22, 115:14,
116:20, 118:3,
143:3
**five**
13:13, 14:2,
29:20, 79:8,
80:5, 80:12,
80:13, 84:5,
84:10, 84:22,
89:16, 110:10,
110:12, 113:10,
113:11, 123:3,
123:9, 144:5,
144:8, 145:19
**flores**
116:6
**flows**
50:9
**flyer**
141:13, 141:16,
143:10, 144:19,
144:22, 145:8,
145:14
**flyers**
142:10, 144:13
**focus**
144:11
**focusing**
33:16
**follow**
118:16
**following**
71:12
**follows**
6:5
**footnote**
118:12, 134:3
**foregoing**
151:4, 152:3,
152:4
**forget**
105:18

Transcript of Quentin Kidd, Ph.D.
Conducted on September 25, 2019

166

**form**
25:6, 45:4,
47:19, 49:8,
50:6, 53:22,
57:14, 57:22,
61:6, 62:2,
63:8, 64:7,
65:11, 66:3,
66:20, 67:21,
69:8, 72:3,
72:11, 72:17,
75:2, 76:22,
77:9, 78:3,
80:8, 81:9,
82:18, 83:11,
84:7, 85:3,
85:12, 85:21,
86:18, 88:15,
89:1, 89:10,
90:10, 90:20,
91:6, 92:5,
93:17, 94:3,
94:11, 98:12,
124:4, 125:15,
127:8, 131:7,
132:4, 135:21,
136:10, 143:20,
147:9, 148:3
**formal**
126:2
**formerly**
41:4
**forth**
19:18
**forward**
13:20, 16:9,
16:22, 19:22,
20:5
**found**
58:7, 146:6
**foundation**
25:5, 125:14
**four**
13:13, 54:12,
59:17, 59:18,
60:2, 62:11,
62:18, 79:9,
80:13, 93:8,

144:5, 144:8,
144:20
**fourth**
48:9, 54:11
**framing**
49:17, 50:9,
50:13
**frankly**
145:7
**frequently**
97:15, 97:17
**front**
17:18, 50:22
**full**
7:16, 148:18
**fundamentally**
34:11
**fundraising**
31:2
**furman**
62:19, 63:1,
63:5, 63:12,
63:18, 64:2,
67:4, 67:5,
67:8, 67:17,
68:7, 68:8,
76:20, 78:22,
82:8
**furman's**
64:4
**further**
55:21, 56:6,
149:19

**G**

**gain**
142:14
**game**
122:14
**gary**
102:18
**gave**
43:20, 123:2,
123:8
**geez**
130:22
**general**
15:9, 15:10,

17:2, 17:19,
18:1, 33:22,
34:20, 36:9,
36:10, 40:18,
40:19, 51:18,
70:9, 70:10,
108:1, 128:18
**generally**
30:17, 31:5,
49:3, 49:17,
49:19, 50:8,
50:13, 50:15,
52:19, 70:7,
98:22, 129:18,
137:2, 137:16
**generate**
35:3
**george**
62:19, 63:18,
76:20, 78:22,
82:8, 86:16
**georgia**
1:6, 3:3
**gerald**
3:4, 4:5
**getting**
79:7, 119:19
**gingles**
47:15, 47:17,
48:1, 53:21,
56:14, 56:15,
57:21, 58:16,
86:17, 87:21,
88:11, 88:22,
89:9, 110:13
**give**
17:6, 27:12,
57:7, 57:19,
90:13, 99:7,
99:8, 120:10
**given**
34:22, 151:6,
152:6
**go**
6:15, 21:2,
35:14, 35:16,
36:2, 43:7,
49:14, 58:8,

63:15, 76:4,
76:5, 76:12,
81:17, 82:11,
84:3, 86:5,
86:14, 88:4,
92:15, 93:1,
111:1, 112:22,
113:1, 116:7,
117:15, 121:1,
123:16, 132:12,
133:2, 137:8,
147:13
**goes**
126:20, 129:17
**going**
6:10, 10:22,
13:19, 18:21,
19:21, 20:5,
23:12, 27:1,
32:19, 32:22,
37:6, 37:7,
37:12, 45:12,
55:17, 64:16,
64:17, 65:4,
65:5, 66:13,
68:15, 68:16,
68:21, 84:18,
92:14, 102:7,
104:18, 105:6,
105:13, 105:20,
112:3, 112:4,
112:5, 115:4,
118:22, 120:10,
121:1, 125:4,
137:7, 141:10,
144:15, 147:15,
150:3
**good**
6:8, 29:8,
79:21
**google**
129:8, 129:12,
130:7, 131:16,
131:21
**gotten**
48:17
**government**
37:5, 37:10,

Transcript of Quentin Kidd, Ph.D.
Conducted on September 25, 2019

167

38:15, 42:13
**government's**
39:3
**governor**
40:5, 40:15,
40:18, 40:20,
41:3, 41:15
**graduate**
24:20, 29:4,
30:12, 30:14,
97:20, 98:1
**grew**
32:8
**ground**
6:15
**group**
21:15, 45:11,
47:18, 56:13,
57:20, 99:6,
112:15, 145:9
**groups**
96:9, 96:13,
111:7, 112:20,
115:18, 122:14,
133:5
**guess**
66:15, 139:2,
140:15
**guidance**
18:10

**H**

**half**
31:18, 31:20,
117:6, 117:7
**hall**
116:1
**hallworth**
41:4
**hammond**
81:6
**hampton**
13:4, 129:15,
129:18, 131:1,
144:7
**hand**
152:14
**handed**
27:5, 134:20

**hands**
34:15
**happen**
60:19, 71:7
**happened**
70:6, 70:10,
70:16, 128:17,
133:17
**happening**
70:5, 70:11
**happens**
116:1, 143:2
**harless**
3:11, 5:3, 6:7,
6:9, 23:12,
57:16, 79:19,
80:1, 85:7,
94:14, 105:4,
107:3, 145:13,
145:21, 149:4,
149:19, 149:21
**harris**
4:5, 12:6,
20:12, 20:21,
25:5, 45:4,
47:7, 49:8,
50:6, 53:22,
57:14, 57:22,
61:6, 62:2,
63:8, 64:7,
65:11, 66:3,
66:20, 67:21,
69:8, 72:3,
72:11, 72:17,
75:2, 76:22,
77:9, 78:3,
80:8, 81:9,
82:18, 83:11,
84:7, 85:3,
85:11, 85:21,
86:18, 88:15,
89:1, 89:10,
90:10, 90:20,
91:6, 92:5,
93:17, 94:3,
94:11, 94:16,
95:20, 98:12,
118:20, 119:7,

119:18, 124:4,
125:14, 125:19,
127:8, 131:7,
132:4, 135:21,
136:10, 143:20,
145:19, 147:9,
148:3, 149:6,
149:22, 150:6
**head**
21:11, 26:8,
44:13, 44:16,
61:14, 64:3,
108:10, 124:21
**health**
132:3
**heard**
99:18, 99:19
**heavy**
29:2, 30:4
**hebert**
3:4, 21:2,
57:17, 85:10,
110:2, 119:1,
120:11, 149:20
**held**
2:1, 21:4,
120:2
**help**
47:2, 100:11,
136:5
**helpful**
100:8
**henley**
90:8, 90:17,
91:4, 92:11,
93:8
**here**
6:20, 18:4,
24:11, 43:8,
44:22, 49:4,
49:14, 50:5,
50:21, 51:19,
52:13, 54:9,
63:17, 75:19,
78:9, 80:17,
81:17, 82:1,
82:4, 82:15,
83:9, 89:20,

90:3, 91:3,
91:10, 92:17,
95:13, 105:13,
106:12, 109:18,
111:4, 111:5,
115:4, 116:16,
118:10, 121:4,
122:1, 122:20,
130:1, 134:12,
139:15, 144:3
**hereby**
151:2, 152:4
**hereunto**
152:13
**hesitating**
49:19
**high**
14:9
**higher**
11:16
**himself**
143:2
**hire**
109:8
**hired**
93:5, 96:2,
96:3, 104:2
**hiring**
32:9
**hispanic**
56:3, 56:8,
66:11, 81:19,
86:11, 101:10,
103:16, 109:14,
110:10, 111:5,
113:7, 115:1,
116:10, 117:8,
117:10, 117:14,
117:19, 117:21,
118:1, 118:6,
121:6, 122:22,
123:5, 123:12,
123:20, 132:10,
132:21, 147:17
**hispanics**
111:17, 113:11,
113:18, 113:20,
114:5, 117:4,

Transcript of Quentin Kidd, Ph.D.
Conducted on September 25, 2019

168

122:2, 122:7,
122:17, 123:2,
123:8, 128:20,
129:4, 129:10,
135:8
**historically**
128:21
**history**
30:21, 143:3
**holcomb**
129:22, 130:3,
141:1
**holcomb's**
144:18
**hold**
100:21
**holloway**
1:5, 3:2
**homogeneous**
52:1, 149:11
**honest**
120:16, 120:22,
139:22
**honestly**
16:4, 140:3
**honors**
29:7, 29:12
**hope**
138:19
**hosted**
40:8, 40:9,
40:12, 41:11
**hosting**
41:2
**hour**
10:7, 10:16,
13:11
**hour-and-a-half**
79:17
**hourly**
13:10
**hours**
10:10, 14:13,
19:18
**house**
15:10, 17:1
**human**
101:4

**hundred**
141:6
**hypothetical**
113:2, 113:4,
113:5, 113:16,
114:8, 118:2,
123:19, 124:2,
124:7

---

**I**

**idea**
102:21, 133:16
**identified**
71:22, 72:8,
77:7, 78:17,
83:22, 84:5,
84:10, 84:22
**identifies**
55:3, 55:7
**identify**
92:10, 92:17,
93:11, 120:7
**ignore**
65:18
**ignoring**
65:8
**ii**
53:19
**iii**
53:19, 124:22
**il**
3:15
**illegal**
142:3, 143:11
**image**
142:7, 145:11
**immediately**
71:8
**impact**
128:4, 136:8
**impacts**
136:14
**implicates**
119:8
**implications**
130:4
**important**
7:6, 79:11

**importantly**
56:7
**impossible**
73:5, 73:11
**impression**
107:18
**improves**
29:15
**incidence**
129:4, 131:16
**incidences**
129:9
**include**
58:20, 60:19,
61:18, 61:22,
101:18
**included**
49:22, 62:10,
62:12, 134:7,
137:17
**includes**
67:2, 67:5,
67:8, 77:14
**including**
55:10
**income**
12:11, 12:16
**incorrect**
75:5
**independent**
34:16, 39:22,
40:3, 40:22,
48:16, 56:3,
56:9, 57:11,
67:18, 91:22,
106:8, 106:9,
109:3, 147:18
**independently**
80:19, 80:20,
91:21
**indicate**
110:13
**indicates**
133:19
**indicating**
134:19, 138:1
**individual**
23:19, 50:10,

102:22, 103:1,
106:21
**individualized**
31:14
**individuals**
119:9
**infer**
102:22
**inference**
52:8, 96:22,
97:8, 102:17,
102:19, 149:11,
149:16
**inferences**
98:10, 98:17
**influence**
29:14, 31:14
**information**
72:21, 91:16,
92:2
**informed**
111:9, 111:13,
112:1, 112:10
**initial**
7:18, 51:18,
108:19, 116:3,
148:20
**initially**
64:13, 67:1,
108:16
**innovation**
102:20, 103:2
**insignificant**
73:10, 74:8
**inspire**
101:19
**instance**
131:11
**instances**
130:8, 132:1,
136:16
**instead**
12:8
**instruct**
120:4
**instructing**
21:1
**interdisciplinary**
29:10

Transcript of Quentin Kidd, Ph.D.
Conducted on September 25, 2019

169

**interest**
152:11
**interested**
19:13
**intro**
33:8
**invited**
17:18
**invoice**
10:4, 10:5
**invoices**
9:21
**involve**
111:5
**involved**
11:3, 16:6,
20:16, 20:18,
42:15, 130:18
**involving**
86:16, 87:20,
88:10, 88:21,
89:8
**issue**
128:16
**issues**
126:21
**itself**
102:15, 140:7,
140:12, 140:15,
140:16
**iv**
125:1, 125:3,
125:6

**J**

**jackson**
88:10, 116:5
**january**
40:7, 40:21,
152:16
**jim**
37:8
**job**
1:20, 53:17
**jones**
90:8, 90:17,
91:4, 92:11,
93:9

**joseph**
4:6
**journal**
28:5
**judged**
17:15
**judges**
17:11, 17:14
**judicial**
32:6, 32:17
**july**
8:5, 8:7,
27:22, 28:9
**jurisdiction**
39:10, 39:13,
39:17, 128:4
**justice**
139:15

**K**

**keep**
23:10, 34:21,
57:1
**kempsville**
60:20, 116:5
**keyed**
114:15, 115:4
**kidd**
1:14, 2:1, 5:2,
5:9, 6:3, 6:8,
7:18, 12:6,
27:5, 47:14,
134:20, 149:20,
149:22, 150:11,
151:2
**kill**
35:13
**kimball**
21:17, 43:10,
43:11, 43:12,
44:6, 44:7,
44:11, 44:15,
44:22, 45:1,
45:7, 45:8,
45:19, 46:6,
46:20, 137:20
**kind**
11:6, 18:15,

31:2, 31:3,
33:22, 65:16,
101:16, 128:20,
129:6, 131:6,
131:14, 145:4
**kinds**
18:6
**king**
102:18
**knew**
18:21
**knowledge**
14:10, 108:1,
129:17
**known**
111:14, 120:1,
122:19, 122:20
**kurt**
4:6

**L**

**labeled**
27:17
**lack**
103:18
**laid**
18:2, 104:16
**language**
47:18, 52:11,
52:20, 135:18,
136:4, 136:13,
136:18, 137:3,
137:4, 137:7
**largely**
130:3, 142:12
**larger**
16:7, 117:18,
118:6
**last**
29:18, 29:22,
30:5, 63:12,
63:18, 64:3,
65:9, 65:21,
69:18, 81:17,
86:5, 88:5,
88:6, 92:15,
113:3, 119:16
**latasha**
1:5, 3:2

**late**
27:22, 28:10
**later**
8:18, 106:13
**latino**
110:16, 124:10,
124:17, 135:18
**latinos**
128:11, 130:9,
131:4, 131:13,
136:3, 136:8,
137:12
**latter**
144:19
**law**
20:8, 32:7,
32:21, 57:9,
142:4
**laws**
37:8
**lawsuit**
15:15, 146:12,
146:14
**lawyer**
106:20, 139:15
**lawyers**
110:7
**leave**
125:4, 125:5
**led**
36:21
**left**
120:7
**legal**
3:5, 3:12,
54:6, 54:8,
56:17, 56:19,
58:4, 58:6,
108:11
**legal-speak**
125:19
**legislation**
36:19
**legislative**
34:15, 42:10
**legislatively**
40:16
**legislators**
34:13

Transcript of Quentin Kidd, Ph.D.
Conducted on September 25, 2019

170

**legislature**
42:9
**legitimately**
140:3
**lend**
13:8
**less**
35:9, 60:5,
70:11, 101:21,
117:4, 121:10,
122:2, 122:11
**let's**
39:19, 43:7,
54:9, 69:14,
71:19, 75:6,
76:12, 77:5,
79:2, 82:11,
84:3, 86:14,
90:4, 109:6,
110:6, 111:1,
112:8, 124:22
**lethal**
33:20, 35:9
**level**
15:8, 30:14,
32:11, 64:20,
65:2, 66:13,
68:13, 95:22,
97:18, 137:18
**lexisnexis**
58:12
**liberal**
29:13
**lichtman**
9:1, 25:13,
26:2, 26:3,
26:11, 26:21,
27:11, 122:5,
129:21, 141:8,
141:12, 144:3
**lichtman's**
122:21, 144:21,
145:15, 146:7,
148:20
**life**
29:15
**likely**
9:16, 113:22

**limitations**
136:7
**linda**
94:13
**line**
45:22
**line-by-line**
24:11
**listed**
75:13, 76:19,
78:13, 78:21,
82:6, 82:15,
83:9, 89:16,
89:22, 90:7,
90:15
**lists**
67:5
**literally**
15:21, 16:2,
16:20, 41:11,
86:8
**litigation**
20:13, 20:22,
119:11
**little**
11:3, 11:16,
16:14, 37:1,
101:14, 117:20
**live**
11:2, 11:4,
11:5
**local**
13:1, 13:7,
38:14, 39:2,
39:10, 42:13,
144:4
**locally**
11:2
**look**
24:9, 27:13,
27:15, 29:21,
48:7, 49:14,
50:20, 50:22,
54:9, 60:9,
63:16, 63:20,
63:21, 67:14,
93:2, 93:3,
94:21, 95:3,

95:4, 96:1,
99:9, 103:7,
109:6, 110:6,
113:3, 116:20,
126:3, 130:7,
137:22, 138:1,
143:8, 144:22,
146:5, 147:14
**looked**
15:4, 15:5,
31:8, 73:20,
74:6, 91:14,
91:15, 91:16,
91:18
**looking**
16:8, 55:22,
60:8, 69:15,
69:18, 71:20,
74:4, 77:6,
80:3, 82:11,
84:3, 90:5,
105:8, 109:10,
111:1, 114:19,
116:17, 129:6,
141:4, 147:6
**looks**
29:10, 29:12,
113:20
**loose**
50:17
**loosely**
51:20
**lose**
76:1, 85:20,
138:19
**loses**
86:10, 139:2
**losing**
75:1, 76:7
**lost**
72:2, 72:10,
74:20, 75:11,
76:13, 77:8,
78:14, 80:7,
82:16, 83:4,
83:10, 84:6,
85:1, 89:18,
89:22, 108:21,

130:3
**lot**
13:6, 49:3,
52:18, 102:2,
129:19, 146:7
**lots**
103:3, 136:4
**low**
128:9, 128:10
**lower**
137:13

**M**

**made**
28:17, 40:21,
74:10, 86:13
**majority**
15:3, 15:7,
15:12, 47:19,
60:4, 60:5,
71:10, 71:11,
71:17, 79:3,
79:7, 113:21,
115:19, 115:20,
117:12, 117:17,
147:4
**majors**
29:11
**make**
6:21, 7:14,
27:13, 68:17,
74:5, 88:6,
122:5, 136:18
**makes**
45:16, 67:19,
68:11, 73:19,
135:19
**making**
29:14, 114:18
**mann**
17:12
**manner**
38:10
**many**
10:10, 62:15,
73:6, 107:1,
114:1, 128:6
**map**
17:11, 18:12,

Transcript of Quentin Kidd, Ph.D.
Conducted on September 25, 2019

171

42:19
maps
17:2, 17:3,
17:10, 17:11,
17:15, 17:19,
41:17, 42:5
margins
109:16, 109:21,
110:15, 110:18,
135:7
mark
27:1, 51:16,
106:11, 107:3,
134:11, 134:14,
134:15, 141:10
marked
27:3, 27:6,
107:5, 134:16,
134:21
marking
31:10
massachusetts
12:10
massive
130:2
matter
20:6, 100:19,
139:10
maybe
30:13, 79:17,
102:19, 131:2
mayor
22:12, 143:10
mayor's
145:3
mcdonnell
40:5
mean
9:15, 16:9,
24:9, 24:18,
26:12, 27:21,
32:22, 34:20,
38:20, 44:6,
44:7, 44:20,
48:12, 50:12,
50:18, 52:12,
52:15, 54:3,
60:2, 60:14,

62:8, 65:14,
66:7, 70:9,
71:5, 82:2,
83:18, 87:13,
87:17, 88:18,
91:15, 92:13,
93:6, 94:6,
94:22, 95:4,
96:20, 102:6,
104:3, 104:7,
107:14, 108:2,
108:4, 108:18,
111:12, 112:10,
116:14, 121:22,
122:22, 126:1,
127:21, 129:11,
130:22, 136:13,
137:4, 137:6,
138:4, 138:18,
138:19, 139:7,
139:20, 143:8,
144:1, 145:10,
147:11, 148:4
meaning
43:21, 48:13
means
40:9, 63:11,
78:10, 78:12,
114:22, 117:3,
125:16, 125:18
meant
100:1
measure
96:11
medicine
99:5, 99:15,
100:5, 100:13,
100:16
meetings
41:11
members
22:12, 102:11
memory
51:10
mentioned
16:10, 106:12,
136:17
mentor
18:9, 18:10

method
14:18, 31:11,
38:15, 38:16,
39:3, 39:4,
100:4, 100:16,
102:12, 126:10
methodological
97:21
methodologies
101:1
methodology
38:2, 38:4
methods
30:10, 30:15,
31:16, 31:20,
100:20
mid-august
28:9
mid-july
8:4
middle
7:18, 31:10,
54:22, 115:15,
121:17
might
45:11, 100:6,
100:8, 100:11,
105:2, 128:16
migrate
101:4
mileage
11:2
mind
64:11, 64:12,
66:17, 105:21,
112:6
minorities
51:5, 51:9,
51:15, 115:20,
132:2
minority
15:2, 15:3,
15:7, 15:12,
38:17, 39:5,
47:18, 54:18,
55:7, 57:20,
64:13, 64:15,
64:18, 65:1,

66:10, 67:1,
67:2, 68:14,
68:20, 69:2,
71:10, 71:12,
71:17, 76:1,
80:6, 81:7,
81:14, 82:1,
82:7, 84:6,
85:1, 85:5,
85:8, 85:19,
89:17, 93:15,
93:22, 94:2,
94:7, 94:10,
94:19, 108:20,
111:7, 114:3,
114:12, 114:14,
114:17, 114:21,
115:18, 117:3,
117:6, 125:12,
126:6, 133:5,
147:17
minority-preferr-
ed
54:19, 55:9
minute
90:13, 141:20
minutes
145:20
mistake
73:21, 73:22,
74:5, 74:10
mobilization
36:12, 36:20
model
52:14
modern
36:15, 36:16
moment
18:18, 57:7,
91:10, 95:13,
139:22
money
17:6, 40:16
monroe
3:13
months
19:20, 103:10
more
16:14, 31:12,

Transcript of Quentin Kidd, Ph.D.
Conducted on September 25, 2019

172

33:19, 37:1,
40:19, 46:2,
58:20, 59:2,
59:13, 61:2,
61:11, 61:18,
61:22, 69:21,
70:3, 70:6,
70:14, 70:22,
72:1, 72:9,
76:19, 77:8,
77:15, 78:21,
80:7, 82:7,
89:17, 96:21,
97:1, 97:8,
97:9, 97:10,
97:19, 101:2,
118:2, 118:4,
121:8, 122:12,
122:15, 122:17,
135:19, 136:18
**morning**
6:8
**morrison**
20:19, 21:8,
21:15, 24:7,
118:17, 119:5
**most**
9:16, 27:20,
46:3, 52:21,
61:9, 61:10,
61:17, 99:3,
99:19, 115:15,
116:15, 138:19,
139:22
**mostly**
96:10
**motivate**
101:19
**move**
124:22
**moved**
21:11, 26:8,
44:13, 44:16,
108:10
**much**
10:13, 17:6,
33:19, 35:9,
118:5

**multiple**
59:4, 59:10,
59:12, 59:14,
59:19, 59:21,
59:22, 60:3,
62:12, 62:13,
62:14, 123:22
**multivariate**
32:1
**municipal**
2:7, 4:9
**music**
29:15
**must**
28:9, 140:7,
140:12

### N

**name**
6:8, 7:16,
18:22, 19:2,
23:21, 36:6,
57:19, 131:3
**named**
95:9
**names**
17:12, 17:13
**navigate**
135:19, 136:9,
136:14, 136:19
**nearly**
13:3, 37:12
**necessarily**
53:3
**need**
21:12, 28:3,
28:17, 41:1,
41:2, 44:17,
63:20, 66:15,
72:21, 73:1,
73:4, 73:13,
95:22, 115:12
**needed**
18:11, 109:20,
110:22
**needs**
125:12, 126:5
**negative**
142:1, 142:17,

142:18, 143:5,
143:8, 143:18,
144:16, 145:4
**neither**
152:9
**netted**
117:8
**never**
12:18, 12:20,
13:9, 13:15,
13:20, 14:13,
15:21, 15:22,
16:1, 16:9,
20:17, 46:10,
53:15, 54:13,
55:5, 56:7,
98:6, 101:12,
108:8, 108:12,
128:12, 128:15,
131:5
**new**
97:12, 97:14
**newport**
11:5, 11:10,
11:14, 12:12,
13:2, 21:21,
28:21, 47:11
**news**
11:5, 146:1,
146:5, 146:10,
146:11, 146:18,
146:19
**newspaper**
146:9
**newspapers**
131:1
**next**
7:2, 26:5,
117:15
**nicest**
144:7
**night**
119:16
**nine**
77:8, 82:15,
83:8
**nod**
7:6

**non-testifying**
23:7, 23:16,
119:22, 120:2
**none**
8:1, 28:19,
44:20, 47:4,
80:19, 87:7
**nope**
53:17
**norfolk**
1:3
**northeastern**
12:9
**notarial**
152:14
**notary**
2:18, 152:21
**note**
111:4, 116:2
**noted**
49:1, 49:4,
49:5
**notes**
49:15
**nothing**
44:10, 44:21
**notice**
2:17
**noticed**
74:11
**nullify**
35:12
**number**
28:8, 28:14,
54:18, 55:8,
73:7, 73:10,
74:8, 121:21,
122:3
**numbers**
50:11, 74:2,
91:20, 118:8
**numeric**
47:19
**nuts**
31:1
**nw**
3:6

### O

**oath**
6:5, 7:19

Transcript of Quentin Kidd, Ph.D.
Conducted on September 25, 2019

173

object
20:12, 20:21,
25:5, 45:4,
49:8, 50:6,
57:14, 57:22,
61:6, 62:2,
63:8, 64:7,
66:3, 66:20,
67:21, 69:8,
72:3, 72:11,
76:22, 78:3,
81:9, 88:15,
89:10, 90:10,
90:20, 93:17,
94:3, 94:11,
98:12, 118:22,
119:10, 124:4,
127:8, 131:7,
132:4, 136:10,
143:20
objecting
119:18
objection
53:22, 65:11,
72:17, 75:2,
77:9, 80:8,
82:18, 83:11,
84:7, 85:3,
85:11, 85:12,
85:21, 86:18,
89:1, 91:6,
92:5, 119:7,
125:14, 135:21,
147:9, 148:3
obligation
56:4, 56:10
observed
98:10, 98:18
obvious
74:6, 115:16
obviously
35:1
occurred
118:21
october
101:21, 152:15
offering
47:22, 48:4,

58:4, 58:6,
104:4, 104:7,
104:10, 104:12
offers
125:6
office
4:7, 62:20,
127:7, 127:16,
145:3
officer
152:3
offices
2:2
officials
34:16, 125:11,
126:4
often
58:20, 58:22,
59:10, 59:13,
59:14, 61:18,
61:22, 62:4,
62:7, 100:15
oh
12:15, 44:19,
54:7, 60:17,
88:4, 91:17,
100:6, 114:22,
130:22, 139:11,
146:13
okay
6:12, 6:15,
6:18, 7:4, 7:9,
7:13, 9:17,
9:18, 20:9,
39:1, 44:9,
53:6, 55:14,
61:10, 62:5,
82:13, 84:20,
90:6, 90:16,
99:1, 104:11,
109:11, 120:11,
121:3, 126:8,
127:1, 133:18,
139:11, 146:17
old
101:22
once
134:19

one
2:7, 4:9, 7:3,
10:4, 17:11,
23:4, 30:16,
33:17, 34:6,
35:13, 51:11,
54:11, 54:12,
55:4, 55:13,
58:12, 60:6,
60:12, 60:13,
60:14, 60:15,
60:16, 60:19,
61:2, 61:11,
61:14, 73:11,
73:12, 73:17,
75:13, 75:22,
78:12, 80:13,
86:10, 88:6,
88:8, 116:2
only
7:5, 7:11,
10:4, 20:16,
48:14, 60:6,
60:10, 60:12,
60:16, 61:14,
62:11, 62:17,
69:2, 76:9,
77:14, 88:6,
88:8, 101:11,
111:14, 117:2,
117:9, 118:9,
118:10, 121:8,
138:8, 138:13,
141:2, 141:5,
147:3, 147:15
open
40:19, 53:11,
137:8
opened
53:15, 138:2
opinion
48:1, 48:4,
54:8, 58:5,
58:6, 67:18,
68:3, 76:3,
101:8, 102:7,
104:10, 104:15,
108:14, 108:15,

122:10, 128:11,
129:1, 129:2,
131:4, 138:7,
138:12, 140:6,
140:11, 140:22
opinions
53:20, 54:6,
103:14, 104:4,
104:8, 104:12,
120:1, 125:6,
141:16, 148:12,
148:14, 148:16,
148:21
opportunity
38:16, 39:5,
98:7
opposed
34:14
order
95:21, 116:14,
122:11, 150:1
organizations
136:5, 137:10
organize
31:1
organized
14:8, 16:11
original
24:14, 51:11,
107:10
other
12:11, 20:13,
22:8, 26:16,
35:14, 37:9,
47:8, 48:15,
49:21, 56:22,
57:1, 62:12,
70:8, 87:5,
92:20, 100:21,
101:5, 101:16,
103:13, 115:18,
120:13, 121:7,
123:10, 126:10,
135:5, 144:22,
146:8, 148:21
others
37:13, 37:14,
112:17

Transcript of Quentin Kidd, Ph.D.
Conducted on September 25, 2019

174

| | | | |
|---|---|---|---|
| **otherwise** | **overwhelming** | **paragraph** | **peer-reviewed** |
| 55:18, 152:12 | 113:18 | 48:9, 54:10, | 35:17, 37:16, |
| **out** | **overwhelmingly** | 54:11, 54:22, | 38:1, 38:21 |
| 18:2, 19:6, | 113:17 | 55:21, 56:6, | **pen** |
| 19:7, 19:9, | **own** | 69:15, 79:3, | 104:18, 105:1 |
| 19:16, 34:14, | 12:16, 48:11, | 111:2, 113:3, | **pending** |
| 34:15, 34:21, | 48:16, 52:1, | 115:15, 115:17, | 7:12, 28:7, |
| 51:19, 52:13, | 52:4, 52:7, | 116:18, 116:20, | 28:14 |
| 60:13, 60:14, | 57:10, 57:13, | 117:15, 118:1, | **penny** |
| 60:15, 74:3, | 57:16, 57:17, | 118:3, 118:11, | 1:22, 2:17, |
| 82:15, 83:8, | 58:8, 122:4, | 118:15, 121:1, | 152:2 |
| 85:15, 98:2, | 147:19, 149:10 | 121:17 | **people** |
| 98:4, 98:6, | **ownership** | **paragraphs** | 20:16, 32:9, |
| 102:18, 104:16, | 142:4, 143:12, | 118:15 | 52:20, 74:7, |
| 104:17, 105:21, | 144:14 | **parameters** | 96:10, 100:8, |
| 105:22, 112:9, | | 16:8 | 103:3, 130:3, |
| 115:22, 118:11, | **P** | **parsimonious** | 138:19, 139:19, |
| 137:5, 143:10, | **page** | 111:9, 111:13, | 139:21, 139:22, |
| 144:12, 144:18, | 5:2, 5:9, | 112:2, 112:11 | 140:2 |
| 146:8, 149:7 | 27:16, 28:4, | **part** | **percent** |
| **outcome** | 28:8, 28:13, | 9:12, 12:4, | 55:16, 72:1, |
| 152:12 | 36:8, 39:19, | 18:5, 18:12, | 72:9, 76:19, |
| **output** | 39:20, 43:8, | 50:20, 87:7, | 77:8, 77:15, |
| 53:4 | 48:7, 54:9, | 139:18, 144:16 | 78:12, 78:21, |
| **outside** | 69:14, 71:19, | **participate** | 80:7, 81:7, |
| 21:6, 21:16, | 75:6, 77:5, | 37:15 | 82:7, 89:17, |
| 119:2, 119:3, | 79:2, 79:3, | **particular** | 99:7, 99:8, |
| 119:14 | 81:18, 82:11, | 131:11, 136:17, | 105:15, 105:17, |
| **over** | 84:3, 86:5, | 139:18, 142:2 | 105:18, 112:8, |
| 6:15, 7:3, | 86:14, 88:7, | **particularized** | 114:16, 114:20, |
| 24:9, 36:3, | 90:4, 109:6, | 125:12, 126:5 | 114:21, 117:2, |
| 37:8, 101:4, | 110:6, 111:1, | **parties** | 117:5, 117:9, |
| 105:13, 117:21 | 113:3, 115:10, | 152:11 | 117:21, 117:22, |
| **overall** | 115:11, 115:14, | **parts** | 121:11, 121:14, |
| 76:12, 117:3, | 116:20, 121:2, | 37:9, 135:5 | 121:18, 122:6, |
| 117:6 | 121:16, 125:2, | **party** | 122:7, 122:8, |
| **overlap** | 145:15 | 19:11, 35:13, | 122:11, 122:15, |
| 105:13 | **pages** | 36:14 | 122:16, 122:18, |
| **overly** | 1:21, 133:2, | **past** | 122:21, 123:2, |
| 43:19 | 133:3, 134:12 | 32:8, 35:9, | 123:8, 123:9, |
| **overt** | **paid** | 70:7, 70:10, | 128:7, 128:9, |
| 138:8, 138:13, | 10:5, 10:7, | 132:1 | 136:6 |
| 138:18, 138:20, | 10:13 | **path** | **percentage** |
| 138:21, 139:8, | **panel** | 86:8, 87:2 | 55:15, 91:11, |
| 139:9, 139:14, | 120:17 | **patients** | 91:17, 92:18, |
| 139:17, 139:20, | **paper** | 99:6 | 95:13, 95:17, |
| 140:1 | 104:21, 105:3, | **pay** | 95:21, 112:16, |
| **overtly** | 120:18 | 16:18, 40:15 | 112:21, 147:16 |
| 138:22 | | | |

Transcript of Quentin Kidd, Ph.D.
Conducted on September 25, 2019

175

**perfectly**
120:16
**perform**
15:19, 18:15,
18:17, 41:20,
42:1, 52:1,
52:4, 52:7
**period**
69:20, 69:21,
70:3, 70:4,
70:13, 70:22,
79:4
**permission**
22:3, 22:5,
22:7
**person**
23:10, 120:8,
144:3, 144:7
**personal**
35:7, 35:15,
53:20, 54:5
**personally**
35:4, 35:5,
35:6, 87:11
**peter**
20:19, 21:7,
21:15, 24:7
**ph**
1:14, 2:1, 5:2,
6:3, 98:5,
150:11, 151:2
**philosophy**
29:16
**phone**
8:12, 8:16,
46:9, 46:10,
46:11
**phrase**
104:10
**physically**
83:18
**piece**
104:20, 105:3
**pieces**
36:19
**pivotal**
36:19, 37:2
**place**
17:7, 63:12,

63:18, 64:3,
65:9, 65:22,
128:4, 130:14
**placebo**
99:8, 99:12,
100:7
**places**
51:3, 68:5,
68:6
**plaintiff**
107:19
**plaintiffs**
1:7, 3:2, 6:6,
6:10, 24:15,
25:3, 25:11,
26:15, 107:16,
119:6, 121:8,
122:4, 122:12
**plan**
42:13, 43:1
**plank**
104:16, 104:17,
105:21
**please**
7:16
**plus**
78:12, 86:11,
86:12, 111:5,
117:7, 117:11,
121:6, 122:2
**point**
8:17, 15:22,
30:3, 45:17,
70:12, 70:21,
79:18, 79:21,
92:9, 105:8,
109:17, 115:22,
134:7, 135:6,
135:13, 149:22
**pointed**
74:3, 146:8
**points**
141:12
**polarize**
38:9
**polarized**
15:20, 18:16,
33:3, 37:17,

37:19, 38:3,
38:5, 38:10,
38:12, 39:9,
39:13, 41:20,
48:20, 64:5,
65:16, 66:1,
66:19, 68:12,
69:6, 78:11
**policy**
11:19, 11:21,
40:11
**political**
11:9, 19:11,
30:8, 30:9,
30:17, 31:5,
31:7, 31:9,
31:15, 32:13,
33:9, 33:14,
33:20, 34:9,
34:10, 34:14,
35:16, 97:11,
97:13, 98:3,
98:5, 99:21,
102:3, 102:20,
103:2, 135:19,
136:9, 136:19,
144:7
**politically**
129:17
**politics**
13:4, 13:5,
13:6, 28:6,
31:3, 33:9,
34:4, 35:22,
36:15, 37:15,
129:14, 131:2,
144:12
**poor**
37:14
**pop**
52:13
**population**
71:3, 73:2,
103:1, 111:16,
111:17, 111:18,
111:20, 112:8,
112:9, 112:15,
112:20, 117:18,

117:19, 118:5,
118:6, 135:3
**pornography**
139:16
**portion**
46:17, 86:7
**positive**
142:1, 143:7,
143:16, 143:17
**possible**
60:15, 123:22
**post**
70:16
**post-civil**
37:6
**posts**
144:5, 144:8,
144:10
**potential**
18:19, 121:19,
122:9
**practice**
31:21, 107:16
**precinct**
52:2, 137:18,
149:11
**precincts**
142:13
**precisely**
58:17
**predictive**
31:13
**predictors**
124:11, 124:18
**prefer**
23:10
**preference**
65:3, 123:18,
124:12, 124:19
**preferences**
101:10, 103:15,
115:17
**preferred**
38:17, 39:6,
54:17, 55:7,
82:16, 83:9,
84:5, 85:1,
85:20

Transcript of Quentin Kidd, Ph.D.
Conducted on September 25, 2019

176

preparation
10:8, 20:10
prepare
150:7
prepared
24:7, 25:3,
25:11, 137:19
preparing
45:2, 47:2
prescott
88:21
presence
21:6, 21:16,
118:21
present
22:22, 24:3,
36:4, 59:16,
61:16, 120:14,
132:1
presented
120:18
president
142:6, 142:7,
143:2, 143:3
president's
145:11
pressure
40:18
pretty
82:3, 97:21,
114:18, 128:19,
134:13
primary
31:11
privilege
23:11, 119:11
prizes
17:7
pro
12:8
probably
8:11, 17:8,
26:5, 27:21,
27:22, 29:20,
30:7, 33:16,
33:18, 34:1,
34:5, 36:1,
49:11, 49:12,

57:8, 97:20,
98:4, 98:6,
128:19, 139:18,
139:19, 139:22,
147:6
probative
64:5, 64:21,
65:5, 65:6,
65:15, 66:1,
66:14, 66:16,
66:19, 67:4,
67:7, 67:17,
67:19, 68:11,
68:15, 68:16,
68:20, 69:2,
69:7, 69:22,
70:3, 70:6,
70:11, 70:14,
70:22
problem
102:1, 137:5,
137:7
procedure
96:8, 102:8,
116:9, 116:12
procedures
100:20
process
14:11, 16:19,
18:3, 31:15,
32:7, 32:17,
34:15, 40:20,
79:15
processing
124:14
produce
107:16, 107:20,
112:4, 118:8
produced
104:5, 104:14,
106:6, 107:13,
108:12
product
20:13, 20:22,
119:12
professor
11:9
program
29:7, 29:12,

30:15, 52:21,
53:3, 53:5
programming
52:11
programs
32:2, 97:20,
98:1, 98:5
prohibitive
119:20
project
17:20
promise
40:22, 130:6
prong
47:15, 47:17,
48:1, 50:16,
56:4, 56:10,
56:14, 56:16,
57:21, 75:14,
79:5, 79:9,
110:13
prongs
53:21, 57:3,
86:17, 87:21,
88:11, 88:22,
89:9
pronounces
12:10
property
12:16, 12:17
proportion
73:1, 73:3,
111:15, 111:16,
111:17, 112:9
proposed
42:5
prospects
35:13
provide
9:1, 18:10,
43:11, 78:6,
124:10, 124:17,
132:8, 132:20,
150:7
provided
43:10, 43:12,
43:22, 44:10,
45:2, 45:8,

45:18, 48:20,
57:11
provides
38:16, 39:4
provost
22:3, 29:21,
30:2
psychological
100:12
public
2:18, 11:19,
11:21, 30:15,
40:11, 152:1,
152:21
publication
28:7, 103:12
publicly
91:15
published
28:11, 28:12,
35:20, 37:16,
37:21, 38:1,
101:20, 103:10,
146:9
pulled
51:14
pursuant
2:17
push-back
130:2
put
16:22, 20:1,
23:6, 40:17,
87:12, 103:8,
103:20, 105:22,
106:12, 106:15,
133:13, 135:16,
138:6, 144:18,
148:7
puts
51:16
putting
144:12

**Q**

quality
29:15
quarter
123:17

Transcript of Quentin Kidd, Ph.D.
Conducted on September 25, 2019

177

| quentin | **R** | raising | 148:15, 150:1, |
|---|---|---|---|
| 1:14, 2:1, 5:2, | **race** | 17:5 | 150:4, 150:8, |
| 6:3, 7:18, | 65:8, 65:19, | **ran** | 151:3 |
| 150:11, 151:2 | 74:12, 74:15, | 62:19, 63:13, | **reading** |

**quentin**
1:14, 2:1, 5:2,
6:3, 7:18,
150:11, 151:2
**question**
7:3, 7:11,
21:1, 25:8,
45:5, 49:5,
49:9, 50:7,
51:16, 54:1,
57:15, 58:1,
61:7, 62:3,
63:9, 64:8,
65:12, 66:4,
66:21, 67:11,
67:22, 69:9,
72:4, 72:6,
72:12, 72:18,
75:3, 77:1,
77:10, 78:4,
80:9, 81:10,
82:19, 83:12,
84:8, 85:4,
85:13, 85:22,
86:19, 88:16,
89:2, 89:11,
90:11, 90:14,
90:21, 91:7,
92:6, 92:8,
93:18, 94:4,
94:12, 98:13,
100:1, 120:5,
124:5, 125:20,
127:9, 131:8,
132:5, 135:22,
136:11, 136:22,
138:11, 143:21,
146:22, 147:10
**questions**
6:11, 6:17,
6:22, 7:22,
44:2, 45:8,
45:10, 45:12,
45:20, 46:3,
118:14, 149:19
**quite**
145:7
**quote**
119:20

**R**
**race**
65:8, 65:19,
74:12, 74:15,
74:16, 141:14,
144:19, 145:8
**races**
59:1, 59:3,
59:4, 59:6,
59:7, 59:18,
61:12, 74:1,
114:1, 146:22
**racial**
42:4, 47:18,
122:14, 130:4,
138:8, 138:13,
138:18, 138:20,
138:21, 138:22,
139:4, 139:5,
139:6, 139:8,
139:9, 139:17,
139:20, 140:1,
140:2, 140:6,
140:11, 140:17,
140:19, 141:15,
141:22, 142:15,
142:16, 142:17,
142:18, 142:19,
142:21, 143:4,
143:5, 143:7,
143:8, 143:13,
143:14, 143:16,
143:18, 143:19,
144:15, 144:16,
145:4
**racially**
15:20, 18:16,
33:3, 37:17,
37:18, 38:3,
38:4, 38:9,
38:10, 38:11,
39:9, 39:12,
41:20, 48:19,
64:5, 65:16,
66:1, 66:19,
68:12, 69:6,
78:11

**raising**
17:5
**ran**
62:19, 63:13,
63:19, 65:20
**randomize**
99:5
**randomized**
96:14, 99:4,
99:14, 100:5,
100:15
**randomly**
99:7
**rate**
13:18, 115:2
**rates**
13:10, 137:12
**rather**
100:16, 108:15
**rational**
36:7
**rationale**
68:22, 69:1
**reach**
65:2
**reached**
19:6, 19:7,
19:16
**reaching**
19:9
**reaction**
99:13, 100:10
**read**
24:12, 24:14,
24:17, 25:19,
26:1, 26:3,
26:4, 26:11,
26:12, 52:18,
53:1, 53:2,
57:8, 101:11,
104:3, 106:7,
108:4, 108:5,
113:14, 115:8,
115:9, 115:11,
115:12, 116:15,
116:21, 116:22,
137:15, 141:7,
144:10, 145:1,

**reading**
56:20, 56:21,
56:22, 57:2,
152:8
**realistic**
118:4
**realize**
130:2
**really**
11:3, 14:12,
29:17, 31:7,
44:4, 46:2,
46:4, 73:5,
93:6, 100:9,
101:5, 101:6,
128:8, 128:10
**reason**
7:21, 19:8,
50:20, 133:16,
140:19
**reasons**
70:8, 100:22,
101:1, 124:9,
124:13, 124:16
**rebuttal**
25:3, 25:11,
25:15, 26:16,
26:21, 51:2,
51:6, 51:7,
51:13, 51:21,
101:11, 104:3,
106:7, 107:11,
107:17, 107:20,
108:12, 108:21,
108:22, 141:7,
141:8, 141:12,
145:15, 148:14,
148:22
**receive**
12:3
**received**
72:1, 72:9,
75:9, 77:15,
77:17, 83:2
**receiving**
76:19, 78:21,

Transcript of Quentin Kidd, Ph.D.
Conducted on September 25, 2019                                    178

82:7, 117:1
**recent**
27:20
**recently**
19:1
**recess**
21:5, 80:2,
149:8
**reconfiguration**
83:17, 84:15,
88:19, 89:5,
89:14
**reconfigured**
93:21
**reconfiguring**
81:21, 87:1,
87:14, 90:2
**reconstruction**
77:20
**record**
6:21, 7:5,
7:17, 21:2,
21:4, 23:6,
57:1, 145:13,
152:5
**red**
128:8
**redesigned**
80:16
**redistricting**
14:5, 14:8,
14:11, 16:11,
16:18, 16:19,
17:4, 18:2,
18:3, 19:8,
19:17, 33:6,
33:7, 33:8,
33:11, 33:14,
33:17, 33:19,
34:2, 34:4,
34:8, 34:10,
34:12, 35:7,
35:8, 35:11,
35:16, 40:1,
40:4, 40:12,
40:17, 40:20,
42:16, 43:1,
43:5, 70:16,

70:17, 71:6,
71:12, 71:15
**reduced**
152:7
**reelection**
59:12, 61:15,
74:20, 81:6
**refereed**
28:5
**reference**
101:18
**referenced**
34:6
**reflect**
121:6
**regarding**
9:7, 9:21,
34:7, 42:5,
141:16, 146:1
**region**
13:6
**register**
74:15, 137:9
**registration**
137:11
**regression**
32:1, 52:5,
97:10, 100:17,
149:10, 149:16
**regular**
12:4
**regularly**
29:22
**rejected**
117:13
**related**
152:10
**relates**
68:2
**relatively**
97:12, 97:14
**relevant**
126:17, 140:8,
140:13
**rely**
48:10
**remedy**
43:4

**remember**
8:5, 11:7,
17:6, 17:22,
18:22, 19:2,
19:3, 19:5,
32:18, 40:14,
50:2, 57:4,
57:18, 59:15,
61:13, 79:12,
92:14, 92:21,
95:3, 95:12,
95:18, 97:6
**remembering**
62:9, 101:20
**rendering**
54:6, 54:8,
106:18, 106:22
**rental**
12:16, 12:17
**reorganized**
83:20
**repeat**
24:11, 25:9,
64:17
**replicated**
102:13, 103:4,
103:11
**reported**
1:22, 86:21,
93:2, 109:18,
111:5
**reporter**
6:19, 7:5,
97:2, 97:7,
113:12, 134:21
**reporter-notary**
152:1
**reporting**
110:9
**reports**
8:22, 25:3,
25:11, 26:13,
26:16, 26:21,
27:11, 53:7,
107:12, 107:14,
107:17, 147:20,
148:20
**representational**
126:21

**republican**
36:14, 128:9
**requested**
152:9
**require**
53:21
**required**
18:8, 56:14,
142:4
**requires**
47:17
**research**
30:9, 30:14,
31:16, 102:2,
102:12, 103:9
**residency**
59:7, 61:3,
71:11
**residential**
60:11, 60:19
**respond**
21:12, 44:17,
96:13
**response**
27:10, 48:15,
108:22, 146:7
**responses**
7:6, 9:2, 99:9
**responsive**
125:11, 126:5
**rest**
23:11, 110:8
**result**
36:12, 44:1,
71:4
**resulted**
37:4
**results**
63:4, 71:8,
81:1, 87:4,
94:22, 108:18,
110:13, 121:8
**retained**
8:2, 42:12
**retainer**
8:10
**retention**
9:6, 9:11, 9:19

Transcript of Quentin Kidd, Ph.D.
Conducted on September 25, 2019

179

| | | | |
|---|---|---|---|
| **retired** | 36:5, 36:18, | **rural** | 38:8, 38:19, |
| 19:1 | 37:2, 37:3, | 126:20 | 40:6, 44:5, |
| **review** | 37:4, 37:13, | | 49:3, 49:11, |
| 8:22, 10:8, | 41:18, 58:16 | **S** | 49:12, 49:15, |
| 24:10, 47:5, | **ringers** | **s** | 50:8, 50:12, |
| 47:11, 57:9 | 103:8, 103:20 | 31:10, 31:11, | 51:4, 58:22, |
| **reviewed** | **rmr** | 36:4 | 61:20, 62:4, |
| 24:6, 24:16, | 1:22, 2:18, | **sabrina** | 63:14, 66:16, |
| 24:17, 24:18, | 152:2 | 74:16, 147:2 | 67:17, 71:5, |
| 25:2, 25:10, | **roads** | **safest** | 74:5, 88:7, |
| 28:6, 38:14, | 13:5, 129:15, | 112:6 | 94:14, 97:2, |
| 38:19, 38:20, | 129:18, 131:1, | **said** | 97:19, 105:11, |
| 53:15 | 144:7 | 19:5, 20:4, | 105:18, 111:12, |
| **reviewing** | **roanoke** | 40:21, 53:2, | 112:7, 113:12, |
| 26:15 | 13:15, 15:7, | 57:16, 57:17, | 113:15, 119:13, |
| **right** | 18:19, 19:4 | 58:7, 85:5, | 121:4, 123:7, |
| 9:8, 10:20, | **rocky** | 94:14, 94:16, | 123:17, 124:13, |
| 27:16, 28:2, | 129:22, 130:3, | 95:16, 95:19, | 125:22, 128:15, |
| 28:13, 28:20, | 141:1, 144:18 | 105:9, 105:12, | 128:17, 128:18, |
| 39:19, 43:7, | **role** | 108:20, 131:15, | 129:1, 129:3, |
| 48:2, 48:8, | 29:12, 31:2, | 137:1, 139:8, | 129:13, 131:10, |
| 49:2, 50:1, | 48:3 | 139:15, 141:7, | 138:3, 139:3, |
| 54:8, 59:15, | **room** | 141:20, 148:6, | 139:13, 140:1, |
| 62:9, 63:2, | 2:8, 4:10, | 152:6 | 140:10, 140:22, |
| 63:13, 64:6, | 139:21 | **salary** | 141:4, 143:6, |
| 64:14, 69:14, | **rose** | 11:13, 11:16, | 144:5, 144:21 |
| 70:17, 74:3, | 116:1 | 12:12 | **saying** |
| 75:12, 76:16, | **ross-hammond** | **same** | 8:16, 37:5, |
| 78:18, 79:16, | 74:19, 75:1, | 32:21, 55:21, | 37:12, 60:18, |
| 81:8, 84:6, | 75:14, 81:13, | 60:1, 68:5, | 64:18, 65:1, |
| 86:14, 88:7, | 89:8 | 68:6, 96:13, | 94:6, 120:12, |
| 90:14, 94:2, | **rpr** | 105:14, 115:2, | 139:11, 142:16, |
| 95:15, 95:16, | 1:22, 2:18, | 119:7, 143:13, | 145:1 |
| 100:3, 101:21, | 152:2 | 151:4 | **says** |
| 105:12, 109:6, | **rule** | **satisfied** | 54:13, 64:13, |
| 113:14, 115:9, | 119:21, 120:3, | 79:5, 79:9 | 64:15, 66:10, |
| 117:19, 122:20, | 128:18, 128:19 | **satisfies** | 67:4, 67:7, |
| 123:7, 124:22, | **rules** | 86:16, 87:20, | 67:8, 85:4, |
| 125:21, 135:17, | 6:16, 119:20 | 88:10, 88:21, | 85:5, 89:15, |
| 138:11, 139:5, | **run** | 89:8 | 91:1, 91:9 |
| 141:5, 141:21, | 30:19, 53:9, | **satisfy** | **scenario** |
| 143:19, 150:5, | 63:1, 65:10, | 79:9, 110:13 | 113:8 |
| 150:6 | 127:7, 127:13, | **satisfying** | **scenarios** |
| **rights** | 127:16 | 75:14 | 102:14, 102:16 |
| 14:21, 15:16, | **running** | **say** | **scholars** |
| 18:7, 32:4, | 41:1, 45:15, | 6:20, 20:7, | 103:19 |
| 32:17, 35:18, | 62:15, 68:14 | 24:16, 24:18, | **school** |
| 35:21, 36:1, | **runs** | 32:12, 37:20, | 14:9, 24:20 |
| | 127:13 | | |

Transcript of Quentin Kidd, Ph.D.
Conducted on September 25, 2019

180

science
11:10, 31:9,
97:11, 97:13,
98:3, 98:5,
99:21, 102:3,
102:4, 102:21,
103:2
scope
8:20
screen
134:18
seal
152:14
search
57:11, 58:14,
58:17, 129:12,
131:16, 131:21,
146:19
searches
58:10, 130:7,
146:19
searching
101:14, 129:8
seat
58:21, 60:7,
60:12, 60:15,
60:19, 60:20,
61:2, 61:11,
61:14, 61:19,
62:1, 62:16,
63:2, 95:6
seats
58:20, 59:10,
59:12, 59:14,
59:22, 60:3,
60:15, 61:22,
62:12, 62:13,
62:14
second
17:7, 21:3,
25:15, 25:19,
27:12, 31:20,
69:15, 94:9,
94:19, 116:3
secondly
33:18
section
14:21, 15:16,

41:17, 124:22,
125:1, 125:3,
125:6
sections
53:19
see
39:21, 48:3,
54:21, 56:5,
56:11, 111:10,
121:12, 134:14,
134:19, 139:11,
139:16, 140:3,
141:18, 142:16,
146:5
seem
126:17
seemed
101:19
seems
64:22
seen
27:6, 101:12,
115:18, 134:22
semester
30:1, 30:6,
31:18, 31:21
semesters
29:19
senate
17:2
send
119:4
sense
7:14, 40:10,
40:13, 45:16,
50:15, 52:17,
108:2, 112:1,
112:2
sent
17:16, 26:6,
26:14, 38:20,
108:5, 119:8
sentence
55:4, 55:12,
55:22, 69:19,
121:17
separately
56:13, 57:20

september
1:16
serious
97:21
services
39:21, 87:5
serving
42:7
sessoms
90:8, 90:17,
91:4, 92:10,
93:8, 141:14,
142:5, 142:6,
143:9, 145:1
set
13:10, 17:16,
111:6, 152:13
sets
17:11
setting
68:10
seven
54:20, 55:10,
55:11, 55:15,
71:11, 90:7,
90:15
several
14:12, 19:20,
63:2, 114:9,
125:7
share
110:10, 111:6,
111:8, 121:6,
121:10, 122:11,
124:9, 124:16
she'll
150:6
sheet
150:7, 151:7
sherrod
88:21
shift
36:13, 36:21
shifted
31:12, 108:16
shorthand
152:1
should
34:11, 34:12,

106:19, 107:19,
108:2, 134:2,
148:8
show
141:11
showing
51:8
shown
85:18, 116:16
shows
51:5, 114:11,
115:19
side
21:11, 44:13,
44:16, 108:10,
144:22
sides
35:2, 97:21
sign
150:1, 150:8
signature
150:10, 151:11
signature-p1kal
152:18
signed
8:10, 8:18,
9:6, 9:10, 9:14,
11:8, 151:7
significant
114:13
significantly
114:18
signing
152:9
silos
101:7
similar
24:20, 26:12,
100:10
similarly
103:8
simplest
115:15
simply
90:2
since
13:9, 26:17,
55:11, 79:8,

Transcript of Quentin Kidd, Ph.D.
Conducted on September 25, 2019

181

107:8, 117:10,
130:14, 147:4,
147:22, 148:6
**single**
61:19, 62:1,
63:19, 65:9,
65:21, 66:17,
66:18, 128:16
**single-member**
47:20, 130:15,
146:2, 146:11
**sir**
97:2, 113:12
**sit**
52:13, 95:12
**sitting**
50:5, 63:17,
78:9, 91:3,
91:10
**situation**
13:13, 123:21
**six**
14:3, 55:10,
72:2, 72:10,
77:8, 82:15,
83:8
**sixty**
10:12
**skim**
24:21, 25:22,
26:2
**skimmed**
24:22, 25:21
**slower**
97:4
**slowly**
115:9, 116:22
**social**
101:6, 102:4
**society**
29:8, 29:14,
136:14, 137:2
**sociology**
97:13, 102:3
**software**
32:2
**some**
6:11, 8:17,

8:18, 13:8,
14:10, 17:17,
32:2, 33:18,
44:1, 45:13,
57:6, 64:20,
66:15, 67:3,
67:5, 79:18,
96:10, 112:5,
122:16, 122:18,
126:12, 129:8,
130:7, 146:6,
146:8, 148:13,
148:16
**somebody**
35:2, 127:13,
135:9, 142:16
**something**
24:20, 46:1,
73:5, 96:9,
108:17, 115:4,
131:17, 143:17,
144:2
**sometime**
8:4, 27:22,
28:9, 28:10
**sometimes**
62:6, 62:8,
67:7, 67:8,
67:9, 101:4,
134:18
**somewhere**
10:12, 48:18
**sorry**
54:16, 88:4,
94:17, 97:4,
110:3, 111:22,
113:2, 113:14,
125:19, 138:5,
146:14
**sort**
31:9, 31:15,
31:19, 35:12,
36:15, 36:19,
41:6, 51:2,
52:19, 75:19,
99:16, 100:20,
102:20, 103:2,
106:22, 124:20,

129:17, 129:19,
130:4, 144:12,
144:15
**sorted**
75:10, 77:17,
83:4
**sorts**
100:22
**soundly**
117:13
**sources**
12:11
**south**
36:3, 36:11,
36:13, 36:16,
37:9
**southern**
35:22
**southerner**
36:7
**speak**
20:9, 110:7,
137:3
**speaking**
70:7
**specific**
57:19, 69:4,
69:11, 69:12,
131:3, 136:20
**specifically**
33:3, 37:18,
45:17, 57:5,
92:16, 131:5,
132:10, 132:22
**spell**
12:6, 23:21
**spelled**
51:19, 118:11
**spencer**
9:1, 25:13,
25:22, 26:1,
26:4, 26:21,
27:11, 48:21,
53:6, 55:3,
55:6, 56:7,
64:13, 67:14,
67:15, 67:20,
68:4, 68:6,

68:18, 73:20,
75:10, 75:16,
77:4, 77:12,
77:13, 77:18,
80:12, 80:15,
81:12, 82:21,
83:3, 83:14,
84:11, 84:12,
84:13, 85:9,
85:16, 86:7,
86:22, 87:3,
88:13, 89:4,
90:1, 90:2,
93:2, 104:14,
104:16, 105:9,
105:12, 105:18,
106:12, 107:1,
115:18, 147:20,
148:19
**spencer's**
46:5, 48:10,
48:14, 49:2,
49:6, 53:9,
53:11, 59:16,
60:8, 62:11,
67:2, 68:10,
78:7, 79:13,
80:17, 80:22,
81:21, 82:9,
82:22, 83:17,
83:19, 84:16,
85:18, 86:9,
87:1, 87:2,
87:4, 87:14,
87:16, 87:18,
87:19, 87:22,
88:19, 89:6,
89:13, 89:19,
91:19, 92:1,
93:3, 93:20,
95:1, 95:14,
95:18, 96:1,
96:3, 101:11,
104:1, 110:13,
114:10, 147:7,
147:11, 147:12,
147:18, 147:19,
148:5, 148:14,

Transcript of Quentin Kidd, Ph.D.
Conducted on September 25, 2019

148:22
**spent**
10:10, 13:2,
13:3, 33:18
**spoken**
23:8, 120:13
**sponsored**
40:11
**spreadsheet**
5:12, 87:17,
134:6, 134:7,
135:12
**spss**
32:2, 52:22
**stages**
144:19
**stamp**
142:4, 143:12,
144:13
**standard**
66:15, 67:10,
67:12
**standards**
50:16, 50:19
**star**
106:11, 106:15
**start**
7:1, 113:2,
113:3
**started**
13:14
**starting**
70:12, 70:21
**starts**
55:22
**stata**
32:2, 52:22
**state**
7:16, 15:8,
17:2, 38:14,
39:2, 41:7,
42:9, 42:20,
43:9, 48:10,
54:15, 56:2,
69:19, 126:11,
128:12, 133:6
**state-related**
13:17

**statement**
65:7, 86:13,
148:12, 148:19
**states**
1:1, 30:20,
30:22, 42:10,
57:20
**stations**
131:1
**statistical**
52:10, 96:8,
96:16, 96:19,
96:22, 98:9,
98:16, 100:20,
102:8, 105:7,
116:9, 116:12
**stenographically**
152:7
**step**
79:14, 149:7
**stepping**
37:11
**stick**
68:17, 68:22
**still**
9:18, 54:9,
142:19, 143:11,
143:18, 145:8
**stopped**
32:10
**story**
75:20
**street**
3:6, 3:13
**strong**
128:19, 148:13,
148:15
**strongly**
51:5, 51:9,
51:12, 51:13,
51:15
**structure**
30:19, 51:18
**structured**
49:20, 50:14
**struggle**
137:5, 137:8
**struggling**
50:21, 137:6

**students**
14:9, 16:12,
16:17, 18:6,
29:11, 31:22,
47:2
**studied**
125:10, 125:22
**study**
31:12, 67:14,
126:2
**studying**
13:4, 13:7
**stuff**
31:1, 31:2,
31:4, 37:21,
71:4, 144:14,
146:8
**subject**
146:15, 146:16
**submit**
9:21, 10:2,
18:12
**submitted**
10:3, 10:4,
17:10, 47:12,
119:5, 147:22,
148:6
**submitting**
26:17
**subtle**
138:8, 138:13,
139:4, 139:6,
139:13, 139:17,
139:18, 140:2,
141:22, 142:15,
142:16
**subtlety**
141:20
**subtraction**
116:13
**successful**
140:7, 140:12
**sufficiently**
47:18
**suite**
3:7, 3:14
**sum**
122:14

**summer**
28:22, 29:3
**support**
16:7, 41:2,
41:6, 65:2,
65:4, 66:12,
72:1, 72:9,
75:9, 76:20,
77:7, 77:15,
77:18, 78:2,
78:10, 78:22,
79:8, 80:6,
81:8, 81:18,
82:8, 83:3,
85:8, 86:12,
89:17, 95:22,
102:2, 105:19,
111:5, 113:9,
113:18, 113:21,
114:3, 114:12,
114:14, 114:16,
114:17, 114:20,
114:21, 115:21,
116:10, 116:11,
117:3, 136:5,
137:9, 141:14,
142:6, 142:9,
142:14, 143:1,
145:1
**supported**
40:13, 51:5,
51:9, 51:15,
64:19, 64:20,
105:16, 105:17,
113:17
**supporting**
43:9, 43:10,
43:21, 115:1,
115:3, 115:19
**suppose**
69:12
**suppress**
145:5
**sure**
6:21, 27:13,
35:6, 36:4,
88:7, 91:14,
91:18, 106:16

Transcript of Quentin Kidd, Ph.D.
Conducted on September 25, 2019

183

| | | | |
|---|---|---|---|
| **surface** 32:11 | 132:15, 133:19 | 88:5 | **term** 62:6 |
| **survey** 135:4 | **tables** 73:21, 84:13, 95:4, 135:5 | **tape** 134:12 | **terms** 41:10, 58:14, 58:17, 79:5, 108:3 |
| **sworn** 6:4 | **take** 7:10, 7:12, | **taught** 29:18, 29:22, 30:12, 30:13, | **test** 99:10, 99:11, |

**surface**
32:11
**survey**
135:4
**sworn**
6:4
**system**
39:4, 126:14,
126:16, 128:3,
130:15, 130:16,
135:20, 136:9,
136:19

---

**T**

**table**
69:17, 71:20,
72:1, 72:7,
72:9, 75:6,
75:7, 76:12,
76:13, 76:15,
76:18, 77:3,
77:6, 77:7,
77:12, 77:14,
77:20, 78:13,
78:17, 78:20,
80:3, 80:6,
80:15, 81:3,
81:17, 82:6,
82:12, 82:22,
83:16, 83:19,
83:22, 84:3,
84:21, 85:4,
85:6, 85:19,
86:5, 86:15,
88:5, 88:9,
88:14, 88:18,
88:20, 89:5,
89:7, 89:16,
89:22, 90:5,
90:7, 90:15,
91:1, 91:2,
91:9, 92:15,
93:21, 109:10,
109:11, 109:12,
109:13, 109:17,
110:9, 110:16,
111:2, 114:19,
121:2, 132:13,

132:15, 133:19
**tables**
73:21, 84:13,
95:4, 135:5
**take**
7:10, 7:12,
55:17, 55:20,
79:19, 98:7,
99:6, 100:20,
113:6, 125:4,
145:19, 149:4
**taken**
21:5, 28:14,
34:14, 34:15,
80:2, 130:13,
149:8, 152:4,
152:6
**taking**
48:13, 98:3,
100:9, 100:12,
122:15, 122:18
**talk**
7:3, 14:6,
36:2, 46:9
**talked**
20:17, 22:11,
22:16, 22:19,
22:22, 23:10,
24:4, 33:10,
34:5, 34:7,
34:18, 36:5,
36:17, 46:10,
119:22
**talking**
18:18, 44:3,
44:5, 56:16,
57:5, 59:5,
59:7, 59:21,
59:22, 60:21,
62:14, 62:15,
107:8, 111:19,
143:14, 145:14,
146:10, 146:13,
148:4
**talks**
36:1
**tanya**
87:20, 88:3,

88:5
**tape**
134:12
**taught**
29:18, 29:22,
30:12, 30:13,
30:14, 30:16,
32:3, 32:6,
33:2, 33:5,
97:16, 97:17,
97:18, 97:20,
98:7
**tautology**
139:7
**teach**
28:20, 28:22,
29:2, 29:3
**teacher**
35:4, 127:3
**teaching**
18:10, 30:5,
30:6, 31:22,
32:1, 32:10,
34:21
**team**
16:22, 17:1,
18:8, 18:11,
44:3, 44:6,
56:17, 56:19,
87:7
**teams**
17:9, 17:16,
17:17
**technique**
96:16, 96:19
**techniques**
96:22
**tell**
8:14, 8:18,
16:14, 18:3,
19:16, 28:4,
32:20, 40:8,
58:13, 58:16,
91:10, 99:21,
100:6, 107:7,
115:13, 126:15,
126:19, 137:14
**telling**
75:20

**term**
62:6
**terms**
41:10, 58:14,
58:17, 79:5,
108:3
**test**
99:10, 99:11,
103:20, 140:9,
140:14
**tested**
102:14, 103:5
**testified**
22:18, 149:9
**testify**
6:5, 17:18
**testifying**
41:10
**testimony**
151:4, 151:6,
152:6
**testing**
96:6, 96:7,
96:14, 96:15,
96:18, 97:15,
98:8, 98:10,
98:17, 98:21,
99:3, 99:8,
99:19, 100:15,
101:9, 103:14,
104:1, 104:6,
104:13, 106:2,
106:4, 107:9,
107:13, 109:4
**th**
3:6, 8:5, 8:7,
26:7
**thank**
149:20, 149:21
**themselves**
93:11
**theory**
31:19
**thereafter**
152:7
**thesis**
36:9, 36:10
**thing**
31:15, 60:1

Transcript of Quentin Kidd, Ph.D.
Conducted on September 25, 2019

184

things
34:6, 34:17,
58:18, 67:15,
140:3, 145:2
think
8:5, 9:3, 14:1,
19:4, 28:2,
35:6, 35:14,
35:15, 37:2,
39:7, 45:22,
49:17, 50:17,
51:11, 51:14,
51:16, 54:10,
55:4, 58:12,
59:2, 60:5,
60:9, 61:9,
62:9, 62:17,
64:1, 65:10,
65:15, 65:18,
66:9, 67:5,
68:5, 68:11,
68:19, 69:4,
69:11, 70:5,
71:13, 71:16,
71:18, 88:5,
92:13, 92:14,
92:16, 95:16,
98:19, 99:14,
99:17, 99:20,
100:8, 100:18,
109:20, 110:22,
116:4, 118:2,
120:6, 123:21,
124:2, 124:20,
126:7, 127:22,
139:17, 140:2,
142:1, 144:3,
145:10, 149:2
thinking
19:19, 20:7,
37:19, 37:20,
44:19, 44:20,
46:4, 100:12,
136:16, 136:21
third
79:14
thought
14:10, 94:16,

108:6
three
8:11, 25:2,
25:10, 30:10,
47:15, 54:12,
59:17, 59:18,
60:2, 62:11,
62:18, 76:15,
76:20, 78:16,
78:22, 80:13,
81:2, 82:8,
83:21, 122:13
through
27:13, 34:18,
36:2, 36:3,
37:20, 44:3,
45:15, 46:4,
49:14, 64:15,
75:20, 79:12,
82:2, 82:3,
86:9, 87:2,
103:8, 103:20,
114:9, 115:12,
119:9, 119:14,
133:2, 133:3,
133:4, 133:22,
134:8, 135:13,
145:15
throughout
9:5
time
6:14, 7:10,
10:17, 10:19,
10:22, 11:3,
17:2, 21:14,
29:18, 29:22,
30:5, 31:11,
33:12, 33:19,
34:3, 37:11,
41:4, 57:7,
59:15, 61:9,
61:11, 63:12,
63:19, 65:9,
65:21, 68:5,
68:6, 69:20,
70:3, 70:4,
70:13, 70:22,
79:4, 120:13,

128:1, 131:3,
138:19
timeframe
26:12
times
32:7, 32:8,
63:2, 128:1,
136:3, 136:17,
137:1, 137:3
title
75:7
today
6:11, 6:20,
7:19, 7:22,
10:20, 35:9,
50:5, 57:18,
63:17, 70:11,
78:10, 91:3,
148:11, 149:1,
149:9
together
134:12
told
120:8, 149:1
tony
24:15, 25:20
took
53:17, 135:5
tool
33:20, 34:14,
35:16
top
48:9, 61:14,
64:3, 69:16,
79:2, 85:6,
104:17, 124:20
total
73:20, 74:6
totality
125:7, 140:9,
140:14
totally
17:13, 17:20,
51:10
toward
36:14
tracked
135:6

training
18:6, 127:3
transcript
27:4, 107:6,
134:17, 152:5
transcription
151:5
transformation
36:11
transition
36:2, 36:3
transparent
43:19
travel
11:1
traveling
11:3
trials
99:4, 99:15,
100:5, 100:15
tried
16:21, 45:12
tries
129:21
tripping
140:15
trouble
66:9
true
63:3, 63:14,
63:15, 72:15,
72:20, 72:22,
74:22, 80:5,
80:13, 82:9,
93:10, 93:12,
128:3, 151:4,
152:5
truthfully
7:22
try
34:21, 100:2,
131:17, 145:8
trying
16:17, 19:19,
40:14, 53:1,
55:2, 68:7,
68:8, 71:2,
72:6, 96:11,

Transcript of Quentin Kidd, Ph.D.
Conducted on September 25, 2019

185

**96:12, 102:9,**
129:9, 145:5,
145:6
**turn**
27:16, 39:19,
69:14, 71:19,
75:6, 77:5,
79:2, 90:4,
112:9
**turnout**
109:14, 128:5,
128:8, 128:10,
132:9, 132:16,
132:21, 133:5,
135:7, 137:18
**turpin**
129:22, 141:2,
144:20
**tv**
131:1, 146:9
**twice**
74:9, 95:19
**two**
8:11, 8:22,
17:11, 17:14,
26:13, 33:22,
54:12, 58:21,
59:3, 60:3,
61:18, 61:22,
73:8, 73:12,
73:14, 73:15,
73:17, 74:2,
76:16, 78:16,
80:13, 81:2,
83:21, 95:8,
96:9, 96:13,
107:11, 107:14,
111:7, 115:22,
125:5, 144:20
**two-minute**
149:5
**two-thirds**
123:15
**type**
31:1
**typewriting**
152:8
**typically**
105:7

**typo**
133:12, 133:13,
133:16, 133:17

**U**

**uh-huh**
56:1, 70:1,
71:21, 73:9,
80:4, 110:1
**ultimately**
75:20, 81:15
**undefined**
66:13
**under**
6:5, 7:19,
15:16, 23:11,
39:20, 56:14,
57:21, 121:2,
152:8
**undergraduate**
29:4, 29:5,
30:10, 30:11,
97:18
**underneath**
111:2
**understand**
7:19, 16:18,
23:14, 25:8,
31:13, 46:5,
53:2, 53:4,
57:3, 68:4,
73:19, 74:10,
99:3, 100:11,
106:13, 107:15,
120:11
**understanding**
8:20, 23:15,
53:20, 56:15,
56:16, 56:19,
71:9, 101:3,
107:22, 116:18,
129:20, 142:10
**understandings**
54:5
**understood**
99:18, 103:4
**united**
1:1, 30:20,

30:22, 42:10
**universities**
17:9
**university**
11:10, 11:14,
12:5, 12:13,
13:3, 16:21,
21:21, 28:21,
30:2, 47:11,
137:4
**unpack**
81:22, 82:1
**updated**
27:22
**updates**
28:2
**urban**
126:21
**use**
45:1, 48:19,
52:20, 52:21,
62:6, 64:16,
68:7, 101:8,
102:8, 102:11,
103:14, 116:9
**useful**
65:10, 65:14,
79:18, 100:4
**usefulness**
101:3
**uses**
51:12, 52:18,
129:21
**using**
48:14, 114:10,
114:12, 122:4,
138:9, 138:14,
145:8
**usually**
85:20
**utilize**
87:5

**V**

**va**
2:9, 4:11
**value**
53:18

**values**
121:5
**various**
29:13, 102:14,
102:15, 135:4
**vcu**
41:4
**verbal**
7:5, 7:7
**verbally**
21:13, 44:18
**verbiage**
64:17
**verify**
118:18, 150:2
**versus**
73:12, 139:13,
139:17
**viability**
102:15, 103:6,
103:21
**viable**
63:5, 63:7,
63:11
**vice**
29:20, 30:2
**view**
34:19, 35:5,
35:7, 35:15,
70:10, 70:13,
70:22
**views**
34:21
**virginia**
1:2, 1:9, 1:15,
2:5, 2:9, 2:19,
4:2, 4:7, 4:11,
13:4, 14:8,
14:11, 16:19,
16:22, 17:10,
22:11, 34:2,
34:4, 42:16,
58:20, 62:20,
63:2, 66:1,
69:6, 70:18,
71:16, 73:17,
74:7, 74:14,
75:8, 83:1,

109:8, 109:14,
111:20, 111:22,
124:11, 124:18,
125:11, 126:4,
126:10, 126:13,
128:12, 128:17,
128:21, 129:2,
129:3, 129:10,
129:15, 129:18,
130:9, 130:14,
131:5, 132:10,
132:15, 132:18,
132:22, 133:6,
137:12, 137:19,
141:15, 143:10,
146:2, 146:20,
146:21, 147:4,
152:22
**volume**
28:8, 28:13
**vote**
37:15, 38:10,
73:11, 73:12,
91:11, 91:17,
92:18, 95:14,
95:17, 110:10,
110:16, 111:7,
112:20, 117:2,
117:3, 117:6,
117:9, 117:10,
117:13, 117:20,
117:22, 121:6,
121:10, 122:1,
122:10, 123:15,
123:17, 124:9,
124:16, 137:9,
141:5, 145:5,
145:6, 147:5,
147:17
**voted**
73:7, 74:22,
76:6
**voter**
116:10, 116:11,
128:4, 128:20,
129:5, 129:9,
130:8, 133:5,
137:11, 137:18,

142:13
**voters**
15:6, 36:12,
36:14, 36:20,
38:17, 39:5,
54:18, 55:8,
56:3, 56:4,
56:8, 56:9,
66:11, 66:12,
72:2, 72:10,
73:3, 73:6,
73:10, 73:12,
73:14, 73:17,
74:8, 74:13,
74:15, 82:16,
83:10, 84:6,
85:1, 85:5,
90:9, 90:18,
91:5, 91:18,
92:12, 92:19,
92:22, 93:15,
94:2, 94:10,
94:19, 101:10,
103:16, 105:16,
105:19, 109:15,
113:7, 113:8,
114:2, 114:6,
115:1, 115:3,
115:17, 117:7,
117:8, 117:14,
123:6, 123:12,
123:20, 124:10,
124:17, 132:10,
132:21, 135:18,
143:1, 145:9
**votes**
72:16, 73:8,
73:12, 73:14,
73:15, 73:17,
73:20, 74:2,
74:6, 112:15,
122:3, 123:3,
123:9, 141:2,
141:6, 146:21
**voting**
14:21, 15:16,
15:20, 18:6,
18:16, 32:4,

32:16, 33:3,
35:18, 35:21,
36:1, 36:5,
36:18, 37:2,
37:3, 37:17,
37:19, 38:3,
38:5, 38:12,
39:9, 39:13,
39:16, 41:18,
41:21, 42:2,
48:20, 58:16,
64:6, 65:17,
66:1, 66:19,
68:12, 69:6,
73:16, 74:8,
75:11, 75:22,
76:10, 78:11,
83:5, 86:11,
101:9, 103:15,
117:18, 117:19,
146:21
**voting-related**
128:13

### W

**w-a-s-o-n**
12:8
**wait**
6:22, 7:1
**waived**
150:10
**walk**
114:9
**walked**
82:2, 82:3,
104:17
**walking**
75:19, 75:20,
79:12, 86:6,
86:8, 87:1,
105:21
**want**
27:13, 40:6,
55:19, 59:5,
87:8, 102:10,
102:11, 103:8,
112:22, 115:6,
116:15, 126:20,

126:22, 128:14,
128:15, 131:18,
134:14, 144:4,
145:2, 145:19,
147:13
**wanted**
16:22, 17:6,
109:8
**wants**
143:1
**war**
37:6
**washington**
3:8
**wason**
11:19, 11:20,
11:21, 12:2,
12:7, 12:8,
12:10, 40:10,
41:5
**wasons**
12:9
**watching**
129:14
**water-drinking**
110:4
**way**
21:7, 21:17,
21:20, 30:19,
42:5, 42:15,
45:2, 49:20,
50:14, 64:15,
67:13, 83:20,
96:10, 96:11,
96:13, 99:3,
102:10, 104:9,
113:15, 127:5,
127:12, 127:18,
130:19, 143:13,
146:21, 147:15
**wayson**
12:9
**we'll**
6:15, 82:5,
130:6, 134:14,
149:6, 150:8
**we're**
32:19, 32:22,

Transcript of Quentin Kidd, Ph.D.
Conducted on September 25, 2019

187

37:5, 37:7,
37:12, 66:13,
79:17, 104:18,
105:13, 105:19,
107:8, 118:22,
119:1, 119:18,
120:6, 120:10,
143:13, 145:21,
148:4, 150:3
**we've**
116:21, 119:22,
120:8, 145:13
**wednesday**
1:16
**well-known**
144:6
**went**
13:19, 13:20,
14:13, 15:22,
16:1, 16:9,
143:10, 144:10
**weren't**
19:21, 20:5,
46:11
**whatever**
39:4, 65:3,
71:3, 87:8,
96:11, 100:22,
133:16
**whereof**
152:13
**whereupon**
6:2
**whether**
13:17, 15:4,
15:5, 23:9,
34:11, 38:15,
61:3, 61:14,
63:18, 65:20,
71:9, 72:22,
73:17, 74:10,
75:10, 77:17,
83:4, 91:4,
92:3, 92:10,
92:20, 92:21,
95:5, 95:10,
96:9, 96:12,
99:13, 101:15,

125:10, 126:3,
126:22, 127:2,
127:13, 131:13,
138:22, 139:1,
139:2, 143:17,
147:2
**white**
36:13, 36:21,
39:16, 42:1,
55:2, 55:6,
65:20, 74:22,
75:11, 75:22,
76:6, 76:10,
83:4, 86:10,
90:9, 90:18,
91:5, 91:11,
91:18, 92:3,
92:12, 92:18,
92:19, 92:22,
93:9, 94:9,
94:15, 94:18,
95:5, 95:7,
95:9, 95:10,
95:14, 95:17,
95:19, 113:7,
123:4, 123:10,
147:5, 147:16
**white's**
95:13, 95:17
**whites**
37:14, 113:11,
137:13
**whoever**
139:15
**whole**
134:13
**wife**
23:4, 24:1
**wile**
1:22, 2:17,
152:2
**willing**
16:6, 128:18
**win**
63:11, 64:2,
81:6, 95:7,
95:8, 127:20,
147:4

**winners**
17:7, 17:15,
90:7, 90:15
**winning**
78:17, 81:3,
83:22
**wins**
138:9, 138:14,
139:2, 139:10
**winter**
29:19
**wish**
134:18
**withdraw**
85:11
**within**
26:13, 35:8
**without**
46:6, 120:14,
122:15, 122:18
**witness**
8:3, 12:18,
12:22, 106:17,
152:13
**witnesses**
47:9
**won**
54:20, 55:9,
72:16, 74:16,
74:19, 75:10,
76:16, 78:17,
81:3, 83:4,
83:22, 95:5,
140:20, 141:2,
141:5
**wooten**
74:16, 147:2
**word**
46:15, 51:13,
55:17, 55:20
**words**
48:15, 62:12
**work**
8:21, 9:7,
9:21, 10:14,
12:13, 13:14,
20:13, 20:21,
20:22, 26:16,

39:8, 39:15,
44:21, 52:18,
52:21, 53:14,
53:18, 108:2,
119:11
**worked**
16:20
**working**
10:11, 17:4
**works**
64:14, 98:21,
98:22
**world**
102:7, 144:8
**wouldn't**
65:6, 86:12,
88:2, 90:3,
127:5, 135:17,
140:21
**write**
46:13, 46:15,
46:17, 48:15,
54:16, 79:3,
104:18, 104:20,
104:22
**writes**
105:5
**writing**
6:19, 46:19
**written**
35:17
**wrong**
71:17
**wrote**
144:4, 144:5,
144:8

**Y**

**yeah**
16:16, 26:10,
32:5, 32:22,
34:9, 49:4,
60:1, 60:12,
61:1, 61:13,
70:17, 80:16,
82:5, 87:13,
106:3, 106:14,
110:5, 110:20,

Transcript of Quentin Kidd, Ph.D.
Conducted on September 25, 2019

188

113:14, 118:9,
127:21, 128:1,
137:21, 139:12,
144:1, 145:10,
149:15
**year**
13:22, 29:1,
40:21, 59:9,
60:22, 101:21
**years**
13:3, 13:4,
13:13, 14:3,
29:20, 30:13,
30:14, 32:6,
32:19, 33:1,
37:12, 37:21,
59:11, 59:18,
60:6, 60:10,
102:19, 120:16,
121:7, 129:16,
131:2, 135:4,
144:20
**yep**
7:15, 111:3,
111:11, 132:19
**you-guys**
145:17
**yourself**
120:14

**Z**

**zero**
122:14

**$**

**$20,000**
10:15
**$225**
10:7
**$275**
10:16, 13:11

**0**

**00069**
1:8

**1**

**10**
32:6, 37:21,

59:18, 60:13,
60:14, 60:15,
62:10, 75:6,
76:18, 82:11,
103:10, 113:10,
121:2
**100**
11:15, 37:12,
99:6, 136:6
**107**
5:11
**11**
28:6, 84:3
**1101**
3:6
**12**
5:10, 8:5, 8:7,
33:1, 86:14,
150:12
**134**
5:12
**14**
3:6, 78:13,
89:21
**15**
32:6, 33:1,
37:21, 90:4,
102:19, 120:16,
123:3, 123:9
**152**
1:21
**16**
76:12
**17**
17:9, 54:20,
55:10, 55:15,
78:13, 89:21,
113:3
**18**
1:8, 30:13,
102:19, 115:11,
115:14
**19**
76:13, 116:20,
121:16
**19.3**
122:6, 122:21
**1990**
130:14

**2**

**20**
30:13, 30:14,
102:19, 109:6,
113:11, 131:2
**20005**
3:8
**2006**
133:9, 148:7
**2008**
59:16, 61:16,
69:20, 70:4,
75:8, 79:4,
82:14, 83:2,
83:8, 84:4,
84:21, 109:15,
116:5, 133:6,
133:10, 133:12,
133:14, 133:15,
133:19, 133:20,
141:13, 147:4,
148:8
**2010**
62:20, 70:14,
70:16, 71:5,
71:7, 76:5,
76:7, 86:16,
87:20, 88:3,
88:10
**2011**
39:21, 40:7,
42:8, 42:17,
70:16, 71:15,
88:21
**2012**
55:11, 69:21,
70:3, 70:12,
70:15, 70:21,
74:19, 79:8
**2014**
29:22, 30:1,
30:7, 62:20,
71:1, 116:1
**2016**
62:21, 74:20,
75:1, 75:14,
81:7, 81:14,

81:18, 89:8
**2017**
141:1
**2018**
69:21, 70:3,
70:4, 74:17,
75:8, 76:16,
78:17, 79:5,
81:3, 82:14,
83:2, 83:8,
83:22, 84:4,
84:21, 93:13,
93:21, 94:8,
94:18, 95:6,
101:21, 109:15,
133:6, 133:10,
133:11, 133:14,
133:15
**2019**
1:16, 5:10,
8:7, 8:8, 28:7,
28:12, 152:15
**202**
3:9
**2021**
152:16
**21**
110:6
**22**
118:12
**22.3**
117:9, 117:11
**2200**
3:9
**225**
13:10
**23**
13:3, 76:5,
81:18, 88:8,
111:1, 121:2
**23456**
2:9, 4:11
**24**
86:6
**2401**
2:6, 4:8
**25**
1:16, 13:4,

Transcript of Quentin Kidd, Ph.D.
Conducted on September 25, 2019

189

105:15, 123:2,
123:8, 125:2,
129:15
**26**
26:7, 120:3
**260**
2:8, 4:10
**261911**
1:20
**27**
5:10
**28**
133:2, 133:3
**2:cv**
1:8

---
**3**
---
**30**
114:21, 133:2,
133:3
**302**
3:14
**31**
152:16
**312**
3:16
**34**
145:15
**35**
1:17, 145:15,
150:12
**37**
117:2, 117:5,
117:11
**385**
2:10, 4:12
**389**
141:2

---
**4**
---
**40**
114:20
**400**
3:7
**41**
55:15
**4351**
2:10, 4:12

**44**
27:17
**47**
28:4, 36:8

---
**5**
---
**50**
36:4, 72:1,
72:9, 76:19,
77:7, 77:15,
78:12, 78:21,
80:6, 82:7,
89:17, 99:7,
99:8, 117:16,
117:17, 118:4
**51.7**
117:1, 117:8,
117:10
**53**
39:19
**5508**
3:16
**561**
3:16
**57,000**
11:15
**59.9**
81:7

---
**6**
---
**6.1**
117:22, 122:7
**6.6**
117:22, 122:6
**60**
10:12, 31:10,
98:6, 114:20,
117:21
**60.3**
117:21, 121:11,
121:14, 121:18,
122:8, 122:11,
122:15
**60603**
3:15
**6th**
152:14

---
**7**
---
**70**
10:12, 31:11,

98:6
**73**
3:13
**736**
3:9
**75**
105:18
**757**
2:10, 4:12

---
**8**
---
**8.8**
112:7
**80**
105:16, 114:16,
128:7, 128:9

---
**9**
---
**9**
1:17
**98**
98:4
**99**
98:5