**IN THE UNITED STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF VIRGINIA
NORFOLK DIVISION**

| | |
|---|---|
| **Latasha Holloway, *et al*.,** | |
| **Plaintiffs,** | |
| | **Civil Action No. 2:18-cv-0069** |
| **v.** | |
| **City of Virginia Beach, *et al*.,** | |
| **Defendants** | |

**PLAINTIFFS' BRIEF IN OPPOSITION TO DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT**

# PLAINTIFFS' EXHIBIT 7

Deposition Transcript of Virginia Beach City Council Member John Moss



# Transcript of John D. Moss

**Date:** September 13, 2019
**Case:** Holloway, et al. -v- City of Virginia Beach, et al.

**Planet Depos**
**Phone:** 888.433.3767
**Email::** transcripts@planetdepos.com
**www.planetdepos.com**

```
 1            IN THE UNITED STATES DISTRICT COURT

 2          FOR THE EASTERN DISTRICT OF VIRGINIA

 3                 NORFOLK DIVISION

 4   -------------------------------x

 5   LATASHA HOLLOWAY and             :

 6   GEORGIA ALLEN,                   :

 7                 Plaintiffs,   :     CASE NO.

 8   v.                               :     2:18cv00069

 9   CITY OF VIRGINIA BEACH, et al., :

10                 Defendants.   :

11   -------------------------------x

12

13

14            Deposition of JOHN D. MOSS

15             Virginia Beach, Virginia

16            Friday, September 13, 2019

17                   9:10 a.m.

18

19

20   Job No. 261326

21   Pages 1 - 215

22   Reported by:  Penny C. Wile, RPR, RMR, CRR
```

1          Deposition of JOHN D. MOSS, held at the

2     offices of:

3

4

5          VIRGINIA BEACH CITY ATTORNEY

6          2401 Courthouse Drive

7          Municipal Center, Building One

8          Room 260

9          Virginia Beach, VA 23456

10          (757)385-4351

11

12

13

14

15

16

17          Pursuant to Notice, before Penny C. Wile,

18     RPR, RMR, CRR, Notary Public of the Commonwealth

19     of Virginia.

20

21

22

```
 1              A P P E A R A N C E S

 2   ON BEHALF OF THE PLAINTIFFS, LATASHA HOLLOWAY

 3   AND GEORGIA ALLEN:

 4        ERIN CHLOPAK, ESQUIRE

 5        CAMPAIGN LEGAL CENTER

 6        1101 14th Street NW

 7        Suite 400

 8        Washington, DC 20005

 9        (202)736-2200

10            and

11        ANNABELLE E. HARLESS, ESQUIRE

12        CAMPAIGN LEGAL CENTER

13        73 W. Monroe Street

14        Suite 302

15        Chicago, IL 60603

16        (312)561-5508

17

18

19

20

21

22
```

Transcript of John D. Moss
Conducted on September 13, 2019                    4

```
1              A P P E A R A N C E S

2    ON BEHALF OF THE DEFENDANTS, CITY OF VIRGINIA

3    BEACH, ET AL.:

4         CHRISTOPHER S. BOYNTON, ESQUIRE

5         OFFICE OF THE VIRGINIA BEACH CITY ATTORNEY

6         2401 Courthouse Drive

7         Municipal Center, Building One

8         Room 260

9         Virginia Beach, VA 23456

10        (757)385-4351

11

12

13

14

15

16

17

18

19

20

21

22
```

Transcript of John D. Moss
Conducted on September 13, 2019                    5

```
 1              C O N T E N T S

 2   EXAMINATION OF JOHN D. MOSS              PAGE

 3          By Ms. Harless                      7

 4

 5

 6

 7

 8              E X H I B I T S

 9   MOSS DEPOSITION EXHIBIT                  PAGE

10   Exhibit 1    Subpoena, John D. Moss       14

11   Exhibit 2    Virginian-Pilot article     132

12   Exhibit 3    Subpoena, Jessica Abbott     136

13   Exhibit 4    Subpoena, James Wood         162

14   Exhibit 5    Email dated 1/10/17,

15                DEF08407                     175

16   Exhibit 6    Email dated 6/10/15,

17                DEF09810-09813               182

18   Exhibit 7    Virginia Beach City Clips,

19                6/12/18, DEF07773-07777      201

20   Exhibit 8    Email dated 10/17/18,

21                DEF09444-09445               208

22
```

Transcript of John D. Moss
Conducted on September 13, 2019                              6

```
 1                 P R O C E E D I N G S
 2    Whereupon,
 3                    JOHN D. MOSS,
 4    after having been first duly sworn, was examined
 5    and did testify under oath as follows:
 6
 7          MS. HARLESS:  So we'll state our
 8    appearances for the record.
 9          I'm Annabelle Harless, and I represent the
10    plaintiffs in this case.  And I work with the
11    Campaign Legal Center in Chicago.
12          MS. CHLOPAK:  Erin Chlopak.  And I also
13    work for the plaintiffs in this case.  And I work
14    at the Campaign Legal Center in Washington, D.C.
15          MR. BOYNTON:  I'm Chris Boynton.  I'm with
16    the Virginia Beach City Attorney's Office.  And I
17    represent the defendants in the case.
18          THE DEPONENT:  And I'm John Moss, City
19    Council Member At-Large for the City of Virginia
20    Beach, Virginia.
21
22
```

```
 1      EXAMINATION BY COUNSEL FOR THE PLAINTIFFS:

 2   BY MS. HARLESS:

 3      Q. Nice to meet you, Mr. Moss.  As I said, my

 4   name is Annabelle Harless.  And I'm going to be

 5   asking you some questions today.

 6          Before I do, have you ever been deposed

 7   before?

 8      A. Yes.

 9      Q. You have?

10      A. Correct.

11      Q. So you know the basic ground rules of a

12   deposition?

13      A. Well, you can repeat them to refresh my

14   memory.

15      Q. I'll go over a couple.

16          The court reporter is writing down

17   everything that we say.  So that she's able to get

18   everything on the record, please wait for me to

19   finish asking my question before you start

20   answering, and I will do the same for you, so we

21   don't interrupt each other and so we can get a

22   clear record.
```

Transcript of John D. Moss
Conducted on September 13, 2019                              8

1        The court reporter can only record verbal

2    responses, so it's important that you answer with

3    a yes or a no or an audible answer rather than

4    nodding your head.

5        And we can take a break at any time but

6    not while a question is pending.

7        Does that make sense?

8        A. Correct.  It does.

9        Q. Okay.  Could you please state your full

10   name for the record?

11       A. John Darrell -- that's D-A-R-R-E-L-L --

12   Moss, M-O-S-S.

13       Q. And, for the record, what is your race?

14       A. Caucasian.

15       Q. Do you understand you're under oath today?

16       A. I do.

17       Q. Is there any reason why you cannot give

18   truthful answers to my questions today?

19       A. No.

20       MR. BOYNTON:  And before we get too deep

21   into the deposition, there's been some discussion

22   about the scope and the invocation of legislative

1    privilege with respect to Council members.

2          Just to get it on the record, Mr. Moss, do

3    you wish to invoke your right to legislative

4    privilege to the extent it applies to the

5    questions here today?

6          THE DEPONENT:  I do.

7          MS. HARLESS:  It is our understanding that

8    that privilege has to be brought up at every

9    question that is asked.

10         MR. BOYNTON:  And we will.  But he's

11   invoking it as a general principle, just to make

12   clear that he has chosen to do that.  And, then,

13   we will raise it as an objection as to questions

14   appropriate for that objection.

15     Q. You've mentioned you've been deposed

16   before, correct?

17     A. Correct.

18     Q. Were those in cases involving you

19   personally or the city?

20     A. The city only.

21     Q. Were any of those cases about --

22     A. Correction.  Way back when I was a minor I

Transcript of John D. Moss
Conducted on September 13, 2019                         10

```
 1   was deposed for a traffic accident, so...

 2       Q. Okay.  Personally?

 3       A. Correct.

 4       Q. What were the depositions for the city?

 5       A. They were regarding the arena case.  We

 6   were being sued by ESG for breach of contract.  It

 7   was a state court matter.

 8       Q. What was the issue?  Breach of contract?

 9       A. Breach of contract.  Correct.

10       Q. Have you ever been deposed in any other

11   cases?

12       A. None other than the two that I mentioned,

13   no.

14       Q. Okay.  I'm not asking for the content of

15   any communications you've had with your attorneys

16   here.  When did you first learn about this

17   lawsuit?

18       A. When I received an email that --

19   requesting that I would be being asked for dates

20   and that the city had received a notice for

21   deposition.  I can't tell you the exact date, but

22   it's been in the last 30 days.
```

Transcript of John D. Moss
Conducted on September 13, 2019                    11

```
1          MR. BOYNTON:  Okay.

2      Q. So --

3      A. I was aware there was a lawsuit.  But in

4  terms of being asked for a deposition?

5      Q. No.  No.  I'm asking when did you first

6  become aware that this lawsuit had been filed?

7      A. When we got an advance notice from the

8  City Attorney telling us.  I can't recall.  It was

9  a piece of memorandum or something that was

10 received.

11     Q. I don't know want to know the contents of

12 the document.  I just want to know the date.

13     A. I do not know the date.

14     Q. Was it 2018?

15     A. I couldn't tell you.  It's in the last 60

16 days, maybe.  I can't tell you when.  I do not --

17 I cannot definitively recall when I was first

18 notified that the lawsuit was being filed.

19     Q. Do you know when the lawsuit was

20 originally filed?

21     A. I do not.

22     Q. Okay.  Besides meeting with your
```

Transcript of John D. Moss
Conducted on September 13, 2019                    12

1   attorneys, did you do anything to prepare for this

2   deposition?

3       A. No, other than we were in executive

4   session, which it is legislative privilege.  I

5   have that information.  But I have not personally

6   done any preparation, no.

7       Q. You didn't review any documents, besides

8   meeting with your attorneys?

9       A. Other than we got a memo in package Friday

10  that talked about all city litigation that was

11  going on.  I did read that memo.  I received it on

12  Friday in my packet.  But that's, I guess,

13  attorney privilege, I assume.

14      MR. BOYNTON:  They get letters from the

15  attorneys explaining various -- status of various

16  cases.  That's what he's referring to.  It is pure

17  attorney-client privilege.

18      Q. Did you discuss this deposition with

19  anyone?

20      A. Other than the City Attorney, no.

21      Q. Besides any communications with your

22  attorneys, did you have any communications with

Transcript of John D. Moss
Conducted on September 13, 2019                    13

1    anyone else about this deposition?

2        A. No.

3        Q. Did you bring any documents with you to

4    this deposition today?

5        A. No.

6        Q. Is there any reason why you could not be

7    in Norfolk, Virginia during the week of January

8    14th, 2020?

9        A. I work for the Commander of Submarine

10   Forces.  The operational demands of the Submarine

11   Force are not predictable; they're dependent upon

12   our adversaries, so I cannot give you a definitive

13   answer you would like.  I would make my best

14   efforts.  But my job is very unpredictable as the

15   adversaries are very unpredictable.

16       Q. You're not going to be out of the country?

17       A. Not to the best of my knowledge at this

18   time.

19       Q. You don't have a vacation planned for that

20   week?

21       A. Not at this time.

22           MS. HARLESS:  I'm going to mark this as

Transcript of John D. Moss
Conducted on September 13, 2019                    14

1    Exhibit 1.

2                        (Exhibit 1 was marked and

3                    attached to the transcript.)

4        A. Can I have time to read the whole thing?

5        Q. Yep.

6        A. Thank you very much.

7            Okay.  Thank you very much.

8        Q. So you were just taking a look at Exhibit

9    1.  Have you seen this document before?

10        A. I haven't seen this part of the exhibit.

11   This is pages, I guess -- the cover page, the

12   second page proof of service, the Federal Civil

13   Procedures and effective things, Exhibit A.  I

14   don't remember seeing this specific document, but

15   I do recall the things I was being asked to look

16   for in discovery in terms of things I was supposed

17   to search my records for.  I can't recall if this

18   was the exact format I reviewed, but I do find the

19   things being asked for being familiar relative to

20   the request for discovery.

21        Q. Okay.  So you've never seen the subpoena

22   or this exhibit, but you've been given the

Transcript of John D. Moss
Conducted on September 13, 2019                    15

1    document production request?

2        A. I got a thing with my name on it.  It

3    didn't look exactly like this.  The subpoena thing

4    I have -- I have it in my phone what I received.

5    But it had -- I was being -- giving a deposition.

6    But this particular document you're asking here, I

7    have not seen this particular page.  I saw a

8    thing about giving a deposition.  But I don't

9    recall seeing this specific page.  I just don't

10   recall it.

11       Q. Okay.  So if you turn --

12       A. Not saying I didn't get it.  I'm just not

13   recalling it.

14       Q. Let's turn to the very last page.  The

15   very last page says, "Councilmember John Moss

16   indicates he does not possess any responsive

17   documents."  Do you see that?

18       A. That's not what I said.

19       Q. I understand.

20       A. What I said was all the documentation that

21   I had that was responsive could be found in the

22   councilmail archived documents on vb.gov.  But I

Transcript of John D. Moss
Conducted on September 13, 2019                    16

1    did not physically possess any documentation.

2    That was my response.

3       Q. Okay.  I'm not sure that was communicated

4    to us, but we'll discuss that in a second.

5          So I'd like you to just go to page 4 of

6    this document, which is titled Exhibit A.

7       A. Let me number them myself.

8       Q. At the top of this page it says Documents

9    to be produced by John Moss.  Do you see that?

10      A. Uh-huh.

11      Q. So you said you haven't seen Exhibit A

12   before but you've seen these requests, correct?

13      A. Yes.  The content.  I just don't recall

14   this specific exhibit.  But I do recall being

15   asked to search all my stuff and look through my

16   garage, look though all -- everything that I had

17   from campaign material.

18          I don't retain any city documents at my

19   home because they're always available from the

20   city.  So when my Council meeting is over, the

21   trash can is the favorite place I go to.  I do not

22   retain physical documents at my home.

Transcript of John D. Moss
Conducted on September 13, 2019                    17

1        Q. You don't retain any physical documents?

2        A. City business?  No.  There is no need to.

3        Q. What about non-city business?

4        A. Well, my personal stuff, yes.

5        Q. So this subpoena was sent to you in your

6    personal capacity.  Do you understand that?

7        A. I understand that.  But I'm asking my

8    personal finances, my checkbook, stuff for myself

9    personally, not within the scope of what you were

10   asking for?

11        I don't retain campaign stuff when the

12   campaign is over, except for financial documents

13   I'm required to retain for five years.  When the

14   campaign is over, it's over.  All the stuff I

15   have, because all -- campaigns change.  I don't

16   retain anything, other than four-by-four signs.

17   But I don't retain documentation.  It's not -- it

18   doesn't have any value.

19        Q. You don't retain any emails?

20        A. No.  I'm not required to, and I don't on

21   purpose.

22        Q. Do you delete your emails?

Transcript of John D. Moss
Conducted on September 13, 2019                    18

1        A. I certainly do, on purpose.

2        Q. Do you recall receiving anything of a

3   litigation hold memorandum in this case?

4        A. Yes, but not since my campaign was over.

5   My campaign ended before the -- before the notice

6   was received.  Now, if you're asking me do I have

7   all my Council emails, that answer would be in the

8   affirmative.  And that's why I made a comment it's

9   either in vb.gov or I've sent copies when I

10  respond.  Go into the councilmail@vb.com, I think

11  it is, is the archive maintained by the City Clerk

12  of all the City Council member emails, and they

13  are there.

14       Q. We'll get into that.

15       A. Okay.

16       Q. I just want to make sure that you've

17  actually seen these document production requests,

18  read them, and then looked for responsive

19  documents.

20       A. Correct.

21       Q. So you have not seen this document, but

22  you think you've seen all these production

Transcript of John D. Moss
Conducted on September 13, 2019                    19

1   requests, correct?

2       A. Yes.

3       Q. Did you search for any and all documents

4   responsive to these requests that were in your

5   possession, custody, or control?

6       A. I did.

7       Q. How did you conduct your search for

8   responsive documents?

9       A. First of all, I went through and looked in

10  my garage, because that's where I keep boxes, just

11  to see if, by chance, there was anything other

12  than campaign banners, four-by-four signs, yard

13  signs, did I have any stuff left that was other

14  than that.  I found some stickers, but that wasn't

15  responsive; just had my name on it.  So that's the

16  first thing I did.

17          Secondly, I went back and looked in my

18  hard drive of my computer to look for stuff that

19  would have been campaign material.  And that was

20  responsive to what you asked for, other than

21  things like my financial records which I have to

22  keep for five years.  And I didn't find anything

Transcript of John D. Moss
Conducted on September 13, 2019                    20

1    that was responsive to these questions, and so I

2    responded back I was not in possession of

3    materials that were within the scope of the

4    discovery.

5        Q. What did you do to search your hard drive

6    for responsive materials?

7        A. Can you be more specific?

8        Q. What search terms did you use to look for

9    responsive documents on your computer?

10       A. I went to look to the actual folders

11   because that's what I have on my machine.  I

12   looked at my campaign folders.  And that's what I

13   went and looked for.

14       Q. Did you look at any documents besides your

15   campaign folders?

16       A. No.  I had no reason to reasonably believe

17   that I would have put something other than that on

18   my hard drive.  I mean, it's very -- I don't have

19   lots of stuff, but, no, I did not do a look for

20   this expression on everything in my hard drive,

21   no.

22       Q. So you manually looked through only a few

Transcript of John D. Moss
Conducted on September 13, 2019                    21

1    folders on your hard drive, correct?

2         A. I manually looked through the applicable

3    folders.  I wouldn't use the adjective few or many

4    or lots or little, but all that were appropriate.

5         Q. And to be clear, the folders you looked

6    through were campaign-related, correct?

7         A. Correct.

8         Q. Did you search your personal email account

9    for any responsive documents?

10        A. I certainly did.

11        Q. How did you --

12        A. That's not easy to do, I might add.

13        Q. How did you conduct that search?

14        A. I used them by the names that were

15   provided.  I looked for anything that said

16   election.  I looked for anything that said voting,

17   campaign, disparity.  I can't tell you all the

18   expressions that I used, but I did use a number of

19   expressions to look.

20        Q. Can you remember any others that -- any of

21   the search terms that you used to search through

22   your email?

Transcript of John D. Moss
Conducted on September 13, 2019                    22

1      A. I did use things, you know, like -- I know

2   John Perry was empty.  I ran with John Perry in

3   1986, so I knew that that wasn't going to be in

4   there.  But I did go back and look through all the

5   emails that I did have, like 10,000, but I can't

6   tell you all the search terms, but I think they

7   were reasonable terms I used.

8          But for the bulk of the stuff that's city

9   business, it would all be in my vbgov account or

10  it would be in my Council archive account.  And

11  I'm sure you probably were able -- and I know the

12  city searched those to give you the answers, so I

13  think you -- that should be fairly comprehensive.

14     Q. So right now I'm just asking for things

15  that are in your personal capacity, not city.

16     A. Oh.  Campaign.  That's why I looked for

17  the campaign terms, yes.  To the extent that I --

18     Q. Campaign or anything else.  It's not

19  solely related to the campaign.

20     A. I automatically delete personal stuff

21  after so many months.  I don't retain personal

22  email forever.

Transcript of John D. Moss
Conducted on September 13, 2019                    23

1        Q. What -- how many months?

2        A. About six.  And I just don't keep them

3   after that.  I mean, it's just -- I hope everybody

4   else does that, too.  There is no need to keep

5   stuff on a personal basis.  But notes to my wife,

6   my kids, you know, that's personal.

7        Q. So after six months your personal email

8   account is set up to automatically delete?

9        A. Purge.  Correct.  Yes.  I don't know

10  whether they archive on the cloud.  You know, I

11  don't use cloud services, so...

12       Q. Are there any types of emails that are --

13  that you have set the account up to not

14  automatically purge after six months?

15       A. Not to my knowledge.

16       Q. Did you search your text messages for

17  responsive information?

18       A. I did.  I don't keep very much in the way

19  of text messages for very long.  I can't tell you

20  how far back that is, but I don't keep them very

21  long.

22       Q. How did you search your text messages?

Transcript of John D. Moss
Conducted on September 13, 2019                    24

```
 1        A. I look for names.  You know, look for
 2    names.  And, then, you have to go back and scroll.
 3    That's why I'm glad I don't keep many because it
 4    takes a long time to open those up and go and
 5    look.
 6            But there was nothing that was in there
 7    that I could see that dealt with voting systems,
 8    anything within the scope of this, because that
 9    hasn't been a topic on my -- hasn't been a topic
10    for me.  And I don't have any texts on it.  I just
11    look, I mean --
12        Q. When you mentioned you don't keep your
13    texts very long, what did you mean by that?
14        A. I try to go through there often and just
15    delete, delete, delete, delete, and just because
16    my phone, one, has limited storage.  That
17    partially drives me there.  I don't have a big
18    phone.  But I just delete my messages just as a
19    matter of practice.
20        Q. What kind of cellphone do you have?
21        A. An iPhone.
22        Q. Who is your service provider?
```

Transcript of John D. Moss
Conducted on September 13, 2019                    25

1        A. T-Mobile.  But it has been Verizon, as

2     well.

3        Q. How long has it been T-Mobile?

4        A. Gosh.  I don't know.  Maybe a year.  Maybe

5     two.

6        Q. And before that, it was Verizon?

7        A. Uh-huh.

8        Q. How long do you think the service provider

9     was Verizon?

10       A. Gosh.  I don't know.  It's been a long

11    time.  I just know it was at least, probably, four

12    years.

13       Q. All right.

14       A. But I don't remember exactly the exact

15    dates.

16       Q. Do you have a Google Drive or any kind of

17    file-sharing account?

18       A. No.

19       Q. Are you on social media?

20       A. Yes.

21       Q. Which social media accounts?

22       A. Facebook is the only social media account

Transcript of John D. Moss
Conducted on September 13, 2019                    26

1    that I use.

2        Q. You don't have a Twitter account?

3        A. No.

4        Q. Don't have an Instagram?

5        A. I had a Twitter account with my campaign,

6    but I have had no Twitter account since then; and

7    it hasn't been active in a long time.

8        Q. So there was a Twitter account for your

9    campaign?

10       A. Correct.

11       Q. In what year?

12       A. The one I just -- 2018.

13       Q. And you think that account is inactive?

14       A. I know it's inactive.  I haven't used it.

15       Q. Did you search that account for

16   responsive documents?

17       A. I did.  I only used it two or three times

18   in 2018.  I know my campaign wanted me to use it;

19   I just didn't have the time.

20       Q. You said you have a Facebook account,

21   correct?

22       A. Two.  I have a personal Facebook account,

Transcript of John D. Moss
Conducted on September 13, 2019                    27

1    and I have a Coucilman John D. Moss Facebook

2    account.  And they are open access.  I did not

3    search those accounts because they are open to the

4    public.  And I haven't suspended them or deleted

5    them or otherwise manipulated them.  You can go

6    back a long ways, since their inception.  But I

7    did not search those accounts.

8        Q. Do you know what year you first joined

9    Facebook?

10       A. No, I do not.

11       Q. Do you have an idea?

12       A. I do not.  Seems like forever, but I do

13   not have a date when that happened.

14       Q. Do you have any kind of recollection of

15   whether you joined it when it first became a thing

16   or --

17       A. I do not have a recollection of when I

18   joined.  I just don't.  It's been a long time, but

19   I can't tell you when.

20       Q. Do you ever post about any of the items in

21   these document --

22       A. I may have.

Transcript of John D. Moss
Conducted on September 13, 2019                         28

1        Q. -- requests on social media?

2        A. I can't tell you if I did or did not.  I

3    just don't have that kind of historical cognition.

4    But it's all there.  You can see it if I did.  I'm

5    sure I have commented on it, but I can't tell you

6    that I have or I haven't in an affirmative way.

7    It's just a -- I comment on a lot of stuff, if

8    anyone looks.  I just don't have a recollection.

9    But I did not search Facebook, either accounts,

10   so...

11       Q. Okay.  And you don't have an Instagram

12   account?

13       A. I do not.

14       Q. Do you have a blog of any kind?

15       A. No.

16       Q. A website?

17       A. I had a website for my campaign.  It's

18   been inactive since the election was over in 2018.

19   That's one of the reasons why I couldn't retrieve

20   any information from that website, because I no

21   longer paid to maintain it.

22       Q. So you tried to look on it for responsive

Transcript of John D. Moss
Conducted on September 13, 2019                    29

1    material and you couldn't?

2        A. I didn't look because it's inactive and I

3    didn't pay for it.

4        Q. Okay.  Any other accounts or anything else

5    that you searched for responsive documents?

6        A. I have no other social media accounts.

7        Q. Any other kind of account?

8        A. Can you be more specific?

9        Q. Besides what we've talked about today, is

10   there any other location that you searched for

11   responsive documents?

12       A. My personal dwelling.

13       Q. Your garage, right, you mentioned?

14       A. And my house, as well.  I mean, my house

15   is part of my personal dwelling.  But I

16   specifically looked in the garage because that's

17   where I have boxes with campaign stuff in them,

18   but they were signs and stickers and things of

19   that nature.

20       Q. Okay.  So let's go to the last page of

21   this document.  And this is your -- this is the

22   response that was given to us.  And in your

1    response to the subpoena you said, "Councilmember

2    John Moss indicates he does not possess any

3    responsive documents."

4         MR. BOYNTON:  And I'm going to put on the

5    record here that this is in the context of my

6    office facilitating responses that Council members

7    are providing to you in an effort to just work

8    through a process where the City Attorney's Office

9    was unable to represent the Council members in

10   their individual or personal capacities.

11        So when we were -- and I will tell you

12   that my office generated that term based upon

13   information we received from the Council member as

14   to his personal information.

15     A. Correct.

16        MR. BOYNTON:  We took the subpoena to mean

17   personal information.  And that's what the

18   response indicates.

19     Q. Okay.  So you had indicated earlier that

20   you thought maybe this wasn't -- this is not what

21   you had said?

22     A. Well, in that context, yes.  In the

Transcript of John D. Moss
Conducted on September 13, 2019                    31

1    context -- because my response was that any

2    government -- in my Council capacity information

3    that I would have would either be in my vbgov.

4    account or in the councilmail archive account.

5    And that's where it would be.

6          I possessed -- and this deals with what do

7    I personally possess physically or, I guess you

8    could say, electronically myself.  And that is the

9    answer that is correct.

10         Q. Did you personally withhold any documents

11   that were responsive to any of these production

12   requests --

13         A. Not to the best of my knowledge.

14         Q. -- for any reason?

15         Sitting here today, after we've gone

16   through this, can you think of any documents you

17   may have that are responsive to the production

18   requests that you did not produce to the

19   plaintiffs?

20         A. The only thing I think I could do is I

21   could do a comprehensive search of my hard drive

22   using more keywords and VF keywords you would want

1    me to make sure that I used.  I would be happy to

2    apply those to my hard drive and provide any

3    material that showed up.

4        Q. Okay.  And you didn't search your Facebook

5    account?

6        A. I did not.

7        Q. But that account is public?

8        A. Both are public.  And all comments are,

9    per the usual precedent, retained.  I don't sensor

10   or otherwise edit what goes on there.

11       Q. Do you ever conduct city business via text

12   message?

13       A. I have, yes.

14       Q. And do you retain those text messages?

15       A. Two ways I do.  One, where I -- I do

16   retain some, which is why I have them in my phone.

17           And, secondly, when I think there is a

18   long dialogue of those, I will cut and paste them,

19   put them in an email, and send them to the

20   councilmail.com archive.  Those are emails that I

21   don't -- text messages I don't delete.

22           And as of today, we've just established a

Transcript of John D. Moss
Conducted on September 13, 2019                    33

1   new service which makes it easier for us to

2   actually automatically send them to an archive

3   text account.  But that just started today, just

4   so you know.  But, yes, I have conducted city

5   business by text.

6       Q. What kinds of things do you do over text

7   messages?

8       A. It could be I'm planning to put something

9   on the agenda.  It could be I received -- I cut

10  and pasted a text from a constituent about an

11  issue and I send it to Nancy Bloom or the

12  appropriate department person to answer.  It could

13  be a text I got from a Council member.  It could

14  be about an appointment, which would be a

15  privileged communication.  It could be about a

16  personnel matter, which would be a personnel

17  matter, and I often try to put that exemption,

18  assertion, on that text message so people know at

19  least I'm making that claim.  Obviously, someone

20  else has to adjudicate that.  That's a personnel

21  matter.

22          It could be anything.  You know, it's a

Transcript of John D. Moss
Conducted on September 13, 2019                    34

1    full -- in today's world, it's a -- it could be

2    about agreeing to go speak someplace as a Council

3    member.  It's a lot.  I would almost say it's the

4    full spectrum of the city's business, I suspect,

5    at any -- some point in time I have done a text

6    message on, I would suspect.

7        Q. Have you ever sent a text message about

8    changing to a single-member district system?

9        A. Not that I can recall.  I did look for

10   that.  It's -- not that I can recall, but I may

11   have.

12       Q. So I want to understand how these text

13   messages are captured by the city.  Is every -- is

14   any text message you send that discusses city

15   business captured by the city in any way?

16       A. Not all.  They're still on my phone, so

17   they can be downloaded.  Some I do, like when I

18   say I'm going to go speak someplace.  But if

19   they're big, controversial issues, like when we

20   were doing the arena, I tend to capture those,

21   screen capture them, copy and paste them into an

22   email, and send them to the councilmail archive.

Transcript of John D. Moss
Conducted on September 13, 2019                    35

1      Q. So it's just you decide when to capture

2   the text messages and send them?

3      A. That's correct.  There is no city policy

4   that certainly that we have to retain either

5   personally, which I have.  And I'm thinking maybe

6   a couple thousand, maybe, on there.  I don't know.

7   Quite a few.

8      Q. So a moment ago you told me that you

9   deleted your text messages?

10     A. I said except for -- I'd really be careful

11  about when I go after my Council stuff.

12     Q. I just want to clarify.  So you don't

13  delete any messages that may or may not discuss

14  city --

15     A. Correct.

16     Q. That may discuss city business?

17     A. Yes.

18     Q. What if it's a text message that discusses

19  city business but it's not one that you screenshot

20  and send in to the city?

21     A. That would still be on my phone.

22     Q. Okay.

Transcript of John D. Moss
Conducted on September 13, 2019                    36

1        A. I will --

2           MR. BOYNTON:  Go back and look?

3    Absolutely.

4        A. As a matter of fact, you can download it

5    today before I leave.

6        Q. So you had mentioned you searched your

7    text messages in your personal capacity.  Did you

8    search the text messages on your phone that are

9    related --

10       A. When you use a search feature, it doesn't

11   discriminate between which texts you're searching

12   for.  I mean, you don't, ah-ha, search city

13   business where it says personal business.  You can

14   just look for a topic or a subject, and it tells

15   you everything that's responsive.  Maybe there is

16   another way to do it.  But I'm happy when I leave

17   here today that they can download them all and

18   they'll screen them and give you the parts that

19   they think is applicable to the scope.  But I do

20   not recall any text messages relative to the scope

21   of this.

22           And my record retention, I think, as a

Transcript of John D. Moss
Conducted on September 13, 2019                37

1    City Council member, I think is three years, if I

2    remember correctly.

3         MR. BOYNTON:  I don't have it in front of

4    me.  There is a period.

5      Q. Are you aware of whether other City

6    Council members conduct city business over text

7    message?

8      A. Do I have -- has someone personally

9    testified to me that they use text -- what do I

10   think or what do I know?

11     Q. Do you ever text any other City Council

12   members about city business?

13     A. Yes.

14     Q. Who?

15     A. Probably Jessica Abbott, Aaron Rouse, the

16   Mayor, maybe -- probably Louis Jones.  Might be

17   some others, but those are ones I can consciously

18   recall.

19     Q. Mayor Dyer?

20     A. Correct.  As a matter of fact, I just sent

21   him one the other day.

22     Q. What kinds of things do you text him

Transcript of John D. Moss
Conducted on September 13, 2019                    38

1   about?

2       A. Well, city business, I mean.  I could

3   thumb through, but it wasn't about voting.  But it

4   might be something about the -- well, I did talk

5   to him about the City Manager.  I won't go into

6   the details.  But his resignation would be

7   something I had exchanged emails on, along that

8   particular issue recently.

9       Q. Texts or emails?

10      A. Both.

11      Q. Who did you text about the City Manager

12  resignation?

13      MR. BOYNTON:  I think you can say who you

14  texted.  The contents would be legislative

15  privilege.

16      A. Definitely Aaron Rouse, and the Mayor, and

17  Jessica Abbott, and possibly Louis Jones.  I'm not

18  saying for certain.  As a matter of fact, I texted

19  Aaron Rouse during the actual executive session.

20      Q. Okay.  Did Mr. Hansen resign or was he

21  fired?

22      A. He resigned.

Transcript of John D. Moss
Conducted on September 13, 2019                          39

1      Q. Besides Dave Hansen, any other things you

2   can recall that you texted about with other City

3   Council members?

4      A. Possibly the arena.  I'd have to go back

5   and look.  I don't want to look like I'm trying to

6   be evasive, but, gosh, there is so much business

7   that we conduct.  Saying it's like this, this, or

8   this -- a number of items is probably the best way

9   to say.  I don't really restrict myself as to

10  what, but it would be the full spectrum of

11  activities.

12     Q. Would it be fair to say that it's fairly

13  common for City Council members to text about city

14  business?

15     MR. BOYNTON:  I object to the form of the

16  question.  I think you need --

17     Q. I'm speaking --

18     MR. BOYNTON:  I'm objecting to the form of

19  the question.

20     MS. HARLESS:  No speaking objections.

21     MR. BOYNTON:  I'm objecting to the form of

22  the question.

Transcript of John D. Moss
Conducted on September 13, 2019                    40

```
1          MS. HARLESS:  No speaking objections.

2          MR. BOYNTON:  -- as to --

3          MS. HARLESS:  No speaking objections.

4          MR. BOYNTON:  I'm going to finish my

5     objection.

6          MS. HARLESS:  Objection to form.

7     Otherwise, it's a speaking objection.

8          MR. BOYNTON:  You yesterday spent about

9     six hours talking about argumentative and asked

10    and answered and a bunch of other things.

11         MS. HARLESS:  Those are objections.

12         MR. BOYNTON:  I'm putting mine on the

13    record if you'll let me do it.

14         MS. HARLESS:  No.  The objection is

15    objection to form.

16         MR. BOYNTON:  I'm putting my objection on

17    the record.

18         MS. HARLESS:  You did.

19         MR. BOYNTON:  No, I have not yet because

20    you interrupted me.  When you're done talking --

21    he's not talking again until I put my objection on

22    the record.
```

Transcript of John D. Moss
Conducted on September 13, 2019                    41

```
 1          MS. HARLESS:  You did.

 2          MR. BOYNTON:  I have not yet.

 3          MS. CHLOPAK:  You don't need to raise your

 4    voice.

 5          MS. HARLESS:  You don't have to scream

 6    every objection.

 7          MR. BOYNTON:  I am responding in tone with

 8    her tone to me.

 9          MS. HARLESS:  No, you're not.

10          MR. BOYNTON:  My objection is that the

11    question is unclear and vague; and, therefore, I

12    object to the form of the question.

13          MS. CHLOPAK:  You're shouting.

14          MR. BOYNTON:  I've just done it.  I am not

15    shouting.  Thank you.

16          MS. CHLOPAK:  Be professional.  Thank you.

17          MR. BOYNTON:  I'm waiting on her being

18    professional.  Thank you.

19          MS. HARLESS:  I've done nothing

20    unprofessional.

21          MR. BOYNTON:  You've interrupted me and

22    tried to prevent me from putting an objection on
```

1   the record.  That's unprofessional.

2          MS. HARLESS:  I did not.  You're doing an

3   improper speaking objection.

4          MR. BOYNTON:  I disagree.  I can object to

5   the form of the question for vagueness and --

6          MS. HARLESS:  Court reporter, can you

7   please repeat the question?  I don't remember what

8   it was at this point.

9          THE REPORTER:  "Would it be fair to say

10  that it's fairly common for City Council members

11  to text about city business?"

12      A. I do not have a basis upon which to answer

13  your question.  I can't speak for what's common

14  for other Council members.  I don't have a state

15  of mind to make that kind of assessment.

16      Q. Is it common for you?

17      A. Yes.

18      Q. And you've given me the names of at least

19  four other City Council members that you text

20  about --

21      A. That I have texted to, not texted about.

22      Q. That you text city business about?

Transcript of John D. Moss
Conducted on September 13, 2019                    43

1      A. Correct.

2      Q. As far as you can recall, have you ever

3   texted any other City Council members about

4   changing to a single-member district system of

5   election in Virginia Beach?

6      A. To the best of my recollection, I cannot

7   give you an answer that I have or haven't.  My

8   memory is not that good.  But I may have, but I

9   can't affirmatively say that I have.

10     Q. And if you say you may have, would those

11  texts have been discovered when you searched your

12  text messages?

13     A. Should have been, yes, but I was going to

14  say -- you're asking me a question and I'm trying

15  to answer it.  It didn't show up or I would have

16  provided it.  But it's more likely that would have

17  been a personal conversation versus a text

18  message.  I have talked with many Council members

19  about the -- in-person on the election system.  My

20  views are well-known.

21     Q. Who are the people you've talked to about

22  the election system?

Transcript of John D. Moss
Conducted on September 13, 2019                              44

```
 1        A. Well, probably every single member because
 2    we've talked about it in the informal session.  So
 3    in that sense they've all heard my views, which
 4    are well-known.
 5        Q. So you're saying every single current
 6    member of City Council?
 7        A. Yes, because we've had informal session
 8    discussions on this, and I've expressed my views.
 9        Q. Have you discussed it with any former
10    members of the City Council?
11        A. Let's see who just left.  Well -- because
12    they would have been in those informal sessions,
13    too.  So John Uhrin would have heard that.
14        Q. Can you spell that name?
15        A. U-H-R-I-N.
16           And I'm trying to think who -- there would
17    have been Shannon Kane.  That's another one.
18    She's a former Council member.  I'm trying to
19    think.  We had so many changes.  Anyone who has
20    served since I've been on City Council has had
21    conversations collectively and in formal session.
22    I have been in favor of a different system for a
```

Transcript of John D. Moss
Conducted on September 13, 2019                    45

1    long time.  It's not a new position that I've

2    taken.  It's one I publicly -- I know I have

3    expressed on Facebook at some point.  And I've

4    done it in many candidate forums I've expressed my

5    view.

6         Q. When you say you've expressed your view at

7    candidate forums, do you remember any specific

8    candidate forums?

9         A. No, but we get -- some ask it more than

10   others.  Probably the one that I definitely know I

11   was asked was the forum held at Seatack Elementary

12   School.  I can't remember the sponsoring

13   organization.  I know it must sound terrible I

14   can't recall who sponsored it, but I can't.

15        Q. Was that in 2018?

16        A. Correct.

17        Q. Was it videotaped in any way?

18        A. Not by me.  I can't see who else might

19   have videotaped it, but it wasn't videotaped by me

20   and I don't have a videotape of it.

21        Q. Was there any kind of transcript that was

22   taken at that --

Transcript of John D. Moss
Conducted on September 13, 2019                    46

1       A. I've never known a candidate's forum in

2   Virginia Beach, at least on my part, that's had a

3   transcript done.  That doesn't mean that people

4   videotaped it.  I have no knowledge of a

5   transcript of those events --

6       Q. Okay.

7       A. -- ever being transcribed.

8       Q. Can you remember any other candidate forum

9   where you may have discussed single-member

10  districts?

11      A. No, but if they asked it I would have

12  answered it.

13      Q. Okay.  Can you remember the name of any

14  other former City Council members that you may

15  have discussed single-member districts with, going

16  back -- I know you were first selected in --

17      A. Well, as a matter of fact, this goes

18  back -- well, now she's deceased, but the Mayor --

19  it would be Meyera Oberndorf; she's deceased -- or

20  anyone who served on City Council from '86 through

21  '90 because that was a hot topic.  You know, we

22  would have talked about it during that timeframe.

Transcript of John D. Moss
Conducted on September 13, 2019                     47

1    I don't know how many of those people are still

2    living.

3          John Baum has passed away.  Al Balko has

4    passed away.  Meyera has passed away.  John Perry

5    has passed away.

6          Then I served again in -- started in --

7    was it '91-'92?  Served again.

8          I served on -- there is a document that

9    was done -- I don't possess it -- that was done by

10   the Mayor.  It was -- when Al Balko didn't win

11   his -- won his district but lost the election,

12   there was a Mayor's Commission on Reapportionment

13   or something.  I can't remember the exact name.

14         Don Clark -- you might remember Don Clark

15   who's a senior lawyer.  He chaired it.  It was all

16   about, you know, the voting system, should we

17   change it.  We actually had a referendum.  I can

18   look at those results.  But I served on that

19   Commission that made the recommendation to go to a

20   modified award system.  That goes back a ways.

21   You probably have that documentation, I suspect.

22         Q. Did you retain a copy of that document?

Transcript of John D. Moss
Conducted on September 13, 2019                    48

```
 1        A. No.  Actually, that's one of the things I
 2   was looking for I thought maybe I had.  But that
 3   goes back a long ways.  That was '80 -- maybe
 4   1990, '91.  It was after that 1990 election, that
 5   Commission and Don Clark chaired it.  There was a
 6   formal report issued, which I'm sure the City
 7   Clerk would have, but I do not have one.
 8        Q. And what did the formal report recommend?
 9        A. We went to a referendum.  This is my
10   recollection of what it recommended, so give me a
11   little break on time.  We actually had a
12   referendum to go to a seven member ward district
13   system of equal population and retaining the four
14   at-large that went to -- that passed.  It went to
15   the General Assembly.  It passed in the House of
16   Delegates.  It was sidetracked for a period -- you
17   can use the pejorative if you like -- by then
18   Senator Stolle, who's now the Sheriff, I suspect
19   somewhat at the assistance and help of then Vice
20   Mayor, I think it was, Will Sessoms.
21            And it went from when it passed in the
22   House to in the Senate saying to keep the all
```

Transcript of John D. Moss
Conducted on September 13, 2019                          49

1    at-large system but to make the districts all

2    equal population, which is what -- this is the

3    system we still have today.

4         Then I believe there was another

5    referendum -- don't hold me to the -- and I wasn't

6    here at that time -- and the city -- wasn't a

7    resident here -- that failed to change the system.

8    People were asked once again if they wanted to

9    change, and the answer was no.

10        And there has been several efforts, you

11   know, off and on for people to go back.  I have

12   another referendum to that end, but that hasn't

13   materialized at this point.

14       Q. Okay.  So the formal report first

15   recommended that the city hold a referendum to

16   switch to seven single-member districts and four

17   at-large seats?

18       A. Correct.  That's my recollection.

19       Q. Do you remember how that recommendation

20   was reached?

21       A. Well, they had -- it was the

22   recommendation of the people who served on that

Transcript of John D. Moss
Conducted on September 13, 2019                    50

1   Commission.

2       Q. Right.

3          So how did you decide -- you were on that

4   Commission, correct?

5       A. Correct.  It was a long time ago, so give

6   me some break.

7       Q. To the best of your recollection, how did

8   you decide that switching to seven single-member

9   districts and four at-large would be a good idea?

10      A. Well, first of all, we thought -- one of

11  the biggest things that was driving it, in my

12  personal opinion, from my point of view, is that

13  the all at-large election system created

14  disadvantages from a reduced competition because

15  of money.  That was the driver.

16         It costs so much money to run an all-city

17  campaign that, really, it disenfranchised people

18  who were not well-aligned with special interests

19  that have the money.  So, therefore, special

20  interests were getting a disproportionate

21  representation on the Council because of how hard

22  it was to campaign, you know, 200-plus square

1    miles of the city, and that single districts would

2    provide more competition because it would reduce

3    the capital barriers to entry to campaign.  You

4    could effectively campaign door-to-door, much like

5    you can think of General Assembly districts do;

6    and, therefore, we would get a more competitive

7    system and people would benefit from composition

8    that that would allow.

9          That was my entering argument.  And, of

10   course, the thing that stimulated it was that Al

11   Balko was a very popular Council member in his

12   district, obviously wasn't perceived well by

13   special interest at large, and he won his district

14   but he lost the election.  And that kind of -- so

15   that -- but my view was to reduce the barriers

16   that -- the money faces when you're trying to run

17   a city at-large election and it basically

18   disenfranchises people that have good messages but

19   they can't effectively reach out to the public who

20   they want to serve because it's such a huge

21   dispersed community.  And it is a barrier, the

22   entry, to this day.

Transcript of John D. Moss
Conducted on September 13, 2019                    52

1      Q. Can you spell the name Al Balko?

2      A. It's Al, A-L.  I think Albert was his full

3   official name, but don't hold me to that.  Balko

4   is B-A-L-K-O.  He's deceased, just so you know.

5   His nickname was the Balko Brigade.  I remember

6   that from his campaign.  That was his slogan, the

7   Balko Brigade.  Nice gentleman who was a retired

8   AT&T manager.

9      Q. So you mentioned a couple of times you

10  thought -- your biggest reason for supporting the

11  change to single-member districts was that the

12  at-large system reduces competition, correct --

13     A. Correct.

14     Q. -- because it costs so much money --

15     A. Correct.

16     Q. -- to run?

17        And people aligned with special interests

18  have advantages; is that correct?

19     A. Special monied interest.  They provide the

20  money for the campaigns, and so, therefore, that

21  creates a disadvantage for people who aren't

22  willing to align themselves with the -- the view

Transcript of John D. Moss
Conducted on September 13, 2019                    53

1    and the advocacy of the monied interest in the

2    city.

3        Q. So when you say special monied interest,

4    do you have anyone in particular in mind?

5        A. You can probably use a recent campaign

6    because I was the target of one of those.  Bruce

7    Thompson is one of them.  But if you could go back

8    in time, you could find -- you know, change the

9    name, R. G. Moore.  You know, you can -- the

10   Chamber.  You know, the political PAC of the

11   Chamber.

12       Q. When you say the Chamber --

13       A. The Chamber of Commerce.  Their political

14   PAC is definitely -- Board of Realtors, their

15   political PAC.  You know, you just have to go and

16   look at the financial records of those candidates

17   and you can see the people that provide those

18   big-dollar contributions.  It makes it very --

19   basically, you know, that's how it works.  It's

20   politics.  But it does -- but when you have to run

21   at large in a big city and you want to run a

22   campaign, and you don't have those, if you can't

Transcript of John D. Moss
Conducted on September 13, 2019                          54

1   communicate with the voters, you can't win someone

2   over you can't market to.  So they have a

3   marketing advantage and a communication advantage

4   with the public through their financial backers.

5   And that would be dissipated -- not eliminated but

6   would be dissipated or mitigated by district

7   systems.

8       Q. So you just mentioned that Virginia Beach

9   is a big city?

10      A. Correct.

11      Q. Are there any other challenges that you

12  faced running for an at-large seat in such a big

13  city?

14      A. Well, since the jobs are part-time and you

15  have a full-time employment, so if you -- so then

16  you're just -- you're time-limited.  So if you're

17  dollar-limited and you're time-limited, you are

18  obviously -- you have a much more difficult thing

19  to do.  But you know that going in up front.  But

20  if you're asking me what are the barriers, it's

21  just your physical time because you're working,

22  and the time you have to spend to campaign is

Transcript of John D. Moss
Conducted on September 13, 2019                    55

1     reduced.  That's -- so time is a constraint.

2         Q. Is it difficult to campaign across the

3     whole city given how large it is?

4         A. I'm an at-large member, so I can tell you

5     that it is.  And so that's where you have to look

6     at -- the fact that it's hard for me doesn't mean

7     the at-large system is inherently flawed.  That's

8     another conclusion I would not draw, that it's the

9     wrong system, because the public gets to decide

10    that, I think.  But it certainly makes it

11    difficult for me to -- how much I can go

12    door-to-door is evenings and weekends and canvass

13    or how much time you have for campaign meetings or

14    go to different forums and be out in the

15    community, that's all true.

16         And I'm here, so that's proof it can be

17    done, but it takes a lot of work, and it takes a

18    long time.  It's not -- not easy, and it's not

19    been replicated very often.  That a poorly

20    financed candidate makes it to the City Council is

21    an anomaly versus a pattern.

22        Q. Uh-huh.

Transcript of John D. Moss
Conducted on September 13, 2019                    56

1          I want to go back to what you mentioned

2     about the Commission that recommended the change

3     to the seven single-member districts and four

4     at-large.  You said that referendum was passed?

5          A. Correct.

6          Q. And, then, it went to the General

7     Assembly?

8          A. Correct.

9          Q. And it was passed by the General Assembly,

10    and, then, it got sidetracked for a period?

11         A. No.  It didn't get -- it didn't pass -- I

12    said it passed in the House of Delegates in the

13    General Assembly.  Glenn McClanan, then Delegate

14    McClanan, was the sponsor of that and got it

15    through the House, and it passed.  It then crosses

16    over, you know, to the Senate.  And in the Senate,

17    as I mentioned, then Senator Stolle, now Sheriff

18    Stolle, basically highjacked the thing.  That's my

19    pejorative characterization of it.

20         I'm sure back then Vice Mayor Sessoms had

21    a lot to do with that because this would have

22    definitely been a change of the power structure

Transcript of John D. Moss
Conducted on September 13, 2019                    57

1    they got it converted to.  We'd still have an all

2    at-large district system -- I mean, an all

3    at-large voting system -- excuse me -- but that we

4    would have -- the districts would be of equal

5    population.

6           An argument had been -- there was a

7    borough called Blackwater, and it had about, you

8    know, probably less than 4,000 people in the whole

9    thing, but they had a Council member.  And,

10   obviously, the number of people that wanted to be

11   considered to be a Council member among those was

12   very small.  So while you had a choice to choose,

13   you really had no choice.  Right?

14        Q. What were the demographics of Blackwater?

15        A. Mostly agricultural farmers.  It's a very

16   rural area even today.  I couldn't tell you the

17   actual ethnicity or anything, breakup of it, but

18   it was -- until we went to the seven district

19   system, Blackwater went away as a district seat.

20   And what was then called -- you had Princess Anne

21   and all that and Pungo all became one big

22   district, now called the Princess Anne district,

Transcript of John D. Moss
Conducted on September 13, 2019                    58

1    because you had to have equal population.

2          The last time we had a redrawing of the

3    districts was after the 2020 -- after the 2010

4    census they redrew the districts, and you now have

5    the district names that you have today.

6      Q. So I want to ask you a little bit about

7    Senator Stolle.  You said that Senator Stolle

8    highjacked the change of the electoral system.

9    What did you mean by that?

10     A. Well, he didn't honor the voters' will to

11   go to a district system.  And he chose to decide

12   that what the voters voted for is not what they

13   needed.  I call that highjacking because the

14   voters expressed what they wanted, and he chose

15   that that's not what they needed.  To me, that's a

16   highjack.

17     Q. Why do you think he did that?

18     A. Well, my personal view is --

19     Q. Your personal view.

20     A. My personal view --

21         MR. BOYNTON:  Personal view only.

22     A. Personal view is he and the people that

Transcript of John D. Moss
Conducted on September 13, 2019                    59

1    got him to do that, which I have my own suspicions

2    but no proof, did not want the power structure of

3    the Beach to be disrupted.

4        Q. Why?

5        A. Well, because they're going to lose their

6    advantage to make decisions in the city, and then

7    it's going to be more competitive.  And if you had

8    a monopoly and you pretty much can control the

9    majority of Council by how you finance campaigns,

10   why would you want to volunteer and support a

11   system that is going to change the balance of

12   power on how -- the power of the voters in the

13   city?  That's a disruptive influence.  And people

14   tend to not like change.  That's my personal

15   opinion.

16       Q. Okay.

17       A. But it's nothing to do with

18   disenfranchising people.  It's they didn't want

19   something that would change how power was

20   distributed and where it rests in the city.

21       Q. So besides Senate Stolle, you mentioned

22   Vice Mayor Sessoms at that time?

Transcript of John D. Moss
Conducted on September 13, 2019                    60

1      A. At that time.  I think he -- I believe --

2   I can't prove this, but I don't believe he acted

3   on his own.  I do believe those people had

4   communications, hey, this isn't what we want,

5   despite what the people said.  But that's just my

6   suspicion.

7      Q. Is there anyone else you think was

8   communicating with Senator Stolle?

9      A. I have no idea, but I'm certain -- I'm

10  fairly certain he was.  That's my personal

11  opinion.  I have no documentation to that effect.

12  But it's history.  But it's interesting.

13     Q. You mentioned that Senator Stolle is still

14  involved in city government, correct?

15     A. He's the current Sheriff, which is an

16  elected constitutional office in the Commonwealth

17  of Virginia.  It has no legislative authorities;

18  just the Sheriff.

19     Q. All right.  I want to go back for a

20  second --

21     A. Okay.

22     Q. -- and ask you a question about your

Transcript of John D. Moss
Conducted on September 13, 2019                    61

1    personal email account.

2          You only use your personal email account

3    to conduct city business, correct?

4        A. Correct.

5        Q. You don't use your virginiabeach.gov

6    account, correct?

7        A. Only to the extent that it forwards email

8    to my personal account, correct.

9        Q. Have you ever used any other email

10   account, besides your personal email account or a

11   virginiabeach.gov account, to conduct city

12   business?

13       A. I don't have any other personal email

14   accounts.  I had a cox.net account many, many

15   years ago, but I switched providers.  I haven't

16   had that for, probably, four or five years, I

17   think.  It's been a long time since I had a

18   cox.net account.  I don't even have access to that

19   account.  So I'll tell you I didn't even search

20   that because I don't use it and haven't used it

21   and don't have that service provider.

22       Q. Why do you use your -- only use your

Transcript of John D. Moss
Conducted on September 13, 2019                    62

1     personal email and not the vb.gov account?

2          A. Because there is no legislative

3     requirement that I do so.  It's convenient.

4          Q. Just personal preference?

5          A. It's convenient.  That's why I have to

6     religiously copy to councilmail, whatever that

7     thing is when I send stuff out, because if it

8     comes from the vbgov account and I send it back

9     out and copy to that account, then it's a closed

10    loop.

11         Q. So I want to understand that.  If you

12    could explain, how are your -- how are emails sent

13    from your personal email account captured by the

14    city's document system?

15         A. When I go into my account on the copy to

16    line or the blind copy to line, there is an

17    archive account that the clerk maintains.  It's

18    councilmail@vb.com, I think it is.

19             MR. BOYNTON:  vbgov.com.

20         A. vbgov.com.  And that's where they go to.

21    And I just send a reply.  If I don't reply to the

22    email, then I just delete it because I know where

Transcript of John D. Moss
Conducted on September 13, 2019                    63

1    it came.  I don't retain something I don't respond

2    to.  Like I got, hey, we're doing a -- a good

3    example would be Public Affairs Office,

4    Communication sends out all these notices:  city

5    event, city event, city event.  I don't retain

6    those.  I just (indicating) because I'm not

7    responding to them.  It's just information.  They

8    put it out.  They have it.  All Council members

9    got it, so it's going to City Council.  I know it

10   came through vbgov.  I just swipe those and make

11   them go away.

12      Q. Does anybody else retain that email?

13      A. Those emails would be retained.

14         MR. BOYNTON:  They're sent through the

15   vb.com system is what he's telling you.

16      A. They go from vbgov.com to City Council.

17      Q. I understand that.  I'm just trying to

18   understand if there's any kind of gap between what

19   is being retained.

20         So any email that you reply to, in order

21   for it to be recorded in -- captured in the city

22   system, you have to cc the email account?

Transcript of John D. Moss
Conducted on September 13, 2019                    64

1      A. Correct.

2      Q. Are there any emails that you send that

3   are city business that you do not cc the city

4   email account?

5      A. I will never say that I've never not done

6   it, but, to the best of my knowledge, I have not

7   consciously omitted providing it.

8      Q. To the best of your recollection, have you

9   ever emailed anyone about changing to a

10  single-member district system for City Council

11  elections in Virginia Beach?

12     A. I cannot recall that specifically.  I'm

13  not saying I didn't; I just can't recall.

14     Q. You are currently an at-large City Council

15  member for the City of Virginia Beach, correct?

16     A. Correct.

17     Q. How long have you held that position?

18     A. I was elected to this position in 2011 in

19  a special election.  And I took office on the

20  Thursday after the election.

21     Q. So you've held the at-large seat from 2011

22  to the present?

Transcript of John D. Moss
Conducted on September 13, 2019                    65

1    A. Correct.  I ran two reelection campaigns,

2    2014 and 2018.

3    Q. And, then, prior to the current time

4    period, you also served on the Virginia Beach City

5    Council twice before?

6    A. Correct.  I served from 1986 to 1990 as

7    the Kempsville borough representative.  That's

8    back when we had the borough -- the borough still

9    existed before we went to the legislative change

10    that we have today.

11        And, then, I was elected in 1992 in the

12    at-large race.  And I served until 1995, March

13    15th, I believe it was, when I resigned to

14    relocate to Tennessee.

15    Q. Okay.  So the first time you held office

16    was 1986 to 1990?

17    A. Correct.

18    Q. And you were elected to that position or

19    were you appointed?

20    A. Elected.

21    Q. And, then, the second time?

22    A. Elections were in May at that time, just

Transcript of John D. Moss
Conducted on September 13, 2019                    66

1   so you know.  We've changed the time when Council

2   was elected.  They were elected in May in that

3   timeframe.

4       Q. When was the time of the elections

5   changed?

6       A. I'd have to rely upon -- I couldn't tell

7   you.  But sometime -- I don't know the exact date

8   when that was changed, but it was changed to

9   November.  I can't give you the date.  You'll have

10  to get that from someone else.  I can't recall.  I

11  do know when we elected the Mayor in -- for the

12  first -- gosh.  I don't want to say.  I just can't

13  recall.

14      Q. Okay.  Then the second time you were on

15  the City Council was 1992 to 1995 at-large?

16      A. Correct.

17      Q. Were you elected in 1992 --

18      A. Correct.

19      Q. -- or were you appointed?

20      A. Elected.  Yes, ma'am.

21      Q. Why was there a gap between your time on

22  the City Council between 1990 and 1992?

Transcript of John D. Moss
Conducted on September 13, 2019                    67

1      A. One, I didn't get reelected.  Special

2   interest made sure I didn't come back.  So I have

3   personal experience.

4      Q. Which election was it that you lost?

5      A. That was 19 -- 1990.

6      Q. What is your personal view about why you

7   lost that election?

8      A. It was two things.  One, there was a lot

9   of money spent to make sure we didn't come back

10  because only one of the incumbents came back.

11  That was Nancy Parker.  Very close race,

12  400-something votes.

13       We also -- that election had been preceded

14  by the riots at the oceanfront.  And I think the

15  public, rightfully so -- if you run a ship

16  aground, the people hold you responsible.  So all

17  the people that were up for reelection, save one,

18  bit the dust, if I remember correctly.

19       MR. BOYNTON:  Politically speaking, to be

20  clear.

21      A. Yes.  Politically speaking.  Yes.

22       And the public felt, obviously, we didn't

Transcript of John D. Moss
Conducted on September 13, 2019                    68

1    do a good job, but also a substantial sum of money

2    was also spent to make sure we didn't come back.

3        Q. So when you say a substantial amount of

4    money was spent to make sure you didn't come back,

5    who was spending that money?

6        A. Well, you can look -- you have to go back

7    and look at the financial records, but it's the

8    same group -- it would be different names, but the

9    same market segments:  developers, realtors,

10   because development was a big issue at that time.

11   You have to go back to '86 and understand the

12   election -- if I could digress for a moment, if

13   that's permissible.

14       Q. Briefly, yes.

15       A. In 1986, or prior to that, there had been

16   a lot of high-density development approved in the

17   City of Virginia Beach.  We grew by a phenomenal

18   rate.  We were growing by 20-, 30,000 people a

19   year at some of those points in there.  This is a

20   consequence somewhat of the Reagan defense boom.

21   But, you know, also, interest rates were kind of

22   high, too, so people wanting to sell product,

Transcript of John D. Moss
Conducted on September 13, 2019                    69

1    wanted to create a lot of high-density

2    development.

3          You know, the public was really upset

4    about it.  They actually defeated, in 1985, a bond

5    referendum for roads and schools and sewer.

6    That's just how angry they were.

7          So in 1986, there were five of us that ran

8    together as The Team For Responsible Leadership.

9    John Perry, a good friend of mine, the first

10   African American elected to City Council, the

11   most -- oldest person ever first elected to City

12   Council, retired history teacher at Kempsville

13   High School, we ran together.  It was myself,

14   Barbara -- myself, John Perry -- gosh.  That guy's

15   name -- it will come back.  Sam Meekins.  Not Sam

16   Meekins.  Sam -- his brother's got the memorial

17   named after him at the Veterans -- at the

18   Convention Center.  Sam -- I can't think of his

19   last name.  And Nancy Parker.  Anyway --

20       Q. How many --

21       A. There were five of us.  It was called The

22   Team for Responsible Leadership.  I don't have

Transcript of John D. Moss
Conducted on September 13, 2019                    70

1    that brochure either.  I wish I did.  That would

2    be a great thing to put up on a wall in a picture

3    frame, but I don't have it.

4           And as a consequence, four of us got

5    elected.  And along with the Mayor, that gave --

6    then -- excuse me -- Meyera Oberndorf gave us five

7    votes.

8           Did I say we had five?  That's close.

9           And, then, Bob Jones was an at-large

10   Council member.  And I negotiated in my house -- I

11   lived in Thalia at the time -- that if we voted

12   for him for Mayor that he would vote to make

13   Meyera Vice Mayor.

14          This might be a story you've never heard

15   before.  We were in my living room.  We negotiated

16   that.

17          In fact, that did shift the balance of

18   power.  And Bob Jones more often than not voted

19   with us.  And we made a lot of changes:  you know,

20   sign ordinances, billboard ordinances, changed the

21   nature about development.  We made -- cost a lot

22   of people probably money that we didn't even know

Transcript of John D. Moss
Conducted on September 13, 2019                    71

1    in terms of what they couldn't accomplish.  And

2    that was a very good period, I thought, of the

3    city.

4         But, nonetheless, that's the backdrop to

5    give you.  You put that in the backdrop of -- put

6    the two together:  the riot issue, which people,

7    rightfully so, thought we didn't do what we should

8    have done, those two things contributed along with

9    a substantial sum of money.

10        But we won that race in 1986 on $30,000,

11   which is phenomenal.  That just tells you how

12   upset the public really was with the development

13   that had preceded, and also building up the bond

14   referendum that defeated in 1985 including

15   schools, which are very popular in Virginia Beach.

16   That just gives you an idea how upset people were

17   with the status quo.

18        Q. Just a second ago you said people were

19   upset about the riots and rightfully so.  What did

20   you mean by that?

21        A. I think they have -- our job as Council

22   members first and foremost is always public

Transcript of John D. Moss
Conducted on September 13, 2019                       72

1   safety.  You know, I just come from a Navy

2   background.  You run a ship aground, I don't care

3   who all didn't do their job; you know, the captain

4   loses his job just -- because your job is to make

5   sure that's not happening.

6        So people are holding us accountable for

7   how we prepped for it, you know, why didn't we

8   anticipate better, the police -- you can look at a

9   lot of places.  In the end, the buck stops at --

10  it's the City Council who's ultimately

11  accountable to the public.  And they held us

12  accountable, and they fired us.

13       And I really can't argue with their

14  assessment, you know.  I'm just saying that, on

15  top of that, there was these other things going on

16  that people certainly made sure -- and, as a

17  matter of fact, one of the ads they ran back in

18  1986, which was retracted when John Perry was on

19  our ticket, they -- I don't know where they built

20  it, but they did this -- they had us all

21  characterized as monkeys.  They had a monkey ad.

22  It didn't last long on TV, as you can imagine.

Transcript of John D. Moss
Conducted on September 13, 2019                    73

1    But they characterized the five of us running for

2    election as monkeys, monkeying around, going to

3    ruin the city.  But that's what they used.

4           Well, obviously, clearly, you know, with

5    an African American on our ticket, John Perry, you

6    can imagine that that took on -- even then, that

7    that had some kind of bad taste.  I'll put it that

8    way.  Everybody can draw their own conclusions.

9    But I think it probably helped us more than hurt

10   us because in the end it was all the backlash just

11   showing how arrogant some of those people were

12   that they thought that that would -- that that

13   would be an acceptable way of campaigning in the

14   Beach, which it was not.  They were highly

15   ridiculed and castigated for that effort.

16       Q. You said the ad was on TV?

17       A. Yes.  Not long.

18       Q. Was it in print anywhere?

19       A. I don't remember print, but it was run on

20   TV.  It was a TV ad.

21       Q. Do you know who paid for that ad?

22       A. I do not.  I don't -- my memory of that is

Transcript of John D. Moss
Conducted on September 13, 2019                    74

1    just not that good.  I do remember the ad.  I know

2    it backlashed and it disappeared rapidly.

3         Q. Can you describe what the ad looked like?

4         A. It was five monkeys.  Obviously, people in

5    a suit and the (indicating) kind of thing, even

6    the noises.  It was pretty interesting.  It's --

7    and a vegetation kind of background.  But just --

8    I can't remember.

9         Q. Did it have your names?

10        A. I can't recall.  I just can't recall.  But

11   I --

12        Q. Did it say Team for Responsible

13   Leadership?

14        A. I can't recall that either.  I just

15   remember that the ad came out.  We thought, oh, my

16   gosh, how desperate can they be.  And the backlash

17   was huge.  And it disappeared as quickly as it

18   came along.

19        Q. What was the backlash?

20        A. Well, bad taste.  I think there was some

21   view by some that it was -- I don't think that was

22   the case personally.  But some people viewed it,

Transcript of John D. Moss
Conducted on September 13, 2019                    75

1    because John Perry was on our ticket, that somehow

2    it had a racial tone to it.  I don't think that's

3    true.  I think -- I don't think they were being

4    that malicious.  I just think they were going and

5    saying how can you show these people are a bunch

6    of jokers, they're not serious.  These are the

7    people that you think can represent the city and

8    run the city's business?  They're going to monkey

9    around and mess things up.  I think that was the

10   nature.

11        But there were parts of the community that

12   certainly took it the wrong way and they took it

13   in a different way.  But needless to say, the ad

14   disappeared as quickly as it arrived.  And I think

15   it helped us -- in all fairness, I think it helped

16   us rather than hurt us.

17        MR. BOYNTON:  So we've been going about an

18   hour.  Let's take a five-minute break, stretch our

19   legs, use the bathroom, all that.

20        MS. HARLESS:  I just want to ask one more

21   question about his City Council -- earlier City

22   Council time.

Transcript of John D. Moss
Conducted on September 13, 2019                     76

1        Q. Why did your time on the City Council end
2    in 1995?
3        A. I resigned.  And I resigned because the
4    Navy made me an offer I couldn't refuse.  They
5    said, We'd like you to go take this job out in
6    Memphis, Tennessee, and if you do we'll send you
7    to Harvard for a year later, and we'll send you to
8    the National War College a year later.  So I got
9    two degrees out of it.  And I went out and did a
10   job out there that needed to get done.  And it was
11   good for me, good for my family.  And I just made
12   a choice.  It wasn't an easy choice to make, but
13   sometimes you've got to think about family
14   considerations in the long-term.
15           So that's why I departed.  It wasn't
16   anything about frustration or I thought I was
17   going to be -- you know, any of that kind of
18   stuff.  Other people were more disappointed that I
19   left, and some were happy.
20           MS. HARLESS:  All right.  Good time for a
21   break.
22               (A recess was taken.)

Transcript of John D. Moss
Conducted on September 13, 2019                          77

1       Q. Okay.  Ready?

2       A. Absolutely.

3       Q. All right.  Why did you decide to run

4    again for an at-large seat in -- was it 2011?

5       A. The special election -- that is correct.

6    I had ran in the election in 2010.  It was the top

7    two.  I was number three.  And, then, Rita

8    Bellitto resigned to relocate with her spouse.

9    And people encouraged me.  They thought I should

10   run since I was the number three voter on the

11   election in 2010.  And with my wife's concurrence,

12   I decided to run.

13      Q. Why did you decide to run?

14      A. Because I thought there was a voice that

15   was not being heard on the City Council, and I

16   thought I could be an effective and competent

17   voice and push back on the status quo a bit.

18   That's why I ran.

19      Q. What was the voice that you thought was

20   not being heard on the City Council?

21      A. Fiscal responsibility; the average citizen

22   who pays most of the bill but gets the least

Transcript of John D. Moss
Conducted on September 13, 2019                          78

1      amount of the benefits.  And I thought those

2      voices were being emasculated by money interests,

3      which I, you know -- the decisions being made were

4      not in the public's best interest, and a

5      counter-voice needed to be heard.  Even if we

6      weren't the majority, at least we got a chance to

7      be heard on the dais.

8          Q. You said you also ran in the 2010

9      election?

10         A. Correct.

11         Q. Was that for the at-large seat?

12         A. Correct.

13         Q. You lost that election?

14         A. Correct.

15         Q. Why do you think you lost that election?

16         A. The voters picked the other two people to

17     be the top two.  I mean, I can't -- I don't judge

18     the mind of the voters.  I just didn't do a

19     successful job communicating why they should vote

20     for me.

21         Q. What is your current salary as a member of

22     the City Council?

Transcript of John D. Moss
Conducted on September 13, 2019                    79

1        A. $28,000 a year.

2        Q. And you mentioned earlier that you have

3    other employment besides your position with the

4    city?

5        A. That is correct.

6        Q. And what is that employment?

7        A. I am the Director of Submarine Warfare

8    Requirements, Warfare Development and Readiness,

9    for Commander Submarine Forces for the United

10   States Navy.

11       Q. And how long have you been in that job?

12       A. Since March the 2nd of -- March the 11th

13   of 2002.

14       Q. And it's based in Virginia Beach?

15       A. No.  It's based in Norfolk, Virginia.

16       Q. Okay.

17       A. And Naval Support Activity Norfolk is

18   where the Command is located.

19       Q. Okay.  Let's switch back to your City

20   Council job.  What are your job duties as a City

21   Council member?

22       A. To fulfill my oath of office.  And more

Transcript of John D. Moss
Conducted on September 13, 2019                    80

1    specifically, to -- I'm a fiduciary agent for the

2    public.  I have an oversight role.  And I have a

3    legislative role.  And all those are a part of my

4    overall -- I would call my accountability to

5    fulfill my oath.

6        Q. Anything else?

7        A. That's it.

8        Q. You'd agree that as a City Council member

9    you have a lot of responsibilities, wouldn't you?

10       A. I have all the responsibilities vested in

11   me in the Charter, and they are extensive.

12       Q. Do you think a City Council member is an

13   important position?

14       A. It's a position of public trust;

15   therefore, yes, it is an important position.  Any

16   position that can confiscate collectively other

17   people's wealth and income through the power of

18   the state is important.

19       Q. Do you communicate directly with

20   constituents?

21       A. I certainly do.  I maintain -- as a matter

22   of fact, if you look at my Facebook, you'll see

Transcript of John D. Moss
Conducted on September 13, 2019                    81

```
1    what I do.  I hold town halls.  I'll be speaking

2    someplace on Saturday.  I don't think anyone would

3    call me a wallflower as a Council member.

4         Q. How often do you hold town halls?

5         A. Probably on a quarterly basis, I would

6    say, but at least once every six months.  And

7    sometimes I'll hold a whole bunch in all districts

8    in the same two-month period.  Usually just before

9    the budget I will hold a town hall in each of the

10   seven districts just to get a feel for what

11   people -- what's on their mind as we go forward

12   for the budget process.

13        Q. Besides the town halls related to the

14   budget, where do you usually hold the town hall

15   meetings?

16        A. I hold them in libraries, and schools, and

17   the EMS building on the Boulevard.  Usually always

18   public facilities are always open to the public.

19   Then, of course, I speak at different breakfasts

20   or evening engagements at different civic

21   organizations, they'll invite me to speak at, like

22   I'm speaking Saturday at an event.
```

Transcript of John D. Moss
Conducted on September 13, 2019                    82

1      Q. What is the event you're speaking at

2   Saturday?

3      A. Virginia Beach Taxpayers Alliance at

4   Marian Manor on Saturday.  But I've spoken at

5   Ruritans, you know, all of the -- sometimes church

6   groups, you know.  It all depends.  Wherever I get

7   invited, if I have the time to make available I'll

8   show up.

9      Q. So besides Facebook communications, town

10  halls, and speaking events, are there any other

11  ways you can think of that you interact with

12  constituents?

13     A. Well, at the Council meetings itself.  You

14  know, after the Council meetings are over I'm

15  always out in the crowd, you know, pressing the

16  flesh, talking with people.  Before the informal

17  sessions I'm talking to people from the public who

18  come and sit around the table.  And, obviously,

19  indirectly, at any time someone is watching us on

20  TV or watching in the chambers, I guess you can

21  say that we are interacting with the public,

22  though not in an active way but in a passive way.

1   They're hearing what we think.  And sometimes

2   they'll interact with us later.

3       Q. Do you ever text with constituents?

4       A. Not too much.  I don't get much texts from

5   constituents.  A lot of emails from constituents

6   because usually they come through vb.gov because

7   they go to the web page.  But, no, I do not get a

8   lot of texts from constituents.  I do get emails,

9   but they usually, almost always, come through the

10  vbgov.  I get phone calls, too.  There are people

11  who like to call.  I get quite a few of those,

12  usually two or three a night.

13      Q. Have you ever run for any public elected

14  office besides Virginia Beach City Council?

15      A. No.

16      Q. Have you ever been appointed to fill a

17  vacant seat?

18      A. No.

19      Q. Have you ever endorsed a candidate running

20  for a seat on the Virginia Beach City Council?

21      A. Oh, yes.

22      Q. Who?

Transcript of John D. Moss
Conducted on September 13, 2019                    84

1      A. Well, I guess I ran with John Perry, so

2   that would be the first place I'd start.  That's

3   an endorsement.  I've endorsed Robert Dean.  I

4   endorsed Aaron Rouse.  Gosh.  I'm trying to think

5   all the elections that have taken place.

6      Q. If you want, you can limit it to

7   2016-2018.

8      A. Okay.  Thank you.  That will help me a

9   little bit because I'm trying to go back.

10      Q. Let's limit it to the most recent time you

11   were reelected.

12      A. 2018.  I endorsed Aaron Rouse.  I

13   endorsed -- I'm trying to think who all ran in

14   that race.  Was it Shannon Kane?  At the end I

15   know I endorsed R. K. Kowalewitch because there

16   was just no other good choices.  That just tells

17   you how bad the choices were.

18      Q. Did you endorse Sabrina Wooten?

19      A. I did not.

20      Q. Why?

21      A. I looked at her financial disclosures.

22   She is backed by Bruce Thompson, the developer

Transcript of John D. Moss
Conducted on September 13, 2019                    85

1    where she got her money.  That is why I didn't

2    endorse her.

3        Q. Why did that mean you didn't endorse her?

4        A. Well, because Bruce Thompson, one, ran a

5    tremendous -- raised a lot of money that ran the

6    negative campaigns against myself.  And he

7    certainly is one of those monied special interests

8    which I talked to; and, generally speaking, that

9    would be an automatic disqualifier for me almost.

10   Someone who is backed by him is not somebody who I

11   would support on a political basis because,

12   obviously, we don't share the same views of the

13   future.  So that's me.  Just a discriminator.

14       Q. Are you aware why Bruce Thompson backed

15   Sabrina Wooten's campaign?

16       A. I can't read his mind.  I only read what

17   influence he exerts in the city and on the City

18   Council, and that his views are not aligned with

19   mine.  But I have no idea as to why he -- I can't

20   read his mind why he endorsed Sabrina.  I don't

21   know.

22       Q. Do you have a personal opinion of why he

Transcript of John D. Moss
Conducted on September 13, 2019                                86

1    backed Sabrina Wooten?

2        A. I do not.  I assume that she must be

3    aligned with his interests, but I do not know why.

4        Q. Anyone else in the 2018 election that you

5    endorsed?

6        A. Bobby Dyer for Mayor.  I'm trying to run

7    through all the candidates for all the races that

8    happened.  Oh.  I endorsed Tim Worst -- that's

9    W-O-R-S-T -- against Barbara Henley.

10       Q. Why didn't you endorse Barbara Henley?

11       A. We just have different political views.

12   And Tim Worst was aligned with my -- with my

13   thoughts that we don't need to be constantly

14   raising taxes, that we're misusing or borrowing

15   authority, and we weren't in support of, like, big

16   projects that were taking place in the city, so it

17   was just the political alignment of objectives.

18       Q. Uh-huh.

19       A. I'm trying to think if there was -- that

20   comes to mind.  I have to go back.  Those are the

21   ones I can remember.

22       Q. Okay.  What about 20 -- what was the

Transcript of John D. Moss
Conducted on September 13, 2019                87

1    next -- the year before that?

2        A. It was 2014 is when I ran.  2014 is when I

3    ran.  But 2016, I wasn't in that race.

4        Q. Did you endorse anyone even though --

5        A. I endorsed Dane Blythe against Rosemary

6    Wilson.

7        Q. Why didn't you endorse Rosemary Wilson?

8        A. The same reasons I wouldn't be endorsing

9    Wooten.  Her alignment of financial supporters

10   were definitely not on the same political

11   wavelength as myself.

12       Q. Did the same people support Rosemary

13   Wilson as Sabrina Wooten?

14       A. I can't say all the same but some of the

15   same.

16       Q. What are the same?

17       A. Bruce Thompson for one.  That's enough.

18       Q. Any other people you can remember

19   endorsing in 2019?  Did you endorse Jessica

20   Abbott?

21       A. I did.  Thank you for helping me.  I

22   definitely endorsed Jessica Abbott.  I think I

Transcript of John D. Moss
Conducted on September 13, 2019                    88

1    endorsed Shannon Kane in that 2016 race, if I

2    remember correctly.

3        Q. Why did you endorse Jessica Abbott over

4    Amelia Ross-Hammond?

5        A. She was a -- not a light rail supporter,

6    and Hammond was.  That was the biggest issue.  And

7    I thought she had a -- she was more in touch with

8    the interests that I had, my political agenda,

9    than Ross-Hammond because she had a record.  But

10   she voted -- she voted for all those budgets with

11   budget tax increases.  That and light rail -- her

12   fiscal positions and her support of light rail

13   were more than sufficient to support Jessica over

14   Ross-Hammond.

15       Q. And, then, what about 2014?

16       A. I can't remember that race.  That tells

17   you how awful that is.  I can't even remember who

18   all the candidates were.  I know I ran myself, but

19   I can't tell you who else was in the -- I just

20   can't recall.

21       Q. What about 2012?

22       A. I wasn't -- I guess I was just on Council

Transcript of John D. Moss
Conducted on September 13, 2019                    89

1     for that 2012 race, wasn't running.  I can't

2     recall.  I know I didn't support the current --

3     when the Mayor ran for reelection.  I know that.

4          Q. Are you talking about Mayor Sessoms?

5          A. Yes.  I would not have supported him for

6     certain.

7          Q. You mentioned you endorsed the campaign of

8     Aaron Rouse, correct?

9          A. Uh-huh.

10         Q. Why?

11         A. I thought he represented a fresh voice.

12    He clearly wasn't being -- as a matter of fact,

13    wasn't being supported by Bruce Thompson.  Bruce

14    Thompson, in fact -- I still have this letter --

15    ran a personal letter with his financial

16    disclosure on it telling him that John Moss,

17    Rouse, all of us, would be the end of Virginia

18    Beach if any of us got elected.  So not being

19    endorsed by Bruce Thompson is clearly a good

20    reason to support someone.

21         Q. When you said that Bruce Thompson ran a

22    personal letter --

Transcript of John D. Moss
Conducted on September 13, 2019                    90

1        A. He had a big ad.  It was, like, a letter
2    he sent out to all his constituents, and he
3    personally said who people should vote for and who
4    they shouldn't vote for.  And he called us The
5    Magnificent Seven.  And Rouse was one of those
6    names that was on there.  I do have that piece of
7    literature, if you thought that was in the scope
8    of the thing.  I didn't see where they fell into
9    the scope if you did.  I still have that on my
10   desk.  I'd be happy to provide that.  I didn't
11   think it fell within this.
12        But that was something that he ran, and
13   mailed out to all his friends I should say.
14   That's how I got it.  Someone sent it to me.  I
15   don't know who he mailed it to, but someone who
16   got it provided it to me.  That's how I got it.
17        But I just thought Aaron represented a
18   fresh voice.  Smart guy.  Communicates well.  And
19   I think he has a different view than the good ol'
20   boy network he often talked about during his
21   campaign.  And I couldn't agree with him more.
22        Q. What's the good ol' boy network?

Transcript of John D. Moss
Conducted on September 13, 2019                    91

1      A. I talked about these monied interests, the

2    Development Authority, these people that walk in

3    there with their six votes and they, basically,

4    listen to us but then they do what they want

5    anyway.  And that's a personal opinion, but I

6    think it was a perception held by the public that

7    these aren't people you can trust.

8      Q. Have you ever actively opposed a candidate

9    running for City Council in Virginia Beach?

10      A. Can you define actively?

11      Q. Have you ever donated money to a campaign

12    because you didn't want someone else's campaign to

13    win?

14      A. I think every contribution you make is

15    that case.

16      Q. Have you ever run an ad?

17      A. No.  Not run an ad, no.

18      Q. Have you ever made a public comment

19    against a particular campaign?

20      A. Yes.  If you're going to ask me when, I

21    can't recall.  I know I've done Facetime videos

22    for candidates where I've mentioned a candidate

Transcript of John D. Moss
Conducted on September 13, 2019                    92

1    who I didn't want to get elected.  If you -- if

2    you ask me to account when and who it was, I

3    can't, but they're out there on the public view.

4    I don't have them.  Some private -- private thing.

5        Q. When you said you've done Facetime videos,

6    what does that mean?

7        A. You know, Facebook Live and you go out and

8    you post it on your website -- not on your website

9    but your Facebook site.  I have those, but they're

10   on Facebook.  I don't have some archive video

11   collection, something saved.  But they're out

12   there on my Facebook.

13       Q. All right.  Have you ever personally

14   contributed money to a candidate running for a

15   seat on the Virginia Beach City Council?

16       A. Oh, yes.  Now you're going to ask me who?

17       Q. Yes.

18       A. This will not be an exhaustive list, but

19   I'm just going to give you something because,

20   obviously, their campaign reports would reflect

21   that.

22       Q. Uh-huh.

Transcript of John D. Moss
Conducted on September 13, 2019                    93

1        A. Bobby Dyer, Tim Worst, Eric Wray.  He ran

2    in the race against Wooten.  He's another African

3    American, just to make that for the record.  Dane

4    Blythe, Jessica Abbott.  That's a good

5    representation.  I can't recall the people I've

6    written a check to.

7        Q. Has your campaign ever given money to

8    another candidate's campaign?

9        A. My campaign?  I do not recall writing a

10   check during a campaign, but I'd have to go back

11   and look to see if -- when I closed out my

12   campaign account whether or not I wrote a check to

13   another campaign just to close out my own account

14   towards -- that's possible, but usually I write

15   those checks to charity, but I won't say it didn't

16   happen.  That's possible, but I don't recall

17   writing any -- I rarely had enough money for my

18   own campaign to give it to someone else.  I do not

19   recall doing that.

20       Q. Have you ever volunteered for the campaign

21   of a candidate running for City Council in

22   Virginia Beach?

Transcript of John D. Moss
Conducted on September 13, 2019                94

1        A. Oh, yes.  Since I was knee-high to a

2     grasshopper, probably.  I've been campaigning when

3     I was 16, way back when, so yes.

4        Q. Okay.  What about in 2018?

5        A. 2018.  I'm actively on the Council for

6     2018.  I was busy doing my own race, so I didn't

7     have much time to do stuff.  But when I was

8     passing out literature, I did include some

9     literature for other people.

10       Q. Who else?

11       A. I'm trying to -- now I'm trying to think

12    of who was running that I would have done that

13    for.  Probably Eric Wray.  Eric Wray.  I did do

14    some campaigning for Eric Wray, although I was

15    busy with my own campaign.

16       Q. Why did you support the campaign of Eric

17    Wray?

18       A. Well, Eric Wray is a longtime personal

19    friend, number one.  He's always been helpful in

20    my races.  He's a small businessman.  And his

21    political views are very much aligned with my own.

22       Q. Any other reason?

Transcript of John D. Moss
Conducted on September 13, 2019                95

1      A. No.

2      Q. Did you support his campaign because you

3   didn't prefer Sabrina Wooten?

4      A. Well, I would have supported -- no matter

5   who the opposition was, I would have supported

6   Eric Wray because he's a personal friend.  But

7   when you asked me that question about why I didn't

8   support her, I wouldn't have -- if there had been

9   no one else in the race, I would not have

10  supported her because of who was backing her

11  campaign.

12     Q. Anyone else you can remember handing out

13  literature for in 2018 besides Eric Wray?

14     A. No, I cannot.

15     Q. Okay.  What about 2016?  Do you remember

16  volunteering on anyone's campaign?

17     A. Well, I know I did stuff with Jessica, but

18  I can't tell you -- you know, I did some

19  door-to-door stuff for Jessica.  Obviously, at

20  different events, when I spoke places, if it

21  was -- I was there being invited as -- like, a VBT

22  breakfast or a Taxpayer Alliance meeting or

Transcript of John D. Moss
Conducted on September 13, 2019                    96

1    someplace like that, I would have said I'm

2    supporting Jessica.  But that would be the extent

3    of it.

4         Q. 2014?

5         A. I can't recall.

6         Q. 2012?

7         A. I know I -- you're going back that far.

8    No.  I just can't remember.  I'm certain somebody

9    would say he did this, but I'm not recalling it.

10        Q. In 2018, did you ever put up a yard sign

11   for any other candidates running for City Council

12   in Virginia Beach?

13        A. Yard sign?  No.

14        Q. Sticker?

15        A. I can't see a sticker.  But when you say a

16   yard sign, can you be more explicit?  I'm thinking

17   a yard sign has specific meaning in a campaign.

18   Do you mean any kind of sign posted on a property

19   independent if it's a yard or not?

20        Q. Yes.

21        A. Okay.  I didn't want to be evasive, but a

22   yard sign has a specific meaning.  Then there is

Transcript of John D. Moss
Conducted on September 13, 2019                    97

1    the four-by-four signs that go up for candidates

2    that goes on property.  You want to include that

3    in your --

4        Q. Yes.

5        A. Okay.  Just making -- then I probably did.

6    I can't tell you who gave us signs, but we went

7    out in a truck and put signs up.  I just can't

8    recall which candidates they would be for, but

9    they would be one of those candidates I endorsed.

10   But we did go out and put four-by-four signs up.

11   Some candidates didn't have them because they

12   couldn't afford them.  I can't tell you which ones

13   they were, but, yes, I did go out and help and put

14   posts in and put signs up; I just can't recall

15   who.

16       MR. BOYNTON:  You're killing her again, I

17   think.

18       A. Sorry.

19       MR. BOYNTON:  That's a lot of words per

20   minute.

21       A. I'll slow down.

22       Q. Have you ever supported a candidate

Transcript of John D. Moss
Conducted on September 13, 2019                    98

1    running for City Council in Virginia Beach in any

2    other way, in -- let's just start with 2018?

3        A. In any other way?  I'm trying to think of

4    the ways you mentioned.  You mentioned signs.  You

5    mentioned money.  I mentioned I did Facetime

6    videos.  I mentioned I did some distribution of

7    material.  And --

8        Q. Endorsements?

9        A. Endorsements.  I didn't do any TV ads.  I

10   didn't do any radio ads, that I can recall.  So I

11   would think -- I can't think of something else,

12   but that doesn't mean there wasn't.  But I'm not

13   recalling something we haven't captured.

14       Q. Okay.  Can you think of any candidates for

15   City Council who supported your campaign in any

16   way?

17       A. Well, Jessica Abbott has supported my

18   campaign.  Council members, correct?

19       Q. Uh-huh.

20       A. Bobby Dyer, Louis Jones.  That's probably

21   a thin list.  I'm not the most popular person.

22       Q. What did Jessica Abbott do to support your

Transcript of John D. Moss
Conducted on September 13, 2019                    99

1   campaign?

2        A. I recall Facebook stuff that she did.  She

3   helped critique campaign materials.  I call that,

4   you know, a help.  And I think when she went out

5   and about town, I'm sure she spoke on my behalf

6   that she was supporting me.  Those are things I

7   know that she did.

8        Q. What about Mayor Dyer?

9        A. He publicly stated he was supporting me.

10  And I do recall a small campaign contribution.

11  But that would be the extent of his known support.

12       Q. What about Louis Jones?

13       A. He let me put signs on his property if I

14  chose to.  And I think he told people in the

15  community that he was supporting me.  But he

16  didn't -- we didn't actively campaign together or

17  anything of that nature.  But that's what I can

18  think of.  He didn't make any public endorsement,

19  if that's what you're asking.

20       Q. Can you think of anyone else in the

21  Virginia Beach city government that supported your

22  campaign for City Council?

Transcript of John D. Moss
Conducted on September 13, 2019                    100

1      A. I probably would discourage that because I

2    think they should remain apolitical.  So I am not

3    cognizant of anyone who was actively supporting my

4    campaign, nor did I ever solicit it.

5      Q. Does Sheriff Stolle ever support anyone's

6    campaign?

7      A. Elected constitutional officers is not

8    city government, number one.  He certainly didn't

9    support my campaign last time.  I don't know that

10   he's ever actively endorsed me, that I'm cognizant

11   of.  That doesn't mean that he hasn't supported me

12   unbeknownst to me, but I've never gotten a check

13   or anything where I've seen his name on it saying,

14   hey, I'm for John Moss.

15         And City Commissioner of Revenue, no.  I

16   can't recall any -- maybe John Atkinson because he

17   was City Treasurer.  But I don't think in 2018 he

18   gave me money, but I don't recall if he gave me

19   absolutely a public endorsement, but he may have.

20   But for the most part, not any of the

21   constitutional officers which aren't city

22   employees, but I don't recall, you know, getting

Transcript of John D. Moss
Conducted on September 13, 2019                    101

1   their active endorsement.  As a matter of fact,

2   quite to the contrary in 2014.

3       Q. Why do you say that?

4       A. Because they endorsed the person I ran

5   against or was running for the empty seat.

6       Q. Who was the person you ran against?

7       A. Dennis Free.

8       Q. Have you ever held any other position with

9   a city government, whether Virginia Beach or

10  elsewhere?

11      A. When I was living in Germantown, Tennessee

12  I was appointed to the Education Commission, but

13  that Commission didn't have any direct oversight

14  over the Shelby County Schools because Germantown

15  was a city where the county provided schools.  It

16  was just a liaison to the school system there.  I

17  did serve in that capacity.  That was 1995 to

18  19 -- sometime in 1998 when I left for Harvard, so

19  for about a three-year period of time.

20      Q. So very briefly, and slowly for the court

21  reporter's benefit, what are your current policy

22  priorities as a City Council member?

Transcript of John D. Moss
Conducted on September 13, 2019                    102

1        A. No tax and fee increases is number one.

2        Q. What else?

3        A. Two is flooding, meaning flood

4    mitigations, and specifically a bond referendum in

5    2020.

6        Q. What else?

7        A. And to successfully complete our post-May

8    31st shooting facility realignment we have to take

9    place.  We're redoing about $50 million worth of

10   buildings to get everybody back to the main

11   campus.  And that is a priority for me.

12       Q. Would you say changing the city's

13   electoral system to single-member districts is a

14   priority?

15       A. It would be a priority for me, but here is

16   the context.  I support having -- and I have said

17   this and continue to say it -- us having a bond --

18   having a referendum in 2020 and letting the public

19   vote.  I have also said I am not opposed to giving

20   them a choice of the hybrid system and a 10

21   district system.

22            It's not for me to decide as a Council

1    member.  This government belongs to the people,

2    and they shouldn't be denied the right to vote.

3    And when they vote, then we should go to the

4    General Assembly.  And unlike in the past, the

5    General Assembly has to modify our Charter.  And

6    whatever the public decides is what they should

7    do.  This is not my decision to make.  I owe it to

8    the public so they have a right to decide for

9    themselves.  It's their government, not mine.

10        Q. If it were your choice, would you select a

11   single-member district system of election?

12        A. I personally support -- and I said this --

13   you have asked me, so I would -- if the public

14   wants 10, I support the hybrid system that came

15   back -- because I think it represents a balance of

16   competing interests in the community.  And that's

17   a balance against parochialism you can get from a

18   district system.  They have their pluses and

19   minuses.  I think it's the best point of

20   indifference, the need of reflection on the point

21   of the curve, of the political curve so to speak.

22   And that's what I would support.  But I would

Transcript of John D. Moss
Conducted on September 13, 2019                    104

1    respect whatever the public chooses, including

2    retaining the current system should that be their

3    choice.

4         Q. So just to be clear for the record, when

5    you say the hybrid system you're referring to

6    seven single-member districts and four at-large?

7         A. Correct.

8         Q. Do you know how Sabrina Wooten came to run

9    for City Council?

10        A. I do not.

11        Q. Had you ever heard of Sabrina Wooten

12   before she ran for City Council?

13        A. I had not.  She had served on some boards

14   and commissions, but I didn't know her.

15        Q. Do you know anything about how her

16   candidacy for City Council came about?

17        A. What do you mean?  Can you be more

18   specific?  I assume she got 125 signatures and she

19   filed and did that.  I'm sure you're not asking

20   that.

21        Q. No.

22            Do you know anything about who supported

Transcript of John D. Moss
Conducted on September 13, 2019                    105

1    her candidacy as a City Council member?

2       A. I do know her initial campaign manager was

3    Brian Kerwin.  And somewhere in the course of that

4    campaign he was dismissed.

5       Q. Who is -- can you spell that name?

6       A. Brian, B-R-I-A-N, Kerwin, K-E-R-W-I-N.

7    Kerwin.

8       Q. Who is he?

9       A. He's a political consultant.  And I don't,

10   you know -- he's a local figure that's around

11   quite a bit, but he does run campaigns.  That's a

12   profession that he does.  I know that only because

13   it became common knowledge, not because he called

14   me up and said, hey, John, I just got let go or

15   anything like that.

16      Q. Has he helped run any other City Council

17   members' campaigns?

18      A. Oh, yeah.  He's been involved in a number

19   of campaigns.  Now you're going to ask me which

20   ones.  I can't recall.  But he's been involved in

21   a number of Council members' campaigns and people

22   wanting to be on City Council's campaigns.

Transcript of John D. Moss
Conducted on September 13, 2019                    106

1      Q. Can you remember any specific examples?

2      A. I think he's currently supporting Rosemary

3  Wilson's reelection campaign.  I think he worked

4  Shannon Kane's campaign when she was on City

5  Council.  But, really, that would be about --

6  that's all -- not known for a fact but my best

7  understanding.

8      Q. Do you know how Sabrina Wooten hired --

9  came to hire Brian Kerwin?

10     A. No.  I don't really know anything about

11  the workings of her campaign.

12     Q. Okay.  And you mentioned earlier that you

13  did not support her campaign?

14     A. That is correct.

15     Q. Is the only reason why you didn't support

16  her campaign because she got money from Bruce

17  Thompson?

18     A. Well, as I mentioned earlier, to repeat,

19  no matter who was in that race, I was going to be

20  supporting a personal friend, Eric Wray.  But if

21  he had not been in that race, I would not have

22  supported her based on the people who are backing

Transcript of John D. Moss
Conducted on September 13, 2019                    107

1   them.  Principally, Bruce Thompson was an

2   immediate disqualifier for me to support anyone

3   who's being supported by Bruce Thompson.  It's a

4   litmus test.

5       Q. Are you aware of any other City Council

6   candidates or members that supported the campaign

7   of Sabrina Wooten for a City Council seat?

8       A. Tell you the truth, I didn't keep track of

9   any of that.  No.

10      Q. Are you aware whether the Mayor supported

11  the campaign of Sabrina Wooten?

12      A. I know that she was a student of his at

13  one time, but I don't know that he actively --

14  since he was running for Mayor, I think he was

15  trying to -- trying to make sure he wasn't taking

16  sides.  But you can ask him.  I don't recall him

17  or seeing a statement where he had actively

18  endorsed her campaign.  I don't recall that.

19      Q. Do you know how Aaron Rouse came to run

20  for City Council?

21      A. I do not know how he came to run for City

22  Council.  I did meet with him after he decided to

Transcript of John D. Moss
Conducted on September 13, 2019                    108

 1  run for City Council.

 2      Q. I'm sorry?  You did meet with him?

 3      A. Yes, after he was declared he was going to

 4  be -- he was a candidate, I did meet with him.

 5  Correct.

 6      Q. What was that meeting about?

 7      A. I think he was trying to pick my brain, in

 8  part, which I was more than willing to do, just

 9  about races, campaigns in general.  He was asking

10  me, you know, what my priorities were.  I was

11  asking what his priorities were.  And, you know,

12  he's announced he was just looking to have a level

13  playing field.  He also thought that there were

14  voices in the community that weren't being heard

15  on the City Council.

16          You know, he referenced the fact that all

17  the time he lived in Seatack or different

18  communities he never saw any Council members in

19  his neighborhood, and he wanted to be on a Council

20  to go out and reach the people who -- I don't want

21  to say disenfranchised, but who rarely see the

22  faces of political leaders in their neighborhood,

1    and he wanted to give them a voice, and that he

2    was a capitalist, which I love.  And I think he

3    brought a fresh view and, I thought, a youthful

4    face on City Council with a necessary voice on top

5    of Jessica's.

6           And I think also being a member of the

7    African American community, I thought that was

8    another way to increase diversity.  And that's why

9    I ran with John Perry back in 1986.  I supported

10   Eric Wray, who's an African American candidate.

11   I've always thought the Council is always better

12   with diversity.  And I've always looked out and

13   looked for competent people that have the right

14   sense of virtue to seek public office.

15          And I didn't make any commitment at that

16   meeting, but later on I did.  But it was the first

17   meeting we met with his campaign manager -- I

18   can't remember his name -- at a restaurant on

19   Lynnhaven Boulevard -- Parkway -- Lynnhaven Road.

20   I can't recall the name of that either.  That's

21   the first time we met.  We met other times, too,

22   during the course of the campaign, just general

Transcript of John D. Moss
Conducted on September 13, 2019                    110

1    conversation.  And we did a joint thing at Mike

2    Standing's parents' home over in Bay Colony.

3        Q. Had you ever heard of Aaron Rouse before

4    he ran for City Council?

5        A. Only as a Tech football player.  I'm a

6    fellow Hokie.

7        Q. And we've already discussed that you've

8    supported Aaron Rouse's campaign?

9        A. Correct.

10       Q. Are there any other ways that you

11   supported his campaign, that you can think of,

12   that we haven't already talked about?

13       A. No.  I didn't -- I didn't write him -- I

14   don't think I wrote him any check, any money.  I

15   didn't do that.

16       Q. Are you aware whether the Mayor supported

17   the campaign of Aaron Rouse in any way?

18       A. It would seem logical he would have, but I

19   can't consciously say that I know he did.

20       Q. Are you aware of any other City Council

21   candidates or members that supported the campaign

22   of Aaron Rouse?

Transcript of John D. Moss
Conducted on September 13, 2019                    111

1      A. Jessica probably did.  I'm pretty certain

2   Jessica did.  But after that, I wouldn't venture.

3   I don't recall.  I know Jessica did.  I just can't

4   recall anybody else.

5      Q. Have any Latino candidates ever been

6   elected to the City Council?

7      A. No.

8      Q. Besides Ron Villanueva, have any Asian

9   candidates ever been elected to the City Council?

10      A. Not to my knowledge.

11      Q. How long have you lived in Virginia Beach?

12      A. 19 -- maybe even -- '59 or '60.  I came

13   here as a young kid with my dad in the Navy, so it

14   might have been late '59 or early '60s, in that

15   time.  Princess Anne County then, when I lived

16   here.

17         Of course, I didn't live here from March

18   15th, 1995 until I moved back in, I think it was,

19   sometime in 2001, I believe it was, 2001.

20      Q. Would you agree that between 1959 or 1960

21   when you first moved here and today the minority

22   population in Virginia Beach has grown?

Transcript of John D. Moss
Conducted on September 13, 2019                    112

1       A. Demographically, that's a true statement.

2       Q. How would you describe the size of the

3   minority population in Virginia Beach?

4       A. If my memory serves me, the African

5   American community is around 20 percent.  I think

6   that's about right.  I know we have one of the

7   larger -- second largest Filipino American

8   populations in the United States, a large part due

9   to the Navy.  I don't know how big that is.  Maybe

10  5 percent.  I don't know.  I don't know the

11  percentages for that, but I think it's probably in

12  that realm.

13         And, then, probably, after that is --

14  probably, I guess you would call it -- you used

15  the word Latino, I think, probably comes next.  I

16  think the Filipino community might be larger than

17  the Asian Pacific Islander community.  I know they

18  all fit in that category.  But the Filipino

19  community here is quite large.  They're probably

20  27 -- maybe 27 percent of the population as a

21  whole.  That's a guess.

22      Q. Would you agree that minorities tend to

Transcript of John D. Moss
Conducted on September 13, 2019                    113

1    live close to each other in Virginia Beach?

2        A. No.  I would not say that.  There's been

3    several studies, and I can't recount what they

4    were, but I would say that Virginia Beach, if it

5    has any kind of segregation it's economic versus

6    ethnicity or racial.  Our neighborhoods are fairly

7    integrated.

8            In fact, the city got recognized as having

9    some of the most integrated neighborhoods in the

10   United States.  So I think we have -- in large

11   part due to the large segment of our population

12   that is either state, local, or federal government

13   employed, and therefore has a better than average

14   income, causes our neighborhoods to be much more

15   integrated than what you might otherwise see.  So,

16   no, I would not share that conclusion.

17       Q. Which neighborhoods in the city would you

18   classify as predominantly black neighborhoods?

19       A. If you go back to the traditional Doyle

20   Town, Reid Town, those were the communities --

21   when we were doing the Community Block Program

22   back in the '70s, those were neighborhoods that

Transcript of John D. Moss
Conducted on September 13, 2019                    114

1    called -- Seatack -- that were called traditional

2    African American communities, which were free

3    landholders going back some period of time.

4         Over time they, too, have become

5    integrated because of the attractiveness of the

6    location of the land holdings.  Not saying that

7    still they might not be predominantly minorities,

8    but not as much as they were back in the early

9    days of the county only because people sold out or

10   people moved in.  They're attractive places to

11   live.

12        But Seatack probably is the biggest single

13   concentration of traditionally -- in terms of

14   neighborhoods or communities -- it's still

15   predominantly African American -- that hasn't had

16   substantial redevelopment to other races, for

17   instance.

18        So I don't know that I would say that

19   there are dominant places that are -- where there

20   is a majority.  I think there is places where

21   maybe no one is a majority.  But I don't know --

22   other than mentioning those areas, nothing comes

Transcript of John D. Moss
Conducted on September 13, 2019                    115

1    to mind as this is a -- oh.  Take it back.  L&J

2    Gardens is a neighborhood.

3        Q. How do you spell that?

4        A. L&J Gardens.  It's a subdivision that's --

5        Q. How do you spell it?

6        A. L&J, with an and, Gardens.  It's between

7    Wesleyan Drive and Baker Road, Northampton.

8    That's the three roads that bound that

9    neighborhood.  That neighborhood goes back, way

10   back.  That was a traditional neighborhood of

11   professional black businessmen and other kind of

12   professionals, women as well.  And John Perry

13   lived in that neighborhood.  That since, too,

14   has -- people have moved in there.  So that's not

15   now absolutely -- but that was a place back in the

16   day, right on the border of Norfolk, where it was

17   predominantly a single-family home, very nice

18   neighborhood of black professionals.  That's a

19   small neighborhood.  I wouldn't characterize that

20   as a community.  It's a neighborhood.  But I want

21   to be as accurate as I can.

22       Q. Can you think of any neighborhoods in the

1   city that you would classify as predominantly

2   Latino?

3       A. No.

4       Q. Can you think of any neighborhoods in the

5   city you would classify as predominantly Asian?

6       A. No, for the reasons I specified earlier.

7       Q. Following the 2010 census, the City of

8   Virginia Beach redistricted the city's seven

9   residency districts, correct?

10      A. Correct.

11      Q. You were not on the City Council at that

12  time?

13      A. Correct.

14      Q. Were you involved in any way in the

15  redistricting that took place in Virginia Beach

16  following the 2010 census?

17      A. No.

18      Q. Were you involved in the hiring of any

19  consultants to help with redistricting?

20      A. No.

21      Q. Even though you were not on the City

22  Council, did you have any conversations with

1    anyone regarding the redistricting that was going

2    on?

3         A. Not that I can recall.  The people that

4    chaired that, however, was -- Glenn Davis on the

5    City Council and Louis Jones were the two Council

6    liaisons who headed up that effort.  But I was not

7    in communication with them nor anyone else.

8         Q. Do you know who Kimball Brace is?

9         A. Obviously not.  No.

10        Q. You never had any conversations with

11   Kimball Brace?

12        A. I don't recognize the name.  Maybe if I

13   saw a face it might help, but I don't recognize

14   that name.

15        Q. Do you vote in City Council elections?

16        A. I do.

17        Q. In which residency district in Virginia

18   Beach do you currently live?

19        A. I live in the Bayside district.

20        Q. What City Council member currently

21   represents that district?

22        A. Louis Jones.

Transcript of John D. Moss
Conducted on September 13, 2019                    118

1        Q. Have you ever lived in any other residency

2    district in Virginia Beach?

3        A. Yes.

4        Q. Which ones?

5        A. I lived in the Kempsville borough district

6    when I was elected to the Kempsville borough seat,

7    which no longer exists.

8        Q. Was that 1986?

9        A. Yes.  And I lived in the Bayside district

10   as a young adult when I was still living at home

11   going to school.

12       Q. Uh-huh.

13       A. That's the three places I've lived.

14       Q. I think you said Bayside twice, correct?

15       A. Right.

16       Q. Bayside and Kempsville?

17       A. I moved and lived in Thalia, which at that

18   time was the Kempsville borough.  It's now the

19   Lynnhaven borough -- Lynnhaven district.  We got

20   away from boroughs.  But it was Kempsville at the

21   time I lived there.  So I've lived in Bayside,

22   Kempsville, Bayside.

Transcript of John D. Moss
Conducted on September 13, 2019                    119

1      Q. Yep.

2         You have been a vocal supporter to a

3   change to single-member districts in the city for

4   some time, correct?

5      A. Yes.  Going back to the '80s.

6      Q. So when was the first time you can

7   remember supporting a change to a single-member

8   district method of election?

9      A. Right after -- probably in the '89-'90

10  timeframe because, first of all, we had to get the

11  direct election of the Mayor.  That was the first

12  thing we worked on.  Then we went from appointed

13  School Boards to elected School Boards.  And I was

14  an advocate and, I'd call, maybe even the

15  principal architect of making that happen, but

16  getting all these positions elected, and then

17  getting the Mayor as a directly elected versus

18  appointed.  And then, of course, there was the

19  Commission.  But we were pushing for that before

20  then even.

21     Q. So when you say that the first time you

22  supported a change to a single-member district was

Transcript of John D. Moss
Conducted on September 13, 2019                    120

1   1989 and 1990, what particular thing did you do at

2   that time?

3       A. Talk.  You know, it might sound strange,

4   but having a community conversation, trying to

5   build support, make the case.  And, of course, in

6   the 1990 election when Balko didn't win, as I

7   talked about earlier, that -- and the people in

8   that community were extremely disappointed that

9   the person they wanted they didn't get, well, then

10  the Mayor, then Mayor Meyera Oberndorf -- she's

11  deceased -- took it on her own, based on that, to

12  do a Mayor's Commission, which I mentioned

13  earlier, which then led to that first referendum.

14  And I wish I could remember the year of that, but

15  it's escaping me.

16      Q. What kinds of things did you do to talk in

17  support of single-member districts?  Did you hold

18  town halls?  Did you talk about it at City Council

19  meetings?

20      A. I don't recall going -- holding town

21  halls, but anyplace I could get a platform.

22  That's a long time ago.  It seems like now

Transcript of John D. Moss
Conducted on September 13, 2019                    121

1    forever.  But no, I can't recall any specific

2    things that I did.

3        Q. What else have you done to advocate for a

4    change to a single-member district system?

5        A. I can't recall.  And the City Clerk could

6    get it, but we did put -- I don't know what

7    legislative packet.  We did put in a proposal to

8    have -- you know, to have the Charter changed at

9    referendum.  I didn't get the votes of my peers.

10   You'd have to go to the City Clerk to know when

11   that was.  It's been since I've been on City

12   Council this time, since 2011.  I've introduced it

13   maybe twice.  And, of course, you know, at some

14   point when you get no traction, you know, you

15   realize that -- you know, you don't want to be Don

16   Quixote, so you realize that the critical mass is

17   not there.  But hopefully, if all the people who

18   campaigned on it stick to their word, maybe we'll

19   be able to put something on the ballot this

20   November.

21       Q. Who campaigned on it?

22       A. Aaron Rouse did.  He said he would support

Transcript of John D. Moss
Conducted on September 13, 2019                    122

1    it.  So did Ms. Wooten.  She said she would

2    support it.

3        Q. Jessica Abbott?

4        A. Yep.  Well, she has said she would.

5           Bobby Dyer has indicated he could consider

6    it.  I'll put him on the maybe column.  Of course,

7    there is myself.  And I think that's pretty close.

8    I think that -- I think we can get something

9    there.  We've just got to work that coalition.

10   But it's not because we're trying to cure an ill.

11   We're trying to make it -- take money out of the

12   equation so the races -- it's more open to every

13   day citizens to run.  It's all about reducing the

14   influence of money to run an effective campaign.

15           And people want to have their own -- they

16   have their own General Assembly district.  They

17   have their own Congressman.  They want their own

18   Council member that they can hold accountable.

19   And they feel the at-large system precludes them

20   from holding their district Council member

21   accountable.  You hear that a lot from voters who

22   come to town halls and whatnot.

1      Q. Do a lot of voters tell you that they want

2    to change to single-member districts?

3      A. A lot -- I will say the people who show up

4    at town halls or these community meetings, yes,

5    but that's still anecdotal.  I can't make the leap

6    and say it's a large number because that's a

7    statistical judgment.  I can just say --

8    anecdotally, I would say that the people -- the

9    majority of events I go to, that people think at

10   least they should have a chance to choose.  Even

11   if they don't want to change it, they do agree

12   that people have a right the vote to choose if

13   they want to change it.

14     Q. So of the members of the current City

15   Council, you told me that Aaron Rouse, Sabrina

16   Wooten, Jessica Abbott, and yourself support a

17   change to single-member districts, and, then,

18   perhaps Mayor Bob Dyer does.  So if we count that

19   up, that's five --

20     A. A little short.

21     Q. -- of 11?

22     A. A little short.

Transcript of John D. Moss
Conducted on September 13, 2019                                    124

1      Q. So would you say that the majority of the

2    current City Council favors retaining the at-large

3    system?

4      A. No.

5      Q. Why?

6      A. I would just say the majority -- some are

7    in favor, that's clear.  There are some who do not

8    want to change.  They made that clear.  And I

9    respect that.

10     Q. Who?

11     A. Barbara Henley is one.  She's probably the

12   biggest advocate of retaining the current system.

13     Q. What about Rosemary Wilson?

14     A. I think she is, as well.  The others, I

15   think -- sometimes we say good politicians -- have

16   not made a public position except they didn't

17   support my legislative packet change.

18       MR. BOYNTON:  And I do want to be clear

19   that you're testifying as to public positions and

20   not as to legislative secret conversations?

21     A. Correct.  This is just all derived from my

22   public assessment of -- there is no executive

Transcript of John D. Moss
Conducted on September 13, 2019                          125

```
 1    session or anything.  This is all my personal
 2    opinion.
 3         Thank you.
 4      Q. So between 1989 and today, besides talking
 5    in support of a change to single-member districts
 6    and putting forward proposals on the agenda to
 7    change to single-member districts, can you think
 8    of anything else you've done to support --
 9      A. I've spoken with selective members of the
10    legislature in the General Assembly that, you
11    know -- that I'm in support of it.  Not
12    surprisingly -- and I would say the same thing.
13    They said, well, if that's what the Council
14    majority or the public says they want, then, you
15    know, we'll support it.  I wasn't asking them to
16    do otherwise.  I was just letting them know what
17    my position was.  And I would say they are
18    apolitical on the question, rightfully so.
19      Q. Uh-huh.
20      A. It's up to the people to decide.  If
21    you're asking me have I spoken with people, I have
22    just to let them know I'm out there working the
```

Transcript of John D. Moss
Conducted on September 13, 2019                    126

1    system, so to speak, to get -- you know, to get
2    this on a referendum as something that I think
3    deserves to be out there for the public to choose.
4         Q. Who in the General Assembly?
5         A. I've spoken with Delegate Knight.
6         Q. Can you spell that?
7         A. K-N-I-G-H-T, like in the Knights of the
8    Roundtable.
9         Q. Uh-huh.
10        A. And Senator Bill DeSteph.  That's D-E,
11   then a capital S, T-E-P-H.  And I'm trying to
12   think of who else I might have spoken with.
13        Delegate Fowler, one conversation.  But
14   principally it's been -- and Jason Miyares.  He's
15   a Delegate.
16        Q. Can you spell that?
17        A. Help me here.
18        MR. BOYNTON:  M-I-Y-A-R-E-S.
19        A. Thank you very much.
20        Q. Thank you.
21        Do you say the same general things?
22        A. Yeah.  I'm just giving them heads up, hey,

Transcript of John D. Moss
Conducted on September 13, 2019          127

```
 1    I'm working this.  And I expect for them to say,
 2    hey, well, if you can build a majority on Council,
 3    if the public says this is what they want they
 4    will support it, but, rightfully so, they're not
 5    going to inject or impose their will on the
 6    public.  I just want to let them know it's
 7    something that we're working.  Just a friendly
 8    conversation.
 9        Q. So you'd agree that you've been advocating
10    for a change to single-member districts since
11    about 1989?
12        A. Yes.
13        Q. Yet, the city still utilizes an at-large
14    method of election for City Council, correct?
15        A. Correct.
16        Q. Would you agree that minority groups in
17    Virginia Beach have expressed support for a change
18    to a single-member district system?
19        A. I can say that minorities have.  But to
20    say that minorities as a collective have, I can't
21    say that I have proof of that.  When someone comes
22    up, I'm speaking for the somebody's community, and
```

Transcript of John D. Moss
Conducted on September 13, 2019                    128

1    they're just saying that, well, what proof do they

2    have?  You know, they don't provide you any

3    statistical polling.  They don't have some

4    resolution from some group adopted.

5          So I do believe there are minorities that

6    have come and told us that the system would work,

7    but I don't know what the minority community

8    that's defined demographically thinks.

9      Q. When you say that there are minorities

10   that have come and told you they support a change

11   to a single-member district system, what do you

12   mean?

13     A. Well, they came before City Council.

14   There is -- Andrew Jackson has come and spoken to

15   the City Council directly.  The gentleman who --

16   gosh.  He just left Cox Cable not too long ago.

17   He ran for the state Senate against Wagner.  I can

18   see his face.  A tall, thin gentleman.  I can't

19   think of his name.  I'm terrible about names; good

20   about faces.  He came and spoke.  Some people came

21   out and spoke and said exactly what they wanted.

22   And specifically, they said they wanted the 10

Transcript of John D. Moss
Conducted on September 13, 2019                    129

1    district system.  And they spoke at City Council

2    and expressed that.

3         I haven't heard anyone come forward from

4    the Filipino community and say that.  I haven't

5    heard anyone who declared that they were the

6    Latino community and say that.  And I haven't

7    heard someone say I'm the Asian Pacific Islander

8    community and that's what I said.  So I don't know

9    what the community that would be considered

10   demographic minority speaking as a group thinks.

11   But I do know people have come up to us and say --

12   from their people and saying I represent this

13   group, the NAACP, or the African American

14   Coalition Group.  But I don't know that they

15   necessarily represent the body demographically

16   that would be considered a minority group.

17   That's -- I'm not trying to parse words.  I just

18   can't say what the minorities think because we

19   have very integrated neighborhoods.

20     Q. I'm not asking you to --

21        MR. BOYNTON:  I think she's got it on that

22   one.  Next question.

Transcript of John D. Moss
Conducted on September 13, 2019                    130

1      Q. Were you around for the 2001

2  redistricting?

3      A. Was I here?  Yes.  1995 -- no.  I was not.

4  I had to go back and pop in the dates.  No.

5      Q. Is improving the diversity among the City

6  Council members in Virginia Beach a reason why

7  you'd support a change to a single-member district

8  system?

9      A. That was not the reason.

10     Q. Is it a reason?

11     A. It is an outcome possibly, but that was

12  not my reason.

13     Q. Is it a possible outcome that you would

14  support?

15     A. I support always the choice of the voters.

16  It's the voters' choice, not mine.

17     Q. Is providing minority voters an

18  opportunity to elect candidates of their choice a

19  reason why you support a change to a single-member

20  district system?

21     A. I support increasing the competition of

22  any group, majority or minority, to effectively be

1    able to run for Council.

2        Q. Besides what we've already discussed

3    today, any other reasons why you support a change

4    to a single-member district system?

5        A. No.  I think I've expressed that pretty

6    clearly.

7        Q. Besides what we've already talked about

8    today, do you think the current at-large method of

9    election is unfair in any way?

10       A. Personally, yes.  I think it

11   disenfranchises the people's ability to run for

12   office and be a competitive candidate, and it

13   denies the public a better spectrum of choices of

14   whom they can elect.

15       Q. Why?

16       A. Because I had mentioned earlier, to run

17   at-large across the whole city requires tremendous

18   financial resources, for the most part, to be

19   effective, and, therefore, it -- the need for

20   money reduces the competitive -- reduces

21   competition and reduces choice to the voters.

22       Q. Does the city's at-large election system

Transcript of John D. Moss
Conducted on September 13, 2019                                    132

1    reduce voter turnout?

2        A. There is no evidence of that, that I'm

3    aware of.

4        Q. Does the city's at-large election system

5    reduce voter turnout among minority voters?

6        A. I am not in possession of any information

7    that would suggest that.

8            MS. HARLESS:  Let's mark Exhibit 2.

9                       (Exhibit 2 was marked and

10                       attached to the transcript.)

11       Q. Mr. Moss, the court reporter has just

12   handed you what was marked as Exhibit 2.  Have you

13   seen this document before?

14       A. I'm sure I've read this newspaper article

15   before.  I don't recall specifically, you know,

16   when I read it, but I'm a pretty good reader of

17   the newspaper.

18       Q. And this article is dated October 2nd,

19   2018, correct?

20       A. October 2nd, 2018.  That is correct.

21       Q. And the title of the article is 2 Virginia

22   Beach Council members want to change the city's

Transcript of John D. Moss
Conducted on September 13, 2019                    133

1    election system, correct?

2        A. Right.

3        Q. You were one of the two Council members

4    who wanted to change the city's election system,

5    correct?

6        A. Correct.

7        Q. I'd like you to turn to page 4 of this

8    article.  The paragraph at the very top of the

9    page says, "Six years ago Moss and state Senator

10   Bill DeSteph, a former Councilman, made a similar

11   effort to end at-large voting districts but

12   couldn't persuade most Council members to get on

13   board."

14       A. Yep.  I told you I put something forth a

15   couple of times.

16       Q. What, specifically, is this referring to

17   that you and Senator Bill DeSteph made an effort?

18       A. Bill DeSteph had been on City Council at

19   one time.  You may not know -- I believe we -- as

20   a matter of fact, remember the times I told you in

21   our legislative package we made a proposal to make

22   a change?  I think this is one of those events.  I

Transcript of John D. Moss
Conducted on September 13, 2019                134

```
1    couldn't remember all of them.  But we did, and we
2    weren't successful.  He was a former Council
3    member.
4        Q. Uh-huh.
5        A. That's when we did that.  We were not
6    successful in doing so.  That is correct.
7        Q. And you don't remember what year that was?
8        A. No.  That would have been after 2011 when
9    I got back on City Council.  But I can't tell you
10   if it was 2012 -- it would have to be '12 or later
11   because I took office in November of 2011 in a
12   special election.  And our legislative package
13   would have been completed.  So unless I tried to
14   push something before Christmas, which we could
15   have, it was 2012.
16       MR. BOYNTON:  Again, a lot of words.  I
17   think you think out loud.  And she's having to
18   transcribe all of it, so --
19       Q. Just slow down.  It's okay.  Just slow it
20   down.
21       If we go two paragraphs below that one on
22   this Exhibit 2, there is a quote from you.  Do you
```

Transcript of John D. Moss
Conducted on September 13, 2019                    135

1    see that?

2         A. I do.

3         Q. Could you read that into the record,

4    please?

5         A. "It creates a scale that enables

6    grassroots campaigning and fosters competition, he

7    said.  The city's geography of 250-plus square

8    miles disproportionately empowers monied special

9    interests' influence on the voters' choices and

10   election outcomes."

11        Q. When it says "It creates a scale that

12   enables grassroots campaigning and fosters

13   competition", you're referring to single-member

14   districts?

15        A. Correct.

16        Q. You'd still agree with this statement,

17   correct?

18        A. Absolutely.  And I believe I have restated

19   this in my deposition.

20        Q. Uh-huh.

21           Would you agree that the city's current

22   at-large system makes it difficult for minority

Transcript of John D. Moss
Conducted on September 13, 2019                            136

```
1    voters to elect candidates they prefer to the City
2    Council?
3        A. I think it makes it difficult for any
4    voters to get a better choice.  I don't know that
5    I would concur with the statement that you made.
6        Q. All right.  You can put that one to the
7    side.
8            MR. BOYNTON:  She gets the sticker ones
9    back.
10       A. This is not a sticker one.
11           MR. BOYNTON:  It is at the bottom.
12           MS. HARLESS:  We're going to mark this as
13   Exhibit 3.  And it's very big.  So there are tabs
14   on the pages you'll need to turn to.
15                         (Exhibit 3 was marked and
16                          attached to the transcript.)
17           MR. BOYNTON:  Going to the first tab?
18       Q. I have just handed you what's been marked
19   as Exhibit 3 by the court reporter.  I'm going to
20   represent to you this is a subpoena that was sent
21   to Council Member Jessica Abbott by the plaintiffs
22   in this case, similar to the one that was sent to
```

1    you.  And the documents attached here were

2    produced by Council Member Abbott in response to

3    that subpoena.  Does that make sense?

4        A. That's what it says, yes.

5        Q. So I'd like you to turn to the first tab,

6    tabbed page, in this document, which is page 26 of

7    the document.

8            MR. BOYNTON:  The pages aren't numbered.

9    So let the record reflect we are referring to a

10   September 28, 2018 letter from David L. Hansen to

11   Honorable Louis R. Jones, Mayor, and members of

12   Council.

13           MS. HARLESS:  And we were just going to

14   get into that.

15           MR. BOYNTON:  Sorry.

16           MS. HARLESS:  Unfortunately, when Council

17   Member Abbott produced this there were no page

18   numbers, so I tried to tab it to be helpful.

19           MR. BOYNTON:  I was just trying to keep it

20   straight.

21       Q. Have you seen this document before?

22       A. Yes.  I would have seen this at the time,

1    correct.

2        Q. And you'd agree that it is just what your

3    counsel stated on the record?

4        A. Yes.

5        Q. Generally, what is a General Assembly

6    session legislative agenda?

7        A. Annually the Council, through a public

8    participation process, puts forth a set of

9    proposals that we would like the General Assembly

10   to consider and pass that would benefit the City

11   of Virginia Beach and its residents.  And it's

12   adopted subsequent to a public hearing and by a

13   majority vote.  But prior to that, obviously,

14   individual Council members can put things in here,

15   but that's because it's proposed.  They don't

16   necessarily make the final vote.  They're not

17   included in the actual package that goes to the

18   General Assembly.

19       Q. So I'd like you to look at the first

20   sentence of the letter from Mr. Hansen.  And in

21   that he -- Mr. Hansen wrote that this was a draft

22   of the 2019 General Assembly Session Legislative

1    Agenda, correct?

2        A. Correct.  That would be the process.

3        Q. Do you remember if the Council actually

4    voted on the Legislative Agenda on October 2nd,

5    2018?

6        A. We did have a vote on that day.  I assume

7    that's the day we voted.  I can't remember if we

8    deferred it or not.  It would be in the month of

9    October that we normally would adopt it.  I cannot

10   recall -- sometimes we do deferrals.  And it might

11   have been adopted later.  But I do recall that we

12   did adopt a legislative package in October.  I

13   don't know that we actually did it on the 2nd.

14       Q. Okay.  And I'd like you to look at the

15   second proposed agenda item.  And this is an

16   agenda item proposed by you and Council Member

17   Abbott to have an amendment to the City Charter to

18   change the seven residency districts to seven

19   single-member districts, correct?

20       A. Correct.

21       Q. Was the amendment to change to seven

22   single-member districts added to the 2019 General

1  Assembly Session Legislative Agenda that was

2  ultimately passed by the City Council?

3      A. It was not adopted by a majority of the

4  City Council.

5      Q. Why not?

6      A. Well, I can't speak for whether people who

7  voted no or not to include it, but they judged it

8  to be not in the best interest of the city is all

9  I can judge -- convey.  But I don't know their

10  specific reasons.

11      Q. Since asking to place this item on the

12  2019 General Assembly Legislative Agenda, have you

13  done anything else to follow up on this request?

14      A. We've -- if I remember right, we did talk

15  about it at the February retreat.  It was a topic

16  of discussion.  But no direction was provided or

17  guidance, but it was a topic of discussion.  But I

18  can't say that I've done anything -- we did not

19  put forth a proposal in the legislative package

20  this year to do this because no one sponsored

21  something to go forward, and so it's not a part of

22  this year's package thus far.

Transcript of John D. Moss
Conducted on September 13, 2019                    141

1       Q. When you say you talked about the

2    single-member district issue at the February

3    retreat, what do you mean?

4       A. Talking about the need to change the

5    manner in which Council should be elected.  It's

6    come up in a couple of formal sessions.  I can't

7    tell you which ones because I don't remember.

8    There have always been people representing their

9    views.

10           We talked about having a referendum in

11   2020 and -- at one of those meetings.  And some

12   people expressed, well, if they're going to do

13   that we have to have this, you know, huge

14   education campaign so people know what they're

15   going to do.  But that's the extent of it.  Once

16   again, no direction, no consensus; just dialogue.

17      Q. Can you remember anything else that was

18   said about it?

19      A. No.

20           MR. BOYNTON:  Public sessions you're

21   referring to?

22      A. Yeah.  These are all public sessions.

Transcript of John D. Moss
Conducted on September 13, 2019                    142

1   Workshop sessions are informal sessions, nothing

2   closed.  These are just -- if you went back and

3   looked at the proceedings on video, you can see --

4        MR. BOYNTON:  The reason I'm asking for a

5   clarification is because to the extent they were

6   private conversations that would implicate

7   legislative privilege.

8        A. Okay.

9        Q. So --

10       A. These are public, in a big public setting

11  where the public could be present.

12       Q. That's --

13       MR. BOYNTON:  I'm not trying to --

14       MS. HARLESS:  No.  No.

15       Q. Is the retreat considered public?

16       A. It is public.  The citizens come to it.

17  It's not televised.  And it wasn't recorded.

18  There is not transcripts maintained of it.  But

19  the public can attend.

20       Q. Is there anything else you remember from

21  the retreat?

22       A. No.

Transcript of John D. Moss
Conducted on September 13, 2019                    143

```
 1        Q. Okay.

 2        A. I'm just trying to be as complete as I

 3   can.

 4        Q. Was there a public hearing about the

 5   proposed items for the 2019 Legislative Session

 6   Agenda?

 7        A. Yes.  There is a public hearing.

 8        Q. Were you at that public hearing?

 9        A. I was.

10        Q. Do you remember if it was only in October

11   2018?

12        A. It was.  I just can't recall -- we would

13   have held a hearing independent of whether or not

14   we voted.  I just can't recall if we deferred it

15   or did something.  That's why I say I don't know

16   that we voted on the 2nd.  But if that was the

17   date for the public hearing, we would have had the

18   public hearing on the adoption date, I think.  The

19   City Clerk can confirm that.

20        Q. Okay.  Are there usually transcripts of

21   public hearings?

22        A. You have to ask the City Clerk.  I know
```

Transcript of John D. Moss
Conducted on September 13, 2019                          144

1    they keep minutes, but I think -- unless it's

2    transcripts expressly requested, I don't know that

3    they keep a word-for-word transcript.  The City

4    Clerk would have to answer that question.

5        Q. Was the proposed amendment to change to

6    seven single-member districts discussed at the

7    public hearing?

8        A. I can't recall what the speakers said.  I

9    can't recall.

10        Q. Have you personally taken any action on

11    the proposed agenda item of a change to

12    single-member districts since the Council voted on

13    the 2019 Legislative Agenda?

14        A. Other than just general discussions, which

15    I referenced earlier I participated in, I have not

16    been out actively in the community advancing this

17    as an issue.  I've been consumed with addressing

18    the flooding problem.

19        Q. So you've been focusing on other issues?

20        A. Correct.

21        Q. Would that be fair?

22        A. Correct.

Transcript of John D. Moss
Conducted on September 13, 2019                    145

1        Q. Why did you propose to make seven of the

2    seats single-member districts but keep three

3    at-large?

4        A. Well, four at-large --

5        Q. Four at-large?

6        A. -- including the Mayor.  As I mentioned

7    earlier, I believe there is an -- all district

8    systems tend to -- not unlike the House of

9    Representatives, they tend to promote more vote

10   trading which, generally, has the impact of

11   increasing the size and the expense of government

12   because everybody is trying to get something in

13   their district, you know, to take back the bacon

14   so to speak.  So there is that aspect.  So they

15   tend to be -- have a trend to spend more.

16        In order to -- then there is a balance

17   that that's, like, the Senate -- people looking at

18   the broader interest of the city and looking at

19   larger fiscal issues and understand the bigger

20   consequences.  So that's one of the reasons why I

21   think that having a hybrid system is better.

22        Secondly, district people tend to get

Transcript of John D. Moss
Conducted on September 13, 2019                    146

1    recognized for advancing their district interest

2    because now they're exclusively accountable just

3    to that district, just like the Congressmen are.

4    But there are issues that are bigger for the

5    bigger at-large city that need advocacy, as well,

6    not unlike the U.S. Senate, someone who's speaking

7    for the state as a whole.  And the at-large system

8    provides that voice also to be heard.  And you

9    need the competition between the larger macro as

10   the city and the more parochial issues of

11   districts.  That's, also, a type of competition.

12   And competition always, generally, benefits the

13   public.

14         So while single districts promotes

15   competition in a different way, you need to

16   balance that out so at the end, like a balanced

17   portfolio, you get the optimal decision-making and

18   ultimately the best public interest calculus comes

19   out.

20      Q. This proposal would have called for the

21   seven single-member districts to be in place for

22   the next round of redistricting, correct?

1        A. Correct.

2        Q. All right.  I'd like you to turn to page

3     29 of this document, which I will represent to you

4     is the second tab.  This is a document that was

5     produced by Council Member Jessica Abbott.  It

6     starts with two paragraphs of bolded text at the

7     top and is a written summary by Council Member

8     Abbott of her top priorities for the 2019 Council

9     retreat.  Would you like a second to read through?

10       A. I've read that second paragraph.

11       Q. The whole document.

12       A. The whole document?

13       MR. BOYNTON:  She has many, many pages

14    here of that.

15          Is there a part you'd like him to focus

16    on?

17       Q. I'd like you to read -- I want you to

18    focus on the next page, the very bottom of the

19    next page.  That, also, goes on to page 31.  I'm

20    looking at the very bottom down there.  It's a

21    paragraph that starts, "I favor a district voting

22    approach..."  Do you see that?

Transcript of John D. Moss
Conducted on September 13, 2019                              148

1        A. I do.

2           MR. BOYNTON:  So review that.

3        A. Okay.

4        Q. So in that first part Ms. Abbott writes

5    that she favors a district voting approach and the

6    redistricting of 10 voting districts through the

7    City of Virginia Beach to singularly elect their

8    district representative and the Mayor to be

9    elected at large.

10          Would you also support a proposal of 10

11   single-member districts?

12       A. As I stated earlier in my deposition, I

13   would favor both questions being asking, asking

14   the public do they choose to have a hybrid system

15   or would they prefer to go to 10 district systems.

16   And I would accept the judgment of the public.

17   But I would be an advocate for the hybrid system.

18   But ultimately it's a choice of the public to

19   make, and I would respect that choice.

20       Q. Would you oppose -- if the public

21   supported a 10 single-member district system,

22   would you oppose it?

Transcript of John D. Moss
Conducted on September 13, 2019                    149

1        A. As I just stated, if the public in a

2    referendum votes in the majority that this is the

3    system they want, I'm a voice of the public, not

4    my own voice, and I would be a strong advocate for

5    the voters' choice.

6        Q. All right.  In the next sentence

7    Ms. Abbott writes, "District elections give

8    geographically concentrated groups of voters a

9    better chance of being represented."

10        Do you see that?

11        A. Yes, I do.

12        Q. Would you agree with that statement?

13        A. I would rephrase that to say that it gives

14    the people who live in that district a better

15    ability to hold them accountable.  That's not the

16    same thing as they will be more responsive, but

17    they can hold them accountable.

18        Q. So the sentence says, "District elections

19    give geographically concentrated groups of voters

20    a better chance of being represented."

21        A. I think --

22        Q. It doesn't say anything about --

Transcript of John D. Moss
Conducted on September 13, 2019                          150

```
 1          MR. BOYNTON:  You said "therefore being
 2    more responsive."
 3          MS. HARLESS:  No.  No.  You're looking at
 4    a different sentence.
 5          MR. BOYNTON:  I'm sorry.
 6       Q. I'm looking at the very next sentence
 7    following the one we just discussed.  It's on the
 8    bottom of the page.
 9       A. "Being represented."  I would concur with
10    that.  I'm sorry.  I thought you said in
11    responsive.
12       Q. So just for the record, just to get the
13    record straight, the sentence says, "District
14    elections give geographically concentrated groups
15    of voters a better chance of being represented."
16       A. That is correct.
17       Q. And you'd agree with that?
18       A. I would.
19       Q. Okay.  Now, let's turn to the next page.
20    And I'm looking two sentences down that starts "I
21    believe that incumbents..."  Do you see that?
22       A. I do.
```

Transcript of John D. Moss
Conducted on September 13, 2019                    151

1      Q. Ms. Abbott states, "I believe that

2  incumbents would find themselves to be less

3  insulated from the competition of challengers

4  because it is easier and less costly to run a

5  grassroots campaign in a district consisting of

6  roughly 30,000 neighbors rather than 300,000

7  voters in the largest city of Virginia."  Would

8  you agree with that?

9      A. I think that's a truism.  Yes.

10     Q. Now, further down in the paragraph in the

11 sentence that starts most U.S. -- "Most large U.S.

12 cities..."  Do you see that?

13     A. Uh-huh.

14     Q. Ms. Abbott writes, "Most large U.S. cities

15 with populations over 200,000 people use district

16 voting, and our outdated hybrid system should be

17 modernized to reflect the current needs of our

18 city and its citizens."  Do you agree with that

19 statement?

20     A. I don't know that to be factually true.

21 There is no footnote.  Relative to most large

22 cities, I don't know what the universe of large

1    cities is.  And I don't know if that's 10 large

2    cities, 50, that "most" defines.  So I can't

3    concur with the accuracy because it's not

4    footnoted as to the source of it.

5        Q. Okay.

6        A. And furthermore --

7            MR. BOYNTON:  Continue if you want.

8    That's fine.  I just --

9        Q. Would you agree that the city's current

10   hybrid system is outdated?

11       A. If you say the current system is outdated,

12   but you cannot extrapolate that to mean that if

13   you went to seven district systems it would be

14   outdated.  So if you said the current system, the

15   answer would be yes.

16       Q. So all I'm asking is would you agree that

17   the city's current hybrid system is outdated?

18       A. All at-large voting, correct.

19       Q. Do you think the city's current hybrid

20   system is unusual in any way?

21       A. Oh, it's extremely unusual.

22       Q. Why?

Transcript of John D. Moss
Conducted on September 13, 2019                    153

1        A. Well, if I remember correctly, it had to

2    be validated by a Supreme Court decision, if I

3    remember correctly, when it was first put together

4    of the borough district systems.  And it's kind of

5    unusual in that regard.  It's very unique.  But it

6    goes back.  If you look at the history of the city

7    at the time, it's certainly self-explanatory as to

8    why we had that system to start with.  But I don't

9    know you want to go into a history lesson here,

10   but, if you do, I'm happy to share it.

11       Q. I'm more interested in why you think the

12   system is unusual.

13       A. Well, it's unusual because it represents

14   what was necessary at the time of the merger of

15   the City of Virginia Beach with the County of

16   Princess Anne, to get something that both the

17   agricultural lawyers and the city could live with

18   and accept to create the merger.  So it's in the

19   context of its conception that makes it unusual.

20   And without that understanding, you wouldn't know

21   how it ever got to be.  But it is the uniqueness

22   of how the little resort strip and the county came

Transcript of John D. Moss
Conducted on September 13, 2019                               154

1    to be one big city that makes it unique.  And

2    those circumstances haven't been replicated

3    elsewhere.  And so that's why it's an unusual

4    situation.

5        Q. Do you know of any other cities that have

6    a system similar to Virginia Beach's?

7        A. I do not.

8        Q. All right.  I'd like you to turn to page

9    71 of this, which I will represent is the third

10   tabbed page here.

11       MR. BOYNTON:  And just, may I -- just put

12   some context.

13       MS. HARLESS:  I am about to.

14       MR. BOYNTON:  Thanks.

15       Q. It's actually that page, the page with the

16   tab on.  He was looking at it.  You were looking

17   at the other page.

18       I'm directing you to the very bottom of

19   the page where there is bolded text.  And it says

20   "December 9th, 2017 - Data from Contested District

21   Seat Elections in Virginia Beach and Norfolk Since

22   2008."  Do you see that?

Transcript of John D. Moss
Conducted on September 13, 2019                    155

1          A. Uh-huh.  I do.

2          Q. If you turn the page, this continues.  And

3      there is an image and a link to a Facebook post by

4      Jessica Abbott.  Do you see that?

5          A. I do.

6          Q. Underneath the link the text states, "Last

7      week, a lawsuit was filed against the City of

8      Virginia Beach regarding violations of the Voting

9      Rights Act.  The lawsuit makes the argument that

10     the city dilutes minority voting strength on the

11     Virginia Beach City Council from an at-large

12     voting system."  Do you see that one?

13         A. Uh-huh.

14         Q. And one paragraph below Ms. Abbott writes,

15     "I support much of what this lawsuit seeks to

16     accomplish."

17              Do you also support much of what the

18     plaintiffs' lawsuit in this case seeks to

19     accomplish?

20         A. No.

21         Q. Why?

22         A. Because I think this choice belongs to the

Transcript of John D. Moss
Conducted on September 13, 2019                     156

1    voters to decide in a referendum and shouldn't be

2    adjudicated in a court of law.

3        Q. And the next paragraph Ms. Abbott states

4    that "The only requirement to serve in a district

5    seat is residency.  It is entirely possible for a

6    candidate to lose their own district but win

7    elsewhere in the city and still get elected."

8        A. Yes.

9        Q. I know we've discussed this earlier.  You

10   would agree with that statement, correct?

11       A. Correct.  It's happened -- in 2018 it also

12   happened.  Louis Jones lost his district but won

13   citywide.  David Nygaard ultimately disqualified,

14   lost -- won his district.  And John Uhrin, who was

15   the incumbent, won his district but lost citywide.

16   So you had both situations take place.  And that

17   was in the most recent Council election.

18       Q. That also happened to Al Balko?

19       A. Yes.  And that was back in 1990.

20       Q. Can you think of any other examples?

21       A. Those are the only ones I can recall.

22       Q. Jessica Abbott endorsed your campaign for

Transcript of John D. Moss
Conducted on September 13, 2019                              157

1    City Council?

2        A. Correct.

3        Q. Besides what we've discussed already

4    today, have you had any conversations with any

5    current City Council members about changing to a

6    district-based, rather than at-large, election

7    system for City Council seats?

8        A. I am certain at times and dates that I

9    cannot specify that Jessica and I have had

10   conversations.  And I might have had some with

11   Rouse.  This is -- you know, it could have come up

12   at a social event, anywhere.  It's just not in

13   a -- in a casual sense, not like, oh, let's have a

14   meeting and sit down and talk about this.  In the

15   course of other conversations it could come up,

16   but I couldn't tell you when or what places.

17          MR. BOYNTON:  Again, because we're getting

18   into the more private nature of conversations,

19   identify who you're talking with but don't get

20   into the content of the conversation.

21       A. It would be most likely Jessica, and

22   probably Aaron.  Probably not the others.

Transcript of John D. Moss
Conducted on September 13, 2019                    158

1        Q. Were any of those conversations outside of

2    the context of closed City Council meetings?

3        A. Oh.  Well, yes.

4        Q. Do you remember any of them specifically?

5        A. Well, this gets back to the one-on-one

6    conversations.  I'm not qualified --

7            MR. BOYNTON:  You can say the context of

8    the conversation.  But our position is they're

9    private conversations.  They don't have to be

10   physically in the halls of government to be

11   protected by legislative privilege.  You can

12   answer the question as to who you had the

13   conversations with and where they were.

14       A. I'm sure the context was about do you

15   think we can get the votes to have a referendum in

16   2020.  I'm sure they're in that nature.

17           MR. BOYNTON:  Again, you're asking content

18   as opposed to --

19       A. All I can say, the general nature was

20   about that issue.

21       Q. Are you following your counsel's

22   instructions and you're not waiving the

1   legislative privilege?

2       A. I'm not waiving legislative privilege, no.

3       Q. Besides what we've already discussed

4   today, have you had any conversations with any

5   former City Council members about changing to a

6   district-based --

7       A. No.

8       Q. -- rather than at-large system?

9       A. No.

10      Q. Besides what we've already discussed

11  today, have you had any conversations with the

12  current Mayor of Virginia Beach about changing to

13  a district-based, rather than at-large, election

14  system?

15      A. Nothing that wouldn't be covered by

16  legislative privilege, no.

17      Q. Besides what we've already discussed

18  today, have you had any conversations with any

19  former Mayor of Virginia Beach about changing to a

20  district-based election system?

21      A. No.

22      Q. Why do you laugh?

Transcript of John D. Moss
Conducted on September 13, 2019                    160

1      A. Just Mayor Sessoms and I had very few

2  conversations.

3      Q. Besides what we've discussed already

4  today, have you had any conversations with anyone

5  else about changing to a district-based, rather

6  than at-large, election system for City Council

7  seats?

8      A. Not that I can recall.  It's not a hot

9  topic.

10      Q. Have you done any interviews with

11  reporters before about it?

12      A. Obviously, I did those interviews

13  (indicating).  But we've talked about it.  If I

14  did, they would be reported.  You're asking me can

15  I recall them.  No.  I get asked lots of

16  questions, but I can't recall.  I'm not trying to

17  be evasive.  I just can't remember.

18      Q. Do you ever talk to constituents about it?

19      A. If they ask.  It's not something that

20  would stick in my brain and say, oh, on this day I

21  spoke with so and so.  But if someone asks me

22  about it, would I be responsive?  Yes.  But do I

Transcript of John D. Moss
Conducted on September 13, 2019                    161

```
1    have a recollection of those?  No.  But I do tell
2    them the position which I've shared here.
3        Q. Uh-huh.
4           And just to be clear, there have been two
5    referendums in the city's past on the change to a
6    single-member district system?
7        A. One took place when I was not here, so I
8    don't have the -- that's what -- the outcome.  One
9    was yes and one was no.  You'd have to go back to
10   the City Clerk to get those results.
11       Q. What was the referendum that took place
12   when you weren't there?
13       A. That would be the one that was no.
14       Q. Which year?
15       A. You're going to have to go to the City
16   Clerk and ask.  I just don't recall.  But I know
17   there was a second one.  And it's often mentioned
18   by the other side when it comes up.
19       Q. What do you mean, mentioned by the other
20   side?
21       A. People talk about, hey, people said they
22   wanted it.  And, then, people on the other side
```

1    who don't support it say, oh, yes, but remember we

2    had another referendum and the people said they

3    wanted to keep the current system.  So there are

4    two different answers at two different points in

5    time.  In the end, it's the public's choice,

6    right?

7         Q. All right.

8         MS. HARLESS:  We're going to mark another

9    exhibit.  I believe this is Exhibit 4.

10                        (Exhibit 4 was marked and

11                         attached to the transcript.)

12        Q. Mr. Moss, you've just been handed what was

13   marked Exhibit 4 by the court reporter.  Similar

14   to the document we just looked at or the set of

15   documents we just looked at, I'm going to

16   represent to you that this is a subpoena that was

17   sent to Council Member Jim Wood by the plaintiffs

18   in -- I guess is he a Council member or Vice Mayor

19   or both?

20        A. Vice Mayor.

21        MR. BOYNTON:  Presently Vice Mayor.

22        Q. I'll represent to you this is a subpoena

Transcript of John D. Moss
Conducted on September 13, 2019                                        163

1     that was sent to Vice Mayor Jim Wood by the

2     plaintiffs in this case, similar to the one that

3     was sent to you.  And the documents attached here

4     were produced by Vice Mayor Wood in response to

5     that subpoena.

6            And I'd like you to turn to page 10 of

7     this document.  And at the top this document has

8     James Wood's official city letterhead.  And it's

9     dated June 25th, 2019.  Do you see that?

10         A. Uh-huh.

11         Q. And the subject line says response to

12    subpoena, correct?

13         A. Uh-huh.  That's what it says.

14            MR. BOYNTON:  Yes or no?

15         A. Yes.

16         Q. So I'd like you to turn to page 3.  There

17    is numbered pages at the top of this document.

18    And I want you to look at the numbered category

19    15.  This document production request reads,

20    "Provide any and all documents, communications,

21    and things related to allegations of racial

22    appeals or racist incidents in political campaigns

1    in Virginia Beach from January 1st, 2000 to the

2    present."

3            Mr. Wood's response says, "See Attachment

4    A."  Correct?

5        A. It does say "See Attachment A."

6        Q. Turn three pages in this document.  Do you

7    see Attachment A?

8        A. Uh-huh.

9            MR. BOYNTON:  Well, read the Attachment A

10   part before you get to the document.

11       Q. The text on the page says, "Screenshot of

12   a text message where a candidate reported to me

13   that poll workers for another candidate were

14   handing out different color handouts depending

15   upon the race of the person they encountered at

16   the polling place."

17       A. I do read that.

18       Q. Do you see that?

19       A. I do.

20       Q. Were the poll workers referenced there

21   working for your campaign?

22       A. Which poll workers?

Transcript of John D. Moss
Conducted on September 13, 2019                     165

1          MR. BOYNTON:  Let him review the document
2    first before --
3       A. Is there names?
4       Q. I'm talking about the comment here
5    (indicating).
6          MR. BOYNTON:  How would he know?
7       A. How would I know poll workers?  I don't
8    know who that is.
9       Q. You can answer the question.
10          MR. BOYNTON:  I think it requires him to
11    look at the document that is the Attachment A.
12    And I object to the question until he has reviewed
13    the document.
14          MS. HARLESS:  He's welcome to look at any
15    pages of this document and answer the question.
16    No one has told him he can't.
17          MR. BOYNTON:  Why don't you review the
18    actual Attachment A before you answer the
19    question?
20       A. Can I ask a question?  I hope.  Can you
21    define who are the universal poll workers and who
22    is the universe for another candidate?

Transcript of John D. Moss
Conducted on September 13, 2019                               166

1          Q. So I didn't write this.  Jim Wood wrote

2     this.

3          A. Okay.  Well, I can't answer the question

4     because I don't know who the poll workers are and

5     I don't know who another candidate is.  Without

6     specificity, I cannot answer that ambiguous

7     question -- ambiguous statement.

8          Q. Let's look at the next page.

9          A. Next page being?

10         Q. The next page of the document.  This has

11    two columns of text messages with images of the

12    colored ballots that were being handed out in

13    2018, according to the prior page.  There are two

14    columns of text messages on this page.  Do you

15    seat that?

16         A. I can't discern them, but I can tell that

17    they're --

18         Q. No.  No.  The text messages themselves.

19    There is two.  There is a left column and a right

20    column of text messages, correct?

21         A. I'm reading this.  Correct.

22              MR. BOYNTON:  I think she's just asking

Transcript of John D. Moss
Conducted on September 13, 2019                    167

1    you if you turn it on the side are there two

2    separate columns?  Turn it.  Landscape mode.

3    There you go.  Two columns.  One column.  Two

4    columns.

5        A. Yes.  There are two columns.  Sorry.

6        Q. I'm just trying to orient you because I'm

7    going to ask you to look at the right text

8    message, so the top of the right column.  Do you

9    see the name Dee?

10       A. Right here (indicating)?  Is that what

11   you're referring to?

12          Dee.  Okay.  Yes.  I see that.

13       Q. Dee Oliver was the candidate running for

14   an at-large seat in 2018, correct?

15       A. She was.

16       Q. And you only --

17       A. Yes.

18       Q. And you only beat her by a small number of

19   votes, right?

20       A. I won by a small number of votes, yes.

21       Q. And, in fact, there was a recount,

22   correct?

Transcript of John D. Moss
Conducted on September 13, 2019                    168

1        A. Correct.

2        Q. And so do you understand -- this page,

3     along with the prior page, Attachment A, do you

4     understand these to be text messages from Dee

5     Oliver to Jim Wood?

6          MR. BOYNTON:  Objection.  Lack of

7     foundation.

8        A. I do not know that.

9        Q. Do you question whether Attachment A was

10    produced by Jim Wood?

11       A. Attachment A?  This being Attachment A?

12    That says that statement is his statement,

13    correct?

14       Q. Correct.

15       A. His statement does not contain the word

16    Dee Oliver, so if I can take that as correct --

17       Q. His statement says, "Screenshot of a text

18    message where a candidate reported to me that poll

19    workers for another candidate" -- and the

20    candidate -- you see the name Dee Oliver at the

21    top?

22          MR. BOYNTON:  Respectfully, the only thing

Transcript of John D. Moss
Conducted on September 13, 2019                    169

1   at the top is Dee.

2        A. There is no Oliver.

3        Q. You see the name Dee at the top?

4        A. Correct.  I do see Dee at the top.

5        Q. Do you believe that to be Dee Oliver?

6        A. I have no -- I have no basis to believe it

7   is or that it isn't.

8        Q. So sitting here today, you don't know for

9   sure whether that's Dee Oliver who's texting Jim

10  Wood; is that correct?

11       A. That's correct.

12       Q. If you look at the left column of texts,

13  Dee writes that there are three colors of sample

14  ballots.  Do you recognize these sample ballots to

15  be ballots handed out by your campaign?

16       A. I can't discern the details of them, so I

17  can't answer that in the affirmative.  I mean, I

18  can't see what the disclosure statement is.  Is my

19  campaign disclosure statement on the sample

20  ballot?  I can't read that from here.  That's not

21  discernible.  And I don't know who was handing

22  them out, so I can't say, yes, that my campaign

Transcript of John D. Moss
Conducted on September 13, 2019                    170

 1  workers were or weren't.  But I can't read the

 2  disclosure statement on the ballot itself.

 3      Q. Did your campaign ever produce sample

 4  ballots that looked like this?

 5      A. I don't want to say yes or no.  I know we

 6  had a sample ballot, but I don't remember us

 7  having two different colors of the sample ballot.

 8  But I -- without seeing these in the full text and

 9  seeing the disclosure statement, I can't be

10  responsive to your question in an affirmative way.

11  But if you had the hard copies of them in greater

12  resolution so it's discernible, I would be happy

13  to respond.

14      Q. Have you ever heard anyone claim that a

15  poll worker working for your campaign was handing

16  out different colored handouts depending upon the

17  race of the person they encountered at a polling

18  place?

19      A. No.  And all of my people that work polls

20  were volunteers.  And who might have shown up, I

21  don't have a full who worked where.  Yes, I do

22  have poll workers.  But I do not recall someone

Transcript of John D. Moss
Conducted on September 13, 2019                    171

1    saying I'm handing out ballots based upon the race

2    of the candidates.  No, I did not.

3        Q. So if that happened, you're not aware of

4    it?

5        A. Correct.

6        Q. One more question.  You can't read

7    anything on these sample ballots?

8        A. Well, I can't read -- I can read sample

9    ballot.  I can't read the disclosure statement

10   that would be on a sample ballot.  I can -- if I

11   stretch, I can see John Moss.  I can see Louis

12   Jones.  I can see check marks.  But the key part

13   that you want to be able to read, which is this

14   part at the bottom, which I guess is the

15   disclosure statement, that's totally not

16   discernible to me.

17       Q. What is Friends of the Elephant?

18       A. That's not part of my campaign.  That's a

19   separate organization, I think.  That's not my --

20   my campaign would say John D. Moss Campaign.  So

21   you'd have to go and look at the Federal Election

22   and look at the filing cost to see who Friends of

Transcript of John D. Moss
Conducted on September 13, 2019                    172

1   the Elephant is.

2       Q. You don't know anything about Friends of

3   the Elephant?

4       A. I know who they are.  They actually gave

5   me a campaign contribution.  That's all I can tell

6   you.  I got a campaign contribution from them.

7   It's a matter of public record.  But I can't tell

8   you, you know, who all their membership is.

9   That's one of these things I had no involvement

10  in.  They were not members of my campaign or

11  anything of that nature.  There was no

12  interlocking directorship or corporation, no.

13      Q. Do you know any name of any individual at

14  Friends of the Elephant?

15      A. I do know one name is Gary Byler.

16      Q. How do you spell that?

17      A. B-Y-L-E-R.

18      Q. Who's Gary Byler?

19      A. An attorney.

20      Q. Where does he work?

21      A. I think he works for himself.  And he's --

22  I think if you go look at the State Board of

Transcript of John D. Moss
Conducted on September 13, 2019                    173

1    Elections or whoever keeps all that stuff, you can

2    get all that information about who Friends of the

3    Elephant is because they would be registering.  I

4    do not have knowledge here.

5        Q. So if we look at that same text message,

6    you said you could read your name listed there,

7    correct?

8        A. The image?  Not the text?

9        Q. The image sent in the text message.

10       A. Yeah.  I mean, I really stretch -- I can't

11   see it on the blue -- on the pink one.  I can't

12   really see that -- my name there.  It's hard to

13   see.  I think that's my name.  But it's very clear

14   it's my name on the bluer one, but I can't --

15   looks like it's Moss on the pink, but I'm having

16   to squint a bit.  I think that's my name there.  I

17   can't affirmatively say that is.

18       Q. Looking at that image still --

19       A. Which one?

20       Q. The same one we were looking at.

21       A. The pink or the blue?

22       Q. Both.

1      A. Okay.

2      Q. Can you tell that one version of the

3  sample ballot lists Aaron Rouse's name and one

4  does not?

5      A. Louis Jones.

6         Yes.  I can tell that.

7      Q. Are you aware whether the sample ballot

8  that did not include Aaron Rouse's name was handed

9  only to white voters?

10     A. I have no knowledge of that.  No, I

11  cannot.

12     Q. Are you aware whether the sample ballot

13  that was handed out to black voters did include

14  Aaron Rouse's name?

15     A. I have no knowledge of that either.

16     Q. Do you have any idea why there were

17  different sample ballots?

18     A. I can talk to -- if one of these ballots

19  was authorized and has my authorization -- I can

20  only speak to the one from my campaign rep.  I

21  can't speak to something that somebody else

22  authorized.

Transcript of John D. Moss
Conducted on September 13, 2019                    175

1      Q. Put that aside.

2         MR. BOYNTON:  The entire exhibit?

3         MS. HARLESS:  Yep.

4         Let's mark this as Exhibit 5.

5                    (Exhibit 5 was marked and

6                    attached to the transcript.)

7      Q. Mr. Moss, you've just been handed what is

8  marked Exhibit 5 by the court reporter.  Have you

9  seen this document before?

10     A. Well, yes.

11     Q. What is it?

12     A. An email exchange between Dave Hansen and

13 myself.  But can I have the opportunity to refresh

14 my memory?

15     Q. You can.

16     A. Thank you very much.

17        Okay.

18     Q. All right.  Do you see in the bottom

19 right -- well, what is this document?

20     A. This is an email exchange between then

21 City Manager Dave Hansen and myself.  He's --

22 initially my response to him was asking for

1    additional --

2         MR. BOYNTON:  She just wanted you to

3    authenticate the document.  She didn't ask you for

4    commentary.

5        Q. And it's dated --

6         MR. BOYNTON:  Answer the question.

7        Q. -- January 20, 2017, correct?

8        A. She said, well, what is it?  I was going

9    to tell her what it is.

10       Q. You're very thorough.

11            It is dated January 10th, 2017, correct?

12       A. Correct.

13       Q. Do you see in the bottom right that this

14   document is marked with the letters D-E-F and the

15   numbers 08407?

16       A. Correct.

17       Q. I'll represent to you that this is a

18   document produced by the defendants and your

19   counsel in this case in response to plaintiffs'

20   document production requests.  Does that make

21   sense?

22       A. Yes.

Transcript of John D. Moss
Conducted on September 13, 2019                    177

1      Q. Let's start with the email at the bottom

2   of the page, which is from you to Dave Hansen,

3   right?

4      A. Correct.  Yes.

5      Q. At the time you sent this email in 2017,

6   you were a City Council member?

7      A. Yes.

8      Q. Why were you emailing Mr. Hansen from your

9   personal Gmail address rather than your city email

10  address?

11     A. As I mentioned before, there is no

12  legislative requirement that I have to provide and

13  conduct my business on a vbgov account.  And I

14  choose not to.  And as you can see, the record was

15  recoverable.  And that complies with the FOIA

16  requirements.

17     Q. Uh-huh.

18        So in this email you refer to a briefing?

19     A. Correct.

20     Q. Do you see that?

21     A. Correct.

22     Q. What was the briefing that you were

Transcript of John D. Moss
Conducted on September 13, 2019                    178

1    referring to?

2        A. The briefing that we received in the

3    informal session, if I remember correctly, it was

4    about our efforts to go out and secure and do --

5    secure a consultant to do a disparity study.

6        Q. The top of Exhibit 5, this is a reply

7    email from Mr. Hansen to you, right?

8        A. It is.

9        Q. Do you need a second to read it?

10       A. I've read it.  Thank you.

11       Q. In the third sentence of the reply

12   Mr. Hansen says that "SWaM is easy to obtain,

13   hence why we think the sheltered bidding would be

14   helping in preserving race neutral completion for

15   small business."

16           At the time that email was sent, the city

17   had actually not obtained parity in contracts with

18   small, minority-owned businesses, correct?

19       A. We had not yet achieved the goal we had

20   set, correct.

21       Q. In the email Mr. Hansen continues,

22   "Race-based set-asides are most problematic and

Transcript of John D. Moss
Conducted on September 13, 2019                    179

1    that is the target of a disparity study.  Very

2    emotional subject."

3          Would you agree that race-based set-asides

4    are problematic?

5        A. Yes, only because of the judicial issues

6    that have dealt with in litigation at various

7    different levels.  You have to be careful because

8    there are very certain standards you have to meet.

9    I don't know if you consider that problematic, but

10   you have to be careful to stay within all the

11   judicial precedents that deal with those types of

12   issues, yes.

13       Q. Any other reasons?

14       A. No.

15       Q. Are you opposed to race-based set-asides?

16       A. I'm opposed to anything that isn't in

17   compliance with established judicial and

18   legislative precedent, yes.

19       Q. If a race-based set-aside was in

20   compliance with judicial precedent, would you be

21   opposed to it?

22       A. No.

Transcript of John D. Moss
Conducted on September 13, 2019                              180

1      Q. In the email Mr. Hansen then says to you,
2    "Appreciate your patience this evening allowing it
3    to play out."  Do you see that?
4      A. Uh-huh.
5      Q. Are you aware of what Mr. Hansen is
6    referring to there?
7      A. I'd only have to infer that the Council
8    stayed longer to talk that day and went over the
9    6:00 parameter, more than likely, and led to
10   Council staying longer, I'm assuming.  But I don't
11   know what his state of mind was, no.
12     Q. Did you personally always support a full
13   disparity study?
14     A. I don't know what full means, but I have
15   never opposed a disparity study.  I don't know
16   what full means, but I --
17     Q. Did you --
18     A. -- have not been in favor of doing things
19   that aren't in compliance with legislative and
20   judicial precedent.
21     Q. Okay.  Did you ever advocate for doing a
22   disparity study in phases?

Transcript of John D. Moss
Conducted on September 13, 2019                    181

```
 1        A. I did.
 2        Q. Did you ever advocate for only doing
 3   certain phases before continuing on to the rest?
 4        A. I did.
 5        Q. Can you elaborate on that?
 6        A. No.
 7        Q. Which phases of a disparity study did you
 8   support?
 9        A. Well, obviously, if you support phases,
10   you have to support the first phase before you can
11   go to phase two or three.  And the importance of
12   that is you get -- just like in any other
13   professional work you do, you learn something from
14   phase two which you would use you to what?  Help
15   you inform your work from phase two.  I'm just a
16   logical person.  But that's my answer.
17           It's just nothing about the study per se.
18   I would approach that to any kind of study, to do
19   it in phases because you learn something at each
20   phase which informs the next phase.
21        Q. You'd agree that the disparity study found
22   that overall the participation of minority-owned
```

Transcript of John D. Moss
Conducted on September 13, 2019                    182

1    businesses in contracts that the city awarded

2    during the study period was substantially lower

3    than one might expect based on the availability of

4    those businesses for that work, correct?

5        A. That was the finding and conclusion of the

6    report, yes.

7        Q. You can set that exhibit to the side.

8            MS. HARLESS:  We'll mark this as Exhibit

9    6.

10           MR. BOYNTON:  Are we nearing either an end

11   or a break point in the next few minutes?

12           MS. HARLESS:  We can take a break.

13           (A recess was taken.)

14                       (Exhibit 6 was marked and

15                   attached to the transcript.)

16       Q. This document has just been marked as

17   Exhibit 6 by the court reporter.  I'll give you a

18   second to look at it.  And, then, can you just let

19   me know yes or no whether you've seen this

20   document before?

21           MR. BOYNTON:  It may be helpful to go all

22   the way to the back first and review it in time

Transcript of John D. Moss
Conducted on September 13, 2019                    183

1    sequence.

2         A. Okay.

3         Q. Have you seen this document before?

4         A. No.

5         Q. All right.  If you look in the lower right

6    corner, there are the letters D-E-F and the

7    numbers 09810 through 09813, correct?

8         A. Correct.

9         Q. I'd like you to turn to page 09813, which

10   is the last page.  At the very bottom there is an

11   email on June 16th, 2015 from Dave Hansen to John

12   E. Fowler and Phil A. Davenport, correct?

13        A. Correct.

14        Q. Who is John E. Fowler?

15        A. I'm not certain who that is.  I know who

16   Phil Davenport is.  But John E. Fowler is not a

17   name that's registering with me.  Maybe it should.

18   If I saw a face, it might.  But the name is not

19   registering.

20        Q. Who is Phil Davenport?

21        A. He was at the time, I believe, the

22   Director of Public Works.

Transcript of John D. Moss
Conducted on September 13, 2019                    184

1      Q. The subject of this email is AE selection

2   process.  Do you see that?

3      A. Uh-huh.

4      Q. Do you know what AE selection process --

5      A. Architectural engineering.  Architectural

6   engineering.

7      Q. In the text of the message Mr. Hansen

8   wrote, "Need a briefing on the process.  Need the

9   dollars spent on who over the last three years.

10  Councilman Moss is questioning our reliance on a

11  select few.  We need to prepare to respond in

12  advance of the question being asked.  Dave."

13         Are you aware of what Mr. Hansen is

14  referring to when he said Coucilman Moss is

15  questioning our reliance on a select few?

16     A. I have consistently, across a number of

17  issues -- and I don't know what this issue refers

18  to.  But the city seems to have a pattern of

19  always going to a certain number of firms for any

20  work and other types of work.  And he probably

21  knows that I'm a very inquisitive person.  By my

22  reputation, I always ask a lot of questions.  I'm

Transcript of John D. Moss
Conducted on September 13, 2019                    185

1  wondering what a pattern is, how is it that the

2  same people are always, like, people we go to to

3  get work done at and are we getting the best

4  value.

5       It seems like that would be statistically

6  unusual for the same people to always be getting

7  the work.  He knows I ask those types of

8  questions.  I don't know his state of mind because

9  he references in advance, knowing I haven't asked

10  anything yet.  But he's anticipating I'm going to

11  ask.  He's wanting the people to spool up and be

12  able to answer my question when I ask it.  That's

13  how I take this to read.  And that -- I have no

14  other -- I have no knowledge of this.

15      Q. I'm not asking about any of Mr. Hansen's

16  intent.  I'm -- he states, "Coucilman Moss is

17  questioning our reliance on a select few."  And

18  I'm just wondering if you know specifically what

19  that's referring to?

20      A. At this point, in context, I can't tell

21  you specifically what he's referencing.  But, in

22  general, I always ask questions where there

Transcript of John D. Moss
Conducted on September 13, 2019                    186

1    appears to be a pattern that would suggest that

2    maybe competition hasn't been in place.

3        Q. Do you know who the select few in this

4    particular email are?

5        A. I have no idea.

6        Q. I'd like you to turn to page 09811 of this

7    document.

8        A. Uh-huh.

9        Q. And towards the top of the page there is

10   an email sent on June 17th, 2015 from John E.

11   Fowler to various, what appear to be, city

12   employees; is that correct?

13       A. This is the one that says to Rob Clark,

14   Rich Nettleton, Bobby J. Wheeler, and Nancy

15   Keenan?  Is that the one you're referring to

16   (indicating)?

17       Q. It's from -- yes.

18       A. Okay.  That reflects that I'm talking on

19   Wednesday, June 17th, email on John E. Fowler to

20   Rob Clark referencing AE selection process.

21       Q. Yes.  Do you know who Rob Clark is?

22       A. I do not.

Transcript of John D. Moss
Conducted on September 13, 2019                    187

1        Q. Do you know who Rich Nettleton is?

2        A. Not by name.  I might know by face.  No.

3        Q. Do you know Bobby J. Wheeler?

4        A. Nope.

5        Q. Do you know Nancy Keenan?

6        A. No.  I do not know any of these people by

7    name.  If I saw them in person, I might recognize

8    them from the informal sessions, but not by name.

9        Q. In the body of the email Mr. Fowler

10   writes, "Also, you should watch the video of last

11   night's Council meeting.  Mr. Moss was talking

12   about procurement in general; don't know why we're

13   zeroing in on A/E professional services selection

14   - but that's the direction."

15        Do you remember what comments you were

16   making about procurement?

17        A. No, but this does affirm my earlier

18   remarks that I, in general, ask questions.  And it

19   appears there is a pattern that reflects a lack of

20   competition.  But I do not have a direct

21   recollection of that particular meeting.

22        Q. Does the city video record Council

Transcript of John D. Moss
Conducted on September 13, 2019                      188

1    meetings?

2         A. And the informal sessions, correct.

3         Q. And would a video from the June 16th, 2015

4    Council meeting still be available on the city's

5    website?

6         A. I would defer to the city to answer that

7    question.

8         Q. So you don't know?

9         A. I'd like to think it is, but I do not

10   affirmatively know.  And this is 2015.

11        Q. Uh-huh.

12            So please turn the page to the page number

13   09810.

14        A. Yes, ma'am.

15        Q. And I want you to look at the bottom.

16   It's an email from Tom Leahy, dated June 18, 2015,

17   to various other individuals, correct?

18        A. Correct.

19        Q. And we already went through, you don't

20   know who Rob Clark is?  You do know who Phil

21   Davenport is?

22        A. Uh-huh.

Transcript of John D. Moss
Conducted on September 13, 2019                    189

1      Q. You don't know who Rich Nettleton is?

2      A. Correct.

3      Q. You do know who Marilyn Crane is?

4      A. No.  But I do know who Tom Leahy is.

5      Q. Who is Tom Leahy?

6      A. He was, I think at this time -- I don't

7   know this, but he might have been the Director of

8   Public Utilities or he had taken the position of a

9   Deputy City Manager whose portfolio was over

10  Public Works and Public Utilities.  I'm just not

11  certain that it happened by that date.  It might

12  have been later.

13     Q. In this email Mr. Leahy says that he

14  watched the Council meeting video, we just

15  discussed.  And he lists a series of allegations

16  from minority-owned businesses he took away from

17  the meeting.  Do you see that, just generally?

18     A. I do.

19     Q. One of the allegations he lists was that

20  the way -- "The way we write our RFPs includes a

21  bias that tends to preclude minority firms from

22  qualifying."

Transcript of John D. Moss
Conducted on September 13, 2019                190

1          Did you agree with that allegation?

2      A. I can't recall the context at the time.  I

3   wouldn't say -- if I was looking -- bias tends to

4   preclude -- I would tend to say there is a bias --

5   preclude is a word I probably would not use, but

6   certainly a bias that maybe discourages or works

7   against.  But preclude means that they can't in

8   any way be successful.  I don't know that I would

9   use the word preclude.

10     Q. So would you agree that the way the city

11  writes their RFPs included a bias that tends to

12  discourage minority firms from qualifying?

13     A. I would think that's probably closer to

14  where I would be, yes.

15     Q. Another allegation listed was that "The

16  same firms always get the work."

17         We already discussed this somewhat.  But

18  did you agree with that allegation?

19     A. That certainly is the appearance, yes.

20  The reason why is unknown, but yes.

21     Q. The next -- there is another item that

22  says minority -- "Minority firms are told they are

Transcript of John D. Moss
Conducted on September 13, 2019                    191

1    not qualified so they simply give up."

2         A. I can't agree or disagree with that

3    statement.  I have no basis to know the validity

4    of that.

5         Q. Okay.  So going back, you mentioned that

6    you would agree with the allegation that the way

7    the city wrote their RFPs includes a bias that

8    discourages minority firms from qualifying.  Why

9    do you think that's the case?

10        A. Well, not -- working off the appearance

11   because, obviously, I'm not directly engaged in

12   receiving, reviewing, or the factors for RFPs, but

13   when you look at the fact that it does -- you have

14   to make an inference -- an inference that there is

15   something about the process that is discouraging

16   people, which is why I didn't want to use preclude

17   because preclude means if you participate and do

18   all this stuff you might be getting a successful

19   outcome.

20             But clearly something is indicated in the

21   larger statistics that there is something about

22   the process because the same results always seem

Transcript of John D. Moss
Conducted on September 13, 2019                          192

1  to turn up that's discouraging people.  And that's

2  why I came to that conclusion.  It's an inference

3  versus an empirically validated conclusion.

4      Q. All right.  You can set that one to the

5  side.

6          Prior to his resignation on August 23rd,

7  2019, did you think City Manager Dave Hansen was

8  performing satisfactorily?

9      A. I'm asserting legislative privilege.

10         MR. BOYNTON:  Well, here is the thing we

11 have here.

12     A. Educate me.

13         MR. BOYNTON:  You can answer your personal

14 opinions.  It's the conversations between you and

15 other legislative actors; i.e., Council members,

16 that is the privilege.  So you are fair to say

17 your opinions.

18     A. No.

19     Q. Okay.  Can we -- just to get it clear --

20         MR. BOYNTON:  Sure.

21     Q. Prior to his resignation on August 23rd,

22 2019, did you think City Manager Dave Hansen was

Transcript of John D. Moss
Conducted on September 13, 2019                    193

1    performing satisfactorily?

2        A. No.

3        Q. Why?

4        MR. BOYNTON:  You can answer the question

5    for your own personal opinions.

6        A. My own personal opinion.

7            Two examples.  And they were documented in

8    the paper.  I sent a privileged communication

9    regarding a development that was taking place in

10   the city, the pier project specifically, that

11   involved Bruce Thompson.  Counsel had yet to hold

12   an executive session on this particular pier

13   proposal.  I had sent a privileged, and

14   FOIA-exempt communication I might add, to the City

15   Manager on my thoughts about that particular

16   project.  And he took it upon himself to forward

17   that communication, a privileged communication, to

18   Bruce Thompson.

19           Needless to say, that's an extreme

20   violation of trust.  And I don't care what your

21   performance is in other jobs, if you can't trust

22   someone then they need to be fired.  So that's one

Transcript of John D. Moss
Conducted on September 13, 2019                    194

1    event.  That was in December.  And I forget the

2    year on that.  '17.  It wouldn't have been '18.

3    Probably was '17 when it happened.  Could have

4    been '18.  That whole -- it was well-reported in

5    the paper.

6        Q. We'll get into that.

7           What is the second one?

8        A. The second one is the City Manager was on

9    North Great Neck Road.

10       Q. Slow down just a little bit.

11       A. The City Manager was on North Great Neck

12   Road.  There was an off-duty police officer in

13   uniform performing a traffic control function

14   under, I'll call it, a personal contract for a --

15   I don't know if it's landscape, but some kind of

16   construction activity that required him to shut

17   off a lane of highway on North Great Neck Road.

18          The City Manager approached the situation.

19   This is my personal opinion again.  He found that

20   whatever the activity that -- the traffic

21   direction that the police officer was providing

22   was not consistent with what he thought should be

Transcript of John D. Moss
Conducted on September 13, 2019                          195

1    happening.  So he got out of his vehicle and

2    instructed the police officer to change his

3    behavior and how he was performing his function at

4    that location.

5          The exact nature of all the

6    instructions -- but I guess there was some

7    pushback from the officer for which the then City

8    Manager Hansen said, Hey, don't you know who I am?

9    That always gets people's attention.  But clearly

10   under the city's Charter and authority he is

11   superior to the Police Chief, and he is in a

12   position of power to give directions to police

13   officers whether they're on duty or not when in

14   uniform.  Anyway, that was less than a pleasant

15   experience.  Put it that way.

16         The police officer in question, I don't

17   know if he filed a formal grievance with the City

18   Council, because that's who he works with, but,

19   nonetheless, he brought that to Council's

20   attention about how he thought he had been, my

21   words, disrespected or dealt with inappropriately

22   and not in a professional manner.  So that got

Transcript of John D. Moss
Conducted on September 13, 2019                    196

1    quite a bit of attention in the paper.

2            Well, in the course of all of this a lot

3    of private memos were exchanged, as you can

4    imagine.  And one of these got out into the public

5    domain.  And when the Manager had a private

6    meeting with this officer, he accused me of

7    providing that information and accused me of doing

8    it for political purposes.

9            As it turned out, that document was

10   actually released by his own PAO officer through

11   the television station and I had no involvement

12   with it.  At first, he denied that he threw me

13   under the bus.  But the police officer,

14   fortunately, had recorded the conversation, so, in

15   fact, it was documented what he said.  And he had

16   lied about what he said.  So that is infraction

17   number two.

18           And so those are my two bases for saying

19   under no condition was his performance acceptable

20   to me because, one, he has lied, and, secondly, he

21   isn't trustworthy.  Everything else is immaterial.

22   So on that basis his performance was

Transcript of John D. Moss
Conducted on September 13, 2019                              197

1    unsatisfactory.

2        Q. What was the name of the police officer?

3        A. I can't recall that, but it's a matter of

4    public record.

5        Q. But it's a matter of public record --

6        A. It was in the newspaper.

7        Q. And do you remember what year that was?

8        A. Might have been '17.

9        Q. Has Mr. Hansen ever made racially

10   insensitive comments during his time as City

11   Manager?

12       MR. BOYNTON:  Are you asking him for his

13   observation?

14       Q. In your opinion.

15       A. Well, that's not something that's an

16   opinion either.  Factually -- have I --

17       Q. Have you --

18       A. -- directly heard him?  Is that what

19   you're asking?  I'm not even sure I know what --

20       MR. BOYNTON:  That's why I was asking.

21       Q. Let's start with that one.  Have you ever

22   directly heard Mr. Hansen make racially

Transcript of John D. Moss
Conducted on September 13, 2019                    198

1    insensitive comments?

2         A. No.

3         Q. Are you aware of any racially insensitive

4    comments that Mr. Hansen has made?

5         A. Statements that can be inferred to be so,

6    yes.  Yes.

7         Q. What are those statements?

8         A. One was with regards to the recent event

9    at Floatopia.  That's the best way to express it,

10   I think.  Some people could take that and did take

11   that expression, you know, paint your face

12   comment -- that's one.  I mean, that certainly was

13   taken by many people as being an insensitive

14   choice of words.  And --

15        Q. Why do you think that was taken as an

16   insensitive choice of words?

17        A. Well --

18           MR. BOYNTON:  I'll object to the extent

19   it's calling for any kind of speculation.

20        A. I don't know why people -- I can

21   imagine -- speaking for myself --

22        Q. That's all I'm asking.  That's all I'm

Transcript of John D. Moss
Conducted on September 13, 2019                    199

1   asking.

2        A. Just want to make sure.

3            In today's environment, and certainly

4   after Governor Northam's whole thing, you can

5   imagine that adds to the context of that

6   statement.  You know, when people think you're

7   referring to what he claims was not his intent,

8   that, hey, if you are one race but you had -- and

9   your face was white, that you wouldn't be being

10  asked.  And that's how people kind of read that he

11  was making that inference from his statement.

12  Poor choice of words.  Having reported it in the

13  press, I could see how some people could be

14  offended.  And I could see other people would say,

15  eh, what's the big deal?  But clearly when you're

16  a public official, you have to watch all your

17  words.

18       Q. Were you about to talk about another one?

19       A. It wasn't him specifically, but it was --

20  because it was Ron Williams.  And it's how the

21  Manager responded to it, I think, is probably more

22  indicative than if you're talking about -- that

Transcript of John D. Moss
Conducted on September 13, 2019                          200

1   was the five percenter comment.  That was not by

2   him, but he certainly didn't come out and

3   aggressively disown that and take appropriate

4   action.  So people think you're condoning that.

5   That's a different issue.

6          But that's kind of -- that was all based

7   on the parade.  I was at that parade.  I was

8   really surprised by that.  But those are the two.

9   But I've never directly observed him making any

10  comments.

11      Q. So besides the two examples you gave me of

12  Mr. Hansen sharing the privileged communication

13  that you sent to him about the pier project and

14  the incident involving the police officer on North

15  Great Neck Road, in his over three years as City

16  Manager was there anything Mr. Hansen did that you

17  thought was grounds for termination?

18      A. Recommended consistently higher tax rates

19  and fee increases.

20      Q. In the past you had called -- openly

21  called for Mr. Hansen to be fired, correct?

22      A. Correct.

Transcript of John D. Moss
Conducted on September 13, 2019                    201

1          MS. HARLESS:   Let's mark this as Exhibit

2     7.

3                        (Exhibit 7 was marked and

4                    attached to the transcript.)

5          Q. Mr. Moss, you've just been handed what was

6     marked Exhibit 7 by the court reporter.  Have you

7     seen this document before?  I'll give you a

8     second.  I'm specifically going to be asking you

9     to look at page 0776, and that's it, of this

10    document.

11         MR. BOYNTON:   Okay.

12         Q. Just for the record, if you look at the

13    bottom right corner, there is the DEF and the

14    numbers 0776, correct?

15         A. Correct.  Yes.

16         Q. I'll represent to you this was a document

17    produced by your Council in response to

18    plaintiffs' document production requests in this

19    case.

20         If you look at the top of this page, there

21    is an article titled -- that says Two Virginia

22    Beach Council members call for City Manager to be

Transcript of John D. Moss
Conducted on September 13, 2019                    202

1    fired.  Do you see that?

2        A. I do.  Yes.

3        Q. And it's dated June 11th, 2018?

4        A. Yes.

5        Q. Were you one of the two City Council

6    members that called for City Manager Dave Hansen

7    to be fired?

8        A. Yes.

9        Q. Why did you call for Mr. Hansen's

10   termination at this time?

11       A. This is repeating what I mentioned

12   earlier.  Because he did a breach of privileged

13   communication and provided an email that I sent to

14   him directly to the individual in the private

15   sector over which an executive session was being

16   held about the project, that person being Bruce

17   Thompson.

18       Q. Why was the communication privileged?

19       A. Because it was directly dealing with a

20   negotiation deal that we were having about a pier

21   development project.  So we had not yet set the

22   terms.  And so now he's sharing my thoughts and

Transcript of John D. Moss
Conducted on September 13, 2019                    203

1    views about an issue that Council had not yet

2    decided, which was going to be in the executive

3    session that following Tuesday, and now he's

4    giving that information and insight to the person

5    about which the executive session was about their

6    deal proposal.

7        Q. And you thought that was inappropriate,

8    correct?

9        A. Yes.

10       Q. Did Mr. Hansen have a close relationship

11   with Bruce Thompson?

12       A. It would appear so.

13       Q. As far as you're aware, did Mr. Hansen

14   ever give a heads up like this to any other

15   developer?

16       A. I have no proof of it, but I suspect it.

17       Q. You suspect that he gave a heads up to

18   other developers?

19       A. It's just a suspicion.

20       Q. Who?

21       A. I have no idea, but -- yeah.  That's just

22   a personal opinion.

Transcript of John D. Moss
Conducted on September 13, 2019                          204

1       Q. Would you say you have a good relationship

2    with Mr. Thompson?

3       A. No, I do not.  I have no relationship with

4    Mr. Thompson.

5       Q. Is that because -- well, why is that?

6       A. Because all he wants to do is to make

7    private expense with public taxpayers' money.

8       Q. As far as you're aware, had Mr. Hansen

9    ever given a heads up, like the heads up he gave

10   to Bruce Thompson, to Bruce Smith?

11      A. I have no knowledge of that.

12      Q. Okay.  So we're looking at the first

13   paragraph here.  And further down in this

14   paragraph, close to the bottom, there is a quote

15   from you, and you're referring to Mr. Hansen.  And

16   you said, "I think the public has to ask itself

17   given the track record do we have a managerial

18   leadership that we can trust?"  You then

19   continued, "My answer is we do not."

20          What is the track record you're referring

21   to regarding Mr. Hansen?

22      A. We dealt with that police issue which

1    preceded this.  It would just go with what he --

2    his support for things like light rail, when the

3    public clearly, even after we -- the public voted

4    it down, he was still an advocate for it, in

5    effect.  So there is just a number of issues on

6    which he, rather than being, in my view, a City

7    Manager being neutral as to policy, was an

8    advocate for the very special interest that I

9    often talk about.

10       Q. Which special interest was he an advocate

11   for?

12       A. Well, certainly Bruce Thompson.

13       Q. Any others?

14       A. Well, there are other people involved with

15   the pier project, but I can't recall their names.

16   But, generally speaking, he was -- CityView Two

17   was another one he was an advocate for.  These are

18   all taxpayer subsidies for developers.  But not

19   all developers get those taxpayer subsidies.  So

20   he certainly had a short list, in my opinion.

21       Q. Are you -- sorry.  Are you -- I didn't

22   mean to interrupt.  I thought you were done.  Are

Transcript of John D. Moss
Conducted on September 13, 2019                    206

1    you done?

2        A. I am done.

3        Q. What do you mean by certainly not all

4    people get the taxpayer money?

5        A. I'll give you a good example.  I like

6    examples.  We had Cecil Cutchins, who's Olympia

7    Development Corporation, wanted to acquire a piece

8    of city property on Bonney Road.  He only wanted

9    to build two office buildings on it.  He was not

10   looking for any city indirect or direct tax

11   expenditures.  The Manager and staff kept pushing

12   on him that he had to include retail and office

13   and all sorts of other development.  And he said,

14   hey, that won't sell in the marketplace.  He said,

15   yes, but we'll make it so it can because we'll

16   give you tax rebates on real estate and we'll do

17   this, this, and this.

18          The guy was so incensed he actually

19   reached out to Council members about it, saying

20   why are you forcing development on me that I'm

21   willing to build here at no taxpayer anything but

22   there is no market for this.  And so in the end

Transcript of John D. Moss
Conducted on September 13, 2019                    207

1   the Council, after this got fairly public, said,

2   no, we're going to approve what it is.  But

3   it's -- that's just -- just an example of an

4   approach to business that costs the taxpayers

5   money and there is no reasonable, rational

6   explanation for it.

7          But, anyway -- but he seems to have his

8   own agenda.

9       Q. Dave Hansen?

10      A. Well, when he was in the job as City

11  Manager, yes, appeared to have his own vision of

12  what he thought the city should look like.  And he

13  was willing to use taxpayers' money to get what he

14  wanted even when it didn't make sense.  So he has

15  a track record of having his own view of what he

16  thinks the city should be, and I think often

17  usurping Council's prerogatives.  That's my

18  personal view.  Maybe that's why he's not the City

19  Manager.

20      Q. How you spell Cecil Cutchins?

21      A. C-E-C-I-L, Cecil.  Cutchins is

22  C-U-T-C-H-I-N-S.  And he's the CEO of Olympia

Transcript of John D. Moss
Conducted on September 13, 2019                    208

1    Development Corporation.  And all that was

2    discussed in informal and open session, so there

3    is a clear record of all of that.

4         Q. All right.  You can set that to the side.

5            MS. HARLESS:  We'll mark this as Exhibit

6    8.

7                          (Exhibit 8 was marked and

8                          attached to the transcript.)

9         Q. I'll give you a second to look at that

10   before I ask you about it.

11        A. Okay.

12        Q. Have you seen Exhibit 8 before?

13        A. I remember when this came through from

14   Henry.  You know, I don't -- I can't -- I do

15   remember when this came through.  Like I said,

16   this would go to all City Council, so it would

17   have been forwarded to my personal account.  I do

18   recall -- I remember the cumulative voting.

19   That's what stuck in my memory because that was --

20   most people don't even know about cumulative

21   voting.

22        Q. If you look at the bottom right corner of

Transcript of John D. Moss
Conducted on September 13, 2019                    209

1    this document, you'll see the letters DEF and the

2    number 09444 to 09445, correct?

3        A. Yes.

4        Q. I'd like you to look at the middle of the

5    first page, so 094444.  This is an email from

6    Henry Ryto on October 16th, 2018 to the City

7    Council, correct?

8        A. Correct.  Yes.

9        Q. And you already mentioned you got this

10   email as a City Council member?

11       A. Yes.

12       Q. Who is Henry Ryto?

13       A. He's a resident of Virginia Beach.  That's

14   what I know Henry as.  He used to come often or

15   earlier times down to City Council and sometimes

16   spoke.  But he comes to town halls occasionally.

17   I think that one time he was actually employed by

18   HRT.  That's how I know Henry.

19       Q. What's HRT?

20       A. Hampton Roads Transit.

21       Q. Have you met him in person?

22       A. Yes.  Not outside the Council chambers or

1    a public event.  But I have met him, yes.

2        Q. What is Mr. Ryto's race?

3        A. He's Caucasian.

4        Q. In the email Mr. Ryto proposes several

5    alternative methods for electing members to the

6    City Council, correct?

7        A. Correct.  Yes.

8        Q. Did you support any of these proposals?

9        A. No.  There is a record we previously

10   discussed, I have supported the hybrid system for

11   the seven districts, going to single-member

12   districts with four at-large, including the Mayor,

13   so no.

14       Q. Were you interested in any of these

15   proposals?

16       A. No.

17       Q. You mentioned earlier that cumulative

18   voting caught your eye.  Was there anything

19   particular about the cumulative voting that caught

20   your eye?

21       A. Only that rarely do people have a

22   knowledge of it that aren't in the ins and outs of

Transcript of John D. Moss
Conducted on September 13, 2019                    211

1    politics of voting.  Usually it's not something

2    you hear people talk about much, so it caught my

3    eye as, oh, an average citizen that knows about

4    cumulative voting.  That was kind of unique.

5    That's why.  Not because anything about the

6    topics, but just that the citizen was aware of

7    cumulative voting.

8        Q. Do you know what ranked choice voting is?

9        A. Say again.

10       Q. Do you know what ranked choice voting is?

11       A. I've heard of it.  I'm not an expert on

12   it.  I wouldn't want to opine on it.  But I am

13   familiar with the basic principles of it.

14       Q. Besides this email and the communications

15   you mentioned earlier, have you ever communicated

16   in any way with Mr. Ryto regarding alternative

17   election systems for the City Council in Virginia

18   Beach?

19       A. I might have.  And it would show up in my

20   councilmail -- my archive.gov if I did.

21       Q. Do you know why Mr. Ryto is proposing

22   alternative methods of elections to the City

Transcript of John D. Moss
Conducted on September 13, 2019                    212

1    Council?

2        A. I have no idea, other than he has a

3    sincere interest in, you know, expressing his

4    views.  But no, I do not.

5        Q. Did you discuss this email from Mr. Ryto

6    with anyone else on the City Council?

7        A. No.  I'm certain of that.

8        MS. HARLESS:  All right.  Could we just

9    take a short break?

10       MR. BOYNTON:  Uh-huh.

11       (A recess was taken.)

12       MS. HARLESS:  No further questions from

13   me.

14       MR. BOYNTON:  Thank you.  I have no

15   questions for you, sir.

16       You have a right to read and sign the

17   deposition transcript once it's transcribed to

18   make sure it's been transcribed accurately.  We've

19   been advising our clients to read.

20       THE DEPONENT:  I do.

21       MR. BOYNTON:  If you'd advise --

22       THE DEPONENT:  Yes.  I always want to have

Transcript of John D. Moss
Conducted on September 13, 2019          213

1    a chance to read.

2

3          (Signature having not been waived, the

4    deposition of JOHN D. MOSS was concluded at 12:50

5    p.m.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

```
1              ACKNOWLEDGMENT OF DEPONENT

2          I, JOHN D. MOSS, do hereby acknowledge

3    that I have read and examined the foregoing

4    testimony, and the same is a true, correct, and

5    complete transcription of the testimony given by

6    me and any corrections appear on the attached

7    Errata Sheet signed by me.

8

9

10   _____      _____

11        (DATE)                          (SIGNATURE)

12

13

14

15

16

17

18

19

20

21

22
```

1   CERTIFICATE OF SHORTHAND REPORTER-NOTARY PUBLIC

2        I, Penny C. Wile, RPR, RMR, CRR, the

3   officer before whom the foregoing deposition was

4   taken, do hereby certify that the foregoing

5   transcript is a true and correct record of the

6   testimony given; that said testimony was taken by

7   me stenographically and thereafter reduced to

8   typewriting under my direction; that reading and

9   signing was requested; and that I am neither

10  counsel for, related to, nor employed by any of

11  the parties to this case and have no interest,

12  financial or otherwise, in its outcome.

13       IN WITNESS WHEREOF, I have hereunto set my

14  hand and affixed my notarial seal this 23rd day of

15  September, 2019.

16       My commission expires:  January 31, 2021.

17

18

19

20  _____

21   NOTARY PUBLIC IN AND FOR

22  THE COMMONWEALTH OF VIRGINIA

PENNY C. WILE
Notary Public
Commonwealth of Virginia
Registration No. 212528
My Commission Expires Jan 31, 2021

Transcript of John D. Moss
Conducted on September 13, 2019

216

| A | | | |
|---|---|---|---|
| **a-1**<br>52:2<br>**aaron**<br>37:15, 38:16,<br>38:19, 84:4,<br>84:12, 89:8,<br>90:17, 107:19,<br>110:3, 110:8,<br>110:17, 110:22,<br>121:22, 123:15,<br>157:22, 174:3,<br>174:8, 174:14<br>**abbott**<br>5:12, 37:15,<br>38:17, 87:20,<br>87:22, 88:3,<br>93:4, 98:17,<br>98:22, 122:3,<br>123:16, 136:21,<br>137:2, 137:17,<br>139:17, 147:5,<br>147:8, 148:4,<br>149:7, 151:1,<br>151:14, 155:4,<br>155:14, 156:3,<br>156:22<br>**ability**<br>131:11, 149:15<br>**able**<br>7:17, 22:11,<br>121:19, 131:1,<br>171:13, 185:12<br>**absolutely**<br>36:3, 77:2,<br>100:19, 115:15,<br>135:18<br>**accept**<br>148:16, 153:18<br>**acceptable**<br>73:13, 196:19<br>**access**<br>27:2, 61:18<br>**accident**<br>10:1<br>**accomplish**<br>71:1, 155:16, | 155:19<br>**according**<br>166:13<br>**account**<br>21:8, 22:9,<br>22:10, 23:8,<br>23:13, 25:17,<br>25:22, 26:2,<br>26:5, 26:6,<br>26:8, 26:13,<br>26:15, 26:20,<br>26:22, 27:2,<br>28:12, 29:7,<br>31:4, 32:5,<br>32:7, 33:3,<br>61:1, 61:2,<br>61:6, 61:8,<br>61:10, 61:11,<br>61:14, 61:18,<br>61:19, 62:1,<br>62:8, 62:9,<br>62:13, 62:15,<br>62:17, 63:22,<br>64:4, 92:2,<br>93:12, 93:13,<br>177:13, 208:17<br>**accountability**<br>80:4<br>**accountable**<br>72:6, 72:11,<br>72:12, 122:18,<br>122:21, 146:2,<br>149:15, 149:17<br>**accounts**<br>25:21, 27:3,<br>27:7, 28:9,<br>29:4, 29:6,<br>61:14<br>**accuracy**<br>152:3<br>**accurate**<br>115:21<br>**accurately**<br>212:18<br>**accused**<br>196:6, 196:7<br>**achieved**<br>178:19 | **acknowledge**<br>214:2<br>**acknowledgment**<br>214:1<br>**acquire**<br>206:7<br>**across**<br>55:2, 131:17,<br>184:16<br>**act**<br>155:9<br>**acted**<br>60:2<br>**action**<br>144:10, 200:4<br>**active**<br>26:7, 82:22,<br>101:1<br>**actively**<br>91:8, 91:10,<br>94:5, 99:16,<br>100:3, 100:10,<br>107:13, 107:17,<br>144:16<br>**activities**<br>39:11<br>**activity**<br>79:17, 194:16,<br>194:20<br>**actors**<br>192:15<br>**actual**<br>20:10, 38:19,<br>57:17, 138:17,<br>165:18<br>**actually**<br>18:17, 33:2,<br>47:17, 48:1,<br>48:11, 69:4,<br>139:3, 139:13,<br>154:15, 172:4,<br>178:17, 196:10,<br>206:18, 209:17<br>**ad**<br>72:21, 73:16,<br>73:20, 73:21,<br>74:1, 74:3,<br>74:15, 75:13, | 90:1, 91:16,<br>91:17<br>**add**<br>21:12, 193:14<br>**added**<br>139:22<br>**additional**<br>176:1<br>**address**<br>177:9, 177:10<br>**addressing**<br>144:17<br>**adds**<br>199:5<br>**adjective**<br>21:3<br>**adjudicate**<br>33:20<br>**adjudicated**<br>156:2<br>**adopt**<br>139:9, 139:12<br>**adopted**<br>128:4, 138:12,<br>139:11, 140:3<br>**adoption**<br>143:18<br>**ads**<br>72:17, 98:9,<br>98:10<br>**adult**<br>118:10<br>**advance**<br>11:7, 184:12,<br>185:9<br>**advancing**<br>144:16, 146:1<br>**advantage**<br>54:3, 59:6<br>**advantages**<br>52:18<br>**adversaries**<br>13:12, 13:15<br>**advise**<br>212:21<br>**advising**<br>212:19<br>**advocacy**<br>53:1, 146:5 |

Transcript of John D. Moss
Conducted on September 13, 2019

217

advocate
119:14, 121:3,
124:12, 148:17,
149:4, 180:21,
181:2, 205:4,
205:8, 205:10,
205:17
advocating
127:9
ae
184:1, 184:4,
186:20
affairs
63:3
affirm
187:17
affirmative
18:8, 28:6,
169:17, 170:10
affirmatively
43:9, 173:17,
188:10
affixed
215:14
afford
97:12
african
69:10, 73:5,
93:2, 109:7,
109:10, 112:4,
114:2, 114:15,
129:13
after
6:4, 22:21,
23:3, 23:7,
23:14, 31:15,
35:11, 48:4,
58:3, 64:20,
69:17, 82:14,
107:22, 108:3,
111:2, 112:13,
119:9, 134:8,
199:4, 205:3,
207:1
again
40:21, 47:6,
47:7, 49:8,
77:4, 97:16,

134:16, 141:16,
157:17, 158:17,
194:19, 211:9
against
85:6, 86:9,
87:5, 91:19,
93:2, 101:5,
101:6, 103:17,
128:17, 155:7,
190:7
agenda
33:9, 88:8,
125:6, 138:6,
139:1, 139:4,
139:15, 139:16,
140:1, 140:12,
143:6, 144:11,
144:13, 207:8
agent
80:1
aggressively
200:3
ago
35:8, 50:5,
61:15, 71:18,
120:22, 128:16,
133:9
agree
80:8, 90:21,
111:20, 112:22,
123:11, 127:9,
127:16, 135:16,
135:21, 138:2,
149:12, 150:17,
151:8, 151:18,
152:9, 152:16,
156:10, 179:3,
181:21, 190:1,
190:10, 190:18,
191:2, 191:6
agreeing
34:2
agricultural
57:15, 153:17
aground
67:16, 72:2
ah-ha
36:12

al
1:9, 4:3, 47:3,
47:10, 51:10,
52:1, 52:2,
156:18
albert
52:2
align
52:22
aligned
52:17, 85:18,
86:3, 86:12,
94:21
alignment
86:17, 87:9
all-city
50:16
allegation
190:1, 190:15,
190:18, 191:6
allegations
163:21, 189:15,
189:19
allen
1:6, 3:3
alliance
82:3, 95:22
allow
51:8
allowing
180:2
almost
34:3, 83:9,
85:9
along
38:7, 70:5,
71:8, 74:18,
168:3
already
110:7, 110:12,
131:2, 131:7,
157:3, 159:3,
159:10, 159:17,
160:3, 188:19,
190:17, 209:9
also
6:12, 65:4,
67:13, 68:1,

68:2, 68:21,
71:13, 78:8,
102:19, 108:13,
109:6, 146:8,
146:11, 147:19,
148:10, 155:17,
156:11, 156:18,
187:10
alternative
210:5, 211:16,
211:22
although
94:14
always
16:19, 71:22,
81:17, 81:18,
82:15, 83:9,
94:19, 109:11,
109:12, 130:15,
141:8, 146:12,
180:12, 184:19,
184:22, 185:2,
185:6, 185:22,
190:16, 191:22,
195:9, 212:22
ambiguous
166:6, 166:7
amelia
88:4
amendment
139:17, 139:21,
144:5
american
69:10, 73:5,
93:3, 109:7,
109:10, 112:5,
112:7, 114:2,
114:15, 129:13
among
57:11, 130:5,
132:5
amount
68:3, 78:1
andrew
128:14
anecdotal
123:5
anecdotally
123:8

Transcript of John D. Moss
Conducted on September 13, 2019                                218

| | | | |
|---|---|---|---|
| **angry**<br>69:6<br>**annabelle**<br>3:11, 6:9, 7:4<br>**anne**<br>57:20, 57:22,<br>111:15, 153:16<br>**announced**<br>108:12<br>**annually**<br>138:7<br>**anomaly**<br>55:21<br>**another**<br>36:16, 44:17,<br>49:4, 49:12,<br>55:8, 93:2,<br>93:8, 93:13,<br>109:8, 162:2,<br>162:8, 164:13,<br>165:22, 166:5,<br>168:19, 190:15,<br>190:21, 199:18,<br>205:17<br>**answer**<br>8:2, 8:3,<br>13:13, 18:7,<br>31:9, 33:12,<br>42:12, 43:7,<br>43:15, 49:9,<br>144:4, 152:15,<br>158:12, 165:9,<br>165:15, 165:18,<br>166:3, 166:6,<br>169:17, 176:6,<br>181:16, 185:12,<br>188:6, 192:13,<br>193:4, 204:19<br>**answered**<br>40:10, 46:12<br>**answering**<br>7:20<br>**answers**<br>8:18, 22:12,<br>162:4<br>**anticipate**<br>72:8<br>**anticipating**<br>185:10 | **anybody**<br>63:12, 111:4<br>**anyone**<br>12:19, 13:1,<br>28:8, 44:19,<br>46:20, 53:4,<br>60:7, 64:9,<br>81:2, 86:4,<br>87:4, 95:12,<br>99:20, 100:3,<br>107:2, 117:1,<br>117:7, 129:3,<br>129:5, 160:4,<br>170:14, 212:6<br>**anyone's**<br>95:16, 100:5<br>**anyplace**<br>120:21<br>**anything**<br>12:1, 17:16,<br>18:2, 19:11,<br>19:22, 21:15,<br>21:16, 22:18,<br>24:8, 29:4,<br>33:22, 57:17,<br>76:16, 80:6,<br>99:17, 100:13,<br>104:15, 104:22,<br>105:15, 106:10,<br>125:1, 125:8,<br>140:13, 140:18,<br>141:17, 142:20,<br>149:22, 171:7,<br>172:2, 172:11,<br>179:16, 185:10,<br>200:16, 206:21,<br>210:18, 211:5<br>**anyway**<br>69:19, 91:5,<br>195:14, 207:7<br>**anywhere**<br>73:18, 157:12<br>**apolitical**<br>100:2, 125:18<br>**appeals**<br>163:22<br>**appear**<br>186:11, 203:12, | 214:6<br>**appearance**<br>190:19, 191:10<br>**appearances**<br>6:8<br>**appeared**<br>207:11<br>**appears**<br>186:1, 187:19<br>**applicable**<br>21:2, 36:19<br>**applies**<br>9:4<br>**apply**<br>32:2<br>**appointed**<br>65:19, 66:19,<br>83:16, 101:12,<br>119:12, 119:18<br>**appointment**<br>33:14<br>**appreciate**<br>180:2<br>**approach**<br>147:22, 148:5,<br>181:18, 207:4<br>**approached**<br>194:18<br>**appropriate**<br>9:14, 21:4,<br>33:12, 200:3<br>**approve**<br>207:2<br>**approved**<br>68:16<br>**architect**<br>119:15<br>**architectural**<br>184:5<br>**archive**<br>18:11, 22:10,<br>23:10, 31:4,<br>32:20, 33:2,<br>34:22, 62:17,<br>92:10, 211:20<br>**archived**<br>15:22<br>**area**<br>57:16 | **areas**<br>114:22<br>**aren't**<br>52:21, 91:7,<br>100:21, 137:8,<br>180:19, 210:22<br>**arena**<br>10:5, 34:20,<br>39:4<br>**argue**<br>72:13<br>**argument**<br>51:9, 57:6,<br>155:9<br>**argumentative**<br>40:9<br>**around**<br>73:2, 75:9,<br>82:18, 105:10,<br>112:5, 130:1<br>**arrived**<br>75:14<br>**arrogant**<br>73:11<br>**article**<br>5:11, 132:14,<br>132:18, 132:21,<br>133:8, 201:21<br>**asian**<br>111:8, 112:17,<br>116:5, 129:7<br>**aside**<br>175:1<br>**asked**<br>9:9, 10:19,<br>11:4, 14:15,<br>14:19, 16:15,<br>19:20, 40:9,<br>45:11, 46:11,<br>49:8, 95:7,<br>103:13, 160:15,<br>184:12, 185:9,<br>199:10<br>**asking**<br>7:5, 7:19,<br>10:14, 11:5,<br>15:6, 17:7,<br>17:10, 18:6, |

Transcript of John D. Moss
Conducted on September 13, 2019

219

22:14, 43:14,
54:20, 99:19,
104:19, 108:9,
108:11, 125:15,
125:21, 129:20,
140:11, 142:4,
148:13, 152:16,
158:17, 160:14,
166:22, 175:22,
185:15, 197:12,
197:19, 197:20,
198:22, 199:1,
201:8
asks
160:21
aspect
145:14
assembly
48:15, 51:5,
56:7, 56:9,
56:13, 103:4,
103:5, 122:16,
125:10, 126:4,
138:5, 138:9,
138:18, 138:22,
140:1, 140:12
asserting
192:9
assertion
33:18
assessment
42:15, 72:14,
124:22
assistance
48:19
assume
12:13, 86:2,
104:18, 139:6
assuming
180:10
at&t
52:8
at-large
6:19, 48:14,
49:1, 49:17,
50:9, 50:13,
51:17, 52:12,
54:12, 55:4,

55:7, 56:4,
57:2, 57:3,
64:14, 64:21,
65:12, 66:15,
70:9, 77:4,
78:11, 104:6,
122:19, 124:2,
127:13, 131:8,
131:17, 131:22,
132:4, 133:11,
135:22, 145:3,
145:4, 145:5,
146:5, 146:7,
152:18, 155:11,
157:6, 159:8,
159:13, 160:6,
167:14, 210:12
atkinson
100:16
attached
14:3, 132:10,
136:16, 137:1,
162:11, 163:3,
175:6, 182:15,
201:4, 208:8,
214:6
attachment
164:3, 164:5,
164:7, 164:9,
165:11, 165:18,
168:3, 168:9,
168:11
attend
142:19
attention
195:9, 195:20,
196:1
attorney
2:5, 4:5, 11:8,
12:13, 12:20,
172:19
attorney's
6:16, 30:8
attorney-client
12:17
attorneys
10:15, 12:1,
12:8, 12:15,

12:22
attractive
114:10
attractiveness
114:5
audible
8:3
august
192:6, 192:21
authenticate
176:3
authorities
60:17
authority
86:15, 91:2,
195:10
authorization
174:19
authorized
174:19, 174:22
automatic
85:9
automatically
22:20, 23:8,
23:14, 33:2
availability
182:3
available
16:19, 82:7,
188:4
average
77:21, 113:13,
211:3
award
47:20
awarded
182:1
aware
11:3, 11:6,
37:5, 85:14,
107:5, 107:10,
110:16, 110:20,
132:3, 171:3,
174:7, 174:12,
180:5, 184:13,
198:3, 203:13,
204:8, 211:6
away
47:3, 47:4,

47:5, 57:19,
63:11, 118:20,
189:16
awful
88:17

B

b-a-l-k-o
52:4
b-r-i-a-n
105:6
b-y-l-e-r
172:17
back
9:22, 19:17,
20:2, 22:4,
23:20, 24:2,
27:6, 36:2,
39:4, 46:16,
46:18, 47:20,
48:3, 49:11,
53:7, 56:1,
56:20, 60:19,
62:8, 65:8,
67:2, 67:9,
67:10, 68:2,
68:4, 68:6,
68:11, 69:15,
72:17, 77:17,
79:19, 84:9,
86:20, 93:10,
94:3, 96:7,
102:10, 103:15,
109:9, 111:18,
113:19, 113:22,
114:3, 114:8,
115:1, 115:9,
115:10, 115:15,
119:5, 130:4,
134:9, 136:9,
142:2, 145:13,
153:6, 156:19,
158:5, 161:9,
182:22, 191:5
backdrop
71:4, 71:5
backed
84:22, 85:10,

Transcript of John D. Moss
Conducted on September 13, 2019

220

**85:14**, 86:1
**backers**
54:4
**background**
72:2, 74:7
**backing**
95:10, 106:22
**backlash**
73:10, 74:16, 74:19
**backlashed**
74:2
**bacon**
145:13
**bad**
73:7, 74:20, 84:17
**baker**
115:7
**balance**
59:11, 70:17, 103:15, 103:17, 145:16, 146:16
**balanced**
146:16
**balko**
47:3, 47:10, 51:11, 52:1, 52:3, 52:5, 52:7, 120:6, 156:18
**ballot**
121:19, 169:20, 170:2, 170:6, 170:7, 171:9, 171:10, 174:3, 174:7, 174:12
**ballots**
166:12, 169:14, 169:15, 170:4, 171:1, 171:7, 174:17, 174:18
**banners**
19:12
**barbara**
69:14, 86:9, 86:10, 124:11
**barrier**
51:21

**barriers**
51:3, 51:15, 54:20
**based**
30:12, 79:14, 79:15, 106:22, 120:11, 171:1, 182:3, 200:6
**bases**
196:18
**basic**
7:11, 211:13
**basically**
51:17, 53:19, 56:18, 91:3
**basis**
23:5, 42:12, 81:5, 85:11, 169:6, 191:3, 196:22
**bathroom**
75:19
**baum**
47:3
**bay**
110:2
**bayside**
117:19, 118:9, 118:14, 118:16, 118:21, 118:22
**beach**
1:9, 1:15, 2:5, 2:9, 4:3, 4:5, 4:9, 5:18, 6:16, 6:20, 43:5, 46:2, 54:8, 59:3, 64:11, 64:15, 65:4, 68:17, 71:15, 73:14, 79:14, 82:3, 83:14, 83:20, 89:18, 91:9, 92:15, 93:22, 96:12, 98:1, 99:21, 101:9, 111:11, 111:22, 112:3, 113:1, 113:4,

116:8, 116:15, 117:18, 118:2, 127:17, 130:6, 132:22, 138:11, 148:7, 153:15, 154:21, 155:8, 155:11, 159:12, 159:19, 164:1, 201:22, 209:13, 211:18
**beach's**
154:6
**beat**
167:18
**became**
27:15, 57:21, 105:13
**because**
16:19, 17:15, 19:10, 20:11, 24:3, 24:8, 24:15, 27:3, 28:20, 29:2, 29:16, 31:1, 40:19, 44:1, 44:7, 44:11, 46:21, 50:14, 50:21, 51:2, 51:20, 52:14, 53:6, 54:21, 55:9, 56:21, 58:1, 58:13, 59:5, 61:20, 62:2, 62:7, 62:22, 63:6, 67:10, 68:10, 72:4, 73:10, 75:1, 76:3, 77:14, 83:6, 84:9, 84:15, 85:4, 85:11, 88:9, 91:12, 92:19, 95:2, 95:6, 95:10, 97:11, 100:1, 100:16, 101:4, 101:14, 103:15, 105:12, 105:13,

106:16, 114:5, 114:9, 119:10, 122:10, 123:6, 129:18, 131:16, 134:11, 138:15, 140:20, 141:7, 142:5, 145:12, 146:2, 151:4, 152:3, 153:13, 155:22, 157:17, 166:4, 167:6, 173:3, 179:5, 179:7, 181:19, 185:8, 191:11, 191:17, 191:22, 195:18, 196:20, 199:20, 202:12, 202:19, 204:5, 204:6, 206:15, 208:19, 211:5
**become**
11:6, 114:4
**been**
6:4, 7:6, 8:21, 9:15, 10:10, 10:22, 11:6, 14:22, 19:19, 24:9, 25:1, 25:3, 25:10, 26:7, 27:18, 28:18, 43:11, 43:13, 43:17, 44:12, 44:17, 44:20, 44:22, 49:10, 55:19, 56:22, 57:6, 61:17, 67:13, 68:15, 75:17, 79:11, 83:16, 94:2, 94:19, 95:8, 105:18, 105:20, 106:21, 111:5, 111:9, 111:14, 113:2, 119:2, 121:11, 126:14, 127:9, 133:18, 134:8, 134:13, 136:18,

Transcript of John D. Moss
Conducted on September 13, 2019                    221

139:11, 141:8,
144:16, 144:17,
144:19, 154:2,
161:4, 162:12,
175:7, 180:18,
182:16, 186:2,
189:7, 189:12,
194:2, 194:4,
195:20, 197:8,
201:5, 208:17,
212:18, 212:19,
213:3
**before**
2:17, 7:6, 7:7,
7:19, 8:20,
9:16, 14:9,
16:12, 18:5,
25:6, 36:5,
65:5, 65:9,
70:15, 81:8,
82:16, 87:1,
104:12, 110:3,
119:19, 128:13,
132:13, 132:15,
134:14, 137:21,
160:11, 164:10,
165:2, 165:18,
175:9, 177:11,
181:3, 181:10,
182:20, 183:3,
201:7, 208:10,
208:12, 215:3
**behalf**
3:2, 4:2, 99:5
**behavior**
195:3
**being**
10:6, 10:19,
11:4, 11:18,
14:15, 14:19,
15:5, 16:14,
41:17, 46:7,
63:19, 75:3,
77:15, 77:20,
78:2, 78:3,
89:12, 89:13,
89:18, 95:21,
107:3, 108:14,

109:6, 148:13,
149:9, 149:20,
150:1, 150:9,
150:15, 166:9,
166:12, 168:11,
184:12, 198:13,
199:9, 202:15,
202:16, 205:6,
205:7
**believe**
20:16, 49:4,
60:1, 60:2,
60:3, 65:13,
111:19, 128:5,
133:19, 135:18,
145:7, 150:21,
151:1, 162:9,
169:5, 169:6,
183:21
**bellitto**
77:8
**belongs**
103:1, 155:22
**below**
134:21, 155:14
**benefit**
51:7, 101:21,
138:10
**benefits**
78:1, 146:12
**besides**
11:22, 12:7,
12:21, 20:14,
29:9, 39:1,
59:21, 61:10,
79:3, 81:13,
82:9, 83:14,
95:13, 111:8,
125:4, 131:2,
131:7, 157:3,
159:3, 159:10,
159:17, 160:3,
200:11, 211:14
**best**
13:13, 13:17,
31:13, 39:8,
43:6, 50:7,
64:6, 64:8,

78:4, 103:19,
106:6, 140:8,
146:18, 185:3,
198:9
**better**
72:8, 109:11,
113:13, 131:13,
136:4, 145:21,
149:9, 149:14,
149:20, 150:15
**between**
36:11, 63:18,
66:21, 66:22,
111:20, 115:6,
125:4, 146:9,
175:12, 175:20,
192:14
**bias**
189:21, 190:3,
190:4, 190:6,
190:11, 191:7
**bidding**
178:13
**big**
24:17, 34:19,
53:21, 54:9,
54:12, 57:21,
68:10, 86:15,
90:1, 112:9,
136:13, 142:10,
154:1, 199:15
**big-dollar**
53:18
**bigger**
145:19, 146:4,
146:5
**biggest**
50:11, 52:10,
88:6, 114:12,
124:12
**bill**
77:22, 126:10,
133:10, 133:17,
133:18
**billboard**
70:20
**bit**
58:6, 67:18,

77:17, 84:9,
105:11, 173:16,
194:10, 196:1
**black**
113:18, 115:11,
115:18, 174:13
**blackwater**
57:7, 57:14,
57:19
**blind**
62:16
**block**
113:21
**blog**
28:14
**bloom**
33:11
**blue**
173:11, 173:21
**bluer**
173:14
**blythe**
87:5, 93:4
**board**
53:14, 133:13,
172:22
**boards**
104:13, 119:13
**bob**
70:9, 70:18,
123:18
**bobby**
86:6, 93:1,
98:20, 122:5,
186:14, 187:3
**body**
129:15, 187:9
**bolded**
147:6, 154:19
**bond**
69:4, 71:13,
102:4, 102:17
**bonney**
206:8
**boom**
68:20
**border**
115:16

Transcript of John D. Moss
Conducted on September 13, 2019

222

| | | | |
|---|---|---|---|
| **borough** 57:7, 65:7, 65:8, 118:5, 118:6, 118:18, 118:19, 153:4 **boroughs** 118:20 **borrowing** 86:14 **both** 32:8, 38:10, 148:13, 153:16, 156:16, 162:19, 173:22 **bottom** 136:11, 147:18, 147:20, 150:8, 154:18, 171:14, 175:18, 176:13, 177:1, 183:10, 188:15, 201:13, 204:14, 208:22 **boulevard** 81:17, 109:19 **bound** 115:8 **boxes** 19:10, 29:17 **boy** 90:20, 90:22 **boynton** 4:4, 6:15, 8:20, 9:10, 11:1, 12:14, 30:4, 30:16, 36:2, 37:3, 38:13, 39:15, 39:18, 39:21, 40:2, 40:4, 40:8, 40:12, 40:16, 40:19, 41:2, 41:7, 41:10, 41:14, 41:17, 41:21, 42:4, 58:21, 62:19, 63:14, 67:19, 75:17, 97:16, 97:19, | 124:18, 126:18, 129:21, 134:16, 136:8, 136:11, 136:17, 137:8, 137:15, 137:19, 141:20, 142:4, 142:13, 147:13, 148:2, 150:1, 150:5, 152:7, 154:11, 154:14, 157:17, 158:7, 158:17, 162:21, 163:14, 164:9, 165:1, 165:6, 165:10, 165:17, 166:22, 168:6, 168:22, 175:2, 176:2, 176:6, 182:10, 182:21, 192:10, 192:13, 192:20, 193:4, 197:12, 197:20, 198:18, 201:11, 212:10, 212:14, 212:21 **brace** 117:8, 117:11 **brain** 108:7, 160:20 **breach** 10:6, 10:8, 10:9, 202:12 **break** 8:5, 48:11, 50:6, 75:18, 76:21, 182:11, 182:12, 212:9 **breakfast** 95:22 **breakfasts** 81:19 **breakup** 57:17 **brian** 105:3, 105:6, 106:9 **briefing** 177:18, 177:22, | 178:2, 184:8 **briefly** 68:14, 101:20 **brigade** 52:5, 52:7 **bring** 13:3 **broader** 145:18 **brochure** 70:1 **brother's** 69:16 **brought** 9:8, 109:3, 195:19 **bruce** 53:6, 84:22, 85:4, 85:14, 87:17, 89:13, 89:19, 89:21, 106:16, 107:1, 107:3, 193:11, 193:18, 202:16, 203:11, 204:10, 205:12 **buck** 72:9 **budget** 81:9, 81:12, 81:14, 88:11 **budgets** 88:10 **build** 120:5, 127:2, 206:9, 206:21 **building** 2:7, 4:7, 71:13, 81:17 **buildings** 102:10, 206:9 **built** 72:19 **bulk** 22:8 **bunch** 40:10, 75:5, 81:7 | **bus** 196:13 **business** 17:2, 17:3, 22:9, 32:11, 33:5, 34:4, 34:15, 35:16, 35:19, 36:13, 37:6, 37:12, 38:2, 39:6, 39:14, 42:11, 42:22, 61:3, 61:12, 64:3, 75:8, 177:13, 178:15, 207:4 **businesses** 178:18, 182:1, 182:4, 189:16 **businessman** 94:20 **businessmen** 115:11 **busy** 94:6, 94:15 **byler** 172:15, 172:18 ——— **C** ——— **c-e-c-i-l** 207:21 **c-u-t-c-h-i-n-s** 207:22 **cable** 128:16 **calculus** 146:18 **call** 58:13, 80:4, 81:3, 83:11, 99:3, 112:14, 119:14, 194:14, 201:22, 202:9 **called** 57:7, 57:20, 57:22, 69:21, 90:4, 105:13, 114:1, 146:20, 200:20, 200:21, |

Transcript of John D. Moss
Conducted on September 13, 2019                     223

202:6
**calling**
198:19
**calls**
83:10
**came**
63:1, 63:10,
67:10, 74:15,
74:18, 103:14,
104:8, 104:16,
106:9, 107:19,
107:21, 111:12,
128:13, 128:20,
153:22, 192:2,
208:13, 208:15
**campaign**
3:5, 3:12,
6:11, 6:14,
16:17, 17:11,
17:12, 17:14,
18:4, 18:5,
19:12, 19:19,
20:12, 20:15,
21:17, 22:16,
22:17, 22:18,
22:19, 26:5,
26:9, 26:18,
28:17, 29:17,
50:17, 50:22,
51:3, 51:4,
52:6, 53:5,
53:22, 54:22,
55:2, 55:13,
85:15, 89:7,
90:21, 91:11,
91:12, 91:19,
92:20, 93:7,
93:8, 93:9,
93:10, 93:12,
93:13, 93:18,
93:20, 94:15,
94:16, 95:2,
95:11, 95:16,
96:17, 98:15,
98:18, 99:1,
99:3, 99:10,
99:16, 99:22,
100:4, 100:6,

100:9, 105:2,
105:4, 106:3,
106:4, 106:11,
106:13, 106:16,
107:6, 107:11,
107:18, 109:17,
109:22, 110:8,
110:11, 110:17,
110:21, 122:14,
141:14, 151:5,
156:22, 164:21,
169:15, 169:19,
169:22, 170:3,
170:15, 171:18,
171:20, 172:5,
172:6, 172:10,
174:20
**campaign-related**
21:6
**campaigned**
121:18, 121:21
**campaigning**
73:13, 94:2,
94:14, 135:6,
135:12
**campaigns**
17:15, 52:20,
59:9, 65:1,
85:6, 105:11,
105:17, 105:19,
105:21, 105:22,
108:9, 163:22
**campus**
102:11
**candidacy**
104:16, 105:1
**candidate**
45:4, 45:7,
45:8, 46:8,
55:20, 83:19,
91:8, 91:22,
92:14, 93:21,
97:22, 108:4,
109:10, 131:12,
156:6, 164:12,
164:13, 165:22,
166:5, 167:13,
168:18, 168:19,

168:20
**candidate's**
46:1, 93:8
**candidates**
53:16, 86:7,
88:18, 91:22,
96:11, 97:1,
97:8, 97:9,
97:11, 98:14,
107:6, 110:21,
111:5, 111:9,
130:18, 136:1,
171:2
**cannot**
8:17, 11:17,
13:12, 43:6,
64:12, 95:14,
139:9, 152:12,
157:9, 166:6,
174:11
**canvass**
55:12
**capacities**
30:10
**capacity**
17:6, 22:15,
31:2, 36:7,
101:17
**capital**
51:3, 126:11
**capitalist**
109:2
**captain**
72:3
**capture**
34:20, 34:21,
35:1
**captured**
34:13, 34:15,
62:13, 63:21,
98:13
**care**
72:2, 193:20
**careful**
35:10, 179:7,
179:10
**case**
1:7, 6:10,

6:13, 6:17,
10:5, 18:3,
74:22, 91:15,
120:5, 136:22,
155:18, 163:2,
176:19, 191:9,
201:19, 215:11
**cases**
9:18, 9:21,
10:11, 12:16
**castigated**
73:15
**casual**
157:13
**category**
112:18, 163:18
**caucasian**
8:14, 210:3
**caught**
210:18, 210:19,
211:2
**causes**
113:14
**cc**
63:22, 64:3
**cecil**
206:6, 207:20,
207:21
**cellphone**
24:20
**census**
58:4, 116:7,
116:16
**center**
2:7, 3:5, 3:12,
4:7, 6:11, 6:14,
69:18
**ceo**
207:22
**certain**
38:18, 60:9,
60:10, 89:6,
96:8, 111:1,
157:8, 179:8,
181:3, 183:15,
184:19, 189:11,
212:7
**certainly**
18:1, 21:10,

Transcript of John D. Moss
Conducted on September 13, 2019

224

35:4, 55:10,
72:16, 75:12,
80:21, 85:7,
100:8, 153:7,
190:6, 190:19,
198:12, 199:3,
200:2, 205:12,
205:20, 206:3
**certificate**
215:1
**certify**
215:4
**chaired**
47:15, 48:5,
117:4
**challengers**
151:3
**challenges**
54:11
**chamber**
53:10, 53:11,
53:12, 53:13
**chambers**
82:20, 209:22
**chance**
19:11, 78:6,
123:10, 149:9,
149:20, 150:15,
213:1
**change**
17:15, 47:17,
49:7, 49:9,
52:11, 53:8,
56:2, 56:22,
58:8, 59:11,
59:14, 59:19,
65:9, 119:3,
119:7, 119:22,
121:4, 123:2,
123:11, 123:13,
123:17, 124:8,
124:17, 125:5,
125:7, 127:10,
127:17, 128:10,
130:7, 130:19,
131:3, 132:22,
133:4, 133:22,
139:18, 139:21,

141:4, 144:5,
144:11, 161:5,
195:2
**changed**
66:1, 66:5,
66:8, 70:20,
121:8
**changes**
44:19, 70:19
**changing**
34:8, 43:4,
64:9, 102:12,
157:5, 159:5,
159:12, 159:19,
160:5
**characterization**
56:19
**characterize**
115:19
**characterized**
72:21, 73:1
**charity**
93:15
**charter**
80:11, 103:5,
121:8, 139:17,
195:10
**check**
93:6, 93:10,
93:12, 100:12,
110:14, 171:12
**checkbook**
17:8
**checks**
93:15
**chicago**
3:15, 6:11
**chief**
195:11
**chlopak**
3:4, 6:12,
41:3, 41:13,
41:16
**choice**
57:12, 57:13,
76:12, 102:20,
103:10, 104:3,
130:15, 130:16,

130:18, 131:21,
136:4, 148:18,
148:19, 149:5,
155:22, 162:5,
198:14, 198:16,
199:12, 211:8,
211:10
**choices**
84:16, 84:17,
131:13, 135:9
**choose**
57:12, 123:10,
123:12, 126:3,
148:14, 177:14
**chooses**
104:1
**chose**
58:11, 58:14,
99:14
**chosen**
9:12
**chris**
6:15
**christmas**
134:14
**christopher**
4:4
**church**
82:5
**circumstances**
154:2
**cities**
151:12, 151:14,
151:22, 152:1,
152:2, 154:5
**citizen**
77:21, 211:3,
211:6
**citizens**
122:13, 142:16,
151:18
**city's**
34:4, 62:14,
75:8, 102:12,
116:8, 131:22,
132:4, 132:22,
133:4, 135:7,
135:21, 152:9,

152:17, 152:19,
161:5, 188:4,
195:10
**cityview**
205:16
**citywide**
156:13, 156:15
**civic**
81:20
**civil**
14:12
**claim**
33:19, 170:14
**claims**
199:7
**clarification**
142:5
**clarify**
35:12
**clark**
47:14, 48:5,
186:13, 186:20,
186:21, 188:20
**classify**
113:18, 116:1,
116:5
**clear**
7:22, 9:12,
21:5, 67:20,
104:4, 124:7,
124:8, 124:18,
161:4, 173:13,
192:19, 208:3
**clearly**
73:4, 89:12,
89:19, 131:6,
191:20, 195:9,
199:15, 205:3
**clerk**
18:11, 48:7,
62:17, 121:5,
121:10, 143:19,
143:22, 144:4,
161:10, 161:16
**clients**
212:19
**clips**
5:18

Transcript of John D. Moss
Conducted on September 13, 2019

225

close
67:11, 70:8,
93:13, 113:1,
122:7, 203:10,
204:14
closed
62:9, 93:11,
142:2, 158:2
closer
190:13
cloud
23:10, 23:11
coalition
122:9, 129:14
cognition
28:3
cognizant
100:3, 100:10
collection
92:11
collective
127:20
collectively
44:21, 80:16
college
76:8
colony
110:2
color
164:14
colored
166:12, 170:16
colors
169:13, 170:7
column
122:6, 166:19,
166:20, 167:3,
167:8, 169:12
columns
166:11, 166:14,
167:2, 167:3,
167:4, 167:5
com
18:10, 32:20,
62:18, 62:19,
62:20, 63:15,
63:16
come
67:2, 67:9,

68:2, 68:4,
69:15, 72:1,
82:18, 83:6,
83:9, 122:22,
128:6, 128:10,
128:14, 129:3,
129:11, 141:6,
142:16, 157:11,
157:15, 200:2,
209:14
comes
62:8, 86:20,
112:15, 114:22,
127:21, 146:18,
161:18, 209:16
command
79:18
commander
13:9, 79:9
comment
18:8, 28:7,
91:18, 165:4,
198:12, 200:1
commentary
176:4
commented
28:5
comments
32:8, 187:15,
197:10, 198:1,
198:4, 200:10
commerce
53:13
commission
47:12, 47:19,
48:5, 50:1,
50:4, 56:2,
101:12, 101:13,
119:19, 120:12,
215:16
commissioner
100:15
commissions
104:14
commitment
109:15
common
39:13, 42:10,

42:13, 42:16,
105:13
commonwealth
2:18, 60:16,
215:22
communicate
54:1, 80:19
communicated
16:3, 211:15
communicates
90:18
communicating
60:8, 78:19
communication
33:15, 54:3,
63:4, 117:7,
193:8, 193:14,
193:17, 200:12,
202:13, 202:18
communications
10:15, 12:21,
12:22, 60:4,
82:9, 163:20,
211:14
communities
108:18, 113:20,
114:2, 114:14
community
51:21, 55:15,
75:11, 99:15,
103:16, 108:14,
109:7, 112:5,
112:16, 112:17,
112:19, 113:21,
115:20, 120:4,
120:8, 123:4,
127:22, 128:7,
129:4, 129:6,
129:8, 129:9,
144:16
competent
77:16, 109:13
competing
103:16
competition
50:14, 51:2,
52:12, 130:21,
131:21, 135:6,

135:13, 146:9,
146:11, 146:12,
146:15, 151:3,
186:2, 187:20
competitive
51:6, 59:7,
131:12, 131:20
complete
102:7, 143:2,
214:5
completed
134:13
completion
178:14
compliance
179:17, 179:20,
180:19
complies
177:15
composition
51:7
comprehensive
22:13, 31:21
computer
19:18, 20:9
concentrated
149:8, 149:19,
150:14
concentration
114:13
conception
153:19
concluded
213:4
conclusion
55:8, 113:16,
182:5, 192:2,
192:3
conclusions
73:8
concur
136:5, 150:9,
152:3
concurrence
77:11
condition
196:19
condoning
200:4

Transcript of John D. Moss
Conducted on September 13, 2019

226

| | | | |
|---|---|---|---|
| conduct<br>19:7, 21:13,<br>32:11, 37:6,<br>39:7, 61:3,<br>61:11, 177:13<br>conducted<br>33:4<br>confirm<br>143:19<br>confiscate<br>80:16<br>congressman<br>122:17<br>congressmen<br>146:3<br>consciously<br>37:17, 64:7,<br>110:19<br>consensus<br>141:16<br>consequence<br>68:20, 70:4<br>consequences<br>145:20<br>consider<br>122:5, 138:10,<br>179:9<br>considerations<br>76:14<br>considered<br>57:11, 129:9,<br>129:16, 142:15<br>consistent<br>194:22<br>consistently<br>184:16, 200:18<br>consisting<br>151:5<br>constantly<br>86:13<br>constituent<br>33:10<br>constituents<br>80:20, 82:12,<br>83:3, 83:5,<br>83:8, 90:2,<br>160:18<br>constitutional<br>60:16, 100:7, | 100:21<br>constraint<br>55:1<br>construction<br>194:16<br>consultant<br>105:9, 178:5<br>consultants<br>116:19<br>consumed<br>144:17<br>contain<br>168:15<br>content<br>10:14, 16:13,<br>157:20, 158:17<br>contents<br>11:11, 38:14<br>contested<br>154:20<br>context<br>30:5, 30:22,<br>31:1, 102:16,<br>153:19, 154:12,<br>158:2, 158:7,<br>158:14, 185:20,<br>190:2, 199:5<br>continue<br>102:17, 152:7<br>continued<br>204:19<br>continues<br>155:2, 178:21<br>continuing<br>181:3<br>contract<br>10:6, 10:8,<br>10:9, 194:14<br>contracts<br>178:17, 182:1<br>contrary<br>101:2<br>contributed<br>71:8, 92:14<br>contribution<br>91:14, 99:10,<br>172:5, 172:6<br>contributions<br>53:18 | control<br>19:5, 59:8,<br>194:13<br>controversial<br>34:19<br>convenient<br>62:3, 62:5<br>convention<br>69:18<br>conversation<br>43:11, 110:1,<br>120:4, 126:13,<br>127:8, 157:20,<br>158:8, 196:14<br>conversations<br>44:21, 116:22,<br>117:10, 124:20,<br>142:6, 157:4,<br>157:10, 157:15,<br>157:18, 158:1,<br>158:6, 158:9,<br>158:13, 159:4,<br>159:11, 159:18,<br>160:2, 160:4,<br>192:14<br>converted<br>57:1<br>convey<br>140:9<br>copies<br>18:9, 170:11<br>copy<br>34:21, 47:22,<br>62:6, 62:9,<br>62:15, 62:16<br>corner<br>183:6, 201:13,<br>208:22<br>corporation<br>172:12, 206:7,<br>208:1<br>correction<br>9:22<br>corrections<br>214:6<br>correctly<br>37:2, 67:18,<br>88:2, 153:1, | 153:3, 178:3<br>cost<br>70:21, 171:22<br>costly<br>151:4<br>costs<br>50:16, 52:14,<br>207:4<br>coucilman<br>27:1, 184:14,<br>185:16<br>could<br>8:9, 13:6,<br>15:21, 24:7,<br>31:8, 31:20,<br>31:21, 33:8,<br>33:9, 33:12,<br>33:13, 33:15,<br>33:22, 34:1,<br>38:2, 51:4,<br>53:7, 53:8,<br>62:12, 68:12,<br>77:16, 120:14,<br>120:21, 121:5,<br>122:5, 134:14,<br>135:3, 142:11,<br>153:17, 157:11,<br>157:15, 173:6,<br>194:3, 198:10,<br>199:13, 199:14,<br>212:8<br>couldn't<br>11:15, 28:19,<br>29:1, 57:16,<br>66:6, 71:1,<br>76:4, 90:21,<br>97:12, 133:12,<br>134:1, 157:16<br>council's<br>105:22, 195:19,<br>207:17<br>councilmail<br>15:22, 31:4,<br>32:20, 34:22,<br>62:6, 211:20<br>councilmail@vb<br>18:10, 62:18<br>councilman<br>133:10, 184:10 |

Transcript of John D. Moss
Conducted on September 13, 2019

227

councilmember
15:15, 30:1
counsel
7:1, 138:3,
176:19, 193:11,
215:10
counsel's
158:21
count
123:18
counter-voice
78:5
country
13:16
county
101:14, 101:15,
111:15, 114:9,
153:15, 153:22
couple
7:15, 35:6,
52:9, 133:15,
141:6
course
51:10, 81:19,
105:3, 109:22,
111:17, 119:18,
120:5, 121:13,
122:6, 157:15,
196:2
court
1:1, 7:16, 8:1,
10:7, 42:6,
101:20, 132:11,
136:19, 153:2,
156:2, 162:13,
175:8, 182:17,
201:6
courthouse
2:6, 4:6
cover
14:11
covered
159:15
cox
61:14, 61:18,
128:16
crane
189:3

create
69:1, 153:18
created
50:13
creates
52:21, 135:5,
135:11
critical
121:16
critique
99:3
crosses
56:15
crowd
82:15
crr
1:22, 2:18,
215:2
cumulative
208:18, 208:20,
210:17, 210:19,
211:4, 211:7
cure
122:10
current
44:5, 60:15,
65:3, 78:21,
89:2, 101:21,
104:2, 123:14,
124:2, 124:12,
131:8, 135:21,
151:17, 152:9,
152:11, 152:14,
152:17, 152:19,
157:5, 159:12,
162:3
currently
64:14, 106:2,
117:18, 117:20
curve
103:21
custody
19:5
cut
32:18, 33:9
cutchins
206:6, 207:20,
207:21

D

d-a-r-r-e-l-l
8:11
d-e
126:10
d-e-f
176:14, 183:6
dad
111:13
dais
78:7
dane
87:5, 93:3
darrell
8:11
data
154:20
date
10:21, 11:12,
11:13, 27:13,
66:7, 66:9,
143:17, 143:18,
189:11, 214:11
dated
5:14, 5:16,
5:20, 132:18,
163:9, 176:5,
176:11, 188:16,
202:3
dates
10:19, 25:15,
130:4, 157:8
dave
39:1, 175:12,
175:21, 177:2,
183:11, 184:12,
192:7, 192:22,
202:6, 207:9
davenport
183:12, 183:16,
183:20, 188:21
david
137:10, 156:13
davis
117:4
day
37:21, 51:22,

115:16, 122:13,
139:6, 139:7,
160:20, 180:8,
215:14
days
10:22, 11:16,
114:9
dc
3:8
deal
179:11, 199:15,
202:20, 203:6
dealing
202:19
deals
31:6
dealt
24:7, 179:6,
195:21, 204:22
dean
84:3
deceased
46:18, 46:19,
52:4, 120:11
december
154:20, 194:1
decide
35:1, 50:3,
50:8, 55:9,
58:11, 77:3,
77:13, 102:22,
103:8, 125:20,
156:1
decided
77:12, 107:22,
203:2
decides
103:6
decision
103:7, 153:2
decision-making
146:17
decisions
59:6, 78:3
declared
108:3, 129:5
dee
167:9, 167:12,

Transcript of John D. Moss
Conducted on September 13, 2019

228

167:13, 168:4,
168:16, 168:20,
169:1, 169:3,
169:4, 169:5,
169:9, 169:13
**deep**
8:20
**def**
5:15, 5:17,
5:19, 5:21,
201:13, 209:1
**defeated**
69:4, 71:14
**defendants**
1:10, 4:2,
6:17, 176:18
**defense**
68:20
**defer**
188:6
**deferrals**
139:10
**deferred**
139:8, 143:14
**define**
91:10, 165:21
**defined**
128:8
**defines**
152:2
**definitely**
38:16, 45:10,
53:14, 56:22,
87:10, 87:22
**definitive**
13:12
**definitively**
11:17
**degrees**
76:9
**delegate**
56:13, 126:5,
126:13, 126:15
**delegates**
48:16, 56:12
**delete**
17:22, 22:20,
23:8, 24:15,

24:18, 32:21,
35:13, 62:22
**deleted**
27:4, 35:9
**demands**
13:10
**demographic**
129:10
**demographically**
112:1, 128:8,
129:15
**demographics**
57:14
**denied**
103:2, 196:12
**denies**
131:13
**dennis**
101:7
**departed**
76:15
**department**
33:12
**dependent**
13:11
**depending**
164:14, 170:16
**depends**
82:6
**deponent**
6:18, 9:6,
212:20, 212:22,
214:1
**deposed**
7:6, 9:15,
10:1, 10:10
**deposition**
1:14, 2:1, 5:9,
7:12, 8:21,
10:21, 11:4,
12:2, 12:18,
13:1, 13:4,
15:5, 15:8,
135:19, 148:12,
212:17, 213:4,
215:3
**depositions**
10:4

**deputy**
189:9
**derived**
124:21
**describe**
74:3, 112:2
**deserves**
126:3
**desk**
90:10
**desperate**
74:16
**despite**
60:5
**desteph**
126:10, 133:10,
133:17, 133:18
**details**
38:6, 169:16
**developer**
84:22, 203:15
**developers**
68:9, 203:18,
205:18, 205:19
**development**
68:10, 68:16,
69:2, 70:21,
71:12, 79:8,
91:2, 193:9,
202:21, 206:7,
206:13, 206:20,
208:1
**dialogue**
32:18, 141:16
**different**
44:22, 55:14,
68:8, 75:13,
81:19, 81:20,
86:11, 90:19,
95:20, 108:17,
146:15, 150:4,
162:4, 164:14,
170:7, 170:16,
174:17, 179:7,
200:5
**difficult**
54:18, 55:2,
55:11, 135:22,

136:3
**digress**
68:12
**dilutes**
155:10
**direct**
101:13, 119:11,
187:20, 206:10
**directing**
154:18
**direction**
140:16, 141:16,
187:14, 194:21,
215:8
**directions**
195:12
**directly**
80:19, 119:17,
128:15, 191:11,
197:18, 197:22,
200:9, 202:14,
202:19
**director**
79:7, 183:22,
189:7
**directorship**
172:12
**disadvantage**
52:21
**disadvantages**
50:14
**disagree**
42:4, 191:2
**disappeared**
74:2, 74:17,
75:14
**disappointed**
76:18, 120:8
**discern**
166:16, 169:16
**discernible**
169:21, 170:12,
171:16
**disclosure**
89:16, 169:18,
169:19, 170:2,
170:9, 171:9,
171:15

Transcript of John D. Moss
Conducted on September 13, 2019

229

**disclosures**
84:21
**discourage**
100:1, 190:12
**discourages**
190:6, 191:8
**discouraging**
191:15, 192:1
**discovered**
43:11
**discovery**
14:16, 14:20,
20:4
**discriminate**
36:11
**discriminator**
85:13
**discuss**
12:18, 16:4,
35:13, 35:16,
212:5
**discussed**
44:9, 46:9,
46:15, 110:7,
131:2, 144:6,
150:7, 156:9,
157:3, 159:3,
159:10, 159:17,
160:3, 189:15,
190:17, 208:2,
210:10
**discusses**
34:14, 35:18
**discussion**
8:21, 140:16,
140:17
**discussions**
44:8, 144:14
**disenfranchised**
50:17, 108:21
**disenfranchises**
51:18, 131:11
**disenfranchising**
59:18
**dismissed**
105:4
**disown**
200:3

**disparity**
21:17, 178:5,
179:1, 180:13,
180:15, 180:22,
181:7, 181:21
**dispersed**
51:21
**disproportionate**
50:20
**disproportionate-**
**ly**
135:8
**disqualified**
156:13
**disqualifier**
85:9, 107:2
**disrespected**
195:21
**disrupted**
59:3
**disruptive**
59:13
**dissipated**
54:5, 54:6
**distributed**
59:20
**distribution**
98:6
**district**
1:1, 1:2, 34:8,
43:4, 47:11,
48:12, 51:12,
51:13, 54:6,
57:2, 57:18,
57:19, 57:22,
58:5, 58:11,
64:10, 102:21,
103:11, 103:18,
117:17, 117:19,
117:21, 118:2,
118:5, 118:9,
118:19, 119:8,
119:22, 121:4,
122:16, 122:20,
127:18, 128:11,
129:1, 130:7,
130:20, 131:4,
141:2, 145:7,

145:13, 145:22,
146:1, 146:3,
147:21, 148:5,
148:8, 148:15,
148:21, 149:7,
149:14, 149:18,
150:13, 151:5,
151:15, 152:13,
153:4, 154:20,
156:4, 156:6,
156:12, 156:14,
156:15, 161:6
**district-based**
157:6, 159:6,
159:13, 159:20,
160:5
**districts**
46:10, 46:15,
49:1, 49:16,
50:9, 51:1,
51:5, 52:11,
56:3, 57:4,
58:3, 58:4,
81:7, 81:10,
102:13, 104:6,
116:9, 119:3,
120:17, 123:2,
123:17, 125:5,
125:7, 127:10,
133:11, 135:14,
139:18, 139:19,
139:22, 144:6,
144:12, 145:2,
146:11, 146:14,
146:21, 148:6,
148:11, 210:11,
210:12
**diversity**
109:8, 109:12,
130:5
**division**
1:3
**document**
11:12, 14:9,
14:14, 15:1,
15:6, 16:6,
18:17, 18:21,
27:21, 29:21,

47:8, 47:22,
62:14, 132:13,
137:6, 137:7,
137:21, 147:3,
147:4, 147:11,
147:12, 162:14,
163:7, 163:17,
163:19, 164:6,
164:10, 165:1,
165:11, 165:13,
165:15, 166:10,
175:9, 175:19,
176:3, 176:14,
176:18, 176:20,
182:16, 182:20,
183:3, 186:7,
196:9, 201:7,
201:10, 201:16,
201:18, 209:1
**documentation**
15:20, 16:1,
17:17, 47:21,
60:11
**documented**
193:7, 196:15
**documents**
12:7, 13:3,
15:17, 15:22,
16:8, 16:18,
16:22, 17:1,
17:12, 18:19,
19:3, 19:8,
20:9, 20:14,
21:9, 26:16,
29:5, 29:11,
30:3, 31:10,
31:16, 137:1,
162:15, 163:3,
163:20
**doing**
34:20, 42:2,
63:2, 93:19,
94:6, 113:21,
134:6, 180:18,
180:21, 181:2,
196:7
**dollar-limited**
54:17

Transcript of John D. Moss
Conducted on September 13, 2019

230

| | | | |
|---|---|---|---|
| **dollars** | 21:1, 25:16, | **easier** | 66:11, 66:17, |
| 184:9 | 31:21, 32:2, | 33:1, 151:4 | 66:20, 69:10, |
| **domain** | 115:7 | **eastern** | 69:11, 70:5, |
| 196:5 | **driver** | 1:2 | 83:13, 89:18, |
| **dominant** | 50:15 | **easy** | 92:1, 100:7, |
| 114:19 | **drives** | 21:12, 55:18, | 111:6, 111:9, |
| **don** | 24:17 | 76:12, 178:12 | 118:6, 119:13, |
| 47:14, 48:5, | **driving** | **economic** | 119:16, 119:17, |
| 121:15 | 50:11 | 113:5 | 141:5, 148:9, |
| **donated** | **due** | **edit** | 156:7 |
| 91:11 | 112:8, 113:11 | 32:10 | **electing** |
| **done** | **duly** | **educate** | 210:5 |
| 12:6, 34:5, | 6:4 | 192:12 | **election** |
| 40:20, 41:14, | **during** | **education** | 21:16, 28:18, |
| 41:19, 45:4, | 13:7, 38:19, | 101:12, 141:14 | 43:5, 43:19, |
| 46:3, 47:9, | 46:22, 90:20, | **effect** | 43:22, 47:11, |
| 55:17, 64:5, | 93:10, 109:22, | 60:11, 205:5 | 48:4, 50:13, |
| 71:8, 76:10, | 182:2, 197:10 | **effective** | 51:14, 51:17, |
| 91:21, 92:5, | **dust** | 14:13, 77:16, | 64:19, 64:20, |
| 94:12, 121:3, | 67:18 | 122:14, 131:19 | 67:4, 67:7, |
| 125:8, 140:13, | **duties** | **effectively** | 67:13, 68:12, |
| 140:18, 160:10, | 79:20 | 51:4, 51:19, | 73:2, 77:5, |
| 185:3, 205:22, | **duty** | 130:22 | 77:6, 77:11, |
| 206:1, 206:2 | 195:13 | **effort** | 78:9, 78:13, |
| **door-to-door** | **dwelling** | 30:7, 73:15, | 78:15, 86:4, |
| 51:4, 55:12, | 29:12, 29:15 | 117:6, 133:11, | 103:11, 119:8, |
| 95:19 | **dyer** | 133:17 | 119:11, 120:6, |
| **down** | 37:19, 86:6, | **efforts** | 127:14, 131:9, |
| 7:16, 97:21, | 93:1, 98:20, | 13:14, 49:10, | 131:22, 132:4, |
| 134:19, 134:20, | 99:8, 122:5, | 178:4 | 133:1, 133:4, |
| 147:20, 150:20, | 123:18 | **eh** | 134:12, 135:10, |
| 151:10, 157:14, | | 199:15 | 156:17, 157:6, |
| 194:10, 204:13, | **E** | **either** | 159:13, 159:20, |
| 205:4, 209:15 | **each** | 18:9, 28:9, | 160:6, 171:21, |
| **download** | 7:21, 81:9, | 31:3, 35:4, | 211:17 |
| 36:4, 36:17 | 113:1, 181:19 | 70:1, 74:14, | **elections** |
| **downloaded** | **earlier** | 109:20, 113:12, | 64:11, 65:22, |
| 34:17 | 30:19, 75:21, | 174:15, 182:10, | 66:4, 84:5, |
| **doyle** | 79:2, 106:12, | 197:16 | 117:15, 149:7, |
| 113:19 | 106:18, 116:6, | **elaborate** | 149:18, 150:14, |
| **draft** | 120:7, 120:13, | 181:5 | 154:21, 173:1, |
| 138:21 | 131:16, 144:15, | **elect** | 211:22 |
| **draw** | 145:7, 148:12, | 130:18, 131:14, | **electoral** |
| 55:8, 73:8 | 156:9, 187:17, | 136:1, 148:7 | 58:8, 102:13 |
| **drive** | 202:12, 209:15, | **elected** | **electronically** |
| 2:6, 4:6, | 210:17, 211:15 | 60:16, 64:18, | 31:8 |
| 19:18, 20:5, | **early** | 65:11, 65:18, | **elementary** |
| 20:18, 20:20, | 111:14, 114:8 | 65:20, 66:2, | 45:11 |

Transcript of John D. Moss
Conducted on September 13, 2019

231

elephant
171:17, 172:1,
172:3, 172:14,
173:3
eliminated
54:5
else
13:1, 22:18,
23:4, 29:4,
33:20, 45:18,
60:7, 63:12,
66:10, 80:6,
86:4, 88:19,
93:18, 94:10,
95:9, 95:12,
98:11, 99:20,
102:2, 102:6,
111:4, 117:7,
121:3, 125:8,
126:12, 140:13,
141:17, 142:20,
160:5, 174:21,
196:21, 212:6
else's
91:12
elsewhere
101:10, 154:3,
156:7
email
5:14, 5:16,
5:20, 10:18,
21:8, 21:22,
22:22, 23:7,
32:19, 34:22,
61:1, 61:2,
61:7, 61:9,
61:10, 61:13,
62:1, 62:13,
62:22, 63:12,
63:20, 63:22,
64:4, 175:12,
175:20, 177:1,
177:5, 177:9,
177:18, 178:7,
178:16, 178:21,
180:1, 183:11,
184:1, 186:4,
186:10, 186:19,

187:9, 188:16,
189:13, 202:13,
209:5, 209:10,
210:4, 211:14,
212:5
emailed
64:9
emailing
177:8
emails
17:19, 17:22,
18:7, 18:12,
22:5, 23:12,
32:20, 38:7,
38:9, 62:12,
63:13, 64:2,
83:5, 83:8
emasculated
78:2
emotional
179:2
empirically
192:3
employed
113:13, 209:17,
215:10
employees
100:22, 186:12
employment
54:15, 79:3,
79:6
empowers
135:8
empty
22:2, 101:5
ems
81:17
enables
135:5, 135:12
encountered
164:15, 170:17
encouraged
77:9
end
49:12, 72:9,
73:10, 76:1,
84:14, 89:17,
133:11, 146:16,

162:5, 182:10,
206:22
ended
18:5
endorse
84:18, 85:2,
85:3, 86:10,
87:4, 87:7,
87:19, 88:3
endorsed
83:19, 84:3,
84:4, 84:12,
84:13, 84:15,
85:20, 86:5,
86:8, 87:5,
87:22, 88:1,
89:7, 89:19,
97:9, 100:10,
101:4, 107:18,
156:22
endorsement
84:3, 99:18,
100:19, 101:1
endorsements
98:8, 98:9
endorsing
87:8, 87:19
engaged
191:11
engagements
81:20
engineering
184:5, 184:6
enough
87:17, 93:17
entering
51:9
entire
175:2
entirely
156:5
entry
51:3, 51:22
environment
199:3
equal
48:13, 49:2,
57:4, 58:1

equation
122:12
eric
93:1, 94:13,
94:14, 94:16,
94:18, 95:6,
95:13, 106:20,
109:10
erin
3:4, 6:12
errata
214:7
escaping
120:15
esg
10:6
esquire
3:4, 3:11, 4:4
established
32:22, 179:17
estate
206:16
et
1:9, 4:3
ethnicity
57:17, 113:6
evasive
39:6, 96:21,
160:17
even
57:16, 61:18,
61:19, 70:22,
73:6, 74:5,
78:5, 87:4,
88:17, 111:12,
116:21, 119:14,
119:20, 123:10,
197:19, 205:3,
207:14, 208:20
evening
81:20, 180:2
evenings
55:12
event
63:5, 81:22,
82:1, 157:12,
194:1, 198:8,
210:1

Transcript of John D. Moss
Conducted on September 13, 2019

232

**events**
46:5, 82:10, 95:20, 123:9, 133:22
**ever**
7:6, 10:10, 27:20, 32:11, 34:7, 37:11, 43:2, 46:7, 61:9, 64:9, 69:11, 83:3, 83:13, 83:16, 83:19, 91:8, 91:11, 91:16, 91:18, 92:13, 93:7, 93:20, 96:10, 97:22, 100:4, 100:5, 100:10, 101:8, 104:11, 110:3, 111:5, 111:9, 118:1, 153:21, 160:18, 170:3, 170:14, 180:21, 181:2, 197:9, 197:21, 203:14, 204:9, 211:15
**every**
9:8, 34:13, 41:6, 44:1, 44:5, 81:6, 91:14, 122:12
**everybody**
23:3, 73:8, 102:10, 145:12
**everything**
7:17, 7:18, 16:16, 20:20, 36:15, 196:21
**evidence**
132:2
**exact**
10:21, 14:18, 25:14, 47:13, 66:7, 195:5
**exactly**
15:3, 25:14, 128:21

**examination**
5:2, 7:1
**examined**
6:4, 214:3
**example**
63:3, 206:5, 207:3
**examples**
106:1, 156:20, 193:7, 200:11, 206:6
**except**
17:12, 35:10, 124:16
**exchange**
175:12, 175:20
**exchanged**
38:7, 196:3
**exclusively**
146:2
**excuse**
57:3, 70:6
**executive**
12:3, 38:19, 124:22, 193:12, 202:15, 203:2, 203:5
**exemption**
33:17
**exerts**
85:17
**exhaustive**
92:18
**exhibit**
5:9, 5:10, 5:11, 5:12, 5:13, 5:14, 5:16, 5:18, 5:20, 14:1, 14:2, 14:8, 14:10, 14:13, 14:22, 16:6, 16:11, 16:14, 132:8, 132:9, 132:12, 134:22, 136:13, 136:15, 136:19, 162:9, 162:10, 162:13,

175:2, 175:4, 175:5, 175:8, 178:6, 182:7, 182:8, 182:14, 182:17, 201:1, 201:3, 201:6, 208:5, 208:7, 208:12
**existed**
65:9
**exists**
118:7
**expect**
127:1, 182:3
**expenditures**
206:11
**expense**
145:11, 204:7
**experience**
67:3, 195:15
**expert**
211:11
**expires**
215:16
**explain**
62:12
**explaining**
12:15
**explanation**
207:6
**explicit**
96:16
**express**
198:9
**expressed**
44:8, 45:3, 45:4, 45:6, 58:14, 127:17, 129:2, 131:5, 141:12
**expressing**
212:3
**expression**
20:20, 198:11
**expressions**
21:18, 21:19
**expressly**
144:2

**extensive**
80:11
**extent**
9:4, 22:17, 61:7, 96:2, 99:11, 141:15, 142:5, 198:18
**extrapolate**
152:12
**extreme**
193:19
**extremely**
120:8, 152:21
**eye**
210:18, 210:20, 211:3

**F**

**face**
109:4, 117:13, 128:18, 183:18, 187:2, 198:11, 199:9
**facebook**
25:22, 26:20, 26:22, 27:1, 27:9, 28:9, 32:4, 45:3, 80:22, 82:9, 92:7, 92:9, 92:10, 92:12, 99:2, 155:3
**faced**
54:12
**faces**
51:16, 108:22, 128:20
**facetime**
91:21, 92:5, 98:5
**facilitating**
30:6
**facilities**
81:18
**facility**
102:8
**fact**
36:4, 37:20,

38:18, 46:17,
55:6, 70:17,
72:17, 80:22,
89:12, 89:14,
101:1, 106:6,
108:16, 113:8,
133:20, 167:21,
191:13, 196:15
**factors**
191:12
**factually**
151:20, 197:16
**failed**
49:7
**fair**
39:12, 42:9,
144:21, 192:16
**fairly**
22:13, 39:12,
42:10, 60:10,
113:6, 207:1
**fairness**
75:15
**familiar**
14:19, 211:13
**family**
76:11, 76:13
**far**
23:20, 43:2,
96:7, 140:22,
203:13, 204:8
**farmers**
57:15
**favor**
44:22, 124:7,
147:21, 148:13,
180:18
**favorite**
16:21
**favors**
124:2, 148:5
**feature**
36:10
**february**
140:15, 141:2
**federal**
14:12, 113:12,
171:21

**fee**
102:1, 200:19
**feel**
81:10, 122:19
**fell**
90:8, 90:11
**fellow**
110:6
**felt**
67:22
**few**
20:22, 21:3,
35:7, 83:11,
160:1, 182:11,
184:11, 184:15,
185:17, 186:3
**fiduciary**
80:1
**field**
108:13
**figure**
105:10
**file-sharing**
25:17
**filed**
11:6, 11:18,
11:20, 104:19,
155:7, 195:17
**filing**
171:22
**filipino**
112:7, 112:16,
112:18, 129:4
**fill**
83:16
**final**
138:16
**finance**
59:9
**financed**
55:20
**finances**
17:8
**financial**
17:12, 19:21,
53:16, 54:4,
68:7, 84:21,
87:9, 89:15,

131:18, 215:12
**find**
14:18, 19:22,
53:8, 151:2
**finding**
182:5
**fine**
152:8
**finish**
7:19, 40:4
**fired**
38:21, 72:12,
193:22, 200:21,
202:1, 202:7
**firms**
184:19, 189:21,
190:12, 190:16,
190:22, 191:8
**first**
6:4, 10:16,
11:5, 11:17,
19:9, 19:16,
27:8, 27:15,
46:16, 49:14,
50:10, 65:15,
66:12, 69:9,
69:11, 71:22,
84:2, 109:16,
109:21, 111:21,
119:6, 119:10,
119:11, 119:21,
120:13, 136:17,
137:5, 138:19,
148:4, 153:3,
165:2, 181:10,
182:22, 196:12,
204:12, 209:5
**fiscal**
77:21, 88:12,
145:19
**fit**
112:18
**five**
17:13, 19:22,
61:16, 69:7,
69:21, 70:6,
70:8, 73:1,
74:4, 123:19,

200:1
**five-minute**
75:18
**flawed**
55:7
**flesh**
82:16
**floatopia**
198:9
**flood**
102:3
**flooding**
102:3, 144:18
**focus**
147:15, 147:18
**focusing**
144:19
**foia**
177:15
**foia-exempt**
193:14
**folders**
20:10, 20:12,
20:15, 21:1,
21:3, 21:5
**follow**
140:13
**following**
116:7, 116:16,
150:7, 158:21,
203:3
**follows**
6:5
**football**
110:5
**footnote**
151:21
**footnoted**
152:4
**force**
13:11
**forces**
13:10, 79:9
**forcing**
206:20
**foregoing**
214:3, 215:3,
215:4

Transcript of John D. Moss
Conducted on September 13, 2019

234

| | | | |
|---|---|---|---|
| **foremost** | **four** | **function** | 128:18 |
| 71:22 | 25:11, 42:19, | 194:13, 195:3 | **geographically** |
| **forever** | 48:13, 49:16, | **further** | 149:8, 149:19, |
| 22:22, 27:12, | 50:9, 56:3, | 151:10, 204:13, | 150:14 |
| 121:1 | 61:16, 70:4, | 212:12 | **geography** |
| **forget** | 104:6, 145:4, | **furthermore** | 135:7 |
| 194:1 | 145:5, 210:12 | 152:6 | **georgia** |
| **form** | **four-by-four** | **future** | 1:6, 3:3 |
| 39:15, 39:18, | 17:16, 19:12, | 85:13 | **germantown** |
| 39:21, 40:6, | 97:1, 97:10 | | 101:11, 101:14 |
| 40:15, 41:12, | **fowler** | **G** | **getting** |
| 42:5 | 126:13, 183:12, | **gap** | 50:20, 100:22, |
| **formal** | 183:14, 183:16, | 63:18, 66:21 | 119:16, 119:17, |
| 44:21, 48:6, | 186:11, 186:19, | **garage** | 157:17, 185:3, |
| 48:8, 49:14, | 187:9 | 16:16, 19:10, | 185:6, 191:18 |
| 141:6, 195:17 | **frame** | 29:13, 29:16 | **give** |
| **format** | 70:3 | **gardens** | 8:17, 13:12, |
| 14:18 | **free** | 115:2, 115:4, | 22:12, 36:18, |
| **former** | 101:7, 114:2 | 115:6 | 43:7, 48:10, |
| 44:9, 44:18, | **fresh** | **gary** | 50:5, 66:9, |
| 46:14, 133:10, | 89:11, 90:18, | 172:15, 172:18 | 71:5, 92:19, |
| 134:2, 159:5, | 109:3 | **gave** | 93:18, 109:1, |
| 159:19 | **friday** | 70:5, 70:6, | 149:7, 149:19, |
| **forth** | 1:16, 12:9, | 97:6, 100:18, | 150:14, 182:17, |
| 133:14, 138:8, | 12:12 | 172:4, 200:11, | 191:1, 195:12, |
| 140:19 | **friend** | 203:17, 204:9 | 201:7, 203:14, |
| **fortunately** | 69:9, 94:19, | **general** | 206:5, 206:16, |
| 196:14 | 95:6, 106:20 | 9:11, 48:15, | 208:9 |
| **forum** | **friendly** | 51:5, 56:6, | **given** |
| 45:11, 46:1, | 127:7 | 56:9, 56:13, | 14:22, 29:22, |
| 46:8 | **friends** | 103:4, 103:5, | 42:18, 55:3, |
| **forums** | 90:13, 171:17, | 108:9, 109:22, | 93:7, 204:9, |
| 45:4, 45:7, | 171:22, 172:2, | 122:16, 125:10, | 204:17, 214:5, |
| 45:8, 55:14 | 172:14, 173:2 | 126:4, 126:21, | 215:6 |
| **forward** | **front** | 138:5, 138:9, | **gives** |
| 81:11, 125:6, | 37:3, 54:19 | 138:18, 138:22, | 71:16, 149:13 |
| 129:3, 140:21, | **frustration** | 139:22, 140:12, | **giving** |
| 193:16 | 76:16 | 144:14, 158:19, | 15:5, 15:8, |
| **forwarded** | **fulfill** | 185:22, 187:12, | 102:19, 126:22, |
| 208:17 | 79:22, 80:5 | 187:18 | 203:4 |
| **forwards** | **full** | **generally** | **glad** |
| 61:7 | 8:9, 34:1, | 85:8, 138:5, | 24:3 |
| **fosters** | 34:4, 39:10, | 145:10, 146:12, | **glenn** |
| 135:6, 135:12 | 52:2, 170:8, | 189:17, 205:16 | 56:13, 117:4 |
| **found** | 170:21, 180:12, | **generated** | **gmail** |
| 15:21, 19:14, | 180:14, 180:16 | 30:12 | 177:9 |
| 181:21, 194:19 | **full-time** | **gentleman** | **go** |
| **foundation** | 54:15 | 52:7, 128:15, | 7:15, 16:5, |
| 168:7 | | | |

Transcript of John D. Moss
Conducted on September 13, 2019

235

16:21, 18:10,
22:4, 24:2,
24:4, 24:14,
27:5, 29:20,
34:2, 34:18,
35:11, 36:2,
38:5, 39:4,
47:19, 48:12,
49:11, 53:7,
53:15, 55:11,
55:14, 56:1,
58:11, 60:19,
62:15, 62:20,
63:11, 63:16,
68:6, 68:11,
76:5, 81:11,
83:7, 84:9,
86:20, 92:7,
93:10, 97:1,
97:10, 97:13,
103:3, 105:14,
108:20, 113:19,
121:10, 123:9,
130:4, 134:21,
140:21, 148:15,
153:9, 161:9,
161:15, 167:3,
171:21, 172:22,
178:4, 181:11,
182:21, 185:2,
205:1, 208:16

**goal**
178:19
**goes**
32:10, 46:17,
47:20, 48:3,
97:2, 115:9,
138:17, 147:19,
153:6
**going**
7:4, 12:11,
13:16, 13:22,
22:3, 30:4,
34:18, 40:4,
43:13, 46:15,
54:19, 59:5,
59:7, 59:11,
63:9, 72:15,

73:2, 75:4,
75:8, 75:17,
76:17, 91:20,
92:16, 92:19,
96:7, 105:19,
106:19, 108:3,
114:3, 117:1,
118:11, 119:5,
120:20, 127:5,
136:12, 136:17,
136:19, 137:13,
141:12, 141:15,
161:15, 162:8,
162:15, 167:7,
176:8, 184:19,
185:10, 191:5,
201:8, 203:2,
207:2, 210:11
**gone**
31:15
**good**
43:8, 50:9,
51:18, 63:2,
68:1, 69:9,
71:2, 74:1,
76:11, 76:20,
84:16, 89:19,
90:19, 90:22,
93:4, 124:15,
128:19, 132:16,
204:1, 206:5
**google**
25:16
**gosh**
25:4, 25:10,
39:6, 66:12,
69:14, 74:16,
84:4, 128:16
**gotten**
100:12
**gov**
15:22, 18:9,
61:5, 61:11,
62:1, 83:6,
211:20
**government**
31:2, 60:14,
99:21, 100:8,

101:9, 103:1,
103:9, 113:12,
145:11, 158:10
**governor**
199:4
**grasshopper**
94:2
**grassroots**
135:6, 135:12,
151:5
**great**
70:2, 194:9,
194:11, 194:17,
200:15
**greater**
170:11
**grew**
68:17
**grievance**
195:17
**ground**
7:11
**grounds**
200:17
**group**
68:8, 128:4,
129:10, 129:13,
129:14, 129:16,
130:22
**groups**
82:6, 127:16,
149:8, 149:19,
150:14
**growing**
68:18
**grown**
111:22
**guess**
12:12, 14:11,
31:7, 82:20,
84:1, 88:22,
112:14, 112:21,
162:18, 171:14,
195:6
**guidance**
140:17
**guy**
90:18, 206:18

**guy's**
69:14

---
**H**
---

**hall**
81:9, 81:14
**halls**
81:1, 81:4,
81:13, 82:10,
120:18, 120:21,
122:22, 123:4,
158:10, 209:16
**hammond**
88:6
**hampton**
209:20
**hand**
215:14
**handed**
132:12, 136:18,
162:12, 166:12,
169:15, 174:8,
174:13, 175:7,
201:5
**handing**
95:12, 164:14,
169:21, 170:15,
171:1
**handouts**
164:14, 170:16
**hansen**
38:20, 39:1,
137:10, 138:20,
138:21, 175:12,
175:21, 177:2,
177:8, 178:7,
178:12, 178:21,
180:1, 180:5,
183:11, 184:7,
184:13, 192:7,
192:22, 195:8,
197:9, 197:22,
198:4, 200:12,
200:16, 200:21,
202:6, 203:10,
203:13, 204:8,
204:15, 204:21,
207:9

Transcript of John D. Moss
Conducted on September 13, 2019

236

**hansen's**
185:15, 202:9
**happen**
93:16, 119:15
**happened**
27:13, 86:8,
156:11, 156:12,
156:18, 171:3,
189:11, 194:3
**happening**
72:5, 195:1
**happy**
32:1, 36:16,
76:19, 90:10,
153:10, 170:12
**hard**
19:18, 20:5,
20:18, 20:20,
21:1, 31:21,
32:2, 50:21,
55:6, 170:11,
173:12
**harless**
3:11, 5:3, 6:7,
6:9, 7:2, 7:4,
9:7, 13:22,
39:20, 40:1,
40:3, 40:6,
40:11, 40:14,
40:18, 41:1,
41:5, 41:9,
41:19, 42:2,
42:6, 75:20,
76:20, 132:8,
136:12, 137:13,
137:16, 142:14,
150:3, 154:13,
162:8, 165:14,
175:3, 182:8,
182:12, 201:1,
208:5, 212:8,
212:12
**harvard**
76:7, 101:18
**head**
8:4
**headed**
117:6

**heads**
126:22, 203:14,
203:17, 204:9
**hear**
122:21, 211:2
**heard**
44:3, 44:13,
70:14, 77:15,
77:20, 78:5,
78:7, 104:11,
108:14, 110:3,
129:3, 129:5,
129:7, 146:8,
170:14, 197:18,
197:22, 211:11
**hearing**
83:1, 138:12,
143:4, 143:7,
143:8, 143:13,
143:17, 143:18,
144:7
**hearings**
143:21
**held**
2:1, 45:11,
64:17, 64:21,
65:15, 72:11,
91:6, 101:8,
143:13, 202:16
**help**
48:19, 84:8,
97:13, 99:4,
116:19, 117:13,
126:17, 181:14
**helped**
73:9, 75:15,
99:3, 105:16
**helpful**
94:19, 137:18,
182:21
**helping**
87:21, 178:14
**hence**
178:13
**henley**
86:9, 86:10,
124:11
**henry**
208:14, 209:6,

209:12, 209:14,
209:18
**here**
9:5, 10:16,
15:6, 30:5,
31:15, 36:17,
49:6, 49:7,
55:16, 102:15,
111:13, 111:16,
111:17, 111:21,
112:19, 126:17,
130:3, 137:1,
138:14, 147:14,
153:9, 154:10,
161:2, 161:7,
163:3, 165:4,
167:10, 169:8,
169:20, 173:4,
192:10, 192:11,
204:13, 206:21
**hereby**
214:2, 215:4
**hereunto**
215:13
**hey**
60:4, 63:2,
100:14, 105:14,
126:22, 127:2,
161:21, 195:8,
199:8, 206:14
**high**
68:22, 69:13
**high-density**
68:16, 69:1
**higher**
200:18
**highjack**
58:16
**highjacked**
56:18, 58:8
**highjacking**
58:13
**highly**
73:14
**highway**
194:17
**himself**
172:21, 193:16

**hire**
106:9
**hired**
106:8
**hiring**
116:18
**historical**
28:3
**history**
60:12, 69:12,
153:6, 153:9
**hokie**
110:6
**hold**
18:3, 49:5,
49:15, 52:3,
67:16, 81:1,
81:4, 81:7,
81:9, 81:14,
81:16, 120:17,
122:18, 149:15,
149:17, 193:11
**holding**
72:6, 120:20,
122:20
**holdings**
114:6
**holloway**
1:5, 3:2
**home**
16:19, 16:22,
110:2, 115:17,
118:10
**honor**
58:10
**honorable**
137:11
**hope**
23:3, 165:20
**hopefully**
121:17
**hot**
46:21, 160:8
**hour**
75:18
**hours**
40:9
**house**
29:14, 48:15,

Transcript of John D. Moss
Conducted on September 13, 2019

237

48:22, 56:12,
56:15, 70:10,
145:8
**however**
117:4
**hrt**
209:18, 209:19
**huge**
51:20, 74:17,
141:13
**hurt**
73:9, 75:16
**hybrid**
102:20, 103:14,
104:5, 145:21,
148:14, 148:17,
151:16, 152:10,
152:17, 152:19,
210:10

**I**

**idea**
27:11, 50:9,
60:9, 71:16,
85:19, 174:16,
186:5, 203:21,
212:2
**identify**
157:19
**il**
3:15
**ill**
122:10
**image**
155:3, 173:8,
173:9, 173:18
**images**
166:11
**imagine**
72:22, 73:6,
196:4, 198:21,
199:5
**immaterial**
196:21
**immediate**
107:2
**impact**
145:10

**implicate**
142:6
**importance**
181:11
**important**
8:2, 80:13,
80:15, 80:18
**impose**
127:5
**improper**
42:3
**improving**
130:5
**in-person**
43:19
**inactive**
26:13, 26:14,
28:18, 29:2
**inappropriate**
203:7
**inappropriately**
195:21
**incensed**
206:18
**inception**
27:6
**incident**
200:14
**incidents**
163:22
**include**
94:8, 97:2,
140:7, 174:8,
174:13, 206:12
**included**
138:17, 190:11
**includes**
189:20, 191:7
**including**
71:14, 104:1,
145:6, 210:12
**income**
80:17, 113:14
**increase**
109:8
**increases**
88:11, 102:1,
200:19

**increasing**
130:21, 145:11
**incumbent**
156:15
**incumbents**
67:10, 150:21,
151:2
**independent**
96:19, 143:13
**indicated**
30:19, 122:5,
191:20
**indicates**
15:16, 30:2,
30:18
**indicating**
63:6, 74:5,
160:13, 165:5,
167:10, 186:16
**indicative**
199:22
**indifference**
103:20
**indirect**
206:10
**indirectly**
82:19
**individual**
30:10, 138:14,
172:13, 202:14
**individuals**
188:17
**infer**
180:7
**inference**
191:14, 192:2,
199:11
**inferred**
198:5
**influence**
59:13, 85:17,
122:14, 135:9
**inform**
181:15
**informal**
44:2, 44:7,
44:12, 82:16,
142:1, 178:3,

187:8, 188:2,
208:2
**information**
12:5, 23:17,
28:20, 30:13,
30:14, 30:17,
31:2, 63:7,
132:6, 173:2,
196:7, 203:4
**informs**
181:20
**infraction**
196:16
**inherently**
55:7
**initial**
105:2
**initially**
175:22
**inject**
127:5
**inquisitive**
184:21
**ins**
210:22
**insensitive**
197:10, 198:1,
198:3, 198:13,
198:16
**insight**
203:4
**instagram**
26:4, 28:11
**instance**
114:17
**instructed**
195:2
**instructions**
158:22, 195:6
**insulated**
151:3
**integrated**
113:7, 113:9,
113:15, 114:5,
129:19
**intent**
185:16, 199:7
**interact**
82:11, 83:2

Transcript of John D. Moss
Conducted on September 13, 2019

238

| | | | |
|---|---|---|---|
| **interacting**<br>82:21<br>**interest**<br>51:13, 52:19,<br>53:1, 53:3,<br>67:2, 68:21,<br>78:4, 140:8,<br>145:18, 146:1,<br>146:18, 205:8,<br>205:10, 212:3,<br>215:11<br>**interested**<br>153:11, 210:14<br>**interesting**<br>60:12, 74:6<br>**interests**<br>50:18, 50:20,<br>52:17, 78:2,<br>85:7, 86:3,<br>88:8, 91:1,<br>103:16, 135:9<br>**interlocking**<br>172:12<br>**interrupt**<br>7:21, 205:22<br>**interrupted**<br>40:20, 41:21<br>**interviews**<br>160:10, 160:12<br>**introduced**<br>121:12<br>**invite**<br>81:21<br>**invited**<br>82:7, 95:21<br>**invocation**<br>8:22<br>**invoke**<br>9:3<br>**invoking**<br>9:11<br>**involved**<br>60:14, 105:18,<br>105:20, 116:14,<br>116:18, 193:11,<br>205:14<br>**involvement**<br>172:9, 196:11 | **involving**<br>9:18, 200:14<br>**iphone**<br>24:21<br>**islander**<br>112:17, 129:7<br>**issue**<br>10:8, 33:11,<br>38:8, 68:10,<br>71:6, 88:6,<br>141:2, 144:17,<br>158:20, 184:17,<br>200:5, 203:1,<br>204:22<br>**issued**<br>48:6<br>**issues**<br>34:19, 144:19,<br>145:19, 146:4,<br>146:10, 179:5,<br>179:12, 184:17,<br>205:5<br>**item**<br>139:15, 139:16,<br>140:11, 144:11,<br>190:21<br>**items**<br>27:20, 39:8,<br>143:5<br>**itself**<br>82:13, 170:2,<br>204:16<br>**J**<br>**jackson**<br>128:14<br>**james**<br>5:13, 163:8<br>**january**<br>13:7, 164:1,<br>176:7, 176:11,<br>215:16<br>**jason**<br>126:14<br>**jessica**<br>5:12, 37:15,<br>38:17, 87:19,<br>87:22, 88:3, | 88:13, 93:4,<br>95:17, 95:19,<br>96:2, 98:17,<br>98:22, 111:1,<br>111:2, 111:3,<br>122:3, 123:16,<br>136:21, 147:5,<br>155:4, 156:22,<br>157:9, 157:21<br>**jessica's**<br>109:5<br>**jim**<br>162:17, 163:1,<br>166:1, 168:5,<br>168:10, 169:9<br>**job**<br>1:20, 13:14,<br>68:1, 71:21,<br>72:3, 72:4,<br>76:5, 76:10,<br>78:19, 79:11,<br>79:20, 207:10<br>**jobs**<br>54:14, 193:21<br>**john**<br>1:14, 2:1, 5:2,<br>5:10, 6:3, 6:18,<br>8:11, 15:15,<br>16:9, 22:2,<br>27:1, 30:2,<br>44:13, 47:3,<br>47:4, 69:9,<br>69:14, 72:18,<br>73:5, 75:1,<br>84:1, 89:16,<br>100:14, 100:16,<br>105:14, 109:9,<br>115:12, 156:14,<br>171:11, 171:20,<br>183:11, 183:14,<br>183:16, 186:10,<br>186:19, 213:4,<br>214:2<br>**joined**<br>27:8, 27:15,<br>27:18<br>**joint**<br>110:1 | **jokers**<br>75:6<br>**jones**<br>37:16, 38:17,<br>70:9, 70:18,<br>98:20, 99:12,<br>117:5, 117:22,<br>137:11, 156:12,<br>171:12, 174:5<br>**judge**<br>78:17, 140:9<br>**judged**<br>140:7<br>**judgment**<br>123:7, 148:16<br>**judicial**<br>179:5, 179:11,<br>179:17, 179:20,<br>180:20<br>**june**<br>163:9, 183:11,<br>186:10, 186:19,<br>188:3, 188:16,<br>202:3<br>**K**<br>**k-e-r-w-i-n**<br>105:6<br>**k-n-i-g-h-t**<br>126:7<br>**kane**<br>44:17, 84:14,<br>88:1<br>**kane's**<br>106:4<br>**keenan**<br>186:15, 187:5<br>**keep**<br>19:10, 19:22,<br>23:2, 23:4,<br>23:18, 23:20,<br>24:3, 24:12,<br>48:22, 107:8,<br>137:19, 144:1,<br>144:3, 145:2,<br>162:3<br>**keeps**<br>173:1 |

Transcript of John D. Moss
Conducted on September 13, 2019

239

**kempsville**
65:7, 69:12,
118:5, 118:6,
118:16, 118:18,
118:20, 118:22
**kept**
206:11
**kerwin**
105:3, 105:6,
105:7, 106:9
**key**
171:12
**keywords**
31:22
**kid**
111:13
**kids**
23:6
**killing**
97:16
**kimball**
117:8, 117:11
**kind**
24:20, 25:16,
27:14, 28:3,
28:14, 29:7,
42:15, 45:21,
51:14, 63:18,
68:21, 73:7,
74:5, 74:7,
76:17, 96:18,
113:5, 115:11,
153:4, 181:18,
194:15, 198:19,
199:10, 200:6,
211:4
**kinds**
33:6, 37:22,
120:16
**knee-high**
94:1
**knew**
22:3
**knight**
126:5
**knights**
126:7
**knowing**
185:9

**knowledge**
13:17, 23:15,
31:13, 46:4,
64:6, 105:13,
111:10, 173:4,
174:10, 174:15,
185:14, 204:11,
210:22
**known**
46:1, 99:11,
106:6
**knows**
184:21, 185:7,
211:3
**kowalewitch**
84:15

**L**

**l&j**
115:1, 115:4,
115:6
**lack**
168:6, 187:19
**land**
114:6
**landholders**
114:3
**landscape**
167:2, 194:15
**lane**
194:17
**large**
51:13, 53:21,
55:3, 112:8,
112:19, 113:10,
113:11, 123:6,
148:9, 151:11,
151:14, 151:21,
151:22, 152:1
**larger**
112:7, 112:16,
145:19, 146:9,
191:21
**largest**
112:7, 151:7
**last**
10:22, 11:15,
15:14, 15:15,

29:20, 58:2,
69:19, 72:22,
100:9, 155:6,
183:10, 184:9,
187:10
**latasha**
1:5, 3:2
**late**
111:14
**later**
76:7, 76:8,
83:2, 109:16,
134:10, 139:11,
189:12
**latino**
111:5, 112:15,
116:2, 129:6
**laugh**
159:22
**law**
156:2
**lawsuit**
10:17, 11:3,
11:6, 11:18,
11:19, 155:7,
155:9, 155:15,
155:18
**lawyer**
47:15
**lawyers**
153:17
**leaders**
108:22
**leadership**
69:8, 69:22,
74:13, 204:18
**leahy**
188:16, 189:4,
189:5, 189:13
**leap**
123:5
**learn**
10:16, 181:13,
181:19
**least**
25:11, 33:19,
42:18, 46:2,
77:22, 78:6,

81:6, 123:10
**leave**
36:5, 36:16
**led**
120:13, 180:9
**left**
19:13, 44:11,
76:19, 101:18,
128:16, 166:19,
169:12
**legal**
3:5, 3:12,
6:11, 6:14
**legislative**
8:22, 9:3,
12:4, 38:14,
60:17, 62:2,
65:9, 80:3,
121:7, 124:17,
124:20, 133:21,
134:12, 138:6,
138:22, 139:4,
139:12, 140:1,
140:12, 140:19,
142:7, 143:5,
144:13, 158:11,
159:1, 159:2,
159:16, 177:12,
179:18, 180:19,
192:9, 192:15
**legislature**
125:10
**legs**
75:19
**less**
57:8, 151:2,
151:4, 195:14
**lesson**
153:9
**let's**
15:14, 29:20,
44:11, 75:18,
79:19, 84:10,
98:2, 132:8,
150:19, 157:13,
166:8, 175:4,
177:1, 197:21,
201:1

Transcript of John D. Moss
Conducted on September 13, 2019

240

letter
89:14, 89:15,
89:22, 90:1,
137:10, 138:20
letterhead
163:8
letters
12:14, 176:14,
183:6, 209:1
letting
102:18, 125:16
level
108:12
levels
179:7
liaison
101:16
liaisons
117:6
libraries
81:16
lied
196:16, 196:20
light
88:5, 88:11,
88:12, 205:2
likely
43:16, 157:21,
180:9
limit
84:6, 84:10
limited
24:16
line
62:16, 163:11
link
155:3, 155:6
list
92:18, 98:21,
205:20
listed
173:6, 190:15
listen
91:4
lists
174:3, 189:15,
189:19
literature
90:7, 94:8,

94:9, 95:13
litigation
12:10, 18:3,
179:6
litmus
107:4
little
21:4, 48:11,
58:6, 84:9,
123:20, 123:22,
153:22, 194:10
live
92:7, 111:17,
113:1, 114:11,
117:18, 117:19,
149:14, 153:17
lived
70:11, 108:17,
111:11, 111:15,
115:13, 118:1,
118:5, 118:9,
118:13, 118:17,
118:21
living
47:2, 70:15,
101:11, 118:10
local
105:10, 113:12
located
79:18
location
29:10, 114:6,
195:4
logical
110:18, 181:16
long
23:19, 23:21,
24:4, 24:13,
25:3, 25:8,
25:10, 26:7,
27:6, 27:18,
32:18, 45:1,
48:3, 50:5,
55:18, 61:17,
64:17, 72:22,
73:17, 79:11,
111:11, 120:22,
128:16

long-term
76:14
longer
28:21, 118:7,
180:8, 180:10
longtime
94:18
look
14:8, 14:15,
15:3, 16:15,
16:16, 19:18,
20:8, 20:10,
20:14, 20:19,
21:19, 22:4,
24:1, 24:5,
24:11, 28:22,
29:2, 34:9,
36:2, 36:14,
39:5, 47:18,
53:16, 55:5,
68:6, 68:7,
72:8, 80:22,
93:11, 138:19,
139:14, 153:6,
163:18, 165:11,
165:14, 166:8,
167:7, 169:12,
171:21, 171:22,
172:22, 173:5,
182:18, 183:5,
188:15, 191:13,
201:9, 201:12,
201:20, 207:12,
208:9, 208:22,
209:4
looked
18:18, 19:9,
19:17, 20:12,
20:13, 20:22,
21:2, 21:5,
21:15, 21:16,
22:16, 29:16,
74:3, 84:21,
109:12, 109:13,
142:3, 162:14,
162:15, 170:4
looking
48:2, 108:12,

145:17, 145:18,
147:20, 150:3,
150:6, 150:20,
154:16, 173:18,
173:20, 190:3,
204:12, 206:10
looks
28:8, 173:15
loop
62:10
lose
59:5, 156:6
loses
72:4
lost
47:11, 51:14,
67:4, 67:7,
78:13, 78:15,
156:12, 156:14,
156:15
lot
28:7, 34:3,
55:17, 56:21,
67:8, 68:16,
69:1, 70:19,
70:21, 72:9,
80:9, 83:5,
83:8, 85:5,
97:19, 122:21,
123:1, 123:3,
134:16, 184:22,
196:2
lots
20:19, 21:4,
160:15
loud
134:17
louis
37:16, 38:17,
98:20, 99:12,
117:5, 117:22,
137:11, 156:12,
171:11, 174:5
love
109:2
lower
182:2, 183:5
lynnhaven
109:19, 118:19

Transcript of John D. Moss
Conducted on September 13, 2019

241

| M |
|---|

**m-i-y-a-r-e-s**
126:18
**m-o-s-s**
8:12
**ma'am**
66:20, 188:14
**machine**
20:11
**macro**
146:9
**made**
18:8, 47:19,
67:2, 70:19,
70:21, 72:16,
76:4, 76:11,
78:3, 91:18,
124:8, 124:16,
133:10, 133:17,
133:21, 136:5,
197:9, 198:4
**magnificent**
90:5
**mailed**
90:13, 90:15
**main**
102:10
**maintain**
28:21, 80:21
**maintained**
18:11, 142:18
**maintains**
62:17
**majority**
59:9, 78:6,
114:20, 114:21,
123:9, 124:1,
124:6, 125:14,
127:2, 130:22,
138:13, 140:3,
149:2
**make**
8:7, 9:11,
13:13, 18:16,
32:1, 42:15,
49:1, 59:6,
63:10, 67:9,

68:2, 68:4,
70:12, 72:4,
76:12, 82:7,
91:14, 93:3,
99:18, 103:7,
107:15, 109:15,
120:5, 122:11,
123:5, 133:21,
137:3, 138:16,
145:1, 148:19,
176:20, 191:14,
197:22, 199:2,
204:6, 206:15,
207:14, 212:18
**makes**
33:1, 53:18,
55:10, 55:20,
135:22, 136:3,
153:19, 154:1,
155:9
**making**
33:19, 97:5,
119:15, 187:16,
199:11, 200:9
**malicious**
75:4
**manager**
38:5, 38:11,
52:8, 105:2,
109:17, 175:21,
189:9, 192:7,
192:22, 193:15,
194:8, 194:11,
194:18, 195:8,
196:5, 197:11,
199:21, 200:16,
201:22, 202:6,
205:7, 206:11,
207:11, 207:19
**managerial**
204:17
**manipulated**
27:5
**manner**
141:5, 195:22
**manor**
82:4
**manually**
20:22, 21:2

**many**
21:3, 22:21,
23:1, 24:3,
43:18, 44:19,
45:4, 47:1,
61:14, 69:20,
147:13, 198:13
**march**
65:12, 79:12,
111:17
**marian**
82:4
**marilyn**
189:3
**mark**
13:22, 132:8,
136:12, 162:8,
175:4, 182:8,
201:1, 208:5
**marked**
14:2, 132:9,
132:12, 136:15,
136:18, 162:10,
162:13, 175:5,
175:8, 176:14,
182:14, 182:16,
201:3, 201:6,
208:7
**market**
54:2, 68:9,
206:22
**marketing**
54:3
**marketplace**
206:14
**marks**
171:12
**mass**
121:16
**material**
16:17, 19:19,
29:1, 32:3, 98:7
**materialized**
49:13
**materials**
20:3, 20:6,
99:3
**matter**
10:7, 24:19,

33:16, 33:17,
33:21, 36:4,
37:20, 38:18,
46:17, 72:17,
80:21, 89:12,
95:4, 101:1,
106:19, 133:20,
172:7, 197:3,
197:5
**maybe**
11:16, 25:4,
30:20, 35:5,
35:6, 36:15,
37:16, 48:2,
48:3, 100:16,
111:12, 112:9,
112:20, 114:21,
117:12, 119:14,
121:13, 121:18,
122:6, 183:17,
186:2, 190:6,
207:18
**mayor**
37:16, 37:19,
38:16, 46:18,
47:10, 48:20,
56:20, 59:22,
66:11, 70:5,
70:12, 70:13,
86:6, 89:3,
89:4, 99:8,
107:10, 107:14,
110:16, 119:11,
119:17, 120:10,
123:18, 137:11,
145:6, 148:8,
159:12, 159:19,
160:1, 162:18,
162:20, 162:21,
163:1, 163:4,
210:12
**mayor's**
47:12, 120:12
**mcclanan**
56:13, 56:14
**mean**
20:18, 23:3,
24:11, 24:13,

Transcript of John D. Moss
Conducted on September 13, 2019

242

29:14, 30:16,
36:12, 38:2,
46:3, 55:6,
57:2, 58:9,
71:20, 78:17,
85:3, 92:6,
96:18, 98:12,
100:11, 104:17,
128:12, 141:3,
152:12, 161:19,
169:17, 173:10,
198:12, 205:22,
206:3
**meaning**
96:17, 96:22,
102:3
**means**
180:14, 180:16,
190:7, 191:17
**media**
25:19, 25:21,
25:22, 28:1,
29:6
**meekins**
69:15, 69:16
**meet**
7:3, 107:22,
108:2, 108:4,
179:8
**meeting**
11:22, 12:8,
16:20, 95:22,
108:6, 109:16,
109:17, 157:14,
187:11, 187:21,
188:4, 189:14,
189:17, 196:6
**meetings**
55:13, 81:15,
82:13, 82:14,
120:19, 123:4,
141:11, 158:2,
188:1
**member**
6:19, 18:12,
30:13, 33:13,
34:3, 37:1,
44:1, 44:6,

44:18, 48:12,
51:11, 55:4,
57:9, 57:11,
64:15, 70:10,
78:21, 79:21,
80:8, 80:12,
81:3, 101:22,
103:1, 105:1,
109:6, 117:20,
122:18, 122:20,
134:3, 136:21,
137:2, 137:17,
139:16, 147:5,
147:7, 162:17,
162:18, 177:6,
209:10
**members**
9:1, 30:6,
30:9, 37:6,
37:12, 39:3,
39:13, 42:10,
42:14, 42:19,
43:3, 43:18,
44:10, 46:14,
63:8, 71:22,
98:18, 105:17,
105:21, 107:6,
108:18, 110:21,
123:14, 125:9,
130:6, 132:22,
133:3, 133:12,
137:11, 138:14,
157:5, 159:5,
172:10, 192:15,
201:22, 202:6,
206:19, 210:5
**membership**
172:8
**memo**
12:9, 12:11
**memorandum**
11:9, 18:3
**memorial**
69:16
**memory**
7:14, 43:8,
73:22, 112:4,
175:14, 208:19

**memos**
196:3
**memphis**
76:6
**mentioned**
9:15, 10:12,
24:12, 29:13,
36:6, 52:9,
54:8, 56:1,
56:17, 59:21,
60:13, 79:2,
89:7, 91:22,
98:4, 98:5,
98:6, 106:12,
106:18, 120:12,
131:16, 145:6,
161:17, 161:19,
177:11, 191:5,
202:11, 209:9,
210:17, 211:15
**mentioning**
114:22
**merger**
153:14, 153:18
**mess**
75:9
**message**
32:12, 33:18,
34:6, 34:7,
34:14, 35:18,
37:7, 43:18,
164:12, 167:8,
168:18, 173:5,
173:9, 184:7
**messages**
23:16, 23:19,
23:22, 24:18,
32:14, 32:21,
33:7, 34:13,
35:2, 35:9,
35:13, 36:7,
36:8, 36:20,
43:12, 51:18,
166:11, 166:14,
166:18, 166:20,
168:4
**met**
109:17, 109:21,

209:21, 210:1
**method**
119:8, 127:14,
131:8
**methods**
210:5, 211:22
**meyera**
46:19, 47:4,
70:6, 70:13,
120:10
**middle**
209:4
**might**
21:12, 37:16,
38:4, 45:18,
47:14, 70:14,
111:14, 112:16,
113:15, 114:7,
117:13, 120:3,
126:12, 139:10,
157:10, 170:20,
182:3, 183:18,
187:2, 187:7,
189:7, 189:11,
191:18, 193:14,
197:8, 211:19
**mike**
110:1
**miles**
51:1, 135:8
**million**
102:9
**mind**
42:15, 53:4,
78:18, 81:11,
85:16, 85:20,
86:20, 115:1,
180:11, 185:8
**mine**
40:12, 69:9,
85:19, 103:9,
130:16
**minor**
9:22
**minorities**
112:22, 114:7,
127:19, 127:20,
128:5, 128:9,

129:18
**minority**
111:21, 112:3,
127:16, 128:7,
129:10, 129:16,
130:17, 130:22,
132:5, 135:22,
155:10, 189:21,
190:12, 190:22,
191:8
**minority-owned**
178:18, 181:22,
189:16
**minuses**
103:19
**minute**
97:20
**minutes**
144:1, 182:11
**misusing**
86:14
**mitigated**
54:6
**mitigations**
102:4
**miyares**
126:14
**mode**
167:2
**modernized**
151:17
**modified**
47:20
**modify**
103:5
**moment**
35:8, 68:12
**money**
50:15, 50:16,
50:19, 51:16,
52:14, 52:20,
67:9, 68:1,
68:4, 68:5,
70:22, 71:9,
78:2, 85:1,
85:5, 91:11,
92:14, 93:7,
93:17, 98:5,

100:18, 106:16,
110:14, 122:11,
122:14, 131:20,
204:7, 206:4,
207:5, 207:13
**monied**
52:19, 53:1,
53:3, 85:7,
91:1, 135:8
**monkey**
72:21, 75:8
**monkeying**
73:2
**monkeys**
72:21, 73:2,
74:4
**monopoly**
59:8
**monroe**
3:13
**month**
139:8
**months**
22:21, 23:1,
23:7, 23:14,
81:6
**moore**
53:9
**more**
20:7, 29:8,
31:22, 43:16,
45:9, 51:2,
51:6, 54:18,
59:7, 70:18,
73:9, 75:20,
76:18, 79:22,
88:7, 88:13,
90:21, 96:16,
104:17, 108:8,
113:14, 122:12,
145:9, 145:15,
146:10, 149:16,
150:2, 153:11,
157:18, 171:6,
180:9, 199:21
**moss**
1:14, 2:1, 5:2,
5:9, 5:10, 6:3,

6:18, 7:3, 8:12,
9:2, 15:15,
16:9, 27:1,
30:2, 89:16,
100:14, 132:11,
133:9, 162:12,
171:11, 171:20,
173:15, 175:7,
184:10, 184:14,
185:16, 187:11,
201:5, 213:4,
214:2
**most**
69:11, 77:22,
84:10, 98:21,
100:20, 113:9,
131:18, 133:12,
151:11, 151:14,
151:21, 152:2,
156:17, 157:21,
178:22, 208:20
**mostly**
57:15
**moved**
111:18, 111:21,
114:10, 115:14,
118:17
**much**
14:6, 14:7,
23:18, 39:6,
50:16, 51:4,
52:14, 54:18,
55:11, 55:13,
59:8, 83:4,
94:7, 94:21,
113:14, 114:8,
126:19, 155:15,
155:17, 175:16,
211:2
**municipal**
2:7, 4:7
**must**
45:13, 86:2
**myself**
16:7, 17:8,
31:8, 39:9,
69:13, 69:14,
85:6, 87:11,

88:18, 122:7,
175:13, 175:21,
198:21

---

**N**

**naacp**
129:13
**name**
7:4, 8:10,
15:2, 19:15,
44:14, 46:13,
47:13, 52:1,
52:3, 53:9,
69:15, 69:19,
100:13, 105:5,
109:18, 109:20,
117:12, 117:14,
128:19, 167:9,
168:20, 169:3,
172:13, 172:15,
173:6, 173:12,
173:13, 173:14,
173:16, 174:3,
174:8, 174:14,
183:17, 183:18,
187:2, 187:7,
187:8, 197:2
**named**
69:17
**names**
21:14, 24:1,
24:2, 42:18,
58:5, 68:8,
74:9, 90:6,
128:19, 165:3,
205:15
**nancy**
33:11, 67:11,
69:19, 186:14,
187:5
**national**
76:8
**nature**
29:19, 70:21,
75:10, 99:17,
157:18, 158:16,
158:19, 172:11,
195:5

Transcript of John D. Moss
Conducted on September 13, 2019

244

naval
79:17
navy
72:1, 76:4,
79:10, 111:13,
112:9
nearing
182:10
necessarily
129:15, 138:16
necessary
109:4, 153:14
neck
194:9, 194:11,
194:17, 200:15
need
17:2, 23:4,
39:16, 41:3,
86:13, 103:20,
131:19, 136:14,
141:4, 146:5,
146:9, 146:15,
178:9, 184:8,
184:11, 193:22
needed
58:13, 58:15,
76:10, 78:5
needless
75:13, 193:19
needs
151:17
negative
85:6
negotiated
70:10, 70:15
negotiation
202:20
neighborhood
108:19, 108:22,
115:2, 115:9,
115:10, 115:13,
115:18, 115:19,
115:20
neighborhoods
113:6, 113:9,
113:14, 113:17,
113:18, 113:22,
114:14, 115:22,

116:4, 129:19
neighbors
151:6
neither
215:9
net
61:14, 61:18
nettleton
186:14, 187:1,
189:1
network
90:20, 90:22
neutral
178:14, 205:7
never
14:21, 46:1,
64:5, 70:14,
100:12, 108:18,
117:10, 180:15,
200:9
new
33:1, 45:1
newspaper
132:14, 132:17,
197:6
next
87:1, 112:15,
129:22, 146:22,
147:18, 147:19,
149:6, 150:6,
150:19, 156:3,
166:8, 166:9,
166:10, 181:20,
182:11, 190:21
nice
7:3, 52:7,
115:17
nickname
52:5
night
83:12
night's
187:11
nodding
8:4
noises
74:6
non-city
17:3

none
10:12
nonetheless
71:4, 195:19
nope
187:4
norfolk
1:3, 13:7,
79:15, 79:17,
115:16, 154:21
normally
139:9
north
194:9, 194:11,
194:17, 200:14
northam's
199:4
northampton
115:7
notarial
215:14
notary
2:18, 215:21
notes
23:5
nothing
24:6, 41:19,
59:17, 114:22,
142:1, 159:15,
181:17
notice
2:17, 10:20,
11:7, 18:5
notices
63:4
notified
11:18
november
66:9, 121:20,
134:11
number
16:7, 21:18,
39:8, 57:10,
77:7, 77:10,
94:19, 100:8,
102:1, 105:18,
105:21, 123:6,
167:18, 167:20,

184:16, 184:19,
188:12, 196:17,
205:5, 209:2
numbered
137:8, 163:17,
163:18
numbers
137:18, 176:15,
183:7, 201:14
nw
3:6
nygaard
156:13

O

oath
6:5, 8:15,
79:22, 80:5
oberndorf
46:19, 70:6,
120:10
object
39:15, 41:12,
42:4, 165:12,
198:18
objecting
39:18, 39:21
objection
9:13, 9:14,
40:5, 40:6,
40:7, 40:14,
40:15, 40:16,
40:21, 41:6,
41:10, 41:22,
42:3, 168:6
objections
39:20, 40:1,
40:3, 40:11
objectives
86:17
observation
197:13
observed
200:9
obtain
178:12
obtained
178:17

Transcript of John D. Moss
Conducted on September 13, 2019

245

**obviously**
33:19, 51:12, 54:18, 57:10, 67:22, 73:4, 74:4, 82:18, 85:12, 92:20, 95:19, 117:9, 138:13, 160:12, 181:9, 191:11

**occasionally**
209:16

**oceanfront**
67:14

**october**
132:18, 132:20, 139:4, 139:9, 139:12, 143:10, 209:6

**off-duty**
194:12

**offended**
199:14

**offer**
76:4

**office**
4:5, 6:16, 30:6, 30:8, 30:12, 60:16, 63:3, 64:19, 65:15, 79:22, 83:14, 109:14, 131:12, 134:11, 206:9, 206:12

**officer**
194:12, 194:21, 195:2, 195:7, 195:16, 196:6, 196:10, 196:13, 197:2, 200:14, 215:3

**officers**
100:7, 100:21, 195:13

**offices**
2:2

**official**
52:3, 163:8, 199:16

**often**
24:14, 33:17, 55:19, 70:18, 81:4, 90:20, 161:17, 205:9, 207:16, 209:14

**oh**
22:16, 74:15, 83:21, 86:8, 92:16, 94:1, 105:18, 115:1, 152:21, 157:13, 158:3, 160:20, 162:1, 211:3

**okay**
8:9, 10:2, 10:14, 11:1, 11:22, 14:7, 14:21, 15:11, 16:3, 18:15, 28:11, 29:4, 29:20, 30:19, 32:4, 35:22, 38:20, 46:6, 46:13, 49:14, 59:16, 60:21, 65:15, 66:14, 77:1, 79:16, 79:19, 84:8, 86:22, 94:4, 95:15, 96:21, 97:5, 98:14, 106:12, 134:19, 139:14, 142:8, 143:1, 143:20, 148:3, 150:19, 152:5, 166:3, 167:12, 174:1, 175:17, 180:21, 183:2, 186:18, 191:5, 192:19, 201:11, 204:12, 208:11

**ol**
90:19, 90:22

**oldest**
69:11

**oliver**
167:13, 168:5,

168:16, 168:20, 169:2, 169:5, 169:9

**olympia**
206:6, 207:22

**omitted**
64:7

**once**
49:8, 81:6, 141:15, 212:17

**one**
2:7, 4:7, 24:16, 26:12, 28:19, 32:15, 35:19, 37:21, 44:17, 45:2, 45:10, 48:1, 48:7, 50:10, 53:6, 53:7, 57:21, 67:1, 67:8, 67:10, 67:17, 72:17, 75:20, 85:4, 85:7, 87:17, 90:5, 94:19, 95:9, 97:9, 100:8, 102:1, 107:13, 112:6, 114:21, 124:11, 126:13, 129:22, 133:3, 133:19, 133:22, 134:21, 136:6, 136:10, 136:22, 140:20, 141:11, 145:20, 150:7, 154:1, 155:12, 155:14, 161:7, 161:8, 161:9, 161:13, 161:17, 163:2, 165:16, 167:3, 171:6, 172:9, 172:15, 173:11, 173:14, 173:19, 173:20, 174:2, 174:3, 174:18, 174:20, 182:3, 186:13, 186:15,

189:19, 192:4, 193:22, 194:7, 194:8, 196:4, 196:20, 197:21, 198:8, 198:12, 199:8, 199:18, 202:5, 205:17, 209:17

**one-on-one**
158:5

**ones**
37:17, 86:21, 97:12, 105:20, 118:4, 136:8, 141:7, 156:21

**only**
8:1, 9:20, 20:22, 25:22, 26:17, 31:20, 58:21, 61:2, 61:7, 61:22, 67:10, 85:16, 105:12, 106:15, 110:5, 114:9, 143:10, 156:4, 156:21, 167:16, 167:18, 168:22, 174:9, 174:20, 179:5, 180:7, 181:2, 206:8, 210:21

**open**
24:4, 27:2, 27:3, 81:18, 122:12, 208:2

**openly**
200:20

**operational**
13:10

**opine**
211:12

**opinion**
50:12, 59:15, 60:11, 85:22, 91:5, 125:2, 193:6, 194:19, 197:14, 197:16, 203:22, 205:20

Transcript of John D. Moss
Conducted on September 13, 2019

246

opinions
192:14, 192:17, 193:5
opportunity
130:18, 175:13
oppose
148:20, 148:22
opposed
91:8, 102:19, 158:18, 179:15, 179:16, 179:21, 180:15
opposition
95:5
optimal
146:17
order
63:20, 145:16
ordinances
70:20
organization
45:13, 171:19
organizations
81:21
orient
167:6
originally
11:20
other
7:21, 10:10, 10:12, 12:3, 12:9, 12:20, 17:16, 19:11, 19:13, 19:20, 20:17, 29:4, 29:6, 29:7, 29:10, 37:5, 37:11, 37:21, 39:1, 39:2, 40:10, 42:14, 42:19, 43:3, 46:8, 46:14, 54:11, 61:9, 61:13, 72:15, 76:18, 78:16, 79:3, 80:16, 82:10, 84:16, 87:18, 94:9,

94:22, 96:11, 98:2, 98:3, 101:8, 105:16, 107:5, 109:21, 110:10, 110:20, 113:1, 114:16, 114:22, 115:11, 118:1, 131:3, 144:14, 144:19, 154:5, 154:17, 156:20, 157:15, 161:18, 161:19, 161:22, 179:13, 181:12, 184:20, 185:14, 188:17, 192:15, 193:21, 199:14, 203:14, 203:18, 205:14, 206:13, 212:2
others
21:20, 37:17, 45:10, 124:14, 157:22, 205:13
otherwise
27:5, 32:10, 40:7, 113:15, 125:16, 215:12
out
13:16, 51:19, 55:14, 62:7, 62:9, 63:4, 63:8, 74:15, 76:5, 76:9, 76:10, 82:15, 90:2, 90:13, 92:3, 92:7, 92:11, 93:11, 93:13, 94:8, 95:12, 97:7, 97:10, 97:13, 99:4, 108:20, 109:12, 114:9, 122:11, 125:22, 126:3, 128:21, 134:17, 144:16, 146:16, 146:19, 164:14, 166:12, 169:15, 169:22,

170:16, 171:1, 174:13, 178:4, 180:3, 195:1, 196:4, 196:9, 200:2, 206:19
outcome
130:11, 130:13, 161:8, 191:19, 215:12
outcomes
135:10
outdated
151:16, 152:10, 152:11, 152:14, 152:17
outs
210:22
outside
158:1, 209:22
over
7:15, 16:20, 17:12, 17:14, 18:4, 28:18, 33:6, 37:6, 54:2, 56:16, 82:14, 88:3, 88:13, 101:14, 110:2, 114:4, 151:15, 180:8, 184:9, 189:9, 200:15, 202:15
overall
80:4, 181:22
oversight
80:2, 101:13
owe
103:7
own
59:1, 60:3, 73:8, 93:13, 93:18, 94:6, 94:15, 94:21, 120:11, 122:15, 122:16, 122:17, 149:4, 156:6, 193:5, 193:6, 196:10, 207:8, 207:11, 207:15

P

pac
53:10, 53:14, 53:15
pacific
112:17, 129:7
package
12:9, 133:21, 134:12, 138:17, 139:12, 140:19, 140:22
packet
12:12, 121:7, 124:17
page
5:2, 5:9, 14:11, 14:12, 15:7, 15:9, 15:14, 15:15, 16:5, 16:8, 29:20, 83:7, 133:7, 133:9, 137:6, 137:17, 147:2, 147:18, 147:19, 150:8, 150:19, 154:8, 154:10, 154:15, 154:17, 154:19, 155:2, 163:6, 163:16, 164:11, 166:8, 166:9, 166:10, 166:13, 166:14, 168:2, 168:3, 177:2, 183:9, 183:10, 186:6, 186:9, 188:12, 201:9, 201:20, 209:5
pages
1:21, 14:11, 136:14, 137:8, 147:13, 163:17, 164:6, 165:15
paid
28:21, 73:21
paint
198:11

Transcript of John D. Moss
Conducted on September 13, 2019

247

pao
196:10
paper
193:8, 194:5,
196:1
parade
200:7
paragraph
133:8, 147:10,
147:21, 151:10,
155:14, 156:3,
204:13, 204:14
paragraphs
134:21, 147:6
parameter
180:9
parents
110:2
parity
178:17
parker
67:11, 69:19
parkway
109:19
parochial
146:10
parochialism
103:17
parse
129:17
part
14:10, 29:15,
46:2, 80:3,
100:20, 108:8,
112:8, 113:11,
131:18, 140:21,
147:15, 148:4,
164:10, 171:12,
171:14, 171:18
part-time
54:14
partially
24:17
participate
191:17
participated
144:15
participation
138:8, 181:22

particular
15:6, 15:7,
38:8, 53:4,
91:19, 120:1,
186:4, 187:21,
193:12, 193:15,
210:19
parties
215:11
parts
36:18, 75:11
pass
56:11, 138:10
passed
47:3, 47:4,
47:5, 48:14,
48:15, 48:21,
56:4, 56:9,
56:12, 56:15,
140:2
passing
94:8
passive
82:22
past
103:4, 161:5,
200:20
paste
32:18, 34:21
pasted
33:10
patience
180:2
pattern
55:21, 184:18,
185:1, 186:1,
187:19
pay
29:3
pays
77:22
peers
121:9
pejorative
48:17, 56:19
pending
8:6
penny
1:22, 2:17,

215:2
people's
80:17, 131:11,
195:9
perceived
51:12
percent
112:5, 112:10,
112:20
percentages
112:11
percenter
200:1
perception
91:6
performance
193:21, 196:19,
196:22
performing
192:8, 193:1,
194:13, 195:3
perhaps
123:18
period
37:4, 48:16,
56:10, 65:4,
71:2, 81:8,
101:19, 114:3,
182:2
permissible
68:13
perry
22:2, 47:4,
69:9, 69:14,
72:18, 73:5,
75:1, 84:1,
109:9, 115:12
person
33:12, 69:11,
98:21, 101:4,
101:6, 120:9,
164:15, 170:17,
181:16, 184:21,
187:7, 202:16,
203:4, 209:21
personal
17:4, 17:6,
17:8, 21:8,

22:15, 22:20,
22:21, 23:5,
23:6, 23:7,
26:22, 29:12,
29:15, 30:10,
30:14, 30:17,
36:7, 36:13,
43:17, 50:12,
58:18, 58:19,
58:20, 58:21,
58:22, 59:14,
60:10, 61:1,
61:2, 61:8,
61:10, 61:13,
62:1, 62:4,
62:13, 67:3,
67:6, 85:22,
89:15, 89:22,
91:5, 94:18,
95:6, 106:20,
125:1, 177:9,
192:13, 193:5,
193:6, 194:14,
194:19, 203:22,
207:18, 208:17
personally
9:19, 10:2,
12:5, 17:9,
31:7, 31:10,
35:5, 37:8,
74:22, 90:3,
92:13, 103:12,
131:10, 144:10,
180:12
personnel
33:16, 33:20
persuade
133:12
phase
181:10, 181:11,
181:14, 181:15,
181:20
phases
180:22, 181:3,
181:7, 181:9,
181:19
phenomenal
68:17, 71:11

Transcript of John D. Moss
Conducted on September 13, 2019

248

**phil**
183:12, 183:16, 183:20, 188:20
**phone**
15:4, 24:16, 24:18, 32:16, 34:16, 35:21, 36:8, 83:10
**physical**
16:22, 17:1, 54:21
**physically**
16:1, 31:7, 158:10
**pick**
108:7
**picked**
78:16
**picture**
70:2
**piece**
11:9, 90:6, 206:7
**pier**
193:10, 193:12, 200:13, 202:20, 205:15
**pink**
173:11, 173:15, 173:21
**place**
16:21, 84:2, 84:5, 86:16, 102:9, 115:15, 116:15, 140:11, 146:21, 156:16, 161:7, 161:11, 164:16, 170:18, 186:2, 193:9
**places**
72:9, 95:20, 114:10, 114:19, 114:20, 118:13, 157:16
**plaintiffs**
1:7, 3:2, 6:10, 6:13, 7:1, 31:19, 136:21,

155:18, 162:17, 163:2, 176:19, 201:18
**planned**
13:19
**planning**
33:8
**platform**
120:21
**play**
180:3
**player**
110:5
**playing**
108:13
**pleasant**
195:14
**please**
7:18, 8:9, 42:7, 135:4, 188:12
**plus**
50:22, 135:7
**pluses**
103:18
**point**
34:5, 42:8, 45:3, 49:13, 50:12, 103:19, 103:20, 121:14, 182:11, 185:20
**points**
68:19, 162:4
**police**
72:8, 194:12, 194:21, 195:2, 195:11, 195:12, 195:16, 196:13, 197:2, 200:14, 204:22
**policy**
35:3, 101:21, 205:7
**political**
53:10, 53:13, 53:15, 85:11, 86:11, 86:17, 87:10, 88:8,

94:21, 103:21, 105:9, 108:22, 163:22, 196:8
**politically**
67:19, 67:21
**politicians**
124:15
**politics**
53:20, 211:1
**poll**
164:13, 164:20, 164:22, 165:7, 165:21, 166:4, 168:18, 170:15, 170:22
**polling**
128:3, 164:16, 170:17
**polls**
170:19
**poor**
199:12
**poorly**
55:19
**pop**
130:4
**popular**
51:11, 71:15, 98:21
**population**
48:13, 49:2, 57:5, 58:1, 111:22, 112:3, 112:20, 113:11
**populations**
112:8, 151:15
**portfolio**
146:17, 189:9
**position**
45:1, 64:17, 64:18, 65:18, 79:3, 80:13, 80:14, 80:15, 80:16, 101:8, 124:16, 125:17, 158:8, 161:2, 189:8, 195:12
**positions**
88:12, 119:16,

124:19
**possess**
15:16, 16:1, 30:2, 31:7, 47:9
**possessed**
31:6
**possession**
19:5, 20:2, 132:6
**possible**
93:14, 93:16, 130:13, 156:5
**possibly**
38:17, 39:4, 130:11
**post**
27:20, 92:8, 155:3
**post-may**
102:7
**posted**
96:18
**posts**
97:14
**power**
56:22, 59:2, 59:12, 59:19, 70:18, 80:17, 195:12
**practice**
24:19
**preceded**
67:13, 71:13, 205:1
**precedent**
32:9, 179:18, 179:20, 180:20
**precedents**
179:11
**preclude**
189:21, 190:4, 190:5, 190:7, 190:9, 191:16, 191:17
**precludes**
122:19
**predictable**
13:11

Transcript of John D. Moss
Conducted on September 13, 2019

249

**predominantly**
113:18, 114:7,
114:15, 115:17,
116:1, 116:5
**prefer**
95:3, 136:1,
148:15
**preference**
62:4
**preparation**
12:6
**prepare**
12:1, 184:11
**prepped**
72:7
**prerogatives**
207:17
**present**
64:22, 142:11,
164:2
**presently**
162:21
**preserving**
178:14
**press**
199:13
**pressing**
82:15
**pretty**
59:8, 74:6,
111:1, 122:7,
131:5, 132:16
**prevent**
41:22
**previously**
210:9
**princess**
57:20, 57:22,
111:15, 153:16
**principal**
119:15
**principally**
107:1, 126:14
**principle**
9:11
**principles**
211:13
**print**
73:18, 73:19

**prior**
65:3, 68:15,
138:13, 166:13,
168:3, 192:6,
192:21
**priorities**
101:22, 108:10,
108:11, 147:8
**priority**
102:11, 102:14,
102:15
**private**
92:4, 142:6,
157:18, 158:9,
196:3, 196:5,
202:14, 204:7
**privilege**
9:1, 9:4, 9:8,
12:4, 12:13,
12:17, 38:15,
142:7, 158:11,
159:1, 159:2,
159:16, 192:9,
192:16
**privileged**
33:15, 193:8,
193:13, 193:17,
200:12, 202:12,
202:18
**probably**
22:11, 25:11,
37:15, 37:16,
39:8, 44:1,
45:10, 47:21,
53:5, 57:8,
61:16, 70:22,
73:9, 81:5,
94:2, 94:13,
97:5, 98:20,
100:1, 111:1,
112:11, 112:13,
112:14, 112:15,
112:19, 114:12,
119:9, 124:11,
157:22, 184:20,
190:5, 190:13,
194:3, 199:21
**problem**
144:18

**problematic**
178:22, 179:4,
179:9
**procedures**
14:13
**proceedings**
142:3
**process**
30:8, 81:12,
138:8, 139:2,
184:2, 184:4,
184:8, 186:20,
191:15, 191:22
**procurement**
187:12, 187:16
**produce**
31:18, 170:3
**produced**
16:9, 137:2,
137:17, 147:5,
163:4, 168:10,
176:18, 201:17
**product**
68:22
**production**
15:1, 18:17,
18:22, 31:11,
31:17, 163:19,
176:20, 201:18
**profession**
105:12
**professional**
41:16, 41:18,
115:11, 181:13,
187:13, 195:22
**professionals**
115:12, 115:18
**program**
113:21
**project**
193:10, 193:16,
200:13, 202:16,
202:21, 205:15
**projects**
86:16
**promote**
145:9
**promotes**
146:14

**proof**
14:12, 55:16,
59:2, 127:21,
128:1, 203:16
**property**
96:18, 97:2,
99:13, 206:8
**proposal**
121:7, 133:21,
140:19, 146:20,
148:10, 193:13,
203:6
**proposals**
125:6, 138:9,
210:8, 210:15
**propose**
145:1
**proposed**
138:15, 139:15,
139:16, 143:5,
144:5, 144:11
**proposes**
210:4
**proposing**
211:21
**protected**
158:11
**prove**
60:2
**provide**
32:2, 51:2,
52:19, 53:17,
90:10, 128:2,
163:20, 177:12
**provided**
21:15, 43:16,
90:16, 101:15,
140:16, 202:13
**provider**
24:22, 25:8,
61:21
**providers**
61:15
**provides**
146:8
**providing**
30:7, 64:7,
130:17, 194:21,

Transcript of John D. Moss
Conducted on September 13, 2019

250

196:7
**public**
2:18, 27:4,
32:7, 32:8,
51:19, 54:4,
55:9, 63:3,
67:15, 67:22,
69:3, 71:12,
71:22, 72:11,
80:2, 80:14,
81:18, 82:17,
82:21, 83:13,
91:6, 91:18,
92:3, 99:18,
100:19, 102:18,
103:6, 103:8,
103:13, 104:1,
109:14, 124:16,
124:19, 124:22,
125:14, 126:3,
127:3, 127:6,
131:13, 138:7,
138:12, 141:20,
141:22, 142:10,
142:11, 142:15,
142:16, 142:19,
143:4, 143:7,
143:8, 143:17,
143:18, 143:21,
144:7, 146:13,
146:18, 148:14,
148:16, 148:18,
148:20, 149:1,
149:3, 172:7,
183:22, 189:8,
189:10, 196:4,
197:4, 197:5,
199:16, 204:7,
204:16, 205:3,
207:1, 210:1,
215:1, 215:21
**public's**
78:4, 162:5
**publicly**
45:2, 99:9
**pungo**
57:21
**pure**
12:16

**purge**
23:9, 23:14
**purpose**
17:21, 18:1
**purposes**
196:8
**pursuant**
2:17
**push**
77:17, 134:14
**pushback**
195:7
**pushing**
119:19, 206:11
**put**
20:17, 30:4,
32:19, 33:8,
33:17, 40:21,
63:8, 70:2,
71:5, 73:7,
96:10, 97:7,
97:10, 97:13,
97:14, 99:13,
121:6, 121:7,
121:19, 122:6,
133:14, 136:6,
138:14, 140:19,
153:3, 154:11,
175:1, 195:15
**puts**
138:8
**putting**
40:12, 40:16,
41:22, 125:6

**Q**

**qualified**
158:6, 191:1
**qualifying**
189:22, 190:12,
191:8
**quarterly**
81:5
**question**
7:19, 8:6, 9:9,
39:16, 39:19,
39:22, 41:11,
41:12, 42:5,

42:7, 42:13,
43:14, 60:22,
75:21, 95:7,
125:18, 129:22,
144:4, 158:12,
165:9, 165:12,
165:15, 165:19,
165:20, 166:3,
166:7, 168:9,
170:10, 171:6,
176:6, 184:12,
185:12, 188:7,
193:4, 195:16
**questioning**
184:10, 184:15,
185:17
**questions**
7:5, 8:18, 9:5,
9:13, 20:1,
148:13, 160:16,
184:22, 185:8,
185:22, 187:18,
212:12, 212:15
**quickly**
74:17, 75:14
**quite**
35:7, 83:11,
101:2, 105:11,
112:19, 196:1
**quixote**
121:16
**quo**
71:17, 77:17
**quote**
134:22, 204:14

**R**

**race**
8:13, 65:12,
67:11, 71:10,
84:14, 87:3,
88:1, 88:16,
89:1, 93:2,
94:6, 95:9,
106:19, 106:21,
164:15, 170:17,
171:1, 178:14,
199:8, 210:2

**race-based**
178:22, 179:3,
179:15, 179:19
**races**
86:7, 94:20,
108:9, 114:16,
122:12
**racial**
75:2, 113:6,
163:21
**racially**
197:9, 197:22,
198:3
**racist**
163:22
**radio**
98:10
**rail**
88:5, 88:11,
88:12, 205:2
**raise**
9:13, 41:3
**raised**
85:5
**raising**
86:14
**ran**
22:2, 65:1,
69:7, 69:13,
72:17, 77:6,
77:18, 78:8,
84:1, 84:13,
85:4, 85:5,
87:2, 87:3,
88:18, 89:3,
89:15, 89:21,
90:12, 93:1,
101:4, 101:6,
104:12, 109:9,
110:4, 128:17
**ranked**
211:8, 211:10
**rapidly**
74:2
**rarely**
93:17, 108:21,
210:21
**rate**
68:18

Transcript of John D. Moss
Conducted on September 13, 2019

251

**rates**
68:21, 200:18
**rather**
8:3, 75:16,
151:6, 157:6,
159:8, 159:13,
160:5, 177:9,
205:6
**rational**
207:5
**rd**
192:6, 192:21,
215:14
**reach**
51:19, 108:20
**reached**
49:20, 206:19
**read**
12:11, 14:4,
18:18, 85:16,
85:20, 132:14,
132:16, 135:3,
147:9, 147:10,
147:17, 164:9,
164:17, 169:20,
170:1, 171:6,
171:8, 171:9,
171:13, 173:6,
178:9, 178:10,
185:13, 199:10,
212:16, 212:19,
213:1, 214:3
**reader**
132:16
**readiness**
79:8
**reading**
166:21, 215:8
**reads**
163:19
**ready**
77:1
**reagan**
68:20
**real**
206:16
**realignment**
102:8

**realize**
121:15, 121:16
**really**
35:10, 39:9,
50:17, 57:13,
69:3, 71:12,
72:13, 106:5,
106:10, 173:10,
173:12, 200:8
**realm**
112:12
**realtors**
53:14, 68:9
**reapportionment**
47:12
**reason**
8:17, 13:6,
20:16, 31:14,
52:10, 89:20,
94:22, 106:15,
130:6, 130:9,
130:10, 130:12,
130:19, 142:4,
190:20
**reasonable**
22:7, 207:5
**reasonably**
20:16
**reasons**
28:19, 87:8,
116:6, 131:3,
140:10, 145:20,
179:13
**rebates**
206:16
**recall**
11:8, 11:17,
14:15, 14:17,
15:9, 15:10,
16:13, 16:14,
18:2, 34:9,
34:10, 36:20,
37:18, 39:2,
43:2, 45:14,
64:12, 64:13,
66:10, 66:13,
74:10, 74:14,
88:20, 89:2,

91:21, 93:5,
93:9, 93:16,
93:19, 96:5,
97:8, 97:14,
98:10, 99:2,
99:10, 100:16,
100:18, 100:22,
105:20, 107:16,
107:18, 109:20,
111:3, 111:4,
117:3, 120:20,
121:1, 121:5,
132:15, 139:10,
139:11, 143:12,
143:14, 144:8,
144:9, 156:21,
160:8, 160:15,
160:16, 161:16,
170:22, 190:2,
197:3, 205:15,
208:18
**recalling**
15:13, 96:9,
98:13
**received**
10:18, 10:20,
11:10, 12:11,
15:4, 18:6,
30:13, 33:9,
178:2
**receiving**
18:2, 191:12
**recent**
53:5, 84:10,
156:17, 198:8
**recently**
38:8
**recess**
76:22, 182:13,
212:11
**recognize**
117:12, 117:13,
169:14, 187:7
**recognized**
113:8, 146:1
**recollection**
27:14, 27:17,
28:8, 43:6,

48:10, 49:18,
50:7, 64:8,
161:1, 187:21
**recommend**
48:8
**recommendation**
47:19, 49:19,
49:22
**recommended**
48:10, 49:15,
56:2, 200:18
**record**
6:8, 7:18,
7:22, 8:1, 8:10,
8:13, 9:2, 30:5,
36:22, 40:13,
40:17, 40:22,
42:1, 88:9,
93:3, 104:4,
135:3, 137:9,
138:3, 150:12,
150:13, 172:7,
177:14, 187:22,
197:4, 197:5,
201:12, 204:17,
204:20, 207:15,
208:3, 210:9,
215:5
**recorded**
63:21, 142:17,
196:14
**records**
14:17, 19:21,
53:16, 68:7
**recount**
113:3, 167:21
**recoverable**
177:15
**redevelopment**
114:16
**redistricted**
116:8
**redistricting**
116:15, 116:19,
117:1, 130:2,
146:22, 148:6
**redoing**
102:9

Transcript of John D. Moss
Conducted on September 13, 2019

252

redrawing
58:2
redrew
58:4
reduce
51:2, 51:15,
132:1, 132:5
reduced
50:14, 55:1,
215:7
reduces
52:12, 131:20,
131:21
reducing
122:13
reelected
67:1, 84:11
reelection
65:1, 67:17,
89:3, 106:3
refer
177:18
referenced
108:16, 144:15,
164:20
references
185:9
referencing
185:21, 186:20
referendum
47:17, 48:9,
48:12, 49:5,
49:12, 49:15,
56:4, 69:5,
71:14, 102:4,
102:18, 120:13,
121:9, 126:2,
141:10, 149:2,
156:1, 158:15,
161:11, 162:2
referendums
161:5
referring
12:16, 104:5,
133:16, 135:13,
137:9, 141:21,
167:11, 178:1,
180:6, 184:14,

185:19, 186:15,
199:7, 204:15,
204:20
refers
184:17
reflect
92:20, 137:9,
151:17
reflection
103:20
reflects
186:18, 187:19
refresh
7:13, 175:13
refuse
76:4
regard
153:5
regarding
10:5, 117:1,
155:8, 193:9,
204:21, 211:16
regards
198:8
registering
173:3, 183:17,
183:19
reid
113:20
related
22:19, 36:9,
81:13, 163:21,
215:10
relationship
203:10, 204:1,
204:3
relative
14:19, 36:20,
151:21
released
196:10
reliance
184:10, 184:15,
185:17
religiously
62:6
relocate
65:14, 77:8

rely
66:6
remain
100:2
remarks
187:18
remember
14:14, 21:20,
25:14, 37:2,
42:7, 45:7,
45:12, 46:8,
46:13, 47:13,
47:14, 49:19,
52:5, 67:18,
73:19, 74:1,
74:8, 74:15,
86:21, 87:18,
88:2, 88:16,
88:17, 95:12,
95:15, 96:8,
106:1, 109:18,
119:7, 120:14,
133:20, 134:1,
134:7, 139:3,
139:7, 140:14,
141:7, 141:17,
142:20, 143:10,
153:1, 153:3,
158:4, 160:17,
162:1, 170:6,
178:3, 187:15,
197:7, 208:13,
208:15, 208:18
rep
174:20
repeat
7:13, 42:7,
106:18
repeating
202:11
rephrase
149:13
replicated
55:19, 154:2
reply
62:21, 63:20,
178:6, 178:11
report
48:6, 48:8,

49:14, 182:6
reported
1:22, 160:14,
164:12, 168:18,
199:12
reporter
7:16, 8:1,
42:6, 42:9,
132:11, 136:19,
162:13, 175:8,
182:17, 201:6
reporter's
101:21
reporter-notary
215:1
reporters
160:11
reports
92:20
represent
6:9, 6:17,
30:9, 75:7,
129:12, 129:15,
136:20, 147:3,
154:9, 162:16,
162:22, 176:17,
201:16
representation
50:21, 93:5
representative
65:7, 148:8
representatives
145:9
represented
89:11, 90:17,
149:9, 149:20,
150:9, 150:15
representing
141:8
represents
103:15, 117:21,
153:13
reputation
184:22
request
14:20, 15:1,
140:13, 163:19
requested
144:2, 215:9

Transcript of John D. Moss
Conducted on September 13, 2019                                    253

| | | | |
|---|---|---|---|
| **requesting** | **responded** | **retain** | 50:2, 57:13, |
| 10:19 | 20:2, 199:21 | 16:18, 16:22, | 60:19, 76:20, |
| **requests** | **responding** | 17:1, 17:11, | 77:3, 92:13, |
| 16:12, 18:17, | 41:7, 63:7 | 17:13, 17:16, | 103:2, 103:8, |
| 19:1, 19:4, | **response** | 17:17, 17:19, | 109:13, 112:6, |
| 28:1, 31:12, | 16:2, 29:22, | 22:21, 32:14, | 115:16, 118:15, |
| 31:18, 176:20, | 30:1, 30:18, | 32:16, 35:4, | 119:9, 123:12, |
| 201:18 | 31:1, 137:2, | 47:22, 63:1, | 133:2, 136:6, |
| **required** | 163:4, 163:11, | 63:5, 63:12 | 140:14, 147:2, |
| 17:13, 17:20, | 164:3, 175:22, | **retained** | 149:6, 154:8, |
| 194:16 | 176:19, 201:17 | 32:9, 63:13, | 162:6, 162:7, |
| **requirement** | **responses** | 63:19 | 166:19, 167:7, |
| 62:3, 156:4, | 8:2, 30:6 | **retaining** | 167:8, 167:10, |
| 177:12 | **responsibilities** | 48:13, 104:2, | 167:19, 175:18, |
| **requirements** | 80:9, 80:10 | 124:2, 124:12 | 175:19, 176:13, |
| 79:8, 177:16 | **responsibility** | **retention** | 177:3, 178:7, |
| **requires** | 77:21 | 36:22 | 183:5, 192:4, |
| 131:17, 165:10 | **responsible** | **retired** | 201:13, 208:4, |
| **residency** | 67:16, 69:8, | 52:7, 69:12 | 208:22, 212:8, |
| 116:9, 117:17, | 69:22, 74:12 | **retracted** | 212:16 |
| 118:1, 139:18, | **responsive** | 72:18 | **rightfully** |
| 156:5 | 15:16, 15:21, | **retreat** | 67:15, 71:7, |
| **resident** | 18:18, 19:4, | 140:15, 141:3, | 71:19, 125:18, |
| 49:7, 209:13 | 19:8, 19:15, | 142:15, 142:21, | 127:4 |
| **residents** | 19:20, 20:1, | 147:9 | **rights** |
| 138:11 | 20:6, 20:9, | **retrieve** | 155:9 |
| **resign** | 21:9, 23:17, | 28:19 | **riot** |
| 38:20 | 26:16, 28:22, | **revenue** | 71:6 |
| **resignation** | 29:5, 29:11, | 100:15 | **riots** |
| 38:6, 38:12, | 30:3, 31:11, | **review** | 67:14, 71:19 |
| 192:6, 192:21 | 31:17, 36:15, | 12:7, 148:2, | **rita** |
| **resigned** | 149:16, 150:2, | 165:1, 165:17, | 77:7 |
| 38:22, 65:13, | 150:11, 160:22, | 182:22 | **rmr** |
| 76:3, 77:8 | 170:10 | **reviewed** | 1:22, 2:18, |
| **resolution** | **rest** | 14:18, 165:12 | 215:2 |
| 128:4, 170:12 | 181:3 | **reviewing** | **road** |
| **resort** | **restated** | 191:12 | 109:19, 115:7, |
| 153:22 | 135:18 | **rfps** | 194:9, 194:12, |
| **resources** | **restaurant** | 189:20, 190:11, | 194:17, 200:15, |
| 131:18 | 109:18 | 191:7, 191:12 | 206:8 |
| **respect** | **restrict** | **rich** | **roads** |
| 9:1, 104:1, | 39:9 | 186:14, 187:1, | 69:5, 115:8, |
| 124:9, 148:19 | **rests** | 189:1 | 209:20 |
| **respectfully** | 59:20 | **ridiculed** | **rob** |
| 168:22 | **results** | 73:15 | 186:13, 186:20, |
| **respond** | 47:18, 161:10, | **right** | 186:21, 188:20 |
| 18:10, 63:1, | 191:22 | 9:3, 22:14, | **robert** |
| 170:13, 184:11 | **retail** | 25:13, 29:13, | 84:3 |
| | 206:12 | | |

Transcript of John D. Moss
Conducted on September 13, 2019

254

| | | | |
|---|---|---|---|
| **role** | 105:11, 105:16, | 89:21, 90:3, | **save** |
| 80:2, 80:3 | 107:19, 107:21, | 92:5, 96:1, | 67:17 |
| **ron** | 108:1, 122:13, | 102:16, 102:19, | **saved** |
| 111:8, 199:20 | 122:14, 131:1, | 103:12, 105:14, | 92:11 |
| **room** | 131:11, 131:16, | 118:14, 121:22, | **saw** |
| 2:8, 4:8, 70:15 | 151:4 | 122:1, 122:4, | 15:7, 108:18, |
| **rosemary** | **running** | 125:13, 128:21, | 117:13, 183:18, |
| 87:5, 87:7, | 54:12, 73:1, | 128:22, 129:8, | 187:7 |
| 87:12, 106:2, | 83:19, 89:1, | 135:7, 141:18, | **say** |
| 124:13 | 91:9, 92:14, | 144:8, 150:1, | 7:17, 31:8, |
| **ross-hammond** | 93:21, 94:12, | 150:10, 152:14, | 34:3, 34:18, |
| 88:4, 88:9, | 96:11, 98:1, | 161:21, 162:2, | 38:13, 39:9, |
| 88:14 | 101:5, 107:14, | 173:6, 176:8, | 39:12, 42:9, |
| **roughly** | 167:13 | 184:14, 195:8, | 43:9, 43:10, |
| 151:6 | **rural** | 196:15, 196:16, | 43:14, 45:6, |
| **round** | 57:16 | 204:16, 206:13, | 53:3, 53:12, |
| 146:22 | **ruritans** | 206:14, 207:1, | 64:5, 66:12, |
| **roundtable** | 82:5 | 208:15, 215:6 | 68:3, 70:8, |
| 126:8 | **ryto** | **salary** | 74:12, 75:13, |
| **rouse** | 209:6, 209:12, | 78:21 | 81:6, 82:21, |
| 37:15, 38:16, | 210:4, 211:16, | **sam** | 87:14, 90:13, |
| 38:19, 84:4, | 211:21, 212:5 | 69:15, 69:16, | 93:15, 96:9, |
| 84:12, 89:8, | **ryto's** | 69:18 | 96:15, 101:3, |
| 89:17, 90:5, | 210:2 | **same** | 102:12, 102:17, |
| 107:19, 110:3, | | 7:20, 68:8, | 104:5, 108:21, |
| 110:17, 110:22, | **S** | 68:9, 81:8, | 110:19, 113:2, |
| 121:22, 123:15, | **s** | 85:12, 87:8, | 113:4, 114:18, |
| 157:11 | 111:14, 113:22, | 87:10, 87:12, | 119:21, 123:3, |
| **rouse's** | 119:5 | 87:14, 87:15, | 123:6, 123:7, |
| 110:8, 174:3, | **sabrina** | 87:16, 125:12, | 123:8, 124:1, |
| 174:8, 174:14 | 84:18, 85:15, | 126:21, 149:16, | 124:6, 124:15, |
| **rpr** | 85:20, 86:1, | 173:5, 173:20, | 125:12, 125:17, |
| 1:22, 2:18, | 87:13, 95:3, | 185:2, 185:6, | 126:21, 127:1, |
| 215:2 | 104:8, 104:11, | 190:16, 191:22, | 127:19, 127:20, |
| **ruin** | 106:8, 107:7, | 214:4 | 127:21, 128:9, |
| 73:3 | 107:11, 123:15 | **sample** | 129:4, 129:6, |
| **rules** | **safety** | 169:13, 169:14, | 129:7, 129:11, |
| 7:11 | 72:1 | 169:19, 170:3, | 129:18, 140:18, |
| **run** | **said** | 170:6, 170:7, | 141:1, 143:15, |
| 50:16, 51:16, | 7:3, 15:18, | 171:7, 171:8, | 149:13, 149:22, |
| 52:16, 53:20, | 15:20, 16:11, | 171:10, 174:3, | 152:11, 158:7, |
| 53:21, 67:15, | 21:15, 21:16, | 174:7, 174:12, | 158:19, 160:20, |
| 72:2, 73:19, | 26:20, 30:1, | 174:17 | 162:1, 164:5, |
| 75:8, 77:3, | 30:21, 35:10, | **satisfactorily** | 169:22, 170:5, |
| 77:10, 77:12, | 56:4, 56:12, | 192:8, 193:1 | 171:20, 173:17, |
| 77:13, 83:13, | 58:7, 60:5, | **saturday** | 190:3, 190:4, |
| 86:6, 91:16, | 71:18, 73:16, | 81:2, 81:22, | 192:16, 193:19, |
| 91:17, 104:8, | 76:5, 78:8, | 82:2, 82:4 | 199:14, 204:1, |

Transcript of John D. Moss
Conducted on September 13, 2019

255

| | | | |
|---|---|---|---|
| 211:9 | seal | secret | 14:21, 15:7, |
| **saying** | 215:14 | 124:20 | 16:11, 16:12, |
| 15:12, 38:18, | **search** | **sector** | 18:17, 18:21, |
| 39:7, 44:5, | 14:17, 16:15, | 202:15 | 18:22, 100:13, |
| 48:22, 64:13, | 19:3, 19:7, | **secure** | 132:13, 137:21, |
| 72:14, 75:5, | 20:5, 20:8, | 178:4, 178:5 | 137:22, 175:9, |
| 100:13, 114:6, | 21:8, 21:13, | **see** | 182:19, 183:3, |
| 128:1, 129:12, | 21:21, 22:6, | 15:17, 16:9, | 201:7, 208:12 |
| 171:1, 196:18, | 23:16, 23:22, | 19:11, 24:7, | **segment** |
| 206:19 | 26:15, 27:3, | 28:4, 44:11, | 113:11 |
| **says** | 27:7, 28:9, | 45:18, 53:17, | **segments** |
| 15:15, 16:8, | 31:21, 32:4, | 80:22, 90:8, | 68:9 |
| 36:13, 125:14, | 36:8, 36:10, | 93:11, 96:15, | **segregation** |
| 127:3, 133:9, | 36:12, 61:19 | 108:21, 113:15, | 113:5 |
| 135:11, 137:4, | **searched** | 128:18, 135:1, | **select** |
| 149:18, 150:13, | 22:12, 29:5, | 142:3, 147:22, | 103:10, 184:11, |
| 154:19, 163:11, | 29:10, 36:6, | 149:10, 150:21, | 184:15, 185:17, |
| 163:13, 164:3, | 43:11 | 151:12, 154:22, | 186:3 |
| 164:11, 168:12, | **searching** | 155:4, 155:12, | **selected** |
| 168:17, 178:12, | 36:11 | 163:9, 164:3, | 46:16 |
| 180:1, 186:13, | **seat** | 164:5, 164:7, | **selection** |
| 189:13, 190:22, | 54:12, 57:19, | 164:18, 167:9, | 184:1, 184:4, |
| 201:21 | 64:21, 77:4, | 167:12, 168:20, | 186:20, 187:13 |
| **scale** | 78:11, 83:17, | 169:3, 169:4, | **selective** |
| 135:5, 135:11 | 83:20, 92:15, | 169:18, 171:11, | 125:9 |
| **school** | 101:5, 107:7, | 171:12, 171:22, | **self-explanatory** |
| 45:12, 69:13, | 118:6, 154:21, | 173:11, 173:12, | 153:7 |
| 101:16, 118:11, | 156:5, 166:15, | 173:13, 175:18, | **sell** |
| 119:13 | 167:14 | 176:13, 177:14, | 68:22, 206:14 |
| **schools** | **seatack** | 177:20, 180:3, | **senate** |
| 69:5, 71:15, | 45:11, 108:17, | 184:2, 189:17, | 48:22, 56:16, |
| 81:16, 101:14, | 114:1, 114:12 | 199:13, 199:14, | 59:21, 128:17, |
| 101:15 | **seats** | 202:1, 209:1 | 145:17, 146:6 |
| **scope** | 49:17, 145:2, | **seeing** | **senator** |
| 8:22, 17:9, | 157:7, 160:7 | 14:14, 15:9, | 48:18, 56:17, |
| 20:3, 24:8, | **second** | 107:17, 170:8, | 58:7, 60:8, |
| 36:19, 36:20, | 14:12, 16:4, | 170:9 | 60:13, 126:10, |
| 90:7, 90:9 | 60:20, 65:21, | **seek** | 133:9, 133:17 |
| **scream** | 66:14, 71:18, | 109:14 | **send** |
| 41:5 | 112:7, 139:15, | **seeks** | 32:19, 33:2, |
| **screen** | 147:4, 147:9, | 155:15, 155:18 | 33:11, 34:14, |
| 34:21, 36:18 | 147:10, 161:17, | **seem** | 34:22, 35:2, |
| **screenshot** | 178:9, 182:18, | 110:18, 191:22 | 35:20, 62:7, |
| 35:19, 164:11, | 194:7, 194:8, | **seems** | 62:8, 62:21, |
| 168:17 | 201:8, 208:9 | 27:12, 120:22, | 64:2, 76:6, 76:7 |
| **scroll** | **secondly** | 184:18, 185:5, | **sends** |
| 24:2 | 19:17, 32:17, | 207:7 | 63:4 |
| **se** | 145:22, 196:20 | **seen** | **senior** |
| 181:17 | | 14:9, 14:10, | 47:15 |

Transcript of John D. Moss
Conducted on September 13, 2019

256

sense
8:7, 44:3,
109:14, 137:3,
157:13, 176:21,
207:14
sensor
32:9
sent
17:5, 18:9,
34:7, 37:20,
62:12, 63:14,
90:2, 90:14,
136:20, 136:22,
162:17, 163:1,
163:3, 173:9,
177:5, 178:16,
186:10, 193:8,
193:13, 200:13,
202:13
sentence
138:20, 149:6,
149:18, 150:4,
150:6, 150:13,
151:11, 178:11
sentences
150:20
separate
167:2, 171:19
september
1:16, 137:10,
215:15
sequence
183:1
series
189:15
serious
75:6
serve
51:20, 101:17,
156:4
served
44:20, 46:20,
47:6, 47:7,
47:8, 47:18,
49:22, 65:4,
65:6, 65:12,
104:13
serves
112:4

service
14:12, 24:22,
25:8, 33:1,
61:21
services
23:11, 187:13
session
12:4, 38:19,
44:2, 44:7,
44:21, 125:1,
138:6, 138:22,
140:1, 143:5,
178:3, 193:12,
202:15, 203:3,
203:5, 208:2
sessions
44:12, 82:17,
141:6, 141:20,
141:22, 142:1,
187:8, 188:2
sessoms
48:20, 56:20,
59:22, 89:4,
160:1
set
23:8, 23:13,
138:8, 162:14,
178:20, 182:7,
192:4, 202:21,
208:4, 215:13
set-aside
179:19
set-asides
178:22, 179:3,
179:15
setting
142:10
seven
48:12, 49:16,
50:8, 56:3,
57:18, 81:10,
90:5, 104:6,
116:8, 139:18,
139:21, 144:6,
145:1, 146:21,
152:13, 210:11
several
49:10, 113:3,

210:4
sewer
69:5
shannon
44:17, 84:14,
88:1, 106:4
share
85:12, 113:16,
153:10
shared
161:2
sharing
200:12, 202:22
sheet
214:7
shelby
101:14
sheltered
178:13
sheriff
48:18, 56:17,
60:15, 60:18,
100:5
shift
70:17
ship
67:15, 72:2
shooting
102:8
short
123:20, 123:22,
205:20, 212:9
shorthand
215:1
should
22:13, 43:13,
47:16, 71:7,
77:9, 78:19,
90:3, 90:13,
100:2, 103:3,
103:6, 104:2,
123:10, 141:5,
151:16, 183:17,
187:10, 194:22,
207:12, 207:16
shouldn't
90:4, 103:2,
156:1

shouting
41:13, 41:15
show
43:15, 75:5,
82:8, 123:3,
211:19
showed
32:3
showing
73:11
shown
170:20
shut
194:16
side
136:7, 161:18,
161:20, 161:22,
167:1, 182:7,
192:5, 208:4
sides
107:16
sidetracked
48:16, 56:10
sign
70:20, 96:10,
96:13, 96:16,
96:17, 96:18,
96:22, 212:16
signature
213:3, 214:11
signature-y8kzx
215:18
signatures
104:18
signed
214:7
signing
215:9
signs
17:16, 19:12,
19:13, 29:18,
97:1, 97:6,
97:7, 97:10,
97:14, 98:4,
99:13
similar
133:10, 136:22,
154:6, 162:13,

Transcript of John D. Moss
Conducted on September 13, 2019

257

163:2
**simply**
191:1
**since**
18:4, 26:6,
27:6, 28:18,
44:20, 54:14,
61:17, 77:10,
79:12, 94:1,
107:14, 115:13,
121:11, 121:12,
127:10, 140:11,
144:12, 154:21
**sincere**
212:3
**single**
44:1, 44:5,
51:1, 114:12,
146:14
**single-family**
115:17
**single-member**
34:8, 43:4,
46:9, 46:15,
49:16, 50:8,
52:11, 56:3,
64:10, 102:13,
103:11, 104:6,
119:3, 119:7,
119:22, 120:17,
121:4, 123:2,
123:17, 125:5,
125:7, 127:10,
127:18, 128:11,
130:7, 130:19,
131:4, 135:13,
139:19, 139:22,
141:2, 144:6,
144:12, 145:2,
146:21, 148:11,
148:21, 161:6,
210:11
**singularly**
148:7
**sir**
212:15
**sit**
82:18, 157:14

**site**
92:9
**sitting**
31:15, 169:8
**situation**
154:4, 194:18
**situations**
156:16
**six**
23:2, 23:7,
23:14, 40:9,
81:6, 91:3,
133:9
**size**
112:2, 145:11
**slogan**
52:6
**slow**
97:21, 134:19,
194:10
**slowly**
101:20
**small**
57:12, 94:20,
99:10, 115:19,
167:18, 167:20,
178:15, 178:18
**smart**
90:18
**smith**
204:10
**social**
25:19, 25:21,
25:22, 28:1,
29:6, 157:12
**sold**
114:9
**solely**
22:19
**solicit**
100:4
**some**
7:5, 8:21,
19:14, 32:16,
34:5, 34:17,
37:17, 45:3,
45:9, 50:6,
68:19, 73:7,

73:11, 74:20,
74:21, 74:22,
76:19, 87:14,
92:4, 92:10,
94:8, 94:14,
95:18, 97:11,
98:6, 104:13,
113:9, 114:3,
119:4, 121:13,
124:6, 124:7,
128:3, 128:4,
128:20, 141:11,
154:12, 157:10,
194:15, 195:6,
198:10, 199:13
**somebody**
85:10, 96:8,
174:21
**somebody's**
127:22
**somehow**
75:1
**someone**
33:19, 37:8,
54:1, 66:10,
82:19, 85:10,
89:20, 90:14,
90:15, 91:12,
93:18, 127:21,
129:7, 146:6,
160:21, 170:22,
193:22
**someplace**
34:2, 34:18,
81:2, 96:1
**something**
11:9, 20:17,
33:8, 38:4,
38:7, 47:13,
59:19, 63:1,
67:12, 90:12,
92:11, 92:19,
98:11, 98:13,
121:19, 122:8,
126:2, 127:7,
133:14, 134:14,
140:21, 143:15,
145:12, 153:16,

160:19, 174:21,
181:13, 181:19,
191:15, 191:20,
191:21, 197:15,
211:1
**sometime**
66:7, 101:18,
111:19
**sometimes**
76:13, 81:7,
82:5, 83:1,
124:15, 139:10,
209:15
**somewhat**
48:19, 68:20,
190:17
**somewhere**
105:3
**sorry**
97:18, 108:2,
137:15, 150:5,
150:10, 167:5,
205:21
**sorts**
206:13
**sound**
45:13, 120:3
**source**
152:4
**speak**
34:2, 34:18,
42:13, 81:19,
81:21, 103:21,
126:1, 140:6,
145:14, 174:20,
174:21
**speakers**
144:8
**speaking**
39:17, 39:20,
40:1, 40:3,
40:7, 42:3,
67:19, 67:21,
81:1, 81:22,
82:1, 82:10,
85:8, 127:22,
129:10, 146:6,
198:21, 205:16

Transcript of John D. Moss
Conducted on September 13, 2019

258

**special**
50:18, 50:19,
51:13, 52:17,
52:19, 53:3,
64:19, 67:1,
77:5, 85:7,
134:12, 135:8,
205:8, 205:10
**specific**
14:14, 15:9,
16:14, 20:7,
29:8, 45:7,
96:17, 96:22,
104:18, 106:1,
121:1, 140:10
**specifically**
29:16, 64:12,
80:1, 102:4,
128:22, 132:15,
133:16, 158:4,
185:18, 185:21,
193:10, 199:19,
201:8
**specificity**
166:6
**specified**
116:6
**specify**
157:9
**spectrum**
34:4, 39:10,
131:13
**speculation**
198:19
**spell**
44:14, 52:1,
105:5, 115:3,
115:5, 126:6,
126:16, 172:16,
207:20
**spend**
54:22, 145:15
**spending**
68:5
**spent**
40:8, 67:9,
68:2, 68:4,
184:9

**spoke**
95:20, 99:5,
128:20, 128:21,
129:1, 160:21,
209:16
**spoken**
82:4, 125:9,
125:21, 126:5,
126:12, 128:14
**sponsor**
56:14
**sponsored**
45:14, 140:20
**sponsoring**
45:12
**spool**
185:11
**spouse**
77:8
**square**
50:22, 135:7
**squint**
173:16
**st**
102:8
**staff**
206:11
**standards**
179:8
**standing's**
110:2
**start**
7:19, 84:2,
98:2, 153:8,
177:1, 197:21
**started**
33:3, 47:6
**starts**
147:6, 147:21,
150:20, 151:11
**state**
6:7, 8:9, 10:7,
42:14, 80:18,
113:12, 128:17,
133:9, 146:7,
172:22, 180:11,
185:8
**stated**
99:9, 138:3,

148:12, 149:1
**statement**
107:17, 112:1,
135:16, 136:5,
149:12, 151:19,
156:10, 166:7,
168:12, 168:15,
168:17, 169:18,
169:19, 170:2,
170:9, 171:9,
171:15, 191:3,
199:6, 199:11
**statements**
198:5, 198:7
**states**
1:1, 79:10,
112:8, 113:10,
151:1, 155:6,
156:3, 185:16
**station**
196:11
**statistical**
123:7, 128:3
**statistically**
185:5
**statistics**
191:21
**status**
12:15, 71:17,
77:17
**stay**
179:10
**stayed**
180:8
**staying**
180:10
**stenographically**
215:7
**stick**
121:18, 160:20
**sticker**
96:14, 96:15,
136:8, 136:10
**stickers**
19:14, 29:18
**still**
34:16, 35:21,
47:1, 49:3,

57:1, 60:13,
65:8, 89:14,
90:9, 114:7,
114:14, 118:10,
123:5, 127:13,
135:16, 156:7,
173:18, 188:4,
205:4
**stimulated**
51:10
**stolle**
48:18, 56:17,
56:18, 58:7,
59:21, 60:8,
60:13, 100:5
**stops**
72:9
**storage**
24:16
**story**
70:14
**straight**
137:20, 150:13
**strange**
120:3
**street**
3:6, 3:13
**strength**
155:10
**stretch**
75:18, 171:11,
173:10
**strip**
153:22
**strong**
149:4
**structure**
56:22, 59:2
**stuck**
208:19
**student**
107:12
**studies**
113:3
**study**
178:5, 179:1,
180:13, 180:15,
180:22, 181:7,

Transcript of John D. Moss
Conducted on September 13, 2019

259

181:17, 181:18, 181:21, 182:2

**stuff**
16:15, 17:4, 17:8, 17:11, 17:14, 19:13, 19:18, 20:19, 22:8, 22:20, 23:5, 28:7, 29:17, 35:11, 62:7, 76:18, 94:7, 95:17, 95:19, 99:2, 173:1, 191:18

**subdivision**
115:4

**subject**
36:14, 163:11, 179:2, 184:1

**submarine**
13:9, 13:10, 79:7, 79:9

**subpoena**
5:10, 5:12, 5:13, 14:21, 15:3, 17:5, 30:1, 30:16, 136:20, 137:3, 162:16, 162:22, 163:5, 163:12

**subsequent**
138:12

**subsidies**
205:18, 205:19

**substantial**
68:1, 68:3, 71:9, 114:16

**substantially**
182:2

**successful**
78:19, 134:2, 134:6, 190:8, 191:18

**successfully**
102:7

**sued**
10:6

**sufficient**
88:13

**suggest**
132:7, 186:1

**suit**
74:5

**suite**
3:7, 3:14

**sum**
68:1, 71:9

**summary**
147:7

**superior**
195:11

**support**
59:10, 79:17, 85:11, 86:15, 87:12, 88:12, 88:13, 89:2, 89:20, 94:16, 95:2, 95:8, 98:22, 99:11, 100:5, 100:9, 102:16, 103:12, 103:14, 103:22, 106:13, 106:15, 107:2, 120:5, 120:17, 121:22, 122:2, 123:16, 124:17, 125:5, 125:8, 125:11, 125:15, 127:4, 127:17, 128:10, 130:7, 130:14, 130:15, 130:19, 130:21, 131:3, 148:10, 155:15, 155:17, 162:1, 180:12, 181:8, 181:9, 181:10, 205:2, 210:8

**supported**
89:5, 89:13, 95:4, 95:5, 95:10, 97:22, 98:15, 98:17, 99:21, 100:11, 104:22, 106:22, 107:3, 107:6, 107:10, 109:9,

110:8, 110:11, 110:16, 110:21, 119:22, 148:21, 210:10

**supporter**
88:5, 119:2

**supporters**
87:9

**supporting**
52:10, 96:2, 99:6, 99:9, 99:15, 100:3, 106:2, 106:20, 119:7

**supposed**
14:16

**supreme**
153:2

**sure**
16:3, 18:16, 22:11, 28:5, 32:1, 48:6, 56:20, 67:2, 67:9, 68:2, 68:4, 72:5, 72:16, 99:5, 104:19, 107:15, 132:14, 158:14, 158:16, 169:9, 192:20, 197:19, 199:2, 212:18

**surprised**
200:8

**surprisingly**
125:12

**suspect**
34:4, 34:6, 47:21, 48:18, 203:16, 203:17

**suspended**
27:4

**suspicion**
60:6, 203:19

**suspicions**
59:1

**swam**
178:12

**swipe**
63:10

**switch**
49:16, 79:19

**switched**
61:15

**switching**
50:8

**sworn**
6:4

**system**
34:8, 43:4, 43:19, 43:22, 44:22, 47:16, 47:20, 48:13, 49:1, 49:3, 49:7, 50:13, 51:7, 52:12, 55:7, 55:9, 57:2, 57:3, 57:19, 58:8, 58:11, 59:11, 62:14, 63:15, 63:22, 64:10, 101:16, 102:13, 102:20, 102:21, 103:11, 103:14, 103:18, 104:2, 104:5, 121:4, 122:19, 124:3, 124:12, 126:1, 127:18, 128:6, 128:11, 129:1, 130:8, 130:20, 131:4, 131:22, 132:4, 133:1, 133:4, 135:22, 145:21, 146:7, 148:14, 148:17, 148:21, 149:3, 151:16, 152:10, 152:11, 152:14, 152:17, 152:20, 153:8, 153:12, 154:6, 155:12, 157:7, 159:8, 159:14, 159:20, 160:6, 161:6, 162:3, 210:10

**systems**
24:7, 54:7,

Transcript of John D. Moss
Conducted on September 13, 2019

260

145:8, 148:15,
152:13, 153:4,
211:17

**T**

**t-e-p-h**
126:11
**t-mobile**
25:1, 25:3
**tab**
136:17, 137:5,
137:18, 147:4,
154:16
**tabbed**
137:6, 154:10
**table**
82:18
**tabs**
136:13
**take**
8:5, 75:18,
76:5, 102:8,
115:1, 122:11,
145:13, 156:16,
168:16, 182:12,
185:13, 198:10,
200:3, 212:9
**taken**
45:2, 45:22,
76:22, 84:5,
144:10, 182:13,
189:8, 198:13,
198:15, 212:11,
215:4, 215:6
**takes**
24:4, 55:17
**taking**
14:8, 86:16,
107:15, 193:9
**talk**
38:4, 120:3,
120:16, 120:18,
140:14, 157:14,
160:18, 161:21,
174:18, 180:8,
199:18, 205:9,
211:2
**talked**
12:10, 29:9,

43:18, 43:21,
44:2, 46:22,
85:8, 90:20,
91:1, 110:12,
120:7, 131:7,
141:1, 141:10,
160:13
**talking**
40:9, 40:20,
40:21, 82:16,
82:17, 89:4,
125:4, 141:4,
157:19, 165:4,
186:18, 187:11,
199:22
**tall**
128:18
**target**
53:6, 179:1
**taste**
73:7, 74:20
**tax**
88:11, 102:1,
200:18, 206:10,
206:16
**taxes**
86:14
**taxpayer**
95:22, 205:18,
205:19, 206:4,
206:21
**taxpayers**
82:3, 204:7,
207:4, 207:13
**teacher**
69:12
**team**
69:8, 69:22,
74:12
**tech**
110:5
**televised**
142:17
**television**
196:11
**tell**
10:21, 11:15,
11:16, 21:17,

22:6, 23:19,
27:19, 28:2,
28:5, 30:11,
55:4, 57:16,
61:19, 66:6,
88:19, 95:18,
97:6, 97:12,
107:8, 123:1,
134:9, 141:7,
157:16, 161:1,
166:16, 172:5,
172:7, 174:2,
174:6, 176:9,
185:20
**telling**
11:8, 63:15,
89:16
**tells**
36:14, 71:11,
84:16, 88:16
**tend**
34:20, 59:14,
112:22, 145:8,
145:9, 145:15,
145:22, 190:4
**tends**
189:21, 190:3,
190:11
**tennessee**
65:14, 76:6,
101:11
**term**
30:12
**termination**
200:17, 202:10
**terms**
11:4, 14:16,
20:8, 21:21,
22:6, 22:7,
22:17, 71:1,
114:13, 202:22
**terrible**
45:13, 128:19
**test**
107:4
**testified**
37:9
**testify**
6:5

**testifying**
124:19
**testimony**
214:4, 214:5,
215:6
**text**
23:16, 23:19,
23:22, 32:11,
32:14, 32:21,
33:3, 33:5,
33:6, 33:10,
33:13, 33:18,
34:5, 34:7,
34:12, 34:14,
35:2, 35:9,
35:18, 36:7,
36:8, 36:20,
37:6, 37:9,
37:11, 37:22,
38:11, 39:13,
42:11, 42:19,
42:22, 43:12,
43:17, 83:3,
147:6, 154:19,
155:6, 164:11,
164:12, 166:11,
166:14, 166:18,
166:20, 167:7,
168:4, 168:17,
170:8, 173:5,
173:8, 173:9,
184:7
**texted**
38:14, 38:18,
39:2, 42:21,
43:3
**texting**
169:9
**texts**
24:10, 24:13,
36:11, 38:9,
43:11, 83:4,
83:8, 169:12
**th**
3:6, 13:8,
65:13, 79:12,
111:18, 163:9,
176:11, 183:11,

Transcript of John D. Moss
Conducted on September 13, 2019

261

186:10, 186:19,
188:3, 202:3,
209:6
**thalia**
70:11, 118:17
**thank**
14:6, 14:7,
41:15, 41:16,
41:18, 84:8,
87:21, 125:3,
126:19, 126:20,
175:16, 178:10,
212:14
**thanks**
154:14
**themselves**
52:22, 103:9,
151:2, 166:18
**thereafter**
215:7
**therefore**
41:11, 50:19,
51:6, 52:20,
80:15, 113:13,
131:19, 150:1
**thin**
98:21, 128:18
**thing**
14:4, 15:2,
15:3, 15:8,
19:16, 27:15,
31:20, 51:10,
54:18, 56:18,
57:9, 62:7,
70:2, 74:5,
90:8, 92:4,
110:1, 119:12,
120:1, 125:12,
149:16, 168:22,
192:10, 199:4
**things**
14:13, 14:15,
14:16, 14:19,
19:21, 22:1,
22:14, 29:18,
33:6, 37:22,
39:1, 40:10,
48:1, 50:11,

67:8, 71:8,
72:15, 75:9,
99:6, 120:16,
121:2, 126:21,
138:14, 163:21,
172:9, 180:18,
205:2
**thinking**
35:5, 96:16
**thinks**
128:8, 129:10,
207:16
**third**
154:9, 178:11
**thompson**
53:7, 84:22,
85:4, 85:14,
87:17, 89:13,
89:14, 89:19,
89:21, 106:17,
107:1, 107:3,
193:11, 193:18,
202:17, 203:11,
204:2, 204:4,
204:10, 205:12
**thorough**
176:10
**thought**
30:20, 48:2,
50:10, 52:10,
71:2, 71:7,
73:12, 74:15,
76:16, 77:9,
77:14, 77:16,
77:19, 78:1,
88:7, 89:11,
90:7, 90:17,
108:13, 109:3,
109:7, 109:11,
150:10, 194:22,
195:20, 200:17,
203:7, 205:22,
207:12
**thoughts**
86:13, 193:15,
202:22
**thousand**
35:6

**three**
26:17, 37:1,
77:7, 77:10,
83:12, 115:8,
118:13, 145:2,
164:6, 169:13,
181:11, 184:9,
200:15
**three-year**
101:19
**threw**
196:12
**through**
16:15, 19:9,
20:22, 21:2,
21:6, 21:21,
22:4, 24:14,
30:8, 31:16,
38:3, 46:20,
54:4, 56:15,
63:10, 63:14,
80:17, 83:6,
83:9, 86:7,
138:7, 147:9,
148:6, 183:7,
188:19, 196:10,
208:13, 208:15
**thumb**
38:3
**thursday**
64:20
**ticket**
72:19, 73:5,
75:1
**tim**
86:8, 86:12,
93:1
**time**
8:5, 13:18,
13:21, 14:4,
24:4, 25:11,
26:7, 26:19,
27:18, 34:5,
45:1, 48:11,
49:6, 50:5,
53:8, 54:21,
54:22, 55:1,
55:13, 55:18,

58:2, 59:22,
60:1, 61:17,
65:3, 65:15,
65:21, 65:22,
66:1, 66:4,
66:14, 66:21,
68:10, 70:11,
75:22, 76:1,
76:20, 82:7,
82:19, 84:10,
94:7, 100:9,
101:19, 107:13,
108:17, 109:21,
111:15, 114:3,
114:4, 116:12,
118:18, 118:21,
119:4, 119:6,
119:21, 120:2,
120:22, 121:12,
133:19, 137:22,
153:7, 153:14,
162:5, 177:5,
178:16, 182:22,
183:21, 189:6,
190:2, 197:10,
202:10, 209:17
**time-limited**
54:16, 54:17
**timeframe**
46:22, 66:3,
119:10
**times**
26:17, 52:9,
109:21, 133:15,
133:20, 157:8,
209:15
**title**
132:21
**titled**
16:6, 201:21
**today**
7:5, 8:15,
8:18, 9:5, 13:4,
29:9, 31:15,
32:22, 33:3,
36:5, 36:17,
49:3, 57:16,
58:5, 65:10,

Transcript of John D. Moss
Conducted on September 13, 2019

262

111:21, 125:4,
131:3, 131:8,
157:4, 159:4,
159:11, 159:18,
160:4, 169:8
**today's**
34:1, 199:3
**together**
69:8, 69:13,
71:6, 99:16,
153:3
**told**
35:8, 99:14,
123:15, 128:6,
128:10, 133:14,
133:20, 165:16,
190:22
**tom**
188:16, 189:4,
189:5
**tone**
41:7, 41:8,
75:2
**took**
30:16, 64:19,
73:6, 75:12,
116:15, 120:11,
134:11, 161:7,
161:11, 189:16,
193:16
**top**
16:8, 72:15,
77:6, 78:17,
109:4, 133:8,
147:7, 147:8,
163:7, 163:17,
167:8, 168:21,
169:1, 169:3,
169:4, 178:6,
186:9, 201:20
**topic**
24:9, 36:14,
46:21, 140:15,
140:17, 160:9
**topics**
211:6
**totally**
171:15

**touch**
88:7
**towards**
93:14, 186:9
**town**
81:1, 81:4,
81:9, 81:13,
81:14, 82:9,
99:5, 113:20,
120:18, 120:20,
122:22, 123:4,
209:16
**track**
107:8, 204:17,
204:20, 207:15
**traction**
121:14
**trading**
145:10
**traditional**
113:19, 114:1,
115:10
**traditionally**
114:13
**traffic**
10:1, 194:13,
194:20
**transcribe**
134:18
**transcribed**
46:7, 212:17,
212:18
**transcript**
14:3, 45:21,
46:3, 46:5,
132:10, 136:16,
144:3, 162:11,
175:6, 182:15,
201:4, 208:8,
212:17, 215:5
**transcription**
214:5
**transcripts**
142:18, 143:20,
144:2
**transit**
209:20
**trash**
16:21

**treasurer**
100:17
**tremendous**
85:5, 131:17
**trend**
145:15
**tried**
28:22, 41:22,
134:13, 137:18
**truck**
97:7
**true**
55:15, 75:3,
112:1, 151:20,
214:4, 215:5
**truism**
151:9
**trust**
80:14, 91:7,
193:20, 193:21,
204:18
**trustworthy**
196:21
**truth**
107:8
**truthful**
8:18
**try**
24:14, 33:17
**trying**
39:5, 43:14,
44:16, 44:18,
51:16, 63:17,
84:4, 84:9,
84:13, 86:6,
86:19, 94:11,
98:3, 107:15,
108:7, 120:4,
122:10, 122:11,
126:11, 129:17,
137:19, 142:13,
143:2, 145:12,
160:16, 167:6
**tuesday**
203:3
**turn**
15:11, 15:14,
133:7, 136:14,

137:5, 147:2,
150:19, 154:8,
155:2, 163:6,
163:16, 164:6,
167:1, 167:2,
183:9, 186:6,
188:12, 192:1
**turned**
196:9
**turnout**
132:1, 132:5
**tv**
72:22, 73:16,
73:20, 82:20,
98:9
**twice**
65:5, 118:14,
121:13
**twitter**
26:2, 26:5,
26:6, 26:8
**two**
10:12, 25:5,
26:17, 26:22,
32:15, 65:1,
67:8, 71:6,
71:8, 76:9,
77:7, 78:16,
78:17, 83:12,
102:3, 117:5,
133:3, 134:21,
147:6, 150:20,
161:4, 162:4,
166:11, 166:13,
166:19, 167:1,
167:3, 167:5,
170:7, 181:11,
181:14, 181:15,
193:7, 196:17,
196:18, 200:8,
200:11, 201:21,
202:5, 205:16,
206:9
**two-month**
81:8
**type**
146:11
**types**
23:12, 179:11,

Transcript of John D. Moss
Conducted on September 13, 2019

263

184:20, 185:7
**typewriting**
215:8

**U**

**u-h-r-i-n**
44:15
**uh-huh**
16:10, 25:7,
55:22, 86:18,
89:9, 92:22,
98:19, 118:12,
125:19, 126:9,
134:4, 135:20,
151:13, 155:1,
155:13, 161:3,
163:10, 163:13,
164:8, 177:17,
180:4, 184:3,
186:8, 188:11,
188:22, 212:10
**uhrin**
44:13, 156:14
**ultimately**
72:10, 140:2,
146:18, 148:18,
156:13
**unable**
30:9
**unbeknownst**
100:12
**unclear**
41:11
**under**
6:5, 8:15,
194:14, 195:10,
196:13, 196:19,
215:8
**underneath**
155:6
**understand**
8:15, 15:19,
17:6, 17:7,
34:12, 62:11,
63:17, 63:18,
68:11, 145:19,
168:2, 168:4
**understanding**
9:7, 106:7,

153:20
**unfair**
131:9
**unfortunately**
137:16
**uniform**
194:13, 195:14
**unique**
153:5, 154:1,
211:4
**uniqueness**
153:21
**united**
1:1, 79:9,
112:8, 113:10
**universal**
165:21
**universe**
151:22, 165:22
**unknown**
190:20
**unless**
134:13, 144:1
**unlike**
103:4, 145:8,
146:6
**unpredictable**
13:14, 13:15
**unprofessional**
41:20, 42:1
**unsatisfactory**
197:1
**until**
40:21, 57:18,
65:12, 111:18,
165:12
**unusual**
152:20, 152:21,
153:5, 153:12,
153:13, 153:19,
154:3, 185:6
**upset**
69:3, 71:12,
71:16, 71:19
**use**
20:8, 21:3,
21:18, 22:1,
23:11, 26:1,

26:18, 36:10,
37:9, 48:17,
53:5, 61:2,
61:5, 61:20,
61:22, 75:19,
151:15, 181:14,
190:5, 190:9,
191:16, 207:13
**using**
31:22
**usual**
32:9
**usually**
81:8, 81:14,
81:17, 83:6,
83:9, 83:12,
93:14, 143:20,
211:1
**usurping**
207:17
**utilities**
189:8, 189:10
**utilizes**
127:13

**V**

**va**
2:9, 4:9
**vacant**
83:17
**vacation**
13:19
**vague**
41:11
**vagueness**
42:5
**validated**
153:2, 192:3
**validity**
191:3
**value**
17:18, 185:4
**various**
12:15, 179:6,
186:11, 188:17
**vb**
15:22, 18:9,
62:1, 63:15,

83:6
**vbgov**
22:9, 31:3,
62:8, 62:19,
62:20, 63:10,
63:16, 83:10,
177:13
**vbt**
95:21
**vegetation**
74:7
**vehicle**
195:1
**venture**
111:2
**verbal**
8:1
**verizon**
25:1, 25:6,
25:9
**version**
174:2
**versus**
43:17, 55:21,
113:5, 119:17,
192:3
**vested**
80:10
**veterans**
69:17
**vf**
31:22
**via**
32:11
**vice**
48:19, 56:20,
59:22, 70:13,
162:18, 162:20,
162:21, 163:1,
163:4
**video**
92:10, 142:3,
187:10, 187:22,
188:3, 189:14
**videos**
91:21, 92:5,
98:6
**videotape**
45:20

Transcript of John D. Moss
Conducted on September 13, 2019

264

**videotaped**
45:17, 45:19,
46:4
**view**
45:5, 45:6,
50:12, 51:15,
52:22, 58:18,
58:19, 58:20,
58:21, 58:22,
67:6, 74:21,
90:19, 92:3,
109:3, 205:6,
207:15, 207:18
**viewed**
74:22
**views**
43:20, 44:3,
44:8, 85:12,
85:18, 86:11,
94:21, 141:9,
203:1, 212:4
**villanueva**
111:8
**violation**
193:20
**violations**
155:8
**virginia**
1:2, 1:9, 1:15,
2:5, 2:9, 2:19,
4:2, 4:5, 4:9,
5:18, 6:16,
6:19, 6:20,
13:7, 43:5,
46:2, 54:8,
60:17, 64:11,
64:15, 65:4,
68:17, 71:15,
79:14, 79:15,
82:3, 83:14,
83:20, 89:17,
91:9, 92:15,
93:22, 96:12,
98:1, 99:21,
101:9, 111:11,
111:22, 112:3,
113:1, 113:4,
116:8, 116:15,

117:17, 118:2,
127:17, 130:6,
132:21, 138:11,
148:7, 151:7,
153:15, 154:6,
154:21, 155:8,
155:11, 159:12,
159:19, 164:1,
201:21, 209:13,
211:17, 215:22
**virginiabeach**
61:5, 61:11
**virginian-pilot**
5:11
**virtue**
109:14
**vision**
207:11
**vocal**
119:2
**voice**
41:4, 77:14,
77:17, 77:19,
89:11, 90:18,
109:1, 109:4,
146:8, 149:3,
149:4
**voices**
78:2, 108:14
**volunteer**
59:10
**volunteered**
93:20
**volunteering**
95:16
**volunteers**
170:20
**vote**
70:12, 78:19,
90:3, 90:4,
102:19, 103:2,
103:3, 117:15,
123:12, 138:13,
138:16, 139:6,
145:9
**voted**
58:12, 70:11,
70:18, 88:10,

139:4, 139:7,
140:7, 143:14,
143:16, 144:12,
205:3
**voter**
77:10, 132:1,
132:5
**voters**
54:1, 58:10,
58:12, 58:14,
59:12, 78:16,
78:18, 122:21,
123:1, 130:15,
130:16, 130:17,
131:21, 132:5,
135:9, 136:1,
136:4, 149:5,
149:8, 149:19,
150:15, 151:7,
156:1, 174:9,
174:13
**votes**
67:12, 70:7,
91:3, 121:9,
149:2, 158:15,
167:19, 167:20
**voting**
21:16, 24:7,
38:3, 47:16,
57:3, 133:11,
147:21, 148:5,
148:6, 151:16,
152:18, 155:8,
155:10, 155:12,
208:18, 208:21,
210:18, 210:19,
211:1, 211:4,
211:7, 211:8,
211:10

---

**W**

**w-o-r-s-t**
86:9
**wagner**
128:17
**wait**
7:18
**waiting**
41:17

**waived**
213:3
**waiving**
158:22, 159:2
**walk**
91:2
**wall**
70:2
**wallflower**
81:3
**want**
11:11, 11:12,
18:16, 31:22,
34:12, 35:12,
39:5, 51:20,
53:21, 56:1,
58:6, 59:2,
59:10, 59:18,
60:4, 60:19,
62:11, 66:12,
75:20, 84:6,
91:4, 91:12,
92:1, 96:21,
97:2, 108:20,
115:20, 121:15,
122:15, 122:17,
123:1, 123:11,
123:13, 124:8,
124:18, 125:14,
127:3, 127:6,
132:22, 147:17,
149:3, 152:7,
153:9, 163:18,
170:5, 171:13,
188:15, 191:16,
199:2, 211:12,
212:22
**wanted**
26:18, 49:8,
57:10, 58:14,
69:1, 108:19,
109:1, 120:9,
128:21, 128:22,
133:4, 161:22,
162:3, 176:2,
206:7, 206:8,
207:14
**wanting**
68:22, 105:22,

185:11
**wants**
103:14, 204:6
**war**
76:8
**ward**
48:12
**warfare**
79:7, 79:8
**washington**
3:8, 6:14
**watch**
187:10, 199:16
**watched**
189:14
**watching**
82:19, 82:20
**wavelength**
87:11
**way**
9:22, 23:18,
28:6, 34:15,
36:16, 39:8,
45:17, 73:8,
73:13, 75:12,
75:13, 82:22,
94:3, 98:2,
98:3, 98:16,
109:8, 110:17,
115:9, 116:14,
131:9, 146:15,
152:20, 170:10,
182:22, 189:20,
190:8, 190:10,
191:6, 195:15,
198:9, 211:16
**ways**
27:6, 32:15,
47:20, 48:3,
82:11, 98:4,
110:10
**we'll**
6:7, 16:4,
18:14, 76:6,
76:7, 121:18,
125:15, 182:8,
194:6, 206:15,
206:16, 208:5

**we're**
63:2, 86:14,
102:9, 122:10,
122:11, 127:7,
136:12, 157:17,
162:8, 187:12,
204:12, 207:2
**we've**
29:9, 31:15,
32:22, 44:2,
44:7, 66:1,
75:17, 110:7,
122:9, 131:2,
131:7, 140:14,
156:9, 157:3,
159:3, 159:10,
159:17, 160:3,
160:13, 212:18
**wealth**
80:17
**web**
83:7
**website**
28:16, 28:17,
28:20, 92:8,
188:5
**wednesday**
186:19
**week**
13:7, 13:20,
155:7
**weekends**
55:12
**welcome**
165:14
**well-aligned**
50:18
**well-known**
43:20, 44:4
**well-reported**
194:4
**went**
19:9, 19:17,
20:10, 20:13,
48:9, 48:14,
48:21, 56:6,
57:18, 57:19,
65:9, 76:9,

97:6, 99:4,
119:12, 142:2,
152:13, 180:8,
188:19
**weren't**
78:6, 86:15,
108:14, 134:2,
161:12, 170:1
**wesleyan**
115:7
**whatever**
62:6, 103:6,
104:1, 194:20
**whatnot**
122:22
**wheeler**
186:14, 187:3
**whereof**
215:13
**whereupon**
6:2
**wherever**
82:6
**whether**
23:10, 27:15,
37:5, 93:12,
101:9, 107:10,
110:16, 140:6,
143:13, 168:9,
169:9, 174:7,
174:12, 182:19,
195:13
**white**
174:9, 199:9
**whoever**
173:1
**whole**
14:4, 55:3,
57:8, 81:7,
112:21, 131:17,
146:7, 147:11,
147:12, 194:4,
199:4
**wife**
23:5
**wife's**
77:11
**wile**
1:22, 2:17,

215:2
**williams**
199:20
**willing**
52:22, 108:8,
206:21, 207:13
**wilson**
87:6, 87:7,
87:13, 124:13
**wilson's**
106:3
**win**
47:10, 54:1,
91:13, 120:6,
156:6
**wish**
9:3, 70:1,
120:14
**withhold**
31:10
**within**
17:9, 20:3,
24:8, 90:11,
179:10
**without**
153:20, 166:5,
170:8
**witness**
215:13
**women**
115:12
**won**
47:11, 51:13,
71:10, 156:12,
156:14, 156:15,
167:20
**wondering**
185:1, 185:18
**wood**
5:13, 162:17,
163:1, 163:4,
166:1, 168:5,
168:10, 169:10
**wood's**
163:8, 164:3
**wooten**
84:18, 86:1,
87:9, 87:13,

Transcript of John D. Moss
Conducted on September 13, 2019                                              266

93:2, 95:3,
104:8, 104:11,
106:8, 107:7,
107:11, 122:1,
123:16
**wooten's**
85:15
**word**
112:15, 121:18,
168:15, 190:5,
190:9
**word-for-word**
144:3
**words**
97:19, 129:17,
134:16, 195:21,
198:14, 198:16,
199:12, 199:17
**work**
6:10, 6:13,
13:9, 30:7,
55:17, 122:9,
128:6, 170:19,
172:20, 181:13,
181:15, 182:4,
184:20, 185:3,
185:7, 190:16
**worked**
106:3, 119:12,
170:21
**worker**
170:15
**workers**
164:13, 164:20,
164:22, 165:7,
165:21, 166:4,
168:19, 170:1,
170:22
**working**
54:21, 125:22,
127:1, 127:7,
164:21, 170:15,
191:10
**workings**
106:11
**works**
53:19, 172:21,
183:22, 189:10,

190:6, 195:18
**workshop**
142:1
**world**
34:1
**worst**
86:8, 86:12,
93:1
**worth**
102:9
**wouldn't**
21:3, 80:9,
87:8, 95:8,
111:2, 115:19,
153:20, 159:15,
190:3, 194:2,
199:9, 211:12
**wray**
93:1, 94:13,
94:14, 94:17,
94:18, 95:6,
95:13, 106:20,
109:10
**write**
93:14, 110:13,
166:1, 189:20
**writes**
148:4, 149:7,
151:14, 155:14,
169:13, 187:10,
190:11
**writing**
7:16, 93:9,
93:17
**written**
93:6, 147:7
**wrong**
55:9, 75:12
**wrote**
93:12, 110:14,
138:21, 166:1,
184:8, 191:7

**Y**

**yard**
19:12, 96:10,
96:13, 96:16,
96:17, 96:19,

96:22
**yeah**
105:18, 126:22,
141:22, 173:10,
203:21
**year**
25:4, 26:11,
27:8, 68:19,
76:7, 76:8,
79:1, 87:1,
120:14, 134:7,
140:20, 161:14,
194:2, 197:7
**year's**
140:22
**years**
17:13, 19:22,
25:12, 37:1,
61:15, 61:16,
133:9, 184:9,
200:15
**yep**
14:5, 119:1,
122:4, 133:14,
175:3
**yesterday**
40:8
**young**
111:13, 118:10
**yourself**
123:16
**youthful**
109:3

**Z**

**zeroing**
187:13

**$**

**$28,000**
79:1
**$30,000**
71:10
**$50**
102:9

**0**

**00**
180:9

**00069**
1:8
**0776**
201:9, 201:14
**07773**
5:19
**07777**
5:19
**08407**
5:15, 176:15
**09444**
5:21, 209:2
**094444**
209:5
**09445**
5:21, 209:2
**09810**
5:17, 183:7,
188:13
**09811**
186:6
**09813**
5:17, 183:7,
183:9

**1**

**10**
1:17, 5:14,
5:16, 5:20,
102:20, 103:14,
128:22, 148:6,
148:10, 148:15,
148:21, 152:1,
163:6, 176:11
**10,000**
22:5
**11**
79:12, 123:21,
202:3
**1101**
3:6
**12**
5:19, 134:10,
213:4
**125**
104:18
**13**
1:16

Transcript of John D. Moss
Conducted on September 13, 2019

267

**132**
5:11
**136**
5:12
**14**
3:6, 5:10, 13:8
**15**
5:16, 65:13,
111:18, 163:19
**16**
94:3, 183:11,
188:3, 209:6
**162**
5:13
**17**
5:14, 5:20,
176:7, 186:10,
186:19, 194:2,
194:3, 197:8
**175**
5:15
**18**
1:8, 5:19,
5:20, 188:16,
194:2, 194:4
**182**
5:17
**19**
67:5, 101:18,
111:12
**1959**
111:20
**1960**
111:20
**1985**
69:4, 71:14
**1986**
22:3, 65:6,
65:16, 68:15,
69:7, 71:10,
72:18, 109:9,
118:8
**1989**
120:1, 125:4,
127:11
**1990**
48:4, 65:6,
65:16, 66:22,

67:5, 120:1,
120:6, 156:19
**1992**
65:11, 66:15,
66:17, 66:22
**1995**
65:12, 66:15,
76:2, 101:17,
111:18, 130:3
**1998**
101:18
**1st**
164:1

---
**2**
---

**20**
68:18, 86:22,
112:5, 176:7
**200**
50:22
**200,000**
151:15
**2000**
164:1
**20005**
3:8
**2001**
111:19, 130:1
**2002**
79:13
**2008**
154:22
**201**
5:19
**2010**
58:3, 77:6,
77:11, 78:8,
116:7, 116:16
**2011**
64:18, 64:21,
77:4, 121:12,
134:8, 134:11
**2012**
88:21, 89:1,
96:6, 134:10,
134:15
**2014**
65:2, 87:2,

88:15, 96:4,
101:2
**2015**
183:11, 186:10,
188:3, 188:10,
188:16
**2016**
84:7, 87:3,
88:1, 95:15
**2017**
154:20, 176:7,
176:11, 177:5
**2018**
11:14, 26:12,
26:18, 28:18,
45:15, 65:2,
84:7, 84:12,
86:4, 94:4,
94:5, 94:6,
95:13, 96:10,
98:2, 100:17,
132:19, 132:20,
137:10, 139:5,
143:11, 156:11,
166:13, 167:14,
202:3, 209:6
**2019**
1:16, 87:19,
138:22, 139:22,
140:12, 143:5,
144:13, 147:8,
163:9, 192:7,
192:22, 215:15
**202**
3:9
**2020**
13:8, 58:3,
102:5, 102:18,
141:11, 158:16
**2021**
215:16
**208**
5:21
**215**
1:21
**2200**
3:9
**23**
192:6, 192:21,

215:14
**23456**
2:9, 4:9
**2401**
2:6, 4:6
**25**
163:9
**250**
135:7
**26**
137:6
**260**
2:8, 4:8
**261326**
1:20
**27**
112:20
**28**
137:10
**29**
147:3
**2:cv**
1:8
**2nd**
79:12, 132:18,
132:20, 139:4,
139:13, 143:16

---
**3**
---

**30**
10:22
**30,000**
68:18, 151:6
**300,000**
151:6
**302**
3:14
**31**
102:8, 147:19,
215:16
**312**
3:16
**385**
2:10, 4:10

---
**4**
---

**4,000**
57:8

Transcript of John D. Moss
Conducted on September 13, 2019

268

**400**
3:7, 67:12
**4351**
2:10, 4:10

**5**

**50**
152:2, 213:4
**5508**
3:16
**561**
3:16
**59**
111:12, 111:14

**6**

**6**
180:9
**60**
11:15, 111:12,
111:14
**60603**
3:15

**7**

**70**
113:22
**71**
154:9
**73**
3:13
**736**
3:9
**757**
2:10, 4:10

**8**

**80**
48:3, 119:5
**86**
46:20, 68:11
**89**
119:9

**9**

**9**
1:17
**90**
46:21, 67:5,

119:9
**91**
47:7, 48:4
**92**
47:7
**98**
101:18
**9th**
154:20