# IN THE UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF VIRGINIA
## NORFOLK DIVISION

| | |
|---|---|
| **Latasha Holloway, et al.,** | |
| **Plaintiffs,** | |
| **v.** | **Civil Action No. 2:18-cv-0069** |
| **City of Virginia Beach, et al.,** | |
| **Defendants.** | |

## DEFENDANTS' REPLY TO PLAINTIFFS' BRIEF IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

## INTRODUCTION

COME NOW the Defendants, by counsel, and for their Reply to Plaintiffs' Brief in Opposition to Defendants' Motion for Summary Judgment, state as follows:

## STATEMENT OF UNDISPUTED FACTS

Despite their best efforts, Plaintiffs cannot hide from the undisputed facts that form the basis of Defendants' Motion for Summary Judgment by relying generally upon sophistic wordplay and misplaced editorializing about other related facts.  That Plaintiffs' quibbles fail to create any genuine material factual disputes is evidenced in both parties' briefs. Defendants' undisputed facts all arise from the content of Plaintiffs' own expert reports, expert witness deposition testimony and factual allegations.  Defendants therefore reassert that, there remain no genuine material disputes as to the facts essential to resolution of this Motion in Defendants' favor.

**Def. Facts Nos. 3 and 6:** Plaintiffs and Defendants agree that Plaintiffs' expert Anthony Fairfax has produced a report that purports to contain his opinions.  Plaintiffs' assertion that Fairfax may have offered opinions on additional subjects to those mentioned by Defendants is not contested.  There is no meaningful dispute regarding these facts.

**Def. Fact No. 7:** Defendants' statement of fact is admitted by the Plaintiffs.  Plaintiffs have only added superfluous argument by referencing other materials from Fairfax's report that the Defendants have not referenced.  There is no meaningful dispute regarding this fact as written.

**Def. Fact No. 10:** Plaintiffs do not dispute this fact as written by Defendants.  Plaintiffs instead reference additional related testimony.  There is no meaningful dispute regarding this fact: Fairfax did not calculate margins of error for his proposed minority-majority districts.

**Def. Fact No. 20:** Spencer explained in his Rebuttal Report that "precinct-level populations [of Asians and Hispanics] are simply too small to draw reliable conclusions about the voting

1

preferences of these groups independently." (Ex. 5 at 6).  Spencer also testified that the information available in this case does not allow him to make a reliable estimate because "[t]here are no precincts where the population size of Hispanic and Asian is larger than 15 or 20 percent."  (Ex. 4 at 71; *see also* Ex. 6 at 49-55, 68-71, Ex. 8 at 40 (Lichtman identifying 90% or greater as proper for homogenous precincts and going down to 80%, if necessary)).  It is true that Spencer did not testify "that Hispanic voters or Asian voters were 'too insufficiently concentrated in precincts in Virginia Beach to produce reliable estimates,'" in those exact words, but that phrasing is a wholly accurate interpretation of Spencer's own words.  There is no genuine dispute of fact here.

**Def. Facts Nos. 21-22:** There is no genuine dispute as to these facts.  Plaintiffs do not attempt to rebut the language quoted directly from Spencer's own report.  Spencer wrote that elections with a minority candidate are probative.  Plaintiffs' reference to the appendix of Spencer's report, which concludes the Furman elections should be discounted, does not alter the undisputed fact that Spencer used the exact words quoted by the Defendants.

**Def. Fact No. 24:** Plaintiffs apparently dispute this fact only to the extent they contend that Spencer reserved the right to "confirm" his work.  Spencer has not done so to date.  Spencer's Initial Report identified Sessoms (2016), Davenport (2014) and Jones (2010) as minority candidates of choice.  Plaintiffs' own discovery responses—which have not been further supplemented or amended as to these three candidacies—confirm these undisputed facts.[1] Spencer's assertion that he may, at some unknown future date, wish to "confirm" or "double-check" (i.e., change) his statements is not a basis to dispute his current testimony.

**Def. Fact No. 25:** Plaintiffs misapprehend the undisputed material fact being identified here.  The parties, and all retained experts, agree that Dr. Spencer is the only retained expert who

---

[1] *See* Exhibit 9 (Plaintiffs' Supplemental Discovery Responses dated July 30, 2019, identifying Sessoms (2016), Davenport (2014), and Jones (2010) as minority candidates of choice).

has <u>generated</u> any independent voting pattern data in this case.  To the extent Lichtman intends to opine on Prongs 2 and 3, he does so only to support his "totality of the circumstances" analysis. More specifically, where  Lichtman may offer opinions as to racially polarized voting, which may overlap in some ways with Prongs 2 and 3, Lichtman himself admits that he relies upon Spencer's data to create his tables (this includes those initially produced or subsequent to his deposition) and Lichtman has not generated his own independent data in this case. (*See* Ex. 8 at 44-46, 220-221). Therefore, it is undisputed that Spencer's voting pattern data is the exclusive data source for Plaintiff's voting pattern statistical evidence in this case.

**Def. Fact No. 27:** It is undisputed that three candidates listed by Spencer in his Initial Report as minority candidates of choice in the Furman elections – Sessoms (2016), Davenport (2014), and Jones (2010) – were not listed in Table 1 of Spencer's Rebuttal Report.  Plaintiffs distract from that fact by arguing over whether these three elections should be considered probative.  Regardless of the attempted explanation, these three successful candidates, who were previously identified by Spencer and by Plaintiffs as minority candidates of choice, were undisputedly not included in Table 1 of Spencer's Rebuttal.

**Def. Fact No. 29:** The material fact in this paragraph is that Spencer, through counsel for Plaintiffs, provided a data set to the Defendants, by email, on September 5, 2019 which comprised the underlying data Spencer used to generate Table 1 in his Rebuttal Report.  This was the first time this data was produced in this format to the Defendants.  Plaintiffs' quibbling about whether providing a "code" is equal to providing the expert's actual calculated data as eventually produced (along with a baseless insult) does not create a genuine dispute about Spencer's Data Set.  While Plaintiffs may disagree with Defendants' recounting of the process by which Plaintiffs provided the Data Set, the email and attachment provided on September 5, 2019 show that Spencer provided

point estimates for Hispanic voters (alone) and Asian voters (alone) for the 13 candidates he analyzed in Table 1 of his Rebuttal Report. There is no genuine dispute about the material facts.

**Def. Fact No. 30.** Plaintiffs assert this quote from Spencer's Initial Report is taken "out of context" but do not explain their assertion or point to any language providing a fuller context. Defendants invite the Court to review the Rebuttal Report, confident it will reach the same conclusion. Plaintiffs have no basis whatsoever for challenging a material fact where their own expert's written report is directly and accurately quoted.

**Def. Fact No. 31.** This is a direct quotation from Exhibit 6 at 125. Plaintiffs make no effort to dispute the accuracy of the quote from Spencer's Deposition. Plaintiffs' reliance on other portions of the deposition amount to nothing more than argument and obfuscation. Plaintiffs' denial of this fact is also deeply misleading for the reasons explained previously and further explained herein. (*See* ECF No. 115 at 24, n. 12).

**Def. Fact No. 33**. Plaintiffs have not disputed the stated fact that Spencer's Data Set shows only 6 of 13 candidates analyzed received 50% or more support from both Black voters and Hispanic voters. Plaintiffs have not disputed that Spencer's Data Set shows only 3 of 13 candidates analyzed received 50% or more support from both Black voters and Asian voters. (Ex. 7). Plaintiffs dispute of the appropriate "threshold" is a legal argument that is not a proper basis to dispute a clear fact that Plaintiffs do not actually challenge.

**Def. Fact No. 34:** Plaintiffs' dispute again relies on Spencer's apparent desire to at some undefined later date "double-check" his work. Spencer has not provided any supplementation to his Initial Report, his Rebuttal Report, and his deposition testimony. Spencer's statement that he may, at some unknown future date, wish to "confirm" a fact is not a basis to dispute a material fact where the record before this Court is clear. To the extent Spencer were to later provide opinion

testimony or evidence that Flores should be included as a minority candidate of choice, as Plaintiffs' counsel apparently hopes, the result of Table 1 would still show four of eight minority candidates of choice winning their elections.

**Def. Fact No. 35:** By Lichtman's own admission, his analysis is predicated on and informed by Spencer's data. Lichtman did not generate his own data. (*See* Ex. 8 at 44:16-18 (Lichtman testified that "I did not do any of my own independent statistical analysis of racially polarized voting."); *see also id.* at 118-122, 220-222). Plaintiffs cannot dispute this fact.

**Def. Fact Nos. 37 and 39:** Lichtman stated in deposition testimony: "I also don't think you can isolate Hispanic and Asian voting…." and "…you can certainly get estimates, but the error margins are going to be large, which is why you've got to use the equivalence testing analysis." (*See* Exhibit 8 at 58; *see also* Exhibit 8 at 216, ("As I said, you can't isolate Hispanics and Asians….")). While Defendants agree with Plaintiffs' apparent admission that equivalence testing is not appropriate in the present context, Lichtman's testimony makes clear be believed Spencer's original data to be insufficient to isolate the voting preferences of Hispanics and Asians.

**ARGUMENT**

In Plaintiffs' Brief in Opposition to Defendants' Motion for Summary Judgment ("Response Brief"), they contend that Defendants misunderstand the complex issues involved in this litigation. However, having confirmed in their Response Brief both their inability to statistically isolate Hispanic and Asian voting preferences in Virginia Beach and the inappropriateness of using equivalence testing for such purpose, Plaintiffs cast about to survive summary judgment by employing various smokescreens and alternative theories designed to cloak the patent insufficiency of their evidence. Defendants arguments presented herein demonstrate how easily the smoke is cleared away to reveal facts that warrant summary judgment in their favor.

## I.   Coalition Claims are Not Cognizable under the Voting Rights Act.

Plaintiffs' use a substantial portion of their Response Brief addressing the unresolved threshold legal question of whether a multiracial coalition claim is cognizable under the Voting Rights Act.   Plaintiffs' treatment of the Fourth Circuit's opinion casting doubt on the appropriateness of coalition claims is unpersuasive.   Though it appears in *dicta*, the Fourth Circuit's analysis and commentary simply is not limited to crossover districts, as Plaintiffs contend.   *Hall v. Virginia*, 385 F.3d 421, 431 (2004).   In fact, the opposite is true.   The plain language employed by the Fourth Circuit reveals it is making a broader statement that the viability of coalition district claims is doubtful at best.   In *Hall*, the Fourth Circuit cites *Nixon* favorably and makes the general statement that "any construction of Section 2 that authorizes the vote dilution claims of multiracial coalitions would transform the Voting Rights Act from a law that removes disadvantages based on race, into one that creates advantages for political coalitions that are not so defined. *Id.* at 431 (emphasis added).

Following the holding of the Sixth Circuit in *Nixon,* and considering the strong indication of support the Fourth Circuit provided in *Hall*, this Court should hold as a matter of law that the Voting Rights Act does not allow multiracial coalition vote dilution claims.

## II.   Plaintiffs Grossly Mischaracterize Spencer's Use of Equivalence Testing.

There is no better example of Plaintiffs' chameleon-like approach in advancing their claim than their bald mischaracterization of Spencer's use of Equivalence Testing, a dubious approach that makes a virtue of unreliable data and the use of which Spencer ultimately disavowed in his deposition testimony.   It is a truly remarkable element of this litigation.

In Plaintiffs' Response Brief, they charge that "Defendants mischaracterize why Dr. Spencer provided individual estimates of voter preferences for each racial group, and why he performed equivalence testing in the first place."  (ECF No. 118 at 36).  Plaintiffs go on to assert

that "the purpose of Dr. Spencer's calculation of individual estimates, along with equivalence testing, was to show that the individual estimates alone are <u>not</u> reliable measures of candidate preference, and thus why he necessarily relied on the combined minority estimates in his initial report." (ECF No. 118 at 37 (emphasis added)).  This is a galling claim—being either flatly untrue or an admission that Defendants were badly deceived in the first instance.

As a matter of simple logic, it is inconceivable why Spencer would expend the time and effort of misapplying a novel approach—never before used in a Section 2 Voting Rights Act claim—simply to prove an assertion that is not contested: the Hispanic and Asian populations in Virginia Beach are not concentrated enough to produce reliable voter support estimates. What is stranger yet about Plaintiffs' gloss on this topic is that equivalence testing's use of overlapping distribution ranges does not prove anything about the underlying reliability of the data points used.[2] Had Spencer wanted to emphasize the unreliability of Asians and Hispanic datapoints for voters, considered separately, he simply could have produced Spencer's Data Set in his Rebuttal Report (which he did not do) and explained that the confidence intervals were far too large to rely upon.

---

[2]    During Spencer's deposition testimony, Defendants exposed the absurdity of Spencer's use of Equivalence Testing by asking questions about its application to unreliable datapoints (i.e. those having large confidence intervals). As Defendants explained in their Brief in Support, Spencer confirmed that the larger the confidence interval in question (i.e. the more unreliable the datapoint), the more likely Spencer was to find the distribution overlap he used as a measure of a given group's support for a particular candidate. Spencer was thereafter forced to admit that equivalence testing has no place in this litigation.

In making the implausible assertion that Spencer was using equivalence testing to demonstrate that he could not produce reliable point estimates for Asians and Hispanics, separately, Plaintiffs fail to make a key distinction: although Defendants were able to highlight the absurdity of Spencer's conclusions by pointing out his reliance on unreliable datapoints, equivalence testing itself does not measure of the reliability of those datapoints. Stated differently, the results reached through equivalence testing are <u>affected by the reliability</u> of the datapoints: equivalence testing does not <u>measure the reliability</u> of those datapoints. Spencer himself explained that equivalence testing is a method of comparing groups, (Ex. 6 at 124-127), not measuring the reliability of data points. Lichtman also confirmed that equivalence testing has no impact on the reliability of datapoints. (Ex. 8 at 226:3-7).

Why, then, did Spencer feel the need to build the peculiar Rube Goldberg contraption that is Equivalence Testing? Further, why create a table based upon an approach that Plaintiffs now seem to suggest was used for ironic effect only? A more likely common-sense answer is that Spencer employed a desperate measure to try to save the Plaintiffs' crumbling case but was forced to retreat when the folly of his efforts was exposed.  Plaintiffs' final attempt at explaining this chicanery is revealed by the striking contrast between how Spencer describes Table 1, whose inputs are based upon his equivalence testing, in his deposition testimony as compared to the explanation he provided in his Rebuttal Report.  In Spencer's deposition, he testified:

> Procedurally, I don't think Table 1 is very meaningful, which is why I did not generate it for my original report. I don't think the estimates that are used in this table actually mean much. I am not confident in their findings at all, but I generated it in response to some comments made by Dr. Kidd to try to—to try to point out exactly why I didn't do this in my original report.

(emphases added). Compare that with Spencer's statements about the same Table 1 in his Rebuttal Report (which was generated prior to Defendants' receipt of Spencer's Data Set and Spencer's deposition):

> In Table 1, I present a summary of minority support for the thirteen candidates (ten black, three white) that I identified as minority candidates of choice in my report. In 11 of the 13 cases, I find that coalitional voting was sufficient enough for minority-preferred candidates to have been elected in the absence of white bloc voting. In just two of the 13 cases (Cabiness in 2014 and Jackson in 2010) I find that minority support was likely not due to coalitional voting.

(emphases added).  Neither this nor any other passage found in the Rebuttal Report suggests even a whiff of ironic distance between Spencer's actual views and his many statements about (and based upon) equivalence testing.  Defendants took at face value both Spencer's question, "How do we make sense of this uncertainty [caused by large confidence intervals]?" and his answer, "To draw my conclusions, I adopt the logic of equivalence testing." (emphasis added).  Spencer now eschews the logic of equivalence testing.  That is seismic shift of opinion.

The Plaintiffs have continually shifted their basis for proving cohesion: first offering only an "All Minority" data point that is plainly insufficient; next attempting to cure this deficiency by offering equivalence testing; and finally retreating to their first position when the absurdity of their second attempt was exposed.  Although it is somewhat unfair that Defendants are asked to defend this case on a field of shifting sands, for the reasons expounded upon *infra* it is of no moment because all of Plaintiffs' approaches fail.

### III.    Plaintiffs' Admissions Confirm that Their Evidence Cannot Prove Cohesion Among Black, Hispanic, and Asian Voters

*a.    Plaintiffs' "All Minority" voter support data is insufficient to prove cohesion.*

Plaintiffs make clear throughout their Response Brief that they no longer wish to rely upon the opinions and conclusions that Spencer set forth in his Rebuttal Report.  Instead, Plaintiffs now return to the "All Minority" voter support datapoints Spencer provides in his Initial Report—which are a combined estimate of the support of Black, Asian, Hispanic, and all other non-White voters— claiming they constitute competent evidence to prove cohesion. Plaintiffs further insist that "[t]he parties' disagreements over the reliability of a combined minority estimate" give rise to a "classic 'battle of the experts.'" (ECF No. 118, at 18).  The truth, however, is that the "All Minority" datapoints do absolutely nothing to prove cohesion among the three specific minority groups in question, and no special expertise is needed to reach this inescapable conclusion.  Rather, all that is needed is a reliance upon simple logic and basic math.

The Plaintiffs' watchword regarding the "All Minority" voter datapoints is "reliability." It well may be that their "All Minority" datapoints are "reliable",[3] but Plaintiffs grossly

---

[3] For purposes of Defendants' Motion for Summary Judgment, Defendants do not challenge the reliability (i.e. general accuracy) of the "All Minority" voter support datapoints offered by Dr. Spencer and do not object to the Court's assuming *arguendo* that the datapoints are accurate. As explained herein, Defendants argue only that Plaintiffs and their experts misuse these datapoints as their evidence of cohesion.

misunderstand <u>for what purpose</u> these datapoints may be reliable. In fairness, Plaintiffs hit the mark as to the narrow reliability of the "All Minority" datapoints exactly once, stating, "Dr. Spencer's 'All Minority' estimate is exactly what Plaintiffs' experts say it is: an estimate of the preferences of Hispanic, Black, and Asian voters *together*."[4] (ECF No. 118 at 15 (emphasis original)).  That is exactly correct. However, whatever reliability the "All Minority" datapoints have begins and ends with their being estimates only of the total voting support level for all minority groups when combined together.

The pivotal question is: How can a datapoint that combines all minority groups <u>together into a single datapoint</u> ever serve as a basis for <u>comparing or contrasting</u> three (or more) constituent groups that are included therein?  The answer is simple: they cannot. Neither can these created datapoints themselves justify the choice to band these groups together in the first place.

A hypothetical example may be useful in explaining why the "All Minority" voter datapoints do nothing to prove cohesion amongst the constituent groups.  Plaintiffs voiced displeasure with Defendants' "Jack and Jill" hypothetical, complaining that it was "based on a single measurement" only—whereas Spencer "use[s] three different statistical models." (ECF No. 118 at 16).  Perhaps Plaintiffs will be more amenable to the example of Mack and Bill. Assume an accountant wants to compare the net worth of Mack, a plumber, and Bill, the owner of a large software company.  However, the accountant can arrive at a reliable estimate only for the average net worth of Mack and Bill <u>combined</u>—not of each man. Could a combined "Both Mack and Bill" datapoint, estimating the two men's average net worth at $30 billion, serve as a basis for <u>comparing</u>

---

[4] The Plaintiffs are generally correct, here, but omit the fact that other non-White voters also are included in these datapoints, as Dr. Spencer himself explains in his Initial Report. (*See, e.g.,* Ex. 4 at 9 ("All minority support includes Hispanic, Asian, and other minority groups"), Ex. 4 at 13 (the listed *p* values are based on "minority vs. white support")).

the net worth of these two men to each other?  Further, could one take this datapoint as proof that Mack and Bill have a similar net worth?

Before answering these questions, some additional details may serve to inoculate this hypothetical against Plaintiffs' aforementioned critique.   Suppose now that this brilliant accountant—who is much smarter than Defendants and their experts—uses three highly complex methodologies to produce three different estimates of the average net worth of Mack and Bill: $28 billion, $30 billion, and $33 billion. In that case, could any of these three "Both Mack and Bill" average net worth estimates—or any pattern observed between all three estimates—<u>ever</u> serve as a basis for <u>comparing</u> Mack's net worth with Bill's net worth?  The answer is a resounding "no." One needs no special expertise to understand this point.

For the same reason, Spencer's All Minority datapoints do not—and cannot—provide a basis for comparing the constituent groups incorporated therein.  The numerosity and complexity of Spencer's methodologies in arriving at these estimates does not alter this basic fact.  Spencer opined that the "most reliable method for interpreting the candidate preferences of Black, Hispanic, and Asian voters it to estimate their joint vote share." (Ex. 5 at 6).  This statement is facially absurd, and Plaintiffs cannot point to anything in Spencer's report explaining how he can determine the candidate preferences of an individual group by looking at this "joint vote share number."  The reason is that he cannot do it.  Instead, he merely presumed these groups share the same preference.

> b.   *Comparing Black voter support to the All Minority voter support datapoint actually suggests a lack of cohesion amongst these three groups.*

In order to demonstrate cohesion amongst three minority groups, one must compare the minority groups' voting preferences to each other.  Spencer acknowledges as much in both his Initial Report and in his deposition testimony.  This common-sense principle is also affirmed by the Fifth Circuit Court of Appeals' holding in *Brewer v. Ham,* 876 F.2d 448 (5th Cir. 1989).  If

Spencer actually had conducted such a comparison of each group to the others in his Initial Report, his analysis might give rise to a so-called "battle of the experts." But no such comparisons were ever performed.

The only comparison of datapoints that Plaintiffs or their experts undertake is between estimates for Black voter support and All Minority voter support. This comparison is to no avail for the reasons set forth in Defendants' initial Brief in Support: because the Black voting age population in Virginia Beach is larger than the combined voting age populations of Hispanics and Asians in Virginia Beach, strong Black support for a given candidate can mask weak support among Hispanics and/or Blacks.

Plaintiffs nonetheless have the temerity to assert that "the combined estimate is not 'masking' differences between racial groups." (ECF No. 118 at 16). Plaintiffs specifically point to the 2016 Kempsville election that pitted Dr. Amelia Ross-Hammond, an African American incumbent, against Jessica Abbott to support their contentions. This is a curious choice on Plaintiff's part. In his Initial Report, Spencer estimates Black support for Ross-Hammond at 83.3% using ecological regression ("ER") and 76.8% using ecological inference ("EI"). (ECF No. 118 at 16). Spencer estimates All Minority support for Ross-Hammond using these two methods at 65.9% and 59.9%. Thus, these two estimates reveal gaps between Black and All Minority support of 17.4% and 16.9%, respectively. Spencer's homogeneous precinct ("HP") estimates for Black and All Minority support are nearly identical to each other—though Spencer gives "less weight" to this method because of the lack of homogenous precincts in Virginia Beach.[5] (ECF No. 118 at 91).

---

[5] Lichtman testified that in conducting homogenous precinct ("HP"), or 'extreme case' analysis, he would "like to get at 90 percent [precinct population] for whatever group I'm looking at. Sometimes you can't get there and you've got to go down to 80 percent." (Ex. 8 at 40: 4-7.) Spencer testified that there was not a single Virginia Beach precinct with an all-minority population that

The parties have sharply divergent views about what the above-cited datapoints indicate, but facts and logic support only the Defendants' view.  Defendants aver that without any data regarding Asian and Hispanic voters, considered separately, simple logic dictates that one simply cannot conclude that <u>each</u> of the three groups preferred Ms. Ross-Hammond.  Further, Defendants maintain that the substantial gap between the Black and All Minority datapoints (using Spencer's two preferred methods) actually indicates strongly that, because Black voters are included in the All Minority estimate, the combined Asian and Hispanic voter support must be substantially lower than Black support.  Plaintiffs—who seem to believe that the immutable operation of mathematical averages somehow does not apply to their inconvenient data—contend that this same data indicates that "[i]n this race, Hispanic, Black, and Asian voters <u>together strongly preferred</u> Ross-Hammond over Abbott." (ECF No. 118 at 16 (emphasis added)).  To Plaintiffs, this dispute is more evidence of a "battle of the experts." It simply is not.

Were basic logic not sufficient to resolve this "dispute" in Defendants' favor—though it is—Spencer's own data settles the matter definitively.  According to Spencer's Data Set, generated using a modified EI method, Black support for Ross-Hammond was 81.2%, closely tracking his original EI and ER estimates.  Hispanic support is estimated at 49% and Asian support at 26.2%.[6] (Ex. 7).   Spencer's own data thus indicates that the All Minority voter datapoint did indeed mask dramatically weak support for Ross-Hammond among Asian voters. Two other implications regarding this two-person race are that Hispanic voters were split roughly evenly between the two candidates while Asian voters favored Ms. Abbott decisively.  One wonders whether the actual

---

exceeded 70 percent. (Ex. 6 at 49-50). It appears by the account of Plaintiffs' witnesses that HP analysis has no value in this case—though its consideration does not alter the Defendants' analysis to any degree.

[6] This estimate of Asian support at 26.2% is also the basis for Spencer's inclusion of an "x" in Table 1 of the Rebuttal Report, which indicates Asians <u>did not</u> support Ross-Hammond in 2016.

will of Asian and Hispanic voters—who are entirely and conspicuously absent as plaintiffs in this case—is of genuine concern to the Plaintiffs.

The data regarding Prescott Sherrod's 2011 candidacy is one of a host of other examples that confirms Defendants' assertion about the operation of averages and reveals Plaintiffs' falsehood that the All Minority datapoint is not masking low or wildly divergent Asian and Hispanic support levels.  In Spencer's Initial Report, he produces ER and EI estimates of Black support for Sherrod at 92.4% and 87%, respectively.  (Ex. 4 at 22).  Spencer's ER and EI estimates of All Minority support are 70.9% and 64.8%, respectively.  (Ex. 4 at 22).  Plaintiffs ask the Court to consider this data as proof of cohesion.  Defendants contend it suggests just the opposite. But now consider that, Spencer's Data Set estimates Black support for Sherrod at 90.2%, Hispanic support at 49.5%, and Asian support at 27.2%.  (Ex. 7).  This same startling trend is apparent, with few exceptions, throughout Spencer's Data Set. In the end, the immutable laws of mathematics and logic devastate Plaintiffs' contentions.

> a. *Spencer's Data Set is a death knell for Plaintiffs' claim that cannot be un-rung*

Defendants averred in their Brief in Support that Spencer's Data Set represents a final fatal blow to Plaintiffs' claim.  Defendants maintain that this is so, for although the datapoints contained in Spencer's Data Set are far from precise, they nonetheless point unmistakably towards the conclusion that cohesion simply does not exist among these three minority groups. Further, this data indicates that neither Hispanic nor Asian voters are cohesive within their own groups—a conclusion that becomes even more apparent when one considers data Spencer omitted.

Plaintiffs complain in their Response Brief that Defendants' Table A, which represents some of the data provided in Spencer's Data Set, is "meaningless when put into context," given that Defendants did not include the wide confidence intervals attached to Spencer's point

estimates. (ECF No. 118 at 37). A full copy of Spencer's Data Set—including the standard error—is included, here:

| | | | | Black | | Hispanic | | Asian | |
|---|---|---|---|---|---|---|---|---|---|
| Year | Seat | Candidate | Threshold | est. | se | est. | se | est. | se |
| **Minority Candidates** | | | | | | | | | |
| 2018 | At-large | Rouse | 45.2 | 83.0 | 6.4 | 33.3 | 21.0 | 53.0 | 15.2 |
| 2018 | Centerville | Wooten | 62.1 | 90.3 | 14.9 | 79.9 | 25.1 | 73.4 | 18.4 |
| 2016 | Kempsville | Ross-Hammond | 59.4 | 81.2 | 4.7 | 49.0 | 18.8 | 26.2 | 10.7 |
| 2014 | Rose Hall | Cabiness | 48.3 | 70.2 | 4.5 | 13.0 | 11.0 | 9.4 | 7.4 |
| 2012 | Kempsville | Ross-Hammond | 32.2 | 82.6 | 4.4 | 53.9 | 20.5 | 33.6 | 12.6 |
| 2011 | At-large | Sherrod | 37.0 | 90.2 | 4.3 | 49.5 | 22.0 | 27.2 | 12.7 |
| 2010 | At-large | Jackson | 44.8 | 52.9 | 2.5 | 11.6 | 8.6 | 6.9 | 5.0 |
| 2010 | Princess Anne | Bullock | 54.4 | 79.0 | 3.6 | 67.1 | 17.7 | 87.9 | 8.1 |
| 2008 | At-large | Allen | 44.1 | 79.4 | 3.4 | 77.0 | 14.6 | 29.8 | 9.9 |
| 2008 | Kempsville | Flores | 48.7 | 52.9 | 2.4 | 40.4 | 13.0 | 33.9 | 7.0 |
| | | | | | | | | | |
| **White Candidates** | | | | | | | | | |
| 2018 | At-large | White | 45.2 | 61.1 | 10.7 | 53.3 | 40.4 | 19.6 | 20.4 |
| 2014 | Princess Anne | Henley | 76.7 | 62.4 | 2.8 | 69.5 | 12.4 | 82.9 | 6.9 |
| 2010 | At-large | Bellitto | 44.8 | 8.4 | 2.3 | 45.2 | 12.2 | 47.2 | 6.4 |

Spencer's Data Set was produced to Defendants on September 5, 2019, in the format shown above—and to which Defendants have highlighted the point estimates for each minority group presented.

The contrasts presented in this table are remarkable. For one, the average gap between Black and Asian voters is a whopping 35%. The Amended Complaint's assertion that "Hispanic and Asian voting patterns track Black voting patterns," therefore is demonstrably false. (ECF No. 62 at ¶ 62). In their Response Brief, Plaintiffs cite *Campos v. Baytown*, a case from the Fifth Circuit holding that Section 2 claims based on cohesive coalitions are cognizable. 840 F.2d 1240 (5th Cir. 1988). In *Brewer v. Ham*, however, the Fifth Circuit refined *Campos'* sometimes vague language regarding the cohesion standard that applied to coalition cases, while affirming *Campos'* unambiguous common-sense holding that, "if one part of the group cannot be expected to vote with the other part, the combination is not cohesive." 876 F.2d 448, 453 (5th Cir. 1989) (quoting 840 F.2d at 1245). The simple truth that Asians cannot be expected to vote with Blacks is sufficient, by itself, to end the analysis of this case and grant summary judgment to Defendants.

Another vivid contrast highlighted by Spencer's Data Set is between the apparent pattern of cohesion among Black voters and the lack of a similar pattern of cohesion among Hispanic voters (standing alone) and among Asian voters (standing alone).  At least for the elections presented in Spencer's table, Black support in most cases would appear to meet the 60% cohesion threshold adopted by this Court in *Smith v. Board of Supervisors*, 801 F. Supp. 1513, n.11 (E.D.Va. 1992)—which ironically was proposed by Dr. Allan Lichtman, one of Plaintiffs' experts in this case.  Hispanic support for the same candidates runs the gamut, however, ranging from as low as 13% to as high as 79.9%.  Moreover, Hispanic voter support levels are distributed fairly evenly between the two extremes, with six (6) cases above 50% and seven (7) cases below 50%.  The extreme ranges, and scattered levels, of support also are observable in regard to Asian voters.  One must necessarily conclude that in many of these races—some of them involving only two or three candidates—Hispanic voters and Asian voters must have strongly preferred a different candidate than the one preferred by Black voters.  Spencer's omission of estimates for any other candidates saves Plaintiffs the embarrassment of these inconvenient facts—but only until one gives a moment's consideration as to what his presented data suggests about his omitted data.

Given that Spencer's Data Set suggests Hispanics and Asians are not cohesive even among their own groups, it is difficult to conceive of the standard Plaintiffs would have this Court adopt which would allow it to find cohesion among all three groups.  Certainly, any such standard would be far lower than the 60% threshold their own expert (Lichtman) offered in *Smith*. Moreover, Plaintiffs implicitly ask this Court to find that, as a plaintiff adds more minority groups to a Section 2 claim, the standard for cohesion becomes more relaxed.  That notion is entirely at odds with common sense, doesn't comport with Spencer's own standard that "each group has the most preferred candidate, and the most preferred candidate of each three groups is the same" (Ex. 6 at

109), ignores the Supreme Court's admonition in *Emison v. Growe*, and violates the standard adopted by the U.S. Circuit that has been most receptive to coalition claims. *See* 507 U.S. 25, 41 (1993); *Brewer v. Ham*, 876 F.2d 448, 454 (5th Cir. 1989).

It is little wonder, then, that Plaintiffs vigorously wish to disavow Spencer's Data Set. Plaintiffs state that it is "puzzling" that Defendants would acknowledge that Spencer's Data Set includes datapoints that are unreliable and then "proceed to use these same unreliable estimates to comment on candidate preferences." (ECF No. 118 at 37). It must first be noted that in presenting Table 1—without the slightest hint of irony—it was Spencer himself who first advanced conclusions based upon the Data Set.

Setting aside that bit of hypocrisy, however, the appropriate use of Spencer's Data Set does warrant discussion. Both parties agree that one cannot generate reliable estimates of Asian and Hispanic voter support in Virginia Beach because the attached confidence intervals (or standards of error) are simply too large. This undisputed truth does not mean, however, that Spencer's Data Set is of no value whatsoever. For one thing, some of the datapoints included therein are more reliable than others. Consider, for example, the point estimates for Hispanics and Asians with the lowest corresponding confidence intervals. (Ex. 6 at 45:3-4 (Spencer testified at his deposition that "the larger number of confidence interval means the less confidence.")).

For Asian voters, the most reliable datapoints are the point-estimates of support for Andrew Jackson in the 2010 at-large election and Rita Sweet-Bellitto for that same election. The standard errors for these datapoints, 5% and 6.4% respectively, are equal to or less than the standard error attached to Spencer's point estimate for Black support of Aaron Rouse in the 2018 at-large race, which Spencer believes is reliable using ER. (Ex. 6 at 13). For Hispanics, the least unreliable datapoints are those for candidate James Cabiness in the 2014 Rose Hall race and the 2010 Jackson

candidacy. These four point-estimates for Asian and Hispanic support—the most reliable of the Data Set—constitute strong evidence that these two minority groups are <u>not</u> cohesive with Black voters.  Even when the corresponding confidence intervals are factored in, the distribution ranges for Hispanic and Asian support do not come close to overlapping the range of possible Black support.

Spencer's Data Set also possesses value for a second reason.  Viewed as a whole, it confirms Defendants' contentions about the implications of the Black support and the All Minority support datapoints included in Spencer's Initial Report.  Although each individual point estimate in Spencer's Data Set is not particularly accurate or reliable, the unmistakable pattern that emerges demonstrates the correctness of Defendants' two core contentions about what can be gleaned by applying mathematical averages to the All Minority data contained in Spencer's Initial Report: (1) Spencer's original data indicates that, in most elections he analyzed, Asian and Hispanic <u>combined</u> support <u>must be markedly lower</u> than Black support, and (2) it is likely that in each such instance, either Asian or Hispanic <u>individual</u> support is even lower than that combined percentage.  Although no evidence is required to prove these mathematical truths, Spencer's Data Set confirms Defendants' logic.

Finally, the utility of Spencer's Data Set may be analogized to a smudged fingerprint in the context of a criminal case.  Suppose that a small section of a fingerprint is clear, but is not sizable enough to produce the threshold number of "points in common" that forensic technicians require to make a definitive match.  If the determinative inquiry is whether the latent print matches the defendant, it is true that the prosecution cannot properly use this fingerprint to meet its burden.  It is simultaneously true, however, that such an imperfect print could nonetheless have some important probative value in such a case—such as if the clearly visible whorls and arches prove

wholly inconsistent with the defendant's fingerprint.  This is, in essence, the role Spencer's Data Set—and, in equal measure, the data in his Initial Report—plays in this case. The data is unmistakably smudged, but it is clear enough to demonstrate that no cohesion exists.

      *b.  Neither exogenous elections nor reconstituted election results prove cohesion.*

Plaintiffs' last gasp at offering some type of statistical data supporting cohesion is to point to Spencer's data regarding exogenous federal elections and reconstituted election results using Plaintiffs' proposed illustrative districts. (ECF No. 118 at 18).  This is a particularly feeble argument, and the cases Plaintiffs cite demonstrate why this data does not prove cohesion.

Plaintiffs cite one case from the Fourth Circuit to support their assertion that exogenous elections can help them satisfy their Prong 2 burden, *Cane v. Worcester County*, 840 F. Supp. 1081 (Dist. M.D 1994).  Indeed, *Cane* represents the quintessential situation where courts consider exogenous elections to assist their inquiry.  First, there was an insufficient number of endogenous elections: there were only three total endogenous elections involving the minority group at issue and in one of those, there was evidence that the minority candidate "did not attempt to win the election, making an analysis meaningless."

The court, therefore, had to look elsewhere to conduct its evaluation. Here, there are more than a dozen endogenous elections involving minority candidates.[7]  Second, both the endogenous and exogenous elections analyzed by the *Cane* court were partisan in nature. 840 F.Supp at 1088. Councilmanic elections in Virginia Beach are nonpartisan; the exogenous federal elections Spencer analyzes are partisan.  This is a crucial qualitative difference.  Finally, for both endogenous and exogenous elections considered by the *Cane* court, it was possible to estimate the

_____

[7] It is also worth noting that Spencer analyzed seventeen (17) endogenous elections between 2008 and 2018 in his Initial Report; yet, there were twenty-seven (27) competitive (i.e. including at least two candidates) endogenous elections during this same time period in Virginia Beach. Plaintiffs have not even attempted to analyze these remaining ten (10) endogenous elections.

level of support of the minority group in question—African Americans. Stated differently, the *Cane* court supplemented its analysis of only two endogenous elections with <u>the relevant data point</u> from numerous exogenous elections. To the extent Plaintiffs claim the data from endogenous elections is "unreliable" and in need of supplementation, that data is unreliable not because of the total number of elections analyzed (as in *Cane*), but because it is not possible to reliably isolate estimated voting support levels for Hispanic and Asian voters in Virginia Beach. The obvious flaw with Plaintiffs' effort here is that Spencer's data for exogenous elections also does not isolate estimated Asian and Hispanic voting support levels—only those for white and non-white voters. (Ex. 4 at 30).

In the best of cases, the value of exogenous elections is limited. *NAACP v. City of Thomasville*, 401 F. Supp. 2d 489, n.4 (M.D.N.C. 2005) (holding, "while black-white exogenous elections may have some limited evidentiary value," election results informed by partisan voting patterns "add[] little to the court's analysis.") The present scenario is the worst of cases, however. The four cherry-picked federal elections offered by Plaintiffs do not provide evidence of cohesion between Black, Asian, and Hispanic voters and therefore cannot overcome Plaintiffs' endogenous evidence that no cohesion exists.

Plaintiffs' newfound reliance upon reconstituted elections to prove cohesion is even less efficacious. The first case Plaintiffs cite in support of their use of reconstituted elections is *Johnson v. Miller*; but the *Johnson* court did not use reconstituted elections <u>to evaluate cohesion</u>. See 864 F. Supp. 1354, 1391 (S.D. Ga. 1994). Another court opinion Plaintiffs cite noted "the court is well aware of the decreased probative value of reconstituted elections." *Hall v. Louisiana*, 108 F. Supp. 3d 419, 436 (M.D. La. 2015).

Importantly, Spencer himself did not present his analysis of reconstituted elections as evidence of cohesion. Spencer's introduction to his *Analysis of Alternative Districts* explains, "I have been asked to evaluate the potential ameliorative effects of two possible voting districts." (Ex. 4 at 32). He further stated, "The question is whether minority voters in Virginia Beach will be more able to elect candidates of their choice" in the illustrative districts. (Ex. 4 at 32). Stated differently, this is an analysis of the efficacy of Plaintiffs' proposed remedy, not of cohesion.

Moreover, following a now familiar pattern, Spencer's ensuing analysis actually makes things worse for Plaintiffs. Spencer unequivocally states that minority preferred candidates will fare better in the two proposed districts, "because voting in these districts is less likely to be racially polarized" and because minority candidates "are more likely to benefit from cross-over support from white voters." (Ex. 4 at 32). Spencer elaborates on this point, stating that with two exceptions, "the election preferences of white and minority voters is [sic] <u>statistically indistinguishable</u> or not substantively significant for all other hypothetical elections in both proposed districts." (Ex. 4 at 33 (emphasis added)). Given their own expert's conclusion that whites and minority voter preferences are "indistinguishable" and the relatively low numbers of Asians and Hispanic voters in these two districts—19% combined and 11% combined, respectively—it boggles the mind that Plaintiffs contend "[i]f HBA voters do not vote together in elections, they would not be able to regularly elect candidates of choice in Plaintiffs' illustrative districts…" (ECF No. 118 at 21). Candidates of <u>someone's</u> choice would be elected in those districts, to be sure, but Spencer's reconstituted data provides no indication that those candidates would be the choice of either or both Hispanic and Asian voters.

       c.   *Plaintiffs' weak offering of qualitative evidence is insufficient to create a triable issue*

Plaintiffs correctly state that courts may consider qualitative evidence of cohesion. Plaintiffs efforts in this regard, however, are insufficient to prove cohesion for two reasons. The first is the dearth of evidence Plaintiffs can point to that supports their claim. The holding of *Campos*, which Plaintiffs cite, is that "plaintiffs must prove that the minorities so identified <u>actually vote together</u>." 840 F.2d 1240, 1244 (5th Cir. 1988) (emphasis added). Plaintiffs evidence does no more than suggest that someone, somewhere, <u>thinks of these groups vote together</u>. That will not suffice to meet their evidentiary burden. The second reason that qualitative evidence does not help Plaintiffs meet their burden is that, although such evidence may complement or reinforce quantitative evidence, there is no precedent for any court allowing qualitative evidence to overcome Plaintiffs' own quantitative evidence that demonstrates a lack of cohesion.

No member of the Hispanic or Asian community is a plaintiff in this case, and Plaintiffs proffer only paltry evidence to support their theory of cohesion among all three minority groups at issue. Plaintiffs' assertion, for instance, that the City's "Minority Business Council (MBC) works to support 'minority business owners' without limiting that support to any particular group" does nothing to prove cohesion amongst Black, Asian, and Hispanic voters. (ECF No. 118 at 24).

Plaintiffs likewise do not advance their claim of cohesion by simply pointing out that two councilmembers "speak about minorities in Virginia Beach as a group with group-specific needs and priorities." (ECF No. 118 at 24). Plaintiffs cite *Bridgeport Coal. for Fair Representation v. City of Bridgeport*, 26 F.3d 271, 276 (2d Cir. 1994), as supporting their claim that "[o]ther courts have considered the impressions of elected officials…" (ECF No. 118 at 24). True enough, but the language of the *Bridgeport* opinion indicates that the elected officials in that case did much more than "speak about minorities . . .as a group." The *Bridgeport* court explained that "the Coalition presented both testimonial and statistical evidence that African Americans and Hispanics

in Bridgeport are politically cohesive and that voting in the City is remarkably racially polarized." 26 F.3d at 276. In addition to compelling statistical evidencing supporting the Bridgeport plaintiff's claims, "Americo Santiago, a state representative from Bridgeport, testified, based on his observations of past city elections and personal contacts with minority citizens, that both the Latino and African American communities are politically cohesive." *Id.* Plaintiffs have not identified a single elected official in Virginia Beach who will testify that Black, Asian, and Hispanic voters in Virginia Beach are politically cohesive.

The only specific instance Plaintiffs identify wherein "HBA communities have acted as a unified coalition in Virginia Beach" is Plaintiff Georgia Allen's claim, set forth in her declaration, that in 2001 a group called "Community Coalition for a Better Virginia Beach," advocated for single-member districts. Once again, the case Plaintiffs themselves cite to in support of their reliance on such evidence provides a stark contrast with the case bar. In *Arbor Hill Concerned Citizens Neighborhood Ass'n. v. County of Albany*, the Court summarized the qualitative evidence before it:

> According to these witnesses, blacks and Hispanics have jointly participated in and supported various events and projects of interest to one or the other group, including festivals, Puerto Rican rights and youth sports. They also jointly publish a bilingual community newspaper. Anecdotal evidence has also been offered of past instances where blacks and Hispanics joined to support candidates preferred by one group or the other. Defendants have not rebutted or refuted this evidence nor offered any contradictory evidence.

2003 U.S. Dist. LEXIS 11386, *29-30 (N.D.N.Y. 2003) (citations omitted). This passage exemplifies what types of qualitative evidence actually support cohesiveness. The Plaintiffs have no such similar evidence.

The claims made by Plaintiff Allen in her declaration also must be considered in light of her deposition testimony. *See generally* Exhibit 10, Deposition Testimony of Georgia Allen

23

(attached hereto and incorporated by reference).   Allen presided over the Virginia Beach Chapter

of the NAACP for approximately ten years and is a former candidate for both Virginia Beach City

Council and state delegate. Given her political and community involvement, one might suspect

that she would have personal experience with other members of the alleged Black-Asian-Hispanic

coalition.  However, Allen testified to the following facts:

- As candidate for City Council, she could not recall receiving the endorsement of any Hispanic or Asian community groups (Ex. 10 at 90);

- She did not campaign at any Asian-American places of worship, though she did campaign at African American places of worship (Ex. 10 at 91-92);

- She did not campaign at Hispanic civic leagues, churches, or community groups (Ex. 10 at 93);

- There were no Asian or Hispanic members of her campaign team (Ex. 10 at 93-94);

- As a candidate for delegate, she did not receive any endorsements from the Asian or Hispanic community, though she believes she was the candidate-of-choice of the African American community (Ex. 10 at 94);

- The only Asian-community groups she could recall was "Fil-Am," though she wasn't sure that was the name of the group in question (Ex. 10 at 97);

- When asked, she could not identify any leaders of the Asian-American or Hispanic-American communities (Ex. 10 at 98); and

- The only Hispanic community group that she could recall was "Hispanic Dialogue," though she could not be sure "if that's in existence" (Ex. 10 at 98).

Plaintiffs cite the other Plaintiff, Latasha Holloway, as providing deposition testimony that

"'all black and brown individuals' including Hispanic, Black, and Asian persons are affected by

breakdowns resulting from a deficit of representation." (Plaintiffs' Ex. 19 at 25).   But Ms.

Holloway also testified that she had not had any involvement with Asian or Hispanic American groups, (Plaintiffs' Ex. 19 at 33), and that she was unaware of any support for this lawsuit from the Asian or Hispanic communities. (Plaintiffs' Ex. 19 at 30).   Neither Plaintiff's testimony provides evidence of cohesion.

The Plaintiffs take poetic license in asserting that their qualitative evidence "bolsters Plaintiffs' claims of minority cohesion." (ECF No. 118 at 26).   There simply is no evidence to "bolster"—as the quantitative evidence strongly indicates that cohesion does not exist. Furthermore, Plaintiffs fail to proffer one iota of qualitative evidence proving that Blacks, Asians, and Hispanics "actually vote together."   So while the Court may consider Plaintiffs proffer, the evidence offered can not serve as a basis for finding cohesion in spite of the quantitative evidence—produced by Plaintiffs—to the contrary.

## IV. Plaintiffs' Evidence Shows That Whites in Virginia Beach Do Not Vote Sufficiently as a Bloc Usually to Defeat the Preferred Candidates of the Alleged Minority Group

As Defendants contend in their Memorandum in Support, the lack of cohesion amongst Black, Hispanic, and Asian voters not only renders moot the *Gingles* Prong 3 inquiry, it makes it impossible to conduct such an inquiry in a meaningful way.   To whatever degree the Court is willing, however, to undertake the Zen riddle of evaluating the success of the preferred candidates of a minority coalition that does not exist, the arguments set forth in Plaintiffs' Response Brief only confirm that Plaintiffs cannot meet their Prong 3 burden.

### a. Plaintiffs offer no evidence that the 2018 election represents a "special circumstance" that renders that election non-probative.

The 2018 election of two African Americans, Sabrina Wooten and Aaron Rouse, represents a huge challenge for the Plaintiffs, making it even more fanciful for them to assert that the White majority votes sufficiently as a bloc usually to defeat the preferred candidates of the alleged

minority group.  But although Plaintiffs are correct in asserting that a "special circumstances" doctrine exists in case law, they fail to point to evidence that supports the conclusion that the doctrine is properly applied to the 2018 election.

Once again, a case cited by the Plaintiffs serves as the best argument as to why their assertion holds no currency.  In *Collins v. City of Norfolk*, the United States Court of Appeals for the Fourth Circuit found that the 1984 election of a minority candidate, during the pendency of the lawsuit (in its current iteration), "was <u>due to</u> the special circumstances arising out of events associated with the pendency of this action." 883 F.2d 1232, 1242 (1989).  The *Collins* court found a causal connection between the lawsuit and this unusual election of a second Black councilman because the mayor not only had "[f]or the first time…supported a second black candidate," but also publicly "suggested that this suit could be mooted" should that candidate prevail. *Id.* at 1241-42.  The "unique" conduct of a group closely affiliated with the mayor also led to the court's finding that circumstances surrounding the *Collins* suit caused the unusual election result.  There was no question that the mayor and others knew about that lawsuit, which was filed more than a year before the 1984 Norfolk City Council election. *Collins v. City of Norfolk*, 2:83-cv-00526-MSD-TEM (filed Aug. 12, 1983).

The circumstances surrounding the 2018 Virginia Beach City Council election are not at all similar to those present in *Collins*.  The election in question took place on November 6, 2018—<u>the week before</u> the Plaintiffs filed their Amended Complaint. At the time of the election, Plaintiff Holloway, acting *pro se*, had twice moved to stay the litigation, moved for leave to file an Amended Complaint, repeatedly requested appointment of counsel because she claimed she was suffering from a disability and required assistance of counsel to properly litigate this matter and Defendant City of Virginia Beach had filed a motion to dismiss the *pro se* Complaint pursuant to

Fed. R. Civ. P. 12(b)(6). (*See* ECF Nos. 2, 13, 14, 18, 24, 28, 33, and 41).  Given the circumstances that existed on the date of the election, there is no reason to believe that this lawsuit had any impact whatsoever on the election results.  In deposition questioning and in other discovery, Plaintiffs conducted an extensive fishing expedition designed to find facts that would support application of the special circumstances doctrine to this case. Plaintiffs came up with nothing on their hooks.

Plaintiffs' intimation of a grand conspiracy to elect minority members to City Council manages the special trick of being both entirely threadbare and deeply insulting.  Plaintiffs produced no evidence that any Councilmembers, City leaders, or politically influential citizens knew much, if anything, of the suit, which existed only in an embryonic (and stalled) stage. Plaintiffs do not compellingly fill the yawning gaps in their evidence with references such as this: "Councilwoman [Rosemary] Wilson not only endorsed Ms. Wooten but also donated to her campaign." (ECF No. 118. at 30).  Apparently, this is an accusation.  If not, it is unclear how this fact has any bearing in this case.  Plaintiffs offer more apparently sinister detail: Wilson apparently "introduced Ms. Wooten to many of her top donors and helped her solicit those donations, attended her events, and lent her other support and advice." (ECF No. at 30).

The evidence that the election of Mr. Rouse's election constituted special circumstances includes his three-year career as a professional football player and receiving endorsements from the Virginia Governor and U.S. Senator Mark Warner. (ECF No. at 30).  Plaintiffs cite not one case that supports a finding that the circumstances surrounding the democratic election of either Councilmembers Rouse or Wooten constitute "special circumstances."

      b.   *Even granting to Plaintiffs a host of generous assumptions, their expert's conclusions defeat Plaintiffs' ability to demonstrate their Prong 3 burden.*

For obvious reasons, Plaintiffs wish to disavow Spencer's Table 1, even though their own expert produced it.  As discussed in Defendants Memorandum in Support, Spencer admitted in

deposition that he could only support the identification of seven (7) candidates as being minority preferred—four (4) of whom won. To put it mildly, this is an inconvenient truth for Plaintiffs.

In response to the disaster of Table 1, Plaintiffs attempt to run back to the shelter of Spencer's Initial Report. No sanctuary is to be found there, however. It must first be noted that Plaintiffs committed flagrant errors in their summary of the Initial Report's findings. Plaintiffs claim that of 17 City Council elections analyzed, "In 10 of those elections, Spencer identified a minority-preferred candidate. Unsurprisingly, of the 10 candidates, only three won elections." (ECF No. at 31). That is not even in the ballpark of Spencer's actual findings. Spencer produced seven (7) charts labeled "All Probative Races" in his Initial Report. (Ex. 4 at 14, 16, 19, 21, 23, 27 and 29). These charts cover 7 election cycles that involved 17 seats. Including Spencer's deposition testimony that he should have marked Ben Davenport as the All Minority preferred candidate in the 2014 at-large election, Spencer identifies 16 candidates as being All Minority preferred.[8] Eight of these 16 candidates won election.[9] That result is not hard to tally, and it may be that Plaintiffs momentarily forgot that the relevant inquiry is the success of <u>minority-preferred</u> candidates and not only of <u>minority</u> candidates.[10] *See, e.g., Mallory v. Ohio*, 173 F.3d 377, 383 (6th Cir. 1999) (citing *Thornburg v. Gingles*, 478 U.S. 30, 51 (1986)).

Defendants make the following claims regarding to how Prong 3 is tallied: (1) The entire Prong 3 inquiry is an exercise in folly because of Plaintiffs' failure to offer competent evidence of

---

[8] Spencer indicated with checkmarks that both Jackson and Flores were minority candidates-of-choice for the 2008 Kempsville race—a single seat election. During his deposition testimony, when Spencer was asked, "Can you have more than one minority candidate of choice for a single seat election?" he answered, "No, you cannot." (Ex. 6 at 105:4-6.) At most, this single-seat election can yield only one All Minority candidate of choice.

[9] Spencer identified these 8 winning candidates as preferred by All Minority voters: Rouse (2018); Wooten (2018); Sessoms (2016); Davenport (2014); Henley (2014), Ross-Hammond (2012); Bellitto (2010); and Jones (2010).

[10] *See also* Ex. 9 (Plaintiffs' discovery responses identifying minority preferred candidates).

cohesion among Black, Asian, and Hispanic voters; (2) Setting aside the first assertion, Plaintiffs have not offered a defensible method of identifying minority-preferred candidates; (3) For any analysis of minority candidates of choice and probative elections, the probative period should be from 2011 (after the most recent redistricting) through the most recent election in 2018; and (4) Even ignoring (3), adopting Plaintiffs' preferred time span, the All Probative Races analysis in Spencer's Initial Report, reveals that 8 minority candidates of choice prevail in 16 opportunities, and using Table 1 of Spencer's Rebuttal Report, 4 minority candidates of choice prevail out of 7 opportunities (both as amended by Spencer's deposition testimony).  Again, applying simple math, in neither analysis is the minority candidate of choice "usually" defeated, whether by white bloc voting or otherwise.  Those "best case" tallies are grounds for summary judgment in Defendants' favor on Prong 3.  *See Lewis v. Alamance Cty.*, 99 F.3d 600, 606 (4th Cir. 1996).

## V.      Plaintiffs' Fail in Their Attempt to Manufacture a "Battle of the Experts."

At numerous points in Plaintiffs' Brief in Support, they attempt to manufacture a "battle of the experts" by focusing on Defendants' experts.  The motive behind this strategy is transparent, but Plaintiff's efforts to tarnish Defendants' experts is wholly irrelevant to Defendants' summary judgment motion, which is based solely on Plaintiffs' own evidence.

In presenting the undisputed fact and arguments upon which they rely for summary judgment, Defendants rely solely on the remarkably self-defeating evidence offered by Plaintiffs' own experts, and in particular: Spencer's 7 "All Probative Races" charts, found in his Initial Report; Spencer's Rebuttal Report Table 1 and its underlying Data Set; and the deposition testimony of Plaintiffs' experts Spencer and (to a lesser degree) Lichtman.  Defendants contend that an objective analysis of this evidence, produced by the Plaintiffs alone, makes it abundantly

clear that Plaintiffs cannot meet their burden with regard to either or both *Gingles* Prongs 2 and 3. Defendants support this argument by relying upon simple math and irrefutable logic.

Defendants' case for summary judgment simply does not rely upon a single fact or opinion promulgated by Defendants' experts, and accordingly, Plaintiffs' reference to them in their Response Brief is at best a distraction. The Court has before it the facts it needs to render summary judgment in Defendants' favor.

## **CONCLUSION**

WHEREFORE, for all the reasons set forth herein and in Defendants' Brief in Support, Defendants hereby renew their request that this Court grant the Defendants' motion for summary judgment and for such other relief as the Court deems appropriate.

Respectfully submitted,

CITY OF VIRGINIA BEACH, et al.,

By: _____/s/_____
Of Counsel

**Mark D. Stiles** (VSB No. 30683)
City Attorney
**Christopher S. Boynton** (VSB No. 38501)
Deputy City Attorney
**Gerald L. Harris** (VSB No. 80446)
Associate City Attorney
**Joseph M. Kurt** (VSB No. 90854)
Assistant City Attorney
*Attorneys for the City of Virginia Beach*
Office of the City Attorney
Municipal Center, Building One
2401 Courthouse Drive
Virginia Beach, Virginia 23456
(757) 385-4531 (Office)
(757) 385-5687 (Facsimile)
mstiles@vbgov.com
cboynton@vbgov.com
glharris@vbgov.com
jkurt@vbgov.com

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 15th day of November, 2019, I will electronically file the foregoing with the Clerk of the Court using the CM/ECF system, which will then send a notification of such filing (NEF) to the following:

**Joseph Gerald Hebert**
**Danielle Marie Lang**
**Paul March Smith**
**Annabelle Harless**
**Ruth Merewyn Greenwood**
Campaign Legal Center
1411 K Street, NW
Suite 1400
Washington, DC 20005
(202) 736-2200 (telephone)
(202) 736-2222 (facsimile)
ghebert@campaignlegal.org
dlang@campaignlegal.org
psmith@campaignlegal.org
aharless@campaignlegal.org
rgreenwood@campainlegal.org


/s/
Gerald L. Harris

**Mark D. Stiles** (VSB No. 30683)
City Attorney
**Christopher S. Boynton** (VSB No. 38501)
Deputy City Attorney
**Gerald L. Harris** (VSB No. 80446)
Associate City Attorney
**Joseph M. Kurt**
Assistant City Attorney (VSB No. 90854)
*Attorneys for the City of Virginia Beach*
Office of the City Attorney
Municipal Center, Building One, Room 260
2401 Courthouse Drive
Virginia Beach, Virginia 23456
(757) 385-8803 (Office)
(757) 385-5687 (Facsimile)
mstiles@vbgov.com
cboynton@vbgov.com
glharris@vbgov.com
jkurt@vbgov.com