IN THE UNITED STATES DISTRICT
COURT FOR THE EASTERN DISTRICT
OF VIRGINIA NORFOLK DIVISION

| | |
|---|---|
| **Latasha Holloway,** *et al.*, <br><br> Plaintiffs, <br><br> v. <br> **City of Virginia Beach,** *et al.*, <br><br> Defendants | Civil Action No. 2:18-cv-0069 |

**DEFENDANTS' MOTION TO EXCLUDE PLAINTIFFS' SUPPLEMENTAL EXPER REPORTS AND OPINIONS**

# PLAINTIFFS' EXHIBIT 6

June 9, 2020 Deposition Excerpts of
Douglas M. Spencer

```
 1   were not asked to analyze any other plans in
 2   Fairfax's supplemental report?
 3        A.    That is correct.
 4        Q.    Well, and -- and I'm taking this that
 5   you did not also analyze the performance of any
 6   illustrative or alternative districts in Fairfax's
 7   rebuttal report.  Correct?
 8              MS. GREENWOOD:  Objection to the extent
 9   that it calls for drafts, but you may answer.
10        A.    I -- I think that's correct.  The -- the
11   -- the plans that I evaluated were an illustrative
12   plan that was in my original report, and these three
13   plans that -- and all of these plans were provided
14   to me by counsel.  So I'm not exactly sure in which
15   report they were provided by Mr. Fairfax.
16   BY MR. BOYNTON:
17        Q.    Okay.  That's fair enough, but, sitting
18   here today, if you looked at your own rebuttal
19   report, and feel free to do so -- it's -- it's your
20   Exhibit 2 -- there does not appear to be any
21   analysis of performance of any illustrative or
22   alternative districts, correct?
23        A.    That is correct, yes.
24        Q.    And the scope of the supplemental expert
25   report does not include any analysis of prior
```

```
 1   illustrative or alternative plans, correct?
 2       A.   It includes just the three plans that
 3   counsel asked me to analyze.  Correct.
 4       Q.   Understood.  Thank you, sir.
 5            So these -- in your summaries you -- the
 6   second thing you're doing beyond analyzing the
 7   performance of three modified districts or plans --
 8   I'm sorry -- six districts, three plans, you -- you
 9   also confirm certain findings of your original
10   report by providing additional supporting
11   information, correct?
12       A.   That is correct.
13       Q.   That relates solely to the 2010 election
14   between George Furman and Louis Jones; is that
15   correct?
16       A.   That is correct, yes.
17       Q.   Okay.  So moving to what you say in the
18   analysis of modified plans, still on page 2, you
19   say, "In this section I analyze the potential
20   cohesion in, and ameliorative effect of, three sets
21   of possible majority-minority districts in Virginia
22   Beach," correct?
23       A.   That's what I wrote, correct.
24       Q.   Where is the potential cohesion analysis
25   in the supplemental report?
```

1    A.    So in the three -- excuse me.  In the
2 two tables that are provided on pages 4 and 5 I
3 report the estimated support for these candidates in
4 the new districts which are a majority minority.
5    Q.    And that is an all-minorities analysis,
6 correct?
7    A.    That is correct, yes.
8    Q.    Is there anywhere in this supplemental
9 report that you show the breakdown between or among
10 different minority groups?
11    A.    No, there is not.
12    Q.    Why is that?
13    A.    Well, as an extension of a conversation
14 we've had previously, the relevant comparison for
15 determining whether or not these districts perform
16 is to compare the vote totals of white voters and
17 non-white voters, minority voters, in these
18 districts.
19    Q.    How does that analyze cohesion?
20    A.    Well, if as a pattern and as a group
21 black/Hispanic/Asian voters are preferring a
22 particular candidate and that candidate is losing
23 due to white bloc voting, then that rises to the
24 level of racially polarized voting under the
25 Gingles.

1      Q.   Am -- am I accurate, returning briefly
2  to the three plans that -- for performance analysis,
3  you are capable of reviewing other plans, you were
4  just simply not asked to?
5      A.   That's correct.
6      Q.   So tell me the process that went into
7  your analysis of the modified plans.  I assume the
8  process was the same, but there were three plans and
9  two districts in each plan, correct?
10          MS. GREENWOOD:  Objection, just to the
11 extent that that's a series of questions.
12     A.   Just -- I missed some of that question.
13 BY MR. BOYNTON:
14     Q.   That's fine.  I can --
15     A.   Sorry, Mr. Boynton.
16     Q.   Sorry.
17     A.   I missed some of that question.
18     Q.   Sure.  And it was objectionable anyway,
19 so let me start over.
20     A.   Okay.
21     Q.   You -- when you performed your analysis
22 of modified plans you used one process to review
23 three plans, correct?
24     A.   Can you clarify what you mean by
25 process?  Sorry.

1       Q. That's what I'm trying to ask you. What
2 was your process in analyzing these modified plans?
3       A. I used a geographic information systems
4 platform or software, a GIS software. I added the
5 census data as a layer on the maps. I overlaid Mr.
6 Fairfax's districts. I then overlaid a map of
7 election returns by precinct. I then used the
8 software to assure that the boundaries were aligned.
9 And then I aggregated vote totals into these new
10 illustrative and modified -- modified illustrative
11 and modified alternative plans.
12       Q. Are you still of the opinion as you were
13 in your August 26th report that 15 precincts are too
14 few to generate good ecological inference estimates?
15       MS. GREENWOOD: Objection. Continue.
16       A. It depends on the -- it depends on the
17 CVAP in those districts.
18 BY MR. BOYNTON:
19       Q. Okay. So for purposes of your analysis
20 of these modified plans what is the minimum number
21 of precincts needed for ecological inference to
22 provide reliable estimates?
23       A. (Audio interruption.)
24       THE REPORTER: I'm sorry, Dr. Spencer.
25 I can't hear you.