**IN THE UNITED STATES DISTRICT
COURT FOR THE EASTERN DISTRICT
OF VIRGINIA NORFOLK DIVISION**

| | |
|---|---|
| **Latasha Holloway, *et al*.,** | |
| **Plaintiffs,** | **Civil Action No. 2:18-cv-0069** |
| **v.** | |
| **City of Virginia Beach, *et al*.,** | |
| **Defendants** | |

**DEFENDANTS' MOTION TO EXCLUDE PLAINTIFFS' SUPPLEMENTAL
EXPER REPORTS AND OPINIONS**

# PLAINTIFFS' EXHIBIT 7

Expert Report of Dr. Quentin Kidd:
Response to Spencer and Lichtman

August 12, 2019

United States District Court for the Eastern District of Virginia

Holloway v. City of Virginia Beach

Case No.: 2:18-cv-00069

Expert Report of Dr. Quentin Kidd:
Response to Spencer and Lichtman

Professor of Political Science
Christopher Newport University
Newport News, VA

Supporting Data and Analysis Provided by:
Kim Brace, President
Election Data Services, Inc.
Manassas, VA

## I. INTRODUCTION AND BACKGROUND

My name is Quentin Kidd, and I am a tenured professor of political science at Christopher Newport University in Newport News, Virginia. I also serve as the Director of the Wason Center for Public Policy, which focuses on Virginia and Hampton Roads politics and public policy. I have been a faculty member at Christopher Newport for 22 years. I am an expert in American politics, specifically in the areas of political behavior, voting behavior, racial politics, Southern politics, and Virginia politics, having published in all subject areas. I teach courses in American politics, political behavior, political campaigns and elections, and research methods and quantitative analysis.

I have received nearly $500,000 in grants to support research. I have authored, co-authored or edited five books and over 30 peer reviewed studies and book chapters, and funded research reports. My academic publishing is detailed in a copy of my cv. I have provided no prior expert testimony.

In assisting the Defendants in this case, I am receiving $225 per hour for review and report preparation and $275 per hour for depositions and trial attendance.

## II. SCOPE AND OVERVIEW

I have been asked by counsel for the Defendants to respond to the expert reports of Professor Richard M. Spencer and Professor Allan J. Lichtman. Professor Spencer's report focuses on an analysis of racially polarized voting in Virginia Beach and Professor Lichtman's report examines the totality of circumstances in Virginia Beach.

Under the Gingles three-pronged preconditions test, plaintiffs must demonstrate the existence of the following three preconditions in order to prove a violation of Section 2 of the Voting Rights Act: [1]

1. That the racial or language minority group is sufficiently numerous and compact to form a majority in a single member district (Prong 1);
2. That the racial or language minority group is politically cohesive in that its members tend to vote similarly (Prong 2); and
3. That the majority votes sufficiently as a bloc to enable it usually to defeat the racial or language minority group's preferred candidates (Prong 3).

I focus on Professor Spencer's report in Section III and Professor Lichtman's report in Section IV. My conclusions, in brief, are as follows:

Relying almost completely on Spencer's own data and analysis, I show that the African American electorate analyzed by Spencer is **not usually united** in contests involving African American candidates in Virginia Beach, half the time behaving as a cohesive voting bloc and half the time not behaving as a cohesive voting bloc. Less than a third of the elections analyzed by Spencer resulted in an African American candidate who received majority support among minority voters lost the election due to white bloc voting. Spencer **does not satisfy** plaintiffs' obligations in terms of demonstrating both Prongs 2 and 3 in 71 percent of elections when focusing just on African American voters. When white candidates who Spencer identified as the preferred candidates of minority voters are considered, the number of African American and minority-preferred candidates who won their elections is seven of 17, including six of seven since 2012. Finally, and very importantly, Spencer **NEVER** conducts an examination of Asian and Hispanic voters independent of African American voters, which is a Prong 3 obligation since plaintiffs' attempt at meeting their Prong 1 obligation involves combining African American, Asian, and Hispanic voters. Further examination of the Asian + Hispanic vote in Virginia Beach demonstrates a lack of cohesion among minority voters, resulting in only **one race** (Bullock 2010) that ultimately satisfies Prongs 2 and 3, and 16 of 17 that DO NOT satisfy Prongs 2 and 3.

In response to Lichtman's report, I conclude that the three minority groups at the heart of this litigation – African Americans, Asians, and Hispanics – experienced a history of discrimination differently or not at all in Virginia Beach. Contemporary levels of political participation do not reflect lingering effects of discriminatory actions when compared to white voters. Virginia Beach's political subdivisions are not unusual, and its method of elections are not unusual. There is no documented or apparent evidence of informal slating via campaign contributions. The record of participation among African Americans, Asians, and Hispanics does not support the

---

[1] Thornburg v. Gingles, 478 U.S. 30 (1986).

claim that discrimination in areas of education, employment, and health results in differences in political participation. Plaintiffs provide no documented evidence of overt or subtle racial appeals in Virginia Beach City Council elections, and where there are cases of overt racial appeals in other Virginia Beach elections, voters have rejected them. And finally, there is no evidence of unusual white support for black candidates in recent elections; rather, in recent elections white voters have supported some black candidates and not others.

In Sum, I document here that Virginia Beach's minority voters are NOT politically cohesive and that Hispanic and Asian voting patterns cannot be demonstrated to track black voting patterns. I provide evidence that in multiple contests, Asians + Hispanics do NOT unite behind candidates who Spencer shows attracting majority support from African Americans. I document that black, Hispanic, and Asian voters often do not vote as a coalition. And finally, I document that it cannot be demonstrated that minority voters vote overwhelmingly for different candidates than white voters, and in fact there are a number of elections where even plaintiffs admit that minorities and whites supported the same candidates.

## III. RESPONSE TO PROFESSOR DOUGLAS M. SPENCER'S EXPERT REPORT[2]

Under the Gingles three-pronged preconditions test, plaintiffs must demonstrate the existence of the following three preconditions in order to prove a violation of Section 2 of the Voting Rights Act: [3]

1. That the racial or language minority group is sufficiently numerous and compact to form a majority in a single member district (Prong 1);
2. That the racial or language minority group is politically cohesive in that its members tend to vote similarly (Prong 2); and
3. That the majority votes sufficiently as a bloc to enable it usually to defeat the racial or language minority group's preferred candidates (Prong 3).

This section will focus on Spencer's expert report as it relates to satisfying the Prong 2 and Prong 3 obligations. Relying almost exclusively on Spencer's own data, this section will show:

- The African American electorate analyzed by Spencer is **not usually united** in contests involving African American candidates in Virginia Beach, half the time behaving as a cohesive voting bloc and half the time not behaving as a cohesive voting bloc;
- Less than a third of the elections analyzed by Spencer resulted in an African American candidate who received majority support among minority voters losing due to white bloc voting;
- Spencer identifies 17 elections where at least one African American candidate was on the ballot and plaintiffs **do not satisfy** their obligations in terms demonstrating both Prongs 2 and 3 in 12 of those 17 contests when focusing just on African American voters;
- When white candidates who were the preferred candidates of minority voters are considered - something that plaintiffs accept as a possibility in both Spencer's report and their Supplemental Responses to Interrogatories Nos. 8-10, the number of African American-preferred candidates who won their races is seven of 17, including six of seven since 2012;
- Plaintiffs fail to conduct an examination of Asian and Hispanic voters <u>independent</u> of African American voters, which is a Prong 3 obligation since plaintiffs' attempt at meeting their Prong 1 obligation involves combining African American, Asian, and Hispanic voters; and
- Further examination of the Asian + Hispanic vote in Virginia Beach demonstrates a lack of cohesion among minority voters, <u>resulting in only **one election** (Bullock 2010) that ultimately satisfies Prongs 2 and 3, and 16 of 17 that DO NOT satisfy Prongs 2 & 3.</u>

---

[2] Douglas M. Spencer, "Expert Report: Racially Polarized Voting in Virginia Beach," July 15, 2019.
[3] Thornburg v. Gingles, 478 U.S. 30 (1986).

A) Political Cohesion Among Minority Groups – Test of Prong 2

Gingles' second prong requires that plaintiffs demonstrate political cohesion among African American, Asian, and Hispanic voters. While proving cohesion in a single group can often be a challenge, the challenge is manifestly more difficult in this case since plaintiff must prove that all three of the minority groups share candidate preferences. However, the only group that Spencer examines independently in his expert report is black voting behavior. He attempts to extend that analysis to the other two groups with an overly generalized sleight-of-hand that lumps Asian, Hispanic, and African American voters, into one category that he labels 'All Minority.'[4] In a later part of this report we will address Spencer's 'All Minority' strategy, but for now we will use Spencer's results as analyzed.[5]

Table 1 shows the distribution of 19 African American Virginia Beach City Council candidacies (across 17 elections) from 2008 through 2018 in terms of whether or not the second prong is satisfied, for only the African American voting population.[6] Unless otherwise indicated, all results are Spencer's Ecological Inference (EI) estimates, which he characterizes as the proverbial 'gold standard' since, unlike homogenous precincts, it uses data from all precincts, and unlike ecological regression, the results of EI are bounded by 0 and 100.[7] In much of the analysis that follows, results are demarcated between the period 2008 to 2011 and the period 2012 to 2018, the more recent period being more probative than the prior period for reasons outlined in a later section of this report.

---

[4] The dataset used by Spencer is provided by plaintiffs' expert witness Anthony E. Fairfax. Each of the districts Fairfax created is composed of individual census *blocks*. The numerical CVAP values for each block are not published by the Census Bureau; those values must be derived from the Bureau's published *block group* data, which is a special tabulation provided at the request of the U.S. Department of Justice (DOJ). While there is no one 'right' way of deriving these estimates, there are several wrong ways of doing so. A common hallmark of the latter is the appearance of alarming logical inconsistencies among the values of individual blocks. Defense expert Peter A. Morrison undertook an evaluation of the quality of the block-level estimates which Mr. Fairfax used to construct his two demonstrative districts [and] discovered numerous inconsistencies in his census block-level data leading to the conclusion that Mr. Fairfax's derivation method has produced flawed census block data. His flawed data overstates the actual minority share of CVAP in each of his two demonstrative districts. These defects render the dataset untrustworthy for drawing any scientifically reliable conclusions (See Morrison's Expert Witness Report, paras. 14-21). These flawed datasets also form the basis for Spencer's report in that the Fairfax data is then aggregated to the precinct/voting tabulation district level (with additional errors there) so that it can be joined to the precinct election results for his (Spencer's) racial bloc voting analysis.

[5] It should be noted that Spencer has maintained the same 94 precincts configurations from 2008 throughout his analysis, taking no account of the newly drawn (or redrawn or newly created) precincts and the new voters in those precincts. This omission renders his analysis an incomplete picture of the electorate and introduces an unknown bias in all analysis after 2011. His data are only even potentially valid for analysis through 2011. Further, it is unclear whether he even has precincts #s 95 to 100 in his analysis, even though there are 13,510 registered voters in those precincts and they cast 6,374 votes in the 2018 election (and 6,224 in the 2016 election).

[6] Spencer analyzes 17 contested elections with at least one African American candidate. However, between 2008 and 2018 there were 27 contested City Council elections in Virginia Beach. Despite Spencer's and plaintiffs' concession that white candidates can be and have been minority candidates of choice, they do not conduct a full analysis of all contested City Council elections during this time.

[7] Spencer, page 6-7.

Table 1: African American Candidates for Virginia Beach City Council From 2008 to 2018
Sorted by Whether They Received Cohesive African American Support According to Spencer
(% African American vote in parentheses)          [Win/Lose in brackets]

| **Received Cohesive Support (Satisfies Prong 2)** | | **Did Not Receive Cohesive Support (Does Not Satisfy Prong 2)** | |
|---|---|---|---|
| Elections 2012-2018 | | | |
| Wooten 2018 (95.7) | [W] | Wray 2018 (1.1) | [L] |
| Ross-Hammond 2016 (76.8) | [L] | Bright 2018 (23.1) | [L] |
| Cabiness 2014 (51.7) | [L] | Rouse 2018 (36.6) | [W] |
| Ross-Hammond 2012 (86.9) | [W] | Furman 2016 (26.5) | [L] |
| | | Furman 2014 (23.4) | [L] |
| | | Burton 2014 (41.8) | [L] |
| | | Smith 2012 (13.4) | [L] |
| Elections 2008-2011 | | | |
| Sherrod 2011 (87.0) | [L] | Cabiness 2010 (38.5) | [L] |
| Jackson 2010 (86.5) | [L] | Furman 2010 (44.2) | [L] |
| Bullock 2010 (89.2) | [L] | Flores 2008 (56.5) | [L] |
| Allen 2008 (86.3) | [L] | Jackson 2008 (50.5) | [L] |

Three of the electoral contests Spencer analyzed had two black candidates competing for the same seat: Wooten and Wray in 2018, Ross-Hammond and Smith in 2012, and Jackson and Flores in 2008. In the two most recent contests, while support for the weaker candidate did not reach a level of cohesion among African Americans (i.e., did not meet Prong 2), support of the winner did. In a third instance, in 2008 Flores and Jackson competed against each other and a white candidate (Diezel), who won the election with 48.7% of the vote.

While EI is not as prone to logically impossible estimates (e.g., over 100% or less than 0) as Ecological Regression, when estimates are made for multiple candidates for the same office, it is possible for the sum to exceed 100%. This is the case with Spencer's analysis of the 2008 Flores-Jackson-Diezel race, where the sum of the total African American vote equals 110.7%.[8] While it is possible that one of the two non-white candidates was an African American majority preference, it may also be that neither candidate received a majority support from African Americans. The one thing that IS certain, however, is that both did not receive a majority of the African American vote, the logically impossible result Spencer reports. It is clear, however, that had the vote that Flores and Jackson split united behind a single candidate, that candidate would have won the election since the two non-white candidates shared 51.3% of the overall vote. Lack of cohesion in the minority electorate caused defeat in this case, and thus results in a failure to meet Prong 2.

---

[8] See table on Spencer page 29, Kempsville race.

7

It is likely that Spencer's analysis of the 2018 At-large election includes a miscalculation in that he (Spencer) appears to have treated this election as if there were a single seat at stake instead of two seats at stake.[9] It is thus likely that Rouse, who competed for one of the two At-large seats, did in fact receive a majority of the black vote in 2018. The analysis that follows will be based upon that conclusion.

As is, Table 1 shows that since 2012, four candidates satisfy Prong 2 and seven fail to satisfy Prong 2. Between 2008 and 2011, four candidates satisfy Prong 2 and four fail to satisfy Prong 2. Across the entire period, eight of the 19 African American candidates satisfy Prong 2 in terms of cohesion among black voters and 11 fail to satisfy Prong 2.

Table 2 is a reconstruction of this data with two adjustments: It assumes Rouse did in fact receive a majority of the African American vote and it takes into account two of the three head-to-head races where, while support for the weaker candidate did not meet Prong 2 (Smith in 2012 and Wray in 2018), support for the winner did (Ross-Hammond in 2012 and Wooten in 2018). Because neither Flores nor Jackson satisfied Prong 2, it is uncertain which one was the stronger of the two candidates in terms of African American support, they are both listed on the same line.

Table 2: African American Candidates for Virginia Beach City Council From 2008 to 2018 Sorted by Whether They Received Cohesive African American Support According to Spencer, Excluding Losing Head-to-Head Candidates
(% African American vote in parentheses)          [Win/Lose in brackets]

| Received Cohesive Support (Satisfies Prong 2) | | Did Not Receive Cohesive Support (Does Not Satisfy Prong 2) | |
|---|---|---|---|
| | Elections 2012-2018 | | |
| Wooten 2018 (95.7) | [W] | Bright 2018 (23.1) | [L] |
| Ross-Hammond 2016 (76.8) | [L] | Furman 2016 (26.5) | [L] |
| Cabiness 2014 (51.7) | [L] | Furman 2014 (23.4) | [L] |
| Ross-Hammond 2012 (86.9) | [W] | Burton 2014 (41.8) | [L] |
| *Rouse 2018 (36.6) *  | *[W]* | | |
| | Elections 2008-2011 | | |
| Sherrod 2011 (87.0) | [L] | Cabiness 2010 (38.5) | [L] |
| Jackson 2010 (86.5) | [L] | Furman 2010 (44.2) | [L] |
| Bullock 2010 (89.2) | [L] | | |
| Allen 2008 (86.3) | [L] | *Flores / Jackson 2008 (56.5 / 50.5)?  [L]* | |

---

[9] This same miscalculation also appears in the analysis of the 2014 At-large race, but not in the analysis of the 2010 At-large race. All other At-large races were for a single seat. Where a single seat is at stake, the total vote should sum to 100%. Where two seats are at stake, the total vote should sum to 200% as it does in Spencer's 2010 analysis on page 27.

Table 2 shows that, assuming that a correct analysis of the Rouse vote would show him receiving majority African American support, since 2012, five candidates satisfy Prong 2 and four fail to satisfy Prong 2. Between 2008 and 2011, four candidates satisfy Prong 2 and three fail to satisfy Prong 2. Across the entire period, nine candidates satisfy Prong 2 in terms of cohesion among black voters and seven fail to satisfy Prong 2. Thus, a bare majority of the contests satisfy Prong 2 in terms of African American cohesion.

But the obligation for the plaintiffs does not end with a minimal demonstration of cohesion among black voters. Rather, the responsibility of plaintiffs is to demonstrate cohesion among African American, Asian, and Hispanic voters. Nevertheless, Spencer's analysis generously uses an 'All Minority" category which has embedded in it an assumption of cohesion among the three minority groups that Spencer never verifies. Table 3 is a reconstruction of Table 1, above, but focusing on the cohesion among this combined minority electorate.

Table 3: African American Candidates for Virginia Beach City Council From 2008 to 2018 Sorted by Whether They Received Cohesive Combined Minority Support According to Spencer (% all minority vote in parentheses)          [Win/Lose in brackets]

| Received Cohesive Support (Satisfies Prong 2) | | Did Not Receive Cohesive Support (Does Not Satisfy Prong 2) | |
|---|---|---|---|
| *Elections 2012-2018* | | | |
| Wooten 2018 (85.5) | [W] | Bright 2018 (16.5) | [L] |
| Ross-Hammond 2016 (59.9) | [L] | Furman 2016 (18.1) | [L] |
| *Rouse 2018 (31.8)* * | *[W]* | Furman 2014 (16.4) | [L] |
| Ross-Hammond 2012 (65.7) | [W] | Burton 2014 (34.3) | [L] |
| | | Cabiness 2014 (37.0) | [L] |
| | | | |
| *Elections 2008-2011* | | | |
| Sherrod 2011 (64.8) | [L] | Cabiness 2010 (26.7) | [L] |
| Jackson 2010 (58.2) | [L] | Furman 2010 (43.7) | [L] |
| Bullock 2010 (79.7) | [L] | | |
| Allen 2008 (70.5) | [L] | *Flores / Jackson 2008 (44.2 / 42.2)?  [L]* | |

Table 3 shows that, again assuming a correct analysis of the Rouse vote would show him receiving majority of the combined minority support, since 2012, four candidates satisfy Prong 2 and five fail to satisfy Prong 2. Between 2008 and 2011, four candidates satisfy Prong 2 and three fail to satisfy Prong 2. Across the entire period, eight candidates satisfy Prong 2 in terms of cohesion among combined minority voters and eight fail to satisfy Prong 2.

In terms of plaintiffs' responsibility to demonstrably prove political cohesion among the combined minority electorate, the results of Spencer's own analysis demonstrate that **the minority electorate is not usually united in contests involving black candidates in Virginia Beach. Half of the time it behaves as a cohesive voting bloc and half the time it does not behave as a cohesive voting bloc.**

9

B) White Bloc Voting – Test of Prong 3

Gingles' third prong requires that plaintiffs demonstrate the majority votes sufficiently as a bloc to enable it usually to defeat the racial or language minority group's preferred candidates. Table 4 provides information, drawn from Spencer's report, demonstrating when African American candidates who received cohesive black support in Virginia Beach City Council races won and lost as a result of white bloc voting between 2008 and 2018. As with the analysis in the previous section, it is assumed that Rouse did in fact receive cohesive African American support in 2018.

Table 4: African American Candidates for Virginia Beach City Council From 2008 to 2018 Who Received Cohesive African American Support According to Spencer Sorted by Whether They Won or Lost Due to White Bloc Voting

| Candidate Lost (Satisfies Prong 3) | Candidate Won (Does Not Satisfy Prong 3) |
|---|---|
| *Elections 2012-2018* | |
| Ross-Hammond 2016 | Wooten 2018 |
| Cabiness 2014 | Rouse 2018 |
| | Ross-Hammond 2012 |
| *Elections 2008-2011* | |
| Sherrod 2011 | |
| Jackson 2010 | |
| Bullock 2010 | |
| Allen 2008 | |

Since 2012, two of five African American candidates who received majority support among African American voters lost their respective races, while three won them. However, between 2008 and 2011 all four African American candidates who received majority support among African American voters lost their respective races, resulting in six races overall that support plaintiffs' Prong 3 obligation (that is, received majority black support yet lost their races).

Table 5 presents a similar analysis, but with a focus on how Spencer undertook to document plaintiffs' actual obligatory focus: All minority voters rather than only black voters. In this context, since 2012, one of four African American candidates who received majority support among minority voters lost, while three won[10]. However, between 2008 and 2011 all four African American candidates who received majority support among minority voters lost their respective races, resulting in five races overall that support plaintiffs' Prong 3 obligation (that is, received majority minority support yet lost their races).

---

[10] Cabiness is included in Table 4 but is removed from Table 5, having received according to Spencer's analysis 51.7% support from black voters but only 37% of minority voters overall.

Table 5: African American Candidates for Virginia Beach City Council From 2008 to 2018 Who Received Cohesive Minority Support According to Spencer Sorted by Whether They Won or Lost Due to White Bloc Voting

| Candidate Lost (Satisfies Prong 3) | | Candidate Won (Does Not Satisfy Prong 3) |
|---|---|---|
| | Elections 2012-2018 | |
| Ross-Hammond 2016 | | Wooten 2018 |
| | | Rouse 2018 |
| | | Ross-Hammond 2012 |
| | Elections 2008-2011 | |
| Sherrod 2011 | | |
| Jackson 2010 | | |
| Bullock 2010 | | |
| Allen 2008 | | |

11

C)  Combined Test of Prongs 2 and 3

Given that plaintiffs seek districts in which it will require a combination of African American, Asian, and Hispanic voters to satisfy Prong 1, Table 6 combines the results of the Prong 2 and Prong 3 tests and examines cohesion among minorities, as reported by Spencer, and not just black cohesion. The analysis looks at whether plaintiffs satisfy or fail to satisfy Prongs 2 and 3.

Table 6: Contests in Which Plaintiffs Satisfy or Fail to Satisfy Prongs 2 and 3
[Win/Lose in brackets]

**Candidate Satisfies Prongs 2 & 3**
**(Minority vote cohesion but candidate loses to white bloc vote)**

Ross-Hammond 2016 [L]

| | |
|---|---|
| Sherrod 2011 | [L] |
| Jackson 2010 | [L] |
| Bullock 2010 | [L] |
| Allen 2010 | [L] |

| **Candidate Fails to Satisfy Prong 2** | | **Reason for Failure** |
|---|---|---|
| Bright 2018 | [L] | No black or minority cohesion |
| Furman 2016 | [L] | No black or minority cohesion |
| Furman 2014 | [L] | No black or minority cohesion |
| Cabiness 2014 | [L] | No minority cohesion |
| Burton 2014 | [L] | No black or minority cohesion |
| Cabiness 2010 | [L] | No black or minority cohesion |
| Furman 2010 | [L] | No black or minority cohesion |
| Jackson 2008 | [L] | No black or minority cohesion |
| Flores 2008 | [L] | No black or minority cohesion |

| **Candidate Fails to Satisfy Prong 3** | | **Reason for Failure** |
|---|---|---|
| Rouse 2018 | [W] | Won election |
| Wooten 2018 | [W] | Won election |
| Ross-Hammond 2012 | [W] | Won election |

As is shown in Table 6, since 2012 eight of nine contests fail to meet the two requisite conditions that plaintiffs must meet in order to satisfy both Prongs 2 and 3. The one instance in which they do is the Ross-Hammond loss to Abbott in the 2016 Kempsville district race. Between 2008 and 2011 only four races satisfy both Prongs 2 and 3, and in total plaintiffs can meet their obligations

12

in only five of 17 electoral contests. Put differently: **Plaintiffs fail to meet their obligation in 12 of the 17 electoral contests.**[11]

In his report, Spencer asserts: "Ten of the 17 black candidates who ran were the candidate of choice for black and other minority voters. Of the ten candidates who were the candidate of choice, seven faced strong opposition by white voters and were defeated by white bloc voting" (page 7). How do we reconcile the difference between Table 6 above and Spencer's conclusions? There are two possible explanations. Spencer may have considered Jackson and Flores to have *both* been the choice of black and minority voters. However, since they competed for the same Kempsville district seat that would be very hard to imagine because both candidates cannot conceivably be the candidates of choice for black and minority voters when they are running against each other. As has already been noted, had there only been one African American candidate who consolidated the vote that the two of them split, he very well would have won the election. According to Spencer's estimate, neither Jackson nor Flores was the All Minority candidate of choice.

Alternatively, if Spencer considered only Jackson or Flores to have received majority black support, then his 10th case might be Cabiness in the 2014 Rose Hall district race, who got 51.7% of the African American vote. However, like Jackson and Flores, Cabiness was not the choice of minority voters, attracting only 37.0% of their votes.[12]

Thus, at a minimum, either way Spencer misstates when he claims that there were ten "candidates of choice for black *and other minority voters*" (emphasis added). According to his own figures, no more than seven candidates received a majority of the minority vote, and two of those won.[13]

---

[11] In Table 6, Jackson and Flores are treated as two separate cases, which Spencer appears to do (see page 7 of the Spencer report). If they are combined into one case since they competed for the same seat, then in 11 of 16 contests plaintiffs fail to meet their obligations by demonstrating evidence to support both Prongs 2 and 3.
[12] Spencer incorrectly indicates minority cohesion for the Rose Hill 2014 race and the Kempsville 2008 race in his table on page 11. Clearly, these contests did not see a united minority vote.
[13] As has already been noted, it is possible (likely) that in 2018 Rouse, who won, received a majority of the minority vote.

D) Combined Test of Prongs 2 and 3 Including White Candidates as Candidates of Choice for Minority Voters

Spencer seemingly applies different standards when assessing support among minority voters for African American vs. white candidates. He characterizes support for Cabiness in 2014 as follows: "Mr. James Cabiness was the *clear choice* of black and other minority voters…" (emphasis added, p. 17). Cabiness received an estimated 51.7% of the black vote but only 37.0% of the minority vote. In contrast, white candidate Henley, who polled 58.0% of the African American vote and 65.5% of the minority vote is described by Spencer as follows: "The 2014 election for the Princess Anne seat provides *little evidence of minority coalitional voting, coethnic vote cohesion,* or oppositional white block voting" (emphasis added, p. 18). These two conclusions obviously make little sense because Henley drew far more support from African American and minority voters than did Cabiness.

However, Spencer's table on page 11 seems to have considered a white candidate to have been the minority candidate of choice in the 2014 At-large and 2016 mayoral races. Further, in supplemental responses to interrogatories Nos. 8-10, plaintiffs affirm that they consider white candidates to be the candidates of choice by black, Asian, and Hispanic voters in 2010 (Jones), 2014 (Davenport [blacks only] and Henley), 2016 (Sessoms), and 2018 (White).[14] In fact, from 2010 to present, 5 of 13 candidates that plaintiffs identify as the candidates of choice for African Americans were white (and four of them won) and four of 12 candidates that plaintiffs identify as the candidates of choice for Asian and Hispanic voters were white (and three of them won).

George Furman ran for office three times during the period under analysis: For the Bayside district seat in 2010, for an At-large seat in 2014, and for mayor in 2016, making him the most frequent black candidate in the plaintiffs' dataset. Yet Spencer, and Lichtman following Spencer's lead, discount the three Furman candidacies, excluding them from most (but not all) of their analysis. The stated rational for excluding Furman, according to Spencer, is that he "was not the candidate of choice of black voters in any of those contests"[15]. This is acknowledgement on the part of Spencer and plaintiffs' counsel that white candidates can be the candidates of choice for black and minority voters and – more importantly – should be counted as such in the court's analysis. One cannot logically both discount the Furman candidacies AND discount the candidates who were the African American and/or minority candidate of choice in those races.

Thus, if we extend the analysis from the above section to include contests where minorities fail to unite behind a black candidate and instead provide cohesive support for a white candidate – again, something Spencer does not consider as an example of an African American or minority-preferred candidate winning office in the main body of his report, but does document in his tables and acknowledge in the appendices (pp. 39-40), and something that is acknowledge in supplemental responses to interrogatories Nos. 8-10 – our tally of black or minority-preferred candidates who won their electoral contests goes from three to seven (See Table 7). According to Spencer's analysis, in four elections minority and/or African American voters' candidate of

---

[14] Plaintiffs' letter dated July 30, 2019 in response to defendants' propounded discovery, pages 4-6.
[15] Spencer, page 7, fn. 7.

choice was a white candidate who won over a black candidate: Sessoms in 2016 (over Furman), Davenport in 2014 (over Furman), Henley in 2014 (over Burton), and Jones in 2010 (over Furman).[16]

Table 7: Contests in Which Plaintiffs Satisfy or Fail to Satisfy Prongs 2 and 3 When Whites Candidates are Considered Minority-preferred Candidates          [Win/Lose in brackets]

**Candidate Satisfies Prongs 2 & 3**
**(Minority vote cohesion but candidate loses to white bloc vote)**

Ross-Hammond 2016 [L]

| | |
|---|---|
| Sherrod 2011 | [L] |
| Jackson 2010 | [L] |
| Bullock 2010 | [L] |
| Allen 2010 | [L] |

| **Candidate Fails to Satisfy Prong 2** | **Reason for Failure** |
|---|---|
| Bright 2018 | No black or minority cohesion |
| Cabiness 2014 | No minority cohesion |
| | |
| Cabiness 2010 | No black or minority cohesion |
| Jackson 2008 | No black or minority cohesion |
| Flores 2008 | No black or minority cohesion |

| **Candidate Fails to Satisfy Prong 3** | **Reason for Failure** |
|---|---|
| Rouse 2018 | Won election |
| Wooten 2018 | Won election |
| Ross-Hammond 2012 | Won election |
| Sessoms 2016 | Won election |
| Davenport 2014 | Won election |
| Henley 2014 | Won election |
| | |
| Jones 2010 | Won election |

If Sessoms, Davenport, Henley, and Jones are treated as the preferred candidates of minority voters, then the number of African American-and minority-preferred candidates who won election is not limited to the three African Americans listed in Table 6 but becomes a total of seven wins in 17 electoral contests. Table 7 is a revised Table 6 that includes these four-additional white minority-preferred candidates and removes the black candidates that they beat.

---

[16] Courts have recognized that white candidates can be the candidates of choice for minority voters. See Lewis v. Alamance County, 99 F.3d 600 (4th Cir. 1996).

Of the remaining contests, the minority-preferred candidates lost due to a lack of cohesive support, leaving only five contests in which a candidate attracted cohesive minority support and yet lost to white bloc voting.

**Since 2012, candidates that have attracted cohesive minority support have won six of seven times. Of the three minority-preferred candidates who lost, two failed to achieve cohesive minority support, leaving only Ross-Hammond in 2016 meeting both Prongs 2 and 3.**

E)  There is Little Evidence of a Tripartite Racial Group in Terms of Candidate Preferences

In a previous section of this report it was pointed out that the only group that Spencer examines independently in his expert report is African Americans, and that he uses a sleight-of-hand in lumping Asian and Hispanic voters, and African American voters also, into another category that he labels 'All Minority.' The groups plaintiffs propose to combine in an effort to satisfy Prong 1 are: African Americans, Asians, and Hispanics. It is not enough to assume that these diverse groups share candidate preferences; *plaintiffs must prove the fact*. Since plaintiffs have to combine three minority groups in their effort to meet the Gingles Prong 1 standards, it is incumbent on them (presumably via Spencer) to be able to show that these multiple groups do, in fact, share candidate preferences: That they are a tripartite racial group when it comes to their candidate preferences.

No precincts in Virginia Beach come close to being homogenously composed of either Asian or Hispanics (typically 90% or more) because those populations are relatively small and because they are dispersed across the city.[17] No precinct in the city comes close to having a majority of its CVAP made up of either group. In 2018 the most heavily Asian precinct was 21.6% CVAP and the most heavily Hispanic precinct was 14.6% CVAP.[18] Indeed, given that the share of the city's population that is Asian and Hispanic has grown by just over 36% since 2000, the concentrations were likely much lower in earlier election years, including those included in plaintiffs' data set.

In his report, Spencer describes three methods for estimating voting preferences from aggregated data, but he makes no attempt to calculate the voting preferences of either Asian or Hispanics as independent groups, because conventional approaches do not lend themselves to that analysis for groups with small percentages and high distribution such as is the case with Virginia Beach. In light of this, Spencer attempts to finesse the plaintiffs' responsibility by reporting estimates of voting preferences for what he labels 'All Minority.' This approach does not meet the plaintiffs' obligation because it does not actually demonstrate that Asians and Hispanics have the same voting preferences as African Americans. In fact, with African Americans casting more votes than Asians + Hispanics, strong cohesion among black voters may in fact give the **false** impression that Asians + Hispanics share African American voting preferences when they actually do not.

Consider a hypothetical: We have 10 African Americans, 5 Asians, 5 Hispanics, and 20 whites casting votes in a two-way race where the candidates are A and B. Candidate A receives the votes of 9 African Americans, 1 Asian, 1 Hispanic, and 4 whites (for a total of 15 votes) while Candidate B receives the votes of 1 African American, 4 Asians, 4 Hispanics, and 16 whites (for a total of 25 votes). In this scenario, **following Spencer's approach**, Candidate A could be considered the candidate of choice for minority voters, having received 90% of the black vote and 55% of the 'All Minority' vote, but Candidate B wins the election with 62.5% of the total vote. The logic of Spencer's analysis would say that the minority candidate of choice (Candidate

---

[17] According to the 2017 American Community Survey the Asian population in Virginia Beach was 6.7% and the Hispanic population was 7.8%.
[18] Source: Plaintiffs' file 'cvap2018'.

17

A) lost to Candidate B due to white block voting. Yet, Candidate B was actually the choice of not only a majority of white voters, but also Asian and Hispanic voters. In this scenario, overwhelming black support for Candidate A gives the false impression under Spencer's logic that Candidate A is also the candidate of choice for All Minority.

The above hypothetical appears to play out in several elections that Spencer analyzes. While it is not possible to develop separate estimates for Asians and Hispanics, it is possible to determine whether these two groups combined agree with or differ from African Americans.

The simplest and most obvious evidence of a disparity in preferences between black voters and the other two groups can be seen when Spencer shows a majority of African Americans supporting a candidate but a majority of All Minorities failing to support that candidate. There are two elections where this happens, in the 2014 Rose Hall election with Cabiness and 2008 Kempsville election with Jackson and Flores. Given issues that have already been identified with the 2008 Kempsville race, we will focus on the 2014 Rose Hall election. In his analysis of that race, Spencer reports that Cabiness was the choice of 51.7% of black voters but attracted only 37.0% of the vote when the three groups are lumped together into the 'All Minority' category.[19] It is clear that Cabiness was not the candidate of choice for Asians + Hispanics, demonstrating that his inability to attract majority support from across minority groups constitutes a failure to satisfy *Gingles*' Prong 2.

Indeed, Image 1 is a political advertisement that the Kane campaign released late in the 2014 Rose Hall election cycle in which she defeated Cabiness.  Kane touts her endorsement from an Asian group, the Filipino American Community Action Group (among other endorsements), perhaps the largest organized voice of Filipinos in Virginia Beach.[20]

---

[19] In this analysis, all estimates about the level of support given candidates by black and all minorities are based on Spencer's EI estimates.
[20] There is evidence from other recent elections in Virginia Beach (see Appendix A) that suggests Filipino voters' preferences at not as aligned with black voters' preferences as plaintiffs might suggest.

Image 1: Kane Political Ad From 2014 Rose-Hall Special Election



With Cabiness receiving 51.7% of the African American vote but only 37.0% of the overall minority vote, it means that his support from Asian and Hispanics is actually far less than 37%. Consider, for example, that if the overall minority vote (All Minority) was half from black voters and half from Asian + Hispanic voters, Cabiness would have netted 51.7% of the black vote but only 22.3% of the combined Asian and Hispanic vote since $(51.7 + 22.3)/2 = 37$. Thus, while Cabiness gets a bare majority of the African American vote, he is soundly rejected by Asian and Hispanic voters.

However, the combined vote from Asians + Hispanics is almost certainly less than the number of votes cast by African Americans. Using plaintiffs' own data, according to the Lichtman report, African Americans make up 19.3% of the CVAP, Asians are 6.6%, and Hispanics are 6.1%. Thus, blacks constitute 60.3% of the combined African American-Asian-Hispanic potential electorate. If the three groups voted at the same rate as their proportion of the voting age population, which as Table 8 suggests is unlikely, then with the Asian + Hispanic vote now accounting for less than half the vote, their support for Cabiness would be even lower than the 22.3% reported above. If the three groups turned out at the same rate, then 60.3% of the vote would come from African Americans and 39.7% from Asian + Hispanic. Assuming Asian + Hispanic cast 39.7% of the vote in the 2014 Rose Hall election and not 50% of the vote, then only 14.6% of Asian + Hispanics supported Cabiness.

But, we know that Asian and Hispanic voters do not turn out at the same rate as African American voters. According to the Pew Research Center, Asian and Hispanic turnout has trialed black turnout nationally by 10% or more since 2000.[21] A similar but slightly smaller pattern of differential turnout exist in Virginia as well. Table 8 reports Census Bureau estimates of turnout in federal elections in Virginia for the three minority groups since 2008. The average African

---

[21] See: https://www.pewresearch.org/fact-tank/2019/05/01/historic-highs-in-2018-voter-turnout-extended-across-racial-and-ethnic-groups/

American turnout during these election years is 54.3%. Asian average turnout lags that by 6.9 percentage points and Hispanic average turnout lags it by 9.9 percentage points. If, as is likely for Virginia Beach as it is for the nation and for the Commonwealth of Virginia, Asians and Hispanics turnout at a lower rate than do African Americans, then the share of their votes for Cabiness would be even less than 14.6%. In short, assuming that the turnout rate for African Americans and Asians + Hispanics are the same produces an over-estimate of the Asian + Hispanic support for black candidates.

Table 8: Census Bureau Estimates of Virginia Turnout Among Black, Asian, and Hispanic CVAP, 2008-2018

| Group | | 2008 | 2010 | 2012 | 2014 | 2016 | 2018 | Average Turnout |
|---|---|---|---|---|---|---|---|---|
| | Black | 68.3 | 35.6 | 67.2 | 34.2 | 64.9 | 56.4 | 54.3 |
| | Asian | 61.4 | 22.7 | 53 | 31.6 | 69.9 | 46 | 47.4 |
| | Hispanic | 56.5 | 18.9 | 66.8 | 25.4 | 64.2 | 34.6 | 44.4 |

Source: U.S. Census Bureau, Current Population Survey, various years

The exercise above using the Cabiness data raises serious questions about the level of Asian + Hispanic support for other candidates when Spencer's estimates show a substantial drop between support given by African American voters and that given by All Minority. In particular, special focus should be given to the five candidates represented in Table 7 above, who appear relying on Spencer's analysis to satisfy Prongs 2 and 3 when considering minority cohesion: Ross-Hammond 2016, Sherrod 2011, Jackson 2010, Bullock 2010, and Allen 2010.

To explore this, let's examine Ross-Hammond's race in 2016, who is the only black candidate since 2012 up to this point who appears to satisfy Prongs 2 and 3. Spencer estimates that she received 76.8% of the African American vote but once the estimate includes Black + Asian + Hispanic, the share drops to 59.9% of the vote. This drop of almost 17 percentage points indicates that Ross-Hammond was far less successful in winning over Asians + Hispanics than she was with African American voters. Her share of the Asian + Hispanic vote has to be well below 59.9%. If we assume that Asians + Hispanics account for 39.7% of the All Minority voters, then she was the choice of only 34.3% of this component of the electorate.[22]

If Asians + Hispanics actually cast less than 39.7% of the All Minority vote, then Ross-Hammond fared even worse among these voters. If they accounted for 30% of the minority vote, for instance, and blacks accounted for 70% of it, then she got only 20.3% of the combined Asian + Hispanic vote. The only way that the numbers for the Black and All Minority vote for Ross-Hammond would indicate that she was the choice of the Asian + Hispanic component of that electorate would be if the non-African American minorities cast substantially more votes than did African Americans, which is highly unlikely.

---

[22] The algebraic equation for this contest, solving for $X$, is: $(.603)(.768) + .397X = .599. \ldots X = .343$

Turning our attention to the other four candidates who so far appear to satisfy Prongs 2 and 3, we see a similar situation emerge when estimating the Asian + Hispanic support for Jackson in 2010. Spencer reports that Jackson received 85.6% of the African American vote but a much smaller 58.2% of the All Minority vote. To account for this 27.4 percentage point drop, non-black support had to be much less than that of black support. Assuming the Asian + Hispanic vote constituted 39.7% of the All Minority vote, then Jackson was supported by just 16.6% of the Asian + Hispanic voters, meaning that, like with the Ross-Hammond 2016 race, there is evidence that other minorities did not support the African American-preferred candidate.

In the 2008 Allen example that Spencer uses to show how he did his work, the Asian + Hispanic support is less than 50%, dropping from 86.3% among African Americans to 70.5% among Asians + Hispanics. Assuming that Asians + Hispanics cast 39.7% of the All Minority vote, Allen got 46.6% of their support.

A similar pattern maintains with Sherrod in 2011. He was the overwhelming favorite of African Americans, who gave him 87.0% of their vote, but once Asians + Hispanics were added in, Sherrod's overall share of the All Minority vote plummets to 64.8%. Using the approach outlined above, we can estimate Sherrod's share of the Asian + Hispanic vote at only 31%.

The **only** candidate who appeared to meet the Prong 2 and Prong 3 requirements and did so is Tanya Bullock in 2010. Bullock got 89.2% of the African American vote and once the Asian + Hispanic vote is included her All Minority support only drops to 79.9%. As might be expected given such a small drop from the Black to the All Minority vote, and following the same approach as outline above, we can estimate that Bullock draws 65.7% of the Asian + Hispanic vote.

Table 9: Share of the Asian + Hispanic Vote Received by Candidates for Whom Spencer's Results Indicate Satisfying Gingles Prongs 2 and 3

| Candidate | Share |
|---|---|
| Bullock 2010 | .657 |
| Allen 2008 | .466 |
| Ross-Hammond 2016 | .343 |
| Sherrod 2011 | .310 |
| Jackson 2010 | .166 |

Table 9 reports the estimates of the share of the Asian + Hispanic vote for the five candidates who appeared up to this point to satisfy Prongs 2 and 3. They are listed in descending order showing the share of the Asian + Hispanic vote that each candidate received, assuming these two groups accounted for 39.7% of the All Minority vote. Bullock is the only candidate on this list who manages to be the preferred candidate of African American AND Asian + Hispanic voters.

Table 10 is a recreation of Table 7 above with changes to reflect instances in which support from Asian + Hispanic voters failed to reach a majority. Once estimates of support for Asians + Hispanics are introduced, **the only contest that meets the Prong 2 and Prong 3 test is Bullock in 2010**. It should also be noted that this one election that satisfies the plaintiffs' obligation occurred almost a decade ago. In eight contests involving nine candidates, the evidence does not show cohesion across the three minority groups that plaintiffs seek to use to fashion majority minority districts in Virginia Beach.[23] In the remaining seven contests, the candidate of choice for African American voters won. Three of these preferences are African Americans that Spencer notes won. The other four are white candidates who Spencer acknowledges were the preferred candidate among black voters by excluding Furman as not being the candidate of choice (thus admitting the white candidate was the candidate of choice) in his appendices.[24]

---

[23] Jackson and Flores, who competed against one another in 2008, are included in the table.

[24] Caveat reminder that it is assumed, given the mistake Spencer makes in treating the 2018 At-large race as if only one seat was available rather than two, that Rouse did achieve a majority black support (and possibly a majority of the Asian + Hispanic vote as well).

22

Table 10: Contests in Which Plaintiffs Satisfy or Fail to Satisfy Prongs 2 and 3 When Whites Candidates are Considered Minority-preferred Candidates

**Candidate Satisfies Prongs 2 & 3**
**(Minority vote cohesion but candidate loses to white bloc vote)**

Bullock 2010          [L]

| **Candidate Fails to Satisfy Prong 2** | **Reason for Failure** |
| --- | --- |
| Bright 2018 | No black or minority cohesion |
| Cabiness 2014 | No All Minority cohesion |
| Ross-Hammond 2016 | No Asian + Hispanic cohesion |
| | |
| Cabiness 2010 | No black or minority cohesion |
| Jackson 2008 | No black or minority cohesion |
| Flores 2008 | No black or minority cohesion |
| Jackson 2010 | No Asian + Hispanic cohesion |
| Allen 2010 | No Asian + Hispanic cohesion |
| Sherrod 2011 | No Asian + Hispanic cohesion |

| **Candidate Fails to Satisfy Prong 3** | **Reason for Failure** |
| --- | --- |
| Rouse 2018 | Won election |
| Wooten 2018 | Won election |
| Ross-Hammond 2012 | Won election |
| Sessoms 2016 | Won election |
| Davenport 2014 | Won election |
| Henley 2014 | Won election |
| | |
| Jones 2010 | Won election |

The estimates for Asian + Hispanic support reported here involve a set of assumptions about what share of the All Minority vote are from these two groups and what share are from African Americans. It is an informed and parsimonious estimation. Of course, alternative values for African American and Asian + Hispanic vote share to reflect other years and other conditions can be estimated but results more favorable to plaintiffs can only be estimated if the distribution of the African American vote share is assumed to be less than 60.3%.

23

To summarize, using Spencer's own data Section III demonstrates:

- The minority electorate analyzed by Spencer is **not usually united** in contests involving African American candidates in Virginia Beach, half the time behaving as a cohesive voting bloc and half the time not behaving as a cohesive voting bloc;
- Less than a third of the elections analyzed by Spencer resulted in an African American candidate who received majority support among minority voters losing due to white bloc voting;
- Plaintiffs **do not satisfy** their obligations in terms demonstrating both Prongs 2 and 3 in 71 percent of elections when focusing just on African American voters;
- When white candidates who were the preferred candidates of minority voters are considered - something that plaintiffs accept in both Spencer's report and their Supplemental Responses to Interrogatories Nos. 8-10, the number of African American and minority-preferred candidates who won their electoral contests is seven of 17, including six of seven since 2012;
- Plaintiffs fail to conduct an examination of Asian and Hispanic voters <u>independent</u> of African American voters, which is a Prong 3 obligation since plaintiffs' attempt at meeting their Prong 1 obligation involves combining African American, Asian, and Hispanic voters; and
- Further examination of the Asian + Hispanic vote in Virginia Beach demonstrates a lack of cohesion among minority voters, <u>resulting in only **one race** (Bullock 2010) that ultimately satisfies Prongs 2 and 3, and 16 of 17 that DO NOT satisfy Prongs 2 & 3</u>.

## IV. RESPONSE TO PROFESSOR ALLAN J. LICHTMAN'S EXPERT REPORT[25]

This section will focus on Professor Allan J. Lichtman's "Totality of Circumstances" expert report submitted on July 15, 2019. Lichtman organizes his report using the seven major elements and two secondary ones from the Totality-of-the-Circumstances Test from the 1982 amendment to the Voting Rights Act (VRA). This section will rebut many of the assertions made by Lichtman. It will show the following:

- The three minority groups at the heart of this litigation – African Americans, Asians, and Hispanics – experienced a history of discrimination differently or not at all in Virginia Beach. Levels of political participation do not reflect lingering effects of discriminatory actions when compared to white voters;
- Virginia Beach's political subdivisions are not unusual, and its method of elections is not unusual;
- There is no documented or apparent evidence of informal slating via campaign contributions;
- The record of participation among African Americans, Asians, and Hispanics does not support the claim that discrimination in areas of education, employment, and health results in differences in political participation';
- There is no documented evidence of overt or subtle racial appeals in Virginia Beach City Council elections, and where there are cases of overt racial appeals in other Virginia Beach elections, voters have rejected them; and
- There is no evidence of unusual white support for black candidates in recent elections; rather, in recent elections white voters have supported some black candidates and not others.

---

[25] Allan J. Lichtman, "Expert Report of Dr. Allan J. Lichtman: Totality of Circumstances Analysis," July 15, 2019.

A) Political Participation of the Three Groups at Heart of Plaintiffs Suit (Factor 1)

We cannot rewrite the history of black-white race relations and the discriminatory treatment African Americans experienced in Virginia or Virginia Beach; nor can we assume that the mistreatment of African Americans extended in equal measures to Hispanic and Asian residents, or that it continues to this day. At the time that blacks were disenfranchised at the turn of the 20th century, there were very few Asian residents among the 11,000 or so residents of what was then Princess Anne County, and it is unclear how many Hispanics were among that population. In fact, the U.S. Census of 1900 reported a total 253 residents of Asian and Pacific Island decent.[26] Prior to the Census of 1970, there was no systematic effort to count Hispanic residents in the United States by the Census Bureau.[27]

Even in 1965 when the Voting Rights Act struck down the literacy test and a few years later when the poll tax was banned, the then two-year-old City of Virginia Beach had an insignificant number of Asian or Hispanic residents. The U.S. Census of 1960 reported a total of 4,725 residents of Asian and Pacific Island decent. The 1970 Census marked the first effort to enumerate what are now referred to as Hispanics or Latinos, using the concept of "Persons of Spanish Language". That year the Census lists 2,292 such persons in Virginia Beach, or 1.3% of the population of the city.[28] Thus, it is impossible to identify very many Asian or Hispanic residents who might have been impacted long ago; moreover, the number who are present-day survivors still alive would be even fewer.

As a practical matter, the easiest way to see a continuing impact of the historical denial of the ballot would be on political participation rates. Following plaintiffs' lead in presenting state-level data, we can demonstrate little evidence of a continuing impact of the historical denial of the ballot on African Americans in Virginia in recent years. We can also demonstrate Hispanic and Asian political participation in Virginia during that same time period. We can further observe that there is no logical reason to think that the political participation of black, Hispanic, and Asian citizens in Virginia Beach would look different from those across the Commonwealth.

Figures 1, 2, and 3 present U.S. Census estimates of Virginia turnout among white, black, Asian, and Hispanic CVAP from 2008 to 2018, with margins of errors as dashed lines. Each Figure compares white turnout with one of the minority groups at the heart of the plaintiffs' suit.

As Figure 1 demonstrates, while white non-Hispanic turnout rates usually exceed those for minority groups, the differences between white and black turnout during this time period are statistically negligible in four of the most recent six federal elections (in fact, in two elections white and black turnout is nearly identical), while in two others black turnout marginally trailed white turnout. In its totality, black turnout rates closely approximate those of whites during this time period.

---

[26] See page 89 of: https://census.gov/content/dam/Census/library/working-papers/2002/demo/POP-twps0056.pdf.
[27] For a brief history of the Census Bureau's efforts at counting Hispanics, see this Pew Research Center report: https://www.pewsocialtrends.org/2010/03/03/census-history-counting-hispanics-2/.
[28] See *1970 Census: Detailed Housing Characteristics: Virginia*, Table 69.

For Asians (Figure 2), few if any of whom were in Virginia to experience past discrimination, turnout rates narrowly exceed that for whites in 2016, are statistically indifferent from whites in three other elections, and trail turnout by whites in two other elections. Again, as with turnout trends for African Americans, there is little suggestion of political participation levels that are – at least in modern times – drug down by past racial discrimination, even assuming that Asians had negative experiences in Virginia Beach.

For Hispanics (Figure 3), there are wider swings in voting levels across these six elections, but even then, Hispanic levels of voting match white levels in 2012 and come close in 2016. As with Asians, Hispanics' newness to Virginia raises questions as to whether their lower rates of participation – which are seen across the United States[29] – can be blamed on a history of discrimination carried out in Virginia Beach like plaintiffs would like us to believe.

**In sum, turnout trends among these three groups provide no suggestion of political participation levels that are – at least in modern times – drug down by past racial discrimination.**

---

[29] The Hispanic vote has tended to lag the white vote nationally by around 15% since 1990, according to the Pew Research Center: https://www.pewresearch.org/fact-tank/2019/05/01/historic-highs-in-2018-voter-turnout-extended-across-racial-and-ethnic-groups/



Figure 1: Census Bureau estimates of Virginia Turnout among White and Black Voters - 2006-2018



Figure 2: Census Bureau estimates of Virginia Turnout among White & Asian Voters - 2008-2018



Figure 3: Census Bureau estimates of Virginia Turnout among White and Hispanic voters - 2008-2018

B)  Racially Polarized Voting (Factor 2)

Given that Lichtman largely follows Spencer's lead on this factor, the rebuttal can be found in the section of the report focused on Spencer, above.

C)  Virginia Beach's Political Subdivisions are not Unusual (Factor 2)

Virginia has three cities among the 30 largest cities in terms of geographical landmass in the United States: Suffolk (14th), Chesapeake (17th), and Virginia Beach (30th). These three cities are the result of a series of mergers and consolidations between various cities and counties that took place in the 1950s, 1960s, and 1970s.[30] Given their size, all three of these cities have had to contemplate how best their city councils could represent residents dispersed across such a large geography, initially opting for an At-large methods of elections for that reason.[31] If Virginia Beach were to adopt the 10 SMD model proposed by plaintiffs, the mean district sizes would be 24.9 square miles, making them larger than 7 of the cities shown on Table 3 of Lichtman's report. The nearby cities of Chesapeake, Hampton, Portsmouth, and Suffolk would all have larger mean district sizes. As it stands right now, Virginia Beach mean district size of 249 square miles (because its elections for city council are At-large), does not even rank as the largest, with Chesapeake and Roanoke coming in larger according to Lichtman's Table 3. In short, the mean district size is not out of the ordinary.

Additionally, of the 12 other Virginia cities that Lichtman compares Virginia Beach with, seven have At-large methods of electing city council (Chesapeake, Alexandria, Hampton, Portsmouth, Roanoke, Harrisonburg, and Leesburg), and three others have at least some of their council seats elected At-large (Newport News, Suffolk, and Lynchburg). The major distinguishing feature between Virginia Beach and the rest of the cities that Lichtman compares it with is its population, which is 90% larger than the next two largest cities (Norfolk and Chesapeake), and almost 9 times larger than the two smallest cities on the list (Harrisonburg and Leesburg).

**There is, in short, very little that is unusual about the challenges posed by the size of the city of Virginia Beach (it is among a small group of geographically very large cities in Virginia) as it relates to local electoral representation, the method of At-large elections (there are many cities in Virginia who have some form of At-large methods of electing representative), or the mean size of districts (Virginia Beach does not even rank in the top two, coming in at number three behind Chesapeake and Roanoke).**

---

[30] For historical background on this, see David Graham Temple, *Merger Politics; Local Government Consolidation in Tidewater Virginia*, Charlottesville, VA: University Press of Virginia, 1972.

[31] Suffolk, the youngest of these three cities, moved to a system of 7 boroughs and direct election of mayor in 2007. Prior to that, Suffolk's council was elected At-large with an appointed mayor.

D)  No Evidence of Informal Slating Via Campaign Contributions (Factor 4)

As Lichtman noted, there is no evidence of formal slating for city council candidates in Virginia Beach. However, he attempts to show evidence of informal slating through the extent to which candidates unite to finance each other's campaigns. Lichtman presents a table on page 26 showing council candidates between 2008 and 2018 who had received contributions from two or more other candidates <u>during that decade</u>. In presenting the table the way he does, Lichtman muddies the water, so to speak, by crossing contributions and election years. In other words, Lichtman wants us to believe that a candidate running in one year (say 2016) who receives a contribution from a person who was a candidate in a previous year (say, 2010, 2012, or 2014) is evidence of informal slating. However, to approximate a slate, the contribution would need to be among candidates appearing on the ballot at the same time. Slates don't cross time and/or elections.

As Figure 4 and Table 11 indicates, such intra-election contributing has been rare in Virginia Beach city council elections over the last 10 years, and black candidates have been the recipients of nearly half the amount. During this time, 92 candidates have run for city council seats, raising $6,757,998. There are only 13 instances of intra-election donations totaling $34,750, with no intra-election donations occurring during the 2010 and 2011 elections. The largest single intra-election donation was in 2016 to a black candidate from a white candidate when Sessoms (running for mayor) gave Ross-Hammond (running for reelection for the Kempsville seat) $13,000. In 2018, Davenport (running for mayor) gave Rouse (running At-large) $2,000. Of the total intra-election donations during this time period, black candidates received 43.2%. This share of the intra-election donation far exceeds the proportion of African American candidates competing during the last decade (17.4%).



Table 11: Intra-Election Cross-Candidate Contributions in Virginia Beach City Council Elections From 2008 to 2018

| Election Year | # of Candidates Running in Election Cycle | Total Amount Raised by all Candidates in Election Cycle | Intra-Election Donor | Intra-Election Recipient | Amount Donated | Notes |
|---|---|---|---|---|---|---|
| 2008 | 15 | $1,178,040 | | | | |
| | | | Wilson | Diezel | $250 | |
| | | | Diezel | Wilson | $500 | |
| 2010 | 14 | $791,419 | | | | |
| 2011 | 3 | $172,756 | | | | |
| 2012 | 12 | $1,186,616 | | | | |
| | | | Wilson | Davis | $500 | |
| | | | Davis | Wilson | $1,000 | |
| 2014 | 13 | $563,232 | | | | |
| | | | Jones | Henley | $1,000 | Jones running unopposed |
| | | | Jones | Martin | $1,000 | |
| | | | Jones | Moss | $1,000 | |
| | | | Jones | Kane | $1,000 | |
| 2016 | 13 | $1,183,968 | | | | |
| | | | Sessoms | **Ross-Hammond** | $13,000 | |
| 2018 | 22 | $1,681,967 | | | | |
| | | | Davenport | Henley | $9,500 | |
| | | | Davenport | Uhrin | $2,000 | |
| | | | Davenport | Wood | $2,000 | |
| | | | Davenport | **Rouse** | $2,000 | |

Source: Virginia Public Access Project (vpap.org)

E)  Any Effects of Discrimination in Education, Employment, and Health Do Not Hinder
Political Participation (Factor 5)

At the heart of the allegation Lichtman is leveling with this factor is that minority residents of
Virginia Beach are hindered in their political participation due directly to the effects of
discrimination in areas such as education, health, and employment. The logic behind Lichtman's
presentation is that the greater the disparity between a minority and whites, the greater the
impediment to minority participation.

However, Lichtman's argument breaks down on two fronts. First, on multiple dimensions, the
data that Lichtman presents show Asians to be more like whites than Hispanics or African
Americans. Lichtman's Tables 7 – 9 (pp. 29-36) compare racial and ethnic groups on 15
different measures. On six of these, Asians score better than non-Hispanic whites; on two
measures they (Asians and non-Hispanic whites) have comparable scores, and on three measures
Asians are more like whites than like Hispanics or African Americans. These data provide no
evidence to support a claim that Asians' conditions lead them to participate at lower rates than
whites, and as Figure 2 above shows, in fact, in recent elections Asians have participated at rates
statistically equal to or even slightly <u>higher</u> than whites.

Further, if scoring poorly on these measures is associated with less political participation, then
the group that is the most disadvantaged would be the least politically active. On 11 of the 15
dimensions presented by Lichtman, African Americans score poorer than Hispanics. This is the
case for all of the measures of academic achievement. Relying on the logic of Lichtman's
presentation, Hispanics should be more politically active than blacks. However, Figure 5
presents turnout rates for African American and Hispanic voters for six federal elections from
2008 to 2018 demonstrating a far different picture: While black and Hispanic participation is
within the margin of error for every election, and while during two elections (2012 and 2016) the
two groups are very close to equal in their levels of voting, black participation is always higher
than Hispanic participation.

In sum, the record of participation does not support the claim that discrimination in areas of
education, employment, and health results in differences in political participation.  Without
going into plaintiffs' allegations of past or present instances of discrimination against minorities
in education, employment, or health, there is no evidence that what plaintiffs contend negatively
impacts political participation today. As reported in Figures 1 and 2, recent participation rates for
African Americans and Asians are very similar to those for non-Hispanic whites.



Figure 5: Census Bureau estimates of Virginia Turnout among Hispanic & Black Voters - 2008-2018

F) Overt and Subtle Racial Appeals (Factor 6)

The overt and subtle racial appeals that Lichtman documents in his report are to be condemned, full stop. But Lichtman documents a series of examples that occurred well beyond Virginia Beach. George Allen's infamous 'Macaca' moment occurred on a highway rest stop in the western part of the state. Loudoun County is hundreds of miles away from Virginia Beach. House Districts 31 and 51 are in Prince William County, in the northern part of the Commonwealth. The plaintiffs' suit is aimed at the City of Virginia Beach, and thus evidence of overt or subtle racial appeals should be drawn from Virginia Beach.

Lichtman presents two examples from Virginia Beach. Racist taunts directed at Louisa Strayhorn in 1998 are a negative mark and should be roundly condemned. But, they do not constitute overt or subtle racial appeals; rather, they reflect racism on the part of some individuals, but Lichtman presents no evidence that they went beyond that. He provides no evidence that these taunts became a part of statements made by her opponent(s) or in campaign materials distributed by her opponent(s) or those who supporter her opponent(s).

The one instance that Lichtman does present from Virginia Beach that would constitute an instance of overt racial appeal has an interesting story that is not fully told by Lichtman, and that demonstrates a rejection of racial appeals on the part of Virginia Beach voters.

In November 2016, Scott Taylor resigned his seat representing the 85th district of the Virginia House of Delegates to take a newly-won seat representing the 2nd Congressional District of Virginia in Congress. A local sheriff and a local school teacher, Rocky Holcomb and Cheryl Turpin, ran to fill the remaining months of Taylor's term. It was a fast-paced and hard-fought special election campaign that Holcomb won with 52.8% of the vote, and Turpin immediately announced that she would challenge Holcomb later that fall in the general election.

The fall 2017 general election proved to be a difficult environment for Republicans in Virginia, with many Republican incumbents finding themselves on the defensive fighting to hold on to their seats. Among those was Holcomb. As the campaign season neared the end, the Republican Party of Virginia, with the authorization of the Rocky Holcomb campaign, distributed a mailer (depicted on page 42 of Lichtman's report) that the Turpin campaign and many in the community accused of being an overt racial appeal. The Turpin campaign hit back, calling the mailer racist and calling Holcomb racist. It is fair to say that the later days of this campaign were substantially about race, with many local and statewide news stories reporting on the mailer and the accusations each side was making about the other. In the end, voters of the 85th district rejected Holcomb and elected Turpin to the seat. The debate over the mailer and the racial appeals carried on after the election, with Holcomb initially refusing to concede and then wanting a recount.

When the story is described in full, the one actual instance of an overt or subtle racial appeal that plaintiffs present actually works against their case. Voters in Virginia Beach, recoiling from the Holcomb mailer, rejected the appeal and the candidate who ran it.

Finally, it should be noted that Lichtman presents no evidence of overt or subtle racial appeals being made in any city council races, which are the focus of plaintiffs' suit. There is no evidence presented that racial appeals have impacted city council races, and where evidence of racial appeals in Virginia Beach have been presented, the full story reveals that voters reject them.

G)  Recent Elections for City Council Do Not Represent Special Circumstances (Factor 7)

In his report,[32] Lichtman attempts to discount recent electoral success on the Virginia Beach city council by black candidates, as such facts clearly weaken plaintiffs' assertions. In doing so, Lichtman roots his argument in a passage from Justice Brennan from *Thornburg v. Gingles*, where Brennan says that the courts can take into consideration (and discount) the markedly increased number of electoral success by black candidates after a suit is filed. He also notes that other courts have held that no overt conspiracy to support black candidates needs to be present, just evidence of "unusual white support" for black candidates AFTER a suit has been filed. Lichtman is attempting to discount the electoral successes of two black city council candidates in 2018 by claiming they were simply the result of unusual white support spontaneously or conspiratorially generated by news of this lawsuit.

Lichtman's standard of proof, then, is to demonstrate what he considers to be unusual white support. However, further analysis of the evidence, including some presented by both Lichtman and Spencer, suggests a more nuanced pattern of behavior among white voters and among the white large-donor class in 2018, behaviors that at minimum do not suggest strategic voting or giving in order to thwart a suit. They cause Lichtman's claim to break down on several fronts.

First, Lichtman presents no evidence to support a claim that the suit that was initially filed on November 20, 2017 generated much attention in the community or among the donor class. Additionally, the amended complaint was not filed until November 18, 2018, <u>following</u> the election that plaintiffs wish us to ignore. According to a Virginia Beach city attorney, the Virginia Beach City Council was first briefed on the lawsuit on January 15, 2019 in closed session, well after the elections that plaintiffs seek to dismiss.[33]

Second, if white voters were behaving unusually in support of black candidates, one would expect those black candidates across the board to receive that white support, but as the table on page 14 of Spencer's report shows, of the four black candidates on the ballot in Virginia Beach in 2018 (Rouse, Bright, Wooten, & Wray), only Wooten received a slim majority of the white vote at 51%. The three other candidates received 43.4% (Wray), 5.7% (Bright), and 24.4% (Rouse),[34] demonstrating little evidence of unusual widespread support of black candidates. In fact, according to Spencer's analysis, two white candidates of the six candidates running at-large in 2018 received higher percentages of the white vote than did Rouse (Moss at 30.8% and Oliver at 25.9%).

Third, Lichtman further claims "special circumstances" existed in 2018 as it relates to donors to black city council candidates[35], but the data presented in his report, viewed another way, suggests anything but unusual circumstances existed when it came to the behavior of white donors to candidates for office in Virginia Beach in 2018. Of the 22 candidates included in his

---

[32] Dr. Allan J. Lichtman, "Expert Report of Dr. Allan J. Lichtman: Totality of Circumstances Analysis," July 15, 2019, page 44.
[33] E-mail correspondence with Mr. Joseph M. Kurt of the Virginia Beach City Attorney's office on July 22, 2019 in response to my request as to when the City Council was first informed of the lawsuit.
[34] Although, as noted in the prior section of this report, it is believed that Spencer's analysis of the Rouse (and Bright) support is the result of a mistake in his calculations.
[35] Lichtman, page 47.

analysis[36], the average contribution per candidate from the 5 major white donors is $11,090. Three of the candidates included in his analysis (Rouse, Oliver, Jones) received contributions right near the average, three received contributions above the average (Davenport, Wood, Wooten), and five received contributions below the average (Dyer, Henley, Kwasny, Martin, Uhrin). Not included on Lichtman's Table 12 are the 11 other candidates who ran for a city council seat in 2018 and who received no contributions from the 5 major white donors, including African American candidate Linda Bright. [37]

If "unusual white support" for black candidates in Virginia Beach was present in 2018, one would expect to see that support broadly reflected in the contribution patterns of top donors to those campaigns. In Table 14 of his report, Lichtman attempts to demonstrate that the top donors to candidates Rouse and Wooten were predominantly white, but in doing so also demonstrates that those top donors were primarily interested in supporting Rouse.[38] In fact, only 3 of Rouse's top donors also contributed to Wooten, and none of Rouse's top donors contributed to Bright's campaign. As Lichtman demonstrates in Table 15 of his report, only 2 of the top 10 contributors to Wooten's campaign for the Centerville District seat in 2018 also contributed to Bright. [39]

In Sum, if there was a strategic pattern of "unusual white support" for black candidates among the large-donor class in 2018, one would fairly expect to see it demonstrated across the black candidates running in 2018. Instead, the large-donor class appears to have behaved as they often do, which is to spread financial support around as widely as possible with an eye toward supporting candidates who they perceive as having the best chances of winning and who are most likely to support policies that they favor. This is how the large-donor class appears to have viewed the candidacies of both Rouse and Wooten, but apparently did not similarly view the candidacies of Bright and Wray similarly.

---

[36] There were 22 candidates total, but only 11 included in the Lichtman analysis.
[37] See page 50.
[38] See page 56.
[39] See page 57.

To summarize, Section IV demonstrates:

- The three minority groups at the heart of this litigation – African Americans, Asians, and Hispanics – experienced a history of discrimination differently or not at all in Virginia Beach. Levels of political participation do not reflect lingering effects of discriminatory actions when compared to white voters;
- Virginia Beach's political subdivisions are not unusual, and its method of elections are not unusual;
- There is no documented or apparent evidence of informal slating via campaign contributions;
- The record of participation among African Americans, Asians, and Hispanics does not support the claim that discrimination in areas of education, employment, and health results in differences in political participation;
- There is no documented evidence of overt or subtle racial appeals in Virginia Beach City Council elections, and where there are cases of overt racial appeals in other Virginia Beach elections, voters have rejected them; and
- There is no evidence of unusual white support for black candidates in recent elections; rather, in recent elections white voters have supported some black candidates and not others.

## V. CONCLUSION

In conclusion, I document here that Virginia Beach's minority voters are NOT politically cohesive and that Hispanic and Asian voting patterns cannot be demonstrated to track black voting patterns.  I provide evidence that in multiple contests, Asians + Hispanics do NOT unite behind candidates who Spencer shows attracting majority support from African Americans. I document that black, Hispanic, and Asian voters often do not vote as a coalition. And finally, I document that it cannot be demonstrated that minority voters vote overwhelmingly for different candidates than white voters, and in fact there are a number of elections where even plaintiffs admit that minorities and whites supported the same candidates.

I, Quentin Kidd, affirm that all of the opinions and conclusions contained in this report are provided to a reasonable degree of professional certainty consistent with the scientific standards in my field. I reserve the right to update the opinions and conclusions contained herein prior to trial.

Signed: _____

41

Appendix A

Below are images captured from social media and the web demonstrating instances in recent non-City Council elections in Virginia Beach where Filipino political behavior was the opposite of African American political behavior.

Image 2: Story Reporting on the Endorsements in a 2016 Republican Congressional Primary



Image 3: Announcement on Filipino American Community of Hampton Roads' Facebook Page



Appendix B

# QUENTIN KIDD
## CURRICULUM VITAE

Work:
Christopher Newport University
1 Avenue of the Arts
Newport News, VA 23606
757.594.8499 / qkidd@cnu.edu

Personal:
113 Jones Road
Newport News, VA 23601
757.775.6932 (mobile)
drqkidd@gmail.com

### CURRENT:

Dean of the College of Social Sciences and Founding Director of the Judy Ford Wason Center for Public Policy at Christopher Newport University. *Christopher Newport is a thriving selective public liberal arts university in Newport News, Virginia, with an enrollment of 5,000 full-time students. The institution offers over 80 areas of study at the undergraduate and graduate levels.*

### FORMAL EDUCATION:

| | |
|---|---|
| Ph.D. | Political Science, Texas Tech University, 1998. |
| M.A. | Political Science, University of Arkansas, 1993. |
| B.A. | Political Science, University of Arkansas, 1991. |

### CONTINUING EDUCATION:

| | |
|---|---|
| Certificate | Management & Leadership in Education, Harvard University, 2018. |

### ACADEMIC APPOINTMENTS:

Professor of Political Science, Christopher Newport University, 2012-present
Associate Professor of Political Science, Christopher Newport University, 2003-2012
Assistant Professor of Political Science, Christopher Newport University, 1997-2003

### ADMINISTRATIVE MANAGEMENT AND LEADERSHIP:

Dean of College of Social Sciences, 2017-present

Leadership Responsibilities: Responsible for the overall organization, administration, personnel management, fiscal management and coordination of academic programs and instructional activities of the College, comprising nearly a third of all graduates, over 70 full-time faculty, around 35 part-time faculty, 9 staff, and a budget of approximately $8.5 million.

Accomplishments:
- Strategic Planning: Oversaw the first strategic plan in the College's history.
- Fundraising: Played a central role in the fundraising and establishment of an endowed professorship ($500,000) in Jewish studies.
- Research: Initiated the first of what is planned to be an annual national survey on leadership values and attitudes. The study is designed to be a highlight study for the Department of Leadership and American Studies (annual budget of $35,000).

- Fundraising for Research: Raised initial $50,000 research startup funds from private industry to established the Center for Education Policy and Research within the College.
- Administrative Work: Successfully completed the first outside chair search in the history of the College in the Department of Economics.
- Faculty Life: Initiated a junior faculty (pre-tenure) research incubator as a format to encourage and support junior faculty research.
- Faculty Life: Began a series of faculty socials (three per semester) as a way to bring faculty together in a social and non-working setting.
- Research: Initiated discussion with faculty in Sociology, Psychology, Communication, and Political Science about establishing an interdisciplinary research program in health-related fields.
- Curricular: Initiated a discussion with department chairs on the "just right major", and whether our curriculum in the social sciences includes enough courses that teach analytics skills (such as programming or data analytics) that students will need on the job market.
- Facilities: Initiated the redesign and construction of facilities in the College to allow for better utilization of space.

## Vice Provost for Undergraduate Education, 2014-2017

Leadership Responsibilities: As senior vice provost, served as a member of the senior academic leadership team responsible for working collaboratively with other senior administrators and faculty on strategic academic planning and implementation of the University's academic vision and mission.

Accomplishments:
- Worked closely with University provost to develop the academic affairs budget (approximately $50 million)
- Conducted provost-level interviews of candidates for faculty positions and negotiated offers when Provost was unavailable.
- Provided management and oversight of annual evaluation calendar and process for all 285 University faculty.
- Provided management and oversight of faculty tenure and review process.
- Served as administrative coordinator for the various faculty curriculum review and oversight committees.
- Collaborated with other University leadership on compliance with Commission on Colleges of the Southern Association of Colleges and Schools (SACCOC) requirements.
- Worked with Faculty Senate on University initiatives and University Handbook changes.
- Responsible for policy and administrative oversight of the following units: Honors Program, Center for Community Engagement, Center for Effective Teaching, and Study Abroad and International Programs.
  - Oversaw implementation of new Christopher Newport study center at the University of Glasgow and exchange program with Beijing Normal University.
  - Negotiated exchange programs between Christopher Newport and Tsinghua University and Shanghai University of Political Science and Law in China, and Kozminski University in Poland.

45

- o Oversaw expansion of Study Abroad office staff and doubling of number of students studying abroad from approximately 200 to 400 per year.
- Served as Christopher Newport's liaison to State Council of Higher Education for Virginia (SCHEV) Provost-level Academic Affairs and Planning committee.
- Served as University Ombudsman.
- Served on Christopher Newport's SACSCOC reaccreditation leadership team.
- Participated in fundraising activities in support of University's comprehensive campaign "Defining Significance" (raised $67 million).

Chair, Department of Government and Public Affairs, 2008-2014

Leadership Responsibilities: Responsible for the overall organization, administration, fiscal management and coordination of academic programs and instructional activities of the department of 400 majors, 13 full-time, 10 part-time faculty, 1 staff and a budget of just over $50,000.

Accomplishments:
- Chaired hiring committees for 7 new faculty (5 tenure track and 2 lecturers) in the Department, including dramatically broadening the diversity profile of faculty.
- Evaluated faculty for pre-tenure, tenure, post-tenure, and promotion review.
- Conducted annual reviews of all full-time faculty for merit purposes.
- Regularly evaluated teaching performance of part-time and adjunct faculty.
- Lead Department through major curriculum evaluation and program redesign.
- Initiated Departmental and academic major program evaluation.
- Developed schedule of classes and dynamically adjusted schedule during enrollment to eliminate student-scheduling problems.

Founding Director, Judy Ford Wason Center for Public Policy, 2007-Present

Leadership Responsibilities: Initiated the original concept of and fundraising for the establishment of the Wason Center for Public Policy. To date have raised ≈$1.2 million in private donations, including ≈$600,000 in endowments, to support the Wason Center.

Accomplishments:
- Grew the Wason Center from a one-person operation to a 3-staff and 100-student operation.
- Opened a 24-station fully-operational survey research laboratory on campus.
- Awarded ≈$400,000 in grants and contracts to conduct research on public policy topics ranging from quality of life and transportation to fish and wildlife surveys.

## FUNDRAISING AND GRANTS:
- Actively participated in many aspects of advancement as part of Christopher Newport's first comprehensive campaign, *Defining Significance* (total of $67 million raised), including initiating the fundraising for an endowed Professorship in Jewish Studies ($500,000) and participated in direct fundraising for gifts and endowed scholarships for study abroad and other programs and scholarships.

46

- Participated in the fundraising discussions that resulted in the lead gift to establish the Reiff Center for the Study of Human Rights and Conflict Resolution (to date Center endowed at ≈$1 million).
- Lead the fundraising ($50,000) to establish the Center for Education Research and Policy in the College of Social Sciences.
- Lead all fundraising, and grant and contract awards, related to the Wason Center for Public Policy (to date ≈$1.6 million).

## AREAS OF RESEARCH INTEREST:

Civic Participation, Political Behavior, and Political Change.

## PUBLICATIONS:

Books (5):

2012 *The Rational Southerner: Black Mobilization, Republican Growth and the Partisan Transformation of the American South.* Oxford University Press. (co-authored with MV Hood III and Irwin L. Morris).
- Nominated for the **V.O. Key Award** for outstanding book on Southern Politics, the **Ralph Bunch Award** for best scholarly work exploring the phenomenon of ethnic and cultural pluralism, and the **Leon D. Epstein Award** for research on political organizations and parties.
- Soft cover edition 2014

2012 *A Simple Guide to SPSS® for Political Science.* Belmont, CA: Wadsworth (textbook co-authored with Lee Kirkpatrick)

2011 *Civic Participation in America.* New York: Palgrave Macmillan
- Soft cover edition 2013

2000 *American Government: Readings from Across Society.* New York: Longman. (Editor)

1999 *Government and Politics in Virginia: The Old Dominion at the 21st Century.* Needham Heights, MA: Simon & Schuster. (Editor)

Refereed Journal Articles and Book Chapters (21):

Double-blind Reviewed Articles on Politics (11):

2019 (pending) "Ready for Hillary: Sexism in the Evaluations of the 2016 Presidential Candidates," in *The Forum* 17:2 (Rachel Bitecofer and Michelle Barnello, co-authors).

2015 "Tea Leaves and Southern Politics: Explaining Tea Party Support Among Southern Republicans" in *Social Science Quarterly* 96: 96-112, (M.V. Hood III and Irwin L. Morris, co-authors).

2015 "Race and the Tea Party in the Old Dominion: Split-Ticket Voting in the 2013 Virginia Elections" in *PS: Political Science and Politics* 48: 107-114, (M.V. Hood III and Irwin L. Morris, co-authors).

2008 "Two Sides of the Same Coin? Employing Granger Causality Tests in a Time Series Cross-Section Framework" in *Political Analysis* 16:324-344, (M.V. Hood III and Irwin L. Morris, co-authors).

2008 "The Real (lack of) Difference Between Republicans and Democrats: A Computer Word Score Analysis of Party Platforms, 1996-2004" in *PS: Political Science and Politics* 41:519-525.

2007 "Black Voters, Black Candidates, and Social Issues: Does Party Identification Matter?"

47

*Social Science Quarterly*, 88: 165-176, (Herman Diggs, Mehreen Farooq, and Megan Murray, three student co-authors).

2003 "A Report on the Reintroduction of the Elephas maximus in the Southern United States: Explaining the Rise of Republican State Parties, 1960-2000." *American Politics Research* 31: 1-34, (M.V. Hood III and Irwin L. Morris, co-authors).

2001 "The Key Issue: Constituency Effects and Senatorial Roll Call Voting on Civil Rights." *Legislative Studies Quarterly* 26: 599-621, (M.V. Hood III and Irwin L. Morris, co -authors).

1999 "Of Byrd[s] and Bumpers: Using Democratic Senators to Analyze Political Change in the South, 1960-1995." *American Journal of Political Science* 43: 465-487, (M.V. Hood III and Irwin L. Morris, co-authors).

1997 "More on Postmaterial Values and the Environment." *Social Science Quarterly* 78: 36-43, (Aie-Rie Lee, co-author).

1997 "Postmaterial Values and the Environment: A Critique and Reappraisal." *Social Science Quarterly* 78: 1-15 (Aie-Rie Lee, co-author).

<u>Double-blind Reviewed Articles on the Discipline and the Scholarship of Teaching (3):</u>
2006 "Civic and Political Leadership Education." *Academic Exchange Quarterly*, 10: 77-81, (R. Marc Johnson, Sean O'Brien, and Thomas Shields, co-authors).

1999 "Texas Graduate Programs in Political Science: A Research Note." *Texas Journal of Political Studies* 21: 65-71, (Nelson C. Dometrius, M.V. Hood III, and Kurt A. Shirkey, co-authors).

1998 "Bugs in the NRC's Doctoral Program Evaluation Data: From Mites to Hissing Cockroaches." *PS: Political Science & Politics* 31:829-835, (Nelson C. Dometrius, M.V. Hood III, and Kurt A Shirkey, co-authors).

<u>Peer Reviewed Book Chapters (7):</u>
2012 "Partisan Change in the American South: From Radical Fringe to Conservative Mainstream." In *Oxford Handbook of Southern Politics*, Charles S. Bullock, III and Mark J. Rozell, editors. New York: Oxford University Press. (M.V. Hood III and Irwin Morris, co-authors).

2011 "The Rintroduction of Elephas Maximus to the Southern United States: The Rise of Republican State Parties (Updated)." In *Controversies in Voting Behavior, 5th ed.* Richard Niemi, Herbert Weisberg and David Kimball, eds. Washington, DC: Congressional Quarterly. (M.V. Hood III and Irwin Morris, co-authors).

*2004 How It Happened! The 2004 Race for the White House as Reported by The New York Times.* New York: Longman. (A supplement with commentary bound in all 2004 editions of Longman's *American Government: Continuity and Change.*)

1999 "Virginia's Governor: Curator of the Political Museum Piece." In Quentin Kidd, ed., *Government and Politics in Virginia: The Old Dominion at the 21st Century.* Needham Heights, MA: Simon & Schuster (Laura Van Assendelft, co-author).

1999 "The General Assembly: Coping with Change and Tradition." In Quentin Kidd, ed. *Government and Politics in Virginia: The Old Dominion at the 21st Century.* Needham Heights, MA: Simon & Schuster (Connie Jorgensen, co-author).

1997 "Environmental Policy in Texas: Opportunities and Challenges for the 21st Century." In Mark Somma, ed., *Texas Policy and Politics.* Needham Heights, MA: Simon & Schuster

(Evan J. Ringquist, co-author).

1997 "Black Gold and Texas Tea: The Energy Industry in Texas." In Mark Somma, Ed., *Texas Policy and Politics*. Needham Heights, MA: Simon & Schuster (Evan J. Ringquist, co-author).

Research Reports (13)                                              * Grant Funded

2019, "Feasibility Study of Retirement Savings Programs for Virginia." Wason Center for Public Policy, Christopher Newport University, Newport News, Virginia.*

2018, "Understanding Hampton Roads: A Snapshot of What We Care About." Wason Center for Public Policy, Christopher Newport University, Newport News, Virginia.*

2017, "Public Opinion & Environmental Policy in the Commonwealth." Wason Center for Public Policy, Christopher Newport University, Newport News, Virginia, with Rachel Bitecofer & Katelyn Hoisington.*

2016, "The Cost of Retiring in Virginia." Wason Center for Public Policy, Christopher Newport University, Newport News, Virginia, with Jia Yu.*

2015, "Virginia Millennials Come of Age." Wason Center for Public Policy, Christopher Newport University, Newport News, Virginia, with Tom Kramer & Sarah Miller.

2015, "Commonwealth of Contrasts: A Political Typology of the Virginia Electorate." Wason Center for Public Policy, Christopher Newport University, Newport News, Virginia, with Tom Kramer and Sarah Miller.

2014, "Envision Hampton Roads." Wason Center for Public Policy, Christopher Newport University, Newport News, Virginia, with Chris Bonney.*

2014, "Results of the 2013-2014 Virginia Hunter Survey." Wason Center for Public Policy, Christopher Newport University, Newport News, Virginia.*

2014, "Results of the 2013-2014 Virginia Trapper Harvest Survey." Wason Center for Public Policy, Christopher Newport University, Newport News, Virginia.*

2014, "Results of the 2013-2014 Virginia Waterfowl Hunter Survey." Wason Center for Public Policy, Christopher Newport University, Newport News, Virginia.*

2014, "South Hampton Roads Midtown and Downtown Tunnels Tolls Survey." Wason Center for Public Policy, Christopher Newport University, Newport News, Virginia.*

2013, "A Report on the Views of Newport News Residents of the Virginia Living Museum and the City's Arts and Cultural Attractions." Wason Center for Public Policy, Christopher Newport University, Newport News, Virginia.*

2010, "The Present and Future of Transportation in Hampton Roads." Wason Center for Public Policy, Christopher Newport University, Newport News, Virginia.*

Invited, Commissioned, and other Non-refereed Essays and Chapters (14):

2017, "How to win elections under Trump? Democrats may have figured it out." November 10. *The Washington Post*, B1, with Rachel Bitecofer.

2016, "Students Are Inconsistent Voters for a Reason." *New York Times*. March 22, 2016. http://www.nytimes.com/roomfordebate/2016/03/22/do-college-students-votes-really-matter-in-an-election.

2015, "Afterword." In *Mark Warner the Dealmaker: From Business Success to the Business of Governing*, Will Payne, Mt. Pleasant, SC: The History Press.

2014, "Virginia's Ethics Rules for Public Officials: The Need for Reform" *The Virginia News Letter* Vol. 90 (1), with Meyrem Baer.

2014, "Bob and Maureen McDonnell: Middle Class in the Governor's Mansion." January 23.
    *The Washington Post*, B1.

2012, "Accessible Redistricting," *Virginia Issues & Answers* 17 (Winter): 10-11.

2010, "Civic Engagement: A Topic as Old as Jefferson and as New as Today," *Choice* 47(May).

2008, "The Purpling of Virginia." *Richmond Times-Dispatch*, E-1

2007, "Mitt Romney." *San Diego Union-Tribune*, G1.

2007 "Love Lost? Byrd-era Values and Suburban Virginia Voters." *New Dominion* 1(3): 67-71.

2004 "The Virginia GOP's Responsibility Gap." April 4. *The Washington Post*, B1.

2003 "What We Don't Hear May Be Bad For Our Democracy." October 12. Newport News
    *Daily Press*, K1.

2003 "The Failed Transportation Tax: A Simple Message From Voters?" *The Virginia News
    Letter* Vol. 79 (1).

1996 "Verification/Replication: A Graduate Student's Perspective." *PS: Political Science &
    Politics* 29(3):415.

Encyclopedic Entrees (8):

1996 "The Cold War" in George Kurian, ed., *Encyclopedia of the Democratic Party*. Armonk,
    NY: M.E. Sharpe, Inc.

1996 "Carl B. Albert" in George Kurian, ed., *Encyclopedia of the Democratic Party*. Armonk,
    NY: M.E. Sharpe, Inc.

1996 "Thomas S. Foley" in George Kurian, ed., *Encyclopedia of the Democratic Party*. Armonk,
    NY: M.E. Sharpe, Inc.

1996 "Franklin Pierce" in George Kurian, ed., *Encyclopedia of the Democratic Party*. Armonk,
    NY: M.E. Sharpe, Inc.

1996 "Henry T. Rainey" in George Kurian, ed., *Encyclopedia of the Democratic Party*. Armonk,
    NY: M.E. Sharpe, Inc.

1996 "The Cold War" in George Kurian, ed., *Encyclopedia of the Republican Party*. Armonk,
    NY: M.E. Sharpe, Inc.

1996 "Frederick H. Gillett" in George Kurian, ed., *Encyclopedia of the Republican Party*.
    Armonk, NY: M.E. Sharpe, Inc.

1996 "Thomas B. Reed" in George Kurian, ed., *Encyclopedia of the Republican Party*. Armonk,
    NY: M.E. Sharpe, Inc.

Other Non-refereed publications (1):

2001 *LongmanParticipate.com* – content author for Simulation and Comparative sections.

Book Reviews (19):

*2007 Devolution and Black State Legislators,* by Tyson King-Meadows and Thomas F. Schaller.
    *Perspectives on Politics 5(4): 829-830.*

*2007 A New Kind of Engagement?,* by Cliff Zukin, et al. *Choice* 45 (March).

*2007 Common Ground: Committee Politics in the U.S. House of Representatives,* by John
    Baughman. *Choice* 45 (March).

*2006 Politics in the New South,* edited by Charles E. Menifield and Stephen D. Shaffer. *Choice*
    44 (March).

*2005 Senate Procedures and Practices,* by Martin B. Gold. *Choice* 43 (June).

2005 *Counting Votes: Lessons From the 2000 Presidential Election in Florida,* edited by Robert P. Watson. Choice 42 (January).

2003 *Congress and Defense Spending: The Distributive Politics of Military Procurement*, by Barry S. Rundquist and Thomas M. Carsey. Choice 41 (September).

2002 *Change and Continuity in the 2000 Elections*, by Paul R. Abramson, John H. Aldrich, and David W. Rohde. Choice 40 (September).

2002 *Government and Politics in Tennessee*, by William Lyons, John m. Scheb, and Billy Stair. Choice 39 (June), 2002.

2001 *Partisan Linkages in Southern Politics: Elites, Voters, and Identifiers*, by Michael A. Maggiotto and Gary D. Wekkin. Choice 38 (February).

2001 *Realignment and Party Revival: Understanding American Electoral Politics at the Turn of the Twenty-first Century*, by Arthur Paulson. Choice 38 (January).

2000 *Before the Vote: Forecasting American National Elections*, by James E. Campbell and James C. Garand, eds. Choice 37 (June).

2000 *Methods and Models A Guide to the Empirical Analysis of Formal Models in Political Science*, by Rebecca B. Morton. Choice 37 (March).

2000 *Assessing the New Federalism State Database*. Web Site. Choice 37 (January).

1999 *Opensecrets*. Web Site. Choice 36 (Special Supplement III) p. 182.

1999 *Short of the Glory: The Fall and Redemption of Edward F. Prichard Jr.,* by Tracy Campbell. *Choice* 36 (March).

1999 *Tennessee Government and Politics: Democracy in the Volunteer State*, by John R. Vile and Mark Byrnes, eds. *Choice* 36 (February).

1999 *Center for Responsive Politics*. Web Site. *Choice* 36 (February).

1995 *On The Make: The Rise of Bill Clinton*, by Meredith L. Oakley. *Texas Journal of Political Studies* 17(Spring/Summer): 84.

## WORK IN PROGRESS:

"License to Drive" – in the early stages of a book-length study examining the evolution of the driver's license from a sheet of paper giving permission to operate a modernized vehicle in the early 1900s to effectively a national identification card containing federally mandated biometric information today.

## PAPERS AND ACTIVITIES AT PROFESSIONAL MEETINGS (most recent 10 of 45):

"Polarized Politics and Evaluation Criteria for Supreme Court Nominees: Lessons from the Gorsuch Nomination." (with Rachel Bitecofer and Rich Vining). Scheduled for presentation at the Annual Meeting of the American Political Science Association, August 2018.

"Polarized Politics and Evaluation Criteria for Supreme Court Nominees: Lessons from the Gorsuch Nomination." (with Rachel Bitecofer and Rich Vining). Paper presented at the Annual Meeting of the Western Political Science Association, April 2018.

"It's Not the Message: Partisan Cues in a Polarized Era." (with Rachel Bitecofer). Paper presented at the Annual Meeting of the Southern Political Science Association, January 2018.

"Seeing is Believing: The Role of Geographic Proximity in Mitigating Partisan Attitudes Toward Environmental Issues." (with Rachel Bitecofer and Andrew Kirkpatrick). Paper presented at the Annual Meeting of the Southern Political Science Association, January 2018.

"Ready for Hillary: Sexism in the Evaluations of the 2016 Presidential Candidates." (with Rachel Bitecofer and Michelle Barnello). Paper presented at the Annual Midwest Political Science Association Conference, April 2017.

"Electoral Implications of Racial Resentment in the South (and Beyond): The Case of Clinton v. Trump" (with M.V. Hood and Irwin L. Morris). Paper presented at the Annual Meeting of the American Political Science Association, Philadelphia, PA, September 1-4, 2016.

"Candidate Race and Perceptions of Candidate Ideology: The Tea Party, Racial Resentment, and the 2014 Elections in the Palmetto State" (with M.V. Hood and Irwin L. Morris). Paper presented at the Citadel Symposium on Southern Politics. Charleston, SC, March 3-4, 2016.

"Racial Resentment and the Tea Party: Taking Regional Differences Seriously" (with M.V. Hood and Irwin L. Morris). Poster presented at the Annual Meeting of the American Political Science Association, Chicago, IL, September 2-5, 2015.

"Millennial Civic Engagement" (with students Sarah Miller and Dagney Palmer). Poster presented at the Annual Meeting of the Midwest Political Science Association, Chicago, IL, April 7-10, 2015.

"Race and the Tea Party in the Palmetto State: Tim Scott, Nikki Haley, Bakari Sellers and the 2014 Elections in South Carolina" (with M.V. Hood and Irwin L. Morris). Paper presented at the Annual Meeting of the Southern Political Science Association Meeting, New Orleans, LA, January 15-17, 2015.

## SURVEY RESEARCH AND SURVEYS CONDUCTED:
Conducted over eighty regional, statewide, and national surveys focusing on politics and public policy topics for public consumption, media organizations, and research.

## DETAILS ON GRANTS FOR RESEARCH:
Hampton Roads Transportation Planning Organization ($15,978) to conduct a survey of users of the Capital to Capital bike trail in Williamsburg, Virginia, 2019.

Hampton Roads Community Foundation ($25,000) to conduct a regional forward-looking quality of life survey in Hampton Roads, Virginia, 2018.

AARP Work and Save Study #CNT0009935 ($50,000) to conduct an economic analysis of the cost of establishing a work and save program in Virginia, 2018.

AARP Retirement Study #CNT0006626 ($8,000) to conduct an economic analysis of the projected cost to live in retirement in Virginia over the next 10 years, 2016.

Virginia Environmental Endowment Grant #16-15 ($13,500) to conduct a statewide survey of Virginia residents on environmental attitudes, 2016.

Hampton Roads Planning District Commission ($29,000) to conduct a region-wide survey focusing on public policy values and preferences, 2015.

Virginia Department of Game and Inland Fisheries ($79,000) to conduct surveys of hunters and trappers in Virginia, 2014.

Dominion Resources Renewable Portfolio Standards Research and Development Partnership ($50,000) for "Overview of Offshore Wind Energy in the United States and the European Union (Tom Hall, Co-Principle Investigator), 2012.

Hampton Roads Transportation Planning Organization ($40,000) to conduct focus groups in Hampton Roads on transportation, 2010.

Virginia Environmental Endowment Grant #08-11 ($40,000) to conduct the Virginia Environmental Attitudes Survey, 2009, 2010, and 2011.

Faculty Research Grant ($1, 945) from Christopher Newport University for "Words as Data: Determining the Ideological Position of Political Parties from Convention Acceptance Speeches", 2004.

Faculty Research Grant ($1,750) from Christopher Newport University for "Race as an

Issue in Southern Gubernatorial Races: 1950-2000", 2001.

## TEACHING AREAS OF INTEREST/SPECIALIZATION (undergraduate):

American Politics:    American Politics, Political Behavior, Virginia Politics, Political Parties, Political Campaigns and Elections, and Virginia Government and Politics.

Methodology:    Methods of Social Science Research, Quantitative Analysis

## TEACHING AND RELATED EXPERIENCE:

Courses Taught:

GOVT 100 Political Thought and Society, Christopher Newport University.
GOVT 101 Power and Politics in America, Christopher Newport University.
GOVT 202 State and Local Politics, Christopher Newport University.
GOVT 351 Methods and Tools of Social Science Research, Christopher Newport University.
GOVT 352 Research Methods and Quantitative Analysis, Christopher Newport University.
GOVT 363 Judicial Process, Christopher Newport University.
GOVT 354 Political Campaigns and Elections, Christopher Newport University.
GOVT 333 Legislative Politics, Christopher Newport University.
GOVT 344 The Presidency, Christopher Newport University.
GOVT 454 American Political Behavior, Christopher Newport University.
GOVT 552 Advanced Quantitative Analysis (graduate), Christopher Newport University.
HONR 490 Problems in the Modern World, Christopher Newport University.
HONR 335: The Good Society, CNU study abroad course at Harris Manchester College, University of Oxford.

## ACTIVITIES AND SERVICES:

To Community:

Board Member, **Riverside Regional Health System Foundation**, 2019 to present (Newport News, Virginia)

Member, **Governance/Funding Working Group of Hampton Roads Transit**, 2019 to present (Norfolk, Virginia).

Board Member, **Rodef Sholom Temple**, 2019 to present (Newport News, Virginia).

Committee member, **Logistics Committee of the 2019 Commemoration Steering Committee**, 2016 to present (Virginia statewide).

Advisor, **Independent Bipartisan Advisory Commission on Redistricting** (appointed by Governor Bob McDonnell, the commission's job was to propose new redistricting maps to the Governor and General Assembly), January 2011 to April 2011 (Virginia statewide).

Board Member, ***Hampton Roads Center for Civic Engagement*** (a non-partisan organization to promote greater citizen participation in politics and public policy in Hampton Roads, Virginia), 2007 to 2012 (Hampton Roads regional).

Board Member, ***Blogs United*** (a non-partisan organization to promote ethical behavior in the pursuit of citizen participation in the political process), 2008 to 2015 (Virginia statewide).

Appointed to (elect chair January 2005) the **Governor's Commission on National and Community Service**, April 2002 (appointed by Governor Mark Warner and reappointed 2003, 2004, and 2005) (statewide).

Faculty Chair, College Leaders Program of the Sorensen Institute at The University of Virginia,

1999-2016.
Invited speaker, approximately four dozen invited talks per year, locally to statewide and Washington D.C.
Guest and/or quoted in various local, regional, national and international radio and television on topics related to elections, politics, and public policy.

To Department & University:
University Budget Advisory Committee, Christopher Newport, 2010-2014 & 2017 to present.
Chair, Luter School of Business Dean Search Committee, Christopher Newport University, 2015.
Chair, Provost Search Committee, Christopher Newport, 2014.
Chair, Liberal Learning Core Curriculum Task Force, Christopher Newport, 2011-2012.
Chair, Department of Government, Christopher Newport, 2008-2014.
Member, American Studies Development Committee, Christopher Newport, 2005-2006.
Coordinator, Prestigious Scholarships Mentoring Program, Christopher Newport, 2003-present.
Co-Chair, Faculty Council on Liberal Learning, Christopher Newport, 2004-2006.
Senator, Faculty Senate of Christopher Newport, 2000-2006 (member of Executive Committee 2002-2003 and 2005-2006, Secretary 2003-2004 academic year).
Co-Chair, Task Force on Curriculum and Academic Life, Christopher Newport, 2002-2004.
Dean William Parks Colloquia, Christopher Newport, fall 2000-spring 2004 (Chair 2001-2004).
Member, Undergraduate Degrees Committee, Christopher Newport, 1998-2002.
Member, Committee for the Library of the 21st Century, Christopher Newport, 2001-2002.
Member, General Education Council, Christopher Newport, 1999-2002.
Member, Online Faculty Advisory Committee, Christopher Newport, 1999-2001.
Member, Student Assessment Committee, Christopher Newport, 1999-2000.
Member, International Studies Committee, Christopher Newport, 1998-2000.
Served as member of over three dozen search committees at Christopher Newport.

To Discipline:
Served on Executive Committee of the Undergraduate Education Division of the American Political Science Association, 2004-2013 [Treasurer, 2007-2013].
Served on Annual Meetings Committee of the American Political Science Association, 2006-2008.
Book Review Editor, *Journal of Political Science Education*, Fall 2005-2012.
Division Chair for the Undergraduate Education Division of the 2005 American Political Science Association Annual Meeting, Washington, D.C., September 1-4, 2005.
Grader, American Government Advanced Placement exam, Summers 2002 and 2004.
Book and web page reviewer for *Choice*, 1998-2011.
Manuscript reviewer for *Legislative Studies Quarterly*, *Social Science Quarterly*, *American Journal of Political Science, American Politics Quarterly*, and the *Journal of Politics*, October 1996 to present.

## RECENT PROFESSIONAL MEMBERSHIPS:

Council of Colleges of Arts and Sciences, American Conference of Academic Deans, American, Southern, Southwestern, and Midwestern Political Science Associations, American Association of Public Opinion Researchers, Virginia Association of Political Scientists.

## AWARDS AND HONORS:

*Outstanding Faculty Award,* State Council of Higher Education for Virginia, 2014 (extremely competitive statewide)

*Annual Faculty Award for Excellence in Scholarship*, Christopher Newport University, 2013 (given annually by the University Provost – nominated by faculty committee).

*Dr. Wolfgang Pindur Award for Service in Academia and Practice*, 2013 (given annually by the Hampton Roads chapter of the American Society of Public Administration).

*Alumni Society Award for Excellence in Teaching and Mentoring*, Christopher Newport University, 2008 (annually awarded to one member of the faculty – nominated by chair or dean and selected by panel of alumni).

*Professor of the Year*, Christopher Newport University, 2002-2003, 2003-2004, 2005-2006 (annual award to one member of the faculty - nominated and selected by students).

Honored by the American Political Science Association at its annual meeting in 2002, 2003, and 2006 for teaching.

## FOREIGN TRAVEL:

Extensive foreign travel in the following countries: Canada, Mexico, Iceland, United Kingdom, Ireland, France, Belgium, Switzerland, Spain, Netherlands, Germany, Poland, Italy, Morocco, Israel, Iraq, Kuwait, Saudi Arabia, Bahrain, and China.

## NON-ACADEMIC EXPERIENCES AND ACTIVITIES:

• U.S. Army (and Reserve), February 1984 to May 1995. (Psychological Warfare Specialist).
• National Democratic Institute for International Affairs, Washington, D.C., 1992.
• Democratic National Convention in New York City, 1992. (International Visitor's Program).
• Sheet Metal Workers' International Association, Washington, D.C., 1990-1991.

I am an avid distance runner, having completed two dozen half-marathons, marathons, and ultra-marathons (50K through 50 mile). In addition, I have finished a dozen sprint-distance triathlons and for several years played on an intramural dodge ball team. I am also a novice unicyclist and will ski down any hill with enough snow on it.