IN THE UNITED STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF VIRGINIA
NORFOLK DIVISION

Latasha Holloway, *et al.*,

     Plaintiffs,

v.

City of Virginia Beach, *et al.*,

     Defendants

Civil Action No. 2:18-cv-0069

**MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE
PLAINTIFFS' SUPPLEMENTAL EXPERT REPORTS AND OPINIONS**

# PLAINTIFFS' EXHIBIT 5
Supplemental Deposition of Plaintiffs' Expert Dr. Doug Spencer

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
NORFOLK DIVISION


-----------------------------------

LATASHA HOLLOWAY and GEORGIA ALLEN,

                    Plaintiffs,    CIVIL ACTION NO.
                                   2:18-cv-00069
v.

CITY OF VIRGINIA BEACH, et al.,

                    Defendants.
-----------------------------------



DEPOSITION UPON ORAL EXAMINATION
OF DOUGLAS M. SPENCER,
TAKEN ON BEHALF OF THE DEFENDANTS


Lafayette, Colorado

June 9, 2020

VOLUME II



Appearances:

On behalf of the Plaintiffs:

    CAMPAIGN LEGAL CENTER (via teleconference)

        RUTH GREENWOOD, ESQUIRE

        1101 14th Street NW, Suite 400

        Washington, DC 20005

        202.736.2200

        rgreenwood@campaignlegalcenter.org

2

```
 1    Appearances: (Cont'd)

 2            J. GERALD HEBERT, ESQUIRE

 3            1101 14th Street NW, Suite 400

 4            Washington, DC 20005

 5            202.736.2200

 6            ghebert@campaignlegal.org

 7

 8            CHRISTOPHER D. LAMAR, ESQUIRE

 9            1101 14th Street NW, Suite 400

10            Washington, DC 20005

11            202.736.2200

12            clamar@campaignlegalcenter.org

13

14            DANIELLE M. LANG,

15            1101 14th Street NW, Suite 400

16            Washington, DC 20005

17            202.736.2200

18            dlang@campaignlegal.org

19

20            PAUL M. SMITH, ESQUIRE

21            1101 14th Street NW, Suite 400

22            Washington, DC 20005

23            202.736.2200

24            psmith@campaignlegal.org

25
```

3

```
 1   Appearances: (Cont'd.)
 2          ROB N. WEINER, ESQUIRE
 3          1101 14th Street NW, Suite 400
 4          Washington, DC 20005
 5          202.736.2200
 6          rweiner@campainglegalcenter.org
 7
 8          ANNABELLE HARLESS, ESQUIRE
 9          1101 14th Street NW, Suite 400
10          Washington, DC 20005
11          202.736,2200
12          aharless@campaignlegalcenter.or
13
14   On behalf of the Defendants:
15      OFFICE OF THE VIRGINIA BEACH CITY ATTORNEY
16      (via teleconference)
17          CHRISTOPHER S. BOYNTON, ESQUIRE
18          Municipal Center, Building 1
19          2401 Courthouse Drive, Room 260
20          Virginia Beach, Virginia 23456
21          757.385.4531
22          cboynton@vbgov.com
23
24
25
```

```
 1    Appearances: (Cont'd.)
 2            GERALD L. HARRIS, ESQUIRE
 3            Municipal Center, Building 1
 4            2401 Courthouse Drive, Room 260
 5            Virginia Beach, Virginia 23456
 6            757.385.4531
 7            glharris@vbgov.com
 8
 9            JOSEPH M. KURT, ESQUIRE
10            Municipal Center, Building 1
11            2401 Courthouse Drive, Room 260
12            Virginia Beach, Virginia 23456
13            757.385.4531
14            jkurt@vbgov.com
15        and
16        BAKER HOSTETLER (via teleconference)
17            KATHERINE L. McKNIGHT, ESQUIRE
18            1050 Connecticut Avenue NW, Suite 1100
19            Washington, DC 20036-5304
20            202.861.1618
21            kmcknight@bakerlaw.com
22    Also Appearing:        Jeff Zalesin
23     (via teleconference)   Simone Leeper
24                            Grace Judge
25                            Kate Hamilton
```

5

```
 1                        I N D E X

 2
      DEPONENT                EXAMINATION BY         PAGE
 3
      Douglas M. Spencer    Mr. Boynton               6
 4

 5

 6                          EXHIBITS
 7
 8    NO.    DESCRIPTION                             PAGE

 9    11     Expert Report of Anthony Fairfax         6

10    12     Expert Report of Anthony E. Fairfax,     6
             Response to Peter Morrison's Report
11
      13     Supplemental Expert Report of            6
12           Anthony E. Fairfax

13    14     United States Census 2010                6

14    15     United States Census 2020                6

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                  Deposition upon oral examination of
 2    DOUGLAS M. SPENCER, via teleconference, taken on
 3    behalf of the Defendants, before Kathleen Beard
 4    Adams, CCR, RPR, CRR, an e-Notary Public for the
 5    Commonwealth of Virginia at large, commencing at
 6    9:13 a.m. MDT, on June 9, 2020, at 720 Barberry
 7    Circle, Lafayette, Colorado, and this in accordance
 8    with the Federal Rules of Civil Procedure.
 9                       - - - - -
10                  (Spencer Exhibits 11 through 15 were
11                   pre-marked for identification.)
12                  (The deponent was sworn.)
13                  MR. BOYNTON:  Thank you, Ms. Adams.
14
15                  DOUGLAS M. SPENCER, having been first
16    duly sworn, was examined and testified as follows:
17                    DIRECT EXAMINATION
18    BY MR. BOYNTON:
19         Q.    Dr. Spencer, good morning.  How are you
20    today?
21                  MS. GREENWOOD:  Just a --
22         A.    I'm --
23                  MS. GREENWOOD:  -- moment, Mr. Boynton.
24    I'm sorry.  I just wanted to put on the record first
25    that we've agreed to extend the deposition of
```

1    Dr. Spencer today to cover additional issues he

2    raised in the supplemental report from March 2020,

3    but this isn't an opportunity for counsel to re-ask

4    questions about the first two reports or engage in

5    new lines of questioning about those reports.

6              Thank you.  Please go ahead.

7    BY MR. BOYNTON:

8         Q.    Dr. Spencer, I think I was asking you

9    how -- how your morning is.

10        A.    My morning is great.  Thank you.

11        Q.    That's very good to hear.  It's good to

12   see you again, sir.  My name is Chris Boynton, as

13   you know, and I represent the defendants in this

14   case along with my colleagues who are on this video

15   deposition, including Jerry Harris, Joe Kurt and

16   Kate McKnight.

17             MR. BOYNTON:  First things first.  This

18   is a remote deposition, and my understanding is that

19   the parties have waived any objections that would --

20   that would arise under the -- the nature of taking a

21   deposition remotely; i.e., in the absence of the

22   court reporter being with you.  Correct?

23             MS. GREENWOOD:  That's correct.

24   BY MR. BOYNTON:

25        Q.    Okay.  Now, especially since we're doing

```
 1   this over Zoom it's going to be particularly

 2   important that each of us complete our -- our

 3   question or answer and not talk over each other.

 4   Beyond that the usual deposition rules apply, which

 5   are if I've asked a question that is re -- I'm sorry

 6   -- is -- is in any way confusing or not clear, just

 7   speak up and I'll be happy to rephrase.  Also, if

 8   you have given an answer that at some point occurs

 9   to you is inaccurate or incomplete, please speak up

10   and we'll correct the record and move forward.

11           Please -- please be mindful of not

12   responding with nods or gestures but only with

13   words.  The court reporter is not able to take down

14   anything but verbal statements.

15           Does that all work for you, sir?

16       A.    That makes sense to me.  Yes.

17       Q.    Very good.  Now, we last spoke I believe

18   on October 1st, 2020; is that -- or 2019; is that

19   correct?

20       A.    I believe so.  Yes.

21       Q.    And in -- in the deposition we covered

22   your current curriculum vitae at the time, correct?

23       A.    Correct.

24       Q.    If I direct -- and --  and what I've

25   done -- let's start with this in terms of
```

9

1    definitionally.  You have given now three reports in

2    this case, correct?

3          A.    That is correct.

4          Q.    So can we refer to them as the initial

5    report, the rebuttal report and the supplemental

6    report in sequence?

7          A.    That would be clear for me.

8          Q.    Okay.  And -- and just for the record,

9    the -- and you can tell me if I'm being inaccurate.

10   I've pre-marked and pre-circulated exhibits to the

11   -- the witness and to his counsel -- or through his

12   counsel.

13              Your initial report is Spencer Exhibit

14   1.  We have the same numbers for the first nine

15   exhibits as your October 1st deposition.  So when I

16   say original or -- or initial report I'm referring

17   to Spencer 1, correct?

18         A.    Correct.

19         Q.    Okay.  And when I refer to rebuttal

20   report I'm referring to Spencer 2, which was dated

21   August 26th, 2019, correct?

22         A.    That's correct.

23         Q.    Okay.  And then the supplemental report,

24   which is the focus of our deposition testimony here

25   today, is dated March 16th, 2020, Exhibit 10 to

1  today's deposition?

2          A.    That is my understanding.  Yes.  That's

3  -- that accords with what I see as well.

4          Q.    Okay.  And I don't know how deeply we'll

5  get into them --

6          A.    I don't hear you right now, Mr. Boynton.

7          Q.    Okay.  Can you hear me now?

8          A.    Yes.

9          Q.    Okay.  I don't know how deeply we will

10  get into them, but your -- your fellow expert on

11  behalf of the plaintiffs, Anthony Fairfax, has also

12  issued three reports in this case, correct?

13              MS. GREENWOOD:  Objection.

14          A.    I -- I --

15  BY MR. BOYNTON:

16          Q.    Go ahead.

17          A.    I know he's issued multiple reports.  If

18  -- if you counted three, that sounds right.

19          Q.    Well, and I'm just really trying to

20  establish nomenclature at this point.  I -- I intend

21  to refer to his reports as the initial report, which

22  I believe is provided at Exhibit 11 --

23          A.    (Moved head up and down.)

24          Q.    -- and dated July 15th, 2019.  I will

25  refer to his rebuttal report, which is Exhibit 12,

1   dated August 26th, 2019, correct?  And the third,

2   his supplemental expert report dated March 16th,

3   2020, is Deposition Exhibit 13.  So hopefully that

4   just establishes the nomenclature.  And the -- the

5   six reports were made after reference by virtue of

6   the -- the -- the focus of today's work, which is

7   your supplemental expert report, which is Exhibit

8   10.

9          A.    (Moved head up and down.)

10         Q.    Bear with me for just a second.

11               All right.  Now, referring to the

12  credentials that you identified as your CV, starting

13  at page 42 in your initial report, which is Exhibit

14  1, has anything changed or been updated in regard to

15  your curriculum vitae since October 1st, 2019?

16         A.    Yes.  There are a few changes that

17  aren't reflected in that copy of the curriculum

18  vitae.  The first is that I was a visiting professor

19  at the Yale Law School during the spring 2020

20  semester.  The second is that I beginning July 1st,

21  but I'm here now, will be a visiting professor at

22  the University of Colorado law school.

23         Q.    Okay.  So other than the two visiting

24  professorships is there any change to your -- your

25  CV?

```
 1          A.    If you'll -- i -- I think there are one

 2    or two additional publications that have hit since

 3    that time, and I'm -- I'd need to look to remind

 4    myself.  If that's relevant, I'm happy to provide

 5    that.

 6          Q.    Okay.  That would be most appreciated.

 7                Can you, sitting here today, recall the

 8    topics of the new publications?

 9          A.    Yes.  One of them was about the campaign

10    mobilization activities with regards to poor voters

11    and voters of color.  One of them is a paper about

12    campaign finance disclosure.

13          Q.    Okay.  Any other changes to your CV

14    beyond a couple of papers and a couple of visiting

15    professorships?

16          A.    No.  None that are relevant.

17          Q.    Have you been disclosed or retained to

18    testify in any Voting Rights Act cases since October

19    1, 2019 that was not previously disclosed?

20                MR. BOYNTON:  I can't hear you.  You're

21    muted.  You're muted, Ruth.

22                MS. GREENWOOD:  Yes.  I apologize.  Just

23    objection to the extent that if he is not able to

24    disclose, then that would be privileged information.

25    If he's going --
```

13

```
 1              MR. BOYNTON:  I'm happy to limit the
 2    question to -- to matters that are public at this
 3    point.
 4              MS. GREENWOOD:  Thank you.
 5         A.   The -- the answer is no.
 6    BY MR. BOYNTON:
 7         Q.   Okay.  Has your basis of compensation in
 8    this case changed since we discussed it in October
 9    of 2019?
10         A.   It has not.
11         Q.   What is the basis of your compensation?
12         A.   $250 per hour.
13         Q.   Does that change when giving testimony
14    in deposition or at trial?
15         A.   No, it does not.
16         Q.   Okay.
17         A.   I believe the scope of my agreement is
18    for written reports and depositions, but the rate is
19    uniform for all activities performed.
20         Q.   Understood.  Thank you.
21              Similarly I'd ask you to look at
22    previously marked Exhibit 4.  It's a one-page
23    exhibit.  It's your UConn School of Law profile
24    page.  It was previously used in the first
25    deposition.  It's Exhibit 4.
```

14

 1          A.    Give me one moment, please.

 2          Q.    Certainly.

 3          A.    I'm scrolling down.

 4          Q.    It's after your two long reports, which

 5    is somewhere deep in the first, you know, set of

 6    exhibits.

 7          A.    There we go.  Okay.  I see this exhibit.

 8          Q.    Take a moment to look at it.  I know the

 9    print is pretty small.

10          A.    Okay.

11          Q.    Do you recall if that profile has been

12    updated since October of 2019?

13          A.    I don't recall.  I don't have control

14    over the content of this page, but it looks

15    substantively up to date.

16          Q.    Okay.  Fair enough.  Thank you.

17                Has the scope of your work changed since

18    we talked in October of 2019?

19          A.    No.

20          Q.    Okay.  So I'd ask you to look at Exhibit

21    10, which is your supplemental expert report.

22          A.    Do you have a question?

23          Q.    That is the correct document?  I'm not

24    hearing --

25          A.    Okay.

```
 1          Q.     -- you, though, which is --
 2          A.     Can you hear me speaking now?
 3          Q.     Yes.
 4          A.     Okay.  I've printed out a copy.  I'd
 5   like to use a hard copy.  If that's not acceptable,
 6   I'm happy to scroll through the attachment that you
 7   sent.  I just want to check with you.
 8          Q.     You're welcome to use your own copy of
 9   it.  I have no problem with that.
10          A.     Thank you.
11          Q.     Okay.  I'd ask you to turn to page 2.
12          A.     Okay.
13          Q.     Okay.  So I'm -- I'm looking at the
14   second paragraph at the summary.  It says, "As
15   an..." --
16          A.     Yes.
17          Q.     "As an update to my earlier reports, I
18   analyzed the performance of three modified
19   illustrative plans for Virginia Beach City Council
20   elections produced by Plaintiffs' expert Dr. Anthony
21   Fairfax in his supplemental expert report."
22                 Do you see that?
23          A.     I do.
24          Q.     Okay.  And so those are the Modified
25   Illustrative Plan, the Modified Alternative Plan 1
```

```
 1    and the Modified Alternative Plan 2, correct?

 2          A.    That's correct.

 3          Q.    All three of those maps you did not have

 4    prior to your deposition in -- on October 1st, 2019?

 5          A.    That is correct.

 6          Q.    Okay.  In terms of the scope of this

 7    supplemental expert report you did not have to do an

 8    anal -- analysis of the performance of any other

 9    modified illustrative or alternative plans in

10    Mr. Fairfax's supplemental report, which is Exhibit

11    13 and dated March 16th, 2020, correct?

12          A.    The only analysis that I provided was

13    the three plans that are in this supplemental report

14    that I provided to you.  I don't know what else was

15    provided in Mr. Fairfax's report.

16          Q.    What -- what -- have you reviewed

17    Mr. Fairfax's entire supplemental report?

18          A.    I have reviewed it, yes.

19          Q.    What prompted you to do a performance

20    analysis for only the illustrative plan and the two

21    -- the first two alternative plans and not any other

22    plans in that report?

23          A.    These were the three plans that I was

24    asked to analyze.

25          Q.    So you -- to say it another way, you
```

```
1    were not asked to analyze any other plans in

2    Fairfax's supplemental report?

3         A.    That is correct.

4         Q.    Well, and -- and I'm taking this that

5    you did not also analyze the performance of any

6    illustrative or alternative districts in Fairfax's

7    rebuttal report.  Correct?

8              MS. GREENWOOD:  Objection to the extent

9    that it calls for drafts, but you may answer.

10        A.    I -- I think that's correct.  The -- the

11   -- the plans that I evaluated were an illustrative

12   plan that was in my original report, and these three

13   plans that -- and all of these plans were provided

14   to me by counsel.  So I'm not exactly sure in which

15   report they were provided by Mr. Fairfax.

16   BY MR. BOYNTON:

17        Q.    Okay.  That's fair enough, but, sitting

18   here today, if you looked at your own rebuttal

19   report, and feel free to do so -- it's -- it's your

20   Exhibit 2 -- there does not appear to be any

21   analysis of performance of any illustrative or

22   alternative districts, correct?

23        A.    That is correct, yes.

24        Q.    And the scope of the supplemental expert

25   report does not include any analysis of prior
```

1    illustrative or alternative plans, correct?

2          A.    It includes just the three plans that

3    counsel asked me to analyze.  Correct.

4          Q.    Understood.  Thank you, sir.

5                So these -- in your summaries you -- the

6    second thing you're doing beyond analyzing the

7    performance of three modified districts or plans --

8    I'm sorry -- six districts, three plans, you -- you

9    also confirm certain findings of your original

10   report by providing additional supporting

11   information, correct?

12         A.    That is correct.

13         Q.    That relates solely to the 2010 election

14   between George Furman and Louis Jones; is that

15   correct?

16         A.    That is correct, yes.

17         Q.    Okay.  So moving to what you say in the

18   analysis of modified plans, still on page 2, you

19   say, "In this section I analyze the potential

20   cohesion in, and ameliorative effect of, three sets

21   of possible majority-minority districts in Virginia

22   Beach," correct?

23         A.    That's what I wrote, correct.

24         Q.    Where is the potential cohesion analysis

25   in the supplemental report?

1        A.    So in the three -- excuse me.  In the

2   two tables that are provided on pages 4 and 5 I

3   report the estimated support for these candidates in

4   the new districts which are a majority minority.

5        Q.    And that is an all-minorities analysis,

6   correct?

7        A.    That is correct, yes.

8        Q.    Is there anywhere in this supplemental

9   report that you show the breakdown between or among

10  different minority groups?

11       A.    No, there is not.

12       Q.    Why is that?

13       A.    Well, as an extension of a conversation

14  we've had previously, the relevant comparison for

15  determining whether or not these districts perform

16  is to compare the vote totals of white voters and

17  non-white voters, minority voters, in these

18  districts.

19       Q.    How does that analyze cohesion?

20       A.    Well, if as a pattern and as a group

21  black/Hispanic/Asian voters are preferring a

22  particular candidate and that candidate is losing

23  due to white bloc voting, then that rises to the

24  level of racially polarized voting under the

25  Gingles.

 1          Q.    Am -- am I accurate, returning briefly

 2    to the three plans that -- for performance analysis,

 3    you are capable of reviewing other plans, you were

 4    just simply not asked to?

 5          A.    That's correct.

 6          Q.    So tell me the process that went into

 7    your analysis of the modified plans.  I assume the

 8    process was the same, but there were three plans and

 9    two districts in each plan, correct?

10          MS. GREENWOOD:  Objection, just to the

11    extent that that's a series of questions.

12          A.    Just -- I missed some of that question.

13    BY MR. BOYNTON:

14          Q.    That's fine.  I can --

15          A.    Sorry, Mr. Boynton.

16          Q.    Sorry.

17          A.    I missed some of that question.

18          Q.    Sure.  And it was objectionable anyway,

19    so let me start over.

20          A.    Okay.

21          Q.    You -- when you performed your analysis

22    of modified plans you used one process to review

23    three plans, correct?

24          A.    Can you clarify what you mean by

25    process?  Sorry.

1      Q.   That's what I'm trying to ask you.  What

2  was your process in analyzing these modified plans?

3      A.   I used a geographic information systems

4  platform or software, a GIS software.  I added the

5  census data as a layer on the maps.  I overlaid Mr.

6  Fairfax's districts.  I then overlaid a map of

7  election returns by precinct.  I then used the

8  software to assure that the boundaries were aligned.

9  And then I aggregated vote totals into these new

10  illustrative and modified -- modified illustrative

11  and modified alternative plans.

12      Q.   Are you still of the opinion as you were

13  in your August 26th report that 15 precincts are too

14  few to generate good ecological inference estimates?

15          MS. GREENWOOD:  Objection.  Continue.

16      A.   It depends on the -- it depends on the

17  CVAP in those districts.

18  BY MR. BOYNTON:

19      Q.   Okay.  So for purposes of your analysis

20  of these modified plans what is the minimum number

21  of precincts needed for ecological inference to

22  provide reliable estimates?

23          A.   (Audio interruption.)

24          THE REPORTER:  I'm sorry, Dr. Spencer.

25  I can't hear you.

```
 1          A.    (Audio interruption.)

 2                Am --

 3                THE REPORTER:  There you are.

 4          A.    -- I still --

 5  BY MR. BOYNTON:

 6          Q.    Okay.  We just got you back.

 7          A.    Okay.  Sorry.  I'm not sure.

 8                The number of precincts is relevant, but

 9  not by itself, only as it interacts with the CVAP of

10  the particular precincts themselves.  15 could be

11  enough, but it's not necessarily too few or too

12  many.

13          Q.    How many precincts were included in

14  Modified Illustrative Plan District 1?

15          A.    I don't remember off the top of my head,

16  but I could look if you -- if it's important.

17          Q.    Well, tell me what you remember first.

18  Is it more than 30 precincts?

19          A.    I remember it being in the range of 15

20  to 20 perhaps.

21          Q.    And was the number of precincts in

22  Modified Illustrative Plan District 2 the same

23  number of precincts, smaller or larger?

24          A.    Smaller or larger than what?

25          Q.    The number of precincts in District 1.
```

1         A.    Oh.  I don't remember that.  They're

2    pretty close.  They're both 12, 15, 20, something

3    like that.

4         Q.    What do you remember about the -- the

5    voting behaviors precinct to precinct (audio

6    interruption) -- of the Modified Illustrative

7    Plan --

8              THE REPORTER:  I'm sorry, Chris.  I

9    missed the middle of your question.

10   BY MR. BOYNTON:

11        Q.    What do you remember about the voting

12   behavior of the various precincts that you included

13   in Modified Illustrative Plan 1 analysis?

14              MS. GREENWOOD:  Objection.  Do you mean

15   Modified Illustrative Plan District 1?

16              MR. BOYNTON:  Yes.  Thank you.

17        A.    I'm not -- I -- I'm not sure I have any

18   particular recollection.  Sorry.

19   BY MR. BOYNTON:

20        Q.    Okay.  I mean do you recall if there are

21   any majority-Hispanic precincts in District 1 of the

22   Modified Illustrative Plan?

23        A.    I don't -- I don't have that information

24   directly in front of me, and I don't recall,

25   unfortunately.

24

```
 1          Q.    Do you recall anything about the
 2     demographics of District 1's precincts?
 3          A.    Not of the individual precincts off the
 4     top of my head, no.
 5          Q.    Okay.  So do you know if the information
 6     upon which Mr. Fairfax drew his map was based on
 7     actual Virginia Beach precincts or not?
 8          A.    When I first received the maps I -- I
 9     created my own underlying census blocks and
10     precincts, and when I aggregated them into the
11     districts the first thing I did was compare the
12     total number of majority-minority population -- or
13     excuse me -- the minority population to confirm that
14     I -- my reading of the data was the same as
15     Mr. Fairfax's.  And I was able to confirm that, that
16     the population was 50.3 or 51 percent or something.
17     When those numbers aligned then I did my own
18     analysis of voting totals.
19          Q.    Did you do any analysis of Asian voting
20     behavior in any of the six districts that are
21     contained in the three plans you analyzed?
22          A.    Not -- not independently, or not -- not
23     that's included in the report, no.
24          Q.    Did you do any analysis of Hispanic or
25     Latino voting behavior in the six districts that are
```

1    contained within the modified plans?

2         A.    Not that's presented.  What's presented

3    in the tables on page 6 are kind of a racially

4    polarized voting analog to the analysis in the

5    report, my report number one, for all minority

6    voters.

7         Q.    In your opinion, does any version of the

8    three plans for District 1 or District 2 have

9    sufficient precincts for ecological inference to

10   generate reliable estimates of group voting

11   preference?

12        A.    I would say that I'm less su -- I'm not

13   confident (audio interruption) of an ecological

14   inference estimate for District 1 --

15             THE REPORTER:  I'm sorry --

16        A.    -- so --

17             THE REPORTER:  -- Dr. Spencer.  You

18   broke up.

19             THE DEPONENT:  Okay.  Can you hear me

20   now?

21             THE REPORTER:  Can you -- I can.

22        A.    I'm -- I'm less confident of an

23   ecological inference of voting patterns in District

24   1 because there's far less dispersion between the

25   different precincts, which is shown in the tables on

1    page 6 of the supplemental report, than I would be

2    of ecological inference estimates in District 2

3    where the dispersion of CVAP among the precincts is

4    much larger.

5    BY MR. BOYNTON:

6          Q.    Can you tell me what in your mind is the

7    difference between a coalition district and a

8    crossover district?

9          A.    So a coalition district in my mind is a

10   -- is a district that is comprised of a majority of

11   a minority population.  A crossover district is a --

12   a definition that would include white voters who

13   have shown a -- a preference for or a voting pattern

14   in favor of the minority candidate of choice, its --

15   to some degree.

16         Q.    So what have you done to determine

17   whether the map -- the -- the three modified maps

18   you -- or plans you reviewed had coalition voting

19   rather than crossover voting?

20         A.    So the purpose of generating these

21   estimates was simply to say in these two districts

22   were minority candidates of choice who lost their

23   election under the current election rules able to

24   secure a better outcome in these districts, period.

25         Q.    All right.  (Audio interruption) your

```
 1    analysis of crossover district -- or crossover
 2    voting versus --
 3                 THE REPORTER:  Chris.  Chris.
 4    BY MR. BOYNTON:
 5          Q.     -- coalition voting?
 6                 THE REPORTER:  Chris, i didn't hear the
 7    first part of your question.
 8    BY MR. BOYNTON:
 9          Q.     Does that mean then that you did not do
10    an analysis of whether the performance of these
11    plans is related to crossover voting versus
12    coalition voting?
13          A.     The purpose of the maps was just to show
14    whether the candidates would have fared better in
15    these districts regardless of the mechanism.
16          Q.     So that was not part of the analysis,
17    correct?
18          A.     That's correct.
19          Q.     Give me a moment.
20                 Looking at your District 1 performance
21    on page 4 of your supplemental report you have
22    chosen nine representative races, correct?
23          A.     I count seven.
24          Q.     Well, tell me how you count seven
25    races -- no, I'm sorry -- nine candidates of choice?
```

1      A.    That is correct, yes.  Nine candidates

2  of choice in seven races.

3      Q.    How did you select those seven races and

4  nine candidates?

5      A.    So from the original report, my first

6  report, where I identified minority candidates of

7  choice and noted which candidates had won and lost

8  in every race, I selected the races where a minority

9  candidate of choice had lost their election.  Some

10  of those cases included a minority candidate of

11  choice who also won, for example in the 2018

12  at-large election where the minority candidate of

13  choice White lost, which is why I included that

14  race.  But because I included that race that also

15  includes Mr. Rouse, who won.  The seven elections

16  were selected because they featured a candidate of

17  choice in the minority community who had lost their

18  election under the current election rules since

19  2008.

20      Q.    But is there any academic or research

21  support for selecting only candidates who lost to

22  determine districts' performances?

23      A.    My interpretation of what the court

24  requires in Gingles is that at the outset some

25  showing of an illustrative plan where candidates who

 1   lost would be able to perform better and win their

 2   elections drove my decision to focus my analysis on

 3   those particular candidates.

 4        Q.   Did you perform any analysis of which of

 5   these candidates actually list -- lived in the -- in

 6   District 1 as drawn in the three plans?

 7        A.   I did not.

 8        Q.   Isn't that relevant to whether they can

 9   even run in those districts?

10        A.   It would be -- if these were the plans

11   that were ultimately adopted, that would be a

12   relevant criteria.  Yes.

13        Q.   Do you know, sitting here today, if any

14   of the seven candidates who lost or even the two who

15   won (audio interruption) in District 1 at any point

16   in time in the last 12 years?

17        A.   Sorry.  I didn't capture the -- the very

18   middle of that question.  Can you repeat?

19        Q.   Sure.  Of the -- the seven races and

20   nine candidates of choice that you've selected to

21   look at on page 4 for your District 1 performance

22   analysis do you know if any of them lived in

23   District 1 as drawn under the three maps?

24        A.   I don't know.

25        Q.   Does your selection of these nine

30

```
1    candidates of choice have any bearing upon what you
2    considered to be probative races in your prior
3    analysis?
4         A.    No.  I considered these seven races
5    merely to be probative of the question of -- of
6    performance of these districts.
7         Q.    So they are a subset of the -- the --
8    the races you previously defined as probative?
9         A.    That is correct.
10         Q.    And -- and you have omitted from prior
11    probative races the 2012 Ross-Hammond election,
12    correct?
13         A.    I can't remember.  If -- if you'll give
14    me a moment to review my first report, I can confirm
15    that.
16         Q.    Certainly, but I was actually
17    referencing back to your second report because I
18    think we -- we went from approximately 17 or 19 down
19    to approximately 13, taking out the three Furman
20    races, as I recall, and maybe one other.  Does that
21    sound correct?
22              MS. GREENWOOD:  Objection.
23         A.    Right.  I don't believe that it was
24    Ross-Hammond, though.  I believe it may have been
25    the race between Jackson and Flores in 2008.
```

1    BY MR. BOYNTON:

2         Q.    But -- agreed, but, to be clear, what

3    I'm trying to go from is what races you defined as

4    probative in your rebuttal report and worked to

5    here.  I'm not trying to retrace the first results.

6    I'm trying to go from October 1st to today.

7         A.    Okay.

8         Q.    So I -- I want you to start with the 13

9    races that were probative in -- in your -- your

10   rebuttal report, Exhibit 2, and tell me why you

11   omitted the ones you omitted in this report.

12        A.    Got it.

13              MS. GREENWOOD:  Objection to the extent

14   that -- yeah.  Actually, objection.

15   BY MR. BOYNTON:

16        Q.    You can answer.

17        A.    So if I look at my rebuttal report in

18   Appendix B on page 15 where I list -- where I begin

19   listing -- no.  Excuse me.  That's only an update.

20              It would take me a moment, so let me

21   explain my general logic.  And if that's not

22   sufficient, I'm happy to go through the reports.

23              Of the 13 probative races that I

24   identified in the rebuttal report I then identified

25   seven races where a minority candidate of choice

32

```
1    lost their election.  There were some races where a
2    minority candidate of choice won their election
3    without there being a second minority candidate of
4    choice who lost.  Those were the cases that -- the
5    races that were omitted from this particular
6    analysis of the supplemental report.
7         Q.    Okay.  I think maybe your 13 races are
8    found at page 8 of Exhibit 2.
9         A.    Yep, that's correct.  Thank you.
10        Q.    Okay.  So which of the -- of the
11   candidates that you identified as probative in your
12   rebuttal report did you eliminate consideration of
13   in your supplemental report?
14        A.    Got it.  So I do eliminate the
15   Ross-Hammond race in 2012 because Ms. Ross-Hammond
16   won that election in the Kempsville district in
17   2012.
18        Q.    Okay.
19        A.    And I eliminate the 2008 Kempsville race
20   because there was not evidence of all-minority
21   cohesion between Mr. Andrew Jackson and Mr. José
22   Flores, who ran against each other, both of whom
23   lost their election that -- in that year.
24             I -- I exclude Barbara Henley from the
25   Princess Anne district in 2014, a white candidate
```

1    who was the minority candidate of choice, because

2    she won her election.

3              And I include the Bellitto race even

4    though, according to this table, at the time --

5    excuse me.  I include the Bellitto race in 2010

6    because there was a candidate of choice in that

7    race, Mr. Jackson, and Mr. Cabiness in fact, who did

8    not win the election even though Bellitto won the

9    election.

10        Q.    So the fourth one you omitted is -- is

11   Wooten 2018?  Does that sound correct?

12        A.    Yes, that's correct.

13        Q.    Your reasons for omitting her are?

14        A.    That she won her election.

15        Q.    Okay.  So I'm not still understanding

16   your answer on how this analysis addresses cohesion.

17   I understand how you say it addresses Gingles 3,

18   i.e., the -- the -- the possible white bloc voting

19   to overcome a candidate, but where -- where in -- in

20   your analysis do you actually address cohesion

21   between and among the three minorities that you say

22   are cohesive in these races from prior testimony?

23        A.    The analysis is simply that in race --

24   in districts where the population of minority

25   candidates exceeds 50 percent -- candidates who are

1    preferred by the all-minority communities were

2    performing better in these districts.  That's the

3    extent of the analysis, so...

4         Q.   So you -- you did no granular research

5    on Asian voting in these precincts -- or in these

6    districts for purposes of this anal -- this report?

7         A.   That is correct.  That -- that kind of

8    analysis does not appear in my supplemental report.

9         Q.   Now, you referenced use of ACS data in

10   some capacity.  Can you explain that to me, please?

11        A.   Yes.  So the demographic information of

12   these precincts is based on census blocks which are

13   published by the American Community Survey and the

14   data that were used to build up these maps from the

15   five-year ACS sample that runs between 2014 and

16   2018.

17        Q.   What -- what is the difference between

18   the ACS and the census, in your understanding?

19        A.   Well, the ACS is a product of the

20   census.  The word "census" is sometimes used

21   interchangeably with the long-form decennial census

22   report.  ACS represents one percent of the

23   population and is administered each year and has

24   more questions than the census that people think

25   about every ten years.

```
 1          Q.    How accurate is the ACS as compared to
 2    the decennial census?
 3          A.    It depends on the questions that are
 4    asked in the ACS.  It's a representative sample.  So
 5    there are -- it's -- because it's not a total
 6    population measure there are standard errors to
 7    compensate for any uncertainty in the questions.
 8          Q.    Can you rely on ACS data to conduct your
 9    analysis, in your opinion?
10          A.    In my opinion, yes.
11          Q.    Is -- is -- once a census is available
12    is that a more reliable dataset for determining
13    district performance?
14                MS. GREENWOOD:  Objection.
15          A.    I -- I think the answer is somewhat
16    nuanced.  So the census -- and I'll provide the best
17    answer that I can and -- and -- and you can follow
18    up if it's not sufficient.
19                The census is conducted once every ten
20    years.  So I think in the very first year that the
21    census data is made available it's more accurate
22    than the American Community Survey.  But within a
23    year or two that census data is already outdated,
24    and then I believe the ACS data provides a better
25    snapshot of where we are in terms of the questions
```

1    that are being asked and are relevant.

2    BY MR. BOYNTON:

3         Q.    You rely on ACS data at least in part

4    for your analysis as to the behavior of minority

5    voter populations in this case, correct?

6         A.    Yes, I -- that is correct.

7         Q.    Okay.  Okay.  Do you recall what the ACS

8    says as to Hispanic and Latino being a separate race

9    category or not?

10        A.    My understanding is that on the -- the

11   -- the questionnaire for the ACS respondents are

12   asked their race and Hispanic/Latino is a separate

13   question.

14        Q.    Okay.  And is Asian a single race

15   category on the ACS?

16        A.    I'm not 100 percent certain.  My

17   understanding is that it -- it is a

18   single-check-boxed question with the opportunity to

19   specify a more granular place of origin for your

20   family if you choose.

21        Q.    Okay.  Well, let's look at the actual

22   census form from 2010 to compare.  It's Exhibit 14.

23   I'll give you a moment to get to it.  I know you're

24   looking at it online.

25        A.    I think from the attachment that you

1   sent to me it may be page 121.  Does that sound

2   about right, or maybe --

3        Q.   It's toward the end of the last batch of

4   attachments.  It's Exhibit 14, which is, you know,

5   almost the end.  I -- I actually have a version

6   myself that I'm working from so I don't know about

7   that number, but it says Census 2010.  It's the

8   first page of Exhibit 14.

9        A.   Yeah.  I'm almost there.

10       Q.   And please take your time.  I'm not

11  trying to rush you through it.

12       A.   Okay.  I see that first 2010

13  questionnaire.

14       Q.   Okay.  So at least as to the census in

15  2010 question 8 seems to be how the census was

16  getting at the Spanish, Latino or Hispanic origin,

17  correct?

18            MS. GREENWOOD:  Objection.

19       A.   Excuse me.  Question 8 is -- it looks

20  like it asks if the member of the household is of

21  Hispanic, Latino, Spanish origin, yes.

22  BY MR. BOYNTON:

23       Q.   Okay.  And look at the note right above

24  that.  What does the note say for this particular

25  census?

1      A.    So it asks respondents to answer both

2   the question about Hispanic origin and the following

3   question about the person's race.  It then says,

4   "For this census, Hispanic origins are not races."

5      Q.    Okay.  So at least for the 2010 census

6   Hispanic origin was not deemed a race, from the form

7   at least?

8      A.    The form includes that statement, "For

9   this census, Hispanic origins are not races," not

10  part of question 9.

11     Q.    Now, how many different Hispanic, Latino

12  or Spanish origins do they list under question 8?

13     A.    Well, by my count you can check a -- a

14  box one of four options; Mexican, Mexican American,

15  Chicano, Puerto Rican, Cuban, and then there's also

16  some examples given if somebody would like to

17  identify something else.  So Argentinian, Colombian,

18  Dominican, Nicaraguan, Salvadorian, Spaniard, and so

19  on.  So of the -- the -- the Hispanic origins that

20  are listed -- one, two, three, four, five six,

21  seven, eight, nine -- I count 11.

22     Q.    Did -- did any of your cohesion analysis

23  in this case drill down on any of those 11 different

24  origin groups?

25     A.    No, it did not.

1    Q.    Okay.  Is there a reason why that your

2    cohesion analysis did not address any of these

3    specific Hispanic or Latino origin groups?

4    A.    There were a few reasons, I suppose.

5    One is that the purpose of this report was to

6    provide an analysis of whether the minority

7    candidate of choice performed according to all

8    minority voters.  And the conventional approach to

9    determining minority populations is to look at major

10   racial categories, and in this case it's black,

11   Hispanic and Asians.

12   Q.    Do you have any knowledge independent of

13   quantitative data analysis of Hispanic or Latino

14   voting behavior or trends in Virginia Beach?

15   A.    Aside -- in general, I would say I'm not

16   -- I'm not so sure.  I do recall, and I would have

17   to look back in my findings, some evidence that

18   there was some campaigning done re -- related to a

19   Hispanic candidate that dealt with some

20   subcategories.  At some point along the way I

21   remember seeing an advertisement, but I don't recall

22   off the top of my head.

23   Q.    But at least one race that you looked at

24   involving a Hispanic candidate, Flores, and a black

25   candidate, I believe Jackson, you determined was not

1  a cohesive race, correct?

2       A.    That is correct.

3       Q.    Okay.  Now, turning to designation of --

4  of Asian origin, would -- would you look at question

5  9, please?

6       A.    Of the 2010 census?

7       Q.    Yes.  Same page, just the next question.

8       A.    Okay.

9            MS. GREENWOOD:  Objection.  Can you

10  identify for the record which exhibit?  Is this

11  Exhibit 14?

12            MR. BOYNTON:  Yes.  Sorry for that.

13       A.    I see the question.

14  BY MR. BOYNTON:

15       Q.    Okay.  Is there a single box to -- to

16  check if you're Asian on the 2010 census?

17       A.    There is not.

18       Q.    Okay.  How many different Asian origin

19  groups are listed under question 9?

20       A.    Well, like before, there are

21  possibilities for people to add and -- and so on, or

22  et cetera, so -- but at least according to check

23  boxes it looks like 13.

24       Q.    Now, did you make any analysis of -- of

25  voter cohesion in Virginia Beach among those 13

1    different Asian origins?

2         A.    No, I did not.

3         Q.    Do you have any independent knowledge

4    separate and apart from statistical analysis that

5    you performed in prior reports of -- of voting

6    behaviors of these different Asian-origin subsets?

7         A.    With respect to Virginia Beach you mean?

8         Q.    Specific to Virginia Beach.

9         A.    I do not specifically -- it's -- the

10   kind of systematic vote differences in Virginia

11   Beach in this time period, I do not have knowledge

12   of that.

13        Q.    Okay.  Turning your attention to then

14   Exhibit 15, which is the 2020 census form -- take a

15   moment to get there.

16        A.    Okay.  I see it.

17        Q.    I believe the questions that we're going

18   to look at are on page 2.

19        A.    I see that.  Yes.

20        Q.    Question 8 I'd focus your attention on

21   on page 2 of Exhibit 15.

22        A.    I see it.

23        Q.    How does the 2020 census address

24   Hispanic origin?

25        A.    It looks very similar, if not exact, to

1    the 2010 census.

2         Q.    Is -- is that the case with how the 2020

3    census treats Asian origin as well?

4         A.    It looks very similar.  I -- it does --

5    it does not look exactly the same, just based on my

6    memory, but it looks very similar.

7         Q.    Okay.  Under the opportunity to mark a

8    person's race as white it lists examples in question

9    9, correct?

10        A.    That is correct.

11        Q.    And -- and one of those examples is

12   Egyptian, correct?

13        A.    That is correct.

14        Q.    Do you, sitting here today as an expert

15   in this case, have any understanding for why

16   Egyptian, which is a country in Africa, is listed as

17   white versus being of African American origin?

18        A.    Well, I -- besides the fact it's listed

19   as one possible example and not inclusive of white,

20   I -- I do not.

21        Q.    Do you -- do you have any other insight

22   or knowledge of how the census developed its

23   categories for -- for national decennial census

24   purposes?

25        A.    I don't have information about their

1    decisions on those subcategories, no.

2         Q.    Now, going -- making sure I've -- I've

3    gotten your answer correct -- I know you -- we

4    talked about the subgroups of -- of Asian American

5    voters and of Hispanic American voters.  Is it your

6    testimony also that you do not have specific factual

7    knowledge of Hispanic voting behavior in Virginia

8    Beach generally other than your statistical

9    analysis?

10        A.    I would say that as a general matter

11   that is correct.

12        Q.    And the same thing with general Asian

13   American voting trends in Virginia Beach?  You don't

14   have personal knowledge other than statistically set

15   forth in your prior reports?

16        A.    That -- generally speaking, that is

17   correct.

18        Q.    Are there any exceptions that you have

19   in mind?

20        A.    I think there may be an exception to

21   this.  I looked through my records.  I recall seeing

22   an advertisement that -- maybe about a Filipino

23   candidate in Virginia Beach, perhaps before 2008, if

24   I recall correctly.  There is something in -- in

25   that realm that comes to mind, but systematically in

1   terms of the voting preferences of these subgroups

2   of Hispanic and Asian communities systematically

3   over this decade I don't have a -- a -- a deep

4   understanding.

5        Q.    Do you recall if the -- the Filipino

6   candidate you recall from 2008 ran as a more

7   conservative, more liberal or more moderate

8   candidate?

9        A.    I don't recall anything about the

10  content of the message.  It's just that that ad is

11  in my mind somewhere.

12       Q.    Okay.  Now, when -- it's possible for

13  people to check more than one box, correct?

14            MS. GREENWOOD:  Objection.  I'm sorry.

15  Are we talking about --

16            MR. BOYNTON:  Oh, yeah.  Okay.  I -- I

17  can rephrase.  That's fine.

18  BY MR. BOYNTON:

19       Q.    It -- it -- certainly, you know, on the

20  ACS and on the census a -- a person might identify

21  as more than one ethnic group, correct?

22            MS. GREENWOOD:  Objection.

23       A.    I -- so I -- like, according to the

24  instructions for question number 8 and 9,

25  respondents are supposed to answer questions 8 and

9.   And I see that the question to number 9 says you

may mark one or more boxes and print origins.

BY MR. BOYNTON:

     Q.    So my -- my question is specific to your

analysis in this case.  How did you treat people who

identified with multiple group -- multiple ethnic or

racial groups?

     A.    So two -- one clarification and then one

direct response.

          As a point of clarification, I wasn't

relying on these decennial census questions, but I

was relying on the American Community Survey

questions, which I do believe are different than

these long-form census questions.  But to that

degree there are still respondents in the American

Community Survey who appear as more than one race.

And my analysis of the racial breakdown in -- for my

reports are non-Hispanic white, non-Hispanic black,

Hispanic or -- or Latin or Spanish origin, and then

all Asian.  Now, those are categories provided by

the census itself that aggregates these

subcategories into an Asian category itself, so I

have not done that aggregation myself and decided

whether Filipino or Samoan counts as Asian.  I've

relied on the census's own categorization for those

1    determinations.

2         Q.    So if a person was identifying as both

3    white and one of the three minority groups, what --

4    what column did they fall in?  Were they minority or

5    not minority?

6         A.    If the -- the respondent was -- had

7    checked white and Hispanic, then they would appear

8    as in the Hispanic category.  If they were to check

9    the box white and something else, then they were

10   excluded from the analysis because I relied only on

11   people who chose one race, unless it was Hispanic,

12   because that's a separate question.

13        Q.    And all of the data you looked at was

14   ACS data not census data, or did you also look at

15   2010 census data?

16        A.    I need to confirm in my records whether

17   for the 2010 race I relied on the 2010 long-form

18   census, but for every other race I relied on the

19   American Community Survey.

20        Q.    Now, tell me the -- the mathematical

21   process -- and -- and -- and we're still on page 4

22   of your supplemental report, Exhibit 10.  The -- the

23   -- just tell me the mathematical process that

24   generated each of the numbers in that very first

25   row, 2018 Rouse.

```
 1        A.    Got it.

 2        Q.    What does that at-large number

 3   represent?

 4        A.    So the at-large number represents the

 5   proportion of ballots that Mr. Rouse actually

 6   received in the 2018 at-large race.  The Modified

 7   Illustrative Plan and the Modified Alternative Plans

 8   number 1 and 2 reflect the proportion of votes that

 9   Mr. Rouse would have earned if he had been running

10   in those districts at that time hypothetically.

11        Q.    And to generate that very first Modified

12   Illustrative Plan 61.1 did -- how did you do that?

13   How did you calculate 61.1?

14        A.    I have vote totals that are generated by

15   Virginia Beach elections division by precinct.  And

16   I overlay the precinct vote totals onto these

17   illustrative maps.  And then I use a function that

18   is a geographic -- it's called Spatial join.  And it

19   categorizes -- it aggregates up all of the vote

20   totals in a precinct if it's completely inside of

21   the district, and if it straddles the district line

22   then the mapping software apportions the number of

23   votes to the district based on the percentage of

24   geography that's actually within that district.  And

25   I aggregate those numbers to find Mr. Rouse's
```

48

```
 1   support.
 2        Q.    So there is some possibility that your
 3   analysis includes (audio interruption) --
 4        A.    Sorry.  I heard you say there's some
 5   possibility my analysis includes, and then I lost
 6   the last part.  Sorry.
 7        Q.    Splitting precincts.
 8        A.    Splitting precincts.  Yes.
 9        Q.    Okay.  So did you make an adjustment
10   somehow based on ACS data '14 through '18 cycle to
11   change that number to 61.1?
12             MS. GREENWOOD:  Objection.
13        A.    No, I did not.  That number is based on
14   the precinct vote totals.
15   BY MR. BOYNTON:
16        Q.    So tell me how ACS data factored into
17   your analysis of the performance of the various
18   districts.
19        A.    So the ACS analysis appears in the --
20   the figures on page 6 of the report.
21        Q.    And if -- describe for me what those
22   boxes represent.
23        A.    So these boxes are an aggregation of
24   individual analyses of racially polarized voting for
25   each candidate in each district in each race.
```

49

```
 1                So if we just look, for example, at the
 2      top left panel, which is Georgia Allen from 2008 in
 3      District 1, on the X axis horizontally left to right
 4      is the percentage of non-white CVAP.  This is
 5      analogous to the -- the figures that I presented in
 6      my original report.  And the Y axis, which is
 7      vertical, shows the proportion of votes.
 8                So what this shows -- and the X axis is
 9      built using the American Community Survey data 2014
10      to 2018 for this race, for -- for these maps.  This
11      shows that Ms. Allen would earn approximately, you
12      know, somewhere close to 50 percent -- 45-50
13      percent, if you zoomed in, in all of the precincts.
14      And you can also see from the CVAP data that all of
15      the precincts in District 1 have a CVAP that's
16      pretty close to .5.
17                Then -- then the boxes are shaded if the
18      candidate would have won the election, meaning they
19      would have earned enough votes to defeat all of the
20      other people running against them during that race
21      in each of these districts throughout.
22          Q.   So if it's a shaded box it's a win, if
23      it's not shaded it's a loss?
24          A.    In -- yes, correct, in this
25      counterfactual analysis of the illustrative
```

50

```
1    districts.
2         Q.    And you're running as -- regardless of
3    residence, clearly on losing -- a minority -- or
4    minority candidates of choice who lost the race?
5         A.    That is correct.
6         Q.    And so when you write up top in your
7    findings, "In the panel of figures below, I plot
8    voter support for each of the minority candidates of
9    choice that lost between 2008-2018..." you are not
10   making a statement about what races you deemed
11   probative for your earlier analysis?
12        A.    That's correct.
13        Q.    Okay.  Do you agree with the following
14   statement:  Hispanic and Asian voting patterns track
15   black voting patterns in Virginia Beach?
16        A.    Sorry.  Repeat one more time.
17        Q.    Do you agree with this statement:
18   Hispanic and Asian voting patterns track black
19   voting patterns in Virginia Beach?
20        A.    As a general matter over the course of
21   the -- the years that I studied, yes, I think that's
22   -- that's my opinion.
23        Q.    And -- and what particular analyses
24   informed that opinion?
25        A.    So much of that analysis was provided in
```

```
 1    the initial report and clarified in the second
 2    report.  I guess I -- that -- that's where the --
 3    the vast majority of the analysis for that opinion
 4    is -- comes from.
 5         Q.    My understanding of your prior testimony
 6    was it was not possible to tell under the
 7    traditional metrics of homogenous precincts
 8    ecological regression or ecological inference voting
 9    behaviors of Asians or Hispanics in Virginia Beach.
10    Is that still the case?
11              MS. GREENWOOD:  Objection to the extent
12    that you're asking questions you've asked before and
13    you are only asking questions about prior reports.
14              MR. BOYNTON:  I'm asking him if he's
15    changed his opinion.
16         A.    The opinion with respect to one specific
17    point estimate for an individual candidate and their
18    support from an Asian community -- I have not
19    provided that to the court.  And in fact part of
20    this supplemental report was to explain why that was
21    not a -- a reliable enterprise.
22              Systematically over the course of the
23    entire period that I studied I see high levels of
24    cohesion among all of these groups together,
25    including when we separate out the black community
```

1    and other communities as well and compare them.  And

2    importantly as a group -- as a coalition the

3    preference -- the preferences that that coalition

4    shares in the 13 races that I identified in my

5    supplemental report, eight of those candidates who

6    were preferred by that coalition have been defeated

7    due to white bloc voting.  And so that's the --

8    BY MR. BOYNTON:

9         Q.   How do you know they shared that

10   candidate's opinion -- or this preference?  If you

11   don't know who Asians preferred specifically, how do

12   you know they preferred any specific candidate?

13             MS. GREENWOOD:  Objection, asked and

14   answered.  Go ahead.

15        A.   I would say that in the same way that I

16   have not provided any point estimate for any

17   individual African American voter in their

18   preference for a particular candidate, but I have

19   made a -- a showing about the African American

20   community in general that is, I think, persuasive

21   and meets the standard of -- of evidence in Section

22   2 cases.

23             The same can be said of these coalition

24   groups where in some cases I don't have a specific

25   independent reliable estimate of the Asian

53

```
 1   preference, but as a group -- we see that as a group
 2   systemically over time the minority-preferred
 3   candidates are losing their elections.
 4   BY MR. BOYNTON:
 5        Q.    To a reasonable degree of scientific
 6   certainty can you determine Asian voter behavior in
 7   Virginia Beach?
 8             MS. GREENWOOD:  Objection.
 9        A.    State the question one more time while I
10   think about the -- the terms that were used.  Sorry.
11   BY MR. BOYNTON:
12        Q.    To a reasonable degree of scientific
13   certainty can you calculate the voting behavior of
14   Asian voters in Virginia Beach?
15             MS. GREENWOOD:  Objection.
16        A.    Not -- given the dispersion of the Asian
17   community, which we discussed before, the metrics
18   that we have are -- at least as was shown in the
19   supplemental report are not particularly reliable.
20   No.
21   BY MR. BOYNTON:
22        Q.    And that's the case for the Hispanic
23   community as well, correct?
24             MS. GREENWOOD:  Objection.
25        A.    Yeah, with the same kind of caveats to
```

1    their dispersion in the community.

2              These particular metrics -- I mean

3    you're asking if there's any way to determine the

4    Asian and Hispanic preferences.  And -- and given --

5    I'm not trying to be coy.  I'm just trying to be

6    clear.

7              To the extent that it's possible, I

8    would say if I went and asked every single one of

9    them door to door, then I would have reliable

10   scientific certainty of their preferences.  But

11   given aggregate statistical information about the

12   groups and their dispersion among the precincts,

13   then reliable estimates are not always possible.

14   Sometimes yes, but not always.  The confidence

15   intervals can become quite large.

16   BY MR. BOYNTON:

17        Q.   Well, then, generally speaking, they're

18   not possible in Virginia Beach, correct?

19              MS. GREENWOOD:  Objection, asked and

20   answered.

21        A.   Generally speaking, that is correct.

22   BY MR. BOYNTON:

23        Q.   Can you tell me, based on your

24   expertise, is a white Democrat more or less likely

25   than a Republican to vote for a minority candidate

1    of choice in Virginia Beach?

2              MS. GREENWOOD:  Objection.  Can I just

3    jump in again?  We're moving right out -- away from

4    the supplemental report here.  I'm not sure how many

5    of these questions you have.  I've sort of let it go

6    on a little bit because you said you were updating

7    to see whether he had --

8              MR. BOYNTON:  I don't have a lot.

9              MS. GREENWOOD:  Yeah.  Thanks.

10       A.    So many of these races are run without a

11   -- a particular partisan affiliation for the

12   candidates, so I don't have a -- a strong opinion

13   about your question whether white Democrats would

14   perform better than a white Republican or -- or --

15   or those combinations, no.

16   BY MR. BOYNTON:

17       Q.    Are you aware of any changes in the

18   census for 2020 as compared to 2010 as to how they

19   count members-of-the-military residents?

20              MS. GREENWOOD:  Objection.

21       A.    No.  I -- I can't recall.  No.

22              MR. BOYNTON:  Why don't we go ahead and

23   take about a five-minute break.  We've been going

24   for a while.  Is that fair?  We all just stay on the

25   line and kind of come back so we don't have to set

1    this up again.  Does that work for everybody?

2              MS. GREENWOOD:  Yeah.  I guess we might

3    mute and turn our videos off until we're ready to

4    come back.  Shall we come back at --

5              MR. BOYNTON:  Yeah.

6              MS. GREENWOOD:  -- five minutes?  Okay.

7              THE DEPONENT:  Five minutes all right?

8    My clock says 12:25 or 12:23.  12:30, does that

9    sound about right?

10             MR. BOYNTON:  12:30 is perfect.  Thank

11   you, Doug.

12             (Recess)

13   BY MR. BOYNTON:

14        Q.   A couple -- I'm back on the record, if

15   everybody's ready.

16        A.   I'm ready.

17        Q.   Okay.  A couple of cleanup questions

18   that go back to the things we've touched upon.

19             I -- I made mention of that the fact

20   that the 2020 census is changing how it counts the

21   military members.  Did you in your analysises --

22   your analyses thus far make any analysis or -- or

23   effort to determine the impact on changes in

24   military residency under the census, how that would

25   affect these districts?

1      A.    I -- the short answer is not, but I'd

2    like to just add that I'm not sure how the ACS deals

3    with the question about residence of military

4    personnel.  And -- and -- and so with that caveat I

5    would say no, I did not.

6      Q.    And you have not done anything based

7    upon any expectation of what the 2020 census will

8    provide?

9      A.    That's correct.  I have not anticipated

10   the 2020 census.

11     Q.    You told me that -- when we were talking

12   about 15 precincts may or not be too few to generate

13   good ecological inference estimates that it was tied

14   to CVAP in -- in that -- those areas, that district,

15   I suppose.  What did you mean by that?  How -- how

16   -- what level of CVAP and what type of CVAP are we

17   talking about that makes fewer than 15 precincts

18   reliable?

19           MS. GREENWOOD:  Objection to the extent

20   you mischaracterized.

21           MR. BOYNTON:  Okay.  Well, I'm -- I'm

22   happy to have him characterize for me --

23           MS. GREENWOOD:  Right.

24           MR. BOYNTON:  -- if that would be

25   better.

```
 1              MS. GREENWOOD:  He can answer that
 2   question then.  Sure.
 3        A.    So in -- in -- as brief as possible, if
 4   you look at page 6 of my supplemental report, which
 5   is Exhibit 2, if you're looking at...
 6   BY MR. BOYNTON:
 7        Q.    (Indicating.)
 8        A.    You can see, as I pointed out before, in
 9   District 1, if we focus again on the top left panel
10   of Ms. Allen in 2008, that the dispersion, meaning
11   the percentage of C -- of minority CVAP in each
12   precinct, doesn't vary greatly.  So if -- ev -- if
13   -- if this were the pattern of CVAP distribution
14   among precincts, even with a hundred precincts the
15   estimates may not be particularly reliable.
16              If you look at District 2, Ms. Allen,
17   where there's more dispersion, meaning there are
18   some precincts that are 25 percent minority CVAP and
19   some that are close to 75 percent, there's more
20   dispersion, which then allows us to make more
21   reliable estimates about the minority voting
22   preferences.  And the fur -- in general, the more
23   dispersed the CVAP is the fewer the precincts you
24   might need to get a reliable estimate, and the more
25   contracted they are the more precincts you would
```

1    need to get, but there's no mathematical cutoff at

2    15 or at 25 if CVAP is at .75.  It's a -- it's an

3    interaction between those two inputs.

4         Q.    It's really the variability in the CVAP

5    that allows you to use fewer precincts?

6         A.    I think as a general matter I would

7    agree with that statement, yes.

8         Q.    And in this case we're talking about min

9    -- all-minority voter CVAP?

10        A.    That is correct.

11        Q.    And then for purposes of the

12   supplemental expert report you used only ACS data

13   series 2014 to 2018?

14        A.    That is correct, yes.

15        Q.    For your earlier reports you used ACS

16   series 2013 to 2017?

17        A.    Yes.

18        Q.    Okay.  On pages 7 and -- well, 7 through

19   15 it looks like of your supplemental report you

20   depict various elections of -- of candidates both

21   who prevailed and lost under District 1 and District

22   2.  What -- what was your process in -- in the --

23   making that calculation?

24        A.    So these figures illustrate the relevant

25   takeaway from the tables on pages 4 and 5 of the

1   supplemental report, but instead of reporting in

2   these bar charts the vote total that Mr. Rouse

3   earned -- for example, I don't report 61.1, if we're

4   back on line 1 of -- of -- of the table on page 4.

5   Instead I compare the margin of victory.  So the

6   difference between whatever the vote total was

7   between the candidate and the threshold they would

8   need to have won the election.  And then I plotted

9   those for each of the different districts and the

10  different versions of each district and compared

11  them to the actual election, which on pages 7 and 15

12  I denote with actual election, but on pages 4 and 5

13  I -- I refer to them as at-large instead of actual.

14  But those are the same things.

15       Q.   So is it a simple algebraic function

16  that you take the 61.1 percent that you projected

17  Aaron Rouse would have received in Modified

18  Illustrative Plan District 1 and subtracted off some

19  amount that -- in the margin of victory?

20            MS. GREENWOOD:  Objection to the extent

21  that 61.1 isn't a percent.  I believe Dr. Spencer

22  said it's a proportion.

23       A.   Yeah.  So just as a clarification,

24  because in this particular race the number of

25  ballots adds up to 200 percent because individuals

```
 1    cast two ballots, it's a proportion of votes, but
 2    you'll see in the 2018 at-large election that the
 3    second-highest vote total in the Modified
 4    Illustrative Plan was by Ms. -- by Oliver, which was
 5    40.6.  And so the -- the threshold in order to win
 6    that election, because two candidates were -- were
 7    winning, was 40.6.  Any vote total above that would
 8    have won.  So the margin of victory there is 61.1
 9    minus 40.6.  If you look at page 7, you'll see that
10    that first bar is at 20.1 or something like that,
11    20.3.
12    BY MR. BOYNTON:
13         Q.    So there has been no further adjustment
14    of the 61.1 or the 40.6, correct?
15         A.    That is correct.  It's just a
16    subtraction.
17         Q.    Okay.  And that's the case with all of
18    these charts pages 7 through 15, they -- they would
19    correlate to pages 4 and 5?
20         A.    Yes, with the clarification that in the
21    races that didn't feature more than one candidate
22    winning the margin of victory is determined by the
23    number of votes earned minus the -- the -- the
24    second-place runner, not the -- not the third-place
25    runner.
```

```
 1          Q.    Makes sense.
 2                So under the Modified Alternative Plans
 3     for -- for Ms. White in 2018 she would have still
 4     lost either way, correct, on page 8 --
 5          A.    Her --
 6          Q.    -- under any of the maps?
 7          A.    Her margin of victory was smaller, but
 8     because it's below the line that denotes that she
 9     still would have lost.
10          Q.    Okay.  And that is the case for District
11     1 across the board for Dr. Ross-Hammond in 2016,
12     correct?
13          A.    That is correct, yes.
14          Q.    And for Mr. Cabiness in 2014, he would
15     have lost under District 1 or District 2 (audio
16     interruption) any of the plans?
17                THE REPORTER:  I'm sorry, Chris.
18          A.    That --
19                THE REPORTER:  What was -- what was the
20     last part of your question?
21     BY MR. BOYNTON:
22          Q.    He would have lost under -- or District
23     1 or District 2 in any of the plans?
24                THE REPORTER:  Thank you.
25          A.    That is correct.
```

BY MR. BOYNTON:

    Q.    And on page 13, the second minority
candidate in the 2010 at-large election,
Mr. Jackson, would have lost under -- in his
District 1 plan?

    A.    In the District 1 plans all versions,
correct, he does not earn enough to win.

    Q.    Is shrinking the margin of defeat a
sufficient ju -- justification for invalidating an
at-large system and replacing it with a
single-member district, in your view?

    A.    Well, in the context of Section 2 of the
Voting Rights Act, and the requirements that the
Supreme Court lays out in Thornburg v. Gingles,
what's asked for is where there's evidence of white
bloc voting that is sufficient to usually defeat
minority candidates of choice a -- a remedy that's
been accepted by the courts, one of several possible
remedies, is to draw districts that would increase
the opportunity of minority communities to
participate in politics in a real and meaningful way
and to elect candidates of choice.

        So I interpret that instruction from the
court and subsequent lower-court opinions to both
motivate a -- a remedy that doesn't guarantee

64

```
 1    victories for minority communities but it allows

 2    them to meaningfully participate.

 3              So in my view, yes, if you lost by 30

 4    percent under the original -- the current at-large

 5    system, but under a districting system you would

 6    only lose by two or three percent in a really close

 7    contested race, that is relevant, and I think, if a

 8    Section 2 violation is found, a -- a -- an

 9    acceptable, in fact a -- a -- a -- a hopeful

10    outcome.

11        Q.    Are you -- have you testified to that

12    effect previously in other cases?

13        A.    I have not, no.

14        Q.    Are you aware of any specific cases that

15    rely on the proposition that losing by less is a

16    justification to set aside an at-large district

17    system?

18        A.    I'm aware of cases that speak to a

19    concern about the Voting Rights Act being used to

20    guarantee victories for minority-community can --

21    preferred candidates, and speaking to the power of

22    allowing meaningful participation.  It's independent

23    of whether or not a candidate wins, but whether

24    there's a chance that a particular

25    minority-preferred candidate could win and a chance
```

1    for them to actually engage in politics in a way

2    where it's not just as a token candidate that loses

3    by 30 percent.

4         Q.    Do you have -- or did you in preparing

5    these analyses for the supplemental report -- do you

6    have the data files for the precincts you used in

7    each of the sets?

8         A.    Yes.  I believe they were disclosed, but

9    I do have them, yes.

10        Q.    I'll circle back and -- and, if -- if

11   not, we'll follow up after the deposition.

12             Turning your attention to your

13   deposition followup on page 16 of your report --

14   we're still on Exhibit 10, the supplemental report.

15        A.    I see that.

16        Q.    Okay.  You -- you do a specific response

17   relating to the 2010 race between Louis Jones and

18   George Furman, correct?

19        A.    That is correct.

20        Q.    What was your purpose in -- in doing

21   that deposition followup?

22        A.    Only that in the course of the

23   deposition when I couldn't recall off the top of my

24   head and I stated that I would reserve the right to

25   confirm that, I just wanted to transparently provide

66

```
 1    that confirmation as opposed to let it slide, I
 2    suppose.
 3         Q.    Okay.  So you say that after you went
 4    back and looked that "I have confirmed that the
 5    estimated support among minority voters for Jones
 6    and Furman in 2010 is not statistically
 7    significantly different."
 8              You then refer to your ecological
 9    inference calculations that show support for Jones
10    at 56 percent plus or minus 14 percent and support
11    for Mr. Furman at 44 percent plus or minus 16
12    percent.  Why is that not statistically significant?
13         A.    The confidence -- so at -- at the very
14    minimum the confidence intervals overlap, which is a
15    -- a hallmark of -- of group metric statistical
16    significance does not match.
17              THE REPORTER:  I'm sorry.
18         A.    So --
19              THE REPORTER:  I'm -- I'm sorry.  My
20    dog.  Can you -- can you repeat your answer?
21              MR. BOYNTON:  Take a moment.
22              THE REPORTER:  Yeah.  The -- the Fed Ex
23    guy is here.  Go ahead.  I'm sorry.
24         A.    So you'll see Mr. Jones is 56 percent
25    plus or minus 14 percent.
```

1          So even just with that confidence

2    interval it would be as low as 42 percent, which is

3    lower than Furman's estimate -- point estimate.

4    But, of course, Furman's estimate could be as high

5    as 60 percent.  So there's overlap in the confidence

6    intervals that suggests we can't with certainty say

7    that the minority preferences for these candidates

8    is different.

9    BY MR. BOYNTON:

10          Q.    So every time the confidence intervals

11   overlap in your analysis you cannot say with

12   statistical certainty that one result retains versus

13   the other; is that your testimony?

14          A.    I cannot say with the standard

15   95-percent confidence that they're different, no,

16   which is the standard that's often used, but it's

17   not -- I'll just -- I'll leave it there.

18              I would say when the confidence

19   intervals overlap I do not include markers of

20   statistical significance in my analysis, which in

21   the original report were asterisks and check --

22   checkmarks.

23          Q.    Okay.  So have you gone back and -- and

24   -- and determined that every -- every race -- every

25   election that you analyzed was -- and that you found

68

1  statistically significant was inside the mar -- the

2  overlapping margin of error?

3              MS. GREENWOOD:  Objection.

4       A.    It would be the opposite.  I did go back

5  and confirm these, but every -- every race where

6  there wasn't confidence interval overlap then I

7  determined statistical significance.

8              In fact, to be especially clear, I run

9  statistical tests to make that determination.  The

10 mechanisms of those tests are essentially equivalent

11 to looking at confidence intervals and whether or

12 not they overlap, but I didn't just visually look at

13 them or use arithmetic to determine whether they

14 overlapped.  I run a -- what's called a T test that

15 looks at statistical differences between estimates

16 to -- to make that determination.

17 BY MR. BOYNTON:

18      Q.    But your testimony is that in any

19 instance where the confidence intervals overlap that

20 the -- that you cannot say that that outcome versus

21 the other is -- is the result with statistical

22 certainty, correct?

23             MS. GREENWOOD:  Objection.

24      A.    That -- I -- I think -- I -- I think

25 that's correct.  I cannot say with certainty that

1    they are different.  I also cannot say that they're

2    the same because I can't rule out an alternative

3    hypothesis.  It just becomes a result that you have

4    to describe the way we're describing it now, which

5    is the estimates are different, but they're not

6    statistically significantly different.

7              And so that prompts a larger discussion

8    perhaps about the relevance.  In the relevance of

9    the Furman versus Jones case the point just came up

10   in the deposition that if the race was probative was

11   Mr. Jones the minority candidate of choice.  And I

12   just wanted to -- the point of this was just to

13   confirm that I wouldn't have marked him as a

14   minority candidate of choice because I could not

15   distinguish him from the vote preferences of a

16   different candidate.

17   BY MR. BOYNTON:

18         Q.    Understood.

19              Have you provided us with the confidence

20   intervals for your original report?  I don't know

21   that we've seen that.

22         A.    I -- the -- the T tests and the report

23   for the T tests were disclosed in the materials that

24   I provided after all three reports actually.

25         Q.    Okay.  Well, we'll go back and look at

 1     it then.  I won't further bear upon it now.

 2              Give me one moment.  I'm making sure I

 3     haven't omitted anything.

 4              With respect to the Jones versus Furman

 5     race you -- you refer to the overlapping confidence

 6     intervals and EI.  Is it your testimony that, for

 7     example, the homogenous precinct number of 63.1

 8     versus 36.9 also overlaps the confidence intervals?

 9              MS. GREENWOOD:  Objection.

10         A.    Can you -- can you --

11              MS. GREENWOOD:  Yeah.  Go ahead.

12         A.    Can you direct me to where you're

13     looking?  Sorry.  Is this Exhibit 1?

14     BY MR. BOYNTON:

15         Q.    Well, in your -- I'm just trying to

16     understand the -- your -- your testimony as to the

17     supplemental report by looking at your original

18     report, Exhibit 1, where you do the -- the -- the

19     three factor -- the -- the three types of analysis

20     for each candidate that you analyze.

21         A.    Uh-huh.

22         Q.    So let me get -- I'll get you a page

23     number.  Just give me a second.

24              It looks like it's page 27 of your

25     original report.

1        A.    Okay.  I see it.  It's page 28 for me,
2   but that may include a title page.  So, yes, I see
3   it.
4        Q.    Okay.  So you have -- for Jones versus
5   Furman you have black and all-minority numbers under
6   HP, ER and EI, correct?
7        A.    That is correct.
8        Q.    And in your deposition follow-up in your
9   supplemental report you make specific reference to
10  the EI calculations and compare the 56.6 to the 43.7
11  and say those overlap -- the confidence intervals
12  overlap for those two numbers; correct?
13       A.    That is correct.
14       Q.    And, therefore, that metric is not
15  statistically reliable, correct?
16       A.    Correct.  Which is why there's no star.
17       Q.    Okay.  So there are two other methods
18  that do have stars at least as to African American
19  candidate of choice, correct?
20       A.    Correct.
21       Q.    Okay.  And so even though you don't have
22  a star by one of the three you initially identified
23  Jones as the minority candidate of choice,
24  correct -- of black and all minorities, correct?
25       A.    That's correct.  That's what prompted

1    the exchange at the original deposition.

2          Q.   Okay.  So you got two out of three and

3    you checked those boxes.  So he's still the minority

4    candidate of choice, correct?

5                MS. GREENWOOD:  Objection.

6          A.   So if the -- if we were looking just at

7    black voters and not all minority voters, then given

8    that -- I -- I would -- I would go look at the

9    difference in the ecological inference between that

10   55 and that 44 to see how much those overlap because

11   part of this exercise was to -- was to look at all

12   three metrics kind of taken together.  But all

13   that's irrelevant because the -- the relevant metric

14   now is all-minority, not black voters only, and

15   there -- there -- there there's more overlap and not

16   significance.  That checkmark, as I pointed out

17   before, was -- is incorrect.

18   BY MR. BOYNTON:

19         Q.   Simply because of the overlap, not

20   because Jones did not lead in all three of your

21   analyses?

22         A.   That's correct.  If we had just looked

23   at black voting, it's possible that I would have

24   identified Jones as a minority candidate of choice,

25   again looking closely at the ecological inference as

 1  well to add to that determination.  But for the

 2  all-minority view I would not make that

 3  determination.

 4      Q.    What is your understanding of why the

 5  modified plans were offered?

 6      A.    I -- I was -- I wasn't told specifically

 7  what the motivation was, but given the requirements

 8  for Section 2 litigation and the -- the need to show

 9  a court that there is a possible remedy under

10  Gingles 3 -- I guess all three Gingles factors,

11  these illustrative districts are part and parcel of

12  Section 2 litigation, so I took them as a part of

13  the next step of analysis.

14      Q.    Well, other than including Georgia

15  Allen, one of the plaintiffs, in the modified

16  District 1, what other changes were made to the --

17  the -- the plans between pre-modification and

18  modification?

19          MS. GREENWOOD:  Objection.

20      A.    That I don't -- I don't know.

21  BY MR. BOYNTON:

22      Q.    And these plans are organized or

23  developed to -- with a predominant factor of race

24  involved, correct?

25          MS. GREENWOOD:  Objection.

```
 1          A.    I don't -- I don't know what
 2   Mr. Fairfax's process or motivations were.  I just
 3   received the maps and performed an analysis.
 4   BY MR. BOYNTON:
 5          Q.    Turning to page 4 of your report...
 6          A.    Is this the supplemental report?
 7          Q.    Yes.  Sorry.  It's Exhibit 10.
 8          A.    (Moved head up and down.)
 9          Q.    An asterisk identifies the minority
10   candidate, correct?
11          A.    It -- yes.  It indicates that the
12   candidate themselves was non-white.
13          Q.    Okay.  Tanya Bullock is non-white,
14   correct?
15          A.    I believe so, yes, and Georgia Allen,
16   who were left out.
17          Q.    Those would both be errors?
18          A.    Those would both be errors, yes.
19                MR. BOYNTON:  I don't believe I have
20   anything else fur -- further.  Thank you, sir.
21                THE DEPONENT:  Thank you.
22                MS. GREENWOOD:  And -- and, as we said
23   before, we'll review and sign.
24                MR. BOYNTON:  Understood.  Thank you.
25                (Discussion off the record)
```

1                    (Signature not waived.)

2                    (The deposition concluded at 1:02 p.m.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

76

1                    DEPOSITION ERRATA SHEET

2

3     Case Caption:  Latasha Holloway, et al. v. City of

4                    Virginia Beach, et al.

5     Deponent:    Douglas M. Spencer

6     Deposition Date: June 9, 2020

7

8          I have read the entire transcript of my
       deposition taken in the captioned matter or the same
       has been read to me.  I request that the following
9     changes be entered upon the record for the reasons
       indicated.  I have signed my name to the Errata
10    Sheet and the appropriate Certificate and request
       both to be attached to the original transcript.

11

       Page/Line Nos.  Correction/Reason
12    _____   _____

13    _____   _____

14    _____   _____

15    _____   _____

16    _____   _____

17    _____   _____

18    _____   _____

19    _____   _____

20    _____   _____

21    _____   _____

22    _____   _____

23    _____   _____

24    Signature:_____ Date: _____
                     DOUGLAS M. SPENCER

25

```
 1                  CERTIFICATE OF DEPONENT

 2    STATE OF_____

 3    CITY OF _____

 4        Before me, this day, personally appeared DOUGLAS
      M. SPENCER, who, being duly sworn, states that the
 5    foregoing transcript of this deposition, taken in
      the matter, on the date and at the place set out on
 6    the title page hereof, constitutes a true and
      complete transcript of said deposition.

 7

 8

 9                  ---------------------------
                          DOUGLAS M. SPENCER
10

11

12        SUBSCRIBED and SWORN to before me this _____
      day of _____, 2020, in the jurisdiction
13    aforesaid.

14

15

16    _____   _____
      My Commission Expires          Notary Public
17

18

19

20

21

22

23

24

25
```

1  COMMONWEALTH OF VIRGINIA AT LARGE, to wit:

2          I, Kathleen Beard Adams, CCR, RPR, CRR, an
   e-Notary Public for the Commonwealth of Virginia at
3  large, of qualification in the Circuit Court of the
   City of Virginia Beach, Virginia, and whose
4  commission expires August 31, 2022, do hereby
   certify that the within named deponent, DOUGLAS M.
5  SPENCER, appeared before me at Lafayette, Colorado,
   as hereinbefore set forth, and after being first
6  duly sworn by me, was thereupon examined upon his
   oath by counsel for the respective parties; that his
7  examination was recorded in Stenotype by me and
   reduced to computer printout under my direction; and
8  that the foregoing constitutes, to the best of my
   ability, a true, accurate, and complete transcript
9  of such examination.

10         I further certify that I am not related to
   nor otherwise associated with any counsel or party
11 to this proceeding, nor otherwise interested in the
   event thereof.

12
           Given under my hand and notarial seal this
13 21st day of June, 2020.

14

15

16                          Notary Public
                   Certified Court Reporter No. 0313086

17

18

19

20

21

22

23

24

25