**IN THE UNITED STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF VIRGINIA
NORFOLK DIVISION**

| | |
|---|---|
| **Latasha Holloway,** *et al.*, | |
| **Plaintiffs,** | |
| | **Civil Action No. 2:18-cv-0069** |
| **v.** | |
| **City of Virginia Beach,** *et al.*, | |
| **Defendants** | |

**MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE
PLAINTIFFS' SUPPLEMENTAL EXPERT REPORTS AND OPINIONS**

# PLAINTIFFS' EXHIBIT 6

Supplemental Deposition of Plaintiffs' Expert Mr. Anthony Fairfax

```
        IN THE UNITED STATES DISTRICT COURT
        FOR THE EASTERN DISTRICT OF VIRGINIA
                NORFOLK DIVISION


------------------------------------
LATASHA HOLLOWAY and GEORGIA ALLEN,

        Plaintiffs,                  CIVIL ACTION NO.
                                      2:18-cv-00069
v.

CITY OF VIRGINIA BEACH, et al.,

        Defendants.
------------------------------------



            DEPOSITION UPON ORAL EXAMINATION
                 OF ANTHONY E. FAIRFAX,
            TAKEN ON BEHALF OF THE DEFENDANTS


                 Hampton, Virginia

                  June 24, 2020

                   VOLUME II



Appearances:

On behalf of the Plaintiffs:

    CAMPAIGN LEGAL CENTER (via teleconference)

        ANNABELLE HARLESS, ESQUIRE

        1101 14th Street NW, Suite 400

        Washington, DC 20005

        202.736,2200

        aharless@campaignlegalcenter.org
```

2

```
 1   Appearances: (Cont'd)
 2          RUTH GREENWOOD, ESQUIRE
 3          1101 14th Street NW, Suite 400
 4          Washington, DC 20005
 5          202.736.2200
 6          rgreenwood@campaignlegalcenter.org
 7
 8        CHRISTOPHER D. LAMAR, ESQUIRE
 9        1101 14th Street NW, Suite 400
10        Washington, DC 20005
11        202.736.2200
12        clamar@campaignlegalcenter.org
13
14        ROB N. WEINER, ESQUIRE
15        1101 14th Street NW, Suite 400
16        Washington, DC 20005
17        202.736.2200
18        rweiner@campaignlegalcenter.org
19
20
21
22
23
24
25
```

```
 1    On behalf of the Defendants:

 2       OFFICE OF THE VIRGINIA BEACH CITY ATTORNEY

 3       (via teleconference)

 4            CHRISTOPHER S. BOYNTON, ESQUIRE

 5            Municipal Center, Building 1

 6            2401 Courthouse Drive, Room 260

 7            Virginia Beach, Virginia 23456

 8            757.385.4531

 9            cboynton@vbgov.com

10

11            GERALD L. HARRIS, ESQUIRE

12            Municipal Center, Building 1

13            2401 Courthouse Drive, Room 260

14            Virginia Beach, Virginia 23456

15            757.385.4531

16            glharris@vbgov.com

17

18            JOSEPH M. KURT, ESQUIRE

19            Municipal Center, Building 1

20            2401 Courthouse Drive, Room 260

21            Virginia Beach, Virginia 23456

22            757.385.4531

23            jkurt@vbgov.com

24

25
```

4

```
 1    Appearances: (Cont'd.)

 2          BAKER HOSTETLER (via teleconference)

 3          KATHERINE L. McKNIGHT, ESQUIRE

 4          1050 Connecticut Avenue NW, Suite 1100

 5          Washington, DC 20036-5304

 6          202.861.1618

 7          kmcknight@bakerlaw.com

 8

 9

10    Also Appearing:        Claire Stickley

11     (via teleconference)    Simone Leeper

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

5

```
 1                        I N D E X

 2                         DEPONENT

 3

 4   Anthony E. Fairfax                         PAGE

 5          Examination by Mr. Boynton            8

 6

 7

 8

 9

10

11                        EXHIBITS

12   NO.    DESCRIPTION                         PAGE

13   6      Supplemental Report of               6
            Anthony E. Fairfax
14
     7      Plaintiff's Mod Plan (10 Districts)  6
15
     8      Plaintiff's Illustr Plan 10 Dist Alt 2  6
16
     9      United States Census 2010            6
17
     10     United States Census 2020            6
18

19

20

21

22

23

24

25
```

```
 1                 Deposition upon oral examination of
 2   ANTHONY E. FAIRFAX, taken on behalf of the
 3   Defendants via teleconference before Kathleen Beard
 4   Adams, CCR, RPR, CRR, an e-Notary Public for the
 5   Commonwealth of Virginia at large, commencing at
 6   10:20 a.m. on June 24, 2020, at 16 Castle Haven
 7   Road, Hampton, Virginia; and this in accordance with
 8   the Federal Rules of Civil Procedure.
 9                         - - - - -
10                 (Fairfax Exhibits 6 through 10 were
11                  pre-marked for identification.)
12                 (The deponent was sworn.)
13                 (Off-the-record discussion)
14                 MR. BOYNTON:  Well, sorry for that bit
15   of fun, everybody.  I'm trusting, Mr. Fairfax, you
16   can hear me.
17                 THE DEPONENT:  Yes.
18                 MR. BOYNTON:  And, Annabelle, same
19   thing?
20                 MS. HARLESS:  Yep.
21                 MR. BOYNTON:  Okay.  Kathy, I -- I think
22   we'll just need to make a notation that I'm on
23   Jerry's line, so to speak, and Jerry is going to be
24   observing on my line, or listening.
25                 THE REPORTER:  Okay.
```

```
 1              MR. BOYNTON:  So I think I have what I
 2    need if we're ready to proceed otherwise.  Thank
 3    you, everybody, for your patience.  Okay.
 4              MS. HARLESS:  Really quick before we
 5    start I'd just like to put on the record similar to
 6    what we did in Dr. Spencer's deposition that we've
 7    agreed to extend Mr. Fairfax's deposition today to
 8    cover his supplemental report from March 2020, but
 9    this is not an opportunity for counsel to re-ask
10    questions about the first two reports or engage in
11    any lines of questioning about those reports.  Thank
12    you.
13              MR. BOYNTON:  The -- the other piece of
14    this is that everybody has agreed to waive any
15    objections that might otherwise exist as to deposing
16    Mr. Fairfax remotely and particularly deposing him
17    in a context where the court reporter is not present
18    in the same room as Mr. Fairfax, correct?
19              MS. HARLESS:  Correct.
20              MR. BOYNTON:  Has the witness been sworn
21    on the -- on the video?
22              THE REPORTER:  No.
23              Would you raise your right hand, Mr.
24    Fairfax?
25
```

8

```
 1              ANTHONY E. FAIRFAX, having been first
 2    duly sworn, was examined and testified as follows:
 3                    DIRECT EXAMINATION
 4    BY MR. BOYNTON:
 5         Q.    Good morning, Mr. Fairfax.  We've met
 6    once before.  My name again is Chris Boynton.  I
 7    work with Jerry Harris and Joe Kurt as well as Ka --
 8    Kath -- -- Katherine McKnight representing the City
 9    of Virginia Beach and the defendants in this case.
10    How are you this morning?
11         A.    I'm doing well.
12         Q.    Good.  Good to hear it.
13              A couple of ground rules that I'll go
14    over that I think we discussed previously.  If you
15    will allow me to complete my question, then I will
16    allow you to complete your answer so the court
17    reporter does not have to jump back and forth.
18              Also if at any point I've asked a
19    question that is -- that you don't understand or
20    it's not well-worded, please let me know.  I'll be
21    happy to rephrase.
22              Also please respond verbally with yeses
23    or nos where the question asks for that.  Nods and
24    gestures are not things the court reporter can take
25    down.
```

```
 1                Finally, if you give an answer and it
 2    occurs to you later on in the deposition that the
 3    answer you gave is inaccurate or incomplete, please
 4    just speak up and we'll correct the record and move
 5    forward.
 6                Do all those work for you, sir?
 7        A.    Yes.
 8        Q.    Okay.  Great.
 9                Now, you -- you gave a deposition in
10    this case back in -- I think it was September 24th,
11    correct?
12        A.    Yes.
13        Q.    Since then have there been any changes
14    in your credentials, experience, background,
15    anything along those lines?
16        A.    Well, my résumé in -- in -- didn't
17    include at that particular time one of the efforts
18    that I'm working on right now currently, and that is
19    I'm -- I was hired as a districting master for the
20    City of Everett at the beginning of this year to
21    help them, advise them and guide them through their
22    first initial redistricting plan.
23        Q.    Is that Everett, Washington?
24        A.    Yes, city of Everett, Washington.
25        Q.    And is that under court jurisdiction or
```

```
 1    control?
 2         A.    No.
 3         Q.    Okay.  That is purely a -- a single
 4    locality with a redistricting plan?
 5         A.    Correct.
 6         Q.    Okay.  Have you been designated in -- in
 7    -- in -- as an expert witness in any other cases
 8    since November 24th, 2019 -- I'm sorry -- September
 9    24th, 2019?
10         A.    No.
11         Q.    Okay.  Have you testified in any other
12    cases since September 24th, 2019?
13         A.    No.
14         Q.    Have there been any changes to your rate
15    of compensation in (audio interruption) --
16         A.    Could you repeat that?  You got cut off.
17         Q.    Sure.  Have there been any changes to
18    how you are being compensated in this case since
19    September --
20         A.    No.
21         Q.    -- 24th, 2019?
22               Okay.  You're still being paid on an
23    hourly basis; is that correct?
24         A.    Correct.
25         Q.    And I believe the rate was $180 an hour.
```

1    Is that correct?

2          A.    Correct.

3          Q.    Okay.  For purposes of this deposition

4    we will make reference to various reports that you

5    have prepared.  Exhi -- have you had a chance to

6    review the exhibits I sent you yesterday?

7          A.    Yes.  I went through them.

8          Q.    Okay.  What we attempted to do was have

9    the first five numbered exhibits have the same

10   numbers that they had from your first deposition and

11   then add new exhibits 6 through 10.  Is that correct

12   from your review?

13         A.    That -- that seems to be correct.

14         Q.    Okay.  Well, when I use the term initial

15   or original report that will be referring to Exhibit

16   2, which is dated July 15th, 2019.  Do you agree

17   with that?

18         A.    Yes.

19         Q.    And when I use the term rebuttal report

20   I'll be referring to Exhibit 4, which was August

21   26th, 2019, correct?

22         A.    Yes.  Correct.

23         Q.    And when I say supplemental report I'll

24   mean and be referencing Exhibit 6, which is the

25   March 16th, 2020 report, correct?

1       A.     Correct.

2       Q.     Okay.  So what were the scope of

3    services that you were asked to perform for the

4    supplemental report?

5       A.     I was asked to review or clarify whether

6    the plaintiffs' residences were included in the

7    Hispanic, black or Asian combined -- and Asian

8    combined districts for the demonstrative plans that

9    I created.  And specifically it was to look at

10   whether Ms. Holloway's address was contained in all

11   of the plans and Ms. Allen's address was contained

12   in none of the plans.  Also I reviewed whether

13   Ms. Holloway's new address was included in the plans

14   as well.  The second part was to see if one plan or

15   more could be modified to include Ms. Allen's

16   address, and so three plans were included or

17   modified.  And then finally it was to update the

18   plans with the most recent American Community

19   Survey, the five-year.

20      Q.     And is that the 2014 through 2018 series

21   you're referring to?

22      A.     Yes.  Correct.

23      Q.     Other than the changes that you -- or

24   modifications you've referenced, did you make any

25   other changes or modifications to the maps as

1    provided in your supplemental report compared to the

2    rebuttal report?

3         A.    Did I make any modifications or changes

4    to the plans?

5         Q.    The plans.  Other than to include

6    Georgia Allen's address.  Now, ob -- obviously, the

7    ACS data just tells you how they perform arguably,

8    so they don't -- the ACS data you used doesn't

9    change the plans, correct?

10         A.    Correct.  Importing them.  Exactly.

11         Q.    Okay.  So when you -- when you modified

12    the plans -- I believe you testified you modified

13    three plans -- other than incorporating Georgia

14    Allen's address into a -- a majority HBA CVAP

15    district what else did you do to change those plans?

16         A.    Each plan had you could say three

17    changes really.  The first plan, which was the

18    Illustrative Plan, actually had two additions and

19    one removal.  The second plan had another two

20    additions and one removal.  And the third had three,

21    in essence, block groups that were added.

22         Q.    And so in each case when you say an

23    addition or a removal you're referring to a block

24    group?

25         A.    No.  Referring to just area.  It may not

```
 1    be a block group.
 2          Q.    Areas?
 3          A.    The -- the third one, remember, was a --
 4    a -- a plan that was wholly using block groups to
 5    create the district.
 6          Q.    The --
 7          A.    The --
 8          Q.    -- only alt was at a block-group level,
 9    correct?
10          A.    Alt 2.  Correct.
11          Q.    Modified Illustrative Plan and Modified
12    Alt 1 were not at block-group levels, correct?
13          A.    That's correct.
14          Q.    What levels were they at?
15          A.    They were mainly at the VTD le -- level,
16    but there were some split voting tabulation
17    districts.
18                THE REPORTER:  I'm sorry.
19    BY MR. BOYNTON:
20          Q.    Okay.  Well --
21                THE REPORTER:  I'm sorry.  I couldn't
22    understand you.
23          A.    There were mainly at -- they were mainly
24    at the VTD level, and VTD standing for voting
25    tabulation district, but there were some split VTDs.
```

BY MR. BOYNTON:

Q.    And -- and VTDs, for the record, are voting tabulation districts, correct?

A.    Correct.

Q.    So you -- you will agree with me then that none of the six plans contained in your rebuttal report contains Georgia Allen's residence address in a majority HBA CVAP district, correct?

A.    That is correct.

Q.    And do you agree with me that the Illustrative Plan or map that pro -- was provided in your original report did not contain Georgia Allen's residence address in a majority HBA CVAP district, correct?

A.    Correct.

Q.    Okay.  Why did you not include Ms. Allen's residence address in the two prior reports in the districts that you drew?

A.    Well, I tried to recall where the issue or the problem began, and -- and what I -- I think happened was when I first started writing the report I imported the new ACS data at that particular time, and -- and after I imported it or processed it I made some slight modifications to the plan.  And I believe that's when I left Ms. Allen's address out,

16

```
 1    when I made those slight modifications to the plan.
 2         Q.    But -- and Ms. Allen's address is the
 3    same as it was going back to 2018, correct?
 4         A.    Correct.
 5         Q.    And you drew the map that was included
 6    in the amended complaint, correct?
 7         A.    Correct.
 8         Q.    That map included or purported to
 9    include Ms. Allen's address, correct?
10         A.    Correct.
11         Q.    So nothing on Ms. Allen's address
12    changed for purposes of your analysis after the
13    amended complaint was filed?
14         A.    Correct.
15         Q.    So would you agree that the three
16    modified plans for District 2 in the supplemental
17    report were modified for the sole purpose of
18    correcting your error of not including Georgia
19    Allen's residence address in the plans contained in
20    your original report and your rebuttal report?
21              MS. HARLESS:  Objection to form.
22    BY MR. BOYNTON:
23         Q.    You can answer.
24         A.    That was the purpose of the
25    modifications.
```

```
 1          Q.    Were there any other purposes of

 2   modifying those three plans in the supplemental

 3   report?

 4          A.    No.  No.

 5                Of course, as I was developing them I

 6   was using traditional redistricting criteria, so

 7   they were al -- always objectives to creating the

 8   plan.

 9          Q.    Did you have a purpose other than

10   including Georgia Allen's address in generating the

11   supplemental reports and plans?

12          A.    No.  No.  The -- the purpose really was

13   to see if her address could be contained with

14   minimal modifications, and that's what I concluded.

15          Q.    Now, even though your supplemental

16   report shows only the two HBA CVAP majority

17   districts, you did draw all ten districts as part of

18   your process in preparing the supplemental report,

19   correct?

20          A.    Correct.

21          Q.    Is there a reason you did not include

22   the other districts fully in the -- in the -- in the

23   supplemental report?

24          A.    No.  There -- there was a --

25                MS. HARLESS:  Objection to form.
```

18

```
 1    BY MR. BOYNTON:
 2         Q.    You can answer.
 3         A.    Most of the districts remained the same.
 4    There were some slight changes on the adjacent
 5    districts here and there, but nothing that would
 6    dramatically change the perception of the districts
 7    or the -- the configurations of the districts
 8    dramatically.
 9         Q.    So what was your reason for not
10    including the other eight districts in the plan that
11    you illustrated in your supplemental report?
12              MS. HARLESS:  Objection to form.
13    BY MR. BOYNTON:
14         Q.    You may answer.
15         A.    Because most of the districts did not
16    change.
17         Q.    Now, you -- you -- you have on page 2 of
18    your supplemental report, and -- and please feel
19    free to turn to it --
20         A.    So I should -- I can bring that report
21    up?
22              MS. HARLESS:  Can you give us an --
23              MR. BOYNTON:  Yes.
24              MS. HARLESS:  -- exhibit number?
25
```

```
 1   BY MR. BOYNTON:
 2        Q.    It's Exhibit 6.  And it's the second
 3   page.  Are you there?
 4        A.    Not yet.
 5              Okay.  I'm here now.
 6        Q.    Okay.  At the very bottom you have a
 7   footnote, footnote 1, and it says, "As in my two
 8   prior reports, in this supplemental report I include
 9   the HBACVAP percentages for both Hispanic, Black
10   alone, and Asian alone individuals as well as
11   Hispanic, Black, and white (mixed race), and Asian
12   alone individuals."
13              Where did you get the data for those
14   percentages for each race or origin group?
15        A.    They come from the Census Bureau, the
16   ACS data, and, of course, it's disaggregated down
17   and built back up to the district level.
18        Q.    Okay.  And so is there -- when you're
19   pulling down ACS data, I assume electronically, or
20   is it in printed form when you download it?
21        A.    Oh.  It's in digital form.  You have to
22   use digital form.
23        Q.    So there is one number for each block
24   group for Hispanics?
25              MS. HARLESS:  Objection to form.
```

20

```
 1    BY MR. BOYNTON:
 2         Q.    Well, I'm going to ask you to explain to
 3    me, sir, what -- when you're pulling data down how
 4    is it represented?  How is it visually represented
 5    to you?
 6         A.    It -- it's represented at the block
 7    group level.
 8         Q.    I understand, but does it -- I mean is
 9    it a single number in the block group for all
10    Hispanics of all national origins?
11         A.    It -- it is a -- what they call a point
12    value that they have for the Hispanic population.
13         Q.    Does it provide a point value for
14    Hispanic subgroups, like Filipino?
15         A.    No.
16         Q.    Okay.  Does it provide a -- a -- a
17    subgroup for Hispanic origins that are from
18    Colombia?
19         A.    No.
20         Q.    So it simply gives you an all-Hispanics
21    number; is that accurate?
22         A.    That's correct.
23         Q.    Okay.  Does the same apply as to people
24    of -- with Asian origin?
25         A.    Correct.
```

```
 1              MS. HARLESS:  Objection to form.
 2    BY MR. BOYNTON:
 3         Q.    You get one number for all Asians
 4    regardless of national origin, correct?
 5         A.    Correct.
 6         Q.    You don't have a separate one -- again I
 7    -- I mis -- misspoke -- for Filipino, but Filipino
 8    Asians --
 9         A.    Correct.
10         Q.    -- is that correct?
11               You don't get a separate number for
12    people who are of Japanese American descent?
13         A.    Correct.
14         Q.    It's only one number for all Asians?
15         A.    Correct.
16         Q.    Okay.  And for -- for black there is
17    both people who identify as black in the survey and
18    there are -- there's a fourth number or fourth
19    column of people who identify as black and white; is
20    that correct?
21         A.    That's correct.
22         Q.    Okay.  What about Asian and white?  Is
23    that a category that the data has provided?
24         A.    Yes.
25         Q.    Okay.  So -- but you did not use the
```

1    Asian and white data?

2         A.    Correct.

3         Q.    And you didn't -- is -- is there a

4    category of data that's Hispanic and white?

5         A.    No.  No.  Not that I recall.

6         Q.    It's only Asian and white?

7         A.    Correct.

8         Q.    Okay.

9         A.    They isolate -- I'm sorry.

10        Q.    Please answer.  I'm sorry.

11        A.    That's all right.  They -- they isolate

12   Hispanic and you use the other what's called

13   non-Hispanic race categories.  And that's how you

14   can come up with 100 percent.

15        Q.    Are -- are you aware whether the ACS

16   makes any in its questioning differentiation between

17   Hispanics of Latino or of Spanish subgroups?

18        A.    I -- I'm not sure.  I'm not sure whether

19   they try to catalog that.

20        Q.    Are you aware of whether the ACS

21   question -- survey questionnaire tries to capture

22   Asian origin subgroups?

23        A.    I'm not sure --

24        Q.    Okay.

25        A.    -- whether they do or not.

23

```
 1          Q.    Have you ever seen the ACS survey

 2     questionnaire?

 3          A.    Yes.  Yes, a while back.

 4          Q.    Okay.  So you did not look at it in

 5     preparation for this case?

 6          A.    No.  No.

 7          Q.    And in -- for -- for -- from the -- the

 8     end-user data it's not broken out into Asian

 9     subgroups or Hispanic subgroups, correct?

10          A.    That's correct.

11          Q.    Okay.  If you wanted that data, could

12     you obtain it from ACS?

13          A.    Well, if -- if the question is on there,

14     potentially you could request a supplemental report,

15     but that's a little bit unclear of how well that

16     would bode for the entire city.  So you may be able

17     to find some information data for it, enough samples

18     for a particular area inside the city of Virginia

19     Beach, but maybe not for the entire area because of

20     the sampling -- the way they do sampling.

21          Q.    But, sitting here today, you made no

22     effort to pull down Asian or Hispanic subgroup

23     information from the ACS?

24          A.    Correct.

25          Q.    Okay.
```

1        A.    And -- and let me -- let me just say

2   that as normal convention that's used in the

3   redistricting process that's not done.  You know,

4   the DOJ had guidance back in 2000 and they sort of

5   provided some guidance on the racial combination

6   that you would use, and they didn't break it up into

7   subgroups.

8        Q.    Okay.  So turning to page 3 of your

9   report, I -- I think we've already discussed A of

10  your Summary of Opinions.  I'd like you to focus on

11  B of your Summary of Opinions.  Do you have the

12  document in front of you?

13       A.    Yes, I do now.

14       Q.    On page 3 of your supplemental report,

15  subheading IV, Summary of Opinions, b), you state,

16  "With minor modifications and insignificant district

17  statistical alterations, the current addresses of

18  both Plaintiff Georgia Allen and Plaintiff Latasha

19  Holloway could, at least, be contained within

20  majority-HBACVAP District 2 of the Illustrative Plan

21  as well as District 2 in the Alternative Plan 1 and

22  Alternative Plan 2.  I did not attempt to modify

23  Alternative Plans 3, 4, or 5 for this supplemental

24  report."

25                 Is that a correct statement of what you

 1    wrote, sir?

 2           A.     That's correct.

 3           Q.     Okay.  And so you -- sitting here today,

 4    Alternative Plans 3, 4 or 5 do not include Georgia

 5    Allen's residence address in an HBA CVAP majority

 6    district, correct?

 7           A.     That is correct.

 8           Q.     Why did you not attempt to modify those

 9    three districts?

10           A.     I didn't see the need to -- to do those.

11    I wanted to show that the original Illustrative Plan

12    could contain Georgia Allen's address.  The

13    Alternative 1 could contain it because of the issues

14    raised by Dr. Morrison's on the borderline

15    percentage districts.  And Alternative 2 plan

16    addresses the concern over the disaggregation issue

17    that Dr. Morrison has pointed to as well.  And those

18    were -- the three issues, I think, were the major

19    highlights of his -- his report.

20                  And so the other plans, in -- in my

21    opinion, weren't as relevant as those; however, I'm

22    -- I'm fairly confident that I could modify and

23    include Alternative Plans 3, 4 and 5.

24           Q.     But to date you have not done it in --

25    in reports, correct?

26

```
 1          A.    Correct.
 2          Q.    And how far down the path of modifying
 3    Alts 3, 4 and 5 did you get?
 4          A.    Oh.  I -- I didn't do it at all.  I --
 5          Q.    You didn't touch it at all?
 6          A.    No.  No.  No.  I didn't touch it at all.
 7    No.
 8          Q.    (Audio interruption) analysis on that?
 9          MS. HARLESS:  I -- I'm sorry.  I didn't
10    hear the first part of your question.
11    BY MR. BOYNTON:
12          Q.    You did no work, no -- made no effort,
13    to look at Alt 3, Alt 4 or Alt 5 in terms of
14    including Ms. Allen's residence address in -- in
15    District 2 of those plans?
16          MS. HARLESS:   Objection.
17          A.    Correct.
18          MS. HARLESS:   Asked and answered.
19          A.    Cor -- correct.
20    BY MR. BOYNTON:
21          Q.    Right.
22          A.    Right.
23          Q.    So what minor modifications did you make
24    in District 2 plans that you did change?
25          A.    The Illustrative Plan 1 had three
```

 1    modifications, as I mentioned before.  There was a

 2    modification to include the plaintiff's address, so

 3    there was a slight addition of area to include the

 4    plaintiff's address.  There was an addition on the

 5    northern end, very similar to the Alt 1 that wasn't

 6    modified, to include several Hispanic, black and

 7    Asian combined subdivisions that were on that

 8    northern end.  I noticed this on the first analysis

 9    of the first report.  And then there was a removal

10    of a split VTD areas to remove sev -- several census

11    blocks on -- on the sort of mid-center area of the

12    district plan.

13            The second Alternative 1 plan, the same

14    or very similar extension to include the plaintiff's

15    address, Allen -- the plaintiff Allen's address was

16    included in that.

17            Was there a question?

18       Q.    I'm just listening to you talk.

19       A.    Okay.  I'm sorry.  I thought I heard a

20    question.

21            Second, there was an addition of a area

22    or subdivision that was added in and it made the

23    district more compact.  And then there was a third

24    removal down at the sort of southern western end of

25    -- of the district.  And the final Alt 2 plan had

28

1    the addition of three block groups that were added.

2    Two block groups could have added to include the

3    plaintiff, but I added the third one to make it more

4    compact.

5         Q.    Okay.  And what -- what do you deem to

6    be a minor modification versus a major modification?

7         A.    Well, when I look at the measurements of

8    traditional redistricting criteria and whether they

9    changed dramatically or not, and that includes the

10    compactness as well as split VTDs and statistics,

11    equal population, all -- all of them, I think, I

12    believe I remember becoming more equally populated

13    to the ideal.  That's what led me to believe that

14    they were insignificant.

15         Q.    Do you have a standard for what is

16    significant versus insignificant?

17         A.    It's subjective for a -- plan to plan.

18    You have to just -- just like compactness is

19    subjective from jurisdiction to jurisdiction.

20    Determining that is really subjective, and you have

21    to look at what -- what the conditions are.

22         Q.    So you made reference in that same

23    Summary of Opinions to insignificant district

24    statistical alterations, correct?

25         A.    Correct.

29

```
 1          Q.    What were the statistical alterations
 2    that occurred?
 3          A.    The compactness changed I think
 4    insignificantly, and the split VTDs changed
 5    insignificantly -- split VTDs changed
 6    insignificantly, and equal population -- it -- it
 7    changed.  I -- I think that was maybe the most
 8    significant change where it was improved.
 9          Q.    Is it your testimony that the
10    compactness improved in all three plans?
11          A.    No.  No.  No.
12          Q.    Is it your testimony that the -- the
13    number of split VTDs improved in all three plans?
14          A.    No.
15          Q.    Is it your testimony that equal
16    population improved in all three plans?
17          A.    Yes.
18          Q.    Okay.  And you made no modifications to
19    any of District 1's, correct?
20          A.    Correct.
21          Q.    So explain to me step by step your
22    methodology in preparing the three new maps that you
23    prepared.
24          A.    For the first plan the first objective
25    was to include Ms. Allen's address.  And so I added
```

1   areas that were surrounding the district to her

2   residency in a compact fashion looking to attempt

3   to, you know, follow the roads and follow a -- a

4   configuration that would be -- make it more compact.

5            The second addition was used to add

6   those additional subdivisions, as I mentioned

7   before, in the nor -- the northern end of the

8   district that I noticed early on there was an area

9   that had an HBA community that existed up in the

10   northern end.  And so I added it -- that on, a whole

11   block group, if you will, that was added to the

12   district.  And then the -- the northern end -- I

13   mean, excuse me, the southern end that was removed

14   was removed to -- just to ensure that the -- and it

15   was a two-way -- rather, a split voting tabulation

16   district.  So I didn't have to split an additional

17   VTD down there, but it was used to allow for the

18   District 2 -- to ensure that it was a majority

19   Hispanic, black and Asian combined district that was

20   comfortable above 50 percent.

21       Q.    And that was the Illustrative Plan as

22   modified, correct?

23       A.    That's correct.

24       Q.    What -- what were -- what were your

25   steps in modifying Alt 1?

1        A.    Alt 1 was to a certain extent similar.

2   The first addition was the -- the same additional

3   area that included the plaintiff Allen's address.

4   It was -- remained intact -- was expanded, rather,

5   and remained similar to the Illustrative Plan

6   modification.

7              There was a subdivision that was down

8   below that was added in.  It was added in.  It made

9   it more compact, if you will, the district compact.

10             The third was a removal of a block that

11  I had -- previously when I was early, early on in

12  the modifications I hadn't removed it because it --

13  it made sense for the district boundaries to be cut

14  that way, if you will.  It didn't necessarily have

15  to occur.  If -- if I didn't do it, it would have

16  been above -- the district would have been above 50

17  percent.  But in the beginning of modifying it

18  appeared that it would be better configured if I

19  went the -- the path of removing versus the path of

20  not removing it.

21        Q.    In Alt 1 did you add that same little

22  area in the north of the district to add or pick up

23  the HBA blocks that you're referring to?

24        A.    That area was already included.  That's

25  one of the modifications that I did in the Alt 1

32

```
 1    plan, which was -- once again I noticed that this
 2    Hispanic, black and Asian subdivision was in the
 3    northern end, and so I added that to the district in
 4    the first original Alt 1 plan, so I didn't have to
 5    actually add it in the second.
 6          Q.    So it was already in Alt 1, it was not
 7    already in the modified illus -- in the Illustrative
 8    Plan as of the rebuttal report?
 9          A.    It wasn't in the --
10          MS. HARLESS:  Objection to the form.
11    You can answer.
12          A.    It -- it wasn't in the original
13    Illustrative Plan.
14    BY MR. BOYNTON:
15          Q.    But it was in the original Alt 1?
16          A.    Correct.
17          Q.    What -- what were your steps in
18    preparing Alt 2 modified for the supplemental
19    report?
20          A.    Alt 2 was probably the easiest one to
21    modify.  It -- by including the plaintiff's address,
22    Ms. Allen's address, I added three block groups to
23    the district plan.  And as I had mentioned before, I
24    could have added only two, but I wanted to make it
25    more compact and so I added a third.
```

33

1          Q.    So when you're looking at HBA numbers

2    for the various blocks or block groups that you're

3    adding and subtracting from these three modified

4    districts are -- are you looking at the numbers from

5    ACS '13-'17 or ACS '14-'18?

6          A.    The latest version was imported, so I

7    was utilizing the latest version, the '14-'18.

8          Q.    So you -- so in drawing these three

9    modified maps you -- your baseline was ACS '14-'18;

10   is that correct?

11         A.    If you could clarify what baseline was

12   or means.

13         Q.    Well, you had maps that already you had

14   drawn that you were going to modify, correct?

15         A.    Correct.

16         Q.    Okay.  So -- and in -- in preparing the

17   modification was the modification itself based on

18   ACS '14-'18 data or ACS '13-'17 data?

19         A.    It was based upon the '14 to '18 data.

20   It's based upon the most recent and I assume the

21   most accurate data, and that would be the '14 to '18

22   data.

23         Q.    Okay.  And then you went back and

24   layered over it the ACS '13-'17 to see a comparison;

25   is that accurate?

```
 1          A.     Repeat that again.  I'm sorry.

 2          Q.     Sure.  Did you -- and you can look at --

 3    I'm kind of jumping ahead a bit, but some of your

 4    narrative in your reports -- in your report refers

 5    to the performance of these new or modified

 6    districts under ACS '13-'17, correct?

 7          A.     Right now I can't recall.  If you have

 8    anything, could you please --

 9          Q.     Yeah.  I'll get to that in -- in

10    sequence.

11          A.     -- refresh my recollection?

12          Q.     All right.  But in -- in drawing these

13    modifications you drew them off of ACS '14-'18,

14    correct?

15          A.     I -- I would say that they became the

16    primary data reference point.

17          Q.     What other data reference points did you

18    use in drawing the modifications to these three

19    districts?

20          A.     You mean other than the compactness and

21    equal population and split VTDs?

22          Q.     Sure.  Anything other than ACS '14-'18.

23          A.     Okay.  Well, the reports that I just

24    mentioned, the compactness measurements, those

25    three; Reock, Polsby-Popper and Convex Hull.  The
```

```
 1    equal population district statistics and the split
 2    VTDs.  And, of course, as I mentioned before, prior,
 3    in the original report, I utilized an overlay of the
 4    political or the neighborhood subdivisions.
 5         Q.    Okay.  Did you overlay actual precincts
 6    on this -- on these maps?
 7         A.    No.  We -- I think in my original report
 8    I had mentioned that I was going to use VD -- VTDs,
 9    or voting tabulation districts, because the
10    precincts were found to split census blocks, and the
11    more reliable unit would be VTDs, voting tabulation
12    districts.
13         Q.    Did you use 2010 census data to draw
14    these plans?
15         A.    I -- I -- I -- you cut out.  2010?
16         Q.    Did you use 2010 census data to draw
17    these modified plans?
18         A.    Correct.
19         Q.    No.  Did you or did you not use data
20    from the 2010 census to draw your modified plans?
21         A.    The -- the boundary levels.  Sure.  The
22    boundary --
23         Q.    Okay.  In terms of actual data for HBA
24    CVAP or HBA VAP did you use 2010 census data?
25         A.    The 2010 census data was included.  And,
```

```
 1    of course, for equal population purposes you'd use

 2    the 2010 population census, but for the other

 3    percentages of Hispanic, black and Asian CVAP you'd

 4    use the American Community Survey, the latest

 5    version.

 6          Q.    Did -- did you do an analysis of how

 7    these modified districts perform under the 2010

 8    census data?

 9                MS. HARLESS:  Objection to form.

10          A.    No.  And -- and when you refer to 2010

11    census let me say that the -- the boundaries are

12    2010 census as well.  So --

13    BY MR. BOYNTON:

14          Q.    Understood --

15          A.    Okay.

16          Q.    -- from boundaries.  I'm asking you

17    about HBA VAP or CVAP, the data that was generated

18    by the 2010 census, did you overlay that data on

19    these districts and see what the percentages were of

20    HBA VAP or CVAP under 2010 census data?

21                MS. HARLESS:  Objection to form.  You

22    can answer.

23          A.    Right.  Right.  The -- the 2010 census,

24    if we're speaking of the PL94-171, there is no CVAP

25    data for that.  We'd have to go to the American
```

```
 1    Community Survey, the five-year sample, in order to

 2    get the CVAP data.  So there wouldn't be an

 3    equivalent dataset that would have that.

 4    BY MR. BOYNTON:

 5         Q.   Did you take any type of dataset from

 6    the 2010 census and overlay it to see performance of

 7    minority voting trends in those modified districts?

 8              MS. HARLESS:  Objection.  Asked and

 9    answered.

10    BY MR. BOYNTON:

11         Q.   You may answer.

12         A.   No, I -- I -- I did not.  It -- it --

13    the 2010 census does not include the data.  CVAP

14    data.  Let me be clear.

15         Q.   Talking about CVAP data, what kind of

16    data does it include --

17         A.   It includes the break --

18         Q.   -- the 2010 census?

19         A.   I'm -- I'm sorry.  It includes the

20    breakdown of race and the breakdown of voting age

21    population.

22         Q.   So you could have done a race voting age

23    population analysis of these districts as modified

24    using the 2010 census, correct?

25         A.   That's correct, but I believe we were
```

```
 1    desiring to use the citizen voting age population
 2    and the most recent one, 2010 voting age population,
 3    would be now ten years old.
 4         Q.    Understood, but I just need a simple
 5    answer to a simple question.  You did not use the
 6    2010 census data for that purpose, correct?
 7               MS. HARLESS:  Objection.  Asked and
 8    answered.
 9         A.    Correct.
10    BY MR. BOYNTON:
11         Q.    Thank you.
12               I -- I believe you've -- you testified
13    in -- in your earlier deposition that you had at
14    times been appointed by a court to -- as a special
15    master or otherwise to -- to draw districts in a
16    remedial plan.  Is that accurate?
17         A.    There was one time -- in 1990 there was
18    a team, myself and another individual, that was
19    appointed to draw the city of -- of Miami back in
20    19 --
21         Q.    And in drawing either those remedial
22    plans or any others have you ever had a court accept
23    ACS data as the basis for drawing those plans?
24               MS. HARLESS:  Objection to form.  You
25    can answer.
```

39

```
 1          A.    I can't recall; however, I do recall
 2    seeing plans adopted by the -- the court that
 3    included CVAP data.
 4    BY MR. BOYNTON:
 5          Q.    Where were those plans?  What
 6    jurisdictions?
 7          A.    I -- I believe -- I believe the most
 8    recent House delegate districts that the special
 9    masters created had CVAP data included in the
10    report.
11          Q.    Is -- is -- is that -- you mean the --
12    the Virginia state legislature case?
13          A.    Yes, the Bethune-Hill.
14          Q.    Okay.  Do you know if the -- the court
15    actually approved a plan that was drawn from ACS
16    data as opposed to census data?
17          A.    I -- I believe that that data was
18    included, and so I assume that they approved it with
19    the data.  Whether they relied solely on that I am
20    not sure, but it was included.
21          Q.    Were you a witness in that case?
22          A.    No.  No, but I drew the NAACP's plan
23    that they submitted.
24          Q.    And that plan was not approved, correct?
25          A.    Correct.
```

40

```
1          Q.    Now, how accurate is the ACS compared to
2     the census, in your experience?
3          A.    It -- it's difficult for me to -- to
4     quantify that.  They're two different types of
5     surveys.  One is a sample survey and the other is a
6     -- theoretically a hundred-percent count.
7          Q.    But theoretically a hundred-percent
8     count would be more accurate than a survey of fewer
9     than a hundred percent, correct?
10         A.    It should be, but there is something
11    called an undercount that misses individuals, and so
12    you may end up with a lesser accurate on a
13    100-percent count than the ACS.
14         Q.    But the census is always counting more
15    people than the ACS is counting in any given year,
16    correct?
17         A.    When you say counting more people they
18    are sur -- surveying more people.  Is that -- is
19    that what you're saying?
20         Q.    Fair correction.  Yes.
21         A.    Yes, they -- they are surveying more
22    people.  But, as I said before, there is an
23    undercount, and so the sample may actually end up
24    being more accurate on occasion.
25         Q.    How would you know when that has
```

1   occurred?

2       A.    The only -- the only probably time that

3   you could probably get an idea is they do an

4   estimate of how -- the accuracy of the census.  And

5   so after -- or -- or during the census they do a

6   parallel accuracy test.  And so theoretically you

7   could see in a particular state maybe where the

8   accuracy was -- was lower or less than, say, the

9   margin of error for the ACS.

10      Q.    Have you seen that in any instance

11  involving the State of Virginia --

12      A.    No, not --

13      Q.    -- where the ACS data appears to be more

14  accurate than the actual census data?

15      A.    No.  I'm just saying that there is a

16  possibility.

17      Q.    I understand.

18            Other than using demographic data to

19  draw maps, what knowledge or information do you draw

20  upon as to how minorities vote in a pattern or

21  trend?

22            MS. HARLESS:  Objection to form.  You

23  can answer.

24      A.    I assume you are trying to ask whether I

25  have any familiarity of the pattern of vote for,

1    say, African American or Hispanic, La -- Latino and

2    Asian votes -- voting.  Is that what you're

3    referring to I guess?

4    BY MR. BOYNTON:

5         Q.    But what do you know about voting

6    patterns of various minority groups in Virginia

7    Beach?

8         A.    It -- I have not analyzed Virginia

9    Beach, but in the south there is a -- a -- a racial

10   polarization that exists, unfortunately, where

11   racial groups tend to vote very similarly along race

12   lines.  And so that's the pattern that exists.

13        Q.    And you know that from what information?

14        A.    Oh.  I -- I've seen and read throughout,

15   I guess, the years racial polarization analyses

16   that, you know, experts have created and developed

17   along the way.

18        Q.    And that is constant throughout the

19   southern United States?

20        A.    It -- it is -- it permeates much of the

21   -- the south.  It actually exists throughout the

22   country in certain areas.  So not just the south,

23   but it permeates a -- a little heavily in the

24   southern areas.

25        Q.    But what do you know about how Hispanic

1    voters in Virginia Beach behave or what their voting

2    trends are?

3           A.    Oh.  I haven't analyzed that.

4           Q.    What do you know about Asian voters in

5    Virginia Beach, what their voting trends are?

6           A.    Haven't analyzed that.

7           Q.    You will not be offering testimony at

8    trial as to voter cohesion or polarization in the

9    Hispanic or Asian communities in Virginia Beach?

10          A.    That is correct.

11          Q.    Okay.  So going to your methodology on

12   page 3 of your report, Exhibit 6 --

13          A.    Yes.

14          Q.    -- you make the statement under

15   Methodology, "First, I generated maps including the

16   Plaintiffs' addresses to determine whether each

17   Plaintiff is contained within one of the

18   majority-HBACVAP districts for each of the

19   previously developed demonstrative plans."

20                So you did that step for all six plans;

21   is that correct?

22          A.    That's correct.

23          Q.    And you learned in doing that that none

24   of those six plans contained Georgia Allen's

25   address, correct?

44

```
 1          A.    Correct.
 2          Q.    Okay.  And so from that, going to page 5
 3    then in your report -- and I'll take a moment so
 4    you're there.
 5          A.    Yes.  I'm here.
 6          Q.    So you applied the plaintiffs' addresses
 7    on each of six maps you prepared, you reviewed the
 8    Illustrative Plan and all alternative plans to see
 9    if they were included.  They were not, and so you
10    say, Where necessary, I then modified the
11    Illustrative Plan, Alt Plan 1, and Alt Plan 2 to
12    contain both Plaintiffs' addresses in either of the
13    majority-HBACVAP districts and generated maps to
14    confirm the results.
15                That was the next step?
16          A.    Correct.
17          Q.    Okay.  And you say "where necessary."
18    What did you mean by that term?
19          A.    Well, the District 1 wasn't modified at
20    all.
21          Q.    So why did you deem it necessary to
22    modify the three District 2s in -- in the
23    illustrative, the Alt 1 and the Alt 2 to include
24    Georgia Allen's address?
25          A.    To include the plaintiff's address.
```

```
 1          Q.    What made that necessary, in your
 2   opinion?
 3          A.    They weren't contained inside the
 4   district, or a -- a Hispanic, black and Asian CVAP
 5   district.
 6          Q.    And you believe that needed to be
 7   changed?
 8          A.    Correct.
 9                MS. HARLESS:  Objection to form.
10   BY MR. BOYNTON:
11          Q.    So turning your attention then to page
12   6, it appears that your Table 2 on page 6, and -- as
13   well as your Table 3 on page 7, has a kind of a -- a
14   range of HBA CVAP percentages with the lowest being
15   50.75 and the highest being, at least for District
16   2, 52.11.  Correct?
17                MS. HARLESS:  Objection to form.
18          A.    Cor -- correct for the illustrative
19   original plans.
20   BY MR. BOYNTON:
21          Q.    Okay.  Well, I -- I'm looking at Table
22   2.  And you're -- you've got -- the first three rows
23   are the original plans and then the next three rows
24   are the modified plans, correct, in Table 2?
25          A.    Correct.
```

         1          Q.    And the lowest of the percent HBA CVAP

         2    under the ACS '14 to '18 series is the 50.75 for the

         3    original illustrative District 2, correct?

         4          A.    Correct.

         5          Q.    And the highest percent HBA CVAP under

         6    the ACS '14 to '18 series is the original Alt 2

         7    District 2, correct?

         8                MS. HARLESS:  Objection to form.

         9    Mischaracterizes.

        10    BY MR. BOYNTON:

        11          Q.    You can answer.

        12          A.    Correct.  And let me make sure that --

        13    that I -- heard correctly.  You said 50.75 was the

        14    lowest and 52.11 was the highest.

        15          Q.    I see 52.16, so I -- I misspoke.  So

        16    52.16 is actually the highest, right?

        17          A.    Correct.  I'm reading -- yes, that is

        18    correct.  52.16 is the highest.

        19          Q.    And so all three of the modified

        20    districts are between those two extremes, correct?

        21          A.    Correct.

        22          Q.    Was that a target of yours or did that

        23    just work out that way?

        24                MS. HARLESS:  Objection --

        25          A.    It just worked --

```
 1              MS. HARLESS:  -- to form.
 2         A.    It just worked out that way.
 3  BY MR. BOYNTON:
 4         Q.    Okay.  And in -- in modifying the plans
 5  to include Georgia Allen's address the percent HBA
 6  CVAP under the '14 to '18 ACS series went down for
 7  both Alt 1 and Alt 2 as modified, correct?
 8         A.    Could you repeat that?
 9         Q.    Sure.  In modifying plans Alt 1 and Alt
10  2 to include Georgia Allen's address the percent HBA
11  CVAP under the ACS '14 to '18 series declined in Alt
12  1 and Alt 2 from what it was previously?
13         A.    One of the plans increased for -- the
14  Illustrative Plan, the original, and Alt 1 and Alt 2
15  decreased.
16         Q.    Okay.  Now, you make a note at the
17  bottom of that chart that says, Note: 14 to 18 ACS
18  is 2014 to 2018 5-year ACS.  Total Hispanic (HCVAP),
19  Black (BCVAP), and Asian (ACVAP) may not sum to
20  HBACVAP percentage due to summing totals prior to
21  disaggregation.
22              Can you explain that sentence to me,
23  please?
24         A.    Sure.  There are two ways of
25  disaggregating the data.  You can disaggregate each
```

1    of the -- the attributes of the racial components,

2    Hispanic, white, black, Asian, and then total after

3    the disaggregation, then total Hispanic, black and

4    Asian to get the HBA.  That can give you a -- an --

5    a total population that's equal to the sum of the

6    parts.  Or you can total and create a category of

7    total for the Hispanic, black and Asian combined and

8    then disaggregate the total.

9         The second one is more accurate for the

10   -- the total.  The other one -- the other way

11   actually provides you with a hundred-percent sum of

12   the three race and ethnicity categories.

13        Q.    The -- the piece I'm not understanding

14   as a lay person is how it wouldn't sum to a hundred

15   prior to disaggregation.  I get it when you pull it

16   apart and put it back together things shift, but why

17   is it not summing to a hundred before you're

18   disaggregating?

19        A.    It -- no.  It -- it -- what happens is

20   there is a -- a -- a -- some type of disaggregation

21   error that occurs with each one of the fields.  And

22   so when you disaggregate for Hispanic, black and

23   Asian and then sum it up at the end you're going to

24   get the sum.  It's just mathematics.  You're going

25   to get the total.  However, when you total in the

1    beginning and then disaggregate, that disaggregate

2    -- that disaggregation error exists whereby it's not

3    equal to -- or it may not be equal to the sum

4    Hispanic, black and Asian combined.

5           And so the focal point really is where

6    do you want the focal point to be with and the more

7    accurate amount.  Do you want -- do you want it to

8    be after you disaggregate in total, which you may

9    include a disaggregation error associated with

10   totaling, or do you want to eliminate that from the

11   beginning and then have the most accurate depiction

12   of the total.  So it's a question of whether you

13   want the -- the 100 percent to be the sum of the

14   three areas or you want a more accurate total.

15          And so in this particular case you want

16   a more accurate total because potentially you are

17   summing the disaggregation error for the Hispanic,

18   the disaggregation error for the black, the

19   disaggregation error for the Asian, and you're

20   summing that up to a total at the end.  And so you

21   end up with potentially three different

22   disaggregation errors versus really one.

23        Q.    Okay.  So what you're really saying, I

24   think, and please correct me because I may be wrong,

25   they -- they may not sum to some extent due to

50

```
 1    summing totals -- when it -- when you say summing
 2    totals prior to disaggregation the -- the issue is
 3    you're summing them and then you're disaggregating?
 4         A.    Correct.  Correct.
 5         Q.    And it's -- it's not that the error
 6    occurs in the -- in the -- in the pre-disaggregation
 7    phase?
 8         A.    No.  It -- when you sum in the beginning
 9    you know that there is an accurate total, and so you
10    know that the total is an accurate total when you
11    sum in the beginning.  When you sum at the end
12    potentially you have the disaggregation -- or,
13    rather, let me backtrack and say when you sum in the
14    beginning you have a disaggregation of -- of one
15    field and that's the total.  When you sum at the end
16    you have a disaggregation of potentially three
17    fields; Hispanic, black and Asian.  And so if you
18    are concerned about the total, then you would use
19    the one where you disaggregate only the total.  It
20    would only have that disaggregation of the total.
21              If we were concerned about each of the
22    individual racial components -- race and ethnicity
23    components, then we would do it the other way.  But
24    in this instance to a certain extent we're concerned
25    mostly with the total HBA CVAP not the individual
```

```
 1   Hispanic, black and Asian combined statistics.
 2          Q.    Okay.   Thank you.
 3                And the reason there is a disaggregation
 4   or summing error at all is because the ACS provides
 5   data at the block group level and you're trying to
 6   distill it down to a smaller sector of blocks,
 7   correct?
 8          A.    Correct.
 9          Q.    And when you talk about blocks you're
10   using voting tabulation districts as -- as what
11   you're building it back up into?
12          A.    Correct.  As well as the -- the district
13   itself.
14          Q.    What prompted you to include a black and
15   white mixed-race data in this report?
16          A.    Okay.  It's commonly used many times,
17   and -- and it shows you, I think, more of a -- a
18   true depiction of -- of the racial component.  And
19   -- and, you know, black and white is many times the
20   most -- or the largest mixed-race category in many
21   areas -- not in all but in many areas.
22          Q.    Do you have any knowledge of mixed-race
23   voting behavior in Virginia Beach?
24          A.    No.  No.  I -- I do know that -- that
25   many times people look at the combined race when
```

```
 1    they're calculating sometimes the racial
 2    polarization, and so they'll --
 3          Q.    And --
 4          A.    -- over the course of --
 5          Q.    But it would not be your role in this
 6    case, correct?
 7          A.    That's correct.  That's correct.
 8          Q.    And do -- did you not -- and you said, I
 9    believe, that there was Hispanic white mixed-race
10    data available from ACS.  Did I misunderstand that?
11          A.    No.  No, not Hispanic white.  It would
12    be -- I think you mentioned white and Asian.
13          Q.    Okay.  So there is white and Asian
14    mixed-race data from the ACS available to you?
15                MS. HARLESS:  Objection.  Asked and
16    answered.
17    BY MR. BOYNTON:
18          Q.    You can answer.
19          A.    Yes.  Yes, but I -- I didn't add it.  I
20    -- I -- I didn't add it.
21          Q.    Is there reason why you chose one
22    mixed-race group to add and not a second mixed-race
23    group to add?
24          A.    Yes, because usually -- usually black
25    and white is the largest mixed-race category.
```

53

1    Usually.  It may not be in this particular case, but

2    I was using the general rule of thumb.

3        Q.    Now, is -- is that rule of thumb

4    published anywhere that you can refer to?

5        A.    No.  It's just in -- in reports many

6    times people will -- you'll see that people -- or I

7    have seen where they'll add either black and white

8    or the entire combined black is what I've -- I've

9    seen and focused upon.

10        Q.    Well, when drawing the planned

11    districts, and I'm referring to Alt 10 in this

12    instance, for your supplemental report did you

13    consider the residence of any incumbents?

14            MS. HARLESS:  Objection to form.

15        A.    I did not consider the residence of any

16    incumbents.  I -- in that first report I had an

17    overlay of the incumbents.

18    BY MR. BOYNTON:

19        Q.    I'm sorry.  That was the original

20    report; is that correct?

21        A.    Correct.

22        Q.    And -- and so when you prepared the six

23    report -- or the six plans in the rebuttal report

24    you did not at any point overlay residence addresses

25    of incumbents?

54

1          A.     Correct.

2          Q.     And when you prepared the three new

3    District 2s under your supplemental report you did

4    not overlay or consider residence address of

5    incumbents?

6          A.     Correct.

7          Q.     Sitting here today, do you have any

8    knowledge as to where or in what districts any

9    incumbents would reside under this plan, either of

10   these three plans that are modified?

11         A.     No, not without referring to the -- you

12   know, the original report map that I did.  And I

13   would imagine that it didn't -- since there were

14   slight changes it would be very similar to that --

15   that map.

16         Q.     Did you go back and see if there had

17   been any changes on City Council with respect to

18   members of City Council since that first map?

19         A.     No.  No, I did not.

20         Q.     So you made no attempt to separate each

21   incumbent into a single residence district in

22   District 2 among any of these three modified maps?

23         A.     No.  No.  That wasn't the purpose of --

24   of -- of this first prong of Gingles, if you will.

25         Q.     Okay.  And so circling back to something

1    we started to talk about earlier, on page 7, in the

2    second-to-last paragraph on the bottom, you note

3    that, The modified Illustrative, Alternative 1 and

4    Alternative 2 plan's HBACVAP percentages using the

5    2013 to 2017 5-year ACS data for District 1 were

6    50.03, 51.50 and 51.4 -- 04 percent, respectively,

7    and 50.24, 50.87, and 50.71 percent, respectively

8    for District 2.

9            So does that refresh your recollection

10   as to whether you overlaid the ACS '13 to '17 data

11   series on the new three District 2s?

12        A.   Yes, I did review those, but I think

13   there was a different question that you asked, but I

14   did look at that.

15        Q.   You -- so you considered that and you

16   put it in your report.  Why did you put it in your

17   report?

18        A.   Just to show that they were above in

19   both of the plans.  I -- we're looking or using the

20   2014 to 2018, but it's just a good thing to -- to

21   look at the 2013-2017 ACS, but --

22        Q.   Did you look at any other five-year ACS

23   data series for the three new maps?

24        A.   No.  No.

25        Q.   And I think you previously testified you

56

 1    did not use 2010 census HBA VAP data for that

 2    purpose either.

 3         A.    Correct, because it doesn't exist.

 4    That's right.

 5         Q.    Oh.  Well, what does exist?

 6         A.    I mean the 2010 CVAP.  I'm sorry.  I

 7    thought you said 2010 CVAP.  I did not --

 8         Q.    VAP.

 9         A.    Right.  I did not use the 2010 VAP data

10    and look at that.  I -- it's -- it's included, of

11    course, in the reports.  Yeah, I include it in the

12    -- the table reports.

13         Q.    Did you calculate the percent H -- or

14    the HBA VAP percentages for these three new

15    districts using 2010 census data?  Is it in your

16    report anywhere?

17         A.    Let me reflect because I used some of

18    the reports in the appendices, but in order to save

19    space because I wanted to include the 2013-2017 and

20    the 2014 and 2018 I removed some of the -- or one of

21    the tables that were included.  So I'd have to

22    refresh my memory on the appendix.

23         Q.    Well, take your time.  Take your time to

24    do that, please.

25         A.    Okay.  So I see that the 2010 voting age

57

1    population -- total population and voting age

2    population I included.

3         Q.    Where is that, sir?  Give me a page,

4    please.

5         A.    Sure.  If you go to page 29, the -- the

6    second table.  It's a little difficult,

7    unfortunately, because it's -- it's in portrait mode

8    and not in landscape mode, but that second table is

9    -- where it says 18 Pop that's the voting age

10   population.

11        Q.    From the 2010 census?

12        A.    Correct.

13        Q.    Okay.  But if I look across and I see

14   District 2 at HBA VAP percent 49.24, then that is

15   the comparative number for the 2010 census for the

16   Illustrative Plan District 2 as modified?

17        A.    Correct.

18        Q.    So that district would not be majority

19   minority under the -- or not majority HBA per the

20   2010 census data?

21        A.    Correct, in 2010.

22        Q.    And you did that for all three of the --

23   the new districts?

24        A.    That is correct.

25             MR. BOYNTON:  Okay.

58

1           MS. HARLESS:  Chris, when you get to a

2     good place, we've been going for a while, so I think

3     it might be -- I need to take a quick break.

4           MR. BOYNTON:  That's fine.  Let's take a

5     break.  What do you want to say; ten minutes?

6           MS. HARLESS:  Yes.  That works.

7           MR. BOYNTON:  Okay.  Sounds good.

8     Thanks everybody.  I appreciate the patience with

9     it.

10          (Recess)

11    BY MR. BOYNTON:

12       Q.    Back on the record.

13          Mr. Fairfax, you mentioned earlier the

14    traditional criteria for redistricting.  What are

15    they?

16       A.    There are several traditional criteria

17    that are somewhat universal.  And the ones that are

18    universal includes equal population, trying to

19    equally populate the districts; contiguity,

20    attempting to make sure that they're joined together

21    -- all parts of the districts are joined together.

22    And, of course, there are exceptions to the rules

23    with each one of these.  Compactness, which has to

24    do with disperse -- or dispersion or irregular

25    configurations of the district and there are

59

```
 1    measurements to try to measure that.  Another one is
 2    the political subdivision splits, trying to minimize
 3    political subdivision splits, so you're looking to
 4    minimize county splits or city splits or what's
 5    called voting tabulation districts -- splits of
 6    those, and precinct splits.  And then communities of
 7    interest, which is the most -- the largest -- the
 8    wide-ranging of all of them, and it could be an
 9    interest of in -- income or education or poverty or
10    crime or some issue that's relevant to a particular
11    community.  And those are sort of the -- the -- the
12    five sort of main traditional redistricting
13    criteria, but there are several others from state to
14    state and jurisdiction to jurisdiction that apply.
15         Q.    Okay.  And you considered all five of
16    those areas, those criteria, in preparing these
17    three maps?
18         A.    Yes.
19         Q.    Where does drawing districts on the base
20    of race or national origin fit in those traditional
21    criteria?
22         A.    Well, the -- the courts have ruled race
23    can't predominate.  And there is sort of a gray area
24    for Section 2 lawsuits where the objective is for
25    race to be proven, if you will, in creating a
```

1  sufficiently large and geographically compact

2  district.  But in -- in the case that I try to do

3  and I try to use -- or develop a plan where race

4  becomes one of many factors, if you will.  And so

5  you're trying to achieve all of -- all of the

6  traditional redistricting criteria, including the

7  aspect of race being -- or the district being above

8  50 percent CVAP.

9       Q.    And clear -- clearly your efforts here

10  were to draw two majority minority districts, which

11  necessarily considers race as a predominant factor

12  in drawing, correct?

13            MS. HARLESS:  Objection to form and it

14  calls for a legal conclusion.

15  BY MR. BOYNTON:

16       Q.    Well, tell me your conclusion, sir.

17       A.    I -- I -- I would -- I would say that

18  you attempt to draw a 50-percent CVAP district in

19  addition to following all the other traditional

20  redistricting criteria.

21       Q.    And race was a factor in drawing these

22  districts, correct?

23       A.    It -- it was a factor, yes.

24       Q.    Now, how did you consider compactness

25  when you drew the plans for the supplemental report?

61

```
1         A.    Well, most of the time if -- if you're

2    looking and you're drawing a district you can tell

3    whether something is -- visually tell whether

4    something is not compact or less compact when you're

5    actually adding on areas.  And so as you're adding

6    on areas you can visually see.  And then, of course,

7    when you get to a good stopping point you run a

8    report and then you look at -- you can look at the

9    measurement to see if what you thought was right or

10   not.  And, of course, you don't do that every time

11   you make a change.  You just do it periodically.

12            And so as you're developing -- as I'm

13   developing a plan I would visually look and see if

14   something is more compact.  And usually you're --

15   you recognize sort of the measurements and how they

16   actually work, and -- and you develop according to

17   that.  And that means no fingers sticking out

18   somewhere, try to have less squiggly lines, things

19   of that nature, as you're drawing, as you're

20   developing the plan.

21         Q.    So what are the measures of compactness

22   that you used in the supplemental report?

23         A.    I use the Reock, Polsby-Popper, and the

24   Convex Hull.

25         Q.    Do you have one that -- one of those
```

62

```
 1    three tests you consider more reliable or most

 2    reliable?

 3         A.    No.   No.   And that's why you use three.

 4    That's why I use three.   Because every district or

 5    jurisdiction may have sort of biases that favor or

 6    disfavor according to one particular compactness

 7    measurement.   And so you use three to sort of break

 8    the decision point, if you will.   If you use two,

 9    you may have two that disagree.   Three you can at

10    least look at two of the three and -- and make a

11    determination.

12         Q.    So in -- in using all three of these

13    compactness measurements did illustrative District 2

14    -- when it became modified illustrative District 2

15    did it become more or less compact?

16         A.    I -- I believe -- and I want to check,

17    but I believe it became less compact.

18         Q.    It is on page 8, sir.   You're welcome to

19    look at it.

20         A.    Yes.   Okay.

21              Yes.   I believe it became less compact.

22         Q.    Under all three measures?

23         A.    Under all three measures -- Alter --

24    Alternative 1 actually became more compact under the

25    Reock measurement.
```

63

```
 1          Q.    Okay.  And I was -- sir, I was still on
 2    the illustrative mod District 2.
 3          A.    Okay.  I'm sorry.  Yes, under all three
 4    measures it became less compact.
 5          Q.    Okay.  And -- and under -- for Alt
 6    District 1 versus Modified Alt District 1 the
 7    modification became less compact under two of the
 8    three metrics; is that correct?
 9              MS. HARLESS:  Objection --
10          A.    That's correct.
11              MS. HARLESS:  -- to form.
12              I'm sorry.  I think you said District 1.
13    BY MR. BOYNTON:
14          Q.    I -- I -- I did.  That was my question.
15          A.    District 1.
16          Q.    Under the mod -- Alt -- under Alt -- Alt
17    1 -- I'm sorry.  Let me rephrase to get it clear.
18              Under the modified Alt 1 for District 2
19    as compared to the original Alt 1 for District 2 did
20    two of your three metrics show the modification
21    becoming less compact?
22          A.    Correct.
23          Q.    And that was the Polsby-Popper and the
24    Convex Hull calculations?
25          A.    Correct.
```

64

```
 1          Q.    And for Alt 2 modified District 2 the
 2    Polsby-Popper and the Convex Hull also showed the
 3    modification of Alt 2 being less compact than the
 4    original Alt 2 for District 2, correct?
 5          A.    Correct.  At -- at 1 you're talking
 6    Polsby-Popper and Convex Hull; is that
 7    specifically --
 8          Q.    Yes.
 9          A.    -- what you said?
10                Yes.
11          Q.    Yes, sir.  Thank you.
12                So you say they did not change
13    significantly when compared to the original.  What
14    would be a significant change compared to the
15    original districts?
16          A.    I -- I would think that the significant
17    difference would, of course, depend upon each
18    measurement.  And so, for example, I would think
19    that if -- if the Illustrative 2 for the original
20    plan went to -- say 1. -- for Reock went down to,
21    say, 1.5 let's say or 1.4, I would consider that
22    (audio interruption) significant.
23                THE REPORTER:  I'm sorry.
24    BY MR. BOYNTON:
25          Q.    You mean .1 --
```

```
 1              THE REPORTER:  I'm -- I'm sorry.  Your
 2   end --
 3   BY MR. BOYNTON:
 4         Q.    -- 4 or --
 5         A.    I'm sorry.  .1.  I'm sorry.  Yeah.  .1.
 6              THE REPORTER:  The end -- the end of
 7   your answer dropped off back there.
 8         A.    Okay.  Let me repeat.
 9              I -- I would think for Reock if -- if it
10   moved -- for example, the Illustrative Plan, it
11   moved from .24 to say .15, 14, 13, that may be
12   considered moving towards significant, although I --
13   I've seen measurements in -- in that range before.
14   But it would be a difference in -- with the
15   Polsby-Popper once again I would say also if it
16   moved from .2 to under .1, that -- that would be
17   considered probably significant.  And Convex Hull
18   would -- since it -- it starts at a larger
19   measurement point, which is the -- the mid .5, I
20   would actually consider that having to go to maybe
21   point -- close to .3 or something -- .3 something.
22   BY MR. BOYNTON:
23         Q.    Okay.  Thank you.
24              Looking at page 28 of your supplemental
25   report...
```

66

1              MS. HARLESS:  You mean the appendix,

2      right?

3              MR. BOYNTON:  Oh.  I -- I have it all

4      together as one exhibit, but -- and I think the

5      numbering is sequential.  So it is page 28 as a

6      whole.

7          A.    That's the map?

8      BY MR. BOYNTON:

9          Q.    It is the map, yes, sir.

10         A.    Yes.

11         Q.    And specifically it is a zoom of

12     Illustrative Plan Modified District 2, correct?

13         A.    Correct.

14         Q.    Now, I -- I look at the map and in the

15     northeast corner I see that two areas, Lynch Lane

16     and Olivieri Lane, all the way up to Sullivan

17     Boulevard -- there's kind of a notch there.  Do you

18     see where I'm talking -- the location I'm talking

19     about?

20         A.    Let me -- let me zoom in and see if I

21     can -- you're referring to -- could you repeat what

22     you said?

23         Q.    Lynch Lane and Olivieri Lane --

24         A.    Yes.

25         Q.    -- there is a divot or a notch.

1       A.    Correct.

2       Q.    Do you recall why that divot or notch is

3    there?

4       A.    I recall when I developed the plan

5    trying to include Ms. Allen's address in a minimal

6    fashion but still maintain some reasonable

7    compactness.

8       Q.    Do you -- do you have any -- sitting

9    here today, any sense of why that location of Lynch

10   Lane, Olivieri Lane, Bark Lane is not part of

11   District 2 as drawn there?

12      A.    No.  No.  I -- I didn't focus on the

13   areas that I didn't include.  I focused on the areas

14   that I did include.  And so what I was trying to do

15   was include that address of Ms. Allen's and -- and

16   at the -- with the least amount of change as I could

17   but still in some type of compact fashion.

18      Q.    Okay.  And so in doing that you had to

19   cross North Witchduck Road and -- and create some --

20   some portion of the district on the east side of

21   Witch -- North Witchduck Road, correct?

22           MS. HARLESS:  Objection to form.

23      A.    Correct.  Correct.

24   BY MR. BOYNTON:

25      Q.    Do you know if in including Georgia

68

```
1    Allen in the district you split VTDs specifically to
2    get to Ms. Allen's address?
3            A.    Yes.  Correct.
4            Q.    You did do that?
5            A.    Yes.
6            Q.    Do you recall how many VTDs you split to
7    get -- to reach Ms. Allen's address?
8            A.    I -- I believe there were two split
9    VTDs -- additional VTDs.  And -- and --
10           Q.    Yes, sir.
11           A.    -- let me al --
12           Q.    Sure.
13           A.    I'm sorry.  Let me -- let me also say
14   that it -- it was possible to -- to split one.  If
15   -- if I just followed the southern area of Witchduck
16   Road, I -- I could have added her address that --
17   that way, but, of course, that would have been, in
18   my estimation, considered not compact.  And so --
19           Q.    Okay.
20           A.    -- in order to make it compact or
21   reasonably compact I added that extension on at the
22   top.
23           Q.    Okay.  And -- and that is the -- the
24   area right above Georgia Allen's name on the map?
25   You said you added a bit on the top.  I'm trying to
```

69

```
 1    figure out --
 2          A.    On -- on --
 3          Q.    -- what is the top.
 4          A.    On the -- I'm sorry.  I'm sorry.  On the
 5    top of Witchduck Road, meaning that if -- if you
 6    notice that below Witchduck Road there is an area
 7    that's defined by -- below -- if you can turn the
 8    map sideways and visualize it, below Witchduck Road
 9    there is an area that actually could be added or
10    attempted to add to include Ms. Allen's address.
11    However, what I did was I added on this other area
12    that -- that was above that to make it more compact,
13    the area that's --
14          Q.    All right.  So --
15          A.    -- to the north, if you will, of
16    Witch --
17          Q.    Got you.
18          A.    -- Witchduck Road.
19          Q.    Where it says -- where -- where it says
20    Holladay Lane and going on toward Merrimac Lane --
21    that's the area north of North Witchduck Road you're
22    talking about?
23          A.    That's correct.  That's correct.
24          Q.    Okay.  Thank you.
25                And the area that you picked up to the
```

70

1    very north I guess west of the district -- can you

2    tell me kind of the boundaries of that?

3         A.    The area that -- that you --

4         Q.    You said you added because it had a high

5    concentration of HBA CVAP.

6         A.    Oh, yes.

7              MS. HARLESS:  Objection to form.  You

8    can answer.

9         A.    Okay.  The question was --

10   BY MR. BOYNTON:

11        Q.    What would be the area that you added to

12   Illustrative Plan Mod District 2 in the northwestern

13   quadrant of that modified district for the purpose

14   of including additional concentrations of HBA CVAP

15   voters?

16        A.    Correct.  Correct.

17        Q.    Can you tell me where that is, the

18   boundaries, by street name?

19        A.    I can't tell you by street name.  It's

20   in that northern area up -- up top.

21        Q.    So would that be along Diamond Springs

22   Road?

23        A.    I would have to pull up the Maptitude

24   program to check.

25        Q.    Okay.  Sitting here today, you're --

71

```
 1          A.     But --
 2          Q.     -- not sure?
 3          A.     Right.  And -- and all I am sure is that
 4     there is a series of Hispanic -- I mean Hispanic,
 5     black, and Asian combined subdivision that exists in
 6     that area, and so I added that --
 7          Q.     And you picked (audio interruption)
 8     adding race -- additional members of those races to
 9     the district?
10               MS. HARLESS:  Objection to form.  I -- I
11     didn't hear that question.  I just heard the last of
12     it.
13          A.     Yes, sir.
14               MR. BOYNTON:  Could you read it back?
15               THE REPORTER:  I didn't hear the first
16     of it either.
17     BY MR. BOYNTON:
18          Q.     Okay.  And you added that partial VTD to
19     pick up additional Hispanic, black and Asian voters,
20     correct?
21               MS. HARLESS:  Objection to form.
22     BY MR. BOYNTON:
23          Q.     You may answer.
24          A.     I added several subdivisions that exist
25     in there.  It's -- it's a -- it's a complete block
```

72

1    group similar to, I guess, a -- a neighborhood

2    section or subdivisions that are a majority

3    Hispanic, black and Asian combined.  At least some

4    of them were close to Hispanic, black and Asian

5    combined, a majority Hispanic, black and Asian

6    combined.  I added those to the district.

7           Q.    And that was for the purpose of -- of

8    increasing the concentration of those races in the

9    district, correct?

10               MS. HARLESS:  Objection to form.

11   BY MR. BOYNTON:

12          Q.    You may answer.

13          A.    That was for the purpose of achieving a

14   -- a majority Hispanic, black and Asian CVAP

15   district.

16          Q.    Please turn your attention to page 42.

17          A.    42.  Okay.  I'm here.

18          Q.    Okay.  This you will agree -- or would

19   you agree that this map we're looking at is titled

20   Illustrative Plan Alt 2 Mod District 2 Zoom?

21          A.    Correct.

22          Q.    There's an area that looks like a V in

23   the northern part of the district -- or that's

24   excluded from the district along Brinson Road,

25   including Whitman Lane and Olivia Grove Lane.  Do

73

 1   you see that area?

 2         A.    Yes.  Yes, I do.

 3         Q.    Do you recall, sitting here today, why

 4   that area is not included in the modified District 2

 5   under Alt 2?

 6         A.    Because I wanted to contain Ms. Allen's

 7   district in a minimal configuration that was

 8   compact, and so I added those three block groups.

 9   That wasn't one of them.

10         Q.    Do you know why that particular group

11   was ex -- that particular area was excluded?

12         A.    It -- it wasn't needed to add to include

13   Ms. Allen's address.

14         Q.    Would you agree that not having a -- a

15   clean line across the area of where Brinson Avenue

16   is decreases the compactness of the district?

17              MS. HARLESS:  Objection to form.

18         A.    I had already added in a block group

19   that -- that I most likely did not have to increase

20   the compactness, and I didn't see it necessary to

21   add an additional block group.

22   BY MR. BOYNTON:

23         Q.    Does -- does that configuration not

24   appear awkward to you, sitting here today?

25         A.    Well, block groups attempt to follow

```
 1    neighborhood patterns.  They -- they attempt to do

 2    that, the census bureau.  And so what may be awkward

 3    may be because of the patterns of -- the

 4    neighborhood patterns, how the -- they segmented out

 5    the area.  So it -- it may look a little awkward,

 6    but it may reflect the residents inside.  And that's

 7    just from a general standpoint.

 8         Q.   Is it your testimony that you drew that

 9    area out of the district that was a separate block

10    group?

11         A.   It is a separate block group, yes.  And

12    -- and I don't know how far it goes, but since I

13    only used block groups that's contained within a --

14    a -- a -- another block group.

15         Q.   And so do you know if it's within the

16    same VTD as areas in the Illustrative Plan Alt 2 Mod

17    District 2?

18         A.   It -- it may be.  I'm not sure at this

19    particular moment whether it's contained within the

20    same VTDs.  As I mentioned before, that one of the

21    objectives of this is to develop a plan consisting

22    only of block groups because of the concern of --

23    Dr. Morrison has had of this disaggregation process.

24         Q.   Okay.  So how did you consider political

25    subdivision splits in preparing your plans?
```

```
 1          A.    I considered not splitting the political

 2    subdivisions as -- as much as possible.  In this

 3    particular case it was the VTDs, or voting

 4    tabulation districts.  So I tried to minimize the

 5    splitting of those and still achieve the objectives

 6    of -- of the -- the plan.

 7          Q.    So in this context you consider

 8    splitting a VTD to be a political subdivision split,

 9    correct?

10          A.    Correct.

11          Q.    And in this context, although you did

12    not use actual precincts, you were splitting

13    precincts that would also be a political subdivision

14    split in this context, correct?

15          A.    Correct.

16          Q.    When you say at page 8 of your report --

17    and take a moment to get back to it --

18          A.    Okay.  I'm there.

19          Q.    -- that, "Once again, the political

20    subdivision splits of District 2 in the

21    Illustrative, Alternative 1, and Alternative 2 plans

22    were...not significantly altered after modifying the

23    Plans..." -- what do you deem to be a significant

24    alteration for -- of -- of amount of political

25    subdivision splits?
```

```
 1        A.    Under the context of where we stand with
 2   these splits, I -- I -- I would say probably leaning
 3   toward four splits or something like that.  And
 4   again you're looking at the context of each
 5   jurisdiction and each plan because in some
 6   jurisdictions you just have to split.
 7              And so in the context of this I'm
 8   looking at the illustrative plan, the original one,
 9   as a baseline, and I split two additional ones for
10   the first plan and one for the second and the other
11   one remained the same.  The Alternative 2 remained
12   the same.  And so that leads me to believe that
13   there wasn't a significant amount of splits created
14   by modifying the plans.
15        Q.    And in Alt 2, which is the -- the
16   alternative where you use block groups,
17   interestingly that resulted in the most VTD splits
18   of these three plans, correct?
19        A.    Yes.
20        Q.    Why is that?
21        A.    Because block groups automatically split
22   VTDs.  Not automatically, but block groups don't
23   conform to precincts or VTDs.  They're two different
24   purposes.
25        Q.    Did you make any effort to overlay
```

```
 1   actual city of Virginia Beach precincts on your maps
 2   that you drew for the supplemental report?
 3              MS. HARLESS:  Objection.  Asked and
 4   answered.
 5        A.   And -- and I -- I missed the first part,
 6   and I believe it was did I make any attempt to
 7   overlay precincts?
 8   BY MR. BOYNTON:
 9        Q.   Yes.  Over the districts or over the --
10   yeah, the districts prepared in your -- your new
11   report, your supplemental report.
12              MS. HARLESS:  Same objection.
13   BY MR. BOYNTON:
14        Q.   You may answer.
15        A.   No.  As I had mentioned before, once I
16   noticed that the precincts split census blocks, I
17   opted to go with the VTDs as the primary entity
18   division of -- of -- of the -- of the plan.
19        Q.   And is that your consistent approach
20   through all three reports, never applying census --
21   I'm sorry -- precincts to your reports?
22        A.   Correct.  And let me also say that I --
23   I -- I looked at it in the beginning, and the
24   majority of the precincts followed the VTDs.  And so
25   I don't want the impression that they didn't follow
```

1   them the majority of times.  The majority of the --

2   the precincts follow VTDs.  There were some that

3   deviated and then some that actually deviated across

4   census blocks.  So it's --

5           Q.    So you looked at --

6           A.    -- it's --

7           Q.    You looked at that at one point in time,

8   the very beginning before your original report?

9           A.    Right.  Correct.  But what I originally

10  did -- I think I mentioned this in the report.  I

11  looked and analyzed the -- the precincts.  And I

12  think I men -- mentioned this in the original

13  deposition, which was for the most part the -- the

14  precincts followed the VTDs; however, there were

15  some that did not follow.  But I think the majority

16  of them followed the VTDs.  However, once the --

17          Q.    Do you know how many precincts there are

18  in Virginia Beach currently?

19          A.    Offhand I -- I can't recall.

20          Q.    Do you know if that number has changed

21  from 2010 to 2019?

22          A.    No, I do not.

23          Q.    And at no point in time did you lay

24  precinct districts over -- precincts over districts

25  in these three maps?

```
 1              MS. HARLESS:  Objection.  Asked and
 2      answered.
 3         A.    Correct.  Once I decided that VTDs would
 4      be the unit -- the component unit, then I stuck with
 5      VTDs.  I did not switch back to precincts.
 6      BY MR. BOYNTON:
 7         Q.    Can you tell me how or the process for
 8      accounting for voters when VTDs are split --
 9              MS. HARLESS:  Objection to form.
10      BY MR. BOYNTON:
11         Q.    -- from within the district from outside
12      the new district?
13         A.    Can -- can you clarify that, what you're
14      trying to ask?
15         Q.    Mathematically -- well, let's start with
16      the baseline.  You've said in your three modified
17      plans that Modified Illustrative District 2 split
18      seven VTDs, correct?
19         A.    Correct.
20         Q.    And Alt 1 Modified District 2 split
21      eight VTDs, correct?
22         A.    Correct.
23         Q.    And Alt 2 Mod District 2 split ten VTDs,
24      correct?
25         A.    Correct.
```

80

```
 1        Q.    So in each of these instances where
 2   we're splitting VTDs that is putting a portion of
 3   the VTD in District 2 and a portion of the VTD
 4   outside of District 2, correct?
 5        A.    Correct.
 6        Q.    So how do you allocate the population
 7   for purposes of HBA CVAP analysis between the
 8   portion of the VTD that remains in District 2 and
 9   the portion that is outside?
10        A.    Right.  One of the reasons why you use
11   VTDs is they follow census blocks, whereas precincts
12   specifically when they are splitting blocks do not
13   follow census blocks.  And so because census blocks
14   is a subcomponent of the precincts and we're
15   building the district using census blocks as the
16   smallest element, you're able to actually aggregate
17   the population.  And, of course, that's -- you
18   determine CVAP after you do or provide -- perform
19   the disaggregation process, which brings it down to
20   the block level, and then you can rebuild that up to
21   each of the VTDs and -- and additional district
22   components.
23        Q.    Turning your attention to Exhibit 7,
24   please, sir, behind the -- the full report that is
25   Exhibit 6...
```

1          A.    I believe that's -- does that start --
2     where does that begin?  What page number does that
3     begin?
4          Q.    In the PDF I am not sure, but let's --
5     you have -- how many pages are on your report?  It
6     looks like 47.  It should be 48.
7          A.    Okay.  Yes.
8          Q.    Okay.  I will represent to you that this
9     is your -- or it's a zoom of your modified
10    illustrative plan which compares to the exhibit you
11    looked at on page 28 previously of your report.
12         A.    (Moved head up and down.)
13         Q.    Does that look accurate from a quick
14    review?
15         A.    From -- from what I see, it -- it looks
16    accurate.
17         Q.    Okay.  I'd ask you to take a look at the
18    area that we were referring to before with Lynch
19    Lane and Olivieri Lane that is not in District 2.
20         A.    Correct.  Yes.
21         Q.    I will represent to you that the yellow
22    lines represent precinct lines based on Virginia
23    Beach's 2019 precincts.  Assuming that is accurate,
24    has the omission of Lynch Lane and Olivieri Lane
25    from District 2 split a precinct?

1          A.     Yes.

2          Q.     Similarly, the inclusion of Ms. Georgia

3    Allen's location or residence address on the extreme

4    eastern part of District 2 -- does that not also

5    split a precinct, assuming these precinct lines are

6    drawn accurately?

7                MS. HARLESS:  Objection to form.

8          A.     I believe you -- you're referring to the

9    northern end right at --

10   BY MR. BOYNTON:

11         Q.     I'm -- I'm referring to the eastern end.

12   There's a number that says 48 --

13         A.     Yes.

14         Q.     -- which I believe is very close to

15   where Ms. -- Ms. Allen lives.  Jericho Road.

16   Merrimac Lane.  That area.  District 2 is the -- the

17   bright fuchsia color.

18                MS. HARLESS:  Objection to form.

19                MR. BOYNTON:  I'm just trying to get him

20   oriented for now.

21         A.     Sure.  I -- I see that that's part of

22   the same precinct, yes, that Lynch Lane is in, if

23   I'm looking at the -- the yellow lines correctly.

24   BY MR. BOYNTON:

25         Q.     Sir, what I'm asking you is, does the

```
 1    inclusion of area 48 in District 2 split a precinct

 2    with area -- or with District 6 on your map?

 3              MS. HARLESS:   Objection to form.

 4        A.   And -- and what I'm saying is is that

 5    the same precinct, at least is what I see on my map,

 6    that includes Lynch -- Lynch Lane -- they are

 7    included in the same precinct.  And so it's the same

 8    precinct that includes Lynch Lane -- that split that

 9    we just talked about is included in that number 48.

10    That's the same precinct.

11    BY MR. BOYNTON:

12        Q.   Okay.  But I guess I -- in looking at

13    the yellow lines as precinct boundaries --

14        A.   Correct.

15        Q.   -- and I'm -- I'm referring to 48 just

16    to orient you, not assuming that's a precinct

17    number.

18        A.   Yes.

19        Q.   And so that might have been my error.

20        A.   Okay.

21        Q.   But assuming that precinct lines are

22    accurately put on there as yellow lines on Exhibit

23    7 --

24        A.   Yes.

25        Q.   -- does the fuchsia area where Ms. Allen
```

 1    lives -- does its inclusion in area 2 split a

 2    precinct with portions of District 6?

 3              MS. HARLESS:  Objection to form.  Asked

 4    and answered.

 5    BY MR. BOYNTON:

 6         Q.    You can answer.

 7         A.    Well, right.  And -- and I guess what

 8    I'm saying is it's included in the same split

 9    precinct as before.  So, yes, it includes.  It's not

10    an additional split.

11         Q.    But it's -- it's -- it's -- it's one

12    split when you look at Olivieri and Lynch Lane?

13    That's what you're telling me?

14         A.    Yes.

15         Q.    I got it.

16         A.    Yes.

17         Q.    Okay.  Turning your attention to Exhibit

18    8, which is very next page.

19         A.    Yes.

20         Q.    Looking at the V-shaped area at -- on

21    the northern portion of District 2, which is green

22    on this map, the -- the blue area that comes into

23    the green at the northern portion of District 2 with

24    Brinson Lane and Holladay Lane -- do you see that

25    area?

1          A.    I see Brinson Arch.  I don't see Brinson

2     Lane.  Let me see.  I -- I --

3          Q.    Do you see the --

4          A.    Yes, I see it now.

5          Q.    -- the middle of the --

6          A.    Yes.  Yes.

7          Q.    I'm referring to that area.  It has

8     numbers 86 and 119 around it.

9          A.    Yes.  That is correct.

10         Q.    You would agree that -- again we're --

11    the baseline assumption for this line of questioning

12    is that the yellow lines accurately represent 2019

13    Virginia Beach precincts.  And so that -- that's an

14    assumption I'm asking you to bake into your answers.

15         A.    Yes.

16         Q.    Okay?

17              Okay.  Assume -- assuming that, you

18    would agree that including the green area of -- of

19    Brinson Arch in the district but not including the

20    blue area that includes Brinson Lane splits a

21    precinct, correct?

22         A.    Correct.

23         Q.    Okay.  And then -- and I think -- I'm

24    trying to learn your language here and -- and it's

25    not a language I speak every day.  I'm not a

```
 1    demographer.  So I appreciate your patience in -- in

 2    working with it.

 3         A.    Okay.

 4         Q.    There is a second precinct split when we

 5    -- when you include Ms. Allen's address, correct?

 6    That's a different precinct split?

 7              MS. HARLESS:  Objection to form.

 8         A.    Correct.

 9    BY MR. BOYNTON:

10         Q.    And the purposes of -- of including

11    those two areas in the District 2 Alt 2 as

12    illustrated was what?

13              MS. HARLESS:  Objection to form.

14         A.    The purpose of including those areas

15    were to include Ms. Allen's address and using block

16    groups in a compact form.

17    BY MR. BOYNTON:

18         Q.    And -- and to maintain HBA CVAP above 50

19    percent, correct?

20         A.    Exactly.  Yeah.  That was one of the

21    criterias, or one of the goals, if you will, in

22    addition to the other goal -- tra -- traditional

23    redistricting criteria.

24         Q.    Okay.  Did you consider communities of

25    interest in your plan for the -- your three plans
```

87

1     for the supplemental report?

2          A.     Yes, insofar as the subdivisions.

3          Q.     Okay.  So tell me what -- what efforts

4     you made to determine communities of interest.

5          A.     Which -- with each of those plans when

6     they originated I looked at the neighborhoods and

7     attempted to not split the neighborhoods or

8     subdivisions that existed in the plans.  And -- and

9     I did the same thing for the modified plans, if I

10    could.  And that's why when I added that extension

11    on the northern end that's a -- that's a complete

12    subdivision or group of subdivisions that were

13    Hispanic, black and Asian combined.

14         Q.     Did you look at neighborhoods on a map

15    or did you assume from block groups or blocks what

16    was a neighborhood?

17         A.     I looked at the subdivisions on a map.

18    I overlaid it on top of the district boundaries.

19         Q.     What was the source of that map?

20         A.     I pulled down the subdivisions from the

21    Virginia Beach website.  They were GIS --

22         Q.     So other than trying not to split

23    subdivisions what other efforts did you make to

24    identify and -- and -- and preserve communities of

25    interest in the same districts?

88

 1       A.     Well, in -- in the beginning -- what I
 2   talked about in the beginning was that these areas,
 3   census tracks that existed throughout the city, and
 4   there was a commonality among these census tracks
 5   within the city of Virginia Beach insofar as
 6   Hispanic, black and Asian combined existed most of
 7   the time similarly in income and -- and education, I
 8   believe, and -- of the other ones I looked at in the
 9   report.
10           And -- and so as I was building I was --
11   in the beginning of the report -- or, rather, the
12   original plan actually used that as somewhat of a
13   basis of these communities that would have --
14   communities of interest that would be gathered
15   together.  And so the concept is, of course,
16   reviewing those census transactions and including
17   those census tracks in the plan to include
18   communities of interest within the plan.
19       Q.     Okay.  So can we go to your Illustrative
20   Plan Districts 1 or 2 map on page 14 of your
21   supplemental report, please?
22       A.     Yes.
23       Q.     Can you tell me within --
24       A.     Just a moment.
25       Q.     Are you there yet?  I'm sorry.

1        A.     Just a second.  Yes.

2               Okay.  Yes.  I'm there.

3        Q.     On page 14 you would agree that we have

4   the overview Illustrative Plan Districts 1 and 2 on

5   a map, correct?

6        A.     Correct.

7        Q.     And this is pre-modification, correct?

8        A.     That's correct.

9        Q.     Okay.  So then we get to the

10  modifications at Appendix B; is that correct, page

11  26 and later?

12       A.     Page 26?

13       Q.     That's the -- the beginning of the

14  modified plans in your report.

15       A.     Yes.  Okay.  Yes.

16       Q.     Okay.  On the very next page, 27, is

17  modified illustrative plan.  That's the -- that's

18  the change that adds Ms. Allen's address and a

19  couple of other locations, correct?

20       A.     Correct.

21       Q.     Can you tell me on this map with --

22  within District 2 where the Hispanic neighborhoods

23  are located?

24              MS. HARLESS:  Objection to form.

25       A.     I could not tell you where Hispanic

1    neighborhoods are located.  One, I wasn't just

2    looking at Hispanic neighborhoods.

3    BY MR. BOYNTON:

4         Q.    Okay.  Can you tell me in -- in District

5    2 where Asian neighborhoods are located?

6              MS. HARLESS:  Objection to form.

7         A.    No, I -- I couldn't tell you that.  I --

8    I did look at the growth of each of the individual

9    race and ethnicities in that original report --

10   report and a dot density report.  That may provide

11   some insight to where they're located.

12   BY MR. BOYNTON:

13        Q.    But, sitting here today, you don't have

14   a -- a familiarity with neighborhoods as to

15   concentration of various minority groups in Virginia

16   Beach?

17        A.    Not without going back to my original

18   report and referring to it.  I would have to do that

19   because that provided some insight to where they're

20   located.

21        Q.    Okay.  Did you make any effort to in --

22   in this report or before identify, say, Filipino

23   neighborhoods as a subgroup of -- of Asian

24   neighborhoods?

25        A.    No.

```
 1          Q.    Okay.  Did you make any effort to
 2    identify Cuban-concentrated neighborhoods as a
 3    subgroup of Hispanic neighborhoods?
 4          A.    No.
 5          Q.    Can you point even to where a -- a
 6    contempla -- a concentration of black voters are
 7    within District 2?
 8                MS. HARLESS:  Objection to form.
 9          A.    I possibly could; however, I would have
10    to refer to my previous report to really be sure and
11    clear.
12    BY MR. BOYNTON:
13          Q.    Well, looking solely at the map, you
14    don't have any sense of that?
15          A.    I -- I have somewhat of a sense, but I
16    don't want to be inaccurate and -- and point out
17    something that -- that is incorrect.
18          Q.    Well, what if -- again understanding
19    that you rely on your original report for specifics
20    and for data, I -- I would like to know your
21    understanding of -- of on this map where black
22    communities are concentrated.
23                MS. HARLESS:  Asked and answered.
24                MR. BOYNTON:  He has not answered.
25
```

```
 1   BY MR. BOYNTON:
 2         Q.    Identify it, please.
 3               MS. HARLESS:  Same objection.  He did
 4   answer it.
 5               THE REPORTER:  I'm sorry, Ms. Harless.
 6   I didn't hear you.
 7               MS. HARLESS:  I said same objection.  He
 8   did answer it.
 9               THE REPORTER:  Thank you.
10   BY MR. BOYNTON:
11         Q.    Please identify the location on -- on
12   page 27 of -- of African American-concentrated
13   neighborhoods.
14         A.    I --
15               MS. HARLESS:  Same objection.
16         A.    It -- it would be slightly difficult be
17   -- because I'd have to refer to my original
18   documentation because the purpose wasn't to locate
19   African Americans or Hispanic or Asians
20   individually.  It was to create a district where
21   African Americans, Hispanic and Asians combined were
22   concentrated and was in a majority.  And so that's
23   where I concentrated.  So, you know, I did not focus
24   my attention on individual race or ethnicity groups.
25
```

93

BY MR. BOYNTON:

    Q.   So that was not part of your
communities-of-interest analysis, correct?

    A.   I -- I looked at that -- that's what I'm
saying.  I'd have to refer to my original report to
see.

    Q.   Well, it's Exhibit 2, so why don't you
go ahead and do that.

        MS. HARLESS:  And you can take the time
you need to look at that, just to be fair.

    A.   Okay.  I -- I can give you a summary.

        If you're looking at the Hispanic
population, there is a concentration of His --
Hispanic population in that northern west end of
Virginia Beach right above that notch, if you will,
that's carved out that I -- I mentioned before that
reduces the compactness.  There is another
concentration to the west of -- of -- the western
end of Virginia Beach of Hispanic population.  And
there is another concentration in District 1, of
course -- not of course, but District 1, that's in
that bubble area, if you will, of District 1.  And
there appears to be a -- a -- a concentration near
the western end of -- of District 1.

94

```
 1   BY MR. BOYNTON:
 2        Q.    Those are all concentrations?
 3        A.    Yes.  Hispanic.
 4              Now, it's --  they're -- they're
 5   populated throughout, but I think your question was
 6   concentration.  And so I'm making --
 7        Q.    Throughout?
 8        A.    Right.  And I'm looking -- referring to
 9   the dot density area map that I'm looking at.
10        Q.    What page of your original report are
11   you on?
12        A.    I'm looking at page 15 of my original
13   report, the map that shows the dot density.  And the
14   first one is Hispanic population.  Then I believe I
15   move over to black population.  And then third would
16   be Asian population.
17              So there's a map that depicts -- excuse
18   me, as I went to the wrong page.  There's a map that
19   depicts a dot density.  And what dot density tries
20   to do is approximate the concentration of the
21   particular group that you're focusing in on.  In
22   this case -- particular case it would be Hispanic
23   for the map.
24        Q.    Okay.  Did -- did you redo dot density
25   analyses for the 2014 through 2018 ACS series as
```

```
 1    part of your supplemental report?

 2         A.    No, I did not.

 3         Q.    So the extent of -- of your knowledge of

 4    Hispanic, black and Asian concentrations in Virginia

 5    Beach are those three maps from your original

 6    report, the dot density maps?

 7         A.    Yes.  I mean this was the resulting

 8    output that I -- that I looked at, but they were in

 9    numerical format, if you will, before I did the dot

10    density, meaning that I came up with this as a -- a

11    way of de -- depicting where the Hispanic or where

12    the Asian, where the black population is, but in

13    doing so I, you know, went back and -- and attempted

14    to look at it visually in a variety of different

15    forms, but this was -- this was the one that was

16    selected.

17         Q.    I understand.  You took numbers, you

18    turned them into dots and put them on a map.  I -- I

19    understand that process informs your --

20         A.    Right.

21         Q.    -- opinion about communities of interest

22    in Virginia Beach.  But my question is, are there

23    any other sources of information?  Have you ever

24    lived in Virginia Beach?  Do you know any Virginia

25    Beach neighborhoods personally?  Anything of that
```

96

1   ilk.

2          A.   I've never lived in Virginia Beach.

3   I've been to Virginia Beach, of course, several

4   times, but I -- I'm certainly not an expert to talk

5   about life in -- in Virginia Beach.

6          Q.   Or where certain ethnic or racial

7   minorities concentrate to live?

8               MS. HARLESS:  Objection to form.

9          A.   Well, no.  No.  I -- I -- I -- I think

10  when it comes to where -- when it comes to where

11  they reside, you definitely can tell using this map

12  where the concentrations of Hispanic, concentrations

13  of black and concentrations of Asians live.  And

14  then, of course, the -- the objective really is the

15  Hispanic, black and Asian combined and not the

16  individual.

17              And so, once again, those maps actually

18  depict where they are concentrated insofar as census

19  tracks are concerned.  So I do know and I'm familiar

20  with where they are located in concentrations at the

21  census-track level and to a certain extent the

22  subdivision level on -- on occasion.

23  BY MR. BOYNTON:

24         Q.   But the -- the piece I'm trying to

25  understand is I -- I -- I -- I fully, I think,

```
 1   understand your testimony that by virtue of having
 2   received that data, having put it on a map and
 3   identified the points on a map, that you have
 4   familiarity from that source of -- of concentrations
 5   of -- of -- of -- of various races and
 6   national-origin groups in Virginia Beach.  I'm
 7   asking if you have any other sources of -- of that
 8   knowledge.
 9        A.    No.  Outside the data is I think what
10   you're referring to, I believe.
11        Q.    Correct.
12        A.    Right.  Outside the data, no, I can't
13   say.  I've been to Virginia Beach.  I've been to
14   some of the neighborhoods, but that would be it.
15        Q.    Thank you.
16              Did you consider where schools are
17   located in drawing the three modified districts --
18   District 2s?
19        A.    No.
20        Q.    Did you consider how streets divided the
21   districts in your plan?
22        A.    Yes.
23        Q.    How so?
24        A.    In some type -- in some cases I tried to
25   follow streets along the way if -- if they split a
```

98

```
 1    VTD.
 2         Q.    Did you talk with anyone in Virginia
 3    Beach when you drew these three modified districts?
 4         A.    No.
 5               MS. HARLESS:  Objection to form.
 6         A.    No.
 7    BY MR. BOYNTON:
 8         Q.    Okay.  Thank you.
 9               So let's turn back then to the
10    supplemental report, page 12.
11         A.    Okay.  I'm here.
12         Q.    These are your conclusions, I believe,
13    on this page, correct?
14         A.    Correct.
15         Q.    Okay.  You make the statement that, in
16    first paragraph, "Plaintiff Georgia Allen's address
17    was not contained with any of the original
18    demonstrative plans, but at least three of the plans
19    can be easily modified to include both Ms. Allen and
20    Ms. Holloway in majority-HBACVAP District 2, as
21    demonstrated in this report."
22               Do you see that sentence?
23         A.    Yes.
24         Q.    Okay.  When you say that the three --
25    three of the plans can be easily modified there's an
```

99

```
 1    inference that the other three plans are not as

 2    easily modified, correct?

 3          A.    No.

 4          Q.    So you did not intend that inference?

 5          A.    No.

 6          Q.    Did you -- I think you said before, I

 7    just want to confirm, that you did not actually

 8    attempt to modify Alt plans 3, 4 or 5, correct?

 9          A.    Correct.

10          Q.    So you don't know whether they're easily

11    modified or not, correct?

12                MS. HARLESS:  Objection.  Asked and

13    answered.

14    BY MR. BOYNTON:

15          Q.    You can answer.

16          A.    As -- as I mentioned before, I believe

17    that they can be easily modified, but I didn't see

18    any reason to modify them because these should have

19    been sufficient for this report.

20          Q.    Do you expect to offer any opinions at

21    trial other than Modified Plans Illustrative

22    District 2 and 1, Modified Alt 1 Districts 1 and 2,

23    and Modified Alt 2 Districts 1 and 2?

24          A.    I can -- let me just say that I -- I

25    plan on discussing the content of my reports.
```

100

1      Q.   Do you rely at this point in time on any

2  plans other than the three that were modified in

3  your supplemental report and the corresponding

4  District 1s in those three plans?

5      A.   When you say rely what are you referring

6  to?

7      Q.   Well, you'll agree that plans 3, 4 and 5

8  at no point in time included Georgia Allen's

9  address.  I think we've already answer established

10  that, correct?

11      A.   Correct.

12          MS. HARLESS:  Objection.

13      A.   Correct.

14          MS. HARLESS:  Asked and answered.

15  BY MR. BOYNTON:

16      Q.   Do you expect to offer any opinions at

17  trial other than contained in your three reports to

18  date?

19      A.   I don't expect to do so.

20      Q.   Do you expect to further supplement your

21  reports at any point in time?

22      A.   Not at this moment, no.

23          MR. BOYNTON:  Give me a moment and we

24  will see if we are done.  I think we're close.

25          MS. HARLESS:  Okay.

1           MR. BOYNTON:  Mr. Fairfax, thank you

2    very much for your time.  You have a good afternoon.

3           THE DEPONENT:  Thank you.  You do the

4    same.

5           (Signature not waived.)

6           (The deposition concluded at 12:50 p.m.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

102

```
1                     DEPOSITION ERRATA SHEET

2

3    Case Caption:  Latasha Holloway, et al. v. City of

4                 Virginia Beach, et al.

5    Deponent:    Anthony E. Fairfax

6    Deposition Date: June 24, 2020

7

8         I have read the entire transcript of my
     deposition taken in the captioned matter or the same
     has been read to me.  I request that the following

9    changes be entered upon the record for the reasons
     indicated.  I have signed my name to the Errata

10   Sheet and the appropriate Certificate and request
     both to be attached to the original transcript.

11

     Page/Line Nos.  Correction/Reason

12   _____    _____

13   _____    _____

14   _____    _____

15   _____    _____

16   _____    _____

17   _____    _____

18   _____    _____

19   _____    _____

20   _____    _____

21   _____    _____

22   _____    _____

23   _____    _____

24   Signature:_____ Date: _____
                     ANTHONY E. FAIRFAX

25
```

```
 1                    CERTIFICATE OF DEPONENT

 2    COMMONWEALTH OF VIRGINIA
      CITY OF _____
 3
          Before me, this day, personally appeared ANTHONY
 4    E. FAIRFAX, who, being duly sworn, states that the
      foregoing transcript of this deposition, taken in
 5    the matter, on the date and at the place set out on
      the title page hereof, constitutes a true and
 6    complete transcript of said deposition.

 7

 8                     _____
 9                        ANTHONY E. FAIRFAX

10

11
          SUBSCRIBED and SWORN to before me this _____
12    day of _____, 2020, in the jurisdiction
      aforesaid.
13

14

15
      _____  _____
16    My Commission Expires            Notary Public

17

18

19

20

21

22

23

24

25
```

1    COMMONWEALTH OF VIRGINIA AT LARGE, to wit:

2            I, Kathleen Beard Adams, CCR, RPR, CRR, an
     e-Notary Public for the Commonwealth of Virginia at
3    large, of qualification in the Circuit Court of the
     City of Virginia Beach, Virginia, and whose
4    commission expires August 31, 2022, do hereby
     certify that the within named deponent, ANTHONY E.
5    FAIRFAX, appeared before me via teleconference at
     Hampton, Virginia, as hereinbefore set forth, and
6    after being first duly sworn by me, was thereupon
     examined upon his oath by counsel for the respective
7    parties; that his examination was recorded in
     Stenotype by me and reduced to computer printout
8    under my direction; and that the foregoing
     constitutes, to the best of my ability, a true,
9    accurate, and complete transcript of such
     examination.

10

11           I further certify that I am not related to
     nor otherwise associated with any counsel or party
12   to this proceeding, nor otherwise interested in the
     event thereof.

13           Given under my hand and notarial seal this
     6th day of July, 2020.

14

15

16

17
                         _____
18                            Notary Public
                   Certified Court Reporter No. 0313086
19

20

21

22

23

24

25