```
 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE EASTERN DISTRICT OF VIRGINIA
 2                       Norfolk Division

 3  - - - - - - - - - - - - - - - - - - - - - - -
                                              )
 4    LATASHA HOLLOWAY and                     )
      GEORGIA ALLEN,                           )
 5                                             )   CIVIL ACTION NO.
            Plaintiffs,                        )     2:18CV69
 6                                             )
      v.                                       )
 7                                             )
      CITY OF VIRGINIA BEACH,                  )
 8    VIRGINIA BEACH CITY COUNCIL,             )
      LOUIS JONES, JESSICA ABBOTT,             )
 9    JAMES WOOD, ROBERT DYER,                 )
      BARBARA HENLEY, JOHN MOSS,               )
10    ROSEMARY WILSON, DONNA PATTERSON,        )
      AARON R. ROUSE, SABRINA WOOTEN, GUY      )
11    TOWER, MICHAEL BERLUCCHI, AND            )
      PATRICK DUHANEY, in his official         )
12    capacity as City Manager for the        )
      City of Virginia Beach,                  )
13                                             )
            Defendants.                        )
14  - - - - - - - - - - - - - - - - - - - - - - -

15

16
                    TRANSCRIPT OF PROCEEDINGS
17                    (Bench Trial - Day 1)

18                      Norfolk, Virginia

19                      October 6th, 2020

20

21

22  BEFORE:  THE HONORABLE RAYMOND A. JACKSON
                 United States District Judge
23

24

25
```

```
 1   APPEARANCES:

 2            CAMPAIGN LEGAL CENTER
              By:   Joseph G. Hebert
 3                  Annabelle E. Harless
                    Christopher D. Lamar
 4                  Dana Paikowsky
                    Robert N. Weiner
 5                  Ruth M. Greenwood
                    Simone T. Leeper
 6                      Counsel for the Plaintiffs

 7            OFFICE OF THE CITY ATTORNEY - VIRGINIA BEACH
              By:   Gerald L. Harris
 8                  Christopher S. Boynton
                        - and -
 9            BAKER & HOSTETLER LLP
              By:   Erika D. Prouty
10                  Katherine L. McKnight
                        Counsel for the Defendants
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
1                        I N D E X

2   PLAINTIFFS'
    WITNESSES                                      PAGE
3
      GEORGIA F. ALLEN
4          Direct Examination By Ms. Leeper          27
           Cross-Examination By Mr. Harris           67
5     ANTHONY FAIRFAX
           Direct Examination By Ms. Greenwood      110
6          Cross-Examination By Ms. McKnight        178
           Redirect Examination By Ms. Greenwood    209
7

8   DEFENDANT'S
    WITNESSES                                      PAGE
9
      (None offered)
10

11

12                      E X H I B I T S

13  PLAINTIFFS'
    NO.                                            PAGE
14
      145                                            45
15    349                                            52
      350                                            55
16    432A-K          (For identification only)     136
      75                                            210
17    76                                            210
      79                                            210
18    80                                            210
      84                                            210
19    85                                            210
      86                                            210
20

21  DEFENDANTS'
    NO.                                            PAGE
22
      165             (For identification only)     100
23    166             (For identification only)     104
      167             (For identification only)     192
24

25
```

Carol L. Naughton, Official Court Reporter

```
 1              (Proceedings commenced at 10:07 a.m.)
 2              THE CLERK:  Latasha Holloway and Georgia Allen v.
 3    City of Virginia Beach, Virginia, Virginia Beach City
 4    Council, Louis Jones, Jessica Abbott, James Wood, Robert
 5    Dyer, Barbara Henley, John Moss, Rosemary Wilson, Donna
 6    Patterson, Aaron R. Rouse, Sabrina Wooten, Guy Tower, Michael
 7    Berlucchi, and Patrick Duhaney, in his official capacity as
 8    City Manager for the City of Virginia Beach, in Civil Action
 9    2:18cv69.
10              Mr. Weiner, are the plaintiffs ready to proceed?
11              MR. WEINER:  Yes, plaintiffs are ready.
12              THE CLERK:  Ms. McKnight, are the defendants ready
13    to proceed?
14              MS. McKNIGHT:  Yes, they are.  Thank you.
15              THE COURT:  Good morning, counsel.
16              MR. WEINER:  Good morning, Your Honor.
17              MS. McKNIGHT:  Good morning.
18              THE COURT:  The Court received your final retrial
19    order.  I think the Court made it clear I wanted it during
20    the daylight.  You filed at 11:00 p.m. on October the 2nd, so
21    the Court will be more precise in the future to avoid that
22    type of situation.
23              The Court has reviewed the final pretrial order, and
24    the Court will sign and file it, as you've amended it.
25              Now, with respect to the case, it's the Court's
```

1    expectation that we will start at 9:30 in the morning.  We'll

2    go generally 9:30 to 5:30.  Depending upon the situation, it

3    may be 6:00 or 6:30, but the Court's usual practice is to

4    stop around 5:30.

5           I note you have a number of witnesses lined up to

6    call.  Do not run out of witnesses -- I've had that

7    experience -- because we do not wish to waste any time.  Do

8    not waste any time.

9           It's the Court's expectation that we should be

10   finished with this case certainly within three weeks' time or

11   less, so I'm generally thinking that the plaintiffs will have

12   about seven or eight days to get it done, and the defendants.

13   It all depends upon whether you are putting on cumulative

14   testimony, which we will avoid in this case.

15          All right.  With that, the Court is prepared to get

16   started, unless there's some other matters to be raised here

17   by the plaintiffs.

18          Now, the Court has read your factual contentions in

19   this case.  Sometimes counsel ask for opening statements.

20   Unless you have something different from what you've set

21   forth in your factual statement, the Court doesn't really

22   necessitate an opening statement; we can begin to call

23   witnesses.

24          What is your desire?

25          MR. WEINER:  We can proceed, Your Honor.

```
1              THE COURT:  All right.  I'm not familiar with all
2       counsel.  Who is at the table with you?
3              MR. LAMAR:  Chris Lamar.
4              THE COURT:  Okay.  And Ms. McKnight?
5              MS. McKNIGHT:  Yes, good morning.  Kate McKnight and
6       Gerry Harris for defendants at the table.
7              THE COURT:  Okay.  So we have two counsel at the
8       table.  Is that correct?
9              MR. HARRIS:  Yes, Your Honor.
10             THE COURT:  We were not sure whether you were going
11      to put your IT person there or not.  This courtroom is not
12      exactly IT friendly.
13             MS. McKNIGHT:  Yes, Your Honor.  Our IT personnel
14      are sitting in the front row.  Thank you.
15             THE COURT:  All right.  Let us begin.  Call your
16      first witness.
17             Oh, one other thing:  All persons who are going to
18      testify in this case, with the exception of a representative
19      for each party -- who is your party representative,
20      Ms. McKnight?
21             MS. McKNIGHT:  Thank you, Your Honor.  Today in the
22      courtroom we have with us Vice Mayor Jim Wood.
23             THE COURT:  Is he going to be your party
24      representative?
25             MS. McKNIGHT:  He will be for today and likely other
```

1    days, Your Honor.  We'll let you know if that changes, but

2    he's here today.  There is a Council meeting today, so other

3    council members are not able to be here, but he is here.

4         THE COURT:  The reason I ask that question is all

5    persons who are going to be testifying cannot be in the

6    courtroom.  Your witnesses will have to be out of the

7    courtroom.  The only people that can remain will be your

8    party representative.  So today you said it's the Vice Mayor?

9         MS. McKNIGHT:  Correct, it's the Vice Mayor, Your

10   Honor.

11        THE COURT:  As long as that individual that will

12   come in is going to be a party representative.  We do not

13   want a witness coming in sometime later in the trial to

14   testify, so I think we need to be very clear about that.

15   Since you can't keep the same party representative, how many

16   different party representatives are you going to have?

17        MS. McKNIGHT:  Yes, Your Honor.  All Council members

18   are defendants.  We will endeavor to have Jim Wood here, but

19   there may be days that we need to substitute him.

20        And, Your Honor, just so I understand correctly,

21   that witness rule does not apply to expert witnesses.  Is

22   that right?  That's what we understood.

23        THE COURT:  That's what the Court said.  Expert

24   witnesses may remain in the courtroom, and certainly the

25   defendants may remain in the courtroom.

1              MS. McKNIGHT:  Okay.

2              THE COURT:  Hold on one second.

3              (There was a brief pause.)

4              THE COURT:  All right.

5              MR. WEINER:  Your Honor, Ms. Simone Leeper has

6    joined us at counsel table.

7              THE COURT:  Okay.  And who will be your party

8    representative -- are the plaintiffs in the courtroom?

9              MR. WEINER:  One of them is.

10             THE COURT:  Okay.  Well, the plaintiffs can remain

11   in the courtroom, but the witnesses in this case -- the

12   public line is up.  Everybody in America can listen to this

13   case, but witnesses -- you must indicate to them that they

14   cannot listen on the public line, because when they take the

15   stand, the Court may ask, "Have you listened to the case,"

16   and if they have, they may march back out that door and not

17   testify.  So do not have your witnesses, if they are not a

18   plaintiff or a defendant, listening on the public line, all

19   right?

20             MS. McKNIGHT:  Your Honor, pardon me.  One more

21   note:

22             Understanding your direction about no opening

23   statements, Attorney Chris Boynton will join Attorney Gerry

24   Harris at the table for the first witness.

25             THE COURT:  Okay.  No, what I said was unless you

```
1    had something to add, other than what's in your factual
2    contentions, there would be no opening statement.  But if you
3    have something new you want to add, I'll hear it.
4          MS. McKNIGHT:  I understand, Your Honor.  We have an
5    opening statement that lasts about 15 minutes in duration.
6    We believe that it gives the Court an idea of our case.  We
7    understood the Court's direction and plaintiffs' interest in
8    not having an opening statement.  We would be happy to give
9    it, but -- pardon me, Your Honor, I'm a bit on the spot.  We
10   think it has value, but I do not want to infringe on the
11   Court's time.
12         THE COURT:  Well, you're not infringing on my time.
13   I'm simply saying if it's a repeat of the factual
14   contentions, then you're not telling the Court anything new.
15   I'm interested in anything that you want to supplement your
16   factual contentions with.
17         MS. McKNIGHT:  Okay.  Well, then, Your Honor, I
18   would like to give this opening statement.
19         THE COURT:  All right.  Would you like to do the
20   same thing?
21         MR. WEINER:  Yes, Your Honor.
22         THE COURT:  All right.  We'll hear it.  Move on.
23   Let's go.
24         For the plaintiffs?
25         MR. LAMAR:  Thank you, Your Honor.  Chris Lamar,
```

1    appearing on behalf of plaintiffs.

2          May it please the Court, throughout this trial this

3    Court will hear testimony from experts discussing maps and

4    percentages and other types of statistical analysis, but at

5    the end of the day, this case is about people being able to

6    express their fundamental rights to be able to choose the

7    members that represent them on the City Council.

8          Plaintiffs and other members of the minority

9    community who live, vote, and raise their families in the

10   City of Virginia Beach have long been shortchanged by the

11   City's method of electing City Council members.  Regardless

12   of how the City set up the system to elect the City Council

13   members in 1966, now, in 2020, in a city that has become much

14   more larger and increasingly diverse, the city government

15   simply has not kept up.

16         The City Council continues to imbue the ability of a

17   cohesive community of Hispanic, Black, and Asian voters from

18   having equal say in the political process in the City of

19   Virginia Beach.  The evidence in this trial will show that

20   the at-large method of electing City Council members,

21   combined with the racial disparities in the City, deprive the

22   minority community from having an equal voice in the

23   political process.

24         Virginia Beach has been -- has beared witness to a

25   long and ugly history of racial discrimination against the

1    minority community.  Minorities in the City of Virginia Beach

2    continue to suffer the consequences of this discrimination,

3    and the evidence will show this through a host of

4    socioeconomic disparities.  These disparities, in turn,

5    prevent the minority community from having a full and

6    effective participation in the political process.

7            And, Your Honor, this is no coincidence.  The method

8    that the City of Virginia Beach uses to elect City Council

9    members prevents the minority community from having a full

10   and effective ability to participate in the political

11   process.  The City of Virginia Beach elects four City Council

12   members at large, including the Mayor.  The remaining seven,

13   however, come from seven residential districts.  These seven

14   residential districts, however, are voted on by every member

15   of the City of Virginia Beach.

16           So, for example, the Kempsville residents may prefer

17   Candidate A, but the rest of the city may prefer Candidate B,

18   so Candidate B will then go on to represent the Kempsville

19   District on City Council.  The evidence will show in this

20   case that this dilutes the ability of the minority community

21   to elect the candidates of their choice.

22           Section 2 requires two things.  First, it requires

23   proof that the City Council election dilutes the minority

24   community votes.  Secondly, based on the totality of the

25   circumstances, the minority community has less opportunity to

1    elect their candidates of their choice.

2            The Supreme Court has outlined a three-prong test to

3    determine whether or not a jurisdiction dilutes the ability

4    of the minority community to vote.  These are known as the

5    *Gingles* prongs.  *Gingles* one requires proof that the minority

6    community is sufficiently large and geographically compact to

7    constitute a majority in a single-member district.

8            *Gingles* two requires proof that the minority

9    community is politically cohesive.  That just means that the

10   minority community tends to vote for the same candidates.

11   *Gingles* three requires proof that the majority community --

12   here that means White voters -- sufficiently votes as a bloc

13   to prevent the minority community from being able to elect

14   the candidates of their choice.

15           For *Gingles* one, plaintiffs will show that it is

16   possible to draw districts that are in compliance with the

17   Voting Rights Act.  Plaintiffs' expert, Mr. Anthony Fairfax,

18   will present evidence discussing how he has drawn maps that

19   are -- that at least two of the districts in the ten-district

20   plan have majority/minority districts.  Mr. Fairfax is a

21   demographer, and he is an expert who has drawn hundreds of

22   plans that are legally compliant.  Mr. Fairfax will also

23   present evidence showing how he has made it possible to draw

24   one district that is majority Hispanic and Black minority

25   voters in the City of Virginia Beach.

1           Throughout this trial, this Court will hear

2     testimony from Mr. Fairfax discussing nine illustrative

3     districts.  These nine illustrative districts are in

4     compliance with one person/one vote, requirements of the

5     Equal Protection Clause, and that they're in compliance with

6     federal and state law.  Mr. Fairfax will also testify that

7     the methods he used to draw these maps were reliable and

8     credible.

9           This Court won't just hear testimony from

10    plaintiffs' expert, Mr. Anthony Fairfax, this Court will also

11    hear testimony from Mr. Andrew Jackson, who worked with

12    defendants' expert, Mr. Kimball Brace, to draw a residential

13    district that was majority Black.  City Council rejected this

14    and other plans that were drawn by community members such as

15    the NAACP.

16          For the second *Gingles* factor, plaintiffs' expert,

17    Dr. Douglas Spencer, who is a professor of political science

18    and an expert on racial polarization, will testify that he

19    used reliable, credible, and widely accepted statistical

20    techniques to analyze voting patterns in the City of Virginia

21    Beach.  That evidence will show that the minority community

22    is politically cohesive, and a significant amount of the

23    minority community votes for the same candidates.

24          Dr. Spencer will also discuss the third *Gingles*

25    factor, and the evidence will show that the White community

1   votes as a bloc to prevent the minority community from being

2   able to elect the candidates of their choice.

3          Courts look at *Gingles* two and *Gingles* three under

4   what we call a racially polarized voting analysis; that is,

5   courts look to see if the minority community votes for one

6   candidate and if the majority community votes for a

7   completely different candidate.

8          The evidence in this case will show that the White

9   community almost always votes for White candidates, and those

10  candidates almost always win.  On the other hand, the

11  evidence will show that the minority preferred candidate

12  usually loses.  The evidence will also show that since

13  Virginia Beach came to be in 1966, only six minority

14  candidates have been elected to the City Council.  Of those

15  six, only one was reelected.

16         Furthermore, of those six, two were elected after

17  this litigation was pending.  That is, courts in this country

18  have considered that to be a special circumstance where

19  minority candidates tend to be elected after there's a

20  challenge under the Voting Rights Act.

21         This Court won't just hear cohesiveness evidence

22  from plaintiffs' expert, Dr. Douglas Spencer.  This Court

23  will also hear qualitative evidence discussing the political

24  cohesiveness of the minority community.  Indeed, time and

25  time again, the minority community has come before the City,

```
 1    and the City has routinely rejected their requests.

 2              This Court will hear testimony from residents

 3    discussing the 2001 redistricting cycle where a coalition of

 4    Hispanic, Black, and Asian voters came to the City and

 5    requested that the City switch to single-member districts,

 6    but the City ultimately said, "No."

 7              This Court will hear testimony from State Delegate

 8    Kelly Fowler, who will testify that the minority community is

 9    aligned but continues to be rejected by the City Council.

10              Your Honor, this Court won't just hear testimony

11    from plaintiffs' expert about how the minority community is

12    cohesive, and it won't just hear testimony from the residents

13    of Virginia Beach about how the minority community is

14    cohesive.  This Court will also hear testimony from the City

15    itself about how the City recognizes that the minority

16    community is politically cohesive.

17              In 2011, the City tried to create a

18    majority/minority district; that is, the City recognized that

19    Hispanic, Black, and Asian voters deserve to be in the same

20    district, regardless of the fact that the entire city still

21    would have been able to choose the candidate that represents

22    that majority/minority district.

23              The City of Virginia Beach has also created a

24    minority business council that focuses on the business issues

25    for the minority community.  So that although the City
```

1    recognizes that there's minority cohesion, the Court has

2    continued to fail to address the disparities and the

3    political disadvantages that the minority community faces.

4          The courts look at several factors to determine

5    whether, based on the totality of the circumstances, that the

6    process of electing City Council members is not equally open

7    to full participation from the minority community.

8          Plaintiffs' expert, Dr. Allan Lichtman, who is an

9    award-winning expert, who has studied racial discrimination

10   and its effects, will testify about the City's long history

11   of racism and racial appeals.  He will discuss the racial

12   disparities in the City, ranging from income, the value of

13   homes, to the percentage of those without health insurance.

14         He will also discuss how the City's method of

15   electing City Council members enhances the opportunity for

16   discrimination against the minority community.  Case after

17   case after case has shown that the use of at-large method of

18   electing City Council members is a tried-and-true method of

19   diluting the polls.

20         Furthermore, you will hear testimony from

21   Dr. Lichtman stating that there's no justification for the

22   City's decision to use this method of electing City Council

23   members.

24         This Court won't just hear testimony from

25   Dr. Lichtman regarding the totality of the circumstances

1  factors.  Indeed, this Court will hear testimony from

2  residents who live, work, and participate in the political

3  process in the City of Virginia Beach.  Our plaintiffs and

4  other members of the community will discuss the barriers that

5  they have faced and the City's resulting neglect of the

6  minority community's interests.

7          At the conclusion of this trial, plaintiffs will

8  respectfully request that the Court find, in light of the

9  *Gingles* prongs and the other factors, that the use of

10  at-large elections in this city violate Section 2 of the

11  Voting Rights Act.

12          The plaintiffs will then respectfully request that

13  the Court move to the next stage to determine the appropriate

14  remedy.  The minority community in Virginia Beach has been

15  working for an election system that helps ensure meaningful

16  representation for the minority community for at least 20

17  years.  They only ask that the Court recognizes their rights

18  under federal law and strikes this discriminatory system.

19          Thank you.

20          THE COURT:  Thank you.

21          Attorney McKnight.

22          MS. McKNIGHT:  Thank you, Your Honor.  May it please

23  the Court.  Good morning.  I am Kate McKnight.  I am with

24  defendants in this matter.

25          We are here to resolve a fundamentally flawed

1    application of the Voting Rights Act.  I call it

2    "fundamentally flawed" because plaintiffs' misapplication of

3    the Act infects their contentions at every stage and works no

4    small harm to the Asian and Hispanic communities of Virginia

5    Beach.

6            Members of those communities are being used in this

7    case as instruments to satisfy Voting Rights Act

8    requirements, but there is no data about how those specific

9    communities vote.  Tellingly, members of the Asian and

10   Hispanic communities have not been asked to join as

11   plaintiffs or, worse, they were asked but declined because

12   they don't want what plaintiffs seek.

13           Plaintiffs allege, under Section 2 of the Voting

14   Rights Act, that the at-large system of electing City Council

15   members in Virginia Beach dilutes the votes of a very

16   specific coalition of minority voters.  Using plaintiffs'

17   terms, that coalition is comprised of Black, Hispanic, and

18   Asian voters, but there is no reliable evidence that a

19   cohesive coalition between these minorities exists.

20           And plaintiffs will be very quick to stop talking

21   about Black, Hispanic, and Asian, and will instead talk to

22   this Court about minority voters.  And you just heard that

23   from plaintiffs' counsel in his opening statement.  I heard

24   reference to the "minority community" dozens and dozens of

25   times.  I lost count.  I heard reference to "Hispanic, Black,

1    and Asian" three times.

2         But this Court must keep this distinction in mind

3    for the very simple reason that Black, Hispanic, and Asian

4    communities in Virginia Beach are distinct.  Every one of

5    plaintiffs' expert witnesses will tell you that they cannot

6    identify how Hispanics vote.  They also do not know how Asian

7    voters vote in Virginia Beach.  The best they can do is

8    provide this Court an estimate, based on statistical

9    analyses, of how all minorities vote.

10        But all minorities are not the same, and treating

11   them that way for the convenience of math is not reasonable

12   or consistent with the tenets of the Voting Rights Act, let

13   alone the 14th and 15th Amendments.  To that point, fact

14   witnesses called by defendants and plaintiffs will tell you

15   that Asian voters do not vote alike.  They do not vote alike,

16   and with Black voters, and the same with Hispanic voters.

17        Residents of Virginia Beach know that the City's

18   strong Filipino population comes out in force to support

19   candidates who are not the candidates of choice for Black

20   voters.  But here plaintiffs must show that Black, Hispanic,

21   and Asian voters vote cohesively, as a coalition, before they

22   can succeed with their claims in this case, and plaintiffs'

23   own statistical estimates show that there is no such

24   cohesion.

25        But I jumped ahead, Your Honor.

1          Section 2 of the Voting Rights Act prohibits state

2     and political subdivisions from redistricting in a manner

3     which results in members of a protected class of racial and

4     language minorities from having less opportunities than other

5     members of the electorate to participate in the political

6     process and elect their representatives of choice.

7     Nondiscrimination is enshrined in the Constitution and the

8     laws of the United States.  Judges around this country have

9     written, rightfully so, that the Voting Rights Act is perhaps

10    the noblest and most transformative legislation in American

11    history.

12         But the VRA does not work to address every

13    circumstance where a plaintiff believes their candidates of

14    choice aren't being elected on account of race.  First, there

15    is no guarantee of electoral success.  The VRA's text is

16    explicit, and relevant case law underscores that it is

17    electoral participation and opportunity, not electoral

18    success, that is the proper barometer for determining whether

19    a Section 2 violation has occurred.

20         A viable Section 2 claim must show unequal

21    opportunity, and plaintiffs cannot make that showing, nor

22    many others in this case, for every minority group in their

23    so-called coalition.

24         Now, you heard plaintiffs' counsel describe the

25    three *Gingles* factors, and we will be talking a lot about

1   those factors in this court.  If plaintiffs fail under even

2   one prong of *Gingles*, their claim must fail, too.

3          In this case, you will hear that the Black community

4   in Virginia Beach cannot satisfy prong one alone; that is to

5   say, the Black community itself is not sufficiently large or

6   geographically compact to constitute a majority in a

7   single-member district.  And this makes sense.  Virginia

8   Beach is marked not by aggregation but by integration.  It

9   is, in fact, one of the most racially integrated cities in

10  the United States.

11         Experts in this case will tell you that Black,

12  Asian, Hispanic, and other minority residents in Virginia

13  Beach are spread out and integrated within their communities.

14  That is a positive development and a point of pride for the

15  City, but it makes it difficult to isolate voting patterns.

16  Plaintiffs attempt to solve this problem by adding Hispanic

17  and Asian voters into their proposed majority/minority

18  district, into this purported coalition, but plaintiffs

19  acknowledge that they are not themselves Asian or Hispanic.

20         They concede that they themselves do not represent

21  Asian or Hispanic voters, and yet they are here asking this

22  Court to issue maps that will collect Asian and Hispanic

23  voters, based on their race, into a district that performs to

24  elect candidates of plaintiffs' choice.  To the extent that

25  these candidates of choice are not the same candidates of

1    choice of Asian and Hispanic voters -- and you will hear

2    plenty of evidence that that is the case -- plaintiffs are

3    asking this Court to dilute the votes of these Asian and

4    Hispanic voters based on their race.

5           That brings us to prong two of *Gingles*.  Plaintiffs

6    must show that Black, Asian, and Hispanic voters are

7    politically cohesive, meaning members of this collection of

8    different races and ethnicities tend to vote similarly.

9    Simply put, plaintiffs cannot make a coalitional claim

10   without showing a cohesive coalition.

11          The Supreme Court has repeatedly condemned the

12   presumption that members of the same political group think

13   alike, share the same political interests, and will prefer

14   the same candidates at the polls.  This same admonition

15   applies all the more where members are of different racial

16   groups, as they are here.

17          And plaintiffs' own evidence shows definitively that

18   their all-minority data points do not prove that Asian and

19   Hispanic voters prefer the same candidates as Black voters.

20   Because the plaintiffs themselves produce estimates to this

21   Court and will show this Court estimates of Black support for

22   a particular candidate that are consistently higher than the

23   all-minority support for that candidate, one can only

24   conclude that Asian, Hispanic, and other non-Black minorities

25   are dragging down the combined all-minority support.

1          As an illustration, Your Honor, plaintiffs' expert

2   analyzed one election and determined that one candidate

3   received over 85 percent of the votes from Black voters.  But

4   when he combined Black voters and all other minorities, that

5   point estimate dropped 30 points -- nearly 30 points, I

6   should say -- to 58.  What this tells the Court is that there

7   were a lot of minorities who do not share this same candidate

8   of choice.  And the fact witnesses you will hear from this

9   week won't make up the difference.

10          You will hear that sometimes a Hispanic or Asian

11   voter may vote for candidates of choice of the Black

12   community, but oftentimes they do not.  Indeed, the largest

13   population of Asian voters in Virginia Beach is the Filipino

14   community, and it shows up at the voting booth time and time

15   again for candidates who are not the candidates of choice for

16   the Black community.  "Sometimes" is not enough to prove a

17   coalitional claim.

18          This brings us to prong three:  Does the White

19   majority in Virginia Beach vote sufficiently as a bloc to

20   enable it to usually defeat the minority-preferred candidate?

21   The answer is no.  The Court cannot find that an

22   Asian-preferred candidate is usually the same as the

23   Black-preferred candidate.  There's no one preferred

24   candidate for plaintiffs' mix of minority groups.

25          Simply put, at the end of the trial, the Court will

1   not be in a position to say that a White majority of Virginia

2   Beach votes sufficiently as a bloc to enable it to usually

3   defeat the minority candidate of choice.

4          Even if we get to the totality of circumstances

5   analysis, Your Honor -- and getting there is a heavy burden,

6   or a heavy lift for plaintiffs -- here again, it is not

7   sufficient for plaintiffs, two members of the

8   African-American community, to satisfy these factors for the

9   Black community alone.  And Virginia Beach does not dispute

10  that members of its Black community historically have

11  suffered greatly due to racial prejudice and injustice, but

12  this Court must make a finding that under the totality of

13  circumstances, it is clear that the City's at-large election

14  system dilutes the votes of its Asian and Hispanic

15  communities.

16         Your Honor, we ask you to ask yourself during this

17  case if there is any evidence that a history of official

18  discrimination against Asian voters affects their right to

19  vote today.  Ask the same of the Hispanic community.

20  Plaintiffs' own witness, Dr. Lichtman, is clear that Asians

21  are not discriminated against in socioeconomic areas such as

22  education, employment, and health, and you will hear some of

23  those details come out at trial.

24         Now, there is a reason why plaintiffs' proposed

25  triable issues are so much shorter than defendants', a

1    difference this Court noted during the pretrial phase.  The

2    reason is that plaintiffs asked this Court to ignore the

3    differences between these different racial and ethnic groups.

4          THE COURT:  I do not believe that's the reason, but

5    go on.  And your time is winding down.

6          MS. McKNIGHT:  I understand, Your Honor.

7          Reviewing a Voting Rights Act claim is a complicated

8    undertaking, Your Honor.  This week and next we will hear

9    evidence of a sometimes painful local history.  We will hear

10   of tightly contested elections, intricate legal inquiries,

11   and a deep desire for electoral fairness, but we will also

12   hear evidence about a vibrant and integrated city, with a

13   bustling economy, on the cusp of the next decennial census,

14   which is likely to show even more growth.

15         We will hear evidence from a number of people from

16   different races and backgrounds who are not shut out of the

17   political process but are in the thick of it; voting,

18   rallying, organizing, unifying, and fully participating in

19   Virginia Beach politics without regard to race.

20         The minority community in Virginia Beach is much

21   like the City itself; vibrant and diverse.  Plaintiffs --

22   I'll wrap up, Your Honor.

23         Plaintiffs had plenty of potentially co-plaintiffs

24   to choose from, if they wanted to pick even one member of the

25   Asian community and one member of the Hispanic community.

1   They did not.  They do not have a Filipino plaintiff.  They

2   do not have a Korean or Chinese-American plaintiff, no

3   plaintiff from the Asian community in Virginia Beach to stand

4   before this Court and say, "I want this for me, and my

5   community needs it."  The same is true for members of the

6   Hispanic community.  Even more damning, plaintiffs have no

7   data to support their claim.

8           Finally, why does this matter, Your Honor?  Because

9   on this flimsy ground -- no data, no plaintiffs from these

10  communities asking for this relief -- plaintiffs ask the

11  Court to use race as a guide when drawing maps to collect

12  these disparate groups, Asians, Hispanics, and Blacks, in

13  districts that are likely to elect plaintiffs' candidates of

14  choice, but that is offensive both to the language and spirit

15  of the VRA and precedent, and it is also offensive, as you

16  will hear, to members of the Asian and Hispanic communities,

17  who do not share plaintiffs' candidates -- it's hard to

18  breathe in this mask, Your Honor.  Pardon me, Your Honor.

19          This is a fundamentally flawed application of the

20  Voting Rights Act, and we ask this Court to reject it.

21          Thank you, Your Honor.

22          THE COURT:  Thank you.

23          Call your first witness.

24          MR. WEINER:  Plaintiff calls Georgia Allen.

25          (The witness was duly sworn.)

1        THE COURT:  You may proceed.

2        MS. LEEPER:  Your Honor, before I begin the direct

3   examination, I would like to note the defendants have

4   stipulated in stipulated fact 4 that Ms. Allen is a United

5   States citizen, an eligible and registered voter, and an

6   African-American resident of Virginia Beach.

7        THE COURT:  All right.  So noted.

8        **GEORGIA F. ALLEN**, a Plaintiff, having first duly

9   affirmed to tell the truth, was examined and testified as

10  follows:

11                     DIRECT EXAMINATION

12  BY MS. LEEPER:

13  Q.  Could you please state your name for the record?

14  A.  Georgia F. Allen.

15  Q.  And where do you live?

16  A.  4649 Merrimac Lane, Virginia Beach, Virginia.

17  Q.  How long have you lived in Virginia Beach, Ms. Allen?

18  A.  Total, around 58 years.

19  Q.  What is your current occupation?

20  A.  I'm currently retired.

21  Q.  What did you do when you worked full time?

22  A.  Full time, I was in the financial services industry, as I

23  was about to retire, and prior to that I worked in the

24  cellular phone industry for a number of years.

25  Q.  Ms. Allen, have you been involved in any community

Allen, G. - Direct

1   organizations in Virginia Beach?

2   A.  I'm the former President of the Virginia Beach Branch in

3   the NAACP, and I'm also the former Youth Advisor for the

4   Virginia Beach NAACP.

5   Q.  Any other community organizations in your time?

6   A.  I've done a number of volunteer work in the City of

7   Virginia Beach.  I worked with the USO.  I worked with the

8   Cancer Society.  I've done a lot of volunteer work, including

9   working with the special Olympics.

10  Q.  Have you been involved in any Virginia Beach City

11  organizations?

12  A.  For the City, I've served on the Human Rights Commission,

13  and I've also served on the Vision 2040 Commission, and it

14  was later changed to VTAC.

15  Q.  What does VTAC stand for?

16  A.  It is the -- oh, gosh.  I always have trouble with that

17  acronym.  It's too long for me.

18  Q.  Is it the Virginia Beach Vision to Action?

19  A.  Vision to Action Committee, yes, uh-huh.

20  Q.  Could you tell me more about your involvement with the

21  NAACP?

22  A.  Initially, I started out as a youth advisor, and a friend

23  of mine and I -- we worked with the kids for a number of

24  years.  And I'll go -- we both read the Constitution from

25  start to finish.  We found that the Youth Advisor and the

─────Allen, G. - Direct─────

1   Youth Council was responsible for developing youth
2   leadership.  And so for years we worked with our young
3   people, and we made sure that they understood the importance
4   of being in a position where they could be a leader.
5           And so one of the things that was very important to
6   us was to introduce our children to their history.  So we had
7   a lot of meetings that were out of town.  So every time we
8   got ready to go out of town, what we would do is we would
9   find out what was the history of that particular area that we
10  were going to.  And so -- this is a little bit of a
11  challenge, so I do apologize; trying to talk through this.
12          But anyway, so we would always take them to a place
13  of historical value, and during that period of time, we had
14  the opportunity to take them up to Richmond to the Maggie
15  Lena Walker House, which was one the first African-Americans
16  in the country.
17          THE COURT:  Stop, please.
18          MS. LEEPER:  Just a moment, Ms. Allen, please.
19          THE WITNESS:  Okay.
20          THE COURT:  When the Court starts talking, you stop.
21          THE WITNESS:  Okay.
22          THE COURT:  This is for all counsel through this
23  trial.  I want you to avoid long narratives.  I want the
24  witnesses to get to the point, but I don't want a long
25  narrative.  Guide them through the testimony.

Allen, G. - Direct

1   BY MS. LEEPER:

2   Q.  Ms. Allen, you said that you found it important to show

3   the youth in the NAACP their history.  Why did you find that

4   to be important?

5   A.  Because by young people knowing their history, it would

6   better give them a more stronger foundation, and because of

7   that, out of our Youth Council, we had a number of business

8   owners that came out of that council, which is advantageous

9   to our community.  But we also had Pharrell Williams to come

10  out of that Youth Council, who has touched many lives.  And

11  so that's why the Youth Council, to me, was extremely

12  important.

13  Q.  When were you the President of the Virginia Beach NAACP?

14  A.  From approximately 2001 to 2011.

15  Q.  And in that time, besides the youth promotions, what were

16  the most significant areas of advocacy in your tenure?

17  A.  We advocated for economic inclusion in the City of

18  Virginia Beach.  They were building a Convention Center at

19  the time, and our concern was that African-Americans had

20  little or no contracts with the City.

21          As a matter of fact, in Virginia Beach a $25 ticket

22  to a Freedom Fund banquet was considered a contract with our

23  entire community, and so I worked with that.

24          I also worked with trying to ensure that we had fair

25  hiring practices in the City of Virginia Beach with our

─────Allen, G. - Direct─────

1   police and our fire department.  And so those were some of
2   the things that we did.
3   Q.  When did the Virginia Beach NAACP start looking into City
4   contracting practices?
5   A.  Pretty much, not long after we got -- I came into office,
6   because that's when they were building the -- looking to
7   build the Convention Center.
8   Q.  Ms. Allen, have you ever run for public office?
9   A.  I have, twice.
10  Q.  What offices were those?
11  A.  It was the 3rd District for the House of Delegates and
12  City Council, At-Large District.
13  Q.  And what year was that election?
14  A.  The House of Delegates position was in 2005, but the City
15  Council was 2008.
16  Q.  Who was your opponent in the at-large City Council race?
17  A.  The incumbent was Rosemary Wilson.
18  Q.  And what is Ms. Wilson's race?
19  A.  She is a White Lady.
20  Q.  Why did you decide to run against Ms. Wilson for City
21  Council seat in 2008?
22  A.  Well, I felt it was important that the community had
23  representation, and so it was important for me to, hopefully,
24  open up a door.
25  Q.  When you say "representation," do you mean minority

─────Allen, G. - Direct─────

1    representation or something else?

2    A.  I do mean we needed to have representation for folks who

3    did not currently have representation.  It was primarily the

4    non-White community.

5    Q.  How did you campaign for City Council?

6    A.  Well, mine was pretty much a grass roots campaign, so I

7    pretty much went door to door, and also to events such as

8    family reunions, activities, and things of that nature.  So

9    it was mostly a grass roots campaign.

10   Q.  Was it easy or difficult to do door-to-door campaigning

11   in this race?

12   A.  Absolutely, because Virginia Beach is a large city.  I

13   think at the time it had about 94 precincts or so, and so

14   it's a substantial amount of time and all to get to all of

15   those people.

16   Q.  Just for clarity's sake, I ask if it was easy or

17   difficult?  Could you say which of those two did you find it

18   to be?

19   A.  It was difficult.

20   Q.  Were there any particular issues that you campaigned on

21   when you ran in 2008?

22   A.  One of the things that the community was concerned about

23   is the housing issue.  Virginia Beach can be a pretty

24   expensive city to live in.  Even when you work for City

25   government, even when you work for government contractors,

—————Allen, G. - Direct—————

 1    trying to find decent housing can be a tremendous issue.

 2            The other thing that people were concerned about was

 3    transportation.  Even if you found a decent job, if you were

 4    in certain parts of the City, if you didn't have a vehicle,

 5    you couldn't get there, you couldn't get to a job.  So it put

 6    them in a position that they could have made a higher salary

 7    if only they were able to get to a job.

 8    Q.  Did you face any difficulties while running?

 9    A.  Well, of course, when you are a candidate who is not

10    financially wealthy, that can be a challenge in and of itself

11    in a city the size of Virginia Beach, and so financially that

12    was a challenge.

13            The other thing was just going out daily when you're

14    a full-time employee, working and then having time to go out

15    and campaign.  So that could be a challenge as well.

16    Q.  Ms. Allen, when you were running, did you do any outreach

17    aimed at the Black community to support your candidates?

18    A.  Excuse me?

19    Q.  When you were running, did you do any outreach toward the

20    Black community?

21    A.  My outreach was more or less opened to anybody that

22    wanted to join our campaign, but I did directly go to events

23    of persons of my own race who had events that was going on.

24    And so I attended those events, I spoke at those various

25    events, and others, as well.

———Allen, G. - Direct———

1  Q.  Did you have any notable endorsements from the Black

2  community?

3  A.  The Virginia Beach APAC was an endorser of my candidacy.

4  Q.  And based on that endorsement and the work that you did

5  in the African-American community during the campaign, did

6  you believe that the African-American community supported

7  you?

8  A.  Absolutely.

9  Q.  Did you reach out to the Hispanic community for support?

10  A.  Well, of course.  I had relationships with people like

11  Shewling Wong, Beatriz Amberman, Alicia Bobulinski -- it

12  doesn't sound like it's Spanish, but she is.  And, you know,

13  I made them aware that I was running for office.

14  Q.  Could you clarify who those individuals are and which

15  minority communities you saw them as representing?

16  A.  Okay.  Shewling Wong is, of course, from the Chinese

17  community.  And Alicia and Beatriz are both from the Filipino

18  community, and one was the head of Making a Difference

19  Foundation, and the other one was head of the Hispanic

20  Dialogue.

21  Q.  Based on your contacts with Ms. Amberman and

22  Ms. Bobulinski, and your other outreach to the Hispanic

23  community during your campaign, did you believe that the

24  Hispanic community supported you?

25  A.  Yes.

─────────Allen, G. - Direct─────────

 1          MR. HARRIS:  Objection.  Calls for speculation.

 2          THE COURT:  Sustained.

 3    BY MS. LEEPER:

 4    Q.  Ms. Allen, based on your run for office in Virginia

 5    Beach, including the council -- your run for office in

 6    Virginia Beach, including City Council, and your experience

 7    as a leader and an advocate for the African-American

 8    community, as well as your relationships with Hispanic and

 9    Asian leaders, have you formed a belief as to whether you

10    were the minority candidate of choice in your 2008 campaign

11    for City Council?

12          MR. HARRIS:  Object to improper opinion testimony.

13    That's this Court's determination in this case.

14          THE COURT:  The Court will sustain it, in part.

15          You can rephrase that question, Counsel, to

16    determine whether she had the support of her community.

17    BY MS. LEEPER:

18    Q.  Ms. Allen, did members of the various minority

19    communities in Virginia Beach tell you whether they had --

20    you had their support?

21          MR. HARRIS:  Object to hearsay, to the extent it's

22    being offered for the truth.  Out-of-court statement.

23          THE COURT:  Overruled.

24          THE WITNESS:  Okay.  When I spoke to the different

25    people in the Hispanic community, they gave me the impression

—Allen, G. - Direct—

1   that, yes, I was a candidate that they would support.  Okay.

2   But we all know with elections you can't guarantee anything.

3   But I do know that they said to me that they felt like I was

4   the candidate that they would support.

5          THE COURT:  Let me insert that is hearsay, what

6   "they" said, but this is a bench trial, and the Court is able

7   to give such testimony the weight that it deserves.  So you

8   can be very adept in asking your questions in another way to

9   get the same information.

10          But that's just a note for all counsel.

11          MS. LEEPER:  Yes, Your Honor.  Thank you.

12  BY MS. LEEPER:

13  Q.  Ms. Allen, do you recall Rosemary's Wilson's response to

14  your strong electoral showing?

15  A.  I do.

16  Q.  Do you remember verbatim what she said?

17  A.  Not verbatim, but I know that she made an off-color

18  remark with regards to me running in the same year that

19  President Obama was running.

20  Q.  I'm going to try to refresh your memory about the exact

21  response.

22          MS. LEEPER:  Could we please pull up Plaintiffs'

23  Exhibit 171?  And if you could highlight the portion

24  beginning with, "My guess is..."  I believe it's about midway

25  down the page.

─────────Allen, G. - Direct─────────

1    BY MS. LEEPER:

2    Q.  Ms. Allen, could you read the highlighted portion?

3    A.  "My guess is she benefitted from the Obama phenomena,

4    said Wilson, who ran an aggressive campaign.  I was surprised

5    it was not visible what she was doing."

6    Q.  Ms. Allen, what was your reaction to that statement?

7    A.  I found it extremely offensive, because I felt that she

8    was, you know, making an off-color remark because I was

9    running for office and I happened to be running the same year

10   that President Obama ran.

11   Q.  Ms. Allen, based on your experience campaigning, do you

12   believe that your campaign was visible?

13   A.  I do.  We had signs all over Virginia Beach, some of the

14   largest signs, that even when I would come to work, I would

15   have people saying, "I see your signs everywhere.  You are

16   everywhere."  And so -- and these were people from all

17   different backgrounds and nationalities, and they all said

18   that they felt that they could see my signs everywhere.

19           THE COURT:  Once again, I just caution your witness

20   saying what "they" said.  We don't know who "they" are.

21           THE WITNESS:  Okay.  My coworkers said.  I can give

22   you a name of one, if you'd like.

23           MS. LEEPER:  Your Honor, I move to admit Plaintiffs'

24   Exhibit 171.

25           MR. HARRIS:  Your Honor, we object to Exhibit 171.

―――――――Allen, G. - Direct―――――――

1    There's been no foundation laid for what appears to be a news

2    bank printout, and this discussion has been solely about this

3    witness's discussions with Ms. Wilson.  It simply doesn't

4    match, so the foundation hasn't been laid.

5         THE COURT:  Your objection would be sustained.

6         MS. LEEPER:  Your Honor, would you be amenable to

7    admitting the exhibit not for the truth of the matter

8    asserted but as Ms. Wilson's statement as a statement of a

9    party opponent under 801(d)(2)(A)?

10        THE COURT:  Well, if you're trying to admit this

11   document for the statement that's being highlighted here,

12   allegedly made by her opponent, she's given the testimony.

13   And, certainly, the testimony -- you would make that

14   statement with respect to the testimony, but not with respect

15   to the exhibit.

16        The Court doesn't believe you've laid any foundation

17   for the exhibit, but you certainly may raise that exception

18   to the hearsay with respect to the testimony she gave about

19   this.  So the Court sustains the objection to just the

20   article.

21        MS. LEEPER:  Yes, Your Honor.

22   BY MS. LEEPER:

23   Q.  Ms. Allen, did you have a basis for assessing your

24   Hispanic support in your 2008 run for Virginia Beach City

25   Council?

─────Allen, G. - Direct─────

1   A.  Repeat that, please.

2   Q.  Did you have a basis for assessing your support in the

3   Hispanic community in your 2008 run for City Council?

4   A.  Mostly my relationship with a number of people in the

5   community was my basis.

6   Q.  Do you believe that you would have won a City Council

7   seat in 2008 with a different system of election?

8            MR. HARRIS:  Object.  Speculation.

9            MS. LEEPER:  Your Honor, this is based on her

10  experience campaigning, going door to door and understanding

11  who in which district supported her.

12           THE COURT:  Objection overruled.

13  BY MS. LEEPER:

14  Q.  Ms. Allen, do you believe that you would have won a City

15  Council seat in 2008 with a different system of election?

16  A.  I do believe that I could have won with a different

17  system of election, yes.

18  Q.  And why do you believe that?

19  A.  Because if I didn't have to run in the whole entire city,

20  I could have narrowed my focus on a geographic area, which

21  would have allowed me to get to more people in the entire

22  city that could directly vote for me in a smaller group.  So

23  I feel that if it was in a smaller group, I could have had a

24  much better outcome and won.

25  Q.  Ms. Allen, we're going to turn away from your campaign

Allen, G. - Direct

1   now and focus on some of your community involvement.

2          Are you familiar with the Community Coalition for a

3   Better Virginia Beach?

4   A.   Yes.

5   Q.   Could you describe it for the Court?

6   A.   In -- what was it -- 2001, I believe, we were concerned

7   about the elections in Virginia Beach, that they weren't a

8   lot of people of color that were winning races, and on the

9   City Council, especially, because when you look at -- when

10  you look at the races that was won, which was School Board a

11  lot of times, the School Board didn't have the same

12  legislative power that the City Council does, so we wanted

13  people who could run in that race.

14         And so we formed the coalition with the various

15  communities, including the Hispanic community, the Latino --

16  the Asian community, and from different groups within the

17  Asian community, to include the Chinese and the Filipinos,

18  et cetera.  And what we did is we formed the coalition, and

19  the coalition asked me to be the chairperson because I was

20  the president of the NAACP.

21         And so I became the head of the coalition simply

22  because of my leadership in the NAACP.  And they wanted to

23  help to win elections as a group because they felt we had

24  more leverage if we went as a unit.

25  Q.   Was there any benefit to having different minority

Carol L. Naughton, Official Court Reporter

Allen, G. - Direct

1  communities involved in this advocacy, rather than just one
2  group, such as African-Americans?
3  A.  Well, it gave us a broader group of people to choose from
4  when we ran for office.
5          The goal is never to not have people who are
6  non-minority -- which I hate to use that term -- or
7  non-diverse.  It was never the goal to say, "Well, if you're
8  not diverse, I don't want your vote."  The goal was to make
9  sure that people of diverse backgrounds could get elected to
10 office in the City of Virginia Beach.
11 Q.  Did the Community Coalition for a Better Virginia Beach
12 participate in campaigning for any candidates for City
13 Council?
14 A.  We did not do a campaign, per se, but all of us
15 individually throughout the City were working our own
16 different community groups to get people to go to the polls
17 and vote, so to make sure that we had a strong turnout of all
18 the different diverse communities.
19 Q.  Were there any candidates in particular that the
20 different members of the Community Coalition for a Better
21 Virginia Beach were supporting at that time?
22 A.  In that particular year, that was the year that I believe
23 Ron Villanueva ran for office, and so, overall, that was the
24 candidate that we supported.
25 Q.  And what was Mr. Villanueva's race?

—————Allen, G. - Direct—————

1    A.  He was Filipino.

2    Q.  Was there any other advocacy that the Community Coalition

3    did, perhaps, before the Virginia Beach City Council?

4    A.  I don't recall offhand right now.

5    Q.  Was the Community Coalition at all involved in advocating

6    regarding redistricting?

7    A.  Yes, we did take a look -- and, again, the NAACP took the

8    lead on it, but the coalition came together, and we spoke

9    before City Council a few times, I think.  I went week after

10   week to speak to City Council about changing our election

11   process.

12   Q.  Could we please pull up Plaintiffs' Exhibit 145 starting

13   at Page 2.

14            Ms. Allen, take a moment to look at this.

15            Have you seen this document before?

16   A.  Yes, I believe I have, uh-huh.  It's a public hearing

17   document.

18   Q.  If we could turn our attention to Page 11, and perhaps we

19   could highlight the portion beginning with, "We, the members

20   of the Community Coalition..."

21            Ms. Allen, could you read this aloud, this

22   paragraph, for me?

23   A.  "We, the members of the Community Coalition for a Better

24   Virginia Beach, believe that the City's current system of

25   electing members to City Council does not provide a fair

Allen, G. - Direct

1    opportunity for citizens who are racially and ethnically

2    diverse to elect a candidate of their choice to Council."

3    Q.  Do you still believe that's true today?

4    A.  I do.

5    Q.  And if you could, highlight the paragraph beginning with,

6    "We believe that the current plan..."

7         And, Ms. Allen, could you read aloud the sentence

8    starting with, "In addition..."

9         MR. HARRIS:  Your Honor, I'm going to object to this

10   as an improper legal conclusion by this plaintiff, especially

11   the first sentence.

12        THE COURT:  Well, let's put it this way, Counsel.

13   The Court realizes that she's a layperson, and, once again,

14   and the Court will give that statement such weight as it

15   deserves, which is if it's intended to be a legal conclusion,

16   it's not something that the Court is bound by here.

17        So you go on and read it.

18        MR. HARRIS:  Thank you, Your Honor.

19        THE WITNESS:  "In addition, our current system which

20   provides for at-large election of all 11 members of the

21   Council, does not allow reasonable elected representation

22   from the current diverse population of the City, which is

23   close to 30 percent racially diverse."

24   BY MS. LEEPER:

25   Q.  And, Ms. Allen, do you still believe that is true today?

─────Allen, G. - Direct─────

1   A.   I do.

2            MS. LEEPER:  I ask that the Court admit Plaintiffs'

3   Exhibit 171 into evidence.

4            MR. HARRIS:  Your Honor, I object for the same

5   reasons.  There's been no foundation.  There's been no

6   objection to the testimony, except for the qualifying

7   testimony that's, in fact, in evidence before Your Honor.

8            THE COURT:  Okay, counsel.  Let me go back.

9            What is this Exhibit 145?

10           MS. LEEPER:  2001.

11           THE COURT:  What is it?

12           MS. LEEPER:  What is it?  It is, as she said,

13  minutes of the City Council hearing in 2001 on redistricting.

14           THE COURT:  So this is a public document?

15           MS. LEEPER:  It is a public record under Rule 803(8)

16  that was produced to us by defendants.

17           THE COURT:  All right.  Objection overruled.  The

18  document will be admitted.

19           MR. HARRIS:  Your Honor, if I may note an objection

20  to the other portions of this document that are hearsay from

21  other individuals that are not Ms. Allen herself, for what

22  it's worth, for the Court's ability to weigh the hearsay

23  testimony.

24           THE COURT:  Okay.  Well, what you can do, Counsel,

25  is you can certainly cross-examine her on that.

─────────Allen, G. - Direct─────────

1            The other thing is I think the parties probably

2    should have gotten together before now and redacted those

3    portions that were -- that -- well, on second thought, no.

4            If these statements were made, and they're part of

5    the minutes from a public hearing, the Court is going to just

6    admit the document, period.

7            MS. LEEPER:  Thank you, Your Honor.

8            (Plaintiffs' Exhibit 145 was received in evidence.)

9    BY MS. LEEPER:

10   Q.  Ms. Allen, were you involved in a 2011 redistricting

11   process following the 2010 Census?

12   A.  I was.

13   Q.  How were you involved?

14   A.  Again, I continued to push for fair elections and fair

15   drawing of districts.

16   Q.  When you say you "pushed" for that, in what venues did

17   you make that push?

18   A.  I spoke before council, and I believe we pulled together

19   another group of people to help draw district lines, to look

20   at a better way of persons having an opportunity to run --

21   not only run but win elective office in the City of Virginia

22   Beach.

23   Q.  Ms. Allen, are you familiar with the Virginia Beach

24   Concerned Citizens Coalition?

25   A.  Yes.

Allen, G. - Direct

1   Q.   And what was that?

2   A.   We worked together to bring about a change, again, in the

3   election process of the City of Virginia Beach.

4   Q.   What was the racial makeup of that group?

5   A.   It was a diverse group of people.

6   Q.   Was there a benefit to putting out the redistricting plan

7   with the Virginia Beach Concerned Citizens Coalition, rather

8   than just the NAACP, in your view?

9   A.   Well, with anything, you want to make sure that other

10  people are on board, and so in order for you to find that

11  out, you reach out to other groups, other members of the

12  community.  And so through that mission, through that effort,

13  through that advocacy, then we pulled the persons together

14  who felt that we could change the way that elections are held

15  in Virginia Beach to make it more fair, more equitable, and

16  not so discriminatory.

17  Q.   And, Ms. Allen, when you spoke before City Council during

18  this 2011 push, was it in your individual capacity or as the

19  President of the NAACP?

20  A.   At that time I spoke on behalf of the NAACP.

21  Q.   During your years in Virginia Beach, have you been

22  involved in activities that bring you into contact with the

23  Hispanic, Black, and Asian communities?

24  A.   I continue to be involved with different communities.  I

25  recently spoke for the Asian Business Association of Hampton

─────Allen, G. - Direct─────

 1   Roads as the keynote speaker for their annual meeting, and so
 2   I continue to be involved with different people and continue
 3   to keep those connections.
 4   Q.  And over the course of your time in Virginia Beach, are
 5   there any other places that you engaged with the different
 6   Asian and Hispanic and Black communities?
 7   A.  From time to time I attend the Hispanic Dialogue, when
 8   they are active, but I also attend other groups, as well.  I
 9   do Nigerian groups.  I do other groups.  I don't just do
10   Asian, American Blacks, and Hispanics.  I also attend various
11   other groups and always have.
12   Q.  Based on your interactions with the Hispanic, Black, and
13   Asian communities in Virginia Beach, do you believe that
14   those minority communities act in concert with each other or
15   against each other?
16   A.  In many instances, yes, we act in concert with one
17   another, depending upon whether we're running for office, and
18   things of that nature, and based upon the issue that is front
19   and center that affects us all.
20   Q.  And based on those same interactions, do you believe that
21   the minority communities in Virginia Beach share common
22   interests?
23   A.  Yes.
24   Q.  What are some of those common interests?
25   A.  Housing.  It's a major problem in the City of Virginia

─Allen, G. - Direct─

1   Beach.  Housing.  A number of people from other groups, they

2   need transportation, just like other groups, without having

3   to enter into positions that they would rather not.  But

4   sometimes they're forced to simply because they don't have

5   the flexibility.  So there are a number of issues that in

6   Virginia Beach that we do have concerns about.

7   Q.  Ms. Allen, are you familiar with any incidents involving

8   former City of Virginia Beach Treasurer, John Atkinson?

9   A.  Yes.  He's made some off-color remarks.

10         MR. HARRIS:  I'll object to hearsay.  The problem is

11   it hasn't been laid that she was there or that there's some

12   exception applicable to what I believe will be the next

13   question, which is what did Mr. Atkinson say.

14         MS. LEEPER:  That is actually not my next question.

15         THE COURT:  Okay.  Your objection is premature.

16   But, Counsel, once again, it's the method, the way, the

17   approach that you use to ask her questions to avoid a hearsay

18   objection.  You get the same information by the way you frame

19   the question.

20         So with that, the objection is overruled.

21         MS. LEEPER:  Yes, Your Honor.

22   BY MS. LEEPER:

23   Q.  Ms. Allen, do you recall that at a council meeting John

24   Atkinson described the people that a tax applied to as,

25   quote, "the poor, the illiterate, and dark-skinned"?

———Allen, G. - Direct———

 1        MR. HARRIS:  Your Honor, please note our continuing
 2    objection to the line of questioning to the extent it
 3    continues to ask for statements that she has not either
 4    personally been aware of or offered for some other purpose
 5    other than the truth of the matter asserted.
 6        THE COURT:  Well, the Court doesn't know at this
 7    moment for what purpose it's being asked, or whether she knew
 8    about it, was present, or anything else.
 9        So I still overrule your objection so the Court can
10    get a clear view of where we're going with the question.
11    BY MS. LEEPER:
12    Q.  Once more, do you recall that at a council meeting John
13    Atkinson described the people that a tax applied to as,
14    quote, the poor, the illiterate, and dark-skinned?
15    A.  Yes.
16    Q.  Do you recall that comment verbatim?
17    A.  No, I do not recall it verbatim, but I do recall
18    especially when he talks about the poor and the dark-skinned
19    people.
20    Q.  Could we please bring up Plaintiffs' Exhibit 349.
21        Ms. Allen, could you identify what this is?
22    A.  That's the Virginia Beach City Council meeting minutes
23    again.
24        THE COURT:  What did you say it was?
25        THE WITNESS:  It appears to be the City Council

─Allen, G. - Direct─

1   meeting, unless that's not the page you want me to see.

2   BY MS. LEEPER:

3   Q.  No, that is.

4           MS. LEEPER:  It was a set of minutes from a City

5   Council meeting from March 19, 2002.

6           THE COURT:  All right.  Continue.

7           MS. LEEPER:  Could we please turn our attention to

8   Page 32, and could you highlight the second full paragraph

9   from the bottom.

10  BY MS. LEEPER:

11  Q.  Ms. Allen, could you please read aloud the highlighted

12  portion, the first paragraph, please.

13  A.  Do you want me to read whose name is inside the

14  highlighted paragraph?  It's a specific name.  It says, "John

15  Atkinson:  $20 come up to a million-six, and a million-six is

16  going to be applied to the poor, to the illiterate, to the

17  dark-skinned, and to the people who just don't have the

18  money."

19  Q.  Ms. Allen, do you recall those remarks being made by John

20  Atkinson?

21  A.  And I remember it, yes, yes.

22  Q.  Do you find that comment to be offensive?

23  A.  Absolutely.

24  Q.  Against whom do you consider it to be offensive?

25  A.  Well, he put a lot of people in that comment.  Which I

─────Allen, G. - Direct─────

1    find -- I personally find, especially when he speaks to

2    dark-skinned people, and as someone who works with people,

3    "poor" and "illiterate" I find extremely offensive, because

4    my whole background is helping those who are less fortunate.

5    So I find it extremely offensive.

6           MS. LEEPER:  Your Honor, I ask that you admit

7    Plaintiffs' Exhibit 349, the City Council minutes, into

8    evidence.

9           THE COURT:  Once again, is this a public document?

10          MS. LEEPER:  Yes, sir.

11          THE COURT:  What's your objection to the public

12   document, Counsel?

13          MR. HARRIS:  Your Honor, I don't have an objection

14   to the document itself, it's just the hearsay contained

15   herein.  If it's being offered for truth of the matter

16   asserted, she hasn't testified that she was there on that day

17   and actually heard it or any other exception that would

18   apply, other than perhaps what the Court is prepared to do,

19   which is this is a public record.

20          So to the extent the Court is going to receive it, I

21   would ask that the Court qualify its acceptance of that

22   understanding that it is truly hearsay.

23          THE COURT:  The Court is not going to do any of that

24   right now.

25          First of all, the Court can take it all in context;

———Allen, G. - Direct———

 1    it's a public document.  It's undisputed.

 2           The Court has a question, though.  What was the

 3    nature of the discussion going on here?

 4           MS. LEEPER:  There was a discussion about, I

 5    believe, taxing and specifically a tax system that was going

 6    on in Virginia Beach at that time.

 7           THE COURT:  The only reason the Court raises that

 8    question is to try to see if we can get at relevance.

 9           MS. LEEPER:  The relevance of the rest of the

10    document is not sufficient.  It's really this comment that

11    we're focusing on, so we are satisfied if you allow the rest

12    of it in not for the truth of the matter asserted.

13           THE COURT:  All right.  The Court will take a very

14    limited and narrow look at what it is here.  It all depends

15    on the purpose for which the document is offered.

16           MS. LEEPER:  Yes, Your Honor.

17           (Plaintiffs' Exhibit 349 was received in evidence.)

18           THE COURT:  I will tell you the Court has more

19    latitude in a bench trial than it would have in a jury trial,

20    but that doesn't mean that we're going to do violence to the

21    Rules of Evidence here in the next few weeks.  I just caution

22    all counsel of that, because it reaches a point where the

23    Court starts sustaining everything.  And that will go for

24    both parties.

25           All right.  Continue.

─────────Allen, G. - Direct─────────

```
 1              MS. LEEPER:  Yes, Your Honor.
 2              THE WITNESS:  Can I say something?
 3              THE COURT:  No, you can't.  Only answer questions
 4    raised by counsel.
 5              MS. LEEPER:  Thank you, Ms. Allen.
 6    BY MS. LEEPER:
 7    Q.  Do you recall that John Atkinson wrote an Op-Ed where he
 8    used the phrase, "No ticky, no laundry"?
 9    A.  Yes, I do.
10    Q.  Can you pull up Plaintiffs' Exhibit 350.
11              Ms. Allen, if you could take a close look at this
12    first page.
13              And then a look at the third page, please, Mike.
14    And if we could highlight the column underneath the header,
15    "Keep sticker, add fee to property tax."
16              Ms. Allen, you can take your time, but when you've
17    reviewed it, I would like to know if you recall this article?
18    A.  I do.
19    Q.  And how do you recall this article?
20    A.  Again, I received calls from -- as a matter of fact, I
21    received calls from the Asian community, because they found
22    it extremely offensive.
23              MR. HARRIS:  Objection to hearsay, Your Honor.
24              THE COURT:  Sustained.
25    BY MS. LEEPER:
```

Allen, G. - Direct

1  Q.  Ms. Allen, if you could, keep your testimony to your

2  understanding at the time and why it was impressionable to

3  you and refrain from talking about what other members said

4  about this at this point.  Thank you.

5  A.  Okay.  I found it offensive because I am familiar with

6  the "No ticky, no laundry" comment that is a racial slur to

7  the Asian community and primarily to the Chinese community.

8  Q.  Mike, if you could, please highlight the first partial

9  paragraph in the Op-Ed's right column.

10          And, Ms. Allen, if you could read starting at, "It

11  was and still is..."

12  A.  "It was and still is the simplest and most cost-effective

13  way to collect delinquent personal property bills.  No ticky,

14  no laundry."

15  Q.  What do you know about the phrase, "No ticky, no

16  laundry"?

17  A.  Basically, of course, there was a lot to do about the

18  fact that a lot of the people from China that laundry --

19  primarily over on the West Coast, in the California area --

20  and that that became more or less a negative comment to their

21  community.  "No ticky no laundry" was primarily a negative

22  comment.

23  Q.  Could you remind me what John Atkinson's position was in

24  the City?

25  A.  He was a City Treasurer.

—————————Allen, G. - Direct—————————

1    Q.  And were you concerned that a public official of the City

2    expressed this kind of language and these views?

3    A.  It was a -- it was an issue to -- and offensive to me as

4    a community leader at the time.

5              MS. LEEPER:  Your Honor, I ask that you enter

6    Plaintiffs' Exhibit 350 into evidence.

7              MR. HARRIS:  No objection, Your Honor.  It's a

8    newspaper article.  It's unauthenticated.

9              MS. LEEPER:  Newspaper articles are

10   self-authenticated.

11             THE COURT:  He has no objection.  It will be

12   admitted.

13             (Plaintiffs' Exhibit 350 was received in evidence.)

14   BY MS. LEEPER:

15   Q.  Are you familiar with the Diverse Communities Coalition?

16   A.  Yes.

17   Q.  Could you explain what that group was?

18   A.  Once again, we came together to work on issues,

19   primarily, in the elections.  Virginia Beach is a unique

20   city.  Okay?  To put it mildly, it is a unique city.  As

21   someone who has been in the City, came to the City when I was

22   a year old -- my father was a pastor, and we moved here.  I

23   remember when it was Princess Anne County, and throughout my

24   whole upbringing and growing-up years, there was always the

25   concern of the issue with discrimination in the City, and so

─────Allen, G. - Direct─────

1   has been that way throughout my whole entire lifetime, that

2   concern.

3          So as someone who got involved in civil rights,

4   whenever we see something, we do try to pull ourselves

5   together and not just work as individuals, but work as a

6   collective unit.  And so again, there was this opportunity to

7   look at what was going on and look at how we can bring about

8   a change when it comes to our election process, and so we did

9   that once again.

10  Q.  Were there any protests surrounding specifically the

11  incidents with John Atkinson?

12  A.  We did.  We did.

13  Q.  And do you recall the makeup of that group?

14  A.  It was very diverse.  Shewling Wong contacted me

15  directly, so I hope that's okay if it's an individual.  She

16  contacted me directly.

17          THE COURT:  Don't tell us what she said.

18          THE WITNESS:  I can't tell you what she said?

19          THE COURT:  No, you can't.  You can tell us what you

20  did as a result of the conversation with her, but not what

21  she said.

22          THE WITNESS:  Okay.  All right.

23          Okay.  She contacted me with regards to the comment

24  that was made, and from there we got on the phones, and we

25  pulled people together to march against that particular

—Allen, G. - Direct—

 1    situation.  And so there were former City Council members,

 2    former business owners -- when I say "former," that doesn't

 3    mean they're not currently business owners, it was just the

 4    newspaper article, along with the people that I met came

 5    together as a cohesive group to act against their particular

 6    issue.

 7    BY MS. LEEPER:

 8    Q.  Ms. Allen, did the group participating in those protests

 9    include minority groups that were either not targeted by the

10    comments or were only targeted by one of the comments?

11    A.  It was diverse groups.  Whether we were targeted directly

12    by the comment or not, it was offensive to one, so offensive

13    to all.

14            THE COURT:  What year are we talking about, Counsel?

15            MS. LEEPER:  If we could pull up the article, it has

16    it on there.

17            MR. HARRIS:  Your Honor, it was 2002.

18            THE COURT:  Thank you, Counsel.  2002.

19    BY MS. LEEPER:

20    Q.  Ms. Allen, why did you personally participate in both

21    protests about Atkinson's comments?

22    A.  Because that behavior is totally inappropriate as a City

23    employee, who was paid by all of the taxpayers, not just one,

24    and so that is -- that was an inappropriate comment to make.

25    Q.  Ms. Allen, are you familiar with the Disparity Study?

─────Allen, G. - Direct─────

1    A.   Yes.

2    Q.   Were you at all involved in the push for the Disparity

3    Study?

4    A.   I worked along with the ministers with the Disparity

5    Study.  I'm the Religious Affairs Committee Chair for the

6    NAACP currently, and so -- in Virginia Beach, and so I attend

7    their meetings on Saturday mornings, and we talk about some

8    of the issues.  And so in some instances we look at which

9    group should push a particular issue.

10            In this particular case, we agreed for the

11   ministers, VBIMC, which is the Virginia Beach

12   Interdenominational Ministers Council Conference, to push

13   that issue with regard to disparity.

14   Q.   Did you attend the Faith Freedom and Justice March?

15   A.   Yes, I did.

16   Q.   And what was your understanding of the purpose for that

17   event?

18   A.   That was to continue to push the City with regard to

19   their disparity in their contracting and hiring practices,

20   et cetera.  I'm sorry.

21   Q.   What was the racial makeup of the crowd at that march?

22   A.   That was a very diverse group.  There were a lot of

23   people from -- all the different races were there.  Of

24   course, there were people who were running for office, there

25   were people who already were elected to office, there were

─────Allen, G. - Direct─────

1    young people, there were older people.  There were people of

2    all different diverse backgrounds.

3    Q.  Ms. Allen, you spoke earlier about the NAACP's work in

4    the early 2000s regarding the City's contracts with

5    minorities.

6              Were those problems flagged by the NAACP in the

7    early 2000s the same as the problems you aware advocating to

8    address with the 2017 Disparity Study, or were they

9    different?

10   A.  We continued to have issues with City contracting and

11   fairness in their contracting awards.

12   Q.  Now, has the City implemented all the recommendations

13   from the Disparity Study?

14              MR. HARRIS:  Object to foundation.

15              THE COURT:  Objection sustained.  We don't know what

16   the recommendations were.

17              MS. LEEPER:  That's fine, Your Honor.  I'll move on.

18   BY MS. LEEPER:

19   Q.  Ms. Allen, do you recall any events that you took part in

20   or attended in your life to address the issue of police

21   brutality?

22   A.  Yes.  The City held some meetings after a young man was

23   beaten or harmed or brutalized.  It's in the newspaper.  So

24   it's Mr. Stokes' son, and so they had put together some open

25   forums for people to come to and attend, and so I attended

─────Allen, G. - Direct─────

1    the forums.

2              THE COURT:  It would be helpful to the Court when

3    asking questions to know the time frame.

4              MS. LEEPER:  Yes, Your Honor.

5              If we could please pull up Plaintiffs' Exhibit 181,

6    an article from 1991, Your Honor.

7    BY MS. LEEPER:

8    Q.  Ms. Allen, do you recall attending the 1991 panel on

9    police brutality mentioned in this article?

10   A.  Yes, I do.

11   Q.  And do you recall some of the proposals that the

12   African-American community raised at that meeting?

13   A.  Could you --

14   Q.  Do you recall any of the proposals that the

15   African-American community raised at that meeting?

16   A.  We were looking for a citizens -- more or less, a

17   citizens review board or community review board.

18             MS. LEEPER:  We can take that down now.

19   BY MS. LEEPER:

20   Q.  Are you familiar with the five-point policing plan put

21   forward by the African-American Leadership Conference in

22   2016?

23   A.  Yes.

24   Q.  And do you know if a citizen review board was also

25   requested as a part of that plan?

────Allen, G. - Direct────

1   A.  It was requested again, yes.

2   Q.  Has the City of Virginia Beach created the citizen review

3   board?

4   A.  To my knowledge, it hasn't.

5   Q.  And, Ms. Allen, I'm going to ask you some questions about

6   some of the City groups you've been involved in.

7           What is the purpose of the Human Rights Commission,

8   as you understand it?

9   A.  Well, the Human Rights Commission, as I understand it way

10  back then, was to look at any issues and concerns that

11  citizens may have with regards to their treatment in the City

12  of Virginia Beach, whether it's discriminatory or what have

13  you.  Those were some of the things that we tried to review.

14  Q.  And what was your role in the Human Rights Commission?

15  A.  I was a member.

16  Q.  What do you think, based on your time as a member of the

17  Human Rights Commission, of the Virginia Beach Human Rights

18  Commission?

19  A.  Excuse me?

20  Q.  Based on your experience as a member of the Human Rights

21  Commission, what do you think of it?

22          MR. HARRIS:  Objection.  Relevance.

23          THE COURT:  Sustained.  That just calls for pure

24  opinion.  Let's move to a substantive question.

25          MS. LEEPER:  Yes, Your Honor.

—————Allen, G. - Direct—————

1   BY MS. LEEPER:

2   Q.  Do you recall the Human Rights Commission subcommittee

3   conducting a study on the hiring and promotion practices of

4   the police and fire departments?

5   A.  We did.

6   Q.  Were you a member of the Human Rights Commission at that

7   time?

8   A.  I believe I was still a member at that time.

9   Q.  And did you review that study created by the

10  subcommittee?

11  A.  I'm sure I did.

12  Q.  Do you recall what you thought about that report that was

13  produced by the subcommittee?

14          MR. HARRIS:  Objection, Your Honor.  It calls for

15  opinion, no foundation.  She hasn't testified she's even

16  exactly aware of the study at this point.

17          THE COURT:  Well, Counsel, you can revise your

18  question, if there's something specific you're getting at.

19          MS. LEEPER:  Yes, Your Honor.

20          If we could pull up Exhibit 177 to refresh

21  Ms. Allen's memory on this.

22  BY MS. LEEPER:

23  Q.  And, Ms. Allen, I can direct you to the last three lines

24  of the first page, starting with, "Other commission

25  members..."

Allen, G. - Direct

1    A.   Okay.  Do you want me to read it?

2    Q.   No, that's all right.  Ms. Allen, do you now recall what

3    you thought about the report that was produced by the

4    subcommittee?

5    A.   My concern was that this particular subcommittee would be

6    more or less beholden to the City and they would not

7    necessarily be able to be objective.  Also, it just appeared

8    to be more window dressing at that time than it was real

9    substantive, and so that was my concern back then.  And so I

10   was pretty disappointed in what had been put together.

11   Q.   We can pull that down.

12        Ms. Allen, what direction was the purpose of the

13   Vision 2040 Committee, as you understood it?

14   A.   The previous Mayor reached out to community people and

15   asked us to take a look out to year 2040 to try to look at

16   what we felt the City would look like.  And we looked at

17   everything from education, from, you know, development, the

18   whole, you know, gamut.  Technology was a biggie.

19        And my concern with the community -- with the

20   committee was that it didn't have high school seniors and

21   college people, because at my age I didn't know if I was

22   going to be here in 2040.  So it was a committee to kind of

23   give the City a vision to work toward.

24   Q.   And, Ms. Allen, what is the purpose of the Vision to

25   Action Committee, as you understand it?

─────Allen, G. - Direct─────

1   A.  It's to inform the community about what the vision is so

2   that we can begin to get partners to buy into that vision and

3   work alongside of us.

4   Q.  Ms. Allen, did you feel that the Vision 2040 Committee,

5   and do you feel that the Vision to Action Committee are

6   addressing the concerns of the minority community?

7   A.  Not as in-depth as I think it should.  One of the main

8   things that we talk about a lot is housing, and in the City

9   of Virginia Beach, they quickly build new neighborhoods, and

10  then the neighborhoods are low 300,000, and I don't think our

11  police officers, school teachers, and people like that, or

12  people who work in the cellular phone industry, that is in

13  their ballpark, and so those are some of the issues.  And so

14  I think it's a good idea.  I don't think they followed

15  through in terms of making it feasible for the people who

16  live here in Virginia Beach.

17          THE COURT:  And what year was the Vision 2040

18  Committee?  When did that come up?

19          THE WITNESS:  I want to say 2010 was when we first

20  got started, because I wanted to say it was under Mr. Will

21  Sessoms, Mayor Will Sessoms, and then we continued on.

22          MS. LEEPER:  And, Your Honor, she's currently on the

23  Vision to Action Committee today.

24          THE WITNESS:  Right.

25          THE COURT:  Thank you.

—Allen, G. - Direct—

1   BY MS. LEEPER:

2   Q.  Could you tell the Court about your involvement with the

3   African-American Cultural Center?

4   A.  Well, my initial part in that group was when Amelia

5   Ross-Hammond was a City Council member, Carl Wright and I

6   went to her and asked her if she would take our message to

7   City Council with regards to finding land in the City of

8   Virginia Beach, as a community that has been here from day

9   one, that we could use to build an African-American Cultural

10  Center.

11        In terms of serving on the different committees, I

12  really only serve on one, which is the historical committee

13  where we take a look at the seniors who are here who are in

14  their late 70s, 80s, who could give us a good historical

15  perspective, who have pictures of what Virginia Beach looked

16  like when they were children, et cetera, or their parents and

17  grandparents.  So that's the particular committee I serve on,

18  and so I continue to push forward to have the Cultural Center

19  in place.

20  Q.  Ms. Allen, do you believe that the African-American

21  Cultural Center is a sign that the City of Virginia Beach and

22  the Virginia Beach City Council are being responsive to the

23  African-American community?

24  A.  I believe it's a step, uh-huh.

25  Q.  Ms. Allen, how would you define an inclusive community?

Allen, G. - Direct

1    A.  Well, when I wake up in the morning, I like to know that
2    if I drive my car out on the Witchduck Road or on Virginia
3    Beach Boulevard, I'm not going to be stopped by the police,
4    or if I'm coming home from church, and I'm driving down
5    Rosemont Road, I'm not going to be stopped by the police,
6    when they can easily view my tags, call my plate number in
7    and know exactly who I am and know exactly whether or not I
8    have any tickets or any outstanding warrants of any kind.
9           And so an inclusive community would be one where I
10   did not have to feel uncomfortable riding or driving in my
11   own city that I would be unnecessarily stopped by our
12   wonderful police department.
13   Q.  Ms. Allen, by your own definition, do you see Virginia
14   Beach as an inclusive community?
15   A.  In ways they are, uh-huh.
16   Q.  You say, "In ways they are."  Are there ways that are
17   excluded from that?
18   A.  Well, I would say that for someone who is 67 years old
19   and has only seen, what, six City Council members in 67
20   years, has never seen one African-American City Council
21   member reelected to office in 67 years, I would suggest we
22   have some work to do.
23   Q.  Ms. Allen, is having minority representation on the City
24   Council important?
25   A.  I think it's very important, for my kids, my grandkids,

——————Allen, G. - Cross——————

1    my great grandkids, and generations I don't know about yet.

2          MS. LEEPER:  No further questions from me at this

3    time.

4          THE COURT:  What we're going to do, counsel, before

5    we go further, we're going to take about a 15-minute break.

6          You may step down during the break.  Don't discuss

7    your testimony.

8              (There was a recess from 11:41 a.m. to 11:57 a.m.)

9          MR. HARRIS:  Thank you, Your Honor.  May I inquire?

10         THE COURT:  Cross-examination.

11                    CROSS-EXAMINATION

12   BY MR. HARRIS:

13   Q.  Good afternoon now, Ms. Allen.

14   A.  Good afternoon.

15   Q.  We've met you from the record already, but you are a

16   Black female?

17   A.  Yes, I am.

18   Q.  And you are a leader in the Black community here in the

19   City of Virginia Beach?

20   A.  Yes.

21   Q.  And you believe you represent the views of the Black

22   community here in Virginia Beach?

23   A.  Yes.

24   Q.  Ms. Allen, you are not of any mixed Asian descent, are

25   you?

──────────Allen, G. - Cross──────────

1  A.  None that I know of.

2  Q.  I have the same question about any Hispanic descent.

3  A.  Not that I know of.

4  Q.  You do not consider yourself a leader within the Hispanic

5  community in Virginia Beach, do you?

6  A.  I do not.

7  Q.  You do not purport to represent the interests of the

8  Hispanic community here today, do you?

9  A.  I'm not clear on that question.

10 Q.  I'm asking you whether you view your testimony today as

11 speaking on behalf of the Hispanic community in Virginia

12 Beach.

13 A.  Although I'm not a Latina, there are times when we share

14 the same views.

15 Q.  Ms. Allen, you do not consider yourself to be a leader in

16 the Asian community in the City of Virginia Beach, do you?

17 A.  No.

18 Q.  And you do not purport to represent the interests of the

19 Asian community with your testimony here today, do you?

20 A.  Even though I'm not Asian, there are times when we do

21 have interests at-large together.

22 Q.  Ms. Allen, you testified that you've lived in Virginia

23 Beach for approximately 54 years?

24 A.  More like 58 years.  I'm 67, so...

25 Q.  I understand.  My apologies.

─────Allen, G. - Cross─────

1          You've lived continuously in the City of Virginia
2    Beach from 1994 until present; is that correct?
3    A.   That is correct.
4    Q.   And you've lived in your current home since 2003?
5    A.   That is correct.
6    Q.   That address is 4649 Merrimac Lane, Virginia Beach,
7    Virginia, 23455?
8    A.   That is correct.
9    Q.   Ms. Allen, I spell Merrimac M-e-r-r-i-m-a-c.  Is that
10   correct?
11   A.   Yes.
12   Q.   You are accompanied in this lawsuit with a co-plaintiff
13   in this lawsuit by the name of Latasha Holloway; is that
14   correct?
15   A.   Yes.
16   Q.   You indicated in prior testimony that you first met
17   Ms. Holloway at a campaign event in 2016; is that correct?
18   A.   I believe so.
19   Q.   That was in reference to a race for the 2nd Congressional
20   District with Ms. Shawn Brown?
21   A.   Yes.
22   Q.   Based on your prior testimony, it appears that you wanted
23   to assist Ms. Holloway in this lawsuit to join her interests;
24   is that correct?
25   A.   I joined the lawsuit because I strongly believe that

Allen, G. - Cross

1    there is a problem in Virginia Beach.  Ms. Holloway and I
2    shared that same feeling.
3    Q.  You've not reached out specifically to any members of the
4    Hispanic community to join this lawsuit, have you?
5    A.  I have not personally reached out to them, but I have
6    shared with them the lawsuit.
7    Q.  And you have not personally reached out to any members of
8    the Asian-American community in Virginia Beach to join you in
9    this lawsuit, have you?
10   A.  I have not.
11   Q.  In fact, during your deposition testimony I asked you
12   whether you could identify any Asian-American groups in the
13   City of Virginia Beach, and you offered one Asian group named
14   FIL-AM; is that correct?
15   A.  Do you have the testimony on the screen, and I can --
16   I'll review it, and I can either confirm or deny.
17   Q.  Let me ask it a different way.
18   A.  Okay.
19   Q.  Ms. Allen, do you recall a group in the City of Virginia
20   Beach called the FIL-AM group?
21   A.  I do.
22   Q.  Tell me what you understand the purpose of that group to
23   be?
24   A.  That's the Filipino-American group, and that's members of
25   the Filipino community.

—————Allen, G. - Cross—————

1   Q.  When I asked you about the other Hispanic groups that may

2   exist in the City of Virginia Beach, you made a reference to

3   the Hispanic Dialogue?

4   A.  That is correct.

5   Q.  You understand the Hispanic Dialogue to be an

6   organization within the City of Virginia Beach that is

7   predominantly of Hispanic descent?

8   A.  I understand the Hispanic Dialogue is a group of Latinos,

9   and they do meet in Virginia Beach.  Now, I can't say if

10  they're only Virginia Beach people.

11  Q.  Ms. Allen, you mentioned that you had not reached out

12  specifically to anyone to join the lawsuit, but it's true

13  that you've reached out to an individual by the name of Pepe

14  Cabacoy to support your efforts to change the Virginia Beach

15  voting method.  Isn't that true?

16  A.  That is not true.

17  Q.  Do you understand that Mr. Cabacoy has signed an

18  affidavit in this case attesting that he has, in fact, spoken

19  to you on the phone about this case?

20  A.  He may do that.  I can say I don't even remember the last

21  time I've talked to Pepe.

22  Q.  You are familiar with Mr. Cabacoy?

23  A.  I know of Mr. Cabacoy, yes.

24  Q.  What do you know of Mr. Cabacoy?

25  A.  I thought he lived in Norfolk, to be honest with you.

Allen, G. - Cross

1    Q.  Do you know him to be a leader in the Asian-American

2    community?

3    A.  I don't know what his status is now.  The last time I

4    remember when we met -- I can't remember how many years

5    ago -- at the time, he was working in the Norfolk area.

6    That's the only thing I remember.  If I recall correctly, he

7    was working with candidates in the Norfolk area and some

8    other things, and he would come down to Virginia Beach to

9    events that were happening in Virginia Beach, whether it was

10   the Latino community, the Asian community, or the

11   African-American community that he attended.

12   Q.  Do you regularly attend the FIL-AM meetings?

13   A.  I do not regularly attend the FIL-AM meetings, no.

14   Q.  Have you ever been to a FIL-AM meeting?

15   A.  I'm sure I have, but I cannot recall over the years.  I

16   am 67 now, so I probably don't recall all the places that I

17   have been and the meetings I have attended.

18   Q.  Can you recall the last time that you attended a FIL-AM

19   community meeting?

20   A.  I can't off the top of my head, but I'm sure -- if you

21   refresh my memory, I'm sure I could remember.

22   Q.  Have you attended meetings of the Hispanic Dialogue?

23   A.  I have not, but I have spoken with Beatriz, and I've

24   asked her about any upcoming meetings, and she assured me

25   that she would let me know of any.

Carol L. Naughton, Official Court Reporter

—————————————Allen, G. - Cross—————————————

1   Q.  Your reference to "Beatriz" is Beatriz Amberman; is that

2   correct?

3   A.  That is correct, uh-huh.

4   Q.  She's an individual that you identified during your

5   direct examination testimony.

6   A.  Yes.

7   Q.  Would you identify Ms. Amberman as a leader in the

8   Hispanic community?

9   A.  Yes.

10  Q.  Is she a plaintiff in this case?

11  A.  Right now, as far as I know, it's me and Latasha.

12  Q.  Did you reach out to Ms. Amberman to support you in this

13  lawsuit?

14  A.  I made them aware.  Okay?  As a civil rights

15  organization, we tend to carry the load.  It has always been

16  that way in America.

17          THE COURT:  Counsel, perhaps counsel does not

18  recall -- I think you raised the issue about whether any

19  members of the Asian community or the Filipino community or

20  the Hispanic community were plaintiffs in this case or

21  whether they had to be plaintiffs in this case, and I think

22  the Court basically addressed that.  I see you working on it

23  again, but I think the Court has dealt with that issue here.

24  But you can continue.

25          MR. HARRIS:  Yes, sir, Your Honor.

—————————————Allen, G. - Cross—————————————

1          THE COURT:  I think the Court indicated it was not

2    necessary to do what you are alleging here, and to the extent

3    that you believe the Court is wrong, depending upon how the

4    case comes out, you certainly have already established your

5    position and opposed it, but the Court simply reminds you of

6    that.

7          MR. HARRIS:  Thank you for that admonition, Judge.

8          THE COURT:  Ammunition?  Oh, admonition.

9          MR. HARRIS:  No, that would be the wrong thing to

10   say to Your Honor, I guarantee you that.

11         MR. BOYNTON:  On many levels.

12         THE COURT:  All right.  Continue.

13         MR. HARRIS:  Thank you, Your Honor.

14   BY MR. HARRIS:

15   Q.  As you sit here today, can you identify any other

16   predominantly Asian or predominantly Hispanic organizations

17   in the City of Virginia Beach?

18   A.  The Asian Business Association of Hampton Roads is one.

19   I know within the Filipino community there's a number of

20   organizations, but just like all the other groups and

21   communities, I'm sure, you know, I could not possibly name

22   every African-American group or organization, and I've been

23   African-American since 1953.  So I can tell you I will not be

24   able to name all of the Asian groups or all of the Latino

25   groups.  I hope that helps you out significantly.

Allen, G. - Cross

1   Q.   Thank you, Ms. Allen.

2           In reference to Ms. Amberman, when was the last time

3   you had a meeting with Ms. Amberman?

4   A.   Prior to the COVID-19 was the last time -- I want to say

5   it was the last time we were together, is prior to the

6   COVID-19.

7   Q.   What was the purpose of that meeting, ma'am?

8   A.   I do believe that we were discussing the disparity study

9   at that time.

10  Q.   Do you have a better idea what time frame that meeting

11  occurred, perhaps a month?

12  A.   I want to remind you, Attorney, I have a difficult time

13  remembering yesterday.  Okay?

14  Q.   Respectfully, Ms. Allen, the answer to my question, then,

15  would be, no, you can't recall the month that you --

16  A.   I cannot recall the exact month, no.

17  Q.   Thank you.  As to Ms. Bobulinski, in your prior

18  testimony, you had indicated that you hadn't spoken to her

19  for years.  Is that true?

20  A.   That was true up until recently.  We had an opportunity

21  to meet with each other recently.  We both decided that we

22  would do the Census, and so we had conversation at that time,

23  and we've called each other since.

24  Q.   But as of the time on your deposition in September of

25  2019, you hadn't seen her for years?

Allen, G. - Cross

1   A.  Other than when her husband passed away and things of

2   that nature.  But in terms of -- I'm not sure what you're

3   asking, but not on a regular basis, like we once did, of

4   course.

5   Q.  Would you agree with me that you've predominantly

6   advocated on behalf of the African-American community in your

7   adult life as a volunteer and leader with the NAACP?

8   A.  I can't say that, because if you look at the history of

9   the NAACP, when a law changes, it changes for everybody.  We

10  don't separate out and say, "Okay.  Only Black people can

11  walk through the door and not go through the back door."  I

12  don't think we have any laws that the NAACP has advocated for

13  us and us alone.

14  Q.  Ma'am, I want to follow up on that and ask you, in your

15  personal experience, would you say that you have

16  predominantly advocated on behalf of African-Americans in the

17  City of Virginia Beach?

18  A.  I have advocated for equity and justice in the City of

19  Virginia Beach, and anybody that falls into that category is

20  entitled to equity and justice.  And while I might be head of

21  an organization that says for the advancement of colored

22  people, the last I checked, everybody in the whole world is

23  colored of some sort.

24  Q.  Yes, ma'am, I understand.

25  A.  Okay.

————Allen, G. - Cross————

```
1    Q.   I want to talk about your service to the NAACP in the
2    City of Virginia Beach now.
3    A.   Okay.
4    Q.   Specifically, I want to turn your attention to 2001 to
5    2011.  I understand you were the president of the
6    organization at that time.  Is that correct?
7    A.   Yes.
8    Q.   One of your priorities as the NAACP president was youth
9    programming; is that correct?
10   A.   Yes.
11   Q.   One of the programs that you were proud of was the
12   ACT-SO.  Is that correct?
13   A.   ACT-SO, yes.
14   Q.   Tell the Court a little bit about that program.
15   A.   That's the African-American Cultural -- African-American
16   Cultural Technological Scientific Olympics, which is the
17   Olympics of the mind.
18   Q.   That was a sponsored program with the NAACP; is that
19   correct?
20   A.   Yes.  It falls under the youth programs.
21   Q.   Is that an extension of the Youth Council that you've
22   already testified about today?
23   A.   No.  It really falls under the youth -- it's another --
24   we have a number of different committees, and in --
25   underneath that committee there is -- there's the ACT-SO
```

—————Allen, G. - Cross—————

1    program.

2    Q.   To clarify, you view the ACT-SO program -- that's ACT-SO?

3    A.   Correct.

4    Q.   -- as different from the Youth Council?

5    A.   It is different from the Youth Council, yes.

6    Q.   Are both of those programs aimed at empowering

7    African-American youth in Virginia Beach?

8    A.   Yes.  Well, let me go back.

9            The African-American -- the youth program actually

10   is under what we call youth coordination.  Okay?  So we have

11   a youth coordinator and then underneath the coordinator, we

12   have a youth council and an ACT-SO program, and at one time

13   we had a back-to-school/stay-in-school program.  All three

14   fell underneath youth.

15           Okay.  Does that help?

16   Q.   Yes, ma'am.  Each of those programs, then, were also

17   aimed at empowering young African-Americans in the City of

18   Virginia Beach?

19   A.   Primarily African-Americans, but if you recall correctly,

20   we did have other people to join the Youth Council.

21   Q.   I heard your testimony earlier that you also placed an

22   emphasis or a priority during your time as the NAACP

23   president on Black-owned businesses; is that correct?

24   A.   That is correct.

25   Q.   Is it correct that you, as the president, observed or had

—————————Allen, G. - Cross—————————

1  concerns about minority contracting in the City of Virginia

2  Beach?

3  A.  That is correct.

4  Q.  Specifically, that related to the construction of the

5  Convention Center within the City of Virginia Beach?

6  A.  That was one issue that we pushed simply because it was

7  front and center at that time.

8  Q.  That was in the early 2000s?

9  A.  Correct.

10  Q.  As a result of your efforts, certain minority contractors

11  were placed on the construction of the Convention Center;

12  isn't that true?

13  A.  That is correct.

14  Q.  Another priority of yours as the president of the NAACP

15  was to see more African-American leadership within City

16  management; isn't that correct?

17  A.  That is correct.

18  Q.  You had questions about the hiring and recruiting

19  practices in the police and fire departments?

20  A.  Yes.

21  Q.  You had an opportunity to meet directly with the Chief of

22  Police as the NAACP President; isn't that correct?

23  A.  That is correct.

24  Q.  That chief was Jake Jacocks?

25  A.  Yes.

———Allen, G. - Cross———

1   Q.  Chief Jacocks sat down and discussed your concerns with

2   you; isn't that correct?

3   A.  That is correct.

4   Q.  Following your conversations with the chief, Mr. John

5   Bell was promoted to Deputy Chief of Police; isn't that

6   correct?

7   A.  That is correct.

8   Q.  He was the first African-American to reach that post

9   within the police department; isn't that true?

10  A.  Yes.  In 67 years.  In my life.

11  Q.  And you believe that promotion of Mr. Bell to Deputy

12  Chief to be in response to your conversations with Chief

13  Jacox.  Isn't that correct?

14  A.  I believe it was in response to not me personally but my

15  organization and the community at large.

16  Q.  Are you aware that the police department also began

17  connecting with local ministers to try and increase

18  enrollment of African-Americans in the police academy?

19  A.  Yes, I am aware of that.

20  Q.  Was that also a concern that you raised with Chief

21  Jacocks?

22  A.  That is.

23  Q.  You would agree with me, then, that there was at least

24  some responsiveness on the part of Chief Jacocks to your

25  concerns as president of the NAACP?

─────────Allen, G. - Cross─────────

1   A.   Some incremental steps, yes.

2   Q.   You ended your term as president in 2011, correct?

3   A.   That is correct.

4   Q.   Since that time, there have been three presidents of the

5   NAACP?

6   A.   Yes.

7   Q.   They are Carl Wright, W-r-i-g-h-t, Gerald Daniels, and

8   Karen Hills-Pruden; is that correct?

9   A.   P-r-u what?

10  Q.   D-e-n.

11  A.   Yes.

12  Q.   Sorry.  I think I spelled that wrong.  I didn't mean to

13  confuse you.

14  A.   That's okay.  And that's Dr. Pruden.  Dr. Karen

15  Hills-Pruden.

16  Q.   Thank you for that clarification.

17  A.   Uh-huh.

18  Q.   After your term as president, you continued to

19  participate in the mission of the NAACP; isn't that correct?

20  A.   That is correct.

21  Q.   What is your current role within the NAACP?

22  A.   I am the Chairperson of the Religious Affairs Committee.

23  Q.   There was a reference earlier to a Faith, Freedom, and

24  Justice March in reference to the Disparity Study in the City

25  of Virginia Beach.

─────────────Allen, G. - Cross─────────────

1      Did you attend that march as a member of the NAACP

2  or as your own individual, Ms. Georgia Allen?

3  A.  I attended it as both.

4  Q.  I understand you were invited to be a speaker at that

5  march?

6  A.  Yes.

7  Q.  Did you have an opportunity to address the crowd?

8  A.  Yes.

9  Q.  I heard your testimony earlier that you said it was a

10  very diverse crowd?

11  A.  Yes.

12  Q.  You would agree with me that that march was represented

13  by all races, creeds, and colors --

14  A.  It was.

15  Q.  -- to include White men and women?

16  A.  That is correct.

17  Q.  The NAACP does not endorse candidates for office; is that

18  correct?

19  A.  We do not.

20  Q.  That is because of your status as a not-for-profit

21  organization prohibits those sorts of endorsements?

22  A.  We are a nonpartisan organization.

23  Q.  Because the NAACP is a nonpartisan organization, did you

24  have to step away from your responsibilities there to run for

25  public office?

Allen, G. - Cross

1    A.  I did.

2    Q.  You first ran for public office in 2004, for delegate?

3    A.  That is correct.

4    Q.  That was for the 83rd District?

5    A.  That is correct.

6    Q.  I understand from your prior testimony that you had a

7    campaign team that you worked with for that campaign?

8    A.  A small campaign team, yes.

9    Q.  It was a total of seven people on your campaign team, if

10   I recall?

11   A.  I believe so.

12   Q.  There were two White individuals on that campaign team?

13   A.  I believe so, yes.

14   Q.  There were no Asians on that campaign team?

15   A.  I don't recall any directly.  Indirectly, yes.

16   Q.  And you indicated that there may have been one Hispanic

17   individual from Peru on that team?

18   A.  That is correct.

19   Q.  You did not receive any formal endorsement from any

20   Asian-American groups within the City of Virginia Beach in

21   your campaign in 2004?

22   A.  Don't recall any.

23   Q.  You did not receive any formal endorsement from any

24   Hispanic organizations in the City of Virginia Beach in your

25   campaign in 2004?

Carol L. Naughton, Official Court Reporter

```
                          ─Allen, G. - Cross─
```

 1   A.   No.

 2   Q.   Based on your testimony today, it is your belief that you

 3   were, however, supported by the African-American community,

 4   based on your campaign efforts?

 5   A.   That is true, uh-huh.

 6   Q.   I heard you say you attended family reunions?

 7   A.   Yes.

 8   Q.   And other community events?

 9   A.   Correct.

10   Q.   Would it be fair to say that those family reunions and

11   community events were predominantly of African-American

12   groups?

13   A.   Many were, yes.

14   Q.   You also campaigned -- I need to rephrase that question.

15   Excuse me.

16          You are active in the local church.  I heard you say

17   that your father was a pastor.  Is that true?

18   A.   My father is deceased, but he was a pastor, yes.  That's

19   why I'm here in Virginia.

20   Q.   I understand.  And I apologize for misstating the status

21   of your father.

22   A.   Uh-huh.

23   Q.   You understood that you had received support from your

24   friends within the African-American community because of your

25   involvement with the churches?

Allen, G. - Cross

1  A.  From the faith-based community?

2  Q.  Yes, ma'am.

3  A.  I'm sure that was part of it.

4  Q.  You also ran for City Council in 2008?

5  A.  Correct, yes.

6  Q.  You also had a campaign staff in 2008; is that correct?

7  A.  Yes, a small staff.

8  Q.  If I recall your prior testimony correctly, it was a

9  total of five people?

10  A.  I believe so.

11  Q.  And of those five, none of them were White?

12  A.  I don't think so, for City Council.  I don't believe for

13  City Council, no.

14  Q.  Sorry, ma'am, I talked over you.  Will you repeat --

15  A.  I don't think so for City Council.  I can't remember, but

16  I don't think so, not for City Council.

17  Q.  There were no Asians that were a member of that campaign

18  team, correct?

19  A.  I don't believe so.

20  Q.  And there were no Hispanics that were a member of that

21  campaign team; is that correct?

22  A.  I don't believe so.

23  Q.  In 2008, did you not receive any formal campaign

24  endorsement from Asian-American groups within the City of

25  Virginia Beach; is that correct?

———Allen, G. - Cross———

1   A.   I don't believe so.

2   Q.   Your answer, "I don't believe so," does that leave open

3   the possibility that you did, or are you suggesting that, no,

4   you were not formally endorsed by any of those groups?

5   A.   Okay.  "I don't believe so" means I don't believe I was,

6   and, you know...

7   Q.   Thank you.  I just needed that point of clarification.

8           You also had no formal endorsement from any Hispanic

9   groups in your campaign for office in 2008?

10  A.   I don't believe so.

11  Q.   During your direct examination you were asked about

12  whether you spoke or campaigned in Hispanic or Asian

13  communities, and you indicated that you did.  Is that right?

14  A.   I believe so.  I believe, you know, like events in -- I

15  think there's a huge FIL-AM event, and there's a huge Latino

16  event, and at those particular events I do believe that, you

17  know, those were the times that we went there and shook hands

18  with folks, and things of that nature, which is pretty

19  standard.

20  Q.   Do you remember the names of any of those specific

21  individuals that you may have spoken to back in 2008 as part

22  of your campaign who you would identify as leaders within the

23  Hispanic or Asian community?

24  A.   During that period of time, Nony was someone who was

25  actively involved.  Sylvia Nery Strickland was actively

—————————Allen, G. - Cross—————————

1   involved in the community at that time for the Asian

2   community.  And then, of course, Beatriz and Alicia, from the

3   Latino community.

4   Q.  During your direct examination, you referenced in 2001

5   that there was a community coalition that came together.

6           Can you tell me the name of that coalition again,

7   please?

8   A.  I believe at that time it was the Community Coalition for

9   a Better Virginia Beach.

10  Q.  Ms. Allen, I apologize.  I have to go backwards.

11          You mentioned Nony, and I know who you are talking

12  about, but the court reporter and the record may not.  Can

13  you give the full name of that individual?

14  A.  It's Nony Abra -- it's a little difficult to pronounce.

15  It's Nony Abrajano, I think it's pronounced.  If you know how

16  to spell it, if you have it in front of you...

17  Q.  Ma'am, if I said Abrajano, would that --

18  A.  Abrajano, uh-huh.

19          THE COURT:  And how do you spell that?

20          MR. HARRIS:  A-b-r-a-j-a-n-o.

21          THE COURT:  Thank you.

22  BY MR. HARRIS:

23  Q.  Ms. Allen, let's return back to 2001, the Community

24  Coalition for a Better Virginia Beach.

25  A.  Uh-huh.

Allen, G. - Cross

1  Q.  When is the last time that coalition or committee came

2  together?

3  A.  We have not come together since we were working on that

4  specific issue when we were -- when we came together.  So we

5  have not come back together in quite some time.

6  Q.  You would agree with me that the last time that coalition

7  came together was sometime shortly after the 2001

8  redistricting effort in the City of Virginia Beach?

9  A.  That sounds right, yes.

10  Q.  You mentioned also that there was a 2011 redistricting

11  effort that you pushed for.  I wrote that down.  Do you

12  recall that testimony?

13  A.  I do recall we -- that testimony, yes.

14  Q.  You mentioned that there was another coalition.  Do you

15  recall the name of that coalition?

16  A.  I believe there were three, so one -- the first -- the

17  first one you mentioned was Community Coalition For a Better

18  Virginia Beach.  And then we had the Concerned Citizens, and

19  I do believe we had another one called Diverse Communities.

20        So I'm not quite sure if they overlapped, because

21  there was different things going on during that period of

22  time.

23  Q.  I want to talk specific about the Virginia Beach

24  Concerned Citizens Coalition.

25        Do you recognize the name of that group?

Carol L. Naughton, Official Court Reporter

——————Allen, G. - Cross——————

1   A.   Yes.

2   Q.   On your direct examination testimony, you indicated that

3   it was a, "Diverse group of people."

4   A.   Uh-huh, yes.

5   Q.   Do you recall who you specifically served with on that

6   Virginia Beach Concerned Citizens Coalition?

7   A.   To be honest with you, I do not remember the different

8   people that were there at that particular time.  I just

9   remember that we were looking at some of the different issues

10  of the City, and we formed a group to address the concerns.

11  Q.   Do you remember how many people were on that Concerned

12  Citizens Coalition?

13  A.   I don't.

14  Q.   Do you recall whether there were any Asian members of

15  that coalition?

16  A.   I believe on the Concerned Citizens it came about with

17  persons from different diverse backgrounds and diverse

18  groups.  So -- and most of the time during that span, a lot

19  of the same people came back together.  It was one of those

20  things that it would morph back together, so the Shewlings,

21  the Beatrizes, the Alicias, the Nonys.  We would disperse and

22  go about our business, and then an issue would come forward.

23  And when that issue came forward, we would then come back

24  together and coalesce and work on it as a unit.

25  Q.   Is it your testimony that Mr. Nony Abrajano was a member

—————Allen, G. - Cross—————

1   of the Virginia Beach Concerned Citizens Coalition?

2   A.  Again, as I explained, hopefully, most of those groups --

3   we would come together as issues surfaced, and most of those

4   groups were a lot of the same people.

5           Can I say specifically that he was there that time

6   or whether it was Rob Colanero or whether it was one of the

7   other people from the group, I cannot say because of the

8   number of years that it has been.  I can only say that over

9   the years, as things happen in our city, these members would

10  come back and coalesce together to work on a specific issue,

11  and we did it, as you can see, through the Concerned

12  Citizens, through the Community Coalition.  They were

13  basically most of the same people, but I can't tell you

14  specifically one by one.

15  Q.  You mentioned a name, Rob Colanero.  Do you happen to

16  know how to spell that name?

17  A.  I think it's C-o-l-a-n-e-r-o, I think it is.

18  Q.  That's okay.  It's not meant to be a pop quiz.  I'm just

19  trying to help the court reporter.

20          Ms. Allen, you've used the phrase "coalesce" in your

21  last answer, and in your direct examination you used the

22  phrase "act in concert with one another" in reference to the

23  Hispanic, Black, and Asian groups within the City of Virginia

24  Beach.

25          Other than your testimony related to the 2001

———Allen, G. - Cross———

1    coalition and the 2011 coalition, can you identify any other
2    specific instances where these three groups have come
3    together where you've been a part of it?
4    A.  For the most part, it has been when a City leader has
5    said something that was off-color that we would come
6    together.  It was -- when we were looking at fair election
7    practices in the City of Virginia Beach, we would come
8    together, and I believe we came together more than one time
9    with regards to districting.
10   Q.  We spent some time in your direct examination, using your
11   phrase, off-color remarks, specifically in reference to the
12   City Treasurer, Mr. Atkinson.
13           Are you aware that the City Treasurer in the City of
14   Virginia Beach is actually a constitutional officer?
15   A.  Oh, I'm very much aware, yes.
16   Q.  He's elected by the people of the City of Virginia Beach?
17   A.  Yes.
18   Q.  And that he is, in fact, not a City employee?
19   A.  Correct.
20   Q.  He is not appointed by City Council, and City Council
21   does not have any control over the way he handles his
22   Treasurer's office; is that correct?
23   A.  He is an -- he is an elected official, the Treasurer is.
24   Q.  The comments that were referenced regarding Mr. Atkinson,
25   those comments happened in 2001 and 2002; is that correct?

─────Allen, G. - Cross─────

1   A.   I believe so.

2   Q.   And you are aware that Mr. Atkinson is no longer the City

3   Treasurer for the City of Virginia Beach?

4   A.   That is correct.

5   Q.   You expressed in your direct examination that the

6   Hispanic, Black, and Asian communities have common interests,

7   and you referenced housing was a common interest amongst

8   those groups.  Do you recall that testimony, ma'am?

9   A.   Yes.

10  Q.   When you reference housing, are you referring to the

11  levels of home ownership within the City of Virginia Beach?

12  A.   It was in reference to not only home ownership, but

13  affordable homes, period, you know, affordable living spaces

14  that allow us to have a quality of life.

15  Q.   Can you identify any members of the Hispanic or Asian

16  community who may have expressed those types of concerns to

17  you?

18  A.   If I recall correctly, I think I mentioned to you that

19  when I was on the campaign trail asking people what their

20  concerns were, and I don't believe that when we go door to

21  door that we generally get people's personal names and

22  information.  So I would say in a grass roots campaign, it's

23  the City at large and not a specific leadership, per se.

24  Q.   Are you familiar with the Housing Resource Center in the

25  City of Virginia Beach?

—————Allen, G. - Cross—————

1   A.  I'm familiar.

2   Q.  What do you know about the Housing Resource Center?

3   A.  I know I don't use it, so -- and my housing committee

4   chair would be the person -- the NAACP Housing Committee

5   Chair would be the one that would do that.

6   Q.  Do you have personal knowledge of the fact that the City

7   cooperates with the NAACP and other organizations to ensure

8   those City services at the Housing Resource Center are made

9   available to the citizens?

10  A.  I do not recall seeing anything from the City of Virginia

11  Beach to the NAACP with regards to housing resources.

12  Q.  I'm referring specifically to the Housing Resource

13  Center.

14  A.  I have not seen anything from the City of Virginia Beach

15  that came to the NAACP with regards to the Housing Resource

16  Center.  Now, if you have something, please share.

17  Q.  Do you know the mission of the Housing Resource Center in

18  the City of Virginia Beach?

19  A.  I'm not familiar with their particular mission, no.

20  Q.  You've also discussed the African-American Cultural

21  Center here in the City of Virginia Beach.

22  A.  Yes.

23  Q.  Do you have some familiarity with that center?

24  A.  I do have some familiarity from the standpoint of what I

25  shared earlier, that I am on the subcommittee to work on

—————Allen, G. - Cross—————

1    getting historical data from folks who are still living who
2    are in their waning years, and that part of it I am familiar
3    with.  So I'm merely focused on the African-American Cultural
4    Center, I'm not in the center of it.
5    Q.  I understand.  How long have you served on that
6    subcommittee?
7    A.  I want to say it was put in place sometime last year.
8    Q.  Do you know Ms. Louisa Strayhorn?
9    A.  I do.
10   Q.  Do you know that Ms. Louisa Strayhorn is on the board of
11   the African-American Cultural Center?
12   A.  I don't remember the names of the people.  I have looked
13   at the names initially, but I've forgotten most of them,
14   other than, maybe, Bruce Williams.
15   Q.  Would you agree with me that the racial makeup of the
16   African-American Cultural Center is predominantly
17   African-American?
18   A.  Again, I have not looked at the group, because I have
19   focused on my particular area, so I can't tell you who is on
20   there.  I do know Bruce Williams, the last I checked, was, I
21   want to say, the president or something.
22   Q.  Were you aware that the City provided the land on which
23   that center has been built?
24   A.  Yes.
25   Q.  Are you aware that that land was valued at $1.7 million?

————Allen, G. - Cross————

1    A.   Yes.

2    Q.   Are you aware that the City has provided or agreed to

3    tax-exempt status for all activities that are conducted for

4    the charitable purposes of the center?

5    A.   I don't recall that part of it.

6    Q.   Would you agree with the statement that the construction

7    and granting of land for the African-American Cultural Center

8    was City Council action in response to calls from the

9    African-American community?

10   A.   I believe that was a step.

11   Q.   You also served on the Human Rights Commission.

12   A.   I did.

13   Q.   You served for four years.

14   A.   That's correct.

15   Q.   And you credit Mr. George E. Minns with having started or

16   at least bringing about this Human Rights Commission?

17   A.   I believe.  The late Mr. George E. Minns.

18   Q.   Do you recall approximately what time frame that was?

19   A.   I would say probably in the '90s, sometime in the '90s.

20   Q.   So you would agree with me, then, that for at least

21   approximately 30 years, the City has operated a Human Rights

22   Commission?

23   A.   Yes.

24   Q.   Can you tell me what you believe the purpose of the Human

25   Rights Commission is?

—————————Allen, G. - Cross—————————

1    A.   It is my understanding from Mr. Minns that it was

2    supposed to look into issues of discrimination and any issues

3    that was unfavorable to persons of diverse backgrounds.

4    Q.   Since you've left -- well, let me ask you this.   I

5    apologize.

6             Do you recall the time frame of your four-year term

7    on the Human Rights Commission?

8    A.   I'm sure it was somewhere in the early 2000s.

9    Q.   Since completing your four-year term, have you continued

10   to follow the activities of the Human Rights Commission in

11   the City of Virginia Beach?

12   A.   Not religiously, no.

13   Q.   Do you read their meeting minutes or agendas?

14   A.   Not often.  Occasionally, but not often.

15   Q.   You also served on the Vision 2040 Committee in the City

16   of Virginia Beach?

17   A.   That is correct.

18   Q.   You testified previously that you loved your work on that

19   committee?

20   A.   I do enjoy working on the Vision Committee, yes.

21   Q.   You were invited to serve on that committee at the

22   request of Mayor Will Sessoms?

23   A.   That is correct.

24   Q.   That committee was chaired by a Mr. Malbon and a

25   Mr. McCullom; is that correct?

Allen, G. - Cross

1    A.   That is correct.

2    Q.   Mr. Malbon is a White male, and Mr. McCullom is a Black

3    male; is that correct?

4    A.   That is correct.

5    Q.   Would you agree that the Vision 2040 committee was a

6    diverse group of individuals?

7    A.   Yes.

8    Q.   The ultimate product of the Vision 2040 committee was a

9    comprehensive report; is that correct?

10   A.   That is correct.

11   Q.   Were you proud of the report after it was completed?

12   A.   Yes.

13   Q.   Do you remain proud of that report and continue to work

14   toward the goals stated therein?

15   A.   I think it's a solid report, but with anything, you

16   always want to improve upon it.  But is it a solid report?  I

17   do believe it's a solid report.

18   Q.   Those improvement measures occur at the Vision to Action

19   Committee; is that correct?

20   A.   That is correct.

21   Q.   On the Vision to Action Committee, you attend regular

22   meetings, do you not?

23   A.   I do.

24   Q.   At those regular meetings, they have a roundtable

25   discussion in which each member is able to provide input to

——————Allen, G. - Cross——————

 1   the Vision to Action Committee?

 2   A.  We do.

 3   Q.  You've taken the opportunity to speak up at several of

 4   those roundtable moments; is that correct?

 5   A.  I do.  I do from time to time, absolutely.

 6   Q.  Specifically, as recently as last year, you reference the

 7   positive electoral turnout in November of 2019 in the City of

 8   Virginia Beach; isn't that correct?

 9   A.  I don't recall.

10   Q.  All right.

11   A.  Is he going to pull it up so I can read it?

12           THE COURT:  Don't ask him questions.

13           THE WITNESS:  Oh.

14   BY MR. HARRIS:

15   Q.  Do you recognize that document?

16   A.  Yes.  That is the typical minutes of the Vision to Action

17   Community Coalition.

18   Q.  And I apologize.  We've put up October.  I need to get to

19   November.

20           THE COURT:  What's the exhibit number you're working

21   with?

22           MR. HARRIS:  Judge, I don't intend to offer this as

23   an exhibit.  I'm trying to refresh the witness's

24   recollection, and then I'll move away from it.

25           THE COURT:  Even when you refresh recollection in

—————————Allen, G. - Cross—————————

1    court, you have to have an exhibit number to know what the

2    witness was looking at.

3            MR. HARRIS:  I've marked it for my own purposes as

4    Georgia Allen Cross-Examination Exhibit Number 7.  I know

5    that doesn't serve the Court's purpose, so I'm trying to get

6    some guidance from the Court as to how you would like me to

7    mark this exhibit.

8            THE COURT:  Well, usually, you'll use an exhibit

9    number that's in your final pretrial, or, if it's not in the

10   final pretrial, whatever you're using, you need to mark it,

11   provide it to the courtroom deputy so at a future point we

12   can know exactly what was used to refresh the recollection of

13   the witness, if that's what you're trying to do.

14           MR. HARRIS:  Yes, Your Honor.  And I would offer to

15   the Court -- we would suggest Number 165, which is the next

16   exhibit on our list.  I don't intend to offer it, but I

17   understand for purposes of the record you do need to have a

18   copy of it.

19           THE COURT:  All right.  Just provide the courtroom

20   deputy a copy of Exhibit 165, if you have it out there.  Do

21   you have multiple copies?

22           MR. HARRIS:  Judge, I have one copy.  We can get

23   copies made and provide them to the Court.

24           THE COURT:  I tell you what you do.  You send that

25   copy up here, and she is going to mark it for identification,

––––––Allen, G. - Cross––––––

1   and then what we'll do, we'll return it to you at some

2   subsequent point.

3           Just provide it to her.  She'll mark it, and then

4   she'll return it to you.

5           MR. HARRIS:  And I will confess that I did not hand

6   that to plaintiffs' counsel.  I don't believe they've seen

7   that yet, either.

8           THE COURT:  Mark it first, and then show it to them.

9           (Defendants' Exhibit 165 was marked for

10  identification.)

11          Now, you can use it on the document camera to show

12  it to the witness and direct her to the part that you're

13  concerned about.

14          MR. HARRIS:  I'm going to point to Page 2, Your

15  Honor, of this exhibit.

16          THE COURT:  All right.

17          MR. BOYNTON:  It's on the screen.

18  BY MR. HARRIS:

19  Q.  I apologize for that delay.  That was my fault.

20          On this Page 2 of the document, your name is listed

21  five up from the bottom on those bullet points.  Do you see

22  that, ma'am?

23  A.  I do.

24  Q.  It appears to be a reference to your statements made at

25  this roundtable at the Vision to Action Committee.  It

Allen, G. - Cross

1   indicates that you, as a voting poll election official,

2   "Georgia was pleased with the voter turnout for this election

3   and how fast the marketing signs have been removed."

4          Do you recall making that statement?

5   A.  I do.

6          MR. HARRIS:  Mr. Williamson, if you'll go back to

7   the first page.

8          For clarity of the record, Your Honor, I referenced

9   the November 8, 2019, 2040 Vision to Action Community

10  Coalition.

11  BY MR. HARRIS:

12  Q.  Ms. Allen, do you see that at the top of the page there?

13  A.  I do.

14  Q.  There's a check mark next to your name.  You can confirm

15  that you were present on that day?

16  A.  Yes, I was.

17  Q.  Thank you, Ms. Allen.

18         MR. HARRIS:  If you can bring it down.

19  BY MR. HARRIS:

20  Q.  Ms. Allen, I want to draw your attention to the meeting

21  the month prior, in October of 2019.  It appears that you

22  attended the Vision to Action Community Coalition meeting and

23  again spoke at the roundtable, and you shared the diversity

24  accomplishments with the high school graduation rates,

25  highlighting the African-American male academic success

──────Allen, G. - Cross──────

1   efforts.  Do you recall that?

2   A.  I do.

3   Q.  Ms. Allen, you've lived in Virginia Beach for quite a

4   long time.  Do you make a habit of voting in the City of

5   Virginia Beach?

6   A.  I do.

7   Q.  Do you recall whether you supported or voted for Aaron

8   Rouse for City Council in 2018?

9           THE COURT:  Well, what is the relevance of that

10  question?

11          MR. HARRIS:  Your Honor, there's an allegation made

12  in this case as to the minority candidates of choice.

13  Ms. Allen has suggested today that she speaks on behalf of

14  herself but also the members of the African-American

15  community.  I'm interested to know whether she in fact

16  supported these candidates herself.

17          MS. LEEPER:  Your Honor, we object.  Her vote is a

18  private matter.

19          THE COURT:  Well, to pursue this case, who she voted

20  for is not necessarily something you have to establish.

21          MR. HARRIS:  Your Honor, I'll rephrase my question

22  to avoid an objection.

23          THE COURT:  Yes, because I sustain that objection.

24  BY MR. HARRIS:

25  Q.  Ms. Allen, do you recall any activities that you may have

—————Allen, G. - Cross—————

 1   done supporting Aaron Rouse's candidates for City Council in

 2   2018?

 3            THE COURT:  We need you to answer.

 4            THE WITNESS:  I know.  I'm trying to think back,

 5   because, given the number of things that I do in this

 6   community, it's hard to remember if and when I was at a

 7   particular event.  So I'm going to be honest with you.  I

 8   can't specifically remember.  I'm sure I probably did, but

 9   when and where, I don't know.

10            THE COURT:  Does the law require -- so we get into a

11   legal question.  Does the law require that this

12   representative support every African-American candidate

13   that's ever run for City Council or sought election in the

14   City?

15            MR. HARRIS:  No, Your Honor, I would not make that

16   assertion to this Court.

17            THE COURT:  All right, then, fine.  Let's move on.

18   BY MR. HARRIS:

19   Q.  Ms. Allen, I want to draw your attention to 2010.  There

20   was a vacancy on City Council when Mr. Ron Villanueva moved

21   on to the State Legislature.  Do you recall that?

22   A.  I do.

23   Q.  Do you recall that the City Council then, in Virginia

24   Beach, had to appoint a new council member for that vacant

25   position?

                              ─Allen, G. - Cross─

1   A.   That is correct.

2   Q.   Do you recall who was appointed in Mr. Villanueva's

3   place?

4   A.   I believe that was Mr. Sherrod, Prescott Sherrod.

5   Q.   Would you be surprised to know that it was Ms. Rita Sweet

6   Bellitto?

7   A.   Well, you know, in the City of Virginia Beach, that's not

8   a shock.

9   Q.   In fact, you called her appointment the "ultimate in

10  discrimination," did you not?

11  A.   Once again, I don't recall.

12          MR. HARRIS:  Mr. Williamson, will you do 3?

13          I need to request, again, the Court's indulgence.  I

14  came unprepared without these marked in advance.  I didn't

15  expect to have to refresh the witness's recollection on this

16  exhibit.  I would ask the Court to kindly mark it as 166.

17          THE COURT:  All right.

18          (Defendants' Exhibit 166 was marked for

19  identification.)

20          THE COURT:  While she's marking that, Counsel, could

21  you restate the name or have the witness restate the name of

22  Bonita -- what was the full name?

23          MR. HARRIS:  Sweet Bellitto.

24  BY MR. HARRIS:

25  Q.   I'm going to ask you to draw your attention to the

                Carol L. Naughton, Official Court Reporter

—————————Allen, G. - Cross—————————

1    screen, and specifically the fifth paragraph down, that

2    begins, "I've been taken aback..."

3         The second sentence in that paragraph appears to be

4    a quote from you.  Do you recall telling Mr. Roger Chesley of

5    the Virginian-Pilot that you believe the appointment of Rita

6    Sweet Bellitto was "the ultimate in discrimination"?

7    A.  I don't recall.  I do recall being upset about the

8    appointment, now that you brought it back to my attention.

9         THE COURT:  Counsel, I don't know how much longer

10   your cross-examination is going to be because we usually

11   break at 1:00, but if it's going to be short, we will

12   continue.  Otherwise, we can break.

13        MR. HARRIS:  Judge, I can assure the Court that it

14   will not be longer than five or ten minutes, and then I will

15   be finished, and we can all go to eat.

16        THE COURT:  Just stay on track, and we'll let you

17   finish the cross.

18        MR. HARRIS:  Thank you, Your Honor.

19   BY MR. HARRIS:

20   Q.  Ms. Allen, in reference to Ms. Sweet Bellitto, do you

21   know her to be of Puerto Rican descent?

22   A.  No, I do not.

23   Q.  Would it surprise you to know that she is of Hispanic

24   heritage?

25   A.  It would.

—————Allen, G. - Cross—————

1   Q.  Would it surprise you to know that during her

2   presentation to City Council, she mentioned that her Puerto

3   Rican grandma had taught her that there's no substitute like

4   hard work?

5   A.  I don't remember that.

6   Q.  Ms. Allen, you are familiar with an individual by the

7   name of Delceno Miles?

8           MR. HARRIS:  And if I could, I'll spell that for the

9   court reporter.  D-e-l-c-e-n-o.  Miles is M-i-l-e-s.

10          THE WITNESS:  Yes.

11  BY MR. HARRIS:

12  Q.  How do you know Ms. Miles?

13  A.  She has her own marketing firm, I believe, yes.

14  Q.  You would consider her a leader in the Black community in

15  Virginia Beach?

16  A.  I do.

17  Q.  And she is a supporter of the NAACP.  Isn't that correct?

18  A.  That is correct.

19  Q.  And you are aware of her service on the Minority Business

20  Council in the City of Virginia Beach?

21  A.  Yes.

22  Q.  Do you know how long she's worked on the Minority

23  Business Council?

24  A.  For quite a few years.

25  Q.  What do you believe the purpose of the Minority Business

Allen, G. - Cross

1   Council to be?

2   A.  The supposed goal was to increase contracts with the

3   minority communities.

4   Q.  Are you personally aware of any of the progress that's

5   been made in the Minority Business Council over the last,

6   say, ten years?

7   A.  I don't know any specifically, no.

8   Q.  Ms. Miles was awarded the 2009 Community Service Award

9   from the Virginia Beach NAACP; is that correct?

10  A.  That is correct.

11  Q.  You were the president of the organization at that time,

12  and you, in fact, gave her that award, didn't you?

13  A.  That is correct.

14          MR. HARRIS:  Ms. Allen, I thank you for your time

15  today.  I don't have anything further.

16          Thank you, Your Honor.

17          THE COURT:  All right.  We're going to take a break

18  here.  We will reconvene at 2:30.

19          During your break, ma'am, you cannot discuss your

20  case with -- you can talk to your counsel, but you cannot --

21  you are still under examination.  I think counsel understands

22  exactly what that means.

23          We'll be in recess until 2:30.

24          (There was a recess from 1:00 p.m. to 2:30 p.m.)

25          THE COURT:  Good afternoon, counsel.  Is there any

Carol L. Naughton, Official Court Reporter

1   redirect?

2           MR. LAMAR:  No, Your Honor.

3           THE COURT:  Thank you very much.

4           (The witness was excused.)

5           MS. GREENWOOD:  Before I call our next witness, my

6   name is Ruth Greenwood.  I'm appearing for the plaintiffs.  I

7   apologize, my accent is even harder with a mask.

8           We have two items of housekeeping.  The first item

9   is that Ms. Leeper sought to admit Exhibit 171, when you were

10  talking about Exhibit 145.  I think that the record should be

11  clear that you admitted 145, but I wanted to put that clearly

12  into the record.  I don't see any objections.

13          MS. McKNIGHT:  Your Honor, we're trying to -- the

14  examining attorney is taking a look at that exhibit number to

15  make sure we don't have objections.

16          MR. BOYNTON:  My note is that 145 was admitted and

17  that 171 was not admitted.

18          THE COURT:  Okay.  Well, the official record keeper

19  is right here.

20          MS. GREENWOOD:  Ms. Thompson, I can check with you

21  later that it reflects that.

22          THE COURT:  She'll check with me.

23          MS. GREENWOOD:  And the second item of housekeeping

24  is a little more serious.

25          We are seeking leave under Local Rule 45(e) to issue

1    a trial subpoena to Shewling Moy.  She is -- she was a

2    witness to appear for the plaintiffs.  We've been in contact

3    with her for more than a year.  We spoke with her last week.

4    She said she was speaking with a member of defendants'

5    counsel, and since then she has not been in contact except to

6    say, "I will not be going to court."

7              THE COURT:  Where is she located?

8              MS. GREENWOOD:  She is in Virginia Beach.

9              THE COURT:  All right.  Don't speak out there,

10   unless I recognize you, now.  Are you one of the counsel?

11             MR. BOYNTON:  Yes, Your Honor.  Mr. Boynton here.

12   I'm ready to respond to that when the appropriate time

13   arises.

14             THE COURT:  Okay.  The appropriate time is now.  Let

15   me see what the response to that is.

16             MR. BOYNTON:  Ms. Moy had also been on our witness

17   list.  We did speak with her a week or two ago.  We had

18   subpoenaed her for trial, and she had related to us in her

19   most recent conversations that she had a number of health

20   issues, and for that reason alone, we decided to release her

21   from our subpoena and to not list her as a witness.

22             Apparently, plaintiffs never subpoenaed her.  She

23   asked us what her obligation was.  We told her she had every

24   right to voluntarily appear, if she wanted to, but that if

25   she was not -- if she had not received a subpoena, it was her

Fairfax, A. - Direct

 1   choice, and if she did receive a subpoena, that it was out of

 2   time but she could take it up with the Court.  That's how we

 3   left it.

 4          THE COURT:  All right.  Fine.  Here's where the

 5   Court is.  This case is going to be going on for at least two

 6   weeks.  The clerk will issue a subpoena for her to appear.

 7   It shouldn't be a heavy lift.  She is right here in Virginia

 8   Beach.

 9          All right?

10          MS. GREENWOOD:  Thank you, Your Honor.

11          THE COURT:  Get your proposed subpoena to

12   Ms. Thompson or to the Clerk's Office.

13          MS. GREENWOOD:  Okay.  I would like to call our next

14   witness, please, Mr. Anthony Fairfax.

15          (The witness was duly sworn.)

16          **ANTHONY FAIRFAX**, called by the Plaintiffs, having

17   been first duly sworn, was examined and testified as follows:

18                        DIRECT EXAMINATION

19   BY MS. GREENWOOD:

20   Q.  Good afternoon, Mr. Fairfax.

21   A.  Good afternoon.

22   Q.  Will you introduce yourself to the Court.

23   A.  My name is Anthony Fairfax.  I'm a demographic and

24   mapping consultant.  I have a company called Census Channel.

25   It specializes in GIS services, which is Geographic

—Fairfax, A. - Direct—

1    Information System services.  My personal specialty is

2    redistricting.

3              THE COURT:  Wait a minute, wait a minute, wait a

4    minute now.  Remember my rule.  You lead the witness, but we

5    avoid long narratives.  Experts usually give long

6    explanations, but otherwise -- one step at a time.

7              MS. GREENWOOD:  Thank you.  I'll go through his CV

8    in a more pointed way.

9              THE COURT:  Okay.

10   BY MS. GREENWOOD:

11   Q.  Mr. Fairfax, were you retained as an expert witness in

12   this case by plaintiffs?

13   A.  Yes.

14   Q.  Did you prepare an expert report in this case?

15   A.  Yes.

16   Q.  Did you -- and so I'd like you -- there has been an

17   agreement between the parties that all of the expert reports

18   prepared by experts, if they testify, will be -- can be

19   admitted into evidence.

20             THE COURT:  Well, that's a decision the Court makes.

21             MS. GREENWOOD:  I'm sorry.  We've removed any

22   objection to the admission.  If the Court does not want to

23   admit them into evidence, that's obviously your choice.

24             THE COURT:  The Court will let you know about that,

25   because it's the usual -- the Court's practice is to not

─────Fairfax, A. - Direct─────

1    admit expert reports, because the best evidence is what the

2    expert says on the stand.  The reports often contain

3    extraneous matters or maybe hearsay or other things that

4    never came before the Court.  But the Court will let the

5    parties know whether it's going to take the expert reports.

6              MS. GREENWOOD:  Thank you.

7              I would just identify the exhibit numbers for the

8    various reports and appendixes for Mr. Fairfax.

9              Mark, if we can bring up Exhibit P-75 on the screen,

10   please.

11   BY MS. GREENWOOD:

12   Q.  Is this a copy of your expert report in this case?

13   A.  Yes, it appears to be.

14   Q.  Can we bring up Exhibit P-76, please.

15             Is this a copy of the appendix to your expert

16   report?

17   A.  Yes, it appears to be.

18   Q.  Okay.  Did you prepare any other expert reports in this

19   case?

20   A.  Yes.  I prepared a response and rebuttal report and a

21   supplemental report.

22   Q.  Can we bring up P-79, please.

23             Is this a copy of your expert -- sorry -- your

24   rebuttal report?

25   A.  Yes, it appears to be.

Fairfax, A. - Direct

1   Q.  And can we bring up, please, P-80.

2           Is this a copy of the appendix that goes with your

3   rebuttal report?

4   A.  It appears to be.

5   Q.  And then can we also bring up P-84.  Thank you.

6           Is this a copy of your supplemental expert report in

7   this case?

8   A.  Yes, it appears to be.

9   Q.  And if we can bring up P-85.

10          Is this a copy of the appendix that goes with your

11  supplemental expert report?

12  A.  Yes, it appears to be.

13          MS. GREENWOOD:  I have copies of these in binders

14  for the Court, the defendants, and the witness, if I can hand

15  them out.

16          THE COURT:  Okay.  Counsel, perhaps the Court cut

17  you off a few minutes ago when you were getting around to the

18  qualifications of the expert.

19          So if the Court disrupted you, you may go back to

20  that.

21          MS. GREENWOOD:  Thank you, Your Honor.  I will.

22          If we can bring up Exhibit P-86.

23  BY MS. GREENWOOD:

24  Q.  Is this a copy of your most recent curriculum vitae,

25  Mr. Fairfax?

Carol L. Naughton, Official Court Reporter

Fairfax, A. - Direct

1    A.   It appears to be.

2    Q.   Okay.  Now, this obviously reflects many years of your

3    education and experience.  I will just ask you about a couple

4    of those items.

5            How did you first get your start in redistricting?

6    A.   I first began in the 1990 round of redistricting where I

7    began to work on a project at Norfolk State University in the

8    political science department.  It was a unique project, and

9    it was a grant-funded project that had two major goals and

10   objectives.

11           The first goal was to assist organizations that

12   didn't have the wherewithal or the technical know-how how to

13   develop redistricting plans.  The second goal was to somewhat

14   duplicate ourselves and go out and actually train other

15   universities to be able to provide redistricting locally or

16   in the region to do the same thing we were doing.

17           And so during the course of that -- and I don't want

18   to speak too long -- we probably developed a couple hundred

19   to 300 different redistricting plans and about 50, 60

20   different organizations we helped.

21   Q.   Thank you, Mr. Fairfax.

22           Have you -- do you have any experience with

23   redistricting in the City of Virginia Beach?

24   A.   During that period of time after, the project was winding

25   down, a co-director of the project and I actually provided

Carol L. Naughton, Official Court Reporter

--------Fairfax, A. - Direct--------

1   assistance to the City of Virginia Beach Planning Department.

2   Q.  And if we can highlight the top line on your work

3   experience, the City of Everett, Washington.

4           It's halfway down, Mike.

5           That's in the deposition.  What is your role in

6   that?

7   A.  The City of Everett is moving voluntarily from an

8   at-large system to a districting system, and so they reached

9   out to look for a districting master, and I submitted an RFP,

10  or responded to an RFP, and interviewed, and they selected me

11  to shepherd them through the redistricting process.

12  Q.  And so you are referred to there as a districting master

13  to the City of Everett; is that correct?

14  A.  Yes.

15  Q.  Mr. Fairfax, what were you asked to do in your engagement

16  as an expert witness for the plaintiffs?

17  A.  I was asked to determine whether one or more majority

18  Hispanic, Black, and Asian combined districts could be

19  created in the City of Virginia Beach.  I was also asked to

20  look the same for Hispanic and Black.  And then, finally, I

21  was asked to look at demographic aspects of the City.

22  Q.  Can you tell the Court generally what you do to

23  investigate these issues?

24  A.  Sure.  First, I had to obtain data, mostly from the

25  Census Bureau, and I obtained decennial data, the American

—————————Fairfax, A. - Direct—————————

1   Community Survey data -- and I can go into each one if

2   necessary -- just to get an idea of the growth in population

3   of the Hispanic, Black, and Asian combined populations.

4           The American Community Survey allowed me to look at

5   different socioeconomic indicators, such as income below

6   poverty and education, to find if there's commonality amongst

7   the Hispanic, Black, and Asian populations.  I then could

8   look at different areas of these communities, Hispanic,

9   Black, and Asian communities, looking at Census tract data,

10  finding where the locations of these Hispanic, Black, and

11  Asian communities exist, and then I could use that as a

12  baseline to start and develop a district to determine whether

13  one or more districts could be created.

14          THE COURT:  Before you go any further, before you

15  start having the expert testify, it is standard practice to

16  establish that expert's credentials, and you need to go back.

17  Where was he educated?  You may have it -- suppose the Court

18  decides it's not going to put this in the record?  You have

19  nothing on his background or his credentials.

20          MS. GREENWOOD:  I'm happy to go through that, Your

21  Honor.

22          THE COURT:  Let's do that every time we put an

23  expert on the stand, before you start talking about what he's

24  supposed to be doing or -- so back up, Counsel.

25          MS. GREENWOOD:  Thank you.

Fairfax, A. - Direct

1    BY MS. GREENWOOD:

2    Q.  Mr. Fairfax, where did you receive your degree?

3    A.  My undergraduate degree was from Virginia Tech, as an

4    electrical engineer -- go Hokies -- and then I have a

5    Master's in GIST from NC State University.

6    Q.  And how many redistricting plans have you drawn in your

7    career, do you think?

8    A.  Approximately, a little less than 1,000 redistricting

9    plans, over the course of almost 30 years.

10   Q.  And roughly how many community organizations have you

11   worked with to draw redistricting plans?

12   A.  Dozens and dozens.  I've worked with national

13   organizations, regional, and local organizations.

14   Q.  Are the opinions that you set forth in your expert

15   reports, and that you will testify to today, based on the

16   facts, data, and analysis in those reports?

17   A.  Yes.

18   Q.  Are your opinions based on reliable principles and

19   methods in your field?

20   A.  Yes.

21   Q.  Have you applied those principles and methods in

22   formulating your opinions in this case?

23   A.  Yes.

24   Q.  Are your opinions accurate to a reasonable degree of

25   scientific certainty?

─────────Fairfax, A. - Direct─────────

1    A.  Yes.

2          MS. GREENWOOD:  Your Honor, I tender the witness as

3    an expert pursuant to Federal Rule of Evidence 702 as a

4    demographic and mapping expert.

5          MS. McKNIGHT:  No objection, Your Honor.

6          THE COURT:  One question from the Court.  Have you

7    ever testified in a case before?

8          THE WITNESS:  Yes, several times.

9          THE COURT:  That was the next question.  How many

10   times?

11         THE WITNESS:  Probably about six or seven times.

12         THE COURT:  Have you ever testified in federal

13   court?

14         THE WITNESS:  Yes.

15         THE COURT:  Okay.  Thank you.

16         The Court will accept him as an expert in the area

17   you've indicated.

18         MS. GREENWOOD:  Thank you.

19   BY MS. GREENWOOD:

20   Q.  Mr. Fairfax, let's go through your reports roughly in

21   order.  Let's start with your data and methods.

22         Mike, if you can brick up P-75, at Page 5.

23         What data did you use in your analysis?

24   A.  As I mentioned before, the bulk of the data was Census

25   data, the decennial data for 1990, 2000 and 2010.  I reviewed

─────Fairfax, A. - Direct─────

1    ACS data, American Community Survey data, five-year data.

2    This was 2008-2012, 2013, 2017, and 2014-2018.  I obtained

3    data from the Virginia Beach City's website, GIS website, to

4    download precincts and subdivisions, shape files.

5    Q.  Now, you mentioned data from the decennial Census.  What

6    other data from the Census Bureau that is not in the

7    decennial Census did you use?

8    A.  The American Community Survey data.

9    Q.  Okay.  And what is that?

10   A.  That's a survey data.  It used to be called the summary

11   file that occurred every ten years, the long form, but the

12   Census decided to provide this data every year.  And so they

13   have two different versions, a one-year now and a five-year.

14   They used to have a three-year ACS.

15         And so the one-year data goes down to approximately

16   geographic areas of 65,000 or above, whereas the five-year

17   can go down to the block group level.

18   Q.  You mentioned the Census block group.  Are the ACS

19   five-year estimates used in redistricting -- sorry -- are

20   they reliable for use in redistricting?

21   A.  Yes.  People usually use it for race and ethnicity data,

22   and they also use it for looking at socioeconomic variables

23   pertaining to the jurisdiction.

24   Q.  Okay.  So in this case we're going to talk about the

25   voting age population or the VAP.  Can you tell me what that

Carol L. Naughton, Official Court Reporter

Fairfax, A. - Direct

1    is?

2    A.   The voting age population, the population above 18.

3    Q.   And where does that data come from, the VAP data?

4    A.   It usually comes from the decennial data.

5    Q.   Okay.  So the most recent decennial Census data from

6    2010; is that right?

7    A.   The most recent what is called 100 percent count, yes, it

8    comes from the decennial data in 2010.

9    Q.   And the other term that we'll be using in this case is

10   CVAP, citizen voting age population.  What is that?

11   A.   Those are individuals above the age of 18 that are

12   citizens.

13   Q.   And where do you get those data from?

14   A.   That's from the American Community Survey, and usually,

15   if you want to provide what the districts show, you have to

16   go down to the block level.

17   Q.   Okay.  We will get to how you --

18   A.   Block group level, excuse me.  Block group level.

19   Q.   Okay.  Thank you.

20            What software do you use to draw your plans?

21   A.   I use Maptitude for Redistricting.  It is probably the

22   standard, if you will, for redistricting, and it's used by

23   national entities, such as the Department of Justice, state

24   governmental bodies, national organizations, and consultants

25   like myself.  It's a $10,000 program.

─────Fairfax, A. - Direct─────

1   Q.   If we can bring up P-80 at Page 43, please, Mike.

2         Is this a list of -- this is the beginning of a list

3   of the many clients that use Maptitude for redistricting?

4   A.   Yes.  Yes, it is.

5   Q.   And the rest of the list is contained in that appendix in

6   P-80; is that right?

7   A.   That's correct.

8   Q.   Okay.  If we can bring up P-75 at 7.

9         There's a heading there, "Demographic Profile, City

10  of Virginia Beach."  After you gathered your data for the

11  City, what did you do next?

12  A.   One of the things that I wanted to look at was the trends

13  of Hispanic, Black, and Asian combined populations, and so I

14  looked at the population increase, if you will, from 1990 to

15  2017.

16  Q.   Okay.  Let's -- if we can bring up P-75 at 8.

17        And focusing on the table, what does this table show

18  us about the demographics of Virginia Beach?

19  A.   Right.  You can see that the Hispanic, Black, and Asian

20  combined, that very last row, actually increased from almost

21  21 percent to 33 percent from 1990 to 2017.

22  Q.   And this is using the total population; is that right?

23  A.   That's correct.

24  Q.   And so that includes people under 18 and includes

25  noncitizens?

Fairfax, A. - Direct

1    A.  That's correct.

2          MS. GREENWOOD:  If we can go to Table 2, please,

3    Mike, on the next page.

4    BY MS. GREENWOOD:

5    Q.  And this says it's the VAP, V-A-P, and those are major

6    race/ethnicity.  So what does this tell us?

7    A.  Once again, it says the population, but this is the

8    voting age population of the different race and ethnicity

9    groups and the HBA voting age population increasing from

10   19 percent to 34 percent --

11   Q.  And when you say --

12   A.  -- from 1990 to 2017.

13   Q.  In that -- in the notes under that table, it says that

14   the race categories are a "low (single race)."  What does

15   that mean?

16   A.  That means on the survey you can select now since 2000

17   multiple racial categories, and so this includes only those

18   individuals in that selected one race, Black or White or

19   Asian, and that's it.

20   Q.  And how is Hispanic ethnicity dealt with?

21   A.  Hispanic is treated as a separate entity.  It's treated

22   as ethnicity.  So you can be non-Hispanic Black, non-Hispanic

23   White, or Hispanic Black and Hispanic White.  So it's treated

24   as a separate entity.  So it's not included in this because

25   they use the non-Hispanic categories.

Fairfax, A. - Direct

1   Q.   Okay.  So the H in HBA is Hispanic; is that right?

2   A.   Yes.

3   Q.   And then the B is the non-Hispanic Black single race.  Is

4   that right?

5   A.   Now, where are you?  Oh, you're talking about HBA?

6   Q.   Yes.

7   A.   Yes, H is for Hispanic, B is for Black, and A is for

8   Asian.

9   Q.   Okay.  And the Black is non-Hispanic Black single race;

10  is that correct?

11  A.   Correct.

12  Q.   And then the Asian is non-Hispanic Asian single race?

13  A.   Correct.

14  Q.   So if somebody identifies as both Black and White, they

15  wouldn't appear in these statistics; is that right?

16  A.   That's correct.  There was one of the tables that I could

17  not get the non-Hispanic Black.  I had to include Blacks that

18  were Hispanic in one of the tables, and I believe that was --

19  there's a footnote that talked or discussed that.  But it was

20  insignificant.

21  Q.   If we can bring up figure 1, please, Mike, which is P-75,

22  at Page 10.

23        What does this figure show, Mr. Fairfax?

24  A.   This shows graphically.  The most important is the

25  increase in the Hispanic, Black, and Asian combined

─────Fairfax, A. - Direct─────

1   populations from 1990 to 2017.  So you can see the trend,

2   where it's increasing, and that trend is continuing to

3   increase.

4   Q.  And if we can move to P-75, Page 12, to figure 2, please,

5   Mike.

6           What is this figure?

7   A.  This shows a similar thing for CVAP, the citizen voting

8   age population, where you see that increasing trend of

9   Hispanic, Black, and Asian, CVAP.  The difference is that

10  this is from 2000 to 2017, because the 1990 data wasn't

11  available.

12  Q.  Okay.  So do all of these data show us that the Hispanic,

13  Black, and Asian community is increasing in Virginia Beach?

14  A.  Correct.

15  Q.  After you had reviewed those demographic trends, what did

16  you do next?

17  A.  Then I looked at the ACS data for socioeconomic

18  commonalties.

19  Q.  So if we could bring up P-75, at Page 13, table 4,

20  please, Mike.

21          Are these some of the data that you looked at?

22  A.  Correct.

23  Q.  What did you find?

24  A.  And so this shows some of the common statistical

25  indicators; income, education, and poverty.  It shows that

─Fairfax, A. - Direct─

1    with median household income, Hispanic, Black, and Asian are

2    all below the White population income for the City.

3          They were also below for -- or greater in those

4    individuals that did not have a high school education,

5    Blacks, Hispanics, and Asians were higher, and they showed

6    that Hispanics and Blacks were higher for below poverty.

7    Q.  Why did you look at these data, Mr. Fairfax?

8    A.  Well, one, these data form potentially some communities

9    of interest, some commonalities, if you will, and maybe even

10   some disparities inside the City.

11   Q.  Okay.  What did you do next in your report?

12   A.  I also looked or went down a level and looked at the

13   Census tracts for these HBA populations or communities, if

14   you will.

15   Q.  Just a moment.

16          So, Mike, could you bring up P-75, at Page 14.  And

17   this is figure 3.

18          Does this reflect the analysis you are discussing?

19   A.  Yes.  Yes.

20   Q.  Can you explain what you found?

21   A.  So the figure on the left is the 1990 Census tracts, and

22   the coloring represents the HBA percentage.  And so you can

23   see at that time there was one Census tract that was greater

24   than 50 percent.  The light green are the Census tracts that

25   are greater than 40 percent but less than 50 percent.

Fairfax, A. - Direct

1           And on the right it shows the most recent ACS data
2    at that particular time.  It shows it increased those --
3    50 percent or greater increased 10 Census tracts, and you can
4    see many more in the 40 to 50 percent Census tracts.
5    Q.  And could you explain please to the Court what a Census
6    tract is?
7    A.  Right.  It's a Census geography.  The Census tracts are
8    designed mostly for longitudinal analysis, if you will.  So
9    the Census Bureau attempts to try to not change them over a
10   period of time, because they want to actually look back over
11   the decades of how the population has shifted and changed.  I
12   don't know if you want me to go into the geography or is that
13   too much detail?
14   Q.  Unless the Court has a question, I'm okay to proceed.
15   Thank you.
16           Why did you analyze the HBA by Census tract?
17   A.  This gives me an idea, one, whether the Hispanic, Black,
18   and Asian combined communities are dispersed throughout the
19   City, or are they concentrated in certain locations?  And it
20   looks like they're concentrated in certain locations.  And it
21   also allowed me to actually know where I would begin
22   developing the districts.
23   Q.  Did you do any other analysis of the location of the
24   Hispanic, Black, and Asian populations in Virginia Beach?
25   A.  Yes.  I did dot density analysis.

─────Fairfax, A. - Direct─────

1    Q.   Let's pull up figure 4, please, Mike.

2            Is this one of the subsequent analyses that you did?

3    A.   Yes.

4    Q.   What is this?

5    A.   This is for the Hispanic population, and so each one of

6    the red dots represent 500 Hispanic persons.  And so what

7    this shows you is that if you look at the graph visually, you

8    can see that those 500 groups are congregated, if you will,

9    residing in, near, or around those Hispanic, Black, and Asian

10   majority Hispanic, Black, and Asian Census tracts or the ones

11   that are nearly majority Hispanic, Black, and Asian.

12   Q.   Okay.  If we can go to figure 5, on Page 16.

13           What does this figure show, Mr. Fairfax?

14   A.   This shows the same thing, except for the Black

15   population.  And so, once again, you can see that the Black

16   population resides close to those majority HBA Census tracts.

17   Q.   Okay.  And if we can bring up figure 6, please, Mike, on

18   Page 17.

19           Mr. Fairfax, what does this show?

20   A.   This shows the same thing for the Asians.  You can see

21   that those red dots are congregated either near the 50

22   percent or greater or the 40 percent to 50 percent Census

23   tracts.

24   Q.   Okay.  Now, in this case are you offering any conclusions

25   about whether a majority/minority district should be drawn in

                        ┌─────Fairfax, A. - Direct─────┐

1   Virginia Beach?

2   A.   No.   No.

3   Q.   Are you simply looking at whether it's possible to draw a

4   majority Black and Asian district?

5   A.   That is correct.

6   Q.   Or a Hispanic and Black district?

7   A.   That is correct.

8   Q.   Okay.  After you had analyzed the demographics and the

9   location of the Hispanic, Black, and Asian populations, what

10  did you do next?

11  A.   I was able now to begin to draw and develop a

12  redistricting plan.

13  Q.   Could we bring up Page 6, please, of P-75.

14          I believe here you set out the commonly used

15  traditional redistricting criteria during the map-drawing

16  process.  Can you explain what you mean by that, please?

17  A.   Right.  So there's a set of guidelines or criteria or

18  principles.  That's the way you actually draw or develop

19  redistricting plans.  And the State of Virginia includes

20  three of these criteria, these traditional redistricting

21  criteria.

22          I use five.  And so equal population, contiguity,

23  and compactness are the ones included in the Virginia State

24  Code, but I added two additional ones that are standard and

25  permeate through most of the states' constitutions or codes

———Fairfax, A. - Direct———

1   out there.

2   Q.  Okay.  Let's go through them one at a time, Mr. Fairfax.

3          The first one says "equal population."  What is

4   that?

5   A.  Well, this is really what kicked off modern-day

6   redistricting in the '60s, and the Courts have ruled that

7   districts should be equally populated within a certain

8   deviation -- it varies depending upon what districting scheme

9   you're actually using and governmental office, rather, that

10  you're actually developing.

11         And so they've ruled that for local jurisdictions,

12  it's acceptable to be 10 percent, 10 percent of the ideal

13  from the smallest populated district to the largest populated

14  district, and so you're drawing to meet and adhere to that

15  standard.

16  Q.  I'm sorry.  So how do you calculate an ideal population

17  for a district, Mr. Fairfax?

18  A.  Very simple, very simple.  It's taking the jurisdiction

19  population and dividing it by the number of districts.

20  Q.  So if the population of Virginia Beach is 437,994 people,

21  and you divide that by 10, what is the ideal population for

22  the district?

23  A.  Right.  You're using the population of Virginia Beach?

24  Q.  That's right.

25  A.  43,799, yes.

Fairfax, A. - Direct

1  Q.  Thank you.  Okay.  The second criteria that you mention

2  is contiguity.  What is that?

3  A.  That's assuring that all areas of the districts touch

4  each other; however, there are exceptions, usually, for

5  islands and annexed areas.

6  Q.  And bridges and tunnels, can they be exceptions, too?

7  A.  Yes, leading to different areas, yes.

8  Q.  The third criteria you mentioned is compactness.  What

9  does that mean?

10  A.  Compactness has to do with how dispersed or irregularly

11  shaped your district is.  And so what they've done is

12  individuals have come up with what's called compactness

13  measurements, and what they do is they compare the district

14  to what's called a perfectly compact shape, like a circle or

15  a square, or something called a Convex Hull.  And a Convex

16  Hull is like wrapping a rubber band around the district

17  enough to shape that it forms, and you compare the district

18  to that.

19  Q.  Okay.  Let's go through them.  So what are some measures

20  of compactness that you used?

21  A.  I use three different measures.  They're commonly used.

22  If you look at the literature, they're out there.

23          One is called Reock.  Let me make sure that I get

24  the spelling right.  It's R-e-o-c-k.

25          The second one is Polsby-Popper.

Fairfax, A. - Direct

1        And the third one is Convex Hull.  They call it
2    Minimum Convex Hull in the Maptitude program.
3    Q.  And what is the Reock test?
4    A.  The Reock test looks at the area of the district and
5    compares it to the smallest what they call circumscribed
6    circle.  So if you can imagine the district, what is the
7    smallest circle that can fit around that district?  And so
8    they compare those two areas, and they come up with a ratio.
9        In Maptitude, the ratio is usually from 0 to 1.
10   There are some occasions on some of the measures that it's
11   greater than 1, but 1 would be an ideal, perfectly compact
12   district.
13   Q.  And so the district would get a score of 1 in the Reock
14   test if it was actually a complete circle.  Is that right?
15   A.  Exactly.
16   Q.  And what is the Polsby-Popper test?
17   A.  The Polsby-Popper test looks at the area of the district
18   to the area with the same perimeter as the district.  And so
19   if you can imagine that you would take a district's
20   boundaries and just stretch it out to a circle, that's the
21   circle that you're comparing it to.  Conceivably, you can see
22   how these little irregular shapes can actually add to that
23   perimeter.
24   Q.  And then what is the Convex Hull test?
25   A.  The Convex Hull is what I mentioned before.  The way you

Fairfax, A. - Direct

1    view it is if the district was a 3-dimensional object, and
2    you wrapped a rubber band around it.  That point to point to
3    point location or shape that it forms, that's what you
4    compare to the area of the district.
5    Q.  Okay.  Are there any measures of compactness that are
6    better than others?
7    A.  No.  Unfortunately, each one has sort of biases, if you
8    will, associated with them.  And so, like I said, if your
9    district has irregularly shaped boundaries, like a coastal
10   boundary, then Polsby-Popper is not going to work well.
11          If you have, for example, notches cut out, as I
12   mentioned in my report, that can actually affect the
13   compactness measurement, as well.
14   Q.  If we can go, Mike, to Page 7.
15          Number 4 there says, "minimizing political
16   subdivision splits."  Is this one of the criteria that you
17   used when drawing your plans?
18   A.  Yes.
19   Q.  And what is that criteria?
20   A.  You should try to minimize splitting political
21   subdivisions, and they include counties or cities, of course,
22   if you're drawing large statewide plans or precincts and
23   VTDs.  VT Ds are voting tabulation districts.
24   Q.  Okay.  And why did you use VTDs with respect to --
25   sorry -- as a political subdivision, not, for example,

———Fairfax, A. - Direct———

1   precincts?

2   A.   Right.   I used VTDs because when I first downloaded the

3   data, the precinct data from the City and overlapped it, most

4   of those precincts came out and aligned themselves with the

5   VTDs, but there were several that cut through Census blocks.

6   There were several of the precincts that cut through Census

7   blocks, and so the problem is how do you determine what the

8   population is inside these precincts.

9   Q.   Why can you not determine the population of a precinct if

10  it cuts across a Census block?

11  A.   Well, there's nothing there to actually give you a

12  measurement of what's included in each of the sides that it

13  cuts through, unless you do pretty much a Census or a survey.

14  You can estimate it, but when using population equality, you

15  don't use estimates or sample data.

16  Q.   Okay.   The next criteria you mentioned is preservation of

17  communities of interest.   What do you mean by that?

18  A.   Communities of interest are becoming more and more

19  popular as these districts tend to become communities, and so

20  this actually includes commonalities, and they could include

21  income -- almost everything; income, education, language,

22  could be a coastal region that's in common with each other.

23  And so the idea is that you do not -- you try to preserve,

24  rather, those areas contained within the district.

25  Q.   How did you consider communities of interest when you

—————————Fairfax, A. - Direct—————————

1    were drawing your plans?

2    A.  Really, I guess two things.  One, I looked at

3    subdivisions.  I downloaded data from the Virginia Beach

4    website, GIS website, and I looked at neighborhood

5    subdivisions.  And, unfortunately, the two overlapped Census

6    blocks, so I had to actually visually look at the

7    subdivisions to ensure that I minimize the splitting or

8    preserved the splitting as best as I could.

9            And the second one is that these HBA commonalities,

10   of course, the income, education, and below poverty, also act

11   as communities of interest, and also we want to preserve

12   those, as well.

13   Q.  Okay.  So with respect to the neighborhood --

14           MS. GREENWOOD:  Mike, could you bring up P-76, which

15   is the appendix, at Page 55?

16   BY MS. GREENWOOD:

17   Q.  What am I looking at here, Mr. Fairfax?

18   A.  Each of the colors represent different subdivisions that

19   are in Virginia Beach near this district, and so you can see

20   visually that most of these, the neighborhood subdivisions,

21   are left intact within the district.

22   Q.  Okay.  And who determines those neighborhood

23   subdivisions?

24   A.  That's the City.

25   Q.  So you just used the file the City had publicly

Fairfax, A. - Direct

1   available?

2   A.  Correct.

3   Q.  Did you consider race when you drew your illustrative

4   districts?

5   A.  Race can be a factor, just can't predominate.  So clearly

6   race can be a factor in your drawing; you just can't use it

7   as a dominant factor.  And so it was a factor, just like any

8   of the other traditional redistricting criteria.

9   Q.  And when you were looking at whether a district was

10  majority/minority, what metric did you use to assess that?

11  A.  I used the citizen voting age population, if it was above

12  50 percent.

13  Q.  And why did you focus on CVAP when drawing your plans?

14  A.  Because the CVAP, one, is the closest data to those that

15  have the ability to vote.  Voting age population includes

16  noncitizens, and, of course, total population includes people

17  who can't vote.

18          It's also -- if you use the American Community

19  Survey, you get a more current indication of what the

20  population is.

21  Q.  Right.  So the ACS data that you used came from where,

22  Mr. Fairfax?

23  A.  It originally came from 2013 to 2017, so a five-year data

24  set, and then in the supplemental report, I used 2014 to

25  2018, more recent data.

Fairfax, A. - Direct

1          MS. GREENWOOD:  If we can bring up demonstrative
2    Exhibit 432A.
3          Your Honor, I've included a copy of these in the
4    witness binder.  My understanding is that the demonstratives
5    are not admitted as evidence, but I've asked to mark them as
6    Exhibit 432, if that's okay.  And then it has a series of
7    pages, and I'm going to go through Pages A through K.
8          (Plaintiffs' Exhibit 432A-K was marked for
9    identification.)
10   BY MS. GREENWOOD:
11   Q.  This first page says that it's Plaintiffs' Amended
12   Complaint ECF No. 62, which I have designated "Plan 1."
13         What is this, Mr. Fairfax?
14   A.  This was the original complaint plan that I drew for two
15   districts.  They're called -- C2 is the one to the west, and
16   D is the one to the east.
17   Q.  And that orange table, what does that show us?
18   A.  It shows you that C2 had a Hispanic, Black, and Asian
19   CVAP population percentage of 50.13, for C2, and D had a
20   50.21 percentage, and that was using 2012 to 2016 data.
21   Q.  And was that using single-race data for the Hispanic,
22   Black, and Asian communities?
23   A.  Yes.
24         MS. GREENWOOD:  If we can move to the next
25   demonstrative, 432B, please.

————Fairfax, A. - Direct————

1   BY MS. GREENWOOD:

2   Q.  This is what you have called Plaintiffs' Illustrative

3   Plan, and for the ease of the court, I've called it "Plan 2."

4          What am I looking at in the picture?

5   A.  You're looking at the two districts.  You're looking

6   at -- the one to the east, or right, is District 1.  The one

7   to the west or left is District 2.

8   Q.  And then there's a blue box on the right.  What does that

9   box tell us?

10  A.  That provides the Hispanic, Black, and Asian combined

11  percentage for Districts 1 and 2.  This is using the 2013 to

12  2017 American Community Survey.  And you can see that

13  District 1 is 50.03 percent single race.  If you add Black

14  and White to the single race, you get 51.11 percent.

15         And for District 2 it's 50.04 percent for the single

16  race.  If you add Black and White, you get 51.08 percent.

17  Q.  Thank you.  And then what is in the green box?

18  A.  The green box is the 2014 to 2018, the most recent

19  version of the data.  And so you can see that it's increased

20  now.  The Hispanic, Black, and Asian combined CVAP has

21  increased from District 1.  It's now 51.77 percent for the

22  single race.  Adding Black and White, you get 52.91 percent.

23         For District 2, it's 50.75 percent for the single

24  race and 51.88 percent when you add Black and White to the

25  single race.

Fairfax, A. - Direct

1   Q.   What is the overall population deviation for this plan?

2   A.   7.45.

3   Q.   How do you calculate that deviation for this plan?

4   A.   You take the lowest populated deviation, which is

5   negative, usually, and then add it to the highest populated

6   deviation, and you end up with the overall deviation.

7   Q.   And how many VTD splits are there in Plan 2?

8   A.   Let me just correct that mathematically.

9        It's the difference between the highest populated

10  district and the lowest populated district, just to be clear.

11  Q.   So 7.45 is the amount above zero and below zero added up;

12  is that right?

13  A.   It's the difference, if you add the two, you actually

14  wouldn't get the total population deviation, if you add like

15  negative 4 and plus 2.

16        What it is, it's actually the difference between the

17  lowest and the highest, just to be clear.

18  Q.   So we're using the magnitude of the numbers, not the

19  sign?

20  A.   Correct, that's right.  Very good.

21  Q.   And how many VTDs does Plan 2 split?

22  A.   12.

23  Q.   And is Plan 2 contiguous?

24  A.   Yes.

25  Q.   Okay.  Now, there's also a gray box that lists the 2010

──────────Fairfax, A. - Direct──────────

1    decennial Census data.

2            What is the Hispanic, Black, and Asian voting age

3    population for each district, according to the 2010 data?

4    A.   District 1 is 51.03 percent, and District 2 is 49.24

5    percent.

6    Q.   When we talked earlier about the single race and then the

7    single race plus Black and White data in the tables on this

8    exhibit, could you just explain again who was included as

9    Black/White?

10   A.   Included in this, the HBA VAP?

11   Q.   I'm sorry, I'm going back to the CVAP tables, the blue

12   and the green tables, and there's a column that says HBA CVAP

13   single race, and there's a column that says HBA CVAP single

14   race plus Black/White.

15           Could you just explain the difference between those

16   columns, please?

17   A.   Yes.  As I mentioned before, the single race includes

18   those individuals that only selected one race, and so they

19   selected they're Black that selected one race, and Asian that

20   selected one race, and those are both non-Hispanic, so they

21   don't include the Hispanic population.  The Hispanic

22   population is anyone who selected Hispanic.

23           And the other one, which is the Black and White,

24   those also include the same thing; the non-Hispanic Black

25   alone, those that selected only one category, Black, the

—————Fairfax, A. - Direct—————

1    Asian -- non-Hispanic Asian alone, those that only selected
2    Asian, but it adds also the non-Hispanic Black and White,
3    those that selected Black and White mixed race.
4    Q.  Is there any federal guidance on whether you should
5    include Black and White people in a calculation of
6    majority/minority districts?
7    A.  Years ago the OMB and, actually, the DOJ adopted a series
8    of racial data suggestions, if you will, to use when you
9    analyze districts like this, and Black and White is included
10   in that.
11   Q.  And you mentioned the DOJ.  Is that the Department of
12   Justice?
13   A.  Yes.
14   Q.  And then you said the OMB?
15   A.  Yes.
16   Q.  What's that?
17   A.  The Office of Management and Budget.  They came out with
18   a memo somewhere around 2000, I believe, that suggested how
19   do you address the multiracial?
20          Remember, this is -- in 2000 was the first time that
21   you could select Black and White or select mixed race.  In
22   1990 they forced you to select -- I hate to say "forced," but
23   they compelled you to select only one racial group.
24          So they had to address how do you do this in voting
25   rights cases?  So they came up with this memo that gave a

1    suggestion of how you actually use it in voting rights cases.

2    Q.  Thank you.  Now on the bottom right I see there's a

3    measures of compactness report.  Can you describe the

4    compactness report for what I call Plan 2?

5    A.  Yes.  Unfortunately, I cannot -- that's a little small.

6    Q.  There's a copy in your witness binder, as well.

7    A.  Could you tell me that --

8    Q.  If you turn to P-432B.

9    A.  It's solved.  I appreciate that.

10          So the Reock measurement is, for District 1, .36.

11   The Polsby-Popper for District 1, .31, and the Convex Hull is

12   .67.

13          For District 2 you have .24 for Reock, the

14   Polsby-Popper is .20, and the Convex Hull is .58.

15   Q.  Can the illustrative plans that you drew be directly

16   compared to the current residency district plan in terms of

17   compactness?

18   A.  To a certain extent it's different, because you're

19   dealing with two different district numbers, but you can at

20   least look at it and get a gauge.  But it's difficult to

21   determine.

22   Q.  What do you mean by "different district numbers"?

23   A.  The residence plan has seven, and this has ten -- seven

24   districts, rather, and this one has ten.

25   Q.  And does the shape of the boundary of the City of

———————Fairfax, A. - Direct———————

1   Virginia Beach impact compactness scores in plans that you

2   draw?

3   A.  Yes, absolutely.  The shape of the jurisdiction, I think,

4   is widely known can affect the compactness scores.  And so in

5   Virginia Beach I know for District 2 there's this western

6   notch, if you will, that is sort of carved out on that

7   western side, and that affects the compactness scores on each

8   one of these measurements.

9   Q.  So if I'm looking at the picture on demonstrative

10  Exhibit 432B, there's a red district to the left.  Is the

11  notch the bit in the middle there that's white?

12  A.  Yes.  Yes, it is.  And you can see and kind of visualize

13  that if you had a circle wrapped around the district, all of

14  that area would work to lower the compactness ratios for

15  Reock.  And the perimeter would be lowered because now,

16  instead of a straight line, you now have this line that juts

17  in and jags down and then goes to the right, so it increases

18  the perimeter.

19          And the Convex Hull is affected because -- it's very

20  similar to the Reock, because that area right there is empty,

21  and it's going to work against the measurement for Convex

22  Hull, as well.

23  Q.  In your experience of drawing hundreds of plans, are the

24  compactness scores for Plan 2 within the acceptable range for

25  this type of geography?

—————Fairfax, A. - Direct—————

1    A.  Yes, they're within an acceptable range.

2    Q.  Did you consider communities of interest when you drew

3    Plan 2?

4    A.  Yes.  As I mentioned before, the political -- excuse

5    me -- the subdivisions, neighborhood subdivisions, were

6    underlaid or overlaid on top of the district boundary lines

7    as I was drawing, with the attempt to make sure I didn't

8    split any subdivisions as much as possible.

9           And, once again, these commonalities, these Census

10   tracts, I looked at those actually, as well, to see if I

11   could keep those intact as much as I could.

12   Q.  And did you consider any other types of communities of

13   interest when you drew Plan 2?

14   A.  Besides the two?

15   Q.  I'm sorry.  What were the two?

16   A.  One were the subdivisions, and two were the Census tract

17   Hispanic, Black, and Asian commonalities that I found.

18   Q.  The commonalities, were they the socioeconomic

19   characteristics?

20   A.  Yes, the socioeconomic characteristics, yes.

21   Q.  Thank you.

22          MS. GREENWOOD:  Mike, if we could pull up

23   demonstrative Exhibit P-432C.

24   BY MS. GREENWOOD:

25   Q.  Now, this is what, Mr. Fairfax, you've called Plaintiffs'

——————Fairfax, A. - Direct——————

1    Illustrative Alternative 1 Plan.  I've called it Plan 3.

2            What was your goal when drawing Plan 3?

3    A.  Well, this plan addressed the concerns of Professor

4    Morrison, who was the expert for the City, that stated that

5    the percentages of Hispanic, Black, and Asian were too close

6    to 50 percent.  And so the purpose of this was just to

7    draw -- make minimal changes to the original plan and make

8    minimal changes to see that there's a little higher increase

9    in Hispanic, Black, and Asian population, using, of course,

10   traditional redistricting criteria.

11   Q.  Okay.  Let's go through that, Mr. Fairfax.

12           In the blue box it has the ACS five-year estimates

13   for 2013 to 2017.  What is the HBA CVAP using single race for

14   District 1?

15   A.  In the blue box?

16   Q.  That's right.

17   A.  Yes.  It's 51.50.

18   Q.  Okay.  And using the ACS five-year estimates for 2013 to

19   2017, what is the HBA CVAP single race for District 2?

20   A.  51.64 percent.

21   Q.  Using the ACS five-year estimates for 2013 to 2017, using

22   the HBA CVAP single race plus Black and White, what is the

23   score for District 1?

24   A.  52.64 percent.

25   Q.  And using the ACS five-year estimates for 2013 to 2017,

Fairfax, A. - Direct

1   what is the HBA CVAP single race plus Black and White for

2   District 2?

3   A.   It is 52.62 percent.

4   Q.   Okay.  And for -- if we use the ACS five-year estimates

5   for 2014 to 2018, are all -- are both Districts 1 and 2

6   greater than 50 percent for the Hispanic, Black, and Asian

7   CVAP single race?

8   A.   Yes, they are.

9   Q.   And using the ACS five-year estimates for 2014 to 2018,

10  are both Districts 1 and 2 over 50 percent by the Hispanic,

11  Black, and Asian CVAP single race plus Black and White?

12  A.   Yes, they are.

13  Q.   How many VTD splits are there in Plan 3?

14  A.   22.

15  Q.   What is the total population deviation of Plan 3?

16  A.   9 percent.

17  Q.   Now, you said before that the reason that you drew this

18  plan was to respond to the question of whether the Hispanic,

19  Black, and Asian VAP could be over 50 percent, so I'd like to

20  look at what the Hispanic, Black, and Asian VAP was for

21  District 1 in Plan 3.

22          Can you tell me, using the 2010 decennial Census

23  data, what the HBA VAP was for District 1 in Plan 3?

24  A.   Yes.  It was 51.07 for District 1.

25  Q.   Okay.  And using the 2010 decennial Census data, what was

Fairfax, A. - Direct

1   the HBA VAP for District 2, in Plan 3?

2   A.  It was 50.08 percent.

3   Q.  And looking at the compactness scores on the bottom

4   right-hand side, in your experience drawing hundreds of

5   plans, are the compactness scores for Plan 3 within the

6   acceptable range for this type of geography?

7   A.  Yes, they are.

8   Q.  Thank you.

9        MS. GREENWOOD:  If we can move to illustrative Plan

10  4.

11  BY MS. GREENWOOD:

12  Q.  I've brought up Demonstrative Exhibit 432D, which is

13  titled Plaintiffs' Illustrative Alternative 2 Plan, which I

14  have labeled "Plan 4."

15       What was the purpose of this plan, Mr. Fairfax?

16  A.  This plan -- there was an original plan that was --

17  sorry.  This plan actually addressed one of the questions

18  that -- or issues that Professor Morrison had on the

19  disaggregation, and so this plan was developed using whole

20  block groups.  And so the concept is that if you use whole

21  block groups and the data is brought in at the block group

22  level, there's no disaggregation of data.  And so this plan

23  was developed with that in mind.

24  Q.  Okay.  So we're going to talk about the disaggregation

25  process in a minute, but, if I understand you correctly, in

Fairfax, A. - Direct

1  this case you didn't need to disaggregate any citizen voting
2  age population data in order to assess the citizen voting age
3  population in these districts.  Is that right?
4  A.  Correct.
5  Q.  Okay.  If we look at the ACS five-year estimates for 2013
6  to 2017 for Plan 4, what is the HBA CVAP using single race
7  for District 1?
8  A.  It is 51.04 percent.
9  Q.  And what is the HBA CVAP single race for District 2,
10  using those same estimates in Plan 4?
11  A.  It's 51.07 percent.
12  Q.  Okay.  And using the ACS five-year estimates for 2013 to
13  2017, what is the HBA CVAP single race plus Black and White
14  estimate for District 1 in Plan 4?
15  A.  It is 52.15 percent.
16  Q.  And using the ACS five-year estimates for 2013 to 2017,
17  what is the HBA CVAP single race plus Black and White number
18  for District 2 in Plan 4?
19  A.  52.12 percent.
20  Q.  Using the ACS five-year estimates for 2014 to 2018, what
21  is the HBA CVAP using single race for District 1 in Plan 4?
22  A.  52.72 percent.
23  Q.  And using the ACS five-year estimates for 2014 to 2018,
24  what is the HBA CVAP single race percentage for District 2 in
25  Plan 4?

Fairfax, A. - Direct

1   A.  52.11 percent.

2   Q.  Using the HBA CVAP single race -- sorry.

3         Using the ACS five-year estimates for 2014 to 2018,

4   what is the HBA CVAP single race plus Black and White

5   percentage for District 2 in Plan 4?

6   A.  For District 2?

7   Q.  Yes.

8   A.  It is 53.25 percent.

9   Q.  I'm sorry if I've asked you this before.

10        Using the ACS five-year estimates for 2014 to 2018,

11  what is the HBA CVAP single race plus Black and White

12  percentage for District 1 in Plan 4?

13  A.  53.94 percent.

14  Q.  Thank you.  How many VTDs are split in Plan 4?

15  A.  25.

16  Q.  And what is the total population deviation for Plan 4?

17  A.  7.57 percent.

18  Q.  Okay.  Now, if we were to use a 2010 decennial Census

19  data, using the Hispanic, Black, and Asian single race voting

20  age population, what is the percentage for District 1?

21  A.  51.02 percent.

22  Q.  And what is the HBA VAP using the 2010 decennial Census

23  data for District 2?

24  A.  50.03 percent.

25  Q.  Okay.  And looking at the measures of compactness report,

Fairfax, A. - Direct

1    in your experience drawing hundreds of plans, are the

2    compactness scores for Plan 4 within the acceptable range for

3    this type of geography?

4    A.   Yes, they are.

5    Q.   Thank you.

6         MS. GREENWOOD:  If we can please move to

7    Exhibit 432E.  Thank you, Mike.

8    BY MS. GREENWOOD:

9    Q.   This is what you have called Plaintiffs' Illustrative

10   Alternative 3 Plan.  I've labeled it "Plan 5."

11        What was the goal of this plan?

12   A.   The goal of this is to show that two majority Hispanic,

13   Black, and Asian combined districts can be drawn using

14   different areas of the City.  I drew them in one consistent

15   area, but this is to show you there are other areas where you

16   can draw a majority Hispanic, Black, and Asian combined

17   districts.

18   Q.   Okay.  So let's look at that.

19        Using the ACS five-year estimates for 2013 to 2017,

20   what is the HBA CVAP single race percentage for District 1 in

21   Plan 5?

22   A.   54.47 percent.

23   Q.   And using the ACS five-year estimates for 2013 to 2017,

24   what is the HBA CVAP single race percentage for District 2 in

25   Plan 5?

Fairfax, A. - Direct

1    A.  51.92 percent.

2    Q.  Using the ACS five-year estimates for 2013 to 2017, what

3    is the HBA CVAP single race plus Black and White percentage

4    for District 1 in Plan 5?

5    A.  55.72 percent.

6    Q.  Using the ACS five-year estimates for 2013 to 2017, what

7    is the HBA CVAP single race plus Black and White percentage

8    for District 2 in Plan 5?

9    A.  52.75 percent.

10   Q.  And what is the total number of VTDs that are split by

11   Plan 5?

12   A.  21.

13   Q.  I didn't ask you this before.

14          How many VTDs are split by the current residency

15   plan for the City of Virginia Beach?

16   A.  28.

17   Q.  What is the total population deviation for Plan 5?

18   A.  9.65 percent.

19   Q.  Using the 2010 decennial Census data, what is the

20   Hispanic, Black, and Asian single race voting age population

21   for District 1 in Plan 5?

22   A.  54.05 percent.

23   Q.  Using a 2010 decennial Census data Hispanic, Black, and

24   Asian single race voting age population, what is the

25   Hispanic, Black, and Asian voting age population percentage

Fairfax, A. - Direct

1   for District 2 in Plan 5, using the 2010 decennial Census

2   data?

3   A.   51.32 percent.

4   Q.   And looking at the measures of compactness report, in

5   your experience of drawing hundreds of plans, are the

6   compactness scores for Plan 5 within the acceptable range for

7   this type of geography?

8   A.   They're acceptable.   Very low, but they're acceptable.

9            MS. GREENWOOD:   If we can move on, if we can move,

10   please, to F.

11   BY MS. GREENWOOD:

12   Q.   Demonstrative Exhibit 432F, which you have called

13   Plaintiffs' Modified Illustrative Plan and I have labeled as

14   "Plan 6."

15            What was the purpose of drawing Plan 6?

16   A.   The purpose of this was to include one of the plaintiffs

17   that was left out in the original illustrative plan.

18   Q.   Okay.   So if we look at the picture, what do the stars

19   represent?

20   A.   The address of the plaintiffs.

21   Q.   And are both of those stars contained in one of the

22   districts, those highlighted in color?

23   A.   Yes.

24   Q.   What is the district number that the stars are contained

25   in?

─────────── Fairfax, A. - Direct ───────────

1   A.   District 2.

2   Q.   District 2.  And there's another district that you've

3   highlighted in color.  What number is that district?

4   A.   District 1.

5   Q.   Okay.  Using the ACS five-year estimates for 2013 to

6   2017, what is the HBA CVAP single race percentage for

7   District 1 in Plan 6?

8   A.   50.03 percent.

9   Q.   And using the ACS five-year estimates for 2013 to 2017,

10  what is the HBA CVAP single race percentage for District 2 in

11  Plan 6?

12  A.   50.24 percent.

13  Q.   Using the ACS five-year estimates for 2013 to 2017, what

14  is the HBA CVAP single race plus Black and White percentage

15  for District 1 in Plan 6?

16  A.   51.11 percent.

17  Q.   Using the ACS five-year estimates for 2013 to 2017, what

18  is the HBA CVAP single race plus Black and White percentage

19  for District 2 in Plan 6?

20  A.   51.23 percent.

21  Q.   And using the ACS five-year estimates for 2014 to 2018,

22  what is the HBA CVAP single race percentage for District 1 in

23  Plan 6?

24  A.   51.77 percent.

25  Q.   Using the ACS five-year estimates for 2014 to 2018, what

Fairfax, A. - Direct

1    is the HBA CVAP single race percentage for District 2 in Plan

2    6?

3    A.   50.93 percent.

4    Q.   Using the ACS five-year estimates for 2014 to 2018, what

5    is the HBA CVAP single race plus Black and White percentage

6    for District 1 in Plan 6?

7    A.   52.91 percent.

8    Q.   And using the ACS five-year estimates for 2014 to 2018,

9    what is the HBA CVAP single race plus Black and White

10   percentage for District 2 in Plan 6?

11   A.   52.02 percent.

12   Q.   What is the total number of VTD splits in Plan 6?

13   A.   15.

14   Q.   What is the total population deviation for Plan 6?

15   A.   7.49 percent.

16   Q.   And if we go back and use the 2010 decennial Census data,

17   what is the HBA voting age population percentage for

18   District 1 in Plan 6?

19   A.   51.03 percent.

20   Q.   And using the 2010 decennial Census data, what is the HBA

21   voting age population percentage for District 2 in Plan 6?

22   A.   49.08 percent.

23   Q.   And looking at the measures of compactness report, in

24   your experience drawing hundreds of plans, are the

25   compactness scores for Plan 6 within the acceptable range for

———Fairfax, A. - Direct———

1    this type of geography?

2    A.  Yes, they are.

3    Q.  And I haven't asked you -- are all of the plans that you

4    have offered in this case contiguous?

5    A.  Yes, they are.

6    Q.  Okay.  Thank you.

7           We can turn to Demonstrative Exhibit 432G.  This is

8    called Plaintiffs' Modified Illustrative Alternative 1 Plan.

9    I've called it Plan 7.

10          Mr. Fairfax, what was the purpose of this plan?

11   A.  Once again, this is a modification of the Alt 1 plan, to

12   include the address of both plaintiffs.

13   Q.  So when I look at the picture there, there are stars.

14   What do they represent?

15   A.  They represent the addresses of the plaintiffs.

16   Q.  And can you confirm that the addresses of the two

17   plaintiffs in this case are contained within District 2 of

18   Plan 7?

19   A.  That's correct.

20   Q.  According to the ACS five-year estimates for 2013 to

21   2017, what is the HBA CVAP using single race percentage for

22   District 1 of Plan 7?

23   A.  51.50 percent.

24   Q.  Using the ACS five-year estimates for 2013 to 2017, what

25   is the HBA CVAP single race percentage for District 2 in

─────Fairfax, A. - Direct─────

1    Plan 7?

2    A.   50.87 percent.

3    Q.   Using the ACS five-year estimates for 2013 to 2017, what

4    is the HBA CVAP single race plus Black and White percentage

5    for District 1 in Plan 7?

6    A.   52.64 percent.

7    Q.   Using the ACS five-year estimates for 2013 to 2017, what

8    is the HBA CVAP single race plus Black and White percentage

9    for District 2 in Plan 7?

10   A.   51.87 percent.

11   Q.   Thank you.  Using the ACS five-year estimates for 2014 to

12   2018, what is the HBA CVAP single race percentage for

13   District 1 in Plan 7?

14   A.   53.07 percent.

15   Q.   Using the ACS five-year estimates for 2014 to 2018, what

16   is the HBA CVAP single race percentage for District 2 in

17   Plan 7?

18   A.   51.37 percent.

19   Q.   Using the ACS five-year estimates for 2014 to 2018, what

20   is the HBA CVAP single race plus Black and White percentage

21   for District 1 in Plan 7?

22   A.   54.31 percent.

23   Q.   And using the ACS five-year estimates for 2014 to 2018,

24   what is the HBA CVAP single race plus Black and White

25   percentage for District 2 in Plan 7?

—————Fairfax, A. - Direct—————

1    A.   52.47 percent.

2    Q.   And what is the total number of VTDs that are split in

3    Plan 7?

4    A.   23.

5    Q.   And what is the total population deviation for Plan 7?

6    A.   9.21 percent.

7    Q.   And using the 2010 decennial Census data, what is the HBA

8    voting age population for District 1 in Plan 7?

9    A.   51.07 percent.

10   Q.   And using the 2010 decennial Census data HBA voting age

11   population -- I'm sorry.

12          Using the 2010 decennial Census data, what is the

13   HBA voting age population percentage for District 2 in

14   Plan 7?

15   A.   49.92 percent.

16   Q.   And looking at the measures of compactness report for

17   Plan 7, in your experience drawing hundreds of plans, are the

18   compactness scores for Plan 7 within the acceptable range for

19   this type of geography?

20   A.   Yes, they are.

21   Q.   Thank you.

22          MS. GREENWOOD:   If we can turn to Demonstrative

23   Exhibit 432H.

24   BY MS. GREENWOOD:

25   Q.   This is a plan that you have called Plaintiffs' Modified

Fairfax, A. - Direct

1    Illustrative Alternative 2 Plan and I've labeled "Plan 8."

2              What was the goal in drawing this plan?

3    A.  Once again, this is a modification of the Alt 2 plan,

4    using block groups, but to include the plaintiffs' address,

5    both plaintiffs' addresses.

6    Q.  And when you say "using block groups," what did you mean

7    by that?

8    A.  This was a plan that used block groups to build the

9    districts.

10   Q.  And so you didn't split any block groups in drawing this

11   plan; is that right?

12   A.  Correct.

13   Q.  I see in the picture that there are two stars in the

14   diagram of the redistricting plan.  What do those stars

15   represent?

16   A.  They represent the plaintiffs' addresses.

17   Q.  And are both of those plaintiff addresses contained in

18   District 2 of Plan 8?

19   A.  That's correct.

20   Q.  Using the ACS five-year estimates for 2013 to 2017, what

21   is the HBA CVAP single race percentage for District 1 of

22   Plan 8?

23   A.  51.04 percent.

24   Q.  Using the ACS five-year estimates for 2013 to 2017, what

25   is the HBA CVAP single race percentage for District 2 of

Carol L. Naughton, Official Court Reporter

—————Fairfax, A. - Direct—————

1   Plan 8?

2   A.  50.71 percent.

3   Q.  Using the ACS five-year estimates for 2013 to 2017, what

4   is the HBA CVAP single race plus Black and White percentage

5   for District 1 in Plan 8?

6   A.  52.15 percent.

7   Q.  Using the ACS five-year estimates for 2013 to 2017, what

8   is the HBA CVAP single race plus Black and White percentage

9   for Plan 2 -- sorry -- for District 2 in Plan 8?

10  A.  51.68 percent.

11  Q.  Using the ACS five-year estimates for 2014 to 2018, what

12  is the HBA CVAP single race percentage for District 1 in

13  Plan 8?

14  A.  52.72 percent.

15  Q.  Using the ACS five-year estimates for 2014 to 2018, what

16  is the HBA CVAP single race percentage for District 2 in

17  Plan 8?

18  A.  51.38 percent.

19  Q.  Using the ACS five-year estimates for 2014 to 2018, what

20  is the HBA CVAP single race plus Black and White percentage

21  for District 1 in Plan 8?

22  A.  53.94 percent.

23  Q.  Using the ACS five-year estimates for 2014 to 2018, what

24  is the HBA CVAP single race plus Black and White percentage

25  for District 2 in Plan 8?

Carol L. Naughton, Official Court Reporter

─────────Fairfax, A. - Direct─────────

1    A.  52.45 percent.

2    Q.  What is the total number of VTD splits in Plan 8?

3    A.  23.

4    Q.  What is the total population deviation of Plan 8?

5    A.  7.36 percent.

6    Q.  Using the 2010 decennial Census data, what is the HBA VAP

7    percentage for District 1?

8    A.  51.02 percent.

9    Q.  And that's in Plan 8, correct?

10   A.  Excuse me?

11   Q.  I'll ask that question again.

12           Using the 2010 decennial Census data, what is the

13   HBA VAP for District 1 in Plan 8?

14   A.  51.02 percent.

15   Q.  Using the 2010 decennial Census data, what is the HBA VAP

16   percentage for District 2 in Plan 8?

17   A.  48.8 percent.

18   Q.  And if we highlight the measures of compactness report,

19   in your experience drawing hundreds of plans, are the

20   compactness scores for Plan 8 within the acceptable range for

21   this type of geography?

22   A.  Yes.

23   Q.  Okay.  Thank you.

24           MS. GREENWOOD:  I'd like to move to Demonstrative

25   Exhibit P-432I.

Fairfax, A. - Direct

1  BY MS. GREENWOOD:

2  Q.  This is what you have called Plaintiffs' Illustrative

3  Alternative 4 Plan.  I've labeled it "Plan 9."

4          What is this?

5  A.  The purpose of this was to show that you could create a

6  Hispanic -- a majority Hispanic, Black, and Asian CVAP

7  district using whole VTDs.

8  Q.  So this actually isn't an entire plan, it's a single

9  district.  Is that right?

10  A.  That's correct.

11  Q.  Okay.  And using the ACS five-year estimates for 2013 to

12  2017, what is the HBA CVAP single race for District 1 in

13  Plan 9?

14  A.  50.58 percent.

15  Q.  Using the ACS five-year estimates for 2013 to 2017, what

16  is the HBA CVAP single race plus Black and White percentage

17  for District 1 in Plan 9?

18  A.  51.46 percent.

19  Q.  And just to confirm, how many VTDs are split in

20  District 1 of Plan 9?

21  A.  Zero.

22  Q.  And there are no other districts in Plan 9, correct?

23  A.  Correct.

24  Q.  Using the 2010 decennial Census data, what is the HBA VAP

25  percentage for District 1 in Plan 9?

———Fairfax, A. - Direct———

1    A.   48.36 percent.

2    Q.   And looking at the Reocks, Polsby-Popper, and Convex Hull

3    scores, in your experience drawing hundreds of plans, are the

4    compactness scores for District 1 in Plan 9 within the

5    acceptable range for this type of geography?

6    A.   Yes.  Polsby-Popper is a little low, but it's still

7    acceptable.

8              MS. GREENWOOD:  If we can move to Demonstrative

9    Exhibit 432J.

10   BY MS. GREENWOOD:

11   Q.   This is what you called Plaintiffs' Illustrative

12   Alternative 5 Plan.  I've labeled it "Plan 10."

13             What was the purpose of this district?

14   A.   This district showed that you can create a Hispanic and

15   Black CVAP district, a majority Black and Hispanic CVAP

16   district.

17   Q.   And that means that you didn't include the Asian

18   population when you calculated the Hispanic and Black CVAP.

19   A.   Correct.

20   Q.   Using the ACS five-year estimates for 2013 to 2017, what

21   is the Hispanic and Black CVAP single race for District 1 in

22   Plan 10?

23   A.   51.04 percent.

24   Q.   Using the ACS five-year estimates for 2013 to 2017, what

25   is the Hispanic and Black CVAP single race plus Black and

1    White percentage for District 1 in Plan 10?

2    A.  52.17 percent.

3    Q.  How many VTDs are split in District 1 in Plan 10?

4    A.  16.

5    Q.  And if we go back and use the 2010 decennial Census data

6    to look at the Hispanic, Black, and Asian VAP, what is the

7    HBA VAP percentage for District 1 in Plan 10?

8    A.  56.54 percent.

9    Q.  And looking at the Reocks, Polsby-Popper, and Convex Hull

10   scores, in your experience drawing hundreds of plans, are the

11   compactness scores for District 1 in Plan 10 within the

12   acceptable range for this type of geography?

13   A.  Yes.

14   Q.  Thank you.

15          MS. GREENWOOD:  Now, at this point, I would like to

16   use an easel with the witness, if that's possible.

17          THE COURT:  The witness may have to step down to go

18   to the podium.

19          MS. GREENWOOD:  Your Honor, I would like for the

20   witness to do the drawing, if that's okay.

21          THE COURT:  That's fine.  Turn it slightly that way

22   so that she can see it and just leave -- a little twist.

23   Okay.  That's it.  Set it up.

24          MS. McKNIGHT:  Your Honor, if I may, before we move

25   on to another topic, we would just like to ask Counsel on the

—————Fairfax, A. - Direct—————

1    record to tell the counsel when they disclosed the analysis

2    in Plans 9 and 10 in these demonstratives.

3              MS. GREENWOOD:   The analysis of Plans 9 and 10, as

4    listed in the documents, is in Plaintiffs' Exhibit 80, which

5    was disclosed with Mr. Fairfax's rebuttal report in late

6    2019.

7              MS. McKNIGHT:   Thank you, Your Honor.

8              Thank you, Counsel.

9              THE COURT:   All right.   You may continue.

10             MS. GREENWOOD:   Here's a marker for Mr. Fairfax.

11   BY MS. GREENWOOD:

12   Q.   Before you walk over, Mr. Fairfax, are you familiar with

13   the report from defendants' expert Peter Morrison, submitted

14   in this case?

15   A.   Yes, I am.

16   Q.   Did Mr. Morrison criticize the disaggregation/aggregation

17   technique that you used?

18   A.   Yes.

19   Q.   What does Mr. Morrison mean when he refers to your

20   disaggregation/aggregation technique?

21   A.   What he's referring to is that he saw what he called

22   inconsistent block populations, or CVAP populations, where

23   the CVAP populations were larger than the populations,

24   essentially.

25   Q.   So let's go through how do you disaggregate Census

Fairfax, A. - Direct

1    population data from the block group to the block level.  If

2    I can ask you to use the easel to explain, that would be

3    great.

4            Describe the disaggregation process.

5    A.  This is somewhat of a standard.

6    Q.  Just one moment.

7            I know the court reporter needs to hear you.  I'm

8    not sure -- please address.

9    A.  This is somewhat of a standard disaggregation process.

10   I'm going to draw a picture.  And please forgive my artistic

11   prowess here, but this is a block group, for example, and

12   let's say that there is a Census block in here, and there

13   could be some other Census blocks somewhere else, but we're

14   going to focus on this.  And let's say that we want to try to

15   determine what the CVAP is -- what the CVAP is inside this

16   block.

17           And so we know the CVAP of the block group, because

18   that's where we're bringing in the American Community Survey

19   data.  But what we don't know is what is the CVAP of that

20   block.  There's no data available, so what we do usually is

21   we use a weight, a weighting scale, and we attempt to try to

22   find some other type of variable that can help us estimate

23   what that CVAP population is.

24           And if it's CVAP, usually we use voting age

25   population.  If we use population, then that's going to

Fairfax, A. - Direct

1    include everybody, all persons.  Voting age population is

2    closer to CVAP because it eliminates at least all the people

3    under 18.

4         So what we know for the block group is voting age

5    population, and we know the voting age population for the

6    block.  So, for example, if we know that there is 1,000

7    people in the block group and we know that there's 100

8    persons in this block, we can create a ratio, or this weight

9    that I'm talking about, and use it against the voting age

10   population, which we know.

11        So if the voting age population is 500, we can

12   create that ratio, which would be 100 divided by 1,000, and

13   that equals .1 or 10 percent, so we can apply this .1 or the

14   10 percent to the citizen voting age population, and we now

15   know that it is -- there's an estimate of 50.  And so that's

16   repeated throughout all of the blocks.

17   Q.  I think you can go back to the microphone, and we can

18   keep discussing it.

19        If I can just confirm, Mr. Fairfax, in the example

20   that you used, you knew that the block group had 1,000 people

21   of voting age, and you knew that the block group had 500

22   people of citizen voting age.  You also knew from the

23   decennial Census data that the block had 100 people of voting

24   age.  Is that right?

25   A.  Correct.

Fairfax, A. - Direct

1   Q.  And how were you able to determine an estimate for the

2   citizen voting age population of that block that had 100

3   people of voting age population?

4   A.  We created that ratio or that weight that equated an

5   example of .1, and we multiplied that by what we do know,

6   which is that CVAP or the block group of 500 people.

7   Q.  Right.  So because that block is 10 percent of the block

8   group, the CVAP is 10 percent of 500?

9   A.  Correct.

10  Q.  Now, if you have -- sorry.

11        Why did Mr. Morrison critique your disaggregation

12  process?

13  A.  Right.  Because what Maptitude does -- let me first say

14  that this is a nice and simple process, and it's using whole

15  numbers, but for the vast majority, we end up with fractions

16  of people at the block level.  So the question is how do you

17  get rid of those fractions of people, because you don't want

18  to have fractions of persons when you actually provide the

19  data.

20        So Maptitude has a process of stripping away all the

21  fractions of people and adding those to what they call the

22  largest populated block.

23        MS. GREENWOOD:  Let's pull up P-79 at Page 13.

24  We'll look at table 3.

25  BY MS. GREENWOOD:

─────Fairfax, A. - Direct─────

1    Q.  Just before we get to that, why do we even need to

2    disaggregate the citizen voting age population from the block

3    group?

4    A.  One, the data is just not available at the block.  And,

5    two, the blocks are what we actually use to build districts.

6    Q.  Okay.  So the decennial Census data releases voting age

7    population at the block level --

8    A.  Right.

9    Q.  -- but the ACS five-year estimates release the citizen

10   voting age population only at the block group level.  Is that

11   right?

12   A.  No, they go from the block group all the way up.

13   Q.  I'm sorry.  But they don't release it at the block level.

14   A.  Correct.

15   Q.  Okay.  So let's look at table 3.

16          How does Maptitude disaggregate citizen voting age

17   population from the block group to the block?

18   A.  Right.  So I think it's best for me to carry you through

19   each of the columns and show what they actually do.

20          So the first column is the block ID, and so we have

21   five different blocks there, if you will, from 004 all the

22   way to 000.

23          The second column is the voting age population for

24   the block.

25   Q.  Let me just confirm.

Fairfax, A. - Direct

1            So that first column -- there are five blocks.  One
2   of them is number 0, and then there's also blocks 1, 2, 3,
3   and 4; is that right?
4   A.  That's correct.
5   Q.  So the square that you had before, this would have five
6   subdivisions, five blocks, in one big block group.
7   A.  That's correct.  And I failed to say that the 000 is the
8   largest populated block.
9   Q.  How do you know that?  How do you know that that's the
10  largest populated block.
11  A.  It's got the most population.
12  Q.  Okay, good.
13  A.  The second column is data that we know, which is the
14  voting age population for the block, and we can see that in
15  that column.
16          The third column shows the data that we know, which
17  is the voting age population for the block group.
18  Q.  Let me stop you there.
19          That number of 692 is just like in the example we
20  just did, where we had the voting age population for the
21  entire block group being 1,000.
22  A.  Correct, exactly.
23          And so this is -- the next column is where we create
24  that weight, if you will, that ratio.  Just like we had the
25  .1 or 10 percent, we're going to create that here in this

─────Fairfax, A. - Direct─────

1    column.  And so if you take that 26 and divide it into the
2    692 -- and notice that each of those blocks have a 692 in it,
3    because they're in the same block group.  And so if you do
4    that, you end up with 3.8 percent for a 4 -- for 003 and 6.2
5    percent, and so forth and so on.
6    Q.  And so if I added up all of those percentages in that
7    weight column, would that be 100 percent?
8    A.  Yes.
9    Q.  What do you do next?
10   A.  The next column includes the CVAP.  And, once again, this
11   is information that we know.  I mean, this is where the data
12   is being provided and inputted into the system.  So in this
13   case it's 540 persons.
14   Q.  And just to check, the CVAP you have there is the
15   American Community Survey gives you a five-year estimate of
16   the citizen voting age population for the block group.
17   A.  Correct.
18   Q.  And in this example, the 2010 Census gave us a voting age
19   population for the block group of 692, but according to the
20   most recent ACS estimates, there are only 540 people who are
21   citizens of voting age in that block group.
22   A.  That is correct.
23   Q.  Then what do we do?
24   A.  And so the next column, if you see, this is that
25   disaggregation process, where you take that weight or that

—————————Fairfax, A. - Direct—————————

1    percentage and multiply it by that 540 persons, and this is

2    what you get when you do that.  So that 3 percent times that

3    540 gives you 20.28902.

4    Q.  If I did 3.8 percent times 540, I would get 20.28902?

5    A.  Correct.

6    Q.  Okay.  Then what do I do?

7    A.  And so you can see that you have all of these fractions

8    for all of the blocks that are included in there, and so what

9    Maptitude does is it strips away all of those fractions.

10          So the next column shows you what it is when it

11   strips away.

12   Q.  Okay.  Let's understand the "stripping away."

13          So even though the actual percentage using the

14   percentage, we would say that there are 20.2-something people

15   in block 4; you have taken that fraction away and said there

16   are only 20 people in that block that are citizens of voting

17   age; is that right?

18   A.  That's correct.

19   Q.  Okay.  So what happened to the .2?

20   A.  So that next column, the fractional change, all of those

21   blocks are then summed together and added to that low.  If

22   you can see that the combined value is 1.26012 for 001, down

23   at the bottom there, that's the total of all those fractions,

24   and that's added to the -- if you see the disaggregated value

25   for 224.7398 -- and that ends up giving you 226 in the next

————Fairfax, A. - Direct————

1    column.

2    Q.  So in that next column, which is called step 2 DisAg 2,

3    if I added up those numbers, would I get back to the 540

4    total people that were listed for the ACS?

5    A.  Yes.

6    Q.  Okay.

7    A.  That's the concept.  So you strip away all those

8    fractions of persons, add it to the largest populated block,

9    and then you come up with the resulting data.

10   Q.  Okay.  Is the Maptitude disaggregation method a reliable

11   and commonly used method in the redistricting industry?

12   A.  Yes.  Yes, all of the organizations, I'm fairly

13   confident, utilizes this disaggregation process for Maptitude

14   in one way or another.

15   Q.  Did you do any analysis in your reports to show -- to

16   determine whether the Maptitude disaggregation method is

17   reliable?

18   A.  Yes, I did.

19         MS. GREENWOOD:  Let's bring up P-79, at Page 15.  If

20   we can highlight table 4 -- zoom in on table 4.

21   BY MS. GREENWOOD:

22   Q.  Okay.  What is this that you did?

23   A.  Yes.  In essence, what this is is duplication of that

24   last table before the entire district.  And so what I did was

25   I point to you that the disaggregated or the straight

Fairfax, A. - Direct

1    disaggregation amount, that process that I did on the board,
2    is in that first column.
3         The third column is the Maptitude version, really,
4    the 29,000.  If we look at District 1, 29,761 for the third
5    column.
6    Q.  Okay.
7    A.  And the fourth column is the difference or the change
8    between those two.
9    Q.  I'm sorry.  I don't understand.  What is -- what are
10   you -- are you changing between the strip and the
11   disaggregated?
12   A.  I'm only looking at the citizen voting age population.
13   Let's be correct in this particular one.  And I'm looking
14   at -- for the top version, it's the total CVAP.  For the
15   bottom, if you can highlight the bottom one, it's for the HBA
16   CVAP.
17   Q.  So the bottom table, Districts 1 to 10, is looking at
18   what is the Hispanic, Black, and Asian CVAP, using the 2013
19   to 2017 ACS estimates.
20   A.  Correct.  And the top one looks at the total CVAP.  So
21   this is how we're going to get that percentage of HBA
22   percentage -- HBA CVAP.
23   Q.  Is that because you need the total district level -- no.
24   Do you need it for weight?
25   A.  No, you just need it to calculate what the CVAP is for

———Fairfax, A. - Direct———

 1    the district.

 2          So the CVAP, the HBA CVAP, percentage is calculated

 3    using the HBA population divided by the total CVAP

 4    population, to give you that 50 percent or so.

 5          And so this shows you both of those.  It goes

 6    through the same disaggregation process for the CVAP, for the

 7    total CVAP population.  That's at the top, those columns at

 8    the top.  The columns at the bottom show you the HBA CVAP

 9    percentage that's at the bottom, the same process.  And the

10    result are those final two columns.

11    Q.  So that column that says, "HBA CVAP 17 percent Mapt,"

12    what does that mean?

13    A.  Right.  That first column, or the second-to-the-last

14    column, shows you what Maptitude came out to; this is what we

15    have in the report.

16          The second, the last column, shows you if you didn't

17    use that lowest populated -- lowest populated block technique

18    that they use and use straight disaggregation, what would you

19    get.

20    Q.  I have a question.  So when you said you didn't use the

21    lowest populated block, did you then have fractions of

22    persons in each of the blocks you added up?

23    A.  No.  The Maptitude uses the lowest populated block, and

24    it gives you fractions in the beginning but strips away and

25    assigns to the largest -- excuse me, I misspoke.  Largest

Fairfax, A. - Direct

1   populated block.

2   Q.  Right.  And then that final column that says, "Maptitude

3   without largest populated block," what technique is used

4   there?

5   A.  That's a straight disaggregation, as I showed you on the

6   board there.  So you end up with actually fractions for your

7   persons in each of the blocks, but it's a straight

8   disaggregation.

9   Q.  If I look at this, I can see that District 1 has the same

10  number, 50.03, whether it's in the column that's titled

11  "Maptitude" or the column titled "Maptitude without LPB."

12          I see, though, that down in District 10 the score

13  for the HBA CVAP 17 percent Maptitude is 21.69, while the HBA

14  CVAP 17 percent Mapt without LPB is 21.70.

15          Why are they different?

16  A.  That's that error associated, I guess, with that largest

17  populated block.

18  Q.  So the error is?

19  A.  .01 percent for that.

20          And as I went through, I did this for all of the

21  districts, all of the plans in that rebuttal report, and the

22  largest difference was .03 in all of the plans.

23  Q.  So you did the disaggregation and the reaggregation to

24  the district level for every single one of your plans using

25  the two different methods, and the largest difference that

—————Fairfax, A. - Direct—————

1   you found between those two methods was what?

2   A.  .03 percent.

3   Q.  Thank you.

4          THE COURT:  Before you move on to your next topic,

5   we're going to take a 15-minute break, and then we'll come

6   back and continue.

7          (Recess from 4:04 p.m. to 4:28 p.m.)

8          MS. GREENWOOD:  Thank you, Your Honor.

9   BY MS. GREENWOOD:

10  Q.  Mr. Fairfax, before the break, we were talking about

11  disaggregation and aggregation.  We discussed what

12  disaggregation was.  What is the aggregation part?

13  A.  The aggregation is how you add up or sum up all of the

14  parts to the whole.  So you sum up the blocks to block

15  groups, the block groups to tracts, the tracts to counties

16  and states.

17  Q.  So if I had a block group that was split between two

18  different districts, and I had disaggregated the citizen

19  voting age population to the Census block level, would I

20  aggregate the Census blocks that are in one district to that

21  district and the Census blocks in the other district to the

22  other district total?

23  A.  Yes.  If you're splitting -- is that what you're saying?

24  Q.  Yes, if you split a block group.

25  A.  Yeah, if you're splitting a block group, you would add

Fairfax, A. - Direct

1    whatever blocks are contained with inside each of the

2    districts.

3    Q.  Now, we talked before the break about one of the analyses

4    that you did to determine whether Professor Morrison's

5    critiques were valid.

6           MS. GREENWOOD:  I'd like to bring up P-79, your

7    rebuttal report, at Page 16, and show figure 7.

8    BY MS. GREENWOOD:

9    Q.  What is this?

10   A.  This is a visualization of the largest populated block,

11   and so this shows you that the largest populated block is

12   basically random; there's no pattern really associated with

13   it.  And the reason why that's important is because when you

14   carve out these districts, there are going to be some of the

15   largest populated block existing in the district and some

16   outside the district, and what they do is -- this is another

17   thing that actually offsets each other in that largest

18   populated block being a little more, so it also evens it out.

19   Q.  So did Mr. Morrison's critique have any impact on your

20   conclusions in this case?

21   A.  No.

22   Q.  Another -- sorry.

23          Did Mr. Morrison criticize you for presuming

24   political cohesion amongst the Hispanic, Black, and Asian

25   voters while drawing the illustrative plans?

Fairfax, A. - Direct

1    A.   Yes.

2    Q.   What is your opinion of Mr. Morrison's critique?

3    A.   I didn't analyze cohesion.

4    Q.   Okay.

5         MS. GREENWOOD:  I want to go back to your original

6    report to P-77, to table 5, which is on Page 17.

7         We were talking -- I'm sorry, that's not P-77.

8         I'm sorry, P-75.

9    BY MS. GREENWOOD:

10   Q.   And we talked earlier about your analysis of Census

11   tracts and how you looked at the Hispanic, Black, and Asian

12   populations in Census tracts in the City of Virginia Beach.

13        What does table 5 show us?

14   A.   Table 5 shows the number of Census tracts that are

15   greater than 40 percent Hispanic, Black, and Asian combined

16   total.  And the important thing is that if you look at that

17   measurement of greater than 40 percent, you end up with 31

18   Census tracts that represent 54.9 percent of the Hispanic,

19   Black, and Asian combined population.

20   Q.   Okay.  So in 31 of the Census tracts in the City of

21   Virginia Beach, included in those 31 tracts are more than 50

22   percent of the Hispanic, Black, and Asian population.  Is

23   that what this says?

24   A.   Correct, 31 out of 100.

25   Q.   Mr. Fairfax, given your analysis in this case, in your

Carol L. Naughton, Official Court Reporter

—Fairfax, A. - Cross—

1    expert opinion, is the Hispanic, Black, and Asian community

2    in Virginia Beach sufficiently large and geographically

3    compact to constitute the majority of a single-member

4    district?

5    A.  Yes, it is.

6         MS. GREENWOOD:  I was going to move the exhibits

7    into evidence, but, Your Honor, if you don't want the expert

8    reports --

9         THE COURT:  What we're going to do is I'll defer

10   your motion to move them into evidence after any

11   cross-examination.

12        MS. GREENWOOD:  Thank you, Your Honor.  I tender the

13   witness for cross-examination.

14                    CROSS-EXAMINATION

15   BY MS. McKNIGHT:

16   Q.  Good afternoon, Mr. Fairfax.

17   A.  Good afternoon.

18   Q.  Mr. Fairfax, I'd like to start by asking you some

19   questions about your experience and background.

20   A.  Sure.

21   Q.  I heard you testify earlier today that you were involved

22   with the Virginia Beach City planning for the 1990

23   redistricting.  Did I hear that right?

24   A.  No, no.

25   Q.  Okay.  Were you involved with City planning for the 1990

──────────── Fairfax, A. - Cross ────────────

1   redistricting in any way in this area?

2   A.   In the area outside of Virginia Beach?

3   Q.   In Virginia Beach.

4   A.   No, no, other than what I mentioned, which was training.

5   Q.   And what training -- that was training in Virginia Beach?

6   A.   Yes.   The Planning Department bought a package, the same

7   package that we use, which is -- at Norfolk State, I'm

8   speaking of -- which is called REAPS, and they wanted to

9   train those individuals and provide technical support on how

10  to actually use it, and so I came and trained those

11  individuals in the Planning Department.

12  Q.   And so was it Norfolk State University that hired you for

13  that?

14  A.   No.   This was an entity outside.   As a consultant I did

15  it, yeah.

16  Q.   And so it was not a local jurisdiction that hired you to

17  do that; is that right?

18  A.   I think you would call the Planning Department for the

19  City of Virginia Beach part of the jurisdiction.

20  Q.   I see.   Okay.

21  A.   This was the Planning Department for the City of Virginia

22  Beach.

23  Q.   Okay.   Thank you.

24  A.   Sure.

25  Q.   Have you ever worked for defendants in a Voting Rights

─────Fairfax, A. - Cross─────

1    Act lawsuit?

2    A.   Speaking -- be a little more specific.  Meaning...

3    Q.   Sure.  Have you ever offered expert witness services to

4    defendants in a Voting Rights Act litigation?

5    A.   For defendants?

6         THE COURT:  Perhaps we can make it a little bit --

7    just specifically state the defendant that you're referring

8    to.  That will help him answer.

9    BY MS. McKNIGHT:

10   Q.   Well, I think -- have you ever --

11   A.   I'm sorry.  Do you have something specifically?  Mostly,

12   I work for plaintiffs.  I'm trying to think if I've worked

13   for any defendants.

14   Q.   Okay.  And as you sit here today, you can't recall

15   working for any defendants defending in a lawsuit against a

16   Voting Rights Act claim?

17   A.   Right.  A jurisdiction or something like that is what

18   you're referring to?

19   Q.   Sure.

20   A.   I can't recall as I'm sitting here.  It's mostly the

21   plaintiffs, on the plaintiffs' side.

22   Q.   And if I asked you that same question for any lawsuit

23   regarding redistricting, would your answer be the same?

24   A.   For redistricting, period?

25   Q.   Yes, any lawsuit involving redistricting, such as

Fairfax, A. - Cross

1   lawsuits other than Voting Rights Act lawsuits, either

2   related to the 14th Amendment or a partisan gerrymandering

3   claim, any of those lawsuits?

4   A.   No.  You're saying as a defendant?

5   Q.   Correct.

6   A.   No, not that I can recall.

7   Q.   And have you ever worked for clients affiliated with the

8   Republican Party?

9   A.   When the co-director of the project and I set up this

10  company, this entity, to take over the support of this

11  project called REAPS, we sold a package to the Republican

12  Party, and I believe -- I can't recall which state, but there

13  was a state that we sold a package to.  It might have been

14  Pennsylvania.  But there was a state that we actually sold a

15  package to.

16  Q.   Okay, I understand.  And other than that one instance,

17  you can't think of any others today?

18  A.   No.

19  Q.   Okay.  Have you ever been hired by a state legislature to

20  draft a state legislative plan?

21  A.   By a state legislature, no, I don't think so.

22  Q.   And before this year, have you ever been hired by a

23  locality to draft a representational plan at the county

24  level?

25  A.   At the county level, no, unless you want to include the

———Fairfax, A. - Cross———

1   Miami-Dade, which really was a metropolitan Miami -- excuse

2   me, metropolitan Dade.  I was one half of an expert masters

3   team.  Both of us actually came in and drew that plan.

4   Q.  Okay.  And that was a masters team hired by the county,

5   Miami-Dade County?

6   A.  That was hired by the City.  Essentially, the Courts

7   found that that large system diluted minority voting strength

8   and directed the City to actually draw a plan that was fair.

9   The City turned to attorneys to find an expert for them, and

10  another individual and myself, a political scientist and

11  myself, drew the plans.  They hired us.

12  Q.  Were those plans adopted?

13  A.  Yes.  They were the first districting plans for the City

14  of Miami.

15  Q.  And other than that instance, can you think of any other

16  instances where a locality hired you to draft a

17  representational plan before this year?

18  A.  No, I can't recall.  No, I don't think I have.

19  Q.  And have you ever drafted a plan that was adopted by any

20  representational body?

21  A.  What do you mean "representational body"?  You mean a

22  governmental legislative body?

23  Q.  Correct.

24  A.  Except for the City of Miami and now the City of Everett,

25  which I'm working through, no.

Carol L. Naughton, Official Court Reporter

─────────────────Fairfax, A. - Cross─────────────────

1            But indirectly, yes.  I would say indirectly, yes,
2   if you can take indirectly.  The plans that we drew at
3   Norfolk State University -- which we drew dozens and dozens
4   of plans -- ultimately, that plan or modification of the plan
5   was adopted by the city or the jurisdiction; it just wasn't
6   directly through us.
7   Q.   Have you ever been hired by a jurisdiction to help
8   administer elections in any way?
9   A.   No.
10  Q.   Have you ever been hired by a jurisdiction to conduct
11  what's called a voter crosscheck or otherwise make sure that
12  the voter file had the right people in the right precincts?
13  A.   No, no.
14  Q.   I'd like to ask you a few questions about your process
15  for drawing maps in this case.
16  A.   Sure.
17  Q.   Now, you drew maps in this case using the software
18  program called Maptitude, correct?
19  A.   Correct, Maptitude for Redistricting.
20  Q.   And when you drew these plans, you had certain Census
21  data for the district you were drawing available on your
22  screen; is that right?
23  A.   At times I did.
24  Q.   And this kind of data is -- when it appears on your
25  screen in Maptitude, it would shift as your map drawing

Fairfax, A. - Cross

1    changed the shape of the district and included new population

2    and excluded other population.  Is that right?

3    A.  The population changed, depending upon when I add or

4    subtract, yes.

5    Q.  Okay.  And this is a feature in Maptitude; is that right?

6    A.  Yes.  It's a feature in most redistricting packages,

7    about all of them I can remember.

8    Q.  And you can choose what data to have available to you as

9    you draw the plan; isn't that right?

10   A.  If you're speaking of the data view, you can select the

11   fields that you want to show up in the data view, I think is

12   what you're saying.

13   Q.  And when you drew plans for this case, what kind of data

14   did you have in the data view?  Did it include -- pardon me.

15            Did it include population numbers?

16   A.  Yes.

17   Q.  Did it include population deviations from the ideal?

18   A.  Yes.

19   Q.  Did it include information about different race

20   categories?

21   A.  Yes.

22            MS. McKNIGHT:  If we can pull up Plaintiffs'

23   Demonstrative Exhibit P-0432A.

24   BY MS. McKNIGHT:

25   Q.  This is Page 1 of that demonstrative, Mr. Fairfax.  If

─────Fairfax, A. - Cross─────

1    you'd like to know.

2    A.  Yes.

3             THE COURT:  Which exhibit number?

4             MS. McKNIGHT:  P-0432A.  This is Plaintiffs'

5    Demonstrative Exhibit.  I believe you have a paper copy in

6    your witness binder from plaintiffs.

7             THE COURT:  Okay.  Go on.

8    BY MS. McKNIGHT:

9    Q.  Mr. Fairfax, there are certain rows of data at the top of

10   this map on this page.  Do you see that?

11   A.  Yes.

12   Q.  Is this an example of the kind of data you would have had

13   available to you as you drew the maps in this case?

14   A.  Yes, in addition to others.

15   Q.  Okay.  What others would you have available to you?

16   A.  Total population, the race groups, as well as any type of

17   other previous CVAP data.  Voting age population, as well.

18   Q.  Mr. Fairfax, I have very limited experience with

19   Maptitude.  I'd like to ask you a question about when you

20   drew your map.  I understand there are a couple of different

21   ways you can draw maps in Maptitude.

22            When you drew your map, did you draw it in a way

23   that you could click on new areas to include in the districts

24   that you were working on, or did you identify some Census

25   block number that you would add to it?

─────Fairfax, A. - Cross─────

1   A.   Oh, I used the latter; viewed the area and added or

2   subtracted.

3   Q.   And I'm sorry to be so elementary, but how did you do

4   that specifically on your computer?  Did you use your mouse

5   to click on an area to include in the district or do it in

6   some other way?

7   A.   The mouse.  Actually, it might have been the touch pad,

8   unfortunately.

9   Q.   And would you -- how would you decide when to stop

10  clicking on pieces of geography to know that you had achieved

11  a district that you wanted?

12  A.   Right.  When you draw or develop a plan, you're

13  constantly looking at those traditional redistricting

14  criteria that I spoke about, so that's going through your

15  mind constantly.  So you're thinking about equal population

16  and looking at that deviation.  Periodically, you may run a

17  report of compactness to see how the district is.

18        I was looking at subdivisions, so constantly I'm

19  looking at not splitting those subdivisions.  And, of course,

20  race played a factor in this, like I mentioned before.

21  Q.   And so would you keep your eye on the racial composition

22  of your district as you drew it?

23  A.   No, no.  That was a periodic thing.  It's mostly the

24  deviation, but, of course, again, race is a factor, so

25  periodically I would look at that.

Fairfax, A. - Cross

1   Q.   Now, using this map that you have before you as a basis

2   of a discussion about the district you drew, do I understand

3   correctly on the western border of this map there is a thick

4   black line indicating the border of the City of Virginia

5   Beach?

6   A.   Correct.

7   Q.   Okay.  So you could not cross that thick black line when

8   you were drawing a district to be within Virginia Beach; is

9   that right?

10  A.   That's correct.

11  Q.   Now, I notice in this district on the western side that

12  it skirts along the western border of the district.

13          Why did you draw it in that way, and why did you not

14  alternatively pick up area in the interior of the district?

15  A.   Why did I go to the border -- the borders?  Is that what

16  you're saying?

17  Q.   Correct, I'm wondering why you snaked along the border,

18  as opposed to picking up geography inside.

19  A.   As I mentioned previously, when I did that first analysis

20  of those HBA communities, they exist in really four different

21  pocket areas, and creating districts is a matter of placing

22  two of those communities inside the district.

23          And so there's one at the northern end and one at

24  the southern end, and it's a matter of making sure that they

25  are in a compact district.

──────Fairfax, A. - Cross──────

1   Q.  Thank you.  And now, using the same exhibit, I'd like to
2   flip through quickly, because it appears to me, looking at
3   your plans, most of them have this shape of skirting along
4   the border, as we just discussed.
5           Plan 1 skirts the border.  Is that fair to say?
6   A.  Yes.  It hugs the border, yes.
7   Q.  Plan 2 has a similar geography, on Page 2?
8   A.  Yes.
9   Q.  Turning the page to Plan 3, that also skirts the border?
10  A.  Correct.
11  Q.  Plan 4 skirts the border in a similar way.  Is that fair
12  to say?
13  A.  Correct.
14  Q.  Now, Plan 5 is materially different, and we can discuss
15  that later.
16  A.  Okay.
17  Q.  But moving on to Plan 6, that skirts the border?
18  A.  Correct.
19  Q.  Plan 7 skirts the border?
20  A.  Correct.
21  Q.  Plan 8 skirts the border?
22  A.  Correct.
23  Q.  And I believe Plan 9 and 10 are materially different.
24  A.  That's correct.
25  Q.  So by my count, seven of your ten districts drawn skirt

---
Fairfax, A. - Cross
---

1    the border of Virginia Beach for the reason you described?

2    A.   That's correct.

3         MS. GREENWOOD:   Can I object to the extent that

4    there are two districts in all of these plans, and we're just

5    discussing one of the districts.

6         THE COURT:   You can redirect on that.

7    BY MS. McKNIGHT:

8    Q.   Now, I'd like to focus on the three supplemental maps you

9    prepared.

10        MS. McKNIGHT:   And we can take that down,

11   Mr. Williamson.   Thank you.

12   BY MS. McKNIGHT:

13   Q.   -- the three supplemental maps you submitted in your

14   March 2020 report.

15        For the record, I believe that your illustrative

16   plan modified is being referred to as Plan 6 in this

17   demonstrative from plaintiffs.

18   A.   I didn't put those plan numbers to memory.   I know the

19   plan numbers I called them, but I'm assuming that's correct.

20   Q.   Well, then, to make it easier, I will use the term that

21   you used in preparing the plan, and where appropriate, I'll

22   reference the plan numbers to make it easier.

23   A.   I appreciate that.

24   Q.   Now, I understand that none of the plans submitted in

25   your first two reports included both plaintiffs in the

─────Fairfax, A. - Cross─────

1    illustrative districts; is that right?

2    A.  That's correct.  They included -- all of them included

3    one plaintiff, but none of them included the other plaintiff.

4         MS. McKNIGHT:  So if we could bring up Defendants'

5    Trial Exhibit 128, at Page 27.

6         And for the record, Defendants' Trial Exhibit 128 is

7    a combination of Plaintiffs' Exhibit 84 and 85.

8    BY MS. McKNIGHT:

9    Q.  So, Mr. Fairfax, on Page 27 of DTX 128, we have a map of

10   your illustrative plan modified.  Is that right?

11   A.  That's correct.

12   Q.  And, now, the first objective in preparing this map was

13   to include Plaintiff Allen's address in one of the two

14   proposed districts, correct?

15   A.  Yes.

16   Q.  And, now, the second addition was used to add additional

17   subdivisions in the northern end of the district, correct?

18   A.  That is correct.

19   Q.  And, in fact, you noticed early on that there was an area

20   that had an Asian, Hispanic, Black community that existed up

21   in that northern end, correct?

22   A.  That's correct.

23   Q.  And so you added that area -- that is, a whole block

24   group -- to this district, proposed District 2, correct?

25   A.  That's correct.

—Fairfax, A. - Cross—

1   Q.  And in exchange, the third change you made to this map is
2   that you removed the southern end of the illustrative
3   district; is that right?
4   A.  There was removal of an area.
5   Q.  And I understand you were able to get rid of a split VTD
6   down in that southern area; is that right?
7   A.  I believe so, yes.
8   Q.  But that change to the northern end was used to allow for
9   the District 2 to ensure that it was a majority Hispanic,
10  Black, and Asian combined district that was comfortable above
11  50 percent, right?
12  A.  Yes, including traditional redistricting criteria
13  included in all of that.
14          (There was a pause in the proceedings.)
15          THE COURT:  Waiting on you, Ms. McKnight.
16          MS. McKNIGHT:  Yes.  Thank you, Your Honor.
17  BY MS. McKNIGHT:
18  Q.  Do you recall being deposed in this matter, Mr. Fairfax?
19  A.  Yes.
20  Q.  Okay.  Do you recall being deposed in June of 2020 in
21  this matter?
22  A.  Yes.
23  Q.  Now, I understood that -- your answer to be that the
24  change to the northern end was made while you were
25  considering traditional district criteria as well; is that

─────────Fairfax, A. - Cross─────────

1    right?

2    A.  That's correct.

3    Q.  But that's not how you testified in June; isn't that

4    right?

5    A.  I don't recall.  Please refresh my memory what I said,

6    and then I can explain.

7    Q.  Okay.

8           THE COURT:  I think you have to mark the transcript

9    and show it to him.

10          MS. McKNIGHT:  Okay.  This is the June 24, 2020,

11    deposition of Mr. Fairfax.  We have a paper copy here.  We

12    also have an electronic copy.

13    BY MS. McKNIGHT:

14    Q.  Mr. Fairfax, what would be easier for you to review?

15          THE COURT:  The paper copy, because I want to mark

16    it.

17          MS. McKNIGHT:  We're up to 166, Ms. Thompson --

18    we're up to 167.

19          (Defendants' Exhibit 167 was marked for

20    identification.)

21          THE COURT:  Show it to the witness.  Direct him to

22    the page at the same time.

23    BY MS. McKNIGHT:

24    Q.  Mr. Fairfax, I'm going to give you a page number and a

25    range, a line range.  This begins on Page 29, with line 21,

193

Fairfax, A. - Cross

1   and it goes through Page 30, through line 23.  Please take
2   your time to review.
3           THE COURT:  Do you have a specific question in
4   there?  He's reading a number of lines.  Do you have a
5   specific question?
6           MS. McKNIGHT:  Sure.  The specific question was when
7   he was -- when he answered this question earlier, under oath
8   in deposition, he did not say he was considering traditional
9   directing criteria at the time.  He described what is
10  described here in the deposition text in what we asked, what
11  we discussed.
12          THE COURT:  All right.
13          THE WITNESS:  The assumption I made about every plan
14  I draw uses traditional redistricting criteria.  I wouldn't
15  stop using them.  So, regardless, the assumption is that I'm
16  going to draw using traditional redistricting criteria.  I
17  wouldn't stop.
18  BY MS. McKNIGHT:
19  Q.  Okay.  So is it true that when you testified earlier at
20  deposition you did not discuss traditional redistricting
21  criteria when you were asked a question about drawing this
22  district?
23  A.  I'm still trying to find specifically.  Can you give me
24  the specific point?
25  Q.  Sure.  So Page 30, lines 5 through 20, discuss "a second

—————Fairfax, A. - Cross—————

1    addition was used to add those additional subdivisions."

2          I'm going to let you read, Mr. Fairfax.  We've

3    already discussed a number of these points, but that is what

4    I'm focused on, that section.

5    A.  And the assumption -- I would make the assumption that

6    I'd automatically use traditional redistricting criteria for

7    all the plan drawings.  That's the default.  What I was

8    focused on was the specific actions of adding and removing.

9    Q.  Okay.

10   A.  And I'm sure I probably stated somewhere "using

11   traditional redistricting criteria," somewhere.

12   Q.  But here, when asked, you said that, "The change to the

13   northern end was used to allow for the District 2 to ensure

14   that it was a majority Hispanic, Black, and Asian combined

15   district that was comfortable above 50 percent," right?

16   A.  Yes.

17   Q.  Thank you.

18   A.  Using traditional redistricting criteria, exactly.  And I

19   see "compact" in there, as well, so that's one of the

20   measurements -- one of the criteria, rather.

21   Q.  Let's turn to Page 28 of your supplemental report.

22          MS. McKNIGHT:  And, Your Honor, this would be

23   DTX 128, Page 28.

24          THE COURT:  I don't have it in this book, Counsel.

25   I think you'll just have to put it up on the screen.  That's

─────Fairfax, A. - Cross─────

1   fine.

2        MS. McKNIGHT:  And pardon us, Your Honor.  We

3   understood that the Court did not want paper witness binders.

4        THE COURT:  That's fine.  But it's on the screen.

5   That's fine.

6        MS. McKNIGHT:  And, Your Honor, if you would like to

7   follow along on paper, this is the same as Plaintiffs'

8   Exhibits 84 and 85 in your paper binder.

9        THE COURT:  Okay.  Thank you.

10  BY MS. McKNIGHT:

11  Q.  Mr. Fairfax, what we have on the screen is an enlargement

12  of an area in the illustrative plan modified.  Do you see

13  that?

14  A.  Yes, I do.

15  Q.  Okay.  Now, I see on the eastern side of this enlargement

16  that you drew the district to cross Witchduck Road to pick up

17  Plaintiff Allen's address; is that right?

18  A.  That's correct.

19  Q.  I'd like to draw your attention to the area northwest of

20  Witchduck Road between Merrimac and Holiday Lane.  Do you see

21  that?

22  A.  Yes.

23  Q.  Now, you included this area in District 2 because it had

24  a high concentration of Hispanic, Black, Asian CVAP, correct?

25  A.  No, that's not correct.

─────Fairfax, A. - Cross─────

1   Q.   Okay.

2   A.   I included it to make it more compact.  I could have

3   attached her address with all of the blocks that were under

4   Witchduck Road, but if you look at that, that would have made

5   it less compact, so I added those to make it a more compact

6   area.

7   Q.   Okay.  So do I understand that today your testimony is

8   that you did not add this area because it had a high

9   concentration of HBA CVAP?

10  A.   That is correct.

11  Q.   Do you remember being asked about this in your deposition

12  in June?

13  A.   No, but can you show me?

14  Q.   Of course.

15          MS. McKNIGHT:  Can we pull up Mr. Fairfax's

16  deposition from June 2020?

17  BY MS. McKNIGHT:

18  Q.   We are looking at Page 69, Mr. Fairfax, and it starts --

19  the questioning starts on line 19, and it goes down to

20  Page 70, line 6.

21  A.   You are on Page 69?

22  Q.   Correct.

23  A.   If you look, I think you're getting part of the -- part

24  of the aspect of what I was saying.

25          If you look on 12, line 12, it says, "that was above

Carol L. Naughton, Official Court Reporter

─────Fairfax, A. - Cross─────

1   to make it more compact."  And so previously, prior to what

2   you're saying, I'm saying, "However, what I did, I added the

3   area.  That area was above to make it more compact."

4   Q.  Okay.  Thank you.  Thank you, Mr. Fairfax.

5   A.  Sure.

6          MS. McKNIGHT:  And pardon me.  I do not mean to

7   belabor this, Your Honor.

8   BY MS. McKNIGHT:

9   Q.  I want to make sure that the testimony is clear, because

10  I want to make sure that I'm not misreading your testimony

11  from the deposition.

12         I had understood your testimony in the deposition as

13  saying that you added that area because it had high

14  concentration of HBA CVAP.  I believe here you are referring

15  to the northwest area of the district that we were discussing

16  earlier, as opposed to the area north of Witchduck Road; is

17  that right?

18  A.  This is the area above.  We're talking about the area

19  above Witchduck Road.  That's what I was talking about.

20  Maybe there was a confusion between what you -- or what I was

21  being deposed, but I was speaking of the same area that

22  you're talking about now.

23  Q.  Witchduck Road?

24  A.  Exactly, as we mentioned "Witchduck Road."

25  Q.  And so on Page 70, lines 4 through 6, when it says, "You

Carol L. Naughton, Official Court Reporter

—Fairfax, A. - Cross—

1    said you added because it had a high concentration of HBA

2    CVAP," and you said, "Oh, yes," there you're referring to the

3    area in the northwest of the district; is that correct?

4    A.   That is correct.

5    Q.   Thank you.  Now, these edits we've just discussed exist

6    in your other two maps in your supplemental report, correct?

7    A.   Yes.

8    Q.   Okay.  And to illustrate what we're talking about is

9    Illustrative Plan Alt 1 Modified, depicted on Pages 34 and 35

10   of your report.  This is also referred to as Plan 7 in

11   plaintiffs' demonstrative.

12           MS. McKNIGHT:  If we would pull that up, this is

13   DTX 128 at Page 35 -- 34, rather.

14   BY MS. McKNIGHT:

15   Q.   And this is your second of three plans you submitted in

16   your supplemental report, and I see the inclusion of the same

17   area in the northern part of the district, as we saw in that

18   first map, correct?

19   A.   That's correct.

20   Q.   And let's turn to Page 41 of your supplemental report.

21   This depicts Illustrative Plan Alt 2 Modified.  This is

22   referred to as Plan 8 in plaintiffs' demonstrative.

23           And in this third of three maps you submitted in

24   your supplemental report, you have the same added in the

25   northwest area of the district; is that right?

Fairfax, A. - Cross

1    A.   Correct.   This is the block group, so it's slightly

2    different -- the block group map.

3    Q.   Thank you.

4         MS. McKNIGHT:   We can take that down.

5    BY MS. McKNIGHT:

6    Q.   And you are not providing the Court with any seven

7    district plans, correct?

8    A.   That is correct.

9    Q.   Let's turn back to plaintiffs' demonstrative to use to

10   guide our discussion.

11        This is the -- you have it in your paper exhibit.

12        MS. McKNIGHT:   This is, Your Honor, demonstrative

13   Exhibit P-0432.

14   BY MS. McKNIGHT:

15   Q.   And I'll ask you a couple of general questions, but feel

16   free to flip through as you need to.

17        As I read this, Plans 1 through 8 that you depict

18   that are depicted in plaintiffs' demonstrative that you

19   prepared for this case just show data for Districts 1 and 2,

20   correct?

21   A.   No, not in the illustrative plans.   The original

22   illustrative plans were ten districts.

23   Q.   Thank you for the clarification.   I want to make sure

24   we're talking about the same thing.

25   A.   Yes.

Fairfax, A. - Cross

1   Q.  When I look at these maps, I understand that you drew all

2   ten districts, but these maps for the Court only show data

3   for Districts 1 and 2, correct?

4   A.  Correct, but in the appendix, when I drew the ten

5   districts, you'll see the data for all ten districts.

6   Q.  Thank you.

7   A.  Yes.

8   Q.  And now turning in this demonstrative to Plans Number 9

9   and 10, these are Demonstrative Exhibit P-0432I and P-0432J.

10  I see here that you did not draw other districts for these

11  illustrative plans; is that right?

12  A.  That is correct.

13  Q.  So how can you be sure that these districts as drawn in

14  Plan 9 and 10 fit within an overall districting plan for the

15  City?

16  A.  The deviations, the population deviations, were under

17  5 percent, so I'm fairly confident that I can draw a

18  ten-district plan or nine more districts.

19  Q.  Let's move on.  I have a few questions for you about

20  traditional districting criteria.

21          First, in drawing your plans, you did not consider

22  incumbent residencies while drawing your maps, right?

23  A.  That is correct.  I looked at that on that first plan, I

24  believe.  There's an appendix, a map on that.

25  Q.  And by "first plan," you mean the plan with the amended

─────Fairfax, A. - Cross─────

1    complaint?

2    A.  The illustrative plan.  There is a map, I believe, that

3    had the incumbents' residences in that appendix.

4    Q.  But when you were preparing your supplemental report, you

5    never took the step to plot incumbent residence addresses on

6    your illustrative plans, right?

7    A.  That is correct.

8    Q.  I want to clarify something you testified about,

9    population deviation.

10          Is it your position that the deviation can deviate

11   plus or minus 10 percent for a span of 20?

12   A.  No.

13   Q.  Okay.  Is your belief that it can span plus or minus 5,

14   for a total percent deviation of 10?

15   A.  Correct, plus or minus 5.  That said, you can even do

16   minus 2 and plus 8.  But I don't suggest it to people,

17   because you're doing something that's not an industry

18   standard.

19   Q.  Now, on compactness, you believe compactness is really

20   subjective from plan to plan, jurisdiction to jurisdiction,

21   based on local conditions, right?

22   A.  To a certain extent, yes.  It is a little subjective to

23   the jurisdictional boundaries and irregularities associated

24   with the jurisdiction.

25   Q.  And now I'd like to turn back to plaintiffs'

—Fairfax, A. - Cross—

1    demonstrative.  This is Demonstrative Exhibit P-0432.

2              Mr. Fairfax, I'd like to look at the Polsby-Popper

3    Reock, and Convex Hull numbers.  I think the most efficient

4    way to do this is I will read the numbers per page, and at

5    the end of every page I'd ask you to confirm that I've read

6    them accurately.  Is that fair?

7    A.   That sounds good.

8    Q.   Okay.  Starting with Page 1 of this demonstrative plan 1,

9    I do not see any compactness scores on this page.  Is that

10   fair to say?

11   A.   That's correct.

12   Q.   Turning to Page 2, plan number 2, I see the following

13   compactness numbers:

14             District 1 has a Reock score of .36, a Polsby-Popper

15   score of .31, and a Min Convex Poly of .67.

16             District 2 has a Reock of .24, a Polsby-Popper of

17   .20, and a Min Convex Poly of .58.

18             Did I read those correctly?

19   A.   Yes.

20   Q.   Turning to Plan 3, in Plan 3, District 1 has a Reock

21   score of .31, a Polsby-Popper score of .20, and a Min Convex

22   Poly of .58.

23             District 2 has a Reock score of .20, a Polsby-Popper

24   of .16, and a Min Convex Poly of .54.  Is that correct?

25   A.   That is correct.

Fairfax, A. - Cross

1   Q.  Turning to Plaintiffs' Illustrative Alternative 2 Plan,

2   Plan 4, District 1 has a .32 Reock score, .21 Polsby-Popper

3   score, .61 Min Convex Poly.

4       District 2 has a Reock score of .20, a Polsby-Popper of

5   .15, and a Min Convex Poly of .49.  Is that right?

6   A.  That's correct.

7   Q.  Turning to Plaintiffs' Illustrative Alternative 3 Plan,

8   Plan 5, District 1 has a Reock score of .14, a Polsby-Popper

9   score of .14, a Min Convex Poly of .49.

10          District 2 has a Reock score of .12, a Polsby-Popper

11  of .12, and a Min Convex Poly of .41.

12          Did I read that correctly?

13  A.  Yes, you did.

14  Q.  Moving on to Plaintiffs' Modified Illustrative Plan,

15  Plan 6, District 1 has a Reock score of .36, a Polsby-Popper

16  of .31, a Min Convex Poly of .67.

17          District 2 has a Reock of .21, Polsby-Popper of

18  .616, and a Min Convex Poly of .53.

19          Did I read that correctly?

20  A.  Yes.

21  Q.  Moving on to Plaintiffs' Modified Illustrative

22  Alternative 1 Plan, Plan 7, District 1 has a Reock score of

23  .31, a Polsby-Popper score of .20, and a Min Convex Poly of

24  .58.

25          District 2 has a Reock of .12, a Polsby-Popper of

─────Fairfax, A. - Cross─────

1    .15, a Min Convex Poly of .51.

2             Did I read that correctly?

3    A.   Yes.

4    Q.   Turning the page to Plaintiffs' Modified Illustrative

5    Alternative 2 Plan, Plan 8, here District 1 has a Reock of

6    .32, a Polsby-Popper of .21, a Min Convex Poly of .61.

7             District 2 has a Reock of .20, a Polsby-Popper of

8    .14, and a Min Convex Poly of .47.

9             Did I read that correctly?

10   A.   Yes.

11   Q.   Turning the page, Plaintiffs' Illustrative Alternative 4

12   Plan, Plan 9.  We have one district here.  It has a Reock of

13   .19, a Polsby-Popper of .11, and a Min Convex Poly of .47.

14            Did I read that correctly?

15   A.   Yes.

16   Q.   And, finally, turning to Plaintiffs' Illustrative

17   Alternative 5 Plan, Plan 10, District 1 has a Reock of .11, a

18   Polsby-Popper of .09, and a Min Convex Poly of .42.

19            Did I read that correctly?

20   A.   Correct.

21   Q.   And as I look at the compactness figures on Plan 10, this

22   is close to your threshold.  This is certainly close to your

23   threshold for not being sufficiently compact to survive

24   scrutiny, correct?

25   A.   It's close, but it's still acceptable.

─Fairfax, A. - Cross─

1   Q.  You believe it's certainly close to the threshold, right?

2   A.  It's close, but it's still acceptable.

3   Q.  Okay.  In your supplemental maps, you agree that the

4   compactness scores did not improve in all three plans, right?

5   A.  Not in all three plans, no.

6   Q.  Okay.  And in your supplemental maps, the number of split

7   VTDs did not improve, correct?

8   A.  That is correct.

9   Q.  Okay.  Let's take a look at those VTD splits.  If we

10  could pull up DTX 128, this is your report.

11          MS. McKNIGHT:  Your Honor, if you'd like to look at

12  the paper version, this is Plaintiffs' Exhibits 84 and 85,

13  and we are looking at Pages 32 through 33.

14          Let's start on 32 -- actually, Mr. Williamson, would

15  you be able to put up both pages?

16  BY MS. McKNIGHT:

17  Q.  Now, Mr. Fairfax, this is a report of political

18  subdivision splits for your illustrative plan modified; is

19  that right?

20  A.  That is correct.

21  Q.  And the way we read this report is that you split 15 VTDs

22  in this map out of a total of 79 VTDs in Virginia Beach; is

23  that right?

24  A.  That's correct.

25  Q.  Now turning to Page 33, I notice that you split one VTD

—Fairfax, A. - Cross—

1    in a voting district called Point O' View, where you included

2    just 180 people in your split.  Do you see that?

3    A.   Yes.

4    Q.   Now, I understand that figure 180 is not voting age

5    population, it is just population; is that right?

6    A.   That's correct.

7    Q.   Okay.  And so the voting age population would be lower

8    than that figure; is that right?

9    A.   That's correct.

10   Q.   Okay.  Were you concerned at all about the privacy of

11   voters -- namely, the secrecy of the ballots -- with so few

12   people split into this area?

13   A.   I didn't consider that.

14   Q.   Let's turn to Page 39 of your report.  This is Alt 1

15   modified.

16   A.   Can I add on?  Because these are illustrative plans,

17   these are demonstrative plans, these aren't final plans to be

18   approved by the City.  That may have been a concern if I was

19   drawing or developing a final plan.  So...

20   Q.   So you do not expect that these plans will pass muster

21   with the City?

22   A.   No, these are just examples.  These are just

23   demonstrative.  These are just examples, illustrative,

24   different from a final plan.  I assume that the final plan

25   will have other factors, political factors, involved that I

Fairfax, A. - Cross

1    don't consider.

2    Q.  Do you consider privacy of voters a political issue or

3    something else?

4    A.  No, I'm saying that there will be other factors involved,

5    including political factors, so these will most likely not be

6    the actual plan.  What I'm trying to do is actually show you

7    that it can be created to determine, it can, not show you the

8    plan that would be passed.  There's a difference, a slight

9    difference, if anything.

10            MS. McKNIGHT:  Could we turn to Page 39 of your

11   report?  It's 39 and 40, if we could put both pages up.

12   BY MS. McKNIGHT:

13   Q.  Mr. Fairfax, I understand that this is your political

14   subdivision analysis of your Alt 1 plan; is that right?

15   A.  That's correct.

16   Q.  And I see you split 23 VTDs in this map out of the total

17   79; is that right?

18   A.  That's correct.

19   Q.  I see here that you split the VTD called Timberlake three

20   times.  Do you see that?

21   A.  Yes.

22   Q.  Why did you do that?

23   A.  That's, unfortunately, the way it worked out.  And, once

24   again, these are just demonstrative plans, they're not

25   necessarily the actual plans that would be passed.  Under

─────Fairfax, A. - Cross─────

1    normal circumstances, I probably wouldn't do it, if this was
2    a final plan.
3    Q.   Okay.  Moving on to Page 46 and 47 of your report, this
4    is the political subdivision split for your third of three
5    maps in your supplemental report Alt 2 Mod.  Here you split
6    23 VTDs in this map out of the total 79; is that right?
7    A.   That's correct.
8    Q.   And you split Pembroke VTD three ways, right?
9    A.   That's correct.
10   Q.   And you split Rock Lake three ways; is that right?
11   A.   That's correct.
12   Q.   And you split Timberlake three ways; is that right?
13   A.   That's correct.
14   Q.   And you have one VTD split in Providence with zero
15   population.  Do you see that?
16   A.   Yes.
17   Q.   Why did you do that?
18   A.   That probably wasn't intentional.  It might have been an
19   accidental block that I added.  It wasn't intentional.
20   Q.   Turning to the last topic I'd like to discuss with you,
21   you did not consider any racial subgroups while drawing your
22   map, right?
23   A.   That's correct.
24   Q.   You did not make any effort to determine where Filipino
25   voters reside when drawing your maps, right?

──────Fairfax, A. - Redirect──────

1  A.  That's correct.

2  Q.  You did not make any effort to determine where, say,

3  Cuban voters reside when drawing your maps, correct?

4  A.  That's correct.

5  Q.  And you would have the same answer for all other racial

6  and ethnic subgroups; you do not know where they reside,

7  correct?

8  A.  That is correct.

9  Q.  And you cannot tell the Court how Asian voters vote in

10  Virginia Beach, right?

11  A.  I didn't do that type of analysis.

12  Q.  Okay.  Just the same, you cannot tell the Court how

13  Hispanic voters vote in Virginia Beach; is that right?

14  A.  That's correct.

15       MS. McKNIGHT:  Thank you, Your Honor, no further

16  questions.

17       THE COURT:  Any redirect?

18       MS. GREENWOOD:  Yes.

19       THE COURT:  Concise.

20       MS. GREENWOOD:  Yes.  Your Honor, I'll be concise

21  for you and slow for the court reporter.

22       THE COURT:  Thank you.

23                 REDIRECT EXAMINATION

24  BY MS. GREENWOOD:

25  Q.  Thank you, Mr. Fairfax.  You were asked to put into the

Fairfax, A. - Redirect

1   record all of the compactness scores for the illustrative

2   plans that you drew for Districts 1 and 2.

3          MS. GREENWOOD:  My question here is actually for

4   Your Honor.  I would now like to elicit the maximum, minimum,

5   and mean compactness scores for each of those plans to put it

6   into the record, if Your Honor is going to admit the expert

7   reports.

8          THE COURT:  Okay.  To save you the time, you can

9   elicit whatever you want about why you're doing that, but

10  they're in the report, and the Court has decided it will

11  admit the report in view of the fact that both sides have

12  done extensive examination of these documents.  Ordinarily,

13  we don't do that, but you can do that when both parties have

14  had such extensive examination of the report.

15         So you can ask him the reason you're doing that, but

16  they're there for the Court to see.

17         MS. GREENWOOD:  Thank you.

18         (Plaintiffs Exhibits 75, 76, 79, 80, 84, 85, and 86

19  were received in evidence.)

20  BY MS. GREENWOOD:

21  Q.  I'd just like to then play --

22         MS. GREENWOOD:  Mike, if we could bring up

23  Plaintiff's Demonstrative P-432K.

24  BY MS. GREENWOOD:

25  Q.  Mr. Fairfax, on the left, do you recognize that as the

Carol L. Naughton, Official Court Reporter

———Fairfax, A. - Redirect———

1   current residency district plan for the City of Virginia

2   Beach?

3   A.  Yes.

4   Q.  On the right do you see that is Plan 2 that you draw as

5   the illustrative plan?

6   A.  Yes.

7   Q.  When you look at the districts on the left and the

8   districts in your plan, can you make any determinations about

9   how they compare in terms of compactness?

10  A.  No, visually, you can't.

11  Q.  Thank you.  Mr. Fairfax -- sorry.

12          MS. GREENWOOD:  Mike, if we could bring up P-432I.

13  BY MS. GREENWOOD:

14  Q.  Mr. Fairfax, there was a lot of discussion about the

15  number of VTD splits in various of your plans.  How many VTDs

16  are split in Plan 9?

17  A.  Zero.

18  Q.  And so it's possible to draw a plan that includes no VTD

19  splits; is that right?

20  A.  That's correct.

21          MS. GREENWOOD:  I have no further questions.  Thank

22  you.

23          THE COURT:  All right.  Well, may this witness step

24  down and be excused?

25          You may stay in the courtroom, but you may step

1  down.

2           THE WITNESS:  Thank you, Your Honor.

3           (The witness was excused.)

4           MS. GREENWOOD:  I see it's half past 5:00.

5           THE COURT:  We're going to quit.

6           MS. GREENWOOD:  Do we want to finish for today and

7  start with a new witness tomorrow morning?

8           THE COURT:  That's exactly what the Court is going

9  to do.  I told you we're going to try to stick to the plan,

10  and under extraordinary circumstances, we may go to 6:00 or

11  7:00, but we're going to prevent the extraordinary.

12           So we'll be in recess until tomorrow morning 9:30.

13  We're going to come in and get to moving.

14           I think the courtroom will be secured tonight.  Is

15  that correct?

16           THE COURTROOM SECURITY OFFICER:  Yes, Your Honor.

17           THE COURT:  So you won't have to move all of your

18  materials out of the courtroom.

19           Okay.  Recess court until 9:30 tomorrow morning.

20           (Proceedings adjourned at 5:25 p.m.)

21

22

23

24

25

Carol L. Naughton, Official Court Reporter

```
 1                        CERTIFICATION

 2

 3       I certify that the foregoing is a correct transcript

 4  from the record of proceedings in the above-entitled matter.

 5

 6

 7           _____/s/_____

 8                     Carol L. Naughton

 9                     October 6, 2020

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Carol L. Naughton, Official Court Reporter