# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Norfolk Division

*MEMORANDUM OPINION AND ORDER*
*In*

**LATASHA HOLLOWAY et. al.,**
      **Plaintiff,**

      **v.**                                    **CIVIL ACTION NO. 2:18-cv-69**

**CITY OF VIRGINIA BEACH, et. al.,**

      **Defendant.**

Holloway et. al. v. City of Virginia Beach
## TABLE OF CONTENTS

**I. PROCEDURAL HISTORY** ............................................................................1

**II. JURISDICTION AND STANDING**...........................................................3

**III. STIPULATED FACTS** ...........................................................................5

**IV. THE COURT'S FINDINGS OF FACT**....................................................9

**V. CONCLUSIONS OF LAW** ......................................................................30
  A. Voter Dilution Claims...............................................................................30
  B. The Voting Rights Act 1982 Amendments and Senate Factors ...............31
  C. The *Gingles* Factors ...............................................................................33
  D. The Deferential Fourth Factor.................................................................35
  E. Minority Coalitions May Bring Aggregated Section 2 Claims ...............37

**VI. DISCUSSION**.......................................................................................38
  A. Minority Community May Bring Section 2 Claims..................................38
  B. Plaintiffs Have Established the Three *Gingles* Preconditions...............50
    1. Minority Group is Sufficiently Large and Geographically Compact ......51
    2. Minority Group is Politically Cohesive..................................................66
    3. White Majority Votes Sufficiently as a Bloc..........................................87
    4. The Deferential Fourth Factor ...............................................................92
  C. The Totality of the Circumstances Inquiry .............................................93
    1. Senate Factor One: History of Official Discrimination.........................94
    2. Senate Factor Two: Voting in City Council Elections is Racially Polarized ......99
    3. Senate Factor Three: Discriminatory Voting Practices or Procedures ...........100
    4. Senate Factor Four: Exclusionary Slating Process...............................103
    5. Senate Factor Five: Minorities Bear the Effects of Discrimination .................104
    6. Senate Factor Six: Overt or Subtle Racial Appeals..............................112
    7. Senate Factor Seven: Minorities Elected to City Council ....................118
    8. Senate Factor Eight: Unresponsive Elected Officials...........................122
    9. Senate Factor Nine: Unjustified Methods of Election ..........................131

**VII. CONCLUSION** ..................................................................................133

Before the Court is Plaintiffs' claim under § 2 of the Voting Rights Act of 1965, as amended, *see* 42 U.S.C. § 1973, alleging that the City of Virginia Beach dilutes the voting strength of Black, Latino, and Asian American voters ("Minority Voters") and therefore prevents minority voters from participating in the political process and electing representatives of their choice. The Court held a six (6) day bench trial beginning on October 21, 2020. The Court, having heard the arguments, read the submissions of counsel, and considered the evidence including court-room testimony, deposition testimony, and exhibits, and based on the following findings of fact and conclusions of law enters judgement for the Plaintiffs

## I.    PROCEDURAL HISTORY

On November 20, 2017, Plaintiff Latasha Holloway a United States citizen, an eligible and registered voter, and an African American resident of Virginia Beach, initiated a *pro se* suit against the City of Virginia Beach under Section 2 of the Voting Rights Act of 1965 ("VRA"). ECF No. 1; *see also* ECF No. 190 at ⁋ 2 ("Stipulated Facts"). On November 13, 2018, Plaintiff Holloway, along with co-Plaintiff Georgia Allen, an unsuccessful Black candidate for an at-large seat on the City Council, retained counsel and filed an Amended Complaint against the City of Virginia Beach, the Virginia Beach City Council ("City Council"), individual members of the City Council, the City Manager, and the Director of Elections (collectively, "Defendants"). ECF No. 62. Plaintiff Georgia Allen is a United States Citizen, an eligible and registered voter, and an African American resident of Virginia Beach. ECF No. 190 at ⁋ 4. According to Plaintiffs' Amended Complaint, the City of Virginia Beach's at-large election for City Council violates Section 2 of the VRA by diluting the voting strength of Black, Hispanic, and Asian American voters ("Minority Voters") and, therefore, preventing minority voters from participating in the political process to elect representatives of their choice. *Id.* Plaintiffs' request that the Court (1)

1

declare Virginia Beach's at-large method of electing members to the City Council violates Section 2 of the VRA; (2) enjoin Defendants from administering any future elections in the City of Virginia Beach under the current at-large method; (3) order implementation of an election system for City Council that complies with Section 2 of the VRA; and (4) order all future elections for the City of Virginia Beach to comply with Section 2 of the VRA. *Id.* at 16. On January 24, 2019, Defendants filed an Answer denying Plaintiffs' claims. ECF No. 67.

On October 19, 2020, Defendants filed a Motion for Summary Judgment which Plaintiffs opposed. ECF Nos. 114, 115, 118, 121, 122. On March 11, 2020, the Court denied Defendants' Motion for Summary Judgment, finding genuine dispute as to material facts and, therefore, Defendants were not entitled to judgment as a matter of law. ECF No. 126. On June 30, 2020, Defendants filed a Motion to Dismiss for Lack of Jurisdiction which Plaintiffs opposed. ECF No. 149–150, 158. On August 17, 2020, the Court denied Defendants' Motion to Dismiss holding that Plaintiffs' claims were ripe, Plaintiffs have standing, and that the Court would not issue an advisory opinion. ECF No. 168. From October 6, 2020 to October 14, 2020, the Court held a bench trial on this matter. ECF Nos. 209, 212, 213-216. The next election for City was held on November 3, 2020. Upon conclusion of the bench trial, both parties submitted proposed findings of fact and law. ECF Nos. 237-238.

On March 22, 2021, Defendants filed a Notice of New Authority indicating that on March 18, 2021, the Governor of the Commonwealth of Virginia signed House Bill 2198 into law. ECF No. 204 at Exhibit 1. The law amends Section 24.2-222 of the Virginia Code to prohibit at-large voting for candidates "in a city or town that imposes district-based or ward-based residency requirements for members of the city or town council." *Id.* The law will take effect on January 1, 2022, before the next City Council election on November 8, 2022. *Id.* Defendants also argued

that this Court's adjudication of the instant case is moot because HB 2198 invalidates the City's current at-large system. *Id.* In response, Plaintiffs argued that HB 2198 did not make the instant case moot because the at-large system Plaintiffs challenged is still in effect in violation of Section 2 of the Voting Rights Act, the bill does not remedy the Section 2 violation, and Defendants have not shown that " 'the alleged behavior could not reasonably be expected to recur.'" ECF No. 241 (citing *Porter v. Clarke*, 852 F.3d 358, 364 (4th Cir. 2017) (internal quotes omitted).[1]

## II.    JURISDICTION AND STANDING

The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1345. Standing has both constitutional and prudential components. *Bishop v. Bartlett*, 575 F.3d 419, 423 (4th Cir. 2009). To satisfy the constitutional component of standing, a party must meet three elements: (1) an "injury in fact" that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) a causal connection between the injury and the conduct complained of – the injury has to be "fairly traceable to the challenged action of the defendant"; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, at 560-61 (1992).

---

[1] The Court finds that HB 2198 does not make the instant case moot because the law does not specifically address Plaintiffs' Section 2 claims of voter dilution which means that the issues are still live. *See Chafin v. Chafin*, 568 U.S. 165, at 172 (2013) ("There is thus no case or controversy, and a suit becomes moot, 'when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome.'" (quoting *Murphy v. Hunt*, 455 U.S. 478, at 481 (1982)); *see also, Ellis v. Railway Clerks*, 466 U.S. 435, at 442 (1984) ("[A]s long as the parties have a concrete interest, however small, in the outcome of the litigation, the case is not moot."). Second, HB 2198 does not prescribe Plaintiffs the relief of the "the implementation of an election system for the City Council that complies with Section 2 of the Voting Rights Act" and "that all future elections for the City of Virginia Beach comply with Section 2 of the Voting Rights Act." ECF 62 at 16. Accordingly, the Court can provide Plaintiffs with "effectual relief" pursuant to the VRA. *See Erie v. Pap's A.M.*, 529 U.S. 277, at 287, (2000) ("A case becomes moot only when it is impossible for a court to grant 'any effectual relief whatever' to the prevailing party.") (quoting *Church of Scientology of Cal. v. United States*, 506 U.S. 9, at 12, (1992). Finally, HB 2198 does not make "absolutely clear" that the Defendants' Section 2 violation will cease because the law allows Defendants to eliminate the district residency requirements for the seven seats on the City Council and allows them to retain the at-large system of election for those positions. *See Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, at 190 (2000). Therefore, the instant case is not moot.

Here, Plaintiffs have established constitutional standing. The purpose of Section 2 of the VRA is to prevent voter dilution and preclude racial discrimination in voting. Plaintiffs claim that although the Hispanic, Black, and Asian communities (collectively "Minority Community") votes cohesively for candidates of choice, these shared political preferences are submerged by the at-large electoral system. ECF No. 62 at ¶¶ 7–8. According to the Complaint, Plaintiffs both identify as Black and are part of the Minority Community which has allegedly suffered a dilution of their votes. *Id.* at ¶¶ 14–15; *See Allen v. State Bd. of Elections*, 393 U.S. 544, at 557 (1969) (recognizing that aggrieved voters have standing to enforce their right to vote); *see also, Wilson v. Minor*, 220 F.3d 1297, 1303 n. 11 (11th Cir. 2000) (citing *United States v. Hays*, 515 U.S. 737, at 742, (1995) and stating "the essential point remains that in order to have standing one must reside in the area directly affected by the allegedly illegal voting scheme"). Plaintiffs therefore have sufficiently pleaded an injury in fact, that is neither conjectural nor hypothetical, and the type of injury Section 2 of the VRA was designed to protect. Plaintiffs have also demonstrated that this injury is fairly traceable to the challenged conduct of Defendants since Plaintiffs allege that their votes have been diluted because of Virginia Beach's at-large voting system for City Council. ECF No. 1 at 5–6. Regarding redressability, Plaintiffs have sufficiently pleaded that it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision. Moreover, Plaintiffs also have prudential standing since the purpose of the VRA is to protect Minority Voters. *Perry-Bey v. City of Norfolk, Va.*, 678 F. Supp. 2d 348, 363 (E.D. Va.), *aff'd*, 333 F. App'x 733 (4th Cir. 2009) *citing Roberts v. Wamser*, 883 F.2d 617, 621 (8th Cir. 1989). Accordingly, Plaintiffs have established constitutional standing.

### III. STIPULATED FACTS

On September 25, 2020, the parties submitted the following stipulated facts, which the Court incorporates into its final judgment. *See* ECF Nos. 190, 211.

1. Plaintiffs Latasha Holloway and Georgia Allen filed an amended complaint on November 13, 2018 against Defendants.

2. Plaintiff Latasha Holloway is a United States Citizen, an eligible and registered voter, and an African American resident of Virginia Beach.

3. Plaintiff Holloway's address is [Redacted]

4. Plaintiff Georgia Allen is a United States Citizen, an eligible and registered voter, and an African American resident of Virginia Beach.

5. Plaintiff Allen's address is in Virginia Beach.

6. The City of Virginia Beach ("the City") is the largest city in Virginia in terms of population.

7. The City is in southeastern Virginia.

8. The 2010 Census reported that the City has a total population of 437,994. P-0161 at 3.

9. Defendant Virginia Beach City Council ("the City Council" or "the Council") is the governing body in Virginia Beach.

10. Defendant Robert Dyer, a white male, is currently[2] the Mayor of Virginia Beach.

11. Defendant James Wood, a white male, currently serves as the Vice Mayor and the Councilmember representing the Lynnhaven District.

12. Defendant Jessica Abbott, a white female, currently serves as the Councilmember representing the Kempsville District No. 2.

---

[2] Current as determined on September 25, 2020 and agreed to by both parties in their Stipulated Facts.

13. Defendant Michael Berlucchi, a white male, currently serves as the Councilmember representing the Rose Hall District No. 3.

14. Defendant Barbara Henley, a white female, currently serves as the Councilmember representing the Princess Anne District No. 7.

15. Defendant Louis Jones, a white male, currently serves as the Councilmember representing the Bayside District No. 4.

16. Defendant John Moss, a white male, currently serves as the Councilmember who was elected At-Large.

17. Defendant Aaron Rouse, a Black male, currently serves as the Councilmember who was elected At-Large.

18. Defendant Guy Tower, a white male, currently serves as the Councilmember representing the Beach District No. 6.

19. Defendant Rosemary Wilson, a white male, currently serves as a Councilmember who was elected At-Large.

20. Defendant Sabrina Wooten, a Black female, currently serves as the Councilmember representing the Centerville District No. 1.

21. Defendant Donna Patterson, a Black female, currently serves as the Director of Elections/General Registrar for the City.

22. Defendant Patrick Duhaney, a Black male, was appointed City Manager by the City Council in June 2020, effective July 20, 2020.

23. In 1966, the Virginia General Assembly adopted at-large elections for electing 11 Virginia Beach City Council members.

Rules.

24. Under the current at-large system, seven of these members are elected from designated or numbered posts, where they run from residential districts with a single seat at stake but all voters in the city vote on the councilmember from each district

25. Since 1966, five Black City Council candidates (Aaron Rouse, Sabrina Wooten, Dr. Amelia Ross-Hammond, Louisa M. Strayhorn, and John L. Perry) and one Asian-American candidate (Ron A. Villanueva) have been elected to the City Council.

26. The City Council appointed Prescott Sherrod, a Black male, to an open seat on the City Council in July 2011 in a 9-1 vote.

27. In the past five elections for the Virginia Beach City Council (2010-2018), 16 out of 74 City Council candidates were black.

28. The U.S. decennial census is mandated by Article I, Section 2 of the Constitution and takes place every 10 years.

29. The most recent completed decennial census was in 2010.

30. The 2010 Census enumeration of the population of the City of Virginia Beach, Virginia is reported in the table that forms part of the composite exhibit DTX132.

31. In addition to the decennial census, the Census Bureau publishes one-, three-, and five-year estimates of population demographics based on the American Community Survey ("ACS"). The last three-year estimates produced were the 2011-2013 estimates, as the Census Bureau stopped producing three-year estimates after December 31, 2013.

32. The City's Budget and Management Services has used demographic information from the ACS in the performance of its duties.

33. The Census Bureau's ACS 2013-2017 5-Year Estimates for the City of Virginia Beach, Virginia, is part of the composite exhibit DTX132.

34. The Census Bureau's ACS 2014-2018 5-Year Estimates for the City of Virginia Beach, Virginia is part of the composite exhibit DTX132.

35. The Virginia Division of Legislative Services published a document entitled "Guide to Local Redistricting for 2011. *See* DTX011 at 37.

36. During the Reconstruction period that followed the era of slavery and the end of the Civil War, African Americans in Virginia participated in the politics of the Commonwealth as voters and office-holders.

37. By the 1880s, the Virginia state legislature began to adopt measures aimed at eliminating Black voting and office-holding in Virginia.

38. During Virginia's Constitutional Convention of 1901-1902, the Commonwealth adopted literacy testing and poll tax requirements for voting.

39. Virginia still enforced a poll tax law in January of 1964, when the Twenty-Fourth Amendment abolished the use of the poll tax in federal elections.

40. Virginia continued to require poll taxes in state elections until it was struck down in *Harper v. Virginia Board of Elections* in 1966.

41. During the early part of the Twentieth Century, the Virginia General Assembly enacted laws requiring racial segregation of whites and blacks in schools, public transportation, and public facilities. These laws are generally referred to in common parlance as "Jim Crow laws." In addition, some providers of housing and public accommodations in Virginia gave out their services on the basis of race. This is known in common parlance as "de facto segregation."

42. In 1964, Congress enacted the Civil Rights Act that banned racial discrimination in both public facilities and public accommodations. It prohibited employment discrimination based on race or sex and racial discrimination in programs and activities receiving federal financial assistance and applied to institutions such as federally-funded schools and colleges.

43. In 2017, the Virginia Beach City Council authorized a disparity study of city contracts.

44. In January 2019, BBC Research & Consulting presented a report to the City of Virginia Beach entitled "2018 Disparity Study." *See* Exhibit P-0298; DTX046.

## IV.  THE COURT'S FINDINGS OF FACT

**A. Demographic Information and Statistical Background**

1. The City of Virginia Beach ("the City") is the largest city in Virginia in terms of population. ECF No. 190 at ¶ 6 ("Stipulated Facts"). In 2010, the Census reported that the City has a total population of 437,994. *Id.* at ¶ 8.

2. The City is 249 square miles in size.

3. The City attained its current form in 1963 through consolidation of Princess Anne County with "the old city of Virginia Beach." *Davis v. Dusch*, 205 Va. 676, 677 (1964). Princess Anne County joined with Virginia Beach city, which was then a small resort strip along the coast largely surrounded by Princess Anne County. *Id.* at 677–78; Tr. 957:18–958:14 (Kidd). The newly formed city included urban boroughs of the old city and the rural boroughs of the old county. *Dusch v. Davis*, 387 U.S. 112, 113 (1967).

4. In addition to the decennial census, the Census Bureau publishes one-, three-, and five-year estimates of population demographics based on the American Community Survey ("ACS").

According to the decennial censuses of 1990 and 2010, the Minority Community grew from "almost 21 percent to 33 percent" of Virginia Beach's total population (and VAP and CVAP). P-0075 at 8-11, Tr. 121:15-25; Tr. 122:4-11; Tr. 124:3-10. Each of the constituent groups—Hispanic, Black, and Asian—increased during that period while the white population fell. P-0075 at 4, 7-8; P-0076 at 14-17. The last three-year estimates produced were the 2011-2013 estimates, as the Census Bureau stopped producing three-year estimates after December 31, 2013. *Id.* at ₱ 31.

5. According to the most recent ACS 5-Year Estimates (2014-2018), the City's population is 450,135. The Minority Community constitutes 33% of the total population (8% Hispanic, 18.5% Black, and 6.5% Asian). *Id.* at ₱ 33; *see also,* DTX132 at 4. Based on 2013-2017 ACS data, the Minority Community is concentrated in certain areas of the City, with 54.90% living in 31 of the 100 census tracts in the City. *See* P-0075 at 13, 17; Tr. 177:7-21.

## B. Method of Election for Virginia Beach

1. Defendant, Virginia Beach City Council ("the City Council"), is the governing body in Virginia Beach. ECF No. 190 at ₱ 9.

2. In 1966, the Virginia General Assembly adopted at-large elections for electing eleven Virginia Beach city council members. *Id.* at ₱ 23. Under the current-at large system, seven members are elected from designated or numbered posts, where they run from residential districts with a single seat at stake but all voters in the city vote on the councilmember from each district. *Id.* at ₱ 24.

3. During the City's formation in 1963, proponents of the consolidation plan between the old city of Virginia Beach and Princess Anne County "would have to produce a plan which would be acceptable to the voters in the half of the county which was rural and to those in the

half which was urban and which would, at the same time, win the support of the voters in the old city." *Davis*, 205 Va. at 679. They proposed a seven-borough city-council plan, demarcating the old city as one borough with five council seats and dividing the old county into six boroughs with one seat each. *Id.*; Tr. 957:11–18. The plan prevailed but was invalidated in 1965 under the one-person, one-vote principle. *See Dusch*, 387 U.S. at 114.

4.  The General Assembly responded with an at-large system. ECF No. 190 at ¶ 23. The Council has eleven members including the City's Mayor. Four are elected at-large without regard to residence, and seven are elected at-large but must reside, respectively, one in each of seven residency districts. *Dusch*, 387 U.S. at 114; ECF No. 190 at ¶ 24.

5.  The City Council, which includes the Mayor and eleven council members, is the City's governing body that makes decisions affecting the health, well-being, and livelihood of Virginia Beach's residents. ECF No. 1 at ¶¶ 2, 21. Each City Council member is elected using an at-large voting system. *Id.* at ¶ 21. Three Council Members and the Mayor do not have district residency requirements. *Id.* The other seven members are required to live in the districts they represent: Bayside, Beach, Centerville, Kempsville, Lynnhaven, Princess Anne, and Rose Hill. *Id.*

6.  As of trial, no Black Councilmember had ever been re-elected. P-0078 at 45.

7.  During 2010-2018, there were five City Council elections and only 16 out of 74 candidates were Black. ECF No. 190 at ¶ 27. Of the 22 winners, only three were Black. P-0396 at 4-5.

8.  The Minority Community elected a candidate of choice in only one of the seven (14%) elections. Tr. 316:21-317:1; P-0077 at 34.

9. Between 2008 - 2018, there were 36 City Council elections. Tr. 370:11-12. Of those, six were uncontested and 13 included only white candidates. Moreover, 17 of the 36 City Council elections had a candidate from the Minority Community.

10. In the Commonwealth of Virginia, primary elections are open to all voters, regardless of their political party affiliation.

11. Virginia Beach is unique among 13 cities of comparable size in Virginia because it requires all City Council candidates to run citywide. Six of twelve other large cities in Virginia use either a district system or a mixed at-large/district system for their city elections, with the majority elected from districts. P-0078 at 68.

12. The City requires that all at-large candidates campaign across 249 squares miles. Accordingly, the City requires that each at-large candidate compete for votes from approximately 450,000 eligible voters. P-0078 at 22-24; P-0082 at 13, 15, 51; DTX163 (Abbott Dep.) at 51:19-52:3

13. Candidates usually informally combine their support and resources in Virginia Beach to run as a slate. The slating process is usually done by white candidates. P-0078 at 25. A common method for informal slating in City Council elections is through sample ballots.

14. During the City Council elections from 2008-2018, 17 white candidates received $250 or more from two or more other candidates. However, from 2008-2018, only two Black candidates out of 20 received more than $250 or more from two or more other candidates. P-0078 at 25. When intra-election candidates (those who ran in City Council elections from 2008-2018 but not in the same year as the recipient of the contribution) are included, seven white but no Black candidates received two or more intra-election donations ($250 or more).

The only Black candidates to garner any intra-election candidate contributions (one each) were Ross-Hammond (2016), Rouse (2018), and Wooten (2018). P-0078 at 25-27.

15. In 1990, the City conducted a "comprehensive review of the then existing system of electing City Council members," seeking "views from every conceivable interested party as to the best manner to provide representation for the citizens of the City." *Lincoln v. City of Virginia Beach*, 2:97-cv-756, at 2 (E.D. Va. Dec. 29, 1997). The City declined proposals for race-based single-member districts that "stretched nearly all the way across the City, and in many instances" were "only a block wide or came together at a single point." *Id.* at 3. This Court also rejected these racial gerrymanders and the Voting Rights Act lawsuit that sought to impose them. *Id.* at 11. Since 1990, the City has retained Kimball William Brace to draw the legislative districts.

16. In 2011, the City underwent another redistricting effort. Tr. 585:3–15. The City obtained input from leaders of many racial and ethnic groups who could obtain Mr. Brace's assistance in preparing proposed districts. Tr. 587:20–586:19. One such proposal by Mr. Andrew Jackson, a Black community leader, was for a majority-Black residency district. *See* DTX107-013, -087 (Ex. K); Tr. 590:6–12. Mr. Brace believed that statistical estimation methods could not provide information on Asian and Hispanic voting patterns because these groups are small and dispersed throughout the City. Tr. 566:8–25.

## C. Expert Witnesses Background, Qualifications, and Statistical Methodology

1. Plaintiffs' expert, Mr. Anthony E. Fairfax, is a demographic and mapping consultant, the CEO/Principal Consultant of CensusChannel LLC, and an expert in demography and drawing redistricting plans. P-0075 at 2. As a consultant on redistricting issues for 28 years and three decennial redistricting cycles, he has developed nearly 1,000 redistricting plans for

jurisdictions ranging from states to small municipalities. P-0075 at 2. The Court qualified Mr. Fairfax as a demographic and mapping expert. *See* Tr. 118:1-16.

2. Plaintiffs' expert, Dr. Douglas Spencer, is a Professor of Law and Public Policy at the University of Connecticut with a joint appointment in the School of Law and the Department of Public Policy. He earned a Ph.D. in Jurisprudence and Social Policy and a J.D from the University of California, Berkeley. Dr. Spencer is an expert in empirical analysis of public law, with an emphasis on voting rights and campaign finance. He publishes academic articles that use social science methods to assess election laws, including two reflecting his nationwide surveys of polarized attitudes (racial and political) in U.S. elections. P-0077 at 43-45. The Court qualified Dr. Spencer as an expert in political science and quantitative statistical analysis. *See* Tr. 266:4-6; P-0077 at 35, 43-44.

3. Plaintiffs' expert Professor Allan Lichtman is an expert in statistical methods and qualitative research in American voting rights and elections. He is a Distinguished Professor of History at American University in Washington, D.C, and has authored numerous scholarly works on quantitative methodology in social science. He has worked as a consultant or expert witness for both in more than 90 voting and civil rights cases, and the U. S. Supreme Court has authoritatively cited his expert work. *LULAC v. Perry*, 548 U.S. 399, 427 (2006).

4. Defendant's expert witness, Dr. Quentin Kidd, Professor of Political Science and Dean of the College of Social Sciences at Christopher Newport University ("CNU"). *See* Tr. 871:16–20, 872:1–9. Dr. Kidd earned his Ph.D. from Texas Tech University in 1998 and has been on the faculty of CNU since 1997. Tr. 871:7–15, 871:23–25. Dr. Kidd has taught and researched American Politics, Citizenship/Civic Participation, Virginia Politics, Methods of Social Science Research, Quantitative Analysis, and Political Campaigns and Elections. Tr. 872:10–

873:2. Dr. Kidd published a book and peer-reviewed articles on race and politics, focusing on the American South. *See* Tr. 874:25–877:5; Tr. 873:3–9.

5. Political scientists use three statistical methods to infer voting behavior of demographic subgroups: (1) homogenous precinct analysis ("HP"), (2) ecological regression ("ER"), and (3) ecological inference ("EI"). P-0077 at 4. Tr. 268:12-273:4. HP analysis examines precincts with high concentrations of a demographic group and uses the voter preferences there as a proxy for the preferences of members of that race or ethnicity throughout the larger jurisdiction. ER uses linear regression to determine the relationship between the voting patterns of particular groups in the jurisdiction in each precinct for each relevant election. EI also uses regression analysis but relies on information known with certainty to narrow the bounds of possible support from demographic groups and draw inferences from the data. The strongest case for racially polarized voting exists when HP, ER, and EI all generate similar estimates and point in the same direction. Tr. 359:3-360:16; P-0077 at 7. Statistical methods, such as HP, ER, and EI, can be used to identify demographic and voter information to ascertain the Minority Community's preferred candidates using election returns by precinct. Tr. 295:7-9; P-0081 at 6.

**D. The Minority Community's Composition, History of Discrimination, and Interests**

1. The Minority Communities is composed of Black, Asian, and Hispanic racial/ethnic populations.

2. According to the 2010 U.S. Census, White residents then composed 64.49% of the total population (and 67.38% of the voting-age population ("VAP")), Black residents 19.00% (18.10%), Hispanic residents 6.62% (5.64%), and Asian residents 6.01% (6.30%). P-0075 at 8–9.

3. According to the most recent ACS 5-Year Estimates (2014-2018), the City's population is 450,135. The Minority Community constitutes 33% of the total population (8% Hispanic, 18.5% Black, and 6.5% Asian). *Id.* at ⁋ 33; *See* DTX132 at 4. Based on 2013-2017 ACS data, the Minority Community is concentrated in certain areas of the City, with 54.90% living in 31 of the 100 census tracts in the City. *See* P-0075 at 13, 17; Tr. 177:7-21.

4. The City has a substantial military presence which has contributed to an influx of people who do not have familial ties to Virginia or Virginia Beach. The Naval presence has also contributed to a vibrant Filipino community. Tr. 955:10–15.

5. The Commonwealth of Virginia and the City of Virginia Beach have long established histories of racial discrimination that have affected the Minority Community. See P-0078 at 4-13; Tr. 392:22-24, 393:19-21.

6. Like the Commonwealth, the City has a history of discrimination from its founding in the 1960s through recent times. P-0078 at 12. Virginia saw decades of *de jure* racial discrimination and prejudice against Black residents. *See, e.g.*, ECF No. 190 at ⁋⁋ 36–41.

7. The Commonwealth of Virginia and the City have histories of voter discrimination as it pertains to registration, voter suppression, gerrymandering, and other forms of discrimination. P-0078 at 5. *See, e.g., Page v. Virginia St. Bd. of Elections* No. 3:13CV678, 2015 WL 3604029, at *15 (E.D. Va. June 5, 2015) (holding that Virginia's post-2010 congressional redistricting was unconstitutional because it needlessly packed Black voters into a single district, diminishing their political influence elsewhere in the State.). In 2018, a federal district court also found "overwhelming evidence" that Virginia engaged an unlawful racial gerrymandering by sorting "voters into districts based on the color of their skin." P-0078 at 10-11.

8.  The Minority Community in Virginia Beach continues to suffer the effects of past official discrimination and lacks certain rights afforded to whites. P-0078 at 28-36; DTX163 (Abbott Dep.) at 151:10 (agreeing that the City has a history of racial discrimination and that people in the Minority Community still endure downstream effects of long-term discrimination); DTX157 (Rouse Dep.) at 121:2-11 (same); Tr. 393:19-21 (Councilmember Wooten agreeing that minority communities in the City still suffer downstream effects of racial discrimination).

9.  Disparities between Black and white, Hispanic and white, and Asian and white communities exist with regard to per capita income, the poverty rate for individuals, the percentage with SNAP assistance, median home values, and the percentage of 18-64 year-olds with no health insurance. P-0078 at 28-36.

10. There are also gaps in educational outcomes. The white community graduates from high school at the rate of 95.0%, while the Minority Community lags behind, with rates of 89.4% for Black individuals, 88.7% for Hispanic individuals, and 91.8% for Asian individuals. P-0078 at 33. The Black and Hispanic communities, in particular, lag behind the white community in their passage rate in basic skills. For example, the English writing passage rate for white persons is 89% but just 68% for Black persons and 81% for Hispanic persons, with similar trends for reading, math, and science passage rates. P-0078 at 33.

11. Although, the Virginia Beach Public School District temporarily showed progress toward integration after a 1969 court desegregation order, segregation in the District has increased since 1990. The District's Dissimilarity Index score, a commonly used measure of segregation, was 45.0 in 1968, 27.0 in 1990, 32.7 by 2000, and back up to 38.9 by 2011. P-0078 at 18.

12. The City lags in employing minority teachers relative to minority public school enrollment. In 2011, the City had one white teacher for every nine white students, but only one minority teacher for every 43 minority students. Virginia Beach's minority teacher employment levels in 2011 lagged behind Virginia overall. In Virginia, 43 percent of students and 17 percent of teachers were minorities; while in the City over 50 percent of students were minority and just 15 percent of teachers were minorities. P-0078 at 20.

13. There are also disparities in voter registration rates between white and minority communities. On average, from 2008-2018, white registration as a percentage of CVAP was 74%, while it was only 66.1% for Black persons, 55.2% for Hispanic persons, and 64.2% for Asian persons. P-0082 at 23-24.

14. From 2008-2018, the average white voter turnout of 59.6% was higher than the 54.5% rate for Black voters, 44.4% for Hispanic voters, and 47.4% for Asian voters. Overall, the 56.4% voter turnout in Virginia Beach is significantly lower than the 71.5% statewide, even though the jurisdictions have very similar demographics. P-0082 at 18.

15. In the 2008 U.S. Presidential election, about 90% of voters from the Minority Community strongly preferred Barack Obama over John McCain and about 65% of white voters strongly preferred McCain. In the 2012 U.S. Presidential Election, about 90% of voters from the Minority Community strongly preferred Barack Obama over Mitt Romney, while about 65% of whites preferred Romney (65% support). Tr. 312:1-15; P-0077 at 30. In the 2008 Presidential primary election, support for Obama (over Clinton) was much stronger among non-white voters than white voters. P-0077 at 30.

16. In the 2016 mid-term elections, Minority Community voters strongly supported Black candidate Shaun Brown for the Second Congressional District, while white voters strongly

supported white candidate Scott Taylor. Tr. 313:7-13; P-0077 at 31. In the 2008 and 2012 Presidential Election and the 2016 mid-term elections, the candidate of choice of the Minority Community got less than 50% of the vote in Virginia Beach. Tr. 312:16-20, Tr. 313:11-13.

17. Members from the Minority Community have cooperated numerous times to change the City's method of elections and remedy the dilution of their votes under the at-large scheme. Specifically, in 2001, "a coalition of African Americans, Hispanics, Asians, and Indians advocated for the City to adopt single-member districts." *See* P-0145 at 15; *see also,* P-0145 at 10-11. The advocates who led the coalition included, Ron Villanueva, a Filipino-American and former Council member who testified as the President of the Filipino-American Community of Tidewater and Chairman of the Filipino-American Community Action Group. P-0145 at 15-16. The Coalition also included Nonato Abrajano, a former leader of the City's Filipino-American community, who was a part of the coalition on behalf of the National Federation of Filipino-American Associations (NaFFAA) who urged the City Council to adopt single-member districts to help ensure "equal representation." Tr. 761:25-762:24; P-0145 at 12-13. According to Mr. Abrajano, the NaFFAA chapter in Hampton Roads has never changed its support for district elections. Tr. 762:15-24.

18. To better advocate for the City Council to adopt an alternative method of electing City Council members, the Minority Community formally created the Virginia Beach Concerned Citizens Coalition ("VBCCC"). Tr. 489:6-490:9.

19. In 2003, the Minority Community organized two protests against the City Treasurer's racially derogatory remarks about the Minority Community. The Minority Community joined

those protests because they were all offended by those remarks. Tr. 50:11-23; Tr. 53:6-9; 57:8-13.

20. In 2011, the Chairman, Andrew Jackson, of the Virginia Beach African American Leadership Forum repeatedly requested that the City Council change its method of electing Councilmembers because the present method "impedes equal representation." Tr. 490:18-491:4; P-0210 at 2-3. Chairman Jackson also presented at least three 10-district plans to the City Council in 2011, including one where the Minority Community was a majority of the VAP in at least one district. Tr. 493:9-494:1. DTX011 at 285, 289, 294. In furtherance of this effort, the Virginia Beach Chapter of the National Association for the Advancement of Colored People ("NAACP") and the VBCCC also proposed illustrative redistricting maps. DTX010 at 34 ¶ 32b, g, l. Mr. Jackson obtained help from Mr. Kimball Brace, whom the City hired for redistricting in 2011, to help draw these maps. Tr. 563:3-8.

21. Current Councilmember Moss also asked the City to support the NAACP/VBCCC's map and "a district (or ward) system for local elections because the current system is flawed" and "the at-large voting system dilutes the voting strength of voters." DTX011 at 158.

22. The City Council rejected all the proposals by the Minority Community. DTX011 at 222-226.2

23. In 2011, the City Council attempted to create a Majority-Minority "district" in its at-large system. DTX162 at 57:6-58:22. Mayor Dyer explained that the Council's motivation behind the creation of this district was "to see equal representation," DTX156 (Der Dep.) at 39:2-16. However, all city council members were still elected at-large.

24. In 1995, the City created the Minority Business Council ("MBC") to support "minority business owners" without limiting that support to any particular racial or ethnic group.

DTX157 (Rouse Dep.) at 107:2-9 (describing the purpose of the MBC). The MBC was created because of the shared history of economic and social discrimination in the Minority Community. The MBC served "[t]he Hispanics, the Asians, the African-Americans [because they] all had inequities. They all had very, very low percentages of the kinds of contracts that could be gotten." Tr. 451:19-452:11.

25. The City Council has recognized the importance of increasing minority representation. DTX157 (Rouse Dep.) at 79:18–20.

26. Housing and transportation are long-term common interests of the Minority Community, composed of Hispanic, Black, and Asian communities. Tr. 47:12-48:6. The Minority Community has also jointly supported light rail while whites opposed it. Tr. 454:10-455:1. Additionally, Minority Community members have shared a common desire for (1) district voting and (2) a desire for a disparity study. DTX163 (Abbott Dep.) at 136:15-137:12.

27. In 2016, Dr. Ross-Hammond, a former Black City Councilmember, supported expansion of light rai through the City and this issue "played a major part" in her re-election loss in 2016. Tr. 728:5-16. Dr. Ross-Hammond's opponent, Jessica Abbott, opposed the light rail. DTX163 (Abbott Dep.) at 162:1-3. Polling data showed that support for the light rail was split along racial lines like that of the Presidential election in 2016. Tr. 312:10-20; Tr. 998:20-25.

28. The Minority Community also shares the common interest in ensuring an accurate 2020 Census count. See Tr. 763:25-764:5.

29. In 2004, higher ratios of registered voters per machine were associated with lower levels of voter participation in Norfolk, Richmond, and Virginia Beach, indicating that the disparate treatment likely deterred people from voting. The magnitude of the decline in voter

participation in Virginia Beach was substantial: from high to low, on the order of 5 to 10 percent. P-0078 at 17.

30. In Virginia Beach, minorities who are also immigrants face adverse treatment unlike that of their white counterparts. For example, immigrant Latinos face housing discrimination because of generalized hostility towards immigrants. P-0078 at 11.

31. On March 19, 2019, the Governor of Virginia vetoed Senate Bill 1156, which would have barred any "locality [from adopting] any ordinance, procedure, or policy intended to restrict the enforcement of federal immigration laws."[3] All but one legislator representing Virginia Beach voted for the bill.

32. In 2019, the Virginia General Assembly passed House Bill 2270 which required correctional facility officials to notify the U.S. Immigration Customs and Enforcement when immigrants were being released from custody. The Governor vetoed the bill. P-0078 at 11.

33. Between 2008-2018, the Minority Community elected a candidate of choice in only one of the seven (14%) elections. Tr. 316:21-317:1; P-0077 at 34.

34. Most recently, the Minority Community has recently collaborated to remove Confederate monuments and to march against racial injustice. Tr. 225:2-16.

**E. History and Present Use of Overt and Subtle Racial Appeals in Political Campaigns.**

1. In 1998, after becoming the second Black Councilmember ever elected four years prior, Louisa Strayhorn faced racial harassment in her unsuccessful reelection bid for the City Council. P-0078 at 42; Tr. 447:5-10.

---

[3] *SB 1156 Sanctuary policies; policies prohibited that restrict enforcement of federal immigration laws*, VIRGINIA'S LEGISLATIVE INFORMATION SYSTEM, https://lis.virginia.gov/cgi-bin/legp604.exe?191+sum+SB1156

2.  In 2003, the Minority Community organized two protests because of the City Treasurer's racially derogatory remarks about the Minority Community. Tr. 50:11-23; Tr. 53:6-9; 57:8-13

3.  In 2008, a flyer distributed in Black neighborhoods in the City showed white Republican Virginia Beach mayoral candidate Will Sessoms with a smiling Barack Obama, without the legally required attribution (*e.g.*, "paid for by …"). P-0082 at 33, 34. A second flyer circulated in the 2008 mayoral race, also without the legally required attribution, purported to represent "African Americans for Change." It claimed that Will Sessoms "will do more in his first term as mayor to contract with African Americans than the current mayor has done in twenty years." P-0082 at 33, 35.

4.  In 2017, a political campaign ad for Del. Rocky Holcomb (R-85 Virginia Beach) claimed that his Democratic opponent wanted to reinstate parole in Virginia "and let rapists out of jail early." The ad shows a dark hand over the mouth of a little girl who appears to be white. P-0078 at 44.

5.  In 2018, Friends of the Elephant, a Political Action Committee, handed out sample ballots at one or more polling places with recommended candidates for office. These sample ballots were color coded, with one color for Black voters and another color for white voters. Aaron Rouse, a Black candidate for City Council, was included on sample ballots handed to Black voters, but not on the ones handed to white voters. DTX175 (Wood Dep.) at 76:10-77:13.

6.  In 2019, Shannon Kane, a white Virginia Beach City Councilmember from 2014-2019, challenged Del. Kelly Fowler, who is of both Mexican and Filipino descent. Kane's campaign sent a flyer with a photoshopped image of Fowler next to MS-13 gang members.

The flyer stated: "Kelly Fowler. Good for illegal immigrants. Bad for us." P-0419. Kane did not apologize to Fowler. Tr. 234:23-235:23; Tr. 257:24-258:1.

**F. History of Minority Community Elected to Public Office in the City**

1. Since 1963, only one member of the Minority Community—Tina E. Sinnen, the current Filipina Circuit Court Clerk—has ever been elected to any of the City's five constitutional offices. P-0078 at 45.

2. Only one of eleven members of the elected School Board, a Black woman named Sharon R. Felton, is a minority. A second Black woman, Jessica L. Owens, was appointed to the School Board in 2019, while this lawsuit was pending. P-0078 at 45.

3. In 2018, after the lawsuit was filed, two Black candidates, Aaron Rouse and Sabrina Wooten, were elected to City Council in 2018. White voters' support for Rouse's candidacy was 15.4 percentage points, which is 179% higher than their average support for the five other Black candidates who ran for at-large seats since 2008. Wooten was the only Black candidate for City Council in Virginia Beach since 2008 to win a majority of the white vote. P-0078 at 45-49. In 2018, Wooten won the white vote in all precincts, for the first time in the City's electoral history.

4. No Black candidates other than Rouse and Wooten have garnered substantial contributions from white donors. All five major white donors in City Council elections donated to both Rouse and Wooten and all in the amount of $1,000 or more. No other candidate garnered contributions from all five major donors in 2018. Prior to 2018, none of Rouse's or Wooten's top white donors had ever contributed to a non-incumbent Black candidate. P-0082 at 39, 55.

**G. The City's Response to the Particularized Needs of the Minority Community**

1. Council members' phone numbers are posted to the City's website and regularly given out by City Clerk's office. Tr. 778:18–779:7 (Barnes). Agendas are publicly available through distribution lists and on the City's website. Tr. 780:7–784:7. The City appoints personnel to handle citizen concerns. Tr. 784:10–21. Members of the public can speak at many council meetings, Tr. 785:8–12; Tr. 787:12–788:8. City Councilmembers hold townhall meetings throughout the City to engage and inform residents of City business. DTX156 at 20:10–21:16 (Dyer).

2. The Human Rights Commission appears at City Council meetings and also communicates through a liaison member. Tr. 789:9–21.

3. The African American Roundtable appears at Council meetings, Tr. 789:22–790:5, as does the Interdenominational Ministers Conference, Tr. 790:6–16.

4. The Something in the Water Festival, first held in April 2019, was created by Pharrell Williams, a well-known African-American artist and producer who is a native of Virginia Beach, and supported by the City Council—including through a $250,000 sponsorship—and the City Manager to provide programming for Virginia Beach visitors during College Beach Weekend. Tr. 459:14–461:24, Tr. 473:11–474:24 (Strayhorn); DTX157 at 112:10–17.

5. In 2016, the City Council unanimously supported the African American Cultural Center, at the request of the Black community, Tr. 95:6–10 (Allen); Tr. 733:21–736:10 (Ross-Hammond), and donated land valued at $1.7 million, Tr. 94:25–95:1 (Allen); Tr. 736:11–22 (Ross-Hammond). The City Council unanimously granted the land tax-exempt status. Tr. 736:23–737:9.

25

6. In 1995, the City Council established the Minority Business Council to improve minority participation in contracting. Tr. 398:12–23 (Wooten); Tr. 464:16–465:3 (Strayhorn); Tr. 689:5–15 (Miles). The Minority Business Council provides tools and information to small, women, and minority-owned ("SWaM") businesses to be competitive in pursing contracts with the City. Tr. 686:16–689:4. The City provides support staff to the Minority Business Council, utilizes the database of SWaM firms to recruit minority businesses to bid on city contract opportunities, and holds contractors accountable under a SWaM utilization requirement. Tr. 690:21–693:14, Tr. 694:24–695:19. The Minority Business Council gives the Council annual briefings and communicates to it through a liaison member. Tr. 788:9–15, Tr. 788:23–789:8 (Barnes).

7. Around 2016, the City supported Dr. Ross-Hammond's efforts with resources and staff to start up an annual workshop for SWaM businesses, and to secure $50,000 from the City for a partnership with Hampton University to benefit these businesses. Tr. 730:21–733:6 (Ross-Hammond).

8. In 2008, the City set an aspirational goal of 10 percent for minority participation in city contracts overall. However, the City has failed to reach this goal. P-0277 at 4, 22; P-0429; Tr. 833:11-16 (Questioning from the Court); Tr. 845:9-846:21 (Adams testimony for 2008 to 2016 data).; Tr. 855:2-14 (Adams testimony for 2017-2018 data); Tr. 857:6-14 (Adams testimony for 2019 data).

9. The Minority Community lobbied for over nine years to obtain a disparity study of city contracts. Tr. 498:10-16. The Minority Business Council also began advocating for a disparity study in 2011. Tr. 452:12-453:6 (Strayhorn testimony).

10. In 2016, a Black former-NFL player and Virginia Beach resident claimed that the City had turned him down for multiple projects at least in part because of his race. He also began to publicly call for a disparity study and offered to cover half its cost. P-0078 at 61; Tr. 384:5–385:11. In 2017, the Minority Business Council voted to reaffirm its 2011 request that the City Council conduct a disparity study. Tr. 399:6-25. In 2017, leaders of the Minority Community organized the Faith, Freedom and Justice March to call for a disparity study. Tr. 385:16-20; Tr. 224:15-225:1; Tr. 58:1-59:1.

11. In July 2017, the Virginia Beach City Council authorized a disparity study of city contracts ("the Disparity Study"), ECF No. 190 at ¶ 43. The Disparity Study costing $475,000 and the City accepted the former-NFL player's offer to pay half the costs of the study. Tr. 405:24–406:3, Tr. 400:1–9 (Wooten).

12. In January 2019, the City released the results of the Study. The study computed a "Disparity Index" measuring the difference between the availability of minority-owned businesses for contracts and their actual participation. A disparity index level of 80 or below "indicates a substantial disparity." P-0078 at 61; P-0298.

13. The results showed a substantial disparity in the participation of minority-owned businesses in contracts that the City awarded during the study period. P-0298 at 13, 18.

14. The Disparity Study showed that the City achieved its 10% minority contracting goal over a 5-year period, Tr. 813:16–814:4, Tr. 815:8–17 (Adams). The Disparity Study also showed that the City had overutilized Asian-American owned businesses, but underutilized other minority owned businesses, Tr. 814:12–815:1; Tr. 816:8–16; Tr. 834:19–835:15, and that the appropriate aggregate minority owned business contacting goal is 12%, Tr. 814:3–17.

15. The Disparity Study showed that Black owned businesses had the largest eligibility of share of city contracts at 8.1 percent, but received only 4.5 percent, a disparity index of 56, well below the threshold of 80. P-0078 at 61; P-0298. Hispanic-owned businesses had the second highest eligibility among minority-owned businesses at 2.7 percent, but received only 0.5 percent of city contracts, a disparity index of 20. P-0078 at 61; P-0298. Third, Asian-American owned businesses had an eligibility percentage of just 0.8 percent, and received 5.6 percent of city contracts, for a disparity index of 700. P-0078 at 61; P-0298. Asian-American owned businesses accounted for just seven percent of eligible business owned by members of the three minority groups but accounted for 53 percent of the contracts that awarded to minority businesses. However, these contracts were not spread among the community; 86 percent of the total dollars went to a single Asian-American owned business. P-0298 at 74; Tr. 833:24-834:15 (Adams testimony).

16. The Disparity Study identified numerous deficiencies in City policies to help achieve greater participation for minority-owned businesses. P-0078 at 61. The Disparity Study recommended that Virginia Beach create an office dedicated to implementing the City's Small, Women, and Minority owned businesses (SWaM) program. P-0298 at 97-98; Tr. 389:15-22.

17. In 2019, after the lawsuit was filed, the City Council approved a $30,000 budget item to monitor progress in minority contracting. Tr. 407:5–8 (Wooten). The City unanimously approved Ms. Wooten's proposal of increasing the City's minority contracting goal from 10% to 12%. Tr. 408:3–13. The City also approved Ms. Wooten's request to implement the Disparity Study's recommendation to hire an additional staff member to work in the SWaM office. Tr. 389:15–390:17. The City Council unanimously adopted a race-conscious remedial

program called "Project Goals" in June 2020 to address the concerns and recommendations of the Disparity Study. Tr. 408:14–409:12. The City Council unanimously adopted a Sheltered Bidding Program in June 2020 to enhance opportunities for minority contractors. Tr. 409:13–410:12. The City Council unanimously adopted an Enhanced Subcontracting Program in June 2020. Tr. 410:13–412:1. The City debarred two contractors who failed to satisfy minority contracting obligations. Tr. 826:14–23 (Adams).

18. In 2006, a consent decree between the U.S. Justice Department and the City and its police force, noted: "the City has pursued policies and practices that discriminate against and deprive or tend to deprive African Americans and Hispanics of employment opportunities because of their race and national origin." P-0078 at 59-60. According to the 2010 Census, the Minority Community made up 32.6% of the adult population in the City, but, as of 2015, only 15.5% of the City's police force. Specifically, the force was only 9.4% Black (compared to 18.9% of the adult population), 3.3% of Hispanic (compared to 5.6% of the adult population), and 2.2% Asian (compared to 7.2% of the adult population). P-0078 at 65-67.

19. There is a documented history of discrimination and neglect by the City, experienced by the Burton Station Community. The Burton Station community is an historically African American community in Virginia Beach, who reside next to the airport. The Burton Station community has historically been "vocal regarding their lack of – their feelings on a lack of resources in the past that have been provided by the City." Tr. 867:19-23. For decades, the Burton Station Community lacked basic sewer and water infrastructure.[4] The Community has advocated for decades for the City to develop its infrastructure. The City has only started to work on the sewer and water project for Burton Station in the past five years. Tr. 867:1-8.

_____

[4] The Court takes judicial notice of this fact.

29

20. There are no identified white areas or neighborhoods in the City that were neglected in terms of basic needs such as adequate water supply and sewer services.

## V.   CONCLUSIONS OF LAW

### A. Voter Dilution Claims

The Fifteenth Amendment provides that: "The right of citizens of the United States to vote shall not be denied or abridged by the United States or by any State on account of race, color, or previous condition of servitude." U.S. Const., Amdt. 15, § 1. The most common type of political subdivision in the country is the single member district, a district drawn to enable the voters residing there to elect one representative to the legislative body. Multi-member districts are one means of meeting the Supreme Court's "one person, one vote" standard, particularly in large or heavily populated districts. *See Reynolds v. Sims*, 377 U.S. 533, at 558 (1964) (holding that "'[t]he conception of political equality from the Declaration of Independence, to Lincoln's Gettysburg Address, to the Fifteenth, Seventeenth, and Nineteenth Amendments can mean only one thing—one person, one vote.'") (citing *Gray v. Sanders*, 372 U.S. 368, at 381 (1963)). However, since the party able to control 51 percent of the votes will win 100 percent of the seats in multi-member districts, these districts and at-large elections have a long history of use as vehicles for diluting the votes of minority populations.[5]

As detailed below, plaintiffs "asserting § 2 liability must show by a preponderance of the evidence that the minority population in the potential election district is greater than 50 percent" but that their vote is diluted based on race. *Bartlett v. Strickland,* 556 U.S. 1, at 19–20 (2009).

---

[5] *See Ex Parte Yarbrough*, 100 U.S. 651, 660-661 (1884) (holding that multi-member districts give "an undue preponderance of power to the political party which had majority votes in the State, however small....")

## B. The Voting Rights Act 1982 Amendments and Senate Factors

As amended in 1982, § 2(a) of the Voting Rights Act of 1965 ("VRA") prohibits in part any state or political subdivision from imposing or applying "any standard, practice, or procedure" which "results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color[.]" 42 U.S.C. § 1973(a). In 1982, Congress clarified that a violation of § 2(a) occurs, if, based upon the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) of this section in that its members have *less opportunity* than other members of the electorate to participate in the political process and *to elect representatives of their choice.* 42 U.S.C. § 1973(b) (emphasis added).[6] The 1982 Congressional Amendments made clear that certain practices and procedures that *result* in the denial or abridgment of the right to vote are forbidden even though the absence of proof of discriminatory intent protects them from constitutional challenge. Section 2 requires proof only of a discriminatory result, not of discriminatory intent. *Chisom v. Roemer,* 501 U.S. 380, at 394 (1991)[7]. Moreover, the 1982 Amendments specifically deny "a right to have members of a protected class elected in numbers equal to their proportion in the population," but provide for purposes of establishing a § 2 violation, courts may consider as one circumstance the extent to which "members of a protected class have been elected to office in the State or political

---

[6] *See* S. REP. No. 97-417, at 16 (1982), reprinted in 1982 U.S.C.C.A.N. 177, at 193) ("The Senate Committee has concluded that this intent test places an unacceptably difficult burden on plaintiffs. It diverts the judicial inquiry from the crucial question of whether minorities have equal access to the electoral process to a historical question of individual motives. In our view, proof of discriminatory purpose should not be a prerequisite to establishing a violation of Section 2 of the Voting Rights Act. Therefore, the Committee has amended Section 2 to permit Plaintiffs to prove violations by showing that Minority voters were denied an equal chance to participate in the political process, i.e. by meeting the pre-*Bolden* results test.")

[7] In *Chisom,* the Supreme Court explained that "[u]nder the amended statute, proof of intent is no longer required to prove a Section 2 violation. Now plaintiffs can prevail under Section 2 by demonstrating that a challenged election practice has resulted in the denial or abridgment of the right to vote based on color or race." *Chisom,* 501 U.S. at 394, 111 S.Ct. 2354.

subdivision...."[8] Thus, the essence of a § 2 results-claim is that an "electoral law, practice, or structure interacts with social and historical conditions to cause an inequality in the opportunities enjoyed by [minority] and white voters to elect their preferred representatives." *Thornburg v. Gingles,* 478 U.S. 30, at 47 (1986). In all, the Committee outlined the factors, dependent upon the kind of rule, practice, or procedure called into question, that courts may consider in determining that plaintiffs establish a § 2 violation. The typical factors relevant to the "totality of the circumstances" inquiry include:

1) the extent of any history of official discrimination in the state or political subdivision that touched the rights of the members of the Minority group to register, to vote, or otherwise to participate in the democratic process;

2) the extent to which voting in the elections of the state or political subdivision is racially polarized

3) the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group;

4) whether minority candidates have been denied access to any candidate-slating process;

5) the extent to which minorities in the state or political subdivision bear the effects of discrimination in education, employment, and health, which hinder their ability to participate effectively in the political process;

6) whether political campaigns have been characterized by overt or subtle racial appeals; and

---

[8] S. REP. 97-417, 239, 1982 U.S.C.C.A.N. 177, 410.

 7) the extent to which minority group members have been elected to public office. S. REP. 97-417, 28-29, 1982 U.S.C.C.A.N. 177, 206-07.

Additional factors that the Committee recognized include:

 8) whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of members of the minority group[9];

 9) whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous.[10]

*Id.* The Committee also recognized that while these nine factors may be probative of voter dilution, the Court may consider other facts. Moreover, "…there is no requirement that any particular number of factors be proven, or that a majority of them point one way or the other." *Id.* In other words, the Court has broad discretion in examining factors it deems relevant to the inquiry of whether the political subdivision's electoral system, socio-political and economic history, and/or political governance system result in voter dilution of minority groups.

## C. The *Gingles* Factors

 In *Thornburg v. Gingles,* 478 U.S. 30 (1986), the Supreme Court interpreted § 2 of the amended Voting Rights Act as it applied to a challenge to multi-member districts in which candidates were elected at large. Most notably, the Supreme Court has found that at-large voting schemes can "minimize or cancel out the voting strength of racial [minorities in] the voting

---

[9] *See* S. REP. 97-417, 239, 1982 U.S.C.C.A.N. 177, 410 ("Unresponsiveness is not an essential part of plaintiff's case. Therefore, Defendant's proof of some responsiveness would not negate Plaintiff's showing by other, more objective factors enumerate here that minority voters nevertheless were shut out of equal access to the political process. The amendment rejects the ruling in *Loge v. Buxton* and companion cases that unresponsiveness is a requisite element, 639 F. 2D 1358, 1375 (5th Cir. 1981). However, should the plaintiff choose to offer evidence of unresponsiveness, then the defendant could offer rebuttal evidence of its responsiveness.").

[10] *See* S. REP. 97-417, 239, 1982 U.S.C.C.A.N. 177, 410 ("If the procedure markedly departs from past practices or from practices elsewhere in the jurisdiction, that bears on the fairness of its impact. But even a consistently applied practice premised on a racially neutral policy would not negate a plaintiff's showing through other factors that the challenged practice denies minorities fair access to the process.")

population." *Gingles*, 478 U.S. at 47 (alteration in original) (citation omitted); *Johnson v. De Grandy*, 512 U.S. 997, 1018 (1994); *Collins II*, 883 F.2d at 1236 (at-large system and staggered terms can dilute minority votes). While the Court in *Gingles* expressly limited the three-factor test to the facts of its case, the Court also stated:

> [w]e have no occasion to consider whether § 2 permits, and if it does, what standards should pertain to, a claim brought by a minority group, that is not sufficiently large and compact to constitute a majority in a single-member district, alleging that the use of a multimember district impairs its ability *to influence* elections [or whether those standards] ... are fully pertinent to other sorts of vote dilution claims, such as a claim alleging that the splitting of a large and geographically cohesive minority between two or more multimember or single-member districts resulted in the dilution of the minority vote.

*Gingles,* 478 U.S. 30, at 46 fn.12 (1986).

Rejecting the claim that an at-large election scheme is *per se* violative of the Voting Rights Act, *id.* at 48, the Court established three preconditions to proving that such a voting system dilutes minority group voting strength sufficiently to violate the Act. First, the minority group must be able to demonstrate that it is sufficiently large and geographically compact to constitute a majority in a single-member district. Second, the minority group must be able to show that it is politically cohesive. Third, the minority must be able to demonstrate that the white majority votes sufficiently as a bloc to enable it ... usually to defeat the minority's preferred candidate. 478 U.S. at 50–51. If these preconditions are met, the court must then determine under the "totality of circumstances" whether there has been a violation of Section 2. *See  De Grandy,* at 1018; *Collins v. City of Norfolk, Va.,* 816 F.2d 932, at 938 (4th Cir. 1987) ("*Collins I*") ("[The] ultimate determination [of vote dilution under the Voting Rights Act] still must be made on the basis of the 'totality of the circumstances.'"); *see also, Chisom v. Roemer*, 501 U.S. 380, 383–84 (1991) (holding that state judicial elections are included within ambit of statute which prohibits

imposition of voting qualification or prerequisite in manner resulting in denial or abridgement of right to vote on account of race or color.).

The Court must also perform a "totality of circumstances" inquiry. The Supreme Court has looked to the Senate Report accompanying the 1982 extension of the Voting Rights Act for guidance as to the "nature of § 2 violations and [ ] the proof required to establish these violations." *Gingles,* 478 U.S. at 43. The *Gingles* Court expressly limited the three-factor test to the facts stated in the claim address in that case—a minority group sufficiently large and geographically compact to constitute a majority in a single member district alleging that the selection of a multi-member electoral scheme impaired their ability to elect representatives of their choice.

## D. The Deferential Fourth Factor

In *Johnson v. De Grandy*, 512 U.S. 997 (1994), the Court added a deferential fourth factor to the *Gingles* analysis in its holding that "the three *Gingles* factors may not be isolated as sufficient, standing alone, to prove dilution in every multimember [or single-member] district challenge." *Id.* at 1012. The original three factors provided structure to section 2's totality-of-the circumstances requirement, *Id.* at 1110, but "cannot be applied mechanically and without regard to the nature of the claim." *Id.* at 1007 (quoting *Voinovich v. Quilter*, 507 U.S. 146, 158 (1993)). Specifically, the *De Grandy* Court held that "evidence indicating that minority voters form voting majorities in a number of voting districts roughly proportional to their respective share of the appropriate population is relevant, though not dispositive, of whether minority voters have less opportunity than other members of the electorate to elect representatives of their choice." *N.A.A.C.P., Inc. v. City of Columbia, S.C.*, 33 F.3d 52 (4th Cir. 1994) (citing *De Grandy,* 512 U.S. 997, at 1000 ("no violation of § 2 can be found here, where, in spite of continuing

discrimination and racial bloc voting, minority voters form effective voting majorities in a number of districts roughly proportional to the minority voters' respective shares in the voting-age population.")). Thus, the initial three factors are a prerequisite but are not necessarily dispositive. *Id.* at 1012; *see also*, *Chisom v. Roemer* 501 U.S. 380, at 403 (1991) (holding that state judicial elections fell within the scope of § 2 of the VRA because Section 2 protections under the VRA must be liberally construed). In *Chisom,* the Court also recognized that Congress's purpose for passing the VRA was "rid[ding] the country of racial discrimination in voting." *Id.* (quoting *South Carolina v. Katzenbach*, 383 U.S. 301, 315 (1966)). Accordingly, the VRA was "enacted to protect voting rights that are not adequately protected by the Constitution itself." *Id.* As a result, the Court concluded that § 2 must be "interpreted in a manner that provides 'the broadest possible scope' in combatting racial discrimination." *Id.* (quoting *Allen v. State Bd. of Elections,* 393 U.S. 544, 567 (1969)). The Court recognized the difficulties of this broad, fact-specific inquiry but determined that such difficulties "cannot justify a judicially created limitation on the coverage of the broadly worded statute, as enacted and amended by Congress." *Id.*

Therefore, in a constitutional *racial vote dilution* case, the plaintiff must show that the State has uses or maintains devices or procedures which, regardless of intent, cause minority citizens to have less opportunity than other citizens to participate in the political processes and to elect legislators of their choice. This dilutes the minority voter's ability to exercise the "full and effective" right to vote. To make this determination, the Court must examine the totality of the circumstances.

### E. Minority Coalitions May Bring Aggregated Section 2 Claims

Two or more politically cohesive minority groups can bring a claim as a coalition under Section 2. A minority coalition group exists where more than one ethnic, cultural, language, and/or racial minority group combine to form a numerical majority of the eligible voting population. Minority coalition groups are distinct from "cross-over" groups, where a protected minority constitutes a numerical majority of the electorate only when combined with members of the white majority who vote for the minority's preferred candidate. *See Bartlett v. Strickland*, 556 U.S. 1, 25–26 (2009) (Explicitly refusing to extend Section 2 protections to crossover voting districts.); *see also, Gingles,* 478 U.S. at 56 ("Crossover" voters are persons outside a minority group who support the minority group's candidate in an election.); *see also, Hall v. Virginia*, 385 F.3d 421, 431 (4th Cir. 2004) (holding that Black and white voters could not bring a claim under the VRA, using the crossover theory, because whites were not a protected minority group.)

Both United States Supreme Court[11] and the United States Court of Appeals for the Fourth Circuit ("Fourth Circuit") have yet to rule on the question of whether a coalition of protected minority groups may bring an aggregated § 2 claim under the VRA. However, sister circuit courts have either assumed or explicitly held that § 2 allows minority groups to bring claims as a coalition.

The Court finds that racial coalitions, claiming voter dilution based on race, can bring a § 2 claim because it is consistent with the language and purpose of the VRA as well as Supreme Court precedent, namely *Gingles*. For distinct non-white minority groups to bring a § 2 claim

---

[11] The Supreme Court has declined to reach this issue, *see Bartlett v. Strickland*, 556 U.S. 1, 13–14 (2009), but previously assumed without deciding that a minority voter coalition could satisfy Section 2. In *Growe v. Emison*, 507 U.S. 25, at 41 (1993), the Court reviewed a ruling from the District of Minnesota assuming that the district court was allowed to aggregate more than one distinct minority group. The Supreme Court determined that the presence of a coalition group made "proof of minority political cohesion . . . all the more essential." However, explicitly stated that it would not decide the validity of coalition claims under section 2 in this case.

together, they must show that they are politically cohesive. Plaintiffs must provide evidence that the distinct minority communities have a history of working, voting, advocating, or organizing together around similar political, social, economic, or legal issues in the community. *See League of United Latin American Citizens, Council No. 4386 v. Midland Indep.* Sch. Dist.,(*LULAC I*), 812 F.2d 1494, at 1500–01 (5th Cir. 1987), *reh'g granted*, 818 F.2d 350 (5th Cir. 1987), *and vacated on other grounds*, 829 F.2d 546 (5th Cir. 1987) ("The bringing of this lawsuit by Blacks and Hispanics is symbolic of their realization that . . . they have common social, economic, and political interests which converge and make them a cohesive political group."); *see also, Concerned Citizens of Hardee Cty. v. Hardee Cty. Bd. of Comm'rs*, 906 F.2d 524, 526 (11th Cir. 1990) (holding that "[t]wo minority groups . . . may be a single section 2 minority if they can establish that they behave in a politically cohesive manner.") (first citing *Campos v. City of Baytown*, 840 F.2d 1240, 1244 (5th Cir. 1988); then citing *LULAC I*.)).

## VI.    DISCUSSION

### A. Minority Community May Bring Section 2 Claims

As an initial matter the Court previously denied the Defendants' Motion to Dismiss challenging, *inter alia*, as a matter of standing, the Plaintiffs ability to bring an aggregated § 2 claim on behalf of Hispanic, Black, and Asian voters in Virginia Beach. *See* ECF No. 168 at 13-14. As a purely legal question, the Court recognized that Plaintiffs could satisfy the evidentiary burden of the three *Gingles* preconditions, *see* 478 U.S. at 51, by showing that the minority coalition of Hispanic, Black, and Asian voters in Virginia Beach are politically cohesive. ECF No. 156; *See Nat'l Ass'n for Advancement of Colored People, Spring Valley Branch v. E. Ramapo Cent. Sch. Dist.*, No. 17-CV-8943 (CS), 2020 WL 2731163, at *4 (S.D.N.Y. May 25, 2020) ("combining minority groups is permissible where the statistical evidence is that the

38

minority groups vote cohesively for the same candidates."). However, the Court clarified that this *Gingles* precondition is an evidentiary matter separate from whether Plaintiffs have prudential standing to bring a VRA claim in the first place. Notably, the Court made a critical distinction in that "Plaintiffs who identify with one minority group may meet its *Gingles* preconditions by putting on evidence of a minority coalition, without the threat of losing their own legal standing. Thus, because Plaintiffs are asserting their own legal rights and interests, Plaintiffs have prudential standing." ECF No. 168 at 14-15 (citing *Kumar v. Frisco Indep. Sch. Dist.*, No. 4:19-CV-00284, 2020 WL 4464502, at *10 (E.D. Tex. Aug. 4, 2020) (recognizing that "*Gingles* is not requiring a plaintiff to assert the rights of other unnamed parties, but rather requiring a plaintiff to offer evidence establishing a minority coalition to which he or she belongs").

Now, the Court will further elaborate on the questions of whether minorities may aggregate their § 2 claims in the Fourth Circuit and, if so, how a coalition of minorities may satisfy the *Gingles* preconditions. Based upon sister jurisdictions consistent decades-long interpretation of § 2 claims, the Court finds that (1) distinct minorities are allowed to aggregate voter dilution § 2 claims as a class of citizens; (2) in order for a coalition of minorities to bring forth a cognizable § 2 claim as a class of citizens, they must satisfy the *Gingles* factor of showing they are political cohesive as defined by case law; and (3) since the Fourth Circuit has not explicitly denied a coalition of minorities from bringing § 2 claims, Plaintiffs in the instant matter may do so.

1. Sister Jurisdiction's Recognition of Minority Coalition Claims

In 1987, the Fifth Circuit, in *League of United Latin American Citizens, Council No. 4386 v. Midland Indep. Sch. Dist.*, (*LULAC I*), 812 F.2d 1494 (5th Cir. 1987), *reh'g granted*, 818 F.2d 350 (5th Cir. 1987), *and vacated on other grounds*, 829 F.2d 546 (5th Cir. 1987), was the first

circuit court to explicitly accept minority coalitions for Section 2 claims. In *LULAC I*, a coalition of Black and Hispanic voters brought a Section 2 claim alleging that an at-large voting scheme to elect a school board diluted their votes. *See LULAC I* at 1495 (5th Cir. 1987). The District Court held that the at-large voting scheme violated Section 2 and ordered that the district be divided into seven single-member voting districts. *Id.* The case was appealed and remanded so that the district court consider the *Gingles* preconditions. On remand, the district court applied the *Gingles* factors and again found that both minority groups were subject to a history of "oppressive discrimination" and that such discrimination impacted their "right to vote and effectively participate in the political process." *See id.* (quoting *League of United Am. Citizens, Council No. 4836 v. Midland Indep. Sch. Dist.*, 648 F. Supp. 596, 600 (W.D. Tex. 1986)). The district court also conducted a totality-of-the-circumstances review, using the Senate Factors. *Id.* at 1497–98 (The Court reasoned that "[a]lthough there are two minority groups ... both have suffered the same adverse social and economic effects Justice Brennan described in discussing the [B]lack minority in *Gingles*."). On a second appeal, the Fifth Circuit also applied the *Gingles* factors. To satisfy the first factor, the Fifth Circuit accepted the trial judge's finding that "Blacks and Hispanics live predominately in a geographically discrete area." *See id.* at 1500. The Fifth Circuit identified three voting precincts that comprised over 90 percent of the district's Black population and over 70 percent of the Hispanic population. *See id.* One of these precincts had a population that was roughly 45 percent Black and 25 percent Hispanic, for a total minority population of roughly 70 percent. *See id.* This "overwhelm[ing]" minority presence was sufficient to establish "a geographically compact group capable of carrying a district." *See id.* The court then separated the second political cohesion factor into two questions: (1) whether each minority group was individually cohesive and (2) whether the two groups were cohesive

together. *See id.* Both questions were answered affirmatively. *See id.* at 1500–02. Notably, the court reasoned that it did not matter that "there [were] many cultural and ethnic differences between the two groups" because the "prejudice of the majority is not narrowly focused." *Id.* Instead, the key inquiry was that both groups had an undeniable history of discrimination by the white majority and common goals stemming from that history. *See id.* at 1500–01 ("The bringing of this lawsuit by Blacks and Hispanics is symbolic of their realization that . . . they have common social, economic, and political interests which converge and make them a cohesive political group."). In support of the court's factual finding that the groups were politically cohesive, the court found it persuasive that both racial groups used the same statistical methods used in *Gingles* to show that school board elections followed racial lines. *Id.* at 1501.[12]

The Fifth Circuit upheld this interpretation in 1988, twice in 1989, and again in 1993 but reiterated that plaintiffs had to factually show that the minorities in the minority coalition were politically cohesive. *See League of United American Citizens, Council No. 4434 v. Clements, (LULAC II),* 999 F.2d 831, at 864 (5th Cir. 1993) (The Court reaffirmed that "[i]f blacks and Hispanics vote cohesively, they are legally a single minority group. Nevertheless, we have treated the issue as a question of fact, allowing aggregation of different minority groups where the evidence suggests that they are politically cohesive, and we need not revisit this question here."); *Brewer v. Ham,* 876 F.2d 448, at 453 (5th Cir. 1989) (holding that while "minority groups may be aggregated for the purposes of asserting a Section 2 violation" plaintiffs had to show that they were politically cohesive.); *see id.* (referencing *Overton* to caution against

---

[12] In determining political cohesiveness of Blacks and Mexican-Americans, the district court acknowledged that "that Blacks and Mexican-Americans are racially and culturally distinct. However, it is also clear that the two groups share common experiences in past discriminatory practices. Whereas the two groups may not always have the same political goals, it is clear that the two groups have political goals that are inseparable." *See League of United Latin Am. Citizens, Council No. 4836 v. Midland Indep. Sch. Dist.,* 648 F. Supp. 596, 606 (W.D. Tex. 1986).

reaching conclusions about "inter-minority cohesion absent a diligent inquiry into the political dynamics of the particular community."); *Overton v. City of Austin*, 871 F.2d 529 (5th Cir. 1989) (finding that while minority groups could bring a Section 2 claim, plaintiffs' case was dismissed because they could not prove that Blacks and Mexican Americans could not prove that they were politically cohesive as a threshold matter.); *Campos v. City of Baytown*, 840 F.2d 1240 (5th Cir. 1988) (The court ultimately vacated and remanded, finding that the city's proposed remedial voting plan was insufficient.).

Notably, in *Campos,* in applying the first *Gingles* factor, the Fifth Circuit rejected that defendant's argument that, because a significant percentage of minorities lived outside the disputed district, the coalition failed to establish geographical compactness. *See Campos* at 1241. The Court clarified that the presence of a majority of minorities outside the disputed district was insignificant because it only mattered that the minorities *within* the disputed district constituted a majority of that particular district. *Id.* Regarding the second *Gingles* factor, the Fifth Circuit recognized that the dual purpose of identifying racially polarized voting in *Gingles* made it clear that "a minority group is politically cohesive if it votes together." *Id.* The Fifth Circuit's most notable deviation from *LULAC I* was its finding that a showing of political cohesion for each minority group individually was "too great [of,] if not impossible," a burden. *Id.* at 1245. Accordingly, the Fifth Circuit held that the political cohesion of the coalition group as a whole is sufficient for the *Gingles* test.

Similarly, the Eleventh Circuit held that two minority groups may aggregate so long as they are politically cohesive. *See Concerned Citizens of Hardee Cty. v. Hardee Cty. Bd. of Comm'rs*, 906 F.2d 524, 526 (11th Cir. 1990) (holding that "[t]wo minority groups . . . may be a single section 2 minority if they can establish that they behave in a politically cohesive manner.") (first

citing *Campos v. City of Baytown*, 840 F.2d 1240, 1244 (5th Cir. 1988); then citing *LULAC I*, 812 F.2d 1494, 1499–502 (5th Cir. 1987), *reh'g granted*, 818 F.2d 350 (5th Cir. 1987), *and vacated on other grounds*, 829 F.2d 546 (5th Cir. 1987)). In *Concerned Citizens*, Black and Hispanic plaintiffs brought a Section 2 claim alleging that an at-large voting system "unlawfully dilute[ed] the [group's] combined voting strength." *Id.* at 525. Ultimately, the "class failed to demonstrate that blacks and hispanics in county had ever voted together and offered little evidence that blacks and hispanics worked together and formed political coalitions." *Id.* at 527.

Since the Fifth and Eleventh Circuit explicitly recognized that minority groups could coalesce to bring Section 2 claims, if they can show they are politically cohesive, other circuits have followed. First, the Ninth Circuit in *Romero v. City of Pomona*, 883 F.2d 1418 (9th Cir. 1989) and again in *Badillo v. City of Stockton*, 956 F.2d 884 (9th Cir. 1992) heard voter dilution claims by a coalition of Black and Hispanic voters without questioning their right to aggregate. However, the *Badillo* court found insufficient evidence to show political cohesiveness. *See Badillo* at 891, *as amended* (Apr. 27, 1992) ("…plaintiffs must be able to show that minorities have in past voted cohesively for minorities and have potential to elect minority representatives."); *see id.* at 889-891 (The court recognized that the contested voting system embodied "many electoral devices and practices that have been readily identified as common means of diminishing minority voting strength." Regardless, the plaintiffs' claim failed because there was no requisite showing that Blacks and Hispanics were politically cohesive, "either when combined or when considered separately.").[13]

---

[13] Although numerous cases have refused to combine groups that were shown *not* to be politically cohesive, these courts have found that a coalition of minorities *could* form a class of citizens and bring a claim under Section 2 so long as there is sufficient evidence to show that they are politically cohesive. These courts have emphasized that the inquiry is case specific and that the District Court must make the determination. *See Romero v. City of Pomona*, 883 F.2d at 1426 (Blacks and Hispanics not cohesive); *Valladolid v. City of National City*, 976 F.2d 1293, 1296–97 (9th Cir.1992) (Anglos and minority class not cohesive); *Badillo v. City of Stockton*, 956 F.2d at 886 (Blacks and Hispanics not cohesive); *Brewer*, 876 F.2d at 448, 453–54 (5th

The Second Circuit has also allowed minority coalition claims in *Bridgeport Coalition for Fair Representation v. City of Bridgeport*, 26 F.3d 271 (2d Cir. 1994) but also recognized the circuit split on the issue.[14] In *Bridgeport,* the Second Circuit found that, with respect to the first *Gingles* factor, Black and Hispanic populations constituted a substantial share of the area's eligible voting population which made it possible to create two more minority-controlled districts. *See id.* at 275–76. The *Bridgeport* court then accepted "both testimonial and statistical evidence that African Americans and Hispanics . . . are politically cohesive" in a city plagued by "remarkably racially polarized" voting. *Id.* at 276. The court also found that there was undisputed evidence of white bloc voting because "politically influential whites have worked to" elect white candidates over Black candidates. *Id.*

2. The Sixth Circuit's Interpretation

While the Second, Fifth, Ninth, and Eleventh circuits have either assumed or explicitly accepted that minority groups can aggregate claims under Section 2, the Sixth Circuit has ruled otherwise.[15] In *Nixon v. Kent County,* 76 F.3d 1381, at 1389-91 (6th Cir. 1996), the court held that the "[p]lain language of Voting Rights Act did not authorize voting dilution claim

---

Cir.1989) (Hispanics, Blacks and Asians not cohesive); *Overton,* 871 F.2d at 536 (Blacks and Hispanics not cohesive); *Butts v. City of New York,* 614 F.Supp. 1527, 1546 (S.D.N.Y.), *rev'd as to violation,* 779 F.2d 141 (2d Cir.1985), *cert. denied,* 478 U.S. 1021, 106 S.Ct. 3335, 92 L.Ed.2d 740 (1986) (Blacks and Hispanics not cohesive); *Latino Political Action Committee v. City of Boston,* 609 F.Supp. 739, 746 (D.Mass.1985), *aff'd,* 784 F.2d 409 (1st Cir. 1986) (Latinos, Asians and Blacks not cohesive); *De Baca v. County of San Diego,* 794 F.Supp. 990, 998–1000 (S.D.Cal.1992) (Latinos, Asians and Blacks not cohesive).

[14] *See id.* at 572 n.5 ("The circuits are split as to whether different minority groups may be aggregated to establish a Section 2 claim.").

[15] The Court recognizes that the First, Third, and Seventh have not explicitly ruled on this question. The First Circuit has also not explicitly rejected aggregate claims. In 2003, the First Circuit found that "[w]hile the 'protected class' being discriminated against must be constituted of *a particular 'race or color,'*" the same was not required of the majority voting bloc. *See Metts v. Murphy,* 347 F.3d 346, 359 (1st Cir. 2003), *vacated on reh'g en banc,* 363 F.3d 8 (1st Cir. 2004). The Seventh Circuit, in *Frank v. Forest County,* 336 F.3d 570 (7th Cir. 2003), addressed a Section 2 claim brought by an Indian tribe who relied on a multiracial group consisting of tribe members and Blacks to satisfy *Gingles'* first requirement. *See id.* at 575. In addressing the coalition argument, Judge Richard A. Posner identified the circuit split and the Supreme Court's decision to reserve judgment. *See id.* Although Judge Posner did not explicitly reject the viability of minority aggregation, the court briefly acknowledged the "problematic character" of such claims and ultimately rejected the claim for lack of evidence of mutual interest. *See id.* at 575-576.

against county and county apportionment committee by coalition of two different minority groups which individually lacked sufficient members to state separate prima facie claims." The *Nixon* court reasoned that if Congress intended to extend protection to coalition groups, it would have invoked a plural protected "*classes* of citizens" instead of a singular protected "*class* of citizens" identified under the Act. *Id.* at 1386–87. The Sixth Circuit also rejected an argument that the purposes of the 1975 and 1982 VRA amendments condoned "a broad and boundless 'trend' to expand the Act to protect" minority coalitions. *Id.* at 1390. Notably, the *Nixon* court also reasoned that allowing minority aggregation would create an unsolvable "puzzle" for state legislatures that, "in good faith, seek to draw district lines according to the [VRA's] nebulous requirements." *Id.* at 1390–91. Accordingly, the court contended that permitting coalition claims would require eliminating the first *Gingles* factor. *Id.* Finally, permitting minority aggregation would run contrary to the law's purpose by providing "minority groups with a political advantage not . . . authorized by the constitutional and statutory underpinnings of [the VRA]." *Id.* at 1391–92 ("The Equal Protection Clause, the Fifteenth Amendment and the Voting Rights Act are aimed only at ensuring equal political opportunity: that every person's chance to form a majority is the same, regardless of race or ethnic origin.").

3.  The Fourth Circuit Has Not Directly Addressed Minority Coalition Claims

The Court finds that although the Fourth Circuit has denied crossover claims, it has not explicitly denied coalition claims between distinct racial/ethnic minorities if they show they are politically cohesive. Therefore, this Court finds that such claims are permissible. Critically, crossover claims are distinct from coalition claims because the latter involve protected minorities recognized under the VRA whereas the former does not. *See Barnett v. Chicago,* 556 U.S. 1, at 13 (7th Cir. 1998) (distinguishing between crossover claims and coalition claims and explaining

why crossover claims are analytically distinct and cannot be conflated with coalition claims). Notably, in *Hall v. Virginia,* 385 F.3d 421, at 430 (4th Cir. 2004), the Fourth Circuit held that crossover claims between Blacks and whites, a non-protected minority, "confuses the purpose of Section 2 [because] the objective of Section 2 is not to ensure that a candidate supported by minority voters can be elected in a district. Rather, it is to guarantee that a minority group will not be denied, on account of race, color, or language minority status, the ability 'to elect its candidate of choice on an equal basis with other voters.'") (quoting *Voinovich v. Quilter,* 507 U.S. 146, at 153 (1993).). However, the Fourth Circuit did not foreclose minority coalitions. Rather, the Fourth Circuit affirmed that "Section 2 is not violated unless minorities 'have less opportunity *than other members of the electorate* to ... elect representatives of their choice.'" *Id.* (citing 42 U.S.C. § 1973(b) (emphasis in original)). In dicta, the Fourth Circuit stated that "…any construction of Section 2 that authorizes the voter dilution claims of multiracial coalitions would transform the Voting Rights Act from a law that removes disadvantages based on race, into one that creates advantages for political coalitions that are not so defined." *Id.* at 431. However, the Fourth Circuit was concerned that the VRA would be used to protect non-cohesive political coalitions between distinct racial groups, notably with whites who are a non-protected class, rather than serve it's intended purpose of redressing "vote dilution 'on account of race' in violation of Section 2. *Id.* (Stating that the "Voting Rights Act 'is a balm for racial minorities, not political ones—even though the two often coincide.'" (quoting *Baird v. Consol. City of Indianapolis,* 976 F.2d 357, at 361 (1992).)).

The Court finds that racial coalitions, claiming voter dilution based on race, can bring a Section 2 claim because it is consistent with the language and purpose of the VRA as well as with Supreme Court and Fourth Circuit precedent, namely *Gingles* and *Hall.* First, based on an

ordinary reading, Section 2 of the VRA, safeguards "members of a class of citizens protected by subsection (a)," which identifies racial and language minorities as the beneficiaries of the VRA. *See* 52 U.S.C. § 10301(b) (2018). As an initial matter, a "class" is defined as a "*group* sharing the same economic or social status." (emphasis added).[16] Based on the presumptive last antecedent rule of statutory interpretation,[17] the VRA limited protection to those "class of citizens listed in subsection (a)." *Id.* Accordingly, it is not the singular class that must be composed of a racial or language minority protected under subsection (a) but rather a category of citizens who make up the class. So long as one class is asserting a claim, and each citizen in that class is a protected racial or language minority, the statutory requirements are met. Specifically, the inclusive language of Section 2 protects "any citizen" against denial or abridgement of voting rights on account of race, color, or membership in a language minority," 52 U.S.C. § 10301(a), and recognizes that discrimination in voting does not target any one race. Notably, § 10301(b) plainly states that a violation occurs when the electoral process is not "equally open to participation by members of *a class* of citizens protected by subsection (a) in that its *members* have less opportunity than *other members of the electorate* to participate in the political process and to elect representatives of their choice." 52 U.S.C. § 10301(b) (emphasis added). The Court interprets this provision to mean "a class of citizens" is composed of "members" who share the common trait of being denied the right to vote based on their race, color, or language. Nothing in the statutory text requires each member of "a class" to be of the same race, color, or language minority status. As other courts have recognized, the members of a class must be politically cohesive with each other regardless of the differences in race, color, or language of each

---

[16] See *Class*, MERRIAM-WEBSTER; *see also Class*, BLACK'S LAW DICTIONARY (11th ed. 2019) ("A group of people . . . that have common characteristics or attributes.").

[17] *See Barnhart v. Thomas*, 540 U.S. 20, 26 (2003) (stating that the last antecedent rule is "quite sensible as a matter of grammar").

member. Indeed, requiring that the protected class consist of just a single minority group further separates, classifies, and labels minority groups in a way that further entrenches their separate minority status rather than promoting the cross-sectional unity a class is designed to offer. An arbitrary limitation of a single minority requirement not only contravenes the plain legal definition of "a class of citizens" but also erases the complex intersectional ways in which citizens identify as minorities, either by race, ethnicity, or language, but face the same impediment to vote for their preferred candidates. Further, the single minority limitation not only limits the VRA, it also repeats the long history of how government has legally and narrowly constructed race, albeit differently for various minority groups, with the common purpose of furthering discrimination.[18] Therefore, the plain reading of Section 2 instructs that a "class of citizens" does not mean that each member in the "class" have the same race, color, or language minority status. Rather, as other sister jurisdictions have found, the "class of citizens" may be composed of distinct racial/ethnic protected minorities who share common attributes, suffer similar or the same social and economic consequences, or are politically cohesive.

---

[18] *See Ho by Ho v. San Francisco Unified Sch. Dist.,* 147 F.3d 854 (9th Cir. 1998) ("...race has historically been used as way of oppressing, persecuting, or discriminating against group of persons on basis of accidental physical attributes, origins of notion of race as embodied in color are social rather than scientific...."); *See id.* at 863 (9th Cir. 1998) ("That race is a social construct does not mean, of course, that the concept of it does not affect the way reality is sometimes perceived. Sometimes the concept has been invoked to instill pride into an immigrant or discriminated-against group....It is one thing, however, for a group to emphasize voluntarily the features that make it cohesive and confident and an entirely other thing for government to require racial self-designation and impose governmental sanctions for failure to do so and add further sanctions as the consequence of doing so."); *see id.* ("It is less than half a century ago that this governmental use of race as an instrument of discrimination was finally repudiated. Misuse of race by government for over three centuries in America must make any new governmental use of race stand suspect and in pressing need of justification. Race got its standing in the nineteenth century by pseudo-science. In the name of that science the 'Anglo–Saxon race' was glorified, and immigration to America diluting 'the Anglo–Saxon heritage' was viewed with alarm. In the name of that science the 'yellow peril' of immigration from Asia was decried....In the name of that science, persons were assigned to biological groupings that were perceived as superior or as degenerate.....Now it is scientifically accepted that races 'are not, and never were, groups clearly defined biologically.'") (citing *Brown v. Board of Education,* 347 U.S. 483, (1954), Ian Haney Lopez, White By Law (1996), at 27–33; William W. Howells, The Meaning of Race in The Biological and Social Meaning of Race (Richard H. Osborne ed. 1971) at 16; Ian F. Haney Lopez, *The Social Construction of Race: Some Observations on Illusion, Fabrication, and Choice,* 29 Harv. C.R.–C.L. L. Rev. 1, 13 (1994).).

Second, the legislative history of the VRA shows that Congress intended for broad protection of minorities as a group of citizens. Overtime, as Congress has repeatedly expanded the scope of the VRA, it has also recognized that distinct racial minorities share common struggles of voter dilution and disenfranchisement which were to be redressed with the VRA.[19] Moreover, Congress intended to confer protections beyond those explicitly embedded in the Constitution and that the burden to show discriminatory intent is inappropriate for vote dilution claims. Ultimately, as Congress intended, the most critical inquiry of Section 2 is whether a minority group, or class, has less opportunity to participate in the political process— which may be true for a minority group composed of various racial minorities who face the same barriers to voting.

Third, as demonstrated by sister jurisdictions, coalition claims are cognizable and workable under the existing *Gingles* preconditions and Senate Factors. The Second, Fifth, Ninth, and Eleventh circuits have shown that multi-racial coalition Section 2 claims can be examined under the current legal framework. Moreover, they have consistently held that although distinct minority groups may have varied histories of discrimination, the VRA still requires plaintiffs to show by a preponderance of the evidence that each protected minority in the coalition have sufficient similar socioeconomic backgrounds and histories of discrimination, similar attitudes toward the challenged voting practice, and a documented tendency to vote for the same minority preferred candidates. *See generally, LULAC I,* 812 F.2d 1494 (1987) (establishing the test for examining multi-racial coalition § 2 claims). In other words, the minority coalition must still prove that they are politically cohesive and subject to voter dilution. The presence of mutual

---

[19] In 1975, for example, the Senate Judiciary Committee found that discrimination against Hispanics was evident in "almost every facet of life," paralleling the barriers faced by Blacks. *See* S. REP. NO. 94-295, at 25-29 (1975). The Senate explicitly relied on precedent involving a minority coalition claim between Hispanics and Blacks and observed how at-large voting schemes in Texas denied both minority groups access to electoral representation. *See* S. REP. NO. 94-295, at 27–28. In 1982, Congress developed the totality-of-the-circumstances test as it considered the rights and shared struggles of distinct racial and language minorities. *See* S. REP. NO. 97-417, at 28–29 (1982). Absent an explicit omission by Congress, a coalition group bringing the claim should merely be one circumstance considered in the totality.

political goals among members of a coalition group does not negate the reality that vote dilution is taking place. Mutual political interests are present in any group seeking to elect a particular candidate, including in the single-minority groups currently awarded protection under section 2. However, the minority coalitions must still satisfy the *Gingles* test, a high bar designed to prevent cases brought solely for strategic political alliances but without a history of voter discrimination.

The Court's analysis is also consistent with Supreme Court precedent which has ruled that a protected minority group and non-white group cannot claim that their combined votes are diluted by a white majority. *See Gingles,* 478 U.S. at 56 ("Crossover" voters are persons outside a minority group who support the minority group's candidate in an election.). Relying on the Supreme Court's implied deference to minority coalitions in *Emison*[20], other courts have moved to explicitly allow minority coalitions to bring Section 2 claims.[21] Accordingly, the Court finds that the Minority Community in the instant case may aggregate their Section 2 claims so long as they can show that they are politically cohesive, as defined by other circuits.

## B. Plaintiffs Have Established the Three *Gingles* Preconditions

The Court concludes that Plaintiffs have established the three *Gingles* preconditions for the Minority Community composed of Hispanic, Black, and Asian voters. Plaintiffs showed that the Minority Community is sufficiently large and geographically compact, politically cohesive, and

---

[20] In *Growe v. Emison,* 507 U.S. 25, at 41 (1993), the Court reviewed a ruling from the District of Minnesota assuming that the district court could aggregate more than one distinct minority group. The Supreme Court determined that the presence of a coalition group made "proof of minority political cohesion . . . all the more essential." However, explicitly stated that it would not decide the validity of coalition claims under section 2 in this case.

[21] *See, e.g., Perry v. Perez,* 565 U.S. 388 (2012); *Huot v. City of Lowell,* 280 F. Supp. 3d 228 (D. Mass. 2017) (permitting a minority coalition claim, while addressing the circuit split and ambiguity of its own circuit's precedent); *Perez v. Abbott,* 250 F. Supp. 3d 123 (W.D. Tex. 2017) (permitting minority aggregation); *Rodriguez v. Pataki,* 308 F. Supp. 2d 346, 405 (S.D.N.Y. 2004) (identifying the circuit split but relying on *Emison* to consider the cohesion requirement of a Black-Hispanic coalition); *Arbor Hill Concerned Citizens Neighborhood Ass'n v. County of Albany,* No. 03-CV-502 (NAM-DRH), 2003 U.S. Dist. LEXIS 11386 (N.D.N.Y. July 7, 2003) (permitting coalition claims).

that there is white bloc voting. The Court also concludes that Plaintiffs at a minimum established the *Gingles* preconditions for the African American community in Virginia Beach.

### 1. Minority Group is Sufficiently Large and Geographically Compact

First, the minority group must be able to demonstrate that it is sufficiently large and geographically compact to constitute a majority in a single-member district. *See Gingles*, 478 U.S. at 50. To make this showing, Plaintiffs must create an illustrative plan with a single-member district in which the Minority Community constitutes a majority of the voting age population. *See Bartlett*, 556 U.S. at 18 (2009) (stating that *Gingles* precondition one asks a simple threshold question: whether the protected group of voters can make up "more than 50 percent of the voting-age population in the relevant geographic area?"). Here, Plaintiffs have shown that the Minority Community is sufficiently geographically compact and numerous in Virginia Beach that an illustrative district can be drawn that has a Black majority, Hispanic and Black, or Hispanic, Black, and Asian majority of eligible voters. Therefore, Plaintiff has satisfied part one of the *Gingles* threshold test.

#### a. CVAP Majority Illustrative Districts

To satisfy the first *Gingles* precondition, a plaintiff must show that it is possible to draw an election district of an appropriate size and shape where the Citizen Voting Age Population ("CVAP") of the minority group exceeds 50% of the relevant population in the illustrative district. *Bartlett v. Strickland*, 556 U.S. 1 (2009); *Perez v. Pasadena Indep. Sch. Dist.*, 165 F.3d 368, 372 (5th Cir. 1999). This requirement ensures that the minority group will possess the potential to elect representatives of its choice in the absence of the at-large voting scheme. *Gingles*, 478 U.S. at 50 n. 17, 106 S.Ct. 2752. Unless minority voters possess such

electoral potential, they cannot claim to have been injured by the at-large voting scheme. *Id.*; *see also*, *Benavidez v. City of Irving, Tex.*, 638 F. Supp. 2d 709, 728 (N.D. Tex. 2009).

Here, Plaintiffs established that the Minority Community in Virginia Beach is sufficiently large and geographically compact to constitute the majority in at least one of ten single-member districts. Plaintiffs' expert witness, Mr. Fairfax drew ten illustrative plans, eight with ten single-member districts and two with a single illustrative district. Each illustrative plan had one or two districts where ACS data shows the Minority Community is a majority of the CVAP, and eight plans have two districts where the 2010 Decennial Census data show the Minority Community is a majority of the VAP. In all, the Illustrative Plans show that there are two separate districts (1 and 2) that have a majority of Hispanic, Black, and Asian CVAP ("HBACVAP"). Mr. Fairfax's illustrative plans are summarized in Table 1 below provided by the Plaintiffs. *See* ECF No. 238 at 9.

*Table 1: CVAP and VAP Data for Majority-Minority Districts in Demonstrative Plans*

| Plan | District | Percent HBA CVAP using ACS 2014-2018[22] | | Percent HBA VAP using 2010 Census |
|------|----------|------------------------------|----------------------------------------|-------------------|
| | | (using single race Black)[7] | (using single race Black plus Black/White) | |
| Plan 1 | C2 | 50.13% | Not available | Not available |
| | D | 50.21% | Not available | |
| Plan 2 | 1 | 51.77% | 52.91% | 51.03% |
| | 2 | 50.75% | 51.88% | |
| Plan 3 | 1 | 53.07% | 54.31% | 51.07% |
| | 2 | 52.16% | 53.23% | 50.08% |
| Plan 4 | 1 | 52.72% | 53.94% | 51.02% |
| | 2 | 52.11% | 53.25% | 50.03% |
| Plan 5 | 2013-2017 ACS data only: | | | |
| | 1 | 54.47% | 55.72% | 54.05% |
| | 2 | 51.92% | 52.75% | 51.32% |
| Plan 6 | 1 | 51.77% | 52.91% | 51.03% |
| | 2 | 50.93% | 52.02% | |
| Plan 7 | 1 | 53.07% | 54.31% | 51.07% |
| | 2 | 51.37% | 52.47% | |
| Plan 8 | 1 | 52.72% | 53.94% | 51.02% |
| | 2 | 51.38% | 52.45% | |
| Plan 9 | 2013-2017 ACS data, % Hispanic and Black only: | | | |
| | 1 | 50.58% | 51.46% | |
| Plan 10 | 2013-2017 ACS data, % Hispanic and Black only: | | | % Hispanic and Black only: |
| | 1 | 51.04% | 52.17% | 56.54% |

---

[22] The sources for the VAP and CVAP data in this table are: Plan 1 (ECF No. 62, App. A; Tr. 136:8-20), Plan 2 (P-0085 at 17; P-0084 at 7; Tr. 136:24-137:4 and Tr. 137:14-22; Tr. 138:22-139:2), Plan 3 (P-0085 at 24; Tr. 143:19-7, Tr. 145:1-9; Tr. 145:14-24), Plan 4 (P-0080 at 31; Tr. 146:6-147:1; Tr. 147:9-23, Tr. 148:15-21), Plan 5 (P-0080 at 17; Tr. 149:3-14, Tr. 149:24-150:6, Tr. 150:16-25), Plan 6 (P-0085 at 18; Tr. 151:9-152:1, Tr. 152:18-153:8, Tr. 153:13-16), Plan 7 (P-0085 at 25; Tr. 154:4-16, Tr. 155:8-23, Tr. 156:4-6), Plan 8 (P-0085 at 32; Tr. 156:19-157:16, Tr. 158:8-23, Tr. 159:9-11), Plan 9 (P-0080 at 24; Tr. 159:21-160:15), Plan 10 (P-0080 at 30; Tr. 161:5-24, Tr. 162:2-5).

b. Criteria for Drawing Illustrative Districts

The Court finds that Mr. Fairfax is a credible expert witness. As a consultant on redistricting issues for 28 years and three decennial redistricting cycles, Mr. Fairfax has developed nearly 1,000 redistricting plans for jurisdictions ranging from states to small municipalities. P-0075 at 2. The Court qualified Mr. Fairfax as a demographic and mapping expert. Tr. 118:1-16.

To draw up the Illustrative Districts, Mr. Fairfax used decennial data for 1990, 2000, and 2010 and data from the American Community Survey[23] for 2008-2012, 2013, 2017, and 2014-2018. Tr. 118:24-119:4. Mr. Fairfax also used the Census and ACS Data to "look at different socioeconomic indicators, such as income below poverty and education, to find if there's commonality amongst the Hispanic, Black, and Asian populations." Tr. 116:4-13. Then, Mr. Fairfax used Census tract data to identify where Hispanic, Black, and Asian communities reside to determine whether one or more districts could be created. Tr. 116:4-13.

The Court finds that Plaintiffs' alternative (CVAP based) Illustrative District Plan also comports with traditional redistricting principles of population equality and respect for existing official geographic boundaries. *See Miller v. Johnson,* 515 U.S. 900, at 919, (1995); *Shaw v. Reno,* 509 U.S. 630, at 651 (1993); *see also,* Title 24.2 Chapter 3 (VA Code § 24.2-304.1 [2018]). The Court finds that Mr. Fairfax properly used the five common redistricting criteria: equal population, contiguity, compactness, minimization of political subdivision splits of Voter Tabulation Districts ("VTDs"), and preservation of communities of interest. P-0075 at 6-7; Tr.

---

[23] The American Community Survey is conducted on an annual and five-year basis, and previously on a three-year basis. The one-year data goes down to approximately geographic areas of 65,000 or above, whereas the five-year can go down to the block group level. This data is usually used to obtain demographic regarding race, ethnicity, socioeconomic status, and other social factors. Tr. 119:10-23.

128:12-135:1.[24] Mr. Fairfax balanced these criteria while also considering race and ethnicity data

to draw districts compliant with Section 2. P-0075 at 6-7; Tr. 135:2-7. Mr. Fairfax drew up ten

illustrative plans and then examined how they complied with the five criteria and compared them

to the current City Council Seven District Residency Plan ("the Current Plan"). In drawing up

the Illustrative Plan, Mr. Fairfax used a ten-member single district scheme. Based on 2010

Census data, the plan's ideal population is 43,799 for each district. As a result, the ideal

population deviation for each district was 157 (.36%) for District 2 and -2,090 (-4.77%) for

District 1. In all, the overall population deviation was 3,264 persons (7.45%). Mr. Fairfax's

findings with respect to total population deviation, compactness, and VTD splits for Plans 2

through 8 are set out below in a table provided by the Plaintiffs. *See* ECF No. 238 at 8.

*Table 2: Compliance with Traditional Redistricting Criteria in Current and Demonstrative Plans*

| Plan | Total Pop. Deviation | VTD splits |
|------|----------------------|------------|
| Plan 2 | 7.45% | 12 |
| Plan 3 | 9.0% | 22 |
| Plan 4 | 7.57% | 25 |
| Plan 5 | 9.65% | 21 |
| Plan 6 | 7.49% | 15 |
| Plan 7 | 9.21% | 23 |
| Plan 8 | 7.36% | 23 |
| Current Plan | 7.29% | 28 |

c. Defendants' Objections to the Illustrative Districts

Defendants raise several objections to the Illustrative plans Mr. Fairfax drew showing at

least two districts with a majority of the Minority Community. First, Defendants argue that

---

[24] Supreme Court precedent has established various criteria for redistricting during map drawing processes. *See, e.g., Baker v. Carr,* 369 U.S. 186 (1962), *Gray v. Sanders,* 372 U.S. 368 (1963), *Wesberry v. Sanders,* 376 U.S. 1 (1964); *Gaffney v. Cummings,* 412 U.S. 735 (1973), *Thornburg v. Gingles,* 478 U.S. 30 (1986) (Requiring that the plaintiff's show that the minority group is "sufficiently numerous and geographically compact to form a majority in single-member district.").

coalition claim is not cognizable under Section 2 of the VRA and, thus, Plaintiffs cannot group Hispanic, Black, and Asian minority communities to form a single majority-minority district and satisfy the first *Gingles* precondition. ECF No. 237 at ¶¶ 81-86. As noted above in Sections V.E and VI.A, the Court finds that minority coalition Section 2 claims are cognizable if Plaintiffs can show that the Minority Community is politically cohesive.

Second, Defendants argue that Mr. Fairfax's Illustrative plans are remedial, based on the 2010 Census, and are not legally enforceable for future elections. *Id.* at ¶ 88. The Court finds this argument without merit. Plaintiffs' Illustrative District Plans are not the Court's final plans. Rather, they are, as defined by their name, *illustrative* of the fact that it is possible to draw single-member districts where the Minority Community exceeds 50% of the relevant population. *See Bartlett,* 556 U.S. 1, (2009); *Perez v. Pasadena Indep. Sch. Dist.,* 165 F.3d 368, 372 (5th Cir. 1999). To draw illustrative maps as accurately as possible, Plaintiffs must use accurate demographic data of the minority population. The U.S. Census and ACS provides the most accurate data. At the time this case was filed, the 2010 Census provided was the most recent decennial census data. Therefore, Plaintiffs properly relied upon the 2010 Census as well as the 2013-2017 ACS data to draw the best illustrative maps possible.

Third, Defendants argue that Plaintiffs' Illustrative Plans fail the one-person, one-vote standard "because they do not show that a properly apportioned, court-imposed plan can be drawn with a majority HBACVAP." ECF No. 237 at ¶¶ 89-90 (citing *Connor v. Finch*, 431 U.S. 407, 413 (1977). Specifically, Defendants argue that Plaintiffs' Illustrative Plans do not meet a "de minimis" standard because they have deviations of more than 7%. *Id.* (citing *Connor*, 431 U.S. at 418 n.17 ("The Court refused to assume in *Chapman v. Meier* that even a 5.95% deviation from the norm would necessarily satisfy the high standards required of court-ordered

plans.").). The Defendants' argument is without merit and misreads *Connor* and *Chapman* and seeks to apply case law that is not binding in the Fourth Circuit. First, the Illustrative Plans are not the final plans that this Court will adopt. Rather, they are only being used to show the possibility that two majority-minority districts can be drawn. Second, even if the final Court-ordered redistricting plans had populations-deviations between 7%-9%, they would be close to the current District map drawn up by the State Legislature, which has a population-deviation of 7.29%. Third, although Court drawn district maps would be subject to a de minimis population-deviation standard review, the Court would not specifically be limited to a 1% threshold as the Defendants argue. *See* ECF No. 237 at ¶ 15. Rather, the Court would have to justify any population-deviation in the plan in accordance with principles previously recognized by the Supreme Court such as "...the integrity of political subdivisions, the maintenance of compactness and contiguity in legislative districts or the recognition of natural or historical boundary lines." *Swann v. Adams*, 385 U.S. 440, at 444-445 (1967). In *Reynolds v. Sims,* the Supreme Court established that both houses of a state legislature must be apportioned so that districts are "as nearly of equal population as is practicable." 377 U.S. 533, at 577 (1964); *see also, Bd. of Estimate of City of New York v. Morris*, 489 U.S. 688, at 701 (1989) ("In calculating the deviation among districts, the relevant inquiry is whether 'the vote of any citizen is approximately equal in weight to that of any other citizen,' the aim being to provide "fair and effective representation for all citizens.'" (citing *Reynolds v. Sims,* 377 U.S., at 579, 565–566.); *see id.* at 703 (holding that the city's proffered governmental interests did not justify population-deviations of 132% and 78%, because they were such a substantial departure from the one-person, one-vote ideal.). The Court clarified that "while '(m)athematical exactness or precision' is not required, there must be substantial compliance with the goal of population equality.

*Chapman v. Meier*, 420 U.S. 1, at 22 (1975) (quoting *Reynolds* at 577). *Chapman* also recognized that "each case must be evaluated on its own facts, and a particular population deviation from the ideal may be permissible in some cases but not in others...." *Id.* at 22. In *Chapman,* the Supreme Court reviewed the Court-ordered redistricting lines, which resulted in 20% population-deviations, and found that the justifications offered by the District Court "fail[ed] to meet the standards established for evaluating variances in plans formulated by state legislatures or other state bodies." *Id.* at 26 (Referring to the justification for the population-deviation standard recognized in *Swann*, 385 U.S., at 444). *Chapman* clarified that it was not implying that any particular redistricting plan be adopted or that a specific "5.95% population variance necessarily would be permissible in a court-ordered plan." *Id.* at 25-26. Instead, the Supreme Court referenced other plans "to show that the factors cited by the District Court cannot be viewed as controlling and persuasive when other, less statistically offensive, plans already devised are feasible. *Id.* Therefore, contrary to Defendants position, *Chapman* did not establish a specific de minimis population-deviation standard for Court-ordered plans. Later, in *Connor*, the Supreme Court reiterated that "[a] court is held to stricter standards than a state legislature in devising a legislative reapportionment plan, and 'unless there are persuasive justifications, a court-ordered reapportionment plan of a state legislature must avoid use of multimember districts, and, as well, must ordinarily achieve the goal of population equality with little more than de minimis variation.'" *Connor* at 407 (citing *Chapman* at 26-27 (where the Court imposed standard of deviation was stricter than the State). That is, a court may impose a stricter de minimus population-deviation requirement than the State legislature, but it must have compelling reasons to do so. However, in *Connor*, the Supreme Court found that District Court's plan substantially departed from the "population equality" because the "resulting maximum

population deviations of 16.5% in the Senate districts and 19.3% in the House districts cannot be characterized as de minimis." *Id.* At the same time, the Supreme Court recognized that an "'under 10%' deviations have been previously considered to be of prima facie constitutional validity only in the context of legislatively enacted apportionments." *Connor* at 418 (citing *Gaffney v. Cummings*, 412 U.S. 735 (7.83% maximum deviation from the population norm); *see also, White v. Regester*, 412 U.S. 755, (9.9% maximum deviation from the population norm).). Therefore, neither *Connor* nor *Chapman* limit the population-deviation to a specified percentage to 1% as the Defendants argue. Rather, if the Court orders a district plan to be drawn, it must properly justify any population deviations in accordance with accepted principles of equality representation. Moreover, although the Court recognizes that other jurisdictions have found population-deviations greater than 5% to be unlawful, those jurisdictions do not bind this Court and those courts reaffirmed that the evaluation is fact-specific and based on the Court's justifications. *See, e.g., Larios v. Cox,* 300 F. Supp 1320 (N.D. Ga. 2004), *aff'd,* 542 U.S. 947 (2004) (holding that a Georgia legislative redistricting plan with a 9.98% overall deviation range was unconstitutional because the justifications offered were insufficient.); *See Marylanders for Fair Representation, Inc. v. Schaefer,* 849 F. Supp (D. Md. 1994) (noting that deviations within 10% range, while not prima facie unconstitutional, can be set aside "if the deviation is the result of an unconstitutional or irrational state purpose."); *Hulme v. Madison County,* 188 F. Supp. 2d 1041 (S.C. Ill, 2001) (holding an Illinois county redistricting plan with a 9.3% overall deviation range was unconstitutional because plaintiffs showed that the plan was drawn with no effort to draw "districts... as nearly of equal population as practicable.").

Fourth, Defendants argue that Plaintiffs' Illustrative districts fail to show that at least two districts with a majority minority population can be drawn using 2010 Census data and that the

Illustrative Plans do not comport with traditional districting principles. ECF No. 237 at ¶¶ 91-96. However, as detailed above in Section VI.B.a.1, the Court finds that the Illustrative Plans clearly show at least two districts with a majority minority population which were drawn using the traditional districting principles.

Finally, Defendant's argue that Plaintiffs' expert witness, Dr. Spencer, failed to show that their Illustrative Plans enhance the ability of the minority coalition to elect their preferred candidates. *Id.* at ¶¶ 97-100 (citing *Harding v. County of Dallas, Tex.*, 948 F.3d 302, 309 (5th Cir. 2020). However, as detailed below, Dr. Spencer did show that the Illustrative Plans enhance the ability of the Minority Community to elect their preferred candidates.

### d. Proof of Changed Demographic Characteristics

#### *1. Reliability of ACS Data*

ACS data is reliable Census data and it is commonly used by expert witnesses in Voting Rights Act cases. The ACS is the only source of local information on the citizen voting age population (CVAP). Notably, sister jurisdictions have consistently relied upon ACS for examining demographic information of minority populations for Section 2 cases. *See,* e.g., *League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, at 438 (2006); *United States v. Sch. Bd. of Osceola Cty.,* No. 608CV582ORL31DAB, 2008 WL 11508421, at *1 (M.D. Fla. Apr. 23, 2008) (relying on ACS Data to determine Hispanic population.); *United States v. Euclid City Sch. Bd.,* 632 F. Supp. 2d 740, 745 (N.D. Ohio 2009) (Relying on 2005-2007 ACS data to examine the growth rate and composition of African–American populations.); *Benavidez v. City of Irving, Tex.,* 638 F.Supp.2d 709, 729 (N.D. Tex. 2009) (Finding that "ACS data *is* Census data [because it is] produced and promulgated by the Census Bureau, and it is intended to replace the long form in the decennial Census.... ACS data can be—and eventually

must be—relied upon; the Census Bureau will be utilizing ACS data in lieu of long form survey data beginning in 2010."); *Patino v. City of Pasadena*, 230 F. Supp. 3d 667, 687 (S.D. Tex. 2017).

In this case, Plaintiffs' expert witness, Mr. Fairfax, relied upon data produced by the Census Bureau. *See, e.g., Valdespino v. Alamo Heights Indep. Sch. Dist.,* 168 F.3d 848, at 854 (5th Cir. 1999) (affirming decision that housing stock data could overcome Census data); *Reyes v. Farmers Branch,* No. 3:07–CV–900, 2008 WL 4791498, at *16 (N.D.Tex. Nov. 4, 2008) (declining to rely on plaintiffs' "actual count" of SSRV to overcome the *Valdespino* presumption). Thus, ACS data can be relied upon as the Census Bureau has utilized ACS data in lieu of long form survey data since 2010. *Id.* ACS meets the standards which make it indistinguishable in terms of accuracy and reliability from the Census figures. Moreover, ACS sampling errors are transparent and may be accounted for using the margins of error published by the ACS and the use of confidence intervals. Although the Fourth Circuit does not have a similar *Valdespino* threshold, the Court concludes that Mr. Fairfax's use of ACS data is thoroughly documented, has a high degree of accuracy, and is clear, cogent and convincing enough to overcome doubts.

### 2. *Estimates Derived from Census and ACS Data*

Plaintiffs have shown that according to the 2010 Census and ACS data, there is a majority Hispanic, Black, and Asian Voting Age Populations ("HBAVAP") Illustrative districts. The Court finds Mr. Fairfax's methodology for estimating HBAVAP numbers to be reliable: he thoroughly documented and explained his process, he comported with accepted statistical principles, and his estimates have been corroborated by the 2013-2017 five-year ACS data and the 2017 one-year ACS numbers. These ACS figures demonstrate a clear, persistent trend in the

growth of HBAVAP percentages and decrease of white VAP in Virginia Beach that is unlikely to change in the 2020 Census data. P-00075 at 5. According to Census data, the HBAVAP increased from 19.22% in 1990 to 30.04% in 2010, meanwhile the white VAP decreased from 80.42% in 1990 to 67.38% in 2010. P-00075 at 9. Moreover, based on 2013-2017 ACS data, Mr. Fairfax was able to reliably estimate that the HBAVAP increased to 34.31% by 2017 while the white VAP decreased again to 65.64%. *Id.*

Mr. Fairfax then used the ACS data to estimate the Citizen Voting Age Population (CVAP). According to Census and ACS data, from 2000-2017, the Hispanic, Black, Asian Citizen Voting Age Population (HBACVAP) increased significantly from 23.94% in 2000 to 31.75% in 2017. P-00075 at 10-11. At the same time, the white CVAP decreased from 73.27% in 2000 to 65.37% in 2017. *Id.*

Also, according to the most recent ACS 5-Year Estimates (2014-2018), the City's population is 450,135. The Minority Community constitutes 33% of the total population (8% Hispanic, 18.5% Black, and 6.5% Asian). DTX132 at 4. Based on 2013-2017 ACS data, Mr. Fairfax established that 31 of the 100 census tracts in Virginia Beach, spanning 249 square miles, contain 54.90% of the Hispanic, Black, and Asian communities. *See* P-0075 at 13, 17; Tr. 177:7-21. Within these 31 tracts, 45.50% are Hispanic, 59.02% are Black, and 52.20% are Asian. *See* P-0075 at 13, 17; Tr. 177:7-22.

Plaintiffs have not employed an *ad hoc* procedure to construct the Illustrative Districts. *See Kirkpatrick v. Preisler,* 394 U.S. 526, at 535 (1969) (post-Census population shifts may be considered if they are "thoroughly documented and applied through the state in a systematic, not an ad hoc, manner"). Rather, Mr. Fairfax determined that the 2010 Census figures did not present the most accurate data of recent population trends, because the 2013-2017

ACS data showed continuing growth in HBAVAP and a concurrent decrease in white VAP. Mr. Fairfax then implemented a clear and direct way of estimating HBAVAP and white VAP in Illustrative Districts—applying city-wide growth rates reflected in the ACS to the districts. Thus, the Court concludes that Plaintiffs' methodology was not *ad hoc*, and the estimated HBAVAP numbers for 2017 are clear, cogent, and convincing to override the presumptive correctness of the prior Census.

  e. Compactness and Contiguity

*Gingles* further requires that the proposed district be geographically compact. *See Shaw v. Hunt*, 517 U.S. 899, at 916 (1996) (finding no § 2 violation where "no one looking at [that district] could reasonably suggest that the district contains a 'geographically compact' population of any race"). The Supreme Court has "refused to consider a noncompact district as a possible remedy for a [§ 2] violation." *LULAC*, 548 U.S. at 431, 126 S.Ct. 2594 (citing *Shaw*, 517 U.S. at 916, 116 S.Ct. 1894). The inquiry into compactness should consider "traditional districting principles such as maintaining communities of interest and traditional boundaries." *Id.* (internal quotes omitted)

However, "[t]he first *Gingles* precondition does not require some aesthetic ideal of compactness, but simply that the [minority] population be sufficiently compact to constitute a majority in a single-member district." *Houston v. Lafayette County, Miss.*, 56 F.3d 606, 611 (5th Cir. 1995) (quoting *Clark v. Calhoun County, Miss.*, 21 F.3d 92, 95 (5th Cir. 1994)). Additionally, *Gingles* does not require the Court to inquire as to whether the Illustrative District are oddly drawn, but rather only requires that the Court examine whether the Illustrative Districts show that a geographically compact district could be drawn. *See Id.*; *see also, Clark*, 21 F.3d at 95 ("[P]laintiffs' proposed district is not cast in stone. It was simply presented to demonstrate

that a majority-black district is feasible in [the] county. If a § 2 violation is found, the county will be given the first opportunity to develop a remedial plan." (citations omitted)). Here, the Court concludes that Plaintiffs' Illustrative Districts satisfy the *Gingles* compactness requirement.

To determine compactness of the two majority-minority districts (1 and 2) for the Illustrative Plans, Mr. Fairfax used three reliable measures, Reock, Polsby-Popper, and Convex Hull. Then, Mr. Fairfax compared the measures for the two majority-minority districts with the current City council districts. P-00075 at 21. In all, the Court finds that Mr. Fairfax credibly testified that each of this Plans' compactness scores were "within the acceptable range for this type of geography." Tr. 142:21-24 (Plan 2); Tr. 146:1-5 (Plan 3); Tr. 148:23-149:2 (Plan 4); Tr. 151:2-6 (Plan 5); Tr. 153:21-25 (Plan 6); Tr. 156:14-18 (Plan 7); Tr. 159:16-20 (Plan 8). The City's current districts have compactness measures that range (min to max) from 0.29 to 0.54 (Reock), 0.21 to 0.55 (Polsby-Popper), and 0.58 to 0.91 (Convex). *See* P-00075 at 22. In comparison, the Illustrative Plan's compactness measures range from 0.24 to 0.56 (Reock), 0.20 to 0.56 (Polsby-Popper), and 0.58 to 0.90 (Convex Hull). *Id.* Specifically, for example, the City Council's current District 1 has measures as follows: 0.29 Reock, 0.26 Polsby-Popper, and 0.66 Convez Hull. *Id.* In comparison, the measures for District 1 of the Illustrative Plan, a majority-minority district, were 0.36 for Reock, 0.31 Polsby-Popper, and 0.67 for Convex Hull. Similarly, the City Council's current District 2 has measures as follows: 0.34 Reock, 0.21 Polsby-Popper, and 0.58 Convez Hull. *Id.* at 21. In comparison, the measures for District 2 of the Illustrative Plan, a second majority-minority district, were 0.24 for Reock, 0.20 Polsby-Popper, and 0.58 for Convex Hull. *Id.* In other words, the Court has enough evidence to show that the differences in compactness measures between the current City Council districts and the majority-minority

districts in the Illustrative Plans are virtually nonexistent. Therefore, the Court finds that Plaintiffs have proven that it is possible to draw two majority-minority districts that are compact.

With respect to contiguity, Mr. Fairfax credibly determined that Plans 2 through 8 complied with the traditional criteria. Tr. 153:25-154:2. The Court finds that the two majority-minority districts of the Illustrative Plans are contiguous with no separate land masses or areas. *See* P-0076 at 45 (A contiguity report by Mr. Fairfax dated June 8, 2019).

Thus, as to the first *Gingles* precondition, this Court concludes that Plaintiffs have demonstrated through the alternative (CVAP based) Illustrative Districts, that the Hispanic, Black, and Asian population in Virginia Beach is sufficiently large in number and geographically compact to constitute an effective majority in a single-member district in the southern part of the City. Accordingly, Plaintiff has satisfied the first *Gingles* factor.

The Court also concludes that, based on the above-mentioned evidence, Plaintiffs established that the African American community in Virginia Beach is sufficiently large and geographically compact. According to the 2010 U.S. Census, African American residents then composed 19.00% of the total population (18.10% of the VAP). PTX75 at 8–9. Mr. Fairfax reliably used 2014-2018 ACS data to estimate the most recent VAP for the African American population. Accordingly, as detailed in above in Table 1, Plaintiffs established that it is possible to draw two districts where African Americans exceed 50% of the population both illustrative districts. *See Bartlett*, 556 U.S. 1 (2009). Moreover, the population deviations in the Illustrative Districts are acceptable and Plaintiffs also established that the African American community is geographically compact.

## 2. The Minority Group is Politically Cohesive

Second, the minority group must be able to show that it is politically cohesive. *Gingles,* 478 U.S. at 51, 106 S.Ct. 2752. According to *Gingles,* "if the minority group is not politically cohesive, it cannot be said that the selection of a multimember electoral structure thwarts distinctive minority group interests." *Id.* The Court concludes that Hispanic, Black, and Asian voters in Virginia Beach are politically cohesive, because they tend to vote as a bloc, have a history of advocating for similar political and legal issues, and have similar experiences of discrimination. In support of its finding, the Court relies on statistical evidence Dr. Spencer generated as well as credible testimony various members of the community provided.

As the Court found above in Section V.E, multi-racial coalitions, claiming voter dilution on the basis of race, can bring a Section 2 claim because it would consistent with the language and purpose of the VRA as well with Supreme Court precedent, namely *Gingles.* In order for Plaintiffs to show that the Minority Community is politically cohesive, they must provide evidence that Hispanic, Black, and Asian communities in Virginia Beach have a history of voting, advocating, or organizing together around similar political, social, economic, or legal issues in the community. *See League of United Latin American Citizens, Council No. 4386 v. Midland Indep. Sch. Dist.,(LULAC I),* 812 F.2d 1494, at 1500–01 (5th Cir. 1987), *reh'g granted*, 818 F.2d 350 (5th Cir. 1987), *and vacated on other grounds*, 829 F.2d 546 (5th Cir. 1987) ("The bringing of this lawsuit by Blacks and Hispanics is symbolic of their realization that . . . they have common social, economic, and political interests which converge and make them a cohesive political group."); *see also, Concerned Citizens of Hardee Cty. v. Hardee Cty. Bd. of Comm'rs*, 906 F.2d 524, 526 (11th Cir. 1990) (holding that "[t]wo minority groups . . . may be a single section 2 minority if they can establish that they behave in a politically

66

cohesive manner.") (first citing *Campos v. City of Baytown*, 840 F.2d 1240, 1244 (5th Cir. 1988); then citing *LULAC I.*)).

    a. Metrics of Political Cohesiveness

The Court finds that there is substantial qualitative evidence showing that Hispanic, Black, and Asian communities are politically cohesive with respect to their shared political advocacy. Critically, qualitative evidence can be used as a strong metric for determining the political cohesion of a minority group. *See Sanchez v. Bond*, 875 F.2d 1488, 1494 (10th Cir. 1989) ("The experiences and observations of individuals involved in the political process are clearly relevant to the question of whether the minority group is politically cohesive."); *see also, Bridgeport Coalition for Fair Representation v. City of Bridgeport*, 26 F.3d 271, at 276 (2d Cir. 1994) (finding that sufficient evidence of cohesiveness by considering qualitative evidence from the minority community.); *see also, Arbor Hill Concerned Citizens Neighborhood Ass'n v. Cty. of Albany*, 2003 WL 21524820 at *8-9 (N.D.N.Y. 2003) (finding that even without statistical evidence of political cohesion, the district court may rely on qualitative evidence.). The Court also recognizes that the political cohesiveness inquiry does not require that the Minority Community be perfectly cohesive in every aspect. Such a requirement would be impossible and would ignore the important differences between and within the Minority Community. However, in the instant case, the Court finds that there is sufficient common overlap between the Hispanic, Black, and Asian communities to show that they are politically cohesive.

First, the Minority Community has cooperated several times to change the City's method of elections and remedy the dilution of their votes under the at-large scheme. Specifically, in 2001, "a coalition of African Americans, Hispanics, Asians, and Indians advocated for the City to adopt single-member districts." *See* P-0145 at 15; *see also,* P-0145 at 10-11; ECF Nos. 190, 211.

The advocates who led the coalition included, Ron Villanueva, a Filipino-American and former Council member who testified as the President of the Filipino-American Community of Tidewater and Chairman of the Filipino-American Community Action Group. *See* P-0145 at 15-16. It also included Nonato Abrajano, a former leader of the City's Filipino-American community, who was a part of the coalition on behalf of the National Federation of Filipino-American Associations (NaFFAA), where he urged the Council to adopt single-member districts to help ensure "equal representation." Tr. 761:25-762:24; P-0145 at 12-13. According to Mr. Abrajano, the NaFFAA chapter in Hampton Roads has never changed its support for district elections. Tr. 762:15-24.

Notably, the Minority Community officially created the Virginia Beach Concerned Citizens Coalition ("VBCCC") to advocate that the Council adopt a fairer method of electing City Council members. Tr. 489:6-490:9. In 2011, the Chairman, Andrew Jackson, of the Virginia Beach African American Leadership Forum repeatedly requested that the City Council change its method of electing Councilmembers because the present method "impedes equal representation." Tr. 490:18-491:4; P-0210 at 2-3. Chairman Jackson also presented at least three 10-district plans to the City Council in 2011, including one where the Minority Community was a majority of the VAP in at least one district. Tr. 493:9-494:1. DTX011 at 285, 289, 294. In furtherance of this effort, the NAACP and the VBCCC also proposed illustrative redistricting maps. DTX010 at 34 ¶ 32b, g, l. Mr. Jackson obtained help from Mr. Kimball Brace, whom the City hired for redistricting in 2011, to help draw these maps. Tr. 563:3-8. Councilmember Moss also asked the City to support the NAACP and VBCCC's map and "a district (or ward) system for local elections because the current system is flawed" and "the at-large voting system dilutes the voting

strength of voters." *See* DTX011 at 158. The City Council subsequently rejected each proposal from the Minority Community. DTX011 at 222-226.2

However, in 2011, the City Council recognized a need to create a Majority-Minority "district" in its at-large system. *See* DTX162 at 57:6-58:22. Mayor Dyer explained that the Council's motivation behind the creation of this district was "to see equal representation," DTX156 (Der Dep.) at 39:2-16. However, the proposal failed, and all City Council members were still elected at-large.

The Minority Community also has a history of protesting together on issues of racial justice. For example, in 2003, the Minority Community organized two protests against the City Treasurer's racially derogatory remarks about the Minority Community. The Minority Community joined those protests because they were all offended by those remarks. Tr. 50:11-23; Tr. 53:6-9; Tr. 57:8-13. Additionally, the Minority Community has recently collaborated to remove Confederate monuments and to march against racial injustice. Tr. 225:2-16.

The Minority Community has also advocated together to improve economic development. For example, in 1995, the City created the Minority Business Council ("MBC") to support "minority business owners" without limiting that support to any racial or ethnic group. DTX157 (Rouse Dep.) at 107:2-9 (describing the purpose of the MBC). The MBC was created because of the shared history of economic and social discrimination in the Minority Community. The MBC served "[t]he Hispanics, the Asians, the African-Americans [because they] all had inequities. They all had very, very low percentages of the kinds of contracts that could be gotten." Tr. 451:19-452:11. The City Council has recognized the importance of increasing minority representation. DTX157 (Rouse Dep.) at 79:18–20.

Similarly, there is a long history of the Minority Community advocating together for an economic disparity study. In 2008, the City set an aspirational goal of 10 percent for minority participation in city contracts overall. However, the City has failed to reach this goal. P-0277 at 4, 22; P-0429; Tr. 833:11-16 (Questioning from the Court); 845:9-846:21 (Adams testimony for 2008 to 2016 data).; 855:2-14 (Adams testimony for 2017-2018 data); 857:6-14 (Adams testimony for 2019 data). In response, the Minority Community lobbied for over nine years to obtain a disparity study of city contracts. Tr. 498:10-16. In 2011, the Minority Business Council also began advocating for a disparity study. Tr. 452:12-453:6 (Strayhorn testimony). In 2016, a Black former-NFL player and Virginia Beach resident claimed that the City had turned him down for multiple projects at least in part because of his race. He also began to publicly call for a disparity study and offered to cover half its cost. P-0078 at 61; Tr. 384:5-385:11. In 2017, the Minority Business Council voted to reaffirm its 2011 request that the City Council conduct a disparity study. Tr. 399:6-25. In 2017, leaders of the Minority Community organized the Faith, Freedom and Justice March to call for a disparity study. Tr. 385:16-20; Tr. 224:15-225:1; Tr. 58:1-59:1.

The Court finds that there is a long history of the minority community advocating together over issues of housing and transportation. Tr. 47:12-48:6. The Minority Community has long supported expanding the light rail while whites opposed it. Tr. 454:10-455:1. According to Dr. Ross-Hammond, a former Black city councilmember who supported the expansion of the light rail, the issue "played a major part" in her re-election loss in 2016. Tr. 728:5-16. Dr. Ross-Hammond's white opponent, Jessica Abbott, opposed light rail. DTX163 (Abbott Dep.) at 162:1-3. Polling data showed that support for light rail was split along racial lines like that of the split

for the Presidential election in 2016, with Black people supporting extending the light rail and whites in opposition. Tr. 312:10-20; Tr. 998:20-25.

### b. Cohesive Voting

Traditionally, but not exclusively, minority groups are politically cohesive when "a significant number of minority group members usually vote for the same candidates," *Levy v. Lexington Cty., S.C.*, 589 F.3d 708, 719-20 (4th Cir. 2009) (citation omitted). Similarly, Plaintiffs may establish cohesiveness by showing that voting is racially polarized, *i.e.*, there is "a consistent relationship between [the] race of the voter and the way in which the voter votes, or to put it differently, where black voters and white voters vote differently," *Gingles*, 478 U.S. at 53 n.21 (alteration in original) (citations and internal quotation marks omitted). This "consistent relationship" does not preclude overlap in racial preferences, as "the *Gingles* standard presupposes the existence of crossover voting." *Jenkins v. Red Clay Consol. Sch. Dist. Bd. of Educ.*, 4 F.3d 1103, 1123 (3d Cir. 1993).

Here, Plaintiffs established that Hispanic, Black, and Asian voters tend to vote together for similar preferred candidates.

### 1. Expert Witness's Methodology and Data

In support of this finding, the Court relies on the credible testimony of Dr. Douglas Spencer, who the Court qualified as an expert in political science and quantitative statistical analysis. Tr. 266:4-6; P-0077 at 35, 43-44. Since there was no historical survey data on vote choice representative of racial minority groups in Virginia Beach, Dr. Spencer used information from individual voting precincts across fourteen races between 2008-2018, to infer the voting behavior of racial minorities. P-0077 at 4. To reliably measure cohesion in voting within the Minority Community in those elections, Dr. Spencer estimated the joint preference of non-white

voters overall, as well as the individual preferences of Black voters and white voters. P-0077 at 4-6. Determining the aggregate preference for non-white voters was necessary because the City's Asian and Hispanic populations make it difficult to individually ascertain their preferred candidates using election returns by precinct. *Id.* Dr. Spencer utilized three statistical methods (1) homogenous precinct analysis ("HP"), (2) ecological regression ("ER"), and (3) ecological inference ("EI"). P-0077 at 4-5. Tr. 268:12-273:4. HP analysis examines precincts with high concentrations of a demographic group and uses the voter preferences there as a proxy for the preferences of members of that race or ethnicity throughout the larger jurisdiction. ER uses linear regression to determine the relationship between the voting patterns of particular groups in the jurisdiction in each precinct for each relevant election. *Id.* EI also uses regression analysis but relies on information known with certainty to narrow the bounds of possible support from demographic groups and draw inferences from the data. *Id.* The strongest case for racially polarized voting exists when HP, ER, and EI all generate similar estimates and point in the same direction. Tr. 359:3-360:16; P-0077 at 7. Statistical methods, such as HP, ER, and EI, can be used to identify demographic and voting patterns to ascertain the Minority Community's preferred candidates using election returns by precinct. Tr. 295:7-9; P-0081 at 6.

The Court finds that the methods utilized by Dr. Spencer have been accepted by numerous courts in voting rights cases and are sufficient for the Court to draw reasonable conclusions about the voting patterns and preferences of the Minority Community in the City. *See e.g., United States v. Village of Port Chester,* No. 06 Civ. 15173(SCR), 2008 WL 190502, at *25 (S.D.N.Y. Jan. 17, 2008); *see also, Benavidez v. City of Irving, Tex.,* 638 F. Supp. 2d 709, 731 (N.D. Tex. 2009).

## 2. *Evidence of Cohesive Voting*

Based upon Dr. Spencer's credible analysis, the Court finds that Plaintiffs provided sufficient evidence showing consistent minority cohesive voting for a minority-preferred candidate and that whites overwhelmingly vote for different candidates. *See Gingles*, 478 U.S. at 53 n.21; *see, Jenkins v. Red Clay Consol. Sch. Dist. Bd. of Educ.*, 4 F.3d 1103, 1123 (3d Cir. 1993). Overall, between 2008-2018, the Court finds strong evidence of minority voter cohesion in the following seven "probative"[25] elections with nine minority candidates: Allen (2008), Bullock (2010), Jackson (2010), Sherrod (2011), Ross-Hammond (2012), Cabiness (2014), Ross-Hammond (2016), Wooten (2018), Rouse (2018). Second, when white minority-preferred candidates are included, the Court finds an additional four elections with strong minority coalition voting for five candidates: Jones (2010), Henley (2014), Davenport (2014), Sessoms (2016), and White (2018). The Defendants' expert witness, Dr. Kidd, also accepted that if white candidates were also treated as the preferred candidates of minority voters, then the number of minority-preferred candidates increases. *See* DTX083-015; *see also, Ruiz v. City of Santa Maria*, 160 F.3d 543 (9th Cir. 1998) (holding that for purposes of vote dilution claim, minority's "preferred candidate" need not be a member of the racial minority.). Third, the Court finds some evidence, albeit not as strong as the other elections, of minority voter cohesion in the elections of Jackson (2008) and Flores (2008). Thus, overall, the Court finds strong evidence of minority voter cohesion and coalition in seven probative elections between 2008-2018. Moreover, the Court finds that only 50% of the Minority Community's preferred candidates were successful in

---

[25] Elections are probative of racially polarized voting when they feature a minority candidate running for a position on City Council. Defendants' expert witness, Dr. Kidd, also accepted that when conducting an ecological inference analysis, it is methodologically important to select which elections are probative of the of racially polarized voting. *See* Tr. 975:1-7. Similarly, Dr. Kidd accepted that at a base level an election is probative if a minority candidate is running in an election, then that particular election is probative to determine whether there is racially polarized voting. *Id.*

their elections, while 94% of the white community's preferred candidates were successful. Critically, when only Black minority-preferred candidates are considered, only 3 out of 14, or 21.4% won, and two of the three Black minority-preferred candidates won election *after* the instant lawsuit was filed.

### *Minority Preferred Candidates*

There are multiple instances of cohesive voting for minority preferred candidates for both Black voters (disaggregated) and all minority voters, which includes Hispanic, Black, and Asian voters. For example, in the 2008 at-large election, Ms. Allen (a Black woman) received about 70% (EI) of the all minority vote (Hispanic, Black, and Asian) and 86% (EI) of the Black disaggregated vote. *See* P-0077 at 29. Although, Allen was the minority candidate of choice, she only received 20% of the white vote and lost to Wilson (a white woman) who received about 59% (EI) of the white vote but less than 1% (EI) of the Black vote and about 8% (EI) of the all minority vote. *Id.* Moreover, support for Ms. Wilson exceeded 53.2% in homogenous white districts but was just 22% in homogenous minority precincts. Wilson ultimately defeated Allen 44.1% to 34.6%. Defendants' expert witness, Dr. Kidd, also admitted that Allen's 2010 loss was a clear example of minority vote cohesion and white bloc voting. *See* DTX083-015.

Another instance of minority cohesive voting was in the 2010 election for the Princess Anne district seat. In this election, candidate Tanya Bullock (a Black woman) was defeated despite receiving about 80% support among Black and all minority voters. *See* P-0077 at 26-27. Defendants' expert witness, Dr. Kidd, also agrees that Bullock had cohesive minority support but lost because of white bloc voting. *See* Tr. D5 929:15-18. Notably, while only about 33% (EI) of white voters supported Bullock, 67% (EI) of white voters supported candidate Barbara Henley (a white woman). *See* P-0077 at 26-27.

The third example is also in the 2010 election with Andrew Jackson (a Black male) who ran for an at-large seat and received about 58.2% (EI) of the all minority vote and nearly 90% of the Black vote but received less than 7% (EI) of the white vote. *See* P-0077 at 24. Instead, Rita Bellitto (race/ethnicity unknown), who was one of minority preferred candidates with large white voter support, and DeSteph (a white male incumbent), also with large white voter support, won the at-large election. *Id.* Dr. Kidd also listed Jackson's 2010 loss as an example of minority voter cohesion. *See* DTX083-015.

There was also minority cohesive voting in the 2011 at-large special election for the Rose Hall seat. In this election, candidate Prescott Sherrod (a Black male) was appointed to fill a vacancy six months before the election. Although, Mr. Sherrod had strong support from the Minority Community (about 70-85%), he had very low support among white voters (less than 18%) and was defeated by John Moss (a white male) who received the highest support among white voters but less votes from all minorities. *See* P-0077 at 22-23. Defendants' expert witness, Dr. Kidd, also admitted that Sherrod's 2011 loss is another clear example of minority vote cohesion and white bloc voting. *See* DTX083-015.

There was another clear instance of minority cohesive voting in the 2012 election for the Kempsville city council seat. Here, there was strong minority cohesion and support for Dr. Ross-Hammond (a Black woman) who received about 65% (EI) of the all minority vote and 87% (EI) support from Black voters but less than 20% from white voters. *See* P-0077 at 20-21. However, since there was a white voter split between three other candidates, Ross-Hammond was elected to City Council and became the third Black member in the City's history. *Id.* Defendants' expert witness, Dr. Kidd, admits that Ross-Hammond's 2012 win is an example of minority vote cohesion but not of white bloc voting. *See* DTX083-015.

Another example of minority cohesive voting is the 2014 special election for the Rose Hall seat where candidate Mr. James Cabiness received 51% (EI) support from Black voters and 37% (EI) from all minorities. However, Cabiness received low white voter support with 6.4% (EI). Cabiness lost to Shannon Kane who received low Black voter support, with 8% (EI) and 22.5% (EI) from minorities, but high white voter support with 59% (EI). *See* P-0077 at 17-18. Although the Court considers this as an example of minority voter cohesion, the Court acknowledges some split between Black and minority voters. As noted above, the case law requires evidence to show sufficient basis for finding minority cohesive voting of multi-racial coalitions and allows for acknowledging differences between the minority groups while preserving the coalition. *See LULAC I,* 812 F.2d 1494, at 1500–02 (5th Cir. 1987), *reh'g granted,* 818 F.2d 350 (5th Cir. 1987), *and vacated on other grounds,* 829 F.2d 546 (5th Cir. 1987) (the Fifth Circuit reasoned that it did not matter that "there [were] many cultural and ethnic differences between the two groups" because the "prejudice of the majority is not narrowly focused." Instead, the key inquiry was that both groups ". . . have common social, economic, and political interests which converge and make them a cohesive political group.").

In the 2016 election for Kempsville, there was also evidence of minority cohesive voting. In this election, candidate Ross-Hammond (a Black woman) was seeking re-election after becoming the third Black member of the City Council in its fifty-five-year history. Based on Dr. Spencer's analysis, Ross-Hammond was the preferred candidate of choice for all minority voters, with 59% (EI), and Black voters with 77% (EI) support. *See* P-0077 at 16. However, Ross-Hammond received low white voter support, with 33% (EI). *Id.* at 15-16. On the other hand, her opponent, Jessica Abbot (a white woman) received 69% (EI) of the white vote but less than 40% of the all minority vote and less than 38% of Black vote. *Id.* As noted below in the Court's

76

analysis of Senate Factors surrounding racial appeals, Ross-Hammond testified that she lost the election in large part due to the split between white and minority voters on the issue of expanding the light rail. *See* Tr. 728:5-16 (Dr. Ross-Hammond supported the light rail and this issue "played a major part" in her re-election loss in 2016.); *see also,* DTX163 (Abbott Dep.) at 162:1-3 (Jessica Abbott, opposed light rail.).

Another example of minority cohesive voting for a minority candidate comes from the 2018 election for the Centerville district in the race between Ms. Sabrina Wooten (a Black woman) and Mr. Eric Wray (a Black male). *See* P-0077 at 12-13. Specifically, Ms. Wooten was the preferred candidate for Black voters (95%, EI) and all minority (85%, EI) voters and also received strong support from white voters (51%, EI). In fact, Ms. Wooten earned more support from white voters than any other minority candidate elected between 2008-2018 with 51% of the white vote which is more than three times the average support for minority candidates during this time. *Id.* The Court notes that Ms. Wooten's election was *after* the instant lawsuit was filed and, thus, was under special circumstances.

The final example of minority cohesive voting involving a minority candidate comes from the 2018 at-large election. In this election, Aaron Rouse (a Black male) and Allison White (a white woman) were the Minority Community's preferred candidates. *See* P-0077 at 13-14. Notably, all minority and Black voters split their support between Rouse and White. *Id.* Ultimately, Rouse was elected because he received 31% (EI) support all minority voters, 36% (EI) from Black voters and large white crossover support with 24% (EI). However, Rouse still received lower support from white voters as compared to John Moss (a white male), who defeated White for the second at-large seat with strong white voter support and dismal support from Black (0.5%, EI) and all minority (3.9%, EI) voters. *Id.* Like Ms. Wooten's election, Mr.

Rouse's election was also *after* the instant lawsuit was filed and, thus, also occurred under special circumstances.

### White Minority-Preferred Candidates

In addition to multiple examples of minority cohesive voting involving minority candidates, there are multiple examples involving white minority-preferred candidates.

In the 2010 Bayside district election, candidate Jones (a white male) received 55% (EI) support from Black voters and 56% (EI) support from all minority voters. *See* P-0077 at 27. Critically, Jones also received robust support from white voters with 67% (EI) of the vote. *Id.*

There was also minority cohesive voting involving a white candidate in the 2014 election for the Princess Anne seat. In this election, the incumbent Barbara Henley (a white woman) received 81% (EI) support from white voters, 58% (EI) from Black voters, and 65% (EI) from all minority voters. *See* P-0077 at 18-19. Like Jones (2010), Barbara Henley was a white minority-preferred candidate who received strong support from all minority and white voters. In his rebuttal report, Dr. Kidd stated that Henley's 2014 win is another clear example of minority vote cohesion but not of white bloc voting. *See* DTX083-015.

Another instance of minority voter cohesion is in the 2014 at-large election of Ben Davenport (a white male) who was the minority preferred candidate with about 40% (EI) of the all minority vote and 48.5% (EI) of the Black voter. Ultimately, like Jones (2010) and Henley (2014), Davenport was elected to City Council because he also received high white voter support with 30% (EI). In his report, Dr. Kidd also listed Davenport as an example of minority voter cohesion but not as an example of white bloc voting. *See* DTX083-015.

Yet another example of minority voter cohesion involving a white candidate comes from the 2016 at-large election of Sessoms (a white male) who received 75% (EI) of Black voter

support and 66% (EI) of the all minority vote. *See* P-0077 at 16. Notably, Mr. Sessoms also received 47% (EI) of the white vote which helped to secure his win. *Id.*

Finally, there was also minority voter cohesion with a white minority-preferred candidate in the 2018 at-large election. As noted above, there were two minority-preferred candidates for the two at-large seats, Aaron Rouse (a Black male) and Allison White (a white woman). Ms White received the second highest support from all minority and Black voters at 26% (EI) and 36% (EI), respectively. *See* P-0077 at 13-14. While Rouse was elected for the at-large seat, White was not elected because she lacked support from white voters. Unlike Jones (2010), Henley (2014), Davenport (2014), and Sessoms (2016), White came in a distant fourth (out of six candidates) because of strong opposition from white voters who instead supported John Moss (a white male) with 30% (EI) of their vote. However, unlike White who was the minority-preferred candidate, Moss received less than 0.5% (EI) support from Black voters and less than 4% (EI) from all minority voters. *Id.*

### Limited Evidence of Cohesive Voting

Finally, the Court notes that there is an additional noteworthy example of minority voter cohesion which the Court stills considers as supportive of the second *Gingles* precondition. Although the minority and Black voter support was split between two candidates, the Court still considers this election an example of minority voter cohesive voting because the split occurred between and within all minority voters. In the 2008 election for the Kempsville district, the minority preferred candidates were Andrew Jackson (a Black male) and Jose Flores (a Black-Latinx male). Jackson received 42.2% (EI) of the all minority vote and 50.5% (EI) of the Black vote. *See* P-0077 at 28-29. Similarly, Jose Flores received 44.2% (EI) of the all minority vote and 56.5% (EI) of the Black vote. *Id.* Therefore, all minority and Black voters supported Jackson and

Flores at similarly high rates. However, less than 20% of white voters supported Jackson and less than 18% supported Flores. *Id.* Despite receiving near unanimous support from all minority and Black voters, Jackson and Flores were defeated by the white incumbent Diezel who won about 65% (EI) of the white vote and less than 25% (EI) of the all minority and Black vote. *Id.* The Court notes that while this serves as an example of minority voter cohesion, it also illustrates that minorities may prefer two candidates and, thus, split their vote. Notably, as noted below, this example also illustrates the power of white bloc voting which can capitalize on a vote split within the minority community to defeat the minority-preferred candidates.

*          *          *

Overall, the Court can solidly identify multiple examples of minority voter cohesion in seven elections between 2008-2018. First, the Court finds strong evidence of minority voter cohesion in seven elections with nine minority candidates: Allen (2008), Bullock (2010), Jackson (2010), Sherrod (2011), Ross-Hammond (2012), Cabiness (2014), Ross-Hammond (2016), Wooten (2018), Rouse (2018). Second, when white minority-preferred candidates are included, the Court finds an additional five candidates with minority cohesive voting: Jones (2010), Henley (2014), Davenport (2014), Sessoms (2016), and White (2018). Thus, from 2008-2014 there were fourteen (14) total minority preferred candidates with strong all minority and Black voter support. Accordingly, the Court finds that this is sufficient evidence establishing that the Minority Community is politically cohesive. Third, an additional example of minority voter cohesion occurred when there was a near-equal split between two candidates in one election: Jackson (2008) and Flores (2008). The Court recognizes that *Gingles* does not require Plaintiffs show that minorities must vote for the same preferred candidate across every election. That would be an impossibly high burden to meet and would not serve the purpose of Section 2 of the

Voting Rights Act. Rather, *Gingles* requires that Plaintiffs show a consistent pattern of minority cohesive voting across a period of elections. Therefore, the Court finds that Plaintiffs have satisfied this burden and shown that the minority community is politically cohesive.

In addition to local elections, there is evidence of minority cohesive voting during national elections. For example, in the 2008 U.S. Presidential election, about 90% of voters from the Minority Community strongly preferred Barack Obama over John McCain, while about 65% of white voters strongly preferred McCain. In the 2012 U.S. Presidential Election, about 90% of voters from the Minority Community strongly preferred Barack Obama over Mitt Romney (2012), while about 65% of whites preferred Romney (65% support). Tr. 312:1-15; P-0077 at 30. In the 2008 Presidential primary election, support for Obama (over Clinton) was much stronger among non-white voters than white voters. P-0077 at 30. In the 2016 mid-term elections, Minority Community voters strongly supported Black candidate Shaun Brown for the Second Congressional District, while white voters strongly supported white candidate Scott Taylor. Tr. 313:7-13; P-0077 at 31. In the 2008 and 2012 Presidential Election and the 2016 mid-term elections, the candidate of choice of the Minority Community got less than 50% of the vote in Virginia Beach. Tr. 312:16-20, 313:11-13.

The following table illustrates the Court's findings on voting patterns.

*Table 3: Minority Preferred Candidates Compared to White Voters Preferred Candidates (2008-2018)*

| Year | Election | Minority Preferred Candidates | Wins by Minority Preferred Candidates | Preferred Candidates of white Voters | Wins for Preferred Candidates for white Voters |
|------|----------|-------------------------------|----------------------------------------|--------------------------------------|------------------------------------------------|
| 2018 | At-large (2) | 1. Rouse (W) 2. White* (L) | 1 | 1. Moss, 2. Oliver or Rouse | 2 |
|      | Centerville | Wooten (W) | 1 | Wooten | 1 |
| 2016 | At-large (M) | Sessoms* (W) | 1 | Sessoms | 1 |
|      | Kempsville | Ross- Hammond (L) | 0 | Abbott | 1 |
| 2014 | At-large (2) | Davenport* (W) | 1 | 1. Davenport, 2. Moss | 2 |
|      | Princess Anne | Henley* (W) | 1 | Henley | 1 |
|      | Rose Hall | Cabiness (L) | 0 | Kane | 1 |
| 2012 | Kempsville | Ross- Hammond (W) | 1 | Dale | 0 |
| 2011 | At-large | Sherrod (L) | 0 | Moss | 1 |
| 2010 | At-large (2) | Jackson (L) | 0 | Bellitto, DeSteph | 2 |
|      | Bayside | Jones* (W) | 1 | Jones | 1 |
|      | Princess Anne | Bullock (L) | 0 | Henley | 1 |
| 2008 | At-large | Allen (L) | 0 | Wilson | 1 |
|      | Kempsville | Jackson or Flores** (L) | 0 | Diezel | 1 |
| | **Total** | **14** | **7 (4*)** | **17** | **16** |

*White Minority Preferred Candidates*
** Not Strong Minority Voter Cohesion Due to Voter Split*

c. Defendants' Objections to Dr. Spencer's Findings

In response to Dr. Spender's findings, Defendants raise the following objections based on

Dr. Quentin Kidd's report. First, they argue that Dr. Spencer only considered elections involving

a minority candidate and, thus, excluded 13 of the 30 contested City Council elections from

2008-2018. *See* ECF No. 237 at ⁋ 28; *see also,* Tr. 295:16–296:23, Tr. 891:3–22 (Kidd). Defendants argue that the analytic "focus ought to be on voters, not on candidates," Tr. 891:21–22, and the omission of 13 elections is material and undermines the analysis. Second, Defendants argue that Dr. Spencer generated voting support estimates for white voters alone, Black voters alone, and for "All Minority Voters" (i.e., a category that combines all non-white voters), but not for Asians and Hispanics. *See* ECF No. 237 at ⁋ 29; *see also,* PTX77 at 8–10; Tr. 330:3–15 (Spencer). Based on the 2013–17 ACS, Black voters constitute 19.3% of the City's population, Asian voters 6.6%, and Hispanic voters 6.1%. Tr. 910:3–9 (Kidd); PTX078 at 14, Tbl. 1. Therefore, Black voters make up 60.3% of the "All Minority" category; Asian, Hispanic, and other minority voters together make up 39.7%. *Id.* Defendants argue that Dr. Spencer did not generate individual estimates of Asian or Hispanic support because these groups are too small and insufficiently concentrated to produce reliable estimates. Tr. 336:7–337:9 (Spencer). That is, Defendants claim that Dr. Spencer's aggregation of three racial groups into an "All Minority Voters" category does not allow the Court to assess whether each group is internally cohesive, and all three groups are together cohesive. Tr. 906:22–907:11 (Kidd). Since the Asian and Hispanic communities are much smaller than the Black community, high Black support for a given candidate *could* mask far lower support—or even opposition—from Asian and Hispanic voters. *See* ECF No. 237 at ⁋ 31; Tr. 910:14–24, 911:11–912:2. As a result, Defendants' expert witness, Dr. Kidd, found that Black voters behave as a cohesive voting bloc only about half of the time. Dr. Kidd also found that less than a third of the elections analyzed by Dr. Spencer resulted in an African American candidate who received majority support among all minority voters. Ultimately, Dr. Kidd only found minority voter cohesion in one election with Bullock in 2010. *See* DTX083 at 5.

83

However, Dr. Kidd's analysis does not match the record. As the Court found above, between 2008-2018, there were 14 elections where at least one African American candidate was on the ballot, yet only three candidates won. The Court found nine instances of minority cohesive voting across those elections with minority candidates. Moreover, when white minority-preferred candidates were considered, the Court found an additional five instances of minority cohesion.

Furthermore, Defendants did not provide sufficient evidence at trial to properly qualify Dr. Kidd as an expert in quantitative statistical methods or racial polarized voting. Specifically, during *voir dire* Dr. Kidd admitted that he last taught an undergraduate political science courses in the summer of 2014, he last taught a course about the Voting Rights Act ten years ago, he has not taught a graduate level statistical methods course for 20 years, he has never published a peer review article on racially polarized voting. Tr D5 880:20-883:25. Most critically, Dr. Kidd admitted that he has never conducted an analysis of racially polarized voting in any jurisdiction, neither assessed Dr. Spencer's "R" code nor opened the data file, and he did not run an independent analysis of Dr. Spencer's data because he "didn't feel like it was needed." *Id.* Accordingly, the Court qualified Dr. Kidd as an expert in political science with an emphasis on racial politics but not in quantitative statistical methods nor an expert in racially polarized voting.

Tr. 886:11- 887:10.[26] Consequently, the Court finds that Dr. Kidd's analysis, methodology, and findings are neither credible nor sufficient to rebut Dr. Spencer's findings.

First, the Court finds Dr. Kidd's did not independently conduct a separate rigorous analysis using HP, ER, or EI statistical methods. Rather, Dr. Kidd relied on Dr. Spencer's methodology and analysis but sought to draw different conclusions. Tr. 882:7-21. At trial, Dr. Kidd admitted that he had never conducted a racially polarized voting analysis in any jurisdiction before. Tr. 882:3-6. Dr. Kidd did not conduct his own statistical analysis to support his conclusions that, for example, where the ER and EI estimates for a particular candidate were higher for "Black support" than "All minority support," Asian and Hispanic voters must support that candidate at a lower rate than Black voters. DTX083 at 17. However, since Dr. Kidd did not conduct a separate statistical analysis, the Court is unable to determine the credibility of his conclusions. Second, the Court finds that Dr. Kidd's use of differing voter turnout rates for each minority group for ten years of elections cannot disprove that Hispanics, Asians, and Blacks vote cohesively. *See, e.g., Montes v. City of Yakima*, 40 F. Supp. 3d 1377, 1405 (E.D. Wash. 2014) ("[T]he Ninth Circuit has prohibited district courts from discounting statistics about a minority

---

[26] The Court recognizes that Dr. Kidd has done some quantitative work. However, ultimately, the Court finds that his work is not sufficient to qualify him as an expert in quantitative statistical methods for the purpose of rebutting Dr. Spencer's statistical methods because Dr. Kidd's expertise in statistical methods is not recent and he has not used such methods in his work. On direct examination, Dr. Kidd stated that his formal training in statistical methods was 21-hours in seven courses when he completed during his PhD program over 20 years ago. Tr. 872:20-873:2; *see also,* Tr. 878:8-15. Moreover, Dr. Kidd stated the most common course he teaches was Undergraduate Research Methods in Quantitative Analysis, which he has not taught since 2014. Tr. 879:3-8. Additionally, Dr. Kidd stated that he is familiar with the statistical techniques of homogeneous precinct analysis, ecological regression, and ecological inference from his time at graduate school in 1998, over 20 years ago. Tr. D5 878:16-25. He also stated that his research work largely focuses on American political behavior, the politics of the South, race, and the transition of the South, over the last 60 to 70 years. He also stated he has done "a bit of good work on Virginia politics [including]... 120 or so surveys in Virginia ... [that] are scientifically valid." Tr. 873:5-18. The Court also notes that although Dr. Kidd stated that he has "used quantitative data analysis in almost everything that I've done in terms of peer-reviewed work -- not all of it but most of it," Tr. 876:5-11, he has not published studies about racially polarized voting using statistical methods. Finally, Dr. Kidd stated that he published a book in 2012 titled "Simple Guide to SPSS For Political Science," but this is only guide for students on how to use the software and not on conducting racially polarized voting analysis. *See* DTX083-047.

group's candidate preferences on the basis of low voter turnout."). Finally, Dr. Kidd's opinion that a candidate of choice must receive 50% +1 or more support in *every* election makes no sense in the many multi-candidate races in Virginia Beach. Minority preferred candidates *have won* with less than 50% of the vote, which is a fair measure of success. *See Lewis v. Alamance Cty., N.C.*, 99 F.3d at 613 n. 10 (4th Cir. 1996). (holding that candidates are not required to "achieve a threshold of 50% in a multi-candidate election" to be considered a minority-preferred candidate). In fact, in multi-member districts the Court has acknowledge that the degree of support may be lower when many candidates are running because minorities may split their vote. *Gingles* only requires that Plaintiffs provide evidence that candidates with enough minority support to win their election usually loss because of white bloc voting. *Gingles* 478 U.S. at 56 ("showing that a *significant* number of minority group members usually vote for the same candidates is one way of proving the political cohesiveness to a vote dilution claim.") (emphasis added).

In response to Dr. Kidd's critique, Dr. Spencer explained that it was more likely that all three minority communities usually supported the same candidate because where the ER and EI estimates differed for Black support and "All minority" support, it was likely caused by the non-linear distribution of the data. *See* Tr. 281:13-22; *see also*, Tr. 295:10-15. Moreover, Plaintiffs and Dr. Spencer recognized the limitations of his methodology and data because he could not obtain separate data for Asian and Hispanics. However, to address his own limitations, Dr. Spencer used statistical methods to strengthen his conclusions with two additional statistical analyses: 1) HP analyses confirming the ER and EI results, *see e.g.* Tr. 302:7-13 (Rouse 2018 election); Tr. 305:18-306:12 (Ross-Hammond 2016 election); Tr. 307:8-15 (Sherrod 2011 election); and 2) non-linear "LOESS" curves showing that the most accurate line through the distributed precinct data for the "All minority" community was nonlinear. Tr. 287:4-289:2,

289:21–290:19. P-0087 at 6; P-0077 at 33. Accordingly, Dr. Spencer concluded that the term "All minority" in his reports and testimony accurately "capture[d] the preferences of the Hispanic, Black, and Asian voters in Virginia Beach as a cohesive community." Tr. D2 295:10–15; P-0087 at 6; P-0077 at 33.

While the Court recognizes that Plaintiffs' methodology for estimating voter cohesion among Minority Community is limited, the Court does not find that the methodology is flawed. Rather, as noted above, Plaintiffs acknowledged several times that there is limited individual data to properly disaggregate the voting preferences of each demographic group, particularly Asians and Hispanics. *See* PTX430 at 120:2–13; PTX430 at 120:13–15, 225:17–21. To bolster credibility of his findings, Dr. Spencer used robust statistical methods to minimize these methodological limitations— which are not unique to the instant Section 2 case.

Furthermore, the Court concludes that Plaintiffs established that the African American community is politically cohesive. As detailed above, the Court found that between 2008-2018, there were seven elections with at least one Black candidate on the ballot. The Court found nine instances of minority cohesive voting across those elections with minority candidates. Across each of these nine instances, the Black community had consistent voter cohesion measured by their support for the minority-preferred candidate. Although, the rate of Black voter support for the minority-preferred candidate was sometimes higher than the all minority voter support, the differences were minor. Moreover, when white minority-preferred candidates were considered, the Court found an additional five instances of Black voter cohesion.

**3. White Majority Votes Sufficiently as a Bloc**

Third, the Court finds that there is sufficient evidence showing that the white majority in Virginia Beach votes "sufficiently as a bloc to enable it ... usually to defeat the minority's

preferred candidate." *Gingles,* 478 U.S. at 50–51. *Gingles* acknowledged that "there is no simple doctrinal test for the existence of legally significant racial bloc voting." *Id.* at 58. Rather, the Supreme Court held that "the degree of racial bloc voting that is cognizable as an element of a §2 vote dilution claim will vary according to a variety of factual circumstances", *Id.* at 57-58, including "the number of seats open and the number of candidates." *Id.* at 56.

Based on the data and analysis above, the Court finds that between 2008-2018, there were 16 Black candidates running for a Virginia Beach City Council seat. Out of these 16 Black candidates, nine were minority-preferred candidates for the Hispanic, Black, Asian Citizen Voting Age Population (HBACVAP). Moreover, there were five minority-preferred candidates who were white. In all, the Court finds that only 50% of the Minority Community's preferred candidates were successful in probative elections, while 94% of the white community's preferred candidates were successful. That is, 50% of the minority-preferred candidates have lost City Council elections between 2008-2018 due to white bloc voting.

However, the 50% success rate for minority-preferred candidates does not comprehensively explain the severity and extent of white bloc voting in Virginia Beach. Critically, when only Black minority-preferred candidates are considered for probative elections between 2008-2018, only 3 out of 14 candidates, or 21.4%, were successful. Moreover, two of the three Black minority-preferred candidates won their elections under special circumstances because their elections were *after* the instant lawsuit was filed and they had abnormally large support from white voters. For example, in 2018, Aaron Rouse (a Black male) won an at-large seat with 24% (EI) support from white voters. *See* P-0077 at 14. In the same election, Allison White (a white woman) was the minority-preferred candidate and came in fourth place because she had dismal support from white voters (8.3%, EI), though she had the second highest levels of support from

Black and minority voters at 36% (EI) and 26% (EI), respectively. *Id.* Similarly, in the 2018 election for Centerville, Ms. Sabrina Wooten (Black woman) received strong support from white, Black, and minority voters at 51% (EI), 95% (EI), and 85% (EI), respectively. *Id.* at 12. The elections of Rouse and Wooten occurred ***after*** the instant lawsuit was filed which was a topic of debate and discussion in the election. Therefore, the Court does not view these elections as indicative of the lack of a problem as the Defendants' suggest. Rather, the Court finds that the Rouse and Wooten 2018 election have less probative value because they occurred under special circumstances given the present lawsuit and the fact that both Rouse and Wooten received unusual white support as compared to all other Black City Council candidates since 2008. DTX155 (Hansen Dep) at 60:13-17 (admitting that Aaron Rouse received the most votes for City Council that he had ever seen). *See Gingles*, 478 U.S. at 75-76 (finding that elections marked by special circumstances have less probative value); *see also Ruiz v. City of Santa Maria*, 160 F.3d 543 at 557-58 (elections "not representative of the typical way in which the electoral process functions" have less probative value); *see also, United States v. Charleston Cty., S.C.*, 365 F.3d 341, 348 (4th Cir. 2004) (Holding that for racially polarized voting to be "legally significant" in Section 2 cases, "minority voters must 'usually' vote for the same candidates, and white bloc voting must 'normally' or 'generally' lead to the defeat of minority-preferred candidates."). Specifically, white voters' support for Rouse's candidacy was 15.4 percentage points (179%), higher than their average support for the five other Black candidates who ran for at-large seats since 2008. Wooten was the only Black candidate for City Council in Virginia Beach since 2008 to win a majority of the white vote. P-0078 at 45-49. Therefore, the elections of Rouse and Wooten are further evidence of white bloc voting because they demonstrate that when whites support a minority-preferred candidate, the minority candidate can win.

Accordingly, across ten years of probative elections, there is only one election where a Black minority-preferred candidate elected to office absent the socio-political effects of the present lawsuit: the election of Dr. Ross-Hammond in 2012 for the Kempsville seat. However, ultimately, her election is still an example of white bloc voting. In 2012, Dr. Ross-Hammond (a Black woman) received 65% (EI) of the all minority vote and 87% (EI) support from Black voters but only 17% from white voters. *See* P-0077 at 20-21. However, since there was a white voter split between three other candidates, Dr. Ross-Hammond was elected to City Council and became the third Black member in the City's history. *Id.* In 2016, Dr. Ross-Hammond ran for re-election and lost despite having 76% (EI) support from Black voters, 60% from minority voters, and increased support from white voters at 30% (EI). *See* P-0077 at 16. Dr. Ross-Hammond's opponent, Ms. Abbott (a white woman) won because she received 70% (EI) of the white vote, despite having only 24% support from Black voters and 40% from minority voters. *Id.* The Court finds that Dr. Ross-Hammond's 2012 win and subsequent loss in 2016 is a prime example of white bloc voting. Although she had large support from the Minority Community in 2012 and 2016, she only won in 2012 because the white vote was split between three candidates and then lost in 2016 because the white vote consolidated to support her opponent and, thus, block her re-election. According to Dr. Ross-Hammond, the expansion of the light rail, which she supported, "played a major part" in her re-election loss in 2016. Tr. 728:5-16. Dr. Ross-Hammond's opponent, Jessica Abbott, opposed light rail. DTX163 (Abbott Dep.) at 162:1-3. Polling data showed that support for light rail was split along racial lines with whites strongly opposing it. *See* Tr. 998:20-25; Tr. 312:10-20.

The Court also finds the Defendants' argument that the explanation for voter polarization is based on partisanship is without merit. Consistent with Fourth Circuit precedent, the Court finds

that "expanding the inquiry into the third *Gingles* precondition to ask not merely whether, but also why, voters are racially polarized, would convert the threshold test into precisely the wide-ranging, fact-intensive examination it is meant to precede. We have rejected this approach." *United States v. Charleston Cty., S.C.,* 365 F.3d 341, 348 (4th Cir. 2004) (citing *Alamance County,* 99 F.3d at 615–16 n. 12). Most of our sister circuits have also rejected this approach. *Compare Goosby v. Town Bd.,* 180 F.3d 476, 493 (2d Cir.1999) (treating causation under the totality of circumstances analysis rather than the third *Gingles* precondition); *Milwaukee Branch of the N.A.A.C.P. v. Thompson,* 116 F.3d 1194, 1199 (7th Cir.1997); *Sanchez v. Colorado,* 97 F.3d 1303, 1313 (10th Cir.1996); *Uno,* 72 F.3d at 980–81; *Nipper v. Smith,* 39 F.3d 1494, 1524–25 & n. 60 (11th Cir.1994) (en banc), *with LULAC,* 999 F.2d at 891–92 (finding the third *Gingles* precondition unsatisfied because "partisan affiliation, not race, caused the defeat of the minority-preferred candidate").

Overall, the Court can only find one instance across ten-years when a Black minority-preferred candidate was elected with no evidence of white bloc voting, because the white vote was split between three other candidates. Moreover, the Court finds that although minority-preferred candidates won about 50% of the elections between 2008-2018, white minority-preferred candidates account for about 30% of these election wins. Notably, four of these five white minority-preferred candidates received substantial support from white voters which is the reason that they won their election. Critically, the only white minority-preferred candidate, Ms. White (2018), who lost, was unsuccessful because she received dismal support from white voters with 8.3% (EI) of their vote. *See* P-0077 at 14.

Therefore, the evidence shows that when white voters support the same candidate as the Minority community, the minority-preferred candidate has about a 50% chance of winning.

However, when white voters are not able to block a minority-preferred candidate because the white vote is split, for example, even then the minority-preferred candidate has about a 20% chance of winning. In all, the Court finds substantial evidence of white bloc voting in Virginia Beach Council elections.

## 4. The Deferential Fourth Factor

The Court has discretion to examine the deferential *De Grandy* fourth factor to the *Gingles* test. In *De Grandy,* the Supreme Court held that "held that evidence indicating that minority voters form voting majorities in a number of voting districts roughly proportional to their respective share of the appropriate population is relevant, though not dispositive, of whether minority voters have less opportunity than other members of the electorate to elect representatives of their choice." *N.A.A.C.P., Inc. v. City of Columbia, S.C.*, 33 F.3d 52 (4th Cir. 1994) (citing *De Grandy,* 512 U.S. 997, at 1000 ("no violation of § 2 can be found here, where, in spite of continuing discrimination and racial bloc voting, minority voters form effective voting majorities in a number of districts roughly proportional to the minority voters' respective shares in the voting-age population.")). Here, the Court finds no evidence that minorities form effective voting majorities in various districts roughly proportional to the minority voters' respective shares in the voting-age population. Rather, the evidence shows that under the current district lines, the Minority Community is prevented from forming effective voting majorities, even though they are politically cohesive. As noted above, although there is strong evidence showing that the Minority Community is politically cohesive, based on quantitative voting patterns and qualitative evidence, the efforts of the Minority Community are only successful when the white majority does not block their vote. Although the Minority Community's preferred candidates have won in some elections between 2008-2018, this is because the minority-preferred candidate

also received support from the white voting bloc. Accordingly, the Court finds that the fourth *De Grandy* factor is inapplicable in this case and that the City's electoral system does not merit deferential treatment.

## C. The Totality of the Circumstances Inquiry

After finding that Plaintiffs have satisfied the *Gingles* preconditions, the Court must now determine whether, "based on the totality of the circumstances, there has been a violation of Section 2." *United States v. Charleston Cty.*, S.C., 365 F.3d at 345 (4th Cir. 2004). The Fourth Circuit has recognized that, where "a plaintiff [has] established the *Gingles* prerequisites, that plaintiff is likely to succeed under the totality of the circumstances." *Baten v. McMaster*, 967 F.3d 345, 379 (4th Cir. 2020), as amended (July 27, 2020). As noted above in Section V.B, the totality of circumstances inquiry typically involves nine factors. *See* S. Rep. No. 97-417, at 28-29; *see also Gingles*, 478 U.S. at 44-45. The totality of the circumstance's inquiry does not require that Plaintiffs prove "any particular number of factors . . . or that a majority of them point one way or the other." *See, Montes v. City of Yakima*, 40 F. Supp. 3d 1377 (E.D. Wash. 2014). Notably, the Senate Committee observed that "...there is no requirement that any particular number of factors be proved, or that a majority of them point one way or the other." S. Rep. No. 97-417, at 29. Rather, the Committee determined that "the question whether the political processes are 'equally open' depends upon a searching practical evaluation of the 'past and present reality,'" and on a "functional" view of the political process. *Id.* at 30, n. 120. Despite the flexibility of the Senate Factors, the Senate Committee did limit the circumstances under which Section 2 violations may be proved in three ways. First, electoral devices, such as at-large elections, may not be considered *per se* violative of Section 2 unless Plaintiffs demonstrate that, under the totality of the circumstances, the devices result in unequal access to the electoral

process. *Id.* at 16. Second, the conjunction of an allegedly dilutive electoral mechanism and the lack of proportional representation alone does not establish a violation. *Id.* Third, the results test does not assume the existence of racial bloc voting; plaintiffs must prove it. *Id.* at 33.  In other words, while the Court has broad discretion in examining factors it deems relevant to the inquiry of whether the political subdivision's electoral system, socio-political and economic history, and/or political governance system result in voter dilution of minority groups, there are some limitations.

In all, the Court finds that based on the totality of the circumstance's inquiry, Plaintiffs have satisfied their burden of showing that the Minority Community has less opportunity than other members of the electorate to participate in the political process and elect their preferred candidates. Critically, Plaintiffs provided sufficient evidence to show that each factor is met.

## 1. Senate Factor One: History of Official Discrimination

The first Senate Factor requires the Court to examine the "extent of any history of official discrimination in the state or political subdivision that touched the rights of the members of the Minority group to register, to vote, or otherwise to participate in the democratic process." *See* S. Rep. No. 97-417, at 28-29; *see also Gingles*, 478 U.S. at 44-45.

There is a long history, which cannot be fully detailed here, of official discrimination against the Minority Community in Virginia Beach as well as across the Commonwealth of Virginia. The vestiges of this official history of discrimination persist today and are negatively impacting minority communities. During the Reconstruction period that followed the era of slavery and the end of the Civil War, African Americans in Virginia participated in the politics of the Commonwealth as voters and officeholders. ECF No. 190 at ⁋ 36. However, by the 1880s, the Virginia state legislature began to adopt measures aimed at eliminating black voting and

94

office-holding in Virginia. *Id.* at ¶ 37. During Virginia's Constitutional Convention of 1901-1902, the Commonwealth adopted literacy testing and poll tax requirements for voting. *Id.* at ¶ 38. Virginia still enforced a poll tax law in January of 1964, when the Twenty-Fourth Amendment abolished the use of the poll tax in federal elections. *Id.* at ¶ 39. Virginia continued to require poll taxes in state elections until it was struck down in 1966. *Id.* at ¶ 40; *see also, Harman v. Forssenius,* 380 U.S. 528 (1965) (holding that Virginia's poll tax law for state elections violated the Twenty-Fourth Amendment.); *see also, Commonwealth of Virginia v. United States,* 386 F.Supp. 1319 (D.D.C. 1974) (three-judge court), *aff'd* 420 U.S. 901, (1975) (finding that Virginia's constitutional requirement of proof of literacy for persons registering to vote violated § 5 of the Voting Rights Act of 1965.); *Harper v. Virginia State Board,* 383 U.S. 663 (1966) (Finding Virginia's poll tax unconstitutional because it was intended to specifically discriminate against Black voters).

During the early part of the Twentieth Century, the Virginia General Assembly enacted laws requiring racial segregation of whites and Blacks in schools, public transportation, and public facilities. These laws are generally referred to in common parlance as "Jim Crow laws." ECF No. 190 at ¶ 41. In addition, some providers of housing and public accommodations in Virginia gave out their services based on race. This is known as "de facto segregation." These racial segregation laws were challenged in Federal Court and ultimately stricken down. *See Griffin v. Board of Supervisors of Prince Edward County,* 339 F.2d 486 (4th Cir. 1964) (holding unconstitutional Prince Edward County's use of foundation schools supported by public funds in form of tuition grants for white students only because it was school segregation on the basis of race.); *Hamm v. Virginia State Board,* 230 F.Supp. 156 (E.D. Va.1964) (three-judge court), *aff'd sub nom. Tancil v. Woolls,* 379 U.S. 19, 85 S.Ct. 157, 13 L.Ed.2d 91 (1964) (holding that

Virginia laws unconstitutionally required the separation of names by race on voter registration, poll tax, residence-certificate, and property ownership and tax lists.); *Brown v. City of Richmond*, 204 Va. 471, 132 S.E.2d 495 (1963); *Blackwell v. Harrison*, 221 F.Supp. 651 (E.D.Va. 1963) (finding that Virginia statutes requiring racial segregation in places of public assemblage were unconstitutional.); *Loving v. Virginia*, 388 U.S. 1, (1967) (finding that Virginia's prohibition of interracial marriage was unconstitutional.).

Overall, the history of public racial discrimination in the Commonwealth of Virginia is well documented and includes: (1) literacy tests until 1974; (2) an unconstitutional poll tax that existed until 1966; (3) racial segregation until 1963; (4) upholding its interracial marriage ban in 1955; and (5) maintaining this ban until the Supreme Court struck it down in 1967. *See Neal v. Coleburn*, 689 F. Supp. 1426, 1428 (E.D. Va. 1988) ("The Commonwealth of Virginia and its political subdivisions bear a history of official racial discrimination against black persons, as is evidenced by the discriminatory voting practices.").

However, Courts continue to find evidence that Virginia still discriminates against minorities. Most recently, in 2015, a federal court in this District held in *Page v. Virginia St. Bd. of Elections* No. 3:13CV678, 2015 WL 3604029, at *15 (E.D. Va. June 5, 2015) that Virginia's post-2010 congressional redistricting was unconstitutional because it needlessly packed Black voters into a single district, diminishing their political influence elsewhere in the State. In 2018, a federal district court also found "overwhelming evidence" that Virginia engaged in an unlawful racial gerrymander by sorting "voters into districts based on the color of their skin." P-0078 at 10-11. Moreover, there is evidence in the record that Virginia has recently targeted minority immigrant communities. For example, evidence shows that Latinos in Virginia Beach face housing discrimination because of generalized hostility towards immigrants. P-0078 at 11. Most

recently, on March 19, 2019, the Governor of Virginia vetoed Senate Bill 1156, which would have barred any "locality [from adopting] any ordinance, procedure, or policy intended to restrict the enforcement of federal immigration laws."[27] All but one legislator representing Virginia Beach voted for the bill. On April 9, 2018, Gov. Ralph Northam vetoed House Bill 1257, which would have prohibited sanctuary cities.[28] In 2019, the Virginia General Assembly passed House Bill 2270 which required correctional facility officials to notify the U.S. Immigration Customs and Enforcement when immigrants were being released from custody. Although the Governor vetoed the bill, there was increased animus towards minority immigrant communities which manifests in material discrimination. P-0078 at 11.

The Defendants' expert witness, Dr. Kidd, did not credibly refute Plaintiffs' claims regarding discrimination against minority groups in Virginia Beach. In his report, Dr. Kidd stated that Hispanics and Asians have not suffered from the exact same long history of voting, and general, discrimination as Black people because the Hispanic and Asian voting turnout rates are like those for non-Hispanic whites. *See* DTX083 at 26-27. While it is true that Asian, Hispanic, and Black communities have experienced different forms of discrimination, they have nonetheless experienced discrimination.

---

[27] See, Virginia's Legislative Information System, "SB 1156 Sanctuary policies; policies prohibited that restrict enforcement of federal immigration laws."

[28] The Court takes judicial notice of this legislative fact. *See,* Fed.Rules Evid.Rule 201(b), 28 U.S.C.A; *see also, United States v. Harris,* 331 F.2d 600, 601 (6th Cir. 1964) ("[I]t [is not] necessary that the Court be requested to take judicial notice of a fact before it is authorized to do so. The Court may take judicial notice *sua sponte.*"); *see also; Korematsu v. United States*, 584 F. Supp. 1406, at 1414 (N.D. Cal. 1984) ("Judicial notice may be taken of adjudicative facts in accordance with Fed.R.Evid. 201, as well as of legislative facts.... Adjudicative facts are usually those facts that are in issue in a particular case. Judicial notice of adjudicative facts dispenses with the need to present other evidence or for the factfinder to make findings as to those particular facts. Rule 201 provides that only those adjudicative facts which are not subject to reasonable dispute because they are generally known or "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned" may be judicially noticed.); *see also, United States v. Gould,* 536 F.2d 216, 220 (8th Cir. 1976) (Legislative facts are "established truths, facts or pronouncements that do not change from case to case but [are applied] universally, while adjudicative facts are those developed in a particular case."); *See Territory of Alaska v. American Can Co.,* 358 U.S. 224, at 227 (1959); *See Leo Sheep Co. v. United States,* 440 U.S. 668, (1979) (historical facts, commercial practices and social standards are frequently noticed in the form of legislative facts.); *see,* Virginia's Legislative Information System, "HB 1257: Governor's veto."

The first problem with Dr. Kidd's rebuttal is methodological because he only uses statewide, not Virginia Beach-specific, turnout data and he does not provide any statistical analysis to support this claim. As discussed below, Dr. Lichtman, Plaintiffs' expert, used statistical methods and qualitative research in American voting rights and elections to credibly show that the Minority Community's voter turnout percentage in Virginia Beach was lower than that of non-Hispanic whites. P-0082 at 17-20. The second problem with Dr. Kidd's claim is that, although there are fewer Hispanic and Asian populations in comparison to the Black population in Virginia Beach, the impact of discrimination is similar across all minority groups. There is overwhelming evidence in the record showing that Hispanic, Asian, and Black people in Virginia Beach experience discrimination which negatively impacts their life outcomes. Dr. Kidd even admits that there is lower voter turnout among Hispanic voters. *See* DTX083-27. The third, and most severe, problem with Dr. Kidd's and Defendants' argument is that they attempt to obfuscate the issue by arguing that since there was/is no direct law officially sanctioning discrimination against Hispanics and Asians, that they do not suffer from discrimination. This argument is problematic because this framing of discrimination is ahistorical and dismissive of how discrimination against people of color operates. Such a framing of discrimination is a prime example of why racial discrimination persists across Virginia, generally, and in Virginia Beach specifically. That is, to argue that racial discrimination exists only when it is visible, or when law or policy directly states it is discriminatory misses the daily and ordinary discriminatory experiences of minority communities and undermines the insidious and persistent nature of racial discrimination.

For example, at trial Plaintiff Latasha Holloway credibly testified to her experience as a Black woman in Virginia Beach describing it as "horrific," feeling like a "second class citizen,"

and being deprived of an equal access to education and community resources. Tr. 417:6-418:5. Ms. Holloway's experience is corroborated by the record. For example, although the Virginia Beach Public School District formally desegregated in 1969 by court order, the evidence shows that minority children are structurally deprived of the same quality resources as those that white students receive. The District's Dissimilarity Index score, a commonly used measure of segregation, was 45.0 in 1968, 27.0 in 1990, 32.7 by 2000, and back up to 38.9 by 2011. P-0078 at 18. Furthermore, although Dr. Kidd and Defendants accept that Asian and Hispanics experience racial discrimination in Virginia Beach, they argue it is not the kind of discrimination that hinders Asians and Hispanics to vote. The Court concludes that voter turnout data is not evidence of the lack of discrimination and cannot soften the impact racial discrimination. Defendants' argument is flawed. Rather, voter turnout data is evidence of the persistent effort and resilience of Hispanic, Asian, and Black communities to collectively, and cohesively, participate in the democratic process. As detailed above, the Minority Community is united, through the Virginia Beach Concerned Citizens Coalition ("VBCCC"), in asking City Council to change the at-large system because it dilutes their votes and "impedes equal representation." Tr. 489:6-490:9; Tr. 490:18-491:4; P-0210. Yet, because City Council has refused to change the electoral system, the Minority Community has no choice but to turn out to vote.

In short, there is evidence of official discrimination against Hispanic, Asian, and Black people in Virginia Beach, specifically, and across the Commonwealth of Virginia, generally, which is sufficient to satisfy the first Senate Factor in favor of Plaintiffs.

## 2.  Senate Factor Two: Voting in City Council Elections is Racially Polarized

The second Senate Factor requires the Court to examine "the extent to which voting in the elections of the state or political subdivision is racially polarized." *See* S. Rep. No. 97-417, at 28-

29; *see also Gingles*, 478 U.S. at 44-45. As detailed above in Section VI.B, the Court finds that there is evidence of racially polarized voting in the City's elections. First, the Hispanic, Black, and Asian voting age population in Virginia Beach is politically cohesive because they consistently support the same minority-preferred candidates in seven probative elections between 2008-2018. Specifically, the Court found evidence that the Minority Community was politically cohesive in support of nine minority candidates and five white candidates. Second, the Minority Community has a long a history of advocating for similar political and social issues, including changing the at-large district system. Third, there is strong evidence that the white majority votes to consistently block the minority preferred candidates in elections be probative between 2008-2018. The Court notes, however, that white minority-preferred candidates account for about 30% of election wins for minority-preferred candidates. Notably, four of these five white minority-preferred candidates received substantial support from white voters which is the reason that they won their election. Critically, the only white minority-preferred candidate, Ms. White (2018), who lost, was unsuccessful because she received dismal support from white voters with 8.3% (EI) of their vote. *See* P-0077 at 14. Therefore, the evidence shows that when white voters support the same candidate as the Minority community, the minority-preferred candidate has about a 50% chance of winning. However, when white voters are not able to block a minority-preferred candidate because the white vote is split, for example, even then the minority-preferred candidate has about a 20% chance of winning. In all, the Court finds substantial evidence of white bloc voting in Virginia Beach probative elections.

### 3. Senate Factor Three: Discriminatory Voting Practices or Procedures

The third Senate Factor requires the Court to examine the "extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single

shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group." *See* S. Rep. No. 97-417, at 28-29; *see also Gingles*, 478 U.S. at 44-45. The Court finds that there is sufficient evidence showing that the City maintains unusually large election districts and has a single-shot system which have both long been recognized as discriminatory electoral practices against minorities.

　　a. Unusually Large Election Districts

　　The Supreme Court has held that at-large voting schemes can "minimize or cancel out the voting strength of racial [minorities in] the voting population." *Gingles*, 478 U.S. at 47 (alteration in original) (citation omitted); *Johnson v. De Grandy*, 512 U.S. 997, 1018 (1994); *Collins II*, 883 F.2d at 1236 (at-large system and staggered terms can dilute minority votes). Specifically, courts have found that, given structural socioeconomic and social disadvantages that minority communities face, at-large districts heavily disadvantage minority candidates because "are likely to have less access to the necessary resources for travel and advertising" outside the immediate area surrounding the candidates' homes. *Ward v. Columbus Cty., N.C.*, 782 F. Supp. 1097, 1104 (E.D.N.C. 1991). In Virginia Beach, minority candidates running for the at-large seats are expected to campaign across 249 square miles which requires immense resources. Virginia Beach is unique among 13 cities of comparable size in Virginia because the City requires all City Council candidates to run citywide. At 249 square miles, the City is essentially tied for second among those cities in the size of the area candidates must traverse to win a city council position. With a population of 450,000, the City has the largest electorate for which each candidate must compete. P-0078 at 22-24; P-0082 at 13, 15, 51; DTX163 (Abbott Dep.) at 51:19-52:3 (agreeing that it is unusual for a city the size of Virginia Beach to use an at-

large system). Under Plaintiffs' proposed Plan 2, the mean district sizes would be 24.9 square miles, reducing the area for electoral competition by 90 percent. P-0082 at 51; DTX083 at 31.

### b. De Facto Majority Vote Requirement

The composition of the City's electoral system, in which seven of the City Council's 11 seats are designated posts, has been recognized by the Senate Committee as an electoral device that exacerbates the discriminatory effect of at-large elections. P-0082 at 10, 15. Particularly Virginia Beach has a single-shot voting system for a preferred candidate in multi-winner elections. Accordingly, the Minority Community can only vote for one candidate which increases the vote total for a preferred candidate without increasing it for other candidates. The City's designated posts combined with at-large voting precludes single-shot voting by requiring voters to split their votes among seven residency district seats, enhancing the dilutive effect of at-large elections. P-0078 at 4, 21; P-0082 at 10. Therefore, the City has a de facto majority vote requirement which is recognized by *Gingles* as a tactic of voter dilution.[29] *See Gingles*, 478 U.S at 39 n. 5 (1986) ("'Single-shot voting enables a minority group to win some at-large seats if it concentrates its vote behind a limited number of candidates and if the vote of the majority is divided among a number of candidates.'" (quoting *City of Rome v. United States*, 446 U.S. 156, 184, n. 19)); *see also, Missouri State Conference of the Nat'l Ass'n for the Advancement of Colored People v. Ferguson-Florissant Sch. Dist.*, 894 F.3d 924, at 936 (8th Cir. 2018) ("Bullet voting is when a voter casts their ballot with one vote for the preferred candidate, but leaves the

---

[29] The *Gingles* Court explained bullet (single-shot) voting as follows: "'Consider [a] town of 600 whites and 400 blacks with an at-large election to choose four council members. Each voter is able to cast four votes. Suppose there are eight white candidates, with the votes of the whites split among them approximately equally, and one black candidate, with all the blacks voting for him and no one else. The result is that each white candidate receives about 300 votes and the black candidate receives 400 votes. The black has probably won a seat. This technique is called single-shot voting. Single-shot voting enables a minority group to win some at-large seats if it concentrates its vote behind a limited number of candidates and if the vote of the majority is divided among a number of candidates.'" *City of Rome v. United States*, 446 U.S. 156, 184, n. 19, (1980), quoting United States Commission on Civil Rights, The Voting Rights Act: Ten Years After, pp. 206–207 (1975). *See Thornburg v. Gingles*, 478 U.S. 30, at 39 Fn 5. (1986)

other votes blank in an effort not to dilute the strength of their vote for the preferred candidate.");
*see also, Ruiz v. City of Santa Maria*, 160 F.3d 543 (9th Cir. 1998) (Finding that the ability of
Hispanic voters to use single-shot voting in city council elections was insufficient to sustain
summary judgment in favor of the City.)

Moreover, the City's use of staggered terms "promote the dilution of minority voting strength
because they limit the number of seats, [and] create more head-to-head contests between white
and minority candidates, which highlights the racial element and minimizes the influence of
single-shot voting." *Buckanaga v. Sisseton Indep. Sch. Dist. No. 54-5, S.D.*, 804 F.2d 469, 475
(8th Cir. 1986). Staggered terms, as well as numbered posts, prevent the Minority Community
from concentrating their votes on a single candidate and increasing the chances that that
candidate gets elected. Therefore, there is sufficient evidence for Senate Factor Three.

### 4. Senate Factor Four: Exclusionary Slating Process

The fourth Senate Factor requires the Court to examine "whether minority candidates have
been denied access to any candidate-slating process." *See* S. Rep. No. 97-417, at 28-29; *see also
Gingles*, 478 U.S. at 44-45. The Court concludes that there is evidence showing that minority
candidates are denied access to the informal candidate-slating processes, campaign contributions
and sample balloting, in Virginia Beach.

Plaintiffs' expert witness, Dr. Lichtman, examined how candidates for City Council unite
to help fund each other's campaigns. Dr. Lichtman found that, for City Council elections from
2008-2018, while 17 white candidates received $250 or more from two or more other candidates,
only two Black candidates (out of 20 from 2008-2018) received such financial support. P-0078 at
25-27. Dr. Lichtman also considered intra-election candidates, which are those who ran in City
Council elections from 2008-2018 but not in the same year as the recipient of the contribution.

With respect to intra-election candidates, seven white but no Black candidates received two or more intra-election donations of $250 or more. Dr. Lichtman found that Ross-Hammond (2016), Rouse (2018), and Wooten (2018) were the only Black candidates to garner *any* intra-election candidate contributions (one each). P-0078 at 25-27. As noted above, Rouse (2018) and Wooten (2018) were elected under special circumstances *after* the instant lawsuit was filed. Accordingly, their campaign contributions were also received under such special circumstances.

Plaintiffs also established that the informal City Council candidate slating process also occurs through sample ballots. For example, in 2018, Friends of the Elephant, a Political Action Committee, handed out sample ballots at one or more polling places with recommended candidates for office. These sample ballots were color coded, with one color for Black voters and another color for white voters. Aaron Rouse, a Black candidate for City Council, was included on sample ballots handed to Black voters, but not on the ones handed to white voters. DTX175 (Wood Dep.) at 76:10-77:13.

The Court concludes that minority candidates have been denied access to the candidate-slating processes for City Council elections. Furthermore, the Court notes that the candidate slating process is corroborated by the fact that only three Black candidates were elected to City Council, between 2008-2018, where two candidates were elected *after* the instant lawsuit was filed. Therefore, the high disparity between white and Black candidates receiving campaign contributions correlates with the dismal success of minority candidates to serve on City Council.

### 5. Senate Factor Five: Minorities Bear the Effects of Discrimination

The fifth Senate Factor requires the Court to examine "the extent to which minorities in the state or political subdivision bear the effects of discrimination in education, employment, and health, which hinder their ability to participate effectively in the political process." *See* S. Rep.

No. 97-417, at 28-29; *see also Gingles*, 478 U.S. at 44-45. As noted above in Senate Factor one, the Court finds that the Minority Community in Virginia Beach has suffered the consequences of official past and ongoing discrimination. Accordingly, the Court concludes that the history of racial discrimination has had a disproportionate impact on the education, employment, economic, and social conditions of the Minority Community.

a. Disproportionate education, employment, income level, and living conditions arising from past discrimination.

*1. Education*

As noted above, the Commonwealth of Virginia has a long official history of racial segregation in education which has had a severe impact on the outcomes of minority students compared to whites. According to Dr. Lichtman's report, which used data from the 2011-2015 ACS and the Virginia State Board of Education, while the white community graduates from high school at the rate of 95.0%, the Minority Community graduates at a rate of 89.4% for Black students, 88.7% for Hispanic students and 91.8% for Asian students. P-0078 at 33. However, graduation rates are only the tip of the iceberg. In terms of academic achievement, the Black and Hispanic students underperform compared to the white students in their passage rate in basic skills. For example, the English writing passage rate for white persons is 89% but just 68% for Black students and 81% for Hispanic students. P-0078 at 33. Moreover, the Math passage rate is 70% for Black students, 81% for Hispanic, and 88% for white students. *Id.* Similarly, the Science passage rate for Black and Hispanic students are 69% and 82%, respectively, compared with 92% for white students. *Id.* The Court notes that while Asian students perform at the same, or higher, rate compared to white students, this is not evidence of the lack impact on discriminatory impact of the Minority Community as a whole because the Asian community faces disparities in other social, economic, and healthcare factors detailed below. In all, the academic

underachievement impacts the rate of Black and Hispanic students who obtain a bachelor's degree or more. The data shows that only 25.3% of Black students and 21.8% of Hispanic students obtained a bachelor's degree compared with 36.4% of white and 41.6% of Asian students. *Id.*

There is also evidence showing that Black students in Virginia Beach public schools are suspended and expelled at a disproportionately high rate compared with their white peers. For example, according to a 2017 study cited in the record, conducted by the Legal Aid Justice Center, Virginia Beach schools continue to have an issue with out-of-school suspensions, with two-thirds of them being for minor offenses. *See* P-0078 at 18.[30] The study found that while the rate of short-term suspensions for white students in Virginia Beach is comparable to the state rate for suspensions, the rate for African American students is 3.7 times higher than the white rate.

According to two studies by the Heller School for Social Policy and Management at Brandeis University and the Lewis Mumford Center for Comparative Urban and Regional Research University at Albany, there is evidence of increasing segregation based on race in public schools in Virginia Beach. *See* P-0078 at 18.[31] Specifically, the Lewis Mumford Center examined the "dissimilarity index" and found that although Virginia Beach Public School District temporarily showed progress toward integration after 1969, segregation in the District has increased since 1990. For example, the District's Dissimilarity Index score, a commonly used measure of segregation, was 45.0 in 1968, 27.0 in 1990, 32.7 by 2000, and back up to 38.9

---

[30] *See* AMY WOOLARD, LEGAL AID JUSTICE CENTER, SUSPENDED PROGRESS 2017: AN UPDATE ON THE STATE OF EXCLUSIONARY DISCIPLINE IN VIRGINIA'S PUBLIC SCHOOLS, (October 2017), at 3, 17.

[31] The Court takes judicial notice of the article referenced and cited in Dr. Lichtman's report. The Court was readily able to find the study since it occurred in its jurisdiction. *See* JOHN R. LOGAN & DIEDRE OAKLEY, LEWIS MUMFORD CENTER FOR COMPARATIVE URBAN AND REGIONAL RESEARCH UNIVERSITY AT ALBANY, THE CONTINUING LEGACY OF THE BROWN DECISION: COURT ACTION AND SCHOOL SEGREGATION, 1960-2000 (January 28, 2004) at 10; *see also,* THE HELLER SCHOOL FOR SOCIAL POLICY AND MANAGEMENT, SCHOOL SEGREGATION (DISSIMILARITY INDEX): PUBLIC PRIMARY SCHOOL STUDENTS DISSIMILARITY WITH WHITE (NON-HISPANIC) STUDENTS BY RACE/ETHNICITY 2010-2011 (2011).

by 2011. P-0078 at 18. Similarly, a more recent study by the Heller School found that for the 2010-2011 school year, the dissimilarity index up again at 38.9, based on the 2010 Census.

Additionally, a 2011 study by the Virginia Pilot found that there is a substantial racial gap in the City's employment of minority teachers relative to minority public school enrollment. For example, the study found that the City had one white teacher for every nine white students, but only one minority teacher for every 43 minority students.[32] *See* P-0078 at 20. The study found that while the disparity was statewide Virginia Beach had the sharpest disparities because 85% of the schoolteachers in Virginia Beach were white but about 50% of the students were minorities. *Id.* Specifically, while in Virginia, 43 percent of students and 17 percent of teachers were minorities; the City had 50 percent of minority students and just 15 percent of teachers were minorities. P-0078 at 20.

### 2. *Employment, Income Level, and Living Conditions*

The Court finds that there is evidence showing disparate levels of income, unemployment, poverty, health care access, and public assistance.

According to Dr. Lichtman's exert report, based on 2010 Census and the 2011-2015 ACS data, the median household income for Black, Hispanic, and Asian households was $51,559, $54,825, and $72,001, respectively. *See* P-0078 at 28-29. However, the median household income for whites in Virginia Beach over the same time was $71,948. When per capita income was measured between 2011-2013, there were disparities for all racial/ethnic groups compare to whites. The per capital income for a Black, Hispanic, and Asian Virginia Beach resident was $22,773, $20,784, and $26,512, respectively, but it was $37,443 for whites. *Id.*

---

[32] The Court takes judicial notice of the article referenced and cited in Dr. Lichtman's report. The Court was readily able to find the study since it occurred in its jurisdiction. *See* Mike Hixenbaugh, *Teacher-Student Racial Imbalance Widest in Va. Beach*, THE VIRGINIAN-PILOT, September 17, 2011.

Additionally, there is disproportionate poverty and unemployment rates between the Minority Community and whites. Based on the 2010 Census and the 2011-2015 ACS data, Dr. Lichtman found that the poverty rate for Black, Hispanic, and Asian individuals is 14.4%, 14.2%, and 7.4%, respectively, compared with 5.8% for whites. *Id.* Moreover, the unemployment rate for Blacks and Hispanics was 9.2% and 8.8%, respectively, while it was 5% for whites. As a result of higher poverty and unemployment rates, it is unsurprising that the Minority Community relies on food stamps (e.g. SNAP) at a higher rate than whites. For example, while only 4.1% of whites use food stamps, 5.5% of Asians, 10.9% of Hispanics, and 15.9% of African Americans use food stamps. *Id.* Furthermore, there is a disparity in the rate of 18-64-year-old individuals without health insurance. That is, 17.1% of Black, 24.5% of Hispanic, and 15.7% of Asian individuals are without health insurance, while only 11.6% of whites are. *Id.* Finally, there is a dismal lack of wealth, measured by home ownership, in the Minority Community. For example, according to the 2011-2015 ACS survey, 44.9% of African Americans, 46.1% of Hispanics, and of 69.4% of Asians owned their home compared to 69.5% of whites. *Id.* at 36. When minorities do own their homes, there is a disparity in home values. *Id.*

In all, the Court concludes that the official history of discrimination, as well as the present-day instances of structural discrimination, against the Minority Community has manifested in educational, economic, housing, and health disparities.

b. Political Participation

The economic, educational, and wealth disparities caused by structural discrimination hinder the ability of the Minority Community in Virginia Beach to participate in the political process. P-0078 at 4-5. For example, according to Dr. Lichtman's credible report, minority voter registration in Virginia trails white voter registration. On average, from 2008-2018, white

registration as a percentage of CVAP was 74%, while it was only 66.1% for African Americans, 55.2% for Hispanics, and 64.2% for Asians. P-0082 at 23-24. For all Virginia elections from 2008-2018, the average white voter turnout of 59.6% was higher than the 54.5% rate for Black voters, 44.4% for Hispanic voters, and 47.4% for Asian voters. Overall, the 56.4% voter turnout in Virginia Beach is significantly lower than the 71.5% statewide, even though the jurisdictions have very similar demographics. P-0082 at 18.

c. Defendants' Objections

Defendants' raise some objections to Dr. Lichtman's findings. First, Defendants agree that the "historical discrimination against the Black community is undisputed." ECF No. 237 at ⁋ 133. However, Defendants argue that the evidence showing that the discrimination hinders current Black political participation "is undeveloped or non-existent." *Id.; see also,* DTX83-034–35. Further, Defendants argue that the evidence of discrimination against Hispanics and Asians is "thin" and that, at best, there is some shared socioeconomic and educational discrimination. *Id.*

First, Defendants' expert witness, Dr. Kidd, argues that "on six [of 15] measures, Asians score better than whites, on two measures they have comparable scores, and on three measures Asians are more like whites than like Hispanics or African Americans." DTX83-034. Thus, Dr. Kidd argues that the data does not show that the social conditions of Asians' correlate with lower voter turnout rates, compared to whites. *Id.* Rather, Dr. Kidd argues that Asians participate in elections at a similar or higher rate than whites. *Id.*

Second, Dr. Kidd, explores Dr. Lichtman's argument that if "scoring poorly on these measures is associate with less political participation, then the group that is the most disadvantaged would be the least political active." *Id.* Specifically, Dr. Kidd argues that since African Americans score poorer than Hispanics in 11 of the 15 measures presented by Dr.

Lichtman, then there should be higher political participation by Hispanics. *Id.* However, Dr. Kidd argues that based on six federal elections between 2008-2018, "the Hispanic participation rate is within the margin of error for every election, and while during two elections (2012 and 2016) the two groups are very close to equal in their levels of voting, black participation is always higher than Hispanic participation." *Id.*

Overall, the Court finds Dr. Kidd's claims unpersuasive because of his lack of statistical analysis to support his arguments. As noted above in the Court's examination of Dr. Kidd's rebuttal of Dr. Spencer's *Gingles* analysis, Dr. Kidd has not conducted his own statistical analysis and when he has it has severe limitations. With respect to his claims about voter turnout, Dr. Kidd relied on the Current Population Survey for the Commonwealth of Virginia, not for Virginia Beach, which comprises only about 5% of Virginia's population. *See* DTX083-034-035; *see also,* P-0082 at 18. Thus, Dr. Kidd assumes, without any supporting evidence, that the Virginia Beach's voter turnout patterns would be the same as Commonwealth's turnout patterns. In response, Dr. Lichtman used Virginia Beach voter turnout data to show that, in 2018, Virginia Beach voter turnout was lower, at 66%, compared to 71.2% statewide. *Id.* Moreover, Dr. Kidd relies on self-reported voter turnout from the Current Population Survey (CPS), which has a wide margin of error. As a result, Dr. Kidd's own analysis leads to the plausible conclusion that the voter turnout rates for Blacks, Hispanics, and Asians across six election cycles from 2008-20018 is likely lower than white turnout. *See* Tr. at 965:9-24 (Dr. Kidd admitting that the based on the margin of errors, it is plausible that Asian voter turnout could be lower, higher, or the same as white voter turnout.). Because of the wide margins of errors, Dr. Kidd's analysis is not credible and methodologically flawed, which prevents the Court from drawing reasonable conclusions about minority voter turnout.

On the other hand, Dr. Lichtman reliably used Virginia Beach election data to show that Hispanics, Blacks, and Asians have consistently had lower voter turnout in every election compared to whites with the single exception of a 0.3% lead for Asian turnout in the 2016 election. *See* P-0078 at 18-21. Notably, Asian turnout was on average 12.2 percentage points lower than white turnout, except for the 2016 election. *Id.* Moreover, African American turnout is substantial lower than white turnout, except for the 2008 and 2012 Presidential Elections. Overall, African American voter turnout was, on average, 5.2 percentage points lower than white turnout. *Id.* Similarly, Hispanic voter turnout was lower than white turnout for all elections measured between 2008 and 2018. On average, Hispanic turnout was 15.2 percentage points lower than white turnout.

There are other flaws in Dr. Kidd analysis. First, Dr. Kidd argued that socioeconomic differences were the determining factor for voter turnout. However, as Dr. Lichtman argued, though socioeconomic data may be an important factor to political participation, political mobilization is equally important. Although Dr. Kidd ignored this factor for his rebuttal report, his own research has found that political mobilization plays a central role in minority voter turnout in elections in the South. *See* P-0072 at 21.[33] Consequently, as various members of the community credibly testified, Hispanics, Blacks, and Asians in Virginia Beach face challenges initiating and sustaining political mobilization within their respective communities because the lack of resources, support from whites, and structural barriers. *See* P-0078 at 28-36; DTX163 (Abbott Dep.) at 151:10 (agreeing that the City has a history of racial discrimination and that people in the Minority Community still endure downstream effects of long-term discrimination); DTX157 (Rouse Dep.) at 121:2-11 (same); Tr. 393:19-21 (Councilmember Wooten agreeing that

---

[33] Based on Dr. Kidd's curriculum vitae in the record, the Court notes his publication. *See* M.V. HOOD III, QUENTIN KIDD, & IRWIN L. MORRIS, *THE RATIONALE SOUTHERNER: BLACK MOBILIZATION, REPUBLICAN GROWTH, AND THE PARTISAN TRANSFORMATION OF THE AMERICAN SOUTH* (2012), at 70.

minority communities in the City still suffer downstream effects of racial discrimination). A key measure of political mobilization are voter registration rates. The record shows that even based on Dr. Kidd's own data there are vast disparities in voter registration rates for Hispanics, Blacks, and Asians compared to whites. *See* P-0082 at 23. For example, on average Black, Hispanic, and Asian registration rates are 7.9, 17.3, and 9.8 percentage points, respectively, lower than whites. *Id.* at 23, 27-31.

*          *          *

In short, the Court weighs the evidence for Senate Factor Five in favor of the Plaintiffs and concludes that there is substantial evidence showing that the Minority Community continues to the face the consequences of discrimination which has a causal impact on their political participation and mobilization in Virginia Beach City Council elections.

### 6. Senate Factor Six: Overt or Subtle Racial Appeals

The sixth Senate Factor requires the Court to examine "whether political campaigns have been characterized by overt or subtle racial appeals." *See* S. Rep. No. 97-417, at 28-29; *see also Gingles*, 478 U.S. at 44-45. The Court concludes that there is evidence of political campaigns for Virginia Beach City Council in which racial appeals were made.

Political ads can contain coded language to trigger deeply seated racial stereotypes and animus and to catalyze white communities to vote in opposition.[34] For example, Defendants' expert witness, testified that racial appeals involve an attempt to "convey all the worst

---

[34] Legal scholars have suggested that the power of racial appeals in political ads that tie criminality and violence with people of color to mobilize white voters. *See, e.g.,* IAN HANEY LOPEZ, DOG WHISTLE POLITICS: HOW CODED RACIAL APPEALS HAVE REINVENTED AND WRECKED THE MIDDLE CLASS (2014) at 18 (Tracing the history and use of racial appeals in elections to mobilize white voters); Gregory A. Huber & John S. Lapinski, *The "Race Card" Revisited: Assessing Racial Priming in Policy Contests*, 50 AM. J. POL. SCI. 421, at 421 (2006) (citing studies by Lawrence Bobo and Martin Gilens among others and concluding that "[m]any white Americans hold negative views of African Americans, and these racial predispositions are powerful predictors of opinions on a host of political issues."); Joshua S. Sellers, *Election Law and White Identity Politics*, 87 FORDHAM L. REV. 1515 (2019).

stereotypes of a character, of whoever the character – the focus of the appeal is and trying to convey all of those negative connotations onto the candidate that you're opposing in that racial appeal…a racial appeal is a negative thing." Tr. 966:6–18; *see also* PTX430 at 158:3–7. Dr. Kidd also stated that "the quintessential example of a racial appeal is the Willie Horton ad from the [1988] George H. W. Bush/Michael Dukakis presidential campaign." *Id.*[35] Sister jurisdictions have similarly found that coded language can be evidence of racial appeals based on the context in which those words are used. *See, e.g., Ash v. Tyson Foods, Inc.,* 546 U.S. 454, 456 (2006) ("Although it is true the disputed word ['boy'] will not always be evidence of racial animus, it does not follow that the term, standing alone, is always benign. The speaker's meaning may depend on various factors including context, inflection, tone of voice, local custom, and historical usage"); *Smith v. Fairview Ridges Hosp.,* 625 F.3d 1076, 1085 (8th Cir. 2010) (code words such as "fried chicken" and "ghetto" may provide evidence of discriminatory intent by sending a clear message and carrying the distinct tone of racial motivations and implications); *McGinest v. GTE Serv. Corp.,* 360 F.3d 1103, 1117 (9th Cir. 2004) ("[R]erefence to [the plaintiff] as a 'drug dealer' might certainly be deemed to be a code word or phrase"); *Abramson v. William Paterson Coll. of N.J.,* 260 F.3d 265, 278 (3d Cir. 2001) (noting that the use of code words such as "all of you" and "one of them" could be sufficient evidence from which a jury could find an intent to discriminate).

The Court has identified various instances of racial appeals in Virginia Beach elections. First, in 1998, candidate Louisa Strayhorn faced racial harassment in her unsuccessful reelection bid for the City Council after becoming only the second Black member ever elected four years prior. *See* P-0078 at 42; *see also,* Tr. 447:5-14 (Ms. Strayhorn testified that her

---

[35] *See* Haney–López, supra note 34, at 106 (López's research provides evidence for how the Willie Horton political ad was almost singularly responsible for Bush's victory: "[t]he commercial hit its mark with deadly accuracy. From lagging his opponent, Bush gained ground and took the lead.)

reelection was "probably was one of the most contentious situations I've ever been in.) Based on Dr. Lichtman's report, candidate Strayhorn had stated in a 2003 interview that she and her campaign staff received explicit racists threats stating things like "'we're going to make sure that nigger doesn't get elected.'" *See* P-0078 at 42. After the election Strayhorn said that "people would drive by sand say, 'See, nigger, we said we'd get you." *Id.* In her trial testimony, Ms. Strayhorn corroborated her experience as a candidate in 1998 when she stated "I would say that on an average of 57 times I was threatened when I ran for reelection because of the color of my skin and that they did not know that I was African-American when I ran, and that now that they did -- and they used the 'N' word...." Tr. 448:5-10.[36] Defendants' expert witness, Dr. Kidd, also agreed that the 1998 Strayhorn incidents were also examples of racial appeals. Tr. 967: 6-10. [37]

Based on overwhelming evidence in the record, Ms. Strayhorn's experience is, unfortunately, not an exception but rather it is a common experience for minority candidates in Virginia Beach. In 2008, a flyer distributed in Black neighborhoods in the City showed white Republican Virginia Beach mayoral candidate Will Sessoms with a smiling Barack Obama, without the legally required attribution (*e.g.*, "paid for by …"). P-0082 at 33-34. A second flyer circulated in the 2008 mayoral race, also without the legally required attribution, purported to represent "African Americans for Change." It claimed that Will Sessoms "will do more in his first term as mayor to contract with African Americans than the current mayor has done in

---

[36] The Court takes judicial notice of the article referenced and cited in Dr. Lichtman's report. The Court was readily able to find the study since it occurred in its jurisdiction. *See* Bruce Murphy, "Virginia Beach, Nearby Cities Tell Complex Story of Black White Politics," Sentinel Journal, (14 Jan. 2003), http://mumford.albany.edu/census/2003newspdf/jsonlineSeries/011403MURPHYjsonline.pdf;*see also,* Deidre Fernandes, "Checkered History: For Va, Beach Blacks Power Still Elusive," The Virginian-Pilot (8 Sep. 2009), https://www.pilotonline.com/news/article_4eaaf0c4-0c3d-5722-9e67-1e72606620c0.html

[37] Dr. Kidd testified that "If you were just looking at it sort of clinically, with an eye, you know, on what a racial appeal is in the context of the worst case, being Willie Horton -- or the penultimate case, the Willie Horton ad, I think you could give that to Louisa Strayhorn. You could give it to her."

twenty years." P-0082 at 33, 35. Defendants' expert witness did not agree that the Sessoms/Obama flier was evidence of a racial appeal because to him it appeared that Sessoms was "attempting to ride the coattails of a very popular presidential candidate...that his campaign, at least, believed was going to win or get a lot of votes out of Virginia Beach." Tr. 969:12-18. However, on cross-examination, Dr. Kidd retracted his statement and instead found that the Sessom's flier *could* reasonably be a racial appeal if African American voters were offended by the flier. Tr. 996:1-997:4. The Court reasonably infers that the flier could reasonably offend Black voters because the flier falsely claims that Obama, the Nation's first African American U.S. President, and that the unknown group "African Americans for Change" both supported Sessoms, and thus, African Americans should too. P-0082 at 33; Tr. 994:20-995:4; Tr. 448:9-17, 449:5-16. That is the flier clearly suggests that African American voters would be ignorant enough to believe a false political ad and, thus, could vote for a candidate solely based on whether Obama supports the candidate. Thus, the Obama flier is further evidence of racial appeals in Virginia Beach.

In the 2017 House of Delegates elections, Delegate Rocky Holcomb (R-85 in Virginia Beach) created a political advertisement which stated that his Democratic opponent Cheryl Turpin was a "liberal...[who] wants to bring back parole & let rapists out of jail early." *See* P-0078 at 42, 44. The political advertisement showed a dark hand over the mouth of a white female child. *Id.* The picture had the following caption: "Police: Convicted rapist out on parole attacked a 7-year old girl." *Id.* Defendants' expert witness, Dr. Kidd, agreed that he believed

"the Rocky Holcomb/Cheryl Turpin flier mailer..." was a clear example of a racial appeal. *See* Tr. 966:21-13.[38]

Another instance of racial appeals occurred in 2018, when Friends of the Elephant, a Political Action Committee, handed out sample ballots at one or more polling places with recommended candidates for office. These sample ballots were color coded, with one color for Black voters and another color for white voters. Aaron Rouse, a Black candidate for City Council, was included on sample ballots handed to Black voters, but not on the ones handed to white voters. DTX175 (Wood Dep.) at 76:10-77:13.

Similarly, in 2019, Shannon Kane, a white Virginia Beach City Councilmember from 2014-2019, challenged Del. Kelly Fowler, who is of both Mexican and Filipino descent. Kane's campaign sent a flyer with a photoshopped image of Fowler next to MS-13 gang members. The flyer stated: "Kelly Fowler. Good for illegal immigrants. Bad for us." P-0419. Kane did not apologize to Fowler. Tr. 234:23-235:23; Tr. 257:24-258:1. The Court finds that the terms and imagery contained in both the 2017 and 2019 political ads are clear examples of racial appeals.

The use of racial appeals is also commonplace for national and statewide elections which contribute to a general political culture of racial animus. A statewide racial appeal occurred in the 2006 U.S. Senate election when incumbent Republican candidate and former Governor George Allen called a volunteer at East Indian descent for his Democratic opponent Jim Webb a racial slur at a rally for Allen. Moreover, despite Virginia's well-established history of

---

[38] Dr. Kidd testified that the Rocky Holcomb/Cheryl Turpin flier mailer "...became a massive, big issue at the end of that campaign. The Turpin campaign and the supporters of Cheryl Turpin reacted very viscerally against it; said it was racial in its undertones and it was intended to sort of instill racial tension and fear in the election and sort of direct that fear to Cheryl Turpin. The Holcomb campaign denied it and said that wasn't really the purpose of it, but that's what it became. The flier depicted a hand over the mouth of a child, and it was sort of a - - the argument being made was that the skin color of the hand was darker. It was intended to imply, to suggest to people, that this was a dark-skinned hand, so it became a big deal." *See* Tr. 968: 1-13.

116

slavery and segregation in Virginia, Governor's Allen and Bob McDonnell both issued, on separate occasions, proclamations noting the South's celebration of Confederate History month without any mention of slavery. *See* P-0078 at 39. Similarly, during the 2017 Republican primaries, gubernatorial candidates Corey Stewart and Ed Gillespie publicly embraced Confederate symbols and, separately, commented on their Democratic opponents supporting the removal of Confederate statutes in Virginia *See* P-0078 at 41. The Court views this as the use of racial appeals for statewide elections as a way to trigger racial animus. Critically, the Fourth Circuit has affirmed the proposition that a Court could reasonably infer that symbolic acts (e.g. the Confederate Flag) revering the Confederate South can increase racial tensions against African Americans and minorities. *Hardwick ex rel. Hardwick v. Heyward,* 711 F.3d 426, at 438 (4th Cir. 2013) ("Taken together, they tell a story of a community and its schools that, although making progress in race relations, are not immune from incidents of racial conflict. Although the incidents caused by the Confederate flag are enough on their own to justify the decision of the school officials to prohibit the Confederate flag shirts, when combined with other racially charged incidents, they provide overwhelming support for the conclusion that the Confederate flag shirts 'would materially and substantially disrupt the work and discipline of the school.'") (quoting *Tinker v. Des Moines Independent Community School District,* 393 U.S. 503, at 513 (1969)); *see also Defoe ex rel. Defoe v. Spiva,* 625 F.3d 324 , at 335(6th Cir.2010) ("*Tinker* does not require that displays of the Confederate flag *in fact* cause substantial disruption or interference, but rather that school officials reasonably *forecasted* that such displays could cause substantial disruption or materially interfere with the learning environment." (citing *Tinker,* 393 U.S. at 514)) (emphasis added).

117

### 7. Senate Factor Seven: Minorities Elected to City Council

The seventh Senate Factor requires the Court to examine "the extent to which minority group members have been elected to public office." *See* S. Rep. No. 97-417, at 28-29; *see also Gingles*, 478 U.S. at 44-45. The Court concludes that the City of Virginia Beach has a dismal history of electing minorities to public office. Moreover, there is a substantial lack of racial/ethnic representation on the City Council compared with the demographic makeup of Virginia Beach.

According to the joint stipulated facts, since 1966, the City has elected only five Black Councilmembers and one Asian-American. ECF No. 190 at ⁋ 25. The five Black Councilmembers include Aaron Rouse (2018), Sabrina Wooten (2018), Amelia Ross-Hammond (2012), Louisa Strayhorn (1994), and John Perry (1986-1990).[39] *See* P-0078 at 45. From the City's founding until 2016, before the instant lawsuit was filed, only three African Americans, Perry (1986), Strayhorn (1994), and Ross-Hammond (2012) had been elected to the City Council, and none won re-election. *Id.* Defendants claimed a Latina (Rita Bellitto) was elected but offered no evidence of her ethnicity. DTX175 49:16-20. Therefore, the Court cannot determine Bellito's racial/ethnic identity. Moreover, in 2011, the City Council appointed one Black member, Prescott Sherrod, to a vacancy on the Council but he was not re-elected. P-0078 at 45; *see also*, ECF No. 190 at ⁋ 26.

In 2018, two African Americans were elected to City Council, Rouse and Wooten. However, as the Court noted above, the elections of Rouse and Wooten are considered as special circumstances because they occurred *after* the instant lawsuit was filed. *See Gingles,* 478 U.S. 30, at 76 (1986) (Holding that the District Court could "take account of the circumstances

---

[39] The Court takes Judicial Notice of John Perry's historic election in 1986 as the first African American to serve on the Virginia Beach City Council and his unsuccessful bid for re-election in 1990. *See* Daily Press, *John L. Perry, 1st Black On Beach Council,* THE DAILY PRESS (Feb. 1, 1992)

surrounding recent black electoral success in deciding its significance.... In particular, as the Senate Report makes clear, the court .... could properly consider to what extent 'the pendency of this very litigation [might have] worked a one-time advantage for black candidates in the form of unusual organized political support by white leaders concerned to forestall single-member districting.'"); *see also, Zimmer v. McKeithen,* 485 F.2d 1297, at 1307 (5th Cir.1973) *aff'd sub nom East Carroll Parish School Board v. Marshall,* 424 U.S. 636 (1976) (Holding that the court "cannot endorse the view that the success of black candidates at the polls necessarily forecloses the possibility of dilution of the black vote.... [S]uch success might be attributable to political support motivated by different considerations—namely that election of a black candidate will thwart successful challenges to electoral schemes on dilution grounds.").

Defendants argue that the 2018 election of Rouse and Wooten is evidence that the at-large system is not dilutive. *See* ECF No. 237 at ¶¶ 68-72. Moreover, Defendants rebut Plaintiffs' assertation that the 2018 election qualifies as special circumstances for a few reasons. First, Defendants argue that Plaintiffs filed the amended complaint a week after the 2018 election and there is no direct evidence that the suit impacted the races. Tr. 971:17–22 (Kidd). Defendants also argue that neither Rouse nor Wooten was aware of the suit when they ran. Tr. 403:25–404:11 (Wooten); DTX157 at 11:2–4 (Rouse). Finally, Defendants maintain that no one from City Council asked Wooten or Rouse to run for City Council. Tr. 402:23–24 (Wooten); DTX157 at 37:9-11 (Rouse).

The Court concludes that the election of Rouse and Wooten occurred under special circumstances and that their election does not show the lack of voter dilution in Virginia Beach's electoral at-large system. Critically, the Court notes that Rouse and Wooten received unusually high white support as compared to all other Black City Council candidates since 2008. DTX155

(Hansen Dep) at 60:13-17 (admitting that Aaron Rouse received the most votes for City Council that he had ever seen). White voters' support for Rouse's candidacy was 15.4 percentage points (179%), higher than their average support for the five other Black candidates who ran for at-large seats since 2008. Wooten was the only Black candidate for City Council in Virginia Beach since 2008 to win a majority of the white vote. P-0078 at 45-49. Moreover, the Defendants argument that there is no voter dilution because minorities have been elected to City Council is without merit. Rather, it is the same argument that a neighboring subdivision, the City of Norfolk, used in *Collins v. City of Norfolk, Va.*, in defense to a challenge to Norfolk's at-large system. 816 F.2d 932 (4th Cir. 1987). In *Collins,* the court found that there had been only one African American on the Norfolk city council from 1968 to 1984. After the suit was filed, a second African American was elected to the Norfolk City Council in 1984 with unusually high white voter support and with first-time support from the white Mayor at the time who publicly stated, "After the election, the issue of black representation may become a moot point." *Id.* at 932. The Fourth Circuit held that "the absence of a conspiracy or an intent to moot this litigation does not end the district court's inquiry. The court should probe further to determine whether the black candidate's success in 1984, while this action was pending, resulted from unusual circumstances.... If voting patterns show unusual white support for the black candidate in 1984, the legal significance of his success should be diminished. As long as that particularized investigation is made, however, the trial court's findings should not be disturbed on appeal unless they are clearly erroneous." *Id.* at 938.

Similarly, here, the Court has reviewed the record which shows that Rouse and Wooten did receive unusual white support. Specifically, Dr. Lichtman conducted an analysis comparing the white voter support Rouse and Wooten received in 2018 with the support other Black candidates

received since 2008. *See* P-0078 at 46-51. Dr. Lichtman showed that Rouse's candidacy was 15.4 percentage points and 179 percent higher than the average white support, of 8.6 percent, for the five other black candidates since 2008. The average of 8.6% includes Allen (2008, receiving 20% of white votes), Cabiness (2010, 2.9%), Jackson (2010, 3.8%), Sherrod (2011, 10.7%), and Bright (2018, 5.8%). *Id.* at 47 Similarly, white support for Wooten's candidacy was 28.3 percentage points and 125 percent higher than the average white support, of 22.7%, for the nine other black candidates. The average of 22.7% average includes Flores (2008) (who received 15% of white votes), Jackson (2008, 19.9%), Bullock (2010, 33%), Smith (2012, 24.2%), Ross-Hammond (2012, 16.2%), Burton (2014, 18.7%), Cabiness (2014, 4.4%), Ross-Hammond (2016, 29.3%), and Wray (2018, 43.4%). *Id.* at 50. Moreover, Dr. Lichtman also found that although white donors have contributed primarily to white candidates in the past, only four black candidates between 2008-2018 received contributions from white donors. *Id.* at 49. Notably, Rouse and Wooten received 72% of the total dollar amount contributed to Black candidates from 2008 to 2018. *Id.* at 50-52. Therefore, the Court concludes that there is substantial evidence showing that Rouse and Wooten were elected under special circumstances after the lawsuit was filed because they received unusually high support from white voters as well as large contributions from white donors, both of whom have historically not support Black candidates. Moreover, as noted above, the 2018 election of Rouse and Wooten show that white voters can either act as a bloc to support or deny the minority-preferred candidate.

The Court also considers the dismal election of minorities to other elected offices in Virginia Beach. For example, in the City's history, only one member of the Minority Community—Tina E. Sinnen, the current Filipina Circuit Court Clerk—has ever been elected to *any* of the City's five constitutional offices. P-0078 at 45. Moreover, only one of 11 members of

the elected School Board, a Black woman named Sharon R. Felton, is a minority. A second Black woman, Jessica L. Owens, was appointed to the School Board in 2019, *after* the instant lawsuit was filed. P-0078 at 45.

### 8. Senate Factor Eight: Unresponsive Elected Officials

The eighth Senate Factor requires the Court to examine "whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of members of the minority group."[40] *See* S. Rep. No. 97-417, at 28-29; *see also Gingles*, 478 U.S. at 44-45. The Court concludes that the City of Virginia Beach has been unresponsive to the needs of the Minority Community.

#### a. Disparity Study

The Court concludes that the City's decades-long refusal to conduct a disparity study, as well as its results, is a prime example of the City's unresponsiveness to the Minority Community's needs. Despite decades of organizing for a research study, the City delayed funding and authorizing the study for nearly a decade until right before the instant lawsuit was filed. Then, the City delayed again in releasing the results for two years. Once the results were finally released, the study showed that although the Minority Community makes up about 33% of the population in Virginia Beach, they only account for 10% of the business contracts with the City. Moreover, although Defendants' argued that the City was responsive because it offered to increase its contract procurement goal to 12%, the disparity between the Minority Community's population, business ownership, and contract procurement with the City remains stark.

---

[40] *See* S. REP. 97-417, 239, 1982 U.S.C.C.A.N. 177, 410 ("Unresponsiveness is not an essential part of plaintiff's case. Therefore, Defendant's proof of some responsiveness would not negate Plaintiff's showing by other, more objective factors enumerate here that minority voters nevertheless were shut out of equal access to the political process. The amendment rejects the ruling in *Loge v. Buxton* and companion cases that unresponsiveness is a requisite element, 639 F. 2D 1358, 1375 (5th Cir. 1981). However, should the plaintiff choose to offer evidence of unresponsiveness, then the defendant could offer rebuttal evidence of its responsiveness.").

In 1995, after Ms. Strayhorn became the first Black woman elected to City Council, she worked to get the City Council to create an organization that would "try to correct the inequities that there were in the number of procurements that were given to minority vendors who came before the City to be able to get some of the work that was there." Tr. D3 452:2-10. Accordingly, the City Council established the Minority Business Council ("MBC") to improve minority participation in contracting. Tr. 398:12–23 (Wooten); Tr. 464:16–465:3 (Strayhorn); Tr. 689:5–15 (Miles). The MBC included representatives from the Hispanic, Black, and Asian communities because they all faced the "… same kind of inequities." Tr. 952: 12- 453:11. Thus, the MBC was "formed to be able to, number one, do the research, number two, find a way in which to encourage or educate the procurement staff and others within the city that it was okay not to just give contracts to people who you know; that some of these minority firms were very good, and they could get contracts and do a good job on it." Tr. 453:5-11.

In 2008, the City set an aspirational goal of 10 percent for minority participation in city contracts overall. However, the City has failed to reach this goal. P-0277 at 4, 22; P-0429; Tr. 833:11-16 (Questioning from the Court); Tr. 845:9-846:21 (Adams testimony for 2008 to 2016 data).; Tr. 855:2-14 (Adams testimony for 2017-2018 data); Tr. 857:6-14 (Adams testimony for 2019 data). In 2011, the Minority Business Council began advocating for a business disparity study regarding the procurement of contracts in the City being granted to minority owned businesses. Tr. 452:12-453:6 (Strayhorn testimony). The Minority Community lobbied for over nine years to obtain a disparity study of city contracts. Tr. 498:10-16.

In 2016, a Black former-NFL player and Virginia Beach resident claimed that the City had turned him down for multiple projects at least in part because of his race. He also began to publicly call for a disparity study and offered to cover half its cost. P-0078 at 61; Tr. 384:5-

123

385:11. In 2017, the Minority Business Council voted to reaffirm its 2011 request that the City Council conduct a disparity study. Tr. 399:6-25. In 2017, leaders of the Minority Community organized the Faith, Freedom and Justice March to call for a disparity study. Tr. 385:16-20; Tr. 224:15-225:1; Tr. 58:1-59:1.

In July 2017, after nearly a decade of lobbying from the Minority Community, the Virginia Beach City Council authorized a disparity study of city contracts ("the Disparity Study"), ECF No. 190 at ¶43. The Disparity Study costing $475,000 and the City accepted the former NFL player's offer to pay half the costs of the study. Tr. 405:24–406:3, Tr. 400:1–9 (Wooten).

In January 2019, the City released the results of the Study. The Study computed a "Disparity Index" measuring the difference between the availability of minority-owned businesses for contracts and their actual participation. A disparity index level of 80 or below "indicates a substantial disparity." P-0078 at 61; P-0298. The results showed a substantial disparity in the participation of minority-owned businesses in contracts that the City awarded during the study period. P-0298 at 13, 18. The Disparity Study showed that the City achieved its 10% minority contracting goal over a 5-year period, Tr. 813:16–814:4, 815:8–17 (Adams). The Disparity Study showed that the City had overutilized Asian-American owned businesses, but underutilized other minority owned businesses, Tr. 814:12–815:1, 816:8–16, 834:19–835:15, and that the appropriate aggregate minority owned business contacting goal is 12%, Tr. 814:3–17.

The Study showed that Black owned businesses had the largest eligibility of share of city contracts at 8.1 percent, but received only 4.5 percent, a disparity index of 56, well below the threshold of 80. P-0078 at 61; P-0298. Second, Hispanic-owned business had the second highest eligibility among minority-owned businesses at 2.7 percent, but received only 0.5 percent of city

contracts, a disparity index of 20. P-0078 at 61; P-0298. Third, Asian-American owned businesses had an eligibility percentage of just 0.8 percent, and received 5.6 percent of city contracts, for a disparity index of 700. P-0078 at 61; P-0298. Asian-American owned businesses accounted for just seven percent of eligible business owned by members of the three minority groups but accounted for 53 percent of the contracts that awarded to minority businesses. However, these contracts were not spread among the community; 86 percent of the total dollars went to a single Asian-American owned business. P-0298 at 74; Tr. 833:24-834:15 (Adams testimony).

The Disparity Study identified numerous deficiencies in City policies to help achieve greater participation for minority-owned businesses. P-0078 at 61. The Disparity Study recommended that Virginia Beach create an office dedicated to implementing the City's Small, Women, and Minority owned businesses (SWaM) program. P-0298 at 97-98; Tr. 389:15-22. However, the City has refused repeated requests by Council member Wooten for changes to reduce disparities in the City. Tr. 389:19-390:1 (stating that she requested that the City increase the funding for a staff member for the implementation of the Disparity Study but that was initially not approved).

In 2019, *after* the lawsuit was filed, the City Council approved a $30,000 budget item to monitor progress in minority contracting. Tr. 407:5–8 (Wooten). The City unanimously approved Ms. Wooten's proposal of increasing the City's minority contracting goal from 10% to 12%. Tr. 408:3–13. The City also approved Ms. Wooten's request to implement the Disparity Study's recommendation to hire an additional staff member to work in the SWaM office. Tr. 389:15–390:17. The City Council unanimously adopted a race-conscious remedial program called "Project Goals" in June 2020 to address the concerns and recommendations of the Disparity

125

Study. Tr. 408:14–409:12. The City Council unanimously adopted a Sheltered Bidding Program in June 2020 to enhance opportunities for minority contractors. Tr. 409:13–410:12. The City Council unanimously adopted an Enhanced Subcontracting Program in June 2020. Tr. 410:13–412:1. The City debarred two contractors who failed to satisfy minority contracting obligations. Tr. 826:14–23 (Adams).

In summary, the Disparity Study is evidence of the City's consistent refusal to respond to the Minority Community's needs, even when the requests are basic such as a research study. Moreover, as noted above, the results of the Disparity Study also illustrate that structural lack of resources that the Minority Community must mobilize economically. That is, given the high rates of poverty, low incomes, and lack of intergenerational wealth (e.g. housing), it is no surprise that the Minority Community lacks the capital to create businesses or participate equally in the City's economic development.

b. Burton Station

The record also reflects that predominantly African American communities have historically been neglected by the City. The prime example is Burton Station. Defendants' witness Taylor Adams testified that the Burton Station community "is an historically strong African-American community in Virginia Beach, who have been somewhat vocal regarding their lack of – their feelings on a lack of resources in the past that have been provided by the City." Tr. 867:19-23. Burton Station is located in the Bayside District and has been represented by Louis Jones, a white male, for more than 35 years. Tr. D5 867:13-21; see also ECF No. 190 at ⁋ 15.[41] Mr. Adams also explained that it was only in the last five years that the City worked on the sewer

---

[41] Based on the Stipulated Facts, the Court also takes Judicial notice of the fact that "Council Member Jones has served on the City Council for more than 35 years, representing the Bayside District." See City of Virginia Beach, "City Councilmembers," *Government,* https://www.vbgov.com/government/departments/city-clerk/city-council/pages/city-council-members.aspx.

and water project for Burton Station. Tr. 867:1-8. However, Mr. Adams also testified that he is only familiar with the recent complaints from the members of the Burton Station community and that "no one educated [him] about the history of Burton Station." Tr. 869:8-14.

Pursuant to Federal Rules of Evidence 201(b), the Court *sua sponte* takes judicial notice of newspaper articles in its jurisdiction regarding historical facts about Burton Station. *See* Fed.R. Evid.R. 201(b), 28 U.S.C.A.; *see also, United States v. Martinez-Mendoza*, No. 3:17-CR-164-HEH, 2019 WL 1293340, at *2 (E.D. Va. March 20, 2019) (citing *United States v. Harris*, 331 F.2d 600, 601 (6th Cir. 1964) ("[I]t [is not] necessary that the Court be requested to take judicial notice of a fact before it is authorized to do so. The Court may take judicial notice sua sponte." ); *see also, Dockery v. Berryhill*, No. 3:18-CV-56-HEH, 2019 WL 1379933, at *1 (E.D. Va. Mar. 27, 2019); *Associated Gen. Contractors of Am. v. City of Columbus*, 936 F. Supp. 1363 (S.D. Ohio 1996), *vacated on other grounds*, 172 F.3d 411 (6th Cir. 1999) ("District court would take judicial notice of newspaper articles regarding participation of minority-owned and female-owned business enterprises in recent large construction projects, for purposes of determining whether affirmative action legislation proposed by city was appropriate; facts reported in articles were generally known in community and capable of accurate and ready determination.") (citing Fed.R. Evid.R. 201(b), 28 U.S.C.A.). On August 3, 2017, the Virginian-Pilot published an article by Mechelle Hankerson titled "Virginia Beach has spent $28 million on Burton Station. So why is it disappearing?"[42] The article notes that Burton Station is a historic Black community built by freed slaves more than a century ago.[43] In the 1960s, Princess Anne County re-zoned Burton Station from residential to a

---

[42] *See* Mechelle Hankerson, *Virginia Beach has spent $28 million on Burton Station. So why is it disappearing?,* THE VIRGINIA PILOT, Aug. 3 2017.
[43] *See also,* Roger Chesley, *Suddenly, the Beach cares about Burton Station? We're not buying it,* THE VIRGINIAN-PILOT, Apr. 18, 2015.

light industrial zone in preparation for an airport expansion. At the time, there were at least 85 Black families who lived in Burton Station and who opposed the light industrial re-zoning.[44] However, for years, the City kept Burton Station as a light industrial zone which meant that Black families could not obtain permits or loans for basic infrastructure for their homes. *Id.* In the 1980s, the City re-zoned the 180 acres of Burton Station back to residential. However, in the early 1990s, the City moved to re-zone Burton Station back to an industrial area. The newspaper article states that "[t]he location was ideal because there was already some industry there, and the city didn't want to invest $1 million to connect the neighborhood to public utilities." *Id.* By the mid-1990s, the City ask the Commonwealth of Virginia if it could exercise eminent domain and/or purchase property in Burton Station. Although the City was denied its request, "the city spent at least $2 million buying land but never acquired enough to create an industrial park." In the 2000s, the City purchased land in Burton Station as most of the "structures on the land were demolished." Today, Virginia Beach owns 11 of 35 parcels on Burton Station Road, homeowners own 16, and the Norfolk Airport Authority and private real-estate investment firms own the rest. In 2009, the City created the "Burton Station Strategic Growth Area Plan." The plan included "an idea to recreate the past, with homes, a park and a small general store. The city would invest in infrastructure, including public water and sewer lines. The goal was to keep the area residential."

The Court takes judicial notice of the previous newspaper articles, which is within its jurisdiction, regarding the City's historically tense relationship with African Americans living in Burton Station. Notably, the history of Burton Station, as an African American community, is critical to this case as an example of the decades-long lack of responsiveness to the needs of the Minority Community. Specifically, the Court notes that a sole Councilmember, Mr. Jones (a

---

[44] *Id.*

white male), has served on the City Council for more than 35 years, since at least 1986. Throughout his time as Councilmember, African American families in Burton Station have undergone a tumultuous history and the City has neglected to meet basic needs, such as providing water and sewer lines. It was not until the 2009 when the City approved an official plan to provide basic water and sewer lines to the Black community of Burton Station— almost fifty years after Burton Station was re-zoned to light industrial.

Finally, the Court notes that Defendants offered no evidence that there were white areas or neighborhoods in the City that were neglected of basic needs such as adequate water supply and sewer services.

### c. Hiring Practices

The record also reflects that the City lacks in hiring members from the Minority Community. For example, in 2006, a consent decree between the U.S. Justice Department and the City and its police force, noted: "the City has pursued policies and practices that discriminate against and deprive or tend to deprive African Americans and Hispanics of employment opportunities because of their race and national origin." P-0078 at 59-60. According to the 2010 Census, the Minority Community made up 32.6% of the adult population in Virginia Beach, but, as of 2015, only 15.5% of the City's police force. Specifically, the force was only 9.4% Black (compared to 18.9% of the adult population), 3.3% of Hispanic (compared to 5.6% of the adult population), and 2.2% Asian (compared to 7.2% of the adult population). P-0078 at 65-67.

### d. Defendants' Evidence of Responsiveness

In response, the Defendants' argue that the City has been responsive to the needs of the Minority Community. In support, they argue that Council members' phone numbers are posted to the City's website and regularly given out by City Clerk's office. Tr. 778:18–779:7 (Barnes).

Also, Defendants' point to the fact that agendas are publicly available through distribution lists and on the City's website. Tr. 780:7–784:7. The City appoints personnel to handle citizen concerns. Tr. 784:10–21. Members of the public can speak at many council meetings, Tr. 785:8–12; Tr. 787:12–788:8. City Councilmembers hold townhall meetings throughout the City to engage and inform residents of City business. DTX156 at 20:10–21:16 (Dyer). However, the Court notes that accessibility to City Council meetings does not mean that the City is responsive to the needs of the Minority Community. Moreover, the City did not provide any evidence showing the relevance of this evidence with respect to improving its responsiveness to the Minority Community.

Defendants' also point to the "Something in the Water Festival," first held in April 2019 as evidence of its responsiveness to the Minority Community. The Festival was supported by the City Council—including through a $250,000 sponsorship—which was for programming for Virginia Beach visitors during College Beach Weekend. *See* DTX157 at 112:10–17. However, the record shows that the Festival occurred *after* the instant lawsuit and Pharrell Williams, a well-known African American artist and producer who is a native of Virginia Beach, created the festival. Tr. 459:14–461:24, Tr. 473:11–474:24 (Strayhorn).

Defendants' also state that in 2016, the City Council unanimously supported the African American Cultural Center, at the request of the Black community, Tr. 95:6–10 (Allen); 733:21–736:10 (Ross-Hammond), and donated land valued at $1.7 million, Tr. 94:25–95:1 (Allen); 736:11–22 (Ross-Hammond). The City Council unanimously granted the land tax-exempt status. Tr. 736:23–737:9. The Court notes that while this is a commendable example of the City's responsiveness, it stands out as an outlier in contrast with the Plaintiffs' evidence of unresponsiveness.

130

In weighing the evidence regarding the City's responsiveness to the Minority Community, the Court concludes that the evidence of non-responsiveness overwhelms the City's responsiveness to the Minority Community's needs.

### 9. Senate Factor Nine: Unjustified Methods of Elections

The ninth, and final, Senate Factor requires the Court to examine "whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous."[45] *See* S. Rep. No. 97-417, at 28-29; *see also Gingles*, 478 U.S. at 44-45. Based on all the evidence in the record and the Court's Senate Factor analysis, the Court concludes that the City of Virginia Beach has not offered a credible and reasonable justification for maintaining its at-large electoral system.

Notably, the Minority Community has advocated for decades for the City to change the at-large district. For example, members from the Minority Community have cooperated numerous times to change the City's method of elections and remedy the dilution of their votes under the at-large scheme. Specifically, in 2001, "a coalition of African Americans, Hispanics, Asians, and Indians advocated for the City to adopt single-member districts." *See* P-0145 at 15; *see also,* P-0145 at 10-11; ECF No. 211. The advocates who led the coalition included, Ron Villanueva, a Filipino-American and former Council member who testified as the President of the Filipino-American Community of Tidewater and Chairman of the Filipino-American Community Action Group. P-0145 at 15-16. It also included Nonato Abrajano, a former leader of the City's Filipino-American community, who was a part of the coalition on behalf of the National Federation of Filipino-American Associations (NaFFAA), where he urged the Council to adopt single-member

---

[45] *See* S. REP. 97-417, 239, 1982 U.S.C.C.A.N. 177, 410 ("If the procedure markedly departs from past practices or from practices elsewhere in the jurisdiction, that bears on the fairness of its impact. But even a consistently applied practice premised on a racially neutral policy would not negate a plaintiff's showing through other factors that the challenged practice denies minorities fair access to the process.")

districts to help ensure "equal representation." Tr. 761:25-762:24; P-0145 at 12-13. According to

Mr. Abrajano, the NaFFAA chapter in Hampton Roads has never changed its support for district

elections. Tr. 762:15-24.

To advocate for the City Council to adopt a fairer method of electing City Council

members, the Minority Community formally created the Virginia Beach Concerned Citizens

Coalition ("VBCCC"). Tr. 489:6-490:9. As noted above, Chairman Andrew Jackson repeatedly

requested that the City Council change its method of electing Councilmembers because it

"impedes equal representation." Tr. 490:18-491:4; P-0210 at 2-3. Mr. Jackson also presented at

least three 10-district plans to the City Council in 2011, including one where the Minority

Community was a majority of the VAP in at least one district. Tr. 493:9-494:1. DTX011 at 285,

289, 294. The NAACP and the VBCCC also proposed maps. DTX010 at 34 ¶ 32b, g, l.

Accordingly, in 2011, the City Council attempted to create a Majority-Minority "district" in its

at-large system in order "to see equal representation,". DTX162 at 57:6-58:22; *see also*, DTX156

(Der Dep.) at 39:2-16. However, all city council members were still elected at-large. Current

Councilmember Moss also asked the City to support the NAACP and VBCCC's map and "a

district (or ward) system for local elections because the current system is flawed" and "the at-

large voting system dilutes the voting strength of voters." DTX011 at 158. Despite the Minority

Community's decades-long advocacy, the City Council rejected all the proposals by the Minority

Community. DTX011 at 222-226.2

Although six of the twelve other large cities in Virginia use either a district system or a

mixed at-large district system for their city elections, with the majority elected from districts,

none shares Virginia Beach's combination of at-large elections, designated seats for most

positions, and staggered terms. P-0078 at 68. That is, while there are two at-large seats, the rest

of the nine seats on City Council are designated. In response, Defendants' have not proffered a reasonable explanation for designing such system.

## VII.    CONCLUSION

By a preponderance of the evidence, the Plaintiffs have demonstrated that the at-large system of elections for the Virginia Beach City Council denies Hispanics, African Americans, and Asians equal access to the electoral and political process, in contravention of Section 2 of the Voting Rights Act. Accordingly, it is hereby **DECLARED** that Virginia Beach's at-large method of election is illegal and cannot be enforced in future elections. It is, therefore,

**ORDERED**, that any further use of the at-large system of election for the Virginia Beach City Council is hereby **ENJOINED**.

**ORDERED,** that the City of Virginia Beach shall not adopt any system of election for members of its City Council that does not comply with Section 2 of the Voting Rights act.

**ORDERED**, that the City of Virginia Beach shall not implement or utilize any practice, policy, procedure or other action that results in the dilution of minority participation in the electoral process.

Pursuant to 42U.S.C. 1988(b) and Title 52 U.S.C. 10310(e), the Court **GRANTS** Plaintiffs' request for attorneys' fees, costs, and litigation expenses.  Plaintiffs shall file their request for attorneys' fees, costs, and litigation expenses within thirty (30) days of the date of this Order.

The Court will contact counsel as necessary regarding the scheduling of argument regarding remedies.

The Clerk is **DIRECTED** to electronically provide this Order to all parties.

**IT IS SO ORDERED**

Norfolk, Virginia
March *31*, 2021

UNITED STATES DISTRICT JUDGE