IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
NORFOLK DIVISION

Latasha Holloway, et al.,

*Plaintiffs*,

v.

City of Virginia Beach, et al.,

*Defendants*.

Case No. 2:18-cv-0069

## DEFENDANTS' SUBMISSION IN RESPONSE TO COURT'S MAY 12, 2021, ORDER

COME NOW the Defendants, by counsel, and, in response to the Court's May 12, 2021 Order (Dkt. 252) (the "Remedial Order"), hereby offer the following submission.

Defendants are continuing to prosecute their appeal consistent with their legal rights. *See* 28 U.S.C. § 1292(a)(1). As expressed in their appeal papers, Defendants respectfully disagree with the Court's liability ruling (Dkt. 242) (the "Opinion"). However, for purposes of the remedial phase only—and without waiving any rights, including the right to challenge the liability ruling on appeal before and after final judgment—Defendants are proposing two plans designed as remedial plans consistent with the legal and factual premises of the Opinion, within the confines of demographic and other practical realities inherent in this remedial phase. Nothing in this filing, or in any other of Defendants' remedial filings, should be read as a waiver of any position, legal or factual, Defendants are pressing on appeal, and any assertions consistent with or endorsing the Opinion's legal and factual findings are made for the sake of argument, at the remedial phase, only.

1. **Experts hired to assist with preparation of remedial submissions.**

Defendants have retained two experts to assist with this submission: Kimball W. Brace, to draw proposed districts, (*see* Exhibit 1 – Affidavit of Kimball W. Brace ("Brace Aff.")), and, Dr. Lisa R. Handley, to evaluate the political performance of those districts (*see* Exhibit 2 – Affidavit of Lisa R. Handley ("Handley Aff.")).[1]  Both types of expertise—map drawing and map analysis—are necessary for drawing remedial districts and the City will rely on Mr. Brace and Dr. Handley throughout this remedial phase to prepare and evaluate proposed plans.

2. **The City is afforded priority and deference in fashioning a remedial plan and no such opportunity will exist until after 2020 Census data is released.**

As detailed in Defendants' Response in Opposition to Plaintiffs' Motion to Modify the Remedial Briefing Schedule (Dkt. 257) ("Defendants' Response to Plaintiffs' Motion to Modify"), the City of Virginia Beach is afforded both priority and deference in fashioning a remedial plan in this matter.  (*See id*. at 2.)  No Party or Special Master can propose a legally acceptable final remedy until after 2020 census data are released.  (*See id.* at 2-6; *see also* Plaintiffs' Reply (Dkt. 258) ("Plaintiffs agree that the Court should not rely upon ACS data alone to issue its final remedial plan[.]")); *see also* Brace Aff. ¶¶15-17; Handley Aff. ¶12 (noting that the percentages of minorities in the proposed districts vary, sometimes by as much as three percentage points, depending on which set of population projections are being reported and it will not be until the PL 94-171 2020 census data is released later this year that we will be able to

---

[1] This court is familiar with Mr. Brace from the liability phase of this case.  Dr. Handley is a renowned expert, practitioner and academic in the areas of redistricting and voting rights. Dr. Handley's clients have included the U.S. Department of Justice, civil rights organizations (American Civil Liberties Union, Lawyers' Committee for Civil Rights Under Law), state redistricting commissions, and scores of state and local jurisdictions. In addition, she has served as an expert in dozens of redistricting and voting rights court cases.  Dr. Handley has conducted hundreds of racial bloc voting analyses across the country, including analyses of voting patterns by race and ethnicity.  *See* Handley Aff. Ex. A (resume of Dr. Handley).

determine with any certainty the minority demographics of any proposed remedial districts); *see also id*. ¶28 (noting that the PL 94-171 2020 census data is important to "ensure the districts satisfy equal population requirements and to gauge the demographic composition of the proposed districts."). Defendants will not have an adequate opportunity to redistrict the City Council until they are able to do so using 2020 census data. (*See* Dkt. 257 at 6-8.)

As detailed in Defendants' Response to Plaintiffs' Motion to Modify, Defendants propose a tight briefing schedule lasting seven weeks following the release of 2020 census data. (Dkt. 257 at 8-10.) Should the release of 2020 census data usable for redistricting occur prior to September 30, 2021, then Defendants' proposed schedule should be adjusted commensurately. Defendants are not interested in "paralyz[ing] the remedial process until the winter," as characterized by Plaintiffs in their reply brief. (Dkt. 258 at 8.) Defendants are only interested in ensuring that the City has an adequate opportunity to redistrict following 2020 census data release.

### 3. Defendants' preliminary proposed remedial concept plans.

Defendants submit two different concept plans for the Court's consideration as detailed below.[2] In the case of the 7-3 Concept Plan, the plan adheres closer to Virginia policy choices by remaining consistent with the challenged plan to the extent possible while addressing the violation found in the Opinion. (Brace Aff. ¶¶ 6, 20.) Finally, these plans honor the principles underlying Section 2 of the Voting Rights Act. In this way, these proposed concept plans would

---

[2] As noted, Defendants propose these maps assuming the validity of the Opinion for the sake of advancing remedial proceedings and not out of any concession that the Opinion was correct as a matter of fact or law. Among other things, Defendants are concerned that maps drawn to achieve a coalitional goal lack a firm basis in evidence under the Voting Rights Act, which does not authorize coalitional claims, and Defendants are concerned that the lack of cohesive voting among distinct minority groups in Virginia Beach further undermines any basis in evidence for these districts. But, as explained, Defendants acknowledge that the remedial phase is not the proper forum to relitigate liability.

best fulfill this Court's remedial mandate. *See, e.g.*, *Personhuballah v. Alcorn*, 155 F. Supp. 3d 552, 564-565 (E.D. Va. 2016).

It bears repeating that these concept plans cannot be finalized until after 2020 census data is released and available for map drawing, and the map drawing by Mr. Brace and performance analysis by Dr. Handley are updated to reflect that data. Further, meaningful challenges exist in drawing remedial majority minority districts that will perform to elect the candidates of choice as defined by the Opinion. Defendants propose that these maps could form the starting point of remedial plans drawn using 2020 census data after it becomes available, and after Mr. Brace, Dr. Handley, and any other experts involved in the case, including any Special Master, are able to conduct final analyses and bring a proposed remedial plan to finality.

### a. The 7-3 Concept Plan

The first concept plan includes 7 single-member districts, and 3 super wards (in addition to the mayoral seat which will remain at-large) (the "7-3 Concept Plan"). (Brace Aff. ¶¶19-20, Exs. B and C (map showing 7-3 Concept Plan)). This electoral structure adheres closer to Virginia policy decisions by being more similar to the existing system except without the three at-large seats. Each district seat is elected by residents within each district, and each super ward seat is elected by residents within each super ward. (Brace Aff. ¶20b.) In this system, every resident in Virginia Beach would be represented by one district seat, one super ward seat, and the mayor. (Brace Aff. ¶20c.)

The principal purpose of the 7-3 Concept Plan was to achieve the equal racial opportunity the Court's Opinion identifies as the legal requirement for a Virginia Beach redistricting plan, and this entailed drawing districts with sufficient percentages of voters from the various minority communities to qualify as opportunity districts within the meaning of the district court's opinion. (*See* Brace Aff. ¶6.) A subsidiary purpose was to follow traditional districting criteria to the

4

extent possible given the predominant goal of compliance with the Court's Opinion. (Brace Aff. ¶6.) The districts are as compact as possible, they follow precinct boundaries, the districts respect communities of interest, and avoid pairing incumbents except when necessary. (Brace Aff. ¶¶8, 20e, 20f.) The only incumbent pairing in the 7-3 Concept Plan is the pairing of incumbents John Moss and Louis Jones who reside in the same precinct and therefore it was not possible to draw them in separate districts in a whole-precinct plan. (Brace Aff. ¶20f.)

Incumbent terms have been respected in the 7-3 Concept Plan. As detailed in the following table, each incumbent who is not paired has a "home" district or super ward that matches the term of service of their current seat. (Brace Aff. ¶20f.) There is one open district due to the necessary pairing and so incumbent Rouse has an option of whether he would like to run for reelection in Super Ward 1 or District 1. (Brace Aff. ¶20f.) The plan yields two majority minority districts (District 1 and District 3) and one majority minority Super Ward (Super Ward 1). (Brace Aff. ¶20d.)

| Incumbent Terms and Seats in 7-3 Concept Plan | | |
|---|---|---|
| **Incumbent** | **Up for Reelection** | **Seat in 7-3 Concept Plan** |
| Abbott | November 2024 | District 2 |
| Berlucchi | November 2024 | District 4 |
| Henley | November 2022 | District 7 |
| Jones* | November 2022 | Super Ward 2 |
| Moss* | November 2022 | Super Ward 2 |
| Rouse | November 2022 | Super Ward 1^ or District 1^ |
| Tower | November 2022 | District 6 |
| Wilson | November 2024 | Super Ward 3 |
| Wood | November 2022 | District 5 |
| Wooten | November 2024 | District 3^ |

*Incumbents paired due to residing in same precinct.
^Majority-minority district/super ward.

(Brace Aff. ¶20f.)

### b. The 10-1 Concept Plan

The second concept plan is a 10-district plan where each district seat is elected by residents within each district (the "10-1 Concept Plan"). (Brace Aff. ¶¶21-22, Exhibit D) (map showing 10-1 Concept Plan). In this system, every resident in Virginia Beach would be represented by one district seat and the mayor. (Brace Aff. ¶22b.) Because this plan has more districts in it, the geography of each district is smaller than the 7-3 Concept Plan districts. (Brace Aff. ¶22b.)

The principal purpose of the 10-1 Concept Plan was to achieve the equal racial opportunity the Court's Opinion identifies as the legal requirement for a Virginia Beach redistricting plan, and this entailed drawing districts with sufficient percentages of voters from the various minority communities to qualify as opportunity districts within the meaning of the district court's opinion. (Brace Aff. ¶6.) A subsidiary purpose was to follow traditional districting criteria to the extent possible given the predominant goal of compliance with the Court's Opinion. (Brace Aff. ¶6.) The districts are as compact as possible, they follow precinct boundaries, the districts respect communities of interest, and avoid pairing incumbents except when necessary. (Brace Aff. ¶¶8, 22d.) There are two incumbent pairings in the 10-1 Concept Plan. (Brace Aff. ¶22e.) First, incumbents John Moss and Louis Jones reside in the same precinct and so unpairing them is not possible in a whole-precinct plan. (Brace Aff. ¶22e.) Second, incumbents James Wood and Guy Tower reside in the northeast corner of the City where opportunities for separating them are limited in a 10-district plan where water borders the north and east sides of the district, and multiple incumbents live just over the western border of the district (incumbents Jones and Moss) and the southwestern border (incumbent Berlucchi). (Brace Aff. ¶22e.) The need to draw more districts within the geography of Virginia Beach to

6

create a 10-district plan as opposed to a 7-district plan made it more difficult to avoid pairing incumbents. (Brace Aff. ¶22f.)

Incumbent terms have been respected in the 10-1 Concept Plan. As detailed in the following table, each incumbent who is not paired has a "home" district that matches the term of service of their current seat. The 10-1 Concept Plan yields three majority minority districts (Districts 1, 3 & 5) according to ESRI data, and barely four minority districts (Districts 1, 2, 3 & 5) using ACS data, with District 2 barely majority minority at 50.08%. (Brace Aff. ¶22c.) There are two open districts due to the necessary pairings described above: one is majority minority District 1 and the other is District 9. (Brace Aff. ¶22g.)

| Incumbent Terms and Seats in 10 District Concept Plan | | |
|---|---|---|
| **Incumbent** | **Up for Reelection** | **Seat in 10 District Concept Plan** |
| Abbott | November 2024 | District 2^ |
| Berlucchi | November 2024 | District 5^ |
| Henley | November 2022 | District 10 |
| Jones* | November 2022 | District 6 |
| Moss* | November 2022 | District 6 |
| Rouse | November 2022 | District 4 |
| Tower* | November 2022 | District 7 |
| Wilson | November 2024 | District 8 |
| Wood* | November 2022 | District 7 |
| Wooten | November 2024 | District 3^ |

*Incumbents paired.
^Majority-minority district.

(Brace Aff. ¶22g.)

### 4. Performance analysis of Defendants' proposed concept plans

Dr. Handley applied two related approaches to evaluate the proposed concept plans and ascertain whether they are likely to provide voters from minority communities with an opportunity to elect their candidates of choice to office: a "percent minority population required" analysis and a recompiled election results analysis. (Handley Aff. ¶4.)

7

### a. Percent minority population required for the minority-preferred candidate to win with at least 50 percent of the vote.

The first method is based on an analysis of voting patterns by race and uses the estimates derived from this analysis to calculate the percent minority population required for the minority-preferred candidate to win with at least 50 percent of the vote. (Handley Aff. ¶4.) This approach takes into account the participation rates of minority and white voters, as well as the degree of minority political cohesion and the degree of white crossover votes for minority-preferred candidates in a jurisdiction and uses algebra to compute the percent minority population needed for the minority-preferred candidate to receive 50 percent of the vote based on these voting patterns. (*Id.*)

Though this form of analysis has shortcomings here, (Handley Aff. ¶¶11-13), there is at least one reason why this analysis is useful in this case: it reveals the need for a higher concentration of all minorities combined than would be necessary if only Black CVAP is considered in crafting an effective remedy. (Handley Aff. ¶15.) This dynamic is caused by lower levels of political cohesion when all minority voters are considered together as opposed to Black voters alone. (Handley Aff. ¶¶15-18 & Tables 2 and 3.)

Dr. Handley found that there were "consistently lower levels of cohesion among all minority voters compared to Black voters." (Handley Aff. ¶19 n.4.) She prepared a table illustrating these differences:

| Year | District | Minority-Preferred Candidate | Minority CVAP Needed | Black CVAP Needed | Difference |
|---|---|---|---|---|---|
| 2018 | At-large | Rouse | 70.4 | 67.4 | 3.0 |
| 2018 | At-large | White | 77.8 | 71.6 | 6.2 |
| 2016 | Kempville | Ross-Hammond | 53.9 | 47.6 | 6.2 |
| 2016 | Rose Hill | Cabiness | 71.7 | 64.4 | 7.3 |
| 2012 | Kempsville | Ross-Hammond | 55.8 | 48.9 | 7.0 |
| 2011 Sp | At-large | Sherrod | 57.7 | 50.4 | 7.3 |
| 2010 | At-large | Jackson | 61.4 | 51.9 | 9.4 |
| 2010 | Princess Anne | Bullock | 45.6 | 42.9 | 2.7 |
| 2008 | At-large | Allen | 53.2 | 48.1 | 5.1 |

(*Id.*) Dr. Handley found that these consistent differences raise a question about whether Black voters and other minority voters are actually supporting the same candidates. (*Id.*) As an example, in a district with 150 voters, $2/3^{rd}$ (100) of whom are Black and $1/3^{rd}$ (50) of whom are Hispanics and Asians, if 80 Black voters support a candidate and only 10 of the other minority voters support that candidate, the Black level of cohesion is 80% (80/100) and the overall level of minority cohesion is 60% (90/150) but only 20% (10/50) of Hispanics and Asians actually supported the candidate. (*Id.*) While a level of voting support at 20% does not support a finding of cohesion, (*id.*), that lack of cohesion is masked when using "all minorities" by the much higher and more weighted Black cohesion figure.

For the purposes of her analysis, and pursuant to the remedial posture of this case, Dr. Handley adopted the Court's view that Blacks, Hispanics and Asians are cohesive. But even Plaintiffs' expert found that "the population of Hispanic and Asian voters is not large enough to generate precise estimates of candidate preference using traditional statistical methods." (*Id.*) (citing Spencer Report, Aug. 26, 2019, at 6). As a consequence, Dr. Handley could not draw any conclusions about Asian or Hispanic voting preferences in Virginia Beach, (*id.*), but her analysis raised serious questions about minorities' voting cohesion in the city.

9

### b. Recompiled election results analysis

The second method Dr. Handley used involves conducting a racial bloc voting analysis, identifying the minority candidates of choice in each of the election contests, and recompiling the election results of these contests to conform to proposed district boundaries to determine if minority-preferred candidate would prevail if the contest were confined within the proposed district boundaries. (Handley Aff. ¶5.) This recompilation takes into account the same information as the first approach – the participation rates of minorities and whites, the degree of minority political cohesion and white crossover voting – but can only be used if proposed districts have been put forward and have been drawn using existing election precincts and the precinct boundaries have not changed over time. (*Id.*) If precinct lines have changed over the course of the time period being considered, or census blocks have been used to draw districts rather than precincts, this approach can be utilized only if the precinct results are disaggregated down to the census block level – they can then be reaggregated up to conform with the boundaries of the proposed districts. (*Id.*) In this case, Dr. Handley used the racial bloc voting analysis conducted by Plaintiffs' expert Douglas Spencer, and the Court's Opinion about candidates of choice to inform her analysis. (Handley Aff. ¶6.) For reasons detailed in her affidavit, (*id.* ¶¶21-23), Dr. Handley identified two bellwether elections for use in her analysis: the 2012 and 2016 Kempsville election contests where Dr. Amelia Ross-Hammond was the candidate of choice in both elections.

In the 10-1 Concept Plan, Dr. Handley found that there are three or four majority minority districts depending on whether the estimates are derived from the ACS (four minority districts – Districts 1, 2, 3, 5) or ESRI (three minority districts – Districts 1, 3, and 5). (Handley Aff. ¶25.) Despite substantial minority populations in three of these districts, only one has a minority CVAP of greater than 50 percent (District 3 with a minority CVAP of 50.03 percent).

(*Id.*)  Under the reconstituted election analysis, Ross-Hammond does not carry District 3 in her bid for the Kempsville seat against a single opponent in 2016.  (*Id.*)  However, she does win District 1 with 53.73 percent of the vote in this 2016 contest.  (*Id.*)  Ross-Hammond wins the plurality vote in both of these districts (Districts 1 and 3) in 2012.  (*Id.*)  She also wins a plurality of the vote in Districts 2 and 5, both with substantial but less than majority minority CVAPS, as well as Districts 4, 6, 8 and 9.  (*Id.*)

| | 10 District Plan ||||||||
|---|---|---|---|---|---|---|---|---|
| | Percent of Total Population |||| Percent of CVAP || Recompiled election results: Votes for Black-preferred Candidate ||
| District | NHBlack || Minority || NHBlack | Minority | 2016 | 2012 |
| | ACS | ESRI | ACS | ESRI | ACS | ACS | Ross-Hammond | Ross-Hammond |
| 1 | 32.64% | 34.87% | 55.34% | 56.11% | 32.25% | 49.08% | 53.73% BP won | 49.98% BP plurality win |
| 2 | 25.74% | 24.51% | 50.08% | 48.66% | 26.67% | 46.09% | 42.84% BP lost | 35.01% BP plurality win |
| 3 | 24.80% | 25.65% | 52.55% | 56.79% | 26.42% | 50.03% | 43.46% BP lost | 40.19% BP plurality win |
| 4 | 18.43% | 17.67% | 39.52% | 40.23% | 19.64% | 36.95% | 39.80% BP lost | 26.51% BP plurality win |
| 5 | 26.09% | 26.07% | 53.09% | 53.23% | 27.04% | 46.79% | 46.71% BP lost | 38.43% BP plurality win |
| 6 | 11.05% | 12.68% | 29.13% | 31.27% | 11.33% | 24.50% | 37.44% BP lost | 28.21% BP plurality win |
| 7 | 2.49% | 2.71% | 11.94% | 12.22% | 2.69% | 10.12% | 35.06% BP lost | 20.46% BP lost |
| 8 | 15.66% | 16.27% | 31.75% | 34.25% | 15.23% | 26.95% | 38.23% BP lost | 31.33% BP plurality win |
| 9 | 17.55% | 15.68% | 35.90% | 37.41% | 17.72% | 32.81% | 38.91% BP lost | 32.66% BP plurality win |
| 10 | 9.24% | 11.39% | 22.92% | 26.80% | 10.27% | 21.60% | 32.77% BP lost | 25.33% BP lost |

(*Id.* at Table 4.)

In the 7-3 Concept Plan there are two majority minority districts in the 7-district component of the plan: Districts 1 and 3. Only one of these – District 3 – is majority minority in CVAP.  (Handley Aff. ¶26.)  Ross-Hammond did not carry either of these districts in 2016 but did win with a plurality of the vote in Districts 1 and 3 (as well as four additional districts) in 2012. (*Id.*)  In the three super ward districts, there is one district (District 1) that is majority minority in population but not majority minority in CVAP.  (Handley Aff. ¶27.)  Ross-Hammond did not carry this district in 2016 but was the plurality winner in this district in 2012. (*Id.*)

11

| District | 7-3 District Plan | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Percent of Total Population | | | | Percent of CVAP | | Recompiled election results: Votes for Black-preferred Candidate | |
| | NHBlack | | Minority | | NHBlack | Minority | 2016 | 2012 |
| | ACS | ESRI | ACS | ESRI | ACS | ACS | Ross-Hammond | Ross-Hammond |
| 1 | 29.37% | 31.49% | 51.26% | 53.06% | 29.10% | 45.44% | 49.30% BP lost | 41.48% BP plurality win |
| 2 | 24.22% | 21.93% | 45.82% | 44.56% | 25.15% | 41.97% | 41.75% BP lost | 31.46% BP plurality win |
| 3 | 23.88% | 25.67% | 54.36% | 56.71% | 25.97% | 51.40% | 43.23% BP lost | 38.80% BP plurality win |
| 4 | 13.95% | 14.55% | 33.11% | 34.28% | 13.95% | 28.24% | 39.69% BP lost | 30.41% BP plurality win |
| 5 | 8.09% | 7.73% | 20.00% | 20.78% | 8.50% | 17.88% | 35.82% BP lost | 23.72% BP lost |
| 6 | 19.91% | 19.84% | 38.92% | 40.60% | 19.65% | 33.79% | 42.53% BP lost | 34.84% BP plurality win |
| 7 | 8.58% | 9.84% | 23.08% | 27.13% | 9.08% | 21.20% | 33.15% BP lost | 26.45% BP plurality win |
| Large Overlay Districts | | | | | | | | |
| 1 | 26.02% | 25.74% | 50.15% | 50.65% | 26.56% | 45.64% | 43.90% BP lost | 35.57% BP plurality win |
| 2 | 13.09% | 13.55% | 29.55% | 30.65% | 13.11% | 25.39% | 39.61% BP lost | 29.89% BP plurality win |
| 3 | 16.29% | 17.50% | 35.39% | 38.59% | 17.06% | 32.27% | 38.27% BP lost | 31.38% BP plurality win |

(*Id.* at Table 5.)

    5. **Special Master Proposal**

Defendants propose **Dr. Bernard Grofman** as a special master in this case. Professor Grofman holds a Ph.D. in political science from the University of Chicago and is a distinguished professor of political science at the University of California, Irvine. He is the author and editor of multiple books and more than 300 articles and research notes on the political process, including voting-rights and redistricting issues. Professor Grofman's work has been cited by the Supreme Court of the United States in at least a dozen cases including the landmark *Gingles* decision where the standard used to define racially polarized voting was based on his work. *Thornburg v. Gingles*, 478 U.S. 30, 52-53 & n. 20 (1986). Professor Grofman has served as a consultant in at least seven federal cases. Most relevant here, Professor Grofman served as Special Master in *Personhuballah v. Alcorn*, 155 F. Supp. 3d 552 (E.D. Va. 2016) and *Bethune-*

12

*Hill v. Virginia State Board of Elections*, 368 F. Supp. 3d 872, 876 (E.D. Va.), *appeal dismissed sub nom. Virginia House of Delegates v. Bethune-Hill*, 139 S. Ct. 2715 (2019).  In both cases, this Court adopted the plans he drew.  Dr. Grofman's familiarity with Virginia's redistricting data and this Court would facilitate an efficient remedial process.

DATE: July 1, 2021

Mark D. Stiles (VSB No. 30683)
City Attorney
Christopher S. Boynton (VSB No. 38501)
Deputy City Attorney
Gerald L. Harris (VSB No. 80446)
Senior City Attorney
Joseph M. Kurt (VSB No. 90854) Assistant City Attorney
OFFICE OF THE CITY ATTORNEY
Municipal Center, Building One, Room 260
2401 Courthouse Drive
Virginia Beach, Virginia 23456 Telephone: (757) 385-4531
Facsimile: (757) 385-5687
mstiles@vbgov.com cboynton@vbgov.com
glharris@vbgov.com
  jkurt@vbgov.com

Respectfully submitted,

*/s/ Katherine L. McKnight*
Katherine L. McKnight (VSB No. 81482)
Richard B. Raile (VSB No. 84340)
BAKER & HOSTETLER, LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036
Telephone: (202) 861-1500
Facsimile: (202) 861-1783
kmcknight@bakerlaw.com
rraile@bakerlaw.com

Patrick T. Lewis (*pro hac vice*)
BAKER & HOSTETLER, LLP
127 Public Square, Suite 2000
Cleveland, OH 44114
Telephone: (216) 621-0200
Facsimile: (216) 696-0740
plewis@bakerlaw.com

Erika Dackin Prouty (*pro hac vice*)
BAKER & HOSTETLER, LLP
200 Civic Centre Drive, Suite 1200
Columbus, OH 43215
(614) 462-4710
eprouty@bakerlaw.com

*Counsel for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that on July 1, 2021, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will then send a notification of the filing to all parties of record.

*/s/ Katherine L. McKnight*
Katherine L. McKnight (VSB No. 81482)
*Counsel for Defendants*
