IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
NORFOLK DIVISION

| | |
|---|---|
| LATASHA HOLLOWAY, *et al.*, | |
| *Plaintiffs,* | |
| v. | Civil Action No. 2:18-cv-0069 |
| CITY OF VIRGINIA BEACH, *et al.*, | |
| *Defendants*. | |

**PLAINTIFFS' BRIEF IN RESPONSE TO SPECIAL MASTER REPORT**

For the reasons set out below, in Plaintiffs' prior remedial briefing, *see* ECF Nos. 261-6, 273-2, and in the Report of Special Master Dr. Bernard Grofman, ECF No. 281-1 ("Report"), Plaintiffs ask the Court to adopt the Special Master's Illustrative Map with two minor modifications. Plaintiffs' suggested modifications both include adjustments to minority opportunity District 4—first, to change the boundary of District 4 so as to include the residence of Plaintiff Georgia Allen, and second, to include the historically African-American community of interest, Burton Station, in District 4. These modifications will have little impact on other districts or redistricting criteria and will ensure that the remedial map provides a "'complete' and legally adequate remedy for . . . [the] dilution violation." *McGhee v. Granville Cty., N.C.*, 860 F.2d 110, 115 (4th Cir. 1988).

In addition, in light of the supplemental expert evidence in the parties' remedial submissions and the Special Master's Report, Plaintiffs respectfully request that when it issues its remedial order, the Court make express factual findings that this evidence further supports the Court's previous findings regarding the cohesion of Hispanic, Black, and Asian American ("HBA") voters and the presence of white bloc voting. *See, e.g.*, ECF No. 273 at 1-6.

1

## ARGUMENT

I.  **District 4 in the Special Master's Illustrative Map Should be Modified To Include the Residence of Plaintiff Georgia Allen.**

Inadvertently, the Special Master's Illustrative Map does not include the residence of Plaintiff Georgia Allen within the boundaries of any of the three minority opportunity districts (Districts 4, 7, and 10). In the current version of the Special Master's Illustrative Map, Ms. Allen's residence is in District 9, which contains a majority non-Hispanic white Citizen Voting Age Population ("CVAP"). *See* Report at 38 (listing District 9's non-Hispanic white CVAP as 75.6%). However, Ms. Allen's residence was included in a minority opportunity district (District 4) in Plaintiffs' proposed remedial map, *see* ECF No. 261-1 at 5, and could easily be added to District 4 in the Special Master's Illustrative Map with minor modifications and little impact on other districts or redistricting criteria. No current incumbent would be moved into a new district or otherwise impacted by the suggested change, and the modification would *decrease* the Illustrative Map's overall population deviation.[1] *See* Report at 50 (showing incumbent locations). Given Ms. Allen's status as a Plaintiff who has been directly harmed by the City's vote dilution, ECF No. 242 at 133, the remedy here should address that harm. Plaintiffs respectfully request that District 4 be modified so that Ms. Allen's residence be moved within a minority opportunity district.[2]

---

[1] Plaintiffs agree that the Special Master's Illustrative Map currently falls within the allowable constitutional threshold for population deviations. *See, e.g., Brown v. Thomson*, 462 U.S. 835 (1983). However, in the Special Master's Illustrative Map, District 4 is currently slightly underpopulated, while District 9 is slightly overpopulated. An effect of including Ms. Allen's residence in District 4 (as well as the other modification suggested by Plaintiffs) would be to add individuals from District 9 into District 4, thus reducing the population deviations.

[2] As this Court is aware, at least one Plaintiff has received racist threats due to her involvement in this litigation, *see* ECF Nos. 231-33. Thus, Plaintiffs' counsel intend to submit the addresses of both Plaintiffs to the Court via email (and copy Defendants' counsel) for consideration by the Special Master. For this same reason, Plaintiffs have not prepared any maps showing the location of Plaintiffs' residences.

II. **District 4 in the Special Master's Illustrative Map Should be Modified to Include the Burton Station Community.**

Burton Station is a historically African-American community in Virginia Beach that is located near the Norfolk airport. ECF No. 242 at 29, ¶19. As this Court found in its March 31, 2021 Opinion and Order, "there is a documented history of discrimination and neglect by the City" towards "the Burton Station Community," including a decades-long lack of basic sewer and water infrastructure. *Id*. Given this history of discrimination and neglect, and the commonalities the community shares with other minority neighborhoods, Plaintiffs' proposed remedial map included the Burton Station community in a minority opportunity district (District 4), while balancing other traditional redistricting criteria. *See* ECF No. 261-1 at 5. The Special Master's Illustrative Map places the Burton Station community in District 9, which is not a minority opportunity district. Report at 45. A comparison of the Burton Station community in the Special Master's Illustrative Map and Plaintiffs' remedial map is included below in Figures 1 and 2.



**Figure 1: Treatment of Burton Station (in red) in Special Master's Illustrative Map**



**Figure 2: Treatment of Burton Station (in red) in Plaintiffs' Remedial Map**

It would require only minor modifications to include the Burton Station community in District 4 in the Special Master's Illustrative Map. In fact, as mentioned above, adding the Burton Station community to District 4 would decrease the Illustrative Map's overall population deviation. In addition, no current incumbent lives in the Burton Station area, so the modification would have no impact on incumbents. Thus, this change would keep politically cohesive minority voters together and fully remedy the City's vote dilution while also balancing other redistricting criteria.

**III. The Parties' Remedial Submissions and the Special Master's Report Further Support this Court's Findings of Minority Voter Cohesion and White Bloc Voting, and the Court Should Make Supplemental Factual Findings on these Issues.**

As Plaintiffs noted in their reply regarding the parties' remedial submissions, the parties' remedial proposals and evidence add further support for the Court's finding of cohesion among HBA voters in Virginia Beach. *See* ECF No. 273 at 1-6; 273-1 (Spencer Dec.); ECF No. 260-2 (Handley Dec.). The Report issued by Special Master Dr. Bernard Grofman also strengthens the Court's earlier

factual findings regarding minority voter cohesion, as well as white bloc voting. Because "[a] district court's remedial proceedings bear directly on and are inextricably bound up in its liability findings," and "the entire record" in a Section 2 case is from both the liability and remedy proceedings, evidence adduced during this remedial proceeding adds further support for the Court's previous factual findings on cohesion and bloc voting. *Wright v. Sumter Cty. Bd. of Elections & Registration*, 979 F.3d 1282, 1298-1303 (11th Cir. 2020); *see also E. Jefferson Coal. For Leadership & Dev. v. Parish of Jefferson*, 926 F.2d 487, 492 (5th Cir. 1991) (holding that evidence from remedial phase could be relied upon in support of liability decision because "the 'liability' phase and the 'remedy' phase of Voting Rights Act cases frequently merge"). As shown below, Plaintiffs' respectfully ask this Court to make express factual findings concluding that the evidence from the remedial phase provides additional support for its conclusion regarding the presence of white bloc voting and minority voter cohesion in Virginia Beach.

        **1.**        **The Parties' Remedial Submissions Support the Court's Findings on Cohesion of HBA Voters in Virginia Beach**

In their remedial reply brief, Plaintiffs described in detail how Defendants' expert Dr. Handley's own analysis in the remedial phase, combined with the reconstituted election results in both parties' remedial proposals and demographic data provided by Plaintiffs, support the Court's conclusion of cohesive voting among HBA voters in Virginia Beach. ECF No. 273 at 1-6. Plaintiffs incorporate those arguments by reference, but briefly summarize them here for the Court's benefit. *Id*.

First, Defendants' expert Dr. Handley conducted two types of analyses, including a "percent needed to win" analysis based on the assumption that a candidate must receive 50% in order to win an election. ECF No. 260-2 (Handley Dec.) at 6. Dr. Handley concluded that the differences between the "percent needed to win" for Black voters and all minority voters together

5

"raise[d] a question about whether Black voters and other minority voters are actually supporting the same candidates." *Id*. at 6 n.4. However, as Dr. Handley herself acknowledged, this analysis is flawed because 50% is not the winning threshold for city council elections where multiple candidates are running, sometimes for more than one seat. *Id*. at 4. Further, the reconstituted election results in the parties' remedial proposals show that several candidates that Dr. Handley's analysis suggests would lose *actually in fact would win* in a remedial district with a "far lower minority CVAP than she reports would be 'necessary to win.'" ECF No. 273-1 (Spencer Dec.) at ¶ 31. As Dr. Spencer explains, "the fact that minority candidates of choice (particularly those who lost city-wide) win the majority of these elections in Plaintiffs' remedial districts, in the face of white opposition, but with only 32-36% Black CVAP, strongly suggests that Hispanic and Asian voters vote cohesively with Black voters." *Id.* at ¶ 33; ECF No. 273 at 1-4.

Second, even if Dr. Handley's analysis was sound, it still *supports* the Court's finding that HBA voters are politically cohesive. ECF No. 273-1 (Spencer Dec.) at ¶ 34. Taking the 2010 Princess Anne election as an example, Dr. Handley reports a 2.7% difference between the Black CVAP a district would need for candidate Bullock to win (42.9%) and the all-minority CVAP needed for Bullock to win (45.6%). As Dr. Spencer explains, "The fact that the Black CVAP and all minority CVAP that would supposedly be necessary for Bullock to win are quite similar (within 2.7%) is evidence that Black, Hispanic, and Asian voters share the same preferences, not that they lack cohesion." *Id*. at ¶ 36. Defendants' own remedial submission further proves this. District 2 in their 10-district plan has Bullock narrowly winning, 50.6% to 49.4%, even though the district has a Black CVAP of just 26.6%. "Given that Dr. Handley reports white support of Bullock at just 32%, Handley Affidavit ¶ 18, the only conceivable explanation for Bullock's narrow win [in

6

Defendants' proposed District 2] is that Hispanic and Asian voters, like Black voters, supported Bullock in strong numbers and voted as a coalition." *Id*.; ECF No. 273 at 4-5.

Third, the differences Dr. Handley reports across all elections are "slight . . . , particularly considering the uncertainty (*i.e.* margins of error) inherent in the underlying ecological inference (EI) estimates that form the core of her analysis." ECF No. 273-1 (Spencer Dec.) at ¶ 38. As Dr. Spencer explains, "[t]hese small differences certainly do not suggest that Hispanic and/or Asian voters are *opposing* candidates supported by Black voters." *Id*. Rather, "[t]he reconstituted election results illustrate the opposite. *It would not be possible* for the candidates favored by Black voters to prevail in as many elections as they do in plaintiffs' proposed plan without Hispanic and Asian support, given known opposition by white voters." *Id*. (emphasis added); ECF No. 273 at 5.

Finally, Defendants contend that the relatively larger Asian American population in Plaintiffs' proposed Districts 7 and 10 as compared to District 4 is evidence of non-cohesion, given that minority preferred candidates prevail more frequently in proposed District 4. *See* ECF No. 270 at 3. This argument is meritless for several reasons. All three districts perform for minority voters in the majority of relevant elections. ECF No. 273-1 (Spencer Dec.). In addition, Dr. Spencer analyzed precincts from each of Plaintiffs' three remedial districts that each had relatively equal Asian and Hispanic CVAP percentages. *Id*. at ¶¶ 28-30. He found that "the data suggest that the magnitude of white bloc voting in opposition to minority preferred candidates is higher in Districts 7 and 10 than it is in District 4 (although District 4 nonetheless demonstrates white bloc voting oppos[ing]…minority candidates of choice). The fact that District 4 outperforms Districts 7 and 10 is thus best explained by the degree of white bloc voting and not a lack of cohesion among minority voters." *Id*. at ¶ 28. Dr. Spencer thus concluded that "this evidence adds further support that Asian and Hispanic voters prefer the same candidates as Black voters." *Id.* at ¶ 30.

7

In light of the above evidence, Plaintiffs' respectfully request that the Court issue supplemental factual findings in its remedial order that Defendants' own expert analysis, together with the reconstituted election results and demographic data and analysis provided by Plaintiffs in this remedial proceeding, further demonstrate and support the Court's conclusion of cohesion among HBA voters.

### 2. The Special Master's Report Also Supports the Court's Findings on Minority Voter Cohesion and White Bloc Voting

Dr. Grofman's report provides additional robust evidence demonstrating that voting in Virginia Beach is racially polarized, including that HBA voters are cohesive and that white bloc voting usually defeats minority candidates of choice. ECF No. 281-1. This evidence adds to the Court's previous factual findings on cohesion among HBA voters and the presence of white bloc voting, and as part of the record of this case, the Court should expressly incorporate it as supplemental factual findings.

First, Dr. Grofman analyzed twelve City Council elections with viable minority candidates, reported in Table 2 of his Report. Report at 11-14. Dr. Grofman found that "of the eight elections shown in Table 2 where there is a minority candidate of choice, voting is polarized along racial lines in seven of the eight." *Id.* at 15. He also found that in the only contest in which voting was not racially polarized (Wooten 2018), "there are still dramatic differences between [Ms. Wooten's] estimated support among minority voters (85%) and her bare majority (51.1%) support among White voters." *Id.* at 15. Dr. Grofman thus concluded that "voting in City Council elections between 2010 and 2018 is *clearly* polarized [between the] minority and the non-minority community in terms of willingness to vote for the minority candidate of choice." *Id*. (emphasis added).

8

Dr. Grofman further analyzed electoral cohesion among HBA voters in Table 2 in his Report. His analysis found that "from a political science point of view . . . the minority community in Virginia Beach (African-American plus Hispanic, plus Asian American) is, as a group, *unquestionably politically cohesive* in its support of minority candidates, while the White community in Virginia Beach is unquestionably politically cohesive in its opposition to minority candidates." *Id.* at 17 (emphasis added). Dr. Grofman explained that "[f]or the minority community as a whole, high levels of demonstrated socio-economic cohesion and very high levels of minority electoral cohesion have been shown in the evidence reviewed in the Court Opinion and in my discussion above," for both minority candidates and non-minority candidates who were candidates of choice of minority voters. *Id*. at 19. In support of this conclusion, Dr. Grofman analyzes the ranking of minority candidates by voters. Unsurprisingly, the average rank for viable minority candidates among minority voters (1.5) is much higher than the rank of those candidates among white voters (3.33). The same holds true for minority candidates who are also candidates of choice, who receive a 1.0 rank from minority voters versus a 2.9 rank from white voters. *Id.* at 18. Dr. Grofman also found that "in the six single-seat contests in Table 2 where there is a viable minority candidate who is also the candidate of choice of the minority community, the average vote share of the minority candidate among minority voters is 65.5%. In contrast, the average vote share for the minority candidates of choice among non-minority voters is only 24.9%." *Id.* This is clear and undisputed evidence that HBA voters are politically cohesive, and Dr. Grofman concluded as much, stating "In sum, I find essentially indisputable evidence of political cohesive patterns of voting for both White voters and minority voters in terms of electoral cohesion." *Id*. at 18-19.

The City has argued on appeal that Plaintiffs have not met the third *Gingles* prong, which requires a showing of white bloc voting. Defs. App. Br. at 46. This argument is meritless, as

9

demonstrated by the Court's findings in the liability phase of this litigation. However, in addition to the liability findings, Dr. Grofman found strong evidence that white bloc voting usually defeats the election of minority preferred candidates in City Council elections. Analyzing the 12 City Council elections in Table 2 in the Report, Dr. Grofman found based on his own independent review that, from 2010-2018 "minority candidates of choice regularly lose in the at-large single seat districts." *Id*. at 20. In particular, he found that "minority candidates of choice won in only two of five instances, and both of those two instances were due to special circumstances." *Id*. He also concluded that, "absent special circumstances, minority candidates of choice regularly lose election in the at-large two seat districts," noting that of the four candidates considered in two seat elections, "the only minority victor" was Aaron Rouse in 2018. *Id*. at 20-22. Of these three total victories for minority candidates, Dr. Grofman found that "a plausible expectation for two of these three instances of minority success is that the minority candidate who won that election would have lost had there been fewer White candidates splitting the White vote." *Id.* at 22. Thus, Dr. Grofman concluded that there is "a pattern of actual or expected future minority loss in seven of eight of the elections shown in Table 2 where there is a minority candidate of choice," and that "[m]inority candidates would have won far more often had only minority voters been voting, *i.e. minority candidates regularly lost due to white bloc voting*." *Id*. at 22-23 (emphasis added).

Moreover, Dr. Grofman noted that the "'seven of eight'" calculation actually "*understates* the degree to which the present electoral system has foreclosed minority opportunity to succeed in the electoral arena." *Id* (emphasis added). He explained:

> Because minority candidates are deterred from running for at-large elections in the city by their low chance of electoral success, counting the number of minority candidates who ran and lost substantially understates the actual dilutive effect of the at-large plan struck down by the Court in terms of that plan's effects on minority opportunity to participate in the political process and elect candidates of choice.

10

*Id*.

Given the robust analysis and findings detailed in Dr. Grofman's Report, Plaintiffs respectfully request that this Court make an explicit factual finding that the Report further supports the Court's findings on HBA cohesion and the presence of white bloc voting.

## CONCLUSION

For the reasons stated above, Plaintiffs respectfully request that the Court (1) adopt the Special Master's Illustrative Map after modifications to District 4 are made to include the residence of Georgia Allen and the Burton Station community, and (2) make express factual findings that the remedial submissions from both parties and the Special Master's Report further reinforce the Court's earlier findings that there is minority voter cohesion among HBA voters in Virginia Beach and that white bloc voting usually defeats candidates preferred by HBA voters.

Dated: November 16, 2020

Respectfully submitted,

| | |
|---|---|
| Annabelle E. Harless<br>Campaign Legal Center<br>55 W. Monroe St., Ste. 1925<br>Chicago, IL 60603<br>(312) 312-2885<br>aharless@campaignlegal.org | /s/ J. Gerald Hebert<br>J. Gerald Hebert<br>VSB. No. 38432<br>Robert Weiner<br>Mark Gaber<br>Christopher Lamar<br>Simone Leeper<br>Campaign Legal Center<br>1101 14th Street NW, Suite 400<br>Washington, DC 20005<br>(202) 736-2200 (Office)<br>(202) 736-2222 (Facsimile)<br>ghebert@campaignlegal.org<br>rweiner@campaignlegal.org<br>mgaber@campaignlegal.org<br>clamar@campaignlegal.org<br>sleeper@campaignlegal.org<br><br>*Attorneys for Plaintiffs* |

11

## CERTIFICATE OF SERVICE

I hereby certify that on the 16th day of November 2021, I will electronically file the foregoing with the Clerk of the Court using the CM/ECF system, which will then send a notification of such filing to the following:

Mark D. Stiles (VSB No. 30683)
Christopher S. Boynton (VSB No. 38501)
Gerald L. Harris (VSB No. 80446)
Joseph M. Kurt (VSB No. 90854)
Office of the City Attorney
Municipal Center, Building One, Room 260
2401 Courthouse Drive
Virginia Beach, Virginia 23456
(757) 385-8803 (Office)
(757) 385-5687 (Facsimile)
mstiles@vbgov.com
cboynton@vbgov.com
glharris@vbgov.com
jkurt@vbgov.com

Katherine L. McKnight (VSB No. 81482)
Richard B. Raile (VSB No. 84340)
BAKER & HOSTETLER, LLP
Washington Square, Suite 1100
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036
Telephone: (202) 861-1500
Facsimile: (202) 861-1783
kmcknight@bakerlaw.com
rraile@bakerlaw.com

Patrick T. Lewis
BAKER & HOSTETLER, LLP
127 Public Square, Suite 2000
Cleveland, OH 44114
Telephone: (216) 621-0200
Facsimile: (216) 696-0740
plewis@bakerlaw.com

                                            /s/ J. Gerald Hebert
                                                 *Counsel for Plaintiffs*