IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
NORFOLK DIVISION

| | |
|---|---|
| Latasha Holloway, et al., *Plaintiffs*, v. City of Virginia Beach, et al., *Defendants*. | Case No. 2:18-cv-0069 |

**DEFENDANTS' RESPONSE TO**
**ORDER REGARDING SPECIAL MASTER'S REPORT**

On October 26, 2021, this Court forwarded to the parties the report of the Special Master, Dr. Bernard Grofman, and ordered the parties to "provide any comments" within 21 days. ECF No. 281 at 2. The defendants—the City of Virginia Beach, the Virginia Beach City Council, the council members in their official capacities, the City Manager, and the City Registrar (collectively, "the City")—have reviewed the report and provide this response, which addresses three topics. First, because Plaintiffs contend that liability issues are properly before the Court for further review and adjudication at this stage, and because the Special Master's report touches on issues of liability, the City addresses the impact of the Special Master's findings on the Court's liability order. Second, the City addresses certain material legal errors undermining some of the Special Master's findings. Third, the City addresses the Special Master's proposed remedy.[1]

---

[1] The City does not accept the premises of the liability opinion that give rise to the need for a "remedy." The City intends to prosecute its challenge to the liability ruling on appeal, and nothing in this memorandum (or any other) waives any contention the City has raised or will raise against that order. For purposes of addressing some remedial issues, the City assumes the correctness of the liability ruling for the sake of argument only.

I.      **Impact of the Special Master's Report on the Liability Ruling**

An argument central to Plaintiffs' "successful motion for an abeyance to the Fourth Circuit" was that "the appropriate appellate record in a Section 2 case is 'the entire record' from both the liability and remedy proceedings, because, as the Eleventh Circuit has explained, 'our inquiries into remedy and liability cannot be separated' due to the nature of the *Gingles* inquiry." ECF No. 273 at 1–2 (quoting *Wright v. Sumter Cty. Bd. of Elections & Registration*, 979 F.3d 1282, 1298–1300 (11th Cir. 2020)). The City assumes this Court has authority to address liability issues at this stage within the framework of the *Wright* decision.[2]

Plaintiffs, relying on *Wright*'s conclusion that a district court must reconsider liability issues from the vantage point of the record developed during the remedial phase, urge the Court to make "express factual findings . . . regarding how the evidence submitted as part of the remedial phase further supports" a finding of cohesion. ECF No. 273 at 2; *see also id.* at 24. But *Wright* is not limited to identifying "further support for the Court's factual finding[s]." *See id.* at 2. Rather, *Wright* held that the principle of record interrelatedness may either bolster *or undermine* the liability ruling, depending on how the remedial record develops. *See* 979 F.3d at 1303. The Eleventh Circuit endorsed its prior ruling, *Dillard v. Baldwin County Commissioners*, 376 F.3d 1260 (11th Cir. 2004), which held that remedial-phase developments undermined a liability ruling and "precluded" the district court from adhering to it. *Id.* at 1266; *Wright*, 979 F.3d at 1303. In *Wright* itself, the Eleventh Circuit explained that "[i]t was not inevitable that the district court,

---

[2] The City contested this principle in opposing a stay in the Fourth Circuit, but the Fourth Circuit did not adopt the City's arguments. *See, e.g.*, *Scott v. Land Span Motor, Inc.*, 781 F. Supp. 1115, 1120 (D.S.C. 1991) ("[T]he party against whom estoppel is being invoked . . . must have convinced the judicial or quasi-judicial body to adopt its position."). For purposes of this memorandum, the City assumes the Court's authority to address liability issues without waiving the right to contest this principle during the appellate-review process.

2

relying on [Special Master] Dr. Grofman's analysis, would find a workable remedy" in support of its prior liability ruling. 979 F.3d at 1303. "Had the court instead found that no viable remedy was available, *Dillard* would have instructed the trial court to dissolve its injunction." *Id.*

In this case, the Special Master's report undermines the liability ruling in at least three important respects set forth below. The Court should vacate the liability ruling and dissolve its injunction or else clarify the predicates of that ruling to provide reviewing courts a clear basis for the Court's decision.

### A. Dr. Grofman's Report Rejects the Possibility of Inferring, From Aggregate Data, Cohesion Levels of Individual Groups of the Alleged Coalition

A central dispute in this Section 2 coalitional claim is whether Plaintiffs have proven coalitional cohesion within and among the three constituencies of the alleged coalition: the Black, Asian, and Hispanic communities. The City has urged the Court to adopt the cohesion standard established by the Fifth Circuit in *Brewer v. Ham*, 876 F.2d 448 (5th Cir. 1989), which requires proof of internal cohesion among each constituent group of the alleged coalition and cohesion between or among all groups together. *Id.* at 453. Plaintiffs contend that they *have* proven cohesion as to each group individually—even though their expert, Dr. Spencer, was unable to disaggregate estimates for each constituency individually—through "non-linear" inferences that can be drawn from Dr. Spencer's aggregated estimates. *See, e.g.*, ECF No. 273 at 5. The City criticized this approach as "speculative." ECF No. 237 at 12.

The Court's liability order found for Plaintiffs on this point. The Court's liability ruling did not invoke the standard of *Brewer*, but it did endorse Plaintiffs' view that inferences about Asian and Hispanic voting patterns can be drawn from statistical studies that do not disaggregate estimates of voting patterns of each group individually. The Court recognized that, "[s]ince the Asian and Hispanic communities are much smaller than the Black community, high Black support

3

for a given candidate *could* mask far lower support—or even opposition—from Asian and Hispanic voters." ECF No. 242 at 83. Nevertheless, the Court credited Dr. Spencer's efforts "to address his own limitations"—i.e., his inability "to obtain separate data for Asian and Hispanics." *Id.* at 86. The Court relied on "1) HP [or Homogenous Precinct] analyses confirming the ER [Ecological Regression] and EI [Ecological Inference] results; and 2) non-linear 'LOESS' curves showing that the most accurate line through the distributed precinct data for the 'All minority' community was nonlinear." *Id.* (internal citations omitted).

However, the remedial record undermines Plaintiffs' analysis through the analyses of Dr. Grofman and Dr. Lisa Handley, both internationally recognized experts in the Voting Rights Act,[3] in ways that render any further reliance on Plaintiffs' cohesion analysis untenable.

First, Dr. Grofman's report finds that "separating out the voting behavior of each individual group in the composite minority grouping is, for all practical purposes, impossible." ECF No. 281-1 at 62. Dr. Grofman concludes that, "in the absence of reliable survey data," he cannot "regard any inferences about how the three minority groups voted <u>as individual groups</u>, whether made by an expert for Plaintiffs or an expert for Defendants, to be sufficiently well supported for me to make any use of them in my own analyses." *Id.* (emphasis in original). Dr. Grofman "regard[s] it as essentially mathematically impossible, given the data limitations in this case, to reliably estimate voting behavior for each group separately." *Id.* at 62–63; *see also id.* at 13 n.15. Dr. Grofman also

---

[3] Drs. Grofman and Handley have co-authored dozens of publications about minority representation and the Voting Rights Act which have guided both courts and experts in the field of political science. *See, e.g.*, Bernard Grofman, Lisa Handley, and Richard G. Niemi, *Minority Representation and the Quest for Voting Equality* 83–84 (Cambridge 1992); Bernard Grofman & Lisa Handley, *1990s Issues in Voting Rights*, 65 Miss. L.J. 205, 268–69 (1995); Bernard Grofman, Lisa Handley, & David Lublin, *Drawing Effective Minority Districts: A Conceptual Framework and Some Empirical Evidence*, 79 N.C. L. Rev. 1383, 1420 (2001); David Lublin, Thomas L. Brunell, Bernard Grofman, and Lisa Handley, *Has the Voting Rights Act Outlived Its Usefulness? In a Word "No,"* 34 Legis. Stud. Q. 525 (2009).

rejects the reliance on HP (Homogeneous Precinct) analysis to predict minority voting cohesion, because "even the VTDs with the highest minority proportions do not have sufficiently large minority populations to allow us to use the results in those precincts as reliable indicators of how the minority community (and only the minority community) in those precincts voted." *Id.* at 15.[4]

Second, the City presented additional evidence at the remedial phase from Dr. Handley that an expert "cannot draw any conclusions about Asian or Hispanic voting preferences in Virginia Beach," ECF No. 260-2 at 7 n.4. Dr. Handley stands by that opinion. *See* Handley Declaration (attached as Exhibit A). As Dr. Handley notes, combining minority groups together to analyze minority voting patterns does not provide statistical evidence that majorities of the different groups tend to support the same candidates, especially if one group is larger than the other(s). Such an analysis identifies only the "voting behavior of the compositive minority group **as a whole**." Handley Decl. ¶ 3 (quoting ECF No. 281-1 ¶ 63 (emphasis in the original)). Dr. Handley warns that treating all minority voters statistically as if they constituted a unified whole in order to demonstrate statistically that they are cohesive effectively places the cart before the horse. *Id.* ¶ 4. This method risks assuming cohesion before it is proven, especially where divergent voting patterns of the smaller minority groups may be subsumed into the voting pattern of the larger minority group. *Id.*

Dr. Grofman's findings in his Special Master report on these topics are sound. His finding of mathematical impossibility accords with the basic premise, admitted on all sides, that the Asian

---

[4] It is also noteworthy that Dr. Grofman is under the incorrect but understandable impression that "first and foremost" a "community consisting essentially of African-Americans plus Hispanics plus Asian-Americans" "is the voting rights group which brought this lawsuit." ECF No. 281-1 at 13 n.15 (emphasis added). Anyone with Dr. Grofman's experience in voting rights litigation would assume a coalitional claim must be brought by a coalition. ECF No. 237 at 45. Here, there are no Asian or Hispanic plaintiffs.

and Hispanic communities are too small for purposes of estimating their voting preferences by means of statistical estimates.[5] ECF No. 236 at 125 (Tr. 337) (Dr. Spencer admitting this); ECF No. 281-1 at 62 (Dr. Grofman agreeing with Dr. Spencer and Mr. Brace on this). The Court's liability opinion recognized significant "limitations" on Dr. Spencer's conclusion that Asian and Hispanic voters are internally cohesive, and cohesive across the coalitional groups. ECF No. 242 at 86. Indeed, Dr. Spencer's presentation of his non-linear theory was itself dubious, as the concept was not disclosed in his expert report; consisted of live, *ad hoc* scribbling on an easel during trial; and provided no numerical estimates of Hispanic and Asian voter support for any candidate. *See, e.g.*, ECF No. 236 at 226 (Tr. 279); Trial Ex. P500 (photograph of easel). The City has outlined the problems with Dr. Spencer's approach. *See* ECF No. 237 at 11–14, 33–39.

The Court therefore should not adhere to Dr. Spencer's mathematically impossible inferences of individualized group voting preferences as to the Asian and Hispanic communities. *See Wright*, 979 F.3d at 1303. Because that finding was central to the Court's liability determination and injunction,[6] the proper course of action is vacatur of the liability ruling and dissolution of the injunction, as *Wright* directs. To be sure, Dr. Grofman appears to doubt whether the Court should adopt the standard set forth in *Brewer*. *See* ECF No. 181-1 at 19 ("[T]o further require that a finding of minority political cohesion must be supported by evidence of voting patterns for each minority group separately is simply, in my view, to ask the mathematically impossible." (bolding omitted; emphasis in original)). That would be legally incorrect for reasons

---

[5] Importantly, this is a feature of "the very specific case demographic and geographic facts" of this case. ECF No. 281-1 at 62. In other coalitional cases, plaintiffs may succeed where Plaintiffs here have failed, and plaintiffs in any case could address the flaws in statistical methods by devoting their resources to obtaining "reliable survey data." *Id.*

[6] *See* ECF No. 242 at 73 ("Based upon Dr. Spencer's credible analysis, the Court finds that Plaintiffs provided sufficient evidence showing consistent minority cohesive voting…").

the City has articulated, ECF No. 237 at 34, and it would also conflict with Dr. Grofman's prior political-science views.[7] But, in all events, that legal ruling would alter the basis of the Court's injunction and need to be clarified in the Court's forthcoming written opinion as the basis of liability to aid appellate review. *See* Fed. R. Civ. P. 52(a)(1) & (2).

      **B.    The Special Master's Report Fails To Establish a Viable Remedy That This Court May Implement**

The remedial phase also undermines the Court's liability-phase conclusion that "Plaintiffs have shown that the Minority Community is sufficiently geographically compact and numerous in Virginia Beach to constitute a majority in a single-member district" and satisfy the first *Gingles* precondition. ECF No. 242 at 51. The Special Master's report finds that prior illustrative remedies presented in this action no longer satisfy the one-person, one-vote principle, ECF No. 281-1 at 34, which the City warned would occur after the release of the 2020 census results, *see, e.g.*, ECF Nos. 237 at 29–30 & 150 at 3, 12–13. These plans therefore do not establish the first *Gingles* precondition.

Although the Special Master contends that his proposed remedy establishes that three majority-minority districts (of combined Black, Hispanic, and Asian voting-age persons) can be created as a viable remedy, his plan also does not satisfy the one-person, one-vote principle. The total-population deviation in the Special Master's plan is 9.4%. Brace Decl. ¶ 6 (attached as Exhibit C). Although that deviation would likely be sufficient for "legislatively enacted

---

[7] To the extent Dr. Grofman is urging against the standard in *Brewer*, that position conflicts with his prior writing advocating that, for a finding of coalitional cohesion, he "would require that (1) each group usually supports viable candidates of its own race or ethnicity, and (2) each group usually supports viable candidates of the other group in preference to non-minority candidates in situations where no candidate of the group's own race/ethnicity is in the contest." Bernard Grofman, *Voting Rights in a Multi-Ethnic World*, 13 Chicano-Latino L. Rev. 15, 23 (1993) (footnotes omitted) (attached as Exhibit B). In all events, Dr. Grofman was not hired to give legal opinions but to provide social-science and redistricting expertise.

apportionment plans," "[c]ourt ordered apportionment plans must meet more stringent standards of population equality." *Daly v. Hunt*, 93 F.3d 1212, 1218 n.7 (4th Cir. 1996). The 9.4% deviation exceeds the 5.97% deviation the Supreme Court has found too large for a court-ordered plan in *Chapman v. Meier*, 420 U.S. 1, 26 (1975). *See Connor v. Finch*, 431 U.S. 407 418 n.17 (1977); *see Clark v. Putnam Cty.*, 293 F.3d 1261, 1276–77 (11th Cir. 2002).

In addition, Dr. Grofman's proposed remedial districts do not all cross the majority-minority threshold under the governing legal standard, even measuring Black, Hispanic, and Asian communities combined, and the plan does not establish an adequate remedy. Dr. Grofman asserts that his proposal contains three majority-minority districts, but that is measured by voting-age population (VAP), not citizen voting-age population (CVAP). The law is clear "that citizen-voting age population is the basis for determining equality of voting power" under Section 2. *Barnett v. City of Chicago*, 141 F.3d 699, 704 (7th Cir. 1998); *see also League of United Latin American Citizens v. Perry*, 548 U.S. 399, 429 (2006) (plurality opinion); *Perez v. Pasadena Indep. Sch. Dist.*, 165 F.3d 368, 372 (5th Cir. 1999); *Thompson v. Glades Cnty. Bd. of Cnty. Comm'rs*, 493 F.3d 1253, 1263 n.19 (11th Cir. 2007). As Mr. Brace's affidavit shows, two districts fall below majority-minority status under the CVAP metric. Brace Decl. ¶ 8. A plan with only one additional majority-minority districts is not an effective remedy or an improvement over the current plan. *See Johnson v. De Grandy*, 512 U.S. 997, 1015 (1994) (finding it insufficient for plaintiff to show "that lines could have been drawn elsewhere, nothing more").

Thus, both the liability and remedial phases have failed to yield a remedial plan that consists of proposed majority-minority districts, that constitutes an effective remedy, and that also complies with the one-person, one-vote principle of the Equal Protection Clause. *See* ECF No. 237 at 30.

### C. The Court Should Rescind Its Alternative Ruling That Black Voting Age Persons Can Constitute a Majority in Single-Member Districts

The Special Master's report also impacts the Court's alternative finding that "Plaintiffs established that the African American community in Virginia Beach is sufficiently large and geographically compact" to meet the first *Gingles* precondition. ECF No. 242 at 65. Notably, Plaintiffs did not allege and did not seek to prove a single-race claim, and the table the Court's liability ruling credited reported majority "HBA" districts, meaning Hispanic, Black and Asian combined. ECF No. 242 at 53 (Table 1); *see also id.* at 65 (relying on Table 1 in making alternative finding regarding Black community alone). The Special Master has found that a "community consisting essentially of African-Americans plus Hispanics plus Asian-Americans treated as a whole" is "the only voting rights community with a large enough and geographically concentrated enough minority population to meet the 50% CVAP test of *Bartlett v. Strickland*, 556 U.S. 1 (2009)." ECF No. 281-1 at 13 n.15. The Special Master's remedial proposal contains no district exceeding 35% Black Voting Age Population (BVAP). *See id.* at 36–38. Plaintiffs' remedial proposal contains no district exceeding 36% BVAP. *See* ECF No. 261-1 at 12. There is no evidence supporting a single-race claim, and the Court should clarify that its injunction is predicated solely on a coalitional claim.

### II. Objections to the Special Master's Report

Although the Special Master's report in many respects, including those already discussed, reflects a sound and thorough attempt to address the issues presently before the Court, it is not free from error.

First, the Special Master's racially polarized voting analysis excludes candidates found by the Court (and Plaintiffs' expert) to be minority preferred, yet who are not "members of the minority community." ECF No. 281-1 at 11 & n.14. Circuit precedent rejects this approach. *See*

9

*Lewis v. Alamance Cty., N.C.*, 99 F.3d 600, 607 (4th Cir. 1996). The Fourth Circuit has particularly rejected it as to the third *Gingles* precondition. *See id.* at 609–10 & n.8. Further, the Special Master appeared to exclude races in which minority candidates failed to garner minority support, but these should have been *considered* as evidence *against* cohesion. *See* ECF No. 281-1 at 19–20 & n.20 (noting exclusion of races involving Mr. Furman and Mr. Wray).

Second, in evaluating cohesion (erroneously defined, as discussed, by reference to the amalgamated group of Blacks, Hispanics, and Asians), the Special Master assessed the "average rank of the minority candidate among minority voters" across elections. ECF No. 281-1 at 17. But courts evaluating cohesion have taken the different approach of examining each election to assess whether cohesion exists in *that* election and then count the election either as evidence in support of or evidence against cohesion. *See, e.g.*, *Wright*, 979 F.3d at 1304 ("The district court found that black voters in Sumter County were 'highly cohesive' in ten of the twelve elections the expert studied, including in all of the at-large elections held under the challenged plan."). Under that approach, six elections in Table 2 cut in favor of cohesion, and six—where minority support for a given candidate does not exceed 50%—"demonstrate a lack of political cohesiveness." *Levy v. Lexington Cty., S.C.*, 589 F.3d 708, 720 n.18 (4th Cir. 2009).

III.  **Statement of Position on the Special Master's Remedial Proposal**

As discussed, the City believes that the Special Master's report undermines the Court's liability finding, and the City intends to prosecute its appeal in the Fourth Circuit. Nothing in this brief presents a waiver of any argument that has been or will be made on appeal. Nevertheless, for purposes of the remedial phase, the City recommends that, if the Court chooses to stand by the liability ruling—and concludes that it is not bound by tighter one-person, one-vote standards than bind state legislative bodies—it should implement the Special Master's proposed remedy, with

limited qualifications discussed below. Taking as a given the many premises of liability, which the City disputes, and assuming the Court's disagreement with the City's above-stated arguments, the remedy does appear to effectively remedy the supposed violation better than other options before the Court.[8] Two important qualifications should be noted.

First, the Special Master asserts that his proposal "has unpaired . . . each of [the] pairings" in Plaintiffs' proposal. ECF No. 281-1 at 41. But, in fact, the plan pairs two incumbents Guy Tower and Linwood Branch in District 6. This appears to be due to the recent changes in personnel on the Council. *See* ECF No. 280 (motion to substitute).[9] It appears that the Special Master intended to avoid pairings to the extent consistent with the Court's remedial purpose, ECF No. 281-1 at 41, which would be consistent with governing law, *Larios v. Cox*, 314 F. Supp. 2d 1357, 1362 (N.D. Ga. 2004) (three-judge court) ("[T]he Supreme Court has plainly said that" "incumbency protection" "is a legitimate state interest that may be properly considered by a court as well as a legislative body"). The Special Master should be instructed to determine whether this pairing can be avoided consistent with other criteria and Section 2 considerations.

Second, the Special Master used "voter tabulation districts," or "VTDs," as the building blocks of the plan. VTDs are units of geography created by the U.S. Census Bureau, and it is

---

[8] The City hereby withdraws reliance on the remedial proposals it proffered in July. Although the City respectfully disagrees with many of the Special Master's specific criticisms of the City's proposals, it is verifiably true that the proposals no longer satisfy the one-person, one-vote principle, as the total deviation is 17.5%. ECF No. 281-1 at 34. For the record, it bears noting that the Special Master is wrong that the City's 7–3 plan "is no longer legal." ECF No. 281-1 at 25. The new state law the Special Master cites automatically transforms single-member districts in the City's residency plan into single-member voting districts, Va. Code § 24.2-222 (effective January 1, 2022); ECF No. 240-1, but the City's residency plan is a 7–3 plan. So not only is a 7–3 plan legal, it is *required* by state law. To the extent state-law is deemed controlling, it is the 10–1 plans that are "no longer legal," including the Special Master's.

[9] On October 8, 2021, Counsel for the City sent by e-mail to Dr. Grofman, copying counsel for Plaintiffs, Councilmember Branch's residential address.

common and unobjectionable for redistricting plans to be created at the VTD level. However, the City conducts its elections using "precincts," which are creatures of local law and differ from VTDs. The VTDs forming the basis of the Special Master's plan would not make for workable elections if they were deemed to replace the City's voting precincts. Counsel for the City do not understand precincts to be within the scope of the Section 2 challenge or to be subject to replacement by the Special Master's plan. However, out of an abundance of caution, the City requests that the Court clarify that implementation of the Special Master's plan would not require the City to redraw its precincts to match VTDs utilized in that plan but, rather, to administer the elections using the remedial districts comprised of whatever geographical building blocks the City uses for elections (here, precincts, not VTDs).

## CONCLUSION

The Court should vacate its liability ruling and dissolve its injunction. Alternatively, the Court should clarify the basis of its liability findings in light of the Special Master's rejection of core elements of its liability opinion, adopt the Special Master's remedy, and return jurisdiction to the Court of Appeals.

| | |
|---|---|
| DATE: November 16, 2021 | Respectfully submitted, |
| | */s/ Katherine L. McKnight* |
| Mark D. Stiles (VSB No. 30683) | Katherine L. McKnight (VSB No. 81482) |
| City Attorney | Richard B. Raile (VSB No. 84340) |
| Christopher S. Boynton (VSB No. 38501) | BAKER & HOSTETLER, LLP |
| Deputy City Attorney | 1050 Connecticut Avenue, N.W. |
| Gerald L. Harris (VSB No. 80446) | Washington, D.C. 20036 |
| Senior City Attorney | Telephone: (202) 861-1500 |
| Joseph M. Kurt (VSB No. 90854) Assistant City Attorney | Facsimile: (202) 861-1783 |
| OFFICE OF THE CITY ATTORNEY | kmcknight@bakerlaw.com |
| Municipal Center, Building One, Room 260 | rraile@bakerlaw.com |
| 2401 Courthouse Drive | |
| Virginia Beach, Virginia 23456 Telephone: (757) 385-4531 | Patrick T. Lewis (*pro hac vice*) |
| Facsimile: (757) 385-5687 | BAKER & HOSTETLER, LLP |
| mstiles@vbgov.com cboynton@vbgov.com | 127 Public Square, Suite 2000 |
| glharris@vbgov.com | Cleveland, OH 44114 |
| jkurt@vbgov.com | Telephone: (216) 621-0200 |
| | Facsimile: (216) 696-0740 |
| | plewis@bakerlaw.com |
| | |
| | Erika Dackin Prouty (*pro hac vice*) |
| | BAKER & HOSTETLER, LLP |
| | 200 Civic Centre Drive, Suite 1200 |
| | Columbus, OH 43215 |
| | (614) 462-4710 |
| | eprouty@bakerlaw.com |
| | |
| | *Counsel for Defendants* |

## CERTIFICATE OF SERVICE

I hereby certify that on November 16, 2021, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will then send a notification of the filing to all parties of record.

*/s/ Katherine L. McKnight*
Katherine L. McKnight (VSB No. 81482)
*Counsel for Defendants*