# Exhibit B

**13 Chicano-Latino L. Rev. 15**

**Chicano-Latino Law Review**
Summer 1993

**Articles**
Bernard Grofman [d]

Copyright (c) 1993 Chicano-Latino Law Review; Bernard Grofman

# VOTING RIGHTS IN A MULTI-ETHNIC WORLD

**Introduction**

The Voting Rights Act of 1965 was extended in 1970 and again in 1975 and 1982. The 1970 extension added to the jurisdictions covered under Section 5 of the Act those jurisdictions which had used a literacy test in which either less than 50% of the voting-age residents had been registered in 1968 or in which less than 50% of the voting-age residents had voted in 1968.[1] The 1975 extension broadened coverage under the Act so as to include a number of groups in addition to blacks, namely, American Indians, Asian Americans, Alaskan natives and those of Spanish heritage.[2] The most important feature of the 1982 extension was the addition of new language to Section 2 which made explicit that the Act applied whenever there were discriminatory effects of electoral practices **\*16** even in the absence of a discriminatory purpose.[3] Provisions relating to minority groups were extended in 1992 to apply through the year 2007.[4]

The Act has had a profound effect in fully restoring the franchise to southern blacks[5] and in fostering gains in black and Hispanic[6] representation through the elimination of at-large election systems and the drawing of single-member districts with substantial minority populations.[7] Its effects on descriptive representation have been dramatic for blacks in the South[8] and for Hispanics **\*17** in Texas,[9] but the Act has also benefitted both groups (albeit to a lesser extent) in many other states including California,[10] Florida,[11] Illinois,[12] and New York.[13] Also, the Act has had some impact on the representation of Native Americans in the Southwest.[14]

In order for a group to prevail in a challenge to an election system brought under Section 2, absent a finding of discriminatory purpose, the minority plaintiffs must, as a matter of practical necessity, satisfy all three prongs of the Thornburg[15] test. Litigants must show that the group whose rights are allegedly being violated is large enough and geographically compact enough to constitute a majority in one or more districts, that it is politically cohesive, and that its candidates of choice regularly lose as a result of bloc voting by the majority group.[16] Several of these aspects of the Thornburg test are especially problematic where there are multiple minority groups within the jurisdiction[17] who are subject to the special protections **\*18** of the Voting Rights Act. The focus of this article is on the issues that arise in voting rights cases (and more generally) when there are multiple minorities in a jurisdiction. Issues that will be discussed include determining the extent of common political cohesiveness across the various minority groups, resolving conflicts among competing voting rights claims if these occur, and evaluating alternative voting systems such as limited and cumulative voting.

**When Is A Group Large Enough and Geographically Concentrated Enough To Have A Cognizable Voting Rights Claim Under Section 2 (or Section 5)?**

When is a group large enough to have a claim under the Voting Rights Act? The Thornburg Court suggested that a sufficient condition was that the minority group constitute a majority in at least one district,[18] but this language is ambiguous without further specification. Of what is the minority group to constitute a majority--population, voting age population, voting-age citizen population, registrants, actual voters?

Justice Brennan's language in Thornburg was that: "Unless minority members possess the potential to elect representatives in the absence of the challenged structure or practice, they cannot claim to have been injured by that structure or practice."[19] One way to interpret this language is based on a test of potentially eligible voters, i.e., voting-age population or citizen voting-age population. In Romero v. City of Pomona,[20] the appellate court required that the minority be numerous enough to constitute a citizen voting-age majority in at least one district. A majority of voting-age *19 population was the threshold used in an Illinois case.[21] However, in that case, the citizenship issue was not salient.[22]

In Garza v. Los Angeles County Board of Supervisors,[23] however, the trial court rejected a rigid application of a bright-line test, and harkened instead to another aspect of Justice Brennan's opinion in Thornburg--his emphasis on a functional approach[24] to vote dilution.[25] Justice David V. Kenyon, the trial judge in Garza, noted the fact that the Hispanic population in Los Angeles County was known to be steadily growing while the non-Hispanic white population in the county was on the decline.[26] In light of these and other considerations, a supervisorial district that almost met a 50% citizen voting-age population test, a roughly 65% minority population, and a Hispanic registration percentage comparable to that in other districts that had regularly elected Hispanic candidates, was held to be adequate to create a realistic opportunity for Hispanics to elect a candidate of choice over the course of the decade.[27]

*20 Absent intentional discrimination, how should we interpret the language about size (and geographic concentration) under Thornburg for those situations where there are multiple groups covered under the Act claiming that they ought to be treated as a single group for the purpose of satisfying this prong of Thornburg?[28] The obvious answer would be that if the groups are held to be politically cohesive, then we apply the same threshold test under the first prong of Thornburg to the combined group as we would have to a single racial or ethno-linguistic group covered under the Act.[29] If the groups are not cohesive, then we look at each group separately, against the set of voters not in the group. Thus, the existence of multiple groups might not seem to affect analysis of the first prong of Thornburg.[30]

*21 A federal district court considering Miami/Dade County redistricting[31] was confronted with an interesting pattern of evidence. That court accepted expert witness evidence that blacks, Hispanics and whites could be seen as political rivals, with blacks allying with whites in white versus Hispanic conflicts and Hispanics allying with whites in black versus white contests. It argued for the creation of districts in which each minority group was large enough to elect candidates of choice based on the assumption that each group was facing a unified opposition.

If we take a functional view of the political process, then it matters not only how large is a group and the degree of its own political cohesiveness, but also whether or not the group's candidates of choice can expect to face unified political opposition. Under plurality voting, a group's candidate of choice can win even if the group does not have a majority of the voters, and even if that candidate attracts only limited support from the voters of other groups, if other voting blocs nominate candidates who divide the vote. In such a multi-candidate situation it may be enough for the group to constitute the single largest voting bloc, even though short of a majority.[32] Judge Kenyon's views in Garza suggest that courts should be willing to go beyond raw numbers to look at subtler political realities that might affect a group's realistic opportunity to elect candidates of choice over the course of a decade in deciding when a group is large enough to satisfy the first prong of the Thornburg test. Certainly a group's coalitional prospects and the extent to which the group can expect to be faced with a divided opposition are among such realities.[33]

***22** In co-authored work, I have considered the likelihood of electing a black candidate in a given district as a function not only of the black proportion in the district, but also of the Hispanic proportion, treating the two as having interdependent effects. Similarly, my co-authors and I have looked at the likelihood of electing a Hispanic candidate in a given district as a function not only of the Hispanic proportion in the district, but also of the black proportion. The results are quite interesting. With respect to congressional contests, we found that blacks who are elected from congressional districts that are not majority black are very likely to come from districts with a substantial (but not majority) black population where the combined black and Hispanic population was 60% or more. [34] With respect to black electoral success in Texas city councils, we found that Hispanic plurality districts with a clear combined black and Hispanic majority elect only black or Hispanic candidates; similarly, black districts with a clear combined Hispanic and black majority elect only black or Hispanic candidates. [35] Such results suggest that, even if blacks and Hispanics are not politically cohesive, per se, the presence of members of one group may aid the members of the other group to elect candidates of choice. [36]

**How To Specify The Test For Political Cohesion In The Case Of Combined Groups?**

In jurisdictions with more than one covered minority, the question has arisen whether distinct covered groups (e.g., blacks and Hispanics) could be combined for purposes of determining whether they pass Thornburg's threshold "size" test. [37] Most courts that have looked at this question have held that blacks and Hispanics could, in principle, be treated as a combined group, but to do so would require proof of electoral coalitions between the groupings. [38]

***23** In several California cities [39] and in Boston [40] where this issue has arisen, courts have rejected the evidence of such coalitions offered by plaintiffs' witnesses as inadequate; while in some (but not all) Texas jurisdictions the evidence presented has been held to be sufficient. [41]

In my view, for a combined group to be politically cohesive in satisfaction of Thornburg, we would require that (1) each group usually supports viable [42] candidates of its own race or ethnicity, and (2) each group usually supports viable candidates of the other group in preference to non-minority candidates in situations where no candidate of the group's own race/ethnicity is in the contest. [43]

***24** There are two types of errors possible. One error is to focus on each group's support for its own members rather than on whether or not each group prefers a member of its own or the other minority group to a white candidate. A second type of error is to fail to look separately at the voting behavior of each of the two (or more) groups who are supposed to be part of the combined minority.

On the one hand, if there are both black and Hispanic candidates in the contest, it would be wrong to claim that the fact that blacks may prefer black to Hispanic candidates and Hispanics may prefer Hispanics to black candidates negates a finding of political cohesion for the combined group, [44] any more than the failure of black voters to cast 100% of their vote for a given black candidate, when there is more than one black candidate in the race, shows that blacks are not racially cohesive.

On the other hand, by failing to disaggregate, we might wrongly infer that neither group is supporting the white candidate(s) when in fact one group may be giving most of its support to the white candidate(s). It is mathematically possible for a majority of a combined group to be supporting a minority candidate of a given race or ethnicity even though one of the two groups is giving a majority of its votes to a white candidate. For example, if blacks and Hispanics are present among the electorate in equal numbers, and if 90% of the blacks but only 30% of the Hispanics support a given black candidate in a contest against a white opponent, that candidate will still be receiving 60% support from the combined group, even though 70% of the Hispanic voters voted for the white candidate.

In situations where more than one covered minority group is present and the issue is whether or not the two (or more) groups are politically cohesive, absent homogeneous precincts for each group, it may not easily be possible to separately estimate the voting behavior of each group. However, even if there are no homogeneous precincts for the separate groups, if there are homogeneous precincts for the combined group and these precincts vote

overwhelmingly for minority candidates, we may still be able to reliably establish that neither of the subgroups is casting a majority of its votes for white candidates.

Consider the following example: If the combined minority casts 100% of its votes for minority candidates, then each subgroup within that combined minority must also be casting 100% of its votes for minority candidates! A similar argument is applicable in **\*25** cases far less extreme. Consider, for example, precincts whose electorate is 40% non-Hispanic black, 40% black and 20% non-black non-Hispanic, and in which the minority candidates receive 80% of the vote. Assume further that in overwhelmingly homogeneous non-black non-Hispanic precincts, the minority candidates receive only 5% of the vote. Even under the highly implausible assumption that all non-black non-Hispanic voters in the heavily minority precincts were voting for the minority candidates, at least 75% of the minority voters must have voted for minority candidates. Then, under the specified assumptions, both black and Hispanic voters must have given at least 50% of their votes to the minority candidates, since even if one of the two groups gave 100% support, for the combined support to average 75%, we would need the other group (assumed to be of equal size in this example) to have voted at the 50% level. [45]

More realistically, in the above example, if we assume that even in the heavily minority precincts, non-minority voters are not casting much more than 5% of their votes for the minority candidate, then minority voters in the 80% minority precincts are casting an average of almost 99% of their vote for the minority candidates, i.e., both blacks and Hispanics are voting for the minority candidate at nearly unanimous levels.

There may still be circumstances where the election data required to make a definitive judgment about the cohesiveness of a combined group is not available. In such circumstances, courts may choose to rely on other types of data, including lay witness testimony. For example, in LULAC v. Midland Independent School District, [46] the trial court found that blacks and Hispanics "share)d common experiences in past discriminatory practices" and that, ")t he two groups have political goals that are inseparable. As such, coalition formation will often prove to be mutually beneficial to the two groups. The evidence presented bears out this fact. Testimony presented showed that blacks and Hispanics worked together and formed coalitions when their goals were compatible." [47]

**\*26 How To Resolve Conflict Among the Voting Rights Claims of Different Minorities?**

The Voting Rights Act of 1965 was written to right the wrong of America's historic exclusion of blacks from the electoral process at a time when blacks were still being effectively denied the franchise in parts of the deep South. One line of analysis would say that it is hard to assign the same claims for remedial treatment to groups who lack the same overwhelming burden of historic exclusion as blacks, especially for groups most of whose members are very recent immigrants to the United States. Moreover, it might seem appropriate that groups whose members chose to come to the United States should fall into a different category than would blacks whose ancestors were brought as slaves. In this line of reasoning, claims of black plaintiffs under the Act should have priority over those of other minority groups. For Mexican-Americans, however, testimony at the 1975 Hearings on the Extension of the Voting Rights Act included arguments that Texas patterns of Mexican-American exclusion were, in MALDEF Director Vilma Martinez' words, "strikingly reminiscent of the deep South in the early 1960s." [48] Similarly, historical evidence for exclusion and discrimination against those of Asian descent can readily be compiled. Thus, I would be unwilling to grant any group covered under the Act a special status in situations where its claims may conflict with those of another group also covered under the Act. [49]

In the context of single-member district plans, I believe that we can usually minimize conflicts between different minority groups by drawing, wherever possible, districts in which one minority group is given a relatively clear (majority or clear plurality) preponderance within the likely electorate. [50] This informal rule helped guide the **\*27** decision process of the 1991 redistricting plan drawn by the New York City Districting Commission to which I served as a consultant. [51] However, in looking at jurisdictions wherein reside more than one of the groups covered under the Act, I suggest the need to distinguish between voting patterns in non-partisan contests, party primaries, and general elections. For example, there may be jurisdictions in which we can expect that blacks will support Hispanics, or vice versa, in a general election where the candidate supported is the Democratic party nominee, even though black and Hispanic candidates will be rivals in the Democratic party primary. [52]

I believe that the extent to which the interests of blacks and Hispanics or of Hispanics and Asian-Americans come into conflict in the congressional, legislative and local boundary-drawing process has been much exaggerated.

Part of that exaggeration is due to the fact that, in a number of situations, white officeholders have tried to set these groups against one another by claiming that redistricting is a process in which one group can gain only at another group's expense. This occurred, for example, in the L.A. County supervisorial case when it was suggested that a new seat for Hispanics would require threatening the ability of African-Americans to elect a candidate of choice, especially if a supervisorial district where the African-American plurality was slim was redrawn so as to reduce its percentage of Hispanic (heavily non-voting) population. This claim was false. Also, sometimes minority groups have drawn plans exclusively with their own group interest in mind without paying attention to the consequences for other groups. For example, in the initial 1980s litigation involving Los Angeles City Council redistricting, MALDEF proposed a plan which inadvertently made relatively substantial changes in the configuration of some of the black majority seats, rather than simply preparing a plan that created a second Hispanic majority seat in an area of high Hispanic concentration. Because there was nothing about the 1980s geography or demography of Los Angeles that required the drawing of a new Hispanic seat which would significantly impact the existing black-majority seats, the MALDEF plan *28 raised concern among black incumbents of those seats and within the black community more generally, thus potentially jeopardizing black support for a plan that would be fair to Hispanics.

Another part of the belief that some minority interests can only be satisfied at the expense of the interests of other minorities has come from a failure to appreciate geographic and demographic realities. For example, Hispanics and Asian-Americans have a high proportion of recent immigrants and a correspondingly lower proportion of citizens, as well as a high proportion of disqualified population because of age. [53] Moreover, Hispanic and Asian-American populations are rarely as highly concentrated as the African-American population. Thus, in general, it will be more difficult to draw districts in which these groups have a sufficient population to elect candidates of choice. In consequence, ceteris paribus, [54] relative to population share, we would anticipate greater electoral success for blacks than for Hispanics or Asian-Americans. [55]

Failure to be sensitive to the ways in which demographic and geographic realities impact the redistricting process has sometimes led minority groups-- Hispanics in particular--to complain that they have been discriminated against in the line-drawing process in comparison to blacks. [56] Not only do minority groups usually have a lower proportion of voting-age eligibles, and perhaps also a slightly lower turnout relative to registration, but also the nature of single-member districting schemes is such that they create, ceteris paribus, an advantage for the largest group. [57] The all-too-common insistence on judging outcomes of the redistricting process in terms *29 of proportionality to population share fails to appreciate these demographic and geographic realities. The frequent disproportionality of seat share under districted systems and Hispanic share of population has led to the consideration of alternative voting methods, especially in situations where a group's voting strength is geographically dispersed. However, as discussed below, it is not always the case that these alternative remedies will improve the ability of minorities to elect candidates of choice.

**When Should We Use Alternative Voting Systems Such as the Limited Vote and The Cumulative Vote?**

Political scientists who specialize in the analysis of comparative election systems often align systems on a continuum--anchored at one end by majoritarian voting systems (such as those requiring majority runoffs) and at the other end by systems designed to yield representation proportional to vote share (such as list-based PR and the Hare System [58]). Plurality systems lie close to the majoritarian end of the continuum, while modified at-large systems, such as the limited and cumulative vote, are generally regarded as semi-proportional systems that fall relatively close to the proportionality end of the continuum. [59] However, the degree of anticipated proportionality of both these systems is contingent on the ability of groups to make effective use of their ballots. In each system, votes may be "wasted." If minorities are few in number, they may spread their votes among too many candidates and thus elect none (or at least fewer candidates of choice than they might otherwise have elected had they been more strategic in their voting). If minorities are present in higher proportions, they may waste votes by giving too many of their votes to one candidate rather than distributing their votes in the optimal fashion among several

candidates. Also, the expected degree of proportionality of the limited vote is a function of how many votes each voter is given; the higher the number of votes per voter (relative to the number of seats to be filled) the less proportional, in general, will be a limited voting system. Limited voting is as proportional as cumulative voting only in a "vote for one" situation.[60]

A number of civil rights attorneys and academics have recently ***30** argued for the use of modified at-large systems as potentially appropriate remedies to redress previous submergence of minority voting strength under at-large plurality (or majority runoff) systems.[61] The basic arguments have been that (1) these systems can provide equitable representation for all groups and can benefit groups whose voting strength is geographically dispersed in a way that a single-member district remedy cannot, and (2) such systems can be implemented in the at-large setting, thus avoiding the need to draw districts. In very small cities, where even a city-wide election involves only a small electorate, the drawing of districts to achieve accessible and accountable representation may seem unnecessary.[62] Also, districting may reduce the pool of available candidates because the potential candidates are not evenly distributed across districts.

One major impetus to the use of modified at-large remedies has come from the efforts of Alabama attorney Edward Still,[63] one of the principal litigators of Dillard v. Crenshaw,[64] an Alabama multi-jurisdictional challenge that resulted in the adoption of limited or cumulative voting in over a dozen different local governments as a result of consent settlements in the case. Limited or cumulative voting remedies have also subsequently been adopted by a few jurisdictions in other states including Georgia,[65] New Mexico,[66] and North Dakota,[67] again as a result of consent decrees. However, no court has ever required the use of such election systems as a remedy for a voting rights violation. In McGhee v. Granville County of North Carolina,[68] the Fourth Circuit court explicitly rejected any ***31** claim that a remedy other than a fairly drawn single-member district plan could be compelled.

I remember discussing modified at-large systems with voting rights attorneys in the early and mid 1980s, and being met with a considerable amount of doubt as to their desirability. There was not only concern that these methods were not in the standard repertoire of election systems used in the United States,[69] but also fear about how well they would work in practice. In particular, one concern was whether minority voters would be able to understand these systems and take advantage of their potential for more fair minority representation. Much of the evidence is now available on how these methods work, and the picture is very positive. Minority voters, generally, have been successful in translating their voting strength into electoral success in jurisdictions where these systems have been implemented, and they have taken advantage of the features of these systems designed to enhance the ability of minorities to elect candidates of choice, to plump for one or a few candidates.[70]

However, understanding the consequences of alternative election systems for fair and effective representation is a very important task on which work has only just begun.[71] The impact of electoral systems on descriptive representation has been the critical and probably overriding concern in most (if not all) voting rights litigation,[72] but as scholars have increasingly come to realize, it is not the only issue.[73] In particular, our understanding of the full implications of modified at-large systems on minority representation is limited in ***32** that we do not know the long-term consequences for minority participation rates,[74] nor do we know the extent to which such systems affect the responsiveness of representatives to specific constituency needs, nor about their impact on the possibility of multi-ethnic coalition politics.[75]

Even if we focus exclusively on descriptive representation, the conditions under which a modified at-large system is to be preferred to a single-member district plan are not ones that can be stated simply. Consider m single-member districts. In principle, if a group were perfectly geographically concentrated, it might be possible for it to elect a candidate of choice in one of these districts with a proportion only slightly larger than 1/2 m of the vote even against unified opposition. Now consider a limited voting system, with m seats to be filled and in which each voter has only one vote . It would take a share of slightly more than 1/( m + 1) of the votes to guarantee the election of a candidate of choice against united opposition. Since 1/2 m is less than 1/( m + 1), it might seem that minorities should always prefer single-member districts. However, the ability of minorities to elect candidates of choice with only a 1/2 m share of the vote in a single-member district plan depends upon the minority group being perfectly

geographically concentrated, having levels of registration and turnout comparable to those of the non-minority, and being at least as politically cohesive as the non-minority. In general, we cannot expect all of these things to be true; thus, the effective threshold of representation for a minority group in an m-seat single-member district plan will be considerably higher than 1/2 m share of the total population.

Two critical factors in determining when alternative voting remedies might be preferred to a fairly drawn single-member district ***33** plan are: (1) the degree of geographic concentration of minority voting strength; and (2) the turnout levels of the minority population(s) relative to those of whites. If its voting strength is sufficiently dispersed, then it may be the case that modified at-large systems will provide a group with a higher probability of electing candidates of choice. However, if a group's share of total registration and/or total turnout is very low relative to its population share (because of low proportion of age-eligible voters, a high proportion of non-citizens, or because of socioeconomic factors that reduce turnout), then even a relatively dispersed group may find a single-member district plan preferable to a modified at-large plan.

Consider the situation of Hispanics in Los Angeles County. As of 1990, even though they made up over one-third of the population in the county, they were estimated to constitute only about 15% of the registered voters in 1988, and only about 13% of the voters participating in county supervisorial elections.[76] Looking at the population share, it would appear that limited or cumulative voting could give a unified Hispanic community the opportunity to elect candidates of choice to at least one, and quite possibly two, of the five supervisorial seats. However, once we took into account registration and turnout share, it was apparent that Hispanics were below the one-sixth threshold needed to guarantee even a single seat under cumulative or limited voting ("vote for one"). In contrast, despite low registration and turnout, by drawing a district sufficiently Hispanic in composition (roughly two-thirds Hispanic or more), we could create a district in which Hispanics constituted a bare majority of the registered voters.[77] This was possible because, by creating a district whose Hispanic population was close to 70%, the district contained too few non-Hispanics to constitute a registration majority despite the fact that non-Hispanics had considerably higher average rates of registration and turnout than did Hispanics.[78]

Another reason to be cautious about implementing an alternative vote remedy in all situations is the possibility that divisiveness within the minority community might prevent any minority candidate from being elected, especially in situations where minorities suffer from low rates of participation. Effective use of modified at- ***34** large systems may require a considerable degree of strategic calculation as to how many candidates to run and how to distribute support. In Los Angeles County, in an overwhelmingly Hispanic single-member district, it is likely that the only viable candidates will be Hispanic, and thus the election of a Hispanic candidate preferred by the Hispanic community is virtually certain.[79] In contrast, if a county-wide election were to be held under a modified at-large plan, and if well-known candidates, such as Richard Alatorre and Gloria Molina, were to run, it is quite possible that neither would be elected.[80]

As the Los Angeles County example shows, it is sometimes easier to provide a realistic prospect of minority representation under a single-member district plan than under limited or cumulative voting. For groups with a high proportion of non-citizens such as Hispanics or Asian-Americans, modified at-large systems may have considerable drawbacks, despite the fact that such groups tend to be more geographically dispersed than the African-American population and thus, might be expected to benefit from the adoption of a modified at-large system of voting. Nonetheless, even for a group with high non-citizen proportions, there will be circumstances where the realistic prospect of minority representation is higher under limited or cumulative voting than under a single-member district plan because of the group's high level of dispersion. For example, in New York City, if there were borough-wide use of modified at-large voting and if the Asian-American community in a borough was almost perfectly united, it is possible that an Asian-American candidate might be elected in at least one borough.[81] Under the present 51-seat single-member district plan, given Asian-American geographic dispersion, it was impossible in 1991 to create a seat with an Asian-American majority.[82] However, while a ***35** switch from districts to a modified at-large plan (at the borough level) might be favored by Asian-American groups, it is unlikely to be well received by Hispanics or blacks who already receive substantial representation under the 51-seat plan implemented in 1991.

**Discussion**

To appreciate the law and politics of redistricting in situations involving more than one minority group covered under the Voting Rights Act, it is important to emphasize three simple facts: First, minorities cannot, in general, expect to achieve proportional representation relative to population regardless of which voting system is used; this is especially true for groups with a high proportion of non-eligible voters. [83] Second, the degree of conflict among different minority groups as to choice of redistricting plan, while sometimes quite real, has been exaggerated. In most redistrictings in the 1990s to date, even in jurisdictions with multiple minorities covered under the Voting Rights Act, minorities (in particular, blacks and Hispanics) have not been in substantial conflict. [84] Third, for single-member district plans, it is still preferable to try to draw districts where conflicts between different minority groups are minimized, i.e., when possible to draw districts in which one minority group is given a well-defined (majority or clear plurality) preponderance among the likely electorate, and thus is likely to be able to elect candidates of its choice.

As for the uses of alternative voting systems, such as the various forms of modified at-large systems, no court has held such schemes to be required remedies for voting rights violations; on the other hand, there are circumstances where, for groups with high proportions of ineligible voters, single-member district remedies may give rise to plans with higher levels of expected descriptive representation than for elections under modified at-large plans. Nonetheless, I believe that use of modified at-large plans in consent settlements to voting rights litigation, in jurisdictions where these election methods provide an appropriate remedy to the violation, is **\*36** to be encouraged. [85] This is particularly true in very small jurisdictions, such as rural jurisdictions in the South, where drawing multiple districts may seem unreasonable. [86] However, if there is to be a substantial effort to persuade jurisdictions (or courts) to adopt these methods, compiling a track record from which their merits can be evaluated will be critical. [87]

Ethnic and racial categories used in censuses, e.g., Spanish origin, [88] Native American, [89] or Asian-American, [90] historically have **\*37** often reflected a normatively laden set of prevailing norms of racial division and classification [91] as well as other factors. There is little that is natural or inevitable about how broadly or how narrowly census categories have been defined, as evidenced by the changes in the treatment of categories such as "Native American" and "Spanish origin" just over the past several decades. While racial and ethnic labels are presently matters for self-labeling on the U.S. Census, the categories for that self-labeling, unfortunately in my view, discourage multiple ethnic identification, although respondents can identify more than one country of ancestral origin. In this respect, the census categories do not reflect the changing shape of American society. While we still have a long way to go toward a polity where the most accurate ethnic (or racial) identification is "none" or "all of the above," we are much closer to that than ever before. [92] For that progress I am glad. The Voting Rights Act is a response to a particular set of historical circumstances. The best news we could have is that it is no longer needed in a truly multicultural and multiracial society where, in Martin Luther King's words, people "will not be judged by the color of their skin but by the content of their character." [93]

**Footnotes**

| | |
|---|---|
| d | Professor, School of Social Sciences, University of California, Irvine. I am indebted to the staff of the Word Processing Center, School of Social Sciences, University of California-Irvine, for manuscript typing, and to Dorothy Gormick for bibliographic assistance. This research was supported by Ford Foundation Grant n446740-47007 and also draws on previous research that was supported by National Science Foundation Grant SES n88-09392. Neither the Ford Foundation nor the National Science Foundation is in any way responsible for its contents. Portions of the discussion are adapted from language in Bernard Grofman et al., Minority Representation and the Quest for Voting Equality (1992). |
| 1 | With this expanded threshold, some areas with substantial Latino populations were covered for the first time including, Apache County, Arizona; Imperial County, California; and the New York City boroughs |

of Manhattan and Brooklyn. For discussion of the 1970 extension of the Act, see Rudolfo de la Garza and Louis DeSipio, The Voting Rights Act and Latino Electorate Participation, Paper prepared for conference entitled, Key to Empowerment? The Voting Rights Act of 1965, American University, Washington, D.C. (April 6, 1990)(on file with author).

2    42 U.S.C. s 1973(b)(f )(3). Rudolfo de la Garza & Louis DeSipio, Between Voting Rights and Voter Empowerment: Lessons from the Extension of the Voting Rights Act to Latinos, 71 Tex. L. Rev. (forthcoming 1993)(commenting that "little debate went into the needs of Mexican Americans or Latinos when Congress extended the provisions of the Act to them").

3    See various essays in Controversies in Minority Voting (Bernard Grofman & Chandler Davidson eds., 1992), especially those by Chandler Davidson, Laughlin McDonald and Timothy G. O'Rourke.

4    Voting Rights Language Assistance Act of 1992, 42 U.S.C. s 1971 (1992). The 1992 changes also slightly expanded the circumstances under which bilingual ballots were required.

5    James Alt, The Impact of the Voting Rights Act on Black and White Registration in the South, in Quiet Revolution: The Impact of the Voting Rights Act in the South, 1965-1990 (Chandler Davidson & Bernard Grofman eds., forthcoming 1994) )hereafter Quiet Revolution .

6    I will use the terms "Hispanics" and "Latinos" interchangeably to refer to the group that is covered under the Voting Rights Act under the rubric "persons of Spanish heritage." For alternative perspectives on the use of labels such as "Hispanic" or "Latino" see, e.g., Peter Skerry, E Pluribus Hispanic?, 16 Wilson Q. 62-73 (1992), and the introduction and various essays in The Politics of Ethnic Construction, Hispanic, Chicano, Latino? , 19 Latin Am. Persp. (Fall 1992).
— How to determine who counts as a person of Spanish heritage for purposes of the Voting Rights Act has been a matter of dispute. In Garza v. Los Angeles County Board of Supervisors, Nos. CV 88-5143 KN (Ex), CV 88-5435 KN (Ex), 756 F. Supp. 1298 (C.D. Cal. 1990), an expert witness testified that not all those who identified themselves as of Spanish origin on the census should be regarded as falling under the covered rubric of "persons of Spanish heritage." In particular it was argued that those born in Spain were not covered under the Voting Rights Act and that the portion of the Filipino population who identified themselves as of Spanish origin ought not to be counted as being of Spanish heritage. Garza, 756 F. Supp. at 1326. (The reason that this issue was important in the litigation is that removing these (and some other categories) from the protected class had the effect of reducing the Hispanic citizen voting-age population in the most heavily Hispanic district below 50%). The trial court in Garza followed the precedents of earlier decisions involving Hispanics by taking a Spanish origin response to the census questionnaire as the defining characteristic of the population covered under the Act. The Garza trial court also held that whether a group such as Hispanics, whose population might consist of a number of relatively distinct subgroups if classified by national origin, is in fact politically cohesive is a matter for empirical determination in a case-specific factual context.

7    Bilingual ballot provisions were mandated under the 1975 amendments to Titles 2 and 3 of the Act in jurisdictions that were covered by Section 5 and met certain other threshold conditions. One necessary condition was that the jurisdiction have more than 5% of a single language minority group. The language groups that fell under these provisions were the only groups other than blacks that were given special protection under Section 5, namely, American Indians, Asian Americans, Alaskan Natives, and those of Spanish heritage (Voting Rights Act, 42 U.S.C. s 1973(b)(f )(3)). At least for Spanish speakers, it appears that relatively few voters take advantage of non-English language ballots. de la Garza & DeSipio, supra note 2. These authors argue that, in addition to the help it actually provides to those with limited English competency, the bilingual ballot provisions also play an important symbolic role and should be kept, even if little used.

8    See, e.g., Peyton McCrary et al., Alabama; Laughlin McDonald et al., Georgia ; Richard L. Engstrom et al., Louisiana ; William R. Keech & Michael P. Sistrom; Orville Vernon Burton et al., South Carolina; Thomas R. Morris & Neil Bradley, Virginia; and Lisa Handley & Bernard Grofman, Black Officeholding in Southern State Legislatures and Congressional Delegations , chapters in Quiet Revolution , supra note 5.

9    See Robert Brischetto et al., Texas, in Quiet Revolution, supra note 5.

10   For example, a suit brought under Section 2 of the Voting Rights Act by the Mexican American Legal Defense and Educational Fund (MALDEF) and the United States Department of Justice challenged the councilmanic lines used by the city of Los Angeles. United States v. City of Los Angeles, No. CV. 85-7739 (C.D. Cal. settled Oct. 10, 1986). The case was settled, a settlement that led to the creation of an additional Hispanic-majority council district that subsequently elected Gloria Molina.
— In Garza , MALDEF and the Department of Justice challenged the supervisorial lines under Section 2. After an extensive period of litigation and a long trial, the case was resolved by a ruling that led to the creation of an additional Hispanic-majority supervisorial district--a district that subsequently elected Gloria Molina as the first Hispanic member of the Los Angeles County Board of Supervisors in this century.

11   See Reapportionment and Representation in Florida (Susan McManus ed., 1991).

12   For example, Ketchum v. Byrne, 740 F.2d. 1398 (7th Cir. 1984), cert. denied, 471 U.S. 1135 (1985), involved the Chicago city council, where both Hispanic majority and black-majority districts were at issue. The result of the litigation was a gain of two additional black-majority seats and two additional Hispanic-majority seats. In the 1990s round of congressional redistricting, the threat of possible litigation under the Act was an important factor in leading to the creation of a Hispanic-majority congressional seat in the Chicago area.

13   Michael McDonald, The Effect of the Voting Rights Act in New York, Paper prepared for the Western Political Science Association Meeting, Seattle, WA (March 21-23, 1991)(on file with author).

14   See Gordon Henderson & Jeannette Wolfley, Native American Voting Rights, Presentation at the conference entitled, Impact of the Voting Rights Act, 1965-1990, Rice University (May 10-11, 1990).

15   Thornburg v. Gingles, 478 U.S. 30 (1986).

16   Whether the three prongs of Thornburg are either sufficient or necessary under all circumstances is a matter beyond the scope of this paper. For my views on that topic and a review of court cases through 1991, see Bernard Grofman et al., Minority Representation and the Quest for Voting Equality (1992); and Bernard Grofman & Lisa Handley, Identifying and Remedying Racial Gerrymandering, 8 J.L. & Pol. 345 (1992).

17   Increasingly, American cities, especially larger cities, are a multi-racial and multi-ethnic mosaic. See e.g., Angelo N. Ancheta & Kathryn K. Imahara, Multiethnic Voting Rights: Redefining Vote Dilution in Communities of Color, 27 U.S.F. L. Rev. (forthcoming 1993)(data on the 1990 population characteristics of ten of the largest cities in the United States)(manuscript on file with author); and the discussion of demographic trends in William P. O'Hare, America's Minorities: The Demographics of Diversity , 47 Population Bull. 1 (Dec. 1992).

18   The Brennan opinion is explicit on the point that Thornburg does not address "whether Section 2 permits, and if it does, what standards should pertain to, a claim brought by a minority group that is not sufficiently large and compact to constitute a majority in a single-member district, )and is alleging that the use of a multimember district impairs its ability to influence elections." 478 U.S. at 46 n.13. However, all appellate courts that have considered this question so far have regarded an "influence" claim as lacking judicially manageable standards. See discussion of this issue and case citations in Grofman & Handley, Identifying and Remedying Racial Gerrymandering, supra note 16; cf. J. Morgan Kousser, Beyond Gingles: Influence Districts and the Pragmatic Tradition in Voting Rights Case Law, Working Paper 831, California Institute of Technology, Pasadena, CA (Jan. 1993).

19   478 U.S. at 50-51 n.17.

20   883 F.2d. 1418 (9th Cir. 1989), overruled by Townsend v. Holman Consulting Corp., 914 F.2d 1136 (9th Cir. 1990).

21   McNeil v. City of Springfield, 658 F. Supp. 1015 (C.D. Ill. 1987), 851 F.2d 937 (7th Cir. 1988).

22   The citizenship question raises several pertinent issues. de la Garza & DeSipio have proposed that non-citizens be permitted to vote for the initial five-year period after their arrival in this country when they are not

yet eligible for naturalization, and that non-citizens who display their commitment to political participation by regular voting during this period have their naturalization exam waived. Supra note 2. It is useful to remember that non-citizens who expressed an intent to naturalize had been allowed to vote in local elections in many states during the early part of the 19th century. See Gerald M. Rosberg, Aliens and Equal Protection: Why Not the Right to Vote? 75 Mich. L. Rev. 1092 (1977). Indeed, non-citizen parents are presently allowed to vote in New York City School Board elections, and non-citizen residents have also recently been given the right to vote in Takoma Park, Maryland and five other Maryland towns. Wendy Aviva Shimmerman, Local Voting Rights for Non U.S. Citizen Immigrants in New York City (Center for Immigrants' Rights, New York, NY), July 1992, at 4. However, these are the only examples of contemporary non-citizen voting in the United States of which I am aware; Shimmerman alludes to a California city where this is also true but for which she does not provide details.

23  918 F.2d 763 (9th Cir. 1990), cert. denied, 498 U.S. 1028 (1991).

24  The Senate Report states: "The question whether the political processes are 'equally open' depends upon a searching practical evaluation of the 'past and present reality' ... and on a 'functional' view of the political process" (citations omitted). Thornburg, 478 U.S. at 45, citing S. Rep. No. 417, 97th Cong., 2d Sess. 28 (1992).

25  The appellate court decided the case on other grounds, holding that no strict size threshold applied when a group had been the victim of purposeful voting rights discrimination. Garza, 756 F. Supp. 1298 (1990). Judge Kenyon found purposeful discrimination against Hispanics that took the form of racial gerrymandering to fragment the Hispanic core population in the eastern and central part of the county; it was this aspect of his opinion that was seized on by the 9th Circuit as the grounds for their finding of a voting rights violation. Garza, 918 F.2d at 771. Thus, they did not reach the size threshold issue in the absence of purposeful dilution.

26  Garza , 756 F. Supp. at 1320.

27  My expert witness testimony in the L.A. County case pointed out a problem that apparently was not raised in earlier litigation, namely that citizen voting-age population by race and Spanish origin was not available at the time of the post-censal redistricting in 1981, and would not be available in time for post-censal redistricting in 1991 or even 1992. Thus, a threshold test that would require use of citizen voting-age population data would have made it effectively impossible for Hispanic plaintiffs to challenge 1990s redistricting plans until 1993 or so, and might have made it impossible for jurisdictions to know for sure whether the plans they had drawn would satisfy the Voting Rights Act. Also, because a large number of Hispanic non-citizens will be naturalized in the 1990s as a result of the special amnesty provisions passed by Congress several years ago, the Hispanic non-citizen proportion in 1990 may be a poor indicator of Hispanic potential to elect candidates of choice over the course of the decade. On the other hand, de la Garza & DeSipio note that little is done to encourage naturalization among new immigrants and have proposed a far more active federal role. Supra note 2. Other related issues in Garza had to do with the accuracy of census data used for apportionment and the problems of minority undercount versus minority overreporting of citizenship. Garza , 756 F. Supp. at 1324-25.

28  With respect to the obverse issue: Do groups that are component of a protected group (e.g., Hispanic-identifying Cuban-Americans or Central Americans in the case of Hispanics, or Japanese-Americans or Korean-Americans in the case of Asians), have a right to be treated separately from the remainder of their group if their interest and those of the wider group are not perfectly in agreement? My views are that (1) only Congress should determine when groups are entitled to special attention under the 14th Amendment, and that, at this point, with respect to election practices (except for bilingual ballots), the groups identified by Congress are blacks, Asian-Americans, American Indians, Alaskan Natives and those of Spanish heritage and subgroupings thereof; and (2) while one should not proliferate groups needlessly, this does mean that we cannot pay attention to the nonfragmentation of groups -- such as Salvadorans in New York City, for example--in terms of "community of interest" norms without treating such subgroups as having legal claims under the Voting Rights Act that are distinct from the broader group of which they are component. See Bernard Grofman, Would Vince Lombardi Have Been Right If He Had Said, "In Redistricting Race Is Not Everything, It's The Only Thing?", 14 Cardozo L. Rev. (forthcoming 1993).

29    This is the approach taken by most courts confronting multi-ethnic claims of political cohesiveness. See, e.g., Campos v. City of Baytown, 840 F.2d 1240 (5th Cir. 1988), reh'g denied en banc, 849 F.2d 943 (5th Cir. 1988), cert. denied, 492 U.S. 905
—(1989). For an alternative point of view that is far more hostile to the voting rights claims of "combined" groups, see Katherine I. Butler & Richard Murray, Minority Vote Dilution Suits and the Problem of Two Minority Groups: Can a 'Rainbow Coalition' Claim the Protection of the Voting Rights Act?, 21 Pac. L. J. 619 (1990). It is important to note that most courts confronted with claims of cross-ethnic political cohesiveness have rejected such claims as inadequately substantiated and thus have not needed to determine precisely how to deal with a combined group claim with respect to the first prong of Thornburg. See Ancheta & Imahara, supra note 17.

30    Likewise, the existence of multiple groups might not seem to affect the remedy aspect of Thornburg. Presumably, we would still look at factors such as voting-age population, registration and turnout (either for the combined group or for the individual groups versus the remaining population) to determine the conditions under which a proposed remedy district provides a group with a realistic opportunity to elect candidates of choice. However, as noted below, attentiveness to coalitional possibilities, on the one hand, and to the likelihood of electoral success with only a plurality of the vote, on the other hand, complicates the picture.

31    Meek v. Metropolitan Dade County, No. 86-1820 CIV-Ryskamp (S.D. Fla. Oct. 5, 1988), 908 F.2d l540 (llth Cir. 1990), cert denied, 111 S. Ct. 1108 (1991).

32    Of course, a group with substantial, but not majority support can win with a sufficiently large cross-over support from members of other groups.

33    Alternatively, we might ask whether a single-member district remedy is the appropriate baseline against which to determine whether a group's voting rights have been violated--an issue raised in both its legal and policy aspects in a number of recent articles. See, e.g., Pamela S. Karlan, Maps and Misreadings: The Role of Geographic Compactness in Racial Vote Dilution Litigation, 24 Harv. C. R.-C.L. L. Rev. 173 (1989); Lani Guinier, No Two Seats: The Elusive Quest for Political Equality, 77 Virg. L. Rev. 1413 (1991); Edward Still, Alternatives to Single Member Districts, in Minority Vote Dilution 249 (Chandler Davidson ed., 1984); Edward Still, Cumulative Voting and Limited Voting in Alabama, in United States Electoral Systems: Their Impact on Women And Minorities 183 (Wilma Rule & Joseph F. Zimmerman eds., 1992). Later in this article I consider the issue of the desirability of alternative remedies such as limited and cumulative voting. Arguably, this issue is particularly pertinent in the case of cities with multiple protected groups of substantial size. See Judith Reed, Of Boroughs, Boundaries and Bullwinkles: The Limitations of Single-Member Districts in a Multiracial Context, 19 Fordham Urb. L.J. 759 (1992).

34    Bernard Grofman & Lisa Handley, Minority Population Proportion and Black and Hispanic Congressional Success in the 1970s and 1980s, 17 Am. Pol. Q. 436 (1989), reprinted as revised, Preconditions for Black and Hispanic Congressional Success, in United States Electoral Systems: Their Impact on Women and Minorities 31 (Wilma Rule & Joseph F. Zimmerman eds., 1992).

35    See supra note 9.

36    See also Judith Sanders-Castro et al., The Texas Experience with Combined Minority Districts as an Indication of the Level of Coalitional Politics, Memorandum prepared for MALDEF, San Antonio, TX (Oct. 1989) (on file with author).

37    For further discussion of that test, see Grofman et al., supra note 16.

38    The discussion below elaborates on how best to operationalize this approach. An alternative legal approach, resting more on the pre- Thornburg "totality of the circumstances" approach than on the three-pronged test laid down in Thornburg, is set out in Ancheta & Imahara, supra note 17. They reject adherence to formulaic principles and suggest a fact-intensive remedial theory based on complete relief and the maximization of minority voter opportunities. In contrast, I do not regard the Voting Rights Act as requiring maximizing minority influence, but only requiring equal treatment. For an elaboration of this point and discussion of

the pre- Thornburg case law involving the "totality of the circumstances" approach, see Grofman et al., supra note 16, at 61-81, 129-137.

— It is beyond the scope of this paper to speculate on the conditions under which black and Hispanic or Hispanic and Asian-American coalitions are likely. My own general view is that this is best approached in a case-specific manner. But see , Bruce Cain et al., Blacks, Hispanics, Asians and Anglos: When Do They Coalesce?, Remarks prepared for the Public Choice Conference on Modeling Race and Electoral Politics, University of California, Irvine, CA (May 1991)(on file with author); Paula D. McClain, The Changing Dynamics of Urban Politics: Black and Hispanic Municipal Employment--Is There Competition? J. Pol. (forthcoming 1993)(on file with author); James Jennings, Blacks and Latinos in the American City in the 1990s: Toward Political Alliances or Social Conflict? 3 Ethnic Pol. & Civ. Liberties, Nat. Pol. Sci. Rev. 158 (Lucius J. Barker ed., 1992); Carole J. Uhlaner, Perceived Discrimination and Prejudice and the Coalition Prospects of Blacks, Latinos and Asian Americans, in Racial and Ethnic Politics in California 339 (Byron O. Jackson & Michael B. Preston eds., 1991); Rodney E. Hero, Multiracial Coalitions in City Elections Involving Minority Candidates: Some Evidence from Denver, 25 Urb. Aff. Q. 342 (1989); Charles S. Bullock III & Susan A. McManus, Voting Patterns in a Tri-Ethnic Community: Conflict or Cohesion? The Case of Austin, Texas, 1975-1985, 79 Nat. Civ. Rev. 5 (Jan./Feb. 1990); Rufus P. Browning et al., Protest is Not Enough: The Struggle of Blacks and Hispanics for Equality in Urban Politics, and various essays on racial politics in individual cities, in Racial Politics in American Cities (Rufus P. Browning et al. eds., 1990).

[39] E.g., Romero v. City of Pomona, 883 F.2d 1418 (9th Cir. 1989), overruled by Townsend v. Holman Consulting Corp., 914 F.2d 1136 (9th Cir. 1990); Skorepa v. City of Chula Vista, 723 F. Supp 1384 (S.D. Cal 1989); Vallodolid v. City of National City, 976 F.2d 1293 (9th Cir. 1992); Badillo v. City of Stockton, 956 F. 2d 884 (9th Cir. 1992).

[40] Latino Political Action Committee v. Boston, 784 F.2d 409 (1st Cir. 1986).

[41] LULAC v. Midland Independent School Dist., 812 F.2d 1494 (5th Cir. 1987), vacated, 829 F.2d 546 (5th Cir. 1987)(en banc)(minority plaintiffs prevail); Campos v. City of Baytown, 840 F.2d 1240 (5th Cir. 1988), cert. denied, 492 U.S. 905 (1989)(minority plaintiffs prevail); cf. Overton v. City of Austin, 871 F.2d 632 (4th Cir. 1987)(minority plaintiffs lose).

[42] If the minority candidates are not viable, then I would not be prepared to conclude that lack of support for them from the minority community demonstrated lack of minority political cohesiveness. See Garza, 756 F. Supp. at 1344-46.

[43] I interpret the language of the 5th Circuit in Campos, 840 F.2d at 1245, as holding that the key is the minority group as a whole. Of course, if one part of the group cannot be expected to vote with the other part, the combination is not cohesive. If the evidence were to show that blacks voted against a Hispanic candidate, or vice versa, then the minority group could not be said to be cohesive. However, if the statistical evidence is that blacks and Hispanics vote together for the black or Hispanic candidate, then cohesion is shown. (It is also important to note that all combined group claims of which I am aware were made in the context of a situation where the component groups would singly have been unable to meet any form of 50% size threshold test).

[44] This claim was made during deposition by expert witness, Stephen Klein, for the defendant in Badillo , 956 F.2d 884 (9th Cir. 1992).

[45] This result is derived from a variant of the method of bounds approach in Otis D. Davis & Beverly Davis, An Alternative to Ecological Correlation , 18 Am. Soc. Rev. 665 (1953).

[46] 812 F.2d 1494 (5th Cir. 1984), vacated, 829 F.2d 546 (5th Cir. 1987)(en banc).

[47] Id. at 1500-1501. For a different judicial response to anecdotal evidence of cohesion, see Brewer v. Hamm, 876 F. 2d 448 (5th Cir. 1989). I have suggested that attention to political realities such as multi-ethnic districts and the need to distinguish between voting patterns in primaries and in general elections made a bright-line test problematic for situations when a group was large enough to have a realistic opportunity to elect candidates. This same evidence might also be read to suggest that a test of political cohesion between

|    | |
|----|---|
|    | minority groups that requires such cohesion to be present under all circumstances may be undesirable from the standpoint of a functional approach to political cohesion. This would certainly be the view of Ancheta & Imahara, supra note 17. |
| 48 | de la Garza & DeSipio, supra note 2. They note that, at these hearings, similar claims were made about the status of the voting rights of rural Mexican-Americans in California. |
| 49 | I believe that adding groups to the list of those now given special protection by the Act is not something that should be undertaken lightly. The presumption, in my view, should be for standards of equal protection that apply equally to all individuals. However, when the nature of the discrimination is clearly directed against members of a given racial or ethnic group solely by virtue of their membership in that group it is often the case that remedies must be designed to be explicitly race-conscious. |
| 50 | It seems to me as impermissible to fragment a substantial compact and contiguous black or Asian-American population concentration so as to draw a Hispanic-majority seat as it is to fragment a substantial compact and contiguous Hispanic population concentration so as to protect a non-Hispanic white incumbent. Thus, in my view, if there was a city with a Hispanic majority electing at-large in which there was an Asian-American minority that could satisfy the three prongs of Thornburg, the fact that the voting rights claim would not be directed at whites/Anglos seems to me quite irrelevant. In the case where only one covered group has sufficient population concentration to have a district drawn in which its members will have a realistic opportunity to elect candidates of choice, then, ceteris paribus, I would prefer to see the plan drawn so as to permit that to occur even at the cost of some minor fragmentation of small population pockets of other covered groups. However, I would emphasize that this is a quite complex topic requiring case-specific analysis on which it is virtually impossible to state general rules. For different views on these questions, see Ancheta & Imahara, supra note 17. |
| 51 | See Alan Gartner, Drawing the Lines: Redistricting and the Politics of Racial Succession in New York (1994) (unpublished manuscript, on file with author). Ancheta and Imahara suggest that a similar rule was followed by the California Supreme Court in drawing legislative and congressional plans in 1992 when the state legislature and the governor failed to agree on plans. Supra note 17. See also Wilson v. Eu, 823 P.2d 545, 549-50, 566 (1992). |
| 52 | This was arguably exactly the situation in Ohio. See Voinovich v. Quilter, 113 S. Ct. 1179 (1993). |
| 53 | For both groups there will be growth in the number eligible to vote, but continuing immigration will probably keep the non-citizen proportion high. Also, for Hispanics, except for Cubans and for the long-settled Hispanic community in New Mexico, there is relatively clear evidence of lower turnout rates among Hispanics than among non-Hispanics even among voters who are already registered. See discussion of changing Hispanic demography and participation patterns in de la Garza & DeSipio, supra note 2. |
| 54 | The ceteris paribus assumption fails if, in general, white/Anglo voters are more willing to support Asian-American candidates (or Hispanic candidates) than they are to support African-American candidates. |
| 55 | Cf. Bernard Grofman & Lisa Handley, Black Representation: Making Sense of Electoral Geography at Different Levels of Government, 14 Legis. Stud. Q. 265 (1989). |
| 56 | In my view, this occurred in New York City; however, there also were a handful of unnecessary last-minute changes in the New York City plan that gave the appearance of being unfair to Hispanics and that led the Department of Justice to insist on some minor revisions in the plan before preclearance would be granted. These last-minute changes were made largely to satisfy the preferences of minority incumbents. For a somewhat different perspective on New York City redistricting, see Gartner, Drawing the Lines, supra note 51. |
| 57 | Bernard Grofman, For Single Member Districts Random Is Not Equal, in Representation and Redistricting Issues 55 (Bernard Grofman et al. eds., 1982). However, the advantage of group size may be compensated for by a smaller group's greater geographic concentration. See Grofman & Handley, Black Representation, supra note 55. |

| | |
|---|---|
| 58 | The Hare System is also known as the single transferable vote or STV. |
| 59 | Bernard Grofman, A Review of Macro-Election Systems, in 4 German Political Yearbook 303 (Rudolph Wildenmann ed., 1975). |
| 60 | This is the form of limited voting used in Japan where it is known as the single non-transferable vote. It is also the form of limited voting that has been used in the United States in virtually all jurisdictions that have (by consent decree) adopted limited voting as a way to resolve a voting rights challenge. Edward Still, Limited Voting and Cumulative Voting as Remedies for Minority Vote Dilution in Judicial Elections, Paper prepared for Annual Meeting of the American Political Science Association, Atlanta, GA (Aug. 30-Sept. 3, 1989) (on file with author). |
| 61 | See, e.g., Bernard Grofman, Alternatives to Single-Member Plurality Districts: Legal and Empirical Issues, 9 Pol'y Stud. J. 875 (1981); Still, Alternatives to Single Member Districts, supra note 33; Still, Limited Voting and Cumulative Voting, supra note 60; Still, Cumulative Voting and Limited Voting in Alabama, supra note 33; Karlan, Maps and Misreadings, supra note 33; Lani Guinier, The Triumph of Tokenism: The Voting Rights Act and the Theory of Black Electoral Success, 89 Mich. L. Rev. 1077 (1991); Guinier, No Two Seats, supra note 33; Guinier, Development of the Franchise: 1982 Voting Rights Amendments, in Voting in America 101 (Karen Arrington & William Taylor eds., 1992). |
| 62 | In multi-ethnic settings the process of creating districts can generate conflict between minorities. Thus a modified at-large system might seem especially attractive in jurisdictions with multi-ethnic populations. As yet, however, the settings where modified at-large systems have been implemented are ones where there has been only a single substantial minority population whose voting rights are at issue--blacks in Alabama and Georgia jurisdictions; Native Americans in Sisseton, North Dakota; and Hispanics in Alamagordo, New Mexico. |
| 63 | See Still, Alternatives to Single Member Districts, supra note 33; Still, Cumulative Voting and Limited Voting, supra note 60; Still, Cumulative Voting and Limited Voting in Alabama, supra note 33. |
| 64 | 831 F. 2d 246 (11th Cir. 1987). |
| 65 | United States v. City of Augusta, No. CV. 187-004 (S.D. Ga. July 22, 1988). |
| 66 | Richard L. Engstrom & Charles J. Barrilleaux, Native Americans and Cumulative Voting: The Sisseton-Wahpeton Sioux, 72 Soc. Sci. Q. 386 (1991). |
| 67 | Id. |
| 68 | 860 F.2d 110 (4th Cir. 1988). |
| 69 | The view that these systems are foreign to the American experience is wrong. See historical discussion of the use of limited voting, cumulative voting, and STV in Grofman, For Single Member Districts, supra note 57; Grofman, Criteria for Districting: A Social Science Perspective, 33 UCLA L. Rev. 77 (1985); and Leon Weaver, The Rise, Decline and Resurrection of Proportional Representation in Local Governments in the United States, in Electoral Laws and Their Political Consequences 139 (Bernard Grofman & Arend Lijphart eds., 1986). |
| 70 | See Engstrom & Barrilleaux, Native Americans and Cumulative Voting, supra note 66; Still, Alternatives to Single Member Districts, supra note 33; Still, Limited Voting and Cumulative Voting, supra note 60; Still, Cumulative Voting and Limited Voting in Alabama, supra note 33. |
| 71 | See Chandler Davidson & Bernard Grofman, Introduction to Quiet Revolution , supra note 5. We distinguish between four stages of research on minority voting rights; the first is concerned with minority enfranchisement, the second with descriptive representation, the third with minority political incorporation (including electoral participation), the fourth with the substantive policy implications of growth in minority participation and representation. |

72   See, e.g., Davidson & Grofman, id.; Grofman & Handley, Black Representation, supra note 55; Handley & Grofman, Black Officeholding in Southern State Legislatures , supra note 8.

73   See Guinier, The Triumph of Tokenism, supra note 61; Guinier, No Two Seats, supra note 33; Guinier, Development of the Franchise, supra note 61; Guinier, Groups, Representation and Race Conscious Districting: A Case of the Emperor's Clothes, 71 Tex. L. Rev. (forthcoming 1993)(on file with author).

74   See Guinier, Groups, Representation and Race Conscious Districting, id. Guinier has suggested that modified at-large systems may provide incentives for continued political participation to a greater extent than occurs in cities which have adopted districted plans with districts that are overwhelmingly of a given race or ethnicity. In the latter, after the first (minority and other) representatives are elected from the new districts, political competition may be minimal, and the absence of political competition can be expected to diminish turnout. de la Garza & DeSipio, supra note 2. In contrast, in limited and cumulative voting systems, the potential for a relatively small group to elect a candidate of choice, and the need to mobilize one's voters in order to assure reelection in a city-wide contest should operate to keep incentives to participate relatively high. Unfortunately this hypothesis, while plausible, is as yet without empirical verification.

75   In the worst-case scenario we might conjecture that modified at-large systems have polarizing effects and lead to the election of candidates who see themselves as representing only narrow interests. In such systems, there is no need to appeal to any constituency broader than the relatively small group needed to guarantee one's election, and the latter group can be expected to be even more homogeneous than any geographically defined electorate. Alternatively, the fact that representatives in modified at-large systems are elected at-large may lead them to identify with the interests of the jurisdiction as a whole, even though their voting support derives from only a portion of the electorate.

76   Garza, 756 F. Supp. at 1323.

77   See supra note 10.

78   It is also important to realize that the pool of non-Hispanic potential voters in this district was generally less wealthy and less well-educated than the average county non-Hispanic resident. In particular, registration and turnout rates among the non-Hispanics living in or near the Hispanic barrio area that formed the heart of the new Hispanic-majority supervisorial district were considerably lower than registration and turnout rates for non-Hispanics in the county as a whole. This made it easier to construct a district with a Hispanic registration majority than might first have appeared to be the case.

79   While we can construct scenarios in which this would not occur, such scenarios are unlikely.

80   I am assuming the extistence of only five seats, which is the present number. Proposals to expand the size of the Los Angeles County Board of Supervisors have been rejected. Louis Sahagun & Richard Simon, Controversial Plan To Expand Board of Supervisors Will Not Be Submitted To Voters , L.A. Times , Feb. 26, 1992, at B1.

81   I emphasize this only as a possibility. The prospect of Asian-American political success resting on a base of ethnic voters is hampered by both high non-citizen proportions and the fact that the Asian-American community in New York (and many other areas) is made up of a large number of different language groups, albeit with those of Chinese descent by far the largest grouping. In New York City, there are various organizations that are seeking to stimulate a pan-Asian political identity to strengthen the political clout of Asian-Americans. How successful their efforts will be remains an open question.

82   The Chinese-American community was divided in the debates over how to draw new city council lines in 1991. One well-known Chinese-American candidate and her supporters favored the placing of the Manhattan Chinatown area in a district that would combine it with a population of relatively affluent (and liberal) whites, in which she thought she would run well, while groups such as the Asian-American Legal Defense and Educational Fund wanted to combine Chinatown with a heavily Hispanic section of the lower east side (Losaido). The former proposal was adopted by the New York City Districting Commission, largely if not entirely, because it was the scheme favored by the one Asian-American member of the

    Commission. The Asian-American candidate in the district including the Manhattan Chinatown area was defeated in the 1991 elections held under the new plan. See Gartner, Drawing the Lines, supra note 51.

83    The importance of the citizenship factor is stressed by de la Garza & DeSipio, who, as noted previously, argue for federal governmental involvement in encouraging naturalization, given the virtual absence of the traditional political machines which helped convert new immigrants into new voters in the decades before and after the turn of the century; they also argue for non-citizens' eligibility to vote. Supra note 2.

84    Of course, there are some highly publicized exceptions, such as the failure of Hispanic and black political leaders to reach an agreement about the drawing of new lines for the Los Angeles City Council in 1992. Richard Simon, Blacks, Latinos Clash Over Redistricting, L.A. Times, May 15, 1992, at B3.

85    Cf. Karlan, Maps and Misreadings, supra note 33; Guinier, No Two Seats, supra note 33; Guinier, The Triumph of Tokenism, supra note 61.

86    See Chandler Davidson & Bernard Grofman, The Voting Rights Act and the Second Reconstruction, in Quiet Revolution, supra note 5.

87    Moreover, I share the view of Rudolfo de la Garza that we need to be very cautious about blindly applying remedies designed primarily for one group to the other groups covered under the Act whose factual circumstances may be different. Oral Communication with Rudolfo de la Garza (Nov. 1992).

88    It seems to me to be increasingly common to see "Hispanic" treated as a racial category (as in the statement often found in newspapers that, with growing Hispanic and Asian-American populations, whites will no longer be in a majority of the United States population in the next century). I find this highly misleading. Spanish origin, for example, is a catch-all phrase, partly a category of administrative convenience and partly a categorization responsive to the desire of Mexican-American and other Hispanic politicians to define group membership broadly so as to increase their political clout. Perhaps even more importantly, we should be careful to remember that Spanish origin is used as an ethnic/cultural/linguistic category by the census, not a racial category.
— Hispanics are of various racial groups. While a very large proportion identify themselves as "other" or "none of the above" with respect to the census question that inquires as to racial self-identification, among the Hispanics who do not self-identify as "other," more choose the descriptor "white" than any other racial category. (Racial self-identification of Hispanics does, however, vary with country of origin or ancestral national origin). Moreover, insofar as Hispanics are a linguistically and culturally defined group, Hispanic self-identification is not immutable. Would anyone wish to repeat with respect to Hispanics the pernicious racism of the "one drop of blood" rule that froze categories so that anyone who had any black ancestry was by definition "black"?
— In addition, not all children born to a Hispanic parent will subsequently self-identify as Hispanic. O'Hare reports that, ")i n 1991, there were an estimated ... 1.2 million Hispanics married to non-Hispanics." Supra note 17, at 14. He also reports that, ")n early one-fourth of the babies born to Hispanic parents of any race ... had a non-Hispanic mother or father." Id.
— Similarly, to talk of a Hispanic influx as reducing the size of the U.S. population that is of European-descent is a very problematic assertion, given that the labels "Hispanic" or "Latino" (and even more so the Voting Rights Act descriptor, "Spanish heritage") correctly suggest that the cultural heritage of Hispanics includes a strong European influence. To point out the obvious, Spanish is a European language, a Romance language whose roots are Latin. Richard Alba emphasized the leveling of once-important national origin distinctions among Americans of European descent and the rise of intermarriage rates across national origin and religious lines. Richard D. Alba, Ethnic Identity: The Transformation of White America (1990). Such a process may eventually come to include Hispanics. Also, just as in religious practices there are similarities between Hispanics and Americans with, for example, Italian or Irish roots, similarities in political attitudes on a variety of issues among these three groups are also to be found.

89    Bernard Grofman & Michael Migalski, The Return of the Native: The Supply Elasticity of the American Indian Population, 1960-1980, 57 Pub. Choice 85 (1988) (discussing changes in the census definition of Native Americans over the past several decades).

90    This category includes, for example, natives of both India and Japan.

91    For example, we do not now use a category such as "quadroon" or "octaroon" on the census, whereas both these words were once used.

92    O'Hare, supra note 17, at 14. He points out that there were an estimated "one million inter-racial couples in 1991," and that, "while mixed-race babies are less than 3 percent of all births nationally, they represented at least l3 percent of the children born to a non-white parent in 1989, and a much higher percentage among some groups." Id. In particular, while only "seven percent of marriages )in 1991 involving an African-American were interracial," the proportion of Asian Americans married to someone outside their own race was "about one quarter." Id. See also Elizabeth Campos Rajs, Pros, Cons of Ethnic Labels: Standard Categories Don't Fit Multiethnic Population, 5 U.C. Focus 1 (May/June 1991)(student groups at UC Berkeley and UC Santa Cruz are formed for "mixed-race" students); Paul R. Spickard, The Illogic of American Racial Categories, in Racially Mixed People in America 12 (Maria P. P. Root ed., 1992); Cynthia L. Nakashima, An Invisible Monster: The Creation and Denial of Mixed-Race People in America, in Racially Mixed People in America , id. at 162.

93    Martin Luther King, I Have A Dream, in The Testament of Hope: The Essential Writings Of Martin Luther King, Jr. 217 (James W. Washington ed., 1986).
— A world where fixed racially or ethnically defined groups are awarded a share of a governmentally allocated pie in strict proportion to their numbers, while certainly not as morally repugnant as a politics of racist dominance, is still an anathema to me. See Bernard Grofman & Chandler Davidson, Postscript: What is the Best Route to a Color-Blind Society, in Controversies in Minority Voting , supra note 3, at 300. However, unlike some other advocates of a color-blind society, I am also a realist, opting for what I have called, the "realistic politics of the second best," a politics in which it is recognized that race-conscious remedies are frequently necessary in a race-conscious world. Grofman, Expert Witness Testimony and the Evolution of Voting Rights Case Law, in Controversies in Minority Voting, supra note 3, at 197. A realistic politics of the second best does not mean, though, that we should reify racial or ethnic categories or that we should force people into inappropriate "either-or" identifications.

13 CHLLR 15

**End of Document**    © 2021 Thomson Reuters. No claim to original U.S. Government Works.