

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division

LATASHA HOLLOWAY et al.,

    Plaintiff,

v.                                                       CIVIL ACTION NO. 2:18-cv-69

CITY OF VIRGINIA BEACH, et al.,

    Defendant.

## *FINAL ORDER*

On March 31, 2021, the Court entered a judgment declaring the City of Virginia Beach's at-large election system of City Council members in violation of § 2 of the Voting Rights Act (VRA) and enjoining its use. Mem. Op. & Order, ECF No. 242. The Court further ordered that the City shall not adopt any system of election for members of its City Council that does not comply with § 2 of the VRA, and that the City of Virginia Beach shall not implement or utilize any practice, policy, procedure, or other action that results in the dilution of minority participation in the electoral process. *Id.*

On May 12, 2021, the Court ordered the parties to submit proposed remedial plans by July 1, 2021 to redress the at-large system of election for the Virginia Beach City Council and allowed the parties to recommend an independent expert to evaluate the proposed plan(s). Order to Submit Proposed Rem. Plans, ECF No. 252. On July 1, 2021, the Court instructed the parties to submit their responses and replies to the proposed remedial plans by July 30, 2021. Order Den. Defs.' Mot. to Modify Rem. Br.'g Sched., ECF No. 259. On August 9, 2021, the Court entered an order conditionally appointing Dr. Bernard N. Grofman, Distinguished Professor of Political Science at the University of California, Irvine, as Special Master. Order Cond. App.'g

1

Special Master, ECF No. 275. The Court tasked the Special Master with submitting a report and recommendation of a legally sound remedial plan that addresses the violations in the City's at-large election system and complies with the federal and state constitutions and the VRA. *Id.*

On October 26, 2021, Professor Grofman completed his review of the parties' proposed remedial plans, found that neither plan was responsive to the violations the Court found, and submitted his own proposed remedial plan. Order to Respond to Special Master Rep. Att. 1, ECF No. 281 ("SM Rep."). The Court therefore ordered the parties to review and provide any comments on the Special Master report for the Court to consider in order to make any adjustments deemed appropriate before adopting the Special Master's proposed remedial plan. *Id.* The Court reviewed the responses of the parties to the Special Master report – Pls.' Resp. to Order to Respond to Special Master Rep., ECF No. 282 ("Pls.' Resp."); Defs.' Resp. to Order to Respond to Special Master Rep., ECF No. 283 ("Defs.' Resp.") – and ordered the parties to reply to one another's responses. Order to Respond to Special Master Resps., ECF No. 284. The Court has reviewed the parties' replies. Pls.' Reply to Order to Respond to Special Master Resps., ECF No. 285 ("Pls.' Reply"); Defs.' Reply to Order to Respond to Special Master Resps., ECF No. 286 ("Defs.' Reply"). Professor Grofman has also reviewed all subsequent pleadings and submitted a supplemental memorandum and revised remedial plan in light of them. Special Master Suppl. Memo. 1, ECF No. 288 ("SM Suppl. Memo.").

After thorough consideration of the Special Master report, the parties' subsequent pleadings, and Professor Grofman's responses to those pleadings, including his supplemental memorandum and revised remedial plan, the Court **FINDS** that the Special Master revised plan is an appropriate remedy to cure the VRA § 2 violations the Court found in this case. Moreover, the Court **FINDS** that the Special Master report supports the Court's liability findings in its

Memorandum Opinion and Order that the City of Virginia Beach is liable to Plaintiffs for the VRA § 2 violations. Specifically, the Court finds[1]:

1. The Special Master revised remedial plan demonstrates that there is an available viable remedy for the Defendants' violation of § 2 of the VRA.[2]

2. The Special Master revised remedial plan demonstrates that the Minority Community – Hispanics, Blacks, and Asians – is sufficiently large and geographically compact to constitute a majority in a single-member district.[3]

---

[1] Plaintiffs ask this Court to "make express factual findings" regarding whether the evidence from the remedial phase provides additional support for its findings regarding minority voter cohesion and the presence of white bloc voting in Virginia Beach. Pls.' Resp. at 1. As a preliminary matter, the Court finds it unnecessary to make any findings regarding the supplemental expert evidence in the parties' remedial submissions because the Special Master reviewed and took such evidence into account in his report. In support of their request, Plaintiffs rely on the Eleventh Circuit's holding in *Wright v. Sumter Cty. Bd. of Elections & Registration* that "a district court's remedial proceedings bear directly on and are inextricably bound up in its liability findings." 979 F.3d 1282, 1302-03 (11th Cir. 2020); *see also E. Jefferson Coal. For Leadership & Dev. v. Parish of Jefferson*, 926 F.2d 487, 492 (5th Cir. 1991) (holding that the district court did not exceed a remedy imposition remand order when it amended its liability finding in light of evidence from the remedial phase because "the 'liability' phase and the 'remedy' phase of Voting Rights Act cases frequently merge" and "the finding and the evidence on which it was predicated are closely related to the remedy phase"). In *Wright*, the court also reaffirmed its holding in *Dillard v. Baldwin Cty. Comm'rs*, 376 F.3d 1260, 1262 (11th Cir. 2004) that "[i]n light of the interplay between the inquiries into remedy and liability ... the district court was precluded from finding an ongoing section 2 violation ... when no appropriate remedy was available." *Wright*, 979 F.3d at 1303. Defendants rely on this holding to contend that if evidence from the remedial phase undermines any of the Court's liability findings, then the Court must vacate its liability ruling. Defs.' Resp. at 3. The Court does not read the referenced proposition in *Wright* so broadly. First, the Court notes that *Wright* is not binding precedent. Moreover, even if it were, *Wright* specifically stated that the district court was precluded from finding an ongoing § 2 violation "when no appropriate remedy was available." 979 F.3d at 1303. This proposition, therefore, limits the finding of an ongoing violation to when there is no available remedy. As previously mentioned, and discussed below, the Court finds that the evidence from the remedial phase demonstrates that there is an available viable remedy in this case.

[2] *See Wright*, 979 F.3d at 1302. The U.S. Supreme Court has outlined three "necessary preconditions" that Plaintiffs must meet in order to demonstrate that "multimember districts ... operate to impair minority voters' ability to elect representatives of their choice." *Thornburg v. Gingles*, 478 U.S. 30, 50 (1986). The parties in this case both point to the Eleventh Circuit's holding in *Wright* that the first *Gingles* precondition "dictates that the issue of remedy is part of the plaintiff's prima facie case." 979 F.3d at 1302 (internal citations and quotations omitted). The court found that the "absence of an available remedy is not only relevant at the remedial stage of the litigation, but also precludes, under the totality of the circumstances inquiry, a finding of liability." *Id.* (internal citation and quotations omitted). In his report, the Special Master concluded that Plaintiffs' proposed map "demonstrates it is possible to draw three contiguous and geographically compact districts in a ten-district plan such that each of the three contains a combined minority [civilian voting age population (CVAP)] in excess of 50%." SM Rep. at 6. Ultimately, however, the Special Master concluded that neither Defendants' nor Plaintiffs' maps "in their present incarnations satisfy 'one person, one vote.'" *Id.* at 34. Although he asserts that he could have recommended the Court adopt Plaintiffs' map "after its population has been adjusted," the Special Master instead provided his own "alternative equipopulous map" that meets the constitutional standard. *Id.* In response to the parties' subsequent pleadings, the Special Master elected – even though it was not constitutionally required – to revise his plan such that the total population deviation is now under 5%. SM Suppl. Memo. at 1. Therefore, the Special Master report demonstrates that there is an available remedy in this case; indeed, it demonstrates that there are at least two available remedies.

[3] The first *Gingles* precondition is that "the minority group must be able to demonstrate that it is sufficiently large and geographically compact to constitute a majority in a single-member district." 478 U.S. at 50. In his report, the Special Master explains, as illustrated in Figure 1, that "[t]he minority population in the City of Virginia Beach is geographically concentrated on the western edge of the city." SM Rep. at 4. Figure 1 reflects the

3

3. Table 2 of the Special Master report demonstrates that the Minority Community is politically cohesive.[4] Specifically, the Special Master revised remedial plan supports the Court's finding that the Minority Community is politically cohesive because of their tendency to vote together for similar preferred candidates (i.e., minority voter electoral cohesion).

4. Moreover, the Special Master revised remedial plan demonstrates that, notwithstanding the inability to disaggregate the voting patterns of Hispanics, Blacks, and Asians separately, the Minority Community together is still politically cohesive.[5]

---

voting tabulation districts (VTDs), also known as precincts, with an "above mean" minority CVAP. *Id.* at 4-5. In Table 6, the Special Master includes data concluding that the Minority Community constitutes a majority in District 4, District 7, and District 10 of the Special Master Illustrative Map. *Id.* at 37-38; *see also* SM Suppl. Memo. at 2-4. Indeed, the Special Master report concludes that "the minority population in Virginia Beach is sufficiently concentrated that drawing three 50%+ minority CVAP districts in the area of the heaviest minority population can readily be done." SM Rep. at 6. Therefore, the Special Master report supports the Court's previous finding that Plaintiffs satisfy the first *Gingles* precondition. *See Holloway v. City of Virginia Beach*, 531 F. Supp. 3d 1015, 1056-64 (E.D. Va. 2021).

[4] The second *Gingles* precondition is that "the minority group must be able to show that it is politically cohesive." *Gingles*, 478 U.S. at 51. In his report, the Special Master found, "from a political science point of view ... that, in terms of electoral cohesion, the minority community in Virginia Beach (African-American plus Hispanic, plus Asian-American) is, as a group, unquestionably politically cohesive in its support of minority candidates .... Moreover, this analysis does not change significantly when we examine voting patterns not for all minority candidates but just for those who are also minority candidates of choice." SM Rep. at 17. "In sum, [the Special Master found] essentially indisputable evidence of political cohesive patterns of voting ... for minority voters in terms of electoral cohesion." *Id.* at 18-19. Further, while he did not engage in an analysis on this issue, the Special Master also asserted that, "[f]rom a social sciences perspective there are two basic approaches that might be used to measure cohesion of racial/ethnic groups bringing a Section 2 claim: (1) socio-economic similarities and other similarities in life circumstances, and evidence of political coalition building on (local) issues; (2) evidence of voting cohesively for or against minority candidates." *Id.* at 16. As the Special Master notes, the Court analyzed and found political cohesion under both approaches. *Id.* at 17. Therefore, the Special Master report supports the Court's previous finding that Plaintiffs satisfy the second *Gingles* precondition. *See Holloway*, 531 F. Supp. 3d at 1064-76.

[5] The Special Master report concludes that it is mathematically impossible to derive the voting patterns for each minority group separately. SM Rep. at 19. The Special Master nonetheless concludes that this inability "is not in any way a barrier to a factual finding that it is possible to create districts in which the three groups, taken collectively, have a realistic opportunity to elect a candidate of choice." *Id.* at 23. Indeed, he explicitly states that "there is clear and compelling evidence for racially polarized voting in Virginia Beach City Council elections between White (non-Hispanic) and non-White voters and for political cohesion on the part of both the minority group and White voters in support for or opposition to minority candidates." *Id.* at 63. Defendants dispute that the Special Master report supports the Court's finding in this regard. *See* Defs.' Resp.; Defs.' Reply. However, Defendants misrepresent the legal authority to which they cite, *Brewer v. Ham*, 876 F.2d 448 (5th Cir. 1989). In *Brewer*, the Fifth Circuit explicitly reaffirmed its previous holding that "minority groups may be aggregated for purposes of asserting a Section 2 violation." 876 F.2d at 453. The court went on to note that it "cautions against reaching conclusions about inter-minority cohesion absent a diligent inquiry into the political dynamics of the particular community." *Id.* The Court in this case conducted that very inquiry and found political cohesion. *Holloway*, 531 F. Supp. 3d at 1064-76. Further, despite the Fifth Circuit's purported "determinative question" on this issue, the court went on to acknowledge that, in the absence of statistical evidence, the Supreme Court's decision in *Gingles* suggests that other evidence is sufficiently probative. *Brewer*, 876 F.2d at 453 (citing *Gingles*, 478 U.S. at 31 ("A showing that a significant number of minority group members usually vote for the same candidates is *one* way of proving the political cohesiveness necessary to a vote dilution claim.") (emphasis added)). Defendants incorrectly argue, therefore, that *Brewer* requires district courts to find both "proof of internal cohesion among each constituent group of the alleged coalition and cohesion between or among all groups together." Defs.' Resp. at 3. The fatal flaw in *Brewer* was that the evidentiary record in that case did not establish political cohesion; yet, the record in this case unquestionably does. Thus, the Court notes that it does not have a legal disagreement with

4

5. Finally, the Special Master report demonstrates that the white residents in Virginia Beach voted sufficiently as a bloc to enable them to usually defeat minority-preferred candidates.[6]

The Court notes that the parties have raised several other concerns regarding the Special Master plan in their responses and replies. To implement an effective remedial plan, the Court finds it unnecessary to relocate Plaintiff and Burton Station into any specific voting district. Additionally, the Court finds that although the Special Master fashioned his plan based on voting tabulation districts (VTDs), the Special Master deemed these to be the same as the existing precincts, thereby eliminating the need for the City to redraw its existing precincts.

In conclusion, the Court **ADOPTS** the Special Master revised plan as an appropriate remedy and **ORDERS** the City of Virginia Beach to implement the plan immediately in order to cure its electoral deficiencies which are in violation of § 2 of the Voting Rights Act.

The Clerk is **DIRECTED** to electronically provide this Order to all parties.

**IT IS SO ORDERED.**

Norfolk, Virginia
December 22, 2021

Raymond A. Jackson
United States District Judge

---

*Brewer*; indeed, the Court's opinion and the Special Master report are consistent with it. Rather, the Court disagrees with Defendants' attempts to misconstrue *Brewer* in their favor.

[6] The third *Gingles* precondition is that "the minority must be able to demonstrate that the white majority votes sufficiently as a bloc to enable it—in the absence of special circumstances, such as the minority candidate running unopposed—usually to defeat the minority's preferred candidate. . . . In establishing this last circumstance, the minority group demonstrates that submergence in a white multimember district impedes its ability to elect its chosen representatives." *Gingles*, 478 U.S. at 51. In his report, the Special Master concluded that the "White community in Virginia Beach is unquestionably politically cohesive in its opposition to minority candidates." SM Rep. at 17. Further, he found that "white/Anglo voters almost never give first place support to any minority candidate for City Council and give such paltry support to minority candidates on average that we can conclude that the White community is politically cohesive in opposition to minority candidates." *Id.* at 18. "In sum, [the Special Master found] essentially indisputable evidence of political cohesive patterns of voting for . . . White voters . . . in terms of electoral cohesion." *Id.* at 18-19. Moreover, the Special Master concluded that "minority candidates of choice regularly lose in the at-large single seat districts . . . [and] absent special circumstances . . . regularly lose in the at-large two seat districts." *Id.* at 20. He noted that "[b]ecause minority candidates are deterred from running for at-large elections in the city by their low chance of electoral success, counting the number of minority candidates who ran and lost substantially understates the actual dilutive effect of the at-large plan struck down by the Court in terms of that plan's effects on minority opportunity to participate in the political process and elect candidates of choice." *Id.* at 22. Ultimately, the Special Master concluded that "minority candidates regularly lost due to white bloc voting." *Id.* at 23. Therefore, the Special Master report supports the Court's previous finding that Plaintiffs satisfy the third *Gingles* precondition. *See Holloway*, 531 F. Supp. 3d at 1076-78.