**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

──────────────

**No. 21-1533**

──────────────

LATASHA HOLLOWAY; GEORGIA ALLEN,

Plaintiffs – Appellees,

v.

THE CITY OF VIRGINIA BEACH; the VIRGINIA BEACH CITY COUNCIL; DONNA PATTERSON, in her official capacity as General Registrar for the City of Virginia Beach; ROBERT DYER, in his official capacity as the Mayor of Virginia Beach; PATRICK DUHANEY, in his official capacity as City Manager of Virginia Beach; MICHAEL BERLUCCHI, in his official capacity as member of the Virginia Beach City Council; BARBARA HENLEY, in her official capacity as member of the Virginia Beach City Council; LOUIS JONES, in his official capacity as member of the Virginia Beach City Council; JOHN MOSS, in his official capacity as member of the Virginia Beach City Council; AARON ROUSE, in his official capacity as member of the Virginia Beach City Council; GUY TOWER, in his official capacity as member of the Virginia Beach City Council; ROSEMARY WILSON, in her official capacity as Vice Mayor of Virginia Beach; SABRINA WOOTEN, in her official capacity as member of the Virginia Beach City Council; ROCKY HOLCOMB, in his official capacity as member of the Virginia Beach City Council; LINWOOD BRANCH, in his official capacity as member of the Virginia Beach City Council,

Defendants – Appellants.

------------------------------

COMMONWEALTH OF VIRGINIA,

Amicus Supporting Appellants,

BRENNAN CENTER FOR JUSTICE AT NYU SCHOOL OF LAW; SOUTHERN COALITION FOR SOCIAL JUSTICE,

Amici Supporting Appellees.

---

**No. 21-2431**

---

LATASHA HOLLOWAY; GEORGIA ALLEN,

        Plaintiffs – Appellees,

    v.

THE CITY OF VIRGINIA BEACH; the VIRGINIA BEACH CITY COUNCIL; DONNA PATTERSON, in her official capacity as General Registrar for the City of Virginia Beach; ROBERT DYER, in his official capacity as the Mayor of Virginia Beach; PATRICK DUHANEY, in his official capacity as City Manager of Virginia Beach; MICHAEL BERLUCCHI, in his official capacity as member of the Virginia Beach City Council; BARBARA HENLEY, in her official capacity as member of the Virginia Beach City Council; LOUIS JONES, in his official capacity as member of the Virginia Beach City Council; JOHN MOSS, in his official capacity as member of the Virginia Beach City Council; AARON ROUSE, in his official capacity as member of the Virginia Beach City Council; GUY TOWER, in his official capacity as member of the Virginia Beach City Council; ROSEMARY WILSON, in her official capacity as Vice Mayor of Virginia Beach; SABRINA WOOTEN, in her official capacity as member of the Virginia Beach City Council; ROCKY HOLCOMB, in his official capacity as member of the Virginia Beach City Council; LINWOOD BRANCH, in his official capacity as member of the Virginia Beach City Council,

        Defendants – Appellants.

-------------------------------

COMMONWEALTH OF VIRGINIA,

        Amicus Supporting Appellants,

BRENNAN CENTER FOR JUSTICE AT NYU SCHOOL OF LAW; SOUTHERN COALITION FOR SOCIAL JUSTICE,

        Amici Supporting Appellees.

---

Appeals from the United States District Court for the Eastern District of Virginia, at Norfolk.  Raymond A. Jackson, District Judge.  (2:18-cv-00069-RAJ-DEM)

—————————

Argued: March 8, 2022                                          Decided:  July 27, 2022

—————————

Before GREGORY, Chief Judge, and THACKER and HARRIS, Circuit Judges.

—————————

Vacated and remanded by published opinion.  Judge Harris wrote the opinion, in which Judge Thacker joined.  Chief Judge Gregory wrote a dissenting opinion.

—————————

**ARGUED:** Richard Bryan Raile, BAKER & HOSTETLER LLP, Washington, D.C., for Appellants.  Christopher DeSean Lamar, CAMPAIGN LEGAL CENTER, Washington, D.C., for Appellees.  Erika L. Maley, OFFICE OF THE ATTORNEY GENERAL OF VIRGINIA, Richmond, Virginia, for Amicus Commonwealth of Virginia.  **ON BRIEF:** Mark D. Stiles, City Attorney, Christopher S. Boynton, Deputy City Attorney, Gerald L. Harris, Senior City Attorney, Joseph M. Kurt, Assistant City Attorney, OFFICE OF THE CITY ATTORNEY, Virginia Beach, Virginia; Erika Dackin Prouty, Columbus, Ohio, Katherine L. McKnight, Washington, D.C., Patrick T. Lewis, BAKER & HOSTETLER LLP, Cleveland, Ohio, for Appellants.  J. Gerald Hebert, J. GERALD HEBERT P.C., Alexandria, Virginia; Annabelle E. Harless, Chicago, Illinois, Mark P. Gaber, Robert N. Weiner, CAMPAIGN LEGAL CENTER, Washington, D.C., for Appellees.  Jason S. Miyares, Attorney General, Charles H. Slemp, III, Chief Deputy Attorney General, Andrew N. Ferguson, Solicitor General, Lucas W.E. Croslow, Special Assistant to the Solicitor General, Annie Chiang, Assistant Solicitor General, OFFICE OF THE ATTORNEY GENERAL OF VIRGINIA, Richmond, Virginia, for Amicus Commonwealth of Virginia.  Alicia Bannon, Yurij Rudensky, BRENNAN CENTER FOR JUSTICE, New York, New York; Nathaniel B. Edmonds, Katherine Berris, James W. Brown, Lindsey Ware Dieselman, Anne Marie Egerstrom, Diogo Metz, Mary E. Rogers, Tor Tarantola, PAUL HASTINGS, LLP, Washington, D.C., for Amicus Brennan Center for Justice.  Allison J. Riggs, Noor Taj, SOUTHERN COALITION FOR SOCIAL JUSTICE, Durham, North Carolina, for Amicus Southern Coalition for Social Justice.

3

PAMELA HARRIS, Circuit Judge:

Plaintiffs Latasha Holloway and Georgia Allen sued the City of Virginia Beach and several local officials, claiming that the City's exclusive use of at-large voting to elect members of its City Council diluted the votes of minority voters in violation of Section 2 of the Voting Rights Act of 1965. Before the district court ruled on that claim, however, Virginia's General Assembly passed a law eliminating at-large voting for most of the seats on the City Council. Even so, the district court held, this case was not moot, the City's old all-at-large electoral system violated Section 2, and the plaintiffs were entitled to an injunction remedying that violation going forward.

We agree with the City that the district court erred in reaching the merits. The General Assembly's action left the plaintiffs challenging – and the district court assessing – an electoral system that no longer governs elections in Virginia Beach. It follows that this case is moot, and we therefore vacate the district court's decisions. But because the plaintiffs may have residual claims against the City's new method for electing its Council, the district court may consider on remand whether the plaintiffs should be granted leave to amend their complaint, or develop the record more fully, to bring any new challenges as part of this proceeding.

## I.

## A.

Section 2 of the Voting Rights Act of 1965 prohibits any election-related "standard, practice, or procedure" that "results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color."  52 U.S.C. § 10301(a); *see* § 10303(f)(2) (extending Section 2's protections to "language minority group[s]").  In *Thornburg v. Gingles*, the Supreme Court established the framework for assessing at-large voting systems under Section 2.  478 U.S. 30, 48–51 (1986).  At-large elections are not "*per se* violative of [Section] 2." *Id.* at 46.  But, the Court recognized, "at-large voting schemes may operate to minimize or cancel out the voting strength of racial minorities," and when they do, they are prohibited.  *Id.* at 47 (cleaned up).

To establish that an at-large system violates Section 2, a plaintiff first must meet three "preconditions," showing that (1) a minority group is "sufficiently large and geographically compact to constitute a majority in a single-member district"; (2) the minority group is "politically cohesive"; and (3) "the white majority votes sufficiently as a bloc to enable it . . . usually to defeat the minority's preferred candidate." *Id.* at 50–51. Then, if all three preconditions are met, the plaintiff must show that "under the totality of the circumstances," the at-large system "result[s] in unequal access to the electoral process." *Id.* at 46; *see United States v. Charleston County*, 365 F.3d 341, 345 (4th Cir. 2004).  In undertaking this "totality of the circumstances" inquiry, courts typically rely on the nine factors set out in the Senate Report accompanying Congress's 1982 amendments

to Section 2, including the history of official discrimination in the region, minorities' electoral success, the use of discriminatory electoral devices, and the extent of racially polarized voting. *See Gingles*, 478 U.S. at 36–37; *Charleston County*, 365 F.3d at 345.

**B.**

Virginia Beach, Virginia's most populous city, is governed by a City Council, composed of the City's mayor and ten councilmembers. When this case began, every councilmember was elected at-large – that is, by all City voters, rather than the voters of a single district. This meant that every candidate for City Council had to campaign for the votes of all 450,000 City residents across the City's 249 square miles. In this respect, the district court noted, Virginia Beach was "unique" among Virginia's 13 largest cities, the others of which elected all or most of their councilmembers from individual districts, with only a minority – at most – elected at-large. *Holloway v. City of Virginia Beach*, 531 F. Supp. 3d 1015, 1032–33, 1084 (E.D. Va. 2021).

In addition, seven of the Council's members, though elected at-large, were required to reside in designated districts. For those seats, in other words, candidates campaigned across the entire City for specific seats corresponding to the districts in which they lived. Such "designated seat plans," the Supreme Court recognized in *Gingles*, can make at-large elections especially dilutive of minority votes, preventing minority voters from concentrating their votes on a limited number of favored candidates. *See Gingles*, 478 U.S. at 38–39 & nn.5–6. The remaining three councilmembers were elected at-large and with no residency requirement.

6

Two Virginia Beach residents – Latasha Holloway, a Black voter; and Georgia Allen, an unsuccessful Black candidate for City Council – sued, challenging the "at-large election system used to elect members of the City Council of Virginia Beach."  J.A. 47. That system, according to the plaintiffs – "in which all councilmembers are elected at-large in citywide elections" – resulted, under the totality of the circumstances, in the unlawful dilution of the voting strength of minority voters.  J.A. 48.  As a remedy, they sought a declaration that "Virginia Beach's at-large method" of electing its City Council violated Section 2, an injunction preventing the City from conducting future elections "under the current at-large method," and an order requiring implementation of a Section 2-compliant electoral system.  J.A. 61.

After the district court denied the City's motion for summary judgment, the case proceeded to a six-day bench trial.  Before the district court issued its post-trial decision, however, the City informed the court that Virginia's General Assembly had enacted a new statute, HB 2198, that would significantly affect the City's "at-large residence system" of electing councilmembers.  J.A. 1134–35.  Under HB 2198, any City Council candidate who is subject to a district-based residency requirement – that is, candidates for the seven Council seats described above – must "be elected by the qualified voters of that district . . . and not by the locality at large."   Va. Code Ann. § 24.2-222(A) (codifying HB 2198). Going forward, in other words, candidates for most City Council seats – the seven with residency requirements – would run for office in single-member districts.  And candidates for only three seats – those without any residency requirement – would continue to be

7

elected at-large.  This new law, according to the City, superseded the entirely at-large system challenged by the plaintiffs, rendering that system "no longer legally permissible as a matter of state law." J.A. 1135.  And as a result, the City argued, the plaintiffs' case against that system was now moot.

A week after the City informed the court of HB 2198, the district court issued a comprehensive and thoroughly reasoned decision holding in the plaintiffs' favor. *See Holloway*, 531 F. Supp. 3d 1015.  The district court began by rejecting the City's argument that the case was moot in light of HB 2198.  The new state law, the court explained, did not "specifically address" the plaintiffs' claims, nor provide them all the relief they sought, and so "the issues [we]re still live." *Id.* at 1027 n.1.  Moreover, the court reasoned, HB 2198 would not necessarily lead to a change in Virginia Beach's at-large election system:  The City could retain at-large voting for *all* of its City Council seats by eliminating the district residency requirements in its city charter. *Id.*

The court then assessed the merits of the plaintiffs' challenge to the pre-HB 2198 system, holding with the plaintiffs at each step:  The plaintiffs had satisfied each of the *Gingles* preconditions and, under the totality of the circumstances, the City's all-at-large electoral system diluted the votes of minority voters. *Id.* at 1048–1102.  The court thus declared the City's "at-large method of election" illegal, enjoined further use of that system, and granted plaintiffs' request for fees and costs. *Id.* at 1102.  It reserved decision on a more specific remedial order, pending further proceedings. *Id.*  And after receiving proposed remedial plans from the plaintiffs, the City, and a court-appointed special master,

the court adopted the special master's proposal, ordering the City to implement a plan with ten single-member districts, including three districts where minority voters formed a majority of the voting population. *See Holloway v. City of Virginia Beach*, No. 2:18-CV-69, 2021 WL 6199585, at *2 & n.2 (E.D. Va. Dec. 22, 2021).

The City timely appealed the district court's decisions.

## II.

On appeal, we confront an unusual situation:  Both sides think this proceeding is moot, but for different reasons.  The City continues to argue that HB 2198, enacted before the district court's ruling, mooted the plaintiffs' case against Virginia Beach's entirely at-large system for electing councilmembers.  The plaintiffs, for their part, contend that their case survived HB 2198, but that the City's *appeal* was mooted by events that transpired after the district court ruled – first, enactment of yet another new state law, the Virginia Voting Rights Act; and then preclearance under that law of the district court's remedial plan.  *See* Va. Code Ann. § 24.2-129(D).  The upshot is that neither party believes we have jurisdiction to hear this case.  *See* ECF No. 80-1 at 1 ("At this point, both parties contend this case has become moot.").

9

We agree, and, specifically, we agree with the City:  The plaintiffs' case became moot with the passage of HB 2198.[1]  That law eliminated the unusual Virginia Beach all-at-large system at the heart of this case, leaving the district court without jurisdiction to rule on the legality of that system and thus without jurisdiction to direct a remedy.  We recognize the plaintiffs' concern that a new, HB 2198-compliant system – one in which candidates for some, but not all, City Council seats must run at-large – may itself violate Section 2.  But that is a claim that they must plead and prove first in the trial court.  Accordingly, we vacate and remand for the district court to decide whether the plaintiffs may pursue such a challenge in this case.

---

[1] By contrast, we are not persuaded that the City's appeal was mooted when Virginia's attorney general, acting under the newly enacted Virginia Voting Rights Act, precleared the district court's remedial plan in January of 2022.  According to the plaintiffs, once precleared, that plan became the de facto electoral system for the City and would remain so regardless of the outcome of this appeal.  The City disagrees, arguing that preclearance permits, but does not require, use of the court-ordered plan, and that it could consider other options should we vacate or reverse the district court's decisions.  Regardless of the precise implications of preclearance under state law, we think the persistence of a federal injunction directing City election procedures is enough to give the City a "live" stake in the outcome of this appeal.  *See Norfolk S. Ry. v. City of Alexandria*, 608 F.3d 150, 161 (4th Cir. 2010).  Vacating that injunction would have the "practical effect" of allowing the City, at a minimum, to seek preclearance of a plan other than the one imposed by the district court.  *Id.*

We note, however, that at whatever point this case became moot, the result would be the same.  Even if, that is, the plaintiffs were correct that this case became moot only on appeal, we still would vacate the district court's judgment, as is customary when cases moot out on appeal through no fault of the parties.  *See id.* at 161 ("The customary practice when a case is rendered moot on appeal is to vacate the moot aspects of the lower court's judgment."); *see also U.S. Bancorp Mortg. Co. v. Bonner Mall P'ship*, 513 U.S. 18, 25 & n.3 (1994) (holding that, because parties "ought not in fairness be forced to acquiesce in [a] judgment" when circumstances outside their control moot a case precluding review of that judgment, "mootness by happenstance provides sufficient reason to vacate").

Our jurisdiction under Article III is limited to cases and controversies. *See* U.S. Const. art. III, § 2, cl. 1; *Catawba Riverkeeper Found. v. N.C. Dep't of Transp.*, 843 F.3d 583, 588 (4th Cir. 2016). That limit applies at all stages of a case; a "suit must remain alive throughout the course of litigation," and even if there is a justiciable controversy when a complaint is filed, "subsequent events can moot the claim." *Catawba Riverkeeper Found.*, 843 F.3d at 588 (internal quotation marks omitted). Whether a case has become moot is a question we review de novo. *Porter v. Clarke*, 852 F.3d 358, 363 (4th Cir. 2017).

A dispute is moot, depriving federal courts of jurisdiction to decide it, when "the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *Catawba Riverkeeper Found.*, 843 F.3d at 588 (internal quotation marks omitted). And ordinarily, "statutory changes that discontinue a challenged practice" are enough to render a case moot under this standard. *Valero Terrestrial Corp. v. Paige*, 211 F.3d 112, 116 (4th Cir. 2000). To be sure, not every tweak to a challenged statute will have this effect; "minor and insignificant" changes that do not address the essence of a plaintiff's claims will not forestall legal challenges to the original statute. *Id.* But when a challenged law is "superseded by a significantly amended statutory scheme," then a claim against the original law becomes moot. *Esposito v. S.C. Coastal Council*, 939 F.2d 165, 171 (4th Cir. 1991). "Whatever the merits of the District Court's conclusions on the earlier statutes, any challenge to the new provisions presents a different case." *Allee v. Medrano*, 416 U.S. 802, 818 (1974) (addressing potential mootness when challenged statutes were replaced by "more narrowly drawn" enactments).

11

The Supreme Court recently confirmed this framework, holding that legislative amendments to New York's firearm licensing statute, enacted after commencement of litigation, rendered moot a Second Amendment challenge to the original law. *See N.Y. State Rifle & Pistol Ass'n v. City of New York*, 140 S. Ct. 1525, 1526 (2020). Those amendments, as the Court described them, were significant enough to "change [] the legal framework governing the case," giving the plaintiffs all they sought in their complaint, and thus mooting their challenge. *Id.* (internal quotation marks omitted). And importantly, the Court clarified, the plaintiffs' "residual claim" against the new and amended licensing scheme did not save their original challenge from mootness. *Id.* (internal quotation marks omitted).

Under these principles, HB 2198 mooted this case, "supersed[ing]" the challenged electoral system and replacing it with one that is "significantly" different. *Esposito*, 939 F.2d at 171. The plaintiffs' challenge was not to the use of *any* at-large voting in City Council elections – nor could it have been, under the governing *Gingles* framework. *See* 478 U.S. at 46 (explaining that at-large voting is not *per se* violative of Section 2). Instead, they alleged that Virginia Beach's *particular* at-large system, evaluated under the totality of the circumstances, operated to dilute minority voting strength. *See id.*; J.A. 60 ("The totality of the circumstances establish that the at-large election scheme *currently in place* has the effect of denying Minority Voters an equal opportunity to participate in the political process . . . , in violation of Section 2." (emphasis added)).

And that particular system, the plaintiffs explained, was an anomalous one – unique in Virginia – that coupled at-large voting for all City Council seats with designated residency requirements for most of those seats.  Their amended complaint was clear on this.  *See* J.A. 48 (describing challenged election method "in which *all councilmembers* are elected at-large in citywide elections" (emphasis added)).  Their expert explained the unusual and especially dilutive nature of a system pairing at-large voting with residency requirements.  *See* J.A. 1743 ("Virginia Beach uniquely maintains numbered or designated posts for the election of the majority of city council members, a well-known device that often enhances the discriminatory nature of an at-large election system."); J.A. 1681 (same).  And the district court, in finding a Section 2 violation, emphasized these specific features of  Virginia Beach's system:  It noted that the City's exclusive use of at-large voting made it "unique" among Virginia's largest cities, others of which used single-member districts or "mixed at-large/district system[s] . . . , with the majority elected from districts."  *Holloway*, 531 F. Supp. 3d at 1032–33.  It detailed the way in which the overlap of at-large voting and designated residency seats "exacerbates the discriminatory effect of at-large elections."  *Id.* at 1084–85 (citing *Gingles*, 478 U.S. at 39 & n.5).  And it found that no other city in the state "share[d] Virginia Beach's combination of at-large elections, designated seats for most positions, and staggered terms," faulting the City for failing to provide a "reasonable explanation" for its outlier system.  *Id.* at 1102.

HB 2198 transformed these challenged aspects of the City's electoral system, fundamentally altering the "legal framework" at issue in plaintiffs' case.  *N.Y. State Rifle*

& *Pistol Ass'n*, 140 S. Ct. at 1526 (internal quotation marks omitted).  Candidates for the Council's seven residency seats no longer will be elected at-large; instead, they must be chosen by the voters of their individual districts.  Va. Code Ann. § 24.2-222(A).  Only three seats remain subject to at-large voting,[2] and those seats lack the residency requirements that made most of the City's prior at-large elections especially burdensome for minority candidates and dilutive of minority votes.  "[A]nything but minor and insignificant," HB 2198's changes bear directly on the plaintiffs' challenge, *Valero*, 211 F.3d at 116, eliminating some of the chief offending features of the City's challenged system, and bringing it more closely into line with those used by cities of comparable size in Virginia and cited favorably by the district court in its decision, *see Holloway*, 531 F. Supp. 3d at 1032–33, 1084.

Indeed, we already have recognized that a Section 2 challenge becomes moot in essentially the same scenario.  *See NAACP v. Winston-Salem/Forsyth Cnty. Bd. of Educ.*, 959 F.2d 231, 1992 WL 64875, at *1 (4th Cir. Apr. 3, 1992) (unpublished table decision).  In that case, the plaintiffs had challenged an all-at-large system for electing Board of Education members, and a state law changed significant elements of the at-large system in dispute:  In the future, "some of the members" – but not all – would be elected by district rather than at-large, and all would be elected simultaneously rather than in staggered terms.

---

[2] We recognize that Virginia Beach's mayor – who also sits on the City Council – is elected at-large, as well.  But in discussing HB 2198, the parties speak only of the three at-large Council seats held by non-mayoral councilmembers, and we follow their lead.

*Id.*  That was enough to moot the plaintiffs' lawsuit against the now-altered electoral system.  *Id.*; *see also White v. Regester*, 422 U.S. 935, 935–36 (1975) (per curiam) (vacating district court judgment and remanding in light of potential mootness, where state replaced at-large districts with single-member districts).

Under these well-established mootness principles, federal courts may not opine on the merits of a case when doing so would have no "practical effect on the outcome of the matter." *Norfolk S. Ry. v. City of Alexandria*, 608 F.3d 150, 161 (4th Cir. 2010).  That is the case here, just as it was in the above-cited authority, because by virtue of HB 2198, the plaintiffs already have gotten all that they asked for in their amended complaint.  That law already prevents the City from "administering, implementing, or conducting any future elections in the City of Virginia Beach under *the current at-large method of election.*"  J.A. 61 (emphasis added).  The plaintiffs' claim for relief "with respect to the City's old [system] is therefore moot." *N.Y. State Rifle & Pistol Ass'n*, 140 S. Ct. at 1526.  The only thing a court can add now is an advisory opinion as to the legal status of an effectively defunct electoral system, and that, of course, lies outside the scope of Article III jurisdiction. *See Catawba Riverkeeper Found.*, 843 F.3d at 589; *Norfolk S. Ry.*, 608 F.3d at 161.

The plaintiffs argue – and the district court appears to have agreed, *see Holloway*, 531 F. Supp. 3d at 1027 n.1 – that a court still could provide them with effectual relief because they sought not only an injunction against the City's current election system, but also an order directing implementation of a new system that "compl[ies] with Section 2,"

15

J.A. 61.  But this has things backwards.  The plaintiffs have no right to that court-ordered relief in the abstract; until they have proven that specific conduct by the City violates Section 2, "there neither has been a wrong nor can be a remedy."  *Growe v. Emison*, 507 U.S. 25, 40–41 (1993); *see McGhee v. Granville County*, 860 F.2d 110, 117–18 (4th Cir. 1988) (holding that Section 2 remedies must respond to "the dilution proximately caused by" a challenged "electoral law, practice, or structure" (quoting *Gingles*, 478 U.S. at 47)).  And regardless of whether the plaintiffs proved that the City's old system violated Section 2 – a question we have no jurisdiction to entertain – they have not shown, and the district court did not find, that any new, HB 2198-compliant system does so.

We recognize, as the plaintiffs stress, that HB 2198 will allow the City to maintain at-large elections for three of its City Council seats.  But as discussed above, the district court did not find – indeed, the plaintiffs in their amended complaint did not allege[3] – that

---

[3] The dissent disagrees with this assessment, noting that the amended complaint, at points, contemplated a complete end to all at-large voting in Virginia Beach, *see* Dissenting Op. at 31 (quoting J.A. 48–49), and proposed an illustrative plan with ten single-member districts and no at-large voting, *id.* at 35 (citing J.A. 55).  But the record is clear that the plaintiffs' challenge was to "the current at-large method of election," J.A. 61, which they defined as one characterized by *all-at-large* voting.  *See* J.A. 48 ("That election method, in which *all councilmembers* are elected at-large in citywide elections, unlawfully dilutes the voting strength of Minority Voters[.]" (emphasis added)).  Their "demand for relief" said so.  *See* J.A. 61 (seeking injunction against any further use of "the current at-large method of election").  And the plaintiffs reiterated the point at trial, objecting to defense counsel's suggestion that the ten-single-member plan laid out in their amended complaint was the relief they were seeking:  While a ten-district plan *could* be drawn consistent with the *Gingles* framework, the plaintiffs clarified, the remedy that they had requested was simply that the court "strike down the current system and ask the City to draw a different system.  Whether that is a ten-district plan *or something else* is not what we're requesting."  J.A. 800 (emphasis added).

*any* use of at-large voting in City Council elections would violate Section 2. And while the district court did assess the general effects of at-large voting in Virginia Beach, it did so not in a vacuum but under a "totality of the circumstances" analysis that required exactly what the district court provided:  careful focus on the history and effects of a particular electoral system that uniquely required *all* candidates to run at-large and *most* candidates to do so from especially problematic designated districts.  *See Holloway*, 531 F. Supp. 3d at 1079–1102.  That system – and the plaintiffs' case against it – came to an end with HB 2198.

It may be, as the plaintiffs further suggest, that they will have challenges to any new electoral method adopted by the City that maintains even three at-large seats.  And those challenges may overlap substantially with their first one, especially with respect to the three *Gingles* preconditions.  But as in *New York State Rifle & Pistol Ass'n*, those "residual claim[s]" cannot resuscitate plaintiffs' moot claims against the old system.  140 S. Ct. at 1526 (internal quotation marks omitted).  Any challenge to the new system will present a different case, demanding its own similarly sensitive analysis.  *See De Grandy v. Johnson*, 512 U.S. 997, 1009–13 & n.10 (1994) (emphasizing that even where the three *Gingles* preconditions have been satisfied, courts must go on to examine the totality of the circumstances and the extent to which a challenged system, in fact, allows minority voters to participate equally in the political process).

Finally, the district court suggested that the City's voluntary cessation of the challenged conduct could not moot the plaintiffs' challenge, given that the City remained

free to return to an entirely at-large system by "elimat[ing] the district residency requirements for the seven seats on the City Council." *Holloway*, 531 F. Supp. 3d at 1027 n.1 (citing *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 190 (2000) (applying the voluntary cessation doctrine)). We think this misapprehends both the voluntary cessation doctrine and Virginia state law. First, the City did not voluntarily cease anything; instead, the General Assembly enacted a new voting-rights law that eliminated a device the City had kept on its books for decades. *Cf. Catawba Riverkeeper Found.*, 843 F.3d at 589–91 (declining to impute acts of state legislature to state agency, even where agency lobbied for changes to state law, in deciding whether mootness resulted from the defendant agency's "voluntary action" for vacatur purposes). The plaintiffs have not argued that the City sought or in any way influenced the legislative enactment at issue here, and we are unaware of any evidence that would support such a claim. It follows, we think, that the City itself has engaged in no "voluntary" action implicating the voluntary cessation doctrine.

As for state law, the district court seems to have overestimated the City's authority to reinstate at-large elections for all City Council seats. Virginia Beach's City Charter imposes residency requirements on seven of those seats. *See* Va. Beach, Va., Charter § 3.01. And it is only the General Assembly – not the City – that can amend that charter. *See* Va. Code Ann. §§ 15.2-200 to 203; *Pritchett v. City Council*, 105 Va. Cir. 465, 2020 WL 8832558, at *2 (2020) (unpublished). So contrary to the district court's assumption, without further legislative action, the City cannot side-step HB 2198 and return to an

18

entirely at-large system by eliminating its residency requirements.  And lacking that power, the City does not have "the authority and capacity to repeat [the] alleged harm," as the voluntary cessation doctrine would require.  *Courthouse News Serv. v. Schaefer*, 2 F.4th 318, 323 (4th Cir. 2021) (internal quotation marks omitted).

In sum, HB 2198 prevented the City from conducting any future City Council elections under the electoral system that the plaintiffs challenged, and other aspects of state and local law precluded the City from returning unilaterally to its old ways.  Under those circumstances, the plaintiffs' challenge is moot, and the district court lacked jurisdiction to consider its merits.  Accordingly, we vacate the district court's judgment – as to both liability and remedy – and remand.  *See, e.g.*, *Benham v. City of Charlotte*, 635 F.3d 129, 134, 139 (4th Cir. 2011) ("If an appellate court determines that the district court lacked jurisdiction, vacatur of the district court's ruling, along with a remand with instructions to dismiss, is the appropriate disposition.").

That said, while our usual practice at this point would be to further instruct the district court to dismiss the case upon remand, *see id.*, we depart from that custom here. As the Supreme Court has recently explained, a different course may be appropriate where – as here – mootness "is attributable to a change in the legal framework governing the case, and where the plaintiff may have some residual claim under the new framework that was understandably not asserted previously." *N.Y. State Rifle & Pistol Ass'n*, 140 S. Ct. at 1526 (quoting *Lewis v. Cont'l Bank Corp.*, 494 U.S. 472, 482 (1990)).  In those circumstances, the Supreme Court advised, courts can "vacate the judgment and remand for further

19

proceedings in which the parties may, if necessary, amend their pleadings or develop the record more fully." *Id.* (quoting *Lewis*, 494 U.S. at 482).

We follow that advice here, and remand *without* instructions to dismiss the plaintiffs' case. The plaintiffs maintain that they still may have viable challenges to whatever post-HB 2198 electoral system the City adopts. And if they do, the parties and district court likely will have done much – though not all – of the work necessary to analyze those claims. On remand, the plaintiffs may raise any claims they have against the City's system going forward. The district court then can decide whether the plaintiffs should be permitted to amend their complaint or otherwise develop the record to pursue those claims here, or whether they are better pursued in a new proceeding.

## III.

For the foregoing reasons, we vacate the district court's judgment and remand the case for further proceedings consistent with this opinion.

*VACATED AND REMANDED*

GREGORY, Chief Judge, dissenting:

I respectfully disagree that this case became moot with the passage of HB 2198.[1]  It may be that the City can no longer legally use at-large voting for seven of its ten City Council seats, but the fact that *some* of the City's electoral system[2] is now invalid is not ipso facto enough to moot plaintiffs' challenge to that system.  Indeed, the majority opinion acknowledges as much when it recognizes that statutory changes that do not reach the "essence of a plaintiff's claims will not forestall legal challenges to the original statute." *Ante*, at 11.  The crux of plaintiffs' challenge is to at-large voting in the City of Virginia Beach and plaintiffs' complaint outlined an injury and corresponding remedy based on all ten (nonmayoral) at-large districts.  Thus, I do not believe that plaintiffs have been granted "precise relief" by HB 2198 which does not eliminate at-large voting for three of the City Council's seats or determine the boundaries of its defacto seven single-member districts. Rather, in finding this case moot, I believe the majority expands rather than adheres to the Supreme Court's recent decision in *New York State Rifle & Pistol Ass'n v. City of New York*, 140 S. Ct. 1525 (2020) (per curiam), which merely reaffirmed that a case becomes moot when a court is no longer able to grant "effectual" or "precise" relief.

Further, I would find that plaintiffs have standing to pursue this suit and affirm the district court's conclusions on the merits.

---

[1] I agree with the majority, however, that the City's appeal is not moot.

[2] Notably, HB 2198 did not rescind the City's electoral system nor replace that system with an alternative; it merely rendered aspects of the City's plan impermissible under Virginia law.

I.

A.

Article III, § 2 limits our jurisdiction to "Cases" and "Controversies."  *See* US. Const. art. III, § 2, cl.1.  Thus, if a controversy becomes moot, we no longer have jurisdiction to consider it.  "[B]ut it is equally true, that . . . [w]e have no more right to decline the exercise of jurisdiction which is given, than to usurp that which is not given." *Cohens v. Virginia*, 19 U.S. (6 Wheat.) 264, 404, 5 L.Ed. 257 (1821).

A case "becomes moot only when it is impossible for a court to grant any effectual relief whatever to the prevailing party."  *Chafin v. Chafin*, 568 U.S. 165, 172 (2013).  In other words, "[a] case is moot when 'our resolution of an issue could not possibly have any practical effect on the outcome of the matter.'"  *Catawba Riverkeeper Found. v. N. C. Dep't of Transp.*, 843 F.3d 583, 588 (4th Cir. 2016) (quoting *Norfolk S. Ry. Co. v. City of Alexandria*, 608 F.3d 150, 161 (4th Cir. 2010)).  Under this "demanding standard," *Mission Prod. Holdings, Inc. v. Tempnology, LLC*, 139 S. Ct. 1652, 1660 (2019), "[a]s long as the parties have a concrete interest, however small, in the outcome of the litigation, the case is not moot."  *Catawba Riverkeeper*, 843 F.3d at 588.

A challenge to a statute or ordinance typically becomes moot if the challenged provision expires or is rescinded in full.  *See, e.g.*, *Burke v. Barnes*, 479 U.S. 361, 363 (1987); *Trump v. Hawaii*, 138 S. Ct. 377, 377 (2017).  But where a statutory change amends or replaces—rather than rescinds—a challenged law, how much of a change is "enough" to moot a plaintiffs' claim?

22

It is not sufficient that an amended statute "differs in certain respects from the old one." *Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 656, 662 (1993); *see also H.B. Rowe Co. v. Tippett*, 615 F.3d 233, 240 (4th Cir. 2010) (affirming the district court's finding that a challenge to a statute was not moot though "the amended statute did 'away with many of [the] alleged shortcomings of its predecessor' and so 'undoubtably differs from the old [statute] in material respects'" (alterations in original)).  Rather, the relevant inquiry is whether the new ordinance or statute "resolve[s] the primary problem which the Plaintiff first complained of." *H.B. Rowe Co.*, 615 F.3d at 240; *see also Naturist Soc'y, Inc. v. Fillyaw*, 958 F.2d 1515, 1520 (11th Cir. 1992) ("The entire case becomes moot only where 'a superseding statute . . . satisfies *all* the principles sought in an attack on the prior statute.'").  Thus, as the Supreme Court recently confirmed, a change to a statutory framework moots a suit where the change provides "the *precise relief* that petitioners requested in the prayer for relief in their complaint." *N.Y. State Rifle*, 140 S. Ct. at 1526 (emphasis added); *see also Esposito v. S.C. Coastal Council*, 939 F.2d 165, 171 (4th Cir. 1991) (finding a challenge to a statute moot when the challenged law was "superseded by a significantly amended statutory scheme" such that "[the] remedy granted by the district court has become pointless"); *Ciudadanos Unidos De San Juan v. Hidalgo Cnty. Grand Jury Comm'rs*, 622 F.2d 807, 824 (5th Cir. 1980) ("In those cases in which a statutory amendment has been held to moot a controversy arising under the prior version of the statute, the amendment has generally been one which *completely eliminated* the harm of which plaintiffs complained." (emphasis added)).  But where the "gravamen of petitioner's complaint" remains, a statutory change will not render the case moot.  *City*

*of Jacksonville*, 508 U.S. at 662 ("The new ordinance may disadvantage [petitioners] to a lesser degree than the old one, but . . . it disadvantages them in the same fundamental way.").

B.

The City of Virginia Beach has relied on at-large elections for its City Council seats for over fifty years. In 1966 the City adopted an electoral scheme that called for at-large elections for the City Council's eleven members, including the mayor, with seven members required to run from designated residential districts. Although the minority voting age population of Virginia Beach has increased to 38.5 percent, only five Black candidates and one Asian-American candidate have been elected to the City Council since 1966.

Plaintiffs are two Black registered voters and residents of the City of Virginia Beach, one of whom ran unsuccessfully for a City Council seat in 2008. Plaintiffs filed suit against the City of Virginia Beach alleging that its at-large method of election for the City's ten (non-mayoral) City Council seats violates Section 2 of the Voting Rights Act (VRA) because it "submerges Minority Voters so that they are rendered ineffective electoral minorities in most elections" and, therefore, "denies Virginia Beach's Minority Voters an equal opportunity to participate in the political process and elect councilmembers of their choice." J.A. 51–52.[3] Plaintiffs sought "(1) a declaratory judgment that the at-large election system for electing members to the City Council violates their civil rights by unlawfully diluting the voting strength of Minority Voters; (2) an injunction against the

---

[3] Citations to "J.A." refer to the Joint Appendix filed by the parties in this appeal.

further use of at-large elections for the City Council; [and] (3) an order requiring future elections for the City Council to be conducted under a method that complies with the Constitution and the Voting Rights Act." J.A. 48–49.[4]

Following a six-day bench trial, the district court found in plaintiffs' favor and, therefore, declared that "Virginia Beach's at-large method of election" violated Section 2 and enjoined "any further use of the at-large system of election for the Virginia Beach City Council." *Holloway v. City of Virginia Beach*, 531 F. Supp. 3d 1015, 1102 (E.D. Va. 2021). Several months later, the court ordered the City to implement a remedial plan, consisting of ten single-member districts, proposed by a court-appointed Special Master. *Holloway v. City of Virginia Beach*, No. 2:18-cv-69, 2021 WL 6199585, at *3 (E.D. Va. Dec. 22, 2021).

One week before the district court issued its initial decision in this case, the Virginia State Assembly passed HB 2198 which requires that "in a city or town that imposes district-based or ward-based residency requirements for members of the city or town council, the member elected from each district or ward shall be elected by the qualified voters of that district or ward and not by the locality at large." V.A. Code Ann. § 24.2-222 (West 2022) (codifying HB 2198). In other words, under HB 2198, the City of Virginia Beach is now

---

[4] This description of the relief requested by plaintiffs comes from the introduction to the complaint. In the complaint's demand for relief, plaintiffs described their request for relief as follows: "[A]n order (a) [d]eclaring that Virginia Beach's at-large method of electing members to the City Council violates Section 2 of the Voting Rights Act; (b) [e]njoining [d]efendants, . . . from administering, implementing, or conducting any future elections in the City of Virginia Beach under the current at-large method of election; [and] (c) [o]rdering the implementation of an election system for the City Council that complies with Section 2 of the Voting Rights Act." J.A. 61.

prohibited from using a system of at-large voting for the seven seats for which it imposes district residency requirements.[5]   HB 2198, however, has no impact on the three (non-mayoral) at-large seats without residency requirements or on the boundaries of the City's residency districts.

C.

Relying on the Supreme Court's recent decision in *New York State Rifle*, the majority finds that plaintiffs' case became moot with the passage of HB 2198.

In *New York State Rifle*, the Supreme Court considered a constitutional challenge to a New York City ordinance that prohibited gun owners with "premises licenses" from leaving their home with a licensed firearm except when traveling to seven "authorized" gun ranges that were all located within the City of New York.  140 S. Ct. 1525.  Petitioners sought to bring their firearms to gun ranges and second residences located outside of the City.  *Id.* at 1526.  After the Supreme Court granted certiorari to review the case, the City adopted a new rule that permitted licensed gun owners to travel with their firearms "directly" to ranges and second homes outside the City.  *Id.*; *id.* at 1532 (Alito, J., dissenting).  Further, the State of New York also enacted a law preventing any local law, rule, or regulation from barring the holder of a premises license from carrying the licensed firearm "directly to or from" an authorized range or second home.  *See* N.Y. Penal Law § 400.00(6) (McKinney 2019).  Despite these legal changes, petitioners maintained that

---

[5] The residency requirement for these seven seats is included in the City's charter, which can only be modified by the General Assembly.  *See* Va. Beach, Va., Charter § 3.01; Va. Code Ann. §§ 15.2-200 to 203.

their suit was not moot because they had alleged in their amended complaint that the Second Amendment protects "*unrestricted access* to gun ranges and shooting events." *N.Y. State Rifle*, 140 S. Ct. at 1531 (Alito, J., dissenting) (emphasis added). Thus, petitioners argued that "the new rule may still infringe their rights" because "they may not be allowed to stop for coffee, gas, food, or restroom breaks on the way" to gun ranges and second homes. *Id.* at 1526; *see also id.* at 1534 (Alito, J., dissenting) ("The bottom line is that petitioners, who sought 'unrestricted access' to out-of-city ranges and competitions, are still subject to restrictions of undetermined meaning.").

The *New York State Rifle* Court rejected petitioner's argument and held that the suit was moot because "petitioners may now transport firearms to a second home or shooting range outside of the city, which is the *precise relief* that petitioners requested." *Id.* at 1526. The per curiam opinion did not mention plaintiffs' use of the phrase "unrestricted access" in their complaint, but it clearly rejected the argument that such language alone provided a sufficient basis for finding that plaintiffs had not received "precise" relief. *Id.* Rather, the Court characterized plaintiffs' claim regarding their inability to engage in routine stops on the way to shooting ranges or second homes as a "residual claim under the new framework that was understandably not asserted previously" and, therefore, remanded the case to permit plaintiffs to "amend their pleadings or develop the record more fully" on the new claims. *Id.*

The majority, here, analogizes plaintiffs' case to that of the plaintiffs in *New York State Rifle*. But this case is distinguishable. The gravamen of plaintiffs' complaint in *New York State Rifle* was plaintiffs' inability to travel to gun ranges and second homes out of

the City with their permitted weapons.  The mooting legislation in that case then provided *that exact relief*:  the ability to travel with permitted weapons to gun ranges and second homes out of the City.

Unlike the plaintiffs in *New York State Rifle*, plaintiffs here have not received the "precise relief" they sought.  Plaintiffs challenged the City's use of at-large voting for its ten (nonmayoral) City Council seats and did so, under the applicable *Gingles* framework, by comparing the City's at-large electoral system with an illustrative plan consisting of *ten single-member districts* with its boundaries drawn in such a way that the minority citizen voting age population composed a majority in two districts.  J.A. 55.  While HB 2198 now prevents the City from using at-large voting for seven of its Council seats, the legislation does not impact the use of at-large voting for three seats nor does it affect the boundaries of the defacto[6] seven single-member districts.  By applying *New York State Rifle* here, where plaintiffs received only some of the relief requested in their complaint, I believe the majority expands the reach of that case. [7]

---

[6] Unlike in *New York State Rifle*, HB 2198 does not rescind or replace the City's electoral system but merely renders aspects of it illegal.

[7] The dissent in *New York State Rifle* foreshadowed this concern.  *See* 140 S. Ct. at 1539–40 (Alito, J., dissenting).  The dissent provided the following hypotheticals to illustrate the point:

> Suppose that a city council, seeking to suppress a local paper's opposition to some of its programs, adopts an ordinance prohibiting the publication of any editorial without the approval of a city official.  Suppose that a newspaper challenges the constitutionality of this rule, arguing that the First Amendment confers the unrestricted right to editorialize without prior approval.  If the

(Continued)

D.

At bottom, my disagreement with the majority is a matter of degree: how much of a change to a statutory scheme is sufficient to moot a suit related to that statutory scheme? *See City of Jacksonville*, 508 U.S. at 662 (explaining that "[a]t bottom, the dissent differs with us only over the question whether the new ordinance is sufficiently similar to the repealed ordinance that it is permissible to say that the challenged conduct continues"). To answer that question, we must identify the crux of the underlying suit and compare the relief requested with the relief provided by the allegedly mooting statutory change. *See id.* ("The gravamen of petitioner's complaint is that its members are disadvantaged in their

---

council then repeals its ordinance and replaces it with a new one requiring approval only if the editorial concerns one particular city program, would that render the pending lawsuit moot and require the paper to commence a new one?

Or take this example. A State enacts a law providing that any woman wishing to obtain an abortion must submit certification from five doctors that the procedure is medically necessary. After a woman sues, claiming that any requirement of physician certification is unconstitutional, the State replaces its old law with a new one requiring certification by three physicians. Would the court be required to dismiss the woman's suit? Suppose the court, following the precedent set by today's decision, holds that the case is moot, and suppose that the woman brings a second case challenging the new law on the same ground. If the State repeals that law and replaces it with one requiring certification by two doctors, would the second suit be moot? And what if the State responds to a third suit by enacting replacement legislation demanding certification by one doctor?

*Id.* at 1539–40 (Alito, J., dissenting). Of course, the *New York State Rifle* dissenters also argued that the amended legislation at issue in that case "reduce[d] but d[id] not eliminate the injury originally alleged" based on plaintiffs' use of the phrase "unrestricted access" in their complaint—an argument the majority rejected. *Id.* at 1540. As I have explained, this case is distinguishable because plaintiffs requested an end to at-large voting for City Council elections in Virginia Beach and HB 2198 fails to give them that "precise relief."

efforts to obtain city contracts . . . . [I]nsofar as [the new ordinance] accords preferential treatment to [B]lack- and female-owned contractors[,] . . . it disadvantages [petitioners] in the same fundamental way."); *see also N.Y. State Rifle*, 140 S. Ct. at 1526 (finding mootness where petitioners received "the *precise relief* [they] requested in the prayer for relief in their complaint").

The gravamen of plaintiffs' complaint is that the at-large feature of the electoral scheme for Virginia Beach's ten (nonmayoral) City Council seats has "interact[ed] with social and historical conditions" in the City and resulted in Minority Voters having "less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." [8] *Thornburg v. Gingles*, 478 U.S. 30, 47, 75 (1986) (quoting 42 U.S.C. § 1973(b)).  Plaintiffs' allegations refer generally and repeatedly to the City's "*at-large* method of election."   And plaintiffs sought to challenge the at-large election of *all ten* (nonmayoral) seats—not solely those with residency districts.  For

---

[8] The majority, however, argues that plaintiffs' challenge must be limited to the *particular* electoral system which employed at-large voting for all ten seats and residency districts for seven seats—not to the use of "*any* at-large voting in City Council elections," *ante*, at 12—because finding otherwise would violate the congressional mandate that "there is nothing, per se, unlawful about at-large elections system[s]."  S. Rep. No. 97-417, at 68 (1982), *as reprinted in* 1982 U.S.C.C.A.N. 177, 246.  But plaintiffs' challenge is not to at-large voting *in the abstract* but rather to at-large voting for *City Council members in Virginia Beach* which plaintiffs alleged, and the district court found, has "interact[ed] with social and historical conditions" such that minority voters have "less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice."  *Gingles*, 478 U.S. at 47, 75 (quoting 42 U.S.C. § 1973(b)); *see also* S.J.A. 247 ("[T]he degree to which an at-large district diluted minority voting in Virginia Beach was a central element of the Court's finding that the previous map (with three at-large districts and seven districts voting at-large but with a residency requirement for candidates) violated the Voting Rights Act.").

example, plaintiffs alleged that "[t]he consistent defeat of minority preferred candidates would not occur if the City Council were elected using *ten* single-member voting districts" and that "Virginia Beach's minority population is sufficiently numerous and geographically compact to form a majority of the total population and citizen voting age population in at least two single-member City Council districts in a demonstrative *10-district plan*." J.A. 55 (emphasis added). Indeed, the introduction to plaintiffs' amended complaint described their request for injunctive relief as one for "an injunction against *the further use of at-large elections* for the City Council." J.A. 48–49 (emphasis added).

That plaintiffs would draft their complaint in this way makes sense in the context of *Gingles*. The quintessential *Gingles* suit challenges alleged vote dilution through the use of multi-member districts or an at-large electoral scheme.[9] *See, e.g.*, *id.* at 42, 46–51; *McGhee v. Granville Cnty.*, 860 F.2d 110, 116–17 (4th Cir. 1988). In *Gingles*, the Court considered whether a three-judge district court had correctly held that "the use in a legislative redistricting plan of multimember districts in five North Carolina legislative districts violated § 2." *Gingles*, 478 U.S. at 34. The *Gingles* Court first found that the 1982 congressional amendments to Section 2 had "deliberately codified" "the dilution

---

[9] While the Supreme Court has now also applied the *Gingles* preconditions in vote dilution claims challenging single-member districts, such as where vote fragmentation is at issue, it explained that it did so because "[i]t would be peculiar to conclude that a vote-dilution challenge to the (more dangerous) multimember district requires a higher threshold showing than a vote-fragmentation challenge to a single-member district." *Growe v. Emison*, 507 U.S. 25, 40 (1993) ("We have . . . stated on many occasions that multimember districting plans, as well as at-large plans, generally pose greater threats to minority-voter participation in the political process than do single-member districts.").

concept."[10]   *McGhee*, 860 F.2d at 117.   The *Gingles* Court next sought to reconcile Congress's adoption of a results test[11] for vote dilution claims under Section 2 with the express limitations it placed on such claims, namely that at-large elections "may not be considered *per se* violative of § 2" and that "the conjunction of an allegedly dilutive electoral mechanism and the lack of proportional representation does not establish a violation."[12]   *Gingles*, 478 U.S. at 46.   The *Gingles* Court, therefore, found that three

---

[10] "Section 2 prohibits all forms of voting discrimination, not just vote dilution." *Gingles*, 478 U.S. at 45 n.10.   But the Supreme Court "has long recognized that multimember districts and at-large voting schemes may 'operate to minimize or cancel out the voting strength of racial [minorities in] the voting population.'"   *Id.* at 47 (quoting *Burns v. Richardson*, 384 U.S. 73, 88 (1966)).   The concept underlying such claims "is that racial minorities may not have their group power impermissibly 'diluted' by multimember districting or at-large electoral processes which 'submerge' the minority group in a voting constituency in which the voting power of a racially 'bloc-voting' white majority always insures defeat for the candidates of the minority group's choice."   *McGhee*, 860 F.2d at 116 (citing *Gingles*, 478 U.S. at 46).   As we have previously recognized, vote dilution "is a distinctive way which in recent times, with the gradual eradication of most of the more direct historical forms of outright denials or subversions of voting power and access itself—literacy tests, poll taxes, anti-single shot laws and the like—has become the dominant remaining means of voting rights violations, and hence the most frequent focus of contemporary legal challenges."   *Id.* (noting also that vote dilution is "more subtle" than the "more brutally direct formal devices now largely of the past").

[11] The Supreme Court held in 1980, in *Mobile v. Bolden*, 446 U.S. 55 (1980), that a showing of purposeful discrimination was required to sustain a Section 2 claim.   Prior to *Bolden*, courts had generally considered whether, under the totality of the circumstances, a challenged election practice "operated to minimize or cancel out the voting strength of a racial group."   *McNeil v. Springfield Park Dist.*, 851 F.2d 937, 940 (7th Cir. 1988); *see also Gingles*, 478 U.S. at 35.   In amending Section 2 in 1982, Congress overturned the "intent" test and instead codified the pre-*Bolden* "results" test.   *Gingles*, 478 U.S. at 35.

[12] Congress was concerned that "without adequate legal constraints upon judicial discretion to find and remedy mere vote dilution 'results,' the inevitable consequence would be a proportional representation approach."   *McGhee*, 860 F.2d at 117.   Thus, (Continued)

circumstances were "necessary preconditions for multimember districts to operate to impair minority voters' ability to elect representatives of their choice": the minority group must be able to show that 1) "it is sufficiently large and geographically compact to constitute a majority in a single-member district," 2) "it is politically cohesive [and]," 3) "the white majority votes sufficiently as a bloc to enable it . . . usually to defeat the minority's preferred candidate." *Id.* at 50–51; *see also McGhee*, 860 F.2d at 117 ("The judicial and legislative process of putting principled bounds upon the vote dilution concept has now culminated in the Supreme Court's exhaustive analysis [in *Gingles*] of the concept as codified . . . [, including] find[ing] in it three threshold proof requirements.").

The *Gingles* Court explained that unless the first precondition is met, the "*multi-member form* of the district cannot be responsible for minority voters' inability to elect its candidates" because minority voters must "possess the potential to elect representatives in the absence of the challenged structure or practice."[13] *Id.* at 50 & n.17 (explaining further

Congress added a proviso to Section 2(b), the "Dole Compromise" proviso, which states "[t]hat nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population." 8 U.S.C. § 1973(b). The Senate Report accompanying the 1982 amendments also stressed that "there is nothing, per se, unlawful about at-large elections system. [sic] only when such systems operate, in the context of other objective factors and the totality of the circumstances, to effectively deny members of a minority group the opportunity to participate equally in the process, is a violation established." S. Rep. No. 97-417, at 68, *as reprinted in* 1982 U.S.C.C.A.N. 177, 246; *see also Gingles*, 478 U.S. at 46.

[13] As to the second and third preconditions, the Court explained that "[i]f the minority group is not politically cohesive, it cannot be said that the selection of a multimember electoral structure thwarts distinctive minority group interests" and that "the minority group [must] demonstrate[] that submergence in a white multimember district (Continued)

that "if the minority group is spread evenly throughout a multimember district, or if, although geographically compact, the minority group is so small in relation to the surrounding white population that it could not constitute a majority in a single-member district, these minority voters cannot maintain that they would have been able to elect representatives of their choice in the absence of the multimember electoral structure"); *see also McGhee*, 860 F.2d at 117; *Brewer v. Ham*, 876 F.2d 448, 455 (5th Cir. 1989) (explaining that the "at-large feature of the election system, by itself, cannot be said to violate Section 2" unless the minority is "assured the power to elect representatives of its choice" under "a single-member districting plan"). And the Court elaborated that "[t]he single-member district is generally the appropriate standard against which to measure minority group potential to elect because it is the smallest political unit from which representatives are elected." *Id.* at 50 n.17.

Thus, as we have previously recognized,

implicit in the *Gingles* Court's analysis of the nature of § 2 vote dilution claims is the notion that, so far as those claims are concerned, right and remedy are inextricably bound together, for *to prove vote dilution by districting one must prove the specific way in which dilution may be remedied by redistricting.*

---

impedes its ability to elect its chosen representatives." *Gingles*, 478 U.S. at 51; *see also Growe*, 507 U.S. at 40 ("The 'geographically compact majority' and 'minority political cohesion' showings are needed to establish that the minority has the potential to elect a representative of its own choice in some single-member district. And the 'minority political cohesion' and 'majority bloc voting' showings are needed to establish that the challenged districting thwarts a distinctive minority vote by submerging it in a larger white voting population." (citation omitted)).

*McGhee*, 860 F.2d at 120 (emphasis added); *see also Growe v. Emison*, 507 U.S. 25, 40–41 (1993) ("Unless these [*Gingles* preconditions] are established, there neither has been a wrong nor can be a remedy."); *Hines v. Mayor & Town Council of Ahoskie*, 998 F.2d 1266, 1273 (4th Cir. 1993) (citing *McNeil v. Springfield Park Dist.*, 851 F.2d 937, 942–43 (7th Cir. 1988)).

Plaintiffs here followed the dictates of *Gingles* and compared Virginia Beach's at-large electoral system with an illustrative plan composed of *ten*[14] single-member districts drawn in such a way that the minority citizen voting age population composed a majority in two.[15]  J.A. 55; *see also Gingles*, at 51 n.17; *Collins v. City of Norfolk*, 883 F.2d 1232, 1237 (4th Cir. 1989).  Because this comparison is the basis of plaintiffs' alleged injury, plaintiffs challenge was to at-large voting for all ten (nonmayoral) City Council districts.

---

[14] We have previously explained that federal courts should defer to legislative choices regarding the proper size of a legislative body and, therefore, "[a]ctionable vote dilution must be measured against the number of positions in the existing governmental body rather than some hypothetical model based upon whatever size is necessary to accomplish proportional representation." *Hines v. Mayor & Town Council of Ahoskie*, 998 F.2d 1266, 1271 (4th Cir. 1993) (quoting *Overton v. City of Austin*, 871 F.2d 529, 543 (5th Cir. 1989) (Jones, J., concurring)).  Relying on the existing number of seats as the proper yardstick also ensures that plaintiffs cannot "create a voting right violation where none presently exist" by "[a]dding seats to the boards" to enable them to meet the first prong of *Gingles*.  *McNeil*, 851 F.2d at 946.

[15] Notably, plaintiffs' expert tasked with designing this illustrative plan compared its boundaries to those of the City Council's residency plan and provided Census data showing that the minority citizen voting age population did not form a majority in any of the existing residency districts.  J.A. 1369–76; J.A. 1379–86; J.A. 1413 ("The current City Council plan has zero majority [minority] combined [citizen voting age population] districts."); *see also Holloway*, 531 F. Supp. 3d at 1058 ("Mr. Fairfax drew up ten illustrative plans and . . . compared [them] to the current City Council Seven District Residency Plan . . . .").

The majority stresses that this case is moot, however, because under the "flexible" and "fact-intensive" totality-of-the-circumstances analysis required to prove a violation of Section 2, *Gingles*, 478 U.S. at 46,[16] plaintiffs and the district court "focus[ed] on the history and effects of [the] particular electoral system that uniquely required *all* candidates to run at-large and *most* candidates to do so from especially problematic designated districts," *ante*, at 17.  But it cannot be that a change to *any aspect* of an electoral system, renders a VRA challenge to that system moot simply because of the wholistic and fact-based nature of the totality-of-the-circumstances analysis.[17]  Indeed, such a rule would

---

[16] As the *Gingles* Court explained, even if plaintiffs can satisfy the three necessary preconditions, they must still demonstrate—as with any Section 2 violation—that, under the totality of the circumstances, the challenged "electoral structure operates to minimize or cancel out their ability to elect their preferred candidates." *Gingles*, 478 U.S. at 48 (citing S. Rep. No. 97-417, at 16 (1982), *as reprinted in* 1982 U.S.C.C.A.N. 177, 193); *see also De Grandy v. Johnson*, 512 U.S. 997, 1009–13, 1012 n.10 (1994).  Although, "several of our sister circuits have acknowledged that where a plaintiff establishes the *Gingles* prerequisites, that plaintiff is likely to succeed under the totality of the circumstances." *Baten v. McMaster*, 967 F.3d 345, 379 (4th Cir. 2020), *as amended* (July 27, 2020) (Wynn, J., dissenting) (collecting cases); *see also Jenkins v. Red Clay Consol. Sch. Dist. Bd. of Educ.*, 4 F.3d 1103, 1116 n.6 (3d Cir. 1993) ("[I]t would be a highly unusual case in which a plaintiff successfully proved the existence of the three *Gingles* factors and still failed to establish a violation.").

In determining what "proof [is] required to establish [Section 2] violations," the Senate Report accompanying the 1982 amendments to Section 2 identified nine factors relevant to the totality-of-the-circumstances analysis. *Gingles*, 478 U.S. at 43–45.  The *Gingles* Court, however, emphasized that this "list of typical factors is neither comprehensive nor exclusive. . . . [and that] there is no requirement that any particular number of factors be proved, or that a majority of them point one way or the other." *Id.* at 45.

[17] If this were the test, then even changes that increased rather than lessened the alleged harm would moot the suit.  *See generally Montana Green Party v. Jacobsen*, 17 (Continued)

swallow our mootness jurisprudence and deprive us of jurisdiction following even the most minor statutory changes.

For example, we have previously recognized that the use of staggered terms may "enhance" the dilutive effect of at-large electoral schemes. *City of Norfolk*, 883 F.2d at 1236. And, indeed, in this case, the district court explained as part of its totality-of-the-circumstances analysis that the City's use of staggered terms[18] "promoted the dilution of minority voting strength" by "minimiz[ing] the influence of single-shot voting" and, therefore, that the City's use of staggered terms provided evidence that the "third factor"—the "extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices and procedures that may enhance the opportunity for discrimination"—was met. *Holloway*, 531 F. Supp. 3d at 1084–85. Yet, if the Virginia General Assembly had passed legislation prohibiting the use of staggered terms in City Council elections—instead of HB 2198—that change alone could certainly not have provided plaintiffs with sufficient relief to render this case moot.

_____

F.4th 919, 922 (9th Cir. 2021) (finding a case not moot where "the amended law disadvantages Plaintiffs to a slightly *greater degree* than the previous law").

[18] The City's use of staggered terms is relevant to the three at-large seats without residency districts and, therefore, its relevance is unchanged by HB 2198.

37

Similarly, here, while the district court examined the City's use of residency districts and its use of at-large voting for all, rather than some, of its Council seats,[19] the elimination

_____

[19] For example, when considering the third factor, the court found that there was evidence that Virginia Beach had an anti-single shot system because by combining at-large voting with residency districts, the City effectively prevented minorities from concentrating their vote behind a limited number of candidates and, therefore, "enhance[d] the dilutive effect of at-large elections." *Holloway*, 531 F. Supp. 3d at 1084. But this was only one part of the court's analysis under the third factor. The court also noted that the use of staggered terms for City Council elections functioned to prevent single-shot voting. And the court highlighted another, separate, reason that it found the third factor met: the "unusually large election districts" at issue. *Id.* As the court explained, "[i]n Virginia Beach, minority candidates running for the at-large seats are expected to campaign across 249 miles which requires immense resources." *Id.* At 249 square miles, the City is "essentially tied for second" in Virginia "in the size of the area candidates must traverse to win a city council position." *Id.* The court stressed the intrinsic concerns present with geographically large election districts, including that "given structural socioeconomic and social disadvantages that minority communities face, at-large districts heavily disadvantage minority candidates because [they] 'are likely to have less access to the necessary resources for travel and advertising' outside the immediate area surrounding the candidates' homes." *Id. See generally United States v. Charleston Cnty., S.C.*, 365 F.3d 341, 352 (4th Cir. 2004) (noting that the County's large size "work[ed] to the detriment of minority candidates, who typically have fewer financial resources, in particular because costly television advertising and direct mail have proven important in recent Council elections"). Additionally, the court noted that Virginia Beach's population of 450,000 is the largest in Virginia and, therefore, "the City has the largest electorate for which a candidate must compete." *Holloway*, 531 F. Supp. 3d at 1084. Indeed, Virginia Beach's population is *twice* that of the next largest city: Norfolk. Finally, the court highlighted that, under one of the illustrative plans proposed by plaintiffs, "the mean district sizes would be 24.9 square miles, reducing the area for electoral competition by 90 percent." *Id.*

Further, when considering the ninth factor—"whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous"—the court noted that none of the twelve other cities in Virginia with populations above 50,000 "share[] Virginia Beach's combination of at-large elections, designated seats for most positions, and staggered terms" and that the City "ha[d] not proffered a reasonable explanation for designing such a system." *Id.* at 1102. But the core of the court's finding under this factor was that the City had "not offered a credible and reasonable justification for maintaining its at-large electoral system"—an (Continued)

of these electoral features does not ipso facto render the court's totality-of-the circumstances analysis groundless. As the *Gingles* Court explained, a court need not find that every Senate factor weighs in favor of a Section 2 violation. *Gingles*, 478 U.S. at 45 ("[T]his list of typical factors [considered] is neither comprehensive nor exclusive. . . . [and there is no requirement that any particular number of factors be proved, or that a majority of them point one way or the other."); *see also* S. Rep. 97-417, at 239 (1982), *as reprinted in* 1982 U.S.C.C.A.N. 177, 410 ("The courts ordinarily have not used these factors, nor does the committee intend them to be used, as a mechanical 'point counting' device."). And some factors are more important than others in the context of a vote dilution challenge to at-large or multimember districts. *Id.* at 48 n.15. Notably, the use of "electoral devices which enhance the dilutive effects of multimember districts" such as unusually large election districts or anti-single shot provisions "are supportive of, but not essential to" a Section 2 challenge to at-large voting. *Id.* (emphasis removed).

Here, the district court went above and beyond what is required; it considered *all nine* of the Senate factors and found that *each one* weighed in favor of finding a Section 2 violation. Thus, even if one—or several—factors no longer weigh in favor of finding a

---

absence which was particularly egregious given that "the Minority Community ha[d] advocated for decades for the City to change the at-large district [system]." *Id.* at 1101–02. In any case, as the court explained, where a "procedure markedly departs from . . . practices elsewhere in the jurisdiction, that bears on the fairness of its impact. But even a consistently applied practice premised on a racially neutral policy would not negate a plaintiff's showing through other factors that the challenged practice denies minorities fair access to the process." *Id.* at 1102 n.45 (citing S. Rep. No. 97-417, at 29 n.117 (1982), *as reprinted in* 1982 U.S.C.C.A.N. 177, 207 n.117).

Section 2 violation, that does not necessarily undermine the court's conclusion. *See United States v. Charleston Cnty., S.C.*, 365 F.3d 341, 353 (4th Cir. 2004).

And, in this case, I do not find that the district court's totality-of-the-circumstances analysis hinged on the City's prior use of residency districts or the fact that all—instead of some—of its districts were elected at-large.  Rather, at the core of the district court's totality-of-the-circumstances analysis was the determination that at-large voting for City Council members in Virginia Beach has "interact[ed] with social and historical conditions" in Virginia Beach to deny minority voters an equal opportunity "to participate in the political process and elect representatives of their choice."  *Gingles*, 478 U.S. at 47, 75 (quoting 42 U.S.C. § 1973(b)); *cf. ante*, at 17 (acknowledging that "the district court did assess the general effects of at-large voting in Virginia Beach").  Indeed, during the remedial phase of this litigation, the Special Master likewise explained that an electoral scheme which "retain[ed] an at-large feature for some of [the City Council] districts" would not remedy plaintiffs' injury because "the degree to which an at-large district diluted minority voting in Virginia Beach was a *central element* of the Court's finding that the previous map (with three at-large districts and seven districts voting at-large but with a residency requirement for candidates) violated the Voting Rights Act."  S.J.A. 247 (emphasis added).

E.

Having determined that the core of plaintiffs' challenge is to the use of at-large voting by the City of Virginia Beach for its (non-mayoral) City Council seats, I next consider whether HB 2198 nevertheless provides a sufficient remedy to moot this suit.  In

40

considering the scope of relief that may be granted to plaintiffs if they prevail and reaching the conclusion that plaintiffs' suit remains live, I am informed by our jurisprudence regarding remedies in the context of voting rights challenges to electoral processes and districting schemes.

In discussing the proper judicial remedy for Section 2 violations, the Senate Report accompanying the 1982 amendments stated that:

> The court should exercise its traditional equitable powers to fashion the relief so that it *completely* remedies the prior dilution of minority voting strength and *fully* provides equal opportunity for minority citizens to participate and to elect candidates of their choice.

S. Rep. No. 97-417, at 31 (emphases added).  Although the Report does not "define the standard against which 'completeness' of the remedy is to be measured," we have previously recognized the "principle[]" derived from Section 2 and *Gingles* that "[i]f a vote dilution violation is established, the appropriate remedy is to restructure the districting system to eradicate, to the <u>maximum extent possible</u> *by that means*, the dilution proximately caused by that system."  *McGhee*, 860 F.2d at 118 & n.8 (first emphasis added).

In *McGhee*, both parties stipulated that Granville County's at-large electoral system with staggered terms for its Board of Supervisors violated Section 2.  *McGhee*, 860 F.2d at 112–13.  After receiving remedial proposals from both parties, the district court adopted a version of plaintiffs' "limited voting plan" which called for the simultaneous at-large election of all Supervisors—with each voter entitled to vote for a maximum of two candidates.  *Id.* at 114.  We reversed the district court and instead approved the remedial

41

"single member district electoral plan" proposed by the County even though, despite making up more than 40 percent of the voting age population, Black voters were "likely g[iven] . . . a chance to elect only one commissioner (14% [of the board])" under the plan. *Id.* at 114. We explained that, under *Gingles*, "[t]he maximum extent to which a particular dilution violation may be remedied by restructuring the districting system is constrained by the size, compactness, and cohesion elements of the dilution concept," *id.* at 118, and plaintiffs had conceded that it was "not possible to draw a five or seven single member district plan that gives [B]lack voters any better opportunity to elect representatives of their choice," *id.* at 113. We, therefore, found that the County's proposed single-member district remedial plan was a "complete" remedy because it afforded "the *maximum* remedy possible *by redistricting*"—the *means* at the heart of a dilution claim.[20] *Id.* at 118 (emphases added).

The Supreme Court has also repeatedly reaffirmed that single-member districts are the preferred judicial remedy in the voting rights context. *E.g.*, *Growe*, 507 U.S. at 40 (explaining that the Supreme Court has "stated on many occasions that multimember districting plans, as well as at-large plans, generally pose greater threats to minority-voter participation in the political process than do single-member districts, which is why we have strongly preferred single-member districts for federal-court-ordered reapportionment"

---

[20] In adopting plaintiffs' limited voting plan, we found that the district court had impermissibly sought "to eradicate the dilution by altering other 'electoral laws, practices, and structures' that were not actually challenged by the claim as made." *McGhee*, 860 F.2d at 118. Because the "violation established was vote dilution specifically caused by an at-large electoral scheme," a single-member district plan was the "appropriate remedy." *Id.* at 118–19.

42

(citations omitted)); *Wise v. Lipscomb*, 437 U.S. 535, 540 (1978) ("Among other requirements, a court-drawn plan should prefer single-member districts over multimember districts, absent persuasive justification to the contrary.  We have repeatedly reaffirmed this remedial principle." (citations omitted)); *Chapman v. Meier*, 420 U.S. 1, 26–27 ("We hold today that unless there are persausive [sic] justifications, a court-ordered reapportionment plan of a state legislature must avoid use of multimember districts.").

In sum, the "complete" judicial remedy for a voting dilution injury based on at-large voting, is a single-member district plan with its boundaries drawn to ensure the harmed minority group is provided an equal opportunity to elect representatives of its choice.  And, in fact, at the remedial stage, the district court adopted the Special Master Plan, which consists of a ten-seat single-member district system drawn to permit three opportunity-to-elect seats for minority voters.  Defendants had proposed two remedial "concept plans"— a 7-3 plan and a 10-district plan—both of which the Special Master rejected as insufficient to remedy the Section 2 violation found by the district court.  S.J.A. 52–53; S.J.A. 243–256.  Notably, even the 7-3 remedial plan proposed by defendants did not retain at-large voting for any of the (non-mayoral) City Council seats and was instead composed of seven single-member districts and three single-member "super wards."  S.J.A. 52 ("In this system, every resident in Virginia Beach would be represented by one district seat, one super ward seat, and the mayor.").  Indeed, as the Special Master explained, "retain[ing] an at-large feature for some of [the City's] districts"[21] would fail to correct the City's

---

[21] The Special Master appears to have incorrectly interpreted the 7-3 plan as retaining an at-large feature for the three super ward seats.  S.J.A. 247.

Section 2 violation because "the degree to which an at-large district diluted minority voting in Virginia Beach was a central element of the Court's finding that the previous map (with three at-large districts and seven districts voting at-large but with a residency requirement for candidates) violated the Voting Rights Act." S.J.A. 247.

Thus, I do not find that plaintiffs have been granted effectual or precise relief by legislation that prevents the use of at-large voting for only some of the City's Council seats and without regard to the boundaries of those districts.

The majority notes that we previously recognized that a Section 2 challenge became moot in an identical scenario, albeit in an unpublished case. In *NAACP v. Winston-Salem/Forsyth County Board of Education*, No. 91–1222, 1992 WL 64875, at *1 (4th Cir. Apr. 3, 1992) (unpublished table decision), we acknowledged that a challenge to an electoral system for the County's Board of Education members was mooted by the passage of a state law. Under the former system, the Board's nine members were all elected at-large to staggered terms. *Id.* After plaintiffs filed suit against the Board challenging the system, the state legislature passed a bill adopting a "2-4-3 plan" made up of "a two-member majority [B]lack district, a four-member majority white district, and three members elected at-large" with all members elected concurrently. *Id.* The "2-4-3 plan" did not merely involve a shift from nine at-large seats to six single-district and three at-large seats but also included the boundaries of the six new single-member districts. *See id.* at *1–2. Notably, the 2-4-3 plan "had previously been *proposed by plaintiffs*" during settlement negotiations. *Id.* at *2 (emphasis added). Thus, the *Winston-Salem* plaintiffs did not argue that they had not received complete relief. *See id.* In fact, the issue we

44

considered in that case was whether the district court erred in denying plaintiffs' request for a declaration that they were "prevailing parties" based on the relief received by the 2-4-3 plan. *Id.* We affirmed the district court's dismissal with prejudice and found that plaintiffs were not prevailing parties because the state legislature—not the Board—had adopted the 2-4-3 plan mooting the controversy. *Id.* ("In the absence of evidence of a catalytic action by plaintiffs bringing [the mooting legislation] into being, there is at most unverified suspicion, but no evidence, that the plaintiffs 'contributed in a significant way' and thus were prevailing parties."). Thus, in *Winston-Salem*, we did not find that a statutory change that results in "some of the members" of a governing body being elected in single-member districts provided sufficient relief to moot a challenge to an all at-large electoral system. Rather, the undisputed mootness of plaintiffs' suit was due to the "relief" "give[n]" to plaintiffs in that case, which was identical to relief they had requested. *Id.* at *1–2.

In conclusion, the enactment of HB 2198 neither addresses the entirety of the remedy sought by the plaintiffs nor the wrongs found by the district court. Thus, I would find that HB 2198 does not moot this suit.

## II.

Because I would not find this case moot, I also reach the City's other jurisdictional argument that plaintiffs, two Black voters, lack standing because they improperly seek to assert the rights of Hispanic and Asian voters in the City by bringing a coalition claim. It is true that, ordinarily, a litigant "must assert his own legal rights and interests and cannot rest his claim to relief on the legal rights or interests of third parties." *U.S. Dep't of Lab.*

45

*v. Triplett*, 494 U.S. 715, 721 (1990) (citing *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 474 (1982)).  But in invoking the third-party standing doctrine here, the City overlooks the text of the VRA and misconstrues the nature of plaintiffs' claims.

Under the City's theory, plaintiffs alleging a coalition claim under the VRA lack standing unless a representative from each minority group alleged to be part of the coalition is present.  In arguing that plaintiffs seek to assert the rights of Hispanic and Asian voters by bringing a coalition claim, however, the City conflates the standing and mootness inquiries.  *See Kumar v. Frisco Indep. Sch. Dist.*, 476 F. Supp. 3d 439, 463 (E.D. Tex. 2020) (noting the "tension that *Gingles* and the third-party standing doctrine may elicit" but finding the two legal doctrines distinguishable).

The VRA provides that "an aggrieved person" may bring suit under the Act.[22]  52 U.S.C. § 10302.   Thus, the statute does not require a class action and expressly contemplates that a sole plaintiff may bring a VRA challenge.  *See Kumar*, 476 F. Supp. 3d at 460–61 ("A class action is not mandated by the text.  Moreover, the Court is unaware of any authority which prohibits individual representation in a Voting Rights Act case.").

---

[22] Initially, only the Attorney General had standing to enforce the VRA.  Then, in *Allen v. State Bd. of Elections*, 393 U.S. 544, 557 (1969), the Supreme Court extended standing to "private citizens . . . seek[ing] judicial enforcement of the prohibition." Congress later amended the VRA to expressly provide "aggrieved person[s]" with standing to enforce the Act.  *See Roberts v. Wamser*, 883 F.2d 617, 621 (8th Cir. 1989); 52 U.S.C. § 10302.

Plaintiffs allege that they are *personally* aggrieved because, as Black voters in the City, *their votes* are diluted by the use of at-large voting for City Council seats in violation of Section 2 of the Voting Rights Act.  J.A. 49, 51–52.  In bringing this suit, therefore, plaintiffs assert only their own rights.[23]  Indeed, they do not assert the rights of non-party Hispanic and Asian voters any more than they assert the rights of non-party Black voters. Instead, the cohesiveness of the alleged coalition of Black, Hispanic, and Asian voters in Virginia Beach ("the Minority Community") is relevant to the *Gingles* framework—the evidentiary vehicle through which plaintiffs seek to prove their claim.  *See Kumar*, 476 F. Supp. 3d at 463 (explaining that "[t]he *Gingles* framework sets out a threshold evidentiary burden, not a proxy test for standing").

Thus, I would affirm the district court's finding that plaintiffs have standing.

## III.

The district court also found that plaintiffs had successfully proved a Section 2 claim.  First, the district court found that plaintiffs had established each of the *Gingles* preconditions.  The district court then found that plaintiffs had shown that, under the totality of the circumstances, the Minority Community "has less opportunity than other members of the electorate to participate in the political process and elect their preferred

---

[23] In this way, this case is distinguishable from *Nordgren v. Hafter*, 789 F.2d 334 (5th Cir. 1986), cited by the City, which found that "a white Jewish female . . . cannot successfully assert standing *on behalf of* aggrieved [B]lack applicants to the Mississippi bar.  She is not their representative."  *Id.* at 338 (emphasis added).

candidates." *Holloway*, 531 F. Supp. 3d at 1080.  "[W]e may set aside a trial court's finding of vote dilution only if it is clearly erroneous."  *Charleston Cnty.*, 365 F.3d at 349.

A.

On appeal, the City argues that the district court erred in finding any of the three *Gingles* preconditions met.

i.

The district court found that plaintiffs had satisfied the first *Gingles* precondition because they had demonstrated that the Minority Community was sufficiently large and geographically compact to constitute a majority in a single-member district.

In reaching this conclusion, the district court considered evidence presented by plaintiffs' expert witness, Anthony Fairfax, of ten illustrative plans, each drawn with one or two districts in which the Minority Community would make up a majority of the citizen voting age population.  The court credited Mr. Fairfax as "a credible expert witness" and found that in drawing the illustrative districts, he had "properly used the five common redistricting criteria:  equal population, contiguity, compactness, minimization of political subdivision splits of Voter Tabulation Districts ('VTDs'), and preservation of communities of interest." *Holloway*, 531 F. Supp. 3d at 1057–58.  "[O]ur function is not to reweigh the evidence presented to the district court." *Charleston Cnty.*, 365 F.3d at 349.  And I do not find that the district court clearly erred in reaching this conclusion.

The City objects, however, that the district court committed legal error in permitting plaintiffs to rely on a coalition of Black, Hispanic, and Asian voters in Virginia Beach to prove their claim.  We have not yet decided whether such "coalition claims" are permissible

48

to prove a Section 2 violation, and the Supreme Court has expressly reserved the question.[24]

*Bartlett v. Strickland*, 556 U.S. 1, 13–14 (2009) ("We do not address that type of coalition

district here."); *see also Growe*, 507 U.S. at 41 ("Assuming (without deciding) that it was

permissible for the District Court to combine distinct ethnic and language minority groups

for purposes of assessing compliance with § 2, . . .").  But many of our sister circuits have

expressly accepted or assumed that minority coalitions are cognizable for Section 2 claims.

*See Campos v. City of Baytown*, 840 F.2d 1240, 1244 (5th Cir. 1988); *Concerned Citizens*

*of Hardee Cnty. v. Hardee Cnty. Bd. of Comm'rs*, 906 F.2d 524, 526 (11th Cir. 1990);

*Badillo v. City of Stockton*, 956 F.2d 884 (9th Cir. 1992); *Bridgeport Coal. for Fair*

*Representation v. City of Bridgeport*, 26 F.3d 271 (2d Cir. 1994).  *But see Nixon v. Kent*

*Cnty.*, 76 F.3d 1381, 1386–87 (6th Cir. 1996) (en banc).

The district court found that plaintiffs could bring a coalition claim here because

such claims are "consistent with the language and the purpose of the VRA."  *Holloway*,

531 F. Supp. 3d at 1053.  We review such legal determinations de novo.  *Raleigh Wake*

*Citizens Ass'n v. Wake Cnty. Bd. of Elections*, 827 F.3d 333, 340 (4th Cir. 2016).

Section 2(a) of the VRA prohibits any voting standard or practice that "results in a

denial or abridgment of the right of any citizen of the United States to vote on account of

race and color," or language-minority status.  52 U.S.C. §§ 10301(a), 10303(f).  Section

---

[24] Coalition claims are distinct from cross-over claims, which we, and the Supreme Court, have previously rejected.  *Hall v. Virginia*, 385 F.3d 421, 431 (4th Cir. 2004); *see also Bartlett*, 556 U.S. 1.  Cross-over claims are those involving "communities in which minority citizens are able to form coalitions" with white voters.  *Hall*, 385 F.3d at 431.

2(b) then sets forth how to establish a violation of Section 2(a) and explains that the provision applies to "members of a class of citizens protected by subsection (a)." *Id.* at § 10301(b). Employing a plain reading of the text, the district court found that the VRA does not require each member of the "class" referenced in Section 2(b) "to be of the same race, color, or language minority status." *Holloway*, 531 F. Supp. 3d at 1053. Rather, the members of the "class" must "share the common trait of being denied the right to vote based on their race, color, or language," *id.*, or, in other words, of being "protected by subsection (a)." 52 U.S.C. § 10301(b).

The City, however, invokes the reasoning of our colleagues on the Sixth Circuit who have rejected coalition claims because "§ 2 of the Voting Rights Act does not mention minority coalitions" and because "§ 2 consistently speaks of a 'class' in the singular." *Nixon*, 76 F.3d at 1386. In *Nixon*, the Sixth Circuit found that "[i]f Congress had intended to sanction coalition suits, the statute would read 'participation by members of the *classes* of citizens protected by subsection (a)'" or, alternatively, omit the term "class" altogether. *Id.* (emphasis added).

The City also stresses that Section 2 requires a comparison between the ability of members of a singular "class" and "*other members of the electorate* to participate in the political process and to elect representatives of their choice." 52 U.S.C. § 10301(b). The provision, it argues, therefore requires a contrast between members of a discrete minority group (the protected "class") and, not only white voters, but also voters from other minority groups.

50

Like the district court, and nearly every other circuit to consider the issue, I am persuaded that Section 2 encompasses coalition claims like the one brought by plaintiffs here. First, the absence of any express reference to coalition claims in the text of Section 2 is not dispositive to our interpretation of the provision. *See generally Bostock v. Clayton Cnty.*, 140 S. Ct. 1731, 1747 (2020) ("[T]here [is no] such thing as a 'canon of donut holes,' in which Congress's failure to speak directly to a specific case that falls within a more general statutory rule creates a tacit exception."). Black's Law Dictionary 284 (9th ed. 2009) defines "class" as "[a] *group of people* . . . that have common characteristics or attributes" and "protected class" as "[a] class of people who benefit from protection by statute." *Id.* (emphasis added). The "class of citizens" identified in Section 2(b) is immediately followed by the modifier "protected by subsection (a)." 52 U.S.C. § 10301(b). Thus, a natural understanding of the relevant "class" under Section 2 is that it includes any group whose minority members have had their right to vote denied or abridged "on account of their race or color." *Id.* at § 10301(a)–(b). And the comparison required by Section 2 is naturally understood as one between *harmed* minority voters and *unharmed* other members of the electorate, which, depending on the circumstances, may include only white voters or white voters and members of other discrete minority groups. Reading the use of "class" in the singular to restrict Section 2 claims to discrete minority groups would take the term unnaturally out of the context in which it is written. *See Yates v. United States*, 574 U.S. 528, 537 (2015).

Even if it were ambiguous whether the text of Section 2 protects a coalition of minority voters from discrete minority groups, the legislative history of Section 2 and broad

51

remedial purpose of the VRA both support recognizing such claims.[25]  When Congress amended Section 2 in 1982, it was "aware that more than one minority group could be considered to constitute one plaintiff class in determining the availability of Voting Rights Act protection."  *Nixon*, 76 F.3d at 1395 (Keith, J., dissenting).  Indeed, in its Report on the 1982 amendments, the Senate Judiciary Committee referenced a Supreme Court districting case that involved a coalition of Black and Hispanic voters in New York.  S. Rep. No. 97-417, at 19 n.60 (citing *Wright v. Rockefeller*, 376 U.S. 52, 52–54 (1964)).[26]  Yet it did not seek to limit the protected "class of citizens" to members of a single minority group.  Further, in expanding the VRA to protect language minority groups in 1975, Congress recognized and sought to address the fact that members of different minority groups, including Hispanic Americans and Asian Americans, have faced similar

---

[25] The Supreme Court has often looked to Section 2's legislative history in interpreting the provision in other contexts.  *E.g.*, *Gingles*, 478 U.S. at 50–51.

[26] In *Wright*, plaintiffs alleged that the State's districting scheme was "contrived to create one district . . . which excludes non-white citizens and citizens of Puerto Rican origin," while concentrating those citizens in three other districts.  376 U.S. at 53–54.  The Court subsequently found that plaintiffs had failed to prove a violation of their rights because they had not shown that New York's districting law was motivated by racial considerations.  *Id.*

The Senate Report accompanying the 1975 amendments to the VRA also referenced a Supreme Court case in which several voting rights claims involving Hispanic and Black voters were consolidated in one action with their rights evaluated collectively.  S. Rep. No. 94-295, 27–28 (1975), *as reprinted in* 1975 U.S.C.C.A.N. 774, 793–94 ("In January, 1972, a three-judge Federal court ruled that the use of multi-member districts for the election of state legislators in Bexar and Dallas counties, Texas, unconstitutionally diluted and otherwise cancelled the voting strength of Mexican Americans and [B]lacks in those counties.  This decision was affirmed by the United States Supreme Court in *White v. Regester*, 412 U.S. 755 (1973).").

52

discrimination and barriers to participation in the political process as African Americans. S. Rep. No. 94-295, at 25, 28–29 (1975), *as reprinted in* 1975 U.S.C.C.A.N. 774, 791 ("Language minority citizens, like [B]lacks throughout the South, must overcome the effects of discrimination as well as efforts to minimize the impact of their political participation. . . . Evidence before the Subcommittee documented that Texas also has a long history of discriminating against members of [the Black and Hispanic minority communities] in ways similar to the myriad forms of discrimination practiced, against [B]lacks in the South."). Finally, recognizing coalition claims is consistent with the broad remedial purpose of the VRA of "rid[ding] the country of racial discrimination in voting." *Chisom v. Roemer*, 501 U.S. 308, 403 (quoting *South Carolina v. Katzenbach*, 383 U.S. 301, 315 (1966)); *see also id.* ("[T]he [VRA] should be interpreted in a manner that provides 'the broadest possible scope' in combating racial discrimination." (citing *Allen*, 393 U.S. at 567)).

Thus, I would find, in accord with nearly every other circuit to have faced the issue, that coalition claims are cognizable for the purpose of proving Section 2 violations and, therefore, that the district court did not err.

ii.

The district court also found that the Minority Community in Virginia Beach was politically cohesive and, therefore, that plaintiffs had satisfied the second *Gingles* precondition.

"[T]o determine whether a minority group is politically cohesive, a court must ascertain whether 'a significant number of minority group members usually vote for the

same candidates.'" *Levy v. Lexington Cnty.*, 589 F.3d 708, 719–20 (4th Cir. 2009) (quoting *Gingles*, 478 U.S. at 56).  With reference to coalition claims, the Supreme Court has stated in dicta that "when dilution of the power of such an agglomerated political bloc is the basis for an alleged violation, proof of minority political cohesion is all the more essential." *Growe*, 507 U.S. at 41 (assuming, without deciding, that coalition claims are cognizable under Section 2 and explaining that in such cases "there [is] quite obviously a higher-than-usual need for the second of the *Gingles* showings").

The district court found that the Minority Community was cohesive because "they tend to vote as a bloc, have a history of advocating for similar political and legal issues, and have similar experiences of discrimination." *Holloway*, 531 F. Supp. 3d at 1064.

On appeal, the City argues that the district court applied the wrong legal standard to its cohesion inquiry because plaintiffs seeking to prove a coalition claim must provide statistical evidence demonstrating that each individual constituent group shares the same voting preferences.  The City also argues that the district court erred in relying in part on qualitative evidence of cohesion to support its finding that the second *Gingles* precondition was met.

The City relies primarily on *Brewer*, a Fifth Circuit case that reiterated that "minority groups may be aggregated for purposes of asserting a Section 2 violation." *Id.* at 453.  In *Brewer*, the court stated that the "determinative question" for political cohesion in such cases is:

> [W]hether [B]lack-supported candidates receive a majority of the Hispanic and Asian vote; whether Hispanic-supported candidates receive a majority of the [B]lack and Asian vote; and whether Asian-supported candidates receive a majority of the [B]lack and Hispanic vote in most instances in the KISD area.

876 F.2d at 453 (citing *Campos*, 840 F.2d at 1244–45).  Thus, to prove cohesion, the City argues that plaintiffs were required to provide statistical evidence separately estimating voting preferences for each constituent group in the Minority Community to show that a majority of Asian and Hispanic voters prefer the same candidates that are also preferred by Black voters.  It is undisputed, however, that available statistical techniques are unable to estimate the respective voting patterns of the Hispanic and Asian communities in Virginia Beach because of the small size and geographic dispersion of those communities.  *See* J.A. 439, S.J.A. 284.  As a result, data compiled by plaintiffs' statistical expert, Dr. Douglas Spencer, included voting support estimates in probative elections for White voters, Black voters, and an aggregate "All Minority" group, which included Black, Asian, Hispanic, and other minority voters.[27]

But the City greatly overstates *Brewer*.  In explaining "the determinative question" of the cohesion inquiry for a coalition claim, the *Brewer* Court cited to *Campos*, a case which rejected the strict standard proposed by the City.  *See Brewer*, 876 F.2d at 453 (citing *Campos*, 840 F.2d at 1244–45).  In considering a coalition composed of Black and Hispanic

---

[27] The City argues that this metric is flawed because high Black support for a candidate may mask lower support, or even opposition, from Hispanic and Asian voters since the Black community in Virginia Beach is larger than the Asian and Hispanic communities.  Indeed, plaintiffs' expert agreed that this scenario was "one possible explanation" but found it less likely than that the group voted cohesively.  J.A. 377; *see also Holloway*, 531 F. Supp. 3d at 1075.  The district court thoroughly considered the limitations of the statistical data and rejected the argument that it was "flawed." *Holloway*, 531 F. Supp. 3d at 1076.  In particular, the court stressed that plaintiffs' expert "used robust statistical methods to minimize these methodological limitations" and noted that the limitations present here were not unique to this case. *Id.*  I do not find that the district court clearly erred in reaching this conclusion.

voters, the *Campos* court explained that to show cohesiveness, "[t]he key is the minority group *as a whole*." *Campos*, 840 F.2d at 1245 (emphasis added) (rejecting the argument that "in order to show cohesion when there are two minorities that make up the minority group, plaintiffs must show that Blacks are cohesive, that Hispanics are cohesive and that Blacks and Hispanics are together cohesive" because "that burden is too great, if not impossible, in certain situations"). The *Campos* court further explained that "if the statistical evidence is that Blacks and Hispanics *together* vote for the Black or Hispanic candidate, then cohesion is shown."[28] *Id.* at 1245 (emphasis added).

The *Brewer* court also recognized that "statistical evidence is not a *sine qua non* to establishing cohesion" and noted that although the plaintiffs in that case had failed to provide statistical evidence of cohesion, they could instead have put on "other evidence demonstrat[ing] cohesion . . . . [to] satisfy their burden of proof under Section 2 and *Thornburg*." 876 F.2d at 453–54; *see also Gingles*, 478 U.S. at 31 ("A showing that a significant number of minority group members usually vote for the same candidates is *one way* of proving the political cohesiveness necessary to a vote dilution claim." (emphasis added)). Since no particular type of evidence is necessary to prove cohesion, the district court did not err in considering substantial qualitative evidence showing that the Virginia Beach Black, Hispanic, and Asian communities "are politically cohesive with respect to

---

[28] Indeed, the *Campos* court approved of the district court's finding that an ecological regression model that compared the "Anglo Vote" for each relevant candidate with the "Minority Vote," which combined the Black and Hispanic vote, for each candidate was sufficient to show cohesion. 840 F.2d at 1246 n.9, 1248 ("The standing evidence showed that Blacks and Hispanics, as one minority, were politically cohesive.").

their shared political advocacy." *Holloway*, 531 F. Supp. 3d at 1065.  For example, the court explained that the Minority Community had worked together on previous efforts to change the City's at-large method of elections, on efforts to request an economic disparity study of city contracts, and on housing and transportation issues.  *Id.* at 1065–67.

In sum, the district court applied the correct legal standard and did not clearly err in finding cohesion of the Minority Community and, therefore, I would affirm its finding that plaintiffs' satisfied the second *Gingles* precondition.

iii.

Finally, the district court found that plaintiffs had satisfied the third *Gingles* precondition because they provided sufficient evidence that the white majority in Virginia Beach is "usually [able] to defeat the minority's preferred candidate." *Gingles*, 478 U.S. at 50–51.

"[T]he degree of racial bloc voting that is cognizable as an element of a § 2 vote dilution claim will vary according to a variety of factual circumstances." *Id.* at 57–58. Thus, "there is no simple doctrinal test for the existence of legally significant racial bloc voting." *Id.* at 58.  We have explained, however, that in determining whether the third precondition is met, "the court must first identify those individuals who constitute minority-preferred candidates of choice, and then analyze whether those candidates are *usually* defeated by majority [w]hite bloc voting." *Levy*, 589 F.3d at 716 (emphasis added). Even if "no candidate received 50 percent or more of the minority vote," a candidate constitutes a "minority-preferred candidate of choice if that candidate would have been elected had the election been held only among minority voters." *Id.* at 718.

57

The district court found that between 2008 and 2018, sixteen Black candidates ran for City Council in Virginia Beach, nine of which were minority-preferred candidates. *Holloway*, 531 F. Supp. 3d at 1076. There were also five minority-preferred candidates who were white. *Id.* While 94 percent of the white community's preferred candidates were successful during this time, only 50 percent of the Minority Community's preferred candidates were successful. *Id.* The City emphasizes that such a 50-50 split cannot show that the white majority in Virginia Beach is "usually" able to defeat minority-preferred candidates. But, as the court explained, when the recent election of two Black minority-preferred candidates under special circumstances is discounted, the success rate for minority-preferred candidates fell to 42 percent (five out of twelve probative elections). *Id.* at 1076–77. Specifically, the district court found that over ten years of elections, only one other Black minority-preferred candidate had been elected to City Council "absent the socio-political effects of the present lawsuit" and that the two candidates elected in 2018 received "abnormally large support from white voters" when compared to the support received by Black minority-preferred candidates in prior elections. *Id.* at 1077.

The City, however, argues that the district court improperly discounted the 2018 election of two Black minority-preferred City Council candidates because it failed to explain how this suit was connected to the election of those candidates and improperly concluded that abnormal white support for the successful candidates cut in favor of rather than against a showing of white bloc voting.

"[A] pattern of racial bloc voting that extends over a period of time is more probative of a claim that a district experiences legally significant polarization than are the results of

a single election[,] . . . [and, conversely,] the fact that racially polarized voting is not present in one or a few individual elections does not necessarily negate the conclusion that the district experiences legally significant bloc voting." *Gingles*, 478 U.S. at 57. And, as we have previously explained, "*Gingles* . . . cautions against finding a lack of racially polarized voting where the success of a minority candidate can be attributed to special circumstance." *City of Norfolk*, 883 F.2d at 1241–42 (finding that the election of a second Black councilman to the Norfolk City Council "was due to the special circumstances arising out of events associated with the pendency of this action" and, therefore, that it "should not be dispositive"); *see also Gingles*, 478 U.S. at 57 ("[T]he success of a minority candidate in a particular election does not necessarily prove that the district did not experience polarized voting in that election; special circumstances, such as the absence of an opponent, incumbency, or the utilization of bullet voting, may explain minority electoral success in a polarized contest."). For example, the *Gingles* Court found that the district court had not erred in "viewing with some caution [B]lack candidates' success in [a particular] election, and from deciding on the basis of all relevant circumstances to accord greater weight to [B]lacks' relative lack of success over the course of several recent elections." *Gingles*, 478 U.S. at 76 ("The court could properly notice the fact that [B]lack electoral success increased markedly in the 1982 election—an election that occurred after the instant lawsuit had been filed—and could properly consider to what extent 'the pendency of this very litigation [might have] worked a one-time advantage for [B]lack candidates.'").

Here, the district court discounted the probative value of the 2018 election of two Black minority-preferred candidates only after it conducted a particularized investigation into the circumstances surrounding the election, and I do not find that it clearly erred in reaching this conclusion.  The court explained that "the instant lawsuit . . . was a topic of debate and discussion in the [2018] election"[29] and that both of the successful 2018 minority-preferred candidates received "unusual white support compared to all other Black City Council candidates since 2008."  *Holloway*, 531 F. Supp.3d at 1077.  The court expounded that one of the relevant candidates, Aaron Rouse, won one of the at-large seats with 24 percent of the white vote, which was 15.4 percent higher than the average white support for the five other Black candidates who had run for at-large seats since 2008, and that the other candidate, Sabrina Wooten, was the only Black candidate since 2008 to receive a majority of the white vote (51 percent).  *Id.*

The court also noted that "the 50 [percent] success rate for minority-preferred candidates does not comprehensively explain the severity and extent of white bloc voting in Virginia Beach" because when only Black minority-preferred candidates are considered, the success rate falls to 21.4 percent.  *Id.* at 1076.  And, the court highlighted that "four of the[] five white minority-preferred candidates received substantial support from white voters which is the reason that they won their election" and that "[c]ritically, the only white

---

[29] Notably, we have previously explained that where an election occurs after the filing of a VRA suit, "the absence of a conspiracy or an intent to moot th[e] litigation does not end the district court's inquiry.  The court should probe further to determine whether the [B]lack candidate's success in [a relevant election], while the action was pending, resulted from unusual circumstances."  *Collins v. City of Norfolk*, 816 F.2d 932, 938 (4th Cir. 1987).

60

minority-preferred candidate . . . who lost, was unsuccessful because she received dismal support from white voters . . . ." *Id.* at 1078. Thus, it found that the fact that "white minority-preferred candidates account for about 30 [percent]" of the election wins of minority-preferred candidates is further evidence of white bloc voting in Virginia Beach because it shows that minority-preferred candidates win only in the rare cases where they receive white support or where multiple white candidates split the white bloc vote. *Id.*

Thus, "[b]ased on all the evidence before it," *Gingles*, 478 U.S. at 54, the court found "substantial evidence of white bloc voting in Virginia Beach Council elections." *Holloway*, 531 F. Supp. 3d. at 1078. I do not find that the district court clearly erred in reaching this conclusion.

## B.

The district court then found that, under the totality of the circumstances, minority voters in Virginia Beach "ha[ve] less opportunity than other members of the electorate to participate in the political process and elect their preferred candidates." *Id.* at 1080.

"The ultimate finding of a district court that based on the totality of the circumstances an election scheme dilutes minority voters' ability to participate in the political process and to elect representatives of their choice in violation of § 2 is a factual finding subject to a clearly erroneous standard of review." *Cane v. Worcester Cnty.*, 35 F.3d 921, 925 (4th Cir. 1994). Under this standard, "[i]f the district court's view of the evidence is plausible in light of the entire record, an appellate court may not reverse even if it is convinced that it would have weighed the evidence differently in the first instance." *Brnovich v. Democratic Nat'l Comm.*, 141 S. Ct. 2321, 2349 (2021).

In reaching its conclusion, the district court considered each of the nine factors included in the Senate Report accompanying the 1982 amendments to the VRA and found that plaintiffs had shown that each factor was met.  For example, the court found that there was a long history of official discrimination against members of the Minority Community in the Commonwealth of Virginia and the City of Virginia Beach, including the use of literacy tests and a poll tax (factor one), that this "history of racial discrimination has had a disproportionate impact on the education, employment, economic, and social conditions of the Minority Community" (factor five), and that "the City of Virginia Beach has been unresponsive to the needs of the Minority Community" (factor eight).  *Holloway*, 531 F. Supp.3d at 1096.  The district court properly conducted a "searching practical evaluation of the past and present reality" in Virginia Beach and determined that "the political process is [not] equally open to minority voters" in the City.  *Gingles*, 478 U.S. at 79 (quoting S. Rep. No. 97-417, at 30).  I see no clear error in the court's analysis and would not disturb its conclusion.

The City, however, argues that the district court applied the wrong legal standard in conducting its analysis because it did not rely on evidence related to *each* discrete minority group under *each* factor.  In other words, the City contends that when dealing with a coalition claim, the totality-of-the-circumstances analysis requires that *each* factor is met for *each* constituent minority group and that the court failed to meet that standard here because while it found each factor was met with respect to the Black community in Virginia Beach, it did not make the same finding with respect to the Asian and Hispanic communities.

But when conducting a Section 2 totality-of-the-circumstances analysis, "there is no requirement that any particular number of factors be proved or that a majority of them point one way or the other." *Gingles*, 478 U.S. at 45 (citing S. Rep. No. 97-417, at 29). Thus, the district court was not required to find evidence showing that *all nine* factors were met—much less evidence that *each* factor was satisfied with respect to *each* discreet minority group. Indeed, adopting the legal standard urged by defendants—that the district court must evaluate each factor with respect to each minority group—would result in "[a]n inflexible rule [that] run[s] counter to the textual command of § 2," which requires that a determination of whether a violation has occurred be "based on the totality of the circumstances." *Johnson v. De Grandy*, 512 U.S. 997, 1018 (1994); *see also Gingles*, 478 U.S. at 46.

The City also argues that the district court erred because it should have found, under *De Grandy*, that the fact that two of the ten seats on the City Council are currently held by minority-preferred candidates, in "rough proportion" to the Minority Community's share of the voting age population in the City, weighs heavily against a finding of a Section 2 violation. In *De Grandy*, the Supreme Court held that "where in spite of continuing discrimination and racial bloc voting, minority voters form effective voting majorities in a number of districts roughly proportional to the minority voters' respective shares in the voting-age population. . . . is a relevant fact in the totality of the circumstances." 512 U.S. at 1000; *see also N.A.A.C.P., Inc., v. City of Columbia,* , No. 93-2319, 1994 WL 449081, at *1–2 (4th Cir. Aug. 22, 1994). "[T]he degree of probative value assigned to proportionality[, however,] may vary with other facts." *De Grandy*, 512 U.S. at 1020. The

district court found that *De Grandy* was "inapplicable in this case" because the recent election of two Black minority-preferred candidates to the City Council was due to special circumstances. *Holloway*, 531 F. Supp. 3d at 1079. As previously explained, the district court's decision to give less probative value to the 2018 election of Aaron Rouse and Sabrina Wooten, two minority-preferred candidates, is well supported, and I do not find that the district court committed clear error in reaching its conclusion.

IV.

Plaintiffs have demonstrated by a preponderance of the evidence that the at-large election of the City's ten (nonmayoral) City Council seats denies Black, Hispanic, and Asian voters in Virginia Beach equal access to the electoral and political process, in contravention of Section 2 of the VRA. Thus, I would affirm the district court.

64